# Domb Declaration

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

15 CV 2739

-----------------------------------------------------------x
                                                           :
PETERSEN ENERGÍA INVERSORA, S.A.U.                         :
AND PETERSEN ENERGÍA, S.A.U.,                              :
                                                           :
                        Plaintiffs,                        :    Civil Action No. _____
                                                           :
        -against-                                          :
                                                           :
ARGENTINE REPUBLIC, AND                                    :    **COMPLAINT**
YPF S.A.,                                                  :
                                                           :
                        Defendants.                        :
                                                           :
-----------------------------------------------------------x

RECEIVED
APR 0 8 2015
U.S.D.C. S.D. N.Y.

        Plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U., (collectively,

"Petersen" or "Plaintiffs"), through their court-approved receiver, and by and through their

undersigned counsel, on information and belief allege as follows for their Complaint against

Defendants:

## NATURE OF THE ACTION

        1.      This is the successor action to *Repsol YPF, S.A. v. Republic of Argentina*, No. 12-

CV-3877 (TPG), filed in this Court.  Petersen was included within the putative class definition in

the prior action, but Repsol and the other named plaintiff settled individually after briefing and

oral argument but before any class was certified, and the prior action was voluntarily dismissed.

Plaintiffs now pursue their claims directly through this individual action.  The claims herein

relate to unlawful conduct by YPF S.A., ("YPF" or the "Company"), an Argentine public

company registered with the United States Securities and Exchange Commission ("SEC") and

traded on the New York Stock Exchange ("NYSE"), and by the Argentine Republic

("Argentina") with respect to the shares of YPF.  Plaintiffs, like Repsol, owned American

Depositary Shares ("ADSs") of YPF, which are evidenced by American Depositary Receipts

("ADRs") listed on the NYSE and provided by the Bank of New York Mellon (f/k/a Bank of New York), whose New York City office administers YPF's ADRs as depositary agent pursuant to a deposit agreement governed by New York law.

2.  In 1993, Argentina, acting as the controlling shareholder of YPF, its then state-owned oil company, decided to privatize YPF through an initial public offering ("IPO") of Class D shares of YPF, compromising nearly 100% of YPF's voting stock. Argentina and YPF registered those Class D shares and related ADRs with the SEC and listed the ADRs on the NYSE (hereinafter, the "shares" or the "Class D shares" shall refer collectively to the ADRs, the ADSs, and the Class D shares). In order to induce investors like Petersen to purchase shares in that former state enterprise, Argentina and YPF promised that any subsequent acquisitions of a controlling stake in the Company, explicitly including any reacquisition of control by Argentina itself, would be conditioned on the acquirer making a tender offer for all Class D shares of YPF at a predetermined price. Those promises were made in YPF's bylaws, which constitute a binding contract enforceable against Argentina and YPF, in YPF's U.S. IPO Prospectus dated June 28, 1993 (the "U.S. IPO Prospectus") filed with the SEC and disseminated by Argentina and YPF into the United States, and in numerous SEC filings made by YPF thereafter.

3.  But Argentina and YPF intentionally and in bad faith breached those promises. When, in 2012, Argentina took steps to re-take control of YPF's operations, Argentina and YPF wholly disregarded the tender offer requirement. Argentina acquired a majority stake in YPF, usurped the function of its board and president, and took over governance of the Company — all without making the tender offer required by the bylaws and promised in the U.S. IPO Prospectus. Deputy Economy Minister Axel Kicillof, whom Argentina installed as "Vice-Intervenor" to take

control of YPF, called the tender offer requirement an "unfair" "bear trap" that only "fools" would expect Argentina and YPF to honor.

4.      The result of Defendants' breach of the tender offer requirement and other unlawful conduct was devastating to Petersen and other YPF stockholders.  In a matter of months, YPF's share price dropped by half, causing substantial harm to Petersen.  Defendants' conduct also caused Petersen additional harm by, among other things, causing Petersen to default on its loan agreements with its creditors, which then foreclosed on its YPF shares.  These harms were known and foreseeable to Argentina and YPF because they were fully aware of Petersen's loan agreements, which were attached as exhibits to Petersen's SEC Form 13-D filings on YPF's shares and described in detail in YPF's SEC Form 20-F filings.  As a result of Defendants' conduct, Petersen sustained substantial financial damages and ultimately went bankrupt.

5.      Plaintiffs accordingly seek compensatory damages for Argentina's and YPF's breaches of contract and other relief as set forth herein.  Plaintiffs' claims do not require any ruling on the sovereign acts of Argentina or YPF.  Rather, this action seeks to enforce contractual commitments that Argentina and YPF made in their commercial capacities during their sale of YPF shares to the public and regularly repeated thereafter, including in the United States and on the NYSE.  Argentina's and YPF's reneging on those commitments also constitute quintessentially commercial conduct.  Defendants' conduct occurred in, had a significant nexus with, and had a direct effect in, the United States and this District because, among other things, the promised tender offer was required to occur in substantial part in New York City, and because the foreclosure of Petersen's shares, which was a direct result of Defendants' unlawful actions, was effectuated in substantial part by the Bank of New York Mellon in New York City.

## PARTIES

6.      Plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U., are two limited-liability companies (*sociedad anónima unipersonal*) organized under the laws of the Kingdom of Spain.  Through a series of transactions in 2008 and 2011, Petersen purchased NYSE-listed and SEC-registered shares of YPF stock amounting to just over 25% ownership in the Company.  Petersen financed the purchase in part through two sets of loans, one made by a group of financial institutions and another made by Repsol YPF, S.A. ("Repsol"), YPF's majority shareholder at the time.  Petersen was to service the interest and principal payments due under those loans using the dividend payments associated with the acquired stock.  Both sets of loans were secured by Petersen's YPF shares.  As a result of Argentina's and YPF's actions, the value of Petersen's YPF shares dropped substantially, and Petersen defaulted on its loan obligations to its creditors, which foreclosed on Petersen's YPF shares.  Petersen subsequently entered into insolvency proceedings in Spain and is undergoing liquidation in an effort to satisfy its outstanding creditor claims.  This action is brought by Petersen's receiver pursuant to the liquidation plans approved by the Spanish bankruptcy court.

7.      Defendant the Argentine Republic is a foreign state organized as a federation of twenty-three provinces and an independent federal city (Buenos Aires).  Currently, Argentina is the controlling shareholder of YPF.  Prior to the 1993 IPO of YPF, Argentina was the sole owner of YPF, and it participated in that offering, including the SEC-registered offering of YPF shares, as the Company's sole and selling shareholder.  Subsequent to the IPO, YPF was owned, managed, and controlled by private shareholders.  Argentina remained a minority, non-controlling shareholder of the Company, specifically as the holder of Class A shares, and continued to participate in its management through a designated representative on the Company's board of directors.

4

8.     Defendant YPF is a publicly-held limited liability stock company (*sociedad anónima*) organized under the laws of Argentina.  It is currently an instrumentality of Argentina, which owns a majority and controlling interest therein.  The address of its principal executive offices is Macacha Güemes 515, C1106BKK, Buenos Aires, Argentina.  Prior to 1993, it was an exclusively state-owned, monopolist oil and gas company.  In the early 1990s, YPF was privatized and Argentina took it public in 1993.  YPF's shares trade on the NYSE, in the form of ADRs, under the symbol "YPF."  The ADRs evidence an ownership interest in YPF's ADSs, which in turn represent an ownership interest in YPF's Class D shares.  YPF's Class D shares comprise almost 100% of the Company's outstanding capital stock.  ADRs represent approximately 60% of YPF's outstanding Class D shares, and thus approximately 60% of YPF's capital stock.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1330 and 28 U.S.C. § 1367.  This is a non-jury civil action against a foreign state, as defined in 28 U.S.C. § 1603(a), that asserts claims for relief in personam with respect to which the foreign state is not entitled to immunity under 28 U.S.C. § 1605(a), or under any applicable international agreement.  In particular, immunity under 28 U.S.C. § 1605(a)(2) does not apply, because this action is based upon the defendant's commercial activity and its acts in connection therewith, which have been carried on and performed and have caused direct effects in the United States.  The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a).

10.     Venue in the Southern District of New York is proper pursuant to 28 U.S.C.

§ 1391 because, among other things, a substantial part of the events and omissions giving rise to

the claims alleged occurred in this District.

## FACTUAL ALLEGATIONS

**I.     Argentina's Privatization of YPF and Adoption of the Tender Offer Requirements**

11.     From the 1920s through the 1980s, Argentina maintained a monopoly in the oil

and gas industry through state agencies and YPF's predecessor entity, Yacimientos Petrolíferos

Fiscales.  YPF was an entirely state-owned and state-run enterprise, dominated and controlled by

Argentina as its sole shareholder.  Argentina actively participated in and exercised control over

YPF's operations.  As disclosed in the U.S. IPO Prospectus, Argentina operated YPF in

accordance with the national hydrocarbon policy and other governmental policies.  These

policies "generally reflected broader Argentine political and social objectives rather than

business strategies designed to maximize [YPF's] profitability."  As an instrument of Argentina,

YPF functioned as its agent and representative.

12.     However, in the early 1990s, Argentina made a decision to privatize YPF,

representing to potential investors that the Company would be "transform[ed]" from an

inefficient government monopoly "into an efficient and competitive enterprise."  Acting in a

commercial capacity no different from any private controlling shareholder, Argentina sought to

monetize a portion of its interest in YPF by publicly offering shares.

**A.     YPF's IPO**

13.     On June 29, 1993, acting in a commercial capacity, Argentina and YPF launched

an IPO of YPF's Class D shares.  YPF's Class D shares were offered on multiple stock

exchanges including the NYSE.  The single largest portion of the public offering was Argentina's sale of shares into the United States, which represented 65,000,000 of the total 140,000,000 Class D shares offered in the privatization.  Indeed, the U.S. offering alone generated proceeds of more than $1.1 billion directly to Argentina as selling shareholder.  That offering was registered through registration statements filed with the SEC in accordance with the Securities Act of 1933 and effectuated by means of the U.S. IPO Prospectus.

14.     As part of YPF's IPO and in addition to its extensive contacts with the NYSE and the SEC, Argentina and YPF engaged in substantial commercial activity that occurred in, had a significant nexus with, and had a direct effect in, the United States and this District.  Among other things, YPF's ADRs are issued by the Bank of New York Mellon, a New York banking corporation, from its offices in New York, NY, pursuant to a Deposit Agreement governed by New York law.  The Bank of New York Mellon holds the underlying YPF Class D shares in its capacity as a depositary bank.  According to its SEC Registration Statement, YPF designated CT Corporation Systems in New York City as its agent for service of process.  The IPO was underwritten in the United States by numerous investment banks located in New York with major New York City law firms as counsel.  The IPO roadshow included material presence in the United States generally and New York City specifically.

15.     Argentina and YPF pitched the offering to investors as part of YPF's "transformation from a politically managed, government-owned monopoly to an efficient and competitive integrated oil company."  In marketing the Company to U.S. investors, Argentina and YPF distinguished in the U.S. IPO Prospectus the past management of YPF, in which government policies "dictated the management and operation of [YPF]" based on "broader Argentine political and social objectives rather than business strategies designed to maximize

[YPF's] profitability."  And Argentina and YPF pointedly noted that while YPF was under Argentine state control, "[its] operations were inefficient, and generally lacked continuity in planning and effective internal controls.  Stringent financial criteria were not applied in making investment decisions, and [YPF]'s opportunities to reinvest internally generated funds were subject to government budgetary constraints."  It is thus unsurprising that, in such circumstances, investors insisted on a compensated exit should Argentina once again obtain control of YPF, and again run YPF according to its own policies, rather than shareholder interest.

**B.  Adoption of the Tender Offer Requirement in YPF's Bylaws**

16.  In the context of this privatization and YPF's public offering, Argentina and YPF, again acting in commercial capacities no different than any private controlling shareholder and corporation, adopted certain provisions in YPF's bylaws designed to induce investors to purchase the Company's shares by committing to investors that they would receive a compensated exit in the event Argentina were to have a change of heart and choose to retake control of YPF.  Those bylaw amendments took effect in May 1993 and have been in effect continuously since that date.

**C.  Section 7 of the Bylaws Requires a Tender Offer Upon a Control Acquisition**

17.  Section 7 of YPF's bylaws requires persons intending to consummate a control acquisition to first make a public tender offer for all of YPF's outstanding shares.  Specifically, under Section 7, no acquisition of shares or securities of YPF that would allow the acquirer to hold or exercise control over 20% of more of YPF's Class D shares or 15% or more of the corporate capital may take place unless the acquirer launches a tender offer to acquire all the shares of all classes of YPF.  The rule applies to acquisitions whether direct or indirect and "by

any means or instrument." Section 7 was triggered and honored in the case of two prior acquisitions, including one by the Plaintiffs.

**D.** **The Tender Offer Requirement Applies to Control Acquisitions by Argentina**

18.     Critically, Section 28 of the bylaws expressly provides that the tender offer requirement of Section 7 applies to any acquisition of control by Argentina itself. Argentina added this provision because one of the core purposes of the new tender offer provisions was to assuage investors' concern that if Argentina should later change its mind about privatizing the formerly state-owned oil company, investors could wind up holding equity in a government-dominated YPF, operated not for their benefit as shareholders, but as an instrumentality of the Argentine government. That is precisely what happened in 2012, but Argentina and YPF did not honor their tender offer obligations.

19.     Indeed, Section 28 was addressed specifically to control transactions by Argentina, setting forth "*Normas especiales*" – "Special provisions" – that made such transactions subject to Section 7 and required Argentina to make a tender offer for all outstanding Class D shares as a condition of acquiring directly or indirectly, by any means or instrument, YPF's shares or securities if, as a result, Argentina were to own or exercise control over (i) at least 49% of YPF's capital stock; (ii) at least 8% of all Class D shares outstanding (where it also holds Class A shares representing 5% or more of the company's capital stock); or (iii) 20% or more of YPF's Class D shares.

20.     Underscoring the bylaws' tender offer requirement in the case of Argentina attempting to acquire a controlling stake in YPF, Section 28 expressly prohibits Argentina from exercising control over the Company unless and until it has made a tender offer. The bylaws

also prohibit Argentina from exercising corporate governance powers using control acquired without making a tender offer to the other Class D shareholders.

**E.    The Bylaws Specify the Price Shareholders Must Be Offered**

21.    The bylaws not only require a tender offer, but also specify the procedures such a tender offer must follow and the price at which the offer must be made.  That price is the highest of:  (i) the highest price the acquirer paid for Class D shares in the preceding two-year period; (ii) the highest closing price, at the seller's rate, for a Class D share of stock, as quoted on the Buenos Aires Stock Exchange, for the preceding thirty-day period; (iii) the product of the highest closing price on the Buenos Aires Stock Exchange in the preceding thirty-day period and the ratio of the highest price the acquirer paid for a Class D share in the preceding two-year period against the market price of a Class D share on the day immediately prior to the first day of that two-year period; and (iv) the product of YPF's net income per Class D share during the immediately preceding four complete fiscal quarters and the higher of either the price/income ratio for those four quarters or the highest price/income ratio over the preceding two-year period.

**F.    The Bylaws Specify That the Tender Offer Shall Be Made in New York**

22.    The bylaw provisions also mandate that the required tender offer be specifically made and publicized in New York City.  Under Section 7, the offeror must publish a notice of the offer at least once a week for the duration of the offer in the business section of the major newspapers of New York City.  The notice must set forth, *inter alia*, the identification of the bidder, the tender offer price, and a statement that the offer is open to all of YPF's shareholders.

23.    Section 7 also requires that the tender offer comply with applicable regulations in the jurisdictions where the tender offer takes place and the provisions of the stock exchanges where YPF's shares are listed.  The tender offer mandated by Section 7 therefore must comply

with the applicable rules and regulations of the SEC and the NYSE. Those rules and regulations, incorporated by reference in the tender offer provisions, in turn require that, for the benefit of U.S. investors, a tender offer statement be filed in the United States with the SEC, notice be provided to investors and to the NYSE, and the establishment of a depository or forwarding agent in New York.

> **G.** **Argentina and YPF Reiterate the Tender Offer Commitment in the U.S. IPO Prospectus and Other SEC Filed Documents**

24. In addition to amending the bylaws, Argentina and YPF expressly committed in the U.S. IPO Prospectus that there would not be any acquisition of control (including a reacquisition by Argentina) without the launch of a tender offer for all of the Class D shares it was taking public: "***Under the Company's By-laws, in order to acquire a majority of the Company's capital stock or a majority of the Class D Shares, the Argentine Government first would be required to make a cash tender offer to all holders of Class D Shares on terms and conditions specified in the By-laws.***" Argentina and YPF also committed in the U.S. IPO Prospectus that "***[a]ny Control Acquisition carried out by the Argentine Government other than in accordance with th[at] procedure…will result in the suspension of the voting, dividend and other distribution rights of the shares so acquired***." The value of Argentina and YPF's promise that it would not retake control of YPF without offering all Class D shareholders a compensated exit was priced into the value of Class D shares when they were offered in 1993 and at all times thereafter.

25. Argentina and YPF have repeatedly reiterated and reaffirmed to investors, in the U.S. and elsewhere, their commitment that a tender offer would accompany any acquisition of a controlling stake in YPF. In addition to their inclusion in the U.S. IPO Prospectus, YPF has regularly included or incorporated by reference English versions of the bylaws in the Form 20-F

that it files with the SEC on an annual basis. Indeed, so fundamental are the tender offer provisions that YPF has described them in each of its annual Form 20-Fs filed with the SEC since the 1993 IPO.

26. The privatization and public offering of YPF did not end Argentina's role as YPF shareholder. To the contrary, after privatization, Argentina in its commercial capacity continued to exercise important privileges and play a significant continuing role in YPF's corporate governance. Argentina remained the holder of YPF's Class A shares, holding 3,764 such shares as of December 31, 2011. Pursuant to the bylaws, as the holder of Class A shares, Argentina votes separately with respect to the election of YPF's board of directors and, as long as it held a single Class A share, Argentina was entitled to appoint one director and one alternate director. In addition, Argentina enjoyed veto rights with respect to specific categories of corporate activities, including acquisition by a third party of shares representing more than 50% of YPF's capital stock. As the holder of YPF's Class A shares and through its representative on the Company's board of directors, Argentina made and approved each and every one of those continuing promises and continuously ratified its tender offer obligations under YPF's bylaws.

## II. Petersen's Acquisition of YPF Shares in Reliance on the Tender Offer Protection

27. In February 2008, Petersen entered into several agreements with Repsol and several financial institutions to facilitate the purchase of approximately a 25% ownership stake in YPF via the acquisition of ADSs. Each ADS represented one Class D share, and Repsol's ownership of the ADSs was evidenced by ADRs issued by the Bank of New York Mellon in New York City, which serves as the depositary bank for YPF ADRs. Upon Repsol's sale of the

ADSs to Petersen, Repsol delivered the ADRs to Petersen and notice was provided to the Bank of New York Mellon, which updated its records to reflect Petersen's ownership of the ADSs.

28.    Petersen first purchased a 14.9% stake in YPF Class D shares in February 2008 by purchasing ADSs, evidenced by ADRs issued in New York City. Later in 2008, Petersen exercised an option to acquire an additional 0.1% of YPF, again in ADSs, which acquisition triggered Petersen's obligation under Section 7 of the bylaws to make a tender offer, an obligation with which Petersen complied. As a result of the tender offer, Petersen acquired an additional 0.46% of YPF in December 2008. Then, in May 2011, Petersen exercised a second option to purchase an additional 10% of YPF's stock, again via ADSs, putting its ownership stake at just over 25%.

29.    Petersen made its decisions to invest in YPF in justifiable reliance on the representations and promises that Argentina and YPF made regarding the launching of a tender offer in the event Argentina were to decide to renationalize YPF.

30.    Petersen financed the purchase of its YPF shares through separate agreements with a group of large financial institutions and with Repsol, then the controlling shareholder of YPF. Those loans were secured, among other things, by a pledge of Petersen's YPF shares in favor of the collateral agent designated by the parties, and notice to that effect was provided to Bank of New York Mellon as depositary agent. In the case of the loan by Repsol, the Bank of New York Mellon served as the collateral agent. Under § 2.04(b)(i) of Petersen's credit agreements with both the financial institutions and Repsol (the Credit Agreement, and the Seller Credit Agreement, respectively), Petersen was required every six months to prepay its debt and interest obligations in an amount equal to the dividends generated during that six-month period. These agreements also specified certain events of default that, if triggered, entitled Petersen's

creditors to foreclose on its YPF shares, which were held as collateral. To provide Petersen the necessary liquidity to satisfy those pre-payment obligations, Repsol and Petersen entered a shareholders' agreement (the "Shareholders' Agreement") in which Repsol agreed, among other things, to cause YPF to distribute dividends twice per year, amounting to 90% of YPF's profits. The parties also agreed to a single "extraordinary dividend" of $850,000,000. Argentina and YPF were aware of these agreements, which were subsequently described in the Form 20-Fs that YPF filed with the SEC, and they participated in their implementation.

## III.    Argentina and YPF's Campaign To Devalue YPF's Shares

31.    Through the end of 2011, YPF was a commercial success as a privately held oil and gas company. Throughout that period, YPF made semi-annual dividend payments, generally in May and November, as provided under the Shareholders' Agreement. Accordingly, Petersen satisfied its debt obligations over that time period.

32.    But beginning no later than January 2012 and through mid-April 2012, Argentina began to consider retaking control — and ultimately did retake control — of YPF. In advance of its actual reacquisition of control, Argentina engaged in an intentional campaign to devalue YPF's Class D shares.

33.    In late January 2012, the Argentine newspaper *Página 12*, which is widely regarded to be a mouthpiece for the Kirchner administration, began reporting that Argentina was considering nationalizing YPF. In just the first month after it was leaked that the government was considering nationalizing YPF, the price of YPF's ADRs dropped over 20%. By the end of February, the Argentine legislature had reportedly prepared a plan to nationalize YPF and the plan had been presented to President Kirchner. YPF's ADR price dropped over 14% on the

14

news.  The Argentine, U.S., and Spanish press anticipated that a formal announcement of nationalization would come during the opening of the legislative session on March 1, 2012, but no such announcement was made.  In mid-March, *Página 12* reported that Argentina intended to nationalize YPF before winter began in the southern hemisphere.  Chief Cabinet Minister Juan Manuel Abal Medina stated only that the government had not ruled out nationalization. Moody's subsequently downgraded YPF and other Argentine oil companies on the news.  By the end of March, *Página 12* reported that President Kirchner had decided to nationalize YPF, and was merely determining which way to proceed.  From that time until April 16, when Argentina formally announced the nationalization legislation, YPF's ADRs fell another 23%.

34.    As a direct and intended consequence of this government campaign, the stock market value of the Company and the price of its shares were cut nearly in half in a matter of months.  Public officials acknowledged this objective and celebrated the alleged benefits to Argentina, at the expense of the Company's other shareholders.  For example, on March 14, 2012, Chubut Province Governor Martín Buzzi, speaking on Argentine television, ardently vowed that the decline in YPF's stock price would continue:  "You have seen how YPF's stock price has fallen.  Those shares are going to keep dropping on the Buenos Aires, Madrid and New York Stock Exchange.  But that is because the shares of the people of Santa Cruz and Chubut are going up.  We'll have difficult times, but the best is yet to come."

## IV.    Argentina and YPF's Violations of the Bylaws

35.    On April 16, 2012, Argentina took steps to reacquire control of YPF.  Argentina announced legislation that would expropriate 51% of the Company's Class D shares.  President Kirchner signed the legislation into law on May 4, 2012, and it went into effect on May 7, 2012.

Also on April 16, 2012, by Emergency Decree No. 530/12 of the National Executive Office, Argentina declared through its executive branch that it was taking complete control of YPF, effective immediately, by appointing the Minister of Planning, Julio De Vido, as "Intervenor" and vesting De Vido with all the powers of the Company's board of directors as well as those of its president. The control that Argentina claimed over YPF through its Intervenor exceeded the thresholds that would trigger a mandatory tender offer under Section 28. Indeed, through the "Intervenor," Argentina exercised total control of the Company's management and deprived Petersen and other Class D shareholders of their corporate governance rights, including the power to select the Company's directors and to establish dividend policy.

36.    The same day, government officials entered YPF's headquarters in Buenos Aires, seized control of the Company's facilities, and began exercising control of the Company's operations. Argentina immediately replaced the Company's top management with government officials. The Argentine press reported that, even before President Kirchner had finished announcing the seizure and expropriation legislation, Argentina's board representative arrived at YPF's headquarters with a list of executives, including Sebastien Eskenazi, the Company's CEO (and a part owner of Petersen), who were given fifteen minutes to pack up their belongings and leave the premises. Within hours, Argentina's Intervenor, De Vido, assumed control of the seizure operation and appointed government officials to run each of the Company's key areas.

37.    Due to Argentina's April 16 acquisition of control and announcement of the expropriation legislation, the NYSE suspended trading of YPF's ADRs. When the NYSE allowed trading to resume on April 18, the price of YPF's ADRs continued to fall.

38.    On April 17, 2012, Deputy Economy Minister Axel Kicillof, who was appointed Vice-Intervenor in YPF by Decree No. 532, delivered a speech before the Argentine Senate

regarding Argentina's takeover of YPF, in which he declared that Argentina and YPF did not intend to abide by the bylaws. Kicillof acknowledged the contractual tender obligation but dismissed it as an "unfair" "bear trap" that only "fools" would expect Argentina and YPF to honor.[1] Having mocked the notion that Argentina and YPF should have to honor their legal obligations, Kicillof declared that "'[l]egal certainty' and 'investment climate' are two horrible words."

39.  On April 23, 2012, after the "Intervenor" canceled a regularly scheduled meeting of YPF's Board of Directors, YPF failed to make its scheduled dividend distribution to its shareholders. YPF failed to issue any dividend until November 2012. By that time, Petersen's creditors had already foreclosed on its YPF shares.

40.  On May 4, 2012, the expropriation legislation was signed into law as Law 26,741 (the "Expropriation Law"), which became effective on May 7, 2012. Title III of the Expropriation Law, labeled "Of the Recovery of Control of YPF," provides for the expropriation by Argentina of 51% of the Class D shares of YPF. Pursuant to the Expropriation Law, the expropriation process was governed by Law 21,499, Argentina's 1977 law concerning expropriations. Argentina's announcement and enactment of the Expropriation Law and related statement clearly demonstrated its intent to retake control of YPF without any tender offer and to manage the Company for its own benefit, rather than that of YPF's shareholders.

---

[1] Kicillof stated: "In that unfair by-law, they said that if anyone dared to step foot, like the State itself – because, believe me, that if anyone wanted to buy shares to enter into a company, and passed 15%, he stepped into the bear trap and had to buy 100% of the company at a value equivalent to $19 billion. Because the fools are those who think that the State has to be stupid and buy everyone according to YPF's own law, respecting its by-law."

**V.     Argentina's and YPF's Breaches of Their Contractual Duties Put Petersen into Loan Default and Liquidation**

41.     YPF's bylaws constitute a binding and enforceable contract among YPF and its shareholders, including Argentina and Petersen.  Argentina violated YPF's bylaws by, among other things, failing to comply with the requirement in Sections 7 and 28 of the bylaws that any acquisition of a controlling stake in YPF by Argentina be conditioned on a tender offer for all Class D shares.  YPF also breached the bylaws by, among other things, failing to comply with Section 7's tender-offer requirement, by failing to distribute dividends to YPF's shareholders under the circumstances described above, and, furthermore, by failing to comply with the provision in Section 7 that prohibits Argentina from voting or otherwise exercising corporate governance powers using shares acquired in violation of the tender-offer requirement.  In taking these actions, Argentina and YPF also breached the promises they made to shareholders, including Petersen, in the U.S. IPO Prospectus and other SEC filings.

42.     As a direct and proximate result of these breaches, Petersen was damaged. Argentina's and YPF's illegal conduct significantly reduced the value of Petersen's YPF shares, causing Petersen direct economic harm.  Moreover, Argentina's and YPF's actions caused Petersen to default on its loan obligations, the structure of which had been outlined in previous Form 20-Fs and was known to Argentina and the Company, damaging Petersen's value.  In May 2012, Petersen's institutional lenders foreclosed on Petersen's Class D shares of YPF, the value of which was by then intensely depressed by Argentina and YPF's conduct; thus, the value of those shares was insufficient to meet Petersen's debts, injuring it further.  Petersen subsequently entered bankruptcy.

43.     Since Argentina reacquired control of YPF and YPF suspended dividend payments leading to the Petersen default, the share price of YPF has rebounded to approximately pre-expropriation levels.

44.     Argentina's and YPF's breaches of their contractual obligations occurred in, had a significant nexus with, and had a direct effect in, the United States and this District.  Among other things, because Petersen held ADRs through the Bank of New York Mellon, which is located in New York City, the offer to purchase the shares was required to be made in New York.  Moreover, performance of the contract was required in large part to be made in the United States, including in New York City.  For example, the bylaws required notice of the tender offer to be published in New York's major newspapers.  The bylaws also required the tender offer materials to be delivered to the NYSE in compliance with the NYSE's rules.  And Argentina and YPF were obligated to make appropriate SEC filings detailing the tender offer.  Defendants' failure to perform these contractually required acts occurred in, had a significant nexus with, and had a direct effect in, the United States and this District.

45.     Moreover, when as a result of Defendants' unlawful conduct Petersen's creditors foreclosed on Petersen's YPF shares, notice was delivered by the creditors to the collateral agent, which then notified the Bank of New York Mellon as depositary agent, which in turn listed Petersen's creditors as the new holders of the YPF shares.  In the case of the loan by Repsol to Petersen, the collateral agent designated by the parties was the Bank of New York Mellon in New York City.  The effects of the foreclosure, which was a direct result of Defendants' actions, were thus directly felt in the United States and this District.

46.     In July 2012, as a direct and proximate cause of Argentina's and YPF's breaches, Petersen filed for bankruptcy protection in Spain.  Three months later, a Spanish bankruptcy

court declared the Petersen entities insolvent. In December 2012, Repsol and several financial entities requested that the court-appointed Spanish bankruptcy administrator include their outstanding credits against Petersen in the bankruptcy proceedings. In November 2014, the bankruptcy court approved a plan to liquidate Petersen. The approved plan, submitted by the receiver, noted that Argentina's takeover of YPF "did not comply with the regulations in force in Argentina" and that, had Argentina observed its legal obligations, Petersen "could undoubtedly have paid to all its creditors with the price it should have received."[2]

47.     As a result of Petersen's bankruptcy, caused by Defendants' misconduct, Petersen's court-appointed receiver sought to raise funds necessary to pursue Petersen's claims arising out Petersen's shareholdings in YPF. In accordance with the liquidation plan approved by the Spanish bankruptcy court, the bankruptcy administrator entered into an agreement on behalf of Petersen with Prospect Investments LLC, a Delaware limited liability company and a wholly owned subsidiary of Burford Capital LLC, to provide financing for Petersen's claims.

48.     On May 15, 2012, Repsol and another YPF Class D shareholder, Texas Yale Capital Corp., filed a class action complaint in this Court against Argentina for violating the bylaws when it failed to make a public tender offer after reacquiring control of YPF. That litigation settled for $5 billion in February 2014, and was voluntarily dismissed in May 2014, prior to certification of any class. *Repsol YPF, S.A. v. Republic of Argentina*, No. 12-CV-3877 (TPG), Dkt. No. 31.

49.     Plaintiffs bring their claims without prejudice to other rights and remedies that might be available to them, including but not limited to their rights and remedies under: (a) Argentine law and any other applicable legal order; and (b) the Agreement for the Reciprocal

---

[2] Translated from the original Spanish.

Promotion and Protection of Investments between the Kingdom of Spain and Argentine Republic signed on October 3, 1991 (and which entered into force on September 28, 1992).

**FIRST CAUSE OF ACTION:**
**BREACH OF CONTRACT BY ARGENTINA**

50.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 49 above.

51.     YPF's bylaws provide that no acquisition of a controlling stake in YPF will be made without a public tender offer for all of YPF's outstanding Class D shares at a price set forth in the bylaws.  The bylaws further provide that shares acquired in violation of the tender-offer provision shall not be permitted to exercise voting or other corporate governance rights.

52.     YPF's bylaws constitute an enforceable contract among the Company and its shareholders.  Defendant Argentina is and was at the relevant times specified in this Complaint a YPF shareholder and therefore a party to that contract.  Plaintiffs were shareholders and either parties to or third-party beneficiaries of that contract at the relevant times specified in this Complaint.  Sections 7 and 28 are intended to benefit all record or beneficial holders of Class D shares and the benefit of those provisions to Plaintiffs is immediate, not merely incidental, as they exist precisely to protect the value of shareholders' investment in the event Argentina seeks to retake control of YPF.

53.     Argentina breached the bylaws by, among other things, failing to comply with the requirement in Sections 7 and 28 of the bylaws that any acquisition of a controlling stake in YPF by Argentina be conditioned on a tender offer for all Class D shares.

54.     Plaintiffs were damaged by Argentina's breach in an amount to be determined according to proof.

21

## SECOND CAUSE OF ACTION:
## ANTICIPATORY BREACH BY ARGENTINA

55.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 54 above.

56.     YPF's bylaws provide that no acquisition of a controlling stake in YPF will be made without a public tender offer for all of YPF's outstanding Class D shares at a price set forth in the bylaws.  The bylaws further provide that shares acquired in violation of the tender-offer provision shall not be permitted to exercise voting or other corporate governance rights.

57.     YPF's bylaws constitute an enforceable contract among the Company and its shareholders.  Defendant Argentina is and was at the relevant times specified in this Complaint a YPF shareholder and therefore a party to that contract.  Plaintiffs were shareholders and either parties to or third-party beneficiaries of that contract at the relevant times specified in this Complaint.  Sections 7 and 28 are intended to benefit all record or beneficial holders of Class D shares and the benefit of those provisions to Plaintiffs is immediate, not merely incidental, as they exist precisely to protect the value of shareholders' investment in the event Argentina seeks to retake control of YPF.

58.     Argentina repudiated its contractual obligations under the bylaws, by, among other things, declaring that it would not honor the requirement in Sections 7 and 28 of the bylaws that any acquisition of a controlling stake in YPF by Argentina be conditioned on a tender offer for all Class D shares.

59.     Plaintiffs were damaged by Argentina's breach in an amount to be determined according to proof.

### THIRD CAUSE OF ACTION:
### BREACH OF IMPLIED DUTY OF GOOD FAITH
### AND FAIR DEALING BY ARGENTINA

60.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 59 above.

61.     YPF's bylaws constitute an enforceable contract.  A duty of good faith and fair dealing is implied in the bylaws and binds the parties thereto.  This duty implies obligations consistent with the other terms of the contract, including the obligation that Argentina would not take actions to cause Plaintiffs' rights under the contract to be devalued.

62.     Argentina breached this implied duty of good faith and fair dealing by, among other things, conducting a wide-ranging campaign against YPF's shareholders beginning in January 2012 that caused the price of YPF's shares to drop precipitously.  Argentina engaged in this conduct with the intent and effect to depress the value of YPF's shares and to reduce the price at which it could be obligated to make a tender offer under the terms of the bylaws.  It further breached its implied duty of good faith by intentionally declining to make a tender offer in express and knowing contravention of the terms of the contract.

63.     Argentina's actions had the effect of depriving Plaintiffs of the full benefit of their bargain, including their right under the tender-offer price provisions of the bylaws to be offered fair consideration for their shares, free from manipulation, in the event that Argentina retook control of YPF, and their right to dividend payments.  Plaintiffs have been damaged by Argentina's breach of the implied duty of good faith and fair dealing in an amount to be determined according to proof.

## FOURTH CAUSE OF ACTION:
## PROMISSORY ESTOPPEL AGAINST ARGENTINA

64.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 63 above.

65.     In connection with the 1993 public offering of YPF and continuously at all times thereafter, Argentina promised to U.S. and other investors that it would not retake control of YPF without making a tender offer for all Class D shares as provided in the bylaws.  Those promises were communicated to investors by means including the bylaws and the U.S. IPO Prospectus. Argentina repeated these promises on a regular basis to the U.S. market, including every time the Company's bylaws were publicly filed with the SEC in connection with YPF's periodic reporting requirements under U.S. securities law.

66.     Argentina made these promises with the intention to induce reliance and specifically with the intention to induce investors to purchase shares in YPF, and the value of Argentina's promises was priced into the value of Class D shares at all times.  It was therefore reasonable and foreseeable that investors would rely on Argentina's promise in purchasing their Class D shares of YPF.

67.     Petersen justifiably relied on Argentina's promises to their detriment.  As a direct and proximate — indeed foreseeable and known — result of that detrimental reliance, Petersen suffered monetary damages in an amount to be determined according to proof.

## FIFTH CAUSE OF ACTION:
## BREACH OF CONTRACT BY YPF

68.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 67 above.

69.     YPF's bylaws provide that no acquisition of a controlling stake in YPF will be made without a public tender offer for all of YPF's outstanding Class D shares at a price set forth in the bylaws.  The bylaws further provide that shares acquired in violation of the tender-offer provision shall not be permitted to exercise voting or other corporate governance rights.

70.     YPF's bylaws constitute an enforceable contract among the Company and its shareholders.  YPF is thus bound by the contract.  Plaintiffs were shareholders and either parties to or third-party beneficiaries of that contract at the relevant times specified in this Complaint. Sections 7 and 28 are intended to benefit all record or beneficial holders of Class D shares and the benefit of those provisions to Plaintiffs is immediate, not merely incidental, as they exist precisely to protect the value of shareholders' investment in the event Argentina seeks to retake control of YPF.

71.     YPF breached the bylaws, by, among other things, failing to comply with or enforce the requirement in Sections 7 and 28 of the bylaws that any acquisition of a controlling stake in YPF by Argentina be conditioned on a tender offer for all Class D shares; failing to comply with the provision of Section 7 of the bylaws prohibiting Argentina from voting or otherwise exercising corporate governance powers using a controlling stake acquired in violation of the tender offer requirement; and failing to distribute dividends to YPF's shareholders, including Petersen, under the circumstances described above.

72.     Plaintiffs were damaged by Argentina's breach in an amount to be determined according to proof.

## SIXTH CAUSE OF ACTION:
## ANTICIPATORY BREACH BY YPF

73.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 72 above.

74.     YPF's bylaws provide that no acquisition of a controlling stake in YPF will be made without a public tender offer for all of YPF's outstanding Class D shares at a price set forth in the bylaws.  The bylaws further provide that shares acquired in violation of the tender-offer provision shall not be permitted to exercise voting or other corporate governance rights.

75.     YPF's bylaws constitute an enforceable contract among the Company and its shareholders.  YPF is thus bound by the contract.  Plaintiffs were shareholders and either parties to or third-party beneficiaries of that contract at the relevant times specified in this Complaint. Sections 7 and 28 are intended to benefit all record or beneficial holders of Class D shares and the benefit of those provisions to Plaintiffs is immediate, not merely incidental, as they exist precisely to protect the value of shareholders' investment in the event Argentina seeks to retake control of YPF.

76.     YPF repudiated its contractual obligations under the bylaws, by, among other things, declaring that the Company would not honor the requirement in Sections 7 and 28 of the bylaws that any acquisition of a controlling stake in YPF by Argentina be conditioned on a tender offer for all Class D shares and would not comply with the provision of Section 7 of the bylaws prohibiting Argentina from voting or otherwise exercising corporate governance powers using a controlling stake acquired in violation of the tender offer requirement.

77.     Plaintiffs were damaged by Argentina's breach in an amount to be determined according to proof.

## SEVENTH CAUSE OF ACTION:
## BREACH OF IMPLIED DUTY OF GOOD FAITH
## AND FAIR DEALING BY YPF

78.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 77 above.

79.     YPF's bylaws constitute an enforceable contract.  A duty of good faith and fair dealing is implied in the bylaws and binds the parties thereto. This duty implies obligations consistent with the other terms of the contract, including the obligation that YPF would not take actions to cause Plaintiffs' rights under the contract to be devalued.

80.     YPF breached this implied duty of good faith and fair dealing by, among other things, repudiating, and failing to enforce or to attempt to enforce, the tender-offer obligations in the bylaws against Argentina when Argentina reacquired control of YPF.  Argentina's months-long campaign to devalue and acquire control of YPF put the Company on firm notice of what was to come.  YPF's failure to attempt to secure performance of the contract, despite that advanced warning, is a breach of the implied duty of good faith and fair dealing.

81.     YPF's actions had the effect of depriving Plaintiffs of the full benefit of their bargain, including their right under the tender-offer-price provisions of the bylaws to be offered fair consideration for their shares, free from manipulation, in the event that Argentina retook control of YPF, and their right to dividend payments.  Plaintiffs have been damaged by YPF's breach of the implied duty of good faith and fair dealing in an amount to be determined according to proof.

## EIGHTH CAUSE OF ACTION:
## PROMISSORY ESTOPPEL AGAINST YPF

82.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 81 above.

83.     In connection with its 1993 IPO and continuously at all times thereafter, YPF promised to U.S. and other investors that no acquisition of a controlling stake in the company would take place without a tender offer being made for all Class D shares as provided in the bylaws.  Those promises were communicated to investors by means including the bylaws and the U.S. IPO Prospectus.  YPF repeated these promises on a regular basis to the U.S. market, including every time the Company's bylaws were publicly filed with the SEC in connection with YPF's periodic reporting requirements under U.S. securities law.

84.     YPF made these promises with the intention to induce reliance and specifically with the intention to induce investors to purchase shares in YPF, and the value of YPF's promises was priced into the value of Class D shares at all times.  It was therefore reasonable and foreseeable that investors would rely on Argentina's promise in purchasing their Class D shares of YPF.

85.     Petersen justifiably relied on YPF's promises to their detrimentd.  As a direct and proximate — indeed foreseeable and known — result of that detrimental reliance, Petersen suffered monetary damages in an amount to be determined according to proof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment awarding:

A.     Compensatory damages according to proof;

B.     Such other and further relief as the Court may deem just and proper.

[INTENTIONALLY LEFT BLANK]

Dated:     April 8, 2015

                KELLOGG, HUBER, HANSEN, TODD
                EVANS & FIGEL P.L.L.C.

                Mark C. Hansen
                Derek T. Ho
                1615 M Street N.W., Suite 400
                Washington, D.C. 20036
                Phone: (202) 326-7900
                Fax: (202) 326-7999
                Email: mhansen@khhte.com
                      dho@khhte.com


                KING & SPALDING LLP

                Israel Dahan
                1185 Avenue of the Americas
                New York, NY 10036
                Phone: (212) 556-2114
                Fax: (212) 556-2222
                Email: idahan@kslaw.com

                      -and-

                Reginald R. Smith
                1100 Louisiana
                Houston, TX 77002
                Phone: (713) 751-3200
                Fax: (713) 751-3290
                Email: rsmith@kslaw.com


                *Attorneys for Plaintiffs Petersen Energía Inversora,*
                *S.A.U. and Petersen Energía, S.A.U.*