# Domb Declaration

# Exhibit 5

EX-99.4 5 peterson-ex9904.htm

**Exhibit 99.4**
**Execution Version**

## SHAREHOLDERS' AGREEMENT

**between**

## REPSOL YPF, S.A.
**REPSOL EXPLORACIÓN, S.A.**
**CAVEANT, S.A.**
**REPSOL YPF CAPITAL S.L.**

**and**

## PETERSEN ENERGÍA, S.A.

February 21, 2008

"This is a convenience translation into English of a Spanish language original document. This translation is without legal effect and, in the event of any discrepancy with the Spanish-language original document, the Spanish-language original shall prevail."

Shareholders' Agreement

1

# TABLE OF CONTENTS

**PARTIES:**     **4**

**PREAMBLE:**     **6**

**STIPULATIONS**     **8**

1.  DEFINITIONS     8

2.  RULES OF INTERPRETATION     8

3.  OBJECTIVE OF THE AGREEMENT. NATURE OF THE AGREEMENT. GOVERNING GUIDING PRINCIPLES     9
    3.1  Objective of the Agreement     9
    3.2  Nature of the Agreement     9

4.  MAJORITIES REGIME     9
    4.1  General regime for operation of the Meetings of Shareholders     9
    4.2  General regime for adopting resolutions in the General Meeting of Shareholders     10
    4.3  Special Matters     10

5.  BOARD OF DIRECTORS, MANAGEMENT AND SUPERVISION     12
    5.1  Structure of the management body     12
    5.2  Composition of the Board of Directors     12
    5.3  Designation of positions within the Board of Directors     14
    5.4  Redistribution of positions within the Board of Directors     16
    5.5  Directors     17
    5.5.1  Duration     17
    5.5.2  Designation     17
    5.5.3  Removal     18
    5.5.4  Replacement     18
    5.6  Operation of the Board of Directors     18
    5.6.1  General operating regime     18
    5.6.2  Guests     18
    5.6.3  General regime for adopting decisions of the Board of Directors     19
    5.6.4  Special matters in the Board of Directors     19
    5.7  Actions by the Directors     20

6.  TRANSFER OF STOCK REGIME     21
    6.1  Temporary restriction of transfer by PESA ("lock-up")     21
    6.2  Transfer by Grupo Repsol YPF during the Restriction Period     22
    6.3  Transferability of the shares after the Restriction Period     22
    6.4  Right of Joint Sale ("Tag-along") in favor of PESA on Sales of Material Blocs to Third Parties by Grupo Repsol YPF     23
    6.5  Calculation of participations     24
    6.6  Right of First Offer     25
    6.7  Direct or indirect transfers in PESA and Grupo Repsol YPF     26

Shareholders' Agreement

2

7.    CORPORATE AND OTHER POLICIES                                              27

8.    INFORMATION                                                                30

9.    DEFAULT                                                                    30

10.   DURATION, MODIFICATIONS, AND ASSIGNMENT                                    31

11.   MISCELLANEOUS                                                             31

Shareholders' Agreement

3

In Madrid, on February 21, 2008.

## I.      PARTIES

(1)      Of the first part **Repsol YPF, S.A.**, the parent company of grupo Repsol YPF (hereinafter "**Repsol YPF**"), established pursuant to Spanish law on November 12, 1986 in virtue of public articles of incorporation granted before the notary public of Madrid, Mr. Miguel Mestanza Fraguero on the same date under number 4,293 of those of his / her Protocol, a company duly recorded in the Commercial Registry of Madrid in Volume 7063, 6058 of Section 3rd of the Companies Book, Sheet 119, Page 72.059-1. Repsol has its principal executive offices at Paseo de la Castellana 278, 28046 Madrid and its tax identification code (CIF), A-78374725, is current.

Herein represented by Mr. Antonio Brufau Niubó, of age of majority, married, a Spanish national, with professional domicile at Madrid, Paseo de la Castellana 278, and holder of Spanish National Identification Document number 40.824.513-L, current, in virtue of a power of attorney granted on October 29, 2004, before the Notary of Madrid Carlos Rives Gracia, under number 2,889 of his protocol.

(2)      **Repsol Exploración, S.A.**, (hereinafter "**Repsol Exploración**"), established pursuant to Spanish law on May 5, 1965 in virtue of public articles of incorporation granted before the notary public of Madrid Joaquín Enrique Pérez del Real on the same date under number 2,098 of those of his / her Protocol, a company duly recorded in the Commercial Registry of Madrid in Volume 3146, Sheet 1, Page M-53739. Repsol Exploración has its principal executive offices at Paseo de la Castellana 280, 28046 Madrid and its tax identification code (CIF), A-28138873, is current.

Herein represented by Mr. Nemesio Fernández-Cuesta Luca de Tena, of age of majority, married, a Spanish national, with professional domicile at Madrid, Paseo de la Castellana 280, and holder of Spanish National Identification Document number 786.139-E, current, in virtue of a power of attorney granted on January 26, 2005, before the Notary of Madrid Carlos Rives Gracia, under number 150 of his protocol.

(3)      **Caveant, S.A.**, (hereinafter "**Caveant**"), established pursuant to Argentine law, with Bylaws recorded at the Inspectorate General of Justice on July 2, 1980 under number 2,415 of Book 95 Volume A of Business Companies. Caveant has its principal executive offices at Buenos Aires, Avda. President Roque S. Peña 777, and its tax identification code (CIF), 30-62881362-7, is current.

Herein represented by Mr. Fernando Ramírez Mazarredo, of age of majority, married, a Spanish national, with professional domicile at Madrid, Paseo de la Castellana 278, and holder of Spanish National Identification Document number 1.485.502-R, current, in virtue of a power of attorney granted on February 14, 2008, before the Notary of Buenos Aires Carlos Emilio del Río, under folio 110 of his protocol.

Shareholders'
Agreement

4

(4)     **Repsol YPF Capital, S.L.**, a company wholly-owned by grupo Repsol (hereinafter "**Repsol YPF Capital**"), Spanish on December 20, 2002 in virtue of public articles of incorporation granted before the notary public of Madrid Carlos Rives Gracia on the same date under number 4,116 of those of his / her Protocol, a company duly recorded in the Commercial Registry of Madrid in Volume 18308, Sheet 171, Page M-317473. Repsol YPF Capital has its principal executive offices at Paseo de la Castellana 278, 28046 Madrid and its tax identification code (CIF), B-83505651, is current.

Herein represented by Mr. Fernando Ramírez Mazarredo, of age of majority, married, a Spanish national, with professional domicile at Madrid, Paseo de la Castellana 278, and holder of Spanish National Identification Document number 1.485.502-R, current, in virtue of a power of attorney granted on February 19, 2008, before the Notary of Madrid Martín Recarte Casanova, under number 590 of his protocol..

**Repsol Exploración, Caveant**, and **Repsol YPF Capital** are wholly owned by Repsol YPF, which is the holder, directly or indirectly, of 100% of the respective capital stock, with the exception of 0.000003% of the capital stock of Repsol Exploración which, indirectly, is held by private shareholders.

(5)     Of the second part, **Petersen Energía, S.A.**, a company established pursuant to Spanish law, for purposes of this transaction, on July 23, 2007 in virtue of public articles of incorporation granted before the notary public of Madrid, Mr. José Luis Martínez-Gil Vich on the same date under number 2918 of those of his / her Protocol, a company duly recorded in the Commercial Registry of Madrid at Volume 24588, Sheet 88, Page M-443504. Petersen Energía, S.A. has its principal executive offices at Plaza Pablo Ruiz Picasso 1, Torre Picasso, 38th Floor, 28020, Madrid, and its tax identification code (CIF), A-85174621, is current.

Herein represented by Mr. Matías Eskenazi Storey, of age of majority, married, an Argentine national, with domicile at Cerrito 740, 1st Floor, Buenos Aires, Argentina, and holder of Alien National Identification Document number X-9298890-J, current, in virtue of appointment as Managing Director pursuant to certified document no. 16 of the protocol of Mr. Manuel González-Meneses García Valdecasas dated January 9, 2008.

Hereinafter **Petersen Energía, S.A**. shall be referred to as "**PESA**."

Hereinafter, Repsol YPF, Repsol Exploración, Caveant and Repsol YPF Capital shall be referred to, jointly and/or any of them individually and indistinctly, "Grupo Repsol YPF."

Hereinafter Repsol YPF, Repsol Exploración, Caveant and Repsol YPF Capital, and PESA, shall be referred to, jointly, as the "**Parties**," and any of them individually as a "**Party**."

Shareholders'
Agreement

5

**PREAMBLE**

(A)    The principal activity of Repsol YPF is focused on the hydrocarbons sector and, specifically, in the activities of exploration, exploitation, and production of crude and natural gas, the transportation of petroleum products, liquid petroleum gases (LPG's), and natural gas, refining, production of a broad range of petroleum products and the sale of petroleum products, derived from petroleum, petrochemical products, LPG and natural gas.

(B)    Repsol Exploración, Caveant and Repsol YPF Capital are companies held by Repsol YPF, whose principal activity focuses on the hydrocarbons sector and, specifically, in the case of Repsol Exploración, on the activities of exploration, exploitation, and production of crude and natural gas, the transportation of petroleum products, liquid petroleum gases (LPG's) and natural gas, refining, production of a broad range of petroleum products and the sale of petroleum products, derived from petroleum, petrochemical products, LPG and natural gas. In the case of Caveant and Repsol YPF Capital, their principal activities are focused on holding shares of and interests in other companies.

(C)    PESA is a Spanish company of Spanish nationality whose principal activity is the investment, management, and administration of securities, bonds and/or stock. PESA is wholly owned by Petersen Energía PTY, Ltd., Petersen Energía PTY, Ltd., in turn, is wholly owned by the following natural persons: Mr. Enrique Eskenazi, Mr. Sebastián Eskenazi, Mr. Matías Eskenazi Storey, and Mr. Ezequiel Eskenazi Storey (hereinafter, jointly, "**Messrs. Eskenazi**").

(D)    YPF, S.A. (hereinafter, the "**Company**") is a company listed on the international capital markets owned by Grupo Repsol YPF, it being the intention of the Parties that it remain in such group.

(E)    Grupo Repsol YPF and Messrs. Eskenazi signed a purchase and sale option agreement (hereinafter, the "**First Option Agreement**") today, in virtue of which Messrs. Eskenazi may acquire from Grupo Repsol YPF up to an additional 0.1 percent of the capital stock of the Company (hereinafter, the "**Option 1**").

    Grupo Repsol YPF and Messrs. Eskenazi also signed a purchase and sale option agreement (hereinafter, the "**Second Option Agreement**") today, in virtue of which Messrs. Eskenazi (the "**Holder of the Option**") may acquire from Grupo Repsol YPF up to an additional ten (10) percent of the capital stock of the Company (hereinafter, the "**Option 2**").

(F)    Repsol YPF and PESA state their will and commitment to remain in the long-term, as herein contemplated, shareholder of the Company with a material interest, as well as the desire to contribute to the performance of a shared project or strategy that results in the creation of value for all shareholders.

Shareholders'

Agreement

6

The Parties and the appearing persons, mutually recognizing sufficient legal capacity herefor, have freely agreed to commit themselves by signing this shareholders' agreement (hereinafter, the "**Agreement**") pursuant to the following

Shareholders'
Agreement

7

**STIPULATIONS**

1.   <u>**DEFINITIONS**</u>

For the effect of this Agreement, the terms that appear in <u>Appendix 1</u>, shall be construed pursuant to their correlative definitions.

2.   <u>**RULES OF INTERPRETATION**</u>

This Agreement shall be interpreted pursuant to the special precepts established below and the general rules of contract interpretation pursuant to the Applicable Law.

(i)     All the appendices form an integral part of the Agreement, and they have the same validity and effectiveness as if they were incorporated into its main body.

(ii)    References made to clauses are deemed made to clauses of this Agreement.

(iii)   The terms "including," "included," "inclusive," and other similar acceptations should be interpreted as if they were followed by the phrase, "without limitation and merely by way of example."

(iv)    Provisions introduced with the phrase "for greater clarity" have in and of themselves full normative and binding effects, and they constitute clarifications or [particularities] that do not prejudice the generality of the preceding precepts with respect to such as are indicated.

(v)     Definitions used in singular shall be construed "*mutatis mutandis*" when used in the plural.

(vi)    Except if otherwise indicated, any reference to "days" shall be construed as "calendar days" or "consecutive days." Without prejudice to the foregoing, when the phrase "business days" appears it shall be construed as referring to the days that are also working days, from Monday to Friday, in the cities of Buenos Aires (Argentina), Madrid (Spain) and New York (USA).

(vii)   Any reference in this Agreement to shares or interest held in a specific corporate entity will include shares, interest held and any other form of participation in the capital of such corporate entity, as well as any certificates issued by such corporate entity or by any third party representative of shares, interest held or participation in such corporate entity, including without limitation, "American Depositary Shares", "American Depositary Receipts" and any other depositary certificate or custody of the shares, interest held or participation in such corporate entity.

Shareholders'
Agreement

8

3.   **OBJECTIVE OF THE AGREEMENT. NATURE OF THE AGREEMENT. GOVERNING GUIDING PRINCIPLES**

### 3.1   Objective of the Agreement

The objective of this Agreement is to establish as binding precepts among the Parties:

(i)     the rules that must govern the relationship of Grupo Repsol YPF and PESA in the governance of the Company;

(ii)    the framework of rights and obligations related to certain transfers of the Company's shares; and

(iii)   other provisions and precepts to which the Parties wish to subject their relationship as shareholders of the Company.

### 3.2   Nature of the Agreement

This Agreement has the nature of a quasi-corporate agreement of a binding nature among the parties that sign it.

The corporate bylaws of the Company shall not be amended in virtue of this Agreement and it shall take all its effects with respect to good-faith third parties, without prejudice to which the Parties acknowledge that the provisions established in this Agreement shall govern their relations and shall prevail in the relationship among them above what is stipulated in the corporate bylaws. Excepted from the preceding stipulation are the amendments to the Company's corporate bylaws expressly stipulated in this Agreement.

The Parties undertake to comply with the provisions established in this Agreement and to participate and vote in the General Meeting of Shareholders in full performance hereof. The Parties undertake to take all Necessary Acts (i) for the Directors named by them to do the proper thing in any meeting of the Company's Board of Directors and/or in the performance of their functions; and (ii) for the better performance of all the provisions of this Shareholders' Agreement.

Notwithstanding any provisions made in the corporate bylaws, the Parties respectively undertake at all times to do the Necessary Acts in order to ensure that the provisions of this Agreement to be applicable among them and with respect to the Company.

4.   **MAJORITIES REGIME**

### 4.1   General regime for operation of the General Meeting of Shareholders

The regime for calling, publishing, a quorum, proxies, and holding the Company's Meetings of Shareholders shall be subject to the provisions in the Company's corporate bylaws. Without prejudice thereto, notifications of meetings of any nature shall be made, in addition to the publications stipulated by law, through written notifications from one of the Parties to the other at least twenty (20) days in advance of the date the meeting is held.

Shareholders'
Agreement

**6.2**   ==**Transfer by Repsol YPF during the Restriction Period**==

==During the Restriction Period, Grupo Repsol YPF undertakes to maintain an interest greater than or equal to fifty point zero one percent (50.01%) of the capital stock of the Company.== Such 50.01% shall not in any case include Grupo Repsol YPF's shares that are subject to performance of Option 1 and Option 2.

Notwithstanding, Grupo Repsol YPF may transfer its shares of the Company without being subject to the restriction established in the previous paragraph if two requirements are met: (i) the buyer is a first order company order incorporated in a "*Permitted Country*" (as such term is defined in the Term Loan) primarily dedicated to the oil and gas business and that at the time of the transfer has an ***A1 or better rating from Moody's and of A+ or better from Standard and Poor's*** (and such rating will not fall below such level pursuant to the transfer nor will it be placed in a "negative Watch" due to the same), and (ii) the buyer will adhere to this Agreement (for greater clarity, adhesion is understood to be the assumption by the buyer of the same obligations of Group Repsol YPF under this Agreement, in such a way that the buyer and Group Repsol YPF constitute only one Party in the terms of the current Shareholders Agreement).

The undertaking by Grupo Repsol YPF, established in the first paragraph of this Clause, shall remain for the period initially stipulated for the Term Loan, except if PESA pays off the Term Loan in full in advance.

Without prejudice to the foregoing, once PESA has paid the amounts owed as interest and principal corresponding to the Term Loan, Grupo Repsol YPF may transfer the Company's shares provided that Grupo Repsol YPF maintains (i) a percentage greater than or equal to third-five percent (35%); or (ii) in the case stipulated in the second paragraph of Clause 6.5, the greater percentage participation thereat stipulated.

If during the Restriction Period, PESA's participation were below the Minimum PESA Participation calculated as stipulated in Clause 6.5, such will not generate any liability whatsoever for Grupo Repsol YPF. Notwithstanding, Grupo Repsol YPF may transfer its participation without any amount limit.

In any case, while there are outstanding balances on the Vendor's Loan, the funds that PESA obtains from the transfers that leave it below the Minimum Participation shall be fully allocated to paying off the outstanding balances of the Vendor Loan as stipulated in the Vendor's Loan agreement.

**6.3**   **Transferability of the shares after the Restriction Period**

From the expiration of the Restriction Period onward, PESA may transfer its shares by any means and without limitation. For its part, Grupo Repsol YPF may transfer its shares in the Company until its participation reaches a percentage which, provided that PESA maintains Minimum PESA Participation, adds together with PESA's real participation to forty percent (40%) of the capital stock of the Company.

Shareholders'
Agreement

To proceed with the acquisition of the Latin American Assets, it shall be necessary for such acquisitions, taken as a whole, to be "*accretive*" *(that is to say, "that increase")* for the Company, in relation to its net profit and ability to distribute dividends, both in the short-term and under reasonable medium- and long-term estimates.

The Parties undertake that such acquisitions be made in all cases charged to the financial resources to which the Company has access, and without recourse to its shareholders.

Likewise, for the same purpose, the Parties share the judgment on the convenience of disposing in favor of third parties of certain non-strategic assets in certain areas. The cash flow that such transfers should produce will allow the Company to undertake with greater efficiency the investment plans designed to strengthen and optimize its strategic resources without reducing the dividends paid to its shareholders.

**7.3**     **Dividends**

The Parties agree to strengthen a dividend policy that is satisfactory to the Parties and that contributes to the characterization of the Company shares in the market as particularly attractive for their payout.

The Parties agree to distribute as a dividend ninety percent (90%) of the profit of the Company, which will be made in two (2) payments each year.

The Parties shall vote in favor of the corporate resolutions needed for the Company to decided to distribute a special dividend of eight hundred and fifty thousand United States dollars (US$ 850,000,000) which shall be paid (i) 50% during 2008 (25% during the first six months and 25% in the second half of the year); and (ii) the remaining 50% during the year 2009 (25% during the first six months and 25% in the second half of the year).

**7.4**     **Business Plan and Annual Budget**

The Company's business or strategic plan (hereinafter, the "**Business Plan**") and the Company's annual budget (hereinafter, the "**Annual Budget**") shall be overseen and presented only by the CEO assisted by the Company's management, and submitted for approval by the Board of Directors. The Annual Budget shall be submitted for consideration by the Board of Directors at least two (two) months in advance of the end of the current fiscal year. The Business Plan shall have a duration greater than one year.

The minimum content of the Business Plan shall be: (i) the expenses and investments to be made during the next four (4) years; (ii) the estimated revenue during the next four (4) years; and (iii) the debt level forecast during the next four (4) years.

The Annual Budget shall include all of the immediately prior fiscal year, and its minimum content shall be: (i) the expenses and investments to be made during the year; (ii) the estimated income during the year; (iii) the debt level forecast during the year.

Shareholders'
Agreement

28

AND IN WITNESS WHEREOF, the Parties sigh this Agreement in five (5) copies with one single effect in the place and on the date indicated in the heading.

REPSOL YPF, S.A.

 /s/Mr. Antonio Brufau Niubó
Mr. Antonio Brufau Niubó

CAVEANT, S.A.

 /s/ Fernando Ramírez Mazarredo
Mr. Fernando Ramírez Mazarredo

PETERSEN ENERGÍA, S.A.

/s/  Matias Eskenazi Storey
Mr. Matias Eskenazi Storey

REPSOL EXPLORACIÓN, S.A.

 /s/ Nemesio Fernández-Cuesta Luca de Tena
Mr. Nemesio Fernández-Cuesta Luca de Tena

REPSOL YPF CAPITAL, S.L.

 /s/ Fernando Ramírez Mazarredo
Mr. Fernando Ramírez Mazarredo

36

## <u>LIST OF APPENDICES</u>

**Appendix 1**          **Definitions**

**Appendix 7.2**         **Repsol YPF's exploration businesses and assets**

**Appendix 7.5**         **Agreement not to participate in the Tender Offer [OPA]**

**Appendix 11.5**        Notifications

Shareholders'
Agreement

http://www.sec.gov/Archives/edgar/data/904851/000090342308000195/peterson-ex9904.h...   8/15/2015

**Appendix 1**
**Definitions**

| | |
|---|---|
| **"Agreement"** | Means the present agreement entered into by and between shareholders signed by the Parties in the date presented in the title with all its annexes and possible modifications agreed to by the Parties in accordance with the foreseen in the same. |

**"Necessary Acts"**    Means, in relation to the results whose obtainment is required, all measures that are reasonable in business terms and which, within the legal authority of the Party in charge of performing those "Necessary Acts" is pertinent for the purposes of obtaining such result. Such measures include, without limitation, (a) **attending the corresponding meetings** and **casting votes** with respect to all of the shares of which the Party obligated to perform the "Necessary Acts" owns; (b) **instructing the Directors** appointed by or at the proposal of such Party to **convene** meetings of the board of directors and/or meetings and to **vote** favorably in meetings of the board of directors and/or make entries into the corporate books and pertinent registries, and to make presentations and/or notifications to Caja de Valores S.A., the CNV, the Buenos Aires Stock Exchange, the SEC, the Inspectorate General of Justice, the ADR depositary and any other authority or body which is necessary in order to obtain the result sought, and which are performed pursuant hereto or to order that they be removed from their positions if they do not perform such acts or do not act pursuant hereto; (c) preparing, executing, and/or signing documents, presentations and notifications and/or registrations or similar acts that are required in order to reach the aforementioned result; (d) adoption by the Parties of other legitimate and suitable means to prevent third parties alien to this Agreement from jeopardizing the effectiveness of its provisions, as well as to give instructions and recommendations to the directors designated by or proposed by the Party in relation to such measures to defend the Agreement.

**"Affiliate"**    Shall mean:

a) those companies or natural persons who hold a participation or control, under any title or for any reason, directly or indirectly, more than 50% of the capital stock and the votes of any of the Parties;

b) those companies whose capital stock and votes are by more than 50%, under any title or for any reason, directly or indirectly, owned or controlled by any of the Parties;

c) those companies whose capital stock and votes are by more than 50%, under any title and for any reason, owned or controlled by companies or natural persons who fall under subparagraphs "a" and "b", above.

Shareholders'
Agreement

38

| | |
|---|---|
| **"CCI"** | Means the International Chamber of Commerce. |
| **"Executive Committee"** | Means the collegial body cited in <u>Clause 5.3.4</u>. |
| **"Management Committee"** | Means the collegial body cited in <u>Clause 5.3.5</u>. |
| **"Company"** | Means the company YPF, S.A. |
| "**Purchase and Sale Agreement"** | Means the purchase and sale agreement for 14.9% of the shares of the Company, signed on February 21, 2008 by and between PESA and GRUPO REPSOL YPF. |
| **"First Option Agreement"** | Means the option agreement signed today by and between Repsol YPF and Messrs. Eskenazi. |
| **"Second Option Agreement"** | Means the option agreement signed today by and between Repsol YPF and the Holder of the Option. |
| **"COO"** | Means the person who shall be appointed by the Board of Directors pursuant to Clause 5.5.3. |
| **"PESA"** | Means Petersen Energía S.A., and/or any company 100% owned or controlled, directly or indirectly, by the Eskenazi Family that adheres to this Agreement as a party pursuant to the provisions of <u>Clause 11.3</u>. |
| **"Directors designated by Repsol YPF"** | Means the Directors that Grupo Repsol YPF has a right to designate, both full and alternate Directors, from among the Directs that are appointed by Class D Shares. |
| **"Directors designated by PESA"** | Means the Directors that PESA has a right to designate, both full and alternate Directors, from among the Directs that are appointed by Class D Shares. |
| **"Independent Directors** | Means the Company directors who meet the requirements to be deemed independent directors pursuant to the regulations applicable to the Company, including Decree 677-2001 and the CNV rules. |
| **"Eskenazi Family"** | Means, jointly, Messrs. Eskenazi and/or their heirs, and individually and indistinctly, any of them, as well as (a) the spouses and/or the straight-line descendents (including adopted children) of Mr. Enrique Eskenazi, Mr. Sebastián Eskenazi, Mr. Matías Eskenazi Storey and/or Mr. Ezequiel Eskenazi Storey, (b) any trust to the exclusive benefit of any person or persons cited in clause (a), (c) any family trust, partnership or limited-liability company established for the sole benefit of any person or any persons mentioned in clause (a), or for the purposes of estate planning, of Mr. Enrique Eskenazi, Mr. Sebastián Eskenazi, Mr. Matías Eskenazi Storey and Mr. Ezequiel Eskenazi Storey, and/or (d) their heirs, executors named by testator, executors designated by probate court, curators or conservators of Mr. Enrique Eskenazi, Mr. Sebastián Eskenazi Storey, any of them, or a trust established in virtue of any of their wills after their death or disability. |

Shareholders'
Agreement

39

| | |
|---|---|
| **"Default / Breach"** | Means (i) any full default of material obligations; (ii) defective, repeated, and uncured performance of material or formal obligations; (iii) prolonged arrears in the performance of any obligations; assumed by any of the Parties in virtue of this Agreement or the agreements or contracts to which it refers. |
| **"Meeting"** | Means the shareholders' meeting . |
| **"Applicable Law"** | Means the Laws of the Argentine Republic. |
| **"Option 1"** | Means Messrs. Eskenazi's option to acquire from Repsol YPF up to 0.1 percent (0.1%) of the capital stock of the Company pursuant to the First Option Agreement. |
| **"Option 2"** | Means the option of the Holder of the Option to acquire from Repsol YPF up to ten percent (10%) of the capital stock of the Company pursuant to the Second Option Agreement. |
| **"OPV"** | Means Public Offering for Sale of shares. |
| **"Transferring Party"** | Has the meaning established in <u>Clause 6.5</u>. |
| **"Minimum PESA Participation"** | Means a participation in the Company's capital stock by PESA and/or any company 100% owned or controlled, directly or indirectly, by the Eskenazi Family, calculated without taking into account any dilutions that such participation might suffer because of increases in capital stipulated in <u>Clause 4.3(i)</u> or such other increases as are adopted without the favorable vote of PESA, equivalent (i) in the instance where Option 2 has not been exercised, to 10%; (ii) if Option 2 has been fully exercised, 15%; and (iii) if Options 2 was partially exercised, at the percentage resulting from adding to the 10% participation (applicable if Option 2 was not exercised), the percentage resulting from reducing proportionally by 5% (percentage difference between the case of a full exercise of Option 2 and non-exercise) the percentage at which Option 2 was exercised (never being able to exceed the 15% applicable in the case of full exercise of Option 2). |

Shareholders'
Agreement

40

| | |
|---|---|
| **"Business Plan and Annual Budget"** | Means the business plan and annual budget of the Company. |
| **"Party" or "Parties"** | Mean either Grupo Repsol YPF or PESA or both, as the case may be. |
| **"Waiting Period"** | Means the 3 (three) month period starting from the execution of this Agreement. |
| **"Restriction Period"** | Means the 5-year period for which PESA undertakes not to transfer its shares voluntarily, pursuant to the provisions and the exceptions stipulated in <u>Clause 6.1.1</u>. |
| **"Effective Period"** | Means the duration of the Agreement, as established in <u>Clause 10.1</u>. |
| **"Subsidiary of the Company"** | Means (a) those companies or legal entities whose capital stock and votes are, under any title or for any cause, directly or indirectly more than 50% owned or controlled by the Company; or (b) owned or controlled, in turn, by any company or entity owned or controlled by the Company . |
| **"Material Subsidiary"** | Means any Subsidiary of the Company that represents at least 5% of the Company's net consolidated capital. |
| **"Tag-along"** | Means the right of joint sale to PESA in sales of Material Blocks to third parties by Repsol YPF as stipulated in <u>Clause 6.4</u>. |
| **"Term Loan"** | Means the finance agreement signed by PESA with specific financial entities that is attached as Appendix E-IX to the Purchase and Sale Agreement, signed on February 21, 2008. |
| **"Holder of the Option"** | Means Messrs. Eskenazi and/or any company, 100% controlled, directly or indirectly, by the Eskenazi Family and/or any member of the Eskenazi Family, or those that met the requirements of <u>Clause 6.7</u> of this Agreement. |
| **"Vendor's Loan"** | Means the finance agreement signed by the Parties on February 21, 2008, which is attached as Appendix E-X to the Purchase and Sale Agreement. |

Shareholders'
Agreement

41

**Appendix 10.4**

**Notifications**

**Grupo Repsol YPF**  Paseo de la Castellana no. 278-280
28046 Madrid (Spain)
Fax: (34) 91 348 04 47
Attention: Corporate Director of Strategy and Development
With copy to
Fax: (34) 91 348 40 86
Attention: Corporate Legal Director

**PESA**  Cerrito 740, 1st Floor
C 1010 AAP City of Buenos Aires (Argentina)
Fax: (54) 11 55 55 01 00
Attention: Mr. Ignacio Moran
With copy
Fax: (54) 11 55 55 01 00
Attention: Mr. Mauro Dacomo

**Company**  Avenida President Roque Sáenz Peña, 777

C 1035 AAC City of Buenos Aires (Argentina)

Fax: 54) 11 50 71 57 72

Attention: Director Legal Matters

Shareholders'
Agreement

44