**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK (Civil Action No. 15 CV 2739)**

PETERSEN ENERGÍA INVERSORA, S.A.U. and
PETERSEN ENERGÍA, S.A.U.,

Plaintiffs,

against

ARGENTINE REPUBLIC and YPF S.A.

Defendants.

**DECLARATION OF ALBERTO B. BIANCHI**

1. Pursuant to 28 U.S.C. § 1746, I, Alberto B. Bianchi, state the following:

   **I.   BACKGROUND AND QUALIFICATIONS**

2. I am an Attorney at Law, a Constitutional Law Professor and a Member of the the National Academy of Sciences of Buenos Aires.

3. My professional experience is further described in my *curriculum vitae,* attached as Annex I hereto.

   **II.   INTRODUCTION**

4. I have been asked by the plaintiffs to discuss and provide my answers regarding the following:

i. Explain whether, under Argentine law, contractual rights are protected by the Constitution.

ii. Explain whether, under Argentine law, rights vested under a pre-existing contract may be set aside on account of a public-policy provision.

iii. Explain whether, under Argentine law, the State and state-entities act only within the realm of public law or they can also perform private-law actions.

iv. In your opinion, (a) did the temporary taking *[ocupación temporánea]* of YPF's Class D stock under Law 26,741, Section 13, allow the Argentine State to proceed with the "takeover" provided for in YPF's Bylaws, Section 7(d), and (b) as a consequence of that, was the Argentine State required to carry out the tender offer (TO) provided for in said Bylaws, Sections 7(e)(ii) and 28, as in force as of the enactment of Law 26,741?

v. In your opinion, are the Argentine Republic and YPF liable for compensation for such damage as may have resulted from their failure to carry out the TO?

vi. Analyze these answers in the light of paragraph 19 of the Report submitted by Professor Aída Kemelmajer de Carlucci and paragraph 35 of the Report submitted by Professor Ismael Mata, and explain whether, in your opinion, the obligation to carry out a TO is incompatible with the temporary taking or expropriation of YPF's Class D stock held by Repsol YPF S.A. (Repsol) in this case.

vii. Analyze paragraphs 24-31 of Professor's Aída Kemelmajer de Carlucci's Report, and state whether you agree with the expert's conclusions, considering that, post-expropriation, YPF's majority shareholder was the Argentine State, *i.e.* the same party that had decided to expropriate Repsol's stock.

viii. Analyze paragraphs 47, 48 and 56 of Professor Aída Kemelmajer de Carlucci's Report, and explain whether, under Argentine law, (a) the operation or application of the estoppel *[actos propios]* doctrine "require the absence of a contractual relationship," and (b) said doctrine cannot be relied upon in the context of contractual relationships as an independent source of obligations.

ix. In paragraphs 50-54 of her Report, Professor Aída Kemelmajer de Carlucci argues that the enactment of Law 26,741 rendered the estoppel doctrine inapplicable, as said Law caused the previous actions – the duty to fulfill the obligations established in the Bylaws – to become unlawful or, in any event, impossible to fulfill. Do you

agree with such statement? If you do not, explain why, in your opinion, such contention is incorrect.

    x.    In its Response Memorandum (Chapter IV), the Argentine Republic argues that "The Courts in Argentina Are an Adequate Forum" for this proceeding. Is this correct, in your opinion?

5.    This declaration is made under the laws of Argentina.

### III.    A DISCUSSION OF THE ISSUES SUBMITTED FOR MY CONSIDERATION

#### A.  Explain whether, under Argentine law, contractual rights are protected by the Constitution.

6.    Under Argentine law, rights under contract are afforded constitutional protection. Such protection has been guaranteed by the decisions of the Supreme Court, as well as the provisions of the Civil and Commercial Code *[Código Civil y Comercial]* (CCC).

7.    The concept of "property"[1] was laid down by the Supreme Court of Argentina in *Bourdié v. Municipality of the Capital City*,[2] as follows:

> "*[T]the term 'property' comprises all valuable interests a person may have outside of themselves, or their life or freedom. Any right with value recognized as such by law, whether arising from private-law relationships or administrative decisions, provided, however, that an action is available to its holder against any person attempting to interfere with the enjoyment of such right, is covered by the constitutional concept of property.*"

8.    As to contracts, the judgment reads:

> "*[T]he principle that property may not be violated, broadly guaranteed by Section 17, affords the exact same protection to both contractual rights and ownership rights or any derivation thereof.*"

9.    The Supreme Court has applied this doctrine to every kind of contracts in several cases. As a mere example I mention Marocco y Cía S.A. v. Dirección Nacional de Vialidad.[3]

---

[1]   Pursuant to the Argentine Constitution, Section 17, "*Property may not be violated, and no inhabitant of the Nation can be deprived of it except by virtue of a judgment based on law*".

[2]   Fallos 145-307 (1925).

10. The concept of property, as defined in "Bourdié," applies today.

11. Dr. Ricardo Lorenzetti, Argentina's Supreme Court's Chief Justice, has ratified this principle in several of his recent opinions, as follows:

    *"[C]ontracts and property are afforded constitutional protection under Argentine law; accordingly, any limitation thereon must be interpreted restrictively. Said protection includes both freedom of contract, which is an aspect of the personal autonomy every citizen is entitled to (Argentine Constitution, Section 19), and the freedom to shape the contract's contents, which is a manifestation of the right to engage in any lawful occupation (Argentine Constitution, Section 14) and economic freedom in competitive relations (Argentine Constitution, Section 43)."* See, e.g., the Massa v. the Argentine Executive,[4] and Cuello v. Lucena cases.[5]

12. Moreover, when asked about the CCC -which he co-authored with Professor Kemelmajer de Carlucci– during a very recent press interview, Dr. Lorenzetti said:

    *"In drafting the new code, we took into account the need to define those rules which make private activity possible, as well as the need to update the existing instruments and include new ones for future use. As regards the basic rules for the operation of businesses, stability, predictability and protection from outside interference stand as important concerns. A rule that is key to legal certainty is that under which 'contractual rights are a part of the contracting party's property rights.' Taken from a decision by the Supreme Court, this statement is of utmost importance, as it puts contractual provisions on a par with property, protecting the contract from interference due to emergency reasons, such as back in 2002."*[6]

13. The CCC provision the Supreme Court's Chief Justice was referring to is Section 965, which provides that *"[c]ontractual rights are a part of the contracting party's property rights."*

---

[3] Fallos 312-84 (1989).

[4] Fallos 329-5913 (2006).

[5] C. 724. XLI; 07-08-2007.

[6] La Nación newspaper, September 9, 2015.
http://www.lanacion.com.ar/1826238-aportes-del-nuevo-codigo-civil-y-comercial

14. Lastly, it is worth mentioning Johnson & Johnson de Argentina S.A. v. Deutsche Bank S.A.,[7] where the Supreme Court upheld the integrity of contractual terms, even in cases of emergency legislation.

   **B. Explain whether, under Argentine law, rights vested under a pre-existing contract may be set aside on account of a public-policy provision**

15. Under Argentine law, a public-policy provision may revoke a vested right, but only if compensation is paid for any damage resulting therefrom.

16. The most important and clear illustration of this is expropriation, which is expressly provided for in Argentine Constitution, Section 17, the relevant portion of which provides as follows: "*Expropriation for public-interest reasons must be authorized by law and previously compensated*". Emphasis added.

17. Moreover any expropriation to be regarded as a lawful one, is required to expressly identify the assets subject to expropriation.

18. Said section is the constitutional foundation of the State's liability for legislative action, which is engaged where, due to public-interest reasons, a vested right, whether arising from a contract or from a legal provision, is revoked by a law.[8]

19. In such a case, it is undisputed that the State has sovereign authority to issue a law revoking, affecting or restricting vested rights; it is, however, equally uncontested that any damage thus caused to the holder of those rights must be compensated.

20. As explained below, see § III.E, in this case is it clear that there was never any attempt at expropriation of the rights of YPF shareholders under the bylaws.

---

[7] Fallos 334-516(2011). See also: Johnson & Johnson de Argentina S.A. v. Citibank N.A., J. 68. XLIII; September 6, 2011.

[8] See: BIANCHI, Alberto B.: *La Responsabilidad del Estado por su Actividad Legislativa*, Ábaco, Buenos Aires,

### C. Explain whether, under Argentine law, the State and state-entities act only within the realm of public law or they can also perform private-law actions

21.     Under Argentine law, the State and state-entities may act both in the area of public law as in that of private law.

22.     One of the most recent and relevant examples is Law 26,741, Section 15, which I have already transcribed below (paragraph 101) but bears repeating here: "*[t]o carry out their activities, YPF Sociedad Anónima and Repsol YPF GAS S.A. shall continue to operate as open corporations under Article II, Sub-Article V of Law No. 19,550 and related provisions; they shall not be subject to any legislation or administrative regulations governing the administration, management and control of companies or entities in which the Federal State or the Provinces hold an ownership interest.*" This law provides that YPF acts as a private corporation.

23.     This section shows that not even Argentina's "*national public interest and [] priority goal*" of "*the achievement of hydrocarbon self-sufficiency, as well as the exploration, exploitation, industrialization, transportation and sale of hydrocarbons, in order to guarantee economic development with social equity, job creation, increased competitiveness for the various economic sectors, and the equal and sustainable growth of Argentina's provinces and regions*", as declared in Law 26,741, may keep YPF, in its day-to-day business, from operating as a private-law business company.

24.     Additionally, the Argentine State is currently a minority shareholder of various private companies governed by the – now called – General Companies Law (Law 19,550) and, therefore, there has been enacted Law 27,181[9], creating the Argentine Agency for State Holdings *[Agencia Nacional de Participaciones Estatales en Empresas]* (ANPEE) for a coordinated handling of such stock interests.

### D. In your opinion, (a) did the temporary taking of YPF's Class D stock under Law 26,741, Section 13, constitute the "takeover" provided for in YPF's Bylaws, Section 7(d), and (b) as a consequence of that, was the Argentine State required to carry out the tender offer (TO) provided for in said Bylaws, Sections 7(e)(ii) and 28, as in force as of the enactment of Law 26,741?

25.     My answer is in the affirmative, to both questions.

---

9    Published in the Official Gazette on October 6, 2015

26. My analysis in this answer is based on the language of YPF's Bylaws as in force in May 2012, when Law 26,741 came into force.

27. Under YPF's Bylaws, Section 7(d) a "takeover" will take place whenever a person directly or indirectly acquires, by any means or under any title, shares or convertible securities of the Company and, by virtue of such acquisition, the person becomes the holder of, or gains control over, shares of the Company's Class D stock which, combined with the person's pre-existing Class D holdings, represent an aggregate of FIFTEEN PERCENT (15%) or more of the capital stock, or TWENTY PERCENT (20%) or more of the outstanding Class D shares, provided, however, that the shares representing that TWENTY PERCENT (20%) represent, at the same time, less than FIFTEEN PERCENT (15%) of the capital stock.

28. Furthermore, Section 7(e) provides that no "takeover" may take place unless the party acquiring the shares or securities has previously carried out a "tender offer" (TO) covering the shares of all classes of the Company's stock and all convertible securities, pursuant to Sections 7(e)(ii) and (7)(f).

29. Acquisitions by the Argentine State are specifically provided for in Section 28.

30. Insofar as is relevant here, under Section 28(A)(1), the provisions of Section 7(e) and (f) apply to acquisitions made directly or indirectly by the Argentine State, by any means or under any title, of the Company's shares or securities when, as a result of such acquisition, the Argentine State becomes the holder of, or gains control over, shares of the Company which, combined with the State's pre-existing holdings of shares of any class, represent in the aggregate 49% or more of the capital stock.

31. To sum up,

    i. A "takeover" takes place whenever a person acquires Company shares which, combined with person's pre-existing holdings of the same class, represent, in the aggregate, 15% or more of the capital stock, or 20% or more of the outstanding shares of Class D stock, provided that they represent less than 15% of the capital stock;

    ii. Prior to takeover, the acquirer is required to carry out a TO;

    iii. As regards acquisitions by the Argentine State, a "takeover" requiring a TO takes place whenever the Argentine State acquires, by any means or under any title, stock in the Company which, combined with the State's

pre-existing holdings, represents an aggregate of 49% or more of the capital stock.

32. I will now discuss how the process of YPF's Class D stock being acquired by the Argentine State came about.

33. By means of Executive Order 530/2012,[10] the Argentine Executive ordered YPF placed under Government administration. As a result of this, YPF's Board was removed and the Ministry of Federal Planning, Public Investment and Services took over its duties.

34. Law 26,741[11] was enacted three weeks later, simultaneously (a) declaring "*the public-use and subject-to-expropriation status of fifty-one percent (51%) of the goods of YPF Sociedad Anónima, represented by an equal percentage of the company's Class D shares, directly or indirectly held by Repsol YPF S.A., its parents or subsidiaries*" (Section 7), and (b) providing that, "*from the effective date hereof onwards the Argentine Executive Branch shall, acting through such persons and agencies as it may therefor designate, exercise all rights carried by the stock to be expropriated pursuant to Sections 57 and 59*" of the Expropriation Law (EL)[12] (Section 13).

35. To sum up,

   i.   In April 2012, the entire Board of Directors of YPF was replaced by a Minister of the Argentine Executive;

   ii.  In May 2012, the Legislature ordered:

       a) The expropriation of all shares of YPF's Class D stock representing 51% of the capital stock, and

       b) the temporary taking of such stock (EL, Sections 57, 59), empowering the Executive to exercise "*all rights carried by the stock to be expropriated.*"

36. The above means that:

---

[10] Published in the Official Gazette on April 16, 2012.

[11] Published in the Official Gazette on May 7, 2012.

[12] Law 21,499, published in the Official Gazette on January 21, 1977.

i. Since April 2012, acting through the Ministry of Federal Planning, Public Investment and Services, the Argentine State has been in charge of YPF's administration; and

ii. Since May 2012, acting through the Argentine Executive, the Argentine State has exercised all rights carried by YPF's Class D stock.

37. There is thus no question that, under Law 26,741, the Argentine State engaged in a "takeover" of YPF as defined in Bylaws Sections 7 and 28, as the "temporary taking" of the Class D stock authorized the State of Argentine to exercise <u>all rights carried by said stock</u>.

38. Put differently, even if the formal transfer of title to the stock only took place once the expropriation process was perfected, which process ended with the execution of the "Expropriation Compromise and Amicable Settlement Agreement" on February 27, 2014, which was subsequently approved via Law 26,932,[13] the "takeover" had already taken place much earlier as, ever since Decree 530/2012, the Argentine government exercised complete control of YPF's management, and ever since the enactment of Law 26,741, the Argentine State had exercised its shareholder rights in connection with the Class D shares, which represented 51% of the capital stock.

39. It should be noted that the temporary taking of YPF's Class D stock in the case at hand did not just entail a mere holding of that stock over a limited period of time to resolve a specific emergency within defined time and place boundaries.

40. On the contrary, the temporary taking of YPF's Class D stock was a prelude to its expropriation, which had been ordered in Law 26,741, Section 7. In other words, the Argentine State performed the temporary taking of such stock with a view to acquiring ownership thereof via expropriation.

41. Moreover, by means of Law 26,741, Sections 13 and 14, broad management and administration powers over YPF were delegated upon the Argentine Executive, from the very moment of the temporary taking.

42. Such powers clearly follow from the objectives set out in the first paragraph of Law 26,741, Section 13, namely to "*guarantee the continuation of the hydrocarbon exploration, production, industrialization, and refining activities of YPF Sociedad Anónima and Repsol YPF GAS S.A., as well as of the*

---

[13] Published in the Official Gazette on April 28, 2014.

*transportation, sale and distribution of such hydrocarbons, and an increased inflow of investments, for an adequate supply of the fuels required for the functioning of Argentina's economy*".

43.     It seems apparent that such broad-scope objectives may only be achieved by whoever is exercising "control" of the Company, via the full exercise of all rights carried by the stock they hold.

44.     It should also be noted that, right after ordering the temporary taking of the Class D stock, in the second paragraph of Law 26, Section 13, the Legislature ordered the National Securities Commission *[Comisión Nacional de Valores]* (CNV), which is a public State-entity acting under the purview of the Ministry of Economy, to call "*a Meeting of Shareholders to address, among [...] other issues [...] the removal of all regular and alternate directors and regular and alternate statutory auditors, and the appointment of their replacements to serve for such terms as may be appropriate.*"

45.     Evidently, the purpose of that call was to appoint the directors on behalf of the new shareholder, *i.e.* the Argentine State. The Meeting took place on June 4, 2012, and the shareholders removed all existing Class D directors, appointing new ones to fill their seats. So was all reflected in a letter dated June 4, 2012, which I have had before me, whereby YPF apprised the CNV – among other parties – of this development.

46.     Lastly, to further bolster the powers that were delegated on the Executive, Law 26,741, Section 14 provided as follows: "The Argentine Executive Branch and the Executive-appointed Administrator of YPF Sociedad Anónima and Repsol YPF GAS S.A. are hereby authorized to take such action and steps as may be necessary, until such time as actually in control of YPF Sociedad Anónima and Repsol YPF GAS S.A., to guarantee the operation of the companies, the preservation of their assets, and the supply of hydrocarbons."

47.     In spite of the language used in that section, the "takeover" by the Argentine State had already taken place, insofar as, by virtue of an express legislative mandate, the Argentine State was already exercising all rights inherent in a shareholder.

48.     It is my opinion that, as a consequence of the above, and by virtue of Sections 13 and 14 of Law 26,741, the Argentine State performed its "takeover" of YPF in accordance with Section 28 of its Bylaws, and this immediately triggered the obligation to carry out a TO.

49. My conclusion is based on the opinion that Section 28(A)(1) does not require that the Argentine State have acquired ownership of the stock through a formal transfer in order for the "takeover" to take place. For such purpose, suffice for the Argentine State to perform (a) an acquisition; (b) either directly or indirectly; (c) by any means or under any title, (d) such that it is entitled to control stock of the Company which, combined with its pre-existing holdings of any class, represent 49% or more of the capital stock in the aggregate.

50. All such requirements were satisfied upon the temporary taking of YPF's Class D stock in the terms in which such temporary taking was devised in Law 26,741, Sections 13 and 14.

### E. In your opinion, are the Argentine Republic and YPF liable for compensation for such damage as may have resulted from their failure to carry out the TO?

51. My answer is yes.

52. In my answer to the previous question, I stated that the obligation to carry out the TO arose when the Argentine State temporarily took YPF's Class D stock as provided for in Law 26,741, Sections 13 and 14.

53. Therefore, a failure to do so entails a clear nonfulfillment of Section 7(e)(ii) of YPF's Bylaws by the Argentine State.

54. This duty to redress is merely a natural consequence of the breach of an obligation created by a contract which, in addition, was approved by the Executive via Executive Order 1106/1993.

55. Naturally, such breach affects not just the parties to the contract but also any third parties who may sustain damage as a consequence thereof.

56. Under the old Civil Code (CC) in force at the time the obligation should have been fulfilled, the issue was generally dealt with in Section 505, under which "[t]he effects of an obligation as regards its creditor shall be as follows [...]3) to obtain any applicable compensation from the debtor."

57. Moreover, CC Section 519 provided: "[d]amages and interest shall mean the value of the loss sustained and that of the income lost by the obligation's creditor as a result of its nonfulfillment in proper time."

58. In the CCC, this issue is addressed in Section 1737: "*[d]amage takes place whenever a right or an interest not in conflict with the legal system and the subject of which is a person, assets or a collective right is impaired.*"

59. The State Liability Law (SLL)[14] does not exempt the State from liability for the non-fullfilment of its obligation to carry out a TO either.

60. SLL, Section 2 only exempts the State from liability for damages in two situations: a) for damage resulting from acts of God or events of *force majeure,* except where expressly assumed by the State via a special statute; and b) when the damage is the result of an action by the victim or a third party for whose actions the State is not liable.

61. Clearly enough, the issue under analysis here does not fit either situation.

**F. Analyze these answers in the light of paragraph 19 of the Report submitted by Professor Aída Kemelmajer de Carlucci and paragraph 35 of the Report submitted by Professor Ismael Mata, and explain whether, in your opinion, the obligation to carry out a TO is incompatible with the temporary taking or expropriation of YPF's Class D stock held by Repsol YPF S.A.**

62. Consistently with my statements in the above sections, I disagree with the opinions of Professor Aída Kemelmajer de Carlucci and Professor Ismael Mata in paragraphs 19 and 35 of their respective reports.

63. In my opinion, the obligation to carry out a TO is compatible with the temporary taking or the expropriation of Repsol's YPF Class D stock.

**i. Professor Kemelmajer de Carlucci's Report**

64. In paragraph 19 of her Report, Professor Kemelmajer de Carlucci stated:

"*As a consequence, a by-law whose validity and effect is approved by the shareholders of the company (private person) regulated by <u>such rule will not apply where it requires an action that is incompatible with an expropriation</u>, as in such case the law which regulates this legal concept of expropriation will apply (the observance of which is in the interest of the public order), instead of the by-laws. As such, under Argentine Law, liability cannot exist for breaching a by-law provision on account of any action required under laws of public order, such as expropriation laws.*" Emphasis added.

---

[14] Law 26,944; published in the Official Gazette on August 8, 2014.

65. First, YPF's Bylaws were not just approved by the company's shareholders; they were also approved by the Argentine State via Executive Order 1106/1993, as pointed out above.

66. Second, the obligation to carry out a TO and all related obligations are not incompatible with either an expropriation or a temporary taking.

67. There is no incompatibility at all between the expropriation or the temporary taking of Repsol's YPF stock and the TO, insofar as the TO does not prevent, hinder or restrict the State in its sovereign power to temporarily take or expropriate Repsol's YPF stock and exercise any of the rights vested in it under the EL.

68. Indeed, as its name suggests, a TO consists in offering to buy out the remaining shareholders' stock. This offer is a unilateral action performed by the party who has decided to exercise control of the Company, and it is not subject to any condition or time period that might delay or jeopardize either the temporary taking or the expropriation. The remaining shareholders' agreement is not required, and, once performed, the State does not subject it to any kind of waiting period.

69. Regard should also be had to the fact that neither the temporary taking nor the expropriation relieve the taking or expropriating party from any of the obligations of the taken or expropriated party, or from the duty to pay compensation for any damage resulting from the termination of any contracts executed by the latter.

70. It follows from the above that (a) the Argentine State should have carried out the TO pursuant to YPF's Bylaws, and (b) because it did not, Section 7(h) of the Bylaws applies:

> "*Violation of requirements: Any shares and securities acquired in violation of the provisions of sections 7(c) through 7(g) of this Section shall not vest their holders with voting rights or rights to collect dividends or any other distributions by the Company, and shall not be taken into consideration for the formation of a quorum at any meeting of the Company's shareholders.*"

71. Accordingly, Argentina and YPF are liable for the breach of the above-transcribed section.

72. In this regard, in paragraph 21 of her Report, Professor Kemelmajer de Carlucci stated that "*YPF was legally barred from preventing the*

*expropriating Argentine Government from exercising its right to attend, participate and vote as provided in Law 26,741.*"

73. Such contention runs counter to the very foundations of corporate law and corporate personality.

74. YPF is a legal entity which, as any other of its kind, acts through the decisions made by its shareholders and managers. Those shareholders and managers are obligated to operate the company such that the company's acts comply with its obligations under the Bylaws. If they do not, the Company may be liable based on those shareholders' or managers' decision, made on the company's behalf. It is simply the nature of the liability of legal entities that it traces back to the acts of human beings. Once Argentina seized control of YPF, it — in its capacity of YPF's management — was obligated to operate YPF in compliance with its bylaws. In this case, the Bylaws required YPF not to recognize the voting rights of the shares Argentina acquired in violation of the Bylaws. Argentina declined to cause YPF to enforce this limitation, but YPF was not prevented from doing so by a *force majeure*. Thus, YPF is liable for breaching the Bylaws. If liability for YPF were impossible here, a company would never be liable for its decisions, as, rather than being attributable to the company, all such decisions would be attributable to the shareholders and managers alone.

### ii.    Professor Ismael Mata's Report

75. In a similar vein, paragraph 35 of Professor Ismael Mata's Report reads:

"*To sum up, clauses related to the Public Offer of Shares included in the YPF Bylaws cannot validly restrict, limit or in any way affect the exercise of sovereign powers of the National Government in general and regarding expropriations in particular. Such bylaws clauses are only applicable to shareholders who, acting as private law subjects, acquire shares in the market. But they do not apply –nor may legally apply- to the process of expropriation or temporary occupation, as the latter are inalienable powers of the National Government, as provided in the CN.*"

76. As I have already explained, in no way does the TO hinder or jeopardize the Argentine State's sovereign powers.

77. Second, it is wrong that the bylaws clauses in question "*are only applicable to shareholders who, acting as private law subjects, acquire shares in the market.*"

78.     Section 28(A) of YPF's Bylaws expressly addresses a situation where shares are acquired such that the acquisition entails a takeover by the Argentine State; I have already explained that such "acquisition" does not necessarily involve a legal act via which title to the stock is formally transferred. On the contrary, it requires an act by which the "takeover" is actually exercised. In this regard I refer back to paragraphs 49 and 50.

79.     It is not true either that the TO is limited to takeovers resulting from acquisitions in the market.

80.     Nowhere in YPF's Bylaws is there a limitation such that would support this contention. On the contrary, Section 28(A) provides that "*[t]he provisions* [dealing with the TO] *[...] shall apply to acquisitions made directly or indirectly by the Argentine State, by any means.*" Emphasis added.

   **G.  Analyze paragraphs 24-31 of Professor's Aída Kemelmajer de Carlucci's Report, and state whether you agree with the expert's conclusions, considering that, through Law 26,741, the Argentine State could exercise all rights of YPF's majority stockholder**

81.     I disagree with Professor Kemelmajer de Carlucci.

82.     In paragraphs 24-31 of her Report, Professor Kemelmajer de Carlucci relies on the acts of God doctrine to relieve YPF from liability as a result of the Argentine State's vote in breach of YPF's Bylaws, Section 7(h).

83.     She argues (see, in particular, paragraph 31) that, as far as YPF is concerned, the expropriation of Repsol's stock was an act of God for which YPF is not liable.

84.     In this regard, a distinction could be drawn between (a) the temporary taking and the expropriation of Repsol's shares themselves and (b) the Argentine State's actions exercising YPF's majority stockholder's right after the temporary taking of the Class D stock and its subsequent expropriation via a compromise and settlement agreement.

85.     As regards the former issue, YPF's liability is not engaged. If anything, the only obligation this creates is the taking and expropriating party's duty to pay compensation.

86.     A very different matter – and the acts of God doctrine cannot be relied upon here – is YPF's liability as a result of the recognition of the Argentine State's

votes in breach of Bylaws Section 7(h). As explained, in that situation, Argentina's exercise of voting power and management authority constitutes the acts of the Company, and thus the Company may be liable.

87. I refer back to the preceding section, where I have already stated my opinion on the subject.

**H. Analyze paragraphs 47, 48, and 56 of Professor Aída Kemelmajer de Carlucci's Report, and explain whether, under Argentine law, (a) the operation or application of the estoppel doctrine "require the absence of a contractual relationship," and (b) said doctrine cannot be relied upon in the context of contractual relationships as an independent source of obligations**

88. In my opinion, the "doctrine of estoppel" applies equally to contractual and out-of-court relationships.

89. Paragraphs 47, 48, and 56 of Professor Kemelmajer de Carlucci's Report state as follows:

*"47. Also, in order to be established as autonomous sources of obligations, both pre-contractual liability and estoppel require the absence of a contractual relationship between the parties. In effect, if a contract exists then the source of the obligations will be contractual, not pre-contractual, and the doctrine of estoppel will in the best of cases be used as a tool for interpreting and explaining the existence of contractual liability."*

*"48. In the case of a contractual relationship – which is the kind of relationship that the plaintiffs claim to exist with regard to their association with YPF – once the hypothesis of a pre-contractual liability is dismissed for obvious reasons, then estoppel doctrine can simply serve as a guideline interpretative of the conduct of the allegedly breaching party, but not as an autonomous source of an obligation. The imputed party there may or may not have incurred a contractual breach, and where appropriate will be liable and bound to compensate its counterpart, but its liability will not have derived from having violated estoppel as an autonomous source of obligations."*

*"56. Above all it must be reiterated that – as stated in point A herein with regard to 'Promissory estoppel' – in cases like the present in which a contractual relationship between the Parties is alleged, the criteria of good faith will serve essentially to interpret the contract and the conduct of the parties, but not to give rise to an autonomous obligation or claim, separate from expressly assumed contractual obligations. This in itself would be sufficient to dismiss a claim based solely on the breach of the duty of good faith."*

90. The above-transcribed paragraphs may be summarized as follows: *where a contract exists, the doctrine of estoppel is not an autonomous source of obligations, but merely a tool to interpret the parties' conduct*.

91. I believe some clarifications are in order here, as I see that sources of obligations have been confused with the doctrine of estoppel.

92. In my opinion, in the paragraphs transcribed above, professor Kemelmajer causes confusion when she says that (a) the doctrine of estoppel is not an autonomous source of obligations and that (b) for that reason, estoppel can only be applied to non-contractual relationships.

93. The first point is correct, and the second one is incorrect, but professor Kemelmajer enuciates the issue as if the second point were a consequence of the first point, and that is where her error lies.

94. Even if it is correct to say that, under Argentine law, estoppel is not a source of obligations, this does not hinder, in any way whatsoever, the application of the estoppel doctrine to contractual relationships.

95. In fact, the Supreme Court has applied the estoppel doctrine in various cases in order to prevent the breach of contracts, i.e. Aguas Argentinas S.A. v. Ente Tripartito de Obras y Servicios Sanitarios;[15] Sebastián Maronese e Hijos S.A. v. Provincia de Buenos Aires;[16] Estado Nacional v. Juzgado Federal de la Provincia de Catamarca;[17] YPF v. Provincia de Corrientes;[18] Juan María de Vido e Hijos S.C.A. v. Dirección Nacional de Vialidad;[19] Zubdesa S.A.C.I.F.I. v. Municipalidad de la Ciudad de Buenos Aires,[20] among others.

---

[15] Fallos 328-2004 (2005).

[16] Fallos 327-5073 (2004).

[17] Fallos 315-1738 (1992).

[18] Fallos 315-158 (1992).

[19] Fallos 311-971 (1988).

[20] Fallos 308-191 (1986).

**I. In paragraphs 50-54 of her Report, Professor Aída Kemelmajer de Carlucci argues that the enactment of Law 26,741 renders the estoppel doctrine inapplicable, as said Law caused the previous actions – the duty to fulfill the obligations established in the Bylaws – to become unlawful or, in any event, impossible to fulfill. Do you agree with such statement? If you do not, explain why, in your opinion, such contention is incorrect**

96. I disagree with Professor Kemelmajer de Carlucci.

97. The concept advanced in paragraphs 50-54 is summarized in paragraph 54 of her Report, which reads: "*it is not possible to attribute binding legal effects to any past behavior when its repetition, because of a regulatory change, becomes impossible to fulfill*".

98. In no way did the temporary taking or the expropriation of Repsol's shares by the Argentine State render the obligations arising from YPF's Bylaws unlawful or impossible to fulfill.

99. Again, a distinction needs to be drawn between (a) the sovereign actions of temporary taking and expropriation of Repsol's shares, which allowed the Argentine State to exercise the rights carried by YPF's Class D stock and to own such stock, and (b) the State's obligations as an YPF shareholder and the obligations of YPF itself under its Bylaws.

100. Even assuming the former (temporary taking and expropriation) were sovereign actions governed by public law, the temporary taking and expropriation did not alter the Bylaws. Even after the taking and expropriation, the Argentine State is just another shareholder of YPF (its majority shareholder) and, as such, subject to the obligations imposed upon it by the company's Bylaws, which –to repeat– were approved by the Executive via Executive Order 1106/1993.

101. The entire relationship under the bylaws is governed by private law. In this regard, Law 26,741, Section 15 provides as follows: "*[t]o carry out their activities, YPF Sociedad Anónima and Repsol YPF GAS S.A. shall continue to operate as open corporations under Article II, Sub-Article V of Law No. 19,550 and related provisions; they shall not be subject to any legislation or administrative regulations governing the administration, management and control of companies or entities in which the Federal State or the Provinces hold an ownership interest*."

**J. In its Response Memorandum (Chapter IV), the Argentine Republic argues that "The Courts in Argentina Are an Adequate Forum" for the proceeding. Do you find this to be correct?**

102. The courts of Argentina are not, at the moment, an adequate forum for this proceeding.

103. This is best illustrated by the federal administrative courts' refusal – subsequently affirmed by the Supreme Court – to enforce the judgment rendered by the U.S. District Court - Southern District of New York in "Claren Corporation v. The Republic of Argentina," allowing a claim by holders of Argentina's foreign-debt bonds.[21]

104. In ruling on the request for enforcement of the judgment, the Supreme Court mentioned the opinion of the Attorney General of Argentina, advising against enforcement, and stated:

> " *[...] it should be noted that the argument in said opinion is supported by and consistent with the decisions of this Court, as it contended that [...] as regards the powers of the Argentine State in connection with the possibility of restricting, suspending or restructuring debt payments in times of serious economic crisis in order to bring debt services in line with the actual capabilities of the public treasury, the provision of essential services and the fulfillment of basic state roles which cannot be neglected [...] from that perspective, it can be maintained that the rules [...] whereby the Argentine State exercises such powers are a part of* Argentine law's public policy, *and the* exequatur *in connection with a judgment rendered by a foreign court in clear conflict with these provisions must thus be denied."* Emphasis added.[22]

105. It is evident that, if a vague reference to "Argentine law's public policy" is sufficient to deny the enforcement of a foreign judgment that merely ordered the fulfillment of obligations which had been expressly undertaken by the Argentine Republic upon issuing government bonds, the Argentine Courts do not stand as an "adequate forum" to hear and determine cases in which the Argentine Republic is being asked to fulfill obligations under contract. Enforcement was denied at three different judicial levels in a proceeding that only ended in March 2014, more than six years after the issue of the judgment the enforcement of which was being sought.

106. Also worth mentioning is the case of YPF S.A. v. AES Uruguaiana Emprendimientos S.A. That case is an international arbitration concerning gas

---

[21] 06 CV13675 (TPG), judgment rendered by Judge Thomas Griesa on December 7, 2007.

[22] Claren Corporation v. Estado Nacional, C. 462. XLVII; judgment rendered on March 6, 2014. See whereas paragraph 9.

exports to Brazil, where a partial award was issued holding YPF S.A. liable for interrupting the transportation contract. When the second phase of the arbitration, on quantum, was about to begin, YPF filed a request with Argentina's federal courts to declare the partial award null and void, also seeking an injunction to stay the arbitration.

107. Even though the nullification request was inadmissible, as it should have been filed against the final award and only to the extent that highly specific grounds were established, the Federal Administrative Court of Appeals upheld its jurisdiction to hear and rule on the request and ordered the arbitration stayed.[23] An appeal was taken from this decision before the Supreme Court, where a ruling is still pending, notwithstanding which Argentina's Attorney General has already issued an opinion advising that the Court of Appeal's ruling be affirmed.

To sum up, Argentina's federal courts do not enforce foreign judgments against the Argentine State, in addition to staying ongoing arbitration proceedings in order to avoid an award against YPF. Therefore, it cannot be argued that the courts of Argentina are a neutral forum in cases such as the one at hand.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Buenos Aires, Argentina, October 19, 2015.

**ALBERTO B. BIANCHI**

---

[23]  Case Files Nos. 41,255/2013/1/RH1 and 41,255/2013/CA1; judgment rendered on October 7, 2014.

# Annex I

**ALBERTO B. BIANCHI**

1243 Callao Av., 2nd floor
C1023AAF - Buenos Aires, Argentina
+ 54 11 4812 1200
ab@bgcv.com.ar
www.bgcv.com.ar



*Professional Degrees*

- J.D., Universidad Católica Argentina, 1978.
- Ph.D., Universidad de Buenos Aires, 1988.

*Academic degrees*

- Member (Academician) of the National Academy of Sciences of Buenos Aires.

*Arbitrator*

- Hidroeléctrica Piedra del Aguila S.A. v. Administración Nacional de Usinas y Transmisiones Eléctricas del Uruguay, Buenos Aires Stock Exchange Arbitration Tribunal (2003-2004).

- Papel del Tucumán S.A. v. Estado Nacional, ICC Case 12364/KGA (2003-2014).

- Member of the *Court of Arbitration for Labor and Administrative Law*, *Río de la Plata Administrative Commission* (2003).

*Experience as expert witness*

I. *Arbitration proceedings*

- Teinver S.A., Transportes de Cercanías S.A. y Autobuses Urbanos del Sur S.A. v. The Argentine Republic, ICSID case ARB/09/1 (2013).

- ICS Inspection and Control Services Ltd. V. The Argentine republic, UNCITRAL case CPA 2010-9 (2011 to the present)

- Urbaser S.A. y Consorcio de Aguas Bilbao Bizkaia v. The Argentine Republic ICSID case ARB/07/26 (2010-2014).

- Impregilo S.p.A v. The Argentine Republic, ICSID case ARB/07/17 (2009).

- Mobil Argentina S.A. and Mobil Exploration and Development Argentina Inc. Sucursal Argentina v. The Argentine Republic, ICSID case ARB/04/16 (2008/2009)

- Giovanna A. Beccara  et al. v. The Argentine Republic, ICSID case Nº ARB/07/05 (2008 to the present).

- *Azurix Corp. v.* The Argentine Republic, ICSID, case ARB/01/12 (2008).

- *Siemens A.G. v.* The Argentine Republic, ICSID case ARB/02/8, (2008).

- *Boldt S.A. v. Siemens IT Services S.A. y Siemens A.G.*, ICC case 920/CCO (2008).

- *Compañía General de Electricidad S.A. and CGE Argentina S.A. v. The Argentine Republic*, ICSID, case ARB/05/02 (2007).

- *El Paso Energy International Co. v. The Argentine Republic*, ICSID case ARB/03/15 (2006-2007).

- *Aguas del Aconquija S.A. and Vivendi Universal S.A. v. The Argentine Republic*, ICSID case ARB/97/3 (2006).

- *Camuzzi International v. The Argentine Republic*, ICSID case ARB/03/7 (2005).

- *Enron Corp. and Ponderosa Assets L.P. v. The Argentine Republic*, ICSID case ARB 01/3 (2005).

- *EDFI and Electricidad Argentina S.A. v. The Argentine Republic* and *EDFI, SAURI and León Participaciones Argentinas S.A. v. The Argentine Republic,* ICSID case ARB 03/22 and 03/23 (2003-2009).

### II. *Judicial proceedings*

- *Distribución y Servicio S.A. v. Disco Ahold International Holdings N.V.,* Case A.R. 424/03, Court of First Instance of the Netherlands Antilles (2003-2004).

- *Sempra Energy v. Marsh USA Inc.* Case No. CV07-5431 SJO (SSx), US District Court for the Central District of California.

### *Awards*

- National Academy of Law of Buenos Aires (1990).

- National Academy of Law of Córdoba (2012).

### *Published books*

- Competencia originaria de la Corte Suprema de Justicia de la Nación (1989).

- La delegación legislativa (1990).

- Control de constitucionalidad, 1st edition 1992, 2nd edition, 2002 (2 Volumes).

- Jurisdicción y procedimiento en la Corte Suprema de los Estados Unidos (1994).

- Dinámica del Estado de Derecho (1996).

- La sentencia definitiva ante el recurso extraordinario (1998).

- El juicio por jurados (1999).

- En contra del aborto (1999).

- Responsabilidad del Estado por su actividad legislativa (2000).

- Las acciones de clase (2001).

- La regulación económica, Volume I (2001).

- Organización institucional de la Iglesia Católica (2003).

- Capitalismo y Derecho constitucional (2005).

- Historia de la formación constitucional argentina - 1810-1860 (2007).

- Una Corte liberal - La Corte de Alfonsín (2007).

- Historia Constitucional de los Estados Unidos (2008).

- Historia Constitucional del Reino Unido (2009).

### *Current academic activity*

- Professor of In-Depth Studies on Constitutional Law, Universidad Católica Argentina and Universidad Austral.