**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK (Civil Action No. 15 CV 2739)**

PETERSEN ENERGÍA INVERSORA, S.A.U. and
PETERSEN ENERGÍA, S.A.U.,

Plaintiffs,

against

ARGENTINE REPUBLIC and YPF S.A.

Defendants.

## DECLARATION OF GUSTAVO A. NAVEIRA

1.  Pursuant to 28 U.S.C. § 1746, I, Gustavo Naveira, state the following:

2.  *I am an attorney-at-law authorized to practice law in the Argentine Republic. From 1979 to 1984, I acted as First Instance Judge in Commercial Matters for the City of Buenos Aires, and from 1984 to 1986 I acted as Judge of the Court of Appeals in Commercial Matters for the City of Buenos Aires. In 1997, I was appointed Undersecretary of Justice of the Argentine Ministry of Justice, and was subsequently appointed Secretary in Technical and Legislative Matters for the same ministry, which position I held until 1999. A copy of my curriculum vitae which shows my professional and academic background is attached hereto as* **Exhibit A**.

3.  I have been asked by legal counsel for Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. ("Plaintiffs"), to state my legal opinion in a case filed by Plaintiffs against the Argentine Republic ("Argentina") and YPF S.A. with the United States District Court for the Southern District of New York. My compensation is based on the time spent in preparing this report. Such compensation does not depend at all on the outcome of the lawsuit filed by Plaintiffs or on any of the stages of such proceedings.

4.  To prepare this report, I have reviewed the following documents: (i) the complaint filed by Plaintiffs with the United States District Court for the Southern District of New York on April 8, 2015; (ii) the declaration of Carlos Gustavo Pistarini, signed on August 28, 2015, together with Exhibits A and B thereto; and (iii)

Argentina's written submission to the United States District Court for the Southern District of New York of September 8, 2015.

5. Specifically, I have been asked to state my expert opinion with respect to the following questions:

    A. Whether the impartiality or independence of the Argentine Judiciary is being jeopardized by measures adopted or actions taken by the other Branches of Argentina's Federal Government.

    B. Whether litigating against the Argentine Republic before Argentine courts entails greater delays than litigating against a private party.

    C. What are the costs associated with filing a lawsuit before Argentine courts.

    D. Whether a proceeding similar to the US *Pre Trial Discovery* is provided for under Argentine procedural law, and, if so, which are the main procedural rules applicable to the production of documentary evidence and the examination of witnesses.

**A.**      ***Whether the impartiality or independence of the Argentine Judiciary is being jeopardized by measures adopted or actions taken by other Branches of Argentina's Federal Government.***

6. As I explain below, there are objective reasons to hold that the impartiality and independence of the Argentine Judiciary are being seriously jeopardized by the numerous measures adopted by the other Branches of Argentina's Federal Government in recent years, especially by the Executive Branch. That lack of impartiality and independence affects cases where the Federal Government or the provincial governments aligned therewith have a vested interest. In this report I do not intend to address all those measures, but simply to highlight some of those that, in my opinion, clearly support my conclusion.

7. In 2005, a survey conducted among Argentine lawyers revealed that almost 90% of the believed that the Argentine courts were not independent from the Executive and Legislative branches.[1] Since then, this belief has only strengthened.

8. Since 2013, the Federal Executive Branch, under the pretext of achieving the so-called "Democratization of Justice," has been promoting the enactment of a large number of laws introducing modifications that, far from improving the Argentine

---

[1] Article published in *La Nación* newspaper on October 21, 2005, available at http://www.lanacion.com.ar/749400-para-e1-874-de-los-abogados-la-justicia-no-es-independiente.

court system, aim at politicizing the Judiciary and creating a structure that blindly responds to government interests.

9. These laws deal with such matters as the creation of intermediate courts and changes to the Magistrates' Council. Specifically, the changes to the Magistrates' Council, which is responsible for the pre-nomination of federal judges and judges for the City of Buenos Aires, the imposition of sanctions on judges and, in general, the administration of justice, were widely questioned in the understanding that they clearly aimed at politicizing this body, thus directly affecting the judges' independence.[2]

10. Regarding these changes, the Latin American Federation of Magistrates stated, on a statement released on April 18, 2013, that: "*The amendments proposed [by the Federal Executive Branch] imply a serious danger for the very existence of the Argentine Republic. Argentine citizens are the only victims since the proposed bills materially alter the operation of the Judiciary and in no way do they deal with a reform seeking to broaden the exercise of rights; on the contrary, they curtail the independence of the Judiciary*".[3]

11. In this same regard, the Peace and Justice Committee of the Argentine Episcopal Conference stated as follows: "*The actual or threatened use of state power to influence judges in favor of the interests of the Government should be utterly repudiated and may never be justified on the basis of supposed or actual—and allegedly comparable—pressure by private parties. The popular election of the members of the Argentine Magistrates' Council is a mechanism which seems to be inconsistent with constitutional rules, and which, in any case, will turn a technical and rigorous body into a scenario of struggles between political parties. The politicization of judges is inadmissible and jeopardizes the impartiality that is expected from them. The announced creation of new judicial instances (Courts of Cassation) will result in more delays in the settlement of disputes in the context of proceedings which are already too protracted. Therefore, it is reasonable to suspect that the purpose is not to speed up proceedings, but to create courts higher than those already in place, with judges designated at the will of current majorities, which may modify jurisprudence in favor of the political authority*".[4]

12. In addition, the United Nations Special Rapporteur on the Independence of Judges and Lawyers, Gabriela Knaul, stated: "*I call on Argentina to establish clear*

---

[2] GELLI, María Angélica, "*Unconstitutionalities of the Law Regarding the Magistrates' Council*," La Ley, June 26, 2013, stating that the changes affect judicial independence and impartiality as well as the judicial guarantees of inhabitants in Argentina.

[3] Statement by the Latin American Federation of Magistrates, April 18, 2013.

[4] Statement by the Peace and Justice Committee of the Argentine Episcopal Conference, March 6, 2013, published in El Derecho, Wednesday, April 17, 2013, p. 22.

*procedures and objective criteria for the dismissal and punishment of judges, and to ensure an effective remedy for judges to challenge those decisions, in order to safeguard judicial independence*".[5]

13. When the Argentine Supreme Court of Justice (the "CSJN", for its Spanish acronym) attempted to impose limits on the subjugation of the Argentine Judiciary, declaring various provisions of Law No. 26,855 on the Argentine Magistrates' Council unconstitutional for considering them in violation of Section 114 of the Argentine Constitution,[6] such decision led to the announcement by the Executive Branch of new initiatives aimed at "expanding" the changes to the Judiciary.

14. Those new measures promoted by the Federal Executive Branch include the proposal to deprive the CSJN of its power to manage the funds of the Judiciary;[7] to create a new court with exclusive jurisdiction to rule on the constitutionality of laws,[8] and even to increase the number of members of the CSJN.[9] This last measure would enable the Administration to appoint even more partisan judges.

15. Recently, the highest criminal court in Argentina, the Federal Criminal Court of Cassation, Second Division, warned that "*sections 1 and 2 of Law No. 27,145, which vest the Argentine Magistrates' Council with the power to appoint substitute judges in case of removal of the hearing judge by an absolute majority of the members present out of the judges of the same venue having equal jurisdiction, or the members on the list of associate judges, are unconstitutional, inasmuch as they fail to meet the minimum standard of reasonableness by being in violation of the provisions of the Constitution and of international treaties with constitutional status regarding the right of access to statutory court, and the principle of judicial impartiality and independence, as well as the true purpose of the System of Substitute Judges*".[10]

---

[5] Declaration of April 30, 2013, published at http://www.ohchr.org/SP/NewsEvents/Pages/DispalyNews.aspx?NewsID=13275&LangID=S.

[6] Argentine Supreme Court of Justice (CSJN), "*Rizzo, Jorge Gabriel s/acción de Amparo c/Poder Ejecutivo Nacional, ley 26.865, medida cautelar, Expte. Nº 3034/13*", judgment of June 18, 2013, R. 369. XLIX.

[7] Bill submitted to Congress by Representative Carlos Kunkel and others on June 26, 2013, file No. 4935-D-2013.

[8] News article published in *La Nación* on July 10, 2013, available at http://www.lanacion.com.ar/l599827-un-senador-kirchnerista-quiere-crear-un-tribunal-de-constitucionalidad-para-eludir-a-la-corte.

[9] News article by Adrián Ventura published in *La Nación* on April 27, 2013, available at http://www.lanacion.com.ar/1576835-zaffaroni-propuso-ampliar-la-corte; news article published in *Clarín* on April 26, 2013, available at http://www.clarin.com/politica/Zaffaroni-Corte-Reforma_judicial_0_908309336.html; news article published in *El Cronista* on April 27, 2013, available at http://www.cronista.com/economiapolitica/Zaffaroni-ratifico-su-propuesta-de-ampliar-la-Corte-Suprema-20130427-0004.html.

[10] Federal Criminal Court of Cassation, Second Division, case captioned "*M.M.C. s/falta de mérito*", July 13, 2015.

16. The trend toward the subjugation of the Judiciary has recently escalated as demonstrated by the "investigation" into Supreme Court Justice Dr. Carlos Fayt, prompted by the Chief of the Cabinet of Ministers of the Federal Executive Branch, Aníbal Fernández, with the alleged purpose of assessing his current psycho-physical capacity, albeit with the clear objective of removing a Justice that is not partial to the Government. Under those circumstances, PRO (*Propuesta Republicana*) Representative Mr. Pablo Tonelli stated: "*Mr. Fayt has only been accused of being old. And being old is not a statutory ground to initiate impeachment proceedings*". [11] Although the opposition adamantly fought the Government's maneuver, the goal of removing Justice Fayt was achieved when he decided to resign after the Government's attack.

17. The case of Federal Criminal Judge Dr. Claudio Bonadío is also worth noting. With the votes of the ruling party (*Frente para la Victoria*) and at the request of the Argentine Secretary of Justice, Dr. Julián Álvarez, the Magistrates' Council reduced the judge's salary by 30%, after Dr. Bonadío ordered President Cristina Kirchner, her son Máximo, and her daughter Florencia to provide affidavits. [12] The CSJN subsequently overturned the salary reduction on the understanding that the statutory term for the filing of disciplinary proceedings as the one filed against Judge Bonadío had expired before the date on which the sanction was imposed. However, the Government's measure shows the harassment against judges and courts that make decisions that run counter to the Government's interests.

18. No less emblematic than the referred attempted subjugation of the Judiciary, as that suffered by the representative of the Public Prosecutor's Office, was the persecution of Prosecutor Dr. José María Campagnoli, who was suspended from office by Attorney General Dra. Alejandra Gils Carbó. The Attorney General further initiated impeachment proceedings against Dr. Campagnoli for the abuse of power in the investigation process of Austral Construcciones and its owner, Lazaro Baéz, who is closely related to the Argentine Government. The Attorney General also dismantled Dr. Campagnoli's prosecution office and reassigned his staff to other offices. [13]

---

[11] See *Infobae* news article, "*Kirchnerism Has Been Able to Initiate an 'Investigation' to Assess Justice Carlos Fayt*," May 12, 2015, available at http://www.infobae.com/2015/05/12/1728138-el-kirchnerismo-logro-aprobar-un-proceso-investigativo-evaluar-al-juez-carlos-fayt.

[12] See *La Nación* news article "*Magistrates' Council: Kirchnerism Reduces 30% of Judge that Investigates Cristina's Hotel*," December 3, 2014, available at http://www.lanacion.com.ar/1749030-el-consejo-de-la-magistratura-trata-la-denuncia-del-gobierno-contra-claudio-bonadio.

[13] See *Infobae* news article, "*José María Campagnoli, the Prosecutor that Dared Investigate Lázaro Báez, Is Suspended*," December 12, 2013, available at http://www.infobae.com/2013/12/12/1530536-suspendieron-jose-maria-campagnoli-el-fiscal-que-se-animo-investigar-lazaro-baez.

19. The case of Federal Prosecutor Dr. Alberto Nisman undermines institutional foundations and, as such, it is of outmost importance to mention here. Dr. Nisman was an Argentine Prosecutor in charge of investigating the attack on the AMIA building (the Argentine Jewish Community Center) which took place in July 1994. On January 13, 2015, Mr. Nisman filed a criminal complaint against President Cristina Fernández de Kirchner and other Kirchner administration officials of attempting to cover-up a group of suspects in the AMIA case through the execution of the Memorandum of Understanding between Argentina and Iran.

20. On January 18, 2015, Dr. Nisman was found dead in his home with a gunshot wound to the head hours before he was due to appear before the Criminal Law Committee of the House of Representatives to be examined on the grounds of his complaint against the President and other officials. Prosecutor Nisman's complaint was dismissed shortly afterwards by Federal Judge Daniel Rafecas.

21. One month after Prosecutor Nisman's death, on February 18, 2015, tens of thousands marched in silence from *Plaza del Congreso* to *Plaza de Mayo* in honor of late Prosecutor Nisman, demanding the truth about the surrounding circumstances of his death.

22. Only very recently, I have become aware through the news reports that the Office of the Attorney General for the prosecution of Financial Crimes and Money Laundering (PROCELAC, for its Spanish acronym), at the request of Argentina's Attorney General, has filed a criminal complaint against the Spanish companies that instituted arbitration proceedings against Argentina before the ICSID for the expropriation of Aerolíneas Argentinas, of procedural fraud, specifically including American and Argentine attorneys from the law firm of King & Spalding, who provide legal counsel to those companies. The criminal complaint was made public by two Government agencies, the PROCELAC and the Attorney General's Office, through several press outlets and they even held a press conference to make the announcement. At the press conference, the Attorney General also criticized the action brought by Plaintiffs Petersen and the judge hearing the case, even though they are not related to the criminal complaint *per se*.[14]

23. The criminal complaint brought by the PROCELAC directly involves the attorneys from King & Spalding, who also provide legal counsel to the Plaintiffs in these proceedings. Clearly, if Plaintiffs are forced to litigate before Argentine courts, they would be unable to do so with the legal counsel of those same

---

[14] The news was reported by several national press outlets and the press conference was even published on the Argentine Presidency's website on September 14, 2015, available at http://prensa.argentina.ar/2015/09/14/60586-denuncian-posible-fraude-al-estado-en-el-juicio-ante-el-ciadi-por-la-expropiacion-de-aerolineas-y-austral.php.

lawyers, whose right to freely practice the law as enshrined in the Argentine Constitution has been undermined by the complaint lodged against them.

24. In this scenario, which is particularly relevant to the claim filed by Petersen, in addition to the criticism of and pressure on Argentine judges and other judicial officials—some of them remarkably hostile—it is reasonable to assume that, given the high publicity of the matter at issue in this case and the strong interest of the Argentine Government to obtain a favorable resolution, local judges who would have to rule on the liability attributed to the Government in this lawsuit would probably be under great pressure to rule in favor of Argentina. In this context, the outcome of the claims filed by Plaintiffs would clearly depend on non-legal factors.

25. Furthermore, there are several recent judgments where Argentine courts specifically considered non-legal factors to settle issues that may affect the Government's interests. In those cases, the courts have taken into account the economic importance and possible consequences of their decision instead of limiting their analysis to the merits of the claim brought before them. Thus, for instance, in the judgment pronounced by Division IV of the Federal Administrative Court of Appeals on October 7, 2014, in the case entitled "*YPF S.A. c/AES Uruguaiana Emprendimientos S.A. y otros s/recurso directo de organismo externo*" that Court advanced—among others—the following argument to admit the precautionary measure requested by YPF under which the procedural timetable for the second stage of the pending ICC arbitration was suspended: "*If the motion for annulment is not decided upon and the arbitration continues, in violation of YPF's procedural safeguards, this would seriously affect YPF's operations and investments, exacerbating the energy shortage due to the resulting delay in the investment program that is currently underway and whose goal is to increase hydrocarbon reserves and production.*" By following that rationale, the court considered factors that are extraneous to the purely legal issue brought before it and, in turn, it based its decision on political and economic grounds.

26. Moreover, in its rulings on the cases captioned "*Claren Corporation c/ EN arts. 517/518 CPCC exequátor*", of March 6, 2014, and "*Crostelli, Fernando y otros c/ EN Mº de Economía (arts. 517/518 CPCC exequátur)–BONY*", of November 11, 2014, the Argentine Supreme Court rejected both requests by foreign judges on grounds related to public policy and economic emergency, which, according to both rulings, justifies and necessitates the rejection of individual legal actions by creditors who disavow and hinder the public debt restructuring measures provided by the Federal Government.

27. It may be reasonably inferred from those cases that an Argentine court reviewing this lawsuit would take into account the approach underpinning the

abovementioned court decisions. By following this line of thought, the court would be negatively predisposed towards the admissibility of the complaint filed by Plaintiffs, regardless of its merit.

**B.** ***Whether litigating against the Argentine Republic before Argentine courts entails greater delays than litigating against a private party.***

28. Litigating against Argentina before the Argentine courts entails significantly longer delays than suing a private party.

29. Specifically in litigation against the Argentine State before Argentine courts, once the lawsuit has been filed, the court of competent jurisdiction may take several months to decide whether the claim is procedurally admissible. Then, once admitted, the claim must be notified to the Attorney General's Office (*Procuración del Tesoro de la Nación*) 30 business days before serving the complaint. Once the complaint has been served, the government has 60 business days to answer.

30. Thus, 12 to 18 months normally elapse before the Argentine State responds to the complaint. It is common that it will take more than ten years to obtain a final court judgment by the CSJN in a case instituted against the Argentine State.

31. The statement by one of the witnesses of the Argentine Republic in this case, Dr. Carlos Pistarini, refers to the case entitled "*San Martín José y otro c/PEN*" (a complaint brought against the Argentine Executive on the expropriation of Repsol's shares in YPF), a case that clearly evinces the abovementioned delays. Indeed, that complaint against the Argentine State was filed on August 8, 2012, and only two years later was the matter of jurisdiction resolved. This illustrates the procedural delays and hindrances that Plaintiffs would face if their claim is brought before Argentine courts.

32. Further delays occur during the enforcement stage, where in theory the Argentine State has two years to comply with money judgments. This two-year term results from the need to include the amount of the judgment in the annual appropriation bill, pursuant to Section 22 of Law No. 23,892. It must be noted that, after a decision is rendered against the Argentine State, it is nonetheless extremely difficult to collect the awarded sum. In this respect, I agree with the position of the legal scholars who commented the decision by the Supreme Court of Justice of Argentina in the case captioned "*Grupo Clarín S.A. y otros c/Poder Ejecutivo Nacional y otro s/acción meramente declarativa*" (a claim of unconstitutionality) of October 29, 2013, included in the journal of jurisprudence *El Derecho*, No. 13,391, of December 24, 2013, Drs. Alberto Bianchi and Estela Sacristán, who state as follows:

33. "*When Justices Lorenzetti and Highton de Nolasco state in their opinion that relief for any possible harm the licensee may suffer as a result of this divestment could be sought based on the principles attributing liability to the State for its lawful activity, they allude to an ideal scenario where the State timely pays all debts arising from court judgments. We know full well, however, that reality is quite different, and that collection of money judgments against the State in current-day Argentina is almost a chimera.*"[15]

34. As already mentioned, under Sections 20 and 21 of Law No. 24,624, money judgments against the Argentine State are unenforceable. Rather, they are paid when the State decides—at its own discretion—to include them in the annual appropriation bill.

C.   *What are the costs associated with filing a lawsuit before Argentine courts.*

35. The cost of litigating before Argentine courts is very significant. Therefore, if this case is litigated in Argentina, Plaintiffs would likely end up paying over one hundred million dollars in procedural costs to commence the proceedings and then face over one hundred million dollars in fees if they lose.

36. Indeed, in Argentina, court proceedings are subject to prior payment of a fee, known as "court tax" (*tasa de justicia*), to be paid at the outset of the process by the party who institutes a lawsuit. At the federal level (which, for this purpose, also includes most courts for the Autonomous City of Buenos Aires), the court tax is equal to 3% (three per cent) of the amount claimed.[16]

37. Pursuant to the laws governing the organization of the Judiciary, the amounts collected as "court tax" are specific resources owned by the Argentine Judiciary, which are part of its annual investment and expenditure budget.[17]

38. The court tax is determined according to the value of the claim filed:

(i)    In proceedings where the subject-matter of litigation has no monetary value, plaintiff shall pay ARS 70 (seventy Argentine pesos) as court tax.[18]

---

[15] Comment by Drs. Alberto Bianchi and Estela Sacristán, to the ruling of the Supreme Court of Justice of Argentina in the case captioned "*Grupo Clarín S.A. y otros c/Poder Ejecutivo Nacional y otro s/acción meramente declarativa*" (a claim of unconstitutionality) of October 29, 2013, published in the journal of jurisprudence *El Derecho*, No. 13,391, dated December 24, 2013, issue of February 20, 2014.

[16] Law No. 23,898, Section 2.

[17] Law No. 23,898, Section 3(a).

[18] Law No. 23,898, Section 6.

(ii) Where plaintiff seeks payment of a certain amount of money ("determined amount"), for the purpose of calculation of the relevant court tax, the principal, currency depreciation, and the interest accrued claimed as of the institution of the proceedings shall be taken into account.[19] Plaintiff shall pay a court tax equal to 3% of the aggregate amount thereof.

(iii) Where the amount claimed may not be determined as of the filing of the lawsuit ("indeterminable amount"), plaintiff shall pay ARS 70 (Argentine pesos seventy) as court tax, and the final amount thereof shall be determined later, upon conclusion of the proceedings.[20]

(iv) Where plaintiff claims payment of an amount of money which has not but may, in principle, be determined ("determinable amount"), plaintiff shall pay a court tax equal to 3% (three per cent) of the amount estimated as principal and interest. The estimate made by plaintiff may be challenged by the Tax Authority, and is ultimately determined by the court. In the event that the amount estimated by plaintiff is considerably lower than that ultimately determined, the court may impose a fine ranging from 5% to 30% of the difference between both figures.[21]

39. In general, courts follow strict criteria in relation to the payment of the court tax, as well as in the determination of the amount thereof. In particular, courts have adopted a restrictive approach towards claims that a lawsuit has no monetary value or that the value thereof is "indeterminable." This approach has been summarized by legal scholars as follows: "*Case law agrees on one thing: No one shall be exempted from payment of the court tax.*"[22]

40. In the instant case, if Plaintiffs' action against the Argentine State were brought in Argentina, it is highly probable that the court, either at the request of the Tax Authority or on its own initiative, would take the position that (i) the claim has a monetary value and (ii) such value may be determined at the outset of the litigation (*e.g.*, that it is of a "determinable amount") by applying the parameters set forth in Sections 7 and 28 of the YPF Bylaws.

---

[19] Law No. 23,898, Section 4(a).

[20] Law No. 23,898, Section 5, second paragraph.

[21] Law No. 23,898, Section 4(d).

[22] GORDILLO, AGUSTÍN, "*The Implacable Court Tax*," published in *La Ley* 1995-E, 503. This interpretation criterion is consistent with the allocation of the amounts collected by way of court tax, which, as already explained, constitute specific resources owned by the Argentine Judiciary.

41. Because the amount involved in the claim filed by Plaintiffs in this case would be for billions of dollars, the court tax would certainly be in excess of one hundred million dollars.

42. The court tax is triggered by the mere filing of the complaint. Subsequent abandonment of the litigation does not eliminate the liability for the court tax thus triggered.

43. In addition, pursuant to procedural laws applicable at the federal level, the general principle is that the losing party is to bear all court costs, which include: (i) the fees of the prevailing party's attorneys and (ii) experts' fees. Only as an exception may the court depart from this principle where the circumstances of the case so warrant, stating its reasons, under penalty of annulment.[23]

44. Here, fees could be hundreds of millions of dollars. Fees are established by the court pursuant to the relevant regulations, which set fees as a percentage of the amount claimed, rather than on an hourly rate basis.[24] The statutory fees of the legal counsel for the prevailing party—including the fees pertaining to the lawyer and the attorney—must range from 14% to 28% of the amount of the claim for first instance.[25] This amount should be added to the fees arising from their work before the Court of Appeals and the CSJN, which may range for each instance from 25% to 35% of the fees established for the first instance.[26] Costs would increase in the event that the case were heard by one of the recently created Federal Courts of Cassation. The same percentages set for the regulation of fees for work before Courts of Appeals would be applicable to this possible stage. Fees of experts are also calculated as a percentage—albeit lower than for counsel—on the amount involved.[27] Consequently, the professional fees of counsel and experts, in the aggregate, could amount to hundreds of millions of dollars.

45. A court can award professional fees below statutory percentages only as an exception.[28] In any event, with respect to Plaintiffs' claims, assuming the court calculated their value according to Sections 7 and 28 of the YPF Bylaws, even if the court departed from the statutory amounts, the fees would still be many millions of dollars.

---

[23] Code of Civil and Commercial Procedure, Section 68.

[24] Law No. 21,839 and its supplementary rules.

[25] Sections 7 and 9 of Law No. 21,839. The total fees established for the First Instance (including attorneys', the Attorney General's, and court-appointed experts' fees) shall not exceed, in the aggregate, 25% of the judgment's amount (Argentine Civil Code, Section 505, before the amendment)

[26] Law No. 21,839, Section 14.

[27] See, *e.g.*, Decree-Law No. 16638/1957 regulating experts' fees.

[28] Law No. 24,432, Section 13.

46. Based on the foregoing, legal scholars have asserted that litigation costs in Argentina operate as a barrier to access to justice, since they work as a disincentive to the filing of lawsuits against the Argentine State.[29] However, the Argentine State has not acknowledged these reasons, which may lead to an actual denial of justice. Indeed, Argentina has been held liable by the Inter-American Court of Human Rights for the extremely high litigation costs imposed on an individual whose lawsuit against the State has been rejected.[30]

47. Procedural legislation at the federal level provides that parties showing that they lack resources may file a "motion for leave to litigate *in forma pauperis*." This benefit entails an exemption—total or partial—from payment of the court tax and such other litigation costs as may apply. However, in principle, the motion for leave to litigate *in forma pauperis* may not be granted to corporations. In such regard, the CSJN has maintained in cases of this kind that "*the admission thereof is to be subject to a careful and thorough analysis*."[31]

48. Along these lines, the CSJN has also held that it may be assumed that companies claiming extremely high amounts may apply for a loan in order to pay for the court tax. Therefore, in such cases, the motion for leave to litigate *in forma pauperis* may not be granted.[32] This is likely to happen if Plaintiffs have to institute proceedings against the Argentine State before Argentine Courts.

49. Thus, as already mentioned, it is likely that Plaintiffs would have to pay an amount in excess of one hundred million dollars in court fees to bring this case in Argentina, and could face more than one hundred million dollars in attorneys' fees awards were they to lose.

**D.** ***Whether the US process known as Pre Trial Discovery is provided for under the Argentine procedural law, and, if so, which are the main procedural rules applicable to the document production and the examination of witnesses.***

50. The Argentine Code of Civil and Commercial Procedure (the "CPCCN," for its Spanish acronym), which is the procedural law applicable in the federal courts of

---

[29] MAIRAL, HÉCTOR A., "*The Silence of the Argentine Courts*," Res Pública Argentina, No. 2007-3, page 7. An English translation of this article is available at http://www.iili.org/gal/documents/HectorMairal.ThesilenceoftheArgentinecourts.pdf.

[30] Inter-American Court of Human Rights, "*Cantos c. Argentina*", Court Decision of November 28, 2002, Series C No. 97.

[31] CSJN, "*Estructuras Taft S.A. c. Provincia de Tucumán*", Court Decision of October 20, 1996, published in JA 1997-I-74.

[32] CSJN, "*Coihue S.R.L. c/ Santa Cruz, Provinda de s/ beneficio de litigar sin gastos*", Court Decision of July 11, 2006, published in *Fallos* Volume 329, page 2719.

the Argentine Republic, does not provide for the US process known as *Pre Trial Discovery*. In fact, case-law and legal scholarly writings assert that this process is alien to Argentine law.[33]

51. An Argentine court may only exceptionally order the production of evidence during an earlier phase of the proceedings; however, that situation can hardly be likened to the production of documents or witness statements allowed by the *Pre-Trial Discovery*. This limitation is made even more stringent by the fact that requests for documentation must be made in connection with documents specifically and thoroughly identified by the requesting party. Further, the penalties contemplated for parties who refuse to submit documentation requested by the counterparty are rather limited, which allows many litigants to withhold documents without suffering considerable consequences.

52. Moreover, the CPCCN states that evidence must be offered by plaintiff in the complaint and by defendant in the answer.[34]

53. Among other means of evidence permitted under the Code of Civil and Commercial Procedure, the court may order one party to produce documents identified by the other party and/or the examination of witnesses.[35] This order is issued by the judge at the evidence stage.

    1.    <u>Document production.</u>

54. The Argentine procedural system for document production is restrictive compared to the U.S. system as was described to me. In the Argentine procedural system, documents that may be required to be produced by the other party must be individually identified by the requesting party. The requesting party cannot request from the counter-party the production of categories or classes of documents.[36] Moreover, compliance with the order is not an obligation but a mere burden upon the party being required to produce. Accordingly, failure to submit

---

[33] CSJN, "*Rudaz Bissón, Juan Carlos c/ Editorial Chaco S.A. s/ indemnización de daños y perjuicios,*" *Fallos* 321:667 (pointing that the Argentine system does not have a legal proceeding similar to the U.S. discovery period); Federal Court of Appeals in Civil and Commercial Matters, Panel II, "*R., J. J. c. LR3 Radio Belgrano y otros,*" February 10, 1995, JA 1997-1-21 I (indicating that Argentine law does not apply the U.S. discovery period); and FEUILLADE, MLLTON C., "*Evidence in Proceedings with Foreign Elements,*" JA 2008-IV-1516.

[34] Code of Civil and Commercial Procedure, Section 333.

[35] Code of Civil and Commercial Procedure, Section 388.

[36] In this regard, Argentine legal scholars have stated that: "*The petition for document production shall be accurate as regards both material identification of the document and the consequences of non-submission, expressly set forth by law.*" (CARAMELO DÍAZ, GUSTAVO, *National Code of Civil and Commercial Procedure. Comparison with Provincial Codes. Scholar and Case Law Analysis*, ELENA L HIGHTON - BEATRIZ A. AREÁN (Directors), Volume 7, Hammurabi, Buenos Aires, 2007, page 648.)

the requested documentation creates a mere presumption against that party only if, based on other facts, there is a strong likelihood about the existence and contents of such documentation.[37]

55. Court proceedings are normally instituted through the submission of the complaint. However, exceptionally, plaintiff may commence the court proceedings by requesting the production of some evidence in advance, *i.e.*, prior to the submission of the complaint.[38]

56. The request for advance production of evidence shall only be granted if there are reasonable grounds to believe that the production of evidence would be impossible or very difficult during the evidence stage. This procedure is exceptional in nature[39] and is not intended to prepare evidence for the complaint, but rather attempts to preserve specific evidence that could be impossible or very difficult to produce at the appropriate procedural stage.[40] Documentary evidence that may be produced at this early stage includes the exhibition, safekeeping or seizure of duly identified documents for conservation purposes. Only particular, specifically-identified documents may be requested, not categories or classes of documents.

57. Furthermore, before filing the complaint, the plaintiff may request the performance of preliminary procedures.[41] These procedures are also exceptional in nature[42] and are aimed at gathering information or documentation, provided

---

[37] In this regard, legal scholars have stated that: "Since it is a burden, disregarding the demand or refusing to submit the documentation merely exposes the relevant party to the potential risk of triggering a presumption against it, but does not authorize taking action to force submission or applying penalties." (CARAMELO DÍAZ, GUSTAVO, *National Code of Civil and Commercial Procedure. Comparison with Provincial Codes. Scholar and Case Law Analysis*, ELENA L HIGHTON - BEATRIZ A. AREÁN (Directors), Volume 7, Hammurabi, Buenos Aires, 2007, page 648.)

[38] Code of Civil and Commercial Procedure, Section 326.

[39] "*Evidence assurance under Section 326 of the Argentine Code of Civil and Commercial Procedure is an exceptional procedure which should only be granted where the filing person is likely to lose evidence or find it impossible or very difficult to produce it at a later stage, which requires thoroughly explaining why such exception should be granted and evidencing the supporting grounds*" (Civil and Commercial Court of Appeals of the City of Buenos Aires, Division I, "*Domnicz, José y otro v. Camino de/ Atlántico S.*A.," November 12, 2002, DJ 2003-1-944).

[40] Commercial Court of Appeals of the City of Buenos Aires, Division A, "*Chiri S.A. y otros c. House of Fuller*," December 23, 1998, LL 1998-D-240. The early production of evidence requires previously summoning the other party. If this is not possible and there are reasonable grounds of urgency to do so, this summons could be replaced with the intervention of the Defender of Absent Parties. See ELENA I. HIGHTON - BEATRIZ A. AREÁN (Directors), *National Code of Civil and Commercial Procedure. Comparison with Provincial Codes. Scholar and Case Law Analysis*, Volume 6, Hammurabi, Buenos Aires, 2006, page 131.

[41] Code of Civil and Commercial Procedure, Section 323.

[42] Commercial Court of Appeals of the City of Buenos Aires, Division B, "*Sistemas Médicos S.A. c. St. Jude Medical*," March 16, 1995, LL1996-B-158.

that said information or documentation cannot be obtained by other means. The examples provided by the Code of Civil and Commercial Procedure and by case law also refer only to specific and previously-identified documents.[43]

2.　　Examination of witnesses and parties' oral statements (*absolución de posiciones*).

58. Pursuant to the Argentine Code of Civil and Commercial Procedure,[44] witness examination is subject to specific rules and follows court practice. Under these rules and practices, witnesses in Argentine federal court proceedings are not questioned (either in direct or cross examination) by the parties' counsel. Instead, the party which proposes the witness submits its questions in writing to the court before the hearing.[45] Normally a court clerk, not the judge (who generally is not present at the hearing) then poses those questions—verbatim or amended, as the clerk sees fit—to the witness. Once the witness has answered the first set of questions, opposing counsel may propose its own questions (orally) for the court to be made to the witness. The court may decide whether or not to ask those questions—verbatim or as amended.[46]

59. Government officers, even those of a middle rank such as undersecretaries,[47] do not have to appear personally before the court and testify orally, but submit a written statement based on the questions delivered in writing.

60. The only witness evidence that may be produced prior to submitting the complaint includes those witnesses who are very elderly, seriously ill or about to leave the country.[48]

61. A party to a court proceeding cannot be deposed as a witness in such proceeding. A party may call the other party as such (*i.e.*, as a party but not as a witness), to provide oral statements before the court on the matters in dispute (*absolución de posiciones*).[49] In the case of legal entities—such as the Argentine State— usually its legal representative, or someone appointed thereby, declares on behalf of the

---

[43] For instance, a will shall be shown whenever the petitioner believes he is the heir, co-heir or legatee, if he cannot obtain it by means of a judicial measure; in case of disturbance (*evicción*) the seller or the buyer must exhibit the titles or another instrument referring to the property sold. *See* Code of Civil and Commercial Procedure, Section 323.

[44] Code of Civil and Commercial Procedure, Sections 439-447.

[45] Code of Civil and Commercial Procedure, Section 429.

[46] Code of Civil and Commercial Procedure, Section 442.

[47] Code of Civil and Commercial Procedure, Section 455. CSJN, procedural rule dated December 20, 1967.

[48] Code of Civil and Commercial Procedure, Section 326(1).

[49] Code of Civil and Commercial Procedure, Sections 404-425.

entity. This means of evidence may only be requested once the complaint has been already filed.

62. While being deposed in this manner (*i.e.*, as a party and not as a witness), a party does not commit perjury if he or she does not tell the truth, whether it be a criminal or a civil case.[50]

63. In litigation against the Argentine State, the officer legally empowered to provide these statements on behalf of the State is not required to appear before the court and delivers a written statement.[51] Executive Order No. 1102/86 delegated to the Government counsel the power to deliver these written statements.[52] According to a former Deputy Attorney General, this often means that these statements are delivered by the same counsel that has prepared the answer to the complaint and, in practice, grants an opportunity to the Argentine State to amend or elaborate further on the answer to the complaint.[53]

64. The above rules are mandatory in any federal court proceeding related to litigation instituted in Argentina.

65. In connection with the production of evidence before Argentine federal courts ordered in court proceedings conducted abroad, Argentina and the United States are parties to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters[54] and the Inter-American Convention on Letters Rogatory.[55] These Conventions provide that, in principle, the court which executes a letter rogatory shall apply its own law as to the methods and procedures to be followed. However, upon request of the authority that has issued the letter rogatory, a special method or procedure may be followed, if this is not incompatible with the domestic law of the State of execution.[56] Argentine courts have complied with a

---

[50] FALCÓN, ENRIQUE M., *Treatise on Civil, Commercial and Family Procedural Law*, III, Rubinzal Culzoni, Buenos Aires, 2006, page 125 (explaining that, under Argentine law, the party "may lie freely" when delivering oral statements even under oath, without any criminal liability); PALACIO, LINO ENRIQUE, *Civil Procedural Law*, IV, 4th edition, Abeledo Perrot, Buenos Aires, 2011, page 442 (stating that Argentine law does not provide for specific sanction against perjury by the parties).

[51] Code of Civil and Commercial Procedure, Section 407.

[52] The Attorney General for the Argentine Treasury, the Deputy Attorney General for the Argentine Treasury, and the Legal Directors of the Public Administration's ministries, secretariats, and other agencies.

[53] GARCIA PULLÉS, FERNANDO RAÚL, *Treatise on Contentious Administrative Law*, II, Hammurabi, Buenos Aires, 2004, page 661.

[54] Law No. 23,480.

[55] Law No. 23,503.

[56] DATES, LUIS E., "*International Judicial Cooperation Regarding Taking of Evidence*," published in *La Ley* 2007-D, 1150; FEUILLADE, MILTON C., "*Evidence in Proceedings with Foreign Elements*," published in *La Ley* 2009-A, 1197.

request by a U.S. court to produce witness evidence under terms established in the letter rogatory.[57]

66. Based on the foregoing, the taking of evidence in Argentina pursuant to a letter rogatory issued by a United States court could follow the rules on witness examination specified in such letters rogatory.

67. To sum up, in any domestic litigation before Argentine federal courts, the production of documents held by the other party or the examination of witnesses will only be allowed within the limited scope provided by the Code of Civil and Commercial Procedure. In contrast, pursuant to the Hague Convention and the Inter-American Convention on Letters Rogatory, the production of evidence in Argentina in connection with foreign litigation could, at least to some extent, follow the rules of the court where such litigation is being conducted.

68. In light of the foregoing, it is my opinion that American courts offer a significant advantage vis-à-vis Argentine courts because they allow for the ample production of substantial documentary and witness evidence, even before the commencement of the proceedings, which is severely restricted in the Argentine Republic.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Buenos Aires, Argentina, October 16, 2015.

[Signature]

—————————————

Dr. Gustavo A. Naveira

---

[57] Civil Court of Appeals of the City of Buenos Aires, Division I, February 24, 2000, "*Garramone, Esteban L. y otro c. Solanet, Rodolfo y otro s/ exhorto.*"



## <u>CERTIFICATE OF ACCURACY</u>

IT IS HEREBY CERTIFIED THAT THE TR COMPANY S.A. is a corporation professionally engaged in the rendering of foreign language translation services; that it has translated the following document: *Declaración de Gustavo A. Naveira* and that the foregoing translation is, to the best of our knowledge and belief, a true and accurate rendition into English of the original document, which was written in Spanish.

In the city of Buenos Aires, on this 18th day of October, 2015.

THE TR COMPANY S.A.

TRANSLATION SERVICES

Signed by:

_____

Ms Cynthia Farber
Certified Sworn Translator
License recorded on Page 226: Book XV.
Registered with the Translators Bar Association
City of Buenos Aires
C.T.P.C.B.A. No.5402

CORTE DE DISTRITO DE LOS ESTADOS UNIDOS DE AMÉRICA

DISTRITO SUR DE NUEVA YORK  (Causa Civil N° 15 CV 2739)

PETERSEN ENERGÍA INVERSORA, S.A.U. y
PETERSEN ENERGÍA, S.A.U.,

Demandantes,

-vs-

REPÚBLICA ARGENTINA e YPF S.A.

Demandadas.

## DECLARACIÓN DE GUSTAVO A. NAVEIRA

1. De conformidad con el Artículo 28 U.S.C. § 1746, yo, Gustavo Adolfo Naveira, declaro lo siguiente:

2. Soy abogado y estoy habilitado para ejercer la profesión de abogado en la República Argentina. Desde el año 1979 hasta el año 1984 me desempeñé como Juez Nacional de Primera Instancia en lo Comercial y desde el año 1984 hasta el año 1986 me desempeñé como Juez de la Cámara Nacional de Apelaciones en lo Comercial. En 1997 fui designado Subsecretario de Justicia en el Ministerio de Justicia de la Nación Argentina, y posteriormente fui designado Secretario de Asuntos Técnicos y Legislativos del mismo ministerio, cargo en el que me desempeñé hasta 1999. Adjunto como **Anexo A** copia de mi *curriculum vitae* que da cuenta de mis antecedentes profesionales y académicos.

3. La representación letrada de Petersen Energía Inversora, S.A.U. y Petersen Energía, S.A.U (las "Demandantes") ha solicitado mi opinión legal en una demanda iniciada contra la República Argentina ("Argentina") e YPF S.A. ("YPF") ante la Corte de Distrito de los Estados Unidos de América, Distrito Sur de Nueva York. Mi compensación se basa en el tiempo empleado en preparar este informe. Dicha compensación no depende para nada del resultado que se pueda obtener en el juicio iniciado por las Demandantes o en cualquiera de las etapas de ese proceso.

1

4. Para preparar este informe he revisado los siguientes documentos: (i) la demanda presentada por las Demandantes ante la Corte de Distrito de los Estados Unidos de América, Distrito Sur de Nueva York, el 8 de abril de 2015, (ii) la declaración de Carlos Gustavo Pistarini firmada el 28 de agosto de 2015, junto con sus Anexos A y B; y (iii) el escrito presentado por Argentina ante la Corte de Distrito de los Estados Unidos de América, Distrito Sur de Nueva York, el 8 de septiembre de 2015.

5. Específicamente, se me ha requerido que preste declaración como experto sobre las siguientes cuestiones:

    A. Si la independencia o imparcialidad del Poder Judicial argentino se encuentra amenazada por medidas o actos adoptados por otros poderes del Estado Nacional.

    B. Si litigar contra la República Argentina ante tribunales argentinos implica mayores demoras que demandar a particulares.

    C. Explique cuáles son los costos de litigar en Argentina.

    D. Si en el sistema procesal argentino existe un instituto procesal equivalente al *pre-trial discovery* de los Estados Unidos de América y, en su caso, cuáles son los medios para obtener prueba documental o de testigos.

## A. *Si la independencia o imparcialidad del Poder Judicial argentino se encuentra amenazada por medidas o actos adoptados por otros poderes del Estado Nacional.*

6. Como expongo a continuación, existen razones objetivas para sostener que la independencia y la imparcialidad del Poder Judicial argentino se encuentran seriamente amenazadas a raíz de las numerosas medidas que han adoptado otros poderes del Estado Nacional en los últimos años, principalmente el Poder Ejecutivo Nacional. Esa falta de independencia e imparcialidad afectan los juicios en los que el Gobierno nacional o los gobiernos provinciales con él alineados tienen un interés creado. En este informe no pretendo agotar esas numerosas medidas, sino simplemente destacar algunas de las que considero ejemplifican claramente mi conclusión.

7. Ya en el año 2005, una encuesta realizada entre abogados argentinos demostró que casi el 90% de los interrogados creían que los tribunales del país carecen de

independencia frente a los Poderes Ejecutivo y Legislativo[1]. Con posterioridad, esa percepción solo se ha agudizado.

8. Desde el año 2013 el Poder Ejecutivo nacional, bajo el pretexto de lograr la denominada "Democratización de la Justicia", viene impulsando la sanción de un conjunto importante de leyes a través de las cuales ha propiciado modificaciones que, lejos de mejorar el sistema judicial argentino, persiguen politizar el Poder Judicial y crear una estructura que responda ciegamente a los intereses del Gobierno.

9. Entre esas iniciativas destaco, entre otras, la creación de tribunales intermedios y la reforma del Consejo de la Magistratura. Concretamente, las reformas al Consejo de la Magistratura, que tiene a su cargo la pre-selección de jueces nacionales y federales, la imposición de sanciones a los jueces y en general la administración de justicia, fueron ampliamente cuestionadas porque tendían claramente a politizar dicho organismo, afectándose así directamente la independencia de los jueces[2].

10. En relación con estas reformas, la Federación Latinoamericana de Magistrados emitió una declaración el 18 de abril de 2013 en la que sostuvo que: *"Los cambios propuestos [por el Poder Ejecutivo nacional] importan un grave peligro para la existencia misma de la República Argentina. Siendo los perjudicados los ciudadanos argentinos ya que los proyectos de ley presentados alteran sustancialmente el funcionamiento de la Justicia y de ninguna manera atienden a una reforma que amplíe las posibilidades de ejercer derechos, por el contrario, cercenan la independencia del Poder Judicial"[3].*

11. En ese mismo sentido, la Comisión de Justicia y Paz de la Conferencia Episcopal Argentina indicó que: *"La utilización del poder estatal o la amenaza de su uso, para torcer la voluntad de los jueces a favor de los intereses del Gobierno, merecen la mayor condena y no pueden ser nunca justificadas alegando supuestas o reales presiones pretendidamente simétricas ejercidas por privados. La elección popular de los miembros del Consejo de la Magistratura es un mecanismo que parece reñido con la norma constitucional, y que en todo caso convertirá a un órgano que debe ser técnico y riguroso, en escenario de luchas partidarias. La politización de los jueces es inadmisible y conspira contra la neutralidad que cabe exigir de ellos. La anunciada creación de nuevas instancias*

---

[1] Noticia periodística publicada en Diario La Nación del 21 de octubre de 2005, disponible en http://www.lanacion.com.ar/749400-para-el-874-de-los-abogados-la-justicia-no-es-independiente.

[2] GELLI, María Angélica, " *Las inconstitucionalidades de la ley del Consejo de la Magistratura*", La Ley, 26 de junio de 2013, en donde afirma que la reforma vulnera la independencia e imparcialidad judicial así como las garantías jurisdiccionales de los habitantes de la Nación.

[3] Declaración de la Federación Latinoamericana de Magistrados de fecha 18 de abril de 2013.

*judiciales (Cámaras de Casación) implica una mayor demora en la solución de los juicios, que ya son demasiados lentos. Por lo tanto, es lícito sospechar que lo realmente buscado no es agilizar los procesos, sino crear tribunales superiores a los existentes, con jueces íntegramente designados a gusto de las actuales mayorías, que puedan modificar la jurisprudencia en un sentido favorable a la autoridad política*[4].

12. Asimismo, la Relatora Especial de las Naciones Unidas sobre la independencia de los jueces y abogados, Gabriela Knaul, expresó: *"Hago un llamado a la Argentina a que establezca procedimientos claros y criterios objetivos para la destitución y sanción de los jueces, y que asegure un recurso efectivo a los jueces para impugnar dichas decisiones, en aras de salvaguardar la independencia judicial"*[5].

13. Cuando la Corte Suprema de Justicia de la Nación ("CSJN") intentó poner límites al avasallamiento del Poder Judicial argentino, declarando la inconstitucionalidad de diferentes artículos de la Ley 26.855 sobre el Consejo de la Magistratura por considerarlos contrarios al artículo 114 de la Constitución Nacional argentina,[6] esa decisión dio lugar al anuncio por parte del Poder Ejecutivo Nacional de nuevas iniciativas tendientes a "profundizar" las reformas al Poder Judicial.

14. Entre esas nuevas medidas impulsadas por el Poder Ejecutivo Nacional pueden mencionarse las propuestas de quitar a la CSJN la administración de los fondos del Poder Judicial[7], de crear un nuevo tribunal con competencia exclusiva para pronunciarse sobre la constitucionalidad de las leyes[8], e, incluso, de ampliar el número de miembros de la CSJN [9] . Esta última medida permitiría a la Administración nombrar aún más jueces adeptos.

---

[4] Declaración de la Comisión de Justicia y Paz de la Conferencia Episcopal Argentina de fecha 6 de marzo de 2013, publicada en El Derecho, ejemplar del miércoles 17 de abril de 2013, p. 22.

[5] Declaración del 30 de abril de 2013, publicada en http://www.ohchr.org/SP/NewsEvents/Pages/DispalyNews.aspx?NewsID=13275&LangID=S.

[6] CSJN, *"Rizzo, Jorge Gabriel s/acción de Amparo c/Poder Ejecutivo Nacional, ley 26.865, medida cautelar"* (Expte. N° 3034/13), sentencia del 18 de junio de 2013, R. 369 XLIX.

[7] Proyecto de ley suscripto por el Diputado Carlos Kunkel y otros, el 26 de junio de 2013, Expte. N° 4935-D-2013.

[8] Noticia periodística publicada en Diario La Nación del 10 de julio de 2013, disponible en http://www.lanacion.com.ar/1599827-un-senador-kirchnerista-quiere-crear-un-tribunal-de-constitucionalidad-para-eludir-a-la-corte.

[9] Noticia periodística por Adrián Ventura publicada en Diario La Nación del 27 de abril de 2013, disponible en http://www.lanacion.com.ar/1576835-zaffaroni-propuso-ampliar-la-corte; noticia periodística publicada en Diario Clarín el 26 de abril de 2013, disponible en http://www.clarin.com/politica/Zaffaroni-Corte-Reforma_judicial_0_908309336.html; noticia periodística publicada en Diario El Cronista del 27 de abril de 2013, disponible en http://www.cronista.com/economiapolitica/Zaffaroni-ratifico-su-propuesta-de-ampliar-la-Corte-Suprema-20130427-0004.html.

15. Recientemente, el más alto Tribunal Penal de la Argentina, la Cámara Federal de Casación Penal, Sala II, advirtió que *"los arts. 1° y 2° de la ley 27.145, en cuanto confieren al Consejo de la Magistratura de la Nación la atribución de designar subrogantes en caso de apartamiento del juez interviniente por mayoría absoluta de los miembros presentes, entre un juez o jueza de igual competencia de la misma jurisdicción o con un miembro de la lista de conjueces, son inconstitucionales, pues no superan el estándar mínimo de razonabilidad al confrontarse con las directrices de la Constitución Nacional y de los pactos internacionales con jerarquía constitucional relativas a los principios de juez natural, imparcialidad y de independencia judicial, así como las propias finalidades del Régimen de Subrogancias"*[10].

16. La tendencia a avasallar al Poder Judicial se acentuó recientemente como lo demuestra el "proceso investigativo" que se inició al Juez de la CSJN, Dr. Carlos Fayt, impulsado por el Jefe del Gabinete de Ministros del Poder Ejecutivo nacional, Aníbal Fernández, con el supuesto fin de evaluar su capacidad psicofísica pero con el claro objetivo de deshacerse de un Juez que no era afín al Gobierno. En esas circunstancias, el Diputado del partido opositor PRO (Propuesta Republicana), Dr. Pablo Tonelli, sostuvo que: *"La única imputación que se le hace al Dr. Fayt es la de ser viejo. Y ser viejo no es una causa que esté prevista para iniciar un juicio político"*[11]. Si bien el partido opositor rechazó la maniobra del Gobierno enérgicamente, el objetivo de deshacerse del Juez Fayt fue conseguido ya el que el mismo decidió renunciar a su cargo tras el embate del Gobierno.

17. El caso del Juez Federal Penal Dr. Claudio Bonadío también merece ser destacado. Con los votos del partido oficialista (Frente para la Victoria) y por pedido del Secretario de Justicia de la Nación, Dr. Julián Alvarez, el Consejo de la Magistratura redujo el sueldo del magistrado en un 30 %, luego de que el Dr. Bonadío decidiera ordenar la presentación de las declaraciones juradas de la Presidente Cristina Kirchner y de sus hijos Máximo y Florencia.[12] La CSJN posteriormente revocó esa quita salarial teniendo en cuenta que el plazo reglamentario para tratar los procesos disciplinarios como el iniciado contra el Juez Bonadío se hallaba vencido a la fecha de la sanción. Pero la medida adoptada

---

[10] Cámara Federal de Casación Penal, Sala II, caso caratulado *"M.M.C. s/falta de mérito"*, del 13 de julio de 2015.

[11] Ver noticia periodística de Infobae, *"El kirchnerismo logró aprobar un "proceso investigativo" para evaluar al juez Carlos Fayt"*, del 12 de mayo de 2015, disponible en http://www.infobae.com/2015/05/12/1728138-el-kirchnerismo-logro-aprobar-un-proceso-investigativo-evaluar-al-juez-carlos-fayt.

[12] Ver noticia periodística de La Nación, "Consejo de la Magistratura: el kirchenirsmo le baja 30% el sueldo al juez que investiga el hotel de Cristina", del 3 de diciembre de 2014, disponible en http://www.lanacion.com.ar/1749030-el-consejo-de-la-magistratura-trata-la-denuncia-del-gobierno-contra-claudio-bonadio.

por el Gobierno no deja de ser demostrativa de los acosos que llegan a recibir jueces y tribunales que adoptan medidas contrarias a los intereses del Gobierno.

18. No menos emblemático de la apuntada tendencia al avasallamiento, en este caso de un representante del llamado Ministerio Público Fiscal, es el caso del Fiscal Dr. José María Campagnoli a quien la Procuradora General de la Nación, Dra. Alejandra Gils Carbó, suspendió en su cargo y le formó jury de enjuiciamiento invocando una supuesta extralimitación del Dr. Campagnoli al investigar a la firma Austral Construcciones y a su dueño, Lázaro Báez, íntimamente vinculado con el Gobierno nacional. Al mismo tiempo, la Procuradora desmanteló la fiscalía a cargo del Dr. Campagnoli y resdistribuyó el personal de la misma en otras oficinas[13].

19. El caso del Fiscal Federal Dr. Alberto Nisman tiene un perfil de gravedad institucional particularmente relevante en esta exposición. El Dr. Nisman fue un Fiscal argentino que tuvo a su cargo la investigación de la causa del atentado contra el edificio de la AMIA (Asociación Mutual Israelita Argentina) ocurrido en julio de 1994. El 13 de enero de 2015 el Dr. Nisman denunció penalmente a la Presidente Cristina Fernández de Kirchner y a otros funcionarios de su gobierno atribuyéndoles la intención de encubrir a un grupo de sospechosos en la causa AMIA mediante la firma del Memorandum de Entendimiento entre Argentina e Irán.

20. El 18 de enero de 2015 el Dr. Nisman fue encontrado muerto en su casa con un disparo en la cabeza horas antes de presentarse ante la Comisión de Legislación Penal de la Cámara de Diputados de la Nación que lo había citado para interrogarlo sobre los fundamentos de su denuncia en contra de la Presidente y de otros funcionarios. La denuncia del Fiscal Nisman fue poco tiempo después rechazada por el Juez Federal Daniel Rafecas.

21. Un mes después de la muerte del Fiscal Nisman, el 18 de febrero de 2015, miles de personas marcharon en silencio desde la Plaza del Congreso hasta la Plaza de Mayo en homenaje al fallecido Fiscal Nisman en mudo reclamo por el esclarecimiento de su muerte.

22. Muy recientemente, he tomado conocimiento por noticias periodísticas de que la Procuraduría de Criminalidad Económica y Lavado de activos (PROCELAC), a pedido de la Procuradora del Tesoro de la Nación, ha denunciado penalmente por supuesta estafa procesal a las compañías españolas que demandaron a la

---

[13] Ver noticia periodística de Infobae, "Suspendieron a José María Campagnoli, el fiscal que se animó a investigar a Lázaro Báez", del 12 de diciembre de 2013, disponible en http://www.infobae.com/2013/12/12/1530536-suspendieron-jose-maria-campagnoli-el-fiscal-que-se-animo-investigar-lazaro-baez.

República Argentina ante el CIADI por la confiscación de las Aerolíneas Argentinas, incluyendo en tal denuncia específicamente a abogados tanto americanos como argentinos que asesoran a esas compañías y que pertenecen al Estudio Jurídico King & Spalding. La denuncia penal fue publicitada por dos organismos del Gobierno, la PROCELAC y la Procuradora del Tesoro de la Nación, por diversos medios periodísticos e incluso convocaron una rueda de prensa para hacer público el anuncio. En esa rueda de prensa la Procuradora también se refirió críticamente al presente juicio de las Demandantes Petersen y al juez a su cargo, aún cuando los mismos no tienen vinculación alguna con la denuncia penal en sí misma[14].

23. La denuncia penal presentada por la PROCELAC incluye directamente a los abogados de King & Spalding, quienes también asesoran a las Demandantes en este proceso. Es evidente que si las aquí Demandantes se vieran obligadas a litigar ante tribunales argentinos no podrían hacerlo con la asistencia legal de esos mismos abogados, quienes han visto así amenazado, por la denuncia en su contra, el derecho reconocido por la Constitución Nacional argentina a ejercer libremente su profesión.

24. Ante este escenario particularmente relevante para el reclamo de las Demandantes Petersen, sumado a las críticas y presiones sobre funcionarios y magistrados del Poder Judicial argentino, algunos de ellos con sorprendente virulencia, es razonable suponer que, dado el elevado nivel de exposición pública de la cuestión debatida en este caso y el fuerte interés del Estado Nacional en obtener una resolución favorable, los jueces locales que eventualmente debieran resolver respecto de la responsabilidad que se le atribuye en la demanda al Estado Nacional, estarían expuestos a una considerable presión para fallar a favor de la Argentina. En ese contexto, la suerte de los planteos de las sociedades Demandantes estaría claramente condicionada por factores extrajurídicos.

25. Por lo demás, existen varios antecedentes en fallos recientes en los que los tribunales argentinos han tenido en cuenta muy especialmente factores extrajurídicos para decidir cuestiones que pueden presentar interés para el Gobierno. En esos casos, los tribunales han tenido en cuenta la importancia económica y posibles consecuencias del fallo a dictarse, en vez de restringirse a la procedencia o no del reclamo efectuado. Así por ejemplo, en el fallo de la Sala IV de la Cámara Contencioso Administrativo Federal, del 7 de octubre de 2014, en el caso *"YPF S.A. c/AES Uruguaiana Emprendimientos S.A. y otros s/recurso directo de organismo externo"*, en el tribunal hizo lugar a la medida cautelar

---

[14] La noticia fue publicada por numerosos medios periodísticos nacionales y la rueda de prensa fue incluso publicada en la página web de la Presidencia de la Nación el 14 de septiembre de 2015, disponible en http://prensa.argentina.ar/2015/09/14/60586-denuncian-posible-fraude-al-estado-en-el-juicio-ante-el-ciadi-por-la-expropiacion-de-aerolineas-y-austral.php.

solicitada por YPF para suspender el calendario procesal de la segunda etapa del arbitraje CCI que estaba en curso, y para ello utilizó el siguiente argumento: *"Si el recurso de nulidad no se resolviera y el arbitraje continuara su curso en violación de las garantías procesales de YPF, se afectaría seriamente el desenvolvimiento y las inversiones de YPF, agravando el actual déficit energético como consecuencia del retraso que se produciría en el programa de inversiones en curso para incrementar reservas y producción de hidrocarburos"*. Al argumentar de ese modo, el tribunal tuvo en cuenta consideraciones ajenas a la cuestión netamente jurídica que se le sometió y, en cambio, basó su decisión en fundamentos de tinte político y económico.

26. Asimismo, en los fallos de la Corte Suprema de Justicia de la Nación *"Claren Corporation c/ EN arts. 517/518 CPCC exequátur"*, del 6 de marzo de 2014 y *"Crostelli, Fernando y otros c/ EN M° de Economía (arts. 517/518 CPCC exequátur) –BONY"*, del 11 de noviembre de 2014, el más alto tribunal argentino rechazó ambos requerimientos de jueces extranjeros con invocación de la noción de orden público, y de la emergencia económica la que según ambos fallos justifica e impone el rechazo de acciones individuales de acreedores que desconocen las medidas de reestructuración de deuda pública dispuestas por el Estado Nacional.

27. Los antecedentes reseñados hacen razonable suponer que el tribunal argentino al que eventualmente se le sometiera en consideración el caso objeto de esta declaración adoptaría un enfoque similar al que inspiraron los fallos citados. De seguir esa línea de razonamiento, el tribunal abordaría su decisión con una predisposición negativa a la procedencia de la demanda interpuesta por las Demandantes, independientemente del derecho que corresponda a las Demandantes.

**B.** *Si litigar contra la República Argentina ante tribunales argentinos implica mayores demoras que demandar a particulares.*

28. Litigar contra el Estado Nacional argentino ante los tribunales argentinos implica demoras significativamente más prolongadas que las incurridas al litigar contra particulares.

29. Específicamente en casos de demandas contra el Estado Nacional ante tribunales argentinos, una vez que el juicio ha sido iniciado, el tribunal competente puede tardar varios meses en decidir si la demanda es admisible procesalmente. Una vez admitida la demanda, ésta debe ser notificada a la Procuración del Tesoro de la Nación, con 30 días hábiles de anticipación al traslado de la demanda. Luego del traslado de la demanda, el Estado Nacional dispone de un plazo de 60 días hábiles para contestarla.

30. Todo ello implica que normalmente transcurren entre 12 y 18 meses hasta que el Estado Nacional contesta la demanda. Normalmente transcurren más de 10 años hasta obtener una sentencia definitiva de la CSJN en demandas en contra del Estado argentino.

31. La propia declaración efectuada por uno de los testigos presentados por la República Argentina en este caso, el Dr. Carlos Pistarini, se refiere al caso *"San Martín José y otro c/PEN"* (una demanda iniciada en contra del Poder Ejecutivo Nacional por la expropiación de las acciones de Repsol en YPF), el cual constituye una muestra evidente de las demoras que mencioné anteriormente. En efecto, ese juicio en contra del Estado nacional se inició el 8 de agosto de 2012 y recién después de dos años pudo resolverse la cuestión relacionada con el tribunal competente para entender en ese caso. Este caso es un ejemplo claro que demuestra las demoras y dificultades procesales que las Demandantes deberían enfrentar si la demanda aquí planteada debiera presentarse en Argentina.

32. Aún más, existen demoras adicionales que ocurren durante la etapa de ejecución de la sentencia, en la cual, en teoría el Estado Nacional cuenta con dos años para cumplir la condena que implique una obligación de pago de suma de dinero. Este plazo de dos años resulta de la necesidad de incluir el monto de la sentencia en la ley de presupuesto sancionada anualmente, conforme lo establece el artículo 22 de la Ley 23.892. Lo cierto es que, una vez obtenida una setencia en contra del Estado nacional, resulta sumamente difícil efectivizar el cobro de la misma. En este sentido, comparto la posición sostenida por especializados comentaristas del fallo dictado por la Corte Suprema de Justicia de la Nación en el caso *"Grupo Clarín S.A. y otros c/Poder Ejecutivo Nacional y otro s/acción meramente declarativa"* del 29 de octubre de 2013, publicado en el diario de El Derecho nº 13.391 del 24-12-13, Dres. Alberto Bianchi y Estela Sacristán quienes señalan:

33. *"Cuando el voto de los jueces Lorenzetti y Highton de Nolasco dice que cualquier eventual perjuicio que pudiere sufrir el licenciatario como consecuencia de este proceso de desinversión podría ser reclamado con fundamento en los principios de la responsabilidad del Estado por su actividad lícita, están aludiendo a un mundo ideal, en el cual el Estado paga puntualmente los créditos emergentes de los fallos judiciales. Bien sabemos, sin embargo, que la realidad es muy diferente y que el cobro de las condenas pecuniarias contra el Estado en la Argentina de nuestros días es casi una quimera"*.[15]

---

[15] Comentario de los Dres. Alberto Bianchi y Estela Sacristán al fallo de la Corte Suprema de Justicia de la Nación en el caso *"Grupo Clarín S.A. y otros c/Poder Ejecutivo Nacional y otro s/acción meramente declarativa"* del 29 de octubre de 2013, publicado en el diario de El Derecho N° 13.391 del 24 de diciembre de 2013, ejemplar del 20 de febrero de 2014.

9

34. Como señalé anteriormente, en virtud de los artículos 20 y 21 de la Ley 24.624, las sentencias de condena pecuniaria en contra del Estado nacional no son ejecutables. Por el contrario, esas sentencias se pagan cuando el Estado decide – discrecionalmente– incorporarlas al presupuesto nacional.

C. **_Explique cuáles son los costos de litigar en Argentina._**

35. El costo de litigar ante los tribunales argentinos es sumamente considerable. Por ello, es probable que en caso de tener que litigar esta cuestión en Argentina, las aquí Demandantes terminarían pagando un monto quizás superior a cien millones de dólares en costas procesales para iniciar el caso y luego deberían afrontar más de cien millones de dólares en honorarios si lo perdieran.

36. En efecto, en Argentina las actuaciones judiciales se encuentran sujetas al pago previo de una tasa, denominada "tasa de justicia", que debe ser abonada al comienzo del proceso por la parte que inicia el pleito. En el ámbito federal (que a estos efectos también incluye a los principales tribunales de la Ciudad Autónoma de Buenos Aires), la tasa de justicia es del 3% (tres por ciento) del monto del reclamo[16].

37. Según la legislación que regula la organización del Poder Judicial, las sumas recaudadas en concepto de "tasa de justicia" constituyen recursos específicos y propios del Poder Judicial, que forman parte de su presupuesto anual de inversiones y gastos[17].

38. La tasa de justicia se determina de acuerdo al valor del objeto litigioso:

    (i) En los juicios en los que el objeto litigioso no tiene valor pecuniario el actor debe pagar $70 (pesos setenta) en concepto de tasa de justicia[18].

    (ii) Cuando el actor reclama el pago de una suma de dinero determinada ("monto determinado"), la tasa de justicia debe calcularse sobre el capital, la actualización monetaria y los intereses devengados que se reclamen al momento de la iniciación del proceso[19]. El actor debe pagar una tasa de justicia equivalente al 3% (tres por ciento) de ese total.

    (iii) Cuando el monto del reclamo no pueda ser determinado al comienzo del pleito ("monto indeterminable"), el actor debe abonar $70 (pesos setenta)

---

[16] Ley 23.898, artículo 2.

[17] Ley 23.898, artículo 3(a).

[18] Ley 23.898, artículo 6.

[19] Ley 23.898, artículo 4(a).

en concepto de tasa de justicia y el importe final de la misma se determinara con posterioridad, una vez terminado el proceso[20].

(iv) Cuando el actor reclama el pago de una suma de dinero que no se encuentra determinada pero puede serlo inicialmente ("monto determinable"), el actor debe pagar una tasa de justicia equivalente al 3% (tres por ciento) del monto estimado de capital más intereses. La estimación que realiza el actor puede ser cuestionada por el Fisco y es, en última instancia, determinada por el tribunal. En caso de que la estimación del actor sea sustancialmente menor a la que en definitiva se determine, el tribunal podrá imponerle una multa de entre el 5% y el 30% de la diferencia entre ambos montos[21].

39. Los tribunales generalmente adoptan criterios severos en cuanto a la exigencia del pago de la tasa de justicia, como así también en lo relativo a la determinación de su monto. En particular, los tribunales mantienen una postura restrictiva respecto de planteos que sostengan que un juicio no tiene un objeto litigioso susceptible de apreciación pecuniaria o de que el valor del objeto litigioso es "indeterminable". Este criterio ha sido resumido en doctrina del siguiente modo: "*La jurisprudencia está conteste en algo: No perdonar la tasa de justicia a nadie*"[22].

40. En la situación que analizamos, si la causa iniciada por los Demandantes contra el Estado Nacional fuera iniciada en la Argentina, es altamente probable que el tribunal, ya sea por pedido del Fisco o de oficio, considere que (i) el juicio es susceptible de apreciación pecuniaria y (ii) el valor del objeto litigioso puede ser determinado al comienzo del juicio (p. ej. que tiene "monto determinable"), mediante la aplicación de los parámetros previstos en los artículos 7 y 28 del Estatuto de YPF.

41. Dado que el valor involucrado en la demanda presentada por las aquí Demandantes involucraría varios miles de millones de dólares, la tasa de justicia ciertamente resultaría en un monto superior a los cien millones de dólares.

42. La tasa de justicia se vuelve exigible con la mera presentación de la demanda. El posterior abandono de la acción no implica la extinción de la obligación de abonar la tasa de justicia correspondiente.

---

[20] Ley 23.898, artículo 5, segundo párrafo.

[21] Ley 23.898, artículo 4(d).

[22] GORDILLO, AGUSTÍN, "*La implacable tasa de justicia*", publicado en La Ley 1995-E, 503. Este criterio de interpretación es consistente con el destino de las sumas recaudadas en concepto de tasa de justicia que, como ya fue explicado, constituyen recursos específicos y propios del Poder Judicial de la Nación.

43. Adicionalmente, de acuerdo al derecho procesal aplicable en el orden federal, el principio general es que la parte vencida en el juicio debe pagar todos los gastos judiciales, los cuales incluyen: (i) los honorarios de los abogados del vencedor y (ii) los honorarios de peritos. Sólo excepcionalmente el tribunal puede apartarse de este principio cuando las circunstancias del caso así lo justifiquen, debiendo expresar sus razones bajo pena de nulidad[23].

44. En este caso, los honorarios podrían ser de cientos de millones de dólares. Los honorarios son fijados por el tribunal según las normas que regulan esta cuestión, las que establecen porcentajes sobre el monto del reclamo y no sobre una base horaria[24]. Los honorarios legales de la representación letrada del vencedor, incluyendo los honorarios correspondientes al abogado y al procurador, deben ser fijados entre el 14% y el 28% del monto del reclamo ante el Juzgado de Primera Instancia[25]. A esta suma cabe adicionar los honorarios resultantes de las actuaciones ante la Cámara de Apelaciones y la Corte Suprema de Justicia de la Nación, que deben fijarse, para cada instancia entre el 25% y el 35% de la cantidad determinada para los honorarios de primera instancia[26]. Los costos se incrementarían en caso de que también tuviese intervención alguna de las recientemente creadas Cámaras Federales de Casación. En esa posible etapa serían aplicables los mismos porcentajes fijados para la regulación de los honorarios por actuaciones ante las Cámaras de Apelaciones. Los honorarios de los peritos también se fijan según porcentajes sobre el monto del reclamo, aunque inferiores a los expuestos[27]. En consecuencia, los honorarios profesionales de los abogados y peritos, en su conjunto, podrían ascender a cientos de millones de dólares.

45. Sólo excepcionalmente los tribunales pueden regular honorarios por debajo de los porcentajes legales[28]. De todas formas, con relación a los reclamos de las aquí Demandantes, y considerando que los tribunales calcularían su monto de acuerdo con los artículos 7 y 28 del Estatuto de YPF, incluso si los tribunales dejaran de lado los porcentajes legales, se llegaría igualmente a varios millones de dólares en concepto de honorarios.

---

[23] CPCCN, artículo 68.

[24] Ley 21.839 y sus normas complementarias.

[25] Artículos 7 y 9 de la Ley 21.839. Los honorarios totales establecidos por la actuación en Primera Instancia (comprendidos los del abogado, el procurador y los peritos de oficio) no pueden en conjunto superar el 25% del monto de la sentencia (anterior Código Civil argentino, art.505).

[26] Ley 21.839, artículo 14.

[27] Ver, por ejemplo, el Decreto-Ley N° 16638/1957 que regula los honorarios de los peritos.

[28] Ley 24.432, artículo 13.

46. A la luz de todo lo antes expuesto, la doctrina ha señalado que los costos de los litigios en Argentina constituyen una barrera al acceso a la justicia, dado que operan como un desincentivo para la promoción de demandas contra el Estado Nacional[29]. Sin embargo, el Estado Nacional no ha reconocido estas razones que pueden derivar en una efectiva denegación de justicia. La Argentina ha sido condenada por la Corte Interamericana de Derechos Humanos por el enorme monto de costas judiciales reclamado a un particular cuya demanda contra el Estado Nacional había sido rechazada[30].

47. La legislación procesal en el orden federal permite que las personas que acrediten carecer de recursos soliciten la concesión del denominado "beneficio de litigar sin gastos". Este beneficio implica una dispensa –total o parcial– del pago de la tasa de justicia y demás costas judiciales. Sin embargo, en principio, el beneficio de litigar sin gastos no suele ser concedido a personas jurídicas. Al respecto, la CSJN ha sostenido que en este tipo de casos "*la concesión debe ser apreciada con suma prudencia y estrictez*"[31].

48. Concordantemente, la CSJN también ha sostenido que es posible asumir que las sociedades comerciales que reclaman cuantiosas sumas de dinero pueden solicitar un préstamo para pagar la tasa de justicia, por lo que no cabe otorgar en tales supuestos el beneficio de litigar sin gastos[32]. Esto es lo que probablemente ocurriría en el caso de que las aquí Demandantes debieran iniciar el proceso en contra del Estado Nacional ante tribunales argentinos.

49. Por lo expuesto, como señalé anteriormente, es probable que en caso de tener que litigar esta cuestión en Argentina, las aquí Demandantes deban pagar un monto superior a cien millones de dólares en costas procesales para iniciar el caso y podrían afrontar más de cien millones de dólares en honorarios si lo perdieran.

---

[29] MAIRAL, HÉCTOR A., "*El silencio de los tribunales argentinos*", Res Pública Argentina, N° 2007-3, p. 7. Una traducción al inglés de este artículo titulada "The Silence of the Argentine Courts" puede ser consultada en http://www.iili.org/gal/documents/HectorMairal.ThesilenceoftheArgentinecourts.pdf.

[30] Corte Interamericana de Derechos Humanos, "*Cantos c. Argentina*", sentencia del 28 de noviembre de 2002, Serie CN° 97.

[31] CSJN, "*Estructuras Taft S.A. c. Provincia de Tucumán*", sentencia del 20 de octubre de 1996, publicada en JA 1997-I-74.

[32] CSJN, "*Coihue S.R.L. c/ Santa Cruz, Provincia de s/ beneficio de litigar sin gastos*", sentencia del 11 de julio de 2006, publicada en Fallos 329:2719.

**D. Si en el sistema procesal argentino existe un instituto procesal equivalente al pre-trial discovery de los Estados Unidos de América y, en su caso, cuáles son los medios para obtener prueba documental o de testigos.**

50. El Código Procesal Civil y Comercial de la Nación ("CPCCN") que rige en los tribunales federales de la República Argentina no prevé un mecanismo similar al *pre-trial discovery* de los Estados Unidos de América. En realidad, la jurisprudencia y la doctrina argentinas sostienen que este procedimiento es ajeno al derecho argentino[33].

51. Sólo excepcionalmente un juez argentino puede ordenar la producción de prueba en una etapa preliminar del proceso, pero tal situación difícilmente puede asimilarse a la producción de documentos o declaraciones testimoniales que permite el *pre-trial discovery*. Esa limitación se ve aún más agravada porque los pedidos de documentación deben referirse a documentos específicamente identificados por el solicitante con precisión meticulosa. Asimismo, las sanciones previstas para litigantes que se niegan a presentar la documentación solicitada por la contraparte son bastante limitadas, lo que permite que muchos litigantes retengan documentación sin sufrir consecuencias considerables.

52. Adicionalmente, el CPCCN prevé que la prueba debe ofrecerse por el demandante en su demanda y por el demandado en su contestación[34].

53. Entre otros medios de prueba contemplados en el CPCCN se encuentra la facultad del tribunal de intimar a una parte a acompañar al proceso documentos identificados por la parte contraria o de solicitar la citación de testigos[35]. Tal intimación y citación son realizadas por el juez de la causa en la etapa de prueba.

1.    Obtención de documentos.

54. El régimen procesal argentino de obtención de documentos es restrictivo en comparación con la descripción que se me ha hecho del sistema norteamericano. En el sistema procesal argentino los documentos cuya presentación puede ser solicitada a la contraparte deben ser individualmente identificados por la parte requirente. La parte requirente no puede solicitar a su contraparte la presentación

---

[33] CSJN, *"Rudaz Bissón, Juan Carlos c/ Editorial Chaco S.A.s/ il1demnización de daños y perjuicios"*, Fallos 321.667 (señalando que el derecho argentino no tiene un instituto análogo al discovery period de los Estados Unidos de América); Cámara Nacional en lo Civil y Comercial Federal, Sala II, *"R., J.J. v. LR3 Radio Belgrano y otros"* del 10/02/1995, JA 1997-I-211 (indicando que en el derecho argentino no se aplica el discovery period de los Estados Unidos de América); y FEUILLADE, MLLTON C., *"La prueba en el proceso can elementos extranjeros"*, JA 2008-IV-1516.

[34] CPCCN, artículo 333.

[35] CPCCN, artículo 388.

de categorías o clases de documentos [36]. Además, la presentación de los documentos no constituye una obligación de la parte requerida, sino una simple carga. Por tal motivo, en caso de que la parte requerida no presente los documentos, ello constituirá una mera presunción en su contra sólo si, basándose en otros elementos de juicio, resultare verosímil la existencia y contenido del documento[37].

55. Un proceso judicial normalmente comienza mediante la interposición de la demanda. Sin embargo, excepcionalmente, el proceso puede comenzar con la solicitud del actor de producir ciertas pruebas de manera anticipada, esto es, antes de la interposición de la demanda[38].

56. El pedido de prueba anticipada solo procede si existen motivos fundados para temer que la producción de la prueba pudiera resultar imposible o muy dificultosa durante el período de prueba. Este procedimiento es de carácter excepcional[39] y no tiene como finalidad preparar pruebas para la demanda, sino que intenta conservar ciertas pruebas cuya producción resultase imposible o muy dificultosa en el momento procesal oportuno[40]. La prueba documental que puede producirse de manera anticipada incluye la exhibición, resguardo o secuestro de documentos debidamente individualizados con efectos conservatorios. Sólo puede solicitarse

---

[36] Al respecto, la doctrina argentina ha señalado que: "*La intimación a presentar la documentación debe ser enunciada con precisión, tanto en lo atinente a la individualización material de la pieza cuya agregación se exige, como a las consecuencias de su falta de presentación, expresamente previstas en la norma*" (CARAMELO DIAZ, GUSTAVO, Código Procesal Civil y Comercial de la Nación. Concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial, ELENA L HIGHTON - BEATRIZ A. AREÁN (Dirección), Tomo 7, Hammurabi, Buenos Aires, 2007, p. 648).

[37] Al respecto, la doctrina ha dicho que: "Por ser una carga, el silencio o la negativa del requerido sólo lo exponen al riesgo eventual de generar una presunción en contra de sus intereses en el proceso, pero no autorizan a la adopción de medidas compulsivas dirigidas a la incorporación del documento al trámite de la causa, ni a la aplicación de sanciones" (CARAMELO DIAZ, GUSTAVO, Código Procesal Civil y Comercial de la Nación. Concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial, ELENA L HIGHTON - BEATRIZ A. AREÁN (Dirección), Tomo 7, Hammurabi, Buenos Aires, 2007, p. 648).

[38] CPCCN, artículo 326.

[39] "*El aseguramiento de pruebas en los términos del art. 326 del Cod. Proc. Civ. y Com. de la Nación constituye una vía de excepción que solo debe admitirse cuando se comprueba que el proponente se halla expuesto a perder su probanza o que la misma le resultará imposible o de muy difícil realización en una oportunidad posterior, lo que implica que debe extremar la explicación de las razones que lo hagan viable y acreditar la existencia de los motivos que invoca a su favor*" (Cámara Nacional Federal Civil y Comercial, Sala I, "*Domnicz, José y otro v. Camino del Atlántico S.A.*",12 de noviembre de 2002, DJ 2003-1-944).

[40] CNCom, "*Chiri S.A. y otros c. House of Fuller*", Sala A, 23 de diciembre de 1998, LL 1998-D-240. La producción de la prueba anticipada requiere de previa citación a la contraria. De no ser posible y existiendo razones de urgencia que lo justifiquen, esta citación podrá ser suplida por la intervención del Defensor de Ausentes. Ver ELENA I. HIGHTON - BEATRIZ A. AREÁN (Dirección), Código Procesal Civil y Comercial de la Nación. Concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial, Tomo 6, Hammurabi, Buenos Aires, 2006, p. 131.

el secuestro de documentos particulares, específicamente determinados, y no categorías o clases de documentos.

57. Asimismo, con anterioridad a la interposición de la demanda, el actor puede solicitar la producción de diligencias preliminares[41]. Estas también son de carácter excepcional[42] y tienen como finalidad la obtención de información o documentación, siempre que dicha información o documentación no pudiera ser obtenida a través de otro medio. Los ejemplos dados por el CPCCN y la jurisprudencia se refieren exclusivamente a documentos específicos previamente identificados[43].

2. Interrogatorio de testigos y absolución de posiciones.

58. De acuerdo con el CPCCN[44], el interrogatorio de los testigos está sujeto a reglas determinadas y sigue una práctica judicial. Según estas reglas y prácticas, en los procesos ante los tribunales federales los testigos no son interrogados –ya sea directamente o mediante repreguntas de la contraparte– por los abogados de las partes. Por el contrario, la parte que propone el testigo presenta sus preguntas por escrito al tribunal antes de la audiencia testimonial[45]. Normalmente, es un funcionario del tribunal, y no el juez (quien por lo general no se encuentra presente en la audiencia), quien realiza las preguntas al testigo, literalmente o modificadas, según el funcionario lo considere pertinente. Una vez que el testigo ha contestado esta primera ronda de preguntas, el abogado de la otra parte puede proponer, oralmente, sus propias preguntas para que el tribunal las formule al testigo. El tribunal decide si corresponde o no realizar estas preguntas al testigo, ya sea literalmente o modificadas[46].

59. Los funcionarios públicos, incluso aquellos de jerarquía media como subsecretarios[47], no están obligados a declarar personalmente ante el tribunal, sino que pueden presentar una declaración escrita conforme al interrogatorio que reciban por escrito.

---

[41] CPCCN, artículo 323.

[42] CNCom, *"Sistemas Médicos S.A. c. St. Jude Medical"*, Sala B, 16 de marzo de 1995, LL1996-B-158.

[43] Por ejemplo, el requirente que invoque su condición de heredero, coheredero o legatario, puede requerir a la justicia la exhibición del testamento si no puede obtenerlo por otros medios; en caso de evicción, el enajenante o adquirente puede requerir que se exhiban los títulos u otros instrumentos referentes a la cosa vendida.Ver en este sentido CPCCN, artículo 323.

[44] CPCCN, artículos 439-447.

[45] CPCCN, artículo 429.

[46] CPCCN, artículo 442.

[47] CPCCN, artículo 455. CSJN, Acordada de fecha 20 de diciembre de 1967.

60. La única prueba testimonial que puede producirse antes de la presentación de la demanda es la declaración de testigos de muy avanzada edad, o que estén gravemente enfermos o próximos a ausentarse del país[48].

61. Una parte en un proceso judicial no puede ser llamada a declarar como testigo en su propia causa. Una parte puede requerir que su contraparte sea convocada, como parte y no como testigo, a declarar oralmente ante el tribunal con motivo de las cuestiones discutidas en el litigio, lo que se denomina como "absolución de posiciones"[49]. En el caso de las personas jurídicas, como por ejemplo el Estado Nacional, es usualmente su representante legal, o alguien designado por aquel, quien declara en representación de la entidad. Este medio de prueba sólo puede ser requerido una vez que la demanda ha sido presentada.

62. Al declarar en este carácter (es decir como parte y no como testigo), las partes no cometen perjurio si no dicen la verdad, ya sea en un caso de naturaleza penal o civil[50].

63. En los procesos contra el Estado Nacional, el funcionario público competente para prestar este tipo declaraciones en representación del Estado Nacional no está obligado a comparecer ante el tribunal para declarar, sino que presenta su declaración por escrito[51]. El Decreto 1102/86 delegó en los abogados del Estado Nacional la facultad de presentar estas declaraciones escritas[52]. De acuerdo a un ex Subprocurador del Tesoro, generalmente esto significa que dichas declaraciones son preparadas por el mismo abogado que preparó la contestación de la demanda, con lo que, en la práctica, se le otorga así una nueva oportunidad al Estado Nacional para modificar o ampliar los argumentos presentados en la contestación de la demanda[53].

64. Las reglas mencionadas en los puntos precedentes son obligatorias para los tribunales federales en los procesos judiciales iniciados en la Argentina.

---

[48] CPCCN, artículo 326(1).

[49] CPCCN, artículos 404-425.

[50] FALCÓN, ENRIQUE M., *Tratado de Derecho Procesal Civil, Comercial y de Familia*, III, Rubinzal Culzoni, Buenos Aires, 2006, p. 125 (explica que bajo el derecho argentino, las partes pueden "mentir libremente" al declarar incluso bajo juramento, sin ningún tipo de responsabilidad penal); PALACIO, LINO ENRIQUE, *Derecho Procesal Civil*, IV, 4° Ed., Abeledo Perrot, Buenos Aires, 2011, p. 442 (sostiene que el derecho argentino no prevé una sanción específica contra las partes para el caso de perjurio).

[51] CPCCN, artículo 407.

[52] Procurador del Tesoro de la Nación, el subprocurador del Tesoro de la Nación y los directores de los servicios jurídicos de los ministerios, secretarías y demás dependencias de la administración pública nacional.

[53] GARCIA PULLÉS, FERNANDO RAÚL, *Tratado de lo contencioso administrativo*, II, Hammurabi, Buenos Aires, 2004, p. 661.

65. Con relación a la producción ante tribunales federales argentinos de pruebas ordenadas en procesos judiciales que tramitan en el exterior, la Argentina y los Estados Unidos de América son parte de la Convención de la Haya sobre la Obtención de Pruebas en el Extranjero en Materia Civil o Comercial[54] y de la Convención Interamericana sobre Exhortos y Cartas Rogatorias[55]. Estas convenciones establecen que, en principio, el juez que tramite un exhorto debe aplicar la legislación de su país en lo que se refiere a los métodos y procedimientos a seguir. Sin embargo, ante la solicitud del juez requirente puede seguirse un método o procedimiento especial, si éste no es incompatible con la legislación interna del Estado requerido[56]. La Justicia argentina ha hecho lugar a un pedido de un tribunal de los Estados Unidos de América de producir prueba testimonial bajo los términos previstos en el exhorto[57].

66. A la luz de lo antes expuesto, la producción de pruebas en la Argentina en virtud de un exhorto emitido por un tribunal de los Estados Unidos de América podría seguir las reglas sobre prueba testimonial especificadas en ese exhorto.

67. En conclusión, en cualquier proceso judicial iniciado ante tribunales federales de la Argentina, la obtención de prueba documental en poder de la contraparte o el interrogatorio a testigos sólo se permiten con el limitado alcance previsto en el CPCCN. Por el contrario, si el juicio tramita en el exterior, de acuerdo con la Convención de la Haya y con la Convención Interamericana sobre Exhortos y Cartas Rogatorias, la producción de prueba en la Argentina podría, al menos en alguna medida, seguir las reglas del tribunal extranjero ante el cual se desarrolla el proceso.

68. Por lo expuesto anteriormente, entiendo que los tribunales americanos ofrecen una ventaja significativa frente a los tribunales argentinos, porque permiten obtener numerosas pruebas documentales y testimoniales de manera amplia, incluso con anterioridad a la iniciación de un juicio, lo cual se encuentra sumamente restringido en la República Argentina.

Dejo constancia, bajo pena de perjurio bajo las leyes de los Estados Unidos de América, que lo anterior es cierto y verdadero según mi leal saber y entender.

---

[54] Ley 23.480.

[55] Ley 23.503.

[56] DATES, LUIS E., *"Cooperación judicial internacional procesal en materia probatoria"*, publicado en La Ley 2007-D, 1150; FEUILLADE, MILTON C., *"La prueba en el proceso con elementos extranjeros"*, publicado en La Ley 2009-A, 1197.

[57] CNCiv, Sala I, 24.02.00, *"Garramone, Esteban L. y otro c. Solanet, Rodolfo y otro s/ exhorto"*.

En Buenos Aires, Argentina, a los 10 días del mes de octubre de 2015.

_____

Dr. Gustavo A. Naveira

# EXHIBIT A

## CURRICULUM VITAE

## I.- PERSONAL INFORMATION

1) Last and first names

**NAVEIRA, Gustavo Adolfo**

2) Place and date of birth

Buenos Aires, Republic of Argentina

September 9, 1945

3) Professional Address

Bouchard 680, piso 5º, Buenos Aires.

Tel. 54-11-5272- 7000, FAX.  54-11-5272-7001

E-mail: gnaveira@ntmdallcom

## II.- UNIVERSITY DEGREE

Lawyer.

Class 1970, from the School of Law and Social Sciences, Universidad de Buenos Aires.

## III.- OFFICES HELD IN THE JUDICIARY

- Clerk of the First Instance National Court in Commercial Matters No. 20, appointed on 30-04-70.
- Clerk of Chamber B of the National Commercial Court of Appeals of the City of Buenos Aires.
- First Instance National Judge in Commercial Matters of the City of Buenos Aires presiding Court No. 15, appointed on 7-05-79, with the

agreement of the Honorable National Senate under Decree No. 1530 dated 21-05-84.

- Judge of the National Commercial Court of Appeals of the City of Buenos Aires, Chamber B, appointed under Decree No. 3228 dated 30.09.84, with agreement of the Honorable National Senate.

## IV.- <u>OFFICES HELD IN THE NATIONAL MINISTRY OF JUSTICE</u>

- National Undersecretary of Justice, appointed on 01-07-97, Decree No. 600.
- Secretary of Technical and Legislative Affairs of the Ministry of Justice, appointed on 29-10-97, Decree No. 1127.
- Member of the Executive Committee of the School of Mediation, Resolution No. 200 dated 16.03.98.
- Member of the Advisory Committee of the Center for Social-Legal Studies, Resolution No. 675 dated 21.09.98.
- Alternate Representative and Executive Secretary of the Building Infrastructure Committee of the National and Federal Judiciary, appointed on 25.03.98, Ministry of Justice Resolution No. 228. As such, he lead a team of lawyers, engineers and architects who prepared the Terms and Conditions for National and International Public Bidding Process No. 4/99 and 5/99 for the construction of the Courts City.
- Chairman of the Award Committee in the National Bidding Process for Preliminary Designs for the Courts City.

## V.- <u>PUBLICATIONS</u>

- ***Algunas notas sobre el art. 48 de la ley 24.522*** (ED, 28.09.95) (written together with attorneys Marta E. Acuña and Edgardo Daniel Truffat and accountant Jorge E. Basile).

- ***El arancel del art. 32 de la ley 24.522: Demasiadas dudas, escasas certezas*** (ED, 28.11.95) (written together with attorneys Jorge Basile and Edgardo Daniel Truffat).

- ***Proyectos de reforma a la ley 24.522. Cuadro Comparativo. Comentario a la informalmente llamada " Ley de fe de erratas "*** (E.D.: Legislación Argentina, Boletín Nro. 18) (written together with attorneys Jorge Emilio Basile and Edgardo Daniel Truffat).

- ***Comentarios al proyecto del senador San Millán de reforma del art. 202 de la Ley de Sociedades Comerciales*** (E.D.L.A., Nº 11) (written together with attorneys Jorge Emilio Basile and Edgardo Daniel Truffat).

- ***"El Estudio jurídico y la pérdida de oportunidad de negocios"*** (E.D. 11.12.97) (written together with attorney Edgardo Daniel Truffat).

- ***Para iniciar la polémica: El "anteproyecto de reformas a la ley de concursos y quiebras Nº. 24.522" y la oportunidad de la reforma,*** (E.D. 26.12.97) (written together with attorney Edgardo Daniel Truffat).

- ***Comentario al fallo de la Cámara Nacional Comercial "¿Deslealtad sin daño?***, published in E.D- vol.170-22.

- Paper for "***First End-of-the-World Symposium on Private Law*** entitled ***"Proyecto de reglamento para el Comité de Acreedores",*** (together with attorney Edgardo Daniel Truffat).

- ***"El Anteproyecto de Sociedades Anónimas Deportivas"***, Revista del Colegio Público de Abogados de la Capital Federal Nº 18 (11-98).

- ***"Monopolios actuales vs. Monopolios conjeturales"*** Sports Corporations (written together with attorney Edgardo Daniel Truffat) report on the administration of Raúl Granillo Ocampo, published by the Ministry of Justice, single edition 11/99.

- ***"Concurso Nacional de Anteproyectos Ciudad Judicial"*** article published in Revista de Arquitectura Nº 193 (6/99) of Sociedad Central de Arquitectos.

- ***"Firma Digital: Tratatamiento legislativo de su regulación",*** Revista del Colegio Público de Abogados de la Capital Federal Nº 27 (9/99), (written together with engineer Alejandro J. Román).

- ***"El Documento Electrónico y la Firma Digital al Servicio de la optimización del Servicio de Justicia",*** participation as speaker in the Seminar organized by Centro de Estudios de Informática y Derecho (C.E.I.D.) depending from the Ministry of Justice, held in the City of Buenos Aires, during September 27 and 29,1999.

- ***"La Mediación Previa Obligatoria. "Vehículo de comunicación de la realidad e instrumento para la adopción de políticas públicas"***. (written together with attorney Ester Riesel).

- ***"El embargo del articulo 83 inciso 3) de la ley de sociedades comerciales (¿Herramienta automática o semiautomática?)"***, (written together with attorney E. Daniel Truffat)

- ***"Algo mas sobre la suspensión de las decisiones asamblearias",*** written together with attorney E. Daniel Truffat, Errepar, Volume XIII; N° 169, December 2001, p. 613 et seq.

- ***"Uzal y S.A. La Razón: el fin del principio"*** – written together with attorney E. Daniel Truffat, Revista del Colegio Público de Abogados de la Capital Federal, December 2001/N°52, p. 48 et seq.

- ***"Breves reflexiones sobre los ilícitos societarios a la luz del art. 173, inc. 7º del Código Penal"***, written together with attorney Pablo Arguibay Molina, published in ED, copy dated 7-3-2002.

- ***"Una medida cautelar concursal conmocionante",*** written together with attorney E. Daniel Truffat, La Ley, supplement on bankruptcy proceedings, published on 5-02-02.

- ***"Breves reflexiones sobre los ilícitos societarios a la luz del art. 173, inc. 7º del Código Penal"***, escrito en co-autoría con el Dr. Pablo Arguibay Molina, publicado en ED ejemplar del 7-3-2002.

- *"La Crisis Económica y La Actividad Legislativa"* Breve referencia histórica, escrito conjuntamente con el Dr. E. Daniel Truffat, Revista de las Sociedades y Concursos Nº 15, Ed. Ad Hoc, marzo/abril 2002.
- *"El síndico societario: ¿control de legalidad o de gestión?", ?"*, written together with attorney Dr. E. Daniel Truffat, El Derecho, copy dated 25.04.02.
- *"Plata perdida o tiempo perdido?",* written together with attorney Dr. E. Daniel Truffat, El Derecho, ejemplar del 15 de septiembre de 2003.
- *"¿Personas o máscaras jurídicas?,* written together with attorney Dr. E. Daniel Truffat, Errepar, Revista de Doctrina Societaria y Concursal, N°191, octubre de 2003.
- *"Prueba societaria difícil"*; written together with attorney Dres. E. Daniel Truffat y Javier A. Lorente, E.D. ejemplar del 14 de noviembre de 2003
- "*El síndico, en el anteproyecto de reforma de la ley de sociedades*", written together with attorney Dr. E. Daniel Truffat, E.D., ejemplar del7 de julio de 2004.
- "¿*Seguro de retiro o retiro del seguro*?, E.D. ejemplar del 6 de agosto de 2004.
- Homenaje al Dr. **Enrique Butty**, en coautoría con Francisco Naveira, Errepar, Revista del mes de marzo de 2007.

## VI.- BILLS ORIGINATED ON DR. NAVEIRA'S INITIATIVE:

- Bankruptcy Proceedings, Message No. 346/98 (27-03-98).
- Sports Corporations, Message No. 159/99 (04-03-99).
- Amendment to Law 22.172, Message No. 559/99 (24-05-99).
- Regulation of Internal and National Arbitration, replacing Book VI of the National Commercial and Civil Procedural Code, Message No. 577/99 (28-05-99).

- Agreement of Corporate Cooperation, Message 856/99, (09-08-99).

- Substitution of section 23, Law 19550, Message No. 838/99 (02-08-99)

- Concession, License and Permits of National Public Services and similar forms. File 2189/99 submitted by Representative Vensentini on 03-05-99.

- Incorporation as domestic law of the Framework Law on Commercial International Arbitration adopted by the United Nations Committee for International Commercial Law (CNUDMI), Message and Law, Interim resolution No. 1363/99.

- Project of Message and Law: Warrants. Interim resolution No. 1362/99.