UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. AND PETERSEN ENERGÍA, S.A.U.,<br><br>                              Plaintiffs,<br><br>   - against -<br><br>ARGENTINE REPUBLIC AND YPF S.A.,<br><br>                              Defendants. | No. 15 Civ. 2739 (TPG)<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO YPF S.A.'S MOTION TO DISMISS**

KING & SPALDING LLP

Israel Dahan
1185 Avenue of the Americas
New York, NY 10036
Phone:  (212) 556-2114
Fax:  (212) 556-2222
Email:  idahan@kslaw.com

Reginald R. Smith
1100 Louisiana Street
Houston, TX 77002
Phone:  (713) 751-3200
Fax:  (713) 751-3290
Email:  rsmith@kslaw.com

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

Mark C. Hansen
Derek T. Ho
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone:  (202) 326-7902
Fax:  (202) 326-7999
Email:  mhansen@khhte.com
        dho@khhte.com

*Counsel for Plaintiffs Petersen Energía
Inversora, S.A.U. and Petersen Energía,
S.A.U.*

October 23, 2015

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................2

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ................................................................................................6

ARGUMENT ..................................................................................................................8

    I.     THIS COURT HAS JURISDICTION UNDER THE FSIA
          BECAUSE YPF'S COMMERCIAL CONDUCT CAUSED
          "DIRECT EFFECTS" IN THE UNITED STATES ................................................8

    II.    THE ACT OF STATE DOCTRINE DOES NOT BAR
          PLAINTIFFS' SUIT ...............................................................................11

    III.   PLAINTIFFS' BANKRUPTCY RECEIVER HAS STANDING........................11

    IV.   PLAINTIFFS' COMPLAINT STATES A CLAIM AGAINST
          YPF ...................................................................................................15

          A.     The Bylaws Impose Binding Contractual Obligations on
                 YPF ........................................................................................15

          B.     YPF's Conduct Gives Rise to a Claim for Breach of the
                 Bylaws....................................................................................16

          C.     Plaintiffs' Complaint Adequately Pleads That Their Loss of
                 Dividends Was Caused by Argentina and YPF's Breaches.....................20

    V.    PLAINTIFFS STATE VALID CLAIMS FOR PROMISSORY
          ESTOPPEL AND BREACH OF THE IMPLIED COVENANT OF
          GOOD FAITH .....................................................................................20

CONCLUSION..............................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Acticon AG v. China N.E. Petroleum Hldgs. Ltd.*, 692 F.3d 34 (2d Cir. 2012)............................19

*Adler v. Federal Republic of Nigeria*, 107 F.3d 720 (9th Cir. 1997)............................................10

*Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33 (2d Cir. 1993).....................10

*Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., In re*,
    374 B.R. 122 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y.
    2008) ...............................................................................................................................12

*British Am. Ins. Co., In re*, 488 B.R. 205 (Bankr. S.D. Fla. 2013) .........................................12, 13

*Crimson Semiconductor, Inc. v. Electronum*, 629 F. Supp. 903 (S.D.N.Y. 1986) .......................10

*de Csepel v. Republic of Hung.*, 714 F.3d 591 (D.C. Cir. 2013) .................................................10

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003).......................................................................2

*Fairfield Sentry Ltd. Litig., In re*, 458 B.R. 665 (S.D.N.Y. 2011)................................................13

*Gordon v. Softech Int'l, Inc.*, No. 10-cv-5162, 2011 WL 1795300
    (S.D.N.Y. Apr. 28, 2011)................................................................................................19

*Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769
    (S.D.N.Y. 2012)...............................................................................................................10

*Loy, In re*, 380 B.R. 154 (Bankr. E.D. Va. 2007) ........................................................................13

*Lyondell v. Citgo Refining, LP v. Petroleos de Venez., S.A.*, No. 02 Civ.
    0795(CBM), 2003 WL 21878798 (S.D.N.Y. Aug. 8, 2003) ...........................................19

*National Oil Well Maint. Co. v. Fortune Oil & Gas, Inc.*, No. 02 CV. 7666(LBS),
    2005 WL 1123735 (S.D.N.Y. May 11, 2005) .................................................................21

*Philips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201 (S.D.N.Y. 2013).................................................20

*Pons v. People's Republic of China*, 666 F. Supp. 2d 406 (S.D.N.Y. 2009)................................10

*Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607 (1992) .........................................................9, 10

*Reserve Int'l Liquidity Fund, Ltd. v. Caxton Int'l Ltd.*, No. 09 Civ 9021,
    2010 WL 1779282 (S.D.N.Y. Apr. 29, 2010).............................................................13, 14

*Soundview Elite, Ltd., In re*, 503 B.R. 571 (Bankr. S.D.N.Y. 2014), ...............................14, 15, 17

*Stinnes Interoil, Inc. v. Apex Oil Co.*, 604 F. Supp. 978 (S.D.N.Y. 1985) ....................................19

*Varga v. McGraw Hill Fin. Inc.*, No. 652410/2013, 2015 WL 4627748 (N.Y. Sup.
    July 31, 2015)..........................................................................................................................12

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983)...................................................9

*Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2002) ........................10

*World of Boxing LLC v. King*, 56 F. Supp. 3d 507 (S.D.N.Y. 2014) .............................................18

**STATUTES**

Bankruptcy Code (11 U.S.C.):

    11 U.S.C. § 1509...............................................................................................................12

    11 U.S.C. § 1509(c) ..............................................................................................13, 14, 15

    11 U.S.C. § 1509(f)................................................................................4, 11, 12, 13, 14, 15

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* .......................................2, 3, 4, 8, 9

    28 U.S.C. § 1605(a)(2)...............................................................................................4, 8, 9, 10, 11

**OTHER MATERIALS**

*Black's Law Dictionary* (10th ed. 2014)........................................................................................10

## INTRODUCTION

This case raises a straightforward breach-of-contract claim alleging that NYSE-traded YPF S.A. ("YPF" or the "Company") violated its own bylaws, which are a binding contract enforceable against the Company, and is liable based on promissory estoppel for breaking promises it made directly to investors in its SEC-registered NYSE IPO Prospectus.  As explained in Plaintiffs' opposition to Argentina's motion to dismiss ("Pls.' Argentina Opp."), Sections 7 and 28 of the bylaws required Argentina to make a tender offer in New York for minority shareholders' YPF shares if it retook control of the Company.  *See* Pls.' Argentina Opp. 6, 18-19.

As further protection against Argentina potentially flouting its obligations, the bylaws dealt specifically with that scenario and protected shareholders like Plaintiffs by imposing duties on YPF as well.  As a party to the bylaws, YPF was equally bound by the tender offer provisions and obligated to enforce them.  Moreover, Section 7(h) of the bylaws required YPF not to recognize the voting rights or management authority of any shares acquired in violation of the tender-offer requirements.  *See* Ex. B to Ho Decl. (ECF No. 45) ("Bylaws") § 7(h).  YPF's IPO Prospectus made that same promise to prospective investors.  When Argentina did not tender for the minority shareholders' shares, that obligation *on YPF* was triggered.  Instead of abiding by its clear contractual obligations to shareholders like Petersen, YPF flagrantly ignored those obligations and violated its own bylaws.  The result was catastrophic financial harm to Plaintiffs of precisely the type the bylaws were designed to prevent.

On the merits, YPF tries to distance itself from Argentina, as if to throw up its hands and say there was nothing it could do.  This is nonsense.  The fact that Argentina controlled YPF when it breached the bylaws does not absolve the Company, as a party to a commercial contract, of its obligations thereunder.  Nor does it entitle YPF to break the commitments it made in its

prospectus.  *Every* company's actions are ultimately controlled by its managers, and when those managers cause the company to act unlawfully, the company is liable.  That is hornbook corporate law, both in Argentina and the U.S.  Even with Argentina at the helm, YPF was obligated (i) to comply with the tender-offer provisions of the bylaws, and (ii) to deprive any shares acquired in breach of those provisions of voting rights and other privileges under section 7(h).  YPF breached these contractual promises and cannot escape liability for the harm that it caused by blaming its managers.

Indeed, YPF is liable not only under contract law, but also under promissory estoppel and for breach of the duty of good faith and fair dealing.  YPF made promises in New York that induced behavior in New York and resulted in a successful IPO on the NYSE of shares that Plaintiffs bought and held in New York.  YPF then broke those promises in a way that caused direct harm in New York:  Plaintiffs' ADRs, held by the Bank of New York Mellon, were not purchased for fair value in a tender offer, as they should have been, but were rather foreclosed upon by creditor banks, including Citibank and Goldman Sachs, exercising their rights under loans governed by New York law.

YPF's threshold arguments give the lie to its suggestion that "Argentina made me do it." Invoking sovereign-state defenses under the FSIA and the Act of State doctrine (which do not apply), YPF spins around and tries to convince this Court that, after all, YPF and Argentina cannot so easily be separated.  It is true that YPF is now an "instrumentality" of Argentina, due to Argentina's acquisition of control, and that the FSIA assesses "instrumentality" status as of the time of the lawsuit.  *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 480 (2003).  But YPF's arguments fail for the same reasons Argentina's do.  Plaintiffs' allegations are based on YPF's conduct as a commercial enterprise – namely, its breach of its own bylaws.  As numerous cases

have long established, breaches of contract are by nature commercial activity that are not protected by sovereign immunity under the FSIA.  *See* Pls.' Argentina Opp. 12-13.  Breach of corporate bylaws – a particular form of contract governing *private* corporations – is even more clearly commercial activity.  So is breaching promises made in a securities offering document.

YPF's FSIA and Act of State arguments do little more than mimic Argentina's.  And those arguments are flawed for the same reasons provided in Plaintiffs' opposition to Argentina's motion to dismiss.  To reiterate the principal points, Defendants' argument that this lawsuit challenges Argentina's expropriation of *Repsol*'s shares is a red herring.  Even if that expropriation were sovereign rather than commercial conduct (which it was not), that is irrelevant to the claims brought by *Petersen*, whose shares were not expropriated.  To be clear: Petersen's allegation is that the April 2012 acquisition of control by Argentina of Repsol's majority shareholding interest in YPF triggered contractual provisions in the bylaws (and implicated promises made in YPF's U.S. Prospectus).  Argentina breached the bylaws by failing to tender for Plaintiffs' shares under Sections 7 and 28 of the bylaws.  That breach is also attributable to YPF, which is bound to the bylaws no less than Argentina.  And YPF also breached its distinct obligation to decline to recognize Argentina's management authority, as required by Section 7(h) of the bylaws, given Argentina's failure to tender.  The breach of those *contractual* obligations was clearly commercial activity under longstanding case law.  And Argentina and YPF's breaches of those contractual commitments had more than adequate nexus to the U.S. under the FSIA, because Plaintiffs' shares were held as American Depositary Receipts ("ADRs") by the Bank of New York Mellon in New York, and the bylaws required the tender offer to be published in New York and conducted according to NYSE rules.

The only distinct FSIA argument offered by YPF is that its breach of the bylaws' tender-offer obligation caused no "direct effect" in the United States under the third "commercial activity" exception to sovereign immunity in the FSIA, *see* 28 U.S.C. § 1605(a)(2), because all those U.S. effects were allegedly "incidental."  YPF erroneously suggests that only failure to pay money in the U.S. qualifies as non-incidental.  But courts in this Circuit have consistently held that the "direct effect" test requires simply that there be some consequence in the U.S. that flows directly from the conduct giving rise to Plaintiffs' claim.  Indeed, YPF cites no case limiting direct effects solely to nonpayment.  Here, the direct U.S. consequences of YPF's breach of the tender-offer requirement are numerous:  the tender offer was supposed to be publicized in New York; the tender offer was supposed to be conducted here pursuant to NYSE rules; and, because of these failures in New York, Plaintiffs' ADRs, which were held in New York, were foreclosed upon in New York by Plaintiffs' creditors rather than purchased pursuant to the tender offer at the agreed-upon price.

YPF offers three further arguments for dismissal, all of which are meritless.  First, YPF argues that Plaintiffs' bankruptcy receiver lacks standing to sue on behalf of the Petersen estate because the receiver did not first obtain recognition of the foreign insolvency proceedings under Chapter 15 of the United States Bankruptcy Code.  But YPF, though purporting to rely on Chapter 15, proceeds to omit the single provision of Chapter 15 directly on point:  the safe-harbor provision of Section 1509(f).  That provision says precisely the opposite of what YPF argues:  namely, that recognition is *not* required for a foreign representative "to sue in a court in the United States or to collect or recover a claim which is the property of the debtor."  As numerous cases hold, Plaintiffs' claim for breach of contract falls squarely within that safe harbor.

4

Second, YPF argues that Plaintiffs' Complaint fails to state a claim because Argentina's Expropriation Law "preempted" YPF's bylaws and because Argentina's expropriation was a *force majeure* event that excused YPF from any obligation. These arguments are equally meritless. To the extent Argentina caused YPF's breaches, it did so in its capacity as *YPF's management*, and its decision (for the Company) to do so was neither unforeseeable nor unavoidable, as the *force majeure* doctrine requires. As explained above, a corporation cannot shirk liability by blaming unlawful acts on the conscious decisions of its managers. Moreover, as explained by Plaintiffs' experts, Argentina's Expropriation Law did not change the fundamental operation of YPF as a private corporation governed by its bylaws. Absolutely nothing in the Expropriation Law prevented Argentina or YPF from tendering for shares beyond the 51% Argentina expropriated, as the bylaws required. And, under Argentine law, the Expropriation Law *could not have* interfered with that obligation without expressly saying so. The bylaws thus continued to govern the Company's conduct even after Argentina occupied Repsol's shares and filled YPF's management positions. And, in all events, the *force majeure* argument raises issues of fact outside the Complaint and cannot properly be decided on a motion to dismiss.

Finally, YPF mischaracterizes Argentine law in arguing that it cannot be held liable on the basis of promissory estoppel or good faith. To the extent Argentine law even applies (an issue the Court need not decide), both promissory estoppel and good faith are recognized legal theories under Argentine contract law, and the facts alleged in Plaintiffs' Complaint state claims for both.

## STATEMENT OF FACTS[1]

Before 1993, YPF was run by the Argentine government to serve Argentina's interests. Compl. ¶¶ 11-12; Rovira Decl. ¶¶ 10-21 (ECF No. 46).  That year, YPF was privatized in an IPO, which took the Company's "Class D" shares public.  Compl. ¶¶ 13-15.  The objective of the IPO was to "transform[]" YPF from an inefficient state-run enterprise into a competitive private company, which would attract investors (like Plaintiffs).  *Id.* ¶ 15 (internal quotation marks omitted).  To assure investors that they would be compensated in the event that Argentina retook control of YPF, the Company – through a vote of its then sole shareholder, the Argentine government – adopted a new set of bylaws.  *Id.* ¶ 16.  Those new bylaws included Section 7 – which prohibits any party from carrying out a "takeover" of YPF "whether directly or indirectly . . . by any means or instrument" without first launching a tender offer to acquire all the shares of all classes of YPF stock at a predetermined price, Bylaws § 7(d)-(f) – and Section 28 – which provides that Section 7's tender-offer requirement would specifically "apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of [YPF]," Bylaws § 28(A).

In addition to the tender-offer requirements, the new bylaws included Section 7(h), which provides that "[s]hares of stock and securities acquired in breach of [the tender-offer requirement] shall not grant any right to vote or collect dividends or distributions . . . nor . . . be computed to determine the presence of the quorum at any of the shareholders' meetings of the Corporation."  Under Section 7(h), YPF was obligated not to recognize the corporate governance or voting rights of Class D shares that were acquired in violation of the tender-offer

---

[1] This Statement focuses on facts specifically relevant to YPF's distinct arguments for dismissal.  Because YPF also mimics several of Argentina's arguments for dismissal, the fuller Statement of Facts in Plaintiffs' opposition to Argentina's motion to dismiss is also incorporated by reference.  *See* Pls.' Argentina Opp. 5-9.

requirements.  That provision provided essential security for investors that the tender-offer requirements would be enforced.

YPF included its bylaws in its U.S. IPO Prospectus.  Compl. ¶¶ 24-25.  That Prospectus promised that "[u]nder the Company's By-laws, in order to acquire a majority of the Company's capital stock or a majority of the Class D Shares, the Argentine Government first would be required to make a cash tender offer to all holders of Class D Shares on terms and conditions specified in the By-laws."  *Id.* ¶ 24 (internal quotation marks omitted).  The Prospectus further promised that "[a]ny Control Acquisition carried out by the Argentine Government other than in accordance with th[at] procedure . . . will result in the suspension of the voting, dividend and other distribution rights of the shares so acquired."  *Id.* (internal quotation marks omitted).

With these bylaw provisions in place, and based on YPF's direct promises in the IPO Prospectus that the bylaws would be enforced, YPF's IPO earned the Company billions of dollars of private investment, *see id.* ¶ 13, and YPF was run as a successful private enterprise for nearly 20 years, *see id.* ¶ 31.  Those protections in the bylaws led Plaintiffs to purchase a roughly 25% stake in YPF from 2008 until 2011 with financing provided by several large financial institutions.  *See id.* ¶¶ 27-30.

On April 16, 2012, Argentina issued an emergency decree stating that it was taking immediate control of YPF.  *Id.* ¶ 35.  That same day, Argentina replaced YPF's Board and existing management with one of its own Ministers, who it appointed as "Intervenor," invested with all of the powers of YPF's board of directors and president to run the Company.  *Id.* ¶¶ 35-36.  On April 23, 2012, the "Intervenor," invoking the powers of YPF's management, canceled a scheduled YPF board meeting and made the decision not to issue previously scheduled dividend payments.  *Id.* ¶ 39.  On the same day as the appointment of the "Intervenor," Argentina

announced legislation to take immediate control of, and ultimately expropriate, shares of stock from majority shareholder Repsol S.A. ("Repsol") constituting a 51% stake in YPF. *Id.* ¶ 35. The Expropriation Law took effect May 7, 2012, on which date Argentina acquired "temporary occupation" – en route to an eventual expropriation – of those Repsol shares. *Id.* ¶¶ 35, 40.

In breach of its obligations as shareholder, Argentina did not make the tender offer required by Sections 7 and 28 of YPF's bylaws and YPF took no action to enforce those provisions of its bylaws. *Id.* ¶¶ 39-40. Moreover, YPF independently violated the bylaws by permitting Argentina to exercise the corporate powers associated with the shares it took control of without making a tender offer. *See id.* ¶ 41.

As a result of YPF's and Argentina's breach of the bylaws, the value of Plaintiffs' shares plummeted. *Id.* ¶ 42. Moreover, those breaches caused Plaintiffs to default on their loan obligations to the financial institutions (including New York banks) that had financed Plaintiffs' share purchase. *Id.* In July 2012, Plaintiffs – who are Spanish holding companies, *see id.* ¶ 6 – subsequently entered into bankruptcy proceedings in Spain. *Id.* ¶ 46. As part of Plaintiffs' bankruptcy proceedings, the Spanish court-appointed receiver brought the instant suit to recover for Plaintiffs' injuries. *Id.* ¶ 47.

## ARGUMENT

### I.    THIS COURT HAS JURISDICTION UNDER THE FSIA BECAUSE YPF'S COMMERCIAL CONDUCT CAUSED "DIRECT EFFECTS" IN THE UNITED STATES

As Plaintiffs explain in their Argentina opposition, *see* Pls.' Argentina Opp. 3-4, 9-22, which is incorporated by reference here, this Court has jurisdiction under the first and third of the FSIA's "commercial activity" exceptions. *See* 28 U.S.C. § 1605(a)(2). The only distinct argument raised by YPF is that the breach of the bylaws' tender-offer requirement did not have a

"direct effect" in the United States under the FSIA's third commercial activity exception.[2]  As alleged in the Complaint, however, the failure to make the tender offer had a direct impact in New York.[3]  YPF simply ignores the fact that many shareholders, including Plaintiffs, held YPF Class D shares as ADRs, and many of those ADRs were held in New York by the Bank of New York Mellon.  Compl. ¶¶ 14, 27; *see also* Pls.' Argentina Opp. 7-8, 19, 21, 24, 34.  Moreover, as YPF acknowledges (at 11), the bylaws specify that the notice of the tender offer must be published in major newspapers in New York, and that the tender offer must comply with the rules of the major stock exchanges, including the NYSE.[4]  In real-world terms, the failure to make the tender offer resulted in notices not being published in New York, and ADRs held in New York not being tendered pursuant to NYSE rules.  Instead, the ADRs were foreclosed upon in New York.  Those are substantial effects in the United States that resulted directly from the breach of contract that forms the basis for Plaintiffs' suit.

Invoking *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992), YPF argues that there can be no "direct effect" in the U.S. if the contract does not provide for payment in the U.S. All other effects, YPF says, are "incidental."  YPF Mem. 11-12.  But neither *Weltover* nor the Second Circuit cases interpreting it support YPF's assertion that direct effects are *limited* to non-

---

[2] YPF argues in passing (at 12-13) that Plaintiffs' foreign status should count against jurisdiction.  But that suggestion is frivolous.  The Supreme Court has explicitly held that the FSIA permits "civil actions by foreign plaintiffs against foreign sovereigns."  *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 491, 497-98 (1983).

[3] YPF's breaches facilitated Argentina's violation of its tender-offer obligations.  The U.S. effects of Argentina's failure to make a tender offer are thus equally attributable to YPF's conduct.  Indeed, YPF (at 10-13) does not dispute that point; it merely argues (based on an incorrect reading of the FSIA case law) that the failure to make a tender offer did not have direct effects in the U.S.

[4] YPF (at 12) attempts to brush aside this requirement on the ground that YPF was merely required to comply with "additional or stricter requirements" on foreign exchanges "to the extent applicable."  Bylaws § 7(f).  But it does not dispute that the content of that requirement required offering materials to be present in New York City.  *See* Pls.' Argentina Opp. 19.

payment.  To the contrary, the plain meaning of "direct effect" encompasses *any* direct "result,

outcome, or consequence" in the U.S., not just payment.  *Black's Law Dictionary* 628 (10th ed.

2014) (defining "effect").  In fact, in *Weltover*, the Supreme Court held that such a consequence

existed if the contract provided for performance to occur in New York; in that event, breach of

the contract would have effects in the U.S.  *See* 504 U.S. at 619 ("[b]ecause New York was . . .

the place of performance for Argentina's ultimate contractual obligations, the rescheduling of

those obligations necessarily had a 'direct effect' in the United States").  Second Circuit cases

and cases of this Court likewise ask whether *any* part of the contractual performance – not just

payment – was supposed to occur in the U.S.[5]  That standard is clearly satisfied here because the

bylaws called for a tender offer to be made for shares held in New York, after publication of

notices in New York, and pursuant to rules established by the NYSE.

---

[5] *See Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 239 (2d Cir.
2002) ("Every circuit court of which we are aware that has addressed this issue has held . . . that
an anticipatory contractual breach occurs 'in the United States' for the jurisdictional purposes of
§ 1605(a)(2) if performance could have been required in the United States and then was
requested there."); *Antares Aircraft, L.P. v. Fed. Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir.
1993) ("*Weltover* involved a breach of contract, and the Court found decisive the fact that the
contractually designated place of performance was New York.  The 'legally significant' act was
thus the breach that occurred in the United States."); *Lantheus Med. Imaging, Inc. v. Zurich Am.
Ins. Co.*, 841 F. Supp. 2d 769, 791 (S.D.N.Y. 2012) ("[F]or breach of contract, the Court would
consider the 'place of performance' [as the site of the direct effects]." (quoting *Weltover*, 504
U.S. at 618-19)); *Pons v. People's Republic of China*, 666 F. Supp. 2d 406, 413 (S.D.N.Y. 2009)
("[T]he place of performance relevant to the direct effects test is the place where performance
could be demanded."); *Crimson Semiconductor, Inc. v. Electronum*, 629 F. Supp. 903, 907
(S.D.N.Y. 1986) (finding direct effect because "[d]elivery was to have been made in the United
States").  Other circuits also focus on a breach of contractual obligations, rather than just
payment due.  *See de Csepel v. Republic of Hungary*, 714 F.3d 591, 601 (D.C. Cir. 2013)
(finding direct effect when bailment contract required "return of the property itself" and "this
return was to be directed to [individuals that defendant] knew to be residing in the United
States"); *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 727 (9th Cir. 1997) (finding direct
effect where "New York was the place of performance of Nigeria's ultimate contractual
obligation").

Finally, YPF argues that because Plaintiffs are Spanish companies, their injuries were felt in Spain, and the breach therefore could not have had any "direct effects" in the U.S.  But that argument is unavailing because the third commercial activities exception does not require *injury* within the United States, only a "direct effect."  28 U.S.C. § 1605(a)(2).  *See* Pls.' Argentina Opp. 4, 20-22.  For the reasons given above, YPF's and Argentina's contractual breaches – which caused Plaintiffs' ADRs, most of which were held at Bank of New York Mellon, not to be tendered, but instead to be foreclosed upon – amply satisfies that standard.

## II.    THE ACT OF STATE DOCTRINE DOES NOT BAR PLAINTIFFS' SUIT

YPF's Act of State arguments also track Argentina's, *compare* YPF Mem. 13-15, *with* Argentina Mem. 18-21, and they are unpersuasive for the same reasons.  This suit is based not on the expropriation of Repsol's shares, but the failure to comply with and enforce the bylaws, *see* Pls.' Argentina Opp. 1-4, 10-16, 22-24, 34, and that failure had effects in the United States, *id.* at 4, 10, 20-22, 24-25.  As YPF offers no distinct arguments, we incorporate our responses to Argentina's brief by reference.

## III.   PLAINTIFFS' BANKRUPTCY RECEIVER HAS STANDING

YPF contends (at 15-18) that Plaintiffs, represented by a receiver in their Spanish bankruptcy proceedings, lack standing to pursue their claims in this Court because the receiver did not first obtain recognition for the foreign insolvency proceedings under Chapter 15 of the United States Bankruptcy Code ("Bankruptcy Code").  That argument is meritless.  Plaintiffs are not requesting comity or cooperation from this Court with respect to their foreign insolvency proceedings, as was the situation in YPF's cited cases (at 16-18).  Rather, Plaintiffs are seeking to recover on a claim that is property of their receivership.  As such, Plaintiffs' claims in this suit fall squarely within the safe harbor provision of Section 1509(f) of the Bankruptcy Code, which provides:

11

> Notwithstanding any other provision of this section, the failure of a foreign representative to commence a case or to obtain recognition under this chapter does not affect any right the foreign representative may have to sue in a court in the United States or to collect or recover a claim which is the property of the debtor.

11 U.S.C. § 1509(f).

Courts have consistently rejected YPF's argument based on the plain language of Section 1509(f). *Varga v. McGraw Hill Financial Inc.*, No. 652410/2013, 2015 WL 4627748, at *13 (N.Y. Sup. July 31, 2015), is instructive. In *Varga*, the Cayman joint liquidators for a foreign overseas fund sued rating agencies for an alleged fraud in relation to the assignment of ratings of creditworthiness to various financial instruments invested in by the overseas fund. The New York Supreme Court rejected defendants' contention that plaintiffs' lack of Chapter 15 recognition barred them from suing in the United States. The court held that the joint liquidators did not bring their case "with the express purpose of assisting or facilitating their insolvency proceedings in the Cayman Islands." *Id*. Rather, Section 1509(f) was controlling because they sought to collect a claim. So it is here.

Likewise, in *In re British American Insurance Co.*, 488 B.R. 205, 227-28 (Bankr. S.D. Fla. 2013), the bankruptcy court held that a foreign representative can pursue a claim for breach of fiduciary duty against the former directors of a corporation in the United States even if the bankruptcy court has denied a Chapter 15 petition for recognition and dismissed the Chapter 15 case based on that bankruptcy. The court referred to Section 103(k)(2) of the Bankruptcy Code, which specifically provides that Section 1509 is controlling, whether or not there is a bankruptcy case (including a Chapter 15 proceeding) pending in the United States. *See id.*; *see also In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 133 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) ("[S]ection 1509(f) of the

Bankruptcy Code provides that the failure of a foreign representative to obtain recognition under [Chapter 15] does not affect any right the foreign representative may have to sue in a court in the United States to collect or recover a claim which is the property of the debtor." (citing 11 U.S.C. § 1509(f))); *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 684 (S.D.N.Y. 2011) (finding that state law claims brought by foreign representatives who filed a Chapter 15 petition could have proceeded independently in New York state court and "[h]ad the foreign representatives declined to file a Chapter 15 case, that choice also would not have limited the foreign representatives' ability to pursue their claims in the United States").[6]

*In re Loy*, 380 B.R. 154 (Bankr. E.D. Va. 2007), is also on point.  Before the foreign representative commenced a Chapter 15 proceeding, the representative filed a *lis pendens* against property that it claimed was part of the English insolvency proceeding.  The debtor argued that the *lis pendens* was void since, at the time it was filed, there was no pending Chapter 15 proceeding.  In rejecting the debtor's argument, the bankruptcy court held that the filing of a *lis pendens* did not involve the court's comity and cooperation and, therefore, Chapter 15 recognition was not required.  *Id.* at 167.[7]

The cases cited by YPF are distinguishable because they involved requests for comity, not actions to recover property.  In *Reserve International Liquidity Fund, Ltd. v. Caxton International Ltd.*, No. 09 Civ. 9021, 2010 WL 1779282 (S.D.N.Y. Apr. 29, 2010), there was a dispute as to whether the district court should recognize the belated request made by a

---

[6] YPF's citation (at 16) to *British American Insurance* is misplaced.  YPF's cite is to a discussion of Section 1509*(c)* of the Bankruptcy Code, which governs the conditions of a foreign representative seeking comity and cooperation from a U.S. court.  It has no relevance to the Section 1509(f) situation presented here.

[7] *Loy*'s attempt to block the ultimate request for Chapter 15 recognition by the prior filing of the *lis pendens* also failed.  The bankruptcy court noted that Chapter 15 does not specify the consequences for not gaining Chapter 15 recognition before seeking relief in a U.S. court, and it refused to find for such a "drastic outcome."  380 B.R. at 167.

representative appointed in a foreign proceeding for an offshore fund to stay an interpleader action brought by the board of the fund in the district court.  The court held that the dispute as to whether the foreign representative, as opposed to the board, should be in control of the fund was "precisely the kind of determination that must be made in a Chapter 15 proceeding."  *Id*. at *5. The court also noted that the foreign representative's request for a stay of the interpleader action was, in essence, a request for comity and cooperation from the court.  *See id.*  The court was influenced by the fact that the foreign proceeding had already determined the issue before the U.S. court and that determination was contrary to strong U.S. public policy interests.  *See id.* at *3-*4.  *Reserve International* presents a far different fact pattern than the instant case where (a) no dispute exists as to who controls Plaintiffs' estates; (b) the Spanish insolvency proceeding has not already determined the issue before this Court; and (c) Plaintiffs are not seeking to stay a pending action in this Court or otherwise invoking comity and this Court's cooperation. Moreover, the language from *Reserve International* quoted by YPF (at 16) is taken out of context.  That quotation is part of the analysis as to whether Section 1509(c) of the Bankruptcy Code requires Chapter 15 recognition before a U.S. court will grant a request for comity or cooperation.  Section 1509(f), which applies to this case, adopts a different standard than Section 1509(c).

  *In re Soundview Elite, Ltd*., 503 B.R. 571, 595 (Bankr. S.D.N.Y. 2014), cited by YPF (at 16-17), is also distinguishable.  In *Soundview*, a Chapter 11 bankruptcy case was filed shortly before joint official liquidators were appointed in a Cayman Islands insolvency proceeding.  The dispute was whether the Chapter 11 petitions were filed in good faith (they were), whether a Chapter 11 trustee should be appointed (the court granted such relief), and whether the joint liquidators violated the automatic stay of actions taken in the Caymans insolvency proceeding

(the court retroactively modified the stay to validate the actions taken).  The bankruptcy court ultimately found that a joint protocol was needed to coordinate the two insolvency proceedings. Chapter 15 was not implicated in *Soundview*.  The case's reference to Chapter 15 being an "exclusive door," cited by YPF (at 16-17), was part of the court's general discussion of Chapter 15, assuming Section 1509(f) would not otherwise apply because "[a] Chapter 15 case in the U.S. . . . would not now be an option."  *Soundview*, 503 B.R. at 594.  Indeed, the "exclusive door" citation is part of an analysis of Section 1509(c), not Section 1509(f) which is controlling here.

In sum, the safe harbor provision of Section 1509(f) of the Bankruptcy Code is clearly controlling, and Plaintiffs have standing to bring this lawsuit even though there is no pending Chapter 15 proceeding.[8]

## IV.    PLAINTIFFS' COMPLAINT STATES A CLAIM AGAINST YPF

YPF's final argument for dismissal (at 21-25) invokes Argentine law either to shift the blame for Plaintiffs' injuries to Argentina or disclaim YPF's responsibility for those harms. Those arguments mischaracterize the Complaint, misstate Argentine law, and improperly raise arguments based on facts outside the confines of the Complaint.[9]

### A.    The Bylaws Impose Binding Contractual Obligations on YPF

YPF does not dispute that, under Argentine law, the bylaws constitute an enforceable contract between YPF and its shareholders.  Indeed, YPF recognizes (at 23) that the relationship between Plaintiffs and itself was "governed by contract."  That concession is correct, as

---

[8] YPF's suggestion (at 17 n.6) that the receiver was not authorized to sue YPF (only Argentina) misapprehends Spanish bankruptcy law.  *See* Declaration of Javier García Marrero ¶¶ 13-19.

[9] While YPF's Argentine law arguments are meritless, the Court need not decide at this stage of the case whether Argentine law or U.S. law applies to Plaintiffs' claims.

Plaintiffs' expert, Dr. Rovira, explains in his declaration:  Under Argentine corporate law, "[b]ylaws are a contract enforceable against both its shareholders (i.e., Argentina and the other shareholders) and the company whose legal framework they constitute (i.e., YPF).  Thus, YPF is bound by its bylaws.  Its management and shareholders conduct and resolutions of its corporate bodies must be in accordance thereto."  Rovira Decl. ¶ 22; *see also* Bianchi Decl. ¶¶ 51-55 (ECF No. 47).

### B.     YPF's Conduct Gives Rise to a Claim for Breach of the Bylaws

Plaintiffs' Complaint states a straightforward claim for breach of the bylaws by YPF. YPF breached its obligations under the bylaws in two ways.  First, Section 7(d) of the bylaws provides that "it shall be forbidden to acquire shares or securities of the Corporation" without making a tender offer to remaining Class D shareholders.  That provision, which was binding on YPF just as much as Argentina, was clearly breached here.  Moreover, YPF violated the requirement of Section 7(h) of the bylaws that the "shares and securities acquired in [violation of the tender-offer requirement] shall not grant any right to vote or to collect dividends or other distribution [as may be made by the Company and] shall not be computed to determine the presence of the quorum" at YPF shareholders' meetings.  Bylaws § 7(h).  Through these interrelated provisions, the bylaws were designed to create multiple levels of security for investors by imposing direct obligations on *both* Argentina *and* YPF.  *See* Rovira Decl. ¶ 32 (Argentine contract law prioritizes "the intention of the parties").  If, as occurred here, Argentina acquired control of a majority stake, YPF would share responsibility for the tender-offer obligation *and*, should the obligation be breached, be obligated to refuse to permit Argentina to exercise control over the Company.  Instead, YPF became an instrument in Argentina's theft.  In clear violation of the bylaws, it did nothing to enforce the tender-offer obligation and allowed

Argentina to exercise full corporate control, even though Argentina acquired that control in violation of the tender-offer provision of the bylaws.  Compl. ¶¶ 35-41.  Moreover, it allowed Argentina to cancel the regularly scheduled meeting of the Board of Directors, and stop the payment of dividends to the Company's shareholders, including Petersen.  *Id.* ¶¶ 38-39.

YPF responds with a variety of technical arguments why it cannot be liable for breach of the bylaws, but none is persuasive.  YPF first argues (at 22-23) that Argentina rather than YPF had the obligation to make the tender offer.  But the tender offer provisions are binding on both, and YPF also had a separate and independent obligation under the bylaws to ensure that Argentina (or any other shareholder) could not assume control of the Company without complying with the tender-offer requirement.[10]  YPF suggests (at 22) that any such obligation was "trigged only <u>after</u> notice of [a] proposed tender offer has been given."  But nothing in the bylaws expressly conditions YPF's obligations on notice by Argentina.  Indeed, YPF's construction would undermine the core purpose of the provisions – namely, to give investors a second line of defense against any attempt by Argentina to get away with a take-over without making the tender offer.

Relying on the opinions of its experts, YPF next argues (at 23-24) it should be excused from its contractual breaches because the bylaws were "preempted" by the "Expropriation Law, which granted the Republic the authority to exercise the rights of the shares subject to

---

[10] Moreover, under Argentine law, Argentina's actions – including the failure to make a tender offer – became attributable to YPF once Argentina took control of YPF and its management by appointing the Intervenor.  *See* Compl. ¶¶ 35-36.  Thus, the acts that Argentina and its Intervenor took while running YPF – failing to ensure compliance with the tender-offer requirement and allowing shareholder votes despite that failure – were YPF's own acts because Argentina and its Intervenor constituted the management and board of YPF.  Rovira Decl. ¶ 43.  Consequently, the line that YPF seeks to draw between itself and Argentina is meaningless as a matter of Argentine law:  Argentina's acts were, for all intents and purposes, YPF's.

expropriation."  But that is simply inaccurate.  *First*, the Expropriation Law did not impose any

obligations on YPF inconsistent with Sections 7 and 28 of the bylaws.  Bianchi Decl. ¶¶ 63-74.

The occupation of *Repsol's* shares was distinct from the actions Argentina was obligated to take

with respect to the *remainder* of the YPF shares.  *Id.*  Indeed, the bylaw provisions explicitly

*contemplated* expropriation and provided that it would trigger the tender-offer obligation.  *See*

Bylaws § 28 (referring to a take-over "by any means"); *see also* Pls.' Argentina Opp. 6, 14.

*Second*, the Expropriation Law did not preempt the bylaws; rather, it expressly reaffirmed that

YPF would continue to operate as a private company under the normal terms of its operation,

including the bylaws.  Rovira Decl. ¶ 39.  Indeed, the Expropriation Law said *nothing* about the

bylaws or the tender-offer requirement.  Given that, the Expropriation Law *could not have*

stripped Plaintiffs of their vested contractual entitlement to a tender offer.  Argentine law is clear

that contractual rights – such as Plaintiffs' entitlement to a tender offer – are constitutionally

protected as property that cannot be destroyed by the government without compensation.

Bianchi Decl. ¶¶ 6-20.  Hence, the law requires that expropriations be carefully and specifically

defined.  *Id.* ¶¶ 15-20.  The Expropriation Law in this case applied to Repsol's shares and

extended no further.  It is impossible under Argentine law for that same law to have stripped

Plaintiffs of their vested contractual right *sub silentio* and without any compensation.

YPF's *force majeure* argument fails for similar reasons.  Under Argentine law, for a *force*

*majeure* event to excuse an obligation, the event must be unforeseeable and it must render

compliance with the obligation impossible.  *See* Rovira Decl. ¶ 45; *see also World of Boxing*

*LLC v. King*, 56 F. Supp. 3d 507, 512 (S.D.N.Y. 2014) ("To sustain an impossibility defense, the

'supervening event' must have been 'unanticipated' by the parties.").  Here, compliance was not

at all impossible.  To the extent that Argentina "caused" YPF to violate its bylaws, it did so *in its*

*capacity as YPF's management and Board.*  In that role, Argentina could easily have acted

otherwise (indeed, it was obligated to).  Under ordinary principles of Argentine (or U.S.)

corporate law, Argentina's decisions to breach are thus properly attributable to YPF.  *See* Rovira

Decl. ¶ 45; Bianchi Decl. ¶¶ 74, 86.  Like any corporate decision to breach a contract, YPF's

decision was made by its managers.  That does not constitute a *force majeure*.

At any rate, like *force majeure* under U.S. law, Argentina's *force majeure* defense raises

fact-specific questions that cannot be resolved on the pleadings.[11]  For example, YPF argues (at

22-23) that it would have been futile to resist Argentina's occupation of the Company and

usurpation of its Board function, citing a lawsuit brought by Repsol.  But those facts are beyond

the Complaint and cannot be considered on a motion to dismiss.  *See Gordon v. Softech Int'l,*

*Inc.*, No. 10-cv-5162, 2011 WL 1795300, at *2 (S.D.N.Y. Apr. 28, 2011) (defenses that "turn on

facts outside the Complaint" will not be considered "on a motion to dismiss").

YPF further contends (at 24) that Plaintiffs' breach claims must be dismissed for lack of

causation, making the same argument as Argentina.  *See* Argentina Mem. 31-35.  As Plaintiffs

explain in their Argentina memorandum, which is incorporated by reference, that is nothing

more than "a competing theory of causation" which "raises factual questions not suitable for

resolution on a motion to dismiss."  *Acticon AG v. China Ne. Petroleum Hldgs. Ltd.*, 692 F.3d

34, 39 (2d Cir. 2012) (internal quotation marks omitted); *see* Pls.' Argentina Opp. 34-35.

---

[11] *See, e.g.*, *Lyondell v. Citgo Refining, LP v. Petroleos de Venezuela, S.A.*, No. 02 Civ.
0795(CBM), 2003 WL 21878798, at *6 (S.D.N.Y. Aug. 8, 2003) (declining to consider *force
majeure* issues on motion to dismiss because their adjudication requires a "well developed
factual record"); *Stinnes Interoil, Inc. v. Apex Oil Co.*, 604 F. Supp. 978, 983 (S.D.N.Y. 1985)
("[*Force majeure*] presents yet another factual question which can not [sic] be decided on a
motion to dismiss.").

### C.     Plaintiffs' Complaint Adequately Pleads That Their Loss of Dividends Was Caused by Argentina and YPF's Breaches

As Plaintiffs allege in the Complaint, YPF's failure to distribute dividends was a direct consequence of the Company's breach of the bylaws. *See* Compl. ¶¶ 35-40.  Had YPF not breached the bylaws, including Section 7(h), the dividend distribution to YPF's shareholders would have been made.  Under Argentine and New York law, YPF can be held liable for the harms caused by its breach of the bylaws. *See* Rovira Decl. ¶¶ 43-44.

YPF's argument (at 24-25) that it cannot be held liable for violating the *shareholders' agreement* between Petersen and Repsol misses the point.  Plaintiffs do not allege that that shareholder agreement was binding on YPF.  Their contract claim turns on YPF's "breach[ *of* ] *the bylaws*, by, among other things, failing to comply with or enforce the requirement in Sections 7 and 28 of the bylaws that any acquisition of a controlling stake in YPF be conditioned on a tender offer for all Class D shares."  Compl. ¶ 71 (emphasis added); *see id.* ¶¶ 76, 80, 83-85.[12]

## V.     PLAINTIFFS STATE VALID CLAIMS FOR PROMISSORY ESTOPPEL AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH

YPF's final argument (at 22-23, 25) is that it cannot be held liable for promissory estoppel or breach of the implied covenant of good faith.  First, YPF contends that Argentine law does not recognize either claim when the parties have entered into a contract.  That assertion assumes that Argentine law governs these claims.  But that assumption is unfounded.  Although the issue need not be resolved at this stage, New York's "center of gravity" analysis would point to New York law, not Argentine law, for the promissory estoppel claim. *See Philips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 238 (S.D.N.Y. 2013) (governing law determined by assessing

---

[12] YPF also suggests (at 24-25) that, as a matter of Argentine corporate law, a corporation has no obligation to pay dividends unless they have been approved at a shareholders' meeting, "and no dividends had been approved."  That argument improperly raises facts beyond the Complaint.  Moreover, YPF's expert misstates Argentine corporate law. *See* Rovira Decl. ¶ 42.

"the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties") (citation and internal quotation marks omitted).  Plaintiffs' promissory estoppel and good faith claims are based on broken promises made in the IPO Prospectus disseminated (among other places) in New York and requiring action in New York, *see* Compl. ¶¶ 80, 83, and are clearly *centered* in New York City.  It is irrelevant that the bylaws call for the application of Argentine law; "promissory estoppel, by definition, is a claim outside the contract, and therefore, the parties' choice of law is not binding."  *National Oil Well Maint. Co. v. Fortune Oil & Gas, Inc.*, No. 02 CV. 7666(LBS), 2005 WL 1123735, at *4 (S.D.N.Y. May 11, 2005).

Even if Argentine law did apply to these claims, it recognizes promissory estoppel ("*teoría de los actos propios*"), *see* Bianchi Decl. ¶¶ 88-95, and that theory squarely applies on the facts of this case, where YPF's U.S. IPO Prospectus promised that "the Argentine Government first would be required to make a cash tender offer to all holders of Class D Shares" before it could acquire majority control of the Company, and further that Argentina would not be able to exercise control of the Company without doing so, Compl. ¶ 24 (internal quotation marks omitted); *see* Rovira Decl. ¶¶ 43-44.  Likewise, Argentina's Civil Code expressly recognizes that a duty of good faith and fair dealing applies to the parties to a contract.  Rovira Decl. ¶ 32.

Second, YPF argues that it could not have acted in bad faith, or violated any enforceable promise, because YPF's obligations would have required it to contravene Argentina's statutory expropriation regime.  But YPF's description of Argentine law is inaccurate:  enforcing a private commercial promise made separate and apart from the Argentine government's sovereign acts is not contrary to Argentine law.  *See* Bianchi Decl. ¶¶ 99-100.  And in any event, as discussed above, complying with the tender-offer provision of the bylaws did not require YPF to

contravene Argentina's Expropriation Law.  *See supra* pp. 5, 17-18; *see also* Pls.' Argentina Opp. 8, 14.  There thus are no grounds for dismissing Plaintiffs' promissory estoppel claim.

## <u>CONCLUSION</u>

This Court should deny YPF's motion to dismiss.

Dated: October 23, 2015

New York, New York

Respectfully submitted,

KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.

By:      /s/ Mark C. Hansen
Mark C. Hansen
Derek T. Ho
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7902
Fax: (202) 326-7999
Email:  mhansen@khhte.com
         dho@khhte.com


KING & SPALDING LLP

Israel Dahan
1185 Avenue of the Americas
New York, NY 10036
Phone:  (212) 556-2114
Fax:  (212) 556-2222
Email:  idahan@kslaw.com

-and-

Reginald R. Smith
1100 Louisiana Street
Houston, TX 77002
Phone:  (713) 751-3200
Fax:  (713) 751-3290
Email:  rsmith@kslaw.com


*Counsel for Plaintiffs Petersen Energía Inversora,
S.A.U. and Petersen Energía, S.A.U.*

23