UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
PETERSEN ENERGÍA INVERSORA, S.A.U. and
PETERSEN ENERGÍA, S.A.U.,

                        Plaintiffs,

   -against-

ARGENTINE REPUBLIC and YPF S.A.,

                        Defendants.
---------------------------------------------------------------x

Case No. 15 Civ. 2739 (TPG)

# REPLY DECLARATION OF ISMAEL MATA

Pursuant to 28 U.S.C. § 1746, the undersigned, Ismael Mata, declares the following:

1. I previously submitted a declaration in this case, on September 8, 2015, in support of the motion to dismiss filed by the Republic of Argentina. Concerning my qualifications, I respectfully refer the Court to my *curriculum vitae*, which was annexed thereto.

2. I submit this reply declaration in response to the declarations of Dr. Alberto B. Bianchi ("Bianchi") and Dr. Alfredo L. Rovira ("Rovira") submitted by plaintiffs on October 19, 2015.

3. Bianchi and I agree on certain points. For example, Bianchi states that expropriation is expressly provided for in Section 17 of the Argentine Constitution, which states that "*Expropriation for public-interest reasons must be authorized by law and <u>previously compensated</u>*" (Bianchi ¶ 16 [emphasis in original]). I stated the same thing in my initial declaration (at ¶¶ 8, 20-22).

4. The main point of disagreement between Bianchi and Rovira (on one hand) and me concerns the interplay between (a) the Republic's sovereign acts by which it intervened in

YPF's management and eventually expropriated 51% of YPF's shares then held by Repsol, and (b) the takeover and tender offer provisions contained in YPF's bylaws. Bianchi and Rovira regard these two matters as independent of and compatible with each other. In fact and in law, they are not.

5. In my initial declaration (at ¶¶ 4-12), I explained that Argentine law establishes a hierarchical order, under which public law holds priority over private law and rights. This means that a private contract, such as the YPF bylaws, cannot impede or restrict a constitutionally enacted public law, such as an intervention and expropriation. Bianchi and Rovira do not dispute this principle; however, they misapply the principle in analyzing the meaning and effect of the bylaws' takeover and tender offer requirements.

6. The clause in article 28 of the bylaws, which states that the tender offer provisions "shall apply to the acquisitions directly or indirectly made by the National Government, by any means or instrument, of shares . . . ," can only apply to instances in which the Republic acquires (or assumes control over) shares *by any means available to a private person*, for example, purchases on the open market or from other shareholders, either directly or through its agencies or other controlled entities. Under the hierarchical principle, that bylaws provision, which is a contractual provision that is part of the private law, legally cannot apply, and is not triggered, when the acquisition of shares (or of their control) occurs by operation of a public law, as occurred in this case.

7. Bianchi's analysis of the bylaws' tender offer provision, while flawed, confirms that the obligation to make a tender offer does not apply in this case. Dr. Bianchi asserts that a "takeover" as defined in the bylaws occurred both (a) when the executive branch, under Decree 530/2012 (issued on April 16, 2012), "assumed complete control of YPF's management"

(Bianchi ¶ 38); and (b) when Congress enacted Law No. 26,741 (effective May 7, 2012), under which the Republic temporarily took control of 51% of YPF's shares to be expropriated (Bianchi ¶ 37).

8. In my initial declaration (at ¶¶ 40-48), I described these events as sovereign acts, undertaken pursuant to the Constitution and law, and thus a proper exercise of the Republic's public powers. Bianchi and Rovira do not dispute this.

9. Bianchi goes on to say, however, that under the bylaws, "no 'takeover' may take place unless the party acquiring the shares or securities has *previously* carried out a 'tender offer' (TO) covering the shares of all classes of the Company's stock . . ." (Bianchi ¶ 28 [emphasis added]). He repeats this later on: "*Prior* to takeover, the acquirer is required to carry out a TO" (Bianchi ¶ 31(ii) [emphasis added]).

10. Rovira similarly opines that "Argentina was obligated to make a tender offer under Articles 7 and 28 *before* exercising the control necessary to change YPF's dividend policy" (Rovira ¶ 42 [emphasis added]).

11. Thus, under Bianchi's and Rovira's analysis, the bylaws supposedly *barred* the Republic from either intervening in YPF's management (in April) or temporarily taking control of 51% of YPF's shares (in May), as in neither case did the Republic "previously" carry out a tender offer. In other words, Bianchi and Rovira opine that the bylaws prevented the Republic from carrying out the sovereign acts that, they nevertheless concede, the Republic had the legal right and power to carry out.

12. As is evident, therefore, the bylaws' takeover and tender offer provisions are incompatible with the Republic's sovereign acts of intervention and expropriation. Given such

incompatibility, under Argentine law, the public law prevails over the private rights established by the bylaws. The bylaws may not override or prevent laws related to public order.

13. This conclusion is buttressed by the fact that article 18 of Law No. 26,741 – the YPF expropriation law – states as follows: "*This law is a public order law*." The term "public order" has a particular meaning under Argentine law. It refers to those laws and dispositions that are of fundamental interest to the public and the Nation. When a law or other disposition is described as being one of public order, it means that it prevails over any private rights or interests that are incompatible with it.[1]

14. Article 18 of Law No. 26,741 thus confirms that the private rights in the YPF bylaws concerning takeovers and tender offers, which are incompatible with Law No. 26,741, legally could not be triggered or applied before or after the intervention and expropriation that was carried out under that law.

15. There is another reason why the bylaws' tender offer provisions are incompatible with the intervention and expropriation, and thus cannot be given effect. Law No. 26,741 declared to be "of public interest" and "subject to expropriation" 51% of YPF's shares then held by Repsol.

16. The Republic cannot be bound by a private contractual agreement to acquire a higher number of shares than necessary in order to satisfy the public use as set forth in Law No. 26,741. The National Congress decided to declare for public use 51% of YPF shares, and no more than that percentage. The declaration to subject certain stock to expropriation in the public interest only refers to the shares specified in the law and does not authorize any kind of payment, nor does it grant any rights, to shareholders whose shareholding is not included in this law.

---

[1] Jorge J. Llambías, *Tratado de Derecho Civil*, *Parte General*, Vol. I, ¶¶ 184, 196-97, 200, at pp. 158, 164-65 (16th ed. 1995).

17. If the Argentine Congress had decided that the public interest required the expropriation of a larger proportion of YPF equity represented by a greater number of shares than the number specified in Section 7 of Law No. 26,741, the Congress would have expressed that decision in the law. The intervention and expropriation process therefore excluded any procedure, such as the public tender offer described in YPF's bylaws, which would force the Republic to acquire a larger number of shares than necessary to achieve the purposes of the expropriation as stated in the law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed in Buenos Aires, Argentina on November 9, 2015.

s/ Ismael Mata

_____

Ismael Mata

TRIBUNAL DE PRIMERA INSTANCIA
DEL DISTRITO SUR DE NUEVA YORK
------------------------------------------------------------x
PETERSEN ENERGÍA INVERSORA, S.A.U. y
PETERSEN ENERGÍA, S.A.U.,

                        Demandantes,

   -c-

LA REPÚBLICA ARGENTINA e YPF S.A.,

                        Demandadas.
------------------------------------------------------------x

Caso No. 15 Civ. 2739 (TPG)

## **DECLARACIÓN DE RESPUESTA DE ISMAEL MATA**

De conformidad con la norma 28 U.S.C. § 1746, el que suscribe, Ismael Mata, declara lo siguiente:

1. He presentado anteriormente una declaración para este caso, el día 8 de septiembre de 2015, en respaldo a la solicitud de desistimiento presentada por la República Argentina. Respecto de mi formación académica, respetuosamente solicito al Tribunal que coteje mi *curriculum vitae*, el cuál fue adjuntado a aquella.

2. Presento esta declaración en respuesta a las declaraciones del Dr. Alberto B. Bianchi (en adelante, "Bianchi") y del Dr. Alfredo L. Rovira (en adelante, "Rovira") presentadas por las demandantes el 19 de octubre de 2015.

3. Bianchi y yo estamos de acuerdo en determinados puntos. Por ejemplo, Bianchi sostiene que la expropiación se encuentra establecida expresamente en el artículo 17 de la Constitución Argentina donde expresa: " La expropiación por causa de utilidad pública debe ser calificada por ley y <u>previamente indemnizada</u>" (Bianchi ¶ 16 [énfasis en original]). Sostuve lo mismo en mi primera declaración (en ¶¶ 8, 20-22).

4. El principal punto de desacuerdo entre Bianchi y Rovira (por un lado) y yo se relaciona con la interacción entre (a) los actos soberanos del Estado por los cuales se intervino la administración de YPF y eventualmente se expropió el 51% de las acciones de YPF que por entonces se encontraban en manos de Repsol, y (b) las disposiciones relativas a la adquisición y a la oferta pública de adquisición contenidas en el estatuto de YPF. Bianchi y Rovira consideran estas dos cuestiones como independientes y compatibles entre ellas. Fácticamente y legalmente, no lo son.

5. En mi declaración inicial (en ¶¶ 4-12), expliqué que el derecho argentino establece un orden jerárquico donde el derecho público goza de prioridad sobre el derecho privado y los derechos que este contempla. Esto significa que un contrato privado, tal como es el estatuto de YPF, no puede impedir o restringir la aplicación de una ley de interés publico dictada constitucionalmente, tal como una intervención y expropiación. Bianchi y Rovira no disputan este principio; sin embargo, lo aplican mal al analizar el significado y el efecto de los requisitos para la adquisición y para la oferta pública de adquisición expuestos en el estatuto.

6. La cláusula del artículo 28 del estatuto, que sostiene que las disposiciones relativas a la oferta pública de adquisición "se aplicarán a las adquisiciones que directa o indirectamente efectúe el Estado Nacional, por cualquier medio o título, de acciones …" solamente pueden aplicar en situaciones en donde la República adquiera (o ejerza control sobre) las acciones *a través de cualquier medio que se encuentre disponible para una persona privada*, por ejemplo, compras en el mercado abierto o a otro accionista, sea de manera directa o a través de organismos u otras entidades controladas. En virtud del principio de jerarquía, esa disposición estatutaria, que es una disposición contractual que forma parte del derecho privado, no puede

4. El principal punto de desacuerdo entre Bianchi y Rovira (por un lado) y yo se relaciona con la interacción entre (a) los actos soberanos del Estado por los cuales se intervino la administración de YPF y eventualmente se expropió el 51% de las acciones de YPF que por entonces se encontraban en manos de Repsol, y (b) las disposiciones relativas a la adquisición y a la oferta pública de adquisición contenidas en el estatuto de YPF. Bianchi y Rovira consideran estas dos cuestiones como independientes y compatibles entre ellas. Fácticamente y legalmente, no lo son.

5. En mi declaración inicial (en ¶¶ 4-12), expliqué que el derecho argentino establece un orden jerárquico donde el derecho público goza de prioridad sobre el derecho privado y los derechos que este contempla. Esto significa que un contrato privado, tal como es el estatuto de YPF, no puede impedir o restringir la aplicación de una ley de interés publico dictada constitucionalmente, tal como una intervención y expropiación. Bianchi y Rovira no disputan este principio; sin embargo, lo aplican mal al analizar el significado y el efecto de los requisitos para la adquisición y para la oferta pública de adquisición expuestos en el estatuto.

6. La cláusula del artículo 28 del estatuto, que sostiene que las disposiciones relativas a la oferta pública de adquisición "se aplicarán a las adquisiciones que directa o indirectamente efectúe el Estado Nacional, por cualquier medio o título, de acciones …" solamente pueden aplicar en situaciones en donde la República adquiera (o ejerza control sobre) las acciones *a través de cualquier medio que se encuentre disponible para una persona privada*, por ejemplo, compras en el mercado abierto o a otro accionista, sea de manera directa o a través de organismos u otras entidades controladas. En virtud del principio de jerarquía, esa disposición estatutaria, que es una disposición contractual que forma parte del derecho privado, no puede

aplicar legalmente, y no se dispara cuando ocurre una adquisición de acciones (o sobre su control) en virtud de una ley de carácter público, como ocurrió en este caso.

7. El análisis de Bianchi respecto de la disposición de oferta pública de adquisición del estatuto, si bien es erróneo, confirma que la obligación de hacer una oferta pública no es aplicable en este caso. El Dr. Bianchi afirma que tuvo lugar una "adquisición", según lo define el estatuto, tanto cuando (a) el Poder Ejecutivo, en virtud del Decreto 530/2012 (emitido el 16 de abril de 2012) "asumió el control total de la administración de YPF" (Bianchi ¶ 38); y (b) cuando el Congreso sancionó la Ley N°. 26.741 (en vigencia a partir del 7 de mayo de 2012), por la cual la República ejerció el control temporal del 51% de las acciones de YPF que iban a ser expropiadas (Bianchi ¶ 37).

8. En mi declaración inicial (en ¶¶ 40-48), describí estos eventos como actos soberanos realizados de conformidad con la Constitución y con la ley y, por lo tanto, constituyen un ejercicio adecuado de los poderes públicos de la República. Bianchi y Rovira no disputan esto.

9. Bianchi continúa diciendo, sin embargo, que en virtud del estatuto, "ninguna adquisición podrá tener lugar a menos que una parte que adquiera acciones o títulos valores haya *previamente* llevado adelante una 'oferta pública de adquisición (OP)' por todas las clases de acciones de la Compañía…" (Bianchi ¶ 28 [se agrega énfasis]). Reitera esto mismo más tarde: "*Previo* a la adquisición, se requiere que el adquirente realice una OP" (Bianchi ¶ 31(ii) [se agrega énfasis]).

10. Rovira similarmente opina que "Argentina estaba obligada a hacer una oferta pública de acuerdo con los Artículos 7 y 28 *antes* de asumir el control necesario para cambiar la política de YPF sobre dividendos" (Rovira ¶ 42 [se agrega énfasis]).

11. Por lo tanto, en virtud del análisis de Bianchi y Rovira, el estatuto supuestamente *prohibía* a la República intervenir en la administración de YPF (en abril) o ejercer el control temporalmente del 51% de las acciones de YPF (en mayo), puesto que en ningún caso la República realizó "previamente" una oferta pública de adquisición. En otras palabras, Bianchi y Rovira opinan que el estatuto le prohibía a la República llevar adelante los actos soberanos que, sin embargo reconocen, la República tenía el derecho y la autoridad para encarar.

12. Como es evidente, por lo tanto, las disposiciones relativas a la adquisición y a la oferta pública de adquisición expresadas en el estatuto son incompatibles con los actos soberanos de intervención y expropiación de la República. Dada la existencia de tal incompatibilidad, en virtud del derecho argentino, el derecho público prevalece sobre los derechos de carácter privado establecidos en el estatuto. El estatuto no podrá invalidar o impedir la aplicación de leyes relacionadas al orden público.

13. Esta conclusión se respalda en el hecho de que el artículo 18 de la Ley N° 26.741- la ley de expropiación de YPF- sostiene lo siguiente: *"La presente ley es de orden público"*. El término "orden público" tiene un significado particular en el derecho argentino. Alude a aquellas leyes y disposiciones de fundamental interés para el pueblo y la Nación. Cuando una ley u otra disposición son descriptas como de orden público, significa que prevalecen sobre cualquier derecho o intereses privados que son incompatibles con ella[1].

14. El artículo 18 de la Ley N° 26.741, por ende, confirma que los derechos privados expresados en el estatuto de YPF respecto de las adquisiciones y de las ofertas públicas, los cuales son incompatibles con la Ley N° 26.741, legalmente no podrían ser disparadas o

---

[1] Jorge J. Llambías, *Tratado de Derecho Civil*, *Parte General*, Vol. I, ¶¶ 184, 196-97, 200, en págs. 158, 164-65 (16ta ed. 1995).

aplicables con anterioridad o con posterioridad a la intervención y expropiación realizadas en virtud de la presente ley.

15. Existe otro motivo respecto de por qué las disposiciones relativas a la oferta pública de adquisición son incompatibles con la intervención y la expropiación, y, por ende, no pueden tener efecto. La Ley N° 26.741 declaró de "utilidad pública" y "sujeto a expropiación" el 51% del patrimonio de YPF que entonces poseía Repsol.

16. La República no puede obligarse por un acuerdo contractual privado a adquirir una mayor cantidad de acciones que las necesarias para cumplir con la utilidad pública tal como se establece en la Ley N° 26.741. El Congreso Nacional decidió declarar de utilidad pública el 51% de las acciones de YPF; nada más que ese porcentaje. La declaración de sujetar determinadas acciones a expropiación por causa de utilidad pública solamente se refiere a las acciones especificadas en la ley y no autoriza ningún tipo de pago, ni tampoco reconoce derecho alguno a los accionistas cuya participación accionaria no se incluya en esta ley.

17. Si el Congreso Nacional hubiese decidido que el interés público requería de la expropiación de una mayor proporción del patrimonio de YPF, representándose ello en un mayor porcentaje de acciones que el especificado en el artículo 7 de la Ley N° 26.741, el Congreso hubiese plasmado esa decisión en la ley. Por lo tanto, el proceso de intervención y expropiación excluyó todo proceso, como la oferta pública de adquisición descripta en el estatuto de YPF, que fuerce a la República a adquirir una mayor cantidad de acciones que las necesarias para lograr los objetivos de la expropiación según lo dispuesto en la ley.

Declaro bajo pena de perjurio bajo las leyes de los Estados Unidos de América que la anterior información es verdadera y correcta según mi conocimiento. Suscripto en Buenos Aires, Argentina el 9 de noviembre de 2015.

_____
Ismael Mata

## CERTIFICATE OF ACCURACY OF TRANSLATION

I HEREBY DECLARE that I am a professional translator from Spanish to English (and vice versa); that I am duly licensed in Argentina to perform such translations; that I have translated the document described below from Spanish to English; that attached hereto are copies of the document in its original Spanish and of the English translation that I prepared; and that, to the best of my knowledge and ability, the English translation is an accurate translation of such document.

Document translated: Reply Declaration of Ismael Mata dated November 09, 2015.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Buenos Aires, Argentina on November 09, 2015.

_____
Valeria Cecilia Calle