UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
PETERSEN ENERGÍA INVERSORA, S.A.U. and
PETERSEN ENERGÍA, S.A.U.,

                Plaintiffs,

   -against-

ARGENTINE REPUBLIC and YPF S.A.,

               Defendants.
---------------------------------------------------------------x

Case No. 15 Civ. 2739 (TPG)

## REPLY DECLARATION OF JAVIER ERRECONDO

Pursuant to 28 U.S.C. § 1746, I, Javier Errecondo, state the following:

1. I previously submitted a declaration in this case, on September 8, 2015, in support of the motion to dismiss filed by the Republic of Argentina. Concerning my qualifications, I respectfully refer the Court to paragraphs 2-3 of that declaration and my c.v., which was attached thereto.

2. I submit this reply declaration in response to the declaration of Dr. Gustavo A. Naveira ("Naveira"), submitted by plaintiffs on October 19, 2015. In his declaration, Naveira discusses four reasons why, in his opinion, the Argentine courts are not an adequate forum for resolving the disputes involved in this case. I disagree with Naveira's opinions, for the reasons discussed below.

### Independence of Argentine Courts

3. Argentine courts have a long tradition of independence, since the Argentine Constitution, originally promulgated in 1853 (and reformed from time to time, most recently in 1994), established the judiciary as one of three independent branches of government, the other

two being the executive and legislative branches. This long tradition of independence of the judiciary branch continues to the present, as is evident from judicial decisions, especially those of Argentina's Supreme Court, known as *Corte Suprema de Justicia de la Nación* ("CSJN").

4. Federal judges in Argentina cannot be removed except for misconduct. This is guaranteed by article 110 of the Argentine Constitution, which provides:[1]

> *The Justices of the Supreme Court and the judges of the lower courts of the Nation shall hold their offices during good behavior, and shall receive for their services a remuneration to be ascertained by law and which shall not be diminished in any way while holding office.*

5. The Constitution also protects against improper involvement by the executive branch in the judicial branch, pursuant to article 109, which states as follows:

> *In no case the President of the Nation shall exercise judicial functions, assume jurisdiction over pending cases, or reopen those already adjudged.*

6. Naveira, at ¶ 8 of his Declaration, refers to "a large number of laws" purportedly promoted by the Executive Branch, which – in his view – have threatened judicial independence. However, as will be seen below, my colleague actually cites only three specific statutes passed by Congress (Laws 26,853, 26,855 and 27,145), the first of which has not been implemented, while the other two were declared unconstitutional by the same Argentine Courts which Naveira characterizes as not independent. Naveira also mentions (at ¶ 14) three "proposals" that have remained just that – proposals – and have never been adopted. The Kunkel Bill, for example (Naveira ¶ 14 n.7), was not even voted upon within the relevant committees of the Lower House of Congress, the *Cámara de Diputados de la Nación.* The other two "proposals" were mere commentaries to the press made by then Supreme Court Justice Zaffaroni, who retired from the Court on December 31, 2014.

---

[1] The English translation of the Constitution is available at http://www.wipo.int/wipolex/en/details.jsp?id=7070.

7. As for the statutes passed by Congress, Naveira cites Law 26,855 (enacted in May 2013), which purported to amend the composition and functioning of the Magistrates' Council, a constitutional body that nominates persons for judgeships in the federal courts and the national courts sitting in the City of Buenos Aires (Naveira ¶ 13). However, that same year, Argentina's highest court, the CSJN, issued a 66-page decision[2] in which it declared various provisions of this law unconstitutional, thereby demonstrating its independence from the other branches of government.

8. With regard to the law that purported to create intermediate Courts of Cassation, to be placed above the ordinary Courts of Appeal and below the CSJN (Law 26,853) (see Naveira ¶¶ 11, 44), Naveira fails to mention that the ordinary mechanism to appoint judges for those intermediate courts was never set in motion.

9. Naveira refers to Law 27,145 (at ¶ 15), a statute passed by Congress in June 2015 with the aim of regulating the way the Magistrates' Council should appoint surrogate or temporary judges in the event of vacancies. As Naveira himself acknowledges, in July 2015, only one month after Law 27,145 was passed, a trial court ruled that two of its most important provisions (articles 1 and 2) were unconstitutional.[3] In August of this year, a federal court of appeals also declared those provisions unconstitutional, in a case brought by a judge (Judge Luis M. Cabral).[4] And in October of this year, a trial court again ruled that those provisions were

---

[2] "*Rizzo, Jorge Gabriel s/acción de Amparo c/Poder Ejecutivo Nacional, ley 26.865, medida cautelar, Expte. Nº 3034/13*," CSJN, June 18, 2013.

[3] "*Milla, María C. s/ falta de mérito*" – CNCRIM Y CORREC FED – SALA II - 13/07/2015, elDial.com - AA9069.

[4] Causa Nº 33666/2015 - "*Incidente Nº 1 - Actor: C., L.M. demandado: EN-Consejo de la Magistratura s/inc de medida cautelar*" – CNACAF – SALA I – 11/08/2015. elDial AA9108.

unconstitutional, in a suit brought by an association of lawyers.[5] On November 4, 2015 the CSJN declared unconstitutional a resolution from the Magistrates' Council implementing the subrogation of judges in the event of vacancies, as well as the subrogation regime set forth in Law 27,145.[6]

10. Naveira cites another example, in which the Magistrates' Council reduced a judge's salary by 30%, allegedly under the influence of the executive branch because the judge had issued a pretrial ruling adverse to the President and her son (Naveira ¶ 17). On August 20, 2015, the CSJN reversed the salary reduction (*id.*), again demonstrating its independence from the executive branch.[7]

11. Naveira resorts to sensationalism in citing the case of Alberto Nisman (Naveira ¶¶ 19-20). Naveira does not explain how this ongoing case shows a lack of independence of Argentine courts.

12. Nor does the recent announcement of a criminal complaint and investigation of the financial arrangements behind an international arbitration – in which Burford Capital and the U.S. law firm King & Spalding are implicated (Naveira ¶¶ 22-24) – reflect on the independence of Argentine courts with respect to this case. Although plaintiffs emphasize that this criminal complaint was announced in September 2015, while the motions in this case were being briefed, the news reports submitted by plaintiffs state that the complaint was filed as a result of a petition

---

[5] "*Colegio de Abogados de la Ciudad de Buenos Aires v Estado Nacional – Consejo de la Magistratura*", Federal Court of First Instance for Contentious Adminisrative Matters No. 3, October 15, 2015.

[6] "*Uriarte, Rodolfo Marcelo y otro c/ Consejo de la Magistratura de la Nación s/ acción mere declarativa de inconstitucionalidad*", CSJN, November 4, 2015.

[7] "*Recurso - Bonadío, Claudio s/ Resolución 313/14 del Consejo de la Magistratura*" (File No. 3495/2015).

for investigation that the Treasury Attorney General had filed in February 2015, before the present case was filed.[8]

13. The Treasury Attorney General (Procuración del Tesoro de la Nación, or "PTN") is an office within the Executive Branch, not the Judiciary. The PTN is the main body of lawyers representing the Argentine Government, for example in ICSID arbitrations. PROCELAC, which is conducting the criminal investigation as mentioned by Naveira, is a special unit within the *Ministerio Público*. It is an independent body of public prosecutors, created by the 1994 Amendment to the Constitution. Prosecutors are not part of the Judiciary. Only the Courts will eventually decide the outcome of the investigation launched by PROCELAC.

14. Furthermore, that criminal complaint concerns Burford's financial arrangements with a different set of companies – owned by the Marsans Group of Spain – whose co-founder, Gerardo Díaz Ferrán, pleaded guilty in Spain, in July 2015, to multiple financial frauds and was sentenced to five and one-half years in prison.[9] As stated before, that criminal complaint reflects the actions of a prosecutor and does not show a lack of independence by Argentine courts. Moreover, that criminal complaint does not and cannot affect in any way the right of the Petersen entities to file a complaint in Argentina and to appoint counsel of their own choosing. As in any other litigation conducted before the Argentine courts, counsel representing the parties must be admitted to the Bar of the jurisdiction where the litigation takes place.

---

[8] Sebastian Perry, *Argentina Targets Funder and Counsel Over ICSID "Fraud,"* Global Arbitration Review (Sept. 16, 2015), *available at* http://globalarbitrationreview.com/news/article/34153/argentina-prosecutes-funder-counsel-icsid-fraud/.

[9] *Id*. at p. 2.

15. In fact, Argentine courts have frequently issued rulings adverse to the National Government – notwithstanding the purported threats to judicial independence cited by Naveira. To cite a few illustrative examples from recent years:

- (a) "Arte Radiotelevisivo Argentino S.A. c/ Estado Nacional - JGM - SMC s/ amparo ley 16.986". A CSJN decision dated February 11, 2014 that ordered the Republic to allocate a fair share of the official government advertising to the plaintiff (a licensee of TV Channel 13 of Buenos Aires, part of the Clarín Group).[10]

- (b) "Editorial Perfil S.A. y otro c/ E.N. -Jefatura Gabinete de Ministros— SMC s/ amparo ley 16.906". Decision of the CSJN dated March 2, 2011, which ordered the Republic to allocate a share of the official government advertising to the plaintiff, a company publishing the Buenos Aires newspaper *Perfil* as well as two general information magazines.[11]

- (c) "Camaronera Patagónica S.A. c/ Ministerio de Economía y otros s/ amparo" – A CSJN decision dated April 15, 2014. It ruled that certain export duties imposed on the fishing exports of the plaintiff were unconstitutional.[12]

- (d) "Grobocopatel Hermanos S.A. c/EN-M. Economía Res. 125/08 y 141/08 s/ proceso de conocimiento". A federal court of appeals ruled on November 14, 2013 that certain regulations that imposed export duties on agricultural products were invalid, and ordered the Republic to reimburse the plaintiff the unduly

---

[10] elDial.com - AA850C

[11] elDial.com - AA68D5

[12] elDial.com - AA868E

charged export duties. On March 25, 2015, the CSJN denied a certiorari filed by the Republic, and the Appellate Court ruling became final and binding.[13]

(e) "Asociación Argentina de Compañías de Seguros y otros c/ Estado Nacional - Poder Ejecutivo Nacional s/ nulidad de acto administrativo" – The CSJN ruled on October 27, 2015 that certain Presidential Decrees exempting airlines from the obligation to purchase local insurance to cover risks in Argentina were unconstitutional.[14]

16. As part of its motion papers, the Republic submitted evidence that affiliates of the Petersen entities in this case have filed many lawsuits in Argentina against the National Government and that they have obtained favorable decisions in some of them (Declaration of Carlos Gustavo Pistarini submitted on Sept. 8, 2015 [Dkt. 25], ¶ 9) (*see also id*. ¶ 10 [citing one such decision in 2014, which was affirmed on appeal and as to which the CSJN denied review]). The plaintiffs in this case have not disputed this evidence.

17. In sum, Naveira has not presented any evidence that the Argentine courts have abandoned their long and well-established tradition of independence.

**Timing of Litigation**

18. Naveira claims (at ¶ 28) that litigating against Argentina in Argentine courts "entails significantly longer delays than suing a private party," and (at ¶ 30) that it commonly takes "more than ten years to obtain a final court judgment by the CSJN in a case instituted against the Argentine State." However, Naveira cites no case that took ten years to complete; he

---

[13] "Grobocopatel Hermanos S.A. c/EN-M. Economía Res. 125/08 y 141/08 s/ proceso de conocimiento" – CNACAF – SALA IV - 14/11/2013; elDial.com - AA9130. CSJN certiorari denied, File 228/2014, March 25, 2015.

[14] elDial.com - AA92B3

provides no statistical data or other evidence supporting his statement; and I have found no reliable statistics supporting his statement.

19. Naveira cites the *San Martín* case (at ¶ 31) as supposedly illustrating delay, in that it took two years to resolve the issue of jurisdiction in that case. Naveira omits to state that the decision in that case was issued by the Argentine Supreme Court (CSJN) after three lower courts had previously ruled on the question. Nor does Naveira explain the important jurisdictional question involved in that case, namely, whether the case should be heard by the commercial court, which deals with matters of private law, or the administrative court, which deals with matters of public law.[15] In fact, as the decision states, the issue reached the CSJN prematurely and could have been remanded to the intermediate appellate court for a further ruling, but the high court, "for reasons of procedural speed and economy," decided the issue anyway.

20. I do not consider a two-year period for the CSJN to issue a decision on an important jurisdictional issue – following decisions by three lower courts – to demonstrate inordinate delay. Furthermore, the *San Martín* case, in which the jurisdictional issue arose and was decided, involved essentially the same claims as those of the plaintiffs in this case, namely, that the intervention and expropriation of YPF's shares by the Republic allegedly triggered a requirement under the YPF bylaws for the Government to make a tender offer. As this jurisdictional issue has now been decided, it would not have to be decided again, thereby reducing any potential delay concerning that issue if this case were litigated in Argentina.

21. There are many cases against the Republic that have taken far less time than Naveira claims. Some have been resolved in a matter of months. For example, the *Rizzo* case, mentioned by Naveira (at ¶ 13 n.6), was commenced in 2013 and was finally resolved by the

---

[15] The decision of the CSJN in the *San Martín* case, including the recommended decision of the Attorney General of the Nation (roughly equivalent to the Solicitor General of the United States), was included as Annex B to the Declaration of Carlos Gustavo Pistarini, submitted by the Republic on September 8, 2015.

CSJN that same year.[16] Other examples of cases against the Republic which have taken considerable less time than the ten years mentioned by Naveira are:

(a) The Grobocopatel case, cited in ¶ 15 above, which was commenced on February 8, 2010. The trial court decision was issued on April 22, 2013, the appellate decision was rendered on November 14, 2013, and the CSJN denied the Republic's certiorari on March 25, 2015.

(b) Grupo Clarín y otros c. Poder Ejecutivo Nacional y otro s/ acción meramente declarativa. The action was commenced in 2009. The trial court's decision was issued on December 14, 2012. The appellate court ruled on April 17, 2013 and the CSJN issued its final decision on October 29, 2013[17].

(c) "Glencore Cereales SA y otro c/ EN Dto. 916/04 y 1287/05 s/proceso de conocimiento". The case began in December 2006. The first instance decision was issued on May 8, 2012. The Court of Appeals ruled on November 13, 2012. Finally, the CSJN denied a certiorari filed by the plaintiff on September 17, 2013[18].

(d) "Igarreta SACI c/ EN –Ministerio de Economia - Dto 563/10 y otro s/Proceso de conocimiento". The case began in 2011. A decision was rendered by the trial court of February 4, 2014, and the Court of Appeals ruled on July 16, 2015.

---

[16] *"Rizzo, Jorge Gabriel (apoderado Lista 3 Gente de Derecho s/ accion de amparo c/Poder Ejecutivo Nacional, ley 26.855, medida cautelar (Expte. No. 3034/13),"* CSJN, June 18, 2013.

[17] La Ley On Line AR/JUR/69100/2013.

[18] Appellate Decision: elDial.com - AA7C59. CSJN certiorari denied: File G. 169. XLIX

## Litigation Costs

22. Naveira presents a speculative and highly unrealistic scenario regarding the potential litigation costs that plaintiffs would incur if this case were to be litigated in Argentine courts. He opines that plaintiffs would be required to pay a filing fee of more than $100 million to commence the case and would face having to pay an additional $100 million or more in legal fees if they lose (Naveira ¶ 35).

23. With respect to the filing fee, Naveira relies on Law 23,898, which establishes as a general rule, for federal courts and national courts sitting in the City of Buenos Aires, a court tax (*tasa de justicia*) of 3 percent of the damages claimed or estimated by plaintiff. However, this rule is subject to many exceptions.

24. First, as Naveira acknowledges (at ¶ 38(iii)), when the amount claimed by the plaintiff cannot be determined in advance, the court tax required to be paid at the commencement of the proceeding is seventy pesos – currently about 7 US dollars – with the final amount to be determined once the case has been completed.[19]

25. Second, under Section 78 of the Federal Code of Civil Procedure, plaintiffs may file a motion for leave to litigate *in forma pauperis* when they lack resources, as Naveira also acknowledges (at ¶ 47). This applies both to individuals and to legal entities (such as corporations). The CSJN has recognized that corporations may be granted this status,[20] and so has the National Court of Appeal in Commercial Matters.[21]

---

[19] Law 23,898, Section 5.

[20] CSJN, Nov. 19, 2002, "*Campos y Colonias S.A. c/Buenos Aires, Provincia s/daños y perjuicios – beneficio de litigar sin gastos*"; CSJN, July 11, 2006, "*Coihue S.R.L. c/Santa Cruz, Provincia s/daños y perjuicios – beneficio de litigar sin gastos.*"; CSJN, April 5, 2005, "*Agrogamen S.A. y otro c. Provincia de Buenos Aires*"; CSJN, October 20 1996, "*Estructuras Tafi S.A. c. Provincia de Tucumán*".

[21] National Court of Appeal in Commercial Matters, Chamber A, June 27, 2006, "*Star TVSA c/Direct TV S.A. Argentina*"; and Chamber E, April 1999.

26. Naveira acknowledges (at ¶ 47) that the granting of *in forma pauperis* status would result in a total or partial exemption from the court tax, but he vaguely claims that the status "*may* not be granted to corporations" (*id*. [emphasis added]). His careful use of the word "may," as well as the court decisions cited in the preceding paragraph, show that corporations *can*, in appropriate circumstances, be granted *in forma pauperis* status.

27. That the claim in this case is brought by entities that are in bankruptcy liquidation proceedings in Spain would weigh in favor of granting them *in forma pauperis* status with respect to the court tax, especially given the amount of the tax that could result from a strict application of the 3% rate to the damages – evidently in the billions of U.S. dollars – that plaintiffs would claim.

28. The recently enacted Civil and Commercial Code of Argentina ("CCC"), which came into effect on August 1, 2015, has adopted a widely praised principle of equal treatment for foreign litigants in Argentine courts, as part of its conflict of laws provisions. Article 2610 of the CCC grants unrestricted access to the courts to any foreign citizen or legal entity to defend their rights and interests under the same conditions as nationals and permanent residents in Argentina. Such equal treatment shall apply without any reciprocity requirement. The last paragraph of Article 2610 clarifies that the equal treatment provision applies also to legal entities, such as companies established, registered or authorized under the laws of a foreign State. Therefore, the Petersen entities would be granted equal treatment by the Argentine courts.

29. Based on the above, there are at least two compelling reasons to conclude that a litigation brought in Argentina will not be precluded by the court tax. The first reason is that, for domestic bankrupt individuals or companies, Section 182 of the Argentine Bankruptcy Law, Law 24,522, entitles the court-appointed receiver to seek collection of debts owed to the bankrupt

entity without *prior* payment of any tax or court fee, being such court tax payable out of the proceeds of the collection (which in such case it will normally be at the losing party expense).[22] The exemption covers all types of litigation pursued by the receiver for the benefit of the estate, including actions for damages. Thus, the receiver appointed by the Spanish court in the bankruptcies of the Petersen entities could apply for equal treatment under the provisions of Article 2610 of the CCC.

30. The second path that the Spanish receiver could follow in order to seek equal treatment is based on court precedents under which insolvent companies have obtained total or partial exemption of costs under the above mentioned *in forma pauperis* plea. This argument could be raised by the Spanish receiver in addition to an application under Section 182 of the Bankruptcy Law.

31. In a case brought against the Argentine Government by a former concessionaire of the water and sewage services (Aguas Argentinas S.A.), the trial judge granted the claimant the right to litigate *in forma pauperis* because the company was undergoing a reorganization under Argentina's Bankruptcy Law and it lacked the ability to generate new revenue, as its sole business activity had ceased. Although the Court of Appeals initially granted a 30% reduction of the litigation costs, the company recently was allowed to re-open its petition seeking again a full exemption from costs (including the *tasa de justicia*) upon its submitting new evidence concerning its continued lack of revenues.[23]

---

[22] Law 23,898, Section 10.

[23] File No. 26536/2006 "AGUAS ARGENTINAS SA C/EN -SUBSECRETARIA DE RECURSOS HIDRICOS- S/BENEFICIO DE LITIGAR SIN GASTOS", Federal Contentious Administrative Court No. 8, Secretary No. 15 – Federal Court of Appeals for Contentious Administrative Matters, Division II.

32.     Furthermore, a dispute over the amount of the court tax would not prevent the lawsuit from going forward, as the court tax law specifically provides that a party may oppose payment of the tax, and any proceeding regarding payment of the tax will be heard separately as an incidental proceeding that will not stop or delay the continuance of the main case.[24]

33.     Based on the factors discussed above, in my opinion it is very unlikely that an Argentine court would require the plaintiffs (acting through their bankruptcy receiver) to pay as an initial filing fee a court tax in an exorbitant amount such as $100 million.

34.     With respect to the principle that the losing party is to bear the prevailing party's attorneys' and experts' fees, Naveira acknowledges that this is a "general principle" and that courts can depart from it based on the circumstances of the case (Naveira ¶ 43).

35.     In fact, the Code of Civil Procedure expressly provides that courts may exempt the losing party from paying such costs, for example, if the court concludes that the losing party had reasonable grounds for asserting its case,[25] or if the decision is not entirely favorable to one of the parties, in which event litigation costs may be allocated in proportion to the success of each party.[26]

36.     Furthermore, when the Argentine Government is a party and wins the case, the courts have ruled in numerous cases that each party shall bear its own litigation costs (as well as half of the common costs resulting from the trial).[27] Under these rulings, a party that sues the Argentine Government and loses the case would *not* be required to pay the Government's costs.

---

[24] Law 23,898, Section 11.

[25] Code of Procedure, Section 68.

[26] Code of Procedure, Section 71.

[27] *See, e.g.*, CSJN, July 5, 2011, "*Llago, Jorge Carlos y Otro c/PEN- Ley 25.561 Dtos. 1570/01 214/02 s/Amparo Sobre Ley 25.561*"; CSJN, March 2, 2011, *"Soltex Saica c/PEN - Ley 25.561 Dto. 1570/01 214/02 s/Amparo";* CSJN, Feb. 8, 2011 "*Rozenwurcel, Osvaldo Cesar c/EN – Ley 25.827 (art. 59) y otros s/amparo Ley 16.986*"; CSJN,

37. Naveira also does not mention that, under Law 24,432, Section 13, courts have discretion, when fixing the amount of professional fees of lawyers and experts, to award an amount lower than the statutory percentages when application of the statutory percentages would be disproportionate in light of the nature, scope, time, quality or outcome of the work performed. Thus, the CSJN has held that, when a case involves exceptional amounts, the courts should not automatically refer to the statutory percentages.[28]

38. In sum, Naveira's opinion that litigating this case in Argentina would require plaintiffs to pay a filing fee of more than $100 million at the commencement of the case and that they could be held liable for another $100 million or more in legal and other costs is an exaggeration, as it ignores the exceptions and safeguards that the law provides and that courts have applied, discussed above, in setting the court tax and court costs. In my opinion, courts have adequate discretion and flexibility to set reasonable amounts for such costs based on the circumstances of each case.

39. Naveira also complains (at ¶¶ 32-33) about delay by the Argentine State in complying with money judgments, but this delay is not caused by the Argentine judicial system and is not unreasonable under the circumstances. Rather, as Naveira acknowledges (at ¶ 32), the delay he refers to reflects the Government's legal obligation to include the approval for the payment of the judgment amount in the next budget law to be approved by the Federal Congress, as required by Law 23,982, Section 22, before the judgment can be paid. This obligation also applies when judgments requiring payment are issued in foreign jurisdictions.

---

July 12, 2011, *"Aguirre, Ricardo c/PEN-Ley 25.561 Dtos. 1570/01 214/02 471/02 (Boston) y Otros s/Proceso de Conocimiento";* CSJN, May 8, 2012, *"Proietto, Antonio Francisco –Inc. Ejec. Sent- c/En M° Economía – Dto. 1735/04 s/Proceso de conocimiento";* CSJN, April 23, 2013*, "Rosa, Dolores Estrella c/En-M° Economía-Dto. 138/04 (Bonos Externos) s/Amparo Ley16.986."*

[28] CSJN, Apr. 4, 1997, *"Provincia de Santa Cruz v. Estado Nacional."*

40. In sum, Naveira's opinion concerning court costs is not supported by any evidence or statistical data.

### Pretrial Discovery

41. Naveira states (at ¶ 50) that "the US process known as *Pre Trial Discovery* . . . is alien to Argentine law," as if the Argentine judicial system were an exception. In fact, it is the U.S. system of pretrial discovery that is the exception, as most countries in the world, and in particular most "civil law" countries, such as Argentina, do not have a *pretrial* discovery system resembling that of the United States. That does not mean that the legal systems in all of those countries, including Argentina, are deficient.

42. There is a very good reason why Argentina, and most other countries, do not have a system of "pretrial" discovery: in Argentina and most other countries, there is no division of stages in court cases between "trial" and "pretrial." A case begins with the plaintiff's complaint, followed by the defendant's answer to the complaint, after which all the evidence is gathered and presented to the court throughout the course of the remainder of the case, under the supervision or at the direction of the judge.

43. Naveira acknowledges that there are many different ways that parties in Argentine court cases can get access to information, such as requests for documents (¶¶ 54-63); and that in some cases, documents may be requested even in advance of filing the complaint (¶ 55).

44. In addition, the Government is subject to certain obligations of disclosure of public acts, that plaintiffs and potential plaintiffs may avail themselves of. The General Regulation Granting Access to Governmental Information, which is included as Annex VII to Decree 1172/2003, imposes on the Government the obligation to grant access to public documents.

45. Although Naveira describes document production in Argentina as "restrictive" compared with the U.S. system (¶ 54), he does not claim that the Argentine system fails to provide substantial justice as a result. In my view, the Argentine judicial system provides substantial justice even though discovery is not as broad as under the U.S. judicial system.

46. Finally, Naveira discusses the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"), and suggests that, if this case continued to be litigated in the United States court, then the "letter rogatory" procedure under the Convention "could" possibly be used to obtain evidence in Argentina (¶¶ 65-66). Naveira fails to mention that Argentina, like most of the contracting states to that Convention, issued a reservation (as permitted by the Convention) declaring that it would not execute letters of request issued for the purpose of obtaining pretrial discovery of documents.[29]

47. Upon acceding to the Convention, Argentina made an express reservation within the terms of Article 23.[30] The wording of Argentina's reservation places it among the countries expressing so-called "blanket reservations," as opposed to narrower reservations such as that of the United Kingdom.[31]

48. The Hague Evidence Convention also permits a requested State to express objections to requests received from another State and to adapt to such requests the procedures applicable under the requested State's own laws. Article 5 of the Convention states:

---

[29] Law 23,480 (Argentine law concerning accession to the Convention); *see also* Status Table concerning the Convention, showing all member nations and their respective reservations, available at http://www.hcch.net/index_en.php?act=conventions.status&cid=82.

[30] Article 23 of the Hague Convention provides: "A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries." Argentina's reservation states: "The Argentine Republic will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in the common law countries."

[31] Other blanket reservations under Article 23 include those issued by France, Spain, Italy, Denmark and Germany. *See* Status Table cited in note 29 above.

> *If the Central Authority considers that the request does not comply with the provisions of the present Convention, it shall promptly inform the authority of the State of origin which transmitted the Letter of Request, specifying the objections to the Letter.*

Professor Philip W. Amram, in his Explanatory Report to the Hague Convention, points out that some of the errors or defects which would justify such objections are: *"that the Letter seeks pre-trial discovery of documents, and a declaration has been filed under article 23."* [32]

49.  Along the same lines, in his commentary to Article 9, Professor Amram says: *"Article 9. . . deals with the difficult problem of the extent to which the State of execution will execute Letters in the foreign form of the State of origin, necessarily different from the form used in its own domestic litigation. Article 9(1) states the conventional rule that the State of execution will execute the Letter in conformity with its own internal procedures, just as though it were domestic litigation.*[33]

50.  Finally, in acceding to the Convention, Argentina also excluded application of Chapter II of the Convention, which provides for the taking of evidence in a host country by diplomatic officers, consular agents and commissioners.[34]

51.  In sum, if this case continued to be litigated in the United States, the Hague Convention would not provide an avenue for the parties to obtain evidence in Argentina, for use in the U.S. court, beyond the discovery that Argentine courts allow for any cases litigated in Argentina.

---

[32]  Explanatory Report by the Rapporteur on the Hague Convention, available at the Conference's website: http://www.hcch.net/index_en.php?act=publications.details&pid=2968&dtid=3.

[33]  *Id.* Article 9 of the Convention provides: "The judicial authority which executes a Letter of Request shall apply its own law as to the methods and procedures to be followed. However, it will follow a request of the requesting authority that a special method or procedure be followed, unless this is incompatible with the internal law of the State of execution or is impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties. A Letter of Request shall be executed expeditiously".

[34]  *Id.* The text of the Convention is accessible at http://www.hcch.net/index_en.php?act=conventions.text&cid=82.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Buenos Aires, Argentina on November 9, 2015.

_____
Javier Erreconde