UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
PETERSEN ENERGÍA INVERSORA, S.A.U. and
PETERSEN ENERGÍA, S.A.U.,

                                Case No. 15 Civ. 2739 (TPG)

        Plaintiffs,

   -against-

ARGENTINE REPUBLIC and YPF S.A.,

        Defendants.
-------------------------------------------------------------x


# REPLY MEMORANDUM OF LAW OF THE REPUBLIC
# OF ARGENTINA IN SUPPORT OF ITS MOTION TO DISMISS


                                   AKERMAN LLP
                                   *Attorneys for Defendant*
                                   *Republic of Argentina*
                                   666 Fifth Avenue, 20th Floor
                                   New York, New York 10103
                                   Phone:  (212) 880-3800
                                   Fax:  (212) 880-8965

Dated:  November 9, 2015

**Table of Contents**

                                                                                                                      **Page**

Table of Authorities ................................................................................................................. ii

I.      THE FSIA ...............................................................................................................1

II.     THE ACT OF STATE DOCTRINE .....................................................................5

III.    CHAMPERTY ........................................................................................................6

IV.     *FORUM NON CONVENIENS* ..............................................................................8

V.      CAUSATION ........................................................................................................10

Conclusion ............................................................................................................................10

**Page**

**Cases**

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11 (2d Cir. 1997) ...................................... 7

*Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001),
    *aff'd as modified*, 303 F.3d 470 (2d Cir. 2004) .................................................................... 8-9

*American Constr. Mach. & Equip. Corp. v. Mechanized Constr. of Pak. Ltd.*,
    No. 85 Civ. 3765 (JFK), 1986 WL 2973 (S.D.N.Y. Mar. 5, 1986) ............................................ 4

*Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736 (S.D.N.Y. 2004) .......................... 3

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
    905 F.2d 438 (D.C. Cir. 1990) ........................................................................................ 3

*Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006) ...................................................... 2

*Gibbons v. Udaras na Gaeltachta*, 549 F. Supp. 1094 (S.D.N.Y. 1982) ...................................... 4

*Maritime Int'l Nominees Establishment v. Rep. of Guinea*, 505 F. Supp. 141
    (D.D.C. 1981), *rev'd*, 693 F.2d 1094 (D.C. Cir. 1982) ...................................................... 4

*McKesson Corp. v. Islamic Rep. of Iran*, 672 F.3d 1066 (D.C. Cir. 2012),
    *cert. denied*, 133 S. Ct. 1582 (2013) .......................................................................... 5-6

*Pena-Perez v. Procuraduria General de Justicia of Nicaragua*,
    No. 96 Civ. 0168 (KTD), 1997 WL 122823 (S.D.N.Y. Mar. 17, 1997) .................................... 2

*Rong v. Liaoning Province Gov't*, 452 F.3d 883 (D.C. Cir. 2006) .............................................. 3

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ...................................................................... 7

*Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279 (11th Cir. 2001) ...............................................

*Shapiro v. Republic of Bolivia*, 930 F.2d 1013 (2d Cir. 1991) .................................................. 4

*Transatlantic Shiffahrtskontor v. Shanghai Foreign Trade Corp.*,
    204 F.3d 384 (2d Cir. 2000) .......................................................................................... 5

*WMW Mach., Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*,
    960 F. Supp. 734 (S.D.N.Y. 1997) ................................................................................ 3

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
    296 F.3d 1154 (D.C. Cir. 2002) ...................................................................................... 6

**Statutes, Rules and Other Authorities**

N.Y. Judiciary Law § 489(1), (2)................................................................................7

**Argentine Law**

Decree 530/2012, dated April 16, 2012 ...................................................................1, 2

Law 26,741, effective May 7, 2012 .........................................................................1, 2

Defendant Republic of Argentina (the "Republic") submits this reply memorandum of law in further support of its motion to dismiss all claims alleged against it.

## I.   THE FSIA

In arguing that its claims against the Republic are "based upon" "commercial activity" under the FSIA, Petersen asserts that the bylaws' tender offer requirements are independent of, and compatible with, the Republic's sovereign acts of intervention and expropriation that allegedly triggered those tender offer requirements.  That position is incorrect, both as a matter of law and under the bylaws' provisions themselves.

Under Argentine law, because the Republic took control over YPF by the constitutionally prescribed and sovereign acts of intervention and expropriation, and not as a private entity, the takeover provisions in the bylaws could not be, and were not, triggered (Mata Reply ¶¶ 4-12; Mata ¶¶ 40-48, 56-62).  This is also clear from the text of Law 26,741, which states that it is a "public order" law, and thus prevails over any inconsistent contractual rights (Mata Reply ¶¶ 13-14).  Further, as Law 26,741 called for the expropriation of *only* 51% of YPF's shares, the bylaws' provision, which would have required the Republic to acquire additional shares by tender offer, contradicted that law and thus could not be enforced (*id*. ¶¶ 15-17).

The bylaws themselves, as interpreted by Petersen's experts, Alberto Bianchi and Alfredo Rovira, also confirm that the tender offer provision could not legally apply in this case.  Bianchi asserts that a "takeover" as defined in the bylaws occurred both (a) in April 2012, when the Republic, under Decree 530/2012, assumed control over YPF's management (Bianchi ¶ 38), and (b) in May 2012, when the Republic, under Law 26,741, temporarily took control of 51% of YPF's shares (Bianchi ¶¶ 25-27).  He asserts that, under the bylaws, no such takeover may take place unless the person engaging in the takeover "has *previously* carried out a 'tender offer'

(TO)" (Bianchi ¶ 28 [emphasis added]). *See also id*. ¶ 31(ii) ("*Prior* to takeover, the acquirer is required to carry out a TO" [emphasis added]). Rovira makes the same assertion (Rovira ¶ 42).

Thus, according to Petersen's experts, the bylaws supposedly required the Republic to make a tender offer *before* the President issued and carried out Decree 530/2012 and *before* Congress enacted Law 26,741. The bylaws thus purportedly barred the Republic from taking the sovereign acts that its Constitution grants it the power to take and that it did take. Contrary to Petersen's position, therefore, the bylaws' tender offer provisions in fact are *incompatible* with the acts of intervention and expropriation and could not be given effect. (Mata Reply ¶¶ 7-12.)

Petersen's expert Rovira further proves this point; he states: "it is clear that the triggering event for the obligations in Articles 7 and 28 was Argentina's decision to carry out the temporary occupation and to thus acquire shares representing the majority of YPF's voting capital stock and thereby create a change of control" (Rovira ¶ 40). Rovira thus confirms that Petersen's claims were "triggered" by – *i.e.*, are "based upon" – sovereign acts that cannot be deemed to be "commercial activity" under the FSIA. *Pena-Perez v. Procuraduria General de Justicia of Nicaragua*, No. 96 Civ. 0168 (KTD), 1997 WL 122823, at *2 (S.D.N.Y. Mar. 17, 1997) ("[e]xpropriation is a quintessentially sovereign act and is *never* viewed as having commercial character") (emphasis added).

In seeking to characterize the Republic's acts on which the claims are based as "commercial activity," Petersen points mostly to events in 1993: the privatization of YPF; the adoption of the bylaws; and the raising of capital by the IPO. Those events occurred 15 years before Petersen began buying YPF shares (in 2008) and 19 years before the intervention and expropriation process began (in 2012). Petersen's claims are not "based upon" the 1993 events. In determining what the claims are "based upon," the Court must look at the "gravamen of the complaint." *Garb v. Republic of Poland*, 440 F.3d 579, 586 (2d Cir. 2006). The "triggering"

events in this case, and thus the gravamen of the claims – as both Bianchi and Rovira assert –

were the intervention and expropriation in 2012.[1]

Petersen cites *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449-

50 (D.C. Cir. 1990), for the proposition that a government's abuse of its majority shareholder

position and denial of dividends to a minority shareholder constitute commercial activity under

the FSIA (Pl. Memo at 12).  That case in fact supports the Republic's position because it did not

involve a legal takeover, as the same court noted in *Rong v. Liaoning Province Gov't*, 452 F.3d

883, 890 (D.C. Cir. 2006) (distinguishing *Foremost-McKesson*, in which there was "'no

indication that Iran nationalized Pak Dairy by taking it over through a process of law,' no formal

declaration by the government of Iran that a takeover was to occur and no 'statutory restrictions

or governmental decrees or directives' referring to the takeover").  *Rong*, by contrast, involved a

formal government expropriation of corporate shares, as occurred in this case, which was held to

be non-commercial activity.

Because Petersen's claims are not "based upon" commercial activity, the Court need not

determine whether the additional requirement of a substantial contact with the U.S. is present.

But, even if the Court reached that issue, no adequate nexus exists.  First, as noted above, the

events in 1993, in which Petersen was not involved but which it emphasizes, are too remote in

time to establish such a nexus with respect to claims that arose in 2012.  Second, the fact that

some (but not all) aspects of a tender offer – if it had been made – would have been made in New

York is inconsequential compared to the critical events that occurred in Argentina, on which

---

[1]  For this reason, the two district court cases that Petersen cites for the proposition that "privatizing a state-owned company is commercial activity" are inapposite (Pl. Memo at 11 [citing *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 750 (S.D.N.Y. 2004); and *WMW Mach., Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*, 960 F. Supp. 734, 740 (S.D.N.Y. 1997)]).  In those cases, the claims arose from and were based upon acts during and in furtherance of the privatization, not on an expropriation that occurred 19 years later.

Petersen's claims in fact are based. Petersen's liquidation trustee confirmed this in his letter to

the Republic, notifying it of an arbitrable demand based on these very claims; the trustee stated

that all of the conduct on which the claims are based violated Petersen's rights "in Argentina"

(Domb Decl. [Dkt. 27] Ex. 21, at 5). Third, Petersen completely ignores the fact that the

plaintiffs are Spanish corporations, wholly-owned indirectly by an Argentine corporation, which

in turn is owned by Argentine citizens; thus, any effect from the alleged breach would be in

Argentina, not in New York.[2]

Petersen also relies on *Gibbons v. Udaras na Gaeltachta*, 549 F. Supp. 1094, 1113

(S.D.N.Y. 1982), for the proposition that, in a breach of contract case, there is a sufficient

connection with the United States "if substantial aspects of the contract were to be performed

here" (Pl. Memo at 18 (quoting *Gibbons* and citing *American Constr. Mach. & Equip. Corp. v.*

*Mechanized Constr. of Pak. Ltd.*, No. 85 Civ. 3765 (JFK), 1986 WL 2973, at *5 (S.D.N.Y. Mar.

5, 1986), which relies on *Gibbons*)). However, *Gibbons* assumed that the commercial activity

test under the FSIA was "at least as broad as the jurisdiction conferred on a state court by virtue

of a state long-arm provision." *Gibbons*, 549 F. Supp. at 1113. The Second Circuit has since

stated that, with respect to the substantial contact with the U.S. required under the FSIA,

Congress intended a "tighter nexus" than the minimum contacts standard for personal

jurisdiction. *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1019 (2d Cir. 1991).[3]

---

[2]  Petersen states that in 2012, when the claims accrued, Repsol owned 74% of YPF's shares (Pl. Memo at 8). As Petersen then owned more than 25%, all other shareholders, in the New York and Buenos Aires stock exchanges combined, owned less than 1%. This further shows the minimal "effect," if any, in New York. Petersen has not identified any other YPF shareholder claiming to have been adversely affected in New York as a result of the expropriation.

[3]  Moreover, the *Gibbons* court based its articulation of the principle regarding contract formation and performance on a case whose FSIA holdings were later reversed. *Maritime Int'l Nominees Establishment v. Rep. of Guinea*, 505 F. Supp. 141, 143 (D.D.C. 1981), *rev'd*, 693 F.2d 1094 (D.C. Cir. 1982).

Finally, with respect to the third prong, Petersen wrongly asserts that "Argentina does not contest the first element" of that exception (Pl. Memo at 20 n.6). Under that prong, Petersen must identify an act outside of the U.S., in connection with a commercial activity of the foreign state *upon which the claim is based*, and that act must cause a direct effect in the U.S. *See Transatlantic Shiffahrtskontor v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 390 (2d Cir. 2000) (suit must be "based upon" an act in connection with commercial activity abroad). Petersen does not identify the act on which its claims are based; it states only that it included the Republic's 1993 offer of YPF shares on the Buenos Aires stock exchange (Pl. Memo at 20 n.6). But, Petersen did not participate in that offer; Petersen did not buy YPF shares until 2008; and its claims arose in 2012 and had nothing to do with any "act" in 1993.

In sum, Petersen's claims were "triggered" by and thus are based upon sovereign acts of intervention and expropriation. In any event, given the identity of all the parties and the locus of the critical events, there is not a sufficient connection between the events on which the claims are based and the U.S. to meet the commercial activity exception.

## II.    THE ACT OF STATE DOCTRINE

Petersen claims that it is not seeking to have this Court disregard the laws and decrees issued by the Republic (Pl. Memo at 23), but that is, in fact, what it is doing. The Republic made a determination, through a constitutionally-mandated process, that 51% of the interest of an Argentine corporation was subject to a public need – no more, no less. Petersen is asking this Court to require the Republic to go beyond what its Congress determined by law to be necessary to satisfy a public need (*see* Mata Reply ¶¶ 15-17).

Petersen claims, relying on *McKesson Corp. v. Islamic Rep. of Iran*, 672 F.3d 1066 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 1582 (2013), that the Republic's conduct was not sovereign but rather was "akin to a corporate dispute between majority and minority shareholders" (Pl.

Memo at 23).  In *McKesson*, however, "Iran did not pass a law, issue an edict or decree, or engage in formal governmental action explicitly taking McKesson's property for the benefit of the Iranian public."  672 F. 3d at 1074.  As the *McKesson* court noted, that was in "direct contrast" to the facts of its prior case, *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002).  *McKesson*, 672 F.3d at 1073.  In *World Wide*, the plaintiff claimed a breach of contract against the Republic of Kazakhstan that was triggered by the government's expropriation and transfer of corporate shares.  The D.C. Circuit affirmed the dismissal in that case and "emphasized that the transfer and alleged conversion were accomplished pursuant to an official decree of the Republic of Kazakhstan."  *Id.* (quoting *World Wide*, 296 F.3d at 1166).  It is not disputed here that the alleged breach – *i.e.*, the failure to make a tender offer – was likewise triggered by an expropriation effected by formal decree and duly enacted law.

Petersen's argument that the Republic "did not act pursuant to any formal 'statute, decree, order, or resolution'" with respect to the alleged tender offer obligation (Pl. Memo at 24) is contradicted by its own allegations.  In addition to the complaint's detailed reliance on Argentine legislation and formal government acts (Comp. ¶¶ 35-40), Petersen alleges that "Argentina's announcement and *enactment of the Expropriation Law* and related statement *clearly demonstrated* its intent to retake control of YPF *without any tender offer . . .*" (*id*. ¶ 40 [emphasis added]).  Thus, it could not be clearer, from the complaint itself (as it is from Argentine law, *see* Mata declarations), that the alleged breach – *i.e.*, the decision not to make a tender offer – was part and parcel of the sovereign acts of intervention and expropriation, and that these acts occurred on Argentine soil.

## III.    CHAMPERTY

Petersen makes three arguments as to why champerty does not apply, none of which is valid.  First, Petersen claims that it did not acquire the claim by *assignment* simply because the

agreement states that it is not an assignment (Pl. Memo at 26). Petersen ignores the well-established principle that an agreement's nature is determined by its terms, not by how the parties self-servingly describe it (Republic Memo at 23). Petersen cannot overcome the fact that the agreement gave Prospect complete control over the claim and its settlement, thereby showing that it was in fact an assignment.[4]

Second, Petersen asserts that the assignment is protected by the "bankruptcy exception" in § 489(1). But, the bankruptcy exception applies to claims based on *instruments*, not to bald claims or demands. That is because the prohibition, contained in the first clause of § 489(1), applies to "a bond, promissory note, bill of exchange, book debt, or other thing in action, *or any claim or demand*" (emphasis added), whereas the bankruptcy exception, contained in the second clause of § 489(1), omits the phrase "or any claim or demand" and applies only to "bills receivable, notes receivable, bills of exchange, judgments or other things in action." "Distinctions among descriptions juxtaposed against each other are naturally understood to be significant." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993). Therefore, based on the words of the statute and principles of statutory construction,[5] the transfer of a bald claim such as the one involved in this case is not protected by the bankruptcy exception.

Third, Petersen's argument that the assignment in this case is protected by the safe harbor provision in § 489(2) – concerning transfers having a purchase price of at least $500,000 – completely ignores a key part of its text: "*if* such assignment, purchase or transfer included

---

[4] The case cited by Petersen (at 27), *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17-18 (2d Cir. 1997), is not applicable. It did not involve the champerty statute, and the issue there was whether the plaintiff had standing to sue *in its own name* rather than in the name of the purported assignors, an issue not present in this case (as Prospect is not suing in its own name).

[5] Applicable here are the canons *expressio unius est exclusio alterius – i.e.*, the inclusion of one thing implies the exclusion of the other; and *ejusdem generis – i.e.*, when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed.

bonds, promissory notes, bills of exchange and/or book debts" (emphasis added). In this case, no such instruments were included in the transfer, which concerned a bald claim. Accordingly, the $500,000 safe harbor simply does not apply.

## IV.    *FORUM NON CONVENIENS*

**Deference to plaintiffs' choice of forum**. Petersen does not address this element beyond stating, without any analysis, that "Plaintiffs' choice of forum is entitled to great deference" (Pl. Memo at 28). The opposite is true, given that none of the parties is located in this forum (*see* Republic Memo at 28-29).

**Adequacy of Argentine courts**. Petersen's expert, Gustavo Naveira, cites a number of events that, he claims, show that Argentina's courts lack independence or are subject to undue pressure from the executive branch. In fact, Argentina's courts have a long tradition of independence (Errecondo Reply ¶¶ 3-17). Many of the examples cited by Naveira consisted of executive proposals, which were not adopted. For example, Naveira cites a *proposal* by the executive branch to increase the number of judges on Argentina's highest court (Naveira ¶ 14). In 1937, President Franklin D. Roosevelt similarly proposed a "court-packing plan," which would have increased the number of Justices on the Supreme Court; the fact that the U.S. executive branch made such a proposal did not implicate the independence of U.S. courts.

Other grounds cited by Naveira as supposedly rendering Argentine courts inadequate – delay, court costs, and lack of U.S.-like discovery – are easily rebutted, both factually (Errecondo Reply ¶¶ 18-51) and under U.S. law. *Satz v. McDonnell Douglas Corp*., 244 F.3d 1279, 1283 (11th Cir. 2001) ("The plaintiffs' concerns about Argentine filing fees, the lack of discovery in Argentine courts, and their fear of delays in the Argentine courts do not render Argentina an inadequate forum."); *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 543 (S.D.N.Y. 2001) (the notion that differences in civil law systems, including "tighter restrictions on

discovery, . . . renders 'inadequate' in any fundamental sense the civil law system employed by Ecuador, by most other nations in South America, and by most of the nations of Europe is insulting to those nations and absurd on its face"), *aff'd as modified*, 303 F.3d 470 (2d Cir. 2004).

Private and public interests. Regarding the private factors, Petersen unfairly minimizes the expense and logistical difficulty that would be involved in bringing many witnesses to New York (*e.g.*, Petersen characterizes a 5,300 mile, 11-hour flight as "a need to fly a few hours," Pl. Memo at 33), or in translating testimony and many documents from Spanish. Petersen does not dispute the Republic's list of potential witnesses, all located in Argentina (Republic Memo at 28). And, Petersen identifies no private interest factors weighing in favor of this forum.

With respect to the public interest factors, the New York connections cited by Petersen are inconsequential in comparison to Argentina's. Petersen does not dispute that:

- Plaintiffs are ultimately owned by Argentine citizens, and none of the entities or individuals associated with plaintiffs is located in New York.

- Neither defendant is located in New York.

- The claims are based on the bylaws of an Argentine corporation.

- The corporation's obligations to its shareholders, including its dividend policy, are governed by Argentine law.

- The claim was triggered by sovereign acts of intervention and expropriation that occurred in Argentina, pursuant to the Argentine constitution, Presidential decree, and duly enacted legislation, all of which are also governed by Argentine law.

- The expropriation was based on an express congressional finding of "a national public interest" aimed at ensuring an adequate supply of energy for the public at reasonable cost.

No New York law or public policy is implicated by the claims. Because no tender offer was made, there is no claim that the Republic failed to comply with any securities law or regulation. Petersen states that two of the banks from which Petersen borrowed in order to buy YPF shares

are based in New York. However, the loans were made in London, and London-based banks

acted as administrative and collateral agents (Domb Decl. Ex. 6). The banks' interests, if any, in

the claims are represented in a *Spanish* liquidation proceeding, not in New York. New York's

interest as a "financial capital of the world" (Pl. Memo at 33) does not mean that New York has a

"public interest" in resolving every international financial transaction dispute, especially when

none of the parties is based in New York and virtually all critical events occurred abroad.

## V.      CAUSATION

Petersen concedes that it was YPF's nonpayment of an anticipated May 2012 dividend

that caused Petersen's creditors to foreclose on its shares *that month* (Comp. ¶¶ 39, 42). Petersen

does not dispute that Argentine law does not require a corporation to pay dividends (Errecondo

[Dkt. 26] ¶¶ 6-12). Therefore, its claim that YPF, regardless of who controlled it, was required

to pay a dividend in May 2012 is legally groundless. Nor does Petersen dispute that the

shareholders' meeting at which the decision not to pay a dividend was made occurred *in June

2012* (Marcer Decl. [Dkt. 37] ¶ 9), *after* Petersen's creditors had foreclosed on Petersen's shares.

Finally, Petersen does not dispute that a tender offer, even if made, would not have been

completed until long *after* Petersen lost its shares in foreclosure. Petersen's theory that its

creditors would not have foreclosed in May had they known that a tender offer was on the

horizon (Pl. Memo at 35) is neither viable nor alleged in the Complaint. Thus, it is clear from

the complaint itself that Petersen's claimed losses were not *caused* by the Republic's alleged

failure to make a tender offer or any other actionable conduct.

## Conclusion

For the foregoing reasons, the Court should dismiss all claims against the Republic.

Dated:     November 9, 2015

AKERMAN LLP
*Attorneys for Defendant*
*Republic of Argentina*
666 Fifth Avenue, 20th Floor
New York, New York 10103
Phone:  (212) 880-3800

*s/ Martin Domb*

By: _____

Martin Domb
martin.domb@akerman.com
Benjamin R. Joelson
benjamin.joelson@akerman.com

and

Bryan T. West
bryan.west@akerman.com
AKERMAN LLP
One Southeast Third Avenue, 25th Floor
Miami, FL 33131
Phone: (305) 374-5600

*Of counsel*:

George Volsky
AKERMAN LLP
One Southeast Third Avenue, 25th Floor
Miami, FL  33131-1714
Phone:  (305) 374-5600