G7KHPETC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   PETERSEN ENERGÍA INVERSORA,
    S.A.U. and PETERSEN ENERGÍA,
4   S.A.U.,
5              Plaintiffs,
6         v.                          15 CV 2739 (LAP)
7
    ARGENTINE REPUBLIC and YPF,
8   S.A.,,
                                      Conference
9
               Defendants.
10
    ------------------------------x
11                                    New York, N.Y.
                                      July 20, 2016
12                                    11:05 a.m.
13  Before:
14              HON. LORETTA A. PRESKA,
15                                    District Judge
16                    APPEARANCES
17  KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC
         Attorneys for Plaintiffs
18  BY:  MARK C. HANSEN
         DEREK T. HO
19
    AKERMAN LLP
20       Attorneys for Defendant
    BY:  MARTIN DOMB
21       BENJAMIN R. JOELSON
22  CHADBOURNE & PARKE LLP
         Attorneys for Defendant YPF S.A.
23  BY:  THOMAS J. HALL
         MARCELO BLACKBURN
24
25
```

1          (Case called)

2          MR. HANSEN:  Thank you, your Honor.  Mark Hansen,

3     H-a-n-s-e-n, of Kellogg Huber Hansen Todd Evans & Fiegel in

4     Washington, D.C., for the plaintiffs.

5          THE COURT:  Who else?

6          MR. DOMB:  Good morning.  Martin Domb, D-o-m-b.  You

7     have my card.  From the Akerman firm for the Republic of

8     Argentina.

9          MR. HALL:  Thomas Hall from Chadbourne & Park LLP, on

10    behalf of defendant, YPF S.A.  Good morning, your Honor.

11         THE COURT:  Good morning.

12         (Discussion off the record)

13         THE COURT:  Could we start by going through the bylaws

14    and figuring out what the timeline would/should be for a tender

15    offer and what triggers what and how it would work.

16         So, Mr. Hansen, maybe you could start if you want.

17         MR. HANSEN:  Thank you, your Honor.  Good morning.

18    Mark Hansen for the plaintiffs as I mentioned a minute ago.

19         I think, in answer to your question, your Honor, the

20    bylaws provide that there's a time sequence that an acquirer of

21    shares, such as the Republic of Argentina, if it's going to

22    acquire a percentage as stated in the bylaws, it has to issue a

23    tender for the minority shares as the parties contracted.

24         THE COURT:  The question is more detailed than that.

25    Let's go through each step.  It had been my understanding that

G7KHPETC

the first obligation in time sequence is for the party wishing

to acquire shares to give notice.  Am I wrong on that?

          MR. HANSEN:  Well, I think it's -- to be specific,

your Honor, the section is Section 7 of the bylaws.

          THE COURT:  Right.

          MR. HANSEN:  And just being very specific, Section

7(c) says there's an information duty:  Any person who shall

directly or indirectly acquire by any means more than 3 percent

shall notify the corporation within five days as from the

acquisition to cause such person to report such circumstances.

          THE COURT:  So the acquirer may acquire shares up to

that amount and within five days has to notify the company?

          MR. HANSEN:  That's what this says, your Honor.

          THE COURT:  Okay.  The next thing that happens is

what?

          MR. HANSEN:  This then goes on to say if the terms

of -- then it says:  If the terms of subsections (e) and (f)

are not required for, you can't require.  So you go to Section

(e).  The person wishing to do a takeover, that's defined as a

certain amount, shall (1) obtain a prior consent of special

shareholders meeting of class A shareholders and (2) arrange a

takeover bid for the acquisition of all the shares of all the

classes of the corporation and all securities convertible into

shares.  And then (f) each takeover bid shall be conducted in

accordance with the procedure herein stipulated and, to the

1    extent that applicable regulations in the jurisdictions where

2    the takeover bid takes place and the provisions of the stock --

3              THE COURT:  Mr. Hansen, you want this taken down?

4              MR. HANSEN:  I do, your Honor.

5              THE COURT:  I know you're reading, but don't forget

6    the court reporter.

7              MR. HANSEN:  Thank you, your Honor.  I apologize.

8              At any rate, it goes on to provide the procedures

9    which we've outlined in our briefs, your Honor.  That's what

10   happens in time sequence.

11             THE COURT:  Including in subsection (f)(i), the bidder

12   shall notify the corporation in writing about the takeover bid

13   at least 15 days in advance of the bid?

14             MR. HANSEN:  Yes, your Honor.

15             THE COURT:  There didn't seem to be other strict time

16   requirements.  There in 7(c) it's the notification to the

17   corporation within five days of the acquisition that reached

18   the aggregate amount specified; right?

19             MR. HANSEN:  Yes, your Honor.

20             THE COURT:  And then (e) just says arrange a takeover

21   bid.  So we don't know when that might have to be; is that

22   right?

23             MR. HANSEN:  Right, your Honor.

24             THE COURT:  So that the takeover bid or the tender

25   offer could be made after -- under this would be made after the

G7KHPETC

1    time the acquirer acquires that percentage of the stock; is

2    that right?

3        MR. HANSEN:  Yes, your Honor.  And we know that, among

4    other reasons, because the bylaws speak to what happens if the

5    acquirer has gained a position in the shares but hasn't yet

6    completed the takeover.

7        THE COURT:  Right.  And is that an obligation visited

8    on the company?  Company can't allow the vote, etc., etc.; is

9    that right?

10       MR. HANSEN:  It's visited both on the shareholder and

11   the company.  As our Spanish law expert, our Argentine law

12   expert explains, and I believe it's not really a contested

13   proposition, the bylaws are a contract between the shareholders

14   and between the company and the shareholders.  So it's an

15   obligation on both the shareholders who are acquiring and on

16   the company.

17       THE COURT:  And if the Republic had acquired the

18   shares, let's just say, in the open market, the obligations

19   would be the same?

20       MR. HANSEN:  Yes, your Honor.  Not only that, your

21   Honor, if another acquirer -- if Carl Icahn was to pick an

22   acquirer, anyone who would have done this would have the same

23   obligation.

24       THE COURT:  Your expert argues that the tender offer

25   is not incompatible with expropriation or intervention because

1  the tender offer is a unilateral action "not subject to any

2  condition or time period that might delay or jeopardize either

3  the temporary taking or the expropriation," and that's from his

4  declaration at paragraph 68.

5  Is that consistent with the timeline we've talked

6  about and that is imposed in the Section 7?

7  MR. HANSEN:  I believe completely, your Honor, and for

8  the following reason:  The structure, and as our expert says

9  and I think we've argued in our brief, Argentina was fully able

10  to conduct its expropriation of the Repsol shares, and it did

11  so.  If we took the time to go through the expropriation law,

12  which I assume we'll do at some point this morning, we'll see

13  they very surgically did only one thing.  They stepped into the

14  shoes of Repsol for 51 percent of the shares.  Tendering is not

15  inconsistent with that, indeed required by that, because

16  they've maintained with respect Article 15 of the expropriation

17  law all the commercial arrangements that were in place in YPF.

18  They chose to run it as a public corporation and not to change

19  it.

20  So as our expert says and we believe as even more

21  trenchantly the FSIA cases say, it's a distinct obligation.

22  The obligation to comply with the contract is distinct from

23  taking over the Repsol shares.  So there's no time

24  inconsistency.  As you say, they could do it at various stages.

25  The bylaws contemplate it being done a certain way.  There's no

G7KHPETC

1    condition precedent such that the shares don't even get

2    acquired.  The shares are acquired.  It's a severable and

3    distinct obligation that the Republic of Argentina or Carl

4    Icahn has to comply with, and they did not.

5         THE COURT:  Okay.  Mr. Domb, do you disagree with the

6    timeline that Mr. Hansen has suggested?

7         MR. DOMB:  Yes.  And I'd like to show the Court why

8    not only under the bylaws but under Petersen's own expert's

9    report.

10         THE COURT:  Let's go.

11         MR. DOMB:  Should I take the podium?

12         THE COURT:  Whatever you want.  You can both stay at

13    your seats.  Whatever's more comfortable for you.

14         MR. DOMB:  I think the Court has put your finger on

15    the key issue, which is the timing of the tender offer versus

16    the takeover.  And by "takeover," I'm using that as a

17    shorthand; I mean the sovereign act of the April decree by the

18    executive branch followed three weeks later by the

19    congressional law of expropriation specifically for this case,

20    both conducted under the constitutional power of takeover and

21    the general law of expropriation which were followed.  All of

22    those acts --

23         THE COURT:  I'm not sure any of that is much in

24    contention.  So how about the timeline question?

25         MR. DOMB:  Okay.  I'll go straight to Dr. Bianchi,

1  paragraph -- this is Peterson's expert.  He uses the word

2  "prior to," paragraph 31 of his declaration.  I don't know if

3  you have that handy.  31(ii), prior to a takeover, the acquirer

4  is required to carry out the TO.  Up above on the same page,

5  paragraph 28, he uses the word "previously."  So "previously"

6  and "prior."  Rovira, the other Petersen expert, says the same

7  thing in paragraph 42.

8          THE COURT:  Could I just ask you to go back to Section

9  7 and tell me -- I actually don't really care what the experts

10  say.  I want to see in the agreement how it's supposed to work.

11          MR. DOMB:  I started with the expert because they are

12  interpreting the bylaws, of course, as we all must.  And in the

13  bylaws, I would point out four provisions, your Honor.

14          THE COURT:  Yes, sir.

15          MR. DOMB:  7(d) forbids a person from acquiring

16  control of a certain percentage of shares or control of the

17  company without complying with the tender offer provisions.  So

18  there's a prohibition.  7(e) requires a person bidding for

19  control to arrange a takeover bid.  I insert the word "first"

20  because it's implicit there, and Bianchi and Rovira also did.

21          THE COURT:  Seven which?

22          MR. DOMB:  7(e).

23          THE COURT:  Say it again please.

24          MR. DOMB:  7(e) requires a person bidding for control

25  to first arrange for a takeover bid.

1           THE COURT:  Okay.

2           MR. DOMB:  And I add that Bianchi and Rovira agree

3   that this has to precede, the tender offer has to precede, the

4   acquisition of control.

5           7(f) is a long section that has all of the

6   requirements, we looked at only a piece of it, which has a

7   15-day requirement.  But if you read that entire section, it

8   has all of the requirements for what the tender offer --

9   details of the tender offer have to be given by the acquiring

10  person to the board of directors before launching the tender

11  offer, and the board may reject the takeover bid.  Again, all

12  of that is consistent with the concept that the tender offer

13  must precede the acquisition of control.

14          And, finally, your Honor, 7(h).  7(h) is a remedies

15  provision within the bylaws, and it says that if a person

16  acquires control without complying with the tender offer

17  provision, that person would not be entitled to dividends or

18  voting rights to exercise the rights of a shareholder.  Well,

19  all of that is inconsistent and invalidates the government's

20  sovereign power to take over the company because the bylaws, on

21  the one hand, the bylaws as interpreted by Petersen, are saying

22  you may not take over control unless you first do this tender

23  offer and follow all these procedures, get board control, and

24  so on.  Well, in April of 2012, the government --

25          THE COURT:  I got it.

1          MR. DOMB:  -- took over.

2          THE COURT:  We're just arguing right now about the

3     timeline.  I got it.

4          What do you say?

5          MR. HANSEN:  Proves our point, your Honor.  We'll

6     start with (h).  Clearly, they can acquire the shares, but

7     they're supposed to not vote until they complete the takeover,

8     the tender offer.  And so the timeline is there.  There is a

9     timeline, but it's not inconsistent with doing the tender, as

10    Mr. Domb has suggested.  And I'll tell you why in four, I

11    think, simple ways, your Honor.

12         First, the significance of it is, well, their argument

13    is they've impliedly expropriated the tender rights by

14    acquiring the Repsol shares.  In other words, it's

15    inconsistent.  That's the premise of their argument.  But, in

16    fact, the expropriation law makes very clear they have not done

17    that, and as our expert maintains, you can't do that without

18    actually saying:  We're expropriating the tender rights, and

19    we're going to pay for them.  Remember, your Honor, when they

20    expropriate the Repsol shares, they have to commit to pay for

21    them.  They don't expropriate our tender rights and for good

22    reason; they don't want to pay for them.

23         Second, your Honor, it's not inconsistent at all with

24    their sovereign power to take the Repsol shares to then do the

25    tender.  It's a separate obligation; and, indeed, the bylaws

1    make clear it's a separate obligation.

2            THE COURT:  Can I just ask you, though, what do you

3    say to Mr. Domb's suggestion that the tender offer has to

4    precede the expropriation, and he's calling it a condition

5    precedent that he says is inconsistent with the state's

6    sovereign ability to expropriate?

7            MR. HANSEN:  Two arguments, your Honor.  The only

8    reason he can make that argument, and I think I heard him do it

9    by inserting a word.  And he did; he inserted the word "first"

10   after "arrange" in 7(e)(2).  So, again, you have to do violence

11   to the bylaws to even make the argument.  The argument doesn't

12   say it's a condition precedent.  It doesn't say that

13   acquisitions made without doing the tender are invalid.  It

14   just simply provides a mechanism to try to encourage people to

15   do it.  And as 7(h) shows, if you don't do it, you're not

16   supposed to vote your shares.

17           The second point of your Honor's point and Mr. Domb's

18   argument, well, it's the inconsistency point.  It isn't because

19   the expropriation law makes very clear, all they want to do --

20   and I'll go through it point by point if you want, your

21   Honor -- 7, 8, 15, and 16 say we are taking the Repsol shares,

22   maintaining the company as a public trading company, and

23   everything else stays in place.  In other words, they could

24   have chosen more broadly to say we're taking other rights.

25   They chose not to, ergo there's no inconsistency to them saying

G7KHPETC

1    we want the shares.  The shares come with whatever rights they

2    come with.  And we have these other commercial obligations

3    we're leaving in place.

4              And that's the core of our position, your Honor.  When

5    the commercial arrangements and contracts remain in place, they

6    have to comply with them, and there's no necessary

7    inconsistency.  It's just a money issue.  All they have to do

8    is pay for some additional shares.  Doesn't prevent them from

9    exercising control; doesn't prevent them from carrying out

10   their policy.  It just means they have to do what they've

11   contracted to do.  It's no different, your Honor, from *Guevara*

12   and *Weltover* and the cases that talk about if the government

13   seeks to buy bullets.

14             THE COURT:  I understand.

15             MR. HANSEN:  So, in other words, we don't see any

16   inconsistency.  It's a supplemental obligation they can easily

17   perform.  They just choose not to.  It's not as if we're

18   saying:  Oh, no, there's a bylaw provision that says your

19   shares evaporate and your acquisition has no effect.  That's

20   not what we're saying.  We're saying you got the shares.  We're

21   not contesting.

22             THE COURT:  I got it.

23             Mr. Domb.

24             MR. DOMB:  Yes.  I continue to say that the timing is

25   a key issue of our position, and I disagree and I want to make

G7KHPETC

two points on that.  If I may sit down so I can look at my

notes?

THE COURT:  Yes, sir.

MR. DOMB:  I want to contrast what Petersen said in

its complaint and what its experts say what the bylaws say, on

the one hand, which I say proves our position that the tender

offer has to precede the takeover, with what Petersen is

arguing in its motion papers and now, which is different.  As I

pointed out before, Bianchi says "previously" and "prior."

These are quotes from his declaration.

THE COURT:  Okay.

MR. DOMB:  Rovira says "before."  And hold on a

second.  But in their memo of law, Petersen uses the word

"then" and "later."  So the inconsistency is in their position

what the actual -- what the complaint, their experts, and the

bylaws say and what Petersen is saying.

Another point, your Honor, on the same date that this

case was filed, which was in April of 2015, Petersen, through

its Spanish bankruptcy trustee, sent an official notice to the

president of Argentina, and that is item 21 in my declaration.

You'll note that it has English and Spanish side by side.  This

is a notice of the very same claims that are asserted in this

action.  They are asserted under a bilateral treaty, or BIT.

I'd like to point the Court to language in here that also

addresses the timing, among other things.  And that begins at

1    the very bottom of page 4 with the word "the" and continues on

2    page 5, and I quote:

3          "The government's illegal actions included, inter

4    alia, the de facto and unlawful seizure of YPF's operations,

5    the unilateral appointment of the intervenor, the unilateral

6    transfer of powers granted by the bylaws to the company's board

7    and president to the intervenor, the replacement of the

8    legitimate members of YPF's board of directors with the

9    government's own handpicked members, the termination of the

10   dividend distribution policy previously agreed between the

11   shareholders and enforced by all YPF shareholders and board

12   members, as well as the confiscation of Repsol's controlling

13   shareholder interest without first complying with the public

14   tender offer tender provision of YPF's bylaws to which the

15   government had approved and agreed to comply.  These government

16   measures, inter alia, violated the Republic's obligations under

17   the BIT toward the investors in Argentina."

18         This paragraph from Petersen itself says again that

19   the tender offer has to come first.  It lists all of the

20   government acts which we say, and I think are undisputed, are

21   sovereign acts.  It says those are your violations, and it has

22   hurt us, Petersen, in Argentina.

23         MR. HANSEN:  I believe that's pretty far afield, your

24   Honor.

25         THE COURT:  It really is.  And, by the way, doesn't --

G7KHPETC

1          MR. DOMB:  I don't understand why this is far afield,

2     your Honor.  This is --

3          THE COURT:  Counsel.  Counsel.

4          MR. DOMB:  This is Petersen on the same day that they

5     filed this lawsuit.

6          THE COURT:  Can I just say I really don't care what

7     they said.  The question is what do the bylaws say?  I don't

8     see that the "first" is in there.  I don't see that it's

9     inconsistent.  And doesn't paragraph (h), the remedy paragraph,

10    isn't that just as consistent an explanation of the language

11    you just read to me; right?  The company shouldn't have

12    taken -- shouldn't have permitted all of those actions just

13    read off because the tender offer had not been effected?

14         MR. DOMB:  Exactly.  And I think (h) proves our point,

15    and let me try one more time to say why.

16         (h) says if you -- and it could be anyone I agree,

17    Argentina or anyone else -- take control of the company as

18    defined here and you have not complied with the tender offer

19    provisions, then you may not exercise shareholder rights and

20    dividend rights.  Well, Argentina, by decree and law, took over

21    the company, exercised shareholder rights, exercised dividend

22    rights without taking a tender offer.  So the sovereign acts of

23    Argentina conflict with the bylaws.  And as our experts --

24         THE COURT:  I don't see that it necessarily has to.

25    What do you say to Mr. Hansen's suggestion that they are not

1    necessarily inconsistent?

2           MR. DOMB:  Well, I -- sorry.

3           THE COURT:  That, in this instance, for example, the

4    Republic could have taken the 51 percent and then offered to

5    tender for the rest.

6           MR. DOMB:  Well, that may have happened, but the

7    bylaws don't do it that way.  The bylaws said you have to get

8    board control.  Remember in 7 -- all of the procedures under 7,

9    I believe it's (f), 7(f) lay out all of the procedures.  I

10   believe it's true, I haven't re-checked this, that the 15-day

11   period may be the only specific time frame listed there.  But

12   even that 15-day period says that notice has to be given in

13   advance.  And the rest of 7(f) provides -- and I don't know

14   exactly where, but I know that I picked this out that it says

15   that the board may disapprove.

16          So it's saying that under these bylaws, we can thwart

17   Argentina's sovereign act of takeover if you haven't gone

18   through all of these hoops before you do it.  Well, that's

19   impossible.  Our expert, Dr. Mata, as well as the two experts

20   that YPF put forward, Drs. Marcer and Kemelmajer, all agree

21   that the bylaws are inconsistent with the takeover.  I would

22   add that Bianchi and Rovira also agree in their use of the

23   "previously" and "before."  And under Argentine law -- and, by

24   the way, these bylaws are the bylaws of an Argentine

25   corporation which must be construed under Argentine law, just

1    as if we were dealing with a Delaware corporation, we would be

2    applying Delaware law.  And our experts and YPF's experts say

3    under Argentine law, it is very well-accepted we have public

4    law and we have private law.

5            THE COURT:  I really --

6            MR. DOMB:  When Congress enacts in the public law

7    field, it unfortunately can undo, supersede, rights that are

8    granted by private law.

9            THE COURT:  Counsel, what do you say particularly to

10   the argument counsel makes about the possibility that the board

11   of directors will reject the bid?  And that's in (f)(ii).

12           MR. HANSEN:  I think my first response, your Honor, is

13   it's irrelevant to our case.  It didn't happen; wasn't pled.

14   All that happened in our case is they acquired the Repsol

15   shares, and they had a tender obligation.  Had there been some

16   other thing happen, if you could hypothesize some other state

17   of events, we'd have to analyze how and why that would be

18   somehow inconsistent.  But remember that I think the only

19   relevant point to the argument ultimately is to support this

20   notion of the implied expropriation, I think, as Mr. Domb just

21   referenced, if we didn't say we expropriated these rights but

22   we impliedly did so because having to comply with our

23   contractual obligations is inconsistent with what we sought to

24   do.  And I'd be happy to take your Honor through the

25   expropriation law.

1      All they sought to do was acquire 51 percent of the

2   shares with the rights that came with those shares; left

3   everything else in place.  As your Honor pointed out a minute

4   ago, nothing whatsoever inconsistent about acquiring that

5   position and then doing the rest of the things your commercial

6   contracts required you to do.  Remember that Argentina erected

7   all these contractual provisions to assure investors that their

8   rights would be maintained.  That was a commitment of

9   Argentina.  Argentina did not in any way, shape, or form void

10   that obligation, take it away, impliedly or expressly.  It

11   remained a contractual obligation.  Whether the directors could

12   have done something, would have done something, I don't know,

13   your Honor, but I do know what did happen, which is they got

14   51 percent of the shares.

15      And even in the various expropriation laws, if you

16   look at Section 7 of the expropriation law, if you look at

17   Section -- which says basically all we're doing is we're

18   getting Repsol shares, that's 7.  If you look at Article 13 of

19   the expropriation law, it says we will exercise the rights of

20   those shares.  In other words, they're not getting super

21   shares.

22      THE COURT:  So your position would be different if

23   the -- and forgive me for misnaming -- but if the statute

24   pursuant to which the expropriation took place, if it also

25   said:  And we've decided that for the good of the country we're

1   not going to -- we are not going to undertake the tender offer?

2   They could do that.  They could have done that; right?

3          MR. HANSEN:  The answer is of course they could have

4   done that, your Honor.  And as our expert --

5          THE COURT:  And then you'd be in the soup.

6          MR. HANSEN:  Actually, your Honor, we wouldn't, and I

7   can explain why.

8          THE COURT:  Okay.

9          MR. HANSEN:  I don't think it's necessary to your

10  determination of this motion.  So I caution you that this is

11  where we're sort of off on a hypothetical here.  But in the

12  matter of intellectual honesty, I don't think what you've just

13  specified as a hypothetical would be any different from the

14  government, for example, in the bullets case cited.  They say,

15  You know what, we've decided in the interest of our sovereign

16  goodness that we don't want to pay for bullets.  It impairs our

17  war effort.  And I think what all our foreign sovereign

18  immunity cases say is you, your Honor, will determine the

19  nature of the conduct; it's not how the foreign states are

20  characterizing it.  If it's commercial conduct, it's still

21  commercial conduct, even if a government passes a law that says

22  we're just not going to comply because it's for the good of the

23  realm.

24         THE COURT:  Your position would be weaker had they

25  done that.

G7KHPETC

1          MR. HANSEN:  It would definitely be harder, your

2     Honor, no question.  But I firmly believe it's the right

3     position.  You couldn't nationalize a bullets contract.  You

4     couldn't nationalize a bail contract.  But it's easy here, your

5     Honor, because -- and I think --

6          THE COURT:  Because they didn't.  I got.

7          MR. HANSEN:  And I think it's important to understand

8     why they didn't, because as Bianchi explains, under Argentine

9     law if you expropriate something, you have to do two things:

10    You have to identify it.

11         THE COURT:  You have to pay for it.  I got it.

12         MR. HANSEN:  Thank you, your Honor.

13         MR. DOMB:  Your Honor, the law -- I disagree again,

14    because the law does give Argentina explicitly the right to

15    exercise dividend and shareholder rights of the --

16         THE COURT:  Of the 51 percent.

17         MR. DOMB:  Yes.  And, remember, the bylaws said:  Thou

18    shalt not doing this without first doing a tender offer, and if

19    you do, you may not exercise those rights.  So the bylaw is

20    putting Argentina in the position of not enabling it to carry

21    out a sovereign power.  It couldn't.  And, by the way, I'm

22    referring to Article 9 in the law that says you may exercise

23    all of the political rights of the shares.

24         Since the bullet hypothetical came up, let me please

25    address that, because it's in their briefs.  We have the exact

G7KHPETC

opposite of the bullet hypothetical, which comes out of an
Eleventh Circuit case.

            THE COURT:  How so?

            MR. DOMB:  Okay.  In the bullet hypothetical, the
country entered into a contract to buy bullets contingent on
its --

            THE COURT:  Going to war.

            MR. DOMB:  -- first going to war.

            THE COURT:  I got it.

            MR. DOMB:  Okay.  In that case the country was free to
either declare war or not declare war.  If it did, it was bound
by the bullets contract.  Here, we have the exact opposite
because the bylaws are saying you may not declare war unless
you first do a tender offer.  So it's putting the condition
ahead of the declaration of war.  It's the opposite.

            THE COURT:  Is that argument contingent upon reading
the bylaws to require that the tender offer take place first?

            MR. DOMB:  Yes.  And that is a strong position that we
vigorously maintain, and there are several factors that alluded
to it.  The complaint links them.  Both Petersen's experts link
them by their own words.

            THE COURT:  Counsel.

            MR. DOMB:  Okay.

            THE COURT:  I got it.  You told me five times.
Sometimes I need two or three.

1          MR. DOMB:  There's one new point, your Honor.

2          THE COURT:  Can I talk?

3          MR. DOMB:  I'm sorry.

4          THE COURT:  May I talk?

5          Sometimes I need two or three times, but it doesn't

6     help if you tell me five times.

7          MR. DOMB:  I have one --

8          THE COURT:  And I've told you three times I care more

9     about what the bylaws say than about what they might have said

10    in their complaint or in their letter or anything else.  We

11    have to look at the bylaws.

12         What else did you want to add?

13         MR. DOMB:  The other point is, again, evidence that

14    the claim -- this all goes to the gravamen of the complaint

15    which the Court, of course, has to determine.  And the other

16    point I would point to as showing that the gravamen of the

17    complaint is on the sovereign act is that Petersen lost its

18    shares in May of 2012 when they were foreclosed because

19    Petersen had borrowed, essentially, all of the money to buy the

20    shares.  And when there was that initial takeover by decree and

21    also three weeks later by law, that put Petersen in default

22    because change of control was a default.  And when they didn't

23    get the dividend that they expected in May from which they

24    would service their loans, and that's in the complaint, they

25    lost their shares in May.

G7KHPETC

1          THE COURT:  This is your causation argument now?

2          MR. DOMB:  Well, but I'm not -- yes, but I'm using it

3     for the gravamen point.  The point is that that has nothing to

4     do with the tender offer.  Petersen lost its shares because of

5     the lack of a dividend which was, again, a sovereign act not

6     tied to the tender offer.  And all of that happened by the end

7     of May.

8          THE COURT:  What do you say to the gravamen argument,

9     counsel?

10          MR. HANSEN:  The gravamen argument, the basis of this

11     is a breach of contract to tender for the shares, plain and

12     simple, after a long course of commercial conduct.  They

13     contractually committed --

14          THE COURT:  I know that's your position.  How do you

15     distinguish counsel's position?  Why is he wrong?

16          MR. HANSEN:  Well, we're on his causation argument

17     now, as you alluded to, and here's why he's wrong.  Our

18     complaint says, and our complaint controls here, with all

19     respect, your Honor, that we lost our shares because they

20     didn't do what contractually they were required to do.  Had

21     they come in, in April and May of 2012 and complied with their

22     obligations, we would have had no problem with our lenders.

23     It's a matter of common sense.  The lenders are not going to

24     come down on us with a ton of bricks if we're getting

25     $2 billion or $3 billion imminently.  The reason why the

G7KHPETC

lenders came down on us is because the Republic of Argentina

announced to the world it wasn't going to do that.

Mr. Domb says:  Oh, that's not what really happened.

What really happened is this, this, this.  You know what?

That's fine.  Someday we'll have an interesting and detailed

argument about all the facts, but certainly on a 12(b)(6), your

Honor, our complaint allegations, which are fully plausible

under *Twombly*, must control and not Mr. Domb's

counter-narrative.

MR. DOMB:  This proves our point about the timing of

the tender offer versus the takeover.  The lenders didn't wait

to see if or whether Argentina would then or later do a tender

offer.

THE COURT:  But there had been a lot out in the media,

and I'd forgotten what that juicy quote is where some official

said:  We'd have to have been stupid to do that.  Anyone who

believed that we were going to tender was stupid.  It's not

like they foreclosed on them the next morning with no

information.

MR. DOMB:  Well, okay.  I know what you're referring

to.

THE COURT:  That's in the complaint.

MR. DOMB:  But, nevertheless, whatever the government

may announce, they didn't wait; the lenders didn't wait.  They

went on some announcement, and they foreclosed.

1    By the way, who are the lenders?  The main lender was

2 Repsol who sold the shares to Petersen; had a self-interest in

3 getting repaid.

4    THE COURT:  But, of course, any lender would.

5    MR. DOMB:  Right.

6    THE COURT:  It's your position that the relationship

7 between the public law and the private law essentially

8 immunizes all of the decisions surrounding the expropriation?

9    MR. DOMB:  Yes.  You're stating it in a little bit

10 slanted way; but, obviously, they're so linked together.  Even

11 to take your last point that the government announced early on,

12 let's say, that they weren't going to do a tender offer, it

13 proves that the government's sovereign act was tied up with the

14 tender offer.  And if you're looking for the gravamen of the

15 complaint -- and as the Court knows, you don't do this claim by

16 claim or element by element.  You look at the complaint as a

17 whole -- to us it's very clear that the bylaw tender offer

18 provision is completely tied up with the sovereign acts.  They

19 happen at the same time, as a result of the same actions.  The

20 quotations I read you from Petersen's notice of claim to the

21 president bind them together.  And I won't repeat myself.

22    THE COURT:  But, counsel, I think your adversary

23 argues in the brief, had Argentina purchased the 51 percent on

24 the open market and also failed to tender, they would still

25 have a claim based on the breach of contract.  It's not

G7KHPETC

1   necessarily the expropriation, is it?

2          MR. DOMB:  Well, that makes a ton of difference, I

3   will agree.  And our expert, Dr. Mata, said that the bylaw

4   provision under Argentine law applies to all instances in which

5   Argentina acts in the marketplace.  It could have bought the

6   shares from Repsol.  It could have gone in the marketplace and

7   bought them, and then, yes, there would have been an obligation

8   because there you're talking about all commercial activity.

9   But here, we had sovereign activity intercede.

10         THE COURT:  But doesn't that prove that the gravamen

11  of the complaint is not the expropriation but rather the

12  failure to tender?

13         MR. DOMB:  No.  We say it proves just the opposite

14  because they were bound together, and the bylaws --

15         THE COURT:  I didn't understand that.  That sounds

16  like a conclusion.

17         MR. DOMB:  Well, the gravamen, as we say it is, that

18  the government took over the company -- again, "took over" used

19  in the sense I said before -- without making a tender offer.

20  And so Petersen itself binds it, and it is bound together in

21  the facts.  I think the complaint --

22         THE COURT:  I'm not sure I saw any of the cases

23  talking about bound together by the facts.  The cases really

24  seem to analyze the commercial activity standing alone.  I

25  don't see a basis for your bound-together-by-the-facts argument

1      in the cases.

2              MR. DOMB:  Well, I'm thinking one of the cases

3      Petersen cited, *Foremost-McKesson*, which is a long case and, I

4      believe, in the D.C. circuit involving investments in Iran, in

5      a dairy in Iran.  And there, the Court ruled against the

6      foreign sovereign, but the reason was simple.  The sovereign in

7      that case had taken advantage, in a corporate context, by

8      shutting out a minority shareholder, the U.S. investor.  But

9      the court, the D.C. circuit, pointed out there was no -- it did

10     that purely as a commercial matter, and there was no formal

11     decree, law, or government action that made it a sovereign act.

12     So our case is that --

13             THE COURT:  I think that's Mr. Hansen's argument.  He

14     said -- I mean, I guess I probably said there was nothing in

15     the decree saying "and we shall not make a tender," but also,

16     counsel's argument is that the Republic just didn't want to

17     pay.  That sounds pretty commercial.

18             MR. DOMB:  Well, if the Republic had done what Iran

19     did as a market player, we would agree, but it didn't do that.

20     And by the way, this is not a case where an executive branch

21     official, say, an administrator, can enter into a contract on

22     day one and 30 days later say:  I change my mind; and I, as the

23     government official, hereby, you know, decree by sovereign act

24     that I'm going to breach that contract.  No, Argentina has a

25     very straight law and regimen of expropriation which requires,

G7KHPETC

1    first, that Congress find that there is a public use -- and

2    you're nodding, so I think you've read it.

3          THE COURT:  I've got that.

4          MR. DOMB:  So that's the safeguard that's built in.

5    So it's not a decision to breach a contract.  It's a decision

6    to take a sovereign act to takeover a very important part of

7    the economy when there was no investments being done --

8          THE COURT:  But there's no necessity that in order to

9    do that, in order to acquire its 51 percent, that the Republic

10   not tender.  It doesn't have to.  It isn't required.

11         MR. DOMB:  It was built into the structure --

12         THE COURT:  How do I know that?

13         MR. DOMB:  -- of the takeover.

14         THE COURT:  How do we know that?

15         MR. DOMB:  Because under Argentine law, the takeover

16   has to specifically say the property that's to be taken over.

17         THE COURT:  Fifty-one percent.

18         MR. DOMB:  Yes.  Has to say why, has to identify the

19   public use, and the structure that was put in authorized the

20   purchase of 51 percent and no more.  A tender offer would

21   require the purchase of additional shares, contrary to the

22   structure --

23         THE COURT:  But there didn't have to be Congressional

24   authorization for the tender offer.

25         MR. DOMB:  In the face of the Congressional act and

the act of expropriation, any tender offer would have been

inconsistent with the way that the sovereign takeover was

structured.  Dr. Mata says that.

THE COURT:  Counsel what about the "and no more"

provision that Mr. Domb is relying on?

MR. HANSEN:  Very important to our argument, your

Honor.  They surgically sought to acquire 51 percent, as you've

noted, and no more.  They left all the other commercial

arrangements in place.  And I won't read it again, but Article

15 says we're leaving everything else with the public company.

That included the bylaws.  So as your Honor pointed out, there

are contractual, preexisting contractual commercial

arrangements, Argentina had made with its minority shareholder.

And Argentina was a class A shareholder throughout this period,

so it was a party to this agreement all along.  Nothing

inconsistent, as your Honor said, with them going ahead and

complying with their commercial obligations.

As a matter of expropriation, your Honor, absolutely

right, they only expropriated 51 percent because, as Mr. Domb

admitted, they're only going to pay for the 51 percent.  But

that doesn't do anything to the commercial arrangements that

are left in place.

To your Honor's point earlier, I want to make sure I

address it, you're absolutely right that there's nothing in the

case that give any support to the fundamental argument, which

G7KHPETC

1    is the only argument they make, which is a penumbral

2    expropriation, if you will, or some kind of --

3              THE COURT:  Even counsel wouldn't have said that.

4              MR. HANSEN:  But jesting aside, your Honor, in *De

5    Cspel* they could have said:  Look, the bailments at issue are

6    very close to the government seizure of the art.  In *Guevara*

7    the government could have said:  You know what, the reward

8    concept is very tied up with our chasing fugitives.  In

9    *Weltover* -- we're talking about government obligations here,

10   you know.  Basically, these are all inconvenient to us.  Of

11   course it's inconvenient to a sovereign to have to comply with

12   its contracts.  But there's no basis in law for an argument

13   that while this is an inconvenient part of our commercial

14   obligation, so even though we haven't taken official action

15   with respect to it, we wipe that out.

16             THE COURT:  I got it.  May I ask you, what is the

17   basis for your argument that somehow YPF breached its

18   obligations?  I wasn't so sure where in Chapter 7 we saw any

19   obligations of YPF other than not to permit the exercise of

20   rights if the acquirer failed to tender.

21             MR. HANSEN:  Thank you, your Honor.  The basis for

22   that argument is this:  I believe there's a U.S. case I can

23   cite to you.  It's *WM* or something, but I think it's an

24   unexceptional proposition that's also covered by our expert

25   Bianchi and maybe Rovira as well, and that is this:  Bylaws are

1    contractual in nature, and they bind not only company to

2    shareholder but shareholder to shareholder.  And according to

3    our expert, and we believe this is the correct construction of

4    Argentine law -- and, again, this is a merits question of

5    Argentine law, who's liable for what under this bylaw

6    contract -- under Argentine law Section 7 applies to YPF just

7    as much as it applies to the government.  So even though it

8    doesn't specifically say you should be the tenderer, YPF has a

9    contractual obligation to see that that happens.  It also, as

10   your Honor noted, has a contractual obligation not to let any

11   acquirer, whether it be Carl Icahn or the government, vote the

12   shares until the tender offer has been done.

13           So that's a matter of Argentine law, your Honor. Now,

14   they've got an expert that says, no, it's not Argentine law.

15   So we have a dispute, but no one has cited any dispositive

16   Argentine provision that supports them.  At this stage of the

17   case, your Honor, on 12(b)(6), we don't think anyone could

18   conclude, as matter of law, that YPF was under no obligation to

19   see to it this protection actually was carried out.  Because

20   remember the purpose, your Honor.  When this was all done, it

21   was all erected as a set of protections for minority investors;

22   and, indeed, it's a very important protection to have not only

23   Argentina bound but the company bound.  And the company is

24   clearly bound in the no vote instance, and we think it's bound

25   in the tender provision as well.

1          THE COURT:  Mr. Hall, wait one second.  I know you

2     want to talk, but counsel reminded me that I did want to ask

3     Mr. Domb.  Doesn't Section 28 tell us that this very procedure

4     was anticipated by the parties, and it was clear in Section 28

5     that even if Argentina took over some of the stock, the tender

6     offer still had to be effective?  I mean, this is the one that

7     is entitled "Provisions Applicable to Acquisitions by the

8     National Government."

9          MR. DOMB:  Right.  And the answer is yes, this was

10    made applicable to acquisitions by Argentina.  And our expert,

11    Dr. Mata, addressed that.  This applies only where Argentina

12    acts as a commercial player in the marketplace.

13         THE COURT:  How do we know that?  Doesn't say that

14    here.

15         MR. DOMB:  It doesn't say one way or the other, but

16    under Argentine law, it's very well established.  I don't think

17    it was rebutted.  I think Bianchi agreed that the government,

18    under its constitutional framework and its law of

19    expropriations, laws of public use supersede or can take

20    precedence over private laws.  Let's remember this is a private

21    contract that Petersen is suing under, and we contend that it

22    would invalidate and prevent the country from carrying out a

23    sovereign act.

24         THE COURT:  Yes, but it seems to me it would have to

25    be necessarily inconsistent, and counsel's arguing that the

1    tender offer is not inconsistent with the public law which said

2    we shall acquire 51 percent.

3         MR. DOMB:  I've tried my best to show you why it is

4    inconsistent by the things I said before.  Let me allude to

5    this dividend business.  The lack of a payment of dividend in

6    May of 2012 would have happened with or without a tender offer.

7    And the complaint puts that at issue and says you shouldn't

8    have taken over and violated -- there was no right to dividend

9    except under a sweetheart deal between Repsol and Petersen, but

10   they said:  We expected that dividend.  You went over and you

11   took it.  You denied us our dividend which put us in a big

12   hole.  Even if a tender offer had been made after the fact, as

13   Petersen now argues they could have done, that would not have

14   resolved the issue of the missed dividend, and so that proves

15   an inconsistency.

16        And I would make one other point, your Honor, in terms

17   of the commercial aspect, because Petersen does say this is how

18   Argentina back 23 years earlier, in '93, lured investors to buy

19   shares.  Investors, and particularly sophisticated investors,

20   deal with country risk all the time.  This bylaw did, of

21   course, try to eliminate a large part of country risk, to the

22   extent that a bylaw can under Argentine law, and it did that.

23   But sovereign risk of takeover cannot be contracted away.  It

24   wasn't here.  It certainly wasn't explicitly.

25        THE COURT:  I don't think counsel is arguing that it

1    can be taken away entirely.  I think what counsel is arguing is

2    under the facts of this case where the Republic determined to

3    acquire only 51 percent, that the protections did remain in

4    effect.  I think that's what counsel's arguing.  We're not

5    doing the hypothetical of can a contract entirely eliminate the

6    possibility of expropriation.

7           MR. DOMB:  Well, our answer, and I don't want to

8    repeat, but I think I've tried to show the various ways in

9    which the bylaws, especially as a matter of timing, conflict

10   with the very initial right of Argentina to put the intervenor

11   in the company and take over even before the shares were

12   acquired.  So, in our mind, the inconsistency, the clash

13   between the bylaws and the sovereign acts, are very clear.

14          THE COURT:  Okay.  Mr. Hall.

15          MR. HALL:  Yes, your Honor.  The plaintiffs really

16   seem to make two claims against YPF.  One is that YPF had some

17   obligation to make a tender offer itself and separately Section

18   7(h), that we allowed the Republic to vote.  That really is the

19   heart of the case.  I'll come back to that.

20          There's nothing whatsoever in the bylaws that suggest

21   that YPF had any obligation to make a tender.  All their expert

22   say is that under Argentine law, when multiple parties are

23   bound by a contract, here in the bylaws, they're bound by the

24   contract.  Well, of course.  That doesn't mean we each had each

25   other's obligations to perform.  The bylaws are clear that it's

1    the acquirer -- it's the bidder that's acquiring shares that

2    must make a tender offer.  YPF was not an acquirer.  It

3    acquired those shares, bid for those shares.  There's

4    absolutely no thread of truth to that argument.

5         And 7(h) really is the heart of it, I think, and I

6    think our position is quite simple.  The May 7 expropriation

7    law gave the government what was called temporary occupancy

8    over these 51 percent of the shares.  Those shares were still

9    owned by Repsol, and they continued to be owned by Repsol till

10   2014.  But the public law that was passed gives the Republic

11   all rights to those shares, the right to rote and the right to

12   dividends.

13        THE COURT:  Could I just ask, I think it is wholly

14   irrelevant, but why did it take two years?  What was that

15   about?

16        MR. HALL:  I think it was getting to a price.

17        THE COURT:  I see.

18        MR. HALL:  There was litigation, and they eventually

19   agreed on a price.  The law said that the acquisition wouldn't

20   close until compensation was fixed.

21        THE COURT:  Okay.  You were saying that the law said

22   that the Republic could exercise --

23        MR. HALL:  All rights to those shares.

24        THE COURT:  Fifty-one percent.

25        MR. HALL:  Clearly under the expropriation law, when

G7KHPETC

1    it came to June 4, the Republic had a statutory right to

2    exercise the rights to those shares that it did.

3           Several points, your Honor.  Number one is our experts

4    made clear that under Argentine law, that public law trumped

5    any --

6           THE COURT:  We got that.

7           MR. HALL:  Secondly, your Honor, and related, but is

8    this concept of t force majeure under Argentine law, which is

9    somewhat different than ours.  Here, the event has to be

10   unforeseeable, but there, it's either unforeseeable or

11   unavoidable as to YPF.

12          THE COURT:  Is it "or" or is it "and"?

13          MR. HALL:  It's "or," your Honor.  It's set forth in

14   our expert's affidavit.

15          As to YPF, we could not have avoided the enactment of

16   this law.  We had no control whatsoever over what the Republic

17   did.  It was completely unavoidable as to us which would make

18   any compliance with 7(h) impossible.

19          Further, your Honor, 7(h), all that says is that

20   anyone who acquires shares in violation of the takeover

21   provisions can't vote.  At this point in time, the government

22   had not acquired any shares.  It had announced its intention to

23   acquire shares.  It acquired those shares in 2014.  But in 2012

24   it was simply acting, not as a shareholder, not as the acquirer

25   of shares, but pursuant to the expropriation law that gave it

G7KHPETC

1     the right to those shares in the interim.

2             THE COURT:  Okay.  Let me interrupt you before I

3     forget everything you just said and ask counsel what he says.

4             MR. HANSEN:  Thank you, your Honor.  I think there's a

5     very simple response.  The first response is that I believe

6     Mr. Hall's incorrect about the expropriation law.  It didn't

7     give Argentina the right to vote the shares.  It gave them --

8     and I'll go back to the expropriation law itself because I

9     think it's very important to look at the terms.  It says it

10    gave whatever rights they had.  Of course, those rights were

11    encumbered.  If you look at Article 9, it gave them the rights

12    associated with those shares, the economic rights of the shares

13    also in Article 9.  It says in Article 13:  Shall exercise all

14    of the rights conferred upon the shares.  And then it says in

15    Article 16, the administration of shareholder -- I apologize.

16    I've been doing this for 30 years, and I keep doing it.  I

17    apologize.

18            All to the point, your Honor, they got whatever Repsol

19    got; that's all they took.  They didn't get super shares that

20    had more power than the Repsol shares, and Repsol's shares were

21    encumbered by this obligation not to vote without tendering.

22    So that's the way that one works.

23            THE COURT:  So was it just -- again, probably

24    irrelevant -- but was it the fact that no one was voting those

25    shares in the two years?

1    MR. HANSEN: No, no. I think, frankly, the shares

2 were acquired. They were seized, basically. And the fact that

3 they hadn't come to a price, for all practical purposes,

4 Argentina had those shares, and they were treated as having

5 those shares. But they only had those shares. They didn't

6 have 100 percent of the shares. They didn't have super shares.

7 They had the Repsol shares. And, again, in Article 15 they

8 wrote very clearly to say to the world market -- remember,

9 that's a market. Those shares are still traded today on the

10 New York Stock Exchange -- don't worry. We're not disturbing

11 any of the commercial arrangements in place. It's operating as

12 public company. We're not taking anything else away. We're

13 just taking these shares.

14    So to YPF's point, the bylaws -- they weren't

15 required -- the shares were Repsol shares. If Carl Icahn had

16 those shares, YPF's obligations would have been the same. YPF

17 was in a circumstance where, according to our expert and

18 according to what we understand Argentine law to provide, they

19 had to see to it that tender was carried out; and, secondly,

20 they had an obligation to make sure those shares were not

21 voted.

22    Now let's come to the real crux of the position which

23 Mr. Hall has. What could we do? We had a junta with a gun to

24 our head. I think there's an easy way conceptually to get to

25 that argument, your Honor, to see how it's wrong. Every

company has a shareholder which is the controlling block

shareholder.  Every company has a board of directors.  When the

board says, Don't comply with the contract, of course the

company can't comply with the contract.  When the controlling

shareholder says, Don't comply with the contract, of course the

company can't comply, but that's not a defense.  The fact that

the company can't do it isn't a defense to a breach of

contract.  If I have 10 million --

THE COURT:  Let me ask you again.  And forgive me if

I've asked you.  I think I already did.  The basis of the

company's obligation to make the tender offer is what, and how

could the company do it?  How's the company going to pay for

it, among other things?

MR. HANSEN:  I may have misspoke.  I don't think the

company has to tender.  The company has to see that the tender

occurs.  In other words, it's not just refusing the vote.  The

company's also obligated to see to it that Section 7's carried

out.

THE COURT:  How can they do that?

MR. HANSEN:  They've committed to do it, your Honor.

They're like a guarantor.

THE COURT:  Where did they commit to do it?

MR. HANSEN:  Where did they commit to do it?  Our

understanding of what the Argentine law is, that's what our

expert Mr. -- the first one, Rovira, says is the bylaws bind

1    both YPF and Argentina, both to Article 7 and other articles.

2    So, again, it's according to the Argentine law, your Honor.

3    It's pretty much like a guarantor.  We're not saying YPF had to

4    itself tender, but they're like a guarantor, a controlling

5    shareholder such that they're liable if it doesn't happen.  In

6    other words, I can guarantee someone else is paying

7    $10 million, and if they don't do it, I'm on the hook.  That's

8    the way we understand the Argentine law, and no one is saying

9    it's not so.  No one has given you any law to the contrary.

10           There's also the specific provision saying we, as YPF,

11   have to make sure this tender is carried out by making sure

12   that whoever comes in and acquires this block doesn't get to

13   vote the shares until it's done.

14           THE COURT:  That's (h) now?

15           MR. HANSEN:  And then that comes with the

16   impossibility argument, your Honor.  There's no impossibility

17   argument unless every corporation that does what its

18   controlling shareholder and board says could say:  Don't blame

19   me.  The board told me to do it.  Again, very important

20   conceptually for the case.  Argentina chose not to come in with

21   guns and troops surrounding the oil fields.  They chose to

22   acquire the 51 percent of the shares and exercise the rights to

23   those shares and leave everything else in place.

24           Your Honor, *Smith Rocke* couldn't be more on point.

25   They may have taken over the bank, but all the arrangements are

in place.  They can't walk away from the loan agreements.  They

can't walk away from their compensation obligations in place.

And here, YPF can't walk away from its obligations just because

its controlling shareholder is saying don't do it.  They're

liable.

THE COURT:  Thank you.

Mr. Hall.

MR. HALL:  Your Honor, we did not block Argentina from

voting because our controlling shareholder told us not to.  We

did it because the law told us we could not block them.  It was

Argentine law that we had to comply with, and that's clear from

the affidavits.

Your Honor, I think you have to look at, when it comes

to sovereign community, when it comes to act of state, the

claim against YPF is somewhat different because there's no

claim against Argentina that it had a duty to block voting.

That really is the claim against us, and I think the analysis

is somewhat different.  I think that an act of state, basically

arguing that there's nothing invalid about Argentina giving

itself the right to vote, the act of state doctrine says this

Court shall not adjudicate claims that requires the Court to

analyze the validity of a foreign sovereign's act on its own

territory.  The Second Circuit *Braka v. Bancomer* case, your

Honor, I think is right on point.  They tried to distinguish it

by saying, well, in *Braka* everything took place in Mexico even

1    though --

2           THE COURT:  The performance was supposed to be in

3    Mexico in that case.

4           MR. HALL:  Yes, your Honor.  And all the performance

5    when you look at 7(h), all that performance was in Argentina.

6           THE COURT:  As to you?

7           MR. HALL:  As to us.

8           THE COURT:  What about that?

9           MR. HANSEN:  Your Honor --

10          THE COURT:  Does that make a difference?

11          MR. HANSEN:  I have a hard time conceptualizing a

12   difference, your Honor.  I think you're right about *Braka*.

13   It's all about basically Mexico deciding to change the payment

14   from dollars to pesos in Mexico with no effect outside of

15   Mexico's borders.

16          THE COURT:  And the payments were all to be made in

17   Mexico.

18          MR. HANSEN:  Exactly, all contained within the state.

19   And act of state disappears the minute you start talking about

20   outside the borders of the state.  So not even possibly

21   applicable here.  Now, as to what was supposed to happen here,

22   here we have this long litany.  It's all about New York.  When

23   they tender --

24          THE COURT:  The question -- we're talking about the

25   company and --

1          MR. HANSEN:  The company has to --

2          THE COURT:  I hear what you say about maybe the

3      company did have a right to tender, but if that's not so, they

4      certainly had to prevent the voting.  Why was that not an

5      action that took place wholly within Argentina?

6          MR. HANSEN:  The company can't get the benefit of the

7      act of state.  They're not acting in state.  They're a private

8      actor.  It's an incompetent -- wrong word.  It's not an

9      applicable defense the company can raise.  The conduct -- the

10     company and the government both are engaged in conduct or

11     should have been engaged in conduct which required performance

12     in New York: publishing the tender, delivering the tender.

13         THE COURT:  I got that.

14         MR. HANSEN:  The company, as we say, your Honor -- I

15     recognize this is in dispute -- but the company and the

16     government were both supposed to see that this tender happens.

17     They're both supposed to march to New York and get this done.

18         THE COURT:  I hear you.

19         Mr. Hall, what do you say to counsel's suggestion that

20     the company is not entitled to invoke the act of state

21     doctrine?

22         MR. HALL:  First of all, the company is an

23     instrumentality of the government, and I think the case law

24     suggests it's for the issue in the case as opposed to the

25     party.  This Court cannot review at all the act of a foreign

1    sovereign within its own territory.

2            THE COURT:  But counsel's complaining about the act of

3    the company perhaps within its territory in not preventing the

4    voting.

5            MR. HALL:  And the sole act of the company was

6    complying with the expropriation law.  I think that calls into

7    question the validity of the expropriation law and the

8    enforceability of the expropriation law, which I think -- in

9    *Braka*, your Honor, the defendant there was the bank; it wasn't

10   the government.  And it was the bank that invoked act of state,

11   and the Second Circuit agreed that was appropriate.  Whether or

12   not some tender offer had to be made in the U.S. has nothing to

13   do with voting at the shareholder's meeting in Buenos Aires and

14   whether we should have blocked that.

15           MR. HANSEN:  Your Honor, I believe we go back to

16   Article 15.  The construct is wrong.  It's not a state-owned

17   bank.  It's not a state instrumentality.  Argentina

18   specifically said to the world in Article 15:  We are leaving

19   this public company in place.  So YPF is a public company in

20   which the government is only a shareholder.  Very different

21   from what we're talking about in *Braka*.  And as a public

22   company, it has to act as a public company.  It has contractual

23   commitments, and if has a contractual commitment that it fails

24   to discharge that has effects in the United States, it's

25   liable, and it can't claim an act of state because a

shareholder tells it to do something any more than a Carl Icahn

company can defend based on the fact that Carl Icahn tells it

to do something.  It's a non sequitur.

THE COURT:  May I ask you this.  And maybe it's

repetitive, but it seemed that the company's obligations under

the bylaws had to be triggered by the formal notice from the

acquirer --

MR. HANSEN:  Your Honor, I think --

THE COURT:  -- which never came, of course.

MR. HANSEN:  Which is true, it never came.  And I

think it's a hard statute to read, the bylaws, in some

respects, but I think in substance, that's not right.  I think

in substance the company had an obligation to keep 51 percent

of the shares from voting, and it's not tied to a particular

notice.  I think the form shouldn't control over the substance

here.  I think everybody agrees that the purpose of the

provision was to keep shares acquired without the tender from

voting.

So I don't think it can be sensibly construed that as

long as they haven't gotten a formal notice, they're okay to

let some block of shares that Carl Icahn has bought, put him

in -- I think it proves the point.  Let's say he didn't deliver

the notice.  Could he vote his shares of 51 percent just

because he hadn't provided the notice to the board?  I don't

think so.  I think substance has to control.

1          THE COURT:  Mr. Hall.

2          MR. HALL:  Your Honor, certainly the bylaws are black

3     and white.  Until we receive notice, we had to take no action

4     with regard to the tender offer.

5          I think when it came to the voting, it's not just

6     Section 9 of the expropriation law, it's Section 13 that says:

7     In order to ensure the continuity of the activities associated

8     with the exploration, production, industrialization, and

9     refining of hydrocarbons by YPF, the Republic shall exercise

10    all rights conferred upon those shares.  And all rights were

11    the rights held by Repsol at the time which was the

12    shareholder.

13         Your Honor, I also think that if you focus on what the

14    true claim is against us, 7(h), I think that implicates a

15    different sovereign immunity analysis as well.  When it comes

16    to that claim, it is the expropriation law and the rights that

17    it gave the government to exercise rights over those shares

18    before it acquired them that really is the gravamen of the

19    complaint and our compliance with that law.  There's no

20    commercial activity associated with that.

21         One may say, well, a shareholder voting or not voting

22    is commercial activity.  Argentina was not the shareholder;

23    Repsol was the shareholder.  Argentina was not voting as a

24    shareholder.  It was not acting as a shareholder.  Pursuant to

25    the law, it was granted the rights that Repsol had to vote

1  those shares.  That's a quintessential sovereign act.  So we

2  think the analysis as to YPF on foreign sovereign immunity is

3  somewhat different.

4       THE COURT:  The act of voting is a sovereign act?

5       MR. HALL:  The act of --

6       THE COURT:  I thought the test was whether it was an

7  act that only could be exercised by a sovereign.  You know, for

8  counsel's example, Carl Icahn could vote the shares.  Doesn't

9  sound very sovereigny to me.

10      MR. HALL:  But Carl Icahn cannot pass a law giving him

11 the right to vote somebody else's shares.  Only a sovereign can

12 do that, and that's what's at issue here.

13      MR. HANSEN:  But it really isn't what happened here,

14 your Honor.  It's really important, I think, the very quote

15 that Mr. Hall read.  If what he read said we get the right to

16 vote these shares and nobody can stop us, he'd have an

17 argument, but what he read said "shall exercise the rights

18 conferred upon the shares."  They're preexisting rights

19 conferred upon those shares.  Those shares exist in a

20 corporation that's left undisturbed.  They're just taking those

21 rights, but those rights are encumbered because they haven't

22 taken away any of the encumbrances.

23      And other than this implied or penumbral expropriation

24 argument, they have nothing to say to that.  So, sure, they can

25 take the shares, that's great.  But they've left the commercial

arrangements in place, and they've got a commercial -- again,

it's a commercial company with commercial obligations to comply

with their contracts.  And just like Carl Icahn, or anybody

else, they've got to do it.  This isn't declaring war.  This

isn't hunting down a fugitive.  This is running a corporation.

THE COURT:  You're saying it's an activity that any

Tom, Dick, and Harry could exercise?

MR. HANSEN:  Absolutely, your Honor, and deliberately

so.  I think that's important to keep in mind.  This isn't a

footfall.  Argentina had a very clever strategy here to try to

keep its tab down.  We'll take 51 percent of the shares, and

they want to pay 5 billion for that.  But we're not going to

take anymore because we don't want to pay for it.  We're just

going to kind of go in and take our -- but, okay, that strategy

has consequences.  Leaving the company in place, leaving its

commercial obligations forged over 20 years of investor

protection, they can't just then turn around and say:  By the

way, we're going to pick and choose among the remaining

contractual obligations, and we'll comply with the ones we

think are okay; and the ones we find a little meddlesome, we

won't comply with them.  No court has ever accepted that

argument.  There's no inconsistency as a matter of fact, but

even as a matter of law, inconvenience, inconsistency is not a

basis for finding activity noncommercial.  As you say, your

Honor, it's only activity that only a sovereign could do.

1          And, again, going back to the exchange we had earlier,

2    you put the hard case.  If you say, Mr. Hansen, if they took

3    all the shares, how would that be?  Again, only a sovereign can

4    seize shares.  I agree with you on that.  We had our discussion

5    about that.  It's very important that that didn't happen here.

6    All they did was step in the shoes of a shareholder, and any

7    Tom, Dick, or Harry can do that.

8          THE COURT:  Mr. Hall.

9          MR. HALL:  One final point on foreign sovereign

10   immunity.  We disagree it's commercial activity.  Even if it

11   was, the act of voting in Argentina had no direct effect on the

12   United States.  They argue, well, the tender offer was going to

13   be made here.  The purpose of 7(h), as they set forth in the

14   papers, was to give the acquirer incentive to comply with the

15   takeover requirement such that if it didn't, it was deprived of

16   rights.  Well, the argument, I suppose, is that had we -- I

17   don't know how we would have blocked Argentina from voting.

18   Our majority shareholder went into court in Argentina and tried

19   to block it but was unsuccessful.  But assuming there was a way

20   for us to stop the government from voting those shares, their

21   argument, I suppose, is that might have caused Argentina to

22   reconsider whether it should make a tender offer.

23         That's simply not a direct effect, your Honor.  The

24   Court in *Weltover* said a direct effect is if it follows as an

25   immediate consequence of the defendant's activity.  The

immediate consequence of voting or not voting at a

shareholder's meeting would not have been a tender offer; and,

therefore, there was no commercial activity that had direct

effect in the U.S.

          The last point I make, your Honor, is on causation.

Again, I think our argument is different than Argentina's.  The

breach we allegedly committed was not enforcing Section 7(h) on

June 4, 2012, at the annual shareholders' meeting.  The

complaint alleges that Petersen was foreclosed upon in May.  No

causation of any damages caused by a later brach.

          MR. HANSEN:  I think we've already discussed that,

your Honor.  We say in our complaint -- at this stage I think

our complaint controls -- had they complied with their

obligations, both YPF and Argentina, billions of dollars would

have been coming our ways.  We would have had no problem with

anybody.

          As to his argument about direct effect, very simple,

your Honor.  They're on the hook both for not having tender

happen and for not voting.  Even if you could confine it to

voting, had they done what the contract required them to do,

Argentina would have done the tender because they would have

wanted to vote.  There would have been payments into the United

States, shares would have been acquired, direct effect under

*Weltover* and a plethora of cases.  So it's not true to say

there's no direct effect from nonperformance.  Where a contract

1    calls for performance in the U.S. and it's not done, that's a

2    direct effect, and it all flows from the failure of the

3    defendants to abide by the very protective scheme that they

4    both agreed to.

5             THE COURT:  May I ask you this.  Counsel said, I think

6    Mr. Domb said, there's no right to a dividend.  Are we stuck

7    with the complaint as it is now in that you allege that there

8    would have been a dividend paid?  Where are we on that?

9             MR. HANSEN:  I think the complaint alleges that had

10   they complied with their obligation, there would have been a

11   dividend.  I think that controls, but I don't think the case

12   pivots on whether it does or doesn't.  It's just one

13   allegation.

14            I'm having a hard time understanding "stuck with,"

15   your Honor.  He has this counterfactual narrative about whether

16   something would or couldn't.  Our complaint says in a world of

17   performance, dividends get paid, banks forebear because money's

18   coming our way.  The world looks good.  In their

19   countercomplaint narrative, they said:  Oh, no, no, no, you

20   guys are deadbeats.  You never would have paid.  Other people

21   would have come crashing down around you.  With all respect,

22   your Honor, there's another day to talk about that.  That's

23   down the road when we do full factual discovery and have a full

24   opportunity to ventilate the merits.  I would submit to your

25   Honor we're going to win that one because having $2 billion

G7KHPETC

coming our way, with or without dividends, we would have had no

problem; there would have been ample funding for the banks and

for shareholders, and that controls.

MR. HALL:  Briefly about dividends, in the complaint

it originally pled that the failure to take dividends was a

breach by YPF.  On page 20 of their opposition brief, they

abandoned that argument and say, no, the damage is from other

breaches.  It's no longer a breach, the way I understand it,

that they file against.

MR. HANSEN:  I don't think any --

MR. DOMB:  Sorry.  I have a brief point I want to

address.  A few moments ago you said buying shares is anything

that Tom, Dick, and Harry can do.

THE COURT:  Yes, sir.

MR. DOMB:  I just would point to the *EM Ltd.* case in

the Second Circuit in 2007 where at issue were loans that

Argentina had taken from the IMF.  And, of course, borrowing

money is something that any Tom, Dick, and Harry can do.  But

the Second Circuit said, no, when Argentina borrows from the

IMF, that's something that only a sovereign can do.  And by

analogy, when a country expropriates shares and intervenes in a

company to take it over, that's also something that only a

sovereign can do.

THE COURT:  Anything else on that?

MR. HANSEN:  No, your Honor.

1          THE COURT:  Let me ask you one more questions, please,

2     on these items, Mr. Hansen.  How do you define the commercial

3     activity that we're talking about here, and are you under the

4     third prong?

5          MR. HANSEN:  First and third, your Honor, first and

6     third.  I think first every bit as powerfully as the third.

7     The commercial activity very simply, your Honor, is most

8     clearly put in the failure of Argentina and YPF to comply with

9     the contractual obligation which was left undisturbed by the

10    expropriation law to tender for the shares.

11         But, your Honor, I would equally say that it's not

12    only that, because that follows a long history of commercial

13    conduct which is also relevant to this being commercial

14    activity.  In other words, it doesn't come out of a cabbage

15    patch.  It comes out of a context in which Argentina and YPF

16    offered shares to the public, commercial activity; enacted

17    bylaws that provided shareholder protection; ran the company as

18    a commercial enterprise for 20 years; and then, forget about

19    how they got their shares, breached their contractual

20    obligations that they left in place and expressly left in

21    place.  All of that is commercial activity.  So the basis for

22    our claim is that, your Honor, and most --

23         THE COURT:  Let me ask you this:  Though under the

24    first prong, why isn't the decision not to tender an activity

25    in Argentina?

1          MR. HANSEN:  Well, I think it's --

2          THE COURT:  It has to be; right?

3          MR. HANSEN:  Well, no, your Honor.  I think the way

4    the cases shake out is this.  And I want to get the cases in

5    front of me.  If it has substantial contact with the United

6    States, it qualifies under the first prong.  And so let's talk

7    about that.  Specifically, does the nonperformance here have

8    substantial contact with the U.S.?  I think that's the way to

9    frame the question.  So even if they decide --

10          THE COURT:  I thought the question, though, is it

11   based upon a commercial activity carried on in the United

12   States by the foreign state?

13          MR. HANSEN:  Yes, your Honor.

14          THE COURT:  And you're telling me that the gravamen of

15   your complaint is that the failure to make the tender offer,

16   the decision not to make the tender offer took place in

17   Argentina, didn't it?

18          MR. HANSEN:  That's true in every case in terms of the

19   decision, but I don't think it's the decision that's the key,

20   your Honor; it's the performance.  So I think under the cases

21   we cite -- and I just want to get the cases before you -- under

22   the first, it's basically commercial conduct, which we have,

23   that has substantial contact with the U.S.  In other words, not

24   whether they decide to do something, does the commercial

25   conduct have substantial contact with the U.S.?  And what the

1    cases have said --

2              THE COURT:  Isn't that the third prong?

3              MR. HANSEN:  No, that's direct effects.  I got

4    confused, your Honor, as well.  The third prong says something

5    that's completely outside the U.S. but has an effect on the

6    U.S.

7              THE COURT:  Right.

8              MR. HANSEN:  The first prong is commercial conduct

9    that has substantial contact, and I believe that's the language

10   of the cases.  So, for example, in *Atlantica* cited recently by

11   the Second Circuit, we submitted that as supplemental

12   authority, I'm sure the decision to offer shares in the U.S.

13   was made outside the U.S., but the offering of the shares in

14   the U.S. put it into the first prong.  And the Second Circuit

15   said that.

16             In *Gibbons* the Court said it doesn't matter whether

17   you decide to do it outside of the U.S.  If you're going to be

18   performing -- a substantial aspect of the contract will either

19   be performed or not performed in the U.S., that fits within the

20   first prong.  So then we go to the factual predicate.  Were

21   there substantial aspects of the contract that we say was

22   breached to be performed in the U.S.?  And the answer is

23   absolutely, your Honor.  It gets to all our points about the

24   whole idea here in Section 7 of the bylaws, and I won't go

25   through the litany.  But as a matter of substance, they have to

G7KHPETC

1    acquire shares that are here in the United States.  Sixty-five

2    of the 140 million shares they offered were held in the U.S.

3            THE COURT:  I got it.

4            MR. HANSEN:  So, again, the legal point that you asked

5    me about is I don't think where the decision made is

6    dispositive to the first prong.  I think if we're claiming on a

7    contract that requires substantial aspects of performance in

8    the U.S., that qualifies, and it clearly does.

9            THE COURT:  Yes, sir.

10           MR. DOMB:  Your Honor, you're on the first clause, and

11   Mr. Hansen cited *Atlantica* which was a recent Second Circuit

12   case.  There the Second Circuit expressly said we're not

13   deciding this under clause one; we're deciding it only under

14   clause three.

15           And in *Gibbons*, also cited by Mr. Hansen, that was

16   Judge Ward in 1982 in this court, and he applied what the

17   Second Circuit later in *Shapiro* said was the wrong standard

18   because he applied basically a personal jurisdiction standard

19   in terms of the connection with the U.S. which was improper.

20           So I happen to agree with your Honor that, for

21   purposes of clause one, all of the relevant conduct happened in

22   Argentina.  I won't go into the other clause unless you have

23   questions.

24           THE COURT:  Okay.

25           MR. HALL:  Your Honor, Mr. Hansen said when asked

about the commercial activity, he said the failure to make the

tender.  Obviously, with YPF, if your Honor concludes we had no

obligation to make that tender, then that cannot satisfy the

jurisdictional test as to us.

Separately, when he was talking before about the third

prong, whether voting or lack of voting in Argentina has direct

effect in the U.S., he argued, well, had we prevented them from

voting, the Republic would have made the tender.  Well, I mean,

that's pure speculation.  There's no contractual obligation to

make the tender; nothing in the complaint that would suggest

that.  They may have made a tender.  Possibly.  But that's not

a direct effect.

THE COURT:  Am I stuck with what the complaint says

for today's purposes on that?

MR. HALL:  Yes, your Honor.

THE COURT:  Don't I have to credit that?

MR. HALL:  Well, I don't know --

THE COURT:  You're saying it's speculative.

MR. HALL:  They don't allege that, your Honor.  It's

not alleged.

MR. HANSEN:  It's certainly a fair inference from our

complaint.  I don't think "stuck with it" is the right term.  I

think our factual allegations control as to the first prong.

*Gibbons* is still good law.  We cited other cases at page 18 of

our brief, including *American Construction Machinery v.*

*Mechanised Construction of Pak,* Judge Keenan.  So I believe

we're right about the first prong.  It's not where the decision

is made, it's whether there's a contract requiring performance

of some significant amount.

THE COURT:  All right.  May I ask you all some forum

non conveniens questions, please.  And, Mr. Domb, let me start

with you, please.

I didn't see an awful lot on Argentina's being an

adequate alternative forum, and I had some concern about the

criminal charges against King & Spalding.  What's the status

there?

MR. DOMB:  Right, your Honor, I'd like to address that

one first, and then Petersen makes three others which I'd like

to quickly address that go to the adequacy.

On the criminal charges, those arose out of a

different case, an arbitration between completely different

Spanish companies and Argentina.  The principal of the

plaintiff companies is in jail in Spain, having been sentenced

to five and a half years for fraud.  So the criminal complaint

that we're talking about here arose out of a case where there

was criminal activity.

The treasury attorney general of Argentina,

Dr. Abonna, in February of 2015 made a complaint -- I don't

know if that's the right word -- a criminal complaint in

connection with that case against Burford and some of the

principals in that case. Burford being the financing entity in

that case. That was a few months before this case was filed.

So I mentioned the dating just to let you know that it has

nothing to do with this case. Dr. Abonna left -- is no longer

in office. There was a presidential election in Argentina --

            THE COURT: So I've heard.

            MR. DOMB: -- last November. President Macri from a

different party has appointed a different attorney general. My

understanding, and I've tried to find out the latest for today,

is that whatever investigation may be taking place is not

public. And so even the treasury attorney general is not privy

to anything that's going on. What I have been told is that the

attorney general has never included King & Spalding in her

allegations. And I would also say that accusations by an

executive branch official or even a prosecutor's investigation,

if there is one, don't implicate the independence of courts.

            THE COURT: Well, if, as counsel argues, there were

criminal charges asserted against lawyers for a company suing

the Republic -- I'm obviously paraphrasing -- based on that

representation, that does seem to me to be an issue about an

adequate forum.

            MR. DOMB: There have been no charges filed to my

knowledge. I think that if King & Spalding lawyers or other

people had been charged in Argentina with some criminal charge,

they would know about it. At most, to the best of my

knowledge, after inquiring specifically, there may be an

ongoing investigation.  Even our client, the attorney general

and the ministry of economics and finance, don't know that.  If

there would be charges brought in the future, of course the

defendant would be told about it.

I understand that in the arbitration this issue was

raised by the claimants there represented by King & Spalding

and that the arbitrators issued a very long decision in, I

think, the spring -- I forget if it was March or April -- where

they said it's unclear to us -- they said, first of all,

Dr. Abonna, who was still in the office and representing

Argentina in that case, has told us that her accusation did not

include King & Spalding or the trustee in bankruptcy of the

claimants.  King & Spalding and the claimants say that they're

not sure about that.  We're not sure about that.  They ordered

Argentina not to make any more public statements about it, and

they said to the claimants:  If you have any more trouble,

bring it back to us.  And as far as I know, that's where it

stands as of this spring, and there's nothing further.

I would say this, your Honor:  Four courts that we

cited here in the U.S. have found Argentina to have adequate

courts.  The Eleventh circuit, two judges here in this --

THE COURT:  I'm certainly familiar with that.  But,

again, my concern is whatever the status of these charges are

against the law firm.

1    MR. DOMB:  No charges have been brought, your Honor.

2    At most, there was an accusation.  You know, that would be like

3    saying if the Justice Department had indicted Hillary Clinton,

4    would that somehow bring into question the adequacy of U.S.

5    courts or her ability to defend herself here or to act here?

6        THE COURT:  It's completely different in that at least

7    the allegation, the argument counsel, I think, is making -- and

8    I'll ask him in a minute -- is that because of the lawyers'

9    representation of a party opponent to the Republic, they were

10   subject to this action.

11       Counsel, two things.  Please tell me what the actual

12   facts are as you understand them; and, secondly, do I have to

13   take another look at it now in light of the election?

14       MR. HANSEN:  Well, taking the second one first,

15   Argentina's also promised to pay its commercial obligations

16   when it issued the shares.  So I wouldn't take much comfort

17   from new governments in Argentina.

18       Here's what we understand to be the facts.  And I

19   don't hear Mr. Domb -- frankly, it confuses me only.  He hasn't

20   sorted anything out.  Here's what we understand.  We -- not we,

21   but members of our team, Burford provides financing, and others

22   were engaged in another attempt to collect commercial debt from

23   the Republic of Argentina.  A group of people showed up at a

24   proceeding.  Names were taken down, and every one of those

25   people, including paralegals, your Honor, were told they were

the subject of criminal investigation, criminal investigation

in Argentina.

I'm sitting here with the Ho Declaration A where the

attorney general, who Mr. Domb runs away from, basically talks

about Judge Griesa as the enemy of Argentina and how King &

Spalding's doing bad things. It's shameless. It's truly

shameless. The only thing the lawyers did here was defend a

client, represent a legitimate commercial interest, and yet

they are under criminal investigation. That's just outrageous

that they even try to defend that.

THE COURT: Am I supposed to take judicial notice of

the election and changing administration?

MR. HANSEN: No. I think with respect to your Honor,

I think you take as an undisputed fact that Argentina, our

counterparty here where they're saying we should go to

litigate, has told all the lawyers who have chosen to litigate,

including our cocounsel and others on our team, that they're

the subject of criminal investigation for pursuing a commercial

claim. That's alone enough. No court has ever said you have

to go into a place and face that risk.

I will tell you, your Honor, in 30 years of doing

this, I've never had what I'm going to tell you happen to me.

We had a very fine young lawyer who was a dual citizen,

Argentina-U.S. We asked him to work on this case. He said: I

won't put myself at risk, my family at risk, my safety at risk

1    by having my name show up anywhere near this.  That should end

2    this, your Honor.  Argentina's not an appropriate forum for

3    this case.

4              THE COURT:  Okay.

5              MR. DOMB:  Your Honor, that's off-the-record

6    hyperbole.

7              MR. HANSEN:  It's truth.

8              MR. DOMB:  That I don't think you need to accept.

9              MR. HANSEN:  It's truth.

10             THE COURT:  All right.

11             MR. DOMB:  There have been no charges brought.  This

12   is an executive --

13             THE COURT:  Okay.  You told me that already.  I got

14   it.

15             What else did you want to talk about on forum non

16   conveniens?  One of the things I wanted to ask about is you

17   talk about all these witnesses who are government ministers or

18   were government ministers.  I don't understand that any of them

19   is unwilling to come to New York.

20             MR. DOMB:  Well, there has been a change of

21   government, your Honor.

22             THE COURT:  I'm aware of that.

23             MR. DOMB:  I think people mentioned Minister

24   Kicilloff, and I forget the other names, are no longer part of

25   the government.  But the point is that --

1        THE COURT:  Don't you have to make a showing that

2    these folks are unwilling to appear voluntarily?

3        MR. DOMB:  Well, many --

4        THE COURT:  I think you do.

5        MR. DOMB:  We have not gone person by person.  We have

6    not asked Mr. Kicilloff if he's willing to appear.  The point

7    we have made is that all of the witnesses are in Argentina.

8    Some may be willing to appear, undoubtedly.

9        THE COURT:  Who would not want to come to New York,

10   counsel?

11       MR. DOMB:  Undoubtedly, some will not want to appear.

12   Believe it or not, I think you know many people just don't like

13   to testify.  There are no witnesses in the United States.

14   There are no material issues about facts here.

15       I want to also address, your Honor, just to set the

16   record straight on the adequacy, there are several other

17   arguments that they make about filing fees, that discovery is

18   limited, and all of those things.  That has been shut down

19   repeatedly by the courts.  And also broad allegations of

20   somehow lack of independence by the judges.  I don't want to

21   take up the Court's time, because we've been through it, but

22   they make those accusations through an Argentine lawyer named

23   Naveira.  We responded to it with our lawyer named Errecondo.

24       In addition to those responses by Errecondo, I would

25   make two other points, couple of other points.  Judge McMahon

1    said in *Cortec* in 2008, this was a case cited by Petersen:

2    "The Second Circuit has been reluctant to find foreign courts

3    corrupt or biased absent some particularized showing of

4    wrongdoing."

5           As to discovery, Judge Rakoff in 2001 in the *Aguinda*

6    case said the notion that differences in civil law systems,

7    including tighter restrictions on discovery render inadequate

8    in any fundamental sense the civil law system employed by

9    Ecuador, by most other nations in South America, and by most

10   nations of Europe is insulting to those nations and absurd on

11   its face.

12          And one other point is that Petersen itself has

13   litigated in Argentina multiple times.  Our expert,

14   Dr. Pistarini, cited a bunch of those cases.  And he cited one

15   in particular, a tax case where Petersen prevailed on a tax

16   refund against the Republic.  It went all the way to the

17   Supreme Court.  It was affirmed.  And also cited, Errecondo

18   cited, five or six cases where the Republic was a defendant in

19   Argentina and lost.  And those cases took approximately three

20   to four years, according to his affidavit.

21          So I know that you focused first on the question of

22   the King & Spalding lawyers, but I wanted to emphasize that all

23   of the other stuff that they say about the supposed adequacy of

24   the courts has been rejected by courts, and there's no factual

25   predicate for it.

1          MR. HANSEN:  Very simply --

2          THE COURT:  Counsel.

3          MR. HANSEN:  Very simply, your Honor, and I think I

4   can dispense with this very quickly.  The courts that have

5   found Argentina an appropriate and adequate forum haven't

6   involved suits against Argentina.  Every one of those cases

7   have been litigated here.  And, indeed, in the *Weltover* case,

8   which went all the way to the Supreme Court, Argentina sought

9   forum non conviens, and it was denied.  No court has said

10  Argentina is an appropriate place to go sue Argentina.

11         Secondly, your Honor, the only factor, when you get

12  past the fact that we all have to face criminal prosecution and

13  jail for being lawyers for a party, when you get past that,

14  which I don't think you can, the only factor they even argue on

15  a conveniens scale is witness travel.  It's an airplane flight.

16  Judge Newman made a very trenchant observation in a case we

17  cited.  It's the modern era.  People get in airplanes all the

18  time.

19         THE COURT:  What do you say to counsel's suggestion

20  that your client has prevailed against the Republic in various

21  lawsuits in Argentina?

22         MR. HANSEN:  I'm not aware of any suit directly

23  challenging the government like this in Argentina, and I don't

24  think it would matter.  The mere fact that we could have

25  litigated in Argentina doesn't make it a superior alternative

1  forum for this case under these circumstances.  And, again,

2  it's their burden.  We're the plaintiffs.  We have the right to

3  bring a case where there's jurisdiction and venue.  Those

4  aren't contested.  They have a strong -- they have a strong

5  hill to climb.  They have to show --

6        THE COURT:  It's not so strong because your client

7  really doesn't have any ties to New York.  It's not quite as

8  steep as it usually is; right?

9        MR. HANSEN:  Your Honor, I think it is steep because

10  so much of this case is about New York.  The whole nexus of

11  this case is about a commercial obligation that was supposed to

12  happen in New York.

13        THE COURT:  Right.  But the cases speak in terms of

14  the contacts of the plaintiff with New York.

15        MR. HANSEN:  Well, they also speak of having -- the

16  movant has to show it's a superior forum.

17        THE COURT:  I understand.

18        MR. HANSEN:  The only thing they say is, well, it's

19  easier to do witnesses in Argentina.  It wouldn't be, your

20  Honor.  Nobody would be unwilling to come.  They haven't

21  identified a single witness unwilling to come.

22        THE COURT:  I got it.

23        MR. HANSEN:  There's another thing too, your Honor.

24  It goes to the thing we rushed through a little bit.  In

25  Argentina we wouldn't even be able to cross-examine witnesses

1    under oath.  I don't know how that would be superior from a

2    witness standpoint.  I don't think it's disputed they don't

3    have a process the way we do by having opposing witnesses

4    confronted under oath.  So not a single witness identified, no

5    showing that the witnesses --

6              THE COURT:  I got it.

7              MR. HANSEN:  That's the only factor to argue.

8              MR. DOMB:  Your Honor, on the first factor of forum

9    non conveniens, how much deference the Court should pay, in its

10   brief Petersen has one sentence on this.  They don't seriously

11   contest it, and for obvious reasons.  The plaintiffs --

12             THE COURT:  What about your burden?  What about your

13   burden here?

14             MR. DOMB:  On that element?

15             THE COURT:  On all of the factors.

16             MR. DOMB:  Okay.  So skipping to the public and

17   private interest factors, I have a quick list that,

18   number one --

19             THE COURT:  Counsel, I don't need you to read them to

20   me.  Is there something you want to talk to me about?

21             MR. DOMB:  Yes.

22             THE COURT:  Okay.

23             MR. DOMB:  Mr. Hansen said it's just a matter of air

24   travel, which is absurd.  There's a whole host of the factors

25   that the Court should look at.  The claim is based entirely on

1    bylaws of an Argentine corporation.  The defendants are a

2    foreign country and a company incorporated in Argentina.  The

3    named plaintiffs, Petersen, have no connection to the U.S.  In

4    fact, ultimately, they were owned by an Argentine family.

5    Their only connection is that they -- the shares they happened

6    to buy from Repsol were held in the New York Stock Exchange

7    instead of the Buenos Aires Stock Exchange.  Those shares are

8    treated identically in both exchanges.

9         The real party in interest here is Burford, which

10   wants to about get 70 percent of any recovery.  The events at

11   issue -- and this is as alleged in the complaint -- took place

12   almost entirely in Argentina.  The takeover decree in April,

13   the expropriation law in May, the actual expropriation in 2014,

14   the lack of a dividend payment in May, that happened in a

15   boardroom in Argentina.  The interpretation of YPF's bylaws, I

16   said before, are a matter of Argentine law.  Not only are most

17   witnesses located in Argentina, whether they'd be willing to

18   come here or not, there are no witnesses in the U.S. on any

19   material issue.  The business about the flight is interesting.

20   You know, I've taken that flight.  It's about 11 hours.  Most

21   relevant documents are in Spanish.  Many have not been

22   translated.

23        Now let's look at the U.S. interests here.  Do the

24   U.S. courts and do U.S. jurors have an interest in the outcome

25   of a complaint by foreign entities against a foreign government

1    and a foreign corporation?  Yes, the case has some tangential

2    elements that I don't blame Mr. Hansen for emphasizing, a whole

3    litany of New York stock-related things, but there's no issue

4    Argentina's not accused of violating U.S. securities laws or

5    regulations.  If it had made a tender offer, yes, it would have

6    had to be in New York.

7            THE COURT:  I got it.

8            MR. DOMB:  But it didn't.  So it didn't violate any

9    issues.  And YPF shares, as we say, are trading normally in

10   both exchanges.

11           So if you look at the whole list of both public and

12   private interests, I think it's overwhelmingly in favor of

13   Argentina.

14           THE COURT:  Anything else?

15           MR. HANSEN:  Just briefly, your Honor.  Witnesses

16   we've dealt with.  That's the only factor that really -- in

17   terms of public interest, the *Lafarge* case is instructive.

18   Again, I'm not going to give a speech about the love of New

19   York, but New York is the commercial capital of the world, your

20   Honor.  The parties deliberately chose to make New York the

21   situs of their commercial --

22           THE COURT:  That's what the Supreme Court told us,

23   that that was somewhat of a speculative interest, much as I am

24   in favor of it, of course.

25           MR. HANSEN:  It's not speculative here, your Honor.

1          THE COURT:  That's what the Supreme Court said,

2     though.

3          MR. HANSEN:  But I don't think -- not in this context,

4     your Honor.  I think it is a valid factor in terms of the

5     interest at issue here.  This case was about doing a tender in

6     New York, and New York has an interest in seeing to it that

7     people from all over the world can come here and get commercial

8     predictability, rule of law, all those things.  It's not an

9     accident the parties chose to site their commercial conduct

10     here, because it could rely on it.  That's how Argentina got

11     the billions of dollars in the first place.

12          To say that New York doesn't have interest, New York

13     has a central interest, a central interest.  And, again, it is

14     their burden to show substantially more convenient.  They

15     haven't come close to doing that.  Again, we don't get over the

16     first hurdle because I think it would be outrageous to make

17     lawyers --

18          THE COURT:  I got it.  I got it.

19          Is there anything else you want to tell me about

20     causation here?  I think it all goes to --

21          MR. DOMB:  I don't want to repeat myself.

22          THE COURT:  That was my question.  Anything in

23     addition?

24          MR. DOMB:  Okay.

25          THE COURT:  Anything else?

1        MR. HANSEN:  No, your Honor.

2        THE COURT:  Okay.  On promissory estoppel and good

3   faith and fair dealing, why are those not duplicative?  I don't

4   understand why we have those here, those claims.

5        MR. HANSEN:  We've pleaded them, your Honor.  We

6   believe they're valid under Argentinian law.

7        THE COURT:  I know you've pleaded them.  I got that

8   part.  Why are they not duplicative, improperly duplicative, of

9   the breach of contract claim?

10        MR. HANSEN:  I think in the event -- well, I pleaded

11   it in the alternative, I guess.  As I understand it, promissory

12   estoppel exists when the contract isn't held valid.  If for

13   some reason the contract wasn't valid, there would be an

14   alternative basis for enforcing this under estoppel principles.

15        THE COURT:  So you say --

16        MR. HANSEN:  Pleaded in the alternative.

17        THE COURT:  All right.  Anybody want to add anything

18   to that?

19        MR. HALL:  Just, your Honor, that the alleged promises

20   made in public filings stated nothing more than here's what the

21   bylaws said.  So if there's not a breach of the bylaws, then

22   there couldn't be any breach of the so-called promissory

23   estoppel.

24        MR. HANSEN:  I would add, your Honor, there are also

25   promises in the prospectus that might give rise to liability.

G7KHPETC

1    They're independent of the bylaw contracts, so that could also

2    be a basis for promissory estoppel even if not one of the

3    contract.

4            THE COURT:  All right.  Anything else you want to

5    leave with me, counsel, that you haven't said before?

6            MR. HANSEN:  Your Honor, just our thanks for so much

7    time and attention to the case.

8            THE COURT:  Oh, you say that to all the judges,

9    counsel.

10           MR. HANSEN:  I do, your Honor.

11           MR. DOMB:  I think I've said my piece.  Thank you,

12   your Honor.

13           MR. HALL:  Nothing, your Honor, other than just to

14   emphasize that please try to distinguish the claims against YPF

15   which really are different.  We agree with the Republic's

16   arguments, but there are distinct claims, including 7(h), made

17   against my client.

18           THE COURT:  Let me just ask you that.  At this stage,

19   at the pleading stage, what kind of burden is there on, I

20   guess, the plaintiff in pleading what, at the end of the day,

21   would turn out to be the final determination of who did what to

22   whom and what was required where?  Your point that, for

23   example, the only obligation that the company had was under

24   7(h), do I have to decide today if that obligation was

25   nullified by the Republic's action, or am I stuck with the

1    pleading?

2            MR. HALL:  I think you have to decide that today, your

3    Honor.  I think you have the documentary evidence which should

4    be considered, including the bylaws.  I think you have the

5    foreign law affidavits which I think advise your Honor what

6    Argentine law says on the subject.  I think you can decide that

7    today, your Honor.

8            THE COURT:  Counsel.

9            MR. HANSEN:  You certainly can't decide it today

10   against us, your Honor.  I think, on our complaint and what's

11   before you, you could decide it for us.  I don't think you have

12   to.  I think we've pleaded a cause of action.  Again, under

13   pleading rules this case goes forward.  There's no basis they

14   can say as a matter of law they win.

15           THE COURT:  I think, among other things, counsel does

16   say that based on his expert's affidavits, the obligation under

17   7(h) would be public law -- I'm sorry, private law that would

18   be inconsistent with the public law.  And counsel says that's

19   something that can and should be decided now.

20           MR. HANSEN:  And our response to that, your Honor, our

21   experts say the exact opposite, and their experts don't cite to

22   some text that you could read.  So it's almost like contract

23   interpretation.  You can't decide on the face of the law who's

24   right.  At best for them, it's somehow ambiguous and requires

25   further exploration.  It can't be decided today that that's

1  right.  It can't.  There's not enough material to do that.

2           MR. HALL:  Your Honor, there certainly is.  Our

3  experts do do a comprehensive analysis that cite to Argentine

4  juris prudence supporting their views.  Compare it to their

5  experts.  Completely conclusory with no analysis whatsoever on

6  these points.

7           THE COURT:  All right.  Counsel, thank you.  You're a

8  complete and utter delight.  Your papers were wonderful.  It's

9  a pleasure to have you.  Reserved.

10           MR. HANSEN:  Thank you very much, your Honor.

11           (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25