UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., | : | Case Nos. 1:15-cv-02739-LAP |
| Plaintiffs, | : | 1:16-cv-08569-LAP |
| - against - | : | |
| ARGENTINE REPUBLIC and YPF S.A., | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD. and ETON PARK FUND, L.P., | : |
| | : |
| Plaintiffs, | : |
| - against - | : |
| ARGENTINE REPUBLIC and YPF S.A., | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF BERNARDO SARAVIA FRÍAS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Pursuant to 28 U.S.C. § 1746 and Rule 44.1 of the Federal Rules of Civil Procedure, I, Bernardo Saravia Frías, hereby declare as follows:

1.      I am the Attorney General (*Procurador del Tesoro de la Nación*) of the Argentine Republic ("Argentina" or the "Republic").  I submit this declaration in support of Argentina and YPF S.A.'s motion to dismiss the above-captioned actions (the "Actions") filed by plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (together, "Petersen") and Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd. and Eton Park Fund, L.P.

(together, "Eton Park," and with Petersen, the "Plaintiffs"), based on the doctrine of *forum non conveniens* (the "Motion").

2.      This declaration is based on my personal knowledge and/or information I have learned from the records of the government of Argentina.

3.      I graduated from the University of Buenos Aires with a law degree in 1994 and obtained a Master's degree in Business Law from Austral University in 1997.  Additionally, I obtained a Master of Laws (LL.M., *summa cum laude*) from the University of Illinois at Urbana-Champaign in 2000, and participated in a Program of Instruction for Lawyers at Harvard Law School in 2001.  I have published three books on topics related to business law and numerous articles in legal publications.  Since 2005, I have also been Professor at Austral University, where I teach Master's courses related to banking law, financial derivatives law and constitutional law.

4.      Before my appointment as Attorney General, I was General Counsel at Bank of America N.A., Argentine Branch, from 2003 to 2008; in 2008, I founded the law firm Saravia Frías Abogados, where I was a partner until 2016, advising clients on a large variety of complex legal matters.  In 2017, I became the Legal and Administrative Secretary of the Ministry of the Treasury of Argentina, a position that I held until I was appointed as Attorney General on May 3, 2017.

5.      As Attorney General, I report directly to the President of Argentina and hold a rank equivalent to a minister.  My responsibilities include, among others, providing legal advice to the President of Argentina and government entities and representing the Republic in cases of economic or institutional importance, both in domestic and foreign or international legal proceedings.  I am also the head of all government lawyers.  In that capacity, I impart general or

special instructions to government lawyers, issue resolutions necessary for the technical and professional management of government lawyers and render legal opinions for the interpretation and application of laws and regulations that are obligatory for government lawyers.  The administrative jurisprudence of the opinions of the Attorney General's Office is binding and mandatory for the advisory services that make up the corps of government lawyers.

I.      **Summary of Matters Covered Herein**

6.      First, I address Argentina's paramount interest in having a competent court in Argentina adjudicate the legal issues raised in the Actions.

7.      Second, I explain that there is no basis for the Plaintiffs to fear any prosecution in the Republic if this Court were to dismiss the case and the Plaintiffs were to pursue their claims in Argentina.  I understand that this Court previously held that Argentina had not established that its courts were an adequate forum to adjudicate Plaintiffs' claims because "the facts as alleged give rise to a well-founded fear of prosecution of parties' counsel if the instant action were brought in Argentina."  (Opinion and Order, Docket No. 63 (Sept. 9, 2016), at 33.)  The criminal investigation on which the Court's concern was based did not result in any prosecution of Plaintiffs' counsel and has been dismissed by an Argentine court <u>with prejudice</u>.  As a result, there is no basis for Plaintiffs to be concerned about proceeding with this litigation in Argentina.

8.      Third, I explain that under Argentine law, an expropriation must first be authorized by Congress and is not effectuated unless and until the owner of the property declared to be of public utility and subject to expropriation is compensated for such property.  Therefore, Argentina's acquisition of Repsol's shares of YPF through expropriation did not occur until 2014.

9.       Finally, in my capacity as Attorney General of Argentina, I submit that the declarations of Professor Rafael M. Manóvil and Professor Alfonso Santiago accurately describe Argentine law on the specific matters they each address (respectively, relating to Argentina's exclusive jurisdiction over shareholder claims under an Argentine corporation's bylaws and the adequacy of Argentine courts).

## II.    Argentina's Interest in Having This Controversy Decided At Home

10.      This case implicates several important and complex questions of Argentine constitutional, public and statutory law.  The court that hears this case will have to make a series of important determinations under Argentine law, each of which requires a clear understanding of the Argentine legal system, its civil law jurisprudence and the relevant constitutional, statutory and corporate law principles that are implicated in this dispute.

11.      Argentina's strong interest in deciding this dispute is reflected in the Argentine Capital Markets Law, the Argentine General Corporations Law, and the National Code of Civil and Commercial Procedure, which all contain provisions codifying Argentina's interest in having Argentine courts adjudicate disputes based on the "corporate relationships" of corporations incorporated in Argentina.  These provisions, which vest Argentine courts with exclusive jurisdiction over these "corporate relationship" claims, embody Argentina's concern, which dates back to the 19th century, with preventing Argentine corporations from choosing foreign laws of incorporation to skirt Argentine public policy considerations.  Close familiarity with Argentina's civil law tradition and its robust system of codes is critical for a court applying substantive Argentine law.

12.      Argentina's interest in having this controversy decided in a court familiar with its laws is all the more acute in the context of this dispute, because this case involves matters of the

utmost public concern in Argentina.  Evaluating Plaintiffs' claims in this case requires the interpretation of Argentine executive decrees and legislative enactments adopted to address Argentina's domestic energy crisis.  It also requires deciding whether and how an Argentine company's bylaws, governed exclusively by Argentine law, would apply to the national government following an expropriation.

## III.   The Previous Investigation Upon Which the Court Found a Risk of Prosecution Has Been Terminated With Prejudice

13.     The criminal proceeding referenced in the Court's previous decision was initiated as a result of (i) a complaint in February 2015 by a former Attorney General that was submitted to the Office of the Public Prosecutor of the Argentine Republic,[1] and (ii) an ensuing criminal complaint filed on September 14, 2015, by a former head of the of the Office of the Prosecutor for Economic Crimes and Money Laundering (the "PROCELAC").[2]

14.     The PROCELAC criminal complaint was then assigned to a Federal Prosecutor to conduct an investigation into the matter.  On September 7, 2017, the Federal Prosecutor recommended that the criminal investigation and proceedings be dismissed.  On September 29, 2017, an Argentine federal judge adopted the recommendation of the Federal Prosecutor that the

---

[1] The complaint alleged a possible attempted fraud by the legal representatives of Burford Capital, among others, by engaging in an improper assignment and litigation financing arrangement in connection with an international arbitration proceeding that is unrelated to this matter.

[2] The criminal complaint was filed against the legal representatives of Burford Capital and the claimants in the above-referenced arbitration, as well as certain individuals affiliated with King & Spalding and an Argentine law firm, in their capacity as representatives of the claimants, alleging an attempted fraud against the public treasury.

criminal investigation and proceedings be terminated in their entirety and formally dismissed all claims with prejudice.[3]

15.     I can confirm that the dismissal order conclusively terminated the criminal investigation and proceeding.  Specifically, pursuant to Argentine law, the judge dismissed the claims with prejudice, concluding his decision with the declaration, "*sobreseer por inexistencia de delito*," which pursuant to Article 335 of the Argentine Criminal Procedural Code, "definitively and irrevocably closes proceedings."  This constitutes a dismissal with prejudice and is res judicata.  Accordingly, the claims cannot be revived.

16.     Based on the foregoing, there is no basis to find that the facts give rise to a well-founded fear of prosecution of Plaintiffs or their counsel by virtue of pursuing the claims asserted in this litigation in Argentina, or traveling to or from Argentina in connection with those claims.  In fact, pursuant to Article 20 of Argentina's National Constitution, foreign litigants cannot be prosecuted or detained by reason of their traveling to Argentina to pursue the claims asserted in a complaint.

17.     Nothing herein is intended or shall be deemed to relieve Plaintiffs during any stay in Argentina of the obligation to comply with the laws and regulations of the Republic of Argentina.

## IV.     Argentina's Acquisition of Repsol's Shares of YPF Through Expropriation Occurred in 2014

18.     The Argentine sovereign act of expropriation is not complete until the Republic of Argentina perfects title to the property that is subject to expropriation.  Pursuant to Law No. 21,499, the Argentine State is first permitted to temporarily occupy property to serve the public

---

[3] A copy and translation of the dismissal order duly signed by the judge, dated September 29, 2017, is attached as Exhibit A to this Declaration.

interest.  During that time, however, the title to that property *remains* in the name of its owner, and the property is merely *occupied* by the government; the government is not, however, the owner of the property during that time, and thus no acquisition has yet taken place.

19.     Argentine law requires prior compensation to the expropriated party in order to complete an expropriation, and only then the title of the property is transferred to the government.  Specifically, Article 17 of the Constitution plainly states: "Expropriation for reasons of public interest must be authorized by law and previously compensated."  This compensation process can be carried out either through a settlement between the parties or through the decision of an Argentine court that assesses the fair value of the property.[4]

20.     According to the Argentine Companies Law No. 19,550, the transfer of an Argentine corporation's shares – such as those of YPF – must be reported to and recorded in the company's records of its shareholders, in order for such transfer to produce effects vis-á-vis the corporation and third parties.[5]

21.     In the case of Argentina's expropriation of Repsol's shares of YPF, Law No. 26,741 only authorized the initiation of the expropriation process; the expropriation itself,

---

[4] *See* Law No. 21,499, Arts. 13, 20.  *See also* CSJN, "Argentine Nation v. Las Palmas del Chaco Austral S.A.," Fallos: 291:507 (1975) ("It is a constitutional rule – whose preeminence derives from art. 31 of the Fundamental Law – that the acquisition of the domain over property expropriated by the State 'is subordinated to the payment of the prior compensation . . . The expropriatory relationship is constituted with the declaration of public utility and is exhausted with the payment of compensation that is fixed by agreement of parties or final judgment . . . so that, if the expropriation has not been perfected, the State retains its own power in order to maintain or not the qualification of public utility that served as origin to the process.").

[5] *See* Law No. 19,550, Art. 215.

however, did not occur until 2014, after Argentina and Repsol reached a settlement and Repsol

transferred ownership of its YPF shares to the Republic.[6]

22.     Specifically, Law No. 26,741 only initiated the expropriation process by declaring

51% of the equity of YPF and Repsol YPF Gas S.A. to be of public utility and *subject to*

expropriation, and permitting Argentina to temporarily occupy Repsol's shares of YPF, pending

the acquisition of those shares through expropriation.[7]  Between 2012 and 2014, although the

Republic temporarily occupied those shares, the shares remained under Repsol ownership.

23.     Argentina's acquisition by means of expropriation of YPF's shares occurred only

after Repsol and Argentina reached a settlement in 2014.  In the settlement agreement between

Argentina and Repsol, dated February 27, 2014, the parties agreed to "the transfer to the

ARGENTINE REPUBLIC of the shares subject to expropriation and the concession to REPSOL

of the right to obtain from the ARGENTINE REPUBLIC a single, lump-sum payment of

compensation for the expropriation of the shares," and in connection therewith, Repsol

recognized that – as of that time – it was still "the owner of the SHARES" in question to be

transferred to the Republic of Argentina through expropriation.[8]  The settlement agreement was

ratified by Law No. 26,932 and became effective on May 8, 2014.

24.     On May 9, 2014, YPF disclosed to the Securities and Exchange Commission

("SEC") in a Form 6-K a letter that it had sent the previous day to the Argentine securities

---

[6] Relevant excerpts and translations of the Repsol-Argentina settlement agreement are attached as
Exhibit B.  The settlement agreement settled, *inter alia*, Repsol's litigation "challenging the
provisions of Decree Nos. 530/12, 532/2012, 557/2012 and 732/2012, the sanction provided by
Law No. 26,741 and the application and enforcement of such acts and legal provisions," and
established the amount of compensation to be paid to Repsol for the shares subject to
expropriation.  (Ex. B at 4, 7.)

[7] *See* Law No. 26,741, Arts. 7 and 13.

[8] *See* Ex. B at 5, 18.

commission, in which YPF declared: "As of the date hereof, the expropriation pursuant to the Law No. 26,741 has been concluded, and therefore the Republic of Argentina is definitively the owner of 51% of capital stock of YPF S.A. and YPF GAS S.A."[9]

25.     In conclusion, the Argentine expropriation process of Repsol's 51% interest in YPF was authorized by law in 2012, but the acquisition of those shares through expropriation by the Republic was not effectuated until May 8, 2014, when the settlement agreement between Argentina and Repsol took effect.  Thus, Argentina acquired the title to the YPF shares from Repsol through the sovereign act of expropriation on May 8, 2014.

## V.     **Aspects of Argentina Law Relevant to this Case**

26.     I have reviewed the expert declarations of Dr. Rafael Manóvil (relating to matters of Argentine corporate law) and Professor Alfonso Santiago (relating to the adequacy of Argentine courts) in support of Argentina's motion to dismiss.  In my capacity as Attorney General of Argentina, I submit that these declarations accurately describe Argentine law with respect to the matters they each address.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Buenos Aires, Argentina, on August 29, 2019.

Bernardo Saravia Frías

---

[9] *See* YPF 6-K, at 6 (May 9, 2014); *see also* YPF 20-F, at 27 (Mar. 30, 2015) ("On May 8, 2014, YPF was notified of the entry into force of the Repsol Agreement. As of that date, the expropriation pursuant to the Expropriation Law was concluded, and as a result the Republic of Argentina is definitively the owner of 51% of the capital stock of each of YPF S.A. and YPF GAS S.A.").