UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PETERSEN ENERGÍA INVERSORA, S.A.U.
and PETERSEN ENERGÍA, S.A.U.,          :     Case Nos.
                                              1:15-cv-02739-LAP
              Plaintiffs,              :     1:16-cv-08569-LAP

       - against -                     :

ARGENTINE REPUBLIC and YPF S.A.,       :

              Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ETON PARK CAPITAL MANAGEMENT,
L.P., ETON PARK MASTER FUND, LTD. and  :
ETON PARK FUND, L.P.,
                                       :
              Plaintiffs,
                                       :
       - against -
                                       :
ARGENTINE REPUBLIC and YPF S.A.,
                                       :
              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF MARÍA ALEJANDRA ETCHEGORRY
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Pursuant to 28 U.S.C. § 1746 and Rule 44.1 of the Federal Rules of Civil Procedure, I, María Alejandra Etchegorry, hereby declare as follows:

1.  I am Deputy Director of International Affairs and Disputes of the Office of the Attorney General of the Republic of Argentina ("Argentina" or the "Republic"). I submit this declaration in support of Argentina and YPF S.A.'s (together, "Defendants") motion to dismiss the above-referenced actions (the "Actions") filed by plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (together, "Petersen") and Eton Park Capital Management,

L.P., Eton Park Master Fund, Ltd. and Eton Park Fund, L.P. (together, "Eton Park," and with Petersen, the "Plaintiffs"), based on the doctrine of *forum non conveniens* (the "Motion").

2. This declaration is based on my personal knowledge and/or information I have learned from the records of the government of Argentina.

3. I received my law degree from the University of Buenos Aires Law School in 2006, with concentration in public international law and business law. After serving as counsel with the Attorney General's Office from 2006 to 2010, I attended NYU School of Law, where I was a Fulbright Scholar and received a Master of Laws degree (LL.M.). My time there included a fellowship with the United Nations International Law Commission. From 2011 to 2012, I served as a visiting International Lawyer at Cleary Gottlieb Steen & Hamilton LLP in New York. I returned to the Office of the Attorney General in 2013, where I have remained since that time. Separately, I have also taught courses on public international law at the University of Buenos Aires.

4. I submit this Declaration to (1) outline the significant issues of Argentine law raised by the Defendants' defenses; (2) identify witnesses and documentary evidence necessary to resolve these issues that are located in Argentina; and (3) explain the significant burdens of litigating the Actions in this district, and corresponding efficiencies of dismissal in favor of the courts of Argentina.

5. First, the numerous defenses asserted by the Defendants raise significant issues of Argentine public and private law that will require submissions by Argentine legal experts and turn on evidence located in Argentina.

6. Second, it is my understanding that most witnesses who would be called to testify in the Actions are located in Argentina. These include former and current government officials

of Argentina, board members and employees of YPF S.A. ("YPF"), and domestic experts in Argentina's oil and gas industry, who are knowledgeable about the acts described in the Complaints and/or underlying Plaintiffs' claims, as well as Argentina's defenses to those claims. Also, the Defendants' experts on Argentine law, which governs Plaintiffs' claims, are Argentine residents practicing or teaching in Argentina.

7. Third, it is also my understanding that the overwhelming majority of documentary evidence that may be relevant to Plaintiffs' claims and/or Defendants' defenses is also located in Argentina and predominantly in the Spanish language.

**Defendants' Defenses Raise a Panoply of Argentine Legal and Factual Issues**

8. I have reviewed Defendants' Answers and Affirmative Defenses, as well as the Motion. In their Answers, Defendants have asserted numerous defenses under Argentine law which will require the submission of Argentine legal opinions and the discovery and introduction of testimonial and documentary evidence located in Argentina (as further discussed below). This includes the following affirmative defenses that the Republic asserted in its Answer:

   (a) <u>Exclusive Jurisdiction in Argentina under Argentine Law</u>. In its First Affirmative Defense, the Republic alleges that a claim for the violation of an Argentine company's bylaws must be brought in the location of the company's registered office, as prescribed by Article 5, Section 11 of the Argentine National Code of Civil and Commercial Procedure. Because YPF's registered office is in Buenos Aires, a case challenging YPF's bylaws must be brought in that city. (*See* Argentina 1st Aff. Def.)

   (b) <u>Lack of Standing Due to Lack of Contemporaneous Ownership and No Causation</u>. In its Fourth, Fifteenth and Sixteenth Affirmative Defenses, the Republic alleges that although Petersen claims it was damaged by Argentina's decision not to conduct a tender offer after its expropriation of Repsol's shares, pursuant to Argentine law (including Section 17 of the Argentine Constitution and Law No. 21,499), the property declared to be of public utility is not acquired through the sovereign act of expropriation until the expropriated party receives compensation for the expropriated property, which occurred in 2014. Petersen admits in its Complaint that by 2014 it *was no longer a YPF shareholder*, and therefore lacks standing to challenge Argentina's alleged failure to launch a tender offer after its expropriation. Additionally, because Petersen admits it was no longer a

3

shareholder in 2014, Petersen cannot establish that the expropriation caused Petersen's alleged damages. (*See* Argentina 4th Aff. Def.; 15th Aff. Def.; 16th Aff. Def.)

(c) <u>Lack of Standing Due to Void Agreement</u>. In its Fifth, Ninth and Twenty-Fourth Affirmative Defenses, the Republic alleges that Petersen's purported acquisition of its YPF shares in 2008 was clouded by significant issues of impropriety. Among other things, the Republic alleges that Petersen and Repsol executed an apparent sham agreement which enabled Petersen to acquire a 25% stake in YPF without any meaningful contribution, funded almost entirely by future dividends and with a complete indemnification from Repsol (which it later *did not* enforce). Given these significant improprieties which may involve fraud and other misconduct, the Republic contends that Petersen's ownership should be voided *ab initio*. Argentina further alleges that Petersen should not be permitted to seek recovery from Argentina when it had a complete indemnification from Repsol which it made no effort to enforce. Litigating these defenses will require significant discovery to be conducted in Argentina. (*See* Argentina 5th Aff. Def.; 9th Aff. Def.; 24th Aff. Def.)

(d) <u>Lack of Standing to Bring Direct Claims</u>. In its Seventh Affirmative Defense, the Republic alleges that Argentine law does not provide for shareholders such as Petersen and Eton Park to bring direct claims against Argentina (as a YPF shareholder) for the alleged breach of bylaws, unless, unlike here, the suing shareholder sues derivatively on behalf of the company and has satisfied specific prerequisites, as provided by Articles 276 and 277 of Argentina's General Corporations Law (Law No. 19,550). (*See* Argentina 7th Aff. Def.)

(e) <u>Failure to State a Claim Under the Bylaws</u>. In its Tenth Affirmative Defense, the Republic alleges that pursuant to Section 7(d) of the Bylaws, after Argentina completed the sovereign act of expropriation, it became a controlling shareholder and was exempt from the Bylaws' tender offer requirements. Specifically, "acquisitions by the person already holding, or the person already exercising control of" fifty percent of the capital stock of YPF is exempt. An assessment of the Bylaws (which are governed by Argentine law) in conjunction with the Argentine laws of expropriation signify that Argentina did not breach the Bylaws since its "acquisition" was by means of an expropriation, the legality and legitimacy of which Plaintiffs do not challenge. (*See* Argentina 10th Aff. Def.)

(f) <u>Preemption and Exemption Under Argentine Public Law</u>. In its Eleventh, Fourteenth, Nineteenth and Twenty-Sixth Defenses, the Republic alleges that Argentine public law preempts any conflicting provisions of private law, including alleged bylaw obligations. Specifically, the Republic's constitutionally-granted right to expropriate, pursuant to section 17 of the Constitution, accompanied by Law Nos. 26,741 and 21,499, are matters of public law that preempt any conflicting private legal obligations created under corporate bylaws, including the bylaws of YPF. As a result, Argentina cannot be held liable for any alleged breach of the Bylaws caused by the implementation of a sovereign act of

expropriation. Additionally, as applicable here, resolutions issued under Argentine Law No. 26,831 and its predecessor, Decree 677/01, make clear that mandatory tender offer regimes are *not* applicable to acquisitions through expropriation. (*See* Argentina 11th Aff. Def.; 14th Aff. Def.; 19th Aff. Def.; 26th Aff. Def.)

(g) <u>Justification by Public Necessity</u>.  In its Eighth and Twenty-Sixth Affirmative Defenses, the Republic alleges that Argentina's actions were justified due to the significant harm that Petersen caused to the country and its oil and gas industry. Specifically, Argentina contends that Petersen's policies as a controlling shareholder of YPF caused Argentina to experience a negative energy trade balance for the first time in 17 years.  Alongside the trade balance and the exponentially increasing liabilities of YPF, Argentina further contends that the expropriation of 51% of YPF was a matter of public necessity, and therefore, Argentina's actions were justified.  These defenses will also require significant discovery to take place in Argentina. (*See* Argentina 8th Aff. Def.; 26th Aff. Def.)

(h) <u>Unclean Hands and Unjust Enrichment</u>.  In its Fifth, Ninth and Twenty-Fourth Affirmative Defenses, the Republic alleges that Petersen improperly caused YPF to pay exorbitant dividends, depriving the company of opportunities for reinvestment and growth.  Additionally, Argentina contends that Petersen (as a controlling shareholder of YPF) represented to the Argentine national and provincial governments that it would use government concessions and monetary stipends to benefit the country and those provinces.  Argentina further contends, however, that upon receipt of such benefits, Petersen (as a controlling shareholder of YPF) did not in fact do as it had represented, eventually causing the provinces to terminate concessions to YPF and necessitating the enactment of the Law No. 26,471.  These defenses will likewise require extensive discovery in Argentina. (*See* Argentina 5th Aff. Def.; 9th Aff. Def.; 24th Aff. Def.)

(i) <u>Remedy Precluded by Argentine Law</u>.  In its Twelfth Affirmative Defense, the Republic alleges that under Argentine law, penalty provisions provide the exclusive remedy in the event of a breach.  Because Section 7(h) of the Bylaws prescribes a specific penalty for the alleged violation of tender offer provisions, a damage remedy is precluded.  Additionally, pursuant to Law No. 26,831, art. 89 (Argentina's Capital Markets Law), the exclusive remedy for the violation of a tender offer requirement is a public auction of shares acquired in derogation of tender offer requirements. (*See* Argentina 12th Aff. Def.)

(j) <u>Failure to Mitigate Losses</u>.  In its Thirteenth Affirmative Defense, the Republic alleges that, as mentioned above, pursuant to the agreements between Repsol and Petersen through which Petersen acquired a 25% share of YPF, Petersen had a complete indemnity from Repsol.  However, Argentina contends that Petersen never sought any relief from Repsol and therefore failed to mitigate its losses and should not be permitted to obtain any remedy against Argentina.  Similar to the

      above defenses addressing these underlying issues, this defense will likewise require discovery in Argentina.  (*See* Argentina 13th Aff. Def.)

    (k) <u>Claims Barred by Time Limitations</u>.  In its Twentieth Affirmative Defense, the Republic alleges that challenges to decisions made at a shareholders' meeting of an Argentine company, such as approving a resolution that purportedly violates the bylaws, must be filed in the court of competent jurisdiction within three months, pursuant to Article 251 of Argentina's General Corporations Law (Law No. 19,550).  Because that did not occur here, Plaintiffs' claims are barred.  (*See* Argentina 20th Aff. Def.)

9. These defenses will require application of Argentine law, which will involve submissions by Argentine law experts, and will turn on the discovery and introduction of documentary and testimonial evidence located in Argentina and written in Spanish.

10. Further, it is my understanding that the intent of Argentina's Congress in enacting Law No. 26,741 conflicts in several material ways with Plaintiffs' claims and may be crucial to Argentina's position that Law No. 26,741 allowed Argentina to acquire <u>only</u> 51% of the YPF shares, and no more.  The legislative history of Law No. 26,741 includes several days of Congressional hearings, the transcripts of which are all in Spanish.

## **Witnesses and Documentary Evidence Located in Argentine Are Necessary to Resolve This Matter**

11. Several important potential witnesses are located in Argentina and are under legal restrictions on traveling to the United States due to criminal court proceedings in Argentina, including a witness specifically mentioned in the Complaints who is likely to be called to testify by Plaintiffs and/or the Defendants:

    (a) Julio De Vido formerly served as Minister of Federal Planning and Investment from 2003 to 2015.  He was appointed as Intervenor by Executive Decree No. 530/12. (*See, e.g.*, Petersen Compl. ¶¶ 35-36; Eton Park Compl. ¶¶ 35-36.)

    (b) Roberto Baratta was a top advisor to Julio De Vido during the events relating to the expropriation.  He also served as a director of YPF in 2011 and 2012.

    (c) Exequiel Espinosa was appointed to oversee the Upstream Executive Division during the intervention in YPF.

    (d) Walter Fagyas was appointed to manage the Downstream Executive Division during the intervention in YPF.

**Many Other Potentially Relevant Witnesses are Located In Argentina**

12. In addition to the witnesses mentioned above, many other witnesses with knowledge relevant to Plaintiffs' claims and Argentina's defenses are located in Argentina. It would be unreasonable and unduly burdensome to require all of them to travel to the United States to testify in this case. Moreover, many potential witnesses no longer work for the Argentine government or YPF. If these witnesses are unwilling to come to the United States to testify voluntarily, their testimony would need to be sought through formal letters rogatory, which could pose significant delays.

13. First, it is my understanding that Argentine citizens who owned and controlled Petersen, entered into agreements with Repsol to acquire shares of YPF and served as directors of YPF are located in Argentina. This specifically includes Enrique Eskenazi (former director of YPF and beneficial owner of Petersen, and who is 94 years old), Sebastián Eskenazi (former CEO of YPF and beneficial owner of Petersen), Matías Eskenazi Storey (former director of YPF and beneficial owner of Petersen) and Ezequiel Eskenazi Storey (beneficial owner of Petersen).

14. Second, several witnesses who may be called upon to testify regarding YPF's background and privatization are located and reside in Argentina (*see, e.g.* Petersen Compl. ¶¶ 4, 6 (referring to "promises" made in YPF's bylaws and its IPO); Eton Park Compl. ¶¶ 4, 6.) This includes Miguel Madanes, who served as a YPF Director at the time of the IPO. He served as both Vice-President and President of YPF.

15. Third, witnesses likely to be called to testify concerning the management of YPF prior to the expropriation are located in Argentina, including former directors of YPF, such as Roberto Monti (who remains a director today).

16. Fourth, the governmental witnesses likely to be called to testify regarding the justification for and implementation of the expropriation of YPF are also located in Argentina, including for example:

(a) Axel Kicillof, who formerly served as Minister of the Economy from 2013-2015 and previously was Secretary of Economic Policy and Development Planning from 2011 to 2013.  He was appointed Vice-Intervenor of YPF by Executive Decree No. 532/12, and his statements are cited by Plaintiffs in their Complaints as a basis for their claims.  (Petersen Compl. ¶¶ 6, 38; Eton Park Compl. ¶¶ 6, 38.)  Mr. Kicillof served as a director of YPF and was designated as representative of Argentina's Class A shares (beginning in 2012).  He is currently serving as a member of the Chamber of Deputies, the lower house of the Argentine Congress, and therefore is immune from prosecution during the remainder of his term and is running for public office at this time.

(b) Hernán Lorenzino, who formerly served as the Economy Minister from December 2011 to November 2013, and before that served as Secretary of Finance from April 2008 to December 2011.  Mr. Lorenzino may testify regarding the justification for the expropriation, including Repsol's management of YPF, underinvestment in oil exploration and development and sale of assets.  Mr. Lorenzino resides in Argentina.

(c) Guillermo Moreno, who served as Secretary of Domestic Trade from October 2006 to December 2013.  Mr. Moreno may testify concerning the Republic's rationale and justification for the expropriation, including Repsol's management of YPF, underinvestment in oil exploration and development and sale of assets.  Mr. Moreno resides in Argentina.

(d) Alejandro Vanoli, who served as the President of the Argentine National Securities Commission (*Comisión Nacional de Valores*) from November 2009 to October 2014 and presided over the June 4, 2012 YPF shareholders' meeting convened pursuant to Law No. 26,741.

(e) Julio de Vido and Roberto Baratta, mentioned above, who may also testify regarding the circumstances leading up to the expropriation, including Repsol's mismanagement of YPF, underinvestment in oil exploration and development and sale of YPF's assets which contributed to the Argentine energy crisis that led to the expropriation, and who are located in Argentina and face restrictions on traveling outside of Argentina.

17. Further, various witnesses located in Argentina may be called to testify about the intervention of Argentina in YPF and YPF's corporate activities and performance thereafter.  For example, there are at least 15 directors of YPF as of 2012 and later who reside in Argentina.

**The Parties' Experts on Argentine Law are Located in Argentina**

18. I understand that both Argentina and YPF will be submitting reports of various experts on issues of Argentine law, including:

   (a) A report of Dr. Rafael Manóvil, an Argentine attorney, Of Counsel in the law firm of Bomchil in Buenos Aires, Argentina, specializing in Company Law, Commercial Law, Private International Law, Litigation and Arbitration, and Professor Emeritus and chair-holding Professor in Commercial Law at the University of Buenos Aires Law School.  Dr. Manóvil will testify regarding, among other things, Argentina's corporation laws, its exclusive jurisdiction over Plaintiffs' claims and whether Plaintiffs have raised claims and seek remedies that are cognizable under Argentine law;

   (b) A report of Professor Alfonso Santiago, an attorney duly licensed and in good standing in Argentina and Professor of Constitutional Law at Austral University Law School in Buenos Aires, Argentina.  Professor Santiago will testify regarding, among other things, the adequacy of Argentine courts, and if this case were to advance here, the public law of Argentina and the conflict between Law No. 26,741 and YPF's Bylaws, as well as the legal regime and timeline under Argentine law for sovereign acts of expropriation; and

   (c) A report of Professor Guillermo Cabanellas, professor at the Universities of San Andrés, Austral University Law School, and at the University of Buenos Aires Law School, on Argentine jurisdiction, the adequacy of Argentine courts, Argentine law applicable to the claims raised by Plaintiffs and guarantor liability, among other topics.

19. Those experts on Argentine law are located in Argentina and rely on extensive Argentine legal authority in Spanish.  Proceeding with Plaintiffs' claims in Argentina would obviate the need for expensive translation and travel by the experts to the United States.  In addition, I understand the Defendants intend to call additional experts, located in Argentina to be disclosed at the appropriate time, on matters that may include, among others, the strategic, commercial and valuation aspects of oil and gas enterprises in Latin America and the domestic energy crisis in Argentina leading up to the expropriation.

9

**Documentary Evidence Is Located In Argentina and Is Likely In the Spanish Language**

20.     As referenced above, it is also my understanding that the overwhelming majority of documentary evidence potentially relevant to Plaintiffs' claims and/or Argentina's defenses is located in Argentina and is likely in the Spanish language.

21.     Documents relating to the privatization of YPF and its IPO are likely located in Argentina.  Given the year in which those events occurred (1993), many of those records are likely not available in any electronic format.  For instance, documents that may exist in Argentina include the books and records of YPF, prior iterations of YPF's bylaws, YPF corporate records, legislative documents relating to the privatization, and correspondence relating to the IPO.

22.     In addition, documents relating to the management of YPF, Argentina's domestic energy crisis and Argentina's expropriation of Repsol's stake in YPF would be located in Argentina and most likely would be in the Spanish language.  Such documents may include, for example, YPF books and records, board materials and minutes of board and executive meetings, YPF's communications with YPF directors and Argentine governmental bodies, YPF records regarding the intervention and corporate actions taken following the intervention, legislative history of Law No. 26,741, executive branch documents relating to the expropriation, and documents pertaining to the Argentine government's negotiation and settlement with Repsol and acquisition of its shares in 2014 as provided by Law No. 26,741.  Moreover, documents relating to YPF's performance since the expropriation are likely located in Argentina, including YPF's business plans, documents relating to YPF's capital investments.

23.     Additionally, documents relating to various legal proceedings commenced by Repsol and other YPF shareholders relating to the expropriation are located in Argentina.

24.     Virtually all of these Spanish documents would also have to be translated at significant expense for use in U.S. court proceedings.

25.     Finally, there would be several additional burdens on the Argentine Government if this case were to proceed in the United States that would seriously impair Argentina's ability to defend the Actions. First, there are limitations in place on hiring new government attorneys. To the extent this case were to proceed into discovery and to trial in this Court, it would place an enormous burden on the Defendants' lawyers to explain and translate complicated issues of Argentine law and manage the process of obtaining and translating evidence for use abroad. Additionally, there are currently restrictions in place on the ability of government lawyers to travel abroad for work purposes, which will further prejudice the Republic in its ability to work with U.S. counsel to defend the Actions in the United States. Finally, the significant additional costs of litigating the Actions in New York would pose undue burdens on Argentina and its taxpayers when it is working to implement policies to strengthen its economy and reduce inflation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Buenos Aires, Argentina, on August 29, 2019.

*[signature]*
María Alejandra Etchegorry

11