# LIONBRIDGE

STATE OF NEW YORK ⟩
⟩
⟩ ss
COUNTY OF NEW YORK ⟩

## <u>CERTIFICATION</u>

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached Expert Declaration of Alfonso Santiago.

Kristen Duffy, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this 2*a*ᵗʰ day of *August*, 20 *19*.

LYNDA GREEN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01GR6205401
Qualified In New York County
My Commission Expires 05-11-2021

259 W 30th Street, 11th Floor   New York, NY 10001   +1.212.631.7432

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., | : | Case Nos. 1:15-cv-02739-LAP |
| Plaintiffs, | : | 1:16-cv-08569-LAP |
| - against - | : |  |
| ARGENTINE REPUBLIC and YPF S.A., | : |  |
| Defendants. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD. and ETON PARK FUND, L.P., | : |
| Plaintiffs, | : |
| - against - | : |
| ARGENTINE REPUBLIC and YPF S.A., | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**EXPERT DECLARATION OF ALFONSO SANTIAGO**

Pursuant to 28 U.S.C. § 1746 and Rule 44.1 of the Federal Rules of Civil Procedure, I, Alfonso Santiago, hereby declare as follows:

1.  I submit this expert declaration in support of the motion to dismiss based on *forum non conveniens,* filed by the Argentine Republic ("Argentina") and YPF S.A.

2.  I am an attorney duly licensed and in good standing in Argentina. I am a Professor of Constitutional Law at Austral University Law School in Buenos Aires, Argentina.

3.  I received my Law Degree from the University of Buenos Aires in 1986 and was admitted to practice as a lawyer in the federal judicial system the same year. I completed my doctorate in 1997. A copy of my CV is attached as Exhibit A hereto, which includes all of my publications from the last ten years. I am a member of the National Academy of Law and Social Sciences of Buenos Aires and Director of its Institute of Constitutional Law, comprised of many of the leading constitutional scholars in Argentina. I have also been designated a member of the Royal Academy of Jurisprudence and Legislation of Spain and of the Academy of Law of Sao Paulo, Brazil. I have provided advisory and consultancy services to the Congress of Argentina, the Legislature of the Autonomous City of Buenos Aires, and to the governments of the Provinces of Santiago del Estero and San Luis. I was appointed alternate judge of the Autonomous City of Buenos Aires Court of Appeals for Administrative and Tax Matters.

4.   I am being compensated on an hourly basis for my work in this case, including the preparation of this report and any deposition or trial testimony that is required of me. My compensation does not depend on the outcome of this case.

5.  I have been asked by Argentina's counsel to comment on certain features of the Argentine judicial system, including: (i) access to the Argentine court system for domestic and foreign litigants; (ii) the procedures established in Argentina regarding the taking of evidence; and (iii) the independence of the Argentine judiciary.

**Summary of Opinions**

6.   I opine that Argentina has an independent judicial system capable of fairly and impartially resolving disputes between private litigants, including foreigners, and the Argentine State. I also address the process for appointment and removal of judges and the improvements that have been made to the judicial system. Additionally, I describe how the Argentine judicial system is readily accessible to litigants, including their access to witnesses, the possibility to obtain their witness declarations, and production of documentary evidence. Finally, I explain that there are no impediments to bringing claims against the Argentine State and describe the

process for enforcing a judgment against the Argentine State, which is the same process that applies to enforce a judgment that is rendered outside Argentina (assuming Argentine courts decide that the judgment is enforceable).

A.    **The Argentine Judicial System**

      (a)    **General principles of judicial independence**

7.    Argentina has an independent legal system capable of fairly and impartially adjudicating disputes between private litigants, including foreigners, and the Argentine State.

8.    In Argentina, all federal judges are appointed by the President with approval of the Senate. In the case of federal judges of first instance or courts of appeal, the *Consejo de la Magistratura de la Nación* [Judicial Council] participates by constitutional mandate in the process of selecting the candidates to occupy vacancies in the federal courts. The Judicial Council is an independent body specifically provided for in Article 114 of the National Constitution, and includes members of Congress which must represent both the majority and opposition parties, as well as representatives consisting of judges, lawyers, and academics, elected by their peers. This broad integration provides sufficient control in the process of selection of candidates for judges. The Council is responsible for reviewing and comparing the relevant background information and evaluating the merit of each candidate before proposing to the Executive Branch a list of the three best candidates to occupy each vacancy in the federal judiciary. The Executive Branch, for its part, selects from each short list the candidate to occupy the vacated post and seeks the approval of the Senate. The Judicial Council does not participate in the appointment of the justices of the Supreme Court.

9.    Federal judges are independent and may only be removed through a special procedure expressly established in the National Constitution, which includes (i) impeachment in the case of the Supreme Court justices and (ii) a removal process before a *Jurado de*

*Enjuiciamiento* [Jury] in the case of the lower federal judges.[1] This second process requires the prior intervention of the Judicial Council, which decides by a majority of qualified votes whether or not to formally accuse the federal judge before the Jury.

10. In addition, the National Constitution establishes in Article 110 that the Supreme Court justices and judges of other courts of the Nation shall remain in office subject to good behavior. That same Article establishes that the federal judges "*will receive for their services a compensation that the law will determine, and that cannot be diminished in any way, while they remain in office.*"

11. Argentina has recently undertaken significant efforts to continue improving its justice system. The Supreme Court has taken an active role in this process, through measures that would computerize all federal suits, permit notification by email, electronic submission of all documents presented by the parties, the holding of public hearings and the admission of *amicus curiae* in cases of more public relevance, etc. The process of computerization, which has already been implemented, has the goal of reducing the duration of the judicial process in all federal courts.

12. In addition, the current Ministry of Justice and Human Rights of the Nation is developing an agenda of public policies in order to facilitate and modernize the judicial system and make it more transparent and efficient. The first steps are being taken to create a system of reliable judicial statistics, increase the use of oral hearings in civil trials, simplify procedures, etc. Within the framework of this program, the Ministry has drafted and proposed various laws, including a new Federal Code of Criminal Procedure (Law No. 27,482).

   (b)   **Independence of the judiciary when a claim is filed against the Argentine State**

---

[1]   *Cf.* National Constitution, Arts. 53, 59, 60, 110, 114 and 115.

13.  As discussed further below, private foreign litigants have frequently had access to Argentine courts, especially to the Federal Courts for Administrative Matters and the Federal Courts for Civil and Commercial Matters, to file complaints against the Argentine State. Some cases reach the Supreme Court of Justice of the Nation ("CSJN"). I note, for example, the following cases, which demonstrate the impartial and independent conduct on the part of the Argentine Judiciary:

  i. "The Bank of New York S.A. v. General Directorate of Military Manufacturers," in which the CSJN confirmed a foreign litigant's judgment against the National State for breach of a mutual contract.[2]

  ii. "ENAP Sipetrol Argentina v. General Customs Directorate," in which the CSJN upheld a petition of a foreign oil company opposing a charge imposed by the General Director of Customs for gas exports.[3]

  iii. "Direct TV," in which the CSJN rejected the National State's attempt to revoke the relief obtained by a cable television service provider suspending a resolution of the National Commission of Competition Defense.[4]

  iv. "Petrobras," in which the CSJN upheld the challenge by a foreign petroleum company regarding a fine imposed by the General Customs

---

[2] CSJN, "The Bank of New York S.A. v. General Directorate of Military Manufacturers," Decisions: 328:2851 (2005).

[3] CSJN, "ENAP Sipetrol Argentina v. General Customs Directorate," Decision dated October 1, 2013, resolving the case with reference to the reasons and conclusions in CSJN, "YPF v. General Customs Directorate," Decisions: 336:1624 (2013), resolved on the same date.

[4] CSJN, "Direct TV Argentina S.A.," Decisions: 334:681 (2011).

Directorate based on differences in the taxes owed for crude oil exports.[5]

    v.    "Nidera," in which the CSJN upheld the petition of a foreign company against the criteria that the General Tax Directorate had applied to certain taxes on profits.[6]

    vi.    "Pirelli Neumáticos," in which a claim was brought against the General Tax Directorate for not applying an international agreement between Argentina and Italy to avoid double taxation. The CSJN ordered the General Tax Directorate to apply the agreement according to its text.[7]

### (c)   Access to Argentine courts by domestic and foreign litigants and the procedure for the taking of evidence

14. The judicial system in Argentina is readily accessible to litigants. In a 2004 study, it was determined that Argentina had a litigation rate of approximately 10,225 cases per 100,000 inhabitants, which is greater than that of many countries in the region such as Brazil, Uruguay, Peru or Colombia.[8] That number increased to 11,615 cases per 100,000 inhabitants in 2008 and 11,627 cases per 100,000 inhabitants in 2011.[9] From this it can be inferred that access to litigation in Argentina is broad, and there are no major impediments to litigants in bringing their disputes to the Argentine courts.

---

[5]    CSJN, "Petrobras Energía S.A. v. General Customs Directorate," Decisions: 335:115 (2012).

[6]    CSJN, "Nidera S.A. v. General Tax Directorate," Decisions: 339:1066 (2016).

[7]    CSJN, "Pirelli Neumáticos SAIC et al. v. General Tax Directorate," Decisions: 340:644 (2017).

[8]    Garavano, Germán, *Information & Justice II. Data on Argentine Justice*, Konrad Adenauer, Buenos Aires, 2006, pp. 40 and 52, http://unidosjusticia.org/wp-content/uploads/2014/06/UNIJUS_KONRAD_Infoyjust2_A.pdf (last visited on April 27, 2019). The current Minister of Justice of the Nation, Germán Garavano, participated in this study.

[9]    Garavano, Germán, *Information & Justice II. Data on Argentine Justice*, Konrad Adenauer, Buenos Aires, 2014, pp. 22.

15. Article 20 of the National Constitution (Exhibit B) grants foreigners all the civil rights that Argentine citizens have, including the right to access the justice system and litigate:

> "*Foreigners enjoy within the territory of the Nation all the civil rights of citizens; they may exercise their industry, trade and profession; own real estate, buy and sell it; sail the rivers and coasts; practice their religion freely; make wills and marry according to the laws.*"[10]

16. In addition, Article 2610 of the National Civil and Commercial Code (Exhibit C) provides as follows:

> "*Equal treatment. Foreign citizens and permanent residents enjoy free access to jurisdiction for the defense of their rights and interests, under the same conditions as citizens and permanent residents of Argentina. No bond or deposit, of any denomination, may be imposed by reason of the status of a citizen or permanent resident in another State. Equal treatment is applied to legal persons constituted, authorized or registered in accordance with the laws of a foreign State.*"

17.  Accordingly, Article 115 of the National Civil and Commercial Code of Procedure ("CPCCN") provides for the possibility of having access to a public translator where necessary to pursue a claim, and a foreign litigant is permitted to hire one or more private translators to assist it during a trial.

18. With respect to evidence, parties have a wide variety of possibilities to access and produce evidence considered necessary to carry out the judicial process in Argentina. The CPCCN contemplates various mechanisms for the presentation and taking of evidence, which the parties can make use of according to the needs of their case. Thus, for example, Article 326

---

[10] The reference to "civil rights of citizens" includes the right of foreigners to litigate in the courts.

of the CPCCN establishes a mechanism of "pre-trial evidence," which consists of the possibility of asking a judge, even before the initiation of a judicial proceeding, that a document or other form of evidence be produced when it would be impossible or very difficult to obtain it in the future (declaration of a witness of advanced age, expert evidence, seizure of documents, etc.).

19.   Pursuant to Article 333 of the CPCCN, documentary evidence should accompany claims, counterclaims, answers, or responses to any of these. Expert reports and testimony of witnesses are among the type of evidence that may be offered by the parties. All forms of evidence that each party seeks to produce must be described in and offered with their submissions. The judge will then analyze the evidence offered and decide whether it should be produced. Each party has the obligation to produce the evidence admitted by the judge. The production of evidence is done through the courts.

20.   With respect to the appearance of reluctant witnesses, according to Article 431 of the CPCCN, the courts have the power to compel reluctant witnesses to appear to testify in a hearing. In the case of certain State officials, there are special procedures to require these individuals to provide testimony in writing. The judge may examine the witness in connection with his testimony, and the parties may submit lists of questions to the judge for the examination of that witness. In addition, the testimony of any witnesses can be questioned or challenged in writing from the time the pleadings are filed until the case is decided.

21.   The CPCCN also establishes mechanisms to ensure that documents that are not in possession of the interested party can be obtained and relied upon in the court proceedings. For example, pursuant to Article 387 of the CPCCN, a judge can order both parties and third parties to provide certain documents within their power.[11] In certain cases, the refusal to produce evidence can result in a negative inference against the refusing party.[12]

---

[11]   *See* Articles 326, 333, 387 and 431 (attached hereto as Exhibit D).

[12]   *See* CPCCN, Art. 388.

22. There are certain judicial fees applicable in Argentina, including, for example, a fee of 3% of the total amount of the claim that must be paid by means of a bank deposit upon the order of the corresponding court. In my opinion, this fee is neither prohibitive nor constitutes an impediment to accessing justice, particularly in commercial cases where the plaintiffs are of means and seek to claim a significant sum.[13] In fact, the majority of countries in Latin America, including Brazil, Colombia, Mexico, Peru, Uruguay and Paraguay, apply similar fees and, far from constituting barriers that impede access to justice, these are considered essential to providing effective judicial service, given that the collected amounts are applied to the operation of the judiciary. In certain instances, those fees may be reduced or waived, including in cases of companies that have insufficient economic resources, are unable to obtain them or are insolvent.[14] Also, because Argentine law permits the prevailing party to recover its costs and fees, such fees are unlikely to deter a meritorious case.

   **(d)      Proceedings against the Argentine State**

23. There are no impediments to filing claims against the Argentine State. In the case of an action for damages against the State, the same procedures regarding fees and evidence discussed above in section (c) are applicable.

24. Regarding the enforcement of judgments ordering the State to pay a sum of money, once a judgment is issued and finalized,[15] the party seeking enforcement must ask the judge to

---

[13]  The CSJN held in several rulings that the fee is constitutional, it does not affect the principle of defense in court nor the guarantee of private property, provided that it is not confiscatory. *See* CSJN, "Doña Rosa Judit Ortelli de Trincavelli v. Don Augusto Hebrard," Decisions: 132:360 (1920); CSJN, "Ottonello Hnos. y Cía. et al. v. Province of Tucumán," Decisions: 201:557 (1945); CSJN, "Félix Pedro Suárez v. Jorge J. Sosa Bilbao," Decisions: 258:230 (1964); CSJN, "Industrial Export y Finance Corporation v. Province of Salta," Decisions: 262:497 (1965).

[14]  *See* CPCCN, Arts. 78-86; Law No. 23,898, Arts. 3, 5, 6 and 13.

[15]  *Cf.* CPCCN, Art. 499.

order the State to comply. The State must then include the payment of the judgment within its annual budget. If the budget for the financial year in which the judgment must be paid lacks sufficient funding to satisfy the judgment, the Executive Branch is required to take the necessary measures to ensure that the amount is included in budget for the following fiscal year.[16] The National State usually complies with the payment of the judgment within the fiscal year following the court's order and, if it does not, parties with judgments against the National State may attach the National State's assets under Law No. 23,982.

25. The same process applies in the case of enforcing a judgment that was issued outside of Argentina (assuming Argentine courts decide that the judgment is enforceable).[17] The party seeking enforcement of a judgment issued outside of Argentina must comply with the procedure of *exequatur* for the recognition of a judgment issued by a foreign court.[18] As a result, the enforcement of a judgment of a foreign tribunal may, inevitably, take longer to enforce than a judgment issued in Argentina.

## B.      Additional Issues of Argentine Law

26. I have reviewed the affirmative defenses that Argentina has raised, many of which raise issues that need to be analyzed under Argentine law. I express very brief opinions on some of those issues below. If this case were to continue beyond the current motion, I am willing and able to provide a more comprehensive opinion on these and other issues of Argentine law raised by Argentina's defenses:

---

[16]   *Cf.* Law No. 11,672, Art. 170; Law No. 23,982, Art. 22; Law No. 24,624, Art. 20.

[17]   Argentine courts will not enforce a foreign judgment rendered by a court without jurisdiction, including judgments rendered in cases over which the courts of Argentina have exclusive jurisdiction.

[18]   CPCCN, Arts. 517-518.

- <u>Argentina's Fourth and Fifteenth Defenses</u>: Article 17 of Argentina's National Constitution establishes that the expropriation is complete only when the party subject to expropriation receives compensation for the expropriated property. Repsol was not compensated for its YPF shares until its settlement agreement with Argentina was ratified by Law No. 26,932 and became effective on May 8, 2014. Because Petersen alleged it was no longer a shareholder as of 2014, it lacks standing to sue and cannot prove causation for its damages;

- <u>Argentina's Eleventh Defense</u>: Argentine public law (including Laws Nos. 26,741 and 21,499) prevails over any conflicting obligation under private law (including YPF's Bylaws). Specifically, Article 12 of the National Civil and Commercial Code provides that "[p]articular covenants cannot set aside laws whose observance implicates public order." Article 386 similarly provides that "[t]he acts that contravene public order ... are considered absolutely void." The National Constitution contains several more provisions requiring the priority of public over private law[19], and many CSJN decisions have reinforced this principle over the years.[20] Even if Sections 7 and 28 of YPF's Bylaws were applicable to the acquisition of shares by Argentina through expropriation—which they were not— they would directly conflict with the obligations set forth in Law No. 26,741 (the "Expropriation Law") in several ways. First, Law No. 26,741 expressly provided in Article 12 that YPF would remain a public company and would not be nationalized. But under Section 7(f) of the YPF Bylaws, a tender offer would require the government to offer to acquire all outstanding shares through a public offering, and to accept and purchase all shares tendered through that public offering.  Second, Article 13 of Law 26,741 directed the Republic to exercise all rights with respect to the 51% of YPF's shares that were subject to expropriation. In contrast, Sections

---

[19]   Including, for example, Arts. 27, 28, 31, and 75(22) of the National Constitution.

[20]   CSJN, "Caffarena v. Banco Argentino," Decisions: 10:427 (1871); CSJN, "Figueroa de Cornejo, Hortencia et al. v. Administration of National Parks re inverse Expropriation," Decisions: 339:468, at 475 (2016).

7(h) and 28(C) of the YPF Bylaws would have denied the Republic any "right to vote" shares acquired without complying with the tender offer provisions set forth in Sections 7(c) through 7(g). Third, Article 12 of Law No. 26,741 stipulates that the price of the shares subject to expropriation would be established in accordance with the procedure provided for in Articles 10 et seq. of Law No. 21,499. Section 7(f)(v) of the YPF Bylaws, on the other hand, provides certain *different* criteria by which to establish the price to be paid for shares acquired pursuant to a tender offer, in conflict with both Law No. 21,499 and the Expropriation Law. Finally, Article 7 of Law No. 26,741 declared 51% of YPF shares to be public utility and subject to expropriation. Under Argentine law, this means that only 51% may be acquired. If they were applicable—which they are not—the YPF Bylaws would allegedly trigger a mandatory obligation to launch a tender offer and hence would superimpose on Law No. 26,741 an obligation to acquire more shares than authorized;

- Argentina's Fourteenth Defense: CNV General Resolution No. 622/2013 (and its predecessor) exempts the Argentine State from any tender offer requirements in the event of an acquisition through a sovereign act of expropriation. Specifically, General Resolution No. 622/13 provides that "[t]he obligation to effectuate a public tender offer will not apply in the following cases: . . . b) Acquisitions that are executed in accordance with an expropriation law, and any others that result from the exercise by competent authorities of powers of public law as prescribed by the rules in force."[21];

- Argentina's Nineteenth Defense: Plaintiff's claims are barred by the doctrine of legal impossibility. Because, as set forth above, Laws Nos. 26,741 and 21,499 conflicted with the alleged tender offer requirements under YPF's Bylaws, it would not have

---

[21] CNV General Resolution No. 622/2013, Annex, Title III, Chapter II, Art. 22, paragraph b (translation).

been possible to comply simultaneously with both the applicable public laws and YPF's Bylaws; and

- <u>Argentina's Eighth Defense</u>: Plaintiffs' claims are barred because Argentina actions were justified by public necessity, which excuses any alleged breach caused by a sovereign act of expropriation. Law No. 26,741 explicitly declared Argentina's self-sufficiency in the supply of hydrocarbons to be a national public interest and a priority for the Republic.[22]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: _August 29, 2019_

[signature]

_____

Alfonso Santiago

---

[22] Law No. 26,741, Arts. 1, 3.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETERSEN ENERGÍA INVERSORA, S.A.U.
and PETERSEN ENERGÍA, S.A.U.,                     :     Case Nos.
                                                         1:15-cv-02739-LAP
                                    Plaintiffs,   :     1:16-cv-08569-LAP

        - against -                               :

ARGENTINE REPUBLIC and YPF S.A.,                  :

                                    Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ETON   PARK   CAPITAL   MANAGEMENT,
L.P., ETON PARK MASTER FUND, LTD. and:
ETON PARK FUND, L.P.,

                                                  :

                                    Plaintiffs,   :

        - against -                               :

ARGENTINE REPUBLIC and YPF S.A.,                  :

                                    Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **DECLARACIÓN EXPERTO DE ALFONSO SANTIAGO**

De acuerdo al 28 U.S.C. § 1746 y la Regla 44.1 de las Reglas Federales de los Procedimientos Civiles, yo, Alfonso Santiago, declaro lo siguiente:

1.  Yo presento esta declaración de experto en respaldo de la moción de rechazo basada en *forum non conveniens* interpuesta por la República Argentina ("Argentina") y YPF S.A.

2.  Yo soy un abogado debidamente licenciado y habilitado en la Argentina. Soy profesor de Derecho Constitucional en la Facultad de Derecho de la Universidad Austral en la Ciudad Autónoma de Buenos Aires, Argentina.

3. Obtuve mi título de abogado de la Universidad de Buenos Aires en 1986 y me colegié y fui admitido a practicar como abogado en el ámbito de la justicia federal en ese mismo año. En los años siguientes, he completado estudios de doctorado que finalicé en el año 1997. Adjunto una copia de mi CV en calidad de Anexo A, la cual tiene todas mis publicaciones de los 10 años pasados. Soy miembro de la Academia Nacional de Derecho y Ciencias Sociales de Buenos Aires y dirijo su Instituto de Derecho Constitucional del que son miembros muchos de los principales constitucionalistas argentinos. También he sido designado miembro correspondiente de la Real Academia de Jurisprudencia y Legislación de España y de la Academia de Letras Jurídicas de San Pablo Brasil. He realizado tareas de asesoramiento y consultoría con el Congreso de la Nación Argentina, con la Legislatura de la Ciudad Autónoma de Buenos Aires y con los gobiernos de las provincias de Santiago del Estero y de San Luis. Fui designado juez suplente del Tribunal de Apelaciones de la Ciudad Autónoma de Buenos Aires en Asuntos Contenciosos Administrativos y Tributarios.

4. Me están pagando cada hora por mi trabajo en este caso, incluyendo la preparación de este informe y cualquier deposición o testimonio que se requiera de mí.  Mi compensación no depende del resultado del caso.

5. Los abogados de Argentina me han solicitado que comente ciertas características del sistema judicial argentino, incluyendo: (i) el acceso a los tribunales argentinos por parte de litigantes domésticos y extranjeros; (ii) los procedimientos de prueba establecidos en la Argentina; y, (iii) la independencia del poder judicial argentino.

**Resumen de Opiniones**

6.  Yo opino que Argentina tiene un sistema judicial independiente capaz de justamente e imparcialmente resolver disputas entre litigantes privados, incluyendo extranjeros, y el Estado de Argentina.  También hablo sobre el proceso de elección y remoción de jueces y las mejoras que se han hecho al sistema judicial.  Además, describo como el sistema judicial de Argentina es de fácil acceso para los litigantes, incluyendo el acceso a los testigos, la posibilidad de obtener sus declaraciones testimoniales y producir pruebas documentales. Finalmente, explico que no hay impedimentos para presentar reclamaciones contra el Estado

2

de Argentina y describo el proceso para ejecutar una sentencia en contra del Estado argentino, que es el mismo proceso que se aplica para ejecutar una sentencia dictada fuera de Argentina (suponiendo que los tribunales argentinos deciden que esa sentencia es ejecutable).

A.  **El sistema judicial de Argentina**

    (a)  **Principios generales de la independencia judicial**

7.  Argentina tiene un sistema judicial independiente capaz de ser justo e imparcial al momento de resolver disputas entre litigantes privados, incluyendo extranjeros, y el Estado argentino.

8.  En Argentina, todos los jueces federales son nombrados por el Presidente con acuerdo del Senado.  En el caso de los jueces federales de primera instancia o de las cámaras de apelación, el Consejo de la Magistratura de la Nación interviene por mandato constitucional en el proceso de selección previo de los candidatos a ocupar las vacantes en los tribunales federales.  Se trata de un órgano independiente previsto específicamente en el Artículo 114 de la Constitución Nacional y que está integrado por miembros del Congreso, en representación de la mayoría y de la oposición, así como por representantes de los jueces, de los abogados y del mundo académico, elegidos por sus pares.  Esa integración plural permite un control adecuado en el proceso de selección de los candidatos a jueces.  El Consejo de la Magistratura, es el responsable de revisar y comparar los antecedentes relevantes de los postulantes y evaluar el mérito de cada candidato antes de proponer ante el Poder Ejecutivo una lista de los mejores tres candidatos para ocupar cada vacante en la justicia federal.  El Poder Ejecutivo, a su vez, selecciona de cada terna el candidato para ocupar la vacante y pide el acuerdo del Senado.  El Consejo de la Magistratura no participa en el nombramiento de los jueces que integran la Corte Suprema.

9.  Los jueces federales son independientes y solamente pueden ser removidos a través de un procedimiento especial establecido expresamente en la Constitución Nacional, que incluye (i) juicio político (*impeachment*) en el caso de los jueces de la Corte Suprema y (ii) un proceso de remoción ante un Jurado de Enjuiciamiento para el caso de los jueces federales de menor

rango.[1]  Este último proceso requiere la intervención previa del Consejo de la Magistratura que decide o no por mayoría de votos calificados acusar al juez federal ante el Jurado de Enjuiciamiento.

10. Adicionalmente, la Constitución Nacional establece en su Artículo 110 que los jueces de la Corte Suprema y de los demás tribunales de la Nación permanecerán en sus puestos mientras dure su buena conducta. El mismo Artículo establece que los jueces federales "*recibirán por sus servicios una compensación que determinará la ley, y que no podrá ser disminuida en manera alguna, mientras permaneciesen en sus funciones*".

11. Argentina recientemente ha emprendido significativos esfuerzos para continuar mejorando su sistema judicial.  La Corte Suprema de Justicia de la Nación ha tomado un rol activo en este proceso, a través de medidas que tienden a informatizar todos los juzgados federales, permitir las notificaciones vía email, la carga electrónica de los escritos presentados por cada parte, la realización de audiencias públicas y la admisión de *amicus curiae* en los casos de mayor relevancia pública, etc. El proceso de informatización, que ya se ha puesto en marcha, apunta a reducir los tiempos de duración de los procesos judiciales en todos los juzgados federales.

12. Adicionalmente, el actual Ministro de Justicia y Derechos Humanos de la Nación está desarrollando una agenda de políticas públicas a efectos de agilizar los procesos judiciales, modernizar y convertir el sistema judicial en uno más transparente y eficiente.  Los primeros pasos se están tomando a efectos de obtener estadísticas judiciales confiables, incrementar el uso de audiencias orales en los juicios civiles, simplificar los procesos, etc.  Dentro del marco de este programa, el Ministerio ha redactado y propuesto varios proyectos de leyes, incluyendo un nuevo Código Procesal Penal Federal (la Ley N° 27.482).

**(b)**     **Independencia del poder judicial cuando se demanda al Estado argentino**

---

[1] *Comparar* Constitución Nacional, Arts. 53, 59, 60, 110, 114 y 115.

13. Como se explica más adelante, litigantes extranjeros privados frecuentemente acceden a los tribunales argentinos, especialmente en el fuero Federal Contencioso Administrativo y en los tribunales Federales Civiles y Comerciales, para presentar demandas contra el Estado argentino. Algunos casos llegan hasta la Corte Suprema de Justicia de la Nación ("CSJN"). Por ejemplo, refiero a los siguientes casos, que demuestran la imparcialidad e independencia del Poder Judicial Argentino:

    i.     "The Bank of New York S.A. c/ Dirección General de Fabricaciones Militares"[2], en el que la CSJN confirmo el fallo de un litigante extranjero contra al Estado Nacional por incumplimiento de un contrato de mutuo.

    ii.     "ENAP Sipetrol Argentina c/ Dirección General de Aduanas"[3], en el cual la CSJN sostuvo una petición de una empresa petrolera extranjera impugnando un cargo impuesto por la Dirección General de Aduana para exportaciones de gas.

    iii.     "Direct TV", en el que la CJSN rechazó el intento del Estado Nacional para revocar un amparo obtenido por una empresa proveedora del servicio de televisión por cable suspendiendo una resolución de la Comisión Nacional de Defensa de la Competencia[4].

    iv.     "Petrobras"[5], en el que la CSJN hizo lugar a un planteo de una empresa petrolera extranjera que había impugnado una multa impuesta por la Dirección General de Aduana por diferencias por tributos adeudados en el marco de exportaciones de petróleo crudo.

---

[2] CSJN, "The Bank of New York S.A. c/ Dirección General de Fabricaciones Militares", Fallos: 328:2851 (2005).

[3] CSJN, "ENAP Sipetrol Argentina c/ Dirección General de Aduanas", decisión de fecha 1 de octubre de 2013, resolviendo el caso con remisión a las razones y conclusiones en CSJN, "YPF c/Dirección General de Aduanas", Fallos: 336:1624 (2013), resuelto en la misma fecha.

[4] CSJN, "Direct TV Argentina S.A.", Fallos: 334:681 (2011).

[5] CSJN, "Petrobras Energía S.A. c/ Dirección General de Aduanas", Fallos: 335:115 (2012).

v.      "Nidera"[6], en la que la CSJN hizo lugar a un planteo judicial de una empresa extranjera que impugnó el criterio que el Dirección General Impositiva aplicó en ciertas cuestiones vinculadas al impuesto a las ganancias.

vi.      "Pirelli Neumáticos"[7], en el que el Dirección General Impositiva fue demandado por no aplicar un convenio internacional suscripto entre la República Argentina e Italia para evitar la doble imposición. Ella fue condenada por la CSJN a aplicarlo conforme a su texto.

**(c)      Acceso a los tribunales argentinos por parte de litigantes nacionales y extranjeros y el procedimiento para la obtención de pruebas**

14. El sistema judicial argentino es fácilmente accesible para los litigantes. En un estudio del 2004 se determinó que Argentina tenía una ratio de litigiosidad de aproximadamente 10,225 casos por 100,000 habitantes, que es mayor al de muchos países dentro de la región tales como Brasil, Uruguay, Perú o Colombia.[8]  Ese número se incrementó a 11.615 por cada 100.000 habitantes en 2008 y a 11.627 en 2011[9].  De ello se puede inferir que el acceso a litigar en Argentina es amplio y no existen mayores impedimentos para los litigantes a la hora de traer sus disputas ante los tribunales argentinos.

15. El Artículo 20 de la Constitución Nacional (Anexo B) otorga a los extranjeros todos los derechos civiles de los que gozan los ciudadanos argentinos, entre los que se encuentra el derecho a acceder a la justicia y  litigar:

---

[6] CSJN, "Nidera S.A. c/ Dirección General Impositiva", Fallos: 339:1066 (2016).

[7] CSJN, "Pirelli Neumáticos SAIC y otros c/ Dirección General Impositiva", Fallos: 340:644 (2017).

[8] Garavano, Germán, *Información & Justicia II. Datos sobre la justicia argentina*, Konrad Adenauer, Buenos Aires, 2006, pp. 40 y 52, http://unidosjusticia.org/wp-content/uploads/2014/06/UNIJUS_KONRAD_Infoyjust2_A.pdf (27/4/2019, última visita).  El actual Ministro de Justicia de la Nación, Germán Garavano, participó en este estudio.

[9] Garavano, Germán, *Información & Justicia IV. Datos sobre la justicia argentina*, Konrad Adenauer, Buenos Aires, 2014, pp. 22.

> "*Los extranjeros gozan en el territorio de la Nación de todos los derechos civiles del ciudadano; pueden ejercer su industria, comercio y profesión; poseer bienes raíces, comprarlos y enajenarlos; navegar los ríos y costas; ejercer libremente su culto; testar y casarse conforme a las leyes*"[10].

16. A su vez, el Artículo 2610 del Código Civil y Comercial de la Nación (Anexo C) dispone lo siguiente:

> "*Igualdad de trato. Los ciudadanos y los residentes permanentes en el extranjero gozan del libre acceso a la jurisdicción para la defensa de sus derechos e intereses, en las mismas condiciones que los ciudadanos y residentes permanentes en la Argentina. Ninguna caución o depósito, cualquiera sea su denominación, puede ser impuesto en razón de la calidad de ciudadano o residente permanente en otro Estado. La igualdad de trato se aplica a las personas jurídicas constituidas, autorizadas o registradas de acuerdo a las leyes de un Estado extranjero*".

17. En consecuencia, el Artículo 115 del Código Procesal Civil y Comercial de la Nación ("CPCCN") también prevé la posibilidad de acceder a traductores públicos cuando ello sea necesario para declarar en un juicio, y los litigantes extranjeros pueden contratar a uno o más traductores privados para asistirlos durante el juicio.

18. Con respecto a temas probatorios, las partes tienen una amplia variedad de posibilidades para acceder y producir la prueba que consideren necesaria en el marco de un proceso judicial en Argentina. El CPCCN contempla varios mecanismos para la presentación y obtención de prueba, los que pueden ser utilizados por las partes de un juicio según sus necesidades. Así, por ejemplo, el Artículo 326 del CPCCN establece el mecanismo de "prueba anticipada" que consiste en la posibilidad de pedir a un juez, aun antes del inicio de un procedimiento

---

[10] La referencia a los "derechos civiles del ciudadano" incluye el derecho a litigar en los tribunales por parte de los extranjeros.

judicial, que se produzca una prueba, cuando resultará imposible o muy difícil de obtener en el futuro (declaración de un testigo de edad avanzada, pericia, secuestro de documentos, etc.).

19. De acuerdo al Artículo 333 del CPCCN, la prueba documental debe ser acompañada con los escritos de demanda, contestación, reconvención o respuestas a estos escritos.  Los informes de expertos y pruebas testimoniales se encuentran dentro de las pruebas que pueden ser ofrecidas por las partes. Todas las demás pruebas que cada parte pretenda producir deben ser ofrecidas en esas mismas oportunidades.  El juez debe analizar la prueba ofrecida y decidir si hace o no lugar a la misma. Cada parte tiene luego la obligación de producir la prueba ofrecida y aceptada. Esa producción de prueba se hace por intermedio del tribunal.

20. Con respecto a la aparición de testigos renuentes, de acuerdo al Artículo 431 del CPCCN, los jueces tienen el poder de forzar a que estos testigos renuentes comparezcan a declarar en la audiencia respectiva.  En el caso de ciertos oficiales del Estado, existen procedimientos específicos para que estos oficiales puedan brindar su testimonio de forma escrita.  El juez u oficial de un tribunal puede interrogar al testigo en conexión con su testimonio, y los abogados de las partes pueden presentar listas de preguntas al juez para la examinación del testigo.  A su vez, el testimonio de cualquier testigo puede cuestionarse e impugnarse por escrito al momento de presentar los alegatos antes del dictado de la sentencia.

21. El CPCCN también establece los mecanismos para que aquellos documentos que no se encuentren en posesión de la parte interesada, puedan ser obtenidos y presentados en el proceso. Por ejemplo, de acuerdo al Artículo 387 del CPCCN, un juez puede ordenar tanto a las partes así como a terceros, a exhibir ciertos documentos que se encuentren en su poder[11]. En ciertos casos, la negativa a presentarlo puede constituir una inferencia negativa en contra de la parte renuente[12].

22. Hay ciertas tasas judiciales que se aplican en Argentina, incluyendo, por ejemplo, una tasa del 3% del total del monto total en disputa que debe ser pagada mediante depósito bancario a

---

[11] *Ver* CPCCN, Arts. 326, 333, 387, y 431 (adjuntados como Anexo D).

[12] *Ver* CPCCN, Art. 388.

la orden del tribunal correspondiente.  En mi opinión, esta tasa no es ni prohibitiva ni constituye impedimento alguno al acceso a la justicia, particularmente en casos comerciales donde los demandantes suelen tener suficientes medios y buscan reclamar una suma de dinero significativa[13].  De hecho, la mayoría de los países de América Latina, incluyendo Brasil, Colombia, México, Perú, Uruguay y Paraguay, aplican tasas de justicia de forma similar y, lejos de constituir barreras que impidan el acceso a los tribunales de justicia, se las considera necesarias para poder brindar un servicio de justicia efectivo ya que los montos recaudados son destinados al funcionamiento del Poder Judicial.  En ciertos casos, estas tarifas pueden ser reducidas o eliminadas, incluso en el caso de compañías que tienen recursos económicos insuficientes, no pueden obtenerlas o son insolventes[14].  Además, debido a que la ley argentina permite que la parte prevaleciente recupere sus costos, es poco probable que tales tasas disuadan un caso meritorio.

### (d)   Procesos en contra del Estado argentino

23. No existen impedimentos para demandar al Estado argentino.  En el caso de una demanda por daños y perjuicios en contra del Estado, se tienen las mismas condiciones de tasas y procesos de actuación de pruebas que hemos discutido anteriormente en la sección (c) según sea aplicable.

24. Respecto de la ejecución de sentencias en las que se condena al Estado Nacional a pagar una suma de dinero, una vez que se emite la sentencia y esta queda firme,[15] la parte que busque su ejecución puede solicitar al juez que ordene el cumplimiento al Estado Nacional.  El Estado luego debe incluir dicho pago dentro de su presupuesto anual.  Si el presupuesto del

---

[13] La CSJN sostuvo en varios fallos que la tasa de justicia es constitucional, no afecta el principio de defensa en juicio ni la garantía de la propiedad privada, siempre que no sea confiscatoria (CSJN, "Doña Rosa Judit Ortelli de Trincavelli contra Don Augusto Hebrard", Fallos: 132:360 (1920); CSJN, "Ottonello Hnos. y Cía. y otros v. Provincia de Tucumán", Fallos: 201: 557 (1945); CSJN, "Félix Pedro Suárez v. Jorge J. Sosa Bilbao", Fallos: 258:230 (1964); CSJN, "Industrial Export y Finance Corporation v. Provincia de Salta", Fallos: 262:497 (1965).

[14] CPCCN, Arts. 78-86; Ley No. 23.898, Art. 3, 5, 6, 13.

[15] Cfr. CPCCN, Art. 499.

año económico en el que el pago debe ser cumplido no cuenta con suficientes fondos para el pago de la deuda, el Poder Ejecutivo debe tomar las medidas necesarias para que se incorpore dentro del siguiente año fiscal.[16]   El Estado Nacional normalmente cumple con el pago ordenado dentro del año fiscal siguiente desde que se emite la orden judicial de pago y, si no cumple, las partes que tienen fallos contra al Estado Nacional podrían embargar los bienes del Estado Nacional bajo la Ley N° 23.982.

25. Se aplica el mismo procedimiento para el caso de ejecución de una sentencia emitida fuera de Argentina (asumiendo que los tribunales argentinos decidan que la sentencia es aplicable).[17] La parte que busca la ejecución de una sentencia emitida afuera de Argentina debe cumplir previamente con el procedimiento de *exequatur* para el reconocimiento de esa sentencia dictada por un tribunal extranjero.[18]   En consecuencia, la ejecución de una sentencia de un tribunal extranjero podría llevar más tiempo, inevitablemente, en comparación a la ejecución de una sentencia emitida en Argentina.

## B.      Asuntos adicionales del derecho argentino

26. He revisado las defensas afirmativas que ha planteado Argentina, muchas de las cuales plantean asuntos que deben ser analizadas bajo la ley argentina. Expreso opiniones muy breves sobre algunos de esos temas a continuación. Si este caso continuara más allá de la moción actual, estoy dispuesto y puedo proporcionar una opinión más completa sobre estos y otros temas de la ley argentina planteados por las defensas de Argentina:

- Las defensas cuarta y decimoquinta de Argentina: el Artículo 17 de la Constitución Nacional de Argentina establece que la expropiación se completa solo cuando la parte sujeta a expropiación recibe compensación por la propiedad expropiada.   Repsol no

---

[16] Cfr. Ley N° 11.672, Art. 170; Ley N° 23.982, Art. 22; Ley N° 24.624, Art. 20.

[17] Los tribunales argentinos no harán cumplir una sentencia extranjera dictada por un tribunal sin competencia, incluyendo sentencias dictadas en casos sobre los cuales los tribunales de Argentina tienen exclusividad de competencia.

[18] CPCCN, Arts. 517-518.

recibió compensación por sus acciones de YPF hasta que su acuerdo de liquidación con Argentina fue ratificado por la Ley N° 26.932 y se hizo efectivo el 8 de mayo de 2014.   Como Petersen alegó que ya no era accionista en el 2014, carece de legitimación para demandar y no puede probar la causa de sus daños;

- La undécima defensa de Argentina: el derecho público argentino (incluidas las Leyes N° 26.741 y 21.499) prevalece sobre cualquier obligación conflictiva de derecho privado (incluyendo los Estatutos de YPF).   Específicamente, el Artículo 12 del Código Civil y Comercial Nacional establece que "las convenciones particulares no pueden dejar sin efecto las leyes en cuya observancia está interesado el orden público".  El Artículo 386 establece de manera similar que "son de nulidad absoluta los actos que contravienen el orden público, la moral o las buenas costumbres."  La Constitución Nacional contiene varias disposiciones más que requieren la prioridad del derecho público sobre el privado[19], y muchas decisiones de la CSJN han reforzado este principio a lo largo de los años.[20]  Aunque las Secciones 7 y 28 de los Estatutos de YPF fueran aplicables a la adquisición de acciones por parte de Argentina a través de la expropiación, que no lo fueron, entrarían directamente en conflicto con las obligaciones establecidas en la Ley N° 26.741 de varias maneras.  Primero, la Ley N° 26.741 estipuló expresamente en el Artículo 12 que YPF seguiría siendo una empresa pública y no sería nacionalizada.  Pero según la Sección 7(f) de los Estatutos de YPF, una oferta pública requeriría que el gobierno ofrezca adquirir todas las acciones en circulación a través de una oferta pública, y que acepte y compre todas las acciones ofrecidas a través de esa oferta pública.  Segundo, el Artículo 13 de la Ley N° 26,741 ordenó a la República ejercer todos los derechos con respecto al 51% de las acciones de YPF que estaban sujetas a expropiación.  En contraste, las Secciones 7(h) y 28(C) de los Estatutos de YPF habrían negado a la República cualquier acción de "derecho de voto" adquirida sin cumplir con las disposiciones de la oferta pública establecidas

---

[19]   Incluyendo, por ejemplo, arts. 27, 28, 31 y 75, sec. 22 de la Constitución Nacional.

[20]   CSJN, "Caffarena c/ Banco Argentino," Fallos: 10:427 (1871); CSJN, "Figueroa de Cornejo, Hortensia y otros c/ Administración de Parques Nacionales s/ Expropiación inversa," Fallos 339:468, p. 475 (2016).

en las Secciones 7(c) a 7(g).  Tercero, el Artículo 12 de la Ley N° 26.741 estipula que el precio de las acciones sujetas a expropiación sería establecido de acuerdo con el procedimiento previsto en los Artículos 10 et seq. de la Ley No. 21.499.  La Sección 7(f)(v) de los Estatutos YPF establece, por el otro lado, ciertos criterios *diferentes* para establecer el valor a ser pagado por las acciones adquiridas conforme a la oferta pública que están en conflicto tanto con la Ley N° 21.499 como con la Ley de Expropiación.  Finalmente, el Artículo 7 de la Ley N° 26.741 declaró 51% del interés de YPF utilidad pública y sujeto a expropiación. Según la ley argentina, esto significa que solo se puede adquirir el 51%. Si fueran aplicables, lo que no son, los Estatutos de YPF supuestamente provocarían una obligación de lanzar una oferta pública y, por lo tanto, superpondrían en la Ley N° 26.741 una obligación de adquirir más acciones de las autorizadas.

- La decimocuarta defensa de Argentina: la Resolución General de la CNV N° 622/2013 (y su predecesora) eximen al Estado argentino de cualquier requisito de oferta pública en caso de adquisición mediante un acto soberano de expropiación. Específicamente, la Resolución General N° 622/13 dice que "[n]o será de aplicación la obligación de efectuar una oferta pública de adquisición en los siguientes supuestos . . . b) Adquisiciones que se realicen de conformidad con una ley de expropiación, y las demás que resulten del ejercicio por las autoridades competentes de facultades de derecho público previstas en la normativa vigente."[21];

- La decimonovena defensa argentina: las reclamaciones de los demandantes están prohibidas por la doctrina de la imposibilidad jurídica.  Debido a que, según lo establecido anteriormente, las Leyes N° 26.741 y 21.499 entraban en conflicto con los supuestos requisitos de oferta pública de conformidad con los Estatutos de YPF, no hubiera sido posible cumplir simultáneamente con las leyes de orden público aplicables y los Estatutos de YPF; y

- La octava defensa de Argentina: las reclamaciones de los demandantes están prohibidas porque las acciones de Argentina se justificaron por necesidad pública, lo

---

[21]   CNV Resolución General N° 622/2013, Anexo, Título III, Capítulo II, Artículo 22, párrafo b.

que excusa cualquier presunta violación causada por un acto soberano de expropiación.  La Ley N° 26.741 declaró explícitamente que la autosuficiencia de Argentina en el suministro de hidrocarburos es un interés público nacional y una prioridad para la República.[22]

Yo declaro bajo pena de perjurio conforme a las leyes de los Estados Unidos de América que lo anterior es verdadero y correcto.

Fecha: _29-VIII-19_

_____

Alfonso Santiago

---

[22]  Ley N° 26.741, Art. 1, 3.

13