**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., <br><br> Plaintiffs, <br><br> - against - <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br> Defendants. | Case Nos. <br> 1:15-cv-02739-LAP <br> 1:16-cv-08569-LAP |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., <br><br> Plaintiffs, <br><br> - against - <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br> Defendants. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO MOTION TO DISMISS ON BASIS OF _FORUM NON CONVENIENS_**

KING & SPALDING LLP

Israel Dahan
1185 Avenue of the Americas
New York, NY 10036
Phone: (212) 556-2114
Fax: (212) 556-2222
Email: idahan@kslaw.com

Reginald R. Smith
1100 Louisiana Street, Suite 4000
Houston, TX 77002
Phone: (713) 751-3200
Fax: (713) 751-3290
Email: rsmith@kslaw.com

KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
Email:  mhansen@kellogghansen.com
        dho@kellogghansen.

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... iii

INTRODUCTION ..................................................................................... 1

STATEMENT OF FACTS ......................................................................... 3

ARGUMENT ............................................................................................ 9

    I.        STANDARD OF REVIEW ....................................................... 9

    II.      ETON PARK'S COMPLAINT WARRANTS MAXIMUM
           DEFERENCE TO PLAINTIFFS' CHOICE OF FORUM ................... 11

           A.     Eton Park's Strong Interest In Litigating In Its Home Forum
                    Provides Additional Reason To Deny FNC Dismissal ............. 11

           B.     Plaintiffs And This Case Have A Bona Fide Connection To
                    This District ......................................................................... 13

           C.     No Plaintiff Waived Its Right To Litigate In This Forum ......... 14

    III.     CIRCUMSTANCES SINCE THE COURT'S FNC RULING
           HAVE FURTHER UNDERMINED THE ADEQUACY OF THE
           ARGENTINE COURTS AS A FORUM FOR THIS CASE ................ 15

           A.     Defendants Failed To Disclose That There Is An Ongoing
                    Argentine Criminal Investigation Concerning The Petersen
                    Entities, Their Bankruptcy Receiver, And Their Litigation
                    Funder In Connection With This Lawsuit .............................. 15

           B.     Recent Political Developments Cast Grave Doubt On The
                      Already-Doubtful Ability Of The Argentine Judiciary To
                    Render Impartial Justice In This Case ................................... 17

           C.     The Asserted Running Of The Statute Of Limitations Renders
                    Argentina An Inadequate Forum ........................................... 21

           D.     Defendants' "Exclusive Jurisdiction" Argument Is Meritless ..... 22

                1.     Defendants' Exclusive Jurisdiction Argument Is Waived ...... 22

                2.     Argentine Law Cannot Divest This Court of Jurisdiction ...... 22

                3.     At Any Rate, Argentine Law Recognizes Concurrent
                     Jurisdiction ......................................................................... 24

i

       4.      Argentina's Threat To Refuse To Enforce a U.S. Judgment Does Not Warrant Dismissal ........................................27

IV.    THE PUBLIC AND PRIVATE CONVENIENCE FACTORS TILT EVEN MORE STRONGLY AGAINST DISMISSAL ........................................28

    A.    The Public Factors Strongly Disfavor Dismissal ........................................28

    B.    The Private Factors Now Even More Strongly Favor Litigation In This Court ........................................31

CONCLUSION ........................................35

# TABLE OF AUTHORITIES

Page

## CASES

*Acosta v. JPMorgan Chase & Co.*, 219 F. App'x 83 (2d Cir. 2007)................................13

*Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225 (4th Cir. 2000).....................................31

*Alfandary v. Nikko Asset Mgmt. Co.*, 2019 WL 2525414 (S.D.N.Y. June 19, 2019) .........10, 22, 33

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 782 F. Supp. 215 (S.D.N.Y. 1992) ..............................28

*Alnwick v. European Micro Holdings, Inc.*, 29 F. App'x 781 (2d Cir. 2002) ..............................26

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ...............................23

*Argentine Republic v. Petersen Energía Inversora, S.A.U.*, 139 S. Ct. 2741 (2019) .....................8

*Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17 (S.D.N.Y. 2005)........................10, 33

*Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Bank of Pakistan*,
    273 F.3d 241 (2d Cir. 2001)................................................................21

*Bank of Crete, S.A. v. Koskotas*, 1991 WL 280714 (S.D.N.Y. Dec. 20, 1991) ..............................9

*Bigio v. Coca-Cola Co.*, 448 F.3d 176 (2d Cir. 2006)............................................. 33-34

*Bloomberg Fin. L.P. v. UBS AG*, 358 F. Supp. 3d 261 (S.D.N.Y. 2018) ...............................12, 33

*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000) .........................................18

*Cary v. Curtis*, 44 U.S. (3 How.) 236 (1845)...............................................................23

*CCS Int'l, Ltd. v. ECI Telesystems, Ltd.*, 1998 WL 512951
    (S.D.N.Y. Aug. 18, 1998)................................................................9

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821)......................................................30

*Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*,
    801 F. Supp. 2d 211 (S.D.N.Y. 2011)...............................................13

*Construtora Norbeto Oderbrecht S.A. v. General Elec. Co.*, 2007 WL 3025699
    (S.D.N.Y. Oct. 12, 2007) ................................................................12

*Cyberscan Tech., Inc. v. Sema Ltd.*, 2006 WL 3690651 (S.D.N.Y. Dec. 13, 2006)...............12, 28

*DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21 (2d Cir. 2002) ........................................28

*Eclaire Advisor Ltd. as Tr. to Daewoo Int'l (Am.) Corp. Creditor Tr. v. Daewoo
    Eng'g & Constr. Co.*, 375 F. Supp. 2d 257 (S.D.N.Y. 2005) .............................33

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007) ......................................3

*Flame S.A. v. Freight Bulk Pte. Ltd.*, 762 F.3d 352 (4th Cir. 2014).............................24

*Fogel v. Chestnutt*, 668 F.2d 100 (2d Cir. 1981) ......................................................10

*Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91
    (2d Cir. 1996)....................................................................................................33

*Ge Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374 (S.D.N.Y. 2013)....................10

*Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482 (N.Y. 1999)..................................21

*Grand Bahama Petroleum Co. v. Asiatic Petroleum Corp.*, 550 F.2d 1320
    (2d Cir. 1977)............................................................................................. 23-24

*Gross v. German Found. Indus. Initiative*, 456 F.3d 363 (3d Cir. 2006) ......................31

*Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142 (2d Cir. 2000) ........................13

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)...........................................................14

*Hatteras Enters. Inc. v. Forsythe Cosmetic Grp., Ltd.*, 2016 WL 4083386
    (E.D.N.Y. July 30, 2016) ..................................................................................22

*Henderson v. Metropolitan Bank & Tr. Co.*, 502 F. Supp. 2d 372 (S.D.N.Y. 2007) ............. 34-35

*Hong Kong Deposit & Guar. Co. v. Hibdon*, 602 F. Supp. 1378 (S.D.N.Y. 1985)......................23

*HSBC USA, Inc. v. Prosegur Paraguay, S.A.*, 2004 WL 2210283 (S.D.N.Y.
    Sept. 30, 2004) ........................................................................................11, 32

*Iragorri v. United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001) .................................9, 10, 12, 13, 15

*Locals 302 & 612 of Int'l Union of Operating Eng'rs v. Blanchard*,
    2005 WL 2063852 (S.D.N.Y. Aug. 25, 2005)........................................................24

*Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604 (3d Cir. 1991) .......................35

*Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62 (2d Cir. 1981) ..............................34

*Markham v. City of Newport News*, 292 F.2d 711 (4th Cir. 1961)................................24

*Mata v. Lynch*, 135 S. Ct. 2150 (2015)........................................................................9

*McDermott Inc. v. Lewis*, 531 A.2d 206 (Del. 1987)....................................................26

*Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345 (1st Cir. 1992)....................................35

*Metito (Overseas) Ltd. v. General Elec. Co.*, 2006 WL 3230301 (S.D.N.Y. Nov. 7, 2006) ..................................................................................................33

*Migdal Ins. Co. v. Insurance Co. of Pennsylvania*, 2014 WL 5149128 (S.D.N.Y. Oct. 14, 2014) ..............................................................................21

*Nationsbank of Florida v. Banco Exterior de España*, 867 F. Supp. 167 (S.D.N.Y. 1994) ......................................................................................13

*New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24 (2d Cir. 1997) .........................14

*NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172 (2d Cir. 2011) ........................................................................................3, 30

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146 (2d Cir. 2005) ............................11, 19

*Ole Media Mgmt., L.P. v. EMI April Music, Inc.*, 2013 WL 2531277 (S.D.N.Y. June 10, 2013) ...............................................................................31

*Olympic Corp. v. Societe Generale*, 462 F.2d 376 (2d Cir. 1972) ............................................9, 10

*Overseas Programming Cos. v. Cinematographische Commerz-Anstalt*, 684 F.2d 232 (2d Cir. 1982) ....................................................................................34

*Petersen Energía Inversora, S.A.U. v. Argentine Republic*:

    2016 WL 4735367 (S.D.N.Y. Sept. 9, 2016), *aff'd in part, dismissed in part*, 895 F.3d 194 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019) ..........3, 4, 5, 6, 7, 11, 15, 16, 17, 21, 25, 28, 29, 31, 32, 34

    895 F.3d 194 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019) ..................3, 4, 5, 7, 8, 23, 25, 26, 29

*Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64 (2d Cir. 2003) ...............................13

*R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164 (2d Cir. 1991) ......................................9, 11

*Randall v. Arabian Am. Oil Co.*, 778 F.2d 1146 (5th Cir. 1985) ..................................................23

*Rasoulzadeh v. Associated Press*, 574 F. Supp. 854 (S.D.N.Y. 1983), *aff'd*, 767 F.2d 908 (2d Cir. 1985) ...................................................................20

*Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014) ..............................................30

*Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88 (2d Cir. 2006) .........................................................................................30

*Universal Acupuncture Pain Servs., P.C. v. State Farm Mut. Auto. Ins. Co.*, 2003
     WL 21058105 (S.D.N.Y. May 9, 2003), *aff'd in part, rev'd and remanded
     in part sub nom. Universal Acupuncture Pain Servs., P.C. v. Quadrino &
     Schwartz, P.C.*, 370 F.3d 259 (2d Cir. 2004) .................................................10

*Virgin Atl. Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245 (2d Cir. 1992) ....................10

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400
     (1990) ...................................................................................................30

*Wells Fargo Fin., Inc. v. Fernandez*, 2001 WL 345226 (S.D.N.Y. Apr. 9, 2001) ....................22, 29

*Weltover, Inc. v. Republic of Argentina*, 753 F. Supp. 1201 (S.D.N.Y.), *aff'd*,
     941 F.2d 145 (2d Cir. 1991), *aff'd*, 504 U.S. 607 (1992) .................................17

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000) .................................................9

*Wright v. Cayan*, 817 F.2d 999 (2d Cir. 1987) ........................................................................10

*YPF S.A. v. Petersen Energía Inversora, S.A.U.*, 139 S. Ct. 2741 (2019) .......................................8

## STATUTES, REGULATIONS, AND RULES

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602 *et seq.* ....................1, 2, 6,
                                                                                                       7, 23, 26, 30

NY CPLR § 202 ..........................................................................................................21

17 C.F.R. § 240.10b-5 (SEC Rule 10b-5) ........................................................................27

Fed. R. Civ. P.:

     Rule 12(b)(1) ........................................................................................................24

     Rule 12(b)(6) ........................................................................................................24

Argentine Capital Markets Law:

     Art. 46 .................................................................................................................26

Argentine Civil Code:

     Art. 1216 .............................................................................................................25

Argentine Civil & Comm. Code:

     Art. 2650 .............................................................................................................25

Argentine National Code of Civil & Comm. Procedure:

    Art. 5 ...................................................................................................................26, 27

    Art. 5, ¶ 11 .................................................................................................................27


**ADMINISTRATIVE MATERIALS**

U.S. Dep't of State, *Argentina 2018 Human Rights Report*,
    http://justice.gov/file/1157721/download ..................................................................18, 20


**OTHER AUTHORITIES**

Laura Alonso, Secretary of Justice for Public Ethics, Transparency and the Fight
    Against Corruption, Republic of Argentina, *The Fight Against Corruption
    in Argentina*:  *A Conversation with Argentine Anticorruption Chief Laura
    Alonso*, Remarks at the Meeting of the New York City Bar Association
    (Nov. 22, 2019) .................................................................................................................20

Br. for the United States as Amicus Curiae, *YPF S.A. v. Petersen Energía
    Inversora, S.A.U.*, Nos. 18-575 & 18-581 (U.S. filed May 21, 2019),
    https://bit.ly/2JdAFQq .............................................................................................8, 25, 29

ICSID, *ICSID and the World Bank Group*, https://bit.ly/2N4mdLR..............................................6

Restatement (Second) of Conflict of Laws (1971) .......................................................................23

Todos, https://www.frentedetodos.org/ (last visited Nov. 27, 2019)............................................18

## INTRODUCTION

In denying Defendants' motion to dismiss three years ago, this Court correctly rejected Defendants' argument for dismissal of the *Petersen* Plaintiffs' claims under the doctrine of *forum non conveniens* ("FNC").  It should do so again now.  To the extent any relevant circumstances have changed, they have only *strengthened* the reasons for rejecting Defendants' attempt to override Plaintiffs' choice of forum and move this case to their own home turf.

To begin, the Court is now jointly considering *Petersen* with the parallel claims brought by New York-based plaintiff Eton Park, whose choice of forum deserves even greater deference than Petersen.  Defendants thus face an even steeper climb to displace Plaintiffs' presumptive right to sue where they choose.  Moreover, four years of litigation establishing this Court's subject-matter jurisdiction under the Foreign Sovereign Immunities Act of 1976 ("FSIA") — leading all the way to the U.S. Supreme Court — have only increased the public interest in this Court's adjudication of this case.  Indeed, the brief of the United States Solicitor General recommending denial of Defendants' petitions for certiorari affirmed the United States' strong interest in resolving this case in the U.S. courts.

Were that not enough, there is also a further, and alarming, development.  Despite harping on the dismissal of the criminal investigation of Burford (a litigation funder) and King & Spalding in connection with another Argentine nationalization (known as the *Teinver* case), Defendants have misleadingly withheld from the Court that, as part of a criminal investigation under the Macri administration, Argentine authorities are currently investigating Petersen, its receiver, and Burford *in connection with this very case*.  Now, the Kirchner regime has been returned to power in Argentina — the very regime under which federal prosecutors aggressively investigated Burford and counsel in connection with the *Teinver* matter.  The Court previously

recognized that this kind of conduct prevented Argentina from showing its courts to be an adequate alternative forum.  Yet here we go again — just as last time, without a mention of this new chilling activity in Defendants' briefs.

The Court further recognized three years ago that, even if the Argentine courts were adequate, the public and private convenience factors did not warrant forcing Petersen to litigate there.  The United States has an obvious interest in deciding a case concerning the rights of shareholders on American securities markets, and translating documents and transporting witnesses pose minimal inconvenience to the parties.  On this score, too, the only changed circumstances weigh *against* dismissal:

- Though listing several witness names, Defendants still identify no actual *evidence* they need from Argentina, nor do they explain how this evidence would be relevant to a case alleging straightforward breach-of-contract claims based on undisputed facts.
- Any necessary Eton Park evidence will be located in or near New York City.
- The parties and the Court have expended considerable time and resources in more than four years of litigation in U.S. courts, all the way to the U.S. Supreme Court.

Finally, now that Defendants' challenge to this Court's subject-matter jurisdiction has been squarely rejected, Defendants resort to the argument — never made before — that *Argentine* law deprives this Court of jurisdiction.  That is wrong on multiple levels.  Under well-settled law, *foreign* law does not dictate this Court's jurisdiction; *federal* law does.  And *every judge to consider the question* determined that, under the FSIA, this Court has and should exercise jurisdiction over this case.  The United States agreed, and the Supreme Court denied certiorari.  That is fatal to Defendants' latest (and tardy) attempt to send this case to Argentina.  Moreover, even if Argentine law were somehow relevant, Defendants' argument mischaracterizes both Argentine principles of international jurisdiction as well as the nature of Plaintiffs' complaint.  Nothing in Argentine law purports to strip this Court's jurisdiction over this dispute.

Defendants' motion to reconsider this Court's correct ruling from three years ago relies, as it must, on "changed circumstances" (at 9). The problem for Defendants is that the only changed circumstances favor litigation here now more than ever. This case has additional connections to New York; the United States affirmed this Court's interest in the dispute; the parties have litigated here for years; and, worst of all, Argentina has again resorted to executive overreach of the worst form by abusing the criminal process to pursue baseless claims in the service of litigation. Defendants cannot come close to carrying their heavy burden to justify FNC dismissal, to disturb the law of the case, and to render years of litigation for naught.

## STATEMENT OF FACTS

**A.**     In 1993, Argentina accessed the international capital markets by selling a majority stake in its national oil and gas company, YPF. *See* Compl. ¶ 13, *Petersen*, ECF #1 ("*Petersen* Compl."); *Petersen Energía Inversora, S.A.U. v. Argentine Republic*, 2016 WL 4735367, at *1 (S.D.N.Y. Sept. 9, 2016) ("*Petersen I*"), *aff'd in part, dismissed in part on other grounds*, 895 F.3d 194 (2d Cir. 2018) ("*Petersen II*"), *cert. denied*, 139 S. Ct. 2741 (2019). It engaged in initial public offerings ("IPOs") on several stock exchanges worldwide, notably including in the United States on the New York Stock Exchange ("NYSE"), where it raised more than $1 billion. *See Petersen I*, 2016 WL 4735367, at *1-2.

But Argentina's "sorry history" of failing to honor its "sovereign obligations" was well known. *NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172, 175 (2d Cir. 2011); *see EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 466 n.2 (2d Cir. 2007). To induce the international investment it sought, Argentina had to promise investors, by contract, a compensated exit in the event of renationalization. *See Petersen II*, 895 F.3d at 199. It did that through two amendments to YPF's bylaws that this Court and the Second Circuit analyzed

in *Petersen I* and *Petersen II*.  As the Second Circuit has explained, "[s]imply put," the amendments required "Argentina to make a tender offer in accordance with the procedures set forth in the bylaws if 'by *any means* or instrument' it 'becomes the owner [of], or exercises the control of,' at least 49% of YPF's capital stock."  *Id.* at 206 (first alteration added).  The bylaws implied a similar obligation on YPF to ensure compliance.  *See id.* at 210.

**B.**     Argentina and YPF aggressively promoted their bylaw amendments through additional "marketing efforts."  *Petersen II*, 895 F.3d at 200.  Among other things, Defendants "touted these protections in the [IPO] prospectus filed with the [Securities and Exchange Commission ("SEC")] in connection with the IPO."  *Id.*  The prospectus referenced — indeed, "touted" — the tender-offer requirement and the fact that it "must be carried out in accordance with" the requirements of all "jurisdictions, exchanges or markets in which the offer is made or in which the Company's securities are traded."  YPF SEC Form F-1, at 81, Ex. B to Decl. of Michael A. Paskin, *Petersen*, ECF #112-2 ("IPO Prospectus").  But the promotional prospectus was emphatic that its terms were "summary" in nature and not controlling:

> Set forth below is certain information concerning the Company's capital stock and **a brief summary** of certain significant provisions of the By-laws, and of Argentine law.  **This description does not purport to be complete and is qualified by reference to the By-laws . . . and by applicable Argentine law.**

*Id.* at 79 (emphases added).

**C.**     "By all accounts, Argentina's marketing efforts worked."  *Petersen II*, 895 F.3d at 200.  Between 2008 and 2011, the *Petersen* Plaintiffs ("Petersen") "conducted a series of acquisitions and came to own approximately 25% of YPF's shares, held in the form of [American Depository Shares ("ADSs")] issued by the Bank of New York Mellon in New York City" and traded on the NYSE.  *Id.*  In addition, between late 2010 and early 2012, U.S.-based investment fund Eton Park purchased approximately 11.95 million NYSE-listed shares of YPF

4

stock, at a total cost of approximately $448 million.  Compl. ¶ 30, *Eton Park*, ECF #1 ("*Eton Park* Compl.").

Eton Park traders located in New York executed the trades to acquire this YPF stock. *See* Decl. of Marcy Engel ¶¶ 2, 6 ("Engel Decl.").  Eton Park Capital Management, the party that made investment decisions as the SEC-registered investment advisor for the two other Eton Park Plaintiffs, which are funds, is headquartered in New York City.  *See id.* ¶ 5.  Although the funds have since begun to wind down, Eton Park Capital Management remains in business based in New York City.  *See id.* ¶¶ 8-9.  The former general counsel Marcy Engel, who continues to assist Eton Park in this litigation, is a New York resident.  *See id.* ¶ 9.

D.      In 2012, Argentina retook control of YPF.  Yet, despite the bylaw amendments, "Argentine officials were . . . quick to declare that, despite having acquired control of the company, Argentina and YPF had no intention of complying with the tender offer provisions of YPF's bylaws."  *Petersen II*, 895 F.3d at 202.  And breach they did.  Argentina declined — and YPF declined to require Argentina — to offer to buy the remaining 49% of YPF stock despite having retaken control of the company.  Included in those refusals, Defendants never took the steps the bylaws required in New York City:  for example, they never provided notice of a tender offer in New York newspapers, never made SEC filings detailing the tender offer, and never delivered tender-offer materials to the NYSE.  *See Petersen I*, 2016 WL 4735367, at *7 ("the United States was the place of performance for certain contractual obligations under the Bylaws").  All of the Plaintiffs were thus affected in New York — especially Eton Park, which primarily operates there.

E.      Defendants' breaches caused Plaintiffs financial injury, *see Petersen* Compl. ¶¶ 41-49; *Eton Park* Compl. ¶¶ 40-42, leading them to sue for breach of contract.  The *Petersen*

Complaint was filed first, in April 2015, and Defendants moved to dismiss in September of that year in two motions asserting a wide range of issues, including lack of subject-matter jurisdiction and *forum non conveniens*. Around the same time, Argentina initiated criminal proceedings against Petersen's counsel and its litigation funder, ostensibly for fraud connected to their seeking monetary relief from Argentina in a separate but highly similar matter — an international arbitration pending before ICSID[1] concerning the nationalization of Argentina's airlines (the "*Teinver* Arbitration"). *See Petersen I*, 2016 WL 4735367, at *4.

This Court denied Defendants' motions to dismiss in substantially all respects.[2] Two aspects of the ruling are most relevant here. First, the Court concluded that it possessed subject-matter jurisdiction over the case under the FSIA. *See id.* (FSIA confers jurisdiction when "one of several statutorily defined exceptions applies"); *id.* at *7 (denying "Defendants' motion to dismiss" for "lack of subject matter and personal jurisdiction").

Second, the Court held that this District was not a *forum non conveniens* for two principal reasons. It first held, on the basis of the pending criminal proceedings, that "Defendants ha[d] not shown that Argentina [wa]s an adequate alternative forum" because Plaintiffs had established "a well-founded fear of prosecution of [the] parties' counsel if the instant action were brought in Argentina." *Id.* at *11. It next held, alternatively, that "Argentina ha[d] not shown" that the private and public interest factors "tilt[ed] strongly in favor of" dismissal. *Id.* at *12.

With respect to the "private" factors, the Court observed that, while Defendants had declined to "identif[y] witnesses they would call at trial," "[t]he costs and inconvenience

---

[1] The International Centre for Settlement of Investment Disputes is an international arbitration institution and an arm of the World Bank Group. ICSID, *ICSID and the World Bank Group*, https://bit.ly/2N4mdLR.

[2] Two theories of liability were dismissed as "duplicative" of the breach-of-contract claims. *See Petersen I*, 2016 WL 4735367, at *16.

associated with the potential witnesses' travel . . . do not weigh strongly in favor of dismissal" in any event. *Id.* The Court further explained that the location of documents was "not . . . dispositive . . . in the instant case" because "some of the relevant documents have been translated already," and the remaining "cost of translating" documents would not be "an unreasonable burden on the parties." *Id.* With respect to the public factors, the Court acknowledged that both U.S. courts *and* Argentine courts "have an interest in adjudicating this dispute" and that it would need to decide the case under Argentine law. *Id.* at *13. But, citing well-worn precedents, the Court determined that the need to "apply Argentine law . . . is not a justification for dismissal." *Id.*

The Court made these rulings at a stage when only the Spanish Petersen Plaintiffs' claims were before it. It thus acknowledged at the outset that "deference to [those] Plaintiffs' choice of forum" was "not at its greatest height." *Id.* at *11. Even from that posture, the Court found that Defendants had not justified a ruling that would "disturb[] the Plaintiffs' choice." *Id.* at *13.

**F.**      Defendants appealed this Court's FSIA ruling under the collateral-order doctrine. The Second Circuit framed the question as "whether the federal courts have subject matter jurisdiction over this case," *Petersen II*, 895 F.3d at 203, and it unanimously answered that question in the affirmative, *see id.* at 211. Defendants then sought further review in the Supreme Court, which called for the views of the Solicitor General.

The Solicitor General took the position that *Petersen II* was correctly decided and that certiorari should be denied. In doing so, the Solicitor General emphasized the federal courts' significant interest in adjudicating this dispute:

> [T]he United States has a countervailing interest in ensuring that foreign states that enter U.S. markets as commercial actors do not enjoy immunity from lawsuits regarding violations of their commercial obligations. Here, Argentina conducted an [IPO] for YPF on the [NYSE], and it specifically advertised YPF's bylaws in

7

> order to attract investors.  The FSIA provides for jurisdiction over Argentina and
> YPF to resolve this commercial dispute regarding alleged violations of those
> bylaws that caused a direct effect in the United States.

Br. for the United States as Amicus Curiae 18-19, Nos. 18-575 & 18-581 (U.S. filed May 21, 2019) ("SG Br."), https://bit.ly/2JdAFQq.  The Supreme Court denied certiorari, 139 S. Ct. 2741 (2019), and the case was remanded to this Court.

      **G.**     While *Petersen II* was pending, in July 2017, the ICSID panel in the *Teinver* Arbitration rendered an extensive and detailed decision.  The arbitrators awarded significant damages to the claimants (who had the same counsel and funder as Petersen here).  In addition, in a section spanning more than 60 pages, the panel thoroughly dismantled the factual premises of the Argentine government's criminal accusations.  *See* Decl. of Alejandro Freeland ¶¶ 33-34 ("Freeland Decl.").  After that decision, in September 2017 (almost two years into the Macri administration), the Argentine government dismissed the criminal case.  *Cf.* Decl. of Bernardo Saravia Frías Decl. ¶ 14, *Petersen*, ECF #113 ("Frías Decl.").

     However, despite that dismissal, criminal proceedings in federal court in Argentina have since been commenced against Petersen, Petersen's Spanish bankruptcy receiver, and Petersen's litigation funder, Burford Capital, in connection with *this* case.  As explained in the accompanying declaration of Professor Alejandro Freeland, the Argentine government is pursuing a criminal investigation alleging that Petersen's claims in this case constitute a fraud against Argentina.  *See* Freeland Decl. ¶¶ 20-25.  As a result, Petersen and Burford are currently (and once again) under criminal investigation by an Argentine prosecutor.  *See id.* ¶ 27.

## ARGUMENT

Defendants do not come close to showing that changed circumstances warrant reconsidering this Court's prior FNC ruling. That ruling was correct when decided; and it is all the more correct now that the Eton Park case has been filed, Argentina has commenced an active criminal probe into the Petersen Plaintiffs and their team, and the Solicitor General has affirmed the United States' strong interest in adjudicating Plaintiffs' claims.

## I.      STANDARD OF REVIEW

**A.**      "[W]hen a federal court has jurisdiction, it . . . has a virtually unflagging obligation to exercise that authority." *Mata v. Lynch*, 135 S. Ct. 2150, 2156 (2015) (citation and ellipsis omitted). *Forum non conveniens* is an "exception" to that rule. *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 168 (2d Cir. 1991); *CCS Int'l, Ltd. v. ECI Telesystems, Ltd.*, 1998 WL 512951, at *6 (S.D.N.Y. Aug. 18, 1998) (Preska, J.). Accordingly, to justify denying Plaintiffs the right to choose their forum, Defendants bear the "significant burden," *Bank of Crete, S.A. v. Koskotas*, 1991 WL 280714, at *2 (S.D.N.Y. Dec. 20, 1991), of demonstrating (1) "that an adequate alternative forum exists" and (2) "that, considering the relevant private and public interest factors . . . , the balance of convenience tilts strongly in favor of trial in the foreign forum." *R. Maganlal*, 942 F.2d at 167.

In applying that standard, courts must determine "the degree of deference" due the plaintiff's choice of forum. *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (en banc). Even where the plaintiff is foreign, "the balance must be very strongly in favor of the defendant, before the plaintiff's choice of forum should be disturbed." *Olympic Corp. v. Societe Generale*, 462 F.2d 376, 378 (2d Cir. 1972); *see Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 101 (2d Cir. 2000) ("any plaintiff's selection of a forum is entitled to deference"). And "when the plaintiff is an American citizen and the alternative forum is a foreign one," the

defendant faces an even heavier burden to overcome the heightened deference due the plaintiff's choice of forum.  *Olympic*, 462 F.2d at 378; *see Iragorri*, 274 F.3d at 72-73.

      **B.**     Defendants face a doubly demanding burden on this motion, because they seek "reconsideration of this Court's initial determination not to invoke *forum non conveniens*." Letter from M. Grinalds to Hon. L. Preska at 2, *Petersen*, ECF #86 (June 24, 2019).[3] "Reconsideration is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources."  *Alfandary v. Nikko Asset Mgmt. Co.*, 2019 WL 2525414, at *2 (S.D.N.Y. June 19, 2019) (Preska, J.) (citation omitted).  Likewise, the law-of-the-case doctrine "dictates a general practice of refusing to reopen what has been decided."  *Wright v. Cayan*, 817 F.2d 999, 1002 n.3 (2d Cir. 1987); *see Ge Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 385-87 (S.D.N.Y. 2013) (denying dismissal for *forum non conveniens* under law-of-the-case doctrine).  Under these doctrines, Defendants may not succeed by "making new arguments that could have been previously advanced."  *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005); *accord Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981) (Friendly, J.).  Rather, Defendants must show "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Virgin Atl. Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (applying law of the case) (citation omitted).

---

[3] Despite describing their proposed motion as a reconsideration motion in their pre-conference letter, Defendants do not acknowledge the reconsideration posture in their motion. But a pleading is appropriately "treated as a motion for reconsideration" if it seeks to "modify" a prior order of the Court, whether or not the party chooses to "style" the pleading as such. *Universal Acupuncture Pain Servs., P.C. v. State Farm Mut. Auto. Ins. Co.*, 2003 WL 21058105, at *1 n.2 (S.D.N.Y. May 9, 2003), *aff'd in part, rev'd and remanded in part on other grounds sub nom. Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259 (2d Cir. 2004).

## II.   ETON PARK'S COMPLAINT WARRANTS MAXIMUM DEFERENCE TO PLAINTIFFS' CHOICE OF FORUM

### A.   Eton Park's Strong Interest In Litigating In Its Home Forum Provides Additional Reason To Deny FNC Dismissal

In *Petersen I*, this Court rejected FNC dismissal even though the degree of deference to Petersen's choice of forum was "not at its greatest height" because the Southern District was "not home" to "Plaintiffs[] or Plaintiffs' owners or receiver."  2016 WL 4735367, at *11.[4]  But that is no longer the case, as the Court is now jointly considering Defendants' motion to dismiss the parallel claims brought by both Petersen and New York-based investment fund Eton Park.

Eton Park Capital Management — the SEC-registered investment adviser to the two Eton Park funds — has its principal place of business in New York City, and it managed the two funds from there.  *See* Engel Decl. ¶¶ 4, 6-7.[5]  Employees in New York City executed the purchases of YPF ADSs, which trade on the NYSE.  *See id.* ¶¶ 2, 6; *Eton Park* Compl. ¶ 30.  Those facts alone warrant heightened deference, as Eton Park has "cho[sen] to sue in its home forum." *HSBC USA, Inc. v. Prosegur Paraguay, S.A.*, 2004 WL 2210283, at *2 (S.D.N.Y. Sept. 30, 2004) (Preska, J.); *see also Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 154 (2d Cir. 2005) ("greatest deference" due "a plaintiff's choice of its home forum").[6]

---

[4] Contrary to Defendants' suggestion (at 10, heading), even a foreign plaintiff is due "some weight."  *R. Maganlal*, 942 F.2d at 168 ("reduced" deference certain foreign plaintiffs receive "is not an invitation to accord a foreign plaintiff's selection of an American forum *no* deference") (citation omitted).

[5] In the spring of 2017, Eton Park began winding down and returning money under management to its investors.  That does not alter the deference it is due.  *First*, the wind-down is not complete and is not expected to finish before this case is resolved.  *See* Engel Decl. ¶ 8. Moreover, the Eton Park entity that managed the Eton Park funds continues to operate out of New York City.  *See id.* ¶¶ 8-9.  *Second*, Marcy Engel, a New York resident and Eton Park's former general counsel, continues to assist Eton Park in this litigation and may attend future hearings in the case.  *See id.* ¶ 9.  Eton Park's convenience plainly favors litigation in New York.

[6] And it could not possibly serve concerns of *convenience* to retain *Eton Park* but not *Petersen* in this forum given the near-total overlap of issues in the cases.

In arguing — implausibly — that Eton Park's choice to sue in its home forum is due "no deference," Defendants focus (at 11) on the jurisdictions in which the Eton Park entities are registered. But those formalities do not govern the functional analysis required in the FNC context. *See Iragorri*, 274 F.3d at 71-72; *see also, e.g.*, *Cyberscan Tech., Inc. v. Sema Ltd.*, 2006 WL 3690651, at *8 (S.D.N.Y. Dec. 13, 2006) (company registered in Delaware but operated out of London "ha[d] a greater connection to London than to New York"). Thus, in *Bloomberg Finance L.P. v. UBS AG*, 358 F. Supp. 3d 261 (S.D.N.Y. 2018), the Court held that Bloomberg's choice to sue in the Southern District was "owed great deference" notwithstanding its status as a Delaware limited partnership "[b]ecause Bloomberg has its principal place of business in New York City." *Id.* at 265, 267. *Bloomberg*'s practical analysis merits great deference to every Eton Park Plaintiff: pursuant to investment advisory agreements during the relevant time period, the New York City-based investment adviser made all the investing decisions for the Delaware-registered fund and the Cayman-registered fund. *See* Engel Decl. ¶ 7. Those "bona fide connection[s]" to this District confirm that Eton Park's choice to sue in New York was motivated by "considerations of convenience." *Iragorri*, 274 F.3d at 72.[7]

In particular, the registration of an Eton Park fund in *Delaware* cannot support Defendants' attempt to move this lawsuit *to Argentina*. When a United States citizen sues a foreign defendant, "the entire United States — rather than the particular state in which the plaintiff resides — is considered the home forum for the purposes of a *forum non conveniens*

---

[7] This case is nothing like *Construtora Norberto Oderbrecht S.A. v. General Electric Co.*, 2007 WL 3025699 (S.D.N.Y. Oct. 12, 2007), which Defendants cite (at 11). The plaintiff in *Construtora* was a Brazilian company with its principal place of business in Brazil, and the dispute concerned a contract that contained a forum-selection clause specifying a Brazilian court. *See* 2007 WL 3025699, at *1-2. Moreover, unlike this case, which concerns investments listed and traded on an American stock exchange, *Construtora* concerned construction projects in Brazil.

analysis." *Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*, 801 F. Supp. 2d 211, 218-19 (S.D.N.Y. 2011).  Indeed, it will often "be far more convenient for a U.S. resident plaintiff to sue in a U.S. court than in a foreign country, even though it is not the district in which the plaintiff resides."  *Iragorri*, 274 F.3d at 73; *see also id.* (providing the example of choosing a district where the defendant will be subject to personal jurisdiction).

Applying that principle in *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142 (2d Cir. 2000), the Second Circuit held that American plaintiffs residing in New Jersey and Maryland but choosing to sue in this District did not receive "weakened" deference where the defendant sought *forum non conveniens* dismissal in favor of litigation in Egypt.  *Id.* at 146 & n.4; *see also Nationsbank of Florida v. Banco Exterior de España*, 867 F. Supp. 167, 170-71 (S.D.N.Y. 1994) (Preska, J.) (Miami-based plaintiff received "home forum preference" in this District).  The same deference is due Eton Park here.

### B.      Plaintiffs And This Case Have A Bona Fide Connection To This District

Defendants' suggestion (at 10) that this case lacks a "bona fide connection" to this District is both irrelevant and incorrect.  For starters, as Defendants' own cases hold, the FNC test asks whether the forum has a "bona fide connection" to the case *only* if the plaintiff has chosen a forum *other than* his own home forum.  *See Acosta v. JPMorgan Chase & Co.*, 219 F. App'x 83, 85-86 (2d Cir. 2007) ("any degree of deference to plaintiffs' choice to sue in defendants' home forum (as opposed to plaintiffs' home forum) is available only to the extent that plaintiffs or the case possess a '*bona fide* connection[ ]' to this forum") (citing *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 74 (2d Cir. 2003)) (alteration in original).  If, as here, a plaintiff has sued in his own home forum, courts do not require any further showing before affording that choice the "strongest" deference.  *Id.*  At any rate, even if the argument were reached, it is utterly meritless.  Eton Park is a New York plaintiff.  It bought YPF shares from New York.  All Plaintiffs

purchased shares traded on the NYSE and were harmed by a failure to perform contractual obligations in New York. This case plainly has a "bona fide connection" to New York.

### C.    No Plaintiff Waived Its Right To Litigate In This Forum

Contrary to Defendants' argument (at 12-14 & n.6), YPF's IPO Prospectus does not contain a contractual "forum-selection clause" that overrides Eton Park's (or Petersen's) strong interest in its chosen forum. As an initial — and fatal — matter, the YPF Prospectus is not "new evidence"; it was issued in 1993. At no time did Defendants attempt to argue in their prior motions to dismiss that the Prospectus had any bearing on the proper forum for this litigation.

And for good reason: contrary to Defendants' newfound argument, a prospectus is informational, not an enforceable contract. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 584 (1995) ("[T]he word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder."). Indeed, what Defendants characterize as a forum-selection clause appears in a "summary" of Argentine law that expressly "does not purport to be complete" and, moreover, expressly states that the *operative* contract is the bylaws themselves. The bylaws themselves contain no forum-selection clause.

Likewise, Defendants' assertion (at 13) that Plaintiffs are "cherry-pick[ing]" provisions of the Prospectus is erroneous because it mischaracterizes Plaintiffs as suing for breach of the Prospectus. Plaintiffs' Complaints are clear — and every court to have addressed those Complaints has understood — that Plaintiffs are suing for breach of the bylaws, not for breach of the IPO Prospectus. Thus, even if the Prospectus had an enforceable forum-selection clause, which it does not, it would not apply. *See New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 26, 29 (2d Cir. 1997) (forum-selection clause must be "part of the contract[ ]" to be enforceable).

### III.   CIRCUMSTANCES SINCE THE COURT'S FNC RULING HAVE FURTHER UNDERMINED THE ADEQUACY OF THE ARGENTINE COURTS AS A FORUM FOR THIS CASE

In its original FNC ruling, this Court held that Defendants had failed to show that the Argentine courts are an adequate alternative forum — a necessary showing for any FNC dismissal.  *See Iragorri*, 274 F.3d at 73.  Circumstances since that ruling have only made Argentina a *less* adequate forum for adjudicating Plaintiffs' claims.

### A.   Defendants Failed To Disclose That There Is An Ongoing Argentine Criminal Investigation Concerning The Petersen Entities, Their Bankruptcy Receiver, And Their Litigation Funder In Connection With This Lawsuit

This Court held in *Petersen I* that the facts at the time "g[a]ve rise to a well-founded fear of prosecution of parties' counsel if the instant action were brought in Argentina."  2016 WL 4735367, at *11.  In their renewed motion, Defendants rely again and again (at 2, 8, 20) on Argentina's termination of the criminal investigation related to the *Teinver* case.  Yet they omit a far more relevant development that, if anything, *heightens* Plaintiffs' concerns relative to three years ago.  After the Court's pre-conference hearing in July, Plaintiffs learned that there are pending criminal proceedings against the Petersen entities, their Spanish bankruptcy receiver, and their litigation funder (Burford Capital) alleging that they engaged in criminal misconduct against the Argentine Republic.  *See* Freeland Decl. ¶¶ 20-27.

As explained in the declaration of Professor Freeland, an Argentine criminal law expert who has reviewed key documents related to these pending proceedings, the Argentine government, under the auspices of an Argentine federal judge, is actively investigating the possibility of criminal charges against the foregoing subjects arising from (1) Petersen's acquisition of its stake in YPF in 2008 and 2010, (2) the litigation funding arrangement entered into between Petersen's bankruptcy receiver and Burford in 2015, and (3) Petersen's commencement of this very lawsuit,

through the receiver and current counsel, pursuant to that litigation funding arrangement. *See id.*; Decl. of Armando Betancor Álamo ¶¶ 4-5, 7 ("Álamo Decl.").

Defendants' failure to disclose the pendency of this ongoing criminal investigation — while touting the dismissal of the separate *Teinver* criminal investigation into Burford Capital and King & Spalding — is deeply troubling.  Argentina's half-truths appear to be part of a pattern, reminiscent of the government's failure to be forthcoming about the pendency of the *Teinver* criminal investigation during the briefing and argument on Defendants' first motion to dismiss.  *Cf. Petersen I*, 2016 WL 4735367, at *11-12 (Argentina did not "respond to Plaintiffs' arguments" concerning *Teinver* criminal proceedings in briefing and only later acknowledged at the hearing that "there may be an ongoing investigation").  Defendants' lack of candor aside, the pending criminal investigation is reflected in official Argentine government documents and indisputably justifies an even more "well-founded" fear of criminal prosecution in Argentina now than when the Court denied Defendants' first FNC motion.  *Id.* at *11.  It is thus perhaps unsurprising that Petersen's bankruptcy receiver has expressed his "sincere fear" of entering Argentina where "criminal charges of public administration fraud are being considered against me."  Álamo Decl. ¶¶ 4, 9.  The chief executive of Plaintiffs' funder likewise refuses to enter Argentina "out of fear for my own safety."  Decl. of Christopher P. Bogart ¶ 4 ("Bogart Decl."). In light of the ongoing investigation into Petersen, Defendants' claim that the dismissal of the *Teinver* criminal prosecution makes any fear of prosecution "unfounded" rings utterly hollow.[8]

---

[8] In addition, the *Petersen* investigation is being conducted by a judge and prosecutors who, under Argentine law, fall within the judiciary.  Mr. Saravia Frías, the soon-to-be-replaced Attorney General of the Treasury (Frías Decl. ¶ 1 ("*del Tesoro*")), is an *executive* branch official without the authority to control such investigations.  *See* Freeland Decl. ¶ 11.  And, given recent history, his promises do not mollify justifiable concerns about traveling to Argentina in any event. *See*, *e.g.*, Bogart Decl. ¶¶ 4, 6-8.

Moreover, even on its own terms, the Court should be skeptical that the dismissal of the *Teinver* investigation is as ironclad as Defendants claim.  Argentina's conduct here is part of a pattern of government harassment of civil litigants — especially foreign ones — that have the gumption to sue the government in an effort to obtain financial compensation for commercial misconduct.  *See* Freeland Decl. ¶ 20 (criminal investigation is "being driven by Defendants' concerns about this U.S. litigation"); *id.* ¶¶ 36-38 (describing Argentina's use of criminal investigations as a "litigation tactic" "to obtain leverage").  And it is not the case — contrary to Argentina's effort to portray the dismissal as a principled decision — that the government abandoned the investigation voluntarily.  It was only after the government lost the *Teinver* Arbitration and the ICSID panel rendered a lengthy arbitral award undercutting any basis for a criminal accusation of fraud that Argentina was forced to concede defeat.  *See id.* ¶ 36.  The government's abandonment of the *Teinver* investigation *after it had already lost* provides no reassurance that it will not continue its harassment of Petersen and its team during this litigation.

**B.    Recent Political Developments Cast Grave Doubt On The Already-Doubtful Ability Of The Argentine Judiciary To Render Impartial Justice In This Case**

As this Court noted in its first FNC ruling, U.S. federal courts have questioned whether Argentine courts are an adequate alternative forum in cases *against the State*.  *See Petersen I*, 2016 WL 4735367, at *11 (citing *Weltover, Inc. v. Republic of Argentina*, 753 F. Supp. 1201, 1209 (S.D.N.Y.) (declining to find Argentine courts an adequate alternative forum in lawsuit where Argentina was the defendant), *aff'd*, 941 F.2d 145 (2d Cir. 1991), *aff'd*, 504 U.S. 607 (1992)).  Although the Court did not squarely find that Argentina was an inadequate forum on this basis, its concerns were justified, and events since the initial FNC ruling are cause for those concerns to be heightened today.

17

Argentina has a profoundly checkered track record with respect to the impartiality of the judiciary.  As the accompanying expert report from a leading Argentine constitutional scholar (Prof. Alberto Bianchi) and a prominent former Argentine jurist (Judge Gustavo Naveira) details, the independence of the judiciary in Argentina's constitutional system is extremely weak, as evidenced by numerous episodes where courts have succumbed to intense political pressure, especially in cases involving claims of significant financial liability.  *See* Decl. of Alberto Bianchi & Gustavo Naveira ¶¶ 8-23, 53-56 ("Bianchi & Naveira Decl.").  The U.S. Department of State and international non-governmental organizations have also recognized the Argentine judiciary's lack of independence.  *See*, *e.g.*, U.S. Dep't of State, *Argentina 2018 Human Rights Report* 7 ("Argentina Country Report") ("[w]hile the constitution and law provide for an independent judiciary, the government did not always respect judicial independence and impartiality," and courts have been subject to "political manipulation"), http://justice.gov/file/1157721/download;[9] Bianchi & Naveira Decl. ¶¶ 39-40 (citing World Economic Forum study ranking Argentina near the very bottom of all countries on the scale of judicial independence).

The recent presidential election returned the party of former President Cristina Fernández de Kirchner to power — and, indeed, returned Kirchner herself to power in the position of Vice President.  That party, like the Peronist ideology to which it is the modern successor,[10] makes no secret of its willingness to elevate the perceived interests of "the people" above *all* other civic virtues, including the rule of law itself.  *See*, *e.g.*, Todos, https://www.frentedetodos.org/ (party's public website declaring that "[d]ebts should be paid, but not at the expense of more suffering by

---

[9] The Second Circuit has recognized that such reports are "prepared by area specialists at the State Department" and are generally fit to be admitted and relied upon.  *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143-44 (2d Cir. 2000).

[10] Cristina Kirchner is the widow of former Argentine president Nestor Kirchner and is the modern-day standard-bearer for the Peronist party, founded by Juan and Evita Perón.

the people") (last visited Dec. 6, 2019).  As Professor Bianchi and Judge Naveira explain, that

outlook has led to alarming attacks on judicial independence.  *See* Bianchi & Naveira Decl.

¶¶ 27-31 (describing Cristina Kirchner's 2019 book, *Sinceremente*, in which she attacks the

independent judiciary as engaging in a "new 'judicial terrorism' ").[11]

Kirchnerism's rejection of judicial independence is evident from the actions of the first

Kirchner administration — the presidency of Mrs. Kirchner's husband, Nestor Kirchner.  *See id.*

¶¶ 14-17.  Immediately upon taking power in 2003, the administration orchestrated the

impeachment of five (of nine) sitting Argentine Supreme Court Justices who had ruled against

the national government in a case requiring a state-run company to pay damages to a private

plaintiff.  *See id.* ¶¶ 14-15.  Three of the Justices were removed from office; the two others resigned;

and four of the five were immediately replaced by Kirchner loyalists.  *See id.* ¶ 17 & n.15.

When Cristina Kirchner succeeded her husband as president in 2007, she took up the

mantle of the Kirchnerist assault on the judiciary.  One of her highest-profile moves was her

"Plan to Democratize the Judiciary," which was a euphemism for a court-packing plan to create

a new super-appellate court to review "every decision made by every federal court of appeals in

Argentina."  *Id.* ¶ 22.  And the plan to staff that new court was simple enough:  Cristina Kirchner

would hand pick every single judge.  *See id.* ¶ 23.  Mrs. Kirchner has made no bones about

resuming these types of tactics once her party resumes office.  In a book she wrote as part of her

campaign to return to presidential politics, she said of the 2003 impeachment:  "by completely

renewing the Supreme Court, we helped enhance . . . the authority of the Legislative and

Executive branches of government."  *Id.* ¶ 31.

---

[11] The prior findings that Defendants cite (at 15) of Argentina's adequacy as a forum are
of limited relevance, because *forum non conveniens* dismissal is contingent on the existence of
an adequate alternative forum that is "presently available."  *Norex*, 416 F.3d at 158-59.

Mrs. Kirchner's running mate, President-Elect Alberto Fernandez, shares similar views. He recently told the press that, once he and Mrs. Kirchner get into office, "we'll have to revise a number of judgments entered over the last few years" and "some judges will have to 'explain' their judgments." *Id.* ¶ 43.[12]  Thinly veiled threats like these from the incoming president and vice president have led judges, scholars, and international organizations alike to sound the alarm about the state of the Argentine judiciary.  *See generally id.* ¶¶ 32-40, 45-47.  And they leave no doubt that a case challenging conduct of the executive branch — indeed, a suit seeking significant financial compensation for conduct *that the incoming Vice President oversaw* — would have no chance of being decided impartially.  Even if a lower-court proceeding were decided in Plaintiffs' favor, Plaintiffs would reasonably fear that such a judgment would "have to [be] revise[d]"; that the judge who dared rule against the State might be impeached or have to "explain" himself or herself; or that a new appellate court might be created to undo the judgment. *See id.* ¶¶ 14-17, 22-23, 43.  In any such event, there are grave concerns whether Plaintiffs would be able to obtain "basic justice."  *Rasoulzadeh v. Associated Press*, 574 F. Supp. 854, 861 (S.D.N.Y. 1983), *aff'd*, 767 F.2d 908 (2d Cir. 1985) (table).[13]

---

[12] *See also* Laura Alonso, Secretary of Justice for Public Ethics, Transparency and the Fight Against Corruption, Republic of Argentina, *The Fight Against Corruption in Argentina*: *A Conversation with Argentine Anticorruption Chief Laura Alonso*, Remarks at the Meeting of the New York City Bar Association (Nov. 22, 2019) (reporting attacks and threatened investigations by President-Elect Fernandez, among others, into judges who "investigated the Kirchners").

[13] Exacerbating these concerns are more fundamental concerns about litigating in Argentina, such as:  massive delays when litigating against the government, the unavailability of jury trials or conventional discovery, and exorbitant filing fees.  *See* Bianchi & Naveira Decl. ¶¶ 69-80, 83-84; *see also* Argentina Country Report 8 ("Lengthy delays, procedural logjams, long gaps in the appointment of permanent judges, inadequate administrative support, and general inefficiency hampered the judicial system.  Judges' broad discretion on whether and how to pursue investigations contributed to a public perception that many decisions were arbitrary.").

### C.   The Asserted Running Of The Statute Of Limitations Renders Argentina An Inadequate Forum

It is well settled that "an adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum." *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001).  Although Plaintiffs do not concede the point, both Defendants assert that Petersen's claims would be barred by the statute of limitations under Argentine law if this case were litigated in Argentine court.  *See* Decl. of María Alejandra Etchegorry ¶ 8(k), *Petersen*, ECF #114 ("Etchegorry Decl."); Argentina Answer Twentieth Defense, *Petersen*, ECF #98; YPF Answer Fourth Defense, *Petersen*, ECF #99.  Defendants cannot make those limitations arguments and simultaneously assert that Argentina is an adequate alternative forum.

Importantly, Argentine law would not dictate the timeliness of Plaintiffs' claims before *this* Court.  New York choice-of-law rules — which govern here, *see Petersen I*, 2016 WL 4735367, at *13-14 — would not look to Argentine law for the statute of limitations.  New York law "look[s] only to the place where the claim 'accrued' in deciding which statute of limitations to apply." *Migdal Ins. Co. v. Insurance Co. of Pennsylvania*, 2014 WL 5149128, at *2 (S.D.N.Y. Oct. 14, 2014); *see* NY CPLR § 202 (requiring application of the shorter of the statute of limitations of the place of accrual or of New York State).  And, in New York, a breach-of-contract claim accrues "where the plaintiff resides and sustains the economic impact of the loss." *Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 485 (N.Y. 1999).  As none of the Plaintiffs are Argentine residents, Argentine limitations periods are inapplicable.  Thus, Defendants' own arguments show that Argentine courts are not an adequate alternative forum.

**D.      Defendants' "Exclusive Jurisdiction" Argument Is Meritless**

As part of its argument on the adequacy of the Argentine courts, Defendants shoe-horn in an argument that Argentine courts have exclusive jurisdiction over this dispute. That is wrong.

*1.      Defendants' Exclusive Jurisdiction Argument Is Waived*

As explained above, a motion for reconsideration must be limited to arguments that were not available at the time of the original motion. *See supra* p. 10. Parties seeking to overturn the law of the case may not make "arguments that could and should have been made before." *Wells Fargo Fin., Inc. v. Fernandez*, 2001 WL 345226, at *1 (S.D.N.Y. Apr. 9, 2001) (citation omitted). Defendants' "exclusive jurisdiction" argument surely was available, as it relies on Argentine laws and the 1993 IPO Prospectus — both of which plainly existed at the time of Defendants' initial motions. Indeed, Defendants' first motions to dismiss contained numerous arguments purportedly based on Argentine law. *See* Argentina's Mem. of Law in Supp. of Mot. To Dismiss 20-21, *Petersen*, ECF #28. Defendants' new arguments should thus be disregarded. *See Hatteras Enters. Inc. v. Forsythe Cosmetic Grp., Ltd.*, 2016 WL 4083386, at *7 (E.D.N.Y. July 30, 2016) (refusing under law-of-the-case doctrine to consider argument that could have been raised earlier).[14]

*2.      Argentine Law Cannot Divest This Court of Jurisdiction*

At any rate, Defendants' argument that Argentine law divests this Court of jurisdiction is flatly wrong. This Court's jurisdiction is governed by U.S. law, not Argentine law. And no less than the Second Circuit — in an opinion supported by the Solicitor General and upheld through

---

[14] Defendants' authorities (at 13 n.4) for the lack of a "time limit" for moving to dismiss for FNC address moving for that relief *in the first instance*. They offer Defendants no refuge from the usual rule that the failure to raise an available argument waives that argument in a *successive* motion for the same relief. *Cf. Alfandary*, 2019 WL 2525414, at *2-3 (denying reconsideration of refusal to dismiss for FNC and observing that reconsideration motions "are not vehicles for taking a second bite at the apple") (citation omitted).

denial of certiorari by the Supreme Court — has held that this Court *has* jurisdiction over this case under the FSIA.  *See Petersen II*, 895 F.3d at 203, 211.  That conclusively forecloses Defendants' claim that Argentine courts have "exclusive jurisdiction" over this case.  *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433-34 (1989) (explaining in the FSIA context that "the subject-matter jurisdiction of the lower federal courts is determined by Congress" and that "§ 1330(a) confers jurisdiction on district courts to hear suits").

Argentine law cannot divest this Court of the jurisdiction conferred on it by the FSIA. As the Supreme Court recognized almost 175 years ago, "Congress . . . possess[es] the sole power of creating" inferior federal courts "and of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good."  *Cary v. Curtis*, 44 U.S. (3 How.) 236, 245 (1845).  And in *Hong Kong Deposit & Guaranty Co. v. Hibdon*, 602 F. Supp. 1378 (S.D.N.Y. 1985), this Court rejected the argument that a provision of Hong Kong law could operate to re-categorize a defendant's citizenship and thereby deprive the Court of jurisdiction. As the Court correctly explained, "Hong Kong law does not control this Court's subject matter jurisdiction; federal law does."  *Id.* at 1381.[15]

Courts across the country recognize this fundamental proposition.  *See*, *e.g.*, *Randall v. Arabian Am. Oil Co.*, 778 F.2d 1146, 1150 (5th Cir. 1985) (holding that the "exclusive jurisdiction provisions of [Saudi] Labor Law cannot deprive a United States District Court of subject matter jurisdiction"); *see also Grand Bahama Petroleum Co. v. Asiatic Petroleum Corp.*,

---

[15] The same principle applies to the jurisdictional rules in the various U.S. states.  *See* Restatement (Second) of Conflict of Laws § 91 (1971) ("A State may entertain an action even though the state of the applicable law has provided that action on the particular claim shall not be brought outside its territory.").  The rationale for the rule is that, as with sovereign nations, "each state should be able to determine for itself what controversies its courts will hear."  *Id.* cmt. a.

550 F.2d 1320, 1325 (2d Cir. 1977) (when "'determining its own jurisdiction, a District Court of the United States must look to the sources of its power and not to the acts of states which have no power to enlarge or to contract the federal jurisdiction'") (quoting *Markham v. City of Newport News*, 292 F.2d 711, 713 (4th Cir. 1961)).  As Judge Wilkinson has aptly explained, "it is incoherent to speak of adopting foreign law to decide the jurisdictional question" because jurisdiction arises from the "*sovereign*" — i.e., the United States — "grant of authority to make legally binding rules or determinations in a particular situation."  *Flame S.A. v. Freight Bulk Pte. Ltd.*, 762 F.3d 352, 363 (4th Cir. 2014) (Wilkinson, J., concurring) (emphasis added).

Allowing *Argentine* law to dictate the Southern District's jurisdiction would countermand that basic principle and "divest the Constitution and Congress of their sovereign authority to decide the extent of the power of the judicial branch."  *Id.*; *see also* Decl. of Alejandro M. Garro ¶¶ 10-13 ("Garro Decl.").  Defendants' invocation of Argentine law is thus irrelevant.[16]

> 3.    *At Any Rate, Argentine Law Recognizes Concurrent Jurisdiction*

Defendants are also wrong about Argentine law, even assuming it applied.  Fully recognizing that courts' jurisdiction is dictated by their own domestic law, Argentine law does not purport to limit the jurisdiction of courts in other counties.  *Defendants' own expert* says so. As Professor Guillermo Cabanellas admits, the Argentine codes on which Defendants rely

---

[16] *Locals 302 & 612 of International Union of Operating Engineers v. Blanchard*, 2005 WL 2063852 (S.D.N.Y. Aug. 25, 2005), is no help to Defendants.  There, this Court determined under New York choice-of-law rules that Canadian corporate law governed the substance of the plaintiffs' shareholder derivative suit.  Notwithstanding the term "jurisdiction," the Court's holding was that the plaintiffs' claims could not succeed *on the merits* if they did not satisfy the requirements of Canadian law, including pursuing certain proceedings in a particular Canadian forum.  *See id.* at *6-7 (rule of "substantive" Canadian law being applied imposed "statutory preconditions" including "seek[ing] leave of a specifically enumerated Canadian court").  The Court thus decided and dismissed the claims under Rule 12(b)(6), and not Rule 12(b)(1).  *See id.* at *2.  It was not a decision about the Court's own authority to decide the case before it.

"determine[] the limits of *Argentine* jurisdiction in the international context" and "which court *within Argentina* has jurisdiction in cases falling within the Argentine jurisdictional system." Decl. of Guillermo Cabanellas ¶ 4, *Eton Park*, ECF #57 ("Cabanellas Decl.") (emphases added). They do not purport to govern the jurisdiction of non-Argentine courts. *See* Decl. of Alfredo L. Rovira ¶¶ 12, 20 ("Rovira Decl."); Garro Decl. ¶ 14.

In fact, to the extent Argentine law refers at all to the jurisdiction of foreign courts, it acknowledges that foreign courts have *concurrent* jurisdiction over this case. As this Court and the Second Circuit have held, this case asserts a straightforward claim for breach of a commercial contract — namely, YPF's bylaws. *See Petersen I*, 2016 WL 4735367, at *5 & n.3; *Petersen II*, 895 F.3d at 207; SG Br. 10. Under Argentine law, a plaintiff may bring a claim for breach of contract against an Argentine defendant "before the courts of the [defendant's] domicile *or before the courts of the place where the contract must be performed*." Civil Code art. 1216 (quoted in Rovira Decl. ¶ 15) (emphasis added). Because "the United States was [a] place of performance . . . under the Bylaws," *Petersen I*, 2016 WL 4735367, at *7, jurisdiction in this forum is wholly consistent with Argentine law. *See* Rovira Decl. ¶¶ 16-18; Garro Decl. ¶¶ 16-19.[17]

Defendants' argument for exclusive jurisdiction rests on the misguided premise that Plaintiffs' claim arises under Argentine *corporate* law. But *Petersen II* already classified these claims as sounding in breach of contract. Indeed, Plaintiffs do not seek to invoke any of the relief — such as nullification of shareholders' resolutions or other corporate action — that are provided for by Argentine corporate law. *See* Rovira Decl. ¶¶ 36-37; Garro Decl. ¶¶ 28-30.

---

[17] Contrary to the claim of one of Defendants' experts, Professor Cabanellas (at ¶ 8), Article 2650 of the new Argentine Civil and Commercial Code is fully consistent with that conclusion, because its text explicitly *authorizes* breach claims to be brought before "the judges of the place of performance." Civil & Comm. Code art. 2650 (quoted in Rovira Decl. ¶ 19).

The mere fact that the contract at issue is YPF's bylaws does not transform Plaintiffs' claim into an "intracorporate" dispute. *See* Garro Decl. ¶ 28 (quoting Professor Cabanellas: "a cause of action grounded on a breach of contract or a negotiable instrument does not turn into an intra-corporate dispute merely because a corporation is a party to the dispute"); *see also McDermott Inc. v. Lewis*, 531 A.2d 206, 214-15 (Del. 1987) ("Corporations and individuals alike enter into contracts, commit torts, and deal in personal and real property. . . .  The internal affairs doctrine has no applicability in these situations."); *Alnwick v. European Micro Holdings, Inc.*, 29 F. App'x 781, 784 (2d Cir. 2002) (district court erred in characterizing suit as an "intra-corporate dispute" where plaintiff-directors "pleaded their lawsuit as" a fraudulent and contract-breaching scheme to induce their participation in the foreign venture).[18]

As a result, Defendants' repeated reliance on Argentine corporate law provisions misses the mark.  Article 46 of Argentina's Capital Markets Law is inapplicable here because, as Defendants' expert Professor Rafael M. Manóvil explains, it applies only to "claims arising under the General Corporations law."  Decl. of Rafael M. Manóvil ¶ 21, *Petersen*, ECF #115. At any rate, that Article does not provide for "exclusive jurisdiction" over such claims.  To the contrary, it offers *plaintiffs* in shareholder lawsuits the option to arbitrate the dispute; but, if they choose not to, they may litigate in "any tribunal that may be competent."  Rovira Decl. ¶ 33 (quoting Art. 46).  It is a permissive law; it says nothing about limiting the jurisdiction of any court (much less any foreign court).  *See* Rovira Decl. ¶ 33; Garro Decl. ¶¶ 35-36.

---

[18] Critically, too, Argentine law determines the character of a case by looking to "the claims presented in the complaint," "not by the defenses presented by the defendant."  Rovira Decl. ¶ 27 (quoting National Code of Civil and Commercial Procedure article 5 ("Code of Procedure")); *accord* Garro Decl. ¶¶ 25-26.  The FSIA litigation confirmed that this case raises claims for breach of contract seeking "damages," *Petersen II*, 895 F.3d at 209, and not an intra-corporate dispute.

The same is true of article 5, paragraph 11 of the Code of Procedure, on which Defendants also rely (at 17).  Paragraph 11 governs "actions arising out of corporate relationships," which refers to specific internal-governance disputes covered by Argentina's Corporations Law ("ACL").  *See* Rovira Decl. ¶¶ 30-31 (quoting Art. 5, ¶ 11); Garro Decl. ¶¶ 24-25, 28.  Here, Plaintiffs' claims do not seek to invoke any provision of the ACL.  And, to repeat, the Code of Procedure determines only "which court *within Argentina* has jurisdiction."  Cabanellas Decl. ¶ 4 (emphasis added); *see* Rovira Decl. ¶¶ 25-26.  It says nothing about the jurisdiction of this Court — a question governed by U.S. law.  *See* Garro Decl. ¶ 13.

More fundamentally, YPF ADSs are publicly traded in the United States.  The suggestion that an SEC-regulated entity and its majority owner could, by dint of Argentine law, be shielded from U.S. litigation is absurd.  Yet, under Defendants' logic, if Argentina caused YPF to make material misrepresentations in the Prospectus (with its purported forum-selection clause), a U.S. plaintiff bringing a private action under SEC Rule 10b-5 would have to file in Argentina.

> 4.    *Argentina's Threat To Refuse To Enforce a U.S. Judgment Does Not Warrant Dismissal*

Even though Argentine law *recognizes* the concurrent jurisdiction of foreign courts in cases such as this, Defendants argue (at 19-20) that "Argentine courts will certainly refuse to enforce" any judgment rendered by this Court.  Even if that threat is taken at face value, it is hardly a reason to force Plaintiffs to litigate in *Argentine* courts.  If anything, the government's confidence that Argentine courts will refuse to recognize a valid U.S. judgment highlights the lack of judicial independence and demonstrates why Plaintiffs cannot expect to receive fair treatment if they are forced to litigate on the government's home turf.  If and when Plaintiffs secure a judgment from this Court, they will be entitled to enforce it not only in Argentina but also in any jurisdiction where either Defendant has assets.  Defendants' prediction that Argentine

courts will do the government's bidding cannot be a reason to deprive Plaintiffs of their preferred choice of forum.

## IV.    THE PUBLIC AND PRIVATE CONVENIENCE FACTORS TILT EVEN MORE STRONGLY AGAINST DISMISSAL

This Court has already held that the balance of public and private convenience factors do not support dismissal of Petersen's lawsuit.  *See Petersen I*, 2016 WL 4735367, at *12 ("Argentina has not shown that the balance of private and public interest factors 'tilts strongly in favor of trial in the foreign forum.'") (footnote and citation omitted).  Given the filing of Eton Park's Complaint — and the view of the United States affirming the strong interest of U.S. courts in adjudicating this case — those factors now tilt even more strongly against FNC dismissal.

### A.    The Public Factors Strongly Disfavor Dismissal

As this Court has already found, "none of the public interest factors in this case weigh strongly in Defendants' favor and, therefore, on balance do not warrant dismissal on the basis of *forum non conveniens*."  *Petersen I*, 2016 WL 4735367, at *13.  In reaching that conclusion, the Court correctly observed that it has a valid "interest in adjudicating this dispute," *id.*, given that it centers on Defendants' behavior soliciting investment from and making promises to investors on an American securities market.  Ensuring the integrity of those transactions is an historic priority of this Nation's courts — especially this Court, and especially when American investors are involved.  *See Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 782 F. Supp. 215, 225 (S.D.N.Y. 1992) ("This Court has a substantial interest in . . . preserving the integrity of markets for securities in the United States."); *Cyberscan Tech.*, 2006 WL 3690651, at *6 ("New York clearly has a strong interest in policing activities directed toward its stock markets."); *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir. 2002) (recognizing public interest in U.S. adjudication where "defendants sought out business opportunities in this country by registering stock on

28

American exchanges, filing statements with the SEC and conducting the bulk of its business in the United States — as well as the claim that most plaintiffs conducted their stock transactions within the United States").

The United States government has itself affirmed that U.S. courts have a strong interest in adjudicating this case — and did so without any consideration of Eton Park as a plaintiff.  As the Solicitor General explained in his opposition to Defendants' petitions for certiorari, "Argentina conducted an [IPO] for YPF on the [NYSE], and it specifically advertised YPF's bylaws in order to attract investors."  SG Br. 18-19.  The United States has its own "interest in ensuring that foreign states that enter U.S. markets as commercial actors do not enjoy immunity from lawsuits regarding violations of their commercial obligations."  *Id.* at 18.

Defendants' primary contention (at 24-30) concerning the "public" factors is one that they have already tried:  the Court will need to decide issues of Argentine law.  But that "is not a justification for dismissal under *forum non conveniens*."  *Petersen I*, 2016 WL 4735367, at *13.  That was true three years ago, and it is true today.

Defendants suggest (at 25) that "the complexity" of the Argentine law issues in the case counsels a different outcome.  Having lost their first *forum non conveniens* motion, Defendants cannot now attempt to manipulate the balancing test by injecting a slew of Argentine law doctrines that they "could and should have" cited in their motions four years ago.  *Wells Fargo Fin.*, 2001 WL 345226, at *1 (citation omitted).  In any event, Defendants overstate the case.  Plaintiffs have brought a straightforward claim for breach of contract, and the facts establishing that claim are effectively undisputed.  Moreover, this Court and the Second Circuit have already considered and rejected — seemingly without issue — several of Defendants' Argentine law defenses.  *Compare*, *e.g.*, Mot. 29 (arguing that the expropriation legislation "conflicted with and preempted" Defendants' bylaws obligations) *with Petersen II*, 895 F.3d at 208 ("[W]e see no

29

reason why Argentina could not have complied with both the bylaws' tender offer requirements and the YPF Expropriation Law.").  As Professor Garro explains, "virtually all" of Defendants' supposed defenses "raise contract-law defenses not dissimilar from doctrines finding a functional counterpart in American contract law."  Garro Decl. ¶ 48.  There is thus no basis to depart from the usual rule that the application of foreign law need not merit *forum non conveniens* dismissal.

Defendants also find no refuge in their invocation (at 30-32) of "[p]rinciples of international comity."  Congress's passage of the FSIA ended the practice of analyzing international disputes case-by-case to determine which ones may be heard in federal court and which ones "will undermine international comity."  *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 146 (2014) (brackets and citation omitted); *see id.* at 141 (in codifying the FSIA, Congress "replac[ed] the old" case-by-case "immunity regime" with a "*comprehensive*" set of rules intended to govern when that immunity would be granted and when it would not).  Case-by-case international comity concerns thus cannot justify the *abdication* of jurisdiction that Congress has expressly conferred on U.S. courts under the FSIA.  *See id.* at 141-42 ("any sort of immunity defense made by a foreign sovereign in an American court" — including one grounded in case-by-case comity concerns — "must stand on the Act's text[ o]r it must fall").[19]

At any rate, international comity concerns do not justify forswearing jurisdiction here.  Comity abstention is appropriate only when there is "a parallel action in an adequate foreign jurisdiction" and "exceptional circumstances" exist.  *Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 95 (2d Cir. 2006).  The lack of any parallel proceeding

---

[19] The Court's decision in *NML Capital* is a straightforward extension of the well-worn principle that federal courts "have the power, *and ordinarily the obligation*, to decide cases and controversies properly presented to them."  *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990) (emphasis added); *see Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.  The one or the other would be treason to the constitution.").

here ends the inquiry.  *See Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 393-94 (3d

Cir. 2006) (declining to abstain absent a parallel foreign action); *Al-Abood ex rel. Al-Abood v.*

*El-Shamari*, 217 F.3d 225, 233 (4th Cir. 2000) ("Because the district court correctly determined

that these suits are not parallel, it had no duty to examine the various abstention factors.").

Nor do "exceptional circumstances" exist.  Courts in this Circuit weigh "five

nonexclusive factors" to decide whether there are exceptional circumstances:  "the similarity of

the parties and issues; the interests of judicial economy; the order in which the actions were filed;

the adequacy of the alternative forum; and the convenience of, and potential prejudice to, either

party."  *Ole Media Mgmt., L.P. v. EMI April Music, Inc.*, 2013 WL 2531277, at *3 (S.D.N.Y.

June 10, 2013).  Though these factors would never be reached without a parallel action, at least

four of them weigh heavily against comity:  dismissal would not serve judicial economy because

the parties have already invested significant time and money in this forum; the New York action

is the first (actually, the only) filed action; Argentina is not an adequate alternative forum, *see*

*supra* Part III; and Petersen would be significantly prejudiced if forced to litigate in Argentina,

especially if it faces criminal investigation.

> **B.      The Private Factors Now Even More Strongly Favor Litigation In This Court**

In its prior FNC ruling, this Court rejected Defendants' argument that "several private

interests — the ability to compel witnesses, the costs of travel, and the inconvenience of

translating documents — favor adjudication in Argentina."  *Petersen I*, 2016 WL 4735367, at

*12.  As to witnesses, the Court noted that Defendants had "not identified witnesses they would

call at trial who would be unwilling to appear."  *Id.*  Moreover, in any event, the Court noted that

"[t]he costs and inconvenience associated with the potential witnesses' travel also do not weigh

strongly in favor of dismissal."  *Id.*  Indeed, although "Argentina asserts that virtually all of the

witnesses to the relevant events reside in Argentina," "modern technologies make the location of witnesses and evidence less important to the *forum non conveniens* analysis." *Id.* (alteration and citation omitted).  And, as to documents, the Court held that the fact that many documents were located in Argentina and had to be translated from Spanish to English "is not a dispositive one in the instant case" because many of the key documents "have been translated already." *Id.*

To the extent the private convenience factors have changed, the most relevant change is the filing of Eton Park's case.  As set forth in the accompanying declaration of Marcy Engel, one of Eton Park's partners, litigation in this forum would be far more convenient than litigation in Argentina.  Eton Park's principal place of business is in New York City.  *See* Engel Decl. ¶ 4.  Ms. Engel, who was then Eton Park's General Counsel, lives and works in New York.  *See id.* ¶ 9.  To the extent testimony is needed from anyone then or now affiliated with the firm, New York will be the most convenient location by far.  Moreover, many witnesses from the relevant time are *former* employees that Eton Park cannot compel to travel to Argentina to testify.  *See id.* ¶ 10.  And, given this case's history, it is hard to imagine eager volunteers.  *See id.* ¶ 12; *Prosegur Paraguay*, 2004 WL 2210283, at *4 (Preska, J.) (denying FNC motion where American witnesses refused to return to Paraguay because they legitimately feared for their safety); *see also* Bogart Decl. ¶¶ 4, 6-8; Álamo Decl. ¶¶ 4-9.  The private factors assessing "access to proof," the "availability of compulsory process," and the "cost of obtaining willing witnesses' attendance," *Petersen I*, 2016 WL 4735367, at *12 n.4, therefore tilt against dismissal now more than ever.

Ignoring Eton Park's effect on the private-factor analysis, Defendants' reconsideration motion does little more than relitigate this Court's prior ruling.  Defendants cite (at 21-22) the documentary records they believe they would need to litigate the case.  But this Court correctly

32

held that the physical location of documents is "not dispositive" in this case.  Indeed, as many

courts have held, "physical proximity to documents, testimony, and other proof has become of

less consequence to a *forum non conveniens* analysis, especially when, as here, two large and

sophisticated parties are involved," *Eclaire Advisor Ltd. as Tr. to Daewoo Int'l (Am.) Corp.*

*Creditor Tr. v. Daewoo Eng'g & Constr. Co.*, 375 F. Supp. 2d 257, 265 (S.D.N.Y. 2005), and

especially where both Defendants have top-tier "representation available to them in New York,"

*Metito (Overseas) Ltd. v. General Elec. Co.*, 2006 WL 3230301, at *6  (S.D.N.Y. Nov. 7, 2006).

In an effort to rectify their prior failure, Defendants also list (at 22-23) the witnesses they

intend to call to testify.  But these names, which "could have been previously advanced," come

much too late.  *Associated Press*, 395 F. Supp. 2d at 19.  Reconsideration is not an opportunity

for "a second bite at the apple."  *Alfandary*, 2019 WL 2525414, at *2 (citation omitted).

Defendants also fail (at 22-23) to explain *why* — in a case alleging breach of contract

based on undisputed facts — the Court needs to hear testimony from this long list of former

Argentine officials and YPF employees.  All Defendants allude to (at 23) is "the circumstances

leading up to the expropriation" — circumstances that are, again, undisputed — that are (they

say) "relevant to several" defenses.  They don't say which.  They don't say how.  *See Bloomberg*

*Fin.*, 358 F. Supp. 3d at 270 (movant must provide at least general description of their witnesses'

testimony).  What those witnesses are certainly *not* needed for is adjudicating Plaintiffs' liability

claims, because the plain meaning of the bylaws is a legal question for the Court.  *See Fulton*

*Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 98 (2d Cir. 1996) (summary

judgment appropriate in breach-of-contract cases when contract language is unambiguous).

At any rate, witnesses who cannot be brought to the United States can give testimony

"by depositions taken pursuant to letters rogatory."  *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 179

(2d Cir. 2006); *see also Overseas Programming Cos. v. Cinematographische Commerz-Anstalt*, 684 F.2d 232, 235 (2d Cir. 1982); Bianchi & Naveira Decl. ¶¶ 102-108.  That includes witnesses who may be "under legal restrictions" (Etchegorry Decl. ¶ 11) or incarcerated in Argentina.  *See* Freeland Decl. ¶ 13; Bianchi & Naveira Decl. ¶¶ 107-108.  And this Court has already found that "[t]he costs and inconvenience associated with . . . potential witnesses' travel . . . do not weigh strongly in favor of dismissal."  *Petersen I*, 2016 WL 4735367, at *12.  That is especially so "in light of the increased speed and ease of travel and communication" across borders.  *Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 65 (2d Cir. 1981).  For example, nonstop flights connect New York and Buenos Aires multiple times a day.  *See id.* ("It will often be easier to transfer a witness or a document than to transfer a lawsuit.") (citation omitted).[20]

Another private factor tilting sharply against dismissal is a feature of Argentine procedure.  Rather than pay a *flat* fee to file suit, as in the United States, a plaintiff in Argentine court must pay a fee equal to 3% of the total damages claimed.  *See* Bianchi & Naveira Decl. ¶ 69.  Simply multiplying the number of shares Plaintiffs held by the bylaw-provided damages demonstrates that Plaintiffs' damages may reach billions of dollars.  Three percent of that would be hundreds of millions of dollars — a prohibitive fee for almost any plaintiff.  All the more so where, as here, Petersen is bankrupt and litigating for the benefit of long out-of-the-money (and, it should be noted, many *U.S.-based*) creditors.  A fee that size shifts the balance even further against dismissal.  *See Henderson v. Metropolitan Bank & Tr. Co.*, 502 F. Supp. 2d 372, 380

---

[20] In any event, at least one of Defendants' witnesses "located in Argentina" (Etchegorry Decl. ¶ 15) is in fact a resident of Texas.  *See* Decl. of José María Figuerero ¶¶ 3-4.

(S.D.N.Y. 2007) (prohibitive fee tilted balance decisively "towards the chosen forum — the United States").[21]

Finally, the private-factor calculus tilts further against dismissal now that the parties and the courts have invested four years and considerable resources litigating and developing a case in this District. *See Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604, 614-15 (3d Cir. 1991) ("[o]nce the litigation has progressed significantly in the federal court, a different factor enters into the equation . . . [and] the presumption against dismissal on the grounds of *forum non conveniens* greatly increases"). Defendants' motion for reconsideration essentially asks this Court to render the last four years' worth of litigation — including the work of this Court, the Second Circuit, the Solicitor General, and the Supreme Court — a complete waste of time. Defendants' breach of Plaintiffs' contractual rights occurred in 2012 — more than seven years ago. Plaintiffs deserve their day in court. In addition to all of the other reasons militating against dismissal, there is a compelling interest against sending the parties back to the starting line.

## **CONCLUSION**

This Court should deny Defendants' motion.

---

[21] Indeed, the size of the filing fee may call the very adequacy of the Argentine forum into question. *See Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1353 & n.7 (1st Cir. 1992) (examining cost bond requirement of alternative forum as part of adequacy analysis). Even if Petersen did not face criminal prosecution, even if circumstances suggested a *chance* at a fair shake in an Argentine court, and even if Defendants' statute-of-limitations defense did not preclude their motion to dismiss, Plaintiffs still likely could not file suit.

Dated:  December 6, 2019

New York, New York

Respectfully submitted,

KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.

By:  /s/ Mark C. Hansen
Mark C. Hansen
Derek T. Ho
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999
Email: mhansen@kellogghansen.com
    dho@kellogghansen.com

KING & SPALDING LLP

Israel Dahan
1185 Avenue of the Americas
New York, NY 10036
Phone: (212) 556-2114
Fax: (212) 556-2222
Email: idahan@kslaw.com

- and -

Reginald R. Smith
1100 Louisiana Street, Suite 4000
Houston, TX 77002
Phone: (713) 751-3200
Fax: (713) 751-3290
Email: rsmith@kslaw.com

*Counsel for Plaintiffs*

36