**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., <br><br> Plaintiffs, <br><br> - against - <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br> Defendants. | |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., <br><br> Plaintiffs, <br><br> - against - <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br> Defendants. | Case Nos. <br> 1:15-cv-02739-LAP <br> 1:16-cv-08569-LAP |

<u>**DECLARATION OF ALBERTO B. BIANCHI AND GUSTAVO NAVEIRA**</u>

**DECLARATION OF ALBERTO B. BIANCHI AND GUSTAVO NAVEIRA**

1.  We Alberto B. Bianchi and Gustavo Naveira hereby declare as follows, under penalty of perjury under the laws of the United States of America (28 U.S.C. Section 1746).

2.  We submit this declaration at the request of Counsel for the Plaintiffs, who has requested our opinion on some aspects of Argentine law, including the response to Professor Alfonso Santiago's declaration and the availability of Argentine courts to entertain a civil action for damages similar to the one brought by the plaintiffs before this Court and whether the defendants' proposed forum is adequate to resolve the motion to dismiss on grounds of forum non conveniens.

## I.   BACKGROUND AND QUALIFICATIONS

3.  Alberto B. Bianchi is Professor of In-Depth Studies on Constitutional Law, Universidad Católica Argentina and Universidad Austral. He teaches and studies in the area of Argentine Public Law. He is a Member of the National Academy of Law of Buenos Aires and a Member of the National Academy of Sciences of Buenos Aires. He received the National Academy of Law of Buenos Aires award in 1990, the National Academy of Law of Córdoba award in 2012 and the Konex award in Constitutional Law in 2016. He published nineteen books on various subjects regarding Public Law. His CV is attached as Exhibit A.

4.  Gustavo Naveira is attorney-at-law authorized to practice law in the Argentine Republic. From 1979 to 1984 he acted as First Instance Judge in Commercial Matters for the City of Buenos Aires, and from 1984 to 1986 he acted as Judge of the Court of Appeals in Commercial Matters of the City of Buenos Aires. In 1997, he was appointed Undersecretary of Justice of the Argentine Ministry of Justice, and was subsequently appointed Secretary in Technical Legislative Matters for the same Ministry, which position he held until 1999. A copy of his CV which shows his academic and professional background is attached as Exhibit B.

## II.   SCOPE OF THIS DECLARATION

5.  This Declaration has been divided into three parts: § III includes a description of the most relevant historical and current aspects of the lack of independence of the federal courts in Argentina; § IV presents an

analysis of the influence that the lack of independence of the federal courts has had on some legal cases of major economic relevance, especially where claimants were foreign investors; and § V contains our response to the declaration made by Professor Alfonso Santiago, and our main objections to his declaration.

### III.   ARGENTINA'S LACK OF JUDICIAL INDEPENDENCE

#### A.   Historical background

6.   In a very sharp and realistic book, Carlos Nino,[1] an influential legal scholar, described Argentina as a nation which is not governed under the rule of law.[2]

7.   Nino's harsh criticism is based on a number of aspects of Argentina's institutional life; one of them is what Nino called "hyper-presidentialism", that is to say, the excessive power of the President over the other branches of government.[3]

8.   The substantial influence of the Executive Branch over the Judiciary in Argentina has deep historic roots and can be seen in some very old legal cases, such as *Martínez c/ Otero*,[4] where the Supreme Court justified President Mitre's "revolutionary powers" to intervene in trade affairs.[5]

9.   A few years later, by means of two plenary decisions, the Supreme Court upheld the *coups* of 1930 and 1943, whereby the President was

---

[1]   Carlos Nino (1943-1993) was a professor of Jurisprudence at Universidad de Buenos Aires, Juris Doctor from Oxford University (1977) and a visiting professor at Yale Law School.

[2]   NINO, Carlos: *Un país al margen de la ley*: *Estudio de la anomia como componente del subdesarrollo argentino*, 4ª edición, Ariel, 2014.

[3]   Nino, page 72.

[4]   Fallos 2-127 (1865).

[5]   Mitre had revoked certain payments made to the Rosario Customs Authority; the Supreme Court held that those payments had been validly revoked because Mitre "*provisionally exercised all the federal powers in the wake of the Battle of Pavón, by virtue of the powers of the triumphant revolution supported by the people and further by virtue of the serious duties of the victorious*" (Fallos 2, page 143).

overthrown, Congress was closed and a *de facto* military government was established.[6]

10.    In 1947, after President Perón took office, four out of five Supreme Court Justices were impeached; three of them were removed, while the remaining one resigned. The outgoing Justices were replaced by four new Justices that were politically close to President Perón.

11.    The Supreme Court´s deference towards the President at that time is shown in *Merck Química Argentina,*[7] a case where the Supreme Court validated the confiscation of assets of German companies which were declared by Decree to be "enemy property", even though Argentina had declared war on Germany when that nation was already defeated and Argentina never actually participated in the war.

12.    Four decades later, Carlos Menem, another Peronist President, led the second major reform in the Supreme Court during a lawfully elected Administration.[8] There was no impeachment of Justices this time, but the number of Justices was substantially increased in order to secure a majority deferent to the Administration. The number of Supreme Court members was increased from five to nine; four new Justices, adherent to President Menem's views, were appointed.[9]

13.    As a result of this enlargement of the Supreme Court, a number of relevant decisions made by President Menem were subsequently ratified by the Supreme Court. There is, for instance, the case of *Peralta v. Federal State*,[10] where the Supreme Court validated the Decree No. 36/1990 ordering the exchange of bank deposits for government bonds that had not been actually issued at the time.

---

[6]   Plenary decision dated September 10, 1930, Fallos 158-290, and June 7, 1943, Fallos 196-5.

[7]   Fallos 211-193 (1948).

[8]   The de facto governments of 1955, 1966 and 1976, all of which took power by military coup, removed all the Supreme Court Justices and appointed new Justices, and at the end of each de facto government the new elected government (like the one of President Alfonsin in 1983), removed all the de facto justices and appointed a whole new Supreme Court.

[9]   Nino, page 70.

[10]   Fallos 313-1513 (1990).

### B.   The 2003 Impeachments

14.   From 2003 to 2007, Argentina was governed by President Néstor Kirchner. One of Néstor Kirchner's earliest decisions as President was to impeach five out of the nine Justices that at the time made up the Supreme Court.[11]

15.   Allegations against those Justices were not based on acts of corruption or misbehavior. They were basically accused of wrongly applying the law in an arbitration case in which a State-run company was ordered to pay a sum of money to a private-sector company.[12]

16.   Arbitration of the case was mandated by a Decree issued in 1947,[13] establishing the Public Works Arbitration Tribunal and the Supreme Court's decision holding the arbitral award unreviewable was consistent with its own existing case law in similar cases.[14]

17.   As a result of the impeachment, five vacancies arose in the Supreme Court.[15] Four of those vacancies were filled in by new Justices.[16] The fifth vacancy was not filled in.[17]

---

[11]   The Justices involved were: Julio S. Nazareno, Eduardo Moliné O´Connor, Antonio Boggiano, Adolfo Vázquez and Guillermo A. F. López.

[12]   Meller Comunicaciones S.A. U.T.E. c/ Empresa Nacional de Telecomunicaciones, Fallos 325-2893 (2002)

[13]   Decree N° 11.511/1947.

[14]   In a few words, the crux of the matter was whether or not an arbitration tribunal's award could be appealed before the Supreme Court. In line with its traditional case law, the Supreme Court decided that such an award was not subject to appeal. See: Patrón de la Goleta "Nueva Angelita" c/ Capitán del "Iron King", Fallos 4-291 (1867); Muzlera de Machado c/ Sucesión de Juan B. Iturraspe, Fallos 118-247 (1913); Martín y Cía. Ltda. c/ Erazo, Fallos 208-497 (1947); Vicri Fábrica de Vidrios Planos S.R.L., Fallos 241-203 (1958); Genisetto de Giacomone c/ Giacomone, Fallos 250-408 (1961); Pedraza c/ Pedraza de Molina, Fallos 255-13 (1963); Capdevielle Kay y Cia. S.A. c/ Bunge y Born Ltda. S.A., Fallos 259-145 (1964); De Caro c/ R.J.R. Caputo S.A., Fallos 274-323 (1969); YPF c/ Propietarios del Buque Santa Urchin, Fallos 281-289 (1971); Icer S.A. c/ Molinos Florencia S.A., Fallos 296-230 (1976). An extraordinary appeal has been admitted in instances of mandatory arbitral jurisdiction. Cantiello c/ Copet, Fallos 277-442 (1970).

[15]   Two of the impeached Justices (Boggiano and Moliné O´Connor) were removed, while three others (Nazareno, Vázquez and López) resigned.

18.    Adolfo Vázquez, one of the impeached Justices, went on to write a book about the impeachment process, where he stated that "... *when* [...] *Nestor Kirchner, on Wesnesday June 4, 2003 demanded of the Congress the dismissal of the* [Supreme] *Court it was foreseen as was publicly predicted on that same day by the former Chief Justice Julio S. Nazareno that the government wanted an addict Court in order to obtain total public power something that he would achieve with a new Court*".[18]

### C.    The 2013 "Plan to Democratize the Judiciary"

19.    Néstor Kirchner concluded his term in office in 2007 and was succeeded by his wife, Cristina Fernández de Kirchner, who was President for two consecutive terms (2007-2011 and 2011-2015).

20.    Even though the Supreme Court had been modified by her husband, Mrs. Kirchner deeply distrusted the federal judges on the lower courts.

21.    Her mistrust was evidenced in the speech given at the first Congressional session of 2013.[19]

22.    Based on that mistrust, Mrs. Fernandez de Kirchner proposed the so called "Plan to Democratize the Judiciary". One of the main items in the Plan was to create three "super" courts of appeal, with a seat in the Federal District (City of Buenos Aires), which would review every decision made by every federal court of appeals in Argentina.[20]

---

[16]    The new Justices were: Ricardo Lorenzetti, Eugenio R. Zaffaroni, Carmen Argibay Molina and Elena Highton de Nolasco.

[17]    Soon after that, the number of Supreme Court Justices was lowered to five by Act No. 26.183.

[18]    VÁZQUEZ, Adolfo: *Asalto a la Justicia, La intervención política en la Corte Suprema*, ed. Sudamericana, Buenos Aires, 2016, page 13.

[19]    It was a long speech. As far as the reform of the judiciary is concerned, Ms. Kirchner's main statements were as follows: "[...]*We will also submit a Bill to create a Court of Appeals in Civil and Commercial Matters, a Court of Appeals in Administrative Matters, and a Court of Appeals in Social Security and Labor Matters, so that all four fundamental branches of the law would have a third instance that would make the whole judicial system more transparent* [...]".

[20]    Those three courts of appeals would have jurisdiction over federal administrative matters, labor and social security matters, and civil and commercial matters, respectively.

23.    Thus, in actual practice, the purpose sought by the "Plan to Democratize the Judiciary" was to centralize all federal courts' decisions in three new courts of appeals whose members would be appointed by Mrs. Fernández de Kirchner.

24.    Those courts of appeals were created by Law No. 26,853,[21] but no judges were actually appointed to them. Law No. 26,853 was revoked by Law No. 27,500 in 2019.[22]

25.    Transparency International[23] was very critical of that plan, and pointed out that: "*The upper house in Argentina's Congress has approved a series of laws proposed by the government that allow the executive branch to exert considerable influence over the judiciary, threatening the already limited independence of the country's judicial system. Argentina ranks 133rd out of 144 countries for judicial independence* [...] *The government has claimed that the new laws are "democratising the judiciary", but in reality rather than promoting democracy they threaten the country's rule of law by concentrating too much power in the executive branch. The timing of the new law, which will have to be passed by the lower house, highlights the tension between the political and the judicial branches of the state. In recent months, the courts have refused to allow legal moves by the government to break up media groups seen by President Cristina Kirchner as monopolistic and biased*".[24]

   **D.    Mrs. Cristina Fernandez de Kirchner's actual views on the Judiciary**

26.    Cristina Fernández de Kirchner and Alberto Fernandez were recently elected by the Argentine people to take power as vice president and president, respectively. Mrs. Kirchner was married to President Nestor

---

[21]    Published in the Official Gazette on May 17, 2013.

[22]    Published in the Official Gazette on January 10, 2019.

[23]    https://www.transparency.org/ According to its own web site "*Transparency International gives voice to the victims and witnesses of corruption. We work together with governments, businesses and citizens to stop the abuse of power, bribery and secret deals. As a global movement with one vision, we want a world free of corruption. Through chapters in more than 100 countries and an international secretariat in Berlin, we are leading the fight against corruption to turn this vision into reality*".

[24]    https://www.transparency.org/news/feature/argentina_and_the_judiciary_subverting_the_rule_of_law

Kirchner and was an influential Senator during that time.  She then held the office of President during the time period relevant to this case.  As she will now retake power shortly, it is worth examining her actual views on the judiciary.

27.   In   April   2019,   Mrs.   Kirchner   published   a   book   entitled "Sinceramente",[25] which according to the author is about "*looking back and reflecting on the past in order to clarify some recent historic events*" (page 11).

28.   Her political points of view, which are unabashedly expressed in the book, leave no doubt as to her current views on the Judiciary.

29.   Mrs. Kirchner claims that the Judiciary "*has become a political party that takes part in Argentine politics, acting beyond the scope of the law and the Constitution. This new 'judicial terrorism' of sorts has replaced the role that dictatorships used to play in the face of opposition during the tragic period known as State terrorism and the national safety doctrine*" (page 16).

30.   She further claims that "[t]*he facts clearly evidence an unprecedented complicity of the Judiciary... * [W]*hen I submitted my* [Judiciary] *Reform Bill back in April 2013, members of the already-existing alliance between the media, corporate Argentina and the judiciary was very much alarmed*" (pages 59 and 150).

31.   She also claims partial credit for Nestor Kirchner's remarkable efforts to   reshape   the   Supreme   Court   through   the   above   mentioned impeachments: "*by completely renewing the Supreme Court, we helped enhance not only the authority of the Legislative and Executive branches of government, but also that of the Judiciary*" (page 177).

### E.   Chief Justice Rosenkrantz's opening of the Judicial Year 2019

32.   Even sitting Argentine judges and Justices have expressed concern about the eroding independence of the Argentine judiciary.

---

[25]   Fernández de Kirchner, Cristina, Sinceramente, 8th edition. Sudamericana, Buenos Aires, 2019.

33.   As is standard practice, Chief Justice Carlos Rosenkrantz opened the Judicial Year in March 2019.[26]

34.   His first words were: "[t]*he Argentine judiciary now faces a major institutional challenge, namely, the need to overcome the existing legitimacy crisis*".

35.   He added that "[T]*his did not happen overnight. And it is not the outcome of a fatality; rather, it is the result of a combination of factors involving a number of players; it is the result of something that has been gradually happening over a long period of time. Given the complexity of this legitimacy crisis, it is not easy to find a way out of it*".

36.   He also stated that: [e]*very legitimacy crisis is mainly a crisis of confidence. The Argentine people are losing confidence in the Judiciary. There is doubt as to whether we act as members of a truly democratic republic*".

37.   That mistrust is not without grounds. In an article published in La Nación, Constitutional Law Professor Alberto Garay expressed that: "*… to their astonishment and shock, the* [Argentine] *people learned through the media that a federal judge in criminal matters, Judge Daniel Rafecas, had a number of telephone conversations to discuss legal strategy with counsel to a senior government official that was the defendant in a criminal case being heard by Mr. Rafecas. The press also revealed that, in another legal case involving several government officials, Judge Julián Ercolini had failed to take legal action for months and even years, and had dismembered the case among several courts, thus undermining the core investigation regarding conspiracy. This newspaper revealed another legal case where Judge Marcelo Martínez de Giorgi was supposed to look into the unlawful enrichment of a colleague, Judge Eduardo Freiler, and he improperly acquitted him without any real investigation. Finally, several members of the press have warned that legal proceedings involving allegations of corruption against government officials often fail to reach a conclusion –either conviction or acquittal- because the delays involved are so substantial that the cause of action eventually becomes time-barred*".[27]

---

[26]   http://public.diariojudicial.com/documentos/000/083/452/000083452.pdf

[27]   GARAY, Alberto: *La justicia debe ser y parecer independiente*, La Nación, June 20, 2016.

38.    Additionally, Defendants' own expert, Professor Alfonso Santiago, whose declaration will be discussed in the next section, has spoken harshly about federal judges. In the course of a radio interview, he actually said that seven of them are in "a scandalous situation".[28]

F.    **Independent international organizations have recognized Argentina's lack of judicial independence**

39.    Several statistics published by independent international organizations document Argentina's lack of judicial independence. Argentina was ranked 100th among 135 countries in the ranking published by the World Economic Forum.[29]  The United States is ranked 25.

40.    According to World Bank indicators in turn, Argentina is significantly below average standard in terms of judicial independence.[30]  According to the chart shown in the footnote 30 below, Argentina was ranked very low during 2007-2015, under Cristina Fernandez de Kirchner´s administration.

G.    **Mr. Alberto Fernández's opinions on the Judiciary**

41.    Mr. Alberto Fernández is the President-Elect of Argentina.  He was elected on a ticket with former President Mrs. Fernández de Kirchner and will take power on December 10.

42.    Mr. Fernández discussed the Judiciary throughout his campaign with Mrs. Kirchner, and he has been hostile towards the judges now hearing several cases against former government officials of the Administrations of Néstor Kirchner and Cristina Fernández de Kirchner.

43.    In a statement to the press, he said that: "[w]*e'll have to revise a number of judgments entered over the last few years"; "some judges will have to 'explain' their judgments*; "[I] *think we'll have to revise a number of*

---

28    https://www.austral.edu.ar/derecho/2016/10/18/medios-alfonso-santiago-la-justicia-en-la-mira-el-7-de-los-jueces-han-estado-en-situacion-de-escandalo/

29    http://reports.weforum.org/pdf/gci-2017-2018-scorecard/WEF_GCI_2017_2018_Scorecard_EOSQ144.pdf

30    https://tcdata360.worldbank.org/indicators/h5ebaeb47?country=BRA&indicator=669&viz=line_chart&years=2007,2017

*judgments entered over the last few years, as they have no legal basis and are completely unreasonable from the juridical standpoint*".[31]

44.     Those statements, as well as the statements made by former Justice Eugenio R. Zaffaroni –who has proposed a profound constitutional reform-,[32] have caused Minister of Justice Germán Garavano to state that "*unfortunately, in a number of cases, Kirchnerism went for co-opting members of the Judiciary. As a political movement, they do not seem to be interested in counterbalances, transparency or an independent Judiciary*".[33]

### H.     The opinions of foreign scholars on the Argentine's Judiciary

45.     Professor Diana Kapisewski[34] visited Argentina a few years ago and, as a result of her research work, she published a book about the Supreme Court of Argentina, where she pointed out the following: "*Continued attempts to manipulate the [Supreme Court's] size and membership produced an unstable and insecure court. They also generated a Court with a less-professional profile. As noted previously, few justices had a background in constitutional law and an important minority had not held post in the federal judiciary prior to being appointed to the Court; moreover, even justices who had formed part of the federal judiciary were not necessarily the country's finest jurists as the process for appointing federal judges was also politicized [...] The result of high court politicization was political Court. Throughout much of the postauthoritarian period, the [Supreme Court] was an unstable institution including a subset of justices with weak professional profiles*

---

[31]   https://www.lanacion.com.ar/politica/alberto-fernandez-vamos-tener-revisar-muchas-sentencias-nid2249649

[32]   In the former judge's opinion, "[t]he existing institutions have not succeeded in protecting Argentina against colonialism, which has plunged our Nation into debt at the speed of light. We need institutions that will protect us against that going forward" [...] over the last few years, global capitalism has entered a phase of "financial totalitarianism". One of the goals of the global financial system is to take advantage of deficiencies in the institutional architecture [of nations] in order to demolish them from the inside".   https://www.tiempoar.com.ar/nota/raul-zaffaroni-que-mejor-negocio-que-sean-los-propios-excluidos-quienes-pidan-represion

[33]    https://www.lanacion.com.ar/politica/german-garavano-el-kirchnerismo-intenta-cambiar-sistema-nid2246801

[34]   Provost's Distinguished Associate Professor, Georgetown University.

*and marked by low perceived legitimacy and weak institutional cohesion*". [35]

### I. The 2019 report of the UN's Rapporteur on the judges and lawyers independence

46. Finally it is worth pointing out the report on lack of judicial independence under President Macri prepared by the UN's Special Rapporteur on the judges and lawyers independence, dated on November 1, 2019.

47. The opening statement of this report says: "*I would like to draw the urgent attention of the Government of His Excellency to the information I have received regarding the alleged existence of a systematic and structural plan to intimidate the Judiciary of the Republic of Argentina, which is reflected in the cases that I summary below. According to these allegations, said alleged plan would be executed by the Executive Branch through a series of concatenated acts, closely linked to each other. The alleged acts of intimidation and pressure on the various organs that make up the Argentine judicial system, such as the Public Ministry and the Council of the Magistracy, would have undermined their independence by hindering the possibility of impartial action in decisions that affect the interests of the Executive Power; as well as disciplining the magistrates who had issued resolutions contrary to the will of the Executive*".[36]

### J. Conclusions

48. As expert witnesses, it is not our place to take sides for or against the opinions and statements referred to above.

49. Rather, it is our job to analyze those opinions and statements objectively; from that perspective, the inevitable conclusion is that the Judiciary in Argentina is in the midst of a profound legitimacy crisis, and people simply do not trust the courts of law.

---

[35] KAPISZEWSKI, Diana: *High Courts and Economic Governance in Argentina and Brazil*, Cambridge University Press, 2012, pages 87 and 92.

[36]
http://www.pensamientopenal.com.ar/system/files/2019/11/miscelaneas48312.pdf
http://www.tiempojudicial.com/wp-content/uploads/2019/11/ONU-JUSTICIA-Nota-Naciones-Unidas-Justicia-Argentina.pdf

50.   Alberto Fernández and Cristina Fernandez de Kirchner, the incoming president and vice president, have evidenced deep distrust for the judiciary. Even under President Macri, Argentine judiciary fared poorly under any standard.

51.   This view is also shared by fully independent foreign observers.

52.   Moreover, beyond any political partisanship, this legitimacy crisis was admitted by the highest judicial authority in Argentina, Chief Justice Carlos Rosenkrantz, early in 2019.

### IV.   LACK OF JUDICIAL INDEPENDENCE IS ESPECIALLY PRONOUNCED IN CASES INVOLVING CLAIMS AGAINST THE STATE

53.   As a result of the lack of independence of the federal courts, it is common in Argentina for legal cases of major economic relevance involving the federal state to be resolved in favor of the federal state.

54.   This trend is probably best evidenced in the case of ***Claren Corporation v. Estado Nacional,*[37]** where the holder of certain foreign debt bonds issued by the Republic of Argentina, which included a New York jurisdiction provision, sought payment of those bonds before the Southern District Court of New York, which eventually found for plaintiff. The federal courts of Argentina, in a decision that was later confirmed by the Supreme Court, refused to recognize that judgment (that is to say, refused to grant *exequatur*) by alleging that the decision made by the Southern District Court of New York was clearly contrary to Argentine principles of public order. The concept of public order is often used by Argentine courts to rule in the government's favor.

55.   In other instances, the court deployed arguments based on principles of public order or alleged the existence of "serious institutional matters", as it did in "Aguinda Salazar María c/Chevron Corporation s/medidas cautelares", dated June 4, 2013, and "YPF c/AES Uruguaiana Emprendimientos S.A. y otros" dated July l0, 2014, among others, in order to disregard or postpone the liability of the State.[38]

---

[37]   Fallos 337-133 (2014),

[38]   By means of an injunction (judgement entered on October 7, 2014), the Court of Appeals in Federal Administrative Matters prevented continuation of an international arbitration proceeding held in Montevideo (Uruguay), where an award

56.  Additionally, as a rule, the Supreme Court has ratified every economic emergency governmental decision that operated to restrict individuals' rights. A merely illustrative list shows that such a judicial finding has been made in connection with a number of matters, including without limitation: reduction and freezing of the amount of rental in respect of both urban[39] and rural properties;[40] mandatory extension of the term of lease agreements in respect of urban properties;[41] mortgage moratorium and mandatory reduction of interest rates;[42] suspension of enforcement of judgments and stay of eviction proceedings;[43] suspension of enforcement of fees;[44] establishment of caps in respect of the price of certain goods;[45] mandatory reduction of retirement payments;[46] obligation by movie theaters to hire live performers;[47] replacement of bank deposits by a government bond that had not been

---

had been entered against YPF (a State-owned Argentine company). At the time when the arbitration proceeding was suspended, the amount payable by YPF had not been determined yet. The Supreme Court dismissed an appeal filed against that injunction. (CAF 41255/2013/1/3/RH2; judgment entered on November 18, 2015) Subsequently, the Court of Appeals in Federal Administrative Matters annulled the arbitration award -clearly acting beyond the powers granted by the Code of Procedure- (Judgment entered on December 22, 2015) and later on annulled "ex officio" all the actions taken by the arbitration tribunal (Judgment entered on April 26, 2016).

[39]  Ercolano c/ Lanteri de Renshaw, Fallos 136-161 (1922); Alfredo R. Castro s/ sucesión, Fallos 204-359 (1946).

[40]  *Fernández Orquín c/ Ripoll*, Fallos 264-416 (1966).

[41]  *Ferrari c/ Peiti*, Fallos 199-466 (1944); *Cello de Ciarrapico c/ Marino,* Fallos 204-195 (1946).

[42]  *Avico c/ De la Pesa*, Fallos 172-21 (1934); *Yaben c/ Lavallén*, Fallos 172-291 (1934).

[43]  *Russo c/ Delle Donne*, Fallos 243-467 (1959).

[44]  Videla Cuello c/ Provincia de La Rioja, Fallos 313-1638 (1990).

[45]  Case law on this matter is extremely abundant. In that regard, please see the detailed work on supply laws by CASTRO VIDELA, Santiago and MAQUEDA FOURCADE, Santiago: *Tratado de la regulación para el abastecimiento*, Ábaco, Buenos Aires, 2015.

[46]  Frugoni Zavala c/ Nación, Fallos 173-5 (1935); López c/ Provincia de Tucumán, Fallos 179-394 (1937).

[47]  *Cine Callao*, Fallos 247-121 (1960).

issued yet;[48] mandatory reduction of contractual obligations;[49] conversion of private foreign financial debt into government foreign debt, and extension of the term for payment thereof;[50] mandatory reduction of civil servants' salaries;[51] mandatory conversion into Pesos ("pesification") of foreign currency liabilities, including bank deposits;[52] consolidation of debts into federal[53] and provincial[54] government bonds and mortgage bonds.[55]

## V.   RESPONSE TO PROFESSOR ALFONSO SANTIAGO'S DECLARATION

### A.   Alfonso Santiago's Prior Statements

57.   Alfonso Santiago is a leading Constitutional Law professor and a well respected scholar in Argentina. However, we disagree with his views on the operation of the Judiciary in Argentina, as stated in his report submitted in the context of the case at hand.

58.   In the first place, it should be noted that those views are not consistent with certain statements made by Professor Santiago himself in a recently-published article.

59.   In his declaration, Professor Santiago stated as follows: "*I opine that Argentina has an independent judicial system capable of fairly and impartially resolving disputes between private litigants, including foreigners, and the Argentine State*" (paragraphs 6 and 7).

---

[48]   *Peralta c/ Estado Nacional*, Fallos 313-1513 (1990).

[49]   Porcelli c/ Banco de la Nación Argentina, Fallos 312-555 (1989).

[50]   Brunicardi c/ Estado Nacional - BCRA, Fallos 319-2886 (1996).

[51]   Guida c/ Poder Ejecutivo Nacional, Fallos 323-1566 (2000).

[52]   Bustos c/ Estado Nacional, Fallos 327-4495 (2004); Massa c/ Poder Ejecutivo Nacional, Fallos 329-5913 (2006).

[53]   Galli c/ Poder Ejecutivo Nacional, Fallos 328-690 (2005); Viplán S.A. c/ Banco Central de la República Argentina, Fallos 329-4309 (2006).

[54]   Assisa c/ Provincia de Misiones, Fallos 334-596 (2011) y Misa c/ Provincia de Formosa [M. 757. XXXVIII] 24-05-2011.

[55]   *Rinaldi c/ Guzmán Toledo*, Fallos 330-855 (2007).

60. That opinion is not consistent with the statements made by Professor Santiago in an article published in 2018, where he considered the behavior of the Supreme Court under Chief Justice Ricardo Lorenzetti (2007-2018).[56]

61. In his conclusions as published in that article, Professor Santiago said that: "*There is still some unfinished business at this stage of Lorenzetti's Supreme Court, namely: an internal reform of the Judiciary. An urgent need exists to improve the Judiciary's institutional and operational quality, thus increasing its social credibility. It is crucial to make the Judiciary more effective for the benefit of the people, and to increase the transparency and credibility of our courts of law and their members ... [M]aybe this improvement of the Judiciary's institutional and operational quality will be one of the main items on the agenda under the new Chief Justice, Mr. Rosenkrantz*".

62. Also, Professor Santiago's opinion is not consistent with the statements made by Professors Manuel García-Mansilla and Iván Vigani, regarding the thirty-year delay in the expropriation proceedings associated with Compañía Azucarera Tucumana mentioned in paragraph 79 below.

### B. Professor Santiago appears to have selected a tiny number of cases that cannot be regarded as representative of the Argentine judiciary's behavior where lawsuits against the State are involved

63. As a general comment, the cases mentioned in Professor Santiago's declaration were cherry-picked and cannot possibly be regarded as a pattern of the Argentine Judiciary's behavior where lawsuits against the State are involved.

64. Moreover, that selection of cases is extremely limited. According to Professor Santiago, Argentina has a "litigation rate of approximately 10,225 cases per 100,000 inhabitants". And yet, he has only mentioned 5 cases that, in his view, are relevant in terms of lawsuits to which the Federal State is a party.

65. None of the cases mentioned by Professor Santiago are comparable to this case either in their subject matter or the monies at stake. Furthermore in the case "The Bank of New York S.A. c/ Dirección General de Fabricaciones Militares s/incumplimiento de contrato", the

---

[56] SANTIAGO, Alfonso: *La Corte de Lorenzetti*, El Derecho-Constitucional, 2018, pages 680-684.

first case mentioned by Professor Santiago, the complaint was filed in 1991; it was only in 2005 –14 years later- that the Supreme Court of Argentina upheld plaintiff's demand by a majority of votes, after the complaint was dismissed by the lower court and by the Court of Appeals.

    **C.** **Professor Santiago has failed to consider other serious impediments to fair adjudication**

66.    Professor Santiago states that "[t]*he judicial system in Argentina is readily accessible to litigants*" (paragraph 14).

67.    In this categorical statement, Professor Santiago has failed to consider the issues described below.

   **i.**    **The significant costs of litigating in Argentina**

68.    Professor Santiago has failed to consider the cost of litigating in Argentina, which can be summed up as follows.

69.    In the first place, plaintiff must pay a court fee, which becomes payable at the time of filing the complaint. Pursuant to the provisions of Law N° 23,898, the court fee is equal to 3% of the amount of the claim, calculated as principal adjusted by inflation, plus interest thereon and monetary penalties if any.

70.    In the second place, there are other costs involved, mainly including legal fees currently regulated by Law No. 27,423.

71.    Pursuant to the provisions of Law N° 27,423, legal fees solely in respect of lower court proceedings can be assessed by the judge between 22% and 33% of the amount of the claim in small claims and between 12% and 15% in big claims. Then, at every subsequent stage of the proceedings (Court of Appeals and Supreme Court), legal fees can be assessed by the relevant court anywhere between 30% and 35% of the amount of legal fees associated with the lower court proceedings.

72.    Furthermore, according to Article 68 of the Procedural Code, the losing party has to pay the legal fees of both parties.

73.    In addition, there is the matter of fees associated with the so-called "incidental proceedings". Under Argentine procedural law, an "incidental proceeding" is any proceeding that is separate from but related to the main lawsuit.

74.   That is the case, for example, of jurisdictional defenses or proceedings where the applicable statute of limitations is discussed. As a rule, those types of proceedings are designed to determine whether or not a court may hear a given case, before the actual proceedings start. Requests for injunctive relief are also regarded as incidental proceedings.

75.   Legal fees in connection with incidental proceedings are calculated separately from the main lawsuit and are added to the legal fees associated with it. The fees in incidental proceedings can be assessed by the judge between 8% and 25% of the total amount of the main legal fees.

76.   As far as expert witnesses are concerned, a case such as this will certainly call for an accounting expert, whose fees are assessed at 4% - 10% of the amount of the claim. These fees are also regulated by law.

### ii.   The duration of judicial processes

77.   The duration of judicial processes in Argentina is extraordinary. In some cases it is equivalent to a deprivation of justice.

78.   Without prejudice to other sources, we note the opinion of then Treasury Attorney General and current Supreme Court Justice, Horacio Rosati, who back in 2003 complained about the duration of legal proceedings to which the Federal State was a party: "*A sample taken by the Audit Department of the Treasury Attorney General's Office, formed by 1,600 financially relevant lawsuits against the Federal State filed from 1985 to 2000 and limited to litigation proceedings that called for evidence to be produced (i.e., damages, contractual nonperformance) – that is to say, proceedings whose nature was similar to a conflict arising from nonperformance under a BIT- has shown that the 'average duration' of a judicial process –from the time the complaint is filed until the time when judgment is entered by the lower court- is six (6) years and one (1) month.*"[57]

79.   There is also a critical case mentioned in a recent article by Professors García Mansilla and Vigani, where the courts of law took an exceptionally long time to resolve a case of expropriation: "*Emile Nadra is 97 years old. There are two stages to his life: until the age of 48, he was a successful businessman in Tucumán. After that moment, his life looks*

---

[57]   ROSATTI, Horacio D.: *Los tratados bilaterales de inversión, el arbitraje internacional obligatorio y el sistema constitucional argentino*, Revista Jurídica La Ley, 2003-F, 1283.

*like something out of a Kafka story. First, between the years 1966 and 1970, his company -Compañía Azucarera Tucumana- was expropriated. Then, following the expropriation, he went through a long legal proceeding and had to wait 19 years to obtain a final judgment from the Supreme Court of Argentina. That turbulent stage, however, is not yet closed: even though a final court order issued in 1989 acknowledged his right to monetary compensation for the expropriation, he has been trying (and failing) to enforce that court order for almost 30 years now. Emile Nadra has been litigating against the Argentine State for over 17,800 days. A final decision regarding his case was issued over 10,900 days ago; all that remains now is for him to know when he is going to be paid. And for actual payment to be made, of course. He managed to defeat the Argentine State's army of lawyers, but the insensitive, relentless machine that is State bureaucracy has systematically ignored his claims and his rights. Seventeen Supreme Court Justices have come and gone, and Mr. Nadra has yet to obtain enforcement of the judgment in his favor. As of this day, he remains unable to use and dispose of his constitutional property rights, the expropriation of which –in theory- was subject to "prior monetary compensation".*[58]

80.   On the other hand, computerization of the proceedings will not reduce their duration, as it will not operate to amend the provisions of the Procedural Code. In any case, it will facilitate access to information and will spare lawyers the need to physically check court files.

### iii.   The old and chaotic status of judicial legislation in Argentina

81.   Professor Santiago has failed to point out that judicial legislation in Argentina is so old and dated that it is formed by three basic rules: (a) Law No. 27, passed in 1862; (b) Law No. 48, passed in 1863, and (c) Decree No. 1285, passed in 1958 by a de facto military government.

82.   In spite of the enactment of the Digesto Jurídico Argentino in 2014 (Law No 26,939) Argentina does not have a "Judicial Code" to embody, update and organize all judicial laws and regulations, which are currently dispersed and chaotic.

---

[58]   García Mansilla, Manuel J. y Vigani, Iván: Alegato contra la impunidad estatal. A treinta años del caso "Compañía Azucarera Tucumana", La Ley 26/09/2019; AR/DOC/2791/2019.

### iv.   No trial by jury

83.   Professor Santiago has failed to point out that there is no trial by jury in Argentine federal procedure. Although the Argentine Constitution mandates trial by jury, that provision has never been implemented by the Congress.

### v.   No discovery

84.   There are no discovery proceedings in argentine federal procedure, as former Judge Naveira explained in his first declaration (ECF No. 48).

### vi.   Parties must put forth their evidence without seeing the other side's case

85.   The provision of the Procedural Code referred to by Professor Santiago (article 333) strongly limits claimants' rights, by forcing them to produce and offer all evidence before an answer to the complaint is filed.

86.   As a result, a claimant must offer evidence "blindly", that is to say, without knowing what defendant will argue in its answer to the complaint.

87.   All of the above comes to show how outdated, exceedingly formal and rigid judicial proceedings are in Argentina.

### vii.   The alleged independence of the Judicial Council

88.   In paragraph 8 of his declaration, professor Santiago states: "[t]*he Judicial Council is an independent body specifically provided for in Article 114 of the National Constitution, and includes members of Congress which must represent both the majority and opposition parties, as well as representatives consisting of judges, lawyers, and academics, elected by their peers. This broad integration provides sufficient control in the process of selection of candidates for judges*".

89.   Professor Santiago underlines the importance of the Judicial Council as an alleged independent body that is responsible for the selection of federal judges.

90.   He fails to state, however, that ever since it was created by the 1994 Constitutional amendment, the Judicial Council has been a highly controversial body that successive Administrations have attempted to control.

91.    In the first place, the Judicial Council's structure has been subject to constant changes designed to exercise influence over its decisions. It took Congress over three years after the 1994 Constitutional amendment to pass implementing regulations under Articles 114 and 115 of the Constitution. Law No. 24,937, which established a Judicial Council formed by 19 members, was enacted as late as 1997. Soon after that, Law No. 24,939 was passed, which added one more member to the Judicial Council. This structure remained until 2006, when Law No. 26,080 operated to reduce the number of Judicial Council members to 13.

92.    Also, the Judicial Council has had some serious conflicts with the Supreme Court of Argentina, regarding the appointment of subrogating judges. In the context of those conflicts, Resolution No. 76/2004 was found to be unconstitutional, as the Supreme Court understood that it enabled appointment of judges without compliance with the applicable constitutional provisions. (Carlos Alberto Rosza case, Fallos 330-2361 (2007)). Resolution No. 8/2014 was found to be unconstitutional for the same reason (Uriarte c/ Consejo de la Magistratura de la Nación, Fallos 338-1216 (2015)).

93.    President Mauricio Macri has also attempted to modify the Judicial Council, by means of a program developed by the Ministry of Justice and known as "Justicia 2020".[59]

### viii.  Witness statements

94.    In paragraph 20 of his declaration, Professor Santiago made several references to witness statements. This issue was addressed by former Judge Naveira in his first declaration (ECF No. 48). We make the following additional remarks in that regard.

95.    In accordance with the Argentine Code of Civil and Commercial Procedure (CPCCN)[60], a party submitting a witness must submit their questions in writing to the court before the witness' testimony can be heard[61]. As a rule, witnesses are questioned by an official of the court rather than the judge (who is not normally present at the hearing).

---

[59]    See:    https://www.justicia2020.gob.ar/eje-institucional/reforma-del-consejo-la-magistratura-la-nacion/

[60]    CPCCN, sections 439-447.

[61]    CPCCN, section 429.

Those questions may be literal or modified, as the court official may deem advisable. After the first round of questions is answered by the witness, counsel to the other party may submit his own questions orally, for those to be asked by the court official. The court will decide whether or not those questions should be asked, either literally or in a modified form[62].

96.   Government officials, including middle-level officials such as undersecretaries[63], are under no obligation to testify in person before a court of law, but rather, they may submit a written statement answering the questions that are submitted to them in writing.

97.   Only witnesses of very old age or who are gravely ill or are about to leave the country will be allowed to testify before the time when the complaint is filed[64].

98.   A party to a legal proceeding shall not be asked to testify as a witness in the case. A party may demand that the counterparty be asked to answer interrogatories orally –as a party to the proceedings, but not as witness. This is known as "*absolución de posiciones*"[65].   In the case of legal persons, such as the Federal State, those interrogatories are answered by a legal representative or other State nominee.

99.   In giving statement in the abovementioned capacity (that is to say, as a party to the proceedings rather than as a witness), a party will not commit perjury if they do not tell the truth, whether in criminal or civil proceedings.[66]

---

62    CPCCN, section 442.

63    CPCCN, section 455. CSJN, joint ruling dated December 20, 1967.

64    CPCCN, section 326(1).

65    CPCCN, sections 404-425.

66    FALCÓN, ENRIQUE M., *Tratado de Derecho Procesal Civil, Comercial y de Familia*, III, Rubinzal Culzoni, Buenos Aires, 2006, page 125 (where the author explains that, under Argentine law, the parties "are free to lie" when testifying even under oath, without incurring criminal liability of any kind); PALACIO, LINO ENRIQUE, *Derecho Procesal Civil*, IV, 4° Ed., Abeledo Perrot, Buenos Aires, 2011, page 442 (where the author states that no specific penalty is contemplated under Argentine law if a party to the proceedings commits perjury).

100.  In a proceeding against the Federal State, a government official authorized to answer interrogatories on behalf of the State is under no obligation to appear before the court, but rather, will submit a written statement[67]. The power to submit those written statements was delegated by Decree No. 1102/86 unto counsel to the Federal State[68]. According to a former Treasury Deputy Attorney General, as a rule this means that those statements are actually prepared by the same lawyers who draft the answer to the complaint, which in actual practice means that the Federal State is given another opportunity to amend or expand the allegations made in the answer to the complaint[69].

101.  The rules referred to above are binding on federal courts in all legal proceedings filed in Argentina.

102.  Regarding the production before Argentine federal courts of evidence ordered in legal proceedings heard abroad, both Argentina and the United States are signatories to The Hague Convention on Taking Evidence Abroad in Civil or Commercial Matters[70] and the Inter-American Convention on Letters Rogatory[71].

103.  Those conventions provide that a judge handling a letter rogatory should apply the law of his own country in terms of the applicable methods and procedures. At the request of the foreign judge, however, a special procedure may be followed, provided that it is not inconsistent with the law of the land[72].

---

[67]  CPCCN, section 407.

[68]  Treasury Attorney General, Treasury Deputy Attorney General, and the legal department heads of any Ministries, Secretariats and other federal government divisions.

[69]  GARCIA PULLÉS, FERNANDO RAÚL, *Tratado de lo contencioso administrativo*, II, Hammurabi, Buenos Aires, 2004, page 661.

[70]  Act No. 23.480.

[71]  Act No. 23.503.

[72]  DATES, LUIS E., "*Cooperación judicial internacional procesal en materia probatoria*", published in La Ley 2007-D, 1150; FEUILLADE, MILTON C., "*La prueba en el proceso con elementos extranjeros*", published in La Ley 2009-A, 1197.

104.   Argentine courts of law have upheld a request by a U.S. court to produce witness testimony in the terms of the relevant letter rogatory[73].

105.   In the light of the above, production of evidence in Argentina under a letter rogatory issued by a U.S. court could follow the rules regarding witness testimonies as specified in the letter rogatory.

106.   In conclusion, in any legal proceeding filed before the federal courts of Argentina, documentary evidence in the possession of the counterparty or witness testimonies are only allowed within the limited scope established in the CPCCN. On the other hand, if the proceedings are being heard outside of Argentina, pursuant to the provisions of The Hague Convention and the Inter-American Convention on Letters Rogatory, production of evidence in Argentina could -at least to a certain extent- follow the rules of the foreign court hearing the case.

107.   Thanks to modern technology, witness testimonies may be taken on a remote basis, even in the case of witnesses who are subject to criminal proceedings and have been incarcerated as a result.

108.   In those cases, the court hearing the case will resort to the Judicial Council's Information Technology Bureau ("*Dirección General de Tecnología del Consejo de la Magistratura*"), which – with the assistance of the criminal court that ordered the arrest and the Federal Penitentiary Service- will take steps to ensure that the witness can testify from prison. One recent instance in which this procedure was used was the bankruptcy proceeding of "HOPE FUNDS", now pending before the National Court of First Instance in Commercial Matters Nº 20, Clerk of Court Nº 59. In that case, at the request of the Court in Commercial Matters, the company's main shareholder, Mr. Enrique Juan Blaksley Señorans, testified from prison via video conference.

### D.   Response to Santiago's list of Argentine law issues

109.   In paragraph 26 of his report, Professor Santiago issued his opinion on some of the defenses submitted by Argentina.

110.   We disagree with Professor Santiago for the reasons explained below.

---

[73]   National Court of Appeals in Civil Matters, Panel I, February 24, 2000, "Garramone, Esteban L. y otro c. Solanet, Rodolfo y otro s/ exhorto".

### i.     Fourth and Fifteenth Defenses

111.   It should be noted that Professor Santiago's allegation in respect of Argentina's 4th and 15th defenses, in the sense that claimants were no longer YPF shareholders in 2014, and accordingly –in his opinion- "did not have a right to sue" and "could not prove the cause of damages", cannot be validly upheld if we bear in mind that claimants' rights accrued before that date.

112.   Is not logically possible to maintain at the same time that the plaintiffs ceased to be shareholders -and that is why they have no legitimacy to sue as they do- and simultaneously argue that because the plaintiffs are shareholders they must litigate before the courts of Argentina.

### ii.    Eleventh Defense

113.   This is one of the most dangerous theories of Argentine law –which is widespread among the courts of law. According to this theory, public order will always prevail over private law and agreements between individuals or entities.

114.   This is clearly shown by the "Claren" case referred to above.

115.   Also:

   i.     There is nothing in Law No. 26,741 –either express or that can be reasonably implied- regarding derogation of YPF's obligation to conduct a tender offer of shares and the resulting rights of YPF's minority shareholders.

   ii.    There is nothing express or implied in Law No. 26,741 to the effect that the tender offer mechanism is inapplicable in connection with the actions taken by Argentina based on the provisions of Law No. 26,741.

   iii.   If Congress had intended to derogate YPF's obligation to conduct a tender offer, or to declare it inapplicable to the case at hand, Congress should have stated that intention in clear, express terms, as they did in the instance highlighted by Professor Santiago when supporting Argentina's 14th defense by invoking CNV General Resolution Nº 622/13, where that possibility is contemplated.

   iv.    YPF's minority shareholders have a vested right for their shares to be the subject of a tender offer, in the terms of YPF's By-laws. That vested right is protected as a property right by Articles 14 and 17 of the Argentine

Constitution. Accordingly, under Argentine law, that right could only be expropriated by an Act of Congress, with due compensation.

v.    The provisions of Law No. 26,741 are not incompatible with the procedures established in Articles 7 and 28 of YPF's By-laws. The State's obligation to conduct a tender offer did not restrict or limit the federal State's power to expropriate the 51% of YPF's shares owned by Repsol, and Law No. 26,741 did not preclude the federal State from conducting a tender offer in respect of the remaining shares.

vi.    In the case at hand, claimants do not challenge expropriation of the 51% of YPF's shares owned by Repsol; rather, they just seek payment of a contractual obligation contemplated in YPF's By-laws and voluntarily incurred by the federal State and YPF.

### iii.    Fourteenth Defense

116.    The CNV Resolution No. 622/2013 referred to by Professor Santiago is irrelevant because it was issued in 2013, after the date of the takeover, which took place in 2012.

117.    At the time of the takeover, the legal provision in force was Decree No. 677/2001, which set an Optional Statutory Regimen of Compulsory Tender Offer. Under this Regime regulated by Resolution No. 401/2002 of the CNV, the tender offer was not binding in case of expropriation. Nevertheless, Article 24 of Decree 677/2001 provided that public companies could opt out from such Regime by means of an express decision of its shareholders meeting. YPF decided to opt out of such Regimen (see minutes of the shareholders' meeting held on April 9, 2003); therefore YPF in this respect continued to be ruled only by its own by-laws.

### VI.    CONCLUSIONS

118.    The Judiciary in Argentina is in the midst of a profound legitimacy crisis, and people simply do not trust the courts of law. Beyond any political partisanship, this legitimacy crisis was admitted by the highest judicial authority in Argentina, Chief Justice Carlos Rosenkrantz, early in 2019.

119.    As a result of the lack of independence of the federal courts, it is common in Argentina for legal cases of major economic relevance involving the federal state to be resolved in favor of the federal state.

120.   We disagree with Professor Alfonso Santiago's views on the operation of the Judiciary in Argentina, as stated in his report submitted in the context of the case at hand.

121.   Professor Santiago appears to have selected a tiny number of cases that cannot be regarded as representative of the Argentine judiciary's behavior where lawsuits against the State are involved and has failed to consider, among other issues: (a) the significant costs of litigating in Argentina; (b) the duration of judicial processes and (c) the old and chaotic status of judicial legislation in Argentina.

Under penalty of perjury, under the laws of the United States of America, pursuant to Section 1746 of Chapter 28 of the U.S.C., we declare that the foregoing is true and correct.

Executed on December 4, 2019.

Respectfully submitted,

_____          _____
**ALBERTO B. BIANCHI**                    **GUSTAVO NAVEIRA**