**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., <br><br>         Plaintiffs, <br><br>    - against - <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br>         Defendants. | Case Nos. <br> 1:15-cv-02739-LAP <br> 1:16-cv-08569-LAP |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., <br><br>         Plaintiffs, <br><br>    - against - <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br>         Defendants. | |

<u>**DECLARATION OF ALEJANDRO FREELAND**</u>

DECLARATION OF ALEJANDRO FREELAND

Pursuant to 28 U.S.C. § 1746 and Rule 44.1 of the Federal Rules of Civil Procedure, I, Alejandro Freeland, hereby declare as follows:

**Introduction**

1.      My name is Alejandro Freeland.  I am 54 years of age and a Professor of Criminal Law and Criminal Procedure at the School of Law of the University of Buenos Aires.  I also serve as a Professor of Law at the School of Law of Austral University, which is also located in Buenos Aires.  My expertise is in substantive criminal law and criminal procedure, and I have both written on and taught those subjects for over thirty years.  I also practice as a defense attorney and consultant on various criminal matters in Argentina.  I received my legal degree from the School of Law of the University of Buenos Aires.  I have also received a Master's Degree in Law from the School of Law of Austral University, a Certificate in European Union Law from the University of Navarra, and a Diploma in European Integration Studies from the Colegio de México.  I am also currently completing a Doctorate in Law at the Austral University with a focus on philosophical aspects of criminal law.  A copy of my *curriculum vitae* is attached to this declaration as Exhibit A.  Based on my education and professional experience, I consider myself an expert on matters related to Argentine criminal law and criminal procedure.

2.      This declaration is based on my expertise and education, my personal knowledge, and the filings in this Case, as well as Argentine government records and arbitral and court documents provided to me by counsel.  I have also reviewed relevant news reports to supplement my understanding of facts relevant to the subject matter of this declaration.  I will use the term "Plaintiffs" to refer to the Petersen Plaintiffs, though I have been retained by both the Petersen Plaintiffs and the Eton Park Plaintiffs to provide my opinions on the matters discussed below.

1

3.     I understand that the U.S. court in this matter (the "Court") previously found that Argentina had failed to show that its courts are an adequate forum for this Case based on the risk of the Government of Argentina ("Argentina") prosecuting Plaintiffs' counsel ("King & Spalding") and litigation financer ("Burford").  I also understand that Argentina and YPF S.A. ("YPF") (collectively, "Defendants") have claimed, principally through the testimony of the outgoing *Procurador del Tesoro de la Nación* (roughly translated, the Attorney General of the Treasury), Mr. Bernardo Saravia Frías, that this risk has now abated with the dismissal of a criminal complaint against King & Spalding and Burford, as well as several other individuals.

4.     As I will explain in this declaration, Plaintiffs and Burford, along with their representatives and other related parties, face a still more concrete risk of criminal prosecution than they did at the time of the filing of the complaint in this Case.  Mr. Saravia Frías' declaration does not discuss that Argentina has a current criminal investigation into YPF, Plaintiffs, Burford, and others based on Plaintiffs' purchases of shares in YPF and the funds allegedly used to consummate those transactions.  That investigation has its roots in criminal complaints filed by political figures against other political figures, suggesting that it rests heavily on political interests.  Moreover, as I will discuss below, this investigation has seen significant activity this year, just as this U.S. litigation has begun to accelerate in pace, indicating that the investigation is being pursued as a litigation tactic.  This activity includes the issuance, in February of this year, of a letter rogatory from the presiding Argentine criminal court seeking a large amount of information from the Spanish bankruptcy court handling Plaintiffs' bankruptcy, including Plaintiffs' contracts with Burford.  It also includes an opinion, dated May of this year, written by the prosecutor handling the investigation addressed to the Argentine criminal court that explains the scope of the investigation into Plaintiffs, Burford, Plaintiffs' owners, and others.

Given the national-level importance of matters related to YPF, I find it very difficult to believe that Argentine authorities at the highest level of government have been unaware of this active investigation.

5.      Instead of discussing this active and relevant investigation, Mr. Saravia Frías focuses exclusively on a now dismissed criminal complaint dealing with an entirely separate investigation.   That investigation concerned *Teinver et al. v. Argentina*, an international arbitration conducted against Argentina regarding the expropriation of two airlines, in which the claimants were different, but which also involved Burford and King & Spalding.  Nothing in the dismissal of the *Teinver* complaint prevents Argentina's new administration from continuing to pursue or bringing charges in relation to its current investigation, which is based on entirely different facts.

6.      Moreover, whatever assurances Mr. Saravia Frías or other Argentine officials may offer Plaintiffs, Burford, or the Court are undermined by the fact that the present administration will be out of power in a few days.  The new administration is of the same Peronist party that was in power during the initiation of the *Teinver* prosecution and will be free to pursue a similar approach with respect to this Case.

7.      In this declaration, I will discuss several topics exclusively from the perspective of my criminal law expertise.  First, I will provide an overview of the Argentine federal criminal justice system.  Second, I will describe the nature and consequences of the ongoing investigation into the Plaintiffs, Burford, Plaintiffs' owners, and other parties.   Third, I will discuss the criminal complaint identified by Mr. Saravia Frías and explain the context and limited significance of its dismissal.  Fourth, and finally, I will explain the risks arising from the current criminal investigation to affected parties.

## I.        The Argentine Criminal Justice System

8.        There are four ways in which a federal criminal investigation may be commenced in Argentina.  The first is *ex officio*—that is, a judge or a prosecutor receives notice of a potential crime and begins an investigation.   The second is through police initiated investigation or prevention of a crime.  The third is through the reporting of an offense by a victim who wishes to participate formally in the investigation and prosecution of the offense.  In this circumstance, the victim assumes an active role in the process as a *querellante* (a term similar to "complainant" in English) and effectively acts as a private prosecutor alongside the official prosecutor.  Finally, the fourth means is through a *denuncia*, a written or oral statement by an individual that is solely to give notice to the authorities of the potential commission of an offense.  It is important to recognize the scope of this pathway.  *Any* individual—victim or not—can file a *denuncia* regarding almost any offense.  In contrast to a *querellante*, the filer is not a party and does not play an active role in the investigation; after the *denuncia* is filed, his or her involvement is over. A prosecutor will ultimately have to make the decision whether to proceed with an investigation and charges, but the *denuncia* system allows individuals to present any number of allegations, regardless of their merit, as potentially criminal in nature.

9.        The *denuncia* system in Argentina is a frequently used procedure, as there are virtually no costs associated with filing a *denuncia*.  For example, any individual who reads in the newspaper about the commission of a potential offense, or even just a possibly suspicious set of facts, can file a *denuncia* simply citing to the news story.  Furthermore, it is not uncommon for legislators and other political figures to file *denuncia*s alleging criminal conduct on the part of a wide range of actors.  I would observe that though a prosecutor must make the decision whether to open an investigation based on a *denuncia*, that does not mean that an investigation is

either meritorious or not politically motivated.  As I will discuss below, the investigation into Plaintiffs and other parties related to this Case arose mainly through *denuncia*s that were filed by political figures demanding investigations into other political figures.  That is a strong indication that there are political implications to the investigation.

10.     As the above indicates, in contrast to the American system in which investigations are prosecutor driven and other legal systems in which investigations are judge driven, the Argentine federal system is mixed.  Judges serve within the Judicial Branch of government.  While prosecutors are affiliated with that Branch, rather than the Executive Branch, but maintain formal independence from the judiciary.  Prosecutors have responsibility for commencing investigations and providing proof of the alleged offense, while judges direct the investigation and ensure that the investigation comports with all legal guarantees.  This means that the judge will determine investigative steps and whether the investigation as a whole should advance or be discontinued.  But though investigations and prosecutions are housed in the Judicial Branch, that does not free them from political interference.  In fact, judges are susceptible to significant pressure from the Executive and Legislative Branches, something recognized by even the President of Argentina's highest court.  I will discuss this in greater detail in my closing section.

11.     Furthermore, though Argentina offers Mr. Saravia Frías as a witness regarding prosecutions and investigations carried out by Argentina, it is important to understand that government lawyers are organized differently in Argentina than in the United States.  Mr. Saravia Frías is the *Procurador del Tesoro*, which, as I noted above, translates roughly to the Attorney General for the Treasury.  In that role, Mr. Saravia Frías serves as Argentina's chief government attorney as member of the Executive Branch under the President and supervises government attorneys in any case where Argentina is a party either as a plaintiff or a defendant.

It follows, then, that Mr. Saravia Frías is Argentina's chief lawyer in this very Case.  However, Mr. Saravia Frías is not a *criminal* prosecutor nor does he have any authority over criminal matters.  That power rests with the *Procurador General de la Nación*, which translates to the Attorney General for the Nation.  The Attorney General for the Nation heads the federal Prosecutor's Office which is separate from the Executive Branch of which Mr. Saravia Frías forms part.  Mr. Saravia Frías has no authority over federal prosecutors and, it goes without saying, over federal judges.  In effect, Mr. Saravia Frías's declaration amounts to Argentina's chief lawyer in this Case offering a statement about what Argentina will do in criminal investigations over which he has no authority.

12.     Before turning to the main substance of my declaration, I wish to remark on a smaller point of Argentine law that is relevant to this Case.  As in the United States,  Argentina protects an individual's right against self-incrimination (*nemo tenetur seipsum accusare*).  That right permits individuals to refrain from making compelled statements that would expose them to criminal liability or punishment.  This right applies in any official proceeding, civil or criminal, domestic or foreign.  Thus, for example, an individual who is compelled to testify and/or provide documents in this Case by an Argentine court (acting on a request by this Court) may refuse to do so if that testimony or provision of documents would incriminate him or her.

13.     I only note this doctrine in response to Argentina's statements that many of its potential witnesses, such as Julio de Vido, are incarcerated or unavailable for travel due to ongoing criminal proceedings.  In Argentina, incarcerated individuals routinely give testimony, and can do so either in a formal courtroom setting or from an incarcerated setting through videoconferencing or other methods.  In a civil case such as this, testimony from an incarcerated individual would be obtained through application to the appropriate civil court.  However,

though the means of obtaining such testimony are well-established, the individuals identified by Argentina would have a strong incentive to exercise their right against self-incrimination if their testimony would create criminal liability for them. Given that Argentina has predicated much of its defense in this American Case on the notion that some fraud has been committed with respect to Plaintiffs' purchase of YPF shares, it is unclear to me that these individuals would be willing to testify.

## II.     The Investigation into YPF, Plaintiffs, Burford, and Others

14.     Though there is no mention of it in Defendants' present motion and supporting declarations, including Mr. Saravia Frías' declaration, Argentina is currently investigating Plaintiffs' purchase of a stake in YPF, other matters related to that transaction, and the litigation of this Case as part of a nearly 14 year investigation into YPF. As I will explain in detail below, this investigation commenced with and has changed scope and substance mainly through *denuncia*s filed by political figures against other political figures. Despite the length of this investigation, no one has been formally prosecuted in connection with it. However, there are good reasons to think that this investigation can be used to pressure and threaten Plaintiffs, Burford, Plaintiffs' Spanish bankruptcy receiver, and other affiliates, associates, and related parties. And, though I am not privy to all the details of the investigation, an open investigation necessarily presents a risk of prosecution.

15.     For the Court's benefit, I observe that much of the background of this investigation is summarized in a February 2019 letter rogatory issued by the Argentine judge presiding over the criminal investigation, Ariel Lijo, to the Spanish bankruptcy court handling Plaintiffs' bankruptcies. That letter was received by the Spanish court in September 2019. That letter rogatory is attached to this declaration as Exhibit B.

16.     The investigation has its roots in a *denuncia* filed in March 2006 by two well-known members of the Argentine Congress, Elisa Carrió and Fabiana Ríos.[1]  In that *denuncia*, Ms. Carrió and Ms. Ríos alleged that the then Secretary of Energy had committed various violations of law related to the reporting of technical information by several oil companies, including YPF (then known as Repsol YPF).  While the judge assigned to the *denuncia* took the initial position that no criminal conduct had occurred, he nonetheless ordered the production of documents regarding YPF's oil production, value, and other matters.[2]  It bears noting that these allegations have nothing to do with the issues in this Case.

17.     The investigation remained open and on April 12, 2012, Ms. Carrió filed an additional *denuncia*.[3]  This time, Ms. Carrió alleged that a fraudulent scheme was underway at YPF, consisting of the "emptying" of the company, "predatory behavior" with respect to the company's oil and gas reserves, and the manipulation of the company's share value through financial runs.[4]  Just several days later, on April 17, 2012, Ms. Carrió filed an additional *denuncia*.[5]  This *denuncia* sought the investigation of multiple public officials involved in the expropriation of the majority of Repsol's stake in YPF, including the then President, and now Vice President elect, Cristina Fernández de Kirchner, Julio de Vido (the former Head of the Ministry of Federal Planning, Public Investment, and Services), and Axel Kiciloff (the former Vice Minister of Economy and the newly elected Governor of the Province of Buenos Aires,

---

[1] Ex. B at 8.

[2] *See* Judge Ariel Lijo, *Communication Regarding Transparency in Ongoing Court Cases* at 3 (Nov. 1, 2017) [hereinafter "*Communication Regarding Transparency in Ongoing Court Cases*"], *available at* https://cij.gov.ar/d/doc-21165.pdf.  A true and correct copy of the relevant section of this document is attached to this declaration as Exhibit D.

[3] *See Communication Regarding Transparency in Ongoing Court Cases* at 3-4; *see also* LM Neuquen, *Un clásico: Carrió denunció al directorio de Repsol-YPF por vaciamiento* (Apr. 13, 2012), *available at* https://www.lmneuquen.com/un-clasico-carrio-denuncio-al-directorio-repsol-ypf-vaciamiento-n143835.

[4] A copy of this *denuncia* is available online at: https://es.slideshare.net/lnsincensura/ampliacin-denuncia-ante-el-juez-lijo-1342012.

[5] *See Communication Regarding Transparency in Ongoing Court Cases* at 3-4.

among Argentina's largest).[6]   Again, it is notable that these *denuncia*s were filed by political figures against other political figures.

18.     From 2012 until 2014, a number of additional *denuncia*s were filed alleging a range of frauds related to YPF's management, Argentina's expropriation, and Argentina's settlement agreement with Repsol.[7]   For example, one such allegation was that public funds embezzled from Santa Cruz province by the late Nestor Kirchner—Vice President-elect Kirchner's husband, who served as Governor of that Province and later as President, prior to his wife.[8]   Though these allegations had been dismissed by the Argentine courts, they reemerged in the YPF investigation.[9]   In my view, this evidences that the *denuncia*s and the resultant investigation were intended for political purposes, rather than the legitimate investigation of an actual criminal offense.

19.     Ultimately, as the letter rogatory indicates, these various *denuncia*s were eventually gathered into a single investigation supervised by Ariel Lijo, a judge of the Criminal and Correctional Federal Court No. 4.   Despite its long-running nature, the investigation has remained pending.   Moreover, the investigation has increased in activity just as the instant Case has moved forward.

20.     In fact, three events from this very year demonstrate that the investigation is active and being driven by Defendants' concerns about this U.S. litigation.   *First*, as noted above, in February 2019, Judge Lijo authorized the issuance of the 53-page letter rogatory, through Argentina's Ministry of Foreign Affairs, to the Spanish bankruptcy court responsible for

---

[6] *See* Urgente 24, *Carrió amplió su denuncia contra Cristina por YPF* (Apr. 18, 2012), *available at* https://archivo.urgente24.com/197947-carrio-amplio-su-denuncia-contra-cristina-por-ypf (reporting on the *denuncia* and including a copy of its text).
[7] *See Communication Regarding Transparency in Ongoing Court Cases* at 4.
[8] *See* Ex. B at 34.
[9] *See* M. Arias, *La Justicia confirmó el cierre de la causa por los fondos de Santa Cruz*, La Nacion (June 21, 2008), *available at* https://www.lanacion.com.ar/politica/la-justicia-confirmo-el-cierre-de-la-causa-por-los-fondos-de-santa-cruz-nid1023483. '

Plaintiffs' ongoing bankruptcy proceedings.  Among the documents sought by Judge Lijo are all of Plaintiffs' financial information; all information related to Plaintiffs' property holdings; and, most critically for present purposes, all information related to Plaintiffs' interest in the present Case or any agreements that relate to litigation interests in the Case.[10]  The letter rogatory leaves little doubt that it is in support of a criminal investigation, as Judge Lijo writes that "[f]rom the investigation of the case to which I refer, it appears that the following offenses defined in the National Penal Code might be applicable," before listing multiple criminal offenses.[11]

21.     The letter rogatory also indicates this investigation directly touches on this Case. Judge Lijo has requested, "in particular," "any information related to the assignment of litigation rights or agreements entered into by the business group or, consequentially, your bankruptcy administrator once the proceeding is commenced, in lawsuits that the debtors and/or the business group have against the Republic of Argentina and YPF S.A. in the United States District Court for the Southern District of New York.  Accordingly, you should also indicate who the obligees in the lawsuits filed in the aforementioned Court are."[12]  Indeed, the letter discusses this specific Case by name, identifying Your Honor and this Court.[13]  And the prosecutor's opinion attached to the letter rogatory describes this Case as "the fraudulent lawsuit being heard in the New York Court."[14]

22.     *Second*, Argentina's ongoing investigation into Plaintiffs, Burford, and others is reflected in its filing of a civil complaint before the Spanish courts.  On February 27, 2019, Argentina and YPF filed two separate, but identical, complaints against Plaintiffs in two different Spanish civil courts.  In their complaints, Defendants allege that Burford and the Eskenazi family

---

[10] *See* Ex. B at 10-11.
[11] Ex. B at 8-10.
[12] Ex. B at 11-12.
[13] Ex. B at 7-8.
[14] Ex. B at 40.

(Plaintiffs' owners) committed fraud by entering into the litigation funding agreement that supports King & Spalding's efforts in this case. They claim that instead of treating the funding agreement as a sale of rights—which, in their view, would have entitled Argentina to make an offer to purchase the putative rights—Burford and the Eskenazis instead "simulated" a funding agreement which prevented Argentina from exercising its rights. This "simulation," Defendants allege, constitutes a fraud against public administration. Argentina and YPF's claims before the Spanish civil courts further reflect Argentina's view that a fraud has been committed.[15]

23.     *Third*, on March 1, 2019, an Argentine private practice lawyer named Alejandro Sánchez Kalbermatten filed a *denuncia* alleging criminal conduct on the part of the Eskenazis and other participants in the Petersen-Repsol transaction. This *denuncia* was included in a filing in Plaintiffs' Spanish bankruptcy proceedings and is attached to this declaration as Exhibit C.

24.     Mr. Sánchez  Kalbermatten's *denuncia* echoes the allegations of fraud made in Argentina's February 27, 2019 civil filings in the Spanish court proceeding. Notably, the sole evidence cited in the *denuncia* to support these allegations of fraud is a news article. That article appeared in La Nación newspaper on February 28, 2019—the day before the *denuncia* was filed—and simply restated the allegations made the previous day by Defendants in their Spanish court filings. Reviewing the timing, language, and context of the Spanish court filings, the subsequent newspaper article, and then Mr. Sánchez  Kalbermatten's *denuncia*, I find it difficult to believe that they are not coordinated or connected.

25.     Of particular importance for this Court is that Mr. Sánchez  Kalbermatten's *denuncia* claims that the allegations of fraud are criminal in nature and directly names individuals associated with the present Case as implicated in those crimes. Specifically, the

---

[15] I understand from counsel that the Spanish civil courts have denied jurisdiction (though Defendants are appealing those decisions).

*denuncia* states that the Eskenazi family and "those who, over the course of the investigation, are found to be responsible for the commission of the acts which will be outlined below" were participants in "crimes of fraud against the National State and against the shareholders of YPF S.A."[16] Notably, the *denuncia* repeatedly identifies Burford as a counterparty to the purportedly illicit agreement.

26. A filing from Plaintiffs' Spanish bankruptcy proceeding, attached to this declaration as Exhibit C, shows that Mr. Sánchez Kalbermatten's *denuncia* was forwarded to Judge Lijo, who then asked the prosecutor responsible for the investigation into YPF and Plaintiffs, Ramiro González, to determine whether the allegations merited an investigation or not. In a written opinion dated May 21, 2019, Mr. González reviewed Mr. Sánchez Kalbermatten's allegations and concluded that they were already encompassed by the ongoing investigation.

27. Based on the documents I have reviewed, it is my professional opinion that Argentina has been investigating Plaintiffs, Burford, Plaintiffs' owners (the Eskenazi family), Plaintiffs' Spanish bankruptcy receiver, and perhaps other parties in connection with this litigation and the underlying funding agreement for at least many months, if not years.

28. I observe that Mr. Saravia Frías should have been aware of this investigation. As I explained above, Mr. Saravia Frías has no authority with respect to criminal prosecutors or judges, as he is part of the Executive, rather than Judicial, Branch. However, the federal Anticorruption Office, an agency of the Executive Branch, has intervened in Judge Lijo's investigation as a *querellante* (or private prosecutor) since October 2018.[17] This status as a

---

[16] Ex. C at 11.
[17] *See* D. Santoro, *Maniobras con la petrolera estatal - El juez espera que haya arrepentidos en la causa por la reestatización de YPF*, El Clarín (Oct. 25, 2018), *available at* https://www.clarin.com/politica/juez-espera-arrepentidos-causa-reestatizacion-ypf_0_hP3_eryny.html.

*querellante* gives the Anticorruption Office, and Mr. Saravia Frías (as member of the Executive Branch and Chief Counsel responsible for that Branch's attorneys), access to the investigation file and knowledge of any material developments.   Though I cannot speak to Mr. Saravia Frías' knowledge, I would be surprised if he had not followed the investigation into Plaintiffs, Burford, the Eskenazis, and others, particularly given his role as Argentina's chief counsel in this U.S. litigation and his submission of a declaration.   I would also observe that YPF has also been acting as a *querellante* in Judge Lijo's investigation since October 2018.[18]

### III.   The *Teinver* Investigation and Proceedings

29.   Mr. Saravia Frías does not mention this above referenced federal criminal investigation in his declaration.   Rather, without reference to the relevant details, he focuses on another investigation that is now concluded.   Indeed, his sole reference to the nature of that now terminated investigation comes in a single footnote, in which he acknowledges that the closed investigation was "in connection with an international arbitration proceeding that is unrelated to this matter."[19]   I have reviewed the relevant information regarding that investigation and believe a description of it and its context may prove useful to the Court.

30.   The investigation has its roots in an arbitration, the relevant documents of which are publicly available online.[20]   In December 2008, Argentina expropriated two privately owned airlines.   That same month, the Spanish companies which owned the airlines filed a request for arbitration with the International Center for the Settlement of Investment Disputes ("ICSID") challenging the legality of Argentina's expropriation under the terms of the Spain-Argentina Bilateral Investment Treaty.   As the Spanish companies had entered into bankruptcy proceedings

---

[18] *See* D. Santoro, *Maniobras con la petrolera estatal - El juez espera que haya arrepentidos en la causa por la reestatización de YPF*, El Clarín (Oct. 25, 2018), *available at* https://www.clarin.com/politica/juez-espera-arrepentidos-causa-reestatizacion-ypf_0_hP3_eryny.html.
[19] Decl. of B. Saravia Frías ¶ 13 n.1.
[20] They are located at this website: https://www.italaw.com/cases/1648.

following Argentina's expropriation, the bankruptcy receivers for those companies authorized litigation financing from Burford to pursue the arbitration against Argentina. King & Spalding served as those companies' counsel during the arbitration.

31.     As the publicly available decisions in the arbitration indicate, Argentina carried out a variety of measures to undermine the claimants' efforts to pursue their claims.[21] Relevant to the present Case, however, is Argentina's pursuit of a criminal complaint against the claimants, their owners, the involved bankruptcy trustees, King & Spalding, and Burford, specifically targeting individuals associated with these entities.

32.     In February 2015, during the litigation of the arbitration, Argentina, through the *Procuraduría de Criminalidad Económica y Lavado de Activos* (*PROCELAC*, an agency responsible for economic crimes and money laundering under the *Procurador General de la Nación*) filed a *denuncia* alleging that the aforementioned individuals had committed fraud by arranging litigation funding to pursue the arbitration and failing to obtain proper powers of attorney to represent the claimants. *PROCELAC* accused a wide number of individuals—including junior associates, paralegals, and legal assistants—of fraud and, in the case of Argentine nationals, economic treason under Law No. 14,034, a decades-old statute prohibiting Argentine citizens from seeking economic or political sanctions against Argentina and carrying a possible sentence of up to 25 years' imprisonment (the "Economic Treason Law").[22]

33.     The details of Argentina's criminal investigation of the claimants, their bankruptcy trustees, King & Spalding, and Burford were discussed at length by the arbitral

---

[21] *See Teinver S.A. et al. v. The Argentine Republic*, ICSID Case No. ARB/09/01, *available at* https://www.italaw.com/cases/1648.

[22] The Economic Treason Law states: "Any Argentine who by any means promotes the imposition of political or economic sanctions against the Argentine State shall be punished by imprisonment of from five to twenty-five years." A copy of Law No. 14,034 is attached to this declaration as Exhibit E.

tribunal in its April 2016 Decision on Provisional Measures.[23]   In that Decision, the tribunal ordered Argentina to "refrain from publicizing the [Criminal] Complaints or the criminal investigation and any relation they may have to this arbitration, whether by communications to the press or otherwise," as Argentina had utilized the criminal allegations as means of discrediting the arbitration and its litigation.[24]

34.     The arbitral tribunal ultimately rejected all of Argentina's allegations of fraud in an exhaustive July 2017 Award nearly 400-pages long, with over 60 pages devoted to Argentina's various allegations of fraud.[25]   In particular, the tribunal dismissed Argentina's claims that the litigation funding agreement was unlawful and that King & Spalding and Burford had failed to procure authorization from the claimants to proceed with the arbitration.

35.     This context is important to keep in mind when reviewing Mr. Saravia Frías' declaration.  Mr. Saravia Frías observes in his declaration that the criminal complaint accusing King & Spalding, Burford, and the bankruptcy receivers of fraud and economic treason in connection with the *Teinver* arbitration was dismissed following this Court's September 2016 order denying Argentina and YPF's motions to dismiss.  But there are other key considerations.

36.     To begin, the *Teinver* criminal complaint was dismissed in September 2017, only after the arbitral tribunal had issued its final Award.  Indeed, the order dismissing the complaint (attached as Exhibit A to Mr. Saravia Frías' declaration) states that "the Public Prosecutor referred to a series of considerations made by the Arbitral Tribunal . . . in particular, the objections raised by the Argentine State in the arbitration proceeding," and then quotes at length from the tribunal's Award.  Indeed, until Argentina lost before the arbitral tribunal, it made no

---

[23] *See Teinver S.A. et al. v. The Argentine Republic*, ICSID Case No. ARB/09/01, Decision on Provisional Measures, *available at* https://www.italaw.com/sites/default/files/case-documents/italaw7209.pdf.
[24] *See* Página 12, *A tale of vultures and crows* (Apr. 12, 2015).
[25] *See Teinver S.A. et al. v. The Argentine Republic*, ICSID Case No. ARB/09/01, Award, *available at* https://www.italaw.com/sites/default/files/case-documents/italaw9235.pdf.

effort to dismiss the investigation against the claimants, Burford, King & Spalding, and others. The timing of the dismissal after the Award and the reasons for that dismissal suggest that Argentina's efforts at criminal investigation were done as a litigation tactic. This tactic commenced under the previous Peronist administration, but continued for years under the Macri administration of which Mr. Saravia Frías forms part.

37.     In addition, the subject matter of the *Teinver* investigation is entirely different from the issues raised by the present Case. What overlap there is comes from the presence of Burford and King & Spalding in both matters. As I have explained above, there is an active federal criminal investigation into YPF, Plaintiffs, Burford, and others that directly relates to the issues in this Case, an investigation which Mr. Saravia Frías does not discuss at all in his declaration.

38.     Ultimately, then, nothing prevents Argentina from pursuing charges against Plaintiffs, Burford, King & Spalding, the Spanish bankruptcy receiver, or others based on that active investigation. Though Burford and King & Spalding were defendants in the *Teinver* investigation, Plaintiffs and their Spanish bankruptcy receiver were not and, moreover, the facts at issue are clearly different. As a result, whatever protections Argentine law offers against a renewed investigation and potential prosecution—such as "double jeopardy"—are absent. Accordingly, as I explain in the next section, I believe that there is a significant risk that Argentina can and will use criminal prosecution as a tool to obtain leverage in this litigation.

## IV.     The Implications and Risks of the Investigations

39.     As my discussion above demonstrates, the ongoing investigation into YPF, Plaintiffs' purchase of YPF stock, and the litigation of this Case is different in scope and subject matter from the *Teinver* investigation. With this investigation in place, and perhaps others, of

which I am unaware, Argentina remains empowered to harass Plaintiffs, Burford, counsel, and other individuals related to this Case such as the Spanish bankruptcy receiver for the Plaintiffs, members of the Eskenazi family, and other witnesses. Nothing in Argentine law prevents the Government from pursuing these individuals, and Mr. Saravia Frías has not given, and cannot give, any credible assurance that such pursuit will not follow in the future.

40.     As a result of all these considerations, I believe that there is a serious risk that Argentina can and will use its ongoing criminal investigation to gain leverage in this Case. Such an investigation would provide Argentina with pretextual grounds to harass individuals involved in this Case.

41.     A lengthy investigation of this kind leaves defendants at the mercy of prosecutors and judges for years on end.[26] In addition, the public is left uncertain regarding the veracity of the allegations or the disposition of criminal charges; an unfinished investigation means that no one knows what really occurred. The underlying investigation of YPF here is representative.[27] The investigation commenced in the mid-2000s based on *denuncias* filed by political actors and has persisted for a decade and a half, repeatedly changing its focus and scope over that period. But despite its length, this investigation has resulted in no formal charges against any individuals.

42.     Apart from the issue of delay, there are also significant concerns about the judicial system itself. As I noted above, though the Judicial Branch is technically independent from the Executive and Legislative Branches, it is subject to significant political pressure from those elected Branches. The problem is severe enough that the President of Argentina's National Supreme Court, Carlos Rosenkrantz, made the legitimacy crisis plaguing the Argentine judicial

---

[26] *See In re Angel Mattei*, Corte Suprema de Justicia de la Nación (Fallos 272:188, ¶ 14) (Nov. 29, 1968).
[27] *See Communication Regarding Transparency in Ongoing Court Cases* at 3-4.

system one of the key issues in his speech to the start the 2019 judicial term.  As Chief Justice Rosenkrantz explained, the Argentine public do not see judges as public servants who adjudicate disputes in an impartial way; rather, they see them as serving interests other than law and justice. One portion of his speech is particularly noteworthy: "*The legitimacy crisis is in large part a crisis of confidence.  Argentines are losing confidence in the Judicial Power.  There are doubts that we act as true judges of a democratic republic.  The solution requires, then, that we reverse that perception and for that, judges must show, all of them and every day, that we really are judges in a democratic republic.*"[28]  The concerns that Justice Rosenkrantz discussed apply both to civil claims—and would thus impact Plaintiffs if they were forced to pursue their claims to monetary relief in Argentina—and criminal investigations and prosecutions.

## Conclusion

43.     In light of the above, it is my professional opinion that there is an active investigation of Plaintiffs, Burford, Plaintiffs' Spanish bankruptcy receiver, and potentially others.  It is also my professional opinion that this investigation poses a serious risk to the liberty and the safety of these individuals if they were required to litigate this Case in Argentina.

---

[28] *See Acto de apertura del año judicial 2019* (Mar. 19, 2019), *available at* https://www.cij.gov.ar/nota-33769-Acto-de-apertura-del-a-o-judicial-2019.html.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on Dec. 4, 2019

_____
Alejandro Freeland