UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U.,<br><br>                Plaintiffs,<br><br>  - against -<br><br>ARGENTINE REPUBLIC and YPF S.A.,<br><br>                Defendants. | Case Nos.<br><br>1:15-cv-02739-LAP<br>1:16-cv-08569-LAP |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P.,<br><br>                Plaintiffs,<br><br>  - against -<br><br>ARGENTINE REPUBLIC and YPF S.A.,<br><br>                Defendants. | |

**DECLARATION OF DR. ALFREDO L. ROVIRA**

# DECLARATION OF DR. ALFREDO L. ROVIRA

Pursuant to 28 U.S.C. § 1746, I, Alfredo L. Rovira, declare as follows:

1. I have prepared this declaration at the request of counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U. (collectively, "Petersen"), Eton Park Capital Management L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.

## I.  BACKGROUND AND EXPERTISE

2. I hold a PhD (*Doctor en Derecho*) degree from the national University of Buenos Aires, School of Law (*Universidad de Buenos Aires*, hereinafter "UBA"), and I am an active legal practitioner as a lawyer, arbitrator, expert witness and Chair Professor of Law. I also serve as a Consultant Professor of business law at the UBA's School of Law as well as at other private universities' law schools in Argentina. Further, I am author and co-author of various books and papers published in specialized legal publications on Argentine law, most of them on corporate and contract laws.

3. I obtained a law degree from the UBA's School of Laws in 1967 and was admitted to practice in 1968; since then, I have practiced Argentine law as legal counsel, academic and professor of law for more than 50 years. Most of my legal practice was carried on at Brons & Salas, a law firm with principal office in Buenos Aires, Argentina advising domestic and international clients. I served as the firm's Managing Partner for approximately 20 years, in addition to chairing the firm's corporate legal department and leading the arbitration practice at such firm for more than 30 years until my retirement from the firm in 2013. Currently, I continue with my legal practice at my own firm, mostly as consultant to law firms and companies' in-house legal departments, as arbitrator or litigator in complex litigations and arbitrations and as expert witness.

4. Based upon my professional and academic credentials, I consider myself qualified to act as an expert on business law matters, specifically corporate and contract laws. The foregoing implies a deep knowledge of the Argentine Commercial Code (hereinafter "the Commercial Code"), the Argentine Civil Code (hereinafter "the Civil Code") and their respective supplementary legislations and, currently, of the Civil and Commercial Code of the Nation (*Código Civil y Comercial de la Nación*), hereinafter the "Unified Code", which entered into force on August 1, 2015.[1] As an attorney with active professional activity in the courts at the City of Buenos Aires, Argentina, I do have extensive experience and knowledge of the Civil and Commercial Code of Procedures of the Nation (*Código Procesal Civil y Comercial de la Nación*), hereinafter the "Code of Procedure". As Chair Professor at the UBA's School of Law, I currently teach an undergraduate course on Business Contracts (*Contratación Mercantil*) and post graduate and LL.M. courses on corporate laws at the UBA's School of Law, as well as at the School of Law of the *Pontificia Universidad Católica Argentina*.

---

[1] The enforcement date was set by Law 27,077 of December 19, 2014 which replaced the original text of Art. 7 of Law 26,994 establishing that the Unified Code will become into force as of August 1, 2015.

1

5. As an academic, I studied and wrote on various legal matters that are required to give an opinion in this declaration. While an updated *curriculum vitae* is attached hereto as Exhibit A, which describes my professional, teaching and academic experience, I highlight that I served as Co-Vice Chair of the Corporate Governance Committee and, currently, I am the Co- Chair of the International Litigation Sub Committee, Business and Corporate Litigation Committee, both of the American Bar Association, Business Law Section.

6. I previously submitted a declaration in support of Petersen's opposition to Defendants' motions to dismiss in this case. ECF No. 46.

## II.  SUMMARY OF OPINIONS

7. I have reviewed the declarations of Professors Guillermo Cabanellas and Rafael M. Manóvil in support of Defendants' renewed motion to dismiss on the basis of *forum non conveniens*. In summary, I believe that Professors Cabanellas and Manóvil misstate basic principles of Argentine civil law. Specifically:

    a. No provision of Argentine law provides for "exclusive jurisdiction" in the Argentine courts — *i.e.*, attempts to *divest* a foreign court (like the U.S. federal district court presiding over this case) of jurisdiction — over contractual civil liability claims. To the contrary, Argentine law expressly provides that the jurisdiction of Argentine courts over contractual disputes such as this one is permissive, not exclusive of jurisdiction by foreign courts. Article 1216 of the Civil Code, which was in effect when the breach took place in April 2012, provides: "*If the debtor is domiciled or resides in the Republic and the contract must be performed abroad the creditor may sue him before the courts of the debtor's domicile or before the courts of the place where the contract must be performed, even though debtor does not reside therein.*" That provision, which is carried forward in Article 2650 of the Unified Code — that came into force in 2015 — is consistent with jurisdiction in this court because performance of the tender obligation was due in New York. *See infra* § IV.

    b. Plaintiffs' lawsuit in this case raises a proper claim for breach of contract under Argentine law. There is no doubt that YPF's bylaws are a valid contract under Argentine law, and Professors Cabanellas and Manóvil do not dispute that point. Under Argentine law, a breach of the obligations of a contract gives rise to a claim for damages, and there is no exception to that rule for corporate bylaws, despite the fact that the Argentine Companies Law (hereinafter "ACL") contemplates specific remedies for certain specific breaches to the corporate bylaws, laws and regulations thereto. Plaintiffs' lawsuit in this case addresses an issue governed by the general principles of civil liability, both under the abrogated Civil Code and the current Unified Code. Section 889 of the Civil Code states that any time a contractual obligation is not performed by fault of the obligated party, the obligation is converted into an obligation to pay damages and interest. The same principle is carried forward into Article 955 of the Unified Code. Nothing in the ACL or Capital Markets Law 26,831 (and prior to Law 26,831 entering into force, Decree 677/2001) contradicts or overrides that core principle, because they do not preclude the operation of ordinary contract and civil liability law for breach of contract. *See infra* § V.

    c. It is inappropriate to rely on the Code of Procedure, the ACL, or the Capital Markets Law to determine jurisdiction in this case. Neither the ACL nor the Capital Markets Law speaks to foreign courts' jurisdiction. Defendants rely on Article 5(11) of the Code of Procedure. As a general matter, the Code of Procedure governs the competence of courts *within* the Argentine judicial system with respect to cases that are brought before the National Courts of the City of Buenos Aires or Federal Courts located in any provincial jurisdiction or the Federal District (*i.e.*, the city of Buenos Aires). Thus, Article 5 of the Code of Procedure does not apply to this case. In addition, Article 5(11) of the Code of Procedure would not govern this case because it relates only to "actions arising out of corporate relationships." That phrase does not include all contractual disputes relating to a corporation; it more narrowly relates to lawsuits that deal with internal matters of a corporation. As stated by Professor Manóvil, only actions provided by the ACL, such as a claim for nullity of shareholders' or other corporate bodies' resolutions, are governed by the ACL. This case does not fall into that category. Rather, the claim is a straightforward civil liability claim for breach of contract by former shareholders of YPF, such as Plaintiffs, against a current shareholder (*i.e.*, Argentina) and against YPF for its failure to enforce relevant provisions of the bylaws and for the damages caused by that failure. *See infra* § VI.

    d. Argentine law explicitly recognizes concurrent obligations that could hold YPF jointly and severally liable with Argentina for its misconduct (or non-conduct) in failing to enforce the bylaws' tender-offer obligation. In addition, Argentine law effectively recognizes anticipatory contract breaches. A contract breach is complete whenever it takes place, including if it is announced prior to the time of performance. *See infra* § VII.

### III. OVERVIEW OF SOURCES OF ARGENTINE LAW

**8.** Plaintiffs' claims concern conduct that took place in and before 2012. *See* ECF No. 63, at 1-7. The laws in force at that time were set forth in the Civil Code[2] and the Commercial Code[3], supplemented at times by specialized legislation such as the ACL or Argentine Capital Markets Laws.[4] Current Argentine law is set forth in the new Unified Code, which was adopted and took effect on August 1, 2015.[5] Though, generally, it may be stated that the Unified Code does not formally apply to the claims at issue in this case,[6] in many cases the Unified Code merely ratified or confirmed features of Argentine law under the Civil Code and the Commercial Code

---

[2] Law 340 of 1869 adopted the Civil Code.

[3] Law 2637 of 1889 adopted the Commercial Code.

[4] Laws 19,550, Decree 677/2001. Law 26,831 replaced Decree 677/2001 in December 2012.

[5] Law 26,994 adopted the "Unified" Civil and Commercial Code in force today. It became effective August 1, 2015.

[6] Section 7 of the Unified Code provides that, on taking effect, the Unified Code "*appl[ies] to the consequences of the relations and juridical situations existing at that time.*" Scholars interpret that language to mean that the meaning of contracts and other agreements consummated *prior* to the effective date of the Unified Code should be assessed under the earlier Commercial Code and the Civil Code. Hence, acts and facts not consummated as of July 31, 2015 are governed by the Unified Code.

that were settled as a matter of doctrine or case law.  Further, the Unified Code may be useful in determining the extent of Plaintiffs' damages.

9.  Article 150 of the Unified Code sets forth a general interpretive principle that is useful in applying Argentine law in this case.  In relevant part, it states that, "*Private juridical persons [e.g., companies] which are organized in the Republic are governed . . . by the mandatory norms of the special law or, in default thereof, by this Code*."  In other words, while specialized laws such as the ACL *can* apply to companies when their terms so specify, in the absence of any express applications, those specialized laws must be applied "in a reasoned and integrated manner jointly with the general scheme of the Civil Code [and, eventually, of the Unified Code]."[7]

10. *Limitations* in the specialized legislation are particularly narrowly interpreted, in favor of the more permissive rules in the general codes.  As explained below, provisions of both the prior Civil Code and of the new Unified Code impose a general duty not to cause unjustified damage to another and provide that contract breaches can be converted into an entitlement for civil liability.  *See generally* Civil Code Article 889; Unified Code Articles 944, 1710, 1716.  That permissive entitlement to sue for compensation stems from Article 19 of Argentina's National Constitution (hereinafter the "National Constitution"), which broadly provides that all actions not prohibited by any law are permitted.[8]

11. In addition, the implications of the general Argentine codes *on jurisdiction* are quite limited.  In this regard, I agree with Professor Cabanellas that the Unified Code, like its predecessor the Civil Code, "determines the limits *of Argentine jurisdiction* in the international context."  Cabanellas Decl. ¶ 4.  That is, as Professor Cabanellas says, the Civil Code addresses the jurisdiction of Argentine courts, not foreign courts.

### IV.  ARGENTINE CIVIL LAW EXPRESSLY PERMITS JURISDICTION OF FOREIGN COURTS OVER CONTRACTUAL CIVIL LIABILITY CLAIMS

12. Argentine law does not purport to determine U.S. courts' (or any foreign court's) jurisdiction.[9] This issue becomes clear in reading the Unified Code which, as opposed to the Civil Code,

---

[7]CABULI, Ezequiel, *La responsabilidad civil en las sociedades comerciales,* ponencia publicada en el V Congreso Iberoamericano de Derecho Societario y de la Empresa (San Miguel de Tucumán, 2004).

[8]**Article 19 of the National Constitution:**  "People's private acts which in no way offend the public policy or morals nor prejudice third parties are only reserved to God and exempted from the judiciary's authority.  No *inhabitant of the Nation shall be obligated to do what the law does not mandate nor deprived from what the law* does not prohibit".  *("Las acciones privadas de los hombres que de ningún modo ofendan al orden y a la moral pública, ni perjudiquen a un tercero, están sólo reservadas a Dios, y exentas de la autoridad de los magistrados. Ningún habitante de la Nación será obligado a hacer lo que no manda la ley, ni privado de lo que ella no prohíbe").*

[9]UZAL, Maria E., *Derecho internacional privado*, La Ley, Buenos Aires, 2016, pages 199/203.  This Professor of International Private Law of the School of Law of the National University of Buenos Aires and member of the National Chamber of Appeals on Commercial Matters clarified: "Although many times in international private law the words "jurisdiction" and "competence" are used in a confusing way, when we hereby refer to international jurisdiction we refer to the courts' power of a given country to hear a controversy which is submitted to it and also to a foreign court's power to issue a judgment so that it may be recognized or be available for exequatur in other country" *("Si bien muchas veces se usan de manera confusa en derecho internacional privado los vocablos jurisdicción y competencia, cuando aquí nos referimos a la jurisdicción internacional, lo hacemos al poder de los tribunales de un determinado*

now contains a special section (Title IV) with rules on international private law[10], namely Articles 2601 and 2602 which only refer to the jurisdiction of the Argentine courts.[11]  In a controversy such as this case, which does have international elements, such as the place of performance of the tender-offer obligation, Argentine conflict of law rules — which are located in the Civil Code and the Unified Code — govern when and where a case may be brought to an Argentine court.  Prior to August 1, 2015 this issue was addressed by the Civil Code and, after such date, by the Unified Code.  This is so because criteria to determine jurisdiction in a case with international contents as this, as a general principle, must be fixed by federal laws.[12]

**13.** The Civil Code, the Commercial Code, and the Unified Code are federal laws.  Federal laws are applicable in the entire territory of the Argentine Republic and are enacted by the National Congress (Art. 75 subpar. 32 of the National Constitution), while procedural laws are local

---

*país para conocer en un litigio que le es sometido y también, el poder de un tribunal extranjero de dictar un pronunciamiento en condiciones de ser reconocido o de recibir el exequatur en otro país"*).

[10] The Unified Code is composed of a Preliminary Title ("Título Preliminar") and 6 Books, each of them is composed of Titles, Chapters and Sections, namely, Book 1: General; Book 2: Family Relationships; Book 3: Rights "*ad personam*"; Book 4: Rights "*ad rem*"; Book 5: Transfer of rights "*mortis causae*"; Book 6: Common rules applicable to rights "*ad personam*" and "*in rem*" which, *inter alia*, includes Title IV which contains conflict of laws or international private law rules.

[11] **Article 2601 of the Unified Code**:  "Sources of jurisdiction.  International jurisdiction of Argentine courts, failing international treaties and in absence of the parties' agreement in matters where jurisdiction may be extended, is attributed in accordance with the rules of this Code and the special laws that may be applicable."  *("Fuentes de jurisdicción.  La jurisdicción internacional de los jueces argentinos, no mediando tratados internacionales y en asuencia de acuerdo de partes en materias disponibles para la prórroga de jurisdicción, se atribuye conforme a las reglas del presente Código y a las leyes especiales que sean de aplicación").*  **Article 2602 of the Unified Code:** "Necessary Forum.  Even though this Code does not attribute international jurisdiction to Argentine courts, these may exceptionally intervene with the aim of avoiding justice negation, always provided it may not be reasonable to request that the complaint be initiated abroad and provided the private situation presents sufficient connection with the country, right of defense is guaranteed and convenience of obtaining a valid judgment is considered."  *("Foro de necesidad.  Aunque las reglas del presente Código no atribuyan jurisdicción international a los jueces argentinos, éstos pueden intervenir, excepcionalmente, con la finalidad de evitar la denegación de justicia, siempre que no sea razaonbale exigir la inicicación de la demanda en el extranjero y en tanto la situación privada presente contacto suficiente con el país, se garantice el derecho de defensa en juicio y se atienda a la conveniencia de lograr una sentencia eficaz.").*

[12] UZAL, María E., *Derecho internacional privado*, La Ley, Buenos Aires, 2016, pages 202/203.  Professor Uzal has stated in connection with this matter:  "Distinguished scholars have sustained that it corresponds to the Nation to legislate in this matter, as an implicit power, in the sense given by art. 75, subpar. 32 [National Constitution], and therefore rules on international jurisdiction are federal rules or they have federal nature insofar as they limit the jurisdictional sovereignty of argentine judges vis-a-vis foreign courts.  This idea seems essential to us to be reaffirmed.  Criteria to attribute international jurisdiction must be fixed by national laws, while criteria to establish "special" competence should continue to be held by the provinces".  *("Prestigiosos autores en nuestro medio han sostenido que corresponde a la Nación legislar en esta materia, como poder implícito, en el sentido del art.75, inc. 32, y que por consiguiente las normas de jurisdicción internacional son normas federales(17) o de naturaleza federal(18) en tanto delimitan la soberanía jurisdiccional de los jueces argentinos frente a la de los tribunales extranjeros.  Esta idea nos parece esencial para ser reafirmada Esta idea nos parece esencial para ser reafirmada.  Los criterios de atribución de jurisdicción internacional deben ser fijados por leyes nacionales, mientras que los criterios de competencia "especial" deberían seguir siendo resorte de las provincias").*

laws to be issued pursuant to the local legislative power of each respective province and the autonomous city of Buenos Aires.[13]

14. There is not now, and there has never been, any provision in Argentine law that provided for exclusive jurisdiction over contractual disputes or contractual civil liability.[14]  To the contrary, the provisions governing such disputes expressly provide that the jurisdiction of Argentine courts is permissive, not exclusive of jurisdiction by foreign courts.

15. Article 1216 of the Civil Code applies to the claims in this case by its clear terms.  It provides, "If the debtor is domiciled or resides in the Republic and the contract must be performed abroad the creditor may sue him before the courts of the debtor's domicile or before the courts of the place where the contract must be performed, even though debtor does not reside therein."[15]  And Argentina's Supreme Court of Justice held, when the Civil Code was in force, that provisions in the Civil Code that refer to the place of performance of a contractual obligation refer to "*any* place of performance" of the contractual obligation.  As explained further below, Article 2650 of the Unified Code adopted that interpretation in explicit terms by referring to the place of performance of "any" contractual obligation.[16]

16. Article 1216 of the Civil Code clearly permits suit in the Southern District of New York.  This is a lawsuit for breach of contract, and New York was a place of performance of the tender-offer obligation imposed by the bylaws.

17. As already stated in my declaration dated October 16, 2015, the YPF bylaws "*are a contract enforceable against both shareholders (i.e., Argentina and the other shareholders), and the company*[. . .]."[17]  Though a corporate contract has special features none of them affects the

---

[13] ALL, Paula María, "*Las normas de jurisdicción internacional en el sistema argentino de fuente interna*", publicado en DeCITA (Derecho del Comercio Internacional. Temas y actualidades), n° 4 (Litigio judicial internacional), 2006, Buenos Aires, Zavalía, 2005, pp. 422-444; IUD, Carolina D., "*Contrato internacional y juez competente*", publicado en LA LEY 2000-A, pp. 404-426; MENICOCCI, Alejandro A., "*Jurisdicción internacional directa en materia de contratos en el Código Civil y Comercial de la Nación*", publicado en El Derecho, N° 14.481, Año LVI, ED 279; QUARANTA COSTERG, Juan Pablo, "*Identificación de problemas sobre jurisdicción internacional. Soluciones*", publicado en El Derecho, N° 14.219, Año LV, ED 273; SCOTTI, Luciana B., "*Jurisdicción y cooperación jurídica internacional en el Código Civil y Comercial*", publicado en RCCyC 2017 (septiembre), 05/09/2017, 20 - LA LEY 26/06/2018, 26/06/2018, 1 – LA LEY 2018-C, 1035, cita online: AR/DOC/2042/2017; UZAL, María Elsa, "*Lineamientos de la reforma del Derecho Internacional Privado en el Código Civil y Comercial de la Nación*", publicado en Sup. Esp. Nuevo Código Civil y Comercial 2014 (Noviembre), 17/11/2014, 247, cita online: AR/DOC/3843/2014.

[14] ALTERINI, Jorge H. (Director), *Código Civil y Comercial Comentado, Tratado Exegético,* Tomo XI, La Ley, Buenos Aires, 2015, 955; LORENZETTI, Ricardo Luis (Director), *Código Civil y Comercial de la Nación Comentado,* Tomo XI, Rubinzal-Culzoni Editores, Santa Fe, 2015, 530/533; QUARANTA COSTERG, Juan Pablo, op. cit.; RIVERA, Julio César – MEDINA, Graciela (Directores), *Código Civil y Comercial de la Nación Comentado*, Tomo VI, La Ley, 2014, 822/825; SCOTTI, Luciana B., op. cit. *supra* note 13.

[15] **Article 1216 of the Civil Code**:  "*Si el deudor tuviere su domicilio o residencia en la República, y el contrato debiese cumplirse fuera de ella, el acreedor podrá demandarlo ante los jueces de su domicilio, o ante los del lugar del cumplimiento del contrato, aunque el deudor no se hallase allí.*"

[16] CSJN (Supreme Court of Justice of the Nation), October 20, 1998, *Exportadora Buenos Aires Sociedad Anónima c/ Holiday Inn's Worldwide Inc.* (Recurso de Hecho). E. 347. XXXII. Fallos: 321:2894.

[17] *See* ECF No. 46 (my first report) ¶ 22.

6

substantive contractual nature of a bylaws and the general principle of contract law that dictates that contract provisions must be complied with following the well-known Roman maxim: "*pacta sunt servanda*". I also explained that "Argentina, as a YPF shareholder, was obligated to comply with the Company's bylaws,"[18] the same as any other shareholder. Furthermore, YPF had an obligation to honor the bylaws provisions because the bylaws are binding on the corporation itself, including the tender-offer obligation contained in Articles 7 and 28.[19]

18. Furthermore, as the Court recognized, "here, the United States was the place of performance for certain contractual obligations under the Bylaws required to implement a tender offer, including the publication of the tender-offer notices in New York, [Securities and Exchange Commission] filings detailing the tender offer, the delivery of tender-offer materials to the [New York Stock Exchange], and, if demanded, the purchase of shares held in the United States. (See Compl. ¶¶ 23, 44; Bylaws § 7(f).) Defendants' failure to perform these contractual obligations necessarily had an immediate and direct effect in the United States." ECF No. 63, at 18.[20]

19. Professor Cabanellas says (at ¶ 8) that "since YPF has a domicile in Argentina, Argentine courts would have exclusive jurisdiction over breach of contract claims against YPF and the Republic pursuant to Article 2650 of the Argentine Civil and Commercial Code." Professor Cabanellas is incorrect. First, as explained, the governing code is the prior Civil Code, and Article 1216 of that code permits jurisdiction abroad. Second, Professor Cabanellas is wrong about Article 2650 of the Unified Code. That Article says:

> "Jurisdiction. Failing a valid agreement on the choice of forum, the following are competent to hear actions resulting from a contract, *at the plaintiffs' option*:
>
> (a) the judges of the domicile or habitual residence of the defendant. If there are various defendants, the judges of the domicile or habitual residence of any of them;
>
> (b) *the judges of the place of performance of any of the contractual obligations*;

---

[18]*Id.* ¶ 23.

[19]*Id.* ¶ 43.

[20]Scholars and court precedents interpreting the Civil Code provisions: *see* ALL, Paula María, "*Las normas de jurisdicción internacional en el sistema argentino de fuente interna*", published in DeCITA (Derecho del Comercio Internacional. Temas y actualidades), n° 4 (Litigio judicial internacional), 2006, Buenos Aires, Zavalía, 2005, pp. 422-444; BOGGIANO, Antonio, *Derecho internacional privado: en la estructura jurídica del mundo*, 5ª ed., Abeledo Perrot, Buenos Aires, 2008, 97; MENICOCCI, Alejandro A., "*Jurisdicción internacional directa en materia de contratos en el Código Civil y Comercial de la Nación*", published in El Derecho, N° 14.481, Año LVI, ED 279; SOTO, Alfredo Mario, *Temas estructurales del derecho internacional privado*, 3ª edición, Editorial Estudio, Buenos Aires, 2014, 63; UZAL, María Elsa, *Derecho internacional privado*, La Ley, Buenos Aires, 2016, 259; Argentine Supreme Court of Justice, case law, *Fallos 321:2894, 327:3701, 332:2435, inter alia*, have stated that "place of performance" must be interpreted as "any place of performance" and this interpretation has been adopted by the Unified Code in Art. 2650, subpar. (b).

(c) the judges of the place where an agency, branch, or representation of the defendant is located, provided it has participated in the negotiation or in the execution of the contract."[21]

Thus, even if Article 2650 applied here, it specifically states that "the judges of the place of performance of any of the contractual obligations" have jurisdiction over the case, which includes the Southern District of New York.

20. It is worth reiterating that prior to the Unified Code (which was not in effect at the time of the breach of the tender-offer obligation), there was no provision in the Civil Code that provided for exclusive jurisdiction. Now, under the Unified Code, one exceptional provision, entitled "Exclusive Jurisdiction", applies to three special cases: disputes concerning real estate located in Argentina, disputes concerning public registries located in Argentina, and disputes concerning the registration of certain intellectual property in Argentina.[22] In the rare case in which Argentine law provides for exclusive jurisdiction, it does so in clear terms. That provision clearly does not apply to this case.

## V.  PLAINTIFFS RAISE A PROPER CLAIM OF BREACH OF CONTRACT UNDER ARGENTINE LAW

21. Professors Cabanellas and Manóvil both contend that claims based on violation of corporate bylaws cannot be brought through "traditional" contractual civil liability proceedings. Cabanellas Decl. ¶¶ 16-18; Manóvil Decl. ¶¶ 35-41 (contending that victims of bylaw breaches must "seek a remedy in kind"). To begin, Defendants' attempt to recharacterize Plaintiffs' claims does not affect the question of jurisdiction, since jurisdiction is determined by the nature of the claim as defined by the plaintiff.[23]

---

[21]**Article 2650 of the Unified Code**: *"Jurisdicción. No existiendo acuerdo válido de elección de foro, son competentes para conocer en las acciones resultantes de un contrato, a opción de actor: a) los jueces del domicilio o residencia habitual del demandado. Si existen varios demandados, los jueces del domicilio o residencia habitual de cualquiera de ellos; b) los jueces del lugar de cumplimiento de cualquiera de las obligaciones contractuales; c) los jueces del lugar donde se ubica una agencia, sucursal o representación del demandado, siempre que ésta haya participado en la negociación o celebración del contrato."*

[22]**Article 2609 of the Unified Code**: "Exclusive jurisdiction. Without prejudice to what is provided in special laws, Argentine courts have exclusive jurisdiction to decide the following disputes: a) matters concerning rights "in rem" on real property located in Argentina; b) the validity or nullity of registrations made in an Argentine public registry; c) matters concerning deposit or registration of patents, trademarks, designs, drawings, industrial models and other analogous rights' registrations or the validity thereof, if such deposit or registration has been registered or entered, or deemed to have been registered, in Argentina." (*"Jurisdicción exclusiva. Sin perjuicio de lo dispuesto en leyes especiales, los jueces argentinos son exclusivamente competentes para conocer en las siguientes causas: a) en materia de derechos reales sobre inmuebles situados en la República; b) en materia de validez o nulidad de las inscripciones practicadas en un registro público argentino; c) en materia de inscripciones o validez de patentes, marcas, diseños o dibujos y modelos industriales y demás derechos análogos sometidos a depósito o registro, cuando el depósito o registro se haya solicitado o efectuado o tenido por efectuado en Argentina."*).

[23]BOGGIANO, Antonio, a former Argentine Supreme Court justice, in his paper titled "*Jurisdicción Internacional sobre sociedades constituidas en el extranjero*", El Derecho, T. 111, p. 974, explains that in determining which court has international jurisdiction plaintiffs' description of the object of the claim, as described in the complaint, is controlling. This is consistent with the criteria sustained by the Supreme Court of Justice of Argentina which has interpreted that "in order to determine jurisdictional issues attention should be paid, fundamentally, to the factual description of the complaint made by the plaintiff and thereafter, to the extent applicable, the law invoked in support of the claim as well

22. At any rate, Professors Cabanellas and Manóvil are not correct that contract law is inapplicable to Plaintiffs' claims.  Argentine scholars unanimously agree that corporate bylaws are contracts.[24]  Therefore, claims for breach of corporate bylaws are contractual breaches that give rise to contractual civil liability.  Indeed, as discussed above (in ¶ 10), barring a specific provision in a specialized statute, such claims *must* be allowed.  *See supra* (discussing Article 19 of the National Constitution).

23. None of the characteristics of corporate bylaws identified by Professors Cabanellas and Manóvil, *see, e.g.*, Cabanellas Decl. ¶ 17, affects the claims Plaintiffs may bring or the relief they may seek.  The Civil Code made this explicit.  All contracts, including corporate bylaws, are juridical acts under Argentine law.  *See* Article 944 of Civil Code (juridical acts are "legal voluntary acts that have the immediate purpose of establishing among persons juridical relations to create . . . legal rights").[25]  And, under Argentine law, the violation of any obligation undertaken by a juridical act can produce civil liability (*i.e.*, damages) under Article 889 of the Civil Code.  That Article broadly provides that any time an obligation voluntarily undertaken is not performed by fault of the obligated party, the obligation is converted into an obligation to pay damages and interest.[26]  The same is true under Article 955 of the Unified Code.[27]

24. Article 1716 of the Unified Code, which Professor Cabanellas cites (at ¶ 16 n.17), specifically affirms the same principle.  It provides that "breach of an obligation gives rise to compensation

---

as the nature of the juridical relationship established between the parties." (Fallos 340:853; 340:431; 341:1232 among many others).

[24]Al respecto, ver: HALPERÍN, Isaac – OTAEGUI, Julio. *Sociedades Anónimas*. Segunda Edición. Buenos Aires: Depalma, 1998, página 21; ESCUTI, Ignacio A., *Sociedades,* Editorial Astrea, Buenos Aires, 2006, 20; ZALDÍVAR, Enrique, MANÓVIL, Rafael M., RAGAZZI, Guillermo E., ROVIRA, Alfredo L. & SAN MILLÁN, Carlos. *Cuadernos de Derecho Societario*. Tomo I. Buenos Aires: Ediciones Macchi, 1973. Páginas 36/37; VILLEGAS, Carlos G. *Derecho de las Sociedades Comerciales*. Novena Edición Ampliada y Actualizada. Buenos Aires: Abeledo Perrot, 2001. Página 31; LÓPEZ TILLI, Alejandro. *Las Asambleas de Accionistas*. Buenos Aires: Abaco, 2001. Páginas 40/41.

[25]**Article 259 of the Unified Code** preserved this principle.  "A juridical act is a legal voluntary act that has the immediate purpose of acquiring, modifying, or extinguishing juridical relations or situations."  *("Acto jurídico. El acto jurídico es el acto voluntario lícito que tiene por fin inmediato la adquisición, modificación o extinción de relaciones o situaciones jurídicas.").*

[26]**Article 889 of the Civil Code:** "If performance becomes impossible due to the fault of the obligor, or if he would have taken responsibility for fortuitous cases or force majeure, whether by virtue of a clause that imposes on him the risks associated with those possibilities or by incurring it in default, the original obligation to give or do something becomes an obligation to pay damages and interest."  *("Si la prestación se hace imposible por culpa del deudor, o si éste se hubiese hecho responsable de los casos fortuitos o de fuerza mayor, sea en virtud de una cláusula que lo cargue con los peligros que por ellos vengan, o sea por haberse constituido en mora, la obligación primitiva, sea de dar o de hacer, se convierte en la de pagar daños e intereses.").*

[27]**Article 955 of the Unified Code**: "The unforeseen, objective, absolute, and definitive impossibility of performing the obligation due to fortuitous cases or force majeure extinguishes the obligation without liability.  If such impossibility occurs due to causes attributable to the obligor, the obligation is modified and becomes an obligation to pay compensation for damages caused."  *("La imposibilidad sobrevenida, objetiva, absoluta y definitiva de la prestación, producida por caso fortuito o fuerza mayor, extingue la obligación, sin responsabilidad.  Si la imposibilidad sobreviene debido a causas imputables al deudor, la obligación modifica su objeto y se convierte en la de pagar una indemnización de los daños causados.").*

9

for damages caused."[28]  As a result, Defendants' breach of the bylaws is governed by the principle set forth in Article 889 of the Civil Code and Articles 955 and 1716 of the Unified Code.  It therefore gives rise to a claim for damages.

## VI. IT IS INAPPROPRIATE TO RELY ON THE CODE OF PROCEDURE, THE ARGENTINE COMPANIES LAW, OR THE CAPITAL MARKETS LAW TO DETERMINE JURISDICTION IN THIS CASE

25.  Neither the Code of Procedure nor the ACL contains rules on international jurisdiction.  As discussed above, the Civil Code — and now the Unified Code — do contain specific rules on contractual conflicts of international nature (see Articles 1216 of the Civil Code and 2650 of the Unified Code).

26.  Professor Cabanellas asserts (at ¶¶ 6, 8) that Articles 5(4) and 5(11) of the Code of Procedure would create exclusive jurisdiction.  But as Professor Cabanellas himself explains, that *procedural* code "determines which court *within Argentina* has jurisdiction in cases falling *within the Argentine jurisdictional system*."  Cabanellas Decl. ¶ 4.  Because the procedural code relates only to the jurisdiction of Argentine courts, it has no bearing on the jurisdiction of any U.S. court.

27.  Moreover, even though neither of the procedural provisions Professor Cabanellas cites — Article 5, including Article 5(4) and Article 5(11) — apply to this case, they would not help Defendants even if they did apply.  That is because the general provision of Article 5 allows *plaintiffs* to define the competent court based upon the nature of the claim.  The relevant portions of Article 5 provide:

> "Art. 5:  The competence of the court shall be determined by the nature of the claims presented in the complaint and not by the defenses presented by the defendant….
>
> Art. 5, (4):  In personal actions derived from civil offenses or torts, [the competent court shall be that] of the place of the act or the domicile of the defendant, at the choice of the plaintiff….
>
> Art. 5, (11):  In the actions that derive from corporate relationships, [the competent court shall be that] of the place of the registered corporate domicile...."

28.  Article 5's general provision categorizes claims based upon how the *plaintiff* characterizes the claim "in the complaint," and *not* based on the defendant's assessment of the claim.  That alone would render this claim a straightforward claim seeking civil liability for breach of contract under Article 5, if it applied.

---

[28] **Article 1716 of the Unified Code**: "Duty to repair.  The violation of the duty not to cause damage to others, or the breach of an obligation gives rise to an entitlement of compensation for the damaged caused, in accordance with the provisions of this Code." *("Deber de reparar.  La violación del deber de no dañar a otro, o el incumplimiento de una obligación, da lugar a la reparación del daño causado, conforme con las disposiciones de este Código.")*.

10

**29.** Article 5(4) does not apply to this case because Article 5(4) refers to personal actions arising out of civil offenses or torts while this claim is grounded on civil liability stemming out of a breach of contract. In Argentine law, a "civil offense" (*delito*) is analogous to the concept of an intentional tort. It does not include a breach of contract.

**30.** Article 5(11), which speaks of actions arising out of corporate relationships also does not apply to this case. Article 5(11) could not apply here because this is not a case arising out of "corporate relationships" as that term has been interpreted, nor may it be classified as a "corporate controversy".

**31.** The term "corporate relationships" has been interpreted narrowly to refer only to claims that will affect the *legal structure* of the corporate entity, and therefore will have direct effects on all members of the company regardless of their participation in the claim. Scholars interpreting the meaning of "corporate relationships" or "corporate controversies" state that such actions refer to the following types of actions authorized by the ACL: (a) a claim challenging the existence of a corporation, its reorganization, or its liquidation (for example, a claim to declare the nullity of a company); (b) a claim to void a corporate decision adopted at a shareholder's meeting; (c) a claim to remove a corporate director[29] or (d) when the claim is filed supported by a provision of the ACL[30]. Scholars interpreting this confusing language have further explained that a claim against an officer for breach of the officer's duties (in contrast to a claim to remove him or her) does not fall under Article 5(11) — even if the claim is brought by a shareholder — because such a claim seeks to enforce the corporation's existing rules rather than to modify them. Further, Justice Antonio Boggiano, a former justice of the Supreme Court of Argentina and an expert and professor of international private law, explains that, in order to determine which international jurisdictional norm applies in corporate disputes, it is necessary to distinguish "corporate controversies" from controversies in which a company is merely a party. For example, even a contractual dispute between shareholders or shareholders and the company is not necessarily a corporate dispute by virtue of the company's involvement because the relevant factor is the factual cause of the claim as well as the legal provisions invoked by the party in support of the claim. If the claim is not grounded on the ACL provisions, it would not qualify as a "corporate dispute".[31]

---

[29] CURÁ, José María, "*Acciones que derivan de la relación societaria, determinación de la competencia por razón del territorio. (El caso del artículo 5°, inciso 11, Código Procesal)*", publicado DJ1997-2, 643. Cita Online: AR/DOC/22327/2001; SUÁREZ ANCHORENA, Carlos, "*La noción de "conflicto societario"*", paper presented at V Congreso de Derecho Societario, Córdoba, 1992, Vol. 2, p. 290/291. This author on whose paper Curá developed his article, concludes that "corporate disputes" include only: a) litigations seeking the nullity of the corporate contract, or the nullity of an amendment thereto or the dissolution of the company; b) litigations seeking the nullity of corporate resolutions; and c) litigations seeking removal of directors or management bodies of the company, in other words, any "intra-corporate" litigation (see specifically pages 292/295).

[30] BOGGIANO, Antonio, "*Jurisdicción internacional sobre sociedades constituidas en el extranjero*", El Derecho, T. 111, p. 970/971.

[31] BOGGIANO, Antonio, "*Jurisdicción internacional sobre sociedades constituidas en el extranjero*", El Derecho, T. 111, p. 971. This author adds that "this is particularly clear when dealing with contractual litigations". Moreover, he adds that in those cases the controversy may not be characterized by the mere fact of having a company involved therein but what determines the controversy's features is both the factual cause of the claim as well as the legal provisions invoked by the party in support of his claim. Therefore, he concludes that in order to qualify a controversy

32. This case would not fall within Article 5(11) if it applied because it raises a claim for compensatory damages for breach of contract; it does not challenge the legal structure of YPF, does not challenge the validity of any provision of YPF's bylaws or of YPF's corporate resolutions, all of which would be grounded by a specific provision of the ACL. Professor Manóvil explains the limited cases which the ACL allows, under Articles 251 and 254, all of which refer to claims challenging the validity of shareholders' resolutions, which is not the claim brought by Plaintiffs in this case.[32] In fact, Plaintiffs have never challenged the validity of any shareholders' resolution or of the bylaws. Plaintiffs are suing for damages resulting from a contractual breach that followed the takeover.

33. Professors Cabanellas and Manóvil also cite Article 46 of the Argentine Capital Markets Law (Law 26,831) to conclude that Argentina has exclusive jurisdiction over this case. They are incorrect. That provision requires that plaintiffs raising disputes arising under the ACL be given *the option* to bring their claims in an arbitral tribunal. And it also requires that "in all cases" such plaintiffs retain the choice to file their claims in "any tribunal that may be competent."[33] The provision's text does nothing to restrict a foreign court's jurisdiction.

34. Article 46 does not apply in this case for the following reasons. To begin with, as Professor Manóvil concedes, the law became "effective as of January 27, 2013," months *after* the facts

---

as a "corporate dispute" the legal provisions invoked are relevant and therefore to characterize a controversy of "corporate nature" a provision of the ACL should be invoked.

[32] Likewise, the scholars Professor Manóvil cites in footnotes 14, 16, and 17 refer to corporate actions under the ACL. It is noteworthy that even Nissen, R., one of the authors cited in footnote 14, "in fine" recognizes that even though such corporate actions should be filed with a Court with jurisdiction in the corporate domicile it so applies "with the exception of express or tacit extension [of jurisdiction to another court] when appropriate."

[33] Article 46 of the Law 26,831: "Arbitral Tribunal. All markets must have a permanent arbitral tribunal, to which the entities whose negotiable securities are negotiated within their market must mandatorily submit to in their relations with shareholders and investors. All actions derived from law 19,550 of commercial companies (text of 1984) and their modifications, including claims to challenge resolutions of the corporate bodies and liability actions against their members or against other shareholders, are subject to this the arbitral jurisdiction as well as claims for nullity of the bylaws' clauses or regulations thereto. **In all cases, the regulations must safeguard the shareholders' and investors' right to opt to submit their claims to the competent judicial courts.** In cases where the law establishes the accumulation of actions brought for the same purpose before a single court, the accumulation will be carried out before the judicial court. Also will be subject to the arbitration jurisdiction established in this article those who make a buy out tender offer with respect to the recipients of such tender offer. The regulations issued by the markets, applicable to the creation and operation of the arbitral tribunals, must be submitted to the prior approval of the National Securities Commission." (**Article 46 of the Law 26,831**: "*Tribunal arbitral. Todos los mercados deberán contar en su ámbito con un tribunal arbitral permanente, al cual quedarán sometidas en forma obligatoria las entidades cuyos valores negociables se negocien dentro de su ámbito, en sus relaciones con los accionistas e inversores. Quedan comprendidas en la jurisdicción arbitral todas las acciones derivadas de la ley 19.550 de sociedades comerciales (t.o. 1984) y sus modificaciones, incluso las demandas de impugnación de resoluciones de los órganos sociales y las acciones de responsabilidad contra sus integrantes o contra otros accionistas, así como las acciones de nulidad de cláusulas de los estatutos o reglamentos.* **En todos los casos, los reglamentos deberán dejar a salvo el derecho de los accionistas e inversores para optar por acudir a los tribunales judiciales competentes.** *En los casos en que la ley establezca la acumulación de acciones entabladas con idéntica finalidad ante un solo tribunal, la acumulación se efectuará ante el tribunal judicial. También quedan sometidas a la jurisdicción arbitral establecida en este artículo las personas que efectúen una oferta pública de adquisición respecto de los destinatarios de tal adquisición. Las reglamentaciones que los mercados dicten, aplicables a la creación y funcionamiento de los tribunales arbitrales, deberán ser sometidas a la previa aprobación de la Comisión Nacional de Valores.*").

12

underlying Plaintiffs' claims. Manóvil Decl. ¶ 21.[34]  And although Professor Manóvil in a footnote mentions (but does not rely on) Article 46's predecessor — Article 38 of Decree 677/2001 — neither provision applies to a contractual civil liability claim.  As Professor Manóvil explains, both Articles apply only to "intra-corporate disputes," Manóvil Decl. ¶ 21 — *i.e.*, disputes governed by the Argentine Companies Law, which both Articles 38 and 46 specifically refer to.

35. Professor Cabanellas invokes Articles 118 and 124 of the ACL to conclude that Argentine courts would refuse to recognize a U.S. judgment because Argentine courts have exclusive jurisdiction over Plaintiffs' claims.[35]  Those provisions also do not address jurisdiction, but rather choice of law.  As Professor Cabanellas explains, those provisions "provide certain compulsory rules on *the determination of the law applicable* to business associations, particularly those whose principal place of business is located in Argentina." Cabanellas Decl. ¶ 7; *see also* Manóvil Decl. ¶ 32 & n.23 ("a foreign company is *governed by the laws* of the place of incorporation").  Those provisions thus do not support Professor Cabanellas' assertion that Argentine courts have exclusive *jurisdiction* or would refuse to recognize a foreign court's judgment against Argentina or YPF.[36]

36. Article 251 of the ACL, which Professor Manóvil cites (at ¶¶ 35-38), is not to the contrary and does not override Plaintiffs' right to civil liability under Article 889 of the Civil Code.  *See*

---

[34] Article 7 of the Unified Code provides that the law that applies to a dispute is the law in place at the time of the events underlying the lawsuit.

[35] **Article 118 ACL**: "The existence and legal forms of a company organized abroad are governed by the laws of the place of incorporation.  Isolated acts.  It is entitled to conduct isolated acts and litigate.  Habitual exercise.  In order to conduct habitual acts within the scope of its corporate purpose, establish a branch, premises or any other kind of permanent representation, it must: 1) Prove that it exists in accordance to the laws of its country; 2) Establish domicile in the Republic in compliance with the publication and registration requirements that this law applies to companies organized in the Republic; 3) Justify the decision to set up such representation and appoint the person who shall be in charge thereof.  If it is a branch it should specify the capital assigned thereto as may be required by special laws." *("La sociedad constituida en el extranjero se rige en cuanto a su existencia y formas por las leyes del lugar de constitución.  Actos aislados.  Se halla habilitada para realizar en el país actos aislados y estar en juicio.  Ejercicio habitual.  Para el ejercicio habitual de actos comprendidos en su objeto social, establecer sucursal asiento o cualquier otra especie de representación permanente, debe:  1) Acreditar la existencia de la sociedad con arreglo a las leyes de su país; 2) Fijar un domicilio en la República, cumpliendo con la publicación e inscripción exigidas por esta ley para las sociedades que se constituyan en la República; 3) Justificar la decisión de crear dicha representación y designar la persona a cuyo cargo ella estará.  Si se tratare de una sucursal se determinará además el capital que se le asigne cuando corresponda por leyes especiales.")* **Article 124 of the ACL**: "The company organized abroad which has its premises in the Republic or whose main corporate purpose is to be conducted therein shall be considered as a local company for purposes of the requirements to be complied with for purposes of its organization or [contractual] amendment or the control of its activities."  *("La sociedad constituida en el extranjero que tenga su sede en la República o su principal objeto esté destinado a cumplirse en la misma, será considerada como sociedad local a los efectos del cumplimiento de las formalidades de constitución o de su reforma y contralor de funcionamiento.")*.

[36] Professor Cabanellas misleadingly cites Professor Boggiano (in footnote 6) as stating that "corporations that must be governed by Argentine corporate law pursuant to Section 124 of the Corporations Law are subject to the exclusive jurisdiction of the Argentine courts."  Professor Cabanellas fails to clarify that Boggiano's statement is limited to "corporate controversies," clearly referring to controversies within the company to which Article 124 refers.  Boggiano specifically states in the article cited in footnote 19 that Article 124 does *not* apply "when the 'controversy' is characterized as a conflict of contractual nature."  (BOGGIANO, Antonio, *Jurisdicción internacional sobre sociedades constituidas en el extranjero*, El Derecho, T. 111, p. 970).

13

*supra* ¶ 10.  As Professor Manóvil himself describes it, Article 251 merely "*permits* shareholders to challenge" a resolution at a shareholders meeting and seek its annulment.  *See also* Cabanellas Decl. ¶ 18 (shareholders "*may* challenge" shareholders meeting resolutions).[37]  Accordingly, Article 251 does not *preclude* claims for damages that Article 889 of the Civil Code specifically allows.  This is so because, among other reasons explained herein, Article 19 of the National Constitution permits all acts not prohibited.  *See supra* ¶ 10.

37. In addition, Professor Manóvil concedes (at ¶ 41) that Article 251, which is entitled "Challenging Shareholders' Corporate Resolutions," has no application here because "Plaintiffs do not appear to base their claim on any particular resolution of a shareholders' meeting."  Rather, Plaintiffs' claims are based on breach of the tender-offer obligation contained in the bylaws contract.  It is thus irrelevant that, as Professor Cabanellas observes (at ¶ 18), "[p]laintiffs did not oppose the decision to permit Argentina to vote at the June 4, 2012 shareholders' meeting."

## VII.  ADDITIONAL ISSUES OF ARGENTINE LAW

38. Professor Cabanellas contends (at ¶ 10) that the claims in this case raise "significant and complex questions related to Argentine law."  But the fact that some of the issues related to Plaintiffs' claims are to be analyzed under Argentine law does not impact the definition of the international jurisdiction given to the New York court by the applicable international jurisdictional norms of the Civil Code.  Indeed, as this Court has recognized, "to the extent the Court must apply Argentine law in reaching a determination, it is not a justification for dismissal under *forum non conveniens*."  ECF No. 63, at 36.

39. Professor Cabanellas also contends (at ¶ 22(i)(1)) that Argentine law does not recognize a theory of "concurrent" liability such that YPF can be liable for Argentina's failure to launch a tender offer.  In fact, Article 850 of the Unified Code *explicitly* recognizes "concurrent obligations"[38] that would hold YPF jointly and severally liable with Argentina for its misconduct (or non-conduct) in failing to enforce the bylaws' tender-offer requirement.

---

[37]**Article 251 of the ACL**:  "Challenging shareholders' corporate resolutions.  Standing to challenge.  Article 251.  All shareholders' resolutions adopted in violation of the law, the Bylaws, or their regulation may be challenged by the shareholders that did not vote in favor of the respective decision, as well as by the absent shareholders that prove their shareholders' capacity as of the date of the relevant shareholders' resolution.  Shareholders that voted in favor of the resolution may contest it if their vote is voidable by reason of a flaw in the decision on how to vote.  Directors, syndics, members of the supervisory council, or the government's regulatory agency can also challenge it.  Institution of the action.  The challenging action shall be instituted against the company in the court of the company's domicile within three (3) months from the close of the shareholders' meeting."  *("Impugnación de la decisión asamblearia. Titulares. Articulo 251. Toda resolución de la asamblea adoptada en violación de la ley, el estatuto o el reglamento, puede ser impugnada de nulidad por los accionistas que no hubieren votado favorablemente en la respectiva decisión y por los ausentes que acrediten la calidad de accionistas a la fecha de la decisión impugnada. Los accionistas que votaron favorablemente pueden impugnarla si su voto es anulable por vicio de la voluntad. También pueden impugnarla los directores, síndicos, miembros del consejo de vigilancia o la autoridad de contralor. Promoción de la acción. La acción se promoverá contra la sociedad, por ante el Juez de su domicilio, dentro de los tres (3) meses de clausurada la asamblea").*

[38]**Article 850 of the Unified Code**:  "Concurrent obligations are those in which various debtors owe the same by reason of different causes of action."  *("Obligaciones concurrentes son aquellas en las que varios deudores deben el mismo objeto en razón de causas diferentes.").*

Although the Unified Code postdates the facts at issue in this lawsuit, Article 850 effectively ratified case law and doctrine that was settled while the prior Civil Code was in force.[39]

**40.** As part of his argument that Plaintiffs' claims are effectively corporate-law claims, *but see supra* ¶ 31 (other scholars' opinions), Professor Manóvil contends (at ¶ 14) that Argentine law lacks any cause of action for "anticipatory" breach of contract. His argument is merely semantic. The concept of anticipatory breach existed under Argentine law under the Civil Code and has been explicitly codified in the Unified Code. While the Civil Code was in force, legal scholars understood that when an obligor expressly stated that he would not perform his obligations, it was not necessary to wait until the term of performance expired for the breach of contract to be complete.[40] Courts recognized the same doctrine. For example, in *Giardino v. Dentomat S.A.*, a case dealing with the breach of a construction contract, the Supreme Court of Justice of the Province of Buenos Aires held that "the fact that the defendant has not actually defaulted its obligations does not preclude termination of the contract . . . where it is apparent in the circumstances . . . that defendant has no intention" of performing its obligations.[41]

**41.** The Unified Code codified this principle explicitly in Article 1084(e), which Professor Manóvil cites (at ¶ 14 n.1). That provision provides that a contract breach "announced by a serious and definitive statement" by the obligor to the obligee constitutes a material ["*esencial*"] breach of contract under Argentine law.[42] All of the foregoing is sufficient to find

---

[39]LORENZETTI, Ricardo Luis, *Código Civil y Comercial de la Nación Comentado*, Tomo V., page 313 citing several case law precedents and scholars in support; and ALTERINI, Jorge H., *Código Civil y Comercial Comentado. Tratado Exegético*, Tomo IV, page 353 citing several scholars, all recognizing that "concurrent obligations" were recognized under the Civil Code and called "obligations (obligaciones) *in solidum*."

[40]LLAMBÍAS, Jorge J.: *Tratado de Derecho Civil-Obligaciones*, 5th edition, Editorial Perrot, Buenos Aires, 1994, T. I, at 159. (*"[W]hen the obligor has repudiated performance* [of the contract]*, the obligee is not required to put him in default by a formal act demanding performance, as such action would be futile in light of the obligor's repudiation"*); SALAS, Acdeel E. y TRIGO REPRESAS, Félix: *Código Civil y Leyes Complementarias Anotadas*, 2nd edition, Depalma, Buenos Aires, 1979, T. I, at 256 (*"[W]hen the obligor has manifested that it will not perform, it is not required from the obligee to request performance in order to put the obligor in default, since that would constitute a futile formality"*); PIZARRO, Ramón D. y VALLESPINOS, Carlos G.: *Instituciones de Derecho Privado - Obligaciones*, Hammurabi, Buenos Aires, 1999, T. 2, at 537 (*"[A]nticipatory breach by the obligor. In the same vein, putting the obligor in default is not required when the obligor anticipates its unwillingness to perform, for in such a case the request amounts to a sterile formalism"*).

[41]Supreme Court of Justice of Buenos Aires Province in *Giardino v. Dentomat S.A.*, August 14, 1979, AR/JUR/1483/1979, ED 86-538, recital III. *See also* Panel "A" of the National Court of Appeals in Commercial Matters in *Argencip S.A v. Fondo Compensador Para Jubilados y Pensionados Telefónicos*, June 30, 2010, ED Digital 59486, recital II.2.2. (*"[...][E]xceptionally, [a contract] may be terminated before the obligor is actually in default. That is the case where the circumstances show that the obligor's nonperformance is final in nature, or where it becomes apparent, before the deadline for performance, that the obligation will not be performed […]. That is what happens when the obligor evidences its will not to discharge its obligations. It need not do it expressly, but its will must be clear beyond any doubt. In the case of a tacit expression of will, the obligor's intention not to perform must clearly arise from its actions beyond any doubt."*).

[42]**Article 1084 of the Unified Code**: "Consummation of a breach. For a breach to allow termination, the breach must be material [*esencial*], taking into consideration the contract's purposes. It is deemed material when: a) strict performance is fundamental to the contract's context; b) timely performance is a condition of maintaining the obligee's interest; c) the breach substantially deprives the prejudiced party of what he expects; d) the breach is intentional; or e) the breach has been announced by a serious and definitive statement by the obligor to the obligee." (*"Configuración del incumplimiento. A los fines de la resolución, el incumplimiento debe ser esencial en atención a la finalidad del*

15

that Argentine law recognizes a contract breach that occurs prior to the contractual date of performance — whether or not the breach is labeled "anticipatory."

42. Under this doctrine, as codified in Unified Code Article 1084(e), if a party to a contract unambiguously states its intent to refuse to perform its obligations, the counterparty is entitled to claim for breach of contract as of the date of that repudiation without waiting for the time for performance to pass. Although Article 1084 by its terms discusses only the right to "terminate" the contract, the ramifications of a pre-announced breach of contract must also be analyzed under the scope of the more general requirement of Article 889 of the Civil Code that the violation of any obligation undertaken by a juridical act can produce civil liability, *see supra* ¶ 10.

43. In other words, under Argentine law, a pre-announced breach of contract is both a cause for contract termination and, at the same time, is also a valid ground to claim damages resulting from the breach.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:  December 4, 2019.

_____
Dr. Alfredo L. Rovira

---

contrato. *Se considera que es esencial cuando:  a) el cumplimiento estricto de la prestación es fundamental dentro del contexto del contrato; b) el cumplimiento tempestivo de la prestación es condición del mantenimiento del interés del acreedor; c) el incumplimiento priva a la parte perjudicada de lo que sustancialmente tiene derecho a esperar; d) el incumplimiento es intencional; e) el incumplimiento ha sido anunciado por una manifestación seria y definitiva del deudor al acreedor.*").