# LIONBRIDGE

STATE OF NEW YORK ⟩
⟩
⟩ ss
COUNTY OF NEW YORK ⟩

## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached Reply Declaration of Alfonso Santiago.

Kristen Duffy, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this 7th day of February, 20 20 .

LYNDA GREEN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01GR6205401
Qualified In New York County
My Commission Expires 05-11-2021

259 W 30th Street, 11th Floor   New York, NY 10001   +1.212.631.7432

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

PETERSEN ENERGÍA INVERSORA, S.A.U.   :
AND PETERSEN ENERGÍA, S.A.U.,   :
                             :
            Plaintiffs,   :
                             :
       -against-   :
                             :
ARGENTINE REPUBLIC and YPF S.A.,   :
                             :  Case Nos.
           Defendants.   :
                             :  1:15-cv-2739-LAP

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ETON PARK CAPITAL MANAGEMENT, L.P., :  1:16-cv-8569-LAP
ETON PARK MASTER FUND, LTD., and   :
ETON PARK FUND, LP.,   :
                             :
            Plaintiffs,   :
                             :
       -against-   :
                             :
ARGENTINE REPUBLIC and YPF S.A.,   :
                             :
           Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**Reply Declaration of Alfonso Santiago**

Pursuant to 28 U.S.C. § 1746 and Rule 44.1 of the Federal Rules of Civil Procedure, I, Alfonso Santiago, declare as follows:

1.     I submit this expert declaration in support of the Defendants' Reply on the Motion to Dismiss for Forum Non Conveniens and to respond to certain allegations made in the Declaration filed by Alberto B. Bianchi and Gustavo Naveira, dated December 4, 2019 (together, referred to hereafter as "B&N," and their Declaration as "B&N Declaration") for the Plaintiffs in the above-captioned matter.

## A.  Independence of the Argentine Judicial Branch

2.     I affirm in my prior opinion that Argentina has an independent judicial system capable of fairly and impartially resolving disputes between private litigants, including foreigners, and the Argentine State.[1]  This is supported by the conditions and guarantees of independence offered by the Nation's Judicial Branch: the systems for appointment and removal of federal judges provided in the National Constitution, the constitutional guarantees regarding removal and compensation that judges benefit from, the power held by federal judges to declare the unconstitutionality of laws and other rules that affect judicial independence, the ease of access to the judicial system by litigants to obtain a reasoned decision through a proceeding that guarantees due process, and the possibility of pursuing claims against the Argentine State and obtaining a decision against it.

3.     As an initial matter, I would like to respond to the allegations made by B&N concerning the quality and independence of the judicial system in Argentina. They allege only that the Argentine judicial system lacks "legitimacy" due to its poor public perception.[2]  I do not agree with those statements. As I will explain further below, I consider that the arguments put forward by B&N in support of this view have no relevance in relation to the case at hand. From my standpoint, and as I stated in my first declaration, the Argentine judicial system offers the necessary and sufficient guarantees of independence, impartiality and technical competency for these actions to be adjudicated in the Argentine Republic, even if we bear in mind some of the challenges the system faces, like any institution, in improving certain aspects in an effort to achieve the utmost institutional quality.

---

[1]    Expert Declaration of Alfonso Santiago, filed August 30, 2019 ("Santiago Decl.") ¶¶ 6-12.

[2]    See, e.g., B&N Declaration, ¶ 49, 118.

<u>1.  Political Criticisms</u>

4.      In their Declaration, B&N largely make reference to public statements about the Argentine Judicial Branch made by certain political figures in connection with their own political goals.[3] Generally, such critical statements about the Judicial Branch are relatively common among politicians in Latin American countries—and in fact, as indicated below, in other legal regimes as well—and they have not affected the normal functioning of the Judicial Branch in the Republic of Argentina.

5.      Since the restoration of democracy in 1983, the Supreme Court of Argentina has assumed a more active role, particularly in defending the independence, prerogatives, powers and authorities of the Judicial Branch itself.  In carrying out this mission, the Supreme Court has declared the unconstitutionality of actions by the Executive Branch,[4] Congress,[5] a provincial constituent authority,[6] and the national constituent authority.[7]

---

[3]   See, e.g., B&N Declaration, ¶¶ 26-31, 41-44.

[4]   See CSJN Order 42/91, October 8, 2991. In this Order, the Supreme Court set aside an emergency decree that temporarily suspended the Judicial Branch financial self-sufficiency law. It considered that this decree caused serious harm to the independence of the Judicial Branch.

[5]   See CSJN Order 20/96, April 11, 1996. In Order 20/96 the Supreme Court declared invalid a law of Congress that extended income tax to judges, because it considered that this affected the constitutional guarantee that judges' salaries were "untouchable." See CSJN case "Rizzo, Jorge Gabriel v. National Executive Branch," *Decisions*: 336:760 (2013). In the Rizzo case, the Supreme Court declared unconstitutional the law amending the membership of the Judicial Council, since it conflicted with the Constitution and altered the balance between the representatives of the different sectors that said Council comprises.

[6]   See CSJN, "Iribarren, Casiano R. v. Province of Santa Fe," *Decisions*: 322:1253 (1999). In this case, the Supreme Court declared unconstitutional an article in the Constitution of the Province of Santa Fe that limited the guarantee that judges could not be removed up to the age of 65 years. After that age they had to be reappointed if they were to continue in office. The Supreme Court considered that this might influence judges' decisions and affect their independence.

[7]   See CSJN, "Fayt, Carlos Santiago v. National State," *Decisions*: 322:1616 (1999). In this case, the Supreme Court declared null and void Art. 99. 4 of the National Constitution since it required a new order from the Senate for federal judges to remain in their position after the age of 75 years. The Supreme Court considered that the law of Congress which had established the constituent authority of 1994 had not authorized it to legislate on this aspect. Therefore, the amendment to Art. 99 was declared null and void and unconstitutional.

6.     Moreover, the relationships between other branches and the Judicial Branch are subject to constitutional control and the checks and balances of the distribution of power in a constitutional democracy. Thus, for instance:

- in 2007, a system for designating alternate judges was declared unconstitutional.[8]

- as I discuss below (see paragraph 21), in 2013 the Supreme Court declared the unconstitutionality of several articles of law 26,855 reforming the Judicial Council and Decree 577/13, which called for the election of candidates to the Council.

- in 2019 Congress repealed law 26,853 (enacted in 2013), which had authorized the creation of federal "Cassation Chambers" for contentious-administrative, labor and social security, and civil and commercial matters.[9] These Cassation Chambers, which never took shape and never began to function, were an attempt to insert an intermediate reviewing authority between the Appeal Chambers and the Supreme Court.

- since the restoration of democracy in 1983, members of federal courts have been appointed according to the procedure provided in the National Constitution and the applicable regulations.[10]

---

[8]     See CSJN, "Rosza, Carlos Alberto, et al," *Decisions*: 330:2361 (2007). This system of appointing alternate judges made it possible to appoint interim judges (after the resignation, death or dismissal of a judge) without undergoing the procedure specified in the National Constitution.

[9]     See Law 27,500, Art. 4.

[10]    See *infra*, note 34.

- in the cases where federal judges were removed, it was based on their "poor performance," that is to say, disciplinary problems, acts of corruption, mistreatment of employees and workers, etc.[11]

- numerous decisions by the Supreme Court and the federal courts had been issued that were clearly adverse to the interests of the sitting government,[12] without prompting extensive challenges or debate.  Also, politicians and officials from various parties, including when that party was in power, were put on trial, particularly with respect to criminal matters for allegations of corruption.

7.  Throughout the history of judicial institutions around the world, these types of political criticisms referenced by B&N are not infrequent.  One need only recall the so-called "court-packing plan" proposed by Franklin Delano Roosevelt in the 1930s, to find examples of politically driven attempts to alter the judiciary that do not result in changes to the Judicial Branch as an institution as it relates to its essential characteristics. Or more recently, one can look to the proposal by U.S. presidential candidate Pete Buttigieg to increase the number of Supreme Court justices from nine to fifteen and modify the appointment procedure, or to the strong criticisms offered by President Trump regarding rulings that affected the policies he

---

[11]   See SANTIAGO, Alfonso (Director), *La responsabilidad judicial y sus dimensiones* [The Judicial Responsibility and its Dimensions], Abaco, Buenos Aires, 2006, Volume I, pages 445-558.

[12]   See, among others, CSJN, "Centro de Estudios para la Promoción de la Igualdad y la Solidaridad *et al.* v. Ministry of Energy and Mining," *Decisions*: 339:1077 (2016). In this case, the Supreme Court annulled an increase to the price of gas because the national government had not called a prior public hearing as it was legally obliged to do. Other cases can be cited, among many, from prior time periods:  CSJN, "Verrocchi, Ezio D. v. National Executive Branch," *Decisions*: 322:1726 (1999); CSJN, "Risolía de Ocampo, María J. v. Rojas, Julio C.," *Decisions*: 323:1934 (2000); CSJN, "Zofracor S.A. v. Argentine State," *Decisions*: 325:2394 (2002); Case "Provincia de San Luis v. Argentine State," *Decisions*:  26:417 2003); CSJN, "SELCRO S.A. v. Jefatura Gabinete Mos.," *Decisions*: 326:4251 (2003); "SADOP v. Argentine State," *Decisions*: 326:2150 (2003); CSJN, "Argentine Consumers v. EN – PEN – Dto. 558/02 – SS – ley 20.091 s/ amparo ley 16.986," *Decisions*: 333:633 (2010).

sought to implement in order to see that political statements regarding the Judicial Branch are, more often than not, just that:  statements.[13]

2.  My Previous Declarations

8.     B&N also assert that my previous publications are inconsistent with the opinions I present here and in my first declaration; specifically, B&N reference an article that I wrote in 2018 on the topic of the Supreme Court.[14]  Simply by reading the article in its entirety, a copy of which I attach here as Exhibit A, one can see that it contains no doubt on my part about the independence or impartiality of the Argentine Supreme Court. To the contrary, the article offers an objective examination of the work of the Court from 2007 to 2018, and I mention at the end that the Supreme Court still has work to do on improving "institutional quality and management." This observation is a reflection of an objective, not idealized, look at justice in Argentina.  The need for institutional and operational improvements within the Argentine Judicial Branch is similar to the experience of judicial authorities in the majority of countries in the region, and under no viewpoint can it be understood as accepting that the Argentine courts do not offer sufficient guarantees to independently and impartially decide a dispute such as this one.

---

[13]   See, among others, "In His Own Words: The President's Attacks on the Courts," at https://www.brennancenter.org/our-work/analysis-opinion/his-own-words-presidents-attacks-courts (last visited 02/05/2020).

[14]   B&N Declaration, ¶¶ 57-62.

9.      To the contrary, in the work referenced above, I reference the need for increased internal

transparency and the adoption of open government standards through which the judicial

authorities would report on the actions of the courts, measure their actions against standards,

create improvement processes, etc. These are the internal reforms that I believe the

Argentine Judicial Branch should undertake.

10.     Such reforms are indeed similar to the type of measures indicated by Supreme Court Chief

Justice Dr. Carlos Rosenkrantz in the very speech mentioned by B&N in their declaration,

which was a critical self-reflection on how to improve Argentina's Judicial Branch:[15] (i) the

creation of software to analyze the Court's productivity, (ii) the creation of a schedule of

important matters, and (iii) a new regulation for purchases and contracting.[16]  None of these

reforms go to the fundamental integrity of the courts, but are the type of improvements that

are routinely made in any well-functioning institution.

   3.  Other Criticisms of the Argentine Judicial Branch

11.     The references by Supreme Court Chief Justice Rosenkrantz, cited by B&N as further

evidence of a "legitimacy crisis" in Argentina,[17] are principally references to challenges to

the legitimacy of the courts based on a number of complaints concerning the actions of

certain federal judges presiding over criminal matters in the Federal Capital (Buenos Aires),

of which the accusations of corruption were proven in the case of only one of these judges,

---

[15]   See B&N Declaration, ¶¶ 33-36.

[16]   Opening Speech for the Judicial Year by Chief Justice Carlos Rosenkrantz, pgs. 3-4, at
       http://public.diariojudicial.com/documentos/000/083/452/000083452.pdf (last visited, 02/05/2020).

[17]   See B&N Declaration, ¶¶ 32-38.

who has been removed.[18] This represents a small minority of federal judges, as well as of the cases decided every year by the Judicial Branch. These criticisms do not extend to the federal judges with jurisdiction to hear civil and commercial matters or contentious-administrative matters, nor to the Supreme Court.

12.     Moreover, I maintain my view that the system of appointing and removing federal judges ensures the independence of the judiciary in Argentina.[19]  The system of checks and balances between the three branches of government are mechanisms that ensure judicial independence.

13.     In my first declaration, I explained an essential characteristic of the Argentine judicial system that provides an important check and balance for the independence of the judiciary, and which B&N did not discuss in detail: the role that the Constitution assigns to the Judicial Council in the process of appointing and removing federal judges. It should be recalled that the constitutional reform of 1994 modified the procedure for appointing federal judges, both for the lower courts and the Supreme Court. On one hand, it established a system for selecting candidates to fill vacancies for lower judges through a competitive public process. The Judicial Council was given the authority to "issue proposals in binding lists of three candidates, to appoint judges to the lower courts."[20] Once the three-candidate list is presented, pursuant to the terms of paragraph 4 of Article 99 of the National Constitution, the President of the Nation appoints the lower judges from this list, with

---

[18]   The note of Alberto Garay cited by B&N in paragraph 37 of their declaration refers exclusively to these judges. Similarly, the radio declaration referenced by B&N in paragraph 38 of their declaration is related to federal judges presiding over criminal matters.

[19]   Santiago Decl. ¶ 8.

[20]   Article 114, para. 2 of the National Constitution.

agreement by the Senate. The 1994 constitutional amendment also increased the majorities required for agreement in the Senate for the appointment of Supreme Court justices.[21] The participation by the Judicial Council in the processes related to lower court positions, though it may be deserving of criticism with respect to specific points, has improved the previous system, in which only the President selected judges.

14. B&N seek to raise doubts regarding Argentina's judicial system by referencing a communication by the United Nations Special Rapporteur on the Independence of Judges and Attorneys, Mr. Diego García-Sayán.[22]  In my view, this communication also does not affect the conclusions reached herein.

15. Actually, the communication by the Special Rapporteur refers to allegations reported by another source; it is not a final report resulting from an independent investigation. This is evidenced by the Special Rapporteur's request for more information from Argentina about these allegations. After the change in government, in December of 2019, the Argentine Republic informed the Special Rapporteur that the new authorities have "assumed the strong commitment to improve the institutional quality in the Argentine Republic, which involves the protection and strengthening of the independence of the Judicial Branch and the Public Prosecutor's office" and requested an opportunity to respond to the allegations that arose from the communication of the Rapporteur.[23]

---

[21]   In both cases, our Constitution establishes that the appointments must be made in public sessions.

[22]   B&N Declaration, ¶¶ 46-47.

[23]   Communication from the Republic of Argentina to the United Nations Special Rapporteur, dated January 6, 2020, at https://spcommreports.ohchr.org/TMResultsBase/DownLoadFile?gId=35103 (last visited, 02/05/2020).

16.     It also seems clear that several of the allegations mentioned in the communication by the Special Rapporteur refer to easily explainable situations. For example, note that on page 2 of the communication, there is a reference to the appointment "by decree" of National Supreme Court Justices Carlos Rosenkrantz and Horacio Rosatti, asserting that it was without Senate approval.  However, both appointments obtained the agreement of the National Senate, following the appointment procedure provided under the National Constitution. Also, a supposed appointment "by decree" is confused with the temporary appointment by commission until later agreement by the Senate, which has been a power expressly provided under Article 99, paragraph 19, of the Constitution since 1853. This constitutional provision was copied from the United States Constitution, which provides for the appointment by commission of numerous federal judges, including Supreme Court justices, until they are later ratified through the Senate. Beyond the political opinion that one may have about the timeliness, merit or convenience of exercising this constitutional authority, the fact is that it does not now nor did it ever affect the independence of the Judicial Branch or its functioning.

17.     I find it important to reiterate that the fact that the Argentine Judicial Branch has significant challenges ahead of it for improving its institutional quality in no way prevents it from hearing and independently and impartially deciding complex judicial matters such as the instant matter. The academic standard used to measure the actions of judges in general uses idealistic models that help identify aspects for improvement. Even United States courts have been the target of criticism and study, without this affecting their ability to rule according to

the law.[24] All existing human institutions may be improved upon. However, that does not

mean that they do not function reasonably or, in the case of judicial institutions, that they are

not independent or impartial.[25]

## B.  The Change in Argentine Government Does Not Affect My Opinions

18.     B&N suggest that the new government somehow affects the legitimacy of the Argentine

Judicial Branch.[26] I do not agree. As it relates to the change in government that occurred in

December 2019, it should be noted that, despite the fact that some members of the new

administration have been critical of the Judicial Branch, this does not change my position

about the independence of the Argentine Judicial Branch. In fact, I reaffirm my opinion that

the Argentine Judicial Branch is independent and will function independently.

19.     The change in the presidency—the result of a democratic election—does not entail any

changes in the composition of the Supreme Court, which reflects the republican plurality

and the institutional strength of the highest Argentine court. Of the five current justices on

the Supreme Court, one was appointed by former President Eduardo Duhalde, two by

former President Cristina Fernández and two by former President Mauricio Macri. This

plural composition of the Supreme Court is balanced, diverse and independent from the

---

[24]   See, e.g., Opinion - The Supreme Court's Legitimacy Crisis at
https://www.nytimes.com/2018/10/05/opinion/supreme-courts-legitimacy-crisis.html and Corruption in Our
Courts: What It Looks Like and Where It Is Hidden at
https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?article=5179&context=ylj (last visited, 01/31/2020).

[25]   As stated in the final conclusions of the work *Historia de la Corte Suprema Argentina* [History of the Argentine
Supreme Court], (Santiago, Alfonso (Editor), Ed. Marcial Pons, 2014, Buenos Aires, Volume III, p. 2021), to
which Dr. Bianchi contributed, "[If] the history of the Argentine Supreme Court is viewed as a whole, if the
complete "film" is analyzed and not just the "photo" of a particular moment, one of the constants that is noticed
is the continuous growth of its active role and institutional presence. Over the decades, its degree of participation in
the political process has been increasing, as have society's demands and expectations made of it. The Court itself
would also appear to be increasingly aware of all this."

[26]   B&N Declaration, ¶¶ 41-44.

sitting government.  Nor did the arrival of the new government affect the composition of the lower courts, whose members have been regularly appointed by different governments, in accordance with the National Constitution, which also provides that judges can only be removed for reasons of misconduct.[27]

20.     The critiques of the opinions by the former President and current Vice President of the Nation, Cristina Fernández, expressed by B&N in their declaration,[28] are irrelevant to the functioning of the judicial system during the presidency of Alberto Fernández, considering the limited role that the National Constitution assigns to Vice Presidents. A Vice President has no authority in matters pertaining to Judicial Branch judges: they have no constitutional role in an impeachment that would allow them to become involved in Judicial Branch actions; their participation is not provided for in the processes for appointing or removing federal judges, since as President of the Senate, they have no vote, except in the case of a tie in the vote of the Senate plenary session, which is very rare. Plaintiffs recognize that executive branch officials do not control the Argentine judiciary.[29]

21.     As I stated previously, in 2013, when the current Vice President was President of the Nation, the Supreme Court declared the unconstitutionality of the reform to the Judicial Council (which was known under the name of Democratization of Justice) in the "Rizzo" case, mainly because it considered that (i) increasing the representation of political bodies

---

[27]   As stated above, judges can only be removed by the Council.

[28]   See B&N Declaration, ¶¶ 26-31.

[29]   Plaintiffs' Memorandum in Opposition to Motion to Dismiss for *Forum Non Conveniens* at 16 n.8.

would cause imbalance within the Council and that (ii) the proposal for the election of representatives of the judiciary from academic and scientific circles and from the lawyers on the federal register through a popular vote would threaten the transparency of the process and politicize the Council's composition. Referring to the case, Dr. Alberto Bianchi stated that: "In what can be considered an exemplary decision, the Supreme Court granted an amparo and declared—by a majority of 6 to 1—that Articles 2, 4, 18 and 30 of Law 26,855 were unconstitutional."[30] The Rizzo case is viewed as having broadly affirmed the notions of constitutional supremacy and judicial review.

22. Law 26,853, which in 2013 created the Cassation Chambers that would have reviewed the decisions issued by the federal appeals courts in Argentina, also was later repealed.[31] No judges were appointed to fill these chambers, which never began to function.[32] Similarly, the law that created these courts was repealed by Law 27,500 in 2019.[33] Accordingly, the creation of the Cassation Chambers never had any effect on court decisions.

23. On the other hand, during the eight years that Ms. Cristina Fernández held the office of President, only four lower court judges were removed, all for just cause and by independent and impartial decision of the bodies with jurisdiction over the misconduct of the judges (that is, those institutions with jurisdiction over an impeachment process) under Articles 114 and 115 of the National Constitution: the Judicial Council (which requires the

---

[30]   Bianchi, Alberto, Una reforma inconstitucional [An unconstitutional reform], in SANTIAGO, Alfonso (Editor), *History of the Argentine Supreme Court*, Ed. Marcial Pons, 2014, Buenos Aires, Volume III, p. 1958. There we can see wide-ranging complimentary comments on this judgment and its grounds.

[31]   B&N Declaration, ¶¶ 22-23.

[32]   B&N Declaration, ¶ 24.

[33]   B&N Declaration, ¶ 24.

vote of 9 of its 13 members to find an accusation valid) and the Jury for the Judgment of Magistrates (which requires the vote of 5 of its 7 members to consider dismissal appropriate). The Executive Branch cannot and did not have any involvement in these dismissals.

24.     Since 1983, the democratic system has been functioning normally in Argentina, with different political parties alternating in the exercise of public authority. The members of the Judicial Branch have been appointed in accordance with the procedures provided by the National Constitution,[34] and with the participation of the different branches with authority in these matters. During President Macri's term (2015-2019), for instance, 201 federal judges (out of a total of 977), 29 prosecutors, 38 public defenders and 43 assistant judges were appointed. Along with this, the competitive processes of 142 federal judges, 8 prosecutors, 44 defenders and 19 assistant judges were finalized, and the only thing pending was Senate approval (as at the date of this declaration). This is evidence that there has been a continuity throughout the different governments in the use of the mechanisms provided in the National Constitution for the appointments of judges.

25.     Other considerations include the following:

    A.     The method of election of senators[35] and the plurality of political parties with parliamentary representation that is characteristic of the Argentine political system

---

[34]    Accordingly, since 2001, the year that the Judicial Council performed its first selection process, until 2019, 816 judges were appointed as part of the Judicial Branch of the Nation, according to the constitutional procedure, as follows:  2001: 33; 2002: 46; 2003: 10; 2004: 41; 2005: 71; 2006: 43; 2007: 13; 2008: 94; 2009: 46; 2010: 6; 2011: 107; 2012: 33; 2013: 11; 2014: 38; 2015: 33; 2016: 22; 2017: 50; 2018: 81; 2019: 38.  *See* https://old.pjn.gov.ar/02_Central/ViewDoc.Asp?Doc=142654&CI=INDEX100

[35]    The Senate is made up of three senators from each province and three from the city of Buenos Aires, elected by popular vote. Two of the three seats correspond to the party that had the highest number of votes and the remaining seat corresponds to the party that places second. The term of the senators lasts six years but the Senate is partially renewed every two years through the election of senators in a third of the districts.

make it difficult for a government to have the support of two thirds of the Senate. Neither the current government, nor the previous government had the support of two-thirds of the senators. A two-thirds majority in the Senate is required for consent to appoint new Supreme Court justices and the Attorney General or to remove Supreme Court justices who have been accused by two-thirds of the House of Representatives.

B.   A majority of two-thirds of the members of the Judicial Council is required to initiate the procedures to remove the Nation's lower court judges.

C.   In this context, there is no threat that would lead to an assumption of fear of judges being removed because they were appointed during the terms of previous governments, nor is there any indication that this might take place.

D.   The current President has expressed his desire to improve the independence and institutional quality of the Judicial Branch of the Nation.  For example, in his December 10, 2019 speech to the Legislative Assembly, President Fernández remarked that "[a] democracy without truly independent justice is not a democracy," and that "[w]ithout a justice independent of political power, there is no republic or democracy."[36]

26.   For this reason, the political changes that occurred in recent elections have not affected the normal functioning of the courts, which will continue their regular functioning, ruling for

---

[36]   The text of the speech is available at https://www.eldestapeweb.com/nota/el-discurso-completo-de-alberto-fernandez-en-la-asuncion-presidencial-2019121013450; and video is available at https://www.youtube.com/watch?v=OqMrbhbkY9M.  In addition, in a recent interview, the President emphasized that "judges have to know [that] they will never receive a call from me . . . to tell them what they have to do in a case."  Youtube C5N, *Alberto Fernández mano a mano con Tomás Méndez*, YOUTUBE (December 3, 2019).

and against the Argentine State as the federal judges may deem appropriate within the context of specific cases.

27.     If there were legislative changes related to the Judicial Branch, they would be decided within the framework of the legitimate exercise of a democratic government and must respect the constitutional limits, under penalty of being declared unconstitutional by the Judicial Branch itself.

## C.  Litigation Against the Government of Argentina

28.     I reaffirm my prior opinion that private foreign litigants have frequently been able to access the Argentine courts to file claims against the Argentine State.[37]  This opinion is supported by the various cases in my prior declaration in which the private foreign litigant prevailed against the Argentine State.

29.     B&N selected a single case, *Claren*, in which the Supreme Court refused to recognize a judgment by the Southern District Court of New York against the Republic of Argentina with respect to the collection of amounts owed under certain bonds, and they try to use this example as evidence that the justice system of Argentina is incapable of acting independently in cases involving the government.[38] I discuss the *Claren* case below, but I also wholly disagree with the B&N declarations, which disregard various cases in which the courts of Argentina have ruled against the Republic and/or its state agencies.

---

[37]    Santiago Decl., ¶ 13.

[38]    B&N Declaration, ¶ 54.

30.     The Argentine Supreme Court, which would be the final instance in the judicial process in this case, has shown signs of marked independence, issuing various rulings in recent years that clearly contradicted the interests of the sitting government, independent from the political sector in charge of the government.

31.     The article that I authored,[39] and that B&N reference, reads:

> *"As for the decisions that had a high institutional impact because they controlled measures of great interest to the sitting government, the following are notable: the "Clarín" case,[40] in which the Supreme Court, in a divided decision, declared the media law sanctioned by the Kirchner administration constitutional; the Rizzo case,[41] which invalidated the reforms on the makeup of the Judicial Council promoted by that government through law 26,855; the "Santa Fe" case,[42] handed down days before the end of the Cristina Kirchner administration and at the beginning of the Mauricio Macri [administration], declaring as unconstitutional the 15% deduction of a series of co-participation taxes by the National Government, without agreement by the provinces, to finance the National Social Security Administration (ANSES), which considerably affected the federal government budget; and the "CEPIS" case,[43] which rescinded the tariff increase imposed by the recently seated government of President Macri because there was no prior public hearing" and "Also [the Supreme Court] limited the legislative authorities of the President in Argentine Consumer cases,[44] "Bar*

---

[39]     SANTIAGO, Alfonso. *La Corte de Lorenzetti* [The Lorenzetti Court]*, El Derecho-Constitucional* [Constitutional Law], 2018, pp. 16-17 (attached as Exhibit A).

[40]     CSJN, "Grupo Clarín SA et al v. National Executive Power et al.," *Decisions*: 336:1774, (2013).

[41]     CSJN, "Rizzo, Jorge Gabriel v. National Executive Power," *Decisions*: 336:760 (2013).

[42]     CSJN, "Province of Santa Fe v. National State," *Decisions*: 338:1389 (2015).

[43]     CSJN, "Centro de Estudios para la Promoción de la Igualdad y la Solidaridad et al v. Ministry of Energy and Mining," *Decisions*: 339:1077 (2016).

[44]     CSJN, "Consumidores Argentinos v. National State," *Decisions*, 333:633 (2010).

*Association"[45] and "Camaronera Patagónica," [46] but not in the case of "Aceval Pollacchi." [47]*

Therefore, we can see that in recent years, the Supreme Court ruled independently in several important decisions, some in favor and others against the interests of the sitting government, and that it used all of its judicial authority to defend the independence of the Judicial Branch itself.

32. This observation, which evidences several Supreme Court rulings against several administrations, is not analyzed by B&N in their report. A full reading of this article provides a complete understanding of my beliefs about the actions by the Supreme Court of Argentina between the years of 2007 and 2016, with its decisions both in favor of and against the governments in power, as shown therein. The realistic and balanced description shows that the Supreme Court of Argentina, as the head of the Judicial Branch, is fully competent to hear this case as the final instance, in the event that it reaches that bench. In his article, Dr. Bianchi, while critical of the reforms attempted by the administration between 2003 and 2015, recognizes that the Supreme Court and numerous lower court judges have long served to limit the power of the Executive:  he states that "*the attitude of the Supreme Court and of the many judges who have set limits on a political power that only seems interested in being obeyed must be regained.*"[48]

---

[45]   CSJN, "Pellicori, Liliana Silvia v. Public Attorney Bar of the Federal Capital," *Decisions*: 334:1387 (2011).

[46]   CSJN, "Camaronera Patagónica S.A. v. Ministry of Economy et al.," *Decisions*: 337:388 (2014).

[47]   CSJN, "Aceval Pollacchi, Julio César v. Compañía de Radiocomunicaciones Móviles S.A.," *Decisions*: 334:799 (2011).

[48]   Bianchi, Alberto, "Una reforma inconstitucional" ["An unconstitutional reform"], in SANTIAGO, Alfonso (Editor), *Historia de la Corte Suprema argentina* [History of the Argentine Supreme Court], Op. Cit., p. 1978.

33.     Even more than the Supreme Court itself, the lower courts of the Judicial Branch of

Argentina have issued numerous decisions against the interests of the government, which

shows their true independence. Their actions were notable in the resolution of thousands of

*corralito* actions, which imposed mandatory restrictions on cash withdrawals from banks,

and the conversion to pesos of deposits initially established in dollars. These courts acted

with energy and decisiveness  to fully protect the property rights of savings holders,

declaring the emergency standards issued by the various governments in 2001 and 2002

unconstitutional.

1.  The *Claren* Case

34.     As a *de exequatur* case, the "Claren" case is unique. The *de exequatur* procedure is

regulated by Art. 517 of the National Civil and Commercial Code of Procedure ("CPCCN")

and its application is mandatory for all federal judges when a foreign judgment is sought to

be enforced in the Republic of Argentina.

35.     Art. 517 of the CPCCN provides:

> *Art. 517. - Judgments by foreign courts shall be enforceable under the terms of treaties with their country of origin.*
>
> *When there are no such treaties, they shall be enforceable if they meet the following requirements:*
> *1) That the judgment, with the authority of res judicata in the State where it was handed down, comes from a competent court pursuant to Argentine standards of international jurisdiction and is the result of carrying out a personal action or a property action on personal property, if it has been transferred to the Republic during or after the proceeding carried out abroad.*
> *2) That the defendant against which the judgment is sought to be enforced has been personally served and his right to a defense has been protected.*

> *3) That the judgment contains the requirements necessary to be considered as such in the place where it was issued and the conditions of authenticity required by national law.*
> *4) That the judgment does not affect the principles of public order under Argentine law.*
> *5) That the judgment is not incompatible with another issued previously or simultaneously by ONE (1) Argentine court."*

36.    In "Claren," the enforceability of a foreign judgment was analyzed. The Supreme Court concluded that the exequatur sought by Claren Corporation did not satisfy the requirement provided in paragraph 4 of Article 517 of the National Civil and Commercial Code of Procedure.

37.    The *Claren* case is an exceptional case, one that is not representative of the majority of cases that federal judges decide.  In *Claren*, the Argentine courts decided that public order would be compromised by enforcing this particular judgment from another jurisdiction.  In the *Claren* case, the Argentine judiciary exercised its independent and impartial judgment and declined to enforce the foreign judgment, based on *bona fide* reasons under Argentine law. Contrary to B&N's declaration, the *Claren* decision does not show any lack of independence or impartiality of the Argentine judiciary that would affect Argentine judges – including the Supreme Court of Argentina – in similar cases.

   2.  Cases with a Declaration of National Emergency

38.    In the early 2000s, for example, the Supreme Court issued several rulings that protected property rights and that were contrary to government interests. For example, the "Smith,"[49] and "San Luis"[50] rulings were the result of the serious economic crisis that Argentina

---

[49]    CSJN, "Banco de Galicia and Buenos Aires v. P.E.N.," *Decisions*: 325:028 (2002).

[50]    CSJN, "San Luis Province v. National State," *Decisions:* 326:417 (2003).

suffered in 2001-2002. In those cases, the government cited the economic crisis as a justification for a series of emergency measures, such as decrees 1570/01 and 71/02 and Ministry of Economy resolutions 18/02 and 23/02 that limited the withdrawal of funds from the financial system and rescheduled their due dates. In the "Smith" case, the Supreme Court declared the measures unconstitutional because (1) fundamentally their provisions were harmful to the right to dispose of private property recognized in the National Constitution, and (2) they were outside the scope of the powers delegated by the legislation to the Executive Branch. In the "San Luis" case, the Supreme Court declared unconstitutional Article 2 of Emergency Decree 214/02 which, as a public order decree ordered "pesification," i.e., that bank deposits initially made in U.S. dollars be converted to pesos.[51] Likewise, in the context of an energy emergency, the Court ruled against government interests and in favor of users of the natural gas distribution service in the "CEPIS" case[52] mentioned above. The B&N report makes an incorrect generalization, which is not consistent with reality.

39.     Finally, B&N indicate that in my first declaration I have only included a small group of cases decided against the government, and that these cases differ from the facts in this matter.[53] The cases referred to in my first declaration involve claims made by foreign companies that obtained a favorable result before Argentine courts in litigations against the

---

[51]   Subsequently, in the "Bustos" and "Massa" cases, the Supreme Court qualified its decision and validated the pesification, because the new value of the deposits that had been pesified and updated was equivalent to their initial value in dollars. Therefore, in the highest court's opinion, it was no longer possible to claim that the constitutional right to property had been infringed.  CSJN, "Bustos, Alberto R. and others v. National State et al.," *Decisions*: 327:4495 (2004); The Law, 2004-F-713; CSJN, "Massa, Juan Agustín v. National Executive Branch," *Decisions*: 329:5913 (2006).

[52]   CSJN, "Centro de Estudios para la Promoción de la Igualdad y la Solidaridad et al v. Ministry of Energy and Mining," *Decisions*: 339:1077 (2016).

[53]   B&N Declaration, ¶¶ 63-65.

Argentine State. Accordingly, their relevance seems obvious to me.[54]  Likewise, Prof. Cabanellas included several cases in his declaration, as well as in Appendix B of that declaration.[55] They are additional relevant examples for this case. [56]

## D.  The Functioning of the Argentine Judicial System

40.   I maintain my view that foreign and domestic litigants have full access to the Argentine courts and the mechanisms therein that allow access to witnesses and documents.[57] Argentine law and practice show that foreign and domestic litigants have the same access to produce evidence necessary for their case, as well as to compel reluctant witnesses to appear.[58]

---

[54]   Santiago Decl, ¶ 13.

[55]   Cabanellas Declaration, ¶ 11.

[56]   In "Giustiniani, Rubén Héctor v. YPF, S.A.," a well-known case, which is part of a broader litigation involving contracts for the exploitation of large shale oil fields, the Supreme Court overturned decisions by lower courts and ordered YPF to publish the terms of those contracts. CSJN, "Giustiniani, Rubén Héctor v. YPF, S.A.," *Decisions*: 338:1258, (2015).

In "Silvano Sampietro v. Argentine National Bank," the National Court of Appeals for Federal, Civil and Commercial Matters handed down a decision against a state commercial bank for failure to comply with its obligation to inform its customers about the legal requirements of certain financial transactions. CSJN, "Silvano Sampietro v. Argentine National Bank" *CNCyCFed* (II) (2016).

In "Benito Roggio e Hijos S.A. *et al.* v. E.N. Agua y Energía Eléctrica S.E.," the Supreme Court affirmed the decision of a court of appeals, which had upheld the plaintiff's claim against a state company, relating to the calculation of the price of certain construction projects carried out by the plaintiffs. "Benito Roggio e Hijos S.A. et al v. E.N. Agua y Energía Eléctrica S.E.," B.865.XLVI (2013).

[57]   Santiago Decl. ¶ 14.

[58]   Santiago Decl. ¶¶ 15-21.

41.     I have reviewed the statements of B&N with regard to the functioning of the Argentine judicial system. [59] I am quite surprised by those statements, as B&N frequently appear before the Argentine courts on a variety of matters and regularly use the Argentine judicial system, as do thousands of attorneys like them. The type of criticism that B&N assert against the Argentine judicial system could, to a large extent, be leveled against any judicial system in Latin America. If the attacks by B&N are given credit, then no judicial system in Latin America would be sufficiently suitable to analyze a claim like the one in dealt with here.

42.     There are many civil law countries that do not have trials by jury, that have limited testimonial evidence and no discovery, but it would be absurd to argue that it is not possible to access their courts or that they are not independent because of it. Each system must be judged individually. Each country may legitimately establish its own procedural rules, its own reasonable regulations on the right of access to justice, due process and effective judicial protection, without the litigants being able to evade them simply because they prefer a different process.

43.     Similarly, B&N make misleading allegations regarding Laws 27 and 48, which are called "old."[60] Both laws were enacted and modeled after the United States Judiciary Act of 1789, and they are regularly and often applied, especially by the Supreme Court, leaving no reason to suggest that any change is needed. As for the reference to Decree 1285/58, the B&N

---

[59]     See, generally, B&N Declaration, ¶¶ 68-108.

[60]     See B&N Declaration, ¶81.

Declaration fails to clarify that it has been updated, on several occasions, the most recent of which was through laws 27,145, 27,146 and 27,150 of 2015.

44.     The other points asserted by B&N are unfair characterizations on the functioning of courts or they simply seek to challenge standard proceedings that occur in many civil law countries. For example, B&N argue that Article 333 of the CPCCN requires that the parties present all of their evidence "blindly" before the defendant responds to the complaint.[61] This is incorrect. As I described in my first declaration, and as the article clearly indicates, parties are asked to support their initial claim or defense with evidence, but also have the opportunity to submit additional evidence later.[62] Moreover, legal costs are not an impediment for lawsuits. As I indicated in my first declaration,[63] these types of legal costs are common in courts in Latin America and they do not prevent parties from accessing justice. Because Argentine law permits the prevailing party to recover its costs and fees, such fees are unlikely to deter a meritorious case.

45.     The duration of trials in Argentina does not differ substantially from other countries in the region. There are, of course, exceptional cases like the case that B&N mentions. But "Compañía Azucarera Tucumana" is certainly a unique case that cannot be generalized as a reflection of what typically takes place. The certainly excessive length in a single case by no means reflects what occurs in the majority of cases, and cannot be used as a basis for asserting that legal claims cannot be heard before the Argentine courts.

---

[61]   See B&N Declaration, ¶¶ 85-86.

[62]   Article 333 of the CPCCN: "Documentary evidence and all other evidence that the parties intend to rely upon must be offered and attached to the complaint, counterclaim and the answers to both…"

[63]   See Santiago Decl., ¶ 22.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: February 7, 2020

[signature]

Alfonso Santiago

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

PETERSEN ENERGÍA INVERSORA, S.A.U.   :
AND PETERSEN ENERGÍA, S.A.U.,        :
                                     :
                Plaintiffs,      :
                                     :
        -against-                  :
                                     :
ARGENTINE REPUBLIC and YPF S.A.,     :
                                     :   Case Nos.
           Defendants.      :
                                     :   1:15-cv-2739-LAP

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ETON PARK CAPITAL MANAGEMENT, L.P., :   1:16-cv-8569-LAP
ETON PARK MASTER FUND, LTD., and     :
ETON PARK FUND, LP.,                 :
                                     :
                Plaintiffs,      :
                                     :
        -against-                  :
                                     :
ARGENTINE REPUBLIC and YPF S.A.,     :
                                     :
           Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## Declaración en Réplica de Alfonso Santiago

De acuerdo al 28 U.S.C. § 1746 y la Regla 44.1 de las Reglas Federales de los

Procedimientos Civiles, yo, Alfonso Santiago, declaro lo siguiente:

1. Presento esta declaración de experto en respaldo de la Réplica de los Demandados en la

    Moción de Rechazo por Forum Non Conveniens y para responder a ciertas afirmaciones

    hechas en la Declaración presentada por Alberto B. Bianchi y Gustavo Naveira, con fecha 4

    de diciembre de 2019 (en adelante conjuntamente referidos como "B&N", y su Declaración

    referida como "Declaración B&N") para los Demandantes en el asunto arriba referido.

**A. Independencia del Poder Judicial Argentino**

2.     Afirmo en mi opinión anterior que Argentina tiene un sistema judicial independiente capaz de resolver de forma justa e imparcial las controversias entre litigantes privados, incluyendo extranjeros, y el Estado argentino.[1] Lo anterior se fundamenta en las condiciones y garantías de independencia que ofrece el Poder Judicial de la Nación: los sistemas de nombramiento y remoción de los jueces federales previstos en la Constitución Nacional, las garantías constitucionales sobre remoción y remuneración de las que gozan los magistrados judiciales, la facultad que tienen los jueces federales de declarar la inconstitucionalidad de las leyes y demás normas que afecten la independencia judicial, la facilidad de acceso al sistema judicial por parte de los litigantes para obtener una sentencia fundada lograda a través de un proceso que garantice el debido proceso, y la posibilidad de entablar demandas en contra del Estado argentino y obtener su condena.

3.     Como cuestión inicial, me gustaría responder a las afirmaciones hechas por B&N sobre la calidad e independencia del sistema judicial de Argentina. Ellos sostienen solo que el sistema judicial argentino carece de "legitimidad" por su baja consideración pública.[2] No estoy de acuerdo con esas declaraciones. Como explicaré más abajo, considero que las justificaciones dadas por B&N en apoyo a esta apreciación no tienen relevancia en relación al caso que ocupa a esta corte. Desde mi punto de vista, y tal como señalé en mi primera declaración, el sistema judicial argentino ofrece las necesarias y suficientes garantías de independencia, imparcialidad y competencia técnica para que estas acciones sean adjudicadas en la República Argentina, aun teniendo en cuenta algunos desafíos que

---

[1]     Declaración Experto de Alfonso Santiago, presentada el 30 de agosto de 2019 ("Decl. Santiago"), ¶¶ 6-12.

[2]     Ver, e.g., Declaración B&N, ¶¶ 49, 118.

enfrenta el sistema, como toda institución, para mejorar ciertos aspectos en aras a alcanzar la máxima calidad institucional posible.

1.  Críticas Políticas

4.      B&N hacen referencia en gran parte de su Declaración a las declaraciones públicas sobre el Poder Judicial argentino formuladas por ciertas figuras políticas en relación a sus propios objetivos políticos.[3] De manera general, esas declaraciones de críticas sobre el Poder Judicial son relativamente comunes entre los políticos en países latinoamericanos – y de hecho, como se señala más adelante, también en otros regímenes legales – y no han afectado el normal funcionamiento del Poder Judicial en la República Argentina.

5.      Desde la restauración de la democracia en 1983, la Corte Suprema argentina ha asumido un rol más activo, especialmente en la defensa de la independencia, prerrogativas, atribuciones y competencias del propio Poder Judicial. En el ejercicio de esta misión, la Corte Suprema ha declarado la inconstitucionalidad de actos del Poder Ejecutivo,[4] del Congreso,[5] del poder constituyente provincial[6] y del poder constituyente nacional.[7]

---

[3]    Ver, e.g., Declaración B&N, ¶¶ 26-31, 41-44.

[4]    Ver CSJN, Acordada 42/91, 8 de octubre de 1991. Mediante esta Acordada la Corte Suprema dejó sin efecto un decreto de necesidad y urgencia que suspendía transitoriamente la ley de autarquía financiera del Poder Judicial. Consideró que este acto era gravemente lesivo de la independencia del Poder Judicial.

[5]    Ver CSJN, Acordada 20/96, 11 de abril de 1996. Mediante la Acordada 20/96 la Corte Suprema declaró la invalidez de una ley del Congreso que extendía a los jueces el impuesto a las ganancias, por entender que de este modo se afectaba la garantía constitucional de la "intangibilidad" de las remuneraciones de los magistrados judiciales. Ver caso CSJN, "Rizzo, Jorge Gabriel c/ Poder Ejecutivo Nacional", *Fallos*: 336:760 (2013). En el caso Rizzo, la Corte Suprema declaró inconstitucional la ley de reforma de la integración del Consejo de la Magistratura, por contradecir las disposiciones constitucionales y alterar el equilibrio entre los representantes de los distintos sectores que integran dicho Consejo.

[6]    Ver CSJN, "Iribarren, Casiano R. c/Provincia de Santa Fe", *Fallos*: 322:1253 (1999). En este caso, la Corte Suprema declaró la inconstitucionalidad de un artículo de la Constitución de la Provincia de Santa Fe que limitaba a los 65 años la garantía de inmovilidad de los jueces. A partir de esa edad era necesario un nuevo nombramiento para continuar en el cargo. La Corte Suprema entendió que ello podía condicionar las decisiones del juez y afectar su independencia.

6.      Además, las relaciones entre otros poderes y el Poder Judicial están sujetas al control de constitucionalidad y a los contrapesos propios de la distribución de poderes de una democracia constitucional. Así, por ejemplo:

- en 2007, se declaró inconstitucional un régimen de designación de jueces subrogantes;[8]

- como discuto más abajo (ver párrafo 21), en 2013 la Corte Suprema declaró la inconstitucionalidad de algunos artículos de la ley 26.855 de reforma del Consejo de la Magistratura y del Decreto 577/13, que realizó la convocatoria para la elección de candidatos al Consejo;

- en 2019, el Congreso derogó la ley 26,853 (promulgada en 2013) que había autorizado la creación de las "Cámaras de Casación" federales para cuestiones contencioso administrativas, del trabajo y la seguridad social, y civiles y comerciales.[9] Estas Cámaras de Casación, que no se llegaron a conformar ni a funcionar, fueron un intento de insertar una instancia intermedia de revisión entre las Cámaras de Apelación y la Corte Suprema;

- desde la restauración democrática, en 1983, se han designado a los integrantes de los tribunales federales conforme el procedimiento establecido por la Constitución Nacional y la normativa aplicable[10];

---

*(cont'd from previous page)*

[7]     Ver CSJN, "Fayt, Carlos Santiago c/Estado Nacional", *Fallos*: 322:1616 (1999). En este caso, la Corte Suprema declaró nulo el art. 99 inc. 4 de la Constitución Nacional, en cuanto exigía un nuevo acuerdo del Senado para que los jueces federales continúen en su cargo, una vez cumplidos los 75 años. Nuestro máximo tribunal entendió que la ley del Congreso que había convocado al poder constituyente de 1994 no lo había habilitado para legislar sobre este aspecto. Por ello, la reforma al art. 99 fue declarada nula e inconstitucional.

[8]     Ver CSJN, "Rosza, Carlos Alberto y otros", *Fallos*: 330:2361 (2007). Dicho régimen de designación de jueces subrogantes permitía la designación de jueces interinos (tras la renuncia, muerte o destitución de un juez) sin someterse al proceso previsto por la Constitución Nacional.

[9]     Ver Ley 27.500, Art. 4.

[10]    Ver *infra*, nota 34.

4

- en los casos en que se ha removido a jueces federales, se ha debido a su "mal desempeño", es decir, a problemas disciplinarios, actos de corrupción, mal trato a los empleados y funcionarios, etc.[11]

- numerosos pronunciamientos de la Corte Suprema y de los tribunales federales habían sido emitidos que eran claramente adversos a los intereses del gobierno en turno,[12] sin dar lugar a mayor cuestionamiento o debate. También han sido sometidos a juicio destacados políticos y funcionarios de diversos partidos, incluso cuando ese partido estaba en el poder, especialmente con respecto a causas penales por supuestos hechos de corrupción.

7.   El tipo de críticas políticas mencionadas por B&N no son infrecuentes en la historia de las instituciones judiciales en el mundo. Basta pensar en el llamado "court-packing plan" propuesto por Franklin Delano Roosevelt en la década 1930, para apreciar ejemplos de intentos por alterar la judicatura motivados por razones políticas que no tienen como resultado la alteración del Poder Judicial como institución en sus características esenciales. O más recientemente, se pueden ver la propuesta del candidato presidencial estadounidense Pete Buttigieg para incrementar el número de ministros de la Corte Suprema de 9 a 15 y

---

[11]   Ver SANTIAGO, Alfonso (Director), *La responsabilidad judicial y sus dimensiones*, Abaco, Buenos Aires, 2006, Tomo I, páginas 445-558.

[12]   Ver, entre otros, CSJN, "Centro de Estudios para la Promoción de la Igualdad y la Solidaridad y otros c/ Ministerio de Energía y Minería s/ amparo colectivo", *Fallos*: 339:1077 (2016). En este caso, la Corte Suprema dejó sin efecto un reajuste tarifario del gas porque el gobierno nacional no había convocado a la audiencia pública previa, según lo previsto por el ordenamiento jurídico. También pueden mencionarse, entre muchos otros, los siguientes casos correspondientes a períodos anteriores: CSJN, "Verrocchi, Ezio D. c/Poder Ejecutivo Nacional", *Fallos*: 322:1726 (1999); CSJN, "Risolía de Ocampo, María J. c/Rojas, Julio C.", *Fallos*: 323:1934 (2000); CSJN, "Zofracor S.A. c/Estado Nacional", *Fallos*: 325:2394 (2002); Caso "Provincia de San Luis c/Estado Nacional", *Fallos*: 326:417 (2003); CSJN, "SELCRO S.A. c/Jefatura Gabinete Mos.", *Fallos*: 326:4251 (2003); CSJN, "SADOP c/Estado Nacional", *Fallos*: 326:2150 (2003); CSJN, "Consumidores Argentinos c/ EN – PEN – Dto. 558/02 – SS – ley 20.091 s/ amparo ley 16.986", *Fallos*: 333:633 (2010).

modificar el proceso de nombramiento, o las fuertes críticas hechas por el Presidente Trump respecto a las sentencias que afectaban las políticas que él pretendía llevar a cabo para apreciar que las declaraciones políticas con respecto al Poder Judicial no son, en la mayoría de los casos, más que eso: declaraciones.[13]

### 2. Mis Declaraciones Anteriores

8.     B&N, asimismo, afirman que mis publicaciones anteriores son inconsistentes con las opiniones que presento aquí y en mi primera declaración; específicamente, B&N hacen referencia a un artículo que escribí en 2018 sobre el asunto de la Corte Suprema.[14] Una simple lectura del artículo en su integridad, cuya copia adjunto como Anexo A, permite ver que el mismo no contiene ninguna duda por mi parte sobre la independencia o imparcialidad de la Corte Suprema argentina. Al contrario, el artículo proporciona un examen objetivo del trabajo de la Corte desde 2007 a 2018, y menciono al final que la Corte Suprema aún tiene trabajo que hacer para mejorar la "calidad institucional y de gestión". Esa observación es un reflejo de una mirada objetiva y no idealizada sobre la justicia en la Argentina. La necesidad de mejoras institucionales y operacionales dentro del Poder Judicial argentino es similar a la que experimentan los poderes judiciales de la gran mayoría de los países de la región, y bajo ningún punto de vista pueden ser entendidas como aceptación de que los tribunales argentinos no ofrecen las suficientes garantías para resolver de modo independiente e imparcial un litigio como éste.

---

[13]    Ver, entre otros, "In His Own Words: The President's Attacks on the Courts", en https://www.brennancenter.org/our-work/analysis-opinion/his-own-words-presidents-attacks-courts (última visita, 05/02/2020).

[14]    Declaración B&N, ¶¶ 57-62.

9.      En el trabajo referenciado, por el contrario, hago referencia a la necesidad de una creciente transparencia interna y a la adopción de pautas de gobierno abierto mediante las cuales las autoridades judiciales den cuenta de la actuación de los tribunales, midan con estándares su actuación, formulen procesos de mejora, etc. Estas son las reformas internas que estimo necesario que el Poder Judicial argentino encare.

10.     Esas reformas son de hecho similares al tipo de medidas señaladas por el presidente de la Corte Suprema el Dr. Carlos Rosenkrantz, en el mismo discurso referido por B&N en su declaración, el cual era una autorreflexión crítica sobre cómo mejorar el Poder Judicial argentino:[15] (i) la creación de un software para analizar la productividad de la Corte, (ii) la creación de una agenda de causas trascendentes, y (iii) un nuevo reglamento de compras y contrataciones.[16] Ninguna de estas reformas habla sobre la integridad fundamental de los tribunales, pero son mejoras hechas de forma rutinaria en cualquier institución que funciona bien.

### 3.  Otras Críticas del Poder Judicial Argentino

11.     Las referencias del Presidente de la Corte Suprema, el Dr. Rosenkrantz, citadas por B&N como evidencia adicional de una "crisis de legitimidad" en Argentina,[17] son principalmente referencias a los retos a la legitimidad de las cortes, basados en la serie de denuncias respecto de la actuación de algunos jueces con competencia en materia penal federal de la Capital Federal (Buenos Aires), de las cuales solo se probaron alegaciones de corrupción

---

[15]    Ver Declaración B&N, ¶¶ 33-36.

[16]    Discurso de Apertura del Año Judicial del Presidente de la Corte Carlos Rosenkrantz, págs. 3-4, en http://public.diariojudicial.com/documentos/000/083/452/000083452.pdf (última visita, 05/02/2020).

[17]    Ver Declaración B&N, ¶¶ 32-38.

respecto de uno de estos jueces, quien fue destituido.[18] Ello representa un porcentaje muy minoritario de jueces federales y también de los casos que son anualmente decididos por el Poder Judicial. Esta crítica no se ha extendido a los jueces federales con competencia en cuestiones civiles y comerciales o contencioso administrativo ni a la Corte Suprema.

12.  Asimismo, sostengo mi opinión en cuanto a que el sistema de nombramiento y remoción de jueces federales asegura la independencia de la judicatura en Argentina.[19] El sistema de controles y contrapesos en las tres ramas del gobierno son mecanismos que aseguran la independencia judicial.

13.  En mi primera declaración, expliqué una característica esencial del sistema judicial argentino, la cual proporciona un importante contrapeso en la independencia de la judicatura, y que no fue abordado a detalle por B&N: el rol que la Constitución le asigna al Consejo de la Magistratura en el proceso de designación y remoción de jueces federales. Cabe recordar que la reforma constitucional de 1994 modificó el procedimiento de designación de jueces federales, tanto de los tribunales inferiores como de la Corte Suprema. Por un lado, estableció un sistema de selección de candidatos para cubrir vacantes de jueces inferiores mediante concurso público. Se facultó al Consejo de la Magistratura para "emitir propuestas en ternas vinculantes, para el nombramiento de los magistrados de los tribunales inferiores"[20]. Presentada la terna, de conformidad con lo dispuesto en el inciso 4º del artículo 99 de la Constitución Nacional, el Presidente de la Nación designa a los jueces

---

[18]  La nota de Alberto Garay citada por B&N en el párrafo 37 de su declaración se refiere exclusivamente a estos jueces. En sentido similar, la declaración en radio a la que se refieren B&N en el párrafo 38 de su declaración se relaciona con jueces federales con competencia en materia penal.

[19]  Decl. Santiago, ¶ 8.

[20]  Artículo 114, inciso 2º de la Constitución Nacional.

inferiores de esta lista, con acuerdo del Senado. La reforma constitucional de 1994 también agravó las mayorías requeridas para el acuerdo en el Senado para la designación de los jueces de la Corte Suprema.[21] La participación del Consejo de la Magistratura en los procesos relacionados con los cargos judiciales inferiores, aun cuando pueda merecer críticas respecto a cuestiones puntuales, ha mejorado el sistema anterior, en donde solo el Presidente era quien seleccionaba a los jueces.

14.     B&N pretenden generar dudas con respecto al sistema judicial de Argentina al referirse a una comunicación del Relator Especial de la Organización de las Naciones Unidas sobre la Independencia de los Magistrados y Abogados, el Sr. Diego García-Sayán.[22] En mi opinión, esa comunicación tampoco afecta las conclusiones aquí señaladas.

15.     En realidad, la comunicación del Relator Especial se refiere a alegaciones reportadas por otra fuente; no es un reporte final generado de una investigación externa. Esto se demuestra con la solicitud que el Relator Especial hace para obtener más información por parte de Argentina sobre estas alegaciones. Luego del cambio de gobierno, en diciembre de 2019, la República Argentina hizo saber al Relator Especial que las nuevas autoridades han "asumido el firme compromiso de mejorar la calidad institucional en la República Argentina, lo cual implica la protección y el fortalecimiento de la independencia del Poder Judicial y del Ministerio Público" y solicitó una oportunidad para responder a las alegaciones que surgían de la comunicación del Relator.[23]

---

[21]   En ambos casos, nuestra Constitución establece que las designaciones deben hacerse en sesiones públicas.

[22]   Declaración B&N, ¶¶ 46-47.

[23]   Comunicación de la República de Argentina al Relator Especial de la Organización de las Naciones Unidas, con fecha 6 de enero de 2020, https://spcommreports.ohchr.org/TMResultsBase/DownLoadFile?gId=35103 (última visita, 05/02/2020).

16.   También parece claro que varias de las alegaciones mencionadas en la comunicación del Relator Especial se refieren a situaciones fácilmente explicables. A modo de ejemplo, obsérvese que en la página 2 de la comunicación se hace referencia a la designación "por decreto" de dos jueces de la Corte Suprema de Justicia de la Nación, Dres. Carlos Rosenkrantz y Horacio Rosatti y se alega que se habría hecho sin la aprobación del Senado. Sin embargo, ambos nombramientos obtuvieron el acuerdo del Senado de la Nación, siguiendo el procedimiento para su nombramiento previsto en la Constitución Nacional. Además, se confunde una supuesta designación "por decreto" con la designación temporaria en comisión hasta la obtención del acuerdo posterior del Senado, que es una facultad expresamente prevista en el artículo 99, inciso 19 de la Constitución desde 1853. Esa disposición constitucional fue copiada de la Constitución de los Estados Unidos, cuya práctica incluye el nombramiento en comisión de numerosos jueces federales, incluidos jueces de la Suprema Corte, hasta su posterior ratificación a través del Senado. Más allá de la opinión política que se pueda tener sobre la oportunidad, mérito o conveniencia acerca de ejercicio de esta atribución constitucional, lo cierto es que no afecta ni afectó la independencia del Poder Judicial ni su funcionamiento.

17.   Considero importante reiterar que el hecho de que el Poder Judicial argentino tenga importantes desafíos por delante para mejorar su calidad institucional, de ningún modo lo inhabilita para entender y resolver de modo independiente e imparcial procesos judiciales complejos como el que aquí se ha planteado. El estándar académico con el que se mide la actuación de los jueces en general obedece a modelos idealistas que ayudan a identificar aspectos de mejora. Incluso las cortes norteamericanas han sido objeto de crítica y estudio,

sin que esto afecte su habilidad para resolver conforme a derecho.[24] Todas las instituciones humanas existentes pueden ser susceptibles de ser mejoradas. Pero eso no implica que no funcionen razonablemente o que, en el caso de las instituciones judiciales, no sean independientes o imparciales.[25]

## B. El Cambio del Gobierno de Argentina No Afecta Mis Opiniones

18.     B&N sugieren que el nuevo gobierno de alguna manera afecta la legitimidad del Poder Judicial argentino.[26] No estoy de acuerdo. En relación con el cambio de gobierno operado en diciembre de 2019, cabe destacar que, a pesar de que algunos integrantes de la nueva administración han sido críticos del Poder Judicial, esto no cambia mi posición sobre la independencia del Poder Judicial argentino. De hecho, ratifico mi opinión en cuanto a que el Poder Judicial argentino es independiente y funcionará de manera independiente.

19.     El recambio presidencial, producto de una elección democrática, no conlleva cambio alguno en la integración de la Corte Suprema, que refleja la pluralidad republicana y la fortaleza institucional del máximo tribunal argentino. De los cinco actuales jueces de la Corte Suprema, uno fue nombrado por el ex Presidente Eduardo Duhalde, dos por la ex Presidenta Cristina Fernández y dos por el ex Presidente Mauricio Macri. Esa composición plural de la

---

[24]   Ver, e.g., Opinion - The Supreme Court's Legitimacy Crisis en https://www.nytimes.com/2018/10/05/opinion/supreme-courts-legitimacy-crisis.html y Corruption in Our Courts: What It Looks Like and Where It Is Hidden en https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?article=5179&context=ylj (última visita, 31/01/2020).

[25]   Como fue expresado en las conclusiones finales de la obra *Historia de la Corte Suprema Argentina*, (SANTIAGO, Alfonso (Director), Ed. Marcial Pons, 2014, Bs. As., Tomo III, pág. 2021), en la cual colaboró el Dr. Bianchi, "[Si] se recorre la historia de la Corte Suprema argentina, si se analiza su "película" completa y no solo la "foto" de un determinado momento, una de las constantes que se advierte es el continuo crecimiento de su protagonismo y presencia institucional. A lo largo de las décadas, su grado de participación en el proceso político es cada vez mayor, al igual que las demandas y expectativas sociales que hacia ella se dirigen. También el propio Tribunal parecería ser cada vez más consciente de todo ello".

[26]   Declaración B&N, ¶¶ 41-44.

Corte Suprema es equilibrada, diversa e independiente del gobierno en turno. Por su parte, la llegada del nuevo gobierno tampoco afectó la integración de los tribunales inferiores, cuyos integrantes han sido regularmente designados por los distintos gobiernos, conforme a lo previsto en la Constitución Nacional, la que también dispone que los jueces son inamovibles mientras dure su buena conducta.[27]

20.    Los comentarios críticos sobre las opiniones de la ex Presidenta, y actual Vicepresidenta de la Nación, Cristina Fernández, expresados por B&N en su declaración,[28] son irrelevantes para el funcionamiento del sistema judicial durante la presidencia de Alberto Fernández, dado el rol acotado que la Constitución Nacional le asigna a los vicepresidentes. Un vicepresidente no tiene ninguna facultad en relación con los jueces del Poder Judicial: no tiene un rol constitucional en materia de juicio político que le permita interferir en la actuación del Poder Judicial; no está prevista su intervención ni en los procesos de designación ni de remoción de jueces federales, ya que como Presidente del Senado, no tiene voto, salvo en caso de empate en la votación del pleno del Senado, supuesto del todo excepcional. Los demandantes reconocen que los miembros de la rama ejecutiva no controlan a la judicatura.[29]

21.    Como expuse previamente, en 2013, cuando la actual Vicepresidenta era Presidenta de la Nación, la Corte Suprema declaró inconstitucional la reforma en el Consejo de la Magistratura (que se conoció bajo el nombre de Democratización de la Justicia) en el caso "Rizzo", por considerar principalmente que (i) incrementar la representación de los órganos

---

[27]   Como se indicó anteriormente, los jueces solo pueden ser removidos por el Consejo.

[28]   Ver Declaración B&N, ¶¶ 26-31.

[29]   Memorándum de los Demandantes en Oposición a la Moción de Rechazo por Forum Non Conveniens, en 16 n. 8.

políticos generaría el desequilibrio dentro del Consejo, y que (ii) la propuesta de elección de los representantes de la judicatura, del foro académico y científico y de los abogados de la matricula federal a través del sufragio popular atentaría contra la transparencia del proceso y politizaría la integración del Consejo. El Dr. Alberto Bianchi, al aludir al caso, señala: "En un fallo que puede considerarse ejemplar, la Corte Suprema hizo lugar al amparo y declaró —por mayoría de 6 a 1— la inconstitucionalidad de los arts. 2, 4, 18 y 30 de la ley 26.855".[30] El caso Rizzo es visto como aquél que reafirmó ampliamente las nociones de supremacía constitucional y revisión judicial.

22.    También fue posteriormente derogada la ley 26.853 que en 2013 creó las Cámaras de Casación, las cuales habrían revisado las decisiones dictadas por las cortes federales de apelación de Argentina.[31] No se designaron jueces para ocupar dichas cámaras, las cuales no llegaron a funcionar.[32] Asimismo, la ley que creaba esas cámaras fue derogada mediante la ley 27.500 en 2019.[33] Por ello, la creación de las Cámaras de Casación no tuvo ningún efecto en las decisiones judiciales.

23.    Por otra parte, durante los ocho años en que la Dra. Cristina Fernández ejerció la presidencia, sólo fueron removidos cuatro jueces de tribunales inferiores, todos ellos por motivos fundados y por decisión independiente e imparcial de los órganos competentes para juzgar la mala conducta de los jueces (es decir, aquellas instituciones con jurisdicción en un proceso de juicio político) según los artículos 114 y 115 de la Constitución Nacional: el

---

[30]    Bianchi, Alberto, "Una reforma inconstitucional", en SANTIAGO, Alfonso (Director), *Historia de la Corte Suprema argentina*, Ed. Marcial Pons, 2014, Bs. As., Tomo III, pág. 1958. Allí puede verse un amplio y elogioso comentario acerca de esta sentencia y sus fundamentos.

[31]    Declaración B&N, ¶¶ 22-23.

[32]    Declaración B&N, ¶ 24.

[33]    Declaración B&N, ¶ 24.

Consejo de la Magistratura (el cual requiere el voto de 9 de sus 13 miembros para considerar procedente una acusación) y el Jurado de Enjuiciamiento de Magistrados (el cual requiere el voto de 5 de sus 7 miembros para considerar procedente la destitución). El Poder Ejecutivo no puede tener ni tuvo ninguna intervención en esas remociones.

24.    En Argentina, desde 1983 funciona con normalidad el sistema democrático, alternándose distintos partidos políticos en el ejercicio del poder público. Los integrantes del Poder Judicial han sido designados de acuerdo a los procedimientos previstos en la Constitución Nacional[34] y con la intervención de los diversos poderes con atribuciones en estas cuestiones. Así, por ejemplo, durante el gobierno del Presidente Macri (2015-2019), se designaron 201 jueces federales (sobre un universo total de 977), 29 fiscales, 38 defensores públicos y 43 conjueces. Junto a ello, finalizaron los concursos de 142 jueces federales, 8 fiscales, 44 defensores y 19 conjueces, faltando únicamente el acuerdo del Senado (al momento de esta declaración). Ello pone de manifiesto que ha existido una continuidad a través de los distintos gobiernos en la utilización de los mecanismos previstos en la Constitución Nacional para las designaciones de los jueces.

25.    Otras consideraciones incluyen lo siguiente:

A.    El método de elección de los senadores[35] y la pluralidad de partidos políticos con representación parlamentaria que caracteriza al sistema político argentino dificultan

---

[34]    Así, desde el año 2001, en que el Consejo de la Magistratura realizó su primer concurso, hasta el 2019 se designaron 816 magistrados del Poder Judicial de la Nación, conforme al procedimiento constitucional, según el siguiente detalle: año 2001:33; año 2002:46; 2003:10; 2004:41; 2005:71; 2006:43; 2007:13; 2008:94; 2009:46; 2010:6; 2011:107; 2012:33; 2013:11; 2014:38; 2015:33; 2016:22; 2017:50; 2018:81; y 2019:38. *Ver* https://old.pjn.gov.ar/02_Central/ViewDoc.Asp?Doc=142654&CI=INDEX100

[35]    El Senado está compuesto por tres senadores por cada provincia y tres por la ciudad de Buenos Aires elegidos por el voto popular. Dos de las tres bancas corresponden al partido que obtenga el mayor número de votos y la restante al partido que salga segundo. El mandato de los senadores dura seis años pero el Senado se renueva parcialmente cada dos años mediante la elección de senadores en un tercio de los distritos.

que un gobierno cuente con el apoyo de dos tercios del Senado. Ni el gobierno actual, ni el gobierno anterior contaron con el respaldo de dos tercios de los senadores. Se requiere una mayoría de dos tercios en el Senado para el consentimiento senatorial para el nombramiento de nuevos jueces de la Corte Suprema y del Procurador General o para remover a los jueces de la Corte Suprema que hubieran sido acusados por las dos terceras partes de la Cámara de Diputados.

B.  Se requiere una mayoría de dos tercios de los integrantes del Consejo de la Magistratura para iniciar los procesos de remoción de los jueces de los tribunales inferiores de la Nación.

C.  En este contexto, no se advierte amenaza alguna que permita suponer que los jueces puedan ser removidos por haber sido designados durante períodos de anteriores gobiernos, ni existe ninguna señal en ese sentido.

D.  El actual Presidente ha manifestado su deseo de mejorar la independencia y la calidad institucional del Poder Judicial de la Nación. Por ejemplo, en su discurso de fecha 10 de diciembre de 2019 dirigido a la Asamblea Legislativa, el Presidente Fernández señaló que "[u]na democracia sin justicia realmente independiente no es democracia" y que "[s]in una justicia independiente del poder político, no hay republica ni democracia".[36]

26.  Por ello, los cambios políticos acaecidos en las recientes elecciones no han afectado el funcionamiento normal de los tribunales, que continuarán con su funcionamiento habitual,

---

[36]  El texto del discurso está disponible en https://www.eldestapeweb.com/nota/el-discurso-completo-de-alberto-fernandez-en-la-asuncion-presidencial-2019121013450; y el video está disponible en https://www.youtube.com/watch?v=OqMrbhbkY9M. Además, en una entrevista reciente, el Presidente enfatizó que "los jueces tienen que saber [que] no van a recibir nunca un llamado mío… para decirles lo que tienen que hacer en una causa." Youtube C5N, *Alberto Fernández mano a mano con Tomás Méndez,* YOUTUBE (3 de diciembre de 2019).

fallando a favor y en contra del Estado argentino según lo que consideren correcto los jueces federales en el marco de casos concretos.

27.     Si se llegaran a dar cambios legislativos relacionados con el Poder Judicial, ellos serían decididos en el marco del legítimo ejercicio de un gobierno democrático y deberán respetar los límites constitucionales, bajo pena de ser declarados inconstitucionales por el propio Poder Judicial.

## C.  Litigio en Contra del Gobierno Argentino

28.     Reafirmo mi anterior opinión sobre que los litigantes extranjeros privados han podido acceder frecuentemente a los tribunales argentinos para presentar demandas contra el Estado argentino.[37] Esta opinión está respaldada por los diversos casos de mi anterior declaración, en los cuales el litigante extranjero particular prevaleció en contra del Estado argentino.

29.     B&N seleccionaron un solo caso, *Claren*, en el cual la Corte Suprema se rehusó a reconocer una sentencia de la Corte del Distrito Sur de Nueva York en contra a la República de Argentina con respecto al cobro de montos adeudados bajo ciertos bonos, y tratan de usar este ejemplo como prueba de que la justicia argentina es incapaz de actuar de manera independiente en casos que involucren al gobierno.[38] Discuto el caso *Claren* abajo, pero también estoy en franco desacuerdo con las declaraciones de B&N, las cuales ignoran diversos casos en los cuales las cortes de Argentina han resuelto en contra de la República y/o sus órganos estatales.

---

[37]    Decl. Santiago, ¶ 13.

[38]    Declaración B&N, ¶ 54.

30.     La Corte Suprema de Justicia de la Nación, la cual sería la instancia definitiva en el eventual proceso judicial que nos ocupa, ha mostrado signos de marcada independencia, dictando en los últimos años varios pronunciamientos que claramente contradecían los intereses del gobierno en turno, con independencia del sector político a cargo del gobierno.

31.     En el artículo de mi autoría[39] al que hacen referencia B&N se puede leer:

> "*En lo que hace a fallos que tuvieron alto impacto institucional por controlar medidas de alto interés para el gobierno de turno, cabe mencionar los siguientes: caso "Clarín",[40] en el que la Corte Suprema, en fallo dividido, declaró la constitucionalidad de la ley de medios sancionada por el kirchnerismo; caso Rizzo,[41] en el que invalidó las reformas sobre la integración del Consejo de la Magistratura impulsadas por ese gobierno por medio de la ley 26.855; caso "Santa Fe",[42] dictado días antes de finalizar el gobierno de Cristina Kirchner e iniciarse el de Mauricio Macri, en el que declaró la inconstitucionalidad de la deducción del 15% de la masa de impuestos coparticipables que realiza el Estado Nacional, sin el acuerdo de las provincias, para financiar a la Administración Nacional de la Seguridad Social (ANSES), lo que afectó considerablemente el presupuesto del gobierno federal; y caso "CEPIS",[43] en el que dejó sin efecto el aumento tarifario dispuesto por el recién asumido gobierno del Presidente Macri por no haberse celebrado previamente la correspondiente audiencia pública*" y "*También [la Corte Suprema] limitó las facultades legislativas del Presidente en los casos Consumidores Argentinos,[44] "Colegio de*

---

[39]     SANTIAGO, Alfonso: *La Corte de Lorenzetti,* El Derecho-Constitucional, 2018, páginas 16-17 (adjuntado como Anexo A).

[40]     CSJN, "Grupo Clarín SA y otros c/ Poder Ejecutivo Nacional y otros", *Fallos*: 336:1774 (2013).

[41]     CSJN, "Rizzo, Jorge Gabriel c/ Poder Ejecutivo Nacional", *Fallos*: 336:760 (2013).

[42]     CSJN, "Provincia de Santa Fe c/Estado Nacional", *Fallos*: 338:1389 (2015).

[43]     CSJN, "Centro de Estudios para la Promoción de la Igualdad y la Solidaridad y otros c/ Ministerio de Energía y Minería", *Fallos*: 339:1077 (2016).

[44]     CSJN, "Consumidores Argentinos c/ Estado Nacional", *Fallos*: 333:633 (2010).

Abogados"[45] y "Camaronera Patagónica",[46] no así en "Aceval Pollacchi".[47]

Se puede ver, por tanto, que la Corte Suprema en los últimos años resolvió de modo independiente varios fallos trascendentes, unos a favor y otros en contra de los intereses del gobierno en turno y que utilizó todo su poder jurisdiccional para defender la independencia del propio Poder Judicial.

32.   Esta observación, que da cuenta de varios fallos de la Corte Suprema en contra de diversas administraciones, no es analizada por B&N en su informe. Una lectura completa de ese artículo da una idea acabada de mi parecer sobre la actuación de la Corte Suprema argentina entre los años 2007 y 2016, con sus decisiones en favor y en contra del gobierno en poder, como allí se pone de manifiesto. La descripción realista y equilibrada muestra que la Corte Suprema argentina, como cabeza del Poder Judicial, es plenamente competente para atender como instancia final en este caso, si el mismo llegara ante sus estrados. En su artículo, el propio Dr. Bianchi, si bien es crítico de las reformas intentadas por la administración durante el período 2003-2015, reconoce que la Corte Suprema y numerosos jueces de tribunales inferiores han servido durante mucho tiempo para limitar el poder del Ejecutivo: él señala que "*debe rescatarse la actitud de la Corte Suprema y de los muchos jueces que han puesto límites a un poder político que solo parece estar interesado en que lo obedezcan*".[48]

---

[45]   CSJN, "Pellicori, Liliana Silvia c/ Colegio Público de Abogados de la Capital Federal", *Fallos*: 334:1387 (2011).

[46]   CSJN, "Camaronera Patagónica S.A. c/ Ministerio de Economía y otros", *Fallos*: 337:388 (2014).

[47]   CSJN, "Aceval Pollacchi, Julio César c/ Compañía de Radiocomunicaciones Móviles S.A.", *Fallos*: 334:799 (2011).

[48]   Bianchi, Alberto, "Una reforma inconstitucional", en SANTIAGO, Alfonso (Director), *Historia de la Corte Suprema argentina*, Ed. Marcial Pons, 2014, Bs. As., Tomo III, pág. 1978.

33.     Aún más que la propia Corte Suprema, los tribunales inferiores del Poder Judicial de

Argentina han dictado numerosos fallos en contra de los intereses del gobierno, dando

muestra así de su real independencia. Fue muy destacada su actuación con la resolución de

las miles de acciones judiciales iniciadas con motivo del "corralito", que impuso

restricciones a los retiros en efectivo de los bancos, y la pesificación de los depósitos

inicialmente establecidos en dólares. Con energía y decisión estas cortes protegieron

ampliamente el derecho de propiedad de los ahorristas declarando la inconstitucionalidad de

las normas de emergencia dictadas por los distintos gobiernos que se sucedieron en los años

2001 y 2002.

### 1. El Caso *Claren*

34.     Dado que se trata de un caso de exequatur, el caso *Claren* es única. El procedimiento de

exequatur se encuentra regulado por el art. 517 del Código Procesal Civil y Comercial de la

Nación ("CPCCN") y resulta de aplicación obligatoria para todos los jueces federales

cuando se pretende la ejecución de una sentencia extranjera en la República Argentina.

35.     El art. 517 del CPCCN dispone lo siguiente:

> *Art. 517. - Las sentencias de tribunales extranjeros tendrán fuerza*
> *ejecutoria en los términos de los tratados celebrados con el país de*
> *que provengan.*
>
> *Cuando no hubiese tratados, serán ejecutables si concurriesen los*
> *siguientes requisitos:*
> *1) Que la sentencia, con autoridad de cosa juzgada en el Estado en*
> *que se ha pronunciado, emane de tribunal competente según las*
> *normas argentinas de jurisdicción internacional y sea consecuencia*
> *del ejercicio de una acción personal o de una acción real sobre un*
> *bien mueble, si éste ha sido trasladado a la República durante o*
> *después del juicio tramitado en el extranjero.*
> *2) Que la parte demandada contra la que se pretende ejecutar la*
> *sentencia hubiese sido personalmente citada y se haya garantizado su*
> *defensa.*

> *3) Que la sentencia reúna los requisitos necesarios para ser*
> *considerada como tal en el lugar en que hubiere sido dictada y las*
> *condiciones de autenticidad exigidas por la ley nacional.*
> *4) Que la sentencia no afecte los principios de orden público del*
> *derecho argentino.*
> *5) Que la sentencia no sea incompatible con otra pronunciada, con*
> *anterioridad o simultáneamente, por UN (1) tribunal argentino*".

36.    En *Claren*, se analizó si podía ejecutarse una sentencia extranjera. La Corte Suprema llegó a

la conclusión de que el exequátur pretendido por Claren Corporation no satisfacía el

requisito previsto en el inciso 4 del artículo 517 del Código Procesal Civil y Comercial de la

Nación.

37.    El caso *Claren* es un caso excepcional, que no es representativo de la mayoría de los casos

que los jueces federales deciden. En *Claren*, los tribunales argentinos decidieron que el

orden público estaría comprometido si se ejecutara esta sentencia en particular dictada en

otro país. En el caso *Claren* ha existido un ejercicio independiente e imparcial de la función

jurisdiccional donde se declinó la ejecución de una sentencia extranjera, basada en razones

bona fide bajo derecho argentino. Contrario a lo declarado por B&N, la decisión en *Claren*

no pone de manifiesto ninguna falta de independencia o imparcialidad que inhabilite la

actuación de los jueces argentinos – y aun de la Corte Suprema argentina – en casos

similares.

## 2.  Casos con una Declaración de Emergencia Nacional

38.    Al comienzo de la década del 2000, por ejemplo, la Corte Suprema dictó varios fallos que

protegieron el derecho de propiedad y que fueron contrarios a los intereses del gobierno. Por

ejemplo, los fallos "Smith"[49] y "San Luis"[50] fueron resultado de la grave crisis económica

---

[49]    CSJN, "Banco de Galicia y Bs.As. c/P.E.N.", *Fallos*: 325:028 (2002).

[50]    CSJN, "Provincia de San Luis c/ Estado Nacional", *Fallos*: 326:417 (2003).

que sufrió Argentina en los años 2001-2002. En estos casos, el gobierno invocó la crisis

económica como justificación para una serie de medidas de emergencia, como los decretos

1570/01 y 71/02 y las resoluciones 18/02 y 23/02 del Ministro de Economía que limitaban el

retiro de fondos del sistema financiero y reprogramaban sus plazos de vencimiento. En el

caso "Smith", la Corte Suprema las declaró inconstitucionales porque (1) fundamentalmente

sus disposiciones eran lesivas del derecho a disponer de la propiedad privada reconocido en

la Constitución Nacional, y (2) estas normas excedían el ámbito de las delegaciones

legislativas al Poder Ejecutivo. En el caso "San Luis", la Corte Suprema declaró la

inconstitucionalidad del art. 2 del Decreto de Necesidad y Urgencia 214/02 que, como

norma de orden público, ordenaba la pesificación, es decir la conversión a pesos, de los

depósitos bancarios inicialmente establecidos en dólares estadounidenses.[51] Del mismo

modo, en el marco de una emergencia energética, la Corte falló en contra de los intereses del

gobierno y a favor de usuarios del servicio de distribución de gas natural en el caso

"CEPIS"[52], ya referido. El informe de B&N incurre en una generalización incorrecta, que no

se condice con la realidad.

39.     Finalmente, B&N señalan que en mi primera declaración solo he incluido un pequeño grupo

de casos decididos en contra del gobierno, y que esos casos pueden distinguirse de los

hechos en el presente asunto.[53] Los casos referidos en mi primera declaración involucran

---

[51]   Posteriormente, en los casos "Bustos" y "Massa", la Corte Suprema matizó su postura y convalidó la pesificación, ya que el valor actualizado de los depósitos que habían sido pesificados y actualizados, tenían un valor equivalente a su valor inicial en dólares, por lo que, a criterio del máximo tribunal, ya no se podía alegar un daño al derecho constitucional de propiedad. CSJN, "Bustos, Alberto R. y otros c/ E.N. y otros", *Fallos*: 327:4495 (2004); *La Ley*, 2004-F-713; CSJN, "Massa, Juan Agustín c/ Poder Ejecutivo Nacional", *Fallos*: 329:5913 (2006).

[52]   CSJN, "Centro de Estudios para la Promoción de la Igualdad y la Solidaridad y otros c/ Ministerio de Energía y Minería", *Fallos*: 339:1077 (2016).

[53]   Declaración B&N, ¶¶ 63-65.

reclamos hechos valer por compañías extranjeras que obtuvieron un resultado favorable ante cortes argentinas en litigios en contra del Estado argentino. Por ello, su relevancia para este caso me parece evidente.[54]  Asimismo, el Prof. Cabanellas incluyó varios casos en su declaración, así como en el Apéndice B de dicha declaración.[55] Ellos son ejemplos relevantes adicionales.[56]

## D. Funcionamiento del Sistema Judicial en Argentina

40.    Mantengo mi opinión en cuanto a que los litigantes nacionales y extranjeros tienen pleno acceso a las cortes argentinas y a los mecanismos que permiten el acceso a testigos y documentos.[57] La ley y la práctica argentina demuestran que los litigantes nacionales y extranjeros tienen el mismo acceso a la producción de evidencia necesaria para su caso, así como a forzar la comparecencia de testigos que se rehúsan.[58]

---

[54]    Decl. Santiago, ¶ 13.

[55]    Declaración Cabanellas, ¶ 11.

[56]    En "Giustiniani, Rubén Héctor v. YPF, S.A.", un caso reconocido, el cual es parte de un litigio más amplio involucrando contratos para la explotación de grandes campos de petróleo de esquisto, la Corte Suprema revocó decisiones de cortes inferiores y ordenó a YPF publicar los términos de dichos contratos.  CSJN, "Giustiniani, Rubén Héctor v. YPF, S.A.", *Fallos*: 338:1258 (2015).

En "Silvano Sampietro v. Banco de la Nación Argentina", la Corte Nacional de Apelaciones para Asuntos Federales Civiles y Comerciales dictó una decisión en contra de un banco comercial de capital estatal debido a la falta de cumplimiento de su obligación de informar a sus clientes sobre los requisitos legales de ciertas transacciones financieras. CSJN, "Silvano Sampietro v. Banco de la Nación Argentina", *CNCyCFed* (II) (2016).

En "Benito Roggio e Hijos S.A. y otros c/ E.N. Agua y Energía Eléctrica S.E.", la Corte Suprema confirmó la decisión de una corte de apelación, la cual había admitido la reclamación del demandante en contra de una empresa estatal, relativa al cálculo del precio de ciertas obras de construcción llevadas a cabo por los demandantes.  CSJN, "Benito Roggio e Hijos S.A. y otros c/ E.N. Agua y Energía Eléctrica S.E.", B.865.XLVI (2013).

[57]    Decl. Santiago, ¶ 14.

[58]    Decl. Santiago, ¶¶ 15-21.

41.   He revisado las declaraciones de B&N con respecto al funcionamiento del sistema judicial en Argentina.[59] Estoy bastante sorprendido con dichas declaraciones, ya que B&N frecuentemente comparecen ante las cortes argentinas en una variedad de asuntos y regularmente hacen uso del sistema judicial de Argentina, tal como lo hacen miles de abogados como ellos. El tipo de críticas que B&N hacen en contra del sistema judicial en Argentina podría hacerse, en gran medida, sobre cualquier sistema judicial latinoamericano. Si los ataques de B&N son atendidos, entonces ningún sistema judicial en Latinoamérica sería suficientemente apto para analizar una reclamación como la que aquí se trata.

42.   Existen muchos países del *civil law* que no tienen juicio por jurados, que tienen prueba testimonial limitada y que no tienen *discovery,* pero sería absurdo argumentar que no es posible acceder a sus tribunales o que los mismos no son independientes por ello. Cada sistema debe ser juzgado individualmente. Cada país puede legítimamente establecer sus propias reglas procesales, su propia y razonable reglamentación del derecho de acceso a la justicia, al debido proceso y a la tutela judicial efectiva, sin que los litigantes puedan evadirse de ellas simplemente porque prefieren un proceso diferente.

43.   De forma similar, B&N presentan afirmaciones erróneas respecto a las Leyes 27 y 48, a las que se tildan de "viejas".[60] Ambas leyes fueron sancionadas teniendo como modelo la *Judiciary Act* de los Estados Unidos de 1789 y son aplicadas de forma regular, sin mayor inconveniente, en especial por la Corte Suprema, no dejando razón alguna para sugerir que un cambio es necesario. En cuanto a la referencia al Decreto 1285/58, la Declaración de

---

[59]   Ver en general Declaración B&N, ¶¶ 68-108.

[60]   Ver Declaración B&N, ¶ 81.

B&N omite aclarar que el mismo ha sido actualizado en varias oportunidades, la última de ellas a través de las leyes 27.145, 27.146 y 27.150 de 2015.

44.    Los otros puntos sostenidos por B&N son caracterizaciones injustas sobre el funcionamiento de los tribunales o pretenden simplemente impugnar procedimientos estándar que ocurren en muchos países de *civil law.* Por ejemplo, B&N argumentan que el Artículo 333 del CPCCN exige a las partes presentar toda su evidencia "a ciegas" antes de que la parte demandada responda al escrito de demanda.[61] Lo anterior es incorrecto. Como describí en mi primera declaración, y como el artículo claramente señala, se pide a las partes apoyar su reclamación o defensa inicial con pruebas, pero también tienen la oportunidad de aportar pruebas adicionales posteriormente.[62] Por otro lado, los costos legales no son impedimento para demandas. Como señalé en mi primera declaración,[63] este tipo de costos legales son comunes en las cortes de Latinoamérica, y no impiden que las partes tengan acceso a la justicia. Debido a que la ley argentina permite que la parte prevaleciente recupere sus costos, es poco probable que tales costos disuadan un caso meritorio.

45.    La duración de los procesos en la Argentina no difiere sustancialmente de otros países de la región. Existen, por supuesto, casos excepcionales como el que B&N mencionan. Pero "Compañía Azucarera Tucumana" es ciertamente un caso único que no puede generalizarse como un reflejo de lo que ocurre normalmente. La duración ciertamente excesiva en un solo caso en modo alguno refleja lo que ocurre en la mayoría de los casos y no puede ser usado

---

[61]    Ver Declaración B&N, ¶¶ 85-86.

[62]    Artículo 333 de CPCCN: "Con la demanda, reconvención y contestación de ambas, deberá acompañarse la prueba documental y ofrecerse todas las demás pruebas de que las partes intentaren valerse..."

[63]    Ver Decl. Santiago, ¶ 22.

como fundamento para afirmar que los reclamos judiciales no pueden ser resueltos ante los tribunales argentinos.

Yo declaro bajo pena de perjurio conforme a las leyes de los Estados Unidos de América que lo anterior es verdadero y correcto.

Fecha:  7 de febrero de 2020

_____

Alfonso Santiago

25