UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETERSEN ENERGÍA INVERSORA
S.A.U. and PETERSEN ENERGÍA,
S.A.U.,

                    Plaintiffs,

-against-

ARGENTINE REPUBLIC and YPF
S.A.,

                    Defendants.

ETON PARK CAPITAL MANAGEMENT,
L.P., ETON PARK MASTER FUND,
LTD., and ETON PARK FUND, L.P.,

                    Plaintiffs,

-against-

ARGENTINE REPUBLIC and YPF
S.A.,

                    Defendants.

Nos. 15 Civ. 2739 (LAP)
     16 Civ. 8569 (LAP)

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

        Before the Court is a renewed motion to dismiss the above-
captioned actions under the doctrine of forum non conveniens filed

by Defendants the Republic of Argentina ("the Republic") and YPF

S.A. ("YPF" and, together with the Republic, "Defendants").  (See

Motion to Dismiss, dated August 30, 2019 [dkt. no. 110 in 15 Civ.

2739].)[1]   The motion was fully briefed as of February 7, 2020.
(See Defendants' Memorandum of Law in Support of Motion to Dismiss
("Def. Mem."), dated August 30, 2019 [dkt. no. 111]; Plaintiffs'
Opposition to Defendants' Motion to Dismiss ("Opp."), dated
December 6, 2019 [dkt. no. 125]; Defendants' Reply in Further
Support of Motion to Dismiss ("Reply"), dated February 7, 2020
[dkt. no. 154].)

Defendants first sought dismissal of this action in September
2016. See Petersen Energía Inversora, S.A.U. v. Argentine
Republic, No. 15 Civ. 2739 (LAP), 2016 WL 4735367 (S.D.N.Y. Sept.
9, 2016)("Petersen I"). Then, both YPF and the Republic argued
that this Court lacked subject matter jurisdiction over the action.
The Court, however, concluded otherwise and found that it possessed
jurisdiction over the case under the Foreign Sovereign Immunities
Act (the "FSIA"). Id. at *4, *7. In addition, the Republic--but
not YPF--argued that the doctrine of forum non conveniens required
the case be brought in Argentina, not in New York. Id. at *11.
The Court rejected that argument, too, basing its decision in part
on the existence of then-pending criminal proceedings in Argentina
that centered around parties directly connected to the present
litigation. Id. Nearly three years of appeals on the FSIA issue

---

[1] For the sake of clarity and brevity, all docket cites hereinafter,
unless noted otherwise, shall refer to the docket in Petersen
Energia Inversora, S.A.U. et al. v. Argentine Republic et al., No.
15 Civ. 2739 (LAP).

followed, including affirmance by the Court of Appeals, <u>Petersen Energía Inversora S.A.U. v. Argentine Republic and YPF S.A.</u>, 895 F.3d 194 (2d Cir. 2018)("<u>Petersen II</u>"), and denial of certiorari by the Supreme Court, 139 S. Ct. 2741 (2019.)

Now, this litigation has once again washed ashore in the Southern District of New York. The Republic, this time with YPF in tow, has accordingly attempted to reanimate the issue of <u>forum non conveniens</u>. In so doing, Defendants suggest that new circumstances have emerged since the Court's original ruling that counsel in favor of sending this case on a return voyage to Buenos Aires. Those purportedly changed circumstances, however, do little to alter the Court's original analysis, and some new developments--most notably, the addition of a New York-based Plaintiff--strengthen the justification for proceeding with this litigation in New York. Defendants additionally hinge their renewed motion on the argument that Argentine courts maintain "exclusive jurisdiction" over actions like this one, a fact they say requires dismissal. In light of the Court of Appeals' holding in <u>Petersen II</u> and the fact that it appears to be rooted in a strained reading of Argentine law, however, that argument does little to overwhelm the considerable interest of the United States and of New York in hosting this litigation. Consequently, Defendants' motion to dismiss based on the doctrine of <u>forum non conveniens</u> is <u>DENIED</u>.

I.    <u>FACTUAL BACKGROUND</u>

The parties' familiarity with the facts and prior proceedings in this litigation is here assumed.  The Court will accordingly recount the relevant facts in a summary fashion.

a. Procedural History

Original Plaintiffs Petersen Energia Inversora, S.A.U. and Petersen Energia, S.A.U. (the "Petersen Plaintiffs"), limited-liability companies organized under the laws of the Kingdom of Spain, initiated this litigation in April 2015.  Their complaint primarily alleged that Defendants breached contractual obligations arising out of YPF's By-laws upon the Republic's decision to expropriate outstanding YPF shares in 2012.  Specifically, the Petersen Plaintiffs--at the time 25 percent owners of YPF--alleged that YPF and the Republic refused to honor a contractual obligation to offer to buy the remaining 49 percent of YPF stock after the Republic retook control of YPF.  (<u>See generally</u> <u>Petersen</u> Complaint ("<u>Petersen</u> Compl.", dated April 8, 2015 [dkt. no. 1].)

As mentioned above, in September 2015, the Republic and YPF moved to dismiss the <u>Petersen</u> complaint.  (<u>See</u> Motions to Dismiss, dated September 8, 2015 [dkt. nos. 23, 32].)  In their motions, Defendants primarily argued that the Court lacked subject matter jurisdiction to adjudicate the case.  The Court rejected that argument, agreeing with Plaintiffs that the Republic's and YPF's

actions were covered by the commercial activity exception of the FSIA. See 2016 WL 4735367, at *7.

The Republic (but not YPF) also sought dismissal of the Petersen action under the doctrine of forum non conveniens. See 2016 WL 4735367, at *11-12. Though the Court found that deference to the Spain-based Petersen Plaintiffs' choice of forum was "not at its greatest height" because "[New York] is not home to Defendants, Plaintiffs, or Plaintiffs' owners or receiver," id. at *11, the Court declined to dismiss the case. Critically, the Court found that the Republic had failed to demonstrate that Argentina was an adequate forum for resolution of the action. Id. This conclusion was rooted primarily in the fact that the Republic had filed a criminal complaint against King & Spalding--counsel for the Petersen Plaintiffs--and Burford Capital--a litigation finance firm that owned the Petersen Plaintiffs' stake in the litigation--in connection with a separate case. Id. The Court also ruled that the Republic had failed to establish that the balance of private and public interest factors central to any forum non conveniens motion "tilt[ed strongly" in their favor. Id. at *12.

Shortly after the Court's denial of the original motion to dismiss, Plaintiffs Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (together, the "Eton Park Plaintiffs," and with the Petersen Plaintiffs, the "Plaintiffs") filed their own lawsuit against the Republic and

YPF.  (See Eton Park Complaint, dated November 3, 2016 [dkt. no. 1 in 16 Civ. 8569].)  At the time of the filing, the Eton Park Plaintiffs--a New-York based investment management firm and two of its constituent funds--were the third-largest shareholder of YPF stock.  (Id. ¶ 5.)  Similar to the Petersen Plaintiffs, the Eton Park Plaintiffs alleged that the Republic and YPF breached a contractual obligation in the YPF By-laws to initiate a tender offer for all outstanding shares of YPF in the wake of the Republic's decision to take control of YPF.  (Id. ¶ 6.)

Following the Court's 2016 ruling, the Eton Park action was stayed pending Defendants' appeal of the Court's ruling in the Petersen action that it possessed subject-matter jurisdiction pursuant to the FSIA.  (See Stay Order, dated August 16, 2017 [dkt. no. 21 in 16 Civ. 8569].)  The Petersen ruling was eventually affirmed by the Court of Appeals. See Petersen II, 895 F.3d 194. Following the Court of Appeals' affirmance of the 2016 decision, Defendants sought a writ of certiorari from the Supreme Court. Both the Eton Park and the Petersen actions were again stayed pending the Supreme Court's ruling on that petition.  (See Order Staying Actions, dated May 1, 2019 [dkt. no. 84].) The Supreme Court denied certiorari in June 2019,  139 S. Ct. 2741 (2019, and the stay on the litigation was lifted shortly thereafter.  (See ECF Minute Entry Lifting Stay, dated June 25, 2019.)  After

obtaining leave from this Court, Defendants filed their renewed motion to dismiss on August 30, 2019.  (See dkt. no. 110.)

　　　　b. Relevant Provisions of the Prospectus and By-Laws

Because Defendants' renewed motion to dismiss focuses extensively on the YPF IPO Prospectus and the YPF By-laws, the Court will briefly summarize those materials here.

YPF, an Argentine energy company, was wholly owned and operated by the Republic until 1993.  (See Petersen Compl. ¶ 2.)  In June 1993, the Republic decided to privatize the company through an IPO of YPF's voting stock, shares of which were listed and secondarily traded through American Depository Receipts ("ADRs") on the New York Stock Exchange ("NYSE").  (Id. ¶¶ 2, 13.)

The Republic advertised the opportunity to invest in YPF to American investors through YPF's U.S. IPO Prospectus.  (See 1993 YPF IPO Prospectus ("Prospectus"), dated June 24, 1993 [dkt. no. 112-2].)  By its own terms, the Prospectus was "a brief summary of certain significant provisions of the [YPF By-laws] and of Argentine law" that did "not purport to be complete" and that was "qualified by reference to the By-laws . . . and by applicable Argentine law."  (Id. at 79.)  The YPF By-laws were attached to the Prospectus as an exhibit.  (See By-laws of YPF Sociedad Anonima ("By-laws") [dkt. no. 112-2] at 261-289.)

Contained in the Prospectus is a short provision titled "Exclusive Jurisdiction."  (Prospectus at 88 (the "Exclusive

Jurisdiction Provision").)   The Exclusive Jurisdiction Provision
cautions that "[t]he By-laws are governed by Argentine law and any
action relating to enforcement of the By-laws or a shareholder's
rights thereunder is required to be brought in an Argentine court."
(Id.)   The By-laws, however, contain no such provision.

   II.   DISCUSSION

      a. Procedural Posture

   As a threshold matter, the parties dispute the exact nature
of the instant motion.   Plaintiffs assert that the Republic faces
a "doubly demanding burden on [its] motion" because it is in
actuality a motion for reconsideration of the Court's 2016 forum
non conveniens ruling disguised as a motion to dismiss.   (Opp. at
10.)   "Reconsideration is an extraordinary remedy to be employed
sparingly," Alfandary v. Nikko Asset Mgmt. Co., 2019 WL 2525414,
at *2 (S.D.N.Y. June 19, 2019) (internal quotation marks and
citation omitted), and, if the Court were to agree with Plaintiffs'
contention, it would require the Republic to meet the heavy burden
of showing "an intervening change of controlling law, the
availability of new evidence, or the need to correct a clear error
or prevent manifest injustice" with respect to the original
decision,   Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL
Irrevocable Trust, 729 F.3d 99, 104 (2d Cir. 2013) (internal
quotation marks and citation omitted).   Defendants counter that
they have filed a "renewed motion with the Court's leave" that

should not be subjected to the harsher standards reserved for motions for reconsideration.  (Reply at 5-6 n.5 (citing Malibu Media, LLC v. Doe, 2015 WL 4271825, at *1 n.1 (S.D.N.Y. July 14, 2015).)

The Court will not cast the present motion as one seeking reconsideration of the 2016 ruling.  First, the substance of Defendants' motion does not mesh with any traditional notion of what constitutes a motion for reconsideration.  The gravamen of Defendants' motion is that materially changed circumstances since the original ruling have given rise to a new affirmative case for dismissal based on forum non conveniens, not that the Court overlooked controlling case law or critical evidence that could alter the original analysis of the forum non conveniens issue from several years ago.[2]  Cf. Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995) ("[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.").  Plaintiffs have suggested that Defendants are seeking to "modify" a prior order of the Court.  (Opp. at 10 n.3.)  But the Court's original decision on the forum non conveniens issue

_____

[2] (See, e.g., Def. Mem. At 9 ("While the Court previously denied Argentina's motion to dismiss for forum non conveniens, now, changed circumstances, the more developed fact and expert record and newly asserted defenses warrant dismissal of these Actions.")

was based on the record before it at the time, and it would be impossible for the Court to have overlooked circumstances that have emerged since its initial ruling. Defendants are thus not trying to "modify" anything so much as they are providing a new record, and thus new grounds, for the Court to evaluate with respect to the issue of forum non conveniens.[3]

Second, the Court has historically treated the present motion as a renewed motion to dismiss. For example, the Court granted Defendants leave to file a "renewed forum non conveniens motion." (See Reply at 5-6 n.5.) Then, at a pretrial conference held before the Court on July 11, 2019, the Court requested that the parties file a briefing schedule for such a motion. (See Letter on Briefing Schedule, dated July 23, 2019 [dkt. no. 104].) The Court

---

[3] Despite this, Plaintiffs appear to view as determinative Defendants' statement in their initial request for a pre-motion conference that "[m]aterially changed circumstances warrant reconsideration of this Court's initial determination not to invoke forum non conveniens." (See Letter Requesting Pre-Motion Conference, dated June 24, 2019 [dkt. no. 86] (emphasis added).) This appears to be imprecise language by Defendants rather than a formal request for reconsideration. Immediately following the statement in question is a citation to In re Optimal U.S. Litig. See 886 F. Supp. 2d 298 (S.D.N.Y. 2012). In that decision, this Court granted the defendants' second, i.e., renewed, motion to dismiss based on forum non conveniens, one which argued--as Defendants do here--that the balance of relevant interests had shifted since the district court had denied defendants' original forum non conveniens motion. Id. at 302. Even Plaintiffs would likely admit that this would be an odd case to cite if Defendants were seeking leave to file a motion for reconsideration of the 2016 ruling.

entered a proposed order--filed jointly by the parties--setting a briefing schedule for that renewed motion to dismiss a day later. (See Order on Briefing Schedule, dated July 24, 2019 [dkt. no. 106].)   It would be an inequitable bait-and-switch to grant Defendants leave to file their renewed motion to dismiss only to treat it as a motion for reconsideration once the motion was finally sub judice.   The Court will accordingly not apply the stricter standard reserved for motions for reconsideration to Defendants' motion.   In any event, in light of the Court's conclusion, the stricter standard reserved for reconsideration would yield the same result.

Similarly, the Court does not find that Defendants' arguments are precluded by the law of the case.   "The law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009) (internal quotation marks and citation omitted).   However, application of the law of the case is discretionary, Furlong v. Shalala, 238 F.3d 227, 235 n.4 (2d Cir. 2001)(collecting cases), and, as Plaintiffs themselves note, courts may choose to revisit an issue where new evidence is available, (Opp. at 10 (quoting Virgin Atl. Airways, Ltd. V. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992).).   Here, numerous new factual developments

since the original decision counsel in favor of the Court's revisiting the _forum non conveniens_ issue.

For the foregoing reasons, the Court will consider the arguments raised in Defendants' _forum non conveniens_ motion anew.

   b. Forum Non Conveniens

The doctrine of _forum non conveniens_ "finds its roots in the inherent power of the courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." _In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine_, 311 F.3d 488, 497 (2d Cir. 2002)(internal quotations and citation omitted). As such, "[t]he doctrine of _forum non conveniens_ is a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim." _Carey v. Bayerische Hypo-Und Vereinsbank AG_, 370 F.3d 234, 237 (2d Cir. 2004). Because of federal courts' "virtually unflagging obligation" to exercise its own jurisdiction, _Mata v. Lynch_, 135 S. Ct. 2150, 2156 (2015), however, "dismissal for _forum non conveniens_ is the exception, not the rule," _In re Lloyd's American Trust Fund Litig._, 954 F. Supp. 656, 673 (S.D.N.Y. 1997)(citations omitted).

   i. The Expedited Atlantic-Marine Analysis

At the outset, the Court will not evaluate this case under the abbreviated _forum non conveniens_ analysis set forth by the

Supreme Court's ruling in <u>Atlantic Marine Const. Co. v. U.S. Dist. Court for W. Dist. Of Texas</u>.  (<u>See</u> Def. Mem. at 14 n.6 (citing 571 U.S. 63 (2013); <u>see also</u> Reply at 6-8.)  In that case, the Supreme Court found that a "valid forum-selection clause requires district courts to adjust their [<u>forum non conveniens</u>] analysis," <u>id.</u> at 63, because "[w]hen parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations", <u>id</u>. at 66.  Thus, a valid forum-selection clause would be dispositive as to the appropriate forum where it "was reasonably communicated to the party resisting enforcement," "has mandatory force," and "covers the claims and parties involved in the dispute." <u>Arial Techs. LLC v. Aerophile S.A.</u>, No. 14 Civ. 4435 (LAP), 2015 WL 1501115, at *2 (S.D.N.Y. Mar. 31, 2015).

Here, Defendants have argued that the Exclusive Jurisdiction clause of the 1993 YPF IPO Prospectus "readily satisfies" the elements set forth in <u>Atlantic Marine</u>.  (Def. Mem. at 14 n.6.) This argument relies chiefly on the assertion that the <u>Atlantic Marine</u> analysis does not require that the Prospectus be an enforceable contract, just that it "clearly communicate[s] the exclusive Argentine forum for disputes."  (Reply at 7 n.7.) Presumably, Defendants have no choice but to contend as such, because the YPF By-Laws, <u>i.e.</u>, the document that formally governs

the relationship between Plaintiffs and Defendants, contain no forum-selection clause.  (See Opp. at 14.)

The Court rejects this argument.  First, it sidesteps the reasoning underpinning Atlantic Marine.  There, the Supreme Court was clear that forum-selection clauses are presumptively enforceable precisely because they were "bargained for" by the parties and present in a valid contract.  571 U.S. at 63. Defendants cite no case law to support their contention that a Prospectus, which "describes a public offering of securities by an issuer or controlling shareholder," Gustafson v. Alloyd Co., 513 U.S. 561, 584 (1995), and the summary contents of which are unilaterally controlled by the offering entity, is the product of any sort of arms-length bargaining by contracting parties. Second, the Prospectus--whether it amounts to a contract or not--by its own terms does not govern the parties' rights and obligations with respect to shares of YPF, the By-laws do.  (See Opp. at 14.) Indeed, the Prospectus explicitly "does not purport to be complete" and is "qualified by reference to the By-laws . . . and by applicable Argentine law."  (See 1993 Prospectus [dkt. no. 112-2] at 79.) Cf. Oliveira v. Quartet Merger Corp., 126 F. Supp.3d 424, 429-30 (S.D.N.Y. 2015)("[R]egardless of whether the Prospectus is a binding contractual document, it does not purport to be the controlling document defining the rights of the securities offered" because it "is only a summary of terms" and "does not

purport to be complete.")  And here, the YPF By-laws contain no forum-selection clause.  Accordingly, there is no compelling justification for applying the streamlined <u>forum non conveniens</u> analysis as described in the Supreme Court's decision in <u>Atlantic Marine</u>.[4]

## ii.  The Irragori Forum Non Conveniens Analysis

Given the Court has declined application of <u>Atlantic Marine</u>'s expedited framework, the three-step inquiry laid out by the Court of Appeals in <u>Iragorri v. United Technologies</u> guides the Court's broad discretion in deciding whether this action should be dismissed under the doctrine of <u>forum non conveniens</u>.  <u>See</u> 274 F.3d 65 (2d Cir. 2001); <u>see also</u> <u>Norex Petro. Ltd. V. Access Indus., Inc.</u>, 416 F.3d 146, 153 (2d Cir. 2005).  First, the Court must determine the degree of deference properly afforded Plaintiffs' choice of forum.  Second, the Court must decide whether the "alternative forum proposed by [Defendants] is adequate to adjudicate the parties' dispute."  Third, the Court balances the

---

[4] Even assuming <u>arguendo</u> that the YPF IPO Prospectus is subject to the streamlined <u>Atlantic Marine</u> framework, the Court is skeptical that the Exclusive Jurisdiction Provision could possibly be "clearly communicated" for the purposes of that analysis.  While Defendants are correct that the provision is, in a literal sense, "clearly communicated" because it is plainly featured in the body of the Prospectus, (Def. Mem. at 14 n.6), the substance of the provision itself may not be so because it is "qualified by reference . . . by applicable Argentine law."  (Prospectus at 79.) That is to say, the Exclusive Jurisdiction Provision is, like the Prospectus itself, an incomplete summary of the obligations to be imposed on potential YPF shareholders.

competing private and public interests implicated in the choice of forum.  Id. (citing Iragorri, 274 F.3d at 73-74).

### 1. Step One: Degree of Deference

A defendant who seeks refuge in the doctrine of forum non conveniens generally bears "a heavy burden" in opposing plaintiff's chosen forum. Sinochem Int'l. Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430 (2007).  As the Court of Appeals explained in Irragori, the degree of deference afforded to a plaintiff's chosen forum is determined on a sliding scale.  "The greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for forum non conveniens."  274 F.3d at 71-72.  On the other side of the coin, "the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference the plaintiff's choice commands[.]"  Id.  Defendants, as they must, have argued that "no [Plaintiff] . . . has any meaningful connection to the Southern District."  (Reply at 16.)

Of course, when ruling on the Republic's original forum non conveniens motion in 2016, this Court found that "deference to Plaintiffs' choice of forum [was] not at its greatest height." See 2016 WL 4735367, at *11.  The Court reached that conclusion

16

because New York was not home to the Spain-based Petersen Plaintiffs, i.e., the sole plaintiffs at the time of that decision. Id. (New York "is not home to Defendants, Plaintiffs, or Plaintiffs' owners or receiver."). Now, circumstances have materially changed, as the Court is "jointly considering Defendants' motion to dismiss the parallel claims brought by both Petersen and New York-based investment fund Eton Park." (Opp. at 11.)

While the Court's original conclusion with respect to the Petersen Plaintiffs still holds true,[5] the Court finds that heightened deference is due to the Eton Park Plaintiffs' choice of New York as a forum. First, Eton Park Capital Management--the investment adviser to two Eton Park funds that are also plaintiffs in this action--is at home in New York, where it has maintained its principal place of business. (Opp. at 11.) Defendants give this fact short shrift, arguing that Eton Park is "not at home in

---

[5] Contrary to Defendants' assertions, this does not compel the conclusion that the Petersen Plaintiffs' choice of a New York forum receives no deference. See, e.g., R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 168 (2d Cir. 1991)("[R]educed weight is not an invitation to accord a foreign plaintiff's selection of an American forum no deference since dismissal for forum non conveniens is the exception rather than the rule.") (internal quotation marks and citation omitted); see also Metito (Overseas) Ltd. V. Gen. Elec. Co., No. 05 Civ. 9478 (GEL), 2006 WL 3230301, at *3 (S.D.N.Y. Nov. 7, 2006)( "Even assuming, as defendant argues, that plaintiff was motivated in part by forum shopping . . . that would not mean that plaintiff's forum choice is entitled to 'no' deference, but rather to 'less' deference.").

New York" because "[o]ne of the Eton Park Funds is a Cayman Islands entity,. . . the other is a Delaware limited partnership," and the investment manager is "a Delaware limited partnership."   (Def. Mem. at 11.)   The practice of courts in this circuit, however, has been decidedly less formalistic.   See, e.g., Bloomberg Finance L.P. v. UBS AG, 358 F. Supp.3d 261, 265, 267 (S.D.N.Y. 2018)("Because Bloomberg has its principal place of business in New York City, its choice to file suit in this Court is owed great deference"); see also Int'l Equity Inv., Inc. v. Cico, 427 F. Supp.2d 503, 505 (S.D.N.Y. 2006)(lending "substantial weight" to choice of forum where plaintiffs brought action "in the district in which they are headquartered"); see also Motown Record Co., L.P. v. iMesh.com, Inc., No. 03 Civ. 7339 (PKC), 2004 WL 503720, at *6 (S.D.N.Y. Mar. 12, 2004). Consistent with this practice, the Eton Park Plaintiffs' place of registration should not serve as a basis for affording lesser deference to their choice of forum.[6] Instead, because their principal place of business is in New York, their choice of New York as a forum should receive substantial deference.

_____

[6] In addition, Eton Park's ongoing wind-down does not compel lesser deference to its choice of forum.  (See Reply at 16.)  For one thing, "the wind-down is not complete and is not expected to finish before this case is resolved."  (Opp. at 11 n.5.) For another, that Eton Park is winding down does not mean that it has ceased to operate out of New York City, which is the critical fact in this analysis.

Second, this litigation plainly has a bona fide (and significant) connection to New York.  As Plaintiffs note:

> In 1993 Argentina accessed the international capital markets by selling a majority stake in its national oil and gas company, YPF . . . It engaged in [IPOs] on several stock exchanges worldwide, notably including in the United States on the New York Stock Exchange . . . [B]etween late 2010 and early 2012, U.S.-based investment fund Eton Park purchased approximately 11.95 million [New York Stock Exchange]-listed shares of YPF stock, at a total cost of approximately $448 million . . . Eton Park traders located in New York executed the trades to acquire this YPF stock.

(See Opp. at 3-5.)  Put differently: the Eton Park action arose from New York-based traders--acting on instructions from a New York-based investment firm--purchasing shares of YPF stock that were advertised to New-York based investors and sold (through ADRs) on the New York Stock Exchange.  This is thus a far cry from a case where "the litigation itself . . . is devoid of any significant connection to New York," such that it would be fair to assume that "the New York Forum was selected for tactical purposes."  In re Fosamax Prod. Liab. Litig., No. 06 Civ. 5087 (JFK), 2009 WL 3398930, at *3 (S.D.N.Y. Oct. 21, 2009).[7]

_____

[7] In arguing that the Eton Park Plaintiffs possess no meaningful connection to New York, Defendants suggest that this Court observed in Petersen I that "all of the relevant facts 'took place in Argentina.'"  (Def. Mem. at 12 (quoting 2016 WL 4735367, at *5).) This misses the mark for two reasons.  First, the Court never found that "all" the relevant facts took place in Argentina.  Second, the Court held that "the disputed acts," i.e., Defendants' alleged breaching activity, took place in Argentina for purposes of the FSIA's commercial activity exception.  Id. at *4-5.  That does not mean that the litigation could not possess a significant connection to New York for purposes of a forum non conveniens analysis.

Defendants further argue that whatever deference Plaintiffs might be due is undermined by the fact that they are "sophisticated entities that sought a business relationship with an Argentine corporation." (Reply at 16.)  Whatever the superficial appeal of this argument, it relies on a questionable read of the cited case law.  In support, Defendants rely primarily on the Court of Appeals' decision in Carey v. Bayerische Hypo-Und Vereinsbank AG, which they suggest stands for the proposition that little deference is due to a plaintiff's choice of forum where the plaintiff "voluntarily entered into the business relationship giving rise to the suit." (Reply at 17 (citing 370 F.3d 234, 238 (2d Cir. 2004).)  That case involved a United States citizen who, while living in Germany, "voluntarily entered into a contract [with a German bank] to purchase and finance an apartment unit in Germany." 370 F.3d at 238.  The plaintiff, after moving back to the United States, sued the German bank in the Southern District of New York for recision of the purchase agreement, alleging she was fraudulently induced to enter into it.  Id. at 236.  The Court of Appeals affirmed this Court's dismissal on the grounds of forum non conveniens, noting the "transactions in Germany reasonably give rise to the expectation on all sides that any litigation arising from them will be conducted in Germany."  Id. at 238.

Carey is not applicable for several key reasons.  First, Carey's holding is not that any plaintiff voluntarily conducting

20

business internationally is automatically entitled to lesser deference with respect to her choice of forum.  Indeed, the Court of Appeals in Carey specifically emphasized that it was not "retreat[ing]" from "the presumptive validity of a United States resident's choice of a United States forum for litigation." Id. Second, and relatedly, the Court of Appeals' holding stemmed in part from the fact that no aspect of the litigation in Carey had even a remote connection to New York.  As discussed above, the plaintiff entered the contract while living in Germany, the contract was for German real property, the contract itself (unlike the By-laws here) mandated that any suit be filed in a German Court, and the plaintiff--once back in the United States-- maintained her residence in Texas.  Id. at 236.  Here, a significant portion of the events giving rise to the litigation took place in New York and involved a New York-based business. See supra at 19.  Third, the plaintiff in Carey affirmatively sought out a German bank while living in Germany in order to obtain a mortgage on German real property.  Here, however, the solicitation was a two-way street.  After all, it was Argentina and YPF who aggressively "sought out" American investors to buy a stake in YPF after the 1993 privatization.[8]  It would be strange

_____

[8] The Court of Appeals' ruling in Petersen II crystallizes this fact.  See, e.g., Petersen II, 895 F.3d at 199 ("Argentina and YPF

(Footnote continues on following page.)

for the Court to afford lesser deference to the Eton Park Plaintiffs' choice of forum while ignoring that the Republic and YPF solicited an investment from Eton Park in the first place.

Accordingly, the Court concludes that substantial deference should be afforded to Plaintiffs--in particular Eton Park's--choice of forum.

>                2. Step Two: Existence of an Adequate Alternative Forum

"An alternative forum is ordinarily adequate if the defendants are amenable to service of process there and the forum permits litigation of the subject matter of the dispute." In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine, 311 F.3d 488, 499 (2d Cir. 2002) (citations omitted). As the Court pointed out in its 2016 decision, "[c]ourts generally have found Argentina to be an adequate alternative forum." See 2016 WL 4735367, at *11 (collecting cases).

The Court departed from that traditional wisdom in 2016 because of the Republic's pending criminal investigation of King & Spalding and Burford Capital. See supra at 5. That investigation has since been dismissed, (Def. Mem. 8, 20), which

---

(Continued) took a number of steps to entice investors to participate in the IPO and thereby ensure its success"); id. at 200 ("Argentina and YPF touted these protections in the prospectus filed with the SEC in connection with the IPO"); id. ("Argentina's marketing efforts worked").

obviates the Court's concern that there existed a "well-founded fear of prosecution of parties' counsel" in connection with those specific proceedings, 2016 WL 4735367, at *11.  Plaintiffs continue to challenge Argentina's adequacy based on a new development: that the "Argentine authorities are currently investigating Petersen, its receiver, and Burford in connection with this very case." (Opp. at 1 (emphasis in original).)  As is so often the case, however, the sequel is inferior to the original.  A review of the parties' sworn submissions reveals a number of holes in Plaintiffs' story.

The most prominent issue with Plaintiffs' argument is that Plaintiffs' own expert acknowledges that he was not "privy to all the details of the investigation" and did not conduct a complete review of the investigative file.  (See Declaration of Alejandro Freeland ("Freeland Decl."), dated December 6, 2019 [dkt. no. 131] at ¶¶ 2, 14; see also Opp. at 15.)  This is despite the fact that the Petersen Plaintiffs have had complete access to the file since November 2018.  (See Reply at 11.)  By contrast, Defendants' expert reviewed all 8,000 pages of the investigative record associated with the relevant proceedings.  (Reply at 2.)  Whatever merit there may be to Plaintiffs' argument, the Court is not persuaded that Argentina is an inadequate forum based on Plaintiffs' expert's conclusions about an investigatory record that he did not review in its entirety.

Moreover, the Court agrees with Defendants that there is "no evidence of any improper conduct by Argentine executive or judicial officials, or by YPF" in the context of the investigation. (Reply at 11.)  Many of Plaintiffs' assertions about the investigation, i.e., that it is being wielded as a litigation tactic, (Opp. at 17), appear to be rooted in speculation by their expert. (See, e.g., Freeland Decl. ¶ 4 ("I find it very difficult to believe that Argentine authorities at the highest level of government have been unaware of this active investigation."); id. ¶ 9 (describing "strong indication that there are political implications to the investigation"); id. ¶ 10 (noting that "judges are susceptible to significant pressure from the Executive and Legislative Branches.").  Indeed, if anyone is leveraging the investigation for a litigation advantage, it seems to be Plaintiffs. As Defendants note: the investigation began in 2006, "Petersen has appeared before [the presiding Argentine judge] multiple times," has "request[ed] various types of relief [that have been granted]," and has "never once questioned [the Judge's] impartiality until now." (Reply at 10.)  Given Plaintiffs' active participation in the proceedings, the Court cannot find that Plaintiffs have the same "well-founded fear" of proceeding in Argentina that they did several years ago.

Plaintiffs also seek to undercut Argentina's adequacy by pointing to the outcome of the recent Argentine election, which

ushered into power the party of former President Cristina Fernandez de Kirchner.[9]  Plaintiffs' argument here is essentially that what they coin "Kirchnerism"--a core tenet of which is apparently the "rejection of judicial independence"--will inexorably affect the impartiality of the Argentine judiciary.  (Opp. at 19.)  In support of this thesis, Plaintiffs marshal a number of supporting examples, including:

- The impeachment of five (of nine) sitting Argentine Supreme Court justices in 2003, as orchestrated by former President Nestor Kirchner. (Opp. at 19.)

- A passage in a book by former President Cristina Kirchner boasting that the 2003 impeachment served to "enhance the authority of the Legislative and Executive branches of government." (Id.)

- Former President Cristina Kirchner's "Plan to Democratize the Judiciary," which was a court-packing plan that would establish a new appellate court to review decisions by Argentine appeals courts and whose judges would be appointed by Kirchner herself.  (Id.)

- Comments by new President-Elect Alberto Fernandez suggesting that his administration would "revise a number of judgments entered over the last few years" and require that certain judges explain their rulings.  (Id. at 20.)

In addition, Plaintiffs cite to various State Department reports which note that the Argentine government "did not always respect judicial independence and impartiality."  (Id. at 18.)

---

[9] Indeed, Cristina Kirchner herself is Argentina's newly-minted Vice President. (See Opp. at 18.)

However, generally "considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards." PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 73 (2d Cir. 1998). And here, Plaintiffs have only demonstrated that it is perhaps possible, based on the party's support for certain policies, that the new Kirchnerist regime will attempt to undermine the Argentine judiciary at some undefined point in the future, not that the judiciary is currently incapable of adjudicating this dispute. Indeed, outside of the 2003 impeachment, see supra at 25, Plaintiffs have only pointed to scattered comments and policy proposals that would not by themselves have any effect on the Argentine judiciary. Speculation that Argentina may become an inadequate forum at some point in the future is not enough to overcome the general rule that "it is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." PT United, 138 F.3d at 73 (internal quotation marks and citation omitted).

Finally, Plaintiffs argue that Argentina is an inadequate forum because the Petersen Plaintiffs' claims would be barred by the statute of limitations under Argentine law if the case were litigated in Argentine Court. (See Opp. at 21.) Plaintiffs are, of course, correct that "an adequate forum does not exist if a statute of limitations bars the bringing of the case in that

forum." <u>Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan</u>, 273 F.3d 241, 246 (2d Cir. 2001).  However, here it does not appear that the parties agree that the Argentine statute of limitations would bar litigation in Argentina.  <u>Cf.</u> <u>Baena v. Woori Bank</u>, No. 05 Civ. 7018 (PKC), 2006 WL 2935752, at *5 (S.D.N.Y. Oct. 11, 2006)(concluding that South Korea was inadequate as a forum where "both parties agree[d] that if this case were dismissed in favor of a South Korean forum, the Korean courts would apply the Korean statute of limitations and the case would be dismissed as time-barred").  While the fact that Defendants have relied on a statute of limitations defense in their pleadings certainly lends weight to the argument that Argentina is an inadequate forum, (Opp. at 21), the Court chooses not to reach the issue given (1) the lack of briefing on the issue and (2) the fact that it would not affect the overall outcome of the Court's <u>forum non conveniens</u> analysis.[10]

---

[10]  In addition, courts in this circuit routinely condition dismissal to foreign forums on the moving Defendant agreeing to waive its right to raise their statute of limitations defense upon arrival in its preferred forum.  <u>See, e.g.</u>, <u>Lust v. Nederlandse Programma Stichting</u>, No. 10 Civ. 8963 (WHP), 2011 WL 3279183, at *2 (S.D.N.Y. July 18, 2011) (granting <u>forum non conveniens</u> dismissal "subject to the condition that Defendants waiv[ing] any statute of limitations defenses in a suit in the Netherlands."); <u>see also</u> <u>In re Rezulin Prods. Liab. Litig.</u>, 214 F.Supp.2d 396, 401 (S.D.N.Y. 2002) (dismissal conditioned on consent to personal jurisdiction in foreign court, waiver of statute of limitations and other conditions).  Defendants have not consented to such a

(Footnote continues on following page.)

27

Accordingly, the Court concludes that Argentina is an adequate alternative forum for this dispute.

### 3. Step Three: Private and Public Interests

Having concluded that Argentina is an adequate forum, the third step of the <u>Iragorri</u> analysis requires the Court to balance various public and private interests in order to "ascertain whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum proposed by the defendant." 274 F.3d at 73. The defendant seeking dismissal bears the burden of establishing that the "balance of private and public interest factors tilts heavily in favor of the alternative forum." <u>Abdullahi v. Pfizer, Inc.</u>, 562 F.3d 163, 189 (2d Cir. 2009). The Court concludes that Defendants have failed to show that the balance of private and public interests "tilts heavily" in their favor. <u>Id.</u>

### a. Private Interests

The private interest factors to be evaluated can include "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of

---

(Continued) waiver here but, given the Argentine statute of limitations is the only lurking issue that could undermine Argentina's adequacy as a forum, imposing such a condition might have proved a solution to the statute of limitations issue. Because the Court has elected not to dismiss this case to Argentina, it need not reach that issue here, but for that reason the Court weighed statute of limitations concerns less heavily in its analysis.

obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947).

With respect to the above factors, Defendants have advanced the usual arguments. They note that most of the documentary evidence relevant to Plaintiffs' claims and Defendants' defenses is located in Argentina, (Def. Mem. at 21), that "most, if not all, witnesses who will be called to testify in these Actions are located in Argentina," (id. at 22), and that most of the documentary and testimonial evidence required to establish Defendants' affirmative defenses is located in Argentina, (id. at 23). Plaintiffs point out that Eton Park is based in New York City and that, "[t]o the extent testimony is needed from anyone then or now affiliated with the firm, New York will be the most convenient location by far." (Opp. at 32.)

The Court finds that the private interest factors favor litigating in Argentina. YPF's corporate records and other relevant documents are, of course, located in Argentina, and witnesses who will be called to testify about (1) the Republic's expropriation of YPF's shares and (2) the decision not to initiate the tender offer for outstanding YPF shares will primarily be located in Argentina. Plaintiffs are certainly correct that to the extent testimony is required from current and former Eton Park

employees "New York [is] the most convenient location by far."
(Opp. at 32.)  In the era of hard-copy documents and exclusively
in-person testimony, that would counterbalance somewhat the fact
that significant aspects of the litigation will center around
Argentina, but would not swing the balance entirely in Plaintiffs'
favor.  See Varnelo v. Eastwind Transp., Ltd., No. 02 Civ. 2084
(KMW) (AJP), 2003 WL 230741, at *23 (S.D.N.Y. Feb. 3,
2003)("[B]ecause the Court may not base its decision on speculation
that New York-based witnesses may possess relevant information,
the alleged existence of any New York-based witnesses will be
deemed at best a neutral factor.").

As the Court noted in 2016, however, "modern technologies
. . . make the location of witnesses and evidence less important
to the forum non conveniens analysis."  2016 WL 4735367, at *12
(quoting Metito (Overseas) Ltd. v. Gen. Elec. Co., No. 05 Civ.
9478 (GEL), 2006 WL 3230301, at *6 (S.D.N.Y. Nov. 7, 2006)); see
also Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co., 375
F.Supp.2d 257, 265 (S.D.N.Y. 2005) ("In this day and age of . . .
instant communications, the convenience of immediate physical
proximity to documents, testimony, and other proof has become of
less consequence to a forum non conveniens analysis, especially
when, as here, two large and sophisticated parties are involved.").
That remains true today, perhaps especially so.  Indeed, sure to
be one of the enduring lessons of the ongoing COVID-19 pandemic is

that we can accomplish far more remotely than we had assumed
previously.  That lesson should apply with equal force to managing
this litigation, especially given that both parties are
represented by sophisticated, first-rate, international law
firms.[11]  Accordingly, the private interest facts favor litigation
in Argentina under rules that require use of hard copies and solely
in-person testimony; in today's digital climate, however, the
private interest factors approach neutral.

### b. Public Interests

Public interest factors to be considered by the Court include:
(1) the interest in having local disputes settled locally; (2) the
interest in avoiding problems associated with the application of
foreign law; and (3) the interest in avoiding burdening jurors
with cases that do not affect their community.  Alfadda v. Fenn,
159 F.3d 41, 46 (2d Cir. 1998).  The Court concludes that these
factors support litigating in New York.

The elephant in the room is, without doubt, the Exclusive
Jurisdiction Provision in the Prospectus.[12]  Defendants have argued

---

[11] For example: depositions can be conducted via videoconference;
documents located overseas can be uploaded easily and reviewed by
the parties via e-discovery platforms; and, if it comes to it, the
parties can request that the Court allow trial witnesses to testify
via video pursuant to the good cause exception in Fed. R. Civ. P.
43.

[12] Defendants have threaded arguments related to the Exclusive
Jurisdiction Provision through all three steps of the Iragorri
analysis, but the Court will address those arguments here.

that this action must be litigated in Argentina because Plaintiffs have brought claims that, under Argentine law, are subject to the exclusive jurisdiction of Argentine courts.[13]  This argument relies on Defendants' assertion that Plaintiffs' claims for breach of the YPF By-laws are appropriately labeled "corporate law" claims. According to Defendants, under Argentine law "disputes arising out of the [By-laws] of an Argentine corporation are governed by Argentine corporate law and subject to Argentina's exclusive territorial jurisdiction."  (Def. Mem. at 17; see also Reply at 4.)  The Exclusive Jurisdiction Provision of the Prospectus, in turn, "reinforce[s]" this principle, (Def. Mem. at 19), by requiring that "any action relating to enforcement of the By-laws or a shareholder's rights thereunder" be "brought in an Argentine court."  (Prospectus at 88.)

---

[13] The parties' experts submitted a number of declarations on this issue.  (See Expert Declaration of Rafael M. Manóvil in Support of Defendants' Motion to Dismiss ("Manóvil Decl."), dated Aug. 30, 2019 [dkt. no. 115]; see also Expert Declaration of Guillermo Cabanellas in Support of Defendants' Motion to Dismiss ("Cabanellas Decl."), dated Aug. 30, 2019 [dkt. no. 116]; see also Declaration of Professor Alejandro M. Garro in Opposition to Defendants' Motion to Dismiss ("Garro Decl."), dated Dec. 6, 2019 [dkt. no. 132]; see also Declaration of Dr. Alfredo L. Rovira in Opposition to Defendants' Motion to Dimiss ("Rovira Decl."), dated Dec. 6, 2019 [dkt. no. 133]; see also Reply Expert Declaration of Rafael M. Manóvil ("Manóvil Reply Decl."), dated Feb. 7, 2020 [dkt. no. 152]; see also see also Reply Expert Declaration of Guillermo Cabanellas (Cabanellas Reply Decl.), dated Feb. 7, 2020 [dkt. no. 153].)

Thus, Defendants argue that the exclusive jurisdiction of Argentine courts is mandatory in nature, i.e., because (Defendants posit) Argentine law demands a forum in Argentina for corporate law claims such as Plaintiffs', this case must be dismissed to Argentina. (See, e.g., Def. Mem. at 19 ("Because Plaintiffs assert claims that must be heard in Argentine courts under controlling Argentine law . . . this Court [] lacks jurisdiction.")  For today's purposes, though, that question has already been decided. The Court of Appeals' ruling in Petersen II makes clear that the Republic's jurisdiction over the present action is not "exclusive" at all because "[s]overeigns are not immune from [suits like present one] under the FSIA."  See 895 F.3d at 211.  Relatedly, forum non conveniens dismissal is by its very nature discretionary and requires that any conclusion about Argentine law be balanced with other considerations.  Here, then, the Court must decide whether Argentina's supposed exclusive jurisdiction weighs heavily in favor of declining the jurisdiction it independently retains pursuant to the FSIA.[14]

---

[14] In pressing the exclusive jurisdiction point, defendants make much ado of this Court's decision in Locals 302 & 612 of Int'l Union of Operating Eng'rs v. Blanchard, No. 04 Civ. 5954 (LAP), 2005 WL 2063852 (S.D.N.Y. Aug. 25, 2005).  There, this Court decided that it "[had] no jurisdiction" over a derivative lawsuit brought by shareholders of a Canadian corporation organized pursuant to the Canadian Business Corporations Act (the "CBCA"). Id. at *7. That statute required that such suits be brought in

(Footnote continues on following page.)

33

To do so, the Court must review Argentine law.  As discussed above, see supra at 31-33, Defendants have argued that the Republic has exclusive territorial jurisdiction over "corporate" claims arising out of the by-laws of Argentine corporations.  Based on its review of the parties' expert submissions, the Court concludes that Plaintiffs' claims are "corporate" claims as a matter of Argentine law.  As Professor Cabanellas, one of Defendants' experts, points out persuasively, Section 5(11) of the Argentine National Code of Civil and Commercial Procedure (the "Code") requires that claims "based on corporate relationships" must be brought "where the registered domicile of the relevant corporation is located."  (Cabanellas Reply Decl. ¶ 8.)  Plaintiffs argue in opposition that Section 5(11) was meant to apply to "intra-corporate" disputes that "meddle with . . . [the] internal affairs" of a corporation, (Garro Decl. ¶¶ 25-28; Rovira Decl. ¶ 32), and not claims that sound in contract such as their own.  But the

---

(Continued) certain enumerated Canadian courts, i.e., what Defendants suggest Argentine law provides for here. Id. Defendants specifically zero in on the Court's statement that "where the CBCA specifically establishes exclusive jurisdiction over an action, that choice of forum must be respected." Id. at *3.

The factual similarities between this case and Locals 302 cannot be denied. However, there is a critical difference. In Locals 302 the Court concluded that, as a result of substantive Canadian law, it lacked jurisdiction; it did not decline the exercise of properly held jurisdiction.  Id. at *6.  Here, the Court has already determined that it independently possesses subject matter jurisdiction pursuant to the FSIA. Now, it is determining in its discretion whether to exercise that jurisdiction.

express language of Section 5(11) broadly applies to disputes that are "derived from corporate relationships." (Cabanellas Reply Decl. ¶ 13(iii).   Even in light of Professor Rovira's position that the YPF by-laws "are a contract enforceable against both shareholders . . . and the Company," (Rovira Decl.  ¶ 17), and even acknowledging that Plaintiffs' claims are contractual in nature, see Petersen II, 895 F.3d at 211, the Court is on this record is persuaded by Professor Cabanellas' point that the claims "derive" from Plaintiffs' former status as shareholders of YPF.

However, the fact that Plaintiffs' claims may be properly classified as "corporate claims" under Argentine law does not compel litigation in Argentina because the Code allows for concurrent jurisdiction over this dispute.   Plaintiffs' experts, Professors Alejandro Garro and Alfredo Rovira, point out persuasively that the Code does not speak to international jurisdiction and does not purport to address the ability of foreign courts to address certain types of disputes that arise under Argentine law.   (See Garro Decl. ¶¶ 12-13; see also Rovira Decl. ¶¶ 25-26.)   Indeed, Defendants' own expert acknowledges that the Code merely "determines which court within Argentina has jurisdiction . . . within the Argentine jurisdictional system." (Cabanellas Decl. ¶ 4.)   Thus the Court is persuaded that the Code looks inward, not outward, and does not limit foreign plaintiffs where other overseas courts may be competent to hear their claims.

Because the Court concludes that Argentine law does not itself require a forum in Argentina, it by extension concludes that Defendants' interests in litigating there are greatly lessened.

The Republic does, however, maintain a strong policy interest in having corporate disputes litigated in Argentine courts. Another of Defendants' experts, Rafael Manóvil, points out that the Argentine legislature purportedly wanted Argentine courts to adjudicate such disputes where possible because it wanted to "reduce[] duplicative litigation and ensure[] consistency in the interpretation and application of a single [Argentine] corporation's bylaws."  Reply at 5 (citing Manóvil Decl. ¶ 35; Manóvil Reply Decl. ¶¶ 52-57.)  This policy interest is certainly entitled to some weight.

However, there are more compelling reasons for litigating this case in the United States and specifically in New York.  The Solicitor General of the United States has already noted in the Government's opposition to Defendants' petitions for certiorari on the FSIA issue the strong interest of the United States in ensuring that "foreign states that enter U.S. markets as commercial actors do not enjoy immunity from lawsuits regarding violations of their commercial obligations." (Opp. at 29.)  It bears repeating that the United States made this statement without any consideration of New York-based Eton Park as a plaintiff.  The already substantial

interest of the United States in this litigation has indubitably been heightened now that a U.S.-based plaintiff is in the mix.

Moreover, New York specifically has a considerable interest in hosting this litigation. "New York clearly has a strong interest in policing activities directed toward its stock markets," Cyberscan Tech., Inc. v. Sema Ltd., No. 06 Civ. 526 (GEL), 2006 WL 3690651, at *6 (S.D.N.Y. Dec. 13, 2006). The Court of Appeals has echoed this fact. For example, in DiReienzo v. Philip Services Corp., the Court of Appeals reviewed the district court's forum non conveniens dismissal of securities fraud claims brought by shareholders of a Canadian metal processing company. See 294 F.3d 21 (2d Cir. 2002). In reversing that dismissal, the Court noted New York's heightened interest in adjudicating a lawsuit where it "was [Defendant] who came to [Plaintiffs] by registering its stock on American exchanges." Id. at 32. The Court of Appeals stressed further that "Plaintiffs are involved in this lawsuit precisely because of aggressive selling techniques by [Defendant] within the United States that targeted United States investors as potential purchasers of its stock." Id. This case is no different: through aggressive marketing tactics, the Republic and YPF affirmatively sought out investors in New York and induced them to buy a stake in YPF through YPF ADRs listed on the NYSE, a fact repeatedly emphasized by the Court of Appeals in its decision in Petersen II. (See supra at 21-22 n.8 (quoting Petersen II, 895 F.3d at 199).)

Thus, the interest of the United States and of New York in litigating this case in the Southern District of New York is very strong.

Finally, the Court does not find that the need to apply Argentine law strongly favors dismissal. All agree that Argentine law applies to this action, and all presumably agree that the need to apply foreign law generally favors dismissal in the forum non conveniens analysis. See Piper Aircraft, 454 U.S. at 251 ("[T]he public interest factors point towards dismissal where the Court would be required to untangle problems in conflict of laws, and in law foreign to itself")(internal quotations and citation omitted).

This Court, however, must "guard against an excessive reluctance to undertake the task of deciding foreign law." Varnelo, 2003 WL 230741, at *27 (citations omitted). Here, Defendants have argued that this case should be litigated in Argentina because this case will "require the Court to address fundamental and complex questions of Argentine constitutional law, public law, priority of law and statutory law, and Defendants' obligations thereunder," (Def. Mem. at 27). Practically, it is curious that Defendants did not raise this argument in 2016 and, in any event, Defendants do not explain why the waters have somehow become muddier since the Court first decided that the prospect of applying Argentine law was not a reason to dismiss this case to Argentina. See Petersen I, 2016 WL 4735367, at *13. Moreover,

38

Defendants have not made a compelling showing that any complicated questions of Argentine law will actually arise in what is, at its core, a case involving relatively standard factual allegations of breach of the YPF By-laws.  Third, to the extent that those questions do arise, the high quality of the parties' expert submissions on Argentine law, see supra n.13, gives the Court confidence that similar future submissions will provide the Court with a more than adequate basis to inform itself and reach a decision on any potentially thorny issues.  The Court thus concludes that the necessity of making conclusions of Argentine law does not counsel strongly in favor of dismissal.

In weighing the private and public interests at play here, the Court finds that: 1)  Defendants would have a strong interest in litigating in Argentina if the litigants were required to rely on hard copy documents and exclusively in-person testimony, but the weight of that interest declines to near neutral given the reliability of modern technology that allows litigation to be conducted remotely; 2) both Argentine law and the Court of Appeals decision in Petersen II recognize concurrent jurisdiction over this dispute in this Court and in the Argentine courts, so Argentine law does not serve as a strong basis for litigating in Argentina; 3) the interests of the United States in general and New York in particular in litigating cases arising out of listings on the New York Stock Exchange where United States investors were

specifically solicited to invest weighs very heavily in favor of litigation in New York.  On balance, the Court concludes that the public and private interest factors weigh heavily in favor of litigation in New York.[15]

      *           *           *

To review, the Court holds that: (1) Plaintiffs' choice of a New York forum deserves substantial deference because the Eton Park Plaintiffs are based in and operate out of New York and this litigation has a significant connection to New York; (2) Argentina is an adequate alternative forum for this litigation; and (3) that the various private and public interest factors strongly favor litigation in New York.  Accordingly, the Court concludes that Defendants have failed to carry their burden to demonstrate that the balance of convenience "tilts strongly" in favor of trial in Argentina.  See R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 167 (2d Cir. 1991).

---

[15] For the same reasons, the Court rejects Defendants' argument that this action should be dismissed on the grounds of international comity.  (See Def. Mem. at 30-32.)  Defendants have simply failed to demonstrate the exceptional circumstances, required for such relief, exist.  See Ole Media Mgmt., L.P. v. EMI Apr. Music, Inc., No. 12 Civ. 7249 (PAE), 2013 WL 2531277, at *3 (S.D.N.Y. June 10, 2013).  In addition, this action has been pending in New York for nearly five years, and both parties have spent untold amounts of time and money pressing their various positions in this forum.  Dismissal to Argentina on international comity grounds would thus be woefully inefficient from a judicial economy standpoint.  Id. (noting "interests of judicial economy" as a factor to be balanced when considering dismissal on grounds of international comity).

III. <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss this action pursuant to the doctrine of <u>forum non conveniens</u> (dkt. no. 110 in 15 Civ. 2739; dkt. no. 51 in 16 Civ. 8569) is <u>DENIED</u>.  To the extent that they are not addressed above, the Court has considered the parties' remaining arguments and has found them unavailing.  The parties shall confer and shall inform the Court by letter no later than June 19, 2020, how they wish to proceed.

**SO ORDERED.**

Dated:     New York, New York
           June 5, 2020

_____
LORETTA A. PRESKA
Senior United States District Judge