# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

November 10, 2020

Via ECF

The Honorable Loretta A. Preska,
   United States District for the Southern District of New York,
      500 Pearl Street,
         New York, NY 10007.

         Re:   *Petersen Energía Inversora S.A.U.*, et al. v. *Argentine Republic and YPF S.A.*, No. 15 Civ. 2739 (LAP) (*Petersen*); *Eton Park Capital Mgmt. et al.* v. *Argentine Republic and YPF S.A.*, No. 16 Civ. 8569 (LAP)

Dear Judge Preska:

      I am counsel to Defendant the Argentine Republic ("the Republic"). On behalf of the Republic and YPF S.A. ("YPF"), which joins in this letter, I respectfully request a pre-motion conference regarding (i) the failure of Plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. ("Petersen") to produce critical documents from their principals, the Eskenazi family, or to produce the Eskenazis as witnesses for deposition; (ii) Petersen's improper invocation of privilege to block relevant discovery; and (iii) the need for a limited, 90-day extension of the November 16 fact discovery deadline.[1] Defendants recognize the Court's "reluct[ance] to extend the current discovery schedule" (ECF No. 181), but, as detailed below, this extension is warranted because of Plaintiffs' failure to take basic steps to preserve and to provide Defendants with key evidence relating to their claims, and Defendants' challenges in collecting documents as a result of the Covid-19 pandemic and the broad scope of Plaintiffs' requests. Defendants are prepared to proceed with expert reports and depositions under the current schedule.[2]

      The discovery record developed from Petersen so far—or, more accurately, the lack thereof—has revealed why Plaintiffs pushed for a short four-month fact discovery period: Plaintiffs seek to create a truncated record to avoid discovery from the Eskenazis about the period prior to and including the expropriation of YPF shares. Defendants have learned through discovery

---

[1] Defendants request leave to file this over-length letter, which addresses these three interrelated issues on behalf of both Defendants rather than burdening the Court with separate individual letters on each issue.

[2] Some minimal supplementation of expert reports may be necessary to accommodate discovery produced after the due dates for expert reports.

The Honorable Loretta A. Preska                                                                                    -2-

that Petersen never collected any documents from the Eskenazis, who are the central fact witnesses in the case on Petersen's side, even though Plaintiffs and the entity they sold their claim to (Burford Capital ("Burford"))[3] have been coordinating on litigation strategy with the Eskenazis and their counsel.

Petersen is undergoing liquidation proceedings in Spain, but its ultimate equity owners and former principals are the members of the Eskenazi family—Enrique Eskenazi, Sebastián Eskenazi, Matías Eskenazi Storey, and Ezequiel Eskenazi Storey (the "Eskenazis")—███████████████████████████████████████████████████.[4] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. (Betancor Tr. 32:11-17, 86:11-19.) Despite their central role in the events in this litigation, Petersen has refused to produce any members of the Eskenazi family for deposition testimony or to collect their documents (or those of other affiliated entities and individuals) on the theory that the Eskenazis are no longer under Petersen's "control." Petersen has also blocked development of the record with respect to the Eskenazis and the later sale of Petersen's claims to Burford with improper privilege claims—████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (*See infra* pp. 6-7.)

Under the Federal Rules and basic principles of fairness, Plaintiffs cannot engage in this shell game. Defendants accordingly seek (1) an order directing Petersen to produce all evidence—documents and witnesses—from the Eskenazis and all affiliated Petersen entities in response to Defendants' outstanding document requests (without requiring Defendants to wait to obtain this evidence through the lengthy and cumbersome process under the Hague Convention); (2) an order directing Petersen to provide any improperly withheld testimony and documents based on the improper privilege objections during Petersen' Rule 30(b)(6) deposition; and (3) an extension of the current November 16 fact discovery deadline (a) to allow that evidence to be produced by Petersen; and (b) to allow Defendants the time required to complete their own document productions in light of the COVID-19 pandemic and the broad scope of Plaintiffs' document requests.

---

[3] Burford created a wholly owned subsidiary, Prospects Investments LLC, to acquire Petersen's claims.

[4] *See* Transcript of the November 4-5 Deposition of Armando Betancor (Petersen's Rule 30(b)(6) witness) ("Betancor Tr.") at 35:21-36:13, excerpts attached as Exhibit 1 hereto.

The Honorable Loretta A. Preska                                                                                    -3-

**Procedural Background to Defendants' Requests**

On July 28—shortly after the Court directed that fact discovery proceed—Defendants served document requests seeking Petersen's (and expressly including the Eskenazis') documents beginning from 2007—the period when the Eskenazis first began to explore acquiring a stake in YPF from Repsol. Until October 23, Petersen's production consisted only of newspaper articles, public documents from prior litigation, public documents concerning the expropriation, and public investment analyst reports regarding YPF. On October 31 and November 1—just a few days before the scheduled deposition of its Rule 30(b)(6) witness—Petersen produced additional documents, apparently retained from the Spanish bankruptcy proceeding, which consisted of irrelevant "filler," such as bank statements and accounting invoices.

Remarkably, Petersen has not produced any meaningful contemporaneous documents from Petersen's or the Eskenazis' files or servers. Petersen has refused to obtain these documents from the Eskenazis, claiming they do not have "control" over those documents. But Petersen's bankruptcy administrator testified that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. (Betancor Tr. 93:5-19, 223:23-224:9, 262:17-264:15.) Despite this, Petersen has not produced any Eskenazi documents or agreed to secure the Eskenazis as witnesses for remote depositions in this proceeding.

While shielding itself from discovery by hiding behind its "shell" vehicle status, Petersen served broad discovery requests on Defendants seeking, among other things, "[a]ll documents and communications concerning the solicitation of U.S. investors in YPF" in connection with the 1993 IPO, and "[a]ll documents and communications concerning the Expropriation."[5] These demands were flatly inconsistent with Plaintiffs' representations to the Court, in urging an extremely short fact discovery period, to seek "limited" discovery, "basically like nothing discovery." (Ex. 4 (July 9, 2020 Hearing Transcript) at 7:15-16, 27:24-28:2.) Despite the breadth of Plaintiffs' requests, as detailed below and in the attached declarations of Maria Alejandra Etchegorry (Republic) and Brian O'Durnin (YPF), Exhibits 5 and 6 hereto, Defendants have been working diligently to produce this information, including restoring electronic information and obtaining special authorizations to access government buildings that are otherwise restricted in response to the COVID-19 pandemic. Defendants have produced 27,633 pages of documents, but their efforts are ongoing.

---

[5] *See* Requests 3 and 6 of Plaintiffs' August 12, 2020 requests for production to the Republic and Requests 1 and 3 of Plaintiffs' August 12, 2020 requests for production to YPF, attached hereto as Exhibits 2 and 3, respectively.

The Honorable Loretta A. Preska                                                                                          -4-

**Plaintiffs Should Be Compelled To Produce Documents of Petersen and the Eskenazis**

As Defendants explained in their October 9 letters to the Court, the Petersen entities are shell companies created for the sole purpose of acquiring and holding YPF stock and, now, prosecuting the claims in the *Petersen* action. Burford bought Petersen's claims out of bankruptcy in March 2015 for €15 million, which Burford now seeks to turn into a more than $1 billion windfall to be extracted from the current shareholders of YPF and the public funds of Argentina.[6] Discovery has revealed that the bankruptcy receiver nominally prosecuting the *Petersen* action on Petersen's behalf possesses almost no contemporaneous documents from relevant periods, including:

- The period (2008 to 2011) when the Eskenazis formed Petersen to purchase from Repsol a 25% stake in YPF through a series of agreements, including a pact to have Sebastian Eskenazi installed as YPF's CEO and for Repsol to protect Petersen from any losses it may incur in the future;

- The period (2008 to 2012) when Sebastian Eskenazi—who had no previous experience in the energy sector—operated YPF's business to serve only the interests of his family. The Eskenazis' mismanagement of the company included (i) extracting an exorbitant dividend—which exceeded, at times, YPF's *net income* for the entire year—that the Eskenazis used to service billions of dollars in loans taken out to acquire their YPF shares from Repsol; and (ii) the conscious decision to avoid reinvesting in the company, which depleted YPF's oil and gas reserves (and production capacity);

- The period (2012 to 2015) when the Republic (i) lawfully intervened in YPF; and (ii) expropriated Repsol's shares through a proceeding in accordance with due process of law; and when the Eskenazis (iii) strategically elected not to exercise remedies available to them under Argentine law; and (iv) inexplicably chose not to enforce an indemnity from Repsol.

Documents and communications from these periods bear directly on the claims and issues in *Petersen*. For example, Petersen devotes an entire section of its Complaint to alleging that the Eskenazis "relied" on the YPF bylaws when they invested in YPF shares. (Petersen Compl. ¶¶ 27-30.) Defendants have also pled defenses that turn on (i) Petersen's lack of good faith and unclean hands in acquiring its YPF shares and then managing the company; (ii) Petersen's strategic decision, after the intervention, not to challenge YPF's corporate actions, including allowing Argentina to vote the Repsol shares or otherwise pursue legal remedies available to them under Argentine law (as other shareholders did); (iii) Petersen's decision not to avail itself of the

---

[6] While styled as a "financing," the evidence will show that the substance of the arrangement between Burford and Petersen is an assignment under governing Spanish law, and Defendants anticipate seeking summary judgment on that issue.

indemnity it negotiated from Repsol; and (iv) the invalidity under Spanish law of Petersen's subsequent assignment of its claims to Burford. (*See* Argentina's Answer at 26-27, 29, 32-33.)

Plaintiffs have produced virtually no relevant documents, because when Petersen went into bankruptcy in Spain in 2012, no steps were taken to preserve, or ensure access to, documents that the Eskenazis and other individuals within the Petersen Group had regarding Petersen's business. In addition, when Petersen transferred its claims to Burford for €15 million and retained a contingent 30% share of any recovery here (with Burford obtaining 70% and controlling the litigation), Burford likewise did nothing to preserve relevant evidence, even though its officers, including CEO Christopher Bogart, and the Petersen bankruptcy trustee, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Transcript of the October 29 Deposition of Christopher Bogart ("Bogart Tr.") at 122:22-123:7, 134:7-25, excerpts attached as Exhibit 7 hereto.)

Despite the Eskenazis' critical role, Plaintiffs and Burford have flatly refused to provide testimony regarding the Eskenazis, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*see, e.g.*, Betancor Tr. 98:7-12; Bogart Tr. 124:21-125:15), or ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*see* Betancor Tr. 198:19-199:7), or ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*see* Betancor Tr. 92:17-93:4; Bogart Tr. 203:12-15).[7]

Plaintiffs claim that they have no obligation to collect documents from the Eskenazis or produce them for deposition, because they are "no longer" in control of the Eskenazis. But that the Petersen entities are shell entities—special purpose vehicles—does not relieve them of their duty to collect and produce documents relevant to their claims from their principals, the Eskenazis, and from other affiliated Eskenazi entities and individuals. *See, e.g., Royal Park Inv. SA/NV* v. *Deutsche Bank Nat'l Tr. Co.*, 314 F.R.D. 341, 347 (S.D.N.Y. 2016) (Moses, J.) (ordering Royal Park—a special purpose vehicle created to take over certain distressed assets—to "produce documents held by BNP Paribas to the same extent that it would be required to produce those documents from its own files"). Likewise, the mere fact that the special purpose vehicles entered bankruptcy, and then gave control of the claims to a litigation funder, does not cleanse them (or Burford) of their discovery obligations: federal courts have repeatedly held that it would be "both logically inconsistent and unfair to allow the right to sue to be transferred to assignees of a debt *free of the obligations that go with litigating a claim*." *JP Morgan Chase Bank* v. *Winnick*, 228 F.R.D. 505, 506 (S.D.N.Y. 2005) (Lynch, J.) (emphasis added); *see also Baxter Bailey & Assoc., Inc.* v. *Hovnanian Enter., Inc.*, 2017 WL4174965, at *1 (D. Md. May 8, 2017) ("[t]hose federal

---

[7] Burford, like Petersen, has refused to produce relevant documents, including documents and communications concerning the Claim Prosecution Agreement, and the due diligence Burford conducted prior to entering into that agreement.

The Honorable Loretta A. Preska                                                                                             -6-

courts that have addressed the issue uniformly agree that the assignee of an assignor's claims 'bears the same discovery obligations that [the assignor] would carry had it remained the plaintiff'") (collecting cases).  Petersen should be ordered to produce the evidence and, if it will not, this Court should impose the appropriate sanctions for non-production or spoliation by a party, up to and including dismissal of this action.

Moreover, despite protesting their lack of control over the Eskenazis when responding to Defendants' discovery requests, Defendants have learned that Plaintiffs *can*—and have—obtained the cooperation of the Eskenazis when it serves Plaintiffs' interests.  Defendants learned during depositions on October 29 and November 4 to 5 that, as noted above, .  (*See* Bogart Tr. 128:5-129:4, 137:4-138:6.)  In addition, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████.  (Betancor Tr. 71:10-72:2, 93:5-94:17, 223:23-224:9, 262:17-264:15.)  Indeed, ███████████████████████████████████████████████████████████████.  (*Id.* 58:14-22, 59:18-60:21, 66:8-67:18.)  None of that information has yet been produced to Defendants.[8]

Plaintiffs also cannot hide behind the ongoing Hague Convention process to assert that this evidence is available through other means.  As Plaintiffs know, the Hague Convention process can be extremely unpredictable, time-consuming and cumbersome—often taking months to complete—and is no substitute for party discovery subject to the oversight of this Court.  The Hague Convention process likely will not be completed for many months after the current end of fact discovery on November 16, 2020.  Defendants should not have been forced to make their Hague applications regarding the Eskenazis at all, because it was Petersen's obligation to retain, collect and produce relevant documents regarding their claims in the *Petersen* action.  Accordingly, the Court should order Plaintiffs to produce all documents responsive to Defendants' requests, including any documents in the possession, custody, or control of the Eskenazis, and to make the Eskenazis available for deposition.

**Plaintiffs Should Not Be Permitted To Obstruct Discovery with Improper Privilege Claims**

Regrettably, Plaintiffs' efforts to prevent Defendants from accessing critical documents is part of a larger strategy to impede Defendants' ability to obtain highly relevant

---

[8] Defendants learned of Mr. Betancor's contacts with representatives of the Eskenazis only at Mr. Betancor's 30(b)(6) deposition on Wednesday, November 4, which was just 12 days before the November 16 discovery deadline.

The Honorable Loretta A. Preska                                                                                                    -7-

evidence.  During the November 4 and 5 deposition of Armando Betancor, Petersen's bankruptcy receiver, Mr. Betancor testified in his personal capacity as well as on behalf of Petersen as a 30(b)(6) witness. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Betancor Tr. 141:25-142:5); ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*id.* at 155:2-15, 212:24-213:21); ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*id.* at 150:7-11); ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*id.* at 234:6-235:21; 245:15-21, 259:4-17); ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*id.* at 82:15-21, 92:17-22, 104:11-16, 137:11-21, 138:5-10); ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*id.* at 244:4-245:2, 246:6-248:8, 250:4-251:12, 260:22-261:4, 262:9-263:17).

These improper instructions prevented Defendants from eliciting any testimony on important issues, including, notably, Petersen's Claim Prosecution Agreement with Burford, a key document concerning the dispositive defense that Petersen lacks standing to bring the *Petersen* action at all.  (*See* Argentina's Answer at pp. 26-27.) Defendants respectfully ask that the Court reject Plaintiffs' improper claims of privilege and work product, and order Petersen to provide any improperly withheld documents and to reopen Petersen's 30(b)(6) and Mr. Betancor's deposition.

### The Court Should Order a Limited Extension of the Schedule To Permit the Completion of Essential Fact Discovery

Respectfully, the Court should extend fact discovery, which is scheduled to close on November 16, 2020, for 90-days to allow for the completion of the discovery from Petersen and Burford.  To the extent necessary, the Court should extend the fact discovery deadline so that Defendants can obtain any relevant evidence through the Hague Convention process initiated by this Court's letters of request, issued on October 23.

As Defendants previewed for the Court on October 9 (*see Petersen* ECF Nos. 185-86), the strict lockdown imposed as a result of the global pandemic has made it impossible, despite extraordinary efforts, for Defendants to identify, collect, and produce all documents responsive to Plaintiffs' sweeping document requests prior to the upcoming fact discovery deadline of November 16, 2020.  Argentina has been "battling one of the world's highest daily death tolls" from COVID-19.[9]  In October, the number of cases in Argentina exceeded one million.[10]  Because

---

[9] *See Argentina pandemic crisis deepens as coronavirus deaths hit 30,000*, Reuters (Oct. 28, 2020), https://www.reuters.com/article/us-health-coronavirus-argentina/argentina-pandemic-crisis-deepens-as-coronavirus-deaths-hit-30000-idUSKBN27D2J6.

[10] *Id.*

The Honorable Loretta A. Preska                                                                                        -8-

Argentina first lifted the strictest aspects of its lockdown, on November 9, YPF and the Republic request additional time to complete document discovery.

Defendants have taken extraordinary steps to try to meet the Court's fact discovery deadline. As detailed in the accompanying declaration of Maria Alejandra Etchegorry, Deputy Director of International Affairs and Disputes of the Office of the Attorney General of the Treasury of the Nation (*Procuración del Tesoro de la Nación*, "PTN"), attached as Exhibit 5 hereto, after receiving Plaintiffs' requests for the production of documents on August 12, the Republic's lawyers immediately set to work to determine which Argentine government entities might possess potentially relevant information. This process involved sending requests for documents to several government entities and branches, some of which also sent the corresponding requests to relevant secretariats, under-secretariats and directorates, (*e.g.*, the Ministry of Economy, the Secretariat of Energy, the National Securities Commission, the Legal and Technical Secretariat of the Presidency, the Ministry of Productive Development, the General Archive of the Nation, the National Appraisals Tribunal, and the Argentine Congress), and following up with these entities on a regular basis to monitor their document collection progress and to assist in troubleshooting obstacles posed by, among other things, the COVID-19 pandemic. (Ex. 5 at ¶¶ 13-18.)

While these entities have been able to collect some potentially responsive documents, most of these entities are still, due to the complex nature of the Republic's record-keeping and the restrictions imposed as a result of the pandemic, searching for and obtaining access to other documents. Among other obstacles, the Republic's administrative files from before April 2016 are largely stored in hard copy inside government buildings. Identifying the physical location of potentially responsive administrative files requires first searching an indexing system. Due to the limited technical capabilities of that system and the breadth of Plaintiffs' document requests, searches have been conducted on a month-by-month basis. To determine whether the files are responsive, special essential-functions authorizations for personnel have to be issued to enter government buildings restricted by the COVID-19 pandemic, in each case from the relevant ministry or entity. If the files are located and deemed responsive, those files must be digitized—often needing separate authorization—in order to be transmitted to counsel, reviewed and produced. The Republic is continuing this arduous process and will supplement its document production with responsive documents on a rolling basis. (*Id.* ¶¶ 4-18.)

As to YPF, as explained in Brian O'Durnin's declaration, attached as Exhibit 6 hereto, the COVID-19 pandemic and the measures implemented to contain it have forced YPF's cybersecurity team to redirect already limited resources towards ensuring that the vast majority of YPF's 20,000 workers can work remotely and that YPF is protected from the increased risk of cybersecurity attacks accompanied by such remote operations. Mr. O'Durnin and his team have been working diligently to meet YPF's document discovery obligations in this new remote environment. Critically, YPF is collecting electronic data archived from employee computers and stored offsite on back-up tapes, to ensure the most robust production of relevant documents. This

The Honorable Loretta A. Preska                                                                                       -9-

is above and beyond YPF's discovery obligations, which typically would not require the restoration of archived backup tapes and is a far more intensive and comprehensive effort than Plaintiffs have undertaken. YPF has had to undertake much of this process remotely—adding difficulty—due to limited access to YPF's headquarters tower. This process has required physical access to the building when Argentina (and YPF) was largely shut down to contain the pandemic. Despite this, YPF has been successful in collecting back-up tapes for its 16 document custodians and has restored the data from 100 of the 146 tapes collected to date.

In addition, YPF's legal team has made a concerted effort to obtain consent from its former employees before producing their data and has reached out to Plaintiffs for assistance in obtaining consent from certain former employees affiliated with Petersen, including the Eskenazis and other individuals who held dual roles at YPF and Petersen during the time that the Eskenazis had a stake in YPF prior to the intervention and expropriation. YPF's policy is to seek such consent in light of provisions of the Argentine Constitution and Argentine general law that protect the privacy of employee emails. To date, YPF has made contact with all the document custodians not associated with the Eskenazis and has requested that Plaintiffs contact the Eskenazi-associated document custodians for their consent. As YPF has committed to Plaintiffs, it will produce these documents on a rolling basis as it obtains such consents and completes its responsiveness and privilege review. As a result of all of these circumstances, YPF anticipates that documents for at least some custodians will need to be produced after the November 16, 2020 fact discovery deadline.

Courts in this district have routinely extended discovery schedules because of extraordinary circumstances resulting from the COVID-19 pandemic. *See, e.g.*, *Camacho* v. *City of New York*, 2020 WL 4014902, at *2 (S.D.N.Y. July 16, 2020) (Cote, J.) (explaining that extensions of discovery deadline by 30 days were granted twice), *United States* v. *Carrillo-Villa*, 451 F. Supp. 3d 257, 260 (S.D.N.Y. 2020) (Gorenstein, J.) (extending hearing deadline due to "extraordinary circumstances" presented by COVID-19), *Rouviere* v. *DuPuy*, 2020 WL 3967665, at *2 (S.D.N.Y. July 11, 2020) (Aaron, J.) (granting multiple extensions of fact discovery deadline due to COVID-19), *Kozlowski* v. *Experian Information Solutions, Inc.*, No. 1:19-cv-11640-LJL, ECF No. 30 (Sept. 18, 2020) (Liman, J.) (staying case for 45 days after original fact discovery deadline due to COVID-related complications).

In the present circumstances, Defendants submit that a limited 90-day extension of the schedule is warranted to allow discovery of Petersen (including the Eskenazis) and Burford, and for Defendants to complete their production of documents in response to Plaintiffs' broad requests. YPF hopes to substantially complete its document production within 60 days, barring any unexpected issues in obtaining the consent of its document custodians. Likewise, the Republic hopes that within 90 days it will be able to access and produce substantial additional documents. Defendants submit that a 90-day extension is especially reasonable here because of Plaintiffs' refusal to cooperate to facilitate discovery and because the original four-month schedule was set

The Honorable Loretta A. Preska -10-

based on Plaintiffs' mischaracterizations of the discovery they would seek. As Defendants are prepared to proceed with expert discovery on the current schedule (which has expert discovery closing on February 22, 2021), such an extension will not prejudice Plaintiffs.

\* \* \*

Petersen has sought to avoid producing relevant evidence by treating discovery as a shell game and trying to run out the clock. When that evidence is produced—or if it has been lost or destroyed—Defendants believe that Plaintiffs' claims will be subject to dismissal. Defendants should be allowed to obtain that evidence and be afforded a reasonable time to complete discovery so that these cases can be decided on the merits on a complete record.

Respectfully,

*/s/ Robert J. Giuffra, Jr.*

Robert J. Giuffra, Jr.

cc: Counsel of Record