# Exhibit 6



28-Apr-2020
# Burford Capital Ltd. (BUR.GB)
Q4 2019 Earnings Call

**FACTSET: call**street

1-877-FACTSET    www.callstreet.com

Total Pages: 19
Copyright © 2001-2020 FactSet CallStreet, LLC

| Burford Capital Ltd. (BUR.GB) | Corrected Transcript |
|---|---|
| Q4 2019 Earnings Call | 28-Apr-2020 |

## CORPORATE PARTICIPANTS

**Christopher P. Bogart**
*Co-Founder & Chief Executive Officer, Burford Capital Ltd.*

**Jim Kilman**
*Chief Financial Officer, Burford Capital Ltd.*

**Jonathan Todd Molot**
*Co-Founder & Chief Investment Officer, Burford Capital Ltd.*

## OTHER PARTICIPANTS

**Justin Bates**
*Analyst, Canaccord Genuity Ltd.*

## MANAGEMENT DISCUSSION SECTION

**Operator**: Good morning and good afternoon to everyone, and welcome to the Burford Capital 2019 Full-Year Results Webcast. My name is Seth, and I'll be the operator on your call today. [Operator Instructions] Today, on this call, we are joined by Christopher Bogart, CEO; Jonathan Molot, CIO; and Jim Kilman, CFO.

I'm now handing over to Christopher to begin the call. Please go ahead, sir.

### Christopher P. Bogart
*Co-Founder & Chief Executive Officer, Burford Capital Ltd.*

Thank you very much, and welcome everybody to our 2019 earnings call. At long last, we are thrilled to be presenting our 2019 results. Those results are consistent with the trading update we put out in February. But we're happy to be here and talking through them in substantially more detail. We're going to do this in our usual form. I'll make some opening remarks. John will talk about where we stand with our investment portfolio, and Jim will take you through quite a lot of financial data.

There are three relevant documents for you all now to have.One of them is the RNS that we put out today. Second is a set of slides, and we'll advance them on the webcast and tell you where we are on them. And the third is our annual report.In the RNS that we put out, in addition to providing 2019 results, we also provided our portfolio update for the first four months of 2020.And what we have seen and what we reported was a tremendous level of activity.

You'll have seen that our second half of 2019 was slower but the first half of 2020, thus far, has been anything but, and we've actually already seen successes in matters that if ultimately paid would generate $800 million in cash across the group, $450 million for the balance sheet.And of that cash, $300 million of it is in something that we're calling Final Matters. So these are not just things that have succeeded at the first instance.They've not just won a trial, but they've either won on appeal or they've succeeded in arbitration. And in both of those instances, the prospects of them being set aside are much lower than if they were just a first instance success.




So we're feeling very good about how 2020 has started off.And moving from cash to income, those matters would generate, again,if they all conclude as a similar kind of posture more than $300 million in the balance sheet income, and of that two thirds, $200 million, is in that Final Matters category. So we're not only excited about the profitability impact of that, but obviously that's a significant amount of potential cash coming into add to our already substantial liquidity. And I just note as a footnote that in all of those matters, we have less than $1.5 million,thus far, taken into income as fair value gains. So these are matters that pretty consistent with our historical practice have very little fair value and are predominantly being held at cash.

You also note that Note 32 of our financial statements comments on this 2020 development.And so, this is both us reporting at but it's also something that was within the scope of the others review.And really what this does is it just proves what we have long said about the way this business operates. We make investments. We let them go through the litigation process and ultimately they resolve, and we'll talk in more detail about the ways in which they resolve. But we don't have insight, we don't have control or even predictability into precisely when they resolve. We just have a long history of having them resolved in a satisfactory and profitable way and that's the essential nature of this business.

Turning briefly to slide 3, just as an introductory matter, we have delivered now an enormous new annual report, more than 160 pages of A4 paper, saying goodbye to our smaller and more compact formats from past years. And what we've done in the last month is we've really embarked on a listening tour with investors and analysts to understand what it is that you would like to know, what it is that you'd like to understand about Burford and the way that its business operates, that maybe haven't been as clear to you before.And we've adopted many, many of those suggestions in this enormously expanded annual report that really has a huge amount of incremental data in it.

Page 27 of the annual report summarizes many, many of those changes. And just on this one slide,slide 3, an important changeis noted here about how we have reconfigured our segments. So you're going to start hearing us talk about capital provision as our principal business.

Slide 4 provides the IFRS financial results. Jim is going to talk in more detail about those. They just simply prove the point that I've already made.We always said that this business would be lumpy.And frankly, the way that we run the business, we don't pay a lot of attention to these IFRS results. We run the business on a cash basis, and I'm about to take you to those cash results but as I passed by this page,I do note that even though these numbers have declined somewhat year-over-year, we're nonetheless presenting a very robust operating margin,that 78%. So that's still an enviable set of statistics.

Turning to page 5. This is really what we look at when we think about the business, and we really are looking at two fundamental things. The top two graphs show the frontend of the business and the bottom two graphs show the production of profits and cash. So effectively, we are writing lots of new business.And as you can see in the new commitments graph on the top right, we hit a new record of annual commitments. We committed almost $1.6 billion to new investments last year.

That's an enormous amount of money. And what that will do, as you can see moving to the top left, is that that continues as we deploy capital, that continues to cause our portfolio to grow substantially. Last year, was the third year in a row where we deployed more than $1 billion of capital and that's led to this very substantial portfolio of widely diversified litigation risk.

Then we wait. We apply a significant amount of our own resources and expertise, but fundamentally we wait for the outcome of these matters in which we've invested. And ultimately, they go on to conclude and produce

**Burford Capital Ltd.** *(BUR.GB)*
Q4 2019 Earnings Call

 Corrected Transcript
28-Apr-2020

results. Those results, as you can see in the bottom sector, have been consistently profitable. We generated IRRs around 30% for years, 31% this year. We actually saw our nominal returns on capital tick up this year by a number of points, and what that all translates into is cash.

So we generate a lot of cash, more than $1 billion group-wide, more than $500 million on the balance sheet. And as you can see from that table in the bottom left, the cash that we generate for the balance sheet covers by more than four times the operating costs and financing costs of the business, leaving us with a very significant amount of dry powder, $400 million last year, to turn around and reinvest into new matters. And that's capital that we reinvest alongside what is right now $750 million of available commitments from our third-party investment funds and our Sovereign Wealth Fund relationship.

Turning to slide 6, fundamentally, we've been singing the same tune for some years, and every year seems to bring it home closer and closer to home.And that is simply that the legal market has gone from not knowing much about what we do to embracing the concept of litigation [ph] and accounts (00:08:44). 2019 saw, once again, continued market adoption and we show some data points around that on the left.And it also saw us achieve even greater efficiency in our own investment process, which is a longstanding goal that we've had and we've been continuing to work on.

And by efficiency I simply mean that the quality of the opportunities that we're able to attract keeps on going up with the results that we can close as from a higher percentage of them making our operations more efficient and less time intensive.It is also a point where I'd stop for a moment and mention the coronavirus pandemic that is obviously upending all of our worlds and changing the way all of us live. We have on pages 73 and 74 of the annual report an extensive discussion of both the coronavirus,about its risks for the business but also about the opportunities that it presents for us.

The risks here are short term and they're largely timing risks. So it's probably the case that like many other businesses courts will move more slowly for us, cash flows may come in the door less rapidly. But those are not things – those are not business dollars that we lose forever. So unlike the tragedy of a restaurant where the meals that they are not selling they're never going to get back, if one of our cases is delayed not only is that merely delay it may even in fact work to our benefit. We can actually make more money at the end of the day from that case than we otherwise would.

So we may see some short-term delay, but the flip side of the coin is,as tragic as it is that we're going to see significant opportunity. The pandemic is going to yield significant litigation opportunity. People do not know basic answers about things like insurance coverage and force majeure, and there will also be an economic slowdown here that will yield a meaningful number of disputes in much the same way that Burford was formed on the back of the last financial crisis.

Turning to page 7, this is really a more detailed look at those growth drivers that I described before, commitments and then deployments. And one of the things that is significant to us when you look at these numbers is the impact of BOF-C,our Sovereign Wealth Fund arrangement, which as it comes online is reducing demand for balance sheet capital while providing us with leverage returns. As a reminder, we invest alongside the Sovereign Wealth Fund we put 33% of the capital in and get 60% of the profits. So that's a highly desirable arrangement for us and we're delighted to see the fact that it's coming on line working and it's reducing somewhat the level of deployments from the balance sheet.

And finally from me, turning to page 8, this is a graphic that we haven't used before and we thought that it really helped to simplify and capture just exactly how our business works.And this is a pretty simple model. We make


new commitments. That's a new business that we write with clients where we say, yes,we like your case or we like the way your law firm works [ph] in low financier (00:12:15). Most of those commitments over time, and Jim will give me more data on this, over time turn into deployments and then, as I said before, we wait.

And one of three things happens. More than two thirds of those matters go on and they settle. They don't go all the way to a final adjudication.And when they said all that happens fairly rapidly because it's usually happening before trial and we make pretty good money on that. When they don't sell, they go to adjudication, sometimes we lose but we win much more often than we lose, and when we win we make a lot of money.And the combination of those things which we are largely unable to predict or control is really what makes up our business and creates the business model that we have.

And with that, let me give you Jon Molot.

### Jonathan Todd Molot
*Co-Founder & Chief Investment Officer, Burford Capital Ltd.*

Thanks, Chris. Thanksto you all for joining. If you could turn to slide 9, I think it's a very useful graphic which we've not used before because it not only tells you something about how our portfolio has performed to-date, but also gives you a glimpse at how we underwrite individual investments to add to that portfolio on an ongoing basis,then gives you a sense of what the existing portfolio consists of. So if you just take, first, what does it say about our performance to-date. This is a graphical representation of basically every concluded investment that's on our website investment table, both fully concluded and partially concluded.And they are laid out [ph] created (00:13:57)based on the return on invested capital.

So on the far right you have the red bars that are cases where we aren't greater than a 200% return on invested capital, that means we got our money back plus twice the money, so it's better than a triple.At the far left are the cases that we lost.And in between are the cases where, we can see the turquoise, we won and we received investment back plus greater than 100%. So it'sgreater than a double but not a triple.And the maroon in the middle, are the ones where we've received a positive return investment back plus a return of somewhere between 0% and 100% return on invested capital.

These are not numbers, right?The size of the bar depends on the multiple, the return on invested capital relative to how much we invested. The only dollar figures you have are in the represented at the very top, which shows you the actual dollar figures that fall into each bucket, with the exception that on the losses you see some number of those last bars are shaded black instead of light gray.Those black bars are ones where the loss was relatively insignificant, less than $1 million loss, that could be because we paid an option premium for an opportunity to invest if it made it past some milestone and that didn't come to pass or the case was dismissed early.

So what's very interesting about this is, you see how that return on invested capital of 88% averaged across all the concluded matters is the product of these various investment returns across various different matters, and that's how we've generated the returns to-date. That being said what's very significant about this is, when we take on a new matter, when we underwrite a new investment opportunity, we see a graphical representation, a model that is not dissimilar to this. It's not like the ones on the far right, are outliers that you rarely see.

In fact, it is part of the business model that almost every new matter that we underwrite at the outset of litigation has a spectrum of possibilities, ranging from the jury accepts our version of events, rules in favor of the plaintiffs and awards all damages under the plaintiff's damages model, and it's a homerun.Two, at the other end of the spectrum, the defender wins, the plaintiff loses, and we have a total loss. And there is a spectrum of possibilities in between where we could have a trial win but it's a more modest verdict, still attractive but not the full homerun,


or there could be a settlement ranging from a very high settlement because the prospects of a big trial win are large or a more modest settlement outcome.

So basically, when we underwrite a new matter, we not only engage in legal and financial analysis to decide based on the facts the parties, the jurisdiction, the law, do we think it'll win, what are the obstacles to winning, and how would it go through the process? But we then go ahead and model all of those outcomes adding in some proprietary data we have from our accumulated experience, and we run a Monte Carlo simulation with 5,000 runs to see how it maps out and what the permutations are. So basically, every new matter we kick into the portfolio has a spread of potential outcomes that might not be dissimilar to this.

And then once we decide we like a matter, we price it so that if it comes in high on the far right in the high outcomes, we're going to share in that profitability. Sure, the claimant will do well and that's why they come to us, but we're going to hit a homerun as well.And if it comes in in a more modest outcome, there'll be some sort of preferred return arrangement such that we still do very well and earn an attractive return. So to me this slide is valuable because it shows you,our investors, not only how we've done in the past but also what's in our portfolio today and what we continue to put into the portfolio.So the big wins are not outliers, they are just part of the business model.

Turning to slide 10, this is the first of two slides that I won't spend very much time on because it's a story we have told many times but bears emphasizing. The reason that the business model is so attractive based on what I've just said about slide 9, where you had a spectrum of possibilities from any given matter, is that we don't have just one matter. We don't have 5,000 matters which is the number of things that we run. But basically, we have enough matters that are broadly diversified on basically any criteria you would use, such that across the whole portfolio we should see attractive risk-adjusted returns. So on slide 10, you see diversification based on funding source where we combine balance sheet capital, fund capital and sovereign wealth capital, asset type, product, geography.

Turning to slide 11, you'll see that it is also diversified based on currency, case type, industry. And so, we have this diverse portfolio. Each investment in our portfolio we have evaluated on the merits,decided it is a very good investment, a good bet, attractive risk-adjusted returns, and when we put them all together that's how we've generated the kinds of returns we have. The only thing that might bear some discussion on thisslide 11 is, at the bottom right of slide 11,for the first time, we have laid out that now that our portfolio has grown to be as large as it is, that we are quite a large business compared to what we were 5 years ago, let alone 10 years ago, we are able to make some concentrated investments for high conviction opportunities that could really move the needle for the portfolio as a whole.

They're all within risk parameters where we feel comfortable, we're not overbetting on any particular thing, but we do think it's prudent when we have a portfolio of this size and we see an opportunity to deploy a great deal of capital and a high conviction investment to go ahead and make that bet and be able to offer our investors the prospect of truly outsized returns. And so, when you look at these matters, it could be some of them are multiple corporates that have similar claims that could settle separately and therefore there may be some diversification, but there's some correlation because it's the same kind of case.It could be one corporate that has multiple claims against different defendants in a similar subject matter.But we are seeing increasingly as the business has grown there's great corporate demand for our capital to monetize claims, not just finance but cost of them and we're able to make some larger bets on those very attractive risk-reward opportunities.

Turning to slide 12, there is of course one piece of litigation that's garnered a lot of attention, as well it should, and the YPF-related investments are worth mentioning for two reasons. First, it bears emphasizing that the YPF even

if it were of no value today, which is what the market seems to be crediting and it's not at all true, is that the $236 million in cash we have generated from the YPF-related investments has been quite important to facilitating our growth.Chris alluded at the beginning of the discussion to the successes we've enjoyed in the first part of 2020. Those successes were on capital some of which was reinvested from the cash proceeds we earned from those sales. So there's no question that it was a prudent investment to make in the first place and then to take out that monetization and to reinvest that cash and attractive opportunities. And all of those 2020 successes so far have nothing to do with Argentina or YPF.

But second, the $773 million carrying value on the balance sheet which has attracted some attention. That is – it is worth noting that the YPF-related investments are quite important and valuable right now. The – and to be clear the $773 million includes not only the Petersen case where there was a secondary market transaction at $1 billion valuation, but also the Eton Park case, which is similar merits just the different number of shares held. And, and why is it that this is an important investment, why, why did it transacted at $1 billion valuation. I mean, to be clear, in 2019, when we did a final sale of a portion, we were prepared to sell 10% basically, $100 million worth at $1 billion valuation. And there was excessive demand for what we were willing to offer. So it turns out there were $150 million worth of demand. That is 15% of the asset traded in the days after the Supreme Court lets stand the Second Circuit and lower court's decisions that this case should proceed in New York.

So it turned out that in addition to the $100 million we sold that were secondary market transactions where it did an additional $50 million, 50% again what we were transacting in that transaction. So why is it that a large diverse number of sophisticated institutional investors would place that kind of valuation on Petersen? It's a pretty straightforward case. They were not buying Sovereign Argentine debt or betting on the Argentine economy or politics. They all knew there were – that the current administration at the time will have low popularity ratings and there was a very good likelihood that the administration would change. But that's not what they were doing.

When you're investing in a suit like this, you're not betting on sovereign debt, you're not tied up with a broad group of bondholders where there could be some renegotiation. They were betting on a discrete piece of litigation and the merits of the litigation are pretty straightforward. First, it's about as clear a case of a contract breaches one could have. Argentina, when it decided to list YPF on the New York Stock Exchange as part of an IPO, recognized that investors were not going to buy into this company if it was going to be retaken for the – by the Argentine Government and operated for the benefit of Argentine citizens rather than for the profitability of its shareholders.

And so, they in order to pull off the IPO and listed on the New York Stock Exchange YPF in Argentina had to promise that if they were ever – if Argentina were ever to resume control of the company whether through expropriation purchase or any mechanism, they would make a tender offer to the remaining shareholders so that the shareholders wouldn't be stockholding a company being run by Argentina for the benefit of the country That tender offer provision included in the by-laws and in the SEC filings also specified the price at which they would repurchase the shares. And it's a fairly straightforward formula that takes the highest price to earnings ratio on the prior two years and multiplies it by earnings over a specified period and that's how you arrive at the price.

Could there be uncertainty over that price at the margins? Well, so you might debate over what date would be used to do the calculation, and there might be debates over pre-judgment interest rate which rate would run in the aftermath of it but there [ph] aren't (00:26:17) fundamental issues surrounding it. This was a tender offer that had to be made by its terms in New York for a dollar-denominated security traded on the New York Stock Exchange. It's just a pretty straightforward case and so you look at the spectrum of possible outcomes here, and we're not saying any one of these is going to be the outcome. We do highlight the one that would be the mid-point in the by-laws formula range, not at all the high end, and under any of these scenarios, it's a very attractive asset to hold


and you can understand why sophisticated institutional investors who had underwritten it and who have very high return expectations themselves, thought that buying it at $1 billion valuation was an attractive investment.

So, with that, I will turn it over to Jim to take it from there.

### Jim Kilman
*Chief Financial Officer, Burford Capital Ltd.*

Thanks, Jon, and good morning, everybody. Thanks for being with us. So, Chris touched earlier on our overall portfolio performance statistics, but perhaps I can set those in a – bit of a historical perspective on slide 13. We've now recovered over $1.25 billion, including over $1 billion beyond our Petersen sales, and even as we produce more and more of those recoveries, our portfolio returns have continued to be consistently strong with a return on invested capital of 88% in 2019, up from 80% in the prior year, while our IRR, as Chris mentioned, has hovered right around 30% throughout the last five years.

I would note that now we are showing return metrics on a bit larger portfolio that includes our asset recovery in certain of our complex strategic assets, even though we're doing that, our returns are not much different on this broader portfolio than when you compare it to our core litigation finance portfolio. The ROIC is slightly lower at 88% versus 93%, but the IRR is the same, which shouldn't really be a surprise given how we think about return targeting across our different types of assets.

The average life of our concluded assets continues to trend around two years. But as the slide Chris showed earlier demonstrates timing varies pretty significantly based on whether case is settled or proceed to judgment, we've historically shown this average life data weighted by deployed dollars where it was 1.7 years in both 2019 and the prior year. However, we also think weighting by recoveries is an interesting way of looking at this data. Weighting by deployments, we look at how long each dollar of capital is out before it turns into a realization. While weighting by recoveries, we look – it shows how long it takes to – on average, to get each dollar of realization.

So weighted by recoveries, the average life of our concluded assets has extended a bit over the past several years to 2.3 years in 2019 as the larger dollar amounts associated with longer tenor judgments get picked up in this data. We suggested in the past that the average life of our concluded assets felt a bit too short when it was well under two years. So we're not really surprised to see it extending that a bit now.

All of these portfolio recoveries drive our significant cash generation is shown on the slide 14. In 2019, we received cash proceeds of $480 million from our capital provision asset portfolio, 44% or $210 million from our direct portfolio and the remainder from our share of the Strategic Value Fund in the indirect portfolio. Together with the $38 million of fee and other income, which I would note, covers almost half of our operating expenses, that gave us $518 million of cash receipts in 2019, about the same as 2018 and significantly higher than prior years. That $518 million in cash receipts gave us enough cash to cover our opex and finance costs and still have almost $400 million in cash to distribute or deploy into new assets.

Turning to slide 15, we show the 2019 cash bridge on a Burford-only basis. We started the year with $277 million of cash and cash management assets. As we just saw, we generated $518 million in cash receipts. After we paid to keep the lights on, service our debt and distribute dividends to our shareholders, we had $671 million of cash available for us to choose what to do with. We chose to reinvest in the business to use $465 million of that cash to redeploy the new assets which we would hope will continue to generate the attractive returns we've seen historically.

**Burford Capital Ltd.** *(BUR.GB)*
Q4 2019 Earnings Call

 Corrected Transcript
28-Apr-2020

And 2019 was not unusual in terms of our ability to generate significant cash and our decision to redeploy that cash into profitable assets. Slide 16 looks at a cash bridge since Burford started 10 years ago. Over that time, we've raised about $1.2 billion of external capital but generated significantly more in cash receipts over $2 billion, of which 60% has come from our capital provision direct portfolio.

After covering opex, interest and dividends, that left us with almost $2.8 billion of cash to deploy, of which 87% has been deployed into new assets. Sometimes investors ask us isn't it a problem that Burford is deploying more cash than it generates organically? I would answer that, it's actually a good thing. It means we are finding attractive assets to fund that would allow us to grow our business and our profits over time.

Should we want to of course, we can always choose not to deploy extra cash into growth and run in more of a steady state using only our own resources. Although our business has consistently generated significant cash, we are nonetheless well aware that the timing of that cash coming in can be unpredictable and it's largely out of our control, since it depends on the legal process.

Because of that, we've historically held significant amounts of liquidity on our balance sheet as shown on slide 17. At year-end 2019, we had $206 million in cash and cash management assets on the Burford balance sheet just a bit more than the average over the past five years. That cash is readily available to us on an immediate basis.

In addition, we view our capital provision indirect portfolio as an additional source of more intermediate liquidity. That portfolio consists of our balance sheets investment in our Strategic Value Fund, which was $185 million at year-end 2019. The Strategic Value Fund holds most of our complex strategies assets which have a weighted average life of well under a year. Given the attractive returns from these assets, a 17% IRR since inception before fees we collect to manage the fund, we view this as a portfolio of being a higher yielding source of medium-term liquidity.

And talking about liquidity position, one of the questions that often arises is what about the unfunded commitments that you have on your books, when those require you to use a lot of your liquidity. As you can see on slide 18, we provided this year more data on the nature of those undrawn commitments. In order to show why we think the liquidity needs to address them are quite limited. As a starting point, yes, we have a significant amount of undrawn or unfunded commitments. $829 million on our balance sheet at year-end 2019 related to our legal finance assets. Well, the first thing to recognize on these is that our commitments are not like bank revolvers where the customer can come in the door and demand all of their money immediately. Our undrawn commitment [indiscernible] (00:34:08), almost two-thirds are discretionary, meaning that we have complete control over whether we fund because, for example, the commitment is to fund future cases where we have the right to underwrite and approve those cases.

Secondly, draws on unfunded commitments happen gradually as you can see from the chart on the right-hand side of slide 18. A typical vintage will be 40% to 50% deployed in its first year, then deployed gradually beyond that over the next three or four years. Remember our deployments are usually to fund legal costs as cases progress, so that takes time and it also means our claims can't demand the full funding early because the legal work we are paying for hasn't been done yet. The upside of this is that our recent experience shows that something on the order of 15% to 20% of undrawn commitments, at the end of the year, will be drawn on during the following year. That's a quite manageable number from our perspective when measured against our current liquidity and our historical cash flow generation, especially as we can control it further by throttling back discretionary commitments if need be.

**Burford Capital Ltd.** *(BUR.GB)*
Q4 2019 Earnings Call


Corrected Transcript
28-Apr-2020

In addition to running a balance sheet with lots of liquidity, we also take a conservative approach to our funding strategy as shown on slide 19. Our debt issues have been unsecured and laddered in maturities over time so that the weighted average life of our debt at 5.4 years is well longer than the 2.3-year average life of core assets. We maintain low leverage of 17% of tangible assets, well below the 50% covenant level in our debt and dramatically lower than you might typically see in a specialty finance company.

During 2019 in order to give us more flexibility and ultimately lower cost was a debt issuer, we obtained ratings from both S&P and Moody's. We have no immediate plans to issue additional debt, even though it's been over two years since our last issue. We view debt as a way to fund additional growth, not as something we need to run the business in a steady state since we produce plenty of organic cash. Therefore, we're fairly price sensitive and opportunistic as an issuer, we'll issue debt when we can get attractive [ph] returns (00:36:15) and use proceeds to put on attractive assets.

I want to turn now to unpack 2019 bottom line results a bit on slide 20. We've always said our income has the potential to be lumpy because of the variable timing of judicial decisions. 2019 illustrated this. It was a quieter year with only modest realized gains and, as a consequence, our income was down. Burford-only operating profit was down $67 million or 21% on an adjusted basis in 2019 versus the year before, but still a very healthy $279 million. And as Chris mentioned, this represented a 78% operating margin, which is a level I've rarely come across in over 30 years of working with specialty finance companies.

Our operating profit decline was driven by $80 million of lower top line or total income, which came about from a combination of both lower realized gains and lower unrealized gains for fair value adjustments. Reinforcing the point that 2019 was a quieter year, we have an unusually low level of realized losses, not because of a dramatic change in the quality of the portfolio that's only because not [ph] have anything to (00:37:26) happen. And from a bottom line perspective, though adjusted operating expenses were up as we continue to grow and invest in the business, we actually declined somewhat compared to the growth of the portfolio.

Now, the drill into why realized gains were lower in 2019? I'll turn to slide 21. As we've said a number of times, we have little visibility and even less control over when our cases turn into realizations. So the timing of our realized gains can be quite unpredictable. This means that we can certainly have some slow periods, and even slow years of realizations even while our cases are progressing well.

Nonetheless, from our concluded portfolio data, we can observe it typically takes almost three years from the time of commitment to get to our average realization. Note that the graph on this slide looks at weighted average life from time of commitment while the previous average life statistics on slide 13 starts from the point of average deployment which is about six months later typically.

It's also worth noting as shown on the right-hand side of the slide that our commitment levels grew significantly beginning in 2017. Given the lead time to realizations, we wouldn't expect to see a commensurate pickup in realizations until three years or so later. And we've cautioned that can stretch a little longer now because of the impact of COVID-19, which we discussed at length in our Annual Report. Having said all that, I want again to emphasize the lumpiness of our business. One case can make a sizable difference in the amount of realized gains in any given period.

Slide 22 provides another way of visualizing the timing of realizations in our business introduced and it's just from 2014 and earlier have seen significant realizations with relatively little left as ongoing deployments and it's just from 2017 to present have had relatively little in the way of realizations and still have significant ongoing


deployments. With the deployments on the more recent vintages likely to grow even further as more funds are deployed against commitments in those vintages.

2015 and 2016 or somewhere in between with 2015 a bit of an outlier because it includes Petersen. But if you knock $236 million of Petersen recoveries off of 2015, I think you could see [indiscernible] (00:39:46) the pattern as well. Pivoting to unrealized gains on slide 23, Jon talked earlier about how we now have $734 million of unrealized gains from the YPF-related assets on our books were 95% of our overall fair value mark that clearly has accounted for the lion's share of our fair value marks since 2015 and explains why our unrealized gains have increased so dramatically this is success and value of those YPF assets have increased.

It also means that we've taken only very modest fair value adjustments on the remainder of our portfolio. So, the fair value gains represent only about 4% of the rest of our capital provision direct portfolio and that's consistent with what we've previously said about how our fair value policy works as shown on slide 24. Unless there's a situation like the YPF assets where there's a market value for them which is pretty unusual, we set fair value marks based on progress on the underlying cases. Based on a somewhat formulaic or mechanical policy tied to objective events in the underlying cases, because cases don't tend to have significant objective events such as trial outcomes until late in the litigation process. And in many cases they don't have them at all. That usually means that most assets don't end up being marked up until they near conclusion, and even then to levels that are roughly a third of the ultimately realized value.

It's worth noting from the chart on the right that we historically take larger write-downs on cases that ultimately lose than write-ups on those that ultimately succeed again showing the conservatism of our process.

Finally, let me touch on one more topic which is our asset management business. We got into this business in late 2016 through an acquisition. Since then, we've seen steady growth in assets under management to just under $3 billion today. That growth has started to drive fee income growth from asset management which was up 65% in 2019. However, even this growth understates the ultimate earnings power of our asset management business because many of our funds, including our core litigation funds, have fee structures under which we don't receive our performance fees until late in the funds lives. This means that while we are getting the two [indiscernible] (00:42:05) structure today, we don't get the 20 until some future date.

And with that, let me turn it back to Chris.

### Christopher P. Bogart
*Co-Founder & Chief Executive Officer, Burford Capital Ltd.*

Thanks very much, Jim. And before we take your questions, let me just conclude on a few slides here. I said at the beginning of the call that we had listened hard and that the extensive and expanded financial disclosure in the Annual Report, some of which Jim just went through, was one result of that listening tour. Another result was a variety of changes that we've made in response to shareholder feedback around our governance. You've seen us make significant changes to the board introducing new directors and announcing a clear plan for the phased retirement of existing directors. You've seen changes and upgrades to our management structure, including the creation of a clear set of management responsibilities and a management committee that is responsible for running the business. And even though there is long predated – the events of last year, we continue to move forward with the US listing. As a reminder, there's relatively little that we will be able to say to you publicly about that process other than we intend to file for that listing. Now that we've been able to put these results out, we intend to file as soon as we're able to and as soon as the audit backlog clears. And then, we will effectively be in a quiet period while we go through the US process.

| Burford Capital Ltd. *(BUR.GB)* |  Corrected Transcript |
|---|---|
| Q4 2019 Earnings Call | 28-Apr-2020 |

Turning to slide 27. I addressed COVID-19 already at the beginning of our presentation and, given the amount of data on this slide and in our Annual Report, I don't propose to spend any more time on it right now as opposed to taking your more focused questions about it other than really to reemphasize that, to the extent that we're going to see negative implications from COVID-19, those are largely timing based. And while we hate the idea of trading on in the misery, the reality is that the world post-COVID is going to be a world with an awful lot of disputes and less corporate liquidity to pursue those disputes.

So finally, on slide 28, just to sum up, we're very pleased from a business perspective of 2019. We solidified the growth that we've seen in the business. We generated a lot of cash. We ended the year with a large diversified portfolio that we're very happy with. We have strong liquidity and a strong balance sheet and we're excited to be able to walk into 2020 with an enormous number of early successes and what we see as a very significant amount of opportunity.

And with that, we'd be happy to take your questions.

# QUESTION AND ANSWER SECTION

**Operator**: Thank you. [Operator Instructions] The first question comes from Justin Bates at Canaccord. Please go ahead.

**Justin Bates**  Q
*Analyst, Canaccord Genuity Ltd.*

Thank you. Good afternoon, everyone. I wanted to just cover three quick points for me, please. Firstly, on the acceptance rate, so if you look at the closed legal finance assets to the original enquired screening, that seems to have increased quite a bit that conversion rate from 3.8% back in 2017 to 7% this year in 2019. If you could explain that, that would be helpful, please.

Then on to commitments, the point you make about the deployment profile being at 16%, I was trying to reconcile that with [indiscernible] (00:46:43) five- to six-year period. I was trying to reconcile that with the 2.9 years you quote in the analyst pack, and also when I look at page 44 of the Annual Report, the matrix of concluded cases, if you take the concluded cases of deployment cost to commitments amount, you get to 88%, so it'd be helpful if you could just try and highlight [ph] we aren't going wrong (00:47:14) near those numbers.

And then finally, just in relation to how the – has start for you, has that – with respect to how strong the things have been, has that changed your view with respect to securing further funding with a bond raise or otherwise? Thank you.

**Christopher P. Bogart**  A
*Co-Founder & Chief Executive Officer, Burford Capital Ltd.*

Sure. So let me start with some of those and then I'll pass it to Jim, especially in your second question. So the acceptance rate or the closing rate is something that we've talked about for some time and we've had as a goal getting that number higher and so we're pleased to be succeeding at doing that. Now of course, the investor reaction to that could be oh, my goodness, they're becoming less select, but that's not in fact true. What's going on there instead is we are improving the quality of the inbound inquires and we're doing that in a couple of ways:

One is that we are consistently educating the market and, as a result, we're seeing fewer inquiries that are just completely unsuitable for us. When we earlier on in this business we would get lawyers ringing up and saying well, hey, I've got a fantastic opportunity here, it's a $5 million budget and if the claim wins, it'll make $20 million and that really doesn't work. The $20 million claim will probably settle for closer to $10 million by the time we put $5 million into it, we're going to want to make $7 million, $8 million, $9 million, $10 million. It won't leave enough money for the client and that's not a viable investment for us. And so, starting to weed those out has been successful as has been building our own internal business development and origination team. We find that we have about a 3 times or a 3.5 times greater level of success in moving an inquiry that has come in through the activities of our team into the pipeline than we do just a cold inquiry.

So – and this is an expensive process to run, and so our goal actually is to reduce the number of unqualified inquiries we get and continue to increase that close rate, it's not – even at 7% where we are right now, 7% still means we are saying no 93% of the time which is not all that desirable a dynamic, it would be much better for us to say yes more often because the cases that are coming to or are more suitable. And just jumping to the successes that we've had in 2020 and what that means for finance, we're opportunistic about what we do about capital sources. We've deliberately constructed multiple – a capital structure that has multiple sources of capital that we can call on, and so we have never been committed to the needs to make a debt issuance. And certainly, as cash starts to come in from the things that we've called Final Matters, you know that cash that we can turn around and reinvest.

Jim, do you want to pick that up?

**Jim Kilman**                                                                                                      A
*Chief Financial Officer, Burford Capital Ltd.*

Yeah, so just, Justin, on your question about how to think about deployment and how it works over time. I think probably the easiest way to do that is to look at the graphic we had on slide 18 which is also on page 37 of the Annual Report, although frankly it's easier to see the one on slide 18 because it's bigger, but the way to think about this is typically – and if you look at the solid red line on that graph, you'll be able to follow along, typically a vintage will have somewhere between 40% to 50% deployed in its initial year. So 2019, for example, would be at the low end of that range, but that would be the typical range that you would see.

What that means is that over the rest of its commitment life, there's another 45%, if I want to make my math easy, that needs to get deployed to get to that roughly 90% that we see on concluded cases – deployments on concluded cases. So, the way to think about this is that over the next three or four years that remaining 45% of deployment will occur so that you would have somewhere between 10% and 15% a year going out, that builds you over time for the initial 45% to the final 88% and that's really I think what you see in the graphs on page 18 that the deployments occur kind of gradually over time that way.

**Justin Bates**                                                                                                    Q
*Analyst, Canaccord Genuity Ltd.*

Thank you very much.

**Operator**: Our next question comes from [ph] Brian Flynn at Shannonside Capital (00:52:04). Please go ahead, [ph] Brian (00:52:06).

                                                                                                                    Q

**Burford Capital Ltd.** *(BUR.GB)*
Q4 2019 Earnings Call



Corrected Transcript
28-Apr-2020

---

Yes. Thank you for taking the question. I wanted to ask about the Peterson case. In the Annual Report, you've hopefully given great information on that and you've mentioned that in the context of the claims weakness in the Argentinean currency should be irrelevant because the payout would be based on the formula from the by-laws. So my question is do the by-laws explicitly state that the payout should be based on a multiple of earnings per share in US dollars or do they [ph] say currently (00:52:39) at all?

**Jonathan Todd Molot**       A
*Co-Founder & Chief Investment Officer, Burford Capital Ltd.*

Chris, I'm happy to take...

                                                                               Q

Jon?

**Christopher P. Bogart**      A
*Co-Founder & Chief Executive Officer, Burford Capital Ltd.*

Jon, would you like to...

                                                                               Q

Yeah.

**Jonathan Todd Molot**       A
*Co-Founder & Chief Investment Officer, Burford Capital Ltd.*

Sure, I'm happy to talk about that. So the by-laws do state in Section 7 that the public offering has to be made in the jurisdiction on the exchange and compliance with the exchange rules where it's held. So Petersen and Eton Park held shares that were dollar-denominated, traded on the New York Stock Exchange and, under Section 7 of the by-laws, the tender offer had to be made in New York for those shares in compliance with New York Stock Exchange, SEC rules. So the first thing is it's going to be a dollar-denominated exchange where they would be paying dollars to re-acquire dollar-denominated securities just as any tender offer in the United States for a security to dollar-denominated, traded on the New York Exchange (sic) [New York Stock Exchange] (00:53:36) would be. The formula in figuring out what the price would be is basically to figure out what the price to earnings multiplied by the earnings would be. And that gets you to a value, but that would then be converted to dollars in order to do the tender offer in New York in compliance with SEC and New York Stock Exchange rule. So that's the first point as to why the whole thing would have been a New York-based dollar-denominated exchange.

The second is even if for some reason you were to ignore that and say that the price would have been determined in pesos and frankly for that to happen to have transaction for pesos for a dollar-denominated ADR traded in New York basically what would've had to happen is the holders of the ADRs would have had to break them apart, exchange them for peso-denominated shares traded in Argentina and then sold them in Argentina, which would be at odds with the by-laws. But even if you put that aside, under New York Law, there's a doctrine that says and the US courts generally follow that the breach-day rule with a currency conversion. So even if it were peso-denominated, the currency conversion is done at the date of the breach rather than the date of the award. So they would have been converted from pesos to dollars as of the date of the breach back when they were supposed to tender as supposed to now. So any fluctuation in the exchange rate wouldn't have affected it. And beyond that, there's a doctrine of Foreign Relations Law that says that the creditors are supposed to be made whole and the

---

debtor should not get the benefit of fluctuations in currency afterward. So, it would be dollar-denominated because under the by-laws it had to be done in New York and compliance with the New York Stock Exchange and SEC rules. And even if, for some reason, a court would have ruled otherwise the date of breach rule and Foreign Relations Law would say, the pesos would be converted to dollars the day of the breach and fluctuations wouldn't matter. So I think this is a non-issue and we're pretty comfortable and I think that investors decided to buy in, in 2019 felt the same way.

---

**Q**

Yes. Understood. Can I ask a follow-up question?

---

**Christopher P. Bogart**
*Co-Founder & Chief Executive Officer, Burford Capital Ltd.*

**A**

Sure.

---

**Q**

You mentioned in the slides today in the presentation that with regard to valuation policy, third-party events can impact the valuation and I understand – if I understand correctly, the valuation of Petersen was actually written up slightly the unrealized gain in Petersen because you've chosen to use the sale value from 2019, as the basis for valuation at year-end, the change in government however in Argentina happened after those sales in 2019. And if we look at financial market development such as the currency development, those indicated that the change was quite unexpected. So would that not be a third-party event which would impact valuation? I recognize that it's not a case milestone but nonetheless would it not be a third-party event that would impact the valuation?

---

**Christopher P. Bogart**
*Co-Founder & Chief Executive Officer, Burford Capital Ltd.*

**A**

So I would say that the difference is when you're talking about repayment of sovereign debt and how credit markets are going to view Argentina based on the change of administration, that's a very different matter from the value of the piece of the litigation. When you are a holder of Argentine debt, you are subject to potential renegotiations with the entire debt structuring in Northern Argentina, the IMF and many more creditors beyond just you, the individual holder. When you are a judgment creditor for a judgment that's been entered in the US court against the country, it's a very different matter, and in fact the Kirchner regime before the Macri regime was the one in fact that had settled of its outstanding obligations under arbitral court judgments, in math actually before the Macri Government took over. So, basically whether it's the Macri Administration or the Kirchner Administration successor now, countries cannot evade their debts. And in the way that they may be able to renegotiate their debts, they can avoid paying judgments in a court in the United States, and that's especially the case here because we have a defendant that is not just the sovereign, the country, it's also the company.And it's very difficult, if not impossible, for a multinational, for a company that does business abroad to be able to evade a debt and from a New York court from a judgment.So I think it's a quite different matter looking at credit markets and debt values versus the value of a litigation claim.

---

**Q**

I see. Thank you very much for taking my questions. I appreciate it.

---

**Christopher P. Bogart** A
*Co-Founder & Chief Executive Officer, Burford Capital Ltd.*

Sure. Thanks.

---

**Operator**: So we have a question from the webcast which comes from [indiscernible] (00:58:51). It reads, thanks for the broader disclosures and congratulations on the continued progress you are making. Two questions.One, given the likelihood that exposure to a diversified properly underwritten portfolio of litigation receivables is a relatively scarce and attractive resource as it requires skill and expertise to access and build, how large is the opportunity to expand your third-party capital initiative? Two, could you comment on the currency characteristics of the YPF case, i.e., address any risk that the compensation could be paid in local devalued currency?

---

**Christopher P. Bogart** A
*Co-Founder & Chief Executive Officer, Burford Capital Ltd.*

Great.Thank you for the question. So question number two, we've obviously just answered in response to the prior question. And as to question number one, I think what we're likely to see, you're quite right that that's a valuable thing to have.And we, of course, after 10 years in this business, having looked at thousands and thousands of litigation claims and having actually financed many of them such that we've now returned more than $1 billion of capital just to the balance sheet, that's given us a unique set of data and the ability to go forward and really do a good job compared to the competitive universe when we consider how we underwrite, how we risk assess, and how we make investment decisions. So that's all a significant positive.

And as you suggest, the likelihood is that that means, especially in the next few years where we're going to see we believe considerable growth in disputes and considerable demand for dispute-related capital, I think what you'll see is us continuing a growth strategy and growth trajectory. And it's entirely possible that, that will include continued use of third-party capital.

---

**Operator:** We're just reviewing the next question, please standby. The next question comes from [ph] Thomas Roman. Thomas (01:01:42), please go ahead.

---

Q

Yeah. Hi, there. Thanks for taking my call. I've two questions in relation to the Argentinean case. The first question relates to, you appear to be very confident about winning the case. However, what arguments have the Argentinean lawyers put forward in order to defend themselves? And what merit do you see in those defense proposals?Second portion of the question is, just to confirm for the avoidance of doubt, if you were to lose the case, would you have to fully write-off the $733 million of unrealized gains? Thank you so much.

---

**Jonathan Todd Molot** A
*Co-Founder & Chief Investment Officer, Burford Capital Ltd.*

First one...

[indiscernible] (01:02:27)

---

**Christopher P. Bogart** A
*Co-Founder & Chief Executive Officer, Burford Capital Ltd.*


Sure. So before Jon talks about the [ph] substance (01:02:31), let me just say two things about Petersen and in general about pending litigation, which some of you already know. So there is, obviously, a tension in Burford's business when one of the matters that we have been invested in becomes publically know.And as most of you are aware, most of the matters are not publicly known. And the tension that is created is – the investors, of course, would like lots and lots of information about those matters and would like us to start to do things like what you just asked, assess the, what we think about the defenses that the other side have raised.

Those are not things in active litigation that we could do. We know a lot of other cases that we're involved in, a lot of that material is protected by various legal privileges, and we're not only free to, but it would anger the court if we would start in a public forum effectively litigating the case.So we can give you some basic answers to the questions. But just because Petersen is out there publicly doesn't mean that we're free to discuss case strategy or anything else. And as the evaluation question, as we've always said, there are multiple paths to recovery here and we're just exploring one of them at the moment.

Jon, do you want to?

**Jonathan Todd Molot**  A
*Co-Founder & Chief Investment Officer, Burford Capital Ltd.*

Yes.That was pretty much what I was going to say. I mean, the briefs of what they've argued are public. I'd rather not characterize them. I feel very comfortable with where we are.And the amazing thing is, if you look at our [ph] retreading it is as if (01:04:09)we're not very depended on Petersenat all because the stock price isn't giving any credit for Petersen or the ongoing value of the business and not expecting that the remainder of our cases are going to generate returns anywhere near what our historical track record has produced.

So I'm quite comfortable with the value of it.And I think probably shouldn't,as Chris said, as tempted as I am, you can tell to dig in and explain on the merits, I think it's probably wise for me not to go further in characterizing the arguments which have mostly been about trying to change the forum.

**Operator**: We're just waiting for the next question to come through. So we have a question on the webcastfrom [ph] Dennis Helkins at King Street (01:05:27)which reads, number one, understand you see a significant opportunity set, are you capital-constrained?Why don't you raise incremental capital to address this opportunity set?

Number two, are there any changes to your plans for US listing? And number three, in the past, you have talked about raising incremental debt. How're you thinking about this now with your debt trading in the 70s to 80s?

**Christopher P. Bogart**  A
*Co-Founder & Chief Executive Officer, Burford Capital Ltd.*

Jim,would you like to take a start on those?

**Jim Kilman**  A
*Chief Financial Officer, Burford Capital Ltd.*

Yeah.Look, I think, as we said earlier, our view of this is that we are opportunistic in terms of certainly on the debt side and any other form of capital, we don't have to go out and do anything to run the business, it that generates plenty of organic cash. So it's really all about if there is a good opportunity to raise a capital debt or other forms of capital at attractive terms, then we would certainly consider doing that and using that money to accelerate growth.

And so, that'll always be the tension in how we think about it. We're not in a position where we need to do it. We're in a position where we can if it makes sense.

And I think on the US listing question, we've already said there's very distinct limits to what we can comment on that.

**Operator**: So our next question on the webcast comes from [ph] Trevor Griffith (01:07:08),who's a private investor, says firstly, may I thank you for the next disclosures, particularly the detail on fair value movements which I had asked for in the past. In relation to the quiet period in H2 2019, you have discussed in the past how there tends to be a seasonal boost to results towards the calendar year and which evidently didn't happen this time. Is this due to a change in the nature of the business at all? I know that you are doing more business direct with corporates which may not have the same year-end pressures as lawyers, but I also wonder if there's a move to more contentious cases with less room for settlement or is it just that lawyers have been making so much money of late they didn't need to boost the end of year results? Thank you.

**Christopher P. Bogart** 
*Co-Founder & Chief Executive Officer, Burford Capital Ltd.*

Well, thank you [ph] Trevor (01:07:51)for the question. And for those of you who are unaware, [ph] Trevor (01:07:57)calling himself a private investor is a currently true statement, but [ph] Trevor (01:08:01)is a former research analyst who has followed Burford for many years, in fact, all the way since the IPO. So it's very nice to hear from you [ph] Trevor (01:08:09). The question about timing and yearend, so what has historically happened in our business has not been so much around cash generation at the end of the year, although that has sometimes happened but has been around new business.

And what we do find is that lawyers in law firms are very driven by their calendar yearend and are also, shall I say it, somewhat procrastinators when it comes to managing their business. And so, we historically, have had very busy fourth quarters when it comes to deal flow and deal closings.And by busy I mean that, that routinely on the 31st of December, we tend to close multiple transactions. And that was no different this year. We saw a busy December 31.

In terms of resolutions, I do think as we've discussed already in the context of COVID-19, it wouldn't surprise me if we see some dislocation in the normal settlement patterns of litigation for a little while. And I think there is two reasons for that. One is, while some litigation is going forward at a completely normal pace and as you can see from the first four months of results that we've already released, we've had a very strong first four months and that's showing that courts are still acting and businesses are still engaging.

That being said, there's no question that in some instances, courts are going to slow down or something else around the pandemic is going to slow it down.For example, like our lawyer or a witness getting sick. And so, the other question is as businesses rush to have some liquidity, the question is whether they will elongate matters and not settle them quite as quickly. But as I said earlier, those are short-term impacts. And candidly, if we had to choose between the opportunity set that we see in front of us and those short-term impacts, that's a pretty easy choice for us.

So in this wonderful new world that we're all living in where all of us are doing this one-on-one from our homes, we obviously are not all together for this call. And so, it's hard for us to see exactly what's going on. But I believe that we've tried your patience for 75 minutes and that we should probably call it a day. As always, we are delighted to engage with you directly. We recognize that while you may have asked for it and been excited to receive it, we've just dropped a 160-odd pages of dense information on you.And so, no doubt many of you will

| Burford Capital Ltd. *(BUR.GB)* |  Corrected Transcript |
|---|---|
| Q4 2019 Earnings Call | 28-Apr-2020 |

have further questions about that in the coming days, and we're delighted to respond to those as quickly and as thoroughly as we're able, and also to look forward to speaking with more of you directly.

So with that, I think, we'll bring this to a close. And, again, thank you very much for your attendance and participation.We appreciate your support of Burford very much, and we'll look forward to seeing what the year brings for all of us. Good luck and stay safe. Bye now.

---

**Operator**: Ladies and gentlemen, this concludes today's call. Thank you for dialing in. You may now disconnect your lines.

Disclaimer
The information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete or error-free statement or summary of the available data. As such, we do not warrant, endorse or guarantee the completeness, accuracy, integrity, or timeliness of the information. You must evaluate, and bear all risks associated with, the use of any information provided hereunder, including any reliance on the accuracy, completeness, safety or usefulness of such information. This information is not intended to be used as the primary basis of investment decisions. It should not be construed as advice designed to meet the particular investment needs of any investor. This report is published solely for information purposes, and is not to be construed as financial or other advice or as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Any information expressed herein on this date is subject to change without notice. Any opinions or assertions contained in this information do not represent the opinions or beliefs of FactSet CallStreet, LLC. FactSet CallStreet, LLC, or one or more of its employees, including the writer of this report, may have a position in any of the securities discussed herein.

THE INFORMATION PROVIDED TO YOU HEREUNDER IS PROVIDED "AS IS," AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FactSet CallStreet, LLC AND ITS LICENSORS, BUSINESS ASSOCIATES AND SUPPLIERS DISCLAIM ALL WARRANTIES WITH RESPECT TO THE SAME, EXPRESS, IMPLIED AND STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, COMPLETENESS, AND NON-INFRINGEMENT. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER FACTSET CALLSTREET, LLC NOR ITS OFFICERS, MEMBERS, DIRECTORS, PARTNERS, AFFILIATES, BUSINESS ASSOCIATES, LICENSORS OR SUPPLIERS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS OR REVENUES, GOODWILL, WORK STOPPAGE, SECURITY BREACHES, VIRUSES, COMPUTER FAILURE OR MALFUNCTION, USE, DATA OR OTHER INTANGIBLE LOSSES OR COMMERCIAL DAMAGES, EVEN IF ANY OF SUCH PARTIES IS ADVISED OF THE POSSIBILITY OF SUCH LOSSES, ARISING UNDER OR IN CONNECTION WITH THE INFORMATION PROVIDED HEREIN OR ANY OTHER SUBJECT MATTER HEREOF.

The contents and appearance of this report are Copyrighted FactSet CallStreet, LLC 2020 CallStreet and FactSet CallStreet, LLC are trademarks and service marks of FactSet CallStreet, LLC. All other trademarks mentioned are trademarks of their respective companies. All rights reserved.