# Exhibit 7

Case 1:15-cv-02739-LAP   Document 199-7   Filed 11/13/20   Page 2 of 7



# 2016
## Annual Report

Burford



# About Burford Capital

Burford Capital is a leading global finance firm focused on law. Its businesses include litigation finance and risk management, asset recovery and a wide range of legal finance and advisory activities. Burford is publicly traded on the London Stock Exchange, and it works with law firms and clients around the world from its principal offices in New York, London and Chicago.

This report does not constitute an offer of any Burford fund.

## Contents

| | |
|---|---|
| Highlights | 1 |
| Financial Summary | 2 |
| Report to Shareholders | 3 |
| Directors' Report | 28 |
| Independent Auditor's Report | 30 |
| Consolidated Statement of Comprehensive Income | 31 |
| Consolidated Statement of Financial Position | 32 |
| Consolidated Statement of Cash Flows | 34 |
| Consolidated Statement of Changes in Equity | 36 |
| Notes to the Consolidated Financial Statements | 37 |
| Corporate information | 63 |

Burford counts each of its contractual relationships as an "investment", although many such relationships are composed of multiple underlying litigation matters that are typically cross-collateralised rather than reliant on the performance of a single matter. So, while Burford has 64 ongoing "investments", there are now hundreds of separate claims underlying the investment portfolio (and a single claim may well have multiple paths to a recovery).

Burford makes investments using a wide range of economic structures. The starting point in a single case investment is typically an arrangement under which Burford will receive its invested capital back as a first dollar matter followed by some preferred return on that capital along with a share of the ultimate recovery. Even in straightforward investments the terms agreed will vary widely based on our sense of the risk and likely duration of the matter. Moreover, the larger or more complex a matter, the more likely it is to have an individually designed transactional structure to fit the needs of the matter, to accommodate what are often multiple parties with economic interests and to align interests and incentivise desired behaviour. It is impossible to generalise about the economic terms of litigation finance.

Burford engages in portfolio construction with an eye to balancing risk and return, managing duration and achieving broad diversification. Burford believes that it has – by a considerable margin – the largest diversified portfolio of litigation investments in the world targeting the kind of returns Burford has historically generated. That scale and level of diversification is only augmented by the addition of GKC.

In addition to sheer size, Burford's current portfolio of investments is widely diversified across many other metrics:

- Our investments relate to litigation matters spread across more than 40 US states and countries, and underway in multiple arbitral institutions
- We are presently working with more than 50 different law firms, and even when we have multiple matters with a single law firm, we often work with multiple partners at such firms
- Our claim types run the gamut of commercial litigation and arbitration; we don't specialise in any one area of law
- Our clients are located in every inhabited continent
- There is no capital risk concentration among defendants/respondents in matters we finance for plaintiffs/claimants – none rises to even 10% of our commitments
- We are involved in every stage of claims, from claims where our financing is obtained at the beginning of the matter to appeals to matters where judgment has already been obtained

Commitments to new investments
New commitments are a key – albeit imperfect – leading indicator for our business, because they set the business up for future realisations as those commitments turn into (hopefully) profitable investments.

The reason the measure is an imperfect indicator is that our enthusiasm for committing capital depends on deal structures and terms. When a significant part of our economics in a matter comes from our preferred return on the amount of capital we actually invest, then we are clearly incentivised to commit and deploy capital. However, some of our investments take most or even all of their economics from sharing in the outcome on some formulaic basis (e.g., 40% of whatever is recovered). In those instances, our recovery is not related to the amount of our invested capital, and we are instead incentivised to commit as little capital as possible.

In 2016, we made more new litigation finance commitments than we ever have before – more than $378 million across 30 investments, including further commitments to earlier investments, an increase of 83% over 2015, which was itself a 35% increase over 2014. There is no question that our commitment level was buoyed by closing a single $100 million portfolio arrangement with a global law firm and that such deals remain exceptional and thus this commitment level may well not be "run rate" for us. But there is also no question that the market is moving to some larger deals of this ilk on a regular basis, so we do not regard the transaction as a complete outlier. Even ignoring that one investment entirely, our commitment level increased by 35% in a single year.

New litigation investment
commitments by year
($ in millions)



Moreover, we continue to be happy with the diversity, the pricing and the quality of the investments we take on. We close only a small minority of the potential investments presented to us.

Looking at the new 2016 investments we closed, the 21 commitments ranged from $2 million to $100 million and continued our diversified approach to investing in this market. (We don't do many small investments, but sometimes doing so is needed for relationship-building or other reasons.) As noted previously, only 12% of the capital we committed in 2016 was to single case investments.

### Secondary market activity, fair value and the Petersen investment

We discussed at some length in our 2016 interim report the early stages of the emergence of a secondary market for our investments and our interest in participating in the development of such a market.

Our view remains the same. We see a number of appealing characteristics of a secondary market to assist us in both risk and liquidity management and to increase the efficient utilisation of our capital. A model where we can originate investments using our skill set and then lock in some gain from our origination activities and moderate our risk profile is very appealing, and will also permit us to close larger investments if we are reasonably confident that we can reduce our own risk to a desired level following closing.

The secondary transactions we have done to date will provide some initial colour – but we emphasise that while we intend to devote time and resources to develop the concept, it remains at a very early stage and we do not anticipate significant secondary market deal flow in the near term.

The first transaction we closed, in the first half of 2016, was with respect to a single matter on appeal from a successful trial court judgment. As a result, quite a lot was known about the matter and a prospective buyer could engage in meaningful diligence based on the court record. We had entered into a financing arrangement with our client some time before and we were content with the level of risk we were holding in our portfolio. However, as time passed, the client was interested in obtaining more capital and we did not have the risk tolerance to increase our own position. The client was, however, offering significantly more lucrative terms for the incremental capital. Thus, after some exploration of a possible secondary transaction, we ultimately agreed to increase our capital commitment and take advantage of the increased pricing on offer. We then turned around and sold a piece of the investment to a major investment fund, structured so that we averaged the new and old pricing across the entire capital commitment – thereby increasing significantly the effective pricing on the portion of the investment we retained.

With that successful transaction under our belt, we then turned to the Petersen investment.

Before discussing our Petersen secondary market activity, some background on the investment and an update on current developments is appropriate. The Petersen Group consists of two Spanish companies that, in 2012, collectively held just over a 25% interest in YPF, the New York Stock Exchange listed Argentine energy company. When Argentina, some years earlier, privatised YPF and took it public, it made a series of promises to investors around its future conduct, which included obligating itself to make a tender offer to shareholders if it later wanted to re-nationalise YPF. In 2012, Argentina ignored that promise and expropriated a controlling stake in YPF without making the required tender, causing the market value of YPF's shares to fall sharply and Petersen to become insolvent. Argentina was subsequently sued in New York by Repsol, then the majority owner of YPF with an interest slightly over 50%, and Argentina settled that lawsuit for around $5 billion. Petersen, with a holding of around half of Repsol's, has now brought a similar lawsuit, with financing from

Burford. Burford is entitled to somewhat more than half of any recovery in the matter, depending on the ultimate cost of pursuing the matter.

The Petersen claim is being heard in US federal court in New York and during the course of 2016 the court issued an important preliminary decision in Petersen's favour, permitting the case to be heard in the US. That decision is now being appealed by Argentina and YPF. Without turning this discussion into a legal brief, it is important to understand that US law prescribes the circumstances under which its courts are able to involve themselves in disputes against foreign sovereigns, and so the preliminary issues largely concern whether the claim will be heard in the US as opposed to in an international arbitration proceeding and are not merits adjudications. (It is also important to repeat that any individual legal claim is highly risky and difficult to predict, and we strongly discourage speculation as to the result in Petersen as a basis for a view about Burford's overall potential performance. Litigation investing is best done through widely diversified portfolios, not on the basis of single case speculation.)

The Petersen investment is an illustration of a fundamental dynamic in litigation investing. Litigation is an inherently asymmetrical undertaking, which is one of the drivers of the economics of our business generally: the "investment" in a piece of litigation is often just the costs of pursuing the claim, and no rational actor pursues a claim in litigation that does not have a value significantly above those costs. Thus, losing a piece of litigation results only in losing the costs, whereas winning typically results in receiving a multiple of those costs. The Petersen matter exemplifies this principle because our investment thus far is around $18 million and (if the matter does not fail, which is of course always a risk) there is a credible path to a recovery of substantial multiples of that amount. So, faced with a large and potentially valuable (but risky) matter, is it better to hold 100% of the interest and see what happens, or is it more prudent to lock in some gain now and reduce our risk? We decided that prudence should prevail. Given the potential size of the Petersen claims, we spent considerable time exploring what we thought would be the best approach to offering a portion of the claims to potential buyers. Ultimately, we decided that we were willing to sell a minority interest in the investment at a $400 million valuation. We also decided not to be flexible on the price, so that if we were not able to secure a locked-in profit at a valuation of approximately 20x Burford's cost, we would simply not proceed.

In December 2016, we ran what was essentially a competitive process for the role of anchor investor in a larger deal. That process culminated in the two winning buyers (major global investors) closing a small toehold purchase of a 1% interest in Burford's proceeds from the Petersen claim and becoming entitled to certain preferential rights in a larger transaction.

Then, in 2017, we continued our marketing of the proposition, and have just closed a further transaction, selling 10% of the interest for cash proceeds of $40 million to a group of institutional investors (including the $4 million December sale).

Importantly, what Burford has sold here is a purely passive financial participation interest. Burford continues to be the counterparty to Petersen; the secondary buyers gained no rights of involvement in the case nor any ability to interfere with Burford's judgement and the exercise of our discretion, and that is the model we intend to pursue generally.

With the experience we have gained from this process, we intend to continue to explore secondary market transactions when appropriate, although we think the development of a robust market is quite some distance away.

The development of secondary market activity naturally introduces the IFRS treatment of such transactions and their impact on our long-running discussion of fair value. It is inescapable that a significant secondary market transaction is a potentially key input into our determination of the fair value of an investment, and to the extent that there is truly a secondary market with appetite for a significant amount of one of our investments, we are to some extent joining the mainstream of the financial services world where market-based pricing is accepted unquestioningly as the basis for accounting "marks" on assets. We do, however, remain cautious, as we remain entirely aware that a litigation investment is capable of going to zero in one fell swoop, unlike many other categories of assets. Thus, we do not reflexively accept a market price for a portion of one of our investments as being necessarily indicative of the market clearing price for the investment or the appropriate carrying value for Burford's accounts. Instead, we engage in more analysis, including looking at the size of the transaction and the market conditions around the offering, especially given the early days of this secondary market process. As a result, despite concluding a small toehold Petersen sale in December 2016 at what was ostensibly

a $400 million implied valuation for our investment, for the reasons outlined above we did not believe that the sale of a mere 1% of the investment made it appropriate to value the entire investment at that implied value, and we did not do so; we increased the fair value of the Petersen investment to a level substantially less than that implied value in 2016, although it was our largest fair value adjustment. In total, 2016 saw, as usual, a number of fair value adjustments in the portfolio, both positive and negative, and total unrealised gain increased modestly as a percentage of the total portfolio asset value, from 26% in 2015 to 31% in 2016.[6] Finally, we have not reached any conclusion about the impact on the fair value of the Petersen investment in 2017 of the further sale we have just announced and we will not do so until the valuation process leading to the release of our interim accounts in July.

Below, we depict graphically what we have said for some time in words: that as the business continues to mature and demonstrates a track record, we have seen the amount of unrealised gain on our balance sheet caused by fair value adjustments to increase somewhat, consistent with the dictates of IFRS. However, that evolution has been gradual and still to this day represents only a moderate amount of our asset value. Moreover, we think fair value adjustments based on objective factors such as secondary market activity are the most appropriate way to see this evolution occur.

### Unrealised gains in litigation investments
(% of litigation investment assets)



### An exemplary concluded investment

Given our general inability to discuss pending investment matters, we have a custom of discussing entirely concluded ones to give investors some colour about the business.

This year, we have a remarkable story that not only illustrates the need for patience and perseverance in litigation but also showcases our ability to integrate our litigation finance and judgment enforcement businesses. We are able to discuss this matter given the public filings in the case and have restricted this discussion to publicly available information.

In 2010, we agreed to finance a piece of litigation pending in Florida arising out of a contractual dispute between ex-partners in an oil trading business, International Oil Trading Company. The plaintiff was a member of the Jordanian royal family and the defendant was a high-profile Florida billionaire; their venture had involved oil activities in Iraq following the US military activity there. The plaintiff's lawyers were Simpson Thacher & Bartlett, a major US law firm, and included the head of the firm's global litigation department.

Unlike many litigation matters, the case did not settle and instead went to trial, and our client won a jury verdict for $28.8 million. The billionaire defendant fought tooth and nail but ultimately the Florida Supreme Court affirmed the verdict, along with a further $10 million or so in interest and costs, with interest continuing to accrue until paid.

However – illustrating the need for our judgment enforcement and asset recovery business – the defendant did not comply with the court order to pay the judgment. Instead, using phalanxes of lawyers and multi-jurisdictional structuring, he did his best to avoid paying while going on openly living in his mansion and flying in his private jet.

The reason defendants engage in this kind of egregious misconduct is because it often works. The justice system is slow and inefficient when dealing with multi-jurisdictional assets and financial activity, and often plaintiffs are forced to the Hobson's choice of spending substantial sums on enforcement activities or giving up. However, we are not so easily intimidated.

Thus, combining the expertise of our litigation finance and judgment enforcement teams, we mounted our own multi-jurisdictional offense,

---

6   Individual fair value adjustments are, of course, confidential as they represent legal views about the current status of ongoing litigation, which is why we report them only in the aggregate.