# Exhibit 8

PAPEL EXCLUSIVO PARA DOCUMENTOS NOTARIALES



08/2014



CF8700881

PRIVATE & CONFIDENTIAL

SUBJECT TO CONFIDENTIALITY AGREEMENT

PROTECTED FROM DISCLOSURE BY APPLICABLE PRIVILEGES

Dated as of March 4, 2015

Claim Prosecution Agreement

between

The Counterparty named in Annex I hereto

and

Prospect Investments LLC, as Capital Provider



# CONTENTS

**SECTION**                                                                    **PAGE**

1.  Interpretation ........................................................................................................... 2

    1.1    Definitions .......................................................................................... 2

    1.2    Relationship of Parties ....................................................................... 2

2.  Claim Pursuit ......................................................................................................... 2

    2.1    Initial Payment ................................................................................... 2

    2.2    No Assignment or Transfer of Claims ................................................ 2

    2.3    Funding and Pursuit of Claims ........................................................... 2

3.  Claim Proceeds ...................................................................................................... 3

    3.1    Entitlements ....................................................................................... 3

    3.2    Delivery and Distribution of Proceeds ............................................... 3

    3.3    Priority Right to Capital Provider's Entitlement ................................ 4

    3.4    Capital Provider's Obligation to Fund ............................................... 4

4.  Covenants .............................................................................................................. 5

    4.1    Covenants of Each Party .................................................................... 5

    4.2    Covenants of the Insolvency Administration on Behalf of the Counterparty ..................................................................................... 5

    4.3    Covenants of the Capital Provider ..................................................... 6

5.  Representations and Warranties .............................................................................. 7

    5.1    Representations and Warranties of Each Party ................................... 7

    5.2    Representations and Warranties of the Capital Provider ..................... 8

    5.3    Representations and Warranties of the Insolvency Administration on Behalf of the Counterparty .................................................................. 8

6.  Confidentiality ....................................................................................................... 9

    6.1    Exclusive Ownership of Information by Disclosing Party .................. 9

    6.2    Non-Disclosure of Information ........................................................... 9

    6.3    Confidentiality Procedures ................................................................. 10

    6.4    Judicial and Official Disclosure Requests .......................................... 10

7.  Legal Privilege ...................................................................................................... 10

PAPEL EXCLUSIVO PARA DOCUMENTOS NOTARIALES





06/2014



CF8700882

| | 7.1 | Common Interest Privilege Applies | 10 |
|---|---|---|---|
| | 7.2 | Information Subject to Privilege Protection | 10 |
| | 7.3 | Information Subject to Work Product Protection | 11 |
| 8. | Exculpation | | 11 |
| 9. | Limitations on Transfer, Successors and Assigns; Third Party Beneficiaries | | 11 |
| 10. | Notices | | 12 |
| | 10.1 | Effectiveness of Notices | 12 |
| | 10.2 | Change of Details | 12 |
| 11. | Amendments | | 12 |
| 12. | Entire Agreement | | 12 |
| 13. | Counterparts | | 13 |
| 14. | Survival of Obligations | | 13 |
| 15. | No Waiver | | 13 |
| 16. | Severability | | 13 |
| 17. | Expenses | | 13 |
| 18. | Governing Law | | 14 |
| 19. | Dispute Resolution | | 14 |
| 20. | Language | | 14 |



CLAIM PROSECUTION AGREEMENT, dated as of March 4, 2015, ("*Agreement*"), among each of PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A., entities organized or formed under the laws of the jurisdictions identified in Annex I, which entities, collectively and jointly and severally, form the "*Counterparty*"; PROSPECT INVESTMENTS LLC, a limited liability company formed under the laws of the State of Delaware, as the "*Capital Provider*"; and the INSOLVENCY ADMINISTRATION (as defined in Exhibit A).

WHEREAS, the Counterparty has entered into insolvency proceedings as a consequence of the expropriation by Argentina of 51% of Repsol S.A.'s shareholding stake in YPF, S.A.;

WHEREAS, due to the inability of the Counterparty and its creditors to reach agreement, the insolvency proceedings have entered the liquidation phase;

WHEREAS, the respective plans of liquidation contemplate the monetization of the claims of the Counterparty arising from the aforesaid expropriation, principally by means of the sale or assignment of such claims, and alternatively, in the event a sale or assignment shall not prove practicable, by means of third party management and financing of such claims aimed at demanding and collecting an economic recovery therefrom;

WHEREAS, the sale or assignment of the claims has not proven practicable;

WHEREAS, the Insolvency Administration, based in Spain, desires the professional assistance and expertise of the Capital Provider both to finance and to manage the prosecution of the claims in light of the insufficient financial resources of the insolvent Counterparty and the lack of expertise of the Insolvency Administration with litigation in jurisdictions other than Spain;

WHEREAS, pursuant to the plans of liquidation approved by the Bankruptcy Court (as defined in Exhibit A) and creditors, the Insolvency Administration has conducted a competitive auction process among multiple bidders to manage and finance the claims, and the Capital Provider is interested in proceeding to do so in accordance with the terms hereof;

WHEREAS, pursuant to the process set forth in the liquidation plans and by the Insolvency Administration, the Capital Provider was selected as the winning bidder to manage, finance and bring about the monetization of the claims on behalf of the Counterparty, considering the price of the Capital Provider's bid and the litigation and collection risk associated with the claims;

WHEREAS, the Bankruptcy Court and, through it, the Counterparty's creditors have been kept duly informed of the progress of the competitive auction process; and

WHEREAS, the Counterparty has considered and taken advice from outside counsel in both Spain and the United States concerning the terms and economics of this Agreement, and has concluded that they are fair and reasonable and in the best interest of the Counterparty.

 






08/2014

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## 1.   INTERPRETATION

### 1.1   Definitions

Certain capitalized terms used herein have the meanings assigned thereto in <u>Exhibit A</u>. Capitalized terms used but not otherwise defined in Exhibit A have the respective meanings assigned to such terms in the Agreement.

### 1.2   Relationship of Parties

(a)   Nothing in this Agreement shall give rise to or be construed to create a fiduciary, lawyer-client, agency or other non-contractual relationship between the parties.

(b)   This Agreement does not create any joint venture, partnership or any other type of affiliation between the parties.

## 2.   CLAIM PURSUIT

### 2.1   Initial Payment

The Capital Provider agrees to pay to the Counterparty Fifteen Million One Hundred One Thousand Euros (€15,101,000.00) (the "*Initial Payment*") upon the due execution and delivery of this Agreement, in consideration of the right to finance the Claims and to receive the Capital Provider's Entitlement (if any).  The Initial Payment is non-refundable.

### 2.2   No Assignment or Transfer of Claims

The parties agree that nothing in this Agreement shall be interpreted to constitute an assignment or transfer by the Counterparty of the Claims, or any portion thereof, to the Capital Provider or any Affiliate thereof, and that no such assignment or transfer shall occur as a result of either party's performance of its obligations hereunder.

### 2.3   Funding and Pursuit of Claims

Subject to the terms and conditions of this Agreement, the Capital Provider will fund the pursuit of the Claims.  With specific reference to the unique needs and characteristics of the Claims, the Counterparty, the Insolvency Administration and the process, all as outlined in the preamble to this Agreement, and without limiting the Capital Provider's obligations under Sections 4.3(b) and (c), the Counterparty hereby grants the Capital Provider the Irrevocable Powers of Attorney attached hereto as <u>Annex III</u> to enable the Capital Provider  to manage the conduct of the Claims as set forth therein, at the Capital Provider's expense and in the exercise of its judgment and discretion, subject only to commercial reasonableness.  The Capital Provider shall have the rights and authorities provided in the Irrevocable Powers of Attorney exclusively, and the Counterparty



2

shall not take any actions in connection with the Claims absent the direction of the Capital Provider and shall not take any actions in contravention of the intent of this Section.

3.    **CLAIM PROCEEDS**

### 3.1   Entitlements

Upon the occurrence of a Claim Resolution, the Counterparty shall receive thirty percent (30.00%) of all Proceeds (all amounts to which the Counterparty is entitled, the "*Counterparty's Entitlement*"). The Capital Provider shall receive all other Proceeds (the "*Capital Provider's Entitlement*") as due and just consideration for the Capital Provider's funding of the Claims and the payment of the Initial Payment.

### 3.2   Delivery and Distribution of Proceeds

(a)   *Payment and Delivery of Proceeds in Cash or Other Instruments.* The parties acknowledge and agree that all anticipated Proceeds in the form of cash, check or other instruments are to be paid initially to the Payment Agent, and each party shall take all steps reasonably necessary or appropriate to ensure the same occurs.

(b)   *Other Proceeds.*

    (i)   Payment and Delivery. If anticipated Proceeds consist of property other than cash, check or other instruments (such Proceeds, "*Non-Cash Proceeds*"), such Non-Cash Proceeds shall be delivered to the Payment Agent unless the parties mutually agree, within a period of five (5) Business Days from the date they both become aware that such Non-Cash Proceeds are anticipated to be received (the "*Non-Cash Proceeds Notice Date*"), upon an alternate means of payment and delivery of such Non-Cash Proceeds.

    (ii)   Valuation, Monetization and Distribution. The parties shall promptly endeavor in good faith to mutually agree upon the value of any such Non-Cash Proceeds and the appropriate means of monetization and distribution thereof. If, within a period of ten (10) Business Days from the Non-Cash Proceeds Notice Date, the parties fail to so agree, then the parties shall refer the matter to an appropriate expert appointed by the International Center for ADR of the International Chamber of Commerce (the "*Expert*") to determine such value and means. Once appointed, the Expert shall be mutually instructed by the parties to provide an opinion, within thirty (30) days of appointment, as to the value of the Non-Cash Proceeds and the recommended commercially reasonable means of monetization and distribution, provided that such distribution shall necessarily be in accordance with Section 3.1. Such opinion shall be final and binding upon the parties. The costs and expenses of any Expert shall be borne by the Capital Provider.

(c)   *Proceeds Held in Trust.* In the event any Proceeds are received by either party hereto or a third party other than the Payment Agent, such receiving party shall, or shall direct such third party to, (i) hold such Proceeds in trust for the benefit of the other party; (ii) segregate such Proceeds from other funds and property of the receiving party; and



3

PAPEL EXCLUSIVO PARA DOCUMENTOS NOTARIALES





05/2014

(iii) forthwith pay such Proceeds, or the cash value realized therefrom, to the Payment Agent in accordance with Section 3.1.

(d)     *Designation as Payment Agent*.  The Capital Provider shall use commercially reasonable efforts to, as soon as possible after the date hereof, designate the Payment Agent and secure agreement from the Person so designated to act as such, pursuant to the definition of "Payment Agent" in Exhibit A.  In the event a third party escrow agent is selected pursuant to clause (ii) of such definition, the Counterparty shall use commercially reasonable efforts to, as soon as possible after the Capital Provider notifies it of such selection, review, approve and enter into an agreement with such agent and the Capital Provider in accordance therewith.

### 3.3     Priority Right to Capital Provider's Entitlement

The Capital Provider's right to receive and retain the Capital Provider's Entitlement shall, as between the parties, rank pari passu with the Counterparty's right to receive and retain the Counterparty's Entitlement and otherwise shall take full and absolute priority over any payment right of any other creditor or other party.  The Capital Provider's Entitlement shall be subject to no reduction or set-off on account of any obligations of the Counterparty to other creditors or any fees or expenses of the bankruptcy estate of the Counterparty or the Insolvency Administration (other than Litigation Costs), nor on account of any other Adverse Claim; <u>provided</u> that in no event shall the value of any settled Counterclaim be deemed a prohibited reduction or set-off hereunder, and the Capital Provider hereby waives any claim that the Capital Provider's Entitlement should be increased by the value, in whole or in part, of any settled Counterclaim.

### 3.4     Capital Provider's Obligation to Fund

In the event the Capital Provider ceases funding the Claims in breach of its obligations under Section 2.2 and fails to cure such breach within thirty (30) days of its receipt of written notice thereof from the Counterparty, the Capital Provider shall forfeit the Capital Provider's Entitlement and in lieu thereof shall be entitled to receive only reimbursement of the aggregate amount funded by it pursuant to Section 2.2 prior to the cessation of funding, which amount shall be payable only (i) upon the occurrence of a Claim Resolution in favor of the Counterparty, and (ii) on a pari passu basis with the Counterparty, from any proceeds actually received and retained by the Counterparty as a result of such Claim Resolution after payment of all of the Counterparty's expenses relating to the prosecution of the Claims and enforcement proceedings relating thereto, including any amounts payable to any third party that may have financed the prosecution of the Claims after the Capital Provider's cessation of funding.  Notwithstanding the foregoing, however, if the Capital Provider informs the Counterparty that its cessation of funding is for reasonable strategic reasons that reasonably would not be anticipated to impair the ultimate recovery for the Claims and that the Capital Provider remains committed to the pursuit of the Claims, no breach shall be deemed to have occurred if counsel informs the Counterparty of the reasonableness of Capital Provider's approach.

4.    COVENANTS

4.1    **Covenants of Each Party**

Each party agrees with the other party that, so long as such party has or may have any obligation under this Agreement to the other party:

(a)    It shall preserve and maintain its corporate existence.  In the case of Counterparty, such obligation shall include that Counterparty, represented by the Insolvency Administration, shall not request the conclusion of the Insolvency Proceedings of Counterparty, especially for inexistence of the estate or any assets, and, as applicable, shall diligently oppose any efforts to achieve such conclusion, for any reason.

(b)    It shall use all reasonable efforts to maintain in full force and effect all consents, approvals, actions, authorizations, exceptions, notices, filings and registrations of or with any Governmental Authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and shall use all reasonable efforts to obtain any that may become necessary in the future.

(c)    It shall comply in all material respects with all applicable laws and orders of any Governmental Authority to which it may be subject if failure so to comply could reasonably be expected, either individually or in the aggregate, to (i) impair its ability to perform any of its obligations under this Agreement or any Credit Support Document to which it is a party, (ii) impair the rights or remedies available to the other party under this Agreement or any Credit Support Document, or (iii) have a material adverse effect on the Claims or the value or collectability thereof.

(d)    Each party shall, from time to time at the request of the other party, without any additional consideration, furnish the other party such further information, consents or assurances, execute and deliver such additional documents, instruments and conveyances, and take such other actions and do such other things, as may be necessary or appropriate to carry out the provisions of this Agreement and any Credit Support Document and to give effect to the transactions contemplated hereby and thereby.  The foregoing may include but shall not be limited to entering into any additional pledge or security agreements and/or making, registering or authorizing deeds or security filings in relevant jurisdictions, as necessary to give effect to Section 3.3.

4.2    **Covenants of the Insolvency Administration on Behalf of the Counterparty**

The Insolvency Administration, on behalf of the Counterparty, agrees with the Capital Provider that:

(a)    The Insolvency Administration shall in a timely manner cooperate with the Capital Provider in all matters pertaining to the Claims, including but not limited to (i) producing all relevant documents and information in its possession or control; and (ii) cooperating, and using commercially reasonable efforts to secure the cooperation of all appropriate Representatives of the Counterparty, in all matters pertaining to the Claims, which cooperation may include producing necessary documents; signing, executing and



5

PAPEL EXCLUSIVO PARA DOCUMENTOS NOTARIALES





08/2014

granting additional agreements and powers of attorney; submitting to examination by counsel for the preparation of written statements and subscribing to the same under oath if required; consulting with counsel and their designees as they require for purposes of prosecuting the Claims and enforcing any award; and appearing at any hearings in connection with such statements or the Claims generally; with any reasonable, documented expenses of the Insolvency Administration (including reasonable attorneys' fees) incurred in the performance of all such cooperation activities described in the foregoing clauses (i) and (ii)  being paid by the Capital Provider (collectively, "*Cooperation Costs*").

(b)   The Counterparty shall not do anything to prejudice any benefits, rights or causes of action sought or advanced in connection with, or the general pursuit of, the Claims.

(c)   Other than pursuant to any Credit Support Document to which the Counterparty is a party, the Counterparty shall not dispose of, transfer, encumber or assign, or permit to exist (without objection) any Adverse Claim with respect to, all or any portion of the Claims (or any interest therein) or any Proceeds thereof (or any right to such Proceeds), whether by way of security or otherwise.

(d)   The Counterparty shall not set off or agree to set off any amounts against any Claims.

(e)   The Counterparty shall not institute any separate action, suit or arbitration against any Opponent or any Affiliates of any Opponent prior to a Claim Resolution.

**4.3   Covenants of the Capital Provider**

(a)   The Capital Provider shall use commercially reasonable efforts to, at its own expense, (i) diligently prosecute the Claims and (ii) seek to enforce any favorable judgment, award or settlement arising therefrom.

(b)   The Capital Provider shall keep the Counterparty reasonably informed of the status of the Claims by means of (i) providing the Counterparty quarterly written reports of all material developments in the Claims; (ii) promptly providing to the Counterparty copies of any pleadings, court filings or similar documents; (iii) promptly notifying the Counterparty of any settlement offer; and (iv) responding promptly to any request by the Counterparty for information relating to the Claims.

(c)   In recognition of the Insolvency Administration's interest, on behalf of the Counterparty, in the protection of the Counterparty's Entitlement, and the value that its cooperation hereunder may bring to the Capital Provider in the prosecution of the Claims, the Capital Provider shall give reasonable, good faith consideration to any recommendations of the Counterparty regarding the Capital Provider's conduct of the Claims and shall provide a reasoned response thereto.   Given the Capital Provider's greater knowledge and experience in the field, however, and given the alignment of interests between the Capital Provider and the Counterparty, the Counterparty shall reasonably defer to the Capital Provider in selecting the course of action that is best for the Capital Provider and the Counterparty alike.



6

(d) If the Counterparty raises a question about the Capital Provider's decision to enter into, or agree to enter into, any settlement of the Claims, the Capital Provider shall cause the lawyers appointed by it to prosecute the Claims on behalf of the Counterparty to provide to the Counterparty an explanation, based on all relevant facts and circumstances and including consideration of prior settlements of similar matters, of why such settlement is reasonable.

## 5.   REPRESENTATIONS AND WARRANTIES

### 5.1   Representations and Warranties of Each Party

Each party represents and warrants to the other as follows:

(a) It is duly organized or formed and validly existing under the laws of the jurisdiction of its organization or formation and, if relevant under such laws, in good standing.

(b) It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance.

(c) Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of the Bankruptcy Court (including the liquidation plans of the Counterparty), any other court or other Governmental Authority applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets.

(d) All consents, approvals, actions, authorizations, exceptions, notices, filings and registrations that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party (including, with respect to the Counterparty, all consents, approvals, authorizations, etc. of the Bankruptcy Court) have been obtained and are in full force and effect and all conditions of any such consents, approvals, actions, authorizations, exceptions, notices, filings and registrations have been complied with.

(e) This Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(f) It is acting for its own account, and it has made its own independent decisions to enter into this Agreement and the transactions contemplated hereby and as to whether this Agreement and such transactions appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.



7

  

08/2014

(g)     No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Agreement or any of the transactions contemplated hereby.

(h)     It is capable of assessing the merits of and understanding (on its own behalf or through independent professional legal advice), and understands and accepts, the terms, conditions and risks of this Agreement and the transactions contemplated hereby.

**5.2     Representations and Warranties of the Capital Provider**

The Capital Provider represents and warrants to the Counterparty as follows:

(a)     The Capital Provider knows and accepts all terms of the liquidation plan of the Counterparty, and the financing by the Capital Provider hereunder is provided with no guarantee that the Claims will be successful or that any Proceeds will be received.

(b)     The Capital Provider is financing the Claims at its own risk and peril, having performed all analysis and all legal, economic, tax, financial or other study of the Claims, the rights arising therefrom and the feasibility thereof that the Capital Provider has considered necessary.

(c)     The Capital Provider has analyzed to its satisfaction the impact of the financing by it hereunder on the Claims, on the rights arising therefrom and on the operation of the Counterparty.

(d)     The Capital Provider has and shall have sufficient funds to pay the Initial Payment and all amounts required to fund the Claims in accordance with Section 2.2.

**5.3     Representations and Warranties of the Insolvency Administration on Behalf of the Counterparty**

The Insolvency Administration, on behalf of the Counterparty, represents and warrants to the Capital Provider as follows:

(a)     The Counterparty is the sole owner of, and has good title to, the Claims, and to the Insolvency Administration's best knowledge and subject to the Insolvency Proceedings, such ownership and title are free and clear of any Adverse Claim (other than pursuant to any Credit Support Document to which the Counterparty is a party).

(b)     Other than pursuant to any Credit Support Document to which the Counterparty is a party, it has not disposed of, transferred, encumbered or assigned all or any portion of the Claims (or any interest therein) or any Proceeds thereof, whether by way of security or otherwise.

(c)     None of the Insolvency Administration or its Representatives, nor to its best knowledge the Counterparty, its Affiliates or their respective Representatives, has waived, settled or otherwise compromised the Claims, or agreed to do any of the foregoing.



8

(d)    The Insolvency Administration has not set off or agreed to set off any amounts against the Claims, and to its best knowledge there exist no facts or circumstances giving rise to any (i) meritorious claims of rights of set-off or similar rights against the Counterparty that could permit any set-off against the Claims or (ii) Counterclaims.

(e)    The Insolvency Administration has, by virtue of the plans of liquidation approved by the Bankruptcy Court in the Insolvency Proceedings, full power and authority to bring the Claims.

(f)    Any security interest in the Claims, any proceeds thereof and/or related collateral granted by the Counterparty to the Capital Provider pursuant to any Credit Support Document to which the Counterparty is a party (and without limiting any representation or warranty made by the Counterparty in such Credit Support Document) is a legal, validly created, perfected, first priority security interest, subject to no other Adverse Claim.

6.    CONFIDENTIALITY

6.1    Exclusive Ownership of Information by Disclosing Party

Each recipient of Confidential Information hereunder (the "*Recipient*") agrees that all Confidential Information provided to it is and shall remain at all times the exclusive property of and owned by the other party (the "*Disclosing Party*"), or any its Affiliates or contract counterparties, as the case may be, and that the Recipient's use or awareness of such Confidential Information shall create no rights, at law or in equity, in the Recipient in or to such information, or any aspect or embodiment thereof.  Neither the execution of this Agreement, nor the furnishing of any Confidential Information hereunder, shall be construed as granting, whether expressly or by implication, estoppel or otherwise, any license to distribute or title to any patent, trademark, copyright, service mark, business and trade secret or other proprietary right to such Confidential Information, or to use such Confidential Information for any purpose other than as specified in this Agreement or to constitute a waiver of any attorney-client privilege or work product protection.

6.2    Non-Disclosure of Information

The Recipient shall not for any reason, during the term of this Agreement and for a period of five years following termination or expiration of this Agreement, disclose, use, reveal, report, publish, transfer, or make available, directly or indirectly, to any person, business concern, or other entity other than its Representatives authorized pursuant to Section 6.3, any Confidential Information or Common Interest Material provided to it.  Moreover, notwithstanding any other provision of this Agreement, at no time shall the Recipient knowingly disclose any Confidential Information or Common Interest Material to the Opponent or any other adversary, potential adversary or conduit to an adversary of the Counterparty, and the Recipient shall treat such materials in a manner that does not substantially increase the likelihood that any of the foregoing shall come into possession of it.

9

PAPEL EXCLUSIVO PARA DOCUMENTOS NOTARIALES

  

08/2014

### 6.3    Confidentiality Procedures

The Recipient shall ensure that the Confidential Information it receives is not divulged or disclosed to any person except its Representatives who have a "need to know" such information in order to perform their job responsibilities. The Recipient shall ensure its Representatives' compliance with Section 6.2 and all other provisions of this Agreement and shall be solely responsible for any failure by it or its Representatives to so comply.

### 6.4    Judicial and Official Disclosure Requests

Notwithstanding any provision of this Section 6.4 that follows this sentence, the parties acknowledge and agree that this Agreement, any Credit Support Document and any other agreements, filings or registrations entered into or made in direct connection herewith shall be disclosed to the Bankruptcy Court.  Other than in the foregoing situation, if a Recipient is requested in any judicial, arbitral or administrative proceeding or by any Governmental Authority to disclose any Confidential Information, then such Recipient shall provide the Disclosing Party with written notice of such request prior to disclosing such Confidential Information, sufficiently in advance so that the Disclosing Party may contest the requested disclosure. If the Disclosing Party elects to contest the requested disclosure, the Recipient shall not disclose any Confidential Information until such time as a final, non-appealable or non-stayed order has been entered compelling such disclosure, and the Recipient shall cooperate with the Disclosing Party in its contest.  Moreover, if any such request for the disclosure of Confidential Information seeks disclosure of this Agreement, any terms hereof, the identity of the Capital Provider or any communications between the Counterparty and the Capital Provider, then the Recipient shall, at the Disclosing Party's expense, object to such disclosure on all applicable bases, including work product doctrine, common interest privilege and relevance, as applicable. Should the Disclosing Party not contest the requested disclosure, the Recipient shall not have any obligation to do so; the Recipient may, however, contest the requested disclosure even if the Disclosing Party elects not to do so.

### 7.    LEGAL PRIVILEGE

### 7.1    Common Interest Privilege Applies

The parties agree that the Counterparty, the Capital Provider and the Capital Provider's Affiliates have a "common legal interest" in the Claims and their successful prosecution, this Agreement, and any discussion, evaluation and negotiation and other communications and exchanges of information relating thereto.

### 7.2    Information Subject to Privilege Protection

Notwithstanding any other contrary provision of this Agreement, the parties agree that any Common Interest Material shall at all times remain subject to all applicable Privileges, it being the express intent of the parties and their Affiliates to preserve intact to the fullest extent applicable, and not to waive, by virtue of this Agreement or otherwise, in whole or in part, any and all Privileges to which Common Interest Material, or any part of it, is, may be or may in the future become subject.  It is the good faith belief of the Disclosing Party that Privileges,



10

including the common interest privilege, attach to the Common Interest Material and disclosure of Common Interest Material is made in reliance on that good faith belief.

**7.3    Information Subject to Work Product Protection**

The parties agree that without limiting the foregoing, any materials prepared in anticipation of litigation by or for the Counterparty, the Capital Provider, any of their respective Affiliates or any of their respective Representatives shall remain subject to work product protection. The Capital Provider and its Affiliates shall be considered "representatives" of the Counterparty given that the Counterparty requested assistance and advice from them regarding the plausibility of the Counterparty's obtaining external capital to finance its legal claims. Moreover, the parties agree that information shared between the Counterparty and the Capital Provider is shared pursuant to a common interest and non-disclosure agreement, and the exchange of such information does not increase the risk of disclosure, inadvertent or otherwise, to the Opponent or any other adversary and does not lessen or waive the protection secured under work product doctrine.

**8.    EXCULPATION**

The Capital Provider hereby waives any and all claims against the Counterparty, the Insolvency Administration and their respective legal advisers and affiliates, including their directors, officers, employees, partners and/or shareholders, to the extent such claims arise out of (i) the failure of the Claims or the insufficiency of Proceeds received therefrom, (ii) the inadequacy of the Capital Provider's analysis of the Claims, the rights arising therefrom and/or the feasibility thereof, including any and all legal, economic, tax, financial and other study thereof performed by the Capital Provider in connection therewith, or (iii) the impact of the financing by the Capital Provider hereunder on the Claims, the rights arising therefrom or the operation of the Counterparty, whether as a result of the financing itself or the application of a legal rule.

**9.    LIMITATIONS ON TRANSFER, SUCCESSORS AND ASSIGNS; THIRD PARTY BENEFICIARIES**

(a)    Neither this Agreement nor any right or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) or delegated by either party without the prior written consent of the other party (which consent, in the case of the Counterparty, shall include the consent of the Insolvency Administration), such consent not to be unreasonably withheld. Notwithstanding the foregoing, the Counterparty may, without the consent of the Capital Provider, transfer the right to receive the Counterparty's Entitlement to a third party, provided that (i) the lawyers appointed by the Capital Provider to prosecute the Claims on behalf of the Counterparty have advised in writing that such transfer shall not impair the prosecution of the Claims in any way and (ii) such transfer shall not result in a breach by the Counterparty of its covenant under Section 4.2(c). Any purported transfer that is not in compliance with this provision shall be void.

(b)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(c)    No Person other than the parties hereto shall have any rights under this Agreement.



11







08/2014



## 10.  NOTICES

### 10.1  Effectiveness of Notices

Any notice or other communication in respect of this Agreement shall be in writing and may be given in any manner described below to the address or number provided for the recipient in Annex I and shall be deemed effective as indicated:

(a)     if in writing and delivered in person or by courier, on the date it is delivered;

(b)     if sent by facsimile transmission, on the date it is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt shall be on the sender and shall not be met by a transmission report generated by the sender's facsimile machine);

(c)     if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date it is delivered or its delivery is attempted; or

(d)     if sent by e-mail, on the date it is delivered (it being agreed that the burden of proving receipt shall be on the sender and shall not be met absent a return e-mail message indicating that such message has been opened by the recipient or by other confirmation of receipt from the recipient),

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.  Notices to the Counterparty shall be copied to the Nominated Lawyers, and the time of effectiveness of each such notice shall be the effective time of delivery to either the Counterparty or the Nominated Lawyers, whichever occurs earlier.

### 10.2  Change of Details

Either party may by notice to the other in accordance with Section 10.1 change the address, facsimile number or e-mail details at which notices or other communications are to be given to it.

## 11.  AMENDMENTS

No amendment, modification or waiver in respect of this Agreement shall be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties.

## 12.  ENTIRE AGREEMENT

This Agreement and the Credit Support Documents constitute the entire agreement and understanding of the parties with respect to their subject matter and supersede all oral communication and prior writings with respect thereto.

12

13.   **COUNTERPARTS**

This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission and by electronic messaging system), each of which shall be deemed an original.

14.   **SURVIVAL OF OBLIGATIONS**

The rights and obligations of the parties under Sections 3, 6, 7, 8, 9(b), 9(c) and 12 through 20 shall survive a Claim Resolution or the termination or expiration hereof.

15.   **NO WAIVER**

A failure or delay in exercising any right, power or privilege in respect of this Agreement shall not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege shall not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

16.   **SEVERABILITY**

If any term or provision of this Agreement is held to be unenforceable, invalid or illegal (in whole or in part) for any reason (in any relevant jurisdiction), the remaining terms and provisions, modified by the deletion of the unenforceable, invalid or illegal portion, shall continue in full force and effect, and such unenforceability, invalidity, or illegality shall not otherwise affect the enforceability, validity or legality of the remaining terms and provisions.

17.   **EXPENSES**

(a)   The Capital Provider shall bear all costs and expenses incurred in the conduct of the Claims, including all Cooperation Costs and any costs and expenses incurred in defending any Counterclaims, provided the Claims continue to be prosecuted pursuant to Section 4.3(a), and/or Attachment Proceedings (collectively, "***Litigation Costs***").

(b)   The Capital Provider shall fully indemnify, defend and hold harmless the Insolvency Administration from and against any and all losses, damages, liabilities, costs, or expenses incurred in connection with its performance of its obligations under this Agreement, including any adverse costs awards to the extent confirmed by a valid court judgment as against the Insolvency Administration; except in each case to the extent that such losses, damages, liabilities, costs or expenses result from the gross negligence or willful misconduct of the Insolvency Administration.

(c)   Each party hereto shall bear its own (including, in the case of the Counterparty, the Insolvency Administration's) expenses in connection with the negotiation, execution, delivery and performance of this Agreement and any Credit Support Document. For the avoidance of doubt, the Insolvency Administration shall bear all of its own costs and expenses in respect of the administration of the bankruptcy estate of the Counterparty, except for Litigation Costs.



13





08/2014

**18.    GOVERNING LAW**

This Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever to this Agreement (whether in contract, tort or otherwise) shall be governed by, the law of Spain.

**19.    DISPUTE RESOLUTION**

All disputes arising out of or in connection with this Agreement shall, to the fullest extent legally permissible, be finally settled under the Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with such Rules, whereby each party hereto shall nominate one arbitrator for confirmation by the International Court of Arbitration (the "*Court*"). The third arbitrator, who shall act as president of the arbitral tribunal, shall be jointly nominated by the other two arbitrators within 30 days of the confirmation of the second arbitrator. If the president of the arbitral tribunal is not nominated within this time period, the Court shall appoint such arbitrator. The language to be used in the arbitration shall be English. The place of arbitration shall be Madrid, Spain.  If it is not legally permissible to resolve a dispute by arbitration in accordance with the foregoing, the parties, waiving any other alternate forum to which they may be entitled, expressly and irrevocably agree to submit the resolution of such dispute to the jurisdiction of the courts of the city of Madrid (Spain).

**20.    LANGUAGE**

This Agreement is executed in both English and Spanish. However, in the event of any discrepancy between the two versions of the Agreement, the English version shall prevail.

*[Remainder of this page intentionally left blank.]*



14

<u>Signature page to Claim Prosecution Agreement</u>

　　　　IN WITNESS WHEREOF, the parties have executed and delivered this Claim Prosecution Agreement as of the date first written above.

**Counterparty:**

PETERSEN ENERGÍA INVERSORA, S.A.U.

By:　　THE INSOLVENCY ADMINISTRATION
　　　　WITH LIQUIDATION FUNCTIONS

By: _____
　　Name: Mr. Armando Betancor Álamo

PETERSEN ENERGÍA, S.A.

By:　　THE INSOLVENCY ADMINISTRATION
　　　　WITH LIQUIDATION FUNCTIONS

By: _____
　　Name: Mr. Armando Betancor Álamo

**Capital Provider:**

PROSPECT INVESTMENTS LLC

By: _____
　　Name: Salvador Javier Mendieta Grande
　　Title: Authorized Signatory

**Insolvency Administration:**

THE INSOLVENCY ADMINISTRATION
WITH LIQUIDATION FUNCTIONS

By: _____
　　Name: Mr. Armando Betancor Álamo

15





PAPEL EXCLUSIVO PARA DOCUMENTOS NOTARIALES

CF870089O

08/2014

## EXHIBIT A

### Defined Terms

"*Adverse Claim*" means, with respect to a Claim or any interest therein or any Proceeds thereof, (i) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or affecting such Claim or any interest therein or any Proceeds thereof, (ii) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such Claim or any interest therein or any Proceeds thereof, (iii) any purchase option, call or similar right of a third party with respect to such Claim or any interest therein or any Proceeds thereof and (iv) any other claim that a claimant has a property interest in such Claim or any interest therein or any Proceeds thereof and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with such Claim or any interest therein or any Proceeds thereof.

"*Affiliate*" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. For this purpose, "*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Attachment Proceeding*" means any proceeding by a creditor of the Counterparty seeking to attach or seize Proceeds.

"*Bankruptcy Court*" means Mercantile Court Number 3, Madrid, Spain, or any successor court in which the Insolvency Proceedings may proceed.

"*Business Day*" means a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealings in foreign exchange and foreign currency deposits) in Madrid and New York.

"*Capital Provider*" has the meaning set forth in the recitals to this Agreement.

"*Capital Provider's Entitlement*" has the meaning set forth in Section 3.1.

"*Claim*" means each legal claim described on Annex II, as each such claim may be varied or enlarged by the addition of claims and/or additional parties from time to time, and includes:

(i) any and all related pre- and post-trial proceedings or processes, or pre- and post-hearing proceedings or processes, as applicable, in or in connection with such claim(s), including the pursuit of costs or post-judgment or post-arbitral award remedies;

(ii) all proceedings seeking to appeal, challenge, confirm, enforce, modify, correct, vacate or annul a judgment or award, as well as proceedings on remand or retrial or rehearing;



16



(iii)   all ancillary, parallel or alternative dispute resolution proceedings and processes arising out of or related to the acts or occurrences alleged in such claim(s) (including without limitation, conciliation or mediation or court filings seeking discovery for or filed in aid of a contemplated or pending arbitration);

(iv)    re-filings or parallel filings of such claim(s) and any other legal, diplomatic or administrative proceedings or processes founded on the underlying facts giving rise to or forming a basis for such claim(s);

(v)     ancillary or enforcement proceedings related to the facts or claims alleged from time to time or that could have been alleged in such claim(s) at any time;

(vi)    all arrangements, settlements, negotiations, or compromises made between the Counterparty and any adverse party having the effect of resolving any of the Counterparty's claims against any adverse party that are or could be or could have been brought in such claim(s); and

(vii)   all rights of the Counterparty to collect any damages or awards or otherwise exercise remedies in connection with any of the foregoing.

"*Claim Resolution*" means either full and final settlement of all Claims or the entry of a final, non-appealable and enforceable judgment with respect to all Claims, in either case resolving with prejudice all aspects and elements of the Claims. In circumstances where a final, non-appealable and enforceable judgment does not automatically come into being upon the rendering of a dispositive decision, a Claim Resolution shall be deemed to have occurred on the date that is sixty days following such dispositive decision in the absence of any subsequent challenge thereto.

"*Common Interest Material*" means any information that is protected by the attorney-client privilege, work product doctrine, common interest privilege or any similar privilege in any jurisdiction including, for the avoidance of doubt, legal professional privilege and/or litigation or arbitral privilege, or that is protected by any rules of professional secrecy in any jurisdiction (collectively, "*Privileges*"), including information: (i) prepared by a party to a Claim or any of its Affiliates or their counsel, advisors, consultants or agents; or (ii) prepared by the Capital Provider or its Affiliates, in each case including legal and factual memoranda and case analyses and evaluations.

"*Confidential Information*" means any non-public, confidential or proprietary information relating to: (i) the Capital Provider and its Affiliates and Representatives, and information provided by them about their business and operations or the structures and economic arrangements they use in their business, including this Agreement and any Credit Support Document and their terms and existence, the existence of any relationship between the Counterparty and the Capital Provider or any of its Affiliates or Representatives, and the discussions and negotiations related thereto, (ii) a Claim, including the names of the parties and potential other parties to such claim; the factual, legal, technical, economic and financial background of such claim; and the procedural status, theories, strategies and tactics for the prosecution or defense of such claim; (iii) other financial or business information; and (iv) other



17

  

08/2011

proprietary or non-public information, data or material; in all cases regardless of whether such information is (A) written or oral, irrespective of the form or storage medium, or (B) specifically identified as "Confidential". Confidential Information does not include information that: (i) was or becomes generally available to the public other than as a result of a disclosure by the Recipient; (ii) was available to the Recipient on a non-confidential basis prior to its disclosure; or (iii) was developed independent of the information derived from the Confidential Information.

"*Cooperation Costs*" has the meaning set forth in Section 4.2(a).

"*Counterclaim*" means any claim interposed by the Opponent against the Counterparty in response to the Claims, provided, however, that a claim brought by the Opponent other than in an action instituted by the Capital Provider (an "*Opponent's Claim*") shall not be a Counterclaim if the Capital Provider causes the lawyers appointed by it to prosecute the Claims on behalf of the Counterparty to provide to the Counterparty an explanation, based on all relevant facts and circumstances, as to why it is reasonable not to defend the Opponent's Claim.

"*Counterparty*" has the meaning set forth in the first paragraph of this Agreement.

"*Counterparty's Entitlement*" has the meaning set forth in Section 3.1.

"*Credit Support Document*" means any document identified as such with respect to the Counterparty in Annex I.

"*Disclosing Party*" has the meaning set forth in Section 6.1.

"*Expert*" has the meaning set forth in Section 3.2(b).

"*Governmental Authority*" means the government of any nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Initial Payment*" has the meaning set forth in Section 2.1.

"*Insolvency Administration*" means Mr. Armando Betancor Álamo, the receiver in the Insolvency Proceedings as of the date hereof, and any successor(s) thereto.

"*Insolvency Proceedings*" means the insolvency proceedings of each of Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A., nos. 523/2012 and 405/2012 in the Bankruptcy Court.

"*Litigation Costs*" has the meaning set forth in Section 17(a).

"*Opponent*" means the Person(s) identified as such in Annex II and any other Person added or joined to the Claim from time to time as a defendant or against whom proceedings are asserted or threatened even if such Person(s) are not named or served.



18

"*Payment Agent*" means, at the Capital Provider's election, (i) the legal counsel appointed by the Capital Provider to assist in the assertion of the Claims (as applicable, "*Counsel*"), provided that such counsel has agreed to act in such capacity and has accepted Irrevocable Instructions to Counsel from the Capital Provider (given on the Counterparty's behalf, pursuant to the powers of attorney granted pursuant hereto), in the form attached hereto as Annex IV, directing it to remit any and all Proceeds in accordance with the terms of this Agreement; or (ii) a third party escrow agent that has entered into an agreement with the Capital Provider and the Counterparty to act in such capacity and to remit any and all Proceeds in accordance with the terms of this Agreement. In the event the Payment Agent in place at any time becomes unwilling to continue serving as such, the Capital Provider shall as promptly as practicable identify a replacement that is so willing, and the Capital Provider shall, in any interim period, serve as Payment Agent until the same is accomplished.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership or other entity or Governmental Authority.

"*Privileges*" has the meaning set forth in the definition of "Common Interest Material".

"*Proceeds*" means the aggregate amount of all funds actually received by the Payment Agent (or any other party in accordance with Section 3.2) or, in the case of Non-Cash Proceeds, the aggregate amount of all funds received from the monetization thereof, in each case as a result of the prosecution of the Claims. For the avoidance of doubt, in no event shall Proceeds be deemed to include any amount payable by the Counterparty or set off against amounts awarded to the Counterparty as a result of the resolution of a Counterclaim in favor of the Opponent.

"*Recipient*" has the meaning set forth in Section 6.1.

"*Representatives*" means, with respect to any person or entity, as applicable, its directors, officers, managers, members, partners, principals, employees, shareholders and participants (or potential shareholders and participants), Affiliates, related entities, agents, assignees, reinsurers, lawyers, accountants, consultants, advisors and independent contractors.

19

  

08/2014

### ANNEX I

**Counterparty: Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.**

| 1. Type of Entity: | Each entity is a Spanish public limited liability company (Sociedad anónima española) under liquidation in insolvency proceedings |
|---|---|
| 2. Jurisdiction of Organization or Formation: | Spain |
| 3. Credit Support Document(s): | Pledge Agreement, governed by Spanish law, between the Counterparty, as Pledgor, and the Capital Provider, as Pledgee, to be registered in a public deed. |
| 4. Notice Information: | Address: Insolvency Administration of Petersen Energía, S.A.U. (Alas Abogados, S.L.) Insolvency Administration of Petersen Energía Inversora, S.A.U. (Alas Abogados, S.L.) C/ Ayala 27, 4° Izq. 28010 Madrid, Spain. <br><br> Fax Number: +34 917 819 625 <br><br> Email Address: administracion@alasabogados.es betancor@alasabogados.es <br><br> Attn: D. Armando Betancor Álamo |

**Capital Provider: Prospect Investments LLC**

| 1. Type of Entity: | Limited liability company |
|---|---|
| 2. Jurisdiction of Organization or Formation: | State of Delaware |
| 3. Notice Information: | Address: Prospect Investments LLC 2711 Centerville Road Wilmington, DE 29808 <br> Fax Number: (302) 636-5454 <br> Email Address: info@litfinsolutions.com <br> Attn: Prospect Investments LLC Manager |

20

ANNEX II

| 1. Description of the Claims: | Any claims against any Person resulting from, arising out of or otherwise related to the facts and circumstances related to or caused by the expropriation of shares of YPF, S.A. from Repsol S.A. that resulted in damage or harm to the Counterparty, including but not limited to (i) any breach of any investor protection set forth in the bilateral investment treaty between Spain and Argentina; (ii) any breach or failure to comply with the by-laws of YPF; (iii) any breach or failure to comply with any shareholder agreement; (iv) any breach of any other duty to the Counterparty arising pursuant to contract or at law or in equity; or (v) any facts or circumstances otherwise relevant to the Counterparty's interest, rights or ownership in YPF, S.A. and/or loss or reduction in value thereof. |
|---|---|
| 2. Identity of the Opponent: | Republic of Argentina or any subdivision, federal, regional or local government entity thereof; YPF S. A. and any subsidiary, affiliate, predecessor or successor thereof; and any other defendant or respondent to any action arising out of the facts and circumstances set forth in Section (1) of this Annex II. |

21






PAPEL EXCLUSIVO PARA DOCUMENTOS NOTARIALES

08/2014

## ANNEX III

### IRREVOCABLE POWER OF ATTORNEY

Petersen Energía Inversora, S.A.U., a Spanish public limited liability company (Sociedad anónima española) under liquidation in insolvency proceedings (the "*Company*"), having received the approval of the court overseeing such proceedings, hereby irrevocably appoints PROSPECT INVESTMENTS LLC, a Delaware limited liability company ("*Prospect*") (such appointment being coupled with an interest of both the Company and Prospect), as its agent and attorney-in-fact, with full and exclusive authority in its place and stead and in the name of the Company, to do any and all of the following (the capitalized words used herein shall have the same meaning as attributed to them in the Claim Prosecution Agreement, dated as of the date hereof, among the Company, Prospect and the other parties named therein):

1.      take any and all actions on behalf of the Company that Prospect may deem necessary or advisable to prosecute the Claims (including the defense of any Counterclaims and/or Attachment Proceedings) and bring about the resolution and monetization thereof, including without limitation directing and managing the conduct of the Claims; appointing, hiring, firing and instructing lawyers, experts or any other professionals in connection with the Claims; settling the Claims, including entering into any agreements implementing such settlements; and granting releases of liability to any Opponent in connection with any settlements; and

2.      collect and enforce any settlement, final award or judgment arising out of the Claims, including but not limited to asking for, demanding, collecting, suing for, recovering, receiving and giving acquittance and receipts for moneys due and to become due under or in respect of the Claims or any proceeds thereof;

3.      to the extent necessary or desirable to effectuate the powers above, to receive, endorse and collect any drafts or other instruments or documents, including granting power of attorney in favor of Court representatives and lawyers; and

4.      pay or discharge taxes, liens or other Adverse Claims or clouds upon title levied or placed upon or threatened against the Claims or any proceeds thereof (the legality or validity thereof and the amounts necessary to discharge the same to be determined by Prospect in its sole discretion).

The powers conferred on Prospect hereunder are to protect the interests of Prospect and the Company in the Claims and all proceeds thereof, and the grant of such powers does not create a fiduciary, agency or other non-contractual relationship between the Company and Prospect.  As stated above, this power is irrevocable, and it is coupled with an interest since the power is held for the benefit of Prospect, the attorney-in-fact, and the Company as principal, and this power is also material or essential for the due execution and performance of the agreement to which it relates.  This power of attorney shall continue to be effective even though the Company becomes liquidated and extinct.  The Company agrees that any third party who receives a copy of this document may act under it.

Signed this 4 day of March, 2015



PETERSEN ENERGÍA INVERSORA, S.A.U.

By: _____

Name: Armando Betancor Álamo

Title: Insolvency Administration

Address:

C/ Ayala 27, 4° Izq.
28010 Madrid

KINGDOM OF SPAIN

CITY OF MADRID

On 4 March, 2015, before me, The Notary Public Mr. Jaime Recarte Casanova, personally appeared Mr Armando Luis Betancor Álamo, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person or the entity upon behalf of which the person acted executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public

23

PAPEL EXCLUSIVO PARA DOCUMENTOS NOTARIALES







08/2014

### IRREVOCABLE POWER OF ATTORNEY

PETERSEN ENERGÍA, S.A., a Spanish public limited liability company (Sociedad anónima española) under liquidation in insolvency proceedings (the "*Company*"), having received the approval of the court overseeing such proceedings, hereby irrevocably appoints PROSPECT INVESTMENTS LLC, a Delaware limited liability company ("*Prospect*") (such appointment being coupled with an interest of both the Company and Prospect), as its agent and attorney-in-fact, with full authority in its place and stead and in the name of the Company, to do any and all of the following (the capitalized words used herein shall have the same meaning as attributed to them in the Claim Prosecution Agreement, dated as of the date hereof, among the Company, Prospect and the other parties named therein):

1.      take any and all actions on behalf of the Company that Prospect may deem necessary or advisable to prosecute the Claims (including the defense of any Counterclaims and/or Attachment Proceedings) in order to bring about the monetization thereof through a settlement or final award or judgment and to collect and enforce the same, including appointing and hiring lawyers, experts or any other professionals for the prosecution of the Claims;

2.      ask for, demand, collect, sue for, recover, receive and give acquittance and receipts for moneys due and to become due under or in respect of the Claims or any proceeds thereof;

3.      to the extent necessary or desirable to effectuate the powers above, to receive, endorse and collect any drafts or other instruments or documents, including granting power of attorney in favor of Court representatives and lawyers; and

4.      pay or discharge taxes, liens or other Adverse Claims or clouds upon title levied or placed upon or threatened against the Claims or any proceeds thereof (the legality or validity thereof and the amounts necessary to discharge the same to be determined by Prospect in its sole discretion).

The powers conferred on Prospect hereunder are solely to protect the interests of Prospect in the Claims and all proceeds thereof, and the grant of such powers does not create a fiduciary, agency or other non-contractual relationship between the Company and Prospect. As stated above, this power is irrevocable, and it is coupled with an interest since the power is held for the benefit of Prospect, the attorney-in-fact, and the Company as principal, and this power is also material or essential for the due execution and performance of the agreement to which it relates. This power of attorney shall continue to be effective even though the Company becomes liquidated and extinct. The Company agrees that any third party who receives a copy of this document may act under it.

Signed this 4 day of March, 2015

24

PETERSEN ENERGÍA, S.A.

By:

Name: Armando Betancor Álamo

Title: Insolvency Administration

Address:

C/ Ayala 27, 4° Izq.
28010 Madrid

KINGDOM OF SPAIN

CITY OF MADRID

On 4 March, 2015, before me, The Notary Public Mr. Jaime Recarte Casanova, personally appeared Mr Armando Luis Betancor Álamo, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person or the entity upon behalf of which the person acted executed the instrument.

WITNESS my hand and official seal.

Notary Public

25

PAPEL EXCLUSIVO PARA DOCUMENTOS NOTARIALES

   

08/2014

**ANNEX IV**

**IRREVOCABLE INSTRUCTIONS TO COUNSEL**

as of _____, 2015

[NAME AND
ADDRESS OF LAW FIRM]
Attention: NAME OF ATTORNEY

As you know, Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A. ("Us" "We," or "Clients") have retained [NAME OF LAW FIRM] ("You" or "Legal Counsel") to represent Us in claims against the Opponent. We are entering into a Claim Prosecution Agreement (the "Claim Prosecution Agreement") and a Pledge Agreement (the "Pledge Agreement") (together with the Claim Prosecution Agreement, the "Agreements") with Prospect Investments LLC (the "Capital Provider"). Copies of the Agreements are attached to this letter as Appendix A. All capitalized terms not defined in this letter refer to defined terms in each Agreement.

In connection with the Agreements, We hereby give You the following irrevocable instructions: upon the occurrence of a Claim Resolution, we instruct You to promptly pay to the Counterparty any amounts owed to the Counterparty based on the Claim Prosecution Agreement. Such payment shall be in accordance with the Claim Prosecution Agreement. Following such payments, and the payment of Your agreed upon fees, all remaining funds shall be paid to Us in accordance with our directions.

The provisions of these Irrevocable Instructions to Legal Counsel are for the benefit of Clients, and also for the benefit of the Capital Provider and its Affiliates, permitted successors and assigns (collectively, the "Third Parties"). The Capital Provider would not have entered into the Agreements without these Irrevocable Instructions and Your acknowledgment hereof, and the Agreements are of significant economic value to Us. Clients and Legal Counsel explicitly agree that the Third Parties are express third-party beneficiaries hereunder, and the Third Parties shall be permitted to enforce this letter agreement as if they were a party hereto.

Very truly yours,

By:_____
Name:
Title:
Address:

Telephone:
Fax:
Email:

26

Accepted and agreed,
[NAME OF LAW FIRM]

By:_____
Name:
Title: [Partner] [Member]

27