**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PETERSEN ENERGÍA INVERSORA, S.A.U. and
PETERSEN ENERGÍA, S.A.U.,

                    Plaintiffs,

              -against-

ARGENTINE REPUBLIC and YPF S.A.,

                    Defendants.

---

ETON PARK CAPITAL MANAGEMENT, L.P.,
ETON PARK MASTER FUND, LTD., and
ETON PARK FUND, L.P.,

                    Plaintiffs,

              -against-

ARGENTINE REPUBLIC and YPF S.A.,

                    Defendants.

Case Nos.:

1:15-cv-02739-LAP
1:16-cv-08569-LAP

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' ASSERTION OF PRIVILEGE WITH RESPECT TO COMMUNICATIONS WITH BURFORD CAPITAL

KING & SPALDING LLP

Israel Dahan
Laura E. Harris
1185 Avenue of the Americas
New York, New York 10036

Reginald R. Smith *(pro hac vice)*
1100 Louisiana Street
Houston, Texas 77002

KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U.,*
*Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHOTITIES ......................................................................................... ii

INTRODUCTION ......................................................................................................1

FACTUAL BACKGROUND .......................................................................................1

    A.     The Petersen Plaintiffs ...........................................................................1

    B.     The Eton Park Plaintiffs .........................................................................3

    C.     Procedural Background ...........................................................................5

ARGUMENT .............................................................................................................5

I.      PLAINTIFFS' COMMUNICATIONS WITH BURFORD ARE WORK
       PRODUCT .........................................................................................................5

    A.     Applicable Legal Standards ....................................................................5

    B.     Plaintiffs' Communications with Burford Occurred "Because of"
          Litigation .............................................................................................7

    C.     Burford Acts as Plaintiffs' Representative ...........................................11

    D.     There Was No Waiver of Plaintiffs' Work-Product Protection ............13

    E.     Defendants Cannot Overcome the Work-Product Protection ...............14

II.     PLAINTIFFS' COMMUNICATIONS WITH BURFORD ARE
      PRIVILEGED UNDER THE COMMON-INTEREST DOCTRINE AND
      AGENCY EXCEPTION .....................................................................................17

    A.     The Common-Interest Doctrine Protects Communications with
          Burford ...............................................................................................17

    B.     The Agency Exception Protects Communications with Burford ...........19

CONCLUSION ........................................................................................................20

## **TABLE OF AUTHORITIES**

PAGES(S)

**CASES**

*Abdell v. City of New York*, 2006 WL 2664313 (S.D.N.Y. Sept. 14, 2006) ...................................5

*Acceleration Bay LLC v. Activision Blizzard, Inc.*, 2018 WL 798731
    (D. Del. Feb. 9, 2018) ...................................................................................9, 10

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11 (2d Cir. 1997) .......................16

*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*:

    998 N.Y.S.2d 329 (1st Dep't 2014), *rev'd*, 57 N.E.3d 30 (N.Y. 2016)........................18, 19

    57 N.E.3d 30 (N.Y. 2016) ................................................................................19

*Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479 (S.D.N.Y. 2010)..................................................9

*Carlyle Inv. Mgmt. L.L.C. v. Moonmouth Co. S.A.*, 2015 WL 778846
    (Del. Ch. Feb. 24, 2015) .................................................................................8

*Charge Injection Techs., Inc. v. E.I. DuPont de Nemours & Co.*,
    2015 WL 1540520 (Del. Super. Ct. Mar. 31, 2015) ........................................................8

*Clarex Ltd. v. Natixis Sec. Am. LLC*, 2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012)....................16

*Cohen v. Cohen*, 2015 WL 745712 (S.D.N.Y. Jan. 30, 2015).................................1, 7, 18, 19, 20

*Continental Circuits LLC v. Intel Corp.*, 435 F. Supp. 3d 1014 (D. Ariz. 2020) ...........................9

*Dealer Mgmt. Sys. Antitrust Litig., In re*, No. 18 C 864, MDL No. 2817,
    Dkt. 1113 (N.D. Ill. Aug. 17, 2020)...............................................................9, 14

*Devon IT, Inc. v. IBM Corp.*, 2012 WL 4748160 (E.D. Pa. Sept. 27, 2012).....................8, 13, 18

*Doe v. Society of the Missionaries of the Sacred Heart*, 2014 WL 1715376
    (N.D. Ill. May 1, 2014) ...............................................................................8, 14

*Elm 3DS Innovations LLC v. Samsung Elecs. Co.*, No. 14-1430-LPS, Dkt. 372
    (D. Del. Nov. 19, 2020) ...........................................................................9, 10, 13

*GMA Accessories, Inc. v. Electric Wonderland, Inc.*, 2012 WL 1933558
    (S.D.N.Y. May 22, 2012)................................................................................15

*Grand Jury Subpoena Dated Oct. 22, 2001, In re*, 282 F.3d 156 (2d Cir. 2002) ........................12

*Hickman v. Taylor*, 329 U.S. 495 (1947)......................................................................5

*International Oil Trading Co.*, *In re*, 548 B.R. 825 (Bankr. S.D. Fla. 2016) ..........8, 10, 15, 18, 19

*Kindred Healthcare, Inc. v. SAI Glob. Compliance, Inc.*, 92 N.Y.S.3d 621
(1st Dep't 2019) ................................................................................................................17

*Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings, Inc.*,
2018 WL 466045 (W.D. Pa. Jan. 18, 2018)................................................................9, 10

*Marjam Supply Co. of Florida, LLC v. Pliteq, Inc.*, 2018 WL 1456614
(S.D. Fla. Mar. 23, 2018) ....................................................................................................14

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 229 F.R.D. 441 (S.D.N.Y. 2004).......................6

*Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711 (N.D. Ill. 2014) .................................8, 14

*Mondis Tech., Ltd. v. LG Elecs., Inc.*, 2011 WL 1714304 (E.D. Tex. May 4, 2011) ......7, 8, 10, 13

*Morley v. Square, Inc.*, 2015 WL 7273318 (E.D. Mo. Nov. 18, 2015) .....................................8, 14

*Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, 125 F.R.D. 578
(N.D.N.Y. 1989) ................................................................................................................12

*Schaeffler v. United States*:

22 F. Supp. 3d 319 (S.D.N.Y. 2014), *rev'd and remanded*, 806 F.3d 34
(2d Cir. 2015)................................................................................................................19

806 F.3d 34 (2d Cir. 2015)................................................................................1, 17, 18, 19

*Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008) ................................................16

*Two Pepper Music v. Rhino Records, Inc.*, 1999 WL 264927 (2d Cir. Apr. 23,
1999) ................................................................................................................................16

*United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1998)................................1, 6, 7, 8, 9, 10, 11, 12

*United States v. Homeward Residential, Inc.*, 2016 WL 1031154 (E.D. Tex.
Mar. 15, 2016)......................................................................................................................8

*United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961) ....................................................................19

*United States v. Mount Sinai Hosp.*, 185 F. Supp. 3d 383 (S.D.N.Y. 2016) ................................7

*United States v. Nobles*, 422 U.S. 225 (1975) ..............................................................................12

*United States v. Ocwen Loan Servicing, LLC*, 2016 WL 1031157 (E.D. Tex.
Mar. 15, 2016)..........................................................................................................8, 10, 14

*United States v. Rockwell Int'l*, 897 F.2d 1255 (3d Cir. 1990)....................................................10

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000) ...................16

*Viamedia, Inc. v. Comcast Corp.*, 2017 WL 2834535 (N.D. Ill. June 30, 2017)...........9, 11, 13, 14

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir.
2008) .............................................................................................................................16


**CONSTITUTION AND RULES**

U.S. Const. art. III ........................................................................................................16, 17

Fed. R. Civ. P.:

Rule 17 ..............................................................................................................17

Rule 26 ...............................................................................................11, 12, 14

Rule 26 advisory committee's note (1970 Amendment) ..................................12

Rule 26(b) ...............................................................................................6, 11, 14

Rule 26(b)(1)..............................................................................................6, 15

Rule 26(b)(3).....................................................................................................5

Rule 26(b)(3)(A) ..........................................................................................5, 12

Rule 26(b)(3)(A)(i)-(ii) .....................................................................................7

Rule 26(b)(3)(B) .................................................................................. 7, 12, 14-15


**OTHER MATERIALS**

8 Charles Alan Wright et al., *Federal Practice and Procedure* (3d ed. 2010) ...............................6

# INTRODUCTION

A wealth of authority nationwide holds that communications between plaintiffs and litigation funders are protected work product and also fall under the common-interest doctrine and the agency exception. Those cases are legally correct, are consistent with Second Circuit decisions that require the same result here, and reflect sound policy favoring litigation funding as an appropriate means of leveling the adversarial playing field by expanding litigants' access to capital needed to prosecute meritorious claims. Indeed, both defense counsel here use litigation funding in other contexts, as illustrated by Debevoise's long and extensive relationship with Burford. It would be an aberration, and wrong as a policy matter, to allow defense counsel to rummage around in the communications between Burford and Plaintiffs about how to litigate this complex case. The issue is sufficiently plain, especially after the Second Circuit's decisions in *Adlman* (on work product) and *Schaeffler* (on common interest), that it has not regularly arisen in this District because defendants do not even press the issue. This Court's early (and brief) decision in the *Cohen* matter did not address work product, and its common-interest analysis rested on two cases that have since been overruled. This Court should join its sister courts across the country in holding communications between client and funder as protected from discovery.

# FACTUAL BACKGROUND

**A.     The Petersen Plaintiffs**

i.     *Petersen's Acquisition of YPF Shares*. In 2008, with approval from the Republic as YPF's Class A shareholder, the Petersen Plaintiffs purchased shares of YPF constituting approximately a 25% stake in the company. They purchased an initial 14.9% from Repsol and then, before crossing the applicable 15% threshold, conducted a tender offer pursuant to YPF's bylaws, after which they purchased additional shares to bring the total to 25%. The purchases of YPF shares were financed principally with debt provided by an international consortium of

1

banks that included HSBC, Credit Suisse, Goldman Sachs, BNP Paribas, Banco Itaú, Citibank, and Standard Bank, as well as by Repsol, which was then the majority owner of YPF.  *See* Decl. of Martin Domb, Exs. 6 & 10, Dkt. 27.  For the creditors' protection, the entities financed were Spanish special purpose corporations, and the YPF shares owned by those entities were held by Bank of New York Mellon in New York, as collateral agent for the creditors.

      ii.    *Petersen's Losses*.  Following the Republic's expropriation of a majority interest in YPF and its failure to tender for the remaining shares as required under YPF's bylaws, the Petersen Plaintiffs' creditors foreclosed upon their shares.  Given YPF's depressed share price following the expropriation, the foreclosures did not come close to covering the Petersen Plaintiffs' outstanding debt, and the entities were forced into insolvency and then bankruptcy in Spain.  The Spanish court has placed administration of the bankruptcy estates in the exclusive hands of a bankruptcy receiver, Armando Betancor.  *See* Ex. 1, Betancor Tr. 21:12-14.  The economics of this case make it extremely unlikely that the equity holders will recover; as is common in bankruptcies, the net proceeds from the case are expected to go entirely to the creditors.

      iii.    *Petersen and Burford's Claim Prosecution Agreement*.  In October 2014, the Petersen receiver submitted a liquidation plan to the Spanish bankruptcy court seeking approval to obtain financing to pursue legal claims arising from the failure to tender.  The court approved that plan, and the receiver proceeded to seek financing to pursue the claims.  While Burford Capital and its affiliates (collectively, "Burford") were doing due diligence, the parties signed a Confidentiality and Non-Disclosure Agreement, Ex. 2, PT_000045773 (Feb. 18, 2015), ███

███████████████████████████████████  *Id.* § 2.  Following a public auction process, Petersen's receiver selected Burford and signed a Claim Prosecution Agreement with Prospect Investments LLC ("Prospect"), a wholly owned Burford subsidiary, on March 4, 2015.  Ex. 3, at 1 ("Petersen CPA").

2

███████████████████████████████████████████████████████

██████████████████████████████████████ *See id.* § 4.3(c), (d); Betancor Tr.

250:17-25 (███████████████████████████████████████████

██████) ; Ex. 4, Bogart Tr. 99:18-24 (describing how Burford cannot unilaterally accept

settlement).  The Petersen CPA includes ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████” Petersen CPA, § 6.2.  The Petersen CPA unequivocally provides that ██

█████████████████████████████████████████ *Id.* §§ 2.2, 5.3(a).

**B.    The Eton Park Plaintiffs**

       i.        *Eton Park's Investment in YPF.*  From November 2010 to March 2012, Eton Park

acquired 11.95 million YPF shares.  Pls.' Mem. in Opp'n to Mot. To Dismiss on Basis of *Forum*

*Non Conveniens* at 4-5 (Dec. 16, 2019), Dkt. 125; Decl. of Marcy Engel ¶ 2, Dkt. 128.

Following the Republic's expropriation and failure to tender, Eton Park sold its shares at large

losses.  Ex. 5, Mindich Dep. Ex. 6, at -6568; *see* Ex. 6, Mindich Tr. 71:21-72:1 (“████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████”).

       ii.      *Eton Park and Burford's Claim Prosecution Agreement*.  ████████████████

███████████████████████████████████████████████████████

██████████████████████████████████ Ex. 7, Engel Tr. 80:13-23.  On

October 28, 2016, Burford and Eton Park signed a Confidentiality, Common Interest, and

Non-Disclosure Agreement “████████████████████████████████████████████

████████” Ex. 8, EP_000072932. ███████████████████████████████████

3

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

Engel Tr. 84:9-15.  On November 3, 2016, Eton Park signed a Capital Provision Agreement with Ireton LLC ("Ireton"), a Burford subsidiary.  Ex. 9, EP_000061489 ("Eton Park CPA").  Several months later, in the spring of 2017, Eton Park Capital Management started unwinding its operations and returning capital to investors.  Engel Decl. ¶ 8, Dkt. 128.

     The parties to the Eton Park CPA agreed that ████████████████████████████ ████████████████████████████████████  *See* Eton Park CPA, § 3.1.  The CPA states that Ireton "████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████"  *Id.,* at -1493.  The CPA further provides that Ireton "████████████████████████████ ████████████████████████████████████"  *id.* § 5.2(b), and "████████████████████████ ████████████████████████████████████████████"  *id.* § 5.2(c); *see also* Engel Tr. 85:12-15 (Eton Park is "████████████████████████████████████████████ ████████████").

     Moreover, the agreement contained ██████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████"  Eton Park CPA, § 8.2 & Ex. A.

**C.     Procedural Background**

On December 22, 2020, this Court ordered that, if "Plaintiffs still assert privilege based on a litigation funding arrangement with non-parties, the parties shall confer and propose a briefing schedule on this issue."  Dkt. 249.  Plaintiffs do not assert that their litigation-funding arrangements with Burford are the source of an independent "litigation funder" privilege. However, they do assert that their communications with Burford are protected by the work-product doctrine and the attorney-client privilege under the common-interest doctrine and agency exception.  Although Plaintiffs are still preparing appropriate privilege logs for documents they assert are privileged, the parties understand the Court's order to request briefing on the categorical applicability of those privileges and have agreed to a briefing schedule on that basis.

## ARGUMENT

**I.     PLAINTIFFS' COMMUNICATIONS WITH BURFORD ARE WORK PRODUCT**

**A.     Applicable Legal Standards**

Under Federal Rule of Civil Procedure 26(b)(3), which codifies the protection for party and attorney work product, "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P. 26(b)(3)(A).[1]  As the Supreme Court has explained, "[n]ot even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947).

---

[1] In addition to Rule 26(b)(3), which codified the work-product protection for "documents and tangible things," the common-law work-product doctrine also covers "intangible work product." *Abdell v. City of New York*, 2006 WL 2664313, at *3 (S.D.N.Y. Sept. 14, 2006).

It is settled law in this Circuit that the rule for determining whether a document was prepared in anticipation of litigation is whether the document was prepared or obtained "because of anticipated litigation." *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998). "Where a document was created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation, it falls within Rule 26(b)(3)." *Id.*; *accord* 8 Charles Alan Wright et al., *Federal Practice and Procedure* § 2024 (3d ed. 2010) ("Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."). As *Adlman* held, rejecting the Fifth Circuit's narrower "primary purpose" test, 134 F.3d at 1203, a document prepared "because of" litigation is work product even if its primary purpose was not to assist in litigation but to facilitate a business transaction to which anticipated or pending litigation is significant. *See infra* pp. 10-11.

Disclosure of work product to third parties does not, unlike the attorney-client privilege, waive work-product protection. Because "[t]he work-product doctrine . . . is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries," *Adlman*, 134 F.3d at 1196, disclosure does not waive work-product protection unless it was to an adversary or "substantially increase[d] the opportunity for potential adversaries to obtain the information," *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 229 F.R.D. 441, 445-46 (S.D.N.Y. 2004).

Once Plaintiffs have shown that materials are work product, Defendants must overcome Rule 26(b)'s protections by showing *both* that the documents satisfy Rule 26(b)(1)'s relevance and proportionality requirements *and* that "it has substantial need for the materials to prepare its

case and cannot, without undue hardship, obtain their substantial equivalent by other means."

Fed. R. Civ. P. 26(b)(3)(A)(i)-(ii).  Opinion work product – materials that contain "the mental

impressions, conclusions, opinions, or legal theories of a party's attorney or other representative,"

Fed. R. Civ. P. 26(b)(3)(B) – is entitled to absolute immunity.  *See id.* (even if court orders

disclosure, it "must protect against disclosure of the mental impressions, conclusions, opinions,

or legal theories of a party's attorney or other representative concerning the litigation"); *United

States v. Mount Sinai Hosp.*, 185 F. Supp. 3d 383, 390 (S.D.N.Y. 2016).

> **B.      Plaintiffs' Communications with Burford Occurred "Because of" Litigation**

Plaintiffs' communications with Burford were *all* prepared because of the prospect of

litigation; indeed, the vast majority were made after Plaintiffs had commenced their lawsuits

against Defendants.  Communications with litigation funders are, by their very nature, prepared

"because of litigation."  In *Adlman*'s terms, because such documents "would not have been

prepared in substantially similar form but for the prospect of that litigation" – indeed, they would not

have been prepared at all – they "fall[ ] within Rule 26(b)(3)."  *Adlman*, 134 F.3d at 1195.

Consistent with *Adlman*, numerous courts across the country over the last decade have

held that a plaintiff's communications with a litigation funder or potential litigation funder are

protected work product.  Although no case in this District has squarely addressed the issue,[2] the

overwhelming weight of authority in other jurisdictions yields a clear answer:

- In *Mondis Technology, Ltd. v. LG Electronics, Inc.*, 2011 WL 1714304 (E.D. Tex. May 4, 2011), the court held that documents shared with potential funders were protected from

---

[2] Your Honor's decision in *Cohen v. Cohen*, 2015 WL 745712 (S.D.N.Y. Jan. 30, 2015), "d[id] not consider" the work-product issue because the party opposing production in that case expressly disclaimed reliance on the work-product protection.  *Id.* at *2 n.1; *see id.* ("Plaintiff has not argued that Ms. Napp is an agent or employee of either Plaintiff or her attorneys. . . . Additionally, Plaintiff has explicitly withdrawn her claim that communications with Ms. Napp are privileged work product.  Consequently, this Memorandum & Order does not consider either of those possible avenues to privilege.") (citation omitted).

disclosure under the work-product doctrine because the purpose of the potential investment was to assist in financing plaintiffs' patent claims.  *Id.* at *2-3.

- In *Devon IT, Inc. v. IBM Corp.*, 2012 WL 4748160 (E.D. Pa. Sept. 27, 2012), the district court held that "all communications between Burford and Devon, including all communications with any in-house or outside counsel of Devon," were protected by work-product doctrine.  *Id.* at *1 n.1.  "Litigation strategy, matters concerning merits of claims and defenses and damages would be revealed if the documents were produced. The matters directly involve the mental impressions of counsel and are protected from disclosure as work-product."  *Id.*

- In *Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711 (N.D. Ill. 2014), the court, after extensively analyzing *Adlman*, held that "documents that were provided to the actual and any potential funders by Miller and its counsel" were protected work product.  *Id.* at 730.

- In *Doe v. Society of the Missionaries of the Sacred Heart*, 2014 WL 1715376 (N.D. Ill. May 1, 2014), the court held that documents sent to litigation funders that included counsel's mental impressions, conclusions, opinions, or legal theories were protected as work product.  *Id.* at *3.

- In *Morley v. Square, Inc.*, 2015 WL 7273318 (E.D. Mo. Nov. 18, 2015), the court found that disclosure of documents to a litigation funder did not waive the work-product protection, because "litigation funders and banks have an inherent interest in maintaining the confidentiality of potential clients' information."  *Id.* at *2.

- In *Carlyle Investment Management L.L.C. v. Moonmouth Co. S.A.*, 2015 WL 778846 (Del. Ch. Feb. 24, 2015), the Delaware Court of Chancery, applying the same "because of litigation" test adopted by *Adlman*, held that communications and documents exchanged with a third-party funder "are entitled to work product protection" and "[t]hat protection is not precluded merely because the [discovery documents] may also serve a business function."  *Id.* at *9 (citation omitted).

- In *Charge Injection Technologies, Inc. v. E.I. DuPont de Nemours & Co.*, 2015 WL 1540520 (Del. Super. Ct. Mar. 31, 2015), the Delaware Superior Court likewise held that the terms of a third-party funder's financing agreement "were prepared in anticipation of litigation and reflect the type of attorney mental impressions and litigation strategies which are afforded nearly absolute protection from discovery under the work product doctrine."  *Id.* at *5.

- In *United States v. Ocwen Loan Servicing, LLC*, 2016 WL 1031157 (E.D. Tex. Mar. 15, 2016), the court held that relator's communications with potential and actual funders were protected work product under the "primary purpose" test.  *Id.* at *6; *see also United States v. Homeward Residential, Inc.*, 2016 WL 1031154, at *6 (E.D. Tex. Mar. 15, 2016) (same holding in related case).

- In *In re International Oil Trading Co.*, 548 B.R. 825 (Bankr. S.D. Fla. 2016) ("*IOTC*"), the court held that litigation-funding communications are protected by the work-product doctrine, as well as the attorney-client privilege.  *Id.* at 831-36.

8

- In *Viamedia, Inc. v. Comcast Corp.*, 2017 WL 2834535 (N.D. Ill. June 30, 2017), now-Circuit Judge Amy St. Eve held that documents provided to litigation-funding firms were protected under the work-product doctrine.  *Id.* at *3.

- In *Lambeth Magnetic Structures, LLC v. Seagate Technology (US) Holdings, Inc.*, 2018 WL 466045 (W.D. Pa. Jan. 18, 2018), the court held that the communications and agreement between litigation funder and plaintiffs were protected by work product because they were made and prepared in anticipation of litigation.  *Id.* at *5-6.

- In *Continental Circuits LLC v. Intel Corp.*, 435 F. Supp. 3d 1014 (D. Ariz. 2020), the court likewise held litigation-funding agreements protected as work product because they would not have been created but for prospect of litigation.  *Id.* at 1021.

- In a large antitrust MDL, *In re Dealer Management Systems Antitrust Litigation*, No. 18 C 864, MDL No. 2817 (N.D. Ill.) ("*DMS MDL*"), the court held that communications between plaintiff's counsel and a potential litigation funder were work product, and rejected defendants' waiver and substantial-need arguments.  *See id.*, Dkt. 1113, at 3, 5 (Aug. 17, 2020) (attached hereto as Ex. 10).

- Just two months ago, *Elm 3DS Innovations LLC v. Samsung Electronics Co.*, No. 14-1430-LPS (D. Del.), held that communications with prospective litigation funders, as well as communications with funders who entered into a completed funding agreement (both prior to and after that agreement), "were clearly prepared in anticipation of litigation" and "are thus protected by the work product doctrine."  *Id.*, Dkt. 372, at 2 (Nov. 19, 2020) (attached hereto as Ex. 11).

Defendants' sole work-product case, *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 2018 WL 798731 (D. Del. Feb. 9, 2018), is an outlier, is wrongly decided even under Third Circuit law, and is in any event not good law in this Circuit.  *Acceleration Bay* interpreted Third Circuit law as adopting the Fifth Circuit's rule that "the 'primary' purpose" of the document must be "to aid in possible future litigation."  *Id.* at *1.  "[F]or that reason alone," it held that "the communications are not work product" because they were "prepared with a 'primary' purpose of obtaining a loan, as opposed to aiding in possible future litigation."  *Id.* at *2.

To begin, even assuming *Acceleration Bay* was correct that the Third Circuit has adopted the "primary purpose" test – which it likely has not[3] – its conclusion that communications with a

---

[3] As Your Honor observed in *Amnesty International USA v. CIA*, 728 F. Supp. 2d 479, 521 (S.D.N.Y. 2010), Third Circuit decisions have adopted the *Adlman* "because of litigation"

9

litigation funder do not have the primary purpose of assisting with litigation is unpersuasive.  As numerous courts, including others within the Third Circuit, have correctly held, such communications "clearly" exist "primarily, perhaps exclusively, for the purpose of preparing for litigation."  *Lambeth*, 2018 WL 466045, at *5; *see also Elm 3DS*, at 2 ("documents were clearly prepared in anticipation of litigation (regardless of which test applies to that determination)"); *IOTC*, 548 B.R. at 836 ("[e]ven if the 'primary purpose' test exists . . . , it is satisfied by the Burford Communications" because litigation funding "has a 'primary purpose' of facilitating rendition of legal services"); *Mondis*, 2011 WL 1714304, at *2-3 (communications with potential investors were work product because they were prepared "with the intention of coordinating potential investors to aid in future possible litigation"); *Ocwen*, 2016 WL 1031157, at *6 (same). Indeed, for what other reason does a party seek or obtain litigation funding?

In any event, *Acceleration Bay* is not good law in this Circuit because *Adlman* squarely rejected any requirement that the document have a "primary purpose" to "assist in litigation":

> The formulation applied by some courts in determining whether documents are protected by work-product privilege is whether they are prepared "primarily or exclusively to assist in litigation"—a formulation that would potentially exclude documents containing analysis of expected litigation, if their primary, ultimate, or exclusive purpose is to assist in making the business decision.  Others ask whether the documents were prepared "because of" existing or expected litigation—a formulation that would include such documents, despite the fact that their purpose is not to "assist in" litigation.  Because we believe that protection of documents of this type is more consistent with both the literal terms and the purposes of the Rule, we adopt the latter formulation.

134 F.3d at 1198.  And the courts applying this Circuit's "because of" test are unanimous in concluding that communications with litigation funders satisfy that test.  *See supra* pp. 7-9.

---

test adopted by the majority of Circuits.  The one case on which *Acceleration Bay* relies – *United States v. Rockwell International*, 897 F.2d 1255 (3d Cir. 1990) – embraced *both* the "because of litigation" and the "primary purpose" standards, viewing them as "analogous," *id.* at 1265-66, and therefore provides no authority for adopting one over the other.

In addition to qualifying as work product under Rule 26(b)'s plain text, communications between Plaintiffs and Burford also fall squarely within the core purposes of the work-product doctrine to allow a party to prepare for litigation "free from unnecessary intrusion by his adversaries."  134 F.3d at 1196; *see also Viamedia*, 2017 WL 2834535, at *1 (work-product doctrine serves two purposes:  "to protect an attorney's thought processes and mental impressions against disclosure" and "to limit the circumstances in which attorneys may piggyback on the fact-finding investigation of their more diligent counterparts") (citation omitted).  Permitting Defendants to obtain discovery into the communications among Plaintiffs, their counsel, and Burford would give Defendants an unfair window into Plaintiffs' litigation strategy.  As *Adlman* observed, "[n]either the interests of clients nor the cause of justice would be served" if Plaintiffs' litigation strategy were "freely discoverable."  134 F.3d at 1197.

Indeed, it serves no sensible policy goal to put litigants on the horns of an untenable dilemma between sacrificing outside financing that may be necessary to ensure high-quality legal representation (and even to pursue their claims altogether) and risking the disclosure of confidential litigation strategies by seeking such financing.  That problem is especially severe here:  Defendants are a sovereign government and a now-nationalized oil company that generates billions of dollars in revenue each quarter, while Plaintiffs are three entities in the process of winding up and two entities that were put into bankruptcy when Defendants' breach of their tender-offer obligations stripped Plaintiffs of the value of their only asset (YPF shares).  Protecting communications between Plaintiffs and funders safeguards the adversarial process by allowing claims to be resolved on their merits rather than based on unequal access to capital.

### C.     Burford Acts as Plaintiffs' Representative

Burford's litigation-management role in this litigation provides a further basis for holding that communications between it and the Petersen Plaintiffs are protected by Rule 26.  As

discussed above, Rule 26 protects documents "prepared in anticipation of litigation or for trial by or for another party *or its representative* (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A) (emphasis added); *see also* Fed. R. Civ. P. 26 advisory committee's note (1970 Amendment). Such representatives' mental impressions are, no less than those of Plaintiffs' attorneys, subject to absolute protection. *See* Fed. R. Civ. P. 26(b)(3)(B) (court "must protect" opinion work product "of a party's attorney *or other representative* concerning the litigation") (emphasis added).

Courts in this Circuit have interpreted the term "representative" broadly to include accountants, *see Adlman*, 134 F.3d at 1195; consultants, *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, 125 F.R.D. 578, 587 (N.D.N.Y. 1989); and investigators, *In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002) – in short, anyone the party retains to provide assistance with the litigation. That approach heeds the Supreme Court's admonition that the work-product doctrine is grounded in the reality that litigation often requires attorneys to "rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial." *United States v. Nobles*, 422 U.S. 225, 238-39 (1975).

In this case, since the Petersen CPA was executed in February 2015, ███████████████ ██████████████████████████████████████████████████ *See* Petersen CPA, § 7.3 (providing that ███████████████████████). Petersen's Spanish bankruptcy receiver, in signing the CPA, recognized that ████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████ *Id.* § 4.3(c). Eton Park also relies heavily on Burford's litigation-management role in these consolidated cases; that is why it chose to obtain financing from Burford. Given Burford's role as litigation manager on behalf of

Plaintiffs, its communications with Plaintiffs plainly fall within the protection of the work-product doctrine.[4]

### D.     There Was No Waiver of Plaintiffs' Work-Product Protection

The fact that Plaintiffs' communications are with Burford does not waive the work-product protection.  As explained above, disclosure to a third party does not result in waiver unless that disclosure enables an adversary or potential adversary to obtain the party's work product.  Here, Burford plainly was not Plaintiffs' adversary.  Nor did Plaintiffs' disclosure of information to Burford enable any of the Defendants to obtain the information.  Rather, Plaintiffs sought out Burford as an ally for purposes of obtaining funding for litigation and – in Petersen's case – for purposes of assisting in the management of that litigation.  Moreover, both Petersen and Eton Park entered into formal non-disclosure agreements with Burford covering those communications.  *See* Exs. 2, 8.  Under those circumstances, courts have unanimously held that disclosure of work product to a financing source does not create a waiver because it "did not substantially increase the likelihood that an adversary would come into possession of the materials."  *Mondis*, 2011 WL 1714304, at *3; *see Elm 3DS*, at 2 n.1 ("Samsung has not argued that any work product protection was waived because the documents were disclosed to a third party, and I would reject that argument."); *Devon IT*, 2012 WL 4748160, at *1 n.1 ("The documents turned over to Burford were done so under a Confidentiality, Common Interest and Non Disclosure Agreement. . . . Given these controlled conditions, there was no waiver of the attorney-client privilege or the work product doctrine . . . ."); *Viamedia*, 2017 WL 2834535, at *3 (rejecting waiver argument because "the Court cannot conclude that Viamedia's disclosure made

---

[4] Burford's internal communications are likewise protected, among other reasons, because they are subject to Plaintiffs' work-product and common-interest privileges.  Burford will address its internal communications separately in the context of Defendants' Rule 45 subpoenas to Burford.

it substantially more likely that its work-product protected information would fall in the hands of its adversaries"); *Miller UK*, 17 F. Supp. 3d at 737-39 (no waiver because plaintiff had expectation of confidentiality based on oral agreement); *Doe*, 2014 WL 1715376, at *4 (finding no waiver); *Morley*, 2015 WL 7273318, at *2 (same); *Ocwen*, 2016 WL 1031157, at *6 (same); *DMS MDL*, at 3, 5 (same).

### E.   Defendants Cannot Overcome the Work-Product Protection

Defendants cannot overcome the work-product protection under Rule 26(b).  Defendants' sole argument is that they have a "substantial need" for "information concerning the [Petersen CPA], which is central to Defendants' standing defense."  Defs.' Reply Ltr. at 5, Dkt. 217 (Nov. 20, 2020).  Defendants' legal theory is that such additional "information" will show that the Petersen CPA was actually an assignment of Petersen's claims to Burford, such that "Petersen was never the real party in interest and never had standing to sue."  *Id.*

To begin, Defendants make *no* argument of substantial need for *Eton Park*'s communications with Burford.  Indeed, those communications are not relevant to any defense Defendants have asserted against Eton Park.  There is thus no justification whatsoever for overriding Eton Park's work-product protection.

As to Petersen, Defendants' substantial-need argument cannot override the work-product protection.  First, most if not all of Petersen's communications with Burford – to the extent they are substantive[5] – are *opinion* work product absolutely protected under Rule 26.  *See* Fed. R. Civ.

---

[5] To the extent Defendants' requests seek non-substantive communications, they are neither relevant nor proportional and thus are not discoverable under Rule 26(b)(1).  *See Viamedia*, 2017 WL 2834535, at *3 n.4 (noting that some communications between client and funder "deal purely with ministerial matters . . . such as scheduling phone calls and/or are not relevant to claims or defenses in the present litigation"); *Marjam Supply Co. of Florida, LLC v. Pliteq, Inc.*, 2018 WL 1456614, at *4 (S.D. Fla. Mar. 23, 2018); *GMA Accessories, Inc. v. Electric Wonderland, Inc.*, 2012 WL 1933558, at *5 (S.D.N.Y. May 22, 2012).  Moreover,

P. 26(b)(3)(B) ("If the court orders discovery of [materials prepared in anticipation of litigation], it must protect . . . the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.").  Indeed, the communications among Petersen, Petersen's counsel, and Burford (Petersen's attorney-in-fact under the Petersen CPA) relating to the prosecution of this litigation all contain "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."

The facts of *IOTC* are analogous.  There, the plaintiff whose case Burford had funded (Al-Saleh) so that Simpson Thacher could be retained filed an involuntary bankruptcy petition against one of the defendant's companies (IOTC) as part of his efforts to collect on the fraud judgment he was awarded against the defendant in Florida state court.  *See* 548 B.R. at 829. IOTC served discovery requests on Al-Saleh seeking, among other things, information about Al-Saleh's relationship and communications with Burford – many of the same documents sought by Defendants here.  *See id.*  Like Defendants here, IOTC argued that these communications showed that Al-Saleh was not the "real party in interest" and that the bankruptcy petition was therefore improper.  The court denied IOTC's motion to compel, holding that IOTC's perceived need for the Burford communications was inadequate to justify piercing the work-product protection.  *Id.* at 837.

Moreover, even to the extent communications contain "ordinary" work product, Defendants cannot show substantial need for additional "information" about the CPA. Defendants argue that the Petersen Plaintiffs lack standing because the Petersen CPA assigned Plaintiffs' claims to Burford.  But that contention is properly resolved (and rejected) based on the

---

Plaintiffs should not be "force[d] . . . to sort through . . . years of correspondence" to provide Defendants with non-relevant information.  *IOTC*, 548 B.R. at 837.

terms of the fully integrated CPA.  Defendants' own case illustrates this principle.  *See Clarex Ltd. v. Natixis Sec. Am. LLC*, 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012) (looking to "[t]he language of the contract"); *see also Two Pepper Music v. Rhino Records, Inc.*, 1999 WL 264927, at *1 (2d Cir. Apr. 23, 1999) ("Where the assignment of an exclusive right under a copyright *expressly* includes the right to prosecute accrued claims for infringement, that right passes to the assignee.  It follows that the assignor would no longer have standing to prosecute such claims.") (emphasis added; citation omitted) (cited in *Clarex*).

It bears emphasis that Defendants' "assignment" defense is makeweight.  It is settled law that an "assignment" requires a transfer of legal ownership of a claim to the assignee.[6]  The Petersen CPA, however, unequivocally provides ███████████████████████████ ████████████████████  *See* Petersen CPA, §§ 2.2, 5.3(a).  Neither the fact that ████████████████████████████████████████████████████████████ can transform the Petersen CPA into a transfer of ownership that strips Petersen of its Article III standing.  *See Advanced Magnetics*, 106 F.3d at 17-18 (grant of a power-of-attorney "to sue on and collect on a claim" "is not the equivalent of an assignment of ownership" and does not confer standing on the grantee to sue in its own name); *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 284-85 (2008) (holder of legal title to claim is real party in interest even if it promised to transfer *all* proceeds to another party).[7]  Indeed, the undisputed fact that the Petersen estates – and, principally, their creditors – will retain a substantial portion of any proceeds

---

[6] *See W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008) ("assignment of claims transfers legal title or ownership of those claims"); *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17 (2d Cir. 1997) (valid assignment must "make the assignee the owner of the claim") (citation and alteration omitted).

[7] *See also Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773-74 (2000) (partial assignment leaves both assignor and assignee with Article III standing).

recovered is clearly enough to establish standing under Article III and Rule 17.  Defendants'

standing defense is a meritless distraction; it does not justify piercing Petersen's work-product

protection.

## II.   PLAINTIFFS' COMMUNICATIONS WITH BURFORD ARE PRIVILEGED UNDER THE COMMON-INTEREST DOCTRINE AND AGENCY EXCEPTION

In addition to the work-product doctrine, the communications between Plaintiffs and

Burford are protected under the common-interest doctrine and agency exception.

### A.   The Common-Interest Doctrine Protects Communications with Burford

The common-interest doctrine is a settled exception to the rule that disclosure to a third

party waives the attorney-client privilege.  As the Second Circuit held in *Schaeffler v. United

States*, 806 F.3d 34 (2d Cir. 2015), the common-interest doctrine permits parties and their

respective counsel to maintain privilege over communications among them where those parties

"share a common interest about a legal matter."  *Id.* at 40 (citation omitted).  To have a common

legal interest, it is not necessary that the parties be co-litigants, nor must they share a common

legal claim.[8]  *Schaeffler* found that a consortium of banks had a common interest in a taxpayer's

litigation against the IRS because the tax position arose from a refinancing transaction between

the consortium and the taxpayer, and the outcome of the tax litigation would "materially affect"

the consortium's financial interests arising from the refinancing.  *Id.* at 42.  Moreover, *Schaeffler*

expressly held that a financial interest may be the source of the parties' common legal interest.

*See id.* ("[I]t was the interest in avoiding the losses that established a common legal interest.").

Under *Schaeffler*, and consistent with the holdings of other federal courts, a plaintiff and

litigation funder clearly have a common legal interest because they share an interest in the

---

[8] The same is true under New York law.  *See Kindred Healthcare, Inc. v. SAI Glob. Compliance, Inc.*, 92 N.Y.S.3d 621, 921 (1st Dep't 2019) (common-interest privilege protected legal memorandum "shared with potential merger partners" who were not parties to the suit).

success of the plaintiff's lawsuit.  *See Devon*, 2012 WL 4748160, at *1 n.1 ("Burford and Devon now have a common interest in the successful outcome of the litigation which otherwise Devon may not have been able to pursue without the financial assistance of Burford"); *IOTC*, 548 B.R. at 833 ("all communications among Burford, Mr. Al-Saleh, and his counsel are protected from discovery as they are subject to the attorney-client privilege as a result of application of the common interest exception" because they were made "for the limited purpose of assisting in their common cause, which was to propound litigation" against the defendant).  Accordingly, communications between Plaintiffs, Burford, and their counsel are privileged.

  *Cohen v. Cohen*, 2015 WL 745712 (S.D.N.Y. Jan. 30, 2015), does not warrant a contrary result.  There, the Court held that the plaintiff's communications with the principal of a divorce-litigation funder (Stacey Napp) were not protected by the common-interest doctrine because Napp was "not a party to th[e] litigation" and had no direct claim against the defendant.  *Id.* at *4.  But, as just explained, that reasoning was abrogated by the Second Circuit's subsequent decision in *Schaeffler*, which held that a litigant may have a common interest with someone who is not a party to the litigation and has no legal claim at stake.  The Court also said in *Cohen* that, "[a]lthough [the plaintiff and Napp] may have a common financial interest in the outcome of this litigation, that relationship does not fall into the narrow category primarily reserved for co-litigants pursuing a shared legal strategy."  *Id.*; *see id.* (stating that the funding agreement was "inherently financial and in no way within the mold of a common legal interest").  Here, too, *Schaeffler* held to the contrary, emphasizing that a "common financial interest in the outcome of this litigation" *does* constitute a common legal interest.  Notably, *Cohen* relied on the district court decision in *Schaeffler* that the Second Circuit later unanimously reversed.  *See id.* (citing *Schaeffler v. United States*, 22 F. Supp. 3d 319, 334 (S.D.N.Y. 2014), *rev'd and remanded*, 806 F.3d 34 (2d Cir. 2015)).  This Court also relied on the First Department's decision in *Ambac*

*Assurance Corp. v. Countrywide Home Loans, Inc.*, which was reversed by the Court of Appeals. *See* 998 N.Y.S.2d 329 (1st Dep't 2014) ("*Ambac I*"), *rev'd*, 57 N.E.3d 30 (N.Y. 2016) ("*Ambac II*").[9]  *Cohen*'s rejection of the common-interest doctrine is no longer authoritative.

### B.    The Agency Exception Protects Communications with Burford

In addition to the common-interest doctrine, the agency exception protects from discovery a litigant's communications with non-lawyer professionals whose assistance is "necessary, or at least highly useful," for the effective provision of legal advice by the lawyer to the client.  *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961).  Burford qualifies as an "agent" under this exception, for two reasons.  First, as the *IOTC* court observed:

> Communications with a litigation funder fall within the agency exception for the very reason that litigation funders exist—because without litigation funders, parties owed money, or otherwise stymied by deep-pocketed judgment debtors, might have reduced or no ability to pursue their claims.  Litigation funders may be essential to the provision of legal advice in such cases.

548 B.R. at 835.  The record in this case amply supports that conclusion.  As explained above, the Petersen Plaintiffs were deprived of the value of their sole asset – YPF shares – by Defendants' breach of their contractual tender-offer obligations.  The banks' foreclosure on the Petersen Plaintiffs and their eventual bankruptcy left them without the resources to pursue their contract claims against the Republic and YPF – until Burford agreed to provide the capital needed to prosecute this litigation.  It is no overstatement to say that, but for Burford's (or some other funder's) involvement, the Petersen claims would not have been brought.

---

[9] Notably, although *Ambac II* held that the common-interest doctrine is limited to communications that "relate to" ongoing or anticipated litigation, it did *not* further limit the doctrine to communications between *co-litigants*.  *See* 57 N.E.3d at 39 n.4 ("We hold only that such litigation must be ongoing or reasonably anticipated, *and the exchanged communication must relate to it*, in order for the common interest exception to apply.") (emphasis added).

Second, as explained above, because the Petersen Plaintiffs are foreign entities with no U.S. litigation experience, ██████████████████████████████████████████ ████████████████████████████████████████████████████ *See* Petersen CPA, § 4.3(c).  Burford's expertise in multi-jurisdictional (including Spanish) litigation makes it a critical intermediary between Petersen's Spanish receiver and its U.S. litigation firms.  No less than an "accountant[ ] who can clarify complex financial issues directly related to the provision of legal advice," *Cohen*, 2015 WL 745712, at *3, Burford plays a critical role in managing the litigation and facilitating the provision of legal advice by U.S. counsel to the Petersen receiver (and to Eton Park, whose litigation is closely coordinated with Petersen's).  Stripping Petersen of the ability to engage in privileged communications with Burford would drastically undermine its ability to direct this litigation.  That would not protect the adversary system, but undermine it.

As with the common-interest doctrine, *Cohen v. Cohen* does not justify a contrary result. This Court rejected the agency exception because Napp's "primary purpose" was to look out for *her company's* interests as the funder, not to help the plaintiff or his/her counsel.  2015 WL 745712, at *3; *see id.* (Napp's role was "making a decision as to whether her company will fund Plaintiff's legal team" and "commenting on legal strategy presumably to maximize the chances of a return on her investment").  Here, the record shows that Plaintiffs sought Burford's involvement for *their* benefit and that Burford's assistance is "highly useful" – indeed, indispensable – to Plaintiffs' prosecution of their claims.  For that reason, too, communications between Petersen and Burford therefore are privileged under the agency exception.

## **CONCLUSION**

Plaintiffs' communications with Burford are protected from discovery.

DATED:  January 11, 2021      By:   */s/ Mark C. Hansen*

Israel Dahan
Laura E. Harris
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Phone: (212) 556-2114
Fax: (212) 556-2222
Email: idahan@kslaw.com
Email: lharris@kslaw.com

Reginald R. Smith *(pro hac vice)*
KING & SPALDING LLP
1100 Louisiana Street
Houston, Texas 77002
Phone: (713) 751-3200
Fax: (713) 751-3290
Email: rsmith@kslaw.com

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone:  (202) 326-7900
Fax:  (202) 326-7999
Email: mhansen@kellogghansen.com
Email: dho@kellogghansen.com
Email: agoldsmith@kellogghansen.com

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U.,*
*Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*