**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETERSEN ENERGÍA INVERSORA,
S.A.U. and PETERSEN ENERGÍA, S.A.U.,

          Plaintiffs,

          v.

ARGENTINE REPUBLIC and YPF S.A.,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.:  1:15-CV-02739 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ETON PARK CAPITAL MANAGEMENT,
L.P., ETON PARK MASTER FUND, LTD.,
ETON PARK FUND, L.P.,

          Plaintiffs,

          v.

ARGENTINE REPUBLIC and YPF S.A.,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Case No.:  1:16-CV-08569 (LAP)

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' CATEGORICAL ASSERTION OF**
**PRIVILEGE OVER ALL COMMUNICATIONS WITH BURFORD CAPITAL**

January 25, 2021

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND ..............................................................................................3

    A.    The Eskenazis Acquire a Stake in YPF From Repsol............................3

    B.    The Argentine Government Intervenes in YPF and the Eskenazis File for Bankruptcy Protection in Spain ...................................................4

    C.    Burford Acquires Plaintiffs' Claims .............................................5

    D.    Burford Regularly Discusses Many Aspects of this Case with Investors and in Public Statements........................................................7

    E.    Plaintiffs and Burford Block Discovery into Burford's Acquisition of the Plaintiffs' Claims ...................................................................7

ARGUMENT ..................................................................................................9

I.    PLAINTIFFS ARE NOT ENTITLED TO "CATEGORICAL" WORK PRODUCT PROTECTION ........................................................................9

    A.    Plaintiffs Have Not Attempted To Carry Their "Heavy Burden" of Establishing Work Product Protection over Every Communication with Burford........................................................................................9

    B.    *Adlman* Does Not Support Plaintiffs' Invocation of a Categorical Work Product Claim for Communications with Burford................................12

    C.    Plaintiffs Fail to Show that they Have Not Waived Work Product Protection and Defendants Have a Substantial Need............................15

II.    THE COMMON INTEREST DOCTRINE AND AGENCY EXCEPTION DO NOT SAVE PLAINTIFFS' PRIVILEGE CLAIMS............................17

    A.    Plaintiffs Do Not Share a Common Interest with Burford ...................17

    B.    The "Narrow" Agency Exception Does Not Apply Because Burford's Presence Is Not Necessary To Facilitate Plaintiffs' Communications with Their Attorneys ..........................................................................20

CONCLUSION ..............................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceleration Bay LLC* v. *Activision Blizzard, Inc.*,
  2018 WL 798731 (D. Del. Feb. 9, 2018) ...................................................................13, 18, 19

*AIU Ins. Co.* v. *TIG Ins. Co.*,
  2008 WL 4067437 (S.D.N.Y. Aug. 28, 2008) ..........................................................................13

*Am. Ins. Co.* v. *Elgot Sales Corp.*,
  1998 WL 647206 (S.D.N.Y. Sept. 21, 1998) ...........................................................................13

*Ayers* v. *SGS Control Servs.*,
  2006 WL 618786 (S.D.N.Y. Mar. 9, 2006) ..............................................................................10

*Bank of Am., N.A.* v. *Terra Nova Ins. Co.*,
  212 F.R.D. 166 (S.D.N.Y. 2002) ..................................................................................9, 15, 16

*Bowne of NYC, Inc.* v. *AmBase Corp.*,
  150 F.R.D. 465 (S.D.N.Y. 1993) ........................................................................................2, 9

*Calvin Klein Trademark Tr.* v. *Wachner*,
  198 F.R.D. 53 (S.D.N.Y. 2000) ...............................................................................................20

*Carlyle Inv. Mgmt. L.L.C.* v. *Moonmouth Co. S.A.*,
  2015 WL 778846 (Del. Ch. Feb. 24, 2015) .............................................................................14

*Chan* v. *Big Geyser, Inc.*,
  2018 WL 6075066 (S.D.N.Y. Nov. 21, 2018) ...................................................................12, 13

*Cohen* v. *Cohen*,
  2015 WL 745712 (S.D.N.Y. Jan. 30, 2015) ........................................................2, 3, 18, 19, 20

*Doe* v. *Society of Missionaries of Sacred Heart*,
  2014 WL 1715376 (N.D. Ill. May 1, 2014) .............................................................................13

*FG Hemisphere Assocs., L.L.C.* v. *Republique Du Congo*,
  2005 WL 545218 (S.D.N.Y. Mar. 8, 2005) .........................................................................2, 11

*Gerszberg* v. *Li & Fung (Trading) Ltd.*,
  215 F. Supp. 3d 282 (S.D.N.Y. 2016) ......................................................................................17

*Glaxo, Inc.* v. *Torphram, Inc.*,
  1996 WL 411487 (N.D. Ill. July 18, 1996) .......................................................................10, 11

*Gucci Am., Inc.* v. *Guess?, Inc.*,
   271 F.R.D. 58 (S.D.N.Y. 2010) ..................................................................13

*Howell* v. *City of N.Y.*,
   2007 WL 2815738 (E.D.N.Y. Sept. 25, 2007) ...........................................9

*In re Grand Jury Subpoena Dated July 6, 2005*,
   510 F.3d 180 (2d Cir. 2007).................................................................1, 9

*In re Grand Jury Subpoena Dated Oct. 22, 2001*,
   282 F.3d 156 (2d Cir. 2002).........................................................1, 10, 14

*In re Int'l Oil Trading Co., LLC*,
   548 B.R. 825 (Bankr. S.D. Fla. 2016)................................................14, 20

*In re Steinhardt Partners, L.P.*,
   9 F.3d 230 (2d Cir. 1993)..............................................................13, 16

*In re Symbol Techs., Inc. Sec. Litig.*,
   2015 WL 5719719 (E.D.N.Y. Sept. 29, 2015) ..........................................10

*Leader Techs., Inc.* v. *Facebook, Inc.*,
   719 F. Supp. 2d 373 (D. Del. 2010)........................................................18

*Louis Vuitton Malletier* v. *Dooney & Bourke, Inc.*,
   2006 WL 3851150 (S.D.N.Y. Dec. 18, 2006) ..........................................10

*Midwest Athletics & Sports All.* v. *Ricoh USA, Inc.*,
   2020 WL 5554361 (E.D. Pa. Sept. 16, 2020) ...........................................17

*Miller UK Ltd.* v. *Caterpillar, Inc.*,
   17 F. Supp. 3d 711 (N.D. Ill. 2014) ........................................................18

*Nat'l Educ. Training Grp., Inc.* v. *Skillsoft Corp.*,
   1999 WL 378337 (S.D.N.Y. June 10, 1999) .........................................3, 20

*Network-1 Techs., Inc.* v. *Google LLC*,
   2019 WL 6701909 (S.D.N.Y. Dec. 9, 2019) ............................................20

*Nikkal Indus., Ltd.* v. *Salton, Inc.*,
   689 F. Supp. 187 (S.D.N.Y. 1988) .........................................................14

*Safeco Ins. Co. of Am.* v. *M.E.S., Inc.*,
   289 F.R.D. 41 (E.D.N.Y. 2011).........................................................2, 10

*Samad Bros.* v. *Bokara Rug Co.*,
   2010 WL 5094344 (S.D.N.Y. Nov. 30, 2010).......................................1, 10

*Schaeffler* v. *United States*,
    806 F.3d 34 (2d Cir. 2015)...................................................................................18, 19

*SEC* v. *Vitesse Semiconductor Corp.*,
    771 F. Supp. 2d 310 (S.D.N.Y. 2011).........................................................................17

*Shamis* v. *Ambassador Factors Corp.*,
    34 F. Supp. 2d 879 (S.D.N.Y. 1999)...........................................................................11

*Sidari* v. *Orleans Cty.*,
    2000 WL 33407343 (W.D.N.Y. Oct. 3, 2000) ............................................................15

*Takeda Chem. Indus.* v. *Alphapharm Pty.*,
    2005 WL 1678001 (S.D.N.Y. July 19, 2005) ..............................................................17

*United States* v. *Adlman*,
    134 F.3d 1194 (2d Cir. 1998)................................................................................2, 12

*United States* v. *Kovel*,
    296 F.2d 918 (2d Cir. 1961).........................................................................................20

*United States* v. *Mejia*,
    655 F.3d 126 .................................................................................................................20

*United States* v. *Schwimmer*,
    892 F.2d 237 (2d Cir. 1989).........................................................................................19

*Universal Standard Inc.* v. *Target Corp.*,
    331 F.R.D. 80 (S.D.N.Y. 2019) ...................................................................................11

**Other Authorities**

Fed. R. Civ. P. 26......................................................................................................................10

Local Rule 26.2....................................................................................................................10, 11

The Argentine Republic (the "Republic") and YPF S.A. ("YPF," and together with the Republic, "Defendants") respectfully submit this memorandum of law in support of their opposition to the Motion for Protective Order with Respect to Communications with Burford Capital ("Burford") ("Pls.' Br.") filed by Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (together, "Petersen"), as well as Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd. and Eton Park Fund, L.P. (together, "Eton Park," and with Petersen, "Plaintiffs").

## PRELIMINARY STATEMENT

Throughout these proceedings, Plaintiffs have blocked all discovery into their dealings with the so-called "litigation funder" Burford.  Petersen has, for example, refused to produce a single communication with Burford leading up to—or even after—the execution of the Claim Prosecution Agreement ("CPA") in March 2015, pursuant to which Burford acquired, for €15 million, the right to bring Petersen's claims.  Plaintiffs now ask this Court to issue a broad advisory opinion blessing their approach, on the theory that Plaintiffs' communications with Burford are "categorical[ly]" protected by the work product doctrine or common interest privilege. (Pls.' Br. at 5.)  Plaintiffs' sweeping position is wrong as a matter of settled law.

*First*, the Second Circuit has eschewed "[b]road categorical statements about the scope of the work product privilege"—like Plaintiffs'—in favor of "case by case," and "highly fact specific" determinations.  *In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002).  Plaintiffs must carry the "heavy burden," *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007), of showing that the privilege "applies to each communication for which it is asserted," *Samad Bros.* v. *Bokara Rug Co.*, 2010 WL 5094344 (S.D.N.Y. Nov. 30, 2010) (Fox, J.).  Plaintiffs have not even attempted to meet their heavy burden by preparing a privilege log, or coming forward with other "competent evidence" substantiating

their privilege claims, as they must.  *Bowne of NYC, Inc.* v. *AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N.Y. 1993) (Dolinger, J.).  Indeed, the failure to substantiate work product protection "results in a waiver of any claim of [protection] that might otherwise have existed."  *FG Hemisphere Assocs.* v. *Republique Du Congo*, 2005 WL 545218, at *6 (S.D.N.Y. Mar. 8, 2005) (Pitman, J.).

*Second*, Plaintiffs try to justify their "categorical" work product claims for all communications with their "litigation funder" by advancing an overbroad reading of the Second Circuit's decision in *United States* v. *Adlman*, 134 F.3d 1194 (2d Cir. 1998).  But *Adlman* did not adopt a categorical approach to work product claims or create a "litigation funder" exception to the normal rules.  Rather, the *Adlman* court underscored that work product must be determined "in light of the nature of the document and the factual situation in the particular case."  *Id.* at 1202.

*Third*, because Plaintiffs have still not logged the communications that they claim are protected work product, it is impossible for Defendants to ascertain (i) whether Plaintiffs have waived any such protection that may have attached to a given communication; or (ii) whether Defendants have a substantial need for the communications, thereby overcoming the protection.  Defendants should be given the opportunity to show that they have a substantial need for the supposedly protected documents to prove, for example, that the Petersen CPA was recognized by the parties thereto to be in substance and effect an assignment and that Petersen lacks standing.

*Finally*, the common interest doctrine and agency exception to waiver of attorney-client privilege, which also "require a fact-specific inquiry that [is] not capable of a categorical presumption," cannot save Plaintiffs' effort to immunize themselves from appropriate discovery.  *Safeco Ins. Co. of Am.* v. *M.E.S., Inc.*, 289 F.R.D. 41, 45 (E.D.N.Y. 2011).  Plaintiffs have no way around this Court's holding in *Cohen* v. *Cohen* that a plaintiff's relationship with a litigation funder is "inherently financial and in no way within the mold of a common legal interest."  2015 WL

745712, at *4 (S.D.N.Y. Jan. 30, 2015).  Moreover, the agency doctrine, a "narrow exception" to waiver of attorney-client privilege, does not apply because Plaintiffs have not proven that Burford is "nearly indispensable" in facilitating attorney-client communication.  *Nat'l Educ. Training Grp., Inc.* v. *Skillsoft Corp.*, 1999 WL 378337, at *3-4 (S.D.N.Y. June 10, 1999) (Pauley, J.).

## BACKGROUND

### A. The Eskenazis Acquire a Stake in YPF From Repsol

The plaintiff Petersen entities are special purpose vehicles ("SPVs") created by the Eskenazis—an affluent Argentine family of ███████████ (Ex. 1 (Dec. 22, 2020 Tr.) at 6:22-23)—under the umbrella of the conglomerate Grupo Petersen for the ███████████ ███████████ from Repsol in 2008 and 2011.  (*Petersen* ECF No. 252 at 3; *see also* Ex. 2 (Betancor Tr.) at 32:11-17, 86:11-19.)  Petersen did not acquire its YPF shares in the United States or, indeed, on any stock exchange.  Rather, in 2007, the Eskenazis negotiated a private agreement with the Spanish oil company Repsol—which then owned 99% of YPF—to acquire a 14.9% stake (that Petersen later grew to 25%).  (*Petersen* ECF No. 1 ¶ 28; Ex. 3 (2008 SEC Form 13D) at 11.)

While the Eskenazis nominally paid more than $2 billion for their initial stake in YPF, they put up virtually no money of their own.  Instead, the Eskenazis negotiated for approximately $2 billion in loans from Repsol and other lenders, which the Eskenazis demanded would be repaid solely from *future* YPF dividends and was secured by a pledge of Petersen's YPF shares.  (*Petersen* ECF No. 1 ¶ 30; Ex. 3 (2008 SEC Form 13D) at 11, 13.)

As part of their unusual scheme to acquire YPF shares, the Eskenazis demanded that Repsol agree to cause YPF to issue dividends in the amount of at least 90% of YPF's annual profits—without regard to whether that policy was in the company's long-term interest.  (Ex. 3 at 17.) ███████████████████████████

███████████████████████████████████████████████.  (*Id.* at 16; Ex. 2 (Betancor Tr.) 160:9-17.)

The Eskenazis also negotiated a side agreement with Repsol that provided them complete protection against two risks:  (i) that YPF would *not* continue to issue the 90% dividend; and (ii) that Repsol would lose its majority stake in YPF.  (Ex. 4 (Supplemental Agreement) at § 2.)  If either of those risks materialized, Repsol agreed to repurchase from the Eskenazis their entire stake in YPF.  (*Id.*)  Despite the fact that these matters are squarely relevant to the claims and defenses here, Plaintiffs have produced none of the documents or communications underlying these Eskenazi-Repsol agreements.

## B.  The Argentine Government Intervenes in YPF and the Eskenazis File for Bankruptcy Protection in Spain

After years of plunging revenues, increased debt, and declining production, brought on in large part by the Eskenazi policy of underinvestment and extraction of exorbitant dividends—which often exceeded YPF's *net income* for the entire year—the Republic lawfully intervened in YPF in April 2012.  In May 2012, the Argentine Congress passed legislation declaring Repsol's shares representing 51% of YPF's Class D shares to be of public utility and subject to expropriation, at a price to be determined in accordance with applicable law.  (*Petersen* ECF No. 1 ¶ 40; *Eton Park* ECF No. 1 ¶ 39.)

In July 2012, the Eskenazis put the Petersen Plaintiffs into bankruptcy proceedings in Spain.  ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████.  (*See* Ex. 2 (Betancor Tr.) 307:24-308:9.)  Plaintiffs have produced no communications concerning their decision not to exercise their rights to cause Repsol to repurchase Petersen's YPF shares.

In February 2014, Repsol entered into a settlement agreement with the Republic in which Repsol agreed to extinguish its claims. (*See* Ex. 5 at §§ 1, 6(1)(iv).)  Plaintiffs have produced no documents or communications between the Eskenazis and Repsol, including any that would explain whether Petersen and Repsol struck a deal that let Repsol out of obligations.

### C.   Burford Acquires Plaintiffs' Claims

In October 2014, Petersen submitted a proposed liquidation plan that contemplated "the sale or assignment" of Petersen's claims in a public auction.  (*See* Ex. 6 (October 2014 Liquidation Plan) at 7.)  The plan promised potential bidders information about Petersen and its claims as part of the due diligence process, including "Financing Agreements (including contracts and sureties) related to the acquisition of YPF, S.A. shares of stock; communications regarding termination due to acceleration and documentation related to the execution of pledges on YPF, S.A. shares of stock, which are the property of the bankrupt company."  (*Id.* at 8.)  These documents have not been produced to Defendants here.

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████  (*Id.*; *see* Ex. 2 (Betancor Tr.) 262:17-264:15; *Petersen* ECF No. 252 at 3-4.)  As the Court is aware, Plaintiffs refused to produce, let alone search for, documents from the Eskenazis until after the December 22, 2020 conference with the Court.[1]  (*See Petersen* ECF No. 252.)  The information the Eskenazis put "at the disposal" of the "buyers" has not been produced to Defendants.

---

[1]    While the Eskenazis have suddenly "miraculously surfaced and offered to negotiate to effect a voluntary production of documents" (*Petersen* ECF No. 252 at 4 n.1), they insist that they are "not parties to the Petersen Lawsuit nor are they subject to the jurisdiction of the US courts"

████████   (*See* Ex. 8 (Langdell Bid); Ex. 9 (March 2015 Liquidation Plan); Ex. 2 (Betancor Tr.) at 269:17-270:8.)  Plaintiffs have produced no communications involving these entities' participation in the auction process.

Burford ultimately prevailed in the bidding process and, in March 2015, acquired the right to prosecute Petersen's claims.  (*See* Ex. 10 (Petersen CPA).)  Under the terms of Burford's agreement with Petersen, Burford is empowered to "take any and all actions on behalf of [Petersen] that [Burford] may deem necessary or advisable to prosecute the Claims," giving it complete control of the case.  (*Id.* at 22, 24.) ███████████████

(*See* Ex. 11 (Bogart Tr.) 123:10-18; 128:5-129:4, 137:4-138:6; Ex. 2 (Betancor Tr.) 93:5-94:17.)

████████████████████████. (*See, e.g.*, Ex. 11 (Bogart Tr.) 38:8-19, 76:20-77:4, 105:16-23, 124:21-125:15, 138:18-140:18; Ex. 2 (Betancor Tr.) at 234:6-235:21, 244:4-245:2 245:15-21, 246:6-248:8, 250:4-251:12, 259:4-17, 260:22-261:4, 262:9-263:17.)  On November 3, 2016, the same date that the Eton Park complaint

---

and will only agree to cooperate if "their legal rights are protected" (Ex. 7 (Reisberg Jan. 14, 2021 Letter) at 1-2).  The Petersen Plaintiffs have yet to produce the Eskenazis' documents, and it is unclear when they will do so or what they will produce.

was filed, Burford entered into a Capital Provision Agreement with Eton Park, providing it with substantial control of that case too.  (*See* Ex. 12.)

### D.   Burford Regularly Discusses Many Aspects of this Case with Investors and in Public Statements

Since acquiring Plaintiffs' claims, Burford has regularly discussed this case with prospective third-party investors, in its SEC filings and other public reports, and on public conference calls.  In these communications, Burford has chosen to selectively disclose information covering nearly every aspect of these claims, including (i) its due diligence on Petersen's claims; (ii) the circumstances giving rise to the Republic's expropriation of Repsol's YPF Class D shares; (iii) the Petersen and Eton Park CPAs; (iv) Burford's views of the parties' rights under YPF's bylaws; and (v) the scope of alleged damages here.  (Ex. 13 (2019 Q4 Earnings Call) at 7-8; Ex. 14 (2019 Annual Rpt.) at 63; Ex. 15 (2016 Annual Rpt.) at 13-15.)  Plaintiffs and Burford have, however, refused to produce any of the documents underlying these public disclosures.

### E.   Plaintiffs and Burford Block Discovery into Burford's Acquisition of the Plaintiffs' Claims

Throughout the fact discovery period, Plaintiffs have refused to produce any documents postdating July 2012 for Petersen and June 2013 for Eton Park.  Plaintiffs have sought to justify these cutoff dates through assertions that later documents are necessarily "work product."[2]  These cutoff dates—just four months after the Republic intervened in YPF, for Petersen—means that Defendants have had no discovery concerning key subjects, including (i) the negotiation of the Claims Prosecution Agreement (directly relevant to Defendants' argument that

---

[2]      *See*, *e.g.*, Ex. 16 (Plaintiffs' October 12, 2020 Ltr.) at 4 ("With respect to Defendants' request for an extension of the relevant date range *several years* past [July 31, 2012 and June 30, 2013], Defendants' arguments are meritless. Any contemplation of litigation that might have taken place during that period would be shielded from discovery as work product, as would Plaintiffs' communications with Burford.").

Petersen lacks standing); (ii) the period when Burford conducted due diligence concerning Petersen's claims, including communications between Plaintiffs and Burford from the Eskenazis or others pertaining to the underlying facts; (iii) Petersen's decision not to pursue its rights against Repsol (and what Petersen may have received in exchange for not doing so); and (iv) documents concerning Plaintiffs' supposed damages—a subject Burford routinely discusses on public conference calls and in its annual reports.

Plaintiffs asserted work product and privilege even more aggressively during deposition testimony.  They blocked questioning into areas such as:

- ███████████████████████████████████████████████ ███████████████████████████;

- ███████████████████████████████████████████████ ██████████████████████████████████;

- ███████████████████████████████████████████████ ████████████████████████████████; and

- ███████████████████████████████████████████████ ████████████████████████.

(*See* Ex. 2 (Betancor Tr.) at 234:6-235:21, 245:3-21, 244:4-245:2, 259:4-17, 246:6-248:8, 250:4-251:12, 260:22-261:4, 262:9-263:17; Ex. 11 (Bogart Tr.) 38:8-19, 61:10-18, 76:20-77:4, 105:16-23, 124:21-125:15, 138:18-140:18, 243:13-24.)

Plaintiffs have also blocked any inquiry into their dealings with the Eskenazi family.  ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

██████. (*See, e.g.*, Ex. 2 (Betancor Tr.) 68:9-70:3, 73:19-74:11, 74:25-75:13, 77:1-19, 93:5-19, 94:7-11, 98:7-12, 264:18-265:2, 280:15-20; Ex. 11 (Bogart Tr.) 137:4-138:6.)[3]

## ARGUMENT

**I.    PLAINTIFFS ARE NOT ENTITLED TO "CATEGORICAL" WORK PRODUCT PROTECTION.**

### A.    Plaintiffs Have Not Attempted To Carry Their "Heavy Burden" of Establishing Work Product Protection over Every Communication with Burford.

A party invoking the work product doctrine bears the "heavy burden" of establishing its applicability. *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007); *see Howell* v. *City of N.Y.*, 2007 WL 2815738, at *1 (E.D.N.Y. Sept. 25, 2007) ("[B]ars to disclosure like the work-product doctrine interfere with the public's right to obtain evidence, they are to be strictly construed" and "confined within the narrowest possible limits underlying [their] purpose."). A party asserting the work product doctrine also has the burden of establishing that the protection has not been waived. *See Bank of Am., N.A.* v. *Terra Nova Ins. Co.*, 212 F.R.D. 166, 169 (S.D.N.Y. 2002) (Gorenstein, J.) (collecting cases).

These burdens "can be met only by an evidentiary showing based on competent evidence, and cannot be 'discharged by mere conclusory or *ipse dixit* assertions.'" *Bowne*, 150 F.R.D. at 470. Thus, a party must furnish "evidentiary materials providing, on a document-by-document basis, whatever evidence it has to support its claims of attorney-client or work-product protection." *Id.* At a minimum, an assertion of work product protection "requires the preparation

---

[3]    During the November 23, 2020 Conference, the Court overruled Plaintiffs' objections and ordered Mr. Betancor to appear for further testimony. (*Petersen* ECF No. 219 at 2.) At that time, Plaintiffs essentially conceded that their objections were improper and overbroad. They now take the same approach to the production of documents through this motion: asserting an unsupported and overbroad categorical position to block discovery.

and production of a privilege log." *Ayers* v. *SGS Control Servs.*, 2006 WL 618786, at *2 (S.D.N.Y. Mar. 9, 2006) (Ellis, J.) (citing Federal Rule of Civil Procedure 26(b)(5) and Local Rule 26.2).  A counterparty is "entitled" to a privilege log containing "foundational facts" for each document to enable it to "test a privilege claim." *LVM* v. *Dooney & Bourke, Inc.*, 2006 WL 3851150, at *1 (S.D.N.Y. Dec. 18, 2006) (Dolinger, J.).

The Second Circuit has likewise emphasized that "[b]road categorical statements about the scope of the work product privilege are risky, as individual applications are highly fact specific" and any "analysis should proceed cautiously, case by case." *In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002).  Thus, courts in this Circuit routinely hold that proponents of work product "may not assert blanket or categorical claims" for protection—as Plaintiffs do here—and instead "must show that the [protection] applies to each communication for which it is asserted." *Samad Bros.* v. *Bokara Rug Co.*, 2010 WL 5094344, at *2 (S.D.N.Y. Nov. 30, 2010) (Fox, J.); *see Safeco Ins. Co. of Am.* v. *M.E.S., Inc.*, 289 F.R.D. 41, 45 (E.D.N.Y. 2011) ("[A]ttorney-client privilege and work-product issues require a fact-specific inquiry that are not capable of a categorical presumption.").

Here, Plaintiffs have not met their "heavy burden" because they have not proffered *any* evidence to establish that their communications with Burford meet the requirements for work product protection.  Indeed, Plaintiffs concede that they have still not even logged communications with Burford.  (*See* Pls.' Br. at 5.)  Defendants and this Court therefore cannot "properly engage in a case-specific assessment whether the work product [doctrine] is applicable here in the first instance," *In re Symbol Techs., Inc. Sec. Litig.*, 2015 WL 5719719, at *7 (E.D.N.Y. Sept. 29, 2015), and it is "impossible" for Defendants to test whether Plaintiffs have waived any protection to which they might otherwise be entitled.  *See Glaxo, Inc.* v. *Torphram, Inc.*, 1996 WL 411487, at *5 (N.D.

Ill. July 18, 1996) (finding it "impossible to determine" waiver without privilege log); *Universal Standard Inc.* v. *Target Corp.*, 331 F.R.D. 80, 85-86 (S.D.N.Y. 2019) (Gorenstein, J.) (agreeing with defendant that it could have "no idea [whether] it had a potential waiver argument" because the privilege log was inadequate).  Plaintiffs are not entitled to an advisory opinion immunizing their dealings with Burford from any kind of discovery.

This was exactly this Court's holding at the November 24, 2020 conference on Defendants' motion to compel Burford to respond to its long-outstanding document requests and subpoena.  As the Court observed, Burford also had asked for protection from discovery "on a wholesale basis" instead of following the "traditional[]" course of "search[ing] for the requested documents."  (Ex. 17 (Nov. 24 Hearing Tr.) at 45:17-25.)  This Court squarely rejected Burford's approach, noting that Burford had provided "no affidavits" or other evidence substantiating their privilege claims.  (*Id.* at 45:17-47:12, 53:15-54:12.)  The Court thus ordered Burford to "hunker down" and follow the standard discovery process, including the preparation of a privilege log, before it could assert work product and privilege objections.  (*Id.* at 54:10-12; *Petersen* ECF No. 220.)  Plaintiffs should follow the same path.

Indeed, absent document-by-document substantiation of their work product assertions, Plaintiffs should be deemed to have "waive[d] . . . any claim of [protection] that might otherwise have existed."  *FG Hemisphere Assocs., L.L.C.* v. *Republique Du Congo*, 2005 WL 545218, at *6 (S.D.N.Y. Mar. 8, 2005) (Pitman, J.); *see also Shamis* v. *Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 892 (S.D.N.Y. 1999) (Sweet, J.) ("[F]ailure to satisfy Local Rule 26.2 'will be considered presumptive evidence that the claim of privilege is without factual and legal foundation' and any privilege or immunity asserted over the documents is waived."); *Glaxo*, 1996 WL 411487, at *5 ("Blanket assertions can lead to waiver of the privileges asserted.").

B.    *Adlman* Does Not Support Plaintiffs' Invocation of Categorical Work Product Protection for All Communications with Burford.

Plaintiffs rely heavily on the Second Circuit's decision in *Adlman* and contend that it supports their categorical approach on the theory that their "communications with Burford were *all* prepared because of the prospect of litigation."  (Pls.' Br. at 7 (emphasis in original).)  By Plaintiff's logic, literally everything that Burford does and everything they have communicated to Burford is shielded from discovery because Burford's entire business exists "because of" litigation. *Adlman* does not support this extreme position.

In *Adlman*, a company's in-house counsel commissioned Arthur Andersen to prepare a memorandum "assessing the likely result of an expected litigation" following a contemplated merger.  134 F.3d at 1195.  After conducting an *in camera* review of the memo, which contained a "detailed legal analysis of likely IRS challenges" to the proposed transaction, the Second Circuit considered whether that memorandum met the test—required for any claim of work product—that the document was prepared "in anticipation of litigation," given that none was pending.  *Id.* at 1195-98.    The Court of Appeals held that work product *might* protect that memorandum, but remanded for the district court to consider whether "*in light of the nature of the document and the factual situation in the particular case*, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."  *Id.* at 1202 (emphasis added). The Court of Appeals did not hold that each and every communication that related, in any way, to litigation qualified for work product protection.

Not surprisingly, courts in this district have rejected efforts—like Plaintiffs'—to read *Adlman* as protecting all documents and communications relating in any way to litigation. For example, in *Chan* v. *Big Geyser, Inc.* a corporate executive discussed his "reaction" to litigation involving his employer "[t]hroughout" weekly company reports.  2018 WL 6075066, at

*2 (S.D.N.Y. Nov. 21, 2018) (Netburn, J.).  The court held that "even though the statements may have been created 'because of' Plaintiffs' lawsuit, they are not protected under work product immunity because they do not relate to Defendants' legal strategy."  *Id.* at *3.  Judge Netburn explained that while "*Adlman* held that documents do not need to be created 'primarily' to assist in litigation, the [*Adlman*] court made clear that the documents must nevertheless have some relationship with the party's litigation strategy."  *Id.*[4]

Plaintiffs' own citations confirm that blanket assertions of work product are inappropriate and that the proponent of the protection must prove its entitlement to work product protection.  *See, e.g.*, *Doe* v. *Society of Missionaries of Sacred Heart*, 2014 WL 1715376, at *2-4 n.4 (N.D. Ill. May 1, 2014) (conducting "an individual privilege determination for each of the [litigation] Financing Materials," and holding "[n]ot all of the documents that Plaintiff claims as attorney work product" were entitled to such treatment).  Thus, the "categorical ruling" Plaintiffs seek is "contrary to case law and undermine[s] the liberal policy of discovery embodied in the Federal Rules of Civil Procedure."  *AIU Ins. Co.* v. *TIG Ins. Co.*, 2008 WL 4067437, at *14 (S.D.N.Y. Aug. 28, 2008) (Pitman, J.).[5]

---

[4]    Consistent with *Adlman*, courts have also rejected the notion that a company can immunize itself from discovery by claiming to be in a "perpetual state of anticipated litigation."  *Gucci Am., Inc.* v. *Guess?, Inc.*, 271 F.R.D. 58, 75 (S.D.N.Y. 2010) (Cott, J.); *Am. Ins. Co.* v. *Elgot Sales Corp.*, 1998 WL 647206, at *1 (S.D.N.Y. Sept. 21, 1998) (Buchwald, J.) ("[W]ithout some limiting principle virtually the entirety of an insurance company's files would be exempt from discovery"); *Acceleration Bay LLC* v. *Activision Blizzard, Inc.*, 2018 WL 798731, at *1-2 (D. Del. Feb. 9, 2018) (holding work product doctrine does not extend to communications between a litigation funder and plaintiff "before any [litigation financing] agreement was reached"); *see also In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993) ("Common sense and the practicalities of litigation define the limits of the work product doctrine.").

[5]    Plaintiffs concede that "no case in this District has squarely addressed" the blanket application of work product protection to communications with litigation funders (*see* Pls.' Br. at

Here, Plaintiffs have offered no explanation for why documents concerning important issues in this case—such as their pre-CPA communications with Burford; the due diligence Burford conducted on the Petersen entities before buying the claim; and communications with the Eskenazis—would somehow reveal some "unfair window into Plaintiffs' litigation strategy." (Pls.' Br. at 11.)[6] More broadly, the circumstances of this case—and Plaintiffs' failure to provide meaningful discovery as set forth above, *see supra* pp. 3-9—counsel against the application of a categorical privilege.

For example, the Eskenazis negotiated for protection from Repsol, in which Repsol agreed to repurchase from the Eskenazis their entire stake in YPF in the event, among others, that

---

7) and the cases cited by Plaintiffs confirm that the issue is not settled.  *See In re Int'l Oil Trading Co., LLC*, 548 B.R. 825, 830 (Bankr. S.D. Fla. 2016) ("*IOTC*") (characterizing issue as "novel question of law"); *Carlyle Inv. Mgmt. L.L.C.* v. *Moonmouth Co. S.A.*, 2015 WL 778846, at *7 (Del. Ch. Feb. 24, 2015) ("[O]nly a handful of American courts have addressed privilege claims in the context of litigation funding agreements.  Of these, few contain in-depth analyses, and the cases disagree on the appropriate outcome.").  Given that Plaintiffs' counsel is waging a campaign across the country on behalf of litigation finance firms (*see* Ex. 18 (Ho Ltr. to NYC Bar Art.); Ex. 19 (Ho Website Profile)), it is unsurprising that Plaintiffs are urging the Court to issue a ruling on the "categorical applicability" of work product and privilege to litigation funding.  (*See* Pls.' Br. at 5.) Contrary to Plaintiffs' argument, this Court "should proceed cautiously," before expanding the work product doctrine, *Grand Jury Subpoena*, 282 F.3d at 161, especially because "litigation funding" has in some instances led to abusive practices and should not be shrouded in secrecy. (*See* Ex. 20 (U.S. Chamber of Commerce Rep.) at 12-13.)

[6]     Plaintiffs also assert that their communications with Burford should be protected because they "rely on Burford's strategic advice in prosecuting Petersen's legal claims" and because Burford is acting as its "representative" because of "Burford's 'greater knowledge and experience in the field' of U.S. litigation." (Pls.' Br. at 11-12, 20.)  But Plaintiffs' argument proves too much.  The role Plaintiffs describe for Burford is the role of a party's attorney in litigation.  Burford is not a law firm and its representatives are not Plaintiffs' lawyers in this case.  Burford cannot expand the attorney work product doctrine into a cloak that permits Burford—an investment firm that gambles on litigation—to treat itself as if it were a law firm protected by the privileges that have historically applied to communications between a party and its lawyer. *Nikkal Indus., Ltd.* v. *Salton, Inc.*, 689 F. Supp. 187, 191 (S.D.N.Y. 1988) (Tenney, J.) (The "reluctance to broaden the scope of privilege reflects a strong concern with a fundamental precept of American law" that "the public . . . has a right to every man's evidence.").

the 90% dividend ceased.  Yet, Plaintiffs have blocked entirely any discovery into these issues relating to their claims and have stymied any discovery concerning their dealing with the Eskenazis, even though Burford met with the Eskenazis to discuss the litigation.  *See supra* p. 6. Likewise, Petersen proposed a liquidation plan to the bankruptcy court that contemplated "the sale or assignment" of Petersen's claims in a public auction, with information put "at the disposal" of purchasers, but has produced none of this to Defendants.  *See supra* pp. 6-7.

### C.     Plaintiffs Fail to Show that They Have Not Waived Work Product Protection and Defendants Have a Substantial Need.

Plaintiffs have not only failed to prove that all of their Burford communications are eligible work product in the first instance, they have also failed to prove that they did not waive that protection.  Work product may be waived when "work product" materials are used "in a manner that is inconsistent with the protection."  *Bank of Am.*, 212 F.R.D. at 170.  Plaintiffs concede that there was no non-disclosure agreement in place with Burford until February 18, 2015 (for Petersen) and October 28, 2016 (for Eton Park) (*see* Pls.' Br. 2-3)—meaning that, if a deal fell through, Burford would have apparently been free to share what it had learned from Plaintiffs before these dates with other potential financing customers—including the Republic and YPF.  No work product protection would apply to such documents.  *See Sidari* v. *Orleans Cty.*, 2000 WL 33407343, at *8 (W.D.N.Y. Oct. 3, 2000) (finding waiver where plaintiff had not "present[ed] any proof of a confidentiality agreement").

████████████████████████████████████████

████████████████████████████████████.  (Ex. 14 (2019 Annual Rep.) at 61; Ex. 11 (Bogart Tr.) at 252:21-253:10.)  In its efforts to create a "secondary market" for these claims, Burford has clearly relied on the "work product" communications Plaintiffs refuse to produce,

using that information in a manner "inconsistent with the protection" and "increas[ing] the likelihood that an adversary will obtain the information." *Bank of Am.*, 212 F.R.D. at 170.

Moreover, by regularly discussing views of the parties' rights under YPF's bylaws and the scope of alleged damages in its SEC filings and on public conference calls to build a secondary market and raise capital (*see* Ex. 13 (2019 Q4 Earnings Call) at 7-8; Ex. 14 (2019 Annual Rpt.) at 63; Ex. 15 (2016 Annual Rpt.) at 13-14), Plaintiffs have waived any protection they might have otherwise had over communications discussing these topics. *See Steinhardt,* 9 F.3d at 235 ("selective assertion of privilege should not be merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage").[7]  At a minimum, without a privilege log and other competent evidence, Defendants have been denied the ability to test whether such a waiver occurred by virtue of communications with third parties.

Additionally, as Plaintiffs recognize, any work product protection may yield to a showing of substantial need.  (*See* Pls.' Br. at 14.)  Here, Defendants have a substantial need for at least two categories of documents.  *First*, under Spanish law, the Petersen CPA is a disguised *assignment* of Petersen's claim, which deprives Petersen of standing. (*See* Argentina's Answer in *Petersen* at pp. 26-27; YPF's Answer in *Petersen* at p. 19; *see also* Ex. 6 (Oct. 2014 Liquidation Plan) § 3.2 (seeking "sale or assignment" of claims); Ex. 8 (Langdell Bid) ¶ 5 (bidder explaining that a sale of the claims could lead to potential standing issues).)  Because the interpretation of that contract is central to this defense, Defendants are entitled to discovery regarding the negotiating history of an

---

[7]     Plaintiffs cite several out-of-circuit cases for the proposition "that disclosure of work product [by a plaintiff] to a financing source does not create a waiver" where a plaintiff and a litigation funder have executed a confidentiality agreement.  (*See* Pls.' Br. at 13-14.)  Those cases say nothing about circumstances where, as here, the litigation funder routinely discusses claims in a pending litigation with dozens of investors.

agreement between arms-length counterparties.  *See Gerszberg* v. *Li & Fung (Trading) Ltd.*, 215 F. Supp. 3d 282, 293 (S.D.N.Y. 2016) (Engelmayer, J.) (discovery of negotiating history, including prior drafts of agreement and written and oral communications between the signatories, could bear on standing issue).[8]

   *Second*, to the extent that the Eskenazis or Petersen provided Burford with any factual materials regarding their conduct in operating YPF or during the intervention and expropriation process, their acquisition of YPF shares, or their discussions with Repsol, those materials should be produced, especially because both Petersen and the Eskenazis have not produced any documents on these issues.  *See Midwest Athletics & Sports All.* v. *Ricoh USA, Inc.*, 2020 WL 5554361, at *5 (E.D. Pa. Sept. 16, 2020) (holding that communications with potential funders that "shed any light" on "valuation" were "relevant to damages" and not privileged); *SEC* v. *Vitesse Semiconductor Corp.*, 771 F. Supp. 2d 310, 314 (S.D.N.Y. 2011) (Rakoff, J.) (ordering disclosure of report summarizing factual findings of internal investigation).  There may be additional unknown documents that Plaintiffs are withholding for which Defendants have a substantial need, but which Defendants will not be able to identify until Plaintiffs produce a detailed privilege log.  *See Takeda Chem. Indus.* v. *Alphapharm Pty.*, 2005 WL 1678001, at *5 (S.D.N.Y. July 19, 2005) (Cote, J.).

## II. THE COMMON INTEREST DOCTRINE AND AGENCY EXCEPTION DO NOT SAVE PLAINTIFFS' PRIVILEGE CLAIMS.

### A. Plaintiffs Do Not Share a Common Interest with Burford.

   The common interest doctrine "protects attorney-client communications in the presence of a third party where '(1) the communication[s] qualify for protection under the attorney-

---

[8] Plaintiffs' assertion that Defendants' assignment defense is "makeweight" because of the representations in the Petersen CPA (*see* Pls.' Br. at 16-17), disregards that, under Spanish law, a court must look beyond the four corners of the CPA.

client privilege, and (2) the communication[s][are] made for the purpose of furthering a legal interest or strategy common to the parties.'" *Cohen*, 2015 WL 745712, at *3 (explaining that the common interest doctrine is "narrow" and holding a "common financial interest in the outcome of . . . litigation" is insufficient). "Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected" by the common interest doctrine. *Schaeffler* v. *United States*, 806 F.3d 34, 40 (2d Cir. 2015).

Here, Plaintiffs may not avail themselves of the common interest doctrine because they have not proven that their relationship with Burford was "intended to further a common enterprise" between the two. *Id.* Indeed, this Court has previously held that a party does not share a common legal interest with its litigation funder. In *Cohen*, the plaintiff's counsel engaged a "non-practicing attorney and litigation funder 'to provide litigation support,'" including "'render[ing] advice, assistance, consultation and expert opinion to Plaintiff's attorneys.'" 2015 WL 745712, at *1. The litigation funder and the plaintiff not only exchanged several hundred emails concerning "legal strategy, court filings, discovery, and funding for the litigation," they also executed a "Joint Interest" agreement memorializing their alleged common interest. *Id.* Even though the plaintiff and litigation funder shared "a common financial interest in the outcome of [the] litigation," the Court found no common legal interest. *Id.* at *4.[9]

---

[9]     Contrary to Plaintiffs' argument (Pls.' Br. at 18), this Court's decision in *Cohen* is consistent with other litigation funding cases. *See, e.g.*, *Ricoh USA*, 2020 WL 5554361, at *3 ("Brickell provided funding to [plaintiff] . . . . That relationship is not enough to create a common interest"); *Miller UK Ltd.* v. *Caterpillar, Inc.*, 17 F. Supp. 3d 711, 732 (N.D. Ill. 2014) (holding that a "shared rooting interest in the successful outcome of a case" between a plaintiff and litigation funder is not a common legal interest); *Leader Techs., Inc.* v. *Facebook, Inc.*, 719 F. Supp. 2d 373, 375-77 (D. Del. 2010) (plaintiff "did not establish the existence of the common interest privilege between itself and the litigation financing companies"); *see also Acceleration Bay*, 2018 WL 798731, at *1-3.

While Plaintiffs contend that this Court's reasoning in *Cohen* was "abrogated" by *Schaeffler* (*see* Pls.' Br. at 18), *Schaeffler* had nothing to do with the essentially financial relationship of purchasing or "funding" litigation claims.  In *Schaeffler*, a consortium of banks worked with a borrower to restructure a large loan based critically on advice regarding the tax treatment of the arrangement:  the shape and structure of the restructuring (not just the financial outcome) depended on the tax advice.  806 F.3d at 37, 41.  The Court, applying settled precedent, found that in these circumstances the consortium and the borrower were engaged in "'an ongoing common enterprise'" and the tax advice was "'intended to further the enterprise.'"  *Id.* at 42 (quoting *United States* v. *Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)).  That is not what is happening here, where, as this Court found in *Cohen*, the litigation funder's interest in the outcome of the litigation is merely financial—to get a share of the proceeds.  *Schaeffler* cannot be extended to cover any lending relationship in which repayment depends on the outcome of litigation, as that would eviscerate the requirement of a common *legal* interest.

Moreover, Plaintiffs have failed to demonstrate that their arms-length communications concerning the negotiation of the CPAs are protected under the common interest doctrine because such communications were made before "'a joint defense effort or strategy ha[d] been decided upon and undertaken by the parties and their respective counsel,'" as *Schaeffler* and numerous other cases require.  *Id.* at 40 (quoting *Schwimmer*, 892 F.2d at 243); *see Acceleration Bay*, 2018 WL 798731, at *1-3 (holding that plaintiff and litigation funder were not "allied in a common legal cause" before "any [litigation financing] agreement was reached").  At a minimum, Plaintiffs' communications with Burford concerning the CPAs "were not made for the purpose of providing legal advice and instead involve business negotiations which 'happen to include . . . a

concern about litigation.'" *Network-1 Techs., Inc.* v. *Google LLC*, 2019 WL 6701909, at *2 (S.D.N.Y. Dec. 9, 2019) (Netburn, J.).

**B.      The "Narrow" Agency Exception Does Not Apply Because Burford's Presence Is Not Necessary To Facilitate Plaintiffs' Communications with Their Attorneys.**

The agency exception to waiver of attorney-client privilege communications between clients and third parties applies when the third party's presence is "necessary, or at least highly useful, for the effective consultation between the client and the lawyer[.]" *United States* v. *Kovel*, 296 F.2d 918, 922 (2d Cir. 1961).  The third party must be "nearly indispensable or serve[] some specialized purpose in facilitating attorney-client communication." *Nat'l Educ. Training Grp., Inc.* v. *Skillsoft Corp.*, 1999 WL 378337, at *3-4 (S.D.N.Y. June 10, 1999) (Pauley, J.) (the agency doctrine is a "narrow exception" to waiver of attorney-client privilege).   In the Second Circuit, the agency exception "has always been a cabined one," *United States* v. *Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) and "extends only to essential third parties, such as foreign language interpreters or accountants who can clarify complex financial issues directly related to the provision of legal advice." *Cohen*, 2015 WL 745712, at *3.

Plaintiffs have not shown that Burford's presence is "nearly indispensable" or that it "serve[s] some specialized purpose" to Plaintiffs' communications with its lawyers. *Nat'l Educ. Training*, 1999 WL 378337, at *4.  Any "litigation-management role" Burford may serve (*see* Pls.' Br. at 11) is "far from serving the kind of 'translator' function'" required by the agency exception. *Calvin Klein Trademark Tr.* v. *Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) (Rakoff, J.).[10]

---

[10]      The out-of-circuit bankruptcy case, *IOTC*, cited by Plaintiffs (*see* Pls.' Br. at 19) is inconsistent with the Second Circuit's "cabined" interpretation of the agency doctrine. *See Mejia*, 655 F.3d at 132 ("[T]he privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client.").

## CONCLUSION

The Court should deny Plaintiffs' motion and hold that Plaintiffs may not assert a blanket categorical privilege over their communications with Burford.

Dated:  January 25, 2021
          New York, New York

Respectfully submitted,

*/s/  Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
Sergio J. Galvis
Joseph E. Neuhaus
Thomas C. White
Adam R. Brebner
Elizabeth A. Cassady

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:     (212) 558-4000
Facsimile:     (212) 558-3588

*Counsel for The Argentine Republic*

*/s/   Mark P. Goodman*
Mark P. Goodman
Donald Francis Donovan
Shannon Rose Selden
Dietmar W. Prager

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York  10022
Telephone:     (212) 909-6000
Facsimile:     (212) 909-6836

*Counsel for YPF S.A.*