# Exhibit 51

CONFIDENTIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., ETON PARK FUND, L.P.,<br><br>Plaintiffs,<br><br>-against-<br><br>ARGENTINE REPUBLIC AND YPF S.A.,<br><br>Defendants. | Civil Action No. 1:16-cv-8569 |

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. AND PETERSEN ENERGÍA, S.A.U.,<br><br>Plaintiffs,<br><br>-against-<br><br>ARGENTINE REPUBLIC AND YPF S.A.,<br><br>Defendants. | Civil Action No. 1:15-cv-2739 |

**REPLY EXPERT REPORT OF HAROLD SHARON**

January 14, 2022

## TABLE OF CONTENTS

I.    Introduction ................................................................................................................................... 2

II.   Mr. Blackett's Claim That the YPF IPO Would Have Failed Absent Provisions in the YPF Bylaws Is Baseless and Is Contradicted By the Evidence ......................................................................................................... 3

      A.    Mr. Blackett Overstates the Importance of the YPF Bylaws' Tender Offer Provisions and Investors' Ability to Sue in U.S. Courts ............................................................................................................................... 4

      B.    Mr. Blackett's Opinions on the Enforceability of the YPF Bylaws Misrepresent International Investors' Market Perceptions and Are Inconsistent with Evidence and Basic Logic ................................................. 10

III.  Mr. Blackett's Claim that Petersen's Lenders Would Not Have Foreclosed Absent the April 2012 Expropriation Announcement is Speculative and Unsupported ................................................................................... 16

## I.      INTRODUCTION

1.      On September 24, 2021, Richard Blackett submitted an expert report on behalf of Plaintiffs (the "Blackett Report"). He asserts that the YPF Bylaws' tender offer provisions were "critically important" for investors deciding to invest in Argentina and YPF, and that without them "Argentina likely could not have achieved the valuation it did at the time of its IPO, or even completed the IPO itself."[1]

2.      On December 3, 2021, I submitted a rebuttal expert report ("Sharon Rebuttal Report" or "Rebuttal Report") in which I conclude that, contrary to the unsupported claims in the Blackett Report, the YPF Bylaws' tender offer provisions were not critically important for investors' decisions to invest in YPF or for the completion of YPF's IPO.

3.      On December 3, 2021, Mr. Blackett submitted another expert report on behalf of Plaintiffs (the "Blackett Rebuttal Report") in response to Defendants' expert reports by Rafael M. Manóvil on behalf, separately, of YPF and the Republic of Argentina (the "Republic"), Alejandro Juan Uslenghi on behalf of the Republic, and Julio Pablo Comadira on behalf of YPF.[2] In his rebuttal report, Mr. Blackett re-asserts that the YPF Bylaws' tender offer provisions were critically important, claiming that if investors had understood that the provisions did not provide them with recourse in U.S. courts in the event of an expropriation, "no reasonable investor would have purchased Class D shares in ADR form, and YPF's 1993 IPO would have failed."[3] In addition, Mr. Blackett claims that "Petersen's bank lenders would not have foreclosed on their loans if Argentina had announced in April 2012 that it would launch a tender offer to the Class D shareholders."[4]

4.      I have been asked by Counsel for the Republic and Counsel for YPF to review and respond to the Blackett Rebuttal Report.

---

[1]      Expert Report of Richard Blackett, September 24, 2021, in the matter of *Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. v. Argentine Republic and YPF S.A.*, Case No. 1:15-cv-02739, and *Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. v. Argentine Republic and YPF S.A.*, Case No. 1:16-cv-08569 ("Blackett Report"), ¶¶ 13, 50.

[2]      Rebuttal Expert Report of Richard Blackett, December 3, 2021, in the matter of *Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. v. Argentine Republic and YPF S.A.*, Case No. 1:15-cv-02739, and *Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. v. Argentine Republic and YPF S.A.*, Case No. 1:16-cv-08569 ("Blackett Rebuttal Report"), ¶ 2.

[3]      Blackett Rebuttal Report, ¶ 7.

[4]      Blackett Rebuttal Report, ¶ 7.

CONFIDENTIAL

5.      Details on my experience and qualifications are contained in my rebuttal expert report[5] and in my curriculum vitae, attached as **Appendix A** to this report. I have not testified at deposition or trial in the past four years and have not published any articles in the past ten years. In preparing this reply report, I have relied on my knowledge and professional experience in finance developed over decades of working as an international investor. I have also reviewed the Blackett Rebuttal Report, industry publications, and publicly available data and information. I list the additional materials I relied upon in forming the opinions in this reply report in **Appendix B**. I reserve the right to update, refine, or revise my opinions, or form additional opinions, including in response to opposing experts and any additional information I may receive subsequent to the issuance of this reply report.

## II.      MR. BLACKETT'S CLAIM THAT THE YPF IPO WOULD HAVE FAILED ABSENT PROVISIONS IN THE YPF BYLAWS IS BASELESS AND IS CONTRADICTED BY THE EVIDENCE

6.      Section III of the Blackett Rebuttal Report purports to summarize the various reasons put forth by Defendants' Argentine legal experts to explain why the YPF Bylaws and Argentine law provided investors with limited legal recourse in the event of an expropriation, including: (i) the Argentine government's entitlement to expropriate without compensating remaining Class D shareholders; (ii) there being no obligation for YPF to enforce the provisions in the YPF Bylaws other than to discharge its administrative duties set forth in the YPF Bylaws; (iii) Plaintiffs' inability to obtain money damages based on the formulas in the provisions; and (iv) Plaintiffs' requirement to file their lawsuit in Argentine court.[6] Mr. Blackett's rebuttal to these legal expert opinions is, in essence: "if prospective investors had thought these restrictions on exercising one's rights under the Bylaws would apply, they would not have acquired shares in YPF."[7] However, Mr. Blackett's sweeping opinions in his rebuttal report are completely without support. Moreover, they are inconsistent with the available evidence.

---

[5]      Rebuttal Expert Report of Harold Sharon, December 3, 2021, in the matter of *Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. v. Argentine Republic and YPF S.A.*, Case No. 1:15-cv-02739, and *Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. v. Argentine Republic and YPF S.A.*, Case No. 1:16-cv-08569 ("Sharon Rebuttal Report"), ¶¶ 1-11.

[6]      Blackett Rebuttal Report, ¶¶ 6, 8.

[7]      Blackett Rebuttal Report, ¶ 9.

### A.     Mr. Blackett Overstates the Importance of the YPF Bylaws' Tender Offer Provisions and Investors' Ability to Sue in U.S. Courts

7.     The Blackett Rebuttal Report essentially repeats the opinion presented in the Blackett Report, that without the enforceability of the YPF Bylaws' tender offer provisions in accordance with Plaintiffs' view of the YPF Bylaws, "the IPO would have failed."[8] However, as I described in detail in my Rebuttal Report, Mr. Blackett ignores the key valuation drivers and emerging market risks in an investment like YPF that investors would, and did, base their investment decisions on.[9] He also ignores concrete evidence from YPF's disclosures, investment commentary, and the performance of YPF's IPO that demonstrates that the YPF Bylaws' tender offer provisions were of minor, if any, importance to investors in YPF as compared to other investment considerations.[10] As a consequence, Mr. Blackett substantially overstates the importance of the YPF Bylaws' tender offer provisions for the completion of the YPF IPO and, more generally, for investors' willingness to invest in YPF stock in connection with the IPO. Contrary to Mr. Blackett, I concluded that the YPF Bylaws' tender offer provisions were not critically important to investors' decisions to invest in YPF or for the completion of YPF's IPO.[11]

8.     Similarly, the Blackett Rebuttal Report asserts that the supposed ability of investors to sue in U.S. courts to enforce the YPF Bylaws' tender offer provisions was likewise critical to the success of YPF's IPO. Mr. Blackett states:

> If YPF had merely promised investors in New York that they could run to the Argentine courts to seek redress after a takeover, no underwriter would have agreed to market the IPO because no investor would have accepted the risk of having to litigate in Argentine court against Argentina for money owed. Investors who purchase securities listed on the NYSE rely on access to the US courts to enforce their rights, regardless of the nationality of the underlying issuer.[12]

Again, Mr. Blackett disregards YPF's disclosures and overstates the importance of one factor while ignoring the more fundamental factors that investors base their investment decisions on. He provides no evidence whatsoever for his claim that the IPO would have failed absent the enforceability of the YPF Bylaws in U.S. courts. On the contrary, evidence from YPF's IPO

---

[8]     Blackett Rebuttal Report, ¶ 10. *See also* Blackett Rebuttal Report, ¶¶ 12, 14, 25, and 30.

[9]     Sharon Rebuttal Report, Section III.A and Section III.B.

[10]     Sharon Rebuttal Report, Section III.C.

[11]     Sharon Rebuttal Report, ¶ 20.

[12]     Blackett Rebuttal Report, ¶ 30.

CONFIDENTIAL

prospectus, investment commentary surrounding YPF, and investor behavior around the time of YPF's IPO demonstrates the opposite.

9.   YPF's IPO prospectus explicitly warns investors, including on its very first pages, about uncertainty regarding the enforcement of certain liabilities in U.S. courts:

> All of YPF's current directors and officers … are non-residents of the United States. All or a substantial portion of the assets of YPF and of these persons are located outside the United States. As a result, it may not be possible for investors to effect service of process within the United States upon YPF or such persons with respect to matters arising under the Federal securities laws of the United States, or to enforce, in United States courts, judgments against them obtained in such courts predicated upon civil liabilities of such officers and directors under the laws of jurisdictions other than Argentina, including any judgment predicated upon United States Federal securities laws.[13]

In other words, investors were plainly informed of the risk that judgments and civil liabilities may not be enforceable in U.S. courts, yet they invested anyway. Likewise, investors eagerly acquired equity interests in YPF during the 1993 IPO notwithstanding the fact that they were explicitly told in the YPF IPO prospectus that Argentine Courts would have "*exclusive jurisdiction*" over enforcement of any rights under the YPF By laws:

> *Exclusive Jurisdiction* … The By-laws are governed by Argentine law and any action relating to enforcement of the By-laws or a shareholder's rights thereunder is required to be brought in an Argentine court.[14]

---

[13]   YPF Sociedad Anónima, Form F-1, filed June 24, 1993 ("YPF IPO Prospectus"), p. 3.

[14]   YPF IPO Prospectus, p. 88.

Mr. Blackett fails to acknowledge or address this prospectus disclosure in his rebuttal report.[15] Moreover, the prospectus of the 1997 YPF PPP share offering, which Mr. Blackett himself was involved in,[16] contains an almost identical discussion on enforcement of liabilities.[17]

10.    In my experience as an investor, such disclaimers about the legal environment and enforcement of rights are extremely common in the prospectuses of ADRs and foreign companies listed on the NYSE.[18] It is therefore generally understood by investors, and disclosed by these companies, that the legal environment for these shares can be complex and is highly likely to involve the issuer home country's legal and political systems—which can often be nebulous or even unstable, especially for developing countries. Yet, in practice, investors commonly purchase these shares despite such jurisdictional and legal issues and willingly accept the higher-risk legal conditions of these investments, which are not necessarily insured by the American legal and regulatory systems (as highlighted in the regulatory offering documents).

11.    For example, as a mining analyst, I have followed the development of Oyu Tolgoi, the largest copper mine in Mongolia. It was discovered in 2001 as a result of the 1997 Minerals Law—which incentivized foreign direct investment into Mongolia's mining sector, and developed by international mining companies Turquoise Hill and Rio Tinto. However, due to its large size, the Mongolian government decided to declare it of "strategic importance" in 2006, and the Minerals

---

[15]    In his Rebuttal Report, Mr. Blackett concedes that "[i]nvestors reading the YPF Bylaws would understand that, because YPF was an Argentine company, disputes related to internal corporate governance would be resolved in an Argentine court." *See* Blackett Rebuttal Report, ¶ 29. But Mr. Blackett fails to address that the prospectus makes clear that "*any* action *relating to enforcement of the By-laws or a shareholder's rights*" must be brought in an Argentine court (*see* YPF IPO Prospectus, p. 88 [emphasis added]), and does not explain why investors would have "understood" that statement to mean something different than what it says.

[16]    Blackett Report, ¶ 10.

[17]    YPF Sociedad Anónima, Form F-3, filed June 10, 1997, p. 24 ("[A]ll of [YPF's] current officers, certain of its directors … are non-residents of the United States. All or a substantial portion of the assets of [YPF] and these persons are located outside of the United States. As a result, it may not be possible for investors to effect service of process within the United States upon [YPF] or such persons with respect to matters arising under the federal securities laws of the United States, or to enforce, in United States courts, judgments against them obtained in such courts predicated upon civil liabilities of such officers and directors under the laws of jurisdictions other than Argentina, including any judgment predicated upon United States federal securities laws.").

[18]    *See e.g.*, Mercadolibre, Inc., Prospectus, filed August 9, 2007, p. 32. Note that, as of December 31, 2021, Mercado Libre, Inc. was listed on NASDAQ with a market capitalization of $68 billion, of which over $61 billion was held by foreign investors. *See* Refinitiv; Bloomberg, L.P. Therefore, these disclaimers do not prevent a company from becoming one of the most valuable companies in LATAM with substantial foreign investment. For additional examples of such disclaimers in prospectuses, *see also* Grupo Financiero Galicia S.A., Prospectus, filed September 8, 2017, p. S-19;  XP Inc., Form F-1, filed November 15, 2019, pp. 231-232; On Holding AG, Prospectus, filed August 23, 2021, p. 193.

Law was amended such that the government would own 34% of the mine, with their interest and project costs financed by future expected dividend payments. The legal framework was again modified and the government challenged Rio Tinto via allegations of tax evasion when it became clear that cost overruns and low copper prices would preclude any dividend payments.[19] Despite these and other disputes that continue to this day, large international investors, such as Credit Suisse, Nomura, and Vanguard, continued to invest in the NYSE-listed Turquoise Hill Resources.[20] In doing so, they subjected themselves to a risky jurisdictional and legal framework with little ability to exert their rights over the Mongolian government's changes to mining regulations, ownership rules, and tax policies. These investors sought to earn a return that justified taking the risks they assessed.

12.     Moreover, as I described in my Rebuttal Report, international investors invested enthusiastically in YPF, with the IPO more than four times oversubscribed and priced at the high end of its initial target price range.[21] This evidence flatly contradicts Mr. Blackett's claim that "no investor would have accepted the risk of having to litigate in Argentine court against Argentina for money owed."[22]

13.     In my Rebuttal Report, I reviewed the 10 initiating coverage reports covering YPF from June 29, 1993 through January 29, 2012 and found that, while these reports discuss a broad range of investment factors, they rarely mention issues of minority rights protections and never discuss the YPF Bylaws' tender offer provisions.[23] I reviewed these reports once more for any discussion of enforceability in U.S. courts as an investment factor and found no mention whatsoever of that issue. In other words, the ability for investors to sue in U.S. courts was not identified as an investment consideration in analysts' initiating coverage reports for YPF, belying Mr. Blackett's claim of its critical importance. This finding is unsurprising given the explicit warning in the YPF IPO prospectus I discuss above.

14.     Initiating coverage reports are frequently the most significant reports an investment bank writes and distributes widely to their entire client base. Such reports are often relied upon by investors as

---

[19]     Lander, Jennifer, "A Critical Reflection on You Tolgoi and the Risk of a Resource Trap in Mongolia: Troubling the "Resource Nationalism" Frame," *Law, Social Justice & Global Development Journal*, Vol. 18, No. 2 (2013).

[20]     Refinitiv.

[21]     Sharon Rebuttal Report, ¶ 74.

[22]     Blackett Rebuttal Report, ¶ 30.

[23]     June 29, 1993 is the day YPF's stock began trading. January 29, 2012 is the day of the *Página 12* article in which an expropriation of YPF was first suggested. *See* Sharon Rebuttal Report, footnote 47; Sharon Rebuttal Report, Figure 1.

CONFIDENTIAL

the most thorough and educational reports that analysts covering the stock issue and are often referred back to over the ensuing years. In that way, initiation reports are a benchmark for the key issues surrounding the investment outlook for a company.[24] These reports substantiate several of the valuation drivers and risks that I discuss in my Rebuttal Report.[25] The lack of discussion around the uncertainty of court jurisdiction or enforceability of U.S. securities laws, despite being highlighted up front in the prospectus, shows how irrelevant this factor was to the investment analysis the investment banks wrote for their largest investment clients.

15.     I also conducted a broader review of YPF analyst reports, *i.e.*, not limited to YPF's initiating coverage reports, to determine the extent to which they discuss the U.S. court provision. I identified 236 analyst reports available on Thomson One that covered YPF and were published between June 29, 1993 and January 29, 2012.[26] I searched for a broad collection of terms that could potentially relate to YPF investors' ability to sue in U.S. courts.[27] Only 62 out of 236 (26%) analyst reports contain these terms. I then manually reviewed these 62 reports and found that *none* discuss the keywords in contexts relevant to enforceability in U.S. courts:

- 37 mention the terms in the legal disclaimer sections of the analyst report that do not contain substantive discussion pertinent to YPF;

- 23 mention the terms in irrelevant contexts, such as the Argentinian legal system or YPF's individual legal matters, none of which refers to the U.S. court system;

- 2 mention words that my search was not intended to find, such as "courtesy" or unrelated Spanish words.

16.     These results are, again, unsurprising given the clear warnings in the YPF IPO prospectus and inconsistent with the claim put forth in the Blackett Rebuttal Report that "no investor would have accepted the risk of having to litigate in Argentine court against Argentina for money owed."[28] Corroborating these facts with contemporaneously published benchmark analyst reports eliminates the persistent hindsight bias implicit in many of Mr. Blackett's factually unsubstantiated opinions.

---

[24]    *See* Irvine, Paul, "The incremental impact of analyst initiation of coverage," *Journal of Corporate Finance*, Vol. 9, No. 4 (2003).

[25]    Sharon Rebuttal Report, III.A, III.B, III.C.3.

[26]    In a similarly broad search conducted for the Rebuttal Report, I did not find any Repsol report that mentions the search terms in relevant contexts. *See* Sharon Rebuttal Report, ¶¶ 59-63.

[27]    I searched for "jurisdiction*," "court*," and "legal*" to capture all variations of these words.

[28]    Blackett Rebuttal Report, ¶ 30.

17.   Mr. Blackett's claims also contradict the actual behavior of large YPF institutional shareholders, and international investors in general. These investors often invested in similarly risky companies and in similarly risky countries.[29] They also often bought local shares traded in local markets, in addition to or in lieu of ADRs and GDRs.[30] For example, while Wellington Management Company held a $4.2 million position in YPF ADRs as of December 31, 1993, it also held large positions of local shares, including $5.3 million in Singapore Press (Singapore), $25 million in Tenaga Nasional Berhad (Malaysia), and $30.6 million in China Light and Power (Hong Kong).[31] As another example, while Oakmark held $29.6 million in YPF ADRs as of October 31, 1995, it also held large positions of local shares, including $24.6 million in Banco de Galicia y Buenos Aires (Argentina), $20.2M in Usiminas (Brazil), and $24.1 million in Asia Pulp & Paper Company (Indonesia).[32] The fact that these investors frequently bought local shares (*i.e.*, non-ADRs) that have no connection to the U.S. court system further demonstrates that recourse in U.S. courts is not paramount to the decision-making of international investors and large YPF shareholders. Large international investors, which often purchase local shares along with ADRs, understand that they are "subject[ing] [their] rights" to the decisions of local governments,[33] a conclusion that contradicts Mr. Blackett's statement.

18.   In summary, in his rebuttal report, Mr. Blackett again ignores: (i) key investment considerations that international investors base their investment decisions on; (ii) YPF's disclosures and investment commentary; (iii) YPF IPO performance; and (iv) the behavior of YPF investors. In so doing, he overstates the importance of the YPF Bylaws' tender offer provisions and investors' supposed ability to sue in U.S. courts to investors' willingness to invest in YPF and the success of the YPF IPO.

---

[29]   Sharon Rebuttal Report, Section IV.C and Section IV.D. Even Eton Park held $54 million in shares in another Argentine company, Pampa Energia. *See* Eton Park Capital Management, L.P., Form 13F, March 31, 2011.

[30]   Similar to ADRs, GDRs (Global Repository Receipts) give issuers access to international markets, but they are usually listed on the London Stock Exchange. *See* "Global Depositary Receipts (GDRs): A Primer," *Citi*, available at <https://depositaryreceipts.citi.com/adr/common/file.aspx?idf=1525>; *see also*, "Understanding American Depositary Receipts (ADRs)," *Fidelity*, available at <https://www.fidelity.com/learning-center/investment-products/stocks/understanding-american-depositary-receipts>.

[31]   Wellington Management Company, Form 13F, December 31, 1993, pp. 32, 101, 149, 166.

[32]   Oakmark International Fund, Annual Report, October 31, 1995, pp. 25-28, available at <https://oakmark.com/wp-content/uploads/sites/3/2019/10/95-1031_1995Annual_OakmarkReportrev.pdf>.

[33]   Blackett Rebuttal Report, ¶ 15.

**B.**     **Mr. Blackett's Opinions on the Enforceability of the YPF Bylaws Misrepresent International Investors' Market Perceptions and Are Inconsistent with Evidence and Basic Logic**

19.     Much of the rationale offered by the Blackett Rebuttal Report in its discussion of the enforceability of the YPF Bylaws is contrary to evidence and basic logic with respect to the behavior of international investors. For example, with regards to the Argentine government's right to expropriate "in accordance with the common good," Mr. Blackett states that investors would not rely on a "subjective standard" of what may be included in "common good," and that "no investor would have agreed to subject its rights to the whims of the Government."[34] This is plainly wrong. As I describe in my Rebuttal Report, investors were aware of the risk factors associated with a privatization of state resources and, in particular, the risk of government action impacting YPF's value. For example, YPF's IPO prospectus delineates various ways the Argentine government can unquestionably impact YPF's profitability, including through its currency peg to the U.S. dollar, its regulatory framework governing YPF's key exploration permits and production concessions, taxation, and price controls.[35] Despite the uncertainties surrounding potentially negative government action, investors flocked to YPF's IPO. They did so because they believed their investment would appreciate; as **Figure 1** below shows, it did.

---

[34]     Blackett Rebuttal Report, ¶ 15.

[35]     Sharon Rebuttal Report, ¶ 48.

**Figure 1**
**YPF Total Returns Since IPO**

| Time Period Since IPO | YPF Total Return |
| --- | --- |
| 1-year | 29.8% |
| 3-year | 30.7% |
| 5-year | 81.8% |

**Notes:**

[1] Returns are calculated with respect to the IPO price of $19.

[2] YPF total return includes both appreciation of stock prices and dividends.

**Source:**

[A] Bloomberg, L.P.

20.    Mr. Blackett's criticism of the "capacious concept of the 'common good'"[36] is also at odds with his opening report in that it ignores the fact that investors were aware of how important YPF and the oil and gas sector were to Argentina's national interest. As Mr. Blackett himself describes in his opening report, "Argentina's oil assets were often perceived to be a national patrimony that should be governed by nationalist priorities."[37] Considering YPF's importance to Argentina and its substantial impact on the national economy, annual budget, and international creditors, it is more likely that investors would anticipate that government actions toward YPF for the "common good" might indeed be applied capaciously.[38]

21.    Mr. Blackett suggests that after Argentina declared Repsol's shares subject to expropriation, "investors no longer saw YPF as a market-friendly investment."[39] He provides no evidence for this assertion. In fact, there is clear evidence to the contrary: investors still viewed YPF as an investment opportunity in the years following the Argentine Congress's passage in May 2012 of the law making 51% of YPF's shares subject to expropriation. First, the investor base of the 49% of YPF that was publicly traded after that law was passed was broad and comprised well-known investors

---

[36]    Blackett Rebuttal Report, ¶ 15.

[37]    Blackett Report, ¶ 38.

[38]    There were even examples of this in other emerging market countries. For example, around the time at which Plaintiffs purchased shares of YPF, the Indonesian government passed the Coal and Mineral Mining Law in 2009. This law required all foreign mining companies to divest 51% of their shares to the Indonesian government within 10 years of the start of operations. *See* Reinard Sulaiman, Stefanno, "A Guide to Understanding the Freeport Divestment Deal," *The Jakarta Post*, July 16, 2018, available at <https://www.thejakartapost.com/news/2018/07/13/a-guide-to-understanding-the-freeport-divestment-deal html>.

[39]    Blackett Rebuttal Report, ¶ 16.

and investment funds, such as Carlos Slim, George Soros, and Lazard Asset Management.[40] In fact, Mr. Slim held his shares for over two years after acquiring them from Petersen in June 2012 following Petersen's default and foreclosure, stating at the time, through a spokesman, his view that YPF was "a solid company with good growth potential."[41] This statement by Mr. Slim came just one month after the law making 51% of YPF's shares subject to expropriation was passed by the Argentine Congress, exemplifying that numerous investors still saw the value and potential in YPF after the announcement of the expropriation. Had these sophisticated investors viewed YPF as "market-unfriendly," they would have sold their positions, yet they acquired and continued owning shares for some time.

22.    Second, YPF was still able to secure other foreign direct investment after the expropriation was announced. Specifically, the U.S. oil company Chevron Corp. ("Chevron") announced in July 2013 that it had invested $1.24 billion in YPF's Vaca Muerta shale oil and gas formation, a direct capital investment. This investment was likely riskier than the acquisition of ADRs in YPF and demonstrated an even stronger sense of confidence in YPF and Argentina than a passive and tradeable stock investment in YPF.[42]

23.    Third, as shown in **Figure 2** below, after Argentina announced it was taking control of YPF in April 2012, YPF's publicly traded stock price increased over the subsequent two years. Therefore, investors that retained their shares following the announcement of the planned expropriation had been right to do so. These facts are inconsistent with Mr. Blackett's blanket assertion that "investors no longer saw YPF as a market-friendly investment."[43]

---

[40]    *See* **Appendix C** for a list of YPF's top 20 shareholders (excluding the Argentine government) as of June 30, 2014.

[41]    "Argentina's YPF soars most in three years after billionaire Slim gets 8.4% stake," *Bloomberg News*, June 15, 2012, available at <https://financialpost.com/commodities/energy/argentinas-ypf-soars-most-in-three-years-after-billionaire-slim-gets-8-4-stake>.

[42]    "Chevron, Argentina's YPF sign $1.24 billion Vaca Muerta shale deal," *Reuters News*, July 16, 2013, available at <https://www.reuters.com/article/us-argentina-chevron/chevron-argentinas-ypf-sign-1-24-billion-vaca-muerta-shale-deal-idUSBRE96F18X20130717>.

[43]    Blackett Rebuttal Report, ¶ 16.

**Figure 2**
**YPF Stock Price**
*January 3, 2012 - September 30, 2014*



<u>Note:</u>
[1] Chart represents unadjusted closing prices in USD.

<u>Source:</u>
[A] Bloomberg, L.P.

24.  Mr. Blackett claims that investors in YPF's IPO would be particularly sensitive to government expropriation because "[i]nstitutional investors and hedge funds typically purchase shares on margin as the Petersen entities did."[44] As such, "[t]hese investors knew that if the Government announced its intent to re-nationalize YPF, re-nationalization would be a fait accompli, and the share price would fall if the Government claimed that the tender offer requirement was not enforceable. These investors would need cash in the short-term to pay their lenders."[45]

25.  Mr. Blackett is simply wrong that institutional investors typically purchase shares on margin. Institutional investors are typically legally *not allowed* to buy on margin. Under the Employee Retirement Income Security Act of 1974 (ERISA), pension funds are prohibited from borrowing money or having margin against fund assets.[46] Under the Investment Company Act of 1940, mutual

---

[44]  Blackett Rebuttal Report, ¶ 26.

[45]  Blackett Rebuttal Report, ¶ 26.

[46]  The Employee Retirement Income Security Act of 1974 (ERISA), Section 406(a)(1)(B) ("A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect […] lending of money or other extension of credit between the plan and a party in interest.").

funds face strict limitations regarding borrowing against the value of fund assets.[47] As of March 1997, YPF's investor base included many pension funds and mutual funds that could not hold YPF shares on margin, including BlackRock Balance Capital Fund, a mutual fund that held 6.3 million shares of YPF valued at $167 million, and Ohio Public Employees Retirement System, a pension fund that held 1.6 million shares of YPF valued at $42 million.[48] Instead of borrowing, institutional investors typically function as security *lenders* who earn interest on the securities they lend out to individuals or hedge funds that short stock.[49]

26.     Furthermore, even hedge funds, which I agree frequently buy on margin, do not do so "as the Petersen entities did."[50] Hedge funds take out margin loans on a diversified portfolio of securities such that large declines in one security would *not* be expected to trigger a meaningful collateral call on the entire portfolio. The Petersen entities, on the other hand, appear to have taken out margin

---

[47]     The Investment Company Act of 1940, Section 18(a)(1)(A) ("[I]mmediately after such issuance or sale [of senior security representing an indebtedness], [the fund] will have an asset coverage of at least 300 per centum.").

[48]     Refinitiv; Bloomberg.

[49]     *See e.g.*, Baklanova, Viktoria, *et al.*, "A Pilot Survey of Agent Securities Lending Activity," *Office of Financial Research Working Paper*, August 23, 2016, p. 3; *see also*, "International Securities Finance Survey 2019," *Global Investor Group*, available at <https://www.globalinvestorgroup.com/file/getfile/18649>.

[50]     Blackett Rebuttal Report, ¶ 26.

loans secured only by their ownership in YPF,[51] an extremely risky position that made them highly susceptible to drops in YPF's stock price.[52]

27.     In summary, the opinions offered by Mr. Blackett in his rebuttal report on the enforceability of the YPF Bylaws are based on rationale contrary to evidence and basic logic. For example, regarding the Argentine government's right to expropriate, he is critical of the "common good"[53] standard, suggesting that investors would have avoided investing in YPF given this "subjective standard."[54] However, especially given the importance of YPF to the national economy, which Mr. Blackett himself acknowledges, investors were well aware of the ways the Argentine government could impact YPF and invested in YPF anyway. Mr. Blackett also suggests that investors no longer viewed YPF as a "market-friendly investment" after Argentina announced the planned expropriation of Repsol's shares. But this assertion is contradicted by the behavior of investors and the performance of the YPF stock after Argentina announced the planned expropriation.

---

[51]     "Security Agreement," February 21, 2008, pp. 6-7, available at <https://www.sec.gov/Archives/edgar/data/904851/000090342312000292/petersen-13da13ex9939_0516 htm>; "Security Agreement," May 19, 2011, pp. 5-6, available at <https://www.sec.gov/Archives/edgar/data/904851/000090342311000282/petersen-13da11ex9934_0520 htm>; "Pledge and Security Agreement," February 21, 2008, pp. 3-4, available at <https://www.sec.gov/Archives/edgar/data/904851/000090342312000308/petersen13da14ex9941_0531 ht m>; "Pledge and Security Agreement," May 19, 2011, pp. 4-5, available at < https://www.sec.gov/Archives/edgar/data/904851/000090342311000282/petersen-13da11ex9933_0520 htm>; "Pledge and Security Agreement," November 12, 2008, p. 5, available at <https://www.sec.gov/Archives/edgar/data/904851/000090342308000944/petersen-13da8ex9923_1117 htm>.

[52]     The fact that "Petersen's loan was secured by $175 of calculated collateral value for every $100 of Senior Secured Loan," as Mr. Blackett notes (*see* Blackett Rebuttal Report, ¶ 37), indicates that lenders perceived the YPF shares as high-risk collateral. Non-cash collateral is typically subject to larger "haircuts" when their value is more volatile, so that less than $1 of credit is given per $1 of collateral posted. The YPF shares were subject to a 43% haircut ($75 / $175), while less risky collaterals (e.g., sovereign debt and investment grade corporate debt) are typically subject to a 0.5%-12% haircut. *See* Gregory, Jon, *Counterparty Credit Risk and Credit Value Adjustment: A Continuing Challenge for Global Financial Markets*, Wiley Finance (2012), pp. 73-75, 182-183; "Memorandum Re: Risk Adjustment and Haircut Schedules," *SEC*, November 1, 2016, available at <https://www.sec.gov/comments/s7-24-15/s72415-260.pdf>.

[53]     Blackett Rebuttal Report, ¶ 15.

[54]     Blackett Rebuttal Report, ¶ 15.

## III.    MR. BLACKETT'S CLAIM THAT PETERSEN'S LENDERS WOULD NOT HAVE FORECLOSED ABSENT THE APRIL 2012 EXPROPRIATION ANNOUNCEMENT IS SPECULATIVE AND UNSUPPORTED

28.    I understand that Petersen defaulted on its loans in May 2012 and that Petersen's lenders foreclosed on Petersen's pledged YPF shares thereafter.[55] In Section IV of the Blackett Rebuttal Report, Mr. Blackett asserts that "if Argentina had announced in April 2012 that it would comply with the tender offer requirement, Petersen's bank lenders would not have foreclosed."[56] He also asserts that if a tender offer had been announced, YPF's lenders would have "regarded the loan as safe."[57] Even though, under this hypothetical, the lenders could have foreclosed and collected the tender offer proceeds for themselves, Mr. Blackett "doubt[s]" they would have done so because it would "possibly tarnish[] the lenders' reputations in the eyes of other potential borrowers"[58] and the lenders would have to return any share value that exceeded the loan amount anyway, meaning there would be "no incentive for the lenders to foreclose ahead of a tender offer."[59]

29.    Mr. Blackett is once again speculating without any basis or analysis, this time about what Petersen's lenders would (or would not) have done. He ignores any number of considerations Petersen's lenders may have had in deciding whether to foreclose on the loans, even had Argentina announced that it would make a tender offer. Mr. Blackett admits that he has no securities lending experience, save for some discussions with his direct reports.[60] His mistaken belief that institutional investors typically purchase shares on margin—which, as I explain above, is plainly wrong—confirms his unfamiliarity with the securities lending business. Unlike Mr. Blackett, I have extensive experience with securities lending through my hedge fund, and in my experience, lenders will act in their own best interests to ensure the full repayment of the outstanding principal and interest on their loans. Lender behavior will depend on the circumstances surrounding the event of default and their perception of the evolving creditworthiness of the loan.

---

[55]    *See e.g.*, "Argentina's Petersen Group in default: SEC filing," *Reuters*, May 18, 2012, available at <https://www.reuters.com/article/us-argentina-petersen-ypf/argentinas-petersen-group-in-default-sec-filing-idUSBRE84H12920120518>.

[56]    Blackett Rebuttal Report, ¶ 31.

[57]    Blackett Rebuttal Report, ¶ 41.

[58]    Blackett Rebuttal Report, ¶ 42.

[59]    Blackett Rebuttal Report, ¶ 43.

[60]    Blackett Rebuttal Report, ¶ 32.

30.     In the case of Petersen's loans, Petersen's lenders may very well have decided to foreclose regardless of the Argentine government's decision to announce the expropriation of 51% of YPF or even if Argentina had announced it would conduct a tender offer. Even absent the Argentine government Intervention Decree and passage of the law making 51% of YPF's shares subject to expropriation, the facts and circumstances surrounding YPF had changed since the loans were originated such that Petersen's lenders may have reevaluated whether they wanted to remain exposed to this credit. For example:

- YPF's credit rating was downgraded from Ba1 to Ba2 by Moody's in late-2011.[61]

- YPF announced a major discovery of oil in the Vaca Muerta formation in May 2011, another significant post-loan development.[62] Many shale and drilling-focused oil companies need to reinvest cash flow to grow production levels and capitalize on resource exploitation rather than distribute cash flow via dividends.[63] Hence, as the possibility of YPF developing the shale resources in Vaca Muerta increased over time, so did questions about YPF's dividend sustainability.[64]

In addition, there were a number of event of default triggers on Petersen's loans, including Petersen's failure to furnish financial statements and a missed principal or interest payment,[65] that lenders would have considered when determining the likelihood Petersen would repay the loans absent foreclosure and whether or not Argentina announced a tender offer. Mr. Blackett does not analyze or review any of these factors. He instead conjectures that Petersen's lenders would not have foreclosed simply because of possible reputational harm.

31.     In summary, Mr. Blackett's assertions about what Petersen's lenders would or would not have done are speculative and without basis. In my experience with securities lending, lenders act in their own

---

[61]     Refinitiv.

[62]     Webber, Jude, "YPF makes second shale oil discovery," *Financial Times*, May 10, 2011, available at <https://www.ft.com/content/ca601f88-7b75-11e0-ae56-00144feabdc0>.

[63]     *See e.g.*, Olson, Bradley, "Wall Street Tells Frackers to Stop Counting Barrels, Start Making Profits," *The Wall Street Journal*, December 13, 2017, available at <https://www.wsj.com/articles/wall-streets-fracking-frenzy-runs-dry-as-profits-fail-to-materialize-1512577420>; Wald, Ellen R., "This Is What The End Of Shale Will Look Like," *Forbes*, August 11, 2017, available at <https://www.forbes.com/sites/ellenrwald/2017/08/11/this-is-what-the-end-of-shale-will-look-like/?sh=fe3a30e5a055>.

[64]     *See* "Field Trip Notes: Resurrecting the dead (cow that is)," *Bank of America Merrill Lynch*, November 28, 2011, pp. 3, 9; "Time to Spend Cash Wisely," *Itaú BBA*, December 18, 2011, pp. 1, 6.

[65]     *See e.g.*, "Credit Agreement," February 21, 2008, pp. 48, 56-60, available at <https://www.sec.gov/Archives/edgar/data/904851/000090342308000195/peterson-ex9906.htm>.

CONFIDENTIAL

interests depending on the potential for default and the creditworthiness of the loan. There were a number of scenarios in which Petersen's lenders could have reevaluated whether Petersen would be able to service their debt, and a number of event of default triggers explicitly written into the Senior Secured Loan agreements that would have been applicable irrespective of the hypothetical announcement of a tender offer in April 2012.

Executed on January 14, 2022.

_____

Harold Sharon

CONFIDENTIAL

**Appendix A**

# C.V. FOR HAROLD E. SHARON

### Profile

Senior Executive and Portfolio Manager in Global Investment Management industry for 35 years. Partner and Co-Founder of two award-winning Global Equity groups for prominent investment managers in U.S. Managed all aspects of the business division for those firms, including oversight and implementation of corporate and regulatory policy. Have appeared on CNBC, Bloomberg TV and Public Television's Wall Street Week in Review, as well as contributed to articles in the Wall Street Journal, Barrons, The New York Times, Fortune, Forbes, Kiplingers and many other financial publications. Frequent speaker at conferences for the wealth management, investment banking and institutional consulting industry.

### Work Experience

Lord Abbett & Co, Partner, Director of Global Equity, Global Equity Strategist — 2003-2018 (retired)

$190 billion US Fund Manager. Founded Global Equity division and managed all aspects of the business. Member Strategic Allocation Committee, Global Business Strategy Committee. Oversaw team of 12, managed top-performing funds and secured large clients such as PepsiCo, Akzo-Nobel and Goldman Sachs for institutional mandates.

Warburg Pincus/Credit Suisse Asset Management, Partner/Managing Director and Head of Global Equity Group — 1990-1994, 1997-2001

$25 billion US Fund Manager acquired by $680 billion Global Fund Manager in 1999. Founded Global Equity division and managed all aspects of the business, oversaw team of 22 managing multiple investment strategies. Numerous industry awards for top-performance in multiple products. Member of various business strategy committees and appointed by CSAM Global CEO as Co-Chairman of Global MD Review Committee for 2 years.

Other Experience

Portfolio Manager/Analyst, Oppenheimer, Batterymarch Financial, Credit Suisse Intern

### Consulting Experience

Provided expert report in the matter between *Dennis Fischer, Sheila Snyder, Lawrence Dykun, Ray Shugar and Wayne Dzeoba* and *IG Investment Management LTD, CI Mutual Funds Inc., Franklin Templeton Investments Corp., AGF Funds Inc. and AIC Limited*, February 12, 2021, Court File No. 06-CV-307599CP.

### Education

Massachusetts Institute of Technology, Sloan School of Management — SM, 1982
Thesis Advisor, Professor Donald Lessard, International Management

University of Rochester, BA Economics & Political Science, 1980, High Honors
Additional Graduate Economics work

Passed Series 7,24,66 Licenses from Financial Industry Regulatory Association

CONFIDENTIAL

**Appendix B**
**Additional Materials Relied Upon**

## Expert Reports

- Rebuttal Expert Report of Harold Sharon, December 3, 2021 in the matter of *Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. v. Argentine Republic and YPF S.A.,* Case No. 1:15-cv-02739, and *Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. v. Argentine Republic and YPF S.A.,* Case No. 1:16-cv-08569.

- Rebuttal Expert Report of Richard Blackett, December 3, 2021, in the matter of *Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. v. Argentine Republic and YPF S.A.,* Case No. 1:15-cv-02739, and *Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. v. Argentine Republic and YPF S.A.,* Case No. 1:16-cv-08569.

## Academic Literature

- Baklanova, Viktoria, et al., "A Pilot Survey of Agent Securities Lending Activity," *Office of Financial Research Working Paper* (2016).
- Gregory, Jon, *Counterparty Credit Risk and Credit Value Adjustment: A Continuing Challenge for Global Financial Markets* , Wiley Finance (2012).
- Lander, Jennifer, "A Critical Reflection on You Tolgoi and the Risk of a Resource Trap in Mongolia: Troubling the "Resource Nationalism" Frame," Law, Social Justice & Global Development Journal, Vol. 18, No. 2 (2013).
- See Irvine, Paul, "The incremental impact of analyst initiation of coverage," Journal of Corporate Finance, Vol. 9, No. 4 (2003).

## Analyst Reports

- YPF Report, *Credit Suisse First Boston Corporation,* August 11, 1993.
- YPF Report, *Credit Suisse First Boston Corporation,* December 23, 1993.
- YPF Report, *Natwest Securities Corporation,* July 06, 1994.
- YPF Report, *Deutsche Bank,* May 28, 1996.
- YPF Report, *Deutsche Bank,* July 14, 1997.
- YPF Report, *ING Bank N.V,* December 01, 1997.
- YPF Report, *Deutsche Bank,* June 08, 1998.
- YPF Report, *Deutsche Bank,* August 05, 1998.
- YPF Report, *ING Bank N.V,* August 12, 1998.
- YPF Report, *Cowen And Company,* August 14, 1998.
- YPF Report, *ING Financial Markets History USA,* November 10, 1998.
- YPF Report, *Credit Suisse,* January 22, 1999.
- YPF Report, *Credit Suisse,* January 22, 1999.
- YPF Report, *Bear Stearns,* February 05, 1999.
- YPF Report, *Bear Stearns,* February 07, 1999.
- YPF Report, *Credit Suisse,* February 16, 1999.
- YPF Report, *Credit Suisse,* February 17, 1999.
- YPF Report, *Duff & Phelps Credit Rating Co.,* June 21, 1999.
- YPF Report, *Duff & Phelps Credit Rating Co.,* July 06, 1999.
- YPF Report, *UBS,* August 05, 1999.
- YPF Report, *Natwest Markets,* September 06, 1999.
- YPF Report, *Mergent, Inc. - Company Report,* August 10, 2001.
- YPF Report, *Epsilon S.A.,* August 04, 2003.
- YPF Report, *Epsilon S.A.,* August 04, 2003.
- YPF Report, *Bear Stearns Morning Meeting Notes,* October 11, 2006.
- YPF Report, *Bear Stearns,* October 12, 2006.

- YPF Report, *Itau BBA,* April 14, 2011.
- YPF Report, *Itau BBA,* May 06, 2011.
- YPF Report, *Deutsche Bank,* May 09, 2011.
- YPF Report, *Morgan Stanley,* May 09, 2011.
- YPF Report, *Itau BBA,* May 10, 2011.
- YPF Report, *Morgan Stanley,* May 11, 2011.
- YPF Report, *Itau BBA,* July 06, 2011.
- YPF Report, *Itau BBA,* July 25, 2011.
- YPF Report, *Deutsche Bank,* July 27, 2011.
- YPF Report, *Itau BBA,* July 29, 2011.
- YPF Report, *Deutsche Bank,* July 31, 2011.
- YPF Report, *Morgan Stanley,* August 01, 2011.
- YPF Report, *Itau BBA,* August 07, 2011.
- YPF Report, *Morgan Stanley,* August 09, 2011.
- YPF Report, *Capital Markets Argentina S.B.S.A. - Auerbach Grayson,* August 23, 2011.
- YPF Report, *Capital Markets Argentina S.B.S.A. - Auerbach Grayson,* August 30, 2011.
- YPF Report, *Credit Suisse,* September 12, 2011.
- YPF Report, *Itau BBA,* October 25, 2011.
- YPF Report, *Itau BBA,* October 27, 2011.
- YPF Report, *Raymond James Latin America,* October 28, 2011.
- YPF Report, *Deutsche Bank,* November 03, 2011.
- YPF Report, *Raymond James Latin America,* November 03, 2011.
- YPF Report, *Morgan Stanley,* November 03, 2011.
- YPF Report, *Itau BBA,* November 03, 2011.
- YPF Report, *Credit Suisse,* November 03, 2011.
- YPF Report, *Credit Suisse,* November 07, 2011.
- YPF Report, *Morgan Stanley,* November 08, 2011.
- YPF Report, *Raymond James Latin America,* November 08, 2011.
- YPF Report, *Morgan Stanley,* November 08, 2011.
- YPF Report, *Credit Suisse,* November 08, 2011.
- YPF Report, *Raymond James Latin America,* November 30, 2011.
- YPF Report, *Itau Bba,* December 18, 2011.
- YPF Report, *Raymond James Latin America,* December 21, 2011.
- YPF Report, *Allaria Ledsema & Cia,* January 24, 2012.
- YPF Report, *Allaria Ledsema & Cia,* January 24, 2012.
- YPF Report, *Itau BBA,* January 26, 2012.

## Additional Analyst Reports

- "Field Trip Notes: Resurrecting the dead (cow that is)," *Bank of America Merrill Lynch,* November 28, 2011.
- "Time to Spend Cash Wisely," *Itaú BBA,* December 18, 2011.

## News Articles

- "Argentina's Petersen Group in default: SEC filing," *Reuters,* May 18, 2012.
- "Argentina's YPF soars most in three years after billionaire Slim gets 8.4% stake," *Bloomberg News,* June 15, 2012.
- "Chevron, Argentina's YPF sign $1.24 billion Vaca Muerta shale deal," *Reuters News,* July 16, 2013.
- Olson, Bradley, "Wall Street Tells Frackers to Stop Counting Barrels, Start Making Profits," *The Wall Street Journal,* December 13, 2017.
- Reinard Sulaiman, Stefanno, "A Guide to Understanding the Freeport Divestment Deal," *The Jakarta Post,* July 16, 2018.
- Wald, Ellen R., "This Is What The End Of Shale Will Look Like," *Forbes,* August 11, 2017.
- Webber, Jude, "YPF makes second shale oil discovery," *Financial Times,* May 10, 2011.

CONFIDENTIAL

**Public Sources**

- "Global Depositary Receipts (GDRs): A Primer," *Citi,* available at <https://depositaryreceipts.citi.com/adr/common/file.aspx?idf=1525>.
- "International Securities Finance Survey 2019," *Global Investor Group,* available at <https://www.globalinvestorgroup.com/file/getfile/18649>.
- "Memorandum Re: Risk Adjustment and Haircut Schedules," *SEC,* November 1, 2016.
- The Employee Retirement Income Security Act of 1974 (ERISA).
- The Investment Company Act of 1940.
- "Understanding American Depositary Receipts (ADRs)," *Fidelity,* available at <https://www fidelity.com/learning-center/investment-products/stocks/understanding-american-depositary-receipts>.

**Company Filings and Annual Reports**

- "Credit Agreement," February 21, 2008, available at <https://www.sec.gov/Archives/edgar/data/904851/000090342308000195/peterson-ex9906.htm>.
- Eton Park Capital Management, L.P., Form 13F, March 31, 2011.
- Grupo Financiero Galicia S.A., Prospectus, filed September 8, 2017.
- Mercadolibre, Inc., Prospectus, filed August 9, 2007.
- On Holding AG, Prospectus, filed August 23, 2021.
- "Pledge and Security Agreement," February 21, 2008, available at <https://www.sec.gov/Archives/edgar/data/904851/000090342312000308/petersen13da14ex9941_0531.htm>.
- "Pledge and Security Agreement," November 12, 2008, available at <https://www.sec.gov/Archives/edgar/data/904851/000090342308000944/petersen-13da8ex9923_1117.htm>.
- "Pledge and Security Agreement," May 19, 2011, available at <https://www.sec.gov/Archives/edgar/data/904851/000090342311000282/petersen-13da11ex9933_0520 htm>.
- "Security Agreement," February 21, 2008, available at <https://www.sec.gov/Archives/edgar/data/904851/000090342312000292/petersen-13da13ex9939_0516 htm>.
- "Security Agreement," May 19, 2011, available at <https://www.sec.gov/Archives/edgar/data/904851/000090342311000282/petersen-13da11ex9934_0520 htm>.
- XP Inc., Form F-1, filed November 15, 2019.
- YPF Sociedad Anónima, Form 20-F, for fiscal year ended December 31, 2014.
- YPF Sociedad Anónima, Form F-3, filed June 10, 1997.

**Data Sources**

- Refinitiv.

CONFIDENTIAL

**Appendix C**
**YPF Top 20 Public Shareholders as of June 30, 2014**

| | Investor | YPF Shares Held | % of Total YPF Shares | % of Total YPF Shares Available to Public |
|---|---|---|---|---|
| [1] | Slim Domit Helú (Carlos) | 32,150,394 | 8.17% | 16.69% |
| [2] | Lazard Asset Management, L.L.C. | 16,329,265 | 4.15% | 8.48% |
| [3] | Mason Capital Management LLC | 15,715,962 | 4.00% | 8.16% |
| [4] | Soros Fund Management, L.L.C. | 13,783,638 | 3.50% | 7.15% |
| [5] | Perry Capital, LLC | 7,312,114 | 1.86% | 3.80% |
| [6] | Third Point LLC | 6,250,000 | 1.59% | 3.24% |
| [7] | Fidelity Management & Research Company LLC | 5,767,301 | 1.47% | 2.99% |
| [8] | Morgan Stanley Investment Management Inc. (US) | 4,639,451 | 1.18% | 2.41% |
| [9] | Wellington Management Company, LLP | 4,585,740 | 1.17% | 2.38% |
| [10] | Discovery Capital Management, LLC | 3,949,555 | 1.00% | 2.05% |
| [11] | Highfields Capital Management, L.P. | 3,838,069 | 0.98% | 1.99% |
| [12] | Knighthead Capital Management, LLC | 3,788,253 | 0.96% | 1.97% |
| [13] | Smithwood Advisers, L.P. | 3,500,000 | 0.89% | 1.82% |
| [14] | Columbus Hill Capital Management, L.P. | 3,489,317 | 0.89% | 1.81% |
| [15] | Blackstone Alternative Credit Advisors LP | 2,512,681 | 0.64% | 1.30% |
| [16] | Arrowstreet Capital, Limited Partnership | 2,338,857 | 0.59% | 1.21% |
| [17] | PointState Capital LP | 2,180,849 | 0.55% | 1.13% |
| [18] | Monarch Alternative Capital LP | 2,073,531 | 0.53% | 1.08% |
| [19] | QVT Financial LP | 1,980,313 | 0.50% | 1.03% |
| [20] | Redwood Capital Management, L.L.C. | 1,900,000 | 0.48% | 0.99% |
| | **Total:** | **138,085,290** | **35.11%** | **71.67%** |

**Note:**

[1] There were 393,312,793 YPF common shares outstanding as of June 30, 2014. All 51,810 Class A, B, and C shares were held by Argentine federal government, provincial governments, and employees fund. 200,589,525 Class D shares were held by Argentina, and 192,671,458 Class D shares were held by the public.

**Sources:**
[A] Refinitiv.
[B] YPF Sociedad Anónima, Form 6-K, filed August 15, 2014, p. 60.
[C] YPF Sociedad Anónima, Form 20-F, for fiscal year ended December 31, 2014, p. 159.