# Exhibit 1

CONFIDENTIAL

# LIONBRIDGE

STATE OF NEW YORK       )
                                   )
                                   )     ss
COUNTY OF NEW YORK    )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached Rebuttal Opinion.

Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this ___3___ day of _DECEMBER_ 20 21 .

JEFFREY AARON CURETON
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CU6169789
Qualified in New York County
My Commission Expires 09-23-2023

259 W 30th Street, 11th Floor   New York, NY 10001   +1.212.631.7432

CONFIDENTIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

| | | |
|---|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. AND PETERSEN ENERGÍA, S.A.U. | : : : | |
| | : | |
| Plaintiffs, | : : | |
| | : | Case Nº. 1:15-cv-02739-LAP |
| v. | : | |
| | : | |
| ARGENTINE REPUBLIC AND YPF S.A., | : : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

| | | |
|---|---|---|
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD. AND ETON PARK FUND, L.P., | : : : : | |
| | : | |
| Plaintiffs, | : : | |
| | : | Case Nº. 1:16-cv-08569-LAP |
| v. | : | |
| | : | |
| ARGENTINE REPUBLIC AND YPF S.A., | : : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


## <u>REBUTTAL OPINION BY EXPERT ALFONSO SANTIAGO</u>

CONFIDENTIAL

# TABLE OF CONTENTS

**Page**

**I. UNDER ARGENTINE LAW, THE ARGENTINE REPUBLIC WAS NOT REQUIRED TO EXECUTE A TENDER OFFER UNDER THE BYLAWS FOR THE YPF SHARES NOT SUBJECT TO EXPROPRIATION**.................................................................1

**II. GENERAL FRAMEWORK ON THE PRIORITY OF PUBLIC LAW OVER PRIVATE LAW** .........................................................3

    A.    The primacy of public law and the norms of public order with regard to expropriation over all private legal instruments .................................3

    B.    The expropriation of YPF shares as a matter of public order and public interest.............................................................10

**III. THE PUBLIC INTEREST LAW PREEMPTS THE BYLAWS**...........................14

    A.    The provisions of the Bylaws regarding the tender offer are unconstitutional to the extent that the Public Interest Law provided for the Argentine Republic to acquire 51% of shares in YPF by way of expropriation without having to make a tender offer...........................14

    B.    The Public Interest Law expressly stipulated acquiring 51% of the YPF shares .............................................................19

    C.    The Public Interest Lawstipulated that YPF would continue to be a publicly traded company...............................................20

    D.    The Public Interest Law stipulated the method of valuation of the YPF shares .............................................................21

    E.    The Public Interest Law ordered the Republic to vote the YPF shares subject to expropriation.......................................22

**IV. THE EXPROPRIATION LAW AND PUBLIC INTEREST LAW PREEMPT AND RENDER UNENFORCEABLE THE BYLAWS' PROVISIONS ON THE TENDER OFFER** ...........................................22

CONFIDENTIAL

V.      PROF. BIANCHI INCORRECTLY CONTENDS THAT
        ARGENTINE LAW AFFORDS THE PLAINTIFFS A CLAIM FOR
        DAMAGES AND LOSSES ........................................................................24

        A.      The Civil Code's provisions for damages and losses do not apply
                to the State and, in any case, do not apply in the case of
                expropriation ............................................................................24

        B.      The State Liability Law's provisions for damages and losses also
                do not apply ..............................................................................28

VI.     PROFESSORS ROVIRA AND GARRO REFER TO THE
        INCORRECT INTEREST RATE ...........................................................30

        ANNEX I – MATERIALS CONSIDERED……………………………………………37

CONFIDENTIAL

Counsel for the Argentine Republic (the "Republic") have asked me to draft and respond to the expert opinions of Professors Alberto B. Bianchi ("Bianchi Opinion"), Alfredo L. Rovira ("Rovira Opinion") and Alejandro M. Garro ("Garro Opinion") submitted by the plaintiffs Petersen Energía Inversora, S.A.U. ("PEISA") and Petersen Energía, S.A.U. ("PESA," and together with PEISA, "Petersen"), and Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd. and Eton Park Fund, L.P. (together, "Eton Park," and together with Petersen, the "Plaintiffs"), and to give my opinion as to certain aspects of Argentine public law.

1.  I am an attorney duly licensed and qualified in Argentina. I am a professor of Constitutional Law at the Law School of Universidad Austral in the Autonomous City of Buenos Aires, Argentina.

2.  On August 30, 2019 and February 7, 2020 I submitted statements (*see Petersen Energía Inversora, S.A.U.* et al. v. *Argentine Republic and YPF S.A.*, No. 1:15-cv-02739-LAP (S.D.N.Y.), ECF Nos. 117 and 150), which I am incorporating here for reference. My professional qualifications are described in said statements.

3.  My compensation is USD $450 (plus VAT) per hour of work, including the preparation of this work and any deposition or testimony required of me. My compensation does not in any way depend upon the outcome of the case.

4.  In forming the following opinions, I have taken into consideration the documents and other materials set forth in Annex I.

I.  **UNDER ARGENTINE LAW, THE ARGENTINE REPUBLIC WAS NOT REQUIRED TO EXECUTE A TENDER OFFER UNDER THE BYLAWS FOR THE YPF SHARES NOT SUBJECT TO EXPROPRIATION**

CONFIDENTIAL

5.  Consistent with the recitals set forth below, I am in agreement with the conclusions set forth by Prof. Alejandro J. Uslenghi in his opinion of September 24, 2021.

6.  Specifically, I am in agreement that:[1]

      i.     Argentine public law clearly and indisputably establishes that a private legal instrument such as the corporate bylaws ("Bylaws") of YPF, S.A. ("YPF") is preempted, and therefore becomes unenforceable, to the extent that it conditions, renders ineffective or modifies the exercise of the constitutional power of expropriation by the State, or undermines its effects. For this reason and those I shall set forth in this report, Sections 7 and 28 of the Bylaws are not binding on the expropriating State for purposes of obliging it to exercise, in accordance with a private law instrument (the Bylaws) a tender offer to acquire the YPF shares not subject to expropriation, or to pay any kind of compensation to third parties for allegedly failing to do so.

      ii.     Enforcing the Bylaws' tender offer provisions would frustrate the express intent of the National Congress in Law No. 26,741 (the "Public Interest Law") of (i) expropriating only 51% of YPF's shares and no more, (ii) distributing those shares in a specific manner between the Federal Government and the Provinces, and (iii) that after the expropriation, YPF would continue to operate as a publicly-traded company, rather than as a state-owned entity.

      iii.     Requiring the Republic to comply with the provisions of the tender offer in the Bylaws would be inconsistent with two central aspects of Argentine public law. First, if the National Executive Branch had conducted the tender offer as provided for in Sections 7 and 28 of the Bylaws, it would have usurped the exclusive budgetary powers that the National Constitution bestows on Congress. Second, the share valuation process as set forth in the Bylaws violates the legal standards for valuation in cases of expropriation and the constitutional principle of equality in public burdens.

      iv.     According to the Public Interest Law and Law No. 21,499 (the "Expropriation Law"), the expropriated 51% stake in YPF transferred to the State free of any encumbrance, debt, and obligation that might operate to condition, render ineffective or modify the State's expropriation power or undermine the effects of its exercise.

---

[1] See Expert Report of Alejandro Juan Uslenghi of September 24, 2021 ("Uslenghi Report").

CONFIDENTIAL

v.        Even if the Plaintiffs could claim a right to compensation for the alleged failure to conduct a tender offer after expropriation (which they cannot), such a claim could not result in any liability whatsoever to the Argentine Republic. The Expropriation Law expressly provides that any claim by third parties deriving from encumbrances, liabilities or obligations affecting the expropriated assets can only be made against the compensation paid to the expropriated entity, in this case, Repsol. Therefore if the Plaintiffs believed they were entitled to any compensation derived from the expropriation of 51% of the shares in YPF, they should have filed a timely claim in order to be taken into account in the settlement agreement between the Argentine Republic and Repsol, or against Repsol itself.

## II.    GENERAL FRAMEWORK ON THE PRIORITY OF PUBLIC LAW OVER PRIVATE LAW

7.    Professors Bianchi, Rovira and Garro contend that the Argentine Republic (i) was allegedly required to conduct a tender offer by virtue of the expropriation of 51% of the YPF shares[2] and (ii) it is allegedly liable for alleged damages caused to the Plaintiffs for omitting to do so.[3]

### A.    The primacy of public law and the norms of public order with regard to expropriation over all private legal instruments

---

[2] See Bianchi ¶ 48 ("It is my opinion that . . . by virtue of Sections 13 and 14 of Law 26,741, the Argentine State performed its 'takeover' of YPF in accordance with Section 28 of its Bylaws, and this immediately triggered the obligation to carry out a TO."); Rovira ¶ 11(b) ("Defendants breached the Bylaws . . . . Argentina failed to carry out a tender offer for the remaining shares, including Plaintiffs' shares."); Garro ¶ 8(f) ("Argentina breached its obligations under Sections 7 and 28 of the YPF Bylaws by failing to make a tender offer for Plaintiffs' YPF shares.").

[3] See Bianchi ¶ 51 ("In your opinion, are the Argentine Republic and YPF liable for compensation for such damage as may have resulted from their failure to carry out the TO? . . . My answer is yes."); Rovira ¶ 12 ("Under the Argentine Civil Code, Argentina and YPF are liable for 'full indemnification' for the damages caused to Plaintiffs for their breaches of YPF's Bylaws."); Garro ¶ 8(f) ("Defendants Argentine Republic and YPF S.A. . . . are liable under Argentine law for damages for breach of contract.").

CONFIDENTIAL

8.  In order to clearly address the opinions of Professors Bianchi, Rovira and Garro, I believe it is appropriate to set forth the legal rules and principles that govern in this case, which are the basic premises of the rebuttals I will formulate.

9.  Under the Argentine legal system, private or common law regulates relations between individuals (human persons) or legal entities, and it is fundamentally governed by the principle of freedom of contract, respecting at all times the overriding principles of public order.[4] The interest of private parties, i.e., private interest predominates in private law. By contrast, public law refers to the legal relationship between the State and private parties, whether individuals or legal entities, or between state entities.[5] The general, collective or social interest, i.e., the public interest predominates in public law.[6] The rules of public law cannot be contracted out of by the parties to a private instrument. What is more, "there is no state activity subject solely and exclusively to norms of common law: If such

---

[4] Art. 21 of the Civil Code in force up to 2015 provided that "[p]rivate agreements may not render without effect laws the observance of which is in the interest of public order and good morals." This principle was replicated in the Nation's new Civil and Commercial Code [*Código Civil y Commercial*], Art. 12 of which provides that "[p]rivate agreements may not render without effect laws the observance of which is in the interest of public order. An action with respect to which the protection of a legal text is claimed, which seeks a result substantially similar to the one prohibited by a mandatory norm, is considered to have been granted in violation of the law. In this case, the action must be subject to the binding norm it sought to evade."

[5] This principle has been recognized by the Supreme Court in several areas. As an example, see Supreme Court, "El Tambolar v. Federal Government and General Tax Division," Rulings: 316:1930 (1993). This principle was included in Article 1 of Law No. 26,944 ("State Liability Law") which establishes that "the provisions of the Civil Code are not applicable to the liability of the State in a direct or subsidiary manner".

[6] *Cfr*. VILLEGAS BASALVIBASO, Benjamín, *Derecho Administrativo* [Administrative Law], TEA, Buenos Aires, 1949, Vol. I, pp. 64-65.

CONFIDENTIAL

norms are applied to the State, they are always modified by or interconnected with norms of public law, such that they are integrated into the normative complex of public law."[7]

10. Under the Argentine legal system, the basic principle concerning expropriation is that public law takes precedence over private law.[8] In fact, expropriation has been defined as a "public law restriction" that involves the "definitive and complete privation of property, required by public utility, through fair compensation which is generally paid in advance."[9] It is not an institution of private law, nor a supplemental norm of the Civil Code[10] that was in force until 2015.[11] On the contrary, expropriation is an act of authority or sovereignty in which the expropriating party takes for itself an asset, whatever its nature, for purposes of public utility.[12]

11. For the National Supreme Court of Justice ("Supreme Court"), "expropriation is … a legal phenomenon of conversion and substitution of a private party's rights in favor of the

---

[7] GORDILLO, Agustín A., *Teoría General del Derecho Administrativo* [General Theory of Administrative Law], *Instituto de Estudios de Administración Local* [Institute for Local Administration Studies], Madrid, 1984, p. 109.

[8] "[I]t is a fundamental principle, adopted by sovereign law itself and applied by it frequently, that individual rights must give way to the higher rights and interests of juridically organized society, i.e., before the prerogatives and conveniences of the State that it has created. This principle is essential to the State's being able to effectively fulfill the purposes for which society has established it which, in our case, are expressly defined in the preamble to the Constitution and in all its texts, as noted previously. What is more: from this basic principle and from the resulting need for the State to perform the functions of original sovereignty, is derived the sum of the powers and rights that constitutional science, in the sphere of private property relations with the State, refers to as the latter's eminent domain. The power of expropriation by reason of public utility or use is one of those it includes" (GONZÁLEZ CALDERÓN, Juan A., *Curso de Derecho Constitucional* [Course in Constitutional Law], 4th. ed., Guillermo Kraft Ltda., Buenos Aires, 1963, p. 271. (emphasis in the original).

[9] LEGÓN, Fernando, *Tratado integral de la expropiación pública* [Comprehensive treatment of public expropriation], Buenos Aires, 1934, p. 55.

[10] Civil Code, as approved through Law 340, which entered into force on January 1, 1871 (the "Civil Code"). This Code was replaced by the National Civil and Commercial Code, as approved by Law 26,994 (the "Civil and Commercial Code"), which entered into force on August 1, 2015 in accordance with Law 27,077.

[11] See FIORINI, Bartolomé A., *Manual de Derecho Administrativo* [Manual of Administrative Law], La Ley, Buenos Aires, 1968, t. II, p. 871.

[12] SÁNCHEZ VIAMONTE, Carlos, *Manual de derecho constitucional* [Manual of constitutional law], 2nd. ed., Kapelusz, Buenos Aires, 1956, p. 162.

CONFIDENTIAL

community."[13] Within that framework, as the Supreme Court explains, "expropriation involves a conflict that is resolved by the preeminence of the public interest and the irremediable sacrifice of the private party's interest."[14]

12. According to Article 2 of the Expropriation Law, which regulates the general expropriation regime, the Federal government is among the subjects authorized to expropriate. In this respect, when the State expropriates an asset from a private party, it is not acting as a person under private law, but rather as a public authority. Thus, when we speak of an expropriation procedure, we are not referring to "a procedure governed by common law (forced sale), but rather of a process under administrative public law, the purpose of which is to comply with the law that declares a private party's specific asset as being of public utility and subject to expropriation."[15]

13. Outside of the case of expropriation, the order of priority between the public interest and private interest is also protected in other sources, including Articles 21 and 502

---

[13] Supreme Court, "Federal government v. Textil Escalada S.A. concerning expropriation," Rulings: 312:2444, p. 2454 (1989). This principle has been reiterated in a number of precedents, including "State Tax Authority v. Asociación Comunidad Israelita Latina," Rulings: 327:2584, p. 2587 (2004) (opinion of the Attorney General's Office of the Nation adhered to by the Supreme Court); and "U.N.I.R.E.C. v. Ramos E. Iglesias E. *et al.* concerning expropriation," Rulings: 343:1146, p. 1155 (2020) (opinion of the Attorney General's Office of the Nation adhered to by the Supreme Court).

[14] Supreme Court, "Agua y Energía Eléctrica S.E. v. Gustavo Montelpare," Rulings: 326:2329, p. 2335 (2003) (opinion of the Federal Attorney General's Office to which the Supreme Court adheres).

[15] Casas, Juan Alberto and Romero Villanueva, Horacio J., *Expropiación. Ley 21.499. Comentada, anotada y concordada con las normas provinciales* [Expropriation. Law 21,499. Commentated, annotated and indexed with provincial regulations] Astrea, Buenos Aires, 2014, p. 28.

CONFIDENTIAL

of the Civil Code in force until 2015,[16] Articles 12 and 386 (and corresponding articles) of the National Civil and Commercial Code,[17] and other Supreme Court decisions.[18]

14. Under these provisions, private interest is considered subordinate to the public interest, particularly within the framework of public order rules that cannot be contracted out of by the parties to a private transaction.[19] To the contrary, given their nature, they are mandatory and subject to obligatory compliance for such parties in their private relations. Thus, if a law is of public order, no party whatsoever may invoke a vested right in opposition to it. In this respect, the Supreme Court has said on a number of occasions since the 19th century that "no party can have irrevocably vested rights against a law of public order".[20]

---

[16] For example, Civil Code, Article 21 ("Private agreements may not render without effect laws the observance of which is in the interest of public order and good morals") and Article 502 ("An obligation based on an illicit cause has no effect. The cause is illicit when contrary to the law or public order.").

[17] For example, Article 12 of the Nation's Civil and Commercial Code establishes that "[P]rivate agreements may not render without effect laws the observance of which is in the interest of public order." And Article 386 provides that "[a]cts that violate public order, morals or good practice are absolutely null and void."

[18] See, for example, Supreme Court, "Carlos Alberto Galanti v. Municipality of the City of Buenos Aires," Rulings: 310:2824 (1987) ("when reimbursing an individual sacrifice, it must not be forgotten that satisfaction of the public interest constitutes an imperative mandate of the State community and indubitably results in a benefit for each of its members who, in that regard, cannot claim to be completely exempted from the particular burden necessarily implied in achieving the common good.").

[19] Supreme Court, "Matmetal S.A. v. T.A.M.S.E. and the Federal government concerning damages and losses." Judgments: 322:2113, p. 2117, Cons. 6º (1999). There, the Supreme Court decided that in a contract between private parties, what applies is "domestic Argentine law, supplementing the material conditions the parties had validly agreed to, within the framework of the jurisdiction's public order principles and laws". The Supreme Court also acknowledged the validity of the retroactive application of public order laws to, for example, contracts between private parties in matters of urban leases: "The complaint based on retroactively applying Law 18,880 to the case is not admissible, since the Court's oft-repeated doctrine has determined that the application of public order laws concerning urban leases, approved subsequent to the filing of the dispute, insofar as they so provide, does not violate vested rights". Supreme Court, "Clara Budini de Besse v. Jorge Elías Abraham," Rulings: 281:176 (1971).

[20] Supreme Court, "Caffarena v. Banco Argentino," Rulings: 10:427 (1871). This principle of the primacy of the public order has been reiterated by the Supreme Court in various ways and on numerous occasions and contexts, including, among others, "Cid Besada, Jorge v. Ledo, José," Rulings: 224:752, p. 759 (1952); "Clara Budini de Besse v. Jorge Elías Abraham," Rulings: 281:176 (1971); "Matmetal S.A. v. T.A.M.S.E. and Federal Government concerning damages and losses," Rulings: 322:2113, p. 2117, Cons. 6º (1999); "Marie Aupi Thierry *et al.* v. Banco Francés S.A.," Rulings: 329:5586, p. 5588 (2006) (opinion of the Attorney General's Office adhered to by the Supreme Court); etc.

CONFIDENTIAL

15. In turn, with respect to property rights, the Supreme Court has said that:

> The right to property, as an individual right, is no less subject than any others of that kind, in terms of scope and methods of application, to what public order requires, since any right, as such, involves a relationship with one or more others which, in turn, naturally and indispensably assumes consistency with the general order of the community, i.e., with those requirements of justice that the institutional regime of political society – which is the constitutionally organized nation – must satisfy in order to render the ordered cohabitation of those comprising it immediately possible, as well as to ensure and promote what the Preamble to the Constitution calls 'the general welfare,' or the common good.[21]

16. Within that framework, the Supreme Court has clarified that expropriation is a public institution, the exercise of which cannot in any way be conditioned upon agreements between private parties. Specifically, the Supreme Court has said that a private agreement that conditions the power of expropriation is unconstitutional. In a case where a previous contract existed that set certain restrictions on the determination of the moment at which public utility was verified as a prerequisite to expropriation, the Supreme Court forcefully maintained that:

> "[A]lthough the determination of fair compensation for expropriation could, within certain limits, be the object of a settlement between the expropriating and expropriated entities, the same does not occur with the expropriation itself, public-law nature of which is inconsistent with the freedom of contract proper to the contractual negotiation … [T]he provision in the public services concession agreement on the time at which the expropriating entity may declare the expropriation, would mean conditioning the State in the exercise of its inalienable discretion, to determine the moment at which public utility is verified. Admitting any type of contractual restriction on this point would mean applying the expropriation cause to a private interest, resulting in a manifest unconstitutionality of the agreement, insofar

---

[21] Supreme Court, "Castellano, Inocencio, *et al.* v. Quintana, Aurelio and Germán," Rulings: 208:430, pp. 451 and 452 (1947).

CONFIDENTIAL

as such agreement would obviously end up restricting the constitutional power of declaring the public utility."[22]

17. Further, with respect to the existence of a contract that may be in conflict with a public law, the Supreme Court has stated that a modification by statute of a contract's clauses that are not yet performed is constitutionally valid if the community's higher interests so require it.[23] The Court added that "merely entering into a contract does not afford the rights established in the agreement the nature of vested rights against a public order law."[24]

18. It is also to be noted that in numerous precedents, the Supreme Court has reiterated the social function of property, as well as the obligations that derive from it for purposes of the public interest.[25] That same principle has been applied by the Inter-American Court of Human Rights, the jurisprudence of which, according to the Supreme Court, is "a necessary standard for interpreting the duties and obligations deriving from the American Convention on Human Rights,"[26] which has constitutional hierarchy in the Argentine

Republic as set forth in Article 75(22) of the National Constitution. The principle of the social function of property has been established by the Inter-American Court of Human

---

[22] Supreme Court, "Sociedad de Electricidad de Rosario," Rulings 291:290, pp. 340-41 (1975).

[23] Supreme Court, "Cid Besada, Jorge v. Ledo, José," Rulings: 224:752, p. 758 (1952), which in this case refers to the preceding Supreme Court, "Edistro M. Correa v. Manuel Rodríguez," Rulings: 208:10 (1947).

[24] Supreme Court, "Cid Besada, Jorge v. Ledo, José," Rulings: 224:752, p. 759 (1952).

[25] See, among others, Supreme Court, "Gómez Alzaga, Martín B. v. Province of Buenos Aires," Rulings: 322:3255 (1999); "Brunella Vda. de Weiser, Edda v. D.G.I.," Rulings: 289:67 (1974), etc.

[26] Supreme Court, "Simón, Julio Héctor *et al.* concerning the illegitimate privation of freedom, etc. - Case No. 17,768 -," Rulings: 328:2056 (2005).

CONFIDENTIAL

Rights when interpreting Article 21 of the American Convention on Human Rights ("ACHR").[27]

19. It is clear from all the above that under current Argentine law, the public interest is preeminent, particularly in matters of expropriation, and by contrast, there is an "irremediable sacrifice of the private interest, such that the tension between the constitutional guarantee to private or individual property displaced by the effect of the need of the collective."[28] From that perspective, the private or individual interest always yields to the public or general interest, particularly with regard to expropriation.

**B.    The expropriation of YPF shares as a matter of public order and public interest.**

20. In this case, Decree No. 530/2012, handed down April 16, 2012, utilized the concept of the State's "transitory intervention" in YPF for an initial period of 30 days to "ensure the continuity of the company, preservation of its assets and property, the supply of fuels and to ensure coverage of the country's needs."[29] Decree No. 530/2012 ordered the Intervenor to

---

[27] Art. 21 of the ACHR provides as follows: "Art. 21. Right to Private Property: 1. All parties are entitled to the use and enjoyment of their assets. The law may subordinate such use and enjoyment to the social interest. 2. No party may be deprived of their assets without payment of fair compensation, for reasons of public utility or social interest, and in cases and according to the form established by law. 3. Both usury and any other form of exploitation of man by man must be prohibited by law." After emphasizing the bases for prevalence of the common good over individual rights in a democratic society, the Inter-American Court of Human Rights maintained that: "the social function of property is a critical aspect its functioning and thus the State, in order to guarantee other basic rights of vital relevance to a specific society, may limit or restrict the right to private property, at all times complying with the assumptions contained in the regulation of Article 21 of the Agreement, and the general principles of international law. The right to property is not an absolute right, as Article 21.2 of the Agreement states that in order for the privation of a person's assets to be compatible with the right to property, it must be based on reasons of public utility or social interest, subject to the payment of fair compensation, be applied according to the cases and forms established by law and be carried out in accordance with the Agreement" (IDH Court, "Case of Salvador Chiriboga vs. Ecuador," Preliminary Objection and Merit, Ruling of May 6, 2008, Series C No. 179, ¶¶ 60-61).

[28] CASAS, Juan Alberto and ROMERO VILLANUEVA, Horacio J., *Expropiación. Ley 21.499. Comentada, anotada y concordada con las normas provinciales* [Expropriation. Law 21,499. Commentated, annotated and indexed with provincial regulations], Astrea, Buenos Aires, 2014, p. 3.

[29] Decree No. 530/12, Art. 1.

CONFIDENTIAL

temporarily assume the authority of the company's Board of Directors and/or Chairman.[30] Subsequently, the scope of Decree No. 530/2012 was expanded, through Decree No. 557/2012 of April 18, 2012, to include Repsol YPF Gas S.A. The intervention was extended for an additional 30 days on May 11, 2012, through Decree No. 732/2012.

21. Decrees Nos. 530/2012 and 557/2012 are decrees of necessity and urgency and, consequently, their content is legislative in nature. They were issued by the National Executive Branch pursuant to the powers vested therein within the context of the provisions of Article 99(3) of the National Constitution, which expressly grants the Executive Branch the authority to issue legislative decrees in cases of necessity and urgency when extraordinary circumstances make it impossible to fulfill the ordinary processes for the approval of laws in Congress.[31] After being issued, these decrees of necessity and urgency (as they are referred to in Argentine legal language) are subject to subsequent confirmation by the National Congress as a condition of their validity.[32] The National Congress issued resolutions declaring the validity of Decree No. 530/2012 and Decree No. 557/2012 through the National Chamber of Deputies[33] and the National Senate.[34]

---

[30] Decree No. 530/12, Art. 3.

[31] See National Constitution, Art. 99, Part 3.

[32] That control is regulated in Article 99(3) of the Constitution and in Law No. 26,122.

[33] See Resolution S/N/2012 of the National Chamber of Deputies, dated May 23, 2012, Art. 1 (declaring the validity of Decree No. 530/12); Resolution S/N1/012 of the National Chamber of Deputies dated May 23, 2012, Art. 1 (declaring the validity of Decree No. 557/12).

[34] See Resolution S/N/2012 of the National Chamber of Deputies, dated May 30, 2012, Art. 1 (declaring the validity of Decree No. 530/12); Resolution S/N1/012 of the National Chamber of Deputies dated May 30, 2012, Art. 1 (declaring the validity of Decree No. 557/12).

CONFIDENTIAL

22. On May 3, 2012 Congress approved the Public Interest Law, which provided for a declaration of public utility and rendered subject to expropriation 51% of YPF's property, "represented by an identical percentage of said company's Class D shares belonging to Repsol YPF S.A. and its directly or indirectly controlling or controlled entities."[35] The "temporary occupation" of the shares to be expropriated was also ordered.[36]

23. Consequently, the Public Interest Law (i) declared as being of public interest and subject to expropriation 51% of the YPF class D shares belonging to Repsol YPF S.A., and (ii) provided for the temporary occupation of the shares to be expropriated in order to ensure continuity of the company's activities, providing for the National Executive Branch to exercise the rights conferred by the shares to be expropriated.[37] The Public Interest Law also required the Argentine National Securities Commission [*Comisión Nacional de Valores*] ("CNV") to convene a shareholders meeting to appoint new directors.[38] Article 18 of the Public Interest Law declared it as being of "public order."

---

[35] Public Interest Law, Art. 7. Article 7 of the Public Interest Law also provided as follows: "Further, it is declared as being of public utility and subject to expropriation fifty-one percent (51%) of the property of Repsol YPF GAS S.A., represented by sixty percent (60%) of said company's Class A shares belonging to Repsol Butano S.A., its controlling entities or controlled entities."

[36] Public Interest Law, Art. 13.

[37] It is to be noted that, pursuant to Article 5 of the Expropriation Law, expropriation must refer specifically to certain assets. Further, Article 57 of the Expropriation Law provides for temporary occupation to be of a specified good or thing. The Supreme Court has said that "[c]onsistent with the provisions of Art. 5 of Law 21,499, all convenient or necessary assets for the satisfaction of 'public utility' may be the object of expropriation, regardless of their legal nature, whether they are in the public or private domain, are things or are not things, but to that end, they must be the property of the expropriated subject (Supreme Court, "Machado, Juana," Rulings: 330:2639, p. 2648 (2007) (opinion of the Attorney General's Office, to which the Supreme Court partially adheres).

[38] Public Interest Law, Art. 13.

CONFIDENTIAL

24. Decree No. 1106/93 – which is a regulatory decree as provided for in the current Article 99(2) of the National Constitution and, consequently, its content is not legislative in nature – instructed the then Ministry of Economy and Public Works and Services, in exercise of the Federal Government's rights as YPF shareholder, to submit the text of YPF's Bylaws for approval by the shareholders meeting.[39] The Bylaws' provisions are not of public order, but rather are private in nature, as are the bylaws of all companies subject to the general Corporations Act, Law No. 19,550.[40] In any event, Decree No. 1106/93 is at a hierarchically lower level than the Public Interest Law, and under no circumstances could prevail over it.

25. The concept of expropriation is expressly recognized in Article 17 of the National Constitution. In that regard, the Argentine Republic has followed the parameters set forth in the Constitution in having declared as being of public utility and subject to expropriation 51% of YPF's property through the Public Interest Law, and after the settlement agreement between Repsol and Argentina in 2014, having paid to the

---

[39] Decree Nº 1106/93, Art. 1.

[40] The National Civil and Commercial Code confirms this principle in its Article 149, which provides that "[t]he State's stake in private legal entities does not change their nature. However, the law or bylaws may contain distinct rights and obligations, considering the public interest involved in said stake."

CONFIDENTIAL

expropriated subject the corresponding compensation within the framework of the provisions of Articles 10 to 17 of the Expropriation Law.

### III.   THE PUBLIC INTEREST LAW PREEMPTS THE BYLAWS

26. The opinions of Professors Bianchi, Rovira and Garro that the YPF Bylaws supposedly required the Republic to make a tender offer by virtue of the expropriation of 51% of the YPF shares[41] are incorrect for the simple reason that Sections 7 and 28 of the YPF Bylaws conflict with the obligations provided for in the Public Interest Law and the expropriation regime, in several ways, and are therefore preempted by them.

> **A.   The provisions of the Bylaws regarding the tender offer are unconstitutional to the extent that the Public Interest Law provided for the Argentine Republic to acquire 51% of shares in YPF by way of expropriation without having to make a tender offer.**

27. The Public Interest Law required that the Argentine Republic acquire 51% of the Class D shares belonging to Repsol by means of expropriation without having to make a tender offer for acquisition. This conflicts directly with the interpretation of Professors Rovira and Garro of Section 7(e) of the YPF Bylaws, according to which the tender offer process must be carried out *before* a majority acquisition in the company.[42] Prof. Bianchi also believes that the "takeover" defined in Section 7(d) of the YPF Bylaws occurred on April 16, 2012, when Decree No. 530/2012 was handed down, which

---

[41] See Rovira ¶ 11(b), Garro ¶ 8(f), Bianchi ¶ 52.

[42] See Rovira § IV.E; Garro § IV.F.

CONFIDENTIAL

provided for YPF's intervention, and consequently the State should have made a tender offer for acquisition on that same date.[43]

28. This application of the YPF Bylaws would have contradicted the requirement of the Public Interest Law to acquire by expropriation 51% of the YPF shares belonging to Repsol, insofar as it would have required the Argentine Republic to (i) *previously* hold a special meeting of Class A YPF shares; and (ii) also to *previously* hold a tender offer to acquire the YPF shares. That is, according to the interpretation of the Plaintiffs' experts, the Bylaws would have conditioned and fixed the time when the Argentine Republic could exercise expropriation power to acquire 51% of the Class D YPF shares belonging to Repsol.

29. This interpretation would render the Bylaws unconstitutional, for several reasons. *First*, as noted in Section II.A., the Supreme Court has clearly said that allowing a private legal instrument to determine the time when the State engages in expropriation "would mean conditioning the State in the exercise of its inalienable discretion, to determine the moment at which public utility is verified. Admitting any type of contractual restriction on the point would involve subjecting the expropriation cause to private interests, which clearly unconstitutionally violates what had been agreed to, insofar as said agreement would

---

[43] See Bianchi ¶¶ 25-50. However, Prof. Bianchi admits, in contradictory fashion, that "even if the formal transfer of title to the stock only took place once the expropriation process was perfected, which process ended with the execution of the 'Expropriation Compromise and Amicable Settlement Agreement' on February 27, 2014." *Id.* ¶ 38. Given that, as Prof. Bianchi admits, the intervention did not involve acquisition of the shares subject to expropriation as provided for in the Public Interest Law, the stipulations of the YPF Bylaws, which refer to "acquiring" and to "acquisitions" of YPF shares, could not have been applicable to it.

obviously limit the constitutional authority to determine public utility."[44]

30. *Second*, the law, not a private instrument, is what determines when the sovereign act of expropriation is perfected. Argentine law requires compensation to the expropriated party in order to complete an expropriation and in order for title to the property to be transferred to the State.[45] According to Article 29 of the Expropriation Law, "[e]xpropriation will be understood to be final when the transfer of ownership to the expropriating party has been completed by means of a firm decision, the taking of possession and payment of the compensation." This process of paying compensation may be carried out through an settlement agreement between the parties or by decision of an Argentine judge.[46]

31. The YPF shares were only expropriated after the signing of the settlement agreement between Repsol and Argentina in 2014. In that agreement, dated February 27, 2014, the parties agreed to "transfer of the shares covered by expropriation to the ARGENTINE REPUBLIC and the recognition of REPSOL's right to obtain from the ARGENTINE REPUBLIC a single and complete compensation for expropriation of the shares."[47] When signing the agreement, Repsol acknowledged that, at that time, it itself was the "owner of the SHARES" in question, which would then be transferred to the Argentine Republic by reason of the expropriation.[48] The legal position of both parties when signing the settlement

---

[44] Supreme Court, "Sociedad de Electricidad de Rosario," Rulings 291:290, p. 341 (1975).

[45] See National Constitution, Art. 17.

[46] See Expropriation Law, Arts. 13 and 18. See *also* Supreme Court, "Argentine nation v. Las Palmas del Chaco Austral S.A." Rulings: 291:507 (1975).

[47] See Law No. 26.932, Annex I, Agreement for Amicable Settlement and Accommodation of Expropriation, Recital 17.

[48] See Law No. 26,932, Annex I, Agreement for Amicable Settlement and Accommodation of Expropriation, Clause Eight, § 1(i).

agreement was clear: up to that time, Repsol was retaining ownership of the shares subject to expropriation and, as holder of those shares, it transferred them through the settlement agreement to the Argentine Republic. The settlement agreement was ratified by Law No. 26,932 and entered into force on May 8, 2014.

32. '*Third*, the temporary occupation of an asset by the State does not determine nor require the expropriation of said asset. According to the Expropriation Law, the Argentine State may temporarily occupy a property in order to satisfy a public interest.[49] However, during that time, title to that property *remains* in the name of its owner and the property is simply *occupied* by the government; the government is not the owner of the property during that time, and therefore no acquisition has taken place. That is to say, the owner's loss of property right is not consummated with occupation. Occupation does not necessarily form part of the expropriation process.

33. In the case of the expropriation of 51% of Repsol's shares in YPF, the Public Interest Law only *initiated* the expropriation process by declaring that 51% of YPF's shares were of public utility and subject to expropriation. It also provided that the National Executive Branch would temporarily occupy the shares subject to expropriation *without acquiring title to them* until the expropriation was perfected and the State accordingly acquired those shares.[50] Between 2012 and 2014, while the National Executive Branch temporarily occupied the shares, they continued to be owned by Repsol.

34. Consistent with the above, on the day after the entry into force of the agreement, YPF submitted to the United States Securities and Exchange Commission (SEC), in a Form 6-K, a

---

[49] Expropriation Law, Arts. 57, 58, 59 *et seq*.

[50] See Public Interest Law, Art. 13.

CONFIDENTIAL

letter it had sent the previous day to the CNV, in which it stated, "As of the date hereof, the expropriation pursuant to the Law No. 26,741 has been concluded, and therefore the Republic of Argentina is definitively the owner of 51% of the capital stock of YPF S.A. and YPF GAS S.A."[51]

35. *Fourth*, the Argentine Republic could have desisted from engaging in the expropriation process at any time before its completion in 2014 with the settlement agreement with Repsol. The Expropriation Law provides that, if there is no settlement, the State must initiate an expropriation proceeding to complete the expropriation.[52] The State may desist from the proceeding until after completing the expropriation with the transfer of ownership and the payment of compensation: "[t]he expropriating entity may refrain from the filed action until such time as the expropriation is complete."[53]

36. In conclusion, the expropriation of 51% of Repsol's YPF shares was authorized by law in 2012, but the Republic did not acquire title to those shares until May 8, 2014, when the expropriation was perfected upon the entry into force of the settlement agreement between Argentina and Repsol. Therefore, the Republic's sovereign act of expropriating Repsol's shares in YPF occurred on May 8, 2014, i.e., the date the Republic acquired Repsol's title to the YPF shares, and by virtue of this, any requirement of the YPF Bylaws to hold a tender offer before that date is unconstitutional.

---

[51] See YPF 6-K, p. 6 (May 9, 2014). See *also* YPF 20-F, at 27 (March 30, 2015) ("On May 8, 2014, YPF was notified of the entry into force of the Repsol Agreement. As of that date, the expropriation pursuant to the Expropriation Law was concluded, and as a result the Republic of Argentina is definitively the owner of 51% of the capital stock of each of YPF S.A. and YPF GAS S.A.").

[52] Expropriation Law, Art. 18.

[53] Expropriation Law, Art. 29.

CONFIDENTIAL

**B.** __The Public Interest Law expressly provided acquiring 51% of the YPF
shares.__

37. The Public Interest Law expressly stipulated that the Republic would acquire exactly 51% of
the Class D YPF shares, exclusively from Repsol. With respect to the assets that may be
expropriated, the National Constitution states that expropriation must be for reasons of public
utility as declared by law.[54] The Expropriation Law also provides that public utility must
serve as the legal basis for expropriation, and it covers all cases in which satisfaction of the
common good is sought.[55] Consequently, it provides that all assets appropriate or necessary
for the purpose of obtaining the common good may be subject to expropriation.[56]

38. In this case, expropriation occurred in a situation in which a public interest activity was
involved: the exploration and exploitation of hydrocarbons. Under circumstances like this,
Congress may define the object of the expropriation and determine the assets that are strictly
necessary to fulfill the public interest purpose. Article 7 of the Public Interest Law
establishes this by requiring expropriation of exactly 51% of the shares.[57] Under Argentine
law, this means that only 51% of the share capital may be acquired through expropriation,
and the acquisition of more shares by tender offer or in any other manner is prohibited for
purposes of complying with the Public Interest Law. The Public Interest Law's identification

---

[54] National Constitution, Art. 17.

[55] Expropriation Law, Art. 1.

[56] Id., Art. 4.

[57] Law of Public Utility Art. 7 ("For purposes of guaranteeing fulfillment of the objectives herein, fifty-one percent
(51%) of the property of YPF Sociedad Anónima is declared as being of public utility and subject to expropriation,
represented by an equal percentage of said company's Class D shares, belonging to Repsol YPF S.A., and its
directly or indirectly controlling or controlled entities. Further, fifty-one percent (51%) of the property of Repsol
YPF GAS S.A. is declared as being of public utility and subject to expropriation, represented by sixty percent (60%)
of said company's Class A shares, belonging to Repsol Butano S.A. and its controlling entities or controlled
entities.")

of the exact number of shares to be acquired by the State is inconsistent with the idea that expropriation would cause an automatic obligation under the YPF Bylaws to undertake a tender offer to acquire additional shares.

39. Nothing in the Public Interest Law would allow for the imposition of a tender offer obligation and an additional considerable expenditure of public funds, given the absence of a declaration by Congress that the shares to be acquired through the offer are necessary for satisfying the public interest. That interpretation of the YPF Bylaws would render it unconstitutional in light of the Supreme Court's explanation in the cases highlighted in paragraphs 16-17 above,[58] since it would be clearly conditioning the exercise of the constitutional power of expropriation within the margins and provisions of the Public Interest Law and the Expropriation Law.

### C.    The Public Interest Law stipulated that YPF would continue to be a publicly traded company.

40. Article 15 of the Public Interest Law expressly provided that YPF would continue to operate as a publicly traded company.[59] But pursuant to Section 7(f) of the YPF Bylaws, if it were applicable, a tender offer would require the government to offer to acquire *all* shares in circulation through a tender offer and agree to purchase *all* of the class D shares tendered through the tender offer. This would, in fact, result in YPF's ceasing to be a publicly traded company and would render ineffective and undermine the effects of the Public Interest Law.

---

[58] In particular, Supreme Court, "Sociedad de Electricidad de Rosario," Rulings 291:290, pp. 340 and 341 (1975).

[59] Public Interest Law, Art. 15 ("In carrying out their activity, YPF Sociedad Anónima and Repsol YPF GAS S.A. would continue to operate as publicly traded corporations, under Chapter II, Section V of Law 19,550 and corresponding regulations, and no laws or administrative regulations governing the administration, management and control of companies or entities in which the Federal government or the provincial states have a stake would be applicable thereto").

CONFIDENTIAL

**D.**     **The Public Interest Law stipulated the method of valuation of the YPF shares.**

41. Article 13 of the Expropriation Law establishes that the State may only acquire an expropriated asset by paying "the maximum amounts estimated for that purpose by the National Appraisal Court [*Tribunal de Tasaciones de la Nación*]," in accordance with the procedures provided for in Articles 10 and thereafter of the Expropriation Law.[60] Article 12 of the Public Interest Law required that the value of the assets subject to expropriation be determined by the National Appraisal Court, consistent with this procedure. However, Section 7(f)(v) of the YPF Bylaws sets certain *different* criteria to determine the amount to be paid for shares acquired in accordance with the tender offer. Those criteria provided for in the YPF Bylaws would clearly condition, render ineffective and

undermine the effects of both the Expropriation Law and the Public Interest Law.

**E.**     **The Public Interest Law ordered the Republic to vote the YPF shares subject to expropriation.**

42. Article 13 of the Public Interest Law provided that the National Executive Branch would exercise the rights conferred by 51% of the YPF shares subject to expropriation. By contrast, Sections 7(h) and 28(c) of the Bylaws would have denied the Republic any "right to vote," as long as no tender offer was made in accordance with Section 7 of the Bylaws, thereby frustrating the order of the Public Interest Law. Once again, this would constitute improper conditioning and interference with the provisions of the Public Interest Law.

---

[60] Expropriation Law, Art. 13.

CONFIDENTIAL

IV.   **THE EXPROPRIATION LAW AND PUBLIC INTEREST LAW PREEMPT AND RENDER UNENFORCEABLE THE BYLAWS' PROVISIONS ON THE TENDER OFFER**

43. It is clear that Sections 7 and 28 of the Bylaws would have conditioned, rendered ineffective and undermined the effects of the Expropriation Law and the Public Interest Law. In this context, the Bylaws are overridden by these laws, which are public order laws. The Bylaws' provisions concerning the tender offer that the Plaintiffs seek to make binding on the Republic in this case are non-binding and unenforceable.

44. There are at least three basic reasons for this conclusion:

     i.      The Public Interest Law provides for valid expropriation in the framework of a public order law, which takes priority over a commercial obligation related to the transfer of shares;

     ii.     No private legal instrument may impede, regulate, limit or condition the exercise of a state power expressly provided for in the National Constitution; and

     iii.    Article 28 of the Expropriation Law clearly and forcefully provides that "[n]o action by third parties may impede expropriation or its effects."

45. The first point is clear and requires no further explanation: as I have noted, under current Argentine law, the concept of expropriation does not belong to private law, as does a transfer of shares under the Bylaws.[61] Rather, it is a sovereign action,[62] governed by public law, by which private rights are substituted in favor of the community in defense of the public

---

[61] See *supra* § II.A.

[62] See, among others, Supreme Court, "Nicolás Arias Murúa v. Province of Salta," Rulings: 104:247 (1906); "Bauzá, Horacio, *et al.* v. National General Road Administration," Rulings: 252:310 (1962); "Nation v. Ferrocarriles y Elevadores Depietri S.A.," Rulings: 256:232 (1963).

interest.[63] The compensation needed to be paid is only to the expropriated party with respect to losses incurred through the expropriation itself.

46. Concerning the second point, as I have explained,[64] no private law instrument or corporate document may regulate, impede, restrict, condition or interfere with the exercise of a state power provided for in the National Constitution. This means that a private legal instrument, such as the YPF Bylaws, cannot regulate, impede or restrict the application of a public order law decreed in exercise of powers granted expressly by the National Constitution, such as the Public Interest Law. Therefore, the YPF Bylaws are preempted by said law to the extent that they condition it, render it ineffective or undermine its effects. Any contrary interpretation, I insist, would render the Bylaws unconstitutional on this point, in light of the Supreme Court's case law.[65]

47. With regard to the third point, Article 28 of the Expropriation Law expressly provides that "no third party may impede expropriation or its effects."[66] Claiming that the Bylaws are equally applicable despite the provisions of the Public Interest Law is a means of clearly ignoring the Expropriation Law on this point. In fact, that claim is a clear way of preventing the limited effects of expropriation, as ordered by Congress in the Public Interest Law.

---

[63] Sánchez Viamonte, Carlos, *Manual de derecho constitucional* [Manual of Constitutional Law], 2nd. ed., Kapelusz, Buenos Aires, 1956, p. 162.

[64] See *supra* § II.A.

[65] See Supreme Court, "Sociedad de Electricidad de Rosario," Rulings 291:290, p. 341 (1975).

[66] In commenting on Article 28 of the Expropriation Law, Casas and Romero Villanueva explain that "In theory, no third-party right, whether to the expropriated asset or likely to be applied to it, is capable of obstructing the expropriation" CASAS, Juan Alberto and ROMERO VILLANUEVA, Horacio J., *Expropiación. Ley 21.499. Comentada, anotada y concordada con las normas provinciales* [Expropriation. Law 21,499. Commentated, annotated and indexed with provincial regulations], Astrea, Buenos Aires, 2014, p. 124.

CONFIDENTIAL

48. For all these reasons, the Argentine Republic could not and cannot be subject to the provisions of the Bylaws and the public obligations of the Expropriation Law and the Public Interest Law at the same time. What is more, both laws, taking hierarchical and constitutional precedence, override the Bylaws' provisions on the tender offer, which in fact lack any effect under circumstances of expropriation. Any contrary interpretation renders the YPF Bylaws unconstitutional on this point.

V.    **PROF. BIANCHI INCORRECTLY CONTENDS THAT ARGENTINE LAW AFFORDS THE PLAINTIFFS A CLAIM FOR DAMAGES AND LOSSES**

   A.    **The Civil Code's provisions for on monetary damages do not apply to the State and, in any case, do not apply in the case of expropriation**

49. Professor Bianchi's opinion assumes that all actions preparatory to expropriation as provided for in the Public Interest Law are similar to a "takeover" governed by private law, in this case, the Bylaws. and thus, concludes that:

> [T]here is thus no question that, under Law 26,741, the Argentine State engaged in a 'takeover' of YPF as defined in Bylaws Sections 7 and 28, as the ''temporary 'taking' of the Class D stock authorized the State of Argentine to exercise all rights carried by said stock. Put differently, even if the formal transfer of title to the stock only took place once the expropriation process was perfected, which process ended with the execution of the '''Expropriation Compromise and Amicable Settlement Agreement' on February 27, 2014, which was subsequently approved via Law 26,932, the 'takeover' had already taken place much earlier as, ever since Decree 530/2012, the Argentine government exercised complete control of YPF's management, and ever since the enactment of Law 26,741, the Argentine State had exercised its shareholder rights in connection with the Class D shares, which represented 51% of the capital stock. It should be noted that the temporary taking of YPF's Class D stock in the case at hand did not just entail a mere holding of that stock over a limited period of time to resolve a specific emergency within defined time and place boundaries. On the contrary, the temporary taking of YPF's Class D stock was a prelude to its expropriation, which had been ordered in Law 26,741, Section 7. In other words, the Argentine State performed the temporary

taking of such stock with a view to acquiring ownership thereof via expropriation.[67]

50. However, these are all cases involving acts in the exercise of public powers that, as explained *supra*, cannot be conditioned in such a way as to frustrate said exercise in the context of the Public Interest Law.

51. Prof. Bianchi cites two provisions of the Civil Code and one provision of the Civil and Commercial Code to argue that the Republic is supposedly liable for any damages that may result from failing to execute a tender offer for YPF shares:

> Under the old Civil Code (CC) in force at the time the obligation should have been fulfilled, the issue was generally dealt with in Section 505, under which '*[t]he effects of an obligation as regards its creditor shall be as follows [...]3) to obtain any applicable compensation from the debtor*'. Moreover, CC Section 519 provided: '*[d]amages and interest shall mean the value of the loss sustained and that of the income lost by the obligation's creditor as a result of its nonfulfillment in proper time*'. In the CCC, this issue is addressed in Section 1737: '*[d]amage takes place whenever a right or an interest not in conflict with the legal system and the subject of which is a person, assets or a collective right is impaired*'.[68]

---

[67] See Bianchi ¶¶ 37-40 (emphasis in the original).

[68] Bianchi ¶¶ 56-58.

CONFIDENTIAL

52. However, none of the provisions mentioned by Prof. Bianchi apply in the case of expropriation. On the contrary, Prof. Bianchi omits to cite two articles of the Argentine Civil and Commercial Code that contradict his assertions. I am referring to Article 1764, which provides that "The provisions of Chapter 1 of this Title are not applicable to State Liability Law in a direct or subsidiary manner" and Article 1765 which provides that "State Liability Law is governed by the rules and principles of national or local administrative law as applicable."

53. First of all, civil law on damages does not apply to the State. The Civil Code in force in 2012 provided in its Article 2611 that "[t]he restrictions imposed to the private domain only in the public interest are governed by administrative law." That principle was reiterated in the Civil and Commercial Code of the Nation, whose Article 1970 provides, "Limitations imposed on the private domain in the public interest are governed by administrative law." In addition, Article 1 of Law No. 26,944 (the "State Liability Law") clearly stipulates that "the provisions of the Civil Code are not applicable to State liability, either directly or on a subsidiary basis." Although the aforementioned law was enacted in August 2014, this basic principle of Argentine public law was already applicable when the events of this case occurred, between 2012 and 2014.

54. Second, as I explained above,[69] expropriation is subject to a compensation regime specifically provided for in Article 17 of the National Constitution and in the Expropriation Law. As Prof. Uslenghi has explained, the compensation regime under the Expropriation

---

[69] See *supra* § II.B.

Law is that of "single compensation," without admitting further compensation by the expropriating entity in favor of third parties.[70]

55. This does not imply that anyone who considers themselves affected is without any recourse whatsoever. On the contrary, Article 51 of the Expropriation Law expressly recognizes the mechanism of irregular expropriation. The claims for damages that the Plaintiffs are pursuing are in conflict with that specific recourse provided for in Argentine public law. Article 51 of the Expropriation Law allows third parties (beyond those that were expropriated) who consider themselves injured by the effects of an expropriation to seek irregular or reverse expropriation. In a claim for irregular expropriation, parties hindered from disposing of their property as a result of the expropriation, and who consider themselves harmed by the expropriation action beyond the actual expropriation, may file legal action to protect their rights and obtain reimbursement for the potential injury caused to their right of ownership.[71]

56. To the extent that the Plaintiffs claim to have been injured as a consequence of the expropriation, this could have been the means they could utilize to claim alleged damages that the Public Utility Law might have caused them. The process of assessing compensation is similar to the process used to arrive at a valuation of compensation for the expropriated property in first instance.[72] Under this method, the potential damages would be much lower

---

[70] Uslenghi ¶ 116.

[71] See Expropriation Law, Art. 51: "An irregular expropriation action is appropriate in the following cases: a) If a law exists that declares an asset as of public utility, the State takes it without completing payment of the respective compensation. b) If, under the public utility declaration act, a moveable or real asset is indeed indisposable due to a clear difficulty or impediment in disposing of it under normal conditions. c) If the State imposes an improper restriction or limitation on the right of the holder of a good or thing, which results in injury to its property right."

[72] Expropriation Law, Art. 54 ("In an irregular expropriation judgment the compensable amounts will be set in the same way as stipulated for a regular expropriation judgment, as considered in Article 10 and thereafter of this law.")

than what the Plaintiffs are seeking here. This is another way the Plaintiffs' claims conflict with Argentine public law.

**B.    The State Liability Law's provisions for damages and losses also do not apply.**

57. Prof. Bianchi states that the Republic is responsible for damages to the Plaintiffs since "The State Liability Law (SLL) does not exempt the State from liability for the nonfulfillment of its obligation to carry out a [tender offer]."[73]

58. The case raised here is not one governed by the State Liability Law. According to Article 1, this law "governs the State's liability for damages that its activity or inactivity causes to people's goods or rights. The State's liability is strict and direct. The provisions of the Civil Code are not applicable to the State's liability either directly or subsidiarily." The law governs the State's liability both for illicit activity (Article 3) and licit activity (Article 4), the latter being extraordinary in nature (Article 5).

59. Given the existence of a specific remedy for cases of expropriation, as provided for in the Expropriation Law, the Plaintiffs could not have validly filed a legal action against the Federal Government based on liability under the State Liability Law, as Prof. Bianchi seems to suggest. The State Liability Law provides that the liability of the State for its lawful activity is of an exceptional nature.[74] The expropriation activity is clearly a lawful activity insofar as it is expressly authorized by the Constitution. In turn, compensation to one who suffers an expropriation is expressly provided for in Article 17 of the Constitution and in the Expropriation Law. Consequently, the obligation of the State to pay the compensation that

---

[73] Bianchi ¶ 59.

[74] State Liability Law, Art. 5

corresponds to the expropriated party as a result of the expropriation cannot be increased or reduced. This obligation, I insist, is expressly provided for in the Constitution and in the Expropriation Law. Neither of these norms could be superseded on this point by the State Liability Law.

60. Even if the State Liability Law were applicable, Article 5, a regulation that currently governs this matter and that, as we have already pointed out, contains the previously current scholarly and case law criteria, provides that "[t]he State's liability for legitimate activity is extraordinary in nature."[75] What is more, the statute of limitations provided for by law is of three years, calculated as from verification of the injury or from when the damages action is expedited.[76] This period has expired.

61. Finally, Plaintiffs likewise have no basis to argue that the Argentine Republic would be liable for the failure to carry out the tender offer. This is because, as I explained above, given the public order nature of the expropriation regime, there was no legal obligation for the Argentine Republic to make the tender offer, since the Bylaws were not enforceable against the expropriation regime. In this regard, since the failure to carry out the tender offer would constitute, in any event, a *legitimate* omission, and since, according to the State Liability Law, the Republic is only liable for *illegitimate* omissions[77], there is no claim that Plaintiffs could have made under that law.

---

[75] State Liability Law, Art. 5

[76] State Liability Law, Art. 7.

[77] Article 3(d) of the State Liability Law establishes that "omission gives rise to liability only when there is a failure to comply with an express and definite statutory duty to act".

-29-

CONFIDENTIAL

## VI.   PROFESSORS ROVIRA AND GARRO REFER TO THE INCORRECT INTEREST RATE

62. In their opinions, Professors Bianchi and Garro incorrectly refer to the interest rate used for debts between private parties and not the one that applies in cases to which the State is party and that are governed by public law. Prof. Garro states that:

> To the extent it is possible to come out with a general statement, and setting aside isolated instances in which courts have applied a lower or higher rate, it is fair to conclude that a flat interest rate ranging between 6% to 8% per annum on account of compensatory interest is what most Argentine courts are likely to consider as adequate compensation of the harm sustained by the judgment creditor for the time value of the money (US dollars and other hard currencies) and the lost opportunity it entails.[78]

63. In turn, Prof. Rovira argues that:

> Applying these principles, precedent exists where the interest rate set by the courts for obligations payable in United States dollars or other hard currencies is as high as 10%, 12% or even 15% due to the circumstances of the case, but including compensatory, default and punitive interest. Generally, the trend is to set an average fully comprehensive interest rate ranging from 6 - 8%. More recently, in general the courts have been awarding between 6% to 8% flat interest rates, fixing the amount of the applicable interest rate on a case-by-case basis comprising the three types of interest. But occasionally, courts have awarded 10% interest taking into consideration the circumstances of the case and have even awarded up to 15% interest rates in very specific circumstances. Bearing in mind the purpose of interest, which is to compensate for the loss of the availability of the money the obligee would have enjoyed had the obligor performed, the court may validly consider as a guideline the range of interest that Argentine courts have been considering. Critically, in this case, defendants' breaches have deprived Plaintiffs of (so far) more than nine years of lost-time value.[79]

---

[78] Garro ¶ 41.

[79] Rovira ¶¶ 56-57.

CONFIDENTIAL

64. Prof. Garro and Prof. Rovira are correct when they state that Article 622 of the Civil Code leaves "determination of the rate of interest … left to the discretion of the court, unless the parties have agreed otherwise, and in the absence of a statutory rate."[80] Nevertheless, for the reasons summarized below, the analysis is wrong when Prof. Garro concludes that "a flat interest rate ranging between 6% to 8% per annum … is what most Argentine courts are likely to consider as adequate compensation" in a case such as this.[81]

65. Prof. Garro and Prof. Rovira base their conclusions solely on precedents from the National Commercial Chamber,[82] which is a local legal entity with registered offices in the City of Buenos Aires and which decides cases of a solely commercial nature between private parties. The procedures of this court are irrelevant to this case for *ratione personae* and *ratione materiae* reasons.

---

[80] Garro ¶ 38; Rovira, ¶¶ 53, 55.

[81] Garro ¶ 41.

[82] Prof. Garro also cites a precedent of the National Civil Chamber that does not modify this analysis and to which the same detailed objections apply. See Garro ¶ 38 no. 62.

CONFIDENTIAL

66. As set forth by the National Constitution, in cases to which the Republic is party, the competent jurisdiction is federal (and not the local jurisdiction)[83]. Further, federal courts have jurisdiction in cases involving a federal interest. Because the Republic is party in this case and its resolution requires the adjudication of questions of public law (which is in the federal interest), there are significant reasons to conclude that, if this case had been adjudicated in Argentina, the competent jurisdiction would have been the *federal* jurisdiction.

67. In addition, the case would have been adjudicated by the federal *administrative law* courts, and not by the federal civil and commercial courts since the case involves significant questions of public law.[84] That was the conclusion at which the Supreme Court arrived in a similar claim submitted by a minority YPF shareholder against the Republic ("De San Martín, José *et al.* v. EN-PEN on the knowledge process"). In 2014, the Supreme Court settled the conflict of jurisdiction between those two *federal* courts and declared the federal *administrative law* courts competent due to the relevance of administrative law for the resolution, notwithstanding the possible application of institutions of common law.[85]

68. Consequently, it is necessary to consider the relevant precedents of the federal administrative law courts, which follow the criteria adopted by the Supreme Court, which Prof. Garro and Prof. Rovira do not mention.

---

[83] National Constitution, Art. 116.

[84] The conclusion would be the same if YPF were co-defendant.

[85] Supreme Court, "De San Martín, José et al. v. EN-PEN concerning cognizance process" C. 731. XLIX. COM, Judgment of August 20, 2014 (opinion of the Attorney General's Office adhered to by the Supreme Court).

69. According to the jurisprudence of the federal administrative law courts, if the rate to be applied is not set contractually or by means of the law, it is necessary to set it through the courts and to apply the average borrowing rate published by the Central Bank of the Argentine Republic ("BCRA") in cases in which state liability is being judged.[86]

70. In cases involving debts in pesos, the Supreme Court has for many years fixed the average borrowing rate published by the BCRA[87]: for example, in the case of "YPF v. Province of Corrientes".[88]

71. With regard to debts in US dollars, the Supreme Court has adopted a similar solution. For example, in "Algodonera Lavallol concerning bankruptcy," [89] the Supreme Court applied a fixed-term, 30-day interest rate set for dollars at Argentine banks.

72. Federal administrative courts have followed Supreme Court precedents in the case of peso-denominated obligations.[90] With respect to obligations denominated in dollars, the various

---

[86] Federal Administrative Law Appeals Court ("CACAF"), Chamber V, "Cuenca Jorge Alejandro v. GCBA (Cromañon) et al. concerning damages and losses," November 19, 2021 ("It should be recalled that Article 622 of the Civil Code then in force provides -in what is of interest here- that if the legal interest rate is not fixed, the judges shall determine the interest to be paid. In view of the provisions therein, this Court considered that the borrowing rate -applied in the appealed judgment- was the one to be used in claims for damages and losses (arg. Chamber I, in re: "M. B. T. et al v. Min. Interior -PFA et al concerning damages and losses," dated 12/13/16; Chamber II, in re: "C. M.O. v. EN et al concerning damages and losses," dated 12/01/16; Chamber III, in re: " National Directorate of Roads v. Mendez Tomas Hector concerning Expropriation - Administrative Easement" of 11/23/2003; this Chamber in rebus: "B. M., M. E. v. SIGEN - Resol. 112/05 concerning public employment," dated 02/14/12, "Arena vda. De Riva, María Mercedes et al v. Min. Interior - PFA concerning damages and losses," dated 03/26/2015;). Likewise, such opinion was validated by the Supreme Court of Justice of the Nation in Rulings 315:158 and 315:1209, among others. On the other hand, this Chamber has stated that the lending rate should not be applied unless it has been fixed by law or in the contract in question").

[87] This is contemplated in Article 10 of Decree No. 941/1991, which, in modifying Article 8 of Decree 529/91, provided that "The CENTRAL BANK OF THE ARGENTINE REPUBLIC shall publish monthly the average borrowing rate, which the Judges may order to be applied for the purposes contemplated in Article 622 of the Civil Code".

[88] Supreme Court, "YPF v. Province of Corrientes and Banco de Corrientes," ruling 315:158 (1992).

[89] Supreme Court, "Algodonera Lavallol concerning bankruptcy" (opinion of the Attorney General's Office adhered to by the Supreme Court), Rulings: 333:394 (2010).

chambers of the Federal Administrative Law Appeals Court have generally reiterated the opinion of the Supreme Court and have also applied the average borrowing rate of the Central Bank of the Argentine Republic after converting amounts due in U.S. dollars into pesos.[91]

73. Therefore, the approach defended by Prof. Garro and Prof. Rovira would conflict with the consistent precedents set by the Supreme Court and followed by the federal administrative law courts.

74. Based on the above, the application of the interest rate suggested by Prof. Garro and Prof. Gaviro in their opinions does not meet the standards set by our country's laws and jurisprudence.

---

[90] See Supreme Court, "Spitale, Josefa Elida v. ANSeS concerning challenge of administrative resolution," Judgment of September 14, 2004, Rulings: 327:3721; Supreme Court, "Baeza, Silvia Ofelia v. Province of Buenos Aires et al concerning damages and losses," Judgment of April 12, 2011, Rulings: 334:376; Supreme Court, "Federal Government v. Province of Buenos Aires concerning charging in pesos," Judgment of November 9, 2017; Supreme Court, "Bergerot, Ana María v. Province of Salta, et al. concerning damages and losses," Judgment of December 12, 2019, Rulings 342:2198. Regarding precedents of the federal administrative court see, for example, CACAF, Chamber IV, "González, Néstor Rubén v. EN -Min Defense- FA concerning military and civilian personnel of the Armed Forces and security forces," Judgment of December 7, 2017; CACAF, Chamber V, "Maisonobe Clelia Esther v. EN - Magistrates Council (Case 13-23742/01) concerning cognizance process," Judgment of December 12, 2017.

[91] See for example CACAF, Chamber I, "Alvarez Armando David v. EN- MIN. RE, CI and Chancellery - /Resol 1702/05 concerning Cognizance Process," Case 21819/2006, 9/17/2020; Chamber III, "Amandule Mario Guillermo v. EN- Interior Min. concerning military and civilian personnel of the armed and security forces," 41874/2007, 2/3/2021; Chamber IV, "Ortiz, Juan José Manuel v. E.N. – Defense Min. – FAA concerning Military and Civilian Personnel of the Armed and Security Forces," Case 51777/2016, 20/04/2021; Chamber V, Sachs Pedro Ricardo v. EN - Min. of RE, CI and religion *et al.* concerning damages and losses," Case 30245/2007, 2/26/2016. ,"It should also be mentioned that in at least two precedents (one of them on bonds and a rate that was reduced because it was considered excessive),, said Chamber applied an annual rate of 6%. CACAF, Chamber IV, "Martinez Gondra Ernesto Santiago v. EN– Min. of RE, CI and religion – Resol. 1445/07 (Case 39419/05) concerning public employment," Case 34276/2008, 03/15/2018; CACAF, Chamber V, "Gambero Jorge Osvaldo *et al.* v. PEN Law 25561 Doc. 1570/01 and 214/02 concerning amparo law 25,561" Case 112982/2002, 11/15/2016.

CONFIDENTIAL

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: December 3, 2021

_____

Alfonso Santiago

CONFIDENTIAL

## ANNEX I – MATERIALS UNDER CONSIDERATION

- Statement of Dr. Alberto Bianchi (September 24, 2021)

- Statement of Dr. Alfredo Rovira (September 24, 2021)

- Statement of Dr. Alejandro Garro (September 24, 2021)

- Statement of Dr. Alejandro Uslenghi (September 24, 2021)

- YPF Bylaws

- YPF 6-K, May 9, 2014

- YPF 20-F, March 30, 2015

- Inter-American Convention on Human Rights, 2016

- National Constitution of the Argentine Republic, December 15, 1994

- Argentine Civil Code, September 25, 1869

- Argentine Civil and Commercial Code, October 7, 2014

- Decree No. 530/12, April 16, 2012

- Decree No. 557/12, April 18, 2012

- Decree No. 732/12, May 11, 2012

- Decree No. 941/91, May 19, 1991

- Decree No. 1106/93, May 31, 1993

- Decree No. 214/02, February 3, 2002

- Law No. 19.550, 1984/2014

- Law No. 21.499, January 17, 1977

- Law No. 26.122, July 27, 2006

- Law No. 26.741, May 3, 2012

- Law No. 26.932, April 23, 2013

- Law No. 26.944, August 7, 2014

CONFIDENTIAL

- IDH Court, "Case of Salvador Chiriboga vs. Ecuador," Preliminary Objection and Merits, Judgment of May 6, 2008, Series C No. 179

- Supreme Court, "Algodonera Lavallol concerning bankruptcy" Rulings: 333:394 (2010)

- Opinion of the Federal Attorney General in the case "Algodonera Lavallol concerning bankruptcy," October 1, 2009

- Supreme Court, "Nicolás Arias Murúa v. Province of Salta," Rulings: 104:247 (1906)

- Supreme Court, "Bauzá, Horacio, et al. v. General Administration of National Roads," Rulings: 252:310 (1962)

- Supreme Court, "Nación v. Ferrocarriles y Elevadores Depietri S.A.," Rulings: 256:232 (1963)

- Supreme Court, "Argentina v. Las Palmas del Chaco Austral S.A." Rulings: 291:507 (1975)

- Supreme Court, "El Tambolar v. Federal Government and General Tax Division," Rulings: 316:1930 (1993)

- Supreme Court, "Federal Government v. Textil Escalada SA. concerning expropriation," Rulings: 312:2444 (1989)

- Supreme Court, "State Prosecutor's Office v. Asociación Comunidad Israelita Latina," Rulings: 327:2584 (2004)

- Supreme Court, "U.N.I.R.E.C. v. Ramos E. Iglesias E. et al. concerning expropriation," Rulings: 343:1146 (2020)

- Supreme Court, "Agua y Energia Eléctrica S.E. V. Gustavo Montelpare," Rulings: 326:2329, p. 2335 (2003)

- Supreme Court, "Carlos Alberto Galanti v. Municipalidad de la Ciudad de Buenos Aires," Rulings: 310:2824 (1987)

- Supreme Court, "Matmetal S.A. v. T.A.M.S.E. and Federal Government concerning damages and losses," Rulings: 322:2113 (1999)

- Supreme Court, "Clara Budini de Besse v. Jorge Elías Abraham," Rulings: 281:176 (1971)

- Supreme Court, "Caffarena v. Banco Argentino," Rulings: 10:427 (1871)

- Supreme Court, "Cid Besada, Jorge v. Ledo, José," Rulings: 224:752 (1952)

CONFIDENTIAL

- Supreme Court, "Marie Aupi Thierry et al. v. Banco Francés S.A.," Rulings: 329:5586 (2006)

- Supreme Court, "Castellano, Inocencio, et al. v. Quintana, Aurelio and Germán," Rulings: 208:430 (1947)

- Supreme Court, "Sociedad de Electricidad de Rosario," Rulings 291:290 (1975)

- Supreme Court, "Edistro M. Correa v. Manuel Rodríguez," Rulings: 208:10 (1947)

- Supreme Court, "Gómez Alzaga, Martín B. v. Province of Buenos Aires," Rulings: 322:3255 (1999)

- Supreme Court, "Brunella Vda. De Weiser, Edda v. D.G.I.," Rulings: 289:67 (1974)

- Supreme Court, "Simón, Julio Héctor et al. concerning unlawful deprivation of liberty, etc. -case No. 17.768-," Rulings: 328:2056 (2005)

- Supreme Court, "Machado, Juana," Rulings: 330:2639 (2007)

- Supreme Court, "De San Martín, José et al. v. EN-PEN concerning cognizance process" (S.C. Comp. 731. L. XLIX) Competence (2014)

- Opinion of the Federal Attorney General in the case "De San Martín, José et al. v. EN-PEN concerning cognizance process," December 17, 2013

- Supreme Court, "YPF v. Province of Corrientes and Banco de Corrientes," Rulings: 315:158 (1992)

- Supreme Court, "Spitale, Josefa Elida v. ANSeS concerning challenge of administrative decision," Rulings: 327:3721 (2004)

- Supreme Court, "Baeza, Silvia Ofelia v. Province of Buenos Aires Et al. concerning Damages and Losses," Rulings: 334:376 (2011)

- Supreme Court, "Federal Government v. Province of Buenos Aires concerning charging in pesos" (2017)

- Supreme Court, "Bergerot, Ana María v. Province of Salta et al. concerning damages and losses," Rulings: 342:2198 (2019).

- CACAF, Chamber IV, "González, Néstor Rubén v. EN —Min. Defense— FA concerning military and civilian personnel of the Armed Forces and security forces," December 7, 2017;

- CACAF, Chamber V, "Cuenca Jorge Alejandro v. GCBA (Cromañon) et al. concerning Damages and losses," Case 13122/2011, November 19, 2021

CONFIDENTIAL

- CACAF, Chamber I, "ALVAREZ ARMANDO DAVID v. EN-M° RREECI AND CCANCILLERIA- /RESOL 1702/05 concerning COGNIZANCE PROCESS," Case 21819/2006, September 17, 2020

- CACAF, Chamber III, "AMANDULE MARIO GUILLERMO v. EN- M° INTERIORGN concerning MILITARY AND CIVILIAN PERSONNEL OF THE ARMED FORCES AND SECURITY FORCES," 41874/2007, February 03, 2021

- CACAF, Chamber IV, "Ortiz, Juan José Manuel v. E.N. – Min. Defense – FAA concerning Military and civilian personnel of the Armed Forces and Security Forces," Case 51777/2016, April 20, 2021

- CACAF, Chamber V, "MAISONOBE CLELIA ESTHER v. EN –MAGISTRATES COUNCIL (CASE 13-23742/01) concerning COGNIZANCE PROCESS," Case 17048/2010, December 12, 2017

- CACAF, Chamber V, "SACHS PEDRO RICARDO v. EN - M° RREE CI AND CULTO ET AL. CONCERNING DAMAGES AND LOSSES," Case 30245/2007, February 26, 2016

- CACAF, Chamber IV, "MARTINEZ GONDRA ERNESTO SANTIAGO V. EN–M§ RREE CI AND CULTO–RESOL 1445/07 (CASE 39419/05) CONCERNING PUBLIC EMPLOYMENT," Case 34276/2008, March 15, 2018

- CACAF, Chamber V, "GAMBERO JORGE OSVALDO ET AL. v. PEN LEY 25561 DTO 1570/01 and 214/02 concerning AMPARO LAW 25.561" Case 112982/2002, November 15, 2016

- Resolution S/N/2012 of the National Chamber of Deputies, dated May 23, 2012.

- Resolution S/N1/2012 of the National Chamber of Deputies, dated May 23, 2012

- Resolution S/N/2012 of the National Senate, dated May 30, 2012.

- Resolution S/N1/2012 of the National Senate, dated May 30, 2012.

- CASAS, Juan Alberto and ROMERO VILLANUEVA, Horacio J., *Expropiación. Ley 21.499. Comentada, anotada y concordada con las normas provinciales* [Expropriation. Law 21.499. Annotated, commented and aligned with provincial norms], Astrea, Buenos Aires, 2014

- FIORINI, Bartolomé A., Manual de Derecho Administrativo [Administrative Law Handbook], La Ley, Buenos Aires, 1968

- GORDILLO, Agustín A., Teoría General del Derecho Administrativo [General Theory of Administrative Law], Instituto de Estudios de Administración Local, Madrid, 1984

CONFIDENTIAL

- GONZÁLEZ CALDERÓN, Juan A., Curso de Derecho Constitucional [Course on Constitutional Law], 4th. ed., Guillermo Kraft Ltda., Buenos Aires, 1963

- LEGÓN, Fernando, Tratado integral de la expropiación pública [Comprehensive treatise on public expropriation], Buenos Aires, 1934

- VILLEGAS BASALVIBASO, Benjamín, Derecho Administrativo [Administrative Law], TEA, Buenos Aires, 1949, t. I

- SÁNCHEZ VIAMONTE, Carlos, Manual de derecho constitucional [Handbook of Constitutional Law], 2nd. ed., Kapelusz, Buenos Aires, 1956

CONFIDENTIAL

CONFIDENTIAL

**TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS**
**DISTRITO DEL SUR DE NUEVA YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETERSEN ENERGÍA INVERSORA,　　　:
S.A.U. Y PETERSEN ENERGÍA,　　　　:
S.A.U.　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　Demandantes,　　　　:
　　　　　　　　　　　　　　　　　　:　Caso Nº 1:15-cv-02739-LAP
　　　　　　c.　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
REPÚBLICA ARGENTINA E YPF　　　　:
S.A.,　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　Demandados.　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ETON PARK CAPITAL　　　　　　　　:
MANAGEMENT, L.P., ETON PARK　　　:
MASTER FUND, LTD. Y ETON　　　　 :
PARK FUND, L.P.,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　Demandantes,　　　　:
　　　　　　　　　　　　　　　　　　:　Caso Nº 1:16-cv-08569-LAP
　　　　　　c.　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
REPÚBLICA ARGENTINA E YPF　　　　:
S.A.,　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　Demandados.　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>**DICTAMEN DE RÉPLICA EXPERTO DE ALFONSO SANTIAGO**</u>

## TABLA DE CONTENIDOS

<u>**Página**</u>

**I.     BAJO EL DERECHO ARGENTINO, LA REPÚBLICA
        ARGENTINA NO ESTABA OBLIGADA EN VIRTUD DEL
        ESTATUTO A REALIZAR UNA OFERTA PÚBLICA DE
        ADQUISICIÓN DE LAS ACCIONES DE YPF NO SUJETAS A
        EXPROPIACIÓN** ......................................................................................1

**II.    MARCO GENERAL SOBRE LA PRIORIDAD QUE TIENE EL
        DERECHO PÚBLICO SOBRE EL DERECHO PRIVADO** ...................................3

        A.     La primacía del derecho público y de las normas de orden público
               en materia de expropiación sobre todo instrumento de derecho
               privado ..........................................................................................3

        B.     La expropiación de las acciones de YPF como cuestión de orden
               público y de interés público ..............................................................10

**III.   LA LEY DE UTILIDAD PÚBLICA DESPLAZA AL ESTATUTO** .....................14

        A.     Las disposiciones del Estatuto sobre oferta pública de adquisición
               son inconstitucionales en la medida en que la Ley de Utilidad
               Pública dispuso que la República Argentina adquiriera el 51% de
               acciones en YPF por vía de expropiación sin tener que realizar una
               oferta pública de adquisición ............................................................14

        B.     La Ley de Utilidad Pública expresamente estipuló la adquisición
               del 51% de las acciones de YPF ........................................................19

        C.     La Ley de Utilidad Pública estipuló que YPF seguiría siendo una
               empresa que cotiza públicamente .......................................................20

        D.     La Ley de Utilidad Pública estipuló el método de valuación de las
               acciones de YPF ...............................................................................21

        E.     La Ley de Utilidad Pública ordenó a la República que ejerciera los
               votos con respecto a las acciones de YPF que fueron sujetas a la
               expropiación .....................................................................................21

**IV.    LA LEY DE EXPROPIACIÓN Y LA LEY DE UTILIDAD PÚBLICA
        DESPLAZAN Y TORNAN INOPONIBLES LAS DISPOSICIONES
        DEL ESTATUTO SOBRE LA OFERTA PÚBLICA DE
        ADQUISICIÓN** ....................................................................................22

CONFIDENTIAL

V.     **EL PROF. BIANCHI AFIRMA INCORRECTAMENTE QUE LA LEY ARGENTINA PONE A DISPOSICIÓN DE LOS DEMANDANTES UN RECURSO POR DAÑOS Y PERJUICIOS** ......................24

      A.     Las disposiciones sobre daños y perjuicios del Código Civil no se aplican al Estado y, en todo caso, no se aplican en caso de expropiación......................................................................................................24

      B.     Las disposiciones sobre daños y perjuicios de la Ley de Responsabilidad del Estado tampoco se aplican...............................28

VI.    **LOS PROFS. ROVIRA Y GARRO HACEN REFERENCIA A LA TASA DE INTERÉS INCORRECTA** ......................................................................30

**ANEXO I – MATERIALES CONSIDERADOS**…………………………………………..37

CONFIDENTIAL

Los abogados de la República Argentina (la "República") me han pedido repasar y responder a los dictámenes expertos de los Profs. Alberto B. Bianchi ("Dictamen Bianchi"), Alfredo L. Rovira ("Dictamen Rovira") y Alejandro M. Garro ("Dictamen Garro") presentados por los demandantes Petersen Energía Inversora, S.A.U. ("PEISA") y Petersen Energía, S.A.U. ("PESA"; conjuntamente con PEISA, "Petersen"), y Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd. y Eton Park Fund, L.P. (conjuntamente, "Eton Park," y junto con Petersen, los "Demandantes"), y dar mi opinión sobre ciertos aspectos de derecho público argentino.

1. Soy abogado debidamente licenciado y habilitado en la Argentina. Soy profesor de Derecho Constitucional en la Facultad de Derecho de la Universidad Austral en la Ciudad Autónoma de Buenos Aires, Argentina.

2. He presentado declaraciones fechadas el 30 de agosto de 2019 y el 7 de febrero de 2020 (*ver Petersen Energía Inversora, S.A.U. et al.* c. *Argentine Republic y YPF S.A.*, Nº 1:15-cv-02739-LAP (S.D.N.Y.), ECF Nos. 117 y 150), las cuales incorporo aquí por referencia. Mis cualificaciones profesionales están descritas en dichas declaraciones.

3. Mi compensación es de USD $450 (más IVA) por hora de trabajo, incluyendo la preparación de este informe y cualquier deposición o testimonio que se requiera de mí.  Mi compensación no depende de ninguna manera del resultado del caso.

4. Para formar las opiniones siguientes, he considerado los documentos y otros materiales expuestos en el Anexo I.

I. **BAJO EL DERECHO ARGENTINO, LA REPÚBLICA ARGENTINA NO ESTABA OBLIGADA EN VIRTUD DEL ESTATUTO A REALIZAR UNA OFERTA PÚBLICA DE ADQUISICIÓN DE LAS ACCIONES DE YPF NO SUJETAS A EXPROPIACIÓN**

5. Conforme a las consideraciones expuestas a continuación, estoy de acuerdo con las conclusiones expuestas por el Prof. Alejandro J. Uslenghi en su dictamen del 24 de septiembre de 2021.

6. En particular, estoy de acuerdo con que:[1]

    i.    El derecho público argentino establece clara y pacíficamente que un instrumento de derecho privado como el estatuto social ("Estatuto") de YPF, S.A. ("YPF") se ve desplazado, y resulta por tanto inoponible, en la medida en que condiciona, vuelve ineficaz o modifica el ejercicio de la potestad constitucional de expropiación por parte del Estado o socava sus efectos. Por esta razón y las que expongo en este informe, los Artículos 7 y 28 del Estatuto son inoponibles al Estado expropiante a efectos de obligarlo a realizar, de conformidad con un instrumento de derecho privado (el Estatuto), una oferta pública de adquisición de las acciones de YPF que no estuvieron sujetas a expropiación, o a pagar cualquier tipo de indemnización a terceros por supuestamente no hacerlo.

    ii.    Hacer cumplir las disposiciones del Estatuto sobre la oferta pública de adquisición frustraría la intención expresa del Congreso Nacional en la Ley Nº 26.741 (la "Ley de Utilidad Pública") de: (i) expropiar únicamente el 51% de las acciones de YPF y no más, (ii) distribuir esas acciones de una manera determinada entre el Estado Nacional y las Provincias, y (iii) que tras la expropiación YPF continuase operando como una empresa que cotiza en bolsa, en lugar de una entidad de propiedad estatal.

    iii.    Exigir a la República el cumplimiento de las disposiciones sobre la oferta pública de adquisición previstas en el Estatuto sería inconsistente con dos aspectos centrales del ordenamiento jurídico público argentino. Primero, si el Poder Ejecutivo Nacional hubiera realizado la oferta pública prevista en los Artículos 7 y 28 del Estatuto, habría usurpado las atribuciones presupuestarias exclusivas que la Constitución Nacional otorga al Congreso. Segundo, el proceso de valuación de acciones establecido en el Estatuto viola las normas legales sobre valuación en casos de expropiación y el principio constitucional de igualdad en las cargas públicas.

    iv.    De acuerdo con la Ley de Utilidad Pública y la Ley Nº 21.499 (la "Ley de Expropiación"), el 51% de las acciones de YPF expropiadas pasaron al Estado libres de todo gravamen, deuda y obligación que operase para

---

[1] *Ver* Informe Pericial de Alejandro Juan Uslenghi del 24 de septiembre de 2021 ("Informe Uslenghi") ¶¶ 11-15.

condicionar, volver ineficaz o modificar la potestad expropiatoria del Estado, o socavar los efectos de su ejercicio.

v.        Incluso si los Demandantes pudieran reclamar un derecho de indemnización por la presunta no realización de una oferta pública después de la expropiación (que no pueden), tal reclamo no podría resultar en responsabilidad alguna para la República Argentina. La Ley de Expropiación dispone expresamente que cualquier reclamo por parte de terceros derivado de gravámenes, responsabilidades u obligaciones que afecten a los bienes expropiados solamente pueden dirigirse contra la indemnización pagada a la entidad expropiada, en este caso, Repsol. Por tanto, si los Demandantes creyeron tener derecho a alguna compensación derivada de la expropiación del 51% de acciones de YPF, debieron haber interpuesto un reclamo a tiempo para ser considerados en el convenio de avenimiento entre la República Argentina y Repsol, o contra la propia Repsol.

## II.    MARCO GENERAL SOBRE LA PRIORIDAD QUE TIENE EL DERECHO PÚBLICO SOBRE EL DERECHO PRIVADO

7.  Los Profs. Bianchi, Rovira y Garro sostienen que la República Argentina (i) supuestamente estaba obligada a realizar una oferta pública de adquisición en virtud de la expropiación del 51% de las acciones de YPF[2] y (ii) sería responsable por daños y perjuicios supuestamente ocasionados a los Demandantes por omitir hacerlo.[3]

### A.    La primacía del derecho público y de las normas de orden público en materia de expropiación sobre todo instrumento de derecho privado

---

[2] *Ver* Bianchi ¶ 48 ("It is my opinion that . . . by virtue of Sections 13 and 14 of Law 26,741, the Argentine State performed its 'takeover' of YPF in accordance with Section 28 of its Bylaws, and this immediately triggered the obligation to carry out a TO."); Rovira ¶ 11(b) ("Defendants breached the Bylaws . . . . Argentina failed to carry out a tender offer for the remaining shares, including Plaintiffs' shares."); Garro ¶ 8(f) ("Argentina breached its obligations under Sections 7 and 28 of the YPF Bylaws by failing to make a tender offer for Plaintiffs' YPF shares.").

[3] *Ver* Bianchi ¶ 51 ("In your opinion, are the Argentine Republic and YPF liable for compensation for such damage as may have resulted from their failure to carry out the TO? . . . My answer is yes."); Rovira ¶ 12 ("Under the Argentine Civil Code, Argentina and YPF are liable for 'full indemnification' for the damages caused to Plaintiffs for their breaches of YPF's Bylaws."); Garro ¶ 8(f) ("Defendants Argentine Republic and YPF S.A. . . . are liable under Argentine law for damages for breach of contract.").

CONFIDENTIAL

8.  Para responder con claridad a los dictámenes de los Profs. Bianchi, Rovira y Garro, considero oportuno exponer las reglas y principios del derecho que rigen el caso y que son las premisas fundamentales que fundan las respuestas que formularé.

9.  En el sistema jurídico argentino, el derecho privado o derecho común regula las relaciones entre las personas naturales (personas humanas) o personas jurídicas y es fundamentalmente gobernado por el principio de la autonomía de la voluntad, respetando siempre los principios imperativos de orden público.[4] Lo que predomina en el derecho privado es el interés de los particulares, es decir, el interés privado.  El derecho público, en cambio, se refiere a la relación jurídica entre el Estado y los particulares, ya sean personas naturales o personas jurídicas, o entre entidades estatales.[5]  Lo que predomina en el derecho público es el interés general, colectivo o social, es decir, el interés público.[6] Las reglas del derecho público no pueden ser derogadas por las partes de un instrumento privado. Además, "no hay actividad estatal que se halle sometida única y exclusivamente a normas de derecho común: Cuando tales normas se

---

[4]  El Código Civil vigente hasta 2015 disponía en su Art. 21 que "[l]as convenciones particulares no pueden dejar sin efectos las leyes en cuya observancia estén interesados el orden público y las buenas costumbres". Este principio fue replicado en el nuevo Código Civil y Comercial de la Nación, cuyo Art. 12 dispone que "[l]as convenciones particulares no pueden dejar sin efecto las leyes en cuya observancia está interesado el orden público.  El acto respecto del cual se invoque el amparo de un texto legal, que persiga un resultado sustancialmente análogo al prohibido por una norma imperativa, se considera otorgado en fraude a la ley. En ese caso, el acto debe someterse a la norma imperativa que se trata de eludir."

[5]  Este principio ha sido reconocido por la Corte Suprema en diversos ámbitos. A modo de ejemplo, *ver* Corte Suprema, "El Tambolar v. Estado Nacional y Dirección General Impositiva", Fallos: 316:1930 (1993). Este principio fue receptado en el Artículo 1 de la Ley Nº 26.944 ("Ley de Responsabilidad del Estado") que establece que "las disposiciones del Código Civil no son aplicables a la responsabilidad del Estado de manera directa ni subsidiaria".

[6]  *Cfr.* Villegas Basalvibaso, Benjamín, Derecho Administrativo, TEA, Buenos Aires, 1949, t. I, pp. 64-65.

CONFIDENTIAL

aplican al Estado, están siempre modificadas o interconectadas con normas de derecho público, de forma tal que se integran al complejo normativo del derecho público".[7]

10. En el sistema legal argentino, el principio básico en materia de expropiación es que el derecho público tiene prioridad sobre el derecho privado.[8] De hecho, la expropiación ha sido definida como una "restricción de derecho público" que conlleva la "privación definitiva y completa de la propiedad, exigida por la utilidad pública, mediante una justa indemnización que generalmente se paga con prioridad".[9]  No se trata de un instituto de derecho privado, ni de una norma supletoria del Código Civil[10] vigente hasta 2015.[11]  Por el contrario, la expropiación es un acto de autoridad o soberanía en que el expropiante toma para sí un bien, cualquiera sea su naturaleza, con fines de utilidad pública.[12]

11. Para la Corte Suprema de Justicia de la Nación ("Corte Suprema"), "la expropiación es . . . un fenómeno jurídico de conversión y de sustitución de derechos del particular a favor de la

---

[7] GORDILLO, Agustín A., Teoría General del Derecho Administrativo, Instituto de Estudios de Administración Local, Madrid, 1984, p. 109.

[8] "[E]s un principio fundamental, adoptado por la misma ley soberana y aplicado por ella frecuentemente, que los derechos individuales deben ceder ante los superiores derechos e intereses de la sociedad jurídicamente organizada, esto es ante las prerrogativas y conveniencias del Estado que ella creó. Este principio es esencial para que el Estado pueda cumplir eficazmente los fines con que la sociedad lo ha instituído, que, en nuestro caso, están expresamente definidos en el preámbulo de la Constitución y en todos sus textos, como se ha dicho antes. Y bien, de este principio fundamental y de la necesidad de que, en su consecuencia, el Estado realice las funciones de la soberanía originaria, derívase la suma de poderes y derechos que la ciencia constitucional, en la esfera de las relaciones de propiedad privada con el Estado, llama *dominio eminente* de este último. El poder de expropiación por causa de utilidad o usos públicos es uno de los que comprende". GONZÁLEZ CALDERÓN, Juan A., Curso de Derecho Constitucional, 4ta. ed., Guillermo Kraft Ltda., Buenos Aires, 1963, p. 271 (destacado en el original).

[9] LEGÓN, Fernando, Tratado integral de la expropiación pública, Buenos Aires, 1934, p. 55.

[10] Código Civil, sancionado mediante la Ley 340, que entró en vigor el 1 de enero de 1871 (el "Código Civil"). Este Código fue sustituido por el Código Civil y Comercial de la Nación, sancionado por la Ley 26.994 (el "Código Civil y Comercial") que entró en vigor el 1 de agosto de 2015 de acuerdo con la Ley 27.077.

[11] *Ver* FIORINI, Bartolomé A., Manual de Derecho Administrativo, La Ley, Buenos Aires, 1968, t. II, p. 871.

[12] SÁNCHEZ VIAMONTE, Carlos, Manual de derecho constitucional, 2da. ed., Kapelusz, Buenos Aires, 1956, p. 162.

CONFIDENTIAL

comunidad".[13]   En ese marco, tal como explica la Corte Suprema, "la expropiación supone un conflicto que se resuelve por la preeminencia del interés público y por el irremediable sacrificio del interés del particular".[14]

12. De acuerdo al Artículo 2 de la Ley de Expropiación, que regula el régimen general de expropiaciones, el Estado Nacional se encuentra entre los sujetos facultados a expropiar. Al respecto, cuando el Estado expropia un bien de un particular, no actúa como persona de derecho privado, sino como poder público.  De ahí que cuando hablamos de un procedimiento de expropiación no estamos frente a "un procedimiento regido por el derecho común (venta forzada), sino de un proceso de derecho público administrativo, cuyo fin es que se cumpla la ley que declara de utilidad pública y sujeto a expropiación determinado bien de un particular".[15]

13. Fuera del caso de la expropiación, el orden de prioridad entre el interés público y el interés privado también se encuentra tutelado en otras fuentes, incluyendo los Artículos 21 y 502 del

---

[13]  Corte Suprema, "Estado Nacional c/ Textil Escalada SA. s/ expropiación", Fallos: 312:2444, p. 2454 (1989). Este criterio fue repetido en numerosos precedentes, incluyendo "Fiscalía de Estado v. Asociación Comunidad Israelita Latina", Fallos: 327:2584, p. 2587 (2004) (dictamen de la Procuración General de la Nación al que adhiere la Corte Suprema); y "U.N.I.R.E.C. c/ Ramos E. Iglesias E. y ot. s/expropiación", Fallos: 343:1146, p. 1155 (2020) (dictamen de la Procuración General de la Nación al que adhiere la Corte Suprema).

[14]  Corte Suprema, "Agua y Energía Eléctrica S.E. V. Gustavo Montelpare", Fallos: 326:2329, p. 2335 (2003) (dictamen de la Procuración General de la Nación al que adhiere la Corte Suprema).

[15]  CASAS, Juan Alberto y ROMERO VILLANUEVA, Horacio J., Expropiación. Ley 21.499. Comentada, anotada y concordada con las normas provinciales, Astrea, Buenos Aires, 2014, p. 28.

CONFIDENTIAL

Código Civil vigente hasta 2015,[16] los Artículos 12 y 386 (y Artículos concordantes) del

Código Civil y Comercial de la Nación,[17] y otras decisiones de la Corte Suprema.[18]

14. Bajo estas disposiciones, el interés privado es considerado como subordinado al interés

público, en especial en el marco de normas de orden público que no son de libre disposición

para las partes en una transacción privada.[19] Por el contrario, dada su naturaleza, resultan

imperativas y de observancia obligatoria para dichas partes y sus relaciones privadas. Así,

cuando una ley tiene el carácter de orden público, se impide que persona alguna pueda invocar

un derecho adquirido para oponerse a ella. Al respecto, la Corte Suprema ha dicho en reiteradas

ocasiones ya desde el siglo XIX que "ninguna persona puede tener derechos irrevocablemente

adquiridos contra una ley de orden público".[20]

---

[16]  Por ejemplo, Código Civil, Artículo 21 ("Las convenciones particulares no pueden dejar sin efecto las leyes en cuya observancia estén interesados el orden público y las buenas costumbres") y Artículo 502 ("La obligación fundada en una causa ilícita es de ningún efecto. La causa es ilícita cuando es contraria a las leyes o al orden público").

[17]  Por ejemplo, el Artículo 12 del Código Civil y Comercial de la Nación establece que "[L]as convenciones particulares no pueden dejar sin efecto las leyes en cuya observancia está interesado el orden público". Y el Artículo 386 establece que "[s]on de nulidad absoluta los actos que contravienen el orden público, la moral o las buenas costumbres".

[18]  *Ver*, por ejemplo, Corte Suprema, "Carlos Alberto Galanti v. Municipalidad de la Ciudad de Buenos Aires", Fallos: 310:2824 (1987) ("al resarcirse el sacrificio individual no debe perderse de vista que la satisfacción del interés público constituye un mandato imperativo de la comunidad del Estado e importa, indudablemente, un beneficio para cada uno de sus integrantes que, en ese sentido, no pueden pretender eximirse completamente de la carga particular que supone, necesariamente la realización del bien común").

[19]  Corte Suprema, "Matmetal S.A. c/ T.A.M.S.E. y Estado Nacional s/ daños y perjuicios", Fallos: 322:2113, p. 2117, Cons. 6º (1999). Allí la Corte Suprema afirmó que en un contrato entre particulares aplica "el derecho interno argentino, en subsidio de las condiciones materiales que las partes hubiesen acordado válidamente, dentro del marco de los principios y leyes de orden público del foro". La Corte Suprema reconoció también la validez de la aplicación retroactiva de leyes de orden público a, por ejemplo, contratos entre particulares en materia de locaciones urbanas: "El agravio fundado en haberse aplicado retroactivamente al caso la ley 18.880 no es atendible, toda vez que reiterada doctrina de la Corte ha establecido que la aplicación de leyes de orden público en materia de locaciones urbanas, sancionadas con posterioridad a la traba de la litis, en tanto ellas así lo dispongan, no vulnera derechos adquiridos". Corte Suprema, "Clara Budini de Besse v. Jorge Elías Abraham", Fallos: 281:176 (1971).

[20]  Corte Suprema, "Caffarena c/ Banco Argentino", Fallos: 10:427 (1871). Este principio de primacía del orden público ha sido reiterado por la Corte Suprema de diversas formas y en numerosas oportunidades y contextos, incluyendo, entre otros, "Cid Besada, Jorge c/ Ledo, José", Fallos: 224:752, p. 759 (1952); "Clara Budini de Besse v. Jorge Elías Abraham", Fallos: 281:176 (1971); "Matmetal S.A. c/ T.A.M.S.E. y Estado Nacional s/ daños y

15. A su vez, en relación con el derecho de propiedad, la Corte Suprema ha dicho que:

> El derecho de propiedad en cuanto derecho individual no está menos supeditado que cualesquiera de los otros de esa especie en sus alcances y los modos de su ejercicio a lo que requiera el orden público, puesto que todo derecho comporta en cuanto tal una relación con otro u otros que supone a su vez, natural e indispensablemente, congruencia con el orden general de la comunidad, es decir, con aquellas exigencias de justicia a las que el régimen institucional de la sociedad política –que es la Nación constitucionalmente organizada– debe dar satisfacción para que la convivencia ordenada de quienes la integran sea por de pronto posible, y además asegure y promueva lo que en el Preámbulo de la Constitución se llama 'el bienestar general' o bien común.[21]

16. En ese marco, la Corte Suprema ha aclarado que la expropiación es un instituto de derecho público cuyo ejercicio no puede ser condicionado de forma alguna por acuerdos de partes. En particular, la Corte Suprema ha dicho que un acuerdo privado que condiciona el ejercicio del poder de expropiación es inconstitucional. En un caso en que existía un contrato previo que establecía ciertas restricciones a la determinación del momento en que se verificaba la utilidad pública como requisito previo para expropiar, la Corte Suprema sostuvo, de forma contundente, que:

> [S]i bien la determinación del justo resarcimiento expropiatorio podría, dentro de ciertos límites, ser objeto de transacción entre expropiante y expropiado, no ocurre lo mismo con la expropiación en sí, cuya naturaleza juspublicística no se concilia con la autonomía de la voluntad que es propia de la negociación contractual. . . . [L]a previsión en el contrato de concesión de servicios públicos, del tiempo en que el sujeto expropiante puede declarar la expropiación, significaría condicionar al Estado en el ejercicio de su arbitrio irrenunciable, para establecer el momento en que la utilidad pública se verifica. Admitir cualquier tipo de restricción convencional sobre el punto implicaría afectar la causa expropiatoria al interés privado,

---

perjuicios", Fallos: 322:2113, p. 2117, Cons. 6º (1999); "Marie Aupi Thierry y otra v. Banco Francés S.A.", Fallos: 329:5586, p. 5588 (2006) (dictamen de la Procuración General de la Nación al que adhiere la Corte Suprema); etc.

[21] Corte Suprema, "Castellano, Inocencio, y otros c/ Quintana, Aurelio y Germán", Fallos: 208:430, pp. 451 y 452 (1947).

con ostensible inconstitucionalidad de lo pactado, en tanto y cuanto
tal acuerdo vendría a limitar, de manera palmaria, la facultad
constitucional de calificación de la utilidad pública.[22]

17. Asimismo, en relación con la existencia de un contrato que pueda estar en oposición a una ley de orden público, la Corte Suprema ha expresado que la modificación por ley de las estipulaciones de un contrato aun no cumplido es constitucionalmente válida cuando los superiores intereses de la comunidad lo requieran.[23]  La Corte agregó que "la sola contratación no da a los derechos establecidos en la convención carácter de adquiridos contra una ley de orden público".[24]

18. Cabe destacar, además, que la Corte Suprema ha recordado en numerosos precedentes la función social de la propiedad, así como las obligaciones que derivan de ella con fines de interés público.[25] Ese mismo criterio ha sido establecido por la Corte Interamericana de Derechos Humanos, cuya jurisprudencia, según la Corte Suprema, es "una imprescindible pauta de interpretación de los deberes y obligaciones derivados de la Convención Americana sobre Derechos Humanos",[26] la cual tiene jerarquía constitucional en la República Argentina conforme lo dispuesto por el Artículo 75(22) de la Constitución Nacional. El principio de la función social de la propiedad ha sido establecido por la Corte Interamericana de Derechos

---

[22]  Corte Suprema, "Sociedad de Electricidad de Rosario", Fallos 291:290, pp. 340-41 (1975).

[23]  Corte Suprema, "Cid Besada, Jorge c/ Ledo, José", Fallos: 224:752, p. 758 (1952), que en este punto remite, a su vez, al precedente Corte Suprema, "Edistro M. Correa c/ Manuel Rodríguez", Fallos: 208:10 (1947).

[24]  Corte Suprema, "Cid Besada, Jorge c/ Ledo, José", Fallos: 224:752, p. 759 (1952).

[25]  Entre otros, *ver* Corte Suprema, "Gómez Alzaga, Martín B. c/ Provincia de Buenos Aires", Fallos: 322:3255 (1999); "Brunella Vda. de Weiser, Edda c/ D.G.I.", Fallos: 289:67 (1974), etc.

[26]  Corte Suprema, "Simón, Julio Héctor y otros s/ privación ilegítima de la libertad, etc. -causa N° 17.768-", Fallos: 328:2056 (2005).

CONFIDENTIAL

Humanos a la hora de interpretar el Artículo 21 de la Convención Americana de Derechos Humanos (la "CADH").[27]

19. De todo lo anterior resulta evidente que en el derecho argentino vigente existe una preeminencia de ese interés público, en especial en materia de expropiación, y, como contrapartida, un "irremediable sacrificio del interés particular; de tal modo que la tensión entre la garantía constitucional a la propiedad privada o individual cede por efecto de la necesidad de lo colectivo".[28]  Y, bajo esta perspectiva, el interés privado o individual cede siempre ante el interés público o general, especialmente en materia de expropiación.

**B.    La expropiación de las acciones de YPF como cuestión de orden público y de interés público.**

20. En este caso, el Decreto Nº 530/2012, emitido el 16 de abril de 2012, recurrió a la figura de la "intervención transitoria" en YPF por el Estado por un lapso inicial de 30 días para "asegurar la continuidad de la empresa, la preservación de sus activos y de su patrimonio, el

---

[27]  El Art. 21 de la CADH dispone lo siguiente: "Art. 21. Derecho a la Propiedad Privada: 1. Toda persona tiene derecho al uso y goce de sus bienes.  La ley puede subordinar tal uso y goce al interés social. 2. Ninguna persona puede ser privada de sus bienes, excepto mediante el pago de indemnización justa, por razones de utilidad pública o de interés social y en los casos y según las formas establecidas por ley. 3. Tanto la usura como cualquier otra forma de explotación del hombre por el hombre, deben ser prohibidas por la ley". Luego de destacar las bases para la prevalencia del bien común sobre los derechos individuales en una sociedad democrática, la Corte Interamericana de Derechos Humanos sostuvo que: "La función social de la propiedad es un elemento fundamental para el funcionamiento de la misma, y es por ello que el Estado, a fin de garantizar otros derechos fundamentales de vital relevancia para una sociedad específica, puede limitar o restringir el derecho a la propiedad privada, respetando siempre los supuestos contenidos en la norma del artículo 21 de la Convención, y los principios generales del derecho internacional. . . . El derecho a la propiedad no es un derecho absoluto, pues en el artículo 21.2 de la Convención se establece que para que la privación de los bienes de una persona sea compatible con el derecho a la propiedad debe fundarse en razones de utilidad pública o de interés social, sujetarse al pago de una justa indemnización, practicarse según los casos y las formas establecidas por la ley y efectuarse de conformidad con la Convención". Corte IDH, "Caso Salvador Chiriboga vs. Ecuador", Excepción Preliminar y Fondo, Sentencia de 6 de mayo de 2008, Serie C Nº 179, ¶¶ 60-61.

[28]  CASAS, Juan Alberto y ROMERO VILLANUEVA, Horacio J., Expropiación. Ley 21.499. Comentada, anotada y concordada con las normas provinciales, Astrea, Buenos Aires, 2014, p. 3.

CONFIDENTIAL

abastecimiento de combustibles y garantizar la cobertura de las necesidades del país".[29]  El Decreto Nº 530/2012 ordenó al Interventor que asumiera temporalmente las facultades del Directorio y/o el Presidente de la compañía.[30]  Posteriormente, los alcances del Decreto Nº 530/2012 se ampliaron a través del Decreto Nº 557/2012 del 18 de abril de 2012 para incluir a Repsol YPF Gas S.A.  La intervención fue prorrogada el 11 de mayo de 2012 por otros 30 días a través del Decreto Nº 732/2012.

21. Los Decretos Nos. 530/2012 y 557/2012  son decretos de necesidad y urgencia y, por ende, su contenido es de índole legislativa. Fueron emitidos por el Poder Ejecutivo Nacional a través del uso de sus facultades en el marco de lo previsto en el Artículo 99(3) de la Constitución Nacional, que otorga expresamente al Poder Ejecutivo la capacidad de emitir decretos de carácter legislativo en casos de necesidad y urgencia, cuando circunstancias excepcionales hacen imposible cumplir con los procesos ordinarios para la sanción de leyes en el Congreso.[31] Esos decretos de necesidad y urgencia (como son llamados en el lenguaje jurídico argentino) están, después de ser emitidos, sujetos al control posterior por parte del Congreso de la Nación como condición de su validez.[32]  El Congreso de la Nación emitió resoluciones declarando la

---

[29] Decreto Nº 530/12, Art. 1.

[30] Decreto Nº 530/12, Art. 3.

[31] *Ver* Constitución Nacional, Art. 99, inciso 3.

[32] Ese control se encuentra reglado en el Artículo 99(3) de la Constitución y en la Ley Nº 26.122.

validez del Decreto Nº 530/2012 y del Decreto Nº 557/2012 a través de la Cámara de Diputados de la Nación[33] y el Senado de la Nación.[34]

22. El 3 de mayo de 2012 el Congreso sancionó la Ley de Utilidad Pública, a través de la cual dispuso declarar de utilidad pública y sujeto a expropiación el 51% del patrimonio de YPF, "representado por igual porcentaje de las acciones Clase D de dicha empresa, pertenecientes a Repsol YPF S.A., sus controlantes o controladas, en forma directa o indirecta".[35]  También se ordenó la "ocupación temporánea" de las acciones a expropiar.[36]

23. En consecuencia, la Ley de Utilidad Pública (i) declaró de interés público y sujeto a expropiación el 51% de las acciones clase D de YPF pertenecientes a Repsol YPF S.A., y (ii) dispuso la ocupación temporánea de las acciones a expropiar a fin de garantizar la continuidad de las actividades de la compañía, disponiendo que el Poder Ejecutivo Nacional ejercería los derechos que confieren las acciones a expropiar.[37]  La Ley de Utilidad Pública también dispuso

---

[33] *Ver* Resolución S/N/2012 de la Cámara de Diputados de la Nación, de fecha 23 de mayo de 2012, Art. 1 (declarando la validez del Decreto Nº 530/12); Resolución S/N1/2012 de la Cámara de Diputados de la Nación, de fecha 23 de mayo de 2012, Art. 1 (declarando la validez del Decreto Nº 557/12).

[34] *Ver* Resolución S/N/2012 del Senado de la Nación, de fecha 30 de mayo de 2012, Art. 1 (declarando la validez del Decreto Nº 530/12); Resolución S/N1/2012 del Senado de la Nación, de fecha 30 de mayo de 2012, Art. 1 (declarando la validez del Decreto Nº 557/12).

[35] Ley de Utilidad Pública, Art. 7.  El Artículo 7 de la Ley de Utilidad Pública dispuso también lo siguiente: "Asimismo, declárase de utilidad pública y sujeto a expropiación el cincuenta y un por ciento (51%) del patrimonio de Repsol YPF GAS S.A. representado por el sesenta por ciento (60%) de las acciones Clase A de dicha empresa, pertenecientes a Repsol Butano S.A., sus controlantes o controladas".

[36] Ley de Utilidad Pública, Art. 13.

[37] Cabe destacar que, conforme el Artículo 5 de la Ley de Expropiación, la expropiación debe referirse específicamente a bienes determinados. Asimismo, el Artículo 57 de la Ley de Expropiación dispone que la ocupación temporánea debe ser de un bien o cosa determinados.  La Corte Suprema ha dicho que "[c]onforme a lo dispuesto en el Art. 4º de la ley 21.499, pueden ser objeto de expropiación todos los bienes convenientes o necesarios para la satisfacción de la 'utilidad pública', cualquiera sea su naturaleza jurídica, pertenezcan al dominio público o al dominio privado, sean cosas o no pero, para ello, deben ser de titularidad del sujeto expropiado". Corte Suprema, "Machado, Juana", Fallos: 330:2639, p. 2648 (2007) (dictamen de la Procuración General de la Nación al que remite parcialmente la Corte Suprema).

que la Comisión Nacional de Valores ("CNV") convocaría a una asamblea de accionistas para el nombramiento de los nuevos directores.[38]  El Artículo 18 de la Ley de Utilidad Pública declaró que la misma es de "orden público".

24. El Decreto N° 1106/93 – que es un decreto reglamentario de los previstos en el actual Artículo 99(2) de la Constitución Nacional y, por ende, su contenido no tiene naturaleza legislativa – instruyó al entonces Ministerio de Economía y Obras y Servicios Públicos someter el texto del Estatuto de YPF para su aprobación en la asamblea de accionistas, en ejercicio de los derechos del Estado Nacional como accionista de YPF.[39] Las disposiciones del Estatuto no constituyen disposiciones de orden público, sino que son de naturaleza privada, tal como ocurre con los estatutos de todas las sociedades que se rigen bajo la Ley N° 19.550 general de sociedades.[40] En cualquier caso, el Decreto N° 1106/93 es una norma de rango jerárquico inferior a la Ley de Utilidad Pública, y en ningún caso podría prevalecer sobre ella.

25. El instituto de la expropiación se encuentra reconocido expresamente en el Artículo 17 de la Constitución Nacional.  A este respecto, la República Argentina siguió los parámetros previstos en la Constitución al haber declarado de utilidad pública y sujeto a expropiación al 51% del patrimonio de YPF mediante la Ley de Utilidad Pública y, luego del convenio de avenimiento entre Repsol y Argentina en 2014, haber pagado al sujeto expropiado la

---

[38]  Ley de Utilidad Pública, Art. 13.

[39]  Decreto N° 1106/93, Art. 1.

[40]  El Código Civil y Comercial de la Nación confirma este principio en su Artículo 149, que dispone que "[l]a participación del Estado en personas jurídicas privadas no modifica el carácter de éstas. Sin embargo, la ley o el estatuto pueden prever derechos y obligaciones diferenciados, considerando el interés público comprometido en dicha participación."

correspondiente indemnización en el marco de lo dispuesto en los Artículos 10 a 17 de la Ley de Expropiación.

### III.   LA LEY DE UTILIDAD PÚBLICA DESPLAZA AL ESTATUTO

26. Las opiniones de los Profs. Bianchi, Rovira y Garro de que el Estatuto de YPF supuestamente obligaba a la República a realizar una oferta pública de adquisición en virtud de la expropiación del 51% de las acciones de YPF[41] son incorrectas por la sencilla razón de que los Artículos 7 y 28 del Estatuto de YPF están en conflicto con las obligaciones previstas en la Ley de Utilidad Pública y el régimen de expropiación, de varias maneras, y se ven por tanto desplazadas por estas.

### A.   Las disposiciones del Estatuto sobre oferta pública de adquisición son inconstitucionales en la medida en que la Ley de Utilidad Pública dispuso que la República Argentina adquiriera el 51% de acciones en YPF por vía de expropiación sin tener que realizar una oferta pública de adquisición

27. La Ley de Utilidad Pública dispuso que la República Argentina adquiriera el 51% de las acciones de Clase D pertenecientes a Repsol por expropiación sin tener que realizar una oferta pública de adquisición. Esto entra en conflicto directo con la interpretación que hacen los Profs. Rovira y Garro del Artículo 7(e) del Estatuto de YPF, según la cual el proceso de oferta pública de adquisición debe hacerse *antes* de una adquisición mayoritaria en la compañía.[42] El Prof. Bianchi también opina que la "adquisición de control" definida en el Artículo 7(d) del Estatuto de YPF ocurrió el 16 de abril de 2012, cuando se dictó el Decreto Nº 530/2012 que dispuso la

---

[41] *Ver* Rovira ¶ 11(b), Garro ¶ 8(f), Bianchi ¶ 52.

[42] *Ver* Rovira § IV.E; Garro § IV.F.

intervención de YPF, y que, como consecuencia de ello, el Estado debió haber realizado una oferta pública de adquisición para esa misma fecha.[43]

28. Esta aplicación del Estatuto de YPF habría entrado en contradicción con la exigencia de la Ley de Utilidad Pública de adquirir por expropiación el 51% de las acciones de YPF pertenecientes a Repsol, en cuanto habría obligado a la República Argentina a (i) realizar *previamente* una asamblea especial de las acciones Clase A de YPF; y (ii) realizar, también *previamente*, una oferta pública de adquisición de las acciones de YPF. Es decir, según la interpretación de los expertos de los Demandantes, el Estatuto habría estado condicionando y fijando el momento a partir del cual la República Argentina podría ejercer la potestad expropiatoria para adquirir el 51% de las acciones de la Clase D de YPF pertenecientes a Repsol.

29. Tal interpretación convertiría al Estatuto en inconstitucional, por varias razones. *Primero*, como he indicado en la Sección II.A. *supra*, la Corte Suprema ha dicho claramente que permitir que un instrumento de derecho privado determine el momento en que el Estado expropia "significaría condicionar al Estado en el ejercicio de su arbitrio irrenunciable, para establecer el momento en que la utilidad pública se verifica. Admitir cualquier tipo de restricción convencional sobre el punto implicaría afectar la causa expropiatoria al interés privado, con ostensible inconstitucionalidad de lo pactado, en tanto y en cuanto tal acuerdo vendría a limitar, de manera palmaria, la facultad constitucional de calificación de la utilidad pública".[44]

---

[43] *Ver* Bianchi ¶¶ 25-50. Sin embargo, el Prof. Bianchi admite, de forma contradictoria, que "incluso si la transferencia formal del dominio de las acciones sólo se hubiera llevado a cabo una vez perfeccionado el proceso de expropiación, que terminó con la formalización del 'Convenio de Solución Amigable y Avenimiento de Expropiación' de 27 de febrero de 2014 . . .". *Id*. ¶ 38. Dado que, como admite el Prof. Bianchi, la intervención no supuso una adquisición de las acciones sujetas a expropiación conforme lo previsto en la Ley de Utilidad Pública, las estipulaciones del Estatuto de YPF, que se refieren a "adquirir" y a "adquisiciones" de acciones de YPF, no podían resultar aplicables a ella.

[44] Corte Suprema, "Sociedad de Electricidad de Rosario", Fallos 291:290, p. 341 (1975).

30. *Segundo*, la ley, no un instrumento privado, es la que determina cuándo el acto soberano de expropiación se perfecciona. El derecho argentino exige compensación a la parte expropiada para completar una expropiación y para que el título de la propiedad se transmita al Estado.[45] Según el Artículo 29 de la Ley de Expropiación, "[s]e entenderá que la expropiación ha quedado perfeccionada cuando se ha operado la transferencia del dominio al expropiante mediante sentencia firme, toma de posesión y pago de la indemnización." Este proceso de pago de la compensación puede llevarse a cabo a través de un convenio de avenimiento entre las partes o por la decisión de un juez argentino.[46]

31. La expropiación de las acciones de YPF se produjo solo después de celebrado el convenio de avenimiento entre Repsol y Argentina en 2014.  En ese convenio, de fecha 27 de febrero de 2014, las partes acordaron "la transferencia de las acciones objeto de expropiación a la REPÚBLICA ARGENTINA y el reconocimiento a REPSOL del derecho a obtener de la REPÚBLICA ARGENTINA una indemnización única y total por la expropiación de las acciones".[47]  Al firmar el convenio, Repsol reconoció que, en ese momento, ella misma era "propietaria de las ACCIONES" en cuestión, las cuales luego serían transferidas a la República Argentina en razón de la expropiación.[48] La posición jurídica de ambas partes a la hora de firmar el convenio de avenimiento era clara: Repsol mantenía hasta ese momento la propiedad de las acciones sujetas a expropiación y, como titular del dominio de esas acciones, las

---

[45] *Ver* Constitución Nacional, Art. 17.

[46] *Ver* Ley de Expropiación , Arts. 13 y 18.  *Ver también* Corte Suprema, "Nación Argentina c/ Las Palmas del Chaco Austral S.A." Fallos: 291:507 (1975).

[47] *Ver* Ley Nº 26.932, Anexo I, Convenio de Solución Amigable y Avenimiento de Expropiación, Considerando 17.

[48] *Ver* Ley Nº 26.932, Anexo I, Convenio de Solución Amigable y Avenimiento de Expropiación, Cláusula Octava, § 1(i).

transfirió a través de ese convenio de avenimiento a la República Argentina. El convenio de avenimiento fue ratificado por la Ley N° 26.932 y entró en vigencia el 8 de mayo de 2014.

32. *Tercero*, la ocupación temporánea de un bien por parte del Estado no determina ni obliga a expropiar dicho bien. Según la Ley de Expropiación, el Estado argentino puede ocupar temporalmente una propiedad para poder satisfacer un interés público.[49] Sin embargo, durante ese tiempo el título de esa propiedad *permanece* a nombre de su dueño y la propiedad está simplemente *ocupada* por el gobierno; el gobierno no es el dueño de la propiedad durante ese tiempo y, por lo tanto, no se ha realizado ninguna adquisición. Es decir, la pérdida del derecho de propiedad por parte del dueño no se consuma con la ocupación. La ocupación no forma parte, necesariamente, del proceso de expropiación.

33. En el caso de la expropiación del 51% de las acciones de Repsol en YPF, la Ley de Utilidad Pública solo *inició* el proceso de expropiación al declarar que el 51% de capital social de YPF era de utilidad pública y sujeto a expropiación. Asimismo, dispuso que el Poder Ejecutivo Nacional ocupara temporáneamente las acciones sujetas a expropiación *sin adquirir el título sobre ellas*, hasta que la expropiación se perfeccionase y, por ende, el Estado adquiriese esas acciones.[50]  Entre 2012 y 2014, aunque el Poder Ejecutivo Nacional ocupó temporáneamente las acciones, éstas permanecieron bajo el dominio de Repsol.

34. De forma consistente con lo expuesto, el día siguiente a la entrada en vigor del convenio, YPF remitió a la Comisión de Bolsa y Valores de Estados Unidos ("SEC", por sus siglas en inglés), en un formulario 6-K, una carta que había enviado el día anterior a la CNV, en la cual declaró:

---

[49]  Ley de Expropiación, Arts. 57, 58, 59 y sgtes.

[50]  *Ver* Ley de Utilidad Pública, Art. 13.

"A la fecha del presente, se ha concluido la expropiación conforme a la Ley Nº 26.741 y, por lo tanto, la República Argentina es la propietaria definitiva del 51% del capital social de YPF SA e YPF GAS SA."[51]

35. *Cuarto*, la República Argentina podía haber desistido del proceso de expropiación en cualquier momento antes de su finalización en 2014 con el convenio de avenimiento con Repsol. La Ley de Expropiación dispone que, si no hay avenimiento, el Estado ha de iniciar un juicio expropiatorio para completar la expropiación.[52] El Estado puede desistir del juicio hasta el momento de perfeccionarse la expropiación con la transferencia del dominio y el pago de la indemnización: "[e]l expropiante podrá desistir de la acción promovida en tanto la expropiación no haya quedado perfeccionada."[53]

36. En conclusión, la expropiación del 51% de las acciones de Repsol en YPF fue autorizada por ley en 2012, pero la adquisición del título sobre esas acciones por parte de la República no se dio sino hasta el 8 de mayo de 2014, cuando se perfeccionó la expropiación al entrar en vigencia el convenio de avenimiento entre Argentina y Repsol.  Por lo tanto, el acto soberano de la República de expropiar las acciones de Repsol en YPF ocurrió el 8 de mayo de 2014, es decir, la fecha en que la República adquirió el título de Repsol correspondiente a las acciones de YPF, siendo inconstitucional cualquier requisito del Estatuto de YPF de realizar una oferta pública de adquisición en virtud de ello.

---

[51] *Ver* YPF 6-K, p. 6 (9 de mayo de 2014).  *Ver también* YPF 20-F, en 27 (30 de marzo de 2015) ("El 8 de mayo de 2014, se notificó a YPF la entrada en vigencia del Acuerdo de Repsol. A partir de esa fecha, la expropiación conforme a la Ley de Utilidad Pública fue concluido, y como resultado, la República Argentina es definitivamente propietaria del 51% del capital social de cada una de YPF S.A. e YPF GAS S.A.").

[52] Ley de Expropiación, Art. 18.

[53] Ley de Expropiación, Art. 29.

### B. La Ley de Utilidad Pública expresamente estipuló la adquisición del 51% de las acciones de YPF.

37. La Ley de Utilidad Pública expresamente estipuló que la República adquiriría exactamente el 51% de las acciones Clase D de YPF, exclusivamente de Repsol. Respecto a los bienes que pueden ser expropiados, la Constitución Nacional establece que la expropiación debe obedecer a razones de utilidad pública declaradas por ley.[54] La Ley de Expropiación asimismo dispone que la utilidad pública debe servir de fundamento legal a la expropiación, y comprende todos los casos en que se procure la satisfacción del bien común.[55] Consecuentemente, dispone que todos los bienes apropiados o necesarios a fin de procurar el bien común pueden ser objeto de expropiación.[56]

38. En este caso, la expropiación ocurrió en una situación en la que estaba comprometida una actividad de interés público: la exploración y explotación de hidrocarburos. En circunstancias como esta, el Congreso puede definir el objeto de la expropiación y fijar los bienes que resultan estrictamente necesarios para cumplir con el propósito de interés público. La Ley de Utilidad Pública establece esto al requerir una expropiación de exactamente el 51% de acciones en su Artículo 7.[57] Bajo el derecho argentino, esto significa que solamente se puede adquirir por vía de expropiación el 51% del capital social, y que está prohibida la adquisición de más acciones

---

[54] Constitución Nacional, Art. 17.

[55] Ley de Expropiación, Art. 1.

[56] *Id.*, Art. 4.

[57] Ley de Utilidad Pública, Art. 7 ("A los efectos de garantizar el cumplimiento de los objetivos de la presente, declárase de utilidad pública y sujeto a expropiación el cincuenta y un por ciento (51%) del patrimonio de YPF Sociedad Anónima representado por igual porcentaje de las acciones Clase D de dicha empresa, pertenecientes a Repsol YPF S.A., sus controlantes o controladas, en forma directa o indirecta. Asimismo, declárase de utilidad pública y sujeto a expropiación el cincuenta y un por ciento (51%) del patrimonio de Repsol YPF GAS S.A. representado por el sesenta por ciento (60%) de las acciones Clase A de dicha empresa, pertenecientes a Repsol Butano S.A., sus controlantes o controladas").

-19-

por medio de oferta pública o cualquier otra manera a los efectos de cumplir con la Ley de Utilidad Pública.  La identificación en la Ley de Utilidad Pública del número exacto de acciones a ser adquirido por el Estado es inconsistente con la idea de que la expropiación provocaría una obligación automática bajo el Estatuto de YPF de hacer una oferta pública de adquisición de acciones adicionales.

39. Nada en la Ley de Utilidad Pública permitiría la imposición de una obligación de oferta pública y un gasto adicional considerable de fondos públicos, frente a la ausencia de una declaración del Congreso de que las acciones que se adquirirán a través de la oferta también son necesarias para la satisfacción del interés público. Esa interpretación del Estatuto de YPF lo convertiría en inconstitucional a la luz de lo expuesto por la Corte Suprema en los casos reseñados en los puntos 16-17 anteriores,[58] ya que estaría condicionando claramente el ejercicio de la facultad constitucional de expropiar dentro de los márgenes y previsiones de la Ley de Utilidad Pública y la Ley de Expropiación.

### C.   La Ley de Utilidad Pública estipuló que YPF seguiría siendo una empresa que cotiza públicamente

40. La Ley de Utilidad Pública estableció expresamente en el Artículo 15 que YPF continuaría operando como una sociedad anónima abierta.[59] Pero conforme al Artículo 7(f) del Estatuto de YPF, de ser aplicable, una oferta pública requeriría que el gobierno ofreciera adquirir *todas* las acciones en circulación a través de una oferta pública y aceptar comprar *todas* las acciones

---

[58] En especial, Corte Suprema, "Sociedad de Electricidad de Rosario", Fallos 291:290, pp. 340 y 341 (1975).

[59] Ley de Utilidad Pública, Art. 15 ("Para el desarrollo de su actividad, YPF Sociedad Anónima y Repsol YPF GAS S.A., continuarán operando como sociedades anónimas abiertas, en los términos del Capítulo II, Sección V, de la Ley 19.550 y normas concordantes, no siéndoles aplicables legislación o normativa administrativa alguna que reglamente la administración, gestión y control de las empresas o entidades en las que el Estado nacional o los Estados provinciales tengan participación").

CONFIDENTIAL

clase D ofertadas a través de la oferta pública. Esto resultaría, efectivamente, en que YPF dejase de ser una sociedad anónima abierta y volvería ineficaz y socavaría los efectos de la Ley de Utilidad Pública.

### D. La Ley de Utilidad Pública estipuló el método de valuación de las acciones de YPF.

41. El Artículo 13 de la Ley de Expropiación establece que el Estado solo puede adquirir un bien expropiado pagando "los valores máximos que estime[] a ese efecto el Tribunal de Tasaciones de la Nación," de conformidad con los procedimientos dispuestos en los Artículos 10 y siguientes de la Ley de Expropiación.[60]   El Artículo 12 de la Ley de Utilidad Pública exigió que el valor de los bienes sujetos a expropiación fuese determinado por el Tribunal de Tasaciones de la Nación, de conformidad con este procedimiento. Sin embargo, el Artículo 7(f)(v) del Estatuto de YPF establece ciertos criterios *diferentes* para establecer el valor a ser pagado por las acciones adquiridas conforme a la oferta pública. Esos criterios previstos en el Estatuto de YPF claramente condicionarían, volverían ineficaces y socavarían los efectos tanto de la Ley de Expropiación como de la Ley de Utilidad Pública.

### E. La Ley de Utilidad Pública ordenó a la República que ejerciera los votos con respecto a las acciones de YPF que fueron sujetas a la expropiación

42. El Artículo 13 de la Ley de Utilidad Pública dispuso que el Poder Ejecutivo Nacional ejerciera los derechos que confieren el 51% de las acciones de YPF sujetas a expropiación. En cambio, los Artículos 7(h) y 28(c) del Estatuto le habrían negado a la República cualquier "derecho a voto" en la medida en que no se realizase una oferta pública en los términos del Artículo 7 del Estatuto, frustrando de este modo el mandato de la Ley de Utilidad Pública. Nuevamente,

---

[60]  Ley de Expropiación, Art. 13.

estaríamos ante un condicionamiento e interferencia indebidos con lo dispuesto en la Ley de Utilidad Pública.

## IV.   LA LEY DE EXPROPIACIÓN Y LA LEY DE UTILIDAD PÚBLICA DESPLAZAN Y TORNAN INOPONIBLES LAS DISPOSICIONES DEL ESTATUTO SOBRE LA OFERTA PÚBLICA DE ADQUISICIÓN

43. Está claro que los Artículos 7 y 28 del Estatuto habrían condicionado, vuelto ineficaz y socavado los efectos de la Ley de Expropiación y la Ley de Utilidad Pública. En este contexto, el Estatuto se ve desplazado por estas leyes, que son de orden público. Las disposiciones del Estatuto relativas a la oferta pública de adquisición que los Demandantes pretenden oponer a la República en este caso son inoponibles e inejecutables.

44. Existen por lo menos tres razones fundamentales del porqué de esta conclusión:

     i.     La Ley de Utilidad Pública dispone una expropiación válida en el marco de una ley que es de orden público, la cual tiene prioridad sobre una obligación comercial relacionada a la transferencia de acciones;

     ii.     Ningún instrumento de derecho privado puede impedir, regular, limitar o condicionar el ejercicio de una atribución estatal expresamente prevista en la Constitución Nacional; y

     iii.     El Artículo 28 de la Ley de Expropiación dispone de forma clara y contundente que "[n]inguna acción de terceros podrá impedir la expropiación ni sus efectos".

45. El primer punto es evidente y no requiere mayor explicación: como he indicado, en el derecho vigente en Argentina, el instituto de la expropiación no es de derecho privado, como sí lo es la transferencia de acciones bajo el Estatuto.[61]  Por el contrario, se trata de un acto de soberanía,[62]

---

[61]  *Ver supra* § II.A.

[62]  *Ver*, entre otros, Corte Suprema, "Nicolás Arias Murúa c/ Provincia de Salta", Fallos: 104:247 (1906); "Bauzá, Horacio, y otro c/ Administración General de Vialidad Nacional", Fallos: 252:310 (1962); "Nación c/ Ferrocarriles y Elevadores Depietri S.A.", Fallos: 256:232 (1963).

regido por el derecho público, por medio del cual se sustituyen los derechos del particular a favor de la comunidad en defensa del interés público.[63] La indemnización que corresponde pagar es únicamente al sujeto expropiado respecto del perjuicio causado por la expropiación en sí.

46. Respecto del segundo punto, como he explicado,[64] ningún instrumento de derecho privado o documento societario puede regular, impedir, restringir, condicionar o interferir con el ejercicio de una atribución estatal prevista en la Constitución Nacional. Esto significa que un instrumento de derecho privado, tal como el Estatuto de YPF, no puede regular, impedir o restringir la aplicación de una ley de orden público dictada en ejercicio de atribuciones otorgadas expresamente por la Constitución Nacional, tal como la Ley de Utilidad Pública. Por lo tanto, el Estatuto de YPF se ve desplazado por dicha ley en la medida en que la condiciona, vuelve ineficaz o socava sus efectos. Una interpretación contraria, insisto, convertiría al Estatuto en inconstitucional en este punto a la luz de la doctrina expuesta por la Corte Suprema.[65]

47. En cuanto al tercer punto, la Ley de Expropiación prevé expresamente, en su Artículo 28, que "ninguna acción de terceros podrá impedir la expropiación ni sus efectos."[66] Pretender que el Estatuto sea igualmente aplicable a pesar de lo dispuesto por la Ley de Utilidad Pública es una

---

[63] Sánchez Viamonte, Carlos, Manual de derecho constitucional, 2da. ed., Kapelusz, Buenos Aires, 1956, p. 162.

[64] *Ver supra* § II.A.

[65] *Ver* Corte Suprema, "Sociedad de Electricidad de Rosario", Fallos 291:290, p. 341 (1975).

[66] Al comentar el Artículo 28 de la Ley de Expropiación, Casas y Romero Villanueva explican que "En principio, ningún derecho de los terceros, sea sobre el bien expropiado o susceptibles de hacerse efectivos sobre éste, es capaz de obstaculizar la expropiación". CASAS, Juan Alberto y ROMERO VILLANUEVA, Horacio J., Expropiación. Ley 21.499. Comentada, anotada y concordada con las normas provinciales, Astrea, Buenos Aires, 2014, p. 124.

forma de desconocer claramente la Ley de Expropiación en este punto. De hecho, esa
pretensión es una forma clara de impedir los efectos limitados de la expropiación tal como
fuera ordenada por el Congreso en la Ley de Utilidad Pública.

48. Por todas estas razones, la República Argentina no pudo ni puede estar sujeta a las
disposiciones del Estatuto y a las obligaciones públicas de la Ley de Expropiación y la Ley de
Utilidad Pública al mismo tiempo. Más bien, ambas leyes, teniendo precedencia jerárquica y
constitucional, desplazan a las disposiciones sobre oferta pública del Estatuto, las cuales
carecen de efecto en circunstancias de expropiación. Cualquier interpretación contraria
convierte al Estatuto de YPF en inconstitucional en este punto.

## V. EL PROF. BIANCHI AFIRMA INCORRECTAMENTE QUE LA LEY ARGENTINA PONE A DISPOSICIÓN DE LOS DEMANDANTES UN RECURSO POR DAÑOS Y PERJUICIOS

### A. Las disposiciones sobre daños y perjuicios del Código Civil no se aplican al Estado y, en todo caso, no se aplican en caso de expropiación

49. El dictamen del Profesor Bianchi asume que todos los actos preparatorios para la expropiación
prevista en la Ley de Utilidad Pública se asimilan a una "adquisición de control" regida por el
derecho privado, en este caso, el Estatuto y así concluye que:

> [N]o cabe duda de que, en virtud de la Ley n.º 26.741, el Estado
> argentino participó en una 'toma de control' de YPF, tal como se
> define en los Artículos 7 y 28 de los estatutos, ya que la 'ocupación
> temporal' de las acciones de Clase D autorizó al Estado argentino a
> ejercer <u>todos los derechos inherentes a dichas acciones</u>. Dicho de
> otra manera, incluso si la transferencia formal del dominio de las
> acciones sólo se hubiera llevado a cabo una vez perfeccionado el
> proceso de expropiación, que terminó con la formalización del
> 'Convenio de Solución Amigable y Avenimiento de Expropiación'
> de 27 de febrero de 2014, que fue posteriormente aprobado mediante
> la Ley n.º 26.932, la 'toma de control' ya había tenido lugar mucho
> antes, ya que desde el Decreto n.º 530/2012 el Gobierno argentino
> ejercía el control completo de la administración de YPF, e incluso
> desde la promulgación de la Ley n.º 26.741 el Estado argentino

había ejercido sus derechos de accionista en relación con las acciones de Clase D que representaban el 51 % del capital social. Cabe señalar que la ocupación temporal de las acciones de Clase D de YPF en el caso en cuestión no solo implicaba una mera tenencia de esas acciones durante un período limitado de tiempo para resolver una emergencia específica dentro de límites temporales y espaciales definidos. Por el contrario, la ocupación temporal de las acciones de Clase D de YPF fue el preludio de su expropiación, que había sido ordenada en el artículo 7 de la Ley n.º 26.741. En otras palabras, el Estado argentino realizó la ocupación temporal de tales acciones con el fin de adquirir su propiedad con una expropiación.[67]

50. Sin embargo, se trata en todos los casos de actos en ejercicio de potestades públicas que, como se ha explicado *supra*, no pueden estar condicionadas de modo tal que se frustre dicho ejercicio en el marco de la Ley de Utilidad Pública.

51. El Prof. Bianchi cita dos disposiciones del Código Civil y una disposición del Código Civil y Comercial para argumentar que la República sería responsable por los daños y perjuicios que pudieran corresponder por no haber realizado una oferta pública de adquisición de acciones de YPF:

> En virtud del antiguo Código Civil (CC) vigente en el momento en que debía haberse cumplido la obligación, la cuestión se trataba generalmente en el artículo 505, en virtud de la cual '[L]os efectos de las obligaciones respecto del acreedor son [...]3) Para obtener del deudor las indemnizaciones correspondientes'. Además, en el artículo 519 del CC se disponía lo siguiente: '[s]e llaman daños e intereses el valor de la pérdida que haya sufrido, y el de la utilidad que haya dejado de percibir el acreedor de la obligación, por la inejecución de esta a debido tiempo'. En el CCC, este problema se aborda en el artículo 1737: '[h]ay daño cuando se lesiona un derecho o un interés no reprobado por el ordenamiento jurídico, que tenga por objeto la persona, el patrimonio, o un derecho de incidencia colectiva'.[68]

---

[67] Bianchi ¶¶ 37-40 (énfasis en lo original).

[68] Bianchi ¶¶ 56-58.

52. Sin embargo, ninguna de las disposiciones mencionadas por el Prof. Bianchi se aplica en caso de expropiación.  Por el contrario, el Prof. Bianchi omite citar dos artículos del Código Civil y Comercial de la Nación que contradicen sus afirmaciones. Me refiero al Artículo 1764, que dispone que "Las disposiciones del Capítulo 1 de este Título no son aplicables a la responsabilidad del Estado de manera directa ni subsidiaria" y al Artículo 1765 que dispone que "La responsabilidad del Estado se rige por las normas y principios del derecho administrativo nacional o local según corresponda".

53. En primer lugar, el derecho civil de daños y perjuicios no es aplicable al Estado. El propio Código Civil vigente en 2012 establecía en su Artículo 2611 que "[l]as restricciones impuestas al dominio privado sólo en el interés público, son regidas por el derecho administrativo". Ese principio fue reiterado en el Código Civil y Comercial de la Nación, cuyo Artículo 1970 dispone: "Las limitaciones impuestas al dominio privado en el interés público están regidas por el derecho administrativo." Además, el Artículo 1 de la Ley N° 26.944 ("<u>Ley de Responsabilidad del Estado</u>") establece con toda claridad que "las disposiciones del Código Civil no son aplicables a la responsabilidad del Estado de manera directa ni subsidiaria". Si bien la citada ley fue promulgada en agosto 2014, este principio fundamental del derecho público argentino ya era aplicable cuando ocurrieron los hechos de este caso entre 2012 y 2014.

54. En segundo lugar, tal como expliqué arriba,[69] la expropiación tiene un régimen de indemnización específicamente previsto en el Artículo 17 de la Constitución Nacional y en la Ley de Expropiación. Como ha explicado el Prof. Uslenghi, el régimen de compensación de la

---

[69] *Ver supra* § II.B.

CONFIDENTIAL

Ley de Expropiación es el de "indemnización única", sin que quepan más indemnizaciones del ente expropiante a favor de terceros.[70]

55. Esto no implica que cualquiera que se considere afectado quede sin remedio alguno. Por el contrario, la Ley de Expropiación reconoce expresamente el mecanismo de la expropiación inversa en su Artículo 51. Las reclamaciones por daños que los Demandantes persiguen están en conflicto con ese recurso específico previsto en el derecho público argentino. El Artículo 51 de la Ley de Expropiación permite que aquellos terceros (más allá de los que fueron expropiados) que se vean perjudicados por los efectos de una expropiación, busquen una expropiación irregular o inversa. En una reclamación por expropiación inversa, las partes impedidas de disponer de su propiedad como resultado de la expropiación, y quienes se vean perjudicados por la acción expropiatoria más allá del acto expropiatorio, pueden interponer una acción para proteger sus derechos y obtener resarcimiento por el potencial daño causado a su derecho de propiedad.[71]

56. En la medida en que los Demandantes afirman haber sido perjudicados como consecuencia de la expropiación, esta podría haber sido la vía que podían utilizar para reclamar los supuestos daños que la Ley de Utilidad Pública les pudo haber causado. El proceso para evaluar la compensación se asemeja al proceso utilizado para llegar a una valoración de compensación

---

[70] Uslenghi ¶ 116.

[71] *Ver* Ley de Expropiación, Art. 51: "Procede la acción de expropiación irregular en los siguientes casos: a) Cuando existiendo una ley que declara de utilidad pública un bien, el Estado lo toma sin haber cumplido con el pago de la respectiva indemnización. b) Cuando, con motivo de la ley de declaración de utilidad pública, de hecho una cosa mueble o inmueble resulte indisponible por evidente dificultad o impedimento para disponer de ella en condiciones normales. c) Cuando el Estado imponga al derecho del titular de un bien o cosa una indebida restricción o limitación, que importen una lesión a su derecho de propiedad."

para la propiedad expropiada en primera instancia.[72]  Bajo este método, los potenciales daños serían mucho más reducidos que los que buscan los Demandantes aquí. Esta es otra manera en que los reclamos de los Demandantes interfieren con el derecho público argentino.

**B.  Las disposiciones sobre daños y perjuicios de la Ley de Responsabilidad del Estado tampoco se aplican.**

57. El Prof. Bianchi afirma que la República es responsable de los daños a los Demandantes puesto que "La Ley de Responsabilidad del Estado (LRE) no exime al Estado de responsabilidad por el incumplimiento de su obligación de llevar a cabo una [oferta pública de adquisición]".[73]

58. El caso que aquí está planteado no es un caso regido por la Ley de Responsabilidad del Estado. Según su Artículo 1, esta ley "rige la responsabilidad del Estado por los daños que su actividad o inactividad les produzca a los bienes o derechos de las personas. La responsabilidad del Estado es objetiva y directa. Las disposiciones del Código Civil no son aplicables a la responsabilidad del Estado de manera directa ni subsidiaria". La ley rige la responsabilidad del Estado tanto por actividad ilícita (Artículo 3) como lícita (Artículo 4), teniendo esta última un carácter excepcional (Artículo 5).

59. Dada la existencia de un remedio específico previsto en la Ley de Expropiación para los casos de expropiación, los Demandantes no podrían haber iniciado válidamente una acción judicial contra el Estado Nacional basados en la responsabilidad conforme a la Ley de Responsabilidad del Estado, como parece sugerir el Prof. Bianchi. La Ley de Responsabilidad del Estado

---

[72]  Ley de Expropiación, Art. 54 ("En el juicio de expropiación irregular los valores indemnizables serán fijados en la misma forma prevista para el juicio de expropiación regular, contemplada en el artículo 10 y siguientes de la presente ley.")

[73]  Bianchi ¶ 59.

dispone que la responsabilidad del Estado por su actividad lícita es de carácter excepcional.[74] La actividad expropiatoria es claramente una actividad lícita en la medida en que está expresamente autorizada en la Constitución. A su vez, el resarcimiento a aquel que sufre una expropiación está expresamente previsto en el Artículo 17 de la Constitución y en la Ley de Expropiación. En consecuencia, no se puede ampliar ni reducir la obligación del Estado de pagar la indemnización que corresponde al sujeto expropiado a causa de la expropiación. Esa obligación, insisto, está expresamente prevista en la Constitución y en la Ley de Expropiación. Ambas normas no podrían ser desplazadas en este punto por la Ley de Responsabilidad del Estado.

60. Aún si se considerara aplicable la Ley de Responsabilidad del Estado, el Artículo 5, norma que actualmente rige la materia y que, como hemos ya señalado, recepta los criterios jurisprudenciales y doctrinarios anteriormente vigentes, dispone que "[l]a responsabilidad del Estado por actividad legítima es de carácter excepcional".[75] Además, el plazo de prescripción previsto en la ley es de tres años computados a partir de la verificación del daño o desde que la acción de daños esté expedita.[76] Ese plazo está vencido.

61. Finalmente, los Demandantes tampoco podrían válidamente sostener que la República Argentina sería responsable por la omisión de realizar la oferta pública de adquisición. Ello por cuanto, según expliqué anteriormente, dado al carácter de orden público del régimen de expropiación, no existía ninguna obligación legal para la República Argentina de realizar la

---

[74] Ley de Responsabilidad del Estado, Art. 5.

[75] Ley de Responsabilidad del Estado, Art. 5.

[76] Ley de Responsabilidad del Estado, Art. 7.

oferta pública, ya que el Estatuto resultaba inoponible frente al régimen expropiatorio. En este sentido, siendo que la no realización de la oferta pública de adquisición constituiría, a todo evento, una omisión *legítima*, y atento a que, según la Ley de Responsabilidad del Estado, la República sólo debe responder ante omisiones *ilegítimas*,[77] no existe reclamo alguno que los Demandantes pudieran haber realizado bajo la citada ley.

## VI.   LOS PROFS. ROVIRA Y GARRO HACEN REFERENCIA A LA TASA DE INTERÉS INCORRECTA

62. En sus dictámenes, los Profs. Rovira y Garro hacen referencia incorrectamente a la tasa de interés que se utiliza respecto de las deudas entre particulares y no a la que se aplica en aquellos casos en que el Estado es parte y están regidos por el derecho público. El Prof. Garro afirma que:

> En la medida en que es posible hacer una generalización, y dejando de lado casos aislados en los que los jueces han aplicado tasas menores o mayores, es correcto concluir que una tasa de interés fija de entre el 6% y el 8% anual en concepto de intereses compensatorios es lo que la mayoría de los jueces argentinos parecen considerar una compensación adecuada del daño sufrido por el acreedor por el valor tiempo del dinero (dólares estadounidenses y otras monedas duras) y la pérdida de oportunidades que ello conlleva.[78]

63. A su vez, el Prof. Rovira sostiene que:

> Al aplicar estos principios, existen precedentes en los cuales la tasa de interés establecida por los tribunales para las obligaciones pagaderas en dólares de los Estados Unidos u otras monedas duras llega al 10%, 12% o incluso 15% debido a las circunstancias del caso, pero incluyendo los intereses compensatorios, moratorios y punitorios. En general, la tendencia es establecer una tasa de interés media integral que oscila entre el 6 y el 8%. Más recientemente, en general, los tribunales han otorgado tasas de interés fijas de entre el 6% y el 8%, y han determinado el importe de la tasa de interés aplicable caso por caso e incluido los tres tipos de interés. Pero ocasionalmente, los tribunales han otorgado un interés del 10% teniendo en cuenta las circunstancias del caso e incluso han otorgado tasas

---

[77] El Artículo 3(d) de la Ley de Responsabilidad del Estado establece que "la omisión sólo genera responsabilidad cuando se verifica la inobservancia de un deber normativo de actuación expreso y determinado".

[78] Garro ¶ 41.

CONFIDENTIAL

de interés de hasta un 15% en casos muy específicos. Teniendo en cuenta el propósito de los intereses, que es compensar la pérdida del dinero que el acreedor hubiera tenido a disposición si el deudor hubiera cumplido con su parte, el tribunal puede considerar válidamente como pauta el rango de intereses que los tribunales argentinos han estado considerando. De manera crítica, en este caso, los incumplimientos de la Parte Demandada han privado a la Parte Demandante de (hasta ahora) más de nueve años de valor de tiempo perdido.[79]

64. El Prof. Garro y el Prof. Rovira están en lo correcto cuando manifiestan que el Artículo 622 del Código Civil deja "la determinación de la tasa de interés . . . librada a la decisión de los jueces, salvo acuerdo en contrario de las partes, y en ausencia de una tasa fijada por ley".[80] No obstante, por las razones resumidas a continuación, el desarrollo es equivocado cuando Prof. Garro concluye que una "tasa de interés fija de entre el 6% y el 8% anual . . . es lo que la mayoría de los jueces argentinos parecen considerar una compensación adecuada" en un caso como este.[81]

65. El Prof. Garro y el Prof. Rovira fundan sus conclusiones solo en precedentes de la Cámara Nacional en lo Comercial,[82] que es un órgano judicial local con asiento en la Ciudad de Buenos Aires y que decide únicamente casos de índole comercial entre partes privadas. Los precedentes de esta corte son irrelevantes a este caso por razones *ratione personae* y *ratione materiae*.

---

[79] Rovira ¶¶ 56-57.

[80] Garro ¶ 38; Rovira, ¶¶ 53, 55.

[81] Garro ¶ 41.

[82] El Prof. Garro también cita un precedente de la Cámara Nacional en lo Civil que no modifica este análisis y al cual aplican las mismas objeciones detalladas. *Ver* Garro ¶ 38 n.62.

66. Conforme fue establecido por la Constitución Nacional, en los casos donde la República sea parte la jurisdicción competente es la federal (no la jurisdicción local).[83] Asimismo, los tribunales federales tienen jurisdicción en casos que involucren un interés federal. Dado que la República es parte en este caso y su resolución comprende la adjudicación de cuestiones de derecho público (que es de interés federal), hay razones de peso para concluir que, si este caso hubiera sido juzgado en Argentina, la jurisdicción competente hubiese sido la jurisdicción *federal*.

67. Además, el caso habría sido juzgado por los tribunales del fuero *contencioso administrativo* federal, y no por los tribunales del fuero civil y comercial federal, ya que, el caso involucra cuestiones significativas de derecho público.[84] Esa fue la conclusión a la que arribó la Corte Suprema en una demanda similar presentada por un accionista minoritario de YPF contra la República ("De San Martín, José y otro c/ EN-PEN s/ proceso de conocimiento"). En 2014, la Corte Suprema dirimió el conflicto de competencia entre esos dos fueros *federales* y declaró competente al fuero *contencioso administrativo* federal en razón de la relevancia del derecho administrativo para la resolución, más allá de la posible aplicación de institutos del derecho común.[85]

68. En consecuencia, deben considerarse los precedentes relevantes de los tribunales en lo contencioso administrativo federal, que siguen el criterio adoptado por la Corte Suprema, y que el Prof. Garro y el Prof. Rovira no mencionan.

---

[83] Constitución Nacional, Art. 116.

[84] La conclusión sería la misma si YPF fuese codemandado.

[85] Corte Suprema, "De San Martín, José y otro c/ EN-PEN s/ proceso de conocimiento", C. 731. XLIX. COM, Sentencia del 20 de agosto de 2014 (dictamen de la Procuración General de la Nación al que adhiere la Corte Suprema).

69. Según la jurisprudencia de los tribunales del fuero contencioso administrativo federal, si la tasa a aplicar no estuviera fijada contractualmente o por medio de la ley, corresponde fijarla judicialmente y aplicar la tasa pasiva promedio publicada por el Banco Central de la República Argentina ("BCRA") en los casos en que se juzga la responsabilidad estatal.[86]

70. En los casos que involucran deudas en pesos, la Corte Suprema ha fijado desde hace muchos años la tasa de interés pasiva promedio publicada por el BCRA:[87] por ejemplo, en el caso "YPF c/ Provincia de Corrientes".[88]

71. Con relación a las deudas en dólares estadounidenses, la Corte Suprema ha adoptado una solución similar. Por ejemplo, en "Algodonera Lavallol s/ quiebre,"[89] la Corte Suprema aplicó una tasa de interés establecida para plazos fijos en dólares a 30 días de los bancos argentinos.

72. Los tribunales en lo contencioso administrativo federal han seguido los precedentes de la Corte Suprema en el caso de obligaciones denominadas en pesos.[90] En relación con las obligaciones

---

[86] Cámara de Apelaciones en lo Contencioso Administrativo Federal ("CACAF"), Sala V, "Cuenca Jorge Alejandro c/ GCBA (Cromañon) y otros s/ daños y perjuicios", 19 de noviembre de 2021 ("Es dable recordar que el artículo 622 del Código Civil entonces vigente dispone -en lo que aquí interesa- que si no estuviere fijado el interés legal, los jueces determinarán el interés que se debe abonar. Frente a lo allí dispuesto, esta Cámara consideró que la tasa pasiva - aplicada en la sentencia apelada- era la que debía emplearse en los reclamos por daños y perjuicios (arg. Sala I, in re: "M. B. T. y otro c/ M Interior -PFA y otros s/daños y perjuicios", del 13/12/16; Sala II, in re: "C. M.O. c/ EN y otros s/daños y perjuicios", del 01/12/16; Sala III, in re: "Dirección Nacional de Vialidad c/ Mendez Tomas Hector s/ Expropiacion-Servidumbre Administrativa" del 23/11/2003; esta Sala in rebus: "B. M., M. E. c/ SIGEN - Resol. 112/05 s/empleo público", del 14/02/12, "Arena vda. De Riva, María Mercedes y otros c/ Mº Interior - PFA y daños y perjuicios", del 26/03/2015;). Asimismo, dicho criterio fue convalidado por la Corte Suprema de Justicia de la Nación en Fallos 315:158 y 315:1209, entre otros. Por otro lado, esta Sala tiene dicho que la tasa activa no debe ser aplicada excepto que haya sido fijada por la ley o en el contrato de que se trate").

[87] Esto está contemplado en el Artículo 10 del Decreto N° 941/1991, que, al modificar el artículo 8° del Decreto 529/91, dispuso que "El BANCO CENTRAL DE LA REPUBLICA ARGENTINA deberá publicar mensualmente la tasa de interés pasiva promedio, que los Jueces podrán disponer que se aplique a los fines previstos en el art. 622 del Código Civil".

[88] Corte Suprema, "YPF c/Pcia. de Corrientes y Banco de Corrientes", Fallos 315:158 (1992).

[89] Corte Suprema, "Algodonera Lavallol s/ quiebra" (dictamen de la Procuración General de la Nación al que adhiere la Corte Suprema), Fallos: 333:394 (2010).

[90] Ver Corte Suprema, "Spitale, Josefa Elida c/ ANSeS s/ impugnación de resolución administrativa", Sentencia del 14 septiembre de 2004, Fallos: 327:3721; Corte Suprema, "Baeza, Silvia Ofelia c/ Buenos Aires, Provincia De Y

denominadas en dólares, las distintas salas de la Cámara de Apelaciones en lo Contencioso Administrativo Federal en líneas generales han reiterado el criterio de la Corte Suprema y también han aplicado la tasa pasiva promedio del Banco Central de la República Argentina luego de convertir a pesos los montos debidos en dólares.[91]

73. Por lo tanto, el enfoque defendido por el Prof. Garro y el Prof. Rovira estaría en desacuerdo con los precedentes consistentes establecidos por la Corte Suprema y seguidos por los tribunales federales en lo contencioso administrativo.

74. En base a lo señalado, la aplicación de la tasa de interés propiciada por el Prof. Garro y el Prof. Rovira en sus dictámenes no se corresponde con los criterios establecidos por el derecho y la jurisprudencia de nuestro país.

---

Otros s/Daños Y Perjuicios", Sentencia del 12 de abril de 2011, Fallos: 334:376; Corte Suprema, "Estado Nacional c/ Buenos Aires, Provincia de s/ cobro de pesos", Sentencia del 9 de noviembre de 2017; Corte Suprema, "Bergerot, Ana María c/ Salta, Provincia de y otros s/ daños y perjuicios", Sentencia del 12 de diciembre de 2019, Fallos 342:2198. Con relación a los precedentes del fuero contencioso administrativo federal *ver, por ejemplo*, CACAF, Sala IV, "González, Néstor Rubén c/ EN —M Defensa— FA s/ personal militar y civil de las FFAA y de seg.", Sentencia del 7 de diciembre de 2017; CACAF, Sala V, "Maisonobe Clelia Esther c/ EN -Consejo Magistratura (Expte 13-23742/01) S/Proceso De Conocimiento", Sentencia del 12 diciembre 2017.

[91] *Ver*, *por ejemplo,* CACAF, Sala I, "Álvarez Armando David c/ EN-M° RREECI y Cancilleria- /Resol 1702/05 s/proceso de conocimiento", Expte. 21819/2006, 17/09/2020; Sala III, "Amandule Mario Guillermo c/ EN- M° Interior s/personal militar y civil de las FFAA y de Seg", 41874/2007, 03/02/2021; Sala IV, "Ortiz, Juan José Manuel c/ E.N. – Min. Defensa – FAA s/ Personal Militar y Civil de las FFAA y de Seg", Expte. 51777/2016, 20/04/2021; Sala V, "Sachs Pedro Ricardo c/ EN - M° RREE CI y Culto y otros s/Daños y perjuicios", Expte. 30245/2007, 26/02/2016. Cabe mencionar también que, en al menos dos precedentes (uno de ellos sobre bonos y una tasa que se redujo por considerar excesiva), dicha Cámara aplicó una tasa del 6% anual. CACAF, Sala IV, "Martínez Gondra Ernesto Santiago c/ EN–M§ RREE CI y culto–Resol 1445/07 (expte 39419/05) s/ empleo público", Expte. 34276/2008, 15/03/2018; CACAF, Sala V, "Gambero Jorge Osvaldo y otro c/ PEN Ley 25561 DTO 1570/01 y 214/02 s/amparo sobre Ley 25.561" Expte. 112982/2002, 15/11/2016.

CONFIDENTIAL

Declaro bajo pena de perjurio de conformidad con las leyes de los Estados Unidos de América que lo anterior es verdadero y correcto

Fecha:   3 de diciembre de 2021

_____

Alfonso Santiago

CONFIDENTIAL

## ANEXO I – MATERIALES CONSIDERADOS

- Declaración del Dr. Alberto Bianchi (24 de septiembre de 2021)

- Declaración del Dr. Alfredo Rovira (24 de septiembre de 2021)

- Declaración del Dr. Alejandro Garro (24 de septiembre de 2021)

- Declaración del Dr. Alejandro Uslenghi (24 de septiembre de 2021)

- Estatuto de YPF

- YPF 6-K, 9 de mayo de 2014

- YPF 20-F, 30 de marzo de 2015

- Convención Americana de Derechos Humanos, 2016

- Constitución Nacional de la República Argentina, 15 de diciembre de 1994

- Código Civil Argentina, 25 de septiembre de 1869

- Código Civil y Comercial Argentina, 7 de octubre de 2014

- Decreto Nº 530/12, 16 de abril de 2012

- Decreto Nº 557/12, 18 de abril de 2012

- Decreto Nº 732/12, 11 de mayo de 2012

- Decreto N° 941/91, 19 de mayo de 1991

- Decreto Nº 1106/93, 31 de mayo de 1993

- Decreto N° 214/02, 3 de febrero de 2002

- Ley Nº 19.550, 1984/2014

- Ley Nº 21.499, 17 de enero de 1977

- Ley Nº 26.122, 27 de julio de 2006

- Ley Nº 26.741, 3 de mayo de 2012

- Ley Nº 26.932, 23 de abril de 2013

- Ley Nº 26.944, 7 de agosto de 2014

CONFIDENTIAL

- Corte IDH, "Caso Salvador Chiriboga vs. Ecuador", Excepción Preliminar y Fondo, Sentencia de 6 de mayo de 2008, Serie C Nº 179

- Corte Suprema, "Algodonera Lavallol s/ quiebre" Fallos: 333:394 (2010)

- Dictamen de la Sra. Procuradora General de la Nación en el caso *Algodonera Lavallol s/ quiebra*, 1 de octubre de 2009

- Corte Suprema, "Nicolás Arias Murúa c/ Provincia de Salta", Fallos: 104:247 (1906)

- Corte Suprema, "Bauzá, Horacio, y otro c/ Administración General de Vialidad Nacional", Fallos: 252:310 (1962)

- Corte Suprema, "Nación c/ Ferrocarriles y Elevadores Depietri S.A.", Fallos: 256:232 (1963)

- Corte Suprema, "Nación Argentina c/ Las Palmas del Chaco Austral S.A." Fallos: 291:507 (1975)

- Corte Suprema, "El Tambolar v. Estado Nacional y Dirección General Impositiva", Fallos: 316:1930 (1993)

- Corte Suprema, "Estado Nacional c/ Textil Escalada SA. s/ expropiación", Fallos: 312:2444 (1989)

- Corte Suprema, "Fiscalía de Estado v. Asociación Comunidad Israelita Latina", Fallos: 327:2584 (2004)

- Corte Suprema, "U.N.I.R.E.C. c/ Ramos E. Iglesias E. y ot. s/expropiación", Fallos: 343:1146 (2020)

- Corte Suprema, "Agua y Energia Eléctrica S.E. V. Gustavo Montelpare", Fallos: 326:2329, p. 2335 (2003)

- Corte Suprema, "Carlos Alberto Galanti v. Municipalidad de la Ciudad de Buenos Aires", Fallos: 310:2824 (1987)

- Corte Suprema, "Matmetal S.A. c/ T.A.M.S.E. y Estado Nacional s/ daños y perjuicios", Fallos: 322:2113 (1999)

- Corte Suprema, "Clara Budini de Besse v. Jorge Elías Abraham", Fallos: 281:176 (1971)

- Corte Suprema, "Caffarena c/ Banco Argentino", Fallos: 10:427 (1871)

- Corte Suprema, "Cid Besada, Jorge c/ Ledo, José", Fallos: 224:752 (1952)

- Corte Suprema, "Marie Aupi Thierry y otra v. Banco Francés S.A.", Fallos: 329:5586 (2006)

- Corte Suprema, "Castellano, Inocencio, y otros c/ Quintana, Aurelio y Germán", Fallos: 208:430 (1947)

- Corte Suprema, "Sociedad de Electricidad de Rosario", Fallos 291:290 (1975)

- Corte Suprema, "Edistro M. Correa c/ Manuel Rodríguez", Fallos: 208:10 (1947)

- Corte Suprema, "Gómez Alzaga, Martín B. c/ Provincia de Buenos Aires", Fallos: 322:3255 (1999)

- Corte Suprema, "Brunella Vda. de Weiser, Edda c/ D.G.I.", Fallos: 289:67 (1974)

- Corte Suprema, "Simón, Julio Héctor y otros s/ privación ilegítima de la libertad, etc. - causa N° 17.768-", Fallos: 328:2056 (2005)

- Corte Suprema, "Machado, Juana", Fallos: 330:2639 (2007)

- Corte Suprema, "De San Martín, José y otro c/ EN-PEN s/ proceso de conocimiento" (S.C. Comp. 731. L. XLIX) Competencia (2014)

- Dictamen de la Sra. Procuradora General de la Nación en el caso "De San Martín, José y otro c/ EN-PEN s/ proceso de conocimiento," 17 de diciembre de 2013

- Corte Suprema, "YPF c/Pcia. de Corrientes y Banco de Corrientes", Fallos: 315:158 (1992)

- Corte Suprema, "Spitale, Josefa Elida c/ ANSeS s/ impugnación de resolución administrativa", Fallos: 327:3721 (2004)

- Corte Suprema, "Baeza, Silvia Ofelia c/ Buenos Aires, Provincia De Y Otros s/Daños Y Perjuicios", Fallos: 334:376 (2011)

- Corte Suprema, "Estado Nacional c/ Buenos Aires, Provincia de s/ cobro de pesos" (2017)

- Corte Suprema, "Bergerot, Ana María c/ Salta, Provincia de y otros s/ daños y perjuicios", Fallos: 342:2198 (2019).

- CACAF, Sala IV, "González, Néstor Rubén c/ EN —M Defensa— FA s/ personal militar y civil de las FFAA y de seg.", 7 de diciembre de 2017;

- CACAF, Sala V, "Cuenca Jorge Alejandro c/ GCBA (Cromañon) y Otros s/ Daños y Perjuicios", Expte. 13122/2011, 19 de noviembre de 2021

- CACAF, Sala I, "ALVAREZ ARMANDO DAVID c/ EN-M° RREECI Y CCANCILLERIA- /RESOL 1702/05 s/PROCESO DE CONOCIMIENTO", Expte. 21819/2006, 17 de septiembre de 2020

-38-

CONFIDENTIAL

- CACAF, Sala III, "AMANDULE MARIO GUILLERMO c/ EN- M° INTERIORGN s/PERSONAL MILITAR Y CIVIL DE LAS FFAA Y DE SEG", 41874/2007, 03 de febrero de 2021

- CACAF, Sala IV, "Ortiz, Juan José Manuel c/ E.N. – Min. Defensa – FAA s/ Personal Militar y Civil de las FFAA y de Seg", Expte. 51777/2016, 20 de abril de 2021

- CACAF, Sala V, "MAISONOBE CLELIA ESTHER c/ EN –CONSEJO MAGISTRATURA (EXPTE 13-23742/01) s/PROCESO DE CONOCIMIENTO", Expte. 17048/2010, 12 de diciembre de 2017

- CACAF, Sala V, "SACHS PEDRO RICARDO c/ EN - M° RREE CI Y CULTO Y OTROS s/DAÑOS Y PERJUICIOS", Expte. 30245/2007, 26 de febrero de 2016

- CACAF, Sala IV, "MARTINEZ GONDRA ERNESTO SANTIAGO C/ EN–M§ RREE CI Y CULTO–RESOL 1445/07 (EXPTE 39419/05) S/ EMPLEO PUBLICO", Expte. 34276/2008, 15 de marzo de 2018

- CACAF, Sala V, "GAMBERO JORGE OSVALDO Y OTRO c/ PEN LEY 25561 DTO 1570/01 Y 214/02 s/AMPARO SOBRE LEY 25.561" Expte. 112982/2002, 15 de noviembre de 2016

- Resolución S/N/2012 de la Cámara de Diputados de la Nación, de fecha 23 de mayo de 2012

- Resolución S/N1/2012 de la Cámara de Diputados de la Nación, de fecha 23 de mayo de 2012

- Resolución S/N/2012 del Senado de la Nación, de fecha 30 de mayo de 2012

- Resolución S/N1/2012 del Senado de la Nación, de fecha 30 de mayo de 2012

- CASAS, Juan Alberto y ROMERO VILLANUEVA, Horacio J., Expropiación. Ley 21.499. Comentada, anotada y concordada con las normas provinciales, Astrea, Buenos Aires, 2014

- FIORINI, Bartolomé A., Manual de Derecho Administrativo, La Ley, Buenos Aires, 1968

- GORDILLO, Agustín A., Teoría General del Derecho Administrativo, Instituto de Estudios de Administración Local, Madrid, 1984

- GONZÁLEZ CALDERÓN, Juan A., Curso de Derecho Constitucional, 4ta. ed., Guillermo Kraft Ltda., Buenos Aires, 1963

- LEGÓN, Fernando, Tratado integral de la expropiación pública, Buenos Aires, 1934

CONFIDENTIAL

- VILLEGAS BASALVIBASO, Benjamín, Derecho Administrativo, TEA, Buenos Aires, 1949, t. I

- SÁNCHEZ VIAMONTE, Carlos, Manual de derecho constitucional, 2da. ed., Kapelusz, Buenos Aires, 1956