UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETERSEN ENERGÍA INVERSORA,
S.A.U. AND PETERSEN ENERGÍA,
S.A.U.,

                 Plaintiffs,

         v.

ARGENTINE REPUBLIC AND YPF
S.A.,

               Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

Case Nos.
1:15-cv-02739-LAP
1:16-cv-08569-LAP

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ETON PARK CAPITAL
MANAGEMENT, L.P., ETON PARK
MASTER FUND, LTD. AND ETON
PARK FUND, L.P.,

                 Plaintiffs,

         v.

ARGENTINE REPUBLIC AND YPF
S.A.,

               Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT YPF S.A.'S MOTION FOR SUMMARY JUDGMENT

1007838594

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... ii

Preliminary Statement .................................................................................................. 1

Background ................................................................................................................... 7

I.     Summary of Facts .............................................................................................. 7

II.    Procedural History ........................................................................................... 10

Argument .................................................................................................................... 12

I.     The Contract Claims Fail Because YPF Did Not Have Any Obligation to Plaintiffs under Sections 7 and 28 of the Bylaws............................................. 13

       A.     The Bylaws Are Unambiguous and Do Not Impose Any Obligation on YPF to Enforce or Compel a Tender Offer, or to Impose Penalties. ................... 17

              1.     The Tender Offer Provisions ..................................................... 18

              2.     The "Penalties" Provision ......................................................... 20

       B.     Plaintiffs' Experts Concede that the Plain Language of the Bylaws Does Not Provide a Basis for Their Contract Claims. ................................... 22

       C.     There Is No Legal Basis for a Claim That YPF Is a Guarantor of Any Obligation of the Republic.............................................................. 25

II.    Plaintiffs Cannot Establish the Causal Link Between YPF's Conduct and Plaintiffs' Alleged Damages Required to Sustain Their Contract Claims.......................28

III.   Plaintiffs' Section 7(h) "Penalties" Claim Fails Because of the Superseding Effect of the Public Interest Law. ...............................................................30

IV.    Plaintiffs Have Not Satisfied the Necessary Requirements under Argentine Law to Bring a Claim for Damages Against YPF for Breach of the Bylaws. ..............................33

V.     Plaintiffs Do Not Have Standing to Bring Their Claims ...................................34

Conclusion ..................................................................................................................35

1007838594

# TABLE OF AUTHORITIES

CASES

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co., Ltd.*,
  138 S. Ct. 1865 (2018) ........................................................................12

*Bausch & Lomb Inc. v. Bressler*,
  977 F.2d 720 (2d Cir. 1992) ................................................................28

*Boilermakers Local 154 Ret. Fund v. Chevron Corp.*,
  73 A.3d 934 (Del. Ch. 2013) ...............................................................11

*Chrebet v. Cty. of Nassau*,
  No. 09-cv-4249-DRH-AKT, 2014 WL 1836835 (E.D.N.Y. May 8, 2014) ...........................35

*Ellan Corp., Inc. v. Dongkwang Int'l. Co., Ltd.*,
  No. 09 Civ. 414 (LAP), 2011 WL 4343844 (S.D.N.Y. Aug. 15, 2011) ................................12

*Gutiérrez Enedina y Otros v. Neumaticos Gutiérrez S.A*,
  Goodman Declaration Ex. 38................................................................27

*In re Vitamin C Antitrust Litig.*,
  810 F. Supp. 2d 522 (E.D.N.Y. 2011) ...................................................13

*Jonas v. Estate of Leven*,
  116 F. Supp. 3d 314 (S.D.N.Y. 2015)...................................................12

*Juan Carlos Sicaro v. YPF*,
  Goodman Declaration Ex. 55................................................................15

*Kerzer v. Kingly Mfg.*,
  156 F.3d 396 (2d Cir. 1998)................................................................12

*Kirschten v. Research Inst. of Am., Inc.*,
  No. 94 Civ. 7947 (DC), 1997 WL 739587 (S.D.N.Y. Sept. 24, 1997)....................................20

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
  595 F.3d 458 (2d Cir. 2010)...........................................................13, 15

*Lexington 360 Associates v. First Union Nat. Bank of N.C.*,
  234 A.D.2d 187, (N.Y. Sup. Ct. App. Div. 1st Dept. 1996) ...................................29

*Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...................................................................12, 14

*Mevopal S.A. v. Banco Hipotecario Nacional*
  Goodman Declaration Ex. 56................................................................15

1007838594

*Motta v. Abraxas Construcciones*,
   Goodman Declaration Ex. 57 ............................................................................ 14

*Nastasi & Assocs., Inc. v. Bloomberg, L.P.*,
   No. 18-CV-12361 (JMF), 2021 WL 3541153 (S.D.N.Y. Aug. 11, 2021) ............................ 35

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*,
   392 F.3d 520 (2d Cir. 2004) .......................................................................... 28

*Petersen Energía Inversora, S.A.U. v. Argentine Republic*,
   895 F.3d 194 (2d Cir. 2018) .............................................................. 10, 11, 33

*Petersen Energía Inversora, S.A.U. v. Argentine Republic*,
   No. 1:15-cv-02739-LAP, 2016 WL 4735367 (S.D.N.Y. Sept. 9, 2016) .............. 10, 13, 19, 30

*Petersen Energía Inversora, S.A.U. v. Argentine Republic*,
   Nos. 1:15-cv-02739-LAP, 1:16-cv-08569-LAP,
   2020 WL 3034824 (S.D.N.Y. June 5, 2020) ...................................................... 11, 13

*Reiss v. Fin. Performance Corp.*,
   764 N.E.2d 958 (N.Y. Ct. App. 2001) ................................................................ 22

*Republic of Turkey v. Christie's Inc.*,
   425 F. Supp. 3d 204 (S.D.N.Y. 2019) ................................................................ 12

*Rutgerswerke AG & Frendo S.p.A. v. Abex Corp.*,
   No. 93 CIV. 2914 JFK 2002 WL 1203836 (S.D.N.Y. June 4, 2020) ................................ 12, 13

*Salahuddin v. Goord*,
   467 F.3d 263 (2d Cir. 2006) .......................................................................... 12

*Starr Indem. & Liab. Co. v. Water Quality Ins. Syndicate*,
   320 F. Supp. 3d 549 (S.D.N.Y. 2018) ................................................................ 14

*Tolbert v. Smith*,
   790 F.3d 427 (2d Cir. 2015) .......................................................................... 12

*Tomhannock, LLC v. Roustabout Res., LLC*,
   128 N.E.3d 674 (N.Y. Ct. App. 2019) ................................................................ 15

*W.W.W. Assocs., Inc. v. Giancontieri*,
   566 N.E.2d 639 (N.Y. Ct. App. 1990) ................................................................ 14

1007838594

**STATUTES**

Argentine Commercial Code Art. 217 .................................................................................14

Argentine Commercial Code Art. 218 .................................................................................14

Argentine General Corporate Law Art. 251 ........................................................................33

Argentine General Corporate Law Art. 54 ..........................................................................26

Argentine General Corporate Law Art. 248 ........................................................................26

Argentine General Corporate Law Art. 274 ........................................................................26

Argentine General Corporate Law Art. 275 ........................................................................26

Argentine General Corporate Law Art. 279 ........................................................................26

Argentine Law No. 26,741........................................................................................19, 31

**OTHER AUTHORITIES**

Fed. R. Civ. P. 17(a)(1)..................................................................................................35

Fed. R. Civ. P. 17(a)(3)..................................................................................................35

Fed. R. Civ. P. 56(a) ......................................................................................................12

Fed. R. Civ. P. 44.1 .......................................................................................................12

1007838594

Defendant YPF S.A. ("YPF" or the "Company"), by and through its undersigned counsel, respectfully submits this memorandum of law in support of its motions for summary judgment dismissing the above-captioned actions against it in their entirety pursuant to Fed. R. Civ. P. 56.

## PRELIMINARY STATEMENT

In these cases, two of YPF's former minority investors seek up to $20 billion in alleged damages—70% of which would be paid to the litigation investor, Burford Capital LLC ("Burford")—because YPF's co-defendant, the Republic of Argentina (the "Republic"), intervened in YPF and temporarily occupied the 51% of YPF's capital stock held by Repsol S.A. ("Repsol") and declared it subject to expropriation without making a tender offer to buy out Plaintiffs' interests in YPF. Plaintiffs allege that as the corporation whose securities and corporate bylaws were at issue, YPF can be held financially responsible for the Republic's alleged failure to make a tender offer. In short, Plaintiffs' claim against YPF is a claim that the Company is liable to pay damages to two former investors because another of its investors—a sovereign nation—did not make an offer to buy them out.

That claim has no basis in the Bylaws[1] or Argentine law. YPF is the issuer of the shares subject to expropriation, and the target of the alleged takeover, but it had no obligations to minority investors like Plaintiffs to make, enforce, or compel a tender offer, or to impose penalties or otherwise intercede in the disputed actions. The Company is not responsible for its investors' actions—in this case, the actions of the Republic—and does not guaranty its investors' financial expectations. After extensive discovery, summary judgment for YPF is warranted because Plaintiffs still cannot establish the most rudimentary elements of their claim: that YPF had *a contractual obligation* to Plaintiffs or that any conduct or inaction *by YPF* caused their

---

[1]    All references to the "Bylaws" refer to Exhibit 1 to the Declaration of Mark P. Goodman.

alleged damages.  It would be wholly unprecedented and a complete inversion of core concepts

of both Argentine corporate and Argentine contract law to hold the Company liable for billions

of dollars because one of its investors intervened in and sought to expropriate a stake in the

Company without offering to buy out the others.

As this Court has recognized, the key question regarding Plaintiffs' claims of an

obligation on the part of YPF is "***what do the bylaws say***[?]"  Ex. 26 (ECF No. 61[2] ("MTD Tr."))

at 15:7 (emphasis added).[3]  The answer is now beyond dispute: the Bylaws say ***nothing*** that

provides any cognizable basis to hold YPF liable here.  Plaintiffs cannot point to a single

provision in the Bylaws or Argentine law that imposes any of the obligations they seek to enforce

on YPF, and their experts have conceded in testimony that no such obligation can be found in the

text of the Bylaws or any relevant statute.

Plaintiffs rely on the Bylaws' tender offer provisions, which provide that in certain

circumstances a shareholder who acquires more than a certain set percentage of YPF's Class D

shares or capital stock must conduct a tender offer on specified terms.  It is undisputed that YPF

itself had no obligation to conduct a tender offer.  Instead, Plaintiffs claim that YPF had

obligations (i) to *"enforce"* the tender offer provisions of Sections 7 and 28 of the Bylaws by

somehow compelling the Republic to make an offer for all of YPF's shares after the Republic

had concluded that it was not required to do so, and (ii) to *prevent* the Republic under Section

7(h) of the Bylaws from exercising the voting and other corporate governance powers associated

---

[2]     All references to "ECF No." refer to filings in Case No. 1:15-CV-02739.

[3]     "Ex." refers to the Exhibits attached to the Declaration of Mark P. Goodman filed herewith.

2

with the shares that were temporarily occupied and subject to expropriation in the absence of a tender offer.[4]

Looking at "what the Bylaws say," there can be no question that the obligations Plaintiffs assert do not appear in the document they seek to enforce.  Under the Bylaws, it is the "Bidder" who wishes to conduct a "Takeover" of YPF shares or securities who must make a tender offer—not YPF.  Any tender offer obligations in Sections 7 or 28 apply, respectively, only to such a "Bidder" and to the "National Government," not to YPF.   The Company must provide "notice" of a bid to its shareholders if it receives one, but it has no express or implied obligation to compel an acquirer to make a tender offer and makes no guaranty that its investors will receive one.  Nor does it have any express or implied obligation to impose penalties or take action if an acquirer conducts a "Takeover" without making such an offer.  Plaintiffs attempt to locate such an obligation in Section 7(h), but that provision imposes no duty or obligation on YPF to prevent the voting of shares or the exercise of other shareholder rights by the Republic, and that notion has no basis in the governing Argentine law, or in the Bylaws.  Under applicable Argentine law, it is up to the shareholders—not YPF—to object and seek relief if an acquirer attempts to exercise rights associated with shares in violation of Section 7(h).  Plaintiffs did neither.

In light of the complete lack of textual support for their claims, Plaintiffs appear poised to argue through their experts that a corporation (<u>i</u>) has an *implicit* duty to enforce requirements that its bylaws explicitly impose on others, (<u>ii</u>) has a generalized obligation to enforce all of the terms of its bylaws, regardless of to whom they apply, and (<u>iii</u>) stands in the shoes of all parties to its bylaws with respect to their obligations and incurs derivative contractual liability for money

---

[4]    Ex. 43 (ECF No. 1 ("Petersen Complaint")) at ¶¶ 71, 76; Ex. 44 (E.P. ECF No. 1 ("Eton Park Complaint")) at ¶¶ 64, 69.  All references to "E.P. ECF No." refer to filings in Case No. 1:16-CV-8569.

1007838594

damages arising from any failure of any of the parties to perform.  As one of Plaintiffs' experts explained Plaintiffs' theory, "any liability on the part of YPF is due to the Republic of Argentina disregarding the Bylaws of YPF."  Ex. 32 (Dep. Tr. of Alfredo Rovira ("Rovira Tr.") at 128:22–25.  None of these theories is consistent with the causes of action Plaintiffs purport to advance, and all are utterly without legal basis.  No such corporate obligations exist under Argentine law, and certainly not in the form of obligations enforceable against a company in an action for money damages, like this one.  These generalized and unsupported notions neither identify nor create any obligation to Plaintiffs by YPF, and cannot salvage their claims.

Plaintiffs also cannot establish causation as to YPF and their inability to do so independently warrants dismissal.  Even if the Bylaws could be considered a contract enforceable against YPF in a claim for money damages, as Plaintiffs argue, and even if YPF did have the two obligations that Plaintiffs allege, Plaintiffs' claims would *still* fail because Plaintiffs cannot establish the causal connection between their claimed damages and YPF's purported breach required under Argentine law.  *See* Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶¶ 58, 60; Ex. 65 (Kemelmajer Reply Rep.) at ¶ 33(b).  On the undisputed facts, Plaintiffs cannot possibly demonstrate that any action or inaction by YPF *caused* their purported damages; they insist that their alleged damages arise from the absence of a tender offer by the Republic and not from any action that YPF took or could have taken.  Given the Republic's determination in the context of Law No. 26,741 (the "Public Interest Law") passed by the Argentine Congress on May 3, 2012 that it was not required to conduct a tender offer, and the fact that the Public Interest Law ordered that the Republic be permitted to vote the occupied shares, Plaintiffs cannot show that any action *by YPF* caused them to not receive a tender offer or that there was anything YPF could have done to compel such a tender offer or to prevent the occupied shares from being

4

voted at the June 4, 2012 Shareholders' meeting.  *See* Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 80 ("YPF had no means of forcing the Republic to offer to purchase the remaining outstanding shares for a set price.  I am not aware of any legal avenue that the Company could have taken to compel the sovereign republic to tender to purchase shares in that way, and Plaintiffs have not identified any.").  Nor can Plaintiffs show that—even if YPF had somehow been able to prevent the Republic from voting the occupied shares (in violation of the Public Interest Law)— preventing the vote would have caused the Republic to conduct a tender offer or avoided the damages Plaintiffs claim to have suffered.  As one of Plaintiffs' experts admitted, YPF "could not force Argentina to do anything."  Ex. 33 (Dep. Tr. of Alejandro Garro ("Garro Tr.")) at 403:23–25.

The lack of a duty or obligation and the inability to prove causation are two gaping holes in Plaintiffs' claims.  Each is sufficient to warrant judgment for YPF without requiring any further analysis by this Court.  So is the fact that the Public Interest Law, passed by the Argentine Congress on May 3, 2012, *required* that the Republic "exercise *all of the rights* conferred upon the shares" and directed the Argentine equivalent of the U.S. Securities and Exchange Commission, the *Comisión Nacional de Valores* ("CNV"), to call and preside over the June 4 Meeting and therefore superseded the Bylaws.[5]  Should the Court look further, however, it would find that Plaintiffs' claims are comprised of a long series of equally flawed assumptions that they also cannot prove, including that (i) the Bylaws are a bilateral contract that can give rise to a claim for damages against the Company, (ii) YPF could have *forced* the Republic to make a tender offer against its will, (iii) the Republic had the financial ability to conduct the tender offer,

---

[5]    As discussed in Section III below, even if Sections 7(h) and 28(C) of the Bylaws were found to impose obligations on YPF, any such obligations would have been superseded by the Public Interest Law.

(iv) YPF could have imposed penalties on the Republic by refusing to allow it to vote the occupied shares at the June 4 Meeting, (v) YPF undertook an obligation as guarantor of an acquirer's obligation to conduct a tender offer, and (vi) any attempt by YPF to impose penalties on the Republic would have caused the Republic to change its position and conduct a tender offer notwithstanding its lack of financial ability to do so.  Not one of those assumptions is borne out by Plaintiffs' experts or is consistent with the undisputed facts. Rather, the record is clear that Plaintiffs' attempts to use YPF as a financial backstop for its claims against the Republic rest on wishful thinking, not Argentine law.

Plaintiffs' claims against YPF also fail for lack of standing under Argentine law and because Plaintiffs' claims are corporate in nature and inextricably tied to the YPF securities that Plaintiffs lost to foreclosure or sold *prior* to filing these actions and *prior* to the completion of the expropriation, as argued by the Republic.  Regardless, Petersen lost standing because it sold its claims to Burford.  Despite Defendants' objection six years ago, Burford has yet to ratify the action as the real party in interest, and it is too late to remedy that failure now.

On summary judgment, the Court's remit is simple and substantive.  It should consider the Bylaws under governing Argentine law and recognize that plaintiffs in even the most complex of cases must do the same thing as plaintiffs in any other alleged breach of contract case:  establish the *existence of a duty or obligation* as to each defendant and *causation* of their claimed damages.  Plaintiffs do neither and their claims against YPF should be dismissed. [6]

---

[6]   YPF adopts and incorporates by reference the Memorandum of Law in Support of the Republic's Motion for Summary Judgment ("Republic's Brief") and the Republic's Rule 56.1 Statement of Material Undisputed Facts ("Republic SUF") to the extent relevant to YPF.

6

## BACKGROUND

### I.    SUMMARY OF FACTS[7]

Originally founded in 1922 as a state-run company, YPF is a corporation (*sociedad anónima*) incorporated under the laws of Argentina.  SUF ¶ 1.  YPF is an energy company, and is the largest energy producer in Argentina.  *Id.* ¶ 1.  As of December 31, 2020, the Company had over 20,000 employees.  *Id.* ¶ 2.  Approximately fifty-one percent of the Company is owned by the Republic and the vast majority of the remaining 49% is publicly traded, with a portion owned by YPF's employees.  *Id.* ¶ 2; Ex. 2 (YPF's 2020 Form 20-F) at 196–97.  As of September 24, 2021, YPF had a market capitalization of approximately $1.78 billion, SUF ¶ 3, a fraction of the up to nearly $20 billion in damages Plaintiffs and Burford apparently seek.

YPF has been a publicly traded company since June 1993.  *Id.* ¶ 6–8.[8]  During the relevant period, YPF operated pursuant to the Bylaws, which include the two sections on which Plaintiffs rely: Section 7 and Section 28.  *Id.* ¶ 12–14; *see also* Ex. 1 (Bylaws).  Section 7 required any person or entity seeking to acquire more than certain set percentages of YPF's capital stock or Class D shares (a "Bidder") to make a tender offer for the acquisition of all YPF shares and securities convertible into shares.  SUF ¶ 12.  Section 7(h), which made no reference to any obligations of the Company, provided that any shares acquired in breach of the tender offer provisions of Section 7 "shall not grant any right to vote or . . . be computed to determine the presence of the quorum at any of the shareholders' meetings of the Corporation."  *Id.* ¶ 13.

---

[7]    *See also* YPF's accompanying Statement of Undisputed Facts ("SUF"), filed pursuant to Local Rule 56.1.

[8]    YPF refers to the Republic's Brief at pages 5–6 and accompanying paragraphs of the Republic SUF describing Argentina's privatization of YPF, and relevant supporting exhibits.

Section 28 extended certain requirements of Section 7 to certain acquisitions of YPF securities by the Argentine government. *Id.* ¶ 14.

Beginning in 2008, Plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (collectively, "Petersen") acquired YPF American Depositary Receipts ("ADRs") from YPF's then-controlling shareholder, Repsol. SUF ¶ 19–23. By 2012, following a series of highly leveraged transactions, Petersen held ADRs reflecting a beneficial interest in approximately 25% of YPF's Class D shares. Plaintiffs Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (collectively, "Eton Park", and jointly with Petersen, the "Plaintiffs") first acquired YPF ADRs in November 2010, and continued to acquire them through March 2012. *Id.* ¶ 25–28

On April 16, 2012, the Executive Branch issued Decree No. 530/2012 (the "Intervention Decree"), which started an intervention (the "Intervention") in which the powers the Bylaws conferred on YPF's Board of Directors and President were temporarily granted to an intervenor appointed by the government, the Argentine Minister of Federal Planning, Public Investment and Services, Julio De Vido (the "Intervenor"). SUF ¶ 32. The Argentine government also introduced a bill to the Argentine Congress to have 51% of YPF's share capital, which was held by Repsol, declared of public interest and "subject to expropriation," and emphasized that such steps were necessary to promote the Republic's national interest. *Id.* ¶ 33.

The same day, the Executive Branch issued Decree No. 532/2012 appointing the Argentine Secretary of Economic Policy and Development Planning, Axel Kicillof, as Vice-Intervenor. *Id.* ¶ 34. The next day, April 17, 2012, Secretary Kicillof, speaking before Argentine Senate committees, stated that the Republic was not required to comply with Sections 7 and 28 of the Bylaws given the substance of the proposed public interest law. SUF ¶ 35. The

8

Republic never notified YPF that it intended to conduct a tender offer under Sections 7 and 28 of the Bylaws, and never conducted such an offer at any time.  *Id.* ¶ 44.

On May 7, 2012, the Public Interest Law became effective, making 51% of YPF's shares held by Repsol "subject to expropriation" and under "temporary occupation" by the Republic. *Id.* ¶ 36–37.  The Public Interest Law was explicit that, as of its entry into force, the Argentine Executive Branch "shall exercise all of the rights conferred upon the shares subject to expropriation," and it required the CNV to "call a shareholders' meeting."  *Id.* ¶ 37.  The Republic's expropriation of the 51% of YPF shares held by Repsol was completed on May 2014 pursuant to a settlement agreement with Repsol.  *Id.* ¶ 48.

The first YPF shareholders' meeting following the Intervention and passage of the Public Interest Law was held on June 4, 2012.  SUF ¶ 39–40.  Alejandro Vanoli, then-President of the CNV, presided over that meeting as required by Article 13 of the Public Interest Law.  *Id.* ¶ 40. Multiple YPF shareholders objected to the Republic voting the occupied YPF shares, including by raising express objections under Section 7(h)—but Plaintiffs were not among them.  *Id.* ¶ 41– 42.  CNV President Vanoli proceeded with the vote, having explained the requirements and purpose of the Public Interest Law as mandating the Republic's vote.  *Id.* ¶ 41.

Petersen filed for insolvency in Spain a few months later, in July 2012.  SUF ¶ 49.  In Petersen's liquidation plans, Petersen's insolvency administrator identified as its "main asset" certain "claims that could or should be filed *against the Argentine Republic*" in connection with the expropriation; the liquidation plans did not identify claims against YPF or name it as a guarantor of any other party's obligations or as a potential defendant.  *Id*. ¶ 50–51.  On March 4, 2015, Petersen executed a Claim Prosecution Agreement (the "CPA") with Prospect Investments

LLC—a wholly-owned subsidiary of Burford—in which YPF was identified as an "Opponent" in litigation to be prosecuted by Burford. *Id.* ¶ 54.

## II.   PROCEDURAL HISTORY

On April 5, 2015, a month after signing its agreement with Burford, Petersen filed suit against both YPF and the Republic (jointly, the "Defendants") for breach and anticipatory breach of contract, breach of the implied duty of good faith and fair dealing, and promissory estoppel. Petersen alleged that YPF breached supposed obligations under the Bylaws by "(1) failing to enforce the bylaws' tender offer provisions vis-à-vis Argentina[;] . . . (2) failing to enforce the penalties that section 7(h) imposes on shareholders who have breached their tender offer obligations[,]" *Petersen Energía Inversora, S.A.U v. Argentine Republic,* 895 F.3d 194, 210 (2d Cir. 2018); and (3) "failing to distribute dividends to YPF's shareholders, including Petersen." *Petersen Energía Inversora, S.A.U. v. Argentine Republic* ("MTD Order I"), No. 1:15-cv-02739-LAP, 2016 WL 4735367, at \*15 (S.D.N.Y. Sept. 9, 2016).

Defendants objected to jurisdiction and moved to dismiss.  On September 9, 2016, this Court concluded that it had jurisdiction and that Defendants were not entitled to sovereign immunity because the conduct at issue was commercial in nature. *Id.* at \*5–7.  The Court granted YPF's motion to dismiss the promissory estoppel and breach of the implied duty of good faith and fair dealing claims, *id.* at \*15–16, but permitted the contract claims to go forward. *Id.* at \*15.  The Court declined to address YPF's arguments that Plaintiffs' claims failed for lack of causation because they relied "on facts outside of the Complaint" that could not be considered at the motion to dismiss stage. *Id.*  On interlocutory appeal to the Second Circuit,[9] the viability of

---

[9]   Consistent with the collateral order doctrine, Defendants were permitted to appeal this Court's denial of their motion to dismiss on sovereign immunity grounds. *Petersen*, 895 F.3d at 211–12. Defendants' other arguments for dismissal made under Rule 12(b)(6)—

1007838594

the contract claims was not at issue.[10]  Addressing the jurisdictional and sovereign immunity

issues, the Second Circuit accepted the Complaint's allegations as true for purposes of its

jurisdictional analysis and found that if the Bylaws imposed obligations "to enforce the tender

offer provision triggered by Argentina's expropriation of Repsol's 51% ownership stake" or to

"enforce the penalties imposed by Section 7(h)," they were "commercial" rather than

"sovereign" in nature.  *Id*. at 209–10.  It affirmed this Court's conclusion that Plaintiffs' claims

were properly before a U.S. court, *Petersen*, 895 F.3d at 206, but declined to address "whether

the act of state doctrine bars Petersen's claims," concluding that it "is a merits determination that

turns on the facts."  *Id.* at 212.

      During the pendency of the appeal, Eton Park filed suit against the Republic and YPF.

Eton Park's complaint is substantially identical to Petersen's and also asserts claims against YPF

for breach of contract, anticipatory breach and breach of the implied covenant of good faith and

fair dealing.  Ex. 44 (Eton Park Complaint) at ¶¶ 61-74.

      Defendants filed a renewed motion to dismiss the *Petersen* and *Eton Park* actions on the

basis of *forum non conveniens* in August 2019, which was denied on June 5, 2020.  The Court

found that notwithstanding the connections to Argentina and the applicability of Argentine law,

the balance of conveniences did not favor dismissal.  *See generally Petersen Energía Inversora,

S.A.U. v. Argentine Republic* ("MTD Order II"), Nos. 1:15-cv-02739-LAP, 1:16-cv-08569-LAP,

2020 WL 3034824 (S.D.N.Y. June 5, 2020).

---

       including those addressing the merits of Plaintiffs' claims—were not immediately
appealable and were not considered by the Second Circuit.  *See Id.*

[10]   While the Second Circuit noted that "every corporation is obligated to abide by its bylaws,"
it did not determine whether any specific obligations alleged by Plaintiffs were in fact
imposed on YPF by the text of the Bylaws or otherwise.  *Petersen*, 895 F.3d at 210 (citing
*Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 938-40 (Del. Ch. 2013)).

1007838594

## ARGUMENT

Summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015). Once the moving party has made an initial showing of its entitlement to judgment by "point[ing] to evidence that negates its opponent's claims" or "identify[ing] those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact," *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006), the motion should be granted unless the non-moving party comes forward with admissible evidence demonstrating the existence of a *genuine* issue of material fact that precludes judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Conclusory assertions, unsubstantiated speculation, and disputes over immaterial facts are not sufficient to defeat summary judgment. *See Ellan Corp., Inc. v. Dongkwang Int'l. Co., Ltd.*, No. 09 Civ. 414 (LAP), 2011 WL 4343844, at *2 (S.D.N.Y. Aug. 15, 2011) (quoting *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)).

The interpretation and application of foreign law is a legal question appropriate for resolution by the Court on summary judgment. FRCP 44.1, *Republic of Turkey v. Christie's Inc.*, 425 F. Supp. 3d 204, 214 (S.D.N.Y. 2019); *see also Rutgerswerke AG & Frendo S.p.A. v. Abex Corp.*, No. 93 CIV. 2914 JFK, 2002 WL 1203836, at *16 (S.D.N.Y. June 4, 2020). The testimony of experts "remains the basic mode of proving foreign law," *Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 330 (S.D.N.Y. 2015) (internal quotations and citations omitted), although the Court may consider "any relevant material or source." FRCP 44.1; *see also Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co., Ltd.*, 138 S. Ct. 1865, 1873 (2018). "Disagreement among legal experts on content, applicability, or interpretation of foreign law . . . does not create genuine issues of material fact" and will not prevent the court from granting summary judgment.

12

1007838594

*Rutgerswerke AG*, 2002 WL 1203836, at *16; *see also In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 540 (E.D.N.Y. 2011) ("Disputes among experts regarding foreign law do not create issues of fact.").

Here, the existence and scope of YPF's obligations under the Bylaws is a question of law that this Court can and should resolve at the summary judgment stage.  *See Law Debenture Tr.t Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468–70 (2d Cir. 2010) (affirming where the agreement was unambiguous).  Summary judgment can and should be granted for YPF based on Argentine law, which "all agree" applies to this action.  MTD Order II, 2020 WL 3034824, at *13 ("All agree that Argentine law applies to this action."); *see also* Ex. 26 (MTD Tr.) at 31:4–6 ("[T]his is a merits question of Argentine law, who's liable for what under this bylaw contract."); MTD Order I, 2016 WL 4735367, at *14.

## I.  THE CONTRACT CLAIMS FAIL BECAUSE YPF DID NOT HAVE ANY OBLIGATION TO PLAINTIFFS UNDER SECTIONS 7 AND 28 OF THE BYLAWS.

Plaintiffs' core claims against YPF rest entirely on the assertion that YPF is liable under the Bylaws because it did not *force* the Republic to conduct a tender offer or *penalize* the Republic for failing to do so.  *See* Ex. 43 (Petersen Complaint) at ¶¶ 41, 71; Ex. 44 (Eton Park Complaint) at ¶¶ 40, 64; *see also* ECF No. 49 ("MTD Opp. Br.") at 16–17.  Plaintiffs' claims fail for the most basic of reasons: YPF had no contractual obligation to do either of those things.

As a matter of straightforward contract law, Plaintiffs bear the burden of establishing the basic elements of their claims for anticipatory and actual breach of contract as to YPF, including: (i) the existence of a duty or obligation on the part of YPF, (ii) breach by YPF of that duty or obligation, and (iii) an "adequate" causal link between YPF's alleged breach and Plaintiffs' claimed damages.  Ex. 27 (Kemelmajer Rebuttal Rep.), at ¶¶ 17(g), 21 (citing Ex. 28 (Rovira Rep.) at ¶ 11); and Ex. 29 (Garro Rep.) at ¶ 8(a)); *see also* Ex. 30 (Dep. Tr. of Aída Kemelmajer

13

("Kemelmajer Tr.")) at 75:16–77:24 (noting YPF cannot be held liable for breach of contract, either individually or concurrently with another party, in the absence of an underlying contractual obligation imposed *on YPF*).  Where it is evident that Plaintiffs cannot make the requisite showing, summary judgment is warranted.  *Matsushita*, 475 U.S. at 587.

Under Argentine law, analysis of a contract claim begins with the plain language of the relevant text of the agreement, interpreted in the context of the agreement as a whole. Ex. 30 (Kemelmajer Tr.) at 105:20–24 (noting that it is "fundamental" to "see what the bylaws say and who the bylaws hold liable"); Ex. 31 (Manóvil Republic Reply Rep.) at ¶¶ 21–22, 37; Ex. 25 (Garro Rebuttal Rep.) at ¶¶ 5, 19; *Cf. Starr Indem. & Liab. Co. v. Water Quality Ins. Syndicate*, 320 F. Supp. 3d 549, 569 (S.D.N.Y. 2018) ("As a matter of contract interpretation . . . the Court begins with the plain text of the term at issue."); *W.W.W. Assoc., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. Ct. App. 1990) ("[W]hen the parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.").  If a provision is clear and unambiguous, it should be enforced on its face. *See* Ex. 54 (Argentine Commercial Code ("ACC")) Art. 217 ("The words of contracts and conventions must be understood in the sense given to them by general usage, even if the obligator claims to have understood them differently."); Ex. 54 (ACC) Art. 218 (the literal terms govern, except when they are ambiguous: "Where it is necessary to interpret a contractual clause, the following bases shall serve for interpretation: 1) If there is ambiguity in the words, the common intent of the parties must be sought rather than the literal meaning of the terms. . . ."); *see also* Ex. 31 (Manóvil Republic Reply Rep.) at ¶ 24 ("[T]his is made clear in the very same commentary on the code that Prof. Garro cites.  In it, Prof. Adolfo Rouillon writes: '[T]he starting point of any interpretative work goes through the literal meaning of the terms used in the contract . . . . The

14

rule of literality has been applied by the courts, holding in this regard that 'when the agreement is

clear and precise it cannot be modified by interpretations based on the spirit of the clauses, the

presumed intention of the parties or purposes sought.'"); *see also* Ex. 56 (Argentine Supreme

Court of Justice, *Mevopal S.A. v. Banco Hipotecario Nacional*, 1985) at 307:2216 ("[W]hen the

terms or expressions used in a contract are clear and conclusive . . . one has no option but to

apply them, without the need for additional interpretative work . . . ."); Ex. 55 (Argentine

Supreme Court of Justice, *Juan Carlos Sicaro v. YPF,* 1991) at 314:366 (following the *Mevopal*

holding); Ex. 57 (Argentine National Commercial Court of Appeals, Chamber B, *Motta v.

Abraxas Construcciones*, 1997, La Ley 1998-F) at 283 ("When the agreement is clear and

precise, it cannot be modified by interpretations based on the spirit of the clauses, presumed

intention of the parties or the purposes pursued, since the words themselves correspond to the

reality they designate and, furthermore, as a general rule, they faithfully translate the [parties']

thoughts.") (alterations in original).  Argentine courts will not import into the contract terms and

obligations that are not there.  Ex. 31 (Manóvil Republic Reply Rep.) at ¶¶ 21–22 (under the

rules of interpretation set forth in the ACC, external factors such as the parties' intent may be

considered "where there is an ambiguity or other difficulty in the terms themselves that makes

reliance on their plain meaning impossible or insufficient," but "[w]here there is no ambiguity in

the text, these rules do not come into play"); *Cf. Law Debenture Tr.*, 595 F.3d at 468  ("[A]

written agreement that is complete, clear and unambiguous on its face must be interpreted

according to the plain meaning of its terms . . . without the aid of extrinsic evidence.");

*Tomhannock, LLC v. Roustabout Res., LLC*, 128 N.E.3d 674, 675 (N.Y. Ct. App. 2019) (same)

(citation omitted).  Like New York law, Argentine law does not permit extrinsic evidence to vary

15

the clear terms of a written agreement or to create an ambiguity where none exists. The text governs.

Argentine law takes particular care to focus solely on the unambiguous text where the agreement at issue is a set of corporate bylaws. *See* Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 45 ("[T]here is no case in which the Argentine courts have inferred a company's obligations from its bylaws"); Ex. 30 (Kemelmajer Tr.) at 159:6–25 and corresponding errata sheet; *see also* Ex. 31 (Manóvil Republic Reply Rep.) at ¶ 25. Extrinsic evidence of intent is particularly irrelevant to the interpretation of corporate bylaws because they are not negotiated between counterparties in a "meeting of the minds" reflecting their agreement, but rather are plurilateral organizational contracts among multiple parties who change over time—and who were not necessarily present for, or participants in, the drafting. Ex. 31 (Manóvil Republic Reply Rep.) at ¶¶ 17–19, 25 (explaining that intent is not considered when interpreting a Company's bylaws); Ex. 30 (Kemelmajer Tr.) at 159:6–25 and corresponding errata sheet (explaining that intention of the parties is not important when interpreting bylaws because "the parties change, they are substituted, the original shareholders that existed may not exist anymore and, therefore, the intention that has been had is not important").[11] Discerning what the Bylaws are intended to

---

[11]    Argentine law fundamentally rejects the notion that corporate bylaws can or should be enforced by minority shareholders in an action against the company for money damages in the way that Plaintiffs are attempting here. *See* Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 18 ("In my 26-year career as a judge of the Supreme Court of Mendoza, I have never seen a case of civil contractual liability based on a company's supposed breach of its own bylaws."); *id.* at ¶ 19 ("Professors Rovira and Garro do not point to a *single case* in which an Argentine court has held that a shareholder can sue a corporation for damages based on a purported breach of the company's bylaws."); Ex. 65 (Kemelmajer Reply Rep.) at ¶ 15 (footnotes omitted) ("[A] shareholder does not have a cause of action for damages against a company based on a breach of contract theory because, under Argentine law, bylaws do not create a private right of action for a shareholder to bring damages claims against the company for breach of contract. Bylaws cannot be enforced in the same way that bilateral

mean from sources other than their plain text is neither practical nor appropriate—nor supported by Argentine law.

> ### A. The Bylaws Are Unambiguous and Do Not Impose Any Obligation on YPF to Enforce or Compel a Tender Offer, or to Impose Penalties.

Plaintiffs purport to locate their contract claims against YPF under Section 7 of the Bylaws, which requires a tender offer to be made in the event of certain "takeovers," and rely on Section 28 as extending certain obligations of Section 7 to the Republic. *See, e.g.*, Ex. 43 (Petersen Complaint) at ¶¶ 71, 76; Ex. 44 (Eton Park Complaint) at ¶¶ 64, 69; Ex. 26 (MTD Tr.) at 3–4, 39–40; ECF No. 49 at 16.

As to the tender offer provisions, it is undisputed that the Bylaws do not require YPF to conduct a tender offer. None of Plaintiffs' experts have contended otherwise, and Plaintiffs previously acknowledged this point. Ex. 26 (MTD Tr.) at 39:14–15 ("I don't think the company has to tender."). Instead, Plaintiffs contend that Sections 7(d), 7(e) and 7(f) require YPF to force others to conduct a tender offer, and that Section 7(h) requires YPF itself to prevent stockholders from*, inter alia,* voting shares acquired in violation of the tender offer provisions. *See* Ex. 32 (Rovira Tr.) at 153:25–154:9; Ex. 33 (Garro Tr.) at 362:10–17, 363:7–15; Ex. 28 (Rovira Rep.) at ¶¶ 28, 61 (asserting that YPF's obligations were "clearly spelled out in Sections 7 and 28(A) of the YPF Bylaws."); Ex. 29 (Garro Rep.) at ¶¶ 17–19 (same). Plaintiffs further contend that under Section 28 of the Bylaws, these provisions of Section 7 were triggered, in 2012, by the Republic's Intervention, temporary occupation, and declaration that 51% of YPF's Class D shares held by Repsol were "subject to expropriation." *See* Ex. 28 (Rovira Rep.) at ¶¶ 65-68; Ex. 25 (Garro Rebuttal Rep.) at ¶¶ 15-16.

---

contracts are enforced.") (footnotes omitted); Ex. 34 (Manóvil YPF Rep.) at ¶¶ 90–92. That fallacy is at the heart of all of Plaintiffs' claims.

1007838594

Plaintiffs' contract claims under Sections 7 and 28 of the Bylaws fail for three very straightforward reasons: (i) the Bylaws are unambiguous and do not impose any of the alleged obligations on YPF; (ii) Plaintiffs' experts have conceded that the Bylaws do not expressly impose any of the alleged obligations on YPF; and (iii) under Argentine law, as under New York law, the Court cannot go beyond the express terms of the operative agreement to impute additional and unspecified obligations.

### 1.    The Tender Offer Provisions

As with any contract claim, the starting point for analyzing whether Plaintiffs' claims have any merit is the text of the operative agreement—here, Sections 7 and 28 of the Bylaws.  To support their claims against YPF, Plaintiffs point first to Section 7(d), which provides that "[i]f the terms of subsections e) and f) of this section are not complied with, it shall be forbidden to acquire shares or securities of the Corporation . . . if, as a result of such acquisition, the purchaser becomes the holder, or exercises the control of, class D shares of stock of the Corporation" which together with its prior holdings exceed certain percentages.  Bylaws, Section 7(d); *see also* Ex. 43 (Petersen Complaint) at ¶ 17; Ex. 44 (Eton Park Complaint) at ¶ 20; ECF No. 49 at 16. Section 7(d) imposes no obligation ***on YPF*** with respect to the acquisition of stock; it specifies only that a "***purchaser***" may not exceed the specified thresholds without complying with subsections 7(e) and 7(f).

Plaintiffs next rely on Section 7(e), which defines "[t]he person wishing to [*sic*] a Takeover" as "the Bidder" and is limited to specifying that "***the Bidder***" shall do two things: (i) "[o]btain the prior consent of the special shareholders' meeting of class A shareholders;" and (ii) "[a]rrange a takeover bid for the acquisition of all the shares of all classes of the Corporation and all securities convertible into shares."  Bylaws, Section 7(e); Ex. 26 (MTD Tr.), at 3:24–25, 39:23–40:13.  Section 7(e) expressly cautions that the decision of the Class A shareholders

18

"regarding the matters provided for in this subsection (e) shall be final and shall not entitle any of the parties to claim any kind of compensation," such that no recovery is available in the event of a rejected bid.  *Id.*  Section 7(e) makes no reference to any action to be taken by YPF and imposes no obligations on YPF.

The crux of Plaintiffs' claims against YPF in connection with the tender offer itself is Section 7(f).  *See* MTD Order I, 2016 WL 4735367, at *15 n.6; Ex. 26 (MTD Tr.) at 3:24–25, 39:23–40:13.  That provision lays out the required tender offer procedures.  Like Sections 7(d) and 7(e), Section 7(f) does not impose any relevant obligations on YPF.  *See* Ex. 26 (MTD Tr.) at 3, 39–40; Ex. 24 (Rovira Rebuttal Rep.) at ¶ 77; Ex. 32 (Rovira Tr.) at 153:25–154:19. Section 7(f) provides that "[e]ach takeover bid shall be conducted in accordance with the procedure herein stipulated,"[12] and enumerates, in Subsections 7(f)(i)-(ix), the specific procedures required for the tender offer.  Among other things, Section 7(f) specifies that "***[t]he Bidder shall notify the Corporation*** in writing about the takeover bid at least fifteen business days in advance to the starting date thereof," and that "***[t]he Corporation shall be notified*** about all terms and conditions of any agreement . . . that the Bidder might have entered into or might intend to enter into" prior to launching the bid.  Subsections 7(f)(i)(A)–(G) specify exactly what the Bidder's notice to the Corporation must include, Subsections 7(f)(ii)-(iv) provide that, *after* the Company receives notice from the Bidder, certain events *follow* from the receipt of the Bidder's notice, including that "the Board of Directors shall call [*sic*] special meeting of the class

---

[12]    Section 28 extends certain of the obligations in Section 7(e) and (f) to the Republic, stating that "[t]he provisions of subsections (e) and (f) of Section 7 . . . shall apply to all acquisitions made by the National Government [of Argentina], whether directly or indirectly . . . if, as a consequence of such acquisition, the National Government becomes the owner, or exercises control of, the shares of the Corporation, which . . . represent, in the aggregate, at least 49% of the capital stock."  Bylaws, Section 28(A). It is undisputed that 51% percent of YPF's capital stock was subject to expropriation.  Ex. 15 (Public Interest Law) at § 7.

A shares of stock . . . to be held ten business days following the receipt by the Corporation of the notice," that "the Corporation shall send by mail" the Bidder's notice to each shareholder or holder of securities convertible into stock "at the Bidder's cost and expense," and that the Bidder shall provide such notice, the formula for calculation of the bid, and various other procedures regarding the duration of the bid, and the conditions for its withdrawal or satisfaction.

Sections 7(d), (e), and (f) are clear and unambiguous with respect to the tender offer requirements and impose no obligation on YPF to act in the absence of notice by a Bidder or, on receipt of notice of a bid, to do anything other than to complete certain narrowly specified administrative tasks. *See* Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 25 (footnotes omitted) ("Section 7(f)(iii) only requires YPF to perform an administrative duty of forwarding to shareholders the acquirer's tender offer bid notice. There is no provision elsewhere in the Bylaws (or in Argentine Company Law or Argentine Civil Law) imposing the purported obligations on YPF."); *see also id.* at ¶¶ 26, 32; Ex. 58 (Manóvil YPF Rebuttal Rep.) at ¶ 6 ("YPF's obligations with regard to the tender offer were exclusively limited to administrative duties set forth in Section 7(f)(iii) (i.e., forwarding to shareholders the acquirer's tender offer bid notice.)"); Ex. 31 (Manóvil Republic Reply Rep.) at ¶¶ 22–23; *see also Kirschten v. Research Institute of America, Inc.*, No. 94 Civ. 7947 (DC), 1997 WL 739587, at *9–10 (S.D.N.Y. Sept. 24, 1997) (declining to read substantive obligations into a contract where those obligations are not imposed by the contract's plain text).

### 2.    The "Penalties" Provision

Plaintiffs' claim against YPF with respect to Section 7(h)—referred to in Section 28(C) as the "penalties" provision—is similarly unsupported by the text of the Bylaws. Section 7(h) provides, *inter alia*, that: "Shares of stock and securities acquired in breach of the provisions of subsections 7(c) through 7(g), both included, of this section, ***shall not grant any right to vote*** or

collect dividends or other distributions" and applies to the National Government per Section 28(C). Neither Section 7(h) nor Section 28(C) imposes any obligation on YPF to take any action with respect to the penalties. Bylaws Sections 7(h), 28(C). The shares acquired exceeding the established limits are stripped of their voting and certain other rights, but no corporate action by YPF is specified or required. As Plaintiffs' expert Professor Garro testified, Section 7(h) "does not expect the corporation to take explicitly any action." Ex. 33 (Garro Tr.) at 378:19–23.

It is the other shareholders, not YPF (the corporate entity), who have a mechanism to enforce the penalties in Section 7(h), including by challenging resolutions passed during the relevant shareholders' meetings. Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶¶ 35–36 ("Enforcement of the Section 7(h) sanctions is a matter for YPF's shareholders (not the Company) at the relevant shareholders' meeting. . . . [A]ny shareholder who does not vote in favor of the relevant shareholders' resolutions (including those not present at the meeting) can challenge the meeting's resolutions before Argentine courts pursuant to Article 251 of the [Argentine General Corporate Law ("GCL")]").

The careful delineation of obligations in Section 7, including each of its tender offer and penalties subsections, must be read in the context of the Bylaws overall. *See* Ex. 31 (Manóvil Republic Reply Rep), at ¶¶ 16–17, 21; Ex. 25 (Garro Rebuttal Rep.) at ¶¶ 5, 31. That broader reading confirms that when the Bylaws imposed an obligation on YPF—or anyone else—they did so explicitly, using defined terms. For example, the text is unequivocal that "***the Bidder*** shall . . . [a]rrange a takeover bid;" "[***t***]***he Corporation*** shall send" the notice by mail; "[***t***]***he Board of Directors*** shall call [*sic*] special meeting of class A shares of stock." Bylaws, Section 7(e), 7(f)(ii), (iii). The Bylaws require that "[t]he ***Board***" shall meet at least once a quarter and that a meeting shall be called by "the ***Chairman of the Board of Directors***," Bylaws Section 15;

21

that "[t]he absolute majority of the **board members**" shall constitute a quorum; that "[t]he **Board**" shall adopt resolutions by a majority vote of the members present, Bylaws Section 16; and that "[t]he **Board of Directors** shall have wide powers to organize, conduct and manage the affairs of the Corporation," Bylaws Section 17.  The Bylaws recognize that many actors play a role with respect to corporate affairs generally, and the tender offer provisions specifically, and are careful to specify what those roles are—including as to "the Corporation" itself.

By consistently and explicitly naming *who* is obligated to do *what*, the Bylaws expressly limit each party's affirmative obligations to those specified by its terms.  *See Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 960–61 (N.Y. Ct. App. 2001); Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶¶ 26, 32 (noting that obligations "must have a source," and that the obligations Plaintiffs seek to impose on YPF have no basis in the text of the Bylaws).  If the Bylaws are to be enforced as a contract—as Plaintiffs contend—the Bylaws should be read as one and limited to their plain and unambiguous terms.  There is no ambiguity here and no basis to infer obligations that the agreement does not impose.[13]

### B.   Plaintiffs' Experts Concede that the Plain Language of the Bylaws Does Not Provide a Basis for Their Contract Claims.

Plaintiffs cannot offer any meaningful response to YPF's analysis of the Bylaws' text.  Their experts could not point to any language in Sections 7 or 28 that imposes an obligation on YPF to conduct, enforce, or compel a tender offer.  They acknowledged that the terms of Section 7(e) apply expressly to the **Bidder**, and require the **Bidder**—not YPF—to take certain actions.

---

[13]   Plaintiffs' additional allegation that YPF is in breach for "failing to distribute dividends to YPF's shareholders," Ex. 43 (Petersen Complaint) at ¶ 71; Ex. 44 (Eton Park Complaint) at ¶ 64, also fails because it is undisputed that neither the Bylaws nor Argentine law impose an obligation on the Company to distribute dividends that have not been authorized for payment by a vote of the Company's shareholders.  *See* Bylaws Section 25(d); Ex. 34 (Manóvil YPF Rep.) at ¶¶ 131–33.  It is undisputed that no such authorization occurred between March and November 2012.

Ex. 32 (Rovira Tr.) at 154:11–155:6; Ex. 25 (Garro Rebuttal Rep) at ¶ 14 (noting that Section 28(A) "extends the requirement of Sections 7(e) and 7(f)" to acquisitions in which the Republic is a "bidder"). Plaintiffs' experts have acknowledged that Section 7(f) imposes no affirmative obligation on YPF other than its limited obligation under Section 7(f)(iii) to forward to YPF shareholders—at the Bidder's expense and only after receiving notice—the Bidder's notice of its bid. Ex. 33 (Garro Tr.) at 355:13–356:4, 359:10–360:13.

Although Professors Rovira and Garro assert that YPF was obligated to "ensure Argentina carried out the tender-offer process," Ex. 28 (Rovira Rep.) at ¶ 27, or to "ensure that those willing to take control of the company comply with the tender offer requirement," Ex. 29 (Garro Rep.) at ¶¶ 17, 19, they cannot and do not point to any *actual language in the Bylaws* imposing such an obligation. Professor Rovira relied on Section 7(e), but then acknowledged that it refers solely to the Bidder, not to YPF, Ex. 32 (Rovira Tr.) at 153:18–155:6, while Professor Garro admitted that the Bylaws did not "identif[y] the corporation here as a specific subject of an obligation in 7(f)" other than the limited administrative duty to forward the Bidder's notice after receipt, set forth in Section 7(f)(iii), Ex. 33 (Garro Tr.) at 360:21–361:2. The experts then resorted to generalized obligations untethered to the Bylaws, with Professor Rovira asserting that YPF had an obligation to "alert[]" the Republic of the tender offer requirement, Ex. 28 (Rovira Rep.) at ¶ 27, or to "tr[y] to separate itself or distance itself from the actions carried out by Argentina," Ex. 32 (Rovira Tr.) at 142:7–10,143:18–25, while Professor Garro suggested that YPF should have made "a statement" reminding the Republic of the tender offer requirement. Ex. 33 (Garro Tr.) at 403:12–25. No such obligations appear in the Bylaws or elsewhere in Argentine law. The Bidder provides notice of its bid to the Company, not the

23

other way around.  *See* Bylaws, Section 7(f)(i); *see also* Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 25; Ex. 58 (Manóvil YPF Rebuttal Rep.) at ¶ 6.

The same is true of the Section 7(h) claims. Both Professors Rovira and Garro initially contended, without textual support, that Section 7(h) "imposed on YPF an obligation to withhold certain privileges associated with share ownership," Ex. 28 (Rovira Rep.) at ¶ 27; Ex. 24 (Rovira Rebuttal Rep.) at ¶ 46; *see also* Ex. 25 (Garro Rebuttal Rep.) at ¶ 58, but concede, as Professor Garro put it, that "Section 7(h) does not mention the [corporation] . . . [and] does not expect the corporation to take explicitly any action."  Ex. 33 (Garro Tr.) at 378:18–23.  Under Section 7(h), a share loses its voting rights when it is acquired without a requisite tender offer, without any action by YPF.[14]  To the extent an acquirer nonetheless seeks to vote a share that has been stripped of its voting rights, other shareholders are free to challenge that action.

Not a single expert could point to a textual basis in the Bylaws for his view that YPF itself had direct obligations to Plaintiffs to enforce or compel a tender offer, or penalize any acquirer for failing to conduct one.  It is now beyond dispute that the Bylaws are utterly silent as to the claimed obligations of YPF.  Under Argentine law, unsurprisingly, the utter lack of any basis in the text of the Bylaws for Plaintiffs' $20 billion claims against YPF is fatal.  Silence is not ambiguous; it is dispositive that no such obligation exists.  The claim should be dismissed.

---

[14]   Even assuming YPF had an obligation to prevent the Republic from voting under Section 7(h), the assertion that YPF is liable for failing to enforce Section 7(h) of the Bylaws, *see* Ex. 28 (Rovira Rep.) at ¶ 27; Ex. 49 (Bianchi Rep.) at ¶¶ 27, 74, is wrong as a matter of law because YPF's management and Board had been displaced by the Intervenor.  The Intervenor's actions cannot give rise to liability on the part of the Company.  Argentine law is clear that "any actions taken by the Republic's Intervenor in fulfillment of his public interest mandate under the Intervention Decree and the Public Interest Law cannot be attributed to YPF."  Ex. 59 (Comadira Rebuttal Rep.) at ¶ 18.

1007838594

### C.    There Is No Legal Basis for a Claim That YPF Is a Guarantor of Any Obligation of the Republic.

Any attempt by Plaintiffs to pursue an alternate theory that YPF had an obligation to guarantee others' obligations under its Bylaws also fails as a matter of law, because it also has no basis in the Bylaws or anywhere else in Argentine law. *Petersen Energía Inversora, S.A.U. v. Argentine Republic,* No. 16-3303-cv(L), Dkt. No. 80, Brief of Plaintiffs-Appellees ("Petersen Appeal Br.") at 5-6 (2d Cir. March 14, 2017) ("[T]he bylaws are plausibly understood to make YPF a guarantor of Argentina's obligation to tender. As a party to the bylaws, YPF is equally liable for the failure to tender."); Ex. 24 (Rovira Rebuttal Rep.) at ¶ 77 (asserting that YPF serves as a guarantor); Ex. 25 (Garro Rebuttal Rep.) at § 58; *but see* Ex. 35 (Rovira Reply Rep.) at ¶ 22 (noting that Plaintiffs do not seek to hold YPF liable as a guarantor); Ex. 36 (Garro Reply Rep.) at ¶ 18 (same).

Under Argentine law, for a company to become a guarantor, one of three conditions must be met: (i̲) the company *expressly* agrees to serve as guarantor; (ii̲) the company takes a unilateral act that is later ratified by the obligee; or (iii̲) there is a judicial or statutory mandate requiring the company to act as guarantor. Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 30 (citing the Argentine Civil Code, Arts. 1986, 1987, 1998).

The first two possibilities are utterly irrelevant. As to the first, there is no guarantee provision in the Bylaws and Plaintiffs have conceded that YPF is not an express contractual guarantor. Ex. 32 (Rovira Tr.) at 132:1–16 (the "responsibility of YPF is ***not that of a guarantor***"); *see also* Ex. 34 (Manóvil YPF Rep.) at ¶ 63 ("[T]he Bylaws clearly provide that the only obligor of the tender offer obligation is the person wishing to acquire a controlling stake in the Company."). The second possibility—a unilateral act, later ratified—is irrelevant since no such act has been claimed or taken. Plaintiffs appear to be relying on the third possibility and

1007838594

hoping to argue that some legal mandate compelled YPF to act as guarantor. But expert discovery has confirmed they have no basis for that theory either.  Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 17(b) ("Under Argentine law, a company is not a guarantor of its shareholders' obligations under the Bylaws.").  Plaintiffs' experts could not point to a single Argentine statute imposing liability on a company for a shareholder's breach of company bylaws, as a guarantor or otherwise.  Instead, they point to a series of GCL provisions that authorize damages claims against other actors—like a company's shareholders, directors, and officers—but never against the company itself.  Ex. 35 (Rovira Reply Rep.) at ¶ 42 n.33 (citing GCL Art. 274 (alterations omitted) ("Directors are unlimited and jointly and severally liable vis-à-vis the company, the shareholders, and third parties . . . for the breach of the law, the bylaws . . . .") and GCL Art. 275 (discussing when "[d]irectors and officers liability vis-a-vis the company" can be extinguished), reproduced at Ex. 37); Ex. 29 (Garro Rep.) at ¶ 11 n.10 (citing GCL Art. 54 (providing for a right of action against controlling shareholders or directors to vindicate "damage suffered by the corporation"), GCL Art. 248 (providing for a right of action against a shareholder who votes in violation of the interests of the corporation), and GCL Art. 279 (allowing a shareholder to bring individual actions against directors), reproduced at Ex. 37).

In the absence of any express statutory or judicial guarantee, Plaintiffs' experts also make the entirely unsubstantiated claim that generally speaking, "under Argentine law . . . corporations are required to take affirmative actions to ensure that shareholders abide by the Bylaws."  Ex. 28 (Rovira Rep.) at ¶ 27; *see also* Ex. 29 (Garro Rep.) at ¶ 17.  Although Plaintiffs characterize this concept as a "well accepted" rule, they again cannot point to a single case, article, law, decree, or resolution in which it has been adopted and enforced.  Professor Rovira conceded that all of the cases on which he relies involved either tort or fraud claims or claims against directors or

shareholders, but not against the corporation itself, Ex. 32 (Rovira Tr.) at 75:8–12, 77:11–80:18, or were *failed attempts* against a company.  *Id.* at 82:3–10, 82:18: 83:8.  Professor Garro admitted that none of the cases on which he relied involved imposition of liability on the company for an alleged breach of its bylaws.  Ex. 33 (Garro Tr.) at 142:1–19, 143:5–23.  Professors Garro and Rovira conceded that they are not aware of *any* case in which an Argentine court did what Plaintiffs are asking this Court to do, and sustained a breach of contract action against a company directly for alleged breach of its bylaws, much less an alleged breach by one of its other shareholders.  Ex. 32 (Rovira Tr.) at 77:11–81:22; Ex. 33 (Garro Tr.) at 150:1–17; *see also* Ex. 30 (Kemelmajer Tr.) at 84:5–13.[15]  Professor Rovira even suggested that allowing a shareholder to seek damages against the *company* as a guarantor would be ***inconsistent*** with the need to "prevent the *company* and the shareholders from being exposed to the consequences of the harmful effects" of a shareholder's non-compliance with the Bylaws.  Ex. 32 (Rovira Tr.) at 87:9–88:7.

As their own experts have conceded, Plaintiffs' claims are unprecedented, unsubstantiated, and unsupported by the law.  Nothing in the GCL or the cases Plaintiffs cite requires a company to guarantee performance of obligations owed by its shareholders and

---

[15]  These concessions were necessitated by the holdings of the cases.  Professor Garro relies on *Zullo, Norberto v. Kehoe, Roberto E., et al.*; *Iraldi et al. v. Godoy*; and *M.S.M. v. C.M. de T, et al.,* each of which involved a claim against an entity's directors, board members, or shareholders, not against the entity, Ex. 25 (Garro Rebuttal Rep.) at ¶¶ 36 n.53, 37 n.54, and on *Delvalle Senen v. Constructora Mir S.R.L., et al.*, concerning an employment agreement. *Id.* at ¶ 36 n.53.  Professor Rovira relies on *Sichel, Gerardo F. v. Massuh S.A.*, a case that was later revoked and nullified. Ex. 24 (Rovira Rebuttal Rep.) at ¶ 60 n.55.  Professors Rovira and Garro both purport to rely on *Gutiérrez Enedina y Otros v. Neumaticos Gutiérrez S.A*, which held that "[t]he partner who caused the damage to plaintiff shall be solely liable for such damage with the company bearing no liability."  Ex. 38 (*Gutiérrez Enedina y Otros v. Neumaticos Gutiérrez S.A.*) at ¶ 4; Ex. 30 (Kemelmajer Tr.) at 83:4–84:1 (noting that, in *Gutiérrez*, "the court's decision was to reject the claim against the company"); *see also* Ex. 24 (Rovira Rebuttal Rep) at ¶ 60 n.56; Ex. 25 (Garro Rebuttal Rep) at ¶ 36 n.53.

nothing contemplates that a company could be liable for a shareholder's alleged non-compliance with its bylaws. Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 32; *see also* Ex. 34 (Manóvil YPF Rep.) at ¶¶ 66, 74.  That is a sensible and principled limitation on corporate liability that this Court should not disregard.  After all, when a shareholder breaches its obligations under a company's bylaws, the company itself "has no way of avoiding or preventing" the harm and in fact may be harmed itself by the alleged non-compliance.  *Id*. at ¶¶ 79, 128; *see also* Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶¶ 32, 46–48. Without any statutory mandate or judicial precedent, Plaintiffs cannot establish any guarantee on the part of YPF.

## II.    PLAINTIFFS CANNOT ESTABLISH THE CAUSAL LINK BETWEEN YPF'S CONDUCT AND PLAINTIFFS' ALLEGED DAMAGES REQUIRED TO SUSTAIN THEIR CONTRACT CLAIMS.

Plaintiffs' claims should be dismissed for the additional reason that they cannot show that YPF's alleged breaches caused them any harm.  Any claim for breach of contract under Argentine law requires not just an obligation on the defendant and its breach, but also a causal link between that breach and Plaintiffs' alleged damages.  Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 46 (to make out a breach of contract claim, Plaintiffs must show that YPF "acted out of its own will" and that YPF was "able to prevent and avoid" the resulting harm to Plaintiffs); *Id*. at ¶¶ 62–65 (explaining that Plaintiffs must show an "adequate causal connection" between YPF's actions and Plaintiffs' alleged harm and that no intervening event or third-party act broke the chain of causation); Ex. 28 (Rovira Rep.) at ¶ 22 ("Under Argentine law, any contractual claim for civil liability requires . . . that the breach was the cause of the detrimental effect to the prejudiced party."); *cf. Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 527 (2d Cir. 2004) (internal quotations and alterations omitted) ("[A] plaintiff may recover only for damages that are directly and proximately caused by a defendant's breach of contract," so causation is a "crucial" element of a plaintiff's case); *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 731 (2d

28

Cir. 1992) (affirming dismissal of breach of contract claim for lack of causation).  A motion for summary judgment against a contract claim should be granted when it is clear on the undisputed facts that it was not the defendant's conduct that caused plaintiffs' claimed injury—or when defendant demonstrates that plaintiffs lack sufficient evidence to establish causation.  *See Lexington 360 Assoc. v. First Union Nat'l Bank of N.C.*, 234 A.D.2d 187, 190 (N.Y. Sup. Ct. App. Div. 1st Dept. 1996); *see also* Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶¶ 62–65.

After years of litigation, it is beyond dispute that Plaintiffs cannot establish that YPF caused Plaintiffs' asserted damages.  Their own documents and arguments insist that they were damaged by the lack of an offer, and payment, that YPF was never obligated to make, and could not have forced the Republic to make, as Plaintiffs' own experts concede.  Ex. 33 (Garro Tr.) at 403:23–25.  YPF cannot be held liable for harm it did not cause and had no means to prevent.

Plaintiffs cannot show—as they must—that any failure by YPF caused them to suffer damages resulting from the absence of a tender offer.  Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 60 ("As a matter of Argentine law, it is Plaintiffs' burden to prove a causal link between YPF's conduct and their alleged damages. . . . Failing to do so is fatal to their claims against YPF."); *id.* at ¶ 78 ("It is clear that neither YPF's alleged failure to 'enforce' the tender offer nor its alleged failure to apply the Section 7(h) sanctions was an adequate cause of Plaintiffs' alleged Tender Offer Damages.").  There is absolutely no evidence in the record to support even an inference, much less a conclusion, that the Republic would have conducted a tender offer if YPF had "alerted" the Republic of its purported obligations, attempted to "enforce" the purported obligations, or "distanced itself" from the Republic's conduct, or if it had somehow acted to penalize the Republic pursuant to Section 7(h).  Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 80 ("YPF had no means of forcing the Republic to offer to purchase the remaining outstanding

29

shares for a set price.  I am not aware of any legal avenue that the Company could have taken to compel the sovereign republic to tender to purchase shares in that way, and Plaintiffs have not identified any.").  Professor Garro, Plaintiffs' expert, conceded that YPF "could not force Argentina to do anything," Ex. 33 (Garro Tr.) at 403:23–25, and no evidence suggests that the Republic would have made a tender offer if YPF had somehow prevented it from voting the occupied shares.[16]

## III.   PLAINTIFFS' SECTION 7(H) "PENALTIES" CLAIM FAILS BECAUSE OF THE SUPERSEDING EFFECT OF THE PUBLIC INTEREST LAW.

Plaintiffs' breach of contract claim under Sections 7(h) and 28(C) also fails because the May 2012 Public Interest Law specifically superseded and excused performance of any alleged obligation to prevent the Republic from exercising the rights associated with the shares subject to expropriation, including any obligations allegedly imposed by Sections 7(h) and 28(C).

YPF's and Plaintiffs' experts agree that under Argentine law, if there is a conflict between the rights and obligations imposed by laws passed for the public order and private rights and obligations, the public order laws supersede and excuse performance of any conflicting private obligations, including private contractual obligations.  Ex. 22 (Comadira Rep.) at ¶¶ 35–38; Ex. 49 (Bianchi Rep.) at ¶¶ 105–06; Ex. 39 (Dep. Tr. of Alberto Bianchi ("Bianchi Tr.")) at

---

[16]   The rest of Plaintiffs' claims against YPF also fail, for straightforward reasons.  Plaintiffs' claim for *anticipatory breach* must be dismissed because Argentine law in effect at the time did not recognize that as an independent cause of action.  Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶¶ 154, 156–60; Ex. 23 (Manóvil Republic Rep.) at ¶ 97.  In any event, YPF had no obligation under the Bylaws that could have been breached, as explained above.  Any claim against YPF for breach of contract based on its alleged *failure to distribute dividends* fails because no such obligation existed; there was no shareholder vote prior to or during the intervention providing for the payment of dividends, which would have been required before dividends could have been paid, or required to be paid, under the Bylaws and Argentine law. *See* Bylaws Section 25; SUF ¶¶ 17, 47; Ex. 34 (Manóvil YPF Rep.) at ¶¶ 131–33.  Finally, Eton Park's claim for breach of *the implied duty of good faith and fair dealing* against YPF (Count 6) should be dismissed for the same reasons the Court dismissed Petersen's identical claim against YPF.  MTD Order I, 2016 WL 4735367, at *15.

1007838594

59:17–10 ("There is no possibility to have any such private rights enforced against any public order laws of this country").  The Argentine legal system has a strict hierarchy of laws, and under this hierarchy, a private law instrument, such as a company's bylaws, cannot "contradict, alter, or render ineffective laws and decrees of 'public order.'  Nor can they restrict or limit the State's powers to promote the public interest and enact public order laws and decrees."  Ex. 22 (Comadira Rep.) at ¶ 40 (footnote omitted) ; *see also* Ex. 40 (Comadira Tr.) at 58:5–10.

Article 13 of the Public Interest Law provides in relevant part: "[T]o ensure continuity of the activities associated with the exploration, production, industrialization and refining of hydrocarbons by YPF . . . the Argentine Executive Branch. . . ***shall exercise all of the rights conferred upon the shares subject to expropriation*** . . . ."  Ex. 15 (Public Interest Law) at § 13 (emphasis added); *see* Petersen Appeal Br. at 16-17 (under the Public Interest Law, Argentina would "control YPF" by "exercising the voting rights associated with the expropriated shares" and "would elect YPF's directors").  In enacting the Public Interest Law, the Argentine Congress not only declared that the law was a "public order law," but also expressly found that temporary occupation and eventual expropriation of 51% of YPF's Class D shares held by Repsol was in the public interest, and commanded the Executive Branch to "exercise all of the rights conferred upon the shares subject to expropriation."  Ex. 15 (Public Interest Law) at §§ 7, 13, 18; *see also* Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 93 ("Those rights [referenced in Article 13] clearly included the quorum, voting and dividend rights—at a minimum—attached to the shares.").

The Public Interest Law's mandate that the Republic "exercise" all of the rights of the shares stands in direct contradiction with Plaintiffs' interpretation of Section 7(h) as requiring YPF to prevent the Republic from exercising the right to vote those same shares.  YPF, the Intervenor, and YPF's shareholders were required to comply with the Public Interest Law's

mandate, and the Public Interest Law superseded and excused any obligation allegedly imposed on YPF by Section 7(h).  Ex. 22 (Comadira Rep.) at ¶ 58 ("YPF cannot be held liable for any alleged failure to prevent the Republic from exercising the voting or quorum rights associated with the Shares . . . because . . . Congress—through a public order law—mandated the Republic to 'exercise all of the rights conferred by the shares subject to expropriation' [and] . . . YPF was legally required to abide by this Congressional mandate"); *see also* Ex. 39 (Bianchi Tr.) at 93:18–25 ("[L]aws are enforceable and applicable until the [court] declares them to be unconstitutional."), 94:12–23 (same); Ex. 30 (Kemelmajer Tr.) at 127:5–128:18.  The Bylaws cannot "restrict or limit the exercise of the State's powers" pursuant to this declaration by the Argentine Congress.  Ex. 22 (Comadira Rep.) at ¶ 50.  Any provision of the Bylaws that "places an obstacle on the expropriation", occupation, or intervention "will not be valid or applicable." Ex. 39 (Bianchi Tr.) at 64:4–23 and corresponding errata sheet.  YPF could not comply with Article 13 by recognizing the Republic's mandate to vote the shares while at the same time complying with Plaintiffs' view of Section 7(h) that it was required to prevent that same vote. Any such Section 7(h) obligation must have been superseded and excused, and cannot give rise to liability.  Ex. 40 (Comadira Tr.) at 60:24–25, 61:1–5 and corresponding errata sheet ("if we assume that Article 7 (h) imposed on YPF the obligation to prevent Argentina from voting its shares, there is no doubt that public law would have prevailed, and that provision would have been declared unconstitutional").

Nothing in the prior decisions of the Court forecloses granting summary judgment to YPF on this basis. Whether a commercial obligation on the part of YPF conflicts with, and is excused by, the Public Interest Law's grant to the Republic of the right to vote has not previously been decided. And now, on a complete record, it is evident that "Congress—through a public

32

order law—mandated the Republic to 'exercise all of the rights conferred by the shares subject to expropriation' [and] . . . YPF was legally required to abide by this Congressional mandate. . . ." Ex. 22 (Comadira Rep.) at ¶ 58; *see also* Ex. 59 (Comadira Rebuttal Rep.) at ¶ 7 ("[A]s a matter of Argentine Constitutional and Administrative law, it was not permissible to apply the Section 7(h) sanctions to the Republic in the face of Article 13 of the Public Interest Law"); Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶¶ 93-94 ("[e]nforcing the sanctions in Section 7(h) . . . would have been a direct violation of Article 13 of the Public Interest Law"); *see also Petersen*, 895 F.3d at 203 ("The YPF Expropriation Law also extended the Intervenor's control over the firm's operations and granted the Argentine executive branch the right to 'exercise all the political rights over all the shares subject to expropriation' until the expropriation, including compensation of Repsol, was finalized.").

## IV.   PLAINTIFFS HAVE NOT SATISFIED THE NECESSARY REQUIREMENTS UNDER ARGENTINE LAW TO BRING A CLAIM FOR DAMAGES AGAINST YPF FOR BREACH OF THE BYLAWS.

Plaintiffs' claims should also be dismissed because even if Plaintiffs could sue the Company for breach of the Bylaws—which they cannot, as a matter of law[17]—any such suit would first have had to satisfy the GCL prerequisites for other kinds of damages claims under corporate bylaws.  In that counterfactual world where a claim against the Company was possible, the shareholder would have to first challenge the resolution authorizing the allegedly-wrongful act pursuant to Article 251.  Ex. 23 (Manóvil Republic Rep.) at ¶¶ 101–03 (citing, *inter alia*, GCL, Art. 251 (reproduced at Ex. 37)); *id.* at ¶¶ 110–12; Ex. 34 (Manóvil YPF Rep.) at ¶¶ 80–81, 83.  If the court annuls the resolution in the Article 251 proceeding, then and only then, can a dissenting shareholder seek compensation under Article 254 of the GCL (although the claim

---

[17]   *See supra* Part I.C.

1007838594

would then run into the limitation that Article 254 does not provide that a shareholder can claim compensation from the company).  *See* Ex. 37 (GCL) at Arts. 251, 254.  A successful Article 251 result is a prerequisite to the claim for money damages.[18]

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████  While other shareholders took actions in the Argentine courts to protect their rights, Plaintiffs sat on their hands—and then, in Petersen's case, sold their claims.  *See* Ex. 21 (Minutes of the July 17, 2012 Meeting of Class A and D Shareholders); Ex. 22 (Comadira Rep) at ¶ 29; Ex. 23 (Manóvil Republic Rep.) at ¶ 43 n.56.  Having failed to properly assert and preserve their claims against YPF under Argentine law, Plaintiffs cannot pursue them here.

## V.   PLAINTIFFS DO NOT HAVE STANDING TO BRING THEIR CLAIMS.

Plaintiffs lack standing for at least two reasons in addition to their failure to satisfy the requirements of Article 251.  *First*, they lack standing for the reasons argued by the Republic and incorporated by reference, that Plaintiffs did not own interests in YPF at the relevant times.  *See* Republic's Brief Part I.  *Second,* Petersen's claims fail because Petersen sold any right it had to prosecute the claims asserted in this litigation and is not the real party in interest.[19]  Under Rule

---

[18]   YPF refers to the Republic's Brief at Part II.A and accompanying paragraphs of the Republic SUF and supporting exhibits.

[19]   The undisputed facts show: (i) the CPA transfers all of the key elements of ownership to Prospect, including the irrevocable and exclusive right to control the Petersen claims and any settlement thereof, SUF ¶ 56–62; (ii) this level of control is utterly inconsistent with industry best practices and Burford's own publicly-stated practices, *id.* ¶ 63–67; and (iii) the CPA was intended to be the economic equivalent of a sale of claims.  Under Spanish law, these facts establish the CPA is a simulated agreement and the true cause of the agreement— a sale of claims—must be enforced, with Prospect understood as the legal owner of the

1007838594

17, actions "*must* be prosecuted in the name of the real party in interest," Fed. R. Civ. P. 17(a)(1)

(emphasis added), and dismissal is appropriate if a reasonable time after an objection, the real

party has not taken the requisite action to "ratify, join, or be substituted into the action."  Fed. R.

Civ. P. 17(a)(3).  Defendants objected to Petersen's standing due to the Burford sale nearly three

years ago—on July 8, 2019—yet neither Prospect nor Burford has satisfied Rule 17.  Ex. 61

(ECF No. 98 ("Republic Answer")) at 26–27.  Sufficient time has passed without action that

summary judgment on the Petersen claims is warranted.  *See, e.g., Nastasi & Assocs., Inc. v.*

*Bloomberg, L.P.*, No. 18 Civ. 12361 (JMF), 2021 WL 3541153, at *5–6 (S.D.N.Y. Aug. 11,

2021) (dismissing claims for unreasonable delay); *Chrebet v. Cty. of Nassau*, No. 09 Civ. 4249

(DRH)(AKT), 2014 WL 1836835, at *21 (E.D.N.Y. May 8, 2014) (internal quotations omitted)

(dismissing where "nearly two-year delay" after notice "does not constitute a 'reasonable

time'").

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment dismissing in their

entirety pursuant to Fed. R. Civ. P. 56 all remaining claims against YPF, namely, the claims for

breach of contract (Petersen, Count 5; Eton Park, Count 4), anticipatory breach (Petersen, count

6; Eton Park, Count 5), and of the implied duty of good faith and fair dealing (Eton Park, Count

6).

Dated: April 14, 2022                                 Respectfully Submitted,
       New York, New York

                                                      */s/ Mark P. Goodman*
                                                      Mark P. Goodman
                                                      Shannon Rose Selden
                                                      Dietmar W. Prager
                                                      Carl Riehl

---

claims. *See* Ex. 62 (Conthe Rep.) at ¶¶ 95–136. Accordingly, Petersen is not the real party in
interest.

Wendy B. Reilly
J. Robert Abraham
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000 (phone)
(212) 909-6836 (fax)
mpgoodman@debevoise.com
srselden@debevoise.com
dwprager@debevoise.com
criehl@debevoise.com
wbreilly@debevoise.com
jrabraham@debevoise.com

*Counsel to Defendant YPF S.A.*

36