UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. AND PETERSEN ENERGÍA, S.A.U., <br><br> Plaintiffs, <br><br> v. <br><br> ARGENTINE REPUBLIC AND YPF S.A., <br><br> Defendants. | Case Nos. <br> 1:15-cv-02739-LAP <br> 1:16-cv-08569-LAP |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ETON PARK CAPITAL
MANAGEMENT, L.P., ETON PARK
MASTER FUND, LTD. AND ETON
PARK FUND, L.P.,

               Plaintiffs,

    v.

ARGENTINE REPUBLIC AND YPF
S.A.,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**YPF'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**
<u>**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**</u>

    Defendant YPF S.A. ("YPF") respectfully submits this Statement of Undisputed Material Facts, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York. Together with this statement, YPF submits the Declaration of Mark P. Goodman, dated April 14,

1007839183

2022 (the "Goodman Declaration"), which contains as Exhibits the documents, expert reports, and excerpts of deposition transcripts that are cited both in this statement and in the accompanying Memorandum of Law in Support of YPF's Motion for Summary Judgment. All references below to an Exhibit ("Ex.") are to Exhibits attached to the Goodman Declaration.

## I.     YPF Background

1. Originally founded in 1922 as a state-run company, YPF S.A. ("YPF" or the "Company") is currently a corporation (*sociedad anónima*) incorporated under the laws of Argentina and headquartered in Buenos Aires. Ex. 2 (YPF's 2020 Form 20-F) at 31. YPF is a leading energy company, and is one of the largest energy producers in Argentina. Ex. 2 (YPF's 2020 Form 20-F) at 31–34.

2. As of December 31, 2020, YPF had approximately 20,298 employees. Ex. 2 (YPF's 2020 Form 20-F) at 195–96. Approximately fifty-one percent of the Company's capital stock is owned by the Republic of Argentina (the "Republic") and its political subdivisions. Ex. 2 (YPF's 2020 Form 20-F) at 197–98. The vast majority of YPF's remaining capital stock is publically traded, with a portion owned by YPF's employees. Ex. 2 (YPF's 2020 Form 20-F) at 197–98. As of April 12, 2021, there were 45 holders of record of YPF American Depositary Shares ("ADSs"). Ex. 2 (YPF's 2020 Form 20-F) at 197.

3. As of September 24, 2021, YPF had a market capitalization of approximately $1.78 billion. Ex. 3 (Harris Rebuttal Rep.) at ¶ 65.

4. Prior to 1993, YPF was wholly-owned and operated by the Republic. Ex. 4 (Answer and Defenses of YPF S.A., *Petersen Energía Inversora v. Argentine Republic*, No. 1:15-cv-02739-LAP at Dkt. No. 99 (S.D.N.Y. July 8, 2019) ("Petersen Answer")) at ¶ 8; Ex. 43 (Petersen Complaint, *Petersen Energía Inversora v. Argentine Republic*, No. 1:15-cv-02739-

LAP at Dkt. No. 01 (S.D.N.Y. April 8, 2015) ("Petersen Complaint")) at ¶¶ 7–8; Ex. 44 (Complaint, *Eton Park Capital Management Fund v. Argentine Republic*, No. 1:16-cv-08569-LAP at Dkt. No. 1 (S.D.N.Y. Nov. 3, 2016) ("Eton Park Complaint")) at ¶¶ 10–11.

5.   In November 1992, the Republic passed the Privatization Law (Law No. 24,145), which established procedures for YPF's privatization. *See generally*, Ex. 5 (Law 24,145).

6.   Consistent with these procedures, in June 1993, the Republic launched an initial public offering of YPF's Class D shares (the "Combined Offering"). Ex. 4 (Petersen Answer) at ¶ 12; Ex. 43 (Petersen Complaint) at ¶ 13; Ex. 44 (Eton Park Complaint) at ¶ 16. The Republic remained a Class A shareholder of YPF after the Combined Offering. Ex. 4 (Petersen Answer) at ¶ 26; Ex. 43 (Petersen Complaint) at ¶ 7; Ex. 44 (Eton Park Complaint) at ¶ 10.

7.   The Combined Offering also included the issuance of YPF ADSs, each representing one YPF Class D share. Ex. 4 (Petersen Answer) at ¶ 13; Ex. 43 (Petersen Complaint) at ¶ 2; Ex. 44 (Eton Park Complaint) at ¶ 2.

8.   YPF's Class D shares were and continue to be listed on the Buenos Aires Stock Exchange; YPF's American Depository Receipts ("ADRs"), each representing one ADS, were and continue to be listed on the New York Stock Exchange ("NYSE"). Ex. 4 (Petersen Answer) at ¶¶ 12–14.

9.   An ADR is a negotiable certificate that evidences an ownership interest in ADSs, which in turn represents the right to redeem the shares of a non-U.S. company that have been deposited with a U.S. bank. Ex. 63 (Solomon Rebuttal Rep.) at ¶ 50-51; Ex. 47 (Deposition Transcript of Nancy Lissemore ("Lissemore Transcript")) at 93:19-95:8; 164:2-165:16; 179:7-19; Ex. 6 (Lissemore Rep.) at ¶ 9. YPF's ADRs began trading on the NYSE on June 29, 1993. Ex. 64 (Sharon Rebuttal Rep.) at ¶ 12; Ex. 43 (Petersen Complaint) at ¶ 13.

3

10. Starting in 1999, YPF was controlled by Repsol S.A. ("Repsol"), an integrated oil and gas company headquartered in Spain. Ex. 8 (YPF's 2007 Form 20-F ("2007 Form 20-F")) at 23. As of September 30, 2007, Repsol either directly or indirectly controlled over approximately 99% of YPF's capital stock, with the remainder held by the Republic, Argentine provincial governments, YPF employees, and the general public. Ex. 7 (YPF's February 20, 2008 Form F-3 Registration Statement) at F-40; Ex. 8 (YPF's 2007 Form 20-F) at 120.

## II. YPF's Bylaws

11. The parties' experts have relied upon the same English translation of the relevant YPF bylaws in their expert reports, and there is no dispute as to the English translation of the text of the operative provisions of the bylaws. Ex. 1 (Bylaws of YPF S.A. ("Bylaws")); *see also* Ex. 23 (Manóvil YPF Rep.) (relying on same version of the Bylaws); Ex. 28 (Rovira Rep.) (same); Ex. 49 (Bianchi Rebuttal Rep.) (same).

12. The Bylaws include the provisions in Section 7, which require a "Bidder," defined as a "person wishing to [*sic*] a Takeover"—that is, a person wishing to "acquire shares or securities of the Corporation" in excess of a set percentage—to "(i) [o]btain the prior consent of the special shareholders' meeting of class A shareholders; and (ii) [a]rrange a takeover bid for the acquisition of all the shares of all classes of the Corporation and all securities convertible into shares." Ex. 1 (Bylaws), Sections 7(d), (e) and 28; Ex. 28 (Rovira Rep.) at ¶ 26.

13. Section 7(h) of the Bylaws provides the following:

> h) Breach of Requirements: Shares of stock and securities acquired in breach of the provisions of subsections 7 c) through 7 g), both included, of this section, shall not grant any right to vote or collect dividends or other distributions that the Corporation may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of the Corporation, until such shares of stock are sold, in the case the purchaser has obtained the direct control of YPF, or until the

4

> purchaser loses the control of the YPF's parent company, if the takeover has been indirect.

Ex. 1 (Bylaws), Section 7(h).

14. Section 28 of the Bylaws extends certain requirements of Section 7 to certain acquisitions of YPF securities by the Argentine National Government.  Ex. 1 (Bylaws), Section 28.

15. The Bylaws do not require YPF to conduct a tender offer for its own shares.  Ex. 47 (Lissemore Transcript) at 64-65; Ex. 26 (Transcript of Motion to Dismiss Hearing ("MTD Transcript") at 39-41; Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 25.

16. Section 23 of the Bylaws states that the "Chairman of the Board of Directors, shall preside over the shareholders' meetings, or in his absence, they shall be presided over by the person appointed at the meeting." Ex. 1 (Bylaws), Section 23.

17. Section 25(d) of the Bylaws states that "[t]he shareholders' meeting, or the Board of Directors, as the case may be, may authorize the payment of dividends[.]"  Ex. 1 (Bylaws), Section 25(d).

### III. Petersen Acquires YPF ADSs

18. Plaintiffs Petersen Energía Inversora, S.A.U. ("PEISA") and Petersen Energía, S.A.U. ("PESA") (together, with PEISA, "Petersen") are limited liability companies organized under the laws of the Kingdom of Spain, affiliated with members of the Eskenazi family.  Ex. 4 (Petersen Answer) at ¶ 6; Ex. 43 (Petersen Complaint) at ¶ 6;  ███████████████████  ███████████████████████████████████████████████████████████████ Ex. 3 (Harris Rebuttal Rep.) at ¶ 15; Ex. 8 (YPF's 2007 Form 20-F) at 120.

19. On February 21, 2008, PESA purchased 58,603,606 YPF ADSs from Repsol, representing 14.9% of YPF's capital stock, for approximately $2.23 billion.  Ex. 8 (YPF's 2007

5

Form 20-F) at 120; Ex. 43 (Petersen Complaint) at ¶ 28.  PESA financed its purchase in large part with a senior secured term loan provided by certain financial institutions and a credit agreement with Repsol, and pledged the ADSs as collateral in both agreements.  Ex. 8 (YPF's 2007 Form 20-F) at 120; Ex. 43 (Petersen Complaint) at ¶ 30; Ex. 3 (Harris Rebuttal Rep.) at ¶¶ 15-16.

20. The same day—February 21, 2008—PESA and Repsol entered into a Shareholders' Agreement.  Ex. 9 (Shareholders' Agreement between Repsol and Petersen Energía, S.A.U., signed February 21, 2008 (the "Shareholders' Agreement")).

21. On May 20, 2008, PEISA exercised an option to purchase from Repsol additional YPF ADSs, representing 0.1% of YPF's capital stock.  Ex. 43 (Petersen Complaint) at ¶ 28; Ex. 3 (Harris Rebuttal Rep.) at ¶¶ 15-16; *see also* Ex. 9 (Shareholders' Agreement) at 6, 40 (describing this option).

22. On May 3, 2011, PEISA exercised an option to purchase from Repsol additional YPF ADSs, representing 10.0% of YPF's capital stock.  Ex. 11 (Stock Purchase and Sale Agreement between Repsol and Petersen dated May 19, 2011) at 5; Ex. 43 (Petersen Complaint) at ¶ 28.

23. As of December 31, 2011, Petersen's combined ownership stake in YPF's capital stock was 25.46% (representing 14.9% held by PESA and 10.56% held by PEISA).  Ex. 10 (YPF's 2011 Form 20-F) at 141–43.

24. Petersen's ownership stake in YPF was entirely held in the form of ADSs; Petersen did not directly own any Class D shares in YPF.  Ex. 43 (Petersen Complaint) at ¶¶ 1, 27-28.

1007839183

## IV.     Eton Park Acquires YPF ADSs

25.     Plaintiff Eton Park Capital Management, L.P. was a New York-based investment fund that made investments on behalf of Plaintiffs Eton Park Master Fund, Ltd. and Eton Park Fund, L.P. (collectively, "Eton Park").  Ex. 12 (Answer and Defenses of YPF S.A., *Eton Park Capital Management Fund v. Argentine Republic*, No. 1:16-cv-08569-LAP at Dkt. No. 116 (S.D.N.Y. July 10, 2020) ("Eton Park Answer")) at ¶ 9; Ex. 44 (Complaint, *Eton Park Capital Management Fund v. Argentine Republic*, No. 1:16-cv-08569-LAP at Dkt. No. 1 (S.D.N.Y. Nov. 3, 2016) ("Eton Park Complaint")) at ¶ 9; Ex. 3 (Harris Rebuttal Rep.) at ¶ 17.  In November 2010, Eton Park purchased 875,000 YPF ADSs.  Ex. 77 (Email from Jason Currant to Ricardo Salmon, dated November 5, 2010 (EP_000015278)).

26.     On December 22, 2010, Eton Park acquired an additional 6,410,257 YPF ADSs from Repsol, representing approximately 1.63% of YPF's capital stock.  Ex. 13 (YPF's December 22, 2010 Schedule 13-D/A); Ex. 41 (Deposition Transcript of Edward Misrahi) at 31:1–5, 31:16–21, 32:6–12, 32:13–16.

27.     By March 2012, Eton Park had acquired YPF ADSs amounting to 3.03% of the Company's equity.  Ex. 23 (Manóvil YPF Rep.) at ¶ 23.

28.     In total, between November 2010 and March 2012, Eton Park acquired approximately 11.95 million YPF ADSs, for a total of approximately $448 million.  Ex. 12 (Eton Park Answer) at ¶ 30; Ex. 44 (Eton Park Complaint) at ¶ 30; Ex. 3 (Harris Rebuttal Rep.) at ¶ 17.

29.     Like Petersen, Eton Park held only YPF ADSs; it did not directly own any Class D shares of YPF common stock.  Ex. 44 (Eton Park Complaint) at ¶¶ 2, 30.  Ex. 3 (Harris Rebuttal Rep.) at ¶ 17.

1007839183

### V. The YPF Board of Directors Recommends Suspension of Dividend Payments

30. On March 21, 2012, YPF held a scheduled meeting of its Board of Directors. Ex. 14 (Minutes of the March 21, 2012 Board of Directors' Meeting of YPF S.A.); Ex. 45 (YPF Form 6-K filed March 22, 2012, Item 1). During that meeting, YPF's Board of Directors voted to recommend during YPF's next annual shareholder meeting that YPF implement a capital increase of 91.2% of YPF's total earnings rather than distributing those earnings as dividends. Ex. 14 (Minutes of the March 21, 2012 Board of Directors' Meeting of YPF S.A.); Ex. 45 (YPF Form 6-K filed March 22, 2012, Item 1). This recommendation was not consistent with the Shareholders' Agreement, which contemplated distribution of 90% of YPF's total earnings as dividends. Ex. 9 (Shareholders' Agreement) at Section 7.3.

31. On March 27, 2012, YPF issued a call notice for a general shareholders' meeting to be held on April 25, 2012. Ex. 66 (YPF Form 6-K filed March 27, 2012, Item 1).

### VI. The Intervention and Temporary Occupation of YPF

32. On April 16, 2012, the Executive Branch of the Argentine government issued Decree No. 530/2012 (the "Decree"), which provided for an intervention of YPF (the "Intervention") "with the purpose of guaranteeing the company's continuity, the preservation of its assets, [and] the supply of fuels and the satisfaction of the country's needs." Ex. 16 (Decree No. 530/2012). The Decree appointed the Argentine Minister of Federal Planning, Public Investment, and Services, Julio Miguel De Vido, as the Intervenor of YPF, and granted the Intervenor "the powers conferred to the Board of Directors and/or the President of the Company in the Bylaws of YPF S.A." Ex. 16 (Decree No. 530/2012); Ex. 43 (Petersen Complaint) at ¶ 35; Ex. 44 (Eton Park Complaint) at ¶ 35; Ex. 23 (Manóvil YPF Rep.) at ¶ 27.

33. That same day, a bill was submitted to the Argentine Congress which stated that it is "of public interest and a priority purpose for the Argentine Republic to achieve self-sufficiency in hydrocarbon's supply, as well as the exploration, exploitation, industrialization, transportation, industrialization, and commercialization of hydrocarbons." Ex. 15 (Law No. 26,741 ("Public Interest Law")) at § 1. In order to achieve this national interest, the proposed Public Interest Law stated that "the fifty-one percent (51%) equity interest in YPF [S.A.] represented by the same percentage of Class D shares of the said Company, held by Repsol YPF S.A." and its controlled or controlling entities "is hereby declared to be of public use and subject to expropriation." Ex. 15 (Public Interest Law) at § 7.

34. On April 16, 2012, the Executive Branch of the Argentine government also issued Decree No. 532/2012, appointing the Secretary of Economic Policy and Development Planning, Axel Kicillof, as the Vice-Intervenor of YPF S.A. Ex. 17 (Decree No. 532/2012); Ex. 43 (Petersen Complaint) at ¶ 38; Ex. 44 (Eton Park Complaint) at ¶ 38; Ex. 23 (Manóvil YPF Rep.) at ¶ 30.

35. The following day, on April 17, 2012, and one day after the Intervention had commenced, Secretary Kicillof made a speech before the Argentine Senate committees in support of the proposed Public Interest Law. The speech noted the Argentine government's concerns about the management of the Company by Repsol and Petersen. Ex. 18 (Transcript of Speech made by Axel Kicillof, Secretary of Economic Policy and Development Planning, on April 17, 2012 to the Argentine Senate ("Kicillof Speech")) at 25–28. During his speech, Secretary Kicillof stated that the Republic was not required to comply with the tender offer provisions of the YPF Bylaws. Ex. 18 (Kicillof Speech) at 26.

36. The Public Interest Law was passed on May 3, 2012 and went into effect on May 7, 2012. Ex. 15 (Public Interest Law); Ex. 49 (Bianchi Rebuttal Rep.) at ¶ 121(d)(ii); Ex. 23 (Manóvil YPF Rep.) at ¶ 31.

37. The Public Interest Law made 51% of the share capital of YPF held by Repsol "subject to expropriation" and under "temporary occupation" by the Republic. Ex. 15 (Public Interest Law); Ex. 49 (Bianchi Rebuttal Rep.) at ¶ 120. The Public Interest Law required that the Argentine Executive Branch "exercise all of the rights conferred upon the shares subject to expropriation" and required the *Comisión Nacional de Valores* ("CNV") to "call a shareholders' meeting." Ex. 15 (Public Interest Law) at § 13.

## VII.   The June 4, 2012 Shareholders' Meeting

38. The CNV is an Argentine government body responsible for supervising and regulating the national stock market. *See* Ex. 2 (YPF's 2020 Form 20-F) at 5 (describing the CNV as the "Argentine National Securities and Exchange Commission").

39. On May 8, 2012, pursuant to Article 13 of the Public Interest Law, the CNV convened an annual meeting of YPF's shareholders, to be held on June 4, 2012. Ex. 19 (CNV Call Notice for June 4, 2012 Shareholder Meeting); Ex. 50 (YPF Form 6-K filed May 8, 2012, Item 3, at 11-12).

40. YPF's annual shareholders' meeting was held, as announced by the CNV, on June 4, 2012. As required by Article 13 of the Public Interest Law, then-President of the CNV, Alejandro Vanoli, presided over the June 4 shareholders' meeting. Ex. 20 (Minutes of the June 4, 2012 Meeting of Class A and D Shareholders ("June 4, 2012 Minutes")) at 1.

41. During the June 4 shareholders' meeting, CNV President Vanoli declared that a quorum existed for purposes of the meeting and, consistent with the Public Interest Law, the

10

Republic exercised the voting rights associated with the YPF shares subject to expropriation and under temporary occupation by the Republic. Ex. 20 (June 4, 2012 Minutes) at 2, 7–8. In response to objections by multiple YPF shareholders who expressly invoked Section 7(h) of the Bylaws in an effort to prevent the Republic from voting the YPF shares, President Vanoli referenced the requirements, purpose, and public order character of the Public Interest Law to explain why the Republic was entitled to vote the shares. Ex. 20 (June 4, 2012 Minutes) at 4–8.

42. Neither Plaintiffs nor their designees raised any objections at the June 4 shareholders' meeting, including any objections relating to the requirements of Section 7(h) of the Bylaws or to the Republic's voting the YPF shares subject to expropriation. Ex. 20 (June 4, 2012 Minutes); ▮

43. Neither Plaintiffs nor their designees challenged the Republic's temporary occupation, Intervention or expropriation of YPF in any way, including by seeking to set aside any resolution passed at the June 4, 2012 meeting, or any other meeting, prior to filing their legal complaints in the above-captioned proceedings. ▮

11

## VIII. No Tender Offer

44. The Republic did not conduct a tender offer either before or after the Intervention. Ex. 43 (Petersen Complaint) at ¶ 41; Ex. 46 (Petersen's Motion to Dismiss) at 8; Ex. 44 (Eton Park Complaint) at ¶ 40.

## IX. YPF Did Not Authorize Payment of Dividends until November 6, 2012

45. The YPF shareholders' meeting originally scheduled to occur on April 25, 2012 was suspended on April 23, 2012. Ex. 53 (YPF Form 6-K filed April 23, 2012); Ex. 43 (Petersen Complaint) ¶ 39.

46. The agenda for the June 4, 2012 shareholders' meeting did not include the authorization of payment of any dividends. Ex. 19 (CNV Call Notice for June 4, 2012 Shareholder Meeting); Ex. 50 (YPF Form 6-K dated May 8, 2012, Item 3). The payment of dividends was not authorized at the June 4, 2012 shareholders' meeting. Ex. 20 (June 4, 2012 Minutes).

47. Following the March 2012 YPF Board of Directors meeting, YPF did not formally authorize the payment of any dividends until November 2012. Ex. 43 (Petersen Complaint) ¶ 39 (noting YPF did not authorize or pay dividends following the April 2012 intervention "until November 2012").

## X. Completion of Expropriation

48. The Republic's expropriation of Repsol's 51% of YPF's capital stock was completed in May 2014 pursuant to a settlement agreement with Repsol. *See Repsol YPF, S.A. v. Republic of Argentina*, Case No. 1:12-cv-03877-LAP (S.D.N.Y.); █████████████████████████████████████████████

1007839183

### XI. Petersen's Insolvency and Sale of Claims to Burford

49. PEISA and PESA filed for insolvency in Spain in July 2012, and were declared insolvent in October 2012. Ex. 43 (Petersen Complaint) at ¶ 46.

50. In liquidation plans filed October 6, 2014, Armando Betancor, the insolvency administrator for PEISA and PESA, identified the "main asset" of PEISA and PESA as "claims that could or should be filed against the Argentine Republic." Ex. 67 (Submission to Mercantile Court Number 3, Madrid, dated October 6, 2014, enclosing Liquidation Plan for the Execution of the Properties and Rights Integrated in the Aggregate Assets of the Company Petersen Energía, S.A.U. ("PESA Liquidation Plan")) at PT_000057827-8; Ex. 68 (Submission to Mercantile Court Number 3, Madrid, dated October 6, 2014, enclosing Liquidation Plan for the Execution of the Properties and Rights Integrated in the Aggregate Assets of the Company Petersen Energía Inversora, S.A.U. ( "PEISA Liquidation Plan and, together with the PESA Liquidation Plan, the "Liquidation Plans")) at PT_000061645-6.

51. Neither the PESA Liquidation Plan nor PEISA Liquidation Plan referenced claims that could or should be filed against YPF, or stated that YPF could or should be a guarantor of any other party's obligations under the Bylaws in connection with the Intervention and expropriation. Ex. 67 (PESA Liquidation Plan); Ex. 68 (PEISA Liquidation Plan).

52. The Liquidation Plans called for "the sale or assignment to third parties" of Petersen's alleged claims against the Republic. Ex. 67 (PESA Liquidation Plan) at PT_000057830; Ex. 68 (PEISA Liquidation Plan) at PT_000061648. The Liquidation Plans contemplated several different prices that a bidder could offer to acquire the claims, including:

> "Option D: 1. Fixed price for an amount of 5,000,000 Euros or higher plus the legally attributable taxes. 2. Variable price or "*success fee*" of 30% on the total amount obtained from the claim

13

(whether it is monetary or non monetary) plus the legally attributable taxes." Ex. 67 (PESA Liquidation Plan) at PT_000057835; Ex. 68 (PEISA Liquidation Plan) at PT_000061653.

53. On January 8, 2015 Prospect Investments LLC ("Prospect") submitted a Joint Bid for the Petersen claims. Ex. 69 (Prospect Joint Bid dated January 8, 2015 ("Joint Bid")). In the Joint Bid, Prospect offers to pay to Petersen 5 million Euros and 30% of the proceeds in consideration for Prospect's "<u>exclusive right to direct, manage, fund and settle</u>" Petersen's "Claims." Ex. 69 (Joint Bid) at Pt_000045277 (emphasis added). In the Joint Bid, Prospect defines "Claims" to include Petersen's claims against "the Republic of Argentina, YPF, S.A. ("YPF") and others stemming from expropriation." *Id.* Prospect states that its bid "differs in terms and structure from the options listed in the Liquidation Plans, but it is intended to be <u>economically equivalent</u> to Option D of those Plans." *Id.* (emphasis added).

54. Petersen entered into a Claim Prosecution Agreement ("CPA") with Prospect on March 4, 2015. Ex. 70 (Claim Prosecution Agreement dated March 4, 2015 ("CPA")). Prospect is a wholly-owned subsidiary of Burford Capital, LLC ("Burford"). Ex. 43 (Petersen Complaint) at ¶ 47.

### XII.   The Claim Prosecution Agreement

55. The CPA identifies YPF as a potential "Opponent" in litigation to be prosecuted by Prospect in the United States. Ex. 70 (CPA) at PT_000008166.

56. As reflected in Section 2.1 of the CPA, Prospect acquired the right to prosecute Petersen's claims in exchange for an initial payment of €15,101,000. Ex. 70 (CPA) at PT__000018147.

57. As reflected in Section 3.1 of the CPA, Prospect is entitled to receive 70% of any proceeds from the prosecution of the Petersen claims. Ex. 70 (CPA) at PT_000008148.

1007839183

58. In Section 2.3 of the CPA, Petersen grants Prospect the "Irrevocable Powers of Attorney" attached as Annex III to the CPA (the "POA"). Ex. 70 (CPA) at PT_000008147. In the same section, the CPA states that the powers granted to Prospect are "exclusiv[e]" and Petersen agrees that it "shall not take any actions in connection with the Claims absent the direction of [Prospect]." *Id.* at PT_000008147-48.

59. In the POA, Petersen "irrevocably appoints" Prospect as "its agent and attorney-in fact, with full and exclusive authority in its place and stead and in the name of the Company [Petersen], to do any and all of the following:

> 1. Take any and all actions on behalf of the company that Prospect may deem necessary or advisable to prosecute the Claims . . . and bring about the resolution and monetization thereof, including without limitation <u>directing and managing the conduct of the Claims</u>; appointing, hiring, firing and instructing lawyers, experts or any other professionals in connection with the Claims; <u>settling the Claims</u>, including entering into any agreements implementing such settlements; and granting releases of liability to any Opponent in connection with any settlements; and
>
> 2. collect and enforce any settlement, final award or judgment arising out of the Claims . . . " Ex. 70 (CPA) at PT_000008167. (emphasis added)

60. The POA states that the powers granted therein are "irrevocable" and "shall continue to be effective even though the Company [Petersen] becomes liquidated and extinct." Ex. 70 (CPA) at PT_000008167, PT_000008169.

61. With respect to prosecution of the claims, Section 4.3(c) of the CPA states that Petersen "shall reasonably defer" to Prospect "in selecting the course of action that is best." Ex. 70 (CPA) at PT_000008151.

62. With respect to settlement of the claims, Section 4.3(d) of the CPA states that if Petersen "raises a question about [Prospect's] decision to enter into, or agree to enter into, any

15

settlement of the Claims, [Prospect] shall cause the lawyers appointed to prosecute the Claims on behalf of [Petersen] to prove to [Petersen] an explanation . . . of why such settlement is reasonable." Ex. 70 (CPA) at PT_000008152.

63. Burford has stated in documents posted on its public website that it does not control the prosecution, conduct or settlement of litigation that it funds; instead, the client retains full control of the prosecution, conduct and settlement of litigation. Ex. 71 (Danielle Cutrona, *Control, disclosure, privilege, champerty and other legal finance ethics questions, answered*, Burford Capital: Blog (Jul. 9, 2019), available at https://www.burfordcapital.com/insights/insights-container/control-disclosure-privilege-champerty-and-other-legal-finance-ethics-questions-answered) at YPFPT-CONTHE00001294 ("Our agreements state that we neither control nor will we seek to control strategy, settlement or other litigation-related decision making, nor direct a counter-party to settle a case at all, or for a particular amount . . . We are passive investors and we do not control the legal assets in which we invest. These decisions remain entirely with the client."); Ex. 72 (*Control: Addressing a common question about litigation finance*, Burford Capital: Blog (Oct. 4, 2017), available at https://www.burfordcapital.com/insights/insights-container/control-addressing-a-common-question-about-litigation-finance) at 1-2 ("There is no uncertainty in our deals: Burford is never in control of the litigation, and each deal is set up to make that explicit. . . . Even with the presence of financing from Burford, the decision to settle a case and at what price is the client's. Our contracts specify that clients have sole control of settlement.").

64. Burford has stated in documents posted on its public website that it only controls the legal assets in which it invests when it expressly purchases a claim. Ex. 72 (*Control: Addressing a common question about litigation finance*, Burford Capital: Blog (Oct. 4, 2017),

16

available at https://www.burfordcapital.com/insights/insights-container/control-addressing-a-common-question-about-litigation-finance/) at 1 ("Unless we are expressly purchasing a claim (which of course includes the right to control its prosecution), we do not control the legal assets in which we invest.").

65. The American Bar Association and the Association of Litigation Funders of England & Wales have stated in their official publications that litigation funding agreements should not grant control of the prosecution, conduct, or settlement of claims to the litigation funder and that such decisions should remain with the client. Ex. 73 (American Bar Association, *Best Practices for Third-Party Litigation Funding*, August 20, 2020) at 2, 11, 12-13, 15 ("[T]he funding agreement should be drafted to assure that (a) the client retains control of the litigation (including, for example, decisions as to whether to settle or discontinue the litigation."); Ex. 74 (Association of Litigation Funders of England & Wales, *Code of Conduct for Litigation Funders*, January 2018) at Section 9.3 (noting a funder will "not seek to influence the Funded Party's solicitor or barrister to cede control or conduct of the dispute to the Funder).

66. Petersen's insolvency administrator, Armando Betancor, co-authored an article on litigation funding in Spain that states litigation funders should not have a right to control settlement of funded matters and that such decisions "always lie[] with the funded party." Ex. 75 (Armando Betancor et al., *Spain*, Litigation Funding 2020 (Lexology, eds. Steven Friel & Jonathan Barnes) at 77.

67. The terms of the CPA are not consistent with Burford's litigation funding practices as described in the document on Burford's public website attached as Exhibit 71 to the Goodman Declaration. Ex. 76 (Deposition Transcript of Ignacio Tirado) at 154:15-155:10 (agreeing

17

description of Burford funding practices in Exhibit 71 to the Goodman Declaration "doesn't fit our case").


Dated: April 14, 2022
       New York, New York

Respectfully Submitted,

*/s/  Mark P. Goodman*
Mark P. Goodman
Shannon Rose Selden
Dietmar W. Prager
Carl Riehl
Wendy B. Reilly
J. Robert Abraham
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000 (phone)
(212) 909-6836 (fax)
mpgoodman@debevoise.com
srselden@debevoise.com
dwprager@debevoise.com
criehl@debevoise.com
wbreilly@debevoise.com
jrabraham@debevoise.com

*Counsel to Defendant YPF S.A.*