**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PETERSEN ENERGÍA INVERSORA, S.A.U. and
PETERSEN ENERGÍA, S.A.U.,

                         Plaintiffs,

       -against-

ARGENTINE REPUBLIC and YPF S.A.,

                         Defendants.

Case Nos.:

1:15-cv-02739-LAP
1:16-cv-08569-LAP

---

ETON PARK CAPITAL MANAGEMENT, L.P.,
ETON PARK MASTER FUND, LTD., and
ETON PARK FUND, L.P.,

                         Plaintiffs,

       -against-

ARGENTINE REPUBLIC and YPF S.A.,

                         Defendants.

---

## PLAINTIFFS' RULE 56.1 STATEMENT OF MATERIAL FACTS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

KIRKLAND & ELLIS LLP

Paul D. Clement
George W. Hicks, Jr.
C. Harker Rhodes, IV

KING & SPALDING LLP

Israel Dahan
Laura Harris
Reginald R. Smith

KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U.,*
*Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*

## <u>TABLE OF CONTENTS</u>

Page

I.      The Parties ..................................................................................................... 1

II.     Pre-1993 YPF Operations ............................................................................. 3

III.    Reforms of President Carlos Menem ............................................................ 6

IV.     Privatization of YPF ..................................................................................... 7

V.      Amended YPF Bylaws .................................................................................. 9

VI.     YPF's 1993 IPO ......................................................................................... 18

VII.    Plaintiffs' Purchases of YPF ADRs ........................................................... 18

VIII.   Argentina Manipulates YPF's Value and Then Retakes Control of the Company .......... 21

IX.     Post-Breach Transfer of Plaintiffs' YPF Shares ........................................ 29

X.      Damages Calculations ................................................................................ 30

XI.     YPF's Settlement with Repsol .................................................................... 32

Pursuant to Local Civil Rule 56.1(a), Plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (collectively, "Petersen"), and Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (collectively, "Eton Park," and together with Petersen, "Plaintiffs"), respectfully submit the following Statement of Material Facts in support of their Motion for Summary Judgment.[*]

## I.      The Parties

1.      YPF (originally *Yacimentos Petrolíferos Fiscales*) is an oil and gas company. Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 4).

2.      From 1922 to 1993, the Argentine Government owned and controlled 100% of YPF.  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 2) ("YPF was a state-owned oil company that was privatized through an initial public offering ('IPO') in 1993."); *see also id*. ¶ 11 (same); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 8) ("YPF was state-owned prior to 1993"); *id*. ¶ 11 (same); Hicks Ex. 98 (PT_COFFEE_000000402 at 403) ("Created in 1922, YPF was the world's first state-owned oil company, and for years it enjoyed a monopoly on exploration and production in Argentina."); Hicks Ex. 50 (Ocampo Dec. 2021 Report for Argentina ¶ 44) ("In 1922, YPF was formed as the first national oil company in South America.").

3.      Currently, Defendant YPF is a publicly held limited liability stock company (*sociedad anónima*) organized under the laws of Argentina.  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 8) (admitting Hicks Ex. 5 (ECF No. 1 (Complaint) ¶ 8)).

4.      YPF "is an Argentine public company registered with the U.S. Securities and Exchange Commission ('SEC') and whose American Depositary Receipts ('ADRs') are traded on the New York Stock Exchange ('NYSE')."  Hicks Ex. 8 (ECF No. 98 (Argentina Answer)

---

[*] Unless otherwise stated, all ECF citations refer to the docket in *Petersen Energía Inversora, S.A.U., et al. v. Argentine Republic, et al.*, No. 1:15-cv-02739-LAP.

¶ 1); *see* Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 1) (same); *id*. ¶ 8 ("YPF shares trade on the

NYSE"); *id*. ¶ 25 ("YPF has incorporated its bylaws in its SEC Form 20-F . . . .   YPF further

admits that it has filed its Form 20-F in accordance with SEC regulations."); *id*. ¶ 83 (similar).

5.      Defendant Argentina owns a majority and controlling interest in YPF.   Hicks

Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 8) (admitting Hicks Ex. 5 (ECF No. 1 (Complaint) ¶ 8)

(YPF "is currently an instrumentality of Argentina, which owns a majority and controlling

interest therein")); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 8) ("Argentina currently owns a

majority stake in YPF"); *see also id*. ¶¶ 52, 57 ("Argentina is a YPF shareholder.").

6.      Argentina owned Class A shares of YPF stock during the period January 1, 2012

to December 31, 2012.   Hicks Ex. 19 (YPF's Response to Request for Admission No. 1); *see*

*also* Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 7) ("Argentina retained Class A shares in

YPF after the IPO, which gave Argentina a designated representative on the Company's board of

directors"); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 7) ("[Argentina] remained a YPF Class A

shareholder after the 1993 IPO.").

7.      Plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. are

established as limited liability companies (*sociedad anónima unipersonal*) organized under the

laws of the Kingdom of Spain.   Hicks Ex. 70 (AR00036645 at 36655); Hicks Ex. 104

(YPFPT00002826 at 02828).

8.      The Petersen Plaintiffs are former YPF shareholders, Hicks Ex. 9 (ECF No. 99

(YPF Answer) ¶ 4), having acquired approximately 25% of the ownership of YPF between 2008

and 2011, Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 6).   They owned ADRs.   *See infra*

Section VII.

9.      Both Petersen entities were YPF shareholders throughout the period between January 1, 2012 and May 17, 2012.  Hicks Ex. 47 (Harris Dec. 2021 Report for Defs. ¶ 85).

10.     Plaintiff Eton Park Capital Management, L.P. is a New York-based investment firm that made investments until 2017 on behalf of Plaintiffs Eton Park Master Fund, Ltd., a Cayman Islands-exempted company, and Eton Park Fund, L.P., a Delaware limited partnership. Hicks Ex. 13 (ECF No. 128 (Engel Decl.) ¶ 7).

11.     The Eton Park Plaintiffs are "former YPF Class D shareholders."  Hicks Ex. 15 (*Eton Park* ECF No. 116 (YPF Answer to Eton Park Plaintiffs' Complaint) ¶¶ 5, 9, 30) (admitting Hicks Ex. 14 (*Eton Park* ECF No. 1 (Complaint) ¶¶ 5, 9, 30)).

12.     Eton Park entities were YPF shareholders throughout the period between January 1, 2012 and May 17, 2012.  Hicks Ex. 56 (Mindich Tr. 69:23-70:23) (testifying that Eton Park sold its entire stake in YPF between when "the expropriation was announced in April of 2012" and "the end of June 2013, [when] Eton Park no longer held any shares in YPF").

## II.     Pre-1993 YPF Operations

13.     YPF has stated that, prior to its 1993 IPO, Argentina operated the company as a "politically managed, government-owned monopoly."  Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 16) ("YPF . . . transform[ed] from a politically managed, government-owned monopoly to an efficient and competitive integrated oil company."); *see id.* at 42 ("From the 1920s to 1990, successive governments maintained a nearly monopolistic position in the oil and gas industry in Argentina."); Hicks Ex. 98 (PT_COFFEE_000000402 at 403) ("[F]or years [YPF] enjoyed a monopoly on exploration and production in Argentina.").

14.     YPF has stated that prior to privatization:

[S]uccessive governments . . . implemented the national hydrocarbon policy and other governmental policies through state agencies and state-owned predecessor companies to YPF.  These policies, which dictated the management and operation

> of the Company, generally reflected broader Argentine political and social objectives rather than business strategies designed to maximize the Company's profitability.  Senior management changed frequently, reflecting numerous changes in the political environment in Argentina over much of this period, and labor unions played a significant role in operational decisions. . . .  Stringent financial criteria were not applied in making investment decisions, and the Company's opportunities to reinvest internally generated funds were subject to government budgetary constraints.

Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 42).

15.     Plaintiffs' expert Professor John Coffee of Columbia University has opined that YPF was run "less as a profit-making corporation and more as an agency of the state," with "important social welfare responsibilities."  Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶¶ 18, 19).

16.     As the international press observed, that approach was consistent with the long-prevailing view in resource-rich Latin American countries like Argentina that natural resources, especially oil, were the countries' "crown jewel."  Hicks Ex. 99 (Nathaniel C. Nash, *World Markets; Valuing Argentina's Crown Jewel*, N.Y. Times, May 30, 1993 ("Nash, *Crown Jewel*")) ("the oil company Yacimientos Petroliferos Fiscales, known as Y.P.F.," is "the country's industrial crown jewel"); Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶ 38) (opining that "Argentina's oil assets were often perceived to be a national patrimony that should be governed by nationalist priorities"); Hicks Ex. 50 (Ocampo Dec. 2021 Report for Argentina ¶ 47) (noting the "principle" in "Argentina, and throughout Latin America," that "citizens at large should benefit, at least partly, from the exploitation" of "energy and mineral resources").

17.     Professor Coffee observed that YPF "los[t] money consistently and in large amounts" prior to the 1993 IPO.  Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 19).

18.     The *New York Times* reported that "Y.P.F. lost more than $6 billion in the 1980's, when it employed almost 50,000 people."  Hicks Ex. 99 (Nash, *Crown Jewel*); *see also* Hicks

Ex. 100 (Nathaniel C. Nash, *Argentina Races to Sell Oil Stake*, N.Y. Times, Apr. 16, 1993) (by the early 1990s, YPF was "considered inefficient, antiquated and a bastion of bureaucratic gridlock").

19.     Defendants' expert José Ocampo has opined that, "[f]ollowing President Perón's removal from office in 1955, Argentina entered an extended period of economic and political turbulence."  Hicks Ex. 50 (Ocampo Dec. 2021 Report for Argentina ¶ 13).

20.     "Inflation spiked to 388% in 1988 and 4,924% in 1989."  Hicks Ex. 49 (Marx Dec. 2021 Report for YPF ¶ 51).

21.     Along with inflationary problems, Dr. Ocampo also admitted that "Argentina has had [a] history of financial crisis."  Hicks Ex. 58 (Ocampo Tr. for Argentina 36:25-37:1); *see also* Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 11) ("For several decades, Argentina experienced periods of slow or negative growth, high inflation, large devaluations of the Argentine currency and imposition of exchange controls."); Hicks Ex. 94 (PT_BLACKETT_000000291 at 292) ("The disrepair of Argentina's institutional infrastructure is a legacy of its Perónist past."); Hicks Ex. 97 (PT_COFFEE_000000339 at 342-343) (in the 1950s, under the governance of the ardent populist Juan Perón, Argentina defaulted on its foreign debt); *id.* at 344-345 (during the 1970s and 1980s, Argentina's foreign borrowing spiked from $8 billion to $46 billion, leading to additional default in the 1980s as inflation eclipsed 3000% in 1989); Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶ 24) (opining that "[t]he perception of mismanagement and corruption in Argentina is a long-lasting one"); Hicks Ex. 55 (Marx Tr. for YPF 51:22-25) (acknowledging that, in the late 1980s and early 1990s, "there were situations of significant skepticism as to the perspectives of Argentina"); Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶ 20) (by the early 1990s, Argentina had already demonstrated a propensity for

"repeated swings between a more controlled, closed, and regulated economy and bouts of opening the economy up and trying to deregulate it").

22.     In reviewing the economic history of twentieth-century Argentina, Professor Coffee observed that "the Argentine economy was in dire straits" before President Carlos Menem came to power in 1989.  Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 20).  For example, " '[p]ublic order disintegrated as mobs rioted, and the government declared a state of emergency.' "  *Id.* ¶ 20 n.25 (quoting Hicks Ex. 123 (Judith Teichman, *The World Bank and Policy Reform in Mexico and Argentina*, 46 Latin Am. Politics & Soc'y 39, at 59 (2004))).

## III.    Reforms of President Carlos Menem

23.     In 1989, Carlos Menem was elected the President of Argentina.  Hicks Ex. 50 (Ocampo Dec. 2021 Report for Argentina ¶ 14).

24.     He "decided to implement bold initiatives from the very start of his administration to promote private investment and economic modernization, in order to dramatically improve Argentina's economy."  Hicks Ex. 49 (Marx Dec. 2021 Report for YPF ¶ 55).

25.     YPF's expert Daniel Marx has explained:  "President Menem put in place a series of economic reforms that dramatically improved the international financial community's perception of Argentina. . . .  Among others, these reforms included removing price controls; passing (in December 1989) regulations allowing free access to the foreign exchange market; enacting (in August 1989) Law No. 23,696 ('Reforma del Estado' or 'State Reform'), which enumerated a group of state-owned companies, entities or agencies that would be subject to privatization; and enacting (in September 1989) Law No 23,697 ('Emergencia Económica' or 'Economic Emergency'), which, among other things, limited the public sector's spending and, as a result, fiscal deficit."  Hicks Ex. 49 (Marx Dec. 2021 Report for YPF ¶ 53).

IV.     **Privatization of YPF**

26.     In 1993, Argentina offered for sale to private investors a controlling share of YPF. Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶¶ 2, 8, 11); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶¶ 2, 7, 12).

27.     Plaintiffs' expert Richard Blackett opined that, in light of Argentina's "checkered economic past" and "persistent economic ills," private investors were "very skeptical" of Argentina and viewed its economy as "not suitable for foreign investment."  Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶ 19); *see also id.* ¶ 18 (opining that, previously, Argentina had "pursued a policy of import substitution in order to achieve industrial self-sufficiency, even to the point of introducing government-run monopolies in key domestic industries, oil and telecommunications chief among them. . . .  These Government policies also provided an opening for the illicit purchase and sale of import licenses and access to increasingly scarce foreign exchange, given the creation of multiple categories of foreign exchange rates.  Finally, and especially during the regime of Juan Perón, Argentina was characterized by a perception of excessive regulations . . . .").  He further opined that foreign investors found Argentine investments "to carry a very real risk of the Government enforcing nationalist policies," especially when it came to YPF, which "held a special place in the national psyche" as Argentina's "national energy champion."  *Id.* ¶¶ 12, 17.

28.     Plaintiffs' expert Professor John Coffee opined that, to reassure would-be investors and induce them to purchase shares in a newly privatized YPF, Argentina needed to "transform YPF into an attractive vehicle for foreign investors."  Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 3); *see generally* Hicks Ex. 95 (PT_COFFEE_000000033).  He further opined that Argentina and YPF undertook a series of "extraordinary steps" to convince foreign investors – including New York Stock Exchange ("NYSE") investors – that YPF would be an attractive and

safe investment, despite Argentina's "history of exploiting foreign investors."  Hicks Ex. 25

(Coffee Sept. 2021 Report for Pls. ¶ 22).

29.     Argentina hired prominent American firms like McKinsey & Company, Arthur D.

Little, and Andersen Consulting to restructure YPF's management, operations, and information

technology.  Hicks Ex. 95 (PT_COFFEE_000000033 at 039-041).  Argentina also hired

prominent American investment banks, accountants, and law firms – including Credit Suisse

First Boston, Merrill Lynch, Price Waterhouse, Sullivan & Cromwell, White & Case, Andrews

& Kurth, and Shearman & Sterling – to oversee the IPO.  Hicks Ex. 73 (AR00053507 at 53510);

Hicks Ex. 96 (The World Bank, *Argentine Hydrocarbon Sector Privatization* (1993)

(PT_COFFEE_000000182)); Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 24); *see* Hicks

Ex. 3 (ECF No. 112-2 (Prospectus) at 1, 3); ███████████████████████████;

███████████████████████.

30.     Following the IPO, YPF's capital stock would be divided into four classes:

Class A shares, which the Argentine Government would own; Class B shares, which Argentine

provinces would own; Class C shares, which YPF's employees would be offered; and Class D

shares, which would be sold to private investors.  Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 5).

31.     Argentina offered Class D shares in the United States as American Depositary

Receipts ("ADRs") listed on the NYSE.  Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 92-96);

Hicks Ex. 78 (AR00092490 at 92492) (explaining that ADRs in YPF "represent[ed] [YPF] Class

D Shares").

32.     ADRs are "certificates that represent an ownership interest in foreign securities on

deposit with an intermediary."  Hicks Ex. 125 (SEC Release No. 33-8287, 81 SEC Docket 28, 28

(Sept. 11, 2003)); *see also* Hicks Ex. 126 (SEC Release No. 33-6894, 48 SEC Docket 1440, 1441

n.5 (May 23, 1991)) (describing an ADR as "the physical certificate that evidences [American Depositary Shares] ADSs"); Hicks Ex. 31 (Lissemore Sept. 2021 Report for Pls. ¶ 9) (an ADR is "a negotiable security" issued by a U.S. depositary bank that evidences an "ownership interest" in an ADS, which, in turn, represents an "interest in shares in a non-U.S. company").

33.     ADRs allow investors to acquire equity in foreign companies on U.S. stock exchanges and enjoy the protections of the U.S. exchanges and the regulatory oversight of the Securities and Exchange Commission ("SEC").  Hicks Ex. 77 (AR00092403 at 92408).  They also "eliminate the need for the U.S. investor to convert dividends paid in a foreign currency into dollars" because the dividends "are collected by the custodian, converted into dollars and transmitted by the depositary to the ADR holders."  *Id*. at 92407.  ADRs are the "most prevalent form through which foreign corporations list and offer to the public equity securities in the United States."  *Id*. at 92406.

34.     Argentina and YPF entered into a deposit agreement with Bank of New York Mellon, whose New York office would administer the ADRs and serve as YPF's depositary agent.  Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 92).  YPF's ADRs were priced in U.S. Dollars, and the deposit agreement required Bank of New York Mellon to make distributions to NYSE investors in U.S. Dollars.  *Id*. at 93.  The United States banking system is not capable of distributing foreign currency to ADR holders.  ██████████████████████████; Hicks Ex. 32 (Lissemore Jan. 2022 Report for Pls. ¶ 17).

**V.     Amended YPF Bylaws**

35.     Argentina and YPF amended YPF's Bylaws before YPF's 1993 IPO.  Hicks Ex. 102 (YPF Form 6-K, Nov. 18, 1998 (PT_COFFEE_000000808)); Hicks Ex. 111 (Executive Order 1106/1993 (AR00009259)) (May 31, 1993 Argentine decree approving the amended YPF Bylaws).

36.     Specifically, when Argentina privatized YPF, it adopted two amendments to

YPF's Bylaws, Sections 7 and 28.  *See* Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) §§ 7, 28);

Hicks Ex. 4 (AR00013654 at 13661, 13694) (June 28, 1993 Prospectus for YPF's public offer of

35,000,000 shares published on the Buenos Aires Stock Exchange Bulletin); Hicks Ex. 3 (ECF

No. 112-2 (Prospectus) at 12-13); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 16); Hicks Ex. 8

(ECF No. 98 (Argentina Answer) ¶ 16).

37.     Under Section 7(d) of the Bylaws, it "shall be forbidden" for a shareholder to

acquire at least 15% of YPF stock – a scenario the Bylaws define as an "acquisition of control"

(in Spanish, *adquisiciones de control*) – without complying with Sections 7(e) and 7(f) of the

Bylaws.  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(d)); Hicks Ex. 2 (AR000018934 (YPF

Bylaws in Spanish) § 7(d)).  The pertinent language of Section 7(d) provides:

> If the terms of subsections e) and f) of this section are not complied with, it shall
> be forbidden to acquire shares or securities of [YPF], whether directly or
> indirectly, by any means or instrument . . . if, as a result of such acquisition, the
> purchaser becomes the holder of, or exercises the control of, class D shares of
> stock of [YPF] which, in addition to its prior holdings of such class (if any),
> represent, in the aggregate, FIFTEEN PERCENT (15%) or more of the capital
> stock, or TWENTY PERCENT (20%) or more of the outstanding class D shares
> of stock, if the shares representing such TWENTY PERCENT (20%) constitute,
> at the same time, less than FIFTEEN PERCENT (15%) of the capital stock.

Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(d)).

38.     Sections 7(e) and 7(f) require shareholders who wish to acquire control of the

shares to comply with certain obligations, including making a tender offer before taking control

and adhering to any "additional or stricter requirements" imposed by the Governments and stock

exchanges where YPF's shares are listed.  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(e))

(person "wishing" to make an "acquisition of" control ('*Adquisicion de Control*') shall make a

tender offer ('*oferta publica de adquisicion*') for all shares of all classes of YPF); Hicks Ex. 2

(AR000018934 (YPF Bylaws in Spanish) § 7(e)); Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws)

§ 7(f)) (the tender offer must be carried out in accordance with "regulations in the jurisdictions where the takeover bid takes place and the provisions of the stock exchanges where the Corporation's shares and securities are listed [to the extent they] impose additional or stricter requirements than the ones provided hereunder"); *id.* § 7(f)(i) (the acquiring party "shall notify [YPF] in writing about the takeover bid at least fifteen business days in advance to the starting date thereof"); *id.* § 7(f)(vii) (the tender offer must remain open for "a minimum term of TWENTY (20) days and a maximum term of THIRTY (30) days" from the date the bid is authorized by the Comisión Nacional de Valores de Argentina ("CNV"), Argentina's securities regulator); *id.* § 7(f)(ix) (control is to be taken "once th[e] [tender-offer] procedure has finished").  Section 7(f)(i)(F) requires a tender offer to be made to "all shareholders and holders of securities convertible into shares of stock."  *Id.* § 7(f)(i)(F).

39.     Section 7(f) requires the acquiring shareholder to offer consideration for each share at the "highest" amount resulting from four different price provisions.  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)).  The first three formulae provide:

> (A) the highest price per share or security paid by the Bidder, or on behalf thereof, in relation to any acquisition of class D shares of stock or securities convertible into class D shares of stock within the two-year period immediately preceding the notice of Takeover, adjusted as a consequence of any division of shares, stock dividend, subdivision or reclassification affecting or related to class D shares of stock; or
>
> (B) The highest closing price, at the seller's rate, during the thirty-day period immediately preceding such notice, of a class D share of stock as quoted by the Buenos Aires Stock Exchange, in each case as adjusted as a consequence of any division of shares, stock dividend, subdivision or reclassification affecting or related to class D shares of stock; or
>
> (C) A price per share equal to the market price per class D share of stock determined as stated in paragraph (B) herein multiplied by the ratio between: (a) the highest price per share paid by the Bidder, or on his behalf, for any class D share of stock, in any share acquisition of this class within the two-year term immediately preceding the notice date indicated in paragraph (i), and (b) the market price for class D share of stock on the day immediately preceding the first

day of the two-year period in which the Bidder acquired any type of interest or right in a class D share of stock.  In each case the price shall be adjusted taking into account the subsequent division of shares, stock dividend, subdivision or reclassification affecting or related to class D[.]

*Id.* § 7(f)(v)(A)-(C).

40.     The relevant price provision in this case is the "Formula D" provision, which establishes the per-share consideration as follows:

[YPF's] net income per class D share during the last four complete fiscal quarters immediately preceding the notice date indicated in paragraph (i), multiplied by the higher of the following ratios:  the price/income ratio for that period for class D shares of stock (if any) or the highest price/income ratio for [YPF] during the two-year period immediately preceding the notice date indicated in paragraph (i). Such multiples shall be determined by applying the regular method used by the financial community for computing and reporting purposes.

Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(D)).

41.     Like the other price provisions in Section 7(f), Formula D incorporates a backward-looking formula that considers the market conditions preceding the date that the acquirer notifies the market of its intention to take over the shares.  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(A)-(D)).

42.     Section 7(h) provides that any shares acquired "in breach of" Sections 7(e) and 7(f), including the tender-offer requirement, "shall not grant any right to vote or collect dividends or other distributions that [YPF] may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of [YPF]."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(h)).

43.     Section 28 of the amended Bylaws is entitled "Provisions applicable to acquisitions by the National Government" ('*Normas especiales para adquisiciones del Estado Nacional*').  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 28); Hicks Ex. 2 (AR000018934 (YPF Bylaws in Spanish) § 28).

44.     Section 28 provides in part:

The provisions of subsections e) and f) of Section 7 . . . shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of [YPF], 1) if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of [YPF], which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock; or 2) if the National Government acquires at least 8% of class D outstanding shares of stock, while withholding class A shares of stock amounting at least to 5% of the capital stock . . . .

Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 28(A)).

45.     Section 28(C) provides that the sanctions in Section 7(h) "shall be applied" to Argentina "with no kind of limitation whatsoever," unless "the acquisition in breach of the provisions of Section 7 and [Section 28] has occurred gratuitously," i.e., without intent to exceed the applicable acquisition thresholds, in which case the sanction is limited to "the loss of the right to vote."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 28(C)).

46.     Professor Coffee opined that the protections set forth in amended Sections 7 and 28 of the Bylaws were "clearly designed" "to create a structure that would give U.S. investors (and other investors as well) sufficient assurance that they would invest in the Class D shares" notwithstanding Argentina's checkered economic past.  Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 34).  He further opined that Section 28 gave "special attention to the acquisition of stock (and particularly Class D shares) by Argentina," which was "central to Argentina's and YPF's efforts to convince foreign investors that they could rely on Argentina, despite its long history of prior defaults and frequent disregard for the interests of foreign investors."  *Id*. ¶ 37.  Based on such protections, Professor Coffee opined, foreign investors "could (and did) believe themselves protected against exploitation and expropriation."  *Id*. ¶ 3.

47.     Plaintiffs' expert Professor Daniel R. Fischel opined that the amended Bylaws "provided a method by which shareholders left behind in the event of expropriation by the

Argentine Government have the right to be compensated under a preset pricing mechanism." Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 27).  The tender-offer formulae – along with the tender-offer requirement and other obligations and sanctions set forth in the amended Bylaws – served as a "precommitment" by Argentina intended to hinder re-nationalization of YPF, thereby assuring would-be private investors.  *Id.* ¶ 26 ("By requiring Argentina to commit to pay what could be a very high tender price to minority shareholders if it should decide it wanted to own a controlling stake . . . in YPF again," the Bylaws provided that "the cost of any such future expropriation could be high."  The Bylaws thus "created a means by which to commit to a much lower likelihood of a future . . . expropriation, thereby incentivizing greater private capital investments.").

48.     Eric Mindich, the former head of Eton Park, testified that he viewed the tender-offer provisions in the Bylaws as "a right of minority shareholders."  Hicks Ex. 56 (Mindich Tr. 60:18-19).

49.     In the Prospectus filed with the SEC in connection with the IPO, Argentina and YPF repeatedly referred to the amended Bylaws, the tender-offer requirement for control transactions generally, and the applicability of that requirement to the Argentine Government specifically.  Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 12-13).  In particular, the Prospectus stated:

- "The By-laws require that certain acquisitions of shares of [YPF's] capital stock that would result in the acquiror owning or controlling Class D Shares representing the lesser of 15% or more of the outstanding capital stock or 20% or more of the Class D Shares . . . be preceded by a cash tender offer for all outstanding shares."

- "Special rules apply to acquisitions of shares by the Argentine Government while the Argentine Government holds Class A Shares representing at least 5% of the Company's outstanding capital stock as of the date of the final Prospectus."

- "The tender offer provisions mandated by the By-laws . . . could result in an offer price for the Class D Shares substantially in excess of the market price," which "could have the effect of discouraging a change in control by means of a tender offer."

- "Under [YPF's] By-laws, in order to acquire a majority of [YPF's] capital stock or a majority of the Class D Shares, the Argentine Government first would be required to make a cash tender offer to all holders of Class D Shares on specified terms and conditions."

- "Pursuant to the By-laws, (i) each acquisition of shares . . . as a result of which the acquiror, directly or indirectly . . . , would own or control Class D Shares that . . . represent the lesser of (A) 15% or more of the outstanding capital stock or (B) 20% or more of the outstanding Class D Shares . . . must be carried out in accordance with the procedure described [herein]."

- "The threshold levels at which an acquisition of shares by the Argentine Government is deemed to be a Control Acquisition, and the sanctions applicable to Control Acquisitions carried out by the Argentine Government . . . are different than those applicable to acquisitions of shares by other persons."

- "Prior to consummating any Control Acquisition, an Offeror must . . . make a public tender offer for all outstanding shares . . . .  The tender offer must be carried out in accordance with a procedure specified in the By-laws and in accordance with any additional or stricter requirements of jurisdictions, exchanges or markets in which the offer is made or in which the Company's securities are traded."

- "With respect to acquisitions by the Argentine Government deemed to be Control Acquisitions . . . , the required tender offer need only be conducted for all outstanding Class D Shares."

- "Any Control Acquisition carried out by the Argentine Government other than in accordance with the procedure described . . . will result in the suspension of the voting, dividend and other distribution rights of the shares so acquired."

Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 10-11, 80-82).

50.    Plaintiffs' expert Professor Coffee opined that these provisions were critical not only to the success of the IPO but also to ensuring that future investors could purchase with confidence, knowing they were guaranteed a "compensated exit" in the event of a re-nationalization.  Hicks Ex. 26 (Coffee Dec. 2021 Report for Pls. ¶ 3).  He further opined that the "clear purpose" of Argentina's and YPF's amendments to Sections 7 and 28, therefore, was

"to cause investors to believe that they were protected, as YPF had utilized the latest, state-of-the-art safeguards used in the United States." Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 38).

51.     Years after the IPO, YPF continued to state publicly that Sections 7 and 28 were "added to" the Bylaws "in contemplation of the 1993 initial public offering of YPF shares," were "modeled after contractual and regulatory provisions that protect the interest of shareholders in listed companies in major international capital markets," and were "designed to ensure fair and equal treatment of shareholders." Hicks Ex. 102 (Form 6-K, Nov. 18, 1998 (PT_COFFEE_000000808 at 809)).

52.     Plaintiffs' expert Professor Blackett opined that the protections afforded by the Bylaws were "critical" to the IPO's success; given the historical backdrop and investors' concerns, Argentina "likely could not have achieved the valuation it did at the time of its IPO, or even completed the IPO itself, without providing prospective investors with protections in the event that Argentina either reverted to a nationalist agenda of maintaining state control or did not protect minority investors from a change-of-control event." Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶¶ 11, 50).

53.     Section 7(d) of the Bylaws provides that, if Sections 7(e) and 7(f) are not complied with, it shall "be forbidden to acquire shares or securities of [YPF], whether directly or indirectly, by any means or instrument . . . if, as a result of such acquisition, the purchaser becomes the holder of, or exercises the control of, class D shares of stock of [YPF] which, in addition to its prior holdings of such class (if any), represent, in the aggregate, FIFTEEN PERCENT (15%) or more of the capital stock, or TWENTY PERCENT (20%) or more of the outstanding class D shares of stock." Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(d)). Such acquisitions are called "Takeover[s]." *Id.* In turn, Section 7(e) requires any "person wishing to

[complete] a Takeover" to "[a]rrange a takeover bid for the acquisition of all the shares of all classes of [YPF]." *Id.* § 7(e)(ii). That "takeover bid" must offer to acquire those remaining shares according to a specific process and at a price set by formula in Section 7(f) of the Bylaws. *See id.* § 7(f).

54.     YPF's 2011 Form 20-F stated that, "[p]rior to consummating any Control Acquisition, an Offeror must obtain the approval of the Class A shares, if any are outstanding, and make a public tender offer for all of our outstanding shares and convertible securities. The Offeror will be required to provide us with notice of, and certain specified information with respect to, any such tender offer at least fifteen business days prior to the commencement of the offer . . . . Any such offer must remain open for a minimum of 20 days and a maximum of 30 days following the provision of notice to the shareholders or publication of the offer, plus an additional period of a minimum of five days and a maximum of ten days required by CNV regulations, and shareholders must have the right to withdraw tendered shares at any time up until the close of the offer." Hicks Ex. 103 (YPFEP00000001 at 184).

55.     Section 7's tender-offer mechanism applies by its terms to acquisitions of YPF stock by any person or entity. Section 28 makes clear that the requirements of Section 7 "shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of [YPF]," if, "as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of [YPF], which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock." Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 28(A)).

56.     The requirements of Sections 7 and 28 are triggered by acquisitions of "control" of YPF stock "by any means." Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) §§ 7(d), 28(A)).

57.     Professor Rovira has opined that "Articles 7 and 28 do not turn only on formal stock purchases or transfers of title, but also on the more practical measure of control."  Hicks Ex. 33 (ECF No. 46 (Rovira Decl. for Pls.) ¶ 31).

58.     Section 7(h) of the Bylaws provides that the Company must deny the holder of shares acquired in violation of the tender-offer requirement "any right to vote or collect dividends or other distributions" that would otherwise attend to those shares.  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(h)).  As with the tender-offer requirement, Section 28 explicitly applies Section 7(h) to acquisitions by Argentina in violation of the tender-offer requirement.  *Id.* § 28(C).

## VI.     YPF's 1993 IPO

59.     Argentina and YPF marketed the IPO by undertaking a "roadshow," including in the United States.  Hicks Ex. 99 (Nash, *Crown Jewel*) ("Argentina and its investment bankers First Boston and Merrill Lynch . . . begin the 'roadshow' on Monday for the privatization of the country's industrial crown jewel – the oil company Yacimientos Petroliferos Fiscales, known as Y.P.F.").

60.     Through the IPO, Argentina sold 160 million Class D shares of YPF stock – enough to cede majority control of YPF – to private investors.  Hicks Ex. 103 (YPFEP00000001 at 29-30); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 7).

## VII.    Plaintiffs' Purchases of YPF ADRs

61.     By the spring of 2012, Petersen and Eton Park were the second- and third-largest investors in YPF, respectively.  Hicks Ex. 47 (Harris Dec. 2021 Report for Defs. ¶ 17).

62.     From 2008 to 2011, Petersen purchased ADRs representing more than 100 million Class D shares of YPF stock – slightly more than 25% ownership of YPF – in two acquisitions from YPF's then-majority owner, a Spanish oil company called Repsol S.A. ("Repsol").  Hicks

Ex. 8 (ECF No. 98 (Argentina Answer) ¶¶ 6, 28); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶¶ 17, 28, 30).

63.     When Petersen's ownership exceeded the 15% threshold specified in Section 7 of YPF's Bylaws (*see supra* ¶¶ 37, 49, 53), Petersen made a tender offer under the Bylaws.  Hicks Ex. 68 (May 21, 2008 Letter from YPF to CNV re Stock Tender Offer by Petersen (AR00019185 at 185-191)).  Petersen priced its tender offer for YPF ADRs in dollars, as Repsol had done previously.  Hicks Ex. 130 (PT_LISSEMORE_000000153 at 163); Hicks Ex. 131 (PT_FISCHEL_000000185 at 186).

64.     Most of Petersen's purchases of YPF ADRs were financed through loans.  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 6); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 6).  Petersen did contribute $110.1 million upfront to the purchase.  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) Fifth Affirmative Defense).

65.     Petersen's loans were secured by a pledge of Petersen's YPF ADRs in favor of the collateral agents designated by the parties, HSBC Bank PLC and Bank of New York Mellon (the "Credit Agreement" and the "Seller Credit Agreement," respectively).  Hicks Ex. 83 (PT_000000608); Hicks Ex. 89 (PT_000012493).

66.     Argentina, as YPF's Class A shareholder, approved Petersen's YPF ADR purchases in 2008.  Hicks Ex. 72 (AR00053005); Hicks Ex. 75 (AR00066972 at 66975).

67.     Argentina, as YPF's Class A shareholder, approved Petersen's May 2011 acquisition of YPF ADRs.  Hicks Ex. 67 (AR00013174 at 13175); *see also* Hicks Ex. 71 (AR00050790 at 50792) (Plan Fenix Report noting Argentina "official[ly] consent[ed] [to] the entry of a local partner" in ownership of YPF).

68.     The Argentine Ministry of Economy and Production approved Petersen's YPF
ADR purchases and ordered its representative to support the acquisition on behalf of Argentina
in 2008.  Hicks Ex. 63 (AR00009412); Hicks Ex. 66 (AR00012180).  It also did so in 2011.
Hicks Ex. 65 (AR00010116); Hicks Ex. 64 (AR00009417).

69.     Referring to Petersen's acquisition and the attendant entry of Argentine managers
of the company, President Cristina Kirchner stated:   "[A]s a matter of fact the management of
YPF Argentina has changed substantially since the inclusion of an Argentine Partner. . . .
[W]hen those who are here in the management are also owners, obviously the management
improves, and this happens in Argentina and in any part of the world.  Here, the proof of the
incorporation, of the successful result of the inclusion of the Argentine Partner, is something that
should be mentioned specifically, and should also serve as an example to encourage others to
also incorporate Capital, from National Investment."  Hicks Ex. 74 (AR00056196 at 56196).

70.     ███████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████

71.     Between November 2010 and March 2012, Eton Park owned American
Depositary Shares ("ADSs") "in an amount representing approximately 11.95 million Class D
shares of YPF."  Hicks Ex. 13 (ECF No. 128 (Engel Decl.) ¶ 2).

72.     Eton Park did not engage in any acquisition-specific financing to purchase its
YPF ADRs.  Hicks Ex. 57 (Misrahi Tr. 23:10-24:12).

73.     Eton Park recognized the risks involved in investing in an Argentine company but
was "reassured by the existence of a minority protection . . . in terms of bylaws."  Hicks Ex. 57

(Misrahi Tr. 66:20-24).  YPF also met Eton Park's investment criteria because YPF had been

listed on the NYSE "for a period of time."  *Id.* at 47:16-21.

**VIII.   Argentina Manipulates YPF's Value and Then Retakes Control of the Company**

74.   ███████████████████████████████████████████████

████████████████████████████████████████████

75.   Eric Mindich of Eton Park testified that he viewed the discovery of Vaca Muerta

as "a large potential driver of value" for its investment in YPF.  Hicks Ex. 56 (Mindich Tr.

103:2-3).

76.   ███████████████████████████████████████████████

████████████████████████████████████████████████

77.   On January 29, 2012, the Argentine newspaper *Página 12* reported that

"[l]egislators" and other front-line government "officials" believed that the Government viewed

"the renationalization of YPF" as "an explicit alternative."  Hicks Ex. 81 (EP_000016307 at

16307).

78.   In January and February 2012, Argentina did not make any statement in any

communication or filing with the CNV addressing, confirming, or denying the rumors.  Hicks

Ex. 21 (YPF's Responses to Request for Admission Nos. 63-66); Hicks Ex. 20 (Argentina's

Responses to Request for Admission Nos. 61-64).

79.   On February 21, 2012, Secretary of Energy Daniel Cameron wrote an email to

Roberto Baratta, the Argentine Government's appointed member on the YPF Board, with an

"analysis" explaining that Argentina "rejected the OPA (Stock Tender Offer)."  Hicks Ex. 76

(AR00069033 at 69033).  Cameron then explained:  "It seems to us that the issue is to move

toward an expropriation law, if possible, with the acquisition of a simple majority, and not

going after the entire company," and that "before Friday I will have a first draft of the legal grounds proposal and probably the bill itself." *Id.*

80.     The email also attached a memorandum.  Hicks Ex. 76 (AR00069033 at 69034). The memorandum discussed "the performance of YPF and its future." *Id.*  The memorandum stated that "it is necessary to make some more comprehensive analyses on the hydrocarbons sector in our country, since – in order to achieve change in the situation that accelerates as far as possible some form of rapid self-supply – the issue requires some other decisions regarding the balance with other companies, which we need to attain with respect to self-supply together with a deeper action in relation to YPF." *Id.*

81.     The memorandum said "it is necessary to refer to the magnitude of an eventual takeover of the company, as it is presented in YPF's ownership of infrastructure both in the production of hydrocarbons and in the elaboration of fuels, in its own petrochemicals and in its participation in other companies."  Hicks Ex. 76 (AR00069033 at 69038).

82.     Later in the memo, there is a bolded section entitled, "Let's explore the different forms of accessibility to the company."  Hicks Ex. 76 (AR00069033 at 69040).  The section begins:

> The first possibility of acquiring control of the company would be under the rules of its own bylaws and it implies moving forward with a stock tender offer.  The company has already gone through this when it was taken over by Repsol (when any individual or legal entity acquires more than 3% of the shares, this must be declared, and if the acquisition is more than 15% it will be considered as an attempt to take control, for which it will have to request authorization and then make a Stock Tender Offer, a STO).
>
> . . .
>
> The point is that in YPF's bylaws, which carefully intended at the outset to defend its future minority shareholders, there are takeover mechanisms which have different methodologies of determination, on which the highest value must be set. This implied that in the Stock Tender Offer that the Petersen Group had to carry out, while the share was worth US$ 38.137 on the stock exchange at the time of

the transaction, in the STO it had to bid US$ 49.45, which was the highest calculation according to the methodologies found in its bylaws, i.e. a premium of almost 30%.

. . .

From a reading of the bylaws, it could be estimated that the total value of the company would be between 11 billion and 14.5 billion dollars, assuming that everyone sells and with a premium between 0 and 25% of its price.

*Id.* at 69040-69041.

83.     The memorandum explains that "it is my understanding that this is not the path that will allow us greater possibilities, since the resources that will be necessary to update the investments would have to imply the acquisition of a majority of the shares in a global financial environment that is not simple if we were to add the cost of the purchase, plus the resources that would allow us to increase the investments for a greater production of crude oil and its refining."  Hicks Ex. 76 (AR00069033 at 69041).

84.     The memorandum states:  "The only way to go is expropriation."  Hicks Ex. 76 (AR00069033 at 69041) (bold omitted).  The memorandum admits that this option would "probably involve lawsuits."  *Id*. at 69042.

85.     On February 29, 2012, the *Financial Times* reported that "[m]ounting fears that Cristina Fernández, Argentina's president, could announce greater intervention in Repsol's Argentine subsidiary, YPF, on Thursday at the annual opening of Congress have caused its shares to fall off a cliff, wiping more than $4bn off YPF's value in less than a week."  Hicks Ex. 101 (Jude Webber, *YPF and Repsol shares hit the skids*, Financial Times, Feb. 29, 2012 (PT_COFFEE_000000464 at 464)).

86.     Between January and April 2012, YPF's share price fell from $35 to less than $15.  Hicks Ex. 51 (Sharon Jan. 2022 Report for Defs. at 13, Fig. 2).

87.     On February 29, 2012, Ricardo Salmon of Eton Park wrote to Eric Mindich, Edward Misrahi, and Daniel Valdez-Franco:  "By the way, as per the bylaws of YPF if anyone acquires more than 14.9%, it would trigger a mandatory tender for the remaining of the minorities using the max of 4 conditions:  (i) highest price paid by the buyer over the past 2 years – NA; (ii) the highest price over the past 30 days – $36.40; (iii) a price based on the historical p/e over the past 2 years – $42.99 and (iv) the price the day before 2 years if no shares were bought during that period – $40.68."  Hicks Ex. 80 (EP_000006324 at 6325).

88.     In February and March 2012, Argentina did not make any statement in any communication or filing with the CNV addressing, confirming, or denying those rumors.  Hicks Ex. 21 (YPF's Responses to Request for Admission Nos. 71-74); Hicks Ex. 20 (Argentina's Responses to Request for Admission Nos. 69-72).

89.     On or around March 18, 2012, *Página 12* reported:  "the [N]ational [G]overnment plans on taking control of YPF."  Hicks Ex. 86 (PT_000006866 at 6867).

90.     In March 2012, YPF's credit rating was "downgraded from BA3 to Ba2."  Hicks Ex. 18 (Argentina's Response to Request for Admission No. 20).

91.     On March 18, 2012, *Página 12* reported that the Government was planning to assume control of YPF.  Hicks Ex. 21 (YPF's Response to Request for Admission No. 75); Hicks Ex. 20 (Argentina's Response to Request for Admission No. 73).

92.     Between March 18, 2012 and April 15, 2012, Argentina did not make any statement in any communication or filing with the CNV addressing, confirming, or denying the statement that appeared in *Página 12*.  Hicks Ex. 21 (YPF's Responses to Request for Admission Nos. 75-78); Hicks Ex. 20 (Argentina's Responses to Request for Admission Nos. 73-76).

93.     In April 2012, Moody's downgraded YPF's stock.  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 33); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 33).

94.     Argentina has admitted it did not make a tender offer for Plaintiffs' shares.  Hicks
Ex. 18 (Argentina's Response to Request for Admission No. 25).

95.     ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████

96.     YPF's outside counsel also said that "YPF did not take actions" or "enforce
obligations" under YPF's Bylaws following Argentina's seizure.  Hicks Ex. 22 (Ltr. from D.
Hernandez to A. Goldsmith (Oct. 9, 2020) at 4).

97.     On April 16, 2012, the Government issued Decree 530/2012, which appointed
Julio De Vido, Argentina's then-Minister of Planning, Public Investment, and Services, as the
"Intervenor" to exercise the powers of YPF's Board of Directors and President for 30 days (later
extended for another 30 days).  Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 35) ("YPF further
admits that Decree 530/12 appointed Julio Miguel de Vido as the Intervenor of YPF."); Hicks
Ex. 23 (Bianchi Dec. 2021 Report for Pls. ¶ 26); Hicks Ex. 46 (Comadira Sept. 2021 Report for
YPF ¶ 17) ("De Vido was ordered to exercise 'the powers conferred on the Board of Directors
and/or the President of the Company in the Bylaws of YPF S.A.'").

98.     On April 16, 2012, through Decree 530/2012, Argentina also announced formal
legislation to expropriate from Repsol 51% of YPF's shares.  Hicks Ex. 108 (Exhibit 11 to Decl.
of Martin Domb, ECF No. 27-11, at 5 ("Expropriation Decree") (decree dated April 16, 2012,
and describing expropriation bill)); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 35)
(admitting that, "on or about April 16, 2012, President Fernández de Kirchner introduced to the
Republic's Congress a bill to declare 51% of YPF's Class D shares to be of public utility and

subject to expropriation"); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 35) (admitting that, "on

April 16, 2012, Argentina announced that it would expropriate a 51% interest in YPF"); Hicks

Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 36) (admitting that Argentina "temporarily occupied

51% of YPF's Class D shares").

99.     Argentina simultaneously issued Decree 532/2012, which appointed Axel

Kicillof, then-Secretary of Economic Policy and Development Planning, as the "Vice-

Intervenor" of YPF.  Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 38) (YPF "admits that Executive

Decree 532/2012 appointed Axel Kicillof to the position of Subintervenor of YPF S.A."); Hicks

Ex. 110 (Decree 55/2011) (Dec. 10, 2011 decree appointing Axel Kicillof as Argentina's

Secretary of Economic Policy and Development Planning for the Ministry of Economy and

Public Finance); *see also* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 22); Hicks Ex. 46

(Comadira Sept. 2021 Report for YPF ¶ 18).

100.    Kicillof stated that, as of April 16, 2012, Argentina managed the operations of

YPF.  Hicks Ex. 69 (AR00019489 at 19495).  The intervention conferred upon the Intervenor the

powers of the Board of Directors and/or the President of the Company (a separate office from the

chief executive officer).  Hicks Ex. 19 (YPF's Responses to Request for Admission Nos. 20-21);

Hicks Ex. 18 (Argentina's Responses to Request for Admission Nos. 21-22).

101.    ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

102.    On April 17, 2012, Kicillof gave public remarks to the Argentine Senate.  In those

remarks, he said, in part:

> Look at YPF itself that when it liked the price it produced more, and when after the devaluation it stopped liking the price of crude oil, it did two things:  it asked for an international price in one window and throttled us Argentines in the other.  Poor people!  How can it be only 34 percent?  What is the result of that argument?  Does any senator want to present a bill to expropriate all the companies because he agrees with the content?  Or is it a stupid chicanery that goes nowhere?  What is it?  Is it not enough to expropriate YPF?  And not even YPF, but a part of it, which is the shareholding portion respecting Repsol itself, which is left with a very important share in a huge company.  Besides, this goes to the National Appraisal Court to pay, according to our expropriation law, what ends up being the real cost.  We are not going to pay them what they say, as Mr. Brufau wants:  10 billion dollars.  Where is that?  In the speculation they spread some days ago, when they thought they were going to sell the shares?  In that leonine internal statute that they said that if anyone dared to set foot in the company, like the State itself?  Because believe me, if you wanted to buy shares to enter the company and you went over 15 percent, you stepped in the bear trap and had to buy one hundred percent at a value equivalent to 19 billion dollars.

> Because the fools are those who think that the State has to be stupid and buy everything according to the law of YPF itself, respecting its bylaws!  Otherwise, where is the legal security?  Gentlemen, it was a company, they got together and said:  "What can we do so that nobody ever intervenes in the control of the company?"  Maybe the control of the company is sacred, maybe they realized that they had the goose that lays the golden eggs and said:  we are going to make them suffer but nobody can snoop here in the company.

> That director we have is because the gold stock disappeared, because now we have a dumb gold stock.  How much do we have?  0.9 percent?

Hicks Ex. 69 (AR00019489 at 19513-19514).

103.    Kicillof made this statement "in his capacity as Vice-Intervenor of YPF" and also

"in his capacity as Secretary of Economic Policy and Development Planning of the Ministry of

Economy and Finance."  Hicks Exs. 18, 20 (Argentina's Responses to Request for Admission

Nos. 42-44, 58-59); Hicks Ex. 69 (AR00019489 at 19494).

104.    The NYSE suspended trading of YPF's ADRs on April 17, 2012, and trading

resumed on April 18, 2012.  Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 37); Hicks Ex. 8 (ECF

No. 98 (Argentina Answer) ¶ 37).

105.    On May 3, 2012, the Argentine Congress passed Law 26,741 ("Expropriation

Law"), which expropriated "fifty-one percent (51%) of the goods of Repsol YPF GAS S.A."

Hicks Ex. 112 (AR00109771 at 109772).

106.    Section 13 of the Expropriation Law says:  "In order to guarantee the continuation

of the hydrocarbon exploration, production, industrialization, and refining activities of YPF

Sociedad Anónima and Repsol YPF GAS S.A., as well of the transportation, sale and distribution

of such hydrocarbons, and an increased inflow of investments, for an adequate supply of the

fuels required for the functioning of Argentina's economy in the framework of this Law, from

the effective date hereof onwards the Argentine Executive Branch shall, acting through such

persons and agencies as it may therefor designate, exercise all rights carried by the stock to be

expropriated pursuant to Sections 57 and 59 thereof."  Hicks Ex. 112 (AR00109771 at 109772).

107.    Section 15 says:  "To carry out their activities, YPF Sociedad Anónima and

Repsol YPF GAS S.A. shall continue to operate as open corporations under Article II, Sub-

Article V of Law No. 19,550 and related provisions; they shall not be subject to any legislation

or administrative regulations governing the administration, management and control of

companies or entities in which the Federal State or the Provinces hold an ownership interest."

Hicks Ex. 112 (AR00109771 at 109773).

108.    President Fernández de Kirchner signed the bill on May 4, 2012, and the law went

into effect on May 7, 2012.  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 35).

109.    Argentina never commenced a tender offer for outstanding shares of YPF capital

stock in 2012.  Hicks Ex. 18 (Argentina's Response to Request for Admission No. 25) (admitting

that "[a]t no point during 2012 did Argentina commence a tender offer for outstanding shares of YPF capital stock"); Hicks Ex. 19 (YPF's Response to Request for Admission No. 24) ("YPF admits that Argentina did not conduct a tender offer for YPF stock in 2012").

110.    In March 2014, Kicillof told a legislative committee that, had Argentina "offer[ed] all remaining shareholders a fixed amount per share," as "the bylaws of YPF specified," it would have cost Argentina some "10.671 billion dollars."  Hicks Ex. 121 (Republica Argentina, *Versión Taquigráfica* 31 (Mar. 13, 2014)) (bold omitted).  He further stated that "[t]he buyer was under obligation to offer this price as specified by the Bylaws." Hicks Ex. 122 (Republica Argentina, *Versión Taquigráfica* 52 (Mar. 13, 2014)).

## IX.    Post-Breach Transfer of Plaintiffs' YPF Shares

111.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

112.    Between May and November 2012, the financial institutions that had lent Petersen funds to acquire its YPF shares foreclosed on those shares.  Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 6) (admitting "that Petersen acquired YPF shares in 2008 through a series of loan agreements and that in 2012 creditors foreclosed on Petersen's YPF shares"); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 45) ("Petersen's creditors foreclosed on Petersen's purported YPF shares."); Hicks Ex. 92 (PT_000015271 (June 13, 2012 Credit Suisse letter) at 15271) ("We hereby inform the Borrower that . . . the Collateral Agent was notified of the request of the Lenders to, among other things, use its powers . . . to transfer an amount of Pledged Shares . . . to each of the Lenders as was sufficient to fully pay the Secured Obligations owing to each such Lender."); Hicks Ex. 88 (Nov. 12, 2012 Repsol letter (PT_000007226)); Hicks Ex. 87 (Nov. 12, 2012 Repsol letter (PT_000007120)); Hicks Ex. 85 (May 24, 2012 Credit Suisse letter

(PT_000003922)); Hicks Ex. 84 (May 24, 2012 Credit Suisse letter (PT_000003894)); Hicks

Ex. 91 (May 16, 2012 Credit Suisse letter (PT_000015267)); Hicks Ex. 90 (May 11, 2012 Credit

Suisse letter (PT_000015263)).

113.    Petersen filed for bankruptcy in Spain in July 2012.  Hicks Ex. 93 (PT_000043270 at

43272) ("Request for the Declaration of Voluntary Bankruptcy"); Hicks Ex. 9 (ECF No. 99 (YPF

Answer) ¶ 46) ("Petersen filed for bankruptcy in Spain"); Hicks Ex. 8 (ECF No. 98 (Argentina

Answer) ¶ 42) ("Petersen entered bankruptcy."); *id*. ¶ 46 (similar).

114.    Eton Park began selling its YPF ADRs after the expropriation and, by July 2013,

had completely divested from the company.  *See* Hicks Ex. 56 (Mindich Tr. 69:23-70:23)

(testifying that Eton Park sold its entire stake in YPF between when "the expropriation was

announced in April of 2012" and "the end of June 2013, [when] Eton Park no longer held any

shares in YPF").

115.    Eton Park chose to sell its shares because it concluded that with the "newly

nationalized company . . . [we were] very likely to perform quite a bit worse."  Hicks Ex. 56

(Mindich Tr. 71:10-13); *see also id*. at 71:15-20 (YPF "was materially impaired by [its] state

ownership," because management would "focus[] on whatever the state's interests were as

opposed to the interest of the minority shareholders"); *id*. at 71:21-72:1 (Argentina had also

"done something that was very, very problematic from the standpoint of international capital

markets which also made it . . . much less advisable to own an asset in Argentina").

## X.    Damages Calculations

116.    Defendants' expert Professor Jeffrey Harris and Plaintiffs' expert Daniel R.

Fischel agree that Formula D produces higher tender-offer prices for the period at issue in this

litigation.  Hicks Ex. 47 (Harris Dec. 2021 Report for Defs. ¶ 39); Hicks Ex. 27 (Fischel Sept.

2021 Report for Pls. Ex. 2).

117. In calculating damages under Formula D of the Bylaws, Professor Fischel assumed that, had Argentina completed the tender offer on April 16, 2012, the "notice date" would have been February 13, 2012 for purposes of calculating damages.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 30).

118. Plaintiffs' expert Professor Fischel calculated that the tender-offer price for a notice date of February 13, 2012 would have been $88.35 based on applying Formula D and the applicable peso-dollar exchange rate.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶¶ 34-39 & n.69).

119. According to Plaintiffs' expert Professor Fischel, Petersen suffered $7.533 billion in direct damages and Eton Park suffered $898 million in direct damages.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶¶ 40-41) (explaining that, once the tender-offer price is determined, Plaintiffs' damages are simply the difference between what they would have received for their shares in a tender offer and the value they retained after Argentina failed to tender); *id.* ¶ 41 n.73 (explaining that trading in YPF's shares was halted on April 17, 2012 due to the seizure and thus the latter figure is the closing share price of YPF's shares on April 18, 2012, the next trading day after the Government's takeover); *see also* Hicks Ex. 28 (Fischel Jan. 2022 Report for Pls. Exs. R1, R2) (explaining damages calculations, including Professor Fischel's subtraction of the small dividends that Plaintiffs received on some of their shares after the expropriation).

120. Professor Fischel also calculated that Petersen suffered $156 million in lost value of its shares between the expropriation on April 16, 2012 and its creditors' foreclosure.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 49).

121. New York's 9% prejudgment interest rate generates $6.405 billion in prejudgment interest on the tender offer that Petersen should have received and $763 million on the tender

offer that Eton Park should have received through September 24, 2021, with prejudgment interest continuing to accrue thereafter.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶¶ 44-47); Hicks Ex. 28 (Fischel Jan. 2022 Report for Pls. Exs. R1, R2).

122.    The additional $156 million Petersen lost as a result of the drop in value of its shares generates prejudgment interest of $133 million through September 24, 2021, with prejudgment interest continuing to accrue thereafter.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 49).

**XI.    YPF's Settlement with Repsol**

123.    On May 15, 2012, Repsol filed a putative class action – under which Plaintiffs were class members – against Argentina in the Southern District of New York for breaching Sections 7 and 28 of the Bylaws.  *See* Hicks Ex. 16 (Compl., *Repsol v. Republic of Argentina*, No. 12-cv-03877-LAP, ECF No. 1 (S.D.N.Y. filed May 15, 2012)); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 48).

124.    Repsol settled individually with Argentina on May 9, 2014, before the class had been certified, and, pursuant to the terms of that agreement, Repsol agreed to discontinue the action with prejudice.  Hicks Ex. 17 (Stipulation of Voluntary Dismissal, *Repsol v. Republic of Argentina*, No. 12-cv-03877, ECF No. 31 (S.D.N.Y. filed May 9, 2014)); Hicks Ex. 109 (ECF No. 269-5 (Settlement Agreement)); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 48); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 48); Hicks Ex. 46 (Comadira Sept. 2021 Report for YPF ¶ 31) (discussing Repsol's obligations to abandon any claims it had against Argentina).

125.    Argentina reportedly paid Repsol $5 billion.  Hicks Ex. 124 (Stanley Reed & Raphael Minder, *Repsol in $5 Billion Settlement With Argentina*, N.Y. Times, Feb. 25, 2014; *see also* Hicks Ex. 120 (Alex Kicillof, *Dialogos Sin Corbata* 195 (2015)) (Kicillof acknowledging that Repsol "ended up collecting five billion" dollars); ██████████████████████

███████████████████████████████

████

126.    On February 27, 2014, Repsol also entered into a separate settlement agreement with YPF.  Hicks Ex. 46 (Comadira Sept. 2021 Report for YPF ¶ 32) (discussing Repsol's obligations to abandon any claims it had against YPF).

Dated:  April 14, 2022                    Respectfully submitted,

KIRKLAND & ELLIS LLP

By:        /s/ Paul D. Clement
Paul D. Clement
George W. Hicks, Jr.
C. Harker Rhodes, IV
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone:  (202) 389-5000
Fax:  (202) 389-5200
Email:  paul.clement@kirkland.com
        george.hicks@kirkland.com
        harker.rhodes@kirkland.com


KELLOGG, HANSEN, TODD, FIGEL
    & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone:  (202) 326-7900
Fax:  (202) 326-7999
Email:  mhansen@kellogghansen.com
        dho@kellogghansen.com
        agoldsmith@kellogghansen.com

KING & SPALDING LLP

Israel Dahan
Laura Harris
1185 Avenue of the Americas
New York, NY 10036
Phone:  (212) 556-2114
Fax:  (212) 556-2222
Email:  idahan@kslaw.com
        lharis@kslaw.com

-and-

Reginald R. Smith
1100 Louisiana Street
Houston, TX 77002
Phone:  (713) 751-3200
Fax:  (713) 751-3290
Email:  rsmith@kslaw.com

*Counsel for Plaintiffs Petersen Energía Inversora,
S.A.U., Petersen Energía, S.A.U., Eton Park Capital
Management, L.P., Eton Park Master Fund, Ltd.,
and Eton Park Fund, L.P.*