**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETERSEN ENERGÍA INVERSORA,      :
S.A.U. and PETERSEN ENERGÍA, S.A.U.,   :

          Plaintiffs,        :

          v.           :

ARGENTINE REPUBLIC and YPF S.A.,    :

          Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.:  1:15-CV-02739 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ETON PARK CAPITAL MANAGEMENT,   :
L.P., ETON PARK MASTER FUND, LTD.,  :
and ETON PARK FUND, L.P.,        :

          Plaintiffs,        :

          v.           :

ARGENTINE REPUBLIC and YPF S.A.,    :

          Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.:  1:16-CV-08569 (LAP)

**ARGENTINA'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**

April 14, 2022

# TABLE OF CONTENTS

***Page***

**PRELIMINARY STATEMENT** .................................................................1

**BACKGROUND** ......................................................................................5

    A.    Argentina Privatizes State-Owned YPF.................................................5

    B.    The Eskenazis Acquire a Minority Stake in YPF. ................................6

    C.    The Republic Intervenes and Begins the Expropriation Process. ...........9

    D.    Petersen and Eton Park Elect To Bypass Available Argentine Law Remedies..........................................................................................11

    E.    Petersen and Eton Park Divest All Their YPF Securities and Burford Acquires Their Purported Claims ........................................................12

**PROCEDURAL HISTORY** .................................................................13

**ARGUMENT** ........................................................................................15

I.    **THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE BECAUSE PLAINTIFFS ARE NOT SECURITY HOLDERS NOR WERE THEY SECURITY HOLDERS WHEN ARGENTINA ACQUIRED REPSOL'S SHARES**...............................................................................................15

    A.    Plaintiffs Do Not Hold YPF Securities................................................16

    B.    When Argentina Acquired Repsol's Shares, Plaintiffs Did Not Own Any YPF Shares.........................................................................................19

II.    **PLAINTIFFS' CLAIMS ALSO ARE NOT COGNIZABLE UNDER ARGENTINE PRIVATE LAW**.......................................................................26

    A.    Argentine Law Does Not Recognize a "Breach of Contract" Claim Between Shareholders for Alleged Violations of Corporate Bylaws. ...................26

    B.    Even If Plaintiffs Could Assert a Contract Claim, Neither the YPF Bylaws Nor Argentine Law Permits the Damages Claim Plaintiffs Assert.........................28

III.    **PLAINTIFFS' CLAIMS IMPERMISSIBLY CHALLENGE ARGENTINA'S SOVEREIGN ACTIVITY**.....................................................................31

IV.    **PLAINTIFFS' CLAIMS ARE BARRED BY ARGENTINE PUBLIC LAW**...........33

A.    Argentina's General Expropriation Law Preempts Any Tender-Offer Obligation. ...................................................................................34

B.    Argentina's General Expropriation Law Provides Plaintiffs' Exclusive Remedies for Any Alleged Damages Arising from the Expropriation.................37

V.    **PLAINTIFFS' GOOD-FAITH-AND-FAIR-DEALING CLAIMS ALSO FAIL AS A MATTER OF LAW** .....................................................................38

CONCLUSION.........................................................................................40

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*511 W. 232nd Owners Corp.* v. *Jennifer Realty Co.*,
   98 N.Y.2d 144 (2002) ....................................................................................................39

*In re Activision Blizzard, Inc. Stockholder Litig.*,
   124 A.3d 1025 (Del. Ch. 2015)................................................................................2, 17, 18

*Af-Cap, Inc. v. Republic of Congo*,
   462 F.3d 417, 428 (5th Cir. 2006) ................................................................................32

*Animal Sci. Prod., Inc.* v. *Hebei Welcome Pharm. Co.*,
   138 S. Ct. 1865 (2018) ..................................................................................................15

*Banco Nacional de Cuba* v. *Sabbatino*,
   376 U.S. 398 (1964)......................................................................................................33

*Braka* v. *Bancomer, S.N.C.*,
   762 F.2d 222 (2d Cir. 1985)....................................................................................32, 33

*Commerzbank AG* v. *U.S. Bank Nat'l Ass'n*,
   457 F. Supp. 3d 233 (S.D.N.Y. 2020).........................................................................16

*FDIC* v. *Citibank*,
   2016 WL 8737356 (S.D.N.Y. Sept. 30, 2016).........................................................2, 17, 18

*Henderson* v. *Golden Corral Franchising Sys., Inc.*,
   2021 WL 4392525 (S.D.N.Y. Sept. 23, 2021).......................................................19

*Hourani* v. *Mirtchev*,
   796 F.3d 1 (D.C. Cir. 2015)..........................................................................................26

*Hunt* v. *Mobil Oil Corp.*,
   550 F.2d 68 (2d Cir. 1977)............................................................................................40

*Kashef* v. *BNP Paribas S.A.*,
   925 F.3d 53 (2d Cir. 2019)............................................................................................33

*Korea Life Ins. Co.* v. *Morgan Guar. Tr. Co. of New York*,
   269 F. Supp. 2d 424 (S.D.N.Y. 2003) .........................................................................15

*OBB Personenverkehr AG* v. *Sachs*,
   577 U.S. 27 (2015) .......................................................................................................32

*Petersen Energia Inversora S.A.U.* v. *Argentine Republic & YPF S.A.*,
    895 F.3d 194 (2d Cir. 2018)............................................................................ *passim*

*Phoenix Light* v. *Deutsche Bank National Trust Co.*,
    2022 WL 384748 (S.D.N.Y. Feb. 8, 2022)..................................................16

*R.A. Mackie & Co., L.P.* v. *Petrocorp Inc.*,
    329 F. Supp. 2d 477 (S.D.N.Y. 2004).......................................................17

*Saudi Arabia* v. *Nelson*,
    507 U.S. 349 (1993)...................................................................................32

*SM Kids, LLC* v. *Google LLC*,
    963 F.3d 206 (2d Cir. 2020).......................................................................16

*In re Sunstates Corp. S'holder Litig., C.A.*,
    2001 WL 432447 (Del. Ch. Apr. 18, 2001) ..............................................17

*Urdan* v. *WR Cap. Partners, LLC*,
    244 A.3d 668 (Del. 2020) .....................................................................17, 18

*In re Vitamin C Antitrust Litig.*,
    810 F. Supp. 2d 522 (E.D.N.Y. 2011) ......................................................15

### FEDERAL RULES

Fed. R. Civ. P. 44.1..........................................................................................15

Fed. R. Civ. P. 56(a) ........................................................................................15

### ARGENTINE LAWS

Argentine Constitution .....................................................................................10

Argentine Civil Code ................................................................................. *passim*

Law No. 21,499 (General Expropriation Law)..................................... *passim*

Law No. 26,741 (Public Interest Law) ................................................. *passim*

### OTHER AUTHORITIES

N.Y. U.C.C. § 8-302(A) ..................................................................................17

6 Del. Code § 8-302.........................................................................................17

## PRELIMINARY STATEMENT

This case concerns two former minority shareholders of Argentine energy company YPF S.A. who seek a multi-billion-dollar windfall on claims that could have been resolved in Argentina years ago.  In 2012, after a decade of deteriorating oil and gas production began to hurt the broader Argentine economy, the Argentine Republic intervened in YPF's management.  Two years later, the Republic completed an expropriation of 51% of YPF's shares by paying $5 billion to Repsol, the holder of those shares.   Plaintiffs Petersen and Eton Park did not have their shares expropriated—they did not even own any interest in YPF when the expropriation was completed in 2014.  But they now claim that the YPF Bylaws entitled them to receive a tender offer in 2012. In 2015, Petersen sold that novel claim to litigation funder Burford Capital for €15 million, and Burford later agreed to fund Eton Park's claim.  Burford is now directing this litigation and seeks a windfall of upwards of *$20 billion*, a return of 100,000% on its investment.  There is a simple explanation for why Plaintiffs never brought their own claims and instead sold them for paltry sums: their claims fail as a matter of law for no fewer than six independent reasons.

*First*, Plaintiffs have no right to bring claims for an alleged breach of YPF's Bylaws in 2012, because Petersen and Eton Park are not YPF security holders, nor were they security holders when they filed their complaints in 2015 and 2016.  Plaintiffs held their stakes in YPF through American Depositary Receipts (ADRs), which were created by a New York depository bank under a Deposit Agreement governed by New York law and corresponded to underlying YPF shares held by a depository in Argentina.  Petersen's lenders foreclosed on its ADRs in 2012, and Eton Park had sold its ADRs by 2013.  Thus, by the time they brought these claims, Plaintiffs did not hold any interest in any YPF securities.  That undisputed fact alone is fatal to their case.  Under settled New York law—which governs the transfer of YPF ADRs—corporate claims, including those seeking to enforce a bylaws provision, are "rights in the security" that travel with the transferred

security.  *FDIC* v. *Citibank N.A.*, 2016 WL 8737356, at *4 (S.D.N.Y. Sept. 30, 2016) (Carter, J.) (citing *In re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025 (Del. Ch. 2015)).  The same legal rule is followed in Argentina, where "to have standing to bring corporate claims like those at issue in this case, a plaintiff must be a current shareholder."  (Manóvil Rebuttal ¶ 25.)

*Second*, Plaintiffs cannot bring suit to enforce the YPF Bylaws' tender-offer provisions because, under the plain language of the Bylaws, no tender offer was required in 2012 when Plaintiffs were still security holders.  The relevant tender-offer requirement under the Bylaws is based on the "acquisitions" of YPF shares "made by the National Government."  (Ex. 1 (YPF Bylaws) § 28(A).)[1]  The plain meaning of acquire ("*adquirir*") is obtaining title to something.  (Manóvil Reply ¶ 30.)   In the expropriation context specifically, the property subject to expropriation is not *acquired* as a matter of Argentine law until compensation is paid to the expropriated party, and the Government thereby obtains title to the property.  It is undisputed that the Republic did not obtain title to Repsol's YPF shares until May 8, 2014, when it paid Repsol $5 billion for those shares.   Before that time, Argentina exercised its sovereign rights to "intervene" in the company and temporarily "occupy" Repsol's shares before a *potential* expropriation—which was subject at any point to withdrawal.  Because Plaintiffs were not shareholders in 2014 when Argentina acquired Repsol's shares, they have no claim for breach of the Bylaws' tender-offer provisions.

*Third*, Plaintiffs' claims fail on the merits under well-settled principles of Argentine private law.  As this Court has already recognized, Plaintiffs' breach-of-contract claims are "properly classified as 'corporate claims' under Argentina law," because they are "based on corporate

---

[1]   References to "Ex. _" are to the accompanying Declaration of Robert J. Giuffra, Jr. filed herewith.  References to Manóvil or Uslenghi "Opening," "Rebuttal," or "Reply" refer to those experts' respective reports accompanying their Declarations, also being filed herewith.

relationships" in Argentina.  (*Petersen* ECF No. 161 at 34-35.)  Argentine corporate law, however, does not recognize shareholder-to-shareholder "breach of contract" damages actions based on a violation of corporate bylaws.  Tellingly, Plaintiffs' experts were unable to identify a single case where such an action has been sustained.  Shareholders aggrieved by a violation of corporate bylaws must instead bring a claim under Argentina's well-defined corporate law procedures within a three-month period.  But Plaintiffs never tried to enforce their corporate rights in any fashion—let alone in compliance with Argentine law—until years after the fact.

*Fourth*, even under Plaintiffs' "breach-of-contract" theory, basic Argentine contract law forecloses their claims for *damages*.  Under Article 655 of the Argentine Civil Code, where a contract provides penalties in the event of a breach, those penalties are *exclusive*.  Here, Section 28(C) of the Bylaws expressly prescribes specific "penalties" for noncompliance with the tender-offer provisions, including the loss of the rights to vote at shareholder meetings and to collect dividends.  Moreover, even absent an exclusive penalty clause, the presumptive remedy for a contractual breach in Argentina is an "in-kind" remedy (like specific performance).  A party may recover damages only if performance of an in-kind remedy is "impossible" due to the breaching party's fault.  That was not the case here, and Plaintiffs do not claim otherwise.

*Fifth*, Plaintiffs' current theory of the case also impermissibly challenges Argentina's sovereign activity.  Directly contradicting the position that Plaintiffs took in opposing the Republic's motion to dismiss, they now assert that, to comply with the Bylaws, the Republic was required to launch a multi-billion-dollar tender offer months *before* starting the process of expropriating any YPF shares.  That position undermines a basic premise of this Court's prior decision (and the Court of Appeals' affirmance):  that sovereign immunity did not bar Plaintiffs' suit because the tender-offer requirement mandated a separate commercial act that would occur

only *after* the sovereign act of expropriation. *See Petersen Energía Inversora S.A.U.* v. *Argentine Republic & YPF S.A.*, 895 F.3d 194, 209 (2d Cir. 2018) ("[W]e simply see no basis in the record for concluding that Argentina could not have complied with both the YPF Expropriation Law and the bylaws' tender offer requirements by launching a *post*-expropriation tender offer.") (emphasis added). Because Plaintiffs now directly challenge the validity of the Republic's "sovereign act of expropriation," *id.* at 207, their claims cannot proceed under the Foreign Sovereign Immunities Act (FSIA) and the act-of-state doctrine.

*Sixth*, and finally, Argentine public law bars Plaintiffs' claims. Article 28 of Argentina's Law No. 21,499 (the General Expropriation Law) expressly provides that any expropriated property—such as Repsol's YPF shares—is taken free of any "encumbrances," which would include any Bylaws obligation to tender. That Law also provides the exclusive set of remedies for third parties like Plaintiffs who believe that they were injured in connection with the expropriation of another's property. Once again, Plaintiffs elected not to timely pursue their Argentine law remedies, instead waiting years to bring "contract" claims in this U.S. Court.

*          *          *

In the wake of the Republic's intervention in YPF, and the Republic's commencement of the expropriation process, Plaintiffs chose ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ Other YPF shareholders pursued various claims both at shareholders meetings and in Argentine courts. Those claims were resolved as part of the $5 billion settlement with Repsol. Having bypassed the numerous avenues for relief available to them

-4-

in Argentina while they still were YPF shareholders, Plaintiffs cannot now belatedly seek recourse in this Court.

## BACKGROUND

### A.      Argentina Privatizes State-Owned YPF.

To ensure an adequate domestic energy supply, the Argentine Republic established YPF as a state-owned oil and gas company in 1922.  (Local Rule 56.1 Statement of Facts (SOF) ¶ 2.) In 1993, Argentina privatized YPF.  (SOF ¶ 3.)  YPF's privatization occurred through an initial public offering (IPO) of Class D shares, offered and traded on the Buenos Aires Stock Exchange, with an offering of American Depositary Shares, or ADSs, evidenced by American Depositary Receipts (ADRs), offered and traded on the New York Stock Exchange (NYSE).  (SOF ¶¶ 3-4.)

An ADR is not a share of a company; it is a "negotiable security" that is "issued by a U.S. depository bank" and demonstrates an ownership interest in ADSs.  (SOF ¶ 6.)  Those ADSs, in turn, represent an interest in shares in a non-U.S. Company.  (SOF ¶ 7.)  To establish an ADR program, the issuer (in this case, YPF), the depository bank, and the ADR holders entered a "deposit agreement."  (SOF ¶ 5.)  YPF executed and filed with the SEC such a deposit agreement in connection with its IPO and NYSE listing.  (*Id.*)  That agreement provides that "[t]itle to a[n] [ADR] (and to the American Depositary Shares evidenced thereby) . . . shall be transferable by delivery with the same effect as in the case of a negotiable instrument governed by New York law."  (SOF ¶ 9.)  That agreement further provides that "[t]he Deposit Agreement and the Receipts shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York."  (SOF ¶ 10.)

Plaintiffs' case centers on certain provisions of YPF's Bylaws, which were adopted at a YPF shareholders' meeting in 1993 shortly before the IPO (and amended thereafter).  (SOF ¶¶ 13-14.)  As of 2012, Section 7 of the Bylaws provided that an acquirer of a triggering amount

of shares of stock shall "[a]rrange a takeover bid for the acquisition of all the shares of all classes of the Corporation and all securities convertible into shares."  (SOF ¶ 16.)

Section 28 of the Bylaws imposed a similar tender-offer obligation on acquisitions of YPF shares by the Republic itself, though with different triggering percentages and other variations:

> The provisions of subsections e) and f) of Section 7 [except as provided in Section 28(B)] shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of the Corporation, 1) if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of the Corporation, which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock. . . .

(SOF ¶ 15.)

The Bylaws also outline the procedure by which the tender offer is to be conducted, and provide specific "penalties" for any violation of the tender-offer requirements.  (SOF ¶¶ 17-19); (Ex. 1 (Bylaws) §§ 7(f); 7(h); 28(C).)  Specifically, if any acquirer (including the Republic) does not make a required tender offer, the shares acquired "shall not grant any right to vote or collect dividends or other distributions that the Corporation may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of the Corporation." (*Id.*; *see also* Ex. 5 (Prospectus) at 84.)  These penalties compensate the remaining shareholders for the violation by increasing their proportionate voting power and share of dividends until the breach is cured.  (Manóvil Reply ¶ 73.)

## B.   The Eskenazis Acquire a Minority Stake in YPF.

In January 1999, six years after the IPO, Spain's largest oil company, Repsol, acquired 14.99% of YPF's capital stock; by the end of 2001, it had acquired 99.04%.  (SOF ¶¶ 20-21.)  Over the next decade, the relationship between the Argentine government and Repsol became strained because of concerns about YPF's production.  From 2001 to 2011, YPF's average net daily crude-

oil production declined 38%, and from 2004 to 2011 its average net daily natural-gas production declined 43%.  (SOF ¶ 50.)

Successive Argentine administrations grew increasingly alarmed by YPF's worsening oil and natural gas production.  For example, in 2007, Julio de Vido, Argentina's Minister of Federal Planning, Public Investment and Services, "once again spoke[] out to criticize Repsol YPF for low levels of investment in Argentina [since 1999] and for not putting the situation to rights after earlier governmental criticism." (SOF ¶ 52.)  As energy prices continued to rise, the relationship between Repsol and the Republic worsened, and public calls intensified for a change in direction.  In response, Repsol began seeking a local partner to take a minority stake in YPF.  Repsol ultimately turned to the Petersen Group, an Argentine construction and banking conglomerate controlled by the Eskenazi family, which had no meaningful experience in the energy industry.  (SOF ¶¶ 22-26.)

In December 2007, Repsol agreed to sell the Eskenazis up to a 25% stake in YPF.  (SOF ¶ 22.)  The transaction was unusual in many ways, including that the Eskenazis put up only a tiny fraction of the purchase price with their own money.  To accomplish this and subsequent transactions, Repsol and other entities lent special-purpose vehicles created by the Eskenazis' Petersen Group the money to buy the securities, with *YPF itself* effectively on the hook to service the loans through required payments of dividends of 90% of YPF's profits.  In February 2008, Petersen finalized its first purchase from Repsol of 14.9% of YPF, and it then acquired an additional 0.1% in May 2008.  (SOF ¶¶ 27, 39, 41.)  Petersen financed the over $2-billion transactions through a $1-billion loan from Repsol and another $1-billion loan from a syndicate of international banks.  (SOF ¶¶ 28-29, 42.)  Petersen secured its various loans with a pledge of its YPF ADSs.  (SOF ¶ 30.)  Petersen acquired an additional 10% of YPF in 2011 through a similarly financed transaction. (SOF ¶ 41-42.)

To enable Petersen to make payments on all the loans necessary to finance its purchases, Petersen and Repsol devised an unusual YPF dividend policy.  Repsol agreed to cause YPF to: (i) distribute as dividends 90% *of the profits of the company*, and (ii) distribute an additional "special dividend" of $850 million to be paid over 2008 and 2009, on top of the "regular" 90% dividend.  (SOF ¶ 32.)  Those extraordinary dividends would be distributed regardless of YPF's strategic needs.  (SOF ¶ 33.)  Petersen's credit agreements with Repsol and the banks, in turn, provided that the Petersen special-purpose vehicles would use the cash dividends received from YPF to pay off the loans. (SOF ¶ 35.)  The net effect of these financial machinations was to de-capitalize YPF, preventing it from replenishing its oil and gas reserves in Argentina.

No one at Petersen analyzed whether the extraordinary 90% dividend policy was sustainable for YPF.[2]  It wasn't.  The dividends exhausted YPF's liquidity each year, foreclosing any reinvestment in energy exploration and production.  In fact, in some years YPF paid more in dividends than its *total net income* for the year.  (SOF ¶ 53.)  In 2008, the year in which YPF paid part of the $850-million "special dividend," YPF's dividends approached *250%* of its yearly earnings.  (*Id.*)  Needless to say, those unsustainable dividends were far higher than those of other multinational oil and gas companies.   From 2006 to 2011, for example, YPF's average dividend-payout ratio (the amount of dividends paid in relation to the net income of the company) was a staggering 118%, while peer companies such as BP and Chevron averaged dividend-payout ratios of 40.8%.  (SOF ¶ 54.)  Plaintiffs' own expert characterized a 90% dividend policy as unwise, explaining that "[i]f I was a director it would not be my strategy."  (SOF ¶ 55.)

---

[2]     Ex. 6 (Sebastián Eskenazi Feb. 10, 2021 Hague testimony) at 9 ("Question: What analysis did you or any staff of the Petersen Group or technically linked to the Petersen Group perform regarding the distribution of 90 percent of YPF's earnings as a dividend and that it was in the best interests of YPF?  Answer: No analysis.").

The February 2008 agreement between Petersen and Repsol also installed Sebastián Eskenazi as CEO of YPF. (SOF ¶ 38.) During the four years he served in that role, the company's reserves and production capacity decreased to the point that Argentina became "the only country in the region" with a shrinking supply of oil and gas. (SOF ¶ 58.) By 2010, the depletion of YPF's oil and gas reserves had become so severe that, for the first time in three decades, YPF had to import oil from outside Argentina to meet consumer demand. (SOF ¶ 56.) In 2011, the Argentine press described YPF as plagued by debts and weakened by "the disproportionate distribution of dividends." (SOF ¶ 58.)

### C.   The Republic Intervenes and Begins the Expropriation Process.

On April 16, 2012, the Argentine executive branch submitted a bill to the National Congress that, if enacted, would begin the process of expropriating 51% of YPF's Class D shares from Repsol. (SOF ¶ 59.) At the same time, the Argentine executive branch issued emergency decree 530/2012 (the Intervention Decree), announcing that Repsol's "deepening strategy to virtually eviscerate the company" had "compromise[d] [the] energy sovereignty of the country." (SOF ¶ 60.) The Intervention Decree provided for the immediate appointment of a temporary "intervenor"—a role similar to a receiver under U.S. law—to exercise the powers of the YPF Board of Directors and/or President of the company for a period of 30 days. (SOF ¶¶ 61-62.)

On May 3, the National Congress enacted the proposed bill, which went into effect on May 7, 2012 as Law No. 26,741 (the Public Interest Law). (SOF ¶ 66; Ex. 72 (Public Interest Law).)[3]

---

[3]    The parties, this Court, and the Court of Appeals have used different labels to refer to the various Argentine expropriation-related laws at issue. In this brief, Argentina refers to Law No. 26,741, which in 2012 declared Repsol's shares to be of "public interest and subject to expropriation" and provided for the "temporary occupation" of those shares, as the "Public Interest Law." It refers to Law No. 26,932, which in 2014 provided for the completion of the expropriation and compensation for Repsol's shares, as the "YPF Expropriation Law." And it refers to Law No. 21,499, which was issued in 1977 and supplies the governing framework for all expropriations carried out in Argentina, as the "General Expropriation Law."

Under the Argentine Constitution, an expropriation must be: (i) "authorized by law" for "reasons of public interest"; and (ii) compensated in advance. (*See* Appendix at A-5 (Argentine Constitution) Art. 17; Uslenghi Opening ¶ 28.) The Public Interest Law fulfilled the former requirement by declaring "fifty-one percent (51%) of the equity of YPF Sociedad Anónima, represented by an identical stake of Class D shares held by Repsol" to be of "public interest and subject to expropriation." (SOF ¶ 68; Ex. 72 (Public Interest Law) Art. 7.)

As for compensation, the Public Interest Law provided that the National Court of Appraisals would conduct a valuation of Repsol's YPF shares as part of a payment process governed by the General Expropriation Law. (SOF ¶ 70.) The General Expropriation Law supplies the overarching framework for all expropriations conducted by the Republic. The process involves multiple stages: the Republic first seeks to negotiate a price with the expropriated party, and if the parties cannot agree, an Argentine court determines a price. (Appendix at A-1-A-2 (General Expropriation Law) Arts. 13, 15-17; Uslenghi Opening ¶¶ 40-41.) The Argentine government "may withdraw from the action promoted as long as the expropriation has not been completed." (Appendix at A-2 (General Expropriation Law) Art. 29.)

To ensure YPF's operational "continuity," the Public Interest Law mandated that the Republic temporarily occupy Repsol's shares pending the expropriation, meaning that the Government would, *inter alia*, "exercise all of the rights conferred upon [Repsol's] shares subject to expropriation." (SOF ¶ 71.) But the National Government would not *acquire title* to the shares—and the ability, for example, to sell them—until the expropriation was complete, and the Republic paid Repsol for the shares. (SOF ¶ 98.) This procedure of temporary occupation is expressly permitted, and governed, by the General Expropriation Law. (*See* Uslenghi Opening ¶¶ 42, 55; Manóvil Opening ¶¶ 34, 57, 62.)

-10-

**D.      Petersen and Eton Park Elect To Bypass Available Argentine Law Remedies.**

As noted above, the YPF Bylaws provided penalties should the Republic "acquire" an amount of shares that would, in addition to its prior holdings, represent at least 49% of YPF's capital stock and not make a tender offer for the remainder.  If that happened, the shares the Republic acquired would not be eligible to receive corporate dividends and would not count toward a quorum or grant votes at shareholder meetings.  (SOF ¶¶ 18-19.)  At YPF's June 4, 2012 shareholder meeting, several shareholders objected when the Republic began exercising voting rights and participating in corporate governance, claiming that Argentina had "acquired" a sufficient number of YPF shares to trigger the tender-offer requirement but had failed to satisfy it. Those shareholders invoked the Bylaws' penalty provision, arguing that the shares could not be counted towards the quorum or vote.  (SOF ¶ 75.)

Neither Petersen nor Eton Park attended the June 4 YPF shareholder meeting or objected to the Republic's exercise of voting rights.  (SOF ¶ 79.)  Following the meeting, several YPF shareholders timely challenged in Argentine courts the Republic's exercise of voting rights and the resolutions voted on at the June 4 meeting.  (SOF ¶¶ 76-78.)  Petersen █████████████ ████████████████████████████████████████████████████████████████████ ████████████████████ did not pursue any action in Argentine court against the Republic. (SOF ¶¶ 80-81.)  Neither did Eton Park, which instead began divesting itself of YPF shares.  (SOF ¶ 82.)  Nor did Petersen take any action against Repsol, which had agreed to acquire Petersen's loans if Repsol were to lose its majority stake in YPF.  (SOF ¶ 83.)  Petersen chose not to invoke that right based on its belief that in 2012—after the Republic had intervened in YPF but before it had completed the expropriation of Repsol's majority stake—Repsol had not yet ██████████ and its loan-purchase obligation to Petersen had not yet been triggered.  (*Id.*)

Repsol, for its part, pursued nearly 20 judicial and arbitral actions around the world, including before courts in Argentina, the United States, and Spain, and under the ICSID Convention.  (SOF ¶ 77.)   Other shareholders brought nine additional actions in Argentina. (*Id*.)  In February 2014, the Republic and Repsol reached a settlement agreement under which the Republic agreed to pay Repsol $5 billion as compensation for the expropriated shares and to settle all outstanding legal claims concerning the expropriation.  (SOF ¶ 92.)   Notably, under the settlement, Repsol agreed to obtain the discontinuance of claims filed by third parties, including other YPF shareholders, against the Republic and to indemnify the Republic against such claims. (SOF ¶ 93.)  This settlement provision was in keeping with Argentine law, which provides that third parties affected by an expropriation may seek recovery out of the compensation provided to the expropriated party, but cannot seek damages from the Republic itself.  (*See* pp. 37-38, *infra*.)

On April 23, 2014, the Argentine National Congress passed Law No. 26,932 (the YPF Expropriation Law), which ratified the Repsol settlement agreement and authorized the issuance of the bonds needed to pay the agreed-upon compensation amount.  (SOF ¶ 97.)  On May 8, 2014, the expropriation was finalized when the settlement agreement went into force.  (SOF ¶ 98.)  YPF then disclosed to the SEC that "[a]s of the date hereof, the expropriation pursuant to the Law No. 26,741 has been concluded, and therefore the Republic of Argentina is definitively the owner of 51% of capital stock of YPF S.A. and YPF GAS S.A."  (*Id*.)

### E.   Petersen and Eton Park Divest All Their YPF Securities and Burford Acquires Their Purported Claims.

In May 2012, Petersen's lenders had noticed its default under the loan agreements through which it had originally purchased the YPF ADRs.  (SOF ¶ 84.)  On June 11, 2012, Petersen's bank lenders had foreclosed on Petersen's collateral ADS, which were transferred to the institutional lenders.  (SOF ¶ 85.)  Repsol, in turn, foreclosed upon the Petersen ADS that had been pledged to

it in November 2012.  (SOF ¶ 86.)[4]  Eton Park sold all of its YPF holdings in 2012 and 2013.  (SOF ¶ 91.)

Meanwhile, in July 2012, the Petersen special-purpose vehicles filed for bankruptcy protection in Spain.  (SOF ¶ 89.)  In October 2014, Petersen's receiver in the Spanish bankruptcy submitted a liquidation plan, pursuant to which Petersen's legal claims would be sold in an auction process.  (SOF ¶ 99.)  In March 2015, litigation-finance firm Burford Capital LLC, through a subsidiary, paid approximately €15 million to acquire Petersen's purported legal claims against the Republic and YPF.  (SOF ¶ 100.)  Burford— ███████████████████████ ████████████ subsequently agreed to fund the Eton Park action as well.  (SOF ¶¶ 102, 104.)  Burford, through Petersen and Eton Park, now seeks to recover the lion's share of nearly $20 billion in claimed damages, a more than 100,000% return on its investment.

## PROCEDURAL HISTORY

In April 2015, Petersen sued the Republic and YPF in this Court.  As relevant here, Petersen brought a breach-of-contract claim alleging that the Republic had violated the YPF Bylaws through its "acquisition of a controlling stake in YPF" without making a tender offer to other shareholders.  (*Petersen* Compl. ¶¶ 51-54.)  Petersen also brought a good-faith-and-fair-dealing claim based on the Republic's supposed "wide-ranging campaign against YPF's shareholders . . . to depress the value of YPF's shares."  (*Petersen* Compl. ¶¶ 60-63.)

Argentina moved to dismiss the complaint, contending, *inter alia*, that the claims were barred by the FSIA or the act-of-state doctrine, and otherwise failed to state a claim.  This Court dismissed some of Petersen's duplicative claims, but allowed Petersen's breach-of-contract and

---

[4]     Repsol did not foreclose upon a small portion of Petersen's holdings in 2012.  Those foreclosures were completed by May 8, 2014, when the Republic acquired Repsol's shares.  (SOF ¶ 88.)

good-faith-and-fair-dealing claims to proceed against the Republic.  In particular, the Court held that Petersen's breach-of-contract claim fell within the FSIA's "commercial activity" exception to sovereign immunity, 28 U.S.C. § 1605(a)(2), based on Plaintiffs' assertions that they were not seeking to impose liability for, or otherwise restrict, Argentina's sovereign act of expropriation. (*Petersen* ECF No. 63 at 13-19.)  Accordingly, this Court held that Argentina's "sovereign act" of expropriation had "triggered" its separate, subsequent "commercial contractual obligations" under the Bylaws.  (*Id.* at 17.)  For similar reasons, this Court rejected Argentina's act-of-state defense. (*Id.* at 19-24.)  Immediately following this Court's decision, Eton Park filed a nearly identical suit against Argentina and YPF.

Argentina appealed the FSIA and act-of-state rulings under the collateral-order doctrine. The Second Circuit affirmed this Court's FSIA ruling and declined to hear the appeal as to the act-of-state doctrine.  The court agreed that "expropriation is a decidedly sovereign—rather than commercial—activity."  *Petersen*, 895 F.3d at 206-07 (quoting *Garb* v. *Republic of Poland*, 440 F.3d 579, 586 (2d Cir. 2006)).  But it found that, under the Bylaws, any tender-offer obligation would be incurred not as *part* of the expropriation, but instead *after* the expropriation took place. *Id.* at 205–06.  The Court of Appeals concluded that, "[a]t bottom," the 2012 Public Interest Law "d[id] not prohibit a *post*-expropriation tender offer under YPF's bylaws," because it said "absolutely nothing about Argentina's acquisition of additional YPF shares in a *subsequent* market transaction."  *Id.* at 208-09 (emphases added).  The Court of Appeals therefore affirmed this Court's conclusion that the FSIA did not apply.  *Id.*

On remand, Argentina and YPF again moved to dismiss, arguing that, among other things, the need for this Court to address "complex issues of Argentine law" warranted dismissal of the case under the doctrine of *forum non conveniens*.  (*Petersen* ECF No. 111 at 3.)  This Court agreed

that Plaintiffs' claims were not breach-of-contract claims, but instead were "based on corporate relationships" in Argentina and thus were "properly classified as 'corporate claims' under Argentina law." (*Petersen* ECF No. 161 at 34-35.)  But the Court denied the motion, concluding that such corporate claims were not subject to the exclusive jurisdiction of Argentine courts and that the "prospect of applying Argentine law was not a reason to dismiss the case." (*Id.* at 38.)

## ARGUMENT

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where, as here, a dispute concerns a question of foreign law, a court's determination of that law "'must be treated as a ruling on a question of law,' rather than as a finding of fact."  *Animal Sci. Prod., Inc.* v. *Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018) (quoting Fed. R. Civ. P. 44.1).  Accordingly, the "determination of foreign law is, like a choice of law analysis, a preliminary matter to be resolved by a court."  *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 562 (E.D.N.Y. 2011) (Cogan, J.).  "A disagreement of the experts as to an issue of foreign law does not foreclose the granting of a motion for summary judgment."  *Korea Life Ins. Co.* v. *Morgan Guar. Tr. Co. of New York*, 269 F. Supp. 2d 424, 439 (S.D.N.Y. 2003) (Hellerstein, J.).

**I.   THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE PLAINTIFFS ARE NOT SECURITY HOLDERS NOR WERE THEY SECURITY HOLDERS WHEN ARGENTINA ACQUIRED REPSOL'S SHARES.**

Plaintiffs' theory is that Argentina breached the YPF Bylaws by acquiring a majority of the YPF Class D shares without first conducting a tender offer for the remainder.  But Plaintiffs do not own any YPF shares, nor did they own shares when Argentina acquired Repsol's shares in 2014.  As a matter of law, Plaintiffs' lack of share ownership either in the present day or when the breach occurred is fatal to their breach-of-contract claims.

A.      **Plaintiffs Do Not Hold YPF Securities.**

The Court should grant summary judgment for one simple reason:  Plaintiffs have no legal right to bring claims based on the alleged violation of the YPF corporate bylaws because they are not YPF shareholders and were not shareholders at the time they brought this lawsuit.  Petersen's ADRs were foreclosed on in 2012, while Eton Park sold its ADRs by 2013.  (SOF ¶¶ 84-91.)  As Plaintiffs' expert conceded, "Plaintiffs brought this action long after losing their status as YPF's shareholders." (*Petersen* ECF No. 132 (Garro Declaration of December 6, 2019) ¶ 29.)[5]

New York law governs the transfer of YPF ADRs, including whether Plaintiffs transferred their right to bring a claim for a breach of YPF's Bylaws.  Plaintiffs held their ADRs pursuant to a Deposit Agreement between them (as ADR holders), YPF, and The Bank of New York Mellon (the depository institution).  (SOF ¶ 5 ; *see* Ex. 5 (YPF Prospectus) at 92.)  The Deposit Agreement is governed by New York law and contained a choice-of-law provision stating that the ADRs were "transferable by a delivery with the same effect as in the case of a negotiable instrument governed by New York law."  (Ex. 4 (Deposit Agreement) § 2.01.)  Even absent such an explicit clause, courts in this District have held that New York law controls what rights are transferred with a security when the securities are held by a New York depository.  *See, e.g.*, *Phoenix Light* v. *Deutsche Bank National Trust Co.*, 2022 WL 384748, at *14 (S.D.N.Y. Feb. 8, 2022); *Commerzbank AG* v. *U.S. Bank Nat'l Ass'n*, 457 F. Supp. 3d 233, 243 (S.D.N.Y. 2020).

1.      Under Section 8-302(a) of New York's Uniform Commercial Code, "a purchaser of a certificated or uncertificated security acquires *all rights in the security* that the transferor had

---

[5]      Although some federal courts have analyzed whether a party retains rights to enforce a contract as a question of Article III standing, the Second Circuit recently clarified that it is instead a merits question "of contractual standing."  *SM Kids, LLC* v. *Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020).   "[C]ontractual standing speaks to a party's right to relief for breach of contract," not "the power of a court to adjudicate a controversy."  *Id.*

or had power to transfer." N.Y. U.C.C. § 8-302(a) (emphasis added). Courts in New York and Delaware—which applies an identical UCC provision, *see* 6 Del. Code § 8-302—have consistently differentiated "rights in a security" from "personal rights of the holder" to determine which rights travel with transferred securities. "Personal rights" "do not depend on the relationship between the stockholder and the corporation" and therefore can outlast the existence of that relationship. *Urdan* v. *WR Cap. Partners, LLC*, 244 A.3d 668, 677 (Del. 2020). "Rights in the security," by contrast, "arise[] from the relationship among stockholder, stock and the company." *Id.* Those rights travel with the security because those who sell their securities choose to "dissociate their economic interests from the corporation" and, by doing so, "forego the opportunity to benefit from" such claims. *Activision*, 124 A.3d at 1049-50 (quoting *In re Triarc Companies, Inc.*, 791 A.2d 872, 875 (Del. Ch. 2001)).

The right Plaintiffs assert here—that is, the right to enforce a corporate bylaws provision—is a quintessential "right in the security" that travels with the sale of a security. *Citibank*, 2016 WL 8737356, at *5 (describing "the right to enforce corporate bylaws or charters" as an example of a right in the security). Indeed, Plaintiffs assert that YPF's Bylaws "constitute an enforceable contract among the Company and its shareholders," and that the Bylaws required the Republic to make a tender offer to all Class D shares at a specified price. (*Petersen* Compl. ¶ 52; *see id.* ¶¶ 50-59.) The right to enforce "rights that stockholders possess under [a] corporation's certificate of incorporation and bylaws" is a "property right[] associated with the shares" that "travel[s] with the shares" when they are sold or otherwise transferred. *Activision*, 124 A.2d at 1050; *see also In re Sunstates Corp. S'holder Litig., C.A.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001) (same for breach of certificate of incorporation); *R.A. Mackie & Co., L.P.* v. *Petrocorp Inc.*, 329 F. Supp.

2d 477, 507 (S.D.N.Y. 2004) (same for breach of warrant agreement); *Urdan*, 244 A.3d at 677 (same for "corporate charter violation claim").

That Plaintiffs have styled their claim as a breach-of-contract claim for damages does not change the outcome.  A breach-of-contract claim *based on the violation of a bylaws provision* is still a claim that travels with the security, regardless of whether a plaintiff seeks damages for a past breach or injunctive relief for a current violation.  *Citibank*, 2016 WL 8737356, at *5.  As this Court has already recognized, Plaintiffs' breach-of-contract claim, however denominated, is, in its substance, a "corporate claim[]" that is "derived from [a] corporate relationship[]."  (*Petersen* ECF No. 161 at 34-35.)  That conclusion compels the grant of summary judgment here.

This case is similar to *FDIC* v. *Citibank*, in which the plaintiff, a former holder of RMBS certificates, filed a damages action alleging that U.S. Bank had breached its contractual duties to certificate holders.  2016 WL 8737356, *1.  Even though the alleged breaches occurred while the plaintiff was still a certificate holder, the court concluded that the plaintiff could no longer sue after selling its certificates.  *Id.* at *5.  The court reasoned that because "the claim concerns the relationship between the stockholder and the corporation, or attributes of the security or bond itself, the claim 'inheres' in the security and passes with the sale of the security."  *Id.* at *4-5; *see Urdan*, 244 A.3d at 677 (sale of plaintiffs' "right, title, and interest" in stock included the right to bring claims seeking damages for violations of corporate charter).  Here, Plaintiffs' claims likewise "inhered" in their securities as a matter of law, and the market for those securities "implicitly reflect[d] the value of the pending and any prospective lawsuits."  *Activision*, 124 A.3d. at 1044 (quoting *In re Resorts Int'l S'holders Litig.*, 1988 WL 92749, at *10 (Del. Ch. Sept. 7, 1988)).  Plaintiffs should not be doubly compensated with damages from this Court.

2.      The result would be the same under Argentine law.  Argentina limits the right to bring a claim for breach of corporate bylaws to current shareholders.  Plaintiffs' experts do not dispute that a shareholder making a claim under corporate bylaws in Argentina must maintain its shareholder status throughout the proceeding.  (Manóvil Rebuttal ¶ 25 (citing a corporate law treatise co-written by Plaintiff's expert Alfredo Rovira ("Standing to sue is lost with the loss of the character as shareholder.")).)  If anything, Argentine law is even more strict than New York law. In Argentina, the right to bring a breach-of-bylaws claim does not "travel" when the underlying shares are sold or otherwise transferred to a new owner, but instead is "*extinguished*" entirely under those circumstances.  (Manóvil Rebuttal ¶ 25.)  In other words, "if the challenging party ceases to be a shareholder," even the current shareholder cannot bring suit for past conduct.  (*Id*.)

### B.      When Argentina Acquired Repsol's Shares, Plaintiffs Did Not Own Any YPF Shares.

Plaintiffs' claims fail for the independent reason that Plaintiffs did not own their YPF shares at the time of any possible breach of Sections 7 and 28(A) of the YPF Bylaws—that is, when the Republic *acquired* 51% of YPF without making a tender offer to the remaining Class D shareholders.  (SOF ¶¶ 84-91.)  Argentina did not "acquire" a controlling stake in YPF until May 8, 2014, after Plaintiffs had already sold or otherwise lost their shares.  (*See id*.)  Under Argentine (and New York) law, a plaintiff may bring a claim seeking to enforce a corporate bylaws provision only if she was a shareholder at the time of the alleged breach.  (*See* Manóvil Opening ¶ 65; Uslenghi Reply ¶ 55); *Henderson* v. *Golden Corral Franchising Sys., Inc.*, 2021 WL 4392525, at *5 (S.D.N.Y. Sept. 23, 2021) (Román, J.).  For that reason, too, Plaintiffs' breach-of-contract claim fails.

Plaintiffs have not offered a consistent position as to when Argentina "acquired" the requisite number of shares to trigger the tender-offer obligation, or when the tender offer needed

to be made.  To evade a sovereign-immunity defense, Plaintiffs argued previously that the Bylaws required a tender offer to be made "*upon acquiring* the requisite interest in YPF" but not "*prior to* the acquisition."  (Dkt. No. 16-3303 (2d Cir.), ECF No. 80 (Appellee Petersen's Brief) (first emphasis added); *Petersen* ECF No. 61 (Motion to Dismiss Oral Argument Tr.) at 11 (similar statement by Petersen's counsel); *see Petersen* ECF No. 63 (Decision on MTD) at 16 ("[O]nce Argentina expropriated the shares, it assumed certain contractual obligations in the Bylaws.").)  Plaintiffs now argue that the breach occurred *on or before April 16, 2012*, when Argentina "began running YPF," and that the tender offer should have been launched by February 2012, months before the Intervention Decree was even issued.  (Ex. 7 (Fischel Opening) ¶ 30; Ex. 8 (Garro Opening) ¶ 32; Ex. 9 (Rovira Opening) ¶ 75.); *see also* Ex. 10 (Garro Deposition Tr.) 262:21-25 ("Q: Could the government have complied with the bylaws by offering the tender offer after April 16, 2012?  A: My opinion under oath is no.").)

As shown in Part III, *infra*, Plaintiffs' change in position, if accepted by the Court, would reopen the question of Argentina's sovereign immunity from suit.  But putting that to the side, Plaintiffs' new interpretation misconstrues the Bylaws.  The Bylaws' term "acquisition" refers to *ownership of shares*, not mere temporary rights exercised by the sovereign.  And none of the Republic's actions in 2012 amounted to an "acquisition" of YPF shares that could have triggered the tender-offer obligation.  The Republic did not acquire legal title to the shares and thus could not have triggered the tender-offer requirement until the expropriation was completed in 2014.

1.     Section 28 of the Bylaws applies Section 7's tender-offer requirements to "*acquisitions* made by the National Government, whether directly or indirectly, by any means or instrument, . . . if, *as a consequence of such acquisition*, the National Government becomes the owner, or exercises the control of, the shares of the Corporation, which, in addition to the prior

holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock." (Ex. 1 (YPF Bylaws) at § 28(A) (emphases added).)  Under Section 28's plain terms, only an *acquisition* of shares can trigger the tender-offer obligation.  (Manóvil Opening ¶¶ 56-65.)

As a matter of ordinary meaning, "acquiring" shares means *obtaining ownership* of shares. The term "'acquisition' (*adquisición*)" in Spanish "means obtaining title or ownership of something."  (Manóvil Reply ¶ 30; *see also* Uslenghi Rebuttal ¶ 26.)  Authoritative Argentine dictionaries confirm that in ordinary and legal parlance, to "acquire" means to obtain legal title. (*See* Manóvil Rebuttal ¶ 49 & n.72 (citing Guillermo Cabanellas de Torres, *Diccionario Jurídico Elemental* 19 (11th ed. 1993) (defining "acquisition" as "the act and effect of acquiring; the act by which one becomes the owner of some thing").)  The Argentine Supreme Court has also applied this understanding of the term "acquire" in the expropriation context specifically.  (*See* Manóvil Opening ¶ 64 (citing *La Nación* v. *Las Palmas del Chaco Austral SA s/expropiación de acciones*, May 8, 1975, Fallos: 291:507); *see also* Manóvil Reply ¶ 30 ("Never in my more than half a century of professional experience have I read or heard the words '*adquirir*' or '*adquisición*' used in legal parlance to mean anything other than obtaining title, owning something.").)

Other provisions of the Bylaws confirm that "acquire" means obtaining legal title.  Section 7(h) provides that the penalties resulting from the failure to follow the tender-offer obligation terminate when the acquired shares "are sold, in the case the purchaser has obtained the direct control of YPF, or until the purchaser loses the control of the YPF parent company, if the takeover has been indirect."  (Ex. 1 (YPF Bylaws) § 7(h).)  Section 7(h) therefore presumes that the "*purchaser*" that has acquired shares in YPF obtained legal title, including the ability to sell the acquired shares.  (*See* Manóvil Opening ¶ 60.)  The intervention of YPF in April 2012 and the Republic's temporary exercise of certain of Repsol's shareholder rights between May 2012 and

May 2014 did *not* involve the transfer of title (or otherwise provide the right to sell Repsol's shares) and thus could not amount to the "acquisition" that the Bylaws contemplate.

To try to save their claims, Plaintiffs focus not on the key term "acquisition," but on other portions of Section 28. They emphasize that the tender-offer requirement applies when an acquisition occurs "directly or indirectly, by any means or instrument, . . . if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares." (Ex. 1 (YPF Bylaws) at § 28(A).) In Plaintiffs' view, Section 28's acknowledgement of an "indirect[]" acquisition and the "exercise[] [of] control" means that "[f]or an acquisition to trigger the tender offer obligation . . . it is sufficient that the National Government has 'control' of the shares" or of management. (Bianchi Rebuttal ¶ 132(c).) But Plaintiffs misread Section 28.

Section 28's coverage of "indirect" acquisitions and the resulting exercise of "control" has nothing to do with functional influence over YPF management. Rather, those terms ensure that a purchaser may not evade the tender-offer requirement by acquiring legal title through related corporate entities—*i.e.*, parent companies or subsidiaries. The Bylaws specifically define "indirect" acquisitions to include acquisitions through such intermediate entities. (*See* Ex. 1 (YPF Bylaws) at § 7(i) (providing that, "[f]or the purposes of section 7, the term 'indirectly' shall include the purchaser's parent companies, the companies controlled by it," and similar corporate relationships)).) And because an acquisition may be either "direct" (through the acquirer's own purchase of YPF shares) or "indirect" (through, *e.g.*, a parent company's or subsidiary's purchase of YPF shares), the acquirer either may itself "become[] the owner" of the YPF shares or may "exercise[] the control of" the YPF shares owned by a related corporate entity. In either circumstance, however, the acquirer or its corporate family owns legal title to the YPF shares. Indeed, the Bylaws contemplate that any relevant exercise of corporate "control" occurs

"as a consequence of [an] acquisition" (Ex. 1 at §§ 7(d), 28(A))—meaning that control *results from* the acquisition of legal title, and not the other way around.  The Bylaws nowhere provide that the tender-offer requirement is triggered simply because a non-owner exercises mere "control of management," without any legal title.  (Manóvil Reply ¶ 32.)[6]

2.     The expropriation process under Argentine law was not complete—and therefore the Republic did not "acquire" Repsol's shares—until Argentina compensated Repsol and took title to its YPF shares in 2014.  (*See* pp. 9-10, *supra*.)  Before that, the Intervention Decree permitted the intervenor to exercise the powers of the YPF Board and/or President of the company—irrespective of share ownership—while the Public Interest Law provided for the temporary occupation of 51% of YPF's shares.  Neither activity is the equivalent of an acquisition of shares because neither granted the Republic certain "sticks" in the bundle of property rights associated with the shares, including the authority to sell them.  (Manóvil Opening ¶ 34.)

Moreover, the Republic could have withdrawn from the expropriation process at any point before it was completed in May 2014 without ever having "acquired" Repsol's YPF shares (Appendix at A-2 (General Expropriation Law) Art. 29)  Fatally for their position, Plaintiffs' own expert conceded that Argentina did *not* acquire the YPF shares until 2014:

> The Argentine Republic **became a YPF shareholder with the execution of the settlement agreement of the year 2014 because that's when the formal transfer and the ownership of share from Repsol to Argentine Republic occurred**.  Before that, before the settlement agreement, the Republic of Argentina and Articles 13 and 14 of the public utility law was under an abnormal temporary occupation state . . . whereby it was exercising rights **but which did not turn it into the owner of the shares**.

---

[6]     Relatedly, Section 28's reference to "any means or instrument" merely addresses *how* an entity can acquire legal title, signifying that it "can take place by any means (*e.g.*, purchase, exchange, donation, inheritance, legacy, merger, a company reorganization process, etc.)." (Manóvil Reply ¶ 33.)

(Ex. 11 (Bianchi Deposition Tr.) 146:7-21 (emphasis added); *see also* ████████████

████████████████████████████████████████████████████

████████████████████████████████████

The need for Argentina to *acquire* Repsol's shares before incurring the tender-offer obligation is also consistent with this Court's and the Court of Appeals' ruling on sovereign immunity. In holding that Argentina was not immune from suit under the FSIA, the Second Circuit affirmed this Court's conclusion that Argentina's "commercial obligation" to make a tender offer was a "separate obligation," conditioned on the *predicate* "sovereign act" of expropriation. *Petersen*, 895 F.3d at 206-07. This ruling accepted Plaintiffs' position that the tender-offer obligation did not impede Argentina's exercise of its expropriation power because Argentina could complete the expropriation separately and *prior to* making the tender offer. (*See* Dkt. No. 16-3303 (2d Cir. 2015), ECF No. 80 (Appellee Petersen's Brief) at 41 ("[T]he bylaws . . . do not mandate that Argentina complete the tender offer prior to the acquisition.").) But if the tender-offer obligation was triggered "post expropriation," *Petersen*, 895 F.3d at 207, then it was incurred after Plaintiffs were no longer shareholders. Plaintiffs cannot have it both ways.

Plaintiffs also are wrong to claim that the tender-offer requirement must have been triggered by the intervention, or it would be at odds with the Bylaws' supposed purpose of attracting foreign investors. (Ex. 12 (Rovira Rebuttal) ¶ 27.) As a threshold matter, the text of the Bylaws, not their claimed purpose, controls under Argentine law. (Manóvil Reply ¶¶ 20, 37; *see also* Br. of YPF at 14-17.) In any event, a provision mandating that an acquisition actually take place before the tender-offer obligation is imposed is not at odds with attracting foreign investment; it simply prevents the Republic from having to pay billions in a tender offer when an acquisition has not yet occurred and may never occur at all.

3.    Alternatively, Plaintiffs assert that their claims accrued in 2012 when they were still security holders because the Republic committed an *anticipatory* breach through contemporaneous remarks by government officials about the Public Interest Law.  This argument is baseless.  *First*, under Argentine law, an anticipatory breach does not establish an independent cause of action for damages.  Instead, if the breaching party declares that "he will not meet his obligation," the non-breaching party's remedy is to terminate the contract.  (Manóvil Rebuttal ¶¶ 115-16.)  Plaintiffs did not do so, barring their claim.  (*Id.* ¶ 20.)  Individual shareholders cannot terminate a bylaws provision at all, a reality that only underscores why a violation of a bylaws provision cannot be challenged through a contract action under Argentine law.  (Manovil Opening ¶¶ 96-97.)  *See* Part II.A, *infra*.

*Second*, under Argentine law, a repudiation of contractual obligations must be both "unequivocal" and "addressed directly to the *creditor*" to qualify as anticipatory breach.  (Manóvil Rebuttal ¶¶ 123, 126.)  Yet, in support of their anticipatory-breach claim, Plaintiffs rely only on an email exchange among Argentine government officials regarding the drafting of legislation and a speech made by the Argentine Secretary of Economic Policy expressing the *belief* that the tender-offer obligation was *inapplicable* to the Republic.  (Ex. 9 (Rovira Opening) ¶ 49; Ex. 12 (Rovira Rebuttal) ¶ 83.)  Such conduct does not amount to an unequivocal repudiation *by the Republic* of a contractual obligation—and it was not specifically addressed *to YPF shareholders*.  (Manóvil Rebuttal ¶¶ 123, 126.)

*Third*, the only public remarks on which Plaintiffs primarily rely were part of a political speech made by a member of the Argentine executive branch in support of the Public Interest Bill before an Argentine Senate committee.  (SOF ¶ 63.)  If this Court were required to consider whether this speech was an "unequivocal" repudiation by the Republic amounting to "anticipatory

breach," that would require this Court to determine the validity of an "official act" of a sovereign within its own territory in contravention of the act-of-state doctrine. *See Hourani* v. *Mirtchev*, 796 F.3d 1, 13 (D.C. Cir. 2015) (act-of-state doctrine required dismissal of defamation claim relying on "authoritative representation" of a foreign government's position).

## II. PLAINTIFFS' CLAIMS ALSO ARE NOT COGNIZABLE UNDER ARGENTINE PRIVATE LAW.

For years, Plaintiffs avoided Argentine courts—and for good reason:  their "breach-of-contract" claims are not cognizable under Argentine law.  This Court has already held that Plaintiffs' claims are governed by Argentine law.  (*Petersen* ECF No. 161 at 34-35.)  And Argentina does not recognize either the claims that Plaintiffs assert or the remedies that they seek. *First*, a shareholder cannot bring a breach-of-contract claim against another shareholder for a breach of corporate bylaws.  *Second*, even assuming a shareholder could do so, the claim would be limited to the penalties outlined in the YPF Bylaws, which do not include damages.  *Third*, even if the Bylaws were silent on penalties, Argentine law requires Plaintiffs to seek a remedy "in kind" rather than damages.

### A. Argentine Law Does Not Recognize a "Breach of Contract" Claim Between Shareholders for Alleged Violations of Corporate Bylaws.

Under Argentine law, corporate bylaws do not create bilateral obligations between shareholders. (Manóvil Reply ¶ 8(iii).)  As a result, one shareholder cannot directly demand that another shareholder comply with a bylaws provision, but instead must exercise the rights and remedies available under Argentine corporate law. (Manóvil Opening ¶ 79.)  Argentina's alleged violation of a tender-offer obligation provided by YPF's Bylaws accordingly does not give rise to a contract claim against "Argentina as a co-shareholder of YPF."  (*Id.* ¶ 77.)  Such a "co-shareholder" claim does not exist. (*Id.* ¶¶ 66-78.)

Although shareholders cannot bring a direct action to enforce corporate bylaws against other shareholders, Argentine law provides shareholders with a detailed set of statutory mechanisms to enforce such claims—none of which Plaintiffs elected to use here.   Under Argentina's General Corporations Law (GCL), the shareholders' meeting provides the proper forum for parties to seek redress of their claims for any bylaws violation. (Manóvil Opening ¶¶ 79-95; Manóvil Reply ¶¶ 62-65.)  At that meeting, shareholders can move for a resolution to enforce the bylaws or to enforce the penalties set out in the bylaws.  (*Id.* ¶ 65.)  Shareholders can also challenge in court any resolution passed at a shareholders' meeting during which bylaws are violated.  (*Id.* ¶ 66.)  But Plaintiffs have only a three-month period to bring this claim because the power to challenge shareholder resolutions allows a dissenting shareholder to "effectively paralyze the company" in the interim.  (*Id.*)  If such a challenge proves successful, Article 254 of the GCL allows a shareholder to bring a subsequent claim against the shareholders who voted in favor of the nullified resolution for the harm allegedly caused by the breach.  (*Id.* ¶ 67.)

Other YPF shareholders took advantage of precisely those GCL enforcement mechanisms. For instance, several shareholders objected at the June 4, 2012 shareholders' meeting to counting the Repsol shares "occupied" by the Republic for the purpose of meeting quorum requirements and to the Republic's voting those shares.  (Manóvil Opening ¶ 86.)  Certain shareholders also timely filed claims in Argentine courts challenging the resolutions passed at the June 4 meeting.  (*Id.* ¶ 87.)  But Plaintiffs chose not to avail themselves of the remedies available to them (or, again unlike other shareholders, demand compliance with the tender-offer provisions they now claim were violated).   (SOF ¶ 79.) Plaintiffs cannot evade the GCL's requirements, including its three-month limitations period, by simply labeling their corporate claim a "contract" claim and filing it in a U.S. court.

**B.** **Even if Plaintiffs Could Assert a Contract Claim, Neither the YPF Bylaws Nor Argentine Law Permits the Damages Claim Plaintiffs Assert.**

Assuming Plaintiffs could bring a breach-of-contract claim directly against the Republic as a "co-shareholder," Plaintiffs would not be entitled to the billions of dollars in windfall damages they seek. That is because the YPF Bylaws provide exclusive remedies in the event of a breach of the tender-offer obligation, and damages are not among them. Furthermore, even if the Bylaws were silent on this question, the Civil Code does not permit damages in these circumstances.

1.      Under Argentine law, where parties to a contract specify the penalties for breaching that contract, those remedies are exclusive. (Manóvil Opening ¶ 105.) Article 655 of the Civil Code provides that "the penalty or fine imposed [by the contract] *takes the place of compensation for damages and interest*, upon a breach." (Manóvil Reply ¶ 70 (quoting Art. 655) (emphasis added).) Contractual penalties are limited by the terms of the contract, and, under Article 655, the non-breaching party "will not be entitled to other compensation, even if he proves that the penalty is not sufficient compensation." (*Id.* (quoting Art. 655).) The agreed-upon penalties "may take various forms," *i.e.*, they can be either compensatory or punitive, and need not include damages. (*Id.*; *see also id.* ¶¶ 74, 76.) Whatever their form, contractual penalties are exclusive so long as they are the means by which parties "ensure the fulfillment of an obligation." (Manóvil Opening ¶ 113 (quoting Civil Code, Art. 652).)

The YPF Bylaws supply their own explicit "penalties"—namely, that shares acquired in breach of the tender-offer obligations "shall not grant any right to vote or collect dividends or other distributions that the Corporation may carry out"; or "be computed to determine the presence of the quorum at any of the shareholders' meetings of the Corporation, until such shares of stock are sold." (*See* Ex. 1 (YPF Bylaws) §§ 7(h), 28(C).) Those penalties are thus exclusive, and no separate damages action is available.

-28-

Plaintiffs' experts concede that where a contract supplies its own penalties, those penalties are exclusive. (*See, e.g.*, Ex. 10 (Garro Deposition Tr.) 58:4-9.)  But they claim that Sections 7(h) and 28(C) were not intended to operate as penalty clauses because they do not set a fixed amount of compensation in the event of a breach.  (Ex. 12 (Rovira Rebuttal) ¶¶ 69-70.)  That is wrong as a matter of Argentine law.  The plain language of Article 655 of the Civil Code states that a contractual penalty will be exclusive and the "non-breaching party will not be entitled to other compensation," if *either* "the penalty *or* fine" is set out in the contract.  (Manóvil Reply ¶ 70 (quoting Art. 655) (emphasis added).)

Moreover, the Bylaws' penalty provisions *do* "compensate" non-breaching shareholders. *First*, "blocking the voting power of the breaching shareholder enhances proportionately the voting power" of the remaining shareholders, thereby increasing their influence over corporate management.  (Manóvil Reply ¶ 73).  *Second*, "by depriving the breaching shareholder of its right to participate in dividend distributions," the penalty clause redistributes more funds to the rest of the shareholders.  (*Id.*)  The YPF Bylaws' penalty provisions therefore act both to deter breach—by preventing a breaching shareholder from reaping the benefit of its shares acquired in breach of the provisions—and to compensate for any ongoing breach—by allowing the other shareholders to increase their influence and dividend distributions.  They simply realize those goals without providing for an *additional* possibility of recovering damages in a breach-of-contract action, which is entirely consistent with the limitation on damages in Article 655 of the Civil Code.

2.      Even if the YPF Bylaws were silent on penalties, Plaintiffs' claim for damages would fail.  Under Argentine law, the default rule is that a plaintiff must seek a remedy "in kind"—like specific performance—before recouping damages for a breach of contract.  (Manóvil Opening ¶¶ 96, 98.)  The Civil Code authorizes damages only if performance has become "impossible"

through the fault of the breaching party.  (*Id*. ¶ 99 (citing Art. 889).)  Plaintiffs thus were required to seek a remedy in kind, such as an action to compel the Republic to conduct a tender offer, before bringing this suit.  Because they did not do so, their damages claim fails.  (Manóvil Rebuttal ¶ 60.)

In urging to the contrary, Plaintiffs depart from settled understandings of the Argentine Civil Code.  According to Plaintiffs' experts, a plaintiff can choose freely between requesting specific performance or damages.  (Ex. 14 (Garro Rebuttal) ¶ 44.)  But "Argentine scholars unanimously agree" that the Civil Code means what it says, providing "for the payment of damages *only* in the event of culpable impossibility of performance in kind."  (Manóvil Rebuttal ¶ 65 (citing sources).)  And "[f]or an in kind remedy to be impossible, the relief must no longer exist or no longer be available because of *the breaching party's* fault, or force majeure."  (Manóvil Opening ¶ 99 (emphasis added); *see also* Civil Code Art. 628.)  Impossibility that results from a delay in demanding relief or bringing suit is the *plaintiff's* fault and does not excuse a failure to demand performance.  (Manóvil Rebuttal ¶ 69; Manóvil Reply ¶ 116.)

Performance of the tender-offer provisions in the Bylaws was not impossible at the time of the alleged breach, and Plaintiffs do not claim otherwise.  Indeed, other YPF shareholders promptly demanded an in-kind performance from the Republic.  For example, in 2013, two YPF minority shareholders brought a claim against the Republic (which was later settled as part of the compensation for Repsol's shares, *see* pp. 37-38, *infra*) "seeking a judgment ordering it to make [plaintiffs] an offer to purchase the class 'D' shares in YPF SA . . . at the price set in the Bylaws of the Company."  (Manóvil Opening ¶ 89.)  Plaintiffs did not do so.  And the fact that such in-kind relief, if granted now, would not inure to Plaintiffs' benefit only reinforces that they are not the right plaintiffs to bring this suit.  (*See* Part I, *supra*.)

III.   **PLAINTIFFS' CLAIMS IMPERMISSIBLY CHALLENGE ARGENTINA'S
SOVEREIGN ACTIVITY.**

Even assuming Plaintiffs could overcome the multiple private-law hurdles foreclosing this
suit, their breach-of-contract claims would still fail.  First and foremost, Plaintiffs' new position
that Argentina's obligation to commence a tender offer arose *before* its "acquiring the requisite
interest in YPF," undermines this Court's prior conclusion that Argentina is not immune from suit.
If accepted, their new reading of the Bylaws would require dismissal of the suit under the FSIA
and act-of-state doctrines because it creates a conflict between the Bylaws and Argentina's
sovereign acts of intervention, temporary occupation, and expropriation.

In proceedings before this Court and the Court of Appeals, Argentina asserted that it was
immune from this suit because Plaintiffs sought to impose liability for the Republic's exercise of
its sovereign prerogatives.  In response, Plaintiffs countered that the Bylaws' tender-offer
obligation was "triggered" by the expropriation but did not interfere with that expropriation
process because the tender offer was required only *after* the expropriation was complete.  *See* pp.
19-20, *supra*.   The timing of the tender-offer obligation was thus central to this Court's
conclusion—affirmed by the Second Circuit—that there was no conflict between sovereign acts
of the Argentine government and the application of the Bylaws.  *See* Part I.B., *supra*; *see also*
*Petersen*, 895 F.3d at 206-07 (finding that "Argentina's obligation to conduct a tender offer" was
a separate act "*triggered* by its sovereign act of expropriation" and that there was "nothing unusual
about *conditioning* a commercial obligation on the occurrence of a sovereign act") (emphases
added).

Having end-run sovereign immunity in opposing the Republic's motion to dismiss,
Plaintiffs' experts now assert that the Bylaws required a tender offer to commence "no later than
February 13, 2012" (Ex. 7 (Fischel Opening) ¶ 30), that is, "at least several *months before* the

-31-

takeover on April 16, 2012." (Ex. 9 (Rovira Opening) ¶ 58) (emphasis added). If that is true, then the factual predicate underlying this Court's prior sovereign-immunity decision no longer controls. *See Af-Cap, Inc*. v. *Republic of Congo*, 462 F.3d 417, 428 (5th Cir. 2006) (law of the case does not prevent court from reconsidering sovereign immunity in light of changed factual circumstances or novel legal arguments).

The Republic is immune from any suit predicated on Plaintiffs' novel construction of the tender-offer obligation because the relevant conduct does not fall within the FSIA's commercial-activity exception. A "foreign state engages in commercial activity . . . where it acts in the manner of a private player within the market." *Saudi Arabia* v. *Nelson*, 507 U.S. 349, 360 (1993). By contrast, when a state exercises a power "peculiar to sovereigns," *id.*, it "trigger[s] no commercial exception" under the FSIA. *Braka* v. *Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985). It is settled that a claim is "based upon" commercial activity for the purposes of the FSIA only where commercial activity constitutes the "basis" or "foundation" for that claim. *OBB Personenverkehr AG* v. *Sachs*, 577 U.S. 27, 33 (2015); *see also Nelson*, 507 U.S. at 358 (FSIA "calls for something more than a mere connection with, or relation to, commercial activity"). The Second Circuit held, and Plaintiffs do not dispute, that expropriation is a "sovereign act." *Petersen*, 895 F.3d at 206. And under Plaintiffs' new theory, the expropriation process provides the "basis" for their claims. As now constructed, this suit no longer challenges actions that could have been taken by a "private player," *Nelson*, 507 U.S. at 360; instead, Plaintiffs challenge an expropriation occurring without having been preceded by a tender offer. Plaintiffs' claims therefore cannot proceed against the Republic.

Plaintiffs' change of position also requires dismissal under the act-of-state doctrine because adjudicating their breach-of-contract claim would necessarily entail "judicial review" of the

archetypal act of state—the "taking of property within its own territory by a foreign sovereign government." *Braka*, 762 F.2d at 224 (quoting *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 428 (1964)).  Plaintiffs seek to impose liability for the Republic's "official act[s]" of intervention, temporary occupation, and expropriation, which under their theory constituted a violation of the Bylaws because they were not preceded by a tender offer.  *Kashef* v. *BNP Paribas S.A.*, 925 F.3d 53, 60 (2d Cir. 2019).

In sum, under Plaintiffs' prior reading of the Bylaws, adopted by the Second Circuit, the tender offer had to occur only once the expropriation was complete.  But if that is correct, then Plaintiffs have no right to enforce the obligation.  *See* Part I, *supra.*  Alternatively, if the tender offer had to occur **before** the expropriation was complete, Plaintiffs' claims are barred by the FSIA and the act-of-state doctrine.  Either way, their claims cannot proceed.

## IV. PLAINTIFFS' CLAIMS ARE BARRED BY ARGENTINE PUBLIC LAW.

Regardless of when the alleged tender-offer obligation arose, Plaintiffs' claims still fail. As Plaintiffs' experts conceded, it is an "obvious" principle of Argentine law that matters of public law (and especially of public order) take precedence over and preempt private law agreements. (Ex. 10 (Garro Deposition Tr.) at 292:20-293:5.)  Under Argentina's General Expropriation Law—indisputably a law of "public order" (Uslenghi Opening ¶ 25)—an expropriated asset is taken free of all private-law encumbrances, including putative contractual obligations such as the Bylaws' tender-offer requirement.  And to the extent Plaintiffs were affected by the expropriation of Repsol's shares, the General Expropriation Law provides the exclusive set of remedies available to them, including the ability to bring a claim for compensation to be satisfied from the compensation paid to the expropriated party (here, Repsol).

A.    **Argentina's General Expropriation Law Preempts Any Tender-Offer Obligation.**

By its terms, Argentina's General Expropriation Law, which neither this Court nor the Court of Appeals previously addressed, bars Plaintiffs' claims.  Article 28 of that law provides: "No action by third parties may impede the expropriation or its effects.  The rights of the claimant shall be considered transferred from the thing to its price or to the compensation, leaving the thing free of any encumbrance." (*See* Appendix at A-2 (General Expropriation Law) Art. 28.)  But under Plaintiffs' reading, the Bylaws would impermissibly "impede" the expropriation and its "effects," by placing an "encumbrance" on the expropriated property—the obligation to conduct a tender offer.

1.    Under Argentine law, rights or claims against the State based on any type of private-law encumbrance on expropriated property are precluded.  As the Argentine Supreme Court has ruled, "because expropriation is a manifestation of original State sovereignty . . . its exercise may not be interfered with." (Uslenghi Opening ¶¶ 105-06 & Uslenghi Ex. 5 (citing *Bauzá Horacio and Bauzá Carlos* v. *Administración Nacional de Vialidad Nacional*, Argentine Supreme Court, Judgment of May 18, 1962 (Fallos: 252:310)).)  Article 28 of the General Expropriation Law codifies this settled principle by providing that an expropriated asset is taken by the Republic "free" of any encumbrances.  (*Id.*; Appendix at A-2 (General Expropriation Law) Art. 28.)

That rule, which is referred to in Argentine law as the "original title" principle, is intended to prevent all forms of "private law obstruction of the State's constitutional powers." (Uslenghi Opening ¶ 108.)  In the words of the Argentine Supreme Court, "the acquisition of the property by the expropriating party is pursuant to original title and not derivative title, as in the case of a sale." (*Id.* ¶ 106 & Uslenghi Ex. 4. (citing *Esquivillón de Igón, Matilde Leonie Juana and Igón de Almeyra, Elena Rita* v. *Nación Argentina*, Judgment of August 5, 1957 (Fallos: 238:335)).)  The

expropriation therefore extinguishes "all encumbrances or third-party rights, of any legal nature," including a contractual obligation or, in this case, the Bylaws' tender-offer requirement.  (*Id.* ¶¶ 105, 110-112 (citing cases).)  The Argentine Supreme Court has confirmed that "to admit *any kind of contractual restriction*" on the exercise of the expropriation power would impermissibly "subject[] the question of expropriation to private interest," as opposed to the public interest, "resulting in the obvious unconstitutionality of the agreement." (*Id.* ¶ 31 & Uslenghi Ex. 8 (citing *Sociedad de Electricidad de Rosario*, Judgment of April 14, 1975 (Fallos: 291:290) (emphasis added)).)

This rule has been interpreted expansively and applied to render ineffective private agreements that imposed burdens far less substantial than the alleged multi-billion dollar obligations claimed by Plaintiffs here.  For example, the Argentine Supreme Court has found preempted:

- A forum-selection clause in an agreement between a landowner and an occupant. The Argentine Supreme Court held that this contractual provision was preempted because enforcing it would prevent the expropriation action from moving forward, thereby "undermining in this way—*or delaying in time*—the necessity of its realization." (Uslenghi Opening ¶ 32 & Uslenghi Ex. 9 (discussing *Hidronor, S.A.* v. *Provincia de Río Negro*, Judgment of November 5, 1991 (Fallos: 314:1422).)

- In the case of the expropriation of land for the construction of a railway, a requirement that elevated passes be constructed to remediate the effects of an expropriation, because the requirement was "an encumbrance or easement from which [the expropriated asset] must be considered exempt."  (Uslenghi Opening ¶ 110 & Uslenghi Ex. 7 (discussing *Ferrocarril Central Argentino* v. *L. de Fusse*, Judgment of November 21, 1911 (Fallos: 115:59)).)

- A right to "usufruct" (*i.e.*, to occupy and use land) on land that was being expropriated, because such rights were limited by the clear text of Article 28 of the

General Expropriation Law. (Uslenghi Opening ¶ 111 & Uslenghi Ex. 6 (discussing *Puerto de San Nicolás* v. *Provincia de Buenos Aires*, Judgment of February 16, 1911 (Fallos: 114:124)).)

Judge Uslenghi, who sat on the Argentine Federal Court of Appeals that resolved public law disputes, catalogues other similar examples. (Uslenghi Opening ¶¶ 106-11.) There is therefore no doubt that the Argentine Supreme Court would find the tender-offer requirements in YPF's Bylaws to be preempted by the public-law legislation on expropriation, particularly because, under Plaintiffs' current view, the Bylaws set onerous conditions relating to *if, when, and how* the Republic could conduct the expropriation.

       2.     For three reasons, Plaintiffs' interpretation of the Bylaws would also contravene Article 28 of the General Expropriation Law's rule that "[n]o action by third parties may impede the expropriation *or its effects*." (Appendix at A-2 (General Expropriation Law) Art. 28.) *First*, Plaintiffs' experts concede that the Public Interest Law "had as its ultimate or final intention the acquisition of 51 percent of YPF shares through expropriation" (Ex. 11 (Bianchi Deposition Tr.) at 117:19-23.)[7] But under Plaintiffs' reading, the Republic would have been obliged to acquire more than a 51% interest in YPF, an option it explicitly considered and rejected. (Uslenghi Opening ¶¶ 72-73, 75-77.) *Second*, the Public Interest Law expressly provided that the expropriation would have the "effect" of YPF continuing to operate as a publicly traded company, again a goal that would have been incompatible with a tender-offer that could result in complete government ownership of YPF. (*Id.* ¶ 86.) *Third*, the Public Interest Law provided that the

---

[7]     This argument addresses a question that this Court and the Court of Appeals had no occasion to address: whether the General Expropriation Law's provision that "no action by third parties may *impede* the expropriation or its *effects*"—a provision that, as described above, sweeps quite broadly in the private-law agreements it serves to preempt—necessarily preempted the tender-offer obligation.

expropriated shares would be distributed at a certain fixed proportion between the federal government and the Provinces. (*Id.* ¶¶ 79-80, 85.) Yet conducting a tender offer would have resulted in the Republic acquiring a much higher ownership percentage, diluting the stake given to the Provinces and thereby upsetting this "federal balance." (*Id.* ¶ 85.)

### B.    Argentina's General Expropriation Law Provides Plaintiffs' Exclusive Remedies for Any Alleged Damages Arising from the Expropriation.

The General Expropriation Law also provides specific avenues of relief for third parties, like Plaintiffs, who claim to have been injured as a result of an expropriation of another's property. Specifically, Article 28 of the General Expropriation Law permits a plaintiff to make a claim for a right alleged to be affected by the expropriation of an asset; that claim is "transferred from the [expropriated] thing to its price or to the compensation" paid to the expropriated party. (Appendix at A-2 (General Expropriation Law) Art. 28.) But those third-party rights are not separately compensated by the Government, which acquires the expropriated property "free and clear" of all encumbrances. Instead, pursuant to the Argentine law principle of unitary or "single" compensation for expropriation, those rights are compensated as part of the total amount of compensation paid to the expropriated party. (Uslenghi Opening ¶ 116.) Accordingly, any compensation for Plaintiffs' asserted loss needed to come out of the compensation paid to Repsol.[8]

This compensation process follows from the Argentine "original title" principle with respect to expropriated assets. *See* pp. 35-36, *supra.* When the Republic takes "original title," that title is unencumbered. The Argentine Supreme Court has interpreted the predecessor to Article 28 of the General Expropriation Law to mean that a person allegedly affected by the expropriation of

---

[8]    Under Article 67 of the General Expropriation Law, the same rule applies to third-party claims arising from a temporary occupation: "If the temporary occupation were to affect third parties, their rights shall be enforced against the amount of the compensation." (Appendix A-3 (General Expropriation Law) Art. 67; *see also* Uslenghi Rebuttal n.20; Ex. 13 (Santiago Deposition Tr.) at 93:10-17, 95:3-9).

another's property cannot seek "compensation distinct and separate from that due to the owner; rather, his rights are inevitably transferred from the thing to the price." (Uslenghi Opening ¶ 111 & Uslenghi Ex. 6 (quoting *Puerto de San Nicolás* v. *Provincia de Buenos Aires*, Supreme Court of Argentina, Judgment of February 16, 1911 (Fallos: 114:124)).) And in this case, the "price" or "compensation" of the expropriated assets was the $5 billion paid to Repsol pursuant to the 2014 settlement agreement and YPF Expropriation Law. If Plaintiffs believed they were entitled to compensation for the loss of the tender offer right, they should have made any appropriate claim that could have been accounted for in the settlement agreement. (Uslenghi Opening ¶¶ 58, 117.)

The terms of the Repsol settlement agreement reflect that understanding. Under the agreement, Argentina's provision of $5 billion served as compensation to Repsol not only for the expropriated shares, but also "for any other claim arising from or connected to" the intervention, temporary occupation, and expropriation. (*See* Ex. 15 (Repsol-Argentina Settlement Agreement) at § I; *see also id.* Whereas clause.) Repsol agreed to "obtain discontinuances" of proceedings against Argentina that had been properly initiated by third parties in connection with the intervention, temporary occupation, and expropriation. (*Id.* § VI(1)(iii), Annex VI.) If Repsol could not obtain a "discontinuance," it was required to indemnify Argentina against any subsequent liability. (*Id.* § VI(1)(iii).) In other words, Repsol agreed to extinguish the claims of third parties, including YPF shareholders who had brought suit in Argentina demanding that the Republic conduct a tender offer. (Uslenghi Reply ¶ 22.)

## V.   PLAINTIFFS' GOOD-FAITH-AND-FAIR-DEALING CLAIMS ALSO FAIL AS A MATTER OF LAW.

Finally, Plaintiffs assert that Argentina breached a duty of good faith and fair dealing "implied in the Bylaws" by "conducting a wide-ranging campaign against YPF's shareholders beginning in January 2012 that caused the price of YPF's shares to drop precipitously." (*Eton*

*Park Compl.* ¶¶ 58-59; *Petersen Compl.* ¶¶ 61-62.)  Plaintiffs' allegations in support of this claim largely pertain to rumors that circulated about the potential nationalization of YPF.  For example, Plaintiffs assert that in January 2012, an Argentine newspaper reported that Argentina was "considering nationalizing" YPF.  (*Id.* ¶ 33.)  They further contend that a few months later, an Argentine cabinet chief stated that Argentina "had not ruled out nationalization." (*Id.* ¶ 33.)  Those thin allegations—which Plaintiffs never developed further in discovery—cannot support a good-faith-and-fair-dealing claim.

*First*, Plaintiffs' good-faith-and-fair-dealing claim fails under Argentine law.  Argentina does not recognize a separate cause of action for breach of an implied duty of good faith and fair dealing where the alleged "duty" is distinct from the duties expressly undertaken in the contract. (Manóvil Decl. in support of Mot. to Dismiss ¶ 14, ECF No. 115.)  In other words, "[u]nder Argentine law, the principle of good faith informs the performance of a party's existing obligation, but does not create new obligations." (Ex. 20 (Kemelmajer Rebuttal) ¶ 45.)  Plaintiffs therefore cannot establish a good-faith-and-fair-dealing claim because their claim is not premised on the breach of an explicit contractual provision, but rather invokes a supposed "distinct" duty that is not recognized by Argentine law.  While Plaintiffs' U.S. securities law expert asserted in his reports that unspecified actions taken by Argentina could be construed as a breach of the *New York* law of good faith and fair dealing, New York law does not apply to this claim.  As a matter of New York law, the duty of good faith and fair dealing is an implied contractual covenant. *511 W. 232nd Owners Corp.* v. *Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002).[9]  It is thus subject to the same

---

[9]    Although Professor Coffee suggests that such a covenant could arise from the YPF NYSE listing agreement (Ex. 19 (Coffee Reply) ¶ 10), Plaintiffs have never asserted a claim based on the NYSE listing agreement and the Republic is not a party to that agreement.

law as the underlying contract—in this case the law of Argentina.  (*Petersen* ECF No. 161 at 34-35.)

*Second*, regardless of which law applies, Plaintiffs have never clarified how they believe Argentina breached this alleged duty.  They appear to allege that the Argentine Government did so by failing to dispel rumors regarding a potential expropriation.  But no source of law prevents political officials from *considering* whether to take a particular act.  Alternatively, if Plaintiffs are challenging the actual expropriation through their good-faith-and-fair-dealing claim, the claim is barred by the FSIA and the act-of-state doctrine.  *See Petersen*, 895 F.3d at 205 (holding that Argentina is immune from any suit challenging its exercise of its "sovereign act" of expropriation); *Hunt* v. *Mobil Oil Corp.*, 550 F.2d 68, 77 (2d Cir. 1977) (affirming dismissal of claim challenging nationalization of an oil company under the act-of-state doctrine).

*Third*, and perhaps for the above-mentioned reasons, Plaintiffs have essentially abandoned their good-faith-and-fair-dealing claim by failing to marshal any evidence to substantiate it. Plaintiffs' experts have rarely mentioned the claim and even then only in conclusory terms.  (*See* Ex. 16 (Coffee Rebuttal) ¶¶ 27, 32 (asserting that Argentina acted "in bad faith" in conducting the expropriation); *but see* Ex. 17 (Coffee Deposition Tr.) at 355:12-14 (conceding that he could not offer this legal conclusion to fact finder).)  With the benefit of discovery, Plaintiffs have neither identified conduct by Argentina that could have breached an implied covenant of good faith, nor attempted to quantify their alleged damages as a result of such conduct. (*See* Ex. 18 (Fischel Deposition Tr.) at 86:6-12 (conceding that he had not performed any study or analysis to determine how much, if any, of YPF's share price decline was caused by statements or actions by the federal or provincial governments).)  For all these independent reasons, this claim must be dismissed.

## CONCLUSION

For these reasons, the Court should grant the Republic's motion for summary judgment.

Respectfully,

/s/ Robert J. Giuffra
Robert J. Giuffra, Jr.
Sergio J. Galvis
Amanda F. Davidoff
Jeffrey B. Wall
Thomas C. White
Adam R. Brebner

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:     (212) 558-4000
Facsimile:      (212) 558-3588

*Counsel for the Argentine Republic*

April 14, 2022