**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PETERSEN ENERGÍA INVERSORA, S.A.U. and
PETERSEN ENERGÍA, S.A.U.,

               Plaintiffs,

     -against-

ARGENTINE REPUBLIC and YPF S.A.,

               Defendants.

Case Nos.:

1:15-cv-02739-LAP
1:16-cv-08569-LAP

---

ETON PARK CAPITAL MANAGEMENT, L.P.,
ETON PARK MASTER FUND, LTD., and
ETON PARK FUND, L.P.,

               Plaintiffs,

     -against-

ARGENTINE REPUBLIC and YPF S.A.,

               Defendants.

---

## PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

KIRKLAND & ELLIS LLP

Paul D. Clement
George W. Hicks, Jr.
C. Harker Rhodes, IV

KING & SPALDING LLP

Israel Dahan
Laura Harris
Reginald R. Smith

KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U.,*
*Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

SUMMARY OF THE ARGUMENT ..........................................................................4

ARGUMENT ...............................................................................................................8

I.    Plaintiffs Have Standing To Sue for Breach of Contract...............................8

    A.    Plaintiffs have contractual standing ....................................................8

        1.    Defendants have forfeited their "contractual standing" defense.................9

        2.    Defendants' contractual standing argument fails as a matter of law...........................................................................................11

            a.    Defendants' choice of law "analysis" misreads the Deposit Agreement ......................................................12

            b.    The right at issue here is personal under New York law...................................................................................14

    B.    Plaintiffs owned YPF shares at the time of the breach in April 2012...................20

        1.    Defendants' breach occurred on April 16, 2012, when Argentina acquired a control position in YPF ...........................20

        2.    Defendants' repudiation on April 17, 2012, independently gives Plaintiffs standing..............................................27

II.   Argentina Is Liable for Damages Under the Argentine Civil Code...................................29

    A.    The Bylaws created contract rights governed by the Civil Code..........................29

    B.    Plaintiffs are entitled to damages ........................................................36

        1.    Section 7(h) is not a penalty clause.........................................36

        2.    Plaintiffs had no obligation to pursue specific performance ...................38

III.  YPF Is Liable For Failing To Enforce the Tender-Offer Requirements...........................41

    A.    The Bylaws imposed specific obligations on YPF ...............................42

    B.    YPF's breach caused Plaintiffs' damages.............................................52

    C.    Petersen has not lost its standing to sue YPF.......................................56

        1.     The Prospect-Petersen Claim Prosecution Agreement (the "CPA") is not a simulated assignment contract under Spanish law .................................................................................................57

        2.     Under FRCP 17, YPF's simulation argument cannot alter the trajectory of this case ............................................................60

IV.    Defendants' Public Law Arguments Are Foreclosed by the Second Circuit and Wrong as a Matter of Argentine Law ..........................................................62

    A.     Argentina's arguments under the FSIA and the Act of State doctrine are foreclosed by the Second Circuit's decision ....................................62

    B.     Argentina's repackaged public law arguments are foreclosed and meritless ....................................................................................................65

        1.     Argentina's arguments are foreclosed by the Second Circuit's decision ..........................................................................................65

        2.     Argentina's arguments are wrong as a matter of Argentine law ..............66

            a.     The tender-offer provision does not encumber Argentina's expropriated shares ....................................66

            b.     The tender-offer provision does not impede the "effects" of expropriation .............................................67

            c.     Article 28 of the Expropriation Law does not provide an exclusive remedy ......................................69

    C.     YPF's public law argument also fails ....................................................69

V.     Argentina Acted in Bad Faith ...........................................................................72

CONCLUSION.....................................................................................................................75

# TABLE OF AUTHORITIES

## Cases

*Activision Blizzard, Inc. Stockholder Litig., In re*, 124 A.3d 1025 (Del. Ch. 2015).............. 17, 18

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
    106 F.3d 11 (2d Cir. 1997).......................................................................... 60, 61, 62

*Allan Applestein TTEE FBO D.C.A. Grantor Tr. v. Province of Buenos Aires*,
    415 F.3d 242 (2d Cir. 2005).......................................................................... 9

*Amorim Holding Financeria, S.G.P.S., S.A. v. C.P. Baker & Co.*,
    53 F. Supp. 3d 279 (D. Mass. 2014) .............................................................. 61

*Animazing Ent., Inc. v. Louis Lofredo Assocs., Inc.*,
    88 F. Supp. 2d 265 (S.D.N.Y. 2000).............................................................. 10

*Arb. of Katz, In re*, No. 13 Civ. 2585 (NRB),
    2014 WL 1224445 (S.D.N.Y. Mar. 18, 2014) ............................................. 58

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)............................................................. 28

*Blue Chip Cap. Fund II Ltd. P'ship v. Tubergen*,
    906 A.2d 827 (Del. Ch. 2006)........................................................................ 51

*Broadbill Partners L.P. v. Ambac Assurance Corp.*, No. 653869/2012,
    2014 NY Slip Op 30647(U) (Sup. Ct. Mar. 12, 2014)................................... 16

*Cheatham I.R.A. v. Huntington Nat'l Bank*, 137 N.E.3d 45 (Ohio 2019) ................... 15

*Chrebet v. Cty. of Nassau*, No. 09 CV 4249 (DRH) (AKT),
    2014 WL 1836835 (E.D.N.Y. May 8, 2014) ................................................. 62

*Citibank N.A.*, No. 1:15-cv-6574, 2016 WL 8737356 (S.D.N.Y. Sept. 30, 2016) ....... 17

*Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 457 F. Supp. 3d 233 (S.D.N.Y. 2020) .... 14

*Consol. Edison, Inc. v. Ne. Utils.*, 318 F. Supp. 2d 181 (S.D.N.Y. 2004)................... 16

*Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524 (2d Cir. 2005).................................. 16

*Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329 (2d Cir. 1986)................ 53

*Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239 (10th Cir. 2016)................... 21

*FDIC v. Murex, LLC*, 500 F. Supp. 3d 76 (S.D.N.Y. 2020)....................................... 10

*First United Fin. Corp. v. Specialty Oil Co.*, 5 F.3d 944 (5th Cir. 1993)..................... 15

*FLLI Moretti Cereali v. Cont'l Grain Co.*, 563 F.2d 563 (2d Cir. 1977) ...................................... 57

*Focus Prods. Grp. Int'l, LLC v. Katri Sales Co.*,
    No. 15 Civ. 10154 (PAE), 2021 WL 1946756 (S.D.N.Y. May 14, 2021) .......................... 9, 11

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
    479 F. Supp. 2d 349 (S.D.N.Y. 2007) ............................................................................... 16

*Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423 (2d Cir. 2001) ................................................. 55

*Gale v. Bershad*, No. CIV. A. 15714, 1998 WL 118022 (Del. Ch. Mar. 4, 1998) ...................... 52

*Haber v. Fireman's Ins. Co.*, No. 98Civ.1740 (LLS),
    2000 WL 943562 (S.D.N.Y. July 10, 2000) ..................................................................... 15

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*,
    141 S. Ct. 2172 (2021) ..................................................................................................... 30

*Imperator Realty Co. v. Tull*, 228 N.Y. 447 (1920) .................................................................... 15

*John Hancock Mut. Life Ins. Co. v. Webcor, Inc.*,
    311 F.2d 701 (7th Cir. 1962) ............................................................................................ 13

*Kerman v. City of N.Y.*, 374 F.3d 93 (2d Cir. 2004) ......................................................... 21, 43, 62

*Kim v. DK Cosms.*, No. 19-CV-9079 (JMF),
    2022 WL 540675 (S.D.N.Y. Feb. 23, 2022) ..................................................................... 56

*Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*,
    906 F.3d 215 (2d Cir. 2018) ............................................................................................ 61

*Landau v. Best*, 187 A.2d 75 (Del. 1962) .................................................................................... 13

*Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308 (2020) ...................................... 45

*Maxim Grp. LLC v. Life Partners Holdings, Inc.*,
    690 F. Supp. 2d 293 (S.D.N.Y. 2010) .............................................................................. 64

*Morgan v. Sundance, Inc.*, No. 21-328, 2022 WL 1611788 (U.S. May 23, 2022) ...................... 11

*Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 18-cv-12361 (JMF),
    2020 WL 2555281 (S.D.N.Y. May 20, 2020) ................................................................... 62

*Oliveira v. Quartet Merger Corp.*, 126 F. Supp. 3d 424 (S.D.N.Y. 2015) ............... 15, 51, 52, 64

*Orix Credit All., Inc. v. Horten*, 965 F. Supp. 481 (S.D.N.Y. 1997) .......................................... 56

*Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, No. 17-cv-1388 (KPF) (RWL),
    2022 WL 1446552 (S.D.N.Y. Feb. 22, 2022) ................................................................... 16

*Penske Media Corp. v. Shutterstock, Inc.*, 548 F. Supp. 3d 370 (S.D.N.Y. 2021) ...................... 33

*Petersen Energía Inversora, S.A.U. v. Argentine Republic*,
   No. 15-cv-2739 (LAP), 2016 WL 4735367 (S.D.N.Y. Sept. 9, 2016),
   *aff 'd in part, dismissed in part*, 895 F.3d 194 (2d Cir. 2018),
   *cert. denied*, 139 S. Ct. 2741 (2019) ................................................................ *passim*

*Petersen Energía Inversora, S.A.U. v. Argentine Republic*,
   895 F.3d 194 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019) .................................. *passim*

*Petersen Energía Inversora, S.A.U. v. Argentine Republic*,
   2020 WL 3034824 (S.D.N.Y. June 5, 2020) ................................................................ *passim*

*Phillips Puerto Rico Core, Inc. v. Tradax Petroleum Ltd.*,
   782 F.2d 314 (2d Cir. 1985)................................................................................... 53

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*,
   No. 14-cv-10103 (JGK), 2022 WL 384748 (S.D.N.Y. Feb. 8, 2022) ..................................... 14

*Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1 (1977) ..................................................... 15

*R.A. Mackie & Co. v. Petrocorp Inc.*, 329 F. Supp. 2d 477 (S.D.N.Y. 2004) ............................. 18

*Reich v. Malcolm Pirnie, Inc.*, 821 F. Supp. 905 (S.D.N.Y. 1993) ................................. 21, 43, 62

*Roberts v. Weight Watchers, Int'l, Inc.*, 217 F. Supp. 3d 742 (S.D.N.Y. 2016)........................... 26

*Saks v. Franklin Covey Co.*, 316 F.3d 337 (2d Cir. 2003)................................................. 11

*Sarandi v. Breu*, No. C 08-2118 SBA, 2009 WL 2871049 (N.D. Cal. Sept. 2, 2009) ................ 13

*Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*,
   167 F. Supp. 2d 639 (S.D.N.Y. 2001)....................................................................... 15

*Shaw v. Goebel Brewing Co.*, 202 F. 408 (6th Cir. 1913) ................................................. 58

*SM Kids, LLC v. Google LLC*, 963 F.3d 206 (2d Cir. 2020) ................................................ 9

*Sunstates Corp. S'holder Litig., In re*, No. Civ. A.,
   13284, 2001 WL 432447 (Del. Ch. Apr. 18, 2001)......................................................... 17

*Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*,
   No. 01 Civ. 11814 (LAP), 2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004) ................................. 28

*Triarc Cos., In re*, 791 A.2d 872 (Del. Ch. 2001) ....................................................... 18

*United States v. Botti*, 711 F.3d 299 (2d Cir. 2013)..................................................... 33

*United States v. Craft*, 535 U.S. 274 (2002) ............................................................ 26

*Urdan v. WR Capital Partners, LLC*, 244 A.3d 668 (Del. 2020) .................................................. 18

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) ........................................................................ 30

*Wellman v. Dickinson*, 475 F. Supp. 783 (S.D.N.Y. 1979) ............................................................ 15

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
 127 F. Supp. 3d 156 (S.D.N.Y. 2015) ......................................................................................... 9

*Zimmerman v. Home Shopping Network, Inc.*,
 1990 WL 118363 (Del. Ch. Aug. 14, 1990) .............................................................................. 15

**Statutes**

8 Del. Code Ann. § 102 .................................................................................................................. 17

8 Del. Code Ann. § 109 .................................................................................................................. 17

N.Y. U.C.C. § 1-201 ..................................................................................................................... 13

N.Y. U.C.C. § 8-302 ................................................................................................................ 12, 15

N.Y. U.C.C. § 8-302(a) .................................................................................................................. 16

**Rules**

Fed. R. Civ. P. 17 ........................................................................................................................... 60

Fed. R. Civ. P. 17(a)(3) .................................................................................................................. 60

**Other Authorities**

Restatement (Second) of Contracts § 261 (Am. L. Inst. 1981) ...................................................... 53

## PRELIMINARY STATEMENT

Argentina and its state-owned entities have a long history in this District of advancing spurious arguments to evade clear legal obligations and defer the day of reckoning for as long as possible.  Its latest filings are of a piece with that long tradition, but the bait and switch from the Republic and YPF here is particularly egregious.  Defendants take positions that not only are legally flawed, but fail the test of common sense.  If Defendants had articulated any of the positions they take in their summary judgment papers at the time of YPF's IPO, that critical privatization would have been dead on arrival.  Given Argentina's checkered economic past, if Argentina and YPF had told investors that they could only sue if they held on to their ADRs for years after a re-nationalization and then would have only limited remedies in Argentine courts based on the dueling reports of legal scholars on the vagaries of Argentine corporate law, they would have been laughed out of the road shows and been locked out of international capital markets.

Needless to say, Argentina and YPF took any entirely different tack, making unusual and unusually clear promises to induce foreign investors to overcome their skepticism about Argentina's track record and purchase shares of YPF.  To that end, YPF and Argentina amended YPF's Bylaws specifically and expressly to provide shareholders a "compensated exit" in the event that Argentina reacquired control of the company.  *Petersen Energía Inversora, S.A.U. v. Argentine Republic*, 895 F.3d 194, 200 (2d Cir. 2018) ("*Petersen II*").  That crystal clear promise had its intended effect and allowed Argentina to privatize YPF and raise more than $1 billion by listing YPF's ADRs on the NYSE.

Had Defendants even hinted at what they now proclaim—that NYSE investors would have no right to bring a claim for damages for breach of that promise and could not bring any suit unless they held on to their shares for years after re-nationalization—foreign investors would never have gone near YPF and its ADRs.  Moreover, Sullivan & Cromwell, which served as IPO counsel,

surely would have found it necessary for YPF to disclose these remarkable positions in the IPO prospectus and make clear that what purported to be clear promises and protections against re-nationalization were in fact a mirage. But none of that happened. Instead, investors relied and invested just as Argentina and YPF intended. There is no avoiding the day of reckoning for those promises, and Defendants' meritless *post hoc* arguments are nothing more than a continuing effort to string out this matter and avoid payment.

Not only are Defendants' arguments wholly inconsistent with clear promises they made during the IPO and for years afterward, but they were not even floated when those promises were breached. When Argentina renationalized YPF by seizing control of a majority interest in the company in April 2012, Defendants did not *deny* that they had made this core promise of a "compensated exit"—rather, they publicly and proudly *renounced* that promise. They did not explain their actions by subtle reference to the vagaries of Argentine corporate law, by denying their tender-offer obligations, or by expressing a hope that victimized shareholders would abandon their rights by selling ADRs. Instead, their message was far simpler: They announced that they would not be "stupid" enough to pay the tender-offer price, having determined internally that it would be more financially advantageous to delay payment by forcing shareholders to bring suit. They made no attempt to justify their actions as lawful—either publicly or in their own internal discussions. Argentina baldly refused to make the required tender offer, and YPF flatly declined to enforce that obligation or corresponding sanctions for Argentina's breach. As a result, Plaintiffs were deprived of the compensated buyout to which they were contractually entitled.

Now, years later, facing the very litigation they forced shareholders to bring, Defendants advance a litany of *post hoc* arguments for avoiding their obligations altogether. These arguments do not pass the straight-face test whether measured against well-established legal principles or the

common-sense test whether the IPO could have succeeded were the promises as illusory as Defendants now proclaim.  Argentina's lead argument exemplifies its seemingly limitless ability to discover new reasons not to honor promises designed to be clear and readily enforceable:  Seven years into a case in which Argentina successfully persuaded the Court that *Argentine law* governs, Argentina invokes a newfound contractual "standing" defense under *New York law* that never surfaced in Defendants' two prior motions to dismiss nor was pleaded in either Defendant's answer.  The argument is forfeited and the claim that shareholders needed to hold on to shares for years after re-nationalization is meritless.   Defendants' other arguments fare no better.  Defendants' astonishing contention that the Bylaws are not an enforceable contract is foreclosed by the Second Circuit's ruling that the Bylaws *are* a binding contract as to both Argentina and YPF.  It also finds no support in Argentine statute or case law—only convoluted (and often contradictory) theories offered by their Argentine law experts.  And Defendants' argument that Plaintiffs' claims contravene Argentine public law merely rehashes arguments that this Court and the Second Circuit have already rejected.

At bottom, Defendants' position is that if the Bylaws made any promises at all, shareholders were obligated to jump through an improbable series of hoops, and satisfy a gauntlet of obscure requirements, in pursuit of remedies that not only were far different from the cash payments that the Bylaws plainly provide but also were impossible to obtain according to Defendants' own experts.  Those arguments typify everything investors feared about Argentina and its nationalist past.  The clear contractual promises in the Bylaws were the antidote.  The promises were clear because they had to be clear.  If even those solemn promises are as flimsy as Defendants now claim, the loser will not be the Plaintiffs but every country that seeks to access U.S. capital markets.   Fortunately, the law protects investors and stands as an obstacle to

Defendants' remarkable bait and switch.  The promises were clear.  The promises are enforceable.  The breaches were unmistakable.  This Court should reject Defendants' effort to escape responsibility across the board.

<u>**SUMMARY OF THE ARGUMENT**</u>

This case involves a straightforward breach of clear promises.  What investors feared most when investing in Argentina's long-nationalized oil company was its re-nationalization.  The Bylaws directly protected against that possibility and have already been found to be an enforceable contract.  When the worst fears materialized and Argentina re-nationalized YPF, the contract was breached and Plaintiffs are entitled to damages for that breach.  It really is as simple as that.  Argentina and YPF try very hard to complicate matters, but those efforts are unavailing.

With little to say on the merits—and even less that is not foreclosed by prior rulings in this case—Defendants begin by questioning Plaintiffs' standing.  One way to try to avoid prior unfavorable rulings is to raise brand new arguments, like Argentina's newfound contractual standing defense that Plaintiffs lost the capacity to sue when they transferred their shares.  But well-established forfeiture principles prevent injecting new arguments at this late stage.  Despite years of litigation, including an appeal up to the Supreme Court and multiple rounds of dispositive motions, Defendants never raised this argument—until now.  That would be one thing if this argument went to Article III standing, which can be raised at any time, but "contractual standing," like "statutory" standing, is just a merits argument that can be forfeited.  In any case, Argentina had good reason not to raise this defense earlier:  it arises under the wrong law and is meritless.  Defendants' promise to buy *Plaintiffs'* shares for a sum certain involves a personal right that did not travel with their shares.  *See* Part I.A.

Defendants' other standing argument has been raised before, but it is equally meritless.  It rests on rewriting history to imagine Plaintiffs were never owed a tender offer at all.  The tender-

4

offer obligation is triggered by an acquisition of "control," and Argentina acquired control of YPF on April 16, 2012.  Just one day later, it publicly repudiated its obligations to conduct a tender offer, announcing it would not be "stupid" enough to honor its former promise.  Either way, via breach or repudiation, Plaintiffs' claims arose in April 2012.  Argentina's decision to pay Repsol and take formal title to a subset of shares later in a 2014 settlement is simply beside the point.  *See* Part I.B.

Once those contrived standing arguments—new and old—are swept aside, Defendants' liability remains clear.  Argentina is liable for refusing to conduct the tender offer it owed its fellow shareholders.  Under the Civil Code, bylaws may create bilateral obligations, and the tender-offer provision triggered just such obligations between YPF's shareholders.  Nothing in the General Corporations Law displaced that obligation, certainly not provisions governing intra-corporate spats over the mechanics of shareholder-meeting votes.  Argentina breached its obligations here without needing the help of any impermissible shareholder resolution.  *See* Part II.A.  Like any other sensible country, Argentine law permits Plaintiffs to recover damages for breach of that bilateral obligation.  Argentina attempts to evade its obligations to pay by turning Argentine remedial principles upside down and ignoring the Bylaws' plain text.  Rather than limiting Plaintiffs to an ineffectual remedy, Argentine law permits Plaintiffs to opt for the contractual remedy that makes them whole.  The Bylaws' price-calculation provisions clearly contemplate damages as a permissible choice here and specify damage amounts designed to protect investors.  Other provisions of the Bylaws barring a non-tendering acquirer from voting its shares work in tandem to support, not undercut, that right to compensation.  Argentina cannot now rely on this alternative safeguard—that it and YPF blew right through—to evade its obligation to pay.  *See* Part II.B.

YPF, too, is liable for refusing to enforce the Bylaws' provisions designed to help force a tender offer.  YPF attempts a second bite at the apple here as well, resurrecting its discredited argument that it never made any binding promises in its Bylaws or in other representations to investors, but that extraordinary position runs headlong into the Second Circuit's previous decisions in this case, and it is contradicted by the plain text of the Bylaws and the unmistakable import of YPF's own repeated assurances to investors.  The Second Circuit answered this precise question years ago, holding that "every corporation is obligated to abide by its bylaws" and that YPF had a specific contractual "obligation to enforce the tender offer provision."  *Petersen II*, 895 F.3d at 210.  The Second Circuit was correct, because the Bylaws are unambiguous and non-discretionary:  any entity wishing to acquire control *must* conduct a tender offer, and shares acquired in violation of that requirement *must* be stripped of their right to vote—and YPF has both the power and the obligation to enforce those obligations against all comers, including Argentina. *See* Part III.A.  The Bylaws leave no room for doubt on that score by necessity, because lingering doubt would have been fatal to YPF's campaign to secure billions from foreign investors through its IPO.  To reassure skeptical investors (who were understandably hesitant to part with their cash in light of Argentina's checkered political and economic history), YPF repeatedly told investors that it would enforce the Bylaws' mandatory tender-offer provisions.  When the time came, however, YPF declined to enforce those provisions, and instead *cooperated* with Argentina's scheme to flout the Bylaws entirely.  There can be no question that YPF's defiance of its contractual obligations caused Plaintiffs damages.  YPF's attempt to escape that conclusion now relies on a series of desperate arguments about "force majeure" that are easily contradicted by the record and are nonstarters under Argentine (and United States) law. *See* Part III.B.  Nor can YPF's attempt to argue that Petersen is not the real party in interest succeed.  To do so would require this

Court to overrule a Spanish court and misread the plain text of Petersen's Claim Prosecution Agreement.  *See* Part III.C

Defendants' half-hearted efforts to relitigate old battles about Argentine public law and sovereign authority are unavailing.  They argue that this suit impermissibly challenges sovereign acts under the Foreign Sovereign Immunities Act ("FSIA") and the Act of State Doctrine.  *See* Part IV.A.  And they exhume their tried-and-failed argument that Argentine public law preempts any obligations in the Bylaws' tender-offer and no-vote provisions.  *See* Part IV.B-C.  This Court's decision in *Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15-cv-2739 (LAP), 2016 WL 4735367 (S.D.N.Y. Sept. 9, 2016) ("*Petersen I*") and the Second Circuit's decision in *Petersen II* squarely foreclose these arguments.  Accordingly, the law of the case doctrine bars this Court from considering these arguments now, and they are just as wrong as they were four years ago.  Knowing this full well, Defendants attempt to end-run these prior determinations by mischaracterizing Plaintiffs' damages calculations to suggest that Plaintiffs' theory of the case has somehow changed.  Nothing has changed.  Argentina still had the power to expropriate YPF if and when it saw fit.  That is why the Bylaws provided a mechanism to compensate for a re-nationalization, instead of a quixotic effort to forbid it.  The tender obligation presumes and remains distinct from the sovereign power to expropriate.  And Plaintiffs' experts have consulted pre-expropriation circumstances solely for purposes of calculating the counterfactual tender price required by the Bylaws.

Finally, Defendants ask this Court to turn a blind eye to the rampant evidence of their bad faith in this case.  But Argentine law permits this Court to consider Defendants' conduct in applying the Bylaws, and the un-rebutted record is clear:  Defendants undertook specific obligations in the Bylaws in order to induce foreign investment; years later, and after the discovery

of additional oil resources, Argentina conducted a coordinated campaign to depress YPF's share price knowing its importance for the tender price calculations; Argentina forcibly assumed control of the company and failed to tender an offer to its fellow shareholders; YPF, meanwhile, made no effort to enforce the no-vote provision specifically designed to force a tender; and both Defendants then publicly renounced their obligations, jeering at the chumps left holding the bag. In the years since, Defendants have acted consistently with this course of conduct, seeking to delay their payment obligations at every turn. The time has come for this Court to hold Defendants to their promise. *See* Part V.

## ARGUMENT

## I.    Plaintiffs Have Standing To Sue for Breach of Contract

Defendants' series of *post hoc* justifications for avoiding their obligations begins with two "standing" arguments. *First*, Defendants invoke New York law to contend that Plaintiffs had to continue to hold their YPF shares through today (indeed, through a final, non-appealable judgment) to maintain their "contractual standing" to sue. *Second*, Defendants claim that, following the April 2012 breach of the tender-offer provisions, Plaintiffs had to continue to hold their shares at least until Argentina in its sole discretion decided to settle with Repsol, which it chose to do two years later in 2014. Each of these arguments is meritless—and the first is forfeited. The notion that the Bylaws' apparent financial protection against a re-nationalization required shareholders to hold on to their shares for years after that re-nationalization came to pass borders on the absurd. Plaintiffs held YPF ADRs when they were deprived of their personal right to a tender offer and compensated exit in April 2012. Accordingly, Plaintiffs—not subsequent holders of those ADRs—are the proper parties to vindicate the tender-offer provisions of the Bylaws.

### A.    Plaintiffs have contractual standing

Seven years into this litigation, Defendants argue for the very first time that, under *New*

*York law*, Plaintiffs had to retain their ADRs throughout this lawsuit to possess "contractual" standing to sue Defendants under *Argentine law* for refusing to make a tender offer in April 2012. That argument does not go to Article III standing. It involves only a contractual defense that Defendants did not timely raise and therefore forfeited.  Moreover, the argument is wrong on the merits and defies common sense.  YPF's Bylaws promised Plaintiffs a "compensated exit from their ownership position in the firm if Argentina were to decide to renationalize YPF."  *Petersen II*, 895 F.3d at 200.  That promise was personal to them and others who held shares in April 2012, when Argentina retook control.  Plaintiffs, not YPF's current shareholders, retain the right to sue.

1.    Defendants have forfeited their "contractual standing" defense

Unlike Article III standing, which is uncontested, *see* Argentina Br. at 16 n.5, "contractual standing" is a "merits" defense, *see id*. (quoting *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211-12 (2d Cir. 2020)).  As such, it "must be raised in a party's answer or pre-answer motion to dismiss."  *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 169 (S.D.N.Y. 2015); *see also Allan Applestein TTEE FBO D.C.A. Grantor Tr. v. Province of Buenos Aires*, 415 F.3d 242, 245 (2d Cir. 2005).  Defendants clearly forfeited that affirmative defense here, for they did not previously raise a contractual standing argument.  Indeed, although they had "numerous opportunities" to raise this argument, Defendants "stayed mum" *for years*.  *Focus Prods. Grp. Int'l, LLC v. Katri Sales Co.*, No. 15 Civ. 10154 (PAE), 2021 WL 1946756, at *2-3 (S.D.N.Y. May 14, 2021) (holding defendants forfeited statutory standing defense).

Argentina and YPF first moved to dismiss Petersen's Complaint nearly seven years ago— on September 8, 2015.[1]  They answered Petersen's Complaint on July 8, 2019, then moved to

---

[1] *Petersen* ECF No. 23 (Argentina Notice of Motion To Dismiss); *Petersen* ECF No. 32 (YPF Notice of Motion To Dismiss).

dismiss Eton Park's Complaint, and again to dismiss Petersen's Complaint, on August 30, 2019, and answered Eton Park's Complaint on July 10, 2020.[2]  Not one of those filings asserted a contractual standing defense, even though Plaintiffs acknowledged in their Complaints that they no longer held YPF shares.[3]  Indeed, Defendants' answers asserted numerous affirmative defenses, including five *other* defenses couched in "standing" language.  But Defendants never asserted— until now—that Plaintiffs lost their capacity to sue when they transferred their ADRs.  There is no serious argument that Defendants raised this issue "at the first pragmatically possible time." *Animazing Ent., Inc. v. Louis Lofredo Assocs., Inc.*, 88 F. Supp. 2d 265, 268 (S.D.N.Y. 2000).

The fact that Defendants advanced *other* defenses couched in standing, only makes matters worse.  It merely underscores that they could have asserted this defense—but did not.  That is why this Court has recognized that a defendant forfeits a contractual standing defense even if it raised other standing issues in a timely manner.  In *FDIC v. Murex, LLC*, for example, the defendant sought to avoid forfeiture of a contractual standing defense by "contend[ing] that its Answer raised a standing defense."  500 F. Supp. 3d 76, 97 (S.D.N.Y. 2020).  This Court acknowledged that "the Answer could generously be read to dispute an issue of standing," but found the defendant's prior standing arguments did not preserve "this defense"—contractual standing—which it neglected to discuss in its "earlier motions to dismiss."  *Id.*  The same is true here.  *This defense* is only just now seeing the light of day.[4]

---

[2] Hicks Ex. 8 (*Petersen* ECF No. 98 (Argentina Answer)); Hicks Ex. 9 (*Petersen* ECF No. 99 (YPF Answer)); Hicks Ex. 11 (*Petersen* ECF No. 110 (Defs.' Notice of Joint Motion To Dismiss)); *Eton Park* ECF No. 51 (Defs.' Notice of Joint Motion To Dismiss); Hicks Ex. 15 (*Eton Park* ECF No. 116 (YPF Answer)); *Eton Park* ECF No. 117 (Argentina Answer).

[3] *See* Hicks Ex. 5 (*Petersen* ECF No. 1 (Compl.) ¶ 4); Hicks Ex. 14 (*Eton Park* ECF No. 1 (Compl.) ¶ 41).

[4] None of Defendants' affirmative defenses can be construed, even liberally, to encompass their new contractual standing defense.  Defendants asserted that "Plaintiffs lack standing to bring the claims asserted in the Complaint because they did not own shares of YPF stock at the time the Argentine Government acquired its controlling stake."  Hicks Ex. 8 (*Petersen* ECF No. 98 (Argentina Answer) at 22); *Eton Park* ECF No. 117 (Argentina Answer) at 17.  But that contention—the second standing argument Defendants assert here—is a defense distinct from

Defendants' "persistent and unexcused" failure to raise this defense, "despite numerous opportunities to assert" it over the past seven years, "works a forfeiture" regardless of any impact on Plaintiffs. *Focus Prods.*, 2021 WL 1946756, at *2-3 (holding statutory standing defense forfeited based solely on defendants' failure to raise it in "the first five years of this litigation"); *See also Morgan v. Sundance, Inc.*, No. 21-328, 2022 WL 1611788, at *3 (U.S. May 23, 2022) (holding waiver in federal court generally does not require a showing of prejudice); *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (holding unpleaded affirmative defenses may not be considered where there is "undue delay of the proceedings"). Even if prejudice were required, entertaining Defendants' contractual standing argument now—many years after it could and should have first been raised—would plainly prejudice Plaintiffs, as they have litigated complex issues of foreign sovereign immunity, Argentine law, and the like for years at great expense, all of which would have been utterly unnecessary if the resolution of this case were as simple as "no current ownership of ADRs therefore no suit." In Petersen's case, moreover, this multiyear litigation effort has been undertaken pursuant to a Spanish insolvency court order which ruled many years ago, contrary to Defendants' new argument, that the litigation claims belong to the Petersen estate and *not* its foreclosing creditors.[5]

## 2.      Defendants' contractual standing argument fails as a matter of law

There is a good reason Defendants did not raise their new contractual standing argument earlier: it is meritless. YPF's investors did not insist on protections against re-nationalization only

---

contractual standing (Defendants' first standing argument), which asserts that Plaintiffs lack standing because they did not own YPF stock at the time they *brought suit* and beyond. *Compare* Argentina Br. Part I.A (asserting the latter), *with* Argentina Br. Part I.B (asserting the former). Defendants' other "standing" defenses are even further afield. *Petersen* ECF No. 98 at 26-27; *Eton Park* ECF No. 117 at 15, 18-19.

[5] Hicks Ex. 133 (Order, *Petersen Energía Inversora, S.A.U.*, Ordinary Bankr. 405/2012 (Comm. Ct. Madrid 03 Sept. 1, 2010) ("PESA Bankr. Ct. Order")). Indeed, this provides an additional reason why Defendants' new argument is foreclosed: the Spanish commercial courts (including after exhaustive appeals by YPF) have held that Defendants may not collaterally challenge the rulings of the Petersen insolvency court. *See infra* n.33.

to consign themselves to holding ADRs in perpetuity after re-nationalization.   Defendants'
argument fails at every step.  They invoke the wrong jurisdiction's law and they misread that law.

> a.      Defendants' choice of law "analysis" misreads the Deposit
> Agreement

In a single paragraph (Argentina Br. at 16-17), Defendants assert that New York law—
specifically, N.Y. U.C.C. § 8-302—controls the question of "contractual standing."   This
remarkable contention comes after years of Defendants' asserting (successfully) that *Argentine
law* governs this suit, with no exceptions.[6]  Their newly contrived argument that *New York law*
governs Plaintiffs' contractual standing (while *Argentine law* presumably still governs everything
else) exemplifies Defendants' heads-I-win-tails-you-lose approach to this litigation.   Defendants
cannot have it both ways.  Indeed, if Defendants are right that the Deposit Agreement governs
ADR-holders' substantive rights vis-à-vis the corporation, then Plaintiffs' contract claims against
Defendants (which are parties to the agreement) should be governed by *New York* law, and the
Court would no longer need to devote time and resources to disposing of their many contrived
(and meritless) *Argentine law* defenses.

Regardless, Defendants' choice-of-law argument is unavailing.   They rely primarily on
Section 2.01 of the Deposit Agreement.  But Section 2.01 simply addresses the mechanics of
transferring YPF ADRs; it has no bearing on the substantive rights that holders retain or relinquish
when they transfer ADRs.   This provision makes sense because different financial instruments
may adopt different mechanisms for transfer.  Some, for example, require a formal change in a
book entry registry, while others (e.g., "bearer bonds") require only a change in possession.

---

[6] *See, e.g.*, Hicks Ex. 6 (*Petersen* ECF No. 28 (Argentina MTD) at 32 n.14) (Argentina advocating
application of Argentine law); Hicks Ex. 7 (*Petersen* ECF No. 33 (YPF MTD) at 19-21) (YPF advocating
application of Argentine law).  Indeed, this Court held at Defendants' urging that Argentine law governs Plaintiffs'
breach of contract claims.  *See Petersen I*, 2016 WL 4735367, at *14 ("Argentine law [applies] to Plaintiffs' breach
of contract claims where a conflict between New York and Argentine law exists."); *Petersen III*, 2020 WL 3034824,
at *13 ("All agree that Argentine law applies to this action.").

To avoid any confusion over how YPF ADRs would be transferred, Section 2.01 articulates

the mechanics for transferring negotiable instruments under New York law.  That section provides:

> Title to a Receipt . . . when properly endorsed or accompanied by proper
> instruments of transfer, shall be transferable by delivery with the same effect as in
> the case of a negotiable instrument governed by New York law.

*Id*.  YPF ADRs thus are "transferable by delivery"—that is, by voluntary transfer of possession of

the Receipt—and the legal "effect" of delivery is to transfer ownership in the same way negotiable

instruments are transferred by delivery under New York law.  *See* N.Y. U.C.C. § 1-201; *John*

*Hancock Mut. Life Ins. Co. v. Webcor, Inc.*, 311 F.2d 701, 706 (7th Cir. 1962) (interpreting similar

language to mean a warrant was "transferable . . . similar to a negotiable instrument"); *cf. Landau*

*v. Best*, 187 A.2d 75, 77 (Del. 1962).  None of that moves the needle for Defendants' contractual

standing argument because there is no dispute here about *who owns or possesses* the ADRs as a

result of any intervening transfers.  The only question is whether transferring the ADRs deprived

Plaintiffs of their contractual standing to sue.  It did not, but Section 2.01 has nothing to say about

it, because it addresses a different (and far more technical) matter altogether.

Any reliance on other choice-of-law provisions in the Deposit Agreement would suffer

from the same basic flaw.  Under the Deposit Agreement, New York law applies only to the narrow

issues addressed by the Agreement relating to the deposit of underlying YPF shares with the

depository and the creation, form, transferability, and execution of ADRs.  *See Sarandi v. Breu*,

No. C 08-2118 SBA, 2009 WL 2871049, at *4 (N.D. Cal. Sept. 2, 2009) ("Where an ADS holder

seeks to assert rights not specifically enumerated under the deposit agreement, . . . under New

York law, the choice-of-law clause in the Deposit Agreement does not govern.").  No provision of

the Deposit Agreement purports to alter the substantive rights of a shareholder to litigate a breach

of the Bylaws claim.[7]  *See* Hicks Ex. 134 (AR00092208 at 212 (Deposit Agreement § 1.01)) ("The term 'American Depositary Shares' shall mean the securities representing the interests in the Deposited Securities and evidenced by the Receipts issued hereunder."); *see also* Hicks Ex. 31 (Lissemore Sept. 2021 Report for Pls. ¶ 9) ("Each ADR represents a specific number of underlying ordinary shares in the non-US Company.").

Further, Defendants are incorrect that the existence of a New York depository means New York law governs all actions brought by an ADR holder.  Defendants' cases are inapposite because they involved *primary* securities held by a New York depository, rather than ADRs, and the relevant agreements thus had no analogue to Section 1.01.  *See, e.g., Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*, No. 14-cv-10103 (JGK), 2022 WL 384748, at *14 (S.D.N.Y. Feb. 8, 2022); *Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 457 F. Supp. 3d 233, 243 (S.D.N.Y. 2020).  Also, the courts in Defendants' cases did not apply New York law based on the location of the depository alone.  They undertook comprehensive choice-of-law analyses, which Defendants do not conduct in their brief.  *See Phoenix Light*, 2022 WL 384748, at *12-14 (conducting choice of law analysis "based on a consideration of several factors" under New York's "center of gravity" test); *Commerzbank*, 457 F. Supp. 3d at 242-43 (conducting multi-factored choice of law analysis under "Ohio's choice of law framework").

           b.       The right at issue here is personal under New York law

Even assuming New York law applied, Plaintiffs did not lose standing to sue for breach of

---

[7] Defendants' effort to construe the Deposit Agreement to supply an alternative legal regime that narrows their obligations to Plaintiffs is also prohibited by the Bylaws themselves, which require an acquirer to comply with whichever legal regime is "stricter"—or *more protective* of shareholders' rights—whether that is Argentine law or the laws of "the jurisdictions" and "stock exchanges" "where the Corporation's shares and securities are listed." Hicks Ex. 1 (*Petersen* ECF No. 36-2 (YPF Bylaws) § 7(f)); Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶¶ 92-93); Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 14 & n.16, ¶ 30 & n.36).

the Bylaws when they transferred their ADRs.[8]  Petersen and Eton Park are proper plaintiffs because they were ADR holders of record at the time Defendants breached their tender-offer rights—and triggered a claim for damages—in April 2012.  *See*, *e.g.*, *Wellman v. Dickinson*, 475 F. Supp. 783, 795-97, 808-09, 824 (S.D.N.Y. 1979) (authorizing class of shareholders "as of the close of business January 16, 1978" to sue for failure to conduct proper tender offer on that date); *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 35 (1977) (holding plaintiff must have been "confronted with the decision of whether to tender or retain its stock" to have standing to challenge deceptive conduct during tender offer); *Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639, 651 (S.D.N.Y. 2001) (similar); *Oliveira v. Quartet Merger Corp.*, 126 F. Supp. 3d 424, 427 (S.D.N.Y. 2015) (Rakoff, J.) (allowing former-shareholder to sue merging corporations for failing to honor his conversion demand).

As Defendants acknowledge, the principal provision they invoke—§ 8-302(a)—provides only that a purchaser of a security "acquires all *rights in the security* that the transferor had or had power to transfer."[9]  A right that is personal to the shareholder, however, is not a "right in the security" and therefore does not transfer along with the security itself.  The breach-of-contract claim at issue here is clearly a "personal right" of those who held shares on April 16, 2012.  Under the Bylaws, those shareholders were entitled to elect whether to remain shareholders or receive a "compensated exit."  It was the personal right to make that choice that Defendants disregarded and

---

[8] Defendants' argument is also precluded because Defendants themselves caused Petersen's creditors to foreclose on its ADRs.  *See* Pls. Opening Br. at 20-21; *see Imperator Realty Co. v. Tull*, 228 N.Y. 447, 457 (1920) (Cardozo, J., concurring) ("He who prevents a thing from being done may not avail himself of the non-performance which he has, himself, occasioned." (quotation mark omitted)).

[9] Section 8-302(a) is widely understood as a codification of the "shelter rule."  *See* N.Y. U.C.C. § 8-302, Official Comment 1; *Cheatham I.R.A. v. Huntington Nat'l Bank*, 137 N.E.3d 45, 52-53 (Ohio 2019) ("No other jurisdiction has interpreted [this language] as doing anything more than stating the shelter principle."); *First United Fin. Corp. v. Specialty Oil Co.*, 5 F.3d 944, 947 (5th Cir. 1993); *Zimmerman v. Home Shopping Network, Inc.*, 1990 WL 118363, at *7 (Del. Ch. Aug. 14, 1990).  The "shelter rule" stands for the elementary principle that a transferee is "entitled to the 'rights' or ownership interest in the security that [the transferor] had in the Certificates."  *Haber v. Fireman's Ins. Co.*, No. 98Civ.1740 (LLS), 2000 WL 943562, at *7 (S.D.N.Y. July 10, 2000).

violated.  Even Defendants' expert acknowledged the personal nature of that right. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Plaintiffs retain the ability to vindicate

that personal right, which does not travel with the shares' title.

*Consolidated Edison* is illustrative.  There, Con Ed entered into an agreement with

Northeast Utilities ("NU") to buy all outstanding NU shares at a premium but then refused to do

so.  *Consol. Edison, Inc. v. Ne. Utils.*, 318 F. Supp. 2d 181, 183 (S.D.N.Y. 2004).  NU sued for the

lost premium on behalf of its current and future shareholders—including those who bought shares

*after* the alleged breach—while a former NU shareholder brought a separate claim on behalf of

holders *at the time of* Con Ed's alleged breach of the merger agreement.  *See id.*  This Court

rejected NU's argument that § 8-302(a) meant the claims transferred (along with the shares) to

NU's subsequent shareholders, holding instead that it was those who held shares at the time of the

breach that had viable claims.  *See id.* at 187-91, 195.  This Court reasoned that "rights in the

security against the issuer generally include participatory rights in the corporation, such as the right

to attend meetings, vote, and inspect corporate records, as well as rights to corporate assets, such

as the right to receive dividends."  *Id.* at 192.  Such participatory rights automatically transfer

under § 8-302(a).  But causes of action to enforce other rights—such as the right to exit at the

premium promised by Con Ed—are not covered by that provision and their "assignment must be

express."  *Id.* at 186.[10]  So too here.  Plaintiffs are not asserting any participatory right in YPF.

---

[10] The Second Circuit ultimately held that neither group had viable claims because the merger agreement did not create enforceable third-party rights, but it did not undermine the district court's analysis of why, if anyone had rights, it would be the shareholders at the breach.  *See Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 531 (2d Cir. 2005).  That part of the district court's opinion continues to be relied on by both federal and state courts.  *See, e.g.*, *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 373 n.126 (S.D.N.Y. 2007); *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, No. 17-cv-1388 (KPF) (RWL), 2022 WL 1446552, at *14 (S.D.N.Y. Feb. 22, 2022); *Broadbill Partners L.P. v. Ambac Assurance Corp.*, No. 653869/2012, 2014 NY Slip Op 30647(U), at *10 (Sup. Ct. Mar. 12, 2014).

Just the opposite, they are pursuing a legal claim for damages for breach of their personal right to exit YPF at the price mandated by the Bylaws.

None of the cases Defendants cite is to the contrary.  Defendants' lead case, *FDIC v. Citibank N.A.*, No. 1:15-cv-6574, 2016 WL 8737356 (S.D.N.Y. Sept. 30, 2016), turned on a different New York statute applicable to *bonds*, not stock.  That statute has very different language, providing sweepingly that "a transfer of any bond shall vest in the transferee *all claims or demands of the transferor* . . . for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding."  *Id*. at *4 (quoting New York General Obligation Law 13-107) (emphasis added).  Moreover, *Citibank* distinguished "corporate" claims that "concern[] the relationship between the stockholder and the corporation, or attributes of the security or bond itself" (which do transfer), *id*. at *5, from "personal" claims that "relate to the transfer of securities, such as fraud, or breach of a contract to buy or sell securities" (which do not), *id*. at *4.[11]

Defendants' remaining cases support Plaintiffs, not Defendants.  *Sunstates* recognized that a claim under the bylaws for a missed dividend payment is a personal right and *not* a right in the security:  "the declaration of a lawful dividend has long been understood to give stockholders as of the record date standing as creditors to sue at law for the recovery of the amount due."  *Sunstates*, 2001 WL 432447 at *3.  Meanwhile, *Activision*'s comment that sellers "dissociate their economic interests from the corporation" and, by doing so, "forgo the opportunity to benefit from" future value associated with its securities highlights why Plaintiffs' injury here was personal.  *In re*

---

[11] *Citibank* does not stand for the broad proposition that "the right to enforce corporate bylaws" is always a corporate right.  Argentina Br. at 17.  Bylaws (and charters of incorporation) typically deal with routine corporate governance measures—like how often the Board meets, the scope of authority entrusted to its Committees, what constitutes a quorum at a shareholders meeting, the par value of shares, and so forth.  *Cf.* 8 Del. Code Ann. §§ 102, 109.  Understandably, then, *Citibank* referred to claims growing out of "bylaws and charters" only as shorthand for these sorts of matters.  It did not, and could not, establish a new rule that *all* claims stemming from bylaws are rights in the security that transfer with the shares, because not all bylaws relate to corporate governance.  Indeed, the court cited other cases which acknowledged that personal claims *can* arise from bylaws.  *See Citibank*, 2016 WL 8737356, at *5 (citing *In re Sunstates Corp. S'holder Litig.*, No. Civ. A. 13284, 2001 WL 432447 (Del. Ch. Apr. 18, 2001)).

*Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1049-50 (Del. Ch. 2015) (quoting *In re Triarc Cos.*, 791 A.2d 872, 875 (Del. Ch. 2001)).   They seek compensation for Defendants' breach of a tender-offer right owed to specific shareholders at a specific time in the past (a right to "dissociate"), not vindication of their right to continue to participate in the company's future economic benefits.   *Id.*   Indeed, all of Defendants' cases rest on this same distinction between the right to participate in a company's economics and governance going forward versus the right to a payment that was owed personally to holders as of a particular date in the past.   *See R.A. Mackie & Co. v. Petrocorp Inc.*, 329 F. Supp. 2d 477, 480 (S.D.N.Y. 2004) (claim that freezing future appreciation deprived holders of future value); *Urdan v. WR Capital Partners, LLC*, 244 A.3d 668, 678 (Del. 2020) (claim based on dilution of share value); *Sunstates* (dispute between common and preferred shareholders regarding entitlement to ongoing economic benefits).   None of these cases involved a discrete entitlement offered to the shareholders of record on a specific date.   Unlike here, the wrongful conduct in those cases continued to harm the securities—and their subsequent holders—as ownership passed.   Because Plaintiffs' lawsuit seeks simply to collect the purchase price promised to holders as of April 16, 2012, and the relief sought has nothing to do with the future value or benefits associated with YPF shares, "[t]he underlying property could just as easily be land or a car."   *Citibank* at *4.

Defendants' position—that standing depends on current ownership—would lead to the absurd result that the Bylaws give shareholders a right to exit upon re-nationalization that can only be preserved by holding on to their shares for years—i.e., by not exiting.   Equally nonsensical, shareholders who purchased after the seizure date and who held through the date of judgment in this lawsuit would be entitled to recover even though they were never victims of the breach.   The right to a tender offer cannot—and does not—exist in perpetuity.   Just as the right existed only for

a discrete period when Repsol and Petersen made their tender offers, here again it existed only at the time of Argentina's 2012 control acquisition.[12]  Shareholders during *other* periods—who did *not* hold on the relevant date—have no right to tender and were not injured by any breach.

Finally, Defendants suggest in the alternative (Argentina Br. at 19) that Plaintiffs lack contractual standing even if Argentine law controls.  Their only support for this bald—and equally belated—assertion is a fleeting cite to Dr. Manóvil.  But in the passage Defendants cite, Dr. Manóvil opined only that a shareholder's right *to challenge the validity of an unlawful corporate resolution* under Article 251 of the Argentine Companies Law ("ACL") is extinguished if a shareholder transfers its shares.  *See* Manóvil Ex. 2 (Manóvil Dec. 2021 Report for Argentina ¶ 25) ("The right to bring *an Article 251 claim* . . . is extinguished upon transfer.") (emphasis added).  As explained in detail below, Plaintiffs are not seeking to nullify a shareholders' resolution under the ACL but rather are seeking damages under the civil code for a contractual breach.  As with New York law, under the Argentine civil code, for any claim for damages, the claim belongs to the party that suffered the harm.  *See* Civil Code Section 1109; Section 1716 of the Civil and Commercial Code of the Nation ("CCC"); *see also* Hicks Ex. 136 (National Civil Chamber of Appeals, Room E, *"Perrino, Elizabeth Liliana c. Tschubarov, Adrián y otro",* 09/10/2010. TR La Ley:  AR/JUR/61577/2010) (holding claim for damages "fixed" on the day plaintiff's property was injured and not extinguished when property was sold).

In short, even if New York law governed the question of "contractual standing" to sue under Argentine law for breach of YPF's Bylaws, Plaintiffs retain standing to sue for damages for breach of that right here.  And, under Argentine law, the result would be the same. Defendants'

---

[12] For example, when Petersen made its tender offer, it announced:  "The Offer may be accepted by *holders of Shares during the Acceptance Period* subject to the requirements of applicable laws and regulations."  Pls.' Add'l 56.1 ¶ 2 (emphasis added).  The same was true of Repsol.  *Id.* ¶ 1.

arguments to the contrary are unavailing.

**B.      Plaintiffs owned YPF shares at the time of the breach in April 2012**

Defendants next argue that Plaintiffs lack standing because Plaintiffs did not hold their shares in May 2014, when Argentina settled with Repsol and Repsol formally transferred its YPF shares to Argentina.  Although this defense at least has the virtue of having been timely pleaded— though it remains an entirely *post hoc* suggestion inconsistent with the whole point of the Bylaws and was never mentioned during the 2012-14 timeframe—it is foreclosed by the Second Circuit's prior holdings, conflicts with the plain language of the Bylaws, and is at war with common sense.

1.      <u>Defendants' breach occurred on April 16, 2012, when Argentina acquired a control position in YPF</u>

The date of Defendants' breach in this case was April 16, 2012, the date on which Argentina retook control of YPF; Plaintiffs have standing because they were shareholders of record on that date.  Defendants contend that Plaintiffs lack standing because the breach did not occur until May 2014, when Argentina settled with Repsol and formally took title to Repsol's 51 percent stake in YPF.  Argentina Br. at 19; YPF Br. at 34.  But the Second Circuit has already foreclosed that interpretation of the Bylaws, which is contrary to their text, structure, and purposes.

The Second Circuit interpreted the Bylaws as follows:  "Simply put, section 28(A) compels Argentina to make a tender offer in accordance with the procedures set forth in the bylaws if 'by *any means* or instrument' it 'becomes the owner [of], or *exercises the control of*,' at least 49% of YPF's capital stock."  *Petersen II*, 895 F.3d at 206 (second emphasis added).  Based on that construction, the court of appeals recognized that "Argentina's *acquisition of a control position*" "trigger[ed]" Defendants' contractual obligation to make and enforce a tender offer.  *Petersen II*, 895 F.3d at 207, 210 (emphasis added).  As Defendants do not seriously dispute, that acquisition of "a control position" occurred on April 16, 2012, not in May 2014.  That reality controls the

20

matter.  Under the law-of-the-case doctrine, this Court "lacks discretion" to revisit the Second Circuit's determination on this issue.  *See Kerman v. City of N.Y.*, 374 F.3d 93, 110 (2d Cir. 2004); *see also Reich v. Malcolm Pirnie, Inc.*, 821 F. Supp. 905, 909 (S.D.N.Y. 1993); *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1240 (10th Cir. 2016) (Gorsuch, J.).

At any rate, the Second Circuit's conclusion is eminently correct:  The Bylaws provide that a tender offer is triggered by the requisite corporate control, not by the transfer of formal title.  Multiple provisions of the Bylaws make this clear.  Section 7(d) of the Bylaws bears the heading "*toma de control*" (taking of control).  It provides that "it shall be forbidden" to undertake an acquisition without making a tender offer in compliance with Sections 7(e) and 7(f), "if, as a result of such acquisition, the purchaser becomes the holder of, *or exercises the control of*, class D shares of stock of the Corporation which, in addition to its prior holdings of such class (if any)," exceed certain percentage thresholds.  Reinforcing the point, Section 7(d) ends with a definitional provision stating that "the acquisitions referred to in this section 7(d) are referred to as *Acquisitions of Control*" ("*Adquisiciones de Control*").  Section 7(e), in turn, provides that a person "wishing" to make an acquisition of control ("*Adquisiciones de Control*") must arrange for a tender offer for "all the shares of all the classes in the Company and all securities convertible into shares."

Section 28(A), which governs "acquisitions" by the National Government, adopts the same meaning of "acquisitions" as that given in Section 7.  Specifically, Section 28(A) states that "the provisions of subsections e) and f) of Section 7 . . . shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of the Corporation, . . . if, as a consequence of such acquisition, the National Government becomes the owner, *or exercises the control of*, the shares of the Corporation, which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the

capital stock" of the company.  Like Section 7, Section 28(A) makes clear that the taking or acquiring of the requisite degree of control (*toma de control* or *adquisicion de control*) is one of the disjunctive conditions that triggers the tender-offer requirement, and it further emphasizes that the control acquisition can be accomplished "by any means."

There is no dispute that Argentina took majority control of YPF on April 16, 2012, not two years later in May 2014.  One need go no further than the words of Mr. Kicillof himself, speaking for both Argentina and YPF *in April 2012*.  *See* Hicks Ex. 20 (Argentina's Resps. & Objs. to Pls.' 2d Requests for Admission Nos. 57-59 (Nov. 16, 2020)) (admitting that Kicillof made his April 2012 speech in his capacity as the Secretary of Economic Policy and Development Planning of the Ministry of Economy and Finance); ████████████████████████████████████

████████████████████████████████████████████████████

████████████████; Goodman Ex. 59 (Comadira Dec. 2021 Report for YPF ¶ 17) (YPF expert conceding "the Republic's Intervenor and Deputy Intervenor acted as representatives and agents of the Government"); Hicks Ex. 138 (Comadira Tr. for YPF 112:17-24) (agreeing that Kicillof and De Vido "continued to serve as members of the government while also exercising their roles as intervenor and vice intervenor of YPF").  In his April 17, 2012 speech to the Argentine Congress, Kicillof repeatedly stated that, through Decrees 530 and 532, Argentina had effectuated a taking of control of YPF ("*toma del control de YPF*") as of April 16, 2012.  *See* Goodman Ex. 18.  And Argentina maintained control of YPF for the entire period between April 16, 2012, and May 2014, when the Repsol settlement was executed and Repsol's shares were formally transferred to Argentina.[13]  That formal transfer of title had no impact whatsoever on

---

[13] *See* Pls.' Add'l 56.1 ¶ 3.  As a result of Decrees 530 and 532, "the National Government immediately took from Repsol all of the rights associated with its Class D shares."  Hicks Ex. 23 (Bianchi Dec. 2021 Report for Pls. ¶ 118(b)).  On May 3, 2012, Congress passed Law 26,741 ordering the expropriation of the 51 percent of the YPF

Argentina's pre-existing control over YPF.

There is also no genuine dispute among the parties' Argentine law experts on the proper interpretation of the Bylaws.  Defendants' expert, Dr. Manóvil, acknowledges that the Bylaws expressly define the term "acquisitions" as "acquisitions of control."  Goodman Ex. 31 (Manóvil Jan. 2022 Report for Argentina ¶ 30 n.37) (conceding that the Bylaws define "acquisitions" as "takeovers," which "in the Spanish original are '*adquisiciones de control*'" (emphasis in original)).  Moreover, Dr. Manóvil conceded in his reply report, and again at his deposition, that when the word "acquisition" has as its object the word "control," "acquisition" means acquisition of control, not "acquisition of formal title."  Goodman Ex. 31 (Manóvil Jan. 2022 Report for Argentina ¶ 31) (giving the sentence "the defendant acquired *control* of the company" as an instance where acquisition refers to acquisition of control, not title); Hicks Ex. 135 (Manóvil Tr. for Defs. 56:21-61:2) (asserting that the term "acquisition" "*without any qualifier*" refers to acquisition of title, but acknowledging that when "the word acquire is used with another qualifier," then it refers to acquiring "something else" (emphasis added)).  Because the Bylaws repeatedly use acquisition in connection with *control*, not title, the plain text forecloses Defendants' argument that their tender-offer obligations were triggered by Argentina's acquisition of formal title in 2014.

Even if it were necessary to look beyond the Bylaws' unambiguous text, Argentine contract principles support Plaintiffs' interpretation.  Three canons of construction—familiar in United States law as well—are relevant here.  *First*, no word may be read "in isolation" because "Argentine law calls for the reading of text in context, considering the contract as a whole."  Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 13).  *Second*, under Argentine law, "language is read in context to effectuate the parties' reasonable expectations."  *Id.*  *Third*, "contracts must be

---

shares owned by Repsol and the formal occupation of those shares, "which enabled it to exercise, on a permanent basis, all of the rights to which their holders were entitled."  *Id.* ¶ 211(c).

interpreted in good faith" and consistent with "the purpose of the rights of the parties under the contract."  *Id.*; ████████████████████████████████████████

████████████████████████████████  To apply this third canon, a court must not "attribute to [a contract's] terms a meaning which would defeat the purpose of the rights of the parties under the contract."  Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 13).

Applying those canons here supports the conclusion that "acquisition" means "acquisition of control" rather than acquisition of formal title.  The term "acquisition" must be read in context: The full sentence provides that the tender-offer requirements apply to "all acquisitions" that the National Government makes, "whether directly *or indirectly*, *by any means* or instrument," if the acquisition causes the National Government to "become[] the owner, *or exercise[] the control* of" YPF shares.  The phrase "by any means" shows that YPF and Argentina—the drafters of the Bylaws—plainly did not intend to limit these provisions to acquisitions of formal title.

Argentina's contrary arguments (at 21-23) all miss the mark.  *First*, it suggests that Section 28's expansive language—"indirectly, by any means"—refers only to obtaining title through another entity (i.e., a subsidiary).  Of course, purchasing shares through a subsidiary may be one way of "indirectly" acquiring control.  But the problem for Argentina is that the text does not confine its broad phrasing to such a narrow proposition—there are numerous other "means" by which Argentina could have "indirectly" acquired control of the company.  It bears repeating:  An acquisition may occur "indirectly, by any means."  *Second*, Argentina insists the ability to "exercise[] control" is only "a consequence" of an acquisition, not a means of effectuating an acquisition.  But this argument is clearly self-defeating.  If "control" is merely a "consequence" of an acquisition, and not a means of effectuating one, then so too is "ownership," which appears in the very same phrase:  Section 7 applies "if, *as a consequence of such acquisition*, the National

Government *becomes the owner, or exercises the control of*, the shares of the Corporation."  On that reading, even ownership—recast as a mere "consequence"—could not trigger the tender-offer obligation, despite Argentina's argument to the contrary.  *See* Argentina Br. at 20 ("The Bylaws' term 'acquisition' refers to *ownership of shares*.").  Finally, finding no support in Section 28 itself, Argentina retreats to Section 7(h).  By describing an acquirer's ability to "sell" shares, it says, this provision presumes ownership as a predicate.  Not so.  Section 7(h) just speaks to the possibility of an acquirer later divesting its shares.  An acquirer in that scenario could have acquired control and then later taken title to shares (just like Argentina did here), only to sell them afterward.  This provision says nothing about how someone first acquires and triggers the tender-offer obligation.

Defendants' interpretation also would defeat the purpose of the tender-offer requirements, i.e., to protect minority shareholders by "providing them with a compensated exit if Argentina were to regain *control* of YPF."  Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 20 & n.26) (noting that the Second Circuit has already reasoned that Defendants amended the Bylaws to entice investors and to protect them if Argentina renationalized the company).  Because "foreign investors' main concern was Argentina's reacquisition of control," this purpose is at the core of Sections 7 and 28 of the YPF Bylaws.  *Id*.  Defendants' interpretation, focusing on whether and when Argentina finally reached an agreement with Repsol on a settlement amount, and took formal title to its shares, undermines that core purpose and thus cannot prevail under Argentine law.

Defendants' reading also leads to the absurd result that Defendants could unilaterally avoid their contractual obligations in perpetuity by the simple expedient of refusing to acquire formal title. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████  No shareholder would have reasonably expected or signed

up for such an illusory promise—one that would have incentivized Argentina to avoid its payment obligations *both* to Repsol for the shares it had taken *and* to other shareholders entitled to a tender offer.  An interpretation that leads to absurd results and upsets the parties' reasonable expectations cannot prevail under Argentine law either.  *See* Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 21) ("Dr. Manóvil's interpretation that Argentina's obligation does not arise until the expropriation process is completed with the formal acquisition of the shares would lead to absurd results"); *cf. Roberts v. Weight Watchers, Int'l, Inc.*, 217 F. Supp. 3d 742, 752 (S.D.N.Y. 2016) (New York law disfavors interpretation that would render contractual promise illusory).[14]

Finally, even if the Bylaws could be read to turn on the acquisition of ownership instead of control—despite clear language and purpose to the contrary—nothing in the Bylaws supports Defendants' even narrower interpretation that the tender-offer requirement is triggered only upon transfer of formal *title*.  Here, it is undisputed that Argentina acquired all of the rights—economic and political—pertaining to Repsol's shares immediately upon Argentina's takeover of YPF on April 16, 2012.  On that date, Repsol was stripped of its powers and rights as majority shareholder. It was also stripped of its right to receive any of the economic benefit of those shares, as illustrated by the fact that Argentina, not Repsol, received the dividends issued by YPF on November 19, 2012 and August 28, 2013.  *See* Pls.' Add'l 56.1 ¶ 4.  Thus, even if the Bylaws required Argentina to acquire ownership of the shares (which it does not), Argentina—not Repsol—already held the entire "bundle of sticks" associated with ownership as of April 2012.  *United States v. Craft*, 535 U.S. 274, 278 (2002).  Argentina's formal acquisition of title to the shares in May 2014 had no practical impact whatsoever on its control of YPF.  Defendants' contention that Argentina had no

---

[14] Argentina (at 23) claims that Plaintiffs' expert, Professor Bianchi, admitted that Argentina did not acquire YPF shares until 2014, but that mischaracterizes his testimony, which made clear that Argentina was "exercising [Repsol's shareholder] rights" following the 2012 occupation. *See* Giuffra Ex. 11 (Bianchi Tr. for Pls. 146:7-21).

obligation to tender until it obtained formal *title* to the shares asks this Court to embrace a hyper-formalistic interpretation that would do violence to both the plain text and the core purposes of the Bylaws.  Once again, the Bylaws provided financial protection against a feared re-nationalization. To force shareholders to retain their shares—with no right to compensation—for years until the re-nationalization was formalized at a time of Argentina's choosing based on control it had exercised for years would make the critical protections in the Bylaws illusory.  Plaintiffs were guaranteed a compensated exit, not years of captivity.

   2. <u>Defendants' repudiation on April 17, 2012, independently gives Plaintiffs standing</u>

  Even putting aside all of the foregoing, Argentina's repudiation on April 17, 2012, of its tender-offer obligation independently triggered Plaintiffs' claim for breach of contract and gives Plaintiffs standing.  *See Petersen II*, 895 F.3d at 211; Pls.' MSJ at 27-28.  That day—speaking, again, as both Argentina's Secretary of Economic Policy and Development Planning and as YPF Vice-Intervenor, *see supra* at 22—Axel Kicillof announced in his public remarks before the Argentine Senate that Defendants would not comply with their tender-offer obligations.  Pls.' MSJ at 27-28.  Under Argentine law, this unambiguous repudiation entitled Plaintiffs to a claim "for breach of contract as of the date of that repudiation without waiting for the time for performance to elapse."  Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 38); *see also* Hicks Ex. 29 (Garro Sept. 2021 Reports for Pls. ¶ 34) (under Argentine law, "serious and definitive" declaration by defendant that it will not perform entitles plaintiff to "sue for damages without the need to wait for the time of performance to arrive").

  Argentina's argument (at 25-26) that Kicillof's repudiation of the tender-offer obligation did not give rise to a cause of action contradicts the record and Argentine law.  Argentine law does not—contrary to Argentina's suggestion—require that the repudiation be "addressed directly to

the creditor."  *See* Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 63) ("There is no requirement

that a contract repudiation be made in a private statement."); Goodman Ex. 36 (Garro Jan. 2022

Report for Pls. ¶ 56 n.107) (noting that the provision of the Unified Code that Defendants rely on

is inapplicable and Defendants' argument has never been "advanced by any court or scholarly

comment").  And even if the Court were to engraft such a requirement onto Argentine law,

Mr. Kicillof's *public* statement was a statement to all shareholders, including Plaintiffs.  *Cf.*, *e.g.*,

*Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*, No. 01 Civ. 11814 (LAP), 2004 WL 2997957, at

*5 (S.D.N.Y. Dec. 27, 2004) (Preska, J.) (explaining that the Supreme Court has adopted the fraud-

on-the-market theory whereby an investor is presumed to "fully digest[] all publicly available

information about a security") (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 241-48 (1988)).

Because YPF and Argentina repudiated their obligations in a public forum, that is sufficient for

the repudiation to "be deemed an anticipatory breach of contract."  Hicks Ex. 36 (Rovira Jan. 2022

Report for Pls. ¶ 63).

Similarly, Argentina's suggestion (at 25-26) that Kicillof's statement should be discounted

because it was merely political speech defies reality, Defendants' admissions, and common sense.

As explained above (*supra* at 22), Defendants have repeatedly acknowledged that the acts and

omissions of Kicillof bind the Republic and YPF.  Moreover, Mr. Kicillof's April 17, 2012

statements were not mere rhetoric; they were consistent with, and came on the heels of, an internal

government memorandum outlining Defendants' strategy for refusing to make a tender offer.[15]

Moreover, given that investors feared re-nationalization above all, and the Bylaws guaranteed a

"compensated exit" in the event of that specific eventuality, the notion that statements by the public

officials installed to run the renationalized company could be dismissed as mere rhetoric defies the

---

[15] *See* Pls. April 14, 2022 56.1 ¶¶ 79-84; *see also* Hicks Ex. 76 (AR00069033).

essential guarantee of the Bylaws.  Kicillof's emphatic statements constitute a clear repudiation of Defendants' contractual obligations sufficient to trigger Plaintiffs' right to sue as of that date.

## II.     Argentina Is Liable for Damages Under the Argentine Civil Code

To raise billions of dollars from foreign investors, Defendants chose to include in YPF's Bylaws a clear promise of a "compensated exit" should Argentina re-take control of YPF. Defendants now argue that even though the Bylaws *appeared* to give shareholders the contractual right to a compensated exit in the event of a change of control—the reading the Second Circuit has given to the Bylaws—nonetheless, as a matter of Argentine law, the Bylaws do not actually create contractual rights and obligations under the Civil Code and do not give rise to claims for damages. These arguments are directly at odds with the fundamental promise that Defendants made to raise capital—no rational investor would have purchased YPF shares had that been the true nature of the "promise" set forth in the Bylaws—and are unsupported by Argentine code provisions, caselaw, or scholarship.

### A.     The Bylaws created contract rights governed by the Civil Code

Defendants do not dispute that, "[a]s a matter of straightforward contract law," the elements of breach of contract in Argentina are governed by the Civil Code and resemble the elements under common law familiar to any American lawyer.  YPF Br. at 13; *see generally* Pls.' MSJ at 24-30. Defendants also do not dispute that the Civil Code's provisions govern in all civil cases unless they are displaced by a provision of a specialized statute.  *See* Argentina Br. at 26-27; YPF Br. at 33-34; Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 24) (Civil Code is a "general statute" that constitutes "the backbone of the Argentine legal system of private law."); ███████████

████████████████████████████████████████████████████████████████████

█████████████████████   By contrast, the Argentine Companies Law ("ACL")[16] is a "specialized statute" within the Argentine Commercial Code that governs certain specific corporate governance matters.  *See* Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 24).  The Argentine Commercial Code itself specifies that the Civil Code continues to apply to any civil claim unless its provisions are clearly and specifically displaced by the ACL.  *Id.* ("Unless modified by this Code, the civil law applies to all matters and business transactions.") (quoting Article 207 of the Commercial Code).  This principle "operates in a similar fashion to the familiar rule in American law that a statute is not presumed to alter the common law unless it does so clearly." *Id.* ¶ 25; *see, e.g., Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 798-800, 801-02 (2021).

Moreover, even in cases where the ACL *does* apply, it does not simply displace the Civil Code, as Defendants would have the Court believe.  *See* Argentina Br. at 26-27.  Rather, Argentine courts interpret and apply the two bodies of law harmoniously, much in the same way that U.S. courts seek to reconcile statutes and do not strain to create conflicts.  *See* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 61) ("the ACL should be applied 'in a reasoned and integrated manner jointly with the general scheme of the Civil Code'") (quoting Argentine scholar); Manóvil Ex. 2 (Manóvil Dec. 2021 Report for Argentina ¶ 66) (noting the Supreme Court of Justice has repeatedly held that code provisions "must be interpreted harmoniously and coherently" with the rest of the Argentine legal system); *see also HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2177 (2021).  Indeed, even where the ACL creates a cause of action for a shareholder (as for example in a suit against a director or officer for breach of fiduciary duty), the Civil Code supplies the governing standards for liability and damages.  *See* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 13) ("Indeed, Argentine scholars – including Professor

---

[16] The ACL is sometimes referred to as the General Corporate Law ("GCL").  Plaintiffs refer to it as the ACL in their briefing, consistent with their experts' preference.

Manóvil himself – agree that the ACL's liability regime works in conjunction and in accordance with the general civil liability principles contained in the Civil Code."); *see also* Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶¶ 24-27); Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶¶ 31-34); Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶¶ 73-74); Hicks Ex. 140 (Bianchi Jan. 2022 Report for Pls. ¶ 57).[17]

There is no dispute that the ACL, by its terms, does not address tender offers or displace the remedies available to Plaintiffs under the Civil Code for breach of the tender-offer provisions. *See* Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 27) ("The ACL does not address [a claim to enforce a tender-offer provision] at all, and it therefore does not displace or modify the provisions of the Civil Code governing remedies for breach of contract");

That should end the matter, but Defendants resort—as in their newfound contractual standing theory—to an abstract argument that "claims for any bylaws violation" are "corporate" claims that are governed by the "statutory mechanisms" in the ACL.  Argentina Br. at 26-27; *see* YPF Br. at 33-34 (similar); *supra* Part I.B.  Defendants cite no provision of any statute, no case, and no Argentine scholarship in support of this sweeping theory.  Instead, they cite inapplicable

---

[17] Professor Rovira quotes Professor Manóvil:  "The General Companies Act liability regime is governed by the principles of the general norms applicable to civil liability.  Therefore in order to attribute liability there must exist all the civil liabilities elements:  damage, unlawful act and the attribution factor of cause-effect (i.e. the damaging conduct should have been the cause of the damage)."  Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 13 n.10) (quoting Manóvil, Rafael M., "Algunas incidencias del Código Civil y Comercial sobre la responsabilidad de los directores de sociedades anónimas," Acad. Nac. de Derecho 2016 (septiembre), 12/09/2016, AR/DOC/3449/2016).

provisions of the ACL governing internal housekeeping rules incorporated into corporate bylaws that apply to corporate resolutions. *See* YPF Br. at 33 (discussing ACL Article 251, which governs challenges to corporate "resolution[s] authorizing [an] allegedly-wrongful act"); Argentina Br. at 27 (discussing ACL mechanisms to "challenge in court any resolution passed at a shareholders' meeting" in violation of the bylaws); Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 33) ("Articles 251 through 254 of the ACL . . . regulate the course of action available to shareholders, directors and officers . . . for challenging the validity of shareholders' resolutions.); *id.* at 53-54 (appendix quoting Articles 251 and 254). From these inapposite provisions, Defendants extrapolate—without authority—that *any* violation of *any* corporate bylaws section must be dealt with through the intra-corporate scheme of the ACL.

Defendants' generalized proposition is incorrect under Argentine law and ignores the extraordinary nature of the tender-offer provisions at issue here. Plaintiffs are seeking damages for Defendants' breach of their specific promise to offer Plaintiffs a compensated exit in the event of a feared government takeover. There is no support in Argentine law—or common sense—to conclude that the exclusive recourse for deprivation of that bargained-for right was for Plaintiffs to sue for non-monetary relief under provisions that govern commonplace disputes over shareholders' resolutions and other matters relating to ongoing corporate governance. Indeed, Defendants themselves argue that recourse to such ACL provisions would have improperly interfered with Argentina's public-law right to operate YPF. *See* Argentina Br. at 34-37. Plaintiffs were not seeking to interfere with that right, as the Second Circuit recognized; they merely wanted compensation for Defendants' "repudiation of [a] commercial obligation" that is "separate and

apart" from Argentina's sovereign right to expropriate. *Petersen II*, 895 F.3d at 209.[18]

The distinction between bylaws provisions that give rise to proprietary rights—such as the tender-offer provisions in YPF's Bylaws—and provisions involving participation in ongoing corporate governance is well recognized by Argentine and U.S. courts alike. *See* Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 25) (citing Argentine and U.S. cases and noting that this distinction has also been recognized by the UK Law Reform Commission); *cf. also supra* Part I.A. The latter involve corporate governance disputes that must be resolved internally by corporate actors.[19] The former do not.

Instead of the compensated exit Plaintiffs were promised, Defendants would allow minority shareholders nothing more than a right to run to Argentina to engage in an internal battle for corporate control—a chance to propose shareholders resolutions and to challenge them in Argentine court under the ACL if the shareholder votes did not go their way. Defendants cannot point to any case or scholarly writings supporting the notion that a contract claim under the Civil Code deriving from a tender-offer provision must be rejected under Argentine law. ███

████████████████████████████████████████████████████████

---

[18] Argentina—but not YPF—notes in two sentences of its background section that this Court previously observed that "Plaintiffs' claims are 'corporate' claims as a matter of Argentine law." *Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15-cv-2739 (LAP), 2020 WL 3034824, at *12 (S.D.N.Y. June 5, 2020) ("*Petersen III*"); *see also id.* ("Plaintiffs' claims may be properly classified as 'corporate claims' under Argentine law."); Argentina. Br. at 2-3, 14-15. Because Argentina does not expand on this statement anywhere in its argument section or otherwise develop it into any sort of argument, it has forfeited reliance on it. *See, e.g.*, *United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Penske Media Corp. v. Shutterstock, Inc.*, 548 F. Supp. 3d 370, 381 (S.D.N.Y. 2021) (argument first developed in reply brief was forfeited).

[19] The YPF Bylaws contain myriad such provisions. *See, e.g.*, Hicks Ex. 1 (*Petersen* ECF No. 36-2 (YPF Bylaws) § 6) (establishing share classes and special rights of Class A shares); YPF Bylaws §§ 11-19 (establishing structure and organization of board of directors); YPF Bylaws §§ 21-24 (prescribing rules for shareholder meetings). Plaintiffs have never argued that every single procedural irregularity based on those types of provisions gives rise to a breach of contract claim for damages. *See* Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 25 n.48) ("It goes without saying that not 'all obligations' set forth in the bylaws of a company may find redress in action for damages for breach of contract against the company."). That is no surprise. Claimants challenging violations of such provisions often cannot show how they were injured as a consequence of any breach. But this case is not about internal corporate processes: Argentina caused Plaintiffs a clear injury compensable with the agreed-upon sum certain.

████████████████   And that is all aside from the fact that no rational investor would have handed its money over to Argentina for shares in YPF had its remedy for breach of the tender-offer obligation not been cash, but the opportunity to become mired in Argentine corporate disputes before the courts of the sovereign that had just exercised its prerogative to renationalize.

A variant on Argentina's corporate law argument is its baseless assertion (at 26) that shareholders cannot enforce the Bylaws against other shareholders because bylaws do not create "bilateral obligations."  According to the Republic, only "bilateral" contractual obligations may be enforced against Argentina as a "co-shareholder," and corporate bylaws generally speaking do not create such obligations.  *Id.*  But again, this argument shifts the focus to corporate bylaws in the abstract, ignoring the specific provision for which Argentina is liable here:  the obligation to purchase shares from minority shareholders in a tender offer.  The tender-offer requirement was a specific contractual promise each shareholder made to other shareholders who held YPF securities, not to the world at large or the company in the abstract.  Thus, it imposes "specific bilateral obligations."  Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 52); *id.* ¶ 53.

The Republic's own expert, Dr. Manóvil, agreed that corporate bylaws may contain bilateral obligations among shareholders, and gave an example of a provision that is in substance indistinguishable from the tender-offer obligation.  If corporate bylaws contained a provision in which a shareholder agreed to sell his stake in the company to other shareholders based on certain conditions, ███████ agrees that would create "bilateral obligations" enforceable among those shareholders. ████████████████████████████; *see also* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 48) (explaining that corporate bylaws are a "plurilateral contract [that] can contain bilateral obligations").  Here, the Bylaws contain a provision in which a shareholder agrees to buy an additional stake in the company from other shareholders based on certain

conditions.  That provision, no less than the first, creates an enforceable bilateral obligation.  Argentina cannot conjure any meaningful distinction between these two scenarios.

Argentina's goal with each of these "corporate law" arguments is the same.  Whether it seeks to recharacterize its obligations to Plaintiffs as "plurilateral" (when they are bilateral) or to recharacterize Plaintiffs' claims as a challenge to a shareholders' resolution (when they are not), Argentina ultimately is arguing that Plaintiffs should have filed claims under the ACL in Argentina rather than suing for contract breach in the United States.  That argument is little more than a recycled version of their previously-rejected effort to send this case back to the Argentine courts.

██████████████████████████████████████████████████████

█████████████████████████████████████████████; *see also* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 68) (noting that Professor Manóvil made the same arguments in a prior declaration in support of the conclusion that Argentine courts have exclusive jurisdiction); *Petersen* ECF No. 115 (Manóvil 2019 Decl.) ¶¶ 35-41 (arguing that Plaintiffs should have pursued in-kind remedies under the ACL in Argentina).

This Court, however, has already held that Plaintiffs can bring their contract claims in federal court in New York, *see Petersen I*, 2016 WL 4735367, at *7, and the Second Circuit has affirmed that this Court has subject matter jurisdiction over the dispute under the FSIA, *see Petersen II*, 895 F.3d at 212.  These corporate-law arguments all fail the test of common-sense as well.  If this is all the Bylaws promised, the IPO would have been an abject failure.  No reasonable investor would have invested in YPF notwithstanding Argentina's shaky economic past if the remedy for a breach of the tender-offer obligations was not an immediate cash payment at the Bylaws' specifically calculated price but a tortuous journey down the rabbit hole of Argentine corporate law in Argentine courts.  No matter how Defendants repackage their failed arguments,

they cannot hide from civil liability in the United States for breach of clear promises.

**B.   Plaintiffs are entitled to damages**

Argentina's next attempt at avoiding the consequences of its clear promise and its clear breach is to argue (at 28-30) that even if Plaintiffs could assert a breach of contract claim under the Civil Code, they are not entitled to money damages because:  (1) Section 7(h) of the Bylaws is a "penalty clause" that displaces any damages remedy; and (2) Plaintiffs were limited as a matter of Argentine law to specific performance.  Just like Defendants' corporate law arguments, this set of defenses would render illusory the promise of a compensated exit—requiring Plaintiffs to remain shareholders and undertake a protracted battle in Argentina to protect their shareholder rights from their fellow-shareholder Argentina.  Not surprisingly, both arguments are wrong under Argentine law and contradicted by Defendants' own experts.

1.   Section 7(h) is not a penalty clause

Section 7(h) imposes certain obligations on YPF if Argentina retakes control of the company.  It has nothing to do with damages or the compensated exit set forth in great detail elsewhere in the Bylaws.  Defendants' argument that section 7(h) is a "penalty clause" under Argentine law—akin to a liquidated damages clause under United States law—is not only patently incorrect on its face, but would also violate the most basic principles of contractual interpretation by ignoring the detailed tender-offer provisions.

Under Argentine law, a penalty clause is an agreed-upon substitute for damages or for performance of the contractual obligation.  *See* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 69) (penalty clauses operate as "a sort of liquidated damages clause" that serve to "establish by agreement of the parties the amount of the damages resulting from a potential breach of contract"); Civil Code Art. 653 ("The penalty clause may only consist in an amount of money or any other consideration that may be the object of obligations, either in benefit of the creditor or of a third

party").  These clauses exist for the benefit of the obligee and have the dual purpose of ensuring damages compensation in the event of a breach and inducing the obligor to perform his or her contractual obligation.  *See* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 69).  Thus, penalty clauses are "always interpreted narrowly and in favor of the obligee."  *Id.* ██████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

Section 7(h) is not a penalty clause under these standards.  It does not provide either for substitute compensation to Plaintiffs or for substitute performance of Defendants' tender-offer obligations.  Rather, Section 7(h) contemplates a breach of the tender-offer obligations and imposes on YPF the additional obligation to deny Argentina certain voting and economic rights if it proceeds with an acquisition without making the required tender offer.  In short, Section 7(h) is not a substitute for damages but rather an affirmative obligation on the company to take certain additional steps in the event of a breach.  *See infra* Part III.A.

Argentina appears to suggest (at 28-29) that Section 7(h) is a "penalty clause" because it imposes "sanctions" on Argentina for its failure to tender.  ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████  The Republic also argues (at 29) that the sanctions in Section 7(h) implicitly "compensate" Plaintiffs by "increasing their influence over corporate management" and by internally "redistribut[ing] funds."  This strained argument has no basis in the text of Section 7(h).  And it ignores that the purpose of the tender-offer requirement was to allow Plaintiffs *to leave* a government-controlled enterprise and take their money elsewhere, not to reshuffle their monetary investments within the company.  In any case, these sanctions—

supposedly so powerful that they obviated and displaced the damages remedy explicitly promised elsewhere in the Bylaws—were of no practical value in this case because of Defendants' willful misconduct:  Because YPF refused to enforce Section 7(h) and Argentina refused to comply with it, Argentina was in no way "sanctioned" and Plaintiffs were in no way "compensated."

Even if Section 7(h) were a penalty clause under Argentine law (it is not), such clauses do not limit liability where an obligor is guilty of "dolo" (a willful breach).  *See* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 71) ("Liability for intentional breach of an obligation cannot be waived in advance."); Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 9) ("[A] penalty clause can never limit liability in the context of an intentional (or willful) contractual breach.").  Defendants willfully breached their contractual obligations here—by deciding in February 2012 to proceed despite knowing that the Bylaws required a tender offer, by proudly announcing the day after their breach that they would not be "stupid" enough to abide by their earlier promise, and by refusing to comply with *both* the tender-offer requirement *and* Section 7(h)'s sanctions for violating that requirement.  Defendants may not now rely on Section 7(h), an additional safeguard that they blew right through, to avoid paying for the injury they caused.  *See* Pls.' MSJ at 27-28, 31-32.

## 2.    Plaintiffs had no obligation to pursue specific performance

Argentine law gives Plaintiffs the option to pursue either damages or specific performance; it does not limit Plaintiffs to the latter.  Article 505 of the Civil Code explicitly gives the obligee three optional remedies in the event of a breach:  specific performance by the obligor, substitute performance by a third party, or compensatory damages.  *See* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶¶ 38, 40 n.32) (quoting Article 505:  "The effects of obligations in regard to the creditor are:  1° Give him the right to employ legal means in order for the debtor to procure what he has undertaken; 2° To cause a third party to do at the obligor's charge; 3° To obtain from the

debtor the correspondent indemnifications.").[20]   Numerous Argentine scholars and cases have agreed that, consistent with Article 505's plain text, the Civil Code does not obligate a plaintiff to seek specific performance before it can seek damages.  *See* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 41) (quoting CN CIV, Room E "*L.G.L. v. D.O.R. s/ transferencia/inscripción de automotor*", (May 6, 2014), Online:  TR LALEY AR/JUR/19485/2014 (Argentine court noting scholars opine that Article 505 does not prescribe an order of priority)); Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 42 n.69) (citing Argentine scholars); Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 44  nn.72-73) (citing cases).  Thus, "the remedial scheme of Argentine law gives the obligee the *right* to seek specific performance *or* compensatory damages—in contrast to the common-law approach of ordering specific performance only in exceptional circumstances." Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 40) (emphases added).

Argentina's contrary argument turns Argentine law on its head by "transform[ing] principles . . . that are meant to protect the obligee into principles that harm the obligee." *Id.* ¶ 45. Argentine law is more liberal than United States law in permitting specific performance because it "assumes that the obligee will want the option of seeking specific performance of the obligation she was promised." *Id.* ¶ 43.  But the right to *elect* specific performance does not entail the *requirement* to seek specific performance if it would no longer be useful to the plaintiff.  In that circumstance, the plaintiff may seek damages instead.  *See* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 44 n.41) (noting that Argentine scholarship establishes that "the choice" to seek specific performance "is to the obligee's favor" and choosing "specific performance assumes the existence of the possibility to perform").

---

[20] ████████████████████████████████████████████████

Argentina ignores Article 505 and instead relies (at 29-30) on Article 889 of the Civil Code. But even Article 889 does not limit plaintiffs to specific performance, as the Republic claims. Quite the opposite, Article 889 broadly provides that failure to perform a contractual obligation—due to the fault of the obligor or otherwise—results *in the obligation to pay damages*. *See* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 29 n.21) (quoting Civil Code Art. 889: "If performance becomes impossible due to the fault of the obligor, or if he would have taken responsibility for fortuitous cases or force majeure, whether by virtue of a clause that imposes on him the risks associated with those possibilities or by incurring it in default, the original obligation to give or do something becomes an obligation to pay damages and interest."); ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ Article 889 thus supports rather than undercuts Article 505's clear statement that a breach of contract allows the plaintiff to elect a damages remedy.

Finally, even assuming the Civil Code generally required Plaintiffs to seek specific performance before seeking damages (which it does not), YPF's own expert, Dr. Kemelmajer, acknowledged that an obligee can sue for damages where the obligor has explicitly refused to perform. *See* Hicks Ex. 139 (Kemelmajer Tr. for YPF 142:21-143:15) (recognizing right to sue for damages where debtor is unwilling to perform); *see also* Hicks Ex. 48 (Kemelmajer Dec. 2021 Report for YPF ¶ 131 n.130) (citing scholar agreeing that plaintiff may seek damages "when the debtor is *unwilling* or unable to perform and it is not possible for another to do so") (emphasis added). Again, Argentine law does not limit plaintiffs to futile relief; where the defendant has made clear it will not perform, the plaintiff may sue for damages. *See* Goodman Ex. 36 (Garro

Jan. 2022 Report for Pls. ¶¶ 55-56); Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶¶ 61-63); Hicks Ex. 141 (Coffee Jan. 2022 Report for Pls. ¶ 36).   Here, as explained *supra* at 27-29, Defendants openly and unambiguously repudiated their obligations under the Bylaws.  Moreover, even after Repsol sued Argentina and sought injunctive relief on behalf of a putative class (which included Plaintiffs),[21] Argentina still refused to perform, instead settling with Repsol for money damages.  Thus, even if it were true that Argentine law generally requires a party to seek specific performance, Defendants' repudiation relieved Plaintiffs of any such obligation.

## III.    YPF Is Liable For Failing To Enforce the Tender-Offer Requirements

Whereas Argentina attempts to escape liability for its actions by depriving Plaintiffs of any meaningful remedy and rendering Defendants' promises effectively meaningless, YPF tries to shift the blame and takes the even more extreme position that it never made or broke any promises in the first place.  That argument is even more at odds with reality.  To induce foreign investors to buy billions of dollars in YPF shares, YPF amended its Bylaws to include specific contractual guarantees and concrete sanctions investors were assured would be imposed if a shareholder attaining a control position were ever to violate those provisions.  Article 28 of the Bylaws and YPF's prospectus highlighted that investors specifically anticipated, and were particularly concerned about, Argentina doing so but, in 1993, nobody knew for certain who, if anyone, would cross the ownership thresholds.  The one thing investors could count on was that, whoever did so, one entity would have the power to require compliance with the Bylaws:  YPF, the entity that was taking their money into its coffers.  The Bylaws were explicitly drafted to vest YPF with the power and obligation to enforce the Bylaws provisions.

---

[21] Repsol's complaint defined the class to include holders as of the date Argentina took control.  *See* Hicks Ex. 16, ¶ 55 (Compl., *Repsol YPF, S.A. v. Republic of Argentina*, No. 1:12-cv-03877-LAP (S.D.N.Y. filed May 15, 2012), ECF No. 1).  It is noteworthy that Defendants did not challenge that class definition or argue that holders who sold their stock following the takeover lost contractual standing.  *See supra* Part I.A.

YPF's arguments that its Bylaws nevertheless promised nothing are at odds with the Bylaws' text as well as purpose.  YPF was not simply a guarantor of Argentina's performance. YPF had clearly articulated obligations under Bylaws provisions that relied on *YPF* for their enforcement; the Bylaws did not leave shareholders to self-policing or self-help, as YPF would have one believe today.  No shareholder would have invested in YPF if the Bylaws operated as nothing more than an honor code and that YPF would do nothing to enforce them.  Nor can YPF escape liability by claiming that someone else—Argentina—is solely to blame and YPF's own actions or inactions did not cause Plaintiffs' injury.  Under Argentine law, the entirely foreseeable takeover by Argentina—the very reason the Bylaws and prospectus repeatedly reassured investors of the availability of their "compensated exit"—does not excuse YPF from its obligations, and YPF is responsible for the actions of those individuals who acted as its board of directors and management.  Corporations only take action through the individuals empowered to act on their behalf, and YPF's liability stems from the actions of the Intervenor and Vice-Intervenor who acted as YPF's board and management beginning on April 16, 2012.

A. **The Bylaws imposed specific obligations on YPF**

YPF contends that it could obtain billions of dollars from foreign investors by codifying the tender-offer provisions in its Bylaws, yet incur "no contractual obligation" under those Bylaws. YPF Br. at 13.  YPF is incorrect.

The Second Circuit already agreed with Plaintiffs that "every corporation is obligated to abide by its bylaws" and that YPF had a specific contractual "obligation to enforce the tender offer provision."  *Petersen II*, 895 F.3d at 210.  Almost seven years ago, YPF made the same argument through the exact same expert:  the Bylaws imposed no obligations on YPF.  *See Petersen* ECF No. 33 (YPF MTD) at 22 (citing Dr. Kemelmajer and claiming that the tender offer provisions of the YPF Bylaws impose obligations "on the person acquiring control, not on YPF"); *id.* (arguing

that the only obligations YPF has under the Bylaws "never arose" because they would only have been "triggered" had Argentina in fact conducted a tender offer).  The Second Circuit squarely rejected that argument, holding that the Bylaws imposed on YPF an "obligation to enforce the tender offer provision triggered by Argentina's expropriation of Repsol's 51% ownership stake," as well as an obligation "to enforce the penalties imposed by section 7(h)."  *Petersen II*, 895 F.3d at 210.  That is why the Second Circuit held that "YPF's *failure* to do so [i.e., its failure "to enforce the tender-offer provision"] caused a direct effect in the United States, namely, the required tender for ADRs listed on the NYSE never took place," and likewise, "YPF's *failure* to enforce the penalties imposed by section 7(h) is of a piece with its failure to enforce the tender offer provisions."  *Id.* (emphasis added).  Under the law-of-the-case doctrine, the Second Circuit's holding controls.  *See Kerman*, 374 F.3d at 110; *Reich*, 821 F. Supp. at 909.[22]

Law of the case aside, YPF's argument is foreclosed by the Bylaws' plain text and by Argentine law.  Sections 7 and 28 of the Bylaws spell out specific enforcement obligations in connection with acquisitions of control.  As discussed above, Section 7(d) provides that violations of the tender-offer provisions in Sections 7(e) and 7(f) "shall be forbidden."  Pls. 56.1 ¶ 37.  Section 7(f) further guarantees that acquisitions of control "shall be conducted in accordance with the [Bylaws]" and any "additional or stricter requirements" of the jurisdictions where the company's shares are listed, i.e., Argentina and New York.  Pls. 56.1 ¶ 38.  Section 28(A) explicitly provides that these protections "shall apply" when the National Government takes control of the company.

---

[22] Revisiting this holding would revive Plaintiffs' promissory estoppel claim against YPF.  This Court dismissed Plaintiffs' promissory estoppel claim on the basis that it was "duplicative of a breach of contract claim." *Petersen I*, 2016 WL 4735367, at *16.  This conclusion was predicated on the Court's finding that YPF owed specific contractual obligations to Plaintiffs and that "Plaintiffs ha[d] not identified a promise made in the IPO Prospectus, SEC filings, or elsewhere that is *distinct from* the obligations imposed by the Bylaws." *Id.* (emphasis added).  But, as discussed *infra* at 46-47, were the Court to dismiss the breach of contract claim against YPF on the ground that YPF had no such obligations, the Court must allow Plaintiffs' promissory estoppel claim—predicated on promises YPF made in the Bylaws *and* the IPO Prospectus—to proceed to trial.  YPF cannot have it both ways.

Pls. 56.1 ¶ 44.  And Section 7(h), applicable to the National Government through Section 28(C), provides that control acquisitions that violate the Bylaws "shall not grant any right to vote or collect dividends or other distributions."  Pls. 56.1 ¶¶ 42, 45.

Under Argentine law, enforcement of these obligations fell on the company itself.  *See* Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶¶ 58-60); Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 77).  There is no dispute that the Bylaws create a new juridical person—the corporation— that is capable of entering into contracts and acquiring obligations owed to the shareholders under the Bylaws.  *See* Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 60) ("To the extent that a legal entity is created by virtue of the YPF Bylaws, this newly created juridical person, acting through its legal representatives or board of directors, acquires obligations owed to the shareholders."); Goodman Ex. 23 (Manóvil Sept. 2021 Report for Argentina ¶ 11) ("the relationships that arise from [the Bylaws] are between each shareholder *and the company*") (emphasis added);  ███

████████████████████████████████████████████████████████

███████ ; Hicks Ex. 1 (*Petersen* ECF No. 36-2 (YPF Bylaws) § 5) ("the Corporation has full legal capacity to acquire rights, undertake obligations, and exercise any act not prohibited by the laws or these By-laws"); *see also* YPF Br. at 20 (agreeing that YPF had certain "administrative" obligations under the Bylaws).

It is therefore plain that YPF—acting through its Board—had the power under Sections 7 and 28 to require Argentina to undertake a tender offer and to strip Argentina of certain rights if it illicitly acquired control of the Repsol shares.  In fact, the Bylaws expressly grant YPF the authority to enforce these (and all other) provisions, stating that "[t]he Board of Directors shall have wide powers to organize, conduct and manage the affairs of the Corporation," including the overarching authority to "[e]xercise" every one of the "powers granted by these By-laws."  Hicks

Ex. 1 (*Petersen* ECF No. 36-2 (YPF Bylaws) §17(i), (xviii)).  Those "powers" necessarily include

the power under Sections 7 and 28 to require Argentina to undertake a tender offer, as well as the

power to strip Argentina of the right to vote the shares it acquired in violation of the tender-offer

provisions.  And because YPF had the power to take each of those steps, it also had the obligation

to take them.  Sections 7 and 28 are written in mandatory terms, each stating that the tender-offer

provisions "*shall* apply" and "*shall* be complied with," illicit acquisitions "*shall* be forbidden,"

and sanctions for noncompliance "*shall* be applied."  Pls. 56.1 ¶¶ 37-44 (Bylaws §§ 7(d), 7(f),

7(h), 28(A)) (emphases added); *see Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308,

1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language:

'shall.'  Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a

requirement.").  YPF's claim that it had no obligation to enforce the Bylaws is thus foreclosed by

the Bylaws' plain text.  And this obligation—expressly recognized in the Bylaws' text—aligns

with the general principle in Argentine law that "[t]he Board of Directors must ensure that

shareholders comply with the bylaws."  Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 27 n.23).

YPF does not dispute that these enforcement provisions exist in the Bylaws.  Instead, it

suggests (at 24) that, because these mandatory provisions are written in the passive voice, the

company cannot be the party obligated to enforce them.  But who, if not the company, was

obligated to comply with these enforcement provisions that sought to protect minority shareholders

from a controlling shareholder?  According to YPF, the answer is *nobody*.  ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████.  YPF's reading flies in the face of the mandatory

language in Sections 7 and 28; it ignores that YPF was the sole actor with the undoubted power

(and hence the obligation) to enforce those provisions; and it would unreasonably allow YPF to

reap the benefit of billions of dollars in international investment without incurring any legal obligations. Otherwise, "shall" is meaningless; it would become "may, if so inclined."

In its effort to rewrite the Bylaws, YPF recasts itself as nothing more than a postal service that passively receives tender-offer notices from acquirers (provided that the acquirers choose voluntarily to comply) and merely forwards those notices along to shareholders. Under YPF's reading of the Bylaws, if Repsol in 1999, Petersen in 2008, or Argentina in 2012 had made tender offers that flagrantly violated the Bylaws—by offering a lower price than required, a shorter period to accept, or a limitation on which holders could participate—YPF would merely have passed along the unlawful offers without requiring compliance. The Bylaws clearly exclude such an absurd result, and do not permit YPF to be complicit in such a flagrant breach of the rules; rather, they impose upon YPF a duty to sanction any acquirer who fails to comply with the tender-offer provisions. Given Argentina and YPF's spotted history, global investors would never have parted with billions of dollars if they had known they were signing up for a mail-forwarding service.

Indeed, YPF's position cannot be squared with its contemporaneous assurances to investors that it would enforce the Bylaws' tender-offer obligations both generally and specifically vis-à-vis Argentina. For example, in its IPO prospectus, YPF committed that "[a]ny Control Acquisition carried out by the Argentine Government other than in accordance with the procedure described . . . *will result in* the suspension of the voting, dividend and other distribution rights of the shares so acquired." Hicks Ex. 3 (ECF No. 112-2 (YPF Prospectus) at 10-11, 80-82) (emphasis added)); *see also* Pls. 56.1 ¶¶ 49, 51, 54 (collecting quotations). Under Argentine law principles of estoppel, YPF's prior representations bar the company from now denying that it had any obligation to bring about that result. *See* Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 79); *see also* Hicks Ex. 48 (Kemelmajer Dec. 2021 Report for YPF ¶ 83) (YPF's expert acknowledging that Argentine law

"enshrines the doctrine of '*actos propios*,' a legal theory that is similar to the concept of estoppel, and prevents a party from bringing a claim that contradicts their earlier conduct").  Indeed, crediting YPF's argument that it had no obligations whatsoever to enforce the tender-offer requirement would make a mockery of YPF's repeated assurances that these provisions would be enforced in order to raise over $1 billion from investors in New York.  The court may have dismissed Plaintiffs' promissory estoppel claims as duplicative of its contract claims, *see Petersen I*, 2016 WL 4735367, at *16—because the promises made by YPF in its Bylaws and described in its SEC filings created *contractual* liability—but Argentine estoppel doctrine precludes YPF from recharacterizing the *contractual* promises enshrined in the Bylaws in a way that is inconsistent with the statements it made in its prospectus.[23]

YPF's arguments (at 25-28) about an "alternate theory" of "guarantor" liability under Argentine law attack a straw man.  As an initial matter, Plaintiffs need not invoke principles of guarantor liability, because under the Bylaws, YPF "assumed *direct* liability," i.e., "YPF undertook specific obligations *for itself*, such as to take specific steps in connection with the tender-offer process."  Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 19).  To be sure, those obligations required YPF to ensure that Argentina complied with its own (related, but distinct) obligations under the Bylaws in the event of a takeover, and to sanction Argentina if it breached those obligations.  *See* Goodman Ex. 23 (Manóvil Sept. 2021 Report for Argentina ¶ 108) (Defendants' expert agreeing that Section 7(h) was "designed to compel performance" by the Republic).  But Plaintiffs' theory is not that YPF guaranteed to assume Argentina's obligation to make the tender offer in the event of Argentina's failure to do so.

Even if YPF's liability were analyzed under this inapposite doctrine, Plaintiffs would

---

[23] As noted, *supra* n.22, dismissing Plaintiffs' breach of contract claim now would require reviving Plaintiffs' promissory estoppel claim.

prevail.  YPF recognizes that it can be considered a "guarantor" under Argentine law if it agreed

to serve as a guarantor, or if there is a legal mandate that compelled YPF to act as guarantor.  YPF

Br. at 25-26.  The Bylaws plainly obligated YPF to ensure that Argentina—and any shareholder—

complied with the tender-offer provisions if it made a triggering acquisition of control.  YPF

reiterated those assurances to investors in the run-up to the IPO and in the years after, including as

recently as 2011.  *See generally* Pls. 56.1 ¶¶ 49, 51, 54 (collecting quotations).  For example, in its

IPO Prospectus, YPF assured prospective investors that, "[p]rior to consummating any Control

Acquisition, an Offeror *must* . . . make a public tender offer for all of our outstanding shares and

convertible securities.  The Offeror *will be required* to provide [us] with notice of and certain

specified information with respect to any such tender offer. . . .  The tender offer *must be carried*

*out* in accordance with a procedure specified in the By-laws. . . .  [T]he Offeror *will be obligated*

to acquire all tendered shares."  Hicks Ex. 3 (*Petersen* ECF No. 112-2 (YPF Prospectus) at 80-81)

(emphasis added).  YPF repeated those guarantees in 2011.  *See* Hicks Ex. 103 (YPFEP00000001

at 184).  Every reasonable investor would have understood YPF's emphatic promises to represent

that *YPF* would enforce those mandatory provisions; indeed, those representations carried weight

with prospective investors precisely because they were expressions of YPF's commitment to

guarantee Argentina's compliance with the Bylaws' obligations, and the IPO would have failed if

YPF's assurances were understood to mean anything less.  *See generally* Hicks Ex. 142 (Blackett

Dec. 2021 Report for Pls.).  Those repeated assurances are sufficient to render YPF a guarantor.

YPF asserts in a footnote that, even if "YPF had an obligation to prevent the Republic from

voting under Section 7(h)," it cannot be liable for failing to do so "because YPF's management

and Board had been displaced by the Intervenor," and "[t]he Intervenor's actions cannot give rise

to liability on the part of the Company."  YPF Br. at 24 n.14 (citing Goodman Ex. 59 (Comadira

Dec. 2021 Report for YPF ¶ 18)).  YPF relies on Professor Comadira, ███████████████████████████████████, who cites no Argentine legal sources, *see* Goodman Ex. 59 (Comadira Dec. 2021 Report for YPF ¶ 18) (opining, without support, that the actions of the Intervenor "cannot be attributed to YPF").

Professor Comadira is incorrect.  It is undisputed that the Intervention Decree gave the Intervenor "the powers conferred on the Board of Directors and/or the President of the Company in the Bylaws of YPF S.A."  Pls. 56.1 ¶ 97; *see also* Hicks Ex. 138 (Comadira Tr. for YPF 111:10-112:8) (conceding that the Intervenor "acted in two capacities" as representative of the Republic and YPF). [24]  The Intervenor stepped into the shoes of the YPF Board.  And, it is well accepted under Argentine law that corporations can be held liable for the actions of their boards.  *See* Art. 1763 CCC ("The legal entity shall be liable for any harm that is caused by whoever directs or manages them in the exercise of or in connection with their functions."); Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 80) ("The company may only act through its board members and therefore the acts or omissions of its board are the company's acts or omissions.") (collecting authorities); Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 60) (a "juridical person" acts "through its legal representatives or board of directors").  Thus, YPF is liable for the Intervenor's actions.

Faced with the reality that the Bylaws imposed specific contractual obligations on YPF and that individuals authorized to act on its behalf breached those obligations, YPF alternatively argues that a shareholder can *never* sue a company for a breach of bylaws.  *See*, *e.g.*, YPF Br. at 16 n.11, 25-27.  YPF does not provide any support for this argument—or cite any statute, caselaw, or scholarship for the remarkable proposition that companies cannot be sued for causing direct injury

---

[24] YPF agrees with Plaintiffs that the acts and omissions of the Intervenor and Vice-Intervenor bind the Republic.  *See* Goodman Ex. 59 (Comadira Dec. 2021 Report for YPF ¶ 17) ("the Republic's Intervenor and Deputy Intervenor acted as representatives and agents of the Government").

to shareholders by breaching bylaws obligations.  *See* Hicks Ex. 35 (Rovira Dec. 2021 Report for

Pls. ¶¶ 21, 49-68, 73-80); Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶¶ 11, 28-38, 57-62);

Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶¶ 8-43, 56-60); Goodman Ex. 36 (Garro Jan. 2022

Report for Pls. ¶¶ 7-25, 65-67).  Instead, relying on the extraordinary nature of its promises, YPF

argues that there is no precedent directly on point in which a company was held liable for breaching

such obligations.  But the novelty of the promises in the Bylaws—a prerequisite for accessing

international capital markets—does not make the enforcement of the Bylaws by shareholders

novel.  Argentine courts have squarely recognized that actions arising from corporate bylaws *can*

be brought against the corporation as well as against other shareholders.  *See* Hicks Ex. 143 (*Zullo,*

*Norberto vs. Kehoe, Roberto Eduardo y otros*, CN Com., Room A, July 22, 2008 (TR LA LEY

AR/JUR/8909/2008)) ("actions that arise from the bylaws . . . may be exercised by the company

against the shareholders or by the shareholders among themselves or against the company");

Goodman Ex. 38 (*Gutiérrez Enedina y otros vs. Neumáticos Gutiérrez SA y otros s/ordinario*,

October 16, 2012, CN Com, Room A (TR La Ley AR/JUR/62470/2012)) ("actions arising from

the corporate contract . . . [are] exercisable by the company against the shareholders and by the

shareholders among themselves or against the company").  These pronouncements are persuasive

authority under Argentine law in favor of Plaintiffs, and YPF offers nothing to the contrary.

YPF dismisses the language in those cases as "dicta," but in other cases Argentine courts

have issued monetary awards against companies, as for example when they deprived shareholders

of dividends in violation of corporate bylaws.  *See* Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls.

¶ 17 & n.5).  In any event, "Argentine judges and lawyers do not distinguish between 'dicta' and

holdings – both are regarded as relevant in interpreting the law and developing judicial doctrine."

Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 11).  That is, "[i]n Argentina, when a judicial

decision articulates a legal principle or provides an interpretation of a code provision, courts find such interpretation persuasive even if it is unrelated to the facts of the case or the holding." *Id*. Indeed, that is how YPF's experts use cases in support of their arguments. *See*, *e.g.*, Hicks Ex. 138 (Comadira Tr. for YPF 99:11-18) ("Q. And even though the court rejects this claim based on the statute of limitations, you found that the general statements that the court made about absolute nullity were useful for your analysis; correct?  A. Yes, correct, and that's why I included it.").

Moreover, YPF's complaint about the purported lack of cases in Argentina where a company has been held liable for damages for breach of its corporate bylaws under similar circumstances is misguided.  "As a civil law jurisdiction, Argentina does not place the same emphasis on case law as do common law jurisdictions such as the United States.  Courts in Argentina look first and foremost *to applicable code provisions and statutes, which are the primary sources of binding authority*."  Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 11) (emphasis added).  Cases are only "secondary authority with persuasive force." *Id.*  Thus, what controls is the text of the Civil Code and the ACL, which, as explained *supra* at 29-31, authorize and support Plaintiffs' breach of contract claim for damages.  A purported absence of secondary authority in Argentina would not absolve YPF of its wrongdoing.  But, as the citations above show, there *are* cases explaining that a shareholder *can* sue a company for wrongdoing, and there is no basis to suggest this principle should not apply to the promise of a tender offer in YPF's Bylaws.

Argentine jurisprudence is no different from United States law on this point.  U.S. courts speak with one voice when they hold companies liable for damages for the type of breach at issue here.  *See Oliveira*, 126 F. Supp. 3d at 424 (granting summary judgment to shareholder against corporation for breach of contract); *see also Blue Chip Cap. Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827 (Del. Ch. 2006) (denying dismissal of shareholder's breach of contract claim against

corporation); *Gale v. Bershad*, No. CIV. A. 15714, 1998 WL 118022 (Del. Ch. Mar. 4, 1998) (same).   Judge Rakoff's opinion in *Oliveira* is directly on point.   A company's articles of incorporation promised that, in the event of a merger, any shareholder voting on the merger could opt to be bought out of the combined entity following the merger's consummation (if approved).[25] *See generally Oliveira*, 126 F. Supp. 3d 424.   The plaintiff shareholder voted against a merger and demanded a buy-out, but the corporation refused.   *See id.*   The plaintiff later sold its shares and sued the company for damages under breach of contract, alleging that it breached its contractual obligations when it "refused to honor [the] conversion demand."   *Id.* at 427.[26]   The district court granted summary judgment for the plaintiff, concluding that the articles of incorporation constitute "a contract between the corporation and its shareholders," and the company had a contractual obligation to convert the plaintiffs' "shares to cash."   *Id.* at 427-28.   Thus, under Argentine and United States case law alike, the Bylaws are enforceable against the company.

### B.    YPF's breach caused Plaintiffs' damages

Having admitted that it did *nothing* to enforce the tender-offer provisions of the Bylaws, *see* Pls. 56.1 ¶¶ 95-96, YPF seeks to avoid liability by speculating that nothing would have caused Argentina to conduct a tender offer.   YPF's blame-shifting argument rests on the premise that the Republic's failure to tender is an external force that caused Plaintiffs' damages, and YPF had no means to stop it.   This conjectural claim misapplies Argentine law and contradicts the record.

Similar to common law doctrines frustration of contract and impossibility of performance, the defense of "force majeure" under Argentine law excuses the obligor from damages liability

---

[25] As the parties' comparative law experts unanimously recognize, Argentine corporate bylaws ("estatutos" in Spanish) may be analogized to an American company's articles of incorporation.  *See* Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 15 n.31).

[26] It is noteworthy that the shareholders' sale of its shares prior to winning judgment against the company did not deprive it of contractual standing to sue, contrary to Defendants' arguments in this case.  *See supra* Part I.A.

where nonperformance was due to an event that is *both* "unforeseeable" *and* "external" or "alien" to the obligor.  Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 36); Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 48); Hicks Ex. 139 (Kemelmajer Tr. for YPF 126:10-16); *see* Civil Code Arts. 513-514; Restatement (Second) of Contracts § 261 (Am. L. Inst. 1981) (impossibility defense is only available when "a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made"); *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 339 (2d Cir. 1986).

YPF fails on both counts.[27]  A party cannot provide contractual assurances that it will take certain actions in the event of an occurrence, and then turn around and claim the specifically contemplated occurrence was an unforeseeable force majeure.  At a fundamental level, it is "a foreseeable (adequate) consequence of failing to take one's required contractual steps that the contractual outcome would not occur."  Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 49). Thus, "YPF cannot do *nothing at all* – that is, ignore its contractual obligation – and then defend itself by speculating that nothing would have worked."  *Id.* (emphasis added).  Similarly, as the Second Circuit has held, "the non-performing party must demonstrate its efforts to perform its contractual duties despite the occurrence of the event that it claims constituted force majeure"—a showing YPF cannot make because it concededly made *no effort* to enforce any of its obligations under Sections 7 and 28 of the Bylaws.  *Phillips Puerto Rico*, 782 F.2d at 319.  And just as important, it would blink reality to suggest that Argentina's failure to tender was somehow

---

[27] YPF suggests it is Plaintiffs' burden to show that the Republic's conduct did not break the chain of causation.  *See* YPF Br. at 29 ("Plaintiffs cannot show – as they must – that any failure by YPF caused them to suffer damages" because there is "no evidence" that the Republic would have acquiesced if YPF had enforced the Bylaws). But *force majeure* is a defense that requires Defendants—not Plaintiffs—to establish that an unforeseeable, external intervening event broke the chain of causation.  *See* Hicks Ex. 9 (*Petersen*, ECF No. 99 (YPF Answer, Sixth Defense) at 19); Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 36) (force majeure is a defense under Argentine law); *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985) ("The burden of demonstrating force majeure is on the party seeking to have its performance excused.").

unforeseeable.  Defendants included Sections 7 and 28 in the Bylaws precisely because the drafters foresaw that Argentina might seek to re-take control of the company, and an enforcement mechanism was necessary to ensure minority shareholders their promised compensated exit.  *See* Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 37); Pls.' MSJ at 28 (citing *Petersen III*, 2020 WL 3034824, at *13; *Petersen II*, 895 F.3d at 200); Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 50) ("[N]othing about the April 2012 takeover can be called unforeseeable, especially for Argentina and YPF.  They adopted the Bylaws provisions at issue here precisely because the events of April 2012 *were entirely foreseeable*."); Goodman Ex. 23 (Manóvil Sept. 2021 Report for Argentina ¶ 108) (agreeing that Section 7(h) was "designed to compel performance" by the Republic). ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████; *see also* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 29 n.21) (quoting Article 889 CC).  YPF's attempt to escape liability for an event that investors specifically anticipated—and that was the precise subject of YPF's repeated assurances—rests on self-serving *ipse dixit*.

YPF's argument also fails because it rests on the incorrect premise that Argentina and YPF were independent of each other at the time of the breach.  As the Supreme Court of Argentina has recognized, since the time of the breach, on April 16, 2012, YPF has operated "under the control of the Republic of Argentina . . . 'under the jurisdiction of the Executive Branch' and under the management appointed by the Republic."  Pls.' Add'l 56.1 ¶ 3.  Pursuant to Decrees 530 and 532, the Intervenor and Vice-Intervenor—both high-ranking officials of the Argentine Government— "replaced the YPF Board."  Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 46); *see also* Pls.' MSJ at 18 ("Through Decrees 530 and 532, Argentina took control of YPF's management." (citing

Hicks Exs. 30 & 35)).  Thus, these government officials acted on behalf of both Argentina and YPF during the intervention, and their acts and omissions "cannot constitute an 'external' cause under Argentine law."  Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 46).  Under these facts, YPF cannot avoid responsibility by hypothesizing about what Argentina would or would not have done had YPF enforced the Bylaws.  *See* Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 37); *see also* Hicks Ex. 140 (Bianchi Jan. 2022 Report for Pls. ¶ 49) ("YPF cannot escape liability for [its] conduct by pinning blame on its controlling shareholder.").

Moreover, YPF's speculative take on what Argentina would or would not have done in a hypothetical scenario is refuted by Argentina itself.  In an effort to make its own case as to why Plaintiffs should be deprived of any monetary remedy, the Republic argues that Plaintiffs should have sought specific performance that compelled it to conduct a tender offer.  *See* Argentina Br. at 30 (arguing that Plaintiffs were required to bring "an action to compel the Republic to conduct a tender offer"); *see also* Manóvil Ex. 2 (Manóvil Dec. 2021 Report for Argentina ¶ 62) (same). As explained above (*supra* Part II.B.2), this argument fails under Argentine law.  And, as explained below (*infra* Part IV.B.1), the argument is contradicted by Argentina's own public law experts. But, as relevant to YPF's *force majeure* argument, the Republic's position presupposes that Argentina could have been required to make a tender offer.  *See* Argentina Br. at 30 ("Performance of the tender-offer provisions in the Bylaws was not impossible at the time of the alleged breach"); Manóvil Ex. 2 (Manóvil Dec. 2021 Report for Argentina ¶ 69) ("performance of the tender offer provisions in the Bylaws was not made impossible due to the Republic's fault").  Defendants cannot have it both ways, and YPF's self-serving speculation is neither credible nor entitled to weight on summary judgment.  *See*, *e.g.*, *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (holding that a nonmoving party "may not rely on conclusory allegations or

unsubstantiated speculation" to survive summary judgment).

In support of its argument, YPF relies on a single statement by Professor Garro acknowledging that YPF might have encountered practical difficulties had it tried to enforce Argentina's tender-offer obligation and had Argentina persisted in flouting its obligations under the Bylaws.  Whatever practical difficulties YPF might have experienced in that alternate reality are irrelevant here because the contract anticipated the possibility that Argentina might refuse to comply with its tender-offer obligations.  Argentina's failure to comply was not an external force entirely separate from YPF, and in the real world, YPF made no effort at all to enforce the tender-offer obligation or the sanctions provision.  YPF cannot escape liability on *force majeure* grounds.

Finally, as discussed *infra* Part IV.C, YPF's claim that Argentina's breach was unavoidable is in direct tension with the Second Circuit's recognition that there is "no reason why Argentina could not have complied with both the bylaws' tender offer requirements and the YPF Expropriation Law." *Petersen II*, 895 F.3d at 208.  YPF's causation argument fails as a matter of law.

## C.     Petersen has not lost its standing to sue YPF

YPF makes a half-hearted attempt (at 34-35) to contend that Petersen is not the real party in interest because it assigned its claims to Prospect Investments LLC ("Prospect").  Not only is YPF incorrect (on an argument that applies only to Petersen, not Eton Park), but because the contract between Prospect and Petersen unambiguously provides that Petersen *did not* assign or sell its claims to Prospect, the Court should grant Petersen summary judgment on this issue.  *See Orix Credit All., Inc. v. Horten*, 965 F. Supp. 481, 484 (S.D.N.Y. 1997) (summary judgment to non-movant appropriate even without a formal cross-motion when court's "analysis reveals that there are no genuine issues of material fact, but that the law is on the side of the non-moving party"); *see also Kim v. DK Cosms.*, No. 19-CV-9079 (JMF), 2022 WL 540675, at *5 (S.D.N.Y.

Feb. 23, 2022) (entering summary judgment for defendants on liquidated damages issue even though they "did not cross-move on the issue").[28]

       1.      The Prospect-Petersen Claim Prosecution Agreement (the "CPA") is not a simulated assignment contract under Spanish law

The CPA states that the "parties agree that nothing in this Agreement shall be interpreted to constitute an assignment or transfer" by Petersen to Prospect.  Goodman Ex. 70 (CPA § 2.2, PT_000008143 at -8147).[29]  YPF nevertheless asks the Court (at 34 & n.19) to ignore that clear text and find that the CPA is a "simulated agreement" under Spanish law[30] that made Prospect the legal owner of the claims.  To prevail, YPF bears the burden to prove that the actual agreement—a financing agreement—did not exist, and was merely a cover for a "disguised" sale or assignment. Hicks Ex. 144 (Tirado Dec. 2021 Report for Pls. ¶¶ 58-59) (simulation requires "legal proof on the inexistence of the cause expressed in the agreement").  That burden is high:  if there is any doubt as to whether the contract is simulated, "the validity of [stated] agreement shall prevail." *Id.*; Hicks Ex. 145 (Conthe Jan. 2022 Report for YPF ¶ 68) (agreeing that Defendants have burden to prove contract is a simulation).[31]  YPF has not come close to satisfying that standard.

To begin, this Court is not writing on a blank slate.  For this Court to hold that the CPA is a simulation, it would need to re-interpret a Spanish contract that was solicited, negotiated, and recognized under the aegis of the Spanish bankruptcy court presiding over Petersen's insolvency

---

[28] In no event would YPF be entitled to summary judgment on this issue, because YPF has failed to establish that Petersen *unambiguously* assigned or sold its claims to Prospect in the CPA.  *See FLLI Moretti Cereali v. Cont'l Grain Co.*, 563 F.2d 563, 566 (2d Cir. 1977) (denying summary judgment to movant where "[t]he language of the assignment" was "subject to two fairly reasonable interpretations").

[29] Petersen entered into this financing agreement with Prospect explicitly because "the sale or assignment of the claims ha[d] not proven practicable."  Goodman Ex. 70 (CPA, PT_000008143 at 146).

[30] The parties agree Spanish law governs the CPA.  *See* Goodman Ex. 70 (CPA § 18, PT_000008143 at 159).

[31] Evidence that an agreement is simulated include when there is:  (1) a kinship relation, (2) a "disproportion between the value and the contractual price," (3) "lack of evidence of the payment," (4) "the absence of an economic justification for the agreement" and (5) "a suspicious moment for the agreement," such as the death of one of the parties.  Hicks Ex. 144 (Tirado Dec. 2021 Report for Pls. ¶ 61).

proceedings.[32]   The CPA was "the result of the public execution of an un-challenged, court-approved liquidation plan, conducted in the context of bankruptcy liquidation proceedings." Hicks Ex. 144 (Tirado Dec. 2021 Report for Pls. ¶ 11); Pls. Add'l 56.1 ¶¶ 5-7.  YPF provides no basis for this Court to reject a Spanish court's application of Spanish law and, tellingly, its expert did not bother to review "the full docket in th[e] [Spanish] insolvency proceeding."  Hicks Ex. 146 (Conthe Tr. for YPF 60:21-61:2).  As numerous cases hold, American courts should exercise extreme caution in second-guessing foreign courts on questions of their own domestic law.  *See Shaw v. Goebel Brewing Co.*, 202 F. 408, 412 (6th Cir. 1913) (explaining that American court's construction of British law "should be governed by the decisions of the courts of Great Britain"); *In re Arb. of Katz*, No. 13 Civ. 2585 (NRB), 2014 WL 1224445, at *5 (S.D.N.Y. Mar. 18, 2014) (deferring to British Virgin Island Court's "interpret[ation] [of] the Articles of Association of a corporation organized under BVI law").  That is especially so where YPF has already tried and failed to collaterally attack the Spanish insolvency court's decisions regarding the CPA.[33]

Even if the Court were to revisit Spanish law and reach its own independent conclusion, it should find that the CPA is not a simulated contract.  Under Spanish law, courts do not consider whether a contract may be a simulation unless there is a risk the contract would otherwise violate Spanish public policy.  *See* Hicks Ex. 144 (Tirado Dec. 2021 Report for Pls. ¶ 40) (simulation "has

---

[32] *See id.* ¶ 31 ("Far from some obscure agreement, with unclear terms and entered into following an undisclosed procedure, the Contracts were the result of a public, transparent process, legally-determined in each step, supervised and ultimately approved by the court, which was never challenged by any of the parties (i.e., bankruptcy creditors, interested stakeholders or, indeed, other – unsuccessful – bidders)."). *See also* Pls.' Add'l 56.1 ¶ 7.

[33] YPF brought precisely the same challenge to the CPA, advancing the exact same arguments, and lost in the Spanish commercial court and appeals court.  These courts ruled that only the insolvency court had the authority to revisit the validity of the CPA, which it had previously authorized.  *See* Hicks Ex. 144 (Tirado Dec. 2021 Report for Pls. ¶ 37) (summarizing decisions by the First Instance Court of Madrid nbr. 99, First Instance Court of Madrid nbr. 47, Section 8 of the Court of Appeals of Madrid, and Section 20 of the Court of Appeals of Madrid that all held "that the allegations of simulation affected the bankruptcy estate and therefore were to be exclusively decided by" the insolvency court); Hicks Ex. 147 (PT_TIRADO_000000194 at 206) (affirming the First Instance Court of Madrid nbr. 47); Hicks Ex. 148 (PT_TIRADO_000000094 at 099) (affirming the First Instance Court of Madrid nbr. 99).

been accepted by courts in cases where the parties sought to avoid the undesired consequences of a mandatory Spanish Law").  YPF's expert Manuel Conthe explains that simulation contracts typically arise when parties are trying to:  (i) avoid tax consequences; (ii) circumvent inheritance laws, or (iii) eliminate the vested rights of third parties, such as the right of first refusal to purchase property.  *See* Goodman Ex. 62 (Conthe Sept. 2021 Report for YPF ¶¶ 59-64).  Mr. Conthe concedes that the Spanish Supreme Court recognizes that, unlike those situations, "purchasing the claim" and "funding the claim" are both legitimate.  *Id.* ¶¶ 73-74.  Because assignment of claims is valid under Spanish law, Burford and Prospect had no reason "to hide the 'real' cause of the transaction," and there can be no simulation.  Hicks Ex. 144 (Tirado Dec. 2021 Report for Pls. ¶ 43).

YPF ignores this basic principle of Spanish contract law and instead raises three non-meritorious arguments, which the Court should reject.  *First*, YPF (at 34 n.19) contends that the CPA must be a simulation because it "transfer[red] all of the key elements of ownership to Prospect, including the irrevocable and exclusive right to control the Petersen claims and any settlement thereof."  This assertion mischaracterizes Spanish law, which as its own expert explains, provides that a third-party may "fund" rather than "purchase" a claim even when it "is given more or less powers to control the process."  Goodman Ex. 62 (Conthe Sept. 2021 Report for YPF ¶ 73) (internal quotation marks omitted).  The argument also ignores the text of the CPA, which instructs Prospect and Petersen to collaborate on both the direction of the litigation and settlement.  *See* Pls.' Add'l 56.1 ¶ 8; Hicks Ex. 149 (Bogart Tr. 179:25-180:3) (Burford's CEO Christopher Bogart explaining Petersen and Prospect make "litigation decisions" through "a collaborative process").

*Second*, YPF's suggestion that Prospect's "level of control is utterly inconsistent with industry best practices and Burford's own publicly-stated practices," YPF Br. at 34 n.19, is legally

irrelevant, because whether "the design of the contract between the parties breaches . . . American standards" (which it does not) has no bearing on the "nature of the contract," Hicks Ex. 150 (Tirado Tr. for Pls. 209:10-15).  And, in any event, Mr. Bogart testified that "the fundamental structure[s]" of the CPA and Burford's litigation funding agreement with Eton Park—which YPF does not challenge—are "comparable."  Hicks Ex. 149 (Bogart Tr. 195:3-4).  And Burford's "practices," which are in any event consistent with this arrangement, are hardly the stuff of legal consequence.

*Third*, YPF's contention that "the CPA was intended to be the economic equivalent of a sale of claims," YPF Br. at 34 n.19, is also irrelevant under Spanish law and inaccurate.  Under Spanish law, if there are two legitimate ways to achieve the same economic goal, the parties may choose to structure their transaction either way and simulation doctrine will not disturb their choice.  *See* Hicks Ex. 144 (Tirado Dec. 2021 Report for Pls. ¶¶ 20, 43) ("Both a sale or assignment of claims . . . are perfectly valid under Spanish law").  Moreover, the CPA is not equivalent to a sale of the claims:  because the transaction was structured as a financing transaction in which the Petersen estate retains a material economic interest, the insolvency receiver remained the plaintiff representative and bore responsibility for ensuring Petersen's participation in discovery, and Prospect agreed to give up its contractual entitlement if it did not carry out its contractual duties. *See* Goodman Ex. 70 (CPA § 3.4, PT_000008143 at -8149); *id.* § 4.2 at -8150-51.

       2.     <u>Under FRCP 17, YPF's simulation argument cannot alter the trajectory of this case</u>

Even if the Court found that the CPA was a simulated agreement and Petersen assigned its claim to Prospect, dismissal would not be warranted.  The appropriate course would be Prospect's ratification of Petersen's pursuit of the claims as named plaintiff.  *See* Fed. R. Civ. P. 17(a)(3).

District courts must grant leave liberally to allow the real party in interest to ratify or substitute into the action. *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11,

20 (2d Cir. 1997).  A plaintiff need not even identify a "semblance of any reasonable basis for the naming of an incorrect party" because there should "be no dismissal where substitution of the real party in interest is necessary to avoid injustice." *Id.*  A court must grant a request for substitution or ratification as long as "the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Id.*; *see also Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 226 (2d Cir. 2018) (ruling that "proposed substitution of Qlik would alter none of the factual allegations of the complaint").

Here, even if Prospect ratified this action or was substituted as a plaintiff, the causes of action, substantive law, and operative facts would remain the same.  And the Defendants would not need any additional discovery.  Burford Capital has already produced more than 3,000 documents in this action, and Defendants deposed Mr. Bogart.[34]

Nor, as YPF suggests (at 35), does the passage of time since YPF raised this defense make dismissal appropriate here.  Petersen has never had any reason to believe that it needed to seek ratification.  To the contrary, in ruling on the motion to dismiss, the Court held the CPA did not appear to be a champertous assignment on its face.  *See Petersen I*, 2016 WL 4735367, at *9; *see Amorim Holding Financeria, S.G.P.S., S.A. v. C.P. Baker & Co.*, 53 F. Supp. 3d 279, 294-95 (D. Mass. 2014) (granting leave to ratify three years after defense was raised because court had ruled on motion to dismiss that plaintiff was real party in interest).  And Defendants' Spanish law expert admitted that he had not been provided any evidence from fact discovery that would cast doubt on the Court's conclusion.  *See* Hicks Ex. 146 (Conthe Tr. for YPF 60:1-62:3).

The two cases YPF cites (at 35) to support dismissal are inapposite.  In one, the court

---

[34] Defendant Argentina served a document subpoena on Burford Capital that contained 13 separate requests, not including subparts.  *See* Hicks Ex. 151 (Argentina Subpoena Notice to Burford Capital (Oct. 13, 2020)).  Yet neither Defendant cites a single Burford-produced document in its 56.1 statements.

dismissed the complaint because the plaintiff lacked *standing* to pursue its claim.  *See Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 18-cv-12361 (JMF), 2020 WL 2555281, at *3 (S.D.N.Y. May 20, 2020).  In the other, the plaintiff was the "sole shareholder and operator of Chrebet's Inc.," and had no reason to be mistaken about the real party in interest.  *Chrebet v. Cty. of Nassau*, No. 09 CV 4249 (DRH) (AKT), 2014 WL 1836835, at *22 (E.D.N.Y. May 8, 2014).  The plaintiff also asserted "numerous new causes of action" in a proposed amended complaint and added factual allegations.  *Id.*  But as explained above, even if Prospect were substituted as plaintiff or ratified this action, there would be no change other than changing the case caption.  *See supra* at 57-58.

## IV.  Defendants' Public Law Arguments Are Foreclosed by the Second Circuit and Wrong as a Matter of Argentine Law

As Plaintiffs have standing to sue and Defendants are liable for their breaches, Defendants' only remaining defenses are variations on the public law arguments they litigated and lost at the outset of this litigation.  In various forms, Defendants argue that public law displaced or overrode their private law obligations, excused their violations, or broke the chain of causation.  Each of these arguments is at odds with the promises Defendants made to entice billions from private foreign investors, foreclosed by the Second Circuit's prior ruling, and wrong under Argentine law.

### A.  Argentina's arguments under the FSIA and the Act of State doctrine are foreclosed by the Second Circuit's decision

Almost four years after the Second Circuit affirmed this Court's conclusion that Plaintiffs' breach of contract claim is not based on Argentina's sovereign act of expropriation, *see Petersen II*, 895 F.3d at 206, the Republic yet again asks this Court (at 31-33) to dismiss Plaintiffs' claim on the basis that it is immune from suit because the Plaintiffs' claim interferes with its sovereign prerogatives, *see also* Argentina Br. at 25-26.  The law of the case bars Defendants' effort to reprise this failed argument.  *See Kerman*, 374 F.3d at 110; *Reich*, 821 F. Supp. at 909.

Argentina is incorrect in claiming (at 31-32) a "change of position" by Plaintiffs that

requires reconsideration of an argument both this Court and the Second Circuit have repeatedly rejected.  Throughout this case, Plaintiffs have been consistent that they do not challenge the Republic's sovereign authority to expropriate Repsol's shares.  *See* Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 64) ("Argentina, as a sovereign, may exercise its right to take control of the company at any time"); Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 58) ("My declaration did not express an opinion on the timing for the Argentine Government to proceed with an expropriation"); Hicks Ex. 23 (Bianchi Dec. 2021 Report for Pls. ¶¶ 4-5) ("Plaintiffs' claims are solely aimed at remedying the Argentine Republic's actions as a party to a contractual agreement it explicitly approved — not as a sovereign wielding its powers of expropriation. . . . Plaintiffs do not challenge the Argentine Republic's expropriation of Repsol's 51% stake in YPF.").  Likewise, they have consistently interpreted the Bylaws as triggering the tender-offer provisions on April 16, 2012.  *See supra* Part I.B.1.  And they have always asserted that Defendants breached the Bylaws on April 16, 2012.  *See id.*  There has been no change in position.

Plaintiffs are not arguing that Argentina had, or breached, an obligation to purchase their shares "before its 'acquiring the requisite interest.'"  Argentina Br. at 31.  Plaintiffs argue simply that Defendants are liable because Argentina acquired the requisite interest and failed to make a tender offer *at all*.  Consistent with this Court's and the Second Circuit's previous FSIA rulings, Argentina's decision to expropriate remains distinct from its obligation to make a tender offer for shares.  *See Petersen I*, 2016 WL 4735367, at *6; *Petersen II*, 895 F.3d at 205-07.  That is, any tender obligation, and any breach of that obligation, was triggered after Argentina made the sovereign decision, as was its right, to expropriate YPF.  *See* Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 7(h)).  Pursuant to that sovereign decision, it then proceeded to acquire YPF—in April 2012—by means of exercising control while refusing to tender.

Argentina is thus wrong when it claims (at 32) that Plaintiffs' experts, for purposes of calculating damages, now "challenge an expropriation occurring without having been preceded by a tender offer."  Plaintiffs' experts do no such thing and their calculation of expectation damages as of the date of the breach—April 16, 2012—is in fact routine.  It is elementary in breach of contract cases that the damages to be awarded by a court are the difference between what injured parties would have received on the date of the breach and what they actually received instead.  *See*, *e.g.*, *Oliveira*, 126 F. Supp. 3d at 427 ("Oliveira now alleges that defendants . . . are liable for the difference between the amount Oliveira would have received had his demand been honored and the amount for which he sold his then-Pangaea shares. The Court agrees."); *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 299 (S.D.N.Y. 2010) ("The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach.") (Preska, J.).  This basic characteristic of all contract cases is not disputed in this case—indeed, Defendants' damages expert *expressly agrees* with Professor Fischel on this point.  *Compare* Hicks Ex. 47 (Harris Dec. 2021 Report for Defs. ¶ 90) ("Plaintiffs are only entitled to alleged damages, if any, that reflect the difference between the value they would have received had a tender offer been made (*i.e.*, the tender offer price) and the value of the ADRs that Plaintiffs owned *when the alleged breach was consummated*.") (emphasis added), *with* Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 40) ("The difference between the but-for tender offer price and the closing price on April 18, 2012 [the day trading resumed after the takeover] represents per share economic harm to Petersen and Eton Park at the time of expropriation from Argentina's actions.").

To calculate expectation damages and the amount Plaintiffs *would* have received on the date of the breach had Argentina *complied* with the Bylaws, Plaintiffs instructed their experts to follow the formula provided in the Bylaws.  That formula requires the use of a counterfactual

notice date to determine the tender price.  *See* Pls.' MSJ at 32-36; Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶¶ 58-77); Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶¶ 30-32).  So as to protect shareholders from market fluctuations in the stock price resulting from the government's takeover, the Bylaws' tender price formula is backward-looking and provides three simple, straightforward instructions:  1) conduct the calculation based on public data available as of a "notice date" 40 business days prior to the takeover, 2) take YPF's last-reported annual income number as of that notice date, and 3) multiply it by the highest price-to-income ratio during the prior two-year period.  *See* Pls.' MSJ at 32-35; Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶¶ 58-77); Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶¶ 30-32); Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶¶ 29-30); Hicks Ex. 28 (Fischel Jan. 2022 Report for Pls. ¶ 12).  The mechanical application of the Bylaws' price formula is by no means a change in Plaintiffs' substantive theory of liability.  To the contrary, determining damages as of the date of the breach is simply what the law requires in contract cases.  Plaintiffs' damages calculations certainly have no bearing on the Republic's sovereign prerogative to take over control of the company whenever it wanted.  They establish only that, had Argentina paid the tender-offer price on April 16, 2012, instead of breaching the Bylaws, it would have paid a price which, based on a set of circumstances that pre-dated April 16, 2012, was much higher than the trading price on that day.

### B.  Argentina's repackaged public law arguments are foreclosed and meritless

In rejecting Defendants' sovereign immunity and act-of-state defenses, this Court squarely rejected arguments that Plaintiffs' claims offend Argentine public law or Argentina's sovereignty. The Second Circuit agreed.  So did the Solicitor General, on behalf of the United States, and the Supreme Court denied review.  Defendants' efforts to relitigate these questions come too late and, in any event, do not come close to warranting reconsideration of the prior decisions in this case.

1.  <u>Argentina's arguments are foreclosed by the Second Circuit's decision</u>

The Second Circuit already rejected Argentina's argument that its obligations under YPF's Bylaws would impermissibly interfere with expropriation. *See Petersen II*, 895 F.3d at 207. Argentina previously asked this Court and the Second Circuit to find inconsistency between the YPF Expropriation Law and the Bylaws, but the Second Circuit found none. *See id.* Now, Argentina seeks to repackage the same argument by invoking Article 28 of Argentina's General Expropriation Law. *See Petersen* ECF No. 373-1 (Argentina App'x) at A-2 (General Expropriation Law) Art. 28 ("No action by third parties may impede the expropriation or its effects. The rights of the claimant shall be considered transferred from the thing to its price or to the compensation, leaving the thing free of any encumbrance.").

Argentina's new citation does not justify this Court revisiting the Second Circuit's holding. As the Second Circuit explained: "At bottom, the YPF Expropriation Law does not prohibit a post-expropriation tender offer under YPF's bylaws; indeed, it says absolutely nothing about Argentina's acquisition of additional YPF shares in a subsequent market transaction." *Petersen II*, 895 F.3d at 208-09. That holding is the law of the case and forecloses any argument that Plaintiffs' claim to enforce the Bylaws "impedes" the expropriation under Article 28.

2.   <u>Argentina's arguments are wrong as a matter of Argentine law</u>

At any rate, even if Defendants were free to relitigate the issue, their arguments under Article 28 of the Expropriation Law fail on the merits.

a.   The tender-offer provision does not encumber Argentina's expropriated shares

Contrary to Argentina's contention (at 34), Plaintiffs' claims do not contravene Article 28 of the General Expropriation Law because the Bylaws' tender-offer obligations do not "encumber" the shares Argentina expropriated from Repsol. They in no way limit Argentina's right to use or transfer the shares. Rather, the tender-offer provisions constitute a contractual promise made by

Argentina to pay compensation to *other shareholders* upon acquiring a controlling interest in YPF. Nothing in Article 28 overrides that contractual promise in YPF's Bylaws. To the contrary, as the Second Circuit recognized, the Expropriation Law *preserved* the Bylaws by providing that "YPF shall remain a publicly-traded company after the expropriation" and "confirming that YPF would continue its normal commercial activities after the expropriation." *Petersen II*, 895 F.3d at 208-09.

None of Argentina's cases parallels this case. One involved a contract provision that "would *prevent* the expropriation action from moving forward." Argentina Br. at 35 (emphasis added). And the other two involved contract provisions that stood to give a party property rights *superior* to the government's over expropriated land even after the expropriation. *Id*. at 35-36. Here, the tender-offer provision neither prevents expropriation nor hinders Argentina's rights in its expropriated shares. If Argentina's cases demonstrate anything, it is that private agreements offend the expropriation process when they prevent the government from obtaining full rights of ownership as to the expropriated property. The tender-offer provision here does no such thing.

> b.   The tender-offer provision does not impede the "effects" of expropriation

Argentina next argues that enforcing the tender-offer provision would impermissibly impede the "effects" of its expropriation. None of its three arguments is persuasive.

*First*, Argentina urges the provision would undermine Argentina's ability to acquire 51 percent of YPF shares if it was obligated to purchase a greater interest through the tender-offer process. Argentina Br. at 36. The Second Circuit correctly disposed of this argument: "[T]here is no provision in the YPF Expropriation Law itself and no statement in the expert's opinion that the law compelled Argentina to acquire *exactly* 51% ownership in YPF and no greater ownership position." *Petersen II*, 895 F.3d at 208 (internal quotation marks omitted).

*Second*, Argentina speculates that the tender-offer process could have led to complete

ownership by the Republic, thereby undermining its intent that YPF continue to operate as a publicly traded company.  Argentina Br. at 36.  The Second Circuit rejected that argument as well: "The [Expropriation Law] further provides that YPF shall remain a publicly-traded company after the expropriation and 'shall not be subject to any legislation or regulation applicable to the administration, management and control of companies or entities partly owned by the national or provincial governments'" of Argentina, confirming that YPF would continue its normal commercial activities after the expropriation.  *Petersen II*, 895 F.3d at 208.  Moreover, even if every YPF shareholder had sold its shares to Argentina, nothing would have prevented Argentina from publicly trading those shares.[35]  The Expropriation Law itself reaffirms YPF's authority to do so.  *See* Hicks Ex. 112 (Expropriation Law) § 15 ("To carry out their activities, YPF Sociedad Anónima and Repsol YPF GAS S.A. shall continue to operate as open corporations under Article II, Sub-Article V of Law No. 19,550 and related provisions; they shall not be subject to any legislation or administrative regulations governing the administration, management and control of companies or entities in which the Federal State or the Provinces hold an ownership interest.").

*Third*, Argentina contends that, had it acquired a higher ownership percentage through a tender offer, the provinces' stake would have been diluted, upsetting the intended balance. Argentina Br. at 36-37.  Again, Argentina provides no explanation of how it would have been prevented from transferring shares to the provinces to restore whatever balance it desired. Moreover, the plain language of the Expropriation Law makes clear that the prescribed "federal balance" applies *only* to the distribution of the shares expropriated from Repsol.  *See* Hicks Ex. 112 (Expropriation Law) § 8 ("In compliance with the preceding section, *the shares of stock of YPF Sociedad Anónima and Repsol YPF GAS S.A. that are subject to expropriation* shall be

---

[35] The Expropriation Law only prohibited "future transfer[s]" of the "stock subject to expropriation" without congressional approval.  *See* Hicks Ex. 112 (Expropriation Law) § 10.

distributed as follows:  fifty-one percent (51%) shall be held by the Federal State, and the remaining forty-nine percent (49%) shall be distributed among the Provinces.") (emphasis added); Hicks Ex. 23 (Bianchi Dec. 2021 Report for Pls. ¶ 44) ("The tender offer does not alter or hinder this distribution in any way, as it addresses a situation not covered by this provision of the law.").

> ### c.   Article 28 of the Expropriation Law does not provide an exclusive remedy

Argentina argues that Plaintiffs' damages must be satisfied by the compensation paid to Repsol because Article 28 states that "[t]he rights of the claimant[s]"—here, Plaintiffs—in an action relating to expropriation, "shall be considered transferred from the thing to its price or to the compensation, leaving the thing free of any encumbrance."  This argument is of a piece with its other public law arguments:  it conflates the shares from which Plaintiffs derive their claims with those Argentina expropriated from Repsol.  Plaintiffs have no claim on the latter. Accordingly, it is irrelevant that the $5 billion Argentina-Repsol settlement was intended to compensate *Repsol* "'for any other claim arising from or connected to' the intervention, temporary occupation, and expropriation."  Argentina Br. at 38.  Article 28 refers to the "single" compensation to be granted to all those who have a right "*over the property being expropriated.*" *Cf.* Argentina Br. at 37.  But the compensation fixed in the expropriation proceeding itself refers only to the value of the *expropriated* property, which can affect only the owner and third parties who, according to Article 28, must claim the shares to which they are entitled in a separate proceeding.  The damages claimed in this case are not related to the value of the shares expropriated from Repsol, but arise from the Argentine Republic's failure to make a tender offer for *Plaintiffs' shares* as required by Sections 7 and 28 of YPF's Bylaws.

## C.   YPF's public law argument also fails

YPF argues (at 30-33) that it was "excused" from performing its contractual obligations by

fabricating a conflict between the obligations that Section 7(h) of the Bylaws impose on YPF (i.e., the obligation to sanction Argentina for breaching the tender-offer provisions by stripping Argentina of the right to vote the illicitly acquired shares and receive dividends) and the May 2012 Expropriation Law (which YPF refers to as the "Public Interest Law").  Once again, as the Second Circuit already decided, there is no conflict between the Bylaws' tender-offer requirements and the expropriation.  *See Petersen II,* 895 F.3d at 207.  The Expropriation Law simply recognized that Argentina could exercise "all rights carried by the stock to be expropriated," Hicks Ex. 23 (Bianchi Dec. 2021 Report for Pls. ¶ 120) (quoting Law 26,741), and those "rights" necessarily included only the rights created by the Bylaws—including as limited by Section 7(h). ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

        Indeed, as ██████████ has acknowledged, the expropriation put the Republic into the shoes of Repsol when Repsol acquired its shares—able to exercise *only* the rights Repsol had previously held but *not* obtaining any new rights. ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████; Hicks Ex. 140 (Bianchi Jan. 2022 Report for Pls. ¶ 46) ("The [Expropriation Law] shifts from Repsol to the Republic precisely the same voting rights that Repsol would have if it were in the same position.").  Thus, according to the plain text of the Expropriation Law, the Republic was subject to the same limitations Repsol or any other shareholder would have been subject to had it acquired shares but failed to launch a tender offer: it could not vote those shares.  *See* Hicks Ex. 140 (Bianchi Jan. 2022 Report for Pls. ¶ 46) (noting agreement with this Court's 2016 conclusion that "[Article 13 of the Expropriation Law] placed

Argentina in the position of Repsol with respect to the shares subject to expropriation, leaving commercial rights and obligations intact, including Bylaw § 7(h)") (internal quotation marks omitted).  As explained above, as the Second Circuit has already held, and as ███████ concedes, the Expropriation Law did not prohibit Argentina from conducting a tender offer.  *See supra* at 62-24; ████████████████████████.  Nor does it override the Bylaws insofar as they impose consequences on Argentina for failure to abide by their terms.  Indeed, as explained above, other provisions of the Expropriation Law explicitly reaffirm YPF's status as a publicly traded company to be governed by its bylaws.  *See Petersen II*, 895 F.3d at 208.

Moreover, YPF's argument is that the Expropriation Law directed Argentina to "exercise" the rights of the expropriated shares, which, YPF claims, conflicts with Section 7(h)'s instruction that illicitly acquired shares "shall not grant any right to vote."  YPF Br. at 20-21, 31-32.  But there is no conflict here, because Section 7(h) does not say that expropriated shares are categorically ineligible for voting rights; it says that they shall be stripped of their voting rights only if they were "acquired in breach of the [tender-offer] provisions."  Hicks Ex. 1 (*Petersen* ECF No. 36-2 (YPF Bylaws) § 7(h)).  Hence, to vote the expropriated shares, all Argentina needed to do was comply with the tender-offer provisions.  As noted above, the Second Circuit has already held that there is "no basis in the record for concluding that Argentina could not have complied with both the YPF Expropriation Law and the bylaws' tender offer requirements."  *Petersen II*, 895 F.3d at 209.  It follows that there is no conflict between the sanctions provision and the Expropriation Law.

Even if a conflict existed, moreover, YPF's argument fails to excuse its non-performance because the argument rests on two incorrect premises:  *first*, that the only obligations YPF had under the Bylaws narrowly exist in Section 7(h); and *second*, that YPF owed no duties to Plaintiffs before the Expropriation Law was adopted in May 2012.  As explained, *supra* Part III.A, those

assumptions have no merit.  YPF had much broader enforcement obligations, including those in Section 7(f) of the Bylaws, and those obligations were triggered on April 16, 2012, the day that the Republic took control of the company.  Thus, YPF's illusory conflict does not excuse its undisputed non-performance.

It is important to underscore the radical nature of YPF's claim of conflict here.  If YPF is right that there was a conflict between the Bylaws and the Expropriation Law that required nullifying the Bylaws, Argentine law principles of nullification would require that a court formally declare the contract null and void, either sua sponte or at the request of a party.  *See* Hicks Ex. 46 (Comadira Sept. 2021 Report for YPF ¶ 39) (the nullity "must be declared by the judge").  And because it is undisputed that no court has nullified the Bylaws, ████████████████████████ ██████████████████████ is necessarily asking that this Court do so.  It is also undisputed that nullification of the Bylaws would retroactively void them *as of the date of their adoption*, *see* ████████████████████████████████, effectively invalidating all acts and omissions by all shareholders and the company that arose from the Bylaws since 1993—and specifically the express promises YPF made to investors to entice them to part with their capital.  That astonishing request by YPF is not only sweeping, but it is also foreclosed by principles of estoppel under Argentine law:  because YPF crafted and adopted the YPF Bylaws, it cannot now seek to nullify them.  *See* Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 79); *see also* Hicks Ex. 48 (Kemelmajer Dec. 2021 Report for YPF ¶ 83) (YPF's expert acknowledging that Argentine law "enshrines the doctrine of '*actos propios*,' a legal theory that is similar to the concept of estoppel, and prevents a party from bringing a claim that contradicts their earlier conduct").

## V.      Argentina Acted in Bad Faith

Defendants are liable for breach of contract under the Civil Code and none of their public law defenses can override or excuse their breaches.  When it comes to acknowledging its blatant

bad faith, however, Argentina tries to draw attention away from the undisputed facts of this case and argues (at 38-40) that Argentine law does not recognize breach of the covenant of good faith as an independent cause of action.  True enough.[36]  But Argentina cannot deny that the Argentine doctrine of good faith must inform this Court's interpretation of the Bylaws under Argentina law. *See supra* Parts I.B.1, III.B; ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████[37]

As explained in Plaintiffs' motion for summary judgment, under Argentine law, evidence of Argentina's bad faith may be relevant to the breach of contract claim were the Court to conclude that Defendants' contractual obligations constitute obligations of "best efforts."  Pls.' MSJ at 28-30 ("Under Argentine law, if the breaching party promised merely to undertake its best efforts (*obligación de medios*), the non-breaching party must show that the breach was due to fault – either negligence (*culpa*) or willful or fraudulent intent (*dolo*)").  It is also relevant to the Court's award of indirect damages under Argentine law.  *See* Pls.' MSJ at 31, 36-37.  Argentina's argument thus amounts to nothing but an attempt to shield record evidence of bad faith from judicial scrutiny.

Alternatively, Argentina summarily contends (at 40) that Plaintiffs failed "to marshal any evidence" of bad faith.  But as Plaintiffs explained in their motion for summary judgment, the evidence of Argentina's bad faith in reneging on its tender-offer obligations is overwhelming.  *See* Pls.' MSJ at 17-18, 29-30.  Plaintiffs' experts discussed this evidence at length in supporting their

---

[36] If, however, Defendants now propose to apply New York law, *supra* at 8, then bad faith would be an independent cause of action.

[37] Moreover, to the extent that the duty of good faith and fair dealing under New York law imposes "additional or stricter requirements" on Argentina as an acquirer, Section 7(f) of YPF's Bylaws requires that "such additional or stricter requirements shall be complied with" because YPF securities trade in New York.  *See* Hicks Ex. 141 (Coffee Jan. 2022 Report for Pls. ¶¶ 35-36).

opinions throughout the expert discovery process, putting Argentina on notice of its existence and of Plaintiffs' intent to rely on such evidence at summary judgment.  *See*, *e.g.*, Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 49) (discussing evidence of Argentina's bad faith, including February 2012 memorandum showing Argentina made an intentional choice not to comply with the Bylaws well before the takeover, in connection with Argentine law opinions); Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶¶ 40-48) (discussing evidence in the form of Defendants' representations to the SEC and investors in their public filings and ███████████████).  Argentina does not refute this evidence in any way (because it cannot).  It simply buries its head in the sand and refuses to engage with the record.  *See* Pls.' MSJ at 30 ("Defendants have never contended that their failure to abide by their obligations was anything but intentional – the culmination of a concerted campaign to re-nationalize YPF without paying the contractually required amounts to minority shareholders.").

*     *     *

To induce would-be investors to purchase shares in a newly privatized YPF, Argentina and YPF amended YPF's Bylaws "to incorporate protections for investors" from "attempts by Argentina to renationalize the company."  *Petersen II*, 895 F.3d at 199.  Reassuring investors skeptical of Argentina's checkered economic past required protections that were both clear and clearly enforceable.  And the Bylaws were just that:  they explicitly established a tender-offer requirement applicable when Argentina "exercise[d] the control of" at least 49 percent of the capital stock, they explicitly set forth a mechanism for determining the tender-offer price, and they explicitly required YPF to "enforce the tender offer provision" and "enforce the penalties imposed by section 7(h)."  *Id.* at 208, 210.  It is difficult to imagine clearer and more enforceable obligations—which explains why Defendants "touted these protections" every time they sought to

74

raise money for YPF from foreign investors, and why the IPO was an enormous success.  *Id.* at 200.

The arguments Defendants press now are precisely the kind of technicalities and absurdities that investors feared and that the Bylaws foreclosed.  If investors had been told that their apparent right to a "compensated exit" in the event of re-nationalization depended on holding on to shares for years after re-nationalization or that the clear compensation formulae detailed in the Bylaws would be replaced by illusory remedies under Argentine corporate law, the promises in the Bylaws would have been worse than useless.  They would have reinforced investors' well-grounded fears about investing new cash without protection against Argentina returning to its old ways.

Simply put, all of Defendants' *post hoc* arguments contradict well-established law and fail the test of common sense.  The law does not require shareholders to cling to shares to vindicate their right to a compensated exit or render detailed compensatory formulae entirely illusory.  The law requires parties to honor their promises, especially when the promises are pellucidly clear and intended to induce reliance.  But even apart from the law, Defendants' arguments defy common sense.  If any one of their current arguments had been made in clear and unmistakable terms at the time Argentina and YPF were seeking to tap international capital markets, those efforts would have been an abject failure.  Instead, Argentina and YPF offered clear promises of protection against the one thing investors feared most—the re-nationalization of YPF.  Those fears came to pass.  The time for Defendants to honor their promises has long since passed.

## <u>CONCLUSION</u>

This Court should deny Defendants' motions for summary judgment.

Dated: May 26, 2022                Respectfully submitted,

KIRKLAND & ELLIS LLP

By:       /s/ Paul D. Clement
Paul D. Clement
George W. Hicks, Jr.
C. Harker Rhodes, IV
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone:  (202) 389-5000
Fax:  (202) 389-5200
Email:  paul.clement@kirkland.com
       george.hicks@kirkland.com
       harker.rhodes@kirkland.com


KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone:  (202) 326-7900
Fax:  (202) 326-7999
Email:  mhansen@kellogghansen.com
       dho@kellogghansen.com
       agoldsmith@kellogghansen.com


KING & SPALDING LLP

Israel Dahan
Laura Harris
1185 Avenue of the Americas
New York, NY 10036
Phone:  (212) 556-2114
Fax:  (212) 556-2222
Email:  idahan@kslaw.com
       lharis@kslaw.com

-and-

76

Reginald R. Smith
1100 Louisiana Street
Houston, TX 77002
Phone:  (713) 751-3200
Fax:  (713) 751-3290
Email:  rsmith@kslaw.com

*Counsel for Plaintiffs Petersen Energía Inversora,
S.A.U., Petersen Energía, S.A.U., Eton Park Capital
Management, L.P., Eton Park Master Fund, Ltd.,
and Eton Park Fund, L.P.*