**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., <br><br>                      Plaintiffs, <br><br>        -against- <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br>                      Defendants. | Case Nos.: <br><br> 1:15-cv-02739-LAP <br> 1:16-cv-08569-LAP |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., <br><br>                      Plaintiffs, <br><br>        -against- <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br>                      Defendants. | |

**PLAINTIFFS' RESPONSES TO**
**ARGENTINA'S LOCAL RULE 56.1 STATEMENT OF MATERIAL**
**FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

May 26, 2022

**TABLE OF CONTENTS**

Page

I.     YPF and the 1993 YPF Privatization ................................................................ 1

II.    The YPF Bylaws ................................................................................................3

III.   Petersen's Acquisition of a Stake in YPF from Repsol ....................................7

IV.    Eton Park Acquires YPF ADRs .......................................................................12

V.     Argentine Oil and Gas Production and Reserves Decline................................ 13

VI.    The Impact of the Dividend Policy ................................................................. 14

VII.   The Intervention and the Public Interest Law ................................................. 16

VIII.  The June 4, 2012 YPF Shareholders' Meeting and Challenges by Other Shareholders.....................................................................................................19

IX.    Petersen Defaults on Its Loans and Its ADRs Are Transferred to Lenders ......................22

X.     Eton Park Sells Its YPF ADRs........................................................................ 23

XI.    Repsol and Argentina Execute a Settlement Agreement ................................. 23

XII.   Burford Acquires the Petersen Claims and Funds the Eton Park Action..........................25

**Plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (collectively, "Petersen"), and Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (collectively, "Eton Park," and together with Petersen, "Plaintiffs"), respectfully submit the following Responses to Argentina's Local Rule 56.1 Statement of Material Facts As To Which There Is No Genuine Dispute in Support of Its Motion for Summary Judgment.**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Defendant the Argentine Republic respectfully submits this statement of material facts as to which there is no genuine dispute in support of its motion for summary judgment.[1]

## I.    YPF and the 1993 YPF Privatization

1.    YPF S.A. (YPF), formerly known as Yacimientos Petrolíferos Fiscales Sociedad del Estado, is a corporation (*sociedad anónima*), incorporated under the laws of Argentina. (Ex. 5 (YPF Prospectus) at 5, 81.)

**Plaintiffs' Response:  Undisputed.**

2.    The Republic established YPF as a state-owned oil and gas company in 1922 to ensure an adequate domestic energy supply.  (Ex. 77 (Carl E. Solberg, "Entrepreneurship in Public Enterprise: General Enrique Mosconi and the Argentine Petroleum," *The Business History Review*, Vol. 56, No. 3, 1982) p. 381); Ex. 22 (Ocampo Rebuttal) ¶¶ 43–44; Ex. 23 (YPF, SEC Form 20-F for the fiscal year ended Dec. 31, 2020) at 31.)

**Plaintiffs' Response:  Undisputed.**

---

[1]    References to "Ex. _" are to the accompanying Declaration of Robert J. Giuffra, Jr. filed herewith. References to Manóvil or Santiago "Opening," "Rebuttal," or "Reply" refer to those experts' respective reports accompanying their Declarations, also being filed herewith.

3.      The YPF Initial Public Offering (IPO) was launched in June 1993 and entailed the issuance and public offering of "Class D" shares and American Depositary Shares (ADSs), represented in American Depositary Receipts (ADRs), representing an equivalent amount of Class D shares (the Combined Offering). (Ex. 5 (YPF Prospectus) at 7–8.)

**Plaintiffs' Response:**  **Undisputed.**

4.      In connection with the Combined Offering, Class D shares would be listed for trading on the Buenos Aires Exchange and the ADSs would be listed for trading on the New York Stock Exchange (NYSE) and on the SEAQ International in London through ADRs evidencing the ADSs. (Ex. 5 (YPF Prospectus) at 23.)

**Plaintiffs' Response:**  **Undisputed.**

5.      YPF, The Bank of New York (n.k.a. The Bank of New York Mellon), as depository (the Depository), and the holders from time to time of ADRs entered into a Deposit Agreement pursuant to which ADRs evidencing the ADSs were issuable by the Depository. (Ex. 5 (YPF Prospectus) at 92.) This Deposit Agreement was then filed with the SEC.  (*Id.*)

**Plaintiffs' Response:**  **Undisputed.**

6.      YPF ADRs are not shares of YPF. Rather, they are "negotiable securit[ies]" issued by the Depository evidencing an ownership interest in the ADSs. (Ex. 5 (YPF Prospectus) at 92); Ex. 24 (Lissemore Opening) ¶ 9.)

**Plaintiffs' Response: Undisputed as to any material factual assertion. Although YPF ADRs are not shares of YPF, ADRs in YPF "represent[] [YPF] Class D Shares." Hicks Ex. 78 (AR00092490 at 92492).**

7.      Each YPF ADS represents the rights attributable to one Class D share deposited under the Deposit Agreement with a custodian, The Bank of New York Mellon. (Ex. 5 (YPF Prospectus) at 92.)

**Plaintiffs' Response:  Undisputed.**

8.      The YPF ADRs are transferable on the books of the Depository in accordance with the Deposit Agreement. (Ex. 5 (YPF Prospectus) at 92; Ex. 4 (Deposit Agreement) § 2.)

**Plaintiffs' Response:  Undisputed.**

9.      Section 2.01 of the Deposit Agreement provides that "Title to a [ADR] (and to the American Depositary Shares evidenced thereby) . . . shall be transferable by delivery with the same effect as in the case of a negotiable instrument governed by New York law." (Ex. 4 (Deposit Agreement) § 2.01.)

**Plaintiffs' Response:  Undisputed as to any material factual assertions.  However, the above quote represents only a small portion of Section 2.01. The Plaintiffs direct the Court to Giuffra Declaration Exhibit 4, page 3 for the full text.**

10.      Section 7.06 of the Deposit Agreement provides that "[t]his Deposit Agreement and the [ADRs] shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York." (Ex. 4 (Deposit Agreement) § 7.06.)

**Plaintiffs' Response:  Undisputed.**

II.      **The YPF Bylaws**

11.      YPF's Bylaws "are governed by Argentine law." (Ex. 5 (YPF Prospectus) at 90.)

**Plaintiffs' Response: Undisputed that plaintiffs' claims arising under the Bylaws are governed by Argentine law based on this Court's prior ruling. *See* Hicks Ex. 129 (*Petersen Energía Inversora S.A.U. v. Argentine Republic*, 2020 WL 3034824, at \*13**

(S.D.N.Y. June 5, 2020)). **However, the cited source does not establish the factual assertion**

**because the Prospectus does not dictate the governing law of the Bylaws.** *See id.* **at \*3.**

12.     On May 31, 1993, the National Executive issued Decree No. 1106/93 that, among

other things, directed the Ministry of Economy and Public Works and Services, "in its capacity as

shareholder of YPF," to introduce bylaws amended to reflect the "changes in the organizational

and in the capital structure of YPF" prior to privatization, for approval at a YPF shareholders'

meeting. (Ex. 73 (Decree 1106/93) at Preamble and Art. 1.)

**Plaintiffs' Response:**  **Undisputed.**

13.     The new YPF Bylaws were approved by the YPF shareholders at the June 11, 1993

YPF shareholders' meeting. (*See* Ex. 25 (YPF, SEC Form 20-F for the fiscal year ended Dec. 31,

1993) at 95.)

**Plaintiffs' Response:**  **Undisputed.**

14.     Section 7(d) of the Bylaws, as amended in 2008, provides:

> Takeover: If the terms of subsections e) and f) of this section are not
> complied with, it shall be forbidden to acquire shares or securities
> of the Corporation, whether directly or indirectly, by any means or
> instrument (including within the meaning of the term "securities",
> without limitation, corporate bonds and stock coupons)
> convertible into shares if, as a result of such acquisition, the
> purchaser becomes the holder of, or exercises the control of, class D
> shares of stock of the Corporation which, in addition to its prior
> holdings of such class (if any), represent, in the aggregate, FIFTEEN
> PERCENT (15%) or more of the capital stock, or TWENTY
> PERCENT (20%) or more of the outstanding class D shares of stock,
> if the shares representing such TWENTY PERCENT (20%)
> constitute, at the same time, less than FIFTEEN PERCENT (15%)
> of the capital stock.
>
> Notwithstanding the foregoing: (i) acquisitions by the person
> already holding, or the person already exercising control of, shares
> representing more than FIFTY PERCENT (50%) of the capital stock
> shall be excluded from the provisions of subsections e) and f) of this
> section; and (ii) any subsequent acquisitions by any person already
> holding, or any person already exercising the control of, shares

representing FIFTEEN PERCENT (15%) or more of the capital stock, or TWENTY PERCENT (20%) or more of outstanding Class D shares, if the shares representing such TWENTY PERCENT (20%) constitute, at the same time, less than FIFTEEN PERCENT (15%) of the capital stock, provided the shares the purchaser already holds or becomes a holder of (including the shares it held prior to the acquisition and those it acquired by virtue thereof) do not exceed FIFTY PERCENT (50%) of the capital stock, shall be excluded from the provisions of subsection e) paragraph (ii) and subsection f) of this section.

Acquisitions referred to in this subsection d) are called "Takeovers".

(Ex. 1 (YPF Bylaws) § 7(d); Ex. 27 (April 24, 2008 Shareholders' Meeting Minutes).)

**Plaintiffs' Response:  Undisputed.**

15.      Section 28 of the Bylaws is entitled "Provisions applicable to acquisitions by the National Government." Section 28(A) provides:

The provisions of subsections e) and f) of Section 7 (with the sole exception of the provisions of paragraph B of the said Section) shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of the Corporation, 1) if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of the Corporation, which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock; or 2) if the National Government acquires at least 8% of class D outstanding shares of stock, while withholding class A shares of stock amounting at least to 5% of the capital stock provided for in subsection (a) of section 6 of these By-laws upon registration thereof with the Public Registry of Commerce. Should class A shares represent a lower percentage than the one previously mentioned, the provisions set forth in point 2) of this Section shall not be applicable. Instead, the general criteria set forth in subsection d) of Section 7 shall apply.

(Ex. 1 (YPF Bylaws) § 28(A).) Section 28(D) provides that the " [t]he term 'Takeover' used in Section 7 is applied to the acquisitions provided for in paragraph (A) of this section 28." (*Id.* § 28(D).)

**Plaintiffs' Response:  Undisputed.**

16.     Section 7(e) of the Bylaws requires that "[t]he person wishing to" acquire an amount of YPF shares that triggers the requirements of Section 7(d) "(hereinafter called 'the Bidder') shall: (i) [o]btain the prior consent of the special shareholders' meeting of class A shareholders; and (ii) [a]rrange a takeover bid for the acquisition of all the shares of all classes of the Corporation and all securities convertible into shares." (*Id.* § 7(e).)

**Plaintiffs' Response:**  **Undisputed.**

17.     Section 7(f) of the Bylaws sets forth the procedure applicable to "[e]ach takeover bid," including provisions for notice to the corporation (*id.* § 7(f)(i)); approval by the Board of Directors (*id.* § 7(f)(ii)); notice to shareholders (*id.* § 7(f)(iii)–(iv)); "[t]he consideration for each share of stock or security convertible into stock payable to each shareholder or security holder" (*id.* § 7(f)(v)); and the timing of the takeover bid and withdrawal rights (*id.* § 7(f)(vi)–(ix)). (Ex. 1 (YPF Bylaws) § 7(f).)

**Plaintiffs' Response:**  **Undisputed.**

18.     Section 7(h) of the Bylaws provides penalties for non-compliance with the requirements of Section 7. That Section, as amended in 2000, provides:

> Shares of stock and securities acquired in breach of the provisions of subsections 7 c) through 7 g), both included, of this section, shall not grant any right to vote or collect dividends or other distributions that the Corporation may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of the Corporation, until such shares of stock are sold, in the case the purchaser has obtained the direct control of YPF, or until the purchaser loses the control of the YPF's parent company, if the takeover has been indirect.

(*Id.* § 7(h); Ex. 26 (Dec. 27, 2000 Shareholders' Meeting Minutes) at 7.)

**Plaintiffs' Response:**  **Undisputed.**

-6-

19.     In cases of acquisitions by the Republic, Section 28(C) states that in certain circumstances—where "the acquisition in breach of the provisions of Section 7 and this section has occurred gratuitously or . . . in which the National Government" has not "acted with the intention and purpose of acquiring shares exceeding the established limits"—"[t]he penalties provided      for      in      subsection      (h)      of      Section      7      shall      be      limited . . . to the loss of the right to vote" and "[i]n all other cases, the penalties provided for in subsection h) of Section 7 shall be applied with no kind of limitation whatsoever."  (Ex. 1 (YPF Bylaws) § 28(C).)

        **Plaintiffs' Response:**  **Undisputed.**

**III.     Petersen's Acquisition of a Stake in YPF from Repsol**

20.     In January 1999, Spain's largest oil company, Repsol S.A., acquired 14.99% of YPF's capital stock. (Ex. 29 (YPF, SEC Form 20-F for the fiscal year ended Dec. 31, 2013) at 26.)

        **Plaintiffs' Response:**  **Undisputed.**

21.     Through a series of transactions carried out over the next two years, Repsol acquired an additional 84.05%, making it the owner of 99.04% of YPF's capital stock as of December 31, 2001.  (Ex. 29 (YPF, SEC Form 20-F for the fiscal year ended Dec. 31, 2013) at 26, 157.)

        **Plaintiffs' Response:**  **Undisputed.**

22.     In December 2007, Repsol announced an agreement with the Petersen Group, whereby the Petersen Group could acquire up to a 25% stake in YPF from Repsol.  (Ex. 30 (Repsol Press Release, dated Dec. 21, 2007).)

        **Plaintiffs' Response:**  **Undisputed.**

23.     The Petersen Group is an Argentine conglomerate owned and controlled by members of the Eskenazi family. The Petersen Group includes companies in various fields, such as engineering, construction, and finance, among others, and has operated in Argentina since 1920. (*See* Ex. 30 (Repsol Press Release, dated Dec. 21, 2007) at 9–11; Ex. 31 (Harris Rebuttal) ¶ 15.)

**Plaintiffs' Response: Undisputed as to any material factual assertions. However, the use of the term "controlled" is vague. Plaintiffs direct the Court to Giuffra Declaration Exhibit 30, page 8, which states, "The Group is wholly-owned by the Eskenazi family and its Chairman is Enrique Eskenazi."**

24.     The Petersen Group created the Plaintiff entities Petersen Energía Inversora S.A.U. (PEISA) and Petersen Energía S.A.U. (PESA; together, Petersen), limited liability Spanish companies, as "special-purpose vehicles, with no employees or operations, for the sole purpose of acquiring . . . YPF shares." (Ex. 32 (Transcript of Dec. 22, 2020 Court Conference at 10:4–15); Ex. 33 (YPF, Feb. 21, 2008 Schedule 13D) at p. 8); ██████████████████████████████████

██████████████████████

**Plaintiffs' Response:  Undisputed.**

25.     The agreement between the Petersen Group and Repsol contemplated that Repsol would sell 14.9% of the total outstanding capital stock of YPF to PESA no later than February 15, 2008, and that Repsol would grant the Eskenazi family the option to partially or fully purchase 10.1% of the total outstanding YPF capital stock within a four-year period. (Ex. 30 (Repsol Press Release, dated Dec. 21, 2007) at Annex 2, Memorandum of Understanding, Term One.)

**Plaintiffs' Response:  Undisputed.**

26.     At the time of Petersen's acquisition of YPF ADSs from Repsol, Petersen ████████

████████████████████████████████████████████████████████████████

████████████████████████████; *see also* Ex. 30 (Repsol Press Release, dated Dec. 21, 2007) at 5, 7.)

**Plaintiffs' Response:  Undisputed.**

27.     In February 2008, Petersen acquired an initial 14.9% stake in YPF from Repsol for $2.235 billion. (Ex. 33 (YPF, Feb. 21, 2008 Schedule 13D) at pp. 9, 11, 15; Ex. 37 (YPF, SEC Form 20-F for the fiscal year ended Dec. 31, 2011) at 27.)

**Plaintiffs' Response:  Undisputed.**

28.     To finance this acquisition of ADSs from Repsol, Petersen borrowed $1,015,000,000 from Repsol and assigned to Repsol the right to collect $201,150,000 in dividends from YPF, expected to be paid in May 2008. (Ex. 37 (YPF, Form 20-F for the fiscal year ended Dec. 31, 2011) at 142; Ex. 33 (YPF, Feb. 21, 2008 Schedule 13D) at pp. 9–11.)

**Plaintiffs' Response:  Undisputed.**

29.     Petersen further financed its purchase with a loan of $1,026,000,000 from a syndicate of financial institutions. (Ex. 37 (YPF, Form 20-F for the fiscal year ended Dec. 31, 2011) at 142; Manóvil Opening ¶ 20.)

**Plaintiffs' Response:  Undisputed.**

30.     Petersen's loans from Repsol and the bank lenders were secured by a pledge of the YPF ADSs it was purchasing. (Ex. 37 (YPF, Form 20-F for the fiscal year ended Dec. 31, 2011) at 142; Petersen Compl. ¶¶ 6, 27, 30.)

**Plaintiffs' Response:  Undisputed.**

31.     On February 21, 2008, Petersen and Repsol entered into a shareholders' agreement (the Shareholders' Agreement). (Ex. 33 (YPF, Feb. 21, 2008 Schedule 13D) at Ex. 99.4; Manóvil Opening ¶ 20.)

**Plaintiffs' Response:**  **Undisputed.**

32.     The Shareholders' Agreement provided that Repsol and Petersen "agree[d] to distribute as a dividend ninety percent (90%) of the profit of the Company" on a semi-annual basis and that "the Parties shall vote in favor of the corporate resolutions needed for the Company to distribute a special dividend" of $850,000,000, half to be paid in 2008 and the other half in 2009. (Ex. 33 (YPF, Feb. 21, 2008 Schedule 13D) at p. 13, 17 & Ex. 99.4 § 7.3; Manóvil Opening ¶ 20.)

**Plaintiffs' Response:**  **Undisputed.**

33.     Nothing in the Shareholders' Agreement conditioned the payout of these dividends on the actual profits or strategic needs of YPF.  (Ex. 33 (YPF, Feb. 21, 2008 Schedule 13D) at Ex. 99.4 § 7.3.)

**Plaintiffs' Response:**  **Undisputed.**

34.     There was "no analysis" performed by anyone at Petersen concerning "the distribution of 90% of YPF's earnings as a dividend" and whether "it was in the best interest of YPF." (Ex. 6 (Minutes from Feb. 10, 2021 Minutes of Hague Convention Testimony of Sebastián Eskenazi) at 9; ██████████████████████████

**Plaintiffs' Response:**  **Undisputed.**

35.     The credit agreements Petersen entered into with Repsol and the group of banks in connection with the loans Petersen received to finance its purchase of YPF ADSs provided that Petersen would use YPF dividends to pay back the loans. (Ex. 33 (YPF, Feb. 21, 2008 Schedule 13D) at pp. 11, 20–21.)

**Plaintiffs' Response:**  **Undisputed.**

36.     On February 21, 2008, in connection with its purchase of YPF ADSs, Petersen, through an Australian entity, Petersen Energía Pty Ltd., and the Eskenazi family also entered into a supplemental agreement with Repsol. (Ex. 33 (YPF, Feb. 21, 2008 Schedule 13D) at Ex. 99.13.)

**Plaintiffs' Response:** **Undisputed.**

37.     Under the supplemental agreement, if within five years after the date of the agreement Repsol's stake in YPF dropped below 50.01% or Repsol failed to perform certain corporate acts, such as approving the distribution of dividends of 90% of YPF's profits, then Repsol was obligated to acquire Petersen's loans and buy back Petersen's YPF ADSs. (Ex. 33 (YPF, Feb. 21, 2008 Schedule 13D) at pp. 22–23 & Ex. 99.13 § 2.)

**Plaintiffs' Response:** **Undisputed.**

38.     Pursuant to the February 2008 Shareholders' Agreement, Repsol and Petersen agreed that the YPF Board of Directors would appoint Sebastián Eskenazi as the Chief Executive Officer of YPF. (Ex. 33 (YPF, Feb. 21, 2008 Schedule 13D) at pp. 12, 16 & Ex. 99.4 § 5.3.2.)

**Plaintiffs' Response:** **Undisputed.**

39.     On May 20, 2008, the Petersen Group exercised an option to buy 0.1% of YPF's ADSs from Repsol, doing so through PEISA. (Ex. 41 (YPF, May 21, 2008 Schedule 13D) at 3, 6.)

**Plaintiffs' Response:** **Undisputed.**

40.     The May 20, 2008 transaction was financed by a credit facility with Banco Santander (the Santander Loan Agreement), which was secured by a guaranty from Repsol (the Repsol-Santander Guaranty Agreement). (Ex. 40 (Santander Loan Agreement (Ex. 99.20 to the YPF, SEC Sep. 11, 2008 Schedule 13D)); (Ex. 39 (Repsol-Santander Guaranty Agreement (Ex. 99.21 to the YPF, SEC Nov. 12, 2008 Schedule 13D)); Manóvil Opening ¶ 20.)

<u>**Plaintiffs' Response:**</u>  **Undisputed.**

41.     On May 19, 2011, the Petersen Group exercised an option to buy 10% of YPF's ADSs from Repsol for a total purchase price of $1,304,032,488, doing so through PEISA.  (Ex. 38 (YPF, May 20, 2011 Schedule 13D/A) at Item 3; Manóvil Opening ¶ 20.)

<u>**Plaintiffs' Response:**</u>  **Undisputed.**

42.     The May 19, 2011 transaction was financed by a $625,935,594 loan from Repsol (together with the loan described in paragraph 28 *supra*, the Repsol Credit Agreements) and a $678,096,894 loan from a syndicate of financial institutions (together with the loan described in paragraph 29 *supra*, the Syndicated Financing Agreements).  (Ex. 38 (YPF, May 20, 2011 Schedule 13D/A) at 3; Manóvil Opening ¶ 20.)

<u>**Plaintiffs' Response:**</u>  **Undisputed.**

**IV.     Eton Park Acquires YPF ADRs**

43.     Plaintiff Eton Park Capital Management, L.P. was a multibillion-dollar hedge fund headquartered in New York City, which made investments on behalf of Plaintiff Eton Park Master Fund, Ltd., a Cayman Islands exempted company, and Plaintiff Eton Park Fund, L.P., a Delaware limited partnership (together, Eton Park). (Eton Park Compl. ¶ 9; *see also* Ex. 42 (Goldstein, M., Eton Park to Shut Down as $3 Trillion Hedge Fund Industry Faces Turmoil, The New York Times (Mar. 23, 2017)).)

<u>**Plaintiffs' Response:**</u>  **Undisputed.**

44.     In November 2010, Eton Park purchased 875,000 YPF ADSs.  (Ex. 43 (Email from J. Currant to R. Salmon, dated Nov. 5, 2010 (EP_000015278)).)

<u>**Plaintiffs' Response:**</u>  **Undisputed.**

45.     In December 2010, Eton Park acquired an additional 1.63% of YPF through ADSs acquired directly from Repsol. (Ex. 44 (Email and attached press release from Serge Todorovich to Jonathan Gasthalter, dated Dec. 22, 2010 (EP_000062852)); Manóvil Opening ¶ 21.)

**Plaintiffs' Response:**  **Undisputed.**

46.     Then, in March 2012, Eton Park increased its stake in YPF to 3.04%, in the form of ADSs.  (*See* ███████████████████████████████████████████████████; Ex. 31 (Harris Rebuttal) ¶ 17; Eton Park Compl. ¶ 5; Manóvil Opening ¶ 53.)

**Plaintiffs' Response:**  **Undisputed.**

**V.      Argentine Oil and Gas Production and Reserves Decline**

47.     Between 2002 and 2011, energy production and reserves in Argentina declined steadily. (Ex. 22 (Ocampo Rebuttal) ¶ 55; Ex. 46 (Pagni, C., "YPF Might Exhaust Oil Reserve in Five Years [YPF Podría Agotar En Cinco Años Sus Reservas De Petróleo]," La Nación (Mar. 21, 2011)); Ex. 47 (Sequeira, M. and Fonseca, M., "YPF Sociedad Anonima, - Political risk clouds exploration potential," Deutsche Bank (May 8, 2011)) at 6, 12, 25; Ex. 48 (YPF, Form 20-F for the fiscal year ended Dec. 31, 2007) at 17, 78, 80.)

**Plaintiffs' Response:**  **Undisputed.**

48.     Between 2001 and 2011, YPF's annual production of oil fell 41.2% in comparison to 13.8% for other oil producers in Argentina. (Ex. 22 (Ocampo Rebuttal) ¶ 64.)

**Plaintiffs' Response:**  **Undisputed.**

49.     During the same period, YPF's annual production of natural gas also fell 23.8% while other natural gas producers in Argentina saw their production increase 2.3% during that time. (*Id.* ¶ 65.)

**Plaintiffs' Response:**  **Undisputed.**

50.     From 2001 to 2011, YPF's average net daily crude oil production declined 38%, and from 2004 to 2011 its net daily natural gas production declined 43%. (*Id.* ¶ 61; Ex. 49 (YPF, Form 20-F for the fiscal year ended Dec. 31, 2003) at 23, 28; Ex. 50 (YPF, Form 20-F, for the fiscal year ended Dec. 31, 2004) at 26; Ex. 37 (YPF, Form 20-F for the fiscal year ended Dec. 31, 2011) at 41.)

**Plaintiffs' Response:  Undisputed.**

51.     Around the mid-2000s, the Argentine government began to speak critically of Repsol's management, particularly concerning YPF's declining reserves and production. (Ex. 22 (Ocampo Rebuttal) ¶ 71; *see also* Ex. 51 (*Kirchner reclamó a Repsol y Petrobrás más inversiones en Argentina*, Agence France Presse (Nov. 29, 2007)).)

**Plaintiffs' Response:  Undisputed.**

52.     An article, dated April 20, 2007 and published in widely circulated Argentine newspaper, La Nación, reported that Julio de Vido, the Argentine Minister of Federal Planning, Public Investment and Services, "once again spoke[] out to criticize Repsol YPF for low levels of investment in Argentina [since 1999] and for not putting the situation to rights after earlier governmental criticism." (Ex. 52 (*Argentina: De Vido takes another swipe at Repsol*, La Nación (Apr. 20, 2007) 2007 WLNR 7604358).)

**Plaintiffs' Response:  Undisputed.**

## VI.     The Impact of the Dividend Policy

53.     In 2008, 2009, and 2011, YPF paid more in dividends than its total net income for the year. (Ex. 22 (Ocampo Rebuttal) ¶ 75.) For instance, in 2008, YPF's dividends represented nearly 250 percent of its earnings in that same fiscal year.  (*Id.*)

**Plaintiffs' Response:  Undisputed.**

54.     From 2006 to 2011, other oil and gas companies, including BP, Chevron, Ecopetrol, ENI, Equinor, and Exxon Mobil, had an average dividend payout ratio of 40.8 percent, while over the same time period, YPF had an average dividend payout ratio of 118 percent of earnings. (Ex. 22 (Ocampo Rebuttal) ¶ 79.) From 2008 to 2011, YPF had an average dividend payout ratio of 138 percent. (Ex. 22 (Ocampo Rebuttal) ¶ 75.)

    **Plaintiffs' Response:**  **Undisputed.**

55.     When asked at deposition whether it is "a responsible[] corporate strategy to . . . agree to pay out in advance 90 percent of a company's net income in dividends," Plaintiffs' expert Professor John Coffee testified that "[i]f I was a director it would not be my strategy." (Ex. 17 (Coffee Deposition Tr. at 271:20–21).)

    **Plaintiffs' Response:** **Undisputed as to any material factual assertion. The Republic, however, omits a portion of Professor Coffee's testimony. His full answer was "It may depend. I'm not saying it's always irresponsible. If I was a director it would not be my strategy." (Giuffra Ex. 17 (Coffee Deposition Tr. at 271:18–21).)**

56.     An article, dated March 9, 2010 and published in leading Spanish newspaper El País, reported that for the first time in three decades, YPF had to import oil from outside of Argentina to meet consumer demand. (Ex. 53 (Rebossio, A., "YPF importará petróleo debido a la escasez en Argentina," El País (Mar. 9, 2010)).)

    **Plaintiffs' Response:**  **Undisputed.**

57.     In 2011, Argentina became a net energy importer. (Ex. 22 (Ocampo Rebuttal) ¶ 60.)

    **Plaintiffs' Response:**  **Undisputed.**

58.     An article, dated March 21, 2011 and published in La Nación, described YPF as "affected by four worrisome trends: drop in reserves, increased indebtedness, the disproportionate distribution of dividends with respect to income, and net worth reduction." (Ex. 46 (Pagni, C., "YPF Might Exhaust Oil Reserve in Five Years [YPF Podría Agotar En Cinco Años Sus Reservas De Petróleo]," La Nación (Mar. 21, 2011)); *see also* Ex. 22 (Ocampo Rebuttal) ¶¶ 55, 66, 69.) That same article also noted that Argentina had become "the only country in the region where the supply of [oil and gas] ha[d] shrank." (Ex. 46 (Pagni, C., "YPF Might Exhaust Oil Reserve in Five Years [YPF Podría Agotar En Cinco Años Sus Reservas De Petróleo]," La Nación (Mar. 21, 2011)).)

**Plaintiffs' Response:** Undisputed.

## VII.    The Intervention and the Public Interest Law

59.     On April 16, 2012, the President of Argentina submitted a bill to the Argentine Congress concerning, among other things, Argentina's hydrocarbon policy, and proposing that a 51% interest in YPF held by Repsol be declared "of the public interest and subject to expropriation" (the Public Interest Bill). (Ex. 54 (Public Interest Bill, dated Apr. 16, 2012 (AR00031627)).)

**Plaintiffs' Response:** Undisputed.

60.     Also on April 16, 2012, the Executive Branch issued Decree No. 530/2012 (the Intervention Decree), which stated that Repsol's "deepening strategy to virtually eviscerate the company" demonstrated that "the interests of the majority shareholder have been different from those of [the] Argentine Republic," and "compromise[d] [the] energy sovereignty of the country" and ordered a 30-day government "intervention" into YPF. (Ex. 74 (Intervention Decree No. 530/2012, dated Apr. 16, 2012).)

**Plaintiffs' Response:** Undisputed.

61.     The Intervention Decree appointed the Argentine Minister of Federal Planning, Public Investment and Services, Julio de Vido, as "Intervenor" of YPF. (*See* Ex. 74 (Intervention Decree No. 530/2012, dated Apr. 16, 2012).)

**Plaintiffs' Response:  Undisputed.**

62.     The Intervention Decree provided the Intervenor with the "powers conferred by the YPF S.A. Bylaws to the Board of Directors and/or the President of the company" during the period of the intervention. (Ex. 74 (Intervention Decree No. 530/2012, dated Apr. 16, 2012).)

**Plaintiffs' Response:  Undisputed.**

63.     On April 17, 2012, the Secretary of Economic Policy and Planning Development Axel Kicillof gave a speech at a full committee meeting of the Argentine National Senate Committees on Budget and the Treasury, Constitutional Affairs, and Mining, Energy and Fuels regarding the proposed Public Interest Bill. (Ex. 21 (Transcript of Proceedings of the Argentine Senate Committees on Budget, Treasury, Constitutional Affairs, and Mining, Energy, and Fuels, dated Apr. 17, 2012).) During that speech, the Secretary noted that the bill as introduced sought to expropriate not all of YPF "but a part of it, which is the share portion respecting Repsol itself" and that this would "go[] to the National Appraisal Tribunal to pay, according to [Argentina's] expropriation law, what ends up being the real cost." (*Id.* at 26.)

**Plaintiffs' Response: Undisputed. Secretary Kicillof was also Vice-Intervenor of YPF at the time of his speech. Goodman Ex. 17 (Decree 532/2012 appointing Secretary Kicillof was also Vice-Intervenor of YPF).**

64.     On May 23 and May 30, 2012, the National Chamber of Deputies and National Senate of the Argentine National Congress respectively issued resolutions declaring the validity of the Intervention Decree. (*See* Ex. 55 (Resolution S/N/2012 of the National Chamber of

Deputies, dated May 23, 2012) Art. 1; Ex. 56 (Resolution S/N/2012 of the National Senate, dated

May 30, 2012) Art. 1; Santiago Rebuttal ¶ 21.)

> **<u>Plaintiffs' Response:</u>   Undisputed.**

65.     On May 11, 2012, the President of Argentina issued Decree No. 732/2012, which

extended the Intervention for an additional 30-day period. (*See* Ex. 75 (Intervention Decree

(Extension) No. 732/2012, dated May 11, 2012 (YPFEP00007670)).)

> **<u>Plaintiffs' Response:</u>   Undisputed.**

66.     On May 3, 2012, Congress passed the Public Interest Bill, which became effective

on May 7, 2012 as Argentine Law No. 26,741 (the Public Interest Law). (*See* Ex. 72 (Public

Interest Law, dated May 3, 2012 (AR00031972)).)

> **<u>Plaintiffs' Response:</u>   Undisputed.**

67.     The Public Interest Law stated that "[a]chieving self-sufficiency in the supply of

hydrocarbons," was "a national public interest and a priority for the Republic of Argentina." (*Id.*,

Art. 1.)

> **<u>Plaintiffs' Response:</u>   Undisputed.**

68.     Article 7 of the Public Interest Law declared fifty-one percent (51%) of the equity

of YPF held by Repsol to be of "public interest and subject to expropriation." (*Id.*, Art. 7.)

> **<u>Plaintiffs' Response:</u>   Undisputed.**

69.     Article 8 of the Public Interest Law also provided that the expropriated shares in

YPF and Repsol YPF GAS S.A. would be distributed at fixed proportions between the federal

government and the provinces. (*Id.*, Art. 8.)

> **<u>Plaintiffs' Response:</u>   Undisputed.**

70.     Article 12 of the Public Interest Law provided that "[t]he price of the property subject to expropriation shall be determined in accordance with the provisions of Law 21,499"— the General Expropriation Law—and that "[t]he appraisal shall be conducted by the National Court of Appraisals." (*Id*., Art. 12.)

**Plaintiffs' Response:** **Undisputed.**

71.     Article 13 of the Public Interest Law mandated the National Executive Office of the Republic to temporarily occupy Repsol's shares, pursuant to the General Expropriation Law. Article 13 provided that, to ensure YPF's operational continuity, the National Executive Office "shall exercise all of the [shareholder] rights conferred upon [Repsol's] shares subject to expropriation in accordance with articles 57 and 59 of [the General Expropriation Law]." (*Id*., Art. 13.)

**Plaintiffs' Response:** **Undisputed.**

72.     Article 15 of the Public Interest Law provided that YPF "shall continue to operate as [a] publicly traded corporation[]." (*Id*., Art. 15.)

**Plaintiffs' Response:** **Undisputed.**

## VIII.  The June 4, 2012 YPF Shareholders' Meeting and Challenges by Other Shareholders

73.     On May 8, 2012, the Argentine National Securities Commission (*Comisión Nacional de Valores* (CNV)) convened a YPF shareholders' meeting for June 4, 2012, pursuant to Article 13 of the Public Interest Law. (*See* Ex. 57 (CNV Call for YPF Shareholders' Meeting, dated May 8, 2012 (AR00011109)); Manóvil Opening ¶ 32.)

**Plaintiffs' Response:** **Undisputed.**

74.     The Republic attended the June 4, 2012 YPF shareholders' meeting and exercised voting rights over the YPF shares subject to expropriation under the Public Interest Law.  (*See* Ex. 58 (YPF Shareholders' Meeting Minutes, dated June 4, 2012); Manóvil Opening ¶ 37.)

**Plaintiffs' Response:  Undisputed.**

75.     At the YPF shareholders' meeting of June 4, 2012, Repsol, Mr. Pablo Blanco Pérez, YPF Capital SL, Caveant S.A., Mr. Walter Forwood and others challenged the shares subject to expropriation counting towards the quorum at the meeting and challenged the Republic's right to vote those shares, invoking Sections 7 and 28 of the Bylaws. (*See* Ex. 58 (YPF Shareholders' Meeting Minutes, dated June 4, 2012) at 7; Manóvil Opening ¶¶ 38, 86.)

**Plaintiffs' Response:  Undisputed.**

76.     Certain YPF shareholders, including Repsol S.A., together with Repsol YPF Capital SL and Caveant S.A., timely filed a claim in Argentine courts challenging the resolutions passed by the shareholders' meeting of June 4, 2012 and specifically alleging a violation of Sections 7 and 28 of the Bylaws.  (*See* Ex. 59 (*Repsol S.A., et al.* v. *YPF S.A.*, National Commercial Court of First Instance No. 3, Case No. 103.144/2012); Manóvil Opening ¶ 43.)

**Plaintiffs' Response:  Undisputed.**

77.     In total, Repsol pursued 19 judicial and arbitral actions, including before courts in Argentina, the United States, and Spain, and under the ICSID Convention, to challenge various aspects of the intervention and expropriation. (*See* Ex. 15 (Repsol-Argentina Settlement) Annex V.) Other third parties brought nine additional actions in Argentina, some of which were shareholders. (*Id.* Annex VI.)

**Plaintiffs' Response:  Undisputed.**

78.    At least two YPF shareholders brought claims seeking to compel the Republic to conduct a tender offer. (*See* Ex. 60 (Complaint, *De San Martín, José, et al.* v. *National State*, Federal Court in Contentious Administrative Matters No. 10, File No. 35167/2013); Manóvil Opening ¶ 44.)

   **<u>Plaintiffs' Response</u>:  Undisputed.**

79.    Neither Petersen nor Eton Park attended the June 4, 2012 shareholders' meeting or objected to the Republic's being counted towards the quorum or to the exercise of voting rights. (*See* Ex. 58 (YPF's Shareholders' Meeting Minutes, dated June 4, 2012).)

   **<u>Plaintiffs' Response</u>:  Undisputed.**

80.80.  ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████

   **<u>Plaintiffs' Response</u>:  Undisputed.**

81.    "[I]n 2012," Petersen made the decision "not to bring a lawsuit against Argentina." (Ex. 6 (Minutes from Feb. 10, 2021 Minutes of Hague Convention Testimony of Sebastián Eskenazi) at 16; *see also id.*, at 7; ██████████████████████████████████

   **<u>Plaintiffs' Response</u>:  Undisputed.**

82.    Eton Park also elected ██████████████████████████████████

██████████████████████████████████████████

   **<u>Plaintiffs' Response</u>:  Undisputed.**

83.    Petersen also did not take any action to enforce the Repsol-Petersen Supplemental Agreement, pursuant to which Repsol had agreed to acquire Petersen's loans and buy back Petersen's YPF ADSs if Repsol were to lose its majority stake in YPF. Petersen chose not to

invoke that provision based on its belief that ████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████

**Plaintiffs' Response:** Undisputed.

IX.    **Petersen Defaults on Its Loans and Its ADRs Are Transferred to Lenders**

84.    Between May 11 and May 30, 2012, Petersen received "notices of default and acceleration" under the Syndicated Financing Agreements, the Santander Loan Agreement, and the Repsol Credit Agreements. (*See* Ex. 61 (YPF, June 1, 2012 Schedule 13D/A); Ex. 7 (Fischel Opening) ¶ 49; Manóvil Opening ¶ 46.)

**Plaintiffs' Response:**  Undisputed.

85.    On June 11, 2012, Petersen's bank lenders foreclosed on the ADSs Petersen had pledged under the Syndicated Financing Agreements, and the corresponding ADRs were transferred to the bank lenders. (*See* Ex. 36 (YPF, June 15, 2012 Schedule 13D/A) Item 4; Ex. 7 (Fischel Opening) ¶ 49; Manóvil Opening ¶ 47.)

**Plaintiffs' Response:**  Undisputed.

86.    On November 8, 2012, Repsol foreclosed on ADSs Petersen had pledged in support of the Repsol Credit Agreements, and the corresponding ADRs were transferred to Repsol. (*See* Ex. 62 (YPF, Nov. 9, 2012 Schedule 13D/A (YPFEP00004929, YPFEP00004932)); Ex. 7 (Fischel Opening) ¶ 49 n.84; Ex. 31 (Harris Rebuttal) ¶ 26 n.43; Manóvil Opening ¶ 50.)

**Plaintiffs' Response:**  Undisputed.

87.    On April 23, 2013, Repsol partially foreclosed on a small number of ADSs pledged in support of the Repsol-Santander Guaranty Agreement, and the corresponding ADRs were transferred to Repsol. (*See* Ex. 76 (Letter from Repsol to PEISA, dated Apr. 23, 2013 (PT_000031637)); Manóvil Opening ¶ 50.)

**Plaintiffs' Response:  Undisputed.**

88.     On May 8, 2014, Repsol foreclosed on the rest of the pledged ADSs, constituting less than 2% of all ADSs held by Petersen between 2008 and 2011, and the corresponding ADRs were transferred to Repsol. (*See* Ex. 63 (Letter from Repsol to PEISA, dated May 19, 2014 (PT_000031639)); Manóvil Opening ¶ 50.)

**Plaintiffs' Response:  Undisputed.**

*89.*     On July 13, 2012, the Plaintiff Petersen entities, PESA and PEISA, filed a joint voluntary petition for reorganization in Spain based on that, "neither was able to meet the payment obligations they had assumed with the creditors who financed the purchase of the YPF shares." (Ex. 64 (Petersen's Bankruptcy Petition (PT_000021268–PT_000021274) ¶ 2.3); *see also id.* ¶ 2.1; Manóvil Opening ¶ 48.)

**Plaintiffs' Response:  Undisputed.**

90.     On October 23, 2012, the Commercial Court No. 3 for Madrid declared the Petersen entities insolvent and opened reorganization proceedings. (*See* Petersen Compl. ¶ 46; Manóvil Opening ¶ 49.)

**Plaintiffs' Response:  Undisputed.**

## X.     Eton Park Sells Its YPF ADRs

91.     Between July 2012 and June 2013, Eton Park sold its entire stake in YPF. (*See* Ex. 65 (Eric Mindich Deposition Tr.) 69:23–70:23; Ex. 7 (Fischel Opening) ¶ 49 n.82; Manóvil Opening ¶ 51.)

**Plaintiffs' Response:  Undisputed.**

## XI.     Repsol and Argentina Execute a Settlement Agreement

92.     On February 27, 2014, Repsol and the Republic executed a settlement agreement, which provided that the Republic would pay Repsol $5 billion as compensation for the

expropriated shares and for any claim arising from or connected to the intervention, temporary occupation, or the expropriation (the Repsol-Argentina Settlement Agreement). (Ex. 15 (Repsol-Argentina Settlement Agreement) § I; Manóvil Opening ¶ 52.)

**Plaintiffs' Response:  Undisputed.**

93.     Pursuant to the agreement, Repsol was "obligated to abandon the right [to] all extra-judicial, judicial and/or arbitral actions and claims . . . that it has commenced against the ARGENTINE REPUBLIC and/or its RELATED PERSONS and against YPF and YPF GAS and/or their RELATED PERSONS." (Ex. 15 (Repsol-Argentina Settlement Agreement) § VI(1); Manóvil Opening ¶ 53.)

**Plaintiffs' Response:  Undisputed.**

94.     The Repsol-Argentina Settlement Agreement also provided for Repsol's release and waiver in relation to all past and future claims in connection with the intervention, temporary occupation, or the expropriation.  (Ex. 15 (Repsol-Argentina Settlement Agreement) § VI; Manóvil Opening ¶ 54.)

**Plaintiffs' Response:  Undisputed.**

95.     The Repsol-Argentina Settlement Agreement required Repsol to obtain the discontinuance of proceedings initiated by third parties, or hold the Republic harmless if such discontinuances were not obtained. (Ex. 15 (Repsol-Argentina Settlement Agreement) § VI(1)(iii); Manóvil Opening ¶ 54.) This included the shareholder actions discussed in paragraph 77, *supra*.

**Plaintiffs' Response:  Undisputed.**

96.     The Argentine National Court of Appraisals reviewed the proposed settlement amount and determined that the level of compensation agreed by the Republic and Repsol was

"fair and reasonable" in light of the objective value of the expropriated property. (*See* Ex. 15 (Repsol-Argentina Settlement Agreement) Annex II, National Appraisals Court Note No. 535 (February 25, 2014).)

> **Plaintiffs' Response:**  **Undisputed.**

97.     Law 26,932 (the YPF Expropriation Law), passed by the Argentine Congress on April 23, 2014, ratified the Repsol-Argentina Settlement Agreement and authorized the issuance of National Treasury Bonds to pay the $5 billion to Repsol. (*See* Appendix at A-3 (Law 26,932) Arts. 1, 2; Manóvil Opening ¶ 52.)

> **Plaintiffs' Response:**  **Undisputed.**

*98.*     The Repsol-Argentina Settlement Agreement became effective on May 8, 2014, on which date the Republic compensated Repsol for and took title to the expropriated shares. (*See* Ex. 66 (YPF Note, dated May 9, 2014); ████████████████████████████████; Manóvil Opening ¶ 54.) On the next day, YPF disclosed to the SEC "the expropriation pursuant to the Law No. 26,741 has been concluded, and therefore the Republic of Argentina is definitively the owner of 51% of capital stock of YPF S.A. and YPF GAS S.A." (Ex. 67 (YPF SEC Form 6-K, dated May 9, 2014).)

> **Plaintiffs' Response:**  **Undisputed.**

## XII.    Burford Acquires the Petersen Claims and Funds the Eton Park Action

99.     In October 2014, Petersen submitted a proposed liquidation plan in the Spanish bankruptcy proceeding that contemplated the "sale or assignment" of Petersen's putative claims in a public action. (*See* Ex. 68 (Oct. 6, 2014 Liquidation Plan) at 7.)

> **Plaintiffs' Response:**  **Undisputed.**

100.    Burford Capital LLC, through Prospect Investments LLC—a wholly owned subsidiary of Burford—prevailed in the bidding process and, in March 2015, acquired the

exclusive right to prosecute Petersen's claims in exchange for €15.101 million. (*See* Ex. 69 (Mar. 4, 2015 Claim Prosecution Agreement) § 2.1.)

> **Plaintiffs' Response:** **Undisputed.**

101.    Under the Claim Prosecution Agreement, Burford's Prospect Investments subsidiary is entitled to 70% of any proceeds from the prosecution of the Petersen claims. *See* Ex. 69 (Mar. 4, 2015 Claim Prosecution Agreement) § 3.1.)

> **Plaintiffs' Response:** **Undisputed.**

102.    On November 3, 2016, the same day Eton Park filed its complaint in this action, Burford's subsidiary Ireton LLC entered into a Capital Provision Agreement with Eton Park. (*See* Ex. 70 (Nov. 3, 2016 Capital Provision Agreement).)

> **Plaintiffs' Response:** **Undisputed.**

103.    Burford's subsidiary Ireton is entitled to approximately 75% of the proceeds from the prosecution of the Eton Park action. (*See* Ex. 71 (Burford Capital FY 2019 Annual Report) at 63.)

> **Plaintiffs' Response:** **Undisputed.**

104.104-██████████████████████████████████████

███████████████████████

> **Plaintiffs' Response:** **Disputed.** ████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████

Dated: April 14, 2022          Respectfully submitted,
       New York, New York

                               /s/ *Robert J. Giuffra, Jr.*
                               Robert J. Giuffra, Jr.

Sergio J. Galvis
Amanda F. Davidoff
Thomas C. White
Adam R. Brebner

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone:     (212) 558-4000
Facsimile:     (212) 558-3588

*Counsel for the Argentine Republic*

Dated: May 26, 2022

KIRKLAND & ELLIS LLP

By:        /s/ Paul D. Clement
Paul D. Clement
George W. Hicks, Jr.
C. Harker Rhodes, IV
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 389-5000
Fax: (202) 389-5200
Email:   paul.clement@kirkland.com
         george.hicks@kirkland.com
         harker.rhodes@kirkland.com

KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
Email: mhansen@kellogghansen.com
       dho@kellogghansen.com
       agoldsmith@kellogghansen.com

KING & SPALDING LLP

Israel Dahan
Laura Harris

1185 Avenue of the Americas
New York, NY 10036
Phone: (212) 556-2114
Fax: (212) 556-2222
Email: idahan@kslaw.com
         lharis@kslaw.com

-and-

Reginald R. Smith
1100 Louisiana Street
Houston, TX 77002
Phone: (713) 751-3200
Fax: (713) 751-3290
Email:  rsmith@kslaw.com

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U., Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*