**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETERSEN ENERGÍA INVERSORA,　　　　　:
S.A.U. and PETERSEN ENERGÍA, S.A.U.,　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　Plaintiffs,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　v.　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
ARGENTINE REPUBLIC and YPF S.A.,　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　Defendants.　　　　　　　　　:

Case No.:  1:15-CV-02739 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ETON PARK CAPITAL MANAGEMENT,　　　:
L.P., ETON PARK MASTER FUND, LTD.,　　:
and ETON PARK FUND, L.P.,　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　Plaintiffs,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　v.　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
ARGENTINE REPUBLIC and YPF S.A.,　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　Defendants.　　　　　　　　　:

Case No.:  1:16-CV-08569 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' RESPONSE TO PLAINTIFFS' RULE 56.1**
**STATEMENT OF MATERIAL FACTS**

May 26, 2022

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Defendants the Argentine Republic ("Argentina" or "the Republic") and YPF S.A. ("YPF") respectfully submit this response ("Response") to Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía S.A.U., Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund L.P.'s (together, "Plaintiffs") Rule 56.1 statement of material facts.

## I.    GENERAL OBJECTIONS

Defendants object to Plaintiffs' statement of material facts on the grounds that it does not comply with Local Rule 56.1.  Many of the paragraphs merely restate the unsupported analyses and inadmissible testimony of Plaintiffs' experts, improperly mix factual averments with legal argument and rhetoric, and include terms that are undefined and susceptible to various interpretations.  Plaintiffs' statement of material facts also includes assertions that are irrelevant and immaterial.  Purported "facts" asserted by Plaintiffs that are not material to summary judgment fall outside the scope of Local Rule 56.1, may not be deemed admitted, and should be disregarded.  *See* Local Rule 56.1(c); *see also Congregation Rabbinical Coll. of Tartikov, Inc.* v. *Vill. of Pomona*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015) (Karas, J.) ("The Court will disregard all such repetitive or incomprehensible statements" in a Rule 56.1 statement); *Arch Specialty Insurance Co.* v. *TDL Restoration, Inc.*, 2021 WL 1225447 at *1 n.1 (S.D.N.Y. Mar. 31, 2021) (Karas, J.) (same and collecting cases); *Yien-Koo King* v. *Wang*, 2020 WL 6875403 at *27 (S.D.N.Y. Nov. 23, 2020) (Liman, J.) (disregarding statements in a Rule 56.1 statement that are "improperly asserted or argumentative" or that would be "inadmissible").  Defendants do not purport to address every evidentiary deficiency here, and preserve all evidentiary objections to the materials cited by Plaintiffs.

## II.    RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS

1.      YPF (originally *Yacimentos Petrolíferos Fiscales*) is an oil and gas company. Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 4).[1]

> **Defendants' Response:** Undisputed that YPF is an energy company and the largest energy producer in Argentina, inclusive of YPF's oil and gas assets. Goodman Ex. 2 (YPF 2020 Form 20-F) at 34.[2]

2.      From 1922 to 1993, the Argentine Government owned and controlled 100% of YPF.  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 2) ("YPF was a state-owned oil company that was privatized through an initial public offering ('IPO') in 1993."); *see also id*. ¶ 11 (same); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 8) ("YPF was state-owned prior to 1993"); *id*. ¶ 11 (same); Hicks Ex. 98 (PT_COFFEE_000000402 at 403) ("Created in 1922, YPF was the world's first state-owned oil company, and for years it enjoyed a monopoly on exploration and production in Argentina."); Hicks Ex. 50 (Ocampo Dec. 2021 Report for Argentina ¶ 44) ("In 1922, YPF was formed as the first national oil company in South America.").

> **Defendants' Response:** Undisputed.[3]

---

[1]     Plaintiffs' section headings, to which no response is needed, are omitted from this response.  To the extent a response is needed, the section headings are disputed.

[2]     References to "Goodman Ex. _" from exhibit numbers 1-77 are to the Declaration of Mark P. Goodman accompanying YPF's Motion for Summary Judgment (*Petersen* ECF 377). References to "Goodman Ex. _" from exhibit numbers 78-83 are to the Declaration of Mark P. Goodman accompanying YPF's Opposition to Plaintiffs' Motion for Summary Judgment. References to "Giuffra Ex. _" from exhibit numbers 1-78 are to the Declaration of Robert J. Giuffra, Jr. accompanying the Republic's Motion for Summary Judgment (*Petersen* ECF 363). References to "Giuffra Ex. _" from exhibit numbers 79-119 are to the Declaration of Robert J. Giuffra, Jr. accompanying the Republic's Opposition to Plaintiffs' Motion for Summary Judgment.  References to "Hicks Ex. _" are to the Declaration of George W. Hicks, Jr. accompanying Plaintiffs' Motion for Summary Judgment (*Petersen* ECF 364).

[3]     Defendants' responses herein are directed to the statements of material facts propounded by Plaintiffs, rather than the often lengthy parenthetical quotations.  *See Congregation Rabbinical College of Tartikov, Inc.* v. *Village of Pomona*, 138 F. Supp. 3d 352, 394-95 (S.D.N.Y. 2015) (noting that statements of material fact must be short and concise).

3. Currently, Defendant YPF is a publicly held limited liability stock company (*sociedad anónima*) organized under the laws of Argentina. Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 8) (admitting Hicks Ex. 5 (ECF No. 1 (Complaint) ¶ 8)).

**Defendants' Response:** Undisputed.

4. YPF "is an Argentine public company registered with the U.S. Securities and Exchange Commission ('SEC') and whose American Depositary Receipts ('ADRs') are traded on the New York Stock Exchange ('NYSE')." Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 1); *see* Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 1) (same); *id.* ¶ 8 ("YPF shares trade on the NYSE"); *id.* ¶ 25 ("YPF has incorporated its bylaws in its SEC Form 20-F . . . . YPF further admits that it has filed its Form 20-F in accordance with SEC regulations."); *id.* ¶ 83 (similar).

**Defendants' Response:** Undisputed.

5. Defendant Argentina owns a majority and controlling interest in YPF. Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 8) (admitting Hicks Ex. 5 (ECF No. 1 (Complaint) ¶ 8) (YPF "is currently an instrumentality of Argentina, which owns a majority and controlling interest therein")); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 8) ("Argentina currently owns a majority stake in YPF"); *see also id.* ¶¶ 52, 57 ("Argentina is a YPF shareholder.").

**Defendants' Response:** Undisputed.

6. Argentina owned Class A shares of YPF stock during the period January 1, 2012 to December 31, 2012. Hicks Ex. 19 (YPF's Response to Request for Admission No. 1); *see also* Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 7) ("Argentina retained Class A shares in YPF after the IPO, which gave Argentina a designated representative on the Company's board of directors"); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 7) ("[Argentina] remained a YPF Class A shareholder after the 1993 IPO.").

**Defendants' Response:**  Undisputed.

7.     Plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. are established as limited liability companies (*sociedad anónima unipersonal*) organized under the laws of the Kingdom of Spain.   Hicks Ex. 70 (AR00036645 at 36655); Hicks Ex. 104 (YPFPT00002826 at 02828).

**Defendants' Response:**  Undisputed.

8.     The Petersen Plaintiffs are former YPF shareholders, Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 4), having acquired approximately 25% of the ownership of YPF between 2008 and 2011, Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 6).   They owned ADRs.  *See infra* Section VII.

> **Defendants' Response:**  Undisputed that the Petersen Plaintiffs are former YPF ADR holders.   The Petersen Plaintiffs were not YPF "shareholders" because ADRs are distinct from shares, and the Petersen Plaintiffs as ADR holders did not hold YPF shares.  Giuffra Ex. 103 (Solomon Rebuttal Report) ¶ 153; Giuffra Ex. 24 (Lissemore Opening Report) ¶ 9.

9.     Both Petersen entities were YPF shareholders throughout the period between January 1, 2012 and May 17, 2012.  Hicks Ex. 47 (Harris Dec. 2021 Report for Defs. ¶ 85).

> **Defendants' Response:**  Undisputed that both Petersen entities were holders of YPF ADRs throughout the period between January 1, 2012 and May 17, 2012. The Petersen Plaintiffs were not YPF "shareholders" because ADRs are distinct from shares, and the Petersen Plaintiffs as ADR holders did not hold YPF shares. Giuffra Ex. 103 (Solomon Rebuttal Report) ¶ 153; Giuffra Ex. 24 (Lissemore Opening Report) ¶ 9.

10.     Plaintiff Eton Park Capital Management, L.P. is a New York-based investment firm that made investments until 2017 on behalf of Plaintiffs Eton Park Master Fund, Ltd., a Cayman Islands-exempted company, and Eton Park Fund, L.P., a Delaware limited partnership. Hicks Ex. 13 (ECF No. 128 (Engel Decl.)) ¶ 7.

**Defendants' Response:**  Undisputed.

-4-

11.     The Eton Park Plaintiffs are "former YPF Class D shareholders."  Hicks Ex. 15

(*Eton Park* ECF No. 116 (YPF Answer to Eton Park Plaintiffs' Complaint) ¶¶ 5, 9, 30)

(admitting Hicks Ex. 14 (*Eton Park* ECF No. 1 (Complaint) ¶¶ 5, 9, 30)).

> **Defendants' Response:**  Undisputed that the Eton Park Plaintiffs are former
> holders of YPF ADRs.  The Eton Park Plaintiffs did not, however, hold YPF
> Class D shares and were not "YPF Class D shareholders."  *Eton Park* ECF 1
> (Complaint) ¶ 2; Hicks Ex. 13 (Engel Decl.) ¶ 2; Plaintiffs' Statement of Material
> Facts ¶ 71.

12.     Eton Park entities were YPF shareholders throughout the period between January

1, 2012 and May 17, 2012.  Hicks Ex. 56 (Mindich Tr. 69:23-70:23) (testifying that Eton Park

sold its entire stake in YPF between when "the expropriation was announced in April of 2012"

and "the end of June 2013, [when] Eton Park no longer held any shares in YPF").

> **Defendants' Response:**  Undisputed that Eton Park entities were holders of YPF
> ADRs throughout the period between January 1, 2012 and May 17, 2012.  The
> Eton Park Plaintiffs were not YPF "shareholders" because ADRs are distinct from
> shares, and the Eton Park Plaintiffs as ADR holders did not hold YPF shares.
> Giuffra Ex. 103 (Solomon Rebuttal Report) ¶ 153; Giuffra Ex. 24 (Lissemore
> Opening Report) ¶ 9.

13.     YPF has stated that, prior to its 1993 IPO, Argentina operated the company as a

"politically managed, government-owned monopoly."  Hicks Ex. 3 (ECF No. 112-2 (Prospectus)

at 16) ("YPF . . . transform[ed] from a politically managed, government-owned monopoly to an

efficient and competitive integrated oil company."); *see id.* at 42 ("From the 1920s to 1990,

successive governments maintained a nearly monopolistic position in the oil and gas industry in

Argentina."); Hicks Ex. 98 (PT_COFFEE_000000402 at 403) ("[F]or years [YPF] enjoyed a

monopoly on exploration and production in Argentina.").

> **Defendants' Response:**  Undisputed that YPF was a State-run company prior to
> its 1993 IPO.  Disputed that YPF was "politically managed" at all times prior to
> its 1993 IPO.  For example, as described in the YPF Prospectus, YPF's business
> "ha[d] undergone fundamental changes" since January 1, 1991, including

pursuant to a restructuring plan implemented by YPF's new management appointed in 1990.  Hicks Ex. 3 (YPF Prospectus) at 18.[4]

14.     YPF has stated that prior to privatization:

[S]uccessive governments . . . implemented the national hydrocarbon policy and other governmental policies through state agencies and state-owned predecessor companies to YPF.  These policies, which dictated the management and operation of the Company, generally reflected broader Argentine political and social objectives rather than business strategies designed to maximize the Company's profitability.  Senior management changed frequently, reflecting numerous changes in the political environment in Argentina over much of this period, and labor unions played a significant role in operational decisions. . . .  Stringent financial criteria were not applied in making investment decisions, and the Company's opportunities to reinvest internally generated funds were subject to government budgetary constraints.

Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 42).

**Defendants' Response:**   Undisputed that the quoted statement is a partial quotation from YPF's IPO Prospectus.

15.     Plaintiffs' expert Professor John Coffee of Columbia University has opined that

YPF was run "less as a profit-making corporation and more as an agency of the state," with

"important social welfare responsibilities."   Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls.

¶¶ 18, 19).

**Defendants' Response:**   Undisputed that the quoted language appears in Professor Coffee's report.  Professor Coffee's analysis is, however, disputed.  *See generally* Giuffra Ex. 83 (Ocampo Rebuttal Report).  Professor Coffee's broad generalization is inaccurate in that the oil and gas sector is central to the Argentine economy, and its success has long been a focus of the Argentine government for both the country's energy and its economic security.  Giuffra Ex. 83 (Ocampo Rebuttal Report) ¶ 43.  The Republic took steps prior to the IPO, in the late 1980s and early 1990s, to deregulate the oil and gas industry and transform YPF's business model in order to ensure domestic self-supply.  Giuffra

---

[4]     When referring to the YPF Prospectus, Defendants cite the page numbering of the Exhibit (the numbers stamped at the bottom right of each page), which includes the Registration Statement, rather than the page number of the Prospectus itself (the numbers appearing in the middle of each page).

Ex. 83 (Ocampo Rebuttal Report) ¶ 49 & n.118.   Moreover, Mr. Coffee's testimony on these issues is not properly admissible expert testimony.

16.   As the international press observed, that approach was consistent with the long-prevailing view in resource-rich Latin American countries like Argentina that natural resources, especially oil, were the countries' "crown jewel."   Hicks Ex. 99 (Nathaniel C. Nash, *World Markets; Valuing Argentina's Crown Jewel*, N.Y. Times, May 30, 1993 ("Nash, *Crown Jewel*")) ("the oil company Yacimientos Petroliferos Fiscales, known as Y.P.F.," is "the country's industrial crown jewel"); Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶ 38) (opining that "Argentina's oil assets were often perceived to be a national patrimony that should be governed by nationalist priorities"); Hicks Ex. 50 (Ocampo Dec. 2021 Report for Argentina ¶ 47) (noting the "principle" in "Argentina, and throughout Latin America," that "citizens at large should benefit, at least partly, from the exploitation" of "energy and mineral resources").

> **Defendants' Response:**   Undisputed that the May 30, 1993 New York Times article by Nathaniel C. Nash describes YPF as "the country's industrial crown jewel," but disputed as to the rest of Plaintiffs' characterization of the article; in particular, the article does not discuss the "approach" described in Statement 15 or whether that "approach" is "consistent" with a state's treatment of its natural resources as a "crown jewel."   The same article does, however, note that YPF earned $256 million in 1992.   Hicks Ex. 99 (May 30, 1993 New York Times article).   Defendants further dispute that these facts are material to the issues of the case.

17.   Professor Coffee observed that YPF "los[t] money consistently and in large amounts" prior to the 1993 IPO.   Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 19).

> **Defendants' Response:**   Undisputed that the quoted language appears in paragraph 19 of Professor Coffee's September 2021 expert report, but the statement is incorrect and disputed.   For example, in 1992, the year before the IPO, YPF earned $256 million in profits.   Hicks Ex. 99 (May 30, 1993 New York Times article).   Moreover, Mr. Coffee's testimony on these issues is not properly admissible expert testimony.

18.     The *New York Times* reported that "Y.P.F. lost more than $6 billion in the 1980's, when it employed almost 50,000 people." Hicks Ex. 99 (Nash, *Crown Jewel*); *see also* Hicks Ex. 100 (Nathaniel C. Nash, *Argentina Races to Sell Oil Stake*, N.Y. Times, Apr. 16, 1993) (by the early 1990s, YPF was "considered inefficient, antiquated and a bastion of bureaucratic gridlock").

> **Defendants' Response:**  Undisputed that the *New York Times* reported that YPF lost money in the 1980s, during and after a global economic recession.  Disputed insofar as the quotation is taken out of context and shortened to exclude, among other things, that "[u]nder a hard-nosed oil executive, Jose Estenssoro, the company has pared employees to about 12,000 and restored profits." Hicks Ex. 99 (Nash, *Crown Jewel*).  The quotation from Hicks Ex. 100 is also incomplete. The complete sentence and following sentence reads:  "Just four years ago Y.P.F. was considered inefficient, antiquated and a bastion of bureaucratic gridlock. For Argentina, the fact that Y.P.F. can be sold as a viable, profitable company, is a barometer of the economic turnaround here." Hicks Ex. 100 (Nash, *Argentina Races to Sell Oil Stake*); *see also id.* ("YPF became profitable in the 1990's."). Defendants further dispute that these facts are material to the issues of the case.

19.     Defendants' expert José Ocampo has opined that, "[f]ollowing President Perón's removal from office in 1955, Argentina entered an extended period of economic and political turbulence." Hicks Ex. 50 (Ocampo Dec. 2021 Report for Argentina ¶ 13).

> **Defendants' Response:**   Undisputed that the quoted language appears in Professor Ocampo's report.  Disputed that Professor Ocampo is "Defendants' expert."  Professor Ocampo has submitted expert testimony on behalf of the Republic.  Defendants dispute that these facts are material to the issues of the case.

20.     "Inflation spiked to 388% in 1988 and 4,924% in 1989." Hicks Ex. 49 (Marx Dec. 2021 Report for YPF ¶ 51).

> **Defendants' Response:**  Undisputed.

21.     Along with inflationary problems, Dr. Ocampo also admitted that "Argentina has had [a] history of financial crisis." Hicks Ex. 58 (Ocampo Tr. for Argentina 36:25-37:1); *see*

*also* Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 11) ("For several decades, Argentina experienced periods of slow or negative growth, high inflation, large devaluations of the Argentine currency and imposition of exchange controls."); Hicks Ex. 94 (PT_BLACKETT_000000291 at 292) ("The disrepair of Argentina's institutional infrastructure is a legacy of its Perónist past."); Hicks Ex. 97 (PT_COFFEE_000000339 at 342-343) (in the 1950s, under the governance of the ardent populist Juan Perón, Argentina defaulted on its foreign debt); *id.* at 344-345 (during the 1970s and 1980s, Argentina's foreign borrowing spiked from $8 billion to $46 billion, leading to additional default in the 1980s as inflation eclipsed 3000% in 1989); Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶ 24) (opining that "[t]he perception of mismanagement and corruption in Argentina is a long-lasting one"); Hicks Ex. 55 (Marx Tr. for YPF 51:22-25) (acknowledging that, in the late 1980s and early 1990s, "there were situations of significant skepticism as to the perspectives of Argentina"); Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶ 20) (by the early 1990s, Argentina had already demonstrated a propensity for "repeated swings between a more controlled, closed, and regulated economy and bouts of opening the economy up and trying to deregulate it").

> **Defendants' Response:**  Disputed that Professor Ocampo's statement was an "admission" or was directed to "inflationary problems."  Undisputed that Professor Ocampo said during his deposition that "Argentina has had [a] history of financial crisis as many Latin American or most Latin American countries and I would add as many emerging and developing countries."  Hicks Ex. 58 (Ocampo Tr.) at 36:25-37:4.  Disputed as to the statement quoted from Hicks Ex. 94 (PT_BLACKETT_000000291), which is an opinion piece and not a factual exposition.  Further, Statement 21 contains multiple factual assertions, which "violate[s] the spirit, if not the explicit text, of Local Rule 56.1."  *Congregation Rabbinical College*, 138 F. Supp. 3d at 395.

22.    In reviewing the economic history of twentieth-century Argentina, Professor Coffee observed that "the Argentine economy was in dire straits" before President Carlos

Menem came to power in 1989.  Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 20).  For example, "'[p]ublic order disintegrated as mobs rioted, and the government declared a state of emergency.'"  *Id.* ¶ 20 n.25 (quoting Hicks Ex. 123 (Judith Teichman, *The World Bank and Policy Reform in Mexico and Argentina*, 46 Latin Am. Politics & Soc'y 39, at 59 (2004))).

> **Defendants' Response:**  Undisputed that the quoted language appears in paragraph 20 and n.25 of Professor Coffee's September 2021 expert report, but disputed that the statement is an accurate characterization of Argentina's economic history or supported by an informed "review[]" of Argentine economic history.  For example, to the extent this statement is meant to characterize circumstances during the period leading up to the IPO, it is inaccurate and disputed.  As Professor Ocampo explains, "Professor Coffee and Mr. Blackett ignore key elements of Argentina's macroeconomy at the time of YPF's IPO in 1993, and thus provide a slanted and incorrect depiction of investment conditions at the time of the IPO.  Across Latin America (and in other emerging and developing economies), the 1990s experienced a period of promise of rapid economic growth from an economic liberalization agenda known as the 'Washington Consensus.'" Giuffra Ex. 83 (Ocampo Rebuttal) ¶ 32; *see generally id.* ¶¶ 33-36; *see also* Hicks Decl. Ex. 49 (Marx Rebuttal) ¶¶ 52-55, 57-63, 64-69, 70-79.  Moreover, Mr. Coffee's testimony on these issues is not properly admissible expert testimony.

23.     In 1989, Carlos Menem was elected the President of Argentina.  Hicks Ex. 50 (Ocampo Dec. 2021 Report for Argentina ¶ 14).

> **Defendants' Response:**  Undisputed, though Defendants dispute that this fact is material to the issues in this case.

24.     He "decided to implement bold initiatives from the very start of his administration to promote private investment and economic modernization, in order to dramatically improve Argentina's economy."  Hicks Ex. 49 (Marx Dec. 2021 Report for YPF ¶ 55).

> **Defendants' Response:**  Undisputed, though Defendants dispute that this fact is material to the issues in this case.

25.     YPF's expert Daniel Marx has explained:  "President Menem put in place a series of economic reforms that dramatically improved the international financial community's perception of Argentina. . . .  Among others, these reforms included removing price controls;

passing (in December 1989) regulations allowing free access to the foreign exchange market; enacting (in August 1989) Law No. 23,696 ('Reforma del Estado' or 'State Reform'), which enumerated a group of state-owned companies, entities or agencies that would be subject to privatization; and enacting (in September 1989) Law No 23,697 ('Emergencia Económica' or 'Economic Emergency'), which, among other things, limited the public sector's spending and, as a result, fiscal deficit."  Hicks Ex. 49 (Marx Dec. 2021 Report for YPF ¶ 53).

>    **Defendants' Response**:  Undisputed, though Defendants dispute that this fact is
>    material to the issues in this case.

26.    In 1993, Argentina offered for sale to private investors a controlling share of YPF. Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶¶ 2, 8, 11); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶¶ 2, 7, 12).

>    **Defendants' Response:**  Undisputed that in 1993 YPF offered for sale to private
>    investors an amount of ADSs and Class D Shares sufficient to grant majority
>    control of YPF to private investors.  Hicks Ex. 3 (YPF Prospectus) at 7; Hicks Ex.
>    103 (YPFEP00000001) at 29-30.

27.    Plaintiffs' expert Richard Blackett opined that, in light of Argentina's "checkered economic past" and "persistent economic ills," private investors were "very skeptical" of Argentina and viewed its economy as "not suitable for foreign investment."  Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶ 19); *see also id.* ¶ 18 (opining that, previously, Argentina had "pursued a policy of import substitution in order to achieve industrial self-sufficiency, even to the point of introducing government-run monopolies in key domestic industries, oil and telecommunications chief among them. . . .  These Government policies also provided an opening for the illicit purchase and sale of import licenses and access to increasingly scarce foreign exchange, given the creation of multiple categories of foreign exchange rates.  Finally, and especially during the regime of Juan Perón, Argentina was characterized by a perception of

excessive regulations . . . ."). He further opined that foreign investors found Argentine investments "to carry a very real risk of the Government enforcing nationalist policies," especially when it came to YPF, which "held a special place in the national psyche" as Argentina's "national energy champion." *Id.* ¶¶ 12, 17.

> **Defendants' Response:** The quoted statements of Mr. Blackett are inaccurate and disputed. In particular, as Harold Sharon opined, Mr. Blackett's "depiction of Argentina prior to the YPF IPO is selective, one-sided and untrue." Giuffra Ex. 85 (Sharon Rebuttal) ¶ 93. As Mr. Sharon explained, "[a]fter poor performances and failures of state-owned enterprises, Argentina and several other emerging market countries undertook massive privatization initiatives in the 1990s, which were viewed positively by investors." *Id.* ¶ 88. At the time of YPF's 1993 IPO, the government found that "it was in Argentina's strategic interests to have YPF run professionally as a profit-maximizing company and for the stock to appreciate over time. The privatization initiative was understood by investors as part of an overall strategy of economic reform, intended to provide the government with a financial cushion while its other fiscal reforms were undertaken." *Id.* ¶ 95. Moreover, Mr. Blackett's testimony on these issues is not properly admissible expert testimony.

28.    Plaintiffs' expert Professor John Coffee opined that, to reassure would-be investors and induce them to purchase shares in a newly privatized YPF, Argentina needed to "transform YPF into an attractive vehicle for foreign investors." Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 3); *see generally* Hicks Ex. 95 (PT_COFFEE_000000033). He further opined that Argentina and YPF undertook a series of "extraordinary steps" to convince foreign investors – including New York Stock Exchange ("NYSE") investors – that YPF would be an attractive and safe investment, despite Argentina's "history of exploiting foreign investors." Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 22).

> **Defendants' Response:** Undisputed that YPF's business underwent fundamental changes in the 1990s prior to the IPO, but Professor Coffee's characterization of the reasons for the changes are inaccurate and disputed. As described by Harold Sharon, at the time of YPF's 1993 IPO, the government found that "it was in Argentina's strategic interests to have YPF run professionally as a profit-maximizing company and for the stock to appreciate over time. The privatization

initiative was understood by investors as part of an overall strategy of economic reform, intended to provide the government with a financial cushion while its other fiscal reforms were undertaken."  Giuffra Ex. 85 (Sharon Rebuttal) ¶ 95. Disputed that Argentina has a "history of exploiting foreign investors," which is a gross generalization and false.  *See generally* Giuffra Ex. 83 (Ocampo Rebuttal). Moreover, Mr. Coffee's testimony on these issues is not properly admissible expert testimony.

29.     Argentina hired prominent American firms like McKinsey & Company, Arthur D. Little, and Andersen Consulting to restructure YPF's management, operations, and information technology.   Hicks Ex. 95 (PT_COFFEE_000000033 at 039-041).    Argentina also hired prominent American investment banks, accountants, and law firms – including Credit Suisse First Boston, Merrill Lynch, Price Waterhouse, Sullivan & Cromwell, White & Case, Andrews & Kurth, and Shearman & Sterling – to oversee the IPO.  Hicks Ex. 73 (AR00053507 at 53510); Hicks Ex. 96 (The World Bank, *Argentine Hydrocarbon Sector Privatization* (1993) (PT_COFFEE_000000182)); Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 24); *see* Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 1, 3); ██████████████████████████ ████████████████████████

**Defendants' Response:**  Undisputed.

30.     Following the IPO, YPF's capital stock would be divided into four classes: Class A shares, which the Argentine Government would own; Class B shares, which Argentine provinces would own; Class C shares, which YPF's employees would be offered; and Class D shares, which would be sold to private investors.  Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 5).

**Defendants' Response:**  Undisputed.

31.     Argentina offered Class D shares in the United States as American Depositary Receipts ("ADRs") listed on the NYSE.  Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 92-96);

Hicks Ex. 78 (AR00092490 at 92492) (explaining that ADRs in YPF "represent[ed] [YPF] Class D Shares").

> **Defendants' Response:** Disputed. Argentina did not "offer[] Class D shares in the United States as [ADRs]." Rather, the offering was for ADSs with "ADRs evidencing ADSs" issued by The Bank of New York as depository, and "[e]ach ADS represent[ing] the rights attributable to one Class D Share deposited under the Deposit Agreement with [a] custodian" in Buenos Aires. Hicks Ex. 3 (YPF Prospectus) at 92.

32.    ADRs are "certificates that represent an ownership interest in foreign securities on deposit with an intermediary." Hicks Ex. 125 (SEC Release No. 33-8287, 81 SEC Docket 28, 28 (Sept. 11, 2003)); *see also* Hicks Ex. 126 (SEC Release No. 33-6894, 48 SEC Docket 1440, 1441 n.5 (May 23, 1991)) (describing an ADR as "the physical certificate that evidences [American Depositary Shares] ADSs"); Hicks Ex. 31 (Lissemore Sept. 2021 Report for Pls. ¶ 9) (an ADR is "a negotiable security" issued by a U.S. depositary bank that evidences an "ownership interest" in an ADS, which, in turn, represents an "interest in shares in a non-U.S. company").

> **Defendants' Response:** The statement is imprecise and disputed. It is undisputed that an ADR is "a negotiable security" issued by a U.S. depositary bank that evidences an "ownership interest" in an ADS, which, in turn, represents an "interest in shares in a non-U.S. company." Giuffra Ex. 24 (Lissemore Opening) ¶ 9.

33.    ADRs allow investors to acquire equity in foreign companies on U.S. stock exchanges and enjoy the protections of the U.S. exchanges and the regulatory oversight of the Securities and Exchange Commission ("SEC"). Hicks Ex. 77 (AR00092403 at 92408). They also "eliminate the need for the U.S. investor to convert dividends paid in a foreign currency into dollars" because the dividends "are collected by the custodian, converted into dollars and transmitted by the depositary to the ADR holders." *Id*. at 92407. ADRs are the "most prevalent form through which foreign corporations list and offer to the public equity securities in the United States." *Id*. at 92406.

**Defendants' Response:**  The statement is imprecise and disputed.  Undisputed that Hicks Ex. 77 reads:  "There are three 'levels' of programs for publicly traded ADRs: Levels 1 and 2 relate to shares already outstanding, while Level 3 relates to a new offering of shares.  Each level involves registration requirements of varying complexity and in some cases, also subjects the issuer to ongoing SEC reporting requirements.  Any issuer wishing to establish an ADR program must comply with the U.S. securities laws."  Hicks Ex. 77 (AR00092403) at -92408.  Disputed that dividends paid to ADR holders are always converted into dollars by the depository, whose obligations may vary according to the relevant deposit agreement and requirements of foreign or U.S. law.  For example, the YPF Prospectus reads:  "Subject to any restrictions imposed by Argentine laws, regulations or applicable permits issued by any Argentine governmental bodies, the Depositary is required, to the extent that in its judgment it can convert Argentine pesos (or any other foreign currency) on a reasonable basis into dollars and transfer the resulting dollars to the United States, to convert all cash dividends and other cash distributions which it receives on the underlying Deposited Securities into dollars, and to distribute the amount thus received, net of any expenses incurred by the Depositary in connection with conversion, to the holders of ADRs in proportion to the number of ADSs representing such Class D Shares held by each of them. The amount distributed will be reduced by any amounts required to be withheld by the Company or the Depositary on account of taxes.  See 'Taxation'. If the Depositary determines in its judgment that any foreign currency received by it cannot be converted on a reasonable basis and transferred to the United States, the Depositary may distribute the foreign currency received by it or, at its discretion, hold such foreign currency, uninvested and without liability for interest thereon, for the respective accounts of the holders of ADRs entitled to receive the same." Hicks Ex. 3 (YPF Prospectus) at 93.

34.     Argentina and YPF entered into a deposit agreement with Bank of New York Mellon, whose New York office would administer the ADRs and serve as YPF's depositary agent.  Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 92).  YPF's ADRs were priced in U.S. Dollars, and the deposit agreement required Bank of New York Mellon to make distributions to NYSE investors in U.S. Dollars.  *Id*. at 93.  The United States banking system is not capable of distributing foreign currency to ADR holders.  ████████████████████████████ ;

Hicks Ex. 32 (Lissemore Jan. 2022 Report for Pls. ¶ 17).

**Defendants' Response:**  Disputed that Argentina entered into the referenced YPF deposit agreement.  Undisputed that YPF, the Bank of New York Mellon and "the holders from time to time of ADRs" entered into a deposit agreement, with the

Bank of New York as depository, and the custodian the Bank of New York, S.A. in Buenos Aires.  Hicks Ex. 3 (YPF Prospectus) at 92-93.  Undisputed that the YPF ADRs were priced in U.S. Dollars.  Disputed that Bank of New York Mellon was required to make distributions to NYSE investors in U.S. Dollars, and that the United States banking system is not capable of distributing foreign currency to ADR holders.  For example, the YPF Prospectus provides:  "If the Depository determines in its judgment that any foreign currency received by it cannot be converted on a reasonable basis and transferred to the United States, the Depositary may distribute the foreign currency received by it."  Hicks Ex. 3 (YPF Prospectus) at 93; *see also* Ex. _ (Deposit Agreement) at 15.

35.     Argentina and YPF amended YPF's Bylaws before YPF's 1993 IPO.  Hicks Ex. 102 (YPF Form 6-K, Nov. 18, 1998 (PT_COFFEE_000000808));  Hicks Ex. 111 (Executive Order 1106/1993 (AR00009259)) (May 31, 1993 Argentine decree approving the amended YPF Bylaws).

**Defendants' Response:**  The statement is disputed as written.  The YPF Bylaws were amended before YPF's 1993 IPO pursuant to a vote of YPF's shareholders.  Argentine Executive Decree 1106/1993 approved the draft text of the YPF Bylaws and instructed the Ministry of Economy to submit the proposed text for approval at the next YPF shareholders' meeting.  *See* Hicks Ex. 111 (Decree 1106/93) at Art. 1.

36.     Specifically, when Argentina privatized YPF, it adopted two amendments to YPF's Bylaws, Sections 7 and 28.  *See* Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) §§ 7, 28);  Hicks Ex. 4 (AR00013654 at 13661, 13694) (June 28, 1993 Prospectus for YPF's public offer of 35,000,000 shares published on the Buenos Aires Stock Exchange Bulletin); Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 12-13);  Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 16);  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 16).

**Defendants' Response:**  Disputed that the two amendments to Sections 7 and 28 (at the time, numbered Section 35) were the only changes or amendments made to the YPF Bylaws in connection with the privatization.  Rather, in connection with YPF's privatization, YPF adopted restated Bylaws that contained a number of amendments throughout.  *See generally* Ex. 101 (Bylaws attached to Decree 1106/93); Ex. 118 (Bylaws attached to Decree 2778/90).

37.   Under Section 7(d) of the Bylaws, it "shall be forbidden" for a shareholder to acquire at least 15% of YPF stock – a scenario the Bylaws define as an "acquisition of control" (in Spanish, *adquisiciones de control*) – without complying with Sections 7(e) and 7(f) of the Bylaws.  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(d)); Hicks Ex. 2 (AR000018934 (YPF Bylaws in Spanish) § 7(d)).  The pertinent language of Section 7(d) provides:

> If the terms of subsections e) and f) of this section are not complied with, it shall be forbidden to acquire shares or securities of [YPF], whether directly or indirectly, by any means or instrument . . . if, as a result of such acquisition, the purchaser becomes the holder of, or exercises the control of, class D shares of stock of [YPF] which, in addition to its prior holdings of such class (if any), represent, in the aggregate, FIFTEEN PERCENT (15%) or more of the capital stock, or TWENTY PERCENT (20%) or more of the outstanding class D shares of stock, if the shares representing such TWENTY PERCENT (20%) constitute, at the same time, less than FIFTEEN PERCENT (15%) of the capital stock.

Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(d)).

> **Defendants' Response:**  The characterization of Section 7(d) of the Bylaws is a legal conclusion and disputed.  It is undisputed that the translation of Section 7(d) of the Bylaws is as follows:
>
> > Takeover: If the terms of subsections e) and f) of this section are not complied with, it shall be forbidden to acquire shares or securities of the Corporation, whether directly or indirectly, by any means or instrument (including within the meaning of the term "securities", without limitation, debentures, corporate bonds and stock coupons) convertible into shares if, as a result of such acquisition, the purchaser becomes the holder of, or exercises the control of, class D shares of stock of the Corporation which, in addition to its prior holdings of such class (if any), represent, in the aggregate, FIFTEEN PERCENT (15%) or more of the capital stock, or TWENTY PERCENT (20%) or more of the outstanding class D shares of stock, if the shares representing such TWENTY PERCENT (20%) constitute, at the same time, less than FIFTEEN PERCENT (15%) of the capital stock.
> >
> > Notwithstanding the foregoing: (i) acquisitions by the person already holding, or the person already exercising control of, shares representing more than FIFTY PERCENT (50%) of the capital stock shall be excluded from the provisions of subsections e) and f) of this section; and (ii) any subsequent acquisitions by any person already holding, or any person

-17-

already exercising the control of, shares representing FIFTEEN PERCENT (15%) or more of the capital stock, or TWENTY PERCENT (20%) or more of outstanding Class D shares, if the shares representing such TWENTY PERCENT (20%) constitute, at the same time, less than FIFTEEN PERCENT (15%) of the capital stock, provided the shares the purchaser already holds or becomes a holder of (including the shares it held prior to the acquisition and those it acquired by virtue thereof) do not exceed FIFTY PERCENT (50%) of the capital stock, shall be excluded from the provisions of subsection e) paragraph (ii) and subsection f) of this section.

Acquisitions referred to in this subsection d) are called "Takeovers".

Hicks Ex. 1 (YPF Bylaws) § 7(d).

38.     Sections 7(e) and 7(f) require shareholders who wish to acquire control of the shares to comply with certain obligations, including making a tender offer before taking control and adhering to any "additional or stricter requirements" imposed by the Governments and stock exchanges where YPF's shares are listed.  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(e)) (person "wishing" to make an "acquisition of" control ('*Adquisicion de Control*') shall make a tender offer ('*oferta publica de adquisicion*') for all shares of all classes of YPF); Hicks Ex. 2 (AR000018934 (YPF Bylaws in Spanish) § 7(e)); Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)) (the tender offer must be carried out in accordance with "regulations in the jurisdictions where the takeover bid takes place and the provisions of the stock exchanges where the Corporation's shares and securities are listed [to the extent they] impose additional or stricter requirements than the ones provided hereunder"); *id.* § 7(f)(i) (the acquiring party "shall notify [YPF] in writing about the takeover bid at least fifteen business days in advance to the starting date thereof"); *id.* § 7(f)(vii) (the tender offer must remain open for "a minimum term of TWENTY (20) days and a maximum term of THIRTY (30) days" from the date the bid is authorized by the Comisión Nacional de Valores de Argentina ("CNV"), Argentina's securities regulator); *id.* § 7(f)(ix) (control is to be taken "once th[e] [tender-offer] procedure has

-18-

finished").  Section 7(f)(i)(F) requires a tender offer to be made to "all shareholders and holders

of securities convertible into shares of stock."  *Id.* § 7(f)(i)(F).

> **Defendants' Response:**  The characterization of Sections 7(e) and 7(f) of the Bylaws are legal conclusions and are disputed. Among other things, Sections 7(e) and 7(f) do not impose requirements on shareholders, but on "[t]he person wishing to a Takeover [sic]," who is defined as "the Bidder."  "Takeover" in turn is a defined term in Section 7(d) that refers to "acquisitions" of certain percentages of YPF's capital stock.  Hicks Ex. 1 (YPF Bylaws) § 7(e) ("The person wishing to [conduct] a Takeover (hereinafter called 'the Bidder') . . . ."); *id.* § 7(f) (titled "Takeover Bid" and governing "[e]ach takeover bid").  Under Section 7(d), the trigger for a Takeover is not "control" of shares but an "acquisition."  Section 7(d) only refers to control "as a result of [an] acquisition."  Hicks Ex. 1 (YPF Bylaws) § 7(d) ("[I]t shall be forbidden to acquire shares or securities of the Corporation . . . if, as a result of such acquisition, the purchaser becomes the holder of, or exercises the control of, class D shares of stock of the Corporation . . . .").  As Professor Manóvil explains, control results from the acquisition of legal title.  Manóvil Reply ¶ 32.[5]  Section 7(f) of the Bylaws sets forth the "procedure" applicable to "[e]ach takeover bid," and provides that, with respect to that procedure, "to the extent that applicable regulations in the jurisdictions where the takeover bid takes place and the provisions of the stock exchanges where the Corporation's shares and securities are listed impose additional or stricter requirements than the ones provided hereunder, such additional or stricter requirements shall be complied with in the stock exchanges or markets where they are applicable."  Hicks Ex. 1 (YPF Bylaws) § 7(f).

39.     Section 7(f) requires the acquiring shareholder to offer consideration for each

share at the "highest" amount resulting from four different price provisions.  Hicks Ex. 1 (ECF

No. 36-2 (YPF Bylaws) § 7(f)(v).  The first three formulae provide:

> (A) the highest price per share or security paid by the Bidder, or on behalf thereof, in relation to any acquisition of class D shares of stock or securities convertible into class D shares of stock within the two-year period immediately preceding the notice of Takeover, adjusted as a consequence of any division of shares, stock dividend, subdivision or reclassification affecting or related to class D shares of stock; or

---

[5]      References to Manóvil, Uslenghi, or Santiago "Opening," "Rebuttal," or "Reply" refer to those experts' respective reports accompanying their Declarations filed in support of the Republic's Motion for Summary Judgment (*Petersen* ECF 365, 366, 368).

(B) The highest closing price, at the seller's rate, during the thirty-day period immediately preceding such notice, of a class D share of stock as quoted by the Buenos Aires Stock Exchange, in each case as adjusted as a consequence of any division of shares, stock dividend, subdivision or reclassification affecting or related to class D shares of stock; or

(C) A price per share equal to the market price per class D share of stock determined as stated in paragraph (B) herein multiplied by the ratio between:  (a) the highest price per share paid by the Bidder, or on his behalf, for any class D share of stock, in any share acquisition of this class within the two-year term immediately preceding the notice date indicated in paragraph (i), and (b) the market price for class D share of stock on the day immediately preceding the first day of the two-year period in which the Bidder acquired any type of interest or right in a class D share of stock. In each case the price shall be adjusted taking into account the subsequent division of shares, stock dividend, subdivision or reclassification affecting or related to class D[.]

*Id.* § 7(f)(v)(A)-(C).

**Defendants' Response:**  The preceding statement is a legal conclusion, rather than a statement of fact, and is disputed.  Section 7(f) of the YPF Bylaws provides that "[t]he consideration for each share of stock or security convertible into stock payable to each shareholder or security holder shall be the same, in cash, and shall not be lower than the highest of the following prices of each class D share of stock or security convertible into a class D share . . . [above quoted passage]." Hicks Ex. 1 (YPF Bylaws) § 7(f).

40.    The relevant price provision in this case is the "Formula D" provision, which establishes the per-share consideration as follows:

[YPF's] net income per class D share during the last four complete fiscal quarters immediately preceding the notice date indicated in paragraph (i), multiplied by the higher of the following ratios:  the price/income ratio for that period for class D shares of stock (if any) or the highest price/income ratio for [YPF] during the two-year period immediately preceding the notice date indicated in paragraph (i).  Such multiples shall be determined by applying the regular method used by the financial community for computing and reporting purposes.

Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(D)).

**Defendants' Response:**  Undisputed that Formula D produces higher tender offer prices than Formula B for the alleged damages period.  Giuffra Ex. 102 (Harris Rebuttal) ¶ 39.  Disputed that Plaintiffs are entitled to damages or that the

provisions of Formula D are not subject to Argentine law. Additionally, at the times alleged by Plaintiffs, "Formula D" produces share prices that are economically unreasonable and contrary to Argentine law because they substantially exceed the real value of YPF's shares. *Id.* ¶¶ 28-29; *see also* Manóvil Rebuttal ¶ 143.

41.     Like the other price provisions in Section 7(f), Formula D incorporates a backward-looking formula that considers the market conditions preceding the date that the acquirer notifies the market of its intention to take over the shares. Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(A)-(D)).

> **Defendants' Response:** The characterization of the formulas in Section 7(f)(v)(A)-(D) is vague, imprecise, and disputed. It is undisputed that "Formula D" provides a price in pesos for a given notice date based on certain historical ratios. *See generally* Giuffra Ex. 102 (Harris Rebuttal) ¶¶ 40-47.

42.     Section 7(h) provides that any shares acquired "in breach of" Sections 7(e) and 7(f), including the tender-offer requirement, "shall not grant any right to vote or collect dividends or other distributions that [YPF] may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of [YPF]." Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(h)).

> **Defendants' Response:** Undisputed that Statement 42 contains a partial statement of the provisions of Section 7(h) of the Bylaws. Section 7(h) further provides that the penalties set forth in the Section apply "until such shares of stock are sold, in the case the purchaser has obtained the direct control of YPF, or until the purchaser loses the control of the YPF's parent company, if the takeover has been indirect." Hicks Ex. 1 (YPF Bylaws) § 7(h).

43.     Section 28 of the amended Bylaws is entitled "Provisions applicable to acquisitions by the National Government" ('*Normas especiales para adquisiciones del Estado Nacional*'). Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 28); Hicks Ex. 2 (AR000018934 (YPF Bylaws in Spanish) § 28).

> **Defendants' Response:** Undisputed.

44.    Section 28 provides in part:

> The provisions of subsections e) and f) of Section 7 . . . shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of [YPF], 1) if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of [YPF], which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock; or 2) if the National Government acquires at least 8% of class D outstanding shares of stock, while withholding class A shares of stock amounting at least to 5% of the capital stock . . . .

Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 28(A)).

**Defendants' Response:**  Undisputed.

45.    Section 28(C) provides that the sanctions in Section 7(h) "shall be applied" to Argentina "with no kind of limitation whatsoever," unless "the acquisition in breach of the provisions of Section 7 and [Section 28] has occurred gratuitously," i.e., without intent to exceed the applicable acquisition thresholds, in which case the sanction is limited to "the loss of the right to vote."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 28(C)).

> **Defendants' Response:**    Disputed as an inaccurate paraphrase and misconstruction of Section 28(C) of the YPF Bylaws.  Section 28(C) states that in certain circumstances—where "the acquisition in breach of the provisions of Section 7 and this section has occurred gratuitously or . . . in which the National Government" has not "acted with the intention and purpose of acquiring shares exceeding the established limits, except if, as a consequence of such acquisition, the National Government becomes the owner of, or exercises the control over at least 49% of the capital stock, or over at least 50% of class D shares of stock"—"[t]he penalties provided for in subsection (h) of Section 7 shall be limited . . . to the loss of the right to vote" and "[i]n all other cases, the penalties provided for in subsection h) of Section 7 shall be applied with no kind of limitation whatsoever." Hicks Ex. 1 (YPF Bylaws) § 28(C).

46.    Professor Coffee opined that the protections set forth in amended Sections 7 and 28 of the Bylaws were "clearly designed" "to create a structure that would give U.S. investors (and other investors as well) sufficient assurance that they would invest in the Class D shares"

notwithstanding Argentina's checkered economic past.  Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 34).  He further opined that Section 28 gave "special attention to the acquisition of stock (and particularly Class D shares) by Argentina," which was "central to Argentina's and YPF's efforts to convince foreign investors that they could rely on Argentina, despite its long history of prior defaults and frequent disregard for the interests of foreign investors."  *Id*. ¶ 37.  Based on such protections, Professor Coffee opined, foreign investors "could (and did) believe themselves protected against exploitation and expropriation."  *Id*. ¶ 3.

> **Defendants' Response:**  The quoted statements from Professor Coffee are inaccurate and disputed.  The quoted language from paragraphs 34 and 37 of Professor Coffee's report refers to the YPF Bylaws as a whole, not Sections 7 and 28 in particular.  Disputed that the Bylaws were "designed" to provide investors "assurance" in light of Argentina's "economic past," for which Plaintiffs provide no support.  Disputed that Argentina or YPF had to "convince foreign investors that they could rely on Argentina" at the time of the IPO, or that Sections 7 and 28 were "designed" to accomplish that.  Indeed, in the 1990s, "Argentina was flush with foreign investors" and was considered an exciting and desirable market.  Giuffra Ex. 83 (Ocampo Rebuttal) ¶¶ 33, 36; Hicks Decl. Ex. 49 (Marx Rebuttal) ¶¶ 38-39, 74, 77.  Disputed that foreign investors believed that the Bylaws addressed "protection against exploitation and expropriation," which is unsupported.  Professor Coffee's speculation regarding the reasons for adoption of the Bylaws or investor perception of the Bylaws is unsupported and incorrect.  *See generally* Giuffra Ex. 103 (Solomon Rebuttal) ¶¶ 86-100; Giuffra Ex. 85 (Sharon Rebuttal) ¶¶ 66-71.  Moreover, Mr. Coffee's testimony on these issues is not properly admissible expert testimony.

47.    Plaintiffs' expert Professor Daniel R. Fischel opined that the amended Bylaws "provided a method by which shareholders left behind in the event of expropriation by the Argentine Government have the right to be compensated under a preset pricing mechanism."  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 27).  The tender-offer formulae – along with the tender-offer requirement and other obligations and sanctions set forth in the amended Bylaws – served as a "precommitment" by Argentina intended to hinder re-nationalization of YPF, thereby assuring would-be private investors.  *Id.* ¶ 26 ("By requiring Argentina to commit to pay

what could be a very high tender price to minority shareholders if it should decide it wanted to own a controlling stake . . . in YPF again," the Bylaws provided that "the cost of any such future expropriation could be high."  The Bylaws thus "created a means by which to commit to a much lower likelihood of a future . . . expropriation, thereby incentivizing greater private capital investments.").

> **Defendants' Response:**  Professor Fischel's characterization of the Bylaws is disputed and unsupported.  Nothing in the Bylaws stated that they provide "a method" by which "shareholders left behind in the event of an expropriation by the Argentine Government have the right to be compensated," and such a construction of the Bylaws is inconsistent with Argentine law.  *See* Giuffra Ex. 102 (Harris Rebuttal) ¶ 77; *see also* Uslenghi Opening § IV.A.; Santiago Rebuttal § IV.  Additionally, Professor Fischel is incorrect that the tender offer requirement and other obligations set forth in the amended Bylaws served as a "precommitment" by Argentina.  As set forth in the report of Professor Harris, the Bylaws cannot be considered a pre-commitment.  Giuffra Ex. 102 (Harris Rebuttal) ¶ 78; *see generally id.* ¶¶ 74-81.  The incentives or disincentives created by the tender offer provisions do not function as a "precommitment"—among other things, the tender offer price has often failed to meaningfully exceed the prevailing market price, such that the tender offer price formula fails to meet the criteria for a reliable "precommitment" as set forth in the economics literature.  *Id.* at ¶ 78.  Moreover, the Bylaws contain no reference to expropriation.  *Id.* at ¶ 77.

48.     Eric Mindich, the former head of Eton Park, testified that he viewed the tender-offer provisions in the Bylaws as "a right of minority shareholders."  Hicks Ex. 56 (Mindich Tr. 60:18-19).

> **Defendants' Response:**  It is undisputed that Eric Mindich is the former head of Eton Park and that he testified at deposition as quoted.  The quoted testimony presents a legal conclusion that is vague and disputed.

49.     In the Prospectus filed with the SEC in connection with the IPO, Argentina and YPF repeatedly referred to the amended Bylaws, the tender-offer requirement for control transactions generally, and the applicability of that requirement to the Argentine Government

specifically.  Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 12-13).  In particular, the Prospectus stated:

- "The By-laws require that certain acquisitions of shares of [YPF's] capital stock that would result in the acquiror owning or controlling Class D Shares representing the lesser of 15% or more of the outstanding capital stock or 20% or more of the Class D Shares . . . be preceded by a cash tender offer for all outstanding shares."

- "Special rules apply to acquisitions of shares by the Argentine Government while the Argentine Government holds Class A Shares representing at least 5% of the Company's outstanding capital stock as of the date of the final Prospectus."

- "The tender offer provisions mandated by the By-laws . . . could result in an offer price for the Class D Shares substantially in excess of the market price," which "could have the effect of discouraging a change in control by means of a tender offer."

- "Under [YPF's] By-laws, in order to acquire a majority of [YPF's] capital stock or a majority of the Class D Shares, the Argentine Government first would be required to make a cash tender offer to all holders of Class D Shares on specified terms and conditions."

- "Pursuant to the By-laws, (i) each acquisition of shares . . . as a result of which the acquiror, directly or indirectly . . . , would own or control Class D Shares that . . . represent the lesser of (A) 15% or more of the outstanding capital stock or (B) 20% or more of the outstanding Class D Shares . . . must be carried out in accordance with the procedure described [herein]."

- "The threshold levels at which an acquisition of shares by the Argentine Government is deemed to be a Control Acquisition, and the sanctions applicable to Control Acquisitions carried out by the Argentine Government . . . are different than those applicable to acquisitions of shares by other persons."

- "Prior to consummating any Control Acquisition, an Offeror must . . . make a public tender offer for all outstanding shares . . . .  The tender offer must be carried out in accordance with a procedure specified in the By-laws and in accordance with any additional or stricter requirements of jurisdictions, exchanges or markets in which the offer is made or in which the Company's securities are traded."

- "With respect to acquisitions by the Argentine Government deemed to be Control Acquisitions . . . , the required tender offer need only be conducted for all outstanding Class D Shares."

- "Any Control Acquisition carried out by the Argentine Government other than in accordance with the procedure described . . . will result in the suspension of the voting, dividend and other distribution rights of the shares so acquired."

Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 10-11, 80-82).

> **Defendants' Response:**   Disputed that the YPF Prospectus contains statements made by Argentina.   This characterization of the YPF Prospectus is also misleading and inaccurate.   The Prospectus contains certain references to the tender offer provisions of the Bylaws in two sections.   Hicks Ex. 3 (YPF Prospectus) at 12-13; 82-84.   The Prospectus further notes that the description of the Bylaws in the Prospectus is "qualified by reference to the By-laws . . . and by applicable Argentine Law."   *Id*. at 81.   The Prospectus refers to the "Impact of Acquisition Thresholds and Tender Offer Provisions" in a subsection of the Corporate Governance Matters section of the Investment Considerations Section. *Id.* at 12-13.   That subsection states, among other things, that the Bylaws' tender offer provisions are applicable to "certain acquisitions of shares of the Company's capital stock" exceeding certain thresholds, not to "control transactions generally" and that "[s]pecial rules apply to acquisitions of shares by the Argentine Government."   *Id.* at 12.   In the "Description of Capital Stock" section of the Prospectus, the Prospectus describes "Certain Provisions Relating to Acquisitions of Shares" and defines "acquisitions of shares" exceeding certain thresholds as "Control Acquisitions."   That section also contains a subsection describing certain provisions of the Bylaws relating to "[a]cquisitions of shares of the Company's capital stock by the Argentine Government."   *Id.* at 84.   The Prospectus further provides in the Description of Capital Stock Section that:   "The By-laws are governed by Argentine law and any action relating to enforcement of the By-laws or a shareholder's rights thereunder is required to be brought in an Argentine court."   *Id.* at 90.

50.     Plaintiffs' expert Professor Coffee opined that these provisions were critical not only to the success of the IPO but also to ensuring that future investors could purchase with confidence, knowing they were guaranteed a "compensated exit" in the event of a re-nationalization.   Hicks Ex. 26 (Coffee Dec. 2021 Report for Pls. ¶ 3).   He further opined that the "clear purpose" of Argentina's and YPF's amendments to Sections 7 and 28, therefore, was "to cause investors to believe that they were protected, as YPF had utilized the latest, state-of-the-art safeguards used in the United States."   Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 38).

**Defendants' Response:**   The quoted statements from Professor Coffee are inaccurate and disputed.   Disputed that the Bylaws provisions were "critical" to the success of the IPO, or that investors believed they were "guaranteed a 'compensated exit' through the Bylaws "in the event of re-nationalization."   The Bylaws do not mention expropriation or re-nationalization.   Disputed that the purpose of Sections 7 and 28 was to cause investors to believe they were protected by what Professor Coffee refers to as "fair price provisions."   Hicks Ex. 25 (Coffee Opening Report) ¶ 32, 38.   U.S. fair price provisions "were not designed to address expropriation issues or to delineate tender offer mechanics"; they were created to prevent private takeovers "unique to the U.S." market. Giuffra Ex. 103 (Solomon Rebuttal) ¶ 105.   The Bylaws are not "United States" provisions.   *Id.* at § VII.A; *see also* Giuffra Ex. 104 (Solomon Dep. Tr.) at 66:24-67:6; 152:13-153:1.   Moreover, the Bylaws' tender offer provisions were not "critical" to the success of the IPO or "future investors," but were, at most, of "minor importance" to investors in the YPF IPO, as evidenced by the Prospectus, commentary from equity analysts and financial press at the time, and the demand for YPF's IPO.   Giuffra Ex. 85 (Sharon Rebuttal) ¶ 39.   Moreover, Mr. Coffee's testimony on these issues is not properly admissible expert testimony.

51.     Years after the IPO, YPF continued to state publicly that Sections 7 and 28 were "added to" the Bylaws "in contemplation of the 1993 initial public offering of YPF shares," were "modeled after contractual and regulatory provisions that protect the interest of shareholders in listed companies in major international capital markets," and were "designed to ensure fair and equal treatment of shareholders."     Hicks Ex. 102 (Form 6-K, Nov. 18, 1998 (PT_COFFEE_000000808 at 809)).

**Defendants' Response:**   The quoted language from a 1998 6-K is taken out of context and is not relevant or material to the issues in this case.   *See* Hicks Ex. 102 (Form 6-K, Nov. 18, 1998 (PT_COFFEE_000000808)) at 809.   In particular, the 1998 6-K addresses a purchase by Repsol of a 14.99% stake of YPF held by the Government, and states that if Repsol "wished to acquire additional shares (whether from the Government or otherwise), [it] would be required to make a tender offer to all other YPF stockholders to acquire all of their shares, for cash, at a minimum price determined by the charter."   *Id.*   The 1998 6-K does not in any way address or contemplate if or how the Bylaws' tender offer provisions would apply in the context of an intervention, expropriation or re-nationalization of YPF.

52.     Plaintiffs' expert Professor Blackett opined that the protections afforded by the Bylaws were "critical" to the IPO's success; given the historical backdrop and investors'

concerns, Argentina "likely could not have achieved the valuation it did at the time of its IPO, or even completed the IPO itself, without providing prospective investors with protections in the event that Argentina either reverted to a nationalist agenda of maintaining state control or did not protect minority investors from a change-of-control event."  Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶¶ 11, 50).

> **Defendants' Response:**  The quoted statements of Mr. Blackett are inaccurate and disputed.  The Bylaws' tender offer provisions were not "critical" to the success of the IPO and Mr. Blackett has no basis for his assertions regarding YPF's valuation or the completion of the IPO.  Giuffra Ex. 85 (Sharon Rebuttal) ¶ 39.  Analyst reports from the IPO period show the opposite, indicating that the Bylaws were not critical to the success or pricing of the IPO.  *Id.* ¶ 51.  The reports rarely mentioned the tender offer provisions, and of ten initiating coverage reports, only one mentioned the tender offer provisions, and it characterized them as "an investment risk as opposed to a positive consideration for minority shareholders."  *Id.* ¶ 56.  Moreover, Mr. Blackett's testimony on these issues is not properly admissible expert testimony.

53.     Section 7(d) of the Bylaws provides that, if Sections 7(e) and 7(f) are not complied with, it shall "be forbidden to acquire shares or securities of [YPF], whether directly or indirectly, by any means or instrument . . . if, as a result of such acquisition, the purchaser becomes the holder of, or exercises the control of, class D shares of stock of [YPF] which, in addition to its prior holdings of such class (if any), represent, in the aggregate, FIFTEEN PERCENT (15%) or more of the capital stock, or TWENTY PERCENT (20%) or more of the outstanding class D shares of stock."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(d)).  Such acquisitions are called "Takeover[s]."  *Id.*  In turn, Section 7(e) requires any "person wishing to [complete] a Takeover" to "[a]rrange a takeover bid for the acquisition of all the shares of all classes of [YPF]."  *Id.* § 7(e)(ii).  That "takeover bid" must offer to acquire those remaining shares according to a specific process and at a price set by formula in Section 7(f) of the Bylaws. *See id.* § 7(f).

> **Defendants' Response:**  It is undisputed that Statement 53 contains incomplete quotations of Sections 7(d), 7(e) and 7(f).  *See supra* Defendants' Response to Statements 38 and 39 (providing full text of Bylaws provisions).

54.     YPF's 2011 Form 20-F stated that, "[p]rior to consummating any Control Acquisition, an Offeror must obtain the approval of the Class A shares, if any are outstanding, and make a public tender offer for all of our outstanding shares and convertible securities.  The Offeror will be required to provide us with notice of, and certain specified information with respect to, any such tender offer at least fifteen business days prior to the commencement of the offer . . . .  Any such offer must remain open for a minimum of 20 days and a maximum of 30 days following the provision of notice to the shareholders or publication of the offer, plus an additional period of a minimum of five days and a maximum of ten days required by CNV regulations, and shareholders must have the right to withdraw tendered shares at any time up until the close of the offer."  Hicks Ex. 103 (YPFEP00000001 at 184).

> **Defendants' Response:**  Undisputed that Statement 54 includes an incomplete quotation from YPF's 2011 Form 20-F, which states after the quoted passage "[t]he Expropriation Law has not triggered these obligations."  Hicks Ex. 103 (YPFEP00000001) at -00184.

55.     Section 7's tender-offer mechanism applies by its terms to acquisitions of YPF stock by any person or entity.  Section 28 makes clear that the requirements of Section 7 "shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of [YPF]," if, "as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of [YPF], which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 28(A)).

> **Defendants' Response:**  The statement is imprecise and disputed.  Section 28, not Section 7 generally, is the Bylaws "provision[] applicable to acquisitions by

the National Government," and provides that the "provisions of subsections e) and f) of Section 7 (with the sole exception of the provisions of paragraph B of the said Section) shall apply to all acquisitions made by the National Government . . . of shares or securities of [YPF]."  Hicks Ex. 1 (YPF Bylaws) § 28(A).

56.     The requirements of Sections 7 and 28 are triggered by acquisitions of "control" of YPF stock "by any means."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) §§ 7(d), 28(A)).

> **Defendants' Response:**     Disputed.     Sections 7 and 28 are applicable to "acquisitions, whether directly or indirectly, by any means or instrument, of shares or securities of the Corporation."   Section 7(d) provides that the tender offer obligations are triggered by the "acqui[sition]" of YPF shares, "if as a result of such acquisition, the purchaser . . . exercises the control of, class D shares."  As a matter of ordinary meaning, to "acquire" shares means obtaining legal title of the shares.  Manóvil Reply ¶ 30.  Thus, where there is no acquisition, no tender offer is required.   *Id.*   Section 28(A) of the YPF Bylaws contains similar language.  Hicks Ex. 1 (YPF Bylaws) § 28(A) ("The provisions of subsections e) and f) of Section 7 . . . shall apply to all *acquisitions* made by the National Government . . . if, *as a consequence of such acquisition*, the National Government . . . exercises the *control of, the shares*.") (emphasis added).   The phrase "by any means" in Sections 7(d) and 28(A) of the Bylaws indicates that an acquisition can take place by various means (for example, by purchase, donation, or merger), not that the tender offer provisions apply to actions other than "acquisitions."  Manóvil Reply ¶ 33.

57.     Professor Rovira has opined that "Articles 7 and 28 do not turn only on formal stock purchases or transfers of title, but also on the more practical measure of control."  Hicks Ex. 33 (ECF No. 46 (Rovira Decl. for Pls.) ¶ 31).

> **Defendants' Response:**     The quoted statements from Professor Rovira's declaration are incorrect and unsupported by the text of the Bylaws.    As Professor Manóvil explained, "[t]he reference to the exercise of 'control' must be understood as referring to control resulting from ownership of shares."  Manóvil Reply ¶ 32. The Bylaws refer to "acquisitions" that occur "directly or indirectly." Hicks Ex. 1 (YPF Bylaws) §§ 7(d), 28(A).  The Bylaws' definition of "indirectly" in Section 7(i) demonstrates that the Bylaws are directed to "direct or indirect" acquisitions, not to control of management or some other form of control.  *Id.* § 7(i) ("[T]he term 'indirectly' shall include the purchaser's parent companies, the companies controlled by it or that would end up under the control . . . of the Corporation [and] the companies submitted to the common control of the purchaser . . . ."); *see also* Manóvil Reply ¶ 32.

58.     Section 7(h) of the Bylaws provides that the Company must deny the holder of shares acquired in violation of the tender-offer requirement "any right to vote or collect dividends or other distributions" that would otherwise attend to those shares.  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(h)).  As with the tender-offer requirement, Section 28 explicitly applies Section 7(h) to acquisitions by Argentina in violation of the tender-offer requirement.  *Id.* § 28(C).

> **Defendants' Response:**  Disputed that Section 7(h) of the Bylaws places any obligations on the Company.  *See, e.g.*, Goodman Ex. 65 (Kemelmajer Reply) ¶ 10; Goodman Ex. 79 (Manóvil Reply for YPF) ¶ 13.  The text of Section 7(h) reads:  "Shares of stock and securities acquired in breach of the provisions of subsections 7 c) through 7 g), both included, of this section, shall not grant any right to vote or collect dividends or other distributions that the Corporation may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of the Corporation . . . ."  Hicks Ex. 1 (YPF Bylaws) § 7(h).  Under principles of Argentine corporate law, Sections 7(h) and 28(C) operate as exclusive penalty clauses that may be invoked by shareholders in accordance with the procedures available under Argentine law.  Manóvil Opening ¶¶ 105-119.

59.     Argentina and YPF marketed the IPO by undertaking a "roadshow," including in the United States.  Hicks Ex. 99 (Nash, *Crown Jewel*) ("Argentina and its investment bankers First Boston and Merrill Lynch . . . begin the 'roadshow' on Monday for the privatization of the country's industrial crown jewel – the oil company Yacimientos Petroliferos Fiscales, known as Y.P.F.").

> **Defendants' Response:**  It is undisputed that there was a "roadshow" that marketed the IPO to potential investors.  Disputed that this fact is material.  There is no evidence that the tender offer provisions of the Bylaws were referred to in the roadshow.

60.     Through the IPO, Argentina sold 160 million Class D shares of YPF stock – enough to cede majority control of YPF – to private investors.  Hicks Ex. 103 (YPFEP00000001 at 29-30); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 7).

**Defendants' Response:** Undisputed that the cited exhibits reflect sale of stock by Argentina, both through the IPO and other transactions, sufficient to grant majority control of YPF to private investors.

61.     By the spring of 2012, Petersen and Eton Park were the second- and third-largest investors in YPF, respectively.  Hicks Ex. 47 (Harris Dec. 2021 Report for Defs. ¶ 17).

**Defendants' Response:** Undisputed.

62.     From 2008 to 2011, Petersen purchased ADRs representing more than 100 million Class D shares of YPF stock – slightly more than 25% ownership of YPF – in two acquisitions from YPF's then-majority owner, a Spanish oil company called Repsol S.A. ("Repsol").  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶¶ 6, 28); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶¶ 17, 28, 30).

**Defendants' Response:** Disputed that Hicks Exs. 8 and 9 mention 100 million Class D shares or two acquisitions from Repsol.  Undisputed that between 2008 and 2011, Petersen purchased approximately 25% of YPF ADRs from Repsol, which involved more than two transactions.  *See* Giuffra Ex. 33 (YPF Feb. 21, 2008 Schedule 13D) at 9, 11, 15; Giuffra Ex. 41 (YPF May 21, 2008 Schedule 13D) at 5-6.; Giuffra Ex. 38 (YPF May 20, 2011 Schedule 13D/A) at Item 3.

63.     When Petersen's ownership exceeded the 15% threshold specified in Section 7 of YPF's Bylaws (*see supra* ¶¶ 37, 49, 53), Petersen made a tender offer under the Bylaws.  Hicks Ex. 68 (May 21, 2008 Letter from YPF to CNV re Stock Tender Offer by Petersen (AR00019185 at 185-191)).  Petersen priced its tender offer for YPF ADRs in dollars, as Repsol had done previously.   Hicks Ex. 130  (PT_LISSEMORE_000000153 at 163); Hicks Ex. 131 (PT_FISCHEL_000000185 at 186).

**Defendants' Response:** Undisputed that Petersen made a tender offer in May 2008.  Petersen elected (but was not required) to include within that tender offer a direct offer for YPF ADSs priced in U.S. dollars.  In connection with that tender offer, Petersen entered into an agreement with Repsol, which at that time owned 84.14% of YPF's shares, that Repsol would not tender any of its shares in response to the offer.  Giuffra Ex. 107 (YPF Feb. 29, 2008 Form 13-D) at 17.

Additionally, Petersen stated that it was "not anticipated" that any holders of Class A, B, or C would tender their Shares in any proposed tender offers because the outstanding class A shares were held by the Argentine government, the outstanding Class B shares were held by certain Argentine provinces, and the Class C shares formed part of an employee share ownership plan.  Hicks Ex. 78 (AR00092490) at -92495.  This meant that the proposed tender offer was effectively only for the outstanding Class D shares not held by Repsol, which represented less than 0.93% of the total Class D shares and less than 1% of the total share capital of YPF.  As a result, Petersen only ended up acquiring 0.46% additional YPF shares through the tender offer.  Petersen's tender offer was made at a price that represented a premium of approximately 3.9% to the market price on the notice date.  Giuffra Ex. 102 (Harris Rebuttal) ¶ 31.  In addition, on April 24, 2008, the YPF Bylaws were amended in order to allow Petersen to exercise its second purchase option without having to conduct another tender offer.   Giuffra Ex. 108 (April 24, 2008 Meeting Minutes).  The statement "as Repsol had done" is vague and ambiguous in that it does not specify to which acts of Repsol it refers, and is disputed.  To the extent it refers to the pricing of Repsol's tender offer, Repsol elected (but was not required) to include within that tender offer a direct offer for YPF ADRs priced in U.S. dollars.

64.     Most of Petersen's purchases of YPF ADRs were financed through loans.  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 6); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 6).  Petersen did contribute $110.1 million upfront to the purchase.  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) Fifth Affirmative Defense).

> **Defendants' Response:**  Undisputed that substantially all of Petersen's purchases of YPF ADRs were financed through loans.  The statement that "Petersen did contribute $110.1 million upfront to the purchase" is vague and imprecise in that it does not indicate the source of the funds "contribut[ed]" by Petersen to the purchase.

65.     Petersen's loans were secured by a pledge of Petersen's YPF ADRs in favor of the collateral agents designated by the parties, HSBC Bank PLC and Bank of New York Mellon (the "Credit Agreement" and the "Seller Credit Agreement," respectively).  Hicks Ex. 83 (PT_000000608); Hicks Ex. 89 (PT_000012493).

> **Defendants' Response:**  Disputed as an incomplete description of the financing arrangements for Petersen's loans.  For example, in order to acquire YPF ADRs from Repsol in 2008, Petersen borrowed $1,015,000,000 from Repsol and assigned to Repsol the right to collect $201,150,000 in dividends from YPF,

expected to be paid in May 2008.  Giuffra Ex. 37 (YPF Form 20-F for the fiscal year ended Dec. 31, 2011) at 142; Giuffra Ex. 33 (YPF Feb. 21, 2008 Schedule 13D) at 9-11.  Around the time of the 2008 transaction, Petersen and Repsol entered into a shareholders' agreement which provided that both entities "agree[d] to distribute as a dividend ninety percent (90%) of the profit of the Company" on a semi-annual basis and that "the Parties shall vote in favor of the corporate resolutions needed for the Company to distribute a special dividend" of $850,000,000, half to be paid in 2008 and the other half in 2009.  Giuffra Ex. 33 (YPF Feb. 21, 2008 Schedule 13D) at 13, 17 & Ex. 99.4 § 7.3; Manóvil Opening ¶ 20.

66.     Argentina, as YPF's Class A shareholder, approved Petersen's YPF ADR purchases in 2008.  Hicks Ex. 72 (AR00053005); Hicks Ex. 75 (AR00066972 at 66975).

> **Defendants' Response:**  Disputed as imprecise.  Undisputed that the representatives of the National State voted to grant Petersen "the prior consent and authorization to make a public offer for the acquisition of shares of YPF S.A. under the terms . . . submitted to the consideration of the Company on May 20, 2008 . . . in accordance with and within the scope set forth in Article 7 paragraph (c) item (i) of YPF S.A.'s Bylaws."  Hicks Ex. 72 (AR00053005) at 38.

67.     Argentina, as YPF's Class A shareholder, approved Petersen's May 2011 acquisition of YPF ADRs.  Hicks Ex. 67 (AR00013174 at 13175); *see also* Hicks Ex. 71 (AR00050790 at 50792) (Plan Fenix Report noting Argentina "official[ly] consent[ed] [to] the entry of a local partner" in ownership of YPF).

> **Defendants' Response:**  Disputed as imprecise.  Undisputed that the Argentine Ministry of Economy and Production "approved" "[t]he 'Acquisition of Control' under the terms of Article 7(d)(ii) . . . with the scope provided for in YPF S.A.'s Corporate Bylaws."  Hicks Ex. 67 (AR00013174) at -13175.  Disputed that Hicks Ex. 71 is a "Plan Fenix Report" including the above quote.

68.     The Argentine Ministry of Economy and Production approved Petersen's YPF ADR purchases and ordered its representative to support the acquisition on behalf of Argentina in 2008.  Hicks Ex. 63 (AR00009412); Hicks Ex. 66 (AR00012180).  It also did so in 2011. Hicks Ex. 65 (AR00010116); Hicks Ex. 64 (AR00009417).

> **Defendants' Response:**  Disputed as imprecise.  Undisputed that the Argentine Ministry of Economy and Production instructed its representatives to "move and

vote to grant to the shareholder PETERSEN ENERGIA INVERSORA S.A.U., the prior consent and authorization to make a tender offer for the shares of YPF S.A. under the terms of the tender offer submitted to the Company for consideration on May 20, 2008." Hicks Ex. 63 (AR00009412) at -09414. That direction was given "in accordance with, and with the scope set forth in Article 7(e)(i) of YPF S.A.'s Bylaws" and "highlighting that the favorable recommendation" of the Board of Directors "has been taken into consideration." *Id*. In 2011, "the prior approval of the Argentine State to carry out 'Control Acquisition' [was] still in force." Hicks Ex. 65 (AR00010116) at -10117.

69.     Referring to Petersen's acquisition and the attendant entry of Argentine managers of the company, President Cristina Kirchner stated: "[A]s a matter of fact the management of YPF Argentina has changed substantially since the inclusion of an Argentine Partner. . . . [W]hen those who are here in the management are also owners, obviously the management improves, and this happens in Argentina and in any part of the world. Here, the proof of the incorporation, of the successful result of the inclusion of the Argentine Partner, is something that should be mentioned specifically, and should also serve as an example to encourage others to also incorporate Capital, from National Investment." Hicks Ex. 74 (AR00056196 at 56196).

> **Defendants' Response:** Undisputed that the quoted statement appears in Hicks Ex. 74. Defendants dispute that these facts are material to the issues in this case.

70.     ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████     ████████████████

███████████████████████████████████████████

> **Defendants' Response:** ███████████████████████████████████████
> ████████████████████████████

71.     Between November 2010 and March 2012, Eton Park owned American Depositary Shares ("ADSs") "in an amount representing approximately 11.95 million Class D shares of YPF." Hicks Ex. 13 (ECF No. 128 (Engel Decl.) ¶ 2).

> **Defendants' Response:**  Undisputed.

72.    Eton Park did not engage in any acquisition-specific financing to purchase its YPF ADRs.  Hicks Ex. 57 (Misrahi Tr. 23:5-24:12).

> **Defendants' Response:**  Disputed as imprecise.  When asked about his awareness of "any financing arrangements that [] Eton Park entered into in connection with any purchase of [its] YPF shares," Mr. Misrahi testified as to the existence of "pledge agreements as part of [Eton Parks's] overall financing agreements" as well as "particularities for the first [] lot of shares [Eton Park] purchased."  Hicks Ex. 57 (Misrahi Tr.) at 23:10-24:12.

73.    Eton Park recognized the risks involved in investing in an Argentine company but was "reassured by the existence of a minority protection . . . in terms of bylaws."  Hicks Ex. 57 (Misrahi Tr. 66:20-24).   YPF also met Eton Park's investment criteria because YPF had been listed on the NYSE "for a period of time."  *Id.* at 47:16-21.

> **Defendants' Response:**  Disputed as imprecise, misleading and irrelevant.  Mr. Misrahi testified that Eton Park was "reassured by the existence of a minority protection [] package in terms of bylaws and provisions that reassured [Eton Park] of the protection [] against a controlling shareholder."  Hicks Ex. 57 (Misrahi Tr.) at 66:20-24.  Mr. Misrahi also testified that "YPF was not the first time [Eton Park] invested in Argentina with an Argentine company" and they were "familiar with the risks or dynamics of Argentine regulation and law."  *Id.* at 66:3-7.

74.    ███████████████████████████████

███████████████████████████████

> **Defendants' Response:**  Undisputed that in May 2011, YPF reported, with respect to Vaca Muerta, that it had "discover[ed] important resources of shale oil in the neuquina basin."  Giuffra Ex. 109 (May 11, 2011 YPF 6 K) at 3.  This announcement referred to "technically recoverable resources," requiring significant further development and investment.  *Id.* at 1.

75.    Eric Mindich of Eton Park testified that he viewed the discovery of Vaca Muerta as "a large potential driver of value" for its investment in YPF.  Hicks Ex. 56 (Mindich Tr. 103:2-3).

> **Defendants' Response:** Undisputed that Mr. Mindich testified that he viewed Vaca Muerta as "potentially a large driver of value if international partners could be . . . obtained to help develop it." Hicks Ex. 56 (Mindich Tr.) at 103:6-9.

76. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

> **Defendants' Response:** ███████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

77. On January 29, 2012, the Argentine newspaper *Página 12* reported that "[l]egislators" and other front-line government "officials" believed that the Government viewed "the renationalization of YPF" as "an explicit alternative." Hicks Ex. 81 (EP_000016307 at 16307).

> **Defendants' Response:** Undisputed that on January 29, 2012 the Argentine newspaper *Página 12* published a story that contained the quoted language, but the quotations from the article are incomplete and misleading. The article stated that certain unidentified "officials" were debating, among other things, "the renationalization of YPF" to address "monopolistic conduct in the oil sector" including an "uninterrupted decline" in crude oil production that "affected the provinces' finances" and "also left the country more dependent on the importation of hydrocarbons (for refining) and fuels." Hicks Ex. 81 (EP_000016307) at 16307-08.

78. In January and February 2012, Argentina did not make any statement in any communication or filing with the CNV addressing, confirming, or denying the rumors. Hicks Ex. 21 (YPF's Responses to Request for Admission Nos. 63-66); Hicks Ex. 20 (Argentina's Responses to Request for Admission Nos. 61-64).

> **Defendants' Response:** Disputed as misleading and irrelevant. Argentina had no obligation to confirm or deny rumors such as the ones published by *Página 12*. Manóvil Rebuttal ¶¶ 52-54, 56.

79.     On February 21, 2012, Secretary of Energy Daniel Cameron wrote an email to Roberto Baratta, the Argentine Government's appointed member on the YPF Board, with an "analysis" explaining that Argentina "rejected the OPA (Stock Tender Offer)." Hicks Ex. 76 (AR00069033 at 69033). Cameron then explained: "It seems to us that the issue is to move toward an expropriation law, if possible, with the acquisition of a simple majority, and not going after the entire company," and that "before Friday I will have a first draft of the legal grounds proposal and probably the bill itself." *Id*.

> **Defendants' Response:** Disputed as mischaracterizing the documents. The memorandum attached to Daniel Cameron's February 21, 2012 email makes clear that Republic officials considered market acquisition through a tender offer and an expropriation as "different means of accessing the company" that had different legal consequences. Giuffra Ex. 91 (AR00069033) at -69040-41.

80.     The email also attached a memorandum. Hicks Ex. 76 (AR00069033 at 69034). The memorandum discussed "the performance of YPF and its future." *Id.* The memorandum stated that "it is necessary to make some more comprehensive analyses on the hydrocarbons sector in our country, since – in order to achieve change in the situation that accelerates as far as possible some form of rapid self-supply – the issue requires some other decisions regarding the balance with other companies, which we need to attain with respect to self-supply together with a deeper action in relation to YPF." *Id.*

> **Defendants' Response:** Undisputed that Statement 80 quotes part of Hicks Ex. 76, which also reads that a private acquisition plus tender offer and an expropriation were "different means of accessing the company." Giuffra Ex. 91 (AR00069033) at -69040.

81.    The memorandum said "it is necessary to refer to the magnitude of an eventual takeover of the company, as it is presented in YPF's ownership of infrastructure both in the production of hydrocarbons and in the elaboration of fuels, in its own petrochemicals and in its participation in other companies."  Hicks Ex. 76 (AR00069033 at 69038).

> **Defendants' Response:**  Undisputed that Statement 81 quotes part of Hicks Ex. 76, which also reads that a private acquisition plus tender offer and an expropriation were "different means of accessing the company."  Giuffra Ex. 91 (AR00069033) at -69040.

82.    Later in the memo, there is a bolded section entitled, "Let's explore the different forms of accessibility to the company."  Hicks Ex. 76 (AR00069033 at 69040).  The section begins:

> The first possibility of acquiring control of the company would be under the rules of its own bylaws and it implies moving forward with a stock tender offer.  The company has already gone through this when it was taken over by Repsol (when any individual or legal entity acquires more than 3% of the shares, this must be declared, and if the acquisition is more than 15% it will be considered as an attempt to take control, for which it will have to request authorization and then make a Stock Tender Offer, a STO).
>
> . . .
>
> The point is that in YPF's bylaws, which carefully intended at the outset to defend its future minority shareholders, there are takeover mechanisms which have different methodologies of determination, on which the highest value must be set.  This implied that in the Stock Tender Offer that the Petersen Group had to carry out, while the share was worth US$ 38.137 on the stock exchange at the time of the transaction, in the STO it had to bid US$ 49.45, which was the highest calculation according to the methodologies found in its bylaws, i.e. a premium of almost 30%.
>
> . . .
>
> From a reading of the bylaws, it could be estimated that the total value of the company would be between 11 billion and 14.5 billion dollars, assuming that everyone sells and with a premium between 0 and 25% of its price.

*Id.* at 69040-69041.

> **Defendants' Response:**  Undisputed that Statement 81 quotes part of Hicks Ex. 76, but it omits the following:  "Something interesting is that at that time, Grupo Petersen only bought less than half a percent of all YPF shares, despite the huge premium entailed by the price offered; it's clear that that was an agreement Repsol and Grupo Petersen must have made with all of the company's shareholders (it's clear that it could never have gotten together funds to buy the majority of the company at that price).  Moving forward with a transaction like this requires budgetary authorization from Congress.  Subsequent steps are outlined in the Bylaws."  Giuffra Ex. 91 (AR00069033) at -69041.

83.   The memorandum explains that "it is my understanding that this is not the path that will allow us greater possibilities, since the resources that will be necessary to update the investments would have to imply the acquisition of a majority of the shares in a global financial environment that is not simple if we were to add the cost of the purchase, plus the resources that would allow us to increase the investments for a greater production of crude oil and its refining."  Hicks Ex. 76 (AR00069033 at 69041).

> **Defendants' Response:**  Undisputed that Statement 83 quotes part of Hicks Ex. 76.

84.   The memorandum states:  "The only way to go is expropriation."  Hicks Ex. 76 (AR00069033 at 69041) (bold omitted).   The memorandum admits that this option would "probably involve lawsuits."  *Id.* at 69042.

> **Defendants' Response:**  Undisputed that Statement 84 quotes part of Hicks Ex. 76, but it omits the full content of the quoted statements.  Regarding the first sentence of Statement 84, "[t]he only path forward is expropriation" because acquiring YPF shares through a private acquisition and tender offer "isn't the path giving us the best chance, since, among the resources that will be necessary to update investments, acquisition of the majority of the block of shares will have to be assumed amid a complicated international financial environment if we had to add the cost of the purchase, to the funds needed to increase investments designed to raise crude oil production and refinement."  Giuffra Ex. 91 (AR00069033) at -69041.  Regarding the second sentence of Statement 84, the full paragraph reads:  "One preliminary analysis being conducted involves expropriation of just the majority stake, with the company operating as an S.A., which would likely

involve [lawsuits] with the remaining shareholders but would minimize as much as possible the basic investment, maintaining YPF's price on the stock market, giving them the chance to sell their shares; in preliminary discussions, this would be a pertinent issue to agree on with the company's major shareholders, with them even continuing as shareholders." *Id*. at -69042-43.

85.     On February 29, 2012, the *Financial Times* reported that "[m]ounting fears that Cristina Fernández, Argentina's president, could announce greater intervention in Repsol's Argentine subsidiary, YPF, on Thursday at the annual opening of Congress have caused its shares to fall off a cliff, wiping more than $4bn off YPF's value in less than a week."  Hicks Ex. 101 (Jude Webber, *YPF and Repsol shares hit the skids*, Financial Times, Feb. 29, 2012 (PT_COFFEE_000000464 at 464)).

> **Defendants' Response:**  Undisputed that the Financial Times article so reported, but Argentina did not intervene in YPF until April 16, 2012.  *See* Giuffra Ex. 74 (Decree 530/2012).

86.     Between January and April 2012, YPF's share price fell from $35 to less than $15.  Hicks Ex. 51 (Sharon Jan. 2022 Report for Defs. at 13, Fig. 2).

> **Defendants' Response:**  Undisputed.

87.     On February 29, 2012, Ricardo Salmon of Eton Park wrote to Eric Mindich, Edward Misrahi, and Daniel Valdez-Franco:  "By the way, as per the bylaws of YPF if anyone acquires more than 14.9%, it would trigger a mandatory tender for the remaining of the minorities using the max of 4 conditions:  (i) highest price paid by the buyer over the past 2 years – NA; (ii) the highest price over the past 30 days – $36.40; (iii) a price based on the historical p/e over the past 2 years – $42.99 and (iv) the price the day before 2 years if no shares were bought during that period – $40.68."  Hicks Ex. 80 (EP_000006324 at 6325).

> **Defendants' Response:**

███████████████████████████████████████

88.     In February and March 2012, Argentina did not make any statement in any communication or filing with the CNV addressing, confirming, or denying those rumors.  Hicks Ex. 21 (YPF's Responses to Request for Admission Nos. 71-74); Hicks Ex. 20 (Argentina's Responses to Request for Admission Nos. 69-72).

> **Defendants' Response:**  Disputed as misleading and irrelevant.  Also disputed because Statement 88 is vague and ambiguous in that it does not specify the "rumors" to which it refers.  Argentina had no obligation to confirm or deny rumors circulating in the press.  Manóvil Rebuttal ¶¶ 52-54, 56.

89.     On or around March 18, 2012, *Página 12* reported:  "the [N]ational [G]overnment plans on taking control of YPF."  Hicks Ex. 86 (PT_000006866 at 6867).

> **Defendants' Response:**  Undisputed that on March 18, 2012, *Página 12* published an article in which the author stated "el gobierno nacional planea asumir el control de YPF."

90.     In March 2012, YPF's credit rating was "downgraded from BA3 to Ba2."  Hicks Ex. 18 (Argentina's Response to Request for Admission No. 20).

> **Defendants' Response:**  Undisputed that YPF was downgraded from BA3 to Ba2 by Moody's on March 22, 2012.

91.     On March 18, 2012, *Página 12* reported that the Government was planning to assume control of YPF.  Hicks Ex. 21 (YPF's Response to Request for Admission No. 75); Hicks Ex. 20 (Argentina's Response to Request for Admission No. 73).

> **Defendants' Response:**  Undisputed that on March 18, 2012, an article in *Página 12* stated that "el gobierno nacional planea asumir el control de YPF."

92.     Between March 18, 2012 and April 15, 2012, Argentina did not make any statement in any communication or filing with the CNV addressing, confirming, or denying the

statement that appeared in *Página 12*.  Hicks Ex. 21 (YPF's Responses to Request for Admission Nos. 75-78); Hicks Ex. 20 (Argentina's Responses to Request for Admission Nos. 73-76).

> **Defendants' Response:**  Disputed as misleading and irrelevant.  Argentina had no obligation to confirm or deny press reports.  Manovil Rebuttal ¶¶ 52-54, 56.

93.    In April 2012, Moody's downgraded YPF's stock.  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 33); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 33).

> **Defendants' Response:**  Undisputed.

94.    Argentina has admitted it did not make a tender offer for Plaintiffs' shares.  Hicks Ex. 18 (Argentina's Response to Request for Admission No. 25).

> **Defendants' Response:**  Undisputed that Argentina did not make a tender offer.

95.    ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

> **Defendants' Response:** ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████  Disputed that the referenced testimony is material or relevant given that YPF had no obligation or ability to "forbid" the Republic from expropriating Repsol's shares or "direct" the Republic to make a tender offer. *See, e.g.,* Goodman Ex. 65 (Kemelmajer Reply) ¶ 10; Goodman Ex. 34 (Manóvil Reply for YPF) ¶ 13; ████████████████████████████

████████████████████████████████████

96.     YPF's outside counsel also said that "YPF did not take actions" or "enforce obligations" under YPF's Bylaws following Argentina's seizure.  Hicks Ex. 22 (Ltr. from D. Hernandez to A. Goldsmith (Oct. 9, 2020) at 4).

>     **Defendants' Response:**  Disputed as a misleading and inaccurate characterization
>     of the referenced document.  The October 9, 2020 letter from D. Hernandez (then
>     counsel for YPF) to A. Goldsmith (counsel for plaintiffs) states that "it is
>     necessarily true that YPF did not take actions that it did not have the ability to
>     undertake, nor is YPF in the business of trying to enforce obligations it does not
>     believe exist, especially without any basis or obligation to do so."  Hicks Ex. 22
>     (Oct. 9, 2020 letter) at 4.

97.     On April 16, 2012, the Government issued Decree 530/2012, which appointed Julio De Vido, Argentina's then-Minister of Planning, Public Investment, and Services, as the "Intervenor" to exercise the powers of YPF's Board of Directors and President for 30 days (later extended for another 30 days).  Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 35) ("YPF further admits that Decree 530/12 appointed Julio Miguel de Vido as the Intervenor of YPF."); Hicks Ex. 23 (Bianchi Dec. 2021 Report for Pls. ¶ 26); Hicks Ex. 46 (Comadira Sept. 2021 Report for YPF ¶ 17) ("De Vido was ordered to exercise 'the powers conferred on the Board of Directors and/or the President of the Company in the Bylaws of YPF S.A.'").

>     **Defendants' Response**:  Undisputed, except the characterization of Hicks Ex. 46
>     that Julio De Vido was "ordered" to exercise the powers conferred on him by
>     Decree 530/2012 is misleading and disputed.  The text of Decree 530/2012 reads:
>     "In exercise of such position, the appointed Receiver [*Interventor*] *shall have* such
>     powers conferred by YPF S.A. Bylaws to the Board of Directors and/or the
>     President of the company."  Giuffra Ex. 74 (Decree 530/2012) § 3 (emphasis
>     added).

98.     On April 16, 2012, through Decree 530/2012, Argentina also announced formal legislation to expropriate from Repsol 51% of YPF's shares.  Hicks Ex. 108 (Exhibit 11 to Decl. of Martin Domb, ECF No. 27-11, at 5 ("Expropriation Decree") (decree dated April 16, 2012, and describing expropriation bill)); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 35)

(admitting that, "on or about April 16, 2012, President Fernández de Kirchner introduced to the Republic's Congress a bill to declare 51% of YPF's Class D shares to be of public utility and subject to expropriation"); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 35) (admitting that, "on April 16, 2012, Argentina announced that it would expropriate a 51% interest in YPF"); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 36) (admitting that Argentina "temporarily occupied 51% of YPF's Class D shares").

> **Defendants' Response:** Disputed that "through Decree 530/2012, Argentina also announced formal legislation to expropriate from Repsol 51% of YPF's shares." On April 16, 2012, President Fernández de Kirchner submitted a bill to the Argentine Congress (the "Public Interest Bill") that, if enacted, would begin the process of expropriating 51% of YPF's Class D shares from Repsol YPF. Giuffra Ex. 54 (AR00031627) at 39. Also on April 16, 2012, the Argentine Executive Branch issued Decree No. 530/2012 (the "Intervention Decree"), which ordered a 30-day intervention of YPF to "ensure the continuity of the company, the preservation of its assets and its equity, the supply of fuel and to ensure that the country's needs are met." Giuffra Ex. 74 (Decree 530/2012) at 8.

99.     Argentina simultaneously issued Decree 532/2012, which appointed Axel Kicillof, then-Secretary of Economic Policy and Development Planning, as the "Vice-Intervenor" of YPF. Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 38) (YPF "admits that Executive Decree 532/2012 appointed Axel Kicillof to the position of Subintervenor of YPF S.A."); Hicks Ex. 110 (Decree 55/2011) (Dec. 10, 2011 decree appointing Axel Kicillof as Argentina's Secretary of Economic Policy and Development Planning for the Ministry of Economy and Public Finance); *see also* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 22); Hicks Ex. 46 (Comadira Sept. 2021 Report for YPF ¶ 18).

> **Defendants' Response:** Undisputed.

100.    Kicillof stated that, as of April 16, 2012, Argentina managed the operations of YPF. Hicks Ex. 69 (AR00019489 at 19495). The intervention conferred upon the Intervenor the

powers of the Board of Directors and/or the President of the Company (a separate office from the

chief executive officer).  Hicks Ex. 19 (YPF's Responses to Request for Admission Nos. 20-21);

Hicks Ex. 18 (Argentina's Responses to Request for Admission Nos. 21-22).

> **Defendants' Response:**  Disputed that Hicks Exhibit 69 contains the document
> bearing bates number AR00019489.  Also disputed that Mr. Kicillof stated that
> Argentina managed the operations of YPF as of April 16, 2012.  Mr. Kicillof
> stated, in the context of discussing a different company (Aerolíneas Argentinas)
> that an internal audit "can only be carried out by the State when it is in a position
> to manage the company, as is now the case of YPF."  Hicks Ex. 71
> (AR00019489) at -19495.  It is undisputed that pursuant to the Intervention
> Decree, the Intervenor was temporarily granted "such powers conferred by YPF
> S.A. Bylaws to the Board of Directors and/or the President of the company."
> Giuffra Ex. 74 (Decree 530/2012) at 8.

101.



> **Defendants'  Response:**

102.    On April 17, 2012, Kicillof gave public remarks to the Argentine Senate.  In those

remarks, he said, in part:

Look at YPF itself that when it liked the price it produced more, and when after the devaluation it stopped liking the price of crude oil, it did two things:  it asked for an international price in one window and throttled us Argentines in the other.  Poor people!  How can it be only 34 percent?  What is the result of that argument?  Does any senator want to present a bill to expropriate all the companies because he agrees with the content?  Or is it a stupid chicanery that goes nowhere?  What is it?  Is it not enough to expropriate YPF?  And not even YPF, but a part of it, which is the shareholding portion respecting Repsol itself, which is left with a very important share in a huge company.  Besides, this goes to the National Appraisal Court to pay, according to our expropriation law, what ends up being the real cost.  We are not going to pay them what they say, as Mr. Brufau wants:  10 billion dollars.  Where is that?  In the speculation they spread some days ago, when they thought they were going to sell the shares?  In that leonine internal statute that they said that if anyone dared to set foot in the company, like the State itself?  Because believe me, if you wanted to buy shares to enter the company and you went over 15 percent, you stepped in the bear trap and had to buy one hundred percent at a value equivalent to 19 billion dollars.

Because the fools are those who think that the State has to be stupid and buy everything according to the law of YPF itself, respecting its bylaws!  Otherwise, where is the legal security?  Gentlemen, it was a company, they got together and said:  "What can we do so that nobody ever intervenes in the control of the company?"  Maybe the control of the company is sacred, maybe they realized that they had the goose that lays the golden eggs and said:  we are going to make them suffer but nobody can snoop here in the company.

That director we have is because the gold stock disappeared, because now we have a dumb gold stock.  How much do we have?  0.9 percent?

Hicks Ex. 69 (AR00019489 at 19513-19514).

> **Defendants' Response:**  Disputed that Hicks Exhibit 69 contains the document bearing bates number AR00019489.  Undisputed that the quoted language forms part of the record of the remarks (as translated) of Secretary Kicillof on April 17, 2012 in his public statements before the Argentine National Senate Committees on Budget and the Treasury, Constitutional Affairs, and Mining, Energy and Fuels in support of the Public Interest Bill.  *See* Hicks Ex. 71 (AR00019489) at -19513-14.

103.   Kicillof made this statement "in his capacity as Vice-Intervenor of YPF" and also "in his capacity as Secretary of Economic Policy and Development Planning of the Ministry of Economy and Finance."  Hicks Exs. 18, 20 (Argentina's Responses to Request for Admission Nos. 42-44, 58-59); Hicks Ex. 69 (AR00019489 at 19494).

> **Defendants' Response:**  The statement "in his capacity" is vague and imprecise and asserts a legal conclusion that is disputed.  Disputed that Secretary Kicillof made the quoted statement on behalf of YPF.  Goodman Ex. 58 (Manóvil Rebuttal for YPF) ¶¶ 50-53; Goodman Ex. 59 (Comadira Rebuttal) ¶ 21.  Disputed that Hicks Exhibit 69 contains the document bearing bates number AR00019489.

104.   The NYSE suspended trading of YPF's ADRs on April 17, 2012, and trading resumed on April 18, 2012.  Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 37); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 37).

> **Defendants' Response:**  Undisputed.

105.   On May 3, 2012, the Argentine Congress passed Law 26,741 ("Expropriation Law"), which expropriated "fifty-one percent (51%) of the goods of Repsol YPF GAS S.A." Hicks Ex. 112 (AR00109771 at 109772).

> **Defendants' Response:**  Disputed.  Law 26,741 (the "Public Interest Law"), which was passed on May 3, 2012 and became effective on May 7, 2012, declared "fifty-one percent (51%) of equity interest in YPF S.A. represented by the same percentage of Class D shares of the said Company, held by Repsol" to be "of public [utility] and subject to expropriation"—it did not "expropriate" those shares.  Goodman Ex. 15 (Public Interest Law) § 7.  On February 27, 2014, Repsol and the Republic executed a settlement agreement setting out the

-48-

compensation that the Republic would pay to Repsol for the shares subject to expropriation. Manóvil Opening ¶ 52. The expropriation was not completed until May 8, 2014, when the settlement agreement between Repsol and the Republic— whereby the Republic agreed to pay Repsol $5 billion for the shares subject to expropriation—took effect and title over the shares was transferred. *See* Giuffra Ex. 15 (Repsol-Argentina Settlement Agreement); *see also* Giuffra Ex. 66 (YPF Note, dated May 9, 2014) at 4; ███████████████████████████████ Manóvil Opening ¶ 54; Giuffra Ex. 67 (YPF May 9, 2014 6-K).

106.    Section 13 of the Expropriation Law says: "In order to guarantee the continuation of the hydrocarbon exploration, production, industrialization, and refining activities of YPF Sociedad Anónima and Repsol YPF GAS S.A., as well of the transportation, sale and distribution of such hydrocarbons, and an increased inflow of investments, for an adequate supply of the fuels required for the functioning of Argentina's economy in the framework of this Law, from the effective date hereof onwards the Argentine Executive Branch shall, acting through such persons and agencies as it may therefor designate, exercise all rights carried by the stock to be expropriated pursuant to Sections 57 and 59 thereof." Hicks Ex. 112 (AR00109771 at 109772).

> **Defendants' Response:** Disputed as to the translation. *See* Giuffra Ex. 72 (AR00031972) at 5; Goodman Ex. 15 (Public Interest Law) at 6.

107.    Section 15 says: "To carry out their activities, YPF Sociedad Anónima and Repsol YPF GAS S.A. shall continue to operate as open corporations under Article II, Sub-Article V of Law No. 19,550 and related provisions; they shall not be subject to any legislation or administrative regulations governing the administration, management and control of companies or entities in which the Federal State or the Provinces hold an ownership interest." Hicks Ex. 112 (AR00109771 at 109773).

> **Defendants' Response:** Disputed as to the translation. *See* Giuffra Ex. 72 (AR00031972) at 5; Goodman Ex. 15 (Public Interest Law) at 7.

108.    President Fernández de Kirchner signed the bill on May 4, 2012, and the law went into effect on May 7, 2012. Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 35).

**Defendants' Response:**  Undisputed.

109.   Argentina never commenced a tender offer for outstanding shares of YPF capital stock in 2012.  Hicks Ex. 18 (Argentina's Response to Request for Admission No. 25) (admitting that "[a]t no point during 2012 did Argentina commence a tender offer for outstanding shares of YPF capital stock"); Hicks Ex. 19 (YPF's Response to Request for Admission No. 24) ("YPF admits that Argentina did not conduct a tender offer for YPF stock in 2012").

> **Defendants' Response**:  Undisputed, but disputed that the parentheticals contain a complete statement of Defendants' responses to the cited requests for admission.

110.   In March 2014, Kicillof told a legislative committee that, had Argentina "offer[ed] all remaining shareholders a fixed amount per share," as "the bylaws of YPF specified," it would have cost Argentina some "10.671 billion dollars."  Hicks Ex. 121 (Republica Argentina, *Versión Taquigráfica* 31 (Mar. 13, 2014)) (bold omitted).  He further stated that "[t]he buyer was under obligation to offer this price as specified by the Bylaws." Hicks Ex. 122 (Republica Argentina, *Versión Taquigráfica* 52 (Mar. 13, 2014)).

> **Defendants' Response:**  Disputed.  Secretary Kicillof's remarks to the legislative committee on March 13, 2014 referred to the Republic's decision to expropriate 51% of YPF's capital stock that was held by Repsol—as opposed to "**taking [the other] road**" of a market acquisition.  Hicks Ex. 121 (March 13, 2014 Senate Committee Proceedings) at 3 (emphasis in original).  In that context, Secretary Kicillof described the hypothetical alternative path to expropriation as follows: "Let's suppose that, instead of taking this path, the National State would have decided to take control over the Company by following…the rules in the bylaws of YPF. At the time, the bylaws of YPF specified that if someone was going to buy more than 15 percent, it had to offer all remaining shareholders a fixed amount per share… Therefore, the decision to adopt the method to expropriate 51 percent subject was a very wise decision, **because as specified by the laws, by taking this road, what was necessary was to engage in a takeover bid – meaning an offer – at a given price, and this price determined that 51 percent were worth 10.671 billion dollars**."   *Id.* (emphasis in original).  Secretary Kicillof also said, in the context of explaining the conversations that the Executive Branch had with Repsol—YPF's then-majority shareholder—in the lead-up to the intervention, that Repsol "stated that it was not interested in selling

and pointed to [YPF's] bylaws" and that Repsol further said that, in its view, "[t]he buyer was under obligation to offer this price as specified by the Bylaws." Hicks Ex. 122 (March 13, 2014 Senate Committee Proceedings) at 3.

111. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

**Defendants' Response:** ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

112.     Between May and November 2012, the financial institutions that had lent Petersen funds to acquire its YPF shares foreclosed on those shares.  Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 6) (admitting "that Petersen acquired YPF shares in 2008 through a series of loan agreements and that in 2012 creditors foreclosed on Petersen's YPF shares"); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 45) ("Petersen's creditors foreclosed on Petersen's purported YPF shares."); Hicks Ex. 92 (PT_000015271 (June 13, 2012 Credit Suisse letter) at 15271) ("We hereby inform the Borrower that . . . the Collateral Agent was notified of the request of the Lenders to, among other things, use its powers . . . to transfer an amount of Pledged Shares . . . to each of the Lenders as was sufficient to fully pay the Secured Obligations owing to each such Lender."); Hicks Ex. 88 (Nov. 12, 2012 Repsol letter (PT_000007226)); Hicks Ex. 87 (Nov. 12, 2012 Repsol letter (PT_000007120)); Hicks Ex. 85 (May 24, 2012 Credit Suisse letter (PT_000003922)); Hicks Ex. 84 (May 24, 2012 Credit Suisse letter (PT_000003894)); Hicks

Ex. 91 (May 16, 2012 Credit Suisse letter (PT_000015267)); Hicks Ex. 90 (May 11, 2012 Credit

Suisse letter (PT_000015263)).

> **Defendants' Response:**  It is undisputed that between May and November 2012, Petersen's lenders foreclosed on Petersen's YPF ADRs.  Petersen's lenders included Repsol, not only "financial institutions."  *See* Republic's 56.1 Statement ¶¶ 28, 29, 42.

113.    Petersen filed for bankruptcy in Spain in July 2012.  Hicks Ex. 93 (PT_000043270 at

43272) ("Request for the Declaration of Voluntary Bankruptcy"); Hicks Ex. 9 (ECF No. 99 (YPF

Answer) ¶ 46) ("Petersen filed for bankruptcy in Spain"); Hicks Ex. 8 (ECF No. 98 (Argentina

Answer) ¶ 42) ("Petersen entered bankruptcy."); *id.* ¶ 46 (similar).

> **Defendants' Response:**  Undisputed.

114.    Eton Park began selling its YPF ADRs after the expropriation and, by July 2013,

had completely divested from the company.  *See* Hicks Ex. 56 (Mindich Tr. 69:23-70:23)

(testifying that Eton Park sold its entire stake in YPF between when "the expropriation was

announced in April of 2012" and "the end of June 2013, [when] Eton Park no longer held any

shares in YPF").

> **Defendants' Response:**  Undisputed that Eton Park began selling its ADRs in 2012 and by July 2013 had completely divested from the company.  Disputed that Eton Park began selling its YPF ADRS "after the expropriation":  the expropriation was completed in May 2014, by which time Eton Park had sold all of its shares.  *See* Republic's 56.1 Statement ¶¶ 91, 98.

115.    Eton Park chose to sell its shares because it concluded that with the "newly

nationalized company . . . [we were] very likely to perform quite a bit worse."  Hicks Ex. 56

(Mindich Tr. 71:10-13); *see also id.* at 71:15-20 (YPF "was materially impaired by [its] state

ownership," because management would "focus[] on whatever the state's interests were as

opposed to the interest of the minority shareholders"); *id.* at 71:21-72:1 (Argentina had also

"done something that was very, very problematic from the standpoint of international capital markets which also made it . . . much less advisable to own an asset in Argentina").

> **Defendants' Response:** ███████████████████████████████████████████
> ████████████████ Further, the opinions expressed in the quoted testimony of Mr. Mindich are disputed as inaccurate.

116. Defendants' expert Professor Jeffrey Harris and Plaintiffs' expert Daniel R. Fischel agree that Formula D produces higher tender-offer prices for the period at issue in this litigation. Hicks Ex. 47 (Harris Dec. 2021 Report for Defs. ¶ 39); Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. Ex. 2).

> **Defendants' Response:** Use of the word "higher" is imprecise and ambiguous in Statement 116 because it does not specify what the Formula D approach is purportedly "higher" than. Disputed that Defendants' expert Professor Jeffrey Harris agrees with Plaintiffs' expert Daniel R. Fischel as to the calculation of damages, or with Professor Fischel's application of Formula D. Undisputed that Formula D produces higher tender offer prices than Formula B for the period Professor Fischel considers relevant and through May 7, 2012. Giuffra Ex. 102 (Harris Rebuttal) ¶ 39.

117. In calculating damages under Formula D of the Bylaws, Professor Fischel assumed that, had Argentina completed the tender offer on April 16, 2012, the "notice date" would have been February 13, 2012 for purposes of calculating damages. Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 30).

> **Defendants' Response:** Paragraph 117 does not state a material fact, but the assumption of Plaintiffs' expert. To the extent Statement 117 purports to state a fact, it is disputed. In particular, as set forth in the Report of Professor Harris, Professor Fischel's damages calculation is incorrect for multiple reasons, including because of the notice dates used. *See generally* Giuffra Ex. 102 (Harris Rebuttal) ¶¶ 86-91. It is undisputed that Professor Fischel's calculations of damages rely on an erroneous assumption of a notice date "no later than February 13, 2012" based on his "understanding" that a tender offer needed to "have been completed on April 16, 2012," which he states is the date "Defendant [sic]

announced its expropriation and began running YPF."  Hicks Ex. 27 (Fischel Opening) ¶ 30.

118.    Plaintiffs' expert Professor Fischel calculated that the tender-offer price for a notice date of February 13, 2012 would have been $88.35 based on applying Formula D and the applicable peso-dollar exchange rate.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶¶ 34-39 & n.69).

> **Defendants' Response:**  Disputed.  Professor Fischel's calculations of damages are incorrect and disputed.  *See generally* Giuffra Ex. 102 (Harris Rebuttal) ¶¶ 86-87 (pointing out that Professor Fischel's February 13, 2012 notice date is incorrect and that he has also incorrectly calculated damages for multiple reasons, including his use of the wrong currency and incorrect ratios).

119.    According to Plaintiffs' expert Professor Fischel, Petersen suffered $7.533 billion in direct damages and Eton Park suffered $898 million in direct damages.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶¶ 40-41) (explaining that, once the tender-offer price is determined, Plaintiffs' damages are simply the difference between what they would have received for their shares in a tender offer and the value they retained after Argentina failed to tender); *id.* ¶ 41 n.73 (explaining that trading in YPF's shares was halted on April 17, 2012 due to the seizure and thus the latter figure is the closing share price of YPF's shares on April 18, 2012, the next trading day after the Government's takeover); *see also* Hicks Ex. 28 (Fischel Jan. 2022 Report for Pls. Exs. R1, R2) (explaining damages calculations, including Professor Fischel's subtraction of the small dividends that Plaintiffs received on some of their shares after the expropriation).

> **Defendants' Response:**  Disputed.  Professor Fischel's calculations of damages are incorrect and disputed.  *See generally* Giuffra Ex. 102 (Harris Rebuttal).

120.    Professor Fischel also calculated that Petersen suffered $156 million in lost value of its shares between the expropriation on April 16, 2012 and its creditors' foreclosure.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 49).

> **Defendants' Response:** Disputed. Professor Fischel's calculation that "Petersen suffered $156 million in lost value" is incorrect and disputed. *See* Giuffra Ex. 102 (Harris Rebuttal) ¶ 102. Disputed that the expropriation took place on April 16, 2012; no shares were expropriated until May 8, 2014. *See supra* Defendants' Response to Statement 105. Disputed that Defendants are liable for any damages resulting from the foreclosure of Petersen's shares.

121. New York's 9% prejudgment interest rate generates $6.405 billion in prejudgment interest on the tender offer that Petersen should have received and $763 million on the tender offer that Eton Park should have received through September 24, 2021, with prejudgment interest continuing to accrue thereafter. Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶¶ 44-47); Hicks Ex. 28 (Fischel Jan. 2022 Report for Pls. Exs. R1, R2).

> **Defendants' Response:** Disputed. Professor Fischel's calculation of damages, including prejudgment interest, is incorrect and disputed. *See supra* Defendants' Responses to Statements 116-119. Additionally, the New York prejudgment interest rate is not applicable. *Schwartz* v. *Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) ("Under New York choice of law principles, the allowance of prejudgment interest is controlled by the law of the state whose law determined liability on the main claim.") (quoting *Entron, Inc.* v. *Affiliated FM Ins. Co.*, 749 F.2d 127, 131 (2d Cir. 1984). Additionally, the "tender offer" figures in paragraph 121 are not accurate calculations of Petersen and Eton Park's damages, even assuming liability. *See generally* Giuffra Ex. 102 (Harris Rebuttal).

122. The additional $156 million Petersen lost as a result of the drop in value of its shares generates prejudgment interest of $133 million through September 24, 2021, with prejudgment interest continuing to accrue thereafter. Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 49).

> **Defendants' Response:** Disputed. Professor Fischel's calculation of damages from the alleged "drop in value" of Petersen's ADRs, including prejudgment interest, is incorrect and disputed. *See supra* Defendants' Response to Statement 120. Additionally, the New York prejudgment interest rate is not applicable. *Schwartz* v. *Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) ("Under New York choice of law principles, the allowance of prejudgment interest is controlled by the law of the state whose law determined liability on the main claim.") (quoting *Entron*, 749 F.2d at 131).

123.    On May 15, 2012, Repsol filed a putative class action – under which Plaintiffs were class members – against Argentina in the Southern District of New York for breaching Sections 7 and 28 of the Bylaws.  *See* Hicks Ex. 16 (Compl., *Repsol v. Republic of Argentina*, No. 12-cv-03877-LAP, ECF No. 1 (S.D.N.Y. filed May 15, 2012)); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 48).

> **Defendants' Response:**   Disputed that Plaintiffs were "class members" in Repsol's putative class action.  No class was ever certified.  It is undisputed that, among other actions filed by Repsol, Repsol filed a putative class action in the Southern District of New York in case No. 12-cv-03877-LAP, and the proposed class definition included "all record or beneficial holders of Class D shares of YPF stock, either directly or through ADRs, who held at the time of Argentina's breach and repudiation of its tender offer obligations, and who were damaged thereby."  Hicks Ex. 16 (12-cv-03877-LAP Complaint) ¶ 44.

124.    Repsol settled individually with Argentina on May 9, 2014, before the class had been certified, and, pursuant to the terms of that agreement, Repsol agreed to discontinue the action with prejudice.  Hicks Ex. 17 (Stipulation of Voluntary Dismissal, *Repsol v. Republic of Argentina*, No. 12-cv-03877, ECF No. 31 (S.D.N.Y. filed May 9, 2014)); Hicks Ex. 109 (ECF No. 269-5 (Settlement Agreement)); Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 48); Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 48); Hicks Ex. 46 (Comadira Sept. 2021 Report for YPF ¶ 31) (discussing Repsol's obligations to abandon any claims it had against Argentina).

> **Defendants' Response:**   Undisputed that a stipulation was filed in case No. 12-cv-03877-LAP on May 9, 2014, in which the parties agreed "that the above-captioned case be, and hereby is, dismissed with prejudice."  Hicks Ex. 17 (May 9, 2014 Stipulation).  This stipulation was filed as a result of the global settlement effective as of May 8, 2014 between Repsol and the Republic in which both agreed to "the transfer to the ARGENTINE REPUBLIC of the shares subject to expropriation and the concession to REPSOL of the right to obtain from the ARGENTINE REPUBLIC a single, lump-sum payment . . . . of FIVE BILLION DOLLARS (USD 5,000,000,000.00) as compensation for the expropriation of 200,589,525 Class 'D' shares of YPF."  Giuffra Ex. 15 (Repsol-Argentina Settlement Agreement) at 5, 7.  After receiving the compensation from the Republic, Repsol agreed that it was "obligated to abandon the right and all extra-

judicial, judicial and/or arbitral actions and claims for any GROUNDS PRIOR to the AGREEMENT that it has commenced against the ARGENTINE REPUBLIC and/or its RELATED PERSONS and against YPF and YPF GAS and/or their RELATED PERSONS, both in the Argentine Republic and abroad or internationally, based on domestic or international law, arising from or connected to: the issuance and implementation of Decree Nos. 530/2012, 532/2012, 557/2012 and 732/2012; of Law No. 26,741 and the supplemental rules and acts in enforcement thereof." *Id.* at 11.

125.    Argentina reportedly paid Repsol $5 billion.  Hicks Ex. 124 (Stanley Reed & Raphael Minder, *Repsol in $5 Billion Settlement With Argentina*, N.Y. Times, Feb. 25, 2014; *see also* Hicks Ex. 120 (Alex Kicillof, *Dialogos Sin Corbata* 195 (2015)) (Kicillof acknowledging that Repsol "ended up collecting five billion" dollars); ███████████████████████

████████████████████████████████████████████████████████████

████

**Defendants' Response:**  Undisputed that Argentina paid Repsol $5 billion as compensation for Repsol's expropriated YPF shares, which were then transferred to Argentina on May 8, 2014, and other consideration pursuant to the terms of the settlement agreement between Repsol and the Republic.  *See* Giuffra Ex. 15 (Repsol-Argentina Settlement Agreement).

126.    On February 27, 2014, Repsol also entered into a separate settlement agreement with YPF.  Hicks Ex. 46 (Comadira Sept. 2021 Report for YPF ¶ 32) (discussing Repsol's obligations to abandon any claims it had against YPF).

**Defendants' Response:**  Undisputed.

Dated:  May 26, 2022          Respectfully submitted,

/s/ *Robert J. Giuffra, Jr*

Robert J. Giuffra, Jr.
Sergio J. Galvis
Amanda F. Davidoff
Thomas C. White
Adam R. Brebner

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:     (212) 558-4000
Facsimile:     (212) 558-3588

*Counsel for the Argentine Republic*


/s/ *Mark P. Goodman*

Mark P. Goodman
Shannon Rose Selden
Dietmar W. Prager
Carl Riehl
Wendy B. Reilly
J. Robert Abraham

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York  10022
Telephone:     (212) 909-6000
Facsimile:     (212) 909-6836

*Counsel for YPF S.A.*