**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

PETERSEN ENERGÍA INVERSORA,   :
S.A.U. and PETERSEN ENERGÍA, S.A.U.,  :
                                :      Case No.:  1:15-CV-02739 (LAP)
        Plaintiffs,        :
                                :
          v.                :
                                :
ARGENTINE REPUBLIC and YPF S.A.,  :
                                :
        Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :
ETON PARK CAPITAL MANAGEMENT,  :
L.P., ETON PARK MASTER FUND, LTD.,  :
and ETON PARK FUND, L.P.,       :
                                :      Case No.:  1:16-CV-08569 (LAP)
        Plaintiffs,        :
                                :
          v.                :
                                :
ARGENTINE REPUBLIC and YPF S.A.,  :
                                :
        Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT


May 26, 2022

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ...........................................................................1

**FACTUAL BACKGROUND** .............................................................................5

    A.    The YPF IPO and Bylaws.............................................................5

    B.    The Republic's Intervention in YPF and Expropriation of Repsol's Shares .........10

    C.    Plaintiffs' Shifting Position on the Timing of Any Required Tender Offer .........13

**ARGUMENT** .................................................................................................16

**I.**    **PLAINTIFFS HAVE NO WAY AROUND THREE INDEPENDENT THRESHOLD BARS TO THEIR CLAIMS.** ...................................17

    A.    Before They Brought Their Claims, Plaintiffs Transferred Their ADRs and Thus Lost Their Contractual Standing to Sue.....................17

    B.    Plaintiffs' New Position that the Bylaws Required a Tender Offer *Before* Intervention Means That Their Claims Are Barred by Sovereign Immunity and the Act-of-State Doctrine. .............18

    C.    Plaintiffs Ignore Basic Principles of Argentine Public Law Recognized By Their Own Experts.............................................21

**II.**    **PLAINTIFFS' BREACH-OF-CONTRACT CLAIM FAILS UNDER ARGENTINE LAW** ...................................................24

    A.    Argentine Corporate Law Provides Exclusive Procedures and Remedies for Breach of Corporate Bylaws—But Plaintiffs Chose Not to Use Them.................25

    B.    Plaintiffs Have Not Shown A Contractual "Breach" Because They Were Not A Party To the YPF Bylaws When the Republic Acquired Repsol's Shares in 2014..............................29

    C.    At A Minimum, Plaintiffs' Damages Claim Cannot Succeed. ............35

        1.    The Bylaws Provide the Exclusive Penalty in the Event of a Breach of the Tender-Offer Provisions .................................35

        2.    Plaintiffs Are Not Entitled to Claim Damages Under Argentine Law ...................................................37

**III.**   **PLAINTIFFS HAVE NO RIGHT TO SUMMARY JUDGMENT ON THEIR INFLATED CLAIM FOR BILLIONS OF DOLLARS IN WINDFALL DAMAGES.** ................................................................................................40

    A.   Any Purported Damages Must be Determined in Pesos and Not Converted to U.S. Dollars Until Judgment is Entered. ...........................................42

        1.   Damages Arising from Foreign Currency Obligations Are Determined in the Foreign Currency and Converted to U.S. Dollars on the Judgment Day. ................................................................42

        2.   Plaintiffs' Attempts to Circumvent the Judgment Day Rule Are Unavailing. ................................................................................44

    B.   Under Argentine Law, Plaintiffs' Windfall Tender-Offer Price Is Invalid. ..........48

    C.   Plaintiffs Improperly Use a February 13, 2012 "Notice Date." ............................50

    D.   Plaintiffs' Implementation of the Bylaws' Tender-Offer Price Formula Is Economically Inappropriate. ..................................................................................51

    E.   Petersen Has No Right to Additional Indirect Damages. ......................................53

    F.   New York's 9% Prejudgment Interest Rate Does Not Apply ................................54

**CONCLUSION** .....................................................................................................................55

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*In re Activision Blizzard, Inc. Stockholder Litig.*,
  124 A.3d 1025 (Del. Ch. 2015)......................................................................................2

*Amnesty Am.* v. *Town of W. Hartford*,
  361 F.3d 113 (2d Cir. 2004)...........................................................................................54

*Arturo Giron Alvarez* v. *Johns Hopkins University*,
  275 F. Supp. 3d 670 (D. Md. 2017)................................................................................27

*Barnet* v. *Ministry of Culture & Sports of the Hellenic Republic*,
  961 F.3d 193 (2d Cir. 2020)...........................................................................................20

*Cassirer* v. *Thyssen-Bornemisza Collection Foundation*,
  2022 WL 1177497 (Apr. 21, 2022) ................................................................................42

*Celestin* v. *Caribbean Air Mail, Inc.*,
  30 F.4th 133 (2d Cir. 2022) ...........................................................................................21

*Comm'ns Imp. Exp. S.A.* v. *Republic of Congo*,
  2020 WL 4040753 (S.D.N.Y. July 17, 2020) ................................................................43

*Competex, S.A.* v. *Labow*,
  613 F. Supp. 332 (S.D.N.Y. 1985), *aff'd* 783 F.2d 333 (2d Cir. 1986)..................................43

*Die Deutsche Bank Filiale Nurnberg* v. *Humphrey*,
  272 U.S. 517 (1926)........................................................................................................47

*Dye* v. *Kopiec*,
  2019 WL 2527218 (S.D.N.Y. May 10, 2019) ................................................................43

*ER Holdings, Inc.* v. *Norton Co.*,
  735 F. Supp. 1094 (D. Mass. 1990) ................................................................................21

*In re Factor VIII or IX Concentrate Blood Products Litig.*,
  531 F.Supp.2d 957 (N.D. Ill. 2008) ................................................................................27

*FDIC* v. *Citibank N.A.*,
  2016 WL 8737356 (S.D.N.Y. Sept. 30, 2016)...............................................................2

*Fed. Republic of Germany* v. *Philipp*,
  141 S. Ct. 703 (2021)......................................................................................................18

*Huminski* v. *Corsones*,
    396 F.3d 53 (2d Cir. 2005)................................................................41

*John Hancock Mut. Life Ins. Co.* v. *Carolina Power & Light Co.*,
    717 F.2d 664 (2d Cir. 1983)...........................................................32

*Kenford Co.* v. *Cty. of Erie*,
    73 N.Y.2d 312 (1989) ......................................................................47

*Petersen Energía Inversora S.A.U.* v. *Argentine Republic*,
    895 F.3d 194 (2d Cir. 2018) (*Petersen II*) ................................ *passim*

*Quantum Tech. Partners II, L.P.* v. *Altman Browning & Co*,
    2009 WL 4826474 (D. Or. Dec. 8, 2009) ..................................25, 26

*Quantum Tech. Partners II, L.P.* v. *Altman Browning & Co.*,
    436 F. App'x 792 (9th Cir. 2011) .................................................16

*Saudi Arabia* v. *Nelson*,
    507 U.S. 349 (1993).....................................................................18, 20

*Schwartz* v. *Liberty Mut. Ins. Co.*,
    539 F.3d 135 (2d Cir. 2008)...........................................................54

*Schwimmer* v. *Allstate Ins. Co.*,
    176 F.3d 648 (2d Cir. 1999)...........................................................54

*Vishipco Line* v. *Chase Manhattan Bank, N.A.*,
    660 F.2d 854 (2d Cir. 1981)...........................................................42

*W.S. Kirkpatrick & Co.* v. *Envtl. Tectonics Corp., Int'l*,
    493 U.S. 400 (1990)........................................................................20

*Weiss* v. *La Suisse, Societe D'Assurance Sur La Vie*,
    293 F. Supp. 2d 397 (S.D.N.Y. 2003)............................................43

*Westheimer Mall, LLC* v. *Okun*,
    2008 WL 3891257 (S.D.N.Y. Aug. 21, 2008) ...............................41

## ARGENTINE LAWS

Argentine Civil Code ............................................................................................................ *passim*

Argentine General Companies Law ........................................................................................ *passim*

Law No. 21,499 (General Expropriation Law) ................................................................21, 22, 23

Law No. 26,741 (Public Interest Law) .................................................................................. *passim*

Law No. 27,591 ..................................................................................................................40

## OTHER AUTHORITIES

28 U.S.C. § 1605(a) ...........................................................................................................18

N.Y. Jud. § 27(b)...........................................................................................................42, 43

## PRELIMINARY STATEMENT

Plaintiffs' motion calls this suit "as straightforward a breach-of-contract case as they come." (Pls.' Br. 38.)[1]  It is not.  Plaintiffs are seeking billions of dollars from a foreign government, based on sovereign acts relating to the partial expropriation of a key Argentine energy company.  In doing so, Plaintiffs press legal theories that have never before been recognized under Argentine law.  And Plaintiffs pursue their novel claims despite having transferred any security interest—and thus the right to bring any breach-of-corporate-bylaws claim—before bringing this suit.  If anything is "straightforward," it is that Plaintiffs' unprecedented suit cannot proceed.

Glossing over those fatal legal flaws, Plaintiffs instead seek refuge in (highly disputed) facts.  They assert that a tender-offer provision in YPF's Bylaws was an "extraordinary" "promise" by Argentina's government in 1993 that induced foreign investment in YPF.  That promise, Plaintiffs further assert, barred future Argentine administrations from exercising any control over YPF management, or even beginning an expropriation process, without first conducting a tender offer for *all* outstanding YPF shares.  (Pls.' Br. 1–3, 38–39.)  Yet despite enormous amounts of discovery, Plaintiffs have not uncovered any evidence that the Bylaws' tender-offer provision persuaded *anyone* to invest in YPF; indeed, the evidence is to the contrary.  And in all events, the factual dispute over shareholder expectations is merely a side-show:  the Bylaws do not contain an "extraordinary"—indeed, under Argentine law, impossible—"promise" that the Republic would abstain from any future involvement unless it first made a tender offer to all shareholders.

On the relevant undisputed facts and clear principles of Argentine law, this Court should reject Plaintiffs' claims (and grant Defendants' cross-motions for summary judgment) for at least six reasons:

---

[1]      References to "Pls.' Br." are to "Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment."  (*Petersen*, ECF No. 375; *Eton Park*, ECF No. 305.)

*First*, Plaintiffs lack contractual standing to bring a claim for a breach of the YPF Bylaws. As Plaintiffs admit, they transferred their ADRs in 2012 and 2013, before bringing this suit.  Under settled New York law—which governs the transfer of ADRs, though not the remaining legal questions in this suit—any claim asserting a breach of corporate bylaws is a "right[] in the security" that traveled with the ADRs when they were transferred.  *FDIC* v. *Citibank N.A.*, 2016 WL 8737356, at *4 (S.D.N.Y. Sept. 30, 2016) (Carter, J.) (citing *In re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025 (Del. Ch. 2015)).  And even if Argentine law applied, it similarly provides that any breach-of-bylaws claims are extinguished when a shareholder transfers its shares.

*Second*, the Foreign Sovereign Immunities Act (FSIA) and the act-of-state doctrine bar this suit.  Although this Court and the Second Circuit previously rejected an FSIA defense, Plaintiffs have done an about-face on one of the premises on which those earlier decisions relied.  Plaintiffs now claim that the Republic breached the Bylaws by failing to conduct a tender offer *before* even commencing the expropriation process.  (Pls.' Br. 33–34.)  At the motion-to-dismiss stage, by contrast, Plaintiffs told this Court (and the Second Circuit) the exact opposite:  that the Bylaws required a tender offer only *after* the expropriation had been completed.  On that understanding of the Bylaws, this Court and the Second Circuit construed any tender-offer requirement as an independent commercial obligation, separate from the expropriation process itself.  But Plaintiffs' current view of the required sequence—which would leave the Republic powerless to intervene in a critical national company or to begin the expropriation process without first engaging in a corporate takeover—would impose a direct constraint on the Republic's sovereign prerogatives.  As a result, this Court must either hold Plaintiffs to their prior position (and reject their claims for the fifth reason discussed below) or reject Plaintiffs' newly formulated claims under the FSIA and the act-of-state doctrine.

*Third*, settled Argentine public-law principles foreclose Plaintiffs' claims.   Under Argentina's Constitution and its General Expropriation Law, private agreements—including corporate bylaws—may not impede or delay a government expropriation or its effects.   And Plaintiffs' new position that the Republic had to make a tender offer *before* beginning the expropriation process obviously would impede or delay that process.   In addition, under Argentine law, the government takes expropriated assets—such as Repsol's YPF shares—free from all legal encumbrances, and the tender-offer obligation qualifies as such an encumbrance.

*Fourth*, Plaintiffs' claims fail under Argentine corporate law.   Plaintiffs criticize Defendants for their "forays into Argentine law," and suggest that the "intricacies of Argentine corporate law" should not trouble the Court.   (Pls.' Br. 39.)   But Argentine law is not some misguided detour:  it indisputably governs Plaintiffs' claims, as YPF's IPO Prospectus made clear and as these sophisticated, well-advised Plaintiffs surely understood when they acquired their ADRs.   Under Argentine law, there is no recognized claim for a "breach of contract" between shareholders, or by a shareholder against a company, for an alleged violation of corporate bylaws. Instead, the Argentine General Companies Law provides a comprehensive remedial system to redress allegations of breaches of bylaws, centered around shareholders' power to introduce and challenge corporate resolutions at shareholders' meetings.   Plaintiffs elected not to pursue the remedies supplied by Argentine law, and this Court should not permit them to circumvent Argentina's detailed remedial scheme.

*Fifth*, Plaintiffs have not demonstrated a cognizable breach of contract because they were not parties to the YPF Bylaws at the time of any "breach."   Plaintiffs assume that the Bylaws' tender-offer provisions kicked in when the Republic first exercised functional control over YPF management in 2012.   But the tender-offer requirement applies only to "acquisitions" of YPF

shares, and the Republic did not acquire Repsol's shares until May 2014—when Plaintiffs no longer held ADRs. As a result, even if that "acquisition" triggered a tender-offer obligation, Plaintiffs would not have benefitted from such a tender offer. Although Plaintiffs suggest that this is a mere "quibble about timing" (Pls.' Br. 38), it is plainly not: the timing of the relevant "acquisition" under the Bylaws determines whether Plaintiffs suffered any breach at all.

*Sixth*, the Bylaws themselves bar Plaintiffs' damages claims. Under black-letter Argentine contract law, "penalties" prescribed in a contract are exclusive. Here, as Plaintiffs acknowledge, the Bylaws provide specific "penalties" for breach of the tender-offer requirements: shares so acquired lose their rights to vote or to collect dividends. The Bylaws do not also authorize a shareholder damages suit. Moreover, even absent the Bylaws' penalty provisions, Argentine law bars a stand-alone claim for damages in a breach-of-contract action if the plaintiff could have sought specific performance, as the Plaintiffs here could have done and failed to do. When the Republic first intervened in YPF in 2012, ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ and did not invoke any of the procedures and potential remedies available under Argentine law. Instead, Petersen washed its hands of YPF; Eton Park did the same. Argentine law does not authorize their belated, freestanding damages claim.

*   *   *

Finally, even putting aside the multiple independent bars to liability, Plaintiffs are not entitled to summary judgment on the billions of dollars in damages they claim. As an initial matter, Plaintiffs' damages calculations presume that they would have been paid in U.S. dollars on the date of the supposedly required tender offer. But the Bylaws provide that any tender offer will be made in Argentine pesos, and under the applicable "judgment-day rule," the conversion from pesos

-4-

into U.S. dollars occurs at the exchange rate prevailing on the date of judgment, not the date of breach.  Setting aside the currency dispute, Plaintiffs base their damages on a tender-offer price that is three times the market value of YPF's shares on the date they claim Argentina should have tendered, and more than 70% higher than the highest price at which YPF's shares had *ever* traded at that point.  Argentine law, however, does not permit recovery of a disproportionate premium on a forced acquisition under corporate bylaws, if that premium far exceeds the "real value" of the securities.  In addition, Plaintiffs make several other errors in their damages calculations, and compound those errors by improperly applying New York's 9% pre-judgment interest rate.  Even if Plaintiffs had viable claims, any damages are, at best, highly disputed and come nowhere close to the billions that Plaintiffs claim.

## FACTUAL BACKGROUND

### A.      The YPF IPO and Bylaws.

Plaintiffs devote the majority of their brief to a false narrative about the YPF IPO. According to Plaintiffs, investors were "very skeptical" of Argentina in the early 1990s, and the Bylaws' tender-offer provisions were therefore "critical" to the IPO because they provided a "guarantee" of a "compensated exit in the event of a re-nationalization."  (Pls.' Br. 6, 13 (internal quotations omitted).)  These characterizations rest solely on the *ipse dixit* of Plaintiffs' experts in American law—Richard Blackett, a former U.S. investment banker, and John Coffee, a professor of U.S. securities law—and are highly disputed.  They are also legally irrelevant.

1.      By the time of the YPF IPO in 1993, investors were eager to invest in Latin America and Argentina.  That investor enthusiasm had nothing to do with any corporate bylaw provisions. Starting in 1989, during the administration of President Carlos Menem, Argentina pursued a policy of privatizing state-owned enterprises across a wide variety of industries including telecommunications, railways, utilities, and banks.  (Giuffra Ex. 83 (Ocampo Rebuttal) ¶ 14; Hicks

Ex. 3 (Prospectus) at 9.)  Over just six years in the 1990s, more than sixty Argentine companies were privatized.  (Giuffra Ex. 83 (Ocampo Rebuttal) ¶ 14.)  This wave of privatizations coincided with a period of rapid economic growth and free-market reforms across Latin America arising from a series of policies promoted by the International Monetary Fund (IMF), the World Bank, and other multilateral groups, known as the "Washington Consensus."  (*Id.* ¶ 32.)  At the time, the international press called Argentina a "model IMF student."  (*Id.* ¶ 33.)

As a result of those reforms, Argentina became one of the largest recipients of foreign direct investment in Latin America.  (*Id.* ¶ 35.)  At the time of the YPF IPO, investors viewed "this as an excellent time to be acquiring shares in Latin America" and believed that the Argentine, Colombian, Mexican, and Brazilian "markets should be particularly promising for equity investors in the next few years."[2]  In general, there was "robust demand" for privatizations and other investment opportunities in Argentina and Latin America.  (Giuffra Ex. 85 (Sharon Rebuttal) ¶ 20(vi).)

The 1993 YPF IPO therefore provided a popular opportunity to invest in an important company in a rapidly growing economy.  There was very strong demand for the securities sold in the IPO, which was oversubscribed and priced near the high end of its target range.  (*Id.* ¶ 74 (citing Nash, Nathaniel C., "Argentina's Oil Company Going Public," *The New York Times*, June 28, 1993).)  Investors understood, however, that the YPF opportunity, like any other in a developing economy, presented risks.  As one contemporaneous article explained, "[i]ndustry analysts are attracted to YPF because both the company and the country are viewed as entities that

---

[2]     Giuffra Ex. 119 (Chris Halverson, "Investors Flock to Latin America As Region's Economies Shape Up," *Christian Science Monitor*, May 2, 1994, available at https://www.csmonitor.com/1994/0502/02082.html.)

have put their economic houses in order and have room to grow," but "investors face inherent risks in a Latin American company such as YPF."[3]

Plaintiffs, by contrast, credit the Bylaws' tender-offer provisions for driving up the pricing of the IPO and demand for YPF's shares (*see* Pls.' Br. 14 (citing Blackett Opening ¶¶ 11, 50). But Plaintiffs provide no evidence, empirical or otherwise, to support their assertions. For example, Plaintiffs quote Mr. Blackett's opinion that YPF "likely could not have achieved the valuation it did at the time of its IPO, or even completed the IPO itself" without the tender-offer provisions, which he characterizes as "providing prospective investors with protections in the event that Argentina … reverted to a nationalist agenda." (*Id.*). Tellingly, Mr. Blackett cites *no contemporaneous evidence* to support this conclusion; it is solely his say-so. Similarly, Professor Coffee, an expert in U.S. securities law, offers unsupported speculation about the importance of the tender-offer provisions, and admitted at his deposition that his factual analysis was premised on little more than Google searches of English-language sources and his own inferences, rather than a review of the record. (Giuffra Ex. 88 (Coffee Deposition Tr.) at 260:14–261:1.)

In reality, the record reveals that the Bylaws' tender-offer provisions were of little to no importance to investors. For example, not a single analyst following YPF at the time of the IPO asserted that the tender-offer provisions of the Bylaws would provide significant protection for minority investors in the event of a future partial expropriation of the company. (Giuffra Ex. 85 (Sharon Rebuttal) ¶¶ 52, 56.) In fact, only 7 of the 2,069 analyst reports covering YPF or Repsol

---

[3]     Giuffra Ex. 87 ("YPF-SA-2: Argentina, Company Seen in Good Order > YPF," *Dow Jones Newswires*, June 29, 1993.); Giuffra Ex. 89 ("Big Argentine IPO Includes Risk Any Way One Wants to Play It," *The Wall Street Journal*, June 25, 1993) (explaining that the IPO presented "political risks" because "[w]hat was once nationalized could be nationalized again, if Latin American politics took a sudden turn back to the left . . . [and] [t]here is always a sovereign-risk issue in these national oil companies"); Giuffra Ex. 90 (Nash, Nathaniel C., "Argentina's Oil Company Going Public," *The New York Times*, June 28, 1993) (similar).

between 1993 and 2012—or 0.3%— *mentioned* the tender-offer provisions, and *not one* referred to these provisions as providing investor protection against government action.  (*Id.* ¶ 62.) Likewise, in the more than 150 press reports regarding the IPO, just two mentioned the Bylaws' tender-offer provisions, and neither of those said anything about the Bylaws protecting against government action.  (*Id.* ¶ 67.)  Similarly, the books and articles discussing the IPO cited by *Plaintiffs'* experts nowhere mention the YPF Bylaws' tender-offer provisions.  (*Id.* ¶ 70.)

Far from being "critical," the Bylaws' tender-offer provisions appear to have been of no particular significance to the success of the IPO.  Plaintiffs have no evidence beyond the conclusory assertions of their experts—zero—that investors in the YPF IPO assigned any importance or value to those provisions.[4]

2.      Plaintiffs' argument that the Bylaws' tender-offer provisions were "central" to the success of the IPO also mischaracterizes the prominence and nature of the contemporaneous disclosures to investors, particularly in the 1993 Prospectus.  The Prospectus, which Plaintiffs heavily rely on in interpreting the Bylaws, did not make the extraordinary promises Plaintiffs now attribute to it.

As an initial matter, the supposedly all-important tender-offer provisions were not mentioned at all in the Prospectus Summary, which served to "highlight[] key information about the company to investors" and "encapsulates the most fundamental information about the company and the offering."  (Giuffra Ex. 85 (Sharon Rebuttal) ¶¶ 20(iii), 41.)  Instead, the Prospectus

---

[4]      Plaintiffs also offer "evidence" of a post-IPO reference to the Bylaws' tender-offer provisions in a YPF 6-K filed in 1998.  (*See* Pls.' Br. 13–14.)  That reference does not support their argument.  The 6-K addressed Repsol's acquisition of shares, and, like the Bylaws and 1993 Prospectus, does not suggest that the tender-offer provisions would apply in the event of a nationalization or would displace Argentine public and corporate law.

Summary provided selected financial and operational data and a summary of YPF's business and operations and its classes of shares, among other things.  (Giuffra Ex. 5 (YPF Prospectus) at 4–8; *see* Giuffra Ex. 85 (Sharon Rebuttal) ¶¶ 40–44.)  It is quite evident that "valuation-related factors, and not tender-offer provisions like those in the YPF Bylaws, were the most critical factors to investors."  (*Id.*¶ 20(iii).)

In the few passages, later in the Prospectus, that do mention the Bylaws' tender-offer provisions, there is *no* representation that the tender-offer provisions provided a "guarantee[]" to investors against the potential risks of "re-nationalization" or a "compensated exit" in the event of future government actions generally.  (Pls' Br. 13.)  To the contrary, the Prospectus made clear what investors already knew—that investment in YPF carried a risk of being adversely affected by "future Argentine Government actions," and that any disputes arising out of the Bylaws would be governed by Argentine law.  For example, the Prospectus cautioned:

> the Argentine Government, like many other governments, still exercises significant influence over many aspects of the Argentine business sector.  Accordingly, it is possible that, as in other countries, ***future Argentine Government actions***, including any related to oil and gas prices, taxation, the ability of producers to export crude oil, gas, and refined products, and foreign investment, ***could have a significant effect on the Company*** and on market conditions, prices and returns on Argentine equity securities, including the Class D Shares represented by ADSs.

(Hicks Ex. 3 (YPF Prospectus) at 9 (emphases added); *see also id.* at 88.)

In any event, Plaintiffs did not purchase their ADRs in the IPO.  There is no evidence that the Petersen Plaintiffs even read the Prospectus or any other YPF offering materials when purchasing their ADRs 15 years later. ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████  The Eskenazis were

sophisticated Argentine investors, advised by Argentine and U.S. counsel, who created their own highly-leveraged, non-recourse deal structure to address the risks the purchase presented.  (*See* Argentina's Opening Br. 7–9, 11.)  Eton Park was likewise a sophisticated investor, and bought ADRs even after rumors of nationalization had been widely published—trading on speculation.

████████████████████████████████████████

Whatever else Plaintiffs were aware of, the Prospectus, the Bylaws, and YPF's public filings with the SEC repeatedly made clear to investors that any dispute arising out of the Bylaws would be governed by Argentine law.  Specifically, YPF's "corporate affairs are governed by [its] bylaws and by Argentine corporate law, which differ from the legal principles that would apply if [it] were incorporated in a jurisdiction in the United States or in other jurisdictions outside Argentina."  (Giuffra Ex. 113 (YPF 2007 Form 20-F) at 21; Giuffra Ex. 114 (YPF 2010 Form 20-F) at 15.)

### B.   The Republic's Intervention in YPF and Expropriation of Repsol's Shares

Plaintiffs assert that Argentina "began a campaign to retake control of YPF" because it saw an opportunity to "augment[]" the "national patrimony" through then-recently discovered oil fields.  (Pls.' Br. 16.)  This, too, misconstrues the record, including the very documents Plaintiffs cite.  As explained in the Republic's brief in support of summary judgment, under Repsol and Petersen's watch, YPF's oil and natural-gas production declined dramatically.  (Argentina's Opening Br. 6-9.)  Plaintiffs heavily rely on a single contemporaneous internal email among government officials, but that email confirms that the officials believed YPF's mismanagement was contributing to Argentina's burgeoning energy crisis.  (*See* Giuffra Ex. 91 (Cameron and Kunz Email Correspondence) at AR00069039.)  Specifically, government officials believed that YPF's

"direct lack of investment" and "underinvestment in fields" was contributing to Argentina's inability to meet its domestic energy needs.  (*Id.*)

YPF's underinvestment became particularly problematic from the government's perspective after the discovery of potential resources in the Vaca Muerta shale oil and gas field. According to Plaintiffs, YPF's announcement of the Vaca Muerta discovery provided the "catalyst" for Argentina's "returning to its old ways."  (Pls.' Br. 16.)  Again, Plaintiffs misread the record.   As the evidence demonstrates, the government (and YPF) understood that the unconventional shale oil and gas resources at Vaca Muerta would require massive levels of investment.  (*See* Giuffra Ex. 92 (Mosconi Report) at 79–80.)  This became cause for concern when the government concluded that, under Repsol and Petersen, YPF was not investing sufficiently in Vaca Muerta,  (*id.* at 80-81), and were instead draining YPF's resources through their exploitative dividend policy, under which they caused YPF to distribute at least 90% of its profits in dividends.  (Argentina Opening Br. at 7-8.)

According to Plaintiffs, when the Republic decided to intervene in YPF, it explicitly intended to shirk its obligations under the YPF Bylaws.  That is not so.  (Pls.' Br. 16–17.)  Neither an internal memorandum nor a speech offered by one government official can be considered the binding position of the Argentine government, or determine the meaning of a bylaws provision. In any event, as Plaintiffs' own evidence demonstrates, those Argentine officials believed that the Bylaws' tender-offer provisions did *not* apply to expropriations of shares.  They believed that only a *market* acquisition would trigger the tender-offer requirement, while an expropriation pursuant to a duly enacted law passed by the Argentine Congress, though carrying its own political and legal risks, would not.

In particular, the February 2012 internal memorandum by Argentine Secretary of Energy Daniel Cameron—which Plaintiffs cite extensively as evidence that Argentina decided that it "would not tender"—makes clear that Republic officials considered a market acquisition through a tender offer and an expropriation to be "different" methods of assuming control of the company, each with different legal consequences.  (*See* Giuffra Ex. 91 (Cameron and Kunz Email Correspondence) at AR00069040-AR00069041.)  In this preliminary analysis, the Secretary of Energy ultimately concluded that a tender offer was not feasible for the government and would undermine its objective to revitalize YPF, and that "the only path forward is expropriation."  (*Id.* at AR00069041.)  He then explained that the next step would be to draft legislation to accomplish that sovereign objective pursuant to Argentine law.  (*Id.* at AR00069042.)

The same is true of arguments in a speech that Argentine Secretary of Economic Policy and Development Planning Axel Kicillof gave to committees of the Argentine Senate when debating the proposed Public Interest Bill in Congress.  Secretary Kicillof—speaking as a public official and not as a representative of YPF—stated that the proposed law contemplated only the acquisition of "a part of" YPF ("the share portion respecting Repsol itself"), the calculation of the compensation for which would "go[] to the National Appraisal Tribunal . . . according to our expropriation law," with the payment being "the real cost" for those shares under Argentine law. (Giuffra Ex. 21 (Transcript of Proceedings of the Argentine Senate Committees) at 26.)

Notably, Secretary Kicillof did not advocate that the government repudiate the Bylaws' tender-offer provisions, but instead that it expropriate *only* Repsol's shares, which he understood would not require a tender offer.  (*Id.*)  In particular, the Secretary explained that while the Bylaws created a "bear trap" for acquisitions through market purchases, the government did not need to acquire shares through that procedure because it was empowered to carry out an expropriation with

congressional authorization.  (*Id.*)  The Secretary's statement that the expropriation process was not subject to the Bylaws' tender-offer provision reflected his own (accurate) understanding of Argentine law.  (*See* Uslenghi Opening ¶ 61; Santiago Rebuttal ¶¶ 9–19.)[5]

### C.    Plaintiffs' Shifting Position on the Timing of Any Required Tender Offer

On September 8, 2015, the Republic and YPF moved to dismiss Petersen's claim on the grounds, among others, that the Republic was immune from suit under the FSIA, and that the act-of-state doctrine applied because Petersen's claims challenged the validity of the Republic's sovereign acts of intervention and expropriation.  In response, Petersen initially argued that "[u]nder the bylaws, Argentina was required to *commence* a tender offer when it reacquired control of YPF in April 2012."  *Petersen*, ECF No. 44 at 35 (emphasis added).  In reply, the Republic explained that, "according to Petersen's experts, the bylaws supposedly required the Republic to make a tender offer *before* the President issued and carried out Decree 530/2012 and *before* Congress enacted Law 26,741," which was incompatible with the government's exercise of its sovereign prerogatives.  *Petersen I*, ECF No. 53 at 2 (emphasis in original).

Plaintiffs then shifted position at the hearing on the motion to dismiss.  This Court's first question to Petersen's counsel was directed at "going through the bylaws and figuring out what the timeline would/should be for a tender offer and what triggers what and how it would work." *Petersen I*, ECF No. 61 at 2:13–15.  Apparently recognizing that if the Republic needed to launch a tender offer *before* intervention and before the enactment of the Public Interest Law, Plaintiffs'

---

[5]    The 2014 statement relied upon by Plaintiffs as Mr. Kicillof's remarks to the Argentine Senate Committees on Mining, Energy, and Fuels, and on Budget and Treasury (Pls.' Br. 28 (citing Hicks Decl. Ex. 121) are to the same effect.  That statement described that the government saw two different paths and determined that "the decision to adopt the method to expropriate 51 percent" was preferable as compared to taking the other "road" of a market acquisition and tender offer.

claims would challenge the validity of the expropriation and therefore be barred by the FSIA, Petersen disclaimed any pre-acquisition right to a tender offer. Instead, Petersen's counsel stated that "the tender offer . . . under [the Bylaws] would be made *after* the time the acquirer acquires that percentage of the stock." *Id.* at 4:24–5:6 (emphasis added). Accepting Petersen's position, this Court ruled in its favor on the FSIA and act-of-state doctrine. The Court reasoned that "claims arising out of *subsequent* commercial activity involving expropriated property may fall within the commercial activity exception," and "*once* Argentina expropriated the YPF shares, it assumed certain contractual obligations in the Bylaws" independent of its sovereign acts. *Petersen* ECF No. 63 at 16 (emphasis added).

Defendants then appealed this Court's ruling on sovereign immunity, continuing to argue that if Petersen's claim based on the Bylaws required a tender offer *before*, rather than *after*, the Intervention Decree and Public Interest Law, this lawsuit would necessarily implicate the government's sovereign authority. (*See* Dkt. No. 16-3303 (2d Cir. 2015), ECF No. 61 ("Republic's Second Circuit Br.") at 31.) In response, Petersen again argued strenuously that its claims were entirely separate from any exercise of powers exclusive to the sovereign because "[t]he bylaws do not state or imply that the tender offer *must precede* government acquisition of control." (*See* Dkt. No. 16-3303 (2d Cir. 2015), ECF No. 80 ("Pls.' Second Circuit Br.") at 4 (emphasis added); *see also id.* at 33 ("Regardless of how Argentina acquired its shares, that acquisition triggered Defendants' contractual obligation to tender for the remaining shareholders' shares.").

Based on Petersen's position on the timing of the tender-offer requirement, the Second Circuit affirmed this Court's FSIA ruling. In so doing, the Second Circuit distinguished the timing requirements of Section 28 of the Bylaws—applicable to acquisitions by the Republic—from the

timing requirements of Section 7, which applies to private acquirers.  *Petersen Energía Inversora S.A.U.* v. *Argentine Republic*, 895 F.3d 194, 206–07 (2d Cir. 2018) (*Petersen II*).  As the Second Circuit explained, under its reading of the Bylaws, a private party can only acquire a majority position of YPF *through* a tender offer, whereas "Argentina's acquisition of a control position . . . *merely triggers a separate obligation to make a tender offer*."  *Id.*  at 207 (emphasis added). The Second Circuit concluded that "[u]nder this reading" of the Bylaws, Petersen's lawsuit was "based on Argentina's breach of a commercial obligation" that was "*subsequent*" to and merely "triggered by its sovereign act of expropriation."  *Id.* (emphasis added).  Thus, the court saw "no basis in the record for concluding that Argentina could not have complied with both the [Public Interest Law] and the bylaws' tender-offer requirements by launching a *post-expropriation* tender offer," and held that Petersen's claims against Defendants could go forward under the commercial-activity exception to sovereign immunity.  *Id*. at 209 (emphasis added).

Despite prevailing at the motion-to-dismiss stage by arguing that the Bylaws required only a *separate* tender offer *after* an expropriation, Plaintiffs now take the opposite position.  Plaintiffs contend that the Republic was required to "complete[] the tender-offer process by the time it took control of YPF (*and not after*)" because Sections 7(e)-(f) of the Bylaws are "based on the premise that an Offeror will have completed the tender offer before taking control."  (Pls.' Br. 33 (emphasis added).)  Plaintiffs also rely on statements in the Prospectus that the "By-laws require that certain [control] acquisitions of shares of [YPF's] capital stock . . . *be preceded by* a cash tender offer for all outstanding shares," which must occur "*[p]rior to consummating* any Control Acquisition," including one by the Argentine government.  (*Id.* (citations omitted, emphasis in original).)

Based on their new reading of the Bylaws, Plaintiffs argue that the "latest date" the Republic could have noticed a tender offer was February 13, 2012—more than two months *before*

the date of the Republic's Intervention Decree and the introduction of legislation to commence the expropriation of Repsol's 51% interest in YPF.  As the record makes clear, however, as of February 13, 2012, the Republic had not even drafted the executive decree or the legislation ultimately introduced.  Indeed, on February 20, 2012, government officials were still deliberating potential options and had not written "the first bill."  (Giuffra Ex. 91 (Cameron and Kunz Email Correspondence).)

**ARGUMENT**

Plaintiffs try to frame this case as a "garden variety" breach-of-contract case.  It's not.  Even under American law, corporate bylaws are not treated as ordinary contracts.  *Quantum Tech. Partners II, L.P.* v. *Altman Browning & Co.*, 436 F. App'x 792, 793 (9th Cir. 2011) (concluding that shareholders cannot "sue each other for breach of such bylaws.").  Argentine law is even more stringent in policing shareholder actions based on the alleged breach of a bylaws provision.  And it certainly does not countenance the use of a bylaws provision to impede the sovereign expropriation power.  This Court should reject Plaintiffs' unprecedented suit for at least six independent reasons.

There are three threshold bars to relief that Plaintiffs never discuss in their rush to characterize this as a "simple" case:  (1) Plaintiffs lack contractual standing because they transferred their ADRs before bringing suit; (2) Plaintiffs' claims are barred under the FSIA and the act-of-state doctrine in light of Plaintiffs' new position that a tender offer directly conditioned the Republic's exercise of sovereign powers; and (3) Argentine public law precludes Plaintiffs' claims.  There are also three additional flaws in Plaintiffs' "breach of contract" theory:  (1) Argentine corporate law does not recognize a claim for breach of contract in connection with alleged violations of corporate bylaws; (2) even if such a claim were cognizable under Argentine law, Plaintiffs were not YPF shareholders in 2014 when the Republic acquired Repsol's shares

and allegedly "breached" any tender-offer obligations; and (3) even if a "breach of bylaws" claim were cognizable *and* that breach occurred while Plaintiffs still held ADRs, Plaintiffs may not bring a claim for damages because the Bylaws provide exclusive remedies, and because Argentine law bars a stand-alone claim for damages in a breach-of-contract action if the plaintiff could have sought specific performance.

Finally, even if Plaintiffs could clear all six of those hurdles, they would not be entitled to the inflated damages they claim. Their claimed damages are miscalculated in several respects and would result in an extraordinary windfall of more than five times YPF's entire current market capitalization and more than double Plaintiffs' highly leveraged investment in YPF, much of which they have already recouped.

## I.   PLAINTIFFS HAVE NO WAY AROUND THREE INDEPENDENT THRESHOLD BARS TO THEIR CLAIMS.

### A.   Before They Brought Their Claims, Plaintiffs Transferred Their ADRs and Thus Lost Their Contractual Standing to Sue.

In their opening brief and statement of material facts, Plaintiffs admit that they are no longer YPF security holders *and* were not security holders when they filed suit in 2015 and 2016. Specifically, Plaintiffs acknowledge that Petersen's creditors foreclosed on Petersen's ADRs "[b]etween May and November 2012," and that Eton Park had "completely divested" from YPF by July 2013. (*See* Plaintiffs' Rule 56.1 Statement ¶¶ 112, 114; *see also* Pls.' Br. 20–21.) As explained in the Republic's motion, Plaintiffs' claims fail under both New York law (which applies to the transfer of ADRs) and Argentine law because Plaintiffs are not YPF shareholders, nor were they shareholders when they filed suit. (*See* Argentina's Opening Br. 15–19.)

    **B.**    **Plaintiffs' New Position that the Bylaws Required a Tender Offer *Before* Intervention Means That Their Claims Are Barred by Sovereign Immunity and the Act-of-State Doctrine.**

The FSIA "provides that foreign nations are presumptively immune from the jurisdiction of United States courts." *Fed. Republic of Germany* v. *Philipp*, 141 S. Ct. 703, 707 (2021); *see also* 28 U.S.C. § 1603(b) (YPF also presumed immune as "instrumentality" of the Republic). There is an exception to this general rule, however, when a suit is based on a "commercial activity" with a "direct effect in the United States." 28 U.S.C. § 1605(a)(2). A state's legislative acts and the exercise of its expropriation power are *not* "commercial" activities because they "can be performed only by the state acting as such." *Saudi Arabia* v. *Nelson*, 507 U.S. 349, 355-556 (1993). For that reason, the Second Circuit has already determined that Argentina's expropriation of Repsol's YPF shares was a "sovereign" activity. *Petersen II*, 895 F.3d at 206. And under Plaintiffs' current view, their breach-of-contract theory directly implicates that sovereign activity.

At the motion-to-dismiss stage Plaintiffs attempted to separate Argentina's sovereign acts of intervention into YPF management and expropriation of YPF shares from an allegedly "commercial" failure to tender under the Bylaws. They did so by arguing that the Bylaws imposed a tender-offer obligation *after* any distinct expropriation activity. For example, Plaintiffs' counsel had the following exchange with the Court:

> THE COURT: So that the takeover bid or the tender offer could be made after—under this would be made *after the time the acquirer acquires that percentage of the stock*; is that right?

> PLAINTIFFS' COUNSEL: Yes, your Honor. And we know that, among other reasons, because the bylaws speak to *what happens if the acquirer has gained a position in the shares but hasn't yet completed the takeover*.

*Petersen*, ECF No. 61 at 4:24–5:6 (emphasis added); *see also supra* pp. 13–16.  Likewise, in the Second Circuit, Plaintiffs argued that "[t]he bylaws do not state or imply that the tender offer must precede government acquisition of control."  (Pls.' Second Circuit Br. 4.)

This Court relied on Plaintiffs' interpretation of the Bylaws in holding that the commercial activity exception applies here, reasoning that the suit arose "out of *subsequent* commercial activity involving expropriated property" and not out of the expropriation itself.  *Petersen I*, ECF No. 63, at 16 (emphasis added).  The Second Circuit likewise accepted Petersen's position that Argentina was not immune under the FSIA, on the ground that "YPF's bylaws permitted Argentina to conduct a tender offer *after* it acquired a controlling interest in YPF."  *Petersen II*, 895 F.3d at 205.  In other words, on the basis of Plaintiffs' representations that the Bylaws required only a "*post-expropriation* tender offer," this Court and the Second Circuit held that Plaintiffs' claims did not directly challenge the Republic's sovereign acts of intervention and expropriation.  *Id.* at 209 (emphasis added).

Having avoided the dismissal of their claims, Plaintiffs now take precisely the opposite position: that the Bylaws required Argentina to "complete[] the tender-offer process by the time it took control of YPF."  (Pls.' Br. 33.)  Plaintiffs argue that a "breach" occurred on April 16, 2012—when the Republic issued the Intervention Decree—and that the Republic was required to have initiated a tender-offer process the other YPF shares on February 13, 2012 (*i.e.*, the "notice date" Plaintiffs assert)—*years* before the expropriation was completed and *months* before the Public Interest Law was passed.  (*Id*. at 33-34.)  Plaintiffs thereby assert that the Republic could not expropriate shares without *completing* a tender offer, meaning that the tender-offer requirement directly impeded Argentina's exercise of the expropriation power.

Plaintiffs' change in position demolishes their argument that the FSIA's commercial-activity exception applies.  To determine whether a suit is "based on" commercial activity for the purpose of the FSIA, a court must identify the "core action taken by [the foreign sovereign] outside the United States for which relief is sought." *Barnet* v. *Ministry of Culture & Sports of the Hellenic Republic*, 961 F.3d 193, 200 (2d Cir. 2020).  If that "core action" is sovereign, the commercial activity exception simply does not apply.  *Id.*  The "core predicate acts," *id.*, challenged by Plaintiffs here are the Republic's intervention and commencement of the expropriation process (and YPF's alleged failure to stand in the way), which according to Plaintiffs, *could not begin* until the Republic first offered to purchase all outstanding YPF shares.  Because the sources of potential liability—the alleged acts of "breach"—were those "peculiar to sovereigns," *Nelson*, 507 U.S. at 363, Plaintiffs' claims do not fall within the commercial-activity exception.

Plaintiffs' new position that the tender offer needed to precede the Republic's intervention and commencement of the expropriation process also implicates the act-of-state doctrine.  As this Court explained at the motion-to-dismiss stage, "[a]ct of state issues arise when the outcome of a case turns upon a court's decision regarding the validity of a public act of a foreign sovereign within its territory." *Petersen I*, 2016 WL 4735367, at *7 (citing *W.S. Kirkpatrick & Co.* v. *Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990)).  The Court further explained, however, that the doctrine "permits adjudication of cases concerning the commercial *consequences* of sovereign action." *Id.* (emphasis added).  It thus concluded, for reasons similar to those applicable to the FSIA analysis, that *"*it does not appear from the face of the Complaint that Defendants' failure to comply with or enforce th[e] Bylaws either constituted an official act or was compelled by an official act." *Id.* at *7–8.

Under Plaintiffs' current theory, by contrast, the act-of-state doctrine applies. In Plaintiffs' view, the alleged wrong *was* "seizing control" of YPF through a government decree that "took control of YPF's management," without first "offer[ing] to buy out the minority shareholders." (Pls.' Br. 2, 18.) As a result, the "outcome of [this] case" now necessarily turns on "the validity of [the] public act"—the Argentine government's intervention into YPF without having first conducted a tender offer. *Celestin* v. *Caribbean Air Mail, Inc.*, 30 F.4th 133, 142 (2d Cir. 2022) (explaining that act-of-state doctrine applies where claims would render government determinations "ineffective" or "null and void").

Plaintiffs briefly mention two other government actions that supposedly "confirm" the Republic's alleged breach: the internal government memorandum and speech made in the Argentine Congress. (Pls.' Br. 27-28.) Challenging those actions is at least as problematic under the act-of-state doctrine. Those actions involve internal government deliberations and an ultimate determination to effect an expropriation of a "simple majority" of YPF's stock under Argentina's General Expropriation Law *as opposed to* "moving forward with a stock tender offer" under YPF's Bylaws. Under the act-of-state doctrine, a U.S. court cannot weigh in on the validity of such a choice. *See Petersen I*, ECF No. 63 at 20.

## C.    Plaintiffs Ignore Basic Principles of Argentine Public Law Recognized By Their Own Experts.

Plaintiffs' claims are also untenable under Argentine public-law principles. In particular, in Argentina, public laws prevail over private agreements, including corporate bylaws provisions. This hierarchy of legal authority is comparable under U.S. law. *See ER Holdings, Inc.* v. *Norton Co.*, 735 F. Supp. 1094, 1097 (D. Mass. 1990) (corporate bylaws are superseded by "statute" and "public policy"). Under Plaintiffs' theory, the Bylaws' tender-offer requirement determined whether and when the Republic could exercise its expropriation power. But reading the Bylaws

to directly limit the Republic's expropriation authority would conflict with the Public Interest Law and the Argentine General Expropriation Law, both of which are laws of the "public order" that supersede obligations imposed in private agreements.  (Uslenghi Opening ¶¶ 18-19, 25-26.)

As a threshold matter, it is axiomatic under Argentine law, and undisputed by Plaintiffs' experts, that when private agreements, including bylaws provisions, conflict with Argentine public law, the latter prevails.  (Uslenghi Opening ¶ 26; Hicks Ex. 46 (Comadira Opening) ¶¶ 35-39.) Even Plaintiffs' experts agree that "it's obvious that an issue of public policy prevails over private law" (Giuffra Ex. 97 (Garro Deposition Tr.) at 292:22–25), and that "[t]here is no possibility to have any [] private rights enforced against any public order laws." (Giuffra Ex. 80 (Bianchi Deposition Tr.) at 59:17–21.)  Thus, as Plaintiffs' expert Professor Bianchi acknowledged, "if [a] private contract hinders expropriation . . . the expropriation process will continue and the contract will not be valid or applicable." (*Id.* at 64:10–13.)

Plaintiffs' current view of the Bylaws—requiring the Republic to conduct a tender offer *before* partially expropriating YPF—runs directly afoul of this bedrock principle of Argentine law. Under Plaintiffs' reading, "the Bylaws would have conditioned and fixed the time" at which the Republic could exercise its expropriation powers to acquire 51% of YPF.  (Santiago Rebuttal ¶ 28.) But the Argentine Supreme Court has consistently struck down provisions in private-law instruments purporting to determine when an expropriation may take place, on the ground that such provisions impermissibly "condition[] the State in the exercise of" a power within "its inalienable discretion."  (Santiago Rebuttal ¶ 29 (quoting *Electricidad del Rosario*); *see also* Uslenghi Opening ¶ 32 (quoting *Hidronor, S.A.* v. *Provincia de Río Negro*); Argentina Opening Br. 34-37); *see also* Giuffra Ex. 120 (Comadira Reply) ¶ 15.)  For this reason alone, Plaintiffs' position is untenable.

Plaintiffs also ignore Article 28 of the Argentine General Expropriation Law, which provides that "no action by third parties may prevent the expropriation or its effects." (Uslenghi Opening ¶ 63 (quoting Article 28 of the General Expropriation Law).) Instead, "[t]he rights of the claimant shall be considered transferred from the thing to its price or to the compensation, leaving the thing free of any encumbrance." (*Id.*) Accordingly, the Republic acquires expropriated property, including the YPF shares at issue in this case, with "original title," free and clear of any lien, encumbrance, or other obligation previously associated with it. (*Id.* ¶ 106.) Plaintiffs' public-law expert readily acknowledged this bedrock proposition. (*See* Giuffra Ex. 80 (Bianchi Deposition Tr.) at 97:5–18 ("The asset is transferred free of any encumbrances. For instance, if there was a mortgage on the property, that mortgage has to be lifted."); *id.* at 72:14–20 ("[N]o right to be invoked by a third party may be asserted on the object or thing that is subject to expropriation.").) As the Republic has explained, a tender-offer requirement like the one outlined in the Bylaws clearly qualifies as an "encumbrance" on the YPF shares, and thus cannot be invoked against the Republic. (Uslenghi Opening ¶ 112; Argentina's Opening Br. 34–37.) Plaintiffs have not offered a response.

Finally, any requirement that the Republic make a tender offer for all YPF shares would violate Article 28 of the General Expropriation Law by interfering with the intended *effects* of the expropriation. (Uslenghi Opening ¶ 63.) The only "effect" intended by the Public Interest Law was the expropriation of 51% of YPF shares, and no more. As Plaintiffs' expert Professor Bianchi conceded at his deposition, "the public interest law of May 2012 had as its ultimate or final intention the acquisition of 51 percent of YPF shares through expropriation." (Giuffra Ex. 80 (Bianchi Deposition Tr.) at 117:19–23; Giuffra Ex. 93 (Bianchi Rebuttal) ¶ 10; *see also* Uslenghi Opening ¶ 67; Santiago Rebuttal ¶ 38.)

Relatedly, as Plaintiffs acknowledge, the Public Interest Law "provide[d] that YPF shall remain a publicly-traded company after the expropriation." (Pls.' Br. 20 (quoting *Petersen II*, 895 F.3d at 208 (2d Cir. 2018)); *see also* Giuffra Ex. 72 (Public Interest Law) Art. 15.) Plaintiffs mistakenly take this provision to mean that the Public Interest Law "did not . . . override or modify the Bylaws." (Pls.' Br. 20.) It means precisely the opposite: the Public Interest Law's provisions stating that the government would acquire only "51%" of YPF's shares, and that YPF would remain a publicly traded company trump any alleged private-law requirement to acquire 100% of the company. (*See* Uslenghi Opening ¶¶ 86–89; Santiago Rebuttal ¶ 40.)

## II.   PLAINTIFFS' BREACH-OF-CONTRACT CLAIM FAILS UNDER ARGENTINE LAW.

Even assuming Plaintiffs had standing, could circumvent Argentina's sovereign immunity, and could overcome Argentine public law foreclosing their suit, their breach-of-contract claims would still fail under Argentine law. As this Court previously recognized, Plaintiffs' claims are "based on corporate relationships" in Argentina and are "properly classified as 'corporate claims' under Argentine law." *Petersen I*, ECF No. 161 at 34-35. Although Plaintiffs ostensibly agree, they suggest that the "intricacies of Argentine corporate law" are mere "makeweight" "irrelevancies." (Pls.' Br. 39.) But Argentine corporate law directly controls the outcome here. Try as Plaintiffs might to analogize to a standard breach-of-contract theory, under Argentine law, corporate bylaws provisions do not operate like ordinary contracts. As relevant here, under Argentine law shareholders cannot sue one another—or the company—to enforce a corporate bylaws provision. And even if they could, Argentine law provides only specified corporate remedies—not including damages in a breach-of-contract action—in the event of a breach of a bylaws provision.

-24-

A.    **Argentine Corporate Law Provides Exclusive Procedures and Remedies for Breach of Corporate Bylaws—But Plaintiffs Chose Not to Use Them.**

1.    Plaintiffs claim that this is a "simple" breach-of-contract case (Pls.' Br. 2), but under Argentine law, corporate bylaws are not "simple" contracts.  Generally, Argentine courts and commentators have recognized that "the commercial corporate system" cannot be "subsumed" within the law of contracts.  (Manóvil Opening ¶ 70 n.93.)  And with regard to corporate bylaws specifically, because "both the rights and the obligations of the shareholders hinge on their relations with the legal subject known as the corporation," bylaws do not create bilateral obligations between shareholders or between shareholders and the company.  (*Id.* ¶ 77 (quoting *Gatti* v. *Bulad*, CNCom, Division A, Oct. 22, 1999, El Derecho, Vol. 188, at 698); *see also* Giuffra Ex. 97 (Garro Deposition Tr.) at 131:23–132:2 ("[I]t's true that the obligations and rights of the shareholders tend on their relations with the subject and not with relations to each other."); *see also* Goodman Ex. 27 (Kemelmajer Rebuttal) ¶¶ 18-19).)  Bylaws are therefore considered a "plurilateral organizational contract" with fundamentally different features from an ordinary "bilateral" or "exchange" contract.  (Manóvil Opening ¶¶ 67–76; Rovira Rebuttal ¶ 16.)  For this reason and as detailed in the Republic's brief in support of summary judgment, shareholders cannot sue one another to enforce a corporate bylaws provision (*See* Argentina's Opening Br. 26-27.)

Restrictions on lawsuits between shareholders under corporate bylaws are not unique to Argentine law.  *See Quantum Tech. Partners II, L.P.* v. *Altman Browning & Co,* 2009 WL 4826474, at *5 (D. Or. Dec. 8, 2009) *aff'd*, 436 F. App'x 792 (9th Cir. 2011).  As American courts have explained, there is a difference between *interpreting* "bylaws using the principles of contract construction" and recognizing "a cause of action for damages for breach of contract between shareholders for violations of corporate bylaws."  *Id.*  Accordingly, just because courts have sometimes referred to corporate bylaws as a contract between and among shareholders and the

company, "does not establish that [the law] recognize[s] a cause of action for damages for breach of contract between shareholders for violations of corporate bylaws." *Id.* Argentine law manifestly does not recognize such an action. *See also id.* (acknowledging that Delaware law does not permit shareholders to sue one another for breach of a bylaws provision).

Similarly, as explained in YPF's brief in support of summary judgment, shareholders cannot sue a company for damages for an alleged breach of its bylaws. (*See* YPF's Opening Br. 13-28, 33-34; Goodman Ex. 34 (Manóvil YPF Opening) ¶ 85; Goodman Ex. 27 (Kemelmajer Rebuttal) ¶¶ 18-19; Goodman Ex. 65 (Kemelmajer Reply) ¶ 15 ("[A] shareholder does not have a cause of action for damages against a company based on a breach of contract theory . . . under Argentine law . . . Bylaws cannot be enforced in the same way that bilateral contracts are enforced.").)

Plaintiffs have no answer to the bedrock rule that Argentina does not recognize damages suits between shareholders or between shareholders and an Argentine company. Tellingly, Plaintiffs and their experts could not cite a single case in which an Argentine court upheld a breach-of-contract claim by a shareholder against another shareholder—or against the company—for a breach of corporate bylaws. (*See* Manóvil Reply ¶ 99; Manóvil Opening ¶ 77 ("There is no decision I am aware of that has permitted one shareholder to sue another shareholder directly to claim for noncompliance with a bylaw provision."); Goodman Ex. 27 (Kemelmajer Rebuttal) ¶ 19 ("Professors Rovira and Garro do not point to a *single case* in which an Argentine court has held that a shareholder can sue a corporation for damages based on a purported breach of the company's

bylaws.").)  Plaintiffs' expert Professor Garro flatly admitted the lack of precedential support for his position at his deposition.  (Giuffra Ex. 97 (Garro Deposition Tr.) at 150:1–12.)[6]

Plaintiffs' tactical use of the "breach-of-contract" label does not transform their corporate claims into a breach-of-contract action under Argentine law.  (Argentina's Opening Br. 27.)  As Professor Manóvil explains, it is for the *court* to characterize a plaintiff's claim based on its "true legal nature"—not by the label that a plaintiff has affixed to it.  (Manóvil Rebuttal ¶¶ 8, 9, 14–20.)  Here, there is no doubt that an Argentine court would conclude—as this Court already has—that Plaintiffs' claims are "corporate law claims under Argentine law."  *Petersen I*, ECF No. 161 at 35.

2.      Plaintiffs also cannot seek their claimed damages under Argentine corporate law.  "Plurilateral" contracts like corporate bylaws provisions are governed by the Argentine General Companies Law (GCL).  (Manóvil Opening ¶ 67 n.90 (quoting the "Explanation of Motives" which lays out the lawmakers' understanding of the basis of the GCL).)  The GCL (in civil law terms, a specialized law or "lex specialis") contains a comprehensive remedial system to redress alleged breaches of corporate bylaws provisions, and the GCL does *not* include a claim for

---

[6]      Notably, U.S. courts have previously found Professor Garro's opinions on Argentine law "farfetched," *In re Factor VIII or IX Concentrate Blood Products Litig.*, 531 F. Supp. 2d 957, 970 (N.D. Ill. 2008); (*see also* Giuffra Ex. 97 (Garro Deposition Tr.) at 101:3–102:2), and "not compelling," *Arturo Giron Alvarez* v. *Johns Hopkins Univ.*, 275 F. Supp. 3d 670, 707–708 (D. Md. 2017).  Garro himself has explained that he is *not* "an expert in corporate law," has never "taught a course on the law of corporations," and has not been admitted to practice law in Argentina since 1977. (Giuffra Ex. 97 (Garro Deposition Tr.) at 20:3-7, 29:17-22.)   Alfredo Rovira, Plaintiffs' primary expert on Argentine private law, offers equally farfetched opinions that are likewise not credible.  Notably, Professor Rovira was asked to leave his professor position after being accused of plagiarizing his own graduate student's thesis.  (Giuffra Ex. 98 (Rovira Deposition Tr.) at 36:17–37:1.)  Defendants, by contrast, rely upon the most highly regarded corporate law expert in Argentina—Rafael M. Manóvil (*see* Giuffra Ex. 97 (Garro Deposition Tr.) at 65:13-21("Professor Manóvil is a highly reputable scholar in areas of corporate law")), as well as a renowned former appellate judge and scholar of Argentine public law—Alejandro Uslenghi, among others.

damages in a breach-of-contract action.  (Manóvil Rebuttal ¶ 22; *see also* Giuffra Ex. 97 (Garro Deposition Tr.) at 182:7–8 ("[D]efinitely the lex specialis prevails over the lex generalis.").)

Instead, those aggrieved by a breach of a corporate bylaws provision must pursue certain specified corporate remedies.  Under Argentine law, as in many other civil law jurisdictions, the shareholders' meeting (or "assembly") is the "supreme governance body" of a corporation. (Manóvil Reply ¶¶ 62–63.)  For that reason, Argentina's GCL authorizes shareholders to move for a shareholders' meeting resolution to enforce corporate bylaws or penalties set out in corporate bylaws, and, if that is unsuccessful, to challenge resolutions that violate bylaws in court within three months of the shareholders' meeting.  (*See* Argentina's Opening Br. 27; *see also* Manóvil Opening ¶¶ 79–95; Giuffra Ex. 98 (Rovira Deposition Tr.) at 94:5-12, 94:22-95:10.)  The rights supplied by the GCL thereby give shareholders the ability to effectively paralyze a company if they assert that certain critical corporate resolutions (*e.g.*, appointing directors, distributing dividends, and approving financial statements) are not in compliance with the bylaws.  (Manóvil Reply ¶ 66.)  For this reason, the GCL supplies a short, three-month limitations period (a "*caducidad*" period, which is a substantive limit that operates like a statute of repose) within which challenges must be brought.  *Id.*  Plaintiffs could have availed themselves of these Argentine corporate law remedies for alleged breach of the Bylaws, but they elected not to do so (even though other minority shareholders of YPF did).  If a plaintiff could avoid the GCL's remedial system simply by labeling its bylaws-based claims as "breach-of-contract" claims (as Plaintiffs do here), it would render the three-month limitations period meaningless.  (Manóvil Reply ¶ 66.)

Plaintiffs and their experts attempt to brush the GCL aside by asserting that "[t]he Civil Code . . . applies to all breaches of contract, including breaches of corporate Bylaws." (Pls.' Br. 25).  They contend that Argentine corporate law does not "displace the remedies afforded to

plaintiffs under the Civil Code" "because there is no specific civil liability provision in the [GCL] that specifically applies here."  (Giuffra Ex. 95 (Rovira Rebuttal) ¶¶ 15, 34; *see also* Giuffra Ex. 96 (Garro Rebuttal) ¶¶ 26–27.)

Plaintiffs are wrong to claim that the Civil Code displaces the GCL here.  As Plaintiffs' experts concede, the Commercial Code, of which the GCL is a part, provides that "the rules of the Civil Code shall apply in those cases *not specifically governed by this Code*."  (Manóvil Rebuttal ¶ 30 (emphasis added); (Giuffra Ex. 95 (Rovira Rebuttal) ¶ 30; Giuffra Ex. 96 (Garro Rebuttal) ¶¶ 24–25).)  But the GCL *does* "provide[] a set of remedies for corporate law claims, including for claims based on allegations of breaches of corporate bylaws."  (Manóvil Reply ¶ 52.)  Those remedies are "mandatory," and thus supersede the Civil Code's general remedies for breach of contract.  (Manóvil Opening ¶¶ 80–85.)  Because the GCL specifically governs alleged breaches of corporate bylaws and provides remedies for such breaches, Plaintiffs may not evade the GCL by bringing a breach of contract claim.

### B.    Plaintiffs Have Not Shown A Contractual "Breach" Because They Were Not A Party To the YPF Bylaws When the Republic Acquired Repsol's Shares in 2014.

Even if Plaintiffs could bring their Bylaws-based claims as a breach-of-contract action against another shareholder or the company, their claims would still fail because Plaintiffs did not own any interest in YPF at the time of any "breach" of the Bylaws' tender-offer provisions.  The Republic did not "acquire" the Repsol shares that allegedly triggered the tender-offer obligation until it completed the expropriation on May 8, 2014, when Repsol legally transferred the expropriated shares to the Republic.  (*See* Argentina's Opening Br. § I.B.)  At that point, neither Plaintiff was a YPF security holder.

Plaintiffs assert that the Republic triggered the Bylaws' tender-offer obligations when Plaintiffs were still shareholders by obtaining *functional control* over YPF's management under

the April 2012 Intervention Decree—not by obtaining *legal title* to Repsol's YPF shares under the May 2014 completed expropriation.  (Pls.' Br. 3, 9, 24, 33.)  But Plaintiffs offer no textual support for their reading of the Bylaws.  At most, they observe that the Bylaws mention acquisitions of "control."  (*See, e.g.*, Pls.' Br. 9.)  But the Bylaws specifically refer to "control" resulting only from share *ownership*, either directly by the acquirer or through related corporate entities.  Indeed, in at least three ways, the text of the Bylaws makes clear that managerial control alone does not trigger the tender-offer provisions.

*First*, the Bylaws provide that "acquisition" is the key triggering event and that "control" is merely what *follows* certain acquisitions via corporate intermediaries.  The Bylaws apply the tender-offer provisions to a purchaser "if, *as a result of such acquisition*, the purchaser becomes the holder of, or exercises the control of, class D shares of stock" exceeding certain thresholds. (Giuffra Ex. 1 (YPF Bylaws) § 7(d) (emphasis added).)  This is the same for the Republic.  (*See id.* § 28(A).)  Put differently, the tender-offer procedures are triggered by an entity's acquisition of legal title to shares, whether on its own or through a corporate intermediary, where "as a result" it directly owns or indirectly controls sufficient YPF shares.  Either way, the acquisition of legal title is the required first step.

*Second*, the Bylaws do account for certain "indirect" acquisitions of YPF stock—but not the sort of "functional" control that Plaintiffs seek to rely on here.  (*Id.* § 28(A), *see also id.* § 7(d).) The Bylaws define an "indirect" acquisition not to mean "functional" control, but to mean an acquisition of or through related corporate entities such as parent companies and subsidiaries.  (*See id.* § 7(i) (providing that, "[f]or the purposes of section 7, the term 'indirectly' shall include the purchaser's parent companies, the companies controlled by it," and similar *corporate*

relationships); *see id.* § 28(D) (covering "any kind of entity or organization having a relationship with the National Government of the nature described" in Section 7(i)).)

*Third*, and relatedly, the Bylaws mention "control" only to capture the same possibility of indirect corporate ownership. When an acquisition is "direct" (*i.e.*, through the acquiror's own purchase of YPF shares), the acquiror itself "becomes the owner" of the YPF shares. But when an acquisition is "indirect" (*i.e.*, through a parent company's or subsidiary's purchase of YPF shares, or through the purchase of a YPF parent company), the acquiror may not be the technical "owner" of the YPF shares, as a matter of corporate formalities. In those circumstances, the tender-offer provisions nonetheless apply because the acquiror "exercises the control of" the YPF shares owned by the related corporate entity. Accordingly, Sections 7 and 28 of the Bylaws pair the two options for acquiring YPF shares—directly or indirectly—with the two parallel results of owning (if direct) or controlling (if indirect) those shares. (*See* Giuffra Ex. 1 (YPF Bylaws) § 7(d) (imposing tender-offer obligation if an entity "acquire[s] shares or securities of the Corporation, whether directly or indirectly . . . if, as a result of such acquisition, the purchaser becomes the holder of, or exercises the control of, class D shares of stock"); *see id.* § 28(A) (applying Sections 7(e) and 7(f) to "all acquisitions made by the National Government, whether directly or indirectly, . . . if, as a consequence of such acquisition, the National Government becomes the owner [of], or exercises the control of, the shares").)

Sections 7(h) and 28(C) of the Bylaws, the tender offer "penalties" provisions, further confirm that the Bylaws mention "control" solely to ensure that shares owned by corporate intermediaries still count toward the tender-offer thresholds. Section 7(h) states that penalties for a breach of the tender-offer provisions continue "until such shares of stock are sold, in the case the purchaser has obtained the direct control of YPF, or until the purchaser *loses the control of the*

-31-

*YPF's parent company*, *if the takeover has been indirect*." (*Id.* § 7(h) (emphasis added).  Again, control is a specific concept designed to sweep in related corporate entities which in fact own legal title to YPF shares; it is not Plaintiffs' free-floating concept of functional control over YPF management by the Republic.

If, as Plaintiffs claim, the Bylaws' tender-offer obligation were triggered upon government exercise of "control," then that would capture mere temporary changes in control.  For example, under Plaintiffs' theory, a court-appointed receiver would be obligated to conduct a tender offer. (Manóvil Reply ¶¶ 46–49.)  Indeed, that outcome is precisely what Plaintiffs argue for here: Plaintiffs claim that the government was obligated *to have completed* a tender offer before issuing a decree providing for a 30-day "intervention" into YPF.  (Pls.' Br. 33.)

The Bylaws could have defined control more broadly to extend beyond control resulting from the legal acquisition of shares.  For example, the credit agreements through which Petersen acquired its YPF shares from Repsol provide that "'control' means the possession, directly or indirectly, *of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise*." (Giuffra Ex. 79 (Petersen Credit Agreement with Lenders) at 11 (emphasis added).)  Here, by contrast, the Bylaws limit the definition of "control" only to those situations where an *acquiror* obtains control through *ownership of shares.*  This "definitive, particularized contract language takes precedence" over broader language the parties could have, but chose not to, include.  *John Hancock Mut. Life Ins. Co.* v. *Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983).[7]

---

[7]    The Bylaws' reference to acquisitions "by any means or instrument" (Giuffra Ex. 1 (YPF Bylaws § 7(d); *see id.* § 28(A) (using same language)) also does not help Plaintiffs.  That language refers to the fact that an acquisition of shares can be accomplished in multiple ways "(*e.g.*, purchase, exchange, donation, inheritance, legacy, merger, a company reorganization process,

Plaintiffs' experts do not dispute that the plain meaning of the term "acquisition" is "obtaining title or ownership of something."   (Manóvil Reply ¶ 30.)   Instead they rely on unsupported speculation concerning the purported "purpose" and "intent" of the tender-offer provisions to support their atextual interpretation.   Specifically, Rovira and Garro assert that Section 28(A) "was added by the Argentine Government as part of the YPF privatization process to attract foreign investment" by "guarantee[ing] to minority shareholders a compensated exit in case Argentina renationalized YPF."  (Giuffra Ex. 95 (Rovira Rebuttal) ¶ 27; *see also* Giuffra Ex. 96 (Garro Rebuttal) ¶ 20 ("[T]he purpose of the tender-offer obligations is to protect minority shareholders under the YPF Bylaws, providing them with a compensated exit if Argentina were to regain *control* of YPF.").)  Plaintiffs' speculation regarding the *general* purpose and intent of the Bylaws does not in any way support the specific assertion that the Bylaws "guaranteed" a "compensated exit" in the event "Argentina renationalized YPF" through expropriation, when those concepts are found nowhere in the Bylaws.  (*See* Manóvil Reply ¶ 38; 56.1 Opposition ¶ 50.)

If anything, the parol evidence relied on by Plaintiffs and their experts confirms that Sections 7(d) and 28(A) require a legal acquisition of shares to trigger the tender-offer obligations. Specifically, the IPO Prospectus, like the Bylaws themselves, repeatedly refers to an "acquisition" or an "acquiror" of shares when summarizing the tender-offer provisions:

- "The By-laws require that certain *acquisitions of shares* of [YPF's] capital stock that would result in the *acquiror* owning or controlling Class D Shares representing the lesser of 15% or more of the outstanding capital stock or 20% or more of the Class D Shares . . . be preceded by a cash tender offer for all outstanding shares."

---

etc.)" through a variety of legal instruments, but not that something other than an actual acquisition of shares would suffice.  (Manóvil Reply ¶ 33.)

- "Special rules apply to *acquisitions of shares* by the Argentine Government while the Argentine Government holds Class A Shares representing at least 5% of [YPF's] outstanding capital stock as of the date of the final Prospectus."

- "Under [YPF's] By-laws, in order to *acquire* a majority of [YPF's] *capital stock* or a majority of the *Class D Shares*, the Argentine Government first would be required to make a cash tender offer to all holders of Class D Shares on specified terms and conditions."

- "*[A]cquisition of shares or convertible securities as a result of which the acquiror, directly or indirectly through or together with its affiliates* and persons acting in concert with it" triggers the tender-offer requirement.

(Hicks Ex. 3 (YPF Prospectus) at 10, 11, 80 (emphasis added); *see id.* at 82 (same for Argentine government).)

At bottom, Plaintiffs cannot escape the plain text of the Bylaws, which requires a tender offer only upon the "acquisition" of shares. *See also Petersen II*, 895 F.3d at 206.  And that acquisition of shares occurred in 2014 when Plaintiffs were no longer YPF security holders.[8]  That undisputed fact is fatal to their claims.

---

[8]     Plaintiffs also argue that Secretary Kicillof's April 17, 2012 speech to Argentine Senate committees "confirms" the asserted breach of the Bylaws' tender-offer provisions. (Pls.' Br. 27–28.)  But Plaintiffs do not expressly argue that this speech (or anything else) supports an anticipatory-breach claim.  (*See id.*)  Nor could they.  Under Argentine law, a repudiation, or anticipatory breach, does not establish an independent cause of action for damages.  (*See* Argentina's Opening Br. 25.)  Instead, if the breaching party declares that "he will not meet his obligation," the non-breaching party's remedy is to terminate the contract.  (*Id.*; Manóvil Rebuttal ¶¶ 115–16.)  Plaintiffs did not do so—and, indeed could not have done so, as corporate bylaws, unlike bilateral contracts, are not subject to termination for breach (*see* Manóvil Opening ¶ 97.)  And, in any event, under Argentine law, a repudiation of contractual obligations must be both "unequivocal" and "addressed directly to the creditor" to qualify as anticipatory breach.  (Argentina's Opening Br. 25 (citing Manóvil Rebuttal ¶¶ 123, 126)).  Neither requirement is met here.

C.       **At A Minimum, Plaintiffs' Damages Claim Cannot Succeed.**

1.       **The Bylaws Provide the Exclusive Penalty in the Event of a Breach of the Tender-Offer Provisions**

Even if the Civil Code—as opposed to the exclusive remedies in the GCL—applies here, Plaintiffs' damages claims would fail.  Under the Civil Code, where parties to a contract specify the penalties for breaching that contract, those remedies are exclusive.  (Argentina's Opening Br. 28 (citing Manóvil Opening ¶ 105).)  Article 655 of the Argentine Civil Code provides that "[t]he penalty or fine imposed [by the contract] *takes the place of compensation for damages and interest*, upon a breach." (Manóvil Reply ¶ 70 (quoting Art. 655) (emphasis added).)  Furthermore, the non-breaching party "will not be entitled to other compensation, even if he proves that the penalty is not sufficient compensation." (*Id.* (quoting Art. 655; *see also* Argentina's Opening Br. § II.B.1.)

The Bylaws contain such exclusive penalties.  They provide enumerated penalties in the event of a breach, and damages are not among them.  (Argentina's Opening Br. 28.)  Section 7(h) provides penalties—the loss of the rights to vote and to receive dividends—in the event "that any shares [are] acquired 'in breach of' . . . the tender-offer requirement," and Section 28(C) "provides that the sanctions in Section 7(h) 'shall be applied' to Argentina."  Plaintiffs acknowledge those provisions (Pls.' Br. 10, 11), but they fail to address their relevance under Article 655 of the Civil Code.  Plaintiffs' experts, meanwhile, were unable to explain away the application of Article 655, despite three different attempts at doing so:

*First*, Professors Rovira and Garro assert that penalty clauses must have both a compensatory and compulsory purpose, and that the penalty clauses in the Bylaws "do not provide any compensation to shareholders whose tender-offer rights were violated."  (Giuffra Ex. 96 (Garro Rebuttal) ¶ 49.)  But the "primary purpose" of penalty clauses is to "compel performance," and the text of Article 655 makes clear that penalty clauses are valid "even if . . . the penalty is not

sufficient compensation." (Manóvil Reply ¶ 70 (quoting Article 655).) Further, as explained in the Republic's opening brief, Sections 7(h) and 28(C) of the Bylaws *do* compensate non-breaching shareholders by increasing their voting power and dividend distributions. (*See* Argentina's Opening Br. 29.)

*Second*, Professor Rovira asserts that the Bylaws' penalty provisions do not constitute penalty clauses under Argentine law because they do not "contain a pre-quantified amount" of compensation in the event of a breach. (Giuffra Ex. 95 (Rovira Rebuttal) ¶ 69.) Yet no principle of Argentine law requires that a penalty clause be for a specific amount of money. (Manóvil Reply ¶ 79; *see also* Ex. 97 (Garro Deposition Tr.) at 212:11–17 ("Q: But under the specific code and specifically Article 653, the penalty clause can have as its object not just the sum of money but any other performance by the breaching party, correct? A: That is correct.").) Rather, the plain language of Article 655 provides that a contractual penalty can be *either* a "penalty or fine," and need not be for any particular amount. (*See* Argentina's Opening Br. § II.B.1; Manóvil Reply ¶ 70.)

To dispute this proposition, Professor Rovira relies on Articles 653 and 656 of the Civil Code as well as a single case, *Zucchini de Morra, Josefina* v. *Quinteros, Miguel*. None of those authorities helps him. (Giuffra Ex. 95 (Rovira Rebuttal) ¶ 69 n.67.) Article 653 provides that "[t]he penalty clause may only have as its object the payment of a sum of money, *or any other performance that may be the object of the obligations*" (Manóvil Reply ¶ 79 n.147 (quoting Article 653) (emphasis added).) Professor Rovira completely ignores the portion of Article 653 providing that *any other performance*, beyond sums of money, may also be the subject of a penalty clause. Article 656 is likewise inapposite. It merely provides that the non-breaching party "is not required to prove that he or she has suffered harm" to request a penalty, but that a court may reduce the

penalty if it is disproportionate.  (*Id.*)  And in *Zucchini*, the court reduced a contractual penalty, but did not suggest that a penalty clause requires a "pre-quantified" amount.  (Manóvil Reply ¶ 79.)

*Third*, Professor Rovira claims that, even if the "penalties" in Section 7(h) of the Bylaws constituted a penalty clause under Argentine law, Plaintiffs could sue for damages so long as Defendants' alleged breach was willful under Article 521 of the Civil Code.  (Giuffra Ex. 95 (Rovira Rebuttal) ¶ 71.)  But Professor Rovira misstates Article 521, which "does not refer to mere willful breach (*dolo*) but to malicious breach ("*incumplimiento malicioso*"), *i.e.*, the intention to harm."[9]  (Manóvil Reply ¶ 81.)  As Argentine courts have explained, the "mere failure to perform does not denote, by itself and necessarily, the presence of willful misconduct, for if this were the case, every breach would be willful."  (*Id.* ¶ 82 & n.154 (quoting *Yacoplast S.A.* v. *Molinos Rio de La Plata S.A.*).)  Plaintiffs have made no showing that the Republic intended to harm Plaintiffs by not conducting a tender offer, and in fact, the record shows otherwise.  (*See* § III.E *infra*.)

## 2.    Plaintiffs Are Not Entitled to Claim Damages Under Argentine Law

Plaintiffs assert that "[u]nder Argentine contract law, a non-breaching party is entitled to obtain expectation damages."  (Pls.' Br. 30.)  This is wrong.  Under Argentine law, in the event of a breach, plaintiffs must *first* seek either specific performance or termination, and may seek

---

[9]     Rovira cites *Ply S.A.* v. *Conelmec*, *ACE Seguros SA* v. *Transporte Don Francisco de Carlos Orlando Federico y otro*, and *Yacoplast S.A.* v. *Molinos Rio de la Plata S.A.*, but all three decisions make clear that Article 521 of the Civil Code requires more than just an intentional breach.  *See Ply S.A.* v. *Conelmec S.R.L.*, CNCom, Division B, Mar. 11, 1996, TR LALEY 60000726 (describing how "willful misconduct" requires "shamelessness" or "dishonesty" such that "the serious, clumsy fault, is in this sense equivalent to fraud"); *ACE Seguros S.A.* v. *Transporte Don Francisco de Carlos Orlando Federico y otro* s/ ordinario, CNCom, Division A, May 19, 2011, Online Citation: TR LALEY AR/JUR/29587/2011 (explaining that for a breach to qualify as "willful misconduct" it must be "malicious" or "shameless[]"); *Yacoplast S.A.* v. *Molinos Rio de La Plata S.A.*, CNCom, Division D, June 21, 2012, La Ley Online: TR LALEY AP/JUR/1275/2012 (similar).

damages only if performance is *impossible* as a result of the breaching party's fault.  (*Id.*; Civil Code Art. 889; *see also* Ex. 97 (Garro Deposition Tr.) at 226:7–11 (conceding that "nobody will doubt that" "there is a preference in the civil law for [] specific performance").)  Plaintiffs have not sought specific performance, barring their damages claims.

Article 889 of the Civil Code provides that damages are available only "[i]f performance has become impossible due to the fault of the" breaching party.  (Manóvil Opening ¶ 99 & n.128.) "For an in-kind remedy to be impossible in the relevant sense, the object of the obligation must no longer exist or no longer be available." (Manóvil Rebuttal ¶ 68; *see also* Manóvil Reply ¶ 116 & n.269; Manóvil Opening ¶ 99.)  Plaintiffs have not claimed that the Republic's performance was impossible in 2012 or 2013, while they still held ADRs.  (Giuffra Ex. 97 (Garro Deposition Tr.) at 256:16–22 ("Q:  So to be clear, you are not offering the opinion that performance of the tender-offer obligation was impossible at any time?  A:  I'm not saying that at any point in the report.").) Nor could they, given that some YPF shareholders in 2012 *did* bring suit seeking specific performance from the Republic in the form of a tender offer.  (*See* Manóvil Opening Report ¶ 44.) In contrast, Plaintiffs decided not to bring claims at the time.  In Petersen's case, at least, that tactical decision was a deliberate determination "*not* to bring a lawsuit against Argentina," reflecting the advice of sophisticated Argentine counsel.  (*See* SOF ¶ 81.)  Because Plaintiffs have not (and cannot) show that performance became impossible through Defendants' acts—as opposed to their own delay in bringing a claim—they are precluded from claiming damages under Argentine law.

This basic principle that parties must first seek a remedy in kind has been applied in numerous Argentine cases.  (*See* Manóvil Opening ¶ 98 nn. 125–126 (citing cases and treatises).)  The sole case Plaintiffs' experts cite to the contrary, *Dumit* v. *Villarreal*, questioned

that principle in dicta, but permitted a damages claim where specific performance had become impossible for reasons attributable to the obligor, an acknowledged exception to the general principle applied by most Argentine courts. (*See* Kemelmajer Reply Rep. ¶ 30(c) (citing *Dumit* v. *Villarreal* at pp. 102-103)). In any event, that case—was decided nearly sixty years ago and is no longer applicable because it preceded "substantial reforms made to the Civil Code on the issue of remedies for breach of contract." (Manóvil Reply Report ¶ 108.)

Plaintiffs also cite Article 505 of the Civil Code in support of their assertion that they are entitled to U.S.-style "expectation damages." (Pls.' Br. 30.) Article 505, however, describes the remedies available to a non-breaching party in the event of a breach of contract, *in the order* in which they can be pursued: (i) performance from the breaching party, (ii) performance in-kind from a third party at the cost of the breaching party, and (iii) damages. (Manóvil Reply ¶ 110 & n.239.) Article 505 therefore does not derogate from the rule that damages are unavailable if a claimant has not first sought performance in kind. (Manóvil Rebuttal Report ¶ 71.) Indeed, leading Argentine commentators—whose treatises are viewed as authoritative by Argentine courts and jurists—have interpreted Article 505 as consistent with the basic rule that damages are "subsidiary to the in-kind remedy." (*Id.* & n.114.)[10]

---

[10]    Plaintiffs' experts also pointed to Articles 511 and 628 of the Civil Code to support a general damages claim without a claim for specific performance. (*See* Giuffra Ex. 94 (Rovira Opening) ¶¶ 19–21, 32, 44.) But these provisions confirm the general rule. Article 511 provides that the non-breaching party may seek damages *in addition to specific performance* when the breaching party has breached by its own fault. Setting aside the question of whether Defendants' purported breach was by their fault, this provision does not create a standalone claim for damages independent of a claim for specific performance. (Manóvil Rebuttal ¶ 66.) Likewise, Article 628, like Article 889 discussed above, provides that that damages are available only "[i]f the impossibility [of seeking specific performance] is due to the debtor's fault." (Manóvil Rebuttal ¶¶ 65, 68.)

Finally, contrary to Plaintiffs' assertion (Pls.' Br. 31), there is no "principle of full indemnification" in Argentine contract law.  That principle applies solely to tort claims, and Professor Rovira's assertions that it applies more generally are unsupported.  (*See* Manóvil Rebuttal Report ¶ 80.)[11]

## III.  PLAINTIFFS HAVE NO RIGHT TO SUMMARY JUDGMENT ON THEIR INFLATED CLAIM FOR BILLIONS OF DOLLARS IN WINDFALL DAMAGES.

Beyond the multiple fundamental flaws in Plaintiffs' liability theory, their estimation of $16 billion in damages (most of which would go to Burford, which invested €15 million to buy Petersen's claim) is wildly inflated and unmoored from the Bylaws, Argentine law, the law of this Circuit, and even the testimony of their own damages expert.  To provide context for the enormity of the damages Plaintiffs claim for not having received a tender offer for their minority stake: including pre-judgment interest, the $16 billion sought is more than *five* times YPF's *total* current market capitalization, and is equivalent to at least 4% of Argentina's 2020 GDP and 22% of Argentina's 2021 federal government budget.[12]  Indeed, the windfall amount Plaintiffs seek—even

---

[11]    Plaintiffs also cite Article 1083 in support of their claim for expectation damages (Pls.' Br. 30–31), but Article 1083 likewise applies only to tort liability and is not applicable to a breach of contract.  (Manóvil Rebuttal ¶¶ 80–82; *see also* Giuffra Ex. 97 (Garro Deposition Tr.) at 236:14–16 (admitting that "this provision is within the section of torts").)

[12]    In addition to their claims for $8.6 billion in damages before pre-judgment interest, Plaintiffs assert that $7.3 billion of pre-judgment interest accrued through September 24, 2021 (and has continued to accrue), bringing their total asserted damages to well over $16 billion. YPF's current market capitalization is approximately ARS 360 billion, which, depending on the applicable exchange rate, is at most $3 billion.  *See* Yahoo Finance, *YPF Sociedad Anónima (YPF.BA)*, available at: https://finance.yahoo.com/quote/YPFD.BA?p=YPFD.BA&.tsrc=fin-srch (visited on May 13, 2022); Yahoo Finance, *USD/ARS (ARS=X),* available at: https://finance.yahoo.com/quote/ARS=X?p=ARS=X&.tsrc=fin-srch (visited on May 13, 2022). Argentina's 2020 GDP was approximately $390 billion.  *See World Bank Open Data, Argentina*, available at: https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?locations=AR (visited on May 13, 2022).  The Republic's federal government budget for 2021 was equivalent to at most $70.3 billion, depending on the applicable exchange rate. *See* Law 27,591 of 2020, available at: http://servicios.infoleg.gob.ar/infolegInternet/anexos/345000-349999/345117/norma.htm.

before pre-judgment interest—is more than double their (highly-leveraged) total investment in YPF, a substantial portion of which they already recouped when they transferred their ADRs before bringing this suit.[13]

The moving party bears the burden of showing that it is entitled to summary judgment, *Huminski* v. *Corsones*, 396 F.3d 53, 69 (2d Cir. 2005), and district courts may grant summary judgment as to damages only where legally supported and where "there is no fact dispute as to the amount of damages." *Westheimer Mall, LLC* v. *Okun*, 2008 WL 3891257, at *3 (S.D.N.Y. Aug. 21, 2008). Plaintiffs have not carried their burden here. Their current damages estimate rests on numerous legal errors, and gives rise to several disputes of material fact. Their position: (1) incorrectly assumes that a tender offer would have been made in U.S. dollars rather than in Argentine pesos; (2) contravenes Argentine law prohibiting share pricing unmoored from the real value of the shares; (3) incorrectly calculates the tender-offer price based on an erroneous "notice date"; (4) relies on a flawed interpretation of the Bylaws' tender-offer price formula predicated on daily rather than quarterly price-to-income ratios; (5) incorporates over $156 million in additional indirect damages that are both factually unsupported and unavailable under Argentine law; and (6) misapplies New York's 9% prejudgment interest rate to their Argentine-law claims. For all these reasons, Plaintiffs are not entitled to the enormous windfall that they seek, and certainly have not satisfied their burden to prevail on damages at summary judgment.

---

[13]     Petersen and Eton Park acquired their interests in YPF for $3.6 billion and $458 million, respectively. (Giuffra Ex. 102 (Harris Rebuttal) at ¶¶ 16 & 17.) Petersen has already recouped over $1.1 billion through reductions of its outstanding loan balances as compensation for its ADRs upon their foreclosure. (*See* Giuffra Ex. 102 (Harris Rebuttal) at ¶ 83, n. 128; Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls), at Exhibit 7.) Eton Park recouped approximately $166 million through sales of its ADRs. (*See* Giuffra Ex. 102 (Harris Rebuttal) at ¶ 85, n. 136.)

###### A.   Any Purported Damages Must be Determined in Pesos and Not Converted to U.S. Dollars Until Judgment is Entered.

Plaintiffs' inflated damages calculation presumes that Argentina would have made any tender offer directly to ADR holders in U.S. dollars.  But the Bylaws impose an obligation only to tender for Class D shares in Argentine pesos.  Under New York currency conversion rules, which govern here, Plaintiffs' asserted damages arise out of that foreign-currency obligation, and so must be converted into U.S. dollars at the exchange rate prevailing on the date of judgment, not on the date of the asserted breach.  Given that the U.S. dollar has greatly appreciated in value relative to the peso, application of the judgment-day rule substantially reduces Plaintiffs' claimed damages, which are based on an erroneous conversion from pesos to dollars as of the date of the alleged breach.

###### 1.   Damages Arising from Foreign Currency Obligations Are Determined in the Foreign Currency and Converted to U.S. Dollars on the Judgment Day.

Where, as here, a case involves a "money judgment" in a foreign currency, a federal court applies the law of the forum state to determine "the proper date for conversion of the foreign currency into [U.S. Dollars]."  *Shaw, Savill, Albion & Co.* v. *The Fredericksburg*, 189 F.2d 952, 955 (2d Cir. 1951); *Cassirer* v. *Thyssen-Bornemisza Collection Foundation*, 2022 WL 1177497 at *4 (Apr. 21, 2022) ("[A] foreign state . . . is subject to the same rules of liability as a private party.").  This Court therefore "must apply the currency-conversion rule employed by the courts of New York."  *Vishipco Line* v. *Chase Manhattan Bank, N.A.*, 660 F.2d 854, 865 (2d Cir. 1981).  And New York courts apply a judgment-day rule:

> In any case in which the cause of action is based upon an obligation denominated in a currency other than currency of the United States, a court shall render or enter a judgment or decree in the foreign currency of the underlying obligation. Such judgment or decree ***shall be converted into currency of the United States at the rate of exchange prevailing on the date of entry of the judgment or decree***.

N.Y. Jud. § 27(b) (emphasis added).

Plaintiffs' breach-of-contract claims are "based upon" a foreign-currency obligation because any tender-offer obligation must be satisfied in Argentine pesos. The pricing formulas in Section 7(f)(v) of the Bylaws explicitly require that tender offers be priced *only* in Argentine pesos. (*See* Hicks Ex. 27 (Fischel Opening) at ¶ 28; Giuffra Ex. 102 (Harris Rebuttal) at ¶¶ 22, 97). Plaintiffs' own damages expert, Professor Fischel, testified that "because Formula D uses the price income ratio of Class D shares as one of its inputs, prices using Formula D have to be calculated . . . in pesos in the first instance." (Giuffra Ex. 100 (Fischel Deposition Tr.) at 66:1–7).)

Because Plaintiffs' claims arise out of a foreign-currency obligation, this Court must apply New York's judgment-day rule. New York law "leaves the Court with no discretion as to conversion" and demands application of the judgment-day rule in every case involving a foreign-currency obligation. *Comm'ns Imp. Exp. S.A.* v. *Republic of Congo*, 2020 WL 4040753, at *2 (S.D.N.Y. July 17, 2020); *see also Competex, S.A.* v. *Labow*, 613 F. Supp. 332, 335 (S.D.N.Y. 1985) ("[T]he Court is not free to disregard New York law and to follow the Restatement view," if the two diverge), *aff'd* 783 F.2d 333, 338–39 (2d Cir. 1986). Accordingly, courts in this district have consistently and uniformly applied New York's judgment-day rule in cases arising under foreign law since the rule's enactment in 1987. *See, e.g.*, *Dye* v. *Kopiec*, 2019 WL 2527218, at *5–7 (S.D.N.Y. May 10, 2019); *Weiss* v. *La Suisse, Societe D'Assurance Sur La Vie*, 293 F. Supp. 2d 397, 408–09 (S.D.N.Y. 2003).

Failing to apply the judgment-day rule here would grossly inflate any damages, because the U.S. dollar has greatly appreciated in value relative to the peso. As Professor Harris explains, even assuming an (incorrect) tender-offer notice date of April 16, 2012, correcting for the errors in Professor Fischel's calculations would result in total damages before pre-judgment interest of

approximately $146.5 million, with the currency error explaining the vast majority of the difference between that figure and Plaintiffs' $8.4-billion assessment.  (Giuffra Ex. 102 (Harris Rebuttal) at ¶ 101, Figure 13).)  Plaintiffs' expert's erroneous computation of the purported tender-offer damages in U.S. dollars on the alleged breach date alone precludes this Court from awarding summary judgment to Plaintiffs on their requested amount of damages.

## 2. Plaintiffs' Attempts to Circumvent the Judgment Day Rule Are Unavailing.

To try to avoid the judgment-day rule, Plaintiffs claim that the Republic should have made a tender offer in U.S. dollars, and thus that its "obligation" to tender was *not* denominated in a foreign currency.  (Pls.' Br. 35 & n.11.)  This assumption, in turn, appears to be based on the premise that the Bylaws supposedly required a direct tender for ADRs, and that such a direct tender would have been made in U.S. dollars.  *Id.*  That premise—which Plaintiffs state in a single error-filled footnote (*id*.)—is incorrect.  The Bylaws provide that any tender offer the Republic was required to make would be "limited to the aggregate amount of class D shares of stock" and would be in Argentine pesos.  (Giuffra Ex. 1 (YPF Bylaws ) §§ 28(B); 7(f)(v).)  Plaintiffs identify no sound basis, in the Bylaws or otherwise, for imposing a U.S-dollar obligation paid directly to ADR holders.

*First*, Plaintiffs are wrong that the Bylaws promise a tender offer to ADR holders.  The Bylaws require that any tender offer be made only for Class D shares (and thus in pesos) and not directly to ADR holders (and thus arguably in dollars).  Section 28(B) provides that if the "National Government" has made an "acquisition" of YPF shares under Section 28(A) that triggers a tender-offer obligation, its "purchase offer . . . *shall be limited to the aggregate amount of class D shares*

*of stock.*"[14]  (Giuffra. Ex. 1 (YPF Bylaws) § 28(B) (emphasis added).)  The YPF IPO Prospectus similarly reflects that "the required tender offer need only be conducted for all outstanding Class D Shares."  (Pls.' Br. 13 (quoting Prospectus at 82).)  Even Plaintiffs' own damages expert conceded that "the Argentine Government first would be required to make a cash tender offer to all holders of Class D shares," (Hicks Ex. 27 (Fischel Opening) ¶ 7; *see also id.* ¶¶ 21, 27, 35 (calculating the "offer price for the Class D shares" in Argentine pesos as specified by the Bylaws price formula).)  There is no mention anywhere of a requirement to tender directly to ADR holders.

At the risk of stating the obvious, ADRs are not Class D shares.  ADRs are "negotiable securit[ies] issued by a US depositary bank that evidence[] ownership interest[s] in American Depositary Shares ('ADSs') which, in turn, represent an interest in shares in a non-US company." (Giuffra Ex. 24 (Lissemore Opening) at ¶ 9; *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 171 (S.D.N.Y. 2003) (describing the ADR system).)  The Bylaws accordingly recognize that ADRs are an "indirect" way to hold shares.  (Giuffra Ex. 1 (YPF Bylaws) § 7(i).)  ADR holders could benefit from a tender offer by surrendering their ADRs to the depositary in exchange for the underlying Class D shares, and then tendering those shares directly into the offer for payment in pesos.  (Giuffra Ex. 103 (Solomon Rebuttal) ¶¶ 163-169, 185; Giuffra Ex. 105 (Lissemore Deposition Tr.) at 227:12-19; 241:17-22.)  ADR holders are not entitled to an offer for a direct purchase of their ADRs in U.S. dollars.

Plaintiffs rely on Section 7(f)(i)(F) of the Bylaws to argue that the tender offer should include ADRs (Pls.' Br. 35 n.11), but that provision does not apply.  Section 7(f)(i)(F) requires that a notice of a tender offer include a statement "indicating that the takeover bid shall be open to

---

[14]     For acquirers other than the National Government, Section 7(e)(ii) provides that the tender offer shall be for "all the shares of all classes of the Corporation and all securities convertible into shares." Giuffra Ex. 1 (YPF Bylaws) § 7(e)(ii).

all shareholders and holders of securities convertible into shares of stock." (Giuffra Ex. 1 (YPF Bylaws) § 7(f)(i)(F).) This stems from Section 7(e)(ii)'s requirement that a tender offer be made for "all the shares of all classes of the Corporation and all securities convertible into shares." (*Id.* § 7(e)(ii).) Because Section 28 of the Bylaws, not Section 7, governs the scope of mandatory tender offers by the Republic—and expressly "limit[s]" the Republic's obligation to tendering for "class D shares of stock"— Section 7(f)(i)(F)'s application beyond Class D shares does not apply here. Even if it did apply, moreover, Section 7(f)(i)(F) does not cover ADRs. The Bylaws expressly define "securities convertible into shares" as "securities *of the Corporation*," including instruments such as "debentures" or "corporate bonds." (Giuffra Ex. 1 (YPF Bylaws) § 7(d) (emphasis added); *see also id.* § 7(c) (addressing "securities of the Corporation of any type that may be convertible into class D shares (including . . . without limitation, debentures, corporate bonds, and stock coupons)".) But an ADR is not a "securit[y] of the Corporation." Rather, as the Bylaws themselves elsewhere recognize ADRs are a form of "indirect" ownership of shares. (*Id.* § 7(i).) That characterization is "consistent with the general understanding" of ADRs. (Giuffra Ex. 103 (Solomon Rebuttal) ¶ 157.)[15]

*Second*, Plaintiffs incorrectly argue that "an offer priced in pesos would have been paid to [ADR] holders in dollars under YPF's deposit agreement" governing the ADRs. (Pls.' Br. 35 n.11.) As an initial matter, nothing in the Deposit Agreement could prescribe how the Republic— which is not a party to that agreement—must make a tender offer *under the Bylaws*. In any event, Plaintiffs misconstrue the relevant provision of the Deposit Agreement, which governs the conversion of dividends and other distributions rather than tender-offer proceeds. (Giuffra Ex.

---

[15]    Indeed, in its no-action letter to the SEC with respect to its own 2008 tender offer, Petersen represented that YPF had "[n]o securities convertible into Shares" outstanding, making clear that it did not consider ADRs convertible securities. (Hicks Ex. 78 at 43 n.3.)

103 (Solomon Rebuttal) ¶¶ 51-52, 83).)  In fact, the Deposit Agreement explicitly recognizes that the rights of ADR holders may differ from the rights of direct holders of shares.  (Giuffra Ex. 4 (Deposit Agreement) § 4.04.)

*Third,* the structure of Petersen and Repsol's previous tender offers—which included ADSs—is irrelevant to the scope of the Republic's legal obligation.  The fact that those "bidders" *opted* to conduct dual tender offers in two jurisdictions does not mean that they were *obligated* to do so.  And in all events, Petersen and Repsol did not act under the requirements of Section 28 of the Bylaws, which apply only to the Republic.  *See Kenford Co*. v. *Cty. of Erie*, 73 N.Y.2d 312, 319 (1989) (declining to award damages based on unfulfilled expectations that were not contemplated by contract).[16]

*Fourth*, Plaintiffs' argument that the Republic's obligations must have arisen in U.S. dollars, because ADR investors supposedly did not agree to accept currency risk is incorrect and inconsistent with Plaintiffs' experts' testimony.  "An obligation in terms of the currency of a country takes the risk of currency fluctuations and whether creditor or debtor profits by the change[,] the law takes no account of it . . ."  *Die Deutsche Bank Filiale Nurnberg* v. *Humphrey*, 272 U.S. 517, 519 (1926).  Professor Fischel accordingly acknowledged that Sebastián Eskenazi "thought that owners of YPF ADSs were exposed to currency risk" (Giuffra Ex. 100 (Fischel

---

[16]     Plaintiffs' general invocations of the NYSE Rules and the U.S. banking system similarly have no force.  Plaintiffs' expert on ADRs, Nancy Lissemore, admitted that no SEC regulation or NYSE rule required tender offers to include ADRs.  (Giuffra Ex. 105 (Lissemore Deposition Tr.) at 228:2-24; 230:10–231:5); *see also* Giuffra Ex. 103 (Solomon Rebuttal) at ¶ 185).  Moreover, as Defendants' expert Professor Solomon explains in his report, at the time of YPF's IPO and the drafting of the Bylaws, custom and practice was that a tender offer would *not* be made directly for ADRs and would be made in one currency.  (Giuffra Ex. 103 (Solomon Rebuttal) ¶¶ 178-185.) And even as the practice has developed since then, there are multiple examples of tender offers of companies with U.S.-listed ADRs that are made solely for the company's shares and solely in the company's home currency.  (*Id.* ¶¶ 186-187.)

Deposition Tr.) at 234:6-10); and that YPF had disclosed both "that owners of ADSs were exposed to currency risk" (*id.* at 233:23-234:4); and that "[s]hareholders outside of Argentina may face additional investment risk from currency exchange rate fluctuations in connection with their holding of [YPF] class D shares or the ADSs." (*id.* at 231:2-232:8).

### B.    Under Argentine Law, Plaintiffs' Windfall Tender-Offer Price Is Invalid.

Plaintiffs' damages claim is also significantly inflated because it uses a share price impermissible under Argentine law.  Plaintiffs assert that the formula supplied by the Bylaws would have yielded a tender-offer price equivalent to $88.35 per share as of February 13, 2012, and calculate their damages from that price.  That price is more than triple YPF's last closing price before the alleged breach; more than double YPF's share price on January 26, 2012, before any alleged "rumors" of nationalization on YPF's stock price; and more than 70% higher than the highest price at which YPF's shares had *ever* previously traded on the Buenos Aires Stock Exchange.  (Giuffra Ex. 102 (Harris Rebuttal) ¶ 12.a.)  Such an inflated share price is prohibited by Argentine law, which expressly nullifies disproportionate windfall pricing, even when otherwise dictated by a bylaws provision.  (Giuffra Ex. 115 (GCL) Art. 13(5).)

Argentina's GCL specifically provides that bylaws provisions that "enable the determination of a price to acquire the share of one partner by another that departs notably from its real value at the time it is made effective" shall be "null."  (Giuffra Ex. 115 (GCL) Art. 13(5).) The prohibition against "depart[ing] notably" from "real value" is a mandatory rule of Argentine corporate law.   (*See* Manóvil Rebuttal ¶ 136 (citing case law and treatises.)   Again, the $88.35/share tender-offer price Plaintiffs assert is more than 70% above the highest price at which YPF's shares had *ever* traded.  Such a price quite plainly qualifies as a "notable departure" from

the "real value" of the shares.  (Manóvil Rebuttal ¶¶ 142-143.)  As a result, it is "null" under the plain terms of the GCL, and the "real value" of the shares should be used instead.[17]

Argentine courts ordinarily treat a share's market value as its "real value" for purposes of Article 13(5) of the GCL.  (Manóvil Rebuttal ¶ 142.)  This approach adopts the common-sense economic principle that "the market price at any point in time represents the best estimate of the true value of [a] firm."  (Giuffra Ex. 102 (Harris Rebuttal) ¶ 32 (quoting Damodaran, A., Damodaran on Valuation: Security Analysis for Investment and Corporate Finance, (2006) John Wiley & Sons, Second Edition, pp. 15 & 59.)  Bearing out the accuracy of that principle, when Argentina's Appraisal Court valued the YPF shares expropriated from Repsol, it determined that the "objective value" of YPF's shares was $24.553 per share as of April 16, 2012.  (*See* Giuffra Ex. 102 (Harris Rebuttal) ¶ 35.)  That appraised price is relatively close to the $21.95 closing price of YPF's ADRs on April 13, 2012 (the last trading day before the alleged breach).

Significantly, Article 13(5) of the GCL does not render the Bylaws' pricing formula void *per se*.  Rather, that formula may be nullified at particular times only where—as here—it would produce share prices that "depart notably" from the shares' real value.  (*See* Manóvil Rebuttal at ¶ 137.)  As Plaintiffs' expert stated during his deposition, the early part of 2012 was one of "two periods where there's significant divergence" between the tender-offer price under the Bylaws' formula and the market price for YPF's shares, when "the [Bylaws'] tender offer price was much further out of proportion to the market price than at other times."  (Giuffra Supp. Ex. 100 (Fischel

---

[17]     Although the 1993 YPF IPO Prospectus warned that the Bylaws' tender-offer price formula could sometimes produce prices "substantially in excess of the market price" for YPF's shares, (Hicks Ex. 3.1 (1993 IPO Prospectus) at 11), the tender-offer prices that Plaintiffs calculate in the first half of 2012—and especially on Plaintiffs' claimed notice date of February 13, 2012—were dramatically higher than other tender-offer prices calculated under the Bylaws.  For example, Repsol in 1999 and Petersen in 2008 paid tender offers that exceeded the market price by approximately 7% and 4%, respectively.  (*See* Giuffra Ex. 102 (Harris Rebuttal) ¶ 31.)

Deposition Tr.) at 135:8–9; 132:24–133:4.)  The "significant divergence" in 2012 was caused by the 2008-2009 global financial crisis, which substantially distorted the tender offer price based on the backwards-looking price formula.  (Giuffra Ex. 102 (Harris Rebuttal) at ¶¶ 37-67.)

In the specific and unusual circumstances of this case, Argentine law does not permit the use of the Bylaws' tender-offer price formula, and any damages to Plaintiffs must be calculated using the real value—most simply, the prevailing market price—of YPF's shares.  (*See* Manóvil Rebuttal at ¶ 142.)

### C.  Plaintiffs Improperly Use a February 13, 2012 "Notice Date."

As another means of inflating their asserted "damages," Plaintiffs use an incorrect "notice date" of February 13, 2012 to determine the price at which their YPF shares allegedly should have been purchased.  According to Plaintiffs, the Bylaws and Argentine regulations collectively require a party to give a minimum of forty days' notice before making a tender offer, meaning that a party must leave the tender offer "open" for forty days prior to the "consummat[ion] of its acquisition" of shares.  (*See* Pls.' Br at 34 (citing, *inter alia*, Bylaws § 7(f)(i).)  And under Plaintiffs' interpretation of the Bylaws, the Republic should have completed a tender offer by the date of the April 16, 2012 Intervention Decree.  (*Id.*)  Plaintiffs therefore predicate their damages claim on a February 13, 2012 "notice date," *i.e.*, forty days prior to the Intervention Decree.  (Pls.' Br. 33-34; Hicks Ex. 27 (Fischel Opening) ¶ 30; *see also* Giuffra Ex. 8 (Garro Opening) ¶ 32; Giuffra Ex. 94 (Rovira Opening) ¶ 16.)

Plaintiffs' insistence on a February 13, 2012 "notice date" runs contrary to their prior position on the timing of the tender-offer requirement, *supra* Part I.B, as well as any conceivable interpretation of the Bylaws.  As explained above, the Republic did not "acquire" YPF's shares (and thus trigger any tender-offer obligation) until 2014, and any alleged notice requirement thus would have been incurred at best forty days prior to *that* 2014 date.  (Argentina's Opening Br. §

I.B; *supra*, Part II.B.)  Moreover, even if this Court were to determine that a breach occurred in 2012, predicating damages on a February 13, 2012 "notice date" would make little sense for two reasons.  First, April 16, 2012, cannot be the anchor from which to calculate the notice date because that was merely the date on which the government assumed control of management of YPF via the Intervention Decree; the Government neither initiated the "temporary occupation" of the YPF shares nor commenced the expropriation process until the effective date of the Public Interest Law, May 7, 2012.  (*See* SOF ¶¶ 66, 68, 71; Giuffra Ex. 72 (Public Interest Law) Arts. 7, 13, 18.) Second, Plaintiffs cannot simply count backward from the relevant government action (whether in April or May) and declare a "notice date" in February or March of 2012.  That position would fix liability at a point at which the Government had not yet decided to intervene in YPF in any way. It would thus penalize the Republic for having failed to begin a tender offer even though it had not yet taken *any executive or legislative action* to exercise even functional control over YPF management or Repsol's shares.  There is thus no scenario in which February 13, 2012, or any date before May 7, 2012, could be appropriate for the calculation of damages—even if this Court were to fail to apply the proper May 2014 acquisition date.

At a minimum, the appropriate date for calculating damages is a significant disputed question that precludes summary judgment.

### D.    Plaintiffs' Implementation of the Bylaws' Tender-Offer Price Formula Is Economically Inappropriate.

Plaintiffs' alleged damages are further skewed because they rely on an incorrect interpretation of the Bylaws' tender-offer price formula.  Plaintiffs' damages calculations are based on "Formula D," one of four backward-looking formulas contained in the Bylaws.  Giuffra Ex. 1 (Bylaws) § 7(f)(v)(A), (B), (C), (D)).  Central to Formula D are "price/income" ratios for Class D shares, which may be calculated based on either a daily or quarterly share price.  Although

Plaintiffs opt for the former approach, the latter is more consistent with the Bylaws and provides a more economically rational tender-offer price.  At a minimum, Plaintiffs' calculation of the Bylaws tender-offer price again makes clear that there are material facts in dispute on the question of damages.

In interpreting Formula D, Plaintiffs rely entirely on Professor Fischel's understanding. (Giuffra Ex. 102 (Harris Rebuttal) ¶ 92.)  Yet as Professor Fischel acknowledged, "Formula D is not self-implementing," and "choosing the method to apply to determine the price[/]income ratios mentioned in Formula D requires an exercise of judgment."  (Giuffra Ex. 100 (Fischel Deposition Tr.)  at 188:1-9.)  This is because the Bylaws specify that the price/income ratios "shall be determined by applying the regular method used by the financial community for computing and reporting purposes." (Giuffra Ex. 1 (Bylaws) § 7(f)(v)(D).)  As Professor Fischel recognized, however, *both* daily price/income ratios—which are recalculated every day using share prices that change based on new information unrelated to a corporation's last reported earnings—and quarterly price/income ratios—which are calculated only once per quarter on the day earnings are announced and thus accurately reflect the market's valuation of the corporation's reported earnings—are methods "used by the financial community for computing and reporting purposes." (Giuffra Ex. 99 (Fischel Rebuttal) ¶ 16, Giuffra Ex. 100 (Fischel Deposition Tr.) at 218:2-219:7.)

Plaintiffs "exercise[d]" the wrong judgment here and selected the daily ratios even though quarterly ratios would be more appropriate.  Quarterly ratios "best reflect[] how the market assessed [YPF's] earnings" because YPF released its earnings only on a quarterly basis.  (Giuffra Ex. 102 (Harris Rebuttal) ¶ 93.)  By contrast, YPF's daily ratios could be "misleading" because they did "not provide an indication of how market participants believe[d] the company should be priced relative to its earnings," and instead resulted from "confounding factors," including

arbitrary, fleeting fluctuations in share pricing stemming from, for example, one day of bad press or a one-off account payment.  (*Id*. ¶ 95.)  In such circumstances, the "regular method" preferred by the financial community would be a quarterly price/income ratio for YPF shares, and Section 7(f)(v)(D) of the Bylaws therefore requires that any tender-offer calculations implement that method.  Using the quarterly share price significantly reduces Plaintiffs' alleged damages, reducing Plaintiffs' suggested tender offer price by 34.2% per share.  (*Id.* ¶ 96.)

### E.      Petersen Has No Right to Additional Indirect Damages.

In addition to "expectation damages," Petersen claims "indirect" damages for alleged additional "losses it suffered" upon foreclosure of its YPF ADRs because the Republic's breach was willful (*doloso*), and because Petersen allegedly "was not free" to sell its ADRs on the alleged breach date.  (Pls.' Br. 36-37.)  Petersen is not entitled to such damages under Argentine law.

To start, Petersen misstates Article 521 of the Civil Code, which does not use the word *dolo* (willful intent).  Instead, it provides that where a breach is "*malicious*, the damages and interest will also cover indirect consequences."  (Civil Code Art. 521; *see also* Manóvil Rebuttal ¶ 109.)  In other words, a plaintiff may recover indirect damages only if the breaching party had the intention to *harm* the non-breaching party, not merely an intention to *breach*.  (Manóvil Reply ¶ 81; Manóvil Rebuttal ¶ 111.)  Plaintiffs have made no showing of even intent to breach—let alone the required malicious intent to harm.

Any breach was not willful (whether malicious or *doloso*) because the Republic believed the Bylaws did not apply in the event of expropriation.  Under Argentine law, if the allegedly breaching party did not believe it was breaching a contractual obligation, there can be no willful breach.  (Manóvil Rebuttal ¶ 111; Giuffra Ex. 97 (Garro Deposition Tr.) at 199:9–202:4 (opining that if a party had a "genuine" belief that public law trumped the tender-offer obligations, "that definitely cannot qualify as willful intent".)  Plaintiffs point to only two pieces of evidence to claim

that the Republic intended to breach—the April 17, 2012 speech by Secretary Kicillof and the February 2012 email exchange between Republic officials discussing a potential expropriation. (Pls.' Br. 29–30; *see supra* pp. 12-13.)  But both show the opposite.  The speech and the e-mail reflect their authors' belief that there were two permissible "paths" under Argentine law: the Republic could pursue either (i) a market acquisition that required a tender offer, or (ii) an expropriation that did not require a tender offer.  (*Id.*)  As Plaintiffs' expert conceded at his deposition, a party's good-faith belief that it is not under an obligation cannot constitute *dolo*. (Giuffra Ex. 97 (Garro Deposition Tr.) at 199:9–202:4.)

In addition, and in all events, Plaintiffs have not offered any proof for their bald assertion that Petersen "was not free" to sell its ADSs, and that "fact" is disputed.  (Giuffra Ex. 100 (Fischel Deposition Tr.) at 250:5-252:15.)  Because Plaintiffs' claim for indirect damages relies on disputed assertions and is unsupported by evidence, Plaintiffs cannot prevail on that claim at the summary-judgment stage.  *Amnesty Am.* v. *Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004).

### F.    New York's 9% Prejudgment Interest Rate Does Not Apply.

Plaintiffs assert that "[b]ecause Argentina should have launched a tender in New York on the NYSE for Plaintiffs' ADRs, the relevant prejudgment interest rate is New York's 9%."  (Pls.' Br. 37.)  Irrespective of all the other flaws in Plaintiffs' damages claims, this is incorrect and produces massively inflated damages.

"Prejudgment interest is considered a question of substantive law."  *Schwimmer* v. *Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999).  New York courts thus apply the same law that governs the substantive cause of action to the question of prejudgment interest.  *See Schwartz* v. *Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) ("Under New York choice of law principles, the allowance of prejudgment interest is controlled by the law of the state whose law determined liability on the main claim.").  Here, Plaintiffs have conceded that Argentine law applies to the

underlying obligation they assert.  (Pls.' Br. 24).  As a result, Argentina's prejudgment interest rate applies.

In a footnote, Plaintiffs suggest that, if Argentina's prejudgment interest rate applies, it is "the prejudgment interest rate typically awarded by Argentine courts in commercial cases, which is between 6% and 8%."  (Pls.' Br. n.14.)  That, too, is wrong.  Under Argentine law, Argentine federal administrative law courts, not the commercial courts, retain jurisdiction over cases involving the Republic on matters such as this.  (*See* Santiago Rebuttal ¶¶ 66–67; Uslenghi Rebuttal ¶¶ 58-60.)  Those federal courts typically apply prejudgment interest at the average borrowing rate published by the Central Bank of the Argentine Republic.  (*See* Santiago Rebuttal ¶ 69; Manóvil Rebuttal ¶ 165.)  Thus, the average monthly borrowing rate published by the Argentine Central Bank would apply here to any prejudgment interest.  (Manóvil Rebuttal ¶¶ 162-163.)

\* \* \*

For at least those six reasons, Plaintiffs' damages calculations are legally and logically flawed.  At a minimum, those calculations gloss over serious factual disputes, and no basis exists for the $16-billion windfall that Plaintiffs seek.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment.

Dated:  May 26, 2022
         New York, New York

Respectfully Submitted,

/s/ *Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
Sergio J. Galvis
Amanda F. Davidoff
Jeffrey B. Wall
Thomas C. White
Adam R. Brebner

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588

*Counsel for the Argentine Republic*

/s/ *Mark P. Goodman*
Mark P. Goodman
Shannon Rose Selden
Dietmar W. Prager
Carl Riehl
Wendy B. Reilly
J. Robert Abraham

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Telephone:    (212) 909-6000
Facsimile:    (212) 909-6836

*Counsel for YPF S.A.*