**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., | |
| Plaintiffs, | |
| -against- | |
| ARGENTINE REPUBLIC and YPF S.A., | Case Nos.: |
| Defendants. | 1:15-cv-02739-LAP |
| | 1:16-cv-08569-LAP |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., | |
| Plaintiffs, | |
| -against- | |
| ARGENTINE REPUBLIC and YPF S.A., | |
| Defendants. | |

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

KIRKLAND & ELLIS LLP

Paul D. Clement
George W. Hicks, Jr.
C. Harker Rhodes, IV

KING & SPALDING LLP

Israel Dahan
Laura Harris
Reginald R. Smith

KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U.,
Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

SUMMARY OF THE ARGUMENT .........................................................................2

ARGUMENT ..............................................................................................................5

I.  Defendants Are Liable for Breach of Contract. ................................................5

    A.  Argentina and YPF owed Plaintiffs duties under the Bylaws..................6

        1.  The Bylaws imposed duties on Argentina. ..................................9

        2.  The Bylaws imposed duties on YPF...........................................11

    B.  Argentina and YPF breached their obligations under the Bylaws........17

    C.  These breaches harmed Plaintiffs by depriving them of the promised
        tender offer.............................................................................................21

    D.  Plaintiffs are entitled to damages under the Bylaws.............................25

II.  Defendants' Attempts To Distract from Wrongful Conduct and Avoid
    Liability Fail As a Matter of Law. ....................................................................28

    A.  Defendants' contractual standing argument is both forfeited and
        meritless. ................................................................................................29

    B.  Defendants' Article III standing argument fails because Plaintiffs
        owned YPF shares when Defendants breached in April 2012.................32

    C.  Neither the ACL nor public law principles displaced Defendants'
        duties to Plaintiffs. ................................................................................35

        1.  The ACL does not control or displace Plaintiffs' contract
            claims. ........................................................................................35

        2.  Plaintiffs' claims do not conflict with public law principles. ...................38

III.  Defendants' Attempts To Avoid Paying the Damages They Owe Likewise
    Fail As a Matter of Law. ...................................................................................42

    A.  Argentine law permits Plaintiffs to elect a damages remedy here.........44

    B.  Plaintiffs are entitled to a damages amount fixed at $88 per share. ......47

        1.  February 13 is the correct "notice date." ...................................47

2.      A daily price-income ratio is typical and appropriate.................................52

3.      The price formula was designed to exceed the prevailing market price. ...................................................................................54

4.      Plaintiffs' damages should be paid in U.S. dollars. .................................56

(i)     The Bylaws promised Plaintiffs a tender offer in U.S. dollars...................................................................................57

(ii)    Even if the Bylaws did not promise a tender offer in U.S. dollars, Plaintiffs' damages are in U.S. dollars....................62

(iii)   Even if Plaintiffs' damages are in Argentine pesos, the breach-day rule requires this Court to convert them to U.S. dollars. ...................................................................66

IV.   Defendants' Arguments on Consequential Damages and Prejudgment Interest Do Not Raise Factual Disputes and Can Be Rejected As a Matter of Law. .........................................................................................................70

A.    The Petersen Plaintiffs are entitled to judgment on the consequential damages requested but will forgo them if the Court disagrees.............................70

B.    Prejudgment interest, though discretionary, does not turn on any factual dispute. ...................................................................................73

CONCLUSION.................................................................................................74

# TABLE OF AUTHORITIES

Cases

*In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025 (Del. Ch. 2015) ........................... 43

*In re Am. Fibre Chair Seat Corp.*, 241 A.D. 532 (N.Y. App. Div. 1934) .................................... 14

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
    813 F.3d 98 (2d Cir. 2016).................................................................................................... 20

*Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*,
    821 F.3d 297 (2d Cir. 2016).................................................................................................. 28

*Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*,
    57 F.3d 146 (2d Cir. 1995).................................................................................................... 41

*Barkanic v. Gen. Admin. of Civil Aviation of People's Republic of China*,
    923 F.2d 957 (2d Cir. 1991).................................................................................................. 85

*Bronner v. Duggan*, 249 F. Supp. 3d 27 (D.D.C. 2017) ............................................................ 18

*Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*,
    91 N.Y.2d 256 (1998) ........................................................................................................... 81

*C.R.A. Realty Corp. v. Goodyear Tire & Rubber Co.*,
    705 F. Supp. 972 (S.D.N.Y. 1989)........................................................................................ 47

*Canales Martinez v. Dow Chem. Co.*, 219 F. Supp. 2d 719 (E.D. La. 2002) .............................. 61

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502 (2022) ............................ 85

*Chembulk Mgmt. PTE Ltd. v. Vedanta Ltd.*, No. 1:16-cv-09827 (LTS) (KHP),
    2018 U.S. Dist. LEXIS 16886, at *8 (S.D.N.Y. Jan. 30, 2018)......................................... 74, 82

*Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208 (S.D.N.Y. 2019) ..................................... 69

*Competex, S.A. v. Labow*, 783 F.2d 333 (2d Cir. 1986) .............................................................. 89

*Consolidated Edison, Inc. v. Northeast Utils.*,
    318 F. Supp. 2d 181 (S.D.N.Y. 2004).............................................................................. 40, 43

*Cottam v. Global Emerging Capital Group, LLC*,
    No. 16 Civ. 4584 (LGS), 2020 WL 1528526 (S.D.N.Y. Mar. 30, 2020) ............................... 36

*Daniels-Feasel v. Forest Pharms, Inc.*, No. 17 CV 4188 LTS JLC,
    2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021)........................................................................ 70

*Davis v. Davis*, 419 S.E.2d 913 (Ga. 1992) ............................................................................... 50

*Dick v. Koski Prof'l Grp., P.C.*, 950 N.W.2d 321 (Neb. 2020) ...................................................... 50

*Dougherty v. Equitable Life Assurance Soc'y*, 193 N.E. 897 (N.Y. 1934).................................... 91

*Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329 (2d Cir. 1986)................................. 31

*In re Duplan Corp.*, 9 B.R. 921 (S.D.N.Y. 1980).......................................................................... 69

*FDIC v. Murex, LLC*, 500 F. Supp. 3d 76 (S.D.N.Y. 2020)........................................................... 38

*First United Fin. Corp. v. Specialty Oil Co.*, 5 F.3d 944 (5th Cir. 1993)..................................... 41

*Focus Prods. Grp. Int'l, LLC v. Katri Sales Co.*,
     No. 15 Civ. 10154 (PAE), 2021 WL 1946756 (S.D.N.Y. May 14, 2021)............................... 38

*Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174 (2d Cir. 2019).................................................. 17, 18

*Hood v. Ascent Med. Corp.*, No. 13CV0628 (RWS) (DF),
     2016 WL 1366920 (S.D.N.Y. Mar. 3, 2016) ......................................................................... 87

*Int'l Design Concepts, LLC v. Saks, Inc.*, 486 F. Supp. 2d 229 (S.D.N.Y. 2007) ....................... 42

*Int'l Harvester Co. v. TFL Jefferson*, 695 F. Supp. 735 (S.D.N.Y. 1988).................................... 95

*Levy ex rel. Immunogen Inc. v. Southbrook Int'l Invs., Ltd.*,
     263 F.3d 10 (2d Cir. 2001).................................................................................................... 47

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).......................................................................... 39

*M. Prusman, Ltd. v. The M/V Nathanel*, 684 F. Supp. 372 (S.D.N.Y. 1988) .............................. 95

*M+J Savitt, Inc. v. Savitt*, No. 08 Civ. 8535 (DLC),
     2009 WL 691278 (S.D.N.Y. Mar. 17, 2009) ......................................................................... 14

*Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308 (2020) ....................................... 21

*Malmberg v. United States*, 816 F.3d 185 (2d Cir. 2016)............................................................. 88

*Maxim Grp. LLC v. Life Partners Holdings, Inc.*,
     690 F. Supp. 2d 293 (S.D.N.Y. 2010)................................................................................... 81

*Mgmt. Techs. v. Morris*, 961 F. Supp. 640 (S.D.N.Y. 1997) ....................................................... 13

*Middle E. Banking Co. v. State St. Bank Int'l*, 821 F.2d 897 (2d Cir. 1987)............................... 85

*Nature's Plus Nordic A/S v. Nat. Organics, Inc.*,
     78 F. Supp. 3d 556 (E.D.N.Y. 2015) ......................................................................... 87, 88, 91

*Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127 (2d Cir. 1986)....................................... 86

iv

*Normand v. Bank of N.Y. Mellon*, No. 16-CV-212 (JPO),
2016 WL 5477783 (S.D.N.Y. Sept. 29, 2016)....................................................... 74, 82

*Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036 (9th Cir. 2015) ............................ 11

*Oden v. Chemung Cty. Indus. Dev. Agency*, 661 N.E.2d 142 (N.Y. 1995) .................................. 88

*Oliveira v. Quartet Merger Corp.*, 126 F. Supp. 3d 424 (S.D.N.Y. 2015)................................... 11

*Petersen Energía Inversora S.A.U. v. Argentine Republic*,
895 F.3d 194 (2d Cir. 2018)........................................................................................ *passim*

*Petersen Energía Inversora S.A.U. v. Argentine Republic*,
No. 15 Civ. 2739 (LAP), 2020 WL 3034824 (S.D.N.Y. June 5, 2020)................... 9, 39, 49, 62

*Petersen Energía Inversora, S.A.U. v. Argentine Republic*,
No. 15-cv-2739 (LAP), 2016 WL 4735367 (S.D.N.Y. Sept. 9, 2016) ............................ *passim*

*Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000)............................ 19

*Piper v. Goodwin*, 20 F.3d 216 (6th Cir. 1994) ....................................................................... 41

*Quantum Tech. Partners II, L.P. v. Altman Browning & Co.*,
No. 08-cv-376-BR, 2009 WL 4826474 (D. Or. Dec. 8, 2009) ................................................. 13

*Reiss v. Fin. Performance Corp.*, 279 A.D.2d 13 (N.Y. App. Div. 2000).................................... 10

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ 5587 RKL RLE,
2000 WL 310352 (S.D.N.Y. Mar. 24, 2000) ..................................................................... 68

*Robinson v. Gov't of Malaysia*, 269 F.3d 133 (2d Cir. 2001)....................................................... 20

*Sharon v. Time, Inc.*, 599 F. Supp. 538 (S.D.N.Y. 1984) ....................................................... 26

*Simon v. Electrospace Corp.*, 28 N.Y.2d 136 (1971) ................................................................ 81

*Simon v. Republic of Hungary*, 443 F. Supp. 3d 88 (D.D.C. 2020)............................................. 17

*In re Sunstates Corp. S'holder Litig.*, No. 13284,
2001 WL 432447 (Del. Ch. Apr. 18, 2001) ......................................................................... 43

*Tomfol Owners Corp. v. Walker*, 125 N.Y.S.3d 534 (Civ. Ct. 2020) .......................................... 14

*United States Naval Inst. v. Charter Commc'ns., Inc.*,
936 F.2d 692 (2d Cir. 1991).......................................................................................... 80

*United States v. Texas*, 507 U.S. 529 (1993) .......................................................................... 88

*Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854 (2d Cir. 1981)...................... 85, 87

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
   127 F. Supp. 3d 156 (S.D.N.Y. 2015)................................................................ 37, 38

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995)......................................... 61

*Yakin v. Tyler Hill Corp.*, 566 F.3d 72 (2d Cir. 2009) ............................................ 18

*Zdanok v. Glidden Co.*, 327 F.2d 944 (2d Cir. 1964) .............................................. 18

**Statutes, Rules & Regulations**

N.Y. Jud. Law § 27(a) (McKinney 1987) ................................................................. 85

N.Y. Jud. Law § 27(b) (McKinney 1987)............................................................ *passim*

N.Y. U.C.C. § 8-302 ................................................................................... *passim*

N.Y. U.C.C. § 3-107(2)............................................................................... 91

Interpretive Release on Rules Applicable to Insider Reporting and Trading,
   Exchange Act Release No. 18,114, 46 Fed. Reg. 48,147  (Oct. 1, 1981) ................................ 47

**Other Authorities**

New York State Bill Jacket, Ch. 326, NY Assembly Bill 7563-A .................................... 87

Restatement (Second) of Contracts § 261 (Am. L. Inst. 1981)..................................... 31

Restatement (Second) of Contracts § 347 (Am. L. Inst. 1981)..................................... 81

## PRELIMINARY STATEMENT

At the close of briefing, this remains a straightforward breach of contract case.  Defendants made extraordinary—and extraordinarily clear—promises because they had to convince foreign investors to risk their capital in Argentina's national petroleum company despite Argentina's checkered past and penchant for economic nationalism.  Above all, investors justifiably feared the prospect of renationalization.  To address those specific fears, the Bylaws contained detailed provisions that would require Argentina to make a tender offer to minority shareholders and would obligate YPF to enforce those provisions and take ameliorative action if Argentina did not comply with its obligations.  Despite the clarity and specificity of those promises, both Defendants breached anyway.  Ever since, they have worked mightily to evade their obligations and defer making the payments clearly specified in the Bylaws.  They invoked sovereign immunity and pursued an interlocutory appeal only to be told by the Second Circuit that they must honor their commercial obligations and give Plaintiffs "the benefit of the bargain."  *Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 207 (2d Cir. 2018) ("*Petersen II*").

Defendants continue to labor to avoid giving Plaintiffs their due.  Their latest response attempts to spin out a counter-narrative of YPF's history and investors' expectations.  But that counter-narrative is entirely counter-factual.  The promises were both extraordinary and pellucidly clear.  The Bylaws guaranteed that if Argentina renationalized YPF directly or indirectly "by any means" (say, by seizing control of Repsol's shares), it would make a generous tender offer to minority shareholders at a contractually specified and readily calculated price.  YPF, for its part, promised that it would ensure that minority shareholders received the benefit of the promised compensated exit by, *inter alia*, prohibiting a non-tendering acquirer from voting its shares.

Those provisions were directly responsive to investors' worst fears.  Investors plainly relied on them, but as even Defendants ultimately acknowledge, the question of reliance is legally

irrelevant.  Reliance is not an element of a breach of contract action, and every relevant element—duty, breach, causation, and damages—is amply satisfied here.  The Second Circuit has already held that YPF's bylaws are a "contract governing the relationship among YPF, Argentina (in its capacity as a shareholder), and other YPF shareholders."  *Petersen II*, 895 F.3d at 199.  That contract imposed clear duties on both Argentina and YPF.  Argentina breached its duty when it pointedly refused to make a tender offer to minority shareholders after acquiring YPF; YPF breached its own duty when it refused to take the promised actions to protect minority shareholders in the event of non-compliance with the tender-offer requirements.  Those breaches caused clear economic harm to Plaintiffs.  And both the fact and amount of Plaintiffs' damages as set forth in the Bylaws' tender-offer formulae are clear.

Argentina and YPF raise all manner of arguments to escape the consequences of their promises and breaches, but for all of their protesting, Defendants have little to say about these bedrock elements for a breach of contract claim.  Their various efforts to escape liability or minimize damages are legally flawed, as detailed below, and many have already been rejected and are foreclosed by the law of the case.  But even more important, all of Defendants' arguments are legal in nature, and none raises a disputed issue of material fact.  There is no need for a trial.  After years of obfuscation and delay, the day of reckoning is finally at hand.  The terms of the parties' bargain are set forth in clear terms in the Bylaws.  Plaintiffs were contractually entitled to a tender offer at a specified price.  The summary judgment filings make clear that there is no basis for delaying that award or denying Plaintiffs the benefit of their bargain.

## SUMMARY OF THE ARGUMENT

Both Argentina and YPF are liable for breach of contract.  As the Second Circuit has already recognized, YPF's bylaws are a contract in which both Defendants assumed duties to YPF's individual shareholders.  *Petersen II*, 895 F.3d at 199, 207, 210.  Just as they would under

American law, those duties give rise to a contract claim under the Argentina Civil Code based on obligations between shareholders and the company.  *See* Part I.A.  Argentina clearly breached its duty when it acquired control of YPF in April 2012 but refused to make a tender offer to YPF's minority shareholders.  Rather than check that abuse, as the Bylaws required, YPF abdicated responsibility and repudiated the no-vote provision designed specifically to force a tender offer. *See* Part I.B.  Those breaches caused Plaintiffs' injury, and Argentina does not argue otherwise. YPF speculates that Argentina could not have afforded a tender offer, but that contention is both irrelevant and incorrect.  *See* Part I.C.  Defendants do not seriously dispute that Plaintiffs suffered injury.  *See* Part I.D.

Rather than rebut the elements of Plaintiffs' breach-of-contract claim, Defendants invoke meritless defenses.  They argue that Plaintiffs lack contractual standing because they sold their shares—at values greatly depressed by Defendants' misconduct—but that argument is forfeited and meritless.  *See* Part II.A.  Next, they claim that Plaintiffs were never owed a compensated exit because Argentina did not acquire legal title to Repsol's YPF shares until May 2014, when it chose to settle with Repsol.  But the Bylaws clearly state that an entity may effect an "acquisition," and thus trigger the tender obligation, by obtaining ownership *or* control, and there is no dispute that Argentina controlled YPF in April 2012.  *See* Part II.B.  Defendants' contention that the Argentine Companies Law ("ACL") displaces Defendants' duties under the Bylaws runs headlong into Argentine law, which provides that the Civil Code governs unless specifically superseded.  *See* Part.II.C.1.  And Defendants' effort to recast damages formulae set forth in the Bylaws as implicating sovereign liability concerns that the Second Circuit has already dispatched is a non-starter.  *See* Part II.C.2.

Seeing the writing on the wall with respect to liability, Defendants devote more than half

of their argument section to minimizing or eliminating the amount of Plaintiffs' recovery. Defendants first contend that Plaintiffs were consigned to seeking specific performance and cannot pursue a damages remedy at all—an argument at odds with the Argentine law and the very purposes of the amendments to the Bylaws protecting minority shareholders in the event of renationalization by Argentina. *See* Part III.A. Defendants next try to minimize the quantum of Plaintiffs' damages. They seek to evade the Bylaws' instruction regarding the "notice date" used for calculating damages, urge the use of atypical quarterly price-income ratios, dismiss the contractually specified tender-offer price as "inflated," and insist upon paying any damages in Argentine pesos that just so happen to have lost 95% of their value in the years since Defendants' breaches. Each of these scattershot arguments is unavailing as a matter of law and does not preclude summary judgment for Plaintiffs. *See* Part III.B.

Finally, Defendants endeavor to gin up a fact dispute as to the pre-judgment interest rate and consequential damages. Should this Court accept that invitation to conduct a trial on those damages issues, Plaintiffs will seek the additional damages they are owed. But to bring this decade-long saga to a close, Plaintiffs simply ask this Court to grant summary judgment now for the amounts set forth in the Bylaws and their Opening Brief. *See* Part IV.

*     *     *

In short, the path for deciding this case is clear. All of the elements of a breach-of-contract claim are established, and Defendants offer little to disturb that straightforward determination, as demonstrated in Part I, below. To avoid liability, Defendants raise a variety of standing, public-law, and other non-contractual defenses, but most of these arguments have been rejected by or are inconsistent with the Second Circuit's previous decision, and the remainder are meritless, as demonstrated in Part II, below. The damages calculation is uncomplicated because the Bylaws

4

required a tender offer that complied with a specific formula, rendering the determination of damages a matter of simple math, and Defendants' efforts to minimize damages or ignore that straightforward calculation are unavailing, as demonstrated in Parts III and IV.   Some of Defendants' arguments—like its remarkable effort to pay off a 2022 judgment for breaches concerning dollar-denominated ADRs in massively devalued pesos—are so misguided that they suffer multiple defects detailed below.  But details aside, the proper outcome here is clear.  The bargain was clear, and so was the breach.  There is no need to sort through esoteric damages theories when the Bylaws specify the exact terms of a tender offer that never happened.  Under the plain terms of the contract, Plaintiffs were entitled to the benefit of that bargain.  Under the applicable law, Plaintiffs are entitled to summary judgment.

## **ARGUMENT**

### I.      **Defendants Are Liable for Breach of Contract.**

This case involves a straightforward breach of contract by both Defendants.  Given their egregious nature and scale—*viz.*, utterly disregarding clear contractual obligations to public shareholders—the breaches here generate large numbers, but as a legal matter, there is nothing "unprecedented" or particularly complicated about the Defendants' liability.  Defs.' Opp'n at 16. And there is certainly nothing that precludes summary judgment for Plaintiffs on these claims. Indeed, rather than point to disputed material facts, Defendants largely reprise or repackage legal arguments that have already been rejected in Defendants' ongoing effort to prolong this case and delay their payment obligations—including two unsuccessful motions to dismiss, an unsuccessful appeal, an unsuccessful petition for certiorari, and lengthy but ultimately fruitless fact discovery. Those arguments are no more availing now and do not alter the bottom line:  Defendants made clear promises to Plaintiffs, and Plaintiffs were injured by Defendants' failure to keep those promises and are entitled to the benefit of the bargain.

There is no genuine dispute that the elements for establishing breach of contract under Argentine law are substantially identical to those under U.S. law:  duty, breach, causation, and damages.  *See* YPF Opening at 13; *see generally* Pls.' Opening at 24-30.[1]  And the undisputed facts establish that Plaintiffs have amply satisfied those elements here.  Argentina's seizure of control of YPF on April 16, 2012 triggered a clear obligation under the Bylaws to launch a tender offer for Plaintiffs' shares at a price specified by the Bylaws.  Argentina concededly failed to do so and made its repudiation of its obligations unmistakable.  Even Argentina's current President, Alberto Fernandez, admitted on the day of the takeover that Argentina's approach "has not taken into account . . . YPF's rules," which, "when YPF was privatized," "established . . . the need to make a hostile tender offer to all of the shareholders."  Hicks Ex. 155 (Alberto Fernandez, Sobre La Expropiación de YPF, YouTube (Apr. 16, 2012)).  YPF, for its part, had a separate duty under the Bylaws to require a Bylaw-compliant tender offer and enforce the Bylaws' restrictions on non-compliant acquisitions, which it utterly failed to do.  As a direct result of Defendants' conduct, Plaintiffs suffered billions of dollars in economic harm.  More than a decade since Defendants flouted their obligations, it is now time to hold Defendants accountable and to "award [Plaintiffs] the benefit of the bargain that Argentina and YPF struck with each shareholder who purchased YPF shares on the open market," by providing the "compensated exit" the Bylaws "promise[d]" if Argentina "decide[d] to renationalize YPF," *Petersen II*, 895 F.3d at 200, 211.

### A.    Argentina and YPF owed Plaintiffs duties under the Bylaws.

The Bylaws and their robust protections for shareholders imposed clear duties on both Argentina and YPF.  The Bylaws' commitments go well beyond addressing routine matters of

---

[1] The only additional requirement imposed by Argentine courts on breach of contract claims is that the plaintiff must establish the defendant's fault, but that requirement applies only in cases, unlike this one, where the breaching party did not promise to achieve a specific result.  *See* Pls.' Opening at 29.  In any event, Defendants do not dispute that this requirement would be satisfied here if it applied.

corporate governance to provide airtight and highly specific protections for investors against changes in control in general and renationalization by the Republic in particular—provisions specifically added to the Bylaws to address *the very event that has come to pass*.  Section 7(d) of the Bylaws provides that a purchaser who "becomes the holder of, or exercises the control of" 15% of YPF—"whether directly or indirectly, by any means or instrument"—must comply with the Bylaws' tender-offer requirement.  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(d)).  Section 28 of the Bylaws provides specific protection for minority shareholders in the event of YPF's renationalization by reinforcing that these requirements "apply" to the Republic if it "becomes the owner of, or exercises the control of," at least 49% of YPF.  *Id.* § 28(A); *Petersen II*, 895 F.3d at 206 (alteration omitted).

Defendants' disavowal of these obligations years later conflicts with contemporaneous evidence showing that they understood those commitments and their importance to the effort to privatize YPF and breached them anyways.  As the Second Circuit has acknowledged, Argentina and YPF "touted these protections" in the IPO prospectus.  *Petersen II*, 895 F.3d at 200; *Petersen Energía Inversora S.A.U. v. Argentine Republic*, No. 15 Civ. 2739 (LAP), 2020 WL 3034824, at *13 (S.D.N.Y. June 5, 2020) ("*Petersen III*"); Hicks Ex. 3 (IPO Prospectus at 12-13).  As explained in Plaintiffs' Opening (at 5-6), Defendants needed to include such extraordinary provisions to successfully privatize YPF because investors were skeptical of Argentina's long track record of nationalizations and expropriations.  *See* ███████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████; Pls.' 56.1 ¶ 27; Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶ 19).  To ensure the

IPO's success, and assure skeptical investors, Argentina hired American and World Bank experts to amend YPF's bylaws to include reassuring protections in the event of a subsequent renationalization.  *See* Pls.' 56.1 ¶¶ 28-29, 50 (collecting sources); *see also* Hicks Ex. 73 (AR00053507 at 53510).  ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████

The tender-offer provisions would not have been added to the Bylaws if they were not material—and contrary to Defendants' claim (Defs.' Opp'n at 8), there *is* contemporaneous evidence that investors, including Eton Park, relied on the protections offered by the tender-offer provisions when acquiring their shares.  Pls.' 56.1 ¶ 73; Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 34); Hicks Ex. 26 (Coffee Dec. 2021 Report for Pls. ¶ 3); Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶¶ 11, 50).[2]  But Plaintiffs need not demonstrate reliance or materiality; they

---

[2] While Plaintiffs need not show that they relied on Defendants' statements, evidence of Defendants' public pronouncements regarding their obligations reinforce the existence of those obligations.  Moreover, under Argentine law, the context in which a contract is entered informs the purpose of its provisions and the scope of the obligations imposed.  *See*, *e.g.*, Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 23 n.13) ("When the meaning of the words interpreted in their context is not enough, it should be taken into consideration: a) the circumstances under which the contract was entered into, including preliminary negotiations; b) the parties' behavior including that following contract execution; c) the nature and purpose of the contract.") (quoting Argentine Unified Code Article 1065); Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 13 n.11) ("The conduct of the parties following the execution of the contract, relating to the point in discussion, shall be the best explanation of what the parties meant at the time the contract was concluded") (quoting Art. 218(4) Commercial Code of Argentina of 1862, Law No. 2637).  So too under American law, *see*, *e.g.*, *Reiss v. Fin. Performance Corp.*, 279 A.D.2d 13, 19 (N.Y. App. Div. 2000), *aff'd as modified*, 764 N.E.2d 958 (N.Y. 2001) ("proper contract interpretation is to enforce a contract in accordance with the true expectations of the parties in light of the circumstances existing at the time of the formation of the contract"), including in the context of promises made in corporate bylaws, IPO marketing materials, and a prospectus, *see Oliveira v. Quartet Merger Corp.*, 126 F. Supp. 3d 424, 427-28 (S.D.N.Y. 2015) (holding that a certificate of incorporation formed a binding contract and that the details in the proxy statement and prospectus could clarify the obligations in the certificate); *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1052 n.8 (9th Cir. 2015) (holding that "investors had a contractual right to have the Fund managed in accordance with" fundamental investment objectives in the registration statement and prospectus).

need only demonstrate obligations on the part of the Republic and YPF.  The undisputed facts establish such obligations beyond any doubt.

>    1.    The Bylaws imposed duties on Argentina.

As the Second Circuit has already held, "when Argentina asserted control over" Repsol's majority stake in YPF, it "incurred a separate commercial obligation under the bylaws to make a tender offer for the remainder of YPF's outstanding shares."  *Petersen II*, 895 F.3d at 209.  That obligation was contractual in nature, because "YPF's bylaws [are] the contract governing the relationship among YPF, Argentina (in its capacity as a shareholder), and other YPF shareholders." *Id.* at 199.  Indeed, this Court has already held that the contractual nature of this promise obviated the need to independently consider Plaintiffs' promissory estoppel claims.  *See Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15-cv-2739 (LAP), 2016 WL 4735367, at *16 (S.D.N.Y. Sept. 9, 2016) ("*Petersen I*").  Because there is no dispute that Argentina in fact asserted control over Repsol's stake in YPF (on April 16, 2012, as explained below), Argentina had a clear contractual duty to make a tender offer to other shareholders.

Argentina seeks to escape the Second Circuit's governing precedent (and its own public statements, filed with the SEC) by conjuring up the wholly new argument that Argentine corporate bylaws are special "plurilateral" contracts that do not give rise to bilateral obligations enforceable by one shareholder against another.  Defs.' Opp'n at 26-27.  That is nonsense, especially given that Argentina was the party undertaking both the initial privatizations and the subsequent renationalization.  Other than the say-so of one of Defendants' experts, Professor Rafael Manóvil, not a single Argentine statute, case, or scholarly writing supports this contention.  *See* Hicks Ex. 30

(Garro Dec. 2021 Report for Pls. ¶ 29).[3]

The absence of any such doctrinal support is unsurprising:  As the Second Circuit recognized, the contractual nature of corporate bylaws means that they are enforceable through claims for contract breach.  Indeed, while Defendants can only muster non-binding dicta in an unpublished Ninth Circuit opinion,[4] numerous other decisions demonstrate that U.S. courts routinely recognize breach-of-bylaws claims between shareholders for the kind of clear promises at issue here.  *See*, *e.g.*, *Mgmt. Techs. v. Morris*, 961 F. Supp. 640, 646 (S.D.N.Y. 1997) ("The starting point for analysis is the fact that a company's certificate of incorporation and by-laws in substance are a contract between the corporation and its shareholders and among the shareholders inter se."); *In re Am. Fibre Chair Seat Corp.*, 241 A.D. 532, 536 (N.Y. App. Div. 1934) ("[T]he by-law and the executed agreement contained in the amended certificate of incorporation constituted a contract among the shareholders, binding them, and enforceable unless positively forbidden by some statute or contrary to public policy."); *see also M+J Savitt, Inc. v. Savitt*, No. 08 Civ. 8535 (DLC), 2009 WL 691278, at *9 (S.D.N.Y. Mar. 17, 2009) (recognizing under *Management Technologies* that plaintiff-shareholder could claim breach of contract against other shareholders for violations of the bylaws but finding plaintiff's claim failed only because she did not identify which provision of the bylaws defendants violated); *Tomfol Owners Corp. v. Walker*, 125 N.Y.S.3d 534 (Civ. Ct. 2020) (citing *In re Am. Fibre Chair Seat Corp.*, 241 A.D. 532 (N.Y.

---

[3] The sole case on which Defendants rely is easily distinguishable.  In *Gatti v. Bulad*, plaintiffs brought a claim against a director for having allegedly stolen corporate property.  *See* Hicks Ex. 158 (CNCom, Division A, 22 Oct. 1999, 88 El Derecho 693, at 698).  The court dismissed the complaint on the ground that, because corporate property was at stake, plaintiffs' injury was indirect and plaintiffs had to instead pursue a derivate claim on behalf of the corporation.  *Id.* ("The individual action of liability may be brought only for the damage suffered by the shareholder, who lacks standing to bring this action on account of the damage he suffered indirectly, as part of the damage suffered by the Company").  This case, of course, does not involve a company's proprietary interest in its own assets.

[4] Defendants' sole support for their argument, *Quantum Tech. Partners II, L.P. v. Altman Browning & Co.*, No. 08-cv-376-BR, 2009 WL 4826474, at *5 (D. Or. Dec. 8, 2009), *aff'd*, 436 F. App'x 792 (9th Cir. 2011), merely offers one district court's opinion on what Delaware law, not New York law or U.S. law generally, requires.

Sup. Ct. 1934)).

Faced with the utter lack of support for his position, Professor Manóvil retreated in his reply report and deposition, conceding that specific provisions of Argentine corporate bylaws *can* be enforced by one shareholder against another if the obligations in those provisions are bilateral in nature. ██████████████████████████████; Goodman Ex. 31 (Manóvil Jan. 2022 Report for Argentina ¶ 90) (conceding that "plurilateral organizational contracts . . . [can] establish obligations binding this particular shareholder to that other particular shareholder").  That legal concession is dispositive, █████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Indeed, the Republic is unable to explain— much less coherently—what function Section 28 of the amended Bylaws, which specifically addresses only the prospect of renationalization by Argentina, serves if not to create an obligation enforceable against the Republic once it passed the relevant threshold of YPF control.

>    2.    The Bylaws imposed duties on YPF.

As the Second Circuit has already recognized, the Bylaws impose separate obligations on YPF in the event of non-compliance with the Bylaws' tender-offer provision, and "every corporation is obligated to abide by its bylaws."  *Petersen II*, 895 F.3d at 210.  Yet despite the Second Circuit's express recognition of "YPF's obligation to enforce the tender offer provision," *id.*, YPF insists the Bylaws imposed no affirmative, substantive duties on the company.  That argument contravenes *Petersen II* and ignores the language of the Bylaws.[5]

First, as explained in Plaintiffs' Opposition (at 42-43), the Second Circuit squarely rejected

---

[5] As explained in Plaintiffs' Opposition (at 43 n.22), revisiting this holding would revive Plaintiffs' promissory estoppel claim against YPF.

this argument.  YPF asserts that "[n]either this Court nor the Second Circuit has held, as a matter of law or fact, that YPF had a contractual obligation to Plaintiffs to do the things they claim it should have done—enforce the tender-offer provisions, sanction their alleged breach, or guarantee payment."  YPF Opp'n at 4.  That is a mystifying reading of *Petersen II*.  In that decision, the Second Circuit squarely held that "every corporation is obligated to abide by its bylaws," and, on the basis of that principle, the Second Circuit recognized "YPF's obligation to enforce the tender offer provision triggered by Argentina's expropriation of Repsol's 51% ownership stake," as well as its obligation "to enforce the penalties imposed by section 7(h)."  *Petersen II*, 895 F.3d at 210.  That was not stray dictum; it was central to the Second Circuit's holding that "YPF's *failure* to [enforce the tender-offer provision] caused a direct effect in the United States, namely, the required tender for ADRs listed on the NYSE never took place," and likewise, "YPF's *failure* to enforce the penalties imposed by section 7(h) is of a piece with its failure to enforce the tender offer provisions."  *Id.* (emphases added).  Those holdings—which established that YPF bore the very duties it now denies—were essential to the Second Circuit's rejection of YPF's jurisdictional argument under the FSIA.  *Id.* at 210-11.  Those holdings on "the legal *issues* [the Second Circuit] decided in the course of resolving" the appeal are now law of the case.  *Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174, 182 (2d Cir. 2019) (emphasis in original).

YPF cannot escape the force of those holdings because they came at the motion-to-dismiss stage when the relevant motion to dismiss was based on the FSIA.  "The law of the case doctrine applies to jurisdictional rulings under the FSIA."  *Simon v. Republic of Hungary*, 443 F. Supp. 3d 88, 111 (D.D.C. 2020); *see also Havlish*, 934 F.3d at 182 (applying law-of-the-case doctrine to FSIA jurisdictional determination).  In downplaying the Second Circuit's decision as the mere application of the "generous Rule 8 pleading standard," YPF Opp'n at 4, YPF ignores that the

Second Circuit interpreted YPF's bylaws in the course of rejecting Defendants' jurisdictional arguments under the FSIA—which means that, to the extent the Second Circuit resolved questions of fact,[6] it was *not* applying the deferential standard that ordinarily applies to review of the pleadings under Rule 8.  It is well-established that "[w]hen [a] defendant . . . challenge[s] the factual basis of the court's jurisdiction [under the FSIA], the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant.  Instead, the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).  YPF quoted this same language to the Second Circuit in *Petersen II*.  *See* Br. for Defendants-Appellants YPF S.A., *Petersen II*, No. 16-3303-cv(L), 2017 WL 75638, at *14 (2d Cir. Jan. 6, 2017) (quoting *Phoenix Consulting*).  And that is exactly what the Second Circuit did.  As the court explained, " '[i]n determining whether an exception to the FSIA applies, the district court can and should consider matters outside the pleadings relevant to the issue of jurisdiction,' and we do the same on appeal."  *Petersen II*, 895 F.3d at 203-04; *see also Robinson v. Gov't of Malaysia*, 269 F.3d 133, 143 (2d Cir. 2001) (At the motion-to-dismiss phase in FSIA cases, "the district court may well have taken an excursion into the same legal territory that it would visit in the course of deciding the case on the merits.").  YPF cannot dismiss the Second Circuit's binding decision that YPF was obligated to enforce the tender-offer requirement and other related provisions as some non-binding byproduct of a generous

---

[6] In addition, the "[i]nterpretation of an organization's constitution and bylaws . . . presents legal questions to be resolved by the text of the documents."  *Bronner v. Duggan*, 249 F. Supp. 3d 27, 48 (D.D.C. 2017).  The same is true for the interpretation of contracts.  *See, e.g.*, *Yakin v. Tyler Hill Corp.*, 566 F.3d 72, 75 (2d Cir. 2009) ("[T]he initial interpretation of a contract is a matter of law for the court to decide.").  For that reason as well, it makes no difference that the Second Circuit interpreted YPF's bylaws on Defendants' motion to dismiss; the Second Circuit's holding that the Bylaws imposed obligations on YPF is law of the case all the same.  Indeed, as Judge Friendly once explained, "[t]he construction of a contract has long been recognized as the type of issue 'that is particularly vulnerable to law of the case.' "  *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964).

pleading standing.  To the contrary, the whole reason that FSIA determinations are subject to an interlocutory appeal is that jurisdiction needs to be definitively ascertained at the outset.  *See*, *e.g.*, *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 116 (2d Cir. 2016).

The Second Circuit's recognition of YPF's obligations under the Bylaws remains obviously correct.  YPF complains that Plaintiffs have not pointed to any provision in the Bylaws that imposes obligations *on YPF*, as if someone else would be obligated to enforce the tender-offer provisions or restrict voting and other rights in the event of non-compliance by an acquirer.  YPF Opp'n at 7-11.  As Plaintiffs have repeatedly explained, the "shall" language in Section 7(d), 7(e), 7(f), and 7(h) and Section 28(a) directs the company itself to enforce these provisions.  *See* Pls.' Opp'n at 43-46.  Section 7(d) provides that violations of the tender-offer provisions in Section 7(e) and 7(f) "shall be forbidden."  Pls.' 56.1 ¶ 37.  Section 7(f) further guarantees that acquisitions of control "shall be conducted in accordance with the [Bylaws]," Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)), and any "additional or stricter requirements" of the jurisdictions where the company's shares are listed, *i.e.*, Argentina and New York, Pls.' 56.1 ¶ 38.  Section 28(A) explicitly provides that these protections "shall apply" when the National Government takes control of the company.  Pls.' 56.1 ¶ 44.  And Section 7(h), applicable to Argentina through Section 28(C), provides that control acquisitions that violate the Bylaws "shall not grant any right to vote or collect dividends or other distributions."  Pls.' 56.1 ¶ 42; *see also id.* ¶ 45.

Sections 7 and 28 plainly presuppose that *some* entity has the power to enforce those mandatory requirements.  *See Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) (explaining that the term "shall" ordinarily "connotes a requirement").  And who, if not YPF, would have that power?  Defendants never say who these commands are addressed to if not

to the company itself.  But one need not speculate, because Section 17 expressly provides that YPF's "Board of Directors" has the overarching authority to "[e]xercise" every one of the "powers granted by these By-laws."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 17(i), (xviii)).  Clothed with power to enforce those provisions, YPF also has the duty to enforce them.  This obligation stems directly from the Bylaws' text and aligns with the general principle in Argentine law that "[t]he Board of Directors must ensure that shareholders comply with the bylaws."  Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 27 n.23); *see also* Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 60 ("To the extent that a legal entity is created by virtue of the YPF Bylaws, this newly created juridical person . . . acquires obligations owed to the shareholders.")).

Indeed, in its prospectus, YPF reassured investors more than half-a-dozen times that *it* would enforce these express requirements and prohibitions.  *See* Hicks Ex. 3 (ECF No. 112-2 (Prospectus) at 12-13).  Those repeated assurances that YPF would have the power and the duty to enforce the Bylaws' extraordinary, mandatory requirements were designed to—and did— convince investors to part with their capital.  *See*, *e.g.*, Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶¶ 11, 50).  Even years after the IPO, YPF's SEC filings continued to state that "[p]rior to consummating any Control Acquisition, an Offeror *must* obtain the approval of the Class A shares, if any are outstanding, and make a public tender offer for all of our outstanding shares and convertible securities.  The Offeror *will be required* to provide *us* with notice of, and certain specified information with respect to, any such tender offer at least fifteen business days prior to the commencement of the offer."  Pls.' 56.1 ¶ 54 (emphases added).

YPF's public reaffirmation of its duties in SEC filings independently precludes the Company from adopting a contrary interpretation today in an effort to escape liability.  Argentine principles of estoppel (or, *actos propios*) prevent YPF from "acting contrary to what [it has]

considered proper in the past." Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 79). That YPF's prospectus specifically addressed the tender-offer provisions, and the sanctions for breach of those provisions, is not at all surprising. Investors would never have parted with their capital, and accepted the Bylaws tender-offer provisions as meaningful protection, if YPF disclosed that those provisions placed zero obligations on YPF and depended entirely on the whim of the Argentine government for their enforcement. Of course, YPF did not do that. It amended its Bylaws to take on specific obligations to protect minority shareholders against government acquisition and it emphasized in its prospectus and other regulatory filings that it would enforce these protections.

YPF's obligations, however, stretch beyond its own duties delineated in the Bylaws and promoted in public filings. Under Argentine law, YPF is also concurrently liable for Argentina's breach of its duties. Defendants do not dispute that concurrent liability applies in breach-of-contract cases. Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 58) (collecting cites to Defendants' expert reports). As Professor Rovira explained, Argentine courts have repeatedly recognized concurrent liability where the obligations arise from an agreement that, like the Bylaws here, governs the relationship between affiliated parties and a principal organizing entity. *Id.* In that scenario, where a defendant corporation is aware of a bylaws violation by one of its members or shareholders, Argentine courts demand the entity take steps to ensure compliance. *See id.* ¶¶ 58-59 (citing *B., F.M. y otro/a c/S., F.M: y otro/a s/ daños y perj.del./cuas*, Civil and Commercial Chamber of Appeals of San Isidro, Room I, Feb. 1, 2019, ED, Vol. 282—ED- DCCCXXXIX-94; *M, C. D. y otro v. L:, M.A. y otros s/ daños y perjuicios*, CNCiv., Room G, Apr. 22, 2013, El Derecho Digital, 2013, Online Citation: ED-DCCCXV-286). When the entity makes no effort to obtain compliance with its bylaws, Argentine courts will hold it liable for damages. *See id.* This is in addition to YPF's own duties as "guarantor" under the Bylaws. Pls.' Opp'n at 47-48.

### B.    Argentina and YPF breached their obligations under the Bylaws.

The breaches here are unmistakable.  All parties agree that Argentina passed the 49% control threshold when it gained 51% control of YPF from Repsol, yet it never made a tender offer to other shareholders, including Plaintiffs.  *See* YPF Opening at 8-9; Argentina Opening at 34, 37-38.  Argentina thus breached its clear contractual duty under the Bylaws.  The same is true for YPF, which had reinforcing duties to block a non-complying tender-offer and take specific steps in the event of non-compliance.  Despite raising billions of dollars on the promise that YPF would protect its shareholders in the event of renationalization, when the time came for YPF to fulfill that promise, YPF stood idly by and its managers scorned the idea.  Defendants' Oppositions do not include any arguments to the contrary.  Indeed, they are entirely devoid of evidence that Argentina or YPF honored—or even attempted to honor—the promises they made to YPF shareholders.

Argentina breached with malice aforethought.  The Argentine government prepared a memorandum to "explore the different forms of accessibility to the company," which presented two options:  follow the stipulated path under the Bylaws by arranging a bilateral sale and making a tender offer, or expropriate without paying.  Hicks Ex. 76 (AR00069033 at 69040).  Argentina made its choice:  "[t]he only way to go is expropriation."  *Id*. at 69041.  Rather than comply with the contractual obligations triggered by acquiring Repsol's shares, Argentina simply "rejected the OPA (Stock Tender Offer)," as Argentina's Secretary of Energy Daniel Cameron explained to Roberto Baratta, YPF's Argentina-appointed Board member, at the time.  *Id*. at 69033.

That conscious decision to breach was the foundation for all of Argentina's wrongful conduct thereafter.  On April 16, 2012, through Decree 530/2012, Argentina announced formal legislation to expropriate from Repsol 51% of YPF's shares.  Hicks Ex. 8 (ECF No. 98 (Argentina Answer) ¶ 35).  That same day, the government issued Decree 530/2012, which appointed Julio De Vido, Argentina's then-Minister of Planning, Public Investment, and Services, as the

"Intervenor" to exercise the powers of YPF's Board of Directors and President for 30 days (later extended for another 30 days).  Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 35).  And it appointed Axel Kicillof, then-Secretary of Economic Policy and Development Planning, as the "Vice-Intervenor" of YPF.  Hicks Ex. 9 (ECF No. 99 (YPF Answer) ¶ 38).  The intervention conferred upon De Vido the powers of the Board of Directors and the President of the Company.  Hicks Ex. 19 (YPF's Responses to Request for Admission Nos. 20-21); Hicks Ex. 18 (Argentina's Responses to Request for Admission Nos. 21-22).  The day after evicting YPF's incumbent management from the Company's offices and taking full control, Kicillof, in formal remarks before the Argentine Congress, colorfully announced that Argentina and YPF would not honor the Bylaws.  Kicillof dismissed as "fools . . . those who think that the State has to be stupid and buy everything according to the law of YPF itself, respecting its bylaws," and he characterized the tender-offer requirement as an unfair "bear trap."  Hicks Ex. 71 (AR00019489 at 19513); *see also* Hicks Exs. 18, 20 (Argentina's Responses to Request for Admission Nos. 42, 44, 58-59).  Kicillof made these remarks "in his capacity as Vice-Intervenor of YPF" and also "in his capacity as Secretary of Economic Policy and Development Planning of the Ministry of Economy and Finance."  Hicks Exs. 18, 20 (Argentina's Responses to Request for Admission Nos. 42, 44, 58-59).

Defendants' argument that the act-of-state doctrine shields the memorandum and speech from review is a red herring.  *See* Defs.' Opp'n at 21.  Plaintiffs are not "[c]hallenging" the actions underlying them.  *Id*.  Nor do Plaintiffs challenge Secretary Cameron's decision to circulate a memorandum, or Secretary Kicilloff's decision to make a speech.  Plaintiffs are challenging the purely commercial decision by the Republic not to make a tender offer.  The memorandum and speech are merely contemporaneous evidence of Argentina's willfulness and bad faith in breaching that obligation.  *Cf. Sharon v. Time, Inc.*, 599 F. Supp. 538, 544-45 (S.D.N.Y. 1984) (official

statements used as evidence of intent do not implicate state action doctrine).

Defendants are also incorrect that the memorandum and speech show that "Argentine officials believed that the Bylaws' tender-offer provisions did *not* apply to the expropriations of shares." Defs.' Opp'n at 11. To the contrary, Secretary Kicillof's speech makes plain that Argentine officials knew that the expropriation of the Repsol shares triggered the tender-offer provision vis-à-vis the remainder of the shareholders. He proclaimed that "buy[ing] everything according to the law of YPF itself," would be "respecting its bylaws"—something Kicillof found "stupid." Hicks Ex. 71 (AR00019489 at 19513-14). These statements confirm that Argentina knew full well that the Republic was breaching its legal obligation to minority shareholders. In all events, because Defendants' obligations were obligations of result, they are liable without regard to their intent. Pls.' Opening 28-29. Defendants do not contest this or suggest that Plaintiffs must establish Defendants' intent in order to prevail. Even if Defendants had never set forth their plain intent to breach in the memorandum, and even if Kicillof had never decried paying minority shareholders as "stupid," that would not alter the fact that Argentina failed to make a tender offer despite passing the 49% threshold, constituting breach.

The undisputed facts also firmly establish YPF's breach of the Bylaws. The Bylaws obligated YPF to enforce the tender-offer requirements and impose sanctions for noncompliance. YPF never did. Contrary to Defendants' argument, Plaintiffs do not contend that YPF breached the Bylaws "because of opinions offered by Secretary Kicillof." YPF Opp'n at 13. The opinions of YPF's Vice-Intervenor—offered on behalf of YPF—confirm but do not constitute YPF's breach. Rather, YPF breached when it declined to uphold its promise to enforce the Bylaws in the face of Argentina's failure to conduct a tender offer. Vice-Intervenor Kicillof announced publicly what the Company had already decided—namely, that YPF would enforce neither the tender-offer

provisions nor the no-vote provision against Argentina.  YPF was thus repudiating its contractual

obligations—but at the very least, it did not comply with them, and never has.

YPF does not dispute that account.   Even YPF's outside counsel in this case acknowledged

"YPF did not take actions" or "enforce obligations" under YPF's bylaws following Argentina's

seizure.  Hicks Ex. 22 (Ltr. from D. Hernandez to A. Goldsmith (Oct. 9, 2020) at 4).

Kicillof's statements are also evidence of YPF's breach because Argentine law recognizes

the "organ" theory of corporate action.  *See* Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 8).

"The organ is conformed by individuals or a group of persons whose conduct is attributed to the

juridical person according to certain rules.  The company primarily acts through its organs, and

these in turn may create other juridical relationships attributable to the company."  *Id*. ¶ 28 n.18

(quoting Balbín, Sebastián, *Tratado de Derecho Civil y Comercial*, Vol. IX. Sociedades, Andres

Sanchez Herrero editor, Pedro Sanchez Herrero, coordinator. Thomson Reuters—La Ley, Bs As,

2017, p. 333, 6.1.1).[7]  This is not a situation under Argentine (or U.S.) law in which Kicillof would

face individual liability.  *Contra* YPF Opp'n at 14.  When Kicillof spoke before the Argentine

Congress the day after he was appointed as YPF's Vice-Intervenor, he was speaking in his dual

---

[7] This concept is similar to respondeat superior liability under U.S. law.  *See Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 318 n.9 (2d Cir. 2016) ("[A] corporate legal entity . . . 'necessarily functions through human actors—its officers, agents and employees—whose knowledge and conduct may be imputed to the entity under the doctrine of respondeat superior.' ").

capacity as Deputy Minister of Economy and Vice-Intervenor of YPF. That is how he was introduced, and he acted accordingly.[8] Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 26). Defendants' experts have conceded as much. ███████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████; Hicks Ex. 138 (Comadira Tr. for YPF 112:17-24) (agreeing that Kicillof and De Vido "continued to serve as members of the government while also exercising their roles as intervenor and vice intervenor of YPF").

Speaking in *both* capacities, Kicillof announced that *both* Argentina and YPF were repudiating their obligations under the Bylaws. What Kicillof's statement suggested, Defendants' conduct proved: Argentina never made a tender offer, and YPF never enforced the Bylaws provisions against Argentina to force one. Defendants' breaches were as clear as their obligations.

## C. These breaches harmed Plaintiffs by depriving them of the promised tender offer.

Defendants' breaches plainly harmed Plaintiffs by depriving them of the tender-offer at the sum certain price that the Bylaws promised. Like the breach element, this element is straightforward—so much so that Argentina does not challenge it.

YPF asserts that its conduct could not have damaged Plaintiffs because Argentina would not have carried out a tender offer no matter what YPF had done to try to enforce the Bylaws. YPF Opp'n at 16-17. To begin, that argument is at odds with YPF's separate argument that Plaintiffs had an obligation to pursue specific performance before seeking damages. *See* Defs.' Opp'n at 37-39; Pls.' Opp'n at 55-56. For purposes of that argument, YPF insists that specific performance

---

[8] Throughout the meeting, Kicillof and De Vido referred to each other as Intervenor and Vice-Intervenor. For example, when referring to Kicillof, De Vido pointed out that "the vice intervenor is in charge of the economic, financial and commercial sector of the company and we are jointly working in meetings coordinating the operational management of the two sectors." Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 26 n.16 (quoting Hicks Ex. 71)).

was possible.  Indeed, YPF cites lawsuits that other YPF shareholders brought against Argentina seeking specific performance in 2012.  Defs.' Opp'n at 38; *see* Goodman Ex. 23 (Manóvil Sept. 2021 Report for Argentina ¶ 43 n.57) (citing Giuffa Ex. 60 (*De San Martín, José and others v. Estado Nacional-PEN S/Proceso de Conocimiento*, Federal Court in Contentious Administrative Matters No. 10, File No. 35167/2013)).  YPF cannot turn around and argue that it is absolved from damages because specific performance would have been a dead end.  Indeed, YPF's causation arguments conflict not only with the positions articulated by it elsewhere, but also with the Second Circuit's holding that there was "no reason why Argentina could not have complied with . . . the bylaws' tender offer requirements."  *Petersen II*, 895 F.3d at 208.

Nor is the premise for YPF's causation argument remotely persuasive.  Section 7(h) of the Bylaws contemplated an acquirer intent on bypassing its tender-offer obligations, and it obligated YPF to prevent any such acquirer from voting its expropriated shares, collecting dividends or distributions on those shares, and counting those shares for purposes of a quorum at any YPF shareholder meeting.  *See supra* Part I.A.2; Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(h)).  Defendants claim that Argentina retook control of YPF because YPF was in dire straits and needed emergency intervention.  Argentina Opening at 9.  Even taking that dubious narrative for granted, Argentina could not have accomplished its alleged emergency turnaround goals without exercising majority voting power.  Thus, YPF's enforcement of Section 7(h)—which would have prevented Argentina from voting the 51% of shares over which it gained control, *inter alia*—almost certainly would have forced Argentina to make a tender offer, which is why the provisions were added to the Bylaws in the first place.  It is unthinkable that Argentina would have gone through the effort of gaining control of 51% of YPF (triggering Argentina's financial obligations to Repsol under Argentine expropriation law, as Argentina never disputes), if those shares came without voting

powers, which is precisely the disability that Section 7(h) obligated YPF to effect.

Moreover, YPF has not presented any evidence that it would have been *impossible* for Argentina to obtain the funds required to finance a tender offer for 49% of YPF's shares in 2012. Argentina itself has admitted: "Performance of the tender-offer provisions in the Bylaws was not impossible at the time of the alleged breach." Argentina Opening at 30. And the expert report YPF relies on, Daniel Marx's rebuttal, is not to the contrary. His report states only that, "from a practical perspective, it would have been very difficult for the Republic to obtain the funds required to finance a tender offer for 49% of YPF's shares in 2012 at the prices determined by the parties' experts." Hicks Ex. 49 (Marx Dec. 2021 Report for YPF ¶ 89). Marx's use of "difficult," rather than "impossible," is telling, and further undermines any suggestion of a material dispute regarding Argentina's ability to pay. YPF's Opp'n at 16-17. Argentine law does not allow a promisor to escape liability if fulfilling its legal duty would be "difficult" or cause financial "strain." Hicks Ex. 140 (Bianchi Jan. 2022 Report for Pls. ¶ 68). Any budgetary trade-offs that *may* have been necessary for Argentina to comply with its obligations under the Bylaws do not absolve it of liability—and they certainly do not absolve YPF for its failure to take any steps to enforce those obligations at the time Argentina breached.

At bottom, YPF's arguments are really just attempts to invoke *force majeure*. That effort plainly fails because, under Argentine law, *force majeure* is a defense that requires the event in question—here, Argentina's renationalization of YPF—to have been *both* "unforeseeable" *and* "external" or "alien" to YPF. Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 48); *see also* Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 36); Hicks Ex. 139 (Kemelmajer Tr. for YPF 126:10-15); *see* Hicks Ex. 48 (Kemelmajer Dec. 2021 Report for YPF ¶¶ 86, 88); Restatement (Second) of Contracts § 261 (Am. L. Inst. 1981) (impossibility defense only available when "a

party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made"); *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 339 (2d Cir. 1986). YPF fails on both fronts. Argentina's renationalization of YPF was entirely foreseeable—after all, the Bylaws specifically foresaw it and attempted to ameliorate it by providing rules to protect against precisely that risk. Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 28). Rather than checking Argentina's abuse at the door—or at least *attempting* to use the mechanisms specifically designed to force a tender offer—YPF waved the fox inside the henhouse. Having fully acquiesced in and enabled Argentina's breach, YPF cannot now turn around and claim the result was "external" to the company. Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 49); *see* Pls.' Opp'n at 52-56.

Finally, YPF's failure to create any factual issue regarding Argentina's financial ability to comply is beside the point because YPF accepted contractual responsibility and is liable for breach without regard to whether its compliance would have altered Argentina's behavior. Defendants' own expert Professor Manóvil concedes that a contracting party will be held liable for breach *either* if it caused the harm *or* if it accepted responsibility in the event of a *force majeure* or impossibility. As Manóvil explained, Article 889 of the Civil Code established that "if the debtor (either in the contract or by being in default) has assumed responsibility for unforeseeable circumstances or force majeure, the original obligation is converted into an obligation to pay damages and interest." Goodman Ex. 58 (Manóvil Dec. 2021 Report for YPF ¶ 67). An insurer who agrees to provide flood insurance cannot defeat its obligation by blaming the flood or labeling it a *force majeure*. And here, the Bylaws specifically contemplated the precise events that came to pass and imposed obligations on YPF to act to ameliorate the impact on minority shareholders deprived of the promised tender offer. In that circumstance, YPF was responsible for enforcing

the sanctions for noncompliance and cannot defeat causation by pointing the finger at Argentina. YPF's breach of its own obligation caused Plaintiffs' injuries but would create liability even in the face of *force majeure* or impossibility, according to Defendants' own expert.

**D.      Plaintiffs are entitled to damages under the Bylaws.**

Just as there is no serious dispute that Defendants caused Plaintiffs' harm, there can be no serious dispute that Plaintiffs suffered sufficient damages or harm to support a breach of contract action.  The consequences for Plaintiffs of Argentina's failure to abide by its obligation to make a tender offer to minority shareholders, and YPF's failure to abide by its obligation to take ameliorative actions in the event of non-compliance, were direct and enormous.  Once again, the Bylaws are premised on the undeniable reality that minority shareholders would suffer from a failure to abide by the tender-offer requirements, and the Bylaws provide a ready measure of those damages.  As explained in Plaintiffs' Opening (at 30-32), the amount of damages Defendants owe Plaintiffs is the product of a straightforward calculation prescribed by the Bylaws.  It can be determined as a matter of law and does not turn on any factual issues.  In fact, the parties and their damages experts largely agree on the interpretation and application of the Bylaws' formulas.

Start with the parties' common ground.  The experts agree that this Court must compare, on the one hand, the price Plaintiffs would have received on the date of the breach had there been a tender with, on the other hand, the market price of what they were left holding instead on that date.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 41); Giuffra Ex. 102 (Harris Dec. 2021 Report for Defs. ¶ 36) ("Plaintiffs are only entitled to alleged damages, if any, that reflect the difference between the value they would have received had a tender offer been made and the value of shares that Plaintiffs had in the absence of that tender offer.").  And both sides agree that the Bylaws' four formulae calculate a tender-offer price based on backward-looking and publicly available criteria.  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)).  The parties likewise agree

that in calculating what Plaintiffs would have received in a tender offer, the Court must use the highest price produced by the four different formulas.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 8) ("The tender offer price was to be the same for all shares tendered and could be no less than the highest price resulting from a preset pricing mechanism described in the By-laws"); Giuffra Ex. 102 (Harris Dec. 2021 Report for Defs. ¶ 22) ("Article III, Section 7(f)(v) of the YPF bylaws states that a tender offer price is to be the highest of four values").

There is no disagreement among the experts that these different formulas are designed to protect the interests of shareholders in different scenarios.  If the share price has recently been high in the lead up to a takeover, for example, then shareholders get the benefit of Formula B, which fixes the price at the highest trading price over the 30 days preceding a defined "notice date."  If the share price has been low relative to the company's earnings, in contrast, Formula D provides protection; it takes the last reported annual income number as of that notice date and multiplies it by the highest price/income ratio over the two years preceding the notice date.  All of the formulas are keyed to the same notice date to prevent the government or any other acquirer from manipulating the tender price through any pre-tender actions that could artificially drive the tender-offer obligation down.  *See* Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 7(h)).

Finally, the parties agree that Formula D provides the highest price in this case.  Giuffra Ex. 102 (Harris Dec. 2021 Report for Defs. ¶ 39); Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. Ex. 2).  Formula D requires a contractually-compliant tender offer to be priced at the product of (a) YPF's net income per share for the four quarters preceding a defined notice date, and (b) the higher of (i) the price/net income ratio over the same period and (ii) the highest price/net income ratio during the two years before the notice date.  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(D)); Giuffra Ex. 102 (Harris Dec. 2021 Report for Defs. ¶ 22).

26

Plaintiffs' damages flow directly from that agreed-upon formula and thus can be resolved on summary judgment.  To calculate damages under Formula D, one need only follow three simple instructions set forth clearly in the Bylaws:  (1) Examine publicly available data as of a defined notice date, (2) take YPF's last reported annual income as of that notice date, and (3) multiply by the highest price-to-income ratio in the two years preceding that notice date.  Applying that formula to a breach date of April 16, 2012, and multiplying the annual income figure and the highest price/income ratio measured as of the defined notice date 40 business days earlier (February 13), Professor Fischel arrived at a tender offer share price of $88.35.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶¶ 34-39).  Using that price, determining Plaintiffs' damages is simply a matter of math:  calculating the difference between what they would have received for their shares in a tender offer ($88.35) and the market value they retained after Argentina failed to tender ($13.12) and multiplying by the number of shares held.  *Id.* ¶¶ 39-40.  The result—$7.533 billion in direct damages for Petersen and $898 million in direct damages for Eton Park—is large only because the number of shares wrongly denied a tender offer is substantial.

Defendants do not contest Professor Fischel's calculation of the specific prices generated when the formulas are applied to different hypothetical notice dates.  *See* Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. Ex. 2).  Instead, they endeavor to reduce the amount of any damages by fixing on a different notice date or adopting a different price-to-income ratio.  Both of those arguments can easily be disposed of by the Bylaws' clear textual instruction to use the "highest price/income ratio for the Corporation during the two-year period immediately preceding the notice date."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(D)).  But more fundamentally, Defendants' quibbles over the proper notice date and price-to-income ratio merely go to the *quantum* of any damages, which Plaintiffs address below.  *Infra* Part III.B.  They make no

argument contesting "the fact of damages" that Plaintiffs suffered as a result of Defendants' conduct.  That suffices for purposes of establishing the final element of Plaintiffs' cause of action for breach of contract.  *See*, *e.g.*, *Cottam v. Global Emerging Capital Group, LLC*, No. 16 Civ. 4584 (LGS), 2020 WL 1528526, at *10 (S.D.N.Y. Mar. 30, 2020).

*      *      *

As there is no genuine issue of material fact regarding any element of Plaintiffs' claim, and Defendants' legal arguments fail on each of those elements, Plaintiffs are entitled to summary judgment.  Uncontroverted evidence establishes that Defendants took on contractual duties to Plaintiffs, breached those duties, and caused Plaintiffs injury.  As a matter of law, Plaintiffs have proven their breach-of-contract claim.

## II.    Defendants' Attempts To Distract from Wrongful Conduct and Avoid Liability Fail As a Matter of Law.

Unable to meaningfully contest the elements for breach of contract, Defendants resort to a host of strained defenses designed to render the clear promises in the Bylaws illusory.  Those *post hoc* arguments are non-starters as a matter of both law and common sense.  There is a reason that Defendants made clear promises at the time of the IPO and acknowledged the clarity of their breach in 2012.  If Defendants had articulated any of these arguments at the time of YPF's IPO, that privatization would have been dead on arrival.  And if any of these arguments had any merit, Defendants would have floated them at the time of the breach.  But when Argentina renationalized YPF by seizing control of a majority interest in the company in April 2012, Defendants did not *deny* that they had made their core promise of a "compensated exit," nor suggest that they could escape liability on some obscure technicality.  Instead, they publicly and proudly *renounced* their promises to minority shareholders, labeling fealty to contractual promises "foolish" and a "bear trap."  Unsurprisingly, Defendants' newfound attempts to deprive Plaintiffs of the benefit of their

bargain are wholly groundless.[9]

### A.  Defendants' contractual standing argument is both forfeited and meritless.

Defendants assert that Plaintiffs lost standing to bring this action—and to recover for the damage Defendants caused them—because they transferred their ADRs after Defendants breached.  Defs.' Opp'n at 17.  That argument, which has not previously surfaced despite having been available to Defendants since the complaints were filed in 2015 and 2016, is forfeited.  *See* Pls.' Opp'n at 9-11.  It is also wrong on the merits.

"Contractual standing" is not a real Article III standing argument that can be raised at any time, but a merits defense that Defendants were obligated to raise in their "answer or pre-answer motion to dismiss."  *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 169 (S.D.N.Y. 2015).  Instead, they waited more than seven years after first moving to dismiss this case to even hint at the issue they now label a "threshold bar."  Defs.' Opp'n at 17.  This Court has repeatedly found forfeiture in comparable (albeit less egregious) circumstances.  *See*, *e.g.*, *FDIC v. Murex, LLC*, 500 F. Supp. 3d 76, 97 (S.D.N.Y. 2020) (holding contractual standing defense forfeited where defendants raised different standing arguments, but not contractual standing, previously); *Focus Prods. Grp. Int'l, LLC v. Katri Sales Co.*, No. 15 Civ. 10154 (PAE), 2021 WL 1946756, at *2-3 (S.D.N.Y. May 14, 2021) (holding statutory standing defense forfeited based on defendants' failure to raise it in "the first five years of this litigation"); *Wells Fargo*, 127 F. Supp. 3d at 169 (holding contractual standing defense forfeited where defendant raised it only after plaintiff sought judgment on the pleadings).  The Court should follow that course here.  There is simply no basis to reward Defendants' effort to sandbag Plaintiffs and this Court.

At any rate, there is nothing to this contractual standing argument, which may explain why

---

[9] Many of Defendants' arguments opposing Plaintiffs' motion for summary judgment are in Defendants' motion for summary judgment.  Thus, Plaintiffs' Opposition to that motion also covers much of the ground addressed herein.

it did not surface sooner.  First, Defendants have stretched far to find a hook to say that New York law applies—despite their insistence up to this point that Argentina law controls the issues in this case.  Defendants' invocation of N.Y. U.C.C. § 8-302 as the basis of their contractual standing argument is strange, given that Defendants themselves have steadfastly argued—and this Court has agreed—that Argentine law governs Plaintiffs' breach of contract claims.  *See Petersen I*, 2016 WL 4735367, at *14; *Petersen III*, 2020 WL 3034824, at *13.  Argentine law, like U.S. law, gives the right to bring a legal claim for damages to the party that suffered the harm.  *See* Civil Code Section 1109; Section 1716 of the Civil and Commercial Code of the Nation ("CCC"); *see also* Hicks Ex. 136 (National Civil Chamber of Appeals, Room E, "*Perrino, Elizabeth Liliana c. Tschubarov, Adrián y otro*," 09/10/2010. TR La Ley: AR/JUR/61577/2010) (holding claim for damages "fixed" on the day plaintiff's property was injured and not extinguished when property was sold); *cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992) ("[T]he party seeking review [must] be himself among the injured.").  Plaintiffs have standing because they were ADR holders at the time of Defendants' breaches—*i.e.*, at the time when Defendants were obligated to make a tender offer to minority shareholders—and suffered injuries as a direct result.  It is no surprise then that the Spanish bankruptcy court presiding over Petersen's insolvency has held that Petersen maintains its right to litigate this suit—and that the claims belong to Petersen and not its foreclosing creditors.  *See* Hicks Ex. 133 (Order, *Petersen Energía Inversora, S.A.U.*, Ordinary Bankr. 405/2012 (Comm. Ct. Madrid 03 Sept. 1, 2010)).

Even if New York's UCC did apply, Defendants would still be wrong in any event.  Article 8 of the New York U.C.C.—which includes § 302—is of limited scope.  "Revised Article 8 as a whole does not set forth general rules defining property rights that accrue to holders of securities, nor does it address a holder's rights against third parties.  Rather, Rev. § 8-302 simply codifies the

common law shelter principle.  It ensures that a holder in due course gains clear title and can transfer its rights in the security as such."  6L UCC Reporter-Digest A1 (2022) (discussing *Consolidated Edison, Inc. v. Northeast Utils.*, 318 F. Supp. 2d 181 (S.D.N.Y. 2004)); *see also* N.Y. U.C.C. Law § 8-302, Official cmt. 1 ("Subsection (a) . . . [is a] statement of the familiar 'shelter' principle"); *First United Fin. Corp. v. Specialty Oil Co.*, 5 F.3d 944, 946 (5th Cir. 1993).  Section 8-302 was meant to protect bona fide purchasers when ownership is disputed based on an improper endorsement or another issue concerning the security's transfer.  *See*, *e.g.*, *Piper v. Goodwin*, 20 F.3d 216, 219 (6th Cir. 1994).  It was not intended to disturb the rule in New York that the assignment of a cause of action must be express.  *See*, *e.g.*, *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 151-52 (2d Cir. 1995); *Int'l Design Concepts, LLC v. Saks, Inc.*, 486 F. Supp. 2d 229, 236 (S.D.N.Y. 2007).

Defendants' next piece of fancy footwork involves pointing to American cases discussing bylaws at a level of generality so high that their citations become practically useless.  But nothing in the cases materially advances their cause.  Although some cases have accorded § 8-302 with substantive meaning about *which* rights transfer alongside a security, all of those cases involved rights that inhered "in the security."  § 8-302; *see* Pls.' Opp'n at 16-19 (distinguishing Defendants' § 8-302 cases).  The right to bring this breach-of-contract action, however, does not involve a right in a security; it involves the Plaintiffs' personal right to seek recovery from Defendants for the "compensated exit" that shareholders at a specific moment in time were promised but denied.  Pls.' Opp'n at 14-19.  Indeed, Defendants' own line of cases demonstrates how the right to a compensated exit from a company in the event of a change of control—or the right to sell or dispose of one's shares in any context—gives rise to personal claims.  *See*, *e.g.*, *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015) ("Quintessential examples of

personal claims would include a contract claim for breach of an agreement to purchase or sell shares or a tort claim for fraud in connection with the purchase or sale of shares."); *In re Sunstates Corp. S'holder Litig.*, No. Civ. A. 13284, 2001 WL 432447 (Del. Ch. Apr. 18, 2001) (recognizing that a claim under the bylaws for a missed dividend payment is a personal right and *not* a right in the security). So too, here. Since Plaintiffs' claims are based on the underlying right to sell their shares at a predetermined rate, they do not transfer without express assignment. *Consol. Edison, Inc. v. Ne. Utils.*, 318 F. Supp. 2d 181, 183 (S.D.N.Y. 2004) (holding § 8-302 did not apply to Plaintiffs' rights to exit at premium promised during course of merger).

On top of lacking any support in caselaw, Defendants' interpretation would produce absurd results. Here, for example, it would mean that a shareholder would lose standing to sue for breach of the tender-offer provision unless it held its shares through final judgment, which in this case has taken more than 10 years. That cannot be right. New York Stock Exchange ("NYSE") investors were promised and expected a "compensated exit" in the event of renationalization, not a requirement that they stay on board YPF's sinking ship for a decade as a precondition for recovering anything from the wreckage.

## B. Defendants' Article III standing argument fails because Plaintiffs owned YPF shares when Defendants breached in April 2012.

Defendants' next standing argument—that Plaintiffs lack standing because the breach actually occurred in 2014 when Argentina chose to settle with Repsol—at least has the virtue of being raised before. But it is similarly unavailing. Defendants breached the Bylaws on April 16, 2012, when Argentina retook control of YPF and failed to make a tender offer to minority shareholders, and when YPF refused to enforce the Bylaws. Shareholders were injured on that day and have standing to claim breach of contract. *See* Pls.' Opp'n at 20-27.

The Bylaws are clear on this point, as the Second Circuit recognized: "Simply put, section

28(A) compels Argentina to make a tender offer in accordance with the procedures set forth in the bylaws if 'by *any means* or instrument' it 'becomes the owner [of], or *exercises the control of*,' at least 49% of YPF's capital stock." *Petersen II*, 895 F.3d at 206 (second emphasis added).  Section 28 states that the tender-offer provision applies to "all acquisitions made by the National Government, whether directly or indirectly."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 28(A)). That language readily encompasses Argentina's actions on April 16, 2012, when Argentina assumed "control" of YPF "by any means or instrument"—namely, by occupying 51% of Repsol's stake in the company through its seizure and takeover of YPF.  The Second Circuit has already held as much:  It "conclude[d] that when Argentina asserted control over Repsol's 51% stake in YPF via expropriation, it incurred a separate commercial obligation under the bylaws to make a tender offer for the remainder of YPF's outstanding shares."  *Petersen II*, 895 F.3d at 209.

Defendants' efforts to narrow the broad language applying the tender-offer requirement to "all acquisitions made by the National Government" border on the incoherent.  First, they contend that an acquisition is effected "only from share *ownership*, either directly by the acquirer or through related corporate entities."  Defs.' Opp'n at 30.  "Control," in contrast to ownership they say, is just a "consequence" of an acquisition rather than an alternative to ownership as a trigger event for the tender-offer obligation.  *Id*. at 31.  That simply makes no sense.  The Bylaws use both "ownership" and "control" in the disjunctive in the very same phrase when defining what triggers the tender-offer obligation:  Section 7 applies "if, *as a consequence of such acquisition*, the National Government *becomes the **owner**, or exercises the **control** of*, the shares of the Corporation."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 28(A)).  In one telling slip, Defendants place those two concepts side by side, stating that a tender offer and an expropriation were simply two "'different' methods of *assuming control of the company*."  Defs.' Opp'n at 12.  Elsewhere

the Bylaws repeatedly refer to the acquisition or taking of "control" and Defendants' experts agreed that phrases like the one used here do not require ownership.  *See* Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(d), (e)) ("Adquisiciones de Control"); Goodman Ex. 31 (Manóvil Jan. 2022 Report for Argentina ¶ 31) (giving the sentence "the defendant acquired control of the company" as an instance where acquisition refers to acquisition of control, not title).

Second, Defendants read "indirectly" to cover only one entity's obtaining ownership of shares through another entity.  But the Bylaws plainly rebut that reading.  Section 7(i) lists acquisition through related entities as just one way among "other similar mechanisms" whereby an entity can acquire YPF "indirectly."  The beneficial owners of assets may be different from the owners of legal title in several of the situations Section 7(i) contemplates—for example, acquiring through a company the purchaser controls, or acquiring through trusts or ADRs.[10]  This decision to capture more than just ownership of shares through a related entity makes sense.  With an acquisition by the government, the need for shareholder protection in the event of a change of control is even more pronounced—without regard to whether or when formal title passes—as evidenced by the facts of this case.  Argentina did not wait to acquire formal title to Repsol's shares before it displaced the management and board, changed YPF's dividend policy, and (admittedly) proceeded to run the company based on the national interest, rather than the interests of minority shareholders.  Hicks Ex. 159 (AR00109242 at 109263); Hicks Ex. 160 (AR00010935); Hicks

---

[10] These concepts of beneficial ownership and control under the Bylaws are widely recognized in United States law, too.  *See*, *e.g.*, *Levy ex rel. Immunogen Inc. v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 16 (2d Cir. 2001) ("The beneficial ownership threshold established for disclosure of shareholder control under Section 13(d) is based on, at least in part, the power over corporate affairs associated with significant equity ownership."); *C.R.A. Realty Corp. v. Goodyear Tire & Rubber Co.*, 705 F. Supp. 972, 977 (S.D.N.Y. 1989) ("[I]n determining beneficial ownership for purposes of ascertaining who is a ten percent holder, the analysis properly should turn on the person's potential for control.") (quoting Fed. Sec. L. Rep. (CCH) ¶ 84,343 at p. 89,602-03 (Dec. 2, 1988)); Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act Release No. 18,114, 46 Fed. Reg. 48,147 n.17 (Oct. 1, 1981) ("beneficial ownership" under Section 13(d) "emphasizes the ability to control or influence the voting or disposition of the securities").

Ex. 112 (AR00109771). That is precisely why the Bylaws had to make clear that *legal title* alone is not dispositive—*control* suffices too.  Defendants' strained reading is wrong:  the Bylaws do not limit acquisitions of control narrowly to those in which a company has obtained title to the requisite shares through its subsidiaries; they announce a broad rule that encompasses the myriad ways that a private party or the government could control YPF.

### C.   Neither the ACL nor public law principles displaced Defendants' duties to Plaintiffs.

Defendants suggest their contractual duties under the Bylaws were somehow displaced by other code provisions or background public law principles.  These arguments are wrong across the board.  The Bylaws reflect clear and necessary promises, and Plaintiffs are entitled to the benefit of that bargain, not meaningless rights under Argentine corporate law that would deny Plaintiffs what they were plainly promised in the Bylaws.

### 1.   The ACL does not control or displace Plaintiffs' contract claims.

Defendants contend the Argentine Companies Law ("ACL") provided Plaintiffs' exclusive recourse here.  That is incorrect.  As Defendants concede, the provisions of the Argentine Civil Code, which codify the familiar common-law framework for breach of contract (duty, breach, causation, damages) govern in all civil cases unless they are displaced by a provision of a specialized statute.  *See* Argentina Opening at 26-27; YPF Opening at 33-34; Defs.' Opp'n at 28-29.  That rule is codified in Article 207 of the Argentine Commercial Code (of which the ACL is a part), which provides that, "[u]nless modified by this Code, the civil law applies to all matters and business transactions."  *See* Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 24) (quoting Article 207 of the Commercial Code).  Defendants cannot point to any provision in the ACL or the Commercial Code that addresses tender offers or the elements or remedies involved in a claim for a failure to tender. ████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████  That concession is

dispositive.  Absent such a provision, the Civil Code governs these breach-of-contract claims.[11]

Likewise, Defendants' claim that there is "no recognized claim for a 'breach of contract'

between shareholders or by a shareholder against a company" is both wrong and beside the point.

Defs.' Opp'n at 3, 26.  Argentine courts have explicitly recognized such claims.  *See* Hicks Ex.

143 (*Zullo, Norberto vs. Kehoe, Roberto Eduardo y otros*, CN Com., Room A, July 22, 2008 (TR

LA LEY AR/JUR/8909/2008)) ("actions that arise from the bylaws . . . may be exercised by the

company against the shareholders or by the shareholders among themselves or against the

company"); Goodman Ex. 38 (*Gutiérrez Enedina y otros vs. Neumáticos Gutiérrez SA y otros*

*s/ordinario*, October 16, 2012, CN Com, Room A (TR La Ley AR/JUR/62470/2012)) ("actions

arising from the corporate contract . . . [are] exercisable by the company against the shareholders

and by the shareholders among themselves or against the company"); Hicks Ex. 36 (Rovira Jan.

2022 Report ¶ 17).  And regardless, Defendants' burden is to demonstrate that the ACL *forecloses*

a breach-of-contract claim under the Civil Code.  No Argentine judicial decision so holds, and

Defendants do not cite one.

---

[11] Importantly, the question of whether the ACL displaces the Civil Code is distinct from the question, previously addressed by this Court, whether Plaintiffs' claims fall within section 5(11) of Argentina's Code of Commercial and Civil Procedure.  In addressing Defendants' motion to dismiss for forum non-conveniens, this Court "conclude[ed] that Plaintiffs' claims are 'corporate' claims as a matter of Argentine law."  *Petersen III*, 2020 WL 3034824, at *12. But the Court's general characterization of Plaintiffs' claims does not support the conclusion that they are governed exclusively by the ACL.  Indeed, the Court explained that Plaintiffs' claims were "corporate" within the meaning of the Code of Commercial and Civil Procedure—not within the meaning of the ACL—and that Plaintiffs' claims were "corporate" for procedural purposes "*even acknowledging that Plaintiffs' claims are contractual in nature*." *Id.* (emphasis added) (citing *Petersen II*, 895 F.3d at 211).  It is therefore plain that nothing about the Court's forum-non-conveniens analysis supports an inference that Plaintiffs' claims are governed by the ACL rather than the familiar framework for breach of contract under the Civil Code.  Perhaps that is why neither Defendant argued this point in their opening briefs.

Indeed, contrary to YPF's assertions, under Argentine law it is clear that not only shareholders, but also corporations can be held liable for damages for breaches of their bylaws, and therefore the standard framework for breach-of-contract claims applies with undiluted force to YPF. *See* Pls.' Opp'n at 49-50; Hicks Ex. 36 (Rovira Jan. 2022 Report ¶ 16); Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶¶ 12-13).[12] Argentine law recognizes that bylaws are contracts. And courts in Argentina frequently hold companies liable for damages in breach-of-contract cases involving agreements similar in kind to corporate bylaws. *See* Hicks Ex. 36 (Rovira Jan. 2022 Report ¶ 20) (collecting cases involving shareholder agreements and articles of incorporation). Unsurprisingly, then, Argentine courts have specifically recognized that a company can be held liable for damages for breach of its corporate bylaws. *See* Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 13) ("whenever the action attributed to the controlling shareholders results in compensatory damages, they are responsible together with the company whenever the acts imputed to the controlling shareholders can be extended or transmitted to the company") (quoting Goodman Ex. 38 (*Gutiérrez, Enedina y otros v. Neumáticos Gutiérrez*, CNCom., Div. A, 16 Oct. 2012, TR LALEY AP/JUR/4023/2012)); *see also* Hicks Ex. 161 (*Arana, Martín F v. Muelles y Depósitos S.A. de Estibaje y Transporte*, CNCom., Div. A, 11 Aug. 2003, LL-2004-80, TR LALEY AR/JUR/2429/2003) (requiring corporation to pay damages for failure to make dividend payments where timing of distributions was prescribed by bylaws).

At any rate, Defendants still could not avoid the familiar framework for contract liability because that framework applies even to claims arising under the ACL. Argentine courts interpret and apply the Civil Code and ACL harmoniously so as to allow the Civil Code to fill any gaps left

---

[12] So too, under American law. *See, e.g.*, *Davis v. Davis*, 419 S.E.2d 913 (Ga. 1992) (affirming damages liability against company and controlling shareholder for bylaw breach); *Dick v. Koski Prof'l Grp., P.C.*, 950 N.W.2d 321 (Neb. 2020) (enforcing mandatory buy-out provision in shareholder agreement), *modified in part on other grounds on denial of reh'g*, 953 N.W.2d 257 (Neb. 2021) (*per curiam*).

by the detailed provisions of the ACL.  *See* Hicks Ex. 162 (Manóvil Dec. 2021 Report for Argentina ¶ 66).  As Professor Manóvil explained in his treatise:  "[T]he General Companies Act liability regime is governed by the principles of the general norms applicable to civil liability. Therefore in order to attribute liability there must exist all the civil liabilities elements: damage, unlawful act and the attribution factor of cause-effect (i.e. the damaging conduct should have been the cause of the damage)."  Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 13 n.10) (quoting Manóvil, Rafael M., "*Algunas incidencias del Código Civil y Comercial sobre la responsabilidad de los directores de sociedades anónimas*," Acad. Nac. de Derecho 2016 (septiembre), 12/09/2016, AR/DOC/3449/2016).  Professor Manóvil has also conceded that the Civil Code provides the remedial scheme for Plaintiffs' claims.  *See* Goodman Ex. 23 (Manóvil Sept. 2021 Report for Argentina ¶ 66) (conceding that "Corporate law claims are . . . subsidiarily subject to the provisions on bilateral contract breaches of the Civil Code"); Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 13) ("Professor Manóvil . . . agree[s] that the ACL's liability regime works in conjunction and in accordance with the general civil liability principles contained in the Civil Code.").  Thus, even if the ACL did address this type of claim (it does not), by Manóvil's own admission the Civil Code would supply the ordinary contract law principles that govern liability—duty, breach, causation, and damages—and bring us back where we started.

2.      <u>Plaintiffs' claims do not conflict with public law principles.</u>

As they did in prior motions to dismiss, Defendants again argue that Plaintiffs' breach-of-contract theory impermissibly implicates Argentina's sovereign activity.  Defendants' argument has not improved with time.  As explained in Plaintiffs' Opposition (at 62-69), Defendants' arguments are foreclosed by the Second Circuit's decision and wrong as a matter of Argentine law.

Plaintiffs' claim is that Defendants breached the Bylaws on April 16, 2012.  As the Second Circuit explained:  "under the [B]ylaws, Argentina's expropriation triggered an obligation to make

38

a tender offer for the remainder of YPF's outstanding shares." *Petersen II*, 895 F.3d at 206. "Argentina denied Petersen the benefit of the bargain promised by YPF's bylaws when Argentina repudiated its obligation to tender for [Plaintiffs'] shares." *Id.* at 207. That obligation was a "separate commercial obligation" that Argentina breached. *Id*. at 209. And, importantly, there was "no reason why Argentina could not have complied with both the bylaws' tender offer requirements and the YPF Expropriation Law." *Id.* at 208. YPF, in turn failed "to enforce the bylaws' tender offer provisions vis-à-vis Argentina and . . . to enforce the penalties that section 7(h) imposes on shareholders who have breached their tender offer obligations." *Id.* at 210.

Defendants assert that these rulings can be cast aside because, they say, Plaintiffs have allegedly changed their position as to *when* Argentina should have made a tender offer. Defs.' Opp'n at 18-20. But as Plaintiffs have explained in their Opposition (at 62-63), Plaintiffs have done no such thing. Quoting language from the *damages* section of Plaintiffs' Opening (at 15, 19), Defendants misconstrue Plaintiffs' explanation of *how* to calculate damages as an argument about *when* Argentina had to tender under the Bylaws to avoid liability for breach. But the amount that Defendants contractually agreed must be paid in a tender offer, or the means of calculating it, does not interfere with Argentina's sovereign authority to take control when it wished. In other words, the Bylaws' detailed tender offer price provisions establishing a constructive notice date *before* the date of the acquisition for the purposes of determining a tender offer price, do not and cannot impede or condition Argentina's sovereign power to expropriate at the time and in the manner of its choosing. If the Bylaws required Argentina to make a tender offer at the closing price set for YPF's 1993 IPO in the event of a breach, this would not back-date a 2012 breach for failure to tender all the way back to the 1993 IPO. Defendants' effort to obscure the date of their breach is no more persuasive.

Defendants note the Second Circuit's observation that the Bylaws apply differently to a private acquisition than they do to a government takeover. Defs.' Opp'n at 14-15. That hurts rather than helps their cause. The difference the Second Circuit highlighted only demonstrates *why* the Bylaws keyed the Government's tender-offer obligation to the acquisition of control "by any means"—namely, because Argentina, unlike a private entity may exercise the power of expropriation to acquire YPF by taking ownership or control. *Petersen II*, 895 F.3d at 206–07. As between Section 7 and Section 28, the Bylaws may cast a broader net with respect to what may trigger tender obligations for the Government. But, as explained *infra* III.B.1, when it comes to pricing, a public and private acquirer are subject to the same rules: Section 28 of the Bylaws specifically incorporates the tender-offer pricing provisions in Section 7(f). Thus, whether the government or a private entity triggers the tender-offer provisions of the Bylaws, the price that an acquirer must offer to pay for the remainder of YPF shares is the same, and specifically prescribed by the Bylaws' formula provisions.

The same basic flaw defeats Defendants' arguments that Plaintiffs' application of the Bylaws' notice provisions for the purposes of calculating damages implicates the Act of State Doctrine. The price at which Argentina was required to launch a tender offer has no bearing on *when* it had to do so. Plaintiffs do not question or challenge any public act—only Defendants' "failure to comply with or enforce [the] Bylaws," which, this Court correctly concluded, did not "constitute[] an official act [n]or was compelled by an official act." *Petersen I*, 2016 WL 4735367, at *7-8. Contrary to Defendants' protestations (Defs.' Opp'n at 12), Plaintiffs' allegation is that Argentina seized control of YPF and then failed to *ever* buy out the minority shareholders.

In any event, even if the Court were to accept Defendants' far-fetched argument that Plaintiffs' use of a February 13 notice date in its price calculation *purely for computational*

40

*purposes* is inconsistent with (and therefore foreclosed by) this Court's and the Second Circuit's sovereign immunity and Act of State rulings, the Court could not revive those defenses or rely on them to deny Plaintiffs summary judgment on liability. At most, the Court could interpret the prior decisions as precluding application of the Bylaws price formula in a way that uses pre-acquisition data to calculate a post-acquisition tender price.[13] It should not, because there is no public law concern. But the point is that even if the Court were to credit Defendants' reincarnated FSIA and Act of State arguments, those arguments go only to the size of the damages award and provide no basis for denying Plaintiffs summary judgment in their favor.

Defendants' additional public law arguments are likewise flawed. Defs.' Opp'n at 22-23. As explained in Plaintiffs' Opposition (at 66-69), the Bylaws' tender-offer requirement does not condition, interfere with, or encumber Argentina's expropriation of Repsol's 51% of YPF shares. Applying the Bylaws' tender offer *pricing* provisions to Argentina would not have "conditioned and fixed the time" at which Argentina could expropriate YPF's shares. *Contra* Defs.' Opp'n at 22. Consistent with the Second Circuit's analysis, it would simply impose contractual and commercial obligations on Argentina vis-à-vis minority shareholders as a consequence of the expropriation of the Repsol shares. And, as Plaintiffs have previously explained, Article 28 of the General Expropriation Law is not implicated here because the Bylaws do not limit Argentina's right to use or transfer its expropriated shares. Hicks Ex. 23 (Bianchi Dec. 2021 Report for Pls. ¶ 74) (explaining that "[t]he obligation to carry out the tender offer was not an 'encumbrance' on the expropriated shares"). Nothing prevented the government from making the requisite tender and exercising all the rights associated with the shares. *Petersen II*, 895 F.3d at 208.

---

[13] Professor Fischel has provided the alternative calculation for Plaintiffs, even though he believes it inconsistent with the Bylaws, Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls., ¶ 47 n.81 & Ex. 6), and Defendants' expert Harris does not disagree with Professor Fischel's math. *See* Hicks Ex. 163 (Harris Tr. for Defs. 85:8-86:14).

In short, Defendants' arguments under Article 28 are merely a minor variation on the arguments they previously raised and lost before the Second Circuit. *Compare Petersen II*, 895 F.3d at 208 (rejecting Argentina's argument that "the YPF Bylaws cannot validly *restrict, limit, or in any way affect* the exercise of sovereign powers of the National Government in general and regarding expropriations in particular") (emphasis added), *with* Defs.' Opp'n at 23 (arguing that "any requirement that the Republic make a tender offer for all YPF shares would violate Article 28 of the General Expropriation Law by interfering with the intended *effects* of the expropriation") (emphasis in original). The Second Circuit unmistakably concluded that there was "no reason why Argentina could not have complied with both the bylaws' tender offer requirements and the YPF Expropriation Law." *Petersen II*, 895 F.3d at 208. Nothing has changed that would permit Defendants to revisit that conclusion.

## III. Defendants' Attempts To Avoid Paying the Damages They Owe Likewise Fail As a Matter of Law.

Most of the Defendants' Opposition is devoted to eliminating or reducing Plaintiffs' damages. Neither approach is availing. First, Defendants argue Plaintiffs are barred from seeking money damages entirely because the ACL and the Bylaws obligated Plaintiffs to seek specific performance-type remedies instead. That is an incredible suggestion in light of highly reticulated formulas placed in the Bylaws to help calculate a sum certain. It is also just plain wrong as a matter of Argentine law, as Defendants' own experts eventually had to concede.

Recognizing the weakness of those arguments, Defendants shift to a litany of contentions aimed at reducing the amount of Plaintiffs' recovery here. All of them fail in light of the clarity of the Bylaws' formula. Defendants quibble with two elements of that formula; namely, they insist this Court must use a notice date for calculation purposes that *post-dates* Argentina's acquisition of YPF, and if not that, then they ask to use a quarterly price-income ratio—rather than the

industry-standard daily price-income ratio—when applying Formula D.  Both objections can be resolved based on the Bylaws' clear language, which entitles Plaintiffs to the "highest" amount yielded under formulas keyed off a defined "notice date."  Defendants then claim the Bylaws' price provisions are null and void because they yield a price that is too high.  That requires invoking the ACL—which does not govern here—and ignoring the Bylaws—which do, and which have the manifest purpose of compensating Plaintiffs above the apparent market price (which the Bylaws recognized could be distorted by the machinations of an acquirer).  Finally, Defendants ask permission to pay with watered-down currency.  But Plaintiffs' damages are owed in dollars and no currency conversion is necessary.  The Bylaws explicitly required Argentina to make a tender offer *directly* for ADRs in New York on the NYSE, rendering it impossible for Argentina to pay in pesos instead of dollars.  In any case, the result is the same whether Plaintiffs' damages are in dollars or pesos because the "breach day rule" (which governs performance obligations) controls here—not the "judgment day exception" Defendants invoke (which governs payment obligations expressly denominated in a foreign currency).

If Defendants were to succeed on any of these arguments, the outcome would undermine the ability of countries to offer and investors to rely on clear promises.  Defendants suggest they can get out of an obligation to pay a contractually specified price simply by complaining that the price they agreed to is too high.  Alternatively, they posit that investors worried about renationalization by Argentina "protected" themselves with provisions that left them vulnerable to currency devaluations by the same government that reduced their obligations to pennies on the dollar.  That is nonsense.  Defendants made extraordinary promises that were extraordinarily clear because they had to.  Anything less would have caused investors to direct their hard currency elsewhere.  Having breached those clear promises, the time has come to provide the compensation

demanded by clear formulae, not for arguments that would have been non-starters if articulated when the Bylaws issued.

### A.      Argentine law permits Plaintiffs to elect a damages remedy here.

Defendants raise three arguments for why Plaintiffs are foreclosed from seeking damages at all for their injuries.  All three are unavailing.

*First*, Defendants argue that because they believe the ACL—rather than the Civil Code—governs Plaintiffs' contract-breach claims, Plaintiffs can seek only specified corporate remedies, not damages.  As discussed, *supra* Part II.C.1, however, the premise of Defendants' contention is wrong:  the Argentine Civil Code governs Plaintiffs' claims.  And, as explained, *supra* at 38, even if the ACL did apply to Plaintiffs' claims (it does not), Defendants must concede that the Civil Code—and not the ACL—provides the relevant remedial authority.  Thus, Defendants' arguments (Defs.' Opp'n at 27-29) are beside the point because they focus exclusively on the remedies available to claimants seeking to challenge an unlawful corporate resolution under Article 251 of the ACL, something which has nothing to do with this case.  *See* Pls.' Opp'n at 29-34.

*Second*, Defendants maintain that, even if the Civil Code governs Plaintiffs' claims, the code requires Plaintiffs to seek specific performance before seeking damages.  Defs.' Opp'n at 38-39.  But Article 505 of the Civil Code explicitly gives the obligee three remedial *options* in the event of a breach:  specific performance by the obligor, substitute performance by a third party, or compensatory damages.  Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 38); Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 39).[14]  Defendants do not attempt to argue that Article 505 by

---

[14] Defendants attempt to use Professor Garro's testimony that "there is a preference in the civil law for specific performance," to contend that Argentine law *only* provides Plaintiffs with the option to pursue specific performance to the exclusion of any other remedies.  Defs.' Opp'n at 38.  But Professor Garro's testimony merely reaffirms what he explained in his expert report, that "the remedial scheme of Argentine law gives the obligee the right to seek specific performance or compensatory damages—in contrast to the common-law approach of ordering specific performance only in exceptional circumstances."  Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 40).

its terms—or any gloss on Article 505—makes any one option mandatory or requires Plaintiffs to exhaust each option before moving to the next.

Instead, Defendants resort to Article 889 of the Civil Code, which they claim provides that damages are available *only* if performance of a contractual obligation is impossible.  Defs.' Opp'n at 38.  But that misreads the plain language of Article 889, which provides that "[i]f performance becomes impossible . . . the original obligation to give or do something becomes an obligation to pay damages and interest."  Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 29 n.21) (quoting Article 889 of the Civil Code).  Article 889 simply makes clear that, where performance becomes impossible, the performance obligation becomes an obligation to pay damages.  *Id.*  Nothing in Article 889 states that Plaintiffs may obtain damages *only* when performance is impossible.  Indeed, Defendants' interpretation impermissibly rewrites Article 889 by adding the word "only."  That not only distorts Article 889 but is inconsistent with Article 505's clear proviso—which Article 889 does not supplant or alter—that those to whom an obligation is owed have the option to elect the remedy of their choice if the obligor breaches.

At any rate, even if Article 889 were read in the way Defendants urge, Defendants themselves have maintained that performance here *was* impossible.  YPF Opening at 29; ███

██████████████████████████████████████████████████████

████████████████████.  Defendants cannot have it both ways.  Also, as Defendants' expert Aida Kemelmajer acknowledges, "impossibility" under Argentine law includes situations where the promisor is *unwilling* to perform.  *See* Hicks Ex. 139 (Kemelmajer Tr. for YPF 142:21-143:15) (recognizing right to sue for damages where debtor is unwilling to perform).  Here, there can be no question given Mr. Kicillof's speech on April 17, 2012, that Defendants had repudiated any intention to perform.  *See supra* at 18-19.  At bottom, Argentine law did not require Plaintiffs to

pursue futile relief; given Defendants' clear statement that they would not make the tender, Plaintiffs were entitled under Argentine law to sue for damages for that refusal.

*Third*, Defendants claim that Section 7(h) of the Bylaws is a "penalty clause" that displaces any damages remedy. As explained in Plaintiffs' Opposition (at 36-38), Defendants have not met their burden of proving that Section 7(h) is a penalty clause under Argentine law. ███████████

████████████████████████████████████████████████████████████████████

███████████████████████ Section 7(h) cannot be a penalty clause because it does not provide either for substitute compensation to Plaintiffs or for substitute performance of Defendants' tender-offer obligations. *See* Civil Code Art. 653 ("The penalty clause may only consist in an amount of money or any other consideration that may be the object of obligations, either in benefit of the creditor or of a third party"); ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████.[15]

---

[15] Defendants attack Plaintiffs' experts, Professors Rovira and Garro, by misrepresenting previous decisions and taking deposition quotations out of context. Defs.' Opp'n at 27 n.6. As Professor Garro has explained from the very beginning, as an expert in comparative law, he was "retained by Plaintiffs' counsel to help explain Argentine contract law and apply that law to the allegations of the Complaints in terms that are familiar to a U.S.-trained lawyer." Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 2). Multiple courts, including this one, have relied on Professor Garro's opinions. *See, e.g., Canales Martinez v. Dow Chem. Co.*, 219 F. Supp. 2d 719, 724 (E.D. La. 2002) ("A review of Garro's credentials - which reveal that he is a law professor at Columbia University Law School teaching comparative law, and a Senior Research Scholar at Columbia's Parker School of Foreign and Comparative Law focusing on Latin American Legal Systems - suggests that by any standard, he is qualified to opine on comparative law issues involving Latin American legal systems."); *Xuncax v. Gramajo*, 886 F. Supp. 162, 196 (D. Mass. 1995); *Petersen III*, 2020 WL 3034824, at *12 (describing Professor Garro's and Rovira's opinions as persuasive). And, as Professor Rovira explained in his deposition, he was accused of failing to attribute the identification of a particular citation to a graduate student assisting him with his research and left his position as a visiting professor voluntarily. Giuffra Ex. 98 (Rovira Tr. for Pls. 36:17-37:1). ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████ And Professor Manóvil—as demonstrated throughout Plaintiffs' briefing—has repeatedly offered opinions in this case that are flatly contradicted by his prior public scholarship. *Compare* Hicks Ex. 162 (Manóvil Dec. 2021 Report for Argentina ¶ 28) ("However, Argentine scholars have unequivocally concluded that the causes of liability and the applicable enforcement mechanisms for such a claim are those in the GCL, not the causes of liability and general remedies in the Civil Code."), *with* Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 13 n.10) (quoting 2016 article by Manóvil); *see also* Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 76) (quoting from Professor Manóvil's own sources).

Rather, as explained *supra* 12, 14, Section 7(h) imposes on YPF the additional obligation to deny certain voting and economic rights to any entity that acquires control of the company and fails to make the required tender offer.  Moreover, even if this Court construed Section 7(h) to be a penalty clause (it should not), such clauses do not limit liability where an obligor is guilty of "dolo" (a willful breach).  *See* Pls.' Opp'n at 38.  And, as explained *supra* Part.I.B, Defendants willfully (and loudly) breached their contractual obligations here.

Defendants' three arguments that no damages remedy is available not only are wrong as a matter of Argentine law, but also are completely at odds with the original promises they made.  The Bylaws promise of a compensated exit would have been meaningless if, as Defendants now assert, all the Bylaws offered was an invitation to run to Argentina to engage in internal corporate battles.  Defendants raised billions of dollars from global investors by promising a compensated exit; only a damages remedy can give those investors the benefit of that bargain.

**B.      Plaintiffs are entitled to a damages amount fixed at $88 per share.**

Defendants next advance an array of arguments designed to minimize if not eliminate the amount of damages they owe under the price formulae set forth in the Bylaws.  Each of these contentions implicates only law, not facts, and can be resolved on summary judgment.  And each of these contentions is meritless.

1.      <u>February 13 is the correct "notice date."</u>

Defendants urge the Court to ignore the Bylaws' instruction regarding the use of a "notice date" 40 business days before the takeover.  Defendants' damages argument does not flow from the Bylaws text—and in fact flatly contradicts that text—but is instead an extension of their public law arguments on liability discussed *supra* Part II.C.2.  Defendants suggest that, if Plaintiffs' damages calculation uses a hypothetical notice date *before* the April 16 takeover, then Plaintiffs must be taking the position that the government's sovereign power to expropriate was somehow

conditioned on first completing a tender offer before the takeover. Defs.' Opp'n at 50-51. But, as explained in Plaintiffs' Opposition (at 62-64), Defendants are confusing two discrete issues.

Plaintiffs do not contend—and have never contended—that Argentina was unable to take control of Repsol's 51% stake in YPF without first making a tender offer for other remaining shares. It was Argentina's sovereign prerogative to expropriate the Repsol shares and take control of YPF whenever it chose. The Bylaws did not interfere with that power, but simply triggered obligations to minority shareholders in the event Argentina exercised that sovereign prerogative. Plaintiffs have consistently acknowledged as much at each stage of this litigation. Plaintiffs maintained that position at the motion to dismiss stage in this Court, which rejected Defendants' sovereign immunity and Act of State defenses; before the Second Circuit, which affirmed the sovereign immunity denial; and now in this summary judgment motion.

With prior decisions on sovereign immunity and Act of State now law of the case, the remaining issue is damages, which hinges on *what price* the government was contractually obligated to pay when "it incurred [the] separate commercial obligation under the [B]ylaws to make a tender offer for the remainder of YPF's outstanding shares." *Petersen II*, 895 F.3d at 209. This question—*how much* the government agreed to pay under the terms of the Bylaws—is separate from the question of *when* Argentina had to make the tender offer. Again, if the Bylaws pegged the tender offer to the IPO price, it would not backdate the expropriation to June 28, 1993, the date of the IPO.

Although the Second Circuit did not have reason to address the proper measure of damages, the Bylaws answer the question directly. While, as the Second Circuit held, Argentina did not have to make the tender offer before taking control on April 16, 2012, the price it should have offered other shareholders in a subsequent tender offer that complied with Section 28 of the Bylaws

must be based on public price and earnings data available as of a notice date of February 13—40 business days prior to April 16.

Section 28 of the Bylaws specifically provides that subsections (e) and (f) of Section 7 (the tender-offer provisions) "apply to *all* acquisitions made by the National Government." Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 28(A)). Accordingly, the tender offer price formulas and notice provisions provided in Section 7(e) and 7(f) apply to Argentina—even in the event Argentina acquires control, as here, through an expropriation. Those sections, in turn, provide that the tender-offer price should be based on market data available as of a defined notice date. *See* Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(i)-(ii)). The "notice date" is identified via a cross-reference, which makes clear that the data to be used in the calculation of the tender price is data that exists 40 days *before* the takeover. *See id.* § 7(f)(i), (f)(v)(D).[16] The fact that Argentina never provided actual, proper notice of a tender offer—or that Argentina had the sovereign authority to initiate an actual tender offer after the acquisition, if it wished—does not alter the carefully crafted formula which required it, as a matter of contract, to offer a price based on data as of a specifically defined date preceding the acquisition. The Bylaws make clear that even if the government were to commence the tender offer only after taking control of YPF, even well after, the *price* it must offer under the Bylaws for the remaining shares must be calculated based on publicly-available data that existed 40 business days before the date of the acquisition of control.

---

[16] Formula D instructs as follows: multiply (1) the "net income per class D share during the last four complete fiscal quarters immediately preceding the notice date indicated in paragraph (i)" by (2) "the highest price/income ratio for the Corporation during the two-year period immediately preceding the notice date indicated in paragraph (i)." Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(D)). Both inputs thus consist of data that precede a defined notice date. The cross-referenced paragraph (i) supplies the constructive notice date, indicating that it shall be "at least fifteen business days in advance to the starting date" and that the notice shall include the "scheduled expiration date of the takeover bid period," a period which must be at least another 25 business days. Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(i), (f)(i)(D)); *see* Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶¶ 30(h), 31); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 68). Thus, under paragraph (i), which is incorporated into the price formula by reference, the market data to be used must precede the acquisition by 40 business days (15 plus 25).

Defendants' expert Harris does not offer any opinion of his own actually challenging Professor Fischel's methodology regarding the notice date. Harris says only that he was "instructed by counsel to provide corrected versions of Prof. Fischel's calculations of tender offer prices and associated alleged damages for illustrative purposes *assuming April 16 and May 7, 2012 tender offer notice dates*." Giuffra Ex. 102 (Harris Dec. 2021 Report for Defs. ¶ 89). Harris does not explain *why* the Bylaws would support the use of those later notice dates, because he was not asked to explore that question. Instead, Defendants instructed him to take that "assum[ption]" for granted. Professor Fischel points out that "Professor Harris' criticism and proposed alternatives . . . are not supported by the YPF By-laws, and ignore the By-laws' company notice requirement (15 days), the required minimum length of tender offer (20 days), and the required minimum additional period (5 days)." Hicks Ex. 28 (Fischel Jan. 2022 Report for Pls. ¶ 13). Harris's admission that his calculations depend on Defendants' counsel's instruction reveals that the parties do not disagree about how to properly apply the tender-offer pricing formulas in the Bylaws. Indeed, Defendants' Opposition (at 50-51) advances *only* a public law objection and does not challenge Plaintiffs' straightforward application of the Bylaws' instructions. There is no dispute under the Bylaws, simply a public law objection by Defendants to the proper application of the Bylaws.

Defendants use their public law argument to urge the Court to ignore the Bylaws' express requirement that the relevant market data (the last reported annual income figure and highest price/income ratio) must be measured as of the defined notice date. But the Second Circuit has already rejected their argument that public law allows them to override the Bylaws. *See Petersen II*, 895 F.3d at 208 ("The law further provides that YPF shall remain a publicly-traded company after the expropriation . . . confirming that YPF would continue its normal commercial activities

after the expropriation.").  In addition, Defendants' position makes no sense.  Instead of conducting the calculation based on public data available 40 days *before* the takeover—with figures less likely to be affected by the actions of the government or a potential private acquirer—they would base the calculation on public data that did not exist until after the takeover.  They suggest first that the Court use public data as of May 2012, but that cannot be right.  As described *supra* Part I.B and Part II.B, the tender-offer obligation was triggered by Argentina's acquisition of control on April 16 pursuant to the intervention decree.  Argentina acquired control on April 16, and Defendants announced then that there would be no tender offer forthcoming.  It cannot be that the Bylaws' price calculation would be conducted using public data that was not available—and did not even exist—until *after* Defendants' breach and repudiation of the contract tanked YPF's shares.  That atextual and illogical interpretation would allow Argentina to give *actual* notice that it was taking control on April 16 but to calculate the tender price as of a constructive "notice date" *later* than that—allowing its unlawful actions to depress the price minority shareholders would receive for their shares.

Defendants' alternative suggestion of April 16 as a possible notice date is also squarely foreclosed by the text of the Bylaws and equally at odds with their purpose.  Again, the Bylaws clearly provide that the notice date as of which public data is to be measured—and to which the formulaic calculation is applied—is 40 business days prior to the actual takeover date.  By design, this backward-looking formula protects shareholders against any acquirer, and particularly the government, seeking to evade or manipulate the price formulas in the Bylaws.  *See* Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 7(h)).  The formulas were designed to ensure that shareholders would be adequately compensated in the event that the renationalization they feared became a reality.  *See*, *e.g.*, Hicks Ex. 141 (Coffee Jan. 2022 Report for Pls. ¶ 10); Hicks Ex. 167

(Blackett Jan. 2022 Report for Pls. ¶ 19).  By locking in the price data as of a date *before* an acquirer takes action, the Bylaws limit the ability of an acquirer to drive down the formula price and pay shareholders less than they were promised. The Bylaws protect shareholders from such tactics by basing all four price formulae on the same notice date, and relying in each on public data available 40 days before the change of control.[17]

           2.       A daily price-income ratio is typical and appropriate.

Defendants next suggest that, if the "highest price/income ratio" does not fall on one of the eight days when YPF released earnings during Formula D's specified two-year period, the Court should ignore the "highest price" and choose instead one of the lower prices from those eight dates. Defs.' Opp'n at 51-53.  This argument can be readily dispatched based on the Bylaws' text.

Defendants claim that Formula D calls for the use of quarterly price/income ratios.  But as Professor Fischel explains in his rebuttal report, markets calculate price-to-income ratios on a daily—not a quarterly—basis.  Hicks Ex. 28 (Fischel Jan. 2022 Report for Pls. ¶ 16).  Professor Fischel provides pages and pages of sources to support what is well known to anyone who even occasionally glances at stock prices.  *See* Hicks Ex. 28 (Fischel Jan. 2022 Report for Pls. Ex. R3) (compiling more than 15 sources ranging from finance textbooks to regulatory agency publications, all of which look to daily P/E ratios for pricing).  These sources—including reports published daily on YPF by the Argentine Capital Markets Institute, the public information division of the Buenos Aires Stock Exchange—all refer to the P/E Ratio of publicly traded stocks on any given day.  The price-to-income or price-to-earnings ratio simply reflects the price on any given

---

[17] The structure also applies to private acquirers and would prevent a private bidder from doing what Argentina did here—for example, by driving down the price of shares with announcements of plans to reduce dividends to shareholders upon taking control.  Indeed, if a private acquirer crossed the ownership threshold and initially refused to conduct a tender offer, but then relented in the face of YPF-imposed sanctions under Section 7(h), there is no question the private acquirer's post-acquisition tender offer would be subject to the bylaws pricing provisions just as if it had complied in the first place.  Defendants do not explain why it should be any different for the government.

day divided by the last reported annual income.  *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 RKL RLE, 2000 WL 310352, at *3 n.6 (S.D.N.Y. Mar. 24, 2000) ("The P/E ratio is defined as the current market price divided by the trailing twelve months' earnings per share."); *In re Duplan Corp.*, 9 B.R. 921, 926 (S.D.N.Y. 1980).

Defendants suggest that *quarterly* price-to-income ratios *also* are a "regular method used by the financial community," Defs.' Opp'n at 52, but neither Defendants nor their expert can offer any support for that baseless assertion.  Defendants allude to their expert's belief that "quarterly price/income ratios . . . [more] accurately reflect the market's valuation of the corporation's reporter earnings," but a single expert's opinion about how markets *ought* to work does not amount to a "regular method actually used by the financial community."  *See Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 240-41 (S.D.N.Y. 2019) (excluding expert's testimony that assets under management (AUM)-based expense allocation is "widely accepted" in the mutual fund industry because it was unsupported by the data; although it may be a "reasonable and adequate method for allocating costs," the expert could not assert "that such a method is 'widely used.'"); *Daniels-Feasel v. Forest Pharms, Inc.*, 17 CV 4188 LTS JLC, 2021 WL 4037820, at *17 (S.D.N.Y. Sept. 3, 2021) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."), *appeal pending*, No. 22-00146 (2d Cir. filed Jan. 25, 2022).

In any event, the Court need not decide whether quarterly ratios are a "regular method" because Defendants concede that daily P/E ratios are, and the Bylaws require that the ratio used must be the "*highest* price/income ratio for the Corporation during the two-year period immediately preceding the notice date."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(D)).  Over a two-year period, if the day with the "*highest*" price-to-income ratio does not happen to be one of the eight days when the company releases earnings, then the Bylaws clearly require applying

a different day's ratio.[18]

### 3. The price formula was designed to exceed the prevailing market price.

Defendants next go for broke, claiming that the tender-offer price mandated by the plain language of the Bylaws is invalid *entirely* because it is "inflated." Defs.' Opp'n at 48-49. Not so. As explained, *supra* at 26, Defendants concede that when calculating what Plaintiffs would have received in a tender offer, the Court must use the highest price produced under four different formulas provided in Section 7(f) of the Bylaws. The tender-offer price provisions were designed to exceed the prevailing market price out of concern that the acquirer could manipulate that price or else time its acquisition to occur at a moment when the share price is low—otherwise there would be no reason to provide four formulas to calculate the highest possible price, only one of which exclusively relies on the highest market price. *See* Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(A)-(D)). Investors worried about renationalization would be equally worried about saber-rattling and other machinations designed to manipulate the market price or otherwise to time an acquisition to disadvantage minority shareholders. The multiple formulae directly addressed that legitimate concern. Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 33); Hicks Ex. 28 (Fischel Jan. 2022 Report for Pls. ¶ 10).

As Defendants concede, the 1993 YPF IPO Prospectus specifically provided that the Bylaws' tender-offer price formulas could produce prices " 'substantially in excess of the market' price for YPF's shares." Defs.' Opp'n at 49 & n.17; Hicks Ex. 3 (1993 IPO Prospectus at 11). Indeed, in compliance with the Bylaws' provisions, Repsol's tender offer in 1999 and Petersen's

---

[18] *See* Hicks Ex. 28 (Fischel Jan. 2022 Report for Pls. ¶ 16). Unable to identify any support for the proposition that *only* quarterly and *not* daily P/E ratios are market practice, the best Defendants can do is rely on Professor Fischel's statement in his deposition that Formula D is not self-implementing and its application requires some "judgment." Defs.' Opp'n at 52 (citing Giuffra Ex. 100 (Fischel Tr. for Pls. at 188:1-9)). That does not create a factual dispute over such a simple question as to whether daily P/E Ratios are a "regular method" where the evidence Professor Fischel has provided on the question is overwhelming and unrebutted by Defendants' expert. In any case, any room for judgment is constrained by the fact that the Bylaws call for the "highest" price.

in 2008 both offered to purchase all outstanding YPF shares at prices well in excess of the market price.  *See* Hicks Ex. 152 (Repsol, Schedule 14D-1, dated April 30, 1999, at 1); Hicks Ex. 168 (EP_000000936 at 948, 1024) (Petersen Energía Inversora, S.A., Argentine and U.S. Tender Offers).  Defendants' own contemporaneous statements at the time of the takeover suggest they understood that the Bylaws would require Argentina to offer a price substantially higher than the market price for YPF's shares.  Hicks Ex. 76 (AR00069033 at 69040-41) (Argentina's Secretary of Energy Cameron noting that premium Petersen paid for its tender offer was almost 30% higher than what shares were worth on stock exchange at the time); Hicks Ex. 71 (AR00019489 at 19513) (Kicillof stating on April 17, 2012:  "Because believe me, if you wanted to buy shares to enter the company and you went over 15 percent, you stepped in the bear trap and had to buy one hundred percent at a value equivalent to 19 billion dollars.").

Defendants contend that Article 13(5) of the ACL provides that, where a bylaws provision determines a share purchase price that departs notably from its "real value," that price is nullified.  Defs.' Opp'n at 48.  Defendants' argument that a provision of the ACL—which as discussed *supra* Part II.C.1 does not even apply to Plaintiffs' claims—nullifies the Bylaws' pricing provisions is wrong even on its own terms.  As Professor Manóvil's own sources provide, Article 13(5) of the ACL does not apply where, as here, there is a contractually agreed-upon price.  *See* Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 76) (quoting from Professor Manóvil's own sources).  Nor does it apply where, as here, there are dynamic price formulas relying on publicly available data as inputs.  *Id*. ¶ 85.  Moreover, even to the extent Article 13(5) applied to the Bylaws' price formulas, there is no support (and Defendants' expert can cite none) for the position that the "actual value" ("valor real") is always equivalent to the "market price" of a share.  *Id*. ¶ 81 (collecting "Manóvil's own citations [which] disprove his point").  And that is especially important here, given that the

market price on the date of Argentina's acquisition of control was already depressed by news of the government's impending takeover—just what the pricing provisions protect against.

Defendants and their experts cannot cite a single case where a court has applied Article 13(5)'s *valor real* principle to trump a provision like the one at issue here in order to *reduce* the price to which the selling shareholder is entitled. *Id.* ¶¶ 83-84. That makes good sense, for in Professor Manóvil's own words: Article 13(5) exists to serve the "preservation of the integrity of the shareholder's share," not the right of an acquirer to buy shares at an artificially depressed price. *Id.* ¶ 84. That is precisely why, in every single case that Defendants' expert cites, the court has applied Article 13(5) to protect minority shareholders from receiving a price that was *too low*. *Id.* (collecting cases).

4.     Plaintiffs' damages should be paid in U.S. dollars.

In a final but truly remarkable effort to evade responsibility, Defendants argue that they can pay Plaintiffs' damages in Argentine pesos—which, conveniently enough, have lost 95% of their value in the years since Defendants' breaches, largely as a result of government policies hostile to foreign investors and global capital markets. Hicks Ex. 169 (Calomiris Jan. 2022 Report for Pls. ¶ 22). If Defendants had revealed to NYSE investors at the time of the IPO that their promise of a compensated exit (based on a carefully calculated formula) in the event of a renationalization could be eviscerated by the same government simply devaluing the Argentine currency, investors' well-grounded fears of Argentina's tendency toward economic nationalism would have been unassuaged by the Bylaws. Defendants' attempt to force NYSE investors to effectively hold pesos for more than a decade—as they plummeted in value—is just as implausible as Defendants' suggestion that shareholders had to continue to hold their YPF ADRs indefinitely to vindicate their exit rights. The Court should reject this blatant attempt to artificially minimize damages, for three independent reasons: (1) The Bylaws promised Plaintiffs a tender offer in U.S.

dollars; (2) Plaintiffs suffered damages in U.S. dollars; and (3) even if Plaintiffs were deemed to have suffered damages in Argentine pesos, New York law entitles them to a judgment in U.S. dollars at the conversion rate in effect at the time of the breach in April 2012.

(i)   The Bylaws promised Plaintiffs a tender offer in U.S. dollars.

YPF's bylaws included provisions assuring investors like Plaintiffs that, as ADR holders, they would receive U.S. dollars in the event of an Argentina tender offer.  It is standard practice that ADR holders are paid in U.S. dollars.  As Plaintiffs' expert Nancy Lissemore, who ran Citigroup's ADR program for decades, explained, ADR holders receive dollars, rather than foreign currency.  Hicks Ex. 31 (Lissemore Sept. 2021 Report for Pls. ¶ 21).  ADRs are always issued and traded in dollars[19] and "ADR holders receive all dividend payments and capital gains in U.S. dollars," *Vedanta Ltd.*, 2018 U.S. Dist. LEXIS 16886, at *8 (quoting Investor Publications: International Investing, Office of Inv'r Educ. & Advocacy, SEC 1 (Dec. 2016), https://www.sec.gov/reportspubs/investor-publications/investorpubsininvesthtm.html).

Contrary to Defendants' claims that custom and practice suggest tender offers are not made directly for ADRs but are made in foreign currencies instead, Defs.' Opp'n at 47 n.16, the 25 examples their expert conjures up in an effort to support his erroneous position actually prove the opposite:  In 22 of the 25 tender offers examined, the ADR holders could tender ADRs (not local

---

[19] *See* Hicks Ex. 31 (Lissemore Sept. 2021 Report for Pls. ¶ 10); Hicks Ex. 170 (SEC Office of Investor Education and Advocacy, Investor Bulletin: American Depositary Receipts at 1 (Aug. 2012), *available at* https://www.sec.gov/investor/alerts/adr-bulletin.pdf) ("ADRs trade in U.S. dollars and clear through U.S. settlement systems, allowing ADR holders to avoid having to transact in a foreign currency."); *see also Normand v. Bank of New York Mellon*, 16-CV-212 (JPO), 2016 WL 5477783, at *1 (S.D.N.Y. Sept. 29, 2016) ("Because ADRs are bought and sold domestically in USD, ADR Holders can purchase shares of foreign companies without having to navigate the complexities of the foreign market."); *Chembulk Mgmt. PTE Ltd. v. Vedanta Ltd.*, No. 1:16-cv-09827 (LTS) (KHP), 2018 U.S. Dist. LEXIS 16886, at *8 (S.D.N.Y. Jan. 30, 2018) ("[M]ost U.S. investors choose to own the ADR for convenience reasons because ADRs are denominated in U.S. dollars, traded on U.S. stock exchanges, cleared through U.S. settlement systems, and sold over the counter.").

shares) and received cash consideration in U.S. dollars (and the three outliers also undermine his point).[20]  *See* Hicks Ex. 32 (Lissemore Jan. 2022 Report for Pls. ¶ 20, Ex. B) (compiling and evaluating Argentina's expert Professor Solomon's 25 tender offers); Hicks Ex. 171 (Solomon Tr. 274:14-20) ("Q.  Are you aware of any ADR holder being paid in non-U.S. currency for any of the tender offers that we looked at on your chart?  A.  Sure.  I talk about three of them . . . .").[21]

The circumstances here illustrate why that is the common practice.  To attract global investors, Defendants purposefully established an ADR program, under which investors would pay dollars to Defendants for their original purchases in the IPO and for any subsequent purchases on the secondary market.[22]  The NYSE would quote dollar prices for YPF's ADRs and market makers would facilitate dollar-denominated trading as with other NYSE securities.[23]  The Bank of New York Mellon ("BNYM"), pursuant to the Deposit Agreement, would make dividend distributions in dollars,[24] and investors would receive dollars when they chose to exit their positions.[25]  Consistent with this arrangement, when Repsol and Petersen made tender offers for ADRs in New York, they paid in dollars.  *See* Hicks Ex. 152 (Repsol, Schedule 14D-1, dated April 30, 1999 at 1); Hicks Ex. 168 (EP_000000936 at 952-1001).  Argentina itself did the same thing when it paid Repsol dollars in the 2014 settlement, which involved claims by an ADR holder.  *See* Hicks Ex. 109 (Settlement Agreement).

---

[20] Of the three remaining examples, one was an exchange offer where a foreign company with U.S.-dollar ADRs acquired another foreign company with U.S.-dollar ADRs and the acquirer offered the target company's ADR holders its own dollar-denominated ADRs in the exchange.  *See* Hicks Ex. 32 (Lissemore Jan. 2022 Report for Pls. ¶ 23).  The remaining two offers involved minuscule numbers of U.S. ADRs, with the vast bulk of holders abroad.  In one of them, the offer failed completely and not a single ADR holder accepted; the other was still pending during expert discovery.  *Id.* ¶¶ 24-25.

[21] It is surprising the Defendants chose to cite their expert's data in their brief after Plaintiffs' expert Lissemore demonstrated that his claims were wrong and he had "egregiously misrepresented" the 25 tender offer sample he relied on.  *See* Defs.' Opp'n at 47 n.16; Hicks Ex. 32 (Lissemore Jan. 2022 Report for Pls. ¶¶ 19-25).

[22] Hicks Ex. 3 (1993 IPO Propectus) (listing ADSs in dollars).

[23] Hicks Ex. 172 (PT_FISCHEL_000004206) (showing NYSE YPF ADRs listed in dollars).

[24] Hicks Ex. 134 (Deposit Agreement § 4.01).

[25] Hicks Ex. 134 (Deposit Agreement § 4.05); Hicks Ex. 31 (Lissemore Sept. 2021 Report for Pls. ¶ 10).

In addition to taking the usual steps to establish an ADR program to attract NYSE investors who would fill YPF's coffers with dollars, Defendants drafted the Bylaws' tender-offer provision specifically so that investor expectations of a dollar-denominated exit would be assured in the event of a takeover. The Bylaws did not simply rely on the overwhelmingly clear custom and practice; they included express provisions to protect and reassure NYSE investors on this point. The Bylaws' tender-offer provision expressly states that a takeover bid must be made for "all the shares of all classes of the Corporation *and all securities convertible into shares*," plainly including dollar-denominated ADRs traded on the NYSE. Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(e)(ii)). Accompanying that guarantee, the Bylaws also unambiguously instruct the tender offeror to publish a notice in New York on the New York Stock Exchange. *Id*. § 7(f)(iv). Given the lengths Defendants went to reassure ADR holders that the Bylaws would protect them in the event of a takeover, it is unimaginable that the Bylaws mean anything different from what they say. ADR holders clearly have the right to direct tender offers.

Defendants' argument that ADRs are not "securities convertible into shares," and therefore do not receive direct tender offers, is devoid of any textual or common sense support. Defs.' Opp'n at 46. Section 7(d) does not define the phrase "securities convertible into shares." It simply states that "the meaning of the term 'securities,' *without limitation*, [includes] debentures, corporate bonds and stock coupons." Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(d) (emphasis added)). These securities are listed because the Bylaws elsewhere make clear that they are not always "convertible." *See id.* § 5(ii) (stating YPF has the power to issue "debentures, corporate bonds, and other debt securities . . . [whether] convertible or not."). The Bylaws expressly provide that this is a non-exhaustive list, and there can be no serious argument that ADRs do not fit into "the meaning of the term 'securities.'" *Id*.; *see*, *e.g.*, *Baliga v. Link Motion Inc*, No. 18cv11642 (VM)

(DF), at *3 n.2 (S.D.N.Y. Mar. 9, 2022), ECF No. 275 ("An American Depositary Receipt ('ADR') 'is a *security* that represents shares of non-U.S. companies that are held by a U.S. depositary bank outside the United States.'" (quoting Investor Bulletin: American Depositary Receipts, SEC, https://www.sec.gov/investor/alerts/adr-bulletin.pdf)); Hicks Ex. 32 (Lissemore Jan. 2022 Report for Pls. ¶ 14).  And all parties agree ADRs are convertible into shares.[26]  ADRs are thus "securities convertible into shares"[27] and bids must be made for them directly.  ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

Moreover, even putting aside Defendants' argument over the meaning of "securities," given the Bylaws' requirement that the tender offer must be made not just in Buenos Aires, but on other exchanges as well, *including New York*, *Petersen I*, 2016 WL 4735367, at *7; *Petersen II*, 895 F.3d at 199, and given that *only* ADRs trade in New York, Defendants' argument that they did not have to tender for the dollar-denominated ADRs traded on the NYSE is foreclosed by the Bylaws' text.

Since the bid is to be made for securities themselves—in this case, dollar-denominated ADRs traded in New York—and not the shares underlying those securities, the bidder must offer to purchase the securities in their currency.  As Ms. Lissemore explains, based on her 29 years of global banking experience at Citibank, it is impossible to pay pesos for ADRs in the United States, as the Depository Trust Company and the American banking system are not set up to allow the

---

[26] *See* Defs.' Opp'n at 45 (explaining ADR holders can exchange their ADRs for Class D shares).

[27] The 2008 letter Defendants cite was referring to other convertible securities and not to ADRs, which were included in the Petersen tender offer.  *See* Defs.' Opp'n at 46 n.15; Hicks Ex. 32 (Lissemore Jan. 2022 Report for Pls. ¶ 16).

transfer of that foreign currency.  *See* Hicks Ex. 31 (Lissemore Sept. 2021 Report for Pls. ¶ 20). Simply put, even if the Bylaws' text did not answer this question, common sense does:  ADR holders had to receive dollars when they tendered because there was no other way the tender could be conducted.  With this understanding, NYSE investors bought in and the IPO was a success.  *See* Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶ 42) ("As a matter of custom and practice, these provisions (or ones closely similar to them) were essential in order to convince investors to purchase the Class D shares and were clearly designed to cause prospective investors to believe that . . . payment of all dividends or other distributions (includes those pursuant to a tender offer) [would be] in dollars.").

Defendants' theory of how they might have been able to get away with paying pesos instead of dollars runs as follows:  (1) instead of allowing NYSE holders to tender their ADRs, they would have required NYSE holders to go to BNYM, the depository, and ask BNYM to break apart their ADRs and deliver to them the underlying peso-denominated Argentine shares (which may well have required them to register as foreign holders of Argentine securities)[28]; (2) Defendants then would have required the NYSE holders to find a broker in Argentina to hold those Argentine-traded shares and deliver them to a tender agent for the acquirer in Argentina; (3) and if they got that done on time, they could then receive pesos in a bank account in Argentina (which the ADR holders would have to set up).  The Bylaws, by contrast, state that the tender offer must occur in the jurisdictions where the YPF securities trade, consistent with the rules and regulations on the "stock exchanges where the Corporation's shares and securities are listed."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(f)).  In other words, an offer must also be made in New York on the NYSE, not just in Buenos Aires.  *See* Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 92); *see also*

---

[28] *See* Hicks Ex. 180 (ACL art. 123; IGJ Resolution No. 7/2005, art. 223; AFIP General Resolution 3995-1995, art. 1).

*Petersen I*, 2016 WL 4735367, at *7 ("[T]he United States was the place of performance for certain contractual obligations under the Bylaws required to implement a tender offer, including the publication of the tender offer notices in New York, SEC filings detailing the tender offer, the delivery of tender offer materials to the NYSE, and, if demanded, the purchase of shares held in the United States.").

Alternatively, Defendants suggest (44-45) that even though private acquirers might have to pay dollars for dollar-denominated ADRs traded on the NYSE, somehow Argentina was exempt from this requirement.  This is wrong.  Section 28, which governs Argentina's tender-offer obligations, incorporates Section 7(e)(ii) and its requirement that tender offers must be made for "all securities convertible into shares."  Hicks Ex. 1 (ECF No. 36-2 (YPF Bylaws) § 7(e)(ii)).  Section 28(B)—which says Argentina's tender-offer obligations, as set out in Section 7, are "limited to the aggregate amount of Class D shares"—simply means that Argentina need not make a tender offer for Class A, B, and C shares.  *Id.* § 28(B).  That makes sense, because those shares are not privately owned; they belong respectively to Argentina, Argentina or the Provinces, and YPF's employees under the Shared Ownership Program.  *See id.* § 6(b)(i)-(iii).  Section 28(D) does not exempt Argentina from making a tender offer for securities convertible into *Class D* shares.  Just like the other trap doors that Defendants imagine that YPF's bylaws contain, such an exemption would fly in the face of the promises Argentina and YPF made to NYSE investors about Argentina's obligations under the Bylaws.  Defendants promised Plaintiffs a tender offer in U.S. dollars, not devalued pesos.

> (ii)    Even if the Bylaws did not promise a tender offer in U.S. dollars, Plaintiffs' damages are in U.S. dollars

Even beyond the Bylaws' clear language, Plaintiffs should receive damages in U.S. dollars because they suffered damages in U.S. dollars.  The law in Argentina and the United States alike

requires courts to award damages that compensate the victim for its injury and are calculated from the perspective of the injured party. *See* Goodman Ex. 36 (Garro Jan. 2022 Report for Pls. ¶ 63) (explaining the Argentine legal principle of full indemnification—"that the party aggrieved by the breach of contract is entitled to full compensation for the harm sustained as a result of the obligor's failure to perform"—applies to this action); Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶¶ 89, 95) (same); *cf. United States Naval Inst. v. Charter Commc'ns., Inc.*, 936 F.2d 692, 696 (2d Cir. 1991) ("Since the purpose of damages for breach of contract is to compensate the injured party for the loss caused by the breach, 5 Corbin On Contracts § 1002, at 31 (1964), those damages are generally measured by the plaintiff's actual loss, *see, e.g.*, Restatement (Second) of Contracts § 347 (1981)."); *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 299 (S.D.N.Y. 2010) (Preska, J.) ("The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach.") (quoting *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971)); *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 261 (1998) ("It has long been recognized that the theory underlying damages is to make good or replace the loss caused by the breach of contract."; "Damages are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed.").

Under the Deposit Agreement and common practice, Plaintiffs would have ultimately received their tender-offer payments in dollars from the depository, even if Argentina's obligation was only to pay in pesos. Defendants half-heartedly challenge this (at 46) by urging that the Deposit Agreement's dollar-conversion provisions apply only to dividends and "other distributions." Defendants do not explain why tender-offer proceeds should be exempted, or how BNYM would get around the inability of the U.S. banking system to pay ADR holders in pesos.

Nor could they.  The very purpose of ADRs is to eliminate foreign currency transactions.  *See Chembulk Mgmt. PTE Ltd. v. Vedanta Ltd.*, No. 1:16-cv-09827 (LTS) (KHP), 2018 U.S. Dist. LEXIS 16886, at *8 (S.D.N.Y. Jan. 30, 2018) ("[M]ost U.S. investors choose to own the ADR for convenience reasons because ADRs are denominated in U.S. dollars, traded on U.S. stock exchanges, cleared through U.S. settlement systems, and sold over the counter."); *Normand v. Bank of N.Y. Mellon*, No. 16-CV-212 (JPO), 2016 WL 5477783 (S.D.N.Y. Sep. 29, 2016) ("Because ADRs are bought and sold domestically in USD, ADR Holders can purchase shares of foreign companies without having to navigate the complexities of the foreign market.").  Thus, whether from Argentina or BNYM, Plaintiffs would have received payment in dollars.

Even if one were to ignore all of the above and assume Defendants' far-fetched scenario were permissible under the Bylaws and Deposit Agreement, and Plaintiffs would have received pesos in a bank account in Buenos Aires rather than dollars in New York, it strains credulity to think that Plaintiffs would simply have left those pesos languishing in Buenos Aires for a decade, rather than converting them to dollars as quickly as possible.  As Plaintiffs' expert, Professor Calomiris of the Columbia Business School Finance Department, explains, even domestic Argentine investors do not hold pesos for extended periods.  Hicks Ex. 169 (Calomiris Jan. 2022 Report for Pls. ¶¶ 24-28).  They either buy dollar-denominated assets or else buy other assets, such as real estate or even inflation-protected Argentine government bonds, that insulate them from currency devaluations.  *See id*.

Plaintiffs here were even more likely to convert any pesos they received.  They had invested in a company that earned oil revenues priced in a dollar-dominated global marketplace and that incurred local expenses (*e.g.*, labor and real estate) denominated in pesos.  In essence, holders of YPF ADRs signed up to be long in dollars and short in pesos.  Hicks Ex. 169 (Calomiris Jan. 2022

Report for Pls. ¶ 23).  The idea (advanced by Defendants at 42-44) that when they bought their dollar-denominated ADRs on the NYSE they were signing up to do precisely the opposite—and were making a naked ten-year bet on the Argentine peso—is absurd.  Moreover, Petersen had billions of dollars of dollar-denominated debt owed to an international consortium of banks and a Spanish oil company.  It had to deliver dollars to these creditors to pay off its loans.  *See*, *e.g.*, Hicks Ex. 83 (PT_000000608 at 00642 (Credit Agreement dated as of February 21, 2008, ¶ 2.11(a)) ("All payments hereunder or under any other Loan Document (except to the extent otherwise provided therein) shall be made in Dollars.")).  And Eton Park was a New York-based investment fund—it most certainly would have converted the proceeds to dollars.  As Professor Calomiris has shown, there were ample foreign currency transactions in the period before and after the takeover such that Petersen and Eton Park could have converted the proceeds to dollars at the time and not waited a decade.  Hicks Ex. 169 (Calomiris Jan. 2022 Report for Pls. ¶¶ 23-27).  Moreover, even if they had parked some of the proceeds in peso-denominated assets for some period of time (as unlikely as that sounds), Professor Calomiris has shown that these assets (like real estate and inflation-protected Argentine bonds) would have retained their value as well as dollars, rather than declined precipitously like pesos.  Hicks Ex. 169 (Calomiris Jan. 2022 Report for Pls. ¶ 28).

In sum, because Plaintiffs would have ultimately received dollars had Defendants performed their contractual obligations, they are entitled to an award of damages denominated in dollars.[29]  And as Professor Fischel points out, the difference in value between dollars and pesos

---

[29] Even if the law did not otherwise foreclose this attempt to evade the consequence of their breaches, delivering pennies on the dollar of what Defendants owe would permit Defendants to get away with gross violations of their duty of good faith and fair dealing under Argentine law.  *See* Pls.' Opp'n at 72-74.  In his February 2012 memo, Secretary Cameron counseled in favor of breaching the tender-offer obligation because a tender offer would cost billions of

today is of no significance as an economic matter.  What is important from the standpoint of compensating the Plaintiffs for their injuries is the loss they suffered on the date of the breach and, on that day, the peso and dollar values were identical.  Hicks Ex. 28 (Fischel Jan. 2022 Report for Pls. ¶ 18).

> (iii)   Even if Plaintiffs' damages are in Argentine pesos, the breach-day rule requires this Court to convert them to U.S. dollars.

Even if the Court were to hold that Plaintiffs—NYSE ADR holders—suffered damages in pesos, rather than dollars (which is not the case), the Court should convert Plaintiffs' damages into dollars at the conversion rate in effect as of the date of the breach.  *See* N.Y. Jud. Law § 27(a) (McKinney 1987) (requiring judgments to be "computed in dollars and cents").  It is well settled that, "[w]here damages are sustained in foreign currencies, New York courts apply the 'breach-day rule.'"  *Middle E. Banking Co. v. State St. Bank Int'l*, 821 F.2d 897, 902 (2d Cir. 1987).[30]  The breach-day rule sets the appropriate rate for converting a judgment as the rate "in effect on the date the breach of contract occurred."  *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 138 (2d Cir. 1986).  That common law rule is displaced in only one circumstance—as described by the "judgment-day exception" codified in Judiciary Law § 27(b):

> *In any case in which the cause of action is based upon an obligation denominated in a currency other than currency of the United States*, a court shall render or enter a judgment or decree in the foreign currency of the underlying obligation. Such judgment or decree shall be converted into currency of the United States at the rate

---

dollars.  Hicks Ex. 76 (AR00069033 at 69042).  Vice Intervenor and Under-Secretary Kicillof likewise calculated the cost to the government—from a vantage point several years later—in dollars and took pride in his decision to breach the Bylaws because it had avoided a payment of billions of dollars.  Hicks Ex. 71 (AR00019489 at 19513).  Defendants understood—and admitted both internally and externally—that by refusing to comply, they would force shareholders to sue and thereby delay payment of what they owed.  *See supra* at 17-18.

[30] Defendants agree that New York law—rather than federal common law—applies here.  *See* Defs.' Opp'n at 42.  That is because the rule for converting a foreign judgment is "substantive rather than procedural," *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 865 (2d Cir. 1981) and, "as a general matter, state substantive law is controlling in FSIA cases," *Barkanic v. Gen. Admin. of Civil Aviation of People's Republic of China*, 923 F.2d 957, 959 (2d Cir. 1991); *see also Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1508 (2022) ("[W]hen a foreign state is not immune from suit, it is subject to the same rules of liability as a private party.  Which is just to say that the substantive law applying to the latter also applies to the former.").

of exchange prevailing on the date of entry of the judgment or decree.

N.Y. Jud. Law § 27(b) (McKinney 1987) (emphasis added).  Defendants misunderstand New York law when they state (at 42) that "New York courts apply a judgment-day rule."  New York courts continue to apply the breach-day rule to convert damages into dollars before entering a judgment, unless the narrow circumstances outlined in § 27(b) are present.  *See*, *e.g.*, *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 78 F. Supp. 3d 556, 557 (E.D.N.Y. 2015); *Hood v. Ascent Med. Corp.*, 13CV0628 (RWS) (DF), 2016 WL 1366920, at *23 (S.D.N.Y. Mar. 3, 2016); *see also* New York State Bill Jacket, Ch. 326, NY Assembly Bill 7563-A ("Bill Jacket") at 11 (letter from Counsel for the State of New York Office of Court Administration to Counsel for the Governor, explaining § 27(b) would be "an exception to the general rule").  Indeed, "New York has long favored the breach-day rule." *Vishipco Line*, 660 F.2d at 866 (listing cases).  And as "'a statute enacted in derogation of the common law … it is to be strictly construed … in the narrowest sense that its words and underlying purposes permit.'" *Malmberg v. United States*, 816 F.3d 185, 193 (2d Cir. 2016) (quoting *Oden v. Chemung Cty. Indus. Dev. Agency*, 661 N.E.2d 142 (N.Y. 1995)); *see also United States v. Texas*, 507 U.S. 529, 534 (1993) ("[S]tatutes which invade the common law … are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.").

Under the plain meaning of Judiciary Law § 27(b), the judgment-day rule is limited to causes of action "based upon an *obligation denominated in a currency* other than currency of the United States."  But that exception does not apply to *performance* obligations, only *payment* obligations (such as a payment obligation under a foreign bond). *See Nature's Plus Nordic A/S*, 78 F. Supp. at 557.  That is because a performance obligation cannot be "denominated in a

67

currency."[31]  *Id.*  It cannot be denominated in anything.

Both Argentina and YPF breached performance obligations, rather than payment obligations.  Argentina breached its promise to go through the process of making a tender offer, and YPF breached its promise to enforce the tender-offer provision against Argentina and deny it the right to vote its shares in the event it failed to tender.  Argentina's tender-offer obligation would have transformed into a payment obligation when Plaintiffs accepted, but Argentina never got that far, and this lawsuit is about Argentina's breach of its obligation to *perform* a tender offer. *Petersen I*, 2016 WL 4735367, at *7 (describing "performance" of "contractual obligations" as "including" a number of tasks:  "the publication of the tender offer notices," the submission of "SEC filings," "the delivery of tender offer materials," "and, if demanded, the purchase of shares held in the United States").

Even if Argentina's promise to go through the tender-offer process could be considered a payment obligation, the judgment-day exception still would not apply because the Bylaws' tender-offer formulae are not "denominated" in foreign currency.  The term "denominate" means "to name; to give a specified name to," and a "denomination" is "a class or kind (esp. of units in a system) *having a specific name or value* (coins of different denominations)."[32]  The Bylaws and the Deposit Agreement make clear that any calculations done pursuant to the formulae must

---

[31] There is a good reason the New York legislature chose to apply the judgment-day rule only to payment obligations:  The promisee of a promise to pay foreign-denominated currency has agreed to accept payment of a sum certain at the end of the contract term in the currency specified, and thus has agreed to take the risk that the foreign currency may depreciate relative to the dollar over an extended period.  *See Competex, S.A. v. Labow*, 783 F.2d 333, 338 (2d Cir. 1986) ("If plaintiff holds an English judgment for £1 and the value of £>1 depreciates from $1 to $.60 as of the date of the American judgment, . . . that is merely the consequence of holding an obligation in pounds.").  The promisee of a promise to perform, in contrast, does *not* take such a risk.  Plaintiffs in this case did not take on any currency risk.  As noted above, to the extent they did, Plaintiffs' investment in YPF was long in dollars and short in pesos.  Hicks Ex. 169 (Calomiris Jan. 2022 Rep. ¶ 23).

[32] "Denominate"; "Denomination," Webster's New World Dictionary of the American Language, pg. 377 (2d ed 1976).

ultimately be converted into dollars. *See supra* Part III.B.4.i. But the most that can be said of the formulae—without reference to those provisions of the Bylaws and Deposit Agreement—is that they are silent on the matter. The formulae simply do not by themselves "name" a currency denomination for tender offers.[33] Accordingly, even if this Court finds that various factors suggest Plaintiffs' damages are in pesos, it must still apply New York's breach-day rule because Formula D—the closest thing to a payment obligation—is not in foreign currency. The judgment-day exception applies only when a defendant's "obligation [is] denominated in a currency other than currency of the United States." N.Y. Jud. Law § 27(b) (McKinney 1987). This exception was understood to apply in very different situations, such as cases involving a "'promise or order to pay a sum stated in a foreign currency for a sum certain in money.'" Bill Jacket at 12 (letter from the New York State Bar Association) (quoting U.C.C. § 3-107(2)). It cannot be stretched to include a promise to perform a series of steps after which NYSE ADR holders could decide to tender their shares in exchange for U.S. dollars.

In cases where § 27(b) does not apply, like this one, "the Court is left with the general rule that where damages are sustained in a foreign currency, 'New York courts apply the breach day rule, whereby the appropriate measure of damages is the equivalent of such foreign currency in terms of dollars, at the rate of exchange prevailing at the date of breach.'" *Nature's Plus Nordic*, 78 F. Supp. 3d at 558. That can be determined as a matter of law with the rates published by the Central Bank of Argentina. *See* Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls., Ex. 2). There is no factual dispute in this case regarding conversion rates or calculations; the experts agree on all these points. *See id.*; Giuffra Ex. 102 (Harris Dec. 2021 Report for Defs. Fig. 5, App'x C1, C5, C7, C10) (using rates published by the Central Bank of Argentina); Hicks Ex. 163 (Harris Tr. for

---

[33] That one component of Formula D (the price/net income ratio) involves pesos does not dictate the denomination of Argentina's ultimate payment obligation upon Plaintiffs' acceptance of its tender offer.

Defs. 85:8-86:14).  "Fluctuations in the value of a foreign currency between the date when an obligation was incurred and the date when payment in foreign currency must be made[,] must be disregarded."  *Dougherty v. Equitable Life Assurance Soc'y*, 193 N.E. 897, 912 (N.Y. 1934).

## IV.   Defendants' Arguments on Consequential Damages and Prejudgment Interest Do Not Raise Factual Disputes and Can Be Rejected As a Matter of Law.

Defendants' Opposition to Plaintiffs' motion for summary judgment is unusual insofar as it does not purport to identify issues that would warrant a trial.  Each of the issues addressed thus far in this brief is entirely legal and none of them raises a factual dispute; there simply is nothing to have a trial about.  The only effort Defendants can muster to delay payment further by forcing a trial consists of two arguments—on consequential damages and prejudgment interest—but those issues, too, can be resolved as a matter of law.

### A.   The Petersen Plaintiffs are entitled to judgment on the consequential damages requested but will forgo them if the Court disagrees.

Plaintiffs' direct damages consist of the difference between the tender price they would have received and the market value of what they were left holding.  But the Petersen Plaintiffs had their shares foreclosed upon by creditors over the subsequent months at still *lower* prices.  The prices on the dates of foreclosure—and the credits that Petersen received for those foreclosures in its bankruptcy proceeding—are a matter of public record and are undisputed by Defendants.  *See* Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls., Ex. 7).  Defendants do not challenge Professor Fischel's calculation of this additional category of damages.  Accordingly, there is no factual dispute to resolve and no reason this Court cannot include these consequential damages— consisting of the further losses as of the dates of foreclosure—in a grant of summary judgment.

Instead of challenging Petersen's consequential damages on factual grounds, Defendants offer two half-hearted *legal* challenges that can be resolved on summary judgment.  First, Defendants challenge whether the standard for consequential damages is *dolo* or maliciousness,

Defs.' Opp'n at 53, but Argentine courts use the concepts interchangeably to describe "willful misconduct." *See* Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 95) (citing *Ply S.A. c. Conelmec SRL*, CN Com., Room B, Mar. 11, 1996, La Ley 1997-D, 856).  As one Argentine court has explained:  "willful misconduct in a breach of an obligation consists not in the intention to harm as it applies in criminal matters but in the obligor's shameless [failure] to perform his obligations. . . .  [T]he malicious breach of the obligation is the one made on purpose where the obligor does not perform while he could perform.  It is a specific malice, related to the duty to perform which the obligor bears."  *See* Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 96 n.71) (quoting Hicks Ex. 174 *ACE Seguros SA c. Transporte Don Francisco de Carlos Orlando Federico y otro s/ ordinario*, CN Com., Room A, May 19, 2011, Online Citation: TR LALEY AR/JUR/29587/2011).  The undisputed evidence in this case satisfies that standard.  As the Cameron memorandum shows, before retaking control of YPF, Argentina intentionally plotted to breach the Bylaws by expropriating majority control without making a tender offer.  *See supra* at 17.  And shortly after Argentina seized control of YPF, Vice-Intervenor Kicillof announced publicly that Defendants had no intention of honoring their obligations.  *See supra* at 18.  Even in the years following Argentina's breach, Kicillof has bragged publicly about the government's decision to breach.[34]

Defendants' second legal challenge questions whether the terms of the security agreements underlying Petersen's debt really interfered with Plaintiffs' freedom to dispose of the shares.  They did.  Petersen's agreements provided that, "[u]pon the occurrence of an Event of Default or breach

---

[34] *See* Hicks Ex. 121 (Relevant comments by Kicillof during the Plenary Meeting of the Committees of Mining, Energy, and Fuels and Budget and Treasury held on March 13, 2014, page 31); Hicks Ex. 120 (Axel Kicillof, Dialogos sin Corbata at 195 (2015)).

. . . the Collateral Agent shall have all of the rights and remedies with respect to the Collateral."[35] The parties agreed that the Collateral Agent under each agreement would have "the right, to the fullest extent permitted by law, to exercise all . . . other powers of ownership pertaining to the Collateral as if the Collateral Agent were the sole and absolute owner thereof."[36]  The agreement expressly provides that upon default "the Collateral Agent may sell, assign or otherwise dispose of all or any part of the Collateral, . . . without demand of performance or notice of intention to effect any such disposition or of the time or place thereof."[37]  And, importantly, Petersen agreed "to take all such action as may be appropriate to give effect to [that] right."[38]  Thus, under the terms of its agreements, Petersen could not have disposed of its shares because doing so would have prevented the collateral agents from selling them, and Petersen was obligated to "give effect" to the agents' right of sale.

If the Court disagrees with the Petersen Plaintiffs and concludes that it cannot award this narrow category of consequential damages without conducting a trial, but the Court otherwise agrees with Plaintiffs that they are entitled to summary judgment on their claims for direct damages, then Petersen will forgo this category of consequential damages in the interests of expediency and efficiency, to avoid the delay associated with a trial.  If, however, the Court decides that a trial is necessary on direct damages as well, the Petersen Plaintiffs will seek at trial the entirety of the consequential damages available to them (including not only the losses stemming from foreclosure sales, but also the interest that has accrued on their outstanding debt obligations

---

[35] *See* Hicks Ex. 175 (AR00108369 at 108375-76); Hicks Ex. 176 (AR00076509 at 76516-17); Hicks Ex. 177 (AR00076528 at 76533); Hicks Ex. 178 (AR00076578 at 76584); Hicks Ex. 179 (AR00076615 at 76623).

[36] *See id.*

[37] *See id.*

[38] *See id.*

for the last decade).[39]  It is Petersen's belief that trial should not be necessary, as it has moved for summary judgment only on the subset of consequential damages which clearly does not require the Court to resolve any factual disputes.

**B.  Prejudgment interest, though discretionary, does not turn on any factual dispute.**

The parties agree that prejudgment interest is required under Argentine law, and that the rate to be applied by this Court is a matter of judicial discretion. Pls.' Opening at 37; Defs.' Opp'n at 54-55; *See* Hicks Ex. 162 (Manóvil Dec. 2021 Report for Argentina ¶ 160).  That said, the principle of full indemnification requires Defendants to make Plaintiffs whole.  *See* Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 52); Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 89). Prejudgment interest is a required component of compensation.  *See* Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 19 n.10) (Civil Code art. 511:  "The obligor of the obligation is also liable for damages and interest, when through his own fault he has failed to fulfill it"); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 19 n.10) (Civil Code art. 628:  "If the impossibility to perform is due to the obligor's fault, the obligor is obligated to pay damages and interest to the obligee."). Plaintiffs have therefore argued that because the tender offer for their shares would have been conducted in New York—and New York was the locus of the breach—it is appropriate for the Court to apply the New York rate.  However, because the Court has discretion under Argentine law, it would also be free to apply the rate that Argentine courts apply in commercial matters, which is between 6% and 8%.  Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 56); Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶¶ 39-41).  Plaintiffs' expert Professor Fischel has provided the calculations for whichever rate the Court picks, and Defendants do not challenge his math.

---

[39] In their Opening, the Petersen Plaintiffs explained that they would forgo the claim for accrued interest if the Court otherwise grants summary judgment in their favor.  Pls.' Opening at 37 n.13.

Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 41); Hicks Ex. 163 (Harris Tr. for Defs. 85:8-86:14).  This Court need not hold a trial to exercise its discretion to impose a rate.  *See*, *e.g.*, *Int'l Harvester Co. v. TFL Jefferson*, 695 F. Supp. 735, 740 (S.D.N.Y. 1988) (declining to find any "triable issue of fact" and using discretion to award prejudgment interest at summary judgment); *M. Prusman, Ltd. v. The M/V Nathanel*, 684 F. Supp. 372, 374 (S.D.N.Y. 1988) (exercising "broad discretion" to award prejudgment interest at summary judgment).

The path urged by Defendants to impose the much lower *administrative* rate applicable to suits against the government in its sovereign capacity, Defs.' Opp'n at 55, would be an abuse of the Court's discretion and would run up against the holding of the Second Circuit and the law of the case created by this Court.  The Second Circuit has already agreed with this Court that Defendants' obligations to Plaintiffs were commercial in nature.  *Petersen II*, 895 F.3d at 207.  Under law of the case, Plaintiffs' claims arise from commercial, not sovereign, acts.

In any event, choosing among these options is a matter of law, not fact, and the need to do so should not preclude summary judgment.

## CONCLUSION

Thirty years after Defendants amended YPF's bylaws to provide clear contractual promises to minority shareholders in the event of renationalization, ten years after Argentina seized control of YPF and Defendants refused to comply with those promises, and seven years after Plaintiffs filed suit to enforce the "compensated exit" they were promised, Defendants' day of reckoning has finally come.  Defendants do not identify any genuine issues of material fact precluding summary judgment for Plaintiffs—merely a series of *post hoc* legal arguments for avoiding their obligations altogether.  As might be expected of arguments that surfaced only once Defendants faced the very litigation they dared shareholders to bring (and not when Defendants renounced their obligations), Defendants' theories conflict with well-established legal principles and fail the test of common

74

sense.  Given Argentina's checkered economic past, had Defendants even hinted during YPF's IPO process at what they now proclaim—that Argentine public law supersedes the Bylaws' promises; that investors must hold their shares for years after Argentina's re-assertion of control; that investors' only recourse is in the Argentine courts under arcane principles of Argentine corporate law; that any compensation would be paid in devalued pesos; and so forth—the international markets would have viewed YPF with rightful skepticism and its IPO as merely another opportunity for Argentina to leave foreign investors holding the bag.

But, of course, Defendants did no such thing.  Instead, they amended YPF's bylaws to include unusual and unusually clear promises specifically addressing the possibility of Argentina's re-taking control of YPF.  The Bylaws explicitly established a tender-offer requirement applicable when Argentina "exercise[d] the control of" at least 49% of YPF, they explicitly articulated how to determine that tender-offer price, and they explicitly required YPF to "enforce the tender offer provision" by implementing other back-stop protections in the Bylaws.  *Petersen II*, 895 F.3d at 206-08, 210.  Defendants then "touted these protections" to would-be investors and, as a result, achieved an enormously successful IPO.  *Id.* at 200.  Yet when *the very event* contemplated by the Bylaws came to pass, Defendants did not deny their prior promises—they simply renounced them.  The clarity of the promises and the clarity of Defendants' refusal to comply make this a straightforward case.  There are no disputed material facts—just far-reaching consequences if this Court were to conclude that clear contractual promises to international investors can so easily be evaded.  As a matter of law, Defendants' bait and switch cannot be countenanced.  Plaintiffs are entitled to summary judgment.

Dated: June 23, 2022                    Respectfully submitted,

                                        KIRKLAND & ELLIS LLP

                                        By:        /s/ Paul D. Clement
                                        Paul D. Clement
                                        George W. Hicks, Jr.
                                        C. Harker Rhodes, IV
                                        1301 Pennsylvania Avenue, N.W.
                                        Washington, D.C. 20004
                                        Phone:  (202) 389-5000
                                        Fax:  (202) 389-5200
                                        Email:  paul.clement@kirkland.com
                                                george.hicks@kirkland.com
                                                harker.rhodes@kirkland.com


                                        KELLOGG, HANSEN, TODD, FIGEL
                                            & FREDERICK, P.L.L.C.

                                        Mark C. Hansen
                                        Derek T. Ho
                                        Andrew E. Goldsmith
                                        1615 M Street, N.W., Suite 400
                                        Washington, D.C. 20036
                                        Phone:  (202) 326-7900
                                        Fax:  (202) 326-7999
                                        Email:  mhansen@kellogghansen.com
                                                dho@kellogghansen.com
                                                agoldsmith@kellogghansen.com


                                        KING & SPALDING LLP

                                        Israel Dahan
                                        Laura Harris
                                        1185 Avenue of the Americas
                                        New York, NY 10036
                                        Phone:  (212) 556-2114
                                        Fax:  (212) 556-2222
                                        Email:  idahan@kslaw.com
                                                lharis@kslaw.com


                                            -and-

Reginald R. Smith
1100 Louisiana Street
Houston, TX 77002
Phone:  (713) 751-3200
Fax:  (713) 751-3290
Email:  rsmith@kslaw.com

*Counsel for Plaintiffs Petersen Energía Inversora,
S.A.U., Petersen Energía, S.A.U., Eton Park Capital
Management, L.P., Eton Park Master Fund, Ltd.,
and Eton Park Fund, L.P.*