**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
PETERSEN ENERGÍA INVERSORA,                                 :
S.A.U. and PETERSEN ENERGÍA, S.A.U.,                        :
                                                            :        Case No.:  1:15-CV-02739 (LAP)
          Plaintiffs,                                       :
                                                            :
          v.                                                :
                                                            :
ARGENTINE REPUBLIC and YPF S.A.,                            :
                                                            :
          Defendants.                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
ETON PARK CAPITAL MANAGEMENT,                               :
L.P., ETON PARK MASTER FUND, LTD.,                          :
and ETON PARK FUND, L.P.,                                   :        Case No.:  1:16-CV-08569 (LAP)
                                                            :
          Plaintiffs,                                       :
                                                            :
          v.                                                :
                                                            :
ARGENTINE REPUBLIC and YPF S.A.,                            :
                                                            :
          Defendants.                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x



## ARGENTINA'S REPLY MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT




June 23, 2022

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................................1

I.   PLAINTIFFS' OPPOSITION CONFIRMS THAT THEIR CLAIMS FAIL BECAUSE THEY NO LONGER HOLD YPF SECURITIES .....................................1

    A.   Defendants Did Not "Forfeit" Their Ability to Raise Plaintiffs' Inability to Enforce the YPF Bylaws...........................................................................2

    B.   Under Both Argentine and New York Law, Plaintiffs' Breach-of-Contract Claims Fail Because Plaintiffs Are Not Current Shareholders. ..............................5

II.  PLAINTIFFS INDISPUTABLY WERE NOT PARTIES TO THE YPF BYLAWS WHEN ARGENTINA ACQUIRED THE YPF SHARES ...........................8

    A.   No Tender-Offer Obligation Could Have Been Triggered Until 2014...................8

    B.   Plaintiffs' Anticipatory-Breach Theory Fails. .......................................................11

III. PLAINTIFFS' NEWLY-MINTED THEORY OF WHEN A TENDER OFFER WAS REQUIRED IMPERMISSIBLY CHALLENGES SOVEREIGN ACTIVITY...................................................................................................................12

IV.  PLAINTIFFS HAVE NO SUPPORT FOR THEIR UNPRECEDENTED CLAIMS UNDER ARGENTINE LAW........................................................................15

V.   PLAINTIFFS CANNOT JUSTIFY THEIR CLAIM FOR DAMAGES UNDER ARGENTINE LAW........................................................................................18

    A.   The Bylaws Supply the Exclusive Penalties Available to Plaintiffs......................18

    B.   Plaintiffs Failed to Demand Specific Performance................................................20

VI.  ARGENTINE PUBLIC LAW BARS PLAINTIFFS' CLAIMS................................21

    A.   Plaintiffs' Misreading of the Bylaws Would Impermissibly Impede the Expropriation and Its Intended Effects. ................................................................21

    B.   The General Expropriation Law Provides the Exclusive Remedies for Plaintiffs' Claimed Injuries...................................................................................23

CONCLUSION .......................................................................................................................24

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Allan Applestein TTEE FBO D.C.A.* v. *Province of Buenos Aires*,
   415 F.3d 242 (2d Cir. 2005)...........................................................................................3

*Animal Sci. Prod., Inc.* v. *Hebei Welcome Pharm. Co.*,
   138 S. Ct. 1865 (2018)...................................................................................................8

*Animazing Ent., Inc.* v. *Louis Lofredo Assocs., Inc.*,
   88 F. Supp. 2d 265 (S.D.N.Y. 2000).............................................................................3

*Brevan Howard Credit Catalyst Master Fund Ltd.* v. *Spanish Broad. Sys., Inc.*,
   2014 WL 2943570 (Del. Ch. June 27, 2014)..................................................................7

*Columbia Artists Mgmt., LLC* v. *Alvarez*,
   2010 WL 5396097 (S.D.N.Y. Dec. 23, 2010) ................................................................4

*Consol. Edison, Inc.* v. *Ne. Utilities*,
   318 F. Supp. 2d 181 (S.D.N.Y. 2004)........................................................................6, 7

*Domino's Pizza, Inc.* v. *Donald*,
   546 U.S. 470 (2006).......................................................................................................2

*Erickson Beamon Ltd.* v. *CMG Worldwide, Inc.*,
   2014 WL 3950897 (S.D.N.Y. Aug. 13, 2014)............................................................3, 4

*Fed. Deposit Ins. Corp.* v. *Murex LLC.*,
   500 F. Supp. 3d 76, 97 (S.D.N.Y. 2020) .......................................................................4

*FDIC* v. *Citibank N.A.*,
   2016 WL 8737356 (S.D.N.Y. Sept. 30, 2016)...........................................................2, 7

*Federal Treasury Enterprise Sojuzplodoimport* v. *Spirits Intern. B.V.*,
   809 F.3d 737 (2d Cir. 2016).........................................................................................15

*Konowaloff* v. *Metropolitan Museum of Art*,
   702 F.3d 140 (2d Cir. 2012).........................................................................................15

*Lindsey* v. *Starwood Hotels & Resorts Worldwide Inc.*,
   409 F. App'x 77 (9th Cir. 2010) ....................................................................................2

*Pablo Star Ltd.* v. *Welsh Gov't*,
   961 F.3d 555 (2d Cir. 2020).........................................................................................13

*Patel* v. *Contemporary Classics of Beverly Hills*,
   259 F.3d 123 (2d Cir. 2001)........................................................................2

*Petersen Energía Inversora S.A.U.* v. *Argentine Republic & YPF S.A.*,
   895 F.3d 194 (2d Cir. 2018)................................................................ *passim*

*Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Tr. Co.*,
   2022 WL 384748 (S.D.N.Y. Feb. 8, 2022)..................................................6

*Process & Indus. Devs. Ltd.* v. *Fed. Republic of Nigeria*,
   962 F.3d 576 (D.C. Cir. 2020)....................................................................4

*Republic of Philippines* v. *Pimentel*,
   553 U.S. 851 (2008)....................................................................................4

*Saks* v. *Franklin Covey Co.*,
   316 F.3d 337 (2d Cir. 2003)........................................................................4

*Sesto* v. *Slaine*,
   171 F. Supp. 3d 194 (S.D.N.Y. 2016)........................................................2

*SM Kids, LLC* v. *Google LLC*,
   963 F.3d 206 (2d Cir. 2020)....................................................................2, 3

*Tardif* v. *City of New York*,
   302 F.R.D. 31 (S.D.N.Y. 2014) ..................................................................4

*United States* v. *Carr*,
   557 F.3d 93 (2d Cir. 2009)........................................................................13

*United States* v. *O'Brien*,
   391 U.S. 367 (1968)..................................................................................12

*Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*,
   127 F. Supp. 3d 136 (S.D.N.Y. 2015).........................................................3

### ARGENTINE AUTHORITIES

Argentine Civil Code ................................................................................ *passim*

Argentine General Companies Law ........................................................... *passim*

Law No. 21,499 (General Expropriation Law)........................................... *passim*

Law No. 26,741 (Public Interest Law).........................................11, 12, 22, 23

### OTHER AUTHORITIES

28 U.S.C. § 1605(a) ........................................................................................13

N.Y. U.C.C. § 802-(a).................................................................................................................8

Federal Rule of Civil Procedure 8 ...........................................................................................3, 4

## PRELIMINARY STATEMENT

The parties appear to agree on this much:  if the Republic prevails on any one of the six independent arguments in its motion, the Court should grant summary judgment in favor of Defendants.  Plaintiffs also agree that "Argentine law governs this suit" (Pls.' Opp. 3, 12) yet fail to explain how it supports their unprecedented theory of contract liability.  That should be the end of the matter.  To try to save their claims, Plaintiffs offer a novel theory of relief that conflicts not only with Argentine law but with the text of the Bylaws and the very arguments that Plaintiffs themselves advanced in this Court (and the Second Circuit) to escape dismissal on jurisdictional grounds.  As just one example of the audacity of their position, Plaintiffs demand damages more than five times the size of YPF's entire market capitalization—representing a 100,000% return on their litigation funder's investment—yet fail to identify a single case in Argentine history in which a shareholder sued another for a breach of a bylaws provision and recovered *any* damages at all.

Plaintiffs try to distract from their lack of legal support by bemoaning the supposed "vagaries" and "obscure requirements" of Argentine corporate law, and by repeating unsupported conjecture about what other investors in YPF might have thought about its Bylaws 30 years ago (long before either Plaintiff acquired any stake in YPF).  (Pls.' Opp. 1, 3.)  But with respect to what the YPF Bylaws *actually* provide and the rights Plaintiffs *actually* held through the YPF securities that they purchased, Plaintiffs have no good answers.  This Court should grant the Republic's motion for summary judgment and end this long-running dispute.

## ARGUMENT

## I.   PLAINTIFFS' OPPOSITION CONFIRMS THAT THEIR CLAIMS FAIL BECAUSE THEY NO LONGER HOLD YPF SECURITIES.

It is undisputed that Plaintiffs are no longer YPF security holders.  (Argentina's Opening Br. 16-19.)  Under New York and Argentine law, the right to enforce a corporate bylaws provision

rests only with the current holder of that security.  *FDIC* v. *Citibank N.A.*, 2016 WL 8737356, at *4-5 (S.D.N.Y. Sept. 30, 2016) (Carter, J.); (Manóvil Rebuttal ¶ 25.)  Nothing in Plaintiffs' response—which mostly focuses on issues other than the merits—can rescue their inability to enforce the provisions of the YPF Bylaws.

>    **A.    Defendants Did Not "Forfeit" Their Ability to Raise Plaintiffs' Inability to Enforce the YPF Bylaws.**

Plaintiffs assert that Defendants "forfeited" their "affirmative defense" that Plaintiffs lost the right to bring a breach-of-contract action to enforce the Bylaws when they ceased to hold YPF securities.  (Pls.' Opp. 9-11.)  But whether Plaintiffs lost the right to bring their "contract" claim is not an affirmative defense, but rather a merits question that goes directly to the elements of Plaintiffs' claim.  Although courts have sometimes used inconsistent terminology, the Second Circuit recently clarified that whether a party has an enforceable right under a contract goes to "[w]hether the *elements of a breach of contract* including the existence of a contract are satisfied." *SM Kids, LLC* v. *Google LLC*, 963 F.3d 206, 212 (2d Cir. 2020) (emphasis added).  And it is black-letter law that "if an argument can at most negate an element of the plaintiff's claim, it is not appropriately considered an affirmative defense."  *Sesto* v. *Slaine*, 171 F. Supp. 3d 194, 206 (S.D.N.Y. 2016) (Nathan, J.).  In other words, because "a plaintiff cannot state a claim . . . unless he has . . . rights under the existing . . . contract," *Domino's Pizza, Inc.* v. *Donald*, 546 U.S. 470, 479-480 (2006), the fact that Plaintiffs no longer have the right to enforce the YPF Bylaws goes to an element of Plaintiffs' breach-of-contract claims and can be raised at any time.  *See, e.g.*, *Patel* v. *Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) ("[T]he defense of failure to state a claim is not waivable."); *Lindsey* v. *Starwood Hotels & Resorts Worldwide Inc.*, 409 F. App'x 77, 78 (9th Cir. 2010) ("Whether a plaintiff possesses legally enforceable rights under a contract is a question on the merits. . . . Such a plaintiff fails to state a claim . . . .").

In making their "forfeiture" argument, Plaintiffs cite inapposite cases decided *before* the Second Circuit clarified in 2020 that "contractual standing"—*i.e.*, whether a party has a claim under the asserted agreement—is a merits defense that goes to the elements of a claim. *SM Kids*, 963 F.3d at 212. Plaintiffs primarily rely on *Allan Applestein TTEE FBO D.C.A.* v. *Province of Buenos Aires*, 415 F.3d 242, 245-46 (2d Cir. 2005), in which the Second Circuit did not even reach this issue. It stated in dicta that an argument that the plaintiff's *permission to sue* was "ineffective because it was obtained after the action was filed" "appear[ed] to have [been] waived" in part because the argument had not been raised in a prior lawsuit and because the defendant "appear[ed] to have previously conceded that the permission [plaintiff] obtained was effective." *Id.* Whether "contractual standing" is an affirmative defense was not briefed and the court reached the merits of the allegedly forfeited argument anyway. *Id.*[1] Where courts have considered contractual-standing arguments comparable to those raised here, they have found that a party does not forfeit the argument by failing to raise it in an answer or motion to dismiss. *See, e.g.*, *Animazing Ent., Inc.* v. *Louis Lofredo Assocs., Inc.*, 88 F. Supp. 2d 265, 268 (S.D.N.Y. 2000) (Cederbaum, J.).

In any event, even if "contractual standing" were an affirmative defense, the Republic *did* raise Plaintiffs' "lack of standing based on assignment" and "lack of standing due to lack of contemporaneous ownership" as defenses in its Answers. (*Petersen*, ECF No. 98 at 22-23, 26-27; *Eton Park*, ECF No. 117 at 17-19.) YPF also raised Plaintiffs' "lack [of] standing" as a defense. (*Petersen*, ECF No. 99 at 19; *Eton Park*, ECF No. 116 at 15.) Rule 8(c)(1) requires only that a party "state" the general defense asserted. *Erickson Beamon Ltd.* v. *CMG Worldwide, Inc.*, 2014

---

[1] *Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 169 (S.D.N.Y. 2015), is similarly inapposite. In that case, Judge Englemayer noted in dicta that certain contractual standing arguments regarding an indenture in an "interpleader action" were likely forfeited based in part on counsel's concessions at oral argument, but again reached the merits.

WL 3950897, at *3 (S.D.N.Y. Aug. 13, 2014) (Buchwald, J.).  "There is no requirement under Rule 8(c) that a defendant plead any facts at all" to give a defendant "fair notice of the nature of the defense."  *Tardif* v. *City of New York*, 302 F.R.D. 31, 36 (S.D.N.Y. 2014) (Wood, J.). Defendants' broad pleadings were sufficient to put Plaintiffs on notice that they lacked standing under the Bylaws.[2]

Finally, this Court has the discretion to consider even forfeited "affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings."  *Saks* v. *Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003).  Plaintiffs do not claim any prejudice from Defendants' raising this purely legal defense at summary judgment.  Nor could they, given that this is not the sort of "fact-intensive" defense that could cause prejudice if asserted after discovery. *Columbia Artists Mgmt., LLC* v. *Alvarez*, 2010 WL 5396097, at *6 (S.D.N.Y. Dec. 23, 2010) (Sand, J.).  The resolution of this discrete issue will not cause any undue delay.

Plaintiffs are also wrong in suggesting that the Republic engaged in dilatory tactics in raising the contractual-standing question at summary judgment.  The Republic properly opened its defense with its threshold sovereign-immunity and act-of-state arguments, as well as champerty and *forum non conveniens* defenses unrelated to the merits.  (*Petersen*, ECF No. 28.)  The Republic was justified in focusing only on these threshold issues because "consideration of the merits [is] itself an infringement on foreign sovereign immunity," *Republic of Philippines* v. *Pimentel*, 553 U.S. 851, 864 (2008), and so district courts "resolve immunity assertions. . . *before the sovereign is required to defend the merits*."  *Process & Indus. Devs. Ltd.* v. *Fed. Republic of Nigeria*, 962

---

[2] Plaintiffs' reliance on *Fed. Deposit Ins. Corp.* v. *Murex LLC*, 500 F. Supp. 3d 76, 97 (S.D.N.Y. 2020) is entirely misplaced, as that case concerned *statutory* standing, an argument that was deemed waived because the defendant did not even mention the word "standing" in its Answer.

F.3d 576, 584 (D.C. Cir. 2020) (emphasis added).  Then, on remand from the Second Circuit, this

Court limited briefing to the issue of *forum non conveniens*.  (*See Petersen*, ECF No. 106.)

Because the Republic asserted what Plaintiffs themselves characterize as a "merits" defense (Pls.'

Opp. 9), at the most appropriate juncture, it did not act with any "dilatory motive."

> **B.**     **Under Both Argentine and New York Law, Plaintiffs' Breach-of-Contract Claims Fail Because Plaintiffs Are Not Current Shareholders.**

Plaintiffs next argue that, despite the plain language of the Deposit Agreement, Argentine,

rather than New York law, governs the question whether they can sue to enforce the YPF Bylaws.

They are wrong, but the issue is ultimately beside the point:  both New York and Argentine law

require a current shareholder to bring a claim for breach of corporate bylaws.

1.     Although Argentine law governs the substance of Plaintiffs' claims, *Petersen*, ECF

No. 161 at 34, New York law governs the ownership of those claims upon the transfer of Plaintiffs'

ADRs.  The Deposit Agreement at issue contains a choice-of-law provision:  the ADRs were

"transferable by delivery with the same effect as in the case of a negotiable instrument governed

by New York law."  (Giuffra Ex. 4 (Deposit Agreement) § 2.01; Argentina's Opening Br. 16-18.)

Thus, New York law governs the question of which rights *transferred* with the ADRs.

According to Plaintiffs, the contractual transfer provision addresses only "technical

matter[s]" surrounding the transfer of shares, but has no bearing on "substantive rights."  (Pls.'

Opp. 12-13.)[3]  But the text of the Deposit Agreement makes no such distinction.  Nor would such

a purported distinction save Plaintiffs anyway.  Plaintiffs define "technical matters" to include

issues surrounding the "legal effect" of transfer (*id.* at 13), but that would include *which rights* the

---

[3] Plaintiffs also assert incorrectly that if New York law governs this question concerning the transfer of rights, it also governs "Plaintiffs' contract claims against Defendants (which are parties to the Agreement)."  (Pls.' Opp. 12.)  But the Republic is *not* a party to the Deposit Agreement and this Court has already held that Argentine law governs the *substance* of Plaintiffs' claims.

transferee and transferor own after a transfer.  Moreover, Plaintiffs cannot distinguish decisions finding that New York law governs that question when those securities are held through a New York depository.  (*Id.* at 14 (citing, *e.g.*, *Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Tr. Co.*, 2022 WL 384748, at *14 (S.D.N.Y. Feb. 8, 2022) (Koeltl, J.).)  That courts apply New York law in the absence of an "analogue" to the Deposit Agreement's choice-of-law provision (Pls.' Opp. 13) provides more, not less, support for applying New York law here.

2.      Regardless, the application of New York or Argentine law would lead to the same result here.  Under New York law, as Plaintiffs concede, "rights in the security" travel with the security when sold or otherwise conveyed, unlike "personal rights," which do not travel with the shares.  (Pls.' Opp. 15 (quoting N.Y. U.C.C. § 802-(a).)  Plaintiffs also concede that courts applying New York and Delaware law (which has an identical UCC provision) have found that the right to enforce a corporate bylaws provision is a "right in the security."  (*Id.* at 17-18.)  Those concessions should end this case:  because Plaintiffs are not current YPF security holders, they do not have the right to bring this suit seeking to enforce the YPF Bylaws.

To try to evade this settled law, Plaintiffs argue that only *some* bylaws-based claims travel with the shares.  In Plaintiffs' telling, "the right to enforce corporate bylaws" is not "*always* a corporate right."  (*Id.* at 17 n.11 (emphasis added).)  Plaintiffs assert that courts use "bylaws and charters" as a "shorthand" for a limited set of bylaws provisions concerning "routine corporate governance measures," while apparently excluding bylaws-based claims that Plaintiffs deem less "routine."  (*Id.*)  The only decision Plaintiffs cite in support of this dichotomy of bylaws-based claims was reversed by the Second Circuit on other grounds and supports *Defendants'* position.  *Consol. Edison, Inc.* v. *Ne. Utilities*, 318 F. Supp. 2d 181, 186 (S.D.N.Y. 2004), *rev'd in part*, 426 F.3d 524 (2d Cir. 2005).  In that case, the court concluded that certain rights relating to a merger

agreement were not automatically transferred "rights in the security," because those rights arose "out of agreements *separate* from the contract embodied in the security." *Id.* at 190-91 (emphasis added). But corporate bylaws are not a contract independent from the security. Indeed, the *ConEd* court recognized as much, observing that "rights in the security" would include not only "participatory" bylaws-based rights but also bylaws-based "rights to corporate assets, such as the right to receive dividends." *Id.* at 191.

Other courts have rightly refused to differentiate bylaws-based rights depending on whether "routine" governance issues or payment is involved. Instead, courts have found that the "right to payment" provided for by a bylaws provision is just as much a "right in the security" as any other. For example, in *Brevan Howard Credit Catalyst Master Fund Ltd.* v. *Spanish Broad. Sys., Inc.*, 2014 WL 2943570, *1 (Del. Ch. June 27, 2014), the Delaware Chancery court considered a case in which shareholders alleged that the company had violated its obligations under the company's certificate of incorporation by failing to repurchase their shares of stock. The court explained that "the right to sue for a breach of the Certificate" passed upon the sale of the securities because "*[a] right to performance of a promise to repurchase is a right inherent in these securities*, and thus was transferred, upon sale of the shares." *Id.* at *4 (emphasis added); *see also Citibank*, 2016 WL 8737356, at *4-5 (damages claim for breach of bylaws provision was a right that "traveled with the security").

Under Argentine law, the result is the same. To "have standing to bring corporate claims like those at issue in this case, a plaintiff must be a *current* shareholder." (Manóvil Rebuttal ¶ 25.) Defendants' experts and authoritative treatises of corporate law, including a treatise co-authored by Plaintiffs' expert, Alfredo Rovira, confirm this tenet of Argentine law. (*Id.*) By contrast, none of Plaintiffs' experts opined that a *former* shareholder has the right to bring a claim for a historical

breach of corporate bylaws.  (Giuffra Ex. 120 (Garro Deposition Tr.) at 217-220.)   Instead, Plaintiffs invoke sources with no relevance to their claims:  (1) Article 1109 of the Civil Code, which governs *tort* claims; (2) an Article in the Civil and Commercial Code, a source of law that no party contends governs this dispute and was not in force at the relevant time; and (3) an Argentine case concerning a claim arising out of a water leak that did not involve a contract, let alone a corporate bylaws provision.  (Pls.' Opp. 19; Manóvil Rebuttal ¶¶ 34, 36, 77.)[4]

Finally, Plaintiffs claim that it would be "absurd" if they could not sue as former security holders, as that would force them to "hold onto their shares for years" after a breach.  (Pls.' Opp. 18.)  The Republic cannot be blamed for Plaintiffs' failure to bring suit until three and four years *after* they claim the breach occurred, during which time Plaintiffs transferred their ADRs. Plaintiffs chose not to take advantage of Argentine law remedies, divested their YPF shares, and conceived of their novel breach-of-contract theory years after the fact.  In these circumstances, it is entirely reasonable—far from "absurd"—that basic corporate-law principles no longer allow former security holders, such as Plaintiffs, to invoke any shareholder rights in the YPF Bylaws.

## II.   PLAINTIFFS INDISPUTABLY WERE NOT PARTIES TO THE YPF BYLAWS WHEN ARGENTINA ACQUIRED THE YPF SHARES.

### A.   No Tender-Offer Obligation Could Have Been Triggered Until 2014.

Plaintiffs also cannot pursue their breach-of-contract claims because they did not own shares when the tender-offer obligation could have been triggered, *i.e.*, when Argentina acquired 51% of YPF, Repsol's shares, in May 2014.  (Pls.' Opp. at 20.)  The parties agree that the relevant

---

[4] On this point as with other issues of Argentine law, Plaintiffs present no reason to overcome the "respectful consideration," *Petersen Energía Inversora S.A.U.* v. *Argentine Republic & YPF S.A.*, 895 F.3d 194, 208 (2d Cir. 2018), and "substantial" weight given to Argentina's "official position" on its law.  *Animal Sci. Prod., Inc.* v. *Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1875 (2018).

tender-offer requirement applies only to "acquisitions made by the National Government." (Giuffra Ex. 1 (YPF Bylaws § 28(A).)  They disagree as to whether "acquisition" should be interpreted to encompass mere managerial *control*, in which case, according to Plaintiffs, Argentina "breached" the Bylaws by intervening in YPF in April 2012.  (Argentina's Opening Br. 20-24.)

Although the Republic has focused on the text of the Bylaws, Plaintiffs primarily invoke the Second Circuit's prior decision on sovereign immunity.  (Pls.' Opp. 20-21.)  But the Second Circuit did not interpret the Bylaws' term "acquisition," a legal term that Defendants' experts have now explained in detail with reference to governing principles of Argentine law.  (Manóvil Opening ¶¶ 56-65.)  And the Second Circuit's opinion on a jurisdictional issue at a different stage in the litigation, based on Plaintiffs' since-abandoned interpretation of the tender-offer obligation, does not control the construction of the Bylaws required here.  But even if the law-of-the-case doctrine were to apply, that would not help Plaintiffs:  the Second Circuit's decision assumed that the "expropriation" of Repsol's shares "triggered" a "subsequent" tender-offer obligation. *Petersen*, 895 F.3d at 206.  It *rejected* an interpretation of the Bylaws that would have "required Argentina to conduct a tender offer *in order to acquire* Repsol's 51% stake in YPF."  *Id*.  If that interpretation is binding here, it forecloses Plaintiffs' entire theory of breach.

When Plaintiffs turn to the Bylaws, they offer an implausible reading of their plain text and ignore key definitional provisions.  Plaintiffs claim that the Republic allegedly breached the YPF Bylaws on April 16, 2012, when it "acquired a *control position*" in YPF through the Intervention Decree.  (Pls.' Opp. 20 (emphasis added).)  Thus, according to Plaintiffs, an emergency decree providing for the appointment of a Government intervenor *for 30 days* qualified as an "acquisition" of shares mandating a tender offer.  And that is true under Plaintiffs' theory even though, as they

recognize, the Argentine Congress had not enacted legislation at that point that would have permitted the Government to expropriate *a single* share.  (Argentina's Opening Br. 9-10.)  That is an implausible reading of the term "acquisition."  (*Id.* at 19-21.)  It is a reading inconsistent with other usages in Argentine law as well.  For example, Plaintiffs would give the term "acquisition" a different definition in the Bylaws than in the General Expropriation Law, wherein it indisputably refers to obtaining formal title.  (Giuffra Ex. 11 (Bianchi Deposition Tr.) at 116:9-19.)

In support of their strained interpretation, Plaintiffs offer several arguments already disposed of in Argentina's Opening Brief and Defendants' Opposition Brief.  First, Plaintiffs incorrectly state that the Republic's expert "acknowledged" that the Bylaws "expressly define the term 'acquisition' as 'acquisitions of control.'"  (Pls.' Opp. 23.)  To the contrary, the Republic's experts have consistently shown that the Bylaws treat control as a "*consequence*" of a formal acquisition, meaning that control "arises from an acquisition—*i.e.*, from ownership" and not as a substitute for it.  (Manóvil Reply ¶ 32(i); Argentina's Opening Br. 22-23.)

Plaintiffs next argue that the phrase "directly or indirectly," means that any exercise of control over YPF management triggers the tender-offer obligation.  (Pls.' Opp. 24.)  Again, the tender-offer requirement does not apply to "direct or indirect acquisitions of *control*" but rather to an *acquisition* the result of which is that the purchaser gains *control* of YPF.  The Bylaws' reference to "indirect" acquisition clearly refers to obtaining title through another entity such as a subsidiary. (Defs.' Opp. 30-31.)  Plaintiffs assert that the "text does not confine its broad phrasing" to that "narrow proposition" (Pls.' Opp. 24) but ignore that the Bylaws specifically "confine" "indirect" by defining it that way: "[f]or the purposes of section 7, the term 'indirectly' shall include the purchaser's parent companies, the companies controlled by it," and similar corporate relationships.  (Giuffra Ex. 1 (YPF Bylaws) § 7(i).)  Section 7(h) underscores that "indirectly" is

-10-

a term used to capture corporate relationships, explaining that a breach of the tender-offer provisions continues "until the purchaser loses the control of the YPF's *parent company*, if the takeover has been *indirect*." (*Id.* § 7(h) (emphasis added).)  Plaintiffs ignore Section 7(h) as well.

Finally, Plaintiffs highlight that the Bylaws' tender-offer requirement applies to acquisitions made "by any means or instrument." (Giuffra Ex. 1 (YPF Bylaws) §§ 7(d), 28(A).) But this phrase means what it says:  that the *acquisition* of shares can be accomplished in multiple ways, such as through a "purchase," "merger" or "exchange"; it does not mean that any temporary, functional *control* constitutes an "acquisition." (Manóvil Reply ¶ 33.)

Devoid of textual support, Plaintiffs again rely on an absurdity argument, claiming that the Republic could "avoid [its] contractual obligations in perpetuity by the simple expedient of refusing to acquire formal title." (Pls.' Opp. 25.)  Not so.  Article 59 of the General Expropriation Law—expressly referenced in the Public Interest Law—permits the Government's temporary occupation of property in response to an "urgent" need; but it can last for *only* the period "strictly required to meet the respective need." (Argentina's Opening Br. Appendix at A-3.)  Therefore, a temporary occupation of shares cannot continue in "perpetuity," but instead results in "the occupation of property only for a *limited* period of time." (Uslenghi Opening ¶ 42 (emphasis added).)  Critically a temporary occupation *is not* synonymous with ownership of shares and is not necessarily followed by an expropriation.  (*Id.*; Manóvil Opening ¶¶ 61-64.)  It is therefore ultimately Plaintiffs who propose an "absurd" result:  that the Republic would have to make a multi-billion-dollar tender offer as a prerequisite to the transitory intervention into a company's management in April 2012 or the temporary—and reversible—occupation of shares in May 2012.

**B.    Plaintiffs' Anticipatory-Breach Theory Fails.**

In the alternative, Plaintiffs offer a farfetched theory of breach predicated on an alleged anticipatory repudiation in April 2012.  In support of this theory, Plaintiffs assert that Argentine

Secretary of Economic Policy Axel Kicillof's "public remarks before the Argentine Senate" on April 17, 2012 qualify as an anticipatory breach of contract "sufficient to trigger Plaintiffs' right to sue as of that date." (Pls.' Opp. 27-29.)  Under Argentine law, however, anticipatory breach is not an independent cause of action for damages. A party can demand only "termination" of the contract, and—showing the incongruity of the theory to this case—there can be no "termination" of a corporate bylaws. (Manóvil Opening ¶ 97; Manóvil Rebuttal ¶115-16.)

Additionally, to sustain such an action, the repudiation must be both directed specifically at the contracting party, (*Id.* ¶ 118.), and "serious and definitive." (Pls.' Opp. 27.)  A single speech by a politician, addressed to Senate Committees, cannot establish a "serious and definitive" repudiation no matter how many times Plaintiffs cite it. (*See* Pls.' Opp. 2, 5, 22, 27, 28, 29, 38.) Secretary Kicillof expressed his belief that it would be "stupid" to make a tender offer when the Government was not required to do so under Argentine law. (Giuffra Ex. 21 (Kicillof Speech) at 26; *see also* Part VI, *infra*.)  This opinion, stated in support of proposed legislation, cannot establish the "definitive" intent of the entire Argentine Government to "repudiate" the Bylaws.   In Argentina, as in the United States, legislative intent is discerned primarily from the text enacted by the legislature, not the statements of a single government official. (Manóvil Rebuttal ¶¶ 122-23; Uslenghi Rebuttal ¶¶ 47-49.); *see United States* v. *O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it.").  No "declaration" of *the Republic's* "unequivocal intent" to repudiate exists.

## III.    PLAINTIFFS' NEWLY-MINTED THEORY OF WHEN A TENDER OFFER WAS REQUIRED IMPERMISSIBLY CHALLENGES SOVEREIGN ACTIVITY.

Having no other choice, Plaintiffs double-down on their new theory that Argentina was required to begin carrying out a tender offer months *before* beginning the expropriation process under the Public Interest Law. (Pls.' Opening Br. 9 (under the Bylaws the Argentine Government

was required to "mak[e] a tender offer *before taking control*.") (emphasis added).)  But, in light of

their change in position, Plaintiffs can no longer escape that the Foreign Sovereign Immunities Act

("FSIA") bars their claims challenging the Republic's exercise of its sovereign powers.  *See* 28

U.S.C. § 1605(a).[5]  Under Plaintiffs' current theory, their suit does not challenge the Republic's

"commercial activity."  Instead, the "relevant 'activity' on which the claims are based" is the

Republic's intervention and expropriation—which are *not* the "type of actions by which a private

party engages in 'trade and traffic or commerce.'"  *Pablo Star Ltd.* v. *Welsh Gov't*, 961 F.3d 555,

561 (2d Cir. 2020).

    To try to avoid application of the FSIA, Plaintiffs claim that the Court cannot reconsider

sovereign immunity under the law-of-the-case doctrine.  (Pls.' Opp. 21.)  But where, as here, the

factual "circumstances" supporting a prior decision have "changed," the law of the case does not

apply.  *United States* v. *Carr*, 557 F.3d 93, 107 (2d Cir. 2009).  Plaintiffs argued in both this Court

and in the Second Circuit that Argentina's tender-offer obligation was incurred "*after*" its

"acquisition" of YPF shares, to separate the Republic's sovereign expropriation activity from the

alleged source of its liability.  (Defs.' Opp. 18-19 (quoting *Petersen*, ECF No. 61 at 4:24-5:6).)

The Second Circuit accepted that representation, stressing that the "expropriation itself" was *not*

Argentina's alleged breach, but rather the "*subsequent* failure to make a tender offer."  *Petersen*,

---

[5] Plaintiffs' contention that they "always asserted that Defendants breached the Bylaws on April 16, 2012" (Pls.' Opp. 63) ignores their previous, unequivocal representation to this Court and the Second Circuit that only a post-expropriation tender offer was required.  *See, e.g.*, *Petersen*, ECF No. 61 at 4:24-5:3 ("The Court: So that the takeover bid or the tender offer could be made after—under this would be made after the time the acquirer acquires that percentage of the stock; is that right?  Plaintiffs' Counsel: Yes, your Honor."); Dkt. No. 16-3303 (2d Cir. 2015), ECF No. 80 at 41 ("[T]he bylaws provide that Argentina must make a tender offer upon acquiring the requisite interest in YPF; they do not mandate that Argentina complete the tender offer prior to the acquisition."); *id.* ("Argentina's suggestion that the bylaws would have compelled Argentina to complete any tender offer prior to the acquisition rests on a misreading of the relevant provisions."); *id.* at 42 ("[T]he tender offer need not precede the takeover transaction.").

895 F.3d at 206 (emphasis added).  Relying on Plaintiffs' position, this Court and the Second Circuit held only that the Republic was not immune from a suit challenging any alleged failure to tender *following* a separate expropriation, because at that point the Republic was positioned no differently than if it had acquired the shares in the marketplace.  *Petersen*, ECF No. 63 at 16-17. If this Court permits Plaintiffs to retract that representation, notwithstanding considerations of judicial estoppel, then it must reassess the legal conclusions that relied on that representation.

On the merits, Plaintiffs do not say much.  They deny that they are challenging an expropriation's occurring without a preceding tender offer.  (Pls.' Opp. 64.)  But they elsewhere acknowledge that they are attacking just that:  "acquir[ing] YPF—in April 2012—by means of exercising control *while* refusing to tender."  (*Id.* at 63 (emphasis added).)  And while Plaintiffs try to distinguish their damages theory from a "substantive theory of liability" (*id.* at 64-65), that makes no sense.  As Plaintiffs themselves explain, damages are awarded by reference to the "date of the breach" (*id.*), and Plaintiffs peg *their* calculation to an April 16, 2012 date of breach—the date the Republic exercised its sovereign authority to issue the Intervention Decree.

Plaintiffs also make a half-hearted attempt to separate the Republic's commercial activity from its sovereign acts, stating that "any tender obligation, and any breach of that obligation, was triggered *after* Argentina made the sovereign *decision*, as was its right, to expropriate YPF."  (Pls.' Opp. 63 (emphasis added).)  It is unclear what that means, as under Plaintiffs' theory the breach occurred *before* the Republic "decided" to expropriate a single share of YPF through the Congressional passing of legislation to do so.  In the end, Plaintiffs' imprecision cannot disguise the target of their suit, which is the operation of a government receivership and the initiation of an expropriation process.  Because there is no longer any distinction between the alleged act of breach

and the Republic's sovereign acts (the intervention and expropriation), Plaintiffs' claims are barred by the FSIA.

Beyond Argentina's immunity from suit, Plaintiffs' claims are not justiciable under the act-of-state doctrine.  (Defs.' Opp. 20-21.)  Under that doctrine, "the courts of this country" may not inquire "into the validity of the public acts of a recognized foreign sovereign power committed within its own territory." *Konowaloff* v. *Metro Museum of Art*, 702 F.3d 140, 143 (2d Cir. 2012).  Plaintiffs' extraordinary theory of relief challenges the Republic's failure to conduct a tender offer *as a precondition to* expropriating property.  An American court's dictating of the precise time, place, and manner that a foreign sovereign can expropriate property is precisely the sort of "Judicial Branch" intrusion into foreign policy that the act-of-state doctrine seeks to avoid.  *Federal Treasury Enter. Sojuzplodoimport* v. *Spirits Intern. B.V.*, 809 F.3d 737, 743 (2d Cir. 2016).  Plaintiffs offer no response to the application of the act-of-state doctrine here, except for their general denials that they are challenging the expropriation.

## IV.     PLAINTIFFS HAVE NO SUPPORT FOR THEIR UNPRECEDENTED CLAIMS UNDER ARGENTINE LAW.

As this Court has clearly held, Plaintiffs' claims are "'corporate claims' under Argentine law." (*Petersen*, ECF No. 161 at 35.)  In Argentina, "corporate claims" are governed by the General Companies Law ("GCL"), under which shareholders aggrieved by the breach of a bylaws provision may pursue only limited causes of action and remedies.  (Argentina's Opening Br. 26-27.)  Most notably, under the GCL, shareholders cannot bring "breach of contract" actions against other shareholders based on an asserted violation of a bylaws provision.  (Manóvil Opening ¶ 79; *see also* Giuffra Ex. 124 (Kemelmajer Deposition Tr.) at 72:17-73:1.)  Rather, shareholders must first move internally for a resolution to enforce the bylaws or the penalties enumerated in the bylaws.  (Manóvil Reply ¶¶ 62-65.)  A shareholder can subsequently challenge the meeting's

resolution in an Argentine court within three months of the alleged violation.  (*Id.* ¶ 66.)  Several YPF shareholders followed that prescribed GCL process here, ████████████████████

████████████████████████████████████████████████

████████████████████████████

Plaintiffs agree with the Republic's description of the GCL's prescribed causes of action and remedies, but claim that the GCL is not exclusive here, and that they may proceed with a "breach of contract" claim under the general Argentine Civil Code.  As explained below, Plaintiffs' claims are not viable under the Civil Code either, *see* Part V, *infra*, but their understanding of Argentine law is incorrect.  As Plaintiffs' experts acknowledge, the GCL's specific remedies for breaches of a bylaws provision displace the Civil Code's more generalized remedies for breach of contract.  (Giuffra Ex. 97 (Garro Deposition Tr.) at 182:7–8; Manóvil Opening ¶¶ 79-85.) Plaintiffs counter, however, that the GCL governs only *some* violations of bylaws provisions—but not their claims, because the GCL does not specifically mention "tender offers."  (Pls.' Opp. 31.) According to Plaintiffs, violations of participatory or "housekeeping" bylaws provisions are governed by the GCL, but violations of "proprietary" bylaws provisions are governed by the Civil Code and can be redressed through a breach-of-contract action.  (*Id.* at 31-33.)

Those labels are Plaintiffs' invention.  Argentine law simply does not recognize Plaintiffs' bifurcation of bylaws rights.  Article 251 of the GCL, which governs the remedies available for "[*a*]*ny* decision" made in violation of the Bylaws, certainly makes no such distinction. (Argentina's Opening Br. Appendix at A-4 (emphasis added).)  Indeed, the only citations Plaintiffs provide for such a "proprietary" versus "housekeeping" dichotomy are: (1) a 2006 *United Kingdom* Law Reform Commission report regarding EU law; (2) a 1951 *Pennsylvania* Supreme Court case invalidating a corporate resolution; and (3) a 1997 Argentine case *dismissing* a challenge brought

by a shareholder against an Argentine company and that did not distinguish among bylaws rights. (Pls. Opp. 33.)  None of those inapposite sources concern inter-shareholder lawsuits.  As their expert admitted, Plaintiffs have not cited a *single* example of a shareholder successfully suing another shareholder for breach of contract based on a bylaws provision in Argentina—whether that provision was "proprietary" or not.  (Giuffra Ex. 97 (Garro Deposition Tr.) at 150:1–12.)[6]

Ultimately, Plaintiffs' proprietary versus participatory distinction represents a repackaging of their "internal affairs" argument that this Court already rejected.  In opposing the Republic's motion to dismiss based on the doctrine of *forum non conveniens*, Plaintiffs argued that the GCL governed only "'intra-corporate' disputes that 'meddle with . . . the internal affairs of a corporation,'" as distinct from "claims that sound in contract."  (*Petersen*, ECF No. 161 at 34.) This Court correctly rejected that artificial and unsupported distinction, holding that Plaintiffs' claims are "corporate claims" under Argentine law because they are based on "corporate relationships" that "'derive' from Plaintiffs' former status as shareholders of YPF."  (*Id.* at 34-35) Plaintiffs have substituted the label "housekeeping" for "internal affairs," but the distinction has no more support now than it did at the motion-to-dismiss stage.[7]

---

[6] Perhaps due to the lack of credibility of their own experts— ██████████████████ ███████████████████████████████████████████████████████████████████ — Plaintiffs complain that the Court must rely on "dueling reports of legal scholars." (Pls.' Opp. 1; ████ This criticism is misplaced; Argentine-law experts are necessary only because *Plaintiffs* chose to bring "'corporate claims' under Argentine law" in an American court.  *Petersen*, ECF No. 161, at 35.

[7] Plaintiffs bizarrely suggest that the Republic "forfeited" its ability to rely on this Court's prior holding that "Plaintiffs' claims are 'corporate' claims as a matter of Argentine law," *Petersen*, ECF No. 161 at 34, because the Republic did not "expand on this statement anywhere in its argument section." (Pls.' Opp. 33 n. 18.)  That is incorrect.  Even if reliance on this Court's decision were somehow forfeitable, Argentina made this point in the "ARGUMENT" section of its opening brief.  (*See* Argentina's Opening Br. 18 ("As this Court has already recognized, Plaintiffs' breach-of-contract claim, . . . is, in its substance, a 'corporate claim[]' that is 'derived

In the end, Plaintiffs resort to what they claim is a "common sense" argument about the YPF IPO. (Pls.' Opp. 35.) According to Plaintiffs, if investors had only known that they would have to endure a "tortuous journey down the rabbit hole of Argentine corporate law" in the event of a violation of a bylaws provision, "the IPO would have been an abject failure." (*Id.* at 35.) That speculation is both wrong and irrelevant. As explained in Defendants' Opposition, investors did not participate in the 1993 IPO because of a tender-offer provision that analysts did not discuss and press reports did not mention. (Defs.' Opp. 6-8.) And the IPO Prospectus made clear that the Bylaws were indeed governed by Argentine law. (*Id.* at 9-10.)

## V.   PLAINTIFFS CANNOT JUSTIFY THEIR CLAIM FOR DAMAGES UNDER ARGENTINE LAW.

### A.   The Bylaws Supply the Exclusive Penalties Available to Plaintiffs.

Even if Plaintiffs could bring suit against Argentina under a "breach of contract" theory, their claim for *damages* remains foreclosed. Under Article 655 of the Civil Code, contractually supplied penalties are exclusive: "the penalty or fine imposed [by the contract] take[] the place of compensation for damages and interest, upon a breach." (Manóvil Reply ¶ 70 (quoting Art. 655).) Section 28(C) of the Bylaws expressly incorporates—and carefully calibrates, for acquisitions by the Republic—Section 7(h)'s "***penalties***" provision: shares acquired in breach of the tender-offer obligation do not retain the right to vote, collect dividends or other distributions, nor do they count for the purpose of determining the presence of a quorum. (*See* Giuffra Ex. 1 (YPF Bylaws) §§ 7(h), 28(C).) Plaintiffs could thus claim only those penalties set forth in the Bylaws and no others.

Plaintiffs agree that, under the plain terms of the Civil Code, contractually supplied penalties are exclusive in the event of a breach. (Pls.' Opp. 36.) But they maintain that the Bylaws'

---

from [a] corporate relationship[].'") (quoting *Petersen*, ECF No. 161 at 34-35); *see also* Defs.' Opp. 24 (similar).)

"penalties" section does not qualify as a penalty provision, because Section 7 supposedly does not "provide either for substitute compensation to Plaintiffs or for substitute performance of Defendants' tender-offer obligations." (Pls.' Opp. 37.) Fatally, Plaintiffs cite no support under Argentine law, even from their own experts, for a definition of a penalty clause limited to substitute compensation or specific performance. (*Id.*)[8] Indeed, the plain language of the Civil Code belies Plaintiffs' position. Article 652 states that "[t]he penalty clause is that by which a person, to ensure the fulfillment of an obligation, is subject to a penalty or fine in case that person delays or does not execute the obligation." (Argentina's Opening Br. Appendix, at A-6.) Sections 7(h) and 28(C) of the Bylaws clearly meet this definition. (Manóvil Opening ¶¶ 109-13 & n.133.) And once a provision qualifies as a "penalty clause" under Article 652, Article 655 of the Civil Code makes clear that the non-breaching party "*will not be entitled to other compensation, even if [the creditor] proves that the penalty is not sufficient compensation*." (Manóvil Reply ¶ 70 (quoting Art. 655) (emphasis added).) In any event, Sections 7(h) and 28(C) do compensate shareholders by increasing their voting power and dividends, but without allowing a separate action for damages. (Manóvil Opening ¶¶ 116-18; Manóvil Reply ¶ 73.)

Plaintiffs also try to circumvent the Bylaws' penalty clause by arguing that under Article 521 of the Civil Code, a penalty clause does not control if the alleged breach was willful ("*dolo*"). (Pls.' Opp. 38.) As explained in Defendants' Opposition, Plaintiffs' theory ignores the plain text of Article 521, which refers to *malicious* beach ("*incumplimiento malicioso*") rather than willful ("*dolo*") breach. (Defs.' Opp. at 37; Manóvil Rebuttal ¶¶ 109-11 (quoting Art. 521.) The

---

[8] Plaintiffs' only expert support for their position appears to be the 40-year-old graduate thesis of YPF's legal expert Aída Kemelmajer. (Pls.' Opp. 37.) Her report does not even address the penalty clause, and she testified that the quotes reproduced by Plaintiffs in their brief are irrelevant and outdated. (Giuffra Ex. 124 (Kemelmajer Deposition Tr.) at 117:11-14, 125:18-23.)

distinction matters because a "willful" breach is an "intentional" breach, while a "malicious" breach occurs only in those rare cases where the breaching party acted with "the specific intent to cause harm." (*Id.* ¶ 111.) Therefore, to rely on Article 521, Plaintiffs would have to produce evidence establishing that Argentina intended to cause them harm in failing to tender. They have not done so. Indeed, Plaintiffs have not even shown that Argentina committed a "willful" breach. The Republic acted pursuant to the reasonable belief that under Argentine law it was not required to make a tender offer in order to expropriate Repsol's shares. (*See* Part II.B, *supra.*) As Plaintiffs' own expert conceded, such a "good-faith belief . . . definitely cannot qualify as willful intent." (Giuffra Ex. 97 (Garro Deposition Tr.) at 201:15-202:4.)

Plaintiffs have no response to these points. They label the Republic's interpretation of Section 7(h) of the Bylaws "strained" without offering a competing interpretation. (Pls.' Opp. 37.) Plaintiffs then resort to accusing the Republic of "ignor[ing] the purpose of the tender-offer requirement, [which] was to allow Plaintiffs *to leave* a government-controlled enterprise and take their money elsewhere." (*Id.*) No principle of Argentine law requires that a penalty provision supply Plaintiffs' preferred penalty. Their desire for a different penalty clause they could invoke years after the fact does not entitle them to a damages remedy.

## B.   Plaintiffs Failed to Demand Specific Performance.

Even if the Bylaws did not prescribe specific penalties, Plaintiffs' damages claim would fail. The Argentine Civil Code provides that damages for breach of contract become available only in the event that specific performance is impossible. Article 505 of the Civil Code lists the available remedies for breach in the order in which those remedies may be pursued:(i) performance from the breaching party, (ii) performance in-kind from a third party at the cost of the breaching party, and (iii) damages. (*See* Defs.' Opp. 39 (citing Art. 505).) Article 889 reinforces the mandatory nature of this hierarchy, providing that only where "performance becomes impossible"

due to the fault of the breaching party is the obligation to perform "converted into the obligation to pay damages." (Manóvil Reply ¶ 116 n.268 (quoting Art. 889).) Plaintiffs have no explanation for why Article 889 requires a showing of "impossibility" if damages are always available.

Plaintiffs argue that Article 889 does not mean what it says, and that Article 505 lists all the available remedies in a breach case, with no mandatory order for pursuing them. The weight of authority is entirely on the other side. (Manóvil Rebuttal ¶ 65.) In claiming that plaintiffs may "elect" between damages or specific performance, Plaintiffs rely on a single Argentine case, *L., G.L.* v. *D., O.R.*, that stands for the opposite proposition. (Pls.' Opp. 39.) *L., G. L.*, concerned a breach-of-contract action, in which a plaintiff paid for a car and the defendant failed to deliver it. (Manóvil Reply ¶ 111, iii.) The court held that specific performance was in fact impossible because the car in question was unavailable. Only then did the court order the defendant to refund the plaintiff's purchase. (*Id.*) In doing so, the court explained the *mandatory* hierarchy of remedies outlined in Article 505 and further that parties *may not* choose to "*substitute [performance in kind] with [the obligation] to pay damages*" at their own "discretion." (*Id.* (quoting *L., G.L.* v. *D., O.R.*) (emphasis added).) The court also reiterated Article 889's mandate that damages are available "*when it is absolutely impossible to obtain effective performance*." (*Id.* (emphasis added.)) Plaintiffs' reliance on a single case that refutes their entire damages theory should be dispositive here.

## VI.   ARGENTINE PUBLIC LAW BARS PLAINTIFFS' CLAIMS.

### A.   Plaintiffs' Misreading of the Bylaws Would Impermissibly Impede the Expropriation and Its Intended Effects.

All parties agree that Argentina's expropriation power cannot be limited by private agreement and that laws of public order, including those made to effectuate an expropriation, supersede private agreements. Article 28 of Argentina's General Expropriation Law provides that

"*no action by third parties* may impede the expropriation or its effects.  The rights of the claimant shall be considered transferred from the thing to its price or to the compensation, leaving the thing *free of any encumbrance*."  (Argentina's Opening Br. 34 (quoting Art. 28 (emphasis added).)  Yet according to Plaintiffs, the Republic could not expropriate shares without *first* (i) noticing a tender offer months prior to beginning the expropriation process, and (ii) conducting a multi-billion-dollar tender offer.  Construed that way, the tender-offer requirement is an unenforceable impediment to the expropriation power and an encumbrance on the expropriated shares.

Plaintiffs try to avoid the evident conflict between the General Expropriation Law and the Bylaws by arguing that the Second Circuit already decided this issue in their favor.  That is incorrect.  The Second Circuit held only that there was no clear conflict between the *Public Interest Law* provision giving the Republic the authority to acquire exactly 51% of YPF through expropriation and "any *post*-expropriation tender for the remaining YPF shares."  *Petersen*, 895 F.3d at 208 (emphasis added).  The Second Circuit did not decide a question (whether a *pre*-expropriation obligation to tender would "impede" an expropriation or its effects) that it was not asked about a law (the General Expropriation Law) that was not before it.  And although Plaintiffs suggest that the General Expropriation Law is merely a "new citation" (Pls.' Opp. 66), it is a different source of public law prohibiting a wider category of conflict.

On the merits, the Court should reject Plaintiffs' contention that the multi-billion-dollar tender-offer requirement does not qualify as an "impediment" or an "encumbrance." According to Plaintiffs, the tender-offer requirement did not encumber the Repsol shares subject to expropriation because it did not "prevent the government from obtaining full rights of ownership as to the expropriated property." (Pls.' Opp. 67.)  But the Argentine Supreme Court has rejected Plaintiffs' narrow interpretation of "encumbrance" as limited to an impingement on a "right of ownership."

For example, the Argentine Supreme Court has held that an obligation to fund construction projects triggered by an expropriation qualified as an "encumbrance."   (Uslenghi Opening ¶ 110 (discussing *Ferrocarril Central Argentino* v. *L. de Fusse*, Judgment of November 21, 1911 (Fallos: 115:59)).)  So too here.  A requirement that the Government pay billions of dollars for additional YPF shares in order to expropriate certain YPF shares clearly qualifies as an "encumbrance" on the shares.  And even under Plaintiffs' reading of the Bylaws, the Republic did *not* obtain full rights of ownership in the expropriated shares because, according to Plaintiffs, the Republic should have been "stripped" of those shares' voting rights and rights to dividends.  (Pls.' Opp.  71.)

In addition, under Plaintiffs' theory, the Bylaws would also impede the intended "effects" of the expropriation, in violation of Article 28.  (Argentina's Opening Br. 36-37.)  The Second Circuit did not decide this issue, finding only that the *Public Interest Law*'s provision for the acquisition of 51% of YPF's shares said "nothing about Argentina's acquisition of additional YPF shares in a *subsequent* market transaction."  *Petersen*, 895 F.3d at 209 (emphasis added).  Under Plaintiffs' new reading of the Bylaws, the Argentine Congress could not pass a law providing for the acquisition of 51% of YPF without the Government *having already* tendered for the remaining YPF shares; YPF would not have remained a publicly traded company, and the shares would not have been distributed proportionally as intended between the federal government and the provinces.  Because, under Plaintiffs' reading, the Public Interest Law breached the Bylaws, none of the intended "effects" of the expropriation initiated by that law could have occurred.

## B.   The General Expropriation Law Provides the Exclusive Remedies for Plaintiffs' Claimed Injuries.

The General Expropriation Law also forecloses Plaintiffs' claims for the independent reason that it supplies exclusive remedies for alleged injuries to third parties arising from the expropriation of another's property.  Under Article 28 of that law, a third-party claim arising out

of any right affected by an expropriation is "transferred from the [expropriated] thing to its price or to the compensation" "paid to the expropriated party." (Uslenghi Opening ¶¶ 116, 118 (quoting Art. 28.)  Following an expropriation, the Republic makes only *one* payment.  (*Id.*)  In turn, parties injured by an expropriation, as Plaintiffs acknowledge, have a claim to a part of that payment in "separate proceeding[s]."  (Pls.' Opp. 69.)  In this way, Article 28 provides for the orderly resolution of claims through a unique "single compensation" system.  (Uslenghi Opening ¶ 116.)

The Repsol Settlement Agreement, which Plaintiffs studiously ignore—indeed, their public law expert admitted that he "hadn't seen" it (Giuffra Ex. 121 (Bianchi Deposition Tr.) at 112:23-25)—aligns with that comprehensive scheme.  That agreement provided $5 billion in compensation, not only for the expropriated shares, but also "for any other claim arising from or connected to" the intervention, temporary occupation, and expropriation. (*See* Giuffra Ex. 15 (Repsol-Argentina Settlement Agreement) at § I.)  Plaintiffs have no response as to why the settlement agreement obligated Repsol to resolve third-party claims, including shareholder claims invoking the tender-offer obligation.  They simply assert, without *any* support, that Article 28 governs only damages claims brought by "those who have a right 'over the property being expropriated.'"  (Pls.' Opp. 69.)  In doing so, Plaintiffs appear to define "right over property" narrowly to include only those with title to that property.  (*Id.*)  But Article 28 sweeps more broadly, referring to all actions by "third parties," including "*rights of any nature* that a third party may enforce against the expropriated assets." (Uslenghi Reply ¶ 21 (emphasis added).)  Because Plaintiffs seek to enforce a tender-offer "right" against the expropriated shares, Plaintiffs were limited to seeking relief from the compensation provided to Repsol.

## CONCLUSION

The Court should grant the Republic's motion for summary judgment.

-24-

Respectfully Submitted,

/s/ *Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
Sergio J. Galvis
Amanda F. Davidoff
Jeffrey B. Wall
Thomas C. White
Adam R. Brebner

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:      (212) 558-4000
Facsimile:       (212) 558-3588

*Counsel for the Argentine Republic*

June 23, 2022