UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------ x
PETERSEN ENERGÍA INVERSORA, :
S.A.U. AND PETERSEN ENERGÍA, S.A.U., :
  :
                  Plaintiffs, : Case Nos.
  : 1:15-cv-02739-LAP
  v. : 1:16-cv-08569-LAP
  :
ARGENTINE REPUBLIC AND YPF S.A., :
  :
                  Defendants. :
  :
------------------------------------------------ x
ETON PARK CAPITAL MANAGEMENT L.P., :
ETON PARK MASTER FUND, LTD., :
AND ETON PARK FUND, L.P., :
  :
                  Plaintiffs, :
  :
  v. :
  :
ARGENTINE REPUBLIC AND YPF S.A., :
  :
                  Defendants. :
  :
------------------------------------------------ x

# AMICUS CURIAE BRIEF OF
# THE CHAMBER OF COMPANIES (*CÁMARA DE SOCIEDADES*)

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ i

INTEREST OF AMICUS CURIAE .................................................................................... 1

SUMMARY OF ARGUMENTS ........................................................................................ 2

CONSEQUENCES TO ARGENTINE COMPANIES AND THEIR
    SHAREHOLDERS OF A RULING IN PLAINTIFFS' FAVOR ..................................... 5

    A.    Argentine Companies Listed in the United States ................................................... 6

    B.    Argentine Companies Not Yet Listed in the United States .................................... 7

    C.    Shareholders of Argentine Companies Listed in the United States ........................ 8

CONCLUSION .................................................................................................................. 10

**INTEREST OF AMICUS CURIAE**

The Chamber of Companies (*Cámara de Sociedades*) ("CS") is an Argentine not-for-profit civil organization, founded in 1952, whose purpose is to actively promote the interests and development of Argentine companies. The CS is a representative body of some of the largest companies in Argentina: As of March 31, 2022, the CS had more than 100 members, including 83% of the companies listed on the Buenos Aires Stock Exchange -- many of which also publicly offer their shares in the United States through American Depository Receipts ("ADRs").[1]

The CS works with various Argentine government agencies, such as the National Securities Commission (*Comisión Nacional de Valores*), the Public Registry of Commerce, and the General Inspection of Justice (*Inspección General de Justicia*), as well as through the Argentine courts, to promote the interests of its members. The CS also works closely with the federal, provincial, and municipal tax authorities and other governmental agencies with respect to matters affecting the interest of companies in general. Indeed, the CS has appeared in the case *Municipalidad de Quilmes c/ Exxon* before the Argentine Supreme Court of Justice (CSJ 1533/2017/RH1, *Esso Petrolera Argentina S.R.L. y otro c/ Municipalidad de Quilmes s/ acción contencioso administrativa*) in support of the general interest of taxpayers of state and municipal taxes. The CS is also a permanent member of the OECD-Latin American Corporate Governance Roundtable.

The CS has a significant interest in this case. Should the Court find in favor of Plaintiffs -- in particular, finding YPF S.A. ("YPF") liable for breach of contract with respect to its very

---

[1] These include, in addition to YPF S.A., Banco Macro S.A., Cablevisión Holding S.A., Cresud S.A., Empresa Distribuidora y Comercializadora Norte S.A. (EDENOR), Grupo Financiero Galicia S.A., Grupo Supervielle S.A., IRSA Inversiones y Representaciones S.A., IRSA Propiedades Comerciales S.A., Pampa Energía S.A., Telecom Argentina S.A., Ternium Argentina Sociedad Anónima, and Transportadora de Gas del Sur S.A.

own bylaws -- the effect on the CS's members and on all Argentine companies seeking access to U.S. capital markets and on their shareholders would be swift and extremely damaging. Such a decision would open an entirely new, widespread and potentially devastating area of liability for Argentine companies listed in the United States -- in conflict with long-standing Argentine corporate law and the expectations of Argentine businesses -- and would undermine shareholder value for companies already listed in the United States (including the value of ADRs), thus deterring Argentine companies from listing in the United States in the future. For these reasons, the CS respectfully submits this brief in support of YPF's motion for summary judgment and its opposition to Plaintiffs' motion for summary judgment.

## SUMMARY OF ARGUMENTS

The CS does not seek to reargue the numerous complex legal issues raised by the parties on summary judgment. Rather, two arguments asserted by Plaintiffs Petersen Energía Inversora, S.A.U, Petersen Energía, S.A.U., Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (together, "Plaintiffs"), particularly implicate the interests of the CS and its members. Plaintiffs contend that: (1) notwithstanding statutory remedies for addressing alleged violations of bylaws under the Argentine General Companies' Law ("AGCL"), both current and former shareholders may also sue Argentine companies in the United States under a breach of contract theory where the "contract" at issue is the company's own bylaws; and (2) that as any Argentine company must abide by its own bylaws, an Argentine company is thus a guarantor of the obligations of its shareholders under the bylaws or otherwise has the obligation to enforce the shareholders' alleged obligations under the bylaws, and bears the financial exposure of the shareholders if it does not do so. Both of these legal propositions are incorrect as a matter of Argentine law. Moreover, and as discussed further below, the

adoption of either one of these legal propositions would have a substantial and immediate detrimental -- and potentially existential -- impact on Argentine companies and on the economic interests of their shareholders that will have consequences far beyond the confines of this case.

*First*, under Argentine law, there is simply no basis for the legal proposition that shareholders (whether current or former) may sue a company for damages under a breach of contract theory based on a purported breach of that company's bylaws.  This has never before happened in Argentina under Argentine law.  Bylaws are not bilateral contracts but plurilateral agreements whose enforcement is governed by the AGCL.  The difference between bylaws and bilateral contracts is clear from a review of the remedies for alleged violations of bylaws provided by the AGCL.

Unlike actions for breaches of contract, the AGCL does not provide for the payment of damages by a company to current or former shareholders in the event of a violation of its bylaws by other shareholders, but rather sets out exclusive and unambiguous procedures for shareholders seeking redress for any such violations.  In brief, in the event of a violation of the bylaws of a company, the shareholders have the rights: (i) under Section 251 of the AGCL, to challenge any shareholders' meeting in violation of the bylaws by means of an action against the company for the sole purpose of annulling any and all decisions therein adopted (an action which must be submitted within a three-month time limit); (ii) under Section 254 of the AGCL, and only if the shareholders' decision is declared null and void by a court, to pursue damages against the shareholders who voted in favor of the decision that resulted in the breach, an action which can result in personal shareholder liability (without prejudice to any liability of directors or syndics of the Company); and (iii) under Section 274 of the AGCL, to initiate an action seeking personal liability against the directors of the company who may have participated or collaborated in the

3

violation of the bylaws.  In no event does the AGCL provide for an action for damages to be brought by a shareholder or former shareholder against *the company* for breach of the bylaws, far less if the claim is based on the alleged breach of any obligation imposed on another shareholder.

*Second*, unless otherwise expressly established in its bylaws, an Argentine company is not a guarantor of the obligations of its shareholders nor must it enforce the shareholders' obligations.  Although Plaintiffs seek to style their claim as a simple breach of contract case, at the most basic level, Plaintiffs seek to have YPF act as a guarantor of the obligations of its shareholders.  In particular, because a YPF shareholder allegedly would not have complied with the tender offer process set forth in YPF's bylaws, Plaintiffs argue that YPF must compensate them for that shareholder's alleged failure.  The CS concurs with YPF's position that there is and can be no basis for this novel and unsupportable legal proposition under Argentine law.  *See* Memorandum of Law In Support of Defendant YPF S.A.'s Motion for Summary Judgment, at 27-28 ("As their own experts have conceded, Plaintiffs' claims are unprecedented, unsubstantiated, and unsupported by the law.  Nothing in the GCL or the cases Plaintiffs cite requires a company to guarantee performance of obligations owed by its shareholders and nothing contemplates that a company could be liable for a shareholder's alleged non-compliance with its bylaws.")

If Plaintiffs' legal theory were extended to its logical conclusion, any and every Argentine company would necessarily be a guarantor or an enforcer of each and every obligation set forth in its bylaws.  Indeed, YPF's bylaws -- similar to the bylaws of most public Argentine companies -- concern an extensive range of substantive provisions, including pre-emptive rights, rules governing the issuance of securities, election of directors and their powers, auditing committees, dividend payments, and all manner of corporate matters typical of a publicly traded

4

company. Thus, as discussed further below, Plaintiffs' legal theory would dramatically expand YPF's potential liability, and the liability of all U.S.-listed Argentine companies, by making them guarantors of the wide range of provisions set forth in YPF's and such other companies' own bylaws.

## CONSEQUENCES TO ARGENTINE COMPANIES AND THEIR SHAREHOLDERS OF A RULING IN PLAINTIFFS' FAVOR

As noted above, 83% of the companies listed on the Buenos Aires Stock Exchange are CS members, many of which publicly offer their shares in the United States through ADRs. Moreover, according to information included on the website https://bolsar.info/, which is administered and owned by the Buenos Aires Stock Exchange, the Argentine companies that offer their shares in the United States through ADRs represent more than 60% of the total shares issued in the Argentine capital markets. Thus, a decision in this case will have an immediate impact on the companies that make up the majority of share capitalization of domestically listed Argentine companies.

A finding in favor of Plaintiffs that YPF is liable to Plaintiffs for breaching its own bylaws or is otherwise a guarantor of the obligations of its shareholders would serve to radically distort and disrupt the balance of rights, obligations, policies, and incentives established under long-standing Argentine corporate law, as well as deterring the possibility of Argentine companies engaging in new listings in the United States. In addition, a finding in favor of Plaintiffs would have drastic implications for YPF's current minority shareholders, ***who played no role in the events leading to this lawsuit and would have to bear the cost of compensating YPF's former shareholders***, and would set a precedent subjecting all shareholders in Argentine companies to the same risks. Below is a summary of each of the various groups that may be affected by such a decision:

### A.     Argentine Companies Listed in the United States.

The parties that will most immediately suffer the impact of a ruling for Plaintiffs are the many Argentine companies that are currently listed in the United States. Overnight, these U.S.-listed Argentine companies will face the risk of a substantial increase in legal costs to address a new category of lawsuits arising from the acts or omissions of these companies' shareholders, as distinct from the acts or omissions of the companies themselves. Aside from the direct costs attendant to the defense of such litigation -- let alone potential legal judgments that may be entered and enforced against them in the United States, as well as domesticated against them in Argentina pursuant to the Procedural Civil and Commercial Code (Sections 517 through 519), which establish the rules for enforcement of foreign judgments in Argentina -- U.S.-listed Argentine companies also would face the substantial legal uncertainty arising from the implementation of new remedies that could be imposed on them in addition to (and in conflict with) the current exclusive procedures set forth in Sections 251, 274, and 254 of the AGCL.

From the perspective of a disgruntled shareholder, proceeding against an Argentine company on a purported breach of contract claim for money damages in a court sitting in the United States would be far more attractive than appropriately addressing an alleged violation of bylaws in compliance with Argentine law. Indeed, Argentine law does not provide for money damages against the company for a breach of bylaws, but (as outlined above) sets forth specific procedures for (i) *annulling the decision* that violated company bylaws within a specified time limit; (ii) seeking liability *against the directors* responsible for the alleged violation; and (iii) seeking liability *against the shareholders* who voted for the previously nullified resolution. Needless to say, shareholders of ADRs based in the United States, will almost invariably prefer to proceed with a damages claim here in the United States -- most often in New York -- rather

6

than availing themselves of the Argentine legal system and its mandatory time limits and other limitations.  Such a result would burden U.S.-listed Argentine companies with the extraordinary cost of an entirely new class of shareholder actions in the United States -- posing an existential threat to some of these companies (as is currently YPF's case).  At the same time, it would impose an unnecessary burden on courts in the United States of adjudicating issues properly addressed in Argentina -- effectively obviating the Argentine corporate legal system for disputes like the present one under Argentine law, involving the largest Argentine companies whose operations are global in scope.

Finally, and as noted above, company bylaws cover a wide range of topics.  Should an Argentine company be found liable for violating or failing to enforce its own bylaws (notwithstanding that it is the company's shareholders and directors rather than the company itself that is the decision maker), prospective plaintiffs would have fertile ground with which to create new ways to proceed against Argentine companies, limited only by the scope of the bylaws -- and their imaginations.

**B.     Argentine Companies Not Yet Listed in the United States.**

Argentine companies contemplating seeking to access the international capital markets would also suffer harm in the event of a ruling in Plaintiffs' favor.

Historically, many of Argentina's most prominent and successful companies have chosen to access international capital markets by listing in the United States.  Before doing so, these companies must weigh the benefits of raising money through an offering in the United States against the costs of doing so, including the costs of compliance with the rules and regulations of U.S. exchanges and regulators.  As Argentine companies have consistently chosen to list in the United States year after year, the benefits of doing so appear clearly to outweigh the relative

costs and risks. But this calculation would be skewed substantially if listing in the United States brought with it (i) the immediate risk of shareholder lawsuits for money damages as a result of alleged violations of bylaws; and (ii) *de facto* oversight by such foreign shareholders over the corporate affairs of the company in derogation of the long-standing corporate procedures under Argentine law set forth in the AGCL. Under these circumstances, many Argentine companies would be deterred from listing in the United States as a result of these risks and uncertainties, thereby effectively barring their entry into one of the most important, if not the most important, international capital markets in the world.

       **C.**     **Shareholders of Argentine Companies Listed in the United States**

As stated above, Argentine law provides for a limited set of shareholders' remedies that does not contemplate direct claims for damages against a company for breaches of its bylaws by its shareholders. This regime protects minority shareholders who took no part in a decision subsequently found by a court to be null and void by allowing shareholders to claim damages resulting from the nullified resolution(s) solely from those shareholders who voted in favor of the challenged act and from any directors who breached their duties to the company. Plaintiffs' breach of contract theory disregards these firmly established principles of Argentine corporate law and, by imposing liability on the company, effectively transfers the cost of any judgment to all of the company's shareholders, including minority shareholders who played no part in (and even opposed or were harmed by) the decisions giving rise to liability, unjustifiably reducing and potentially wiping out their equity value for the benefit of a subset of former minority shareholders. In the specific case of YPF, Plaintiffs' theory if adopted would result in YPF's current minority shareholders, holding approximately 49% of YPF's share capital, being forced to underwrite a substantial part of any damages awarded to two former minority ADR holders

8

(Petersen and Eton Park), in an amount alleged to be many multiples of YPF's current market capitalization, effectively wiping out the equity value of YPF's current minority shareholders.

Shareholders of Argentine companies listed in the United States would also face costs and distorted incentives in the face of a holding that YPF may be liable for money damages for breaching its bylaws or may otherwise be responsible as a guarantor or enforcer of its shareholders' alleged obligations.  Currently, shareholders and ADR holders of Argentine companies understand that their corporate rights and obligations are governed by Argentine corporate law, while U.S.-listed Argentine companies are also subject to U.S. securities laws. These sets of rules have provided reliable balances and protections for both domestic and international investors in Argentine companies.  This Court's adoption of Plaintiffs' legal theory would immediately impose costs and uncertainties on these shareholders.  For example:

- **All shareholders** of Argentine companies would likely suffer a diminution in the value of their shares if such companies were subject to breach of contract lawsuits for violations of their own bylaws by their (current or former) shareholders or otherwise required to serve as guarantors or enforcers of shareholders' obligations;

- This is especially true for **shareholders who play no part in the alleged violation of bylaws**, as such shareholders would indirectly be forced to assume responsibility for defaults that were caused neither by them nor by the company but by other shareholders who statutorily and legally assumed those obligations;

- **Domestic shareholders** would be at a disadvantage relative to foreign ADR holders, as the remedies available to domestic shareholders would properly be limited to those set forth in the AGCL, while ADR holders would be able to proceed against the company for money damages in the United States; and

- The disruption in the existing laws governing investors would incentivize **speculative and collusive behavior among shareholders** such as the creation of premeditated breaches of bylaws for the purpose of thereafter having the right to sue the company for money damages.

As demonstrated above, this Court's decision will have substantial international implications for all Argentine companies and shareholders.  As more than 60% of all shares

publicly offered in the Argentine capital markets are of companies that are already listed in the United States (as reported by the website https://bolsar.info/, which is administered and owned by the Buenos Aires Stock Exchange), a ruling by this Court in favor of Plaintiffs would create an entirely new regime of liability against Argentine companies that would prove extremely damaging to these companies, their investors (including U.S. investors), and the Argentine capital markets.

## CONCLUSION

For the foregoing reasons, as well as for the reasons set forth in YPF's motion for summary judgment, this Court should grant YPF's motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Dated: New York, New York
August 8, 2022

Respectfully submitted,

ALLEGAERT BERGER & VOGEL LLP

By: /s/ David A. Berger
David A. Berger

David A. Berger (dberger@abv.com)
Kevin L. MacMillan (kmacmillan@abv.com)
111 Broadway, 20th Floor
New York, New York 10006
(212) 571-0550

*Attorneys for Amicus Curiae*
*Cámara de Sociedades*