**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
　　　　　　　　　　　　　　　　　　　　　 :
PETERSEN ENERGÍA INVERSORA,　　　　 :
S.A.U. and PETERSEN ENERGÍA, S.A.U.,　 :
　　　　　　　　　　　　　　　　　　　　　 :　　Case No.:  1:15-CV-02739 (LAP)
　　　　　　　Plaintiffs,　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　 :
　　　　　　　v.　　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　 :
ARGENTINE REPUBLIC and YPF S.A.,　　 :
　　　　　　　　　　　　　　　　　　　　　 :
　　　　　　　Defendants.　　　　　　　　 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
　　　　　　　　　　　　　　　　　　　　　 :
ETON PARK CAPITAL MANAGEMENT,　　 :
L.P., ETON PARK MASTER FUND, LTD.,　 :
and ETON PARK FUND, L.P.,　　　　　　 :　　Case No.:  1:16-CV-08569 (LAP)
　　　　　　　　　　　　　　　　　　　　　 :
　　　　　　　Plaintiffs,　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　 :
　　　　　　　v.　　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　 :
ARGENTINE REPUBLIC and YPF S.A.,　　 :
　　　　　　　　　　　　　　　　　　　　　 :
　　　　　　　Defendants.　　　　　　　　 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**ARGENTINA'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION FOR RECONSIDERATION**


April 14, 2023

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................1

I.  THE COURT SHOULD RECONSIDER ITS GRANT OF SUMMARY
    JUDGMENT ON LIABILITY AND HEAR LIVE EXPERT TESTIMONY AT
    TRIAL ON ALL DISPUTED ISSUES OF ARGENTINE LAW ................................6

    A.  The Court Has the Power to, and Should, Hear from the Argentine Law
        Experts at Trial on All Disputed Issues of Argentine Law ....................................6

    B.  Hearing from the Argentine Law Experts at Trial Is Required Because the
        Parties' Experts Have Diametrically Opposed Views on Fundamental
        Questions of Argentine Law ................................................................10

II. AT A MINIMUM, THE COURT SHOULD RECONSIDER ITS ORDER WITH
    RESPECT TO TWO DETERMINATIONS CONCERNING THE
    CALCULATION OF DAMAGES................................................................15

    A.  The Republic Did Not "Admit" that the Occupation Took Place Prior to the
        Effective Date of the YPF Expropriation Law ....................................15

    B.  The Court's Determination that the "Commercial Rate" Applies to
        Prejudgment Interest Misconstrues Argentine Court Jurisdiction ........................18

    CONCLUSION ................................................................20

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Animal Science Products, Inc.* v. *Heibei Welcome Pharmaceutical Co. Ltd.*,
138 S. Ct. 1865 (2018) .................................................................................................3, 8, 19

*Aristocrat Leisure Ltd.* v. *Deutsche Bank Tr. Co. Americas*,
262 F.R.D. 293 (S.D.N.Y. 2009) ...........................................................................................8

*Belfrade* v. *Interenergo, Inc.*,
1998 WL 661481 (S.D.N.Y. Sept. 24, 1998)...........................................................................7

*Buchwald* v. *Renco Grp., Inc.*,
2014 WL 4207113 (S.D.N.Y. Aug. 25, 2014)..........................................................................9

*Bugliotti* v. *Republic of Argentina*,
952 F.3d 410 (2d Cir. 2020)...................................................................................................6

*Castillo* v. *Cessna Aircraft Co*,
2010 WL 11505745 (S.D. Fla. July 22, 2010)..........................................................................7

*Cattan* v. *Ermotti*,
2021 WL 6200975 (N.Y. Sup. Ct. Dec. 30, 2021) ..................................................................2

*City of Wilmington* v. *United States*,
157 Fed. Cl. 705 (2022) .......................................................................................................19

*Federal Republic of Germany* v. *Elicofon*,
358 F. Supp. 747 (E.D.N.Y. 1970) ........................................................................................7

*Galu* v. *Swissair: Swiss Air Transp. Co.*,
734 F. Supp. 129 (S.D.N.Y.) (1990)...................................................................................3, 7

*H. Daya Int'l, Co.* v. *Do Denim LLC*,
2022 WL 974382 (S.D.N.Y. Mar. 31, 2022) .........................................................................17

*Karaha Bodas Co.* v. *Perusahaan Pertambangan*
*Minyak Dan Gas Bumi Negara ("Pertamina")*,
313 F.3d 70 (2d Cir. 2002)....................................................................................................8

*Kolel Beth Yechiel Mechil of Tartikov, Inc.* v. *YLL Irrevocable Tr.*,
729 F.3d 99 (2d Cir. 2013)...........................................................................................3, 6, 16

*Library of Congress* v. *Shaw*,
478 U.S. 310 (1986)............................................................................................................19

*MBI Grp. Inc.* v. *Credit Foncier du Cameroun*,
558 F. Supp. 2d 21 (D.D.C. 2008) ....................................................2

*In re Motors Liquidation Company*,
957 F.3d 357 (2d Cir. 2020)......................................................4, 17

*Napier* v. *Bossard*,
102 F.2d 467 (2d Cir. 1939)............................................................9

*Nat'l Grp. for Commc'n and Computers, Ltd.* v. *Lucent Tech. Intern. Inc.*,
331 F. Supp. 2d 290 (D. N.J. 2004) ..............................................6

*In re Oil Spill by the Amoco Cadiz*,
954 F.2d 1279 (7th Cir. 1992) ........................................................3

*Petersen Energia Inversora S.A.U.* v. *Argentine Republic*,
2020 WL 3034824 (S.D.N.Y. June 5, 2020) ..................................1

*Philadelphia Gear Corp.* v. *Philadelphia Gear de Mexico, S.A.*,
44 F.3d 187 (3d Cir. 1994)..............................................................7

*Quantum Tech. Partners II, L.P.* v. *Altman Browning & Co*,
2009 WL 4826474 (D. Or. Dec. 8, 2009) ....................................11

*Republic of Ecuador* v. *ChevronTexaco Corp.*,
499 F. Supp. 2d 453 (S.D.N.Y. 2007)..........................................3, 7

*Rosenfeld* v. *Deutsche Bank*,
No. 651578-2020 (N.Y. Sup. Ct. Mar. 20, 2023) ........................2

*Sarl Louis Feraud Int'l* v. *Viewfinder, Inc.*,
489 F.3d 474 (2d Cir. 2007)..........................................................19

*Schwartz* v. *Liberty Mut. Ins. Co.*,
539 F.3d 135 (2d Cir. 2008)..........................................................19

*Stewart* v. *Adidas A.G.*,
1997 WL 218431 (S.D.N.Y. Apr. 30, 1997)..................................1

*Twohy* v. *First National Bank of Chicago*,
758 F.2d 1185 (7th Cir. 1985) ....................................................4, 8

*U.S. Fid. & Guar. Co.* v. *Petroleo Brasileiro S.A.-Petrobras*,
2001 WL 300735 (S.D.N.Y. Mar. 27, 2001) ..........................3, 6, 7

*United States* v. *McNab*,
331 F.3d 1228 (11th Cir. 2003) ....................................................8

**STATUTES**

28 U.S.C. § 1331 ...........................................................................................................................18

28 U.S.C. § 2516(a) .....................................................................................................................18

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 44.1 .......................................................................................3, 6

Alison Frankel, *This Billion-Dollar Case Against Argentina's YPF Wouldn't Exist
    Without Litigation Funding. Is That a Good Thing?* Reuters (Apr. 3, 2023) ...........................1

Burford Capital, *Burford Capital Statement On YPF Summary Judgment Ruling*
    (Apr. 2, 2023) ..........................................................................................................................1

## PRELIMINARY STATEMENT

The Court's March 31, 2023 summary judgment ruling held the Argentine Republic liable for what may become the largest judgment ever secured in this District. *Petersen* ECF No. 437; *Eton Park* ECF No. 366 (the "Order"). According to public statements by Plaintiffs' litigation "funder," Burford Capital, the Court's summary judgment ruling implies damages between $5 and $8.4 billion, with prejudgment interest almost doubling those amounts.[1] Moreover, this Court's summary judgment decision was based almost entirely on its interpretations of a foreign country's law, and those interpretations were unprecedented. For example, there is not a single case in Argentine history where a shareholder has brought a damages suit against another shareholder for breach of a corporate bylaws provision.

Respectfully, the Republic submits that the Court should reconsider its decision to grant summary judgment to Plaintiffs to the extent that decision rested on complex questions of Argentine law, pending hearing from the parties' experts live during the upcoming damages trial. In denying the Republic's motion for dismissal on the basis of *forum non conveniens*, the Court did not anticipate "that any complicated questions of Argentine law [would] actually arise," *Petersen Energía Inversora S.A.U.* v. *Argentine Republic*, 2020 WL 3034824, at *13 (S.D.N.Y. June 5, 2020). But that turned out not to be the case.[2] The parties' motions for summary judgment

---

[1]     Burford Capital, *Burford Capital Statement On YPF Summary Judgment Ruling* 3-4 (Apr. 2, 2023), https://www.burfordcapital.com/media/3474/20230402-burford-capital-statement-on-ypf-summary-judgment-ruling.pdf ("Burford Press Release). Burford purchased Petersen's claim for €15 million in 2015 and later purchased Eton Park's claim. (Arg. Opening Br. at 1, 13.) Its stock price rose 55% on the date of this Court's decision. Alison Frankel, *This Billion-Dollar Case Against Argentina's YPF Wouldn't Exist Without Litigation Funding. Is That a Good Thing?* Reuters (Apr. 3, 2023), http://www.reuters.com/legal/litigation/column-this-billion-dollar-case-against-argentinas-ypf-wouldnt-exist-without-2023-04-03.

[2]     For this reason and others, the Republic continues to submit that this case does not belong in a U.S. court. *See Stewart* v. *Adidas A.G.*, 1997 WL 218431, at *7 (S.D.N.Y. Apr. 30, 1997)

required the Court to decide numerous complex questions of Argentine law, on which the parties' experts have offered diametrically opposed positions.  In its decision, the Court decided the following disputed—and fundamental—questions of Argentine law:

- Whether a shareholder can bring a breach of contract action against another shareholder for breach of a corporate bylaws provision at all;

- Which body of Argentine law (the General Corporations Law or the Civil Code) would govern Plaintiffs' claim for an alleged violation of corporate bylaws;

- Whether the existence of a specific, non-damages penalty for breach of the bylaws precludes damages claims;

- Whether Argentina's civil law system requires a party to request specific performance before requesting damages in a breach of contract action; and

- Whether the Constitutional and statutory expropriation law of the Argentine Republic forecloses Plaintiffs' claims.

---

(granting *forum non conveniens* motion because "the parties' German law experts cannot even agree whether plaintiff's designs are copyrightable under German law") (Cote, J.); *MBI Grp. Inc.* v. *Credit Foncier du Cameroun*, 558 F. Supp. 2d 21, 35 (D.D.C. 2008) (court's "lack of familiarity with Cameroonian law, and other issues involved with the application of foreign law, weighs heavily in favor of dismissal").

In fact, this case is similar to recent cases in which New York courts have dismissed various "corporate disputes," including derivative actions, on the ground that they belong in the foreign home forum of the corporation in question.  *Rosenfeld* v. *Deutsche Bank*, No. 651578-2020 (N.Y. Sup. Ct. Mar. 20, 2023), Dkt. No. 236 at 54 ("Germany has that compelling interest in interpreting its own [law] as need not be burdened by . . .  New York judges making assessment of German law, and seeking to bind German corporations."); *Cattan* v. *Ermotti*, 2021 WL 6200975, at *1 (N.Y. Sup. Ct. Dec. 30, 2021) ("After all, it is logical for a Swiss company, like many Delaware companies, to mandate that its internal-affairs disputes be adjudicated by a court with expertise in its corporate law.").

Through the opinions and reports of prominent Argentine experts in public and private law, the Republic set forth its considered position on these important questions of Argentine law. The Court, however, held that the Republic was incorrect as a matter of law on each and every one of these questions, ruling against the Republic on basic tenets of its legal system without holding oral argument or a hearing and notwithstanding the "substantial . . . weight" that is owed to a sovereign's "view of its own law."  *Animal Science Products, Inc.* v. *Heibei Welcome Pharmaceutical Co. Ltd.*, 138 S. Ct. 1865, 1875 (2018); *see also In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1312 (7th Cir. 1992) ("A court of the United States owes substantial deference to the construction France places upon its domestic law.").

Respectfully, the Republic believes that the Court's reconsideration of those interpretations of Argentine law pending further live testimony from the experts is necessary to redress "a clear error or prevent manifest injustice."  *Kolel Beth Yechiel Mechil of Tartikov, Inc.* v. *YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (citation omitted).  Because some or all of both parties' foreign law experts will already be required for the upcoming trial on damages, the Court should hear live testimony from the experts on all disputed Argentine law issues, including those bearing on liability.  Hearing this testimony will allow the Court to question the experts, to evaluate their responses to cross-examination, and to reach a more considered evaluation of Argentine law than was possible from reviewing written reports.

Under Federal Rule of Civil Procedure 44.1 the Court can hear live testimony on these foreign law questions.  Where courts find a "sharp conflict in the affidavits by [foreign] law experts" on complex issues of foreign law, they often "hold a hearing to determine [the foreign] law to be applied."  *U.S. Fid. & Guar. Co.* v. *Petroleo Brasileiro S.A.-Petrobras*, 2001 WL 300735, at *22 (S.D.N.Y. Mar. 27, 2001) (Koetl, J.) (requiring a hearing on disputed issues of foreign law);

*Galu* v. *Swissair: Swiss Air Transp. Co.*, 734 F. Supp. 129, 131-32 (S.D.N.Y.) (1990) (Patterson, J.), *aff'd* 923 F.2d 842 (2d Cir. 1990) (same); *Republic of Ecuador* v. *ChevronTexaco Corp.*, 499 F. Supp. 2d 452, 453-54 (S.D.N.Y. 2007) (Sand, J.) (same); *see also Twohy* v. *First National Bank of Chicago*, 758 F.2d 1185, 1193 (7th Cir. 1985) (it "would have been appropriate" for district court to require "complete presentation" of foreign law questions beyond mere submission of expert affidavits) (citing Advisory Committee Note to Rule 44.1).

Given the disputes between the parties' experts on fundamental questions of Argentine law, such as whether Argentine law allows Plaintiffs to bring this case at all, and the importance of resolving those issues in this case where Plaintiffs seek a multi-billion dollar judgment, the Court should hear live testimony from the parties' foreign law experts.

*   *   *

At a minimum, the Court should reconsider two aspects of its decision on the motions for summary judgment that ran contrary to the record and controlling law and bear directly on its calculation of damages.

*First*, the Court incorrectly found that the Republic "admitted" in its Answer that it "occupied" 51% of Repsol's shares of YPF at least by the time the YPF Expropriation Law ("Law No. 26,741") took effect on May 7, 2012.  (Order at 57.)  Whether occupation of the shares is equivalent to control of those shares and the date when the Republic acquired control of the shares bear directly on the Court's assessment of damages.  (Order at 56-58.)  Plaintiffs' litigation "funder" acknowledges that when the Republic acquired control of the YPF shares could make more than a $3 billion dollar difference in damages.  (Burford Press Release, *supra*, at 3-4.)  The Republic has never "admitted" it temporarily occupied any shares prior to May 7, 2012.  Instead, the Republic "admitted" in its Answer only that it occupied shares *after* the YPF Expropriation

-4-

Law took effect on May 7, 2012.  At best, the Republic's statement can be read as ambiguous on this point.  *See In re Motors Liquidation Company*, 957 F.3d 357, 360-61 (2d Cir. 2020) (holding that a factually incorrect statement in defendant's Answer and Notice of Removal "was not an intentional, clear, and unambiguous statement of fact" and "did not constitute a judicial admission").

*Second*, the Court, while reserving judgment on the precise prejudgment interest rate it would apply to any damages award, incorrectly found that the "commercial rate applied by Argentine courts is the appropriate measure as this case involves purely commercial obligations." (Order at 63.)  That holding disregards that the proper court (and any corresponding prejudgment interest rate) in Argentina, as in the United States, is determined by the identity of the parties and the nature of the questions presented.  Because this case presents a claim against the Republic and presents issues of Argentine public law, it could be brought only before the Argentine federal courts on administrative affairs, which apply the average borrowing rate published by the Central Bank.  (Arg. Opp. Br. (citing Santiago Rebuttal ¶¶ 66-69; Manóvil Rebuttal ¶ 165; Uslenghi Rebuttal ¶¶ 58-60).)  In fact, the Argentine Supreme Court has already weighed in on this jurisdictional question in a case involving different YPF shareholders that sued the Republic in Argentina for specific performance of the tender offer obligation under the YPF Bylaws. (Uslenghi Rebuttal ¶ 59; Santiago Rebuttal ¶ 67; Manóvil Rebuttal ¶ 162  (discussing Supreme Court of the Argentine Republic, Aug. 20, 2014, *De San Martín, José and other* v. *Estado Nacional-PEN S/Proceso de Conocimiento*, S.C. Comp. 731 L. XLIX).)

**ARGUMENT**

I.   **THE COURT SHOULD RECONSIDER ITS GRANT OF SUMMARY JUDGMENT ON LIABILITY AND HEAR LIVE EXPERT TESTIMONY AT TRIAL ON ALL DISPUTED ISSUES OF ARGENTINE LAW.**

   A.   **The Court Has the Power to, and Should, Hear from the Argentine Law Experts at Trial on All Disputed Issues of Argentine Law.**

In granting Plaintiffs' motion for summary judgment on liability, the Court was required to decide numerous core (and contested) questions of Argentine law in a case involving a foreign sovereign. The parties offered diametrically opposed positions on these questions. The Republic respectfully requests that the Court reconsider its determination of these issues against a foreign sovereign and without live testimony from the parties' Argentine law experts, which amounts to "manifest injustice" subject to reconsideration. *Kolel Beth Yechiel Mechil of Tartikov, Inc.*, 729 F.3d at 104 (citation omitted). The Court then can decide whether to issue new rulings on Argentine law with the benefit of trial testimony from both sides' experts (who will be there anyway) on all such questions. Given the financial stakes here, we urge the Court to follow this prudent course.

Under Federal Rule of Civil Procedure 44.1, the "procedures for determining [foreign] law are within the court's discretion." *Petroleo Brasileiro S.A.-Petrobras*, 2001 WL 300735, at *22. In particular, "Rule 44.1 preserves a district court's freedom to employ fact-like procedures, including by taking written and oral testimony, as sometimes may be required to adjudicate foreign legal questions." *Bugliotti* v. *Republic of Argentina*, 952 F.3d 410, 413 (2d Cir. 2020). District courts can therefore "tailor fact-like methods of inquiry to the needs of the case," *id.*, including by conducting evidentiary hearings to determine questions of foreign law, *Nat'l Grp. for Commc'n and Computers, Ltd.* v. *Lucent Tech. Intern. Inc.*, 331 F. Supp. 2d 290, 292 (D.N.J. 2004) (court conducted a hearing "wherein expert testimony was heard from both parties regarding the

application of Saudi Arabian law to the circumstances in this case"); *see also Philadelphia Gear Corp.* v. *Philadelphia Gear de Mexico, S.A.*, 44 F.3d 187, 193 (3d Cir. 1994) (it "may be necessary for the court to conduct an evidentiary hearing with expert testimony to ascertain foreign law" if that law is "in dispute").

A hearing is necessary where, as here, the experts have offered directly contradictory positions on virtually all aspects of a foreign country's legal system and laws and thus further presentation of the issues is required. Federal courts have exhibited "reluct[ance] to decide" complex issues of law and fact "on the uncross-examined assertions" of "distinguished experts marshalled by the various parties," and have found that "a hearing on these issues is required" in such circumstances. *Belfrade* v. *Interenergo, Inc.*, 1998 WL 661481, at *10 (S.D.N.Y. Sept. 24, 1998) (Koeltl, J.) (quoting *Federal Republic of Germany* v. *Elicofon*, 358 F. Supp. 747, 752-53 (E.D.N.Y. 1970)) (denying summary judgment because hearing of expert testimony on foreign law was needed). In other words, where courts are presented with "conflict[ing]" expert affidavits on complex issues of foreign law, it is appropriate to hold a hearing to "determine [the foreign] law to be applied." *Petroleo Brasileiro S.A.-Petrobras*, 2001 WL 300735, at *22.

The court's decision in *Galu* v. *Swissair: Swiss Air Transp. Co.*, is instructive. In that case, after the parties submitted motions for summary judgment with accompanying expert affidavits concerning the foreign law issues, Judge Patterson ordered "a more complete presentation [on Swiss law] at a hearing" where the court heard "further elaborat[ion]" on the issues through live testimony from the experts. 734 F. Supp. at 131-32. Similarly, in *Castillo* v. *Cessna Aircraft Co.*, the court held that the parties "*must* participate" in a foreign law hearing after their experts "reached different conclusions" on Guatemala's Civil Code in connection with a summary judgment motion. 2010 WL 11505745, at *2 (S.D. Fla. July 22, 2010); *see also ChevronTexaco*

*Corp.*, 499 F. Supp. 2d at 454, 464 (hearing ordered to determine Ecuadorian law that included "voluminous expert testimony," where parties disagreed, among other things, on application of Ecuadorian constitution to legal claims).

A hearing or trial on foreign law questions is even more warranted in this case given the "substantial . . . weight" and "respectful consideration" owed to the Republic's interpretation of its own laws. *Animal Science Products, Inc.*, 138 S. Ct. at 1869, 1875. And the Second Circuit has held that a sovereign's status as a party to a case does not "blunt this comity concern" with respect to a sovereign's view of its own laws. *Karaha Bodas Co*. v. *Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 92 (2d Cir. 2002); *see also id.* ("[T]he support of a foreign sovereign for one interpretation furnishes legitimate assistance in the resolution of interpretive dilemmas."). Plaintiffs' experts interpreted complex and fundamental questions in ways that directly contradicted the Republic's understanding of its own private and public laws, including its Constitution, in a case that the Republic believes should be heard and decided in its courts. The Republic submits that it is "appropriate for the court to demand a more 'complete presentation by counsel' on the issue" of the determination of foreign law before deciding such weighty issues in an unprecedented manner against a sovereign. *Twohy*, 758 F.2d at 1193 (citing Advisory Committee Note to Rule 44.1); *see also United States* v. *McNab*, 331 F.3d 1228, 1234 (11th Cir. 2003), *as amended* (May 29, 2003) (district court conducted a "hearing on foreign law" at which it heard from foreign government's experts and a high-ranking official).

While the Court had access to deposition testimony at the summary judgment stage, "the preference for live testimony is well established in this Circuit." *Aristocrat Leisure Ltd.* v. *Deutsche Bank Tr. Co. Americas*, 262 F.R.D. 293, 300 (S.D.N.Y. 2009) (Leisure, J.). Given the advantages of live testimony, "dictated by both common sense and Second Circuit case law,"

"[t]he deposition has always been, and still is, treated as a substitute, a second-best, not to be used when the original is at hand." *Buchwald* v. *Renco Grp., Inc.*, 2014 WL 4207113, at *2 (S.D.N.Y. Aug. 25, 2014) (Nathan, J.) (quoting *Napier* v. *Bossard*, 102 F.2d 467, 469 (2d Cir. 1939) (Hand, J.)).

Finally, the upcoming trial on damages questions under Argentine law is the right opportunity to consider additional evidence on issues of foreign law.  In light of the Court's decision, there remain complex questions to be decided at trial, including: (i) "the precise date on which the Republic occupied 51% of YPF's shares or precisely what 'occupation' of the shares entailed and whether such 'occupation' is equivalent to 'control' of those shares"; and (ii) "the precise [prejudgment interest] rate" that will apply in this case.  (Order at 58, 63.)  Resolution of these questions will require not only the presentation of documentary evidence and fact witness testimony, but also testimony from the parties' Argentine law experts.  For example, in their summary judgment briefing Plaintiffs (through three experts, Profs. Alfredo Rovira, Alejandro Garro, and Alberto Bianchi) contended that the Republic controlled 51% of YPF's shares on April 16, 2012, the date that the Republic issued the Intervention Decree.  By contrast, the Republic (through Prof. Rafael Manóvil, Judge Alejandro Uslenghi, and Prof. Alfonso Santiago) argued that the Intervention Decree did not confer any rights over shares in YPF.  All of these experts also offered deposition testimony and expert reports on the remaining Argentine law issues in this case, including the applicable interest rate, *infra* pp. 18-20.  As the Argentine law experts will be before the Court in determining damages, the Court should hear from them on liability before entering what may become the largest judgment ever entered in the history of the Mother Court.

**B.** **Hearing from the Argentine Law Experts at Trial Is Required Because the Parties' Experts Have Diametrically Opposed Views on Fundamental Questions of Argentine Law.**

Reconsideration of the Court's summary judgment decision to allow the Court to hear live testimony of the parties' foreign law experts on all issues of Argentine law is required here, where the foreign law experts have presented not just conflicting but polar opposite views on fundamental questions of Argentine law. For example, the parties' foreign law experts disagree on each of the following five dispositive issues of Argentine law:

*1.* *Whether a shareholder can bring a breach of contract action against another shareholder for breach of a corporate bylaws provision at all*. Plaintiffs mischaracterized their suit as being "as straightforward a breach-of-contract case as they come." (Pls. Opening Br. at 38.)[3] But the parties' Argentine law experts disagreed as to whether Plaintiffs' claim—a breach of contract action by one shareholder against another for an alleged violation of corporate bylaws—even exists under Argentine law. Plaintiffs' experts asserted that such a claim can proceed under "general civil liability principles" in the Argentine Civil Code. (Rovira Rebuttal ¶¶ 47-48.) But Plaintiffs could not identify *a single case* like this one—a breach of contract claim by one shareholder against another for an alleged breach of corporate bylaws. (*See* Giuffra Ex. 97 (Garro Deposition Tr.) at 150:1-12; Manóvil Reply ¶ 99 ("Neither Prof. Rovira nor Prof. Garro is able to provide a cite to a *single* case or other authority to support the proposition that shareholders may bring a breach of contract action seeking damages against another shareholder or the company for alleged violations of corporate bylaws.").)

---

[3]     All references to "Arg. Br.," "Pls. Br.," "Giuffra Ex.," and "Appendix" are to the briefs, exhibits and appendices to the Republic's and Plaintiffs' motions for summary judgment.

The Republic's expert Prof. Manóvil—one of the most "highly reputable scholar[s] in areas of corporate law" (Giuffra Ex. 97 (Garro Deposition Tr.) at 65:13-18)—provided a simple explanation for this absence of authority: corporate bylaws "do not create obligations between shareholders," and thus shareholders "lack standing under Argentine law to bring their [breach of contract] claims directly against . . . a co-shareholder."   (Manóvil Opening ¶ 77 & n.104 (discussing *Gatti* v. *Bulad*, CNCom, Division A, Oct. 22, 1999, El Derecho, Vol. 188, at 698, which held that "both the rights and the obligations of the shareholders hinge on their relations with the legal subject known as the corporation, and not with each of the other shareholders individually considered"); *see also* Manóvil Reply ¶¶ 8, 10-11.)  The same is true under U.S. law. *See Quantum Tech. Partners II, L.P.* v. *Altman Browning & Co.*, 2009 WL 4826474, at *6 (D. Or. Dec. 8, 2009) (holding that under Delaware law, there is no "cause of action for damages for breach of contract between shareholders for violations of a corporation's bylaws"), *aff'd*, 436 F. App'x 792 (9th Cir. 2011).  Under Argentine law, a shareholder wishing to enforce a bylaw's provision must follow the "particular set of remedies" authorized by Argentine corporate law.  (Manóvil Opening ¶¶ 66, 79.)

2.    ***Which body of Argentine law (the General Corporations Law or the Civil Code) would govern Plaintiffs' claim for an alleged violation of corporate bylaws***.  Plaintiffs' experts recognized that Argentina's General Corporations Law (the "GCL") preempts and displaces the Civil Code, and that the Civil Code applies only in those cases "not specifically contemplated" by the GCL.  (Rovira Rebuttal ¶ 30; Garro Rebuttal ¶¶ 24-25.)  Nevertheless, according to Plaintiffs' experts, because the GCL does not contain a "specific civil liability provision" or a provision "that addresses tender offers," the GCL does not displace the Civil Code as to Plaintiffs' claims.  (Rovira Rebuttal ¶ 34; Garro Rebuttal ¶ 26.)

The Republic's expert opined that the GCL does displace the Civil Code because it provides a comprehensive scheme for shareholders to remedy alleged violations of corporate bylaws.  (*See* Manóvil Reply ¶ 57.)  As Prof. Manóvil explained, under the GCL, shareholders may move for a resolution to enforce corporate bylaws or any penalties set out in the bylaws, challenge in court any resolution made in violation of corporate bylaws and, if successful, the challenging shareholder may bring a claim for damages against the shareholders who voted in favor of the challenged resolution.  (Manóvil Opening ¶¶ 79-84; Manóvil Reply ¶¶ 62-67.) Therefore, under the GCL, shareholders have access to various and significant remedies to enforce bylaws and redress any alleged violation thereof.

3.    ***Whether the existence of a specific, non-damages penalty for breach of the bylaws precludes damages claims***.  Under Article 655 of the Argentine Civil Code, where parties to a contract set out the penalties in the event of a breach, those penalties are exclusive.  (*See* Manóvil Opening ¶¶ 109-119 and n.134.)  But Plaintiffs' experts asserted that Bylaws Sections 7(h) and 28(C) (which refers specifically to the "penalties" provided for in section 7(h) and makes those applicable to the Republic) are not penalty clauses under Argentine law because they "do[] not set forth a pre-quantified amount of money to be owed to minority shareholders if the tender-offer obligation is breached" or "state that in case of breach of the tender-offer obligation, a damages remedy available under the Civil Code would not be available."  (Rovira Rebuttal ¶ 70; *see also* Garro Rebuttal ¶ 49.)  Plaintiffs' experts' position conflicts with the plain terms of Article 653 of the Civil Code, which provides that "[t]he penalty clause may only have as its object the payment of a sum of money, *or any other performance* that may be the object of the obligations." (*See* Appendix at A-6; Manóvil Opening ¶ 109 n.133 (emphasis added); *see also* Manóvil Reply ¶ 79.)  Professor Manóvil further explained that the "performance" penalty can constitute any type

of performance, including the "definitive or temporary loss of goods, rights, qualities or benefits, or their non-acquisition." (Manóvil Opening ¶ 112 (quoting SÁNCHEZ HERRERO, A., *La cláusula penal [The Penalty Clause]*, p. 83); *see also id.* ¶ 109 n.133; Manóvil Reply ¶ 74 n.138.)[4]

4. ***Whether Argentina's civil law system requires a party to request specific performance before requesting damages in a breach of contract action***. Unlike in the United States, it is axiomatic that in civil law jurisdictions such as Argentina, there is a preference for in-kind remedies over money damages in a breach of contract action. (*See* Manóvil Opening ¶¶ 96, 98; Kemelmajer Rebuttal ¶ 123; *see also* Giuffra Ex. 97 (Garro Deposition Tr.) at 226:7-11 ("There is a preference in the civil law for a specific performance, nobody will doubt that.").) Plaintiffs' experts argued, however, that a plaintiff in a breach of contract action may freely choose to pursue either specific performance or damages. (Garro Rebuttal ¶¶ 39-46; Rovira Rebuttal ¶¶ 37-46.)

By contrast, Defendants' experts established that "[a]ccording to the majority of opinions expressed in Argentine case law and legal authorities . . . in the event of a breach of contract the obligee should, as a rule, first claim for specific performance of the relevant obligation if performance is materially and legally feasible." (Kemelmajer Rebuttal ¶ 125.) Professor Manóvil similarly explained that a "claim for damages is 'a *subsidiary and last* solution and it should only be resorted to when it is absolutely impossible to obtain the effective fulfillment of the very object of the obligation.'" (Manóvil Opening ¶ 99 (quoting CIFUENTES, Santos, *Código Civil Comentado y Anotado [Civil Code with Annotation and Comments]*, La Ley, Buenos Aires, 2003, Vol. I, p. 368) (emphasis added).)

---

[4]     In its summary judgment decision, the Court concluded that "to be a valid penalty clause," Article 653 required that a clause provide for either "the payment of a sum of money," directly from the allegedly breaching party, or "*substitute performance* of the obligation at issue." (Order at 42-43 (emphasis added).) Neither side's experts advocated for this interpretation.

5.      *Whether the Constitutional and statutory expropriation law of the Argentine Republic forecloses Plaintiffs' claims*.  The Republic's Constitution provides that "Expropriation for reasons of public interest must be authorized by law and compensated in advance."  (Appendix at A-5 (Argentine Constitution) Art. 17.)  Argentina's General Expropriation Law implements that directive by providing that "No action by third parties may impede the expropriation or its effects. The rights of the claimant shall be considered transferred from the thing to its price or to the compensation, leaving the thing free of any encumbrance."  (Appendix at A-2 (General Expropriation Law) Art. 28.)  Plaintiffs' expert opined that the alleged obligation to conduct a tender offer under the Bylaws does not constitute an "encumbrance" because it is "not a right emanating from the expropriated shares, but from the non-expropriated shares," and because the expropriation does not "allow[] the expropriating State to disassociate itself from fulfilling obligations validly assumed towards third parties, prior to the expropriation."  (Bianchi Rebuttal ¶ 19.)  Plaintiffs' expert also claimed that Plaintiffs' claims do not fall into the exclusive compensation scheme for third parties allegedly harmed by an expropriation provided by Article 28, because "Plaintiffs have no claim to the expropriated shares."  (Bianchi Rebuttal ¶ 92.)

Taking exactly the opposite view, Judge Alejandro Uslenghi, a leading authority on Argentine public law and former Judge of Argentina's Federal Court of Appeals, relied on Argentine Supreme Court precedent to opine that the preemptive effect of laws relating to expropriation sweeps much more broadly: "any kind of contractual restriction" on the exercise of the state's sovereign expropriation power is impermissible.  (Uslenghi Opening ¶ 31 (quoting *Sociedad de Electricidad de Rosario*, Judgment of April 14, 1975 (Fallos: 291:290)); *see also*

Santiago Rebuttal ¶ 16.)[5]  Judge Uslenghi further explained that the exclusive compensation scheme under Article 28 applies to "rights of any nature" held by a third party.  (Uslenghi Reply ¶ 21; *see also* Santiago Rebuttal ¶ 47.)  It is, therefore, irrelevant that Plaintiffs "have no claim to the expropriated shares"—what matters is that Plaintiffs allege that their rights were impacted by the expropriation of an asset from someone else.  (*See* Uslenghi Opening ¶¶ 116-17.)

\*      \*      \*

As the examples above illustrate, the Argentine law experts have offered directly contradictory views on virtually all questions of Argentine law in this case.  These are not narrow disagreements or simple questions, and the Republic respectfully submits that the Court erred in concluding that the Republic is incorrect on *all* these questions of its own laws.  Hearing from the parties' foreign law experts—subject to cross-examination and questioning by the Court—can only benefit the Court in resolving this case.  The Republic therefore requests that the Court reconsider its decision to decide all contested questions of Argentine law without having live expert testimony on these questions at trial.

## II.   AT A MINIMUM, THE COURT SHOULD RECONSIDER ITS ORDER WITH RESPECT TO TWO DETERMINATIONS CONCERNING THE CALCULATION OF DAMAGES.

### A.   The Republic Did Not "Admit" that the Occupation Took Place Prior to the Effective Date of the YPF Expropriation Law.

In its summary judgment decision, the Court held that the "tender offer price" relevant for the assessment of damages "must be calculated by determining the date on which the Republic

---

[5]      The *Sociedad de Electricidad de Rosario* case is particularly relevant.  In that case, the Argentine Supreme Court held that "[t]o admit any kind of contractual restriction [on the exercise of the State's expropriation power] would imply subjecting the question of expropriation to private interest, resulting in the obvious unconstitutionality of the agreement."  (Uslenghi Opening ¶ 31.) Placing such "conditions on the State in the exercise of its inalienable powers" was impermissible and unconstitutional.  (Comadira Opening ¶ 53.)

should have provided notice" of its intent to acquire "a sufficient number of shares to trigger Section 7." (Order at 54-56.) That "notice date," according to the Court, depends on "the precise date" of the Republic's "acquisition of control of the requisite number of shares." (*Id.* at 56-57.) According to Plaintiffs, the precise notice date could make billions of dollars of difference in the damages assessment. (Burford Press Release, *supra*, at 3-4.) The Court, however, also held that the Republic "cannot now take the position that occupation of the shares" did not occur until passage of the YPF Expropriation Law, because the Republic supposedly "admitted" in Paragraph 36 of its Answer that it "temporarily occupied" the shares prior to that. (Order at 45.) Because this ruling misunderstood the Republic's Answer, the Court should reconsider its summary judgment decision to "correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc.*, 729 F.3d at 104 (citation omitted).

Paragraph 36 of the Republic's Answer states:

> Argentina lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 36 and otherwise denies the allegations in Paragraph 36, except Argentina admits that Julio De Vido exercised powers conferred upon him as Intervenor, and Argentina then temporarily occupied 51% of YPF's Class D shares pending implementation of legislation declaring these shares to be of public utility and subject to expropriation. Argentina further respectfully refers the Court to Law 26,741.

(*Petersen* ECF No. 98, ¶ 36; *Eton Park* ECF No. 117, ¶ 36.)

With respect to when the Republic temporarily occupied the YPF shares, Paragraph 36 of the Republic's Answer "admits" only that the Republic temporarily occupied Repsol's YPF shares sometime *after* "Law 26,741" (the YPF Expropriation Law that "declare[d] these shares to be of public utility and subject to expropriation") became effective on May 7, 2012 and "*pending [its]*

*implementation*."  The YPF Expropriation Law was "implemented" when the expropriation process was *completed*, and the Republic acquired the expropriated shares in 2014.  (Arg. Opening Br. at 19-21.)  The Republic did not "admit" that it occupied the shares before the effective date of the YPF Expropriation Law ("Law 26,741"), nor could it have.  As the Republic stated in its fourth affirmative defense, "Law 26,741 authorized the commencement of the expropriation process and permitted the Argentine Government to temporarily occupy Repsol's shares of YPF." (*Petersen* ECF No. 98, at 22; *Eton Park* ECF No. 117, at 17.)  Article 13 of that law allowed the Republic to temporarily occupy the shares after its effective date.  (Giuffra Ex. 72, Art. 13.) Plaintiffs themselves conceded that it was the passage of the YPF Expropriation Law that "order[ed] . . . the formal occupation of [Repsol's YPF] shares."  (Pls. Opp. Br. at n.13; *see also* Argentina's SOF ¶ 71; Pls. Response to Argentina's SOF ¶ 71.)[6]  Any occupation, therefore, could only have occurred sometime after the YPF Expropriation Law took effect on May 7, 2012 and while it was being implemented.

To the extent there is any ambiguity as to what the Republic intended in Paragraph 36, the statement cannot qualify as a binding admission.  "[J]udicial admissions must be clear and unambiguous admission[s] of fact."  *H. Daya Int'l, Co.* v. *Do Denim LLC*, 2022 WL 974382, at *11 (S.D.N.Y. Mar. 31, 2022) (citation omitted).  Here, the Republic's Answer does not contain a clear and unambiguous admission of fact, and certainly no admission of an incorrect statement that cannot be reconciled with the undisputed record.  *See In re Motors Liquidation Company*, 957 F.3d at 360-61 (factually incorrect statement in defendant's Answer and Notice of Removal "was not

---

[6]     *See also* Uslenghi Opening ¶ 55; Manóvil Opening ¶¶ 34-35, 62; Giuffra Ex. 11 (Bianchi Deposition Tr.) 146:7-21.

an intentional, clear, and unambiguous statement of fact" and "did not constitute a judicial admission").

> **B.   The Court's Determination that the "Commercial Rate" Applies to Prejudgment Interest Misconstrues Argentine Court Jurisdiction.**

The Court also erred in adopting Plaintiffs' argument that it should apply a prejudgment interest rate used by Argentina's commercial courts, while reserving judgment on the precise rate to be applied.  (Order at 62-63.)  The Court made this determination based on its conclusion that "this case involves purely commercial obligations."  *Id.* at 63.  However, this holding disregards that in Argentina, only Argentine federal courts on administrative affairs—not commercial courts—hear disputes such as this in which the Republic is a party and that involve questions of public law.  (*See* Santiago Rebuttal ¶¶ 66-67; Uslenghi Rebuttal ¶¶ 58-60; Manóvil Rebuttal ¶ 162.)  This rule is similar in some respects to the rule in the American legal system that federal courts enjoy jurisdiction over disputes in which the federal government is a party or that concern questions of federal law.  *See* U.S. Const. art. III, sec. 2; 28 U.S.C. § 1331.  And the Argentine federal courts that would hear this case typically apply prejudgment interest at the average borrowing rate published by the Central Bank of the Argentine Republic, following the case law of the Argentine Supreme Court. (*See* Santiago Rebuttal ¶¶ 68-72; Manóvil Rebuttal ¶¶ 163-65.)

It is not surprising that Argentine law would demand a lower interest rate for judgments secured against the Republic than against a private company.  Indeed, neither pre- nor post-judgment interest is categorically recoverable against the United States except where the liability is imposed by statute or explicitly assumed by contract.  *See* 28 U.S.C. § 2516(a) ("Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof.").  And the U.S. "Supreme Court also has articulated a general 'no-interest rule'" with regard to claims

against the federal government.  *City of Wilmington* v. *United States*, 157 Fed. Cl. 705, 738 (2022) (quoting *Library of Congress* v. *Shaw*, 478 U.S. 310, 314 (1986)).

Were there any doubt that this case would be adjudicated in an Argentine federal court on administrative affairs, the Argentine Supreme Court has already found as much in another case involving a YPF shareholder.  In the *De San Martín* case, the Argentine Supreme Court considered a suit by two minority shareholders of YPF brought against the Republic in connection with the expropriation of YPF seeking specific performance of the tender offer obligation under the YPF Bylaws.  (Uslenghi Rebuttal ¶ 59; Santiago Rebuttal ¶ 67; Manóvil Rebuttal ¶ 162 n.257 (discussing Supreme Court of the Argentine Republic, Aug. 20, 2014, *De San Martín, José and other* v. *Estado Nacional-PEN S/Proceso de Conocimiento*, S.C. Comp. 731 L. XLIX).)  The Supreme Court determined that the Argentine federal administrative courts, not the commercial courts, had jurisdiction over the case because the Republic was a defendant and the case involved fundamental questions of public law.  (Uslenghi Rebuttal ¶ 59; Santiago Rebuttal ¶ 67; Manóvil Rebuttal ¶ 162 n.257.)  Because a federal court is bound by the "relevant state law . . . established by a decision of the State's highest Court," *Animal Science Products, Inc.*, 138 S. Ct. at 1874, so too is a federal court bound by a decision established by a foreign sovereign's highest court in applying that law.  *Id.*; *Sarl Louis Feraud Int'l* v. *Viewfinder, Inc.*, 489 F.3d 474, 479 (2d Cir. 2007) ("[W]e cannot second-guess the French court's finding").

This Court should follow the Argentine Supreme Court's decision on a question of Argentine law and assume that the case would be before an Argentine federal court on administrative affairs, therefore demanding application of the relevant average interest rate published by the Argentine Central Bank to any damages award.  *See Schwartz* v. *Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) ("Under New York choice of law principles, the

allowance of prejudgment interest is controlled by the law of the state whose law determined liability on the main claim.") (citation omitted).[7]

## CONCLUSION

For the foregoing reasons, the Court should reconsider its decision to grant Plaintiffs' motion for summary judgment pending hearing live testimony on the foundational and disputed issues of Argentine law on which its decision was based, and, at a minimum, reconsider its determination that Defendants "admitted" a certain notice-date range and that the interest rate applied by Argentine commercial courts applies to this case.

Dated:  April, 14, 2023
      New York, New York

                      Respectfully Submitted,

                      /s/ *Robert J. Giuffra, Jr.*
                      Robert J. Giuffra, Jr.
                      Sergio J. Galvis
                      Amanda F. Davidoff
                      Jeffrey B. Wall
                      Thomas C. White
                      Adam R. Brebner

                      SULLIVAN & CROMWELL LLP
                      125 Broad Street
                      New York, New York  10004-2498
                      Telephone:    (212) 558-4000
                      Facsimile:     (212) 558-3588

                      *Counsel for the Argentine Republic*

---

[7]     The Court "reserve[d] judgment" on the "precise rate it will utilize," but even assuming the rate applied by an Argentine commercial court is applicable here, Plaintiffs were wrong to suggest in their summary judgment briefing that "Argentine courts" apply an interest rate "between 6% and 8%" in commercial matters.  (Order at 62-63 (quoting Pls. Reply Br. at 73).)  As the Republic's expert explained, "Chamber C of the National Court of Appeals on Commercial Matters has consistently applied the passive interest rate used by the *Banco de la Nación Argentina* [Bank of the Argentine Nation] . . . plus an additional 2%," while the "Federal Court of Appeals in Civil and Commercial Matters has mostly applied an annual rate between 4% and 6%."  (Manóvil Rebuttal ¶ 166.)