**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :

PETERSEN ENERGÍA INVERSORA,
S.A.U. and PETERSEN ENERGÍA, S.A.U., :

           Plaintiffs,      :         Case No.:  1:15-CV-02739 (LAP)

           v.            :

ARGENTINE REPUBLIC and YPF S.A.,  :

           Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :

ETON PARK CAPITAL MANAGEMENT,  :
L.P., ETON PARK MASTER FUND, LTD., :
and ETON PARK FUND, L.P.,      :

           Plaintiffs,      :         Case No.:  1:16-CV-08569 (LAP)

           v.            :

ARGENTINE REPUBLIC and YPF S.A.,  :

           Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## ARGENTINA'S PRE-TRIAL
## MEMORANDUM


July 14, 2023

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ................................................................................ 1

**I.     THE REPUBLIC DID NOT "ACQUIRE CONTROL" OF A MAJORITY
         OF YPF "SHARES" PRIOR TO MAY 7, 2012** ................................................3

**II.    THE COURT SHOULD REJECT OR REDUCE PLAINTIFFS' REQUEST
         FOR BILLIONS IN PREJUDGMENT INTEREST** ........................................7

         A.     Plaintiffs Are Not Entitled to Any Prejudgment Interest........................ 7

         B.     Even if the Court Awards Prejudgment Interest, the Court Should Award
                No More Than the Passive Borrowing Rate Plus 2%............................. 9

**CONCLUSION** .................................................................................................... 10

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Brock* v. *Superior Care, Inc.*,
  840 F.2d 1054 (2d Cir. 1988)......................................................................................8

*Jones* v. *UNUM Life Ins. Co. of Am.*,
  223 F.3d 130 (2d Cir. 2000)........................................................................................8

*Nat'l. Commc'ns Ass'n, Inc.* v. *Am. Tel. & Tel. Co.*,
  1999 WL 258263 (S.D.N.Y. Apr. 29, 1999)................................................................9

*Oneida Indian Nation of N.Y.* v. *Cnty. of Oneida*,
  214 F.R.D. 83 (N.D.N.Y. 2003)................................................................................10

*Rao* v. *N.Y.C. Health & Hosps. Corp.*,
  882 F. Supp. 321 (S.D.N.Y. 1995).............................................................................7

*Slupinski* v. *First Unum Life Ins. Co.*,
  554 F.3d 38 (2d Cir. 2009)..........................................................................................8

**Other Authorities**

Int'l Monetary Fund, *World Economic Outlook: Inflation Rate* (Apr. 2023),................................9

## PRELIMINARY STATEMENT

This case concerns a provision of the YPF, S.A. Bylaws, which provides that "if as a consequence of [an] acquisition, the [Republic of Argentina] becomes the owner, or exercises the control of [49% of YPF's] **shares**," it shall make a tender offer bid for the remaining shares.  (DX 1 (YPF Bylaws) § 28 (emphasis added).)[1]  In its March 31, 2023 Order on Summary Judgment, the Court held that the Republic's "acquisition of control of [YPF] shares" triggered the tender offer requirement, even though the shares were still owned by Repsol.  (*Petersen* ECF No. 437 (Order) at 56-58.)[2]

At the upcoming damages trial, the Court will decide two questions on which more than $11 billion may turn.  *See* Appendix A to this Memorandum (Chart of Plaintiffs' Proposed Damages and Prejudgment Interest).  The first question is when the Republic acquired control of Repsol's YPF shares.   (Order at 56-58; *Petersen* ECF No. 450 (Order on Motion for Reconsideration) at 9-10.)  Plaintiffs say April 16, 2012, when an Executive Decree provided for the appointment of a temporary Intervenor in YPF's *management*, even though the Decree, by its terms, granted the Republic no power over any of Repsol's YPF shares.  (DX 4 (Intervention Decree); *Petersen* ECF No. 394 (Pls' Counterstatement of Facts) ¶¶ 60-62.)  The Republic says no sooner than May 7, 2012, the day Argentine Law No. 26,741 passed by the Argentine Congress became effective.  (DX 3 (the "YPF Expropriation Law").)  That law, for the first time, gave the Republic the power to exercise rights in Repsol's 51% of YPF shares.

---

[1] "DX" refers to Defendant's proposed trial exhibits for the damages trial starting July 26, 2023.

[2] The Republic respectfully continues to maintain that the tender offer obligation was not triggered at the earliest until May 8, 2014 when it "*acquired*," a majority stake in YPF.  (*See Petersen* ECF No. 373 (Arg. MSJ) at 19-24.)  Before then, as *Plaintiffs'* expert testified, the shares were in an "abnormal temporary occupation" state under Argentine law; the Republic had not acquired those shares.  (*Petersen* ECF No. 363-11 (Bianchi Deposition Tr.) 146:7-21).

The second question is the amount, if any, of prejudgment interest on the damages, and the date when such interest should begin to run.  The Court ruled that the "commercial rate applied by Argentine Courts is the appropriate measure" for any interest awarded but reserved judgment on what rate that was.  (Order at 63.)  Plaintiffs claim that this rate is 6% to 8%, while the Republic will ask the Court, in its discretion, to award no interest or a lower applicable commercial rate.

Plaintiffs are wrong on both issues to be decided at trial.  Indeed, even if the Court rules against Plaintiffs by awarding no interest and choosing May 7, 2012 as the date that triggered the tender offer requirement, Plaintiffs—largely their litigation funder Burford Capital LLC—will still obtain enormous damages of approximately $5 *billion*, a nearly 20,000% return on Burford's investment.  (Appendix A; DX 44 (Petersen-Prospect Agreement); DX 45 (Eton Park Agreement) DX 67 (Burford Annual Report).)  If the Court rules for Plaintiffs on all points, Plaintiffs estimate they will obtain approximately $16 billion, an amount significantly in excess of YPF's market cap, for their former interest in approximately 28% of YPF's shares.  *See* Appendix A.  The Court should not increase Plaintiffs' windfall by awarding them billions more in prejudgment interest, especially when the Argentine people are suffering from serious economic challenges.

*First*, under the Court's reasoning, the Republic did not trigger the tender offer obligation until May 7, 2012 at the earliest.  The Court has already held that the Republic's "acquisition of control of [YPF] *shares*, *not* its intervention in or acquisition of control *of YPF*" triggered the obligation (Order at 56 (emphasis added).)  The Republic could not have "controlled" YPF shares until the YPF Expropriation Law went into effect on May 7, 2012, which by its plain terms—for the first time—authorized the Republic to "exercise all rights conferred upon the [YPF] shares." (DX 3 (YPF Expropriation Law).)  Plaintiffs' theory that the Republic "controlled" YPF's shares through the April 16, 2012 Intervention Decree, which temporarily allowed an Intervenor to

exercise the powers of YPF's "Board," (DX 4 (Intervention Decree)), ignores the Court's ruling, the opinions of Plaintiffs' own expert, and the recognized distinction under Argentine law between management and shareholder control.

*Second*, this Court should not award Plaintiffs any prejudgment interest, or at most should set a rate at or below a borrowing rate plus 2%.  In Argentina, as in the United States, the question of whether to apply prejudgment interest is left to the equitable discretion of the Court.  Even if this Court holds that a tender offer was not required until May 7, 2012, because of the tender offer pricing formula in YPF's Bylaws, Plaintiffs will obtain an enormous windfall.  That formula provides for highly inflated damages if YPF's earnings were depressed at any point in a more than *three-year period* before the tender offer date—as those earning were in the aftermath of the 2008 global financial crisis.  Because of the vagaries of this formula, using a May 7, 2012 date, Plaintiffs will obtain a *305%* premium over that day's market price for their shares *without* awarding a cent of prejudgment interest.  And Plaintiffs would receive an astounding *573%* percent premium (without interest) over the relevant April 2012 market price, were the Court to accept April 16, 2012 as the relevant trigger date.  Finally, if the Court decides to apply prejudgment interest, it should use a much lower rate than proposed by Plaintiffs, which the Republic's experts will explain is in accordance with pertinent Argentine commercial court precedent, and should be applied in this case.

## I.     THE REPUBLIC DID NOT "ACQUIRE CONTROL" OF A MAJORITY OF YPF "SHARES" PRIOR TO MAY 7, 2012.

In its March 31 Order, the Court held that there was a question of fact for trial of when the Republic acquired control (but not ownership) of Repsol's 51% of YPF shares, which the Court ruled triggered the YPF Bylaws' tender offer obligation.  (Order at 56.)  Under Argentine law, the answer is clear:  the Republic had no rights over Repsol's YPF shares—and thus no way to

"control" them—until the effective date of the YPF Expropriation Law (May 7, 2012).  Prior to that date, the Republic "intervened" in YPF's *management*, an authority that is legally distinct from control over shares.[3]

As the Court has already held, the Republic's "acquisition of control of [YPF] *shares*"— *not* its intervention in YPF—triggered the tender offer requirement.  (Order at 56 (emphasis added).)  Indeed, under the plain terms of the Intervention Decree and the YPF Expropriation Law, the Republic could not exercise any rights over Repsol's YPF shares until May 7, 2012, the effective date of the YPF Expropriation Law.  The Court's focus on the *shares* as opposed to control of the company is also mirrored in the text of the Bylaws themselves, which  makes the tender offer provision applicable to "acquisitions . . . of shares . . . if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the *shares* of the corporation."  (DX 1 (YPF Bylaws) § 28 (emphasis added).)

The April 16, 2012 Intervention Decree appointed an Intervenor for the temporary management of the company.  (DX 4 (Intervention Decree)); *see also* Order at 8-9 (explaining, relying on Plaintiffs' Counterstatement of Facts, that the Intervention Decree "provided for the immediate appointment of a temporary 'intervenor' who was granted the 'powers [of the YPF] Board of Directors and/or the President of the company'").  The Intervention Decree did not allow

---

[3] The $3.4 billion difference in claimed damages from using an April 16 versus a May 7, 2012 trigger date (assuming no prejudgment interest) has *nothing* to do with the events of 2012.  Rather, this massive difference is the result of Plaintiffs' calculation of tender offer prices under the formula.  As mentioned, the tender offer formula relies on YPF earnings data from more than three years before the tender offer date—the lower those earnings, the higher the tender offer price.  For an April 16, 2012 tender offer, Plaintiffs' calculation brings in earnings from the fourth quarter of 2008 through the third quarter of 2009, which were depressed by the 2008 financial crisis.  For May 7, 2012, the formula uses data from one quarter later (first through fourth quarters of 2009), which was less depressed.  The damages on both dates are inflated compared to YPF's market price, but the more depressed the years-old earnings data used in the tender offer formula, the more inflated the damages numbers.

or commit the Republic to expropriating or even occupying a single share of YPF.  The Argentine

Congress would need to act for the Republic to expropriate or occupy Repsol's YPF shares, which

was not at all certain prior to Congress enacting the YPF Expropriation Law.  (*Petersen* ECF No.

366 Ex. 1 (Uslenghi Opening Report) ¶¶ 28, 42.)

By contrast, three weeks later, on May 7, 2012, the YPF Expropriation Law became

effective and thereby started the process of expropriating Repsol's YPF shares.  The law permitted

the Republic to "temporarily occupy" those shares and to "exercise all of the . . . rights conferred

upon [the] shares" until the completion of the expropriation process.  (DX. 3 (YPF Expropriation

Law) Art. 13.)  Plaintiffs' expert agrees, stating that the *YPF Expropriation Law* permitted the

"National Government [to] formally occup[y] [Repsol's YPF] shares, which enabled it to exercise

. . . all of the rights to which their holders were entitled."  (*Petersen* ECF No. 377 Ex. 49 (Bianchi

Rebuttal Report) ¶ 26).  In other words, the Intervention Decree empowered the Intervenor to

exercise control over YPF's management, while the YPF Expropriation Law authorized the

Republic to temporarily occupy and thus exercise the rights conferred by Repsol's YPF shares.

Argentine corporate law generally and the YPF Bylaws in particular support this distinction

between management and shareholder control.  Under Argentine law, a board of directors enjoys

only the power to administer the "business and affairs of the corporation," including by appointing

officers.  Arg. Gen. Corp. Law Arts. 236, 255, 270.  Shareholders, by contrast, receive dividends

and have the right to participate in shareholder meetings at which they vote the shares, elect the

Board and approve corporate decisions such as mergers and acquisitions, dividend distributions,

and financial statements.  *Id.* Arts. 233-35.  The YPF Bylaws reflect this bifurcation of powers

exactly, providing that the Board shall have the power to "manage the affairs of the Corporation,"

but that its powers shall be limited by the "decisions adopted at the [shareholders'] meetings." (DX 1 (YPF Bylaws) § 17.)

The Republic's actions from April through June of 2012 confirm that before May 7, 2012, under the Intervention Decree, the Intervenor appointed by the Executive Branch exercised only the powers of the "Board."  It appointed managers responsible for the operation of the company and oversaw those operations, but it did not vote any shares, which was the exclusive province of shareholders.  The Republic first exercised *any* rights associated with Repsol's YPF shares on June 4, 2012, at the first shareholder meeting *after* the YPF Expropriation Law became effective on May 7.  Before that date, pursuant to this Court's Order, the Republic could not have breached the tender-offer obligation because it did not exercise any rights over Repsol's YPF shares.

Finally, the Republic never "admitted" in its Answer that it "temporarily occupied" Repsol's YPF *shares* (and thereby exercised the rights conferred by them) prior to May 7, 2012. (Reconsideration Order at 9-10.)  The Republic's Answer stated that only the Republic temporarily occupied YPF shares "pending implementation" of the YPF Expropriation Law, meaning pending completion of the expropriation process that began only *after* the Law "went into effect" on May 7.  (*Petersen* ECF No. 98 (Answer), ¶ 36; *id.* at 22 ("Law 26,741 authorized the commencement of the expropriation process and permitted the Argentine Government to temporarily occupy Repsol's shares.")  Thus, the Republic did not "admit" that it occupied the shares before the May 7 effective date of the YPF Expropriation Law, nor could it have done so given the plain terms of the Expropriation Law and Intervention Decree.

## II.    THE COURT SHOULD REJECT OR REDUCE PLAINTIFFS' REQUEST FOR BILLIONS IN PREJUDGMENT INTEREST.

### A.    Plaintiffs Are Not Entitled to Any Prejudgment Interest.

Under Argentine law, an award of prejudgment interest is subject to the Court's discretion. *See* Arg. Civil Code Art. 622. ("If the legal interest has not been set, the judges will determine the interest that he must pay.")  The parties agree that under Argentine law, the rate to be applied by this Court is a matter of judicial discretion. (*Petersen* ECF No. 371 (Pls.' Opening) 37; *Petersen* ECF No. 402 (Defs.' Opp'n) 54-55; *Petersen* ECF No. 406 (Hicks Ex. 162)).  The same holds true under U.S. law. *See Rao* v. *N.Y.C. Health & Hosps. Corp.*, 882 F. Supp. 321, 325 (S.D.N.Y. 1995) ("[W]hen a federal statute is silent concerning the availability of prejudgment interest, a court may award prejudgment interest in accord with its equitable discretion.").  The Court should set the prejudgment interest rate at zero (or a nominal rate) for at least three reasons.

*First*, prejudgment interest would result in Plaintiffs receiving a massive and unjustified windfall.  As explained, the Bylaws tender-offer formula *already* provides for a vastly inflated share price because of a trailing formula that, as applied here, reflects lower oil prices during the financial crisis and its aftermath. *Supra* at p.3.  Under this formula, even without the application of any interest, Plaintiffs estimate that they will receive a *305%* premium on their shares, which is the difference between the YPF market share price *on May 7, 2012* ($14.88), and the price they calculate under the tender-offer formula ($60.28).[4]  If the Court selects April 16, 2012 as the "control" date, Plaintiffs' damages calculation would result in a *573%* premium, which is the

---

[4] Plaintiffs' calculation of these numbers is based on ignoring earnings information that would have been available at the hypothetical notice dates.  If properly calculated, the May 7 amount is lower, and the April 16 amount is significantly lower.

difference between the YPF market share price on April 18, 2012 ($13.12) and the price they calculate under the tender-offer formula ($88.35).

The Republic's experts will testify that in Argentina, as in the United States, "the aim" of prejudgment interest "is to make the plaintiffs whole, but not to give them a windfall." *Jones* v. *UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000); *see Slupinski* v. *First Unum Life Ins. Co.*, 554 F.3d 38, 54-55 (2d Cir. 2009) ("[T]he court would plainly have discretion . . . to set an interest rate that does not result in a windfall to the plaintiff."); *Brock* v. *Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988) (no prejudgment interest for violation of the Fair Labor Standards Act where liquidated damages are allowed because liquidated damages "compensate for the delay").  Remarkably, Plaintiffs seek more than a $16 billion recovery for a tender-offer obligation concerning approximately 28% of the shares of a company that was valued *in its entirety* at significantly less than this figure on May 7, 2012,  and even though the Republic will not receive a single share of YPF for this enormous sum, since Peterson and Eton Park have long ago sold their YPF shares.[5]  Moreover, most prejudgment interest would accrue to litigation funder Burford, which purchased Petersen's claims for a mere €15.101 million in 2015 and will receive more than 70% of any damages award from this action.  (DX 44 (Petersen-Prospect Agreement); DX 67 (Burford Annual Report).)  Indeed, Burford seeks billions in prejudgment interest dating back to even *before* it purchased its claims, which would only compound its astounding return.

*Second*, an award of prejudgment interest would be inequitable under the circumstances here.  The Republic took a series of actions in 2012 with the goal of saving the nation's largest oil

---

[5] By contrast, Repsol received $5 billion for the expropriation of 51% of YPF's shares in 2014, and compensation for 51% of YPF Gas, and other claims related to the Intervention Decree, the YPF Expropriation Law and other items included in the Settlement Agreement.  (DX 43 (Republic-Repsol Settlement Agreement).)

company and restoring energy self-sufficiency in Argentina.  It acted in response to Repsol and Petersen's gross mismanagement of YPF, under which YPF's oil and gas production plummeted (by 41.2% and 23.8%, respectively from 2001 to 2011), while Petersen continued to pay itself extraordinary dividends in excess of 100% of net profits.[6]  The Republic acted under the good faith belief and understanding that, under Argentine law, the tender-offer requirement would not be triggered by its actions in 2012.  (*See* DX 39 (Cameron E-mail) (explaining the Repsol-Petersen "strategy to virtually eviscerate the company" and belief that it was "possible to take control of the company without" making a tender offer).)  Although this Court disagrees with the Republic's view of its law (*see* Order at 27-28), the Republic's "good faith in contesting liability" affords the Court ample discretion under both Argentine and U.S. law to refuse to award an *additional* recovery in the form of prejudgment interest.  *Nat'l. Commc'ns Ass'n, Inc.* v. *Am. Tel. & Tel. Co.*, 1999 WL 258263, at *3 (S.D.N.Y. Apr. 29, 1999) (Preska, J.).

*Third*, current economic conditions in Argentina weigh in favor of a restrained approach to prejudgment interest.  The Republic is addressing significant economic challenges, including a high inflation rate.  Int'l Monetary Fund, *World Economic Outlook: Inflation Rate* (Apr. 2023).  The Court need not provide Plaintiffs with billions in interest at the expense of the Argentine people, especially when Plaintiffs are already receiving an extraordinary windfall.

## B.    Even if the Court Awards Prejudgment Interest, the Court Should Award No More Than the Passive Borrowing Rate Plus 2%

If the Court decides to award Plaintiffs any prejudgment interest, that rate should be no more than the borrowing rate plus 2%.[7]  As the Republic's expert Prof. Rafael Manóvil will explain

---

[6]  Calculated using Argentine State, Ministry of Economy, Secretary of Energy, http://www.argentina.gob.ar/economia/energia/hidrocarburos/produccion-de-petroleo-y-gas.

[7]  The Republic continues to respectfully submit that because this case presents a claim against the Republic and presents issues of Argentine public law, it could be brought only before the Argentine

at trial, "Chamber C of the National Court of Appeals on Commercial Matters," which hears cases concerning companies like YPF incorporated in Buenos Aires, "has consistently applied the passive interest rate [borrowing rate] used by the [Bank of the Argentine Nation] . . . plus an additional 2%." (*Petersen* ECF No. 368 Ex. 2 (Manóvil Rebuttal Report) ¶ 166).

*Finally*, if the Court awards prejudgment interest, it should run only from the service of Plaintiffs' Complaints on the Republic.  As Prof. Manóvil will testify, "[u]nder Argentine law, interest is due as from the date of *delinquency*[,]" which is the "date an obligation becomes due." (Manóvil Rebuttal  ¶ 158 (emphasis added).)[8]  Because the Bylaws "did not establish a fixed term for conducting the tender offer," "delinquency could only have occurred as of the date of a formal demand for compliance by the non-breaching party or upon the bringing of a judicial claim."  (*Id.*) Plaintiffs never made a formal demand, and thus any interest would be due from the service of their Complaints on the Republic on June 12, 2015 and June 1, 2017 respectively.  (*See Petersen* ECF No. 10; *Eton Park* ECF No. 12.

## CONCLUSION

For the foregoing reasons, this Court should find that the Republic exercised control over the shares no earlier than May 7, 2012 and should not award prejudgment interest.

---

federal courts on administrative affairs, which apply the 30-day passive rate for dollar deposits when awarding interest.  *See Petersen* ECF No. 440 (Arg. Motion for Reconsideration) at 18-19 (citing Supreme Court of the Argentine Republic, Aug. 20, 2014, *De San Martín, José and other* v. *Estado Nacional-PEN S/Proceso de Conocimiento*, S.C. Comp. 731 L. XLIX (finding that the federal courts on contentious administrative matters were courts of competent jurisdiction over claims concerning the expropriation and alleged breaches of the YPF Bylaws)).

[8] The dispute at the summary judgment stage concerned what prejudgment interest rate would apply to any award, and neither party presented arguments on the *date* from which such interest would run.  Because the Court did not decide this issue in its Order, this question must be decided at the upcoming damages trial.  *See Oneida Indian Nation of N.Y.* v. *Cnty. of Oneida*, 214 F.R.D. 83, 94-95 (N.D.N.Y. 2003) ("the date for accruing prejudgment interest" not waived because party "had almost no incentive to raise" it prior to determination of liability).

Respectfully Submitted,

/s/ *Robert J. Giuffra*
Robert J. Giuffra, Jr.
Sergio J. Galvis
Amanda F. Davidoff
Thomas C. White
Adam R. Brebner

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:     (212) 558-4000
Facsimile:     (212) 558-3588

*Counsel for the Argentine Republic*

July 14, 2023