UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PETERSEN ENERGÍA INVERSORA, S.A.U. and
PETERSEN ENERGÍA, S.A.U.,

                    Plaintiffs,

    -against-

ARGENTINE REPUBLIC and YPF S.A.,

                    Defendants.

---

ETON PARK CAPITAL MANAGEMENT, L.P.,
ETON PARK MASTER FUND, LTD., and
ETON PARK FUND, L.P.,

                    Plaintiffs,

    -against-

ARGENTINE REPUBLIC and YPF S.A.,

                  Defendants.

Case Nos.:

1:15-cv-02739-LAP
1:16-cv-08569-LAP

---

## PLAINTIFFS' PRE-TRIAL BRIEF

| | |
|---|---|
| CLEMENT & MURPHY, PLLC | KELLOGG, HANSEN, TODD, FIGEL <br> & FREDERICK, P.L.L.C. |
| Paul D. Clement <br> C. Harker Rhodes IV | Mark C. Hansen <br> Derek T. Ho |
| KING & SPALDING LLP | Andrew E. Goldsmith |
| Israel Dahan <br> Laura Harris <br> Reginald R. Smith | |

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U.,
Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT..................................................................................................... 1

ARGUMENT .................................................................................................................................. 3

I.    Argentina Acquired Control of the Shares on April 16, 2012. ................................................ 3

        A.    Argentina Acquired and Exercised Control of the Shares Through the Intervention Decree..............................................................................................3

        B.    Argentina Has Repeatedly Acknowledged That It Took Control of Repsol's Shares on April 16, 2012. ..........................................................................6

        C.    Argentina Cannot Escape Its Bargain with YPF's Investors...................................7

II.    The Court Should Award Prejudgment Interest of 8%. ............................................................ 9

**PRELIMINARY STATEMENT**

After years of litigation, the Court now has established that Argentina breached the Bylaws "no later than May 7, 2012," when the Expropriation Law gave Argentina the right to "exercise[] all the political rights associated with [Repsol's 51%] shares." ECF No. 437, at 28. Two questions remain: First, did Argentina breach the Bylaws earlier by taking direct or indirect "control of the shares" through the Intervention Decree? *Id.* at 56. Second, what prejudgment interest rate in the Argentine commercial range "between 6% and 8%" is appropriate? *Id.* at 62-63.

The answer to both questions is straightforward. *First*, Argentina acquired and exercised control of Repsol's shares on April 16, 2012 via the Intervention Decree. The Decree explicitly targeted Repsol's rights as "majority shareholder," complaining that Repsol was pursuing interests "different [from] the interests of the Argentine Republic" and blaming the country's energy woes on Repsol's "predatory policy." Ex. A, Decree 530/2012, at 2. The Decree thus designated Repsol's 51% shares "for public use and . . . expropriation." *Id.* at 8. But the Decree did not stop there. Argentina attached such "urgency" to the problem that it refused to wait for "the ordinary procedure . . . for the enactment of laws." *Id.* Argentina immediately installed a bureaucrat—Julio De Vido—as "Intervenor" and supplanted Repsol's chosen Board and Chairman of YPF. *Id.* at 9, § 3. Thus, as of April 16, Argentina took control of the majority shareholder rights that had belonged to Repsol, including the right to appoint those with the powers of the Board and its Chairman. *See* Ex. B, YPF Bylaws §§ 17-19.

On April 16, everyone understood that Repsol was out and Argentina was in. The NYSE suspended trading in YPF shares that day; when it resumed on April 18, the share price plunged 40%. The markets and shareholders did not wait for May 7. Nor did Argentina. The Intervenor appointed new management and canceled the shareholders' meeting scheduled for April 25, prohibiting Repsol from declaring a planned dividend or voting its shares to exert any power over

1

the Board, management, or corporate policy.  Argentine officials recognized immediately that the Decree had "modif[ied] the control that until now belonged to the Repsol group."  ECF No. 364-74, at 23.  YPF and Repsol made SEC filings confirming these developments.  And later, when calculating the compensation Repsol was owed, Argentina acknowledged that Repsol was "dispossess[ed]" of its shares on April 16, 2012 and that "the taking of possession [of Repsol's shares] . . . was in April 2012."  Ex. C, *Hearing on the Friendly Settlement Agreement and Expropriation Agreement of the Energy and Fuels and Budget and Finance Committees* at 1, 5 (Apr. 8, 2014) (Apr. 8, 2014 Hr'g).  In short, the Decree achieved on April 16 through executive power what the YPF Expropriation Law would formalize in legislation on May 7.  The Decree therefore triggered Argentina's tender-offer obligation under the Bylaws.

Any other interpretation would destroy the commitment Argentina made to investors in the Bylaws.  As of April 16, the damage to shareholders was done.  YPF's share price plummeted.  The Bylaws protected against precisely that injury by promising shareholders they would receive a tender offer—at a price set by fixed Bylaws formulae—if Argentina ever took control of 49% or more of YPF's capital stock, "whether directly or indirectly, by any means or instrument."  ECF No. 437, at 7.  That occurred on April 16, as Argentina took control of the shares through the Intervention Decree by taking Repsol's rights as majority shareholder and exercising them itself.  That Argentina on May 7 changed the legal "means" by which it controlled the shares made no difference to the markets and makes no difference under the Bylaws.  Indeed, when the markets closed on May 7, the share price hardly budged.  It was the precipitous decline after April 16 that reflected the true change in majority control—just what the Bylaws protected shareholders against.

*Second*, this Court should award prejudgment interest at 8%.  Argentina's borrowing costs exceed that level, and so do Plaintiffs' losses, meaning that awarding less than 8% would be a

windfall for Argentina and a further injury to Plaintiffs. Indeed, while Plaintiffs do not seek a rate above 8% or compound interest, Plaintiffs' losses are higher and have been compounding for the last 11 years. Eight percent simple interest is far less than full compensation. Argentina has made Plaintiffs its unwilling creditors for more than a decade, and awarding Plaintiffs less than 8% interest for the lost use of their funds over those years would exacerbate their injury.

## ARGUMENT

### I.     Argentina Acquired Control of the Shares on April 16, 2012.

Before April 16, Repsol exercised all the rights of a majority shareholder: to choose the Board, set corporate policy, and decide whether to issue dividends. The Intervention Decree took those rights for Argentina and did so immediately. That the YPF Expropriation Law later permitted Argentina to vote Repsol's shares was of no moment. Transferring control of the shares from one government functionary to another—under a different legal regime—is immaterial under the Bylaws, which protect against direct or indirect control by any means. The market's reaction reinforces that truth; what investors cared about was practical control, not a sham voting of shares.

#### A.     Argentina Acquired and Exercised Control of the Shares Through the Intervention Decree.

"A security itself is essentially a contract between the issuer and the holder that . . . provides rights through the terms of the certificate and incorporated documents." *Consol. Edison, Inc. v. Ne. Utils.*, 318 F. Supp. 2d 181, 192 (S.D.N.Y. 2004). In Argentina, as in the United States, shareholders retain the rights to, *inter alia*, control the Board, set dividends, and call for shareholders' meetings. *See* Ex. D, Law No. 19,550, §§ 233-234, 236 (shareholders have "exclusive competence" to appoint and remove directors and set the "distribution of profits," and may call shareholders' meetings). On April 16, 2012, Argentina usurped all of these rights from Repsol as majority shareholder and took control of its shares.

That was not some incidental effect, but the Decree's stated goal, which was to seize the political and economic rights associated with Repsol's shares. The Decree criticized Repsol-YPF's "predatory strategy" as the cause of a domestic energy shortfall and declared it "vital for the Government," rather than Repsol, "to have the ability and the power to effectively control the activities of this sector." Decree 530/2012, at 5. To achieve that control, the Decree installed an Intervenor to exercise "the powers conferred to the Board of Directors and/or the President of the Company"—depriving Repsol of its rights to appoint and remove directors and thereby influence corporate policy. *Id.* at 9, § 3; *see Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 202 (2d Cir. 2018) ("*Petersen II*") (Intervenor "seized control of YPF's facilities, replaced top management with government officials, and escorted YPF's then-CEO off the premises"); ECF No. 364-25, ¶¶ 121, 133 (Bianchi Rebuttal). Days later, on April 23, Argentina indefinitely "suspend[ed]" the shareholders' meeting scheduled for April 25, ECF No. 377-53, at 5, prohibiting Repsol from voting its shares, appointing a new Board, and approving the dividends that were on the agenda, *see* Ex. E, Mar. 21, 2012 Board Meeting Minutes. Canceling that dividend—and insisting that earnings be reinvested in the government's priorities—was Argentina's explicit policy goal. *See* Decree 530/2012, at 2.[1] As the Second Circuit has already recognized, through the Intervention, "Argentina did indeed exercise the rights of Repsol's shares, using them to cancel YPF's previously-scheduled dividend payment and [shareholders'] meeting *in April 2012*." *Petersen II*, 895 F.3d at 203 (emphasis added).

By design, the Decree carried out the exercise of control over Repsol's shares that the YPF Expropriation Law merely codified weeks later. The Decree said as much on its face: After

---

[1] The same goal also featured in the government's secret February 2012 memo plotting Repsol's ouster. *See* ECF No. 374-81, at 12 (noting the goal of removing Repsol as majority shareholder was to "revers[e] the consequences generated by years of disinvestment").

proposing the YPF Expropriation Law to the Argentine Congress, the Decree claimed that the "urgency" of the situation made it "impossible to follow the ordinary procedure set forth . . . for the enactment of laws" and so ordered the Intervention "to ensure the full and absolute compliance of the measures proposed in the [Expropriation] Bill." Decree 530/2012, at 8; *see* Bianchi Rebuttal ¶ 118. The Decree thus made clear that it achieved on April 16 via executive fiat everything that the YPF Expropriation Law provided via legislation in May. Neither the markets nor the Bylaws obsess about legal formalities or theories, but react to (and protect against) the practical control Argentina exercised as of April 16.

Argentina's contention that it did not acquire control of the shares until the YPF Expropriation Law is just as wrong as Argentina's previous argument that it did not acquire control of the shares until it formally took title in 2014, *see* ECF No. 437, at 27-28, and for the same reason: The Bylaws require Argentina to make a tender offer if it "exercises the control of" the shares "by *any means*," regardless of legal formalities. *Petersen II*, 895 F.3d at 206 (quoting Section 28(A)); *see* ECF No. 437, at 7. The Decree took control of the shares by seizing for Argentina the majority shareholder rights that Repsol had exercised until April 16. *See* ECF No. 364-32, ¶ 16 (Garro Rebuttal). As Argentina explained to the SEC in YPF's post-takeover Annual Report, the Intervention rendered Repsol's chosen Board "devoid of any powers, functions or duties." ECF No. 364-109, at 128. Argentina had taken for itself Repsol's right as controlling shareholder to appoint those exercising Board power. The fact that Argentina did not legislate its seizure until May 7—just like the fact that Argentina did not formally take title until two years later—makes no difference.

### B. Argentina Has Repeatedly Acknowledged That It Took Control of Repsol's Shares on April 16, 2012.

Argentina's own statements prove the point, repeatedly confirming that Argentina took control of Repsol's 51% shares on April 16. Argentina's General Expropriation Law requires the government to compensate an owner for expropriated property as of "the time of the dispossession," Ex. F, Law No. 21,499, art. 20, based on a formal, neutral opinion of the value of the property on that date from a federal accounting agency called the *Tribunal de Tasaciones de la Nación* ("TTN"), *see id.* arts. 10, 13. The YPF Expropriation Law therefore tasked the TTN with "determin[ing]" the "price of" Repsol's 51% stake in YPF. Ex. G, YPF Expropriation Law § 12. As Argentina's expert, Professor Harris, acknowledges in his report: in a February 17, 2014 opinion, the TTN concluded that April 16, 2012 was the date on which Argentina dispossessed Repsol of its shares. Ex. H, at -45, -65; ECF No. 364-49, ¶ 35 (Harris Report). Days later, when Argentina and Repsol proposed to settle, Argentina sought another opinion to confirm the reasonableness of the settlement, and the TTN again determined that April 16 was the date of dispossession and thus the appropriate date for valuation. *See* ECF No. 363-15 (Giuffra Ex. 15), at 7, 15-17. These are dispositive admissions that Argentina had control as of that date.

Senior Argentine executive officials endorsed the TTN's analysis. Daniel Martin, the head of the TTN committee that appraised Repsol's shares, testified before the Argentine House of Representatives that "[t]he appraisal was carried out as of the dispossession date, in accordance with Article 20 of the Expropriation Law, which was April 16, 2012." Apr. 8, 2014 Hr'g at 5. Likewise, Carlos Zannini, the President's Secretary of Legal and Technical Affairs, testified that "the taking of possession . . . was in April 2012." *Id.* at 1.

Argentina made similar statements contemporaneously with the Intervention. On April 16, Argentina's current President, Alberto Fernández, observed that the Republic had seized Repsol's

shares but was flouting the resulting tender-offer obligation. He explained that the Intervention "did not take YPF's recovery rules into account," which "established . . . the need to make a hostile offer to all shareholders" upon an acquisition of control. ECF No. 407-1, at 4. The next day, Vice-Intervenor Axel Kicillof likewise acknowledged that the Intervention had "modif[ied] the control that until now belonged to the Repsol group" and so triggered the tender-offer provision, which he dismissed as a "bear trap" fit for "fools . . . who think that the State has to be stupid and buy everything according to the law of YPF itself, respecting its bylaws." ECF No. 364-74, at 23, 26.

Argentina has made the same admission in this litigation, conceding that, after the Intervention, it "'occupied'" the shares "'pending implementation of'" (i.e., *before*) the YPF Expropriation Law. ECF No. 437, at 57 (quoting ECF No. 98, ¶ 36). Argentina now seeks to avoid that fatal admission, claiming it really meant that it took control of the shares *after* May 7—even though the rest of the quoted sentence (and the corresponding paragraph) refers only to the events of April 2012. *See* ECF No. 1, ¶ 36; *contra* ECF No. 440, at 16-17. This Court graciously "reserve[d] judgment regarding whether the Republic's reading of its answer is plausible," ECF No. 450, at 9, but the full record—including Argentina's prior statements—shows that reading is plainly mistaken. Argentina cannot escape its admission, which simply reflects reality.

### C. Argentina Cannot Escape Its Bargain with YPF's Investors.

Argentina's newfound position that it did not acquire control of the shares until May 7 also conflicts with the basic bargain that Argentina struck with YPF's investors. Argentina promised to "transform[]" YPF "from a politically managed, government-owned monopoly to an efficient and competitive integrated oil company," in which Argentina would control "less than a majority of the Company's outstanding shares." ECF No. 112-2, at 6, 13 (YPF IPO Prospectus). To make good on that obligation, Argentina offered a "precommitment." ECF No. 364-29, ¶ 22 (Fischel Report). "[T]he Republic promised security holders that it would provide them with a

7

compensated exit if it reacquired control over the requisite number of shares." ECF No. 437, at 38 (emphases omitted). By requiring Argentina to make a tender offer if it exercised control over 49% or more of YPF's shares—"whether directly or indirectly, by any means or instrument," *id.* at 7—the Bylaws protected investors from the very conduct that Argentina engaged in here: taking control of the shares, driving down the tender price, and then arguing that no tender offer was required unless and until Argentina enacted formal legislation authorizing its *fait accompli* or eventually took formal title to the shares.

In the context of the bargain the Bylaws embodied, it is clear that Argentina acquired control of the shares on April 16. As of that date, Repsol and other YPF shareholders no longer held stock in a private company governed "solely by the shareholders, the Board of Directors[,] or officers of the Company," in which their shares entitled them to vote for directors and affect corporate policy. YPF IPO Prospectus 13. Instead, the Decree usurped those rights to install a "government-appointed administrator." Decree 530/2012, § 2. If the Bylaws allowed Argentina, as it now insists, to displace the shareholder-elected Board, remove management, install an Intervenor in their place, and indefinitely suspend the next shareholders' meeting (thereby depriving shareholders of any ability to vote their shares or pay a dividend), all without triggering the Bylaws' tender-offer provision, YPF's initial offering would have had precious few takers.

When the Intervention eventually came, the public markets proved the point. After the Intervention on April 16, YPF's share price dropped 40%, and trading of YPF shares on the NYSE was suspended for two days. *See* Ex. I, Closing Prices of YPF ADS's Between 4/13/12-5/8/12. By contrast, there were only modest stock-price movements during several days in which the Argentine Congress passed, and the President signed, the YPF Expropriation Law. *See id.* The message could not be clearer: The markets care about reality, not formalities, and the Bylaws and

8

their formulas should be interpreted to protect investors against the loss of market value caused by Argentina's clear exercise of the majority shareholder's control rights through the Decree.

## II. The Court Should Award Prejudgment Interest of 8%.

As the Court has recognized, "this case involves purely commercial obligations," and so Argentina must pay prejudgment interest at "the commercial rate applied by Argentine courts." ECF No. 437, at 62-63.  While that rate is typically "between 6% and 8%," *id.* at 62; *see* ECF No. 364-31, ¶¶ 39 & n.64, 41 & n.67 (Garro Report) (collecting cases); ECF No. 364-36, ¶ 56 (Rovira Report),[2] Argentine law does not confine prejudgment interest to any upper bound.  Rather, interest must accord "full compensation . . . for all losses suffered and gains foregone as a result of the breach."  Garro Report ¶ 37.  It is "le[ft] . . . 'to the discretion of the court'" to fix a rate that fully compensates the plaintiff.  ECF No. 407-8, ¶ 160 (Manóvil Rebuttal Report) (quoting Civil Code Art. 622).  The court may assess additional interest to sanction a defendant for litigation tactics "aimed at delaying compliance with the obligation."  ECF No. 364-121 (Civil Code Art. 622).

Nothing less than an 8% interest rate would fully compensate Plaintiffs for Argentina's calculated breach of the Bylaws and its decade of litigation delay.  The day after the Intervention, Vice Intervenor Kicillof priced a tender offer under the Bylaws formulae at $19 billion—a sum he bragged only "fools" would expect.  ECF No. 364-74, at 26.  Plaintiffs have been involuntary creditors to Argentina ever since.  Had Argentina complied with the Bylaws and paid as required, Plaintiffs would have done better than 8% simple interest over the past decade.  Petersen could have retired debt obligations carrying a 7.4% *compound* interest rate at that time, which rose to a

---

[2] Many more cases are to the same effect, and Plaintiffs reserve the right to rely on them post-trial if the Court is inclined to accept new authorities.

9.4% compound interest rate because of Argentina's breach.  *See* ECF No. 364-95, § 2.06; Fischel Report Exs. 9-10.  Eton Park, for its part, reported 17.6% returns through mid-November 2013.[3]

Had Argentina instead financed its tender offer payment, its borrowing rate clearly would have been much higher than 8% simple interest.  Set aside that "Argentina's sovereign borrowing rates increased substantially in recent years as the country neared default."  Fischel Report ¶ 47.  In 2014, Argentina paid Repsol $5 billion for its expropriated shares with government bonds, including debt with *compound* interest exceeding 8%.[4]  That Argentina stiffed Plaintiffs and dragged out this litigation for nearly a decade is grounds for a more favorable interest rate, not a lower one.

Argentina's tactics are plain.  By presenting the Court with a lowball interest rate—whether from its "administrative law courts" or elsewhere, ECF No. 437, at 62—Argentina hopes to manufacture for itself a (yet larger) windfall.  The Court should decline the invitation.  Argentina has delayed a multi-billion-dollar liability, interest free, for more than a decade.  Even at an 8% simple rate (which is artificially low absent compounding), Argentina will have saved billions of dollars by refusing to comply with the Bylaws and instead forcing Petersen and Eton Park to become its unwilling creditors.  This Court should not exacerbate that injury—or reward Argentina's recalcitrance—by setting the prejudgment interest rate at anything less than 8%.

---

[3] *See* Svea Herbst-Bayliss, *Exclusive:  Mindich's Eton Park cuts fees, creates more liquid share class*, Reuters (Nov. 20, 2013), https://www.reuters.com/article/us-hedgefunds-etonpark-exclusive/exclusive-mindichs-eton-park-cuts-fees-creates-more-liquid-share-class-idUSBRE9AK06220131121.

[4] Argentina financed $3.25 billion at 8.75%; $1.25 billion at 8.28%; and $500 million at 7%.  *See* Ex. J, 2014 Settlement Agreement, Annex IV, Section A.  Argentina also frequently satisfies arbitral awards with bonds carrying interest exceeding 8%.  *See, e.g.*, Resolution of the Ministry of Fin. No. 241-E/2017 (Nov. 29, 2017) (8.75% for "BONAR 2024" bonds; 8.28% for 2033 bonds), https://perma.cc/BSD7-5A36; Resolution of the Ministry of Fin. No. 112-E/2017 (July 17, 2017) (8.75%), https://perma.cc/6XYE-Z38Q; Resolution of the Ministry of Fin. No. 173/2016 (May 13, 2016) (8.75%), https://perma.cc/N8ZG-L5Q6.

Dated: July 14, 2023                    Respectfully submitted,

                                        CLEMENT & MURPHY, PLLC

                                        By:     /s/ Paul D. Clement
                                        Paul D. Clement
                                        C. Harker Rhodes IV*
                                        706 Duke Street
                                        Alexandria, VA 22314
                                        Phone: (202) 742-8900
                                        Fax: (202) 742-8895
                                        Email: paul.clement@clementmurphy.com
                                                harker.rhodes@clementmurphy.com
                                        *Supervised by principals of the firm who are members of the Virginia bar


                                        KELLOGG, HANSEN, TODD, FIGEL
                                           & FREDERICK, P.L.L.C.

                                        Mark C. Hansen
                                        Derek T. Ho
                                        Andrew E. Goldsmith
                                        1615 M Street, N.W., Suite 400
                                        Washington, D.C. 20036
                                        Phone: (202) 326-7900
                                        Fax: (202) 326-7999
                                        Email: mhansen@kellogghansen.com
                                                dho@kellogghansen.com
                                                agoldsmith@kellogghansen.com


                                        KING & SPALDING LLP

                                        Israel Dahan
                                        Laura Harris
                                        1185 Avenue of the Americas
                                        New York, NY 10036
                                        Phone: (212) 556-2114
                                        Fax: (212) 556-2222
                                        Email: idahan@kslaw.com
                                                lharris@kslaw.com

                                                -and-

11

Reginald R. Smith
1100 Louisiana Street
Houston, TX 77002
Phone:  (713) 751-3200
Fax:  (713) 751-3290
Email:  rsmith@kslaw.com

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U., Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*