**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., | Case No.: 1:15-CV-02739 (LAP) |
| Plaintiffs, | |
| v. | |
| ARGENTINE REPUBLIC and YPF S.A., | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., | Case No.: 1:16-CV-08569 (LAP) |
| Plaintiffs, | |
| v. | |
| ARGENTINE REPUBLIC and YPF S.A., | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## ARGENTINA'S POST-TRIAL MEMORANDUM

SULLIVAN & CROMWELL LLP

Robert J. Giuffra, Jr.
Sergio J. Galvis
Amanda F. Davidoff
Thomas C. White
Adam R. Brebner
125 Broad Street
New York, New York  10004-2498
(212) 558-4000

August 4, 2023                    *Counsel for the Argentine Republic*

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ..................................................................................................1

**I.     THE REPUBLIC DID *NOT* ACQUIRE OR EXERCISE CONTROL OF
        REPSOL'S YPF SHARES *BEFORE* MAY 7, 2012**. .....................................................2

     A.     The April 16, 2012 Intervention Decree and *Proposed* YPF Expropriation
               Bill Did Not Give the Republic *Any* Control Over Repsol's YPF Shares. .............. 2

     B.     Plaintiffs Did Not Carry Their Burden of Proving an April 16, 2012
               "Trigger" Date with Their Other Theories. ............................................................. 4

**II.    THE COURT SHOULD REJECT PLAINTIFFS' FLAWED
        APPLICATION OF THE TENDER OFFER FORMULA** ..........................................9

**III.   PLAINTIFFS HAVE NOT PROVEN THEIR ENTITLEMENT TO
        BILLIONS IN PREJUDGMENT INTEREST** ...........................................................12

     A.     Fatally, Plaintiffs Failed to Present *Any* Argentine Experts on Prejudgment
               Interest at Trial. ...................................................................................................... 12

     B.     The Court Should Exercise its Discretion to Award No Prejudgment
               Interest. .................................................................................................................... 13

     C.     At Most, the Interest Rate Should Be 3% Running From the Service Dates ........ 14

**CONCLUSION** ...........................................................................................................................15

## PRELIMINARY STATEMENT

Plaintiffs had two-and-a-half days to try to justify their jaw-dropping request for a $16.05 billion judgment, which would be the largest ever entered in this District's 234-year history.  But Plaintiffs did not carry their burden to prove that (i) the Republic's tender offer obligation was triggered prior to May 7, 2012; and (ii) Argentine law and Section 7 of the YPF Bylaws support their demand for $8.43 billion in damages *and* $7.62 billion in prejudgment interest.

At trial, Plaintiffs' lone Argentine law expert, Prof. Alberto Bianchi, tried to dodge his earlier sworn statements that the *May 7, 2012 YPF Expropriation Law—**not*** the April 16, 2012 Intervention Decree—granted the Republic rights over Repsol's YPF shares and thereby "triggered" the Republic's tender offer obligation.  Plaintiffs also offered a smattering of other theories for the April 16 trigger date not supported by the evidence that they cite, including that the Republic supposedly admitted to controlling Repsol's YPF shares as of April 16 in its 2014 Settlement Agreement with Repsol.

Plaintiffs also could not justify the decision by their damages expert, Prof. Daniel Fischel, to ignore YPF's Q4-2009 earnings data to inflate their damages by $3 billion.  The testimony of the Republic's expert, Prof. Jeffrey Harris—as well as evidence of Bloomberg's standard methodology—demonstrated that the "financial community" would not cherry-pick earnings data as Prof. Fischel did.  And, as to prejudgment interest, Plaintiffs elected to shield *both* of their private law experts—who had opined on prejudgment interest pre-trial—from cross-examination. Based on the evidence at the damages trial, accepting its summary judgment ruling, which the Republic respectfully disagrees with, the Court should award Plaintiffs no more than $4.92 billion, which is an enormous sum by any measure.

I.    **THE REPUBLIC DID *NOT* ACQUIRE OR EXERCISE CONTROL OF REPSOL'S YPF SHARES *BEFORE* MAY 7, 2012.**

The Court has already held that the Republic's "acquisition of control of [Repsol's YPF] *shares*, **not** its intervention in or acquisition of control of *YPF*," triggered the tender offer obligation.  (SJ Op. at 56 (emphasis added).)  The evidence at trial conclusively established that the Republic did not acquire or exercise control of Repsol's YPF shares before May 7, 2012.

A.    **The April 16, 2012 Intervention Decree and *Proposed* YPF Expropriation Bill Did Not Give the Republic *Any* Control Over Repsol's YPF Shares.**

On April 16, 2012, the President of Argentina issued the Intervention Decree, which granted the Intervenor the "powers conferred by YPF S.A. Bylaws to the Board of Directors and/or the President of the company."  (DX-4t.)  Prof. Bianchi agreed that "by its terms, the decree did not confer any powers on the Intervenor over Repsol's YPF shares."  (Tr. 109:15-18.)  Instead, as Prof. Rafael Manóvil explained, the purpose of the intervention was to "ensure the continuity of the company," and to "preserve[] its assets" by giving the Intervenor the *management* of YPF.  (Tr. 259:6-9; *see* Tr. 108:5-10 (Bianchi).)  The Intervenor's managerial powers over YPF as a whole did not give him "control" over Repsol's YPF shares.  (DX-4t (Intervention Decree) at 6; Tr. 258:2-15; 260:6-14; 263:16-24; 266:25-267:3 (Manóvil).)

Also on April 16, the Argentine Executive Branch proposed a bill to declare "fifty-one percent (51%) of the equity of YPF . . . subject to expropriation," and to allow it temporarily to "exercise all of the rights that the shares to be expropriated confer."  (DX-3t at 40.)  But, as Prof. Bianchi conceded, this bill had "no legal force," was "debated" in Congress, and the government "could not have begun the process of expropriating Repsol's YPF shares" until it passed.  (Tr. 105:8-12; 106:22-107:3.)  The Argentine Congress considered other measures—including buying *Petersen's* YPF stake—and could have rejected the bill or passed an alternative.  (DX-80t; *see* Tr. 105:13-16; 106:16-20.)

The distinction between the Intervenor's powers under the Decree (those of the YPF Board, initially for 30 days, and then for another 30 days following the May 11, 2012 extension (DX-22t)) and the powers that the Argentine Congress granted in the YPF Expropriation Law reflect the settled distinction under Argentine law between management and shareholder rights.  As Prof. Manóvil explained (without contradiction), the Board enjoys the power to "administrate . . . meaning to manage the business and the affairs of the company." (Tr. 262:9-13.)  By contrast, the "rights of shareholders" include "voting the shares at shareholders' meetings, selling the shares [and] receiving dividends." (Tr. 260:15-21.)  The Republic "by no means" acquired control of Repsol's YPF shares before May 7, 2012; it could not and did not exercise "any of [those] rights." (Tr. 258:2-4; 261:21-23.)  As Prof. Manóvil also testified, under settled Argentine law, neither (i) the power to administer a company as an intervenor, nor (ii) the power to prevent the exercise of a shareholder's right, is equivalent to control of shares.  (Tr. 260:6-261:7; 263:13-24; 286:8-287:2.)

Prof. Bianchi did not disagree.  He conceded that, between April 16 and May 7, 2012, the Republic *did not* "sell any YPF shares," "vote any dividends," "elect any directors," or "remove any directors."  (Tr. 109:24-110:11; *see* Tr. 261:12-23 (Manóvil).)  Prof. Bianchi also could not explain away his prior testimony—submitted when relying on a later date advanced Plaintiffs' successful effort to overcome the Republic's sovereign immunity[1]—stating unequivocally that it was Article 13 of the YPF Expropriation Law, effective on May 7, 2012, that "triggered the obligation to carry out a tender offer." (Tr. 113:16-114:18; 115:14-116:5; 117:25-119:11; PX-81 at 6-11.)  As Prof. Bianchi conceded, it was only upon the temporary occupation (May 7, 2012) that "the Argentine state replaced Repsol in the exercise of those rights of those shares"—which,

---

[1] Plaintiffs' current theory–that the intervention triggered the tender offer—runs directly counter to their basis for FSIA jurisdiction, that a "post-expropriation tender offer" would not conflict with Argentina's sovereignty.  *Petersen* v. *Argentine Republic*, 895 F.3d 194, 208-209 (2d. Cir. 2018).

"*[u]ntil that moment*" (May 7, 2012) "Repsol had and regarding which it exercised its rights." (Tr. 134:10-135:13; *see* Tr. 129:19-130:10.)

During closing, Plaintiffs' counsel tried to reconcile their trial position with Prof. Bianchi's contradictory testimony by advancing for the first time a "multi-trigger date" theory as follows: "Bianchi [] in an earlier opinion [] said there was a trigger date on May 7.  It's irrelevant.  Of course there was.  There is also probably another trigger date in 2014 when they took ownership of the shares." (Tr. 473:21-24.)  Here, again, Plaintiffs seek to reinvent Argentine law with unsupported theories offered through U.S. counsel.  Bianchi did not advance this "multi-trigger date" theory in any of his reports or trial testimony.  And nothing in YPF's Bylaws contemplates tender offers triggered multiple times, on multiple notice dates, with multiple calculation periods. Under this Court's summary judgment decision, the Bylaws required a tender offer "when the Republic acquired control of the shares."  (SJ Op. at 56.)  The *only* shares in play are Repsol's former 51% interest in YPF—and the Republic could acquire control of those shares only once.[2]

### B.    Plaintiffs Did Not Carry Their Burden of Proving an April 16, 2012 "Trigger" Date with Their Other Theories.

Because the express terms of the Intervention Decree and YPF Expropriation Law make clear that the Republic did not exercise any control over Repsol's YPF shares before May 7, 2012, Plaintiffs fell back at trial on a hodge-podge of theories, none of which aids their position.

*1. The YPF "New Board*."  Prof. Bianchi initially claimed on direct examination that the Republic exercised "indirect control" over Repsol's YPF shares on the date of the Intervention Decree by "removing the board and appointing a new board." (Tr. 77:9-13.)  But no such removal

---

[2] Plaintiffs also speculate that the Republic could have postponed the trigger date indefinitely by issuing "intervention decree after intervention decree."  (Tr. 476:18-477:2.)  That new theory ignores the facts (a single extension) and Argentine law (which would not have allowed this approach).  (*See* Tr. 280:3-281:6 (Manóvil).)

occurred: the Intervenor assumed the *powers* of the YPF board; he did not become the board, which continued to exist and could have challenged the intervention in an Argentine court. (Tr. 263:8-12 (Manóvil).) On cross-examination, Prof. Bianchi conceded that "the board of YPF was not removed until the June 4 shareholder meeting." (Tr. 120:10-12; *see* DX-26t (Minutes) at 22.)

　　　*2. Suspension of YPF Shareholders' Meeting*. Prof. Bianchi opined that the suspension of a YPF shareholders' meeting scheduled for April 25, 2012 amounted to "control of the shareholders rights." (Tr. 81:18-82:1.) But Prof. Manóvil, the only Argentine corporate law expert who testified, explained that legal authorities are "unanimous" that the "veto power, the power to impede some actions" is not "control." (Tr. 286:8-16.) For example, the ability of a minority shareholder to block a resolution would not make that shareholder a controlling shareholder. (Tr. 286:17-287:2.) Prof. Bianchi's contrary opinion, which he did not disclose before trial, is entitled to no weight given his candid acknowledgment that he is not an expert in corporate law. (Tr. 120:17-121:9; 124:4-11.) Moreover, the suspension of the April 2012 YPF shareholders' meeting "*confirm[ed]*" that "*Repsol still had control of its shares*" during the intervention—otherwise there would have been no need to defer the meeting in the first place. (Tr. 263:25-264:6 (Manóvil).)[3]

　　　*3. TTN Appraisal Report and Repsol Settlement Agreement*. During trial, Plaintiffs offered another new theory, namely that a February 17, 2014 preliminary appraisal performed by the Argentine appraisal tribunal or "TTN" (PX-35) proved that the Republic controlled Repsol's later-expropriated shares as of April 16, 2012. (Tr. 446:9-22.) But, as Judge Alejandro Uslenghi explained, the entire TTN appraisal process was carried out in support of the Republic's "global"

---

[3] The Court should reject Plaintiffs' attempt to re-cast the issue of "control" over YPF's shares as a "public law question," when Plaintiffs conceded that "control" depends on "the meaning of the bylaws," a matter of corporate law. (Tr. 534:4-9.) Prof. Manóvil, who wrote a book on the issue, explained that "control" is a matter of company law, not public law. (Tr. 286:13-14.)

February 2014 settlement with Repsol resolving all claims arising out of "the intervention, the occupation, and the expropriation." (Tr. 310:22-311:14); *see also* Tr. 124:19-125:1 (Bianchi); Tr. 304:5-8; 321:16-18 (Uslenghi); PX-36 at AR00019592 (Repsol's release of "any and all claims . . . deriving from, or in connection with, the issuance and implementation of" the Intervention Decree, the YPF Expropriation Law, and other matters). The Settlement Agreement itself expressly states that the Republic obtained rights over Repsol's YPF shares under "Article 13 of Law No. 26741"—the YPF Expropriation Law—and did not "beg[in] to exercise rights conferred by the shares" until the June 4, 2012 YPF shareholders' meeting. (PX-36 at AR00019584-85.) Accordingly, both the preliminary February 17, 2014 TTN report and the final February 25, 2014 report do not "speak of the dispossession resulting from the shares, but rather, the dispossession resulting from the decree," that is, the "dispossession from the administration" of the company. (Tr. 312:8-14 (Uslenghi)); *see also* PX-36 at AR00019663 (referring to "the date of the dispossession resulting from the entry into force and implementation" of the Intervention Decree).

Having no expert to respond to Judge Uslenghi's reasoned analysis of the Repsol settlement and accompanying appraisal,[4] Plaintiffs' U.S. lawyers offered their own. They pointed to the fact that on page 1 of the February 17, 2014 appraisal, the TTN explained that it would value 51% of YPF's shares (dramatically, "*the 'what'*") as of the "Appraisal Date" of April 16, 2012 (dramatically, "*the 'when'*")—and ask the Court to conclude that the "date of takeover" mentioned 20 pages later must be the date of control of the shares. (Tr. 467:21-468:3; *see* PX-35.) But that reading of the preliminary report was supported by no credible testimony, and was contradicted by Judge Uslenghi's testimony, the global settlement, and the final TTN report.

---

[4] Prof. Bianchi could not meaningfully opine on the Settlement Agreement or TTN reports at trial, because his expert reports did not address them. At his deposition, he testified that he had never read the settlement and refused to answer questions about it. (Tr. 121:23-123:13.)

### 4. *Remarks of Argentine Officials at 2014 Settlement Hearing.*

Plaintiffs try to backstop their TTN theory with April 2014 statements about the Repsol settlement by two government officials (Carlos Zannini and Daniel Martín) that the "taking of possession" or "dispossession" occurred on April 16, 2012.  (Tr. 97:16-99:24 (Bianchi); 471:12-472:11 (Pls.' Closing) (referring to PX-39 at 1, 5).)  This is the same theory warmed over: both officials were speaking to Argentine congressional committees *about the global Settlement Agreement with Repsol*, and their statements about "dispossession," refer to dispossession of YPF's management.  (PX-39 at 1, 5.)  Mr. Zannini's statement directly refutes Plaintiffs' theory: he stated that the Repsol settlement "lives in two worlds: that of the Expropriation Law of the Argentine Republic" and Argentina's "Bilateral Investment Treaty with Spain" ("BIT") under which Repsol had "initiated lawsuits at the international level" (PX-39 at 1), including claims based on the Intervention Decree (*See* DX-75t at 2 (Finance Secretariat Memorandum for TTN describing Repsol's BIT claims arising out of the intervention).)

Through Prof. Bianchi, Plaintiffs also argued that Mr. Martín admitted that the Republic took possession of YPF's Repsol shares as of April 16—although Mr. Martín did not actually mention "shares"—because he said that the TTN appraisal was performed under Article 20 of the General Expropriation Law.  Their argument goes as follows: an Article 20 valuation must assess the value of expropriated *property*; the expropriated property here was Repsol's YPF *shares*; therefore, when Mr. Martín said "[t]he appraisal was carried out as of the dispossession date" under Article 20 "which was April 16, 2012," he must have meant that the Republic controlled the *shares* as of April 16.  (Tr. 98:1-16; DLA 15, § 20.)  This new theory is entirely formalistic—it ignores that the settlement was, *in fact*, a global settlement of all claims, including over the intervention. *See supra* pp. 5-6.  In any event, this argument is premised on an apparent error in Mr. Martín's

*oral* statement.  Although Mr. Martín, a non-lawyer, referenced Article 20 when speaking, that was obviously incorrect, as Judge Uslenghi explained: Article 20 applies only to adjudicated expropriations, not to settlements.  (Tr. 324:18-325:13; *see* DLA-15, Art. 18-20.)  The TTN report *signed* by Mr. Martín (and the instructions to the TTN from the Finance Secretariat) referenced only *Article 10* of the General Expropriation Law—which addresses settlement valuations for expropriated "property" *and* "damages."  (PX-35 at 4; DX-75t at 1; *see* DLA-15, Art. 10-16.)  Consistent with Article 10, just as in the TTN reports and Repsol settlement, Mr. Martín's statement referred to dispossession from management as of April 16, not of shares.

    *5. Kicillof Speech*.  Plaintiffs also pluck out of context quotes from a speech given by then-Argentine Secretary of Economic Policy Axel Kicillof to committees of the Argentine Senate on April 17, 2012, in which Mr. Kicillof stated that the government sought to "modify the control" of YPF that "until now belonged to the Repsol group."  (PX-15 at 22.)  But his remarks were about the draft legislation being submitted to the Congress, and explained that the government "aspired to expropriate" Repsol's shares, not that it had done so.  (*Id.* at 6, 22.)  In that same speech, Mr. Kicillof made clear that "until the day Congress decides on the expropriation—if it does so—they [Repsol] are also owners of the company . . . they still have 57 percent of YPF."  (*Id* at 29.)[5]

    *6. The Republic's Answer*.  In argument, Plaintiffs' counsel repeated their theory that the Republic "admi[tted]" occupying Repsol's shares before May 7, 2012. (Tr. 16:3-11.)  But as even Mr. Bianchi acknowledged on redirect, "[n]obody denies and nobody is in conflict" with the fact that the "temporary occupation" of Repsol's YPF shares was carried out through the YPF

---

[5] Plaintiffs also argued that Mr. Kicillof's characterization of the YPF Bylaws' tender offer provision as a "bear trap" amounts to repudiation.  (Tr. 449:23; 481:12-18.)  Not so.  Mr. Kicillof's remarks reflected his view that no tender offer was required.  (PX-37 at 26.)  And even if the Bylaws were a bilateral contract that could be "repudiated"—they are not—Argentine law requires more for repudiation.  (*See* DX-28 at ¶¶ 123, 126; *see also* ECF No. 373 at 25.)

Expropriation Law, which became effective on May 7, 2012.  (Tr. 130:5-10; 118:7-10.)  In any event, the Republic's Answer expressly stated that it was "Law 26,741" that "authorized the commencement of the expropriation process and permitted" the temporary occupation of Repsol's YPF *shares* until the expropriation process was completed in May 2014 (ECF No. 98 at 22).  *See H. Daya Int'l, Co.* v. *Do Denim LLC*, 2022 WL 974382, at *11 (S.D.N.Y. Mar. 31, 2022) ("[J]udicial admissions must be clear and unambiguous admission[s] of fact.") (citation omitted).[6]

## II.  THE COURT SHOULD REJECT PLAINTIFFS' FLAWED APPLICATION OF THE TENDER OFFER FORMULA.

While the Court should find that the Republic did not exercise control over Repsol's YPF shares before May 7, 2012, the economic importance of this issue is magnified by Plaintiffs' misapplication of the tender offer formula.  Plaintiffs contend that they are entitled to *$3.4 billion* more in damages if April 16, 2012, as opposed to May 7, 2012, is the trigger date.  This massive difference is based upon Plaintiffs' incorrect application of the Bylaws' tender offer formula.

As demonstrated at trial, Plaintiffs' damages expert, Prof. Fischel, ignored available earnings data in computing tender offer prices.  Those prices are set as of a "notice date" 40 business days before the tender offer date.  (SJ Op. at 55.)  Based on the Court's summary judgment ruling, under the Bylaws' "Formula D," an acquirer must calculate the tender offer price using the highest daily price/earnings ("P/E") ratio at any point in the two-year period prior to the notice

---

[6] There is no merit to Plaintiffs' theory that the April 16, 2012 drop in YPF's share price meant that the Republic controlled YPF's shares as of that date.  As Prof. Harris explained, markets react to news, which here included the *proposed* YPF Expropriation Bill.  (Tr. 378:3-379:3.)  Likewise, Plaintiffs' assertion that Argentina's experts "never opined in any of their prior reports that there was any significant difference between April 16th and [May] 7" is false.  (Tr. 19:14-18.)  They did just that.  (*E.g.* DX-29 ¶¶ 43-44.)  And Fischel's "precommitment" theory (Tr. 178:11-179:20) (that the Bylaws were to intended to "discourage" future government action), aside from lacking foundation (Tr. 375:2-23 (Harris)), just begs the question of when the Republic first controlled the shares.

date, with the P/E ratio "determined by applying the regular method used by the financial community for computing and reporting purposes."  (DX-1t (YPF Bylaws) § 7.)  Prof. Fischel testified that he calculated P/E ratios for each day in this two-year look-back period by using the prior four quarters of earnings **available** *as of each day in the look-back period*, as opposed to those available **as of the notice date**.  (Tr. 239:7-21.)  As a result, his calculation of damages for the April 16, 2012 notice date incorporates an extremely high P/E ratio for February 22, 2010 by using depressed Q4-2008 earnings instead of rebounded Q4-2009 earnings, reported *only three days later on Feb. 25, 2010*.  (Tr. 205:2-22.)

As Prof. Harris showed, Prof. Fischel's approach of using only earnings available as of February 22, **2010** is not the "regular" method of computation that would be used by the "financial community" for calculating a tender offer price as of February 13, **2012**.  (Tr. 342:20-343:14.)  Rather, the way it's done "in finance[, i]n the textbooks, on Wall Street" is to use the available *most recent* four quarters of earnings to calculate P/E ratios.  (Tr. 370:1-5; *see also* 365:10-366:14; Tr. 234:16-236:5 (Fischel acknowledgement that authorities cited in his report say the same).)  Prof. Harris's testimony was confirmed by the fact that Bloomberg, which all agreed was the gold standard, computes and reports historical P/E ratios in the same way.  (DX-201; *see* Tr. 238:25-239:6 (Fischel).)[7]

In other words, Prof. Harris's method is the way someone *pricing a tender offer for the Republic* would have done it **on February 13, 2012**.  By contrast, Prof. Fischel's method required

---

[7] On Prof. Harris's cross-examination, Plaintiffs displayed screenshots of a Bloomberg "BQL" programming interface that permits users to access "point in time" data.  (Tr. 425:25-427:23.)  No one disputes the availability of historical "point in time" data from various sources.  But, as Prof. Harris explained, a P/E calculation two years later should use the available "most recent" four quarters of data.  (Tr. 341:17-23.)   Moreover, Prof. Fischel was not even aware of the *existence* of the Bloomberg "BQL" functionality when he testified.  (Tr. 148:12-18; 149:9-13; 220:20-22.)

his team of research assistants to construct a complicated—and incomplete—counterfactual as to what YPF earnings information was available as of each date in 2010 (and other years).  (Tr. 210:8-212:19 ("It took work."); PX-2 (Fischel Backup) at Tab "1".)  No one in the financial community would price a tender offer by engaging in such a tortured process, rather than using Bloomberg.

Prof. Fischel also pointed to P/E ratios published *contemporaneously* by the Instituto Argentino de Mercado de Capitales ("IAMC").  (Tr. 220:12-18.)  But Prof. Fischel provided no basis for the Court to conclude that the regular method used by the financial community to calculate P/E ratios from *two years earlier* would be to ignore current data and to rely on old P/E ratios from the IAMC or another source, which he could not testify *any* investment banker would use in pricing a tender offer years after the fact.  (*See* Tr. 222:3-18; 240:14-242:2.)  Plaintiffs' claim that any doubt should be resolved in their favor (Tr. 458:12-19) is also without basis.  The YPF Bylaws require the Formula D P/E ratio calculation to be done using the "regular method" of the "financial community," not the one that produces the highest tender offer price.  (DX 1 at § 7.)

At trial, Plaintiffs tried to suppress Prof. Harris's testimony about his corrections to Prof. Fischel's calculations on disclosure grounds, but the Court correctly overruled those objections.  (Tr. 335:3-343:7.)  As Prof. Harris explained, his report disclosed the exact same tender offer price calculations using "YPF earnings that were available as of the tender offer notice dates" that he presented at trial; and his corrected damages tables (DX-162) merely used those figures to respond to the damages calculations that Prof. Fischel submitted in *July 2023*, after summary judgment.  (Tr. 366:16-371:24; *see also* DX-34 (Harris Report) at p. 37, Fig. 12 & App'x C8 & C9.)

Likewise, the Republic did not waive its challenge to Prof. Fischel's failure to use YPF earnings data available in 2012 by not specifically arguing this point at summary judgment.  In opposing summary judgment, the Republic expressly disagreed with Plaintiffs' calculations (ECF

No. 401 at ¶ 116), and the Court *denied* summary judgment as to damages.  (SJ Op. at 63.)  "A party need not raise on summary judgment every argument it intends to advance at trial."  *U.S. Bank Nat. Ass'n* v. *PHL Variable Ins. Co.*, 2015 WL 4610894, at *2 (S.D.N.Y. July 30, 2015).  That the Republic "chose not to advance [one particular] theory" in its "opposition . . . means nothing other than that the argument is reserved for trial."  *Id.*; *see*, *e.g.*, *Scott* v. *City of New York*, 604 F. Supp. 2d 602, 604 n.2 (S.D.N.Y. 2009) (permitting revised damages method after liability finding).  In any event, it is Plaintiffs' burden to prove damages, and the Republic was entitled to challenge Prof. Fischel's flawed methodology, including just through cross-examination.

## III.   PLAINTIFFS HAVE NOT PROVEN THEIR ENTITLEMENT TO BILLIONS IN PREJUDGMENT INTEREST.

### A.   Fatally, Plaintiffs Failed to Present *Any* Argentine Experts on Prejudgment Interest at Trial.

Plaintiffs did not come close to carrying their burden of establishing their entitlement to *any* prejudgment interest, let alone the nearly $8 billion that they seek.  Plaintiffs elected not to subject their Argentine private law experts, who had previously offered opinions about prejudgment interest, to cross-examination.[8]  Instead, Plaintiffs tried to sneak those opinions in through their public law expert, but this Court rightly excluded that testimony because there had been "nothing about prejudgment interest" in Prof. Bianchi's Rule 26 disclosures. (Tr. 102:8-12.)

Plaintiffs thus introduced no competent evidence at trial—none—about how an Argentine commercial court would apply prejudgment interest on the facts of this case, much less at the "top end" of the range that Plaintiffs demand (Tr. 449.)  Plaintiffs' suggestion that they would "stick" some cases in their post-trial brief (Tr. 477:20-478:2) does not remedy their failure to offer a

---

[8] Plaintiffs' reticence is unsurprising; Prof. Garro misstated his credentials (Dep. Tr. 20:3-21:7), and Prof. Rovira dissembled under oath about his plagiarism problems.  (Dep. Tr. 33:21-37:1.)

witness on this issue.[9]  As Judge Berman recognized in *Biocon Ltd*. v. *Abraxis Bioscience, Inc.*, 2016 WL 5817002, at *7 (S.D.N.Y. Sept. 26, 2016), citation of foreign law "without more is insufficient; there need[s] to be expert testimony as to the law's interpretation." *See also Dist. Att'y of New York Cnty.* v. *Republic of the Philippines*, 307 F. Supp. 3d 171, 192 (S.D.N.Y. 2018) (faulting the parties for failing to provide expert testimony on foreign legal questions).  Plaintiffs cannot pluck a group of Argentine cases out of context and ask the Court to infer that an Argentine court would apply a similar rate on the facts of this case.  Likewise, the absence of evidence from Plaintiffs cannot outweigh the Court's "respectful consideration" owed the Republic's position on its own law.  *Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co., Ltd.*, 138 S. Ct. 1869, 1874 (2018).  For this reason alone, the Court should award no prejudgment interest.

> **B.     The Court Should Exercise its Discretion to Award No Prejudgment Interest.**

Prof. Manóvil, the only trial witness to offer competent evidence on prejudgment interest under Argentine law, explained that it is entirely a matter for the Court's discretion, "tak[ing] into account several factors" including the "nature of the obligation," "situation," "who the parties are," "what has been the dispute"—in other words what would be "equitable."  (Tr. 268:8-22; *see* DLA-29 (Arg. Civil Code) § 622.)  And Argentine commercial courts can and have declined to award any prejudgment interest in exercising their discretion.[10]  Here, all of the "equitable" factors identified by Prof. Manóvil weigh in favor of no prejudgment interest.

---

[9] The only testimony from Plaintiffs on prejudgment interest was Prof. Fischel's "forced loan" theory—though he had no opinion on the applicable rate under Argentine law.  (Tr. 174:13-175:22; 196:4-8.)  Notably, U.S. courts have rejected that theory, including because it "overcompensates creditors." *Till* v. *SCS Credit Corp.*, 541 U.S. 465, 477 (2004); *In re Dingley*, 189 B.R. 264, 268 (Bankr. N.D.N.Y. 1995) ("coerced loan theory is based upon fictional premises").

[10] DLA-22 (*Bovero Nilda María* v. *Poder Ejecutivo Nacional y otro*, at 6-7; *see also Montenegro Alejandro Fabián y otros* v. *Siembra Seguros de Retiro S.A*., Fed. Court of Appeals in Civil & Comm. Matters (March 11, 2015) at 20; *Avila Benita Antonia* v. *Orígenes Seguros de Retiro S.A.*, Fed. Court of Appeals in Civil & Comm. Matters (December 30, 2016) at 13-14.

*First*, Formula D of the YPF Bylaws results in enormous premiums over typical tender offer prices and extremely high damages for reasons having nothing to do with events of 2012, but instead because the 2008-09 financial crisis depressed YPF's historical earnings.  (Tr. 354:6-355:13; 357:22-358:20.)  Even using Prof. Harris's corrected computation, a tender offer at nearly $60 per share would be a 300% premium over YPF's share price and result in damages of $4.92 billion—close to the current entire ADR market cap of YPF.  (Tr. 355:16-24; 358:15-20.)[11]

*Second*, as to the "parties," the primary beneficiary of this litigation will be Burford, which invested just €15.1 million in Petersen's claims for a 70% interest in the return (and holds a 75% in Eton Park's return).  (DX-44; DX-195.)  Plaintiffs' requested damages would further burden a sovereign nation with a populace enduring pressing economic challenges and would far exceed Argentina's budget for many critical services.  (*See* DX-148t; DX-149t; DX-150t; DX-178.)

*Third*, this "situation" counsels against awarding prejudgment interest.  Plaintiff Petersen purchased its YPF shares through overleveraged transactions and joined with Repsol in a disastrous 118% dividend policy to pay back its loans to Repsol and banks.  (*See* DX-163.)  Repsol and Petersen's policies led to a 41% decline in YPF's oil production and a 66% reduction of its oil reserves.  (DX-91; DX-92.)  The elected government of Argentina in 2012 made the sovereign decision to intervene in YPF and submit to Congress a bill proposing to expropriate Repsol's 51% of YPF shares to address the impact of Repsol and Petersen's policies on the country.

### C.    At Most, the Interest Rate Should Be 3% Running From the Service Dates.

As Prof. Manóvil explained, if any interest is awarded, a strong line of reasoned Argentine

---

[11] Plaintiffs are wrong in claiming a right to a large interest award because "Kicillof estimated [Argentina's] liability at $19 billion." (Tr. 449:24-25.)  Kicillof did not "estimate" liability; he referred to a demand from Repsol.  (PX-15 at 25.)  He was also clear that he was discussing "one hundred percent" of YPF.  *Id.*  Damages to Plaintiffs based on 28% of $19 billion would be around $3.85 billion after netting the value of the shares, much less than Plaintiffs' *lowest* damages figure.

commercial court decisions supports a rate of approximately 3%.  That rate, the average borrowing rate paid by the Banco de la Nación Argentina ("BNA") for its 30-day fixed term deposits in dollars plus an additional 2%, has been applied in "many cases" by the National Court of Appeals for Commercial Matters to approximate a hypothetical U.S. dollar bank lending rate.  (Tr. 269:7-270:15; DLA-8; DLA-9; DLA-10; DLA-11; DLA-12; DLA-13.)[12]  Plaintiffs' counsel argued that the rate should be ignored because there is no recent "benchmark" for "commercial loans in Argentina in hard currencies." (Tr. 448:20-22.)  But that is the point.  As Prof. Manóvil explained, these decisions grappled with that issue and resolved to use the borrowing rate (~1%) plus 2% (the estimated spread between lending and borrowing rates).  (Tr. 269:20-25.)

Finally, any interest should accrue only from the service of Plaintiffs' Complaints.  Prof. Manóvil offered the unrebutted opinion that, under Argentine law, interest accrues from the date of a "formal request," here, the date of service of the initial Complaints.  (Tr. 267:6-268:5.)  Again, Plaintiffs offered no contrary testimony, and no support for counsel's argument that a different rule applies because the Republic supposedly repudiated the Bylaws or Repsol filed a class action.  Because the summary judgment motions did not address when prejudgment interest would start to run, the Court must decide that issue in entering its judgment.  *Oneida Indian Nation of N.Y.* v. *Cnty. of Oneida*, 214 F.R.D. 83, 94-95 (N.D.N.Y. 2003) (accrual date not waived; party "had almost no incentive to raise" it before liability finding).

## CONCLUSION

The Court should (i) find that the Republic controlled Repsol's shares no earlier than May 7, 2012, (ii) reject Plaintiffs' flawed damages calculations, and (iii) award no prejudment interest.

---

[12] Prof. Manóvil also testified, without contradiction, that the other commercial court in Argentina applies a 4% prejudgment interest rate.  (Tr. 270:16-22; *see also* DLA-20; DLA-21; DLA-22.)

Respectfully,

Dated:  August 4, 2023                       /s/ *Robert J. Giuffra, Jr.*
                                             Robert J. Giuffra, Jr.
                                             Sergio J. Galvis
                                             Amanda F. Davidoff
                                             Thomas C. White
                                             Adam R. Brebner

                                             SULLIVAN & CROMWELL LLP
                                             125 Broad Street
                                             New York, New York  10004-2498
                                             Telephone:     (212) 558-4000
                                             Facsimile:     (212) 558-3588

                                             *Counsel for the Argentine Republic*

-16-