**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., <br><br> Plaintiffs, <br><br> - against - <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br> Defendants. | No. 15 Civ. 2739 (LAP) |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., <br><br> Plaintiffs, <br><br> - against - <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br> Defendants. | No. 16 Civ. 8569 (LAP) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR INJUNCTION AND TURNOVER**

KING & SPALDING LLP

Randy M. Mastro
Reginald R. Smith
Laura Harris
Thomas C.C. Childs

CLEMENT & MURPHY, PLLC

Paul D. Clement
C. Harker Rhodes, IV

KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U.,*
*Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ...........................................................**Error! Bookmark not defined.**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ...................................................................................................4

    I.    Argentina's IPO of Its YPF Shares .........................................................4

    II.    Argentina's Control Over YPF's Capital-Raising Activities Since April 2012.......................................................................................................................6

    III.    YPF's Continued Raising of Equity and Debt Capital in the United States Since Its Renationalization .......................................................................7

ARGUMENT .........................................................................................................................8

    I.    Argentina's YPF Shares Are Not Immune from Execution Under the FSIA..........8

        A.    Argentina's YPF Shares Are Not Immune from Execution by Virtue of Being in Argentina .......................................................8

        B.    Argentina Uses Its Majority YPF Shares for a Commercial Activity in the United States.................................................9

        C.    Argentina Used Its YPF Shares for the Commercial Activity Upon Which Plaintiffs' Claim Is Based .............................................14

    II.    The Court Should Order the Turnover of Argentina's YPF Shares to Plaintiffs......................................................................................................16

        A.    New York Law Entitles Plaintiffs to the Court's Assistance in Reaching Argentina's YPF Shares..............................................18

        B.    The Court Should Order Argentina to Transfer Its Ownership Interests in Its YPF Shares to Plaintiffs Through a Global Custody Account at BNYM in New York .............................................19

CONCLUSION....................................................................................................................20

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 650 Fifth Ave. Co.*,
No. 08 Civ. 10934, 2014 WL 1284494 (S.D.N.Y. Mar. 28, 2014) ...................................10, 11

*Bainbridge Fund Ltd. v. Republic of Argentina*,
No. 16 Civ. 8605 (LAP), 2023 WL 5747299 (S.D.N.Y. Sept. 6, 2023)...........................2, 8, 9

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela ("Crystallex I")*,
333 F. Supp. 3d 380 (D. Del. 2018), *aff'd*, 932 F.3d 126 (3d Cir. 2019) ...............................10

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela ("Crystallex II")*,
932 F.3d 126 (3d Cir. 2019)..................................................................................................10

*De Letelier v. Republic of Chile*,
748 F.2d 790 (2d Cir. 1984)..................................................................................................14

*EM Ltd. v. Republic of Argentina*,
389 F. App'x 38 (2d Cir. 2010) ............................................................................................14

*Export-Import Bank of the Republic of China v. Grenada ("Ex-Im Bank")*,
768 F.3d 75 (2d Cir. 2014)................................................................................................9, 10

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
905 F.2d 438 (D.C. Cir. 1990) ..............................................................................................10

*Friedman v. Gov't of Abu Dhabi, United Arab Emirates*,
464 F. Supp. 3d 52 (D.D.C. 2020) ........................................................................................14

*Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V.*,
41 A.D.3d 25 (N.Y. App. Div. 1st Dep't 2007)................................................................17, 20

*Inter-Reg'l Fin. Grp., Inc. v. Hashemi*,
562 F.2d 152 (2d Cir. 1977)...........................................................................................17, 19

*JPMorgan Chase Bank, N.A. v. Herman*,
168 A.3d 514 (Conn. App. Ct. 2017).....................................................................................20

*Kirschenbaum v. 650 Fifth Ave. Co.*,
830 F.3d 107 (2d Cir. 2016)..................................................................................................11

*Koehler v. Bank of Bermuda Ltd.*,
12 N.Y.3d 533 (2009) ...........................................................................................................17

ii

*Ministry of Supply, Cairo v. Universe Tankships, Inc.,*
    708 F.2d 80 (2d Cir. 1983)............................................................................14

*NML Cap., Ltd. v. Republic of Argentina,*
    699 F.3d 246 (2d Cir. 2012)..........................................................................17

*Petersen Energía Inversora S.A.U. v. Argentine Republic ("Petersen I"),*
    895 F.3d 194 (2d Cir. 2018)...........................................................3, 5, 14, 15

*Petersen Energía Inversora, S.A.U. v. Argentine Republic ("Petersen II"),*
    2023 WL 2746022 (S.D.N.Y. Mar. 31, 2023) .........................................4, 6, 15, 16

*Petersen Energía Inversora, S.A.U. v. Argentine Republic ("Petersen III"),*
    2023 WL 5827596 (S.D.N.Y. Sept. 8, 2023)...........................................6, 16

*Peterson v. Islamic Republic of Iran,*
    876 F.3d 63 (2d Cir. 2017), *vacated on other grounds sub nom. Clearstream*
    *Banking S.A. v. Peterson,* 140 S. Ct. 813 (2020) ...........................................8

*Republic of Argentina v. Weltover, Inc.,*
    504 U.S. 607 (1992)......................................................................................14

*Shapiro v. Republic of Bolivia,*
    930 F.2d 1013 (2d Cir. 1991)......................................................................14

**Statutes**

28 U.S.C. § 1603(e) ........................................................................................14

28 U.S.C. § 1610(a) ................................................................................ *passim*

28 U.S.C. § 1610(a)(2).........................................................................2, 8, 9, 14

Securities Act of 1933 Act.........................................................................5, 7

Securities Act of 1934 Act.........................................................................5, 7

Foreign Sovereign Immunities Act ....................................................... *passim*

NY UCC § 8-102(7).....................................................................................18, 20

NY UCC § 8-102(17)...................................................................................18, 20

NY UCC § 8-102(18)...................................................................................18

NY UCC § 8-112 ........................................................................................18, 20

NY UCC § 8-112(b)....................................................................................18

NY UCC § 8-112(e)..............................................................................................18, 19

NY UCC § 8-317(2).................................................................................................18

**Other Authorities**

CPLR § 5225.............................................................................................................8

CPLR § 5201(c)(4)..................................................................................................18

CPLR § 5225...........................................................................................................16

CPLR § 5225(c)........................................................................................16, 17, 19, 20

Fed. R. Civ. P. 69(a)(1)............................................................................................16

Rule 144A..................................................................................................................8

# INTRODUCTION

Plaintiffs request that the Court order Argentina to turn over its 51% shareholding in YPF S.A., in partial satisfaction of the Court's judgment in these actions.

This motion is straightforward legally. There is no dispute that the Argentine Federal Government owns 51% of YPF's Class D shares—it reiterates that at every YPF shareholders meeting.[1] This Court already has held that it has the authority under New York law to order Argentina to bring its extraterritorial property into the United States, if the property would not be immune from execution under the FSIA afterward. Argentina's YPF shares plainly would not be immune: they are the paradigm of an asset used for a commercial activity (as this Court and the Second Circuit already have held), and Argentina clearly both (i) used the YPF shares for the commercial activity upon which Plaintiffs' claim is based and (ii) has used and continues to use them for commercial activity in the United States.

It also is straightforward procedurally. The Court simply needs to order Argentina to (i) transfer its Class D shares of YPF into a global custody account at The Bank of New York Mellon ("BNYM") in New York and (ii) instruct BNYM to turn over the shares to Plaintiffs or their designees. There is ample legal precedent for such orders in favor of judgment-creditors.

Plaintiffs have a long road ahead with respect to the complete enforcement of this Court's judgment against Argentina if forced to do so through compulsory process, given Argentina's many years of structuring its assets to avoid enforcement. Argentina's Class D shares of YPF, however, are unique in their ease of access, and Plaintiffs seek the Court's assistance as to this

---

[1] According to YPF's latest annual report on Form 20-F, Argentina owns 200,589,525 Class D shares of YPF, representing 51.000% of YPF's total share capital. YPF Form 20-F for 2022, at 98 (Mastro Ex. 1). In addition, Argentina owns 3,764 Class A shares of YPF. *Id.* Plaintiffs seek turnover of Argentina's Class D shares only.

starting point, which ideally will facilitate a commercial discussion about the resolution of the Court's judgment which thus far has been lacking.[2] Indeed, it seems clear from other pending matters that the only way to get Argentina to engage is to leave it no choice but to do so through judicial action; for example, Argentina has recently posted a $337 million bond pending appeal in a case in London after exhausting all options to avoid coming to the table.[3]

As with much of this case, the material facts are not subject to dispute. Argentina holds 51% of YPF's Class D shares in book-entry form in an account at Caja de Valores, S.A., Argentina's central securities depository (its equivalent of the U.S.'s Depository Trust Company ("DTC")). In *Bainbridge Fund Ltd. v. Republic of Argentina*, No. 16 Civ. 8605 (LAP), 2023 WL 5747299 (S.D.N.Y. Sept. 6, 2023), this Court held that the Foreign Sovereign Immunities Act ("FSIA") "does not supersede" its authority under New York law to order a foreign state to turn over an extraterritorial asset in full or partial satisfaction of a federal judgment. *Id.* at *3. The Court concluded that the "prudent" course was "to evaluate whether the assets are subject to execution immunity before ordering that they be brought to the United States." *Id.* at *4.

Thus, Plaintiffs' motion presents the Court with only two legal questions: (1) whether Argentina's Class D shares of YPF are "used for a commercial activity in the United States," 28 U.S.C. § 1610(a); and (2) whether the shares "[are] or [were] used for the commercial activity upon which the claim is based," *id.* § 1610(a)(2). The answer to each question is yes.

---

[2]    Instead, Argentina is up to its old tricks notwithstanding the promising rhetoric of its new President. For example, Argentina has refused even basic professional courtesies such as accepting service of process in proceedings seeking recognition and enforcement of this Court's judgment in England, forcing the use of multi-month Hague Convention service. *See* Letter dated Feb. 8, 2024 from Quillon Law LLP to Sullivan & Cromwell LLP (Mastro Ex. 2); Letter dated Feb. 16, 2024 from Sullivan & Cromwell LLP to Quillon Law LLP (Mastro Ex. 3).

[3]    Charles Newberry, *Argentina ready to appeal in GDP warrants case*, LatinFinance (Mar. 26, 2024) (Mastro Ex. 4).

First, Argentina uses its YPF shares to direct substantial commercial activity in the United States. Argentina has run YPF as its controlling shareholder since 2012, which is of course precisely what Argentina intended to achieve when it expropriated 51% of YPF's Class D shares from Repsol S.A. By virtue of its majority position, Argentina appoints YPF's Chairman and a majority of the members of its Board of Directors and exercises control over YPF's major corporate actions. Argentina has "used" that control to direct numerous capital-raising activities in the United States. Among others, Argentina has used its majority shares to cause YPF to: (1) solicit U.S. investment in its Class D shares through repeated filings with the U.S. Securities and Exchange Commission ("SEC"); (2) maintain an SEC-registered American Depositary Receipt ("ADR") program so the shares can trade on the New York Stock Exchange ("NYSE"); and (3) issue billions of dollars in debt securities to U.S. investors. Each of these activities alone—and certainly the entire course of conduct—is of far greater commercial significance than the commercial activities previously found sufficient by the Second Circuit in FSIA cases.

Second, Argentina's Class D shares of YPF were used for the commercial activity on which Plaintiffs' claim is based. The Second Circuit already has identified "[t]he gravamen of [Plaintiffs'] claim": "Argentina denied [Plaintiffs] the benefit of the bargain promised by YPF's bylaws when Argentina repudiated its obligation to tender for [Plaintiffs'] shares." *Petersen Energía Inversora S.A.U. v. Argentine Republic ("Petersen I")*, 895 F.3d 194, 207 (2d Cir. 2018). Argentina "used" its controlling position in YPF both to make and breach its promise. As to formation, the evidence is beyond dispute: In 1993, Argentina acted "in its capacity as shareholder of [YPF]" to amend the company's Bylaws to include the tender-offer provision. ECF No. 363-73 (Decree 1106/93) at 3. As to breach, the Court's findings of fact are equally dispositive: On April 16, 2012, Argentina arrogated to itself Repsol's right to "use its shares to govern the

3

company," "direct corporate policy," or "otherwise exercise all the considerable powers of a majority shareholder." ECF No. 493 at 3. Having acquired control of Repsol's Class D shares, Argentina then breached the tender offer obligation, stranding Plaintiffs as minority shareholders. Argentina clearly used its control of the Repsol shares to effectuate the breach because that control ensured that the Bylaws' tender-offer obligation would never be enforced. The connection between Argentina's YPF shares and this case is inescapable.

At bottom, this motion rests on simple propositions. Like any controlling shareholder, Argentina uses its shares to direct YPF's major corporate actions. It did so years ago to make and break its contract with Plaintiffs. And it does so today to direct substantial capital-raising activities in the United States. The Court should grant Plaintiffs' motion and order turnover of Argentina's Class D shares of YPF.

## FACTUAL BACKGROUND[4]

### I.  Argentina's IPO of Its YPF Shares

In the early 1990s, Argentina decided to privatize YPF through a worldwide IPO of its shares. *See Petersen Energía Inversora, S.A.U. v. Argentine Republic ("Petersen II")*, 2023 WL 2746022, at *2 (S.D.N.Y. Mar. 31, 2023). Argentina first transformed YPF into a corporation *(sociedad anónima)* and then amended YPF's Bylaws by voting its shares at a YPF shareholder meeting. *See id.* Following these changes, Argentina specifically targeted its IPO at U.S. investors. *See* Second Expert Report of Nancy C. Lissemore ("Lissemore 2") ¶¶ 21-22; Fourth Expert Report of John C. Coffee, Jr. ("Coffee 4"), ¶¶ 7-10. Argentina sponsored an ADR program for YPF's Class D shares with BNYM as the depositary bank, and it registered both YPF's Class D shares

---

[4]    Given the Court's familiarity with this case we set out only briefly here the key relevant facts for this motion, and later elaborate on their consequence as needed (such as the operation of the ADR program).

and its American Depositary Shares ("ADSs") representing interests in those shares with the SEC. Lissemore 2 ¶¶ 23-25. Argentina could offer YPF shares to U.S. investors on the NYSE only with an SEC-registered ADR program. *Id.* ¶ 22.

Argentina's decision to target the U.S. ADR market was instrumental to the IPO's success worldwide. ADR programs provide foreign issuers with "increased access to U.S. investors, which may increase share liquidity and help stabilize the price for existing shares, as well as facilitate future capital increases." Guide to Public ADR Offerings in the United States, at 35 (Lissemore Ex. 3); *see also* Lissemore 2 ¶ 16. In other words, the U.S. ADR program benefitted *all* Class D shareholders because having U.S. trading improved liquidity and benefitted the share price.

As described in further detail in the accompanying Lissemore report, a foreign issuer must engage repeatedly with U.S. securities markets and regulators when making an IPO in the United States. *See* Lissemore 2 ¶¶ 11-13. The issuer often establishes (as YPF did here) a "Level 3" ADR program to make a public offering of shares in the United States listed on a U.S. exchange, which includes required registrations and disclosures under both the Securities Act of 1933 (the "1933 Act") and the Securities Exchange Act of 1934 (the "1934 Act"). *See id.* ¶¶ 14, 21.

In May and June 1993, Argentina and YPF registered YPF's Class D shares and corresponding ADSs under both the 1933 Act and the 1934 Act. *Id.* ¶¶ 21-25 . The registration of the Class D shares and ADSs ensured that <u>any</u> holder of a Class D share could exchange that share for an ADS, and that YPF could issue additional ADSs as the need arose. *See id.* ¶ 18. On June 28, 1993, YPF's ADRs began trading on the NYSE. YPF Form 20-F for 1993, at 33 (Mastro Ex. 5). Argentina "raised billions of dollars in investment capital" through the sale of its YPF shares, with "the largest share (more than $1.1 billion in total) coming from the sale of ADRs in the United States on the NYSE." *Petersen I*, 895 F.3d at 200.

## II.    Argentina's Control Over YPF's Capital-Raising Activities Since April 2012

On April 16, 2012, Argentina issued Decree 530/2012 seizing control of 51% of YPF's Class D shares from Repsol. *Petersen II*, 2023 WL 2746022, at *3. The Court has found that Argentina "exercised indirect control over Repsol's shares on April 16, 2012," *Petersen Energía Inversora, S.A.U. v. Argentine Republic ("Petersen III")*, 2023 WL 5827596, at *1 (S.D.N.Y. Sept. 8, 2023), and that Argentina breached Sections 7 and 28 of the YPF Bylaws because it never made a tender offer for Plaintiffs' shares. *Petersen II*, 2023 WL 2746022, at *8-*11.

On May 3, 2012, the Argentine Legislature enacted Law 26,741 (the "YPF Expropriation Law"), which became effective on May 7, 2012, *id.* at *3, and "was intended to escape the obligation to pay the tender offer," *Petersen III*, 2023 WL 5827596, at *4. To this day, the law provides that YPF (and an affiliate) "shall continue to operate as publicly traded corporations." ECF No. 363-72 (YPF Expropriation Law), Art. 15.

Since the renationalization in April 2012, Argentina has controlled YPF's major business and financial decisions through its majority shareholding in the company. As disclosed in YPF's Form 20-F for the year ended December 31, 2013:

> The Argentine federal government controls the Company, and consequently, the federal government is able to determine substantially all matters requiring approval by a majority of our shareholders, including the election of a majority of our directors, and is able to direct our operations.

YPF Form 20-F for 2013, at 10 (Mastro Ex. 6). YPF's Form 20-F for 2013 also explains that "[t]he Argentine federal government will control the Company according to domestic energy policies in accordance with Law 26,741 (the 'Expropriation Law')." *Id.*

As controlling shareholder, the Argentine government appoints a majority of the members

of YPF's Board of Directors and its senior management.[5] In January 2021, for example, Argentine President Alberto Fernández appointed Pablo González, then the Vice Governor of Argentina's Santa Cruz Province, as the Chairman of YPF's Board of Directors.[6] Similarly, in November 2023, then President-elect Javier Milei picked Horacio Marín to serve as YPF's CEO, with a mandate to increase YPF's share price in the run-up to the Argentine government's sale of its YPF shares.[7] On February 6, 2024, YPF's new management announced a plan to quadruple the company's market value in the next four years.[8]

## III. YPF's Continued Raising of Equity and Debt Capital in the United States Since Its Renationalization

Since Argentina's renationalization of YPF, YPF has continued to: (i) sponsor the ADR program for its Class D shares with BNYM; (ii) list the shares on the NYSE; (iii) maintain the registration of its Class D shares and ADSs with the SEC; and (iv) file the forms required by the 1934 Act. *See* Lissemore 2 ¶¶ 27-29; Coffee 4 ¶ 11. In 2023 alone, for example, YPF filed 47 Form 6-Ks updating the American marketplace on various corporate developments. Lissemore 2 ¶ 27.

In March 2022, YPF expanded its ADR program by filing a Form F-6 registration statement for 100 million additional ADSs under the 1933 Act, resulting in a total of 600 million ADSs registered under the 1933 Act. Form F-6, March 1, 2022, at 1 (Lissemore Ex. 9). This filing demonstrates YPF's continuing commitment to the ADR program. Lissemore 2 ¶ 29.

---

[5]    At YPF's most recent annual shareholder meeting (held on April 28, 2023), Argentina used its YPF shares to appoint <u>all</u> 12 members of YPF's Board of Directors. *See* Coffee 4 ¶¶ 24-25; Minutes of YPF's April 28, 2023 Shareholder Meeting, at 23-25 (Mastro Ex. 7).

[6]    Alfredo Zaiat, *YPF: sale Guillermo Nielsen y entra Pablo González,* Página 12 (January 21, 2021) (Mastro Ex. 8).

[7]    *See* Coffee 4 ¶ 27; Charles Newberry, *Argentina president-elect picks Horacio Marín to run YPF in run-up to selling state shares*, S&P Global Insights (Nov. 24, 2023) (Mastro Ex. 9).

[8]    Candelaria Grimberg, *Argentina's YPF seeks to multiply value on Vaca Muerta output surge*, Reuters (Feb. 6, 2024) (Mastro Ex. 10).

YPF also continues to tap the debt capital markets in the United States. *See* Coffee 4 ¶¶ 12-18. On January 5, 2024, for example, YPF launched a successful global offering of $800 million in bonds. Coffee 4 ¶¶ 12-13; Cleary Gottlieb Press Release (Mastro Ex. 11). YPF sold $220.5 million of these bonds to U.S. institutional investors under SEC Rule 144A. Coffee 4 ¶ 13; Luxembourg Stock Exchange Website (Mastro Ex. 12).

## ARGUMENT

### I. Argentina's YPF Shares Are Not Immune from Execution Under the FSIA

Section 1610(a) of the FSIA provides that "[t]he property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune" from attachment or execution in seven enumerated circumstances, including when "the property is or was used for the commercial activity upon which the claim is based." 28 U.S.C. § 1610(a)(2). To be amenable to execution under this section, property of a foreign state must satisfy three requirements: (1) it must be "in the United States"; (2) it must be "used for a commercial activity in the United States"; and (3) it must be (or have been) "used for the commercial activity upon which the claim is based." As explained below, Argentina's YPF shares satisfy the second and third of these requirements, and the first requirement will be satisfied if the Court exercises its authority under New York law to order Argentina to transfer the shares to an account in New York for turnover to Plaintiffs.

### A. Argentina's YPF Shares Are Not Immune from Execution by Virtue of Being in Argentina

In *Bainbridge*, this Court held that a foreign state's property is not immune from execution under the FSIA "by virtue of being outside the United States." 2023 WL 5747299, at *3. The Court concluded that the FSIA "does not supersede CPLR 5225 and prevent the Court from ordering [Argentina], a judgment debtor over which it has personal jurisdiction, to bring assets from outside of New York into New York to pay Bainbridge." *Id; see also Peterson v. Islamic Republic of Iran*,

8

876 F.3d 63, 92 (2d Cir. 2017), *vacated on other grounds sub nom. Clearstream Banking S.A. v. Peterson*, 140 S. Ct. 813 (2020). If the Court orders Argentina to deliver its Class D shares of YPF to the United States by transferring them to a global custody account in New York, as it has the clear authority to do (see Part II.A below), those shares would qualify as property of Argentina "in the United States" under Section 1610(a).

The Court determined in *Bainbridge* that the "prudent" course was "to evaluate whether the assets are [otherwise] subject to execution immunity <u>before</u> ordering that they be brought to the United States." 2023 WL 5747299, at *4 (emphasis added). Under this procedural framework, the Court may exercise its authority under New York law to order Argentina to bring its Class D shares of YPF into the United States if the shares would not be immune from execution afterward. Thus, this motion turns on the remaining two elements of § 1610(a)(2): whether the shares are "used for a commercial activity in the United States," *see* Part I.B, and whether the shares "[are] or [were] used for the commercial activity upon which [Plaintiffs'] claim is based," *see* Part I.C.

B.    **Argentina Uses Its Majority YPF Shares for a Commercial Activity in the United States**

Argentina has been YPF's controlling shareholder for over a decade. During that time, it repeatedly and "actively" has "utilize[d]" its majority shareholding "in service of [YPF's] commercial activity" in the United States. *Export-Import Bank of the Republic of China v. Grenada ("Ex-Im Bank")*, 768 F.3d 75, 90 (2d Cir. 2014) (internal citations omitted). Among many examples, Argentina has caused YPF to: (1) solicit U.S. investment in its Class D shares via repeated SEC filings; (2) maintain an SEC-registered ADR program with BNYM so YPF shares can trade on the NYSE; and (3) issue billions of dollars in debt securities to U.S. investors. Argentina has used its majority shares for these commercial activities by appointing a majority of YPF's Board of Directors, directing the activities of that board as controlling shareholder,

approving YPF's debt issuances, and directly appointing YPF's CEO. In these ways (among others), Argentina has "put into service, availed or employed" its Class D shares of YPF "in service of" YPF's substantial commercial activity in the United States. *Id.* at 90 (cleaned up).

Courts repeatedly have held that foreign sovereigns "use" their majority shares for commercial activity when they exercise the powers of a controlling shareholder. Most recently, in *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela ("Crystallex II")*, 932 F.3d 126 (3d Cir. 2019), the Third Circuit affirmed attachment of Venezuela's controlling shares in PDV Holding, Inc. ("PDVH"), the holding company for CITGO. The Court observed that PDVSA (Venezuela's state oil company and its alter ego) used its shares "to run its business as an owner, to appoint directors, approve contracts, and to pledge PDVH's debts for its own short-term debt." *Id.* at 151. Similarly, in *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990), the D.C. Circuit held that Iran engaged in commercial activity when it "used its majority position" in a dairy company "to lock Foremost out of the management of the company and deny Foremost its share of the company's earnings." *Id.* at 450.

When a foreign sovereign uses its controlling shares to direct a company's commercial activity in the United States, the sovereign's shares are "used for" that activity within the meaning of Section 1610(a). *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela ("Crystallex I")*, 333 F. Supp. 3d 380, 417-420 (D. Del. 2018), *aff'd*, 932 F.3d 126 (3d Cir. 2019). In *Crystallex I*, then-District Judge Leonard Stark held that PDVSA used its controlling shares in PDVH for a commercial activity in the United States by, *inter alia*, "running large-scale gas refining and marketing operations in the United States; and directing PDVH (and its subsidiaries) to enter into related-party transactions for PDVSA's benefit." 333 F. Supp. 3d at 419-20 (cleaned up). Similarly, in *In re 650 Fifth Ave. Co.*, No. 08 Civ. 10934, 2014 WL 1284494 (S.D.N.Y. Mar. 28,

2014), then-Judge Forrest held that Iranian front companies "used" partnership shares in a real estate company for commercial activity in the United States, because: (i) the company owned a building in New York that generated revenue; and (ii) the shares "were the mechanism through which the partners owned the Building and determined the distribution of revenue that it produced." *Id.* at *17.[9] In short, a foreign sovereign's use of its controlling shares to direct or run a company's activities in the United States satisfies the requirement in Section 1610(a) that the shares be "used for" a commercial activity in this country.

Here, Argentina plainly "uses" its majority shares to direct YPF's major corporate actions, including in the United States. Each year, YPF advises U.S. investors that Argentina exercises a high degree of control over YPF. *See*, *e.g.*, YPF 20-F for 2013, at 10 (Mastro Ex. 6) (Argentina "is able to determine substantially all matters requiring approval by a majority of our shareholders, including the election of a majority of our directors, and is able to direct our operations").[10] Argentina exercises control in numerous ways, including through its election of the majority of the members of YPF's Board of Directors. *See id.* In addition, YPF's Bylaws prescribe that many corporate actions, including international debt issuances and the delisting of its shares from the NYSE, require approval from Argentina as controlling shareholder. *See* ECF No. 45-2 (YPF Bylaws), §§ 17(vi), 24. Further, under Argentine law, Argentina must manage "the shareholder rights corresponding to the shares" to procure "[t]he administration" and "management of YPF" in conformity with various principles, including "safeguarding shareholder interest and generating

---

[9]     On appeal, the Second Circuit vacated the District Court's prior alter ego finding and so had no occasion to address its § 1610 analysis. *See Kirschenbaum v. 650 Fifth Ave. Co.*, 830 F.3d 107 (2d Cir. 2016).

[10]    *See also* YPF 20-F for 2022, at 6 (Mastro Ex. 1) ("The Argentine Republic owns 51% of the shares of YPF S.A. and, consequently, the Argentine government is able to decide all matters requiring approval by a majority of shareholders[.] . . . We cannot assure you that decisions taken by our controlling shareholder would not differ from your interests as a shareholder.").

value on their behalf." ECF No. 363-72 (YPF Expropriation Law), Art. 16. Argentina thus has a legal mandate to use its majority shares to direct YPF's major business activities, protect the interests of YPF's shareholders, and create value for them.

Argentina has carried out this legal mandate by directing YPF to tap the equity and debt capital markets in the United States. Capital raising is among the most important corporate actions undertaken by a publicly traded company and can have a significant impact on the price of its shares. *See* Coffee ¶ 30. For this reason, capital-raising activities generally require approval of a majority of a company's shareholders or its board of directors. *See id.* ¶¶ 29-30. Section 17 of the YPF Bylaws grants YPF's Board of Directors wide powers to "organize, conduct and manage" capital-raising activities, including (i) the issuance of debt "within the country or abroad" and (ii) the listing of YPF's shares on "domestic and foreign stock and security markets." ECF No. 363-1 (YPF Bylaws) at 21-24.

At each annual shareholder meeting since 2013, Argentina has used its majority shareholding to approve YPF's raising of debt on international markets, including the United States. For example, at the meeting held on April 29, 2016, Argentina voted its majority shares to approve an increase in the amount of YPF's Global Medium-Term Notes Program from $2.0 billion to $10.0 billion. *See* Coffee 4 ¶ 29; Form 20-F for 2022, at 74 (Mastro Ex. 1). Similarly, at the meeting held on April 28, 2023, Argentina granted the Board of Directors the authority "to create Global Programs for the issuance of negotiable obligations." Minutes of YPF's April 28, 2023 Shareholder Meeting, at 26-27 (Mastro Ex. 6). Since April 2012, YPF has sold more than $2.4 billion in debt just to U.S. investors under these global programs. Coffee 4 ¶ 14.

Argentina also has used its majority shareholding to appoint YPF's Chairman and a majority of the members of its Board of Directors, who have organized and conducted YPF's ADR

program with BNYM, the listing of its Class D shares on the NYSE, and the registration of the shares with the SEC. For example, Argentine President Alberto Fernández appointed Pablo González, then the Vice Governor of Argentina's Santa Cruz Province, as the Chairman of YPF's Board of Directors in January 2021. On March 1, 2022, Mr. González signed a registration statement on Form F-6 that registered an *additional* 100 million YPF ADSs with the SEC. Lissemore 2 ¶ 29; Form F-6, March 1, 2022, at 5-6 (Lissemore Ex. 9). The only reason for YPF to register that large number of additional ADSs with the SEC was to facilitate the continued (and increased) trading of its Class D shares on the NYSE. *See* Lissemore 2 ¶ 29.

Argentina's approval and direction of YPF's capital-raising activities in the United States has greatly benefitted Argentina and all of YPF's other shareholders. As explained by Ms. Lissemore, the listing of YPF's Class D shares on the NYSE increases the liquidity and price of all of YPF's Class D shares, regardless of whether they are held as ADSs. Lissemore 2 ¶¶ 30-33. In view of the significant financial benefit to Argentina, it is no surprise that Argentina has directed YPF to maintain this listing since it seized control of YPF in April 2012.

Argentina also has an obvious (and recent) incentive to continue to direct this commercial activity in the United States. In November 2023, then President-elect Javier Milei named Horacio Marín as YPF's CEO, instructing him to increase YPF's share price in the run-up to the Argentine government's anticipated sale of its YPF shares.[11] Any sale of that magnitude inevitably will occur on the NYSE through ADRs, as was the case during YPF's initial IPO. *See* Lissemore 2 ¶ 34; Coffee 4 ¶ 19. YPF's sponsorship of an ADR program is thus of vital importance for Argentina's plan to sell its Class D shares to private investors.

---

[11]     Charles Newberry, *Argentina president-elect picks Horacio Marín to run YPF in run-up to selling state shares*, S&P Global Insights (Nov. 24, 2023) (Mastro Ex. 10).

Finally, there can be no serious dispute that YPF's capital-raising activities qualify as "commercial activity" under the FSIA. *See, e.g.*, *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 615-17 (1992) (issuing bonds is commercial activity); *EM Ltd. v. Republic of Argentina*, 389 F. App'x 38, 44 (2d Cir. 2010) (facilitating sale of securities is commercial activity). Moreover, this commercial activity is "in the United States," because it has "substantial contact with the United States." 28 U.S.C. § 1603(e); *see, e.g.*, *Ministry of Supply, Cairo v. Universe Tankships, Inc.*, 708 F.2d 80, 84 (2d Cir. 1983) ("the 'substantial contact' standard of § 1603(e) can be met by as little activity as 'reciev[ing] financing from a private or public lending institution located in the United States'"); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1019 (2d Cir. 1991) (U.S. nexus satisfied where Bolivia transferred promissory notes "to an intermediary in the United States"). Far from the mere receipt of financing or transferring promissory notes through a U.S. intermediary, YPF purposefully targets the U.S. equity and debt capital markets.

## C.  Argentina Used Its YPF Shares for the Commercial Activity Upon Which Plaintiffs' Claim Is Based

Argentina's YPF shares also were "used for the commercial activity upon which the claim is based." 28 U.S.C. § 1610(a)(2). As the Second Circuit held in *Petersen I*, for purposes of § 1605 of the FSIA, a claim is "'based upon' the particular conduct that constitutes the gravamen of the suit." 895 F.3d at 204 (cleaned up). That same analysis applies under § 1610(a)(2). *See De Letelier v. Republic of Chile*, 748 F.2d 790, 796 (2d Cir. 1984) ("Congress specifically designed the execution immunity rules to 'conform' to the jurisdictional immunity provisions of § 1605") (internal citation omitted). In cases "involving breach of contract or related equitable claims, courts routinely identify the breach (or formation plus breach) as the gravamen." *Friedman v. Gov't of Abu Dhabi, United Arab Emirates*, 464 F. Supp. 3d 52, 68 (D.D.C. 2020) (collecting cases and citing *Petersen I*, 895 F.3d at 207). This case is no exception. As the Second Circuit already has

held: "The gravamen of Petersen's claim is that Argentina denied Petersen the benefit of the bargain promised by YPF's bylaws when Argentina repudiated its obligation to tender for Petersen's [YPF] shares." *Petersen I*, 895 F.3d at 207. Both of Argentina's actions identified by the Second Circuit – formation and breach – were commercial in nature. *Id.* ("Th[e tender-offer] obligation and Argentina's subsequent repudiation of it were indisputably commercial."). Thus, the only question is whether Argentina's YPF shares were used for those commercial activities.

The answer plainly is yes. Argentina formed the underlying contractual obligation when YPF amended its Bylaws in June 1993 to add the tender-offer obligation in Section 28. As explained above, Argentina amended by the Bylaws through the exercise of its shareholder rights as the then-sole shareholder of YPF. *See* YPF Form 20-F for 2022, at 104 (Mastro Ex. 1). Argentina thus "used" its shares to form the obligation on which Plaintiffs' claims are based.[12]

Argentina also used its YPF shares for the breach of the tender-offer obligation. The fundamental promise of § 28 of the YPF Bylaws was that investors would not be stranded as minority shareholders in a government-run enterprise without being offered a compensated exit. *See Petersen II*, 2023 WL 2746022, at *12 ("the Republic promised security holders that *it* would provide *them* with a compensated exit if it reacquired control over the requisite number of shares"). Argentina's exercise of control over Repsol's YPF shares was thus at the core of its contract breach. As this Court has already found, Argentina used its control of Repsol's shares to

---

[12]     Prior to YPF's IPO, all of its capital stock was owned by Argentina in the form of Class A, B and C shares. *See* ECF No. 112-2 (IPO Prospectus) at 7. Per Section 6(b)(iv) or YPF's Bylaws, Class A, B and C shares are automatically converted into Class D shares upon their transfer to private investors. *See* ECF No. 45-2 (YPF Bylaws), § 6(b)(iv). As explained in the IPO Prospectus, Class D shares "will represent Class A shares transferred by the Argentine Government other than to the provinces." ECF No. 112-2 (IPO Prospectus) at 81. Accordingly, the Class D shares owned by Argentina today are the same shares as the Class A, B and C shares that it owned prior to the IPO and that it used to enact the tender-offer obligation.

"displac[e]" the Repsol-elected Board and render it "devoid of any powers, functions, or duties." *Petersen III*, 2023 WL 5827596, at *1. Argentina "appropriated the rights of the Board to itself, and *used* those rights to cancel the shareholder meeting" scheduled for April 25, 2012. *Id.* at *2 (emphasis added). That cancellation "ensure[d] that Repsol would have no ability to vote its shares," *id.* at *1, including to enforce the Bylaws' tender-offer obligation, *see* ECF No. 45-2 (YPF Bylaws), § 28(C) (requiring YPF to withhold Argentina's right to vote if it acquired a controlling stake and declined to make a tender offer). Moreover, following enactment of the YPF Expropriation Law on May 3, Argentina continued to use the Repsol shares to breach its obligations—using the shares to vote at shareholder meetings, appoint a new Board, run the company, and evade the tender-offer requirement. *See Petersen II*, 2023 WL 2746022, at *3. As this Court has recognized, the YPF Expropriation Law "was intended to escape the obligation to pay the tender offer." *Petersen III*, 2023 WL 5827596, at *4. Argentina invoked its "political rights" in the Repsol shares at the June 4, 2012 shareholders' meeting for the express purpose of overruling minority shareholders' objection that YPF failed to invoke Sections 7(h) and 28 of the Bylaws. ECF No. 112-4 (Minutes of YPF's June 4, 2012 Shareholder Meeting), at 7-8. Thus, by controlling Repsol's shares, Argentina stranded minority shareholders in a government-run enterprise – the precise outcome against which the Bylaws were designed to protect.

## II.     The Court Should Order the Turnover of Argentina's YPF Shares to Plaintiffs

CPLR § 5225 is New York's turnover statute.[13] Paragraphs (a) and (b) of § 5225 authorize a New York court to issue a turnover order directed to the judgment-debtor or a garnishee in custody of the judgment-debtor's property. CPLR § 5225(c) provides that "[t]he court may order

---

[13]     Under Federal Rule of Civil Procedure 69(a)(1), "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located."

any person to execute and deliver any document necessary to effect payment or delivery."

It is well-settled that a New York court can order a judgment-debtor or garnishee to turn over the judgment-debtor's extraterritorial property, including shares in a foreign corporation. *See, e.g.*, *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 541 (2009) (holding that New York court could order garnishee bank to turn over stock certificates located in Bermuda and representing shares in Bermuda corporation); *Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V.*, 41 A.D.3d 25, 35, 39 (N.Y. App. Div. 1st Dep't 2007) (ordering judgment-debtor under CPLR § 5225(c) to "execute appropriate documents transferring ownership of its [Indonesian] subsidiaries to plaintiffs if such ownership is evidenced in some form other than stock certificates"); *Inter-Reg'l Fin. Grp., Inc. v. Hashemi*, 562 F.2d 152, 154-55 (2d Cir. 1977) (affirming order under Connecticut UCC requiring defendant to recall stock certificates located outside the United States).[14]

Section 7(a) of YPF's Bylaws provides that its shares "shall be book-entry shares" and "shall not be represented by certificates." ECF No. 45-2 at 4. The register of YPF's book-entry shares is kept by Caja de Valores, Argentina's central securities depository and (like the U.S.'s DTC) a member of the global network of securities depositories. *See* YPF Form 20-F for 2022, at 101 (Mastro Ex. 1); 2022-2023 Depository Information Gathering Project: A Report for Clients and Participating Depositories, at App. C (Mastro Ex. 13). Argentina's YPF shares "are held in Argentina at the Caja de Valores." ECF No. 539-1 at 4-5. Argentina holds the shares at Caja de Valores directly, rather than in "street name" through a broker or other intermediary.[15]

_____

[14] New York courts have the power to require a wide variety of actions by judgment-debtors. *See, e.g.*, *NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246, 265 (2d Cir. 2012) (affirming order directing judgment-debtor's specific performance of payment priorities in bond indenture); *Gryphon*, 41 A.D.3d at 36 (ordering judgment-debtor to turn over foreign bank accounts).

[15] Most shareholders of Argentine companies hold their shares in "street name," indirectly through a broker or other intermediary that has a participant account at Caja de Valores. *See* World Forum of CSDs, WFC Single Disclosure Report 2020, at 72 (Mastro Ex. 14).

As explained below, New York law authorizes the Court to order Argentina to transfer its ownership interests in its YPF shares to Plaintiffs through a global custody account in New York, and the fact that the shares may exist only in book-entry form in Argentina is of no moment.

**A.      New York Law Entitles Plaintiffs to the Court's Assistance in Reaching Argentina's YPF Shares**

CPLR § 5201(c)(4) provides that New York UCC § 8-112 "shall govern the extent to which and the means by which any interest in a certificated security, uncertificated security or security entitlement (as defined in article eight of the uniform commercial code) may be reached by garnishment, attachment or other legal process." Argentina's YPF shares qualify as "uncertificated securit[ies]" under the UCC because they exist only in book-entry form.[16]

As a general matter, a creditor can reach the interest of a debtor in an uncertificated security "only by legal process upon the issuer at its chief executive office in the United States." UCC § 8-112(b). But where the debtor's interest in a security "cannot readily be reached by other legal process," UCC § 8-112(e) provides that the creditor is "entitled to aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the certificated security, uncertificated security, or security entitlement." As the Second Circuit held in construing UCC § 8-317(2) (the predecessor of § 8-112(e)), a court is "authorize[d] . . . to issue an injunction in aid of the attachment which may take the form of a mandate requiring the defendant to bring the certificates

---

[16]      New York UCC § 8-102(18) defines "uncertificated security" as "a security that is not represented by a certificate." The term "security entitlement" refers to the rights and property interest of a person who holds securities indirectly through a broker or other securities intermediary. *See* NY UCC § 8-102(7), (17). Argentina's YPF shares are not "security entitlement[s]" because they are registered to Argentina and not held in "street name." *See* NY UCC § 8-501(d) ("If a securities intermediary holds a financial asset for another person, and the financial asset is registered in the name of . . . the other person, and has not been indorsed to the securities intermediary or in blank, the other person is treated as holding the financial asset directly rather than as having a security entitlement with respect to the financial asset.").

into the state . . . and to deliver them into the actual physical control and possession of the sheriff."
*Inter-Reg'l Fin. Grp.*, 562 F.2d at 154-55 & n.2. UCC § 8-112(e) entitles Plaintiffs to this Court's assistance, "by injunction or otherwise," in reaching Argentina's YPF shares, because the shares "cannot readily be reached by other legal process."

### B. The Court Should Order Argentina to Transfer Its Ownership Interests in Its YPF Shares to Plaintiffs Through a Global Custody Account at BNYM in New York

Plaintiffs respectfully request that the Court exercise its authority under CPLR § 5225(c) and UCC § 8-112(e) to issue an order requiring Argentina to take the following two steps: (i) transfer forthwith its YPF shares to a global custody account at BNYM in New York for turnover to Plaintiffs; and (ii) instruct BNYM to transfer Argentina's ownership interests in its YPF shares to Plaintiffs or their designees. As explained below, Argentina's compliance with the first part of this order would satisfy the requirement under Section 1610(a) of the FSIA that the property in question be "in the United States."

A global custody account allows an investor to hold all of its domestic and foreign securities through a single global custodian. *See* The Clearing House: The Custody Services of Banks, at page iii-iv (Mastro Ex. 15). The global custodian maintains a network of local sub-custodians in foreign markets, and each sub-custodian in turn is a member of the central securities depositary in its own market. *Id.* at pages ii-iii. In this way, the New York branch of a global custodian can maintain an account that indirectly holds foreign securities on behalf of an investor, including when those securities are uncertificated and exist in book-entry form.

The New York office of BNYM provides global custody services to investors, and through a sub-custodian in Argentina it can hold the book-entry securities of Argentine corporations on behalf of those investors. *See* BNYM List of Sub-Custodians (Mastro Ex. 16). BNYM also has historically had contractual relationships with both Argentina (for which it serves as trustee and

paying agent on sovereign debt issuances) and YPF (for which it maintains the ADR program and serves as depositary).

Upon compliance by Argentina with this Court's order that it transfer its YPF shares to a global custody account at BNYM in New York, its ownership interests in the shares will qualify as "security entitlement[s]" under the UCC. *See* NY UCC § 8-102(7), (17) (term "security entitlement" refers to the rights and property interest of a person who holds securities indirectly through a securities intermediary); NY UCC § 8-112, Official Cmts., ¶ 3 ("If Debtor holds securities through Broker, and Broker in turn holds through Clearing Corporation, Debtor's property interest is a security entitlement against Broker."). Moreover, Argentina's security entitlements will have a New York situs, because the account will be held at the New York office of BNYM. *See, e.g.*, *JPMorgan Chase Bank, N.A. v. Herman*, 168 A.3d 514, 521-22 (Conn. App. Ct. 2017) (judgment-debtor's security entitlement had Connecticut situs under UCC § 8-112 because its account was with Connecticut office of brokerage firm, even though securities certificates were held by securities depositary in New York).

The second part of this Court's order will require Argentina to instruct BNYM to transfer Argentina's ownership interests in its YPF shares to Plaintiffs or their designees. *See Gryphon*, 41 A.D.3d at 39 (ordering judgment-debtor under CPLR § 5225(c) to "execute appropriate documents" to transfer shares in foreign corporations to plaintiffs).

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court issue an order requiring Argentina to take the following two steps: (i) transfer its YPF shares to a global custody account at BNYM in New York within 14 days from the date of the Court's order; and (ii) instruct BNYM to initiate a transfer of Argentina's ownership interests in its YPF shares to Plaintiffs or their designees within one business day of the date on which the shares are deposited into the account.

Dated: April 1, 2024

Respectfully,

KING & SPALDING LLP

By: _Randy M. Mastro_

Randy M. Mastro
Laura Harris
Thomas C.C. Childs
1185 Avenue of the Americas
New York, NY 10036
Phone: (212) 556-2114
Fax: (212) 556-2222
Email: rmastro@kslaw.com
          lharris@kslaw.com
          tchilds@kslaw.com

-and-

Reginald R. Smith
1100 Louisiana Street
Houston, TX 77002
Phone: (713) 751-3200
Fax: (713) 751-3290
Email: rsmith@kslaw.com


KELLOGG, HANSEN, TODD, FIGEL
& FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
Email: mhansen@kellogghansen.com
          dho@kellogghansen.com
          agoldsmith@kellogghansen.com


CLEMENT & MURPHY, PLLC

Paul D. Clement
C. Harker Rhodes IV
706 Duke Street

21

Alexandria, VA 22314
Phone: (202) 742-8900
Fax: (202) 742-8895
Email: paul.clement@clementmurphy.com
harker.rhodes@clementmurphy.com


*Counsel for Plaintiffs Petersen Energía Inversora,
S.A.U., Petersen Energía, S.A.U., Eton Park Capital
Management, L.P., Eton Park Master Fund, Ltd.,
and Eton Park Fund, L.P.*