**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., <br><br> Plaintiffs, <br><br> - against - <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br> Defendants. | No. 15 Civ. 2739 (LAP) |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., <br><br> Plaintiffs, <br><br> - against - <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br> Defendants. | No. 16 Civ. 8569 (LAP) |

**FOURTH EXPERT REPORT OF JOHN C. COFFEE, JR.**

**March 27, 2024**

**Section I: Introduction**

1.      I, John C. Coffee, Jr., submit this fourth report as an expert witness for Plaintiffs in the above actions. I previously submitted three other reports under seal in these actions. Those reports were dated September 22, 2021, December 1, 2021, and January 13, 2022. My qualifications and experience are set forth in my first report, dated September 22, 2021.

2.      In this fourth report, I offer opinions primarily as to customary motivations and practices surrounding privatizations, the establishment and maintenance of an American Depositary Receipt facility, registration of foreign securities with the U.S. Securities Exchange Commission ("SEC"), listing of foreign securities on the New York Stock Exchange ("NYSE"), and the direction that a controlling shareholder typically exercises over these activities. In short, why do foreign issuers take these steps? More specifically, why would Argentina mandate that a company it had just nationalized remain a publicly traded company and continue its status as a "reporting" company in the United States (with an NYSE listing)? This seems contradictory if the goal of YPF's re-nationalization was to protect Argentina from "greedy" capitalists (as the political rhetoric in 2012 suggested).

3.      This report will answer that (i) YPF had and continues to have important economic reasons for raising debt and equity capital in international capital markets by maintaining its status as a "reporting" and listed company in the United States (and thereby insuring sophisticated investors that they will receive a continuing flow of credible financial information subject to the oversight of the SEC); and (ii) Argentina, as YPF's controlling shareholder, had and continues to have important economic reasons for maintaining YPF's presence in the United States that go beyond the interest of YPF. Specifically, Argentina directs YPF's capital-raising activities in the U.S. with a view not simply to minimizing YPF's cost of capital, but to preserve YPF's access to

U.S. and international markets (debt and equity) in order to accomplish a variety of other purposes that will be described later.

4. Initially, Section II will provide an overview of YPF's capital-raising activities in the United States, which included both its registration of YPF's Class D shares (through American Depositary Receipts) with the SEC, the listing of these YPF shares with the New York Stock Exchange, and the use of American Depositary Receipts to accommodate U.S. investors. Beyond these efforts, the continued maintenance (at the direction of Argentina) of YPF's SEC registration statement, its New York Stock Exchange listing, and the American Depositary Receipt facility enabled YPF to issue over $2.4 billion in debt from time to time between 2015 and 2024 (again at the direction of Argentina) to U.S. and other institutional investors under SEC Rule 144A.[1] Section III will then turn to Argentina's strong interest, as controlling shareholder of YPF, in directing YPF's capital-raising activities in the United States, both at the times of YPF's IPO in June 1993, Argentina's renationalization of YPF's Class D shares in April 2012, and, more recently, YPF's issuance of over $2.4 billion in debt securities between 2015 and early 2024. In recent months, the Argentine government has also proposed the re-privatization of YPF.[2] Although this has encountered some difficulties and has been recently "paused," the key point here is that this is another option that Argentina has carefully preserved by maintaining an active and visible presence in the U.S. The impact of this presence is to assure investors in international markets that they will continue to receive credible financial information that has been filed with, and is subject to, the oversight of the SEC. These are not speculations about future possibilities because YPF has already made nine debt offerings between 2015 and 2024 that were facilitated (and possibly only made feasible) by its status as a "reporting" company.

---

[1] These offerings are described and summarized in a table at paragraph 14 *infra*.
[2] *See infra* at paragraph 19.

5. In overview, my basic point is that Argentina has consistently recognized that it needs to keep its future options open by maintaining its presence in the U.S. markets. Not only does this minimize the cost of capital on the multiple debt offerings that YPF has conducted between 2015 and 2024 under SEC Rule 144A, but it has also given Argentina flexibility to utilize YPF to accomplish broader goals in a variety of ways. Here, it must be understood that YPF is not simply the largest oil and gas company in Argentina (and one of the largest oil companies in the world), but it is the flagship of the Argentine economy. YPF's recurrent debt offerings between 2015 and 2024 not only enabled YPF to raise capital at lower cost, but also enabled Argentina to expand its oil exploration and production – and thereby grow the Argentine economy and enhance domestic employment. These latter objectives are perfectly legitimate, but they depend upon maintaining YPF's presence in the U.S. capital markets. Use of other markets would have been far less feasible (which is also why YPF relied on SEC Rule 144A as will be later shown).

**Section II: Argentina Used Its Controlling Position in YPF To Undertake Commercial Activity in the United States.**

    A.    **YPF's Ownership Structure and Its Capital-Raising Activities in the United States**

6. Let us begin with some uncontested facts:

(a) YPF is, of course, the largest oil and gas company in Argentina and one of the largest in the world.[3] But who owns the shares in YPF? According to the Form 20-F that YPF filed with the Securities and Exchange Commission for the fiscal year ended December 31, 2022 (YPF's most recent such year-end filing), YPF's equity shares are divided into four classes, as set forth below:[4]

---

[3] Currently, YPF accounts for slightly over half of Argentina's oil and gas production.
[4] *See* YPF Form 20-F, dated December 31, 2022 at p 98 (Exhibit 1).

| Class | Number of Shares |
|---|---|
| Class A | 3,764 |
| Class B | 7,624 |
| Class C | 40,422 |
| Class D | 393,260,983 |

Clearly, the Class D shares at the heart of this litigation represent the vast majority (over 99%) of YPF's equity capitalization, and Argentina currently owns 51% of the Class D shares.[5] As of March 30, 2023, there were 146,775,011 ADSs outstanding, which represented approximately 37% of the issued and outstanding Class D shares.[6] Argentina also owns all of the Class A shares (which entitle it to elect a single director); Argentina's provincial states own the Class B shares; and the Class C shares are owned by a fund for YPF's employees. Given this concentration of ownership, it is beyond argument that Argentina holds voting control of YPF. If it had wanted, it could have expropriated the remaining Class D shares, but this would serve little purpose and might have further damaged Argentina's already tarnished reputation as a controlling shareholder.

(b)     We will see, however that Argentina actually legislated a requirement that YPF remain a publicly traded company. That deviates markedly from a simple pattern of expropriation. As later discussed, it was and very much remains in Argentina's interest to keep YPF a publicly traded "reporting company" that files periodic reports with the SEC (and thereby achieves greater financial credibility than if it was a private company or if only traded in local markets in South America).

(c)     According to a Yahoo Finance report, dated February 7, 2024, 50.65% of YPF's publicly held stock is held by "institutions," and Yahoo Finance calculates that 150 institutions currently hold shares in YPF.[7] Yahoo Finance's report further indicates that this stock is largely

---

[5] Argentina owns 200,589,525 Class D shares (or 51%). Id. at p 98.
[6] Id. at p 98 note 2.
[7] See Yahoo Finance, "YPF Sociedad Anónima (YPF) Stock Market Holders," dated February 7, 2024 (Exhibit 2).

4

held by large institutional investors (who can be presumed to be sophisticated and attentive to YPF's disclosures).[8] If we look just at YPF's ten largest institutional holders, Yahoo Finance reports that they include Citigroup Inc., BlackRock, Inc., Millennium Management LLC, and Susquehanna International Group, LLP—all among the largest U.S. institutional investors.[9]

7. The efforts of Argentina to privatize YPF in 1993 had a distinctively American character, which was deliberately emphasized by Argentina for its own business purposes. Among the most obvious features of this "American style" privatization were the following:

(1) Substantial reliance on American law, investment banking, and consulting firms to design an attractive vehicle for U.S. investors, with the use of American firms being largely motivated by the assurance and comfort their use would give U.S. investors;[10]

(2) Bylaw amendments that incorporated a well-known American anti-takeover protection, known as a "fair price provision," with which U.S. investors would be familiar and that would assure them that they would be protected against a "cheap" acquisition of control by Argentina if Argentina at any time desired to take back control over YPF;[11]

(3) The use of American Depositary Shares (or "ADSs"), which are evidenced by American Depositary Receipts ("ADRs"), so that U.S. investors would receive dividends or other distributions in U.S. dollars and be able to trade their equity investments in YPF in the U.S.;

---

[8] Id. The largest institutional holder in YPF is currently Helikon Investments, Inc., a British hedge fund, which focuses on identifying undervalued companies. Helikon appears to have acquired most of its shares in YPF when Argentina began to consider a new privatization of YPF in 2023.
[9] Id.
[10] Among the U.S. consulting firms hired by Argentina and YPF were McKinsey & Company, Arthur D. Little, Andersen Consulting, Price Waterhouse & Co., Merrill Lynch, and Credit Suisse First Boston. Each prepared a report on or valuation of YPF. See Robert Grosse and Jiman Yanes, Carrying Out a Successful Privatization: The YPF Case, 12 The Academy of Management Executive, 51, 53-57 (May 1998) (Exhibit 3). Again, this shows the customization of this offering to U.S. investors.
[11] Some 27 U.S. States have adopted "fair price" provisions in their Corporation statute. Their popularity was peaking at this period before the poison pill became popular. Stephen A. Hockman and Oscar D. Folger, Deflecting Takeovers: Charter and By-Law Techniques, 23 Bus. Law. 537, 558 (1979) (Exhibit 4).

(4) The entry by YPF into a Deposit Agreement with Bank of New York Mellon, whose New York office would administer this ADR facility and serve as YPF's agent;

(5) Provisions limiting Argentina (and its provinces) to no more than three of YPF's twelve directors to ensure that the Class D shareholders would have substantial representation on YPF's board and could not be outvoted by Argentina and its agents;

(6) YPF's registration of both the Class D shares and the ADRs with the SEC; and

(7) YPF's listing of the ADRs on the New York Stock Exchange.

8. All these steps were aimed at a U.S. audience, in effect creating a tailor-made security to accommodate U.S. investors. In addition, they also involved substantial payments to U.S. professional firms (law firms, investment banks and consulting firms, such as Arthur Little in the U.S.), which payments also reflect commercial activity in the United States that was closely connected to the Class D shares.

9. Procedurally Argentina and YPF conducted a substantial "road show" in the U.S. just prior to the 1993 offering. The New York Times for May 30, 1993 reported that:

> "Argentina and its investment bankers—First Boston and Merrill Lynch—began the 'roadshow' on Monday for the privatization of the country's industrial crown jewel—the oil company…known as Y.P.F."[12]

This process began in Buenos Aires at its stock exchange and then shifted to "travel to the U.S. for the rest of the week." The "frenzied sales effort" was necessary, the N.Y. Times reported, "to charm investors into putting up as much as $2.5 billion for what will likely be the largest privatization in Latin America -- and the biggest initial public offering of stock in 1993."[13] YPF

---

[12] Nathaniel C. Nash, "World Markets; Valuing Argentina's Crown Jewel," New York Times, May 30, 1993, Section 3, p 13 (Exhibit 5).
[13] Id.

6

was then "one of the world's 20 largest energy companies."[14]

10.     In short, this effort to market the stock in the U.S. was on a unique scale, and Argentina aggressively publicized the offering in the United States. To this end, an Argentina "sales team" came to the U.S. to lead the roadshow.[15]

### B. Argentina's Motivation

11.     Possibly, Argentina may reply that, even if it did dominate the 1993 privatization of YPF as its sole shareholder, these events all occurred in 1993, over thirty years ago. But that answer ignores the critical fact that when Argentina seized control of YPF in April 2012, expropriating 51% of YPF's Class D shares from Repsol S.A. ("Repsol"), Argentina's legislature insisted that YPF continue as a publicly traded company. This meant, as a practical matter, that the most efficient course for YPF was to keep its registration statement current with the SEC, and maintain the listing of its Class D shares on the New York Stock Exchange. Throughout the period from 2012 to today, Argentina has continued to maintain YPF as a public company. This is well over a decade and covers a turbulent period with changes in Argentina's government. Yet, a consistent pattern has been followed under which Argentina maintains YPF as an active and visible participant in the U.S. capital markets. In part, this continuity has been the product of YPF's bylaws that require a 75% supermajority vote to delist YPF"s shares from the Buenos Aires or New York Stock Exchanges.[16] This provision assures Argentina that, even if it sold shares and no longer held an absolute majority, this provision would still give it an effective veto power through its ownership of even 25% of the Class D shares.

12.     Why has Argentina done all this? The minimum answer is that Argentina needed

---

[14] Id.
[15] Id.
[16] See Section 24 of YPF's bylaws, which is discussed later (Exhibit 6).

to preserve YPF's ability to access international debt capital markets, as Argentina and YPF have made much greater use of these markets in the period following Argentina's re-nationalization of YPF in April 2012. As later discussed, on February 1, 2024, YPF issued notes in the amount of $800 million that are "denominated and payable in U.S. dollars."[17]

13.  Once again, this 2024 offering was largely handled by U.S. institutions, as two of the three international underwriters were Citigroup Global Markets and JP Morgan Securities; also, the Bank of New York Mellon acted as trustee under the indenture entered into with YPF.[18] In addition, the bonds are expressly governed by New York law—again to satisfy and assure U.S. investors. Cleary Gottlieb Steen & Hamilton LLP "acted as legal counsel to YPF in New York" and Milbank LLP "acted as legal counsel to the international and local placement agents in New York."[19] Clearly, this transaction was deliberately designed to center around New York and thereby to attract U.S. investors. YPF sold approximately $220.5 million of the notes in this offering to U.S. institutional investors under SEC Rule 144A.[20] This SEC rule allows the initial purchasers of privately placed securities to resell them immediately to "qualified institutional buyers" in the United States without SEC registration;[21] thus, such purchasers need not hold for any period (as in an ordinary private placement) and incur little or no loss of liquidity. This combination—high liquidity and no requisite holding period—made such offerings attractive to U.S. investors, who also benefitted from the financial disclosure that YPF filed with the SEC.

14.  In fact, since Argentina retook control of YPF in April 2012, YPF has sold more than $2.4 billion in debt just to U.S. investors in nine separate offerings under SEC Rule 144A.

---

[17] *See* "Argentina's YPF makes $800 bond issuance," Leaders League Online, February 1, 2024 (Exhibit 7).
[18] Id.
[19] Id.
[20] *See* https://www.luxse.com/security/US984245AX84/395350.
[21] Registration S consists of SEC Rules 901 to 905. *See* 17 CFR § 230.901 to 905.

The following table sets out the relevant details:[22]

| Security | Listing Date | Coupon | Amount sold to U.S. investors under Rule 144A (USD) |
|---|---|---|---|
| YPF 9.5% Notes due 1/17/2031 | 1/25/2024 | 9.5% | 220,487,000 |
| YPF 9% Notes due 6/30/2029 | 3/29/2021 | 9% | 53,652,184 |
| YPF 7% Notes due 9/30/2033 | 3/29/2021 | 7% | 89,041,550 |
| YPF 9% Notes due 2/12/2026 | 3/29/2021 | 9% | 183,239,834 |
| YPF 8.5% Notes due 3/23/2025 | 9/8/2020 | 8.5% | 224,371,000 |
| YPF 8.5% Notes due 6/27/2029 | 8/14/2019 | 8.5% | 131,002,000 |
| YPF 7% Notes due 12/15/2047 | 1/4/2018 | 7% | 272,738,000 |
| YPF 6.95% Notes due 7/21/2027 | 8/10/2017 | 6.95% | 471,640,000 |
| YPF 8.5% Notes due 7/28/2025 | 5/21/2015 | 8.5% | 745,866,000 |
| | | Total: | **2,401,037,568** |

15.     The above series of nine debt offerings by YPF would have been much less feasible if YPF had not remained a "reporting" company. Of course, this was not YPF's decision

---

[22] All of the information in this table was obtained from the website of the Luxembourg Stock Exchange. *See* https://www.luxse.com/search?dataType=securities&q=YPF%20144A.

9

to remain a "reporting" company, as the 2012 Argentine legislation gave it no choice by mandating that YPF remain a publicly traded company. Once that decision was made, the U.S. was the only securities market in the Western Hemisphere that could offer YPF reasonable liquidity.[23] Conceivably, YPF's securities might have traded in Argentina, but this would have meant a higher interest rate and U.S. institutional investors would likely have not been comfortable with the only limited liquidity that they would experience in a local market. Further, YPF, Argentina, and institutional investors might have been uncomfortable with issuing all of YPF's debt in the highly volatile Argentine currency, as Argentina has suffered recurrent bouts of rampant inflation.

16.     Once again, as they did in 1993, Argentina and YPF gave these debt offerings a uniquely American flavor by relying on SEC Rule 144A. Typically such offerings use an elaborate, detailed disclosure document that closely resembles an American registration statement. While such a disclosure document may not be strictly required by Rule 144A, the failure to employ such a document will likely mean that U.S. institutional investors will be reluctant to participate in the offering.

17.     Argentina's likely motivation was not simply to obtain a lower cost of capital for YPF. Reasonable as this motivation might have been, it is incomplete because it overlooks that YPF is the flagship of Argentine industry. When YPF successfully accessed international debt markets (as it did between 2015 and 2024 in raising over $2.4 billion), the proceeds of those offerings flow into the Argentine economy, increasing investment in oil and gas exploration and production. Further, as YPF leads, other Argentine issuers may follow. This was expressly emphasized by those arranging the $800 million YPF debt offering in January 2024. A press

---

[23] I realize that YPF has listed many of these debt securities on the Luxembourg exchange. That may be useful to European investors, but American institutional investors are unlikely to trade abroad when they can engage in screen-trading domestically in the U.S.

release announcing the offering, which has been picked up by the international energy press, noted the prediction of the firms handling the offering that other Argentine issuers would likely follow suit.[24] Specifically, Milbank, the American law firm which has handled several YPF debt offerings, stated:

> "We hope that this issuance could pave the way for more Argentine issuers to return to the international capital markets as Argentine looks to improve economic conditions and implement market-oriented policies."[25]

Given that this law firm has regularly appeared in recent Argentine debt transactions, it seems highly likely that it was expressing the hopes of the Argentine government as well.

18.     In this light, Argentina appears to have been using YPF to blaze a trail for other Argentine companies. This would be entirely rational for Argentina to do for a variety of reasons. If Argentina owned stakes in other domestic issuers, YPF's success in gaining and maintaining access to international securities markets would benefit these other issuers as well. If they could follow YPF's path, they would be able to reduce their cost of capital and obtain greater financing. By analogy, it would be the same as if Warren Buffett, or some other well-known entrepreneur, caused one company in its portfolio to pursue a new financing opportunity in order that others in his portfolio could similarly follow.

19.     Another development that reveals the importance of YPF's continued presence in the U.S. capital market was the announcement in November 2023 by newly elected Argentine President Javier Milei that the Argentine government planned to again privatize YPF.[26] To be sure this plan has encountered opposition and has recently been "paused" for the present.[27] Still, this

---

[24] "Milbank Advises Initial Purchasers in $800 Million Bond Offering by YPF," Contify Energy News, January 19, 2024 (Exhibit 8).
[25] Id.
[26] Richard Mann, "Argentina's YPF Stocks Soar After Milei Announces Privatization Plans," The Rio Times, November 20, 2023. (noting that YPF's stocks "jumped 65% in response to this announcement") (Exhibit 9).
[27] See RT Staff Reporters, "Argentina's YPF Privatization Faces Hurdles," The Rio Times, January 29, 2024

11

Presidential proposal shows that the costs of YPF's maintaining its U.S. capital markets presence were easily justified because a privatization of YPF in the United States market would have been close to infeasible without such a presence. Ultimately, Argentina knew that maintaining YPF's visibility in the U.S. capital markets worked in its interest, both facilitating its multiple debt offerings and enabling Argentina to sell its majority stake in YPF to international investors in 1993 and again when (and if) Argentina so desires. My claim here is not that Argentina always knew it would re-privatize YPF, but that it realized that it needed to keep its options open by directing YPF to continue as a "reporting company" with the SEC and otherwise maintain a visible level of commercial activity in the U.S. Over the interval between Argentina's nationalization of YPF in April 2012 and its new interest in privatization following the election of President Milei in late 2023, YPF made numerous large debt offerings to U.S. investors (as set out in the earlier table), culminating in the successful $800 million global debt offering discussed above.[28] A natural consequence of these offerings is that they familiarized international investors with YPF and made an equity offering or full privatization a more realistic option.

20.     The bottom line is that Argentina took actions over many years at YPF (including amending its bylaws, creating an ADRs depositary, and registering its stock with the SEC, etc.) that were designed to maximize YPF's stock price, both in 1993 and over the interval between this privatization and today. Because these actions were costly, they testify to Argentina's need to maintain the financial credibility of YPF in the United States.

21.     The appropriate way to view Argentina's current consideration of a re-privatization of YPF is not as a speculative "future" transaction, but as the product of an established presence in the U.S. that gave it that option. Not only had Argentina done a privatization of YPF

---

(Exhibit 10).
[28] See "Argentina's YPF makes $800 million bond issuance," supra note 17 (Exhibit 7).

in the past, but, from 1993 to 2024, Argentina has maintained YPF as a "reporting" company and periodically reaped the benefits of so doing. The 2012 legislation actually made it logical that YPF would remain commercially active in the U.S. because being a public company that was traded only in Argentina (or some other smaller market) would not enable YPF to easily access capital.

### Section III: Argentina's Direction and Control of YPF's Capital-Raising Activities in the United States

22. The SEC has long used the following definition of control:

> "The term 'control' (including the terms 'controlling,' 'controlled by,' and 'under common control with') means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."[29]

This is a deliberately broad test that does not require that the controlling person own a majority of the voting stock or have appointed a majority of the board. Although Argentina does hold voting control over YPF and has approved YPF's board at annual meetings, its degree of control over YPF is perhaps better shown by other evidence, including its recurrent intervention into YPF's affairs to appoint its CEO or direct specific policies. In addition, YPF's bylaws, as later noted, expressly recognize Argentina's right to control by requiring supermajority votes that give it specific veto powers.

23. For corporations incorporated outside of the United States, a controlling shareholder is quite common. Although the United States (and the United Kingdom) have dispersed shareholder ownership (and as a result independent directors generally hold the balance of power in public corporations in the U.S.), this is not the case elsewhere. Particularly in emerging market countries, concentrated ownership is the norm, and a controlling owner or ownership group

---

[29] *See* SEC Rule 405, 17 CFR § 230.405.

can usually be identified at such firms. Truly independent directors, selected by an independent nominating committee, are not common and, in any event do not play a decisive role.

24.     At present, Argentina owns 51% of YPF's Class D shares and all of its Class A shares (which are entitled to elect a single Class A director). At present, YPF's board has 12 members. Although a majority of these directors are deemed by YPF to be "independent" under the CNV rules of Argentina's stock exchange, this means relatively little, in part because Argentina (or the "National Government" in the language used in its corporate minutes) can (and recently has) simply overrule YPF's selection of directors at the annual meeting.[30] Given its absolute majority, there is no way to challenge this vote, and the absent ADS holders cannot even vote because they have not been informed of the modification (as next discussed).

25.     Of course, even a director appointed by Argentina can claim that he or she is "independent." Given the "subjective" nature of independence, the independence of any director can be legitimately debated. Thus, it is useful to look at more objective evidence, showing Argentina's controlling power over YPF. First, Argentina can make it impossible (or at least very infeasible) for the institutional shareholders who hold the minority interest in the Class D shares to vote. YPF's most recent annual shareholders meeting provides an example. There, the board of directors had announced a slate of directors to be elected by the Class D shares, but then (in the words of the minutes for that meeting) "[t]he representative of the National Government—Secretariat of Energy—Ministry of Economy for Class D, Certificate No. 306, moved and voted to appoint" a slightly different slate.[31] The Secretary of the meeting took the floor and "clarifies that the motion just made by the shareholder National Government—Secretariat of Energy—

---

[30] See "Ordinary And Extraordinary General And Special Class A General And Special Meeting No. 50" at pp 23 to 26 (discussing procedures followed at the April, 2023 shareholders meeting) (Exhibit 11).
[31] Id. at p 24.

14

Ministry of Economy for Class D, differs from the proposal of the board of directors."[32] A vote was then taken on the amendment offered by the National Government and it was "approved by an absolute majority of the voting shares present with 201,902,731 votes in favor, no votes against, and 149,252,791 abstentions."[33] The abstentions represented the votes of the ADR holders; as their trustee, Bank of New York Mellon, abstained because it could not contact these holders to learn how they wish to have their shares voted, given that it did not have advance notice of the change the National Government had just made.[34] In short, not only did Argentina hold an absolute majority of the Class D shares, but by proposing a change at the meeting, it could effectively deny the ADR voters the ability to vote. At a minimum, Argentina's casual action disregarded both the minority Class D shareholders and its own board of directors.

26.     A second means of rendering the votes of the minority shareholders insignificant is the use of supermajority voting provisions. YPF's bylaws prescribe that certain actions, including certain issuances of notes and securities and the delisting of YPF's shares in international markets and the delisting of YPF's shares from the NYSE, require a supermajority approval (75%).[35] Thus, even if Argentina were to sell a substantial portion of its holdings in YPF, it would still possess an effective veto power over delistings and the other events described in Section 28(b). Because such a veto power gives Argentina control over the "management and policies" of the issuer (in the words of the above-quoted SEC Rule 405), this example provides another illustration showing that Argentina is by the SEC's definition clearly a controlling shareholder.

---

[32] Id.

[33] Id. at p 25.

[34] Id. at p 24 (noting that "[b]ecause the proposal was an amendment to the board's April 4 proposal, and the ADR holders have not had the opportunity to consider this new proposal, the depositary is forced to abstain."). StateStreet Bank and Trust and the Northern Trust Company, two other depositories representing institutional investors, also abstained.

[35] See Section 24 ("Decision-making") (Exhibit 6). The 75% vote is specified in Section 24(a)(iii), and Section 24(b) makes this supermajority applicable to "the approval to cancel the listing of shares in the Buenos Aires and New York Stock Exchanges."

27. A second source of objective evidence as to Argentina's control of YPF comes from its repeated interventions into YPF's affairs by giving direct instructions to YPF on matters that at most corporations would be debated and decided by its board. For example, Argentina has repeatedly selected the CEO of YPF. It first did so in preparation for its 1993 privatization when Argentina chose Jose Estenssoro as YPF's new CEO (apparently because he had considerable experience in the senior management of a large U.S. corporation and would be a recognizable name to American investors). Then in 2023, when President Javier Milei was elected, he announced in November 2023 his decision to install Horacio Marín as YPF's CEO. Mr. Marín had worked at another Argentine oil company ("Tecpetrol"), but was aligned with President Milei and would be likely to support Milei's planned re-privatization of YPF.[36]

28. Another example of Argentina's domination of YPF is its direct interventions into YPF's affairs without any prior board action. Here, the best example was Argentina's appointment of an Intervenor and a Deputy Intervenor in 2012 to affect the ouster of YPF's then current board and management. Argentina instructed two outsiders to take control of YPF, and they essentially evicted the incumbent management of YPF, even before the expropriation legislation was passed by the Argentine legislature.

29. More typically, Argentina exercised control over YPF's capital raising by using its majority voting power. As majority shareholder, Argentina approved each of YPF's debt issuances to U.S. institutional investors by voting at YPF's annual shareholder meetings either (i) to approve YPF's global programs for the issuance of debt or (ii) to grant YPF's Board of Directors the authority to create such global programs. For example, at YPF's annual shareholder meeting

---

[36] *See* "Javier Milei confirmed that Osvaldo Giordano will head ANSES and Horacio Marín will chair YPF," CE Noticias Financieras English, November 24, 2023 (Exhibit 12); *see also* Business Monitor News, "Argentina Oil & Gas Profile: YPF," February 6, 2024 (Exhibit 13).

16

on April 29, 2016, Argentina "approved an increase of the amount of [YPF's Global Medium Term Note] Program from US$ 2.0 billion to a maximum nominal amount in circulation at any time under the program of US$ 10.0 billion, and the 5 year extension of the term of the Program starting from October 25, 2017, which expired in October 2022." *See* YPF's Form 20-F for 2022 at 74; Minutes of YPF's April 28, 2023 Shareholder Meeting. All of the notes that YPF sold to U.S. institutional investors under SEC Rule 144A during the period from April 2016 to October 2022 (see earlier table) were issued under the Global Medium Term Note Program that was approved by Argentina as majority shareholder.

30. That Argentina paid special attention to YPF's capital-raising activities is easily understandable. Capital-raising transactions often involve conflicts of interest between majority and minority shareholders. If the price of an equity offering were set too low, it would dilute non-participating shareholders. If it were set too high, it would adversely affect those who do participate. Debt offerings involve the danger that the firm might be either excessively leveraged or (in the absence of such offerings) that the firm would be denied capital that could allow it to expand profitably. Controlling shareholders often pay little attention to the mundane ordinary business decisions of a controlled corporation, but they watch like a hawk capital-raising decisions. Thus, Argentina had special reason to watch these transactions and exercise, if necessary, a veto power over them (which it possessed under YPF's bylaws).[37]

31. The fact that Argentina chiefly monitored capital raising transactions through shareholder voting brings us back to a key point: Argentina's ownership of YPF's Class D shares gave it the ability to control YPF's capital-raising because its vote as a Class D shareholder to

---

[37] *See* "Javier Milei confirmed that Osvaldo Giordano will head ANSES and Horacio Marín will chair YPF" CE Noticias Financieras English, November 24, 2023 (Exhibit 12). Business Monitor News, "Argentina Oil & Gas Profile: YPF," February 6, 2024 (discussing Marín's selection and background) (Exhibit 13).

17

approve these offerings was obligatory under YPF's bylaws. Similarly, because YPF could not delist from the NYSE without a voting approval by Argentina, ownership of the Class D shares was thus a central means to Argentina's control of YPF.

## Section IV: Conclusions

32. Based on the foregoing evidence, I conclude:

- YPF has engaged in extensive capital-raising activities in the United States markets, both at the time of its IPO and since Argentina retook control of YPF in April 2012. These activities have either depended upon or been greatly facilitated by YPF's maintenance of an ADR program with the Bank of New York Mellon, the listing of YPF's Class D shares on the New York Stock Exchange, YPF's continuation as a "reporting company" under the Securities Exchange Act, and its numerous SEC filings to regularly update and keep current its registration statement. Maintaining this status enabled YPF to convey credible financial information and thus conduct global debt offerings, selling over $2.4 billion in debt to U.S. institutional investors since 2015, and

- Argentina has used its controlling shares to direct YPF's major corporate actions, including its capital-raising activities in the United States and its selection of YPF's CEO. Argentina exercised and continues to exercise direction and control over YPF's capital-raising activities in numerous ways, including (i) through its appointment of YPF's Chairman and a majority of the members of its Board of Directors, (ii) removing Repsol and its directors in 2012, (iii) voting its shares at shareholder meetings to approve YPF's international debt issuances, and (iv)

18

Pursuant to 28 U.S.C. § 1746, I, John C. Coffee, Jr., declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

*John C Coffee, Jr.*

John C. Coffee, Jr.

Dated: March 27, 2024