**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., <br><br> Plaintiffs, <br><br> - against - <br><br> ARGENTINE REPUBLIC and YPF, S.A., <br><br> Defendants. | No. 15 Civ. 2739 (LAP) |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., <br><br> Plaintiffs, <br><br> - against - <br><br> ARGENTINE REPUBLIC and YPF, S.A., <br><br> Defendants. | No. 16 Civ. 8569 (LAP) |

**SECOND EXPERT REPORT OF NANCY C. LISSEMORE**

**March 27, 2024**

1. I, Nancy C. Lissemore, submit this second report as an expert witness for Plaintiffs in support of their Motion for Injunction and Turnover in the above-captioned actions. I previously submitted an expert report dated September 24, 2021 in these actions. *See* ECF No. 377-6.

2. In this second report, I provide my expert opinion on custom and practice for foreign private issuers sponsoring American Depositary Receipt ("ADR") programs, listing ADRs on U.S. stock exchanges, and filing registration statements with the U.S. Securities and Exchange Commission ("SEC") in support of their ADR programs. My opinion is based on my 26 years of experience advising issuers of ADRs, executing ADR programs, and reviewing related SEC registration statements and other relevant documents. I estimate that I have participated in more than 100 ADR programs similar to YPF S.A. ("YPF")'s ADR program.

I. QUALIFICATIONS

3. I have 29 years of global banking experience at Citibank, N.A. ("Citibank"). I retired as a managing director in July 2020. I spent 26 of those years in Citibank's depositary receipt business ("Citi ADRs"). I began my career in Citi ADRs in 1994 as an individual contributor on a transaction structuring team. This team was responsible for executing all types of transactions impacting the depositary receipt facility. The team worked with external legal counsel and investment banks to draft and execute transactional documentation related to primary and secondary offerings and corporate actions undertaken by our ADR clients. The transaction types included, but were not limited to, Initial Public Offerings ("IPOs"), secondary offerings, rights offerings, exchange offerings, and tender offerings. Further, the team worked with other relevant market participants (including the New York Stock Exchange ("NYSE"), NASDAQ, Depositary Trust Company, transfer agents, custodians, and brokers) to ensure the movement of cash and securities relating to the transactions. Most of these transactions included filing registration statements with the SEC. In addition to corporate actions, the team also facilitated

1

documentation related to our clients' proxies for annual general meetings and extraordinary general meetings.

4.     In 1996, I was promoted to manage the team of 10 senior transactors in Citi ADRs. By 2005, I was promoted to Global Head of Citi ADRs.  This expanded role not only included my prior structuring team, but also added responsibility for Sales, Relationship Management, Investor Relations, and Capital Markets Solutions, as well as responsibility to manage the Profit and Loss of this $400mm business.  My management responsibilities spanned 10 countries and included approximately 60 staff.  Citi ADRs' portfolio of ADR clients spanned 60 countries.

5.     I am familiar with NYSE-listed companies and NYSE rules through my role at Citi ADRs, and from sitting on the NYSE Committee on Securities for approximately 12 years, from 2004-2016.  This committee was an appeals panel of industry experts appointed by the NYSE to review appeals from publicly traded companies, many of which were at risk of losing their listing eligibility.  The Committee reviewed submissions by the issuer and the NYSE and held hearings to determine appropriate actions to be taken.

6.     I am also familiar with the roles and responsibilities of Boards of Directors.  I have sat on the Boards of Computershare Trust Company N.A. since September 2021 and Computershare Delaware Trust Company since June 2022.

7.     I graduated from Rutgers College School of Business in 1987 with a Bachelor of Science, majoring in Finance.  I graduated from Rutgers University School of Law with a Juris Doctor in 1990.  I am admitted to the bars of New York and New Jersey but am currently on retired status.

8.     A copy of my Curriculum Vitae is attached as Appendix A to this report and provides additional biographical details.

## II. OVERVIEW OF ADR PROGRAMS

9. An ADR is a negotiable security issued by a U.S. depositary bank that evidences ownership interest in American Depositary Shares ("ADSs") which, in turn, represent an interest in shares in a non-U.S. company (the terms ADR and ADS are often used interchangeably in the market). Each ADR represents a specific number of underlying ordinary shares in the non-U.S. company. The underlying shares are held in a custodian account in the foreign market that the depositary opens for the benefit of the ADR holders.

10. ADRs are treated as U.S. domestic securities by market participants. They are quoted and traded in U.S. dollars and are subject to the trading and settlement procedures of the market in which they trade. *See* Ex. 1 at 3, *SEC Office of Investor Education and Advocacy, Investor Bulletin: American Depositary Receipts* (August 2012), *available at* https://www.sec.gov/investor/alerts/adr-bulletin.pdf ("ADRs trade in U.S. dollars and clear through U.S. settlement systems, allowing ADR holders to avoid having to transact in a foreign currency.").

11. Foreign issuers frequently seek to raise capital in the U.S. and to become listed for trading on a U.S. securities exchange (e.g., NYSE or NASDAQ). ADRs are the most common vehicle for foreign issuers to list and offer securities to the public equity market in the U.S. Listing on a U.S. exchange via ADRs requires these foreign issuers to comply with the U.S. securities laws and the listing rules of the applicable exchange.

12. In order to establish an ADR program in connection with an IPO, an issuer must fully comply with SEC registration requirements and must list its securities on a public exchange. The issuer must file registration statements with the SEC in compliance with the Securities Act of 1933 (the "1933 Act"). These registration statements include: (1) a Form F-1 registration statement, which registers the underlying shares being offered to U.S. investors and contains

3

detailed information about the issuer and its shares; and (2) a Form F-6 registration statement, which registers the ADSs representing interests in the underlying shares and includes the deposit agreement and a sample ADR certificate.

13. In addition, and in order to be listed on a stock exchange, an issuer has registration and reporting requirements under the Securities Exchange Act of 1934 (the "1934 Act"). An issuer conducting an IPO and preparing a Form F-1 registration statement under the 1933 Act is eligible to comply with the 1934 Act by filing a Form 8-A registration statement, which registers the entire class of securities being listed on the exchange. A Form 8-A must be submitted before securities can be listed on an exchange. An issuer also has ongoing reporting obligations under the 1934 Act. It must annually file an annual report on Form 20-F. The Form 20-F identifies the registered class of shares and incorporates the annual report, financial statements, and other information on the company. There is also a requirement that a foreign issuer file a Form 6-K whenever significant information is (1) made public in its home country, (2) filed with a foreign stock exchange and made public, or (3) distributed to its securities holders.

14. Publicly traded ADR programs are described as Level 1, Level 2 or Level 3 programs. Level 1 programs are the most basic and are backed by existing shares of the issuer. The ADRs trade on the over-the-counter market. These programs have minimal SEC registration and reporting requirements. Level 2 programs are also backed by existing shares, but the ADRs trade on a stock exchange, such as NYSE or NASDAQ. These programs must comply with the registration and reporting requirements of the 1934 Act. Level 3 programs are the most complex and involve a new capital raising and are backed by newly issued shares, which are usually issued as part of an IPO. The ADRs are also listed on a stock exchange. Level 3 programs have registration and reporting requirements under both the 1933 Act and the 1934 Act.

15. The ADR security was established to overcome obstacles for U.S. persons to invest in equity of foreign companies. *See* Ex. 2 at 1 (Sullivan & Cromwell, Depositary Receipts Program Payments) ("Non-U.S. Issuers frequently participate in ADR programs in order to make their stock more accessible to U.S. investors."). By investing in ADRs, shareholders hold their securities in the U.S. without needing to open security and cash accounts in the foreign country. ADR investors receive dividends and other cash entitlements in U.S. dollars either by check or through their broker. *See id.* at 1 ("The ADR is priced in U.S. dollars . . . . The ADRs are traded like the shares of a U.S.-based company on U.S. exchanges and over-the-counter markets."); *see also* Ex. 3 at 2–3 (Cleary Gottlieb, *Guide to Public ADR Offerings in the United States*). Moreover, shareholders will vote according to U.S. proxy practices; receive corporate action notifications and other shareholder communications in English; and are afforded protections under U.S. securities laws and regulations. *See* Ex. 3 at 3.

16. Likewise, ADR programs have significant benefits for foreign issuers: (1) accessing the deep and robust U.S. capital market; (2) building visibility within the U.S.; (3) diversifying the shareholder base; and (4) enhancing liquidity by expanding the market for their shares. The increased access to U.S. investors also can help stabilize the share price for the issuer's underlying shares (which ordinarily are listed and traded on a foreign stock exchange), as well as facilitate future capital increases.

17. ADR holders can hold their securities (i) as physical ADR certificates, (ii) in a book-entry position with the depositary, or (iii) through a bank, broker, or other intermediary in a book-entry position in the Depository Trust Company ("DTC"). By far the most common way for individual and institutional investors to hold an ADR is through a brokerage firm, which must be a DTC "participant."

18. Once a foreign issuer has established an ADR program with a U.S. depositary bank, any holder of an ordinary share of the foreign issuer's stock can exchange that share for an ADR issued by the depositary bank and delivered to the investor according to its instructions. To carry out the exchange, the shareholder deposits its ordinary share with the depositary bank's custodian in the country where the share was issued. The investor must pay a fee of $0.05 per ADR issued by the depositary bank, and it also ordinarily must pay a service fee of up to $0.05 annually per ADR that it holds.

19. An ADR holder has an option to cancel the ADR through the depositary bank and have the depositary bank deliver an ordinary share according to delivery instructions in the foreign market. The investor must pay the same $0.05 fee per ADR cancelled by the depositary bank. The majority of cancellation requests are related to a sale of the security, when the buyer wants to receive ordinary shares.

20. The ease of the issuance and cancellation process may be negatively affected in restricted markets. Restricted markets, like Argentina, are markets that have burdensome currency controls or have restrictions on foreign ownership. Nevertheless, investors particularly favor ADRs from issuers in restricted markets, like Argentina. The ADR program alleviates concerns that the investors' shares and/or cash could get locked up in a restricted market. If an investor bought shares on the Bolsas y Mercados Argentinos (the "BYMA"), which is the Argentine stock exchange, it would have to open a local securities account to hold the shares and would need an Argentine Peso-denominated cash account to facilitate the purchase. Purchasing ADRs avoids these complications.

### III. THE ESTABLISHMENT OF YPF'S ADR PROGRAM

21. On November 6, 1992, the Argentine Republic enacted a Privatization Law that established the procedure by which YPF would be privatized. Within a year, the Argentine

Republic announced the terms for the global IPO of YPF's shares, which were owned by the Republic.  This global offering included an IPO of ADRs to be sold to investors in the United States and listed on the NYSE.  In May and June 1993, YPF established a Level 3 ADR program for its Class D shares, and on June 28, 1993, it launched a successful IPO, in which it sold a majority of the YPF shares owned by the Republic.

22.     Investment bankers would have advised the Argentine Republic that it was important to include a U.S. listing in its plan to privatize YPF.  By doing a registered offering in the U.S., the Argentine Republic would have access to deeper pools of capital and would expand the pool of potential investors.  In fact, at least 85% of the IPO would be in ADR form.  A small percentage of the shares would be offered in Argentina. In order to access the public markets in the U.S., YPF had to list its ADRs on an exchange, such as the NYSE.

23.     On June 28, 1993, YPF filed Amendment No. 5 to a Form F-1 with the SEC.  *See* Ex. 4.  As amended, this Form F-1 registered 125,000,000 Class D shares of YPF under the 1933 Act.  *See id.* at 1.  These shares were owned by the Argentine Republic and were to be sold as part of the U.S. IPO.  Amendment No. 5 to the Form F-1 was signed by the Board of Directors of YPF. *See id.* at 179.  The Board at the time consisted of three members, all of whom were appointed by the Argentine Republic, as the sole shareholder of YPF.  *See id.* at 73.

24.     On June 17, 1993, YPF and The Bank of New York ("BNY") filed Amendment No. 1 to a Form F-6 with the SEC.  *See* Ex. 5.  As amended, this Form F-6 registered 500,000,000 ADSs of YPF under the 1933 Act.  *See id.* at 2.  It included as an exhibit the form of the Deposit Agreement among YPF, BNY (as Depositary), and all Owners from time to time of ADRs issued thereunder.  *See id.* at 13-67.  Like the Form F-1, the Form F-6 was signed by all three members of YPF's Board of Directors.  *See id.* at 9.

25. On June 18, 1993, YPF filed a Form 8-A registration statement with the SEC. *See* Ex. 6. The Form 8-A registered the entire class of Class D shares of YPF under the 1934 Act. *See id.* at 1. It incorporated the description of the Class D shares contained in the Form F-1 that YPF had already filed with the SEC under the 1933 Act. *See id.* at 2.

26. On June 28, 1993, the SEC declared YPF's registration statements on Forms F-1, F-6, and 8-A effective. YPF's IPO was launched immediately upon the SEC's declaration of the registration statements as effective.

27. In accordance with the requirements of the 1934 Act, YPF has filed an annual report on Form 20-F with the SEC each and every year since the listing of its Class D shares on the NYSE in June 1993. Each of YPF's annual reports on Form 20-F states on its cover page that the securities registered under the 1934 Act consist of both YPF's ADSs and its Class D shares. *See, e.g.*, Ex. 7 (YPF Form 20-F for 2022). YPF has also filed numerous Form 6-Ks with the SEC each year. In 2023, for example, YPF filed 47 Form 6-Ks updating the American marketplace on various corporate developments and decisions. *See, e.g.*, Ex. 8 (Form 6-K filed on November 15, 2023).

28. Once the decision was made to include a U.S. ADR tranche in its IPO, YPF engaged BNY to act as the depositary bank for its "sponsored" ADR program. A sponsored ADR program is one in which the issuer actively creates an ADR program in order to gain access to U.S. investors. As noted above, YPF and BNY signed a deposit agreement, which was included as an exhibit to the Form F-6 that they filed with the SEC. Typically, the depositary and foreign issuer also enter into a financial agreement providing that the depositary bank would make financial contributions to the issuer for ADR program-related expenses. This is a private agreement and is not filed with the SEC. However, the issuer must now disclose the amount of the financial

contribution it receives from the depository bank. For example, YPF's annual report on Form 20-F for 2022 states that in 2022, BNY made payments totaling $2,312,416 to YPF for ADR program-related expenses. *See* Ex. 7 at 132.

29.     YPF continues to rely upon its ADR program to support the liquidity and market price of its Class D shares. On March 1, 2022, YPF and The Bank of New York Mellon ("BNYM") (which was formerly known as BNY) filed a Form F-6 registration statement with the SEC for the purpose of registering 100,000,000 **additional** ADSs under the 1933 Act. *See* Ex. 9 at 1. This Form F-6 was signed by Pablo González, the Chairman of YPF's board of directors, and seven other directors appointed by Argentina as majority shareholder. *See id.* at 5. It included as an exhibit the Amended and Restated Deposit Agreement among YPF, BNYM, and all Owners and Holders from time to time of ADRs issued thereunder.

### IV.    The Argentine Republic through its ownership of 200,589,525 Class D shares of YPF has benefited from the ADR listing in the United States.

30.     YPF's ADR program is strategically important to the liquidity and market price of its Class D shares. According to data provided by BNYM, as of March 20, 2023, there were 146,775,011 ADSs outstanding and 47 holders of record of ADSs. As explained above, by far the most common way for individual and institutional investors to hold an ADS is through a brokerage firm, which must be a DTC participant. The 47 holders of record of YPF's ADSs are most likely all brokerage firms, which hold the large number of outstanding ADSs on behalf of many thousands of individual and institutional investors.

31.     The 146,775,011 ADSs outstanding represent approximately 37% of the total number of YPF's issued and outstanding Class D shares. *See* Ex. 7 at 98. However, this ADS position represents an astounding 76.18% of the 192,671,458 freely traded Class D shares of YPF.

32.     As of February 16, 2023, YPF ADRs trade at $16.85 and have an average daily

trading volume of 2.28 million shares. The underlying Class D shares trade on the BYMA at $22.66 and have an average daily trading volume of only 294,000 shares. The Class D shares in Argentina trade at a significant 25% premium over the ADRs. This disparity can happen in restricted markets like Argentina because of the country's currency controls. Investors cannot and do not wish to hold shares and currency in Argentina. As a result of the ADR program, the Argentine Republic thus enjoys a 25% premium in the value of its 51% ownership of YPF through its holdings of the Class D shares.

33. The ADR program is vitally important to the stability of the YPF share price. If YPF were to terminate the ADR program, there would be a forced cancellation of the ADRs and a forced sale of the underlying Class D shares in Argentina. The market in Argentina, however, is too illiquid to handle the volume of sales that would ensue. This would cause a drastic drop in the share price. It is simple supply and demand. The Argentine market would be flooded with supply of the Class D shares and with little demand, the price would plummet.

34. The ADR program is also strategically important to the Argentine Republic if it reprivatizes YPF. By maintaining the ADR program and having the overwhelming majority of the liquidity in the ADR program, the Argentine Republic has a ready, set, go facility in place to sell its Class D shares to investors on the NYSE. The time and cost required for a major shareholder to sell its shares on the NYSE are significantly reduced if an issuer already is an SEC registrant and has an active NYSE ADR program in place.

Pursuant to 28 U.S.C. § 1746, I, Nancy C. Lissemore, declare under penalty of perjury that the foregoing is true and correct.

*Nancy C. Lissemore*
Nancy C. Lissemore
Executed on: 3/27/24

10