**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETERSEN ENERGÍA INVERSORA,   :
S.A.U. and PETERSEN ENERGÍA, S.A.U., :
                              :
        Plaintiffs,       :
                              :   Case No.:  1:15-CV-02739 (LAP)
        v.          :
                              :
ARGENTINE REPUBLIC and YPF S.A.,   :
                              :
        Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ETON PARK CAPITAL MANAGEMENT, :
L.P., ETON PARK MASTER FUND, LTD.,:
and ETON PARK FUND, L.P.,     :
                              :
        Plaintiffs,       :
                              :   Case No.:  1:16-CV-08569 (LAP)
        v.          :
                              :
ARGENTINE REPUBLIC and YPF S.A.,   :
                              :
        Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ARGENTINA'S OPPOSITION TO PLAINTIFFS' MOTION
## FOR INJUNCTION AND TURNOVER

Robert J. Giuffra Jr.
Sergio J. Galvis
Amanda F. Davidoff
Thomas C. White
Adam R. Brebner
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
(212) 558-4000

May 16, 2024                     *Counsel for the Argentine Republic*

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ......................................................................................1

BACKGROUND ...........................................................................................................4

ARGUMENT ................................................................................................................7

I.    THIS COURT CANNOT ORDER THE REPUBLIC TO TURN OVER THE
      YPF SHARES IN VIOLATION OF ARGENTINE LAW........................................... 7

      A.   This Court Has No Power To Order the Republic To Violate Its Own
           Laws. ...................................................................................................................7

      B.   The Act-of-State Doctrine Also Precludes Turnover of the YPF Shares. ..............9

II.   PLAINTIFFS'   PROPOSED   TURNOVER   ORDER   ALSO   WOULD
      VIOLATE THE FSIA....................................................................................... 10

      A.   The YPF Shares Are Not and Never Could Be "in the United States."................11

      B.   The YPF Shares Are Not "Used for a Commercial Activity in the United
           States." ...............................................................................................................13

           1.   The Republic's YPF Shares are "used" only in Argentina. ...................... 13

           2.   YPF's claimed commercial activities in the United States are not
                attributable to the Republic, nor are they the "use" of its shares.............. 17

      C.   The Republic's YPF Shares Were Not "Used for the Commercial Activity
           Upon Which the Claim Is Based."........................................................................20

           1.   The Republic's YPF Shares were not "used" to breach any
                contract.................................................................................................... 21

           2.   The "formation" of the obligation at issue is irrelevant and did not
                involve the Class D shares the Republic expropriated from Repsol......... 22

III.  THE YPF SHARES ARE NOT SUBJECT TO TURNOVER UNDER THE
      C.P.L.R................................................................................................................ 24

      A.   The YPF Shares Are Not Transferrable or in the Republic's Possession or
           Custody. ..............................................................................................................24

      B.   Federal Law Displaces C.P.L.R. § 5225 with Respect to the YPF Shares. ...........26

CONCLUSION ..........................................................................................................30

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*In re 650 Fifth Ave. & Related Properties*,
  2014 WL 1284494 (S.D.N.Y. Mar. 28, 2014) ........................................................16

*Af-Cap, Inc.* v. *Chevron Overseas (Congo) Ltd.*,
  475 F.3d 1080 (9th Cir. 2007) ...............................................................................14

*Alliance Bond Fund, Inc.* v. *Grupo Mexicano De Desarrollo, S.A.*,
  190 F.3d 16 (2d Cir. 1999) .....................................................................................24

*Arch Trading Corp.* v. *Republic of Ecuador*,
  839 F.3d 193 (2d Cir. 2016) ...................................................................................18

*Ashmore* v. *CGI Grp., Inc.*,
  923 F.3d 260 (2d Cir. 2019) ...................................................................................22

*Aurelius Cap. Partners* v. *Republic of Argentina*,
  2010 WL 768874 (S.D.N.Y. Mar. 5, 2010) ...............................................14, 15, 16

*Aurelius Cap. Partners* v. *Republic of Argentina*,
  584 F.3d 120 (2d Cir. 2009) .............................................................................11, 17

*In re Austrian, German Holocaust Litig.*,
  250 F.3d 156 (2d Cir. 2001) ...............................................................................1, 8

*Autotech Techs. LP* v. *Integral Research & Dev. Corp.*,
  499 F.3d 737 (7th Cir. 2007) .................................................................................27

*Bainbridge Fund Ltd.* v. *Republic of Argentina*,
  2023 WL 5747299 (S.D.N.Y. Sept. 6, 2023).............................................11, 28, 29

*Bolivarian Republic of Venezuela* v. *Helmerich & Payne Int'l Drilling Co.*,
  581 U.S. 170 (2017).................................................................................................9

*Boyle* v. *United Techs. Corp.*,
  487 U.S. 500 (1988).........................................................................................26, 29

*Braka* v. *Bancomer, S.N.C.*,
  762 F.2d 222 (2d Cir. 1985)...................................................................................10

*Celestin* v. *Caribbean Air Mail, Inc.*,
  30 F.4th 133 (2d Cir. 2022) .....................................................................................9

*City of New York* v. *Chevron Corp.*,
   993 F.3d 81 (2d Cir. 2021)..................................................................................4, 29

*Comm'ns Imp. Exp. S.A.* v. *Republic of Congo*,
   2023 WL 3601035 (S.D.N.Y. May 23, 2023) ........................................................17

*Commonwealth of N. Mariana Islands* v. *Canadian Imperial Bank of Com.*,
   990 N.E.2d 114 (N.Y. 2013)..............................................................................24, 25

*Conn. Bank of Com.* v. *Republic of Congo*,
   309 F.3d 240 (5th Cir. 2002) .....................................................................13, 14, 27

*Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*,
   333 F. Supp. 3d 380 (D. Del. 2018) ......................................................................16

*Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*,
   932 F.3d 126 (3d Cir. 2019)...................................................................................19

*Cuthill* v. *Blinken*,
   990 F.3d 272 (2d Cir. 2021) ..................................................................................20

*De Letelier* v. *Republic of Chile*,
   748 F.2d 790 (2d Cir. 1984)............................................................................20, 27

*Dexter & N.Y. & Cuba Mail S.S. Co.* v. *Republic of Korea*,
   132 F. Supp. 684 (S.D.N.Y. 1955)........................................................................27

*EM Ltd.* v. *Republic of Argentina*,
   695 F.3d 201 (2d Cir. 2012)...................................................................................27

*Exp.-Imp. Bank Republic of China* v. *Grenada*,
   768 F.3d 75 (2d Cir. 2014)............................................................................. *passim*

*First Nat'l City Bank* v. *Banco Para el Comercio Exterior de Cuba*,
   462 U.S. 611 (1983)................................................................................................18

*Flatow* v. *Islamic Republic of Iran*,
   76 F. Supp. 2d 16 (D.D.C. 1999) ..........................................................................20

*Foremost-McKesson, Inc.* v. *Islamic Republic of Iran*,
   905 F.2d 438 (D.C. Cir. 1990) ..............................................................................19

*Friedman* v. *Government of Abu Dhabi*,
   464 F. Supp. 3d 52 (D.D.C. 2020)........................................................................23

*Gryphon Domestic VI, LLC* v. *APP Int'l Finance Co., B.V.*,
   836 N.Y.S.2d 4 (N.Y. App. Div. 2007) ................................................................29

*Havens* v. *James*,
    76 F.4th 103 (2d Cir. 2023) ........................................................................12

*Ings* v. *Ferguson*,
    282 F.2d 149 (2d Cir. 1960)...........................................................................8

*Intellivision* v. *Microsoft Corp.*,
    484 F. App'x 616 (2d Cir. 2012) .................................................................22

*Inter-Reg'l Fin. Grp., Inc.* v. *Hashemi*,
    562 F.2d 152 (2d Cir. 1977)........................................................................29

*JPMorgan Chase Bank, N.A.* v. *Herman*,
    168 A.3d 514 (Conn. App. Ct. 2017)..........................................................12

*Kadic* v. *Karadzic*,
    70 F.3d 232 (2d Cir. 1995).........................................................................30

*Koehler* v. *Bank of Bermuda Ltd.*,
    911 N.E.2d 825 (N.Y. 2009)..................................................4, 24, 28, 29

*Levin* v. *Bank of N.Y.*,
    2022 WL 523901 (S.D.N.Y. Feb. 21, 2022).........................................4, 28

*Liu* v. *U.S. Congress*,
    834 F. App'x 600 (2d Cir. 2020) ...................................................................8

*Minerva Surgical, Inc.* v. *Hologic, Inc.*,
    594 U.S. 559 (2021).....................................................................................28

*Ministry of Supply, Cairo* v. *Universe Tankships, Inc.*,
    708 F.2d 80 (2d Cir. 1983)..........................................................................19

*MMA Consultants 1, Inc.* v. *Republic of Peru*,
    719 F. App'x 47 (2d Cir. 2017) ...................................................................22

*Motorola Credit Corp.* v. *Uzan*,
    388 F.3d 39 (2d Cir. 2004)............................................................................8

*New Hampshire* v. *Maine*,
    532 U.S. 742 (2001)...............................................................................4, 22

*NML Capital* v. *Republic of Argentina*,
    2013 WL 655211 (N.D. Cal. Feb. 21, 2013) .........................................3, 18

*OBB Personenverkehr AG* v. *Sachs*,
    577 U.S. 27 (2015)......................................................................................21

*Permanent Mission of India* v. *City of New York*,
    551 U.S. 193 (2007)..............................................................................30

*Peterson* v. *Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) ...........................................................27

*Peterson* v. *Islamic Republic of Iran*,
    876 F.3d 63 (2d Cir. 2017)............................................................7, 29

*Republic of Argentina* v. *NML Capital, Ltd.*,
    573 U.S. 134 (2014)......................................................................29, 30

*Republic of Austria* v. *Altmann*,
    541 U.S. 677 (2004)..............................................................................10

*Republic of Philippines* v. *Pimentel*,
    553 U.S. 851 (2008)..........................................................................1, 9

*Republic of Philippines* v. *Westinghouse*,
    43 F.3d 65 (3d Cir. 1994) ......................................................................8

*Rubin* v. *Islamic Republic of Iran*,
    830 F.3d 470 (7th Cir. 2016) ...............................................................27

*Sales* v. *Republic of Uganda*,
    1993 WL 437762 (S.D.N.Y. Oct. 23, 1993) ........................................20

*Shapiro* v. *Republic of Bolivia*,
    930 F.2d 1013 (2d Cir. 1991)................................................................19

*Samantar* v. *Yousuf*,
    560 U.S. 305 (2010)..............................................................................28

*Societe Nationale Industrielle Aerospatiale* v. *U.S. Dist. Ct. for S. Dist. of Iowa*,
    482 U.S. 522 (1987)................................................................................7

*Thai Lao Lignite (Thailand) Co., Ltd.* v. *Gov't of Lao People's Democratic Republic*,
    2013 WL 1703873 (S.D.N.Y. Apr. 19, 2013)................................13, 15

*Turkiye Halk Bankasi A.S.* v. *United States*,
    598 U.S. 264 (2023)......................................................................28, 29

*U.S. Fid. & Guar. Co.* v. *Braspetro Oil Servs., Co.*,
    199 F.3d 94 (2d Cir. 1999)...................................................................18

*W.S. Kirkpatrick & Co., Inc.* v. *Env't. Tectonics Corp., Int'l*,
    493 U.S. 400 (1990)..............................................................................10

*Walters* v. *Indus. & Com. Bank of China*,
    651 F.3d 280 (2d Cir. 2011)............................................................... *passim*

**Statutes**

28 U.S.C. § 1602 ..........................................................................................2

28 U.S.C. § 1605 ............................................................................13, 14, 20

28 U.S.C. § 1609 ............................................................................2, 10, 11

28 U.S.C. § 1610 ................................................................................ *passim*

C.P.L.R. § 105 .............................................................................................25

C.P.L.R. § 5201 ..................................................................................4, 24, 25

C.P.L.R. § 5225 ................................................................................... *passim*

U.C.C. § 8-110 ...........................................................................................26

U.C.C. § 8-112 ..................................................................................4, 25, 26

**Other Authorities**

Charter of the Organization of American States .........................................30

H.R. Rep. 94-1487 (1976), *as reprinted in* 976 U.S.C.C.A.N. 6604 .....................21, 27

Restatement (Fourth) of Foreign Relations Law § 432 (2018).......................30

## PRELIMINARY STATEMENT

Through their motion,[1] Plaintiffs ask this Court to order the Argentine Republic, a foreign sovereign, to relinquish its controlling stake in that nation's largest energy company. Without citing any case that has granted such extraordinary relief, Plaintiffs assert that their motion is "straightforward" (Mot. 1), and that Section 5225 of the New York Civil Practice Law and Rules ("C.P.L.R.") somehow authorizes this relief by way of an injunction and turnover order. Specifically, Plaintiffs ask the Court to require the Republic first to transfer to the United States from Argentina the totality of its 200,589,525 Class D shares of YPF S.A. (the "YPF Shares"), and then to deliver those shares to Plaintiffs to satisfy partially the Court's $16.1 billion judgment while it is on appeal.  As required by settled law, this Court should deny Plaintiffs' motion.

*First*, international comity and the act-of-state doctrine bar Plaintiffs' requested relief.  The Republic would violate Law No. 26,741, the YPF Expropriation Law, enacted by the Argentine Congress in 2012 and still in effect, by delivering its 51% stake in YPF to Plaintiffs. Law 26,741 (1) specifically declared the Republic's expropriation of the YPF Shares from Repsol a matter of "public interest"; and (2) prohibits their "future transfer" "without the permission of the National Congress by a two-thirds vote of its members."  (Ex. 1 (YPF Expropriation Law) Arts. 1, 7, 10.)

An order from this Court that the Republic violate its own laws by transferring the YPF Shares to Plaintiffs would be an impermissible affront to Argentine sovereignty.  *See Republic of Philippines* v. *Pimentel*, 553 U.S. 851, 866 (2008).  And it is blackletter law that a U.S. court cannot "require [any] action[] of the legislature of a foreign sovereign" to change those laws.  *In*

---

[1]  *Petersen* ECF No. 555; *Eton Park* ECF No. 481.  All subsequent references to "ECF No. __" are to the docket filings in *Petersen Energía, et al.* v. *Argentine Republic*, 15-cv-02739-LAP.

*re Austrian, German Holocaust Litig.*, 250 F.3d 156, 164 (2d Cir. 2001).  This Court has already recognized that the act-of-state doctrine requires it to treat the Republic's expropriation of the YPF Shares as "valid." (Sept. 9, 2016 MTD Order (ECF No. 63) at 24.)  Plaintiffs' proposed turnover order would do nothing less than reverse that valid sovereign act.

      *Second*, beyond that threshold barrier, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, bars the proposed turnover order.  Under the FSIA, a foreign sovereign's property in the United States "shall be immune from attachment arrest and execution." 28 U.S.C. § 1609.  There are only narrow exceptions to this broad protection.  Plaintiffs invoke one limited exception (Mot. 8)—(i) for "property in the United States of a foreign state," (ii) "used for a commercial activity in the United States" and (iii) "used for the commercial activity upon which the claim is based." *Id.* § 1610(a)(2).  But Plaintiffs cannot satisfy any of its requirements.

      It is uncontested that the YPF Shares are in Argentina, not "in the United States" as the FSIA requires.  (Mot. 17.)  And the YPF Shares have **never** been in the United States and **cannot** be brought here.  Instead, the YPF Shares are uncertificated Argentine securities, which exist in book-entry form in the custody of Caja de Valores S.A. ("CdV"), a privately owned securities depositary (which also acts as custodian and registrar for all YPF shares) in Argentina. Title to the YPF Shares (but not the YPF Shares themselves) can be transferred only in accordance with Argentine law and by, *inter alia*, having those securities registered under the name of a person other than the Republic with CdV in Argentina.  (Mot. 19; *see also* Expert Decl. of Rafael M. Manóvil ("Manóvil") ¶ 38.)  Plaintiffs try to gloss over this fact by proposing that this Court order non-party Bank of New York Mellon ("BNYM") to assume custody of the shares in a "global custody account . . . in New York."  But the Republic does not have such an account with BNYM. In any event, as Plaintiffs concede, BNYM's "global custody" service does not involve BNYM

bringing securities into the United States but instead involves private arrangements with local "sub-custodian" entities that hold securities *outside* the United States.  (Mot. 19.)  In other words, the YPF Shares would remain in Argentina even as part of BNYM's "global custody" service.

Even if the YPF Shares could be transferred into the United States, they would not be subject to attachment or execution upon arrival here because the Republic does not "use" them "for commercial activity in the United States."  Instead, as this Court has held, the Republic "uses" its shares (*i.e.*, votes them at shareholder meetings) in Argentina.  (MTD Order 12–14; Manóvil ¶¶ 15–18.)  Plaintiffs cannot rely on assertions about claimed YPF commercial activities in the United States to circumvent this requirement:  YPF is a separate legal entity, and under both Argentine and United States law, its activities cannot be attributed to the Republic.  (Manóvil ¶¶ 19–28; Third Rep. of Steven Davidoff Solomon ("Solomon") ¶¶ 8, 17–23.)  Tellingly, Plaintiffs do not attempt to pierce the corporate veil (which they have no basis to do, *see NML Capital* v. *Republic of Argentina*, 2013 WL 655211, at *2 (N.D. Cal. Feb. 21, 2013)).

Plaintiffs also cannot show that the YPF Shares are property that "is or was used for the commercial activity upon which the claim is based," 28 U.S.C. § 1610(a)(2), when they previously argued the opposite to assert U.S. jurisdiction.  To overcome the Republic's jurisdictional sovereign immunity and to assert their claims were separate from, and had no effect upon, the Republic's expropriation of the YPF Shares, Plaintiffs repeatedly argued that "Argentina's expropriation of Repsol's shares [was] irrelevant" to their claims (Pls.' MTD Opp. Br. (ECF No. 44) at 13), because the "[YPF] shares from which Plaintiffs derive their claims" were the shares Plaintiffs formerly owned, *not* the expropriated shares.  (Pls.' MSJ Opp. Br. (ECF No. 392) at 69.)  The Court accepted Plaintiffs' argument, holding at both the motion-to-dismiss stage and on summary judgment that Plaintiffs' Complaint concerned "Argentina's failure to issue a

tender offer" (MTD Order 13), and "the tender obligation [was] not attached to the shares that the Republic acquired" (Mar. 31, 2023 MSJ Order (ECF No. 437) at 50).  Because the Court accepted Plaintiffs' argument at a prior stage of the case to rule against the Republic, Plaintiffs are now judicially estopped from reversing course to argue their claims *were* based on the expropriated YPF Shares.  *See New Hampshire* v. *Maine*, 532 U.S. 742, 749 (2001).

    *Finally*, C.P.L.R. § 5225 does not allow Plaintiffs' proposed turnover order.  The Republic's YPF Shares are not transferable, *see* C.P.L.R. § 5201(b), and are in the custody of CdV, not the Republic—as Plaintiffs effectively concede when they invoke U.C.C. § 8-112 (Mot. 18), which C.P.L.R. § 5201(c) applies only to third parties.  And even if Plaintiffs' motion was properly directed at the Republic, the FSIA and federal common law confer absolute immunity on a foreign sovereign's property in the sovereign's territory, which trumps the operation of C.P.L.R. § 5225 against the Republic here.  *See Levin* v. *Bank of N.Y.*, 2022 WL 523901, at *4 (S.D.N.Y. Feb. 21, 2022) (Oetken, J.).  C.P.L.R. § 5225 may allow courts to order turnover of extraterritorial assets by private citizens, *see Koehler* v. *Bank of Bermuda Ltd.*, 911 N.E.2d 825, 830 (N.Y. 2009), but this New York law cannot apply where it is "incompatible" with federal law affording the YPF Shares in Argentina absolute immunity from attachment and execution.  *See City of New York* v. *Chevron Corp.*, 993 F.3d 81, 91 (2d Cir. 2021).

## BACKGROUND

    YPF S.A. is an Argentine corporation (*sociedad anónima*) incorporated under the laws of Argentina, operating in Argentina, and headquartered in Buenos Aires.  (Ex. 2, 2023 YPF 20-F (Apr. 25, 2024), at 17.)  The Republic acquired the YPF Shares via expropriation.  (*Id.* at 18.)

    On May 3, 2012, the Argentine Congress passed Law No. 26,741, otherwise known as the YPF Expropriation Law, which became effective on May 7, 2012.  (*Id.* at 17.)  To promote the "national public interest" of "[a]chieving self-sufficiency in the supply of hydrocarbons as well

as in the exploration, exploitation, industrialization, transportation and sale of hydrocarbons . . . with the goal of guaranteeing socially equitable economic development, the creation of jobs, the increase of the competitiveness of various economic sectors and the equitable and sustainable growth of the provinces and regions," the YPF Expropriation Law "declared [of] public interest and subject to expropriation" 51% of the equity of YPF, "represented by an identical stake of Class D shares held by Repsol."  (Ex. 1, YPF Expropriation Law Arts. 1, 7.)  The Law further provided that 51% of the expropriated YPF Shares would belong to the National Government and 49% would be distributed among Argentina's oil-producing Provinces that are part of the *Organización Federal de Estados Productores de Hidrocarburos* ("OFEPHI").  (*Id.* Art. 8.)  That transfer is pending.  (Ex. 2 at 18.)  Except for this transfer to the OFEPHI Provinces, the YPF Expropriation Law prohibits "any future transfer of the shares" "without the permission of the National Congress by a two-thirds vote of its members."  (Ex. 1, YPF Expropriation Law Art. 10.)  The Republic took title to the expropriated YPF Shares in Argentina in May 2014.  (Ex. 2 at 18.)

The YPF Shares are held in book-entry form at CdV in Argentina, as all YPF shares are.  (*See* Manóvil ¶¶ 33–35; *see also* Fourth Coffee Expert Rep. ("Coffee") Ex. 6 (YPF Bylaws) § 7(a) ("Shares . . . shall be book-entry shares.").)[2]  CdV, an Argentine private corporation established in 1974, acts in Argentina as the depositary, registrar, and custodian for all YPF shares.  (*See* Manóvil ¶ 36; Mastro Ex. 14 at 4–6; Mastro Ex. 15 at 12 (depositories like CdV "operate within national borders").)  As the registrar, CdV has custody of all YPF shares, including the Republic's.  CdV is also responsible for recording in the share registry any changes in title to the

---

[2]  YPF ADRs, representing YPF ADSs, trade on the New York Stock Exchange.  (Ex. 2 at 120.) YPF ADSs are not shares of YPF; they are separate securities that represent the rights attributable to YPF Class D shares in the custody of a local sub-custodian on behalf of BNYM in Argentina. (56.1 Stmt. Resp. (ECF No. 393) ¶ 6; *see* Mot. 19; Second Lissemore Expert Rep. ("Lissemore") ¶ 9; Mastro Ex. 16.)  The YPF Shares are held in Argentina and are not ADSs.  (Mot. 2.)

shares, with such changes only becoming binding and enforceable against third parties once registered by CdV.  When book-entry shares are "transferred" from one owner to another, no physical transfer occurs:  the transfer is noted in the registry, and the shares remain in the custody of CdV in Argentina.  (Manóvil ¶¶ 37–38; *see also* Mastro Ex. 14 at 32 ("dematerialized security positions" may not "be re-certificated and held outside" of CdV in Argentina).)

The Republic exercises its rights as a shareholder by voting at YPF shareholder meetings.  (*See* Manóvil ¶ 11 (explaining rights of shareholders in an Argentine company under Argentine law include the right to "vote at a shareholders' meeting").)  All YPF shareholder meetings must—and do—take place in Argentina.  (*Id.* ¶¶ 16–19; *see* MTD Order 14 (the Republic "exercise[s] shareholder rights," "including voting, . . . in Argentina").)  At these shareholder meetings, the Republic, together with the other shareholders, votes to elect the Board and to approve initiatives generally proposed by the Board, including those that require shareholder approval under Argentina's laws.  For example, the Board may include in the shareholder meeting agenda a proposal on debt issuance, and shareholders may approve it or not at the meeting by voting their shares.  (Manóvil ¶¶ 31–32; *see, e.g.*, Mastro Ex. 7 (Apr. 2023 Meeting Minutes) at 26.)  The YPF Board or management then decides how to execute the authority granted to it by that vote.  (*See*, *e.g.*, Manóvil ¶ 32 (in cases of debt issuances, the YPF Board decides whether to issue such debt and if such debt is issued, "the time, the amount, the conditions, the rate of interest, . . . and also the markets in which [ ] bonds will be offered"); Mastro Ex. 7 at 26; *see also* Solomon ¶¶ 8–23 (describing concepts of corporate separateness and shareholder rights).)

On September 15, 2023, this Court entered a $16.1 billion judgment in favor of Plaintiffs, which is on appeal.  (*See* Notice of Appeal (ECF No. 504).)  On April 1, 2024, while that appeal is still being briefed, Plaintiffs filed their motion seeking an injunction and order

requiring the Republic to "transfer the [YPF] Shares into a global custody account at [BNYM] in New York," and then to "instruct BNYM to initiate a transfer of [the Republic]'s ownership interests in the [YPF] Shares to Plaintiffs or their designees."  (ECF Nos. 555, 555-1.)

## ARGUMENT

## I.   THIS COURT CANNOT ORDER THE REPUBLIC TO TURN OVER THE YPF SHARES IN VIOLATION OF ARGENTINE LAW.

### A.   This Court Has No Power To Order the Republic To Violate Its Own Laws.

International comity—"the recognition which one nation allows within its territory to . . . another nation, having due regard to both international duty and convenience, and to the rights of its own citizens or of other persons who are under the protections of its laws"—requires this Court to deny Plaintiffs' motion outright.  *Societe Nationale Industrielle Aerospatiale* v. *U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987) (citation omitted); *see Peterson* v. *Islamic Republic of Iran*, 876 F.3d 63, 94 & n.23, 95 (2d Cir. 2017) (remanding for district court to consider whether a § 5225 turnover order directed at a foreign sovereign's extraterritorial assets "will infringe on sovereign interests of a foreign state"), *judgment vacated sub nom.*, *Clearstream Banking S.A.* v. *Peterson*, 140 S. Ct. 813 (2020).

1.   Since 2012, Argentine law has barred the transfer of the Republic's YPF Shares to *anyone* without a super-majority Congressional vote.  The YPF Expropriation Law explicitly (1) designates 49% of the expropriated shares (*i.e.*, the YPF Shares) to the Argentine Provinces that are part of OFEPHI; and (2) forbids any other transfer of the expropriated YPF Shares "without the permission of the National Congress by a two-thirds vote of its members."[3] (Ex. 1, YPF Expropriation Law Arts. 8, 10.)  As Plaintiffs recognize, the YPF Expropriation Law

---

[3]  The Court has recognized the Republic cannot pledge to Plaintiffs its YPF Shares "earmarked for the Argentine Provinces."  (Nov. 21, 2023 Order (ECF No. 527) at 10.)

is itself a "legal mandate."  (Mot. 11–12.)  As an independent bar to turnover, Article 170 of the Permanent Supplementary Budget Law provides for payments only of final judgments, which the judgment here is not.  (*See* Expert Decl. of Alfonso Santiago ("Santiago") ¶¶ 27, 29–30.)

If the Court ordered the Republic to turn over its YPF Shares (or any ownership interests in those shares) to Plaintiffs, that order would either (1) purport to obligate two thirds of Argentina's Congress to pass a law authorizing such transfer as a judgment-related payment; or (2) call for the Republic to violate the YPF Expropriation Law and Article 170 of the Permanent Supplementary Budget Law.  (*See* Santiago ¶¶ 29–30.)  As the Second Circuit has held, federal courts have no power to require "the legislature of a foreign sovereign" to "enact or change a law." *Holocaust Litig.*, 250 F.3d at 164–65 (granting mandamus petition and instructing district court to omit language from order that would "seemingly require[] the German legislature" to make changes to its laws).  To "so . . . trammel on the prerogatives of a legislature" is simply "beyond the authority" of the judiciary.  *Id.* at 164; *see also Liu* v. *U.S. Congress*, 834 F. App'x 600, 606 (2d Cir. 2020) (federal courts "lack the power to compel [even] the [U.S.] Congress to exercise its legislative powers").  That is because "each sovereign nation has the sole jurisdiction to prescribe and administer its own laws."  *Republic of Philippines* v. *Westinghouse*, 43 F.3d 65, 79 (3d Cir. 1994) (vacating injunction regulating sovereign's conduct within its borders).

It is likewise a "fundamental principle[]" of international comity that "our courts dedicated to the enforcement of our laws should not take such action as may cause a violation of the laws of a friendly neighbor."  *Ings* v. *Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960); *Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) ("[A] state may not require a person to do an act in another state that is prohibited by the law of that state.").  Because of the unavoidable conflict between Argentine law and Plaintiffs' requested relief, comity requires denial of the motion.

2.     Courts also recognize the "specific affront" to foreign sovereigns "if property they claim is seized by the decree of a foreign court."  *Pimentel*, 553 U.S. at 866; *see Walters* v. *Indus. & Com. Bank of China*, 651 F.3d 280, 289 (2d Cir. 2011) ("'[J]udicial seizure' of the property of a friendly state may be regarded as 'an affront to its dignity'").  This Court's ordering turnover of the Republic's majority ownership in YPF would be a serious "affront" to its sovereignty—particularly when such a turnover would reach into Argentine territory, undo the Republic's valid expropriation of Repsol's shares, and contravene the YPF Expropriation Law.

U.S. courts' "grant of immunity to foreign sovereigns dovetails with [the U.S.'s] own interest in receiving similar treatment."  *Bolivarian Republic of Venezuela* v. *Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 183 (2017).  As the United States recently advised the Second Circuit, a § 5225 turnover order directed at a foreign sovereign's property when that "property is located abroad, including in the foreign state's own territory . . . could in turn put U.S. property at risk, given the possibility of reciprocal adverse treatment of the United States in foreign courts."  Ex. 3, Br. for the United States as *Amicus Curiae* at 26, *Levin* v. *Bank of N.Y. Mellon*, 22-624 (2d Cir. Nov. 10, 2022).  These principles similarly require denial of Plaintiffs' motion.

**B.     The Act-of-State Doctrine Also Precludes Turnover of the YPF Shares.**

Under the act-of-state doctrine, U.S. courts cannot "declar[e] invalid, and thus ineffective as a rule of decision, the official act of a foreign sovereign."  *Celestin* v. *Caribbean Air Mail, Inc.*, 30 F.4th 133, 137 (2d Cir. 2022).  This is "a principle of decision" that is binding on this Court.  *Id.* at 138.  This Court has thus recognized that it is "require[d] [to] proceed under the assumption that the . . . expropriation in Argentina [was a] valid act[]."  (MTD Order 24.)

The YPF Expropriation Law did not merely transfer YPF Shares into the Republic's possession in Argentina:  it prohibits their future transfer without Congressional permission.

(Ex. 1, YPF Expropriation Law Art. 10.)  This is a "valid" part of the act in furtherance of public policy the Argentine Congress "performed . . . within [the Republic's] own borders."  *Republic of Austria* v. *Altmann*, 541 U.S. 677, 700 (2004).  Under the act-of-state doctrine, this Court may not order the Republic to transfer the YPF Shares (to BNYM or Plaintiffs), which would in effect render the prohibition on transfer "null and void."  *W.S. Kirkpatrick & Co., Inc.* v. *Env't. Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990).  Such an extraordinary order requiring the Republic "to violate its own national law with respect to an obligation wholly controlled by [Argentine] law" would also be an "impermissible 'inquiry into the legality, validity, and propriety of the acts and motivation of [a] foreign sovereign[] acting in [its] governmental role[] within [its] own boundaries.'"  *Braka* v. *Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985) (citation omitted). The request for this order should be denied.

## II.   PLAINTIFFS' PROPOSED TURNOVER ORDER ALSO WOULD VIOLATE THE FSIA.

The FSIA requires denial of the motion as well.  Even if this Court could use § 5225 to order the Republic to bring property from Argentina to the United States to satisfy this judgment—which it cannot, *see* Section III—that order would be futile.  Upon arrival in the United States, the YPF Shares would be property "in the United States of a foreign state" and "immune" from attachment or execution.  28 U.S.C. § 1609.  The YPF Shares would remain immune because they do not fall within the only FSIA exception to attachment or execution immunity that Plaintiffs assert is available.  As the Second Circuit has explained, the FSIA "was intended to reduce the scope of immunity from suit previously extended to foreign sovereigns engaging in commercial activity in the United States," but "designed to maintain broad immunity from attachment of a

sovereign's property." *Exp.-Imp. Bank Republic of China* v. *Grenada*, 768 F.3d 75, 90 (2d Cir. 2014). That broad immunity bars Plaintiffs' requested turnover order.[4]

Under FSIA § 1609, a foreign sovereign's property "is immune from attachment or execution unless the property fits within one of the limited exceptions enumerated in [§ 1610] of the Act." *Aurelius Cap. Partners* v. *Republic of Argentina*, 584 F.3d 120, 129–30 (2d Cir. 2009). To overcome that broad immunity, Plaintiffs have the burden of demonstrating an "exception to foreign sovereign immunity [from attachment or execution] applies." *Bainbridge*, 2023 WL 5747299, at *6. In trying to do so, Plaintiffs rely on FSIA § 1610(a)(2), which creates a limited exception only for property (1) "in the United States of a foreign state"; (2) "used for a commercial activity in the United States"; *and* (3) that "is or was used for the commercial activity upon which the claim is based." Plaintiffs cannot satisfy any of these three requirements.

### A.    The YPF Shares Are Not and Never Could Be "in the United States."

1.     As Plaintiffs concede, the Republic's YPF Shares, like all YPF shares, are maintained in Argentina in book-entry form with CdV. (Mot. 17.) CdV has custody of all YPF Shares and maintains that custody independently of whether title passes to a different owner. (Manóvil ¶ 38; Mastro Ex. 14 at 32 (book-entry shares may not "be re-certificated and held outside" of CdV).) As the YPF Shares are not, have never been, and could never be "in the United States," Plaintiffs cannot meet § 1610(a)(2)'s first requirement.

2.     To circumvent that the YPF Shares are and will remain in Argentina, Plaintiffs ask this Court to order the Republic to "transfer . . . its YPF shares to a global custody account at BNYM in New York." (Mot. 19.) But the Court cannot enter such an order: a "global

---

[4]  As this Court noted in *Bainbridge Fund Ltd.* v. *Republic of Argentina*, the "prudent course is to evaluate whether the assets are subject to execution immunity before ordering" turnover. 2023 WL 5747299, at *4 (S.D.N.Y. Sept. 6, 2023) (Preska, J.).

custody" account is a commercial product set up for specific "clients."  (Mastro Ex. 15 at 3.) BNYM has no "global custody" account relationship with the Republic to which the YPF Shares could be transferred—and Plaintiffs present no evidence that such an account could be created by BNYM, which presumably would have to satisfy its own due diligence before doing so.  (*See* Mot. 19–20 ("historically" BNYM has "had contractual relationships" with the Republic only regarding "sovereign debt" and with YPF regarding ADRs).)  BNYM also is not before the Court and cannot be ordered to enter into a commercial relationship with the Republic.  *See Havens* v. *James*, 76 F.4th 103, 111 (2d Cir. 2023) ("entering an injunction against a non-party" is "forbidden").

In any event, even if such a contractual relationship did exist, and this injunction were carried out, the YPF Shares themselves would never leave Argentina.  As Plaintiffs concede, when acting as a "global custodian," BNYM uses "local sub-custodians in foreign markets" to hold foreign securities.  (Mot. 19; Mastro Ex. 15 at 10 ("custodians may establish contractual relationships with local sub-custodian banks, rather than establish a physical presence"); Mastro Ex. 16 (list of BNYM sub-custodians); *see* Lissemore ¶ 9 (for ADRs, "[t]he underlying shares are held in a custodian account in the foreign market").)  Thus, "transferring" the YPF Shares to a BNYM global custody account would involve changing only the YPF share registry at CdV to identify BNYM's local sub-custodian in Argentina as the beneficial owner; the book-entry YPF Shares would still exist only in the register maintained by CdV in Argentina.[5]  Because the YPF Shares would not leave Argentina and enter the United States, Plaintiffs cannot meet this first requirement for the FSIA's exception from execution immunity.  (*See* Manóvil ¶¶ 37–38.)

---

[5]  Plaintiffs' citation (Mot. 20) to *JPMorgan Chase Bank, N.A.* v. *Herman*, 168 A.3d 514 (Conn. App. Ct. 2017) is inapposite; the YPF Shares are not held by a broker in the United States.

**B.    The YPF Shares Are Not "Used for a Commercial Activity in the United States."**

Even if the Republic's YPF Shares were in the United States (which they are not), or could be brought into the United States (which they cannot), the Republic's YPF Shares would be immune from attachment or execution under the FSIA because (1) the Republic "uses" the YPF Shares exclusively in Argentina, not in the United States; and (2) every one of the claimed commercial activities in the United States identified in the motion is an activity of YPF—not of the Republic.

**1.    The Republic's YPF Shares are "used" only in Argentina.**

To be subject to attachment or execution under § 1610(a), the YPF Shares "must be *both* (1) used for a commercial activity[,] and (2) used [for such activity] in the United States." *Thai Lao Lignite (Thailand) Co., Ltd.* v. *Gov't of Lao People's Democratic Republic*, 2013 WL 1703873, at *6 (S.D.N.Y. Apr. 19, 2013) (Wood, J.) (vacating restraining notice and denying motion to commence turnover proceedings); *see Conn. Bank of Com.* v. *Republic of Congo*, 309 F.3d 240, 251 (5th Cir. 2002) (a foreign sovereign's property "is not . . . subject to execution or attachment if it is not 'used for' a commercial activity within our borders").

1.    These requirements reflect that the "commercial activity" exception to *execution* immunity in § 1610 is narrower than the "commercial activity" exception to *jurisdictional* immunity in § 1605.  The FSIA authorizes jurisdiction over a foreign sovereign based upon, among other things, "an act *outside* the territory of the United States *in connection with* a commercial activity of the foreign state *elsewhere* [if] that act causes a direct effect in the United States."  28 U.S.C. § 1605(a) (emphases added).  This Court relied on this provision of § 1605(a)(2) to exercise jurisdiction, holding that Plaintiffs' claims were "based on acts outside the territory of the United States" that allegedly had a "direct effect" here.  (MTD Order 12–19.)

As the Second Circuit has explained, the "breadth" of § 1605(a) "stands in contrast to the more limited scope of [§] 1610(a)." *Exp.-Imp. Bank*, 768 F.3d at 90; *see Walters*, 651 F.3d at 289 ("[T]he asymmetry between jurisdiction and execution immunity in the FSIA reflects a deliberate congressional choice to create a 'right without a remedy'" in some circumstances). Under § 1610(a)'s more limited exception, a foreign sovereign's property is not "used for" commercial activity when it is merely used "in connection with a commercial activity or in relation to a commercial activity." *Exp.-Imp. Bank*, 768 F.3d at 89 (adopting approach of *Conn. Bank*, 309 F.3d 240, and *Af-Cap, Inc.* v. *Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080 (9th Cir. 2007)). "If Congress had intended to allow execution on property that had a 'relationship with' or was 'integral to' a commercial transaction in the United States, we would expect it to say as much, probably by using the same phrase ('in connection with') as it used in crafting the exception to jurisdictional immunity. Instead, . . . Congress used the more specific phrase 'used for a commercial activity.'" *Conn. Bank*, 309 F.3d at 255.

2.      Section 1610(a)'s requirement that the use occur in the United States follows directly from the statute, which creates a single exception for "property in the United States" that is "used for a commercial activity in the United States." 28 U.S.C. § 1610(a). The only possible reading of this language is that the property must be "in the United States" when the "use[]" giving rise to the exception from immunity occurs.

Recognizing § 1610(a)'s narrow scope, courts in this Circuit have repeatedly rejected attempts by judgment creditors to attach a foreign sovereign's property alleged to be used for or connected to *some* commercial activity, if the "use is not occurring in the United States." *Aurelius Cap. Partners* v. *Republic of Argentina*, 2010 WL 768874, at *4 (S.D.N.Y. Mar. 5, 2010) (Griesa, J.) (granting motion to vacate attachment and execution orders). In *Aurelius*, plaintiffs

tried to execute on custodial securities accounts assumed to belong to the Republic at Citibank *in Argentina*. *Id.* at *1. Under plaintiffs' theory there, the accounts were used in the United States because a "substantial amount of service" by Citibank for the account was carried out in the United States. *Id.* Judge Griesa rejected this tactic because all the Republic's "actual live transactions regarding that property"—its actions "in setting up the accounts, . . . giving instructions to Citibank regarding the accounts, . . . [and] directing the sale and purchase of securities"—had "taken place, and are taking place, in Argentina." *Id.* at *4. The accounts were immune from execution because, even if the Republic was "us[ing]" the property for a commercial activity, the Republic's "use [wa]s not occurring in the United States." *Id.*; *see also Exp.-Imp. Bank*, 768 F.3d at 89 (holding funds of Grenada immune from execution where their "use takes place in Grenada"); *Thai Lao Lignite*, 2013 WL 1703873, at *7 ("[T]he appropriate inquiry examines whether the property at issue was used in the United States when in the hands of the sovereign.").

3. Plaintiffs here cannot show any use by the Republic *in the United States* of its YPF Shares, commercial or otherwise. Plaintiffs claim the Republic "uses its majority shareholding" to "approve YPF's raising of debt on international markets, including the United States"; to "appoint YPF's Chairman and a majority of the members of its Board of Directors"; and to "direct YPF's major corporate actions." (Mot. 11–12.) But all of these purported "uses"[6] of the Republic's YPF Shares occur *in Argentina*, not in the United States, as this Court has previously recognized. Specifically, at the motion-to-dismiss stage, this Court held it had jurisdiction under § 1605(a)(2)'s "direct effects" clause, including because when "Argentina

---

[6] Plaintiffs' claim that the Republic "uses" its shareholding to "appoint YPF's Chairman and a majority of the members of its Board" is incorrect. (Mot. 12.) YPF's Chairman is appointed by the Board, not by the shareholders. (Manóvil ¶ 26.) Only one Board member is appointed by the Republic as Class A shareholder. (Coffee Ex. 6 (YPF Bylaws) § 11(c)(i).) The rest of the Board is elected and appointed by vote of all other classes of shareholders. (Manóvil ¶¶ 12, 26.)

exercised shareholder rights associated with its [YPF] shares, including voting," this activity "***took place in Argentina***."  (MTD Order 14 (emphasis added).)  The Court's holding dooms Plaintiffs' turnover claim:  because all the Republic's exercises of shareholder rights occurred *in Argentina*, the Republic did not "use" the YPF Shares in the United States.

Moreover, under Argentine law, a controlling shareholder of an Argentine corporation exercises "control" in Argentina through its voting rights at shareholders' meetings. (*See* Manóvil ¶¶ 11–14.)  For example, for YPF, every one of its shareholders' meetings must take place in Argentina, where it is domiciled:  the Republic "uses" its shares by voting them at those meetings.  (Manóvil ¶¶ 15–18; *see also* Solomon ¶¶ 17–18.)  Plaintiffs' own evidence confirms the same.  (*See, e.g.*, Coffee ¶ 29 (the Republic "exercised control over YPF's capital raising" by "voting at YPF's annual shareholder meetings"); Mastro Ex. 7 at 1 (April 2023 shareholder meeting took place in Buenos Aires); Coffee Ex. 11 at 1 (same).)  This alone requires denial of Plaintiffs' turnover motion:  "even if the [YPF Shares are] being used for commercial activity, this use is not occurring in the United States," and the YPF Shares are "immune from . . . execution." *Aurelius*, 2010 WL 768874, at *4.

4. Neither of the cases Plaintiffs cite involving attempts to attach a foreign sovereign's ownership of a company's shares bears upon the rule that a sovereign's property must be "used" ***in the United States*** as a prerequisite to execution.  (Mot. 10–11.)  In both cases, the sovereign's shares in a corporation were "used" in the United States because the corporations at issue, unlike YPF, were U.S. corporations with U.S. shares.  *See Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380 (D. Del. 2018), *aff'd* 932 F.3d 126 (3d Cir. 2019) (sovereign's alter ego used shares in Delaware corporation in Delaware); *In re 650 Fifth Ave. & Related Properties*, 2014 WL 1284494 (S.D.N.Y. Mar. 28, 2014) (Forrest, J.) (sovereign

used shares in New York entity in New York), *vacated & remanded sub nom. Kirschenbaum* v. *650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016).

> ### 2. YPF's claimed commercial activities in the United States are not attributable to the Republic, nor are they the "use" of its shares.

Plaintiffs try to overcome that the Republic's use of YPF Shares unquestionably occurs within Argentina, where the shares are held and voted, by making allegations about claimed YPF commercial activities in the United States.  At length, Plaintiffs invoke YPF's IPO in 1993 (Mot. 4–5), registration of ADSs in the United States and its ongoing ADR program (*id.* at 5, 7), and "tap[ping of] the debt capital markets in the United States." (*Id.* at 7–8.)  But this Court cannot attribute YPF's actions to the Republic as the Republic's own "commercial activity in the United States."  Under both Argentine and U.S. law, YPF and the Republic are separate.  Consequently, YPF's activities are "irrelevant" to whether the YPF Shares are "used [by the Republic] for a commercial activity in the United States."  *Aurelius*, 584 F.3d at 131 (Argentine social security funds are immune under § 1610(a) because the Republic did not "use" funds in the United States, and "[t]he commercial activities of the [third-party] private corporations who managed these assets [in the U.S.] are irrelevant"); *see Comm'ns Imp. Exp. S.A.* v. *Republic of Congo*, 2023 WL 3601035, at *17 (S.D.N.Y. May 23, 2023) (Failla, J.) (allegation that "a third party maintains [property] for commercial use" without allegation that "any such act was taken as an agent of the [sovereign]" is "plainly insufficient under the FSIA").[7]

> 1. Plaintiffs do not claim that any of the requirements for piercing the corporate veil between a corporation and its majority shareholder are satisfied such that YPF's

---

[7] Although these activities are irrelevant to Plaintiffs' motion, as explained by Professor Solomon, Plaintiffs also mischaracterize YPF's debt offerings and ADR program and the Republic's "need" for or "benefit" from these activities.  (*See* Solomon ¶¶ 24–34.)

conduct could be considered conduct of the Republic.  Under Argentine law (which governs here, *see* Manóvil ¶¶ 6–9; Solomon ¶ 9), such veil-piercing requires a showing, which Plaintiffs do not try to make, that the shareholder has abused the corporate form, or that the shareholder has used the corporation to violate the law, public order, or good faith, or to frustrate a third party's rights. (Manóvil ¶¶ 19–26.)

Similarly, under U.S. law, the conduct of an instrumentality can only be attributed to a sovereign if the *Bancec* alter-ego test is satisfied.  *See Arch Trading Corp.* v. *Republic of Ecuador*, 839 F.3d 193, 202–04 (2d Cir. 2016) (determining "whether we may attribute" conduct of subsidiary to sovereign parent based on *Bancec* factors); *U.S. Fid. & Guar. Co.* v. *Braspetro Oil Servs., Co.*, 199 F.3d 94, 98 (2d Cir. 1999) ("the acts of a state's 'alter ego' may be attributed to the state" only if *Bancec* is satisfied).  Under *Bancec*, the "presumption of independent status" that attaches to sovereign instrumentalities can be overcome only if the instrumentality "is so extensively controlled by [the government] that a relationship of principal and agent is created," or when a distinction would work a fraud or injustice against the government's creditors.  *First Nat'l City Bank* v. *Banco Para el Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 626–27, 629 (1983).  The mere fact the Republic is "YPF's majority shareholder" is insufficient to meet this standard.  *See NML Capital*, 2013 WL 655211, at *2 ("allegations regarding YPF's relationship to the Republic are insufficient as a matter of law to overcome the presumption that YPF is a separate juridical entity").

2.     Plaintiffs cannot evade these basic legal requirements by claiming that the Republic itself "direct[s] or run[s] [YPF's] activities in the United States" simply because, along with holders of the remaining 49% of YPF shares, it participated in Board member elections or authorized certain corporate actions.  (Mot. 11.)  That reasoning would eviscerate basic rules of

corporate separateness.  In any event, the Republic's votes do not "direct or run" YPF's activities anywhere.  Rather, as a general matter, after the Republic uses its shares by voting them in Argentina, the **Board** is vested with the power to "manage the 'business and affairs of the corporation.'"  (Manóvil ¶ 12; *see also* Solomon ¶ 13.)  For example, shareholders may pass a resolution at a meeting authorizing the Board "to approve, in its discretion, the issuance of debt or the completion of any other transaction," but it is the company that actually issues debt, within the discretion authorized by the shareholder vote.  (Manóvil ¶¶ 8, 29–32.)  That the Republic's voting of shares in Argentina may have some "relation to" claimed commercial activities of YPF in the United States cannot satisfy § 1610(a).  *Exp.-Imp. Bank*, 768 F.3d at 89.

Plaintiffs' contrary position—that "sovereigns 'use' their majority shares for commercial activity [of a company] when they exercise the powers of a controlling shareholder" (Mot. 10)—misreads their own authorities.  In *Crystallex*, this finding rested on the Third Circuit's affirmation that the PDVSA was Venezuela's alter ego under *Bancec*—a critical missing fact here.  932 F.3d at 151–52.  And in *Foremost-McKesson, Inc.* v. *Islamic Republic of Iran*, the court assessed jurisdictional immunity based on *Iran's* conduct—not the activities of the corporation it allegedly controlled—in "a corporate dispute between majority and minority shareholders."  905 F.2d 438, 450 (D.C. Cir. 1990).  Plaintiffs' other cases ignore the recognized distinction between jurisdictional immunity under § 1605(a)(2) and immunity from attachment or execution under § 1610(a).  (*See* Mot. 14 (citing *Ministry of Supply, Cairo* v. *Universe Tankships, Inc.*, 708 F.2d 80, 84 (2d Cir. 1983) (addressing jurisdictional immunity under § 1605(a)); *Shapiro* v. *Republic of Bolivia*, 930 F.2d 1013, 1018–20 (2d Cir. 1991) (same)).

3.     Plaintiffs' interpretation of § 1610(a) would result in any foreign sovereign's interest in a majority-state-owned enterprise that raises funds in the United States

becoming subject to execution to satisfy a judgment against the sovereign.[8]  That is not the law.

Allowing attachment or execution on a state's interests without any showing that the separate legal status of the state-owned company should be ignored would "expand the class of cases arising under the Act beyond those limited, enumerated exceptions to immunity prescribed by Congress," and "expose foreign states to far greater liability than was originally contemplated under the Act." *Flatow* v. *Islamic Republic of Iran*, 76 F. Supp. 2d 16, 23 (D.D.C. 1999) (quashing writs of attachment:  the FSIA could not "be applied to foreign state property that is being used by a non-agent third party").  Section 1610(a) does not allow such "absurd results," which are to be avoided in statutory interpretation.  *Cuthill* v. *Blinken*, 990 F.3d 272, 281 (2d Cir. 2021).

### C.     The Republic's YPF Shares Were Not "Used for the Commercial Activity Upon Which the Claim Is Based."

Plaintiffs also have not shown (and cannot show) that the property at issue "is" or "was" used "for the commercial activity upon which the claim is based."  28 U.S.C. § 1610(a)(2); *see Sales* v. *Republic of Uganda*, 1993 WL 437762, at *1 (S.D.N.Y. Oct. 23, 1993) (Haight, J.) (quashing restraining notices served on tenants leasing property in sovereign's building; plaintiff's "injury occurred while he was performing construction work" on the building, but "§ 1610(a)(2) is not available . . . because [the] claims are not based upon the commercial activity generating the property sought to be attached, namely, the leases").

As an initial matter, Plaintiffs are again incorrect that the "same analysis applies" to § 1610(a)(2)'s execution immunity exception and § 1605(a)(2)'s jurisdictional immunity exception.  (Mot. 14.)[9]  But the two tests are related:  § 1605(a)(2) (as relevant here) asks whether

---

[8]  *See* Solomon ¶ 25 (listing government-owned entities that issue debt under Rule 144A).

[9]  Plaintiffs' cited language in *De Letelier* v. *Republic of Chile*, 748 F.2d 790 (2d Cir. 1984), merely refers to legislative history explaining the FSIA "conform[s]" execution and jurisdictional

a sovereign's commercial "act" outside the United States "cause[d] a direct effect" here.  Section 1610(a)(2) asks whether particular sovereign "property" was "used for" that act.  Plaintiffs' positions taken in this case, and the Second Circuit's and this Court's consequent rulings, make clear that the Republic's YPF Shares were not used for the commercial activity on which this Court and the Second Circuit found their claim is based, *i.e.*, "Argentina's failure to issue a tender offer." (MTD Order 13); *Petersen* v. *Argentine Republic*, 895 F.3d 194, 207 (2d Cir. 2018) (similar).  In reaching this conclusion, both Courts had to "zero[] in on the core of [plaintiffs'] suit" to isolate the "acts that actually injured them."  *Petersen*, 895 F.3d at 204 (quoting *OBB Personenverkehr AG* v. *Sachs*, 577 U.S. 27, 35 (2015)).  Plaintiffs cannot now turn around and expand the "commercial activity" that "actually injured them" to satisfy § 1610(a)(2), particularly given the "broad[er] immunity from attachment of a sovereign's property in the United States."  *Exp.-Imp. Bank*, 768 F.3d at 90.

### 1.    The Republic's YPF Shares were not "used" to breach any contract.

In opposing the Republic's jurisdictional defenses to these lawsuits, Plaintiffs maintained that "the shares from which [they] derive their claims" are the *shares they formerly owned*, not those "Argentina expropriated from Repsol."  (Pls.' MSJ Opp. Br. 69; *see* Pls.' MTD Opp. Br. 13 (the "[e]xpropriation of Repsol's [s]hares [i]s [i]rrelevant.").)  This Court accepted Plaintiffs' position, holding that the "gravamen" of their Complaint "is Argentina's failure to issue a tender offer" (MTD Order 13), and that "the tender obligation is not attached to the shares that the Republic acquired" (MSJ Order 50).[10]  As Plaintiffs acknowledge, the Second Circuit likewise

---

immunity in the sense of "partially lowering the barrier of" absolute execution immunity.  H.R. Rep. 94-1487, p. 27 (1976), *as reprinted in* 976 U.S.C.C.A.N. 6604, 6626.

[10]  The Republic maintains that Plaintiffs' claims are based on a sovereign act of expropriation for which the Republic is immune from suit under the FSIA and Argentine law.  This Court and the Second Circuit rejected that position.  (MTD Order 13); *Petersen*, 895 F.3d at 206.

held that the "gravamen" of their Complaint is the alleged "repudiat[ion]" of the "obligation to tender for Petersen's [YPF] shares" in 2012.  (Mot. 15 (quoting *Petersen*, 895 F.3d at 207).)

Having repeatedly disclaimed any connection between the expropriated YPF Shares and their Complaint, Plaintiffs are now judicially estopped from claiming otherwise by asserting "Argentina's exercise of control over Repsol's YPF Shares was . . . at the core of its contract breach" (Mot. 15) and thus satisfies § 1610(a)(2)'s requirements.  *New Hampshire* v. *Maine*, 532 U.S. 742, 749 (2001) (judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase").  "Judicial estoppel is properly invoked where: (1) a party's later position is clearly inconsistent with its earlier position, and (2) the party's former position has been adopted in some way by the court in an earlier proceeding."  *Ashmore* v. *CGI Grp., Inc.*, 923 F.3d 260, 272 (2d Cir. 2019).  Both requirements are met here, where Plaintiffs have for years insisted that their claim is not based on the expropriated YPF Shares, and the Second Circuit and this Court agreed with Plaintiffs' position.  *See Intellivision* v. *Microsoft Corp.*, 484 F. App'x 616, 621 (2d Cir. 2012).

### 2. The "formation" of the obligation at issue is irrelevant and did not involve the Class D shares the Republic expropriated from Repsol.

Plaintiffs also claim that the Republic "used" the YPF Shares to "form[] the underlying contractual obligation."  (Mot. 15.)  Even if Plaintiffs were not estopped from taking this position, *see supra*, the argument is both legally irrelevant and wrong.  To start, contract formation is irrelevant to the analysis of execution immunity here.  The Second Circuit has made clear that when there is "nothing [inherently] wrongful" about the formation of the contract, the "commercial activity" analysis for FSIA purposes turns on the "gravamen" of the "alleged breach" serving as the "foundation" of the suit, *not* the act of formation.  *MMA Consultants 1, Inc.* v. *Republic of Peru*, 719 F. App'x 47, 52 (2d Cir. 2017) (rejecting commercial activity analysis based

on formation); *see Friedman* v. *Government of Abu Dhabi*, 464 F. Supp. 3d 52, 68 (D.D.C. 2020) (cited at Mot. 14) (recognizing that "breach (or formation plus breach)" may be the "gravamen" of a breach of contract or related equitable claim).   Here, because Plaintiffs have identified "nothing inherently wrongful" about the formation of the YPF Bylaws, it makes no difference whether the property in question was used in that formation.

In any event, the YPF Shares were not "used" to create the tender-offer provision of the YPF Bylaws.   To claim otherwise, Plaintiffs conflate the YPF Shares—the publicly traded Class D shares created in 1993 and expropriated from Repsol by the Republic in 2014—with the Republic's "controlling position" in YPF that existed at the time the tender-offer provision was added to the YPF Bylaws.   (Mot. 3 (asserting that the Republic "acted in its capacity as shareholder of YPF to amend the company's Bylaws to include the tender-offer provision") (cleaned up); *id.* at 15 (similar).)   But when the Republic, as majority shareholder, approved of YPF's new Bylaws at the June 11, 1993 shareholders' meeting, it held ordinary shares in a nonpublic company.   (Ex. 5 (Decree No. 2778/90, Annex II (1990 YPF Bylaws) §§ 1, 7).)   At that time no Class D shares even *existed*, whether the YPF Shares or otherwise—in fact, no publicly traded shares existed at all.   The Bylaws approved at the June 11, 1993 meeting provided for the issuance of new classes of stock, including the Class D shares that would be sold to private investors, but only after YPF completed its initial public offering.   (*See* Mastro Ex. 4 (YPF 1993 20-F) at 95; YPF Prospectus (ECF No. 112-2) at 81.)   Because the YPF Shares did not exist when YPF's Bylaws were amended "to include the tender-offer provision" (Mot. 3), they could not have been used for that amendment.

\* \* \*

If the Republic were ordered to bring its YPF Shares into the United States—when the Shares have never been here, never been used here, and never even could be here—there would

be no limits on turnover of any sovereign judgment debtor's property, wherever located worldwide, and regardless of whether it has ever been in the United States.  Nothing in the FSIA's text or legislative history suggests that Congress—which created a "right without a remedy" in some actions against foreign sovereigns, *Walters*, 651 F.3d at 289—intended this result.

## III.    THE YPF SHARES ARE NOT SUBJECT TO TURNOVER UNDER THE C.P.L.R.

### A.    The YPF Shares Are Not Transferrable or in the Republic's Possession or Custody.

1.    Under C.P.L.R. § 5201(b), the judgments are only enforceable "against any property which could be assigned or transferred."  The YPF Shares cannot be transferred to anyone "without the permission of the National Congress by a two-thirds vote of its members."  (Ex. 1, YPF Expropriation Law Art. 10.)  Therefore, they are simply not attachable and cannot be made subject to a turnover order under the C.P.L.R.  *See, e.g., Alliance Bond Fund, Inc.* v. *Grupo Mexicano De Desarrollo, S.A.*, 190 F.3d 16, 24 (2d Cir. 1999) (only property "which by law the debtor may assign or transfer" is subject to attachment).

2.    Even if the YPF Shares could be assigned or transferred, C.P.L.R. § 5225(a) provides that a court, "[u]pon motion of the judgment creditor," may order the judgment debtor to turn over "money or other personal property" only when such property is in the judgment debtor's "possession or custody."  Where the "money or other personal property" is in the "possession or custody" of a third party, § 5225(b) provides that the court may order a third-party *garnishee* to turn over the property—but only "[u]pon a special proceeding" commenced against that garnishee. *See Koehler*, 12 N.Y.3d at 541 ("CPLR 5225(b) applies when the property is not in the judgment debtor's possession.").  Under either § 5225(a) or (b), control is not enough:  the judgment debtor (§ 5225(a)) or a third-party garnishee (§ 5225(b)) must have "possession or custody."  *See Commonwealth of N. Mariana Islands* v. *Canadian Imperial Bank of Com.*, 990 N.E.2d 114, 115

(N.Y. 2013) (under § 5225(b) third-party garnishee "must have actual, not merely constructive, possession or custody of the assets").[11]

While Plaintiffs do not specify, their motion is necessarily under § 5225(a) because they seek to enforce directly against the Republic as judgment debtor. Plaintiffs must thus establish that the Republic has "possession or custody" of the YPF Shares. But, as Plaintiffs concede, the YPF Shares are uncertificated shares maintained in book-entry form at CdV. (Mot. 17.) Thus, CdV has custody of the YPF Shares. (*See* Manóvil ¶¶ 33–38.) Title to the YPF Shares is evidenced solely by CdV's registry, and they cannot be transferred from the custody of CdV. (*See id.*)

3.     To try to get around that the Republic does not have "possession or custody" of the YPF Shares, Plaintiffs invoke C.P.L.R. § 5201(c)(4), and its cross-reference to U.C.C. § 8-112(e), to demand injunctive relief requiring transfer of the YPF Shares. (Mot. 18.) But neither of those provisions applies here or, if they did, would authorize the relief Plaintiffs seek.

C.P.L.R. § 5201(c) determines the "[p]roper garnishee for particular property or debt," and its subsection (c)(4) answers that question for interests in corporate "stock" including "uncertificated securit[ies]." It has nothing to do with execution against judgment debtors, which are not "garnishee[s]" at all under the C.P.L.R.'s definition of that term as "a person *other than the judgment debtor* who has property in his possession or custody in which a judgment debtor has an interest." C.P.L.R. § 105(i) (emphasis added). The cross-reference in C.P.L.R. § 5201(c)(4) to U.C.C. § 8-112(e) therefore does not apply to execution efforts directly against a judgment debtor.

---

[11]  While *Mariana Islands* addressed the meaning of "possession or custody" in § 5225(b), its holding applies equally to § 5225(a). The analysis hinged on (i) the "plain language of [§] 5225(b)," which "exclude[s] any reference to 'control,'" and (ii) that "the predecessor statute" to [§] 5225" referred to "possession" *or* "control" before it was amended to say "possession or custody." *Mariana Islands*, 990 N.E.2d at 117–18. The Court of Appeals concluded that "[t]he exclusion of the word 'control'" was purposeful and "that 'possession or custody' requires actual possession." *Id.* That reasoning applies equally to § 5225(a).

And even if the U.C.C. were relevant, Plaintiffs would not be entitled to an injunction pursuant to U.C.C. § 8-112(e) requiring turnover of the uncertificated YPF Shares maintained in Argentina at the CdV. That provision entitles a judgment creditor (in certain circumstances) to "aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the . . . uncertificated security . . . by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process." But Plaintiffs ignore the choice-of-law rule that governs which are the "means allowed at law or in equity" under this provision. That rule, found in U.C.C. § 8-110(a)(5), provides that the "local law of the issuer's jurisdiction"—*i.e.*, Argentine law—"governs . . . whether an adverse claim can be asserted against a person to whom transfer of a[n] . . . uncertificated security is registered or a person who obtains control of the uncertificated security." Plaintiffs have not even attempted to meet the requirements for execution under Argentine law, nor could they. (*See* Manóvil ¶ 38; Santiago ¶¶ 26, 28.) Plaintiffs would thus be foreclosed from obtaining an injunction under U.C.C. § 8-112(e) even if it did apply here.[12]

### B.    Federal Law Displaces C.P.L.R. § 5225 with Respect to the YPF Shares.

Plaintiffs' motion must also be denied because federal law displaces C.P.L.R. § 5225 to the extent § 5225 would otherwise allow turnover of the Republic's assets in Argentina. *See Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 507 (1988) (federal law displaces state law when a "significant conflict exists between an identifiable federal policy or interest and the [operation] of state law" (quotation marks omitted)).

---

[12] Plaintiffs also fail to explain how they could comply with regulatory requirements for obtaining control of a publicly traded company or with the tender offer requirements in YPF's bylaws.

1.      There can be no dispute that, prior to the FSIA's enactment in 1976, "property of foreign states was absolutely immune from execution"—whether within or outside the United States—as a matter of federal common law.  *Walters*, 651 F.3d at 289 (quoting *De Letelier*, 748 F.2d at 799); *Dexter & N.Y. & Cuba Mail S.S. Co.* v. *Republic of Korea*, 132 F. Supp. 684, 686 (S.D.N.Y. 1955) (principle that "the property of a foreign government is immune from attachment" "is so well established . . . its applicability here could hardly be open to doubt"). Congress explicitly recognized in enacting the FSIA that "the traditional view in the United States concerning execution has been that the property of foreign states is absolutely immune from execution," and that was the "current practice" before the FSIA.  H.R. Rep. 94-1487, pp. 26–27.

2.      With the FSIA's passage, Congress "did not intend to reverse completely the historical and international antipathy to executing against a foreign state's property." *Conn. Bank*, 309 F.3d at 252; *see also De Letelier*, 748 F.2d at 799 ("Congress planned to and did lift execution immunity 'in part,'" but not "wholly").  Indeed, the overwhelming weight of authority in this Circuit and elsewhere holds that a foreign sovereign's extraterritorial property *remains* absolutely immune from execution as a matter of U.S. law even after the FSIA's enactment.[13]

Courts usually reach this conclusion based on the FSIA's plain text, which "does not permit executing against extraterritorial assets," preempting state law that purports to

---

[13]   *See, e.g.*, *EM Ltd.* v. *Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012) ("a district court sitting in Manhattan does not have the power to attach Argentinian property in foreign countries"); *Walters*, 651 F.3d at 297 (China's assets "*outside* of the United States" are "categorically immune from execution under the FSIA"); *Rubin* v. *Islamic Republic of Iran*, 830 F.3d 470, 475 (7th Cir. 2016) (to be "even potentially subject to attachment and execution" property must be "within the territorial jurisdiction of the district court"); *Peterson* v. *Islamic Republic of Iran*, 627 F.3d 1117, 1130 (9th Cir. 2010) (property not "in the United States" was "immune from execution"); *Autotech Techs. LP* v. *Integral Research & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007) ("The FSIA did not purport to authorize execution against a foreign sovereign's property . . . wherever . . . located around the world.").

"circumvent the FSIA's authority." *Levin*, 2022 WL 523901, at *4.[14]  Principles of federal common law require the same result.  The Supreme Court recently reaffirmed that common-law sovereign immunity principles continue to apply in contexts not explicitly covered by the FSIA's text.  *See Turkiye Halk Bankasi A.S.* v. *United States*, 598 U.S. 264, 280 (2023) (holding that "a suit not governed by the FSIA 'may still be barred by foreign sovereign immunity under the common law,'" and remanding for determination of sovereign's common-law immunity) (quoting *Samantar* v. *Yousuf*, 560 U.S. 305, 324 (2010)).

As the U.S. government has submitted to the Second Circuit, "common law sovereign immunity principles that predate the FSIA continue to preclude execution by judgment creditors against foreign sovereign property outside the United States."  Ex. 3, *Levin* Amicus Br. at 17.  Regarding turnover, it is "unlikely that Congress, in providing for only limited inroads on execution immunity for certain foreign sovereign property in the United States . . . intended to subject foreign sovereign property *abroad* to a [§ 5225] turnover order."  Ex. 4, Br. for the United States as *Amicus Curiae* at 15, *Clearstream Banking S.A.* v. *Peterson*, 17-1529 & 17-1534 (U.S. Dec. 2019).  Congress instead "legislates against a background of common-law adjudicatory principles, and it expects those principles to apply except when a statutory purpose to the contrary is evident."  *Minerva Surgical, Inc.* v. *Hologic, Inc.*, 594 U.S. 559, 572 (2021) (cleaned up).[15]

---

[14]   Although this Court has cast doubt on that reasoning, *Bainbridge*, 2023 WL 5747299, at *3, the Republic raises the argument to preserve it for later proceedings or appeal.

[15]   Likewise, even if not displaced, C.P.L.R. § 5225 is unavailable because the Republic is not a "person" subject to its execution provisions.  When § 5225 was enacted in 1962, sovereign assets enjoyed "absolute" immunity from execution, *see Walters*, 651 F.3d at 289; there was thus no reason to include foreign sovereigns in the definition of "person."  The Republic recognizes this Court has rejected this argument, *Bainbridge Fund Ltd.* v. *Republic of Argentina*, 16-cv-8605, ECF No. 82 (S.D.N.Y. Mar. 30, 2023), but preserves the argument for later proceedings or appeal.

Under these principles, even if New York procedural laws like C.P.L.R. § 5225 do allow courts to order the turnover of assets of private citizens held outside the United States, *see Koehler*, 911 N.E.2d at 830, those laws are displaced when applied to a foreign sovereign's extraterritorial property.  *See Boyle*, 487 U.S. at 507; *City of New York* v. *Chevron Corp.*, 993 F.3d 81, 90 (2d Cir. 2021) (state law displaced where incompatible with "federal interests").[16]

3.      This Court did not reference the Supreme Court's 2023 decision in *Turkiye Halk Bankasi* when it decided in *Bainbridge* that extraterritorial assets of foreign sovereigns lost their common law immunity from attachment and execution after the FSIA's enactment.  *See Bainbridge*, 2023 WL 5747299, at *3.  The Court instead relied on *Peterson*, 876 F.3d 63, but *Peterson*'s holding that the "common law execution immunity afforded to a foreign state's extraterritorial assets" did not "survive[] the enactment of the FSIA," 876 F.3d at 90, was vacated and does not withstand scrutiny, particularly in light of *Turkiye Halk Bankasi*.

In particular, as the reasoning of *Turkiye Halk Bankasi* makes clear, *Peterson* over-read the Supreme Court's statement in *Republic of Argentina* v. *NML Capital, Ltd.*, 573 U.S. 134 (2014), that "any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text.  Or it must fall."  876 F.3d at 89 (quoting *NML*, 573 U.S. at 141–42).  *NML* addressed the "narrow question" of whether the FSIA implied a separate "discovery-in-aid-of-execution immunity" for a foreign sovereign's extraterritorial assets—not any request to actually *execute* on such assets.  *NML*, 573 U.S. at 144; *see Turkiye Halk Bankasi*, 598 U.S. at 278 ("general language in judicial opinions" should not be read as "referring to quite different circumstances that

---

[16]  Plaintiffs' cases (Mot. 17) are thus inapposite because they do not involve foreign sovereigns. *See Koehler*, 911 N.E.2d at 830 (involving property of private individual); *Gryphon Domestic VI, LLC* v. *APP Int'l Finance Co., B.V.*, 836 N.Y.S.2d 4, 6 (N.Y. App. Div. 2007) (same); *Inter-Reg'l Fin. Grp., Inc.* v. *Hashemi*, 562 F.2d 152, 154 (2d Cir. 1977) (same).

the Court was not then considering").  As to execution, *NML*'s only observation was that U.S. "courts generally lack authority in the first place to execute against property in other countries," which occurs "under the relevant jurisdiction's law."  573 U.S. at 144.  Consistent with *NML*, this Court lacks authority here to order turnover of the YPF Shares.

4.      Finally, an order requiring turnover of the Republic's assets from Argentina's own territory would violate international law, which is incorporated into federal common law, *see Kadic* v. *Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995), and "codifie[d]" in the FSIA, *Permanent Mission of India* v. *City of New York*, 551 U.S. 193, 199 (2007).  "Under customary international law, a state may not exercise jurisdiction to enforce in the territory of another state without the consent of that other state."  Restatement (Fourth) of Foreign Relations Law § 432 (2018); *see also, e.g.*, Charter of the Organization of American States, Arts. 3, 19 (providing that "[i]nternational law" governs "reciprocal relations" of states, and no state may "intervene" "directly or indirectly" in the affairs of any other State).  It would be a clear violation of these norms for a United States court to reach into Argentina and require turnover of the Republic's assets held there.

\*      \*      \*

If the Court does not deny Plaintiffs' motion outright, it should defer ruling pending appeal.  The Republic requested a stay of execution in part to avoid enforcement orders that would be impossible to unwind.  (Stay Mot. (ECF No. 514) at 16.)  After calling that risk "entirely speculative and ultimately nil" (Stay Mot. Opp. (ECF No. 521) at 17), Plaintiffs now seek an order which could have immediate and permanent consequences for the Republic and third parties.  The prudent course, short of denying the motion, is to defer any ruling until the appeal concludes.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motion.

Respectfully,

Dated:  May 16, 2024

*/s/Robert J. Giuffra Jr.*

Robert J. Giuffra Jr.
Sergio J. Galvis
Amanda F. Davidoff
Thomas C. White
Adam R. Brebner

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:     (212) 558-4000
Facsimile:     (212) 558-3588

*Counsel for the Argentine Republic*