UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETERSEN ENERGÍA INVERSORA,
S.A.U. AND PETERSEN ENERGÍA,
S.A.U.,

      Plaintiffs,

   v.

ARGENTINE REPUBLIC AND YPF
S.A.,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

ETON PARK CAPITAL
MANAGEMENT, L.P., ETON PARK
MASTER FUND, LTD. AND ETON
PARK FUND, L.P.,

      Plaintiffs,

   v.

ARGENTINE REPUBLIC AND YPF
S.A.,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case Nos.
1:15-cv-02739-LAP
1:16-cv-08569-LAP

## EXPERT DECLARATION OF RAFAEL M. MANÓVIL
## ON BEHALF OF THE REPUBLIC OF ARGENTINA

Pursuant to 28 U.S.C. § 1746 and Rule 44.1 of the Federal Rules of Civil Procedure, I, Rafael M.

Manóvil, hereby declare as follows:

   1.   I submit this expert declaration in support of the Republic's Opposition to the

Motion for Injunction and Turnover filed by plaintiffs Petersen Energía Inversora, S.A.U. and

Petersen Energía, S.A.U., and Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd.,

and Eton Park Fund, L.P. ("Plaintiffs").  I previously submitted two declarations, on August 30,

2019, and February 7, 2020, and three expert reports, on September 24, 2021, December 3, 2021, and January 14, 2022, on behalf of the Republic of Argentina ("Argentina" or the "Republic"). *See Petersen* ECF Nos. 115, 152, 368-1, 368-2, 368-3.

2.      I am a duly licensed attorney in good standing in Argentina.  I am a former Partner and present Of Counsel of the law firm Bomchil in Buenos Aires, Argentina, where I focus my practice on company law, commercial law, private international law and arbitration.  Over the course of my career, I have advised numerous Argentine and foreign corporate and business entities regarding Argentine company law, including but not limited to matters of corporate governance, transactions, and disputes arising between and among shareholders, corporate mergers and acquisitions, public offerings on Argentine stock exchanges, and tender offers (both of share capital and bonds).

3.      I obtained a law degree from the Facultad de Derecho (School of Law) of the University of Buenos Aires in 1966 and was admitted to practice as a lawyer in the City of Buenos Aires and before the Federal Courts of Argentina in 1967.  I completed several postgraduate courses and graduated with a Ph.D. in Law, *summa cum laude*, from the University of Buenos Aires.  In 1970, I was appointed assistant lecturer in Commercial Law at the School of Law of the University of Buenos Aires and completed the *cursus honorum* to become a chaired Professor, a position I held until my retirement in March 2023.  The University of Buenos Aires appointed me Professor Emeritus in 2011.  I have lectured at several universities, both in Argentina and abroad (Uruguay, Canada, and Germany), written several books, chapters and papers, and participated in numerous local and international conferences on my areas of specialization.  In 2009, I was elected for life as one of the 30 members of the National Academy of Law and Social Sciences.  This is a semi-public body comprised of academics and scholars, which is intensely active in all fields of

law.  It is called on from time to time by government entities to provide opinions on questions of law and may issue opinions on legal or institutional matters of particular importance.  Several times I have been invited to contribute to draft legislation.  I was a member of a committee appointed by Congress in 1993 to draft a unified Civil and Commercial Code, and a member of a committee appointed by the Minister of Justice in 2003 to draft a Code of Private International Law.  Both drafts were taken into account when the new Civil and Commercial Code came into force in August 2015 (the "CCC").  In May 2018, I was appointed by the President of the Senate to be part of the committee in charge of drafting amendments to the Argentine General Companies Law ("GCL").  The committee delivered the draft in June 2019.  A copy of my curriculum vitae is attached as Exhibit 1 to my September 24, 2021 report.  *See Petersen* ECF No. 368-1.

4.      I have been asked by counsel for the Republic to review Plaintiffs' Motion for Injunction and Turnover (the "Motion") and accompanying filings and to provide my views on certain questions of Argentine company and commercial law relevant to Plaintiffs' Motion.

5.      I understand that Plaintiffs seek an order from the Court requiring that Argentina transfer its Class D shares in YPF S.A. (the "YPF Shares") to a custody account at Bank of New York Mellon ("BNYM") in New York and that BNYM transfer the shares to Plaintiffs or any person or entity that Plaintiffs wish.

## SUMMARY OF OPINIONS

6.      In Section I, I address three issues.  *First*, in Section I.A, I explain that under Argentine law, all shareholders of an Argentine corporation ("*sociedad anónima*" or "*S.A.*")— including controlling shareholders—exercise their rights as shareholders through their participation in the shareholders' meeting.  A "controlling" shareholder can exercise "control" only over the outcome of a matter submitted for a vote at the shareholders' meeting (not a corporation's business or operations generally).  Shareholders' meetings of an Argentine

corporation take place in Argentina.  Therefore, as a matter of law, a controlling shareholder exercises its ability to vote its shares (and thus determine the outcome of any matter submitted to the shareholders' meeting) in Argentina, not in any other jurisdiction where the corporation may conduct its activities, including those activities conducted in furtherance of decisions voted on at shareholders' meetings.

7.      *Second*, in Section I.B, I explain that under Argentine law the actions of a corporation vis-à-vis third parties are the actions of the corporation alone, and the actions of each shareholder are the actions of such shareholder alone.  Such actions of a corporation cannot be attributed to the controlling shareholder, or any other shareholder, absent the exceptional circumstances that allow piercing the corporate veil.  None of the legal requirements under Argentine law for piercing the corporate veil between YPF and the Republic could be satisfied by the evidence presented or the allegations made by Plaintiffs.

8.      *Third*, in Section I.C, I explain that the Republic did not cause YPF to issue debt or take any other action in the United States as claimed by Plaintiffs.  (*See* Mot. 9, 11-12.)  The Republic, in its capacity as shareholder, joined in voting to authorize the YPF board to conduct these activities (and others) if it chose to do so.  In addition, according to Article 9 of the Negotiable Obligations Law 23,576, the issuance of debt can be decided by the board of directors if expressly authorized by the bylaws.  In fact, the YPF Bylaws expressly includes such authorization.[1]  Under Argentine law, the authorization of a range of corporate activities voted upon in the course of a shareholders' meeting is a legally distinct act from a corporation's subsequent decision to undertake some or all of the authorized activities.  Here, the YPF shareholders' authorization

---

[1]      *See* YPF Bylaws § 17(vi).  All references to the YPF Bylaws are to the current version of the Bylaws, an English translation of which was submitted to the SEC with YPF's Form 20-F for 2023 and is attached as Exhibit 1.

(which is also included in the YPF Bylaws) for the board to approve, in its discretion, the issuance of debt or the completion of any other transaction (in Argentina, the U.S., or elsewhere) is legally distinct from the board's approval of the issuance of that debt or completion of such other transaction, and from the subsequent implementation of that debt issuance or transaction by YPF and its management.  Argentine law does not permit a creditor or claimant to conflate YPF and its shareholders solely because the shareholders authorized the board to issue such debt pursuant to the GCL, the Negotiable Obligations Law, and YPF Bylaws.

9.      In Section II, I explain that, because YPF's shares are book-entry shares registered with, and in the custody of, the privately-held Argentine corporation Caja de Valores, S.A. ("CdV"), YPF's shares are not in the possession or custody of the Republic or of any other shareholder.  Further, because the shares are held in book-entry form with CdV, they cannot be transferred outside of Argentina.  In addition, under Argentine law, to enforce a foreign judgment upon the Republic's YPF Shares held at CdV, a judgment creditor would need to obtain an *exequatur* from an Argentine court directing CdV to register a change in ownership of the shares.

I.   **UNDER ARGENTINE LAW, YPF SHAREHOLDERS USE THEIR SHARES IN ARGENTINA, AND YPF'S ACTS ARE NOT ATTRIBUTABLE TO ITS SHAREHOLDERS.**

10.     I understand that Plaintiffs contend that:  (i) since Law 26,741 (the "YPF Expropriation Law") became effective on May 7, 2012, the Republic has "controlled YPF's major business and financial decisions through its majority shareholding in the company"; and (ii) the Republic has "used its majority shares" in YPF for commercial activities in the United States by exercising its control of YPF to "cause[] YPF" to conduct commercial activity in the United States. (Mot. at 6-7, 9-14.)  As examples of the "control" exercised by the Republic, Plaintiffs point to the Republic allegedly "appointing a majority of YPF's Board of Directors, directing the activities of that board as controlling shareholder, approving YPF's debt issuances, and directly appointing

YPF's CEO." (Mot. at 9-10.)  While the Republic has temporarily occupied a majority interest in

YPF's Class D shares since May 7, 2012, and has owned such interest since 2014, Plaintiffs'

remaining assertions are incorrect as a matter of Argentine law for the reasons set forth below.

**A.      Controlling Shareholders Exercise "Control" of an Argentine Corporation Through Participation in Shareholders' Meetings Which Take Place in Argentina.**

**1.      Under Argentine Law, Shareholders Exercise Control Over a Corporation Through the Shareholders' Meeting.**

11.      Under Argentine law, a shareholder of a corporation is vested with several rights.

These rights are codified in the GCL[2] and the corporation's bylaws and can generally be divided

between economic and political rights.  A shareholder's economic rights include, for instance, the

right to receive the distribution of dividends approved at a shareholders' meeting.[3]  A shareholder's

political rights include, among other things:  (i) the right to request certain information from the

statutory auditor and at the shareholders' meeting from the management;[4] (ii) the right to challenge

---

[2]      All references to the English translation of the GCL are to *Petersen* ECF No. 469-17.  For other statutes cited in this declaration, English translations are provided in Appendix of Selected Argentine Laws and Rules, attached as Exhibit 2.

[3]      *See* GCL, Art. 224 ("Distribution of dividends or payment of interests to shareholders shall only be lawful if they derive from net and earned profits from a regularly prepared and approved balance sheet.").

[4]      *See* GCL, Art. 294(6) ("[T]he statutory auditor shall . . . provide the shareholders representing not less than two percent (2%) of capital whenever they require, information on the issues within their scope."); SAURET, H., "*El Derecho a la Información*", II Congreso Argentino de Derecho Societario, Mar del Plata, 1979, p. 291 (Ex. 3 at 8-9) ("Do our laws afford a possibility to require an expansion of technical reports on the basis of the order of business to be addressed at a shareholders' meeting, so that it can be furnished in advance?  The [GCL] provides no answer to this question.  Some legal scholars do admit this possibility with limitations, while some court precedents have coined the principle that additional information should be provided in writing and in advance to the meeting, and decisions have even been rendered to suspend meetings until such requested information is duly furnished to the court, to ensure a valid decision, free of any defects can be adopted by the individual shareholder."); HALPERIN, I. & OTAEGUI, J., *Sociedades Anónimas*, Depalma, Buenos Aires, 2nd Ed., 1998, at 409 (Ex. 4 at 5).

shareholders' meeting resolutions;[5] (iii) the right to request a shareholders' meeting;[6] and (iv) the right to vote at a shareholders' meeting.[7]  The shareholders' meeting is typically responsible for deciding on, *inter alia*: (i) the corporation's financial statements; (ii) the appointment and removal of directors, statutory auditors, and members of the oversight committee and their compensation; (iii) the liability for directors, statutory auditors, and members of the oversight committee; (iv) capital increases, reductions, and share buybacks; (v) mergers, conversion, and the dissolution of the corporation; and (vi) issuance of debentures and bonds.[8]

---

[5]     *See* GCL, Arts. 251-252, 254.

[6]     *See* GCL, Art. 236 ("The [ordinary shareholders'] meetings and [extraordinary shareholders'] meetings shall be called in writing by the Board, the statutory auditor in the cases provided by law, when deemed necessary by either of them or when required by shareholders representing at least five percent (5%) of the capital stock unless the bylaws set a lower representation.  In the latter case, the request shall specify the issues to be addressed and the Board or the statutory auditor shall call the meeting to be held not later than forty (40) days from notice receipt.  Upon failure of the Board or the statutory auditor to do so, the call may be made by the regulatory or judicial authority.").

[7]     *See* GCL, Art. 216 ("Each common share gives one voting right. The bylaws may generate classes recognizing up to five votes per common share. Voting privileges are not compatible with preferential ownership.  No [privileged voting] shares may be issued after the company has been authorized to make public offer of shares.").

[8]     *See* GCL, Art. 234 ("The following issues must be addressed at the [ordinary shareholders'] [m]eeting: 1) General balance sheet, income statement, distribution of profits, annual report and statutory auditor's report as well as any other decision as to the management of the corporation pursuant to the law, the bylaws or any item submitted for consideration to the Board of Directors, the oversight committee or the statutory auditors; 2) Appointment and removal of directors, statutory auditors, members of the oversight committee and determination of their compensation; 3) Liability of directors, statutory auditors and members of the oversight committee; 4) Capital increase under [Article] 188.  In order to consider items 1) and 2), the [ordinary shareholders'] meeting shall be called within four (4) months after the year-end closing."); GCL, Art. 235 ("The amendment of the bylaws, [and] any matters other than those within the scope of the [ordinary shareholders'] meeting, shall be addressed at a[n] [extraordinary shareholders'] meeting, along with the following items: 1) Capital increase, except for the case detailed in [Article] 188.  The Board may only be delegated the time of issuance, method and terms of payment, 2) Capital reduction and repayment, 3) Share buyback, reimbursement and redemption, 4) Merger, conversion and dissolution of the corporation; appointment, removal and compensation of the liquidators; division; consideration of [accounts] and other matters related to their management in

12.     Under Argentine law the powers and duties of the board are clearly separated from the exclusive powers of shareholders participating in duly convened meetings to decide upon matters at those meetings.[9]  The power to manage the "business and affairs of the corporation" is vested solely in the board of directors.[10]   Shareholders, through their participation in the shareholders' meeting, have the right to vote upon certain decisions concerning a corporation's governance and business, but they do not, either individually or through the shareholders' meeting, manage the corporation's business nor perform any of its actions.  A controlling shareholder is no different in this regard from any other shareholder—shareholders exercise "control" of an Argentine corporation through their participation at a shareholders' meeting.  In particular, a controlling shareholder can determine the outcome of a vote at that meeting, but it does not exercise control over how the affairs of the corporation are conducted by the board.[11]

---

the corporate [liquidation], whose approval must be final; 5) Restriction or suspension of the preemptive right for the subscription of new shares under [Article] 197; 6) Issuance of debentures and their conversion into shares; 7) Issuance of bonds.").

[9]     *Compare* GCL, Art. 233 ("[Shareholders'] [m]eetings have exclusive authority to hear the issues included in [Articles] 234 and 235."), *with* GCL, Art. 255 ("Business and affairs of the corporation shall be managed by a board of directors made up of one or more directors appointed at the shareholders meeting or by the oversight committee, if [so foreseen].").

[10]     GCL, Art. 255.

[11]     Under Argentine law, the definition of "control" of a corporation generally contemplates voting power in shareholders' meetings.  *See* Law No. 26,831, the Argentine Capital Markets Law, as amended and supplemented from time to time (the "CML"), Art. 2 (Ex. 2 at 5) ("Controlling entity, controlling group or control groups:  Individuals or legal entities holding, whether directly or indirectly, individually or jointly, as the case may be, under any title, an equity interest or voting securities conferring such holder, legally or de facto, and in the latter case on a permanent basis, the right to cast the number of votes required to establish corporate policy at ordinary shareholders' meetings or to appoint or revoke the appointment of a majority of directors or members of the oversight committee"); *see also* GCL, Art. 33(1) ("Subsidiaries [or controlled companies] are those companies in which another company, whether directly or indirectly, by another subsidiary [or controlled] company:  1) has any interest, of any kind, that grants the necessary number of votes to ensure corporate will, in [company partners'] meetings or [ordinary shareholders'] meetings. . . .").

13.     The separation between the powers and duties of the board and the powers of the shareholders is further underscored by the board of directors' duty of *loyalty*, which I understand is substantially equivalent to the concept of *fiduciary duties* under U.S. law.[12]  This rule is codified in Article 59 of the GCL which applies to all companies,[13] and further developed in Art. 78 of the CML, which applies to publicly listed corporations such as YPF.[14]  The undisputed opinion of Argentine legal scholars is that the board of directors owes a duty of loyalty to the company and all of its shareholders as a whole.[15]  As a consequence, directors' duty of loyalty is not owed to the

---

[12]     Members of the board of directors are also subject to the duty to act with "due diligence," or, as it is phrased in the original Spanish, with the diligence of a good businessman ("*con la diligencia de un buen hombre de negocios*"), which I understand is similar to the duty of care under U.S. law.  *See* GCL Art. 59; *see also* ZALDÍVAR, E., MANÓVIL, R., RAGAZZI, G., ROVIRA, A., SAN MILLÁN, C*., Cuadernos de Derecho Societario*, Abeledo Perrot, Buenos Aires, 1980, Vol. I, at 304-305 (Ex. 5 at 4).

[13]     GCL, Art. 59 ("Managers and representatives of the company must act in good faith with due diligence.  Those who fail to comply with their obligations are jointly and severally liable for damages derived from their action or omissions."); *see also* ROITMAN, H., *Ley General de Sociedades. Comentada y Anotada*, 3rd Ed., La Ley, Buenos Aires, 2022, Vol. II, at 330 (Ex. 6 at 7) ("We have always held that this provision is a key element in the architecture of corporate law. It was revolutionary in its time and it allowed for the creation of a comprehensive liability system effective for all types of business organizations.").

[14]     CML, Art. 78 (Ex. 2 at 6) ("Directors' duty of loyalty.  In the case of companies that make public offering of their shares, the directors' duty of loyalty shall be deemed to especially include: a) The prohibition to make use of corporate assets or any confidential information for private purposes; b) The prohibition to profit or allow any third party to profit, whether by any act or omission, from a business opportunity available to the company; c) The obligation to exercise their powers solely for the purposes for which they were conferred on them by law, the corporate bylaws, the shareholders' meeting or the board of directors; d) The obligation to meticulously ensure that no direct or indirect conflict of interest shall arise between their actions and the company's interests.  In case of doubt as to whether the duty of loyalty has been complied with, the burden of proof lies with the director.").

[15]     *See* ZALDÍVAR, E., MANÓVIL, R., RAGAZZI, G., ROVIRA, A., SAN MILLÁN, C., Carlos*, Cuadernos de Derecho Societario*, Abeledo Perrot, Buenos Aires, 1980, Vol. I, at 305 (Ex. 5 at 4) (explaining that the duty of loyalty means "that the member of the body must perform their tasks as correctly as any honest man and defending the interests whose administration has been entrusted to them, above any other consideration"); HALPERIN, I., *Criterios Generales de la Reforma de las Sociedades Comerciales*, Revista del Derecho Comercial y de las Obligaciones, 1972, at 640 (Ex.

specific shareholders by whom they were appointed (whether controlling or otherwise); rather, once a director has been appointed, he or she owes duties to the company and, as a result, to all its shareholders as a whole, equally and without exception.[16]  Should a director not comply with this duty, any shareholder may hold that director liable for damages caused to the company or personally to each one of them.[17]

14.     In summary, the governance powers of a corporation are strictly divided among a corporation's various organs.  Accordingly, there are "checks and balances" designed to ensure that a shareholder that owns a majority of the voting shares does not "control" the operations of the corporation.  Instead, a controlling shareholder "controls" the formation of the will of the shareholders' meeting, but only with respect to the matters falling within the shareholders' meeting's purview.

## 2.     Shareholders' Meetings of Argentine Corporations Must Take Place in Argentina.

15.     To the extent a controlling shareholder exercises "control" through participation at a shareholders' meeting, by definition that "control" occurs in Argentina, where all shareholders' meetings of Argentine corporations take place.  Article 233 of the GCL—which is a mandatory

---

7 at 4-5) (explaining that the duty of loyalty requires directors to act "in favor of the company interests, according to its purpose and business," which "requires them to act to obtain the biggest advantages for the company and to have no goals unrelated to the company that might modify or divert such manner of acting"); HALPERIN, I. & OTAEGUI, J., *Sociedades Anónimas*, Depalma, Buenos Aires, 2nd Ed., 1998, at 546 (Ex. 8 at 5) ("[T]he advantage underlying the language of [Article] 59 lies in the fact that a duty of loyalty is owed not only to the company but also to the shareholders . . .").

[16]     In addition, a majority of the current members of YPF's board of directors are independent pursuant to CNV regulations.  *See* YPF Form 20-F for 2023 (Ex. 18 at 84-85).

[17]     *See* GCL, Arts. 59, 274, 276, 279.

rule[18]—expressly provides that shareholders' meetings must take place in the jurisdiction of the relevant company's domicile, which is the jurisdiction where the company has been incorporated or is registered.[19]  Therefore, all shareholders' meetings of Argentine corporations, including YPF, must take place in Argentina.  Indeed, a shareholders' meeting held outside of Argentina—and more precisely in the case of YPF, held beyond the borders of the city of Buenos Aires (where YPF is incorporated and has its domicile)—would be null and void.

16.     While Argentine law allows shareholders who are not physically present to participate in a shareholders' meeting via a proxy or representative,[20] this does not change the fact that, as a legal matter, the shareholders' meeting itself must take place in Argentina, in the jurisdiction where the corporation has its domicile.

17.     In addition, in 2020, due to the Covid-19 pandemic, the Argentine securities and exchange commission, the *Comisión Nacional de Valores* ("CNV"), authorized shareholders to participate in shareholders' meetings remotely.[21]  Accordingly, many companies, including YPF,

---

[18]     *See* ROITMAN, H., *Ley General de Sociedades. Comentada y Anotada*, 3rd Ed., La Ley, Buenos Aires, 2022, Vol. IV, at 825-826 (Ex. 9 at 3) ("The [GCL] establishes the territorial scope in which the [shareholders'] meetings must be held.  They must do so at the registered office or in a different place within the jurisdiction of the corporate domicile. . . . The precept cannot be set aside, without invalidating the shareholders' meeting, except in cases of force majeure or in the case of a unanimous meeting.").

[19]     GCL, Art. 233 (". . . Meeting venue. [The shareholders' meeting] shall be held at the registered office or the place within the jurisdiction of the corporate [domicile].").

[20]     *See* GCL, Art. 239 ("Acting by proxy.  Shareholders may be represented at the meetings. Directors, statutory auditors, members of the oversight committee, managers, and other employees of the company may not be proxies.  The proxy may be executed in a private document, which shall bear a signature duly certified before a court, [a notary public] or at a bank, unless otherwise provided in the bylaws."); *see also* YPF Bylaws § 23 ("Shareholders may be represented at any meeting by a written proxy granted by private instrument with the shareholder's signature certified either in court, by a notary public or a bank.").

[21]     *See* CNV General Resolution No. 622/2013, as amended and supplemented from time to time (the "CNV Rules"), Title XVIII, Chapter XII, Art. 1 (Ex. 2 at 13), incorporated by CNV

amended their bylaws to allow shareholders to participate in the meetings remotely.[22]   Section
24(e) of the YPF Bylaws currently provides:

> Shareholders' meetings shall be validly held if all or a part of its participants
> attend the meeting remotely.  At all times, equal treatment and free access
> shall be given to all participants.  The shareholders present at the meeting
> as well as those participating remotely will count for quorum and majority
> purposes.  In order to hold remote meetings, the applicable regulations shall
> be complied with.

Nevertheless, even if one or more shareholders participate in the shareholders' meeting remotely,
as a matter of Argentine law the shareholders' meeting itself still takes place in Argentina.  The
GCL and CNV Rules still require that the shareholders' meeting be convened and held "at the
[corporation's] registered office" or a "place within the jurisdiction of the corporate [domicile]",
*i.e.*, within Argentina.[23]  Those shareholders who wish to attend in person will meet at that location,
and the minutes of the meeting are prepared and signed at that location.  In the case of YPF, this
means that regardless of whether shareholders participate remotely or not, the YPF shareholders'

---

General Resolution No. 830/2020 on April 5, 2020 ("During the entire period in which freedom
of movement of persons in general is prohibited, limited or restricted as a result of the public health
emergency declared under Emergency Decree No. 297/2020 or any other regulations issued
thereafter from time to time by the National Executive, issuers may hold meetings of their
governing body remotely, even if such meetings have not been provided for in the relevant
corporate bylaws, provided that the following minimum requirements are met . . ."); *see also* CML,
Art. 61 (Ex. 2 at 5) ("The corporate bylaws may provide that shareholders' meetings may also be
held remotely, and for such purpose, the [CNV] shall establish the rules concerning the necessary
means and conditions to ensure the security and transparency of any such acts.").

[22]      *See* CNV Rules, Title II, Chapter II, Art. 28 (Ex. 2 at 11) ("Where the corporate bylaws
have so provided, any issuers included in the marketable securities public offering regime may
hold remote meetings **from their main offices or at such other place as appropriate
[corresponding] to the jurisdiction of their [corporate domicile]** . . .") (emphasis added).

[23]      GCL, Art. 233; *see also id.* CNV Rules, Title II, Chapter II, Art. 28.

meeting must, in order to be valid, be convened and held at a venue located in the city of Buenos Aires.[24]

18.     In sum, the powers of a controlling shareholder under Argentine law are limited to being able to determine the outcome of a matter submitted to the vote of the corporation's shareholders at the shareholders' meeting.   The exercise of voting rights by a controlling shareholder occurs through its participation at shareholders' meetings, which take place in Argentina within the jurisdiction of a corporation's domicile.   Shareholders' meetings of Argentine corporations (including YPF) cannot validly take place anywhere else.   Therefore, as a matter of Argentine law, the Republic's use of its "control" as the majority shareholder of YPF occurs only in Argentina.

**B.      Under Argentine Law, the Actions of a Corporation Cannot Be Attributed to Its Shareholders.**

19.     I understand that Plaintiffs contend that the Republic "'uses' its majority shares to direct YPF's major corporate actions, including in the United States." (Mot. at 11.)  To the extent that Plaintiffs contend that the actions of YPF, whether in the United States or elsewhere, are attributable to the Republic because it holds 51% of the Class D shares and thus can determine the outcome of a shareholder vote, that is incorrect as a matter of Argentine law.

20.     Article 2 of the GCL provides that all companies are legal entities:  "A company is a subject of law within the scope hereof."   This provision is consistent with the general rules

---

[24]     *See, e.g.*, YPF, Form 6-K, March 30, 2023 (Ex. 10 at 3) ("Shareholders are hereby called to a General and Special Class A and Class D Ordinary and Extraordinary Shareholders' Meeting to be held on April 28, 2023 at 11:00 a.m., at the Company's offices located at Macacha Güemes 515, City of Buenos Aires . . ."); Minutes of YPF April 28, 2023, Shareholders' Meeting (Mastro Ex. 7 at 1) ("In the Autonomous City of Buenos Aires, on the twenty-eighth day of April 2023, the Shareholders of YPF S.A. meet at its headquarters located at Macacha Güemes 515.").

governing legal entities (*personas jurídicas*) codified in Title II of the CCC.[25]  The CCC provides

that, as legal entities, companies are endowed with certain attributes.  For instance, a company:

(i) has its own name;[26] (ii) has its own legal domicile and business address;[27] (iii) has its own

property;[28] (iv) has a precise duration;[29] and (v) has a precise corporate purpose.[30]  Critically, as a

legal entity, a company may acquire its own rights and incur its own obligations.[31]

21.     Under these rules, a corporation such as YPF is a legal entity in its own right and

distinct from its shareholders, including its controlling shareholder.  A corporation's assets are its

---

[25]     Under the CCC, "companies," such as YPF, are considered private legal entities.  *See* CCC, Art. 148(a) (Ex. 2 at 2).

[26]     CCC, Art. 151 (Ex. 2 at 3) ("Name.  A legal entity shall have a name identifying it as such and with the indication of the legal form adopted.  Legal entities under liquidation proceedings shall clarify this circumstance in the use of their name."); GCL, Art. 11(2) ("Notwithstanding the provisions for specific types of companies, the formation document must include: . . . 2) name and [domicile] of the company.  If the document only included the domicile, the principal place of business must be filed separately upon request executed by the management body.  All notices to the registered place of business shall be valid and binding on the company . . . .").

[27]     CCC, Art. 152 (Ex. 2 at 3) ("[Domicile] and main office.  The address of a legal entity is that established in its bylaws or in the authorization granted to operate.  Legal entities with many establishments or branches have their [domicile] for notice in such establishments only for the obligations contracted therein.  The change of [domicile] requires the bylaws to be amended.  The change of main office, where not a part of the bylaws, may be decided by the management body."); GCL, Art. 11(2).

[28]     CCC, Art. 154 (Ex. 2 at 3) ("Assets.  Legal entities shall own assets.").

[29]     CCC, Art. 155 (Ex. 2 at 3) ("Term of duration.  The term of duration of legal entities is unlimited, unless otherwise provided for by the law or the bylaws."); GCL, Art. 11(5) ("Notwithstanding the provisions for specific types of companies, the formation document must include: . . . 5) duration, which must be specific . . . .").

[30]     CCC, Art. 156 (Ex. 2 at 3) ("Purpose. The purpose of any legal entity shall be specific and determined."); GCL, Art. 11(3). ("Notwithstanding the provisions for specific types of companies, the formation document must include . . . 3) the object, which must be accurate and specific.").

[31]     CCC, Art. 141 (Ex. 2 at 1) ("Definition.  Legal entities are all entities to which the legal system has conferred the capacity to acquire rights and incur obligations to fulfill the purposes for which they were created.").

own and not its shareholders', and a corporation's debts and obligations are its own debts and obligations and not those of its shareholders, who are not liable for such debts and obligations. As one relevant author explained when writing about the consequences of a company being a legal entity, "any rights and obligations arising from the legal relationships held by a company are attributed to it, rather than to its [shareholders]":  (i) "Any capacities and duties arising from the existence or acts of a legal entity are attributable to it, rather than to its [shareholders]," and therefore "any . . . capacities stemming from a company's acts . . . are exclusively attributed to the company and not to its [shareholders]"; (ii) "The rights of a company belong to it and not to its [shareholders] . . . because the company is the only subject of the legal relationship creating such rights and the sole owner of its assets"; and (iii) "Any obligations arising from a company's legal relationships are directly and in any case attributable to it, and third parties only hold rights in respect to such company."[32]  Accordingly, "[t]he notion that a company is a legal entity separate from its [shareholders] strongly applies to the creditors of the [shareholders]."[33]

22.     Therefore, because a corporation is a legally distinct entity from its shareholders, the conduct of the corporation vis-à-vis third parties cannot be attributed to any shareholder and vice versa under Argentine law.  This principle of separation between the corporation as a legal entity and its shareholders, including its controlling shareholder, is strictly adhered to and can only be set aside where a party has established that a shareholder has exercised their control of the corporation in an unlawful way that justifies piercing the corporate veil.[34]

---

[32]     SUÁREZ ANZORENA, C., *Personalidad de las Sociedades*, in ZALDÍVAR, E., MANÓVIL, R., RAGAZZI, G., ROVIRA, A., SAN MILLÁN, C., *Cuadernos de Derecho Societario*, Vol. I, Abeledo Perrot, Buenos Aires, 2000, at 152-154 (Ex. 11 at 5).

[33]     *Id.* at 154 (Ex. 11 at 6).

[34]     *Id.* at pp. 154-155 (Ex. 11 at 5-6).

23.     Corporate veil-piercing is governed by Article 54 of the GCL.  The third paragraph of Article 54 was added when the GCL was amended in 1983 and was the first time that precise rules on when a corporation's veil can be pierced were codified in Argentine law.  The third paragraph of Article 54, provides that:

> If the activities of a company conceal the attainment of goals beyond the scope of the company purposes, constitute a mere means to break the law, breach the public order or the good faith or the rights of third parties, they shall be attributed to the [shareholders] or the controlling [entities] who made them possible, who shall in turn be jointly and severally liable for damages caused.

In summary, Article 54, paragraph 3, provides that (i) when a corporation's activity conceals the use of the corporation to achieve purposes which are foreign or alien to the corporation's purposes, or (ii) when the corporation is used merely as a means to violate the law, public order or good faith, or to frustrate third parties' rights, then the legal separation between the corporation and the shareholder who has abused the corporate form may be set aside vis-à-vis a particular claimant.

24.     The corporate veil can only be pierced pursuant to a court order, based on sufficient evidence that a legal entity has been used for one of the unlawful purposes described in Article 54(3) of the GCL.[35]  Absent such an order, the corporation's activity cannot be attributed for any

---

[35]     Argentine courts, including the Supreme Court, have repeatedly stated that the remedy of Art. 54(3) is exceptional and that its use must be restrictive.  *See* Argentina Supreme Court of Justice, April 3, 2003, *Palomeque* v. *Benemeth SA*, Digital citation TR LALEY 40000126 (Ex. 12 at 1-2) ("The differentiated personality of the corporation and its [shareholders] and administrators is the axis on which the regulations on corporations are based, and . . . these are a special regime because they are a tool that the legal system provides to commerce as one of the relevant engines of the economy . . .  It is not appropriate to extend the [judgment] to the [shareholders] and administrators of the company if it has not been proved that we are in the presence of a fictitious or fraudulent company, incorporated through abuse of law and with the purpose of violating the law which, taking advantage of such personality, affects the public labor order or evades legal regulations."); *see also* ROITMAN, H., *Ley General de Sociedades. Comentada y Anotada*, 3rd Ed., La Ley, Buenos Aires, 2022, Vol. II, at 95-101 (Ex. 13 at 5-8) (citing cases from the commercial courts and explaining that "[t]he Argentine case law in commercial matters is consistent in interpreting that the principle of [corporate veil piercing] must be applied prudently with restrictive

purpose to its shareholders, including any controlling shareholder.  Further, the corporate veil can only be lifted with respect to a particular claim brought by a particular claimant in connection with specific rights, obligations or assets, in light of specific, pleaded facts, and the claim to lift the corporate veil must have been expressly requested by the claimant.  For all other purposes, the separation between the corporation as a legal entity and its shareholders is maintained:  "[T]he [piercing of the corporate veil] does not affect the ordinary and future activity of the company; conversely, it only applies to the specific act or legal relationship affected by the undue use of the company."[36]  Even where a court has ruled that the corporate veil may be pierced with respect to a specific claim and for a specific purpose, the company as a whole does not cease to exist as a legal entity.[37]  In the same vein, in the event the corporate veil is pierced "there is a partial deprivation of effects, and only as regards to the subject to which the case of application of this

---

criteria and only in exceptional cases, when the evidence produced allows such a conclusion.  **The mere existence of the idea of corporate control does not authorize the automatic application of the [corporate veil-piercing]**.") (emphasis added).

[36]    CAPUTO, L., *Inoponibilidad de la personalidad jurídica societaria*, Astrea, Buenos Aires, 2006, at 100 (Ex. 14 at 4).

[37]    OTAEGUI, J., *El Art. 54 de la Ley de Sociedades: Inoponibilidad de la Personalidad Jurídica*, ED, V. 121, 1987, at 811 (Ex. 15 at 12) ("[I]n the cases in which [corporate veil piercing] is applied, the relevant company is not declared null.  If the relevant company were declared null, its dissolution and liquidation would proceed.  However, the law does not impose the nullity of the corporate entity but its [non-opposability].  Therefore, [piercing the corporate veil] of the corporate entity entails that its legal personality will not be taken into account, which means that the solution of [Article] 39 of the Argentine Civil Code will not be applied for certain purposes, without this imposing in itself the dissolution and liquidation of the company.").  For reference, Art. 39 of the old Civil Code provided:  "Corporations, associations, etc., shall be considered as persons entirely distinct from their members.  The property owned by the association does not belong to any of its members, who shall be neither individually nor collectively obligated to repay the debts of the corporation unless they have expressly bound themselves as sureties or joint debtors with the corporation."  (Ex. 2 at 8.)

rule concerns.  It is not the legal person or its actions that are deprived of effects:  in principle, the deprivation of effects affects the imputation of the action."[38]

25.     I note that Plaintiffs do not even attempt to argue in their Motion that YPF's corporate veil should be pierced; rather, Plaintiffs' Motion (and Prof. Coffee's report) assumes that YPF's conduct can be attributed to the Republic broadly and in vague terms.  Specifically, I understand that Plaintiffs refer to the following as examples of the Republic's "control" over YPF's activities such that YPF's claimed conduct can be attributed to the Republic:  (i) alleged use of Argentina's "majority shareholding to appoint YPF's Chairman and a majority of the members of its Board of Directors," (ii) provisions of the YPF Bylaws which "prescribe that many corporate actions, including international debt issuances and the delisting of its shares from the NYSE, require approval from Argentina as controlling shareholder," and (iii) the terms of Article 16 of the YPF Expropriation Law, under which Argentina must manage "the shareholder rights corresponding to the shares" in accordance with certain principles, including "[t]he administration" of YPF in conformity with best industry and corporate governance practices "safeguarding shareholder interest and generating value on their behalf."  (Mot. at 11-13.)  Even if Plaintiffs had expressly argued that the corporate veil should be pierced, Plaintiffs' claim would fail under Argentine law because none of the alleged indicia of control identified by Plaintiffs (even assuming they are factually correct) are sufficient grounds to pierce YPF's corporate veil.

---

[38]     MANÓVIL, R., *Inoponibilidad de la personalidad jurídica*, La Ley, 2022-A, at 459 (Ex. 16 at 21).

26.     *First*, the election of board members is a right exercised by shareholders through their participation at the shareholders' meeting.[39]   The election of directors by shareholders exercising their voting rights, by itself, can never be the basis for piercing the corporate veil.[40]   In addition, under the YPF Bylaws, the board of directors appoints the chairman of the board.[41]   The board also has the authority to appoint all members of the company's staff and management,

---

[39]     GCL, Art. 234(2) ("The following issues must be addressed at the [ordinary shareholders'] meeting: . . . 2) Appointment and removal of directors, statutory auditors, members of the oversight committee and determination of their compensation . . .").

[40]     I understand that Plaintiffs contend, citing the report of Prof. Coffee, that the Republic could appoint all directors by proposing a change to the slate of directors in the shareholders' meeting, "effectively deny[ing] the ADR voters the ability to vote," and pointing to the April 28, 2023 YPF Shareholders' Meeting.  (Coffee ¶ 25; *see also* Mot. at 7 n.5.)  This, however, is a consequence of holding ADRs versus shares, and thus cannot be a basis for piercing the corporate veil.  In brief, an ADR holder can never attend a shareholders' meeting; instead, an ADR holder can only instruct the depository on how they wish to vote on the matters included in the agenda for the shareholders' meeting.  If a new proposal is presented at the shareholders' meeting, the depository will lack instructions to accept the new proposal and will vote against it.

[41]     *See* YPF Bylaws § 18(a) ("Appointment: The Board shall appoint a Chairman from among the members elected by Class D shares, and it may appoint, as applicable, a Vice Chairman of the Board.  In the event of a tie, it shall be decided by the votes cast by the Directors elected by Class D.  The Chairman and Vice Chairman of the Board shall hold office for two (2) fiscal years, provided such term shall not exceed their respective terms of office, and may be indefinitely reelected under such conditions should they be elected or reelected as Directors by Class D.").

including the CEO.[42]   Thus, in the case of YPF, neither the chairman nor the CEO is appointed

directly by any shareholder, whether controlling or not.[43]

27.     *Second*, the YPF Bylaws clearly provide that the board has the power to issue bonds

and other securities.  Section 17(vi) of the Bylaws grants the board broad powers to "[i]ssue, within

the country or abroad, in national or foreign currency, debentures, corporate bonds or bonds

guaranteed by a security interest, or by a special or floating guarantee or unsecured, whether

convertible or not, pursuant to the legal applicable provisions and with the prior consent of the

pertinent shareholders meeting when legally required."  While Article 235 of the GCL provides

---

[42]     *See* GCL, Art. 255 ("Business and affairs of the corporation shall be managed by a board of directors made up of one or more directors appointed at the shareholders meeting or by the oversight committee, if necessary. . . ."); *see also* YPF Bylaws § 18(c) ("General Manager:  The Chairman of the Board of Directors shall also serve as General Manager, who shall be the Company's chief executive officer and shall be responsible for the executive management functions. Should the Chairman of the Board of Directors state, upon his appointment or subsequently, that he does not wish to serve as General Manager, he shall propose the person (who may be a Director or not, but in the first case he shall have been elected by Class D shareholders) who shall hold such office, subject to the Board's approval.  The Chairman of the Board may, at any time, resume his position as General Manager.  The General Manager shall propose to the Board the persons who shall be part of its senior management team, as well as the Assistant General Manager (who may be a director or not, but in the first case he shall have been elected by Class D shareholders), who shall assist in the management of corporate affairs as well as in any other executive functions that may be assigned to them, subject to the Board's approval.  The Assistant General Manager, if any, shall serve as General Operating Officer and shall report directly to the General Manager, whom he shall replace in case of absence or other interim impediment.").

[43]     To the extent that Plaintiffs contend that the Republic directly appointed the chairman and CEO of YPF, pointing to the appointment of Pablo González and Horacio Marín (*See* Mot. at 7, 12-13), and thus did not respect corporate rules, Plaintiffs are incorrect.  Pablo González was appointed by the board as chairman on February 24, 2021 (*see* YPF, Form 6-K, February 24, 2021 (Ex. 17 at 3)), and Horacio Marín was appointed by the board as chairman and CEO on December 14, 2023 (*see* YPF, Form 6-K, December 14, 2023 (Ex. 19 at 4)).  Mr. Marín's appointment as CEO was conditioned upon the approval by the shareholders' meeting of the amendment to the YPF Bylaws allowing for a joint chairman and CEO.  *Id*.  On January 26, 2024, the YPF Shareholders' Meeting approved the amendment "unifying in a single person the Chairman of the Board of Directors and the management of the executive functions for the administration of the Company (CEO)."  *See* YPF, Form 6-K, January 26, 2024 (Ex. 20 at 4).

that the issuance of bonds and debentures must be approved by an extraordinary shareholders' meeting,[44] Section 10(a) of the Bylaws, in turn, provides that "[w]hen it is required by law that the issuance of corporate bonds be decided by the shareholders' meeting, said meeting may delegate all or some of the issuance conditions to the Board of Directors."[45]  Accordingly, there is nothing unusual, and much less unlawful, with the board's exercise of its power to, and the shareholders' meeting's delegation to the board to, issue bonds and other securities.  These are standard corporate actions authorized by law and thus cannot be the basis for piercing the corporate veil.

28.     *Third*, Article 16 of the YPF Expropriation Law is not a basis to pierce the corporate veil.  Article 16 provides that the exercise by the Republic of its shareholding rights under the expropriated shares "shall be executed pursuant to the following principles":  (a) "[t]he strategic contribution of YPF[] [to the fulfillment of] the objectives set forth" in the YPF Expropriation Law; (b) "[t]he administration of [YPF] pursuant to the industry's best practices and corporate governance, safeguarding shareholder interest and generating value on their behalf"; and (c) "[t]he professional management of YPF."[46]  None of these principles supports piercing the corporate veil.  Indeed, Article 16 merely states that the Republic, as a controlling shareholder of YPF, should act

---

[44]     GCL, Art. 235(6)-(7) ("The amendment of the bylaws, [and] any matters other than those within the scope of the [ordinary shareholders'] meeting shall be addressed at a[n] [extraordinary shareholders'] meeting, along with the following items: . . . 6) Issuance of debentures and their conversion into shares, 7) Issuance of bonds.").

[45]     YPF Bylaws § 10(a).  This delegation by the shareholders' meeting to the board of directors is permitted by law. Article 9 of the Negotiable Obligations Law, provides in relevant part that: "In stock companies, limited liability companies and cooperatives, the issuance of negotiable obligations does not require authorization by the bylaws and may be decided at an ordinary meeting or by the governing body of the company, if so provided by the bylaws."  (Ex. 2 at 9; *see also* CNV Rules, Title II, Chapter II, Art. 1 (Ex. 2 at 11) (providing that the shareholders' meeting may delegate to the board of directors for a period of time such matters as "date, amount, term, and other terms and conditions" of issuances of negotiable obligations and shares).)

[46]     *Petersen* ECF No. 363-72 (YPF Expropriation Law), Art. 16.

in the best interest of the corporation and all of its shareholders.[47]   Further, the Republic's compliance with the YPF Expropriation Law (which, in any event, is consistent with the GCL) can never justify the piercing of the corporate veil.

### C. Under Argentine Law, the Republic Did Not "Cause" YPF to Carry Out Any Activity in the United States.

29.   I understand that Plaintiffs also contend that the Republic "plainly 'uses' its majority YPF Shares to direct YPF's major corporate actions," including "by directing YPF to tap the equity and debt capital markets in the United States." (Mot. at 11-12.)  Plaintiffs identify the following examples of such "capital-raising activities" supposedly directed by the Republic as majority shareholder: (i) voting "to approve an increase in the amount of YPF's Global Medium-Term Notes Program" in 2016, and (ii) ratifying the YPF board's authority "to create Global Programs for the issuance of negotiable obligations in 2023." (Mot. at 12.)  This is incorrect.  As described above, in accordance with the YPF Bylaws and the GCL, YPF's shareholders authorize that the board of directors decide the issuance of debt securities at such times and in such amounts as the board may from time to time determine in its discretion.  Under Argentine law, that general authorization is a condition for the valid issuance of such debt securities, but it is a legally distinct act from the actual issuance of debt, which is carried out by YPF's management in its discretion.

30.   As discussed above, the Bylaws and the GCL may require that the shareholders' meeting authorize the board to issue certain debt instruments.  The procedure is generally as outlined below:

---

[47]   This is consistent with Article 149 of the CCC, which provides that "[t]he participation of the State in private legal entities does not modify their nature."  (Ex. 2 at 2.)  While Article 149 also provides that "the law or the bylaws may provide for differentiated rights and obligations, taking into account the public interest involved in such participation," *id.*, this is not the case here.

i. The board, upon calling an upcoming shareholders' meeting, includes in the agenda items for the shareholders' meeting's consideration.[48]  For instance, Agenda Item 22 for the April 29, 2016 shareholders' meeting read:  "Consideration of an increase in the amount of the Company's Global Medium Term Negotiable Obligations Program."[49]  In addition, Agenda Item 23 read:  "Extension of the powers delegated to the Board of Directors to determine the terms and conditions of the notes issued under the current Global Medium-Term Notes Program."[50]

ii. Pursuant to Article 70 of the CML,[51] the board issues a proposal to the shareholders regarding the agenda items for their consideration.  For the April 29, 2016 shareholders' meeting, the proposal for Agenda Item 22 read:  "Considering that the maximum amount authorized under the Company's Global Negotiable Obligations Program is currently US$8,000,000,000; that by April 8th, 2016, the outstanding negotiable obligations issued by the Company reaches the amount of US$7,038,206,753; and that the Board of Directors considers the issue of negotiable obligations in the capital market as the most convenient financing tool, ***the Board of Directors proposes to increase the amount of said Global Medium-Term Negotiable Obligations Program of the Company*** approved by the Argentine Securities Commission (Comisión Nacional de Valores) through Resolution No. 17,631 dated March 26, 2015 and its respective extensions, by US$2,000,000,000, to reach a maximum nominal amount

---

[48]    According to Article 237 of the GCL, the call for the shareholders' meeting must contain, among other things, the meeting agenda.  Pursuant to Article 246 of the GCL, "[a]ll decisions on issues other than those included in the agenda are null and void," except for certain specific exceptions.

[49]    YPF, Form 6-K, April 4, 2016 (Ex. 21 at 4).

[50]    *Id.*

[51]    CML, Art. 70 (Ex. 2 at 5-6) ("Notice of shareholders' meetings.  Companies that make public offering of their shares shall publish the first call to a shareholders' meeting no later than twenty (20) calendar days and no earlier than forty-five (45) calendar days prior to the date on which the shareholders' meeting is set to be held.  The aforementioned terms shall be computed as from the last publication.  Twenty (20) calendar days prior to the date on which the shareholders' meeting is set to be held, the board of directors shall make available to the shareholders, at the corporate main office or by electronic means, all the relevant information related to the shareholders' meeting, the documents to be considered and the board of directors' proposals.  Up to five (5) calendar days prior to the date on which the ordinary shareholders' meeting that is to consider the documents for the fiscal year is to be held, the shareholders representing no less than two percent (2%) of the capital stock shall be entitled to deliver at the corporate main office any comments or proposals regarding the progress of the corporate business for the fiscal year.  The board of directors shall inform the shareholders that such comments or proposals are available at the corporate main office or may be consulted through any electronic means.").

outstanding at any time under the Program of US$10,000,000,000."[52]   The board's proposal for Agenda Item 23 read: "The Board of Directors informs that on September 13, 2016, the said vesting of powers upon the Board of Directors, approved by the General Ordinary and Extraordinary Shareholders' Meeting on May 21, 2014, will expire.   Consequently, ***the Board of Directors proposes the delegation of powers upon the Board of Directors to determine the terms and conditions of the notes issued under the Program should be extended*** for a two-year term as from September 13, 2016."[53]

   iii.   At the shareholders' meeting, shareholders vote on the agenda items.   At the April 29, 2016 shareholders' meeting, a majority vote of all shareholders present (not only the Republic) approved the board's proposal for Agenda Items 22 and 23.[54]

31.   This was the same process that was followed at the April 28, 2023 shareholders' meeting, where YPF shareholders voted to (i) ratify the board's power to determine the terms and conditions of negotiable obligations issued under the frequent issuer regime, and (ii) create Global Programs for the issuance of negotiable obligations (pursuant to Section 10 of the Bylaws):

   i.   Upon calling the April 28, 2023 shareholders' meeting, the board included for the shareholders' meeting's consideration Agenda Item 17, which read: "Ratification of the powers delegated to the Board of Directors to i) determine the terms and conditions of the notes issued under the Frequent Issuer Regime and ii) to create Global Programs for the issuance of negotiable obligations."[55]

   ii.   In connection with Agenda Item 17, the board issued the following proposal:   "***The Board of Directors proposes to the Shareholders of the Company to ratify for five years as from the date hereof, the delegation of powers to the Board of Directors*** and the possibility for the Board to subdelegate such powers to one or more of its members and/or to one or more first line managers of the Company, ***to determine the terms and conditions of the notes to be issued under the Frequent Issuer Regime*** pursuant to the provisions of Section 10 of the Company's By-laws.   Likewise, it is proposed ***to ratify that the Board of Directors be empowered to create a Global Program for the issuance of notes pursuant to Section 10 of the Company's By-laws, if necessary***.   Therefore, the Board of Directors shall be empowered to:   (i) determine all terms and conditions of issuance of the notes, including the amount, rate and term of the notes; (ii) negotiate and execute all necessary agreements and documentation, including

---

[52]   YPF "Board of Directors Recommendation regarding items 2, 3, 4, 6, 13, 15, 17, 18, 19, 20, 22 and 23 of the Shareholders' Meeting Agenda" (Ex. 22 at 5) (emphasis added).

[53]   *Id.* (emphasis added).

[54]   Minutes of YPF April 29, 2016 Shareholders' Meeting (Ex. 23 at 37-40).

[55]   YPF, Form 6-K, March 30, 2023 (Ex. 10 at 4).

without limitation prospectuses, ratification before the [CNV], determination of the amount to be issued under the Frequent Issuer Regime or the program to be created, the corresponding pricing supplements and the securities representing the notes; (iii) file with the CNV, Buenos Aires Stock Exchange, Bolsas y Mercados Argentinos S.A., Mercado Abierto Electrónico S.A., and/or any other stock exchange or organized market in Argentina and/or abroad, and before any controlling authority or corresponding agency —including but not limited to the Central Bank of the Republic of Argentina and Caja de Valores S.A., among others—, all the necessary procedures for the notes; and (iv) subdelegate in one or more of its members, or in one or more of the Company's first line executives, the exercise of all the aforementioned powers."[56]

iii.  At the April 28, 2023 shareholders' meeting, a majority vote of all shareholders present (not only the Republic) considered and approved the board's proposal for Agenda Item 17.[57]

32.    Many corporations have followed this process for decades:  management develops a proposal and submits it to the board for consideration; the board includes the item in the agenda for the shareholders' meeting; the board issues its decision on the proposal, which is typically published; the shareholders then vote on the initiative at the shareholders' meeting, which may mean approving a debt issuance program or an increase of its maximum amount or modify the bylaws to include an authorization; and the board then decides on the time, the amount, the conditions, the rate of interest of the bonds to be issued, and also the markets in which they will be offered.  It is crystal clear that no shareholder, whether controlling or not, "directs" the issuance of any bond or "runs" YPF's debt-raising activities.  Those are matters reserved for the board to decide upon within the scope of its powers, and it is YPF who conducts such debt-raising activities.[58]

---

[56]     YPF "Proposals of the Board of Directors to YPF S.A.'s Shareholders Regarding the Items of the Agenda for the General and Special Class A and Class D Ordinary and Extraordinary Shareholders' Meeting called for April 28, 2023" (Ex. 24 at 7) (emphasis added).

[57]     Minutes of YPF April 28, 2023 Shareholders' Meeting (Mastro Ex. 7 at 26-27).

[58]     In addition to claiming that the Republic caused YPF to issue debt instruments in the United States (which as I have explained is incorrect), I understand that Plaintiffs also contend that "Argentina has caused YPF to:  (1) solicit U.S. investment in its Class D shares via repeated SEC

## II.   THE REPUBLIC'S YPF SHARES ARE REGISTERED WITH AND IN THE CUSTODY OF CAJA DE VALORES AND THEREFORE CANNOT BE TRANSFERRED OUTSIDE OF ARGENTINA.

33.    I understand that Plaintiffs contend that the Court can order Argentina to "transfer its [YPF Shares] into a global custody account at the Bank of New York Mellon . . . in New York." (Mot. at 1.)  While I express no opinion on the validity of Plaintiffs' contention under U.S. law, as a matter of Argentine corporate and securities law, Plaintiffs' demand cannot be carried out for at least two reasons.  *First*, the YPF Shares are registered with, and in the custody of, CdV in book-entry form.  Therefore, the YPF Shares are not in the custody of the Republic and cannot be transferred outside of Argentina, including to a global custody account in New York.  *Second*, because the YPF Shares are in the custody of CdV, any order requiring the transfer of the shares must be directed at CdV, a privately held Argentine corporation.[59]

34.    The current book-entry share system in Argentina is governed by the following laws, decrees, and rules, among others:  (i) the GCL; (ii) the CCC; (iii) the CML; (iv) Law No.

---

filings" and "(2) maintain an SEC-registered ADR program with BNYM so YPF shares can trade on the NYSE."  (Mot. at 9.)  This is also incorrect.  As a preliminary matter, Plaintiffs do not point to any act by the Republic "caus[ing]" YPF to take these claimed actions.  Further, Plaintiffs are incorrect as a matter of Argentine law for the same reasons explained above.   While the shareholders' meeting may authorize the board to carry out certain actions (for instance, under Article 234(1) of the GCL, the shareholders' meeting approves the annual report and financial statements of the corporation), it is the board, within its discretion, that decides whether, and the manner in which, to carry out such actions.  Indeed, Plaintiffs concede as much.  (*See* Mot. at 12-13 (recognizing that it is the "Board of Directors" "who have organized and conducted YPF's ADR program with BNYM, the listing of its Class D shares on the NYSE, and the registration of the shares with the SEC").)

[59]    Plaintiffs are also incorrect that the Court can order Argentina to transfer the YPF Shares to Bank of New York Mellon, or anyone else, because Article 10 of the YPF Expropriation Law prohibits the transfer of the Republic's YPF Shares "without the permission of the National Congress by a two-thirds vote of its members."  *Petersen* ECF No. 363-72 (YPF Expropriation Law), Art. 10.  I understand that Prof. Alfonso Santiago has addressed this prohibition on the transfer of the YPF Shares in a separate declaration, and I will not discuss it here.

20,643, the Private Securities Purchase Law (the "PSPL"); (v) the CNV Rules; and (vi) the CdV's

operating rules (the "CdV Rules").

35.     Under Section 6(a) of the YPF Bylaws, all classes of YPF shares are issued in book-

entry form,[60] and all of YPF's shares are registered with CdV.[61]   Article 208, paragraph 5, of the

GCL allows corporations to issue shares in book-entry form.[62]   Book-entry shares are not

evidenced by physical certificates but rather by entries in the share registry.   Article 208, paragraph

5, provides that (i) the issuing corporation, (ii) "commercial or investment banks," or (iii) an

authorized securities depositary may carry the register of book-entry shares.[63]   Within CdV's

registry of YPF's book-entry shares, the Class D shares are treated as fungible and not individually

identified.   Rather, a registered owner of Class D Shares will be associated with a given quantity

of fungible Class D shares.[64]

---

[60]     YPF Bylaws § 6(a) ("The capital stock is fixed in the amount of THREE THOUSAND NINE HUNDRED THIRTYTHREE MILLION ONE HUNDRED AND TWENTY-SEVEN THOUSAND NINE HUNDRED AND THIRTY ($ 3,933,127,930) fully subscribed and paid in, represented by THREE HUNDRED NINTY-THREE MILLION THREE HUNDRED AND TWELVE THOUSAND SEVEN HUNDRED NINETY-THREE (393,312,793) book-entry shares of common stock, of TEN PESOS ($10.00) nominal value each, entitled to one vote per share.").

[61]     *See* YPF Form 20-F for 2022 (Mastro Ex. 1 at 101).

[62]     GCL, Art. 208, paragraph 5 ("Bylaws may authorize that all shares or some classes of shares not be represented in certificates.   In that case, they must be registered in accounts [by] the issuing company with the names of the holders in a book-entry share registry governed by [Article] 213 as applicable, commercial or investment banks or authorized Securities Depository.").

[63]     *Id.*   CdV is authorized by the CNV to act as both a centralized securities depositary ("*Agente Depositario Central de Valores Negociables*") for all YPF shares and the payment agent and registrar ("*Agente de Registro y Pago*"), as defined in Title VIII, Chapter I and Chapter II of the CNV Rules.   (*See* Ex. 2 at 12-13.)

[64]     The PSPL, which created CdV, provides in Article 39 that "[d]epositors receiving securities from the principal for collective deposit shall return to the principal, at their request, an equal amount of securities of the same issuing entity and of the kind and class received, duly endorsed by Caja de Valores in their favor in the case of registered securities, plus any other credit, where appropriate, but not the same securities." (Ex. 2 at 10.)   In addition, the GCL contemplates that book-entry shares may not even be individually numbered.   GCL, Art. 238 ("When certificates

36.     All YPF shares, including the Republic's YPF Shares registered in CdV's registry, are in the custody of CdV.  That is because, while the Republic and other shareholders have title to the shares, book-entry shares exist only insofar as they are recorded in the registry, and at all times remain in the custody of the registrar.

37.     Under this system YPF shares registered with CdV in book-entry form can never leave Argentina (nor can they ever even leave the custody of CdV, who is the custodian of the register evidencing the book-entry shares) because they exist only in the register maintained by CdV.   Indeed, Article 129 of the CML provides that "[t]he creation, issuance, transfer or establishment of property rights, encumbrances, [interim] measures, and any other circumstance affecting the rights conferred by the marketable security shall be effected by means of entries" in the registry maintained by the registrar.[65]  Under this rule, title to a book-entry share is acquired or transferred only through modification of the registry maintained by the registrar, as custodian of the shares.  And even after a transfer, a shareholder is not entitled to any particular book-entry

---

of deposit or records of book-entry shares do not specify their number and the number of certificates, where appropriate, the controlling authority may, at grounded request of any shareholder, require verification of the existence of the shares to the custodian or the entity responsible for keeping the registration.").

[65]     CML, Art. 129 (Ex. 2 at 6-7); s*ee also* CCC, Art. 1850 (Ex. 2 at 4) (providing, in connection with uncertificated securities, that "[t]he transfer or the creation of property rights on a security, encumbrances, seizures, preventive measures or any other circumstance affecting the rights conferred by the security shall be made by means of entries in special registers to be kept by the issuing entity, or, on their behalf, by a securities depository, an authorized financial institution or a notary public in charge of a notarial register, as from which moment the circumstance affecting such rights shall produce effects against third parties"); PSPL, Art. 31(5) (Ex. 2 at 10) ("The Central Securities Depositary Agent shall have the following functions without prejudice to those established by the regulations of the [CNV]: . . . 5. Provide registration services. Which includes, but is not limited to: i) the initial annotation, ii) the registration of holders and transfers, iii) the registration, lifting and/or execution of measures that affect negotiable securities, and (iv) the conciliation of records.").

Case 1:15-cv-02739-LAP   Document 579   Filed 05/16/24   Page 29 of 31

shares because the shares are fungible. Further, YPF's shares, which are held in book-entry form, cannot be converted to certificated shares without an amendment to the Bylaws.[66]

38.     Given that all YPF shares are in book-entry form, permanently in the custody of CdV, and cannot leave its custody, under Argentine law any enforcement order of a judgment upon Class D shares must be directed to CdV by an Argentine court, not against the share owner. This is so because, as described above, any change in title to shares in book-entry form requires action from the registrar who maintains the registry. Moreover, Article 215 of the GCL provides that a transfer of shares is only binding and enforceable against third parties (including the issuer) once the change has been annotated in the registry.[67] These principles extend to interim measures (such as an attachment, restraining order, or another encumbrance) as well. Under Article 1850 of the CCC and Article 129(a) of the CML, interim measures over the book-entry shares can only be constituted through annotation in the registry, maintained by the entity acting as registrar of the book-entry shares.[68] Further, the CdV Rules provide that, either in its capacity as registrar or

---

[66]     YPF Bylaws § 6(a); *see also* PSPL, Art. 39 (Ex. 2 at 10); World Forum of CSDs, WFC Single Disclosure Report 2020 (Mastro Ex. 14 at 33).

[67]     *See* GCL, Art. 215 ("Transfer of registered or book-entry shares and the real property rights they are encumbered with must be informed in writing to the issuing corporation or entity in charge of the registry and they must be entered in the pertinent book or account. It is enforceable against the company and third parties since registration.").

[68]     S*ee* CCC, Art. 1850 (Ex. 2 at 4) ("[P]reventive measures or any other circumstance affecting the rights conferred by the security shall be made by means of entries in special registers to be kept by the issuing entity, or, on their behalf, by a securities depository, an authorized financial institution or a notary public in charge of a notarial register, as from which moment the circumstance affecting such rights shall produce effects against third parties."); CML, Art. 129 (Ex. 2 at 6-7) ("[E]ncumbrances, preventive measures, and any other circumstance affecting the rights conferred by the marketable security shall be effected by means of entries in special registers to be kept by the issuing entity or, on its behalf, by an authorized collective depositary agent, commercial or investment banks, or designated registrars, and shall take legal effect and be enforceable against third parties as from the date of such registration."); *see also* CNV Rules, Title VIII, Chapter I, Art. 1.

-29-

centralized depository, interim measures over securities within CdV's custody must be ordered "by a competent authority."[69]  Therefore, under Argentine law, assuming that the Republic could be ordered to turn over its property to satisfy a foreign judgment,[70] the only way for the judgment creditor to enforce a judgment upon the Republic's YPF Shares is to obtain an *exequatur* order from an Argentine court directed at CdV.

---

[69]     CdV Rules, Art. 48 (Ex. 2 at 15) ("Caja de Valores S.A. shall only accept the registration of preventive measures on marketable securities in collective deposit and their credits if such measures are issued by a competent authority.  A preventive measure shall only be lifted if a new court order is issued by the same authority that ordered the measure.  In this regard, the expiration of the measures set forth in the final part of [Article] 207 of the Argentine Code of Civil and Commercial Procedure shall not apply."); *id.* Art. 63 (Ex. 2 at 15) ("Caja de Valores S.A. shall only accept the registration of preventive measures on marketable securities existing in the register and their credits if such measures are issued by a competent authority.  A preventive measure shall only be lifted if a new court order is issued by the same authority that ordered the measure.  In this regard, the expiration of the measures set forth in the final part of [Article] 207 of the Argentine Code of Civil and Commercial Procedure shall not apply.").

[70]     Under Argentine law, the state is presumed solvent, and thus cannot be ordered by a court to relinquish property to satisfy a judgment.  I understand that this has been addressed by Prof. Santiago in his declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   May 16, 2024

_____

Rafael M. Manóvil