# LIONBRIDGE

STATE OF NEW YORK     )
                            )
                            )     ss
                            )
COUNTY OF NEW YORK    )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached Expert Report of Alfonso Santiago.

Ethan Ly, Managing Editor
Lionbridge

Sworn to and subscribed before me

this _16th_ day of _MAY_, 20_24_.

LAURA E MUSICH
Notary Public - State of New York
NO. 01MU6386791
Qualified in Queens County
My Commission Expires Jan 28, 2027

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETERSEN ENERGÍA INVERSORA,    :
S.A.U. AND PETERSEN ENERGÍA,    :
S.A.U.    :
   :
         Plaintiffs,    :
   :    Case No. 1:15-cv-02739-LAP
         v.    :
   :
ARGENTINE REPUBLIC AND YPF    :
S.A.,    :
   :
         Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ETON PARK CAPITAL    :
MANAGEMENT, L.P., ETON PARK    :
MASTER FUND, LTD. AND ETON    :
PARK FUND, L.P.,    :
   :
         Plaintiffs,    :
   :    Case No. 1:16-cv-08569-LAP
         v.    :
   :
ARGENTINE REPUBLIC AND YPF    :
S.A.,    :
   :
         Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## EXPERT REPORT OF ALFONSO SANTIAGO

Pursuant to 28 U.S.C. § 1746 and Rule 44.1 of the Federal Rules of Civil Procedure, I, Alfonso

Santiago, state as follows:

1. I have been asked by counsel for the Argentine Republic to review and respond to the motion

   for injunction and turnover filed by Plaintiffs Petersen Energía Inversora, S.A.U. ("PEISA")

and Petersen Energía, S.A.U. ("PESA"; collectively with PEISA, "Petersen"), and Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (collectively, "Eton Park," and together with Petersen, "Plaintiffs"), and to provide my opinion on certain aspects of Argentine public law in connection with that motion.

2.   I am a duly licensed attorney and authorized to practice law in Argentina.  I am a professor of Constitutional Law at the Universidad Austral Law School in the Autonomous City of Buenos Aires, Argentina.

3.   I have submitted reports dated August 30, 2019, February 7, 2020, and December 3, 2021 (*see Petersen Energía Inversora, S.A.U. et al.* v. *Argentine Republic and YPF S.A.*, No. 1:15-cv-02739-LAP (S.D.N.Y.), ECF Nos. 117, 150, and 365-1).  My professional qualifications are described in those reports.

## EXECUTIVE SUMMARY

4.   In the first section of this report I explain why, under Argentine law, it would be legally impossible for the Argentine Republic to comply with an order to turn over its Class "D" shares in YPF to Plaintiffs.  This impossibility arises from the fact that such a measure would directly violate express statutory provisions under Argentine law.

5.   In the second section of this report I explain why, in addition to being an impossible measure to comply with, the turnover order requested by Plaintiffs, if issued, could not be enforced against the Argentine Republic pursuant to Argentine law.  Only final judgments that are not subject to an appeal can follow the compliance and enforcement procedure provided for in the budgetary legislation in order for the Argentine Republic to satisfy the provisions therein.

6. In the final section of this report, I explain that YPF S.A. is a legal entity that is separate and distinct from the Republic.

I.    **AN ORDER TO TURN OVER THE REPUBLIC'S SHARES TO PLAINTIFFS WOULD BE IMPOSSIBLE FOR THE REPUBLIC TO COMPLY WITH UNDER ARGENTINE LAW.**

7. Plaintiffs' request in the motion for injunction and turnover, which seeks to have 51% of the Republic's Class "D" shares in YPF S.A. transferred to a global custody account at The Bank of New York Mellon in New York, faces insurmountable legal obstacles under Argentine law. Specifically, this motion implies that the Argentine Republic would be forced to take an action that is expressly prohibited by Argentine law.

   A.    **The turnover of the shares is legally impossible without explicit authorization from the Argentine Congress.**

8. According to Law No. 26.741, whereby 51% of Repsol's Class "D" shares in YPF were declared to be of public interest and subject to expropriation, the transfer of the expropriated shares is expressly limited and conditioned by such declaration of public interest, and any modification requires an explicit authorization from the National Congress.  Article 10 of this law provides that "any future transfer [of the expropriated shares] is prohibited without the authorization of the Argentine National Congress by a two thirds vote of its members."  In the absence of the legislative authorization required by Article 10, the Argentine Republic cannot turn over or dispose of the shares without violating its own constitutional and legal order.  Any appropriation (even involuntary) made in violation of this provision would therefore be illegal under Argentine law.

9. The fact that the shares are not transferable under Law No. 26.741 means that they also cannot be attached.  The non-transferability of these shares, established by a law of public order,[1] ensures that they cannot be subject to provisional remedies that involve their disposition, such as attachment.  Any interpretation to the contrary would necessarily undermine the purposes of the public interest sought with the enactment of Law No. 26.741.

10. A foreign court order forcing the Argentine Republic to transfer its shareholding in YPF to a third party in order to settle an alleged monetary debt, in direct contravention of the provisions of an Argentine statute, would be a violation of the republican system of government as enshrined in our National Constitution.  If the court order also originates in a foreign court, for purposes of Argentine law this foreign order would be deemed an improper interference in aspects that lie at the core of Argentine sovereignty, by seeking to disregard the requirement of participation and prior authorization of a qualified majority of Congress, which expresses the will of the electorate through its democratically elected representatives.[2]

**B.    The order to turn over the shares would entail an unlawful modification by a foreign court of a public policy approved by the Argentine Congress.**

11. Moreover, an additional insurmountable obstacle faced by an order to turn over the Republic's Class "D" shares in YPF is that Law No. 26.741 has explicitly provided that the Argentine State's ownership of 51% of YPF's shares is a matter "of public interest."  Article 7 of the law

---

[1]    *See* Law 26.741, Art. 18 ("This law is a public order law.").

[2]    It should be noted that the National Congress is a bicameral body made up of representatives of the public (Chamber of Deputies), and of the provinces and the Autonomous City of Buenos Aires (Chamber of Senators), whose members are directly elected by the Argentine people (National Constitution, Arts. 45 and 54) (ECF No. 469-16), serving as a branch that is fully independent from the president and judges.  In turn, it must be emphasized that legislators are elected in separate elections from the elections for Argentina's president and vice president (since they are held two years apart).

declares "fifty-one percent (51%) of the assets of YPF Sociedad Anónima, represented by an equal percentage of the Class D shares of said company, directly or indirectly belonging to Repsol YPF S.A., its controlling or controlled entities, to be of public interest and subject to expropriation." This legislative act determines the strategic importance of these shares for the Argentine State, basing their expropriation on the need to safeguard national objectives concerning energy and resources.

12. Specifically, by declaring the expropriation of the shares as a measure of public interest, a declaration that has remained in place to this day, Law No. 26.741 establishes a clear policy that these shares must remain in the hands of the State until Congress decides otherwise. Ensuring the ability of the Republic, as a shareholder, to sustain YPF's activity is essential for the Nation's strategic and energy interests. Article 13 of the law itself provides that the purpose of declaring the specified shares to be of public interest is to ensure "the adequate supply of the fuels needed for the operation of the national economy." Therefore, converting this majority percentage of shares into private property would not only require a review and repeal of the existing law and an express authorization from Congress—with a supermajority of votes—but would also represent a fundamental change in the public policy adopted by the Argentine State in relation to energy matters.[3]

---

[3]     It is worth highlighting that the reasons of public interest pursued with the enactment of Law No. 26.741 have been validated by the case law of the Fourth Division of the National Court of Appeals in Federal Administrative Matters, in the case *YPF S.A. vs. AES Uruguaiana Emprendimientos S.A. and others concerning a direct appeal from an external body*, dated October 7, 2014 (Exhibit A).

13. Under Argentine law, a foreign court does not have the power to modify, by ordering the transfer of shares to private entities, an Argentine public policy established by the National Congress.  Such an action would, in fact, invalidate a law that is in force without following due legislative process, and would be construed as an encroachment upon the prerogatives of the Argentine legislature, by improperly interfering in the Republic's internal affairs.

14. Furthermore, such an act would contravene the fundamental principle that critical decisions related to the country's hydrocarbons policy must be made exclusively by representatives elected by the people.  This underlying principle of functional separation of powers entails a clear distinction of authorities among the three branches of government in relation to the formulation and implementation of public policies.  In this context, the National Congress has the authority to define the guidelines for federal energy policy; the National Executive Branch is responsible for implementing energy policy, including the determination of utility tariffs; while the Judiciary has the duty to oversee the reasonableness of these policies and verify that they comply with the fundamental rights set forth in the National Constitution. This distribution of powers is carried out through a system of checks and balances that bases the separation of powers on a dynamic balance of reciprocal controls, ensuring that no branch exceeds its constitutional mandate.  (Judgments 339:1077 (Exhibit B), whereas 26 and 29; and Judgments 328:566 (Exhibit C), opinion of Judges Maqueda and Zaffaroni).

   **C.    The order to turn over the shares would violate the legal rights of the Argentine provinces over the shares.**

15. Article 8 of Law No. 26.741 establishes additional provisions that stand as further insurmountable legal impediments to any attempt to force compliance with a foreign court order requiring the turnover of YPF shares to third parties.  According to this article, "[t]he

shares subject to expropriation . . . shall be distributed as follows: fifty-one percent (51%) shall belong to the national State and the remaining forty-nine percent (49%) shall be distributed among the provinces that make up the Federal Organization of Hydrocarbon Producing States."

16. This distribution between the State and the provinces is also part of a public policy established by Congress to ensure that the benefits derived from natural resources (in this case, hydrocarbons) are shared fairly with the provinces that contribute to their development.  In fact, the same Article 8 provides that the distribution must be carried out in an equitable manner and considering objective criteria such as the levels of hydrocarbon production and proven reserves of each province, reflecting the fact that according to the Constitution, natural resources are the original property of the provinces themselves.  (National Constitution, Art. 124) (ECF No. 469-16).

17. A court order requiring the turnover of these shares to third parties would also be contrary to these established legal and constitutional provisions, as it would violate the legal framework governing their distribution between the State and the provinces, in effect preventing the shares from being distributed as Congress has directed.

### D.    A foreign decision that violates Argentine public policy is not enforceable under Argentine law.

18. The Argentine Supreme Court has determined that a court order issued in a judicial proceeding abroad, in which the Argentine Republic is a party, cannot be complied with when what it orders is contrary to Argentine public order.  In the judgment rendered in the case *In re: Ministry of Foreign and Religious Affairs concerning report on judgment handed down in 'Fontevecchia y D'Amico c. Argentina' by the Inter-American Court of Human Rights*, the Supreme Court held that a judgment of the Inter-American Court of Human Rights, which in

principle is binding under international law, was "impossible to comply with" because what it ordered (that the Argentine Supreme Court reverse a final judgment that it had issued) is contrary to the National Constitution.  (Judgments: 340:47) (Exhibit D).

19. The Supreme Court cited the importance of respect for "the principles of public law laid down by this Constitution."  (Judgments: 340:47, opinion of Judge Rosatti, whereas 50) (Exhibit D). Included among those principles is precisely the republican form of government with its separation of powers.[4]  (*See*, e.g., Judgments 1:32 (Exhibit E); 338:1060 (Exhibit F)).  This reasoning applies even more forcefully to Plaintiffs' motion in this case, which would not even involve a conflict between international and domestic law, but instead deals with an order by a foreign court, which would require recognition in the Argentine courts to be enforced.  It would be legally impossible to comply with such an order, which (as explained above) would be contrary to Argentine public order inasmuch as it violates the Constitution and an express law of public order.

20. In *Claren Corporation c/ EN Arts 517/518 CPCC exequatur concerning various matters*, the Argentine Supreme Court rejected a request for recognition of a foreign court decision on the grounds that it was "clearly contrary" to Argentine public order.  In that case, recognition was requested for a judgment ordering the Argentine Republic to pay the plaintiff company a sum

---

[4]     These "principles of public law" have been understood to include, among others: a) the representative, republican, and federal form of government (National Constitution, Art. 1); b) constitutional supremacy (National Constitution, Art. 31); c) the principle of legality and the principle that the executive branch is subject to the rule of law (National Constitution, Art. 19); d) the principle of equality (National Constitution, Arts. 15, 16, 75 subparagraph 23, and related articles); e) the non-absolute nature of rights and the reasonableness standard for purposes of regulating them (National Constitution; Arts. 14, 28, 99 subparagraph 2, and related articles); f) due process of law (National Constitution; Art. 18, and related articles; Supreme Court of Justice of the Nation, Judgments: 319:2411 (Exhibit G); 328:3193 (Exhibit H); 336:503 (Exhibit I)); g) the final nature of Supreme Court judgments (Judgments: 340:47) (Exhibit D); and h) the emergency measures adopted to guarantee the Nation's very existence (Judgments: 337:133) (Exhibit J).

of money as past-due principal and interest on certain Argentine bonds.  The Supreme Court found that enforcing the order would violate Article 517(4) of the Argentine Code of Civil and Commercial Procedure—examined below—because it would imply a validation of the plaintiff's avoidance of the public debt restructuring process ordered by the Argentine State through the emergency rules issued by the relevant authorities, in accordance with the provisions of the Argentine Constitution.  The Court based its decision on the fact that the emergency rules that provided for the restructuring of Argentine debt had been issued "by the constitutionally authorized entities."  (Judgments 337:133, whereas 9) (Exhibit J).

21. Furthermore, the Court stressed the importance of preserving Argentina's right to determine its own public policies, stating that "the State's powers, including the possibility,  in times of severe economic crises, of it limiting, suspending or restructuring debt payments to align the debt service with its actual financial capacity, the supply of essential services, and the fulfillment of basic state functions that cannot be neglected," and the rules that allow for such powers to be exercised, "are part of public order under Argentine law."  *Id*.  Therefore, it is not permissible under Argentine law to grant exequatur to a decision by a foreign court that is "clearly contrary to such provisions."  *Id.*

22. As these cases demonstrate, the principle of public order is an essential element in the Argentine legal system, acting as a bulwark that protects the fundamental and structural values of society.  (Judgments 344:1857) (Exhibit K).  Therefore, any foreign decision whose

enforcement is sought in Argentine territory must be subjected to scrutiny for its compatibility with public order, thus ensuring that the foundations on which the Argentine constitutional order is based are not violated.   (Judgments 319:2411 (Exhibit G); 336:503 (Exhibit I); 342:1568 (Exhibit L); 347:291 (Exhibit M)).

23. In the case of YPF and pursuant to Law No. 26.741, public order is manifested in the protection of strategic decisions regarding energy policy and natural resources.  The legislation declaring a significant percentage of YPF's shares to be a matter of public interest is not only an administrative measure, but a declaration of the Republic's "priority objective" to achieve "the adequate supply of the fuels needed for the operation of the national economy."  A foreign court order requiring a transfer of YPF shares contrary to this law, by involving a forced modification of the shareholding structure ordered by Congress, would constitute an infringement of the political and economic autonomy of the Argentine Republic and an inappropriate intervention in national self-determination, both of which are zealously guarded under the concept of Argentine public order.

24. In terms of judicial procedure, if it is determined that a foreign decision infringes Argentine public order, its recognition and enforcement will be denied by the domestic courts.  Thus, the Argentine Code of Civil and Commercial Procedure provides in Article 132 that "[t]he measures requested by foreign judicial authorities shall be complied with . . . provided that the decision ordering them does not impact the principles of public order in Argentine law."  Likewise, Article 517 mandates that "judgments of foreign courts . . . shall be enforceable if the following requirements are met:. . . . 4) The judgment must not affect the principles of public order in Argentine law."  Thus, public order operates as a critical filter that preserves the integrity of Argentine law and maintains its alignment with the constitutional design.

Indeed, this procedural rule finds a correlate "in an overwhelming number of bilateral and international conventions entered into by Argentina, in accordance with the vast majority of domestic laws that stipulate that foreign decisions shall not conflict with the public order or fundamental public policies of the respective countries in order to be recognized and enforced." (Judgments: 337:133) (Exhibit J).

## II.   AN ORDER SUCH AS THE ONE PLAINTIFFS ARE SEEKING CANNOT BE ENFORCED AGAINST THE NATIONAL STATE.

25.  In addition to being impossible to comply with, an order such as the one Plaintiffs are seeking is not enforceable against the Argentine State under Argentine law.

### A.   Under Argentine law, only final judgments are enforceable.

26. As seen above, and in the absence of a specific treaty binding the two States involved in the dispute, foreign court judgments will be enforceable in accordance with Article 517 of the Argentine Code of Civil and Commercial Procedure, which requires, among other things, that such judgments "must not affect the principles of public order in Argentine law."[5]  In addition to meeting these requirements, a (local or foreign) judgment may only be enforced if it is final and not subject to any procedural appeal.  The requirement of finality of the judicial decision

---

[5]     Art. 517 of the Code of Civil and Commercial Procedure of Argentina: "The judgments of foreign courts shall be enforceable under the terms of the treaties entered into with the country from which they originate. When there are no treaties, they shall be enforceable if the following requirements are met:
1) The judgment, being subject to res judicata in the State where it has been handed down, must be issued by a court having jurisdiction pursuant to the Argentine rules of international jurisdiction and must be the consequence of having brought an action in personam or an action in rem in respect of a personal property, if such property has been transferred to the Republic during or after the proceedings heard abroad.
2) The defendant against whom enforcement of the judgment is sought must have been personally summoned and his right to defense must have been guaranteed.
3) The judgment must meet the necessary requirements to be considered as such in the place where it was issued, along with the conditions of authenticity required by national law.
4) The judgment must not affect the principles of public order in Argentine law.
5) The judgment must not be incompatible with another judgment that has been handed down, whether previously or simultaneously, by ONE (1) Argentine court."

refers to the notion of "res judicata" as it is understood in Argentine law.  In Argentine law, the fact that a judgment is subject to res judicata means that it is no longer subject to challenge or appeal within the same action.  In the case of a foreign judgment, it will fall to foreign procedural law to determine how and under what conditions a decision is not subject to further challenge or appeal.

27. In this case, I understand that the judgment for which enforcement is sought is not yet final in the Argentine Republic (although it may be enforceable in its jurisdiction of origin), due to an existing appeal filed in the U.S. court and awaiting decision.  This appeal precludes, for purposes of Argentine law, the judgment from being considered final, res judicata and, therefore, enforceable.  To initiate the enforcement of this judgment without a final decision in the court proceedings pending in the United States would amount to a flagrant violation of the right to defense at trial under Argentine law, inasmuch as the Argentine Republic would be prevented from exhausting all possible stages of review before it could be enforced.  Pursuant to the rules of the Argentine Code of Civil and Commercial Procedure, a judgment of this sort is not enforceable.

**B.  Under Argentine law, a judgment against the National State can only be enforced through the mechanism provided for in the budgetary regulations.**

28. In the Argentine legal system, the principle of solvency of the National State sets forth that the State has the capacity to comply with its financial obligations.  This principle entails that, generally, it is not necessary to attach state assets in order to ensure compliance with court judgments.  According to this tenet, enforceable judgments against the State are typically limited to those involving the payment of sums of money.

29. Final judgments ordering the National State or any entity of the National Administration to pay sums of money are subject to a specific procedure for their enforcement, as provided in the budgetary regulations.  As the Supreme Court has held, this specific procedure ". . . seeks to harmonize the rational administration of public funds and the economic rights of private parties debated in the courts," and responds to the declaratory nature of judgments issued against the National State—established in Article 7 of Law No. 3952—which "tends to prevent the administration from being placed, as a result of a peremptory judicial order, in a situation of not being able to satisfy the judicial requirement due to the lack of funds provided in the budget for such purpose or in a situation of disturbing the normal functioning of the Public Administration."  (Judgments: 339:1812, whereas 5) (Exhibit N).  At the same time, the Court also stated that ". . . this does not mean a kind of authorization to the State not to comply with court rulings, since this would place it outside the legal framework, when it is precisely the State that must ensure their observance." *Id*.

30. According to Article 170 of Law No. 11.672 Supplementary Permanent Budget Law (text consolidated in 2014), replaced by Article 68 of Law No. 26.895, these judgments must be enforced by including the amounts awarded in the national budget for the corresponding year. This process is in accordance with the provisions of subparagraphs 7 and 8 of Article 75 of the National Constitution, which attribute to Congress the power to regulate these matters.

31. If the budget for the fiscal year in which the adverse judgment must be complied with (once it becomes final) does not have sufficient credit, the National Executive Branch is required to make the necessary provisions to include it in the next fiscal year, meaning that the defendant jurisdictions and entities must be duly informed of the adverse judgment (which must be final) before July 31 of the year in which the draft budget must be sent.  Furthermore, these funds must be allocated according to a strict order of seniority, based on the date of judicial notification, and used until depleted.  Any remainder must be paid for with funds allocated in the following fiscal year.  This ensures that court judgments are dealt with in an orderly and predictable manner, respecting the State's financial planning while ensuring compliance with its legal obligations.

32. When a final and enforceable judgment is issued against the State, either for the payment of sums of money or for the performance of obligations in kind, Article 9 of Law No. 26,854 provides clear rules on judicial action in relation to provisional remedies against the State.  This law expressly prohibits the issuance of any provisional remedy that may impact, hinder, compromise, divert from their original use, or in any way disrupt state assets or resources.  This legal framework is designed to ensure that the State's ability to perform essential government functions and services is not impaired by judicial actions that may impact its assets.

33. The National State's shares in YPF S.A. are protected as a strategic asset of Argentina, ensuring that they cannot be compromised or diminished by judicial decisions.  This is crucial to maintaining the company's autonomy and operating capacity in the pursuit of its objectives of national interest.

## III.   YPF IS A LEGAL ENTITY SEPARATE AND DISTINCT FROM THE ARGENTINE REPUBLIC.

34. YPF is not part of any administrative structure of the Republic.  YPF's operational and administrative autonomy as a company formed pursuant to private law is clearly established in specific legal provisions, such as Article 15 of Law No. 26.741.  This article is crucial, since it stipulates that, despite the significant state-held participation in YPF, the company is not subject to the general administrative regulations governing the management and control of state entities.  In a dispute between a private company and YPF, the Supreme Court determined that it was not appropriate to enable its ordinary appellate jurisdiction, which is reserved for disputes in which the State is a party (provided for in Article 24(6)(a) of Decree-Law No. 1285/58), given that an adverse judgment against YPF would neither directly nor indirectly impact the National State.  (Judgments 341:1306) (Exhibit O).[6]

35. Moreover, despite the expropriation and majority state control (Articles 1 and 7, Law No. 26.741), YPF S.A. retains a structure and operation that distinguish it from the State as a legal entity.

36. The National Government's control as majority shareholder in YPF does not alter the company's legal nature or operational autonomy.  The fact that the State holds 51% of YPF's Class "D" shares, and thus takes part in the company's decision making, does not affect the nature and operations of YPF as a corporation that adheres to the principles of profitability and

---

[6]        Art. 24 of Decree-Law No. 1285/58, as applicable, sets forth that the Supreme Court of Justice shall hear:
"6) By means of an ordinary appeal of final judgments of the national courts of appeals, in the following cases:
a) Cases in which the Nation is a party, directly or indirectly, when the ultimately disputed value, without accessory claims, exceeds two hundred million pesos ($200,000,000);
b) Extradition of criminals wanted by foreign countries;
c) Cases arising from captures or maritime seizures in time of war of military salvage and on the nationality of the vessel, legitimacy of its patent, or legality of its papers."

market efficiency.  This separation in respect of the State ensures that YPF can adapt nimbly to market dynamics and respond effectively to energy needs without the operational limitations it would face as a state company.

37. In conclusion, YPF S.A. remains a corporation governed by ordinary laws, the National Constitution, and its legislation, which is why it operates with the flexibility and responsibilities of a private law company.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Date:        May 16, 2024

_____
Alfonso Santiago

TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
DISTRITO DEL SUR DE NUEVA YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETERSEN ENERGÍA INVERSORA,　　:
S.A.U. Y PETERSEN ENERGÍA,　　　:
S.A.U.　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　Demandantes,　　　　:
　　　　　　　　　　　　　　　　　　:　　Caso Nº 1:15-cv-02739-LAP
　　　　　c.　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
REPÚBLICA ARGENTINA E YPF　　　:
S.A.,　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　Demandados.　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ETON PARK CAPITAL　　　　　　　:
MANAGEMENT, L.P., ETON PARK　:
MASTER FUND, LTD. Y ETON　　　:
PARK FUND, L.P.,　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　Demandantes,　　　　:
　　　　　　　　　　　　　　　　　　:　　Caso Nº 1:16-cv-08569-LAP
　　　　　c.　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
REPÚBLICA ARGENTINA E YPF　　　:
S.A.,　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　Demandados.　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARACIÓN EXPERTO DE ALFONSO SANTIAGO

De acuerdo al 28 U.S.C. § 1746 y la Regla 44.1 de las Reglas Federales de los Procedimientos Civiles, yo, Alfonso Santiago, declaro lo siguiente:

1. Los abogados de la República Argentina me han pedido revisar y responder a la solicitud de interdicto y de entrega presentada por los demandantes Petersen Energía Inversora, S.A.U.

-1-

("PEISA") y Petersen Energía, S.A.U. ("PESA"; conjuntamente con PEISA, "Petersen"), y Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd. y Eton Park Fund, L.P. (conjuntamente, "Eton Park," y junto con Petersen, los "Demandantes"), y dar mi opinión sobre ciertos aspectos de derecho público argentino conectados con esa solicitud.

2.  Soy abogado debidamente licenciado y habilitado en la Argentina.  Soy profesor de Derecho Constitucional en la Facultad de Derecho de la Universidad Austral en la Ciudad Autónoma de Buenos Aires, Argentina.

3.  He presentado declaraciones fechadas el 30 de agosto de 2019, el 7 de febrero de 2020 y el 3 de diciembre de 2021 (*ver Petersen Energía Inversora, S.A.U. et al.* c. *República Argentina e YPF S.A.*, Nº 1:15-cv-02739-LAP (S.D.N.Y.), ECF Nos. 117, 150 y 365-1).  Mis cualificaciones profesionales están descritas en dichas declaraciones.

## RESUMEN EJECUTIVO

4.  En la primera sección de este informe explico por qué, conforme al derecho argentino, sería jurídicamente imposible para la República Argentina cumplir con una orden de entrega de sus acciones clase "D" en YPF a los Demandantes.  Dicha imposibilidad se deriva del hecho de que una medida de esta naturaleza contravendría directamente disposiciones legales expresas del derecho argentino.

5.  En la segunda sección de este informe explico por qué, además de ser una medida de cumplimiento imposible, la orden de entrega requerida por los Demandantes, en caso de que se dictara, no podría ser impuesta a la República Argentina conforme al derecho argentino. Únicamente las sentencias definitivas que se encuentran firmes pueden seguir el procedimiento de cumplimiento y ejecución previsto en la legislación presupuestaria para que la República Argentina cumpla con lo allí dispuesto.

6. En la sección final de este informe, explico que YPF S.A. es una persona jurídica distinta y separada de la República.

## I.   UNA ORDEN DE ENTREGA DE LAS ACCIONES DE LA REPÚBLICA A LOS DEMANDANTES SERÍA DE IMPOSIBLE CUMPLIMIENTO PARA LA REPÚBLICA SEGÚN EL DERECHO ARGENTINO.

7. La petición de los Demandantes en la solicitud de interdicto y entrega, que pretende la transferencia del 51% de las acciones clase "D" de la República en YPF S.A. a una cuenta de custodia global en The Bank of New York Mellon en Nueva York, enfrenta insalvables obstáculos legales bajo el derecho argentino.  Concretamente, esta solicitud implica que la República Argentina se vea obligada a realizar una acción específicamente prohibida por la legislación argentina.

### A.   La entrega de las acciones es jurídicamente imposible sin autorización expresa del Congreso argentino.

8. Según la Ley N° 26.741, por la que se declaró de utilidad pública y sujeto a expropiación el 51% de las acciones clase "D" de Repsol en YPF, la transferencia de las acciones expropiadas está expresamente limitada y condicionada por tal declaración de utilidad pública, y cualquier modificación requiere una autorización explícita del Congreso de la Nación.  El artículo 10 de dicha norma dispone que "se encuentra prohibida la transferencia futura de [las acciones expropiadas] sin autorización del H. Congreso de la Nación votada por las dos terceras partes de sus miembros."  En ausencia de la autorización legislativa requerida por el citado artículo 10, la República Argentina no puede entregar o disponer de las acciones sin violentar su propio ordenamiento constitucional y jurídico.  Cualquier apropiación (incluso involuntaria) efectuada en violación de dicha norma sería, por tanto, ilegal bajo el derecho argentino.

9. El hecho de que las acciones no sean transferibles en virtud de la Ley N° 26.741 implica que tampoco podrían ser embargadas.  La intransferibilidad de estas acciones, establecida por una ley de orden público,[1] asegura que las mismas no puedan ser objeto de medidas cautelares que impliquen su disposición, como el embargo.  Una interpretación en contrario necesariamente desvirtuaría los fines de utilidad pública perseguidos con la sanción de la Ley N° 26.741.

10. Una orden judicial extranjera que obligue a la República Argentina a transferir su participación accionaria en YPF a un tercero para saldar una supuesta deuda monetaria, en contradicción frontal con lo dispuesto por una ley argentina, sería una violación del sistema republicano de gobierno tal como ha sido consagrado en nuestra Constitución Nacional.  Si además la orden judicial emana de un tribunal extranjero, a los efectos de la legislación argentina se consideraría que esa orden foránea constituye una intromisión indebida en aspectos que hacen a la esencia de la soberanía argentina, al pretender desconocer el requisito de intervención y autorización previa de una mayoría calificada del Congreso, que expresa la voluntad del electorado a través de sus representantes democráticamente elegidos.[2]

**B.    La orden de entrega de las acciones implicaría una modificación ilegítima por parte de un tribunal judicial extranjero de una política pública aprobada por el Congreso argentino.**

11. Por otra parte, un obstáculo insuperable adicional que enfrentaría una orden de entrega de las acciones clase "D" de la República en YPF es que la Ley Nº 26.741 ha establecido

---

[1]     *Ver* Ley 26,741, Art. 18 ("La presente ley es de orden público").

[2]     Cabe señalar que el Congreso Nacional es un órgano bicameral integrado por los representantes de la ciudadanía (Cámara de Diputados) y de las provincias y la Ciudad Autónoma de Buenos Aires (Cámara de Senadores), cuyos miembros son elegidos de manera directa por el pueblo argentino (Constitución Nacional, Arts. 45 y 54) (ECF No. 469-16), constituyendo un poder plenamente independiente del presidente y de los jueces.  A su vez, debe destacarse que los legisladores son elegidos en elecciones separadas de las elecciones para presidente y vicepresidente de la Nación (ya que las mismas ocurren con dos años de diferencia).

explícitamente que la propiedad del 51% de las acciones de YPF por parte del Estado argentino son "de utilidad pública." En su artículo 7, la ley declara "de utilidad pública y sujeto a expropiación el cincuenta y un por ciento (51%) del patrimonio de YPF Sociedad Anónima, representado por igual porcentaje de las acciones Clase D de dicha empresa, pertenecientes a Repsol YPF S.A., sus entidades controlantes o controladas, en forma directa o indirecta." Este acto legislativo determina la importancia estratégica de estas acciones para el Estado argentino, fundamentando su expropiación en la necesidad de garantizar objetivos nacionales en materia de energía y recursos.

12. Concretamente, al declarar la expropiación de las acciones como una medida de interés público, declaración que se mantiene hasta la actualidad, la Ley Nº 26.741 establece una política clara de que estas acciones deben permanecer en manos del Estado mientras el Congreso no decida en otro sentido. Asegurar la capacidad de la República, como accionista, de sostener la actividad de YPF resulta esencial para los intereses estratégicos y energéticos de la Nación. La propia ley dispone en el artículo 13 que la finalidad de la declaración de utilidad pública de las acciones especificadas es asegurar "el adecuado abastecimiento de los combustibles necesarios para el funcionamiento de la economía nacional." Por lo tanto, la conversión de este porcentaje mayoritario de acciones en propiedad privada no sólo requeriría una revisión y derogación de la ley existente y una autorización expresa del Congreso —con una mayoría agravada de votos—, sino que también representaría un cambio fundamental en la política pública adoptada por el Estado argentino en materia energética.[3]

---

[3]    Cabe destacar que las razones de interés público perseguidas con la sanción de la Ley Nº 26.741 han sido validadas por la jurisprudencia de la Sala IV de la Cámara Nacional de Apelaciones en lo Contencioso Administrativo Federal, en el caso *YPF S.A. c/ AES Uruguaiana Emprendimientos S.A. y otros s/ recurso directo de organismo externo*, del 7 de octubre de 2014 (Anexo A).

13. En el marco del derecho argentino, un tribunal judicial extranjero no tiene la capacidad de modificar, mediante una orden de que se transfieran acciones a entidades privadas, una política pública argentina establecida por el Congreso Nacional.  Una acción de este tipo invalidaría, de hecho, una ley vigente sin seguir el debido proceso legislativo, y sería interpretada como una usurpación de las prerrogativas del poder legislativo argentino, interfiriendo indebidamente en los asuntos internos de la República.

14. Además, tal acto contravendría el principio fundamental de que las decisiones críticas relacionadas con la política hidrocarburífera del país deben ser tomadas exclusivamente por representantes electos por el pueblo.  Este principio subyacente de separación funcional de poderes implica una clara diferenciación de competencias entre los tres poderes del Estado en relación con la formulación e implementación de políticas públicas. En este contexto, el Congreso de la Nación tiene la autoridad para definir las directrices de la política energética federal; el Poder Ejecutivo Nacional es responsable de implementar la política energética, incluyendo la determinación de tarifas de servicios públicos; mientras que el Poder Judicial tiene la función de supervisar la razonabilidad de estas políticas y verificar su conformidad con los derechos fundamentales establecidos en la Constitución Nacional. Este reparto de competencias se efectúa mediante un sistema de frenos y contrapesos que fundamenta la separación de poderes en un equilibrio dinámico de controles recíprocos, asegurando que ningún poder sobrepase su mandato constitucional.   (Fallos 339:1077 (Anexo B), considerandos 26 y 29; y Fallos 328:566 (Anexo C), voto de los jueces Maqueda y Zaffaroni).

**C.     La orden de entrega de las acciones violaría los derechos legales de las provincias argentinas sobre las acciones.**

15. El artículo 8 de la Ley N° 26.741 establece disposiciones adicionales que se erigen como impedimentos legales insalvables adicionales a cualquier intento de forzar el cumplimiento de

una orden judicial extranjera que exija la entrega de acciones de YPF a terceros.  Según este artículo, "[l]as acciones sujetas a expropiación . . . quedarán distribuidas del siguiente modo: el cincuenta y uno por ciento (51%) pertenecerá al Estado nacional y el cuarenta y nueve por ciento (el 49%) restante se distribuirá entre las provincias integrantes de la Organización Federal de Estados Productores de Hidrocarburos."

16. Esta distribución entre el Estado y las provincias es también parte de una política pública establecida por el Congreso para asegurar que los beneficios derivados de los recursos naturales (en este caso, hidrocarburos) sean compartidos de manera justa con las provincias que contribuyen a su explotación.  En efecto, el mismo artículo 8 dispone que la distribución debe realizarse de manera equitativa y considerando criterios objetivos como los niveles de producción de hidrocarburos y de reservas comprobadas de cada provincia, reflejando el hecho de que según la Constitución, los recursos naturales son de propiedad originaria de las propias provincias.  (Constitución Nacional, Art. 124) (ECF No. 469-16).

17. Una orden judicial que requiera la entrega de estas acciones a terceros también sería contraria a estas disposiciones legales y constitucionales establecidas, pues violaría el marco legal que rige su distribución entre el Estado y las provincias, impidiendo en efecto que las acciones se distribuyan según ha dispuesto el Congreso.

### D.  Bajo el derecho argentino no es ejecutable una decisión extranjera que vulnera el orden público argentino.

18. La Corte Suprema argentina ha determinado que una orden judicial emitida en un proceso judicial en el extranjero, en el que la República Argentina sea parte, no puede cumplirse cuando lo que manda es contrario al orden público argentino.  En la sentencia emitida en el caso *In re: Ministerio de Relaciones Exteriores y Culto s/ informe sentencia dictada en el caso*

*'Fontevecchia y D'Amico c. Argentina' por la Corte Interamericana de Derechos Humanos*, la Corte Suprema declaró que era de "imposible cumplimiento" una sentencia de la Corte Interamericana de Derechos Humanos, que en principio es vinculante de conformidad con el derecho internacional, porque lo que en ella se ordenaba (que la Corte Suprema argentina revocase una sentencia final que ella misma había dictado) es contrario a la Constitución Nacional.  (Fallos: 340:47) (Anexo D).

19. La Corte Suprema señaló la importancia del respeto por "los principios de derecho público establecidos en esta Constitución."  (Fallos: 340:47, voto del juez Rosatti, considerando 50) (Anexo D).  Entre esos principios está precisamente la forma de gobierno republicana con su separación de poderes.[4]  (*Ver*, por ejemplo, Fallos 1:32 (Anexo E); 338:1060 (Anexo F)).  Este razonamiento es aplicable con mayor fuerza a la solicitud de los Demandantes en este caso, el cual ni siquiera implicaría un conflicto entre el derecho internacional y el nacional sino una orden de un tribunal extranjero, el cual requeriría de reconocimiento en las cortes argentinas para su ejecución.  Sería jurídicamente imposible cumplir tal orden, la cual (como se ha explicado) sería contraria al orden público argentino por violar la Constitución y una ley expresa de orden público.

20. En el caso *Claren Corporation c/ EN Arts 517/518 CPCC exequatur s/varios*, la Corte Suprema argentina rechazó el pedido de reconocimiento de una decisión de un tribunal extranjero al

---

[4]     Se ha entendido que esos "principios de derecho público" incluyen, entre otros: a) la forma representativa, republicana y federal de gobierno (Constitución Nacional, Art. 1); b) la supremacía constitucional (Constitución Nacional, Art. 31); c) el principio de juridicidad y el de reserva (Constitución Nacional, Art. 19); d) el principio de igualdad (Constitución Nacional, Arts. 15, 16, 75 inciso 23, y concordantes); e) el carácter no absoluto de los derechos y la pauta de razonabilidad para su reglamentación (Constitución Nacional; Arts. 14, 28, 99 inciso 2 y concordantes); f) el debido proceso legal (Constitución Nacional; Art. 18, y concordantes; Corte Suprema de Justicia de la Nación, Fallos: 319:2411 (Anexo G); 328:3193 (Anexo H); 336:503 (Anexo I)); g) el carácter definitivo de las sentencias de la Corte Suprema (Fallos: 340:47) (Anexo D); y h) las medidas de emergencia adoptadas para garantizar la existencia misma de la Nación (Fallos: 337:133) (Anexo J).

considerar que era "claramente opuesta" al orden público argentino.  En ese caso, se pedía el reconocimiento de una sentencia en la que se ordenaba a la República a pagar a la sociedad actora una suma de dinero en concepto de capital e intereses vencidos de ciertos bonos argentinos.  La Corte Suprema consideró que ejecutar esa orden violaría el inciso 4 del artículo 517 del Código Procesal Civil y Comercial de la Nación —analizado más adelante— porque implicaría convalidar que el accionante eluda el proceso de reestructuración de la deuda pública dispuesto por el Estado argentino mediante las normas de emergencia dictadas por las autoridades competentes, de acuerdo con lo establecido por la Constitución Nacional.  La Corte fundamentó su decisión en que las normas de emergencia que dispusieron la reestructuración de la deuda argentina habían sido dictadas "por los órganos constitucionalmente habilitados." (Fallos 337:133, considerando 9°) (Anexo J).

21. Además, la Corte destacó la importancia de preservar el derecho de la Argentina de determinar sus propias políticas públicas, indicando que "las facultades del Estado Nacional respecto de la posibilidad de que en épocas de graves crisis económicas limite, suspenda o reestructure los pagos de la deuda para adecuar sus servicios a las reales posibilidades de las finanzas públicas, a la prestación de los servicios esenciales y al cumplimiento de las funciones estatales básicas que no pueden ser desatendidas," y las normas que permiten ejercer tales facultades, "integran el orden público del derecho argentino." *Id*.  Por lo tanto, no procede bajo el derecho argentino concederse el exequátur a una decisión de un tribunal extranjero que es "claramente opuesta a esas disposiciones." *Id.*

22. Como demuestran estos casos, el principio de orden público constituye un elemento esencial en el sistema jurídico argentino, actuando como un baluarte que protege los valores fundamentales y estructurales de la sociedad.  (Fallos 344:1857) (Anexo K).  Por tanto,

cualquier decisión extranjera que pretenda ser ejecutada en territorio argentino debe someterse al escrutinio de compatibilidad con el orden público, asegurando así que no se vulneren los cimientos sobre los cuales se asienta la organización constitucional argentina.   (Fallos 319:2411 (Anexo G); 336:503 (Anexo I); 342:1568 (Anexo L); 347:291 (Anexo M)).

23. En el caso de YPF y en virtud de la Ley N° 26.741, el orden público se manifiesta en la protección de las decisiones estratégicas en materia de política energética y de recursos naturales.   La legislación que declara de utilidad pública un porcentaje significativo de las acciones de YPF no es sólo una medida administrativa, es una declaración del "objetivo prioritario" de la República de lograr "el adecuado abastecimiento de los combustibles necesarios para el funcionamiento de la economía nacional."   Una orden judicial extranjera que requiera una transferencia de acciones de YPF contraria a esta ley, al implicar una modificación forzada de la estructura accionaria dictada por el Congreso, constituiría una infracción a la autonomía política y económica de la República Argentina y una intervención inapropiada en la autodeterminación nacional, ambos aspectos resguardados celosamente bajo el concepto de orden público argentino.

24. En términos de procedimiento judicial, si se determina que una decisión extranjera infringe el orden público argentino, su reconocimiento y ejecución serán rechazados por las cortes nacionales.   Así, el Código Procesal Civil y Comercial de la Nación dispone en el artículo 132 que "[s]e dará cumplimiento a las medidas solicitadas por autoridades judiciales extranjeras . . . siempre que la resolución que las ordene no afecte principios de orden público del derecho argentino." Asimismo el artículo 517 manda que las "sentencias de tribunales extranjeros . . . serán ejecutables si concurren los siguientes requisitos: . . . . 4) Que la sentencia no afecte los principios de orden público del derecho argentino."   Así, el orden público opera como un filtro

crítico que preserva la integridad del derecho argentino y mantiene su alineación con el diseño constitucional.   En efecto, esta norma procesal encuentra un correlato "en una abrumadora cantidad de convenios bilaterales e internacionales suscriptos por nuestro país, en concordancia con la gran mayoría de las legislaciones internas que supeditan el reconocimiento y la ejecución de las decisiones foráneas a la condición de que no afecten el orden público o las políticas públicas fundamentales de los respectivos países."  (Fallos: 337:133) (Anexo J).

## II.   UNA ORDEN COMO LA QUE SOLICITAN LOS DEMANDANTES NO SE PUEDE EJECUTAR EN CONTRA DEL ESTADO NACIONAL.

25.  Además de ser imposible de cumplir, una orden como la que solicitan los Demandantes no es ejecutable en contra del Estado argentino según el derecho argentino.

### A.   Según el derecho argentino, sólo las sentencias firmes son ejecutables.

26. Como se ha visto, y en ausencia de un tratado específico que vincule a los dos Estados intervinientes en la disputa, las sentencias de tribunales extranjeros serán ejecutables de acuerdo con el artículo 517 del Código Procesal Civil y Comercial de la Nación, el cual exige, entre otras cosas, que esas sentencias "no afecten los principios de orden público del derecho argentino."[5]   Además de cumplir con estos requisitos, una sentencia (local o extranjera)

---

[5]   Art. 517 del Código Procesal Civil y Comercial de la Nación: "Las sentencias de tribunales extranjeros tendrán fuerza ejecutoria en los términos de los tratados celebrados con el país de que provengan.
Cuando no hubiese tratados, serán ejecutables si concurriesen los siguientes requisitos:
1) Que la sentencia, con autoridad de cosa juzgada en el Estado en que se ha pronunciado, emane de tribunal competente según las normas argentinas de jurisdicción internacional y sea consecuencia del ejercicio de una acción personal o de una acción real sobre un bien mueble, si éste ha sido trasladado a la República durante o después del juicio tramitado en el extranjero.
2) Que la parte demandada contra la que se pretende ejecutar la sentencia hubiese sido personalmente citada y se haya garantizado su defensa.
3) Que la sentencia reúna los requisitos necesarios para ser considerada como tal en el lugar en que hubiere sido dictada y las condiciones de autenticidad exigidas por la ley nacional.
4) Que la sentencia no afecte los principios de orden público del derecho argentino.
5) Que la sentencia no sea incompatible con otra pronunciada, con anterioridad o simultáneamente, por UN (1) tribunal argentino."

únicamente podrá ejecutarse si se encuentra firme y no sujeta a recurso procesal alguno. El requisito de la firmeza de la decisión judicial está referido a la noción de "cosa juzgada" tal como esta se entiende en el derecho argentino. Que una sentencia tenga autoridad de cosa juzgada quiere decir en derecho argentino que ya no está sujeta a impugnación o recurso alguno dentro de un mismo proceso. Tratándose de una sentencia extranjera, corresponderá al derecho procesal extranjero determinar cómo y en qué condiciones una decisión no es susceptible de ulterior impugnación o recurso.

27. En este caso, entiendo que la sentencia que se busca ejecutar aún no se encuentra firme en la República Argentina (aunque pueda ser ejecutada en su jurisdicción de origen), debido a la existencia de un recurso de apelación interpuesto en el tribunal estadounidense y pendiente de resolución. Este recurso impide, a los efectos del derecho argentino, considerar a la sentencia como definitiva, pasada en autoridad de cosa juzgada y, por ende, ejecutable. Iniciar la ejecución de esta sentencia sin que haya recaído una resolución firme en el proceso judicial en trámite en los Estados Unidos constituiría una violación flagrante al derecho de defensa en juicio de conformidad con el derecho argentino, dado que se impediría a la República Argentina agotar todas las instancias de revisión posibles antes de poder ejecutarse. En aplicación de las normas del Código Procesal Civil y Comercial argentino, tal sentencia no es susceptible de ejecución.

**B. Según el derecho argentino, una sentencia contra el Estado Nacional sólo se puede ejecutar a través del mecanismo previsto en la normativa presupuestaria.**

28. En el sistema jurídico argentino, el principio de solvencia del Estado Nacional establece que el Estado tiene la capacidad de cumplir con sus obligaciones financieras. Este principio implica que, en términos generales, no resulta necesario embargar bienes estatales para

garantizar el cumplimiento de las condenas judiciales.  Conforme a este postulado, las condenas ejecutables contra el Estado se limitan, habitualmente, a aquellas que implican el pago de sumas de dinero.

29. Las sentencias firmes que condenan al Estado Nacional o a cualquier entidad de la Administración Nacional a pagar sumas de dinero están sujetas a un procedimiento específico para su ejecución, conforme establece la normativa presupuestaria.  Según ha establecido la Corte Suprema, dicho procedimiento específico "…procura armonizar la administración racional de los fondos públicos y los derechos patrimoniales de los particulares debatidos en el ámbito de la justicia," y responde al carácter declarativo que ostentan las sentencias dictadas contra el Estado Nacional —establecido en el artículo 7° de la Ley N° 3952—, que "tiende a evitar que la administración pueda verse colocada, por efecto de un mandato judicial perentorio, en situación de no poder satisfacer el requerimiento judicial por no tener fondos previstos en el presupuesto para tal fin o en la de perturbar la marcha normal de la Administración Pública."  (Fallos: 339:1812, considerando 5°) (Anexo N).  A la par de ello, la Corte también indicó que "…ello no significa una suerte de autorización al Estado para no cumplir las sentencias judiciales pues ello importaría colocarlo fuera del orden jurídico, cuando es precisamente quien debe velar por su observancia." *Id*.

30. Según el artículo 170 de la Ley N° 11.672 Complementaria Permanente de Presupuesto (texto ordenado en 2014), sustituido por el artículo 68 de la Ley N° 26.895, estas sentencias deben ser ejecutadas mediante la inclusión de los montos adjudicados en el presupuesto nacional del año correspondiente. Este proceso está en conformidad con lo dispuesto en los incisos 7º y 8º del artículo 75 de la Constitución Nacional, que atribuyen al Congreso la potestad de regular estas materias.

31. Si el presupuesto para el año fiscal en que debe atenderse la condena (una vez que ésta se encuentre firme) no tiene crédito suficiente, el Poder Ejecutivo Nacional está obligado a realizar las previsiones necesarias para su inclusión en el próximo ejercicio fiscal, lo cual implica que las jurisdicciones y entidades demandadas deben estar debidamente informadas de la condena (que debe ser firme) antes del 31 de julio del año correspondiente al envío del proyecto de presupuesto. Además, estos recursos deben asignarse según un orden estricto de antigüedad, basado en la fecha de notificación judicial, y utilizarse hasta su agotamiento. Cualquier remanente debe ser cubierto con recursos asignados en el ejercicio fiscal siguiente. De esta manera, se asegura que las condenas judiciales se traten de manera ordenada y previsible, respetando la planificación financiera del Estado y garantizando al mismo tiempo el cumplimiento de sus obligaciones legales.

32. Cuando se emite una sentencia firme y ejecutable contra el Estado, ya sea por el pago de sumas de dinero o por el cumplimiento de obligaciones en especie, el artículo 9 de la Ley N° 26.854 establece normas claras sobre la actuación judicial en relación con las medidas cautelares contra el Estado. Esta legislación prohíbe expresamente la emisión de cualquier medida cautelar que pueda afectar, obstaculizar, comprometer, desviar de su destino original, o de alguna forma perturbar los bienes o recursos estatales. Este marco legal está diseñado para asegurar que la capacidad del Estado para desempeñar funciones y servicios públicos esenciales no se vea afectada por acciones judiciales que puedan impactar en sus activos.

33. Las acciones del Estado Nacional en YPF S.A. están protegidas por ser un activo estratégico de la Nación, asegurando que no puedan ser comprometidas o disminuidas por resoluciones judiciales. Esto es crucial para mantener la autonomía y la capacidad operativa de la empresa en la prosecución de sus objetivos de interés nacional.

## III.   YPF ES UNA PERSONA JURÍDICA DISTINTA Y SEPARADA DE LA REPÚBLICA ARGENTINA.

34. YPF no forma parte de ninguna estructura administrativa de la República.  La autonomía operativa y administrativa de YPF como sociedad de derecho privado está claramente establecida en disposiciones legales específicas, como el artículo 15 de la Ley Nº 26.741.  Este artículo es crucial, ya que estipula que, a pesar de la participación estatal significativa en YPF, la empresa no está sujeta a las normativas administrativas generales que regulan la gestión y control de las entidades estatales.  La Corte Suprema, en una disputa entre una empresa privada e YPF, determinó que no correspondía habilitar su competencia por apelación ordinaria, que está reservada para disputas donde el Estado sea parte (prevista en el artículo 24, inciso 6°, apartado a, del Decreto-ley N° 1285/58), ya que una condena contra YPF no afectaría directa ni indirectamente al Estado Nacional.  (Fallos 341:1306) (Anexo O).[6]

35. Además, a pesar de la expropiación y control estatal mayoritario (Artículos 1 y 7, Ley Nº 26.741), YPF S.A. conserva una estructura y operación que la distingue del Estado como entidad jurídica.

36. El control del Estado Nacional como accionista mayoritario en YPF no altera la naturaleza jurídica ni la autonomía operacional de la empresa.  El hecho de que el Estado sea propietario del 51% de las acciones clase "D" de YPF, y de esa manera participa en la toma de decisiones de la empresa, no afecta la naturaleza y operatoria de YPF como sociedad anónima que adhiere

---

[6]     El art. 24 del Decreto-ley N° 1285/58, en lo pertinente, establece que la Corte Suprema de Justicia conocerá: "6°) Por apelación ordinaria de las sentencias definitivas de las cámaras nacionales de apelaciones, en los siguientes casos:
a) Causas en que la Nación, directa o indirectamente, sea parte, cuando el valor disputado en último término, sin sus accesorios sea superior a doscientos millones de pesos ($ 200.000.000);
b) Extradición de criminales reclamados por países extranjeros;
c) Causas a que dieron lugar los apresamientos o embargos marítimos en tiempo de guerra, sobre salvamento militar y sobre nacionalidad del buque, legitimidad de su patente o regularidad de sus papeles".

a principios de rentabilidad y eficiencia de mercado. Esta separación respecto del Estado asegura que YPF pueda adaptarse ágilmente a las dinámicas del mercado y responder de manera efectiva a las necesidades energéticas sin las limitaciones operativas que enfrentaría como una sociedad del Estado.

37. En conclusión, YPF S.A. se mantiene como una sociedad anónima regida por las leyes ordinarias, la Constitución Nacional y su legislación, razón por la cual opera con la flexibilidad y responsabilidades de una empresa de derecho privado.

Declaro bajo pena de perjurio de conformidad con las leyes de los Estados Unidos de América que lo anterior es verdadero y correcto.

Fecha:      16 de mayo de 2024

_____

Alfonso Santiago