**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

*Petersen Energía Inversora S.A.U. and Petersen Energía S.A.U. v. Argentine Republic and YPF S.A.*, **Case No. 1:15-cv-02739-LAP**

*Eton Park Capital Management L.P. et al. v. Argentine Republic and YPF S.A.*, **Case No. 1:16-cv-08569-LAP**

**THIRD REPORT OF PROF. STEVEN DAVIDOFF SOLOMON**

May 16, 2024

# Table of Contents

I.  **INTRODUCTION AND SUMMARY OF OPINIONS** .................................................. 1

II.  **OPINIONS** .................................................................................................................. 3

    A.  ***Opinion 1*: Professor Coffee conflates YPF's commercial activity with Argentina's role as a YPF shareholder. More particularly, Professor Coffee fails to recognize the basic presumption that corporations are separate entities from their shareholders. Professor Coffee fails to highlight any facts that are inconsistent with principles of corporate separateness; instead, he details Argentina's potential and actual exercise of what would customarily be viewed as shareholder rights.** ........................................................................................ 3

        1.  YPF is a distinct corporate entity with separate operations and governance. . 4

        2.  Professor Coffee fails to recognize that the actions of Argentina as a shareholder of YPF to which he refers are in accord with corporate separateness and the limited rights of shareholders ........................................ 8

    B.  ***Opinion 2*: Professor Coffee fails to provide any concrete evidence that YPF's debt offerings benefitted from YPF's ADR facility. To the contrary, he disregards that YPF's debt offerings were unregistered 144A offerings that did not require YPF to complete a U.S. public listing or U.S. securities registration and that YPF has raised no proceeds through a U.S. registered offering at least since 2001...** 12

        1.  Background on Rule 144A ....................................................................... 13

        2.  Professor Coffee's incorrect assertions on Argentina's access to the 144A market through YPF's ADR facility............................................... 17

    C.  ***Opinion 3*: Professor Coffee and Ms. Lissemore fail to recognize that Argentina's ownership of YPF is held in shares sited in Argentina, and that any sale or privatization of Argentina's controlling interest in YPF would not involve ADRs or any of the entities or facilities that support YPF's ADRs.** ............................. 18

III.  **CONCLUSION** ........................................................................................................ 21

## I.   INTRODUCTION AND SUMMARY OF OPINIONS

1.      I have been asked to prepare this report by the Argentine Republic ("Argentina") in connection with the litigations *Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. v. Argentine Republic, and YPF S.A.*, 1:15-cv-02739-LAP, and *Eton Park Capital Management L.P., Eton Park Master Fund, Ltd., Eton Park Fund, L.P. v. Argentine Republic, and YPF S.A.,* 1:16-cv-08569-LAP.[1] In particular, I have been asked to review and assess the opinions expressed by Professor John C. Coffee, Jr. in his fourth report dated March 27, 2024 (hereinafter, the "Fourth Coffee Report")[2] and Nancy C. Lissemore in her second report dated March 27, 2024 (hereinafter, the "Second Lissemore Report") submitted in connection with Plaintiffs' post-judgment motion for injunction and turnover.[3]

2.      This is the third report I submit in this matter.[4] In the First Solomon Report, I addressed the opinions expressed by Professor Coffee in his September 24, 2021 report (the "First Coffee Report")[5] and Ms. Lissemore in her September 24, 2021 report (the "First Lissemore Report").[6] As part of this assessment, I provided information and background on (a) the dual listing regime and other standards applicable to corporations incorporated and organized under the laws of a foreign country, while operating in the U.S. as foreign private issuers ("FPIs");[7] and (b) custom and practice, including investor expectations, derived from the registration and listing of American

---

[1]   Complaint, *Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. v. Argentine Republic, and YPF S.A.*, United States District Court, Southern District of New York, Docket 1:15-cv-02739-LAP, Doc. No. 1 ("Complaint"); Complaint, *Eton Park Capital Management L.P., Eton Park Master Fund, Ltd., Eton Park Fund, L.P. v. Argentine Republic, and YPF S.A.*, Docket 1:16-cv-08569-LAP, Doc. No. 1 ("Eton Park Complaint"). Hereinafter, I will refer to Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U., as the "Petersen Plaintiffs," or the "Plaintiffs in *Petersen*," or simply "Petersen." I will also refer to Eton Park Capital Management L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. as the "Eton Park Plaintiffs," or "Plaintiffs in *Eton Park*," or simply "Eton Park," and collectively with Petersen as the "Plaintiffs."

[2]   Fourth Expert Report of John C. Coffee, Jr., March 27, 2024.

[3]   Second Expert Report of Nancy C. Lissemore, March 27, 2024.

[4]   Rebuttal Report of Prof. Steven Davidoff Solomon, December 3, 2021 ("First Solomon Report"); Reply Report of Prof. Steven Davidoff Solomon, January 14, 2022 ("Second Solomon Report").

[5]   Expert Report of John C. Coffee, Jr., September 24, 2021.

[6]   Expert Report of Nancy C. Lissemore, September 24, 2021.

[7]   A "foreign private issuer" is any foreign issuer other than a foreign government, except for an issuer meeting the following conditions as of the last business day of its most recently completed second fiscal quarter: (1) More than 50 percent of the outstanding voting securities of the issuer are directly or indirectly owned of record by U.S. residents; and (2) Any one of the following: (i) the majority of the executive officers or directors are U.S. citizens or residents; (ii) more than 50 percent of the issuer's assets are located in the United States; or (iii) the issuer's business is administered principally in the United States. *See* 17 C.F.R. § 230.405, 1982; 17 C.F.R. § 240.3b-4(c), 2016.

Depository Receipts and American Depository Shares ("ADRs" and "ADSs," respectively) in the U.S. by FPIs.[8] In the Second Solomon Report, I replied to the supplemental opinions expressed by Professor Coffee in his December 3, 2021 report (the "Second Coffee Report")[9] and Richard Blackett in his December 3, 2021 report.[10]

3.      My qualifications were detailed in the First Solomon Report. My further qualifications are detailed in my curriculum vitae, which is annexed hereto as **Appendix A**.

4.      In this Third Solomon Report, I review and analyze the opinions of Professor Coffee in the Fourth Coffee Report as well as the opinions of Ms. Lissemore in the Second Lissemore Report. In light of this review, I provide the following rebuttal opinions:

   a.   *Opinion 1*: Professor Coffee conflates YPF's commercial activity with Argentina's role as a YPF shareholder. More particularly, Professor Coffee fails to recognize the basic presumption that corporations are separate entities from their shareholders. Professor Coffee fails to highlight any facts that are inconsistent with principles of corporate separateness; instead, he details Argentina's potential and actual exercise of what would customarily be viewed as shareholder rights.

   b.   *Opinion 2*: Professor Coffee fails to provide any concrete evidence that YPF's debt offerings benefitted from YPF's ADR facility. To the contrary, he disregards that YPF's debt offerings were unregistered 144A offerings that did not require YPF to complete a U.S. public listing or U.S. securities registration and that YPF has raised no proceeds through a U.S. registered offering at least since 2001.

   c.   *Opinion 3*: Professor Coffee and Ms. Lissemore fail to recognize that Argentina's ownership of YPF is held in shares sited in Argentina, and that any sale or privatization of Argentina's controlling interest in YPF would not involve ADRs or any of the entities or facilities that support YPF's ADRs.

5.      Ultimately, neither Professor Coffee nor Ms. Lissemore show that Argentina engaged in

---

[8]   I note that the terms ADR and ADS are often used interchangeably, though they have distinct meanings. *See, e.g.,* SEC, "Investor Bulletin: American Depositary Receipts," August 2012, p. 1, available at https://www.sec.gov/investor/alerts/adr-bulletin.pdf, accessed on May 9, 2024.

[9]   Supplemental Expert Report of John C. Coffee, Jr., December 3, 2021.

[10]   Rebuttal Expert Report of Richard Blackett, December 3, 2021.

commercial activity in the United States through its YPF shareholdings. Instead, Professor Coffee and Ms. Lissemore conflate certain shareholder actions in Argentina with certain activities of YPF in the United States. The two are not the same.

## II.   OPINIONS

    **A.** *Opinion 1*: **Professor Coffee conflates YPF's commercial activity with Argentina's role as a YPF shareholder. More particularly, Professor Coffee fails to recognize the basic presumption that corporations are separate entities from their shareholders. Professor Coffee fails to highlight any facts that are inconsistent with principles of corporate separateness; instead, he details Argentina's potential and actual exercise of what would customarily be viewed as shareholder rights.**

6.    In the Fourth Coffee Report, Professor Coffee states that he offers "opinions primarily as to customary motivations and practices surrounding privatizations, the establishment and maintenance of an American Depositary Receipt facility, registration of foreign securities with the U.S. Securities Exchange Commission ('SEC'), listing of foreign securities on the New York Stock Exchange ('NYSE'), and the direction that a controlling shareholder typically exercises over these activities."[11] More particularly, he concludes that:

> . . . Argentina has used its controlling shares to direct YPF's major corporate actions, including its capital-raising activities in the United States and its selection of YPF's CEO. Argentina exercised and continues to exercise direction and control over YPF's capital-raising activities in numerous ways, including (i) through its appointment of YPF's Chairman and a majority of the members of its Board of Directors, (ii) removing Repsol and its directors in 2012, (iii) voting its shares at shareholder meetings to approve YPF's international debt issuances . . . .[12]

7.    As an initial matter, I do agree with Professor Coffee that Argentina is the controlling shareholder of YPF. Argentina is entitled to vote 51% of the Class D shares and 100% of the Class A Shares of YPF's capital on all matters reserved to shareholders by the bylaws.[13] That is the extent of its "control." Class A shares provide Argentina with the right to nominate and elect a

---

[11]  Fourth Coffee Report, ¶ 2.

[12]  Fourth Coffee Report, ¶ 32. I note that, although paragraph 32 of Professor Coffee's report lists a point (iv), the paragraph is truncated.

[13]  YPF Sociedad Anónima, "Form 20-F Annual Report for the Fiscal Year Ended December 31, 2023," April 25, 2024,   https://www.sec.gov/ix?doc=/Archives/edgar/data/0000904851/000119312524114066/d804823d20f.htm, p. 90, accessed on May 9, 2024.

director of YPF, among other rights.[14] But neither the fact that Argentina is YPF's controlling shareholder, nor any other fact identified by Professor Coffee, justifies his conclusion that YPF's activities are the activities of Argentina.

### 1. YPF is a distinct corporate entity with separate operations and governance.

8.     Fundamentally, Professor Coffee fails to recognize that YPF is a distinct corporate entity. YPF is organized under the laws of Argentina and has a separate corporate existence under Argentine law.[15] As part of its separate corporate existence, YPF has a separate board of directors comprising 12 directors and 11 alternate directors ("Board of Directors" or simply "Board").[16] All directors are appointed to serve three fiscal years.[17]

9.     As I noted in the First Solomon Report, under the internal affairs doctrine, "the internal governance of a corporation is dictated by the laws where the corporation is organized."[18] Because YPF is an Argentine company organized under and governed by Argentine laws, it would be customarily understood by investors and others that Argentine laws determine issues pertaining to YPF's corporate governance, shareholder rights, and corporate separateness.[19]

10.     I understand that under the laws of Argentina—which in this respect appear to be consistent with U.S. custom and practices, as well as U.S. corporate laws—YPF is governed as a distinct and

---

[14]   "By-Laws of YPF Sociedad Anónima," Exhibit 1.2 to YPF Sociedad Anónima, "Form 20-F Annual Report for the Fiscal Year Ended December 31, 2023," April 25, 2024, https://www.sec.gov/Archives/edgar/data/904851/000119312524114066/d804823dex12 htm, accessed on May 9, 2024.

[15]   YPF Sociedad Anónima, "Form 20-F Annual Report for the Fiscal Year Ended December 31, 2023," April 25, 2024, p. 3 ("YPF Sociedad Anónima is a stock corporation organized under the laws of the Republic of Argentina ('Argentina')"); *id.* p. 18 ("According to the Expropriation Law, YPF S.A. is and will continue to operate as a publicly traded corporation pursuant to Chapter II, Section V of the Argentine General Corporations Law and its corresponding regulations, and neither is nor will be subject to any legislation or regulation applicable to the management or control of companies or entities owned by the federal government or provincial governments.").

[16]   YPF Sociedad Anónima, "Form 6-K," April 29, 2024, https://www.sec.gov/Archives/edgar/data/904851/000119312524119066/d786945d6k.htm, accessed on May 9, 2024; YPF Sociedad Anónima, "Form 6-K," April 29, 2024, https://www.sec.gov/Archives/edgar/data/904851/000119312524119066/d786945d6k.htm, accessed on May 9, 2024; YPF Sociedad Anónima, "Corporate Governance. Board of Directors," https://investors.ypf.com/Board-of-Directors html, accessed on May 9, 2024.

[17]   YPF Sociedad Anónima, "Form 6-K," April 29, 2024, https://www.sec.gov/Archives/edgar/data/904851/000119312524119066/d786945d6k.htm, accessed on May 9, 2024.

[18]   First Solomon Report, ¶ 46.

[19]   *Id.* at ¶¶ 47–49, 71–85.

separate entity by its Board of Directors. As YPF states on its website, "[t]he Board of Directors assumes the administration of the Company in accordance with the provisions of the General Companies Law No. 19,550, the Capital Market Law No. 26,831 and the Regulations of the National Securities Commission."[20] The Board of Directors appoints executive officers who oversee the day-to-day operations of YPF.[21] YPF also has a supervisory committee of three members and three alternate members.[22] According to YPF, the supervisory committee "supervises the compliance by the Board of the General Companies Law, the statutes, the applicable regulations and the resolutions of the Shareholders Meeting."[23]

11.     There is a sound economic and theoretical basis for the distinct treatment of YPF as a corporate entity known as entity theory. Separate treatment of companies from shareholders enhances the ability of companies to raise capital and to operate efficiently.[24] This doctrine of corporate separateness is typically viewed as economically beneficial to corporations, shareholders, and third parties.[25] Conversely, an absence of corporate separateness would mean higher costs of capital for corporations, and potentially fewer businesses started or pursued, even if they would otherwise produce net social benefits.[26]

12.     A fundamental premise of entity theory and corporate separateness is that, as a consequence

---

[20] YPF Sociedad Anónima, "Corporate Governance. Board of Directors," https://investors.ypf.com/Board-of-Directors html, accessed on May 9, 2024.

[21] "By-Laws of YPF Sociedad Anónima," Exhibit 1.2 to YPF Sociedad Anónima, "Form 20-F Annual Report for the Fiscal Year Ended December 31, 2023," April 25, 2024, https://www.sec.gov/Archives/edgar/data/904851/000119312524114066/d804823dex12.htm, accessed on May 9, 2024.

[22] YPF Sociedad Anónima, "Form 6-K," April 29, 2024, https://www.sec.gov/Archives/edgar/data/904851/000119312524119062/d786945d6k.htm, accessed on May 9, 2024; YPF Sociedad Anónima, "Form 6-K," April 29, 2024, https://www.sec.gov/Archives/edgar/data/904851/000119312524119066/d786945d6k.htm, accessed on May 9, 2024; YPF Sociedad Anónima, "Corporate Governance. Board of Directors," https://investors.ypf.com/Board-of-Directors html, accessed on May 9, 2024.

[23] YPF Sociedad Anónima, "Corporate Governance. Supervisory Committee," https://investors.ypf.com/Board-of-Directors html, accessed on May 9, 2024.

[24] Henry Hansmann and Reinier Kraakman, "The Essential Role of Organizational Law," *The Yale Law Journal* 110, no. 3 (2000), pp. 387–440 at 390; David K. Millon, "Piercing the Corporate Veil, Financial Responsibility, and the Limits of Limited Liability," *Emory Law Journal* 56, no. 5 (2007), pp. 1305–1382 at 1312–14.

[25] *See, e.g.,* Henry Hansmann and Reinier Kraakman, "The Essential Role of Organizational Law," *The Yale Law Journal* 110, no. 3 (2000), pp. 387–440; Stephen M. Bainbridge, "Abolishing Veil Piercing," *Journal of Corporate Law* 26, no. 3 (2001), pp. 479–535; Richard Posner, "The Rights of Creditors of Affiliated Corporations," *University of Chicago Law Review* 43 (1975), pp. 499–526.

[26] *Id.*

5

of the separate existence of a corporation, shareholders exercise control over the corporation through the shareholder franchise—the vote.[27] This is true of YPF. As a YPF shareholder, Argentina can vote to elect directors. The chair of the YPF Board is also drawn from these directors, although selected by the YPF Board (Professor Coffee is thus incorrect that Argentina directly appoints the YPF chair).[28] Moreover, as a shareholder of YPF, Argentina can vote its shares to remove directors and to call special meetings.[29] And finally, in confined circumstances, shareholders can vote on specified matters such as capital raisings or mergers.[30]

13.     The rights of YPF shareholders are similar to the rights of shareholders in U.S. corporations. In the United States, as in Argentina, the primary power of shareholders is the ability to vote for and appoint directors through the shareholder franchise.[31] This limited right, consistent with corporate separateness, allows shareholders of U.S.-incorporated companies to elect and remove directors, vote on significant proposals, and exercise limited inspection rights.[32] And even these rights can be curtailed within specific corporations. But ultimately, outside these limited powers, which are primarily exercised through the shareholder franchise, the operation of a company is left to its board of directors and corporate officers.

14.     For example, Sergey Brin and Larry Page are the controlling shareholders of Alphabet Inc. (the parent company of Google Inc., which I will refer to as "Google"). They exercise their control

---

[27]   Jill Fisch, Assaf Hamdani, and Steven Davidoff Solomon, "THE NEW TITANS OF WALL STREET: A THEORETICAL FRAMEWORK FOR PASSIVE INVESTORS," *University of Pennsylvania Law Review* 168, no. 1 (2019), pp. 17–72, exploring the various mechanisms by which shareholders can exercise their vote in a corporation.

[28]   Fourth Coffee Report, ¶ 32; "By-Laws of YPF Sociedad Anónima," Exhibit 1.2 to YPF Sociedad Anónima, "Form 20-F Annual Report for the Fiscal Year Ended December 31, 2023," April 25, 2024, https://www.sec.gov/Archives/edgar/data/904851/000119312524114066/d804823dex12 htm ("The Board shall appoint a Chairman from among the members elected by Class D shares"), accessed on May 9, 2024.

[29]   "By-Laws of YPF Sociedad Anónima," Exhibit 1.2 to YPF Sociedad Anónima, "Form 20-F Annual Report for the Fiscal Year Ended December 31, 2023," April 25, 2024, https://www.sec.gov/Archives/edgar/data/904851/000119312524114066/d804823dex12 htm, accessed on May 9, 2024.

[30]   *Id*.

[31]   Megan Wischmeier Shaner, "Confronting New Market Realities: Implications for Stockholder Rights to Vote, Sell, and Sue," *Oklahoma Law Review* 70, no. 1 (2017), pp. 1–8 at 2 ("The shareholder franchise is a key part of corporate law, but that does not mean that shareholders vote on very many things. Most business decisions are left entirely to the board of directors or those to whom they delegate such authority. Shareholders participate only infrequently in a limited set of decisions, including the election of directors, fundamental corporate changes, and ratification.").

[32]   *Id.*

through ownership of high vote class shares of Google's common stock—Class B shares.[33] Public shareholders own either low vote Class A shares or no vote Class C shares.[34] While Messrs. Brin and Page are controlling shareholders, they are distinct and separate from Google, which operates as a company under the direction of Google's board and its executives.[35] So long as Messrs. Brin and Page adhere to well-accepted custom and practices with respect to corporate separateness and act through the shareholder franchise, they are considered distinct and separate from Google itself and are not accountable for Google's commercial activity despite being controlling shareholders of Google.[36]

15.     In addition to the limited rights of shareholders, there are certain fundamental principles of corporate separateness that are, in my experience, regularly observed by corporations and consistent with the application of entity theory. These include:

a.   *Separation of Identities and Formalities*. Corporations observe legal formalities of separateness, including clear establishment of a separate identity through a separate charter, bylaws, board minutes, and books and records. Corporations file separate tax returns (where required), pay separate franchise taxes, and maintain appropriate registrations for good standing in the state of incorporation and where the corporation does business. In addition, corporations separately file required legal documents and act for themselves in such matters (unless authority is legally delegated).

b.   *Separation of Governance*. Corporations formally set up independent and distinct governance structures. This includes the election of directors and appointment of officers, annual elections of directors, and annual shareholder meetings. These directors and officers act on the corporation's behalf in accordance with corporate

---

[33]   Alphabet Inc., "Form 10-K Annual Report for the Fiscal Year Ended December 31, 2023," January 31, 2024, p. 22, https://abc.xyz/assets/43/44/675b83d7455885c4615d848d52a4/goog-10-k-2023.pdf, accessed on May 9, 2024. As of October 2, 2015, Alphabet Inc. became the successor issuer of Google Inc. pursuant to Rule 12g-3(a) under the Exchange Act. *Id.* p. 25.

[34]   *Id*.

[35]   *Id*.

[36]   *See generally* Jack Nicas, Conor Dougherty, and Daisuke Wakabayashi, "How Google's Founders Slowly Stepped Away From Their Company," *New York Times*, December 4, 2019, https://www.nytimes.com/2019/12/04/technology/google-larry-page-sergey-br.html, accessed on May 9, 2024.

separateness. Shareholders separately act only in their capacity as shareholders, voting and providing approvals where necessary.

    c.   *Separation of Assets and Liabilities*. The corporation's assets and liabilities are kept distinct and within the purview of the corporation. Accounting records, including financial statements, are kept separate.

    d.   *Separate Officers and Directors.* The corporation acts through its own officers and directors. It is expected that employees who provide services to the corporation should be employed by the corporation.[37]

16.    In accord with custom and practices, shareholders who abide by these principles are not considered to be engaging in or responsible for the conduct of the underlying corporation. And in assessing a veil piercing claim, courts will look to these principles of corporate separateness to decide whether to pierce the corporate veil and hold shareholders liable for the activities of the company.[38]

        **2.   Professor Coffee fails to recognize that the actions of Argentina as a shareholder of YPF to which he refers are in accord with corporate separateness and the limited rights of shareholders.**

17.    Professor Coffee's assertions that Argentina controlled and benefitted from YPF[39] do not recognize the distinction between exercise of limited shareholder rights that are consistent with corporate separateness and shareholder actions that are inconsistent with corporate separateness. Professor Coffee cites three main actions since YPF's nationalization as showing this control.[40]

---

[37]  David K. Millon, "Piercing the Corporate Veil, Financial Responsibility, and the Limits of Limited Liability," *Emory Law Journal* 56, no. 5 (2007), pp. 1305–1382 at 1335. *See generally* Phillip I. Blumberg, et al., *Blumberg on Corporate Groups*, Second Edition (New York, NY: Wolters Kluwer, 2005).

[38]  Neil A. Helfman, "Establishing Elements for Disregarding Corporate Entity and Piercing Entity's Veil," 114 *American Jurisprudence Proof of Facts* 3d 403 (originally published in 2010; updated in April 2024), discussing that, under U.S. law, a veil piercing claim requires a connection between the claim and the improper use of the corporate form. Professor Coffee provides no support for the proposition that piercing the corporate veil would be appropriate here.

[39]  Fourth Coffee Report, ¶¶ 21–22.

[40]  Professor Coffee also states that Argentina selected YPF's CEO "in preparation for its 1993 privatization." Fourth Coffee Report, ¶ 27. He does not address the corporate mechanics of this selection. Professor Coffee also asserts that the current CEO of YPF was appointed on direct instructions of Argentina. Fourth Coffee Report, ¶ 27. However, Professor Coffee fails to note that Mr. Horacio Marín was first appointed as YPF's board chair at a Board of Directors meeting and that he was appointed CEO by YPF's Supervisory Committee for Class D shares, not

However, even assuming the accuracy of these claimed actions, all three are shareholder rights that are appurtenant to the YPF shares. They are as follows:

| Item | Exercise of Shareholder Rights | Consistent with Corporate Separateness |
|------|--------------------------------|----------------------------------------|
| Removing Repsol directors in 2012 | Yes[41] | Yes |
| Election of a majority of the members of its Board of Directors | Yes | Yes |
| Voting its shares at shareholder meetings to approve YPF's debt issuances carried out at the Board's discretion | Yes | Yes |

18.     None of these actions, even assuming they occurred, are anything other than the exercise of limited shareholder rights, consistent with corporate separateness and exercised within the internal affairs of YPF. I am unaware of any claim to pierce the corporate veil or a lack of corporate separateness with respect to YPF and Argentina pending or described in the Coffee Report.[42]

19.     Moreover, Professor Coffee is incorrect that Argentina directly appoints the YPF chair. Mr.

---

Argentina. *See* YPF Sociedad Anónima, "Form 6-K," December 14, 2023, https://www.sec.gov/Archives/edgar/data/904851/000119312523295720/d659491d6k.htm, accessed on May 9, 2024; YPF Sociedad Anónima, "Form 6-K," January 26, 2024, https://www.sec.gov/Archives/edgar/data/904851/000119312524016999/d720716d6k.htm, accessed on May 9, 2024. Finally, Professor Coffee also cites the appointment of an intervenor for YPF in 2012. Fourth Coffee Report, ¶ 28. However, he fails to note that this was pursuant to an Urgency and Necessity Decree. *See* Decreto 530/2012 (Dispónese la intervención), April 16, 2012.

[41] *See* "YPF Sociedad Anónima, June 4, 2012 Ordinary and Special General Meeting of Classes A and D Shareholders," *Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. v. Argentine Republic, and YPF S.A.*, United States District Court, Southern District of New York, Docket 1:15-cv-02739-LAP, Doc. No. 363-58, p. 21 ("[O]n behalf of the capital shareholder whose political rights are exercised by the National Government under law 26.741, and following the instructions of my authorizing body, I appear to motion, and advance the vote in favor, for the removal of the following board members for Class D . . .").

[42] Professor Coffee also states that "[f]or corporations incorporated outside of the United States, a controlling shareholder is quite common. Although the United States (and the United Kingdom) have dispersed shareholder ownership (and as a result independent directors generally hold the balance of power in public corporations in the U.S.), this is not the case elsewhere. Particularly in emerging market countries, concentrated ownership is the norm [. . .]." Fourth Coffee Report, ¶ 23. Professor Coffee fails to recognize the large number of U.S. public companies, particularly technology companies, that have dual class listings and are controlled by a small group of shareholders. *See* Jay Ritter, "Initial Public Offerings: Dual Class Structure of IPOs Through 2023," April 11, 2024, https://site.warrington.ufl.edu/ritter/files/IPOs-Dual-Class.pdf (reporting 891 dual class IPOs from 1980–2022). In any event, under Professor Coffee's views, all such companies would be subject to allegations that their shareholders are directly responsible for their activities. But this is not the case.

Horacio Daniel Marín was appointed Chairman of the Board and Chief Executive Officer ("CEO") of YPF by the Supervisory Committee for Class D shares. His appointment to CEO was conditioned to the approval by the Shareholders' Meeting of the amendment to the YPF bylaws to enable the dual appointment as the CEO and the Chairman of the Board of YPF. This bylaw amendment was approved on January 26, 2024, with Argentina voting as a shareholder on that matter.[43]

20.     In this regard, Professor Coffee fails to recognize that the exercise of shareholders rights, consistent with corporate separateness, does not turn the activity of the corporation into the activity of the shareholder. An analogy is citizens' vote: by exercising this limited franchise, citizens do not engage in the activity of the government.[44] Similarly, a shareholder vote, even one of a controlling shareholder, is the exercise of the corporate franchise. It is a vote in the direction of the corporation on a certain matter, not an activity on behalf of the corporation. The corporation, not the shareholder, is the one that acts on that vote (or not).[45]

21.     Finally, Professor Coffee states that Argentina may benefit from specific actions of YPF,

---

[43] YPF Sociedad Anónima, "Form 6-K," December 14, 2023 ("Mr. Horacio Daniel Marin was appointed Chairman of the Board and Chief Executive Officer (CEO) of the Company, the latter conditioned to the approval by the Shareholders' Meeting of the amendment to the Company's Bylaws that enables this possibility. Until such time, the corresponding role of the CEO will be temporarily exercised by the Executive Vice Presidencies of Upstream, Downstream and Gas and Power. The Board of Directors of the Company resolved to call a General Extraordinary Shareholders' Meeting to be held on Friday, January 26, 2024 at 11:00 a.m. at the Company's headquarters located at Macacha Güemes 515, Autonomous City of Buenos Aires; in order to consider the amendment of Articles 18, paragraph c) and 19, paragraph vi) of the Company's Bylaws."); YPF Sociedad Anónima, "Form 6-K," January 26, 2024, https://www.sec.gov/Archives/edgar/data/904851/000119312524016995/d741426d6k htm ("The Shareholders' Meeting approved by a majority of computable votes the amendment of articles 18th c) and 19th vi) of the Company's Bylaws, unifying in a single person the Chairman of the Board of Directors and the management of the executive functions for the administration of the Company (CEO), in order to achieve a better internal organization, greater synergy in the process of adopting and executing corporate decisions and facilitating communication between Management and the Board of Directors, all in the best interests of the Company.").

[44] *See* Robert B. Thompson, "Defining the Shareholder's Role, Defining a Role for State Law: Folk at 40," *Delaware Journal of Corporate Law* 33, no. 3 (2008), pp. 771–787 at 784 ("For shareholder voting, the most convenient analogy is to stock in public voting. Shareholder voting discussions often import core assumptions from our political democracy by which shareholders are put into the role of citizens.").

[45] Professor Coffee also states that Argentina has "an effective veto power" over YPF through certain supermajority provisions in the YPF bylaws. Fourth Coffee Report, ¶ 11. However, these veto rights are common among U.S. and non-U.S. corporations and are not considered as the exercise of control on behalf of the corporation itself. *See, e.g., Crispo v. Musk*, 2022 WL 6693660, at *14-15 (Del. Ch. Oct 11, 2022) ("Plaintiff also argues that Defendants' contractual rights to veto Board action through ordinary-course provisions in the Merger Agreement contribute to a finding of control . . . Neither the fact of the Merger Agreement nor Defendants' veto rights thereunder, alone or together, demonstrate controller status.").

including the access by YPF to the U.S. capital markets.[46] Ms. Lissemore similarly cites the YPF ADR facility as potentially benefitting Argentina.[47] However, to the extent these actions benefitted Argentina or shareholders of YPF generally, those benefits remain consistent with principles of corporate separateness and do not transform YPF's actions into the actions of Argentina.[48] For example, many countries enjoy economic or other indirect benefits from the international activities of their domestic corporations, including the potential that the activities of one corporation may "pave the way" for other corporations,[49] but such activities would not customarily be attributed to the foreign sovereign irrespective of its share ownership.[50] Indeed, many of China's state-owned multinationals, such as China Eastern Airlines Corporation Ltd. and China Southern Airlines Company Limited, have had U.S. listings or otherwise operated extensively abroad. Fannie Mae and Freddie Mac are also currently controlled by the United States but deemed to be separate corporate entities from the U.S. government despite their U.S. listings.

22.     Similarly, the potential indirect benefits to shareholders from a company's maintenance of an ADR facility have never, to my knowledge, been viewed as inconsistent with principles of corporate separateness.[51] More particularly, under Professor Coffee's worldview, one could potentially say that any acts of any foreign state-controlled corporation that has a positive effect would be an act attributable to the controlling state, as any such positive effect would have consequences in the home state of the corporation (and thus potentially enhance the local

---

[46]   Fourth Coffee Report, ¶¶ 3, 12, 17–18.

[47]   Second Lissemore Report, ¶¶ 30–34.

[48]   Professor Coffee states that "YPF's recurrent debt offerings between 2015 and 2024 not only enabled YPF to raise capital at lower cost, but also enabled Argentina to expand its oil exploration and production – and thereby grow the Argentine economy and enhance domestic employment." Fourth Coffee Report, ¶ 5. He offers no evidence for this, but assuming that the 144A offerings did lower YPF's cost of capital this again accrued to all shareholders in their capacity as shareholders, and not Argentina, specifically. Moreover, accepting Professor Coffee's point about expanded oil production would mean that any benefit to the company, no matter how tangential, should be allocated to a specific shareholder for purposes of attributing commercial activity.

[49]   Fourth Coffee Report, ¶¶ 17–18.

[50]   *See Allen v. Russian Federation*, 522 F. Supp. 2d 167, 184 (D.D.C. 2007) ("Plaintiffs' second argument invites the court to pierce the corporate veil separating Rosneftegaz and the Russian Federation and to treat them as a single entity for purposes of the instrumentality inquiry. . . . Plaintiffs do not allege that Rosneftegaz failed to follow corporate formalities, was intentionally undercapitalized, or commingled funds . . . the Court holds that its acts shall not be attributable to the Russian Federation.").

[51]   In this regard, the benefits often cited from an ADR program, such as liquidity and ease of sale, are related to the shares themselves, not the company. *See* Steven M. Davidoff (Solomon), "Regulating Listings in a Global Market," *North Carolina Law Review* 86, no. 1 (2007), pp. 90–161 at 101–103, discussing the reasons why foreign issuers list in the United States.

economy). However, there is no principle in theory or law that Professor Coffee cites to support this conclusion.

23.     Finally, the "motivations" Professor Coffee speculates Argentina may have for maintaining YPF as a public company with public shareholders, including to "maximize YPF's stock price" and facilitate access to capital,[52] as a matter of custom and practice, has nothing to do with YPF's corporate separateness from Argentina as its shareholder. Nor does Professor Coffee provide any factual support for this assertion.[53]

> **B.    *Opinion 2:* Professor Coffee fails to provide any concrete evidence that YPF's debt offerings benefitted from YPF's ADR facility. To the contrary, he disregards that YPF's debt offerings were unregistered 144A offerings that did not require YPF to complete a U.S. public listing or U.S. securities registration and that YPF has raised no proceeds through a U.S. registered offering at least since 2001.**

24.     In his report, Professor Coffee asserts—without citing any evidence—that Argentina only partly nationalized YPF because "Argentina needed to preserve YPF's ability to access international debt capital markets, as Argentina and YPF have made much greater use of these markets in the period following Argentina's re-nationalization of YPF in April 2012."[54] He then cites nine 144A debt offerings by YPF and asserts they "would have been much less feasible if YPF had not remained a 'reporting' company."[55] Professor Coffee finally claims that Argentina benefitted from these offerings by "blaz[ing] a trail" for other Argentine issuers and benefitting from the flow of these proceeds into Argentina.[56]

---

[52]   Fourth Coffee Report, ¶¶ 11–21.

[53]   Professor Coffee also fails to acknowledge that Article 15 of the Expropriation Law does not require YPF to maintain a listing on the NYSE (or the ADR program). *See* Law 26,741, "Title III - Recuperation of Control of YPF.    Chapter    III    The    Legal    Continuity    and    Management    of    YPF    S.A." https://www.sec.gov/Archives/edgar/data/904851/000095010312002488/dp30521_6k.htm, accessed on May 9, 2024 ("Article 15.- In the execution of its activities, YPF Sociedad Anónima and Repsol YPF Gas S.A. shall continue to operate as publicly traded corporations pursuant to Chapter II, Section V of Law Nº 19,550 and its corresponding regulations, and shall not be subject to any legislation or regulation applicable to the management or control of Companies or entities owned by the National Government or provincial governments."); "By-Laws of YPF Sociedad Anónima," Exhibit 1.2 to YPF Sociedad Anónima, "Form 20-F Annual Report for the Fiscal Year    Ended    December    31,    2023,"    April    25,    2024, https://www.sec.gov/Archives/edgar/data/904851/000119312524114066/d804823dex12.htm, accessed on May 9, 2024.

[54]   Fourth Coffee Report, ¶ 12.

[55]   Fourth Coffee Report, ¶¶ 14–15.

[56]   Fourth Coffee Report, ¶¶ 17–18.

25.     Professor Coffee, however, fails to recognize that these debt offerings, which extended to numerous countries, did not require that YPF be a reporting company in the United States, have a public listing in the United States, or even register these offerings with the U.S. Securities and Exchange Commission ("SEC"). Moreover, Professor Coffee cites no direct evidence or any study to support his assertions that YPF's ADR listing enhanced YPF's 144A offerings. Professor Coffee's assertions ultimately ignore the actual evidence that Rule 144A offerings by foreign issuers have regularly occurred for decades by both Argentine and non-Argentine companies, including prior to 2012, without the need for a U.S. listing or a U.S. registration of the securities offerings with the SEC. Nor do they need for the issuer to be a U.S. reporting company. In fact, entities that are 100% owned by foreign governments equally access the international capital markets by issuing debt under Rule 144A. For example, Empresa Nacional del Petróleo (Chile), Corporación Nacional del Cobre de Chile (Chile), and Petróleos Mexicanos (Mexico) issued 11, 27, and 66 debt offerings under Rule 144A, respectively, since 1993.[57]

26.     Ultimately, Professor Coffee fails to provide any evidentiary support for his assertions. He also fails to acknowledge that, in the period for which YPF's SEC filings are available on EDGAR (since 2001), YPF has not conducted any primary equity offerings in the United States—a contrary fact that shows that YPF itself has not benefitted from this ADR program with regard to accessing international capital markets in later years. Nor has Argentina conducted any secondary equity offering since the YPF initial public offering ("IPO").

### 1.  Background on Rule 144A

27.     Rule 144A was adopted by the SEC in 1990 to establish a safe harbor for the private resale of "restricted securities."[58] The Rule's purpose was to make a "first step toward achieving a more liquid and efficient institutional resale market for unregistered securities."[59] More specifically, the SEC wanted to enhance the ability of private issuers to raise capital in private markets, principally

---

[57]  Data from CapitalIQ.

[58]  17 CFR § 230.144A. *See* SEC, "Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145," Final Rule, Securities Act Release No. 6862 (April 23, 1990), 55 FR 17933 (April 30, 1990), https://www.sec.gov/files/rules/final/1990/33-6862.pdf, accessed on May 9, 2024.

[59]  SEC, "Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145," Final Rule, Securities Act Release No. 6862 (April 23, 1990), 55 FR 17934 (April 30, 1990).

through debt. As such, Rule 144A "permits unlimited resales of securities that have never been registered under the 1933 Act, so long as all such sales are made to a specific class of large institutional investors."[60] Thus, Rule 144A allows the sale of unregistered securities by issuers, thereby creating a liquid market for such securities.

28.    The touchstone of Rule 144A is that the sales (and the resales) can only be made to qualified institutional buyers ("QIBs").[61] These are defined as institutional investors that own or manage on a discretionary basis at least $100 million worth of securities.[62] QIBs are presumed to be sophisticated investors capable of fending for themselves in the marketplace, without the protections of securities registration under Section 5 of the Securities Act of 1933.[63] Rule 144A broadly allows the sale of securities to QIBs under this exemption as well as the resale to other QIBs without imposing underwriter liability on the QIBs for this sale.[64] In this regard, courts have stated that, in general, a "Rule 144A offering" is not "public" or otherwise directed "at the general investing public."[65] Studies have confirmed the unique role of QIBs with foreign investors finding that, "even though the securities constituting this market are comparatively riskier, they are less exposed to the various dimensions of risk relative to comparable markets," likely due to the involvement of QIBs.[66]

29.    Rule 144A has been enormously successful. This success is particularly true for foreign

---

[60]    Thomas Lee Hazen, *The Law of Securities Regulation*, West Academic Pushing (Seventh Ed.), § 4:111.

[61]    SEC, "Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145," Final Rule, Securities Act Release No. 6862 (April 23, 1990), 55 FR 17933 (April 30, 1990).

[62]    SEC, "Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145," Final Rule, Securities Act Release No. 6862 (April 23, 1990), 55 FR 17936 (April 30, 1990).

[63]    SEC, "Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145," Final Rule, Securities Act Release No. 6862 (April 23, 1990), 55 FR 17933 (April 30, 1990); SEC, "Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145," Proposed Rule, Securities Act Release No. 6806 (October 25, 1988), 53 FR 44016 (November 1, 1988), https://tile.loc.gov/storage-services/service/ll/fedreg/fr053/fr053211/fr053211.pdf, accessed on May 9, 2024.

[64]    SEC, "Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145," Final Rule, Securities Act Release No. 6862 (April 23, 1990), 55 FR 17946 (April 30, 1990).

[65]    *In re Revco, Inc. Securities Litigation*, 503 F. Supp. 2d 611, 627 (S.D.N.Y. 2007).

[66]    Alan G. Huang, Madhu Kalimipalli, Subhankar Nayak, and Latha Ramchand, "Risk Mitigation by Institutional Participants in the Secondary Market: Evidence from Foreign Rule 144A Debt Market," *Journal of Banking and Finance* 99 (2019), pp. 202–21 at 204.

issuers. The Rule 144A market has been "a key innovation for foreign issuers that allowed them to gain access to U.S. capital markets without the stringent SEC registration process and onerous disclosure requirements."[67] And, as one academic study shows, the 144A market has become the primary way that foreign issuers raise debt capital in the United States. The authors found that:

> [o]ver time, this market has expanded significantly, and foreign issuers have accessed it extensively. Data from the Fixed Income Securities Database (FISD) shows that debt issued under Rule 144A . . . grew from 19% of total foreign corporate debt issued in the U.S. during the period of 1994–2004 to 65% over 2005–2010 . . . .[68]

**Figure 1 – Rule 144A Debt Offerings by U.S. and Non-U.S. Issuers Since 1990**



Source: Rule 144A debt offering data as of April 25, 2024 come from CapitalIQ. The country of the issuer is based on the location of the issuer headquarters.

---

[67]    *Id.* at 202.

[68]    *Id.* at 202.

30.     This trend is also true for South American issuers. Since 1990, there have been 2,500 144A debt offerings by issuers with headquarters in South America, of which 345 144A debt offerings were issued by issuers headquartered in Argentina. Since 1990, the total amount offered in 144A debt offerings by South American issuers has exceeded $1.05 trillion in historical rates, while the total amount outstanding is approximately $754 billion in today's rates.

**Figure 2 – Rule 144A Debt Offerings by Argentine and South American Issuers Since 1990**



Source: Rule 144A debt offering data as of April 25, 2024 come from CapitalIQ. The country of the issuer is based on the location of the issuer headquarters. "South America" comprises countries in South America, including Argentina, and in Central America, including Mexico, but it excludes the Caribbean.

31.     This includes companies with U.S. listings and those without.[69] For example, one of the largest 144A debt offerings (more than $8 billion of corporate debentures) by a South American company was issued in September 2019 by Petróleos Mexicanos, which is not an issuer listed in

---

[69]    Based on the "Exchange:Ticker" and "Security Tickers [Ultimate Parent]" variables from CapitalIQ, only a few issuers with headquarters in South America have securities listed in the U.S.

the U.S. As another example, on January 25, 2018, Rio Energy S.A., an Argentine issuer that is not listed in the U.S., issued a 144A debt offering for $600 million corporate debentures.

### 2. Professor Coffee's incorrect assertions on Argentina's access to the 144A market through YPF's ADR facility

32.     Considering Rule 144A's fundamental purpose—to offer a safe harbor for sophisticated investors to invest in unregistered offerings—Professor Coffee's assertions concerning Argentina, YPF, and the 144A market are mistaken. As an initial matter, Professor Coffee nowhere recognizes the central point of 144A, which is to offer an exemption from registration for the sale of unregistered securities and for use by unregistered issuers without regard to whether they have a U.S. listing. To restate, the existence (or not) of an ADR facility is not a necessity or requirement for a Rule 144A offering. Moreover, the extensive use of 144A by issuers who do not have ADR facilities—and are not subject to periodic SEC disclosure requirements—highlights the point of the exemption. An ADR facility is not necessary for or even particularly facilitative of such unregistered offerings, which are attractive to investors because (as Professor Coffee admits) they offer a combination of "high liquidity and no requisite holding period"[70]—even without the need for periodic SEC disclosures. This is perhaps why Professor Coffee offers no evidence that the YPF ADR facility benefitted YPF's international debt offerings.[71]

33.     Moreover, the long history of 144A offerings inside and outside of Argentina shows that YPF was not "blaz[ing] a trail" for these offerings for other Argentine issuers as Professor Coffee asserts. Instead, YPF's 144A offerings as part of its international debt issuance program were using a regularly utilized U.S. channel with a three-decade history for capital offerings by foreign issuers. Professor Coffee also fails to address who the buyers were in YPF's Rule 144A offerings—these are and were QIBs—some of the most sophisticated investors in the market. QIBs have been deemed by the SEC to have the ability to independently assess each issuance, thereby foregoing

---

[70]  Fourth Coffee Report, ¶ 13.

[71]  Instead, Professor Coffee merely asserts without evidence that disclosures in connection with YPF's ADR program must have benefitted investors in Rule 144A offerings by providing those investors with information. *See* Fourth Coffee Report, ¶ 13 (investors "benefitted from the financial disclosure that YPF filed with the SEC"); *id.* ¶ 32 (YPF's "capital-raising" "greatly facilitated by" its ADR program and "numerous SEC filings"). But Professor Coffee cites nothing to support this and, indeed, Rule 144A does not require issuers to register their offerings or file a registration statement in the United States because the assumption underlying the rule is that these sophisticated investors can make investment decisions in the absence of registration.

the need for U.S. securities registration.[72] Not only does Professor Coffee not address this issue, but he also never states how an offering by YPF would even be taken into account by QIBs, who by definition have the independent ability to assess a company whether or not it has a U.S. listing. Nor does he perform any analysis or offer any evidence of whether the investment by these QIBs in YPF's international debt offerings was influenced or affected by the existence of an ADR facility. And, as I noted in my prior opinion, the benefits that Professor Coffee cites with respect to the Rule 144A offerings were to YPF itself because the debt issuance and proceeds went to YPF.

34.     Finally, Professor Coffee does not acknowledge a basic problem with his assumptions that Argentina benefits from the ADR facility in offering unregistered debt under Rule 144A. YPF has never employed this facility to raise capital. All proceeds of the IPO went to Argentina and not YPF. During the period for which public records are available (since 2001), YPF has raised no proceeds through a registered offering in the United States. If YPF (or Argentina) benefitted from this facility (through disclosure or otherwise), it is likely that YPF (or Argentina) would utilize this facility in conjunction with any Rule 144A offering or utilize the U.S. registration process to offer these securities. But YPF has not.

**C. *Opinion 3:* Professor Coffee and Ms. Lissemore fail to recognize that Argentina's ownership of YPF is held in shares sited in Argentina, and that any sale or privatization of Argentina's controlling interest in YPF would not involve ADRs or any of the entities or facilities that support YPF's ADRs.**

35.     In the Second Lissemore Report, Ms. Lissemore asserts that Argentina, presumably as a YPF shareholder, benefits in some manner due to the presence of YPF's ADR program. She asserts that the ADR Program is "strategically important to the Argentina Republic . . . ."[73] She further states that, "[b]y maintaining the ADR program and having the overwhelming majority of the liquidity in the ADR program, the Argentine Republic has a ready, set, go facility in place to sell its Class D shares to investors on the NYSE."[74] Professor Coffee echoes Ms. Lissemore's

---

[72] SEC, "Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145," Final Rule, Securities Act Release No. 6862 (April 23, 1990), 55 FR 17933 (April 30, 1990); SEC, "Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145," Proposed Rule, Securities Act Release No. 6806 (October 25, 1988), 53 FR 44016 (November 1, 1988).

[73] Second Lissemore Report, ¶ 34.

[74] *Id*.

conclusions, stating that "[i]n recent months, the Argentine government has also proposed the re-privatization of YPF. Although this has encountered some difficulties and has been recently 'paused,' the key point here is that this is another option that Argentina has carefully preserved by maintaining an active and visible presence in the U.S."[75]

36.     Aside from being beside the point with respect to corporate separateness for the reasons I have already described, both Ms. Lissemore and Professor Coffee fail to recognize that YPF's ADR facility is unlikely, if at all, to be utilized in any sale of Argentina's shares. Instead, and as I detail below, such a sale would—consistent with custom and practice and if it occurred at all, which is pure speculation—more likely be accomplished through a private sale or other means and might even be deterred by the existence of the ADR program.

37.     In the case of Argentina and YPF, if Argentina decided to dispose of its stake (which I understand would require approval of Argentina's Congress),[76] it would have a number of options based on prior precedent as to the methodology and manner to divest its YPF shares.[77] More specifically, Argentina could choose to sell YPF shares privately through a variety of means that would not involve the YPF ADR facility. This could be accomplished through a private sale to strategic or institutional investors, including investors outside of the United States. I note that more than 99% of YPF was formerly owned by Repsol S.A., a company based in Spain. And only 14.99% of such shares were acquired directly from the Government of Argentina in 1999. An additional 82.47% of the shares were acquired pursuant to a tender offer.[78]

38.     This raises a secondary issue that Professor Coffee fails to analyze. More specifically, the existence of the YPF ADR facility may be harmful to attempts to privatize YPF. This may be because possible buyers for Argentina's YPF's stake may not wish to acquire a company with a

---

[75] Fourth Coffee Report, ¶ 4.

[76] Law 26,741, "Title III - Recuperation of Control of YPF. Chapter I Expropriation," available at https://www.sec.gov/Archives/edgar/data/904851/000095010312002488/dp30521_6k htm, accessed on May 9, 2024. I also understand that under the YPF Expropriation Law, 49% of the YPF Shares held by Argentina are by law subject to distribution to Argentina's oil producing provinces. *See* Article 8 of Law 26,741, "Title III - Recuperation of Control of YPF. Chapter I Expropriation." I am not expressing any opinion as to the steps that the Argentine government would need to take under Argentine law to dispose of all or some of its shares of YPF.

[77] *See generally* William Leon Megginson, "The Structure and Investment Performance of Privatization Share Offerings," in William Leon Megginson, *The Financial Economics of Privatization* (Oxford 2005), pp. 203–232.

[78] YPF Sociedad Anónima, "Form 20-F for the Fiscal Year Ended December 31, 2013," *Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. v. Argentine Republic, and YPF S.A.*, United States District Court, Southern District of New York, Docket 1:15-cv-02739-LAP, Doc. No. 363-29, p. 157.

substantial minority of stockholders who have significant rights under Argentine law and the U.S. federal securities law.[79] The need to abide by these rules would instead diminish the value of Argentina's stake and possibly deter buyers.[80]

39.     Alternatively, Argentina could conceivably—as Professor Coffee assumes—effect a sale of YPF shares through a public offering. But even then, Argentina could choose not to make the offering through the YPF ADR facility. Instead, the shares could be sold on the Argentine exchange or another national exchange, such as the London Stock Exchange.

40.     Thus, there are multiple ways Argentina could choose to privatize YPF, which may or may not even involve U.S. residents. These are all well-documented ways that have precedent in other denationalizations that occurred in the past.[81] Yet, neither Professor Coffee nor Ms. Lissemore recognizes that the usage of the ADR facility for any YPF denationalization is hypothetical and uncertain.

41.     Likewise, Ms. Lissemore overstates the potential benefits to Argentina from the presence of an ADR program. She states that "[t]he time and cost required for a major shareholder to sell its shares on the NYSE are significantly reduced if an issuer already is an SEC registrant and has an active NYSE ADR program in place."[82] However, Ms. Lissemore fails to recognize that, even if Argentina were to decide to sell shares through the ADR facility, it would need to file a full registration statement and that—given the size of the offering—such an offering would likely have to be an underwritten public offering.[83] And Ms. Lissemore also fails to recognize the possible impediments that the existence of an ADR program may present to any privatization.

42.     Neither Ms. Lissemore nor Professor Coffee discusses the costs of such registration, nor do they provide anything more than very general statements regarding the potential advantages to

---

[79]   The U.S. rules themselves are substantial. *See generally* "The Latham FPI Guide: Accessing the US Capital Markets From Outside the Unites States," 2023 Edition, https://www.lw.com/admin/upload/SiteAttachments/Latham-FPI-Guide.pdf, accessed on May 9, 2024.

[80]   *See generally* Jens Dammann, "Corporate Ostracism: Freezing Out Controlling Shareholders," *Journal of Corporate Law* 33, no. 3 (2008), discussing the costs of control and arguing that such costs can deter companies from acquiring control.

[81]   *Id*.

[82]   Second Lissemore Report, ¶ 34.

[83]   Under Section 5 of the Securities Act, any "public offering" of shares in the United States must be registered. *See* 15 U.S. Code § 77e.

a selling shareholder of maintaining an ADR facility.

## III.    CONCLUSION

43.    For the reasons outlined above, the Coffee Report and the Lissemore Report fail to recognize that Argentina, as a YPF shareholder, and YPF, a public company, are separate entities, and, as a matter of custom and practice, the capital raising and other activities of YPF are not attributable to Argentina. Nor has Argentina received unique or unusual benefits from YPF's debt offerings—items that benefit all shareholders of YPF—consistent with principles of corporate separateness. Likewise, capital raising benefits from the maintenance of YPF's ADR facility accrue to YPF's shareholders generally, and any indirect benefits that Argentina may accrue as a sovereign and shareholder of YPF are also consistent with principles of corporate separateness. Ultimately, neither Professor Coffee nor Ms. Lissemore shows that Argentina itself engaged in commercial activity in the United States through its YPF shareholdings.

Pursuant to 28 U.S.C. § 1746, I, Steven Davidoff Solomon, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

*Steven Davidoff Solomon*

Steven Davidoff Solomon

Dated: May 16, 2024

21

# Steven Davidoff Solomon

**Dated March 2024**

*Academic Appointment/Work*

**University of California, Berkeley School of Law**                     2014-
Alexander F. and May T. Morrison Professor of Law
- Teach Mergers & Acquisitions, Business Associations, and Law, Accounting/Economics and Business Workshop (have also taught Contracts & Securities Regulation)
    - Teach Antisemitism and the Law (Graduate and Undergraduate)
    - Co-taught with Erwin Chemerinsky Civil Liberties in a Pandemic
    - Co-teach with Professor Mark Brilliant From Wall Street to Main Street, an undergraduate U.C. Berkeley class
- Faculty Co-Director, Berkeley Center for Law & Business (2014-2022)
    - During my tenure, the Center had ten employees, conducted over 50 programs and conferences a year and operated the executive education program for the law school. In my five-year tenure as co-director I grew revenues from 300K a year to approximately $4 million per year (and from two employees to ten).
- Co-Founder Berkeley Antisemitism Initiative
- Selected Honors
    - Named three times one of the 100 most influential governance professionals in the country by the National Association of Corporate Directors
    - Eight articles selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors
    - Top 10 Most-Cited Corporate & Securities Law Professors 2013-2017; 2016-2020 (per Sisk report)
    - Top 10 Most-Cited U.C. Berkeley, School of Law Professors 2013-2017; 2016-2020 (per Sisk report)
- Fellow, American College of Governance Counsel
- Member American Law Institute, European Corporate Governance Initiative, Academic Freedom Alliance

**Tel Aviv University, Buchmann Faculty of Law**                     Spring, 2022
Visiting Professor

**Social Capital Suvretta Holdings Corp. IV**                     2021-2023
Director, Chair of Audit, Compensation and Nominating Committees

**The New York Times**                     2007-2021
"Deal Professor" Columnist for N.Y. Times DealBook
- Weekly print columnist for The New York Times
- On-line columnist for N.Y. Times DealBook

*Other Academic Appointments*

**The Ohio State University Michael E. Moritz College of Law**                     2011-2014
**Fisher College of Business (By Courtesy)**
Professor of Law

**University of Connecticut School of Law**                     2008-2011
Professor of Law

**Wayne State University School of Law**                                    2006-2008
Assistant Professor of Law

*Entrepreneurial Endeavors*

**Yowlo, PBC**                                                              2021-

Co-founded financial analytics firm with U.C. Berkeley Haas Professor providing high-end financial tools to retail investors. Yowlo, PBC is cash flow positive and has contracted with Microsoft to license certain of its powerful analytics.

**Wasabi Sushi Co.**                                                       1996-

Founding partner of Wasabi Sushi Co, a fast-casual restaurant chain.  Wasabi Sushi has raised over $3 million dollars in capital and is currently cash flow positive.  It's flagship restaurant remains at Tysons's Corner Mall in Virginia.

*Scholarship*

*Casebooks*

MERGERS & ACQUISITIONS: LAW, THEORY & PRACTICE (1ST ED. WEST 2016) (2ND ED. WEST 2019) (3RD ED. WEST 2023) (with Claire Hill and Brian Quinn)

*Books*

THE CORPORATE CONTRACT IN CHANGING TIMES: IS THE LAW KEEPING UP? (UNIV. CHICAGO 2019) (Edited volume) (with Randall Thomas)

RESEARCH HANDBOOK ON MERGERS AND ACQUISITIONS (Elgar 2016) (Edited volume) (with Claire Hill)

THE LAW AND ECONOMICS OF MERGERS AND ACQUISITIONS (Elgar 2013) (Edited volume) (with Claire Hill)

GODS AT WAR: SHOTGUN TAKEOVERS, GOVERNMENT BY DEAL, AND THE PRIVATE EQUITY IMPLOSION (John Wiley & Sons, Inc. 2009)

*Book Chapters*

*Dual Class Stock* (with Jill Fisch) in JEFFREY N. GORDON & WOLF-GEORG RINGE (EDS.), THE OXFORD HANDBOOK OF CORPORATE LAW AND GOVERNANCE (Oxford Forthcoming 2024)

*National Securities Implications in M&A* (with Cathy Hwang) in JEFFREY N. GORDON & WOLF-GEORG RINGE (EDS.), THE OXFORD HANDBOOK OF CORPORATE LAW AND GOVERNANCE (Oxford Forthcoming 2024)

*The Rise and Fall of Delaware's Takeover Standards* (with Randall Thomas) in STEVEN DAVIDOFF SOLOMON & RANDALL THOMAS (EDS.), THE CORPORATE CONTRACT IN CHANGING TIMES: IS THE LAW KEEPING UP? (Univ. Chicago 2019)

*What Do We Know About Law Firm Quality in M&A Litigation?* (with Randall Thomas) in JESSICA ERICKSON, ET AL. (EDS.), RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION (Elgar 2018)

*Mergers & Acquisitions: A Cyclical and Legal Phenomenon* (with B. Quinn and C. Hill) in CLAIRE HILL & STEVEN DAVIDOFF SOLOMON (EDS.), RESEARCH HANDBOOK ON THE ECONOMICS OF CORPORATION LAW (Elgar 2016)

*Takeover Theory and the Law and Economics Movement,* in CLAIRE HILL & BRETT MCDONNELL (EDS.), RESEARCH HANDBOOK ON THE ECONOMICS OF CORPORATION LAW (Elgar Press 2012)

*The Private Equity Contract,* in DOUGLAS CUMMING (ED.), THE OXFORD HANDBOOK OF PRIVATE EQUITY (Oxford University Press 2012)

*Fairness Opinions in Mergers and Acquisitions,* in H. KENT BAKER (ED.), THE ART OF CAPITAL RESTRUCTURING (John Wiley & Sons 2011) (with Anil K. Makhija and Rajesh P. Narayanan)

*Fairness Opinions: Thoughts, Perspectives and Legal Doctrine,* in WOLFGANG ESSLER & SEBASTIAN LOBE (EDS.), FAIRNESS OPINIONS (2008)

### Working Articles

*As California goes, so goes the nation? Gender quotas and the legislation of non-economic values* (with Felix von Meyerinck, Alexandra Niessen-Ruenzi and Markus Schmid), revise and resubmit *Journal of Accounting and Economics*

### Peer Reviewed Articles

*Universal Demand Laws Did Not Increase Management Entrenchment,* CRITICAL FINANCE REVIEW (forthcoming 2024) (with Byung Hyun Ahn and Panos Patatoukas),

*Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions,* 68(3) JOURNAL OF LAW AND ECONOMICS (2023) (with Adam Badawi and Matt Cain) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*Representations and Warranties Insurance in Mergers and Acquisitions,* REVIEW OF ACCOUNTING STUDIES (Sept. 2022) (with Omri Even-Tov & James Ryans)

*Placement Agents and Private Equity: Information Production or Influence Peddling?,* 55(4) J. FIN. & QUANT. ANAL. 1095 (2020) (with Matt Cain and Stephen McKeon)

*An Empirical Study of Special Litigation Committees,* 60 J. CORP. FIN. 101543 (2020) (with CV Krishnan and Randall Thomas)

*The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers,* 74 THE BUSINESS LAWYER 967 (2019) (with Robert Bartlett, Matt Cain, and Jill Fisch)

*What Happened in 1998? The Demise of the Small IPO and the Investing Preferences of Mutual Funds,* 47 J. CORP. FIN. 151 (2017) (with Robert Bartlett and Paul Rose)

*Top Defense Counsel in Mergers & Acquisitions,* 45 J. CORP. FIN. 480 (2017) (with CV Krishnan and Randall Thomas)

*Do Takeover Laws Matter? Evidence from 50 Years of Hostile Takeovers,* 124(3) J. FIN. ECON. 464 (2017) (with Matt Cain and Stephen McKeon)

*Who are the Top Law Firms? Assessing the Value of Plaintiffs' Law Firms in Merger Litigation,* 18(1) AM. LAW AND ECON. REV. 122 (2016) (with Randall Thomas and CNV Krishnan)

*Delaware's Competitive Reach,* 9(1) JOURNAL EMP. LEG. STUD. 92 (2012) (with Matt Cain) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

### Law Review Articles

*Do Social Movements Spur Corporate Change? The Rise of "MeToo Termination Rights" in CEO Contracts,* 98 INDIANA L. J 125 (2022) (with Rachel S. Arnow-Richman and James Hicks)

*The Future or Fancy? An Empirical Study of Public Benefit Corporations,* 11 HARV. BUS L. REV. 114 (2021) (with Michael B. Dorff and James Hicks)

*Does Revlon Matter? An Empirical and Theoretical Analysis,* 108 CALIFORNIA L. REV. 1683 (2020) (with Matt D. Cain, Sean Griffith and Robert Jackson, Jr.) (winner of the John L. Weinberg/IRRCI

Research Award Competition) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*The New Titans of Wall Street: A Theoretical Framework for Passive Investors*, 168 U. PENN. L. REV. 17 (2019) (with Jill Fisch & Assaf Hamdani) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*Is Say on Pay All About Pay? The Impact of Firm Performance*, 8 HARV. BUS. L. REV. 101 (2018) (with Jill Fisch and Darius Palia)

*Settling the Staggered Board Debate*, 166 U. PENN. L. REV. 1475 (2018) (with Yakov Amihud & Markus Schmid) reprinted in 30 J. APP. CORP. FIN. 61 (2018) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*Transactional Administration*, 106 GEORGETOWN L. REV. 1097 (2018) (with David Zaring)

*The Shifting Tides of Merger Litigation*, 71 VAND. L. REV. 603 (2018) (with Matt Cain, Jill Fisch and Randall Thomas)

*How Corporate Governance is Made:  The Case of the Golden Leash*, 164 U. PENN. L. REV. 649 (2016) (with Matt Cain, Jill Fisch and Sean Griffith) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*The Disappearing IPO and the Lifecycle of Small Firms*, 6 HARV. BUS. L. REV. 83 (2016) (with Paul Rose)

*Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 TEX. L. REV.557 (2015) (with Sean Griffith and Jill Fisch) (selected for reprint in 57 Corp. Practice Comm. 493 (2015)) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*A Great Game: The Dynamics of State Competition and Litigation*, 100 IOWA L. REV. 165 (2015) (with Matt Cain) (Selected as one of the year's top 10 corporate and securities articles in the annual poll of corporate law professors)

*After the Deal: Fannie, Freddie and the Financial Crisis*, 95 BOSTON U. L. REV. 371 (2015) (with David Zaring)

*Broken Promises: Private Equity Bid Failures and the Limits of Contract*, 40 J. CORP. LAW 565 (2015) (with Matt Cain and Antonio Macias) (selected as best paper from over 80 submissions at the George Washington C-LEAF Business and Financial Law Junior Faculty Workshop; selected to be presented at American Finance Association 2012 meeting)

*Do Outside Directors Face Labor Market Consequences?  A Natural Experiment from the Financial Crisis*, 4 HARV. BUS. L. REV. 53 (2014) (with Andrew Lund and Robert Schonlau)

*Computerization and the ABACUS: Reputation, Trust, and Fiduciary Duties in Investment Banking*, 37(3) J. CORP. LAW 101 (2012) (with Alan D. Morrison and William J. Wilhelm)

*Form Over Substance? Management Buy-Outs and the Value of Corporate Process*, 36 DEL. J. CORP. L. 849 (2011) (with Matt Cain) (Symposium organized around article) (selected for reprint in 54 Corp. Practice Comm. 793 (2012-13))

*Regulation by Deal: The Government's Response to the Financial Crisis*, 61 ADMIN. L. REV. 463 (2009) (with David Zaring)

*The Failure of Private Equity*, 82 S. CAL. L. REV. 481 (2009)

*Regulating Listings in a Global Market*, 86 N.C. L. REV. 101 (2007) (selected for reprint in 50 Corp. Practice Comm. 959 (2009))

*Black Market Capital*, 2008 COLUM. BUS. L. REV. 172

*The SEC and the Failure of Federal Takeover Regulation*, 34 FLA. ST. U. L. REV. 211 (2007)

*Fairness Opinions*, 55 AM. U.L.REV. 1557 (2006) (cited in HA Liquidating Trust v. Credit Suisse Securities LLC, -- F.3d. -- (7ᵗʰ Cir. 2008) (Easterbrook, J.))

*Getting U.S. Security Holders to the Party:  The SEC's Cross-Border Release Five Years On*, 12 U. PENN J. INT'L ECON. L. 455 (2005) (with Brett Carron)

### Symposium Articles (Includes Full Length Law Review Articles Placed as Symposium Pieces)

*Extending Dual Class Stock: A Proposal* (forthcoming THEORETICAL INQUIRIES IN LAW) (with David J. Berger and Jill Fisch)

*Synthetic Governance* (forthcoming COLUM. BUS. L. REV.) (with Jill Fisch, Panos N. Patatoukas and Byung Hyun Ahn)

*Should Corporations Have a Purpose?*, 99 TEX. L. REV 1311 (2021) (with Jill Fisch)

*Centros, California's "Women on Boards" Statute and the Scope of the Internal Affairs Doctrine*, 20 EUR. BUS. ORG. L. REV. 493 (2020) (with Jill Fisch)

*Mootness Fees*, 72 VAND. L. REV. 1777 (2019) (with Matt Cain Jill Fisch, Randall Thomas)

*The Problem of Sunsets*, 99 B.U. LAW REV. 1057 (2019) (with Jill Fisch)

*Lock-up Creep*, 38 J. CORP. L.  681 (2013) (with Christina Sautter)

*Limits of Disclosure*, 36 SEATTLE U. L. REV. 599 (2013) (with Claire Hill)

*Airgas and the Value of Strategic Decision-Making*, 2012 COLUM. BUS. L. REV. 502

*Uncomfortable Embrace: Federal Corporate Ownership Amidst the Financial Crisis*, 95 MINN. L. REV. 1733 (2011)

*Rhetoric and Reality: A Historical Perspective on the SEC's Regulation of Foreign Private Issuers*, 79 CINC. L. REV. 619 (2010)

*Paradigm Shift:  Securities Regulation in the New Millennium*, 2 BROOK. J. CORP. FIN. & COM. L. 340 (2008) (included as a paper presented at the AALS annual meeting of the securities regulation section and selected for inclusion in the Securities Law Review 2009 as one of the top papers in the field of securities regulation in 2008)

### Selected Other Writings

*On Peter Henning*, 68 WAYNE L. REV. 339 (2023)

*Is The Staggered Board Debate Really Settled?: A Coda*, 168 U. PA. L. REV. ONLINE 113 (2020), http://www.pennlawreview.com/online/168-UPa-L-Rev-Online-113.pdf (with Yakov Amihud, Markus Schmid)

*What CEOs Get Wrong About Activist Investors*, HARVARD BUSINESS REVIEW (May 2018) (with Frank Partnoy)

*Frank & Steve's Excellent Corporate Raiding Adventure*, THE ATLANTIC MONTHLY (May 2017) (with Frank Partnoy)

*Tenure Voting and the U.S. Public Company*, 72(2) THE BUSINESS LAWYER 295 (2017) (with David Berger & Aaron Benjamin)

*Yearly Takeover Litigation Reports* (2011-2015), available at http://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=576465#reg

*Section 632: An Expanded Basis of Federal Jurisdiction for National Banks*, 123 BANKING L.J. 687 (2006)

*A Comparative Study of the Jewish and the United States Constitutional Law of Capital Punishment*, 3 ILSA J. INT'L & COMP. L. 93 (Fall 1996)

## Education

**London Business School**
Masters in Finance, Sept 2005

**Columbia University School of Law**
*Juris Doctor*, May 1995, Harlan Fiske Stone Scholar

**University of Pennsylvania**
Bachelor of Arts, History, *Cum Laude* with Distinction, May 1992
Honors Thesis: *Raphael Lemkin and the Conceptual Evolution of Genocide*

## Other Work Experience

**Freshfields Bruckhaus Deringer**                                    2002-2004
Senior Associate, U.S. Corporate Group (London)

**Shearman & Sterling**
Senior Associate, Mergers and Acquisitions Department (New York/London)      1995-2002

## Testimony, Presentations, Conferences and Panels

### Testimony

*Filling Gaps and Black Holes: Restructuring the Financial Regulatory Apparatus for the Next Crisis*, Testimony before the U.S. Senate Committee on Homeland Security and Governmental Affairs, Where Were the Watchdogs? The Financial Crisis and the Breakdown of Financial Governance (January 2009)

### Presentations

*Twitter: A Case Study in Contractual Certainty*, Tel Aviv Law School Law and Economics Workshop (Feb. 2024); USC Law and Economics Workshop (Jan. 2024).

*ESG and Corporate Purpose: The Real Deal or Fraud?*, Bairadi Corporate Lecture, Wayne State Law School (Sept. 2022)

*Identifying Corporate Governance Effects: The Case of Universal Demand Laws*, ECGI & Bar Ilan University (June 2022)

*Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A*, Notre Dame Law and Economics Colloquium (Oct 2022); American Law and Economics Associations Annual Meeting (Oct 2021)

*Should Corporations Have a Purpose?*, Duke Law School Faculty Workshop (Nov. 2020); Harvard Law and Economics Workshop (Oct. 2020); Stanford Law and Economics Workshop (Oct. 2020); Duke Law and Economics Workshop (Apr. 2020)

*Does Revlon Matter*, Corporate Law Academic Workshop (Jun. 2020); Harvard Law School Law and Economics Workshop (Nov. 2019); London School of Economics (Oct. 2019); University of California, Los Angeles (Sept. 2019); National Business Law Scholars Conference (Jun. 2019); BYU Winter Deals Conference (Feb. 2019)

*As California goes, so goes the nation? Gender quotas and the legislation of non-economic values*, American Law and Economics Associations Annual Meeting (May 2019)

*The Problem of Sunsets,* U. Penn. Law and Economics Roundtable (May 2019), Boston University School of Law (Nov. 2018)

*Mootness Fees*, Institute for Law and Economic Policy, San Juan, Puerto Rico (Apr. 2019)

*The Myth of Morrison*, University of Texas, Austin School of Law (Oct. 2018)

*The New Titans of Wall Street*, Vanderbilt Law School (Jan. 2018); Boston University School of Law (Nov. 2018); Northwestern Law School (Oct. 2018); University of Wisconsin Law School (Oct. 2018); U. Penn. Law and Economics Roundtable (May 2018); NYU Law and Economics Roundtable (Apr. 2018)

*Settling the Staggered Board Debate*, Penn/NYU Conference on Law and Finance (Apr. 2018)

*An Empirical Study of Special Litigation Committees*, American Law and Economics Associations Annual Meeting (May 2018); University of California Los Angeles (Oct. 2017).

*Does the Staggered Board Affect Firm Value?*, Hebrew University, Jerusalem School of Law (May 2017); 2017 GSU CEAR-Finance Conference (May 2017)

*Top Defense Counsel in Mergers & Acquisitions*, American Law and Economics Association Annual Meeting (May 2017), Chicago Kent School of Law (2016)

*How Corporate Governance is Made:  The Case of the Golden Leash*, University of Pennsylvania School of Law, Law and Economics Roundtable (Dec. 2015); Willamette Law School (Sept. 2015); Southwestern Law School (Oct. 2015); American Law and Economics Association Annual Meeting (May 2015); Tel Aviv University School of Law, Law and Economics Workshop (Mar. 2015)

*After the Deal: Fannie, Freddie and the Financial Crisis*, University of San Diego School of Law (Nov. 2014)

*Fairness Opinions as Magic Pieces of Paper*, American Society of Appraisers-CICBV Business Valuation Conference (Oct. 2014)

*Do Takeover Laws Matter? Evidence from 45 Years of Hostile Takeovers*, University of Southern California (Sept. 2016); University of California Los Angeles (Oct. 2015); American Law and Economics Association Annual Meeting (May 2014)

*Placement Agents and Private Equity: Information Production or Influence Peddling?*, American Law and Economics Association Annual Meeting (May 2014)

*The Disappearing IPO and the Lifecycle of Small Firms*, U.C. Irvine, School of Law (Jan. 2015); Conference of Empirical Legal Studies (Nov. 2014); Fordham University Law School (Nov. 2013)

*Deficits of Disclosure*, USC Law and Economics Workshop (Nov. 2012)

*A Great Game: The Dynamics of State Competition and Litigation*, University of Pennsylvania, Institute for Law & Economics Roundtable (Apr. 2013); University of California, Berkeley School of Law (2013); Minnesota Law School (Jan. 2012); American Law and Economics Association Annual Meeting (May 2012); University of Virginia School of Law (Dec. 2011); Vanderbilt Law School (Nov. 2011)

*Broken Promises:  Private Equity Bid Failures and the Limits of Contract*, Minnesota Law School (Mar. 2012); George Washington C-LEAF Business and Financial Law Junior Faculty Workshop (Feb. 2012); Suffolk Law School (Sept 2011); Midwest Corporate Legal Scholars Conference (Jun. 2011); Denver Law School (Jan. 2011); Argentum Conference, Stockholm, Sweden (Oct. 2011); Fordham Law School (Apr. 2010)

*Form Over Substance? Management Buy-Outs and the Value of Corporate Process*, Widener Law School (Apr. 2011); Conf. Emp. Legal Studies (Nov. 2010); SEALS (Aug. 2010); Midwest Corporate Law Colloquium (Jun. 2010); Delaware Bar Association CLE (May 2010)

*Delaware's Competitive Reach: An Empirical Analysis of Public Company Merger Agreements*, University of Pennsylvania Law School (Feb. 2012); Stanford Law School (Oct. 2009)

*Regulation by Deal:  The Government's Response to the Financial Crisis,* University of Pennsylvania, Institute for Law & Economics Roundtable (May 2009)

*Private Equity: Past, Present and Future*, Keynote Presentation, Private Equity M&A Section, ABA Business Section Annual Meeting in Vancouver (Apr. 2009)

*The Failure of Private Equity*, Illinois Corporate Law Colloquium, University of Illinois School of Law (Nov. 2008); Widener University School of Law, 2008 Widener Scholar in Residence in Corporate Law (Oct. 2008); The James E. Rogers College of Law at The University of Arizona (Fall 2008)

*Paradigm Shift:  Securities Regulation in the New Millennium*, AALS Annual Meeting, Securities Regulation Section (Jan. 2008)

*Regulating Listings in a Global Market*, University of Connecticut Law School Faculty Workshop (Dec. 2007)

*Black Market Capital*, Brooklyn Law School Faculty Workshop (Sept. 2007)

### Academic Conferences and Symposiums

*Extending Dual Class Shares*, Controlling Shareholders and Control-Enhancing Mechanisms, Tel Aviv Law School (Jan. 2023)

Commentator, Conference on Empirical Legal Studies, Claremont-McKenna (Nov. 2019)

Commentator, *Centros and European Company Law: Twenty Years of Living Dangerously*, 3rd Annual Oxford Business Law Blog Conference, Oxford University (Mar. 2019)

Commentator, NYU / Penn Conference on Law & Finance (Feb. 2019)

Presenter, Institutional Investor Activism in the Trump Era: Responses to a Changing Landscape, Boston University School of Law (Nov. 2018)

Co-Founder and Organizing Committee, National Business Law Scholars Conference (2008-2018)

Organizer, *Corporate Law Symposium at U.C. Berkeley* (2016 & 2018)

*IP & Dealmaking*, Art & Science of the IP Deal, University of Washington School of Law (Apr. 2017) (Keynote Speech)

*The Rise and Fall of Delaware's Takeover Standards*, Can Delaware Be Dethroned? Evaluating Delaware's Dominance of Corporate Law, UCLA Law School (Feb. 2017)

*The Dealmaking State:  Executive Power in the Trump Administration*, Financial Regulation Roundtable, George Mason Law School (Aug & Dec. 2016)

Presenter, *Fairness Opinions as Magic Pieces of Paper*, ASA-CICBV Business Valuation Conference (Nov. 2014)

Panel Participant, *Texas Tech Conference on Multi-Jurisdiction Deal Litigation* (Apr. 2014)

Panel Participant, University of Virginia Law & Business Law Review Symposium on Corporate Governance (Feb. 2014)

Presenter, *University of San Diego-Oxford Media and Markets Conference*, Proliferation of Stakeholders and Audiences (Jan. 2014)

*Does Plaintiffs' Law Firm Market Share reflect Performance?,* Corporate and Securities Litigation Workshop (Nov. 2013)

*Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform,* Corporate and Securities Litigation Workshop (Nov. 2013)

*Do Outside Directors Face Labor Market Consequences?  A Natural Experiment from the Financial Crisis,* American Law and Economics Association Annual Meeting (May 2013)

*Lock-up Creep, Ten Years After Omnicare: The Evolving Market for Deal Protection* Devices, University of Iowa College of Law (Feb. 2013)

*Deficits of Disclosure*, Berle IV, *The Future of Financial/Securities Markets*, Seattle University School of Law (Jun. 2012)

Presenter, *Airgas and the Value of Strategic Decision-Making*, The Delaware Court of Chancery: Change and Continuity, Columbia University School of Law (Nov. 2011)

Symposium Organizer, *Irreconcilable Differences: Director, Manager and Shareholder Conflicts in Takeovers*, Widener Law School (Apr. 2011).

Presenter, *The Social Dimension of Regulatory Capture*, Fordham Journal of Corporate & Financial Law Symposium, Regulatory Capture (Feb. 2010)

Presenter, *Form Over Substance? Management Buy-Outs and the Value of Corporate Process*, Yale University School of Law, Conference of Empirical Legal Studies (Nov. 2010)

Presenter, *Uncomfortable Embrace: Federal Corporate Ownership Amidst the Financial Crisis*, University of Minnesota Law School, Government Ethics & Bailouts: The Past, Present, & Future (Oct. 2010)

Presenter, *Rhetoric and Reality: A Historical Perspective on the SEC's Regulation of Foreign Private Issuers*, University of Cincinnati Law School, Globalization of Securities Regulation Symposium (Feb. 2010)

Commentator, *Conference on Executive Compensation*, Vanderbilt Law School (Feb. 2010)

Presenter, *Fear, Fraud and the Future of Financial Regulation*, New York Law School (Apr.2009)

Presenter, *Private Equity: Past, Present and Future*, The Rise (and Fall?) of the New Shareholder: Sovereign Wealth Funds, Hedge Funds, and Private Equity, Villanova University School of Law (Mar. 2009)

Moderator, *The Subprime Crisis: Going Forward,* Commentator, Containing Global Contagion and Systemic Risk, University of Connecticut School of Law (November 2008)

Panelist, *The State of the Global Mergers & Acquisitions (M&A) Marketplace*, The History and Future of U.S. and Global Takeover Regulation: The Williams Act 40 Years On, Georgetown Law School (May 2008)

Discussant, *Securities Regulation, Corporate Governance, and Corporate Finance: Global Markets, Law, and Culture*, International Conference on Law and Society in the 21st Century: Joint Annual Meetings of LSA and the Research Committee on Sociology of Law (July 25, 2007)

Moderator and Organizer, *How Much is Enough?  U.S. Securities Regulation in the Face of Global Capital Markets*, ABILA International Law Weekend 2006 (Oct 27, 2006)

Presenter, *Oh, The Places You'll Go!  European Takeover Law*, ABILA International Law Weekend 2006 (Oct 27, 2006)

### *Panels, Roundtables and Practitioner Conferences*

Panelist, AI and the Future of Corporate Governance, NYU & Wilson Sonsini (Mar. 2024)

Panelist, Tulane M&A Conference (2020-2024)

Organizer, Annual Symposium on Corporate Governance (2016-2021)

Organizer, Annual M&A and Antitrust Litigation Conference (2015-2022)

Organizer, Yearly M&A Roundtable with Kirkland & Ellis (2012-2018)

Panelist, M&A Law, Hebrew University, Jerusalem (April 2017)

Commenter, *The Eclipse of the Shareholder Paradigm*, U. Penn Law and Economics Corporate Roundtable (Apr. 2015)

Panelist, *Innovation in State Securities Regulation*, NASAA Public Policy Conference (Apr. 2015)

Panelist, Honoring Chief Justices Strine & Steele at NYU School of Law (May 2014)

Panelist, *NACD Leading Minds of Governance* (Dec. 2013)

Moderator, *Hedge Fund Activism Panel*, Second Annual DealBook Conference, (Nov. 2013)

Panelist, *Securities Litigation Update*, 2013 Ohio Securities Conference (Oct. 2013)

Panelist, *Business Litigation and the Supreme Court*, Institute for Law and Economic Policy, (Apr. 2013)

Panelist, *The JOBS Act, and the Future of Small Business Finance and the U.S. Equity Markets*, AALS (Jan. 2013)

Panelist, *Securities Litigation Update*, 2012 Ohio Securities Conference (Oct. 2012)

Panelist, *The JOBS Act*, Council of Institutional Investors Fall Conference, (Oct. 2012)

Panelist, *Good, Bad or Stupid? Debating the STOCK and JOBS Act at the National Business Law Scholars Conference*, National Business Law Scholars Conference, (Jun. 2012)

Panelist, *Selling the Deal*, Tulane 24th Corporate Law Institute (Mar. 2012)

Panelist, *The New Internationalism: Regulatory Practices and Global Private Equity Opportunities*, Columbia Business School Private Equity & Venture Capital Conference (Jan. 2010)

Panelist, *Revisiting the Conventional Wisdom of Poison Pills and other Anti-Takeover Defenses*, Forum for Institutional Investors (Oct. 2009)

Participant, *Proxy Access Roundtable, Harvard Law School*, Harvard Law School Program on Corporate Governance (Oct. 2009)

Participant, *The Research Roundtable on Corporate Governance*, Searle Center on Law, Regulation, and Economic Growth at Northwestern University School of Law (April 2009).

Panelist, *Delaware Law Developments and Issues*, 27th Annual Federal Securities Institute (Feb. 2009) (with Justice Jack B. Jacobs and Vice Chancellor Donald F. Parsons)

Panelist, *Broken Deals: Who's to Blame?*, Mergers, Acquisitions and Split-offs class, taught by Prof. Robert C. Clark and Vice Chancellor Leo E. Strine, Jr., Harvard Law School (November 2008)

## *Significant University Service*

Merit review advisory committee; strategic committee (chair); hiring committee; other committee service available upon request
Chair, U.C. Berkeley Chancellor's Committee on Jewish Life
Referee: Journal of Law, Economics & Organizations, Journal of Empirical Legal Studies, Review of Financial Studies. Confidential reviews also provided to California, Harvard, Stanford and Yale law reviews.
Area Coordinator (Corporate Governance): American Law and Economics Annual Meeting (2017, 2019).

## *PhD/JSD Committees*

Silvia R. Fregoni, J.S.D. (Member)
Kimberlyn K. George, Accounting Haas (Member)

Young S. Yoon, Accounting Haas (Member)
Stephen Walker, Accounting Haas (Member)
Ogi Radic, Sociology (Member)
Huanting Wu, J.S.D. (Chair)
Amit Elazari, J.S.D. (Chair)
Tristan Fitzgerald, Finance Haas (Member)
Margaret Fong, Accounting Haas (Member)
Lukasz Langer, Accounting Haas (Member)
Alvaro Pereira, J.S.D. (Chair)
Samuel Tan, Accounting Haas (Member), Assistant Professor, Singapore Management University
Cait Unkovic, J.S.P. Program (Chair)

***Selected Outside Service***

Member of Review Committee, The University of Auckland,
the Department of Commercial Law (2020)
Chair, Board of Directors, Israel Institute
Member, Advisory Board, Academic Engagement Network

***Bar Admissions***

New York State
U.S. District Court:  Southern District of New York