**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U.,<br><br>Plaintiffs,<br><br>- against -<br><br>ARGENTINE REPUBLIC and YPF S.A.,<br><br>Defendants. | No. 15 Civ. 2739 (LAP) |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P.,<br><br>Plaintiffs,<br><br>- against -<br><br>ARGENTINE REPUBLIC and YPF S.A.,<br><br>Defendants. | No. 16 Civ. 8569 (LAP) |

**PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION FOR INJUNCTION AND TURNOVER**

KING & SPALDING LLP

Randy M. Mastro
Reginald R. Smith
Laura Harris
Thomas C.C. Childs

CLEMENT & MURPHY, PLLC

Paul D. Clement
C. Harker Rhodes, IV

KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U.,*
*Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT ..............................................................................................................................3

    I.     NEITHER COMITY NOR ACT-OF-STATE PRINCIPLES PROHIBIT
           TURNOVER OF ARGENTINA'S YPF SHARES. ..................................................3

    II.    ARGENTINA'S YPF SHARES ARE SUBJECT TO EXECUTION
           UNDER THE FSIA. ...............................................................................................6

           A.    Argentina's Use of Its YPF Shares to Direct YPF's Substantial
                  Capital-Raising Activities in the United States Satisfies the "Used
                  For" Requirement in Section 1610(a). .........................................................6

                  1.    Only the Commercial Activity Need Occur in the United
                          States. ..................................................................................7

                  2.    Argentina Uses its YPF Shares to Direct Commercial
                          Activity in the United States. ...............................................8

            B.    Argentina's Ownership Interest in the YPF Shares Will Be "in the
                    United States" Upon Argentina's Compliance With the Turnover
                    Order. .......................................................................................................11

           C.    Argentina's Use of Its YPF Shares to Make and Break the Tender-
                    Offer Obligation Satisfies the "Claim Nexus" Requirement in
                    Section 1610(a)(2). ..................................................................................12

           D.    A Foreign State's Extraterritorial Assets Are Not Immune from
                    Execution. .................................................................................................13

    III.   ARGENTINA'S YPF SHARES ARE SUBJECT TO TURNOVER
           UNDER THE CPLR AND THE NEW YORK UCC. ...........................................15

CONCLUSION............................................................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Af-Cap Inc. v. Republic of Congo*,
   462 F.3d 417 (5th Cir. 2006) ..................................................3

*Ashmore v. CGI Grp., Inc.*,
   923 F.3d 260 (2d Cir. 2019)...................................................12

*Aurelius Cap. Partners, LP v. Republic of Argentina*,
   2010 WL 768874 (S.D.N.Y. Mar. 5, 2010) ..........................7, 9

*Aurelius Cap. Partners, LP v. Republic of Argentina*,
   584 F.3d 120 (2d Cir. 2009)....................................................9

*Bainbridge Fund Ltd. v. Republic of Argentina*,
   2023 WL 5747299 (S.D.N.Y. Sept. 6, 2023).......................8, 13

*Compañía De Inversiones Mercantiles S.A. v. Grupo Cementos De Chihuahua
   S.A.B. De C.V.*,
   58 F.4th 429 (10th Cir. 2023) ..................................................5

*Conn. Bank of Commerce v. Republic of Congo*,
   309 F.3d 240 (5th Cir. 2002) (Dennis, J., concurring in part and dissenting in
   part)........................................................................................6

*de Csepel v. Republic of Hungary*,
   27 F.4th 736 (D.C. Cir. 2022)..................................................3

*Dole Food Co. v. Patrickson*,
   538 U.S. 468 (2003).................................................................3

*EM Ltd. v. Republic of Argentina*,
   389 F. App'x 38 (2d Cir. 2010) ..............................................11

*Everard Findlay Consulting v. Suriname*,
   831 Fed. App'x 599 (2d Cir. 2020).........................................12

*Export-Import Bank of the Republic of China v. Grenada ("Ex-Im Bank")*,
   768 F.3d 75 (2d Cir. 2014)................................................7, 10

*Friedman v. Gov't of Abu Dhabi*,
   464 F. Supp. 3d 52 (D.D.C. 2020) ..........................................12

*Hartford Fire Ins. Co. v. Cal.*,
509 U.S. 764 (1993)..................................................................................................5

*Hotel 71 Mezz Lender LLC v. Falor*,
14 N.Y.3d 303 (2010) ............................................................................................15

*JP Morgan Chase Bank, N.A. v. Herman*,
168 A.3d 514 (Conn. App. Ct. 2017)......................................................................11

*JW Oilfield Equip., LLC v. Commerzbank AG*,
764 F. Supp. 2d 587 (S.D.N.Y. 2011).....................................................................5

*Koehler v. Bank of Bermuda*,
12 N.Y.3d 533 (2009) ............................................................................................15

*Kohl v. Arlen Realty, Inc.*,
465 N.Y.S.2d 681 (Sup. Ct. N.Y. Cnty. 1983) ......................................................19

*Levin v. Bank of N.Y.*,
2022 WL 523901 (S.D.N.Y. Feb. 21, 2022)..........................................................14

*In re Lupoli*,
714 N.Y.S.2d 497 (2d Dep't 2000).........................................................................17

*In re Maxwell Commc'n Corp.*,
93 F.3d 1036 (2d Cir. 1996).....................................................................................5

*Motorola Credit Corp. v. Uzan*,
388 F.3d 39 (2d Cir. 2004).......................................................................................4

*NML Cap., Ltd. v. Republic of Argentina*,
2015 WL 1087488 (S.D.N.Y. Mar. 12, 2015) ........................................................4

*People v. Page*,
35 N.Y.3d 199 (2020) ............................................................................................17

*Peterson v. Islamic Republic of Iran*,
876 F.3d 63 (2d Cir. 2017), *vacated on other grounds*, *Clearstream Banking
S.A. v. Peterson*, 140 S. Ct. 813 (2020) ...............................................................4, 8

*Republic of Argentina v. NML Cap., Ltd.*,
573 U.S. 134 (2014)...........................................................................................13, 14

*Republic of Argentina v. Weltover*,
504 U.S. 607 (1992)...............................................................................................10

iii

*Republic of Austria v. Altmann,*
    541 U.S. 677 (2004) ..................................................................................3

*Republic of Philippines v. Pimentel,*
    553 U.S. 851 (2008) ..............................................................................3, 4

*Samantar v. Yousuf,*
    560 U.S. 305 (2010) ................................................................................13

*Simon v. Republic of Hungary,*
    911 F.3d 1172 (D.C. Cir. 2018), *vacated on other grounds*, 141 S. Ct. 691
    (2021) ........................................................................................................3

*Matter of Supreme Merch. Co. v. Chem. Bank,*
    70 N.Y.2d 344 (1987) .............................................................................18

*Sweeney, Cohn, Stahl & Vaccaro v. Kane,*
    822 N.Y.S.2d 632 (2d Dep't 2006) ..........................................................1

*Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic*
    *Republic,*
    2013 WL 1703873 (S.D.N.Y. Apr. 19, 2013) .........................................7

*Turkiye Halk Bankasi A.S. v. United States,*
    598 U.S. 264 (2023) ...........................................................................13, 14

**Statutes**

28 U.S.C. § 1605(a)(2) ......................................................................................10

28 U.S.C. § 1610(a)(2) ......................................................................................12

28 U.S.C. § 1610(g) ..........................................................................................14

UCC § 8-110(a)(5) ............................................................................................17

UCC § 8-112 ...............................................................................................16, 17

UCC § 8-112(e) .................................................................................11, 12, 16, 17

**Other Authorities**

CPLR § 5201 .....................................................................................................18

CPLR § 5201(b) ................................................................................................15

CPLR § 5201(c) ................................................................................................17

CPLR § 5201(c)(4) ...............................................................................................16

CPLR § 5225 .........................................................................................................15

CPLR § 5225(c) ...............................................................................................11, 12

FRCP 69(a)(1) .......................................................................................................18

## PRELIMINARY STATEMENT

Argentina yet again seeks to shirk its legal obligations. This time, it attempts to convert its $16.1 billion debt under this Court's judgment into a "right without a remedy" by claiming that principles of comity and impossibly narrow readings of the FSIA and the CPLR foreclose meaningful relief. But nothing in principles of comity (or the act-of-state doctrine) allows a sovereign to simply declare shares used for commercial activity in the United States inalienable or off-limits. Nor does the FSIA or the CPLR deny a remedy for Argentina's egregious breach. And to the extent Argentina complains that this execution effort is proceeding while its appeal is pending, it has no one to blame but itself. Rather than accept the reasonable conditions for a stay suggested by this Court, Argentina decided to leave this Court's judgment unstayed and subject to execution. Having made that tactical choice, Argentina's effort to convert this Court's judgment into a right without a remedy should be squarely rejected. Argentina's YPF shares are no more immune from execution than Argentina was free to disregard its clear contractual promises with impunity.

Despite Argentina's strained arguments to the contrary, applying the FSIA and CPLR as they are written involves no affront to Argentine sovereignty. Plaintiffs' motion fully accepts that Argentina lawfully expropriated 51% of YPF; that is why the shares are Argentina's property today and can be turned over to satisfy its debts. If Argentina, as sovereign, decides that it prefers to retain the YPF shares and satisfy the judgment using other assets, that is its prerogative.[1] But it does not have the option to simply ignore this Court's unstayed judgment. To the extent Plaintiffs' requested relief prompts Argentina to negotiate an alternative resolution and retain the shares, that

---

[1] *See Sweeney, Cohn, Stahl & Vaccaro v. Kane*, 822 N.Y.S.2d 632, 633-34 (2d Dep't 2006) (judgment-debtor can redeem its property by paying judgment before property is sold to satisfy judgment).

will be a significant improvement over the status quo, in which Argentina has steadfastly refused to commit to compliance with this Court's judgment despite making a tactical decision to leave the judgment unstayed.

Nor is there anything in Argentine law or comity principles that prevents this Court from ordering the turnover of Argentina's YPF shares to satisfy the judgment. The congressional-approval requirement Argentina invokes applies only to *voluntary* share transfers (an effort to prevent the Argentine Executive from unilaterally reprivatizing YPF); it does not apply to a court-ordered transfer to remedy Argentina's breach of its contractual obligations. In all events, foreign governments cannot simply override the exceptions to the FSIA by declaring certain assets off-limits absent legislative approval.

When Argentina finally addresses the applicable law, it asks the Court to rewrite it. Argentina mischaracterizes the operative FSIA language, "used for a commercial activity in the United States," by arguing that: (i) the property must be "used **in**" a commercial activity; (ii) this use must occur in the United States; and (iii) the commercial activity must be carried out by the foreign state itself. The plain language of Section 1610(a) says otherwise: (i) Argentina's YPF shares must be "used for" (not "used in") a commercial activity; (ii) the commercial activity (not the use) must occur in the United States; and (iii) the commercial activity may be carried out by YPF, so long as Argentina uses its shares to direct or otherwise bring about that activity. Argentina's other arguments under the FSIA and the CPLR are equally meritless, and provide no persuasive reason to prevent Plaintiffs from taking this preliminary step toward finally obtaining the amounts that Argentina has now owed them for more than a decade. This Court should grant the motion.

## <u>ARGUMENT</u>

I.   **NEITHER COMITY NOR ACT-OF-STATE PRINCIPLES PROHIBIT TURNOVER OF ARGENTINA'S YPF SHARES.**

The FSIA "provides the sole, comprehensive scheme for enforcing judgments against foreign sovereigns in civil litigation," *Af-Cap Inc. v. Republic of Congo*, 462 F.3d 417, 428 (5th Cir. 2006), and it reflects Congress's understanding and resolution of comity principles, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 479 (2003). Argentina's claim that this Court "has no power" to grant turnover here notwithstanding the FSIA because it would purportedly violate international comity and Argentine law, Opp'n at 1-2, 7-9 (ECF 577), is wrong for several reasons.

<u>First</u>, there is no international comity issue for this Court to resolve. Congress already fully evaluated applicable comity principles in the FSIA, which provides a "comprehensive framework for resolving any claim of sovereign immunity." *Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004); *accord Dole Food*, 538 U.S. at 479 (the FSIA already grants immunity to foreign states and their property "as a gesture of comity"). Nothing in the FSIA turns on whether a foreign sovereign has enacted laws that purport to render property inalienable or otherwise protect its own assets from execution. That is for good reason: If comity could supersede the FSIA and allow foreign law to control which sovereign assets are subject to execution, every foreign state could render itself judgment-proof in United States courts just by passing a law requiring its own approval for any transfer of its property. *See Simon v. Republic of Hungary*, 911 F.3d 1172, 1180 (D.C. Cir. 2018) (rejecting Hungary's comity-based argument that "would in actuality amount to a judicial grant of immunity"), *vacated on other grounds*, 141 S. Ct. 691 (2021); *de Csepel v. Republic of Hungary*, 27 F.4th 736, 753 (D.C. Cir. 2022) (reaffirming *Simon*'s rejection of Hungary's comity-based argument on same ground).

The two cases Argentina cites are not to the contrary. *Pimentel* had nothing to do with the

3

enforcement of a judgment against a foreign state. The case was about the dismissal of an interpleader action on the ground that the Philippines and its commission—which both claimed an interest in the property—were required parties but could not be joined because they were immune from jurisdiction *under the FSIA*. *Republic of Philippines v. Pimentel*, 553 U.S. 851, 865-69 (2008). And *Peterson* involved enforcement efforts against a third-party garnishee, not a direct enforcement action against a foreign sovereign. *Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 86 (2d Cir. 2017), *vacated on other grounds*, *Clearstream Banking S.A. v. Peterson*, 140 S. Ct. 813 (2020). Although the third-party may have had legitimate comity concerns that were not fully resolved by the FSIA, *see id.* at 94 & n.23, Iran—the sovereign defendant—did not.

Second, even if international comity had any role to play here (which it does not), that principle is a two-way street. Argentina cannot demand that this Court extend comity to Argentine law while at the same time refusing to make any effort to honor this Court's unstayed judgment. *See NML Cap., Ltd. v. Republic of Argentina*, 2015 WL 1087488, at *7 (S.D.N.Y. Mar. 12, 2015) ("[I]f Citibank's predicament is a matter of comity, it is only because the Republic has refused to observe the judgments of the court to whose jurisdiction it acceded. Comity does not suggest abrogating those judgments, or creating exceptions to the Injunction designed to enforce them."); *see also, e.g.*, *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (declining to grant comity to Turkish injunction prohibiting turnover of shares because "orders of foreign courts are not entitled to comity if the litigants who procure them have deliberately courted legal impediments to the enforcement of a federal court's orders") (internal quotation marks and citations omitted).

Third, Argentina's comity argument rests on a false premise, as Argentina (once again) distorts Argentine law. There is no "true conflict" between Plaintiffs' requested Turnover Order

4

and Argentine law. *See In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1049 (2d Cir. 1996) ("International comity comes into play only when there is a 'true conflict' between American law and that of a foreign jurisdiction."); *Compañía De Inversiones Mercantiles S.A. v. Grupo Cementos De Chihuahua S.A.B. De C.V.*, 58 F.4th 429, 473-75 (10th Cir. 2023) (ordering turnover of shares because there was no "true conflict" between turnover order and Mexican law). A "true conflict" exists only if it would be "impossible" for a party to comply with the laws of both countries. *Hartford Fire Ins. Co. v. Cal.*, 509 U.S. 764, 799 (1993). Here, as explained by Professor Alberto Bianchi, Article 10 of the Expropriation Law does not prevent Argentina from complying with the Turnover Order for two independent reasons: (i) Article 10 governs the allocation of power between Argentina's legislative and executive branches, and does not restrict the power of an Argentine court (much less a U.S. court) to order Argentina to transfer its YPF shares; and (ii) in any event, there is no legal obstacle preventing the National Congress from approving the transfer of the shares. *See* Declaration of Alberto B. Bianchi (May 30, 2024) ("Bianchi Decl.") ¶¶ 3-7, 16-25. And, of course, Argentina could always avoid the burden of transferring its shares by simply paying its debts or negotiating a resolution with Plaintiffs, using any other assets it chooses.

Fourth, even if there were a true conflict between the Turnover Order and Argentine law and even if courts were free to engage in a *de novo* comity analysis independent of the FSIA, comity considerations would still counsel in favor of the Turnover Order. The United States has a strong interest in enforcing its judgments, and that interest outweighs any putative Argentine interest in avoiding execution on assets that are fully subject to execution under the FSIA. *See JW Oilfield Equip., LLC v. Commerzbank AG*, 764 F. Supp. 2d 587, 596-98 (S.D.N.Y. 2011) (requiring German bank to turn over funds in judgment-debtor's account in violation of German law, based on U.S.'s "strong interest in enforcing its judgments").

Finally, Argentina's argument that Plaintiffs' requested Turnover Order would violate the act-of-state doctrine because it "would do nothing less than reverse" the Republic's valid sovereign act of expropriation, Opp'n at 2, 9-10, is entirely misplaced. As this Court has already held, Argentina breached its contractual undertakings independent of the expropriation, resulting in this Court's unstayed judgment. Far from taking issue with the expropriation, the Turnover Order acknowledges that because of the expropriation, Argentina is the legal owner of the YPF shares. It is precisely *because* Argentina is the valid owner of those shares that they are an asset subject to execution to satisfy its debt. Like this Court's underlying judgment, nothing in the Turnover Order casts any doubt on the validity of Argentina's sovereign act of expropriation; instead, the order simply holds Argentina to the consequences of breaching its separate contractual obligations.

## II.   ARGENTINA'S YPF SHARES ARE SUBJECT TO EXECUTION UNDER THE FSIA.

### A.   Argentina's Use of Its YPF Shares to Direct YPF's Substantial Capital-Raising Activities in the United States Satisfies the "Used For" Requirement in Section 1610(a).

Argentina's controlling shares in YPF are "used for" a commercial activity in the United States because Argentina uses them to direct YPF's substantial capital-raising activities in this country. *See* ECF No. 556 at 14-19. Argentina claims that its YPF shares do not satisfy the "used for" requirement because (i) Argentina uses them only to vote at YPF shareholder meetings, which occur in Argentina, and (ii) YPF's commercial activities in the United States are not "attributable" to Argentina, and are not "the 'use' of its shares." Opp'n at 13-20. Those arguments ignore the plain language of Section 1610(a), which unambiguously provides that (i) the commercial *activity* (not the *use*) must occur in the United States, and (ii) Argentina's YPF shares must be "used for" (not "used in") that commercial activity, which can be an activity of YPF that Argentina uses its shares to direct. *See, e.g.*, *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 266 (5th

6

Cir. 2002) (Dennis, J., concurring in part and dissenting in part) (recognizing that "it is certainly normal usage to consider shares of stock . . . as 'used for' the commercial activity which ultimately generates production and revenue").

### 1.    Only the Commercial Activity Need Occur in the United States.

Argentina's argument that "the use" of the YPF shares themselves must "occur in the United States" (Opp'n at 14) conflicts with the plain text of Section 1610(a). To be attachable, a foreign state's property need only be "used for a commercial activity in the United States." The clause "in the United States" is part of a prepositional phrase and clearly modifies the immediately adjacent words in that phrase—"a commercial activity"— not the distant word "used." Thus, for example, shares pledged in Argentina to finance commercial activity in the United States would satisfy the exception. What matters is not where the shares were used, but where the resulting commercial activity takes place. The Second Circuit recognized as much in declining to attach funds "because they are not used by [Grenada] for *commercial activity that takes place in the United States*." (emphasis added). *Export-Import Bank of the Republic of China v. Grenada ("Ex-Im Bank")*, 768 F.3d 75, 91 (2d Cir. 2014).[2]

Argentina nevertheless contends that the "only possible reading" of Section 1610(a) is that the use must occur in the United States, because this section "creates a single exception for 'property in the United States' that is 'used for a commercial activity in the United States.'" Opp'n

---

[2]    None of the other decisions to which Argentina points had any occasion to distinguish between the "use" of the property at issue and the "commercial activity" for which it was used, because there was no allegation of any "use" *or* any "commercial activity" in the United States. *See Aurelius Cap. Partners, LP v. Republic of Argentina*, 2010 WL 768874, at *1 (S.D.N.Y. Mar. 5, 2010) (Argentina deposited securities in custodial account in Argentina); *Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic*, 2013 WL 1703873, at *7 (S.D.N.Y. Apr. 19, 2013) (Laos received funds in bank accounts outside United States).

at 14. That would require rewriting the FSIA and is the very argument that the Second Circuit rejected in *Peterson*, where it concluded that whether an asset was "used for a commercial activity in the United States" is "independent of whether the asset comes to be located 'in the United States.'" *Peterson*, 876 F.3d at 95. While *Peterson* was vacated on other grounds, its analysis on that point remains correct—which is why this Court has likewise recognized that sovereign assets are not immune from turnover solely by virtue of being outside the United States. *Bainbridge Fund Ltd. v. Republic of Argentina*, 2023 WL 5747299, at *3 (S.D.N.Y. Sept. 6, 2023).

### 2. Argentina Uses its YPF Shares to Direct Commercial Activity in the United States.

Argentina cannot argue that YPF does not conduct commercial activity in the United States. Nor can it maintain that Argentina does not "use" its YPF shares when it appoints the majority of the members of YPF's Board of Directors and exercises control over YPF's major corporate actions.[3] Instead, Argentina suggests that the only way YPF's actions can be relevant to the analysis is if YPF is Argentina's alter-ego, devoting two pages of its opposition to a discussion of corporate separateness (Opp'n at 17-18). But whether Argentina's YPF shares are attachable does not turn on whether YPF's commercial activity can be imputed to Argentina. Rather, Argentina's YPF shares are subject to execution under Section 1610(a) because Argentina uses the shares (its property) to *direct* substantial commercial activity in the United States. *See* ECF 556 at 15-19. Section 1610(a) does not require that resulting commercial activity to be Argentina's own

---

[3]     Argentina's argument that its "votes [at YPF shareholder meetings] do not 'direct or run' YPF's activities anywhere," Opp'n at 19, does not pass the straight-face test. As YPF's controlling shareholder, Argentina unquestionably directs YPF's major corporate actions, including its capital-raising activities in the United States. *See* Expert Report of Dr. Alfredo Rovira (May 30, 2024) ¶¶ 2-28; Fifth Expert Report of John C. Coffee, Jr. (May 30, 2024) ¶¶ 5-19; Fourth Expert Report of John C. Coffee, Jr. (Mar. 27, 2024) (ECF 557) ¶¶ 6-31. *See also* Second Expert Report of Nancy C. Lissemore (Mar. 27, 2024) (ECF 558) ¶¶ 21-34.

activity.

Argentina's reliance on *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 131 (2d Cir. 2009), is thus misplaced. *See* Opp'n at 17 (quoting Second Circuit's holding that "[t]he commercial activities of the private corporations who managed these assets are irrelevant"). *Aurelius* had no occasion to distinguish between the party "using" the property and the party engaged in the resulting "commercial activity," because Argentina did not even own (much less use) the assets at issue; they were owned and managed by private corporations. *See id.* at 130-31. And Argentina's attempt to distinguish *Crystallex* because the decision purportedly "rested on the Third Circuit's affirmation that the PDVSA was Venezuela's alter ego under *Bancec*," Opp'n at 19, misses the mark because that alter ego determination had nothing to do with the district court's determination that PDVSA used its shares in PDVH (a separate entity whose veil was not pierced) for a commercial activity in the United States by (*inter alia*) "directing" the activities of PDVH and Citgo in this country, and thus PDVH shares were subject to execution under §1610(a). *Crystallex*, 333 F. Supp. 3d at 419-20.

Argentina next suggests that the test is not whether property was "used for" commercial activity in the United States, but whether it was "used in" commercial activity in the United States. *See* Opp'n at 17 (contending that "YPF's claimed commercial activities in the United States . . . are [not] the 'use' of [Argentina's] shares"). But prepositions are not fungible; while Argentina's preferred preposition ("in") connotes that the "use" and the "commercial activity" must be inextricably intertwined, the preposition Congress actually used ("for") is "used as a function word to indicate purpose." *for*, Merriam-Webster Dictionary, https://tinyurl.com/2s4j6u2p (last visited May 30, 2024). Section 1610(a) thus requires consideration of the purpose for which an asset is

used.[4] Because Argentina uses its YPF shares to direct (*i.e.*, for the purpose of directing) YPF's extensive capital-raising activities in the United States, it is using those shares *for* a commercial activity in the United States. *See Crystallex*, 333 F. Supp. 3d at 417-20 (holding that PDVSA's shares in PDVH "are used for a commercial purpose" because PDVSA (*inter alia*) "direct[s] PDVH (and its subsidiaries) to enter into related-party transactions for PDVSA's benefit"); *cf. Ex-Im Bank*, 768 F.3d at 91 (finding funds not "used for" a commercial activity in the United States because they were "*devoted to* 'carrying out public functions in Grenada'" (emphasis added)).

Undeterred, Argentina ignores the plain text of the statute and throws out another unprecedented theory: that the "commercial activity" under Section 1610(a) must be *carried out by the foreign state*. *See* Opp'n at 17. That is not what the FSIA says, and no case has adopted any such extratextual limitation on the FSIA's reach. Congress clearly knew how to impose that limit if it wanted to; for instance, the first prong of Section 1605(a)(2) provides for jurisdiction over any case "in which the action is based upon a commercial activity *carried on in the United States by the foreign state*." 28 U.S.C. §1605(a)(2) (emphasis added). Congress chose not to impose any similar limit under Section 1610(a), and instead focused on use by the sovereign (without regard where the use occurs) for the purpose of bringing about commercial activity in the United States (without regard to whether that commercial activity was undertaken by the sovereign or another). That plain text may leave some rights without a remedy, but it plainly allows a turnover remedy here.

---

[4]     By contrast, whether an act qualifies as "commercial activity" under Section 1603(d) depends only on the "nature" of the activity, not its "purpose." *See Republic of Argentina v. Weltover*, 504 U.S. 607, 615 (1992).

**B.     Argentina's Ownership Interest in the YPF Shares Will Be "in the United States" Upon Argentina's Compliance With the Turnover Order.**

Argentina claims (at 11-12) that even if it complied with the Turnover Order, "the YPF Shares themselves would never leave Argentina," because they exist only in book-entry form on a register maintained by Caja de Valores, S.A. in Argentina. That argument is a red herring. The first part of Plaintiffs' requested Turnover Order requires Argentina to transfer the shares to a global custody account at BNYM in New York. *See* ECF 556 at 14, 25. After completing that transfer, Argentina's ownership interest in the shares (referred to as "security entitlements" in the UCC) will have a New York situs. *See EM Ltd. v. Republic of Argentina*, 389 F. App'x 38, 43-44 (2d Cir. 2010) (holding that Argentina's beneficial interests in trust had New York situs and were attachable under FSIA, even though corpus of trust consisted of American Depository Shares that represented interests in shares of Argentine corporation); *JP Morgan Chase Bank, N.A. v. Herman*, 168 A.3d 514, 521-22 (Conn. App. Ct. 2017) (affirming order requiring turnover of security entitlements that had Connecticut situs, even though share certificates were held by securities depository in New York). Argentina's ownership interest in its YPF shares will thus qualify as property "in the United States."

Argentina asserts that there is "no evidence that such an account could be created by BNYM, which presumably would have to satisfy its own due diligence before doing so." Opp'n at 12. But Plaintiffs have presented evidence that BNYM provides global custody services to its customers (*see* ECF 559-16), and BNYM already has a relationship with both Argentina and YPF; Plaintiffs suggested BNYM precisely because BNYM has already done diligence on both Argentina and YPF. Argentina cannot reasonably dispute that CPLR § 5225(c) and New York UCC § 8-112(e) authorize this Court to order Argentina to execute whatever documents are

11

required to open a global custody account at BNYM and to transfer its YPF shares into that account.[5]

### C.   Argentina's Use of Its YPF Shares to Make and Break the Tender-Offer Obligation Satisfies the "Claim Nexus" Requirement in Section 1610(a)(2).

Argentina also used its YPF shares "for the commercial activity upon which the claim is based," 28 U.S.C. § 1610(a)(2), as it used those shares to (i) form the tender-offer obligation on which Plaintiffs' claims are based (by voting the shares to amend YPF's Bylaws) and (ii) breach that obligation (including by ensuring that the tender-offer obligation would never be enforced). *See* ECF 556 at 19-21. Argentina is flat wrong to claim Plaintiffs are judicially estopped from invoking that commercial activity, as Plaintiffs have never argued (and no court has ever held) that Argentina did not use its YPF shares for the breach. *See Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 272 (2d Cir. 2019) (judicial estoppel applies only if "(1) a party's later position is clearly inconsistent with its earlier position, and (2) the party's former position has been adopted in some way by the court in an earlier proceeding"). Plaintiffs have never challenged Argentina's acquisition of its YPF shares, and how Argentina acquired those shares (i.e., via expropriation or otherwise), has no bearing on how Argentina *used* those shares, once acquired (i.e., to breach its obligations under the Bylaws).

Argentina contends that the formation of the tender-offer obligation is "irrelevant" because it is not part of the "gravamen" of Plaintiffs' claim. Opp'n at 22. Not so. *See Friedman v. Gov't of Abu Dhabi*, 464 F. Supp. 3d 52, 68 (D.D.C. 2020) (recognizing that "formation plus breach" of a contractual obligation may be the "gravamen" of a breach of contract claim); *Everard Findlay*

---

[5]      *See* CPLR § 5225(c) (authorizing court to "order any person to execute and deliver any document necessary to effect payment or delivery"); New York UCC § 8-112(e) (authorizing court to assist creditor, "by injunction or otherwise," in reaching debtor's interest in shares).

*Consulting v. Suriname*, 831 Fed. App'x 599, 602 (2d Cir. 2020) (considering the foreign sovereign's "predicate course of commercial activity as a whole," including whether the contract was formed in the United States). Argentina is likewise wrong to contend that it did not use its Class D shares for the formation of the tender-offer obligation because they did not exist when the Bylaws were amended. Opp'n at 23. Argentina owned 100% of YPF's shares at that time, including the shares that shortly thereafter were converted into the Class D shares at issue in this motion. *See* ECF 556 at 20 n.12. In any event, whatever is true of its formation, Argentina does not contest that its breach of its tender-offer obligation was indisputably part of the gravamen of Plaintiffs' claims, nor does Argentina contest that, as a factual matter, it used its shares to effectuate that breach.

### D.    A Foreign State's Extraterritorial Assets Are Not Immune from Execution.

Effectively converting its opposition into an improper collateral attack on this Court's decision in *Bainbridge,* Argentina seeks to relitigate whether its extraterritorial assets are immune from execution under federal law. Opp'n at 26-30. That argument goes nowhere. *Bainbridge* was correctly decided, and the Supreme Court's unequivocal statement that "any sort of immunity defense made by a foreign sovereign in an American court must stand on the [FSIA]'s text" or else "must fall," *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141-42 (2014), forecloses Argentina's attempt to invoke pre-FSIA common law immunity to evade execution.

Argentina's reliance on *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264 (2023), and *Samantar v. Yousuf*, 560 U.S. 305 (2010), is misplaced. Those cases held that the FSIA is inapplicable, and thus cannot displace preexisting common law, in the "discrete" and wholly inapposite contexts of criminal actions and suits against state officials. *Turkiye Halk Bankasi*, 598 U.S. at 267, 275; *Samantar*, 560 U.S. at 308. Neither case remotely suggests that pre-FSIA

13

common law immunity survives in contexts that the FSIA squarely addresses, such as execution on sovereign assets. That is why, four years *after Samantar*, the Supreme Court squarely rejected Argentina's argument in *NML Capital* that its extraterritorial assets were immune from execution under the common law. *NML Cap.*, 573 U.S. at 144 (holding that "even if Argentina were right about the scope of the common-law execution-immunity rule, then it would be obvious that the terms of § 1609 execution immunity are narrower, since the text of that provision immunizes only foreign-state property '*in the United States*'") (emphasis in original). And nothing in *Turkiye Halk Bankasi* remotely suggests that in addressing the application of common-law immunity in the criminal context, the Court meant to tacitly overrule *NML Capital* and re-open the door to common-law immunity from execution on extraterritorial assets.

*Levin v. Bank of N.Y.*, 2022 WL 523901 (S.D.N.Y. Feb. 21, 2022), which Argentina acknowledges this Court has already found unpersuasive, Opp'n at 28 n.14, is not to the contrary. *Levin* principally focused on whether a different FSIA provision, § 1610(g), and the Terrorism Risk Insurance Act ("TRIA") applied extraterritorially to allow the plaintiffs to execute on a foreign bank account. *Levin* found those provisions silent as to their extraterritorial application and thus viewed them as applying only domestically. *Id.* at *3. *Levin* had no occasion to interpret the language of § 1610(a) or circumstances in which specific assets were "used for a commercial activity in the United States." Moreover, *Levin* acknowledged that the New York Court of Appeals has definitively held that "Article 52 of CPLR did not contain a territorial limitation." *Id.* at *4. *Levin* nonetheless suggested that if New York law would permit execution against the foreign bank account, "TRIA and the FSIA would preempt this state law." That suggestion is highly dubious—the same statutory silence that denied the relevant provisions extraterritorial application should also have denied them preemptive effect—but ultimately beside the point. Unlike § 1610(g),

§ 1610(a) specifically addresses the requisite connection to the United States and allows execution of assets "used for a commercial activity in the United States." Thus, there is no conflict whatsoever between CPLR § 5225, which applies without territorial limitation, and § 1610(a), which authorizes execution against the YPF shares because they were "used for a commercial activity in the United States."

## III.  ARGENTINA'S YPF SHARES ARE SUBJECT TO TURNOVER UNDER THE CPLR AND THE NEW YORK UCC.

Argentina next erroneously suggests that Argentine law displaces the CPLR and the New York UCC. *See* Opp'n at 24-30. That contention is meritless.

Once again, Argentina invokes the purported prohibition on transfer in Article 10 of the YPF Expropriation Law, contending this time that Article 10 means that its YPF shares are not property that "could be assigned or transferred" within the meaning of CPLR § 5201(b). Opp'n at 24. But it is well settled that New York law, not foreign law, controls whether shares in a foreign corporation "could be assigned or transferred" under CPLR § 5201(b). *See, e.g.*, *245 Park Member LLC v. HNA Group (International) Co. Ltd.*, Case No 23-842-cv, Summary Order (2d Cir. Apr. 8, 2024) (New York law controls question whether membership interest in Delaware LLC is assignable and transferable); *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 314 (2010) (same). And under New York law, shares in a company—whether held in certificated or uncertificated form, or as security entitlements—are freely transferable and assignable. *See, e.g.*, *Koehler v. Bank of Bermuda*, 12 N.Y.3d 533, 541 (2009).

Regardless, even if the Court applied Argentine law to this issue, the shares are transferable for all the reasons already described. *See* Bianchi Decl. ¶¶ 3-7, 16-25; *supra* p. 5. In fact, each *Constancia de Acciones* (Proof of Shares) issued by Caja de Valores since May 21, 2014 confirms

15

that Argentina's YPF shares are fully transferable, without any restrictions. *See* Mastro Ex. 1. By contrast, each *Constancia de Acciones* issued by Caja de Valores during the period from April 6, 2012 to May 16, 2014 showed that, while Repsol owned the shares but Argentina controlled them, they were "non-transferable" ("*tenencia intransferible*"). *See* Mastro Ex. 2. In other words, although the shares may at one point have been restricted, that is no longer true today. As recently as May 2024, the Milei administration has reaffirmed its intention to reprivatize YPF, a process that would necessarily involve the transfer of Argentina's YPF shares.[6]

Oddly, Argentina asserts that it is unable to transfer the shares—suggesting that it is bound to retain them in its possession—while at the same time asserting that it does not actually have possession or custody of the shares, because they exist only in book-entry form in a register kept by Caja de Valores. *Id.* at 25. Argentina thus maintains (at 25) that the Court cannot order it to turn over its YPF shares because CPLR § 5201(c)(4) and UCC § 8-112 do "not apply to execution efforts directly against a judgment debtor." But if Argentina does not have possession or custody of the shares, the "proper garnishee" for the shares under CPLR § 5201(c)(4) and UCC § 8-112 would be either YPF or Caja de Valores. And if Argentina's interest in the shares "cannot readily be reached by other legal process," Plaintiffs would be "entitled to aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the certificated security, uncertificated security, or security entitlement." UCC § 8-112(e). Under those circumstances, the Court is authorized to issue an injunction against Argentina as judgment-debtor. *See Inter-Reg'l Fin. Grp.*, 562 F.2d at 154-55 & n.2 (affirming injunction under predecessor of § 8-112(e) requiring judgment-debtor to bring stock certificates into the state).

---

[6]     *See* Eduardo Segovia, *Milei asks Spanish businessmen to invest in Argentina and promises them "legal certainty,"* Okdiario (May 18, 2024) (Mastro Ex. 4).

Argentina's argument that UCC § 8-112 does not apply to execution efforts directly against a judgment-debtor also conflicts with the text of § 8-112(a), which provides that "[t]he interest of a debtor in a certificated security may be reached by a creditor only by actual seizure of the security certificate by the officer making the attachment or levy." This provision *requires* legal process upon the judgment-debtor if it has custody or possession of the security certificate. *See* UCC § 8-112, Official Comments, ¶ 1 (explaining that "although injunctive relief is provided in subsection (e) so that creditors may use this method to gain control of the certificated security, the security certificate itself must be reached to constitute a proper levy <u>whenever the debtor has possession</u>") (emphasis added). UCC § 8-112, including its subparagraph (e), thus plainly applies to execution directly against a judgment-debtor.[7]

Argentina once again misreads the relevant statutory provisions in arguing that UCC § 8-112(e) does not apply because § 8-110(a)(5) requires the application of Argentine law to the procedure for execution on the shares of an Argentine corporation. Opp'n at 26. Section 8-110(a)(5) provides that the "local law of the issuer's jurisdiction governs" an "adverse claim" to

---

[7]    Argentina's argument to the contrary appears to be based on the heading of CPLR § 5201(c) ("Proper Garnishee for Particular Property or Debt"). But the text of that section provides that UCC § 8-112 "shall govern the extent to which and the means by which any interest in a certificated security, uncertificated security or security entitlement . . . may be reached by garnishment, *attachment or other legal process*" (emphasis added), and it is well-settled that a heading cannot be used as an interpretive tool to alter the plain meaning of a statute. *People v. Page*, 35 N.Y.3d 199, 204 n.3 (2020) (heading "may not alter or limit the effect of unambiguous language in the body of the statute itself"). In any event, UCC § 8-112 is a specific statute addressing execution on securities, and its scope cannot be limited by the cross-reference in CPLR § 5201(c), a more general statute. *In re Lupoli*, 714 N.Y.S.2d 497, 501 (N.Y. App. Div. 2d Dep't 2000) ("In general, a specific statute that is inconsistent with a general statute should govern.").

a security. Plaintiffs do not assert an "adverse claim" to the YPF shares; on the contrary, Plaintiffs acknowledge that Argentina validly owns the shares, which is precisely why they are subject to execution (which is governed by the FSIA and New York law). *See* FRCP 69(a)(1) (New York law governs execution procedure here); *Inter-Reg'l Fin. Grp.*, 562 F.2d at 154-55 & n.2 (applying predecessor of § 8-112(e) to attachment of shares in foreign corporations).

Argentina also suggests that the Court cannot order it to transfer 49% of its YPF shares under the CPLR and the New York UCC, because the YPF Expropriation Law "designates 49% of the [shares] to Argentine Provinces that are part of OFEPHI." Opp'n at 7. Again, not so. As explained by Professor Bianchi, the provinces do not have any property interest in the shares under Argentine law. *See* Bianchi Decl. ¶¶ 12-15, 50-58. The provinces' *contingent* interest in Argentina's shares, which will ripen into an actual interest only if the Federal Government decides to transfer the shares, is not itself subject to attachment and cannot prevent transfer of Argentina's interest. *See, e.g.*, *Matter of Supreme Merch. Co. v. Chem. Bank*, 70 N.Y.2d 344, 350 (1987) (CPLR § 5201 "preclude[s] a levy against contingent obligations not certain to ripen into something real."). That is why, for instance, YPF's annual report on Form 20-F for 2023 (issued on April 25, 2024) confirms that the "Argentine National State" owns 200.6 million Class D shares of YPF (51% of the total), while the "Argentine provincial governments" own 7,624 Class B shares (which Plaintiffs do not seek to execute upon). YPF Form 20-F for 2023, at 90 (Mastro Ex. 3). And that is why each *Constancia de Acciones* (Proof of Shares) issued by Caja de Valores since May 21, 2014 confirms that the *Estado Nacional – Ministerio de Economia y Finanzas Publicas* has the sole and undivided ownership of all 200.6 million Class D shares. *See* Mastro Ex. 1.

Finally, Argentina suggests that "[t]he prudent course" is for the Court "to defer any ruling until the appeal concludes." Opp'n at 30. That takes real chutzpah. This Court gave Argentina the

option to pledge the YPF shares as security to obtain a stay of enforcement pending the appeal. Having declined that offer and having elected not to seek a stay from the Second Circuit, Argentina has no one to blame but itself for the fact that it stands in the same position vis-à-vis enforcement as it will when it has exhausted its appeals. Granting Argentina a de facto stay of execution by deferring ruling on this motion would reward Argentina's tactical judgment to leave the judgment unstayed and ready for execution. The far better course is to take action now to force Argentina to the bargaining table so that the parties can negotiate an orderly and meaningful remedy for the rights that this Court has recognized. And to the extent there is concern about Plaintiffs actually obtaining and selling the YPF shares before the resolution of the underlying appeal, that issue can be addressed in the context of stay briefing when Argentina brings its promised appeal. *See* Opp'n at 28 n.14.

## **CONCLUSION**

For these reasons, Plaintiffs respectfully request that the Court order Argentina to: (i) transfer its YPF shares to a global custody account at BNYM in New York; and (ii) instruct BNYM to transfer the shares to the U.S. Marshal for the S.D.N.Y. for sale to the public.[8]

Dated: May 30, 2024

Respectfully,

KING & SPALDING LLP

By:     */s/ Randy M. Mastro*
Randy M. Mastro
Laura Harris
Thomas C.C. Childs
1185 Avenue of the Americas
New York, NY 10036
Phone: (212) 556-2114

---

[8]     The sheriff (or U.S. Marshal) is an arm of the court and is not required to register securities with the SEC before selling them. *Kohl v. Arlen Realty, Inc.*, 465 N.Y.S.2d 681, 683 (Sup. Ct. N.Y. Cnty. 1983).

Fax: (212) 556-2222
Email: rmastro@kslaw.com
      lharris@kslaw.com
      tchilds@kslaw.com

-and-

Reginald R. Smith
1100 Louisiana Street
Houston, TX 77002
Phone: (713) 751-3200
Fax: (713) 751-3290
Email: rsmith@kslaw.com


KELLOGG, HANSEN, TODD, FIGEL
& FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
Email: mhansen@kellogghansen.com
      dho@kellogghansen.com
      agoldsmith@kellogghansen.com


CLEMENT & MURPHY, PLLC

Paul D. Clement
C. Harker Rhodes IV
706 Duke Street
Alexandria, VA 22314
Phone: (202) 742-8900
Fax: (202) 742-8895
Email: paul.clement@clementmurphy.com
      harker.rhodes@clementmurphy.com


*Counsel for Plaintiffs Petersen Energía Inversora,
S.A.U., Petersen Energía, S.A.U., Eton Park Capital
Management, L.P., Eton Park Master Fund, Ltd.,*

20

*and Eton Park Fund, L.P.*