# Exhibit A (Volume 1)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BAINBRIDGE FUND LTD,                    :
                                        :
                    Plaintiff,          :
                                        :
        v.                              :
                                        : Case No. 1:16-cv-08605-LAP
THE REPUBLIC OF ARGENTINA,              :
                                        :
                    Defendant.          :
                                        :
                                        :
                                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF ALFONSO SANTIAGO**
**ON BEHALF OF THE REPUBLIC OF ARGENTINA (THE "REPUBLIC")**

Pursuant to 28 U.S.C. § 1746 and Rule 44.1 of the Federal Rules of Civil Procedure, I, Alfonso

Santiago, state the following:

1.  I submit this expert declaration in support of the Republic's Opposition to the Motion for
    Injunction and Turnover filed by the plaintiff Bainbridge Fund Ltd. ("Plaintiff").

2.  Counsel for the Republic have asked me to review Plaintiff's Motion for Injunction and
    Turnover (the "Motion") and provide my opinion on certain issues of Argentine public law
    relevant to Plaintiff's Motion.

3.  I understand that Plaintiff seeks an order from the Court requiring that Argentina transfer its
    Class A and D shares (the "YPF Shares") to a custody account at Bank of New York Mellon
    ("BNYM") in New York and that BNYM transfer the shares to Plaintiff. In its motion, Plaintiff
    generally follows the argument advanced by the plaintiffs in *Petersen Energía Inversora,*

*S.A.U.* v. *Argentine Republic*, 15-cv-02739-LAP and *Eton Park Capital Management, L.P.* v. *Argentine Republic*, 16-cv-08569 (collectively, "*Petersen*").

4. In *Petersen*, I submitted a declaration on issues of Argentine law in support of the Republic's opposition to the plaintiffs' motion for injunction and turnover. *Petersen* ECF No. 580 (May 16, 2024) ("Santiago I"). For the convenience of the Court, I attach to this declaration the declaration I submitted in that case, together with the exhibits I submitted with that declaration (collectively, "Appendix 1"), which I incorporate and adopt for the purpose of this declaration.

5. In addition, the plaintiffs in *Petersen* have recently submitted the declaration of Dr. Alberto B. Bianchi on certain issues of Argentine law. *Petersen* ECF No. 588 (May 30, 2024) (the "Bianchi Declaration"). As the Plaintiff in this case may rely on the Bianchi Declaration, I write briefly to address two points.

I. **ARTICLE 10 OF THE YPF EXPROPRIATION LAW, WHICH MAKES THE TRANSFER OF YPF SHARES CONDITIONAL UPON CONGRESSIONAL APPROVAL, APPLIES WITH EQUAL FORCE TO THE JUDICIAL BRANCH AS WELL AS THE EXECUTIVE BRANCH.**

6. Law No. 26,741 (Exhibit A), which declared 51% of Repsol's Class "D" shares in YPF S.A. ("YPF") to be of public utility and subject to expropriation, established that the transfer of the expropriated shares is expressly limited and conditioned by the declaration of public utility of the shares. Pursuant to Article 10 of this law, "any future transfer of [the expropriated shares] is prohibited without the permission of the National Congress by a two-thirds vote of its members." In the absence of the Congressional authorization required by the aforementioned Article 10, the expropriated shares cannot be "transferred" in any way, either by the Executive or Judicial branches, without violating the constitutional legal order and the separation of powers. Any order by a judge providing for acts that would entail or lead to the transfer of the

-2-

expropriated shares would constitute a measure in violation of a public policy rule and, therefore, be illegitimate under Argentine law.

7.  This rule, like all laws, is mandatory and must be complied with by all branches of government. The argument in the Bianchi Declaration that Article 10 of Law No. 26,741 does not apply to the judiciary has no basis in Argentine law.  In our legal system, public order applies to all branches of government without exception (*Fallos*: 155:248) (Exhibit B) ("The most delicate mission of the Nation's judiciary is to know how to stay within the scope of its jurisdiction, without undermining the functions of the other branches").  The only way an Argentine judge could refuse to comply with this law, or circumvent it, would be to declare it unconstitutional for a specific case, which has not happened in this case.[1]  Apart from that circumstance, a judge cannot fail to apply the provisions of the law.

8.  Therefore, Law No. 26,741, enacted by Congress and promulgated by the Executive branch, establishes a procedure for the transfer of the Class D shares of YPF expropriated by virtue of such law that must be respected by the judiciary, and cannot be circumvented by any judge without previously, and subject to proving the existence of serious reasons that justify it, declaring the law providing for such restriction unconstitutional.  To hold otherwise would amount to disregarding the principle of separation of powers contemplated in our Constitution.

9.  Under Argentine law, a judicial court does not have the ability to modify, by means of an order to the national State, the public policy established by the National Congress, transferring the

---

[1] The Supreme Court has stated that the declaration of unconstitutionality is a remedy of last *resort*, and should be avoided whenever possible by means of an interpretation compatible with the Constitution (*Fallos*: 14:425 (Exhibit C); 147:286 (Exhibit D)). Judicial review is the most delicate function that can be entrusted to a court and should only be practiced as an unavoidable reason for the pronouncement that the case requires (*Fallos*: 335:2333) (Exhibit E). None of this is evident in this case.

Class A shares and/or the expropriated Class D shares to private entities. Any such action would, in fact, invalidate laws in force without following due legislative process and would be construed as a usurpation of the sovereign prerogatives of the Argentine legislature, unduly interfering in the internal affairs of the Republic (*Fallos*: 340:47) (Exhibit F).

10. Furthermore, such an act would contravene the fundamental principle of separation of powers established in the National Constitution (Exhibit G). No Argentine court would allow the enforcement of a judicial order to pay a sum of money to be carried out by executing State owned assets dedicated to public policies sanctioned by the National State.[2] In this context, pursuant to Article 75, paragraph 12, of the National Constitution,[3] the National Congress has the exclusive power to regulate hydrocarbons, which has been exercised through several laws on energy matters, starting with Law No. 17,319 (Hydrocarbons Law) (Exhibit J). The Argentine Executive branch has the power to set the national policy with respect to the activities related to the exploitation, industrialization, transportation and commercialization of hydrocarbons (Arts. 2 and 3 of Law No. 17,319). And the Argentine Judiciary has the function of supervising the reasonableness of these policies and verifying their conformity with the fundamental rights established in the National Constitution. This distribution of powers is

---

[2] Article 9 of Law No. 26,854 provides: "Judges may not issue any precautionary measure that affects, hinders, compromises, distracts from its purpose or in any way disturbs the State's own assets or resources, nor impose personal pecuniary burdens on public officials." (Exhibit H).

[3] At the time of the enactment of the National Constitution, hydrocarbons were included within mining matters. Therefore, when Article 75, paragraph 12 of the National Constitution establishes that Congress has the power to legislate on mining matters, it must be understood as including hydrocarbon matters. In this regard, it has been understood that "Articles 121, 126 and 75 paragraph 12 of the National Constitution make it clear that our National Constitution has granted the National Congress the *exclusive power* to enact a Mining Code that includes the regulation of certain natural resources such as mines and *oil and gas reservoirs*" (Cassagne, Juan C., *Curso de Derecho Administrativo*, 12th ed., Buenos Aires, La Ley, 2018, Volume II, p. 331) (Exhibit I) (emphasis added).

carried out through a system of checks and balances that bases the separation of powers on a dynamic balance of reciprocal controls, ensuring that no power exceeds its constitutional mandate (*Fallos*: 339:1077, recitals 26 and 29; and *Fallos*: 328:566, opinion of Justices Maqueda and Zaffaroni) (Exhibits B and C of Santiago I).

## II.   THE SHARES OF THE NATIONAL GOVERNMENT IN YPF ARE SUBJECT TO A SPECIAL REGIME, AND ARE NOT ATTACHABLE BECAUSE THEY ARE DEDICATED TO A PUBLIC INTEREST PURPOSE.

11. Articles 235 and 236 of the Argentine Civil and Commercial Code ("CCC") (Exhibit K) establish the general regime[4] applicable to property belonging to the public domain[5] and to the private domain of the State,[6] respectively.

---

[4] Balbín, Carlos F., *Tratado de Derecho Administrativo*, 2nd ed., Buenos Aires, La Ley, 2015, Volume II, p. 915 (Exhibit L).

[5] "ARTICLE 235 - Property belonging to the public domain. The following are property belonging to the public domain, except as provided by special laws: a) the territorial sea up to the distance determined by international treaties and special legislation, without prejudice to the jurisdictional power over the contiguous zone, the exclusive economic zone and the continental shelf. Territorial sea is understood to be the water, seabed and subsoil; b) inland waters, bays, gulfs, inlets, ports, anchorages and maritime beaches; maritime beaches are understood to be the portion of land that the tides bathe and vacate during the highest and lowest normal tides, and their continuation up to the corresponding distance in accordance with the special national or local legislation applicable in each case; (c) rivers, estuaries, streams and other waters flowing in natural channels, navigable lakes and lagoons, glaciers and the periglacial environment and any other water having or acquiring the capacity to satisfy uses of general interest, including groundwater, without prejudice to the regular exercise of the right of the owner of the estate to extract groundwater to the extent of his interest and subject to local provisions. A river is understood to be the water, the shores and the bed through which it flows, delimited by the riverbank line fixed by the average of the maximum ordinary floods. Lake or lagoon means the water, its beaches and bed, respectively, delimited in the same manner as rivers; (d) islands formed or to be formed in the territorial sea, the exclusive economic zone, the continental shelf, or in all kinds of rivers, estuaries, streams, or in navigable lakes or lagoons, except those belonging to private individuals; (e) the air space overlying the territory and jurisdictional waters of the Argentine Nation, in accordance with international treaties and special legislation; (f) streets, squares, roads, canals, bridges and any other public works built for common utility or comfort; g) official documents of the State; h) archeological and paleontological ruins and sites." (Exhibit K).

[6] "ARTICLE 236 - Property of the private domain of the State. The following belong to the national, provincial or municipal State, without prejudice to the provisions of special laws: a) the

12. Property in the public domain is characterized by being designated to fulfill a purpose of public interest,[7] which is the reason why the CCC itself establishes that such property "is non-transferable, unseizable and imprescriptible."[8]

13. In turn, assets of the private domain of the State are understood to be characterized by not being dedicated to satisfy needs of general interest,[9] and for being acquired by the State acting as a person subject to private law.[10]

14. The Republic acquired the ownership of the Class D shares of YPF by means of an expropriation, *i.e.*, acting in the exercise of its public power and using public (administrative) law, and not as a person acting in the private legal sphere through a private legal instrument. Accordingly, the expropriated shares of YPF cannot be considered as belonging to the private domain of the State since they are dedicated to the energy policy that satisfies a general interest.

15. Likewise, Article 7 of Law No. 26,741 expressly states that the shares are expropriated to fulfill a purpose of public interest, one of the characteristics that defines the assets of the public domain of the State.

---

real estate that lacks owner; b) the mines of gold, silver, copper, precious stones, fossil substances and all others of similar interest, as regulated by the Mining Code; c) the non-navigable lakes that lack owner; d) the movable things of unknown owner that are not abandoned, except the treasures; e) the assets acquired by the national, provincial or municipal State by any title." (Exhibit K).

[7] Balbín, *Tratado de Derecho Administrativo*, p. 909 (Exhibit L).

[8] CCC, Art. 237 (Exhibit K).

[9] Lorenzetti, Ricardo L., *Código Civil y Comercial de la Nación comentado*, 1st ed., Santa Fe, Rubinzal-Culzoni, 2014, Volume I, pp. 774-777 (Exhibit M); Balbín, *Tratado de Derecho Administrativo*, p. 911 (Exhibit L).

[10] Alterini, Jorge H., *Código Civil y Comercial comentado*. Tratado exegético, 2nd ed., Ciudad Autónoma de Buenos Aires, La Ley, 2016, Volume II, p. 55 (Exhibit N); Lorenzetti, *Código Civil y Comercial de la Nación comentado*, p. 774 (Exhibit M).

16. The similarities with those characteristics of the State's public domain assets explain why Law No. 26,741 in ordering the expropriation of the Class D shares[11] created a special regime that prohibited their transfer without the prior authorization of Congress acting with a majority of two thirds of its members. Any disposition of the expropriated shares, including their attachment for purposes of facilitating the execution of a judgment, as well as an order of a foreign court providing for their direct or indirect transfer, would be contrary to the aforementioned public policy rule. Such special law prevails over the general provisions of the CCC.

17. The link with the public purpose is also present in the case of YPF's Class A shares, which by law can only be owned by the National Government (Article 8, Law No. 24,145 (Exhibit O) and Section 6(b)(i) of YPF's Bylaws (Exhibit P)). The existence of this class of shares seeks to ensure that the national State may exercise the veto right resulting from such ownership, regardless of who the controlling shareholder of YPF is, for the purpose of supporting its public policies in hydrocarbons and energy matters.

18. In this respect, Section 24(a)(ii) of YPF's Bylaws establishes that the affirmative vote of the Class A shares shall be required to decide upon the matters listed in subsection (c) of Section 6, including:

> "(i) Determin[ing] the merger with another or other companies; (ii) Accept[ing] that the Corporation, through the acquisition of its shares by third parties, shall become subject to a takeover, whether consented or hostile, representing the holding of more than fifty percent (50 %) of the capital stock of the Corporation; (iii) Transfer[ring] to third parties all of the exploitation rights granted within the framework of Act 17,319, its supplementary and regulatory rules, and Act 24,145, for it to determine the full suspension of the exploration and exploitation activities of the Corporation; (iv) Determin[ing] the voluntary dissolution of the Corporation;

---

[11] *See* Law No. 26,741, Articles 7 and 10 (Exhibit A).

(v) Transfer[ring] the corporate or fiscal domicile of the Corporation outside the Argentine Republic]."[12]

In this sense, the Class A shares of YPF also have a special nature that distinguishes them from the private property of the State.

19. The existence of the Class A shares, with their special rights, is due to a legislative act (Law No. 24,474) on which the YPF bylaws are based. To give effect to a court order that entails the abrogation of the special regime created by an act of Congress would be contrary to the law's object and purpose. Just as an act of Congress (Law No. 24,474) was necessary at the time to allow the reduction of the equity interest represented by the Class A shares to less than 20% of the total equity in order to transfer them to the private sector, the elimination of Class A in its entirety, and therefore the extinction of the special rights associated with it, can only be the result of an intervention by Congress.[13]

20. In the decision "Vila, Alfredo Luis v. National Government" (*Fallos* 335:1822) (Exhibit R), the Supreme Court held that as long as an asset is intended for public use, it is not susceptible to be seized or disposed of (*Fallos*: 146:289 and 297 (Exhibit S); 147:154-155 and 164-165 (Exhibit T)). This reinforces the idea that, similarly, both the expropriated YPF shares and the Class A shares held by the National State are dedicated to a purpose related to the general

---

[12] Law No. 24,474, Article 1, ratifies the veto right of the Class A shares: "As long as the National State retains at least one Class "A" share, its affirmative vote shall be required to: 1. Decide to merge with one or more other companies. 2. Accept that YPF Sociedad Anónima, through the quotation of its shares in Stock Exchanges or Stock Markets, should suffer a situation of consented or hostile shareholding takeover that represents the possession of fifty-one percent (51%) of the capital stock of YPF Sociedad Anónima. [3.] To transfer to third parties all the exploitation rights granted under Law No. 17,319, its complementary and regulatory rules, and the present Law in such a way that it determines the total cessation of the exploration and exploitation activity of YPF Sociedad Anónima. 4.- The voluntary dissolution of YPF Sociedad Anónima." (Exhibit Q).

[13] Pursuant to Article 8, last paragraph, of Law No. 24,145, "The reduction of the holding of the Class 'A' shares below TWENTY PERCENT (20%) of the Capital Stock of YPF SOCIEDAD ANONIMA shall require prior approval by law." (Exhibit O).

interest, which prevents their seizure and likewise the enforceability of a court order ordering

their transfer.  To hold otherwise would represent a violation of the special regime and of the

regulations on attachment of State assets, as well as a fundamental change in the public policy

adopted by Congress in energy matters.[14]

21. To the extent that the Bianchi Declaration raised issues that I have not addressed, that should

not be construed as my agreeing with them.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on June 11, 2024 in Oviedo, Spain

                                        *Alfonso Santiago*
                                        Alfonso Santiago

---

[14] It should be noted that the reasons of public interest pursued with the enactment of Law No. 26,741 were validated by the jurisprudence of Chamber IV of the National Court of Appeals in Federal Administrative Litigation, in the case *YPF S.A. v. AES Uruguaiana Emprendimientos S.A. et al. s/ recurso directo de organismo externo*, dated October 7, 2014. (Exhibit A of Santiago I).

TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
DISTRITO DEL SUR DE NUEVA YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

BAINBRIDGE FUND LTD.,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Demandante,　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　c.　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:　Caso Nº 1:16-cv-08605-LAP
REPÚBLICA ARGENTINA,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Demandado.　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## DECLARACIÓN DE ALFONSO SANTIAGO
## EN NOMBRE DE LA REPÚBLICA ARGENTINA (LA "REPÚBLICA")

De acuerdo al 28 U.S.C. § 1746 y la Regla 44.1 de las Reglas Federales de los Procedimientos

Civiles, yo, Alfonso Santiago, declaro lo siguiente:

1. Presento esta declaración pericial en apoyo de la Oposición de la República a la Petición de

   Interdicto y Entrega presentada por el demandante Bainbridge Fund Ltd. ("Demandante").

2. Los abogados de la República me han pedido que revisara la moción del Demandante para

   interdicto y entrega (la "Moción") y brinde mi opinión sobre ciertas cuestiones del derecho

   público argentino relevantes para la Moción del Demandante.

3. Entiendo que el Demandante solicita una orden de la Corte requiriendo que Argentina

   transfiera sus acciones Clase A y D (las "Acciones de YPF") a una cuenta de custodia en Bank

   of New York Mellon ("BNYM") en Nueva York y que BNYM transfiera las acciones al

   Demandante.  En su moción, el Demandante sigue en general el argumento presentado por los

   demandantes en el caso *Petersen Energía Inversora, S.A.U. c. República Argentina*, 15-cv-

02739-LAP y *Eton Park Capital Management, L.P. c. Rep blica Argentina*, 16-cv-08569 (en conjunto, "Petersen").

4. En *Petersen*, presenté una declaración sobre cuestiones de derecho argentino en apoyo de la oposición de la Rep blica a la moción de interdicto y entrega de los demandantes. *Petersen* ECF No. 580 (16 de mayo de 2024) ("Santiago I"). Para la comodidad del Tribunal, adjunto a la presente declaración la declaración que presenté allí, junto con las pruebas que acompa é a la misma (en conjunto, "Apéndice 1"), que incorporo y adopto aquí.

5. Adem s, los demandantes en *Petersen* han presentado recientemente la declaración del Dr. Alberto B. Bianchi sobre ciertas cuestiones del derecho argentino. *Petersen* ECF No. 588 (30 de mayo de 2024) (la "Declaración Bianchi"). Como el Demandante en este caso puede basarse en la Declaración Bianchi, escribo brevemente para abordar dos puntos.

## I. EL ART CULO 10 DE LA LEY DE EXPROPIACI N DE YPF, QUE CONDICIONA LA TRANSFERENCIA DE LAS ACCIONES EN YPF A LA APROBACI N DEL CONGRESO, APLICA CON IGUAL FUER A AL PODER JUDICIAL COMO AL PODER EJECUTIVO.

6. La Ley N 26.741 (Anexo A), que declara de utilidad p blica y sujeta a expropiación el 51% de las acciones clase "D" de Repsol en YPF S.A. ("YPF"), estableció que la transferencia de las acciones expropiadas est expresamente limitada y condicionada por la declaración de utilidad p blica de las acciones. Seg n el artículo 10 de esta ley, "se encuentra prohibida la transferencia futura de [las acciones expropiadas] sin autorización del Honorable Congreso de la Nación votada por las dos terceras partes de sus miembros." En ausencia de la autorización del Congreso requerida por el citado artículo 10, las acciones expropiadas no pueden ser "transferidas" de forma alguna, ya sea por el Poder Ejecutivo o Judicial, sin violar el ordenamiento constitucional y la separación de poderes. Cualquier orden de un juez que

disponga actos que importen o conduzcan a la transferencia de las acciones expropiadas constituiría una medida en violación de una regla de orden público y, por tanto, ilegítima bajo el derecho argentino.

7. Esta norma legal, como todas las leyes, es obligatoria y debe ser cumplida por todos los poderes del Estado. El argumento de la Declaración Bianchi de que el artículo 10 de la Ley N° 26.741 no aplica al poder judicial carece de fundamento alguno en el derecho argentino. En nuestro sistema jurídico, el orden público aplica a todos los poderes del gobierno sin excepción. (Fallos: 155:248) (Anexo B) ("[l]a misión más delicada de la justicia de la Nación es la de saber mantenerse dentro de la órbita de su jurisdicción, sin menoscabar las funciones que incumben a los otros poderes"). La única manera en que un juez argentino podría negarse a cumplir con esta ley, o bien sortearla, sería declararla inconstitucional para un caso concreto, lo cual no ha sucedido en este caso.[1] Fuera de esa circunstancia, un juez no puede dejar de aplicar lo dispuesto en la norma.

8. Por tanto, la Ley N° 26.741 sancionada por el Congreso y promulgada por el Poder Ejecutivo establece un procedimiento para la transferencia de las acciones clase D de YPF expropiadas en virtud de dicha norma que debe ser respetado por los jueces, y no puede ser sorteado por ningún magistrado sin que previamente, y acreditando la existencia de graves motivos que así lo justifiquen, se declare inconstitucional a la norma que dispone dicha restricción. Sostener lo contrario importaría desconocer el principio de separación de poderes contemplado en nuestra Constitución.

---

[1] La Corte Suprema ha señalado que la declaración de inconstitucionalidad es un remedio de última *ratio*, debiendo evitarse siempre que sea posible mediante una interpretación compatible con la Constitución (Fallos: 14:425 (Anexo C); 147:286 (Anexo D)). La revisión judicial es la función más delicada que se puede encomendar a un tribunal y solo debe practicarse como una razón ineludible del pronunciamiento que la causa requiere (Fallos: 335:2333) (Anexo E). Nada de ello se advierte en esta causa.

9. En el marco del derecho argentino, un tribunal judicial no tiene la capacidad de modificar, mediante una orden al Estado nacional, la política p blica establecida por el Congreso Nacional, transfiriendo las acciones clase A y/o las acciones clase D expropiadas a entidades privadas. Una acción de este tipo invalidaría, de hecho, leyes vigentes sin seguir el debido proceso legislativo y sería interpretada como una usurpación de las prerrogativas soberanas del poder legislativo argentino, interfiriendo indebidamente en los asuntos internos de la Rep blica (Fallos: 340:47) (Anexo F).

10. Adem s, tal acto contravendría el principio fundamental de la separación de poderes que establece la Constitución Nacional (Anexo G). Ning n tribunal argentino permitiría que el cumplimiento de una condena a pagar una suma de dinero se efect e ejecutando bienes del Estado afectados a políticas p blicas sancionadas por el Estado Nacional.[2] En este contexto, conforme el artículo 75, inciso 12, de la Constitución Nacional,[3] el Congreso Nacional tiene la competencia exclusiva para regular en materia de hidrocarburos, la cual ha sido ejercida mediante diversas leyes en materia energética, empezando por la Ley N  17.319 (Ley de Hidrocarburos) (Anexo J). El Poder Ejecutivo argentino tiene la facultad de fijar la política nacional con respeto a las actividades relativas a la explotación, industrialización, transporte y comercialización de los hidrocarburos (art. 2 y 3 de la Ley N  17.319).  Y el Poder Judicial argentino tiene la función de supervisar la razonabilidad de estas políticas y verificar su

---

[2] El art. 9 de la Ley N  26.854 dispone: "Los jueces no podr n dictar ninguna medida cautelar que afecte, obstaculice, comprometa, distraiga de su destino o de cualquier forma perturbe los bienes o recursos propios del Estado, ni imponer a los funcionarios cargas personales pecuniarias." (Anexo H).

[3] Al momento de la sanción de la Constitución Nacional, la materia de hidrocarburos estaba incluida dentro de la materia de minería. Por ello, cuando el art. 75, inciso 12, de la Constitución Nacional establece que es facultad del Congreso legislar en materia de minería, debe entenderse como incluyendo la materia hidrocarburífera. Al respecto, se ha entendido que "los arts. 121, 126 y 75 inc. 12 de la CN ponen de manifiesto que nuestra Carta Fundamental ha atribuido al Congreso Nacional la facultad exclusiva de dictar un Código de Minería que comprende la regulación de determinados recursos naturales como son las minas y los yacimientos de petróleo y gas" (Cassagne, Juan C., *Curso de Derecho Administrativo*, 12  ed., Buenos Aires, La Ley, 2018, Tomo II, p. 331) (Anexo I). El destacado me pertenece.

conformidad con los derechos fundamentales establecidos en la Constitución Nacional. Este reparto de competencias se efect a mediante un sistema de frenos y contrapesos que fundamenta la separación de poderes en un equilibrio din mico de controles recíprocos, asegurando que ning n poder sobrepase su mandato constitucional (Fallos 339:1077, considerandos 26 y 29; y Fallos 328:566, voto de los jueces Maqueda y Zaffaroni) (Anexos B y C de Santiago I).

## II. LAS ACCIONES DEL ESTADO NACIONAL EN YPF SE ENCUENTRAN SOMETIDAS A UN R GIMEN ESPECIAL, Y NO RESULTAN EMBARGABLES POR ESTAR DESTINADAS A UN FIN DE UTILIDAD P BLICA.

11. Los artículos 235 y 236 del Código Civil y Comercial de la Nación ("CCyC") (Anexo K) establecen el régimen general[4] aplicable a los bienes pertenecientes al dominio p blico[5] y al dominio privado del Estado,[6] respectivamente.

---

[4] Balbín, Carlos F., *Tratado de Derecho Administrativo*, 2 ed., Buenos Aires, La Ley, 2015, Tomo II, p. 915 (Anexo L).

[5] "ARTICULO 235.- Bienes pertenecientes al dominio p blico. Son bienes pertenecientes al dominio p blico, excepto lo dispuesto por leyes especiales: a) el mar territorial hasta la distancia que determinen los tratados internacionales y la legislación especial, sin perjuicio del poder jurisdiccional sobre la zona contigua, la zona económica exclusiva y la plataforma continental. Se entiende por mar territorial el agua, el lecho y el subsuelo; b) las aguas interiores, bahías, golfos, ensenadas, puertos, ancladeros y las playas marítimas; se entiende por playas marítimas la porción de tierra que las mareas ba an y desocupan durante las m s altas y m s bajas mareas normales, y su continuación hasta la distancia que corresponda de conformidad con la legislación especial de orden nacional o local aplicable en cada caso; c) los ríos, estuarios, arroyos y dem s aguas que corren por cauces naturales, los lagos y lagunas navegables, los glaciares y el ambiente periglacial y toda otra agua que tenga o adquiera la aptitud de satisfacer usos de interés general, comprendiéndose las aguas subterr neas, sin perjuicio del ejercicio regular del derecho del propietario del fundo de extraer las aguas subterr neas en la medida de su interés y con sujeción a las disposiciones locales. Se entiende por río el agua, las playas y el lecho por donde corre, delimitado por la línea de ribera que fija el promedio de las m ximas crecidas ordinarias. Por lago o laguna se entiende el agua, sus playas y su lecho, respectivamente, delimitado de la misma manera que los ríos; d) las islas formadas o que se formen en el mar territorial, la zona económica exclusiva, la plataforma continental o en toda clase de ríos, estuarios, arroyos, o en los lagos o lagunas navegables, excepto las que pertenecen a particulares; e) el espacio aéreo suprayacente al territorio y a las aguas jurisdiccionales de la Nación Argentina, de conformidad con los tratados internacionales y la legislación especial; f) las calles, plazas, caminos, canales, puentes y cualquier otra obra p blica construida para utilidad o comodidad com n; g) los documentos oficiales del Estado; h) las ruinas y yacimientos arqueológicos y paleontológicos." (Anexo K).

[6] "ARTICULO 236.- Bienes del dominio privado del Estado. Pertenecen al Estado nacional, provincial o municipal, sin perjuicio de lo dispuesto en leyes especiales: a) los inmuebles que carecen de due o; b) las minas de oro, plata, cobre, piedras preciosas, sustancias fósiles y toda otra de interés similar, seg n lo normado por el Código de Minería; c) los lagos no navegables que carecen de due o; d) las cosas muebles de due o desconocido que no sean abandonadas,

12. Los bienes del dominio p blico se caracterizan por estar designados a cumplir una finalidad de interés p blico,[7] razón por la cual el propio CCyC establece que dichos bienes "son inenajenables, inembargables e imprescriptibles."[8]

13. A su vez, se entiende que los bienes del dominio privado del Estado se caracterizan por no estar destinados a satisfacer necesidades de interés general,[9] y por ser adquiridos por el Estado actuando como persona de derecho privado.[10]

14. La Rep blica accedió a la titularidad de las acciones clase D de YPF por vía de una expropiación, es decir actuando en ejercicio de su poder p blico y valiéndose del derecho p blico (administrativo), y no como persona que act a en el mbito de derecho privado a través de un instrumento de derecho privado. En consecuencia, las acciones expropiadas de YPF no pueden considerarse del dominio privado del Estado al estar afectadas a la política energética que satisface un interés general.

15. Asimismo, la Ley N 26.741 expresamente declara en su Artículo 7 que las acciones son expropiadas para cumplir con una finalidad de interés p blico, una de las características que definen a los bienes del dominio p blico del Estado.

16. Las similitudes con esas características de los bienes del dominio p blico del Estado explican que la Ley N 26.741 haya establecido un régimen especial para las acciones Clase D cuya

---

excepto los tesoros; e) los bienes adquiridos por el Estado nacional, provincial o municipal por cualquier título." (Anexo K).

[7] Balbín, *Tratado de Derecho Administrativo*, p. 909 (Anexo L).

[8] CCyC, art. 237 (Anexo K).

[9] Lorenzetti, Ricardo L., *Código Civil y Comercial de la Nación comentado*, 1 ed., Santa Fé, Rubinzal-Culzoni, 2014, Tomo I, pp. 774-777 (Anexo M); Balbín, *Tratado de Derecho Administrativo*, p. 911 (Anexo L).

[10] Alterini, Jorge H., *Código Civil y Comercial comentado*. Tratado exegético, 2 ed., Ciudad Autónoma de Buenos Aires, La Ley, 2016, Tomo II, p. 55 (Anexo N); Lorenzetti, *Código Civil y Comercial de la Nación comentado*, p. 774 (Anexo M).

expropiación ordenaba,[11] anclado en su transferibilidad condicionada a la previa autorización del Congreso actuando con una mayoría agravada de dos terceras partes de sus miembros. Cualquier disposición de las acciones expropiadas, incluyendo su embargo precautorio a efectos de facilitar la ejecución de una sentencia, así como una orden de un tribunal extranjero disponiendo su transferencia directa o indirecta, sería contrario a la norma de orden público mencionada. Dicha ley especial prevalece por sobre las disposiciones generales del CCyC.

17. El vínculo con la finalidad pública está igualmente presente en el caso de las acciones clase A de YPF, que por ley únicamente pueden ser propiedad del Estado Nacional (art. 8, Ley N° 24.145 (Anexo O) y art. 6.i del Estatuto de YPF (Anexo P)). La existencia de esa clase de acciones busca asegurar que el Estado Nacional pueda ejercitar el derecho de veto que le otorga esa tenencia, con independencia de quién es el controlante de YPF, a efectos de sostener sus políticas públicas en materia de hidrocarburos y energía.

18. Al respecto, el artículo 24.ii del Estatuto de YPF establece que se requerirá el voto afirmativo de las acciones Clase A, para resolver sobre las cuestiones enumeradas en el inciso c) del Artículo 6, saber:

> "(i) Decidir la fusión con otra u otras sociedades; (ii) Aceptar que la Sociedad, a través de la adquisición por terceros de sus acciones, sufra una situación de copamiento accionario consentido u hostil que represente la posesión de más del cincuenta por ciento (50 %) del capital social de la Sociedad; (iii) Transferir a terceros, la totalidad de los derechos de explotación concedidos en el marco de la Ley 17.319, sus normas complementarias y reglamentarias, y la Ley 24.145, de modo tal que ello determine el cese total de la actividad exploratoria y de explotación de la Sociedad; (iv) La disolución voluntaria de la Sociedad. (v) El cambio de domicilio social y/o fiscal de la Compañía fuera de la República Argentina."[12]

---

[11] _Ver_ Ley N° 26.741, arts. 7 y 10 (Anexo A).

[12] La Ley N° 24.474, art. 1, ratifica el derecho de veto de las acciones Clase A "Mientras el Estado nacional conserve al menos una acción de la Clase 'A', se requerirá ineludiblemente su voto afirmativo para: 1. Decidir su fusión con

En ese sentido, también cabe asignar a las acciones Clase A de YPF un carácter especial que las distingue de los bienes del dominio privado del Estado.

19. La existencia de las acciones Clase A, con sus derechos especiales, obedece a un acto legislativo a partir del cual se plasman los conceptos del estatuto de YPF (Ley N 24.474). Dar efecto a una orden judicial que comporta la extinción de un régimen especial creado por ley del Congreso sería contrario al sentido y finalidad de la norma. Así como en su momento fue necesaria una ley del Congreso (Ley N 24.474), para permitir la reducción por debajo del 20% de la participación en el capital social representado por las acciones Clase A para transferirlas al sector privado, la eliminación de la Clase A en su totalidad, y por ende la extinción de los derechos especiales asociados a la misma, debe ser el resultado de una intervención del Congreso.[13]

20. En el fallo "Vila, Alfredo Luis c/ Gobierno Nacional" (Fallos: 335:1822) (Anexo R), la Corte Suprema sostuvo que mientras un bien se encuentre afectado al uso público, no es susceptible de ser ni embargado ni enajenado (Fallos: 146:289 y 297 (Anexo S); 147:154-155 y 164-165 (Anexo T)). Esto refuerza la idea de que, similarmente, tanto las acciones de YPF expropiadas como las acciones clase A en poder del Estado Nacional están afectadas a una finalidad relacionada con el interés general, lo que impide su embargo e igualmente la ejecutabilidad de

---

otra u otras sociedades. 2. Aceptar que YPF Sociedad Anónima, a través de la cotización de sus acciones en Bolsas de Comercio o Mercados de Valores, sufriera una situación de copamiento accionario consentido u hostil que represente la posesión del cincuenta y uno por ciento (51%) del capital social de YPF Sociedad Anónima. 3. Transferir a terceros, la totalidad de los derechos de explotación concedidos en el marco de la Ley N 17.319, sus normas complementarias y reglamentarias, y la presente de modo tal que ello determine el cese total de la actividad exploratoria y de explotación de YPF Sociedad Anónima. 4.- La disolución voluntaria de YPF Sociedad Anónima." (Anexo Q).

[13] Conforme al art. 8, último párrafo, de la Ley N 24.145, "La reducción de la tenencia del paquete accionario de la Clase 'A' por debajo del VEINTE POR CIENTO (20 %) del Capital Social de YPF SOCIEDAD ANONIMA requerirá la previa aprobación por Ley." (Anexo O).

una orden judicial que ordene su transferencia. Sostener lo contrario representaría una violación de régimen especial y de la normativa sobre embargo de bienes del Estado al mismo tiempo que un cambio fundamental en la política pública adoptada por el Congreso, en materia energética.[14]

21. En la medida en que en la Declaración Bianchi se plantearon cuestiones que no he abordado, eso no significa que esté de acuerdo con ellas.

*El resto de la página se ha dejado intencionadamente en blanco.*

---

[14] Cabe destacar que las razones de interés público perseguidas con la sanción de la Ley N° 26.741 fueron validadas por la jurisprudencia de la Sala IV de la Cámara Nacional de Apelaciones en lo Contencioso Administrativo Federal, en el caso *YPF S.A. c/ AES Uruguaiana Emprendimientos S.A. y otros s/ recurso directo de organismo externo*, del 7 de octubre de 2014. (Anexo A de Santiago I).

Declaro bajo pena de perjurio de conformidad con las leyes de los Estados Unidos de América que lo anterior es verdadero y correcto.

Firmado el 11 de junio de 2024 en Oviedo, España

Dr. Alfonso Santiago

## DECLARATION OF TRANSLATOR
## REGARDING ACCURACY OF TRANSLATION

Pursuant to 28 U.S.C. § 1746, Maria E. Manghi hereby declares as follows:

I am a lawyer employed by Cleary Gottlieb Steen & Hamilton LLP presently residing and working within the State of New York;

I am proficient with the Spanish language and the English language and have reviewed the Declaration of Alfonso Santiago on Behalf of the Republic of Argentina ("Santiago II") translated from Spanish into English and believe to the best of my knowledge and belief that the translations are complete and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 11, 2024, in New York, New York.

_____
Maria E. Manghi

# Exhibit A-1

**TRANSLATION**

LAW 26,741

THE SENATE AND HOUSE OF DELEGATES OF THE ARGENTINE
NATION, CONVENED IN LEGISLATURE, ETC.
ISSUES BY LAW:

TITLE I

SOLE CHAPTER

ARGENTINA'S HYDROCARBON SOVEREIGNTY

Article 1. - Achieving self-sufficiency in the supply of hydrocarbons as well as in the exploration, exploitation, industrialization, transportation and sale of hydrocarbons, is hereby declared a national public interest and a priority for the Republic of Argentina, with the goal of guaranteeing socially equitable economic development, the creation of jobs, the increase of the competitiveness of various economic sectors and the equitable and sustainable growth of the provinces and regions.

Article 2.- The National Executive Office, as the authority in charge of setting policy on this subject, shall introduce the measures necessary to accomplish the purpose of the present law with the participation of the provinces and public and private capital, national and international.

Article 3.- The principles of the hydrocarbon policy of the Republic of Argentina are hereby established as the following:

  a.  Promote the use of hydrocarbons and their derivatives to promote development and as a mechanism to increase the competitiveness of the various economic sectors and that of the provinces and regions;

  b.  Convert hydrocarbon resources to proved reserves and their exploitation and the restoration of reserves;

  c.  Integrate public and private capital, national and international, into strategic alliances dedicated to the exploration and exploitation of conventional and nonconventional hydrocarbons;

  d.  Maximize the investments and the resources employed for the achievement of self-sufficiency in hydrocarbons in the short, medium and long term;

  e.  Incorporate new technologies and categories of management that contribute to the improvement of hydrocarbon exploration and exploitation activities and the advancement of technological development in the Republic of Argentina in this regard;

1

Case 1:15-cv-02739-LAP Document 594-45 Filed 06/11/24 Page 5 of 230

f.   Promote the industrialization and sale of hydrocarbons with a high added-value;

g.   Protect the interests of consumers with respect to the price, quality and availability of hydrocarbon derivatives;

h.   Collect outstanding balances relating to exportable hydrocarbons in order to improve the trade balance, ensuring a rational exploitation of the resources and the sustainability of its exploitation for use by future generations.

TITLE II

SOLE CHAPTER
FEDERAL COUNCIL OF HYDROCARBONS

Article 4.- A Federal Council of Hydrocarbons is hereby created which shall include the participation of the following:

a.   The Ministry of Economy and Public Finances, the Ministry of Federal Planning, Public Investment and Services, the Ministry of Labor, Employment and Social Security and the Ministry of Industry, through their respective representatives.

b.   The provinces and the Autonomous City of Buenos Aires, through the representatives that each may appoint.

Article 5.- The duties of the Federal Council of Hydrocarbons shall be the following:

a.   Promote the coordinated action of the National and Provincial Governments, with the purpose of ensuring the fulfillment of the objectives of the present law.

b.   Adopt decisions regarding all questions related to the accomplishment of the objectives of this law and the establishment of the hydrocarbons policy of the Republic of Argentina that the National Executive Office may submit for consideration.

Article 6.- The Council shall convene a meeting with the absolute majority of its members an shall be presided and represented by the representative of the National Government that the National Executive Office designates to such end.  It shall establish its own internal regulations.

2

Case 1:15-cv-02739-LAP Document 594-5 Filed 06/14/24 Page 25 of 230

TITLE III
RECUPERATION OF CONTROL OF YPF

CHAPTER I
EXPROPRIATION

Article 7.- For purposes of ensuring the fulfillment of the objectives of this law, fifty-one percent (51%) of the equity of YPF Sociedad Anónima, represented by an identical stake of Class D shares held by Repsol YPF S.A., its controlled or controlling entities, directly or indirectly, is hereby declared a public interest and subject to expropriation. In addition, fifty-one percent (51%) of the equity of Repsol YPF GAS S.A, represented by sixty percent (60%) of the Class A shares of such company, held by Repsol Butano S.A., its controlled or controlling entities, is hereby declared a public interest and subject to expropriation.

Article 8.- The YPF Sociedad Anónima and Repsol YPF Gas S.A. shares subject to expropriation in accordance with the preceding article shall be distributed in the following manner: fifty-one percent (51%) shall belong to the National Government and the remaining forty-nine percent (49%) shall be distributed among the provinces that compose the National Organization of Hydrocarbon Producing States.

Regulations shall take into consideration the conditions relating to the transfer, ensuring that the distribution of the shares among the provinces that accept their transfer is conducted in an equitable manner, considering each of their levels of hydrocarbon production and proved reserves.

Article 9.- To ensure compliance with the objectives of this law, the National Executive Office, by itself or through an appointed public entity, shall exercise all the political rights associated with the shares subject to expropriation until the transfer of political and economic rights is completed, in accordance with the preceding article.

The transfer of the political and economic rights of the shares subject to expropriation conducted by the National Government in favor of the provincial governments members of the National Organization of Hydrocarbon Producing States, shall provide for the exercise of shareholder rights in a unified manner for the minimum term of fifty (50) years by means of a shareholders' agreement.

The appointment of YPF S.A. Directors corresponding to the expropriated shares shall be completed proportionately considering the holdings of the National Government, Provincial Governments and one Director shall represent the employees of the company.

Article 10.- For purposes of implementing this law and the registration of the ownership rights connected to the shares subject to expropriation, it is hereby recorded that the expropriation of such shares is conducted for the public interest

3

and that any future transfer of the shares is prohibited without the permission of the National Congress by a two-thirds vote of its members.

Article 11.- The expropriation processes shall be governed by the provisions of Law No. 21,499 and the expropriator shall be the National Executive Office.

Article 12.- The price of the property subject to expropriation shall be determined in accordance with the provisions of Law No. 21,499, Article 10 and the corresponding provisions. The appraisal shall be conducted by the National Court of Appraisal.

## CHAPTER II

## OPERATIONAL CONTINUITY

Article 13.- To ensure the continuity of the activities associated with the exploration, production, processing and refining of hydrocarbons by YPF Sociedad Anónima and Repsol YPF Gas S.A., as well as their transport, distribution and sale, and the increasing investment flows, and adequately supplying the fuel required for the function of the national economy pursuant to the provisions of this law, the National Executive Office, through the persons or organizations it appoints, shall exercise all of the rights conferred upon the shares subject to expropriation in accordance with articles 57 and 59 of such act.

The National Securities Commission, on the day of enactment of this law, shall convene a shareholders meeting in order to discuss, among other matters deemed necessary and relevant for the purposes of the foregoing, the dismissal of all the directors and alternate members, trustees and their alternates, and appoint replacements for the applicable term.

Article 14.- The National Executive Office and Intervenor designated by YPF Sociedad Anónima and Repsol YPF Gas S.A. are empowered to adopt all actions and precautions as necessary, until control of YPF Sociedad Anónima and Repsol YPF Gas S.A. is assumed, in order to ensure the operation of the company, the preservation of its assets, and the supply of hydrocarbons.

## CHAPTER III

## THE LEGAL CONTINUITY AND MANAGEMENT OF YPF S.A.

Article 15.- In the execution of its activities, YPF Sociedad Anónima and Repsol YPF Gas S.A. shall continue to operate as publicly traded corporations pursuant to Chapter II, Section V of Law Nº 19,550 and its corresponding regulations, and shall not be subject to any legislation or regulation applicable to the management or control of Companies or entities owned by the National Government or provincial governments.

4

Article 16.- The administration of shareholder rights corresponding to the shares subject to expropriation by the National Government and its provinces shall be executed pursuant to the following principles:

a. The strategic contribution of YPF Sociedad Anónima in compliance with the objectives set forth herein;

b. The administration of YPF Sociedad Anónima pursuant to the industry's best practices and corporate governance, safeguarding shareholder interest and generating value on their behalf;

c. The professional management of YPF S.A.

Article 17.- For purposes of complying with the present law, with respect to sources of finance, YPF Sociedad Anónima shall resort to internal and external, strategic alliances, joint ventures, transitory business unions, and all cooperation partnerships whether public, private or mixed companies, domestic and foreign.

Article 18.- This law is a public order law and shall enter into force upon its publication in the Official Gazette.

Article 19.- It shall be communicated to the National Executive Office.

GIVEN IN THE SESSIONS ROOM OF THE ARGENTINE CONGRESS, IN BUENOS AIRES, THE THIRD DAY OF MAY OF THE YEAR TWO THOUSAND AND TWELVE.

-REGISTERED UNDER NO. 26,741-

AMADO BOUDOU. – JULIAN A. DOMINGUEZ. – Juan H. Estrada. – Gervasio Bozzano.

5

# Exhibit A-2

ENGLISH TRANSLATION

# Exhibit B – English Translation

Supreme Court Ruling

Buenos Aires, August 19, 1929.

Ordered and Seen:

On the grounds of the opinion of the Attorney General and in accordance with the provisions of article 2 of Law 27, the appealed sentence is confirmed in the part that could have been the subject of the appeal. Be notified and returned to the Court of its origin.

Roberto Petetto - R. Guido Lavalle - Antonio Sagarna


*Ricardo Bonevo. Habeas corpus. Appeal in fact.*

Summary: 1st. Once the fundamental purpose of the writ of habeas corpus and of the writ of complaint has been fulfilled, i.e. the release of the detained person, the case does not give rise to any other order of pronouncement on the pretext that the appellant has raised constitutional issues that could only be raised by the injured party himself through the pertinent actions arising from the events that occurred.

2nd. The most delicate mission of the Nation's judiciary is to know how to stay within the scope of its jurisdiction, without undermining the functions of the other branches.

3rd. Although Article 622 of the Code of Criminal Procedure admits the representation of a detained person by any other person, this exception can only be understood to subsist as long as the detention of the detained person is maintained and for the sole purpose of obtaining his freedom, and it ceases once this has been obtained.

Case: This is explained by the following pieces:

Attorney General's Opinion

Buenos Aires, August 9, 1929.

Supreme Court:

The appeal on page 17 of the present habeas corpus appeal, filed in favor of Ricardo Bonevo, in the form in which it has been deduced, does not meet, in order to proceed, any of the requirements of sections 14 and 15 of Law 48.

On the other hand, as rightly stated in the sentence on page 13, the judicial case has disappeared with the liberty regained by the detainee, lacking, therefore, the practical interest of a resolution in this regard by this Supreme Court, which also cannot give it in the abstract.

Therefore, I am of the opinion that the appeal has been properly denied by the Court of Appeals for Criminal and Correctional Matters of the Nation's Capital.

Horacio R. Larreta

Supreme Court Ruling

Buenos Aires, August 21, 1929.

Ordered and Seen:

Whereas:

That according to the main file, Angel Dani promoted on February 8, co-

SPANISH ORIGINAL

Case 1:15-cv-07388-AP Document 59-2 Filed 06/04/24 Page 33 of 230

FALLO DE LA CORTE SUPREMA

Buenos Aires, Agosto 19 de 1929.

Autos y Vistos:

Por los fundamentos del dictámen del señor Procurador
General y de acuerdo con lo que dispone el art. 2° de la ley 27,
se confirma la setnencia apelada en la parte que ha podido ser
materia del recurso. Notifíquese y devuélvase al Tribunal de su
procedencia.

ROBERTO REPETTO. — R. GUIDO LA-
VALLE. — ANTONIO SAGARNA.

---

*Ricardo Boncvo. Habeas corpus. Recurso de hecho.*

*Sumario:* 1° Cumplida la finalidad fundamental del interdicto
de *habeas corpus* y del escrito de demanda, o sea la libertad
de la persona detenida, la causa no da lugar a pronuncia-
miento de otro orden a pretexto de haber el recurrente plan-
teado cuestiones de carácter constitucional que sólo podría
hacer el propio damnificado mediante las acciones pertinen-
tes que derivasen de los hechos ocurridos.

2° La misión más delicada de la justicia de la Nación es
la de saber mantenerse dentro de la órbita de su jurisdicción,
sin menoscabar las funciones que incumben a los otros pode-
res o jurisdicciones.

3° Si bien el art. 622 del Código de Procedimientos en lo
Criminal admite la representación de una persona detenida,
por otra cualquiera, esta excepción sólo puede entenderse

Case 1:15-cv-02739-LAP Document 594-2 Filed 06/14/24 Page 34 of 230

que subsiste en tanto se mantenga la detención de aquélla y al solo objeto de obtener su libertad, y que cesa, una vez obtenida ésta.

*Caso*: Lo explican las piezas siguientes:

### DICTAMEN DEL PROCURADOR GENERAL

Buenos Aires, Agosto 9 de 1929.

Suprema Corte:

La apelación de fs. 17 del presente recurso de *habeas corpus*, interpuesto a favor de Ricardo Bonevo, en la forma en que ha sido deducida, no reune, para su procedencia, ninguno de los requisitos exigidos por los arts. 14 y 15 de la ley 48.

Por otra parte, como acertadamente se afirma en la sentencia de fs. 13, el caso judicial ha desaparecido con la libertad recobrada por el detenido, careciendo, por ello, de interés práctico una resolución al respecto de esta Corte Suprema, que tampoco puede darla con carácter abstracto.

Opino, por ello, que el recurso deducido ha sido bien denegado por la Cámara de Apelaciones en lo Criminal y Correccional de la Capital de la Nación.

*Horacio R. Larreta.*

### FALLO DE LA CORTE SUPREMA

Buenos Aires, Agosto 21 de 1929.

Autos y Vistos:

Considerando:

Que según resulta del expediente principal agregado sin acumular, Angel Dani promovió en fecha 8 de Febrero del co-

## DECLARATION OF TRANSLATOR
## REGARDING ACCURACY OF TRANSLATION

Pursuant to 28 U.S.C. § 1746, Maria E. Manghi hereby declares as follows:

I am a lawyer employed by Cleary Gottlieb Steen & Hamilton LLP presently residing and working within the State of New York;

I am proficient with the Spanish language and the English language and have reviewed the foregoing documents (Ex. B, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 155, pages 248-49; Ex. C, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 14, pages 425-49; Ex. D, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 147, pages 286, 301-04; Ex. E, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 335, pages 2333-62; Ex. F, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 340, pages 47-76; Ex. G, Argentine National Constitution; Ex. H, Argentine Law No. 26,854; Ex. I, Cassagne, Juan C., Curso de Derecho Administrativo, 12ª ed., Buenos Aires, La Ley, 2018, Tomo II, excerpt on page 331; Ex. J, Argentine Law No. 17,319l; Ex. K, Código Civil y Comercial de la Nación, articles 235-37; Ex. L, Balbín, Carlos F., Tratado de Derecho Administrativo, 2ª ed., Buenos Aires, La Ley, 2015, Tomo II, excerpts on pages 909, 911, and 915; Ex. M, Lorenzetti, Ricardo L., Código Civil y Comercial de la Nación comentado, 1° ed., Santa Fé, Rubinzal-Culzoni, 2014, Tomo I, excerpts on pages 774 and 777; Ex. N, Alterini, Jorge H., Código Civil y Comercial comentado. Tratado exegético, 2° ed., Ciudad Autónoma de Buenos Aires, La Ley, 2016, Tomo II, excerpts on pages 55-56; Ex. O, Argentine Law No. 24,145; Ex. Q, Argentine Law No. 24,474; Ex. R, Fallos de la Corte Suprema de Justicia

Nacional, con la Relación de sus Respectivas Causas: Volumen 335, pages 1822-33; Ex. S,

Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas:

Volumen 146, pages 288-89, 297-98; Ex. T, Fallos de la Corte Suprema de Justicia Nacional,

con la Relación de sus Respectivas Causas: Volumen 147, pages 154-55, 164-65) translated from

Spanish into English and believe to the best of my knowledge and belief that the translations are

complete and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 11, 2024, in New York, New York.

_____

Maria E. Manghi

# Exhibit A-3

# ENGLISH TRANSLATION

# Exhibit C – English Translation

CAUSE XXI.

Don José Leonardo Avegno vs. the Province of Buenos Aires, regarding the claim of an estate.

Summary.-1°. A claim for vindication, filed against a possessor whose title derives from a contest that has already expired, cannot be considered as an incident thereof, and therefore does not fall under the sanction of article 12 of the law of jurisdiction and competence of the national courts. The request presented before the Executive Power of a province in the management of a matter, declaring that it is presented before going to the competent court, does not constitute a demand in justice capable of establishing the lawsuit; and is simply equivalent to the conciliatory preliminaries that generally take place between private parties before a lawsuit is filed.

CAUSE XXI.

Don José Leonardo Avegno vs. the Province of Buenos Aires, regarding the claim of an estate.

Summary.-1°. A claim for vindication, filed against a possessor whose title derives from a contest that has already expired, cannot be considered as an incident thereof, and therefore does not fall under the sanction of article 12 of the law of jurisdiction and competence of the national courts.

The request presented before the Executive Power of a province in the management of a matter, declaring that it is presented before going to the competent court, does not constitute a demand in justice capable of establishing the lawsuit; and is simply equivalent to the conciliatory preliminaries that generally take place between private parties before a lawsuit is filed.

The law of congress, by which a province, considered as a juridical person, may be sued before the Supreme Court by individuals who are neighbors of another province or foreigners, is not repugnant either to the letter or the spirit of the Argentine Constitution; it cannot be said to be depressive of the dignity and sovereignty of the provinces, nor incompatible with the independence of their internal administration, and is obligatory in all the territory of the nation, for all the authorities, national as well as provincial.

Case.D. José Léonardo Avegno, oriental citizen, entrusted his attorney-in-fact D. Jorge Pintos to claim from the Government of the Province of Buenos Aires a property located in the town of San Nicolas de los Arroyos, now serving as a public jail, which he said he had bought in 1853, not having transferred his rights to anyone.

The proxy presented himself to this effect to the government of the province, with a written request accompanying his titles, a conference was held with the prosecutor and advisor, and the request was rejected, the Government basing its decision on the fact that the property had been purchased by him in the contest followed against Avegno in 1857.

The aforementioned attorney then went to the Supreme Court, filing the corresponding claim action.

Upon transfer, the Attorney General of the Province of Buenos Aires declined the jurisdiction of the Supreme Court, on the following three grounds.

1st. Because the jurisdiction of the Court does not extend to cases in which a province is sued by private individuals.

He said: that the provincial governments are independent and sovereign, and to compel a province to appear before the bar of the federal court in a suit by a private individual, was to disregard its independence and sovereignty; that art. 100 of the constitution is a faithful translation of clause 2a of art. 3o. of the constitution of the United States; that art. 100 of the constitution is a faithful translation of clause 2a. of art. 3o. of the constitution of the United States; and the doctrine held by those who took part in the formation of the American constitution, was the denial of that right to the Federal Court, which doctrine founded the eleventh amendment, not as a new clause, but as a declaration;-that the difference of our origin cannot be opposed to this theory, because our political ideal is the emancipation of local powers; nor the silence of our constituents, because it is not admissible that having accepted the American provision, they should not also have accepted its authentic interpretation.

2nd. Because the Supreme Court is unable to hear a universal competition trial.

He said that Avegno was declared a fugitive and was declared bankrupt in 1857; that the government bought the farm in question at the proposal of the bankruptcy trustees.

3rd. For not being able to reopen before the national jurisdiction a case that has been closed before the Executive Power of the province.

He said that the Avegno's attorney before the government of the province was a real trial in administrative litigation; and that the Executive Branch had heard the trial and had not appealed its decision.

The Avegno party requested that the objection be dismissed.

He said with respect to the 1st point, that it is necessary to distinguish between the province as a political entity and the province as a juridical person; that as such the province can be sued; that our constituents never thought of accepting the North American amendments in art. 100 and 101 of the Constitution; that they made only two modifications with respect to the jurisdiction of the Federal Court, namely in conflicts between public authorities and in appeals of force; that this theory is a guarantee of tranquility in diplomatic relations and is enshrined in several decisions of the Supreme Court. Regarding the 20th point, that in the present case it was not a question of a contest trial, but only of resolving on the best right between his titles and those of an alleged contest on which the government of the province is based.

Regarding the 3rd point; that no contentious administrative lawsuit has intervened in this matter, nor has he ever recognized the jurisdiction of the Executive Branch to rule on his request.

It was then passed on to the Attorney General who said that the competence of the Court in this case was clearly established by Art. 100 of the Constitution, which responds to the evident needs of the political order; that the province acts in this case as a juridical person; that the example of the United States was counter-productive because before that Constitution was amended, the North American federal court was recognized as having jurisdiction to hear lawsuits brought by individuals against the provinces; that the North American Constitution had been amended afterwards, but that we should be governed not by that Constitution, but by our own, which did not admit said amendment.

Supreme Court Ruling.

Buenos Aires, April 11, 1874.

Having regard to these proceedings filed by Mr. Jorge Pintos, on behalf of Mr. José Leonardo Avegno, citizen of the Oriental Republic of Uruguay, against the Province of Buenos Aires, regarding the claim of a property located in San Nicolás de los Arroyos; and the article therein promoted by the Prosecutor of said Province, declining the jurisdiction of the Supreme Court, it appears that the declinatory action is based on the following three causes:

First, that the house that is being claimed was purchased by the Government of the Province from the fugitive Don José Leonardo Avegno, and that therefore, if the Court were to hear the claim, it would be hearing the case in a contest trial, contrary to the provisions of article twelve of the law of eighteen hundred and sixty-three on jurisdiction and competence.

Second, that Avegno's attorney claimed the estate before the Executive Power of the Province, and having rejected his petition, he did not file any appeal, thus concluding the matter, and it could not be reopened before the national jurisdiction, by virtue of the provisions of article fourteen of the aforementioned law.

Third, that according to the Constitution, the jurisdiction of the Court does not extend to cases in which a Province is sued by private individuals.

First, with respect to the first motive, it appears that the documents sent by the Government of the defendant Provincial Government, and which run in testimony on pages fifty-four to eighty-six, do not precisely prove that Don José Leonardo Avegno has been insolvent, nor that in the trial of his insolvency the house in question has been sold. This could be presumed by the qualification of fugitive that the Prior of the Consulate applies to Avegno in the office of page fifty-four; and the heading with which at page eighty-four back appears the account of the Bank relative to the deposit of the price. But there are other circumstances that convince to the contrary. The trustees of a bankruptcy proceeding do not appear before the Court of Commerce, as would be the case if it existed, but rather the interested creditors themselves. These are the ones who contract the sale, who formulate the conditions, and urge the Government to accept it; and when they indicate in their writings the file in which they are presented, instead of referring

to the bankruptcy proceedings, they say in the proceedings with Don José L. Avegno for collection of the amount of pesos, pages sixty-nine and seventy. It seems then that there has been nothing more than an execution followed by two creditors against Avegno, and that in order to pay those two creditors the house was seized and sold.

But whether or not there was insolvency proceedings, the result would be the same. The universal suit would have been concluded with the sale of the debtor's property and the distribution of its price; and in no way can it be said that it is being reopened with the present claim; a suit brought by an individual who claims not to be the debtor in bankruptcy or executed, which will be investigated in due course, if it is proven, and not directed against the bankruptcy which expired seventeen years ago, but against the present possessor of the property. The title of this would emanate from a contest; but for that reason the real action attempted could not be considered as an incident of it, just as actions directed after the definitive liquidation against those who have purchased goods from the estate could not be considered as incidents of a trial of partition of inheritance. It is therefore not the case to apply article twelve of the law of jurisdiction and competence, not even in the hypothesis that there has been a contest.

Second, if the plaintiff had brought his actions before the Executive Branch of the Province, in a proper trial, he would undoubtedly have lost the right to bring his case before the Court, by virtue of article fourteen of the aforementioned law of jurisdiction and competence. But the allegations made in this respect by the District Attorney of the Province are peremptorily answered with the terms of the request testified on page eighty of the return. There it is seen that when Avegno's attorney presented himself before the Provincial Government, requesting the delivery of the house, he expressly said that he was doing so before going before the Court for the management of his rights, which should protect him in the case of a refusal. That petition, therefore, does not constitute a lawsuit capable of filing a lawsuit, and of bringing the case to provincial jurisdiction, to the exclusion of the national jurisdiction. It is simply equivalent to the conciliatory preliminaries that generally take place between private individuals, and which could not take any other form in this case, given the respect due to the authority to whom the claim was addressed.

Third, only the third alleged ground remains, which consists of the Court's lack of jurisdiction to hear suits brought by private parties against a Province. This question has already been resolved by this Court, and it would suffice to reproduce here the grounds of the decision pronounced in the case of the Mendoza Brothers, against the Province of San Luis (case LXXII, first volume of the Judgments), if the importance of the matter did not make it convenient to further develop some of those grounds, and even to adduce new ones.

It is expressly declared by law of Congress that a province may be sued before the Supreme Court by individuals neighboring another province or foreigners. This is so provided by the law of eighteen hundred and sixty-three on jurisdiction and competence in the first clause of article one, attributing jurisdiction to the Court to hear in the first instance civil cases between a Province and any neighbor or neighbor of another, or foreign citizens or subjects. This is virtually sanctioned by the same law in article eight; and even the possibility of raising doubts and questions on the matter disappears before the fourth clause of article twelve which is expressed in these terms whenever in a civil lawsuit a foreigner sues a Province or a citizen."

This law, like all laws of the Nation, is obligatory throughout its territory; and all authorities, both national and provincial, owe it respect and obedience (article thirty-one of the Constitution); only one reason can prevent it from being applied to the cases that occur, and that is that, in the judgment of the Supreme Court, it is contrary to the prescriptions of the fundamental law or to the principles on which it is based.

The whole present question depends, therefore, upon ascertaining whether the act of Congress is or is not repugnant to the Constitution; and to establish for that purpose what is the true meaning of the constitutional clauses relating to the jurisdiction of the Court.

In entering into this investigation, it is necessary to bear in mind that, for a law duly sanctioned AND promulgated to be declared ineffective on the grounds of unconstitutionality, it is required that the provisions of one and the other law be absolutely incompatible; that there be an evident opposition between them, according to the Federalist's expression (number eighty-one, third paragraph).

This is required by the respect due to the high Powers that concur in the formation of the laws.

The incompatibility may be with the letter of the Constitution, or only with its spirit, that is, with its true meaning when the letter is obscure or gives rise to different interpretations.

With the letter, it can be assured of course that there is no incompatibility in this case, the Supreme Court, according to the Constitution, is responsible for hearing and deciding all cases.... that arise between two or more Provinces; between one Province and the neighbors of another; .... and between a Province and its neighbors against a State or foreign citizen. In cases in which a Province is a party, the Supreme Court shall exercise its original and exclusive jurisdiction.

In both common and legal language, a cause is said to be between a Province and a foreign citizen or subject, both when the Province is plaintiff and when it is defendant, and a Province is a party both when it is defendant and when it is plaintiff.

It is therefore not possible to make the slightest objection to the act of Congress from this point of view: its letter is in perfect harmony with the letter of the Constitution. The most determined opponents of the jurisdiction of the Court recognize this; and the representative of the respondent Province in this case does not claim the contrary, nor does he make any argument which would require entering into demonstrations which it would be easy to carry into evidence.

What is invoked is the spirit and purposes of the Constitution.

The Argentine Constitution, it is said, has done nothing more than adopt the text of the American Constitution, and it must be assumed that in adopting the text it has also wanted to adopt its spirit. And as this would be counter-productive in the presence of the eleventh amendment of that constitution, not accepted by ours, it is claimed that the spirit of the American Constitution was contrary to the jurisdiction of the Court even before the eleventh amendment; that this is nothing

more than a declaration or interpretation of the constitutional clause; and that therefore, although it was not expressly adopted by our constituents of eighteen hundred and fifty-three nor by those of eighteen hundred and sixty, it must be considered adopted with the interpreted text.

All this argumentation falls by its foundation if one only observes that the American Constitution has not been opposed to the jurisdiction in question, but only after and by virtue of the eleventh amendment; and that this is a true amendment and not something else.

To maintain the contrary is to delude oneself by taking as decisive and conclusive individual opinions, which, however respectable they may be, have been opposed by others of no less importance. The American Constitution had numerous opponents, and exalted to such an extent, that each of its clauses, it may be said, gave rise to heated discussions. -Its supporters themselves were sometimes divided, and had to make mutual sacrifices of their individual opinions, in order to arrive at the final result sought.

The clauses concerning the jurisdiction of the Supreme Court were among those which aroused the most ardent opposition, especially in some States; and this explains why they appear understood and commented on in different senses. But in spite of everything, they were finally accepted as sanctioned by the constituent Convention, without alterations or limitations, which would have required a new convocation of that Convention; and without the particular reservations of any State being considered as the expression of the general will.

After the Supreme Court was installed, suits were soon brought by private individuals against some of the States; and a proof that the intelligence contrary to the jurisdiction was not a thing generally admitted as is pretended, is that there were some among the States sued, who plainly appeared and answered the suit, as if it were a duty beyond dispute.

It was the State of Georgia, sued by a neighbor of another State, which brought the question, giving rise to the great debate known as Chisholm v. Georgia. All the arguments of the opposition were then ably asserted, the same that eighty years later are reproduced among us today; but the Supreme Court, in spite of everything, declared itself competent, holding that according to the Constitution, in its letter and in its spirit, one State could be sued by neighbors of another. And it is well to note, in order that the weight and importance of this decision may be fully recognized, that it was Mr. Raudolf, the former Governor of Virginia, and author of the project called the Virginia plan, who sustained that doctrine as Solicitor General; and that among the judges composing the Court were Mr. John Jay, one of the fellows of the Court, Mr. Raudolf, a former Governor of Virginia, and the author of the Virginia plan; and that among the judges who composed the Court was Mr. John Jay, one of the fellows of the Virginia plan. John Jay, one of the companions of Hamilton in the drafting of the Federalist, the jurisconsult Cushing, James Wilson and John Blair, members of the constituent Convention and signers of the Constitution: all more or less respectable collaborators in the preparatory work of that great work, friends characterized by the new order of things, and of sufficient importance to be called upon to set forth and initiate the work of the new judicial institution.

With that sentence, pronounced by judges so competent in every sense, to whom no ignorance of the things of the time, nor the intention of falsifying the Constitution can be attributed, the true

meaning of the disputed clause was fixed. The interpretation of the Supreme Court, as the Power in charge of ruling on constitutional questions and maintaining their spirit unalterable, is final and decisive. A single one of its rulings does not make jurisprudence, in the strict sense of the word. But once the conscience and opinion of the judges are known, the natural presumption is that their subsequent rulings will be in conformity with the first; and that is why in the United States, where great respect is paid to the maxim stare decisis, one ruling is generally sufficient for the point in question to be considered settled. New debates and new decisions may be provoked, because the Court decides only particular cases; but if it is desired to prevent effectively the effects of the interpretation made, and to establish a contrary rule, which will bind even the Court itself, there is no other means than the amendment of the clause interpreted.

The amendment is the only thing authorized by the American Constitution in Article V, and it was resorted to after the decision of the Supreme Court in the aforementioned case. It was desired to limit the Judicial Power in a way that it did not have in the text, and the amendment was proposed. So called by Congress; and as an amendment it was enacted, ratified by a majority of the States, and enrolled with its corresponding order number after those preceding; and as such it has always been held and designated in the United States. And if it embraces future cases and those pending at the time of its sanction, it is not because it is a mere declaration, but because it was so provided by the amendment itself. . The object of the amendment, said Mr. Justice Marshall, commenting on the words; cases commenced or prosecuted, was not only to prevent the institution of future proceedings, but to stop the prosecution of those which were commenced when that article became a part of the Constitution (6 Wheat Rep. four hundred and eight).

It may therefore be affirmed that the judicial power, as originally established, extended to cases brought against one of the States by citizens of another State, or by foreign citizens or subjects (Kent. comment. tome I, paragraph three hundred and twenty), and that it was necessary to amend it by the eleventh amendment in order that it should cease to be so. It follows, therefore, that our Constitution having adopted the original text of the American, omitting the amendment. XI which modified it, it is evident that it wished to give to the jurisdiction of this Court the extension that the American had according to that text, without the limitation of the omitted amendment.

But what precedes is not the only or the most important thing in favor of this conclusion. Antecedents of its own that are forgotten, lead to it with more evidence, if possible.

In the Constitution of eighteen hundred and fifty-three, the clause relating to the jurisdiction of the National Courts was formulated in these terms, article ninety-seven. It corresponds to the Supreme Court and to the inferior Courts of the Confederation, the knowledge and decision of all the causes that deal with points governed by the Constitution, by the laws of the Confederation and by the treaties with foreign nations; of the conflicts between the different public Powers of the same Province; of the causes concerning ambassadors, public ministers and foreign consuls; of the causes of admiralty and maritime jurisdiction; of appeals of force; of matters in which the Confederation is a party; of causes arising between two or more Provinces; between one Province and the neighbors of another; between the neighbors of different Provinces;

BETWEEN A PROVINCE AND ITS OWN NEIGHBORS; and between a Province and a foreign State or citizen.

This article was not a simple copy of the corresponding article of the American Constitution. It subjected to the jurisdiction of the Court, not only the causes submitted to it by that Constitution, but also the appeals of force, the conflicts between the different public Powers of the same Province, and what is more notable, the causes between a Province and its own neighbors.

It is enough to note this to understand that the authors of both Constitutions were not guided on this point by an equally limited purpose. How to reconcile this manifest tendency with the tacit acceptance of limitations alien to the text that was adopted?

The clause relating to questions between a Province and its own neighbors, evidently included both cases in which the Province was the plaintiff and those in which it was the defendant. The literal sense of the words excludes all other understanding; and were it not so, it would be impossible to discover even the shadow of a plausible reason for submitting these controversies not only to national jurisdiction, but of the highest Court of the Nation.

The object could not have been other than to give guarantees to individuals, providing them with judges for their claims, sheltered from all influence and all partiality. And if these purposes were carried to the point of applying them to those who had questions with the Province of their own origin or domicile, with how much more reason will it not be necessary to conclude that they were intended to apply them when the interested party was a foreigner or a neighbor of another Province?

It cannot therefore be said that the constituents of eighteen hundred and fifty-three were simply silent. By provisions of very clear scope they revealed an intention and a will entirely contrary to the doctrine of the American amendment. And so deliberate does their action appear to have been, that at the same time that they clarified the eleventh amendment, they adopted and incorporated into the text several others, such as the fourth (article eighteen-eight), the fifth (articles seventeen and eighteen-eight) and the tenth (article one hundred and four).

Then came the reforms of eighteen hundred and sixty. The provincial convention of Buenos Aires proposed the suppression of only two clauses of article ninety-seven: those that submitted to the Supreme Court the appeals of force, and the decision of conflicts between the different public powers of the same Province. Everything else was left intact, including the jurisdiction over causes between a Province and its own neighbors. He further requested the incorporation in whole or in part of other American amendments not expressly adopted in the text of eighteen hundred and fifty-three, such as the first and ninth (Article thirty-two and thirty-three, reformed Constitution) and made no mention of the eleventh-and note that this could not be explained even by the inaccurate reason of this being a simple declaration, because the ninth has the same form, and was nevertheless incorporated.

The sessions of the Convention shed little light on this matter, and offer few elements of interpretation. But what little they contain is also contrary to the doctrine of the opponents of jurisdiction. When a deputy expressed doubts as to whether questions between a simple foreigner

and the government of a State were of national jurisdiction, another deputy replied that they were (Diario de Sesiones page two hundred and thirty-six) and the text was left as it was; and not even for this reason, which showed the difficulty of having recourse to the eleventh amendment, nor was its adoption requested.

There is only the case of jurisdiction over the States, when one State sues another, said another Convention member in the Commission in charge of ruling on the reforms; and it is intended to draw an argument from this phrase, isolating it from the subsequent ones that fix its true meaning; this Convention member intended to demonstrate the necessity of suppressing the clause that submitted to the Court the conflicts between the different powers of the same Province, and after the transcribed words he continued. But then, it is not the public Power of one State that brings to the bar of the Supreme Court the public Power of another State; but both appear in a particular interest, as individual persons, and not to discuss their political capacity, nor to have the attributions of their public Powers judged, limited or extended, according to the judgment of the Supreme Court. It was therefore the power to judge the States or their public Powers in their political character, which was intended to be denied to the Court; not the power to judge their controversies when they appear as juridical persons, in an individual interest-if the meaning of that phrase had been to limit in an absolute manner the cases of jurisdiction over the States, even in their character as juridical persons, it would have been evidently inaccurate and of no value, because, as will be seen hereafter, there are other cases in which no one denies the existence of such jurisdiction.

Once the reforms proposed by Buenos Aires were submitted to the National Convention of Santa Fe, the part relating to the Judicial Power was modified, deleting in article ninety-seven (today one hundred) the clause that said between a Province and its own neighbors, and the end of said article was left, thus formulated and between a Province or its neighbors, against a State or foreign citizen' that is to say, the same as before, with the only addition of the words, or its neighbors, which came to fill a void, no doubt involuntary, of the primitive text (acts of the Sessions page twenty-four). Consequently, the jurisdiction over the causes between a Province and a neighbor of another or a stranger, remained unaltered. Nothing was written, nothing was said that would even remotely reveal the intention of adopting the amendment, for which a single word would have sufficed.

These antecedents, forgotten as it was said before by the opponents of jurisdiction, leave no doubt that neither the authors nor the reformers of the Constitution intended to adopt the limitation of the amendment, and that on the contrary, they deliberately and intentionally excluded it.

In support of this and in proof that this is how the constitutional clause was always understood, there are also the acts that followed after the reformed Constitution was put into effect. In the first place, there is the law of jurisdiction and competence mentioned at the beginning, in which the Court's jurisdiction was declared to be exclusive to suits brought by private individuals against the States. Not a single voice was raised against it, in spite of the presence in Congress of persons of recognized competence, who had also taken part in the Constituent Convention. There was only difficulty and discussion with respect to the lawsuits against the Nation, which several deputies maintained were and should be declared to be included in the constitutional provision.

This law was enacted by the Executive Branch, without objection.

There is the Court's ruling in the case of Mendoza brothers against the Province of San Luis;

And finally, there is the refusal of the Congress to declare the reform of the Constitution necessary. The reform was proposed by the able lawyer who was leading one of the resistant Provinces (that of Entrerios, which has recently answered a new lawsuit). The opportunity could not have been more favorable, because it was another amendment, considered indispensable, for which a Convention had to be convened. And yet, the Congress, the only power vested with the power to initiate a constitutional reform, declaring it necessary, rejected the proposal almost unanimously, dismissing the alleged reasons.

Thus, the constitutional clause was uniformly understood as favorable to the jurisdiction of the Court, by the three Public Powers of the Nation, in the exercise of their respective powers. And all this accumulation of authority and opinion is intended to be considered as of little or no importance.

But it is alleged, on the other hand, that the jurisdiction of the Court to hear suits brought by private individuals against the Provinces would be depressive of the dignity and sovereignty of the Provinces, incompatible with the independence of their internal administration, and subversive of the federal system of government. It is necessary to take these objections into consideration, in order to demonstrate that also in this area the opposition is without foundation.

Jurisdiction unquestionably exists and is recognized by all as constitutional and necessary. First, when one Province sues another. Second, when a foreign State sues a Province. The Provinces in these cases have the duty to appear before the Court and submit to its decision, without anyone seeing any danger to the institutions, nor the slightest offense to the dignity and sovereignty of the Province sued. What reason is there then for it not to be the same, and on the contrary, for all the principles, and even the existence of the provincial governments to be judged compromised, when it is a private individual who has to implore justice against a Province?

If the humiliating thing is that a Province is obliged to appear before the Court, the person who sues and at whose request the summons is issued should be indifferent. The distinction sought to be made can only be made by establishing in principle that the right of a citizen is less sacred before the law than that of all the individuals who compose a province or a state; and this is not even permitted to be enunciated in a single sentence.

The regime of freedom and equality as guaranteed by our Constitution.

But there is something even more extraordinary. Jurisdiction is recognized without difficulty, in addition to the cases indicated above, when a private individual sued by a province counterclaims against the plaintiff province; and in general when a province consents to be sued by private individuals.

This is the most absolute negation of the doctrine opposed to jurisdiction; and the most conclusive proof that its exercise does not compromise any principle, nor involves the least danger to the institutions. The same authority is exercised by the Court over the Provinces by virtue of a claim, as by virtue of a counterclaim. If the exercise of this authority were to injure and denaturalize the institutions, it would be the same in one case as in the other. If it were true that it annihilates the federal regime, consent would not hinder it.

The truth is that all these dangers are imaginary and that jurisdiction is given in the cases mentioned, and is recognized by the opponents themselves, precisely because there is no violation of any fundamental principle, given the nature of our institutions, they are limitations to the exercise of absolute sovereignty, as are those of article one hundred and eight; but limitations all of them that the system not only allows, but requires to fulfill its purposes more fully, and in which the Provinces themselves have consented for high considerations of policy and common interest.

The object of national jurisdiction in the cases indicated, as in all those in which it takes place by reason of persons, is to assure to those who are in a position to request it, a justice free from all suspicion of partiality; and to avoid complications with foreign States, and quarrels between Province and Province, which would endanger the peace and public order. This is true in the cases in question, as well as in others. A denial of justice, a violation of the laws against the rights of a foreigner, would give rise to the intervention of his Government for his protection, and the whole Republic could find itself in external conflicts due to the act of only one of its members. The same would happen if the injured party in one Province were a neighbor of another Province, since these would be on the footing of absolute independence, without an impartial Tribunal to decide the dispute.

It is clear therefore that jurisdiction is in the reason and ends of the Constitution as much as in its letter; and there is no reason to resist it, while admitting it in analogous cases.

It makes the internal administration of the Provinces impossible, it is said, because all the acts of the Provincial Powers can be the object of a lawsuit; and all those acts being judged by the Court, it would be the Court that would govern the Provinces, and the local Governments would disappear.

The error of this objection could not be more palpable. It is the same as saying that it is the Judges in general who govern families, because they have jurisdiction to judge the acts of individuals; or that it is the Superior Court of Buenos Aires, for example, that governs the Province, because it judges in the last degree the acts of the Executive Power in administrative litigation.

It is not true that all acts of the provincial governments can be the subject of litigation, subject to the jurisdiction of the Court. Only those acts in which the provinces act as juridical persons and which can give rise to civil actions can be subject to the jurisdiction of the Court, and from these only those cases in which provincial jurisdiction is voluntarily prorogued or in which a special jurisdiction has been established by express agreement must be excepted in practice. The action of the provincial Powers would therefore suffer no more hindrance than if the jurisdiction were

exercised by a Court of the same Province; and the extreme exaggeration in which this is incurred in this respect is manifestly shown by observing what has happened up to the present time. It is more than ten years since the Supreme Court was installed: it is eight years since it declared itself competent in the case of Mendoza brothers, and yet only a very small number of suits have been attempted against a Province, and fewer still that have been found by the Court to be admissible. The Government of the Provinces has continued freely exercised by the constituted Powers of each of them: the federal regime has remained unharmed: none of the dangers pointed out has become effective; and the only result that can be shown from the exercise of the jurisdiction of the Court, is that of having avoided a violation of the Constitution which without it would have been consummated.

Another error is suffered by asserting that if a Province resists complying with the Court's ruling, there would be no means of compelling it; from which is deduced an argument against jurisdiction to which much importance is attributed.

It is sufficient to refer in this respect to the grounds of the judgment rendered in the aforementioned case against the Province of San Luis without going into the dangerous doctrines with which it has been attempted to sustain this proposition.

Doing honor to the Provinces, the hypothesis of resistance should be considered a moral impossibility and firmly trusting that none of them will attempt to rise up against the Judicial Power of the Nation, taking upon themselves the responsibility of attacking the prestige of one of the most powerful springs of the adopted system of government. An American Judge said in the same circumstances. I hope and pray to God that none of the stars of the American constellation will ever tarnish its brightness by resisting the judgment of a Court which it has itself adopted. In repeating these votes, the Court will add only one observation which will make all reply impossible.

Suppose that in one of those cases in which jurisdiction is beyond doubt, the Province whose judgment is unfavorable resists complying with it. If jurisdiction is recognized, there must be some legal means to enforce the judgment, otherwise the suit would be illusory. What means then would be employed in such cases? Whatever means are designated, they would be applicable in the case in question.

There are therefore, it is necessary to repeat, no real principles violated or compromised. And lest the example of the United States should be invoked, which is inconducive in this matter, it should be noted that it was not in the interest of principles or institutions that the eleventh amendment was adopted. Men of importance have pretended so, dragged perhaps by feelings of national self-love. But see how the American Supreme Court explains the fact, through the organ of its Chief Justice Marshall, who was also a contemporary of the events. It is a part of our history that when the Constitution was adopted, all the States had large debts; and the apprehension that these debts might be enforced in the Federal Courts formed a very serious objection to that instrument. Suits were brought, and the Court sustained its jurisdiction. The alarm was general, and to allay the apprehensions so much aroused, this amendment (the eleventh) was proposed in Congress, and adopted by the Legislatures of the States. From the terms of the amendment it is inferred that its design was not to preserve the sovereignty of the

States from the humiliation which was supposed to come from a compulsory appearance before the Court of the Nation. It does not extend to controversies between two or more States, or between a State and a foreign State. The jurisdiction of the Court still extends to such cases; and in such cases a State may still be sued. It is then necessary to attribute the amendment to some other cause than the dignity of the States; and it is not difficult to find that cause. Those who were restrained from bringing suits against a State, or from prosecuting those brought before the adoption of the amendment, were probably its creditors (6 Wheat. Rep. four hundred and six.)

The situation was different among us, and the doctrine of amendment lacked its main motive.

It follows, therefore, that the law of 1863 did nothing more than adhere to the letter and spirit of the Constitution, and the Court, therefore, finding no merit but to insist on its first decision, resolves not to give place to the article promoted, and declares that the representative of the Province of Buenos Aires must answer the lawsuit. Be notified with the original.

SALVADOR M. DEL CARRIL-FRANCISCO

JOSÉ BARROS PAZOS.

J. B. GOROSTIAGA. J. DOMINGUEZ.

CAUSE XXII.

D. Cárlos Walrrond, against D. Sebastian Carrion
       on the retention of an estate.

Summary.  After the termination of a lawsuit for the claim of a real estate in favor of the plaintiff, the possessor of the property becomes a simple holder of the thing.

The latter may not exercise the right of retention of the estate by virtue of improvements for which he has not been declared creditor, and for which a separate judgment is pending.

Case. By an enforceable judgment of the Federal Court of San Juan, the Guillies heirs were declared owners of an estate owned by Mr. Sebastian Carrion, representing the heirs of Mr. Carrion.

SPANISH ORIGINAL

# CAUSA XXI.

*Don José Leonardo Avegno contra la Provincia de Buenos Aires, sobre reivindicacion de una finca.*

*Sumario.*—1°. Una demanda reivindicatoria, entablada contra un poseedor cuyo título emana de un concurso ya fenecido, no puede considerarse como incidente de él ni cae por consiguiente bajo la sancion del art. 12 de la ley de jurisdiccion y competencia de los tribunales nacionales.

2°. La solicitud presentada ante el Poder Ejecutivo de una provincia en la gestion de un asunto, declarando que se presenta antes de ocurrir al tribunal competente, no importa una demanda en justicia capaz de radicar el juicio; y equivale simplemente á los preliminares conciliatorios que tienen lugar generalmente entre particulares antes de entablarse una demanda.

3°. La ley del congreso, por la que una provincia, considerada como persona jurídica, puede ser demandada ante la Suprema Corte por individuos vecinos de otra provincia ó estrangeros, no es repugnante ni á la letra ni al espiritu de la Constitucion Argentina; no puede decirse depresiva de la dignidad y soberanía de las

provincias, ni incompatible con la independencia de su administracion interna, y es obligatoria en todo el territorio de la nacion, para todas las autoridades tanto nacionales, como provinciales.

———

*Caso.*—D. José Leonardo Avegno, ciudadano oriental, encargó á su apoderado D. Jorge Pintos para que reivindicase del Gobierno de la Provincia de Buenos Aires una finca situada en el pueblo de San Nicolas de los Arroyos, sirviendo ahora de cárcel pública, la que dijo haber comprado en 1853, no habiendo transferido á nadie sus derechos.

Presentándose el apoderado á este efecto al gobierno de la provincia, con una solicitud escrita acompañando sus títulos, se celebró una conferencia con el fiscal y asesor, y se rechazó la solicitud, fundado el Gobierno en que esa finca habia sido comprada por él al concurso seguido contra Avegno en 1857.

Ocurrió entonces el referido apoderado á la Suprema Corte, entablando la correspondiente accion reivindicatoria.

Conferido traslado, el fiscal general de la Provincia de Buenos Aires declinó la jurisdiccion de la Suprema Corte, por los tres siguientes fundamentos.

1°. Por no estenderse la jurisdiccion de la Corte á los casos en que una provincia es demandada por particulares.

Dijo: que los gobiernos provinciales son independientes y soberanos, y obligar una provincia á comparecer ante la barra del tribunal federal en una demanda de un particular, era desconocer su independencia y soberanía ; que el art. 100 de la constitucion es una fiel traduccion de la cláusula 2ª del art. 3°. de la constitucion de los

Estados Unidos; y la doctrina sostenida por los que toma-
ron parte en la formacion de la constitucion Norte-Americana,
fué la negacion de ese derecho á la Corte Federal, cuya
doctrina fundó la enmienda XI, no como cláusula nue-
va, sinó como declaratoria;—que no puede oponerse á
esta teoria la diferencia de nuestro origen, por ser
nuestro ideal político la emancipacion de los poderes lo-
cales; ni el silencio de nuestros constituyentes por no
ser admisible que habiendo aceptado la disposicion Nor-
te-Americano no hayan aceptado tambien su interpreta-
cion auténtica.

2º. Por no poder conocer la Suprema Corte de un jui-
cio universal de concurso.

Dijo: que Avegno fué declarado prófugo y concursado
en 1857; que el gobierno compró á propuesta de los
sindicos del concurso la finca en cuestion.

3º. Por no poderse reabrir ante la jurisdiccion nacio-
nal una causa fenecida ante el Poder Ejecutivo de la
provincia.

Dijo: que la gestion del apoderado de Avegno ante
el gobierno de la provincia fué un verdadero juicio en
lo contencioso administrativo; y que el Poder Ejecutivo
habia conocido en dicho juicio y no se habia apelado
de su decision.

Conferido traslado, la parte de Avegno pidió se dese-
chara la excepcion opuesta.

Dijo respecto al 1er punto, que es preciso distinguir
entre la provincia como entidad política y la provincia
como persona jurídica; que como tal la provincia pue-
de ser demandada; que nuestros constituyentes nunca
pensaron en aceptar las enmiendas Norte-Americanos en el
art. 100 y 101 de la Constitucion; que no hicieron
sinó dos modificaciones respecto de la jurisdiccion de la

Corte Federal, á saber en los conflictos entre poderes pú-
blicos y en los recursos de fuerza ; que esta teoría es una
garantía de tranquilidad en las relaciones diplomaticas y
está consagrada por varios fallos de la Suprema Corte.

Respecto al 2º punto : que en la cuestion presente
no se trataba de un juicio de concurso sino tan solo
de resolver sobre el mejor derecho entre sus títulos y los
de un pretendido concurso en los que se funda el gobier-
no de la provincia.

Respecto al 3º. punto ; que no ha intervenido en este
asunto ningun juicio contencioso administrativo, ni él
ha reconocido nunca jurisdiccion en el Poder Ejecutivo
para que fallase sobre su solicitud.

Se pasó en seguida visto al Sr. Procurador general
quien dijo que la competencia de la Corte en esta cau-
sa estaba claramente establecida por el art. 100 de la
constitucion que responde á necesidades evidentes del
órden politico; que la provincia obra en este caso co-
mo persona jurídica; que el ejemplo de los Estados-
Unidos era *contra producentem* porque antes de ser en-
mendada aquella constitucion, se reconocia en la corte
federal Norte-Americana jurisdiccion para conocer de las
demandas de los particulares contra las provincias ; que la
constitucion Norte-Americana habia sido enmendada des-
pues, pero que nosotros debemos regirnos no por aque-
lla constitucion, sinó por la nuestra que no admitió
dicha enmienda.

### Fallo de la Suprema Corte.

Buenos Aires, Abril 11 de 1874.

Vistos estos autos promovidos por Don Jorge Pintos, en
representacion de Don José Leonardo Avegno, ciudadano

de la República Oriental, contra la Provincia de Buenos
Aires, sobre reivindicacion de una finca situada en San
Nicolás de los Arroyos; y el artículo en ellos promovido
por el Fiscal de dicha Provincia, declinando la jurisdic-
cion de la Suprema Corte, resulta que la declinatoria se
funda en las tres causas siguientes :

Primera, que la casa que se trata de reivindicar fué
comprada por el Gobierno de la Provincia al concurso de
Don José Leonardo Avegno declarado prófugo; y que por
consiguiente, entrando la Corte á conocer de la demanda,
conoceria en un juicio de concurso, contra lo dispuesto
en el artículo doce de la ley de mil ochocientos sesenta y
tres sobre jurisdiccion y competencia.

Segunda, que el apoderado de Avegno reclamó la finca
ante el Poder Ejecutivo de la Provincia, y desechada su
peticion, no dedujo recurso alguno ; quedando asi con-
cluido el asunto, y no pudiendo ser reabierto ante la ju-
risdiccion nacional, en virtud de lo dispuesto en el artículo
catorce de la ley citada.

Tercera, que con arreglo á la Constitucion, la juris-
diccion de la Corte no se estiende á los casos en que
una Provincia es demandada por particulares.

Primero, con respecto al primer motivo, resulta que
los documentos remitidos por el Gobierno de la Provincia
demandada, y que corren en testimonio de fojas cincuenta
y cuatro á ochenta y seis, no acreditan precisamente que
Don José Leonardo Avegno haya sido concursado, ni que
en el juicio de su concurso haya sido vendida la casa
de la cuestion. Así pudiera hacerlo presumir la califi-
cacion de *prófugo* que el Prior del consulado aplica á
Avegno en el oficio de foja cincuenta y cuatro ; y el en-
cabezamiento con que á foja ochenta y cuatro vuelta
aparece la cuenta del Banco relativa al depósito del pre-

cio. Pero hay otras circunstancias que convencen de lo
contrario. No aparecen gestionando ante el Tribunal de
Comercio los síndicos de un concurso, como seria si este
existiera, sinó los mismos acreedores interesados. Son
estos los que contratan la venta, los que formulan las
condiciones, é instan porque el Gobierno manifieste su
aceptacion; y al indicar en sus escritos el espediente en
que se presentan, en vez de referirse á unos, autos de
concurso; dicen *en los autos con Don* José L. Avegno
*por cobro de cantidad de pesos*, fojas sesenta y nueve y
setenta. Parece pues que no ha habido otra cosa que
una ejecucion seguida por dos acreedores contra Avegno,
y que para pagar á esos dos acreedores fué embargada
y vendida la casa.

Pero hubiese ó no concurso, el resultado seria el misino.
El juicio universal habria quedado concluido con la ven-
ta de los bienes del deudor y distribucion de su precio;
y de ningun modo puede decirse que viene á ser reabier-
to con la presente demanda reivindicatoria; demanda
entablada por un individuo que afirma no ser el deudor
concursado ó ejecutado, lo que á su tiempo se investigará,
si fuere contradicho, y no dirijida contra el concurso
fenecido hace diez y siete años, sinó contra el actual
poseedor de la finca. El título de esta emanaria de un
concurso; pero no por eso podria considerarse como in-
cidente de él la accion real intentada; como no podrian
considerarse incidentes de un juicio de particion de he-
rencia, las acciones dirijidas despues de la liquidacion de-
finitiva contra los que hubiesen comprado bienes de la
testamentaria. No es pues el caso de aplicar el artículo
doce de la ley de jurisdiccion y competencia, ni aun en
la hipótesis de que haya habido concurso.

Segundo, si el demandante hubiera deducido sus ac-

ciones ante el Poder Ejecutivo de la Provincia, siguiéndose un juicio propiamente dicho, indudablemente habria perdido el derecho de ocurrir ante la Corte, en virtud del artículo catorce de la citada ley de jurisdiccion y competencia. Pero á lo alegado á este respecto por el Señor Fiscal de la Provincia se contesta perentoriamente con los términos de la solicitud testimoniada á foja ochenta vuelta. Allí se vé que al presentarse el apoderado de Avegno ante el Gobierno Provincial, pidiendo la entrega de la casa, dijo espresamente que lo hacia *antes de ocurrir, para la gestion de sus derechos, ante el Tribunal que debia ampararlo en el caso de una negativa.* Aquella peticion pues, no importa una demanda en justicia capaz de radicar el juicio, y de surtir el fuero provincial, con esclusion del nacional. Equivale simplemente á los preliminares conciliatorios que tienen lugar generalmente entre particulares, y que no podian tener otra forma en este caso, atentos los respetos debidos á la autoridad á quien se dirijia la reclamacion.

Tercero, solo queda pues el tercer motivo alegado, que consiste en la falta de jurisdiccion de la Corte para conocer en demandas de particulares contra una Provincia. Esta cuestion ha sido ya resuelta por este Tribunal, y bastaria reproducir aquí los fundamentos del fallo pronunciado en el caso de Mendoza Hermanos, contra la Provincia de San Luis (causa LXXII, tomo primero de los Fallos), si la importancia del asunto no hiciera conveniente dar mayor desenvolvimiento á algunos de aquellos fundamentos, y aun aducir otros nuevos.

Está espresamente declarado por ley del Congreso que una Provincia puede ser demandada ante la Suprema Corte por individuos vecinos de otra Provincia ó estrangeros.

Así lo dispone la ley de mil ochocientos sesenta y tres sobre jurisdiccion y competencia en el inciso primero del artículo primero, atribuyendo jurisdiccion á la Corte para conocer en primera Instancia *de las causas civiles que versen entre una Provincia y algun vecino ó vecinos de otra, ó ciudadanos ó súbditos estrangeros.* Lo sanciona virtualmente la misma ley en el artículo ocho ; y hasta la posibilidad de suscitar dudas y cuestiones sobre el particular desaparece ante el inciso cuarto del artículo doce que se espresa en estos términos « siempre que en pleito civil un estrangero demande á una Provincia ó un ciudadano, &, & ».

Esta ley, como toda ley de la Nacion es obligatoria en todo su territorio ; y todas las autoridades tanto nacionales como de las Provincias le deben respeto y obediencia (artículo treinta y uno de la Constitucion ); solo una razon puede obstar á que se aplique á los casos ocurrentes, y es que á juicio de la Suprema Corte, sea contraria á las prescripciones de la ley fundamental ó á los principios que le sirven de base.

Toda la presente cuestion depende por lo tanto de investigar si la ley del Congreso es ó no repugnante á la Constitucion ; y de establecer para ello cuál es la verdadera significacion de las cláusulas constitucionales referentes á la jurisdiccion de la Corte.

Al entrar en esa investigacion, es necesario tener presente que, para que una ley debidamente sancionada y promulgada sea declarada ineficaz por razon de inconstitucionalidad, se requiere que las disposiciones de una y otra ley sean absolutamente incompatibles ; que haya entre ellas una evidente oposicion segun la espresion del « Federalista » ( número ochenta y uno, párrafo tercero ).

Así lo exije el respeto que se debe á los altos Poderes que concurren á la formacion de las leyes.

La incompatibilidad puede ser con la letra de la Constitucion, ó solamente con su espíritu, es decir, con su verdadero significado cuando la letra es oscura ó dá lugar á diversas interpretaciones.

Con la letra, puede asegurarse desde luego que no hay incompatibilidad ninguna en este caso « corresponde á la Suprema Corte, dice la Constitucion, el conocimiento y decision de todas las causas....que se susciten entre dos ó mas Provincias; *entre una Provincia y los vecinos de otra*;....y entre una Provincia y sus vecinos contra un Estado ó ciudadano estrangero ». «En los casos en que una Provincia fuese parte, la Corte Suprema ejercerá su jurisdiccion originaria y esclusivamente».

Tanto en el lenguage comun como en el jurídico se dice que una causa es entre una Provincia y un ciudadano ó súbdito estrangero, lo mismo cuando la Provincia es demandante que cuando es demandada : y una Provincia *es parte*, tanto cuando es demandada como cuando demanda.

No es posible por consiguiente hacer la menor objecion á la ley del Congreso bajo este punto de vista : su letra está en perfecta armonía con la letra de la Constitucion. Los mas decididos opositores á la jurisdiccion de la Corte lo reconocen así ; y el representante de la Provincia demandada en este caso no pretende lo contrario, ni hace argumento alguno que requiera entrar en demostraciones que seria fácil llevar hasta la evidencia.

Lo que se invoca es el espíritu y los propósitos de la Constitucion.

La Constitucion Argentina se dice, no ha hecho mas que adoptar el texto de la Norte-Americana, y debe suponerse que al adoptar el texto ha querido tambien adoptar su espíritu. Y como esto seria *contra producente* .

en presencia de la enmienda undécima de aquella cons-
titucion, no aceptada por la nuestra, se pretende que el
espíritu de la Constitucion Americana era contrario á la
jurisdiccion de la Corte aun antes de la enmienda undécima ;
que esta no es mas que una declaratoria ó interpretacion
de la cláusula constitucional ; y que por lo mismo, á pe-
sar de no haber sido espresamente adoptada por nuestros
constituyentes de mil ochocientos cincuenta y tres ni por
los de mil ochocientos sesenta, debe considerarse adop-
tada con el texto interpretado.

Toda esta argumentacion cae por su base con solo
observar que la Constitucion Americana no ha sido opues-
ta á la jurisdiccion de que se trata, sinó despues y en
virtud de la enmienda undécima; y que esta es una verda-
dadera enmienda y no otra cosa.

Sostener lo contrario es alucinarse tomando como de-
cisivas y concluyentes opiniones individuales, que por
respetables que sean, han tenido otras en contra de no
menos importancia. La Constitucion Americana tuvo opo-
sitores numerosos, y exaltados á tal punto, que cada
una de sus cláusulas, puede decirse, daba lugar á aca-
loradas discusiones. — Sus mismos sostenedores se encon-
traban á veces divididos, y tenian que hacerse mútua-
mente el sacrificio de sus opiniones individuales, para
llegar al resultado final que se buscaba.

Las cláusulas concernientes á la jurisdiccion de la Su-
prema Corte, fueron de las que mas ardiente oposicion
suscitaron, especialmente, en algunos Estados ; y esto es-
plica porque aparecen entendidas y comentadas en di-
ferentes sentidos. Pero á pesar de todo, ellas fueron al
fin aceptadas tales como las sancionó la Convencion cons-
tituyente, sin alteraciones ó limitaciones, que hubieran
exijido una nueva convocatoria de aquella Convencion ;

DE JUSTICIA NACIONAL **435**

y sin que las reservas particulares de algun Estado pudieran considerarse como la espresion de la voluntad general.

Despues de instalada la Suprema Corte, no tardaron en presentarse demandas de particulares contra algunos Estados; y una prueba de que la inteligencia contraria á la jurisdiccion no fué una cosa generalmente admitida como se pretende, es que hubo alguno entre los Estados demandados, que compareció llanamente y contestó á la demanda, como si fuera un deber fuera de toda discusion.

Fué el Estado de Georgia, demandado por un vecino de otro Estado, el que promovió la cuestion, dando lugar al gran debate conocido bajo el nombre de Chisholm V. Georgia. Todos los argumentos de la oposicion se hicieron valer entonces hábilmente, los mismos que ochenta años despues se reproducen hoy entre nosotros; pero la Suprema Corte, á pesar de todo se declaró competente, sosteniendo que con arreglo á la Constitucion, *en su letra* y *en su espíritu*, un Estado podia ser demandado por vecinos de otro. Y conviene notar para que se reconozca todo, el peso é importancia de esta resolucion, que quien sostuvo esa doctrina como Procurador Goneral, fué Mr. Raudolf, antiguo Gobernador de Virginia y autor del proyecto llamado *el plan de Virginia;* y que entre los jueces que componian el Tribunal figuraban Mr. John Jay, uno de los compañeros de Hamilton en la redaccion del Federalista, el jurisconsulto Cushing, James Wilson y John Blair, individuos de la Convencion constituyente y firmantes de la Constitucion : todos colaboradores mas ó menos espectables en los trabajos preparatorios de esa grande obra, amigos caracterizados del nuevo órden de cosas, y de bastante importancia para que fuesen llamados

á plantear ó iniciar los trabajos de la nueva institucion judicial.

Con esa sentencia, pronunciada por jueces tan competentes en todo sentido, á quienes no puede atribuirse ignorancia de las cosas de la época, ni el ánimo de falsear la Constitucion, quedó fijado el verdadero sentido de la cláusula discutida. La interpretacion de la Suprema Corte, como Poder encargado de fallar en definitiva las cuestiones constitucionales, y mantener inalterable su espíritu, es final y decisiva. Uno solo de sus fallos no hace jurisprudencia, en el sentido rigoroso de esta palabra. Pero una vez conocida la conciencia y la opinion de los jueces, la presuncion natural es que sus fallos subsiguientes serán conformes con el primero; y es por esto que en los Estados-Unidos, donde se tributa gran respeto á la máxima *stare decisis*, basta generalmente una sentencia para que se tenga por resuelto el punto cuestionado. Puede provocarse nuevos debates y nuevas resoluciones, porque la Corte no decide sinó casos particulares; pero si se quiere prevenir eficazmente los efectos de la interpretacion hecha, y establecer una regla ó principio contrario, que obligue aún á la Corte misma, no hay otro medio que la enmienda de la cláusula interpretada.

La enmienda es lo único que autoriza la Constitucion Americana en su artículo V, y á ella se recurrió despues del fallo de la Suprema Corte en el caso mencionado. Se quería hacer al Poder Judicial una limitacion que no tenia en el texto, y se propuso la enmienda. Así la llamó el Congreso; y como enmienda fué sancionada, ratificada por la mayoría de los Estados, é inscripta con su correspondiente número de órden á continuacion de las precedentes; y como tal ha sido tenida y designada

siempre en los Estados-Unidos. Y si ella comprende los casos futuros y los pendientes al tiempo de la sancion, no es porque sea una mera declaratoria, sinó porque asi lo dispuso la misma enmienda. « El objeto de la en- mienda, ha dicho el Juez Marshall, comentando las pa- labras ; *causas· iniciadas ó proseguidas*, fué no solo im- pedir la iniciacion de procesos futuros, sinó detener la prosecucion de los que estuviesen iniciados *cuando ese artículo formase parte de la Constitucion* » (6 Wheat Rep. cuatrocientos ocho).

Puede pues, afirmarse que « el Poder Judicial, segun fué originariamente establecido, *se estendia* á las causas seguidas *contra* uno de los Estados por ciudada- nos de otro Estado, ó por ciudadanos ó súbditos estran- geros » (Kent. coment. tomo primero, párrafo trescientos veinte) y que fué necesaria la enmienda XI para que dejara de ser así. Resulta por consiguiente, que ha- biendo adoptado nuestra Constitucion el texto originario de la Americana, omitiendo la enmienda XI que lo mo- dificó, es evidente que quiso dar á la jurisdiccion de este Tribunal la estension que tenia el Americano segun aquel texto, sin la limitacion de la enmienda omitida.

Pero no es lo que precede lo único ni lo mas impor- tante en favor de esta conclusion. Antecedentes propios que se echan en olvido, conducen á ella con mas evi- dencia, si es posible.

En la Constitucion de mil ochocientos cincuenta y tres, la cláusula relativa á la jurisdiccion de los Tribunales Nacionales estaba formulada en estos términos, « artículo noventa y siete. Corresponde á la Corte Suprema y á los Tribunales inferiores de la Confederacion, el conocimien- to y decision de todas las causas que versen sobre puntos regidos por la Constitucion, por las leyes de la Confe-

deracion y por los tratados con las naciones estrangeras;
*de los conflictos entre los diferentes Poderes públicos de una
misma Provincia*; de las causas concernientes á emba-
jadores, ministros públicos y cónsules estrangeros; de las
causas de almirantazgo y jurisdiccion maritima; *de los
recursos de fuerza*; de los asuntos en que la Confedera-
cion sea parte; de las causas que se susciten entre dos
ó mas Provincias; entre una Provincia y los vecinos do
otra; entre los vecinos de diferentes Provincias; ENTRE UNA
PROVINCIA Y SUS PROPIOS VECINOS; y entre una Provincia
y un Estado ó ciudadano estrangero. »

Este artículo no era una simple cópia del correlati-
vo de la Constitucion Americana. El sometia á la ju
risdiccion de la Corte, no solo las causas que le some-
te aquella constitucion, sino ademas *los recursos de fuer-
za, los conflictos entre los diferentes Poderes públicos de una
misma Provincia*, y lo que es mas notable, *las causas
entre una Provincia y sus propios vecinos.*

Basta notar esto para comprender que los autores de
una y otra Constitucion no eran guiados en este punto
por propósito igualmente limitados. Nuestros Constitu-
yentes quisieron dar y dieron al Poder judicial atribucio-
nes mas estensas que los Americanos. ¿Cómo conciliar
esta tendencia manifiesta, con la aceptacion tácita de li-
mitaciones agenas al testo que se adoptaba?

La cláusula relativa á las cuestiones *entre una Pro-
vincia y sus propios vecinos*, comprendia evidentemente
tanto los casos en que la Provincia fuese demandante,
como en que fuese demandada. El sentido literal de
las palabras escluye toda otra inteligencia; y á no ser
así, seria imposible descubrir ni la sombra de una ra-
zon plausible para someter esas controversias no solo á

la jurisdiccion nacional, sinó del mas alto Tribunal de la Nacion.

El objeto no pudo ser otro que dar garantías á los particulares, proporcionándoles para sus reclamaciones, jueces al abrigo de toda influencia y de toda parcialidad. Y si se llevaron estos propósitos hasta el estremo de aplicarlos á los que tuviesen cuestiones con la Provincia de su propio origen ó domicilio, ¿con cuánta mas razon no será necesario concluir que se quiso aplicarlos cuando el interesado fuese un estranjero ó un vecino de otra Provincia?

No puede pues decirse que los constituyentes de mil ochocientos cincuenta y tres guardaron simplemente silencio.—Por disposiciones de muy claro alcance revelaron una intencion y una voluntad enteramente contrarias a la doctrina de la enmienda Americana. Y tan deliberado aparece su proceder, que al mismo tiempo que escluian la enmienda undécima, adoptaban é incorporaban al testo otras varias, como la cuarta (articulo diez y ocho), la quinta (artículo diez y siete y diez ocho) y la décima (artículo ciento cuatro)

Vinieron despues las reformas de mil ochocientos sesenta.—La convencion provincial de Buenos Aires propuso la supresion de solo dos cláusulas del artículo noventa y siete: las que sometian á la Suprema Corte los recursos de fuerza, y la decision de los conflictos entre los diferentes poderes públicos de una misma Provincia. Todo lo demas lo dejó subsistente, inclusa la jurisdiccion sobre las causas *entre una Provincia y sus propios vecinos*—Mas aun, pidió la incorporacion en todo ó en parte de otras enmiendas Americanas no adoptadas espresamente en el texto de mil ochocientos cincuenta y tres, como la primera y la novena (artículo treinta

y dos y treinta y tres, Constitucion reformada) y no hizo mencion de la undécima—Y adviertase que esto no podria esplicarse ni aun por lo razon inexacta de ser esta una simple declaratoria, porque la novena tiene la misma forma, y fué sin embargo incorporada.

Las sesiones de la Convencion arrojan poca luz en esta materia, y ofrecen pocos elementos de interpretacion. Pero lo poco que contienen es contrario tambien á la doctrina de los opositores á la jurisdiccion. Manifestando dudas un diputado sobre si serian de jurisdiccion nacional las cuestiones *entre un simple estranjero y el Gobierno de un Estado*, otro diputado le contestaba que si eran (Diario de Sesiones pájina doscientos treinta y seis) y el testo se dejaba como estaba; y ni aun con este motivo, que ponia de manifiesto la dificultad se recurria á la enmienda undécima, ni se pedia su adopcion.

«Solo hay el caso de jurisdiccion sobre los Estados, cuando un Estado demanda á otro», decia otro Convencional en el seno de la Comision encargada de dictaminar sobre las reformas; y se pretende sacar argumento de esta frase, aislándola de las subsiguientes que fijan su verdadero significado.—Se proponia ese convencional demostrar la necesidad de suprimir la cláusula que sometía á la Corte los conflictos entre los diferentes poderes de una misma Provincia, y despues de las palabras trascriptas continuaba.—Pero entonces, no es el Poder público de un Estado que trae á la barra de la Suprema Corte el Poder público de otro Estado; sinó que ambos comparecen *en un interés particular, como personas individuales*, y no para discutir su capacidad política, *ni para que las atribuciones de sus Poderes públicos sean juzgadas, limitadas ó estendidas*, segun el jui-

cio de la Suprema Corte. » Era pues el poder de juz-
gar á los Estados ó sus Poderes públicos *en su carác-
ter político*, lo que se queria negar á la Corte; no el
poder de juzgar sus controversias cuando comparecen
como personas jurídicas, en un interés individual — Si
el sentido de esa frase hubiera sido limitar de un mo-
do absoluto los casos de jurisdiccion sobre los Estados,
aun en su carácter de personas jurídicas, habria sido
evidentemente inexacta y no tendria valor alguno, por-
que, como se verá mas adelante, hay otros casos en
que nadie niega que exista esa jurisdiccion.

Sometidas las reformas propuestas por Buenos Aires
á la Convencion Nacional de Santa-Fé, la parte relativa
al Poder Judicial fué modificada, suprimiendo en el artículo
noventa y siete (hoy cien) la cláusula que decia « entre
una Provincia y sus propios vecinos » y quedando el final
de dicho artículo, así formulado « y entre una Provincia
*ó sus vecinos*, contra un Estado ó ciudadano estrangero » es
decir, lo mismo que antes era, con la sola agregacion
de las palabras, *ó sus vecinos*, que vinieron á llenar un
vacío, sin duda involuntario, del testo primitivo (actas
de las Sesiones página veinte y cuatro). Por consiguien-
te, la jurisdiccion sobre las causas entre una Provincia
y un vecino de otra ó un estrangero, quedó sin alte-
racion. No se escribió, no se dijo nada que revelase
ni remotamente, la intencion de adoptar le enmienda,
para lo cual habria bastado una sola palabra.

Estos antecedentes, olvidados como se dijo antes por
los opositores á la jurisdiccion, no dejan duda ninguna
de que ni los autores ni los reformadores de la Constitucion
entendieron adoptar la limitacion de la enmienda, y que
por el contrario, la escluyeron deliberada é intencional-
mente.

En apoyo de esto mismo y en prueba de que así fué entendida siempre la cláusula constitucional, vienen ademas los actos que se sucedieron despues de puesta en vigencia la Constitucion reformada. Está en primer lugar la ley de jurisdiccion y competencia de que se ha hablado al principio, y en que se declaró estensiva la de la Corte á las demandas de particulares contra los Estados. Sin que levantase en contra una sola voz, á pesar de figurar en el Congreso personas de reconocida competencia, que habian hecho parte tambien de la Convencion Constituyente. Solo hubo dificultad y discusion respecto á las demandas contra la Nacion, las cuales sostenian varios diputados que estaban y debian declararse comprendidas en la disposicion constitucional.

Está la promulgacion de esa ley hecha por el Poder Ejecutivo, sin objetarla.

Está el fallo de la Corte en el caso de Mendoza hermanos contra la Provincia de San Luis;

Y está por último la negativa del Congreso á declarar necesaria la reforma de la Constitucion. La reforma fué propuesta por el hábil abogado que dirigia en juicio á una de las Provincias resistentes (la de Entrerios, que últimamente ha contestado una nueva demanda). La oportunidad no podia ser mas favorable, porque se trataba de otra enmienda, considerada indispensable, para la cual debia convocarse una Convencion. Y sin embargo, el Congreso, único poder investido con la facultad de iniciar una reforma constitucional, declarándola necesaria, desechó la proposicion casi por unanimidad, desestimando los motivos alegados.

De modo que la cláusula constitucional fué uniformemente entendida como favorable á la jurisdiccion de la Corte, por los tres Poderes Públicos de la Nacion, en

ejercicio de sus respectivas atribuciones. Y todo este cúmulo de autoridad y de opinion se pretende que debe considerarse como de poca ó ninguna importancia.

Pero se alega por otra parte, que la Jurisdiccion de la Corte para conocer en demandas de particulares contra las Provincias, seria depresivo de la dignidad y soberanía de aquellas; incompatible con la independencia de su administracion interior, y subversivo del régimen federal de gobierno. Es preciso tomar en consideracion estas objeciones, para demostrar que tambien en ese terreno la oposicion es destituida de fundamento.

La jurisdiccion existe incuestionablemente y todos la reconocen como constitucional y necesaria. Primero, cuando una Provincia demanda á otra. Segundo, cuando un Estado estrangero demanda á una Provincia.

Las Provincias en estos casos tienen el deber de comparecer ante la Corte y someterse á su fallo, sin que nadie vea peligro alguno para las instituciones, ni la mas leve ofensa á la dignidad y soberanía de la Provincia demandada. ¿Qué razon hay entonces para que no sea lo mismo, y por el contrario, se juzguen comprometidos todos los principios, y hasta la existencia de los gobiernos provinciales, cuando es un particular el que tiene que implorar justicia contra una Provincia?

Si lo humillante es que una Provincia sea obligada á comparecer ante la Corte, la persona que demanda y á cuya instancia se hace el emplazamiento debiera ser indiferente. Solo puede hacerse la distincion que se pretende, estableciendo en principio que es ménos sagrado ante la ley el derecho de un ciudadano, que el del conjunto de individuos que componen una Provincia ó un Estado; y esto ni enunciarlo es permitido ba-

jo un régimen de libertad y de igualdad como el que garante nuestra Constitucion.

Pero hay algo mas estraordinario todavía. La jurisdiccion es reconocida sin dificultad, á mas de los casos antes indicados, cuando un particular demandado por una Provincia, reconviene ó demanda á su vez á la Provincia demandante; y en general cuando una Provincia consiente en ser demandada por particulares.

Esto importa la negacion mas absoluta de la doctrina opuesta á la jurisdiccion; y la prueba mas concluyente de que su ejercicio ni compromete principio ninguno, ni envuelve el menor peligro para las instituciones. La misma autoridad ejerce la Corte sobre las Provincias en virtud de una demanda, que en virtud de una reconvencion. Si el ejercicio de esa autoridad hiriese y desnaturalizase las instituciones, lo mismo seria en un caso que en otro. Si fuese cierto que aniquila el régimen federal, el consentimiento no lo estorbaria.

La verdad es que todos esos peligros son imaginarios y que se da la jurisdiccion en los casos mencionados, y la reconocen los mismos opositores, precisamente porque no hay en ello violacion de ningun principio fundamental, dada la índole de nuestras instituciones, son limitaciones al ejercicio de una soberanía absoluta, como son los del artículo ciento ocho; pero limitaciones todas ellas que el sistema no solo permite, sinó que requiere para llenar mas cumplidamente sus fines, y en que las Provincias mismas han consentido por altas consideraciones de política y de interés comun.

El objeto de la jurisdiccion nacional en los casos indicados, como en todos aquellos en que tiene lugar por razon de las personas, es asegurar á los que se hallen

en el caso de pedirla, una justicia libre de toda sospecha de parcialidad; y evitar complicaciones con Estados estrangeros, y querellas entre Provincia y Provincia, que pondrian en peligro la paz y el órden público.

Eso se verifica en los casos de la cuestion, tanto como en los otros. Una denegacion de justicia, una violacion de las leyes contra los derechos de un estrangero, daria lugar á que su Gobierno interviniese en su proteccion, y la República toda podria verse en conflictos esternos por el hecho de uno solo de sus miembros. Otro tanto sucederia si el injuriado por una Provincia fuese un vecino de otra Provincia, desde que estas se encontrasen en el pié de una absoluta independencia, sin un Tribunal imparcial que decidiese la contienda.

Es claro por consiguiente que la jurisdiccion está en la razon y los fines de la Constitucion tanto como en su letra; y no hay motivo para resistirla, al mismo tiempo que se admite en casos análogos.

Ella hace imposible se dice, la administracion interna de las Provincias, porque todos los actos de los Poderes provinciales pueden ser objeto de una demanda; y siendo juzgados todos aquellos actos por la Corte, vendria á ser ella quien gobernase á las Provincias, desapareciendo los Gobiernos locales.

El error de esta objecion no puede ser mas palpable. Es lo mismo que decir que son los Jueces en general los que gobiernan las familias, porque tienen jurisdiccion para juzgar los actos de los particulares; ó que es el Superior Tribunal de Buenos Aires, por ejemplo, el que gobierna la Provincia, porque juzga en último grado los actos del Poder Ejecutivo en lo contencioso administrativo.

No es cierto que todos los actos de los gobiernos

provinciales puedan ser materia de pleito, sujeto á la
jurisdiccion de la Corte. Solo pueden serlo aquellos, en
que las Provincias obran como personas jurídicas, y que
pueden producir acciones civiles; y de estos mismos
hay que exceptuar en la práctica, los casos en que vo-
luntariamente se proroga la jurisdiccion provincial, ó en
que se ha establecido por pacto espreso una jurisdiccion
especial. La accion pues de los Poderes provinciales no
sufriria mas trabas que si la jurisdiccion fuese ejercida
por un Tribunal de la misma Provincia; y la estrema-
da exageracion en que se incurre á este respecto apa-
rece manifiestamente, observando lo que ha sucedido
hasta el presente. Hace mas de diez años que fué
instalada la Suprema Corte : hace ocho años que se
declaró competente en el caso de Mendoza hermanos,
y sin embargo, solo un número muy reducido de de-
mandas han sido intentadas contra una Provincia, y mé-
nos aun las que han sido encontradas por la Corte en
condiciones de ser admitidas. El Gobierno de las Pro-
vincias ha continuado libremente ejercido por los Po-
deres constituidos de cada una de ellas : el régimen
federal ha permanecido ileso : ninguno de los peligros
señalados se ha convertido en hecho efectivo; y el úni-
co resultado que puede mostrarse del ejercicio de la
jurisdiccion de la Corte, es el de haberse evitado una
violacion de la Constitucion que sin ella se habria
consumado.

Otro error se padece aseverando que si una Provin-
cia resistiese cumplir el fallo de la Corte, no habria
medios de compelerla ; de donde se deduce un argu-
mento contra la jurisdiccion á que se atribuye mucha
importancia.

Basta referirse á este respecto á los fundamentos del

fallo pronunciado en el citado caso contra la Provincia de San Luis sin entrar á considerar las peligrosas doctrinas con que se ha tratado de sostener esa proposicion.

Haciendo honor á las Provincias, debe mirarse como un imposible moral la hipótesis de la resistencia y confiar firmemente en que ninguna de ellas ha de intentar alzarse contra el Poder Judicial de la Nacion, echando sobre sí la responsabilidad de atentar contra el prestigio de uno de los mas poderosos resortes del sistema de gobierno adoptado. Un Juez americano decia en iguales circunstancias. « Espero y pido á Dios que ninguna de las estrellas de la Constelacion Americana hará jamas que se empañe su brillo, oponiendo resistencia al fallo de una Corte que ella misma ha adoptado. » Repitiendo estos votos, el Tribunal solo agregará una observacion que hará imposible toda réplica.

Supóngase que en uno de esos casos en que la jurisdiccion está fuera de toda duda, la Provincia quien el fallo es desfavorable resiste cumplirlo. ¿Qué se hace? Desde que se reconoce la jurisdiccion, algun medio legal debe haber para hacer efectiva la sentencia, porque de lo contrario, el juicio seria ilusorio. ¿Qué medios pues se emplearian en esos casos? Cualesquiera que se designen, esos mismos serian aplicables en el caso de la cuestion.

No hay pues, es preciso repetirlo, verdaderos principios violados ó comprometidos. Y para que no se invoque el ejemplo de los Estados Unidos, inconducente en esta materia, es preciso notar que no fué en el interés de los principios, ni de las instituciones que se verificó la enmienda undécima. Hombres de importancia así lo han pretendido, arrastrados tal vez por sentimientos de amor propio nacional. Pero véase como

esplica el hecho la Suprema Corte Americana, por el
órgano de su Presidente Marshall, contemporáneo tam-
bien de los sucesos. « Es una parte de nuestra historia
que al adoptarse la Constitucion, todos los Estados te-
nian grandes deudas; y el recelo de que esas deudas
pudiesen ser exigidas ante los Tribunales federales for-
mó una objecion muy seria contra aquel instrumento.
Se entablaron demandas y la Corte sostuvo su jurisdic-
cion. La alarma fué general, y para calmar las apren-
siones en tanto grado suscitadas, fué propuesto esta en-
mienda (la undécima) en el Congreso, y adoptada por
las Legislaturas de los Estados. De los términos de la
enmienda se infiere *que su designio no fué preservar la
soberania de los Estados de la humillacion que se suponia
provenir de una comparencia compulsoria ante el Tribu-
nal de la Nacion.* Ella no comprende las controversias
entre dos á mas Estados, ó entre un Estado y un Es-
tado estranjero. La jurisdiccion de la Corte se estien-
de todavia á esos casos; y en ellas un Estado puede
aun ser demandado. *Es preciso entónces atribuir la en-
mienda á alguna otra causa que la dignidad de los Es-
tados;* y no es dificil encontrar esa causa. Los que
quedaron inhibidos de entablar demandas contra un Es-
tado, ó de proseguir las entabladas antes de la adop-
cion de la enmienda, eran probablemente sus acreedo-
res, &ᵃ &ᵃ, (6 Wheat. Rep. cuatrocientos seis.)

Entre nosotros era distinta la situacion, y faltó á la
doctrina de la enmienda su móvil principal.

Resulta pues de todo, que la ley de 1863 no hizo
mas que ceñirse á la letra y al espíritu de la Consti-
tucion, y la Corte, por lo tanto, no encontrando mé-
rito sinó para insistir en su primera decision, resuelve
no hacer lugar al artículo promovido, y declara que el

representante de la Provincia de Buenos Aires debe contestar á la demanda. Notifíquese con el original.

SALVADOR M. DEL CARRIL.—FRANCISCO
DELGADO. — JOSÉ BARROS PAZOS. —
J. B. GOROSTIAGA. — J. DOMINGUEZ.

# CAUSA XXII.

*D. Cárlos Walrrond, contra D. Sebastian Carrion*
*sobre retencion de una finca.*

*Sumario.* — 1º Fenecido un juicio de reivindicacion de un inmueble en favor del actor, el poseedor del fundo se convierte en un simple tenedor de la cosa.

2º Este no puede ejercitar el derecho de retencion del fundo en virtud de mejoras de las que no ha sido declarado acreedor, y sobre las que pende un juicio por separado.

*Caso.* — Por fallo ejecutoriado del Juzgado Federal de San Juan se declararon dueños de una finca poseida por D. Sebastian Carrion, los herederos Guillies represen-

# DECLARATION OF TRANSLATOR
## REGARDING ACCURACY OF TRANSLATION

Pursuant to 28 U.S.C. § 1746, Maria E. Manghi hereby declares as follows:

I am a lawyer employed by Cleary Gottlieb Steen & Hamilton LLP presently residing and working within the State of New York;

I am proficient with the Spanish language and the English language and have reviewed the foregoing documents (Ex. B, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 155, pages 248-49; Ex. C, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 14, pages 425-49; Ex. D, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 147, pages 286, 301-04; Ex. E, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 335, pages 2333-62; Ex. F, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 340, pages 47-76; Ex. G, Argentine National Constitution; Ex. H, Argentine Law No. 26,854; Ex. I, Cassagne, Juan C., Curso de Derecho Administrativo, 12ª ed., Buenos Aires, La Ley, 2018, Tomo II, excerpt on page 331; Ex. J, Argentine Law No. 17,319l; Ex. K, Código Civil y Comercial de la Nación, articles 235-37; Ex. L, Balbín, Carlos F., Tratado de Derecho Administrativo, 2ª ed., Buenos Aires, La Ley, 2015, Tomo II, excerpts on pages 909, 911, and 915; Ex. M, Lorenzetti, Ricardo L., Código Civil y Comercial de la Nación comentado, 1° ed., Santa Fé, Rubinzal-Culzoni, 2014, Tomo I, excerpts on pages 774 and 777; Ex. N, Alterini, Jorge H., Código Civil y Comercial comentado. Tratado exegético, 2° ed., Ciudad Autónoma de Buenos Aires, La Ley, 2016, Tomo II, excerpts on pages 55-56; Ex. O, Argentine Law No. 24,145; Ex. Q, Argentine Law No. 24,474; Ex. R, Fallos de la Corte Suprema de Justicia

Nacional, con la Relación de sus Respectivas Causas: Volumen 335, pages 1822-33; Ex. S,

Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas:

Volumen 146, pages 288-89, 297-98; Ex. T, Fallos de la Corte Suprema de Justicia Nacional,

con la Relación de sus Respectivas Causas: Volumen 147, pages 154-55, 164-65) translated from

Spanish into English and believe to the best of my knowledge and belief that the translations are

complete and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 11, 2024, in New York, New York.

_____

Maria E. Manghi

# Exhibit A-4

ENGLISH TRANSLATION

## Exhibit D – English Translation

Domingo Graffigna, in the case against him, for violation of Law No. 8871, on national elections.

Summary: 1 Interpreted by the appealed judgment, one or more provisions of the pertinent special law of Congress, and its application having been contrary to the right invoked and especially to the right of accusation attributed to the appellant, there exists, in the case, the federal question raised in the terms stated in arts. 14 of Law No. 48 and 6th of Law No. 4055, and, consequently, the extraordinary appeal is admissible: (Judgments, vol. 98, p. 421; vol. 101, p. 216; vol. 114, p. 399, among others).

2o It is contrary to the express text of art. 37 of the Constitution, which states that the Chamber of Deputies shall be composed of representatives elected directly by the people "of the provinces and of the capital, which are considered for this purpose as electoral districts" of a single State, the interpretation of art. 90 of the national election law No. 8871, according to which the Serodino and Clarke sites, located in the province of Santa Fe, constitute two

In this case, the meaning and scope of articles 102 and 110 of Electoral Law No. 4161 were discussed, due to the interference in the electoral propaganda of an official in favor of a specific candidacy.

After the judge convicted said official, his decision was revoked by the Federal Court of Appeals of the Nation's Capital, acquitting the defendant.

It involved the application of electoral provisions analogous to those at issue in this case.

V. E., as I have said, declared the appeal admissible.

This is, in my opinion, what should be stated in the present case.

This is my opinion.

Horacio R. Larreta.

SUPREME COURT RULING

Buenos Aires, September 24, 1926

And having regard to :

The extraordinary appeal filed and granted against the sentence of the Federal Court of Appeals of Rosario in the case against Domingo Graffigna (son), for violation of Law No. 8871; and

Whereas:

That the record shows that the appellant Domingo Bonifatti filed a complaint against the Justice of the Peace of Serodino, Domingo Graffigna, before the judge of the Rosario section, for violation of national election law number

8871, basing the complaint on the fact that the accused abandoned his post as justice of the peace, on the day of a national election, and moved to another locality, where he carried out acts of political propaganda in favor of one of the parties in struggle and, having resolved the case by a first instance conviction, in which the invoked provisions of the referred election law are applied, the Federal Chamber of Rosario annuls said judgment, because according to the understanding it attributes to Art. 90 of Law 8871, the accuser does not belong to the electoral district where the crime is said to have been committed.

That under these conditions, the judgment under appeal having interpreted one or more provisions of the pertinent special act of Congress, and since its application has
In view of the fact that the appeal was contrary to the right invoked and especially to the accusation attributed to the appellant, it is unquestionable that the issue raised in the case exists in the terms set forth in Articles 14 of Law No. 48 and 6 of Law No. 4055, and that, consequently, the extraordinary appeal is admissible, and it is so declared (Judgments, vol. 98, p. 421; vol. 101, p. 216; vol. 114, p. 399, among others).

That, as to the merits, it should be noted, of course, that the fundamental issue to be resolved in this instance is the one that has been determinedly established by the decision appealed against, when expressing that, since the accuser, Mr. Bonifatti, does not belong to the electoral district where the crime is said to have been committed, but to another district, that of Serodino, the accusation by district voter, a prior and indispensable basis for the opening of the trial, does not exist, The accusation by the district elector, a prior and indispensable basis for the opening of the trial, does not exist and, consequently, the trial should not have been opened without this requirement, a precedent by virtue of which the proceedings of the trial are annulled.

That, although it would appear from the transcribed terms that a factual point unrelated to the appeal has been addressed, that is, that of determining that the complainant belongs to one district and not to another, what has been resolved, in essence and in reality, by inter alia, is the fact that the complainant belongs to one district and not another.

The reason for this is that Serodino and Clarke, both located in the province of Santa Fe, constitute two different districts for the electoral purposes in question.

That, as is rightly noted in the record, this interpretation is contrary to the express text of Article 37 of the Constitution, which establishes that the Chamber of Deputies shall be composed of representatives directly elected by the people "of the provinces and of the Capital, which are considered for this purpose as electoral districts of a single State"; so that if the interpretation of said Article 90 were the one attributed to it by the ruling on appeal, said legal provision would be unconstitutional.

For the purposes, therefore, of the national election to which these proceedings refer, the sites mentioned, Serodino and Clarke, belong to the electoral district of Santa Fe, and, therefore, the

legal requirement of the case has been met, since the complainant voter belongs to the district where the alleged violation is said to have been committed; the annulment of the proceedings lacks, consequently, legal grounds.

As for the limitation with which the complaint has been judged and resolved, referring it only to the infraction derived from the political propaganda attributed to the accused official, considering the temporary abandonment of his post as justice of the peace as a mere circumstance to qualify that action, the appealed pronouncement appears, in effect, justified on this point, due to the fact that the accuser only requested the application of the average term of the penalty, as prescribed by art. 82 of the Electoral Law, insisting on said penalty in the brief of fs. 216, filed before this Court and without making reference to the higher penalty that would have corresponded by application of art. 81, item 6 of the aforementioned Law No. 8871.

Based on these grounds, the concordant grounds of the first instance judgment, the dissenting vote on page 195, and the opinion of the Attorney General, the appealed judgment is revoked, and in accordance with the provisions of the first part of Section 16 of Law No. 48, and the provisions established in similar cases (Judgments, vol. 99, p. 414, among others), it is resolved that the Federal Court of Appeals of Rosario shall take new cognizance of these proceedings and, in accordance with the statements of this judgment, retry the case, and the costs shall be paid. 414, among others), it is resolved that the Federal Court of Appeals of Rosario take new cognizance of these proceedings and in accordance with the declarations of this sentence, try the case again, and the costs shall be paid in the order caused.


Ferrocarril Buenos Aires al Pacífico vs. Comisión de Fomento de Aarón Castellanos, for injunction of new construction, on competition.

Summary: 1st Extraordinary appeal under Article 14, Law 48, against a decision denying the federal jurisdiction invoked on the grounds of different neighborhood.

2: It corresponds to the federal justice, by reason of the persons, the knowledge of a lawsuit of interdict deduced by the company of the railroad Buenos Aires al Pacífico, with domicile in this Capital, against the Comisión de Fomento Aarón Castellanos, institution of municipal character with seat within the territory of the province of Santa Fe.

3o While the authorities of a province may be empowered by its local laws or ordinances to open, preserve, widen or modify public streets or other similar streets within the territory of the province, such power shall be without prejudice to the

# SPANISH ORIGINAL

FALLOS DE LA CORTE SUPREMA

lo expuesto y pedido por el señor procurador general, se revo-
ca ·la sentencia apelada, declarándose procedente el otorgamien-
to de la carta de ciudadanía solicitada.

> A. BERMEJO. — J. FIGUEROA AL-
> CORTA. — RAMÓN MÉNDEZ. —
> ROBERTO REPETTO. — M. LAU-
> RENCENA.

*Domingo Graffigna, en la causa seguida en su contra, por in-
fracción a la ley Nº 8871, sobre elecciones nacionales.*

*Sumario*: 1º Interpretado por el fallo recurrido, una o más dis-
posiciones de la pertinente ley especial del Congreso, y
habiendo sido contraria su aplicación al derecho invocado
y especialmente al de acusación que se atribuye al recu-
rrente, existe, en el caso, la cuestión federal planteada en
los términos que estatuyen los arts. 14 de la ley número 48
y 6º de la ley Nº 4055, y, en consecuencia, el recurso ex-
traordinario es procedente: (Fallos, tomo 98, pág. 421;
tomo 101, pág. 216; tomo 114, pág. 399 entre otros).

2º Es contaria al texto expreso del art. 37 de la Cons-
titución que establece que la Cámara de Diputados se com-
pondrá de representantes elegidos directamente por el pue-
blo «de las provincias y de la capital, que se consideran a
este fin como distritos electorales» de un solo Estado, la
interpretación del art. 90 de la ley de elecciones naciona-
les Nº 8871, a mérito de la cual los sitios Serodino y Clar-
ke, situados en la provincia de Santa Fe, constituyen dos

En dicha causa se discutió el significado y alcance de los arts. 102 y 110 de la ley electoral N° 4161, con motivo de la intromisión en la propaganda electoral de un funcionario en favor de una candidatura determinada.

Condenado dicho funcionario por el juez, su resolución fué revocada por la Cámara Federal de Apelación de la Capital de la Nación, absolviendo al procesado.

Se trataba de la aplicación de disposiciones electorales análogas a las que se discuten en esta causa.

V. E., como he dicho, declaró procedente el recurso.

Es, en mi opinión, lo que corresponde declarar en la presente causa.

Tal es mi dictamen.

*Horacio R. Larreta.*


FALLO DE LA SUPREMA CORTE

**Buenos Aires, Septiembre 24 de 1926**

Y vistos:

El recurso extraordinario interpuesto y concedido contra sentencia de la Cámara Federal de Apelación de Rosario en la causa seguida contra Domingo Graffigna (hijo), por infracción a la ley N° 8871; y

Considerando:

Que las constancias de autos acreditan que el recurrente Domingo Bonifatti formuló ante el juez de sección de Rosario, denuncia contra el juez de paz de Serodino, Domingo Graffigna, por infracción a la ley de elecciones nacionales número

8871, fundando la querella en que el acusado hizo abandono
de su puesto de juez de paz, el día que se verificaba una elec-
ción nacional, y se trasladó a otra localidad, donde realizó ac-
tos de propaganda política en favor de uno de los partidos en
lucha y, resuelta la causa por sentencia condenatoria de pri-
mera instancia, en la que se aplican las disposiciones invocadas
de la referida ley de elecciones, la Cámara Federal de Rosario
anula dicho fallo, porque según la inteligencia que atribuye al
art. 90 de la ley 8871, el acusador no pertenece al distrito elec-
toral donde se dice cometido el delito.

Que en estas condiciones, habiéndose interpretado el fallo re-
currido una o más disposiciones de la pertinente ley especial
del Congreso, y puesto que su aplicación ha sido contraria al
derecho invocado y especialmente al de acusación que se atri-
buye al recurrente, es indudable que existe en el caso, la cues-
tión planteada en los términos que estatuyen los arts. 14 de la
ley Nº 48 y 6º de la ley Nº 4055, y que, en consecuencia, el re-
curso extraordinario es procedente, y así se declara (Fallos,
tomo 98, pág. 421; tomo 101, pág. 216; tomo 114, pág. 399,
entre otros).

Que, en cuanto al fondo, se advierte, desde luego, que la cues-
tión fundamental a resolver en esta instancia es la que ha sido
determinadamente establecida por la decisión de que se recu-
rre, al expresar que, resultando de autos que el acusador señor
Bonifatti no pertenece al distrito electoral donde se dice come-
tido el delito, sino a otro distrito, el de Serodino, la acusación
por elector de distrito, base previa e indispensable para la aper-
tura del juicio, no existe, y, por consiguiente, éste no ha debido
abrirse sin dicho requisito, antecedente en virtud del cual se
anulan las actuaciones del proceso.

Que, si bien de los términos transcriptos pareciera que se ha
abordado un punto de hecho ajeno al recurso, esto es, el de
determinar que el denunciante pertenece a un distrito y no a
otro, lo que en el fondo y en realidad se ha resuelto, por inter-

pretación del art. 90 de la ley Nº 8871, es que Serodino y Clarke, situados ambos en la provincia de Santa Fe, constituyen dos distritos distintos, a los fines electorales de que se trata.

Que, como fundadamente se hace notar en autos, esa interpretación es contrario al texto expreso del art. 37 de la Constitución, que establece que la Cámara de Diputados se compondrá de representantes elegidos directamente por el pueblo «de las provincias y de la Capital, que se consideran a este fin como distritos electorales de un solo Estado»; de manera que si la inteligencia del citado art. 90 fuera la que le atribuye el fallo en apelación, dicha disposición legal sería inconstitucional.

A los efectos, pues, de la elección nacional a que estos autos se refieren, los sitios aludidos, Serodino y Clarke, pertenecen al distrito electoral de Santa Fe, y, por consiguiente, se ha llenado el requisito legal del caso, desde que el elector denunciante pertnece al distrito donde se dice cometida la infracción acusada; la anulación de lo actuado carece, en consecuencia, de fundamento legal.

Que en cuanto a la limitación con que se ha juzgado y resuelto la querella, refiriéndola solamente a la infracción derivada de la propaganda política atribuida al funcionario acusado, por estimarse lo relativo al abandono transitorio de su puesto de juez de paz, como una mera circunstancia para calificar aquella actuación, el pronunciamiento recurrido aparece, en efecto, justificado sobre este punto, por el hecho de que el acusador sólo pidió la aplicación del término medio de la pena, que prescribe el art. 82 de la ley electoral, insistiendo en dicha pena en el memorial de fs. 216, presentado ante esta Corte y sin hacer referencia a la pena mayor que habría correspondido por aplicación del art. 81, inc. 6º de la citada ley Nº 8871.

Por estos fundamentos, los concordantes del fallo de primera instancia, del voto disidente de fs. 195, y el dictamen del señor procurador general, se revoca la sentencia apelada, y de acuerdo con lo que dispone la primera parte del art. 16 de la

ley Nº 48, y lo establecido en casos análogos (Fallos, tomo 99, pág. 414, entre otros), se resuelve que la Cámara Federal de Apelación de Rosario tome nuevo conocimiento de estos autos y con arreglo a las declaraciones de esta sentencia, juzgue nuevamente la causa, debiendo abonarse las costas en el orden causadas.

> A. BERMEJO. — J. FIGUEROA AL-
> CORTA. — RAMON MÉNDEZ. —
> ROBERTO REPETTO. — M. LAU-
> RENCENA.

*Ferrocarril Buenos Aires al Pacífico contra la Comisión de Fomento de Aarón Castellanos, por interdicto de obra nuevo, sobre competencia.*

*Sumario*: 1º Procede el recurso exttraordinario del artículo 14, ley 48, contra una resolución denegatoria del fuero federal invocado por razón de la distinta vecindad.

2: Corresponde a la justicia federal, por razón de las personas, el conocimiento de un juicio de interdicto deducido por la empresa del ferrocarril Buenos Aires al Pacífico, con domicilio en esta Capital, contra la Comisión de Fomento Aarón Castellanos, institución de carácter municipal con asiento dentro del territorio de la provincia de Santa Fe.

3º Si bien las autoridades de una provincia pueden estar habilitadas por sus leyes u ordenanzas locales para la apertura, conservación, ensanche o modificaciones de calles públicas u otras análogas dentro del territorio de la misma, tal facultad debe entenderse sin perjuicio de las

# DECLARATION OF TRANSLATOR
## REGARDING ACCURACY OF TRANSLATION

Pursuant to 28 U.S.C. § 1746, Maria E. Manghi hereby declares as follows:

I am a lawyer employed by Cleary Gottlieb Steen & Hamilton LLP presently residing and working within the State of New York;

I am proficient with the Spanish language and the English language and have reviewed the foregoing documents (Ex. B, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 155, pages 248-49; Ex. C, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 14, pages 425-49; Ex. D, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 147, pages 286, 301-04; Ex. E, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 335, pages 2333-62; Ex. F, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 340, pages 47-76; Ex. G, Argentine National Constitution; Ex. H, Argentine Law No. 26,854; Ex. I, Cassagne, Juan C., Curso de Derecho Administrativo, 12ª ed., Buenos Aires, La Ley, 2018, Tomo II, excerpt on page 331; Ex. J, Argentine Law No. 17,319l; Ex. K, Código Civil y Comercial de la Nación, articles 235-37; Ex. L, Balbín, Carlos F., Tratado de Derecho Administrativo, 2ª ed., Buenos Aires, La Ley, 2015, Tomo II, excerpts on pages 909, 911, and 915; Ex. M, Lorenzetti, Ricardo L., Código Civil y Comercial de la Nación comentado, 1° ed., Santa Fé, Rubinzal-Culzoni, 2014, Tomo I, excerpts on pages 774 and 777; Ex. N, Alterini, Jorge H., Código Civil y Comercial comentado. Tratado exegético, 2° ed., Ciudad Autónoma de Buenos Aires, La Ley, 2016, Tomo II, excerpts on pages 55-56; Ex. O, Argentine Law No. 24,145; Ex. Q, Argentine Law No. 24,474; Ex. R, Fallos de la Corte Suprema de Justicia

Nacional, con la Relación de sus Respectivas Causas: Volumen 335, pages 1822-33; Ex. S,

Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas:

Volumen 146, pages 288-89, 297-98; Ex. T, Fallos de la Corte Suprema de Justicia Nacional,

con la Relación de sus Respectivas Causas: Volumen 147, pages 154-55, 164-65) translated from

Spanish into English and believe to the best of my knowledge and belief that the translations are

complete and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 11, 2024, in New York, New York.

_____
Maria E. Manghi

# Exhibit A-5

# ENGLISH TRANSLATION

**Exhibit E – English Translation**

R. 401. XLIII.
Rodriguez Pereyra, Jorge Luis y otra c/ Ejercito Argentines/ **damages**.

**010574**



Buenos Aires, 27 de noviembre de 2012

Having regard to the proceedings: "Rodriguez Pereyra, Jorge Luis and other vs. Argentine Military/ damages.

Whereas:

1°) That Court II of the Federal Court of Appeals of La Plata upheld the first instance decision insofar as it admitted, based on common law rules, the plaintiff's claim for compensation for the injuries he suffered while performing mandatory military service and raised the amount of the sentence (conf. fs. 236/241).

2°) That in order to decide in the indicated sense, the Court took into consideration the doctrine of this Tribunal elaborated in different precedents. It held that they had established the distinction "between permanent staff and conscripts and between the facts that cause the injury, depending on whether they are acts of war or not, calling them acts of service and, also, varying the sentence depending on whether the disabling injury is less or more than 66% (....), according to the interpretation of the law....), according to the interpretation of the special military law as to whether it establishes a retirement benefit or a true compensation" (fs. 237). He also pointed out that a conscript was a subject who had been forced to submit to an unelected regime, so that it would be reasonable to differentiate his situation from that of those who joined the Army ranks voluntarily, complying with the military regime out of conviction and choice.

-1-

It also considered that in the precedent "Aquino" (Judgments: 327:3753), this Court had constitutionally invalidated section 39, paragraph 1 of Law 24.557, "with arguments that may well be used in this case with respect to the plaintiff's right to claim full civil reparation" (page 238). In the end, he judged that the decision in said precedent had implied a "turning point" in the treatment of human rights cases that prevented him from considering what was in force in the case. The Court held that the ruling in the "Bertinotti" case (Judgments: 315:2207) in the sense that it was not appropriate to grant a conscript who suffered injuries as a consequence of the performance of acts of service a compensation under common law when they had caused him a disability of less than 66% for work in civilian life, that is, when the military law does not provide for a retirement benefit, but a specific compensation system that displaces the general compensation system (doctrine reiterated in Judgments: 318:1621; 319:2620; 321:3496; 324:488; 326:407).

For these reasons, it considered that the decision of the lower court should be upheld insofar as it was favorable to the plaintiff's right to obtain reparation in accordance with article 1113 of the Civil Code.

3°) That against such pronouncement, the defendant filed an extraordinary appeal, which has been granted on page 255, since the scope and interpretation of Federal Law 19,101 for military personnel and its regulatory decrees are at stake. These norms establish a special compensation system "for the personnel of students and conscripts" who "as a consequence of acts of service" present "a diminution of their physical condition".

R. 401. XLIII.
Rodriguez Pereyra, Jorge Luis y otra c/ Ejercito
Argentines/ damages.



*Corte Suprema de Justicia de la Nación*

less than 66% for work in civilian life" (confr. art. 76, paragraph 3°, section c, according to the text of law 22.511).

4°) That the extraordinary remedy attempted is formally admissible given that the interpretation of a federal norm -law 19.101- has been challenged and the sentence issued by the superior court of the case has been contrary to the right that the appellant based on it (section 14, paragraph 3 of law 48). In this context, and for the purpose of establishing the intelligibility of the federal rules, the Court is not limited by the positions of the judges in the case and of the appellant, but it is incumbent upon it to make a declaration on the disputed point, according to the interpretation that it rightly grants it (Judgments: 325:1663; 326:2880; 330:2981, 4713; 331:735).

5°) That Law 19.101 -like its predecessor, Law 14.777- is the only statute regulating "military personnel" which, in a systematic and comprehensive manner, determines the rights and obligations arising from the birth of the relationship between the armed forces and their agents, regardless of their status, as well as those arising from their development, termination or situation a f t e r such moment. Therefore, it must be recognized that the provisions contained in its articles prevail over those of other legal systems by virtue of the maxim *lex specialis derogat lex gene ralis* (confr. Judgments: 312:1394) to the extent that there is incompatibility between the provisions of the former and the latter.

However, as can be seen from the evidence in the proceedings, the application of the aforementioned special regime is not a matter of law.

-3-

In this case, however, such a system has not been constitutionally challenged, and it has not been challenged under the Constitution. However, in this case, this system has not been constitutionally challenged.

6 °) That it should be recalled that under the text of Article 100 (now 116 of the National Constitution), as approved by the *ad hoc* Constituent Convention of 1860 -taking in turn the text of 1853, tributary of the one proposed by Alberdi in article 97 of his constitutional project-, it corresponds to the Supreme Court and the lower courts of the Nation the knowledge and decision, among others, of all the causes that deal with points governed by the Constitution, by the laws of the Nation (with the reservation made in art. 75 inc. 12) and by the treaties with foreign nations.

7°) That within this constitutional framework, Law 27 established in 1862 that one of the objects of the national justice system is to uphold the observance of the National Constitution, disregarding, when deciding cases, any provision of any of the other national powers, which is in opposition to it (Section 3). The following year, Congress enacted Law 48, which provides that: "The national courts and judges in the exercise of their functions shall proceed by applying the Constitution as the supreme law of the Nation, the laws enacted or sanctioned by Congress, treaties with foreign nations, the particular laws of the provinces, the general laws that have previously governed the Nation and the principles of the law of nations, as respectively required by the cases that are subject to their jurisdiction" (Art. 4).

R. 401. XLIII.                                        **010576**
Rodriguez Pereyra, Jorge Luis *y* otra vs. Ejercito Argentino s/ daños *y* perjuicios.

-4-

*Corte Suprema de Justicia de la Nación*

to their knowledge, in the order of precedence established therein" (article 21).

8°) That with these normative bases, the doctrine concerning the duty of judges to carry out a comparative examination of the !eyes with the National Constitution has been applied by this Court since its first pronouncements when—counting between its members a constituent assembly, Dr. Jose Benjamin Gorostiaga-delineated its powers to "approve the laws and regulations as they are, as long as they emanate from a competent authority and are not repugnant to the Constitution" (Judgments: 23:37).

9°) That in 1888 the Court ruled along these lines with respect to the power of the magistrates to examine the compatibility between the lower rules and the National Constitution with a formula that is now a classic in its jurisprudence: "it is elementary in our constitutional organization the power that the courts of justice have and the duty they have to examine the laws in the concrete cases that they are called upon to examine the text of the Constitution, comparing them with the text of the Constitution.

This moderating power constitutes one of the supreme and fundamental purposes of the national Judiciary and one of the best guarantees to ensure the rights enshrined in the Constitution, against the possible and involuntary abuses of the public authorities".

Such attribution -the Court concluded- "is a necessary derivative of the separation of the constituent and ordinary legislative powers" (Judgments: 33:162).

As is well known, a year before, in the case "Sojo," this court had already cited to the known authority "Marbury vs. Madison" precedent to establish that "an act of Congress repugnant to the Constitution is not law" and to affirm that "when the Constitution and an act of Congress are in conflict, the Constitution must govern the case to which both refer" (Judgments: 32:120). Such attribution was based on a foundational principle of the Argentine constitutional order, which consists of recognizing the supremacy of the National Constitution (art. 31). 31), since as Sanchez Viamonte stated "there is no valid argument for a judge to fail to apply the National Constitution in the first instance" (Juicio de amparo, in Enciclopedia Juridica Orneba, t. XVII, p&g. 197, cited in Judgments: 321:3620).

10) That the requirement that such control be made *at the request of a party* is a praetorian addition formally established by this Court in 1941 in the "Ganadera Los Lagos" case (Judgments: 190:142). This requirement was based on the warning that the control of constitutionality without the request of a party would imply that judges could control on their own initiative the legislative acts or decrees of the administration, and that such activity would affect the balance of powers. However, in the face of this argument, it was subsequently affirmed that if the judicial power of constitutional control is accepted, it lacks consistency to maintain that the advance on the two democratic powers of the Constitution does not occur when there is a request from a party and when there is not (Judgments: 306:303, vote of Judges Fayt and Belluscio; and 327:3117, considering 4°).

Rodriguez Pereyra, Jorge Luis y otra vs. Ejercito
Argentino s/ daños y perjuicios.



*Corte Suprema de Justicia de la Nación*

The Court added that the ex officio declaration of
unconstitutionality does not "oppose the presumption of validity
of administrative acts or of State acts in general, since such
presumption yields when a norm of higher hierarchy is contravened,
which is the case when the acts are opposed to the Constitution. Nor
(...) can it be seen that it undermines the right of defense of the
parties, because if this were so, any ex officio application of any
legal rule not invoked by them should be disqualified, under the
pretext that the interested parties have not been able to rule on
its application to the case" (Judgments: 327:3117, 4th recital
cited).

11) That, without prejudice to these arguments, it
should be added that after the constitutional reform of 1994, the
directives arising from international human rights law must be
taken into account. In the precedent "Mazzeo" (Judgements
330:3248), this Court emphasized that "the interpretation of the
American Convention on Human Rights must be guided by the
jurisprudence of the Inter-American Court of Human Rights (IACHR),
which is "an unavoidable guideline of interpretation for the
Argentine constituted powers within the scope of their competence
and, consequently, it is necessary to take into account the
interpretation of the American Convention on Human Rights", and,
consequently, also for the Supreme Court of Justice of the Nation,
for the purpose of safeguarding the obligations assumed by the
Argentine State in the inter-American system for the protection of
human rights" (recital 20).

It was also noted in "Mazzeo" that the IACHR "has stated that it is aware that domestic judges and courts are subject to the rule of law and, therefore, are obliged to apply the provisions in force in the legal system. But when a State has ratified an international treaty such as the American Convention, its judges, as part of the State apparatus, are also subject to it, which obliges them to ensure that the effects of the provisions of the Convention are not diminished by the application of laws contrary to its object and purpose, and which from the outset have no legal effect. It concluded that "[i]n other words, the Judiciary must exercise a kind of 'conventionality control' between the domestic legal norms that apply in specific cases and the American Convention on Human Rights" ("Almona cid" case, September 26, 2006, para. 124, recital 21).

12) That on several subsequent occasions the IACHR has deepened the concept established in the aforementioned precedent "Almonacid". In effect, in the case "Trabajadores Cesados del Congreso" it specified that the organs of the Judiciary must exercise not only a control of constitutionality, but also of "conventionality" *ex officio* between the internal norms and the American Convention ["Case of Workers Dismissed from Congress (Aguado Alfaro et al.) v. Peru", of November 24, 2006, para. 128]. This criterion was reiterated some years later, expressed in similar terms, in the cases "Ibsen Cardenas and Ibsen Pena v. Bolivia" (of September 1, 2010, para. 202); "Gomes Lundy et al ('Guerrilha do Raguaia') v. Brazil" (of September 24, 2010, para. 202); "Gomes Lundy et al ('Guerrilha do Raguaia') v. Brazil" (of November 24, 2010, para. 176) and "Cabrera and Montiel Flores v. Mexico" (November 26, 2010, para. 225).

-8-

R. 401. XLIII.
Rodriguez Pereyra, Jorge Luis y otra v. Ejercito
Argentino s/ damages.



Recently, the Court has insisted on the *ex officio* control of conventionality, adding that in this task, judges and bodies involved in the administration of justice must take into account not only the treaty, but also the interpretation made by the Inter-American Court (conf. case "Fontevecchia and D'Arnico vs. Argentina" of November 29, 2011).

The jurisprudence reviewed above leaves no room for doubt that the judicial bodies of the countries that have ratified the American Convention on Human Rights are obliged to exercise, ex officio, the control of conventionality, disqualifying the parties to the Convention from the jurisdiction of the courts of the countries that have ratified it. It would therefore be a contradiction to accept that the National Constitution, which, on the one hand, confers constitutional rank on the Convention (Article 75, paragraph 1). It would therefore be a contradiction to accept that the National Constitution, which, on the one hand, confers constitutional rank on the Convention (art. 75, sub. 22), incorporates its provisions into domestic law and, consequently, authorizes the application of the interpretative rule formulated by its authentic interpreter, i.e., the Inter-American Court of Human Rights - which obliges the national courts to exercise ex officio the control of conventionality, would, on the other hand, make it impossible for those courts to exercise similar review in order to safeguard its supremacy vis-à-vis lower-ranking local norms.

13) It is necessary to point out, however, that the exercise of ex officio review of constitutionality by the judges must take place "within the framework of their respective

–9–

competences and the corresponding procedural regulations" (confr. cases "Ibsen Cardenas and Ibsen Pefia" and "Gomez Lund and others", cited).

From this perspective, the normative control by the judge presupposes a judicial process adjusted to the applicable adjective rules, among which those that determine the competence of the jurisdictional bodies and, above all, those that establish the requirements of admissibility and substantiation of the presentations or allegations of the parties, are particularly relevant. In this regard, it should be recalled that the constitutional disqualification of a normative precept is subject to the condition that in the lawsuit it is clearly demonstrated that it causes a concrete prejudice to any of the disputants insofar as its application entails a manifest disregard or restriction of any guarantee, right, title or prerogative based on the Constitution; it is precisely the evidentiary activity of the disputants, as well as their argumentative arguments, which must reveal such a situation.

In this sense, it should be emphasized that the greater the clarity and factual and legal support of the arguments of the parties, the greater the possibility that the judges will be able to decide whether the encumbrance can only be remedied by declaring the unconstitutionality of the rule that generates it.

As can be seen, the express recognition of the power of ex officio review of constitutionality does not mean invalidating the set of rules developed by the Court.

R. 401. XLIII.
**010579**
Rodriguez Pereyra, Jorge Luis y otra v. Ejército
Argentino s/ damages.

_____

The Company's institutional performance is subject conditions, requirements and scope of such control.

14) That, in this sense, it is important to emphasize the jurisprudence of this Court according to which the declaration of unconstitutionality, when it implies the disregard of the effects, for the case, of a rule issued by a power of equally supreme hierarchy, constitutes a remedy of ultima *ratio* that should be avoided if possible through an interpretation of the legal text at stake compatible with the Fundamental Law, since the validity of the rules should always be favored (Judgments: 14:425; 147:286). Furthermore, when there is the possibility of an adequate solution to the dispute, for reasons other than the constitutional ones included in the case, it is appropriate to disregard the latter for its resolution (Judgments: 300:1029; 305:1304).

In sum, the judicial review at s t a k e, being the most delicate of the functions that may be entrusted to a court, is only practicable as an unavoidable reason for the ruling that the case requires, so that a declaration of unconstitutionality should only be made when it is strictly necessary.

15) That, having admitted in the foregoing terms the power of judges to carry o u t constitutional review even in the absence of an express request from a party, it is necessary to The corresponding examination of the norm that establishes a specific compensation regime for military personnel. To this effect, it is necessary to reiterate that article 76, paragraph 3, s e c t i o n  c), of the aforementioned law 19.101 -text according to law 22.511-, establishes a specific compensation regime for military personnel.

recognizes conscripts who, as a result of acts of service, present "a disability of less than sixty-six percent for work in civilian life", a single indemnity that may not exceed thirty-five monthly salaries of their grade for senior and junior personnel.

With respect to the purpose and scope of this article, this Court has considered that it is evident that it seeks to establish an indemnification, which is in line with what was expressed in the note of elevation of the draft law, according to which "the substitution of retirement for an adequate compensation to the personnel of the incorporated reserve and of students who suffer a diminution of aptitudes for civilian life as a consequence of acts of service" was pursued, and that this was an obstacle to the application of the rules governing general liability (conf. Bertinetti" case, Judgments:315:2207).

16) That subsequent to the precedent cited above, the Court has had the opportunity to pronounce, in cases of compensation for damages caused by accidents, regarding the questioning on constitutional grounds of the susceptibility of the special liability systems that admitted compensation claims against the right to full compensation derived from the general principle *alterum non laedere,* if the existence of a substantial impairment to the guarantee invoked by the interested party were proven (Judgments: 327:3753).

17) In order to determine whether this violation occurred in the present case, it is necessary to examine, on the one hand, the scope o f t h e constitutional rights involved

and, on the other hand, whether the damages caused by the contingency in question are duly repaired with the single benefit established in Article 76, paragraph 3, subparagraph c, of Law 19.101.

In short, based on the constitutional norms and principles at stake, it is necessary to determine whether it has been demonstrated that, after the application of measurable guidelines such as those contemplated in the aforementioned article, the harm suffered manifestly and intolerably exceeds the framework of coverage that can reasonably be understood to be covered by the special system.

18). That, as far as this case is concerned, this Court has stated that the "general principle" established in Art. 19 of the National Constitution, according to which "it is forbidden for 'men' to harm the rights of a third party", is "closely linked to the idea of reparation", and that the regulation made by the Civil Code, as regards persons and the consequent liabilities, does not root them ex clusively and exclusively in private law, but expresses a general principle that regulates any legal discipline (conf. Judgments: 308:1118 and 327:3753).

19) That with regard to the protection of the integrity of the person, this Court has repeatedly ruled that when the victim's physical or psychological abilities are permanently diminished, this disability must be the object of a reparation regardless of whether or not he or she is engaged in a productive activity, since physical integrity has a compensable value in itself and its injury affects various aspects of the personality that affect the domestic, social, cultural and the consequent frustration of the full development of life (see Judgments: 308:1109; 312:752 and 2412; 315:2834; 327:3753; 329:2688 and 334:376, among many others).

20) That, in conclusion, the adequate protection of the right to life and t h e psychophysical integrity of persons requires that the *alterum non laedere* principle be given all the amplitude it deserves, as well as avoiding the establishment of limitations to the extent that they imply "altering" the rights recognized by the National Constitution (art. 28).

In this understanding, it should be emphasized that I
is the violation of the duty not to harm another that generates
the obligation to repair the harm caused and such harm includes
any damage susceptible of pecuniary valuation that affects in a
certain way another in his person, in his patrimony and/or in his
rights or faculties. Such reparation is not achieved if the
damages subsist to some extent, reason for which the compensation
must be integral (conf. Judgments: 324:2972 and arg. Judgments:
326:2329); nor if the compensation -derived from the application
of a special compensation system or as a result of the use of
discretionary powers of the judges- results in derisory or
insignificant values in relation to the amount of the compensable
damage (Judgments: 314:729, Whereas 4°; 316:1949, Whereas 4°;
among others).

21) That in this case the application of the
compensation system at issue here leads to a result incompatible
with the principles and rights referred to above.

**010581**

Rodriguez Pereyra, Jorge Luis y otra v. Ejercito
Argentines/ damages.

In order to reach this conclusion, account must be taken of the actual *amount* of the "indemnity" provided for in the special rule, the payment of which - in its "form and conditions" - was left subject to the regulations and the magnitude of the damage suffered by the actor.

In this regard, it should be noted that Decree 829/82 only contemplates material damages, and within these, according to with the scale it fixes, an aspect of partial character, such as -according to the well-known criterion of this Court- the degree of incapacity. In the scheme of such regulation, it is the determines, in turn, according to the percentage of the latter, the "amount of monthly salary" that constitutes the "indemnity". In this case, according to the provisions of the law, those corresponding to the rank of Corporal or Lance Corporal must be considered.

On those bases, according to the degree of disability recognized, the plaintiff would be entitled, according to the special law and in accordance with the current benefit system in force, to $44,432 in severance pay (16 monthly "corporal" salaries; each of them, $ 2,777, according to decree 1305/2012).

On the other hand, it is important to note that once it was admitted that the accident he suffered while performing his military service - while "cleaning a bread-making machine, his left hand got caught in the rollers [...] crushing it to the muffle" - caused the plaintiff a 30% disability, by raising the amounts fixed. In the first instance ruling, the a quo established an indemnity of 150,000 ($115,000 for the material loss and $35,000 for the moral loss).

-15-

22) That from the foregoing it appears that the amount of the "compensation" reached by applying the parameters of the system established by the special system does not fully compensate the damage suffered by the plaintiff, a circumstance that does occur in the sentence appealed which is based on common law, which not only takes into account the compensation of the moral damage that the special system does not contemplate, but also other guidelines that go beyond the mere disability, such as those considered by the judges of the case: the patrimonial damage comprising the loss of income, the loss of physical integrity and the esthetic damage, taking into account the seriousness of the facts, the impact on the multiple areas in which the subject projects his personality, the economic-social condition, the sex, the age, the marital status and the economically useful life expectancy.

23) That the above clearly reflects the violation of the constitutional rights of the injured party, considering the insufficiency of the compensation obtained under the special system examined in relation to the damage it is intended to repair. In addition, it is unreasonable that a rule intended to remedy the consequences of the disability caused for "work in civilian life" should only provide as a guideline for the estimation of the *amount of* compensation the amount received by those who only work in the armed forces.

010582

R. 401. XLIII.
Rodriguez Pereyra, Jorge Luis y otra vs. Ejercito
Argentino **s/ daños y** perjuicios.

*Corte Suprema de Justicia de la Nación*

In view of the foregoing, it may be concluded that the means chosen do not meet the remedial objective of the law, since it establishes a solution that is incompatible with the principles and rights that the National Constitution orders to respect, protect and implement in the specific case.

24) That the fact that the plaintiff, who is entitled to claim and obtain full and adequate compensation for the damages suffered as a consequence of an accident occurring in the performance of an act of service, had received the rate provided for in section 76, paragraph 3, subsection c, of Law 19.101, does not in itself imply the admission of a double compensation for the same item (loss of earning capacity or loss of profit), since the guidelines used for its determination differ substantially and there is no obstacle for the amount received for such concept to be deducted from the amount resulting from the application of the provisions of common law.

Therefore, and after hearing the Public Prosecutor, the Court resolves: 1) to declare formally admissible the extraordinary appeal, and the unconstitutionality in the case of article 76, paragraph 3, section c, of law 19.101 - according to the text of law 22.511-; 2) to confirm the remaining part of the appealed pronouncement.

Costs for its order in accordance with the form in which it is resolved (art. 68, second paragraph, of the Code of Civil and Commercial Procedure of the Nation).

RICARDO LUIS LORENZETTI

ELENA I. HIGHTON de NOLASCO

ENRIQUE S. PETRACCHI

1

E. RAUL ZAFFARONI

jUAN CARLOS MAQUEDA

II **99111A** filiL 8iffffjjleADA
BY SECRETAR11"1 0 JIURiSPRU0£NCIA
SUPREME COURT Dt: JIJSTICIA Dt THE NATION

R. 401. XLIII.

**010583**

Rodriguez Pereyra, Jorge Luis and other v. Ejercito
Argentines/ damages.

-///-TO MINISTER CARLOS S. FAYT, MR.

Whereas:

1°) That Chamber II of the Federal Court of Appeals of La Plata upheld the decision of the first instance insofar as it upheld the claim in which the plaintiff had demanded that the Argentine Army pay compensation in the following terms of common law for the injuries suffered.

The Court modified, however, the decision regarding the amount of the sentence (fs. 236/241).

Against this decision, the defendant filed the extraordinary appeal on folio 244/246, granted on folio 255, on the grounds that the scope and interpretation of the Military Personnel Law 19. 101 and its regulatory decrees, which establishes the scope and interpretation of the law, were at stake, granted on page 255, on the grounds that the scope and interpretation of Federal Law 19.101 for Military Personnel and its regulatory decrees, which establishes a regime outside the norms of common law, "which is not subject to the rules of common law", is at stake. The scope and interpretation of the scope and interpretation of the law 19.101 for Military Personnel and its regulatory decrees is at stake, which establishes a regime, outside the rules of common law, "for the -person-a1 of students and conscripts" that "as a consequence of acts of service" provide "a disability of less than sixty-six percent for work and civilian life" (conf. art. 76, inc. 3°, ap. c.), according to the text of law 22.511).
-11 - ::

2°) That in so deciding the status quo considered the doctrine of this Court elaborated in various precedents. In these precedents, it had established the distinction "between permanent staff and conscripts and between the acts which cause the damage depending on whether they are acts of war or not, calling them acts of service and, also, varying the solution according to whether the damage is caused in the course of the military service or not.

The Court stated that "if the amount of the training period is less or more than 66% [...], according to the interpretation of the special military law insofar as it establishes a retirement benefit or a real indemnity" (fs. 237). He also pointed out that a conscript is a subject who was forced to submit to a regime that he did not choose, so that it could be reasonable to distinguish this situation from those who entered the ranks of the Army voluntarily, submitting to the military regime by conviction and choice.

It also took into account that in the "Aquino, Isacio" case (Judgments: 327:3753 this Court had declared the constitutional invalidity of section 39, paragraph 1 of Law 24.557, "with arguments that may well be used in this case with respect to the plaintiff's right to claim full civil reparation" (fs. 238). It understood, in the alternative, that there had been a "shift" in the treatment of paradigmatic human rights cases that prevented it from considering what had been established in the "Bertinotti" case (Judgments: 315:227), in which it had been established that it was not appropriate "to grant a conscript who has suffered injuries as a consequence of the performance of acts of service, a compensation under common law when they have caused him a disability of less than sixty-six percent for work in civilian life, that is, when the military law does not provide for a retirement benefit but a specific compensation system that displaces the compensation system of common law (doctrine reiterated in Judgments: 318:1621,319:2620, 321:3496; 324:488; 326:407.")

R. 401. XLIII.
Rodriguez Pereyra, Jorge Luis y otra v. Ejercito
Argentines/ damages.

**010584**



*Corte Suprema de Justicia de la Nación*

On such grounds, it confirmed the previous decision that had allowed the plaintiff to recover the damage caused to the plaintiff in accordance with article 1113 of the Civil Code.

3°) That it is appropriate to dismiss the claims presented by the defendant against the grounds containing this last conclusion. This is so, since the statement according to which the specific regimes applicable to the members of the Armed Forces are exclusive of the general system of liability provided for in the Civil Code, can no longer be maintained in light of the new doctrine referred to by the Court.

Indeed, as this Court had the opportunity to point out in the aforementioned precedent of Judgments: 327:3753, Article 19 of the National Constitution establishes as a general principle the prohibition for men to harm the rights of a third party: *alterum non laedere, which* is closely linked to the idea of reparation.

In this sense - as was shown in the case just mentioned - the jurisprudence of the Court has numerous precedents that have deepened the rationale of the comprehensive remedial scope established by the aforementioned norms of the Civil Code. As has been seen, they express the aforementioned "general principle" enunciated in the Constitution. The "value of human life cannot be assessed with exclusively economic criteria. Such a materialistic conception must yield to an integral understanding of material and spiritual values, which are inseparably linked in human life and whose reparation must at least tend toward justice.

Thus, to measure in monetary terms the exclusive economic capacity of the victims, which would come to establish a sort of distributive justice of the compensations according to their capital or according to their capacity to produce economic goods with their work. It is unquestionable that such aspects do not exhaust the significance of people's lives, since the manifestations of the spirit that are not susceptible to measurement are not the same as those of the victims' economic capacity taking into account the vitality of the men. (Judgments:292:428, considering 16; incorporating: Judgments: 303:820, considering second; 310:2103, considering 10 y 312:1597, among many others.)

In this line of ideas, the Court has also held, within the aforementioned context of the Civil Code and with express reference to an industrial injury, that the reparation must also include, if it has occurred, the "moral damage". Moreover, the "disability must be the object of reparation, apart from what may correspond for the impairment of [the] productive activity and for the moral damage, since physical integrity in itself has a compensable value" (Judgments: 308:1109).

4°) That the aforementioned precedents, moreover, correspond, implicitly but undeniably, with the humanistic principles that, embedded in the National Constitution, have nurtured the constitutional jurisprudence of this Court, as evidenced in the aforementioned "Aquino" decision.

Firstly, that "man is the axis and center of the entire legal system and as an end in himself. Beyond his transcendent nature, his person is inviolable.

R. 401. XLIII.

**010585**

Rodriguez Pereyra, Jorge Luis y otra v. Ej rcito
Argentines/ damages.



*Corte Suprema de Justicia de la Nación*

In this sense, it should not be lost sight of the fact that what is at stake here is not the protection of patrimonial integrity, that is, an instrumental value, but of another fundamental one: the protection of the physical, psychological and moral inviolability of the individual.

On the other hand, this Court recognized the application of Article 21, paragraph 2, of the American Convention on Human Rights: "no person may be deprived of his property, except upon payment of just compensation", to claims based on violations of the right to life, thus giving said property a scope that transcends the patrimonial sphere ("Oharriz", Judgments: 326:3032).

5°) That the application of the compensation system set forth in Law 19.101 for military personnel to which the Respondent claims leads to a result incompatible with the principles set forth in the preceding recitals. This is evident, since, contrary to what happens with civilians, the system of Law 19.101 departs from the comprehensive reparation concept, since it does not admit compensation for any other damage than the loss of the affected person's earning capacity, which, in turn, is commensurable in a plundering manner.

Indeed, if it were to be admitted that a disability of less than 66% for work in civilian life - in the sub examine, 30% - can be understood to be compensated with the payment of "sixteen times the amount of the monthly salary of the rank of corporal or lance corporal" (conf. Law 19.101, art. 76, sub. 3°, par. c and Decree 829/82, art. 5° par. 1.b), it should be recognized that the constitutional rights at stake thus understood constitute hollow statements, to be filled in any way by the State. This is so to the extent that the amount resulting from this rate translates into the sum of $44,432, in accordance with the provisions of Decree 926/11 (text according to Decree 1305/2012), Annex I of which establishes the amount of $2,777 as the monthly payment, which is the reference base for the case of the conscription.

Therefore, even if the plaintiff had received the aforementioned amount, the defendant's argument that the application of common law to the case "would lead us to accept a double indemnity in favor of those who are covered by the military regime to the detriment of citizens who are not" (fs. 245) is irrelevant. This is so since, even in this hypothesis, the amount allegedly received can always be deducted from that which corresponds in constitutional terms to a fair compensation in view of the loss suffered by the agent.

Otherwise, it would be necessary to recognize that our National Constitution represents nothing more than a promising set of wise counsel and illusory rights, whose definition would be left to the good will of the State: it would be denying

R. 401. XLIII.
Rodriguez Pereyra, Jorge Luis y otra c/ Ejercito
Argentines/ damages.

**010586**

*Corte Suprema de Justicia de la Nación*

the dignity of man as an inherent characteristic and dehumanized in consequence what Seneca symbol of Stoic philosophy- advocated in an epistle addressed to Lucilius: "man must be something sacred to man" *(homo res sacra homini}.*

6°} That, even though all of the foregoing is sufficient to dismiss the claim of the plaintiff, it is necessary to consider whether the military rule passes the test of reasonableness in terms of adequacy and proportionality between the means contained in the rule (the reparation at the tariff} and the end to be preserved (the protection of the affected person's recovery) It is evident, in this line of reasoning, that the exactness of the amount resulting from the application of the intra-constitutional rules referred to in the preceding recital, pulverizes the compensatory credit, depriving the latter of its immanent content.

All of the foregoing relativizes the value of the normative plexus invoked by the State. This, to the e x t e n t that - a f t e r the reform established by Law 24,429- military service no longer constitutes a public duty identified with the obligation to "arm oneself in defense of the homeland and this Constitution", i n l i g h t o f t h e provisions of Section 21 of the National Constitution. Under such conditions, claims which, like the present one, are governed by the system of the already repealed "compulsory military service", no longer represent for the State a disproportionate or disproportionately large liability of significant magnitude due to their projection to other cases.

7°) That, by virtue of all the foregoing, it is appropriate to declare the constitutional invalidity of the military internment regime whose application is sought by the defendant, since it intolerably curtails rights of constitutional rationale such as those referred to in recitals 3° and 4° of this pronouncement.

The aforementioned conclusion is not p r e v e n t e d by the fact that the plaintiff did not challenge the norms whose unconstitutionality this Court declares unconstitutional. In fact, since 1984, this Court has already stated that the granting of the power to declare unconstitutionality ex officio cannot be seen as creating a n imbalance of powers in favor of the Judiciary and to the detriment of the other two, since if the power itself is not necessary, it l a c k s consistency to maintain that the advance over the other powers does not occur when there is no request from a party and only when there is no such request; either d o e s the presumption of validity of administrative acts, or of State acts in general oppose the former, since such presumption yields when they are contrary to a higher hierarchical norm, which occurs in laws that are opposed to the Constitution; nor, lastly, can i t b e seen to undermine the right of defense of the parties, because if this were so, any ex officio application of any legal rule not invoked by them should also be disqualified under the pretext that the interested parties have not been able to rule on its application in the case (vote of Judges Carlos S. Fayt and Augusto Cesar Bellini). Fayt and Augusto Cesar Belluscio in the case "Juzgado de Instruccion Militar N° 50 de Rosa rio", Judgments: 306:303).

Furthermore, the undersigned disqualified any decontextualized interpretation of art. 2 of Law 27, which requires as a condition of the law

010587

R. 401. XLIII.

Rodriguez Pereyra, Jorge Luis y otra v. Ejercito
Argentines/ damages.

jurisdictional requirement the existence of a "cause" or "case" in concrete. This has nothing to do with the claim of unconstitutionality that the party may file or omit to file; once the constitutional problem is verified, even if the party is inactive, it could never be argued that there is no "cause" or "case" in the terms of the aforementioned law. This conclusion is reinforced by Section 3 of the aforementioned law, which establishes as the ultimate purpose of national justice "the observance of the National Constitution, disregarding, when deciding cases, any provision of any of the other national powers, which is in opposition to it" {conf. "Peyru, Osvaldo", Judgments: 310:1401, dissent of Judge Carlos S. Fayt).

This criterion, then in the minority, was reproduced in numerous cases, then outlined in "Mill de Pereyra" {Fa llos: 324:3219) and finally adopted by the majority of the Court in "Banco Comercial de Finanzas S.A.". {Fa llos: 327:3117).

8°) That, finally, it is worth noting that the Court has revised its own doctrine on numerous occasions on the basis of admitting, with a high concept, that the authority of precedents must yield to the verification of the error or inappropriateness of the decisions previously handed down. {Judgments: 166:220; 167:121; 178:25; 183:409; 192:414; 216:91;293: 50, among others), so it is pertinent to abandon the criteria established by the undersigned in the "Gunther" cases.

To abide by what has been previously decided is a basic principle of rectitude of the judiciary and the need for certainty in the application of the law. However, this rule leads to unjust solutions when its mechanical application disregards relevant elements such as those mentioned *above*, with the consequent undermining of the constitutional rights at stake. Therefore, it can only be concluded that the compensation fixed by the a quo adequately fulfills the reparatory purpose provided for by the rules of common law, in consonance with the higher order principles involved.

Therefore, after having heard the Public Prosecutor's Office, the extraordinary appeal is declared admissible and the appealed judgment is upheld. With costs in the order caused, in view of the manner in which the case is resolved (Article 68, second paragraph, of the Civil and Commercial Procedure Code of the Nation). Be notified and sent back to the Court.

CARLOS S. FAYT

SECRETAR. u JURISPRISPUDENCE CORTt
SUPRt:MA Le Juo-l ni̅i̅-l DE LA NACION.

## IS A FAITHFUL COPY

010588

R. 401. XLIII.

Rodriguez Pereyra, Jorge Luis y otra c/ Ejercito
Argentines/ damages

-///-JUDGMENT OF SIR MINISTER DOCTOR DON ENRIQUE SANTIAGO PETRACCHI

Whereas:

That this Court shares and endorses the grounds and conclusions of the foregoing opinion of the Prosecutor General, to which we refer for the sake of brevity.

Therefore, and in accordance with what has been ruled, the extraordinary appeal is declared admissible and the appealed judgment is revoked. With costs. Return the case file to the court of origin so that, by whom it may correspond, a new ruling may be issued in accordance with the present one. Notify and, in due course, remit.

ENRIQUES. PETRACCHI

**IS A FAITHFUL COPY**

BY SECAL1AR..., Di.: jJR,SPRUDENCE
GOHI-. ..:.umL111r. u Jui>-l 11,.fFrom: LA NACION

Extraordinary appeal filed by the **Argentine Army,** represented by Dr. **Norberto Daniel Teiseira.**

Transfer answered by **Jorge Luis Rodriguez Pereyra,** represented by Dr. **Emilio Fernando Garcete.**

Court of origin: **Federal Court of Appeals of La Plata, Chamber** II.

Previous Court involved: **Federal Court of First Instance No. 2, Secretariat No. 5 of La Plata.**

SPANISH ORIGINAL

R. 401. XLIII.
**010574**
Rodriguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.

*Corte Suprema de Justicia de la Nación*

Buenos Aires, 27 de noviembre de 2012.

Vistos los autos: "Rodríguez Pereyra, Jorge Luis y otra ·c/
Ejército Argentino s/ daños y perjuicios".

Considerando:

1°) Que la Sala II de la Cámara Federal de Apelaciones de La Plata confirmó el pronunciamiento de primera instancia en cuanto admitió, con fundamento en normas de derecho común, el reclamo indemnizatorio del actor por las lesiones que sufriera mientras cumplía con el servicio militar obligatorio y elevó el monto de la condena (conf. fs. 236/241).

2°) Que para decidir en el sentido indicado, la alzada tomó en consideración la doctrina de este Tribunal elaborada en diversos precedentes. Sostuvo que en ellos se había establecido la distinción "entre plantel permanente y conscriptos y entre los hechos que causan el daño, según sean actos bélicos o no, denominándolos actos de servicio y, también, variando la solución según que el daño incapacitante resultare menor o mayor del 66% (…), según la interpretación de la ley especial militar en cuanto a que ella establece un haber de retiro o una verdadera indemnización" (fs. 237 vta.). Puntualizó, asimismo, que un conscripto era un sujeto que había sido obligado a someterse a un régimen no elegido, por lo que resultaría razonable diferenciar su situación de la de aquellos que ingresaban a las filas del Ejército en forma voluntaria, acatando el régimen militar por convicción y elección propia.

-1-

Consideró, también, que en el precedente "Aquino" (Fallos: 327:3753) esta Corte había invalidado constitucional- mente el art. 39, inc. 1°, de la ley 24.557, "con argumentos que bien pueden utilizarse en esta causa respecto del derecho que le cabe al actor de reclamar la reparación integral civil" (fs. 238). Juzgó, en definitiva, que lo resuelto en dicho precedente había implicado un "viraje" en el tratamiento de casos para- digmáticos de derechos humanos que le impedía considerar vigente lo dicho en la causa "Bertinotti" (Fallos: 315:2207) en el sen- tido de que no correspondía otorgar a un conscripto que sufrió lesiones como consecuencia de la realización de actos de servi- cio una indemnización del derecho común cuando ellas le hubieran causado una disminución menor del 66% para el trabajo en la vida civil, esto es, cuando la ley militar no prevé un haber de reti- ro, sino un régimen indemnizatorio específico que desplaza al sistema resarcitorio general (doctrina reiterada en Fallos: 318:1621; 319:2620; 321:3496; 324:488; 326:407).

Por estas razones, entendió que debía confirmarse la decisión de grado en cuanto había resultado favorable al derecho del demandante de obtener una reparación con arreglo al art. 1113 del Código Civil.

3°) Que contra tal pronunciamiento, el demandado in- terpuso el recurso extraordinario, que ha sido concedido a fs. 255, por encontrarse en juego el alcance e interpretación de la ley federal 19.101 para el personal militar y sus decretos re- glamentarios. Estas normas establecen un sistema resarcitorio especial "para el personal de alumnos y conscriptos" que "como consecuencia de actos de servicio" presenten "una disminución

010575

R. 401. XLIII.
Rodriguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.



*Corte Suprema de Justicia de la Nación*

menor del 66% para el trabajo en la vida civil" (confr. art. 76,
inc. 3°, apartado c, según texto ley 22.511).

4°) Que la vía extraordinaria intentada resulta for-
malmente admisible dado que en autos se ha objetado la interpre-
tación de una norma federal –la ley 19.101– y la sentencia dic-
tada por el superior tribunal de la causa ha sido contraria al
derecho que el apelante fundó en ella (art. 14, inc. 3°, de la
ley 48). En este contexto y a los fines de establecer la inteli-
gencia de las normas federales, la Corte no se encuentra limita-
da por las posiciones de los jueces de la causa y del recurren-
te, sino que le incumbe realizar una declaración sobre el punto
disputado, según la interpretación que rectamente le otorgue
(Fallos: 325:1663; 326:2880; 330:2981, 4713; 331:735).

5°) Que la ley 19.101 –al igual que su precedente, la
ley 14.777– es el único estatuto regulador del "personal mili-
tar" que, con carácter sistémico e integral, determina los dere-
chos y obligaciones que origina el nacimiento de las relaciones
entre las fuerzas armadas y sus agentes, cualquiera sea la si-
tuación de revista que éstos posean, así como los que acarrea su
desarrollo, extinción o situación posterior a tal momento. De
ahí que corresponda reconocer que las disposiciones contenidas
en su articulado prevalecen sobre las de otros ordenamientos ge-
nerales por imperio de la máxima *lex specialis derogat lex gene-
ralis* (confr. Fallos: 312:1394) en la medida en que medie incom-
patibilidad entre lo que unas y otras establecen.

Ahora bien, como se desprende de los elementos obran-
tes en las actuaciones, la aplicación del referido régimen espe-

cial otorga al accidentado un resarcimiento sustancialmente in-
ferior al que ha sido admitido sobre la base de los parámetros
establecidos en el derecho común. Sin embargo, en el caso, dicho
sistema no ha sido impugnado constitucionalmente.

6°) Que cabe recordar que con arreglo al texto del
artículo 100 (actual 116 de la Constitución Nacional), tal como
fue sancionado por la Convención Constituyente *ad hoc* de 1860
—recogiendo a su vez el texto de 1853, tributario del propuesto
por Alberdi en el artículo 97 de su proyecto constitucional—,
corresponde a la Corte Suprema y a los tribunales inferiores de
la Nación el conocimiento y decisión, entre otras, de todas las
causas que versen sobre puntos regidos por la Constitución, por
las leyes de la Nación (con la reserva hecha en el art. 75 inc.
12) y por los tratados con las naciones extranjeras.

7°) Que en este marco constitucional, la ley 27 esta-
bleció en 1862 que uno de los objetos de la justicia nacional es
sostener la observancia de la Constitución Nacional, prescin-
diendo, al decidir las causas, de toda disposición de cualquiera
de los otros poderes nacionales, que esté en oposición con ella
(art. 3). Al año siguiente, el Congreso dictó la ley 48, que
prevé que: "Los tribunales y jueces nacionales en el ejercicio
de sus funciones procederán aplicando la Constitución como ley
suprema de la Nación, las leyes que haya sancionado o sancione
el Congreso, los tratados con naciones extranjeras, las leyes
particulares de las provincias, las leyes generales que han re-
gido anteriormente a la Nación y los principios del derecho de
gentes, según lo exijan respectivamente los casos que se sujeten

R. 401. XLIII.
Rodríguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.

**010576**



*Corte Suprema de Justicia de la Nación*

a su conocimiento, en el orden de prelación que va establecido"
(artículo 21).

8°) Que con estas bases normativas, la doctrina atinente al deber de los jueces de efectuar el examen comparativo de las leyes con la Constitución Nacional fue aplicada por esta Corte desde sus primeros pronunciamientos cuando -contando entre sus miembros con un convencional constituyente de 1853, el Doctor José Benjamín Gorostiaga- delineó sus facultades para "aplicar las leyes y reglamentos tales como son, con tal que emanen de autoridad competente y no sean repugnantes a la Constitución" (Fallos: 23:37).

9°) Que en esta senda se expidió el Tribunal en 1888 respecto de la facultad de los magistrados de examinar la compatibilidad entre las normas inferiores y la Constitución Nacional con una fórmula que resulta hoy ya clásica en su jurisprudencia: "es elemental en nuestra organización constitucional, la atribución que tienen y el deber en que se hallan los tribunales de justicia, de examinar las leyes en los casos concretos que se traen a su decisión, comparándolas con el texto de la Constitución para averiguar si guardan o no conformidad con ésta, y abstenerse de aplicarlas, si las encuentran en oposición con ella, constituyendo esta atribución moderadora uno de los fines supremos y fundamentales del Poder Judicial nacional y una de las mayores garantías con que se ha entendido asegurar los derechos consignados en la Constitución, contra los abusos posibles e involuntarios de los poderes públicos".

-5-

Tal atribución -concluyó la Corte- "es un derivado forzoso de la separación de los poderes constituyente y legislativo ordinario" (Fallos: 33:162).

Como es bien sabido, un año antes, en el caso "Sojo", esta Corte ya había citado la autoridad del célebre precedente "Marbury vs. Madison" para establecer que "una ley del congreso repugnante a la Constitución no es ley" y para afirmar que "cuando la Constitución y una ley del Congreso están en conflicto, la Constitución debe regir el caso a que ambas se refieren" (Fallos: 32:120). Tal atribución encontró fundamento en un principio fundacional del orden constitucional argentino que consiste en reconocer la supremacía de la Constitución Nacional (art. 31), pues como expresaba Sánchez Viamonte "no existe ningún argumento válido para que un juez deje de aplicar en primer término la Constitución Nacional" (Juicio de amparo, en Enciclopedia Jurídica Omeba, t. XVII, pág. 197, citado en Fallos: 321:3620).

10) Que el requisito de que ese control fuera efectuado *a petición de parte* resulta un aditamento pretoriano que estableció formalmente este Tribunal en 1941 en el caso "Ganadera Los Lagos" (Fallos: 190:142). Tal requerimiento se fundó en la advertencia de que el control de constitucionalidad sin pedido de parte implicaría que los jueces pueden fiscalizar por propia iniciativa los actos legislativos o los decretos de la administración, y que tal actividad afectaría el equilibrio de poderes. Sin embargo, frente a este argumento, se afirmó posteriormente que si se acepta la atribución judicial de control constitucional, carece de consistencia sostener que el avance sobre los dos poderes democráticos de la Constitución no se produce

010577

R. 401. XLIII.
Rodríguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.

*Corte Suprema de Justicia de la Nación*

cuando media petición de parte y sí cuando no la hay (Fallos: 306:303, voto de los jueces Fayt y Belluscio; y 327:3117, considerando 4°).

Agregó el Tribunal que la declaración de inconstitucionalidad de oficio tampoco "se opone a la presunción de validez de los actos administrativos o de los actos estatales en general, ya que dicha presunción cede cuando se contraría una norma de jerarquía superior, lo que ocurre cuando las leyes se oponen a la Constitución. Ni (…) puede verse en ella menoscabo del derecho de defensa de las partes, pues si así fuese, debería también descalificarse toda aplicación de oficio de cualquier norma legal no invocada por ellas so pretexto de no haber podido los interesados expedirse sobre su aplicación al caso" (Fallos: 327:3117, considerando 4° citado).

11) Que, sin perjuicio de estos argumentos, cabe agregar que tras la reforma constitucional de 1994 deben tenerse en cuenta las directivas que surgen del derecho internacional de los derechos humanos. En el precedente "Mazzeo" (Fallos: 330:3248), esta Corte enfatizó que "la interpretación de la Convención Americana sobre Derechos Humanos debe guiarse por la jurisprudencia de la Corte Interamericana de Derechos Humanos (CIDH)" que importa "una insoslayable pauta de interpretación para los poderes constituidos argentinos en el ámbito de su competencia y, en consecuencia, también para la Corte Suprema de Justicia de la Nación, a los efectos de resguardar las obligaciones asumidas por el Estado argentino en el sistema interamericano de protección de los derechos humanos" (considerando 20).

Se advirtió también en "Mazzeo" que la CIDH "ha seña-
lado que es consciente de que los jueces y tribunales internos
están sujetos al imperio de la ley y, por ello, están obligados
a aplicar las disposiciones vigentes en el ordenamiento jurídi-
co. Pero cuando un Estado ha ratificado un tratado internacional
como la Convención Americana, sus jueces, como parte del aparato
del Estado, también están sometidos a ella, lo que les obliga a
velar porque los efectos de las disposiciones de la Convención
no se vean mermados por la aplicación de leyes contrarias a su
objeto y fin, y que desde un inicio carecen de efectos jurídi-
cos". Concluyó que "[e]n otras palabras, el Poder Judicial debe
ejercer una especie de 'control de convencionalidad' entre las
normas jurídicas internas que aplican en los casos concretos y
la Convención Americana sobre Derechos Humanos" (caso "Almona-
cid", del 26 de septiembre de 2006, parágrafo 124, considerando
21).

12) Que en diversas ocasiones posteriores la CIDH ha
profundizado el concepto fijado en el citado precedente "Almona-
cid". En efecto, en el caso "Trabajadores Cesados del Congreso"
precisó que los órganos del Poder Judicial deben ejercer no solo
un control de constitucionalidad, sino también "de convenciona-
lidad" *ex officio* entre las normas internas y la Convención Ame-
ricana ["Caso Trabajadores Cesados del Congreso (Aguado Alfaro y
otros) vs. Perú", del 24 de noviembre de 2006, parágrafo 128].
Tal criterio fue reiterado algunos años más tarde, expresado en
similares términos, en los casos "Ibsen Cárdenas e Ibsen Peña
vs. Bolivia" (del 1° de septiembre de 2010, parágrafo 202); "Go-
mes Lund y otros ('Guerrilha do Raguaia') vs. Brasil" (del 24 de

R. 401. XLIII.    010578
Rodriguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.

*Corte Suprema de Justicia de la Nación*

noviembre de 2010, parágrafo 176) y "Cabrera García y Montiel
Flores vs. México" (del 26 de noviembre de 2010, parágrafo 225).

Recientemente, el citado Tribunal ha insistido res-
pecto del control de convencionalidad *ex officio*, añadiendo que
en dicha tarea los jueces y órganos vinculados con la adminis-
tración de justicia deben tener en cuenta no solamente el trata-
do, sino también la interpretación que del mismo ha hecho la
Corte Interamericana (conf. caso "Fontevecchia y D'Amico vs. Ar-
gentina" del 29 de noviembre de 2011).

La jurisprudencia reseñada no deja lugar a dudas de
que los órganos judiciales de los países que han ratificado la
Convención Americana sobre Derechos Humanos están obligados a
ejercer, de oficio, el control de convencionalidad, descalifi-
cando las normas internas que se opongan a dicho tratado. Resul-
taría, pues, un contrasentido aceptar que la Constitución Nacio-
nal que, por un lado, confiere rango constitucional a la mencio-
nada Convención (art. 75, inc. 22), incorpora sus disposiciones
al derecho interno y, por consiguiente, habilita la aplicación
de la regla interpretativa -formulada por su intérprete auténti-
co, es decir, la Corte Interamericana de Derechos Humanos- que
obliga a los tribunales nacionales a ejercer de oficio el con-
trol de convencionalidad, impida, por otro lado, que esos mismos
tribunales ejerzan similar examen con el fin de salvaguardar su
supremacía frente a normas locales de menor rango.

13) Que resulta preciso puntualizar, sin embargo, que
el ejercicio del control de constitucionalidad de oficio por los
magistrados debe tener lugar "en el marco de sus respectivas

—9—

competencias y de las regulaciones procesales correspondientes"
(confr. casos "Ibsen Cárdenas e Ibsen Peña" y "Gómez Lund y
otros", citados).

Desde esta perspectiva, el contralor normativo a car-
go del juez presupone un proceso judicial ajustado a las reglas
adjetivas aplicables entre las cuales revisten especial relevan-
cia las que determinan la competencia de los órganos jurisdic-
cionales y, sobre todo, las que fijan los requisitos de admisi-
bilidad y fundamentación de las presentaciones o alegaciones de
las partes. Es conveniente recordar, al respecto, que la desca-
lificación constitucional de un precepto normativo se encuentra
supeditada a que en el pleito quede palmariamente demostrado que
irroga a alguno de los contendientes un perjuicio concreto en la
medida en que su aplicación entraña un desconocimiento o una
restricción manifiestos de alguna garantía, derecho, título o
prerrogativa fundados en la Constitución; es justamente la acti-
vidad probatoria de los contendientes así como sus planteos ar-
gumentales los que debe poner de manifiesto tal situación.

En este sentido se impone subrayar que cuanto mayor
sea la claridad y el sustento fáctico y jurídico que exhiban las
argumentaciones de las partes, mayores serán las posibilidades
de que los jueces puedan decidir si el gravamen puede únicamente
remediarse mediante la declaración de inconstitucionalidad de la
norma que lo genera.

Como puede apreciarse, el reconocimiento expreso de
la potestad del control de constitucionalidad de oficio no sig-
nifica invalidar el conjunto de reglas elaboradas por el Tribu-

010579

R. 401. XLIII.
Rodríguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.

*Corte Suprema de Justicia de la Nación*

nal a lo largo de su actuación institucional relativas a las de-
más condiciones, requisitos y alcances de dicho control.

14) Que, en tal sentido, cabe recalcar la jurispru-
dencia de esta Corte según la cual la declaración de inconstitu-
cionalidad al importar el desconocimiento de los efectos, para
el caso, de una norma dictada por un poder de jerarquía igual-
mente suprema, constituye un remedio de última *ratio* que debe
evitarse de ser posible mediante una interpretación del texto
legal en juego compatible con la Ley Fundamental, pues siempre
debe estarse a favor de la validez de las normas (Fallos:
14:425; 147:286). Además, cuando exista la posibilidad de una
solución adecuada del litigio, por otras razones que las consti-
tucionales comprendidas en la causa, corresponde prescindir de
estas últimas para su resolución (Fallos: 300:1029; 305:1304).

En suma, la revisión judicial en juego, por ser la
más delicada de las funciones susceptibles de encomendarse a un
tribunal, solo es practicable como razón ineludible del pronun-
ciamiento que la causa requiere, de manera que no debe llegarse
a una declaración de inconstitucionalidad sino cuando ello es de
estricta necesidad.

15) Que, admitida en los términos precedentes la po-
testad de los jueces de efectuar el control de constitucionali-
dad aunque no exista petición expresa de parte, cabe realizar en
autos el correspondiente examen de la norma que establece un
régimen indemnizatorio específico para el personal militar. A
tal efecto es necesario reiterar que el art. 76, inc. 3°, ap.
c), de la mencionada ley 19.101 -texto según la ley 22.511-, le

reconoce a los conscriptos que, como consecuencia de actos de servicio, presenten "una disminución menor del sesenta y seis por ciento para el trabajo en la vida civil", una indemnización única que no podrá exceder de treinta y cinco haberes mensuales de su grado para el personal superior y subalterno.

En lo que respecta a la finalidad y al alcance de dicho artículo, esta Corte ha considerado que resulta evidente que busca establecer un resarcimiento, lo que se compadece con lo expresado en la nota de elevación del proyecto de la ley, según la cual se persiguió "la sustitución del retiro por una adecuada indemnización al personal de la reserva incorporada y de alumnos que sufran una disminución de aptitudes para la vida civil como consecuencia de actos de servicio", y que ello obstaba a la aplicación de las reglas que regían la responsabilidad genérica (conf. causa "Bertinotti", Fallos:315:2207).

16) Que con posterioridad al precedente citado, el Tribunal ha tenido oportunidad de pronunciarse, en casos de resarcimiento de daños producidos por accidentes, respecto del cuestionamiento con base constitucional del que serían susceptibles los sistemas especiales de responsabilidad que admitían limitaciones indemnizatorias frente al derecho a una reparación integral derivado del principio general *alterum non laedere*, si se comprobara la existencia de un menoscabo sustancial a la garantía invocada por el interesado (Fallos: 327:3753).

17) Que a los efectos de determinar si en la presente causa se produjo esa vulneración, es necesario examinar, por un lado, el alcance de los derechos constitucionales involucrados

-12-

R. 401. XLIII.
Rodríguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.

010580

*Corte Suprema de Justicia de la Nación*

y, por el otro, si los daños causados por la contingencia en cuestión encuentran su debida reparación con la prestación única que establece el art. 76, inc. 3°, ap. c, de la ley 19.101.

En definitiva, a partir de las normas y principios constitucionales en juego corresponde dilucidar si quedó demostrado que, tras la aplicación de pautas mensurables como las contempladas por el citado artículo, el perjuicio sufrido excede, en forma manifiesta e intolerable, el marco de cobertura que razonablemente cabe entender abarcado por el sistema especial.

18) Que en lo que interesa al caso, esta Corte ha dicho que el "principio general" que establece el art. 19 de la Constitución Nacional, según el cual se "prohíbe a los 'hombres' perjudicar los derechos de un tercero", se encuentra "entrañablemente vinculado a la idea de reparación", y que la reglamentación que hace el Código Civil, en cuanto a las personas y las responsabilidades consecuentes no las arraiga con carácter exclusivo y excluyente en el derecho privado, sino que expresa un principio general que regula cualquier disciplina jurídica (conf. Fallos: 308:1118 y 327:3753).

19) Que en cuanto a la protección de la integridad de la persona, esta Corte ha resuelto reiteradamente que cuando la víctima resulta disminuida en sus aptitudes físicas o psíquicas de manera permanente, esta incapacidad debe ser objeto de reparación al margen de que desempeñe o no una actividad productiva pues la integridad física tiene en sí misma un valor indemnizable y su lesión afecta diversos aspectos de la personalidad que hacen al ámbito doméstico, social, cultural y deportivo, con la

-13-

consiguiente frustración del desarrollo pleno de la vida (Fallos: 308:1109; 312:752 y 2412; 315:2834; 327:3753; 329:2688 y 334:376, entre muchos otros).

20) Que, en conclusión, la adecuada protección del derecho a la vida y a la integridad psicofísica de las personas exige que se confiera al principio *alterum non laedere* toda la amplitud que éste amerita, así como evitar la fijación de limitaciones en la medida en que impliquen "alterar" los derechos reconocidos por la Constitución Nacional (art. 28).

En ese entendimiento, cabe señalar que es la violación del deber de no dañar a otro lo que genera la obligación de reparar el menoscabo causado y tal noción comprende todo perjuicio susceptible de apreciación pecuniaria que afecte en forma cierta a otro en su persona, en su patrimonio y/o en sus derechos o facultades. Dicha reparación no se logra si los daños subsisten en alguna medida, motivo por el cual la indemnización debe ser integral (conf. Fallos: 324:2972 y arg. Fallos: 326:2329); ni tampoco si el resarcimiento –derivado de la aplicación de un sistema resarcitorio especial o producto de utilización de facultades discrecionales de los jueces– resulta en valores irrisorios o insignificantes en relación con la entidad del daño resarcible (Fallos: 314:729, considerando 4°; 316:1949, considerando 4°; entre otros).

21) Que en el caso la aplicación del sistema indemnizatorio que aquí se trata conduce a un resultado incompatible con los principios y derechos a los que se ha hecho referencia.

R. 401. XLIII.    **010581**
Rodríguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.

*Corte Suprema de Justicia de la Nación*

A los efectos de llegar a esta conclusión se debe te-
ner en cuenta el *quantum* real de la "indemnización" prevista en
la norma especial, cuyo pago -en su "forma y condiciones"- dejó
sujeto a la reglamentación y la magnitud del daño sufrido por el
actor.

En este sentido, es de advertir que el decreto 829/82
solo contempla daños materiales y, dentro de éstos, de acuerdo
con la escala que fija, un aspecto de manifiesto carácter par-
cial, como lo es -según conocido criterio de esta Corte- el gra-
do de incapacidad. En el esquema de dicha reglamentación, ello
determina, a su vez, según el porcentaje de esta última, la
"cantidad de haberes mensuales" que constituyen "la indemniza-
ción". Para el caso, según lo dispuesto en la ley, deben ser
considerados los correspondientes al grado de cabo o cabo 2°.

Sobre esas bases, según el grado de incapacidad reco-
nocido, al actor le corresponderían, según la ley especial y de
acuerdo con el régimen de haberes vigente en la actualidad, $
44.432 de indemnización (16 haberes mensuales de "cabo, cabo se-
gundo"; cada uno de ellos, de $ 2.777, según el decreto
1305/2012).

Por otro lado corresponde tener en cuenta que, una
vez admitido que el accidente que sufriera mientras cumplía con
el servicio militar -al realizar "la limpieza de una máquina so-
badora de pan, su mano izquierda quedó atrapada en los rodillos
[...] produciéndole su aplastamiento hasta la muñeca"-, provocó
al actor una incapacidad del 30%, al elevar los montos fijados
en el fallo de primera instancia, el a quo estableció una indem-

-15-

nización total de $ 150.000 ($ 115.000 por el daño material y $ 35.000 por el daño moral).

22) Que de lo expuesto surge que el monto de la "indemnización" al que se arriba al aplicar los parámetros del sistema fijado por el régimen especial no repara integralmente el daño sufrido por el actor, circunstancia que sí se da en la sentencia apelada que se sustenta en el derecho común, en el que no solo se tiene en cuenta el resarcimiento del perjuicio moral que el sistema especial no contempla, sino también otras pautas que exceden de la mera incapacidad, tales como las consideradas por los jueces de la causa: el daño patrimonial comprensivo del lucro cesante, la pérdida de integridad física y el daño estético, teniendo en cuenta a su vez la gravedad de los hechos, la incidencia en los múltiples ámbitos en que el sujeto proyecta su personalidad, la condición económico-social, el sexo, la edad, el estado civil y la expectativa de vida económicamente útil.

23) Que lo expresado refleja con claridad la vulneración de los derechos constitucionales del accidentado considerando la insuficiencia del resarcimiento que se obtiene según el sistema especial examinado en relación con el daño que se propone reparar. Se añade a ello la circunstancia de que no resulta razonable que una norma que tiene por objeto subsanar las consecuencias de la minusvalía provocada para "el trabajo en la vida civil" prevea únicamente como pauta orientadora para la estimación del *quantum* indemnizatorio el haber que percibe quien solo se desempeña en las fuerzas armadas.

-16-

**010582**

R. 401. XLIII.
Rodriguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.

*Corte Suprema de Justicia de la Nación*

Frente a lo examinado cabe concluir que los medios elegidos no se adecuan al objetivo reparador de la norma pues se consagra una solución incompatible con los principios y derechos que la Constitución Nacional ordena respetar, proteger y realizar en el caso concreto.

24) Que el hecho de que el actor, al que se le reconoce el derecho a reclamar y obtener la reparación integral y adecuada de los daños sufridos como consecuencia de un accidente ocurrido en ejercicio de un acto de servicio, hubiese percibido la tarifa única prevista en el art. 76, inc. 3°, ap. c, de la ley 19.101, no implica de por sí la admisión de una doble indemnización respecto del mismo rubro (pérdida de la capacidad de ganancia o lucro cesante), pues las pautas utilizadas para su determinación difieren sustancialmente y no existen obstáculos para que el monto percibido por dicho concepto sea deducido del que resulte de la aplicación de las disposiciones de derecho común.

Por ello y oída la señora Procuradora Fiscal, el Tribunal resuelve: 1) declarar formalmente admisible el recurso extraordinario, y la inconstitucionalidad en el caso del art. 76, inc. 3°, apartado c, de la ley 19.101 –según texto ley 22.511-; 2) confirmar en lo restante el pronunciamiento apelado. Costas por

-//-

-//-su orden en atención a la forma en que se resuelve (art. 68, segundo párrafo, del Código Procesal Civil y Comercial de la Nación). Notifíquese y, oportunamente, devuélvase.

RICARDO LUIS LORENZETTI

ELENA I. HIGHTON de NOLASCO

CARLOS S. FAYT

ENRIQUE S. PETRACCHI

JUAN CARLOS MAQUEDA

E. RAUL ZAFFARONI

ES COPIA FIEL CERTIFICADA
POR SECRETARIA DE JURISPRUDENCIA
CORTE SUPREMA DE JUSTICIA DE LA NACION

VO-//-

ES COPIA FIEL

R. 401. XLIII.
**010583**
Rodríguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.

*Corte Suprema de Justicia de la Nación*

-//-TO DEL SEÑOR MINISTRO DOCTOR DON CARLOS S. FAYT

Considerando:

1°) Que la Sala II de la Cámara Federal de Apelacio-
nes de La Plata confirmó el pronunciamiento de primera instancia
en cuanto hizo lugar a la demanda en la que la actora había re-
clamado al Ejército Argentino una indemnización en los términos
del derecho común por lesiones sufridas mientras prestaba el
servicio militar obligatorio, de las que derivó una incapacidad
parcial y permanente del 30% de la total obrera. Modificó, no
obstante, lo resuelto en orden al monto de condena (fs.
236/241).

Contra esa decisión, la demandada interpuso el recur-
so extraordinario de fs. 244/246 vta., concedido a fs. 255, por
encontrarse en juego el alcance e interpretación de la ley fede-
ral 19.101 para el Personal Militar y sus decretos reglamenta-
rios, donde se establece un régimen indemnizatorio al margen de
las normas de derecho común, "para el personal de alumnos y
conscriptos" que "como consecuencia de actos de servicio" pre-
senten "una disminución menor del sesenta y seis por ciento para
el trabajo en la vida civil" (conf. art. 76, inc. 3°, ap. c,
según texto ley 22.511).

2°) Que para así decidir, el a quo consideró la doc-
trina de este Tribunal elaborada en diversos precedentes. Ex-
presó que en ellos se había establecido la distinción "entre
plantel permanente y conscriptos y entre los hechos que causan
el daño según sean actos bélicos o no, denominándolos actos de
servicio y, también, variando la solución según que el daño in-

-19-

capacitante resultare menor o mayor del 66% […], según la inter-
pretación de la ley especial militar en cuanto a que ella esta-
blece un haber de retiro o una verdadera indemnización" (fs. 237
vta.). Remarcó, además, que un conscripto es un sujeto que re-
sultó obligado a someterse a un régimen que no eligió, por lo
que podía resultar razonable distinguir esta situación de aque-
llos que ingresaran a las filas del Ejército voluntariamente,
sometiéndose al régimen militar por convicción y elección pro-
pia.

        Tuvo en cuenta, asimismo, que en la causa "Aquino,
Isacio" (Fallos: 327:3753) esta Corte había declarado la invali-
dez constitucional del art. 39, inc. 1° de la ley 24.557, "con
argumentos que bien pueden utilizarse en esta causa respecto del
derecho que le cabe al actor de reclamar la reparación integral
civil" (fs. 238). Entendió, en suma, que allí se había configu-
rado un "viraje" en el tratamiento de casos paradigmáticos de
derechos humanos que le impedía considerar vigente lo dispuesto
en la causa "Bertinotti" (Fallos: 315:2207), en la que se había
establecido que no correspondía "otorgar a un conscripto que ha
sufrido lesiones como consecuencia de la realización de actos de
servicio, una indemnización del derecho común cuando ellas le
hubiesen causado una disminución menor del sesenta y seis por
ciento para el trabajo en la vida civil, esto es, cuando la ley
militar no prevé un haber de retiro sino un régimen indemnizato-
rio específico que desplaza al sistema resarcitorio del derecho
común (doctrina reiterada en Fallos: 318:1621; 319:2620, 2689;
321:3496; 324:488; 326:407)".

R. 401. XLIII.
**010584**
Rodríguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.



*Corte Suprema de Justicia de la Nación*

Sobre tales bases, confirmó el pronunciamiento ante-
rior que había hecho lugar a la reparación del daño ocasionado
al actor según el art. 1113 del Código Civil.

3°) Que corresponde desestimar los agravios expuestos
por la demandada frente a los fundamentos que contienen esta
última conclusión. Ello es así, toda vez que la afirmación según
la cual los regímenes específicos aplicables a los miembros de
las Fuerzas Armadas son excluyentes del sistema genérico de res-
ponsabilidad previsto en el Código Civil, ya no puede mantenerse
a la luz de la nueva doctrina aludida por el a quo.

En efecto, como tuvo oportunidad de señalar esta Cor-
te en el ya aludido precedente de Fallos: 327:3753, el art. 19
de la Constitución Nacional establece como principio general la
prohibición dirigida a los hombres de perjudicar los derechos de
un tercero: *alterum non laedere*, entrañablemente vinculado a la
idea de reparación.

En este sentido —como se señaló en el caso recién re-
ferenciado—, la jurisprudencia del Tribunal cuenta con numerosos
antecedentes que han profundizado la razón de ser de los alcan-
ces reparadores integrales que establecen las mencionadas normas
del Código Civil. Ellas, como ha sido visto, expresan el también
citado "principio general" enunciado en la Constitución. El "va-
lor de la vida humana no resulta apreciable con criterios exclu-
sivamente económicos. Tal concepción materialista debe ceder
frente a una comprensión integral de los valores materiales y
espirituales, unidos inescindiblemente en la vida humana y a cu-
ya reparación debe, al menos, tender la justicia. No se trata,

pues, de medir en términos monetarios la exclusiva capacidad económica de las víctimas, lo que vendría a instaurar una suerte de justicia distributiva de las indemnizaciones según el capital de aquéllas o según su capacidad de producir bienes económicos con el trabajo. Resulta incuestionable que en tales aspectos no se agota la significación de la vida de las personas, pues las manifestaciones del espíritu que no son susceptibles de medida económica integran también aquel valor vital de los hombres" (Fallos: 292:428, considerando 16; asimismo: Fallos: 303:820, considerando 2°; 310:2103, considerando 10, y 312:1597, entre muchos otros).

En esta línea de ideas, la Corte también tiene juzgado, dentro del antedicho contexto del Código Civil y con expresa referencia a un infortunio laboral, que la reparación también habrá de comprender, de haberse producido, el "daño moral". Más aún; la "incapacidad debe ser objeto de reparación, al margen de lo que pueda corresponder por el menoscabo de [la] actividad productiva y por el daño moral, pues la integridad física en sí misma tiene un valor indemnizable" (Fallos: 308:1109).

4°) Que los citados precedentes, por lo demás, se corresponden, de manera implícita pero inocultable, con los principios humanísticos que, insertos en la Constitución Nacional, han nutrido la jurisprudencia constitucional de este Tribunal, tal como se evidenció en el citado fallo "Aquino".

En primer lugar, el relativo a que el "hombre es eje y centro de todo el sistema jurídico y en tanto fin en sí mismo —más allá de su naturaleza trascendente— su persona es inviola-

-22-

010585

R. 401. XLIII.
Rodriguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.



*Corte Suprema de Justicia de la Nación*

ble y constituye valor fundamental con respecto al cual los restantes valores tienen siempre carácter instrumental" ("Campodónico de Beviacqua", Fallos: 323:3229).

En tal sentido, no debe perderse de vista que no está ahora en juego la protección de la integridad patrimonial, esto es, un valor instrumental, sino de otro fundamental: la protección de la inviolabilidad física, psíquica y moral del individuo.

Por otro lado, esta Corte reconoció la aplicación del art. 21, inc. 2, de la Convención Americana sobre Derechos Humanos: "ninguna persona puede ser privada de sus bienes, excepto mediante el pago de indemnización justa", a reclamos fundados en violaciones al derecho a la vida, dando así a dichos bienes un alcance que transciende la esfera de lo patrimonial ("Oharriz", Fallos: 326:3032).

5°) Que la aplicación del régimen indemnizatorio establecido en la ley 19.101 para el personal militar al que se aferra la demandada conduce a un resultado incompatible con los principios enunciados en los considerandos anteriores. Ello es manifiesto, toda vez que, contrariamente a lo que ocurre con el civil, el sistema de la ley 19.101 se aparta de la concepción reparadora integral, pues no admite indemnización por ningún otro daño que no sea la pérdida de la capacidad de ganancias de la persona afectada, la cual, a su vez, resulta conmensurable de manera expoliatoria.

En efecto, si por acaso se admitiese que una disminu-
ción menor del 66% para el trabajo en la vida civil —en el sub
examine, del 30%— puede entenderse reparada con el pago de "die-
ciséis veces el importe del haber mensual del grado de cabo o
cabo segundo" (conf. ley 19.101, art. 76, inc. 3°, ap. c y de-
creto 829/82, art. 5° ap. 1.b), debería reconocerse que los de-
rechos constitucionales en juego así entendidos constituyen
enunciados huecos, a ser llenados de cualquier modo por el Esta-
do. Ello es así en la medida en que el importe que resulta de
esa tarifación se traduce en la suma de $ 44.432, de conformidad
con lo establecido en el decreto 926/11 (texto según decreto
1305/2012), en cuyo Anexo I se fija como haber mensual de cabo
el importe de $ 2.777, base referencial para el caso del cons-
cripto.

De ahí que, aun en el supuesto de que el actor hubie-
ra percibido la suma referida, resulta impertinente el argumento
de la demandada según el cual la aplicación del derecho común al
caso "nos llevaría a aceptar una doble indemnización a favor de
quienes se encuentran alcanzados por el régimen militar en des-
medro de los ciudadanos que no lo están" (fs. 245). Ello es así
toda vez que, aun en esa hipótesis, la suma presuntamente perci-
bida siempre podrá ser deducida de aquello que corresponda en
términos constitucionales a una indemnización justa frente al
menoscabo sufrido por el agente.

De lo contrario, habría que reconocer que nuestra
Constitución Nacional no representa sino un promisorio conjunto
de sabios consejos y de ilusorios derechos, cuya definición que-
daría librada a la buena voluntad del Estado: se estaría negando

-24-

010586

R. 401. XLIII.
Rodríguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.

*Corte Suprema de Justicia de la Nación*

así la dignidad del hombre como imperativo categórico y desnaturalizando en consecuencia aquello que propugnaba Séneca —símbolo de la filosofía estoica— en una epístola dirigida a Lucilio: "el hombre debe ser algo sagrado para el hombre" (*homo res sacra homini*).

6°) Que, aun cuando todo lo anterior resulta suficiente para desestimar el planteo de la demandada, cabe ponderar si la norma militar supera el test de razonabilidad en términos de adecuación y proporción entre el medio contenido en la norma (la reparación tarifada) y el fin a preservar (la tutela del resarcimiento de la persona afectada). Es evidente, en esta línea de razonamiento, que la exigüidad del importe que resulta de la aplicación de las normas infraconstitucionales reseñadas en el considerando anterior, pulveriza el crédito indemnizatorio, privando a este último de su contenido inmanente.

Todo lo anterior relativiza el valor del plexo normativo que el Estado invoca. Ello, en la medida en que —luego de la reforma establecida por la ley 24.429— el servicio militar ya no constituye una carga pública identificada con la obligación de "armarse en defensa de la patria y de esta Constitución", a la luz de lo establecido en el art. 21 de la Constitución Nacional. En tales condiciones, reclamos que, como el presente, se rigen por el sistema del ya derogado "servicio militar obligatorio", ya no representan para el Estado una responsabilidad patrimonial desproporcionada o de magnitudes significativas por su proyección a otros casos.

-25-

7°) Que, en virtud de todo lo expresado, corresponde declarar la invalidez constitucional del régimen indemnizatorio militar cuya aplicación pretende la demandada, pues cercena de modo intolerable derechos de raigambre constitucional como los reseñados en los considerandos 3° y 4° de este pronunciamiento.

No obsta a la conclusión antedicha la circunstancia según la cual el actor no impugnó las normas cuya inconstitucio-nalidad este Tribunal declara. En efecto, ya desde el año 1984, esta Corte ha señalado que en la admisión de la facultad de de-clarar la inconstitucionalidad de oficio no puede verse la crea-ción de un desequilibrio de poderes a favor del Judicial y en mengua de los otros dos, ya que si la atribución en sí no es ne-gada, carece de consistencia sostener que el avance sobre los otros poderes no se produce cuando media petición de parte y sí cuando no la hay; tampoco se opone a aquélla la presunción de validez de los actos administrativos, o de los actos estatales en general, ya que dicha presunción cede cuando contrarían una norma de jerarquía superior, lo que ocurre en las leyes que se oponen a la Constitución; ni, por último, puede verse en ella menoscabo del derecho de defensa de las partes, pues si así fue-se debería también descalificarse toda aplicación de oficio de cualquier norma legal no invocada por ellas so pretexto de no haber podido los interesados expedirse sobre su aplicación en el caso (voto de los jueces Carlos S. Fayt y Augusto César Bellus-cio en la causa "Juzgado de Instrucción Militar N° 50 de Rosa-rio", Fallos: 306:303).

Mas aun, el suscripto descalificó toda interpretación descontextualizada del art. 2° de la ley 27, el que exige como

010587

R. 401. XLIII.
Rodríguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.

*Corte Suprema de Justicia de la Nación*

requisito jurisdiccional la existencia de una "causa" o "caso" en concreto. Ello en nada se relaciona con el planteo de inconstitucionalidad que pudiera impetrar la parte u omitir hacerlo; verificado el problema constitucional, aun ante la inactividad de la parte, jamás podría argumentarse la inexistencia de "causa" o "caso", en los términos de la citada norma. Refuerza esa conclusión el propio art. 3° de la citada ley, al establecer como fin último de la justicia nacional "la observancia de la Constitución Nacional, prescindiendo, al decidir las causas, de toda disposición de cualquiera de los otros poderes nacionales, que esté en oposición con ella" (conf. "Peyrú, Osvaldo", Fallos: 310:1401, disidencia del juez Carlos S. Fayt).

Este criterio, entonces minoritario, fue reproducido en numerosas causas, luego delineado en "Mill de Pereyra" (Fallos: 324:3219) y finalmente adoptado por la mayoría del Tribunal en "Banco Comercial de Finanzas S.A." (Fallos: 327:3117).

8°) Que, por último, es del caso destacar que el Tribunal ha revisado en numerosas oportunidades su propia doctrina sobre la base de admitir, con elevado concepto, que la autoridad de los precedentes debe ceder ante la comprobación del error o de la inconveniencia de las decisiones anteriormente recaídas (Fallos: 166:220; 167:121; 178:25; 183:409; 192:414; 216:91; 293:50, entre otros), por lo que es pertinente abandonar los criterios establecidos por el suscripto en las causas "Gunther" (Fallos: 308:1118), "Valenzuela" (Fallos: 315:1731), "Bertinotti" (Fallos: 315:2207), "Mengual" (Fallos: 318:1959), entre otros.

Estar a lo que se ha decidido previamente es un principio básico de recta judicatura y de necesidad de certeza en la aplicación de la ley. No obstante, esta regla conduce a soluciones injustas cuando su aplicación mecánica prescinde de elementos relevantes como los apuntados *ut supra* con el consiguiente menoscabo de los derechos constitucionales en juego. De tal suerte, no cabe sino concluir que la indemnización fijada por el a quo cumple adecuadamente con la finalidad reparatoria que proveen las normas de derecho común, en consonancia con los principios de orden superior implicados.

Por ello, oída la señora Procuradora Fiscal, se declara admisible el recurso extraordinario y se confirma la sentencia apelada. Con costas en el orden causado, atento a la manera en que se resuelve la causa (art. 68, segundo párrafo, del Código Procesal Civil y Comercial de la Nación). Notifíquese y devuélvase.

CARLOS S. FAYT

ES COPIA FIEL CERTIFICADA
POR SECRETAR.. DE JURISPRUDENCIA
CORTE SUPREMA DE JUSTICIA DE LA NACION

DISI-//-

CARLOS FAYT

ES COPIA FIEL

010588

R. 401. XLIII.
Rodríguez Pereyra, Jorge Luis y otra c/ Ejército
Argentino s/ daños y perjuicios.

*Corte Suprema de Justicia de la Nación*

-///-DENCIA DEL SEÑOR MINISTRO DOCTOR DON ENRIQUE SANTIAGO
PETRACCHI

Considerando:

Que esta Corte comparte y hace suyos los fundamentos
y conclusiones del dictamen de la señora Procuradora Fiscal que
antecede y al que cabe remitirse por razones de brevedad.

Por ello, y de conformidad con lo dictaminado, se declara
procedente el recurso extraordinario y se revoca la sentencia
apelada. Con costas. Vuelvan los autos al tribunal de origen a
fin de que, por quien corresponda, se dicte un nuevo pronuncia-
miento con arreglo al presente. Notifíquese y, oportunamente,
remítase.

ENRIQUE S. PETRACCHI

ES COPIA FIEL

ES COPIA FIEL CERTIFICADA
POR SECRETARÍA DE JURISPRUDENCIA
CORTE SUPREMA DE JUSTICIA DE LA NACION

Recurso extraordinario interpuesto por el **Ejército Argentino**, representado por el Dr. **Norberto Daniel Teiseira**.

Traslado contestado por **Jorge Luis Rodríguez Pereyra**, representado por el Dr. **Emilio Fernando Garcete**.

Tribunal de origen: **Cámara Federal de Apelaciones de La Plata, Sala II**.

Tribunal que intervino con anterioridad: **Juzgado Federal de 1° Instancia n° 2, Secretaría n° 5 de La Plata**.

# DECLARATION OF TRANSLATOR
## REGARDING ACCURACY OF TRANSLATION

Pursuant to 28 U.S.C. § 1746, Maria E. Manghi hereby declares as follows:

I am a lawyer employed by Cleary Gottlieb Steen & Hamilton LLP presently residing and working within the State of New York;

I am proficient with the Spanish language and the English language and have reviewed the foregoing documents (Ex. B, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 155, pages 248-49; Ex. C, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 14, pages 425-49; Ex. D, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 147, pages 286, 301-04; Ex. E, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 335, pages 2333-62; Ex. F, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 340, pages 47-76; Ex. G, Argentine National Constitution; Ex. H, Argentine Law No. 26,854; Ex. I, Cassagne, Juan C., Curso de Derecho Administrativo, 12ª ed., Buenos Aires, La Ley, 2018, Tomo II, excerpt on page 331; Ex. J, Argentine Law No. 17,319l; Ex. K, Código Civil y Comercial de la Nación, articles 235-37; Ex. L, Balbín, Carlos F., Tratado de Derecho Administrativo, 2ª ed., Buenos Aires, La Ley, 2015, Tomo II, excerpts on pages 909, 911, and 915; Ex. M, Lorenzetti, Ricardo L., Código Civil y Comercial de la Nación comentado, 1° ed., Santa Fé, Rubinzal-Culzoni, 2014, Tomo I, excerpts on pages 774 and 777; Ex. N, Alterini, Jorge H., Código Civil y Comercial comentado. Tratado exegético, 2° ed., Ciudad Autónoma de Buenos Aires, La Ley, 2016, Tomo II, excerpts on pages 55-56; Ex. O, Argentine Law No. 24,145; Ex. Q, Argentine Law No. 24,474; Ex. R, Fallos de la Corte Suprema de Justicia

Nacional, con la Relación de sus Respectivas Causas: Volumen 335, pages 1822-33; Ex. S,

Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas:

Volumen 146, pages 288-89, 297-98; Ex. T, Fallos de la Corte Suprema de Justicia Nacional,

con la Relación de sus Respectivas Causas: Volumen 147, pages 154-55, 164-65) translated from

Spanish into English and believe to the best of my knowledge and belief that the translations are

complete and accurate.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on June 11, 2024, in New York, New York.

_____

Maria E. Manghi

# Exhibit A-6

ENGLISH TRANSLATION

**Exhibit F – English Translation**

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Arnico vs. Argentina' por la Corte In
terarnericana de Derechos Hurnanos.

*Corte Suprema de Justicia de la Nación*

Buenos Aires, *14 de febrero de 2017.-*

Having regard to the file: "Ministerio de Relaciones
Exteriores y Culto s/ informe sentencia dictada en el caso
'Fontevecchia y D'Amito vs. Argentina' por la Corte Interamericana
de Derechos Humanos" (Ministry of Foreign Affairs and Worship s/
report of the judgment issued by the Inter-American Court of Human
Rights).

Whereas:

1°) On September 25, 2001, this Supreme Court upheld the
judgment of Chamber H of the National Civil Appeals Court that had
upheld the claim for damages brought by former President Carlos
Saul Menem against Editorial Perfil S.A., Jorge Fontevecchia and
Hector D'Amico (case "Menem, Carlos Saul c/ Editorial Perfil S.A.
y otros s/ daños y perjuicios - sumario" -Fallos: 324:2895-;
hereinafter, "Menem" case). This Court held that the dissemination
of certain newspaper articles related to the alleged existence of
an unacknowledged son of Menem had caused injury to his family.
The Court of Appeals, in its judgment, upheld his right to privacy,
protected by Article 19 of the National Constitution and by
Articles 17, paragraphs 1 and 2 of the International Covenant on
Civil and Political Rights, and 11, paragraphs 2 and 3, of the
American Convention on Human Rights (hereinafter, ACHR), among
other norms, and confirmed the pecuniary sentence ordered by the
Court, reducing the amounts of the sentence.

2°) The aforementioned pronouncement having become
final and having complied with the economic reparation ordered
therein, on November 15, 2001, Jorge Fontevecchia, Hector D'Amico
and Horacio Verbitsky (the latter on behalf of the Association of
the

-1-

ci6n Periodistas) submitted the case to the Inter-American system for the protection of human rights on the understanding that the aforementioned judgment of the Supreme Court had violated the right to freedom of thought and expression (art. 13 of the ACHR), for which they requested that the Argentine State be declared internationally responsible.

3°) On November 29, 2011, the Inter-American Court, after following the proper procedure of international proceedings -in which only the alleged victims and the representatives of our country intervened and the evidence offered therein was weighed-, declared that the Argentine State had violated the petitioners' right to freedom of expression (art. 13, ACHR). It stated there that the judgment was *per se* a form of reparation (operative part, paragraph 1 of the judgment ''Fontevecchia et al. v. Argentina'', p. 40) and, additionally, it ruled that the Argentine State should:

> a. to annul the civil sentence imposed on Jorge Fontevecchia and Hector D'Amico, as well as all its consequences;

> b. publish an official summary of its judgment prepared by the Supreme Court, once only, in the Official Gazette and in a newspaper of wide national circulation, as well as publish the complete judgment of the Inter-American Court on the web page of the Judicial Information Center of the Supreme Court; and

> c. to deliver the sums recognized in that judgment, including the reimbursement of the condemnation blankets.

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Amico vs. Argentina' por la Corte In
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

The Court of Justice's decision, as well as those corresponding to the reparations admitted in its international decision (material damage, expenses derived from the domestic proceeding as well as from the international proceeding).

4°) As to point "b", the measure has been complied with -as far as this Court is concerned- by means of the publication implemented through two portals: the Judicial Information Center and the Court's jurisprudence page, which also includes the publication of the judgment issued by this Court in the "Menem" case.

In relation to point "c", it is worth noting that the obligations imposed therein are beyond the scope of the present proceedings, since -in this instance- judicial intervention is not necessary for the Argentine State to proceed voluntarily to comply with them, in a c c o r d a n c e  w i t h  the constitutional distribution of powers among the different branches of government.

Finally, with respect to point "a", the General Directorate of Human Rights of the Ministry of Foreign Affairs and Worship of the Nation sent to this Supreme Court an official letter informing it of the request made by the Secretary of Human Rights of the Nation to this Court to comply, as appropriate *and i n* accordance with its competence, with the judgment issued by the Inter-American Court of Human Rights in the case of *"Fontevecchia and D 'Amico vs.*

November 29, 2011 (fs. 37 of file 6439/2012).

-3-

(5°) The Court gave sight of the proceedings to the Attorney General's Office, who presented her opinion at fols. 45/48. Subsequently, as suggested in point IV of that brief, this Court ordered Carlos Saul Me nem to be informed of the presentation made by the General Directorate of Human Rights of the Ministry of Foreign Affairs and Worship of the Nation, for the term of ten days, which was answered on page 51. There, the plaintiff stated that "he has not been a party to the international lawsuit, whose pronouncement condemned the Argentine State, so he has nothing to express in that respect".

6°) It is undisputed that the judgments of the Inter-American Court, issued in contentious proceedings against the Argentine State are, in principle, mandatory for the latter (art. 68.1, ACHR) (conf. doctrine of Judgments: 327:5668, vote of Judge Highton de Nolasco, paragraph 6). However, such binding nature only applies to the judgments issued by the international tribunal within the framework of its remedial powers. Indeed, it is with this scope that the Argentine State has bound itself internationally to abide by the decisions of the Inter-American Court.

7°) It is appropriate to analyze in this instance, then, whether the order contained in the operative part of the sentence in question (point 2), insofar as it provides to "annul the civil sentence imposed on Mr. Jorge Fontevecchia and Mr. Hector D'Amico" in the "Menem" case, has been issued within the framework of powers provided by the ACHR and can be complied with by this Court in the light of the national constitutional order. The res-

-4-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Amico vs. Argentina' por la Corte In
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

puesta The reasons for the refusal are       to be exposed to
as follows.

8°) From the perspective of the international
obligations assumed by our country, the structural principles of
the inter-American system of human rights protection, which defines
itself as a subsidiary body, must be taken into consideration.
Thus, it is affirmed that the ACHR creates "an international
protection, of a conventional nature, which is an adjuvant or
complementary to that offered by the domestic law of the American
States" (ACHR Preamble). This subsidiarity is manifested, among
others, in the conventional requirement of exhaustion of domestic
remedies prior to access to the regional system (cfr. arts. 46.1.a
and 61.2 ACHR) and in the  principle that the Inter-American
Court does not act as another instance in the cases dealt with by
the national Courts. The Inter-American Court is not a "fourth
instance" that reviews or annuls State jurisdictional decisions
but, following the structural principles mentioned above, it is
subsidiary, coadjuvant and complementary (see, among others, I/A
Court H.R., case of "Perozo et al. v. Venezuela", judgment of
January 28, 2009, Series C, num. 195, para. 64).

9°) The same international Court has held that "the
Inter-American Court does not have the character of a court of
appeal or cassation of the jurisdictional bodies of a national
character; it can only, in this case, identify the procedural
violations of the rights enshrined in the Convention that have
harmed the [...] affected in this case, but it **lacks** jurisdiction to
remedy such violations in the field of the Convention.

-5-

internal [...]" (I/A Court H.R., "Genie Lacayo" case, Judgment of -29
January 1997, Series C, num. 30, para. 94). For its part, the
Inter-American Commission on Human Rights has also emphasized
these principles by stating that the international protection
granted by the supervisory bodies o f  the Convention is of a
subsidiary nature and that it cannot act as a court of appeal to
examine alleged errors of law or fact that may have been committed
by national courts (conf. Inter-American Commission on Human
Rights, Report 39/96. Case 11.673. Argentina, October 15, 1996,
points 48
y 51).

    10) This understanding of the role of inter national
human rights courts as subsidiary actors has been, moreover,
emphatically embraced by the European Court of Human Rights with
its doctrines of the national margin of appreciation (developed
from the cases "Lawless v. Ireland", judgment of July 1, 1961, and
"Handyside v. The United Kingdom", judgment of December 7, 1976,
and expressed most recently in the case "Lautsi and Others v.
Italy", judgment of March 2011) and of the "fourth instance"
("Schmidt v. Italy", judgment of March 2011) and of the "fourth
instance" ("Schmidt v. The United Kingdom", judgment of March
2011). The United Kingdom", judgment of December 7, 1976, and more
recently expressed in the case "Lautsi and Others v. Italy",
judgment of March 18, 2011) and of the "fourth instance" ("Schenk
v. Switzerland", 10862/84, judgment of July 12, 1988; "Tautkus v.
Lithuania", 29474/09, judgment of November 27, 2012; among
others).

    11) In light of these principles, annulling the
judgment issued by this Supreme Court in the "Menem" case by virtue
of the order of the Inter-American Court (paragraph 2 of the
operative part and paragraph 105) -which is synonymous with

-6-

"revoking" according to the first meaning of this word in the
dictionary of the American Convention on Human Rights- is a
violation of the principles of the Inter-American Convention on
Human Rights.

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Amico vs. Argentina' por la Corte In
teramericana de Derechos Humanos.

*Corte Suprema   Justicia de la Nación*

de la  This would imply transforming said court, effectively, into a "fourth instance" reviewing the judgments handed down by this Court, in clear violation of the structuring principles of the inter-American system and in excess of the obligations conventionally assumed by the Argentine State when it joined said system. Indeed, the idea of revocation is at the very core of the concept of a "fourth instance", inasmuch as a higher judicial instance implies the capacity to review the decisions of the lower court and, if necessary, to render them null and void. To recognize the Inter-American Court as such would imply, on the other hand, the paradox that this reviewing instance would have been exercised in a process that does not recognize continuity with the one developed by this Court, since its fundamental elements, such as the parties and the evidence, are different.

12) On the other hand, the Inter-American Court, in ordering the annulment of the judgment of this Court that has become res judicata, has resorted to a restitutive mechanism that is not provided for by the conventional text. This textual analysis is of fundamental importance, since the letter of the treaties - in the context of their terms and taking into account their object and purpose (art. 31, Vienna Convention on the Law of Treaties) - determines the limits of the remedial competence of international tribunals. By definition, international tribunals are bodies with limited jurisdiction in the manner prescribed in the instruments that have constituted them (Michael Reisman, "Has the International Court Ex ceeded its Jurisdiction", American Journal of International Law,

vol. 80, year 1986, p. 128) and lack an inherent and unalterable jurisdiction to select the remedies of their choice (Chittharanjan Felix Amerasinghe, "Jurisdiction of International Tribunals", Kluwer Law International, The Hague, 2003, p. 389).

13) In this sense, the ACHR establishes that "[w]hen it decides that there has been a violation of a right or freedom protected in this Convention, the Court shall order that the injured party be guaranteed the enjoyment of his right or freedom that was violated. It shall also order, if appropriate, that reparation be made for the consequences of the measure or situation that constituted the violation of those rights and the payment of fair compensation to the injured party" (art. 63.1, ACHR). (art. 63.1, ACHR) C o n s e q u e n t l y, the literal wording of the rule does not contemplate the possibility that the Inter-American Court may order the annulment of a judgment issued in a national venue.

14) This understanding of Article 63(1) is confirmed by the precedents that gave rise to the text of the Convention (see Article 32 of the Vienna Convention on the Law of Treaties). Its examination shows that this restitutive mechanism was not even considered in the preparatory work of the American Convention (see Inter-American Specialized Conference on Human Rights, San Jose, Costa R i c a, November 7-22, 1969, Proceedings and Documents, General Secretariat, Organization of American States, Washington, D.C., OEA/Ser.K/XVI/1.2).

15) Although the Inter-American Court has, on some occasions, ruled against the use of this remedy, qualifying it as a form of reparation, it has explicitly recognized that

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Amico vs. Argentina' por la Corte In
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

in many cases such a remedy is inappropriate. Thus, it has held that "[t]here may be cases in which it [*in integrum restitutio tio]* is not possible, sufficient or adequate (cf. Usine de Chorz6w, fond, supra 43, p. 48). In this way, in the opinion of the Court, Article 63(1) of the American Convention must be interpreted" (I/A Court H.R., September 10, 1993, "Aloeboetoe et al. v. Suriname", Series C 15, para. 49; emphasis added; similarly, I/A Court H.R., "Blake v. Guatemala", January 22, 1999, Series C 48, para. 42).

16) In this case, to set aside the judgment of this Court that has become res judicata is one of the situations in which restitution is legally impossible in light of the fundamental principles of Argentine public law. From this constitutional perspective, Article 27 of the Constitution provides that "[t]he Federal Government is obliged to strengthen its relations of peace and commerce with foreign powers by means of treaties in conformity with the principles of public law established in this Constitution" (emphasis added). These principles translate into the way in which the obligations assumed by the Argentine State must be interpreted. In Article 27, the Argentine Constitution has enshrined a sphere of sovereign reserve, delimited by the principles of public law established in the National Constitution, to which international treaties must conform and with which they must be in conformity (Judgments: 316:1669; among others).

17) Among these unshakable principles is undoubtedly the character of this Court as a sovereign body.

-9-

The Judicial Branch is the head of the Judiciary, according to Article 108 of the National Constitution (Judgments: 256:114; 289:193; 318:986; 319:1973; 328:2429; 329:3235, 5913; 330:49, 251; 338:1575; among many others). Revoking the final judgment issued by this Court implies depriving it of its character as the supreme organ of the Argentine Judicial Power and substituting it for an international court, in clear violation of Sections 27 and 108 of the National Constitution.

18) This interpretation reflects a strong tradition in Argentine constitutional practice expressed, for example, in the so-called "Argentine formula" - upheld at the Hague Peace Conference of 1907 by the delegates Roque Saenz Pena, Luis Maria Drago and Carlos Rodriguez Larreta - which excluded from treaties of compulsory arbitration matters affecting the Constitution of each country. This formula "was born of the terms and spirit of our Constitution, which could not be distorted by any treaty without being null and void" (Carlos Saavedra Lamas, "En torno a la Constitucion que nos rige", Academia Nacional de Derecho y Ciencias Sociales, Buenos Aires, 1957, p. 21).

In the same sense, Joaquin V. Gonzalez stated that "[a] treaty cannot alter the supremacy of the National Constitution, change the form of government, suppress the Constitution, suppress the Constitution, change the form of government, suppress the Constitution, change the form of government, suppress the Constitution, and so on.
a province or incorporate new ones, to limit          powers to expressly conferred on the powers of government,     disintegrate socially or politically to the territory; to          the rights restrict

-10-

and social rights recognized by the constitution to the
inhabitants of the country, nor the prerogatives accorded to the

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores *y* Culto s/ informe
sentencia dictada en el caso 'Fontevec chia *y* D' Amico
vs. Argentina' by the Inter-American Court of Human
Rights.

*Corte Suprema de Justicia de la Nación*

foreigners nor suppress or diminish in any way the constitutional guarantees created to make them effective [...] Insofar as the National Constitution is what it is, Article 27 has for the Nation a singular significance in international law. The invariable rule of conduct, respect for the moral and political integrity of the contracting Nations" (Joaquin V. Gonza lez, Senado de la Nacion, Diario de Sesiones, session of August 26, 1909, volume IX, p. 52).

19) This understanding of Article 27, far from having been altered by the 1994 reform, has been reaffirmed by it. This was the understanding of the Argentine Constitution when, in granting constitutional hierarchy to the ACHR - among other international human rights treaties - it expressly established that its norms "do not derogate any article of the first part of this Constitution", reaffirming the full validity of the principles of public law established in the fundamental norm as an insurmountable barrier to international treaties (doctrine of Judgments: 317:1282).

20) By virtue of the foregoing, it is not appropriate to grant the request of the Secretary of Human Rights of the Nation. What has been said so far does not imply denying the binding nature of the decisions of the Inter-American Court, but only to understand that the binding nature arising from art. 68.1 must be circumscribed to the matter over which the international court has jurisdiction (art. 63, ACHR; arts. 27, 75, inc. 22 and 75, inc. 22 and 75, inc. 23).
108, National Constitution).

Therefore, having heard the opinion of the Attorney General, it is dismissed. la presentacion de fs. 1. nagase saber y file.

RICARDO LUIS LORENmtl

ELENA I. HIGHTON de NOLASCO

Por su voto

1v,,tJlv')

JUAN CARLOS MAQUEDA

HORACIO ROSATTI

VO-//-

N.OSfERAANOOlt

,-12-          -13

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Amico vs. Argentina' por la Corte In
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

-//-TO DEL MR. MINISTER DR. H O R A C I O        R O S A T T I

Whereas:

1°) That on September 25, 2001, the Supreme Court of Justice of the Nation, within the framework of its appellate jurisdiction and by concurring votes, confirmed the judgment of Chamber H of the National Civil Court of Appeals insofar as it had revoked the first instance decision and upheld the claim for damages filed by Carlos Saul Menem against Editorial Perfil S.A., Jorge Fontevecchia and Hector D'Amico seeking compensation for the moral damages suffered as a result of the dissemination of journalistic articles.

-The plaintiff's privacy had been illegitimately harmed by the existence of an unacknowledged child of the plaintiff, inasmuch as this had been an arbitrary intrusion into the plaintiff's sphere of privacy as contemplated in article 1071 bis of the Civil Code.

Notwithstanding this, I modify the economic sentence set by the Court,     que redujo a la suma de $ 60.000 (conf. fs. 367/388 of file 117.391/95 "Menem, Carlos Saul v. Edito rial Perfil S.A. y otros s/ dafios y perjuicios - sumario").

2°) On November 15, 2001, Jorge Fontevecchia, Hector D'Amico and Horacio Verbitsky(on behalf of the Asociacion Periodistas) submitted the aforementioned case to the Inter-American system for the protection of human rights, on the understanding that the Argentine State - through the Supreme Court's ruling referred to above - had violated the right to freedom of expression and freedom of association, and that the Argentine State - through the Supreme Court's ruling referred to above - had violated the right to freedom of expression and freedom of association, and that the Argentine State - through the Supreme Court's ruling referred to

-13-

above - had violated the right to freedom of expression and freedom
of association.

to freedom of thought and expression (art. 13 of the American Convention on Human Rights, hereinafter ACHR), for which they requested a declaration of their international responsibility.

On November 29, 2011, after following the proceedings at the international level, the Inter-American Court of Human Rights (hereinafter IACHR) declared that the Argentine State had violated the right to freedom of expression recognized in Article 13 to the detriment of the plaintiffs (see fs. 1/36 of file No. 6439/2012).

While recognizing that the judgment constituted per se a form of reparation, the IACHR ruled that the Argentine State should:

a) to annul the civil sentence imposed on Jorge Fontevecchia and Hector D'Amico, as well as all its consequences, in the terms of paragraph 105 of the pronouncement (point 2);

b) publish, for one time only, an official summary of its judgment in the official gazette and in a newspaper of wide national circulation, and the complete judgment of the Inter-American Court on the web page of the Judicial Information Center of the National Supreme Court (item 3); and,

c) to deliver the sums recognized in said judgment, including the reinstatement of the Count's blankets duly fixed in the Court judgment

-15-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Amico vs. Argentina' por la Corte In
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

Supreme Court of Justice, as well as those corresponding to the reparations admitted in the international decision (material damages, expenses derived from the domestic and international proceedings) (point 4).

3°) That as a consequence of the foregoing, the Directorate General of Human Rights of the Ministry of Foreign Affairs and Worship of the Nation sent this Court, on September 20, 2012, an official letter in which it made known the request made by the Secretary of Human Rights of the Nation to comply, as appropriate and in accordance with the competence assigned, with the decision of the international court (fs. 37 of file 6439/2012).

This Court ordered the Attorney General to be informed of the proceedings, who on November 28, 2014 submitted the opinion at pages 45/48 of file 6439/2012. As requested in point IV of the aforementioned opinion, the Court ordered to transfer the submission made by the General Directorate of Human Rights of the Ministry of Foreign Affairs and Worship -for the term of ten days- to Mr. Carlos Saul Menem, which was answered on March 25, 2016 (fs. 51 of file 6439/2012), and as of said date the case files were ready to examine the merits of the aforementioned request.

4°) That in light of the obligation arising from art. 68.1 of the ACHR -which has been signed by the Argentine Republic and enjoys constitutional hierarchy (art. 75, paragraph 22 of the Constitution).

-15-

"'

National Constitution)- by which the National State commits itself to the
In its commitment to comply with the decisions of the IACHR Court
in the cases to which it has been a party, the following should
be noted:

With regard to paragraph 2(c), this Court has been
informed that, through the Ministry of Foreign Affairs, the
reparation measure provided for in point 4 of the operative part
of the aforementioned judgment is in the process of being complied
with, a fact which reflects the principle of
execution of said point of the international pronouncement (see-
(fs. 23/24 of the 2869/2016 brief; fs. 1 of the 2016 brief). 32011

With regard to paragraph 2(b), on November 22, 2016,
the IACHR Court declared that the Argentine State did not fully
comply with the reparation measure ordered in paragraph 3 of its
judgment, regarding the publication of the international
pronouncement and the official summary in the media contemplated
therein.

With regard to paragraph a) of the second recital, which
refers to the provisions of point 2 of the operative part of the
international tribunal's decision, insofar as it establishes *"to
annul the civil sentence imposed on Mr. Jorge Fontevecchia* and
*Mr. Hector D'Amico, as well as all its consequences (....) in the
terms of paragraph 105"*, which -in what is referred to here- refers
that *"the State must annul said sentences in all their extremes,
including, as the case may be, the consequences that they have
with respect to third parties; namely: a) the*

-16-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Amico vs. Argentina' por la Corte In
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

*c) as well as any other effect that those decisions have* or *have had",* the feasibility of its compliance must be analyzed in the light of the possibilities offered by our legal system. In this sense, initially, it cannot be overlooked in this instance that the order of the international tribunal insofar as it imposes on the Supreme Court of the Nation to annul a judgment issued within the scope of its competence not only seems to go beyond its powers but also to go beyond the scope of its jurisdiction.

-The Court has not only found an insurmountable obstacle in constitutional provisions that this Supreme Court cannot disregard and for whose protection it must see to it.

5 °) That, in effect, this Court cannot ignore that the ACHR was incorporated with constitutional hierarchy to our legal order without such incorporation implying the repeal of *any article of the first part of the National Constitution (art.* 75, *paragraph 22 of the National Constitution),* within which art. 27 stands out.

In the aforementioned Art. 27, the Constitution has enshrined a sphere of sovereign reserve (national margin of appreciation) delimited by *"the principles of public law established in the National Constitution",* to which international treaties -and even more so the interpretation of such treaties- must conform and with which they must be in conformity.

-17-

From this clause it is not possible to make inter national law -whether from a normative or jurisprudential source- automatically prevail, without any scrutiny, over the constitutional order. This interpretation reflects a strong tradition in Argentine constitutional practice, as Joaquin V. Gonzalez was able to explain: "a treaty does not automatically prevail, without any scrutiny whatsoever, over the constitutional order, whether it is a normative or jurisprudential source. Gonzalez: *"a treaty may not alter the supremacy of the National Constitution, change the form of government, suppress a province* or *incorporate new ones, limit attributions expressly conferred to the powers of government, socially* or *politically disintegrate the territory; restrict the civil, political* and *social rights granted by the Constitution to the inhabitants of the country, nor the prerogatives granted to foreigners, nor suppress* or *dissolve in any way the constitutional guarantees created to make them effective... Insofar as the National Constitution is what it is, art. 27 has for the Nation a singular meaning in international law"* (Joaquin V. Gonzalez, Senado de la Na cion, Diario de Sesiones, session of August 26, 1909, vol. IX, p. 52).

6°) That the supreme character of the decisions of this Court of Justice, head of the Judicial Power of the Nation according to Article 108 of the Constitution (Judgments: 256:114; 289:193; 319:1973; 328:2429; 329:3235 y 5913; 330:49 y 251; 338:1575, among many others), is a constitutive element of the principles of public law referred to in Article 27 examined above.

This jurisdictional power, qualified as the highest and most eminent in the Argentine legal system, connatural

-18-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Amico vs. Argentina' por la Corte In
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

with the institutional responsibility that corresponds to this Court as the head of the Judicial Department of the Federal Government (conf. Judgments: 330:3109; 338:1216, and case FLP 8399/2016/CS1 "Centro de Estudios para la Promoci6n de la Igualdad y la Soli daridad y otros c/ Ministerio de Energia y Mineria s/ amparo co lectivo", judgment of August 18, 2016), is supported by the unalterable character of its regular pronouncements, It is not possible to "render them without effect" -which means "revoke them" in accordance with the first meaning of the expression "revoke" of the Diccionario de la Lengua Espanola de la Real Academia- if that is what is intended in the present case.

7°) That in such conditions, point 2 of the operative part of the international Court's pronouncement (identified as item a) of recital 2 of this judgment) must be interpreted in harmony with the exercise of the highest jurisdictional power established in the republican system upheld by the Argentine constitutional order (arts. 1, 108 and 116 of the National Constitution). Otherwise, the IACHR Court would be set up as a "reviewing" or "cassation" instance of e-statutory jurisdictional decisions, a category that exceeds the adjuvant and complementary character of international juris diction, attributes that are derived from the Preamble of the ACHR (conf. arg. I/A Court H.R., Case of *"Perozo* et *al. v. Venezuela"*, Judgment of January 28, 2009, para. 64; I/A Court H.R., Case of *"Genie Lacayo"*, Judgment of January 29, 1997, para. 94).

-19-

8°) That by virtue of the foregoing, in a context of
In this context, the "jurisprudential dialogue" that seeks to
maintain the decisional convergence between the bodies with
competence to settle disputes in the national and international
spheres, recognizing the IACHR Court as the final interpreter of
the ACHR (art. 62, points 1 and 3 ACHR) and t h e  Supreme Court
of Justice of the Nation as the final interpreter of the Argentine
National Constitution (arts. 116 and 117 of the National
Constitution), it can be concluded that the resolution ordered in
the judgment of the Inter-American Court finds adequate
satisfaction by means of the concretization of the
"jurisprudential dialogue" that the Inter-American Court ordered
in the judgment of the Inter-American Court. 116 and 117 of the
National Constitution), it must be concluded that the remedy
ordered in the judgment of the Inter-American Court is adequately
satisfied through the implementation of the measures mentioned in
the second and third paragraphs of the preceding recital 4), it not
being possible to carry out the formal revocation of the national
decision -if that is what is intended- without violating the
provisions of Arts. 27 and 75 inc. 22) of the Argentine National
Constitution, clauses whose observance this Court must watch over.

In accordance with the review carried out in relation
to the measures adopted by different Argentine State bodies and
with the scope described in the preceding recitals, the following
is hereby approved

-//-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Amico vs. Argentina' por la Corte In
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

//-The judgment of the IACHR Court shall be deemed to have been complied with in accordance with the commitment assumed by Article 68.1 of the ACHR.

Therefore, having heard the opinion of the Attorney General, the filing on page 1 is hereby dismissed.



HORACIO ROSATTI

DISI-//-

CSJ 368/1998 (34-M) /CSl
Ministerio de Relaciones Exteriores y Culto s/ informe sentencia dictada en el caso 'Fontevec chia y D' Amico vs. Argentina' por la Corte In teramericana de Derechos Humanos.



-///-DENCIA DEL SENOR MINISTRO DOCTOR DON JUAN CARLOS MAQUEDA

Whereas:

1 °)That these proceedings were initiated as a result of the letter sent by the Directorate General of Human Rights of the Ministry of Foreign Affairs and Worship of the Nation dated September 20, 2012, in which the request made by the Secretary of Human Rights of the Nation to this Court to comply, as appropriate and in accordance with its competence, with the provisions of paragraphs 1 and 2 of this article.

105 and 108, point c, of the judgment issued by the Inter-American Court of Human Rights in the case of "Fontevecchia and D'Amico v. Argentina", dated November 29, 2011 (fs. 37 of file no. 6439/2012). 6439/2012); to which this Court timely responded by means of an official letter sent to the Ministry of Foreign Affairs informing that the judgment of the Inter-American Court was published since December 19, 2011 in the official website of the Judicial Information Center, the remaining issues being under study (conf. fs. 38/41).

Subsequently, the Court ordered the hearing of the proceedings to the Attorney General, who, on November 28, 2014, presented the opinion that appears on pages 45/48 of file 6439/2012.

As requested in point IV of the aforementioned opinion, the Supreme Court ordered to transfer -for the term of ten days- to Mr. Carlos Saul Menem the presentation made by the Directorate General of Human Rights of the Ministry of Foreign Affairs and Worship of the Nation, which was

-23-

answered on March 25, 2015, and as of said date, the case is ready for judgment (page 51 of file 6439/2012).

2 °) That in the aforementioned pronouncement it was established, as far as the case is concerned, that the Argentine State, when deciding in the case "Menem, Carlos Sa61 v. Editorial Perfil S.A.n, judgment of September 25, 2001 (Judgments: 324:2895), had violated the right to freedom of expression recognized in Article 13 of the American Convention on Human Rights, in relation to Article 1.1 of the aforementioned Convention, to the detriment of the seniors Jorge Fontevecchia and Hector D'Amico.

In the operative part of said international judgment, it was ordered that the State should annul the civil sentence imposed on the aforementioned Jorge Fontevecchia and Hector D'Amico, as well as all its consequences, in the terms of paragraph 105 of the judgment; make the publications ordered in accordance with the provisions of paragraph 108, and deliver the amounts referred to in paragraphs 105, 128 and 129 of said pronouncement in accordance with the modalities specified in paragraphs 105, 128 and 129 of said judgment.
131 to 136 (conf. fs. 1/36 of file 6439/2012).

3°) That since the constitutional reform of 1994, and in accordance with the provisions of section 75, paragraph 22, of the Constitution, the judgments of the Inter-American Court of Human Rights pronounced in cases in which the Argentine State is a party must be complied with by the constituted powers within the scope of their competence and, c o n s e q u e n t l y , they are binding for the Supreme Court of Justice of the Nation.

-24-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Arnico vs. Argentina' por la Corte In
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

Therefore, this Court, as one of  The powers of the -
tado the Argentine courts and in accordance  Article 68.1 of the
same

The Court has to comply with and execute the pronouncement of the
Inter-American court (Law 23.054; Art. 75, paragraph 22, of the
National Constitution; doctrine of Judgments: 326:2968 "Cantos",
dissent of Judge Maqueda; 327:5668 "Esp6sito", vote of Judges
Belluscio and Maqueda; 334:1504 "Derecho", vote of Judge Maqueda;
336:1024 "Carranza Latrubesse", vote of Judge Maqueda and CSJN
resolution 477/15 of March 25, 2015 in file. No. 4499/13 "Mohamed
vs. Argentina").

4°) That the duty to comply with the decision adopted
by the Inter-American Court responds to a basic principle of the
law on the international responsibility of the State, according to
which States must abide by their international treaty obligations
in good faith *(pacta sunt servanda),* and in accordance with the
provisions of the Vienna Convention on the Law of Treaties of 1969,
they cannot, for reasons of internal order, fail to comply with
the obligations already assumed, under penalty of being compromised
the referred responsibility (art. 27 of the aforementioned
convention; conf. 27 of the aforementioned convention; conf.
Judgments: 315:1492, recitals 18 and 18 of the Vienna Convention on
the Law of Treaties 1969; conf.
19, in fine; 318:373, recital[40] ,second paragraph, and
334:1504, considering paragraph 3, last paragraph, of the vote of
Judge Ma queda).

5°) That in light of what has been expressed, meriting
the unequivocal grounds that supported the judgment of the Inter-
American Court in the "Fontevecchia and D'Amico vs. Argentina"
case, and given that said pronouncement must be complied with by
the constituted powers of the Argentine State w i t h i n  the scope

of their competence, the Argentine state has the right to decide on the application of the judgment in the "Fontevecchia and D'Amico v. Argentina" case.

According to paragraph 105 of the aforementioned judgment, it is incumbent upon this Supreme Court, as established in paragraph 105 of the aforementioned judgment, to annul the judgment issued by this Court -with a different composition- in the case "Menem, Carlos Saul v. Editorial Perfil S.A." (Judgments: 324:2895) and, consequently, also that of the National Civil Court of Appeals, which is its antecedent, as well as all its consequences, including the scope it may have had with respect to third parties.

6°) That as the inter-American court has specified in its decision and in order to avoid future questions, it should be clarified that such solution implies leaving without effect the attribution of civil liability of Mr. Jorge Fonte Vecchia and Mr. Hector D'Amico and the sentence to the payment of compensation, interest and costs and justice fee, as well as any other effect that the referred decisions have or would have had.

7°) That by resolution dated November 22, 2016, the IACHR declared that the Argentine State had complied with the reparation measure regarding the publication of its judgment on the Judicial Information Center website (paragraph 108, point c).

8°) That in that same resolution, the IACHR also requested that the compliance supervision procedure be left open with respect to the remaining reparation measures, among them, the one related to annulling the civil sentence.

Consequently, with the present pronouncement, this Tribunal, insofar as it is within its competence, fully complies with its jurisdiction.

-27-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Amico vs. Argentina' por la Corte In
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

compliance with the order of the judgment of the Inter-American Court of Human Rights, without it being appropriate to make any consideration with respect to the payment obligations established in paragraphs 105, 128 and 129 of the aforementioned decision, which depend on administrative and other measures that fall within the competence of other branches of the Argentine State.

Therefore, and having heard the Attorney General, in compliance with point 2 of the operative part of the judgment of the Inter-American Court of Human Rights in the "Fontevecchia and D'Amico vs. Argentina" case, the judgments issued by this Court and by the National Civil Court of Appeals in the aforementioned "Menem" case, insofar as they attributed civil liability and imposed a sentence on Mr. Jorge Fontevecchia and Mr. Hector D'Amico, are hereby annulled.

Consequently, the claim filed by Carlos Saul Menem against Jorge Fontevecchia, Hector D'Amico and Editorial Perfil Sociedad Anonima is dismissed. Add the proceedings forwarded by the Ministry of Foreign Affairs and Worship of the Nation to the principal. Notify Carlos Saul Menem, Jorge Fontevecchia, Hector D'Amico, Editorial Perfil S.A., the Secretary of Human Rights of the Ministry of Justice and Human Rights and the General Direction of Human Rights of the Ministry of Foreign Affairs and Worship.

**–//–**

-/ /-    from                Relations       Foreign  Affairs       and Culture.
         Done,               the main        the main case files to the court of
o r i g i n .

JUAN CARLOS MAQUEDA

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec
chia y D'Amico vs. Argentina' por la Corte In
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

Presentation made by **Dr. A. Javier Salgado,** on behalf of the **General Directorate of Human Rights of the Ministry of Foreign Affairs and Worship of the Nation.**

To access the opinion of the Procuración General de la Nación go to:

http://sjconsulta.csjn.gov.ar/sjconsulta/documentos/verDocumento.html?idAnalisis=735716&interno=1

# SPANISH ORIGINAL

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

Buenos Aires, *14 de febrero de 2017.-*

Vistos los autos: "Ministerio de Relaciones Exteriores y
Culto s/ informe sentencia dictada en el caso 'Fontevecchia y
D'Amico vs. Argentina' por la Corte Interamericana de Derechos
Humanos".

Considerando:

1°) El 25 de septiembre de 2001 esta Corte Suprema
confirmó la sentencia de la Sala H de la Cámara Nacional de Ape-
laciones en lo Civil que había hecho lugar a la demanda de daños
y perjuicios promovida por el ex Presidente Carlos Saúl Menem
contra Editorial Perfil S.A., Jorge Fontevecchia y Héctor
D'Amico (causa "Menem, Carlos Saúl c/ Editorial Perfil S.A. y
otros s/ daños y perjuicios - sumario" —Fallos: 324:2895—; en
adelante, causa "Menem"). Esta Corte entendió que la difusión de
ciertas notas periodísticas vinculadas con la presunta existen-
cia de un hijo no reconocido de Menem había lesionado en forma
ilegítima su derecho a la intimidad, tutelado por el art. 19 de
la Constitución Nacional y por los arts. 17, párrafos 1° y 2°
del Pacto Internacional de Derechos Civiles y Políticos, y 11,
párrafos 2° y 3°, de la Convención Americana sobre Derechos
Humanos (en adelante, CADH), entre otras normas, y confirmó la
condena pecuniaria dispuesta por la cámara, reduciendo los mon-
tos de condena.

2°) Encontrándose firme el mencionado pronunciamiento
y habiéndose cumplido con la reparación económica allí ordenada,
el 15 de noviembre de 2001 Jorge Fontevecchia, Héctor D'Amico y
Horacio Verbitsky (este último en representación de la Asocia-

-1-

ción Periodistas) sometieron el caso al sistema interamericano de protección de derechos humanos en el entendimiento de que la sentencia de la Corte Suprema referida precedentemente había vulnerado el derecho a la libertad de pensamiento y de expresión (art. 13 de la CADH), por lo que solicitaron que se declarara la responsabilidad internacional del Estado argentino.

3°) El 29 de noviembre de 2011 la Corte Interamericana, después de seguir el trámite propio del procedimiento en sede internacional -en el que solo intervinieron las presuntas víctimas y los representantes de nuestro país y se ponderaron las pruebas allí ofrecidas-, declaró que el Estado argentino había violado el derecho a la libertad de expresión de los peticionantes (art. 13, CADH). Afirmó allí que la sentencia constituía *per se* una forma de reparación (parte resolutiva, pto. 1 de la sentencia "Fontevecchia y otros v. Argentina", p. 40) y, adicionalmente, dispuso que el Estado argentino debía:

> a. dejar sin efecto la condena civil impuesta a Jorge Fontevecchia y Héctor D'Amico, así como todas sus consecuencias;

> b. publicar un resumen oficial de su sentencia elaborado por la Corte Suprema, por una sola vez, en el Diario Oficial y en un diario de amplia circulación nacional, así como publicar la sentencia completa de la Corte Interamericana en la página del Centro de Información Judicial de la Corte Suprema; y

> c. entregar las sumas reconocidas en dicho fallo, comprensivas del reintegro de los montos de condena

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

oportunamente fijados en la sentencia de la Corte Su-
prema de Justicia, como de los correspondientes a las
reparaciones admitidas en su decisión internacional
(daño material, gastos derivados del trámite del pro-
ceso interno como del procedimiento internacional).

4°) En cuanto al punto "b" la medida ha sido cumpli-
mentada -en lo que a este Tribunal compete- mediante la publica-
ción instrumentada a través de dos portales: el Centro de Infor-
mación Judicial y la página de jurisprudencia del Tribunal,
ámbito donde figura también la publicación de la sentencia dic-
tada por esta Corte en la causa "Menem".

En relación al punto "c", vale destacar que las obli-
gaciones allí impuestas se encuentran fuera del alcance de las
presentes actuaciones, toda vez que -en esta instancia- no re-
sulta necesaria la intervención judicial para que el Estado ar-
gentino proceda voluntariamente a su cumplimiento, de acuerdo
con la distribución constitucional de competencias entre los
distintos poderes del Estado.

Finalmente, respecto del punto "a", la Dirección Ge-
neral de Derechos Humanos del Ministerio de Relaciones Exterio-
res y Culto de la Nación remitió a esta Corte Suprema un oficio
en el que se hace saber el pedido formulado por la Secretaría de
Derechos Humanos de la Nación a este Tribunal para que cumpla,
en lo que corresponda y de conformidad con su competencia, la
sentencia dictada por la Corte Interamericana de Derechos Huma-
nos en el caso *"Fontevecchia y D'Amico vs. Argentina"*, en fecha
29 de noviembre de 2011 (fs. 37 del expte. 6439/2012).

-3-

5°) El Tribunal dio vista de las actuaciones a la se-
ñora Procuradora General, quien presentó su dictamen a fs.
45/48. Posteriormente, de acuerdo a lo sugerido en el punto IV
de ese escrito, esta Corte ordenó dar traslado a Carlos Saúl Me-
nem de la presentación efectuada por la Dirección General de De-
rechos Humanos del Ministerio de Relaciones Exteriores y Culto
de la Nación, por el término de diez días, el que fue contestado
a fs. 51. Allí, el actor expuso que "no ha sido parte en el jui-
cio internacional, cuyo pronunciamiento recayó condenando al Es-
tado Argentino, por lo que nada tiene que expresar al respecto".

6°) Se encuentra fuera de discusión que las senten-
cias de la Corte Interamericana, dictadas en procesos contencio-
sos contra el Estado argentino son, en principio, de cumplimien-
to obligatorio para este (art. 68.1, CADH) (conf. doctrina de
Fallos: 327:5668, voto de la jueza Highton de Nolasco, conside-
rando 6°). Dicha obligatoriedad, sin embargo, alcanza únicamente
a las sentencias dictadas por el tribunal internacional dentro
del marco de sus potestades remediales. En efecto, es con ese
alcance que el Estado argentino se ha obligado internacionalmen-
te a acatar las decisiones de la Corte Interamericana.

7°) Corresponde analizar en esta instancia, entonces,
si la orden contenida en la parte resolutiva de la sentencia en
cuestión (punto 2), en tanto dispone "dejar sin efecto la conde-
na civil impuesta a los señores Jorge Fontevecchia y Héctor
D'Amico" en la causa "Menem" ha sido dictada dentro del marco de
atribuciones previsto por la CADH y puede ser cumplida por esta
Corte a la luz del ordenamiento constitucional nacional. La res-

-4-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

puesta negativa se impone por las razones que se expondrán a
continuación.

8°) Desde la perspectiva de las obligaciones interna-
cionales asumidas por nuestro país, deben tenerse en consïdera-
ción los principios estructurales del sistema interamericano de
protección de derechos humanos, el que se autodefine como subsi-
diario. Así, se afirma que la CADH crea "una protección interna-
cional, de naturaleza convencional coadyuvante o complementaria
de la que ofrece el derecho interno de los Estados americanos"
(Preámbulo CADH). Esta subsidiariedad se manifiesta, entre
otras, en la exigencia convencional de agotamiento de los recur-
sos internos en forma previa al acceso al sistema regional (cfr.
arts. 46.1.a y 61.2 CADH) y en el principio de que la Corte In-
teramericana no actúa como una instancia más en los casos trata-
dos por las Cortes nacionales. La Corte Interamericana no cons-
tituye entonces una "cuarta instancia" que revisa o anula deci-
siones jurisdiccionales estatales sino que, siguiendo los prin-
cipios estructurales recordados, es subsidiaria, coadyuvante y
complementaria (véase, entre otros, Corte IDH, caso "Perozo y
otros v. Venezuela", sentencia de 28 de enero de 2009, Serie C,
núm. 195, párr. 64).

9°) El mismo Tribunal internacional ha sostenido que
"la Corte Interamericana no tiene el carácter de tribunal de
apelación o de casación de los organismos jurisdiccionales de
carácter nacional; sólo puede en este caso, señalar las viola-
ciones procesales de los derechos consagrados en la Convención
que hayan perjudicado al [...] afectado en este asunto, pero care-
ce de competencia para subsanar dichas violaciones en el ámbito

-5-

interno [...]" (Corte IDH, caso "Genie Lacayo", sentencia del 29
de enero de 1997, Serie C, núm. 30, párr. 94). Por su parte,
también la Comisión Interamericana de Derechos Humanos ha enfa-
tizado estos principios al manifestar que la protección interna-
cional que otorgan los órganos de supervisión de la Convención
es de carácter subsidiario y que no puede hacer las veces de un
tribunal de alzada para examinar supuestos errores de derecho o
de hecho que puedan haber cometido los tribunales nacionales
(conf. Comisión Interamericana de Derechos Humanos, Informe
39/96. Caso 11.673. Argentina, 15 de octubre de 1996, puntos 48
y 51).

10) Esta comprensión del rol de los tribunales inter-
nacionales de derechos humanos como actores subsidiarios ha si-
do, además, abrazada enfáticamente por el Tribunal Europeo de
Derechos Humanos con sus doctrinas del margen de apreciación na-
cional (desarrollada a partir de los casos "Lawless v. Ireland",
sentencia del 1° de julio de 1961, y "Handyside v. The United
Kingdom", sentencia del 7 de diciembre de 1976, y expresada más
recientemente en el caso "Lautsi and Others v. Italy", sentencia
del 18 de marzo de 2011) y de la "cuarta instancia" ("Schenk v.
Switzerland", 10862/84, sentencia del 12 de julio de 1988;
"Tautkus v. Lithuania", 29474/09, sentencia del 27 de noviembre
de 2012; entre otros).

11) A la luz de estos principios, dejar sin efecto la
sentencia dictada por esta Corte Suprema en la causa "Menem" en
virtud de la orden de la Corte Interamericana (punto 2 de la
parte resolutiva y párr. 105) —lo cual es sinónimo de "revocar"
conforme la primera acepción de esta palabra en el Diccionario

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

de la Real Academia Española— implicaría transformar a dicho
tribunal, efectivamente, en una "cuarta instancia" revisora de
las sentencias dictadas por esta Corte, en clara violación de
los principios estructurantes del sistema interamericano y en
exceso de las obligaciones convencionalmente asumidas por el Es-
tado argentino al ingresar a dicho sistema. En efecto, la idea
de revocación se encuentra en el centro mismo del concepto de
una "cuarta instancia", en tanto una instancia judicial superior
supone la capacidad de revisar las decisiones del inferior y, en
su caso, dejarlas sin efecto. Reconocer a la Corte Interamerica-
na tal carácter implicaría, por otra parte, la paradoja de que
esa instancia revisora hubiera sido ejercida en un proceso que
no reconoce continuidad con el desarrollado por esta Corte, al
ser diferentes sus elementos fundamentales, tales como las par-
tes y la prueba.

12) Por otra parte, la Corte Interamericana, al orde-
nar dejar sin efecto la sentencia de esta Corte pasada en auto-
ridad de cosa juzgada, ha recurrido a un mecanismo restitutivo
que no se encuentra previsto por el texto convencional. Este
análisis textual es de fundamental importancia, puesto que la
letra de los tratados -en el contexto de sus términos y teniendo
en cuenta su objeto y fin (art. 31, Convención de Viena sobre
Derecho de los Tratados)- determina los límites de la competen-
cia remedial de los tribunales internacionales. Por definición,
los tribunales internacionales son órganos con competencia limi-
tada de la manera prescripta en los instrumentos que los han
constituido (Michael Reisman, "Has the International Court Ex-
ceeded its Jurisdiction", American Journal of International Law,

-7-

vol. 80, año 1986, p. 128) y carecen de una jurisdicción in-
herente e inalterable para seleccionar los remedios que quieran
(Chittharanjan Felix Amerasinghe, "Jurisdiction of International
Tribunals", Kluwer Law International, La Haya, 2003, p. 389).

13) En este sentido, la CADH establece que "[c]uando
decida que hubo violación de un derecho o libertad protegidos en
esta Convención, la Corte dispondrá que se garantice al lesiona-
do en el goce de su derecho o libertad conculcados. Dispondrá
asimismo, si ello fuera procedente, que se reparen las conse-
cuencias de la medida o situación que ha configurado la vulnera-
ción de esos derechos y el pago de una justa indemnización a la
parte lesionada." (art. 63.1, CADH). En consecuencia, el tenor
literal de la norma no contempla la posibilidad de que la Corte
Interamericana disponga que se deje sin efecto una sentencia
dictada en sede nacional.

14) Esta comprensión del art. 63.1 se ve confirmada
por los antecedentes que dieron lugar al texto de la Convención
(conf. art. 32 Convención de Viena sobre el Derecho de los Tra-
tados). Su examen muestra que este mecanismo restitutivo no fue
siquiera considerado en los trabajos preparatorios de la Conven-
ción Americana (véase Conferencia Especializada Interamericana
sobre Derechos Humanos, San José, Costa Rica 7-22 de noviembre
de 1969, Actas y Documentos, Secretaría General, Organización de
los Estados Americanos, Washington, D.C., OEA/Ser.K/XVI/1.2).

15) A pesar de que la Corte Interamericana ha dis-
puesto en algunas ocasiones el uso de este remedio calificándolo
como una forma de reparación, ha reconocido explícitamente que

CSJ 368/1998 (34-N)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

en muchos casos tal remedio es improcedente. Así, ha sostenido que "[p]uede haber casos en que aquella [la *in integrum restitutio*] no sea posible, suficiente o adecuada (cfr. Usine de Chorzów, fond, supra 43, p. 48). De esta manera, a juicio de la Corte, debe ser interpretado el artículo 63.1 de la Convención Americana" (Corte IDH, 10 de septiembre de 1993, "Aloeboetoe y otros v. Surinam", Serie C 15, párr. 49; el subrayado es agregado; en igual sentido, Corte IDH, "Blake v. Guatemala", 22 de enero de 1999, Serie C 48, párr. 42).

16) En este caso, dejar sin efecto la sentencia de esta Corte pasada en autoridad de cosa juzgada es uno de los supuestos en los que la restitución resulta jurídicamente imposible a la luz de los principios fundamentales del derecho público argentino. Desde esta perspectiva constitucional, el art. 27 de la Carta Magna prescribe "[e]l Gobierno federal está obligado a afianzar sus relaciones de paz y comercio con las potencias extranjeras por medio de tratados que estén en conformidad con los principios de derecho público establecidos en esta Constitución" (subrayado añadido). Estos principios reseñados se traducen en el modo en que deben ser interpretadas las obligaciones asumidas por el Estado argentino. El constituyente ha consagrado en el art. 27 una esfera de reserva soberana, delimitada por los principios de derecho público establecidos en la Constitución Nacional, a los cuales los tratados internacionales deben ajustarse y con los cuales deben guardar conformidad (Fallos: 316:1669; entre otros).

17) Entre dichos principios inconmovibles se encuentra, sin duda alguna, el carácter de esta Corte como órgano su-

-9-

premo y cabeza del Poder Judicial, conforme surge del art. 108 de la Constitución Nacional (Fallos: 256:114; 289:193; 318:986; 319:1973; 328:2429; 329:3235, 5913; 330:49, 251; 338:1575; entre muchos otros). Revocar la sentencia firme dictada por este Tribunal implica privarlo de su carácter de órgano supremo del Poder Judicial argentino y sustituirlo por un tribunal internacional, en clara transgresión a los arts. 27 y 108 de la Constitución Nacional.

18) Esta interpretación es reflejo de una fuerte tradición en la práctica constitucional argentina expresada, por ejemplo, en la denominada "fórmula argentina" -sostenida en la Conferencia de Paz de La Haya de 1907 por los delegados Roque Sáenz Peña, Luis María Drago y Carlos Rodríguez Larreta- mediante la cual se excluían de los tratados de arbitraje obligatorio las cuestiones que afectaban a la Constitución de cada país. Esta fórmula "ha nacido de los términos y del espíritu de nuestra Constitución, los que no podían ser desvirtuados por ningún tratado sin exponerse a caer en nulidad" (Carlos Saavedra Lamas, "En torno a la Constitución que nos rige", Academia Nacional de Derecho y Ciencias Sociales, Buenos Aires, 1957, p. 21).

En el mismo sentido se expresó Joaquín V. González al sostener que "[u]n tratado no puede alterar la supremacía de la Constitución Nacional, cambiar la forma de gobierno, suprimir una provincia o incorporar otras nuevas, limitar atribuciones expresamente conferidas a los poderes de gobierno, desintegrar social o políticamente al territorio; restringir los derechos civiles, políticos y sociales reconocidos por la Constitución a los habitantes del país, ni las prerrogativas acordadas a los

-10-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

extranjeros ni suprimir o disminuir en forma alguna las garan-
tías constitucionales creadas para hacerlos efectivos […] En
cuanto la Constitución Nacional sea lo que es, el art. 27 tiene
para la Nación significado singular en el derecho internacional.
La regla invariable de conducta, el respeto a la integridad mo-
ral y política de las Naciones contratantes" (Joaquín V. Gonzá-
lez, Senado de la Nación, Diario de Sesiones, sesión del 26 de
agosto de 1909, volumen IX, pág. 52).

19) Esta comprensión del art. 27, lejos de haber sido
alterada por la reforma de 1994, ha sido reafirmada con ella.
Así lo ha entendido el constituyente argentino cuando al otorgar
jerarquía constitucional a la CADH -entre otros tratados inter-
nacionales sobre derechos humanos- ha establecido expresamente
que sus normas "no derogan artículo alguno de la primera parte
de esta Constitución", reafirmando la plena vigencia de los
principios de derecho público establecidos en la norma fundamen-
tal como valladar infranqueable para los tratados internaciona-
les (doctrina de Fallos: 317:1282).

20) En virtud de lo expuesto, no corresponde hacer
lugar a lo solicitado por la Secretaría de Derechos Humanos de
la Nación. Lo dicho hasta aquí no implica negar carácter vincu-
lante a las decisiones de la Corte Interamericana, sino tan solo
entender que la obligatoriedad que surge del art. 68.1 debe cir-
cunscribirse a aquella materia sobre la cual tiene competencia
el tribunal internacional (art. 63, CADH; arts. 27, 75 inc. 22 y
108, Constitución Nacional).

Por ello, habiendo dictaminado la señora Procuradora Gene-
ral, se desestima la presentación de fs. 1. Hágase saber y
archívese.

RICARDO LUIS LORENZETTI

ELENA I. HIGHTON de NOLASCO

JUAN CARLOS MAQUEDA

HORACIO ROSATTI

CARLOS FERNANDO ROSENKRANTZ

VO-//-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

-///-TO DEL SEÑOR MINISTRO DOCTOR DON HORACIO ROSATTI

Considerando:

1°) Que el 25 de septiembre de 2001 la Corte Suprema de Justicia de la Nación, en el marco de su jurisdicción apelada y por votos concurrentes, confirmó la sentencia de la Sala H de la Cámara Nacional de Apelaciones en lo Civil en cuanto había revocado la decisión de primera instancia y había hecho lugar a la demanda de daños y perjuicios promovida por Carlos Saúl Menem contra Editorial Perfil S.A., Jorge Fontevecchia y Héctor D'Amico con el objeto de que se le reparara el daño moral sufrido como consecuencia de la difusión de notas periodísticas -vinculadas con la existencia de un hijo no reconocido del actor- que habrían lesionado en forma ilegítima su intimidad, en tanto ello había importado una arbitraria intromisión en la esfera de privacidad del demandante contemplada en el art. 1071 bis del Código Civil.

No obstante ello, modificó la condena económica dispuesta por la Cámara, que redujo a la suma de $ 60.000 (conf. fs. 367/388 del expte. 117.391/95 "Menem, Carlos Saúl c/ Editorial Perfil S.A. y otros s/ daños y perjuicios - sumario").

2°) Que encontrándose firme el mencionado pronunciamiento, el 15 de noviembre de 2001, Jorge Fontevecchia, Héctor D'Amico y Horacio Verbitsky (en representación de la Asociación Periodistas) sometieron el caso citado al sistema interamericano de protección de derechos humanos en el entendimiento de que el Estado argentino -mediante el dictado de la sentencia de la Corte Suprema referida precedentemente- había vulnerado el derecho

-13-

a la libertad de pensamiento y de expresión (art. 13 de la Con-
vención Americana sobre Derechos Humanos, en adelante CADH), por
lo que solicitaron se declarara su responsabilidad internacio-
nal.

El 29 de noviembre de 2011, después de seguir el
trámite propio del proceso en sede internacional, la Corte In-
teramericana de Derechos Humanos (en adelante Corte IDH) declaró
que el Estado argentino había violado el derecho a la libertad
de expresión reconocido en el citado art. 13 en perjuicio de los
actores (véase fs. 1/36 del expte. nº 6439/2012).

No obstante reconocer que la sentencia constituía per
se una forma de reparación, la Corte IDH dispuso que el Estado
argentino debía:

a) dejar sin efecto la condena civil impuesta a Jorge
Fontevecchia y Héctor D'Amico, así como todas sus
consecuencias, en los términos del párrafo 105 del
pronunciamiento (punto 2);

b) publicar, por una sola vez, un resumen oficial de
su sentencia en el diario oficial y en un diario de
amplia circulación nacional, y la sentencia completa
de la Corte Interamericana en la página del Centro de
Información Judicial de la Corte Suprema Nacional
(punto 3); y,

c) entregar las sumas reconocidas en dicho fallo,
comprensivas del reintegro de los montos de la conde-
na oportunamente fijados en la sentencia de la Corte

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

Suprema de Justicia, como así también los correspon-
dientes a las reparaciones admitidas en la decisión
internacional (daño material, gastos derivados del
trámite del proceso interno como del internacional)
(punto 4).

3°) Que como consecuencia de lo anterior, la Direc-
ción General de Derechos Humanos del Ministerio de Relaciones
Exteriores y Culto de la Nación envió a este Tribunal, el 20 de
septiembre de 2012, un oficio en el que hace saber el pedido
formulado por la Secretaría de Derechos Humanos de la Nación pa-
ra que se dé cumplimiento, en lo que corresponda y de conformi-
dad con la competencia asignada, con lo resuelto por el tribunal
internacional (fs. 37 del expte. 6439/2012).

Esta Corte dispuso dar vista de las actuaciones a
la Procuradora General, quien con fecha 28 de noviembre de 2014
presentó el dictamen que obra a fs. 45/48 del expte. 6439/2012.
Conforme a lo solicitado en el punto IV del referido dictamen,
la Corte dispuso dar traslado de la presentación efectuada por
la Dirección General de Derechos Humanos del Ministerio de Rela-
ciones Exteriores y Culto -por el término de diez días- al señor
Carlos Saúl Menem, que fue contestado el 25 de marzo de 2016
(fs. 51 del expte. 6439/2012), quedando los autos a partir de
dicha fecha en condiciones de examinar la procedencia del pedido
mencionado.

4°) Que a la luz de la obligación que surge del art.
68.1 de la CADH -que ha sido suscripta por la República Argenti-
na y goza de jerarquía constitucional (art. 75, inciso 22 de la

-15-

Constitución Nacional)- por la cual el Estado Nacional se com-
promete a cumplir con las decisiones de la Corte IDH en los pro-
cesos en que ha sido parte, corresponde poner de manifiesto lo
siguiente:

Con relación al inciso c) del considerando 2°, se ha
informado a este Tribunal que, por intermedio del Ministerio de
Relaciones Exteriores, se encuentra en vías de cumplimiento la
medida de reparación prevista en el punto 4 de la parte disposi-
tiva del referido fallo, hecho que da cuenta del principio de
ejecución de dicho punto del pronunciamiento internacional (véa-
se fs. 23/24 del escrito 2869/2016; fs. 1 del escrito 3201/
2016).

Con relación al inciso b) del considerando 2°, el 22
de noviembre de 2016 la Corte IDH declaró que el Estado argenti-
no dio cumplimiento total a la medida de reparación ordenada en
el punto 3 de su sentencia, relativa a la realización de las pu-
blicaciones del pronunciamiento internacional y del resumen ofi-
cial en los medios allí contemplados.

Con relación al inciso a) del considerando 2°, que
refiere a lo dispuesto en el punto 2 de la parte resolutiva del
pronunciamiento del tribunal internacional, en cuanto establece
*"dejar sin efecto la condena civil impuesta a los señores Jorge
Fontevecchia y Hector D'Amico, así como todas sus consecuencias
(…) en los términos del párrafo 105"*, el que -en lo que aquí in-
teresa- refiere que *"el Estado debe dejar sin efecto dichas sen-
tencias en todos sus extremos, incluyendo, en su caso, los al-
cances que estas tengan respecto de terceros; a saber: a) la*

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

atribución de responsabilidad civil de los señores Jorge Fonte-
vecchia y Héctor D'Amico (…) c) así como cualquier otro efecto
que tengan o hayan tenido aquellas decisiones", la viabilidad de
su cumplimiento debe ser analizada a la luz de las posibilidades
que brinda nuestro sistema jurídico. En tal sentido, inicialmen-
te, no puede soslayarse en esta instancia que la orden del tri-
bunal internacional en cuanto impone al Tribunal Supremo de la
Nación dejar sin efecto una sentencia dictada dentro del ámbito
de su competencia no solo parece ir más allá de las atribuciones
-propias y específicas- de la Corte IDH (en especial respecto de
lo dispuesto en el art. 63.1 de la CADH), sino que encuentra un
obstáculo insalvable en disposiciones constitucionales que esta
Corte Suprema no puede desatender y por cuya protección debe ve-
lar.

5°) Que, en efecto, esta Corte no puede desconocer
que la CADH fue incorporada con jerarquía constitucional a nues-
tro orden jurídico sin que tal incorporación suponga derogar
*artículo alguno de la primera parte de la Constitución Nacional
(art. 75, inciso 22 de la Constitución Nacional)*, dentro de la
cual destaca el art. 27.

El constituyente ha consagrado en el citado art. 27
una esfera de reserva soberana (margen de apreciación nacional)
delimitada por *"los principios de derecho público establecidos
en la Constitución Nacional"*, a los cuales los tratados interna-
cionales -y con mayor razón aun la interpretación que de tales
tratados se realice- deben ajustarse y con los cuales deben
guardar conformidad.

-17-

A partir de esta cláusula no es posible hacer preva-
lecer automáticamente, sin escrutinio alguno, el derecho inter-
nacional -sea de fuente normativa o jurisprudencial- sobre el
ordenamiento constitucional. Esta interpretación es reflejo de
una fuerte tradición en la práctica constitucional argentina,
tal como supo exponerlo Joaquín V. González: *"un tratado no pue-
de alterar la supremacía de la Constitución Nacional, cambiar la
forma de gobierno, suprimir una provincia o incorporar otras
nuevas, limitar atribuciones expresamente conferidas a los pode-
res de gobierno, desintegrar social o políticamente al territo-
rio; restringir los derechos civiles, políticos y sociales reco-
nocidos por la Constitución a los habitantes del país, ni las
prerrogativas acordadas a los extranjeros ni suprimir o dismi-
nuir en forma alguna las garantías constitucionales creadas para
hacerlos efectivos… En cuanto la Constitución Nacional sea lo
que es, el art. 27 tiene para la Nación significado singular en
el derecho internacional"* (Joaquín V. González, Senado de la Na-
ción, Diario de Sesiones, sesión del 26 de agosto de 1909, volu-
men IX, pág. 52).

6°) Que el carácter supremo de las decisiones de esta
Corte de Justicia, cabeza del Poder Judicial de la Nación según
lo dispuesto por el art. 108 de la Constitución (Fallos:
256:114; 289:193; 319:1973; 328:2429; 329:3235 y 5913; 330:49 y
251; 338:1575, entre muchos otros), configura un elemento cons-
titutivo de tales principios de derecho público a los que refie-
re el art. 27 examinado precedentemente.

Esta potestad jurisdiccional, calificada como la más
alta y eminente del ordenamiento jurídico argentino, connatural

-18-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

con la responsabilidad institucional que le corresponde a esta Corte como titular del Departamento Judicial del Gobierno Federal (conf. Fallos: 330:3109; 338:1216, y causa FLP 8399/2016/CS1 "Centro de Estudios para la Promoción de la Igualdad y la Solidaridad y otros c/ Ministerio de Energía y Minería s/ amparo colectivo", sentencia del 18 de agosto de 2016), se sustenta con el carácter inalterable de sus pronunciamientos regulares, firmes y pasados en autoridad de cosa juzgada, no siendo posible "dejarlos sin efecto" -lo cual supone "revocarlos" conforme con la primera acepción de la expresión "revocar" del Diccionario de la Lengua Española de la Real Academia- si es ello lo que se pretende en el presente caso.

7°) Que en tales condiciones, el punto 2 de la parte dispositiva del pronunciamiento del Tribunal internacional (identificado como item a) del considerando 2°) de este fallo) debe ser interpretado de manera armónica con el ejercicio de la máxima potestad jurisdiccional estatuida en el sistema republicano sostenido por el ordenamiento constitucional argentino (arts. 1°, 108 y 116 de la Constitución Nacional). De lo contrario, se erigiría a la Corte IDH como una instancia "revisora" o "casatoria" de decisiones jurisdiccionales estatales, categoría que excede el carácter coadyuvante y complementario de la jurisdicción internacional, atributos que se desprenden del Preámbulo de la CADH (conf. arg. Corte IDH, caso "*Perozo y otros v. Venezuela*", sentencia de 28 de enero de 2009, párrafo. 64; Corte IDH, caso "*Genie Lacayo*", sentencia del 29 de enero de 1997, párrafo 94).

-19-

8°) Que en virtud de lo expuesto, en un contexto de "diálogo jurisprudencial" que procure mantener la convergencia decisional entre los órganos con competencias para dirimir conflictos en los ámbitos nacional e internacional, reconociendo a la Corte IDH como último intérprete de la CADH (art. 62, puntos 1 y 3 CADH) y a la Corte Suprema de Justicia de la Nación como último intérprete de la Constitución Nacional Argentina (arts. 116 y 117 de la Constitución Nacional), cabe concluir que la reparación ordenada en la sentencia de la Corte Interamericana encuentra adecuada satisfacción mediante la concreción de las medidas mencionadas en los párrafos segundo y tercero del precedente considerando 4°), no siendo posible concretar la revocación formal del decisorio nacional —si es ello lo que se pretende— sin violentar lo dispuesto por los arts. 27 y 75 inc. 22) de la Constitución Nacional Argentina, cláusulas por cuya observancia esta Corte debe velar.

De acuerdo con la reseña efectuada en relación a las medidas adoptadas por distintos órganos del Estado argentino y con el alcance señalado en los considerandos precedentes, se

-//-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

-//-tendrá por cumplimentada la sentencia de la Corte IDH de conformidad con el compromiso asumido por el art. 68.1 de la CADH.

Por ello, habiendo dictaminado la señora Procuradora General, se desestima la presentación de fs. 1. Hágase saber y archívese.

HORACIO ROSATTI

DISI-//-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

-//-DENCIA DEL SEÑOR MINISTRO DOCTOR DON JUAN CARLOS MAQUEDA

Considerando:

1°) Que estas actuaciones se inician con motivo del oficio enviado por la Dirección General de Derechos Humanos del Ministerio de Relaciones Exteriores y Culto de la Nación con fecha 20 de septiembre de 2012, en el que se hace saber el pedido formulado por la Secretaría de Derechos Humanos de la Nación a este Tribunal para que cumpla, en lo que corresponda y de conformidad con su competencia, con lo dispuesto en los párrafos 105 y 108, punto c, de la sentencia dictada por la Corte Interamericana de Derechos Humanos en el caso "Fontevecchia y D'Amico vs. Argentina", con fecha 29 de noviembre de 2011 (fs. 37 del expte. 6439/2012); a lo que oportunamente esta Corte respondió mediante oficio librado al Ministerio de Relaciones Exteriores informando que el pronunciamiento de la Corte Interamericana se encontraba publicado desde el 19 de diciembre de 2011 en la página oficial del Centro de Información Judicial, encontrándose las restantes cuestiones a estudio (conf. fs. 38/41).

Con posterioridad, el Tribunal dispuso dar vista de las actuaciones a la señora Procuradora General, quien, con fecha 28 de noviembre de 2014, presentó el dictamen que obra a fs. 45/48 del expte. 6439/2012.

Conforme lo solicitado en el punto IV del referido dictamen, la Corte Suprema dispuso dar traslado -por el término de diez días- al señor Carlos Saúl Menem de la presentación efectuada por la Dirección General de Derechos Humanos del Ministerio de Relaciones Exteriores y Culto de la Nación, que fue

-23-

contestado el 25 de marzo de 2015, quedando a partir de dicha
fecha los autos para dictar sentencia (fs. 51 del expte.
6439/2012).

2°) Que en el citado pronunciamiento se estableció,
en cuanto al caso concierne, que el Estado argentino, al decidir
en la causa "Menem, Carlos Saúl c/ Editorial Perfil S.A.", sen-
tencia del 25 de septiembre de 2001 (Fallos: 324:2895), había
violado el derecho a la libertad de expresión reconocido en el
art. 13 de la Convención Americana sobre Derechos Humanos, en
relación con el art. 1.1 de la citada convención, en perjuicio
de los señores Jorge Fontevecchia y Héctor D'Amico.

En la parte resolutiva de dicho fallo internacional,
se dispuso que el Estado debía dejar sin efecto la condena civil
impuesta a los citados Jorge Fontevecchia y Héctor D'Amico, así
como todas sus consecuencias, en los términos del párrafo 105 de
la sentencia; realizar las publicaciones dispuestas de conformi-
dad con lo establecido en el párrafo 108, y entregar los montos
referidos en los párrafos 105, 128 y 129 de dicho pronunciamien-
to conforme con las modalidades especificadas en los párrafos
131 a 136 (conf. fs. 1/36 del expte. 6439/2012).

3°) Que a partir de la reforma constitucional de
1994, y de acuerdo con lo dispuesto en el art. 75, inc. 22, de
la norma fundamental, las sentencias de la Corte Interamericana
de Derechos Humanos pronunciadas en causas en las que el Estado
argentino sea parte deben ser cumplidas por los poderes consti-
tuidos en el ámbito de su competencia y, en consecuencia, son
obligatorias para la Corte Suprema de Justicia de la Nación.

-24-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

Por ello, esta Corte, como uno de los poderes del Es-
tado argentino y conforme lo previsto en el art. 68.1 de la mis-
ma convención, debe cumplir y ejecutar el pronunciamiento del
tribunal interamericano (ley 23.054; art. 75, inciso 22, de la
Constitución Nacional; doctrina de Fallos: 326:2968 "Cantos",
disidencia del juez Maqueda; 327:5668 "Espósito", voto de los
jueces Belluscio y Maqueda; 334:1504 "Derecho", voto del juez
Maqueda; 336:1024 "Carranza Latrubesse", voto del juez Maqueda y
resolución CSJN 477/15 del 25 de marzo de 2015 en expte. n°
4499/13 "Mohamed vs. Argentina").

4°) Que el deber de cumplir la decisión adoptada por
la Corte Interamericana responde a un principio básico del dere-
cho sobre la responsabilidad internacional del Estado, según el
cual los Estados deben acatar sus obligaciones convencionales
internacionales de buena fe (*pacta sunt servanda*), y de confor-
midad con lo dispuesto en la Convención de Viena sobre el Dere-
cho de los Tratados de 1969, no pueden, por razones de orden in-
terno, dejar de cumplir las obligaciones ya asumidas, so pena de
verse comprometida la referida responsabilidad (art. 27 de la
citada convención; conf. Fallos: 315:1492, considerandos 18 y
19, in fine; 318:373, considerando 4°, párrafo segundo y
334:1504, considerando 3°, último párrafo, del voto del juez Ma-
queda).

5°) Que a la luz de lo expresado, haciendo mérito de
los fundamentos inequívocos que sustentaron el fallo de la Corte
Interamericana en el caso "Fontevecchia y D'Amico vs. Argentina"
y dado que dicho pronunciamiento debe ser cumplido por los pode-
res constituidos del Estado argentino en el ámbito de su compe-

tencia, corresponde a esta Corte Suprema, según lo establecido en el párrafo 105 del citado fallo, dejar sin efecto la sentencia dictada por este Tribunal -con otra composición- en los autos "Menem, Carlos Saúl c/ Editorial Perfil S.A." (Fallos: 324:2895) y, en consecuencia, también la de la Cámara Nacional de Apelaciones en lo Civil que es su antecedente, así como todas sus consecuencias, inclusive los alcances que hubieran tenido respecto de terceros.

6°) Que como lo ha precisado el tribunal interamericano en su fallo y con el fin de evitar futuros cuestionamientos, cabe aclarar que dicha solución importa dejar sin efecto la atribución de responsabilidad civil de los señores Jorge Fontevecchia y Héctor D'Amico y la condena al pago de una indemnización, de intereses y costas y tasa de justicia dispuesta oportunamente, así como cualquier otro efecto que tengan o hubieran tenido las referidas decisiones.

7°) Que por resolución de fecha 22 de noviembre de 2016, la CIDH declaró que el Estado argentino había dado cumplimiento a la medida de reparación relativa a la publicación de su sentencia en la página web del Centro de Información Judicial (párrafo 108, punto c).

8°) Que en esa misma resolución, la CIDH también resolvió dejar abierto el procedimiento de supervisión de cumplimiento respecto de las restantes medidas de reparación, entre ellas, la relacionada con dejar sin efecto la condena civil.

En consecuencia, con el presente pronunciamiento este Tribunal, en lo que resulta de su competencia, da íntegro cum-

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

plimiento con lo ordenado por la sentencia de la Corte Interame-
ricana de Derechos Humanos, sin que corresponda efectuar consi-
deración alguna respecto de las obligaciones de pago estableci-
das en los párrafos 105, 128 y 129 de la citada decisión, que
dependen de medidas administrativas y de otra índole que perte-
necen al ámbito de competencia de otros poderes del Estado ar-
gentino.

Por ello, y oída la señora Procuradora General, en cumpli-
miento del punto 2 de la parte dispositiva de la sentencia de la
Corte Interamericana de Derechos Humanos en el caso "Fontevec-
chia y D'Amico vs. Argentina", se dejan sin efecto los fallos
dictados por este Tribunal y por la Cámara Nacional de Apelacio-
nes en lo Civil en la citada causa "Menem", en cuanto atribuye-
ron responsabilidad civil e impusieron una condena a los señores
Jorge Fontevecchia y Héctor D'Amico.

En consecuencia, se rechaza la demanda deducida por Carlos
Saúl Menem contra Jorge Fontevecchia, Héctor D'Amico y Editorial
Perfil Sociedad Anónima. Agréguense las actuaciones remitidas
por el Ministerio de Relaciones Exteriores y Culto de la Nación
al principal. Notifíquese a Carlos Saúl Menem, a Jorge Fontevec-
chia, a Héctor D'Amico, a Editorial Perfil S.A., a la Secretaría
de Derechos Humanos del Ministerio de Justicia y Derechos Huma-
nos y a la Dirección General de Derechos Humanos del Ministerio

-//-

-//- de Relaciones Exteriores y Culto. Fecho, devuélvanse los
autos principales al juzgado de origen.

JUAN CARLOS MAQUEDA

CSJ 368/1998 (34-M)/CS1
Ministerio de Relaciones Exteriores y Culto s/
informe sentencia dictada en el caso 'Fontevec-
chia y D'Amico vs. Argentina' por la Corte In-
teramericana de Derechos Humanos.

*Corte Suprema de Justicia de la Nación*

Presentación efectuada por el **Dr. A. Javier Salgado**, en representación de la
**Dirección General de Derechos Humanos del Ministerio de Relaciones Exteriores
y Culto de la Nación.**

Para acceder al dictamen de la Procuración General de la Nación ingrese a:

http://sjconsulta.csjn.gov.ar/sjconsulta/documentos/verDocumento.html?idAnalisis=735716&interno=1

**DECLARATION OF TRANSLATOR**
**REGARDING ACCURACY OF TRANSLATION**

Pursuant to 28 U.S.C. § 1746, Maria E. Manghi hereby declares as follows:

I am a lawyer employed by Cleary Gottlieb Steen & Hamilton LLP presently residing and working within the State of New York;

I am proficient with the Spanish language and the English language and have reviewed the foregoing documents (Ex. B, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 155, pages 248-49; Ex. C, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 14, pages 425-49; Ex. D, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 147, pages 286, 301-04; Ex. E, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 335, pages 2333-62; Ex. F, Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas: Volumen 340, pages 47-76; Ex. G, Argentine National Constitution; Ex. H, Argentine Law No. 26,854; Ex. I, Cassagne, Juan C., Curso de Derecho Administrativo, 12ª ed., Buenos Aires, La Ley, 2018, Tomo II, excerpt on page 331; Ex. J, Argentine Law No. 17,319l; Ex. K, Código Civil y Comercial de la Nación, articles 235-37; Ex. L, Balbín, Carlos F., Tratado de Derecho Administrativo, 2ª ed., Buenos Aires, La Ley, 2015, Tomo II, excerpts on pages 909, 911, and 915; Ex. M, Lorenzetti, Ricardo L., Código Civil y Comercial de la Nación comentado, 1° ed., Santa Fé, Rubinzal-Culzoni, 2014, Tomo I, excerpts on pages 774 and 777; Ex. N, Alterini, Jorge H., Código Civil y Comercial comentado. Tratado exegético, 2° ed., Ciudad Autónoma de Buenos Aires, La Ley, 2016, Tomo II, excerpts on pages 55-56; Ex. O, Argentine Law No. 24,145; Ex. Q, Argentine Law No. 24,474; Ex. R, Fallos de la Corte Suprema de Justicia

Nacional, con la Relación de sus Respectivas Causas: Volumen 335, pages 1822-33; Ex. S,

Fallos de la Corte Suprema de Justicia Nacional, con la Relación de sus Respectivas Causas:

Volumen 146, pages 288-89, 297-98; Ex. T, Fallos de la Corte Suprema de Justicia Nacional,

con la Relación de sus Respectivas Causas: Volumen 147, pages 154-55, 164-65) translated from

Spanish into English and believe to the best of my knowledge and belief that the translations are

complete and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 11, 2024, in New York, New York.

_____

Maria E. Manghi