# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BAINBRIDGE FUND LTD.,<br><br>        *Plaintiff*,<br><br>v.<br><br>THE REPUBLIC OF ARGENTINA,<br><br>        *Defendant*. | Civil Case No. 1:16-cv-08605-LAP |

## DECLARATION OF RAFAEL M. MANÓVIL
## ON BEHALF OF THE REPUBLIC OF ARGENTINA (THE "REPUBLIC")

I, Rafael M. Manóvil, declare the following pursuant to 28 U.S.C. § 1746 and Rule 44.1 of the Federal Rules of Civil Procedure:

1.      I submit this expert declaration in support of the Republic's Opposition to the Motion for Injunction and Turnover filed by plaintiff Bainbridge Fund Ltd. ("Plaintiff").

2.      I have been asked by counsel for the Republic to review Plaintiff's Motion for Injunction and Turnover (the "Motion") and accompanying filings and to provide my views on certain questions of Argentine corporate and commercial law relevant to Plaintiff's Motion.

3.      I understand that Plaintiff seeks an order from the Court requiring that Argentina transfer its Class A and D shares (the "YPF Shares") to a custody account at Bank of New York Mellon ("BNYM") in New York and that BNYM transfer the shares to Plaintiff or any person or entity that Plaintiff wishes.  In seeking this relief, Plaintiff by and large tracks the argument put forward by the plaintiffs in the cases *Petersen Energía Inversora, S.A.U. v. Argentine Republic*, 15-cv-02739-LAP and *Eton Park Capital Management, L.P. v. Argentine Republic*, 16-cv-08569 (together, "*Petersen*").

4.      In *Petersen*, I submitted a declaration on issues of Argentine law in support of the Republic's Opposition to the *Petersen* plaintiffs' Motion for Injunction and Turnover.  ECF No. 579[1] (May 16, 2024) ("Manóvil I").  My prior declaration established my qualifications as an expert.  Manóvil I ¶¶ 2-3.  For the convenience of the Court, I am attaching to this declaration the declaration I submitted in that case, together with the exhibits I submitted with that declaration (together, Appendix 1).

5.      In addition, plaintiffs in *Petersen* have recently put forward the Declaration of Dr. Alfredo L. Rovira on certain questions of Argentine law.  ECF No. 589 (May 30, 2024) (the "Rovira Decl.").  To the extent Plaintiff in this case may seek to rely on the Rovira Declaration, as it relied on the prior *Petersen* turnover declarations in its Motion, I address two points.

6.      *First*, the Rovira Declaration discusses Decree 1278/2012 ("Decree 1278") as an example of how "Argentina has exercised significant and direct control over companies it holds a controlling interest in."  Rovira Decl. ¶ 19.  While Dr. Rovira's assertion that the Republic, as YPF's controlling shareholder, directed YPF's activities (in particular, YPF's alleged commercial activities in the United States) is incorrect for the reasons I previously explained in the declaration I submitted in *Petersen*, Dr. Rovira's error is compounded by his reference to Decree 1278.

7.      Article 15 of Law No. 26,741 (the "YPF Expropriation Law") specifically provides that YPF "shall not be subject to any legislation or regulation applicable to the management or control of Companies or entities owned by the National Government or provincial governments."  ECF No. 363 Ex. 72.  As a result of that clear Congressional

---

[1] The ECF numbers cited herein correspond to the filings in the case *Petersen Energía v. Argentine Republic*, 15-cv-02739-LAP.

mandate, Decree 1278, issued on July 25, 2012, expressly *excluded* YPF from its scope of application, as unambiguously set forth in Article 18 of Annex I to Decree 1278: "By virtue of the provisions of Article 15 of Law No. 26,741 [the YPF Expropriation Law], the Directors appointed by the National Government *in YPF Sociedad Anónima are not included herein*." Rovira Decl., Ex. 3 at 7 (emphasis added).

8.      Furthermore, as admitted by Dr. Rovira (Rovira Decl. ¶ 26 ("Decree 1278 [was] in force from July 7, 2012 through March 2, 2018.")), Decree 1278 was repealed in its entirety by Decree 174/2018 and is thus no longer in effect.

9.      *Second*, Dr. Rovira claims that the Republic, as a controlling shareholder, "imposes its will on [YPF]" and "exercise[s] control over management decisions not only by having the shareholders' meeting fixing the general guidelines and policies," but also by having the ability to "fire any board member at any time" or deal "*ex officio*" with management matters by issuing resolutions which are binding on the board of directors. Manóvil I ¶¶ 6-8, 11. These statements are incorrect as a matter of Argentine law; in demonstrating why, I focus on the distinction between the board and the shareholders' meeting, but note that YPF has another layer of professional managers, executives, and employees who are the people running the day-to-day business in practice.

10.     The Argentine General Companies Law ("GCL") sets forth a general governance system based on checks and balances, where directors are responsible for the administration of the corporation, *see* GCL Art. 255, and shareholders' meetings are entitled to elect the directors and are called upon to adopt enabling resolutions providing the general framework under which the board will conduct its functions, *see* GCL Art. 233-35. As explained further below, the *administration* of a corporation is the responsibility of its directors pursuant to Article 255 of

the GCL, *see* Manóvil I ¶ 12 n.10, ¶ 26 n.42, who in turn under Article 270 of the GCL may delegate powers to the managers who are in charge of running the business.  By contrast, Articles 233, 234, and 235 provide that shareholders' meetings vote on certain questions of a corporation's *governance*.  *See* Manóvil I ¶ 11 n.8, ¶ 12 n.9, ¶ 26 n. 39.  On the one hand, a board is a permanent body, whose members are appointed for a set period of time (unless they pass away, resign, or are removed by a decision at a shareholders' meeting).  On the other hand, shareholders' meetings do not have any kind of "permanent" function and are empowered to vote upon only the specific issues enumerated in the GCL or the bylaws at a duly-convened shareholders' meeting.  Manóvil I ¶¶ 17-18.  In this regard, there is a relevant distinction between the board and the shareholders' meeting, both of which are described as organs under Argentine law.[2]  Accordingly, even when the law or the bylaws permit the shareholders' meeting to authorize or consent to some business decisions, the law does not permit the shareholders' meeting to take part in the administration of a corporation's business.  That is because shareholders' meetings, particularly in publicly traded corporations such as YPF, are not equipped to handle the corporation's daily business or implement decisions relating to the administration of the affairs of the corporation.

11.     As part of the checks and balances system, Article 255 of the GCL sets forth the guiding principle that it is the role of a company's board of directors to administer the company.

---

[2] As to the shareholders' meeting, a relevant author writes: "*La asamblea es un órgano de la Sociedad, por lo que con el acto asambleario se conforma la voluntad social y **no la de los accionistas***" (The shareholders' meeting is an organ of the Company, therefore, the shareholders' meeting forms the corporate will and *not that of the shareholders*) (ROITMAN, Horacio, *Ley General de Sociedades. Comentada y anotada.*, La Ley, Buenos Aires, 3rd. Ed., 2022, V. IV, p. 816, citing a ruling by the Court of Appeals in Commercial Matters, Chamber A, Nov. 30, 1995, in re *Warroquiers c. Quintanilla de Madanes*, ED 167-281, and the same court, Nov. 26, 1998, n re *Escasany c. Retrava SA*, LL 1999-B-460) (emphases added).  *See* Ex. A.

*See* Manóvil I ¶ 12 n.10, ¶ 26 n.42.  Directors are bound to perform their duties with loyalty and a good businessman's diligence.  *See* Manóvil I ¶ 13 n.13 (quoting GCL Art. 59).  Article 274 of the GCL provides that directors are jointly and severally liable to the corporation, shareholders, and third-parties for failure to comply with the standards set forth in Article 59 of the GCL, the company's bylaws, or for any other damage caused by willful misconduct, abuse of power, or gross negligence.

12.     By contrast, a corporation's shareholders are not required to comply with any professional duties nor to have any special skills or training.  Following Dr. Rovira's logic, such shareholders, without any specific professional skills, would be able to provide binding instructions about the day-to-day management of YPF's business to a company's board of directors, whose members would then be liable if those instructions do not meet the professional standards.  This interpretation of the law is unfounded and would lead to absurd results.

13.     As I stated in my declaration in *Petersen*, shareholders may exercise control over a corporation only through their participation at the shareholders' meeting, Manóvil I ¶¶ 6, 11-14, and the shareholders' meeting's authority is limited to those matters expressly included in the meeting agenda and authorized by the law.  In advance of a shareholders' meeting, the board of directors sets an agenda of the items to be considered at the meeting, which is drafted by the board of directors, and the shareholders' meeting may not pass resolutions on matters which are not on the agenda.  That is because a shareholders' meeting "does not have general authority . . . and, on the contrary, can only deal with matters that the law has expressly

assigned to its sphere of authority."[3]  The logical consequence is that shareholders' meeting resolutions are binding on the board *only* if such resolutions are within the scope of the shareholders' meeting's powers as set forth in the GCL.  Thus, the shareholders at the shareholders' meeting are not acting and cannot act "*ex officio*," Rovira Decl. ¶ 7, since they can act only when the meeting has been duly convened and only in ways permitted by law and the company's bylaws.  Manóvil I ¶ 11.  Accordingly, Dr. Rovira's claim that a shareholder can "exercise control over management decisions" by "getting directly involved in management whenever it so chooses," Rovira Decl. ¶ 8, is incorrect.  To state the obvious, "management" occurs outside the shareholders' meeting and shareholders, even controlling shareholders, do not and cannot participate.

14.     In fact, not only is Dr. Rovira's statement that shareholders may "*ex officio*" intervene in the day-to-day management simply wrong, but also his citation to Carlos Suárez Anzorena ("Suárez Anzorena") is misleading.  Rovira Decl. ¶ 7 n.4 (citing Suárez Anzorena).  Suárez Anzorena's paper illustrates how the provisions of the GCL and the bylaws delineate the separation of powers of the shareholders' meeting and the board, *not* that the shareholders can interfere with the board's responsibility to manage the corporation.  This is clear, even in the paragraphs cited by Dr. Rovira:  the shareholders' meeting's authority "*can be extended . . . by the bylaws or by the call made by other organs*"—*i.e.*, the board.  Rovira Decl. ¶ 7 n.4 (citing Suárez Anzorena ¶ 10.4.1.B.4) (emphasis added).  In other words, the shareholders' meeting's powers are not all-encompassing since they can be extended, and the shareholders' meeting can *only* pass resolutions on business matters that are set forth by the bylaws or by the board.

---

[3] ROITMAN, Horacio, *Ley General de Sociedades. Comentada y anotada.*, La Ley, Buenos Aires, 3rd. Ed., 2022, V. IV, p.821.  *See* Ex. B.

Numerous sections of Suárez Anzorena's paper confirm this. *See, e.g.*, Suárez Anzorena ¶ 18.1.2 (management of internal and external business decisions is in the "original competence of the Board of Directors"); *id.* ¶ 18.4 (this authority is "clearly vested in the Board of Directors"); *id.* ¶ 20.3.3 (other than express provisions in the bylaws or by an agenda item to the shareholders' meeting, the board is "empowered" to make all business decisions).

15.     Against this backdrop, the fact that a controlling shareholder prevails at a shareholders' meeting with its majority vote is a quintessential part of the definition of *control*, but it does not imply that the controlling shareholder is handling the corporation's business decisions.  To equate the Republic's position as a controlling shareholder in YPF as "directing" YPF finds no support under (and indeed is contradicted by) Argentine law.

16.     In any event, Dr. Rovira does not identify even one instance where the Republic has actually utilized its shares in YPF to "direct" any commercial action (in the United States or elsewhere), let alone any activity infringing on the role of YPF's directors.  This is because, as I explained in the declaration I submitted in *Petersen*, while shareholders at the shareholders' meeting may authorize or enable the board to undertake certain actions, it is the board that decides, within its discretion, whether and how to undertake those actions.  Manóvil I ¶¶ 8, 27.  Of course, the professional management and employees of YPF are, in practice, the ones carrying out those actions and running the business.

17.     Dr. Rovira also argues incorrectly that "shareholders approv[ing] the issuance of bonds" amounts to shareholders imposing their will on the board and exercising control over the company's management.  Rovira Decl. ¶¶ 8–10.  But as I explained in my declaration in *Petersen* and above, the Republic as a shareholder merely "joined in voting to authorize the YPF board to conduct these activities" if the board chose to do so in its discretion.  Manóvil I

¶ 8.  Indeed, the shareholders' meeting votes on the board's proposals (such as whether or not to grant the board authorization to issue debt), which are proposed by the board as meeting agenda items for the shareholders' consideration.  Manóvil I ¶¶ 30-32.  This authorization is "legally distinct" from the board's subsequent decision to issue debt.  Manóvil I ¶¶ 27, 29-32.  For example, if the shareholders' meeting voted to authorize YPF to issue debt, the board of directors and the YPF employees would still need to subsequently complete a debt issuance or decide to not issue debt.

18.     The Rovira Declaration also points to the shareholders' meeting's ability to "fire any board member at any time without cause."  Rovira Decl. ¶ 11.  However, "appointment and removal" of board members is a typical right of a corporation's shareholders, rather than management of YPF's day-to-day operations.  Manóvil I ¶ 11 (citing GCL Art. 234).  A director may *only* be fired at a shareholders' meeting, with all of its formalities, confirming that shareholders can only influence the corporation through their participation at shareholders' meetings.  *See* GCL Art. 256 ("The director may be reelected and their appointment revoked only at the [shareholders'] meeting . . .").  As a matter of logic: if a controlling shareholder or a corporation's shareholders' meeting directly made business decisions, it would be unnecessary to appoint any directors.  Moreover, Dr. Rovira provides no support for the allegations that the "directors appointed by the Republic are not free to perform their duties in pursuit of YPF's interest" or that "the Republic uses its majority YPF shares to direct YPF's major corporate actions, including its capital raising activities in the United States."  Rovira Decl. ¶¶ 17, 27.  As described above, Argentine law makes clear that this is not the case.

19.     To the extent that the Rovira Declaration raised issues that I have not addressed, that should not be construed as my agreeing with them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 11, 2024, in Buenos Aires, Argentina.

_____
Rafael M. Manóvil

# Exhibit B-1

ENGLISH TRANSLATION

**Exhibit A – English Translation**

# HORACIO ROITMAN

Professor Emeritus of the National University of Cordoba

# GENERAL CORPORATE LAW

## ANNOTATED

### *3rd edition updated and expanded*

Foreword by FRANCESCO GALGANO

## VOLUME IV
*Articles 157 to 244*

### HUGO A AGUIRRE
### EDUARDO N. CHIAVASSA
*Collaborators*

### ALEJANDRO AGUSTIN VERGARA
*(Coordinator 3ª Edition)*

THOMPSON REUTERS

# LAW

The shareholders' meeting is an organ of the Company[2153] , therefore the shareholders' meeting forms the corporate will and not that of the shareholders[2154]. The participation of the shareholder in the formation of the corporate will is reduced to the right to vote[2155] , not even enjoying the guarantee of the corporate pact, since the bylaws can

_____

[2153] Botteri (h.) and Coste postulate that the meeting is a "social mechanism" (Botteri [h], José D. - Coste, Diego, "Las asambleas de sociedades comerciales como mecanismos sociales"; in *XII Congreso Argentina de Derecho Societario - VIII Congreso Iberoamericano de Derecho Societario y de la Empresa,* Buenos Aires, 2013, ps. 50-59.

[2154] CNCom., Room A, 11/30/1995, "Waroquiers, Juan P. and others v. Quintanilla de Madanes and others"; ED, 167-281, *www.laleyonline.com.ar*. The act of the meeting is a manifestation of the corporate will and not of the shareholders, who individually considered contribute to form the corporate will, but only the meeting, as a majority decision, synthesizes the real and effective will of the group, a circumstance that arises from the binding nature of the agreement. CNCom, Room A, 11/26/1998, "Escasany, Maria I. v. Retrava SA", LL, 1999-B-460; DJ, 1999-1-1086: The act of the meeting is a manifestation of the will of the company and not of the shareholders. Thus, the latter individually considered contribute to form the corporate will, but only the meeting, as a majority decision, synthesizes the real and effective will of the whole, a circumstance that arises from the binding nature of the agreement.

[2155] CNCom., Chamber A, 25/02/1983, "Inspección General de Justicia c. Agrosemillas Argentina SRL", ED, 103-708: Deliberation and voting are inherent aspects in the genesis of any assembly decision. CNCom, Room B, 17/11/2004, "Northern Lauzen SA v. Jorge, Hugo Alberto y otro s/ ordinario", RSyC, no. 32, January/February 2005, p. 211: The meeting, as a meeting of shareholders convened in the forms and conditions provided by law and the bylaws, constitutes the technical means for the partners to express their will and thus, to conform the corporate will: it is a collective act tending to reach a common intent, cooperating wills in a common interest.

CNCom, Chamber C, 17/12/2010, "Estado Nacional v. Papel Prensa SAICF y de M. s/incidente de medidas cautelares (asamblea del 12/08/2010)", www.pjn.gouar.Sumario: 19.5.1. "l - The meeting is a governing body of the company, of a necessary nature (see: Gervasio R. Colombres, 'La teoría del órgano en la sociedad anónima', Abeledo Perrot, 1964, p. 105), which has exclusive competence to deal with the matters submitted to it according to the law and the bylaws (Law 19550: 233 et seq.; see Carlos A. Vanasco, Sociedades Comerciales, Astrea, 2006, t. 2, p. 465 ff.). This power cannot be delegated and its exercise requires that the shareholders' meeting be held in compliance with a series of requirements determined by law or the bylaws: summons by the competent body, publicity of the meeting, legitimacy of the attendees, quorum for its constitution and operation, treatment of the agenda, reports and deliberations, voting and proclamation of the results reached with the necessary majorities (this Court, 'Rittner, Irene y otros v. Lago Espejo Resort SA', 5.2.10). 2 - At the same time, the shareholders' meeting is the means by which the so-called corporate will is formed, and the participation of the shareholders in the formation of that corporate will is embodied in the right to vote (see Horacio Roitman, 'Ley de Sociedades Comerciales comentada y anotada', t. IV, p.5, La Ley, 2006). Voting is the technical means for the shareholders to express such will – which will commonly be that of the majority since the law presumes that it best translates the corporate interests- and -as Verón points out- the formation of such corporate will cannot be prevented, since it would lead to the disappearance of the company (CCIV: 35 and its note). Hence, the measure not to innovate -or any other measure- is considered contrary to law insofar as it imposes the prohibition to hold assemblies or board meetings in the ideal entity (conf. Alberto Verón, 'Tratado de las Sociedades Anónimas', t° . III, p. 697, La Ley, 2008). 3 - On the other hand, the shareholder's right to intervene and discuss at the meeting cannot be limited or impaired by the provisions of the bylaws or regulations, which can only provide guidelines or rules of order.

# SPANISH ORIGINAL

# HORACIO ROITMAN

Profesor Emérito de la Universidad Nacional de Córdoba

# LEY GENERAL
# DE SOCIEDADES

## COMENTADA Y ANOTADA

*3ª edición actualizada y ampliada*

Prólogo de FRANCESCO GALGANO

TOMO IV
*Artículos 157 a 244*

## HUGO A AGUIRRE
## EDUARDO N. CHIAVASSA
*Colaboradores*

## ALEJANDRO AGUSTÍN VERGARA
*(Coordinador 3ª Edición)*

THOMPSON REUTERS

## LA LEY

La asamblea es un órgano de la sociedad[2153], por lo que con el acto asambleario se conforma la voluntad social y no la de los accionistas[2154]. La participación del accionista en la formación de la voluntad social se reduce al derecho de voto[2155], no gozando siquiera la garantía del pacto social, pues el estatuto puede

---

(2153) Botteri (h.) y Coste postulan que la asamblea es un "mecanismo social" (Botteri [h], José D. - Coste, Diego, "Las asambleas de sociedades comerciales como mecanismos sociales"; en *XII Congreso Argentina de Derecho Societario - VIII Congreso Iberoamericano de Derecho Societario y de la Empresa*, Buenos Aires, 2013, ps. 50-59.

(2154) CNCom., sala A, 30/11/1995, "Waroquiers, Juan P. y otros c. Quintanilla de Madanes y otros"; ED, 167-281, *www.laleyonline.com.ar*. El acto asambleario es una manifestación de voluntad social y no de los accionistas, quienes individualmente considerados contribuyen a formar la voluntad social, pero solo la asamblea, y en cuanto decisión mayoritaria, sintetiza la real y efectiva voluntad del conjunto, circunstancia esta que nace de la obligatoriedad del acuerdo. CNCom., sala A, 26/11/1998, "Escasany, Maria I. c. Retrava SA", LL, 1999-B-460; DJ, 1999-1-1086: El acto asambleario es una manifestación de voluntad social y no de los accionistas. Así, estos últimos individualmente considerados contribuyen a formar la voluntad social, pero solo la asamblea, yen cuanto decisión mayoritaria, sintetiza la real y efectiva voluntad del conjunto, circunstancia que nace de la obligatoriedad del acuerdo.

(2155) CNCom., sala A, 25/02/1983, "Inspección General de Justicia c. Agrosemillas Argentina SRL", ED, 103-708: Deliberar y votar son aspectos consustanciales en la génesis de toda decisión asamblearia. CNCom., sala B, 17/11/2004, "Northern Lauzen SA c. Jorge, Hugo Alberto y otro s/ ordinario", RSyC, nro. 32, enero/febrero 2005, p. 211: La asamblea en tanto reunión de accionistas convocados en las formas y condiciones previstas por la ley y el estatuto, constituye el medio técnico para que los socios expresen su voluntad y de tal modo, se conforme la voluntad social: se trata de un acto colectivo tendiente a alcanzar un intento común, voluntades cooperantes en un interés común.

CNCom., sala C, 17/12/2010, "Estado Nacional c. Papel Prensa SAICF y de M. s/incidente de medidas cautelares (asamblea del 12/08/2010)", *www.pjn.gouar*.Sumario: 19.5.1. "l - La asamblea es un órgano de gobierno de la sociedad, de carácter necesario (ver: Gervasio R. Colombres, 'La teoría del órgano en la sociedad anónima', Abeledo Perrot, 1964, p. 105), que tiene competencia exclusiva para tratar los asuntos que le fueren sometidos conforme la ley y los estatutos (Ley 19550: 233 y ss.; ver Carlos A. Vanasco, Sociedades Comerciales, Astrea, 2006, t. 2, p. 465 ss.). Esa competencia no es delegable y su ejercicio requiere que la reunión de los accionistas se realice mediante el cumplimiento de una serie de recaudos, determinados por la ley o los estatutos: convocatoria por el órgano competente, publicidad de ella, legitimación de los asistentes, quorum para su constitución y funcionamiento, tratamiento del orden del día, informes y deliberaciones, votación y proclamación de los resultados alcanzados con las mayorías necesarias (esta Sala, 'Rittner, Irene y otros c. Lago Espejo Resort SA', 5.2.10). 2 - A su vez, con el acto asambleario se conforma la llamada voluntad social, y la participación de los accionistas en la formación de esa voluntad social se concreta en el derecho de voto (ver Horacio Roitman, 'Ley de Sociedades Comerciales comentada y anotada', t. IV, p.5, La Ley, 2006). El voto es el medio técnico para que los accionistas expresen dicha voluntad ——que será comúnmente la de la mayoría pues la ley presume que traduce mejor los intereses sociales—— y ——como señala Verón—no puede impedirse la formación de esa voluntad social, pues llevaría a la desaparición de la sociedad (CCIV: 35 y su nota). De ahí que se considere contraria a derecho la medida de no innovar —o cualquier otra—en tanto imponga la prohibición de realizar asambleas o reuniones de directorio en el ente ideal (conf. Alberto Verón, 'Tratado de las Sociedades Anónimas', t°. III, pág. 697, La Ley, 2008). 3 - De otro lado, el derecho con que cuenta el accionista de intervenir y discutir en el seno de la asamblea, no podría ser limitado ni menoscabado por disposición del estatuto o reglamento, que solo pueden dar pautas o normas de ordena-

**DECLARATION OF TRANSLATOR**
**REGARDING ACCURACY OF TRANSLATION**

Pursuant to 28 U.S.C. § 1746, Rebecca D. Rubin hereby declares as follows:

I am a lawyer employed by Cleary Gottlieb Steen & Hamilton LLP presently residing and working within the State of New York;

I am proficient with the Spanish language and the English language and have reviewed the foregoing documents (Ex. A, Horacio Roitman, *Ley General de Sociedades. Comentada y anotada*, La Ley, Buenos Aires, 3rd. Ed., 2022, V. IV, p. 816; Ex. B, Horacio Roitman, *Ley General de Sociedades. Comentada y anotada*, La Ley, Buenos Aires, 3rd. Ed., 2022, V. IV, p. 821) translated from Spanish into English and believe to the best of my knowledge and belief that the translations are complete and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 11, 2024, in New York, New York.

_____
Rebecca D. Rubin

# Exhibit B-2

ENGLISH TRANSLATION

**Exhibit B – English Translation**

# HORACIO ROITMAN

Professor Emeritus of the National University of Cordoba

# GENERAL CORPORATE LAW

### ANNOTATED

*3rd edition updated and expanded*

Foreword by FRANCESCO GALGANO

**VOLUME IV**
*Articles 157 to 244*

## HUGO A AGUIRRE
## EDUARDO N. CHIAVASSA

*Collaborators*

## ALEJANDRO AGUSTIN VERGARA

*(Coordinator 3rd Edition)*

THOMPSON REUTERS

**LAW**

of any other subject that does not fall within the exclusive competence of the ordinary meeting, regardless of the time of the year in which either is convened.

So much so that it is common in certain companies to hold successively, on the same day, one after the other, first the ordinary meeting and then the extraordinary meeting so that each one can deal with the matters authorized by law. We do not agree with the criterion that within the same meeting the *ordinary* and the extraordinary meeting may be held simultaneously, even though this is a practice admitted by certain controlling bodies[2173] We refer to the commentary of art. 237 LGS, § 6.

The assembly does not have general authority[2174] nor is it sovereign[2175] , and, on the contrary, can only deal with matters that the law has expressly assigned to its sphere of authority[2176] .

---

The ten-day period to make up for the omission (Article 11, paragraph 7, Law 19.551), cannot have ratifying effects for a second petition for bankruptcy filed by the administrative body more than one year later.

(2173) Cristiá, Jose M., understands that there is no obstacle for both meetings to be convened simultaneously, provided that the terms of the call are respected, especially the agenda, quorum and majority of each one of them. According to this author, it must be indicated which topics belong to one or the other, and then resolve accordingly according to the formalities that each one requires. "SA Asambleas", in Rouillon, Adolfo N. (dir.) - Alonso, Daniel F. (coord.), *Código de Comercio comentado y anotado,* La Ley, Buenos Aires 2006, t. III, § 6, p. 575.

Balbín, Sebastián, argues that nothing prevents the simultaneous operation of both types of meetings. *Ley General de Sociedades revisada, ordenada y comentada,* the ed., Cathedra Jurídica, Ciudad Autónoma de Buenos Aires, 2016, p. 187.

Grispo, Jorge D., adds that there is also no prohibition to publish a single agenda clarifying which items correspond to the ordinary meeting and which items correspond to the extraordinary meeting in order to deliberate and resolve accordingly, in accordance with the rules of each one of them. "Shareholders' Meetings in Corporations", LL, 13/02/2008, l; LL, 2008-A-1113; *Enfoques,* 2008-3(March), 52; LL Online: AR/DOC/101/2008.

(2174) Galgano, Francesco, *La società per azioni,* CEDAM, Padova, 1984, p. 201.

(2175) Except in the case of a unanimous meeting, the meeting must conform to a framework of competence, since its actions are not unlimited but are regulated by statute and by law. De Gregorio, Alfredo, "De las sociedades...", op. cit., p. 570; Zaldívar, E. - Manóvil, R. - Ragazzi, G. - Rovira, A., *Cuadernos...,* op. cit., pp. 316-317; Sasot Betes, Miguel A. - Sasot Betes, Miguel P., *Sociedades...,* op. cit, ps. 39-40; Garrigues, Joaquín, considers the meeting to be sovereign in the sense that its decisions are binding for all the partners, whether they have voted in favor or not, and for the administrators, and that it is the supreme corporate body from the internal perspective of the company. *Curso....,* op. cit., p. 496; *see* Nissen, Ricardo A., *Ley...,* op. cit., p. 315; Nissen, Ricardo A., *Ley de Sociedades Comerciales comentada,* op. cit., t. III, ps. 120-121; Verón, Alberto V., clarifies the concept by explaining that *sovereign* means that the partners are not appointed by anyone and that they are not obliged to render accounts, *Sociedades...,* op. cit., p. 679.

(2176) Balbín, Sebastián: '...the determination of the matters that concern the corporate bodies corresponds to: i) the law, as in the case of the meeting in the corporation, in which sections 233, 234 and 235 LGS establish it in an exclusive manner; or ii) or to the discretion of the partners established in the articles of incorporation for the best development of the purposes of the corporation, when it is the legal system that allows them to assign it (conventional competence, section 49 of the Entrepreneurial Capital Support Law, LACE)'. 49 Ley de Apoyo al Capital Emprendedor, LACE)", "El órgano de gobierno y la cuestión de la competencia en la sociedad por acciones simplificada", LL, 24/02/2022, LL Online: AR/DOC/740/2022.

SPANISH ORIGINAL

# HORACIO ROITMAN

Profesor Emérito de la Universidad Nacional de Córdoba

# LEY GENERAL DE SOCIEDADES

## COMENTADA Y ANOTADA

*3ª edición actualizada y ampliada*

Prólogo de FRANCESCO GALGANO

## TOMO IV
*Artículos 157 a 244*

## HUGO A AGUIRRE
## EDUARDO N. CHIAVASSA
*Colaboradores*

## ALEJANDRO AGUSTIN VERGARA
*(Coordinador 3a Edición)*

THOMPSON REUTERS

## LA LEY

de cualquier otro tema que no sea de exclusiva competencia de la ordinaria, cualquiera fuere la época del año en que una u otra son convocadas.

Tanto así que es frecuente en determinadas sociedades, que se celebren sucesivamente, en un mismo día una a continuación de la otra, primero la ordinaria y luego la extraordinaria para que cada una trate los asuntos que la ley les autoriza. No compartimos el criterio que dentro de una misma asamblea pueda celebrarse simultáneamente la *ordinaria* y la *extraordinaria,* aun cuando ello es una práctica admitida por ciertos organismos de contralor[2173] Remitimos al comentario del art. 237 LGS, § 6.

La asamblea no tiene competencia general[2174] ni tampoco es soberana[2175], y, por el contrario, solo puede tratar los asuntos que la ley expresamente ha asignado a su esfera de competencia[2176].

plazo de diez días para suplir la omisión (art. 11, inc. 7°, ley 19.551), no puede surtir efectos ratificatorios para una segunda petición de concurso formulada por el órgano administrador a más de un año de distancia.

(2173) Cristiá, Jose M., entiende que nada obsta a que ambas asambleas se convoquen simultáneamente, a condición de que se respeten los términos de la convocatoria, especialmente el temario orden del día, quórum y mayoría de cada una de ellas. Según este autor se debe indicar cuáles temas pertenecen a una y otra, y luego resolver en consecuencia según las formalidades que cada una requiere. "SA Asambleas", en Rouillon, Adolfo N.(dir.) -Alonso, Daniel F. (coord.), *Código de Comercio comentado y anotado,* La Ley, Buenos Aires 2006, t. III, § 6, p. 575.

Balbín, Sebastián, sostiene que nada impide el funcionamiento simultaneo de ambas clases de asambleas. *Ley General de Sociedades revisada, ordenada y comentada,* 1a ed., Cathedra Jurídica, Ciudad Autónoma de Buenos Aires, 2016, p. 187.

Grispo, Jorge D., agrega que tampoco hay prohibición alguna para que se publique un solo orden del día aclarando qué puntos corresponden a la asamblea ordinaria y que puntos a la asamblea extraordinaria para deliberar, y resolver en consecuencia, conforme la normativa de cada una de ellas. "Reuniones de accionistas en las sociedades anónimas", LL, 13/02/2008, l; LL, 2008-A-1113; *Enfoques,* 2008-3(marzo), 52; LL Online: AR/DOC/101/2008.

(2174) Galgano, Francesco, *La società per azioni,* CEDAM, Padova, 1984, p. 201.

(2175) Excepto en el caso de la asamblea unánime, la asamblea debe ajustarse a un marco de competencia, pues su accionar no es ilimitado sino regulado estatutaria y legalmente. De Gregorio, Alfredo, "De las sociedades…", op. cit., p. 570; Zaldívar, E. - Manóvil, R. - Ragazzi, G. - Rovira, A., *Cuadernos…,* op. cit., ps. 316-317; Sasot Betes, Miguel A. - Sasot Betes, Miguel P., *Sociedades…,* op. cit., ps. 39-40; Garrigues, Joaquín, considera a la asamblea soberana en el sentido que sus decisiones son obligatorias para todos los socios, hayan votado favorablemente o no, y para administradores y en que es el órgano social supremo en una perspectiva interna de la sociedad. *Curso…,* op. cit., p. 496; *cfr.* Nissen, Ricardo A., *Ley…,* op. cit., p. 315; Nissen, Ricardo A., *Ley de Sociedades Comerciales comentada,* op. cit., t. III, ps. 120-121; Verón, Alberto V., aclara el concepto explicando que por *soberana* ha de entenderse que los socios no son designados por nadie y que no están obligados a rendir cuentas, *Sociedades…,* op. cit., p. 679.

(2176) Balbín, Sebastián: "…la determinación de las cuestiones que atañen a los órganos sociales corresponden: i) la ley, como sucede en el caso de la asamblea en la SA, en los que los arts. 233, 234 y 235 LGS la fijan de manera excluyente; o ii) o al arbitrio de los socios consagrado en el instrumento constitutivo para el mejor desarrollo de las finalidades de la sociedad, cuando es el ordenamiento jurídico el que permite a aquellos asignarla (competencia convencional, art. 49 Ley de Apoyo al Capital Emprendedor, LACE)''. "El órgano de gobierno y la cuestión de la competencia en la sociedad por acciones simplificada", LL, 24/02/2022, LL Online: AR/DOC/740/2022.

**DECLARATION OF TRANSLATOR**
**REGARDING ACCURACY OF TRANSLATION**

Pursuant to 28 U.S.C. § 1746, Rebecca D. Rubin hereby declares as follows:

I am a lawyer employed by Cleary Gottlieb Steen & Hamilton LLP presently residing and working within the State of New York;

I am proficient with the Spanish language and the English language and have reviewed the foregoing documents (Ex. A, Horacio Roitman, *Ley General de Sociedades. Comentada y anotada*, La Ley, Buenos Aires, 3rd. Ed., 2022, V. IV, p. 816; Ex. B, Horacio Roitman, *Ley General de Sociedades. Comentada y anotada*, La Ley, Buenos Aires, 3rd. Ed., 2022, V. IV, p. 821) translated from Spanish into English and believe to the best of my knowledge and belief that the translations are complete and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 11, 2024, in New York, New York.

_____
Rebecca D. Rubin

# Appendix: Intentionally Omitted