**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., <br><br>                   Plaintiffs, <br><br>    - against - <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br>                   Defendants. | No. 15 Civ. 2739 (LAP) |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., <br><br>                   Plaintiffs, <br><br>    - against - <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br>                   Defendants. | No. 16 Civ. 8569 (LAP) |

### PLAINTIFFS' SUR-REPLY IN SUPPORT OF
### MOTION FOR INJUNCTION AND TURNOVER

KING & SPALDING LLP

Randy M. Mastro
Reginald R. Smith
Laura Harris
Thomas C.C. Childs

CLEMENT & MURPHY, PLLC

Paul D. Clement
C. Harker Rhodes, IV

KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U.,*
*Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*

I.   **NO COURT HAS ENDORSED A COMITY ANALYSIS IN POST-JUDGMENT EXECUTION PROCEEDINGS AGAINST A FOREIGN STATE.**

The FSIA already reflects Congress's resolution of comity principles in execution proceedings against a foreign state. *See* ECF No. 587 at 9-10.[1] And the cases cited by Argentina (at 1-2) do not support its contention that the Court must conduct an additional comity analysis on top of the immunity analysis under the FSIA. *NML* and *Aurelius* held that a comity analysis may be appropriate when ordering discovery about a foreign state's assets, because the FSIA has "nothing to say" about that discovery. *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 142-46 & nn.4 & 6 (2014); *see also Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 589 F. App'x 16, 18 (2d Cir. 2014). In *Thai-Lao*, Judge Wood held that comity supported finding that the collection of overflight fees is a sovereign, not commercial, activity, because foreign courts had reached that conclusion; comity thus was a consideration within the FSIA analysis, not a separate hurdle that the judgment-creditor had to overcome. *See Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic*, 2013 WL 1703873, at *7 (S.D.N.Y. Apr. 19, 2013).

Argentina concedes (at 2) that "[t]he issue in *Peterson* [*v. Islamic Republic of Iran*] was the enforcement of a judgment against a third-party," but it misleadingly suggests that the Second Circuit directed the district court to consider *Iran's* sovereign interests. *See* ECF No. 597 at 3 (quoting Second Circuit's statement that district court should consider "whether 'a court order will infringe on sovereign interests of a foreign state'"). As this Court is well aware, the only comity issue raised in *Peterson* was whether a turnover order would require the third-party garnishee, a Luxembourg bank, to violate *Luxembourg* law. *See, e.g.*, Mem. of Law in Support of Clearstream Banking S.A.'s Motion for Stay, *Peterson v. Islamic Republic of Iran*, Case No. 13-cv-9195

---

[1]   ECF numbers ("ECF No.") refer to the *Petersen* docket.

(S.D.N.Y. Mar. 29, 2023), ECF No. 309 at 13. Neither *Peterson* nor any other case allows a foreign state to invoke its own law to shield its own assets from execution in the United States.

Argentina's argument (at 1-2) that "this Court cannot enjoin" it "to act within its own territory" is even more extreme, and weaker, than its comity argument. First, the only case Argentina cites for this proposition—*Westinghouse*—does not support it.[2] *Westinghouse* vacated a "unique" injunction that "purport[ed] to place the court in the position of supervising the law enforcement activities of a foreign sovereign nation against its own citizens on its own soil," and even then it assumed the district court "had the power to provide th[at] injunctive relief[.]" *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 78-79 (3d Cir. 1994). *Westinghouse* did not involve judgment enforcement or the FSIA. Second, Argentina's argument goes much too far: just a month ago, this Court ordered Argentina to collect documents for production from sources within Argentina. *See* 5/28/2024 Tr. at 39-40. Third, courts have enjoined foreign states—including Argentina—to act within their own territory. *See, e.g.*, *NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246, 254-55, 263 (2d Cir. 2012) (affirming injunction requiring Argentina to specifically perform its obligations under equal treatment provision in bonds).[3]

## II.    A TURNOVER ORDER DOES NOT REQUIRE CONGRESSIONAL APPROVAL.

Even if comity had a role to play (it does not), Argentine law does not prevent Argentina from complying with a turnover order. Professor Bianchi explained that: (i) the public policy behind the requirement of Congressional approval in Article 10 of the YPF Expropriation Law is

---

[2]    *In re Austrian, German Holocaust Litigation* is also inapposite. It held, based on the separation of powers and the political question doctrine, that the district court could not condition a final judgment on findings to be made by a foreign legislature. 250 F.3d 156, 163-64 (2d Cir. 2001). The Second Circuit ordered the court to strike the condition from its judgment. *Id.* at 165.

[3]    Argentina contends (at 2-3) that "cases where U.S. courts were unwilling to recognize foreign limitations on U.S. court jurisdiction [in] actions against sovereigns *within the United States*" are "patently inapposite." This is an action against a sovereign "within the United States."

to prevent the Executive from unilaterally reprivatizing YPF; (ii) if this requirement applied to a judicial turnover order, it would violate the separation of powers under Argentine constitutional law; and (iii) Argentina's YPF shares are subject to execution under Argentine law because they belong to the State's "private domain" goods. ECF No. 588, ¶¶ 17-22, 32-36.

The response of Argentina's expert, Professor Santiago, is meritless. He asserts that the Turnover Order would violate an Argentine "public policy rule," because the YPF Expropriation Law "declared [Repsol's shares] to be of public utility and subject to expropriation." ECF No. 597-1 at 3-4. However, that declaration was a prerequisite to the expropriation under Argentine law—it does not evince a public policy to immunize the shares from execution. *See* ECF No. 470-7 (Law No. 21,499), Art. 5 (expropriation must include "declaration of public utility"). Professor Santiago also asserts that the shares "cannot be considered as belonging to the private domain of the State since they are dedicated to the energy policy that satisfies a general interest." ECF No. 594-2 at 7. That assertion squarely conflicts with Section 236 of the Civil and Commercial Code, which provides that "[t]he goods belonging to the private domain of the [State]" include "mines" of "fossil substances" and "goods acquired by the [State] by any title." *See* ECF No. 588 at 11.

Professor Santiago leaves unrebutted Professor Bianchi's opinion that application of a Congressional approval requirement to a judicial turnover order would violate the separation of powers under Argentine law. Professor Santiago merely observes that the Argentine courts have not yet been called upon to address this issue. *See* ECF No. 594-2 at 4.

## III.   ARGENTINA'S IMMUNITY ARGUMENT CONFLICTS WITH THE PLAIN LANGUAGE OF SECTION 1610(a) OF THE FSIA.

Argentina doubles down on its misreading of Section 1610(a) of the FSIA, arguing (at 4-5) that this section requires that the foreign state's use of its property occur in the United States and that the commercial activity for which the property is used be carried out by the foreign state.

But Argentina fails even to address Plaintiffs' argument (*see* ECF No. 587 at 15-16) that this reading of Section 1610(a) improperly attempts to substitute Argentina's preferred preposition ("in") for the preposition that Congress actually used in Section 1610(a) ("for"). The statute refers to "property . . . used for a commercial activity in the United States." 28 U.S.C. § 1610(a). As Plaintiffs have explained, the sovereign must "use" the property but may do so anywhere, and the "activity" must occur in the United States but may be conducted by anyone. ECF No. 587 at 8-10.

Argentina wrongly asserts (at 5) that "Plaintiffs' sole authority is a *dissent* in a Fifth Circuit case" and that the majority in that case "held the opposite." In fact, the majority did not take issue with the statement Plaintiffs rely upon. *See Conn. Bank of Com. v. Republic of Congo*, 309 F.3d 240 (5th Cir. 2002). In any event, Argentina simply ignores other cases Plaintiffs cite holding that when a foreign state uses controlling shares to direct a company's commercial activity in the U.S., its shares are "used for" that activity. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 417-420 (D. Del. 2018), *aff'd*, 932 F.3d 126 (3d Cir. 2019) (holding PDVSA used PDVH shares for PDVH and Citgo's U.S. refining and marketing operations); *In re 650 Fifth Ave.*, 2014 WL 1284494, at *17 (S.D.N.Y. Mar. 28, 2014) (holding Iranian state agencies used shares in real estate company for company's U.S. leasing operations).[4]

Argentina's argument (at 6) that it does not, as a matter of Argentine law, use its controlling YPF shares to direct YPF's corporate actions is squarely contradicted by Article 16 of the YPF

---

[4]       *Vacated on other grounds sub nom. Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016). Argentina's cases (at 4 n.3) had no occasion to distinguish between the "use" of property and the "activity" for which it was used, because these often are (but need not be) two sides of the same coin. For example, *Aurelius* related to securities that Argentina held in a custodial account in Argentina as a passive investor. *Aurelius Cap. Partners, L.P. v. Republic of Argentina*, 2010 WL 768874, at *1 (S.D.N.Y. Mar. 5, 2010). Argentina's use of the securities (holding them as a passive investor) was indistinguishable from the commercial activity for which they were used, and both the use and the commercial activity occurred in Argentina. *Id.* at *4.

Expropriation Law—which Professor Manóvil's response entirely ignores. *Compare* ECF No. 589 (Rovira Decl.), ¶ 17 (discussing Article 16) *with* ECF No. 597-4 (Manóvil Decl.). That provision explicitly *requires* Argentina to manage "the shareholder rights corresponding to the shares" pursuant to various principles, including "[t]he administration of YPF" in a manner "safeguarding shareholder interest and generating value on their behalf." ECF No. 363-72, at 6.

## IV.   ARGENTINA'S OTHER ARGUMENTS ALSO LACK MERIT.

Argentina's argument (at 6-7) that it could not have used its YPF shares for its April 16, 2012 breach of the YPF Bylaws because it did not yet own or hold the shares ignores this Court's prior rulings that Argentina exercised control over the shares on April 16, 2012 and used that control to evade the tender-offer requirement in the Bylaws. *See* ECF No. 556 at 20-21.

Finally, Argentina's tortured argument that the CPLR and UCC do not permit turnover of its YPF shares conflicts with the plain language of New York UCC § 8-112(e), which provides that a creditor "is entitled to aid from a court of competent jurisdiction, by injunction or otherwise, in reaching [a debtor's ownership interest in a security]," if that interest "cannot readily be reached by other legal process." Plaintiffs cannot "readily" reach Argentina's YPF shares by legal process on Caja de Valores, S.A. or YPF. *See* NY UCC § 8-112(b), (c). *See also, e.g.*, *Childre v. Great Sw. Life Ins. Co.*, 700 S.W.2d 284, 288 (Tex. App. 1985) (holding that similar provision entitled creditor to injunction because "corporate stock . . . in the hands of third parties" and "held out of the State" could not "readily be attached or levied on by ordinary legal process").

<u>CONCLUSION</u>

For the reasons stated above and in Plaintiffs' previous memoranda of law in support of their Motion for Injunction and Turnover, the Court should grant the motion.

Dated: July 8, 2024

Respectfully,

KING & SPALDING LLP

By:      */s/ Randy M. Mastro*
Randy M. Mastro
Laura Harris
Thomas C.C. Childs
1185 Avenue of the Americas
New York, NY 10036
Phone: (212) 556-2114
Fax: (212) 556-2222
Email: rmastro@kslaw.com
        lharris@kslaw.com
        tchilds@kslaw.com

-and-

Reginald R. Smith
1100 Louisiana Street
Houston, TX 77002
Phone: (713) 751-3200
Fax: (713) 751-3290
Email: rsmith@kslaw.com

KELLOGG, HANSEN, TODD, FIGEL
& FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
Email: mhansen@kellogghansen.com
        dho@kellogghansen.com
        agoldsmith@kellogghansen.com

CLEMENT & MURPHY, PLLC

Paul D. Clement
C. Harker Rhodes IV
706 Duke Street

Alexandria, VA 22314
Phone: (202) 742-8900
Fax: (202) 742-8895
Email: paul.clement@clementmurphy.com
       harker.rhodes@clementmurphy.com

*Counsel for Plaintiffs Petersen Energía Inversora,
S.A.U., Petersen Energía, S.A.U., Eton Park Capital
Management, L.P., Eton Park Master Fund, Ltd.,
and Eton Park Fund, L.P.*