# KING & SPALDING

1185 Avenue of the Americas,
34th Floor
New York, NY 1 0036-4003
www.kslaw.com

September 18, 2024

*Via CM/ECF*

Hon. Loretta A. Preska
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: *Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15-cv-02739;
*Eton Park Capital Management, L.P. v. Argentine Republic*, No. 16-cv-8569

Your Honor:

Pursuant to the Stipulation and Order entered on September 9, 2024, Plaintiffs submit this letter in support of their request for: (i) discovery concerning the Republic's relationship with Aerolíneas Argentinas S.A. ("Aerolíneas"), Banco de la Nación Argentina ("BNA"), Energía Argentina S.A. ("ENARSA"), and Empresa Argentina de Soluciones Satelitales S.A. ("ARSAT") (collectively, the "State-Owned Entities"); and (ii) discovery from the three custodians on whom the Court reserved ruling: Eduardo de Pedro, Matias Tombolini, and Julio Vitobello.[1]

## I. Plaintiffs Are Entitled To Discovery Concerning The Republic's Relationship With Each Of The State-Owned Entities

Discovery concerning the Republic's relationships with the State-Owned Entities is crucial to Plaintiffs' efforts to enforce their $16 billion judgment, because the Republic has carefully structured its assets over the last two decades to render itself judgment-proof. On May 28, the Court ordered the Republic to produce documents concerning its relationships with YPF and BCRA, after concluding that there was "reason to think" that these entities may be alter egos of the Republic. *See* May 28 Hr'g Tr. at 39:20-23; Sept. 3 Hr'g Tr. at 58:9-11. The Court now should compel the Republic to produce documents concerning its relationship with each of

---

[1] *See* ECF No. 653 (Stipulation and Order). ECF citations refer to the *Petersen* docket. "Ex." citations refer to Exhibits to the Declaration of Laura Harris.

the four State-Owned Entities.[2]

### A. Plaintiffs Must Establish Only That There Is "Reason To Believe" That The State-Owned Entities Are The Republic's Alter Egos

As the Court held at the September 3 hearing, Plaintiffs "don't have to show any proof now [of alter ego status]" in order to obtain alter ego discovery; rather, "the test is whether plaintiff has demonstrated that there is ***reason to believe*** that these [entities] are alter egos." *Id.* at 58:11-12; 60:5-7 (emphasis added).

Courts have consistently applied that liberal standard to grant alter ego discovery and have rejected efforts such as the Republic's to impose a circular test that would vitiate the discovery process. It is clear that the requisite showing need not reach the threshold required for an alter ego finding. For example, in *Gabay v. Mostazafan Found. of Iran*, Judge Wood permitted alter ego discovery concerning the relationship between an Iranian state entity and a New York foundation based on "newspaper articles, publications by the Iranian [entity], and a complaint filed by a former employee of the New York foundation, later withdrawn," which suggested that the Iranian entity "closely controlled or supervised" the foundation. 151 F.R.D. 250, 256-57 (S.D.N.Y. 1993). Judge Wood determined that, even though "these documents by themselves are legally insufficient to overcome the presumption of the New York Foundation's independence," and would be inadmissible at any trial, they were sufficient to warrant discovery into the question whether the foundation was the alter ego of the Iranian entity. *Id.*; *see also, e.g.*, *Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 2017 WL 2491999, at *3-4 (S.D.N.Y. May 15, 2017) (Pauley, J.) (holding that plaintiff had "met the threshold" for alter ego discovery with, *inter alia*, "a press release stating that Nigeria's then-president ordered the conduct that gave rise to this dispute"); *Costamar Shipping Co., Ltd. v. Kim-Sail, Ltd.*, 1995 WL 736907, at *4 (S.D.N.Y. Dec. 12, 1995) (Francis, M.J.) (permitting alter ego discovery from third party although judgment-creditor's showing was "not enough to establish a prima facie case of alter ego").

As the Court already has recognized, a prior court's determination that a particular instrumentality was not an alter ego of the Republic over a decade ago is

---

[2] Plaintiffs seek an order compelling the Republic to produce documents responsive to Requests 31-52 and 63-77 in their First Post-Judgment Requests for Production of Documents, dated October 16, 2023. Requests 31-39 concern the Republic's relationship with each of the four State-Owned Entities; Requests 40-44 concern its relationship with Aerolíneas; Requests 45-52, ARSAT; Requests 63-73, BNA; and Requests 74-77, ENARSA.

Page 3

of no moment and should not bar discovery on the question today. *See* May 28 Hr'g Tr. at 33:12-13 (Court: "The question, though, is how do we know those conditions are extant today?"), 36:3-4 (same). Those dated rulings cannot resolve the question whether any of the State-Owned Entities is *currently* an alter ego of the Republic. *See, e.g.*, *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 663 F. Supp. 3d 406, 438-39 (D. Del. 2023) (ruling that political change in Venezuela warranted reevaluation of PDVSA's relationship with Venezuelan government because circumstances relevant to alter ego analysis "can change at any time"); *Crystallex Int'l Corp. v. PDV Holding Inc.*, 2019 WL 6785504, at *6-8 (D. Del. Dec. 12, 2019) (August 2018 alter ego decision did not bar Venezuela from relitigating the issue in 2019 following change in government); *OI Euro. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 171-72 (3d Cir. 2023) (alter ego analysis "should consider all relevant facts up to the time of the service of the writ of attachment" because "a state determined to avoid creditors might simply drop vulnerable assets into a new instrumentality") (cleaned up). Discovery is necessary to determine whether the Republic's extensive political and operational control over each of the State-Owned Entities has rendered them alter egos.

### B. There Is "Reason To Believe" Each Of The State-Owned Entities Is An Alter Ego Of The Republic

Plaintiffs seek documents concerning the Republic's relationship with only six out of the dozens of entities that it wholly or majority owns, and today seek discovery concerning only four of those entities: Aerolíneas, BNA, ENARSA, and ARSAT (the "State-Owned Entities"). Ultimately, after discovery, the question will be whether the State-Owned Entities are "so extensively controlled by the state that a relationship of principal and agent" exists, rather than that of an independent instrumentality. *Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 69-70 (2d Cir. 2022) (affirming district court ruling based on "exhaustive factual analysis" following "extensive" alter ego discovery). Factors relevant to this inquiry include whether the state: (1) **uses the instrumentality's property** as its own; (2) **ignores ordinary corporate formalities**; (3) deprives the instrumentality of the independence from **close political control** that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain **approvals for ordinary business decisions** from a political actor; and (5) issues policies or directives that cause the instrumentality to **act directly on behalf of the sovereign** state. *Id.* (emphasis added). Courts in this district also consider whether the sovereign "**created the entity for a national purpose**," whether it "**actively supervises** the entity," whether it "**requires the hiring of public employees** and pays their salaries," whether the entity "**holds exclusive rights** to some right in the foreign

country," and how it is "treated under foreign state law." *Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 335 (S.D.N.Y. 2019) (emphasis added).

There plainly is "reason to believe" that the Republic's control over each of the State-Owned Entities already bears these hallmarks, as set forth below, and Plaintiffs' showing in support of their request for alter ego discovery exceeds that endorsed by Judge Pauley in *Esso Exploration* and Judge Wood in *Gabay*.

### 1. Aerolíneas

The Republic owns 99.98% Aerolíneas's shares and its control over Aerolíneas's day-to-day operations and financial affairs is apparent in its active supervision of the airline, its approval of the airline's operational planning, its appointment of even mid-level managers, its use of airline property, and its direct negotiation of the airline's acquisition of aircraft. *See Esso Exploration*, 40 F.4th at 70 (noting "Nigeria is [the state-owned oil company's] sole shareholder" and "holds appointment and removal power over all . . . board members" with "authority to review and approve [the company's] budget and expenses"). In particular:

- *Political Control:* After nationalizing Aerolíneas, the Republic directly negotiated the airline's acquisition of aircraft.[3] The Republic did not merely "approve[]" these purchases, as it suggested to the Court.[4]

- *Political Control:* The Republic has usurped control over the appointment of Aerolíneas's senior and mid-level management, doling out patronage positions at the airline to unqualified political activists.[5] The Republic also exercises direct control over Aerolíneas's wage negotiations with its employees. As the Minister for Deregulation has stated, "The Government's position is to manage [Aerolíneas] efficiently and not to authorize salary increases at the expense of the taxpayers, who are tired of it."[6]

- *Financial Control:* Since nationalizing Aerolíneas in 2008, the

---

[3] Ex. 12 at 1, 3 ("De Vido is the number-one negotiator that the President sent to Brazil to handle the negotiations"); *see also* Ex. 13.
[4] *See* Sept. 3 Hr'g Tr. at 69:11-70:9.
[5] *See* Ex. 1 at 3 (La Cámpora's control resulted in "a middle management structure of people with little training, but who are militant"); Ex. 4.
[6] Ex. 5 at 4.

Page 5

> Republic has poured an average of US$ 1.55 million per day into the airline to keep it afloat.[7] The Republic regularly blurs any distinction between Aerolíneas's accounts and its own. For example, in October 2023 the Republic caused the Argentine Social Security Agency (ANSES) to purchase US$ 100 million in Aerolíneas debt to conceal the extent of the airline's losses.[8] Similarly, in 2022 the Republic engineered a debt restructuring under which it effectively absorbed Aerolíneas's multimillion dollar debt to a private airport operator.[9] As KPMG has observed, without the constant influx of cash from the Republic, Aerolíneas would not be a going concern.[10] Funds from the Republic are used to pay for voluntary retirements and layoffs at Aerolíneas.[11] Much of the Republic's vast financial support is treated as capital contributions,[12] meaning that Aerolíneas will never have to repay it and does not incur any taxes.

- *Active Supervision:* The Republic approves a detailed annual plan for the airline's operational goals and projections for, *inter alia*, "commercial strategy and positioning in the market" (including the design of Aerolíneas's route network), human resources, investment (including for "fleet engine maintenance"), production, and profitability.[13]

- *Active Supervision:* The Republic controls 99.98% of the airline's shares and occupies all but one board seat, granting it effective control and supervision over numerous operational matters, and it has direct veto power over decisions involving "elimination or substantial

---

[7] Ex. 1 at 2; *see also* Ex. 2; Ex. 3.
[8] *See* Ex. 6 ("The extensive influence of Kirchnerism, and especially La Cámpora, took its toll."); Ex. 7.
[9] *See* Ex. 8 at 4 (discussing airport operator's assignment of debt owed by Aerolíneas to satisfy operator's obligations to Government).
[10] Ex. 9 (Aerolíneas "requires periodic contributions from its majority shareholder, the National Government, to continue with the normal development of its operations").
[11] Ex. 10 at 1.
[12] Ex. 9 at 41 (noting that increase of Aerolíneas's capital stock by ARS 413,878,563,800 "was carried out through the capitalization of contributions made by the National Government").
[13] Ex. 11.

reduction . . . of air transportation services operated by the Company," per the terms of Aerolíneas's Articles of Incorporation.[14]

### 2. BNA

BNA operates as a "financial agent" for the Republic and acts for "the benefit of the productive development of the country."[15] *Esso Exploration*, 40 F.4th at 69 ("The Nigerian statute creating [the state-owned oil company] requires it to engage in activities that would enhance the petroleum industry in the overall interest of Nigeria") (cleaned up). The Republic's control over BNA is also evidenced by the following:

- *Agent of the State:* As a "financial agent for the Federal Government as regards operating aspects," "play[ing] the role of financial branch of the National Government, to the benefit of the productive development of the country,"[16] BNA's third-party obligations and debts are guaranteed by the Republic.[17]

- *Political Control and Supervision:* The Republic not only appoints BNA's officers and directors, but also appoints a "Statutory Auditor" responsible for "supervis[ing]" the bank, and determines their remuneration.[18] For example, on December 27, 2023, the Republic designated Daniel Tillard as the president and Dario Wasserman as vice-president of BNA.[19] On February 5, 2024, the Republic appointed Gonzalo Pascual and Carlos Mario Balter as directors of BNA.[20] On February 15, 2024, the Republic appointed Armando Daniel Guibert, Secretary for State Transformation and Public Function and Chief of the Cabinet of Ministers, to an "ad honorem" position on BNA's Board of Directors.[21]

- *Political Control / Absence of Corporate Formalities:* The Republic recently embroiled BNA's management in a significant public

---

[14] Ex. 14 at 7, 18-19.
[15] Ex. 15, at 222, 237.
[16] *Id.*
[17] Ex. 16, at D-158.
[18] Ex. 17 at 3-4, 9.
[19] Ex. 18.
[20] Ex. 19.
[21] Exs. 20, 21.

corruption investigation.[22] Under the allegedly corrupt scheme, then-President Fernandez instructed administration officials to buy insurance policies from Nacion Seguros,[23] an insurance company 99.69% owned by BNA.[24]

### 3. ENARSA

The Republic owns 97.94% of ENARSA, which it founded to serve as "an energy policy tool" to facilitate the Republic's "direct involvement in the oil and gas industry."[25] It has exercised its political and operational control by directing LNG purchases, appointing a key political ally as a company executive, and granting ENARSA exclusive rights (and key subsidies). *See Esso Exploration*, 397 F. Supp. 3d at 335 (noting alter ego factors, including whether the sovereign "created the entity for a national purpose," "actively supervises the entity," and "holds exclusive rights to some right in the foreign country").

- *Operational Control:* The Republic directed ENARSA to purchase LNG from Petrobras,[26] and instructed ENARSA to sell LNG at below-market prices and issue a Request for Proposal to LNG suppliers to meet recent shortages.[27] By executive decree the Republic requires ENARSA to maintain a stand-by letter of credit in favor of YPF Bolivia to guarantee volumes of natural gas.[28]

- *Political Control and Hiring:* President Milei appointed ENARSA's president, who has close ties to current Energy Secretary Rodríguez Chirillo.[29] ENARSA subsidies have grown 194% since 2022.[30]

- *Exclusive Rights:* By Resolution 67/2022, dated February 7, 2022, the Republic placed ENARSA (referred to as "IEASA") in charge of the construction of the Nestor Kirchner Gas Pipeline ("GPNK").[31] The

---

[22] *See* Exs. 24, 25.
[23] *See* Ex. 22 at 7.
[24] Ex. 23.
[25] Ex. 26; Ex. 27 at D-56; Ex. 28 at D-62.
[26] Ex. 29 at 1.
[27] *Id.* at 2.
[28] Ex. 31 at 1; Ex. 32 at 1.
[29] Exs. 33, 34, 36.
[30] Ex. 35.
[31] Ex. 38 at 4.

>   Republic recently also gave ENARSA oversight authority over hydroelectric concessionaires.[32]
>
>   ### 4.    ARSAT
>
>   ARSAT is smaller than the other State-Owned Entities, but as ARSAT's sole shareholder, the Republic exercises extensive control over ARSAT's operations.
>
>   - ***Operational Control:*** In a recent SEC filing, the Republic explained that it "initiated the acquisition of equipment to expand the cybersecurity and storage capacity of ARSAT's national data center."[33]
>
>   - ***Political Control and Hiring:*** ARSAT's president, Mariano Greco, was appointed by President Milei, who also approves ARSAT's budget, pursuant to article 49 of Law 24,156.[34] Between 2015 and 2018, ARSAT's president was Rodrigo de Loredo, son-in-law of Defense Minister Oscar Aguad,[35] now under investigation by the anti-corruption bureau.[36]
>
>   - ***Absence of Corporate Formalities:*** Between 2018 and 2020, the Republic ignored corporate formalities in paying for more than half of ARSAT's services with sovereign bonds, rather than cash, without appropriate invoicing.[37]

## II.    Plaintiffs Are Entitled to Discovery From De Pedro, Tombolini, and Vitobello

Plaintiffs have requested search-term responsive, electronically stored information (ESI) for twelve additional custodians, each of whom is likely to have evidence relevant to the alter-ego status of YPF, BCRA, or both. *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 139 (2014) ("New York law entitles judgment creditors to discover all matter relevant to the satisfaction of a judgment, permitting investigation of any person shown to have any light to shed on the subject of the judgment debtor's assets or their whereabouts.") (cleaned up).  Plaintiffs

---

[32] Ex. 39 at 2.
[33] Ex. 42 at D-55.
[34] Ex. 43; Ex. 62 at 9.
[35] Ex. 44.
[36] Ex. 45.
[37] *See* Ex. 46 at 8.

submit the following additional facts in support of Eduardo de Pedro, Matias Tombolini, and Julio Vitobello pursuant to the Court's request on September 3, 2024. *See* Tr. at 44:12–17.

**Eduardo ("Wado") de Pedro** was Argentina's Minister of the Interior from December 2019 through December 2023, directing domestic policy and relations with the Provinces. Defendant has argued that Mr. de Pedro was responsible only for policies involving "tourism, the environment, sports, and migration," Tr. at 39:7–8, but this description omitted Mr. de Pedro's attention to the energy sector. In fact, Mr. de Pedro's mandate included significant governmental efforts to develop natural gas production and exports, as well as Argentine fuel suppliers. Mr. de Pedro has acknowledged that as Interior Minister he surveyed infrastructure requirements across Argentina—including in the energy sector—echoing comments he made earlier in 2023 that he had explored government cooperation with private sector entities—including YPF—in each of the Provinces.[38] Major infrastructure projects in Argentina also reflect his engagement and approval, including construction of a natural gas pipeline to transport YPF gas from the Vaca Muerta deposits and a "megaproject" LNG plant that Minister de Pedro and the administration decided to build in Governor Axel Kicillof's Province of Buenos Aires (and which the Milei administration has since moved to the Province of Rio Negro).[39]

Like Governor Kicillof, Mr. de Pedro is also a recognized leader of the political movement La Cámpora, and his interactions with these energy projects demonstrate more than mere oversight typically performed by a government minister. Recent disclosures show that in 2023 YPF recorded a $1.8 billion impairment that media reports have attributed to a manipulation of YPF's finances.[40] The impairment corrected an accounting overvaluation that had enabled YPF to avoid disposing of mature fields that provided substantial employment in Santa Cruz—the home Province of both the Kirchner family and YPF's then-president.[41] As a Kirchnerist, a leader of La Cámpora, and government minister with decisional authority over major projects and regional energy sector investments, Mr. de Pedro sat at the crossroads of these interests.[42]

---

[38] Ex. 48.

[39] *See* Ex. 49 (de Pedro and YPF president launched pipeline to transport YPF gas from Vaca Muerta); Ex. 50 (describing de Pedro's "key role" in approval of LNG project with Petronas in Bahía Blanca); Ex. 51 (same); ECF No. 628-3.

[40] ECF No. 563-7.

[41] ECF No. 563-8; ECF No. 563-9.

[42] *See* Ex. 52.

**Matias Tombolini** served as Secretary of Commerce from August 2022 through December 2023, and played a key role in the day-to-day implementation of several economic policies related to natural gas and oil prices, through YPF. His official responsibilities included oversight of policies that impact and strengthen commerce and competition, the supply of goods and services, and tariffs and exports.[43] In practice, those duties included the direct management of YPF prices.[44] In one November 2022 meeting, Mr. Tombolini and Sergio Massa announced the inclusion of fuel products into the Republic's *Precios Justos* or "Fair Prices" program, and YPF committed to raising prices no more than 4% per month for several months. In May 2023, YPF aggressively sold oil at a below-market price to counteract inflation, an objective set by the Republic.[45] As Secretary of Commerce, Tombolini participated in the Republic's hands-on management, and other energy sector entities petitioned him directly for relief from the *Precios Justos* program.[46]

**Julio Vitobello** was Secretary General of the Presidency from December 2019 through December 2023, with responsibility for logistics and administration of the President's travel.[47] During his tenure, his office coordinated almost 200 flights for then-Vice President Cristina Kirchner, including weekend getaways to Ms. Kirchner's home, unrelated to Ms. Kirchner's official duties.[48] Crucially, many of these flights were on two aircraft owned by YPF, but the government did not pay for their use.[49] As of January 2024, Mr. Vitobello himself was named in a criminal complaint against Ms. Kirchner, along with former President Alberto Fernández, for fraud-related crimes associated with the misuse of the aircraft.[50]

Respectfully,
*/s/ Randy M. Mastro*
Randy M. Mastro

---

[43] *See* Ex. 53, Annex 3.

[44] Ex. 54.

[45] Ex. 55.

[46] Ex. 56.

[46] Ex. 57.

[47] *See* Ex. 58 (listing among General Secretary's functions, "Managing the logistical and administrative aspects, as well as provide budgetary assistance for the trips of the President of the Nation").

[48] Ex. 59; Ex. 60.

[49] ECF No. 563-12.

[50] Ex. 60.