**SULLIVAN & CROMWELL LLP**

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

September 18, 2024

Via ECF

The Honorable Loretta A. Preska,
   United States District Court for the Southern District of New York,
     500 Pearl Street,
      New York, NY 10007.

        Re:  *Petersen Energía Inversora S.A.U.* v. *Argentine Republic*, No. 15 Civ. 2739 (LAP) ("*Petersen*"); *Eton Park Capital Mgmt.* v. *Argentine Republic*, No. 16 Civ. 8569 (LAP) ("*Eton Park*")

Dear Judge Preska:

        On behalf of the Argentine Republic (the "Republic"), and in accordance with the Court's September 9, 2024 Scheduling Order (*Petersen* ECF No. 653), I write regarding (i) U.S. and Argentine law protections for internal Republic governmental communications and documents; (ii) Argentine law restrictions on collecting and producing communications and documents from personal devices, personal email accounts, and messaging applications of Republic officials; and (iii) why the Court should not permit Plaintiffs to add Sergio Massa, Luis Caputo, Santiago Caputo, and Guillermo Michel as document custodians.

        Plaintiffs ask the Court to expand the extensive "alter ego" discovery that they will already receive—responsive emails between 20 high-ranking government officials and YPF or BCRA as well as official government documents. YPF is a public company whose securities trade on the Buenos Aires Stock Exchange and New York Stock Exchange. It files reports on Form 20-Fs annually, and Deloitte & Co. S.A. audits its financial statements in accordance with SEC regulations. YPF's annual report on Form 20-F includes a section for "[r]elated party transactions" that lists "[a]ll material transactions and balances with related

The Honorable Loretta A. Preska                                                                -2-

parties."[1]  YPF files interim reports with the Comisión Nacional de Valores relating to material information, which are submitted to the SEC under Form 6-K.[2]

Among this wealth of concrete public information, Plaintiffs have not identified *any* evidence that YPF is the alter ego of the Republic, resting their case instead on rumors and speculation that Republic "politicians" have used YPF aircraft and that "YPF's executive ranks" are "filled with politically connected hacks." (May 28, 2024 Conf. Tr. 35:17–23.)  As for the BCRA, the Second Circuit has ruled that BCRA's assets held for its own account are immune from attachment under the Foreign Sovereign Immunities Act regardless of whether or not the BCRA is the Republic's alter ego.  *See* 28 U.S.C. § 1611(b)(1); *NML Cap., Ltd.* v. *Banco Cent. de la República Argentina*, 652 F.3d 172, 187–88 (2d Cir. 2011) ("the plain language, history, and structure of §1611(b)(1) immunizes property of a foreign central bank or monetary authority held for its own account without regard to whether the bank or authority is independent from its parent state pursuant to *Bancec*").

The Court should not grant the additional discovery Plaintiffs seek.  *First*, internal government communications are protected from disclosure under both U.S. and Argentine law.  There is no reason for the Republic to go through the burdensome exercise of creating a privilege log for documents that are not discoverable.  *Second*, communications on personal devices and accounts of Republic officials are not within the Republic's possession, custody, or control, and it would violate the Argentine Constitution for the Republic to collect or search such communications absent specific statutory authorization.  *Finally*, Plaintiffs have not met their burden to show that four of the new individuals they proposed as custodians—Sergio Massa, Luis Caputo, Santiago Caputo, and Guillermo Michel—are at all likely to have information relevant to Plaintiffs' "alter ego" inquiries.[3]

---

[1]   2023 YPF Form 20-F (filed April 25, 2024), p. 98, *available at* https://edicion.ypf.com/english/investors/Lists/InformeAnualForm20/YPF%20Form%2020F%202022.pdf.

[2]   *See* Sept. 2024 YPF Form 6-K, *available at* https://www.sec.gov/Archives/edgar/data/904851/000119312524220172/d824257d6k.htm.

[3]   If the Court rules for Plaintiffs on any of these matters, the parties will need to negotiate applicable search terms.  (Tr. 53:15–16; 50:16–17) (instructing the

The Honorable Loretta A. Preska                                                                                  -3-

## I.  Internal Republic Communications Are Protected from Disclosure Under Both U.S. and Argentine Law.

Plaintiffs originally demanded that the Republic satisfy document requests seeking to assess YPF's[4] and the BCRA's alleged status as alter egos by producing, from relevant Republic officials' accounts, emails between those Republic officials and anyone with an @YPF or @BCRA email domain. (Rep. Aug. 26 Ltr. at 2.) Plaintiffs now insist they are also entitled to the Republic's "[i]nternal discussions concerning YPF and BCRA." (*See* Pls.' Aug. 26 Ltr. at 2.) The Court should deny this burdensome request because internal documents are not needed to test whether YPF and the BCRA are alter egos, *i.e.*, whether the Republic significantly and repeatedly exercised control over their day-to-day operations. *See EM Ltd.* v. *Banco Central de la República Argentina*, 800 F.3d 78, 92 (2d Cir. 2015).

As the Court explained at the September 3, 2024 hearing, the relevant standard is "indicia of day-to-day control." (Tr. 60:19.) This issue will be fully addressed by what the Republic has agreed to produce: its official repository for government communications (the "GDE system") as well as emails between YPF or the BCRA and the government officials most likely to engage in interactions, if any, with them. Further discovery is unnecessary and also disproportionate to the needs of this case. Fed. R. Civ. P. 26(b)(1). Legal restrictions heighten these proportionality concerns. The Court should limit Plaintiffs to what they originally asked for: external government communications with YPF or the BCRA.

### A.  U.S. Law Precludes Discovery of the Deliberations of the Republic's Executive Branch.

1. "International comity dictates that courts in this country give a foreign sovereign the same protection afforded to the executive branch of the United States." *In re Grand Jury Subpoena dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 553 (S.D.N.Y. 2002) (Chin, J.); *LNC Invs., Inc.* v. *Republic of Nicaragua*, 1997 WL 729106, at *3 (S.D.N.Y. Nov. 21, 1997) (Ellis, M.J.) ("foreign governments are entitled to protect their executive deliberations"). Under U.S. law, internal

---

parties to "talk with each other" and noting that "some of the search terms suggested are far too broad and should be narrowed down").

[4]   At the September 3, 2024 conference, Plaintiffs repeatedly and incorrectly referred to YPF as "wholly owned" by Argentina. (*See* Tr. 6:14; 15:7-9; 24:8.) Plaintiffs' casual relationship with the facts about YPF is troubling.

The Honorable Loretta A. Preska                                                                                        -4-

communications "that are part and parcel of the process of internal agency decisionmaking" receive the protection of the deliberative process privilege. *Fox News Network, LLC* v. *U.S. Dep't of the Treasury*, 739 F. Supp. 2d 515, 541 (S.D.N.Y. 2010) (Maas, M.J.) (deliberative process privilege covers documents that are "inter or intra-agency," "predecisional," and "deliberative"). In addition, the executive privilege protects from disclosure "communications in performance of a President's responsibilities, . . . and made in the process of shaping policies and making decisions," whether those communications are made by the President or "his immediate [] advisers." *Knight First Amendment Inst. at Columbia Univ.* v. *CDC*, 560 F. Supp. 3d 810, 827 (S.D.N.Y. 2021) (Torres, J.).

        2.    Here, emails between high-level executive branch officials included as custodians or potential custodians (such as the former General Secretary of the Presidency, former Chiefs of Cabinet, and current and former Ministers of Economy, Secretaries of Finance, Secretaries of Treasury, and Secretaries of Energy) related to the Republic's relationship with YPF and the BCRA would be protected from discovery because they are communications "made in the process of shaping policies and making decisions." *Knight*, 560 F. Supp. 3d at 827.

        3.    Moreover, ordering the Republic to undertake the burden of collecting and reviewing its internal emails is unwarranted here, as courts have held in similar circumstances. For example, in a recent case, Judge Failla refused to require the SEC "to produce purely intra-agency communications like e-mails sent from sec.gov to sec.gov addresses" because "most, if not all of these documents, would be subject to deliberative process or similar privileges." *SEC* v. *Coinbase, Inc.*, Sept. 5, 2024 Hearing Tr. at 7:22–8:19, No. 23-4748 (S.D.N.Y. Sept. 5, 2024) (Failla, J.). Likewise, in *Citizens Union of City of N.Y.* v. *Att'y Gen. of N.Y.*, Magistrate Judge Parker held that "locating, collecting, logging, and producing" documents that the plaintiffs sought from the Governor of New York "amount[ed] to an undue burden on the Governor and [was] disproportional to the needs of this case" because the discovery was "of no real probative value to Plaintiffs' claims." 269 F. Supp. 3d 124, 148–49 (S.D.N.Y. 2017) (Parker, M.J.).

    **B.**    **Under Argentine Law, the State's Internal Deliberations are Protected from Disclosure.**

Like the U.S. government, the Argentine government has rules for how government acts are taken and documented. As relevant here, government decisions and instructions are recorded in administrative files, and those files contain all information, reports, and other data relevant to a particular decision. Ivanega ¶¶ 8-

The Honorable Loretta A. Preska                                                                                                -5-

9. The GDE system, which was created in 2016, is currently the system used to electronically create and store such administrative files and documents. (*See* Ex. A (Decree No. 336/2017).)

Argentina's equivalent of the Freedom of Information Act affords the public access (by request) *only* to documents contained in the GDE system that relate to government activity. Ivanega ¶ 13. The relevant Argentine law, the Right of Access to Public Information Law No. 27,275 (Ex. B) with its regulatory decree (Decree No. 206/2017) (Ex. C) (together, the "Public Information Regime"), is the exclusive source of Argentine law determining the extent to which the government can be compelled to turn over documents in its possession to those outside the government (subject to the privacy protections discussed below).

Not all documents in the GDE system constitute public information. To safeguard the government's ability to function, the Public Information Regime protects from public disclosure two categories of government information: (1) "working papers" and documents or communications reflecting "preparatory deliberations" and (2) the types of information identified in Article 8 of Law No. 27,275, including material that "could jeopardize the proper functioning of the financial or banking system." Ivanega ¶ 18. Internal government documents and communications related to the BCRA or YPF are excluded from public disclosure under one or both of these exceptions.

1. Unless they reflect a final decision or an act of government registered in the GDE system, internal emails and documents are "working papers" and "preparatory deliberations" and therefore not public information subject to disclosure under the Public Information Regime. Ivanega ¶ 12. For example, emails among Republic officials related to the energy or banking industries are highly likely to contain "deliberations" regarding policies or regulations.

2. In addition, internal documents and communications regarding the BCRA from current and recent Secretaries of Finance and of the Treasury are certain to contain information that, if made public, could endanger "the financial or banking system." (*See* Ex. B, Art. 8(b).) After all, the Secretary of Finance manages the executive's relationship with the BCRA, and the Secretary of Treasury handles implementation of national budgetary and financial policy. (Ex. D (Decree No. 293/2024).) Their internal deliberations regarding the BCRA would be market moving, highly sensitive information protected from disclosure under Law No. 27,275.

The Honorable Loretta A. Preska                                                                -6-

## II. Argentine Law Bars the Collection of Current or Former Republic Officials' Communications Through Personal Accounts.

Plaintiffs also seek "government-related communications transmitted through personal e-mail accounts or messaging applications (such as WhatsApp, Slack, or Gmail)." (Pls.' Aug. 26 Ltr. at 1.) There is no need to collect such communications because the Republic will produce any emails exchanged with YPF and the BCRA by government officials through their government email accounts. More importantly, such a collection is impossible and illegal because (1) communications from personal devices or accounts of government officials are not in the Republic's possession, custody, or control, and it would be a crime to take them without consent, and (2) even if personal communications were available to the Republic, they would not be disclosable under the Personal Information Regime. Ivanega ¶ 32.

1. Beginning with the practical and legal hurdles, the personal devices and accounts of current and former Republic officials belong to the officials themselves, not to the government. Ivanega ¶ 20. The government therefore cannot, as a practical matter, access such documents—and attempting to do so would violate both the Argentine Constitution and its criminal law. Ivanega ¶¶ 29, 32.

The Argentine Constitution protects individuals' property and privacy rights, including in personal devices and accounts. Ivanega ¶ 28. Collecting, searching, or opening personal communications therefore directly violates the Argentine Constitution, unless expressly authorized by statute or pursuant to an Argentine court order in a criminal investigation. Ivanega ¶ 29. Here, there is no law expressly authorizing the government to access officials' personal devices and accounts. *Id.* The government is thus prohibited from collecting them. *Id.*

In addition, Articles 153 and 153 bis of the Argentine Criminal Code make it a criminal offense to improperly "open or access" private documents or communications, or to knowingly access restricted computer systems or data without due authorization. Ivanega ¶ 31, n.16. Anyone who improperly opens or searches officials' private documents and communications would be subject to criminal sanctions under the Criminal Code for violating officials' right to privacy. Ivanega ¶ 32. Similarly, under Argentina's Personal Data Protection Law No. 25,326, the "treatment or processing" of "sensitive data"—which includes merely collecting or searching any such data on an individual's phone or email account—is illegal absent the data owner's prior written and informed consent. (Ex. E, Arts. 1, 2, 5.1, 7.)

The Honorable Loretta A. Preska                                                                          -7-

        2.    Even if it were possible and legal for the Republic to access officials' personal devices and communications—and it is not—any such communications relating to government business would not be subject to public disclosure.  That is because they would constitute non-public "working papers" and "deliberations" under the Argentine Public Information Regime.  *See* § I.B, *supra*.

### III.    Sergio Massa, Luis Caputo, Santiago Caputo, and Guillermo Michel Are Not Relevant Custodians.

        The Republic proposed searching for all emails to and from the BCRA or YPF email addresses from 18 custodians who are in charge of the areas within the government that interact with YPF and the BCRA, and therefore are most likely to have information relevant to the alter ego inquiry. (*See* Tr. 11:15–19.) In accordance with the Court's order at the September 3 court conference, the Republic is also adding José Ignacio de Mendiguren and Gabriel Rubinstein, for a total of *20* ESI custodians with respect to Plaintiffs' alter ego discovery requests.

        Plaintiffs have not shown that Sergio Massa, Luis Caputo, Santiago Caputo, and Guillermo Michel could "provide unique, relevant and noncumulative evidence" regarding the alter ego inquiry. *Coventry Cap. US LLC* v. *EEA Life Settlements Inc.*, 2020 WL 7383940, at *7 (S.D.N.Y. Dec. 16, 2020) (Cave, J.). Instead, Plaintiffs openly admit that they put these individuals forward merely because they are "of high rank in government or the closest advisers to the president" and thus, Plaintiffs speculate, are "most likely to be the ones exhibiting their control over" state-owned entities. (Tr. 6:4–15.)  This claim lacks any foundation: under Argentina's legal system, were extensive day-to-day control by the government of an entity to be exercised, it would be through officers who deal with that entity (and bear responsibility for the decisions relating to that entity), not by the government's most senior officials acting in a vacuum. Plaintiffs' counsel's references at the Court conference to the "evidence" in the "record" regarding these individuals (Tr. 20:4–19) is perplexing, as Plaintiffs have presented *no* evidence regarding these individuals and instead rely, at best, on mischaracterizations of allegations and rumors from Argentine press reports.

        1.    ***Sergio Massa and Luis Caputo.***  Mr. Massa was Minister of Economy from August 2022 to December 2023 (and presidential candidate in the 2023 elections).  Mr. Luis Caputo currently serves as Minister of Economy. Plaintiffs have offered no basis for their contention that individuals in these cabinet-level roles would have relevant documents, particularly where the Republic has

The Honorable Loretta A. Preska                                                                       -8-

already agreed to produce communications from high-level officials within the Ministry of Economy who would be more likely to have participated in relevant communications, if any. *See Blackrock Allocation Target Shares: Series S Portfolio* v. *Bank of N.Y. Mellon*, 2018 WL 2215510, at *12 (S.D.N.Y. May 15, 2018) (Pitman, M.J.) (rejecting proposed high-level custodians because "the benefit of such circumstantial evidence is minimal" where party had already agreed to produce relevant documents); *see also Mortg. Resol. Servicing, LLC* v. *JPMorgan Chase Bank, N.A.*, 2017 WL 2305398, at *3 (S.D.N.Y. May 18, 2017) (Francis, M. J.) (it was "plausible to assume that because of [proposed custodian's] senior position, he would have less information about specific transactions than employees lower in the hierarchy").

The Republic proposed as custodians the most senior officials who would be likely to have information about regular contacts, if any, with YPF and the BCRA pursuant to their functions and responsibilities. Plaintiffs, on the other hand, proposed the current and former highest-ranking officials at the Ministry of Economy, who were or are senior to the Republic's proposed custodians in the executive branch hierarchy and whose responsibilities include many matters unrelated to YPF or the BCRA.[5] Plaintiffs' speculation that Ministers of Economy must "have some involvement in issues that relate to" YPF or the BCRA (Tr. 15:16–18) is beside the point. "[I]nvolvement in issues" relating to *a state-owned company* is not what matters to the alter ego inquiry, which turns on significant and repeated *day-to-day control*. *See Gater Assets Ltd.* v. *AO Moldovagaz*, 2 F.4th 42, 55 (2d Cir. 2021).

Plaintiffs' purported "facts" about these individuals provide no support for their position. For example, an article cited in Plaintiffs' August 26 letter

---

[5] *See* Ministry of Economy, "Objectives", *available at* https://www.argentina.gob.ar/economia/objetivos (Ministry of Economy's roles include assisting the President in matters related to "economic, budgetary and tax policy; to the administration of public finances; to the economic, financial and fiscal relations with the Provinces and the Autonomous City of Buenos Aires; to productive development, industry, commerce and agriculture, livestock and fishing; to the preparation, proposal and execution of the national policy on energy and mining; to the development of policies regarding public works and infrastructure; to national water policy; to air, rail, automotive, river and maritime transportation; to road activity; to the housing, habitat and urban integration development policy and to the concession of infrastructure works and public services").

regarding Mr. Caputo explains that YPF Luz—a YPF subsidiary—accepted a proposal from the Ministry of Economy to pay certain debts in sovereign bonds. (*See* Ex. F.) As the article makes clear, the Ministry's proposal was directed not just to YPF Luz (which is 25% owned by General Electric, with significant veto powers), but to all power generators, including locally and foreign-owned private companies such as AES, Tecpetrol and Total, all of which accepted the proposal on equal terms. (*Id.*) This proposal has nothing to do with government control of YPF or purported disregard of its separate entity status.

Likewise, Plaintiffs' assertions regarding Mr. Massa's supposed "use of YPF's advertising budget for political purposes and oil price manipulation" and Mr. Caputo's alleged involvement in YPF's decision to relocate a planned LNG plant are unsupported even by the articles Plaintiffs cite[6] and fail to justify Plaintiffs' discovery demands.

Ultimately, all Plaintiffs offer is speculation that these officials must have relevant information because of their high-level positions. Just as such speculation would not allow discovery of the communications of U.S. cabinet members in an action against the U.S. government, it cannot be the basis for allowing a fishing expedition into the communications of the Republic's current and former Ministers of Economy. *See Mortg. Resol. Servicing*, 2017 WL 2305398, at *3 ("speculation" that individual's "position as a senior executive might increase the relevance of his files is not a basis for designating him as a custodian"); *see also In re Terrorist Attacks on Sept. 11, 2001*, 2020 WL 8611024, at *11–12 (S.D.N.Y. Aug. 27, 2020) (Netburn, M.J.) ("[s]ubjecting former officials decision-making processes to judicial scrutiny. . . would serve as a significant deterrent to qualified candidates for public service"—logic that applies "to foreign ministers serving in ranks equivalent to high-level U.S. government officials").

2. **Santiago Caputo.** As Plaintiffs concede, Mr. Caputo "doesn't have a formal role in the government." (Tr. 31:21–22.) Rather, he has been retained by the General Secretary of the Presidency as a consultant under the terms of Decree No. 1109/2017. Plaintiffs' justification for proposing Mr. Caputo as a custodian is that he is reported to be President Milei's "closest advisor" and "buddy" and that President Milei referred to himself, his sister, and Mr. Caputo as an "iron triangle."

---

[6]   *See* Ex. G (explaining that YPF lowered oil prices and making no mention of Mr. Massa); Ex. H (noting that YPF—not the Republic—chose to move the location of an LNG plant).

The Honorable Loretta A. Preska                                              -10-

(Tr. 30:15–17; 32:9–11.)  But any relationship that President Milei may have with Mr. Caputo has no bearing on the alter ego inquiry.  Plaintiffs draw *no* connection between Mr. Caputo and any actions of the Republic with respect to the BCRA or YPF, instead offering only rank speculation that if President Milei is "going to be asserting control outside of normal channels, this is the guy he's going to be talking to and making those decisions with, his sister and this guy."  (Tr. 32:19–21.)  Nowhere have Plaintiffs provided a shred of support for the idea that Mr. Caputo is "likely to have information" regarding daily interactions with the BCRA or YPF.

　　　　　　3.　***Guillermo Michel.***  Finally, Plaintiffs assert that Guillermo Michel, who was the National Director of Customs of the Argentine Federal Administration of Public Income from July 2022 to December 2023, "was directly involved in trade and economic policy decisions affecting both BCRA and YPF." (Pls.' Aug. 26 Ltr. at 4.)  As the former National Director of Customs of the Argentine Federal Administration of Public Income, Mr. Michel's role was to enforce customs legislation, not to interact with YPF or the BCRA.

　　　　　　To try to justify Mr. Michel as a custodian, Plaintiffs cite (Ltr. at 4, n.9) an article announcing an agreement between various government agencies (including Customs) and oil companies to freeze oil prices for a limited period of time.  (*See* Ex. I.)  This was an agreement with multiple oil and gas companies operating in Argentina, including foreign companies like Shell—not solely with YPF—and thus it is irrelevant.  *Id.*  Plaintiffs also claim that Mr. Michel was appointed "to lead the Price Agreements Negotiation Unit which set the price of gasoline and other products."  (*See* Pls.' Aug. 26 Ltr. at 4, n.9.)  *First*, alleged interaction between a private company in which the Republic holds a 51% interest and the Republic over pricing of key commodities would *not* be relevant to the alter ego inquiry.  *See Gater Assets*, 2 F.4th at 56 (government "ratemaking for companies . . . does not make those companies their alter egos").  *Second and in any event*, Plaintiffs are wrong that the Price Agreements Negotiation Unit has anything to do with oil and gas pricing.  The news article cited by Plaintiffs says the Unit was formed to reach agreements with "supermarkets" and makes no reference to YPF at all. (*See* Ex. J.)  And Ministry of Economy Resolution No. 1182/2023, which created the Unit, describes its purpose as ensuring access to basic goods, particularly those aimed at the protection of "*health, food and hygiene*."  (*See* Ex. K at 1) (emphasis added).

　　　　　　The Court should deny Plaintiffs' requests.

The Honorable Loretta A. Preska                                                              -11-

                                                Respectfully,

                                                */s/ Robert J. Giuffra, Jr.*
                                                Robert J. Giuffra, Jr.

cc:    Counsel of Record (via ECF)