# KING & SPALDING

1185 Avenue of the Americas,
34th Floor
New York, NY 1 0036-4003
www.kslaw.com

Randy M. Mastro
Direct Dial: +1 212 827 4019
RMastro@kslaw.com

October 2, 2024

*Via CM/ECF*

Hon. Loretta A. Preska
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

  Re:  *Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15-cv-02739;
        *Eton Park Capital Management, L.P. v. Argentine Republic*, No. 16-cv-8569

Your Honor:

      Plaintiffs respectfully respond to the Republic's letter (ECF 658)[1] regarding discovery of (i) internal government communications; (ii) responsive, work-related communications on personal devices and accounts of the Republic's custodians; and (iii) documents from four senior public officials and advisors (Sergio Massa, Luis Caputo, Santiago Caputo, and Guillermo Michel) (together, the "Four Custodians").

**I.    The Republic's Internal Communications Are Discoverable**

      **A.    Internal Communications Are Highly Relevant and Proportional**

      The Republic's contention (at 3) that "internal documents are not needed to test whether YPF and the BCRA are alter egos" because the two document categories it has agreed to produce will "fully address" the issue is self-serving and plainly incorrect. Records in the Republic's "GDE system" relate only to its official "administrative acts," *see* Bianchi Decl at ¶¶ 43-48, and are thus unlikely to shed *any* light on the many informal means by which the Republic exercises control over YPF and BCRA. Similarly, emails between Republic officials and the two entities would not capture many other communication channels (such as in-person meetings and phone calls) that likely are discussed in internal communications. Further,

---

[1] ECF citations refer to the *Petersen* docket.

Page 2

internal communications likely contain frank and unguarded statements about the Republic's relationships with YPF and BCRA that would not be reflected in communications directly with them.

Additionally, the Republic's claim (at 3) that discovery of its internal communications concerning YPF and BCRA would be unduly "burdensome" and "disproportionate" is frivolous. The Republic refuses to satisfy its $16 billion debt to Plaintiffs under the Judgment, which was entered after almost a decade of litigation, and the Court has already determined that Plaintiffs are entitled to alter ego discovery concerning YPF and BCRA. In these circumstances, discovery of the Republic's internal communications concerning YPF and BCRA is plainly relevant and proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

> **B.   Internal Communications Concerning YPF and BCRA Are Not Protected from Disclosure Under U.S. or Argentine Law**
>
> **1.   U.S. Law**

The Republic invokes the U.S. deliberative process privilege (at 3-4), but this privilege is very narrow and applies only to documents that were: "(1) part of the deliberative process by which policies or decisions are formulated; and (2) truly of a predecisional, or advisory or recommendatory nature, or express[ing] an opinion on a legal or policy matter, or otherwise [are] reflective of a deliberative process." *LNC Invs., Inc. v. Republic of Nicaragua*, 1997 WL 729106, at *2 (S.D.N.Y. Nov. 21, 1997) (Ellis, M.J.). Moreover, "[g]enerally, documents that are factual in nature do not qualify as privileged. Whenever possible, facts that are separable from the privileged portion of a document should be disclosed." *Id.* Further, even if a party establishes that the documents are covered by the privilege, the court "must strike a balance between the public interest in disclosing the documents and the government's interest in protecting them," considering factors such as "the interest of the private litigant," "the need for accurate judicial fact finding," and "the public's interest in learning how effectively the government is operating." *Id*.

Additionally, the party seeking to assert the privilege "must follow certain procedures," including submission of a statement by a senior public official identifying and describing the documents to be protected and providing "precise and certain" reasons for asserting confidentiality over the documents. *Id*. To show that a document meets the standard, the party asserting the privilege should "(i) pinpoint the specific agency decision to which the document correlates, (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (iii) verify that the document precedes, in

temporal sequence, the decision to which it relates." *Reino De Espana v. Am. Bureau of Shipping*, 2005 WL 1813017, at *11 (S.D.N.Y. Aug. 1, 2005) (Ellis, M.J.).

The Republic has not even attempted to identify a specific "policy" or "decision" to which these documents relate, and unless the Republic now contends that it has a *policy* of asserting alter ego control over YPF or BCRA, the requested documents relate to the *facts* of its relationship with YPF and BCRA, which fall outside this privilege. *See LNC,* 1997 WL 729106, at *3 (denying privilege as to cabinet-level discussions because defendant failed to show they "were part of the deliberative process or that they concerned policy matters"); *Reino de Espana*, 2005 WL 1813017, at *13 (denying privilege as to investigative documents because they are "of a factual nature" or "relate to strategy" rather than "formulation of policy"). The Republic's reliance on *Coinbase* is also misplaced because the documents at issue in that case apparently concerned the SEC's formulation of policy regarding how the securities laws apply to digital assets. *SEC v. Coinbase, Inc.*, Sept. 5, 2024 Hearing Tr. at 6:6 – 7:8, No. 23-4748 (S.D.N.Y. Sept. 5, 2024) (Failla, J.).

The Republic's reliance on *Citizens Union of City of New York v. Att'y Gen. of New York*, 269 F. Supp. 3d 124 (S.D.N.Y. 2017) (Parker, M.J.), also is unavailing. Judge Parker held in *Citizens Union* that the Governor did not have to produce internal documents because they were irrelevant, not based on the deliberative process privilege. *Id*. at 148-49. As it happened, the Governor already had collected, reviewed, and logged all of the documents, and after reviewing them, Judge Parker concluded that a few documents "regarding the drafting of (and predating enactment of)" a statute *also* were protected by the privilege. *See, e.g.*, *id.* at 159-60. The Republic does not even attempt a similar showing here.

The Republic also appears (at 4) to invoke the presidential communications privilege, but this privilege applies only to communications made by the President or his or her "immediate" advisers for purposes of advising the President, *and* only if the case involves "a quintessential and nondelegable Presidential power[.]" *Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention*, 560 F. Supp. 3d 810, 828 (S.D.N.Y. 2021) (Torres, J.) (internal quotation marks and citation omitted). The Republic does not argue that the requested communications concerning YPF and BCRA were sent for purposes of advising the Argentine President, or that they concern a "quintessential and nondelegable" presidential power. Moreover, this privilege is waived by "the transmittal of a document to persons who are unlikely to be in a position to give advice to the President." *Knight*, 560 F. Supp. 3d at 828 (internal quotation marks and citation omitted). Because the Republic has not even collected the communications, it is impossible for the Court to determine whether the Republic has waived any such privilege.

## 2. Argentine Law

The Republic's contention (at 4-5) that Argentine law shields its internal communications from disclosure fails because the Federal Rules of Civil Procedure, not Argentine law, govern discovery in this Court. *See, e.g.*, *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for Southern Dist.*, 482 U.S. 522, 539-40 (1987). But even if Argentine law did apply, Law 27,275 (Argentina's equivalent of the U.S. Freedom of Information Act) is not the "exclusive source" of Argentine law for disclosure of government documents. As Prof. Bianchi explains, Law 27,275 regulates a citizen's right to access public information, not the power of an Argentine court to order the Republic to produce documents in a civil proceeding to which it is a party. Bianchi Decl., ¶ 4. Under section 36(4)(c) of the Argentine Code of Civil and Commercial Procedure, an Argentine court can order the Republic to produce internal communications between public officials. *Id.* at ¶ 7.

Also, Law 27,275 itself allows Argentine citizens to access internal governmental communications because they qualify as "public information" under Argentine law. Bianchi Decl, ¶ 9. In 2021, the Argentine agency responsible for implementing Law 27,275 issued a resolution providing that "emails from public officials, sent and/or received in the exercise of their official functions, constitute public documents and do not belong to the private sphere of people who perform functions in the State." Bianchi Decl, ¶ 11 (citing Resolution 237/2021, recital 36). The same resolution also provides that "official information held on a public authority's behalf could be contained in a number of non-corporate channels or locations, including: In private emails accounts e.g. Gmail, ProtonMail or Yahoo Mail. In private messaging accounts eg WhatsApp, Signal or Telegram." *Id.* at ¶ 14.

Further, the exception under Law 27,275 for "working papers" and "preparatory deliberations" applies only to documents related to the formulation of official administrative acts. Bianchi Decl., ¶¶ 46-48. Thus, like the deliberative process privilege, this exception would not apply to internal communications concerning the Republic's relationships with YPF and BCRA by its own terms.

Finally, the fact that some of the requested communications relating to BCRA may concern the financial or banking system does not protect those communications from court-ordered disclosure under Argentine law. Under Law 21,526, "financial secrecy" does not shield documents from disclosure pursuant to court order. The same principle applies to "fiscal secrecy" per Law 11,683. Bianchi Decl., ¶¶ 33-40.

### C. Responsive, Work-Related Communications on Personal Devices and Accounts Are Discoverable Under Argentine Law

The Republic's contention (at 6) that the collection of work-related communications on its officials' personal devices and accounts is "impossible and illegal" under Argentine law is also meritless. As already discussed, work-related communications on personal devices and accounts are discoverable pursuant to a court order under Argentine law. The Republic's expert admits this in her report, stating that "***In the absence of...a court order from an Argentine court*** authorizing it, the Argentine Republic cannot access the private devices or private communications of its citizens without directly violating the National Constitution." ECF 660, Ivanega Decl., at 9-10. Moreover, as discussed above, work-related communications on personal devices and accounts are "public information" that any Argentine citizen can access under Law 27,275 without the need for a court order.

In any event, even if Argentine law prohibited production of these documents, Argentine law would not be entitled to any weight in these proceedings. If a foreign law conflicts with U.S. law, the court must perform a comity analysis "to determine the weight to be given to the foreign jurisdiction's law." *Owens v. Elastos Found.*, 343 F.R.D. 268, 281 (S.D.N.Y. 2023). This comity analysis (which the Republic neglects to address) requires the Court to consider several factors, the "most important" of which is a balancing of the competing interests of the nations whose laws are in conflict as well as "the hardship of compliance on the party or witness from whom discovery is sought." *Id.* at 282, 288. These factors weigh strongly in favor of disclosure because the United States has a "substantial interest in fully and fairly adjudicating matters before its courts, which is only possible with complete discovery." *Reino De Espana*, 2005 WL 1813017, at *4. By contrast, the Republic's interest in the confidentiality of work-related communications on its officials' personal devices and accounts is attenuated at best, given that such communications can be accessed by any Argentine citizen pursuant to Law 27,275. Also, the Republic has not adduced *any* evidence that an individual has ever been prosecuted in Argentina for collecting or producing work-related communications on a public official's personal device or account. *See, e.g.*, *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 425 (S.D.N.Y. 2016) (Pitman, M.J.) (ordering production where defendants presented no evidence of any UK enforcement action taken for violating UK law by complying with discovery demands in the United States).

## II. The Court Should Order Discovery from the Four Custodians

Much like its argument that alter ego discovery should be limited to direct communications between the Republic and the two entities, the Republic's core

objection (at 7) to searching documents of the Four Custodians rests on the faulty premise that relevant evidence can only be found in the documents of Republic personnel whose official job duties entail direct interaction with the entities. This argument is illogical because the Republic does not have an *official* policy of exercising day-to-day control over YPF or BCRA. If an alter ego relationship exists, it arises from the Republic's *de facto* control over the entities, and thus the scope of persons involved in the creation and implementation of such a *de facto* policy cannot logically be defined solely by reference to their *de jure* job responsibilities.

Also, the Republic's suggestion that the Four Custodians are too senior to have relevant documents because day-to-day control would be "exercised through" lower level "officers who deal with that entity" fails for two reasons. Even assuming *arguendo* that a *de facto* policy of exercising alter ego control over YPF or BCRA would only be *implemented* by lower-level officials, it does not follow that more senior officials have no involvement in or knowledge of critical decisions about those relationships. The Republic's high-level decisions about those relationships are just as relevant to the alter ego analysis as the implementation of those decisions,[2] and the fact that senior personnel are more likely to be involved in making critical decisions than implementing them is precisely why the Four Custodians are likely to have "unique, relevant and noncumulative evidence" that will not be found in the documents of lower-level officials. *Coventry Cap. US LLC v. EEA Life Settlements Inc.*, 2020 WL 7383940 at *7 (S.D.N.Y. Dec. 16, 2020) (Cave, J.).

Second, the idea that senior officials and advisors to the President would *not* be involved in such decisions – which the Republic suggests but, tellingly, never

---

[2] The Republic cites residential mortgage cases that are inapposite because the applicable legal standard required proof of breach specific to particular loans within a portfolio and the Court concluded that senior officials were unlikely to have such detailed information. *See Blackrock Allocation Target Shares: Series S Portfolio v. Bank of New York Mellon*, 2018 WL 2215510, at *12 (S.D.N.Y. May 15, 2018) (Pitman, M.J.) (denying discovery from officials who "probably do not possess trust- or loan-specific documents"); *Mortg. Resol. Servicing, LLC v. JPMorgan Chase Bank*, 2017 WL 2305398, at *3 (S.D.N.Y. May 18, 2017) (Francis, M.J.) (denying discovery from senior official who "would have less information about specific transactions than employees lower in the hierarchy"). Here, an intention by high-level public officials to control YPF and BCRA is highly relevant to whether the Republic actually exercised such control in a way that "general knowledge of trustee misconduct" is not relevant to the transaction-specific breach of contract analysis in the residential mortgage cases. *Blackrock,* 2018 WL 2215510 at *12.

actually asserts – beggars belief. YPF and BCRA are both very significant state instrumentalities that are clearly the subject of frequent government attention at the highest levels, as indicated by the many high-level contacts discussed further below.

Finally, the Republic's suggestion that press articles and similar reports are insufficient evidence to justify discovery from the Four Custodians is baseless. Plaintiffs need only show that there is reason to believe that the entities are alter egos of the Republic, which can be met by news articles and similar evidence that would be insufficient and even inadmissible to prove alter ego. *See Gabay v. Mostazafan Found. of Iran*, 151 F.R.D. 250, 257 (S.D.N.Y. 1993) (ordering alter ego discovery based on "newspaper articles, publications by the Iranian [entity], and a complaint filed by a former employee of the New York foundation, later withdrawn"); *Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 2017 WL 2491999, at *3-4 (S.D.N.Y. May 15, 2017) (Pauley, J.) (holding that plaintiff "met the threshold" for alter ego discovery based on, *inter alia*, "a press release stating that Nigeria's then-president ordered the conduct that gave rise to this dispute").

In any event, the Court already has found sufficient indicia of alter ego control over YPF and BCRA to warrant discovery. It makes no sense then to exclude from such discovery any evidence from senior officials who would logically be at the center of the Republic's relationship with those entities. Moreover, as shown further below, each of the Four Custodians is sufficiently involved in the relationship between the Republic and the two entities to warrant the requested discovery.

### A.   Sergio Massa

Contrary to the Republic's representation at the September 3 hearing (*see* Tr., 10:6-18), the Minister of Economy has ultimate responsibility for Argentina's energy policy and for voting the Republic's shares in YPF.[3] Thus, when he held that position in 2022-2023, Mr. Massa was central to the Republic's relationship with YPF.[4]

---

[3] *See* Harris Decl. Ex. 1 (Argentine "Map of the State" describing Minister of Economy's responsibilities to include "execution of the national energy … policy" and "administration of majority or minority interests held by the NATIONAL GOVERNMENT in companies … or banking institutions acting within its orbit").

[4] The Republic's assertion (at 9) that there is no basis to believe that Mr. Massa has relevant information regarding the Republic's use of YPF for oil price manipulation is incorrect. The cited article states that the rationale of YPF's action was to "rein in prices without any written regulations being required" (*i.e.*, carrying out a

Mr. Massa was closely involved in YPF's operations by, for example, (i) attending YPF's earnings calls as a "company participant" where YPF announced its investments in pipelines to export Vaca Muerta natural gas,[5] (ii) announcing through YPF's official X account that YPF will distribute dividends and has "sown the seed" of the LNG export business in Argentina,[6] (iii) discussing YPF's LNG export project directly with Petronas and the Malaysian government just before the agreement was signed,[7] and (iv) announcing that the LNG export agreement was possible due to the legislation that Mr. Massa himself sent to Congress.[8]

Moreover, press articles also indicate that Mr. Massa intervened in the day-to-day operations of BCRA. For instance, when Mr. Massa appointed Lisandro Cleri as director of BCRA in August 2022, the press characterized Mr. Cleri as "Massa's strong man" who would "be in charge of monetary policy on behalf of the Minister of Economy," as part of a process that "is political and is being discussed among the partners of the ruling party [including] Massa."[9] Similarly, in April 2023, the press reported that "Sergio Massa ordered […] that the Central Bank start to intervene in the financial dollar market" to keep those exchange rates in check.[10]

### B.    Luis Caputo

Like Mr. Massa, in his position as Minister of Economy, Mr. Caputo is central to the Republic's relationship with YPF. For example, Mr. Caputo attended a "YPF management meeting" in June 2024, along with YPF's CEO, several other YPF executives, and the Republic's Chief of the Cabinet of Ministers.[11]

As with Mr. Massa, the Republic does not deny that Mr. Caputo is closely

---

governmental function), which was "aligned with the objectives established by the Ministry of Economy." ECF 658-7, Republic Letter Brief, Ex. G. Additionally, the financial press reported in December 2023 that "Sergio Massa ousted" YPF's then-CFO over a dispute about gasoline imports and prices.  Harris Decl, Ex. 2.

[5] *See* Harris Decl. Ex. 3.

[6] *See* Harris Decl. Ex. 4.

[7] *See* Harris Decl. Ex. 5 (explaining that the agreement took shape "after the meeting of the Ministers of Economy Sergio Massa and of the Interior, Wado de Pedro, with the Malaysian Ambassador in Argentina … and the CEO of Petronas"); *see also* Harris Decl. Ex. 6.

[8] *See* Harris Decl. Ex. 7.

[9] Harris Decl. Ex. 8.

[10] Harris Decl. Ex. 9.

[11] *See* Harris Decl. Ex. 10.

Page 9

involved in the Republic's relationship with YPF and BCRA, but rather contends that Plaintiff's evidence is insufficient. The Republic again overstates Plaintiffs' burden at this stage and mischaracterizes the evidence. For instance, the Republic wrongly asserts (at n. 6) that an article cited by Plaintiffs states that "YPF—not the Republic—chose to move the location of the LNG plant," when that article in fact reports an allegation by the Buenos Aires Governor that YPF moved the LNG plant *at the direction of President Milei*, and that "[w]hile YPF is a privately-held company, its directors are officers reporting to Milei, and we find that their decisions were made following the instructions of the President."[12] While that article does not mention Mr. Caputo specifically, other reporting indicates that President Milei's budget bill garnered support after key legislators met privately with Caputo, and "[w]hat seduced them was YPF's nod to Río Negro to build an LNG plant."[13] Furthermore, like Mr. Massa, Mr. Caputo met with Petronas to discuss the LNG project.[14]

There also are substantial indicia that Mr. Caputo is regularly involved in the Republic's relationship with BCRA. The Argentine press describes Mr. Caputo as one of the "closest friends" of BCRA Governor Santiago Bausili, and the two are "partners at the Anker Latinoamerica consultancy firm that has been drawing up reform plans for the economy."[15] Tellingly, when BCRA received a public information request about its transfer of gold reserves out of Argentina, it was Mr. Caputo rather than Mr. Bausili who announced the operation to the press (among other public statements about the government's plans to strengthen the peso – an issue of monetary policy within the domain of BCRA).[16] Additionally, the press reported just yesterday that Mr. "Caputo is close to closing a loan of almost 5 billion dollars from the Bank of Basel … to strengthen the reserves of the BCRA."[17]

### D. Santiago Caputo

The Republic admits that Santiago Caputo has been retained as a consultant to the President and does not deny that it has control over the documents that are in his possession in that capacity. Indeed, the Republic does not deny that Mr. Caputo is President Milei's closest advisor, nor could it in light of President Milei's own description of Mr. Caputo as part of the "iron triangle" (along with himself and his

---

[12] ECF 658-8, Republic Letter Brief, Ex. H, at 4.
[13] Harris Decl. Ex. 11.
[14] Harris Decl. Ex. 12.
[15] Harris Decl. Ex. 13.
[16] Harris Decl. Ex. 14.
[17] Harris Decl., Ex. 20.

sister).[18] Moreover, the fact that Mr. Caputo is a *de facto* high-ranking official within the Milei administration is demonstrated repeatedly by Mr. Caputo's own reported conduct. For instance, the President's nominee to the Supreme Court testified in the Senate that Mr. Caputo in fact was the person who offered him that position.[19] Similarly, the press has reported that Mr. Caputo caused a legislator to be expelled from his position in the Senate, who then proclaimed that Mr. Caputo "is a person who has a lot of power and is doing a lot of damage."[20]

In fact, the Republic's only specific objection to searching Mr. Caputo's documents is the argument that it is "rank speculation" to believe that Mr. Caputo is involved in the administration's day-to-day interactions with YPF and BCRA. Once again, however, the Republic does not actually deny that he is, and that inference is eminently reasonable in light of the clear nature of his role.

### E.   Guillermo Michel

The Republic does not deny that Mr. Michel is Sergio Massa's "most trusted man," or that he has wielded enormous power in his roles both as General Director of Customs and head of the Price Agreements Negotiation Unit ("PANU"). Moreover, the Republic's assertion that the PANU has no responsibility over fuel is not supported by the resolution it cites (which states that the PANU's purpose is "ensuring access to basic goods," which includes but is not limited to "health, food and hygiene"). Indeed, press reports indicate that "Michel negotiated prices of food, medicine, and fuel," including an agreement with oil companies to freeze the price of gasoline.[21] While that agreement did involve other companies in addition to YPF, those companies reportedly were sitting on the sidelines until YPF acted.[22] In other words, Mr. Michel was at the center of the Republic's effort to use YPF's dominant position to manipulate fuel prices, just as it had done in 2023.[23]

---

[18] Harris Decl. Ex. 15.

[19] *See* Harris Decl. Ex. 16 from 50.08 to 50.50 ("The position was offered to me by Mr. Santiago Caputo in a meeting with Mr. Sebastian Amerio. I do not know the President of the Nation. I have never spoken to him on the phone in my life. The person who offered me the position was Santiago Caputo…. The last time I saw him was about two weeks ago at Casa Rosada….")

[20] Harris Decl. Ex. 17.
[21] Harris Decl. Ex. 18.
[22] Harris Decl. Ex. 19.
[23] ECF 658-7, Republic Letter Brief, Ex. G, at 4.

                                                  Respectfully,

                                                  */s/ Randy M. Mastro*
                                                  Randy M. Mastro