## SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

October 2, 2024

Via ECF

The Honorable Loretta A. Preska,
   United States District Court for the Southern District of New York,
     500 Pearl Street,
      New York, NY 10007.

        Re:  *Petersen Energía Inversora S.A.U.* v. *Argentine Republic*, No. 15 Civ. 2739 (LAP) ("*Petersen*"); *Eton Park Capital Mgmt.* v. *Argentine Republic*, No. 16 Civ. 8569 (LAP) ("*Eton Park*")

Dear Judge Preska:

      On behalf of the Argentine Republic (the "Republic"), I respond to Plaintiffs' September 18, 2024 letter (*Petersen* ECF No. 657) regarding (1) "alter ego" discovery concerning Aerolíneas Argentinas S.A. ("Aerolíneas"), Banco de la Nación Argentina ("BNA"), Energía Argentina S.A. ("ENARSA"), and Empresa Argentina de Soluciones Satelitales S.A. ("ARSAT"); and (2) Plaintiffs' demand to add as additional discovery custodians Eduardo de Pedro, Matías Tombolini, and Julio Vitobello. Plaintiffs fail to justify why this discovery is appropriate, let alone necessary. The Court should deny Plaintiffs' request.

### I. Plaintiffs Have Not Met Their Burden to Justify Discovery About the State-Owned Entities.

      At the September 3 conference, the Court made clear that, in light of the strong presumption in favor of separate status, "the mere fact that [Aerolíneas, BNA, ENARSA, and ARSAT] are sovereign entities is not sufficient" to justify discovery into whether they are alter egos. (*See* Sept. 3 Tr. 60:9–11, 24–25.) For discovery, Plaintiffs needed to show "indicia of day-to-day control" providing a "reason to think" they *are* alter egos. (*Id.* at 60:18–19, 58:9–11); *see Gater Assets*

The Honorable Loretta A. Preska                                                                                         -2-

*Ltd.* v. *AO Moldovagaz*, 2 F.4th 42, 56, 58 (2d Cir. 2021) ("'[T]he touchstone inquiry' is 'whether the sovereign state exercises significant and repeated control over the instrumentality's day-to-day operations.'") (citation omitted).  Plaintiffs' letter does not make this required showing.  It merely assembles more of the same evidence that these are ordinary state companies.

   Courts in this District and the Second Circuit have already found the same facts Plaintiffs proffer insufficient to show alter ego status as to any of these entities.  *See Seijas* v. *Republic of Argentina*, 2009 WL 10700009, at \*2 (S.D.N.Y. 2009) (Aerolíneas); *Seijas* v. *Republic of Argentina*, 502 F. App'x 19, 22 (2d Cir. 2012) (BNA); *NML Cap., Ltd.* v. *Republic of Argentina*, 2011 WL 524433, at \*7 (S.D.N.Y. 2011) (ENARSA); *NML Cap., Ltd.* v. *Republic of Argentina*, 2011 WL 1533072, at \*6 (S.D.N.Y. 2011) (ARSAT is an instrumentality of and separate from the Republic).  Plaintiffs cannot simply repackage these same allegations and claim they "suggest alter ego status." (Sept. 3 Tr. 75:8–11.)

   Plaintiffs call these rulings "dated" (Ltr. 3), but have not demonstrated ***any*** relevant change in circumstances that would warrant revisiting them.[1]  *See OI Euro. Grp. B.V.* v. *Bolivarian Republic of Venezuela*, 663 F. Supp. 3d 406, 419 (D. Del. 2023) (reaffirming alter ego determination from 2018 where "the nature of the relationship between [Venezuela] and PDVSA has not materially changed in the time after the Court made its findings of fact in . . . August 2018").[2]  Instead, Plaintiffs cite to the same characteristics of the state-owned entities that the plaintiffs in ***those*** cases relied on.  At best, to the extent Plaintiffs cite to anything ***not*** covered by those prior rulings, it is innuendo and gossip about events irrelevant to the "day-to-day operations" that are the "touchstone" of the alter-ego inquiry.

---

[1] *Gabay* v. *Mostazafan Foundation of Iran*, 151 F.R.D. 250, 257 (S.D.N.Y. 1993) and *Esso Exploration & Production Nigeria Ltd.* v. *Nigerian National Petroleum Corp.*, 2017 WL 2491999, at \*4 (S.D.N.Y. 2017), cited by Plaintiffs, are inapposite because in neither case was there a prior alter ego determination.  The same is true for *Costamar Shipping Co.* v. *Kim-Sail, Ltd.*, 1995 WL 736907, at \*4 (S.D.N.Y. 1995), which *denied* the requested discovery but noted that future discovery "may" be appropriate.

[2] *Compare Crystallex Int'l Corp.* v. *PDV Holding Inc.*, 2019 WL 6785504, at \*7 (D. Del. 2019) (alter ego determination relitigated because the disputed property "is under different control under a new legal regime," such that "the alter-ego status today was not actually litigated and necessarily decided" before).

The Honorable Loretta A. Preska                                                                    -3-

       ***1.  Aerolíneas.***  The primary focus of Plaintiffs' argument is their assertion that the Republic "directly negotiated" Aerolíneas's "acquisition of aircraft," which they claim shows "political control" over Aerolíneas. (Ltr. 4.)  But Plaintiffs' "source" for this assertion is an article describing airline purchases made in ***2008***.  (Pls.' Ex. 12.)  Even if valid, those events occurred ***sixteen years ago***, well ***before*** the district court in *Seijas* determined that Aerolíneas is not an alter ego of the Republic.  *See Seijas*, 2009 WL 10700009, at *2 (fact that Republic had a role "in approving airplane purchases" did not make Aerolíneas an alter ego). Information from 2008 cannot provide a basis for alter ego discovery on whether the entity "is *currently* an alter ego of the Republic."  (Ltr. 3 (emphasis in original).)

       Plaintiffs also claim that the Republic "has poured an average of US$1.55 million per day into the airline to keep it afloat" since 2008, and that some of this support is used to pay for "voluntary retirements and layoffs," which they claim is "financial control."  (Ltr. 4–5.)  These claims are misleading at best, as Plaintiffs' own sources say that most of these funds were transferred years ago. (*See* Pls.' Exs. 1–3; *see also* Pls.' Ex. 10 at 4 (noting "significant drop" in funds transferred in 2023).)  In any event, this same assertion was considered and rejected as purported "alter-ego" evidence before.  *See Seijas*, 2009 WL 10700009, at *2 (fact that Republic "has invested hundreds of millions of dollars in" Aerolíneas did not make Aerolíneas an alter ego).  Far from providing a "reason to think" that Aerolíneas is an alter ego, the allegation that the Republic provides an "influx of cash" (Ltr. 5) demonstrates "the opposite of the typical alter ego relationship, where a sham entity is left underfunded by its principals."  *Seijas*, 2009 WL 10700009, at *2.

       Plaintiffs also claim that the Republic's control of Aerolíneas shares "grant[s] it effective control and supervision over numerous operational matters." (Ltr. 5.)  But, as Plaintiffs' citation to the Aerolíneas Articles of Incorporation makes clear (Pls.' Ex. 14), Plaintiffs are merely referring to the company's corporate governance structure, the very same structure that the court held in *Seijas* did not demonstrate alter ego status.  2009 WL 10700009, at *2 (fact that Republic "owns almost 100% of the airline's stock" and "oversee[s] Aerolíneas operations," including by "approving" large investments, did not make Aerolíneas an alter ego).

       To the extent Plaintiffs refer to anything not directly addressed by the court in *Seijas*, it is unremarkable facts of the type courts hold do not show alter ego status.  Plaintiffs note that the Republic can appoint officers and directors of Aerolíneas, characterizing this as the "doling out [of] patronage positions."  (Ltr. 4.)

The Honorable Loretta A. Preska                                              -4-

The characterization is inaccurate, but in any event the appointment of officers and directors is not evidence of an alter ego relationship. *See Gater Assets*, 2 F.4th at 58 ("If majority stock ownership and appointment of the directors were sufficient, then the presumption of separateness announced in *Bancec* would be an illusion.") (citation omitted); *see also EM Ltd.* v. *BCRA*, 800 F.3d 78, 92–93 (2d Cir. 2015) ("hiring and firing of board members or officers is an exercise of power incidental to ownership" and "not synonymous with control over the instrumentality's day-to-day operations"). Likewise, Plaintiffs' assertion that the Republic made capital contributions to Aerolíneas that "do[] not incur any taxes" (Ltr. 5) is not relevant. *See, e.g.*, *NML Cap.*, 2011 WL 1533072, at *3 (entity not a "part" of the Republic where it is "exempted" from "paying taxes").[3]

Plaintiffs also cite to the Republic's role in approving, pursuant to official government resolutions (*see* Pls.' Ex. 11), the Aerolíneas yearly "Action Plan and Budget." This "Action Plan" is a single page document limited to brief descriptions of objectives on strategic goals for the upcoming year. Again, this is far from day-to-day control and plainly not evidence of alter ego status. *See NML Cap.*, 2011 WL 524433, at *3 (entity not an alter ego where "annual budget is provided by Congressional appropriation and approved by the Economy Minister"); *see also Minpeco, S.A.* v. *Hunt*, 686 F. Supp. 427, 434–35 (S.D.N.Y. 1988) (Peruvian government's final approval over entity's "long-term goals, objectives and budget" was of "limited legal significance"). Likewise, Plaintiffs' assertion that the Republic "engineered a debt restructuring under which it effectively absorbed Aerolíneas's multimillion dollar debt to a private airport operator" (Ltr. 5) fails to support alter ego discovery. *See UAB Skyroad Leasing* v. *OJSC Tajik Air*, 2021 WL 254106, at *7 (D.D.C. Jan. 26, 2021) ("reduction of the company's debt through state action" does not "chip away" at corporate separateness). And the allegation that the Republic "caused the Argentine Social Security Agency (ANSES) to purchase US$100 million in Aerolíneas debt" (Ltr. 5) is both incorrect and irrelevant.[4]

---

[3] In any event, Plaintiffs' speculation about the financing of Aerolíneas is unsupported by the document they cite, which says only that at a shareholders meeting, a capital stock increase "was carried out through the capitalization of contributions made by the National Government, Class A and C shareholder," without reference to how those capitalizations are taxed. (*See* Pls.' Ex. 9.)

[4] Plaintiffs' own sources note that it was not ANSES that purchased bonds issued by Aerolíneas but the *Fondo de Garantía de Sustentabilidad*, the fund administered by ANSES to support the Republic's social security system; other purchasers of this

The Honorable Loretta A. Preska                                                                     -5-

      Plaintiffs also note that the Republic was involved in "wage negotiations" with Aerolíneas employees during a pilot strike. (Ltr. 4.) These allegations have nothing to do with "day-to-day control" over Aerolíneas's operations, and provide no "reason to think" that it is an alter ego of the Republic.[5]

      **2. BNA.** Plaintiffs fare no better with their claims regarding BNA. Plaintiffs rely heavily on the fact that BNA has called itself the Republic's "financial agent" in certain contexts. (Ltr. 6.) This same fact was presented to the court in 2011 and deemed irrelevant to the alter ego inquiry. *See Seijas* v. *Republic of Argentina*, 2011 WL 1137942, at *4 (S.D.N.Y. 2011) ("[A]s plaintiffs note, BNA's website states that the bank's 'principal purpose is to perform the function of financial agent for the Federal Government,'" and BNA's charter "states that BNA 'shall coordinate its action with the economic-financial policies established by the national government'"), *aff'd*, 502 F. App'x 19 (2d Cir. 2012); *id.* at *12 ("[I]nstrumentalities of states regularly carry out the states' policies without becoming an alter ego of the state.").[6]

      Plaintiffs also claim that the Republic's appointment of BNA's officers and directors, as well as a "Statutory Auditor," is evidence of potential alter ego status. Again, these same assertions have been held irrelevant to alter ego status, and do not provide a justification for discovery. *Seijas*, 2011 WL 1137942, at *5–6 (BNA not an alter ego where Plaintiffs alleged that "BNA's compliance with its charter and with other laws is overseen by 'a Supervisor designated by the National Executive Branch,'" and that "BNA's chairman and directors are dependent on the president of the Republic for their positions and compensation").

---

debt included mutual funds and savings banks. (*See* Pls.' Ex. 6; Pls.' Ex. 7.) FGS's operations are regulated by law and subject to oversight by various internal and external bodies. (*See* Pls.' Ex. 16 at D-149–150.)

[5] The Executive issued a decree today that Aerolíneas is subject to privatization which, if it occurs, would mean Aerolíneas is not even a state-owned instrumentality, let alone an alter ego. *See* Decree No. 873/2024.

[6] Plaintiffs also cite a statement in BNA's annual report that BNA "play[s] the role of financial branch of the National Government, to the benefit of the productive development of the country." (Ltr. 6.) This comment in the 350-page annual report comes in BNA's description of its leadership on gender, diversity, and human rights issues and has no bearing on the alter-ego inquiry. (*See* Pls.' Ex. 15 at 222.)

The Honorable Loretta A. Preska                                                                    -6-

According to Plaintiffs, the fact that "BNA's third-party obligations and debts are guaranteed by the Republic" provides a "reason to think" that BNA is an alter ego. (Ltr. 6.) Not so. Courts have held that guaranteeing a state-owned entity's debts is "a normal aspect of the relation between a government and government-owned corporation." *Transamerica Leasing, Inc.* v. *La Republica de Venezuela*, 200 F.3d 843, 852 (D.C. Cir. 2000); *see UAB Skyroad*, 2021 WL 254106, at *8 (similar); *see also Seijas*, 502 F. App'x at 23 (BNA not an alter ego where Plaintiffs pointed only to "BNA's lending activity" "consistent with Argentinian law and its charter").

Plaintiffs also cite to allegations that "then-President Fernandez instructed administration officials to buy insurance policies from Nacion Seguros, an insurance company 99.69% owned by BNA." (Ltr. 7.) Even if these allegations were true, instructions to ***administration officials*** to acquire products or services from a state-owned entity, but not to BNA, provide no "reason to think" that the Republic exercises day-to-day control over BNA.

**3. ENARSA.** Regarding ENARSA, Plaintiffs recycle the same allegations insufficient to show alter-ego status in 2011 and identify nothing that makes the answer to "the question today" any different. Plaintiffs claim that ENARSA was "founded to serve as 'an energy policy tool' to facilitate the Republic's 'direct involvement in the oil and gas industry.'" (Ltr. at 7.) Plaintiffs in *NML Capital* made the same claim. *See NML Cap.*, 2011 WL 524433, at *2 (ENARSA not an alter ego where plaintiffs claimed "ENARSA was established to give the state control over the energy industry in Argentina" and "the Ministry of Planning dictates the quantity, price of purchase, and price of sale for [its] natural gas transactions").

According to Plaintiffs, allegations that the Republic "directed ENARSA to purchase LNG from Petrobras," "instructed ENARSA to sell LNG at below-market prices and issue a Request for Proposal to LNG suppliers to meet recent shortages," and "requires ENARSA to maintain a stand-by letter of credit in favor of YPF Bolivia to guarantee volumes of natural gas" are sufficient to justify discovery. (Ltr. 7.) This is wrong: again, nearly identical allegations were insufficient in 2011. *See NML Cap.*, 2011 WL 524433, at *2 (rejecting arguments that ENARSA was an alter ego because it was required to "sell gas purchased from Bolivian sources to Argentine consumers at half the purchase price"; "transport natural gas from the border between Argentina and Bolivia through certain Argentine provinces via a pipeline whose construction is funded by the Argentine government"; and "sign a contract for the delivery of natural gas" with a Bolivian

The Honorable Loretta A. Preska                                                              -7-

company); *see also Gater Assets*, 2 F.4th at 56 (government "sett[ing] the rates that [company] may charge customers for gas" is not alter-ego evidence).

Plaintiffs also assert that the government provides ENARSA with "subsidies." (Ltr. 7.) Again, this exact allegation was rejected as evidence of alter ego status in *NML Capital*. 2011 WL 524433, at *3 (rejecting argument that ENARSA is an alter ego because "[t]he Argentine government provides billions of pesos in subsidies to ENARSA"). Likewise, Plaintiffs claim that ENARSA is an alter ego because the Republic "placed [it] in charge of the construction of the Nestor Kirchner Gas Pipeline" and "gave ENARSA oversight authority over hydroelectric concessionaires." (Ltr. 7–8.) Such "oversight" roles do not make ENARSA an alter ego. *See NML Cap.*, 2011 WL 524433, at *3, 7 (rejecting alter-ego allegations that "[t]he Argentine government also operates major public works contracts through ENARSA for which government funds are used . . . [and] also provides several concessions to ENARSA for no compensation").

Last, Plaintiffs point to the unremarkable fact that the Republic, as a shareholder, is involved in the appointment of ENARSA's president. Even if the Republic appointed ENARSA's president directly, which is not the case,[7] this is not evidence of an alter-ego relationship. *See EM Ltd.*, 800 F.3d at 92–93 (hiring of officers is merely "an exercise of power incidental to ownership"). Taken together, Plaintiffs' allegations present no "reason to think" that the "Republic managed the day-to-day business of ENARSA or disposed of the funds of ENARSA in any abnormal manner or in any way designed to treat such funds as funds of the Republic." *NML Cap.*, 2011 WL 524433, at *7.

**4. ARSAT.** Regarding ARSAT, Plaintiffs again fail to provide any "reason to think" ARSAT is an alter ego of the Republic. Plaintiffs note that the Republic "initiated the acquisition of equipment to expand the cybersecurity and storage capacity of ARSAT's national data center." (Ltr. 8.) Oversight of major initiatives "does not exceed the normal supervisory control one would expect from a sole shareholder." *UAB Skyroad*, 2021 WL 254106, at *7; *see Seijas*, 2009 WL 10700009, at *2 (fact that Republic "approv[es]" large investments of Aerolíneas did not make Aerolíneas an alter ego).

---

[7] *See* Pls.' Ex. 34 (noting ENARSA's shareholders officially appointed the new president); *see also* Pls.' Ex. 36 (same).

The Honorable Loretta A. Preska                                                               -8-

Plaintiffs also allege that for two years between 2018 and 2020, the Republic "ignored corporate formalities in paying for more than half of ARSAT's services with sovereign bonds" and "without appropriate invoicing." (Ltr. 8.) But the Republic regularly uses sovereign bonds to pay creditors, and Plaintiffs' own source notes that the invoicing "has now been remedied." (Pls.' Ex. 46 at 9.) None of this bears on the alter-ego inquiry at all, much less in the present day.

Plaintiffs' only other proffered showing for ARSAT concerns the appointment of ARSAT's president at shareholder meetings, *see* Pls.' Ex. 43, the Republic's approval of ARSAT's budget, and the existence of an "investigation" into a former president of ARSAT. As with the other entities, none of these allegations provides a "reason to think" there is an alter ego relationship with the Republic. *See EM Ltd.*, 800 F.3d at 92–93 (hiring of officers is "not synonymous with control over the instrumentality's day-to-day operations"); *NML Cap.*, 2011 WL 524433, at *3, 7 (budgetary approval does not show alter-ego relationship).

In sum, Plaintiffs have had multiple opportunities to present a basis for their contention—a "reason to think"—that any of these four entities previously found *not* to be alter egos, may now be an alter-ego of the Republic. But nothing in Plaintiffs' letter alters the fact that "essentially all of the information [Plaintiffs'] proffer has already been found insufficient to show alter ego status." (Sept. 3 Tr. 75:8-11.) Because Plaintiffs have made no showing of new information relevant to the alter ego status of these entities, their request for discovery should be denied.

## II. Plaintiffs Have Not Justified Their Request To Add Additional Document Custodians.

***1. Eduardo de Pedro.*** Plaintiffs try to justify their inclusion of Mr. de Pedro, who was Minister of the Interior from December 2019 to December 2023, as a custodian by arguing that (i) Mr. de Pedro was involved in several "major infrastructure projects" in Argentina and (ii) Mr. de Pedro is "a recognized leader of the political movement La Cámpora." (Pls.' Ltr. 9.) Neither of these allegations suggests that Mr. de Pedro is likely to have relevant information regarding Plaintiffs' alter ego inquiries with respect to YPF.

*First*, Mr. de Pedro's "engagement" in or "approval" of large-scale infrastructure projects—including the construction of a natural gas pipeline and an LNG plant—has nothing to do with "significant and repeated control" over YPF's "day-to-day operations." *Gater Assets*, 2 F.4th at 61. Plaintiffs also assert that Mr. de Pedro made "comments" in 2023 that he "had explored government

The Honorable Loretta A. Preska                                                                      -9-

cooperation with private sector entities—including YPF—in each of the Provinces." (Ltr. 9.) As Minister of the Interior, one of Mr. de Pedro's key duties was designing and implementing policies related to the provinces. It is therefore unsurprising that he might have had discussions with the provinces related to "strategic works that create employment and strengthen the productive matrix." (Pls.' Ex. 48 at 2.) Such discussions are a matter of government policy, not day-to-day control.[8] Indeed, the fact that Plaintiffs' argument is based on a former government Minister engaging in political discussions only highlights the lack of basis for their discovery demands.

*Second*, the fact that Mr. de Pedro is a member of a particular political party or "movement" is also irrelevant to the alter-ego inquiry, particularly since this political party has not been in power since December 2023. Plaintiffs' "evidence" related to Mr. de Pedro includes a lengthy article describing his "low profile" style and personal journey into politics—none of which is remotely relevant. (*See* Pls.' Ex. 52.) Plaintiffs also claim that "in 2023 YPF recorded a $1.8 billion impairment that media reports have attributed to a manipulation of YPF's finances" and that this "impairment corrected an accounting overvaluation that had enabled YPF to avoid disposing of mature fields that provided substantial employment in Santa Cruz—the home Province of both the Kirchner family and YPF's then-president." (Ltr. 9.) Plaintiffs grossly mischaracterize this article, which discusses an impairment related to YPF "divesting from more than 50 mature conventional blocks," but does not mention Mr. de Pedro or any "manipulation." (*Petersen* ECF No. 584-7 at 2.)

**2. *Matías Tombolini.*** Mr. Tombolini was Secretary of Commerce from August 2022 to December 2023. Plaintiffs allege that "in practice," Mr. Tombolini's duties "included the direct management of YPF prices," citing an article announcing the *Precios Justos* or "Fair Prices" program. (Ltr. 10.) However, Plaintiffs fail to mention that the article says that this program involved voluntary undertakings by multiple companies seeking to stabilize the prices of products in areas such as food, personal hygiene, and cleaning products. (*See* Pls.' Ex. 54 at 3 (stating that the program was "a voluntary price agreement for family shopping basket products" and that "[i]n keeping with that effort, fuel prices with the main companies operating in the market," including YPF, Shell, Axion and Puma, "are now being added").) Such arrangements between private companies and the

---

[8]   Plaintiffs also continue to mischaracterize the evidence. For example, they allege that "the Milei administration" moved a planned LNG plant from Buenos Aires province to Río Negro, when in fact, the source Plaintiffs cite says that decision was made ***by YPF***. (Ltr 9.)

The Honorable Loretta A. Preska                                                                       -10-

government related to the price of key commodities is not alter-ego evidence. *Gater Assets*, 2 F.4th at 56 (government "sett[ing] the rates that [company] may charge customers for gas" is not alter-ego evidence). The fact that "other energy sector entities"—specifically, gas stations—"petitioned" Mr. Tombolini for "relief from the *Precios Justos* program" (Ltr. 10) has no bearing on the question of whether YPF is an alter ego of the Republic.

Plaintiffs also allege that "[i]n May 2023, YPF aggressively sold oil at a below-market price to counteract inflation, an objective set by the Republic." (Ltr. 10.) The cited article states that YPF—not the Republic—"sets the boundaries" for oil prices because it is "the most important player in the sector." (Pls.' Ex. 55 at 3.) The article makes no mention of Mr. Tombolini or the Secretary of Commerce.

**3.   Julio Vitobello.**   Finally, Plaintiffs claim that they are entitled to discovery from Mr. Vitobello, who served as General Secretary of the Presidency from December 2019 to December 2023, because his office allegedly "coordinated almost 200 flights for then-Vice President Cristina Kirchner" on "two aircraft owned by YPF," including "weekend getaways to Ms. Kirchner's home, unrelated to Ms. Kirchner's official duties." (Pls.' Ltr. 10.) Yet again, Plaintiffs mischaracterize the evidence. The cited article states that out of "almost 200 flights," **only four** were allegedly "made with YPF aircraft." (Pls.' Ex. 60 at 4.) In any event, even if the former Vice President may have taken flights on YPF aircraft, that is not evidence of "significant and repeated control" over YPF's "day-to-day operations," and provides no justification for adding Mr. Vitobello as a custodian. *Gater Assets*, 2 F.4th at 61.

Plaintiffs also allege that in January 2024, Mr. Vitobello "was named in a criminal complaint against Ms. Kirchner, along with former President Alberto Fernández, for fraud-related crimes associated with the misuse of the aircraft." (Pls.' Ltr. at 10.) However, the article cited by Plaintiffs in support of this allegation explains that the prosecution *closed this case* based on a "lack of merit." (Pls.' Ex. 60 at 3.) The article says that a prosecutor later sought to re-open the case (Pls.' Ex. 60 at 2), but Plaintiffs cite no evidence that this request was granted.

In sum, Plaintiffs have provided no substantial basis to add these three custodians to the 20 custodians whose documents and communications are already being searched related to Plaintiffs' alter ego inquiries regarding YPF and BCRA.

The Honorable Loretta A. Preska                                         -11-

                                                    Respectfully,

                                                  */s/Robert J. Giuffra, Jr.*
                                                  Robert J. Giuffra, Jr.

cc:    Counsel of Record (via ECF)