SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

October 11, 2024

Via ECF

The Honorable Loretta A. Preska,
 United States District Court for the Southern District of New York,
  500 Pearl Street,
   New York, NY  10007.

   Re: *Petersen Energía Inversora* v. *Argentine Republic*, 15-cv-2739;
    *Eton Park Capital Mgmt.* v. *Argentine Republic*, 16-cv-8569

Dear Judge Preska:

  On behalf of the Argentine Republic, I reply to Plaintiffs' October 2, 2024 letter.  (*Petersen* ECF No. 670.)  The Republic has produced thousands of documents in post-judgment discovery and is in the process of turning over records from its official repository for government communications (the "GDE") and emails between YPF or the BCRA and key Republic officials.  There is also a wealth of public information about how both entities operate, including, for example, YPF's annual reports and financial statements filed with the SEC and Argentine regulators and the BCRA's publications.  Plaintiffs have been unable to come up with *any* credible evidence that YPF or the BCRA are alter egos of the Republic.  Day-to-day control by the government is nowhere to be found.  The Court should reject Plaintiffs' latest efforts to needlessly burden the Republic by requiring production from internal government emails, officials' personal accounts, or four custodians beyond the 20 already in place.

### I. Internal Republic Communications Are Protected Under U.S. Law.

  Plaintiffs do not dispute that the U.S.-law deliberative process and executive privileges may apply to internal communications of senior Argentine officials.  Instead, Plaintiffs principally argue that the Republic has not yet followed

The Honorable Loretta A. Preska                                                                              -2-

the "procedures" to assert those privileges, including (1) for the deliberative process privilege, submitting statements by "a senior public official" that explain why the privilege applies to each document, and (2) for executive privilege, explaining how each document relates to presidential advice. (Ltr. at 2-3.) These arguments make the Republic's point. The Republic will make the required showings if ordered to search internal government files, but the Federal Rules protect against such a disproportionate burden that will yield little to no producible information. *See SEC v. Coinbase, Inc.*, Sept. 5, 2024 Hearing Tr. at 7:5–23, No. 23-4738 (S.D.N.Y. Sept. 5, 2024) (Failla, J.) (declining to order production of "purely intra-agency communications" "in recognition of the burdens" involved). Plaintiffs should review the documents now in production before asking for more.

Plaintiffs also assert that the requested documents are not deliberative to the extent they relate to "facts" about the Republic's relationship with YPF and the BCRA. (Ltr. at 3.). But factual material is protected where it is "inextricably intertwined with policy making recommendations so that [its] disclosure would compromise the confidentiality of deliberative information." *Lead Industries Ass'n, Inc.* v. *OSHA*, 610 F.2d 70, 85 (2d Cir. 1979) (cleaned up); *see also LatinoJustice PRLDEF* v. *Dep't of the Treasury*, 2024 WL 965653, at *6 (S.D.N.Y. Mar. 5, 2024) (Oetken, J.) (privilege applies to factual documents that "reflect[] an exercise of discretion and judgment calls"). Here, any factual material is likely to be "inextricably intertwined" with discussions of government policy and reflect "judgment calls" of Republic officials (for example, energy policy discussions within the Undersecretariat of Hydrocarbons or budgetary and financial policy discussions within the Secretariats of Finance and Treasury).

II.     **The Documents at Issue Are Also Protected Under Argentine Law.**

*Internal Republic Communications.* Plaintiffs argue that they must see the Republic's "frank and unguarded" statements about YPF and the BCRA "that would not be reflected in communications" with them (Ltr. at 2), but this makes no sense. Internal discussions that are *not* communicated *to those entities* are not going to shed light on how the Republic interacts with them.

In any event, such internal statements are not available to the public under Argentine law. Plaintiffs respond that "the Federal Rules of Civil Procedure, not Argentine law, govern discovery in this Court" but that if the Court considers Argentine law, it should look to Argentine procedural rules (which supposedly allow disclosure of internal government communications) rather than Argentine substantive law (which does not). (Ltr. at 4.) Plaintiffs are correct that U.S.

The Honorable Loretta A. Preska                                                                -3-

*procedural* rules govern these proceedings, Fed. R. Civ. P. 69(a)(2), but get the consequence backwards.  The Federal Rules *override* Argentine procedure, which Plaintiffs wrongly invoke, while leaving intact Argentine *substantive* Law No. 27,275 regarding access to government documents.  *See Karaha Bodas Co., LLC* v. *Pertamina*, 313 F.3d 70, 83, 87 (2d Cir. 2002) (applying Indonesian substantive law and federal procedural rules).

Plaintiffs are also wrong about what Argentine substantive law says.  In 2023—two years after the resolutions cited by Plaintiffs—the Public Information Access Agency issued Resolution 130/2023, which rejected a public information request for an official's emails under Law No. 27,275 and concluded that government emails "received or sent through institutional inboxes" "deserve the highest level of protection, as established by the Argentine Constitution," which protects an individual's right to privacy. (Ivanega II Ex. A at 5.) Plaintiffs' expert Professor Bianchi also asserts that the protection in Decree 780/2024 for "working papers" and "preparatory deliberations" does not apply to internal emails, only "official administrative act[s]," (Bianchi ¶ 48) but this is incorrect.  The decree states that it applies to "any record that has been generated, that is controlled or that is kept within the framework of government activity", with no exclusion for email or limitation to "administrative acts."  (Ivanega II ¶ 22.)  As for their contention that communications concerning the financial or banking system are not protected "from court-ordered disclosure" (Ltr. at 4), Plaintiffs again refer to Argentine procedural rules regarding the authority of *Argentine* courts to order disclosure, which have no application to the present dispute.  (Ivanega II ¶ 25.)

***Communications from Personal Devices and Accounts.*** Professor Bianchi claims that Public Information Access Agency Resolutions 237/2021 and 250/2021 provide that "[e]-mails and messages sent or received by public officials by WhatsApp, Signal or Telegram are 'public information' under Argentine law." (Bianchi § II.)  These resolutions say no such thing.  Both address requests for emails *from official government accounts*, not personal accounts.[1]  Even worse, the excerpt Professor Bianchi highlights—supposedly showing that officials' WhatsApp, Signal, and Telegram messages are "public" under Argentine law—merely reprints, without endorsing, a statement of United Kingdom law. (Bianchi ¶¶ 13-14.)  The

---

[1] *See* Bianchi Ex. B at 1 (requesting "emails sent from the emails cavizzotti@msal.gov.ar and mmonsalvo@msal.gov.ar to the directors/authorities of AstraZeneca UK Limited"); Ex. C at 2 (requesting "email that has been sent or received from the address cavizzotti@msal.gov.ar").

The Honorable Loretta A. Preska                                                                         -4-

fact that these resolutions are addressed only to official government email emphasizes that other sources are *not* available under Argentine law.

*Comity.* Finally, Plaintiffs argue that under a comity analysis, Argentine substantive law should be entitled *no weight at all*. (Ltr. at 5.) This is wrong. The Second Circuit considers seven factors in a comity analysis (Plaintiffs only purport to address two, competing sovereign interests and hardship), all of which militate against discovery.[2] In Plaintiffs' main authority, *Reino de España* v. *American Bureau of Shipping*, the United States had a heightened interest because Spain had brought "billion-dollar claims against American defendants." 2005 WL 1813017, at *4–6 (S.D.N.Y. Aug. 1, 2005) (Ellis, M.J.). Here, *the Republic* has a heightened interest in upholding its public information laws. The "hardships" also favor the Republic; producing communications from personal accounts is not possible and, if attempted, could lead to criminal sanctions. (*See* Ivanega I § II.B.)

### III.     Discovery From the Proposed Additional Custodians Is Unwarranted.

Plaintiffs claim their proposed custodians "are likely to have 'unique, relevant and noncumulative evidence'", but have not pointed to any basis for this speculation. The idea that numerous senior officials from different administrations (for example, Sergio Massa and Luis Caputo) are all "central" to alleged alter-ego relationships with YPF and the BCRA (Ltr. at 7, 8) beggars belief. Plaintiffs should consider what is now being produced before speculating about the need for more.

*Sergio Massa.* Plaintiffs again mischaracterize Mr. Massa's alleged "involve[ment] in YPF's operations." (Ltr. at 8.) For example, Mr. Massa did not "announc[e]" anything "through YPF's official X account"; the post at issue *by YPF* merely reports Mr. Massa's attendance at a YPF anniversary celebration. (Harris Decl. Ex. 4 at 1.) Plaintiffs also assert that Mr. Massa discussed "YPF's LNG export project" on an earnings call, but the transcript shows that Mr. Massa said nothing. (*See* Harris Decl. Ex. 3.) With respect to the BCRA, Plaintiffs claim that Mr. Massa's appointment of a BCRA Vice-President shows his "interven[tion] in the day-to-day operations of BCRA," (Ltr. at 8) but as the Second Circuit has made clear, appointment or removal of directors "does not render the instrumentality an

---

[2]   These are: (1) the importance of the information; (2) the specificity of the request; (3) where the information originated; (4) alternative means of securing the information; (5) competing sovereign interests; (6) the hardship of compliance; and (7) the good faith of the party resisting discovery. *Owen* v. *Elastos Found.*, 343 F.R.D. 268, 282 (S.D.N.Y. 2023) (Moses, M.J.).

The Honorable Loretta A. Preska                                                                                  -5-

alter ego of the state." *Seijas* v. *Republic of Argentina*, 502 F. App'x 19, 21 (2d Cir. 2012). As for Mr. Massa's alleged "order" that the BCRA "intervene in the financial dollar market," (Ltr. at 8), this is typical coordination between a government and the central bank. *See EM Ltd.* v. *BCRA*, 800 F.3d 78, 94 (2d Cir. 2015) ("[G]overnments and central banks . . . often consult and coordinate their actions with respect to monetary policy.").

**Luis Caputo.** Plaintiffs cite to Mr. Caputo's attendance at a June 18, 2024 meeting with YPF (Ltr. at 8), but the report they cite shows this was actually an advocacy effort by YPF that was one among similar efforts by companies such as Shell and Chevron. (*See* Decree 1172/2003, Annex III (reporting requirements)). Forced to admit that the article they cite regarding YPF's planned LNG plant "does not mention Mr. Caputo," Plaintiffs point to Mr. Caputo's meetings with legislators to "garner[] support" for a budget bill. (Ltr. at 9.) But meeting with legislators is a quintessential ministerial role, not evidence of control over third parties. As for BCRA, Plaintiffs say Mr. Caputo and BCRA Governor Santiago Bausili are "close[] friends," (Ltr. at 9), which is irrelevant to the alter-ego inquiry. Likewise, Mr. Caputo's announcements of high-level policy decisions about "strengthen[ing] the peso" (Ltr. at 9), show normal coordination between a government and central bank, not day-to-day control. The same is true of Mr. Caputo's reported assistance in obtaining a loan to "strengthen" BCRA reserves. *Id.*

**Santiago Caputo.** To justify their proposal to add Santiago Caputo—who Plaintiffs admit is not a government official—Plaintiffs point to (i) speculation that Santiago Caputo suggested a possible Supreme Court nominee for his nomination, and (ii) a statement from a former legislator that Santiago Caputo "has a lot of power and is doing a lot of damage." (Ltr. at 10.) Neither of these allegations is remotely related to YPF or BCRA. Plaintiffs have provided *zero* evidence that Santiago Caputo is involved in YPF or BCRA's "day-to-day operations," and instead insist that their "inference" is "eminently reasonable" in light of Santiago Caputo's role. (Ltr. at 10.) Such pure speculation cannot be grounds for allowing discovery.

**Guillermo Michel.** Plaintiffs continue to claim that the *Precios Justos* program somehow justifies Mr. Michel's inclusion as a proposed custodian. Plaintiffs acknowledge that the fuel pricing program "involve[d] other companies in addition to YPF," but claim that YPF led the discussions. (Ltr. at 10.) This assertion is baseless and, more important, is not relevant to the alter ego-inquiry. *See Gater Assets Ltd.* v. *AO Moldovagaz*, 2 F.4th 42, 56 (2d Cir. 2021) (government "ratemaking for companies . . . does not make those companies their alter egos").

The Honorable Loretta A. Preska                                                                -6-

                                                                  Respectfully,

                                                                  */s/ Robert J. Giuffra, Jr.*
                                                                  Robert J. Giuffra, Jr.

cc:     Counsel of Record (via ECF)