

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

November 6, 2024

**By ECF**
The Honorable Loretta A. Preska
United States District Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:   *Petersen Energia Inversora, S.A.U. v. Argentine Republic,*
             No. 15 Civ. 2739 (LAP)
           *Eton Park Capital Mgmt., L.P. v. Argentine Republic,*
             No. 16 Civ. 8569 (LAP)

Dear Judge Preska:

      Pursuant to 28 U.S.C. § 517, the United States of America ("the United States" or "Government"), by and through its attorney, Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this letter in the above-referenced actions. These related cases have been brought by plaintiffs, shareholders of YPF S.A. ("YPF"), against the Argentine Republic ("Argentina"), for breach of contract. ECF No. 366.[1] Plaintiffs have filed a motion for an injunction and turnover requesting that the Court order Argentina to turn over its 51% interest in the Class D shares of YPF, in partial satisfaction of the Court's judgment in these actions. ECF Nos. 555-556.

      The United States submits this Statement of Interest to reiterate its long-standing position that foreign sovereign property located abroad is not subject to execution in U.S. courts.[2] For the reasons outlined below, the plaintiffs' requested injunction and order requiring Argentina to turn over its sovereign property located in its own territory would violate well-established laws of sovereign immunity and should not be granted by the Court.

---

[1] References to ECF entries refer to the docket in Case No. 15 Civ. 2739.

[2] The Government respectfully refers the Court to its previous briefing on this point before the Supreme Court, *see* Br. for the United States as *Amicus Curiae* at 11-15, *Clearstream Banking S.A. v. Peterson,* Nos. 17-1529, 17-1534 (U.S. 2019), and before the Second Circuit, *see* Br. for the United States as *Amicus Curiae* at 2-5 & 16-29, *Levin v. Bank of New York Mellon*, 22-624 (2d Cir. Nov. 10, 2022). Both amicus briefs are attached to this letter.

## BACKGROUND[3]

### A. Historical Principles of Foreign Sovereign Immunity

"The doctrine of foreign sovereign immunity" originally "developed as a matter of common law." *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010); *see also United States v. Bankasi*, No. 20-3499, 2024 WL 4536795, at *4 (2d Cir. Oct. 22, 2024). For much of the Nation's history, principles adopted by the Executive Branch determined the immunity of foreign states in civil suits in courts of the United States. *See Republic of Mexico v. Hoffman*, 324 U.S. 30, 34-36 (1945). Until 1952, the Executive Branch adhered to the "absolute" theory of sovereign immunity, under which foreign states could not be sued without their consent, and foreign sovereign property was entirely shielded from judicial seizure. *See, e.g.*, *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 199 (2007). This policy changed in 1952 when the Executive Branch adopted the "restrictive" theory of foreign sovereign immunity, under which foreign states would be granted immunity from suit for their sovereign or public acts, but not for strictly commercial acts. *See Bankasi*, 2024 WL 4536795, at *4.

Before the enactment of the FSIA in 1976, foreign sovereign property, no matter where it was found, enjoyed complete execution immunity in U.S. courts. Even in cases where a foreign sovereign "consent[ed] to be sued," and where "a valid judgment ha[d] been entered," courts did not permit execution on the "property of a sovereign government." *Dexter & Carpenter v. Kunglig Jarnvagsstyrelsen*, 43 F.2d 705, 706-08 (2d Cir. 1930). That did not change after the Executive Branch adopted the restrictive theory of sovereign immunity in 1952: foreign sovereigns continued to have "complete immunity . . . from execution against their property" by judgment creditors. *Connecticut Bank of Com. v. Republic of Congo*, 309 F.3d 240, 252 (5th Cir. 2002); *see also* H.R. Rep. No. 1487, 94th Cong., 2d Sess. at 27 (1976) (prior to enactment of the FSIA, "property of foreign states [was] absolutely immune from execution"); *New York & Cuba Mail Steamship Co. v. Republic of Korea*, 132 F. Supp. 684, 685-86 (S.D.N.Y. 1955) (adhering to the State Department's "direct and unequivocal position" that the shift to the restrictive theory of sovereign immunity did not affect execution immunity).

### B. The FSIA and Execution Immunity

In 1976, Congress substantially "codif[ied] the restrictive theory of sovereign immunity," *Samantar*, 560 U.S. at 313, in the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. 1330, 1602 *et seq*. The FSIA governs foreign states' immunity from suit ("jurisdictional immunity"), as well as the immunity of foreign states' property in the United States from execution or attachment ("execution immunity"). With respect to execution immunity, the FSIA provides that "the property in the United States of a foreign state" is "immune from attachment arrest and execution except as provided in sections 1610 and 1611." 28 U.S.C. § 1609. The principal exceptions in Section 1610 specify that "property in the United States" belonging to a foreign state

---

[3] The Government respectfully refers the Court to the parties' briefing concerning the factual and procedural background of these cases.

or its agency or instrumentality "shall not be immune" from execution under specified circumstances. *Id.* § 1610(a), (b).

When it enacted the FSIA, Congress specifically noted "the traditional view in the United States concerning execution has been that the property of foreign states is absolutely immune from execution." H.R. Rep. No. 94-1487 at 27 (citing *Dexter & Carpenter*, 43 F.2d 705)). The FSIA modified this rule by only "partially lowering the barrier of immunity from execution," *id.*, by providing for carefully limited exceptions to execution immunity, solely for property in the United States, at Sections 1610(a) and (b).

## DISCUSSION

At the outset, the Government is mindful that this Court has previously addressed whether Argentina's state-owned property is immune from execution by virtue of being located outside of the United States in *Bainbridge Fund Ltd. v. Republic of Argentina*, 690 F. Supp. 3d 411, 420 (S.D.N.Y. 2023) ("*Bainbridge*"). However, the Government respectfully notes that the Court's decision in *Bainbridge* was reached without the benefit of the Government's views as outlined in this submission.[4]

### I. The FSIA Did Not Abrogate Common Law Principles of Sovereign Immunity from Execution With Respect to Foreign Sovereign Property Located Outside of the United States

Outside of the context of foreign state property located in the United States, the FSIA did not otherwise abrogate common law principles concerning execution immunity of foreign state property located abroad. In the FSIA, Congress provided for certain limited exceptions to the then-existing rule of execution immunity for all foreign sovereign property. *See* 28 U.S.C. §§ 1609-1610. Those exceptions apply specifically to "property in the United States of a foreign state." 28 U.S.C. § 1609, *id.* § 1610(a). Far from abrogating immunity from execution for foreign state property held abroad, the FSIA contains carefully crafted and limited exceptions to immunity from execution that "extend[] *at most* to property located 'in the United States.'" *Elliott Assocs., L.P. v. Banco De La Nacion*, No. 96 Civ. 7916 (RWS), 2000 WL 1449862, at *3 (S.D.N.Y. Sept. 29, 2000) (emphasis added) (citing 28 U.S.C. §§ 1610(a), (b)).

In enacting the FSIA, Congress "did not intend to reverse completely the historical and international antipathy to executing against a foreign state's property even in cases where a judgment could be had on the merits." *Connecticut Bank of Com.*, 309 F.3d at 252 (citing *De Letelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir. 1984)). The FSIA "for the most part embodies basic principles of international law long followed both in the United States and elsewhere." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S.

---

[4] The Government also submits that the Court is not bound to follow its previous decision in *Bainbridge*. In the Second Circuit, even where a prior decision is made in the same case, "[t]he law of the case doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). Here, of course, *Bainbridge* is a different case.

Page 4

170, 179 (2017) (citing *Schooner Exchange v. McFaddon*, 11 U.S. 116, 136-37 (1812)). Indeed, the FSIA was enacted against the backdrop of then-established principles of foreign sovereign immunity. *See id.* at 181 (the FSIA was drafted to "conform fairly closely" to "accepted international standards" in order to "diminish the likelihood that other nations would each go their own way, thereby subjecting the United States abroad to more claims than we permit in this country" (cleaned up)); *see also* H.R. Rep. No. 94-1487 at 23, 25 (citing the 1972 European Convention on State Immunity). As the Second Circuit explained in *De Letelier*:

> Congress passed the FSIA on the background of the views of sovereignty expressed in the 1945 charter of the United Nations and the 1972 enactment of the European Convention [on State Immunity], which left the availability of execution totally up to the debtor state, and its own understanding as the legislative history demonstrates, that prior to 1976 property of foreign states was absolutely immune from execution. It is plain then that Congress planned to and did lift execution immunity "in part." Yet, since it was not Congress' purpose to lift execution immunity wholly and completely, a right without a remedy does exist . . .

748 F.2d at 799.[5]

Given the context of international law and "the traditional view in the United States … that the property of foreign states is absolutely immune from execution," H.R. Rep. No. 94-1487 at 27, it would not be logical to conclude that Congress, in enacting the FSIA, meticulously delineated the circumstances under which execution on foreign-state-owned assets in the United States would be allowed, but, through its silence, abandoned all such limits for assets located abroad. *See F. Hoffman-La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 164 (2004) (courts "ordinarily construe[] ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations").

Congress is also "understood to legislate against a background of common-law . . . principles," *Astoria Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991), and to abrogate those principles, "the statute must speak directly to the question addressed by the common law," *United States v. Texas*, 507 U.S. 529, 534 (1993) (internal quotation omitted). The FSIA contains no such clear statement with respect to foreign-state property located abroad. To the contrary, "[t]he FSIA did not purport to authorize execution against a foreign sovereign's property, or that of its instrumentality, wherever that property is located around the world." *Autotech Techs. LP v. Integral Rsch. & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007). "[S]ome hint from Congress" would be necessary for a court to "adopt[ ] such a breathtaking assertion of extraterritorial jurisdiction." *Id.*; *cf. Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 215 (2018) ("Out of respect

---

[5] The 1972 European Convention on State Immunity explicitly provides that "[n]o measures of execution or preventive measures against the property of a Contracting State may be taken [without its consent] in the territory of another Contracting State." European Convention on State Immunity, art. 23, ETS No. 74, https://rm.coe.int/16800730b1.

for the delicate balance that Congress struck in enacting the FSIA, we decline to read into the statute a blanket abrogation of attachment and execution immunity for § 1605A judgment holders absent a clearer indication of Congress' intent." (construing § 1610(g))). "Far from containing the 'plain statement' necessary to preclude" execution immunity for foreign sovereign assets located abroad, "the Act says not a word on the subject." *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 143 (2014).

As the Supreme Court has made clear, in instances where "a suit is not governed by the [FSIA], it may still be barred by foreign sovereign immunity under the common law." *Samantar*, 560 U.S. at 324. Simply put, the FSIA's exceptions to execution immunity do not apply to assets outside of the United States, and there is no indication that in enacting the FSIA, Congress intended to implement, *sub silentio*, a wholesale revocation of execution immunity for foreign sovereigns' property abroad that existed under the common law. Not only is that result inconsistent with the history of foreign sovereign immunity and the text and structure of the FSIA, it would lead to the anomaly of U.S. law providing greater immunity when a foreign state's property is located in this country—where the exceptions to execution immunity are quite limited, *see* 28 U.S.C. § 1610— than when the property is located abroad, including in the foreign state's own territory.

As outlined above, common law sovereign immunity principles that predate the FSIA continue to preclude execution by judgment creditors against foreign sovereign property outside the United States—including under state law. *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (federal common law, including in the area of "international disputes implicating the conflicting rights of States or [U.S.] relations with foreign nations," supersedes state law). Accordingly, to the extent New York's turnover statute, CPLR 5225, can be construed as applying to a foreign sovereign's property outside of the United States, such execution is barred by federal common law.

## II. New York's Turnover Statute Does Not Reach the Property of a Foreign Sovereign Located Abroad, Especially Property in That Sovereign's Own Territory

Separate and apart from the argument that application of New York's turnover statute to extraterritorial assets of a foreign sovereign is barred by federal common law, for reasons of prescriptive comity,[6] New York's turnover statute must be construed as not reaching the property of a foreign sovereign located outside of the United States, particularly foreign state property located in that sovereign's own territory.

---

[6] Prescriptive comity refers to "the respect sovereign nations afford each other by limiting the reach of their laws." *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005) (citation omitted). Prescriptive comity is distinct from "adjudicative comity," which "asks whether, where a statute might otherwise apply, a court should nonetheless abstain from exercising jurisdiction in deference to a foreign nation's courts that might be a more appropriate forum for adjudicating the matter." *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 100-01 (2d Cir. 2019). However, these two doctrines of international comity sometimes demand similar analysis. *Id.*

The Government is mindful that in *Bainbridge,* this Court determined that because New York's turnover statute, CPLR 5225, had extraterritorial reach it could be used to bring Argentina's property into the United States. *See* 690 F. Supp. 3d at 416 (citing *Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d 825 (N.Y. 2009)). However, the Court did not separately address whether it was appropriate under principles of international comity to apply New York's turnover statute to a foreign sovereign's property held outside of the United States.[7]

In *Koehler*, the New York Court of Appeals held that New York's turnover statute "ha[s] extraterritorial reach." 911 N.E.2d at 829. But the fact that CPLR 5225 applies extraterritorially does not end the inquiry. The Court must decide whether application of the turnover statute to foreign sovereign property is unreasonable under principles of prescriptive comity. *See* Restatement (Third) of Foreign Relations Law §§ 402, 403 (1987). This is because "even where the presumption against extraterritoriality does not apply, statutes should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles of international law." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815 (1993) (Scalia J., dissenting); *see also In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1047 (2d Cir. 1996) ("[I]nternational comity is a separate notion from the presumption against extraterritoriality . . . as a canon of construction, it might shorten the reach of a statute." (internal quotation marks and citation omitted)). "Under the Restatement, a nation [or state] having some 'basis' for jurisdiction to prescribe law should nonetheless refrain from exercising that jurisdiction 'with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable.'" *Hartford Fire*, 509 U.S. at 818 (quoting Restatement (Third) of Foreign Relations Law § 403(1)). "This rule of statutory construction cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws." *Empagran*, 542 U.S. at 164-65 (citing Justice Scalia's dissent in *Hartford Fire* with approval); *accord In Re: Vitamin C Antitrust Litig.*, 8 F.4th 136, 143 n.8 (2d Cir. 2021). Accordingly, the Court must apply these principles of prescriptive comity to determine whether to "shorten the reach" of New York's turnover statute. *See* Restatement (Third) of Foreign Relations Law § 402, comment k.[8]

As outlined below, interpreting New York's turnover statute to apply to a foreign sovereign's property located abroad does not comport with the reasonableness inquiry under Restatement (Third) of Foreign Relations Law § 403.

---

[7] The New York Court of Appeals has reinforced that its decision in *Koehler* did not abrogate long-standing common law rules that promote international comity in the context of CPLR article 52. *See Motorola Credit Corp. v. Standard Chartered Bank,* 21 N.E.3d 223, 229 (N.Y. 2014) ("By limiting the reach of a CPLR 5222 restraining notice in the foreign banking context, the separate entity rule promotes international comity and serves to avoid conflicts among competing legal systems.").

[8] "Exercise of jurisdiction by a State of the United States. Since international and other foreign relations law are the law of the United States, under the Supremacy Clause of the Constitution an exercise of jurisdiction by a State that contravenes the limitations of §§ 402 - 403 [of the Restatement] is invalid. . . . A contention that an exercise of jurisdiction by a State violates international or other foreign relations law raises a federal question."

*First,* the application of CPLR 5225 to foreign state property abroad conflicts with customary international law concerning the extent to which other nations allow for execution of foreign state property within their borders. *See, e.g.,* Restatement (Fourth) of Foreign Relations Law § 432 (2018) ("Under customary international law, a state may not exercise jurisdiction to enforce in the territory of another state without the consent of that other state."); European Convention on State Immunity, art. 23, ETS No. 74 ("No measures of execution or preventive measures against the property of a Contracting State may be taken [without its consent] in the territory of another Contracting State.").[9] This principle is codified in the FSIA, which provides absolute immunity for foreign state property in the United States where foreign, as opposed to domestic, courts seek to attach or execute on that property. *See, e.g., TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005) ("[O]nly a court of the United States (or of one of them) may attach the commercial property of a foreign nation located in the United States." (citing 28 U.S.C. §§ 1609, 1610(a)(6))); *accord Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru,* 665 F.3d 384, 390 (2d Cir. 2011) ("It is no doubt true that only a United States court may attach a [foreign state] defendant's particular assets located here."); *see also* 28 U.S.C. §§ 1609 (foreign state property in the United States is immune from attachment and execution except as provided in § 1610), 1610(a) (permitting attachment and execution of foreign state property in the United States used for a commercial activity "upon a judgment entered by a court of the United States or of a State"). Furthermore, the United States recognizes that this principle reflects a widely accepted rule of customary international law. *See United States v. Alaska*, 503 U.S. 569, 588 n.10 (1992) (accepting principle as customary international law based on government's representation that the United States recognized it as such). In light of this customary international law, New York's turnover statute should not be interpreted to reach foreign sovereign property located abroad.

*Second*, as evidenced by the parties' briefing in this matter, there is a high likelihood of conflict with the laws of foreign sovereigns if the turnover statute is interpreted to apply to foreign sovereign property in that sovereign's own territory. The fact that the New York turnover statute may reach the U.S.-based assets of a foreign sovereign, *Attestor Master Value Fund LP v. Argentina*, 113 F.4th 220, 234 (2d Cir. 2024),[10] does not mean that its application to foreign

---

[9] The United Nations Convention on the Jurisdictional Immunities of States and Their Property contains a similar prohibition on execution upon the property of a state, without that state's consent, "in connection with a proceeding before a court of another State," except if the relevant property "is in the territory of the State of the forum." Report of the Sixth Committee to the General Assembly, United Nations Convention on the Jurisdictional Immunities of States and Their Property, art. 19(c), U.N. Doc. A/59/508 (Nov. 30, 2004), https://treaties.un.org/doc/source/docs/A_59_508-E.pdf.

[10] In *Attestor Master Value Fund LP v. Argentina,* the Second Circuit held that the term "person," as used in CPLR 5225, included foreign sovereigns. 113 F.4th at 234. However, that decision dealt with Argentina's reversionary interests in collateral held by the New York Federal Reserve, *id.* at 227, and the Second Circuit's decision was premised, in part, on the lack of "authority indicating that New York has sought to bar foreign sovereigns from enforcing judgments in its courts or any plausible reason for doing so." *Id.* In contrast, the weight of customary international law, the

sovereign property abroad, let alone within the territory of that foreign sovereign, is reasonable. *See* Restatement (Third) of Foreign Relations Law § 403, comment c (reasonableness inquiry "may lead to different conclusions according to the subject of the regulation"). Indeed, the likelihood of conflicts with the laws of foreign sovereigns is at its zenith when the "subject" of the turnover statute is property of the foreign sovereign located within that sovereign's own territory. Accordingly, application of the New York turnover statute to foreign state property within that foreign state's own territory would "create[] a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs." *Empagran*, 542 U.S. at 165.

*Finally*, any decision that foreign state property located outside of the Court's jurisdiction is subject to turnover implicates important foreign policy interests of the United States with respect to reciprocity. If the Court determines that the turnover statute reaches foreign sovereign property located abroad, let alone foreign sovereign property in that sovereign's own territory, such an order could in turn put U.S. property at risk, given the potential for reciprocal adverse treatment of the United States in foreign courts. *See Philipp*, 592 U.S. at 184 (2021) (statutes affecting international relations are interpreted "to avoid, where possible, producing friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation" (internal quotation and citation omitted)); *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 841 (D.C. Cir. 1984) ("[S]ome foreign states base their sovereign immunity decisions on reciprocity."). Indeed, "[t]he judicial seizure of the property of a friendly state may be regarded as such an affront to its dignity and may . . . affect our relations with it." *Bankasi*, 2024 WL 4536795, at *6 (quoting *Hoffman*, 324 U.S. at 35-36). As such, this factor weighs heavily in favor of finding that New York's turnover statute does not reach foreign sovereign property abroad, and particularly sovereign property within a foreign state's own territory.

### III.   Application of New York's Turnover Statute Would Render the FSIA's Requirement that Foreign Sovereign Property Be Located in the United States a Nullity

The FSIA requires that a court make a threshold determination as to whether the property at issue is "property *in the United States* of a foreign state," 28 U.S.C. § 1610(a) (emphasis added), prior to determining whether such property is subject to the limited exceptions to immunity from execution. Utilizing the turnover procedures at CPLR 5225 to first bring foreign state property into the United States, and then subsequently determining whether that property is immune from execution, renders the FSIA's clear statutory prerequisite that foreign sovereign property be located in the United States a nullity.

Every decision of a court of appeals that has addressed the issue, apart from the Second Circuit's now-vacated opinion in *Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 91 (2d Cir. 2017), has treated the presence of foreign sovereign property in the United States as a prerequisite to execution in U.S. courts. *See Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 475 (7th Cir.

---

likelihood of conflicts with the laws of foreign sovereigns, and the potential for reciprocal adverse treatment of the United States in foreign courts, provide ample reason to shorten the reach of New York's turnover statute in this context.

Page 9

2016) (identifying as one of the "basic criteria" for attachment that the foreign sovereign property "must be within the territorial jurisdiction of the district court"), *aff'd*, 583 U.S. 202 (2018); *Peterson v. Islamic Republic Of Iran*, 627 F.3d 1117, 1131-32 (9th Cir. 2010) (foreign state property abroad is "not 'property in the United States' " and is therefore "immune from execution" (quoting 28 U.S.C. § 1610(a)(7))); *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012) ("[A] district court sitting in Manhattan does not have the power to attach Argentinian property in foreign countries."); *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) ("[P]roperty that is subject to attachment and execution must be property in the United States of a foreign state." (quotation marks omitted)); *Connecticut Bank of Commerce*, 309 F.3d at 247 (U.S. courts "may execute only against property that meets" specified criteria, including that the property be "'in the United States'" (quoting 28 U.S.C. § 1610(a)(1))); *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992) ("[S]ection 1610 does not empower United States courts to levy on assets located outside the United States.").

Even if application of New York's turnover statute to property of a foreign sovereign held abroad were not barred by federal common law or principles of prescriptive comity, application of that statute cannot be used as a judicial fiction to preempt the application of Section 1610(a)'s requirement that foreign state property must be located in the United States. The issue is not whether the FSIA "supersede[s] CPLR 5225 and prevent[s] the Court from ordering the Republic . . . to bring assets from outside of New York into New York," *Bainbridge*, 690 F. Supp. 3d at 416, but whether application of the turnover statute supersedes the FSIA's prerequisite that the foreign state property be located in the United States in the first instance. It cannot. If a court were able to utilize New York's turnover statute, or similar state laws, to first "bring" foreign sovereign property located abroad into the United States, the prerequisite that foreign sovereign property be located "in the United States" would be read completely out of Section 1610(a) of the FSIA.

\* \* \*

We thank the Court for its consideration of this submission.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: */s David Farber*
DAVID E. FARBER
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2772

CC: Counsel of record (by ECF)

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

LAUREN A. WETZLER
Deputy Director, Federal Programs Branch

JOSEPH E. BORSON
Assistant Branch Director, Federal Programs Branch

CORMAC EARLY
Trial Attorney
Civil Division, Federal Programs Branch
United States Department of Justice