Nos. 17-1529 and 17-1534

# In the Supreme Court of the United States

CLEARSTREAM BANKING S.A., PETITIONER

*v.*

DEBORAH D. PETERSON, ET AL.

BANK MARKAZI, AKA THE CENTRAL BANK OF IRAN,
PETITIONER

*v.*

DEBORAH PETERSON, ET AL.

*ON PETITIONS FOR WRITS OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

NOEL J. FRANCISCO
  *Solicitor General*
    *Counsel of Record*
JOSEPH H. HUNT
  *Assistant Attorney*
  *General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
MATTHEW GUARNIERI
  *Assistant to the Solicitor*
  *General*
SHARON SWINGLE
  *Attorney*

MARIK A. STRING
  *Deputy Assistant Secretary*
  *Department of State*
  *Washington, D.C. 20520*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**QUESTION PRESENTED**

Before the enactment of the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. 1330, 1602 *et seq.*, the property of a foreign state was absolutely immune from attachment and execution in U.S. courts. The FSIA modified that regime by providing that a foreign state's "property in the United States" is presumptively immune from attachment and execution, 28 U.S.C. 1609, subject to specific exceptions. The question presented is as follows:

Whether a foreign state's property outside the United States is subject to attachment and execution in United States courts.

(I)

**TABLE OF CONTENTS**

Page

Interest of the United States..................................................... 1
Statement ............................................................................. 2
Discussion ............................................................................ 10
    A.  The court of appeals' interlocutory decision is
        flawed.................................................................... 11
    B.  Further review is not warranted at this time.............. 15
Conclusion ........................................................................... 21

**TABLE OF AUTHORITIES**

Cases:

*Allied Maritime, Inc.* v. *Descatrade SA*, 620 F.3d 70
    (2d Cir. 2010) ................................................................ 18
*Autotech Techs. LP* v. *Integral Research & Dev.
    Corp.*, 499 F.3d 737 (7th Cir. 2007), cert. denied,
    552 U.S. 1231 (2008)....................................................... 14
*Bank Markazi* v. *Peterson*, 136 S. Ct. 1310 (2016) ............ 19
*Connecticut Bank of Commerce* v. *Republic of
    Congo*, 309 F.3d 240 (5th Cir. 2002) ................................ 13
*Gucci Am., Inc.* v. *Bank of China*, 768 F.3d 122
    (2d Cir. 2010) ................................................................ 17
*Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764
    (1993)............................................................................. 17
*Koehler* v. *Bank of Bermuda Ltd.*, 911 N.E.2d 825
    (N.Y. 2009)..............................................................8, 9, 16
*Motorola Credit Corp.* v. *Standard Chartered Bank*,
    21 N.E.3d 223 (N.Y. 2014).............................................. 18
*New York & Cuba Mail S.S. Co.* v. *Republic of
    Korea*, 132 F. Supp. 684 (S.D.N.Y. 1955) .................... 2, 11
*Permanent Mission of India to the United Nations*
    v. *City of New York*, 551 U.S. 193 (2007)..................... 2, 11

(III)

IV

Cases—Continued:                                              Page

*Persinger* v. *Islamic Republic of Iran*, 729 F.3d 835
    (D.C. Cir.), cert. denied, 469 U.S. 881 (1984) .................. 20

*Peterson* v. *Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) ............................................ 12

*Republic of Argentina* v. *NML Capital, Ltd.*,
    573 U.S. 134 (2014) ............................................. 8, 13, 14, 15

*Republic of Mexico* v. *Hoffman*, 324 U.S. 30 (1945) ........... 2

*Republic of Phillipines* v. *Pimental*, 553 U.S. 851
    (2008) ................................................................................. 12

*Rubin* v. *Islamic Republic of Iran*:
    637 F.3d 783 (7th Cir. 2011), cert. denied,
        567 U.S. 944 (2012) .................................................. 12
    830 F.3d 470 (7th Cir. 2016), aff'd, 138 S. Ct. 816
        (2018)............................................................................ 12
    138 S. Ct. 816 (2018) ........................................................ 5

*Samantar* v. *Yousuf*, 560 U.S. 305 (2010) ...................... 2, 14

*Société Nationale Industrielle Aérospatiale* v.
    *United States Dist. Court for the S. Dist. of Iowa*,
    482 U.S. 522 (1987) ........................................................... 17

*The Schooner Exch.* v. *McFaddon*,
    11 U.S. (7 Cranch) 116 (1812) ............................................ 2

*Verlinden B. V.* v. *Central Bank of Nigeria*,
    461 U.S. 480 (1983)............................................................. 2

*Weilamann* v. *Chase Manhattan Bank*,
    192 N.Y.S.2d 469 (Sup. Ct. 1959)....................................... 11

Statutes, regulation, and rule:

Foreign Sovereign Immunities Act of 1976,
    28 U.S.C. 1330, 1602 *et seq.* .................................................. 2
    28 U.S.C. 1604....................................................................... 3
    28 U.S.C. 1605(a)(2)............................................................ 12
    28 U.S.C. 1605(a)(7) (2006) ................................................. 3

V

Statues, regulation, and rule—Continued:        Page

28 U.S.C. 1605A .......................................................... 3
28 U.S.C. 1605A(a)(1) ................................................ 3
28 U.S.C. 1605A(a)(2)(A)(i)(I) .................................. 3
28 U.S.C. 1609 ..................................... 3, 8, 11, 15
28 U.S.C. 1609-1611 ................................................ 15
28 U.S.C. 1610 ...................................... 3, 5, 11
28 U.S.C. 1610(a) ...................................................... 11
28 U.S.C. 1610(a)(1) .................................................. 13
28 U.S.C. 1610(a)(2) .................................................. 12
28 U.S.C. 1610(a)(7) .............................................. 4, 13
28 U.S.C. 1610(b) ...................................................... 11
28 U.S.C. 1610(b)(3) .................................................. 4
28 U.S.C. 1610(g)(1) .................................................. 5
28 U.S.C. 1611 .......................................................... 11
28 U.S.C. 1611(a) ...................................................... 4
28 U.S.C. 1611(b)(1) .................................................. 4
National Defense Authorization Act for Fiscal Year
    2008, Pub. L. No. 110-181, Div. A, Tit. X,
    § 1083, 122 Stat. 338 .......................................... 3
Terrorism Risk Insurance Act of 2002,
    Pub. L. No. 107-297, 116 Stat. 2322 .................. 4
    § 201(a), 116 Stat. 2337 ...................................... 4
    § 201(d)(2), 116 Stat. 2339 .................................. 4
    § 201(d)(4), 116 Stat. 2340 .................................. 4
22 U.S.C. 8772 ........................................................ 19
N.Y. C.P.L.R. (McKinney 2014):
    § 5225 .................................................................. 8
    § 5225(a) .............................................................. 7
    § 5225(b) .............................................................. 7
Exec. Order No. 13,599, 3 C.F.R. 215 (2012 comp.) ............. 4
Fed. R. Civ. P. 69(a)(1) ............................................ 6

VI

Miscellaneous:                                                      Page

165 Cong. Rec. S4604 (daily ed. June 27, 2019) .................. 19

Damon Paul Nelson and Matthew Young Pollard
   Intelligence Authorization Act for Fiscal Years
   2018, 2019, and 2020, H.R. 3494, 116th Cong.,
   1st Sess. § 721(b) (July 17, 2019) ...................................... 20

Joseph Dellapenna, *Suing Foreign Governments
   and Their Corporations* (2d ed. 2003) ............................ 11

H.R. Rep. No. 1487, 94th Cong., 2d Sess. (1976) ............ 2, 11

National Defense Authorization Act for Fiscal Year
   2020, S. 1790, 116th Cong., 1st Sess.
   (June 27, 2019) .................................................................... 19

   § 6206(b) .......................................................................... 19

   § 6206 (b)(1) ..................................................................... 20

   § 6206 (b)(2)(C) ............................................................... 20

Charlie Savage, *Iran Wins Court Ruling in 9/11
   Lawsuit*, N.Y. Times, Mar. 29, 2019 ................................ 18

# In the Supreme Court of the United States

———————

No. 17-1529

CLEARSTREAM BANKING S.A., PETITIONER

*v.*

DEBORAH D. PETERSON, ET AL.

———————

No. 17-1534

BANK MARKAZI, AKA THE CENTRAL BANK OF IRAN,
PETITIONER

*v.*

DEBORAH PETERSON, ET AL.

———————

*ON PETITIONS FOR WRITS OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

———————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

———————

### INTEREST OF THE UNITED STATES

This brief is submitted in response to the Court's order inviting the Solicitor General to express the views of the United States in the above-captioned cases, which arise from the same judgment and present the same question concerning attachment of and execution against property of a foreign sovereign located outside the United States. In the view of the United States, the petitions for writs of certiorari should be denied.

(1)

2

**STATEMENT**

1. a. For much of the Nation's history, principles adopted by the Executive Branch determined the immunity of foreign states in civil suits in courts of the United States. See *Republic of Mexico* v. *Hoffman*, 324 U.S. 30, 34-36 (1945). Until 1952, the Executive Branch adhered to the "absolute" theory of sovereign immunity, under which foreign states could not be sued without their consent, and foreign sovereign property was entirely shielded from judicial seizure. See, *e.g.*, *Permanent Mission of India to the United Nations* v. *City of New York*, 551 U.S. 193, 199 (2007); *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U.S. 480, 486 (1983); see also *The Schooner Exch.* v. *McFaddon*, 11 U.S. (7 Cranch) 116, 144 (1812).

In 1952, the Executive Branch adopted the "restrictive" theory of foreign sovereign immunity, under which foreign states would be granted immunity from suit for their sovereign or public acts but not their private or commercial acts. *Permanent Mission of India*, 551 U.S. at 199 (citation omitted); see *Verlinden*, 461 U.S. at 487. Even after 1952, however, the "property of foreign states [remained] absolutely immune from execution." H.R. Rep. No. 1487, 94th Cong., 2d Sess. 27 (1976) (House Report); see, *e.g.*, *New York & Cuba Mail S.S. Co.* v. *Republic of Korea*, 132 F. Supp. 684, 685-686 (S.D.N.Y. 1955). Judgment creditors of a foreign state could look to the foreign state to satisfy the judgment but could not invoke the jurisdiction of U.S. courts to attach or execute against the state's property.

b. In 1976, Congress "codif[ied] the restrictive theory of sovereign immunity," *Samantar* v. *Yousuf*, 560 U.S. 305, 313 (2010), in the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. 1330, 1602 *et seq.* The

3

FSIA governs foreign states' immunity from suit ("jurisdictional immunity"), as well as the immunity of foreign states' property in the United States from execution or attachment ("execution immunity").

For jurisdictional immunity, the FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. 1604. Section 1605A, which is known as the "terrorism exception," abrogates foreign sovereign immunity for suits seeking money damages for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking," if the foreign state was designated "as a state sponsor of terrorism" by the Secretary of State "at the time the act  * * *  occurred" or "as a result of such act." 28 U.S.C. 1605A(a)(1) and (2)(A)(i)(I).[1]

For execution immunity, the FSIA provides that "the property in the United States of a foreign state" is "immune from attachment arrest and execution except as provided in sections 1610 and 1611." 28 U.S.C. 1609. Section 1610 contains two terrorism-related exceptions to execution immunity. The first exception provides that "[t]he property in the United States of a foreign state  * * *  used for a commercial activity in the United States, shall not be immune from" attachment or execution upon a judgment of a U.S. court, if "the judgment relates to a claim for which the foreign state is not immune" under the terrorism exception—*i.e.,* Section 1605A or its predecessor—"regardless of whether the property is or was involved with the act upon which the

---

[1] A prior version of this exception was codified at 28 U.S.C. 1605(a)(7) (2006); see National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, Div. A, Tit. X, § 1083, 122 Stat. 338.

4

claim is based." 28 U.S.C. 1610(a)(7). The second exception permits attachment of, and execution against, the "property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity," and does not require that the property itself have been used for commercial activity. 28 U.S.C. 1610(b)(3).

Finally, the FSIA identifies certain types of foreign sovereign property that are immune from attachment and execution "[n]otwithstanding the provisions of [S]ection 1610," including the property "of a foreign central bank or monetary authority held for its own account." 28 U.S.C. 1611(a) and (b)(1).

c. Two additional provisions regarding execution of terrorism-related judgments are relevant to this case.

The Terrorism Risk Insurance Act of 2002 (TRIA), Pub. L. No. 107-297, 116 Stat. 2322, provides that, "in every case in which a person has obtained a judgment * * * for which a terrorist party is not immune" under the FSIA's terrorism exception, "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment." § 201(a), 116 Stat. 2337; see § 201(d)(4), 116 Stat. 2340 (defining "terrorist party" to include state sponsors of terrorism). "Blocked assets" are assets that the United States has frozen or seized under certain sanctions regimes. See § 201(d)(2), 116 Stat. 2339. As relevant here, the President has blocked "[a]ll property and interests in property of the Government of Iran, including [Bank Markazi], that are in the United States, [or] that * * * come within the United States." Exec. Order No. 13,599, 3 C.F.R. 215 (2012 comp.).

5

The FSIA also permits a judgment creditor with a terrorism-related judgment against a foreign state to execute against the property of an agency or instrumentality of the foreign state, if that property otherwise comes within one of the exceptions to immunity in Section 1610. 28 U.S.C. 1610(g)(1); see *Rubin* v. *Islamic Republic of Iran*, 138 S. Ct. 816, 821-825 (2018).

2. In prior lawsuits, respondents—victims or representatives of victims—obtained default judgments totaling billions of dollars against Iran and Iran's Ministry of Intelligence and Security for Iran's complicity in the 1983 terrorist bombing of the U.S. Marine barracks in Beirut, Lebanon. Pet. App. 4a-5a.[2] Those judgments rested on the FSIA's terrorism exception. *Id.* at 5a. The validity of the prior judgments is not at issue here.

Respondents registered their judgments in the Southern District of New York and, in December 2013, initiated this proceeding against Bank Markazi, the central bank of Iran. Pet. App. 5a-6a, 78a-79a. The action concerns $1.68 billion in bond proceeds allegedly owned by Bank Markazi. *Id.* at 80a. Respondents also named as defendants three financial institutions alleged to have played a role in processing the bond proceeds: JPMorgan Chase Bank, N.A., a bank headquartered in New York; Clearstream Banking, S.A., a Luxembourg bank; and Banca UBAE, S.p.A., an Italian bank. *Id.* at 78a-79a.

Respondents allege that Bank Markazi was the beneficial owner of U.S.-dollar denominated bonds, which required bondholders to receive their interest and redemption payments in New York. Pet. App. 7a. Bank Markazi engaged Clearstream to receive those payments on its behalf. *Ibid.* Clearstream received the payments in an

_____

[2] All petition appendix citations are to the petition appendix in No. 17-1529.

6

account at JPMorgan Chase in New York. *Ibid.* Clearstream then made corresponding credits to an account it maintained in Bank Markazi's name in Luxembourg. *Ibid.* In January 2008, "apparently because of increasing scrutiny of Iranian financial transactions, [Bank] Markazi stopped processing its bond proceeds through Clearstream directly and instead began doing so through an intermediary bank: UBAE." *Ibid.*; see *id.* at 85a. Thus, Clearstream began crediting the bond proceeds to an account in UBAE's name in Luxembourg, for the ultimate benefit of Bank Markazi. *Id.* at 7a-8a.

"In June 2008, Clearstream notified UBAE that it had blocked [UBAE's account] and [had] transferred the balance of that account to a 'sundry blocked account.'" Pet. App. 8a (citation omitted); see C.A. J.A. 1365-1366 (letter from Clearstream to UBAE stating that "[i]f Clearstream processes transfers of cash and U.S. Persons are involved in such transactions, and if the transfer is for the beneficial ownership of an Iranian party, then Clearstream runs the risk of" violating U.S. sanctions). As of May 2013, Clearstream had credited the sundry blocked account with approximately $1.68 billion in bond proceeds. Pet. App. 86a.

Respondents seek to attach the $1.68 billion in assets reflected in the sundry blocked account and to execute on an unpaid portion of their prior judgments against those assets, which are located in Luxembourg. Pet. App. 12a-13a. In particular, respondents seek an order under New York law requiring JPMorgan Chase, Clearstream, UBAE, and Bank Markazi to turn over the bond proceeds. *Ibid.*; cf. Fed. R. Civ. P. 69(a)(1) ("The procedure on execution [of a judgment] * * * must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."). New York law

7

permits a judgment creditor to initiate a proceeding against a judgment debtor (or a third party in possession of the judgment debtor's assets), in which the court may order the judgment debtor (or third party) to turn over money or property in an amount sufficient to satisfy the unpaid judgment.   N.Y. C.P.L.R. § 5225(a) and (b) (McKinney 2014).

3.  In 2015, the district court dismissed the action.  Pet. App. 78a-105a.  The court determined that it "lack[ed] subject-matter jurisdiction" over the turnover claims against Bank Markazi on sovereign immunity grounds. *Id.* at 103a.  In the court's view, the bond proceeds at issue "are in Luxembourg," and "[t]he FSIA does not allow for attachment of property outside of the United States." *Ibid.*  The court also determined that the turn-over claims against Clearstream, UBAE, and JPMorgan Chase failed as "a matter of law" because there were "no asset[s] in [New York] to 'turn over.'" *Id.* at 94a; see *id.* at 102a, 104a.

4.  The court of appeals affirmed in part, vacated in part, and remanded.  Pet. App. 1a-63a.

a.  The court of appeals agreed with the district court that the assets that respondents seek to have turned over are located in Luxembourg.  Pet. App. 37a.  Respondents had argued that the bond proceeds were received into Clearstream's account at JPMorgan Chase in New York and remained there. *Ibid.*  The court explained, however, that the New York account was a "general pool of cash" that Clearstream used to serve multiple customers. *Id.* at 38a.  When it received the bond proceeds at issue, Clearstream "caused a corresponding credit to be reflected in the [Bank] Markazi, and later UBAE, account in Luxembourg as a right to

8

payment equivalent to the bond proceeds that Clearstream received and processed in New York." *Id.* at 41a. The court further explained that this "right to payment" was located in Luxembourg because Clearstream, the party obligated to make the payment, was located in Luxembourg. *Ibid.*

b. Nonetheless, the court of appeals determined that foreign sovereign immunity did not preclude the district court from ordering Clearstream to bring the disputed property from Luxembourg to New York. Pet. App. 44a-62a. That determination rested on the court of appeals' understanding of this Court's decision in *Republic of Argentina* v. *NML Capital, Ltd.*, 573 U.S. 134 (2014), and New York law—in particular, *Koehler* v. *Bank of Bermuda Ltd.*, 911 N.E.2d 825 (N.Y. 2009).

In *NML Capital*, this Court held that the FSIA does not "limit[] the scope of discovery available to a judgment creditor in a federal postjudgment execution proceeding against a foreign sovereign." 573 U.S. at 136. The Court reasoned that the FSIA is "*comprehensive*" and that "any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text," *id.* at 141-142, which does not contain a provision for immunity from discovery in aid of execution. The court of appeals understood *NML Capital* to dictate that foreign sovereign property outside the United States does not enjoy execution immunity in U.S. courts, because the FSIA's provision for execution immunity applies only to "property in the United States," 28 U.S.C. 1609, and the FSIA "supersede[d]" any immunity that sovereign property abroad may have enjoyed before enactment of the FSIA, Pet. App. 48a; see *id.* at 52a-53a.

The court of appeals also determined that the New York turnover statute, N.Y. C.P.L.R. § 5225 (McKinney

9

2014), permits a court to order a party over whom it has personal jurisdiction "to turn over out-of-state property." Pet. App. 52a (quoting *Koehler*, 911 N.E.2d at 831). In *Koehler*, the Court of Appeals of New York held that the turnover statute "ha[s] extraterritorial reach," 911 N.E.2d at 829, in the sense that the money or property to be turned over need not be located in New York. Instead, "the key to the reach of the turnover order is personal jurisdiction over a particular defendant." *Id.* at 830. On the facts before it, the *Koehler* court found that a New York court could order a bank over which it had personal jurisdiction to deliver stock certificates to New York from Bermuda, to be turned over to a judgment creditor. See *id.* at 827-828, 831.

The Second Circuit noted that *Koehler* did not involve foreign sovereign property, but the court of appeals did not view that distinction as significant in light of its earlier conclusion that the assets at issue here are not immune from attachment or execution. Pet. App. 52a. The court therefore concluded that "*NML Capital* and *Koehler*, when combined, * * * authorize a court sitting in New York with personal jurisdiction over a nonsovereign third party to recall to New York extraterritorial assets owned by a foreign sovereign." *Id.* at 54a.

c. The court of appeals indicated that any sovereign property ordered to be brought to the United States would be presumptively immune from execution under the FSIA once the property is in the United States, unless an exception applies. Pet. App. 59a. Thus, the court envisioned a "two-step process" of transferring the assets to the United States from Luxembourg and then "proceeding with a traditional FSIA analysis." *Id.* at 60a. The court also stated that the district court should consider, before ordering the assets to be brought to

10

New York, whether other "barrier[s]" exist to such a turnover order "for reasons of, *inter alia*, state law, federal law, [or] international comity." *Id.* at 58a (footnote omitted). The court of appeals also directed the district court to determine whether Clearstream is subject to personal jurisdiction in New York. *Ibid.*

## DISCUSSION

The United States strongly condemns the Iranian regime's complicity in the terrorist attack that gave rise to the judgments that respondents hold. That attack took the lives of 241 U.S. service members and wounded many others, making it one of the deadliest single days for United States Armed Forces in modern American history. The United States continues to support the efforts of victims of the attack to obtain lawful redress for the harms they and their families suffered.

In this case, the court of appeals concluded that a foreign sovereign's property outside the United States is subject to attachment and execution in U.S. courts. That conclusion likely would warrant this Court's review in an appropriate case at an appropriate time. In the decision below, however, the court of appeals identified several jurisdictional and other issues for the district court to address on remand, including whether principles of international comity would independently foreclose the turnover order sought by respondents. See Pet. App. 58a. The resolution of those other issues may bear on the practical significance of the decision below and the need for this Court's review in this particular case. In addition, both Houses of Congress have passed separate bills that, if either becomes law, could substantially affect the proper disposition of this case. Accordingly, the Court should deny the petitions for writs of certiorari at this time.

11

### A. The Court Of Appeals' Interlocutory Decision Is Flawed

1. Before the FSIA, foreign sovereign property had absolute immunity from attachment or execution in U.S. courts. Although the Executive Branch had adopted the "restrictive" theory of sovereign immunity in 1952—thus permitting a foreign sovereign to be sued for some commercial activities in the United States, see, *e.g.*, *Permanent Mission of India to the United Nations* v. *City of New York*, 551 U.S. 193, 199 (2007)—the foreign sovereign's *property* still enjoyed "absolute immunity from execution," Joseph Dellapenna, *Suing Foreign Governments and Their Corporations* 743 (2d ed. 2003); see pp. 2-3, *supra*; *New York & Cuba Mail S.S. Co.* v. *Republic of Korea*, 132 F. Supp. 684, 685-687 (S.D.N.Y. 1955) (following the State Department's "direct and unequivocal position" that the shift to the restrictive theory of sovereign immunity did not affect execution immunity); *Weilamann* v. *Chase Manhattan Bank*, 192 N.Y.S.2d 469, 472 (Sup. Ct. 1959) (similar).

When it enacted the FSIA, Congress only "partially lower[ed] the barrier of immunity from execution," House Report 27, by providing for carefully limited exceptions to execution immunity for property *in* the United States. Section 1609 prescribes a general rule of immunity from execution for "the property in the United States of a foreign state." 28 U.S.C. 1609. Section 1610, in turn, provides exceptions to execution immunity for "[t]he property in the United States of a foreign state * * * used for a commercial activity in the United States," and "any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States," subject to the additional limitations imposed by Section 1611. 28 U.S.C. 1610(a) and (b).

12

Those exceptions to execution immunity "are narrower than the exceptions to jurisdictional immunity." *Rubin* v. *Islamic Republic of Iran*, 637 F.3d 783, 796 (7th Cir. 2011), cert. denied, 567 U.S. 944 (2012). For example, the FSIA abrogates jurisdictional immunity for suits "based upon a commercial activity carried on in the United States by the foreign state," 28 U.S.C. 1605(a)(2), but the corresponding execution-immunity exception applies only to property that "is or was used for the commercial activity" in the United States, 28 U.S.C. 1610(a)(2). The statute thus contemplates that some judgment creditors will "have to rely on foreign states to voluntarily comply with U.S. court judgments," *Peterson* v. *Islamic Republic of Iran*, 627 F.3d 1117, 1128 (9th Cir. 2010), as was true before the FSIA. The narrower scope of the immunity exceptions reflects a judgment that authorizing execution against a sovereign's property is a greater intrusion on state sovereignty than merely exercising jurisdiction. See *Republic of Philippines* v. *Pimental*, 553 U.S. 851, 866 (2008) (discussing the "specific affront that could result" to a state from seizing its property "by the decree of a foreign court").

Accordingly, every court of appeals to have addressed the issue before the decision below had treated the presence of the disputed foreign sovereign property *in the United States* as a prerequisite to attachment or execution in U.S. courts. See *Rubin* v. *Islamic Republic of Iran*, 830 F.3d 470, 475 (7th Cir. 2016) (identifying as one of the "basic criteria" for attachment that the property "must be within the territorial jurisdiction of the district court"), aff'd, 138 S. Ct. 816 (2018); *Peterson*, 627 F.3d at 1131-1132 (concluding that foreign-state property located in France is "not 'property in the United

13

States'" and is therefore "immune from execution") (quoting 28 U.S.C. 1610(a)(7)); *Connecticut Bank of Commerce* v. *Republic of Congo*, 309 F.3d 240, 247 (5th Cir. 2002) (stating that U.S. courts "may execute only against property that meets" specified criteria, including that the property be "'in the United States'") (quoting 28 U.S.C. 1610(a)(1)).

2. The court of appeals concluded that this Court's decision in *Republic of Argentina* v. *NML Capital, Ltd.*, 573 U.S. 134 (2014), "vitiated" any prior consensus that foreign sovereign property outside the United States is not subject to attachment and execution in U.S. courts. Pet. App. 53a. *NML Capital*, however, presented the "single, narrow question" whether the FSIA limits the scope of post-judgment discovery in aid of execution "when the judgment debtor is a foreign state." 573 U.S. at 140. Argentina had argued that discovery of its assets outside the United States was inappropriate because those assets could not be subject to execution in U.S. courts. Pet. Br. at 28-29, *NML Capital*, *supra* (No. 12-842). This Court concluded that the FSIA does not speak to the scope of discovery and therefore that the usual rules governing discovery apply, rather than a special rule for foreign sovereigns. See *NML Capital*, 573 U.S. at 142.

In finding that the FSIA does not confer immunity from "discovery of information concerning extraterritorial assets," *NML Capital*, 573 U.S. at 145 n.4, the Court did not hold that such assets are subject to execution in U.S. courts. The Court instead appeared to view discovery as a means of uncovering the location of foreign sovereign property abroad in order to determine whether it might be "executable under the relevant jurisdiction's law." *Id.* at 144. That understanding

14

accords with the usual practice for seeking to enforce the judgment of a U.S. court in a foreign jurisdiction. See, *e.g.*, *Autotech Techs. LP* v. *Integral Research & Dev. Corp.*, 499 F.3d 737, 751 (7th Cir. 2007) ("If assets exist in another country, the person seeking to reach them must try to obtain recognition and enforcement of the U.S. judgment in the courts of that country."), cert. denied, 552 U.S. 1231 (2008).

The court of appeals focused on two other passages in *NML Capital*, neither of which compels the result the court reached. See Pet. App. 48a, 51a-53a. In the first passage, this Court observed that "any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall." *NML Capital*, 573 U.S. at 141-142. But that statement was made to explain why the FSIA itself should not be read to confer implicit immunity from discovery, given its express provisions for jurisdictional and execution immunity. See *id.* at 142-143. The Court has previously recognized, in a case involving official immunity, that "[e]ven if a suit is not governed by the [FSIA], it may still be barred by foreign sovereign immunity under the common law." *Samantar* v. *Yousuf*, 560 U.S. 305, 324 (2010).

In the second passage, the Court observed that, "even if" a foreign state's extraterritorial assets were immune from execution under pre-FSIA law, "then it would be obvious that the terms of [Section] 1609 execution immunity are narrower, since the text of that provision immunizes only foreign-state property '*in the United States*.'" *NML Capital*, 573 U.S. at 144. But that statement was made in response to the argument that "§ 1609 execution immunity implies coextensive discovery-in-aid-of-execution immunity." *Ibid.* The

15

Court reasoned that, because the FSIA itself, in Section 1609, does not establish immunity for foreign sovereign assets abroad, then neither does the FSIA itself confer immunity from discovery about those assets. The Court did not say that the FSIA abrogated whatever immunity from actual execution those assets would have enjoyed prior to enactment of the FSIA, nor that the FSIA forecloses whatever immunity from actual execution those assets now would enjoy independent of the FSIA. In context, moreover, a critical assumption of the Court's reasoning was that U.S. courts "generally lack authority * * * to execute against property in other countries." *Ibid.* No party appears to have raised the possibility that a U.S. court might leverage its exercise of personal jurisdiction over a litigant in the United States to require the litigant to bring foreign sovereign property to the United States for execution. The Court accordingly had no occasion to address that possibility.

3. Other than *NML Capital*, the court of appeals did not identify any basis for its conclusion that U.S. law provides greater immunity when a foreign state's property is located in this country than when the property is located abroad, including in the foreign state's own territory. It is unlikely that Congress, in providing for only limited inroads on execution immunity for certain foreign sovereign property in the United States, see 28 U.S.C. 1609-1611, intended to subject foreign sovereign property *abroad* to the kind of turnover order contemplated here.

**B. Further Review Is Not Warranted At This Time**

Although the court of appeals' decision is flawed, this Court's review is not warranted at this time for several reasons.

16

1. a.  The court of appeals identified several significant unresolved issues for the district court to address on remand, including threshold jurisdictional questions. See Pet. App. 58a, 63a.

*First*, the court of appeals directed the district court to determine whether Clearstream is subject to the district court's personal jurisdiction. Pet. App. 58a.  Personal jurisdiction is the linchpin under New York law for ordering a debtor or third-party garnishee to turn over out-of-state property.  See *id.* at 52a (discussing *Koehler* v. *Bank of Bermuda Ltd.*, 911 N.E.2d 825, 829-831 (N.Y. 2009)).  If Clearstream is not subject to personal jurisdiction in New York, then the district court cannot order it to turn over any property.  Such a finding could obviate any practical need to address execution immunity on the facts of this particular case.

*Second*, the court of appeals acknowledged that the FSIA's execution-immunity provisions may apply after foreign sovereign property is brought into the United States. Pet. App. 59a.  The court indicated that a "two-step process" should occur on remand, first "recalling the asset at issue" and then "proceeding with a traditional FSIA analysis." *Id.* at 60a.  Elsewhere, however, the court appeared to leave open the possibility that the district court can and should address the second step— whether the assets would be entitled to execution immunity in U.S. courts if brought to the United States— before ordering any turnover.  See *id.* at 63a (directing the district court to "determine whether any provision of * * * federal law prevents the court from recalling, or the plaintiffs from receiving, the asset[s]").

The two-step process contemplated by the court of appeals creates uncertainty about the import and effect of the decision below.  Petitioners argue that, under

17

state law, the property need not necessarily first be brought to the United States but could instead be transferred directly to the judgment creditor abroad. See Bank Markazi Pet. 17. If such an order were permissible under state law, the second step contemplated by the decision below would be inapplicable, and the FSIA's carefully crafted provisions for and exceptions to execution immunity would never come into play. And even if such an order were not permissible, ordering a foreign state's property to be transferred from abroad into the United States at step one could affect the legal status of the assets at step two; the decision below leaves unclear how the district court should account for that possibility. See Br. in Opp. 14; Bank Markazi Pet. 32 n.10. Those issues would need to be resolved by the district court on remand.

*Third*, the court of appeals invited the district court to consider whether principles of international comity should bar the contemplated turnover order. Pet. App. 58a. This Court has described international comity as "the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Société Nationale Industrielle Aérospatiale* v. *United States Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987). Among other things, principles of comity counsel special caution when there may be a "conflict between domestic and foreign law," such that a litigant faces the prospect of conflicting legal obligations. *Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764, 798 (1993) (citation omitted); cf. *Gucci Am., Inc.* v. *Bank of China*, 768 F.3d 122, 139 (2d Cir. 2010) (stating that a "comity analysis" is "appropriate before ordering a nonparty

18

foreign bank to freeze assets abroad in apparent con-travention of foreign law to which it is subject"). Here, Clearstream may face such a prospect because the as-sets that respondents seek to have turned over are also the subject of litigation in Luxembourg brought by U.S. victims of the 9/11 terrorist attacks and their families, who are also judgment creditors of Iran.[3]

*Fourth*, the court of appeals directed the district court to consider any potential "state law" barriers to a turno-ver order under the circumstances, and it noted that New York recognizes a limitation on turnover orders known as the "'separate entity' doctrine." Pet. App. 58a & n.22 (ci-tation omitted). Under that doctrine, "even when a bank garnishee with a New York branch is subject to personal jurisdiction, its other branches are to be treated as sepa-rate entities for certain purposes, particularly with re-spect to [N.Y. C.P.L.R.] article 62 prejudgment attach-ments and article 52 postjudgment restraining notices and turnover orders." *Motorola Credit Corp.* v. *Standard Chartered Bank*, 21 N.E.3d 223, 226 (N.Y. 2014). Thus, "a restraining notice or turnover order served on a New York branch will be effective for assets held in accounts at that branch but will have no impact on assets in other branches" outside of New York. *Ibid.*; see *id.* at 226 n.2 (explaining that the separate-entity doctrine generally operates to "prevent[] the restraint of assets held in for-eign branch accounts"); accord *Allied Maritime, Inc.* v. *Descatrade SA*, 620 F.3d 70, 74 (2d Cir. 2010). The appli-cation of that doctrine could stand as a state-law barrier to a turnover order here. Respondents initially sought a

---

[3] A Luxembourg court declined to enforce the 9/11 plaintiffs' judgments, but the litigation is ongoing. See Charlie Savage, *Iran Wins Court Ruling in 9/11 Lawsuit*, N.Y. Times, Mar. 29, 2019, at A10.

19

turnover order for assets they alleged to be held by a branch of JPMorgan Chase in New York, but the courts below determined that the assets are in fact located in an account maintained by Clearstream in Luxembourg. See Pet. App. 37a-44a.

b. The question presented would be better addressed, if necessary, after those issues are resolved on remand. Doing so would ensure that the question arises in a more concrete setting, in which a turnover order is not merely hypothetical. If, for example, the lower courts determine that principles of comity generally foreclose turnover orders like the one sought here, the practical import of the court of appeals' decision regarding foreign sovereign immunity may be significantly lessened. If, however, the lower courts ultimately order the restraint of the assets in Luxembourg, this Court will be able to consider the permissibility of such an order as a matter of both foreign sovereign immunity and comity. Either way, the Court's review of the immunity question could benefit from a full development of those issues in the lower courts.

2. This dispute is also the subject of pending legislation that may bear on the proper disposition of the case. Cf. *Bank Markazi* v. *Peterson*, 136 S. Ct. 1310, 1317 (2016). On June 27, 2019, the Senate passed the National Defense Authorization Act for Fiscal Year 2020, S. 1790, 116th Cong., 1st Sess. (June 27, 2019). See 165 Cong. Rec. S4604 (daily ed. June 27, 2019). Section 6206(b) of that bill would amend 22 U.S.C. 8772—the provision at issue in *Bank Markazi*, see 136 S. Ct. at 1318-1319—to state that, notwithstanding any other provision of law, certain financial assets that would be blocked under U.S. sanctions if they "were located in the United States" shall be subject to "an order directing that the asset[s] be brought to the State in which the

20

court is located  * * *  without regard to concerns relating to international comity." S. 1790, § 6206(b)(1). The bill would further direct that the financial assets subject to those amendments include the assets that are the subject of this case. S. 1790, § 6206(b)(2)(C). The House of Representatives has passed an identical proposal in a separate bill.  See Damon Paul Nelson and Mathew Young Pollard Intelligence Authorization Act for Fiscal Years 2018, 2019, and 2020, H.R. 3494, 116th Cong., 1st Sess., § 721(b) (July 17, 2019).

3. Finally, the decision below implicates important foreign-policy interests of the United States. The court of appeals determined that foreign sovereign property is unprotected by execution immunity in U.S. courts as long as the property is located outside the United States. If, after the resolution of the unresolved procedural and jurisdictional questions described above, the district court were to issue an order restraining foreign sovereign property located abroad, such an order could in turn put U.S. property at risk. "[S]ome foreign states base their sovereign immunity decisions on reciprocity." *Persinger* v. *Islamic Republic of Iran*, 729 F.3d 835, 841 (D.C. Cir.), cert. denied, 469 U.S. 881 (1984). In view of the full range of U.S. foreign-policy interests, the considered view of the United States is that this Court's review is, nevertheless, not warranted at this time.

21

**CONCLUSION**

The petitions for writs of certiorari should be denied.

Respectfully submitted.

NOEL J. FRANCISCO
*Solicitor General*
JOSEPH H. HUNT
*Assistant Attorney*
*General*
EDWIN S. KNEEDLER
*Deputy Solicitor General*
MATTHEW GUARNIERI
*Assistant to the Solicitor*
*General*
MARIK A. STRING
*Deputy Assistant Secretary*      SHARON SWINGLE
*Department of State*                *Attorney*

DECEMBER 2019