**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U.,<br><br>                        Plaintiffs,<br><br>      -against-<br><br>ARGENTINE REPUBLIC and YPF S.A.,<br><br>                        Defendants. | Case Nos.:<br><br>1:15-cv-02739-LAP<br>1:16-cv-08569-LAP |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P.,<br><br>                        Plaintiffs,<br><br>      -against-<br><br>ARGENTINE REPUBLIC and YPF S.A.,<br><br>                        Defendants. | |

## PLAINTIFFS' BRIEF REGARDING
## THE SECOND CIRCUIT'S DECISION IN *PETERSON*

CLEMENT & MURPHY, PLLC

Paul D. Clement
C. Harker Rhodes IV

KING & SPALDING LLP

Randy Mastro
Laura Harris
Reginald R. Smith

KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U.,*
*Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 2

I.    The Court entered judgment against the Republic, which chose not to pursue
      the stay of execution that the Court granted ...................................................... 2

II.   Plaintiffs sought turnover of Argentina's 51% shareholding in YPF and are
      pursuing post-judgment discovery to identify potentially executable assets .................... 3

      A.    The Republic avoids post-judgment discovery served over a year ago ..................4

      B.    YPF refuses to comply in earnest with Plaintiffs' discovery requests ....................8

III.  The Court orders briefing with respect to *Peterson* and grants Plaintiffs'
      request for clarification ............................................................................ 10

ARGUMENT ............................................................................................................ 11

I.    *Peterson* Narrowly Held That Courts Must Have Subject Matter Jurisdiction
      Over New Sovereign Parties Facing New Substantive Claims .......................... 11

II.   *Peterson* Has No Effect on Plaintiffs' Turnover Motion ................................. 12

III.  *Peterson* Does Not Support the Republic's, YPF's, or BNA's Objections to
      Producing Discovery .......................................................................... 15

      A.    Plaintiffs may obtain broad discovery in aid of execution of this Court's
            judgment, including alter-ego discovery .................................................15

      B.    *Peterson* does not support the Republic's discovery-related objections ...............17

      C.    *Peterson* does not support YPF's request for intervention and
            injunctive relief ..........................................................................17

      D.    The Court should compel YPF to produce alter-ego discovery ...........................23

      E.    The Court should compel BNA to produce discovery ..........................................24

CONCLUSION ........................................................................................................ 26

## TABLE OF AUTHORITIES

**Cases**

*Amduso v. Republic of Sudan*,
 288 F. Supp. 3d 90 (D.D.C. 2017) ........................................................... 16

*Aurelius Cap. Master, Ltd. v. Republic of Argentina*,
 589 F. App'x 16 (2d Cir. 2014) ............................................................... 16

*Bainbridge Fund Ltd. v. Republic of Argentina*,
 690 F. Supp. 3d 411 (S.D.N.Y. 2023) ...................................................... 13

*Bank of U.S. v. Halstead*,
 23 U.S. 51 (1825)...................................................................................... 15

*Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*,
 727 F.2d 274 (2d Cir. 1984) ..................................................................... 25

*Conn. Sav. Bank v. Obenauf*,
 758 A.2d 363 (Conn. App. Ct. 2000) ....................................................... 22

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
 932 F.3d 126 (3d Cir. 2019) ......................................... 14, 20, 21, 22, 24

*Eitzen Bulk A/S v. Bank of India*,
 827 F. Supp. 2d 234 (S.D.N.Y. 2011)....................................................... 25

*EM Ltd. v. Republic of Argentina*,
 695 F.3d 201 (2d Cir. 2012) ......................................................... 15, 16, 19

*Epperson v. Ent. Express, Inc.*,
 242 F.3d 100 (2d Cir. 2001) ............................................................... 21, 22

*First City, Texas-Houston, N.A. v. Rafidain Bank*,
 281 F.3d 48 (2d Cir. 2002) ......................................... 12, 14, 16, 24

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
 ("*Bancec*"), 462 U.S. 611 (1983) ............................................... *passim*

*Hercaire Int'l, Inc. v. Argentina*,
 821 F.2d 559 (11th Cir. 1987) .................................................................. 20

*Peacock v. Thomas*,
 516 U.S. 349 (1996)........................................................................ 21, 22, 23

*Petersen Energía Inversora S.A.U. v. Argentine Republic & YPF S.A.*,
 895 F.3d 194 (2d Cir. 2018) ................................................. 4, 14, 23

*Peterson v. Bank Markazi,*
121 F.4th 983 (2d Cir. 2024) ............................................................................... *passim*

*Republic of Argentina v. NML Cap., Ltd.,*
573 U.S. 134 (2014) ........................................................................... 15, 16, 19, 24

*Thai Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic,*
924 F. Supp. 2d 508 (S.D.N.Y. 2013) ............................................................... 24

*Tidewater Inv. SRL v. Bolivarian Republic of Venezuela,*
2023 WL 7182179 (D. Del. Nov. 1, 2023) ........................................................ 21

*U.S.I. Props. Corp. v. M.D. Constr. Co.,*
230 F.3d 489 (1st Cir. 2000) .............................................................................. 19

*Walters v. Indus. & Com. Bank of China, Ltd.,*
651 F.3d 280 (2d Cir. 2011) .................................................................. 13, 23, 24

**Statutes**

22 U.S.C. § 8772 ...................................................................................... 10, 11, 13, 20

28 U.S.C. § 1605(a)(1) ................................................................................................ 25

Conn. Gen. Stat. Ann. § 52-552h(b) ......................................................................... 22

**Rules**

CPLR § 5223 ............................................................................................................... 15

CPLR § 5225 .......................................................................................................... 12, 14

CPLR § 5225(b) .......................................................................................................... 13

Fed. R. Civ. P. 69(a)(1) .............................................................................................. 15

Fed. R. Civ. P. 69(a)(2) .............................................................................................. 15

**Other Authorities**

UCC § 8-112(e) ........................................................................................................... 14

## INTRODUCTION

The Second Circuit's recent decision in *Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024), does not govern any of the parties' pending motions here.  *Peterson* concerned the narrow issue whether a district court had jurisdiction to entertain a *substantive* legal claim against a foreign instrumentality that had never participated in the underlying proceedings, where the claim would hold that instrumentality *directly liable*.  No pending motion here seeks to do that, or even raises the prospect of that scenario.

First, *Peterson* does not affect Plaintiffs' turnover motion because the opinion did not change existing law on execution immunity or subject matter jurisdiction over the judgment-debtor—the subject of Plaintiffs' motion.

Second, *Peterson* does not support YPF's request for intervention and injunctive relief precluding Plaintiffs from seeking discovery concerning YPF's potential status as an alter ego of the Republic.  Plaintiffs' discovery requests do not seek to hold YPF directly liable for Argentina's judgment, nor do Plaintiffs anticipate that any future request for an alter-ego finding that Plaintiffs may submit to this Court would do so.  And Plaintiffs may not even pursue such a request before this Court.  It is entirely possible that discovery obtained under the supervision of this Court could reveal information to support enforcement proceedings *outside* the United States and, therefore, outside the purview of the Foreign Sovereign Immunities Act.  YPF's *res judicata* arguments are thus premature and meritless, and *Peterson* does not suggest otherwise.  Nor does *Peterson* affect this Court's prior jurisdictional holding with respect to YPF—which YPF has not contested (and cannot contest) on appeal.  Unlike the sovereign instrumentality in *Peterson*, YPF is not a new party facing new substantive claims over which this Court must find a new basis for jurisdiction.

Third, *Peterson* does not support YPF's, the Republic's, or Banco de la Nación Argentina's ("BNA") objections to Plaintiffs' post-judgment discovery efforts. *Peterson* did not involve discovery at all, let alone immunity questions concerning post-judgment discovery, the application of *Bancec*, or the types of discovery-related objections YPF, the Republic, and BNA have raised to delay compliance with this Court's directives. BNA, in particular, long ago abandoned any claim to jurisdictional immunity by never raising the defense in its responses and objections to Plaintiffs' subpoena, the parties' meet-and-confer sessions and written exchanges, or any written or oral correspondence with this Court.

Fourth, as the Court correctly concluded in its clarification order, *Peterson* has *no* effect on Plaintiffs' ability to pursue post-judgment discovery—alter-ego or otherwise—from the Republic or non-sovereign non-parties.

## FACTUAL BACKGROUND

I. **The Court entered judgment against the Republic, which chose not to pursue the stay of execution that the Court granted**

More than a year ago, this Court rendered its judgment in the years-long effort by Plaintiffs to obtain judicial relief for the breaches of YPF's Bylaws that denied Plaintiffs the "compensated exit" that the Bylaws promised. ECF 437 at 15; *see* ECF 498.[1] The Court granted Plaintiffs' motion for summary judgment as to liability against the Republic and granted YPF's motion for summary judgment of non-liability. ECF 437 at 63. It then held a trial as to damages against the Republic and awarded Plaintiffs more than $16 billion in damages plus post-judgment interest. ECF 498 at 3-4.

---

[1] "ECF" references are to the docket of *Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 1:15-cv-02739-LAP (S.D.N.Y.), unless otherwise indicated.

A few months later, the Court granted the Republic's motion to stay execution of the final judgment pending appeal without bond, provided Argentina pledged to Plaintiffs certain assets by December 3, 2023, and sought expedited review of its appeal "so as to avoid further delay." ECF 527 at 10. The Republic responded by creating delay, repeatedly seeking extensions of time to comply with the Court's directives and refusing to accept service of recognition actions in other jurisdictions or to consent to the recognition of this Court's judgment abroad. *See* ECF 533 at 2-3, 5; ECF 556 at 2 n.2. Argentina then chose not to avail itself of the stay that the Court had granted, failing to pledge any assets to Plaintiffs or expedite appellate review. *See* ECF 533 at 5-6. Instead, Argentina sought and obtained additional time to file its briefing on appeal, further slowing the appellate process. *See* 2d Cir. ECF 52, 55.[2] As a result, more than a year after this Court entered judgment in Plaintiffs' favor, the appeal remains pending.

## II.     Plaintiffs sought turnover of Argentina's 51% shareholding in YPF and are pursuing post-judgment discovery to identify potentially executable assets

To this day, the Republic refuses to engage on a potential consensual resolution to this long-running dispute. Plaintiffs have thus been left with no choice but to proceed with enforcement efforts. On April 22, 2024, Plaintiffs filed a Motion for Injunction and Turnover requesting that the Court order Argentina to turn over its 51% shareholding in YPF, in partial satisfaction of the Court's judgment. ECF 556. As Plaintiffs explained, this motion offers a straightforward way to facilitate concluding this case because the material facts are not in dispute, and the motion presents two narrow legal questions about execution immunity under the Foreign Sovereign Immunities Act ("FSIA"). *Id.* at 2-4.

---

[2] "2d Cir. ECF" references are to the docket of *Argentine Republic v. Petersen Energía Inversora, S.A.U.*, No. 23-07370 (2d Cir.).

Concurrently, Plaintiffs have also pursued post-judgment discovery to locate potentially executable assets to satisfy the judgment.  At no point during those efforts has the Republic raised any objection to this Court's subject matter jurisdiction, and for good reason: the Second Circuit long ago settled that question, as to both Argentina and YPF.  *See Petersen Energía Inversora S.A.U. v. Argentine Republic & YPF S.A.*, 895 F.3d 194, 205-11 (2d Cir. 2018).

A.      **The Republic avoids post-judgment discovery served over a year ago**

The Republic's evasive tactics have continued through post-judgment discovery. Plaintiffs served their First Post-Judgment Discovery Requests for Production on the Republic over a year ago, on October 16, 2023.  *See* ECF 539 at 1.  In response, the Republic sought to shield entire asset categories from discovery based on, *inter alia*, its self-serving, unilateral claim that the assets are absolutely immune from attachment under the FSIA or comity principles.  *Id*. After three months and eight meet-and-confer sessions, Plaintiffs requested intervention from the Court.  The Court noted that the Republic's production of only "145 documents since October, many of which are public, is not acceptable."  Mar. 18, 2024 Hr'g Tr. 27:7-9.  It thus ordered Argentina to substantially complete within one month its production of responsive documents relating to assets in Argentina or otherwise outside the United States, excluding diplomatic and military assets.  *See id.* at 31:22-32:4.  The Court also ordered the parties to "talk between [them]selves about diplomatic and military [assets]."  *Id*. at 32:5-6.

The Republic failed to comply with the Court's order.  Six months after Plaintiffs served their requests, Argentina continued to object at every turn, largely producing publicly available material to which Plaintiffs already had access and requesting an extension of the substantial-completion date.  *See* ECF 553 at 2.  By May 7, 2024, Argentina had produced only 925 documents, flatly refused to produce discovery related to its alter-ego relationships with state-owned entities, and continued to deny Plaintiffs information concerning financial accounts

relating to its military, diplomatic, and consular assets, based on its unilateral determination that they were immune from execution.  *See* ECF 568.  Plaintiffs thus served their First Information Subpoena on the Republic on May 15, 2024.  *See* ECF 599 at 1.

On May 28, 2024, the Court ordered the Republic to produce information about its "military, diplomatic, and consular assets."  May 28, 2024 Hr'g Tr. 25:4-5.  It also ordered the Republic to produce documents concerning its alter-ego relationship with YPF and Banco Central de la República Argentina ("BCRA"), concluding that it suffices for discovery purposes that there is "reason to think" that these entities may be alter egos of the Republic.  *Id*. at 39:20-23.  The Court also granted Plaintiffs leave to demonstrate that similar discovery is warranted as to other state-owned entities.  *Id.*; *see also id*. at 54:9-11.  The Court acknowledged that Plaintiffs properly seek this discovery to determine whether the target entities are alter egos of the Republic "today."  *Id.* at 33:12-13.  Consistent with the Court's directives, Plaintiffs made that showing with respect to four additional state-owned entities—Banco de la Nación Argentina ("BNA"), Aerolíneas Argentinas ("Aerolíneas"), Energía Argentina S.A. ("ENARSA"), and Empresa Argentina de Soluciones Satelitales S.A. ARSAT ("ARSAT")—and requested discovery from the Republic.  *See* ECF 599 at 4-8.  Plaintiffs also served a subpoena on BNA requesting discovery related to Argentina's assets within BNA's possession, custody, and control, and BNA's potential alter-ego relationship with Argentina.  *Id*. at 4; *accord* Sept. 3, 2024 Hr'g Tr. 72:25-74:17 (BNA counsel describing subpoena scope).

The Republic continued to engage in a clear pattern of obfuscation and delay—in essence, granting itself the unconditional stay of execution that the Court did not.  Despite the Court's May 28 order compelling the production of documents responsive to Plaintiffs' YPF and BCRA alter-ego requests, the Republic did not agree until July 2 to conduct email searches for

those requests.  ECF 599 at 2.  Even then, although Plaintiffs had provided the Republic with proposed custodians and search terms on June 18, the Republic did not respond to those proposals until July 27.  *Id.*  After nine months and nineteen meet-and-confers, the Republic had produced only 3,530 documents.  *Id.* at 2.

Meanwhile, both BNA and the Republic refused to provide documents related to the alter-ego status of the additional state-owned entities.  *Id.* at 4-8.  Despite the Court's prior ruling on the threshold showing for alter-ego discovery, Argentina denied the requested alter-ego information on the basis that Plaintiffs are required to establish the entities' alter-ego status *before* they can obtain discovery on that alter-ego status.  *Id.* at 4.  BNA, too, declined to produce alter-ego discovery on that basis.  *See* ECF 620 at 2.  "In the alternative," BNA argued, that discovery could be produced if Plaintiffs failed "to obtain the same documents and information from the Republic."  *Id.* at 3.

Plaintiffs thus requested judicial intervention once again.  This time, Plaintiffs asked the Court to enter a scheduling order for post-judgment discovery to ensure the Republic's compliance.  *See* ECF 599 at 1-2.  Plaintiffs also requested modification of the Protective Order so Plaintiffs could use evidence obtained in post-judgment discovery to support foreign proceedings to enforce the Judgment.  *See id.* at 2-3.  In addition, Plaintiffs requested that the Court order the Republic to comply with their information subpoena and to produce discovery to determine whether the additional state-owned entities "are presently alter egos of the Republic."  *Id.* at 3-4, 8.  Plaintiffs also moved to compel BNA to produce alter-ego discovery.  *Id.* at 4.

On August 20, 2024, the Court granted Plaintiffs' proposed scheduling order.  Specifically, the Court ordered "[t]he Republic and its e-discovery vendor [to] provide Plaintiffs with progress reports on the ESI collection process, including identification of the custodians and

data affected," "until the ESI production is complete."  ECF 634 at 1.  The Court also directed

the parties to submit scheduling proposals for custodians and search terms, to complete

production of non-ESI documents by October 4, 2024, to begin "rolling production of restored

ESI documents" by November 14, 2024, and to "complete[] its ESI production" by December

14, 2024.  ECF 634 at 2.

On September 3, 2024, the Court held a hearing on the alter-ego information the Republic

and BNA refused to produce.  The Republic again argued that Plaintiffs cannot obtain discovery

related to alter-ego status because they failed to show that the entities are alter egos of the

Republic.  *See* Sept. 3, 2024 Hr'g Tr. 58:24-25 (Counsel for the Republic) ("They need to do

more.  If they don't need to do more, then the showing means nothing.").  BNA appeared,

claiming that it had already produced discovery "with respect to Argentina's assets," that

discovery into its potential alter-ego status is not warranted because Plaintiffs failed to make "a

sufficient showing," and that, at a minimum, BNA should wait to produce that discovery until

Plaintiffs fail to obtain it from the Republic in the first instance.  *Id*. at 72:25-74:17.  The Court

ordered the parties to submit additional briefing on this dispute and ordered the Republic to

provide responses and objections to the information subpoena by September 30, 2024.  The

Republic responded to the subpoena on September 30, 2024.  The parties submitted

supplemental briefing on September 18, 2024.  ECF 657, 658, 669.  Again, the Republic's and

BNA's position is that Plaintiffs are not entitled to this discovery because they have not made

what they view as a necessary threshold showing of alter-ego status.  *See* ECF 671, 669.  The

parties' briefing is currently pending before the Court.

The Republic requested extensions of the scheduling order deadlines, continuing to kick

the can down the road and avoiding its discovery obligations.  ECF 682.  The Court ordered the

Republic to begin rolling production of restored ESI documents by December 18, 2024, and to complete its production by February 18, 2025.  ECF 683.  The Court also granted Plaintiffs' request for modification of the Protective Order.  ECF 674.

### B.    YPF refuses to comply in earnest with Plaintiffs' discovery requests

On March 25, 2024, Plaintiffs served a subpoena on YPF containing 24 document requests.  *See* ECF 584-1.  The requests sought information about Argentina's ownership interest in YPF and YPF's potential alter-ego status.  *Id*.  YPF agreed to produce some discovery related to Argentina's ownership interest in YPF, but it refused to produce alter-ego discovery, taking the position "that Plaintiffs needed to exhaust discovery from the Argentine Republic prior to seeking discovery from YPF."  ECF 583 at 3.

Plaintiffs accordingly requested judicial intervention, moving to compel YPF to produce alter-ego discovery.  *See* ECF 563 ¶ 2.  Purporting to "assert and reserve its right to raise all jurisdictional . . . objections," YPF asked the Court to deny Plaintiffs discovery because they had failed to serve the subpoena properly and "Plaintiffs cannot satisfy the *Bancec* factors."  ECF 569 (citing *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 626-27 (1983)).  On May 28, 2024, the Court rejected YPF's objections, ordered YPF to produce documents related to its potential alter-ego relationship with the Republic, limited the responsive time period to two years, and instructed the parties to meet and confer on the scope of production.  *See* May 28, 2024 Hr'g Tr. 39:20-40:1, 54:5-16.

As months passed, Plaintiffs met and conferred with YPF six times, and YPF repeatedly indicated that production would be forthcoming after the parties reached agreement on search terms and custodians.  ECF 619 at 1.  After stringing Plaintiffs along for months, YPF produced only 65 documents (most of which are publicly available) and refused to commit to any timetable for production.  ECF 626 at 1-2.

On August 12, the purpose of YPF's foot-dragging became clear: it was simply buying time to prepare briefing seeking to enjoin Plaintiffs from enforcing the judgment, hoping to foreclose the production of alter-ego discovery entirely without meeting the high standard required for reconsideration. Specifically, YPF sought orders to show cause for intervention and to enjoin Plaintiffs' post-judgment proceedings on *res judicata* grounds, arguing that Plaintiffs cannot "re-litigate" YPF's liability and therefore should be enjoined from pursuing alter-ego discovery. ECF 609-610, 612-613.

YPF also filed a separate letter about a "related issue" involving jurisdiction. ECF 618. YPF claimed that the Court should resolve the parties' dispute on *res judicata* grounds "without needing to reach questions of jurisdiction," but it argued for the first time that the Court "may wish to consider that the final judgment dismissing YPF not only prevents further litigation as a matter of res judicata, but also reached a final decision on the merits rejecting the factual premises for this Court's exercise of subject matter jurisdiction over YPF." *Id.* at 2-3. Meanwhile, YPF urged the court of appeals to affirm this Court's judgment as to YPF *on the merits* without raising any jurisdictional argument in the alternative. 2d Cir. ECF 177.1 (YPF Br.).

On August 14, Plaintiffs requested that the Court compel YPF to comply with the Court's previous order to produce alter-ego discovery. Specifically, Plaintiffs requested that "the Court order YPF to fulfill its production obligations by October 18 (with rolling productions every three weeks), including through the search and production of all custodial ESI, including chat applications." ECF 626 at 3. Plaintiffs' motion to compel and YPF's requests for intervention and to enjoin Plaintiffs' post-judgment proceedings on *res judicata* grounds are currently pending before the Court.

### III.    The Court orders briefing with respect to *Peterson* and grants Plaintiffs' request for clarification

On November 13, 2024, the Second Circuit issued an opinion in *Peterson*.  In relevant part, the court concluded that subject matter jurisdiction was lacking with respect to the plaintiffs' claims against Bank Markazi—an instrumentality of Iran—because neither 22 U.S.C. § 8772 (a statute affecting certain financial assets of Iran) nor ancillary jurisdiction abrogated the bank's jurisdictional immunity under the FSIA.  *Peterson*, 121 F.4th at 1001.

On November 15, 2024, the Court directed the parties to submit "briefing concerning the applicability and impact, if any, of *Peterson* on the resolution of the issues remaining in this case."  ECF 685 at 2.  The Court noted four matters currently pending: Plaintiffs' motion for an injunction and turnover of the Republic's 51% interest in YPF's Class D shares (ECF 555); YPF's orders to show cause for intervention and to enjoin Plaintiffs' post-judgment proceedings on *res judicata* grounds (ECF 609-610, 612-613); Plaintiffs' motion to compel production from YPF (ECF 626); and the parties' supplemental briefing on Plaintiffs' requests for alter-ego discovery (ECF 657, 658).  The Court also stayed "alter ego discovery already underway . . . pending a determination of the impact, if any, of *Peterson*" on this case.  ECF 685 at 2.  The parties negotiated a briefing schedule, which this Court approved with modifications.  ECF 687.

Plaintiffs then sought clarification that the Court's order did not stay alter-ego discovery that Plaintiffs seek from the Republic or non-sovereign non-parties.  ECF 688.  On December 11, 2024, this Court granted Plaintiffs' motion for clarification.  ECF 694 at 2-3 (clarifying that "its November 15 Order does not stay discovery that Plaintiffs seek from (1) the Republic or (2) non-sovereign non-parties").

**ARGUMENT**

I.    ***Peterson* Narrowly Held That Courts Must Have Subject Matter Jurisdiction Over New Sovereign Parties Facing New Substantive Claims**

The relevant holding of the Second Circuit's decision in *Peterson* is narrow given its unique posture.  The plaintiffs were U.S. service-member victims of the 1983 bombing of the U.S. Marine barracks in Beirut, Lebanon, their family members, and their representatives.  *See Peterson*, 121 F.4th at 990.  They obtained multi-billion-dollar judgments against Iran in the U.S. District Court for the District of Columbia under the terrorism exception to the FSIA.  *Id.*  As part of their ongoing efforts to enforce those judgments, the plaintiffs initiated a *separate* lawsuit in the Southern District of New York against Iran and a group of *new* defendants who were not parties in the underlying terrorism-exception suit—namely, Bank Markazi (the central bank of Iran), Clearstream Banking, S.A. (a Luxembourg-based entity), and other financial institutions. *See id.* at 990-91.  In that separate action, the plaintiffs filed a new complaint asserting eight different counts against Bank Markazi on the theory that it "intentionally engaged in a conspiracy to make fraudulent conveyances designed to avoid Iran's debt to Plaintiffs," which "require[d] that any veil of separation between Markazi and . . . Iran be pierced."  *See* Am. Compl. ¶¶ 232, 227, *Peterson v. Islamic Republic of Iran*, No. 13-cv-09195 (S.D.N.Y. July 24, 2014), ECF 104; *see id.* at 62 (requesting monetary and equitable relief).

In relevant part, the Second Circuit held that the district court lacked "subject matter jurisdiction over [the] claims against Bank Markazi."  *Peterson*, 121 F.4th at 1001.  "The parties [did] not dispute that Bank Markazi is a foreign sovereign within the meaning of the FSIA and that no provision of the FSIA strips Bank Markazi of its jurisdictional immunity."  *Id.* at 994. The court therefore considered two other potential sources of jurisdiction: 22 U.S.C. § 8772

(a statute affecting certain financial assets of Iran, which is irrelevant here) and ancillary jurisdiction. *Id.* at 995.

With respect to ancillary jurisdiction, the Second Circuit recognized that, "where subject matter jurisdiction under the FSIA exists to decide a case, jurisdiction continues long enough to allow proceedings in aid of any money judgment that is rendered in the case." *Id*. at 998-99 (quoting *First City, Texas-Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 54 (2d Cir. 2002)). But jurisdiction could not "continue[ ]" over Bank Markazi, the court reasoned, because the bank was never a "party to the litigation in which the Plaintiffs secured their judgments against Iran." *Id.* Moreover, the court drew "a distinction between 'an attempt simply to collect a judgment duly rendered by a federal court, even if chasing after the assets of the judgment debtor now in the hands of a third party'—in which case ancillary jurisdiction exists—and a proceeding that 'presents a *new* substantive theory to establish liability *directly* on the part of a *new* party'—in which case 'some independent ground is necessary to assume federal jurisdiction over the claim.'" *Id.* at 999 (citation omitted) (emphases added).

As this Court already found, "*Peterson* did not concern subject-matter jurisdiction with respect to [judgment-debtors or non-sovereign non-parties]." ECF 694 at 2-3.

## II.    *Peterson* Has No Effect on Plaintiffs' Turnover Motion

Plaintiffs' turnover motion requests that the Court order Argentina to turn over its 51% shareholding in YPF, in partial satisfaction of the Court's judgment. ECF 556. The motion turns on whether Argentina's YPF shares are immune from execution under § 1610(a) of the FSIA, *see id*. at 8-16, and the scope of the Court's authority under CPLR § 5225, *id.* at 16-20.

*Peterson* did not change existing law with respect to execution immunity or the contours of CPLR § 5225. The Second Circuit addressed only whether Bank Markazi, an instrumentality of Iran, had "jurisdictional immunity." *Peterson*, 121 F.4th at 994. Indeed, the bank conceded

that 22 U.S.C. § 8772 "strip[ped] the execution immunity of the [a]ssets" in question.  *Id.* at 995 (emphasis omitted).  Recognizing that "the two types of immunity—'jurisdictional immunity' and 'execution immunity'—'operate independently,'" the Second Circuit focused on jurisdictional immunity only.  *Id.* at 994 (quoting *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 288 (2d Cir. 2011)).

To the extent *Peterson* informs this Court's execution-immunity analysis, it supports Plaintiffs' reading of Second Circuit law and refutes the Republic's argument that "a foreign sovereign's extraterritorial property remains absolutely immune from execution as a matter of U.S. law even after the FSIA's enactment."  ECF 577 (Republic's Response) at 27; ECF 597 (Republic's Sur-Reply) at 1-3; *accord* ECF 679 (United States Ltr.).  As Plaintiffs explained, "Argentina's attempt to invoke pre-FSIA common law immunity to evade execution" amounts to "an improper collateral attack on this Court's decision in *Bainbridge*," which properly applied Second Circuit law.  ECF 587 (Pls.' Reply) at 13; ECF 598 (Pls.' Sur-Reply) at 1-2; *see Bainbridge Fund Ltd. v. Republic of Argentina*, 690 F. Supp. 3d 411, 416 (S.D.N.Y. 2023).  *Peterson* confirms that *Bainbridge* was rightly decided.  In *Peterson*, a non-sovereign non-party garnishee argued that the court lacked personal jurisdiction over it, in part because the assets of Bank Markazi were "located abroad" and execution "would be an '[a]sserti[on of] jurisdiction beyond U.S. courts' traditional limits.'"  121 F.4th at 1006 (citation omitted).  The Second Circuit rejected that argument, reiterating its view that CPLR § 5225(b) "is one exception to the general principle that courts cannot reach extraterritorial property."  *Id.*  It also construed Supreme Court law as not "'foreclos[ing] th[e] possibility' that a U.S. court may possess the authority to execute against extraterritorial property."  *Id.* at 1006 n.11 (citation omitted).

*Peterson* thus rejects the Republic's (and the United States') sweeping extraterritoriality arguments.[3]

*Peterson*'s analysis of jurisdictional immunity also did not change existing law with respect to judgment-debtors like the Republic—the subject of Plaintiffs' turnover motion.  The parties in *Peterson* did not dispute that the court had jurisdiction over the judgment-debtor in that case, Iran.  There is likewise no dispute here that the court has subject matter jurisdiction over the Republic—an issue long-ago settled by the Second Circuit.  *See Petersen*, 895 F.3d at 211.  *Peterson* does not undermine that prior holding, which carries over to these post-judgment enforcement proceedings.  As *Peterson* recognized, it is settled Second Circuit law that, "[w]here subject matter jurisdiction under the FSIA exists to decide a case, jurisdiction continues long enough to allow proceedings in aid of any money judgment that is rendered in the case."  121 F.4th at 998-99 (quoting *First City*, 281 F.3d at 53-54); *see also*, *e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 137 (3d Cir. 2019) ("[W]hen a party establishes that an exception to sovereign immunity applies in a merits action that results in a federal judgment . . . that party does not need to establish yet another exception when it . . . seeks enforcement [of that judgment].").

Finally, *Peterson* says nothing about the principles Argentina invoked to oppose Plaintiffs' motion, including comity principles, the act-of-state doctrine, and Argentine law.  *See* ECF 577 at 7-10.  It accordingly does not help the Republic with respect to those arguments either.

---

[3] The opinion does not otherwise discuss CPLR § 5225 or UCC § 8-112(e), except to note basic propositions of law.  *See*, *e.g.*, *Peterson*, 121 F.4th at 1002 (noting that CPLR § 5225 authorizes turnover from the judgment debtor and third parties and provides a procedure "for the enforcement of money judgements").

### III.    *Peterson* Does Not Support the Republic's, YPF's, or BNA's Objections to Producing Discovery

*Peterson* does not support the Republic's discovery-related objections.  It also does not alter the conclusion that YPF's motion for intervention and for injunctive relief seeking to limit Plaintiffs' discovery should be denied, and it affirmatively supports Plaintiffs' motions to compel production from YPF and BNA.

#### A.    Plaintiffs may obtain broad discovery in aid of execution of this Court's judgment, including alter-ego discovery

"The judicial power would be incomplete, and entirely inadequate to the purposes for which it was intended, if, after judgment, it could be arrested in its progress, and denied the right of enforcing satisfaction." *Bank of U.S. v. Halstead*, 23 U.S. 51, 53 (1825).  For that reason, "broad post-judgment discovery in aid of execution is the norm in federal and New York state courts." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134 (2014).  The Federal Rules of Civil Procedure authorize the judgment-creditor to "obtain discovery from *any* person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(2) (emphasis added).  "New York state's post-judgment discovery procedures, made applicable to proceedings in aid of execution by Federal Rule 69(a)(1), have a similarly broad sweep." *EM Ltd.*, 695 F.3d at 207.  They authorize a "judgment creditor [to] compel disclosure of *all* matter relevant to the satisfaction of the judgment." CPLR § 5223 (emphasis added).  It is therefore beyond debate that "[t]he rules governing discovery in postjudgment execution proceedings are quite permissive." *Republic of Argentina*, 573 U.S. at 138.

Consistent with the post-judgment discovery rules' broad reach, courts routinely authorize expansive discovery into potentially attachable assets to collect on a judgment against a sovereign defendant, including:

- Discovery from the judgment-debtor about its "worldwide assets generally." *Republic of Argentina*, 573 U.S. at 145.

- Discovery from the judgment-debtor about its "agencies and instrumentalities" to identify potentially attachable assets to satisfy the debtor's judgment. *E.g.*, *Amduso v. Republic of Sudan*, 288 F. Supp. 3d 90, 95 (D.D.C. 2017).

- Discovery from non-parties (via subpoena) seeking information about assets of the judgment-debtor and its agencies and instrumentalities. *See*, *e.g.*, *EM Ltd.*, 695 F.3d at 204 (authorizing non-party subpoenas seeking information about Argentina's assets, where "Argentina" was broadly defined to include "agencies, ministries, instrumentalities, political subdivisions [and] employees"); *Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 589 F. App'x 16, 18 (2d Cir. 2014) (authorizing discovery from Argentina and non-party banks about "entities legally distinct from Argentina," "[e]ven if [that] entity is not an alter ego" because it may "hold attachable assets on behalf of Argentina" or "possess information about Argentina's assets").

- "[D]iscovery regarding a possible alter ego [of the judgment-debtor] that may have assets sufficient to satisfy [the] judgment." *First City*, 281 F.3d at 54.

The Supreme Court long ago settled—in another case involving the Republic's efforts to avoid post-judgment discovery—that there is no freestanding "penumbral 'discovery immunity' " or implied "discovery-in-aid-of-execution immunity" under the FSIA. *Republic of Argentina*, 573 U.S. at 144-45. Thus, because Plaintiffs "*do[ ] not yet know* what property Argentina has and where it is, let alone whether it is executable under the relevant jurisdiction's law," broad "worldwide" discovery that "serve[s] as a 'clearinghouse for information' " is necessary so Plaintiffs "can identify where Argentina may be holding property that *is* subject to execution," whether in the United States or in a different jurisdiction. *Id*. at 138, 144-45.

*Peterson* did not affect this settled understanding of the breadth of post-judgment discovery. That decision did not concern discovery at all—let alone immunity questions

implicated by post-judgment discovery efforts. Instead, *Peterson* involved jurisdictional defenses raised by a sovereign instrumentality and a non-sovereign non-party seeking to dismiss direct claims made against them.

### B. *Peterson* does not support the Republic's discovery-related objections

As this Court already found, *Peterson* does not affect the post-judgment discovery—alter-ego or otherwise—that Plaintiffs seek from the Republic, because *Peterson* does not implicate jurisdictional immunity as to the Republic. ECF 694. In addition, because *Peterson* is not a discovery ruling, it has no effect on the various discovery-related objections the Republic has raised. The opinion says nothing about privilege, burden, comity, privilege logs, or any of Argentina's various musings concerning custodians and relevance. *See* ECF 658. Nor does it alter the standard Plaintiffs must meet under *Bancec* to pursue discovery. Thus, there is no reason for this Court to reconsider its previous ruling that Plaintiffs "don't have to show any proof now [of alter ego status]" in order to obtain alter-ego discovery; rather, "the test is whether plaintiff has demonstrated that there is reason to believe that these [entities] are alter egos." Sept. 3, 2024 Hr'g Tr. 58:11-12, 60:5-7. As even YPF admits, there should be no impediment to Plaintiffs pursuing that discovery from the Republic. *See* May 28, 2024 Hr'g Tr. 47:23-25 (YPF's counsel conceding that, if discovery from the Republic showed that "YPF is or might be an alter ego [of the Republic], then it might be the case that third-party discovery from YPF to fill in whatever holes remain would be appropriate"); *see also* ECF No. 611-3.

### C. *Peterson* does not support YPF's request for intervention and injunctive relief

For largely the same reasons, *Peterson* has no effect on YPF's request for intervention and an injunction, which the Court should deny. YPF claims that, by pursuing alter-ego discovery, Plaintiffs seek to re-litigate direct liability claims and "shift liability" onto YPF. ECF

610 at 2; *see* ECF 613.  But discovery is simply discovery—it does not seek to impose liability at all.

1.  As a threshold matter, YPF's arguments fail for several reasons plainly independent of *Peterson*.  As Plaintiffs have explained, YPF's requests for orders to show cause fail out of the gate because they violate the Local Rules—a deficiency *Peterson* cannot cure. ECF 645 at 2.  YPF appears to have used the order-to-show-cause process to grant itself 38 pages of first-round briefing—in two memoranda and one letter, ECF Nos. 610, 613, 618—rather than the three pages that the Court's pre-motion letter process provides, Individual Practice 2.A.  The Court should reject the proposed orders for their breach of the Local Rules and gamesmanship alone.

Similarly, even if YPF's proposed orders were properly filed, intervention would not be appropriate because YPF's request is untimely.  ECF 645 at 5-6.  *Peterson* has no possible effect on this conclusion either.  YPF knew or should have known that its potential alter-ego status was at issue at least as of March 25, 2024.  *Id.*  Plaintiffs spent substantial time, effort, and expense in numerous meet-and-confer sessions with YPF before YPF belatedly raised its *res judicata* arguments, and therefore would suffer substantial prejudice from YPF's unjustified delay.  *Id.* at 6.  By contrast, YPF will suffer no prejudice if intervention is denied: YPF already litigated Plaintiffs' subpoena and lost, and Plaintiffs' efforts to obtain discovery from the Republic cost YPF nothing.  *Id.*

Finally, *res judicata* cannot possibly require intervention or an injunction because, at this stage, Plaintiffs are seeking only discovery.  *Peterson* concerned jurisdiction over direct liability claims.  As explained *infra*, even assuming Plaintiffs were asking this Court to hold that YPF is the Republic's alter ego to attach YPF's property (they are not), that request would not amount to

a direct liability claim, so *Peterson* would be no obstacle.  But Plaintiffs have not even made such a request.  *Peterson* accordingly has no relevance to the issues currently before the Court.

Underscoring the point, it is entirely possible that discovery obtained under the supervision of this Court could reveal information to support enforcement proceedings *outside* the United States and, therefore, outside the purview of the FSIA.  As Plaintiffs recently explained to the Court in proposing revisions to the Protective Order, "Plaintiffs may use materials obtained in discovery to support foreign proceedings to enforce the Judgment or any foreign judgment recognizing the Judgment (proceedings Plaintiffs have initiated due to the Republic's refusal to satisfy the Judgment)."  ECF 663 at 1.  "Whatever [immunity] hurdles [Plaintiffs] will face before ultimately attaching Argentina's property abroad . . . , [they] need not satisfy the stringent requirements for attachment in order to simply receive information about Argentina's assets."  *EM Ltd.*, 695 F.3d at 209; *see Republic of Argentina*, 573 U.S. at 145.

**2.**    Even if Plaintiffs were now asking the Court to find that YPF is an alter ego of the Republic—which they are not—*Peterson* would not limit the Court's authority.  Plaintiffs' potential alter-ego theory would not present "a new substantive theory to establish liability directly on the part of a new party."  *Peterson*, 121 F.4th at 999 (quoting *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 230 F.3d 489, 498 (1st Cir. 2000)).  In the context of the FSIA, courts may apply the *Bancec* factors to eliminate the distinction between a judgment-debtor and its instrumentalities for at least two different purposes.  First, as in *Peterson*, a creditor can use *Bancec* to pursue an alter-ego claim against a foreign entity to hold that entity directly liable, in which case the court must have a basis for exercising jurisdiction over the entity.  *See id.* at 1001.  Second, unlike in *Peterson*, a judgment-creditor can also pursue its post-judgment recovery

efforts directly against the liable sovereign, using *Bancec* merely to identify assets from an instrumentality potentially subject to execution.[4]

The use of *Bancec* for that latter purpose is illustrated by the Third Circuit's decision in *Crystallex*. *See id.* at 1000 n.6 (discussing *Crystallex*, 932 F.3d at 126). Emphasizing that "the Supreme Court all but confirmed that *Bancec* can indeed be used to reach the assets of a foreign sovereign's extensively controlled instrumentality through post-judgment attachment proceedings," the *Crystallex* court held that "so long as [the instrumentality] is [the judgment-debtor's] alter ego under *Bancec*" and the plaintiff brings the attachment action against the judgment-debtor itself, the court has "the power to issue a writ of attachment on [the instrumentality's] non-immune assets to satisfy the judgment against the [judgment-debtor] country." 932 F.3d at 134, 139. That procedure complied with the FSIA because "the plaintiffs brought their post-judgment proceeding against the foreign sovereign itself while seeking to attach assets belonging to the sovereign's instrumentality." *Peterson*, 121 F.4th at 1000 n.6. Thus, unlike in *Peterson*, "the district court had no need to exercise jurisdiction over a claim against the instrumentality." *Id.*; *see also*, *e.g.*, *Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 563-65 (11th Cir. 1987) (looking to *Bancec* to determine "whether the assets of a foreign state's wholly-owned national airline [i.e., Aerolineas Argentinas] are subject to execution," where Aerolineas "was neither a party to the litigation nor was in any way connected with the

---

[4] *Peterson* recognized that § 8772 "eliminates the distinction between Iran and its instrumentalities for the limited purpose of identifying the assets" subject to execution or attachment. 121 F.4th at 1001. This is precisely why execution immunity was not at issue in *Peterson*: "Bank Markazi concede[d] that [the Iran-specific statute] strips the execution immunity of [its] [a]ssets," effectively satisfying *Bancec* for execution-immunity purposes. *Id.* at 995 (emphasis omitted). It follows "that in *ordinary* FSIA attachment proceedings—*i.e.*, those that do not involve judgments based on state-sponsored terrorism—the judgment holder may reach the assets of the foreign judgment debtor by satisfying the *Bancec* factors." *Crystallex*, 932 F.3d at 139.

underlying [breach of contract claim] giving rise to the suit" against the Republic); *Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*, 2023 WL 7182179, at *11 (D. Del. Nov. 1, 2023) (similar).

As Plaintiffs previously explained, Plaintiffs' alter-ego discovery efforts presage a request under *Crystallex* and its progeny because Plaintiffs seek to ascertain whether Argentina's instrumentalities are "an alter ego of the Republic for purposes of judgment enforcement." ECF 645 at 12-13. In the current posture of the case, Plaintiffs do not expect to seek to hold YPF directly liable for the breach of contract claim that gave rise to this Court's multi-billion-dollar judgment against Argentina—an inquiry that would focus on the alter-ego status of YPF "in 2012 or shortly thereafter." *Id.* at 13. Instead, Plaintiffs' alter-ego discovery goes to the "present-day relationship" between Argentina and those instrumentalities—an inquiry "bearing no connection to the parties' previous contract dispute." *Id.* That discovery is consistent with *Peterson* and Second Circuit law because it seeks to ascertain whether the instrumentalities and the Republic are one and the same *today*, such that the instrumentalities' assets are effectively the assets of the judgment-debtor and potentially subject to execution, either here or abroad.

*Peacock* and *Epperson*, two non-FSIA cases that *Peterson* cited in support of its *Bancec* analysis, also support this view of Plaintiffs' potential future alter-ego argument. *See Peterson*, 121 F.4th at 999 (citing *Epperson v. Ent. Express, Inc.*, 242 F.3d 100, 104 (2d Cir. 2001); *Peacock v. Thomas*, 516 U.S. 349 (1996)). In *Peacock*, the plaintiff prevailed in an ERISA class action but was unsuccessful in collecting the judgment. 516 U.S. at 352. He thus filed a separate suit against the defendants, raising claims of civil conspiracy and corporate veil-piercing. *Id.* The Supreme Court recognized that it is appropriate to exercise "ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and

enforcement of federal judgments—including attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances." *Id*. at 356. But it held the district court lacked ancillary jurisdiction over the plaintiff's civil conspiracy and corporate veil-piercing claims because they amounted to "new theories of liability not asserted in the ERISA suit." *Id*. at 358-59.

Later, the Second Circuit in *Epperson* drew a distinction between the corporate veil-piercing claim at issue in *Peacock* and fraudulent conveyance claims under Connecticut law: courts have ancillary jurisdiction over "fraudulent conveyance claims against transferees who were not parties to the underlying action" because those claims merely "seek[ ] to reach the assets of a judgment debtor in the hands of a third party." *Epperson*, 242 F.3d at 106-07. That is, "fraudulent conveyance actions operate as simple collection mechanisms; they do not present a substantive theory seeking to establish liability on the part of a new party not otherwise liable." *Id*. at 107 (explaining that "[n]othing in Connecticut statutory or common law would permit a party to impose liability for the underlying judgment on the transferee of a fraudulent conveyance or to reach the transferee's own assets") (citing Conn. Gen. Stat. Ann. § 52-552h(b)); *Conn. Sav. Bank v. Obenauf*, 758 A.2d 363, 365 (Conn. App. Ct. 2000) (creditor cannot pursue defendant "for anything other than the specific property transferred or the proceeds thereof").

Any potential alter-ego showing under *Bancec* that Plaintiffs may assert down the line would be materially different from the conspiracy veil-piercing claim in *Peacock*. Plaintiffs' potential showing, modeled after *Crystallex*'s application of *Bancec*, would operate as a collection mechanism by allowing Plaintiffs to "reach the assets of the foreign judgment debtor by satisfying the *Bancec* factors." *Crystallex*, 932 F.3d at 139 (distinguishing *Peacock* because that case did not involve the FSIA, "a specialized jurisdictional statute," or "the *Bancec*

doctrine—the applicability of which is the core question here—[which] is a federal common-law outgrowth of that specialized statute"); *see also Walters*, 651 F.3d at 291 ("execution immunity inures in the property itself"). By contrast, the claim in *Peterson*—one focused on a conspiracy to defraud—resembles the claim in *Peacock* because it sought to impose direct liability on Bank Markazi under New York law. *See* 121 F.4th at 1000 (plaintiffs' "turnover claim against Bank Markazi is ultimately an attempt to establish liability directly on the part of a new party") (citation omitted) (cleaned up).

> **D.    The Court should compel YPF to produce alter-ego discovery**

*Peterson* also does not change the conclusion that this Court should compel discovery from YPF (as it did before). Unlike Bank Markazi in *Peterson*, YPF is not a "new party" that was never "involved in the Plaintiffs' earlier litigation." 121 F.4th at 1001. Rather, the Second Circuit long ago held that this Court has jurisdiction over YPF under the FSIA's commercial-activity exception. *Petersen*, 895 F.3d at 210. YPF has not challenged that ruling on appeal. In fact, in Plaintiffs' appeal, YPF has pressed for affirmance *on the merits*, without making any jurisdictional argument in the alternative. *See* 2d Cir. ECF 177.1 at 9. That appeal is still pending, partly due to the Republic's failure to expedite its own appeal. Similarly, YPF has participated in post-judgment proceedings, at least as and when it suited YPF to do so. *See*, *e.g.*, ECF 550 at 1 (YPF complaining it was not granted access to sealed materials even though it "has a continuing interest in reviewing all filings with the Court"); ECF 583 ¶ 16 (YPF participating in meet-and-confer session with Plaintiffs and agreeing to produce some documents but not others). As the Court previously noted, "[i]t's not like YPF isn't a party, having been dismissed but still on the docket, still pursuing an appeal." May 28, 2024 Hr'g Tr. 41:4-7. YPF cites no case supporting the conclusion that a subject-matter-jurisdiction holding under the FSIA suddenly vanishes for purposes of post-judgment enforcement under these circumstances. *Cf.*

*First City*, 281 F.3d at 49 (enforcing Rule 45 subpoena seeking alter-ego discovery against sovereign that claimed it was "no longer a party to [the] action"); *Thai Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 924 F. Supp. 2d 508 (S.D.N.Y. 2013) (compelling discovery from non-party sovereign instrumentality).

 *Peterson* also confirms that YPF's arguments about lack of notice and abuse of process (*see* ECF 610 at 13-14) are unpersuasive.  YPF claims without citation that Plaintiffs' discovery is procedurally improper because Plaintiffs failed to "plead the factual and legal bases for this Court's jurisdiction or the merits of their alter ego theory" before pursuing discovery and, therefore, Plaintiffs deprived YPF of an opportunity "to move or answer."  ECF 618 at 2.  But as *Crystallex* shows, a creditor can pursue an instrumentality's assets on an alter-ego theory without pleading a claim against the instrumentality itself.  932 F.3d at 134, 139; *see also Walters*, 651 F.3d at 293 ("[T]he FSIA, by its terms, authorizes consideration of sovereign immunity from both jurisdiction and execution even in the absence of an appearance by the sovereign."); *Republic of Argentina*, 573 U.S. at 144 (execution immunity is not "coextensive" with "discovery-in-aid-of-execution immunity").  And YPF's various objections are further belied by *the Republic's* response to Plaintiffs' turnover motion, which uses the *Bancec* factors for purposes of execution immunity (i.e., not as a substantive theory of liability) and put YPF's potential alter-ego status at issue.  *See* ECF 577 (Republic's Opp. to Turnover Motion) at 16-20 (raising execution-immunity arguments by invoking *Bancec* factors and collecting case law applying *Bancec* in this context).

  **E.** **The Court should compel BNA to produce discovery**

 Plaintiffs' requests for discovery as to BNA, like their requests for discovery as to YPF and the Republic, do not involve any substantive attempt to impose direct liability.  *Peterson* therefore does not affect Plaintiffs' requests for discovery as to BNA.

In any event, BNA long ago abandoned any potential claim to jurisdictional immunity. A sovereign entity can waive its immunity "either explicitly or by implication."  28 U.S.C. § 1605(a)(1).  With respect to waiver by implication, "courts have discretion to determine that the conduct of a party in litigation does constitute a waiver of foreign sovereign immunity in light of the circumstances of a particular case."  *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 278 (2d Cir. 1984).  BNA cannot now raise a jurisdictional immunity defense that it has never raised before.  BNA did not assert jurisdictional immunity in its responses and objections to Plaintiffs' subpoena, *see* Ex. A, during the parties' meet-and-confer sessions, *see* Exs. B, C, in its correspondence to the Court objecting to the subpoena, *see* ECF 620, 669, or at the hearing on the subpoena, *see* Sept. 3, 2024 Hr'g Tr. 72:19-74:17.  Thus, the Court can exercise jurisdiction over BNA, even if a jurisdictional finding were required.  *See Eitzen Bulk A/S v. Bank of India*, 827 F. Supp. 2d 234, 241 (S.D.N.Y. 2011) (holding that Bank of India waived its immunity by implication where it provided responses to the subpoena "without objecting on the basis of sovereign immunity" and did not raise the defense until after it "had already served two subpoena responses").

\* \* \*

In sum, the Court should deny YPF's requests for intervention and injunctive relief because *Peterson* does not change the fact that they are procedurally improper and substantively meritless.

The Court should also grant Plaintiffs' motions to compel the Republic, YPF, and BNA to produce alter-ego discovery.  There is no dispute that the Court has jurisdiction over Argentina, and *Peterson* does not alter that pre-existing jurisdiction holding.  Moreover, unlike the *Peterson* plaintiffs, Plaintiffs' discovery efforts do not seek to impose direct liability onto either YPF or

BNA.  And neither instrumentality can persuasively assert a jurisdictional immunity defense because neither entity is similarly situated to Bank Markazi.  YPF is not a new party and is subject to a pre-existing jurisdictional finding, and BNA long ago waived any jurisdictional defense.

## CONCLUSION

The Court should grant Plaintiffs' turnover motion, *see* ECF 555, and motions to compel YPF, the Republic, and BNA to produce alter-ego discovery.  *See* ECF 599, 626, 657.  The Court should deny YPF's requests for intervention and injunctive relief.  *See* ECF 609-610 & 612-613.


Dated: December 20, 2024            Respectfully submitted,

KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.

By:    */s/ Andrew E. Goldsmith*
Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone:  (202) 326-7900
Fax:  (202) 326-7999
Email:  mhansen@kellogghansen.com
      dho@kellogghansen.com
      agoldsmith@kellogghansen.com


CLEMENT & MURPHY, PLLC

Paul D. Clement
C. Harker Rhodes IV
706 Duke Street
Alexandria, VA 22314
Phone:  (202) 742-8900
Fax:  (202) 742-8895
Email:  paul.clement@clementmurphy.com
      harker.rhodes@clementmurphy.com

KING & SPALDING LLP

Randy Mastro
Laura Harris
1185 Avenue of the Americas
New York, NY 10036
Phone:  (212) 556-2100
Fax:  (212) 556-2222
Email:  rmastro@kslaw.com
          lharris@kslaw.com

-and-

Reginald R. Smith
1100 Louisiana Street, Suite 4100
Houston, TX 77002
Phone:  (713) 751-3200
Fax:  (713) 751-3290
Email:  rsmith@kslaw.com

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U., Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*