## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

PETERSEN ENERGÍA INVERSORA,
S.A.U. and PETERSEN ENERGÍA, S.A.U.,

                    *Plaintiffs*,

                    v.

ARGENTINE REPUBLIC and YPF S.A.

                    *Defendants*

-------------------------------------------------------x

Case No.: 1-15-C-V-02739 (LAP)

The Honorable Loretta A. Preska

-------------------------------------------------------x

ETON PARK CAPITAL MANAGEMENT,
LP, ETON PARK MASTER FUND, LTD.,
and ETON PARK FUND, L.P.,

                    *Plaintiffs,*

                    v.

ARGENTINE REPUBLIC and YPF S.A.

                    *Defendants*

-------------------------------------------------------x

Case No.: 1-16-C-V-08569 (LAP)

## REPUBLICAN ACTION FOR ARGENTINA INC.'S MEMORANDUM OF LAW IN SUPPORT OF *EX-PARTE* AMENDED MOTION FOR ORDER PURSUANT TO FED. R. CIV. P, RULE 60(b)(4)

February 26, 2025

## **<u>TABLE OF CONTENTS</u>**

Table of Authorities…………………………………………………………..…..ii

I.    Introduction………..………………………..………………………………..…1

II.    Factual Context………………………………………………………...………3

III.   Applicable Normative…………………………..……………………….......8

IV.   Legal Grounds..……………………………………………..........................9

V.    Conclusion and Relief…………………………………………………………14

Certification…………………………………………………………..…15

## <u>TABLE OF AUTHORITIES</u>

*Cases*

*Hussein v. Maait*, No. 22-1506 (2d Cir. 2025)……………………………………………1, 2, 10, 12

*RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016)……………………………..4

*United States v. Antonius*, No. 21-1083, 7-10-2023 (2d. Cir. 2023)……………………..…..8

*United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1373, 1374 (2010)………………………9

*Luxepress 2016 Corp. v. Government of Ukraine*, No. 18-V-812, 2020 WL 1308357 at *3 (D.D.C. Mar. 19, 2020)……………………………………………………………………………12

*Ben Sager Chems. Int'l, Inc. v. E. Targosz & Co*., 560 F.2d 805, 812 (7th Cir. 1977)…………13

*Page v. Schweiker*, 786 F.2d 150, 159–60 (3d Cir. 1986) (Garth, J., concurring)………………13

*Gschwind v. Cessna Aircraft Co*., 232 F.3d 1347 (10th Cir. 2000)……………………………..13


**Acts, Statutes, and Rules**

Foreign Corrupt Practices Act (FCPA)………………………………………………..............4

Racketeer Influenced and Corrupt Organizations Act (RICO)…………………………………4

Foreign Sovereign Immunity Act (FSIA)…………………………………………………10, 11

28 U.S.C. § 1605(a)(3)…………………………………………………………………..…12

Fed. R. Civ. P., Rule 60……………………………………………………….....1-3, 7-9, 11-12, 14

Fed. R. Civ. P., Rule 24…………..……………………………………….....................1

Fed. R. Civ. P., Rule 62.1………..…………………………………………………………..1

Local Civil Rule 6.1(d)………………………………………………………………………1

Rule 12(b)1…………………………………………………………………………10, 12, 14

Individual Practice Rules LAP, Rule 2……………………………………....……………22


**Doctrine**

Restatement (Fourth) of Foreign Relations Law § 455, Reporter's Note 15, at 374 (2018)…….12

Fox, Hazel; Webb, Phillipa, *The Law of State Immunity*, 430-1 (3rd. ed, 2015)………………12

Ludovici, Stephen E., "Rule 60(b)(4): When the Courts of Limited Jurisdiction Yield to Finality", *66 Fla. L. Rev. 881* (2015)……………………………………………………………….13

* * *

I.      **Introduction**

Last 2/17/2025, Republican Action for Argentina, Inc. ("RA4ARG") filed a *Motion for Order Pursuant to Fed. R. Civ. P., Rule 60(b)(6), (d)(1)–(3)*, seeking relief from this Court's judgment against the Republic of Argentina and in favor of the Plaintiffs in the amount of $16.1 billion plus (# 498, 9/15/2023, as well as all prior and ancillary ones to that effect). All of RA4ARG's filings have been *ex-parte* in full compliance with applicable rules, including a specific affidavit to that effect (Rule 5(a)(1)(D), Local Civil Rule 6.1(d)).

RA4ARG has a clear legal interest in the outcome of this litigation on behalf of the entire Argentinean population –the Republic of Argentina–, based on its own purpose as recognized under US law, and it is evident by now that the articulation of those interests has revealed and proven RA4ARG's own legal standing when compared to the positions –adopted or omitted– by other parties during the 2015-2024 period.

On this occasion, RA4ARG claims the aforesaid judgments of this Court should also be set aside because of new applicable law as of 2/19/2025, *in re,  Hussein v. Maait*, No. 22-1506 (2d Cir. 2025), indicating that *"the judgment is void [lack of subject-matter jurisdiction]"* under Rule 60(b)(4).  All of it, in tandem with the grounds per Fed. R. Civ, P., Rule 60(b)(6), (d)(1)–(3)) that revolve around institutional interests and concerns in light of international criminal activity engulfing the parties that unduly impact the US legal system.  Once more, RA4ARG asks the Court to defer judgment on its Rule 60 motion for order until its intervention has been ruled upon per its motion to intervene dated 2/17/2025 (Fed. R. Civ. P., Rule 24, Rule 62.1, Local Civil Rule 6.1.d).

The timeliness of RA4ARG's request was validated in its original *Motion for Order Pursuant to Fed. R. Civ., P., Rule 60*, which is seemingly applicable to the grounds added herein

under Fed. R. Civ. P., Rule 60(b)(4).  This motion is filed within reasonable time as an equity remedy to avoid manifest injustice, under extraordinary factual circumstances that prevented RA4ARG from prosecuting this case during the 2015-2024 period.

Please do note RA4ARG is an *interested party* that attained its US charitable, tax-exempt status last 12/2024; it was established last 4/2024; and it is devoted to *"strengthening [Argentina's] republican institutions with democratic participation, with the goal of fostering judicial independence and integrity in public office, while also advocating for personal rights and free-market economy."*[1]

Regarding new applicable law to this case as of 2/19/2025, RA4ARG argues that *Hussein v. Maait* from the US Court of Appeals for the Second Circuit –released after RA4ARG's original filings of 2/17/2025– does trigger a subject-matter jurisdictional issue calling for the nullity of Your Honor's aforesaid core judgments –*i.e.*, lack of jurisdictional powers.

As a result of such new applicable law, it is then understood that the issue of subject-matter jurisdiction, amply debated during these civil proceedings and subject to an on-going appeal process, including arguments of forum *non conveniens* and comity principles of law between sovereign nations, is not overlapping with RA4ARG's claims under Fed. R. Civ. P., Rule 60(b)(4).  If this had not been the case, RA4ARG would not be raising the subject-matter jurisdictional issue before Your Honor within this amended frame, as long as Rule 60 is not a substitute to the appeal process, rather an extraordinary remedy for this Court to revise and set aside its own judgment due to exceptional circumstances demanding such a measure.

Based on the factual context and available sound evidence, RA4ARG is hereby requesting a criminal investigation of the facts and parties detailed below by the Department of

---

[1] Exhibit 1 (Certificate of Incorporation (stamped) of Republican Action for Argentina, Inc.) to RA4ARG's *Ex-Parte Motion to Intervene* of 2/17/2025.

2

Justice (DOJ) and other agencies.  In connection with this topic and in light of RA4ARG's submissions of 2/17/2025, the Republic of Argentina in its formal response dated 2/25/2025: **(i)** welcomes any further intervention and contribution by this *interested party* in these legal proceedings; **(ii)** acknowledges that RA4ARG has no connectivity, interaction and/or relationship with the Republic of Argentina –and/or any other party, for clarification purposes–; **(iii)** vouches for a criminal investigation under US law and jurisdiction of the facts and parties as requested by RA4ARG in its own request to the Court; and **(iv)** commits itself to render full cooperation in such an endeavor while preserving its legal views on jurisdictional matters and the overall case.

In addition, it should be noted that the Republic of Argentina further acknowledges the on-going criminal proceedings engulfing some of the parties to this legal conflict in Argentina in connection with the Eskenazi (Grupo Petersen) and Kirchner Families' dealings at YPF, clearly identified by RA4ARG in its fillings, along with exhibits documenting some core criminal complaints[2] and evidence produced by the Argentinean Financial Unit (UIF).[3]  Any allegations made by RA4ARG are already documented in these proceedings via filings and probatory elements within and outside Argentinean federal courts.

## II.     **Factual Context**

As elaborated in the original *Motion for Order Pursuant to Fed. R. Civ. P., Rule 60*, the issues in these legal proceedings were for the most part constrained to Argentinean law, as interpreted by this Court; namely, whether the Republic of Argentina was obliged under YPF's

---

[2] Exhibit 1 to RA4ARG's *Ex-Parte Motion for Order Pursuant to Fed. R. Civ. P., Rule 60(b)(6), (d)(1)—(3).*
[3] Exhibit 2 to RA4ARG's *Ex-Parte Motion for Order Pursuant to Fed. R. Civ. P., Rule 60(b)(6), (d)(1)—(3).*

bylaws and overall corporate law to tender for all of YPF's shares, including those belonging to the Eskenazi Family via their Petersen Group of Companies –established in Spain with the sole purpose of becoming a shareholder of YPF–, who ended up being the Plaintiff in this conflict along with their associates and financiers Burford Capital and its US counterpart Eton Park Capital Management and others.

RA4ARG alleged that such conceptualization of the case is not the true legal conundrum before this Court and the US legal system, rather the alleged international scheme of criminal nature by which those parties were able to secure a $16.1 billion plus award in their favor from this Court –the consummation of fraud on this Court–, turning it into the fruit of criminal activity at inception, as well as conforming money laundering and other practices sanctionable under both the Foreign Corrupt Practices Act (FCPA) and the Racketeer Influenced and Corrupt Organizations Act (RICO), among others.  Please do note the extraterritoriality of RICO would be permissible under US law because the consummation of the alleged criminal scheme takes place via some legal action and Court decree out of the United States.  See *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016).  Such an overall situation is against the national and strategic interests of the United States of America.

For practical purposes, the $16.1 billion plus award becomes a criminal bounty granted to the Plaintiffs via Court decree, which was clothed as a civil or commercial dispute out of Argentina through federal courts in New York City.  As a matter of fact, encapsulating the facts of this case as a civil or commercial honest dispute between the Eskenazi Family –thus the current financial players who acquired such claims fruit of a poisoned relationship at inception– and the Argentinean Government –at the time controlled by the Kirchner Family– means looking at the wrong tree while missing the entire forest subject to arson.  To the contrary, appreciating

4

such alleged criminal activity for what it is indeed sheds legal light to the totality of the factual context.

Therefore, it is respectfully noted that the private law angle of the current legal dispute –civil or commercial–, which derived in the unprecedented $16.1 billion plus judgment against the Republic of Argentina, cannot be fully appreciated without the prism of international criminal activity.  Once those forensic and legal lenses are placed over this entire scheme, the following facts become highly relevant to judge the present case as a whole:

1)      The "nationalization" of YPF was a two-step process for the benefit of the Kirchner and Eskenazi Families.

2)      To begin with, the Kirchner Family compelled YPF's private controlling shareholder at the time, the Spanish energy company Repsol, to sell a 25% stake to their figurehead, the Eskenazi Family.

3)      The Eskenazi Family, foreign to the energy sector, did not invest a single cent of equity in this multi-billion-dollar transaction.  Everything was financed through various loans of approximately $3.4 billion, which were going to be repaid via dividends of YPF.  Even some of dividends distributed were fraudulent based on altered reserves and ancillary.

4)      Repsol mistakenly understood the Kirchner Family was satisfied with such a transaction and the new *status quo*: Repsol, the controlling shareholder, on the one side; and its new minority partners, the political Eskenazi-Kirchner Families, on the other side.

5)      In fact, the Kirchner Family –at the helm of all relevant Argentinean governmental institutions– subsequently triggered the political decision to nationalize YPF by taking Repsol's controlling stake but excluding the one held by their alleged figurehead, the Eskenazi Family.

6)      At this juncture no more dividends were paid, including to the Eskenazi Family. This caused the Eskenazi Family to default those loans and their for-the-occasion investment vehicle in YPF –the Petersen Group companies– went bankrupt in Spain –the jurisdiction where those companies had been established just before executing this transaction and solely to that effect.

5

**7)**    As a result, the Eskenazi Family's 25% stake reverted back to their lenders:  6% to Repsol and 19% to financial lenders.

**8)**    The Eskenazi Family –once more, the alleged figurehead of the Kirchner Family– entered into an agreement with the English fund Burford Capital and its US counterpart Eton Park Capital Management and others to finance and pursue these expensive legal proceedings and ultimately split the $16.1 billion plus award (30/70 split).

**9)**     In such a way, the aforesaid parties resorted to the US legal system against the Republic of Argentina and YPF by seeking compensation before Your Honor.

**10)**     Burford Capital has already monetized part of its own share in such award to undisclosed third-party investors.

**11)**    The outcome of this Court's $16.1 billion plus award in simple economic terms implies compensating the Plaintiffs for a non-existent investment in YPF by the Eskenazi and Kirchner Families of roughly 25% of its total shares, as a result of a "nationalization" process triggered by the Kirchner Family within the administration of the Argentinean Government that excluded what could be considered as their "own" participation in the company.

**12)**    Some ongoing criminal complaints in Argentina were further amended as a result of the $16.1 billion plus award by Your Honor.

**13)**    As a result, Argentinean taxpayers should be obliged to pay such $16.1 billion plus award to corrupt individuals, who in part were already sentenced in criminal proceedings by Argentinean federal courts in schemes quite similar to the one described herein, including figureheads close to the Kirchner Family and the fraudulent appropriation of massive public funds via large infrastructure projects, while resorting to investment vehicles and money transfers around the world. Former President and former Vice President Cristina F. de Kircher's criminal sentence to 6 years in jail was affirmed by the local Federal Court of Appeals and it would be subject to review by the Argentinean Supreme Court, apart from various other criminal proceedings that continue to progress in the direction of due justice.

With regards to the timeline of these legal proceedings versus the Defendants' interests in light of such factual context surrounding YPF, it must be stressed that from 4/2015 to 12/2015 –this case started last 4/2015– and from 12/2019 to 12/2023 –Your Honor's final ruling was

6

entered last 9/2023–, Cristina F. de Kirchner was President and Vice President of Argentina, respectively.  Indeed, from the perspective of the Defendants, any litigation strategy about this case had to be in line with the interests of the Kirchner Family, thus the interests of the Eskenazi Family or the Petersen Group of Companies:  Burford Capital and Eton Park Capital Management and others.  The Republic of Argentina could have never argued anything consistent with the true facts of the case that sustain this motion pursuant to Fed. R. Civ. P., Rule 60, because of self-incrimination by its former President and Vice President, as well as other governmental officials and YPF officers of many years.  All in all, apart from the fact of losing the alleged grounds to obtain a $16.1 billion plus award from this Court.

Separately, it should be highlighted that criminal complaints were filed in Argentina as early as 2006 –still ongoing– against various parties as a result of the elaborated plot concerning YPF, which were updated over the years also to include Your Honor's $16.1 billion plus award against the Republic of Argentina.[4]  Once more, those complaints are supported by a 2018 Intelligence Report from the Argentinean Financial Unit (UIF) –of indicative probatory nature– depicting the *prima facie* criminal activity performed by the Eskenazi and Kirchner Families in connection with YPF and extensive to Spanish jurisdiction.[5]

The latter affirmation does carry the remote possibility of triggering further criminal proceedings in Argentina, as a result of some parties having resorted to the US legal system –also a victim in this scenario– in concert to consummate fraud and money laundering against Argentina and eventually Spain.[6]   RA4ARG brings to the Court's attention that the Second Circuit recently opined that the jurisdictional anchor at the criminal level could be activated, in a

---

[4] Idem 2.
[5] Idem 3.
[6] Idem 2, 3.

factual context like the one under scrutiny, to courts both in the United States and Argentina as a mirror-effect.  See *United States v. Antonius*, No. 21-1083, 7-10-2023 (2d. Cir. 2023).

All of the prior, apart from the criminal complaints currently stalled before Argentinean Federal Judge Ariel Lijo (Docket No. 3518/2006, "*NN /about criminal investigation"*, Federal Criminal Court No. 4, Buenos Aires, Argentina) that involve and revolve around YPF and Cristina F. de Kirchner, former President and former Vice President of Argentina; Sebastián, Matías and Enrique (deceased) Eskenazi, members of Grupo Petersen; Axel Kicillof, former Minister of Economy of Argentina, former Board Member of YPF, and current Governor of Buenos Aires Province; Carlos Zanini, former Legal Counsel to the Presidency; Miguel Galuccio, former President of YPF; Jorge Marcelo Soloaga, former Board Member of YPF; Cristian Girard, former President of Comisión Nacional de Valores (CNV, local SEC) and Alejandro Vanoli, former Vice President Comisión Nacional de Valores (CNV, local SEC); among several others.[7]

### III.    <u>Applicable Normative</u>

**Fed. R. Civ. P., Rule 60. Relief from a Judgment or Order.**

"(a) CORRECTIONS BASED ON CLERICAL MISTAKES; OVERSIGHTS AND OMISSIONS. The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so  on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

**(b) GROUNDS FOR RELIEF FROM A FINAL JUDGMENT, ORDER, OR PROCEEDING. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons**: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether

---

[7] Idem 2, 3.

previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; **(4) the judgment is void**; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or **(6) any other reason that justifies relief.**

**(c) TIMING AND EFFECT OF THE MOTION**. (1) Timing. **A motion under Rule 60(b) must be made within a reasonable time**—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding. (2) Effect on Finality. The motion does not affect the judgment's finality or suspend its operation.

**(d) OTHER POWERS TO GRANT RELIEF**. **This rule does not limit a court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding;** (2) grant relief under 28 U.S.C. § 1655 to a defendant who was not personally notified of the action; or **(3) set aside a judgment for fraud on the court**…"

## IV.    Legal Grounds

Concerning the substantive and procedural viability of Fed. R. Civ. P., Rule 60(b)(4), the Supreme Court has set the standard by holding that *"[a] void judgment is a legal nullity"* and *"...a void judgment is one so affected by a fundamental infirmity that the infirmity may be raised even after the judgment becomes final",* while also clarifying that "*a judgment is not void...simply because it is or may have been erroneous."* Instead, it must be *"premised...on a certain type of jurisdictional error",* and *"a motion under Rule 60(b)(4) is not a substitute for a timely appeal."* See *United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1373, 1374 (2010).

RA4ARG argues new applicable caselaw should compel this Court to vacate its core rulings in furtherance of Fed. R. Civ. P., Rule 60(b)(4), namely that the *"judgment is void"* due to lack of subject-matter jurisdiction, which is in turn sustained by the grounds posed by RA4ARG last 2/17/2025 under Fed. R. Civ. P., Rule 60(b)(6), and Rule 60(d)(1)—(3).   The latter conform a profound infirmity to the extent of making this Court a victim of fraud with the

potential of exerting a legal precedent at odds with the national and strategic interests of the

United States as well as causing profound damage and inequity on 45 million of Argentineans.

As recently reported, the facts and holding *in re, Hussein v. Maait*, No. 22-1506 (2d Cir.

2025) are as follows:

1) ***Dr. Ahmed Diaa Eldin Ali Hussein, a dual citizen of Egypt and the United States, sought to enforce an Egyptian administrative court ruling and a related ministerial decree in the United States. These rulings purportedly entitled him to compensation for the expropriation of his shares in the SIMO Middle East Paper Company by the Egyptian government in the 1990s. Hussein filed an enforcement action*** in New York State court ***against Dr. Mohamed Ahmed Maait, the Egyptian Minister of Finance, in his official capacity***.

2) The case was removed to the United States District Court for the Southern District of New York by Maait, albeit after the 30-day deadline for removal. ***The District Court found that Egypt was the real party in interest*** and allowed the late removal under Section 1441(d) of the U.S. Code, which permits enlargement of the removal period for cause. ***The court then dismissed the suit under Rule 12(b)(1) for lack of subject matter jurisdiction, concluding that Egypt was immune under the Foreign Sovereign Immunities Act (FSIA) and that no exceptions to this immunity applied.***

3) ***On appeal, the United States Court of Appeals for the Second Circuit affirmed the District Court's decision***. The appellate court agreed that Egypt was the real party in interest, as Hussein's claims were fundamentally against the Egyptian government and sought compensation from the public treasury. The court also upheld the District Court's finding of cause to extend the removal period, noting the lack of prejudice to Hussein and the procedural challenges faced by Maait in securing U.S. counsel. Finally, the appellate court determined that Hussein had waived any argument regarding exceptions to FSIA immunity by not raising them on appeal. Thus, ***the dismissal for lack of jurisdiction was affirmed.***

Please do appreciate the profound factual similarities, as construed in these civil legal

proceedings, with the facts and legal implications laid out in Your Honor's judgments:

1) Your Honor considered arguments both in favor and against the Court's jurisdictional powers, and ruled in favor of activating them in this case.

2) The Plaintiffs had sued both the Republic of Argentina and YPF seeking compensation and ancillary on various grounds related to the "nationalization" process of the latter by the prior.  In short, the Plaintiff alleged they must be satisfied by those parties for not enforcing YPF's by-laws (article 7) that should have prompted a tender offer for all shares, including those of the Plaintiffs.  That did not

10

happen; the Republic of Argentina neither tendered for nor acquired those shares from them, except the controlling stake held by the Spanish energy company Repsol.

3) Your Honor deemed that the party responsible for it, at the civil level, was the Republic of Argentina.

4) YPF's by-laws are in substance an agreement yet subject to governmental approval for its enforcement via an administrative resolution (initially the Argentinean Secretary of State, as in the case of any other US corporation), regardless of its public-status per local law and any pertinent listing.

5) At the normative level, the nationalization process of YPF was triggered by a presidential decree from Former President Cristina F. de Kirchner, who also decided –in tandem with her Minister of Economy at the time, Axel Kicillof, among others– not to tender for and acquire the Plaintiff's shares after having taken over Repsol's controlling stake.

6) Your Honor didn't dismiss the Plaintiff's suit for lack of subject-matter jurisdiction, concluding the Republic of Argentina was not immune under the Foreign Sovereign Immunities Act (FSIA) in the present case. Your honor awarded $16.1 billion plus to the Plaintiffs.

In light of the above-applicable new precedent to this Court, with simile factual grounds and opposite legal outcomes in their holdings, RA4ARG pleads the Court to set aside and vacate its own judgment under the premise it lacks jurisdictional powers in this *litis* in accordance with Fed. R. Civ. P., Rule 60(b)(4), Rule 12(b)(1), which implies recognizing the Republic of Argentina's immunity under the Foreign Sovereign Immunities Act (FSIA).  Moreover, it must be stressed that the Department of Justice in its recent intervention has fostered such an argument at the time of opposing the Plaintiffs' attempt to pursue attachments and ancillary of the Republic of Argentina's assets (# 679, # 679-1, # 679-2).

In connection with eventual exceptions to sovereign immunity under FSIA, RA4ARG claims that an intertwined criminal scheme at the international level can never give room to any because criminal behavior cannot be legitimately conceptualized as a commercial or

expropriation exception.[8]  Moreover, the expropriation exception does not cover *domestic takings* –the Eskenazi Family is Argentinean, originally from the Santa Cruz Province, the stronghold of the Kirchner Family, thus lacking any US connectivity; at the very least, Dr. Ahmed Diaa Eldin Ali Hussein was a dual citizen of Egypt and the United States (28 U.S.C. § 1605(a)(3)). As far as *domestic takings* is concerned, see *Luxepress 2016 Corp. v. Government of Ukraine*, No. 18-V-812, 2020 WL 1308357 at *3 (D.D.C. Mar. 19, 2020).  On top, YPF's bylaws do not cover the term expropriation (article 7 and ancillary), which could have been the case if actually intended so by those enacting them.  For reasons of judicial economy on the specific grounds under Fed. R. Civ. P., Rule 60(b)(6), (d)(1)–(3), RA4ARG reverts to its 2/17/2025 filings.

As a matter of fact, there is no possibility of granting legitimacy to what lacks of it from inception.  It would be ludicrous to conclude the Eskenazi and Kirchner Families' agreement regarding YPF and/or any participation by them in YPF as well as their dealings through the Argentinean government could circumvent such an affirmation, with the mere goal of claiming that there was an honest civil or commercial dispute between the Eskenazi Family (Petersen Group of Companies, Burford Capital and ancillary), on the one hand, and the Republic of Argentina and YPF (somehow controlled by the Kirchner Family for most of the critical time consumed in this very same litigation), on the other hand.  In short, there are no available exceptions to the sovereign immunity of the Republic of Argentina in this case.

In addition, it would be against the national and strategic interests of the United States to allow individuals, one way or the other pegged to egregious alleged government-related

---

[8] Restatement (Fourth) of Foreign Relations Law § 455, Reporter's Note 15, at 374 (2018); Fox, Hazel; Webb, Phillipa, *The Law of State Immunity*, 430-1 (3rd. ed, 2015).

corruption, to recoup at an exponential rate the benefits of such corruption via an award in US courts.  It is a fact of reality that corruption does not clean or wash hands when passing from one to another before reaching US courts as an honest claim.  Indeed, a potential legal precedent in the wrong direction would turn US courts into a lighthouse for the dark world of corrupt individuals attempting to defraud it by arguing civil or commercial disputes out of criminal schemes against their own countries.  RA4ARG pleads this Court for that not to be the case.

In this sense, RA4ARG respectfully argues that the Court has gone beyond its powers at the time of exercising jurisdiction in this case, which by default reaches an entire class of cases US court do not want or should not deal with because of their intrinsic nature and what it ultimately entails: foreign government-related corruption, through brokers or not, being rewarded by the legal system of the United States of America.  See *Ben Sager Chems. Int'l, Inc. v. E. Targosz & Co.*, 560 F.2d 805, 812 (7th Cir. 1977); *Page v. Schweiker*, 786 F.2d 150, 159–60 (3d Cir. 1986) (Garth, J., concurring) (accepting as "hornbook law" that the proper standard is over a "class of cases"); *Gschwind v. Cessna Aircraft Co.*, 232 F.3d 1347 (10th Cir. 2000). (acknowledging the "category of cases" approach, irrespective of the ruling); among others.

The so far concept of finality cannot overtrump the consummation of fraud by Court decree eventually propelling highly damaging legal policy-making worldwide, all of which goes way beyond an eventual judicial error under the constitutionally limited jurisdiction of federal courts under current law.[9]

---

[9] Ludovici, Stephen E., "Rule 60(b)(4): When the Courts of Limited Jurisdiction Yield to Finality", *66 Fla. L. Rev. 881* (2015).

## V.    <u>Conclusion and Relief</u>

As a result of the facts and law above-mentioned, once more RA4ARG pleads the Court to grant the following relief: **(i)** order the Department of Justice (DOJ) and any other relevant agencies to initiate a formal criminal investigation at the international level of the facts and parties previously highlighted; **(ii)** stay these legal proceedings pending of such side criminal investigation as well as eventual indictments and prosecution; and **(iii)** timely vacate the $16.1 billion plus award against the Republic of Argentina due to lack of subject-matter jurisdiction as well as institutional interests and concerns in light of international criminal activity unduly impacting the US legal system (Fed. R. Civ. P, Rule 60 (b)(4), (b)(6), (d)(1)–(3), Rule 12(b)(1)).

DATED in Buenos Aires, ARGENTINA, on February 26, 2025.

By: _____
Fernando G. IRAZU (*pro hac vice* motion pending)
Attorney at Law
***Republican Action for Argentina, Inc.***
Interested Party
Billinghurst 1656
Buenos Aires, 1425, ARGENTINA
fgirazu@gmail.com
+54911 3084-8080

14

## <u>CERTIFICATION</u>

Pursuant to Individual Practice Rules LAP, Rule 2(B), the undersigned certifies that the foregoing Memorandum of Law complies with all formatting requirements and contains 4503 words.

_____
Fernando G. IRAZU (*pro hac vice* motion pending)
Attorney at Law