# Exhibit 4

**THE HIGH COURT**

**H.S.2024. 0000158**

BETWEEN:

PETERSEN ENERGIA INVERSORA S.A.U., PETERSEN ENERGIA S.A.U., ETON PARK CAPITAL MANAGEMENT C.P., ETON PARK MASTER FUND, LTD AND ETON PARK FUND L.P.

**Plaintiffs**

- and-

**THE ARGENTINE REPUBLIC**

**Defendant**

**OUTLINE LEGAL SUBMISSIONS ON BEHALF OF THE ARGENTINE REPUBLIC**

**INTRODUCTION**

1.   In these proceedings, the First and Second Named Plaintiffs (the "**Petersen Plaintiffs**"), along with the Third to Fifth Named Plaintiffs (the "**Eton Park Plaintiffs**" and together with the Petersen Plaintiffs, the "**Plaintiffs**"), were granted leave by Twomey J. on an *ex parte* basis on 25 April 2024, to serve proceedings on the Argentine Republic (the "**Republic**"), pursuant to Order 11, Rule 1(q) of the Rules of the Superior Courts ("**RSC**").

2.   The proceedings seek recognition and enforcement in Ireland of a judgment of the United States District Court for the Southern District of New York (the "**SDNY Court**") entered on 15 September 2023 (the "**New York Judgment**") against the Republic. The New York Judgment arose from proceedings brought by the Petersen Plaintiffs in 2015 and the Eton Park Plaintiffs in 2016 (the "**US Proceedings**"). The New York Judgment is under appeal (the "**2023 Circuit Appeal**") to the US Court of Appeals for the Second Circuit (the "**Second Circuit**").

1

3.   The Republic has brought two applications in response to the initiation of these proceedings.

4.   First, albeit second in time procedurally, the Republic seeks a stay of these proceedings, until such time as the 2023 Circuit Appeal and any subsequent appeal thereafter, is finally determined (the "**Stay Application**"). The Republic argues that the balance of justice favours the grant of a stay.

5.   Second, and without prejudice to the Stay Application, the Republic seeks an Order, pursuant to Order 12, rule 26 RSC and/or pursuant to the inherent jurisdiction of the Court, setting aside the service of the proceedings, on the basis that the Irish Courts lack jurisdiction (the "**Set-Aside Application**").

6.   There are three main bases for the Set-Aside Application.

7.   First, the Republic contends that the Plaintiffs have failed to comply with the well-established test for service outside of the jurisdiction for cases falling within Order 11, rule 1(q) RSC.

8.   In this limb, the Republic also maintains that non-disclosure by the Plaintiffs during the *ex parte* leave stage of their US post-judgment enforcement efforts constituted a breach of the duty of *uberrima fides,* which itself is grounds for setting aside service.

9.   Second, the Republic contends that these proceedings engage the doctrine of sovereign immunity, and therefore that they are non-justiciable.

10.   Third, these proceedings engage the act of state doctrine, with the same result that they are non-justiciable.

11.   The factual background to these proceedings is set out in the Affidavit of Mr. Andrés de la Cruz, former Deputy Treasury Attorney General of the Republic, sworn on 17 January 2025. As it is lengthy, it is not rehearsed in these submissions. Instead, the Republic relies on §9-48 of Mr. de la Cruz's affidavit.

12.   The Republic also relies on the affidavit of Thomas C. White, sworn on 18 March 2025. Mr. White prepared a narrative detailing the procedural history and current status of the US Proceedings.[1]

### A.  STAY APPLICATION

13.   As the New York Judgment did not issue from a Court of an EU Member State or a party to the Lugano Convention, the Stay Application is governed by common law principles, and the Court's inherent jurisdiction.

14.   There has been limited judicial consideration in this jurisdiction of the availability of a stay of enforcement proceedings. The case law primarily concerns the availability of a

---

[1] Mr. White and his colleagues in Sullivan & Cromwell LLP represent the Republic in the US Proceedings.

stay in proceedings initiated under Regulation 44/2001/EC (the "**Brussels I Regulation**") and Regulation (EU) No. 1215/2012 (the "**Recast Regulation**").

15. In this regard, the unique context of enforcement proceedings under the Brussels system should be acknowledged. As held by the CJEU in *Draka NK Cables Ltd and ors v. Omnipol Ltd* (Case C-167/08), at §26-27, the objective of the system is "*a very summary, simple and rapid enforcement procedure*". The procedure "*constitutes an autonomous and complete system, independent of the legal systems of the Contracting States*", and the "*rules relating to it must be interpreted strictly*". The Recast Regulation abolished the *exequatur* procedure by introducing a simplified mechanism for the recognition and enforcement of Member State judgments.[2]

16. In *Haier Europe Trading SRL v. Mares Associates Limited* [2017] IEHC 159, the defendant was the subject of an adverse costs order by an Italian court in the course of strike-out proceedings. The defendant appealed the substantive judgment of the Italian court but had not sought a stay on the award of costs. The plaintiff subsequently sought recognition and enforcement of the costs order against the defendant in the Irish courts, pursuant to the Brussels I Regulation, which was granted by the Master of the High Court, along with protective orders, including an order restraining the defendant from disposing of certain assets.

17. The defendant applied to the High Court for a stay of the enforcement proceedings, pursuant to Article 46 of the Brussels I Regulation. Baker J. considered that the correct approach to an application for a stay was to review "*the question of prejudice and the balance of justice*" (at §70). The Court granted a stay of the enforcement proceedings, on the basis of the defendant's submission that due to its impecuniosity, if the costs order was to be enforced against the company, it would likely be wound up. The winding up of the defendant would, in turn, be fatal to the continuation of the proceedings under appeal in Italy. The Court also noted, in respect of prejudice, that the protective measures ordered by the Master protected the interests of the plaintiff (at §71).

18. In *Brompton Gwyn-Jones v. McDonald (No.2)* [2021] IECA 303, the availability of a stay in the context of enforcement proceedings under the Recast Regulation was considered. Judgment had been obtained against the applicant in Sofia City Court, Bulgaria, in 2017. The applicant had subsequently exhausted available appeals in the Bulgarian courts, and initiated arbitral proceedings before the ICC. The applicant then sought *inter alia* a stay on the enforcement of the Bulgarian judgment against him in the Irish courts, pending the outcome of the ICC arbitration. In the judgment of the High Court ([2020] IEHC 689), Barr J. refused to grant the stay on the basis that it was not available under Article 51(1) of the Recast Regulation, which only allows for a stay of proceedings seeking refusal of enforcement where "*an ordinary appeal*" has been lodged against the judgment in the member state of origin.

19. In the Court of Appeal, the applicant was permitted to argue for a stay on enforcement or execution of the judgment pending the outcome of a fresh application he made to the Bulgarian Supreme Court (§33). Murray J. analysed whether, if mistaken in relation to

---

[2] The judgment creditor is now only required to present to the enforcing court a copy of the judgment and a standard certificate delivered by the court which rendered the judgment (Article 53).

the interpretation of certain provisions of the Regulation, the Court's discretion to stay enforcement should be exercised in favour of the applicant. At §56, he observed:

> "... *Any such exercise of discretion would have to strike a balance between two competing considerations. One arises from the interests of the appellant in not facing enforcement of a judgment which is ultimately unwound in the Member State that issued it, and from the undesirability of a situation in which there are conflicting judgments from Member State courts, one enforcing a judgment and the other vacating it. The other arises from the interests of the respondent in obtaining the fruits of the judgments he has obtained in Bulgaria and which have already been the subject of multiple appeals in that jurisdiction.*"[3]

20. At §57, Murray J. held that both of these perspectives had to be *"judged in the light of the purpose of the Recast Regulation, and, in particular, the objective of ensuring the rapid enforcement and free circulation of judgments of Member State courts, the principle of mutual trust as between those courts and the fact that it is the courts of the Member State of origin before which issues on the merits between the parties are properly resolved."* At §58-60, and based on this analysis relating to the Recast Regulation, Murray J. set out a number of reasons for refusing the stay.

21. These decisions demonstrate that any application for a stay on enforcement proceedings will be highly fact-dependent. In addition, applications for a stay on enforcement under the Brussels system are determined by the relevant provisions of the Regulations, which are to be interpreted strictly and in the context of a system of enforcement which prioritises expediency and is founded on mutual trust as between Member States. Those particular considerations are not present here.

22. A recent decision of the English courts in relation to the availability of a stay in enforcement proceedings is illustrative.

23. **Hulley Enterprises Ltd v Russian Federation** [2021] EWHC 894 ("*Yukos No.1*") involved proceedings for the recognition and enforcement in England of arbitral awards against Russia of over US$50 billion. The proceedings were commenced in 2015, but then stayed by consent in 2016, pending an appeal to the Dutch Supreme Court.[4] The claimants subsequently applied to lift the stay. Henshaw J. rejected that application.

24. The application was based on both the court's general case management powers under the Civil Procedure Rules, and its power to adjourn proceedings for the recognition or enforcement of an arbitration award under section 103(5) of the Arbitration Act 1996.[5]

25. Overall, in considering whether to lift the stay, Henshaw J. considered three matters: (a) the prospects of success of the appeal; (b) whether the appeal was a *bona fide* challenge; (c) delay and prejudice (to the claimants and to Russia).

---

[3] Emphasis added here and throughout with underline.
[4] The Netherlands being the seat of arbitration.
[5] As a result, Henshaw J. referred to some authorities for the presumption in favour of the enforcement of an arbitral award (§58-59) which are not relevant.

4

26.   As to the prospect of success for the appeal, Henshaw J. entered into a detailed analysis, concluding ultimately there was a realistic prospect that Russia would ultimately prevail in the Dutch Supreme Court or the CJEU: §129.

27.   As to whether the appeal was a bona fide challenge or merely "delaying tactics": §130, the claimants argued that Russia was determined not to pay the arbitral awards, and would use any means to frustrate the process. Henshaw J. noted that there was a distinction between good faith in the merits of the appeal, and an unwillingness on the part of Russia to accept the result if it lost. Whilst he considered the likelihood of any judgment being honoured by Russia as "*one stage further removed from the equation than the question of good faith belief in the challenge itself*", he ruled that both factors could be taken into account in the exercise of discretion: §169.

28.   As to delay and prejudice to the claimants, the claimants referred *inter alia* to the very large amounts of interest said to be accruing on the awards. Henshaw J. noted that if enforcement of the award were successful then interest could be recovered through such enforcement: §172. He also analysed the claimants' broader submission that delay in the ability to seek to enforce an award is itself a form of prejudice: §173. It was common ground that there was potentially an additional three years' delay involved in Dutch and potential CJEU processes running their course. However, Henshaw J. ruled that the delay was not "*inordinate*" in the context of investor-state arbitrations generally, or in the context of the overall duration of the Yukos case. There was no suggestion that the claimants were lacking in means such that the delay would cause hardship, nor evidence that delay would cause specific business opportunities to be irretrievably lost: §175.

29.   As to delay and prejudice to Russia, Henshaw J ruled that the risk of inconsistent judgments was a factor which weighed "*significantly in favour*" of continuing the stay pending the final outcome of the challenge in the curial court: §203.

## *The Interests of Justice and Question of Prejudice*

30.   The Republic submits that the interests of justice require the grant of a stay of the within proceedings. There are a number of factors which weigh in favour of a grant of a stay:[6]

   i.   The evidence from Professor Pamela Bookman[7] indicates that the Republic's 2023 Circuit Appeal, which includes three main grounds, "*has a realistic prospect of success*". The Plaintiffs rely on expert report from Dean David Levi dated 10 January 2025. However, Dean Levi has addressed (see paragraph 22.III of his report) the much narrower issue of the "*prospects of success of Argentina's*

---

[6] As canvassed in the affidavits of Mr. Juan Ignacio Stampalija, sworn on 31 March 2025 and 30 April 2025.
[7] Professor Pamela Bookman, tenured professor of law at Fordham Law School in New York, provided an expert report dated 13 December 2024 in the context of the Plaintiffs' enforcement proceedings in the United Kingdom. It was exhibited to the affidavits of Mr. Juan Ignacio Stampalija sworn on 18 and 31 March 2025, at Tab 1 of JIS1 and Tab 4 of JIS2.
Professor Bookman confirms, at §20 of this report, that the Republic has "*clearly represented that it objects to the U.S. courts' exercise of jurisdiction*", and notes at §21:
   "*The Republic further maintained its objection to U.S. courts' exercise of jurisdiction through its continued objections based on forum non conveniens and international comity, which are both grounds for its appeal to the Second Circuit.*"

*pending appeal on grounds…of forum non conveniens and…international comity.*"
Accordingly, there is undisputed expert evidence that the Republic's second and
third grounds of the appeal have a realistic prospect of success.

ii.   The New York Judgment may be vacated, or its quantum may be significantly
      reduced, on foot of the 2023 Circuit Appeal. The outcome of the US Proceedings
      is therefore very material to the within proceedings, and may even be entirely
      determinative of the enforcement proceedings before the Irish High Court (see
      *Yukos No.1* at §64(iv)).

iii.  If the enforcement proceedings are not stayed, there is a significant risk that there
      shall be inconsistent and conflicting judgments handed down in these proceedings
      and in the US Proceedings.

iv.   In the absence of a stay, there is therefore a real risk of inefficiency, inconvenience,
      and waste of both judicial resources and the parties' resources, if enforcement
      proceedings are pursued and then transpire to be unnecessary or if the
      proceedings will require further judicial attention, and corrective steps to be taken
      upon the delivery of the appeal judgment(s) in the US Proceedings.

31.   It is submitted that no material prejudice will be suffered by the Plaintiffs upon the grant
      of a stay,[8] in circumstances where:

      i.    There is no risk of dissipation of assets by the Republic, in circumstances where
            no assets have been identified by the Plaintiffs within this jurisdiction.[9]

      ii.   In the event that the New York Judgment is upheld in the US Proceedings, the
            Plaintiffs can be compensated by way of interest for any delay occasioned by a
            stay.

      iii.  There are other extensive enforcement efforts ongoing against the Republic in the
            US.[10]

      iv.   In circumstances where the US Proceedings commenced in 2015, much like in
            *Yukos No.1*, the extra period of time attendant upon a stay of these proceedings
            pending the exhaustion of US appeals is not inordinate.

32.   While the stay of enforcement of the New York Judgment has expired,[11] the availability
      of a stay in these proceedings is a question to be determined in accordance with Irish
      legal principles. A similar approach was followed in *Yukos No.1*, where Henshaw J. held
      that the Dutch court set down a different standard of review in respect of the suspension
      of proceedings, and it was for the English courts to apply its own law and standards in
      relation to stays (at §200).

---

[8] Nor is any identified in the affidavit of Mr. Armando Betancor Alamo sworn on 22 April 2025.
[9] See Ground I of the Set-Aside Application in B.
[10] Ibid.
[11] Further detail on this matter is provided in the Narrative exhibited to the affidavit of Mr. White at §59, and §62-67.

B. **SET-ASIDE APPLICATION**

33. Order 11, rule 1(q) RSC provided the basis or jurisdictional gateway for seeking service outside of the jurisdiction in these proceedings. It permits the Court to allow service out of the jurisdiction when a proceeding is brought "*to enforce any foreign judgment*".

34. Under Order 11, rule 5 RSC, a plaintiff must demonstrate a belief that they have a "*good cause of action*" and it must be clear that the case is a "*proper one*" for the Court to exercise its discretion to grant leave.

35. Order 11, rule 2 RSC requires a Court to consider the comparative cost and convenience of proceedings. It provides:

> *"Where leave is asked from the Court to serve a summons or notice thereof under rule 1, the Court to whom such application shall be made shall have regard to the amount or value of the claim or property affected and to the comparative cost and convenience of proceedings in Ireland, or in the place of the defendant's residence…."*

36. An application to set aside service outside the jurisdiction is available under Order 12, rule 26 RSC.

37. As noted by McGovern J. in *Avobone NV v. Aurelian Oil and Gas Ltd* [2016] IEHC 636, at §12, "*Jurisdiction must be found to exist before enforcement can be considered by the court.*" Thus far, the High Court has only heard the Plaintiffs on this issue.

38. In *Analog Devices B.V. v. Zurich Insurance Company* [2002] 1 IR 272 ("*Analog*") a case which considered the jurisdictional gateway provided by Order 11, rule 1(h) RSC, the Supreme Court emphasised that as leave for service outside of the jurisdiction brings persons before what is for them a foreign court, the international comity of courts has *"long required, therefore, that our courts examine such applications with care and circumspection"* (per Fennelly J., at p.281).

39. As set out above, there are three grounds pleaded in support of the Set-Aside Application:

    I.    **Failure to Meet the Test for Service Out of Recognition of Foreign Judgment Proceedings**

    II.   **Sovereign Immunity**

    III.  **Act of State**

40. These grounds shall be analysed in turn, along with the issue of breach of the duty of *uberrima fides.*

I.    **FAILURE TO MEET THE TEST FOR SERVICE OUT OF RECOGNITION OF FOREIGN JUDGMENT PROCEEDINGS**

41.  As the New York Judgment did not issue from a Court of an EU Member State or a party to the Lugano Convention, the Set-Aside Application is governed by standard common law principles and by the provisions of Order 11 RSC. This was confirmed, in respect of a judgment of a court of a different State – Albania – in the leading and highly relevant Irish Court of Appeal decision on a set-aside application in relation to enforcement of a judgment of a foreign court; *Albaniabeg Ambient Shpk v. Enel SPA & Enelpower SPA* [2018] IECA 46 ("*Albaniabeg*"), at §13.

42.  There is a three-part test in cases concerning the recognition of foreign judgments. In *Albaniabeg*, Hogan J. set this out at §30:

> "…one may agree with McDermott J. when he stated that a plaintiff such as the present one must generally establish (i) that it has a good arguable case; (ii) that it is likely to obtain a practical benefit from the proceedings and (iii) that it satisfies the comparative cost and convenience requirements of Ord. 11, r. 2."

43.  Hogan J. stated that the jurisdictional bases upon which Irish courts may assume jurisdiction may be exorbitant and are mitigated by considerations of *forum conveniens* (§14). He emphasised that the exercise of a potentially exorbitant jurisdiction permitted by Order 11 RSC, was tempered by rules 2 and 5 thereof (§23). He stressed that the jurisdiction under Order 11 RSC is a discretionary one.

44.  It is well established that the party who obtained the *ex parte* order for service out of the jurisdiction must carry the burden of demonstrating that the order in question was properly granted (*Albaniabeg* §19).

**The Three-Part Albaniabeg Test**

*(i)    Good Arguable Case*

**The Test**

45.  In *Albaniabeg*, Hedigan J. granted the plaintiff liberty, on an *ex parte* basis, to serve out of the jurisdiction to seek to enforce in Ireland a judgment of an Albanian court against two Italian defendants, ENEL S.p.A. and ENEL Power S.p.A (together "ENEL") in the amount of approx. €433m. McDermott J. granted ENEL's application to set aside service under Order 12, rule 26 RSC. The plaintiff appealed to the Court of Appeal, and was unsuccessful.

46.  In respect of the first limb of the test, Hogan J noted, at §32, that at common law a foreign judgment delivered by a foreign court is generally unimpeachable on its merits, but that a range of defences to enforcement can be set up. The Court was satisfied that the plaintiff had a good arguable cause of action in seeking to enforce the foreign judgment within the meaning of Order 11 RSC.

8

47.  It is accepted that the first limb is generally a low hurdle (see *Analog* and *IBRC v. Quinn* [2016] 3 IR 197 ("*Quinn*"), both of which related to Order 11, rule 1(h) RSC). However, these proceedings are quite unique, due to the identity of the Republic – a nation State. The Republic maintains that the Irish Courts have no jurisdiction to entertain these proceedings, due to the doctrines of sovereign immunity and act of state.[12] Its immunity is a binary issue which goes to the justiciability of the claim. Either the Republic is immune from adjudication (as the Republic asserts is the case), in which case adjudication on the merits simply cannot proceed, or it is not immune, in which case, the matter, subject to other jurisdictional arguments, might proceed before the Irish Courts.[13]

48.  The UK Supreme Court in *VTB Capital plc v. Nutritek International Corp and others* [2013] 2 AC 337 at §164 held that where a question of law arises in connection with a dispute about service out of the jurisdiction and that question of law goes to the existence of the jurisdiction, then the court will normally decide the question of law, as opposed to seeing whether there is a good arguable case on it.

49.  There is also UK authority to the effect that where a State makes a claim to immunity, it is necessary for the court to determine, on a final and not merely interlocutory basis, whether the ground for immunity/loss of immunity exists. Lord Kerr L.J in *JH Rayner (Mincing Lane) Ltd v. Department of Trade and Industry* [1989] 1 Ch 72 ("*Rayner*"), at p.194, observed:

> *"However, in the end I was persuaded that the judge's conclusion in favour of a good arguable case could not be supported. Although not a decision under the Act of 1978, that was the conclusion of Robert Goff J. in I Congreso del Partido [1978] Q.B. 500, 535-537, in a similar context of an issue as to the court's jurisdiction in the face of a claim to sovereign immunity. Mr. Pollock also pointed to the complications which would arise if a "good arguable case" in favour of an exception to immunity under, say, section 3 were then to lead directly to a trial of the merits of the action, as Mr. Kentridge contends. The defendant state could in that event not defend the substantive claims without taking steps in the proceedings, which would involve a submission to the jurisdiction under section 2(3)(b).*
>
> *In the upshot, therefore, I am persuaded that whenever the question arises under the Act of 1978 whether a defendant state is immune by virtue of section 1 or not immune by virtue of one of the exceptions, then this question must be decided as a preliminary issue in favour of the plaintiff, in whatever form and by whatever procedure the court may consider appropriate, before the substantive action can proceed."*

50.  This point was confirmed in *London Steam-Ship Owners' Mutual Insurance Association Ltd v. Kingdom of Spain* [2022] 1 WLR 3434, at §54.[14]

51.  In *Trafalgar Developments Ltd & Ors. v. Mazepin & Ors.* [2022] IEHC 167 ("*Trafalgar*"), a set-aside application was based, *inter alia*, on the act of state/non-

---

[12] As explained in detail in Grounds II and III below.
[13] The Republic signalled this in the affidavit of Juan Ignacio Stampalija sworn on 18 March 2025.
[14] Furthermore, the duty on courts to consider state immunity (of their own motion) was emphasised recently by the UK Supreme Court in *Embassy of Saudi Arabia v Constantine* [2025] UKSC 9.

justiciability doctrines. The case concerned allegations of conspiracy made by shareholders to a company incorporated in Russia. The defendants alleged that parts of the plaintiffs' case required the Irish courts to consider decisions taken by the Russian courts and by Russian regulatory and administrative authorities.

52. Barniville J. (as he was then), refused to decline jurisdiction on this basis, at §229-232, noting *inter alia* that the plaintiffs did not seek to overturn, quash or reverse the decisions, proceedings and procedures of various Russian administrative, regulatory and executive bodies. He also noted that there was "*a very real question as to whether the "act of state" doctrine or the related doctrine of non-justiciability applies at all to foreign judicial acts*" (§232). Barniville J. concluded that the plaintiffs had demonstrated "*at least a good arguable case that they are not precluded from maintaining the allegations*" (§249) which were challenged by the defendants on the basis of these doctrines. It was held that the defendants did not put forward a "*knockout blow*" or "*unanswerable response*" to the plaintiffs' case that the doctrines did not apply, and it would be a matter for the trial judge to determine whether the plaintiffs succeeded on them.

### *Application*

53. For all of the reasons detailed in Grounds II and III below, the doctrines of sovereign immunity and act of state are engaged, and it is submitted that these proceedings are non-justiciable. The Republic submits that these issues going to the very heart of jurisdiction must be determined. Furthermore, insofar as there is any conflict of evidence that is material to the outcome of these issues, they should be decided in a plenary hearing.

54. The Republic submits that this approach is consistent with *Quinn*, as the Republic must not be obliged to come to Ireland to defend a case which has "*no prospect of being capable of being proven*" (§54).

55. It is submitted that *Trafalgar* should be distinguished, in light of the particular facts of this application, involving as it does a nation State. The burden remains at all times on the Plaintiffs to establish jurisdiction. Furthermore, it is not apparent that cases such as *Rayner* were considered in *Trafalgar*. However, if the Court follows the approach of determining that the Plaintiffs need only show a good arguable case that they are not precluded from maintaining their recognition and enforcement application on the basis of the doctrines of sovereign immunity and act of state, then it must follow that if these issues are not finally determined on this application, the Republic is entitled to fully ventilate them again in any subsequent proceedings.

### *(ii)   Practical Benefit*

#### *The Test*

56. In *Albaniabeg*, Hogan J. held, at §24, that the "*practical benefit*" limb of the test reflected the principle that a court "*will not act in vain*". Hogan J. held that the real question was whether the enforcement of the Albanian judgment in this jurisdiction would serve "*any useful purpose*" given the absence of any assets of ENEL in this jurisdiction (§35). Hogan J. noted, at §36, that it was not a precondition to the exercise of the court's

10

discretion that the proposed defendants should have "*already assets*" within the jurisdiction.

57. Hogan J. discussed *Yukos Capital Sarl v OAO Tomknefit VNK* [2014] IEHC 115 ("*Yukos*") and *Tasarruf Mevduati Sigorta Fonu v. Demirel* [2007] 1 WLR 2508 ("*Tasarruf*"), both considered below. Hogan J. reached the following conclusion, at §49:

> "*The underlying principle, nevertheless, remains that there must be some prospect that a judgment creditor will obtain a benefit from commencing enforcement proceedings in respect of the foreign judgment in question. While, as Clarke J. said in Quinn, the bar regarding the grant of leave under Ord. 11 is a low one, it is nonetheless not asking too much of that litigant to demonstrate that it stands to obtain some practical benefit from those enforcement proceedings, even if that benefit is an indirect or prospective one.*"

58. In *Albaniabeg,* Hogan J. provided two main rationales for the requirement of practical benefit, at §50-51:

> "*First, there are considerations of costs. The cost implications are obvious, because if Albaniabeg is correct, every foreign judgment creditor in whose favour an award has been made in a commercial dispute could – in principle, at least - seek enforcement in the Irish courts by reason of the status of Dublin as a global financial centre, regardless of whether there was any prospect of recovery or material benefit (even if indirect), thus increasing the costs for both themselves and the judgment debtor.*
>
> *Second, the courts are under a duty to manage their own affairs such that scarce judicial resources are conserved and are best utilised for the benefit of all litigants. Those resources are generally not well utilised where judicial energies are expended on an issue with no real connection with Ireland and where the prospects of a judgment creditor recovering assets in Ireland are remote or tenuous....*"

59. In *Albaniabeg,* Hogan J. looked at the evidence of ENEL's assets within the jurisdiction. ENEL had listed a number of debt securities on the Irish Stock Exchange ("ISE"). However, at §53-54, Hogan J agreed that this was insufficient, not least because those assets had English or New York jurisdiction clauses. He was satisfied that there were no current assets within the jurisdiction and no evidence of a real prospect of any assets coming into the jurisdiction (§57-58).

60. Hogan J. held that the next question was whether it would be appropriate to permit the plaintiff to commence the enforcement proceedings on the ground that it desired the *imprimatur* of the Irish courts. He noted that Ireland was the fifth jurisdiction in which the plaintiff had applied for recognition and enforcement of the Albanian judgment and that the other four jurisdictions (New York, The Netherlands, Luxembourg and France) were all highly respected venues for the resolution of international commercial disputes. Importantly, Hogan J. held, at §63 that:

> "*While there may well be cases where a court would be prepared to grant leave for Ord. 11 purposes simply for the purposes of simply enabling a judgment*

11

*creditor to obtain the imprimatur of the Irish courts in the manner which I have indicated, nevertheless – as Yukos indicates – it would be rarely correct to do so for this sole purposes when enforcement proceedings have been determined or are pending in the courts of other third party jurisdictions. ·This is especially so having regard to the questions of comparative cost and convenience which I now propose to consider".*

61. At §71 of his judgment, Hogan J. concluded:

*"while the court may well have a jurisdiction to grant leave for Ord. 11, r. 1(q) purposes where the sole purpose of the application is to ensure the imprimatur of the foreign judgment by an Irish court, even if there is no actual material benefit, cases of this kind are likely to remain unusual, even exceptional. Leave should not normally be granted in such cases where enforcement proceedings have already been determined or are pending in other third country jurisdictions."*

62. The decision in *Yukos* is also a leading High Court authority on set-aside applications relating specifically to Order 11, rule 1(q) RSC. The applicant was a Luxembourg company which sought to enforce an international arbitration award in Ireland against a Russian corporation. Kelly J. (as he then was) set aside the order of the High Court which had granted leave.

63. On the "*practical benefit*" question, Kelly J. had regard to the defendant's affidavit evidence to the effect that there were no assets at all in the jurisdiction. He held, at §107:

"*The response to these assertions is rather limp. The applicant appears to accept that there are no assets in Ireland but says that a recognition and enforcement of the award here "would permit enforcement of the award against any future assets of the respondent in the jurisdiction, including any debts owed now or in the future to the respondent by any party present in this jurisdiction*".

64. The plaintiff's position equated to a "*forlorn hope based on little or no evidence that at some stage in the future, assets may become available against which execution could take place in this jurisdiction*" (§111).

65. Kelly J. then reviewed *Tasarruf*, and held that in the absence of assets in or likely to be in this jurisdiction, the question was what "*solid practical benefit*" would ensue if the award was enforced (§124).

66. Kelly J. noted that the plaintiff also asserted recognition would be advantageous because Ireland was an unbiased and internationally respected Court and that a judgment could be enforceable in other jurisdictions. He noted that the plaintiff had sought and failed to obtain recognition in France and that recognition was underway in the courts of Singapore. The Court concluded, at §141-142 that it was not appropriate for the Irish Court to assume jurisdiction:

*"It is a case with no connection with Ireland. There are no assets within this jurisdiction. There is no real likelihood of assets coming into this jurisdiction. This is the fourth attempt on the part of the applicant to enforce this award. There is little to demonstrate any "solid practical benefit" to be gained by the applicant. The*

> *desire or entitlement to obtain an award from a "respectable" court has already been exercised in the courts of France and is underway in the courts of Singapore.*
>
> *The respondent has already had to undertake a defence of the proceedings in Russia and in France and has been successful to date in so doing. It would be unjust to require the respondent to yet again defend its position. The respondent should not be forced to come into a third state (Ireland) which is foreign to it and reargue its case again..."*

67. The Plaintiffs, at the *ex parte* leave stage, laid some emphasis on the decision of *Trafalgar*, a decision where leave to serve out was not set aside. However, this was a case with very different facts, and it can be easily distinguished. First, it did not relate to enforcement of a judgment, and instead was based on Order 11, rule 1(h) RSC. Second, central to the Court's reasoning was the presence of a strong Irish connection. The plaintiffs claimed that parties known as the Russian UCCU defendants were parties to a conspiracy. The conspiracy was also alleged to involve an Irish company, Eurotoaz Ltd. The Court was satisfied that the UCCU defendants were necessary and proper parties to an action properly brought by the plaintiffs against Eurotoaz. Barniville J. distinguished *Albaniabeg* and *Yukos*, holding at §197, "*Here, however, there is an Irish defendant (Eurotoaz) against whom the plaintiffs intend to proceed and, to that extent, an Irish Connection.*"

68. The Plaintiffs also laid emphasis on *Tasarruf,* where it was held that a "*practical benefit*" could be "*indirect or prospective*". However, it was also expressly noted that it will not ordinarily be "*just*" to permit service out of the jurisdiction "*unless there is a real prospect of a legitimate benefit to the claimant from the English proceedings*" (§27). Furthermore, *Tasarruf* can be readily distinguished on its particular facts. The Court of Appeal considered a set of circumstances involving fraud and concern about the shelter of assets by a private person (§39).

69. Furthermore, in *Albaniabeg*, Hogan J. held that *Tasarruf* "*must be viewed as a case where on the facts of that case the English Court of Appeal thought that there was a real prospect that the plaintiff bank would obtain a real benefit by seeking to enforce the judgment in that jurisdiction*" (§43). In *Yukos*, it was held by Kelly J. that the factual situation in *Tasarruf* was very different to the facts of that case (§123). Similarly, the case has no bearing on the facts obtaining in these proceedings.

70. Finally, the decision of the High Court of England and Wales in **Caterpillar Financial Services (Dubai) Limited v National Gulf Construction LLC** [2022] EWHC 914 which again, was relied upon by the Plaintiffs at the *ex parte* stage, has limited application. Importantly, in that case, there was a connection with the UK. At §31, it was held that one of the defendants' groups was an import and export company and there was a reasonable prospect that some transactions may involve import or export from England or involve the movement of assets through London. No Irish Court has approved of this decision. Furthermore, there is no Irish connection in this case.

13

*Application*

71. The affidavit of Mr. Betancor Alamo sworn on 18 April 2024 provided, at §138 that the Plaintiffs "*continue to investigate the nature and extent of the assets of the Argentine State in various jurisdictions*". During the *ex parte* application, a week later, the Plaintiffs stated that they had "*not identified yet assets within the jurisdiction*".[15]

72. Mr. José Ignacio García Hamilton, the Legal and Administrative Secretary of the Ministry of Economy of the Republic, swore an affidavit on 6 December 2024 which detailed the position as regards assets of the Republic in this jurisdiction and confirmed:

    (a) that the only assets of the Republic in Ireland relate to diplomatic and consular representation (§5);

    (b) that there are no debt securities listed by the Republic in this jurisdiction (§7);

    (c) that there is no prospect of any assets of the Republic coming into this jurisdiction in the near or medium future (§8)

73. None of the affidavits sworn by the Plaintiffs has challenged this evidence.

74. Mr. Betancor Alamo makes reference, at §142 of his affidavit sworn on 18 April 2024, to Ireland being "*the place of domicile for 6% of worldwide fund investment assets*" and at §143, he avers that "*Ireland is a jurisdiction in which Argentina could list debt securities*". At §72 of Mr. Betancor Alamo's affidavit of 14 February 2025, he avers that the examples of investment funds and debt securities are "*representative only*" and that is "*readily possible to envisage many other asset classes which might become present in Ireland.*"

75. This Republic submits that these averments amount to a "*forlorn hope*" based on no evidence that assets might become available against which execution could take place in this jurisdiction (*Yukos* §111). Furthermore, the situation regarding potential assets is even weaker than in *Albaniabeg*, where debt securities had actually been listed on the ISE, and service was still set aside.

76. The Plaintiffs detail a range of potential procedural tools which they say might be available to them in this jurisdiction if the New York Judgment is recognised (§135-144 of Mr. Betancor Alamo's affidavit of 18 April 2024). The Plaintiffs emphasise that it is important for them to be in a position to quickly enforce the New York Judgment if and when assets become available (§71 and §74 of Mr. Betancor Alamo's affidavit of 14 February 2025). Several points can be made in response.

77. *First*, there is uncontested evidence that there is no prospect of any assets of the Republic coming into this jurisdiction in the near or medium future.[16] Accordingly, having access to procedures such as charging orders in respect of shares owned by the Republic in any Irish company (§141 of Mr. Betancor Alamo's affidavit of 18 April 2024) is meaningless, and does not constitute a practical benefit.

---

[15] See page 33 of the Transcript at Tab 12 of exhibit ADLC1 to the affidavit of Mr. de la Cruz, sworn on 9 December 2024.

[16] Again, this is set out in the affidavit of Mr. García Hamilton, at §8.

14

78.   **Second**, the Plaintiffs discuss obtaining facilities such as discovery in aid of execution or requiring an appropriate representative of the Republic to give evidence on oath in relation to the ability of the Republic to satisfy the New York Judgment (§140 of Mr. Betancor Alamo's affidavit of 18 April 2024). However, there is now evidence on oath regarding the position in relation to current and prospective assets in this jurisdiction. In the circumstances, procedures designed to establish whereabouts of the assets of the Republic in this jurisdiction are redundant.

79.   **Third**, and relatedly, the Plaintiffs are engaged in extensive enforcement efforts in the US which involve discovery procedures designed to establish the position as regards assets on a worldwide basis. This was not disclosed at the leave stage, and it has never been explained on affidavit why there was a failure to impart this important information. On 16 October 2023, the Plaintiffs began a process of discovery in aid of execution in the US.[17] To date, the Republic has delivered over 9,000 documents to the Plaintiffs, setting out the position as regards assets in multiple jurisdictions.[18]

80.   For instance, on 12 April 2024, before the *ex parte* leave application, and prior to the swearing of the affidavits which underpinned it, the Republic produced deeds relating to diplomatic/consular real estate in Ireland. Furthermore, the Plaintiffs had already, prior to the leave application, served document subpoenas on various parties seeking information as to any bank accounts held by the Argentine Republic worldwide, including those held in the Republic of Ireland.

81.   In addition, on 1 April 2024,[19] the Plaintiffs moved for a motion for injunction and turnover, requesting the SDNY Court to order the Republic to turn over its shares of YPF in partial satisfaction of the New York Judgment.

82.   A full chronology of the steps taken in the post-judgment US enforcement efforts is contained at **Appendix 1**.

83.   When the full picture is available, it is apparent that several of the procedural remedies to which the Plaintiffs seek access in this jurisdiction are wholly duplicative of their efforts in the US.

84.   Incidentally, the Plaintiffs have provided a quote from Judge Preska, at §56 of the final affidavit of Mr. Betancor Alamo in respect of the Set-Aside Application, sworn on 31 March 2025, to which the Republic has no liberty to reply. It is misleading, as it was made in respect of one of the Plaintiffs' over one hundred document requests, in circumstances where the Republic had a relevance objection. The Republic has complied in full with all orders to produce documents, and in fact the Plaintiffs do not suggest otherwise.

---

[17] As detailed more fully in Mr. de la Cruz's affidavit of 17 January 2025 (§69-76).
[18] As stated in the Narrative exhibited to the affidavit of Mr. White, at §76.
[19] It should be noted that in the Narrative exhibited to the affidavit of Mr. White at §77, the date provided is 22 April 2024, whereas in Mr. de la Cruz's affidavit of 17 January 2025 at §76, the date provided is 1 April 2024. This is due to the fact that the Plaintiffs first filed their motion under seal (not on the docket) on 1 April 2024, but when the SDNY Court denied the filing under seal, the Plaintiffs made their motion on the docket on 22 April 2024.

85.  **Fourth**, while the Plaintiffs do not provide any detail as regards their US enforcement efforts in their affidavits, at §73 of Mr. Betancor Alamo's affidavit of 14 February 2025, it is briefly averred that Irish enforcement processes would be available to the Plaintiffs throughout the life of any judgment which might be obtained, and that "*the fact that the plaintiffs have previously obtained information and documentation in aid of execution by order of the New York court does not undermine this benefit*".

86.  In other words, the Plaintiffs appear to acknowledge that they know now the position as regards the Republic's assets, but that it would still be valuable to them at some unspecified point in the future to conduct another trawl for information. There is no jurisdiction to entertain these proceedings on the basis that enforcement processes might possibly prove useful in the future. In *Yukos*, Kelly J. was not satisfied to allow jurisdiction based on the argument that recognition and enforcement, "*would permit enforcement of the award against any future assets of the respondent in the jurisdiction during the operative period (12 years) of such order*" (§107.) Furthermore, it should be added that the Plaintiffs may continue to obtain information and documentation in aid of execution in the future in the US Proceedings, including in relation to Ireland, provided the New York Judgment is not vacated.

87.  **Fifth,** the Plaintiffs have belatedly introduced the idea of the benefit that might be obtained if an order recognising or enforcing the New York Judgment in this jurisdiction benefited from presumptive recognition throughout the European Union under the provisions of the Recast Regulation, in particular Article 36 thereof (§75-76 of Mr. Betancor Alamo's affidavit of 14 February 2025). This potential benefit was not raised at the leave stage, or in any affidavit prior to that delivered in February 2025. It is submitted that even if the Plaintiffs were correct that presumptive recognition would follow from an Irish order, it is too remote to constitute a legitimate or "*solid practical benefit*" (*Yukos*, §124), for the following reasons:

   87.1  The Plaintiffs' arguments depend on Ireland deciding these proceedings, on a substantive basis, first in time. Even if the Plaintiffs can establish jurisdiction, the range of defences the Republic has outlined means that it is likely the parties would subsequently be engaged in contentious and lengthy plenary proceedings. For instance, the prohibition on champerty and maintenance in this jurisdiction is a point which will complicate the Plaintiffs' efforts to enforce here.

   87.2  Presumptive recognition does not deprive the party against whom enforcement is sought of the right to oppose enforcement of that judgment by relying on one of the grounds for refusal in accordance with Article 45 of the Regulation. For example, in accordance with Article 45(1)(a), read in conjunction with Article 46, recognition of a judgment can be refused if such recognition is manifestly contrary to public policy in the Member State addressed.

   87.3  The Plaintiffs have failed to identify on affidavit another EU Member State where they have established the presence of assets of the Republic, current

or prospective. It would be logical to commence enforcement proceedings in such a State.

87.4 In *Yukos*, an averment to the effect that a judgment or order of the Irish Court "*may also be enforceable in other jurisdictions*" (§108) was insufficient.

87.5 This prospective benefit is another way of expressing a desire to obtain the imprimatur of a respected EU court. However, where proceedings are pending in other Member States, as they are here in several jurisdictions, leave to serve out should be exceptional, and is not normally granted (*Albaniabeg* and *Yukos*).

88.  **Sixth,** the Court is entitled to take into account the comments made by Burford in respect of the true intent of the Plaintiffs' worldwide enforcement campaign. In Burford's earnings call of 7 November 2024, which was detailed in §138-142 of the affidavit of Mr. de la Cruz, sworn on 9 December 2024, the goal of the Plaintiffs' enforcement campaign was expressed to be to "*apply pressure and create friction*" on a sovereign State to force it to negotiate, and to throw "*sand in the gears*" in the attempt by that State to rejoin the capital markets and participate in the global economy. Burford revealed that the primary aim was not "*actually seizing and selling off assets*".

89.  **Seventh,** insofar as it has any relevance, the Plaintiffs have engaged in extensive criticism of the conduct of the Republic in its "*engagement with its financial obligations*", at §41-51 in the final affidavit of Mr. Betancor Alamo in respect of the Set-Aside Application, sworn on 31 March 2025, to which the Republic had no liberty to reply. However, the allegations were repeated in the affidavit of the Mr. Betancor Alamo sworn on 22 April 2025 in respect of the Stay Application, and so the Republic addressed them in the affidavit of Mr. Juan Ignacio Stampalija sworn on 30 April 2025.

90.  In short, as set out in that affidavit, the criticism is gratuitous, and the Plaintiffs have selectively presented material and relied on some outdated cases. Notably, the Plaintiffs chose not to refer to decisions such as *Bison Bee LLC v. Republic of Argentina*, a decision of 4 October 2019,[20] where the Second Circuit commented that: "[In] *NML Capital, Ltd v Republic of Argentina, 727 F.3d 230, 247 (2D Cir. 2013). ...we held that Argentina violated the pari passu clause at issue because it was, at the time, a 'uniquely recalcitrant debtor.' ... But times have changed, and Argentina is 'uniquely recalcitrant' no more. It is for this reason that we went so far as to affirm the vacatur of a pari passu injunction against Argentina just a few years ago...*".[21]

---

[20] *Bison Bee LLC v. Republic of Argentina*, 778 F. App'x 72 (2d Cir. 2019).
[21] And see:

   (i)   *Ladjevardian v. Republic of Argentina*, No. 06 Civ. 3276 (TPG), 26 May 2016, in the context of the "Holdout Litigation", where Judge Griesa of the SDNY Court noted, at p.1, that "*after a new administration came to office, the Republic announced a global settlement proposal in February 2016 ... the new administration also entered into negotiations with many FAA bondholders and began reaching settlement agreements. After just a few weeks, bondholders owning the vast majority of outstanding claims had agreed to settle, leaving only a few who continued to hold out ...*".

   (ii)  *Bugliotti v. Republic of Argentina*, 952 F.3d 410 (2d Cir. 2020), 17 March 2020, where the Second Circuit stated that "*As we have previously explained, mere selectivity in payment among FAA bondholders is not enough to give rise to a pari passu violation ... Plaintiffs have not alleged facts*

17

91. In conclusion, although it is not a precondition to the exercise of the discretion to permit service out of the jurisdiction that the proposed defendant must have assets within the jurisdiction, as there are no assets, no prospect of assets, and as no solid or legitimate practical benefits of any kind have been identified by the Plaintiffs, both *Albaniabeg* and *Yukos* dictate that it is then appropriate to consider whether a desire to obtain the imprimatur of Irish courts is sufficient.

92. In this case, in circumstances where *exequatur* proceedings are pending in five other jurisdictions (the UK, Cyprus, France, Luxembourg and Canada), leave to serve out should not be granted.

### *(iii)   Order 11, rule 2 RSC*

#### *The Test*

93. In *Albaniabeg*, Hogan J. considered Order 11, rule 2 RSC, and noted that the companies involved were Italian and Albanian. He said that an Irish court would have to consider a number of matters in light of the prospective defences to recognition and enforcement which ENEL proposed to raise, including the regularity of that judgment, the manner in which it was obtained, and whether fair procedures were observed. He stated that witnesses giving evidence as to matters of fact, or as expert witnesses, for example on matters of law, would have to travel from Albania and Italy and that a relatively lengthy and costly enforcement hearing could not be excluded. He concluded, at §64:

> *"Enforcement proceedings have already issued in a variety of other jurisdictions. I agree with McDermott J. that it cannot be fair to the defendants to require them to attend in yet another foreign jurisdiction to defend yet a further round of enforcement proceedings having regard to the overall cost implications of such fresh proceedings and the lack of any real prospect of achieving any purpose by seeking to secure the enforcement of the Albanian judgment here. This is especially so when the subject matter of the dispute has no connection with Ireland whatever."*

94. In *Yukos*, Kelly J. when examining the question of comparative cost and convenience, held, at §81, that the provisions of Order 11, rules 2 and 5 were of "*general application to all applications which fall to be made under the order* [Order 11 RSC]". He summarised the import of Order 11, rule 2 RSC, at §92:

> *"Before the Irish Courts assert jurisdiction over a foreign defendant, they must be satisfied that the case is a proper one in which to do so. One consideration which has to be borne in mind in that evaluation is the comparative cost and convenience of the proceedings in this country."*

---

*sufficient to disturb our more recent conclusion* [in the *Bison Bee* case] *that 'Argentina is 'uniquely recalcitrant' no more'".*

(iii)   The recent *Palladian* litigation in the UK, referenced by the Plaintiffs, where it should be noted that Argentina has complied with court orders (including by agreeing to the drawdown of the letter of credit in January 2025 and paying the claimants' costs in February 2025) and where negotiations for the payment of the judgment are underway.

95.  Kelly J. noted that in *McCrea v. Knight* [1896] 2 I.R. 619, convenience meant "*fitness, propriety and suitableness*". The Court found assistance in decisions dealing with *forum non conveniens.* Kelly J. was not satisfied, in all the circumstances, that he should exercise his discretion to allow the action to proceed in Ireland (§140-142).

### *Application*

96.  The Plaintiffs maintain throughout their various affidavits that the question of comparative cost and convenience does not arise.[22] In §85 of Mr. Betancor Alamo's 14 February 2025 affidavit, it is argued that as it is not possible to seek "*recognition or enforcement of the New York Judgment in Ireland before the courts of Argentina*", the rule does not arise.

97.  However, at the *ex parte* leave hearing on 25 April 2024, when questioned by Twomey J. about this limb of the test, the Plaintiffs did not deny it was of application, and in fact claimed the test was fulfilled.[23] Emphasis was laid on the value of the New York Judgment, and with the cost of recognition or enforcement in any individual jurisdiction said to be "*completely insignificant relative to that claim*".[24]

98.  Several points can be made in response to the arguments made by the Plaintiffs, and in support of the contention that comparative cost and convenience points away from this Court assuming jurisdiction.

99.  *First*, key judgments such as *Albaniabeg* and *Yukos* involved consideration of Order 11, rule 2 RSC. In *Yukos*, it was described to be a rule of general application to Order 11 RSC cases (§81). The Plaintiffs have framed the proceedings in a narrow and incorrect manner. This is a recognition of foreign judgment application. It is possible to initiate it in a variety of jurisdictions, including in the Republic. Incidentally, the Republic highlighted at §67 of the affidavit of Mr. de la Cruz of 17 January 2025 that there had been no enforcement steps in the Republic. In the final affidavit of the Plaintiffs in respect of the Set-Aside Application, sworn on 31 March 2025, to which the Republic has no liberty to reply, Mr. Betancor Alamo sets out a range of reasons (at §87-102) why the Plaintiffs are not seeking to enforce in the Republic.

100. The Republic refutes all of these reasons. The Plaintiffs rely heavily on the Naveira Declaration from 16 October 2015. To the extent that these criticisms of the Republic retain any currency at a remove of a decade, the Republic relies on the Javier Errecondo Declaration of 9 November 2015, which it filed in the US Proceedings in rebuttal, and which it has exhibited in these proceedings.[25] This Declaration addresses the independence of the Argentine courts, alleged delays in litigation, litigation costs (including the 3% tax which Mr. Betancor raises and which Errecondo notes can be waived in certain circumstances such as in the Plaintiffs' case), and access to discovery.

---

[22] See the affidavit of Mr. Betancor Alamo of 18 April 2024, §161.
[23] See page 32 of the Transcript.
[24] See page 54 of the Transcript.
[25] See Tab 3 of "JIS1" exhibited to in the Affidavit of Juan Ignacio Stampalija sworn 18 March 2025.

19

101. In respect of the narrative about the King & Spalding LLP prosecution, as confirmed in the Declaration of Bernardo Saravia Frías, of 29 August 2019,[26] the complaints were investigated and dismissed with prejudice. The Plaintiffs fail to mention that in the 2020 Opinion and Order, which followed the Republic's second motion to dismiss,[27] Judge Preska observed that any previous concern had been "*obviate*[d]" by the dismissal, and that the investigation showed "*no evidence of any improper conduct by Argentine executive or judicial officials.*" Ultimately, the Court found that the Republic would have been an adequate forum.

102. With respect to Mr. Betancor Alamo's final point, that the New York Judgment would not be recognised in the Republic, as a matter of law, the Government cannot fulfil the judgment until it is final, that is, all appeals have been exhausted. In Argentina, foreign judgments can be enforced through *exequatur* proceedings (provided for in Articles 517 and 518 of the National Civil and Commercial Procedural Code). In the case of final and enforceable judgments against the State, they are to be paid with sums allocated in the general budget; otherwise, a local court with jurisdiction over the Government may instruct payment in enforcement proceedings, and if the instruction is not honoured, enforce the judgment directly.[28]

103. **Second**, in *Albaniabeg*, the Court of Appeal did not appear to confine itself in strict terms to examining the suitability of Ireland as a place to litigate, versus that of Albania. Instead, as set out above, the Court focused on the unattractive prospect of witnesses having to travel to this jurisdiction from Albania and Italy to give evidence as to matters of fact, or as expert witnesses, for example on matters of law. Nor in *Yukos*, did Kelly J. only consider Ireland versus Russia. Instead, he considered in more general terms the issue of the "*comparative cost and convenience of the proceedings in this country*" under the lens of "*fitness, propriety and suitableness*" and *forum non conveniens* (§93-94). It is submitted that an analysis of the "*comparative cost and convenience of proceedings in Ireland, or in the place of the defendant's residence*" is not particularly apt in the case of a defendant nation State, and it is submitted that the Court should adopt the approach in *Albaniabeg* and *Yukos*. However, even if the Court were to only analyse comparative cost and convenience by reference to this jurisdiction and the Republic, it is obvious that to bring the Republic before the Irish Courts would be far more costly and inconvenient than if the proceedings were in the Republic.

104. **Third**, and relatedly, there are a range of defences to recognition which the Republic will maintain should jurisdiction be established.[29] In §85-95 of the affidavit of Mr. de la Cruz of 17 January 2025, he outlines the range of issues on which foreign witnesses would have to travel and give evidence of fact and/or law in plenary proceedings. These issues include complex matters of Argentine expropriation law, and the nature of the funding agreements behind the proceedings.

---

[26] Ibid.
[27] See Tab 30 of the exhibits to the affidavit of Mr. Betancor Alamo of 18 April 2024, at p. 22-24.
[28] The Republic submitted a Declaration from Professor Alfonso Santiago dated 16 May 2024 on this point (see §25-32), and it will seek liberty to rely on this Declaration.
[29] These have been set out in Section III of the affidavit of Mr. de la Cruz of 9 December 2024.

105. The Plaintiffs do not accept that proceedings will be as protracted or complex as the Republic suggests. This is based on the assertion that the issues on which the Republic seeks to rely have been already been "*conclusively determined*" against the Republic in the US Proceedings, and that there is no *bona fide* defence to the claim.[30] However, as confirmed in Mr. White's affidavit (§16), arguments relating to sovereign immunity, act of state and champerty were only determined by reference to US law, and not Irish law. There is no engagement by the Plaintiffs with the details provided by the Republic of the witnesses it would need to give evidence. Furthermore, it is sufficient if this Court is satisfied that "*a relatively lengthy and costly enforcement hearing cannot be excluded*" (§65 of *Albaniabeg*).

106. *Fourth*, an analysis focusing on the size of the New York Judgment does not go towards showing Ireland is the *forum conveniens*. Order 11, rule 2 RSC states that the Court "*shall have regard to the amount or value of the claim or property affected and to the comparative cost and convenience….*". These are two separate matters to which the Court has regard. The Plaintiffs' focus on the question of the scale of New York Judgment as compared to the cost of its recognition does not demonstrate the fitness, propriety and suitableness of this jurisdiction for these proceedings. Furthermore, it is worth noting that the Court in *Albaniabeg* considered a very sizeable judgment, yet this was not determinative, and service was set aside.

**Conclusion on Ground I:**

107. In conclusion, these proceedings have no connection with Ireland whatsoever. In circumstances where:

    (i)    there are no assets of the Republic in this jurisdiction other than diplomatic and consular ones;

    (ii)    there is unchallenged evidence of the lack of likelihood of any assets of the Republic coming into this jurisdiction in the near or medium future;

    (iii)    there are no meaningful procedural remedies potentially available to the Plaintiffs in this jurisdiction which are a) not premised on the presence of assets and b) not duplicative of the US enforcement efforts already underway;

    (iv)    the Plaintiffs' desire to obtain the imprimatur of a respected EU court is conditioned by the fact that Ireland is one of six jurisdictions where enforcement proceedings have been initiated;

    (v)    the comparative cost and convenience of proceedings in this jurisdiction point away from the fitness, propriety and suitableness of Ireland to hear this case,

it would be wholly inappropriate, unjust and contrary to precedent reflecting important policy considerations for the Irish Courts to assume jurisdiction for proceedings which would serve no useful purpose.

108. Under Order 11, rule 5 RSC, the Plaintiffs have not satisfied the Court that the case is a "*proper one*" for service out of the jurisdiction.

---

[30] At §87-§90 of the affidavit of Mr. Betancor Alamo sworn on 14 February 2025.

109. Finally, the Republic also submits that serious material non-disclosure on the part of the Plaintiffs at the *ex parte* leave stage warrants in itself set-aside of the grant of leave. As detailed above and in various affidavits of the Republic, the Plaintiffs failed to disclose their US post-judgment enforcement efforts. Neither the affidavit of Mr. Betancor Alamo of 18 April 2024 nor the transcript of the *ex parte* leave application disclose a single reference to the extensive efforts which were already underway. The Plaintiffs have not addressed this issue, and have failed to provide any explanation as to whether the non-disclosure was accidental, negligent or intentional.

110. As set out above, the non-disclosure is material. The Plaintiffs came to Court seeking access to Irish procedural options "*which would be available to the Intended Plaintiffs to establish the whereabouts of the assets of the Argentine State*" (affidavit of Mr. Betancor Alamo of 18 April 2024, §140). They were already in the course of seeking and establishing the whereabouts of the assets, on a worldwide basis. The non-disclosure goes to the heart of the question of "*practical benefit*".

111. The duty of *uberrima fides* is of particular importance in the context of an application seeking leave to serve proceedings outside the jurisdiction. As far back as in *Rev. Patrick McCartan v. E. Hulton & Co. Ltd.* [1922] 56 I.L.T.R. 13, Samuels L.J. stressed:

> "*These applications for leave to issue and serve writs out of the jurisdiction are of great international importance, and the affidavits on which they are granted should be impeccable.*"

112. Moreover, the courts will set aside an order granting leave to serve proceedings outside the jurisdiction where the order was made on foot of an affidavit that is misleading, even if it is not intentionally misleading, if the facts that ought to have been disclosed were material to the exercise of the Court's discretion (*The Attorney-General (ex relatione Rev. John Johnston) v. The Irish Society* [1892] 26 I.L.T.R. 56 (per Porter M.R) and see *Vodafone GmbH v. IV International Licensing and Intellectual Ventures II LLC* [2017] IEHC 160, and *Ryan v. Governor of Mountjoy Prison* [2021] 1 I.R. 590 at §7, approving *Adams v. DPP* [2001] 2 I.L.R.M. 401).

## II.   SOVEREIGN IMMUNITY

113. The doctrine of sovereign immunity refers to rules of public international law which establish the circumstances in which foreign states and their agents will be immune from the jurisdiction of domestic courts. It is the Republic's submission that by virtue of this doctrine, the Irish courts may not implead the Republic in the within proceedings.

114. The landmark judgment of the Irish courts in this regard remains *Government of Canada v. Employment Appeals Tribunal* [1992] 2 I.R. 484 ("*Government of Canada*"), which concerned an employment law dispute raised by a former employee of the Canadian embassy in Dublin. The Employment Appeals Tribunal had made an award against the Canadian Government, which the nation state subsequently successfully sought to quash on the basis of the doctrine of sovereign immunity.

115. In his judgment, O'Flaherty J. set out the original formulation of the doctrine of absolute
sovereign immunity, as provided by Lord Atkin in *The Cristina* [1938] A.C. 485.
O'Flaherty J. further cited several bases for the doctrine of sovereign immunity, (at p.
494-495). He determined that under international law, the doctrine of absolute state
immunity, under which a sovereign was at all times entitled to resist joinder to
proceedings in a foreign court, had been departed from. He considered that a restrictive
view of sovereign immunity, which did not extend immunity in respect of a state's
commercial or trading acts, had been adopted in international law, and that it was
applicable in Irish law, holding at p.500:

> *"1. I doubt if the doctrine of absolute sovereign immunity was ever conclusively
> established in our jurisdiction.*
>
> *2. Assuming that it was, I believe that it is a doctrine that has now expired.*
>
> *3. The doctrine flourished at a time when a sovereign state was concerned only
> with the conduct of its armed forces, foreign affairs and the operation of its
> currency. Now with so many states engaged in the business of trade, direct or
> indirect, the rule of absolute immunity is not appropriate to such conditions.*
>
> *4. However, <u>if the activity called in question truly touches the actual business or
> policy of the foreign government then immunity should still be accorded to such
> activity</u>."*

116. Hederman J., delivering the minority opinion of the Court, cited the Irish State's
obligation, under Article 29.3 of the Constitution, to accept "*the generally recognised
principles of international law as its rule of conduct in its relations with other States*",
which principles, he held, include the doctrine of sovereign immunity.

117. *Government of Canada* was subsequently affirmed and applied by the Supreme Court
in *McElhinney v. Williams* [1995] 3 I.R. 382 ("*McElhinney*"), where Hamilton C.J. held
that the doctrine of sovereign immunity was engaged in respect of the plaintiff's claim
against the second defendant, the Secretary of State for Northern Ireland, in relation to
alleged tortious acts committed by a corporal in the British Army who was acting as a
servant or agent of the government and was acting within the sphere of governmental
activity.

118. In *Brady v Choiseul t/a Potato Services* [2016] 2 I.R. 337 ("*Brady*"), the High Court
(Noonan J.) considered the plaintiff potato farmers' claim against the Department of
Agriculture and Rural Development of Northern Ireland, in its capacity as the authority
which held statutory duties relating to the certification of potato seed pursuant to certain
Northern Ireland regulations. The plaintiffs had purchased potato seed from the first
defendant which subsequently failed, and they alleged *inter alia* that the Department
had incorrectly certified the seed and was liable for the plaintiffs' losses as it had
operated its potato seed certification system negligently and in breach of its statutory
duties.

119. The High Court held that the Department was entitled to claim immunity as it was acting
in a public law capacity in the course of its duties. Importantly, the claim of sovereign

23

immunity was brought in the context of an application under Order 12, rule 26 RSC to set aside service. Noonan J. held at §19-20:

> *"The primary issue is whether DARD is entitled to the benefit of <u>sovereign immunity in our courts. That is a question of Irish law</u>. … It seems to me to be clear … that once the actor concerned can properly be regarded as an agent of the state, <u>the only question to be answered is whether the activity concerned is of a public rather than private nature</u>.*
>
> *In the present case, it cannot be doubted that DARD <u>was at all material times engaged in governmental activity</u>. It is common case that such activity was carried out as agent and on behalf of the Crown. This is not in dispute. That seems to me to be sufficient to ground a claim for immunity. … Nor can it be doubted that DARD in administering the seed certification programme is doing so <u>in a public law capacity and is not engaging in trade or commerce</u>.*

120. Noonan J. held that the Court lacked jurisdiction to hear the matter and set aside the service of the plenary summons and statement of claim on the Department.

121. The law of sovereign immunity in the UK is adjudicated according to the State Immunity Act 1978. However, the Irish courts have drawn some guidance from the case law.

122. In *Government of Canada,* O'Flaherty and McCarthy JJ. approved the dicta of Lord Wilberforce in the foundational House of Lords decision in *I Congreso del Partido* [1983] 1 A.C. 244 ("*I Congreso*"), where he held at p.267:

> *"The conclusion which emerges is that in considering, under the "restrictive" theory whether state immunity should be granted or not, the court must consider the whole context in which the claim against the state is made, with a view to deciding <u>whether the relevant act(s) upon which the claim is based, should, in that context, be considered as fairly within an area of activity, trading or commercial, or otherwise of a private law character, in which the state has chosen to engage, or whether the relevant act(s) should be considered as having been done outside that area, and within the sphere of governmental or sovereign activity</u>.*

123. Lord Wilberforce continued, at p. 269B-C, that the "*ultimate test*": "...*is not just that the purpose or motive of the act is to serve the purposes of the state, but that the act is of its own character a governmental act, as opposed to an act which any private citizen can perform.*"

124. Subsequent decisions have shown that an overall consideration of context takes place.

125. In *Littrell v USA (No. 2)* [1995] 1 WLR 82 ("*Littrell*"), Rose L.J. identified, at p.91, four relevant propositions from the speech of Lord Wilberforce in *I Congreso*:

> *"(1) The court must consider the <u>whole context</u> of the claim to determine whether the relevant act was fairly within the activity of a private law character.*

24

*(2) The activity must first be characterised as sovereign or non-sovereign: if sovereign, there is immunity; if non-sovereign there is no immunity unless the State can make the case that the particular act complained of is outside the non-sovereign sphere.*

*(3) Focus must be on the <u>nature of the activity</u>, not its purpose.*

*(4) The purpose of the restrictive theory is to accommodate the interests of individuals doing business or otherwise having private relations with foreign governments in having their rights determined by the courts with the interests of foreign governments in being free from interference in performing sovereign acts without the need to defend or justify those acts in a foreign court."*

126. *Littrell* concerned the question of whether the activity of providing medical treatment to the armed forces at an overseas military base was a sovereign or governmental act. The Court of Appeal held that the proceedings were barred by state immunity. Rose L.J. held, at p.91, that "*the court has to look at all the circumstances in relation to the nature of the activity and its context and decide whether those factors together—no one factor being in itself determinative— characterise the activity as sovereign or non-sovereign*". It should be noted that in *McElhinney*, Hamilton C.J. quoted from *Littrell*.

127. In *Kuwait Airways Corp v Iraqi Airways Corp* [1995] 1 WLR 1147 ("*Kuwait Airways Corp*"),[31] the House of Lords held *inter alia*, that the taking of aircraft and their removal from Kuwait Airport to Iraq constituted an exercise of governmental power by the State of Iraq: p.1163A. KAC had argued that the participation in this activity of IAC, by supplying engineers and pilots who performed the "*mundane*" task of preparing the aircraft for flying and then flying them to Iraq was not of a sovereign but a carrier. Lord Goff rejected this argument, commenting: "*I.A.C. was not just doing a job of work, but was closely involved with the State of Iraq in the last stage of an enterprise which entailed both the seizure of the aircraft and their removal to Iraq to be used for such purposes as the Government of Iraq should direct*".

128. *Holland v Lampen-Wolfe* [2000] 1 WLR 1573 ("*Holland*") concerned a claim for libel by an American civilian employed to teach courses at US bases in Europe. The House of Lords held that an unfavourable report by an educational services officer on the claimant's teaching was part of a State's sovereign function of maintaining its armed forces, and the publication of the memorandum in the course of the defendant's supervision of such provision was an act within the sovereign authority of the US so as to attract immunity. When viewed narrowly, it is plain that the preparation of an allegedly libellous report on a lecturer is something which any private citizen could do. Nonetheless, in the circumstances it was deemed a sovereign act. Lord Hope (agreeing with Lords Clyde and Millett) emphasised at p.1577 that "*it is the nature of the act that determines whether it is to be characterised as iure imperii or iure gestionis. The process of characterisation requires that the act must be considered in its context.*" Lord Hope stressed that the "*overall context*" of the case was "*all important*".

---

[31] The parties are referred to as "KAC" and "IAC".

25

129. Finally, in **NML Capital v Argentina** [2011] 2 AC 495, the plaintiff had obtained summary judgment in New York against Argentina in respect of the principal and interest on certain bonds which it had previously purchased from the state. NML then sought to enforce the judgment against assets held by Argentina in England, in the UK courts. The UK Supreme Court was asked to consider first, whether the claim constituted "*proceedings relating to a commercial transaction*" and therefore fell within the exception to the doctrine of immunity set out in section 3(1)(a) of the State Immunity Act 1978, and second, whether Argentina had waived immunity as a term of its agreement in issuing the bonds in question.

130. While the Supreme Court agreed that Argentina had waived state immunity under the bonds issued, a majority of the Court did not consider that the proceedings could be viewed as "*proceedings relating to... a commercial transaction*": as they related to a foreign judgment and therefore not to the commercial transaction of issuing a bond. This conclusion turned largely on the interpretation of the 1978 Act, however the following comments of Lord Mance, at §86, are of relevance:

> "*The exceptions from immunity provided by sections 2 to 11 of the 1978 Act focus on specific conduct (submission) in the domestic UK proceedings or on specific transactions, contexts or interests in relation to which causes of action may arise. The recognition and enforcement of foreign judgments has long been recognised as a special area of private international law. ...*
>
> *In this context, it stretches language beyond the admissible to read 'proceedings relating to ... a commercial transaction' as covering proceedings relating to a judgment which itself relates to a commercial transaction. The improbability of so extended a construction is underlined by the extreme care that the drafters of the Act took to define in section 3, in the widest terms, the concept of 'commercial transactions'.*"[32]

### Application of Sovereign Immunity Doctrine

131. At §109-110 of the affidavit of Mr. Betancor Alamo sworn on 18 April 2024, he avers that the questions of sovereign immunity have been finally and conclusively determined by the US Courts.

132. However, the question of sovereign immunity requires to be determined by the Irish courts according to the binding legal principles set out in Irish law.

133. **First**, this is required as a matter of constitutional law, pursuant to Article 29.3 of the Constitution, under which the State (and the courts) are required to accept and apply the generally recognised principles of international law in the course of its relations with other States. This obligation under the Constitution necessarily entails an inquiry by the Irish courts into the applicability of the doctrine in the within proceedings.

134. **Second**, in *Brady*, Noonan J. rejected the plaintiffs' submission that the government department defendant was not, as a matter of Northern Irish law, entitled to advance a claim of sovereign immunity, ruling that the issue of whether the defendant was entitled

---

[32] Lord Collins and Lord Walker agreed with Lord Mance. Furthermore, see §85 and §116.

to the benefit of immunity in our courts was solely a question of Irish law (§19). Equally, in the within proceedings the entitlement of the Republic to sovereign immunity must be determined according to Irish law, rather than the principles of US law and the provisions of the 1976 Foreign Sovereign Immunities Act.[33]

135. **Third**, there is also UK authority which contradicts the Plaintiffs' argument concerning the alleged lack of permission of this Court to examine matters examined in the US Proceedings. In **Yukos v Rosneft** [2014] Q.B. 458 at §160, the Court of Appeal of England and Wales held that if there was an issue estoppel arising from a Dutch court decision to the effect that the Russian courts were not independent, the English Court should exercise its discretion not to recognise such Dutch judgment. Rix L.J. stated that for the English Court simply to accept the Dutch Court's judgment on such matter "*would be an abdication of responsibility on the part of the English Court*", and a failure of "*respect and comity*"."

136. The Plaintiffs maintain that their claims arose from "*private commercial activities*".[34]

137. First, under the logic of *NML Capital*, this Court ought to characterise these proceedings as properly concerning an entirely different set of issues to those of contract or commercial law – being those in relation to the recognition and enforcement of foreign judgments, and therefore the proceedings could not *per se* relate to the Republic's commercial activities, as alleged by the Plaintiffs. Accordingly, the Republic must be afforded the benefit of state immunity. Adopting the test set out by Noonan J. in *Brady*, the activity concerned is not of a private commercial nature.

138. In the alternative, the Republic submits that the activities impugned in the US Proceedings, ought to be properly construed as falling within the sphere of governmental or sovereign activity, and that the activities cannot be characterised as private commercial activities of a sovereign state.

139. The act which gave rise to the US Proceedings is the Republic's expropriation of a majority of the equity of YPF, represented by Class D shares held by Repsol S.A., which Plaintiffs argued triggered an obligation to make a tender offer under the YPF Bylaws.

140. The fact that no tender offer was made must be viewed in the context of the decision of the Republic to expropriate a majority of the shares in YPF. These were aspects of a single sovereign enterprise, namely the decision of the Republic to take into state control a majority of the YPF equity for important public interest reasons relating to the stability of the supply of energy in the Republic.

141. The overall context is of particular importance, not simply because of the sovereign nature of the act of expropriation, but also because of the effect which the General Expropriation Law and the YPF Expropriation Law had on any alleged obligation of the Republic to make a tender offer under the YPF Bylaws.

---

[33] Again, as confirmed in the affidavit of Mr. White (§16), arguments relating to sovereign immunity, and act of state have only been determined by reference to US law.

[34] See for instance §111-112 of the affidavit of Mr. Betancor Alamo of 18 April 2024.

142. The Republic relies on the detailed legal framework of the Republic set out in Section I of the affidavit of Mr. de La Cruz sworn on 17 January 2025.[35]

143. It is only possible here to set out some of the more salient features of the framework and events which gave rise to the expropriation:

   143.1 Under the Republic's Constitution, as well as the General Expropriation Law, No. 21,499, the Republic's Congress has the constitutional power to authorise the expropriation of an asset in the public interest.

   143.2 The risk to the Republic's energy sovereignty and concerns about mismanagement of YPF[36] led to a sovereign decision to expropriate a controlling stake of YPF in the public interest.

   143.3 The Government opted for partial expropriation, instead of an open market transaction route (with its related tender provisions — section 28 of the YPF Bylaws.

   143.4 On 17 April 2012, the Secretary of Economic Policy and Planning Development of the Republic, Axel Kicillof, addressed a joint meeting of the Argentine National Senate Committees on Budget and the Treasury, Constitutional Affairs and Mining, Energy and Fuels regarding the bill which the President had submitted to Congress the day previously, and which would become the YPF Expropriation Law. The Secretary noted that the bill sought not to expropriate all of YPF, but "*a part of it, which is the share portion respecting Repsol itself*" and that this would go "*to the National Appraisal Tribunal to pay, according to…expropriation law, what ends up being the real cost*". Mr Kicillof specifically referred to the YPF Bylaws and made clear that the Republic did not intend to undergo the additional expense of an open market transaction and the related tender offer obligation which such transaction would have entailed.[37]

   143.5 The emergency Intervention Decree issued by the President referred to a threat to the "*energy sovereignty of the country*", and stated that the intervention and proposed expropriation were matters of "*national public interest*".

   143.6 Article 1 of the YPF Expropriation Law, passed on 3 May 2012 provided:

---

[35] Further, the Republic relies on the Statement of Material Facts and other memoranda from the US Proceedings as listed at §108-111 of this affidavit.

[36] See the Statement of Material Facts at Sections V and VI, and supporting exhibits: Tab 17 of exhibit ADLC1 to Mr. de la Cruz's affidavit of 9 December 2024.

[37] See §63 of the Statement of Material Facts, and supporting exhibit 21, *Transcript of Proceedings of the Argentine Senate Committees on Budget, Treasury, Constitutional Affairs, and Mining, Energy, and Fuels*, dated 17 April 2012), available at Tab 17 of exhibit ADLC1 to Mr. de la Cruz's affidavit of 9 December 2024. A February 2012 internal report by the Argentine Secretary of Energy Daniel Cameron advised that "*The only way to go is expropriation*". The body of the report made clear the expropriation would ensure that YPF would undertake appropriate investments to prevent further decline in its production capacity, which was affecting Argentina's energy policy, and eventually recover its full potential, for the national benefit. There are references to this document on pages 2204, 2206 and 2210 of exhibit ADLC1 to Mr. de la Cruz's affidavit of 9 December 2024 (Tab 23: Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment before the SDNY Court dated 26 May 2022).

> *"Achieving self-sufficiency in the supply of hydrocarbons as well as in the exploration, exploitation, industrialization, transportation and sale of hydrocarbons, is hereby declared <u>a national public interest and a priority for the Republic of Argentina</u>, with the goal of guaranteeing socially equitable economic development, the creation of jobs, the increase of the competitiveness of various economic sectors and the equitable and sustainable growth of the provinces and regions."*

143.7 The Plaintiffs' interpretation of the YPF Bylaws would have rendered the Republic unable to accomplish the temporary occupation and expropriation that the YPF Expropriation Law required. To summarise certain of the facts which are set out in full in the Affidavit of Mr. de La Cruz sworn on 17 January 2025:

    (i)    As a matter of Argentine law, the YPF Bylaws Plaintiffs invoked as the basis for their claims are matters of Argentine "private law" and thus are displaced and ineffective when they conflict with sovereign acts authorised by Argentine "public law" (§113.2);

    (ii)    The Argentine Congress specified that the government was to expropriate not any shares, but a 51% stake from a single shareholder —Repsol, which also would have been impossible if a tender offer had been made to all outstanding shareholders. Furthermore, the YPF Expropriation Law required that the National Court of Appraisals would determine under Argentine law the price of the expropriated YPF Class D shares, which provision conflicts with the YPF Bylaws' requirement that the bidder tender at the price fixed by the formula in § 7(f)(v) (§113.5);

    (iii)    As a matter of Argentine law, the Republic could not have both (1) expropriated 51% of YPF's capital stock in the manner it did, and (2) launched the tender offer contemplated in the YPF Bylaws (§113.6);

    (iv)    Article 28 of the General Expropriation Law extinguishes any third party *"encumbrance"* on expropriated property and bars any third-party claim that might *"impede"* the expropriation or *"its effects"*. Such extinguishment includes contractual agreements or commercial obligations triggered by an expropriation, such as the tender offer in the YPF Bylaws (§25).

144. The decision to expropriate a majority stake of YPF instead of conducting a tender offer ought to be recognised as a single sovereign enterprise on the part of the Republic. Such activity, per O'Flaherty J. in *Government of Canada* "*truly touches the actual business or policy of the foreign government*".

145. The Republic will refer to expert evidence supporting its exposition of Argentine law at the hearing of these proceedings.[38]

---

[38] Including but not limited to:

    (i)    Dr Ismael Mata's Declaration of 8 September 2015, and Second Replying Declaration of 9 November 2015, at Tabs 25- 26 of exhibit ADLC1 to Mr. de la Cruz's affidavit of 9 December 2024.

## III.    ACT OF STATE

146. The general principle underpinning the act of state doctrine is that "*the courts of one state will not, at least generally speaking, inquire into or pronounce upon the validity of the actions jure imperii of another state*", per Hogan J. in *Costello v. Government of Ireland* [2022] IESC 44, at §159. This principle may also be referred to as the principle of judicial restraint, or comity of courts.

147. While the Irish courts have not conclusively ruled on the scope of the application of the act of state doctrine to date, the Supreme Court in this jurisdiction has previously referred to the doctrine with approval. In *Costello,* the *obiter* comments of Hogan J. make clear that he considers that the doctrine is in effect in Irish law. While considering the effect of the ratification of the Comprehensive Economic and Trade Agreement (CETA) on Irish juridical sovereignty, Hogan J. addressed the doctrine at §154-162 specifically:

> "*154.… [T]he jurisdiction to determine to invalidate or annul decisions taken by the executive or the Oireachtas is a core feature of the juridical sovereignty of this State and, for that matter, that of other states in respect of their own executive, parliamentary and judicial decisions.*
>
> *155. This is reflected in not only our own rules of private international law but also, for that matter, public international law. Our courts have, for example, consistently held that they have no jurisdiction to pronounce on the actions of the United Kingdom sovereign (including its armed forces) as to do so would represent an unjustified intrusion into the sovereignty of that State. …*
>
> …
>
> *159. This is also reflected by general principles of public international law such as the Act of State doctrine whereby (again, absent international agreement) the courts of one state will not, at least generally speaking, inquire into or pronounce upon the validity of the actions jure imperii of another state….*"

148. Reflecting similar considerations, the Irish Supreme Court has held in *Short v. Ireland (No. 2)* [2006] 3 IR 297 ("*Short*") that the Irish courts do not have jurisdiction to determine the lawfulness and validity of administrative procedures and decisions of another state. There, the plaintiffs sought to challenge a company based in the UK, which operated the Sellafield power plant, in respect of its alleged non-compliance with Community law. The Court considered that the challenge to the UK-based defendant effectively required the Irish courts to adjudicate as to whether the regulatory decisions made by the UK authorities were valid.

---

(ii)    The reports of Former Judge Alejandro Uslenghi dated 24 September 2021, 3 December 2021 and 14 January 2022, at Tabs 27-29 of ADLC1.

(iii)    The reports of Professor Alfonso Santiago of 30 August 2019 and 3 December 2021, at Tabs 30-31 of ADLC1.

The Republic will also refer to *amici curiae* briefs.

149. The principle of judicial restraint outlined in the decision is salient to these proceedings. Fennelly J. held at §48:

> "What is at issue is the jurisdiction of an Irish court to determine the lawfulness or validity, under the law of the United Kingdom, of administrative decisions made in that jurisdiction in accordance with national law and procedures. It seems to me elementary that our courts have no power to review the lawfulness of administrative decisions made by English administrative bodies under English law, any more than the English courts would have corresponding power to pass judgment on Irish administrative decisions. The courts of each country alone have the power to review the legality, within their own frontiers, of decisions of their own government and administration."

150. Fennelly J. referred to the decision of the House of Lords in **Buttes Gas and Oil Co. v. Hammer (No. 3)** [1982] A.C. 888. This concerned a dispute between two oil exploration companies which required the court to review transactions in which four sovereign states were concerned and adjudicate on whether they were lawful under international law, which issues the House of Lords ultimately determined were non-justiciable. In *Short*, the unanimous judgment of Lord Wilberforce therein was referred to at §53 of Fennelly J.'s judgment.

151. In *Brady*, where service was set aside under Order 12, rule 26 RSC, the Court was satisfied that the substance of the act of state doctrine was implicated, along with sovereign immunity. Noonan J. held at §21:

> "In addition, the plaintiffs' claim, whilst fundamentally sounding in tort, specifically relies on breach of statutory duty as against DARD. As I have already pointed out, the plaintiffs plead that DARD acted in breach of relevant Northern Ireland regulations and the correctness or otherwise of such plea would necessarily involve this court in an analysis of those provisions and a determination of whether there had been compliance with them. As pointed out by Fennelly J. in Short v. Ireland (No. 2)[2006] IESC 46, [2006] 3 I.R. 297 and McGuinness J. in Adams v. Director of Public Prosecutions [2001] 1 I.R. 47, the courts of this jurisdiction are not competent to adjudicate upon the validity of such administrative and executive acts by the agent of a foreign sovereign state acting solely within its own jurisdiction."

152. It should be noted briefly that in *Trafalgar*, discussed under Ground I, the defendants therein sought unsuccessfully to have service of the plaintiffs' proceedings set aside on the basis *inter alia*, that the Irish courts did not have jurisdiction to hear the proceedings by reason of the act of state doctrine. However, as set out at §51-52 above, the issue relating to the act of state doctrine differed significantly to that in the within proceedings.

153. In the UK courts, the scope of the act of state doctrine has been recently clarified. In **Deutsche Bank AG London Branch v Receivers Appointed by the Court** [2023] AC 156 ("**Deutsche Bank**") the issue was whether the UK Government had recognised Interim President Guaidó as Head of State of Venezuela and, if so, whether any challenge to the validity of Mr Guaidó's appointments to the Board of the Central Bank

31

of Venezuela was justiciable in an English court. In the UK Supreme Court, Lord Lloyd-Jones provided a thorough endorsement of the two aspects of the doctrine, at §113:

*"(1) The first rule ("Rule 1") is that the courts of this country will recognise and will not question the effect of a foreign state's legislation or other laws in relation to any acts which take place or take effect within the territory of that state…*

*(2) The second rule ("Rule 2") is that the courts of this country will recognise, and will not question, the effect of an act of a foreign state's executive in relation to any acts which take place or take effect within the territory of that state …"*

154. Rule 1 and 2 can also be termed the Legislative Acts Rule and Executive Acts Rule respectively. The Executive Acts Rule was held to apply to an exercise of executive power involved in Mr Guaidó's appointments to the Central Bank's board.

155. Expropriation has long been treated as a foreign act of state, as evident from the review of law in *Belhaj v. Straw* [2017] AC 964, at §35 per Lord Mance. In that decision, Lord Sumption, at §225, elucidated what he considered were two main considerations underlying the act of state doctrine – comity, and the constitutional separation of powers which assigns the conduct of foreign affairs to the executive. Notably, Lord Mance characterised foreign act of state as a "*principle of non-justiciability, whereby the domestic court must simply declare itself incompetent to adjudicate*" (§7).

156. Certain exceptions apply to the act of state doctrine, including for acts which take place outside of a state's territory, and for commercial activity, as canvassed in *Deutsche Bank* at §136: "*The doctrine does not apply where the conduct of the foreign state is of a commercial as opposed to a sovereign character*".

157. The UK case law discussed under Ground II all has relevance to the commercial activity exception (*I Congreso*, *Kuwait Airways Corp*, and *Holland*).

### Application of Act of State Doctrine

158. The Republic submits that the act of state doctrine is squarely engaged on the facts of these proceedings.

159. For the same reasons as those set out in respect of sovereign immunity, the application of the act of state doctrine in these proceedings is a matter for the Irish courts to decide as a matter of Irish law. In summary, it is wholly objectionable for claimants to use a foreign judgment as a "fig leaf" to enable an Irish Court indirectly to implead a foreign state's sovereign actions.

160. Under UK precedent, it is necessary to consider the character of the impugned acts and where they occurred. In this case (a) the relevant acts were carried out by the Government and the National Congress of the Republic; and (b) they were performed and took place within' the territory of the Republic, since the YPF shares were registered

32

there and the relevant decision-making, of the President and Congress, was also within Argentina.[39]

161. The Irish courts do not have jurisdiction to inquire into the validity of the Republic's executive and legislative acts, and by extension do not have jurisdiction to consider the recognition and enforcement of the New York Judgment against the Republic.

162. Recalling the two rules set out in *Deutsche Bank,* recognition and enforcement of the New York Judgment would question the effect of the Republic's legislation in relation to acts which have taken place within the territory of the Republic, insofar as it undermines the General Expropriation Law and the YPF Expropriation Law.

163. Recognition and enforcement of the judgment would also question the effect of the Republic's President (executive power) in submitting a bill to Congress that once enacted authorised, for public policy purposes, the expropriation which took place.

164. In respect of the commercial activity exception, the Republic relies on the points made above at §138-144 above, under Ground II.

165. Again, the Republic will refer to expert evidence supporting its exposition of Argentine law at the hearing of these proceedings.[40]

**CONCLUSION**

166. For all of the foregoing reasons, and those to be offered, the Republic submits that this Honourable Court should exercise its discretion to grant the Stay Application.

167. Without prejudice to the Stay Application, the Court should accede to the Republic's Set-Aside Application.

**CLAIRE HOGAN**
**MICHAEL CUSH SC**

**Word count: 15,000 words**

**30 April 2025**

---

[39] At §66 of Mr. Juan Ignacio Stampalija's affidavit of 18 March 2025, he confirms that no United States Court has held that the Republic took any action outside the Republic in not making a tender offer.
[40] See footnote 38 for a non-exhaustive list of same.

**Annex 1**

**Plaintiffs' U.S. Post-Judgment Enforcement Efforts**

**October 16, 2023**    Plaintiffs serve First Post-Judgment Requests for Production of Documents from Defendant the Argentine Republic (77 document requests). In the document request, the Plaintiffs sought documents relating to all assets held by the Argentine Republic worldwide.

**November 3, 2023**    Plaintiffs serve document subpoena on Bank of New York Mellon. The document subpoena specifically sought documents regarding the Argentine Republic's shares in YPF.

**January 10, 2024**    Interim stay of enforcement of the New York judgement expires.

**February 7, 2024**    Argentine Republic makes first tranche of document production.

**February 16, 2024**    Argentine Republic makes second tranche of document production.

**February 27, 2024**    Plaintiffs file letter regarding their intended motion to compel the Argentine Republic to produce discovery regarding 17 of their document requests; in particular, they argue that the Argentine Republic should be compelled to produce documents regarding diplomatic, consular, and military assets in all countries (excluding the United States of America and the Argentine Republic), as well as information about the Argentine Republic's accounts at its central bank.

**March 1, 2024**    Argentine Republic makes third tranche of document production.

**March 11, 2024**    Plaintiffs serve document subpoenas on American Express National Bank, Banco Santander, S.A., Bank of America, N.A., Banco Bilbao Vizcaya Argentaria (BBVA), S.A., BNP Paribas, S.A., Deutsche Bank AG, HSBC North America Holdings Inc., JPMorgan Chase Bank, N.A., Wells Fargo Bank, N.A., and Wilmington Trust, N.A. These document subpoenas were also seeking information as to any bank accounts held by the Argentine Republic worldwide, including those held in the Republic of Ireland.

Argentine Republic makes fourth tranche of document production.

**March 13, 2024**    Plaintiffs serve document subpoenas on Banco de Brasil, S.A., Barclays Bank, PLC, BlackRock International Holdings, Inc., BlackRock Inc., Citibank, N.A., Commerzbank Aktiengesellschaft, Credit Agricole CIB Corp., Industrial and Commercial Bank of China, Itaú Chile, Itaú

Unibanco S.A., Natixis, Cooperatieve Rabobank U.A. New York, Société Générale S.A., Standard Chartered Bank, and UBS AG. These document subpoenas were also seeking information as to any bank accounts held by the Argentine Republic worldwide, including those held in the Republic of Ireland.

**March 15, 2024**   Argentine Republic makes fifth tranche of document production.

**March 18, 2024**   Court conference to discuss Plaintiffs' February 27, 2024 letter. The Court directed parties to meet and confer and submit a joint letter with a plan of action, which the parties did.

**March 22, 2024**   Argentine Republic makes sixth tranche of document production.

**March 25, 2024**   Plaintiffs serve document subpoena on YPF. This document subpoena sought information about the Argentine Republic's shares in YPF and also about an alleged "alter ego" relationship, in furtherance of allegation that YPF is an "alter ego" of the Argentine Republic and as such, the Plaintiffs could attach assets of YPF in satisfaction of the judgement.

Argentine Republic makes seventh tranche of document production.

**April 1, 2024**   Plaintiffs serve document subpoena on Banco de la Nación Argentina ("BNA"). This document subpoena sought information about the Argentine Republic's account information with BNA also about an alleged "alter ego" relationship.

**April 12, 2024**   **Argentine Republic makes eighth tranche of document production. Documents produced include a number of deeds of the Argentine Republic's real estate worldwide, including for diplomatic/consular real estate in the Republic of Ireland.**

**April 19, 2024**   Plaintiffs serve document subpoenas on Banco Latinoamericano de Comercio Exterior, S.A. and The Clearing House Payments Company L.L.C. These document subpoenas were also seeking information as to any bank accounts held by the Argentine Republic worldwide, including those held in the Republic of Ireland.

**April 22, 2025**   Plaintiffs move for turnover of the Argentine Republic's shares of YPF. This motion is still pending.

**April 23, 2024**   Plaintiffs serve document subpoenas on MUFG Bank, Ltd. and Bank of China. These document subpoenas were also seeking information as

to any bank accounts and assets held by the Argentine Republic worldwide, including those held in the Republic of Ireland.

**April 25, 2024**    Argentine Republic makes additional tranche of document production.

**May 2, 2024**    Plaintiffs serve document subpoenas on Berk Communications, Ferox Strategies LLC, Hydro Systems USA, Inc, Mercury Public Affairs LLC, and Myriad International Marketing LLC. These document subpoenas were also seeking information as to any bank accounts and assets held by the Argentine Republic worldwide, including those held in the Republic of Ireland.

**May 7, 2024**    Plaintiffs file letter-motion to compel seeking documents related to alter-ego discovery and military, diplomatic, and consular assets in all countries (excluding the United States of America and the Argentine Republic).

Argentine Republic makes additional tranche of document production.

**May 14, 2024**    Plaintiffs serve document subpoenas on Space Exploration Technologies Corp. and Starlink Services, LLC. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide.

**May 15, 2024**    Plaintiffs serve Second Post-Judgment Requests for Production of Documents from Defendants the Argentine Republic (65 requests).

**May 15, 2024**    Plaintiffs serve First Information Subpoena (written interrogatories regarding the Argentine Republic's assets).

**May 15, 2024**    Plaintiffs serve document subpoena on Kuiper Systems LLC. This document subpoena was also seeking information as to any assets held by the Argentine Republic worldwide.

**May 20, 2024**    Argentine Republic makes additional tranche of document production.

**May 23, 2024**    Plaintiffs serve document subpoenas on Calfrac Well Services Corp., DeGolyer and MacNaughton Corp, Excelerate Energy, Inc., Excelerate Energy Limited Partnership, IAPG Houston, Inc, Progress Resources USA Ltd, Clearing House Payments Company L.L.C (second subpoena), and Myriad International Marketing LLC (second subpoena). These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide.

36

| | |
|---|---|
| **May 28, 2024** | Pre-motion conference addressing Plaintiffs May 7 letter. The Court granted discovery on military, diplomatic, and consular assets (outlined above), with the time period narrowed to two years. The Court granted alter ego discovery regarding YPF and the Argentine Republic's central bank for a limited time period of two years, and ordered the parties to meet and confer about narrowing the scope of the requests. |
| **June 3, 2024** | Argentine Republic makes additional tranche of document production. |
| **June 5, 2024** | Plaintiffs serve document subpoenas on BlackCoral Energy (USA), LLC, Braskem America, Inc., Compagnie Du Ponant USA LLC, Eliis Inc., and Nitron Group LLC. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide. |
| **June 20, 2024** | Plaintiffs serve document subpoenas on Man Energy Solutions USA, Ocean Energy Inc., PGR Operating LLC, Safran Helicopter Engines USA, Inc, Trafigura Trading LLC, WEG Electric Corp. USA, Gunvor USA LLC, and Exxon Mobil Corp. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide. |
| **June 21, 2024** | Plaintiffs serve document subpoenas served on KTB-USA Import-Export, LLC and GS Investigations LLC. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide. |
| **July 8, 2024** | **Argentine Republic produced a list of the Argentine Republic's bank accounts, including the bank accounts held by the Argentine Republic's embassy in the Republic of Ireland. Account statements related to those accounts were produced in rolling productions in July and August of 2024.** |
| **August 1, 2024** | Plaintiffs file letter seeking, *inter alia*, to compel (1) a response to Plaintiffs' First Information Subpoena; (2) documents in response to alter ego discovery requests regarding other entities about which the Court had not previously ruled; (3) an electronically stored information search for documents responsive to requests regarding YPF and the Central Bank of the Argentine Republic ("BCRA" for its acronym in Spanish) from particular email custodians. |
| **August 7, 2024** | Plaintiffs serve document subpoenas on Loomis Armored US, LLC and Loomis International (US) LLC. These document subpoenas were also |

37

seeking information as to any assets held by the Argentine Republic worldwide.

**August 20, 2024**  Plaintiffs serve document subpoena on British Airways PLC. This document subpoena was also seeking information as to any assets held by the Argentine Republic worldwide.

**September 3, 2024**  Court conference to discuss issues raised in Plaintiffs' August 1 letter. The Court ordered a response to the Information Subpoena and further briefing on the alter ego requests and email custodians. The parties later fully briefed these issues, which are still pending.

**September 9, 2024**  Argentine Republic makes additional tranche of document production.

**September 16, 2024**  Plaintiffs serve document subpoena on Ocean Energy Inc. (second subpoena). This document subpoena was also seeking information as to any assets held by the Argentine Republic worldwide.

Argentine Republic makes additional tranche of document production.

**October 4, 2024**  Argentine Republic makes additional tranche of document production.

**October 16, 2024**  Plaintiffs serve document subpoenas on Duquesne Family Office, Stone Ridge Holdings Group LP, and Stone Ridge Asset Management LLC. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide.

**November 8, 2024**  Argentine Republic makes additional tranche of document production.

**December 16, 2024**  Plaintiffs serve document subpoena on Arthur D. Little LLC. This document subpoena was also seeking information as to any assets held by the Argentine Republic worldwide.

**December 18, 2024**  Argentine Republic makes additional tranche of document production.

**December 19, 2024**  Plaintiffs serve document subpoenas on Pumpco, Inc. and Montanagonia Investments LLC. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide.

38

**December 20, 2024**  Plaintiffs serve document subpoena on Techint Engineering Technical and Commercial Services LLC. This document subpoena was also seeking information as to any assets held by the Argentine Republic worldwide.

**December 30, 2024**  Plaintiffs serve document subpoena on Samsung Heavy Industries Co., Ltd. This document subpoena was also seeking information as to any assets held by the Argentine Republic worldwide.

**January 2, 2025**  Plaintiffs serve document subpoenas on Shell USA, Inc. and Energy Transfer LP. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide.

**January 2, 2025**  Plaintiffs file letter seeking to compel production of (1) SWIFT messages for the Argentine Republic's accounts outside of Argentina and the United States; (2) information regarding the Argentine Republic's accounts in Argentina and the United States; (3) documents produced in other post-judgment litigation; and (4) documents sufficient to identify the location and purpose of BCRA's gold reserves

**January 7, 2025**  Plaintiffs serve document subpoenas on Delta Air Lines, Inc. and Avianca, Inc. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide.

**January 14, 2025**  The Court grants Plaintiffs' January 2 motion.

**January 22, 2025,**  Argentine Republic makes additional tranche of document production.

**January 24, 2025**  Plaintiffs serve document subpoenas on Cube Group, Inc. and Rainmaker Technology Corporation. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide.

**January 29, 2025**  Plaintiffs serve document subpoena on LeoLabs, Inc. This document subpoena was also seeking information as to any assets held by the Argentine Republic worldwide.

**January 30, 2025**  Plaintiffs serve document subpoenas on Goldman Sachs & Co. LLC, Rainmaker Technology Corporation (amended subpoena), Moore Capital Management, LP, and Mastercard International Incorporated. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide.

| | |
|---|---|
| **January 31, 2025** | Plaintiffs serve document subpoenas on HP Inc. and S. C. Johnson & Son, Inc. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide. |
| **February 5, 2025** | Plaintiffs serve document subpoenas on Converium Capital (USA) Inc. and Mastercard Incorporated. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide. |
| **February 7, 2025** | Argentine Republic makes additional tranche of document production. |
| **February 18, 2025** | Plaintiffs serve document subpoena on Oracle Advisory Group Inc. This document subpoena was also seeking information as to any assets held by the Argentine Republic worldwide. |
| | Argentine Republic makes additional tranche of document production. |
| **February 21, 2025** | Argentine Republic makes additional tranche of document production. |
| **February 28, 2025** | Argentine Republic makes additional tranche of document production. |
| **March 5, 2025** | Plaintiffs serve document subpoenas on The Bank of New York Mellon and Morgan Stanley. These document subpoenas were also seeking information as to any assets held by the Argentine Republic worldwide. |
| **March 6, 2025** | Plaintiffs serve document subpoena on The Depository Trust Company. This document subpoena was also seeking information as to any assets held by the Argentine Republic worldwide. |
| **March 14, 2025** | Argentine Republic makes additional tranche of document production. |
| **March 20, 2025** | Plaintiffs serve document subpoena on Citigroup Inc. This document subpoena was also seeking information as to any assets held by the Argentine Republic worldwide. |
| **April 6, 2025** | Plaintiffs serve document subpoena on JPMorgan Chase Bank. This document subpoena was also seeking information as to any assets held by the Argentine Republic worldwide. |
| **April 8, 2025** | Argentine Republic makes additional tranche of document production. |

**April 10, 2025**    Plaintiffs serve document subpoena on ·Banco Bilbao Vizcaya Argentaria, S.A. This document subpoena was also seeking information as to any assets held by the Argentine Republic worldwide.

**April 21, 2025**    Argentine Republic makes additional tranche of document production.

**THE HIGH COURT**

H.S.2024. 0000158

BETWEEN:

**PETERSEN ENERGIA INVERSORA S.A.U.,
PETERSEN ENERGIA S.A.U., ETON PARK
CAPITAL MANAGEMENT, L.P., ETON
PARK MASTER FUND, LTD. AND ETON
PARK FUND L.P.**

Plaintiffs

- and -

**THE ARGENTINE REPUBLIC**

Defendant

OUTLINE LEGAL SUBMISSIONS ON
BEHALF OF THE ARGENTINE REPUBLIC

William Fry LLP
Solicitors
2 Grand Canal Square
Dublin 2
D02 A342
www.williamfry.com
Ref: 027025.0002.RJR/GHJ/RKE/DKE
© William Fry LLP 2025