# Exhibit 5

Scheduled for 31/3/2025
Before the Honorable E. Georgiou-Antoniou, Presiding District Judge

**Claim Scale: Above €2.000.000**
**Above €10.000**

**AT THE DISTRICT COURT OF NICOSIA**

**Claim No.: 422/2024**

Between:

    1.   PETERSEN  ENERGIA  INVERSORA,  S.A.U  Registration No. A85392751[ ... ]

    2.   PETERSEN ENERGIA, S.A.U Registration No. A85174621[ ... ]

    3.   Eton PARK CAPITAL MANAGEMENT L.P Registration No. 3783631[...]

    4.   Eton PARK MASTER FUND Ltd Registration No. 138469[... ]

    5.   5. Eton Park Fund LP Registration No. 3834273[. .. ]

**Plaintiffs**

-and-

REPUBLIC OF ARGENTINA [ .. ]

**Defendant**

**WRITTEN PLEADINGS OF THE APPLICANT/DEFENDANT FOLLOWING THE INSTRUCTIONS OF THE COURT DATED 3/24/2025 IN RELATION TO THE HEARING ORDER OF THE FILED APPLICATIONS TO SET ASIDE DATED 27/02/2025 AND APPLICATION TO STAY PROCEEDINGS DATED 28/02/2025**

Your Honor,

**A. INTRODUCTION**

1. This pleading is filed pursuant to the Court's Instructions dated 24/3/2025 for written support and documentation of the parties' positions regarding the order of hearing of the two pending Interim Applications, that is, of the Application to Stay Proceedings dated 28/2/2025 (the "Application to Stay Proceedings")
and the Application to Set Aside dated 27/2/2025 (the "Application to Set Aside which were both filed on behalf of the Applicant/Defendant (the "Applicant") against all Respondents/Plaintiffs ("the Respondents") in the context of the complaint with the above number and title.



2 On 3/24/2025, the date on which the above Applications were scheduled for hearing for the first time, the attorneys for both parties appeared before the Court. The Respondents' side suggested that the Application to Set Aside should be heard first or, alternatively, that both Applications should be heard in parallel. The Applicant's side suggested, for the reasons that will be analyzed and documented below, that the hearing of the Application for Suspension should precede the hearing of the Application to Set Aside.

3.   The Court requested the parties to submit and support their respective positions in writing in order for the Court to decide on the issue and gave Instructions for filing Written Pleadings on 31/3/2025.

4.   Before proceeding with our pleading, we would like to draw the Court's attention and emphasize that in no way does the advancement of the Applicants' position regarding the priority of the Suspension Application prior to the hearing of the Application to Set Aside **constitute a direct and/or indirect and/or in any way acceptance of the jurisdiction of Cypriot Courts to try the Complaint at issue.**

5.   We believe it is clear that the Applicant is advancing the Application to Stay Proceedings and requesting a temporary stay of proceedings of the Complaint with the above number and title **in its entirety, including the issue of the review of the jurisdiction of both the Cypriot Courts and the Courts in the United States, as well as the Application to Set Aside.**

## B. TRUE FACTS

6.   The true facts which led to the filing of both Applications appear in the contents of the Applications and in the Affidavits and exhibits thereof filed in support of them on by the Applicant.

7.   Briefly, the Respondents have filed this Complaint requesting the entry and enforcement, in Cyprus, on the basis of the principles of common law, of the judgment of the United States District Court for the Southern District of New York (hereinafter the "Judgment" and "the First Instance Court", respectively) issued against the Applicant.





P   TRUE COPY

8.  Further, Respondents have filed a number of identical registration and enforcement proceedings in various jurisdictions.

9.  At this time, two linked appeals of the Applicant are pending for trial before the United States Court of Appeals for the Second Circuit (hereinafter "the U.S. Court of Appeals") against the Judgment at issue. The fact of the aforementioned Appeals pending led the Applicant to file the Application to Stay Proceedings, as will be explained below.

10. Through the Appeals, the Applicant challenges the Judgment of the First Instance Court to exercise jurisdiction over their dispute, invoking issues of forum-non-conveniens and violation of the principles of international comity. In addition, the Applicant contested the application of the applicable Argentine law by the First Instance Court, by bringing forth arguments that the First Instance Court erred: **(i)** recognizing an unprecedented complaint for damages for breach of contract by one shareholder against another shareholder for an alleged violation of the company's articles of association; **(ii)** allowing Respondents/Plaintiffs to seek damages, despite that Argentine civil law limits damages for breach of contract to those set forth in the contract and does not allow damages unless specific performance is impossible or the contract has been terminated, **(iii)** allowing Plaintiffs to bring claims when they no longer held YPF's shares; and **(iv)** allowing claims for breach of contract to proceed, even though Argentina's General Law on Expropriation no. 21.499 requires that all third party claims related to an expropriation be resolved through the expropriation procedure. Finally, we note that the Applicant also challenged the First Instance Court's failure to apply the "Day Of Judgment" rule for the currency conversion applicable to "foreign currency obligations", as well as the application of the incorrect breach date and pre-trial interest rate under Argentine law.

11. We respectfully submit that, as explained in the testimony supporting the Application to Stay Proceedings and specifically in the accompanying legal opinion of Professor Pamela Bookman, the appeals have realistic

TRUE COPY

chances of success and involve important and novel issues of US and Argentine law.

12. Success of the Appeals may result in the annulment of the first instance judgment and therefore any further proceedings in Cyprus or abroad regarding the issue of the entry and enforcement of the contested Judgment will become irrelevant.

13. At the same time, the Applicant, which contests the jurisdiction of the Cypriot Courts, as well as the Court of First Instance that issued the contested Judgment, has filed, in accordance with the provisions of the Civil Procedure Rules, the Application to Set Aside for the reasons set out in the content of the Application and the accompanying Affidavits.

## C. POWERS OF THE COURT IN THE MANAGEMENT OF THE CASE

14. We respectfully submit that the question of the order of priority in which the two Applications pending in this case should be heard lies  solely with the discretion of the Honorable Court.

15. In particular, in accordance with Rules 1.5 (2)(d) & 3.1(j) of the Civil Procedure Rules 2023, the order in which matters are heard falls within the general powers of the Court and is inherent in the Court's duty to actively manage cases.

16. The above is also confirmed in the Court of Appeal's decision dated 24/10/2023 in **Civil Application no. 82/23** - **Regarding the EX PARTE Application of Eleni A. Georgiou,** where the following was said:

> *in accordance with **Part 1. 5. (2(d)** the court shall promote  the primary objective by actively managing cases, which includes deciding as to the order of resolving issues."*



17. At the same time, in the decision of the Court of Appeal dated 30/11/2023 on **Civil Appeal no. E31/2023** - **ANDREA AZA v. EIRINOULA CHRISTOU PARAKA, aka EIRINOULA AZA,** the Court of Appeal emphasized the following:

> *"We note that under **Part 3.1(2)(m)** the Court has the power to take any step for the purpose of managing the case and furthering the primary objective."*

18. The criterion in any decision of the Court is always the promotion of the Primary Objective as set out in Regulation 1.2:

> *1.2. **Primary objective***
> *(1) These Rules constitute a procedural code, the primary purpose of which is to enable the court to deal with cases in a fair manner and with proportionate costs.*
> *(2) Handling a case fairly and with proportionate costs includes, as far as it is practicable:*
> *(a) ensuring that the parties are placed on an equal footing;*
> *(/3) cost savings;*
> *(c) handling a case in ways analogous to:*
> *(i) the amount of money in question;*
> *(i) the seriousness of the case*
> *(ii) the complexity of the issues; and*
> *(i) the economic circumstances of each party;*
> *(d) ensuring prompt and fair handling;*
> *(e) the allocation to it of an appropriate part of the resources of the court, taking into account the need to allocate resources to other cases; and*
> *(f) enforcing compliance with regulations and orders.*

19. Guiding as to the philosophy of the implementation of the Primary Objective and more generally of the new Civil Procedure Rules of 2023 is the decision of the Court of Appeal dated 18/10/2024 on **Civil Appeal No 54/2024** - **KONSTANTIS KANTOUNAS v. CHRISTOS ELIADIS et al,** where the following were mentioned:

> *"We point out that with the adoption of the new Rules, in addition to the substantial procedural changes, a change of culture and philosophy is attempted. A modern and progressive culture and philosophy that will allow the Court, in line with its primary objective, to manage cases with flexibility and practicality in the service of law and justice.*



TRUE COPY

## A. THE APPLICATION TO STAY PROCEEDINGS

20. Without going into the substance of the Application to Stay Proceedings, it is deemed necessary to briefly refer to the contents of the said Application, so that the Honorable Court may have a sufficient understanding of its nature and purpose and, consequently, may properly and thoroughly decide the issue of the order of hearing of the pending Applications.

21. **The** general principle on the stay of proceedings - which is also reflected in case law - is that a Court in its wide discretion may grant a stay in whole or in part in cases where this is considered reasonable and appropriate in the circumstances of the case. The Court takes into account the course of events and the circumstances of a case, as well as any difficulties or obstacles.

22. This principle is crystallized in the New Civil Procedure Rules in Part 3, **Rule 3.1 (2)** and specifically in subsections **3.1 (2) (f)** and **3.1 (2) (m)** which provide that the Court may :

    (f) *"stay all or part of any proceedings or decision in general or until a specified date or specified event"*

    (m) *"to take any other step or make any other order for the purpose of administering the case and furthering the primary objective, including taking actions to assist the parties in settling the case."*

23. According to case law, normal practice of considering and approving Application to Stay Proceedings arises when other parallel proceedings or arbitration or appeal are pending that are expected to have a decisive impact on the pending proceedings in which stay is sought.

24. The logic applied is first and foremost to serve the Primary Objective, i.e. to handle cases fairly and proportionately as mentioned above.

TRUE COPY

ΑΝΟΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

25. Indicatively, in the very recent *(201312025)* and relevant to the facts of the present case Judgment of the High Court of Justice Business & Property Courts of England & Wales, Commercial Court **"Michael Wilson and Partners Ltd v Emmott{2025} EWHC 716 (Comm)"**, where the dispute at issue was being litigated for 13 years (in the present case almost 10 years have elapsed since the filing of the first claim in the Southern District Court of New York) in a variety of jurisdictions, including the Courts of New South Wales and the Courts of England and Wales. The English Court stayed the proceedings before it, citing the Court's obligation to ensure that judicial resources are proportionally allocated to proceedings with an unprecedented historical background. The Court ruled that it would be unfair to proceed with applications affected by substantive issues pending before the Court of Appeal of the country of origin of the judgment sought to be recognized. Thus, the Court has adopted a stay of proceedings based on its case management powers until the matter is resolved before the Court in the country of origin of the Judgment.

26. In addition, in  cases  where both a simultaneous application for stay of proceedings and a motion to set aside are pending, choosing to hear the stay application first may in effect put a semicolon on the continuation of the proceedings,   which if   continued,   likely  would bring about undesirable results in the proceedings, particularly in avoiding conflicting judgments, as happened in the again very recent case of *Motorola Solutions Inc and others v Hytrera Communications Corporation Ltd and others, [2025] EWHC 257 (Comm)"*. In this case, an English judgment was initially issued on the basis of a U.S. Court of Appeals decision, which was reversed on appeal by the U.S. Court of Appeals, with the result that the English judgment, which had been deemed final and legally binding, remained in effect,     while the basis on which it was issued had been eliminated, forcing the parties to engage  in further proceedings contesting the validity of the English judgment and its annulment, with all the consequences that this may entail.

27. The fact that an appeal is pending is an essential criterion for a Court, since the expected decision of the appeal can overturn the first instance judgment



TRUE COPY

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

_TER

for which recognition is sought, which inevitably brings about the end of the present proceedings.

28. In particular, where, as in the present case, a decision in the appeal will decide issues of jurisdiction of the Court of First Instance that delivered the original judgment, issues of international comity and other decisive issues on the merits of the Complaint, which will consequently determine the fate of the Complaint itself, making it potentially devoid of objective.

29. Precisely for this reason, it is our position that the Court **cannot try both Applications at the same time.** If, for example, the US Court of Appeals concludes that the US Court of First Instance did not have jurisdiction to hear the complaint there and, in the meantime, this Court proceeds to hear the Application to Set Aside  or even the complaint and makes different findings on various issues such as jurisdiction, then insurmountable difficulties will arise in restoring the legal situation and/or the parties will be forced to undergo new, financially burdensome and time-consuming, legal proceedings to restore the legal situation and secure their affected interests and rights.

30. It should be emphasized that any decision by the Honorable Court to consider both Applications in parallel, as a possible compromising solution, will not bring any practical benefit to the proceedings. On the contrary, given that the very purpose of the Application to stay the proceedings is to avoid advancing the substantive aspects of the case for a limited period of time to save court time and attorney fees, <u>an order for a concurrent hearing would go against the core of the Application to stay judgment rendering its trial futile.</u>

31. By extension, the same will apply in the case of adjudicating the Application to Set Aside by priority, since in this case, too, the Application to stay the proceedings will be rendered meaningless, thus nullifying the existence, in practice, and the usefulness of the Application.





TRUE COPY

32. We also refer to the case ***Reichhold Norway ASA and another v Goldman Sachs International*** where the English Court stayed the case so that it could control duplicate and related proceedings for the purpose of proportionate costs. The Court acted on the basis, inter alia, that the parties in its presence were the same as the parties before the arbitration in Norway, and that if the two proceedings had proceeded in parallel, the Arbitration would have issued an award much earlier than the Court, which would have had a practical impact on the continuation of the English proceedings. Considering the cost, convenience and the interest of justice, the Court stayed the proceedings before it pending the arbitration in Norway.

33. In the present case, both the parties and the issues in dispute are intersected by the pending Appeals in the United States, and indeed any decision in America is expected to be issued shortly (if not earlier than a decision of this Court, at about the same time), having a decisive and practical influence on the further promotion and adjudication of the present Complaint.

34. It is important and we would like to emphasize that pending Appeals in the United States, this Court must and should show the necessary respect within the principle of international comity by allowing the country hearing the Appeal to decide the points at issue before they are decided by this Court.

35. The Court is urged to be cautious in proceeding with the Application to Set Aside and the merits of the Complaint, since the Judgment for which recognition is sought has a strong chance of being overturned by the US Court of Appeals.

36. We believe that a stay may be granted pending the outcome of the court proceedings in another country, such as an appeal, since such proceedings directly and substantially affect the issue of the recognition and usefulness of the judgment.

TRUE COPY

37. Finally, we submit our position that it is imperative to ensure that there is no early recognition of the foreign judgment or early delivery of any other decision of this Court on the issues raised in the Application to Set Aside before those issues are decided by the Court of Appeal in the country where the original judgment was issued.

38. It should be noted that in similar proceedings before the English Courts the parties agreed that the application to stay should be heard first, without any issue of delay having been raised by the Respondents.

## E. JURISDICTION OF THE COURT

39. It is also our position that the Court has the opportunity to hear the Application to stay before deciding whether it has jurisdiction to hear the Complaint, for the following reasons:

   i. The Court is called upon to hear the Application to stay in the context of regulating the proceedings before it and in the context of serving the primary objective of the New Civil Procedure Rules.

   i. The Court, when considering the Application to stay, is not required to decide whether it has jurisdiction over the merits of the Complaint, since to stay or not the proceedings is a decision of the Court on the procedure and not on the merits of the case. The Court in its examination of the Application to Stay Proceedings will not enter into findings, conclusions and findings of fact on the merits of the case so as to require the existence and prior proof of a jurisdictional background.

   ii. With the Court's examination of whether it has jurisdiction prior to hearing the Application to stay proceedings, the Court will consider, inter alia, some of the issues which the US Appellate Court will also consider, and it is possible for this Court to reach a decision on them, which could be contrary to that of the Court of Appeal. We remind at this point that this Court, in the context of the

TRUE COPY

Application to set aside will be called upon to re-examine the jurisdiction of the U.S. District Court, in addition to its own, as required by the rules applicable in such cases.

in.  We also note that, based on Rule 12 of the New Rules of Civil Procedure, an Applicant is provided with the possibility, by filing an Application to Set Aside, to request in the same Application both setting aside the proceedings and/or service out of jurisdiction, as well as to stay the proceedings. However, the inclusion of both remedies in the same Application or the parallel adjudication of two different Applications is likely to lead to unsafe conclusions by this Court pending the decision in the Appeal in the USA. It is for this reason that Defendant/Applicant has chosen to file two separate Applications to avoid confusion and inconsistent procedural remedies.

## F. CONCLUSION

40. Based on its discretion, the Court has the power to decide the proper and fair procedure to be followed in the case and the interim applications, thus avoiding unnecessary procedures and the possibility of creating contradictory judgments that may result from the Court of Appeal's decision. It is neither appropriate nor in the interest of justice for this Court to proceed with the hearing of (also) the Application to Set Aside if in the end the foreign Judgment for which recognition is sought is still in dispute, since the result of the Appeal is still pending.

41. In any event, the examination of the Application to Stay Proceedings deals with a single issue, thus making it legitimate and in the interests of justice to hear first the Application to Stay Proceedings first, and then the Application to Set Aside which is complex and deals with a multitude of legal and factual matters. If the Court allows the two Applications to be heard simultaneously, or the hearing of the Application to Set Aside first, the Court's time will be wasted on matters which may, in view of the outcome of the Appeal, ultimately prove to be irrelevant.



**TRUE COPY**

ANOTEPH ΠΡ

42. Also, if the Court allows the two Applications to be heard in parallel, or gives priority to the hearing of the Application to Set Aside, the Applicant's Application to Stay Proceedings automatically becomes moot. Such a decision of the Honorable Court would deprive the Applicant of the opportunity to defend her Application to Stay Proceedings, since the main objective, intertwined in its very nature, is to not advance the substantive aspects of the case for a limited period of time, in order to save court time and costs prior to the outcome of the pending Appeals abroad.

43. Furthermore, the priority hearing of the Application to Stay Proceedings will not cause any substantial delay in the case, but on the contrary, it is the indicated and/or most correct way for the Court to manage the case, so as to facilitate the procedure and at the same time without entailing any risks of premature decision. Clearly, the benefits to be derived from the temporary stay of the proceedings outweigh any other handling of the case. In any case, the hearing of the Application to Stay Proceedings can be done in a short period of time, as it does not deal with complex legal issues.

44. A possible adjudication of the Application to Set Aside first, prior to the adjudication of the Appeal, which has a serious and realistic chance of success, would create an adverse impact on the Applicant, as she would be faced with recognition of the Decision and attempts of its enforcement prior to the finality of the proceedings in the United States, resulting in an adverse and/or irreparable impact on her rights.

45. We therefore respectfully urge the Honorable Court to decide the Application to Stay Proceedings on a priority basis, by exercising its discretion with flexibility in the service of the Primary Objective.

Υπ................

**Μ. Χ. ΜΥΛΩΝΑΣ & ΣΥΝΕΡΓΑΤΕΣ**

**Attorneys for the Defendant**

Filed on 31/03/2025

TRUE COPY

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

THE STATE OF TEXAS     }
                          }
COUNTY OF HARRIS     }

## AFFIDAVIT OF ACCURACY

BEFORE ME, the undersigned authority, on this day personally appeared <u>Ana Cristina Didoné</u>, who, by oath and by presentation of identification, is personally known to me to be the person subscribing her name below and, after being by me duly sworn according to law, upon her oath deposes and says in due form of law that to the best of her knowledge, information and belief:

1. "My name is Ana Cristina Didoné and I am over the age of twenty-one years and competent to make this affidavit.

2. I am President of TransLite Solutions LLC.

3. I have been a certified sworn translator since 1988 with a M.A. in Legal Translations from the University of Salvador, Argentina. I am certified by the Argentine Association of Sworn Public Translators to translate from English into Spanish and Spanish into English. I am also certified by the American Translators Association for English to Spanish translations. I hold a degree in Executive Business Management from Rice University.

4. I hereby certify that the translator that performed the translation of the document in Greek into English, titled "*WRITTEN PLEADINGS OF THE APPLICANT/DEFENDANT FOLLOWING THE INSTRUCTIONS OF THE COURT DATED 3/24/2025 IN RELATION TO THE HEARING ORDER OF THE FILED APPLICATIONS TO SET ASIDE DATED 27/02/2025 AND APPLICATION TO STAY PROCEEDINGS DATED 28/02/2025*", is a professional legal translator, holds a degree in Business Law and Accounting from Oakton College, a BA in Philosophy from the University of Athens, with over 28 years of experience in translations of Greek◇English and qualified to render an accurate translation.

Translator: ___**Eleftherios Kritikakis**_____

ANA CRISTINA DIDONE, MA
Certified by American Translators Association

Sworn to before me this ___6/6/25___

Notary Public in and for the State of Texas
My commission expires:

CAMERON FEDER
Notary Public, State of Texas
Comm. Expires 05-19-2029
Notary ID 129411929

Certified Translations.281.402.2514

Ορισμένη 31/3/2025
Ενώπιον Έντιμης Ε. Γεωργίου-Αντωνίου, Π.Ε.Δ.

**Κλίμακα Απαίτησης: Άνω των €2.000.000**
**Άνω των €10.000**

## ΣΤΟ ΕΠΑΡΧΙΑΚΟ ΔΙΚΑΣΤΗΡΙΟ ΛΕΥΚΩΣΙΑΣ

**Αρ. Απαίτησης: 422/2024**

Μεταξύ :

1. PETERSEN ENERGIA INVERSORA, S.A.U Αρ. Εγγραφής A85392751[…]

2. PETERSEN ENERGIA, S.A.U Αρ. Εγγραφής A85174621[…]

3. ETON PARK CAPITAL MANAGEMENT L.P Αρ. Εγγραφής 3783631[…]

4. ETON PARK MASTER FUND Ltd Αρ. Εγγραφής 138469[…]

5. 5.ETON PARK FUND LP Αρ. Εγγραφής 3834273[…]

Ενάγοντες

-και-

ΔΗΜΟΚΡΑΤΙΑ ΤΗΣ ΑΡΓΕΝΤΙΝΗΣ […]

Εναγόμενη

**ΓΡΑΠΤΗ ΑΓΟΡΕΥΣΗ ΑΙΤΗΤΡΙΑΣ/ ΕΝΑΓΟΜΕΝΗΣ ΚΑΤΟΠΙΝ ΟΔΗΓΙΩΝ ΤΟΥ ΔΙΚΑΣΤΗΡΙΟΥ ΗΜΕΡ. 24/3/2025 ΑΝΑΦΟΡΙΚΑ ΜΕ ΤΗΝ ΣΕΙΡΑ ΕΚΔΙΚΑΣΗΣ ΤΩΝ ΚΑΤΑΧΩΡΗΘΕΙΣΩΝ ΑΙΤΗΣΕΩΝ ΠΑΡΑΜΕΡΙΣΜΟΥ ΗΜΕΡ. 27/02/2025 ΚΑΙ ΑΝΑΣΤΟΛΗΣ ΗΜΕΡ. 28/02/2025**

Εντιμοτάτη,

## Α. ΕΙΣΑΓΩΓΗ

1. Η παρούσα Αγόρευση καταχωρείται κατόπιν Οδηγιών του Δικαστηρίου ημερ. 24/3/2025 για γραπτή τοποθέτηση και τεκμηρίωση των θέσεων των διάδικων μερών αναφορικά με την σειρά εκδίκασης των δύο εκκρεμών Ενδιάμεσων Αιτήσεων, ήτοι της Αίτησης Αναστολής της διαδικασίας ημερ. 28/2/2025 (η «Αίτηση Αναστολής») και της Αίτησης Παραμερισμού ημερ. 27/2/2025 (η «Αίτηση Παραμερισμού») που καταχωρήθηκαν αμφότερες εκ μέρους της Αιτήτριας/Εναγομένης («η Αιτήτρια») εναντίον όλων των Καθ΄ ων η Αίτηση/ Εναγόντων («οι Καθ΄ ων η Αίτηση») στα πλαίσια της υπό τον ως άνω αριθμό και τίτλο αγωγής.

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

2. Στις 24/3/2025, ημερομηνία κατά την οποία οι πιο πάνω Αιτήσεις ορίστηκαν για πρώτη φορά, οι δικηγόροι αμφότερων των πλευρών παρουσιάστηκαν ενώπιον του Δικαστηρίου. Η πλευρά των Καθ΄ ων η Αίτηση εισηγήθηκε πως θα πρέπει να εκδικαστεί κατά προτεραιότητα η Αίτηση Παραμερισμού ή εναλλακτικά, πως και οι δύο Αιτήσεις θα πρέπει να εκδικαστούν παράλληλα. Η πλευρά της  Αιτήτριας εισηγήθηκε για τους λόγους που θα αναλυθούν και τεκμηριωθούν πιο κάτω,  όπως η εκδίκαση της  Αίτησης Αναστολής  προηγηθεί της εκδίκασης της Αίτησης Παραμερισμού.

3. Το Δικαστήριο ζήτησε από τους διαδίκους όπως τοποθετηθούν και τεκμηριώσουν τις εκατέρωθεν θέσεις τους γραπτώς, ώστε να αποφασίσει το ίδιο επί του ζητήματος και έδωσε Οδηγίες για για καταχώρηση Γραπτών Αγορεύσεων στις 31/3/2025.

4. Προτού προχωρήσουμε με την αγόρευση μας, θα θέλαμε να επιστήσουμε την προσοχή του Δικαστηρίου και να τονίσουμε ότι σε καμία περίπτωση, η προώθηση της θέσης των Αιτητών αναφορικά με την εκδίκαση της Αίτησης Αναστολής κατά προτεραιότητα και πριν την εκδίκαση της Αίτησης Παραμερισμού, **ΔΕΝ συνιστά άμεση και/ή έμμεση και/ή με οποιοδήποτε τρόπο, αποδοχή της δικαιοδοσίας των Κυπριακών Δικαστηρίων να εκδικάσουν την υπό κρίση Αγωγή.**

5. Θεωρούμε πως είναι σαφές πως η Αιτήτρια προωθεί την Αίτηση Αναστολής και αιτείται την προσωρινή αναστολή εκδίκασης της υπό τον ως άνω αριθμό και τίτλο Αγωγής **στο σύνολο της, συμπεριλαμβανομένου του ζητήματος της εξέτασης της δικαιοδοσίας τόσο των Κυπριακών Δικαστηρίων, όσο και των Δικαστηρίων στις ΗΠΑ, ως επίσης και της Αίτησης Παραμερισμού.**

## Β. ΠΡΑΓΜΑΤΙΚΑ ΓΕΓΟΝΟΤΑ

6. Τα  πραγματικά γεγονότα τα οποία οδήγησαν στην καταχώρηση αμφότερων των Αιτήσεων εμφαίνονται στο περιεχόμενο των Αιτήσεων και στις Ένορκες Δηλώσεις και τεκμήρια αυτών που καταχωρήθηκαν προς υποστήριξη τους εκ μέρους της Α...

7. Εν συντομία, οι Καθ΄ ων η Αίτηση καταχώρησαν την παρούσα Αγωγή αιτο... εγγραφή και εκτέλεση στην Κύπρο στη βάση των αρχών του κοινοδικαίου, ...φ... του Δικαστηρίου της Νότιας Περιφέρειας της Νέας Υόρκης (στο εφεξής «η Α... και «το Πρωτόδικο Δικαστήριο», αντίστοιχα) που εκδόθηκε εναντίον της Αιτήτρ...

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤ...

8. Περαιτέρω, οι Καθ΄ ων η Αίτηση καταχώρησαν σωρεία πανομοιότυπων διαδικασιών εγγραφής και εκτέλεσης σε διάφορες δικαιοδοσίες.

9. Αυτή τη στιγμή, εκκρεμούν προς εκδίκαση οι δύο συνδεδεμένες εφέσεις της Αιτήτριας στο United States Court of Appeals for the Second Circuit (στο εφεξής «το Αμερικανικό Εφετείο») εναντίον της επίδικης Απόφασης. Το γεγονός της εκκρεμοδικίας των προαναφερθέντων Εφέσεων οδήγησε την Αιτήτρια στην καταχώριση της Αίτησης Αναστολής, ως θα εξηγηθεί κατωτέρω.

10. Μέσω των Εφέσεων, η Αιτήτρια αμφισβητεί την Απόφαση του Πρωτόδικου Δικαστηρίου να ασκήσει δικαιοδοσία επί της διαφοράς τους, επικαλούμενη θέματα forum-non-conveniens και παράβασης των αρχών της διεθνούς αβρότητας. Επιπλέον, η Αιτήτρια αμφισβήτησε την εφαρμογή από το Πρωτόδικο Δικαστήριο του εφαρμοστέου δικαίου της Αργεντινής, προβάλλοντας τα επιχειρήματα ότι το Πρωτόδικο Δικαστήριο έσφαλε: **(i)** αναγνωρίζοντας μια άνευ προηγουμένου αγωγή για αποζημίωση λόγω αθέτησης σύμβασης από έναν μέτοχο κατά ενός άλλου μετόχου για μια υποτιθέμενη παραβίαση του εταιρικού καταστατικού, **(ii)** επιτρέποντας στους Καθ' ων η Αίτηση/Ενάγοντες να ζητήσουν αποζημίωση, παρά το ότι το αστικό δίκαιο της Αργεντινής περιορίζει την αποζημίωση λόγω αθέτησης σύμβασης σε αυτά που ορίζονται στη σύμβαση και δεν επιτρέπει αποζημίωση εκτός εάν η συγκεκριμένη εκτέλεση είναι αδύνατη ή η σύμβαση έχει καταγγελθεί, **(iii)** επιτρέποντας στους Ενάγοντες να εγείρουν αξιώσεις όταν δεν κατείχαν πλέον τις μετοχές της YPF και **(iv)** επιτρέποντας την προώθηση των αξιώσεων για παραβίαση της σύμβασης, παρότι ο Γενικός Νόμος Περί Απαλλοτριώσεων της Αργεντινής αριθ. 21.499 απαιτεί όπως όλες οι αξιώσεις τρίτων που σχετίζονται με μια απαλλοτρίωση να επιλύονται μέσω της διαδικασίας απαλλοτρίωσης. Τέλος, σημειώνουμε πως η Αιτήτρια αμφισβήτησε και την παράλειψη του Πρωτόδικου Δικαστηρίου να εφαρμόσει τον κανόνα "της ημέρας της απόφασης" (judgment-day rule) για τη μετατροπή του νομίσματος που ισχύει για "υποχρεώσεις σε ξένο νόμισμα", καθώς και την εφαρμογή της λανθασμένης ημερομηνίας παραβίασης και του επιτοκίου προδικαστικού, σύμφωνα με το δίκαιο της Αργεντινής.

11. Ευσεβάστως υποβάλλουμε ότι, όπως εξηγείται στη μαρτυρία που υπο[...] Αίτηση Αναστολής και συγκεκριμένα στη νομική γνωμάτευση της Κα[...] Pamela Bookman που τη συνοδεύει, οι εφέσεις έχουν ρεαλιστικές πρ[...]



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

επιτυχίας και αφορούν σημαντικά και καινοφανή ζητήματα του δικαίου των ΗΠΑ και της Αργεντινής.

12. Τυχόν επιτυχία των Εφέσεων μπορεί να οδηγήσει σε ακύρωση της πρωτόδικης απόφασης και επομένως οποιαδήποτε περαιτέρω διαδικασία στην Κύπρο ή το εξωτερικό αναφορικά με το ζήτημα της εγγραφής και εκτέλεσης της επίδικης Απόφασης θα καταστεί άνευ αντικειμένου.

13. Παράλληλα, η Αιτήτρια, η οποία αμφισβητεί την δικαιοδοσία των Κυπριακών Δικαστηρίων, αλλά και του Πρωτόδικου Δικαστηρίου που εξέδωσε την επίδικη Απόφαση, καταχώρησε συμφώνως με τα όσα διαλαμβάνονται στους Κανονισμούς Πολιτικής Δικονομίας, την Αίτηση Παραμερισμού για τους λόγους που εμφαίνονται στο περιεχόμενο της Αίτησης και στις Ένορκες Δηλώσεις που την συνοδεύουν.

## Γ. ΕΞΟΥΣΙΕΣ ΔΙΚΑΣΤΗΡΙΟΥ ΣΤΗ ΔΙΑΧΕΙΡΙΣΗ ΤΗΣ ΥΠΟΘΕΣΗΣ

14. Ευσεβάστως υποβάλλουμε πως το ζήτημα της σειράς προτεραιότητας εκδίκασης των δύο Αιτήσεων που εκκρεμούν στο πλαίσιο της παρούσας υπόθεσης εναπόκειται αποκλειστικά στη διακριτική ευχέρεια του Σεβαστού Δικαστηρίου.

15. Συγκεκριμένα, σύμφωνα με τους Κανονισμούς 1.5 (2)(δ) & 3.1(ι) των Κανονισμών Πολιτικής Δικονομίας του 2023, η σειρά εκδίκασης των ζητημάτων εμπίπτει στις γενικές εξουσίες του Δικαστηρίου και είναι συνυφασμένη με το καθήκον του Δικαστηρίου για ενεργή διαχείριση των υποθέσεων.

16. Το πιο πάνω επιβεβαιώνεται και στην Απόφαση του Εφετείου ημερ. 24/10/2023 στην **Πολιτική Αίτηση αρ. 82/23 - Αναφορικά με την Αίτηση χωρίς ειδοποίηση ΕΞ ΠΑΡΤΕ της Ελένης Α. Γεωργίου**, όπου λέχθηκαν τα ακόλουθα:

> *"Σύμφωνα με το **Μέρος 1. 5. (2)(δ)** το δικαστήριο προάγει τον πρωταρχικό σκοπό με την ενεργό διαχείριση των υποθέσεων, η οποία περιλαμβάνει και τη λήψη απόφασης ως προς τη σειρά επίλυσης ζητημάτων."*

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

17. Παράλληλα, στην απόφαση του Εφετείου ημερ. 30/11/2023 στην **Πολιτική Έφεση αρ. Ε31/2023 - ΑΝΔΡΕΑ ΑΖΑ v. ΕΙΡΗΝΟΥΛΛΑΣ ΧΡΙΣΤΟΥ ΠΑΡΑΚΑ ΑΛΛΩΣ ΕΙΡΗΝΟΥΛΛΑΣ ΑΖΑ**, το Εφετείο τόνισε τα ακόλουθα:

> *"Σημειώνουμε ότι δυνάμει του **Μέρους 3.1(2) (μ)** το Δικαστήριο έχει την εξουσία να πραγματοποιεί οποιοδήποτε βήμα με σκοπό την διαχείριση της υπόθεσης και την προαγωγή του πρωταρχικού σκοπού."*

18. Κριτήριο στην όποια απόφαση του Δικαστηρίου είναι πάντοτε η προώθηση του Πρωταρχικού Σκοπού, όπως αυτός διατυπώνεται στον Κανονισμό 1.2:

> *1.2. Πρωταρχικός σκοπός*
> *(1) Οι παρόντες κανονισμοί αποτελούν διαδικαστικό κώδικα, πρωταρχικός σκοπός του οποίου είναι η παροχή στο δικαστήριο δυνατότητας χειρισμού υποθέσεων κατά τρόπο δίκαιο και με αναλογικό κόστος.*
> *(2) Ο χειρισμός υπόθεσης δίκαια και με αναλογικό κόστος περιλαμβάνει, στον βαθμό που είναι πρακτικά εφικτό:*
> *(α) τη διασφάλιση ότι οι διάδικοι τίθενται επί ίσοις όροις·*
> *(β) την εξοικονόμηση δαπανών·*
> *(γ) τον χειρισμό μιας υπόθεσης με τρόπους αναλογικούς προς:*
> *(i) το υπό αναφορά χρηματικό ποσό·*
> *(ii) τη σοβαρότητα της υπόθεσης·*
> *(iii) την πολυπλοκότητα των θεμάτων· και*
> *(iv) τις οικονομικές συνθήκες κάθε διαδίκου·*
> *(δ) τη διασφάλιση ταχέος και δίκαιου χειρισμού·*
> *(ε) την κατανομή σε αυτήν κατάλληλου μέρους των πόρων του δικαστηρίου, λαμβανομένης υπόψη της ανάγκης για κατανομή πόρων και σε άλλες υποθέσεις· και*
> *(στ) την επιβολή συμμόρφωσης με κανονισμούς και διατάγματα.*

19. Καθοδηγητική ως προς την φιλοσοφία της εφαρμογής του Πρωταρχικού Σκοπού και γενικότερα των νέων Κανονισμών Πολιτικής Δικονομίας του 2023 είναι η απόφαση του Εφετείου ημερ. 18/10/2024 στην **Πολιτική Έφεση Αρ 54/2024 - ΚΩΝΣΤΑΝΤΗΣ ΚΑΝΤΟΥΝΑΣ v. ΧΡΙΣΤΟΣ ΗΛΙΑΔΗΣ κ.α.**, όπου αναφέρθηκαν τα ακόλουθα:

> *"Επισημαίνουμε ότι με τη θέσπιση των νέων Κανονισμών, πέραν των ουσιαστικών διαδικαστικών αλλαγών, επιχειρείται μια αλλαγή κουλτούρας και φιλοσοφίας. Μιας κουλτούρας και φιλοσοφίας σύγχρονης, προοδευτικής που θα επιτρέπει στο Δικαστήριο, κατ' εφαρμογή πρωταρχικού σκοπού, να διαχειρίζεται τις υποθέσεις με ευελιξία πρακτικότητα προς εξυπηρέτηση του δικαίου και της δικαιοσύνης."*

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

## Δ. Η ΑΙΤΗΣΗ ΑΝΑΣΤΟΛΗΣ

20. Χωρίς να υπεισέλθουμε στην ουσία της Αίτηση Αναστολής, κρίνεται απαραίτητο όπως κάνουμε μια σύντομη αναφορά στο περιεχόμενο της εν λόγω Αίτησης, ώστε το Σεβαστό Δικαστήριο να αποκτήσει επαρκή αντίληψη της φύσης  και του σκοπού της και, κατά συνέπεια, να μπορέσει να κρίνει ορθώς και εμπεριστατωμένα το ζήτημα της σειράς εκδίκασης των εκκρεμουσών Αιτήσεων.

21. Η γενική αρχή σχετικά με την αναστολή διαδικασίας η οποία αντικατοπτρίζεται και μέσα από την νομολογία - είναι ότι ένα Δικαστήριο στη βάση της ευρείας διακριτικής του ευχέρειας μπορεί να εγκρίνει την αναστολή διαδικασίας εν όλω ή εν μέρει σε περιπτώσεις όπου κάτι τέτοιο θεωρείται εύλογο και πρόσφορο υπό τις περιστάσεις της υπόθεσης. Το Δικαστήριο λαμβάνει υπόψη τη ροή των γεγονότων και τις περιστάσεις μιας υπόθεσης, ως επίσης και τις οποιεσδήποτε δυσκολίες ή εμπόδια.

22. Η εν λόγω αρχή αποκρυσταλλώνεται στους Νέους Κανονισμούς Πολιτικής Δικονομίας στο Μέρος 3,  **Κανονισμός 3.1 (2)** και συγκεκριμένα στα υποεδάφια **3.1 (2)(στ)** και **3.1(2) (μ)** τα οποία διαλαμβάνουν ότι το Δικαστήριο δύναται να :

    (στ) *«να αναστέλλει όλη ή μέρος οποιασδήποτε διαδικασίας ή απόφασης γενικά ή μέχρι καθορισμένη ημερομηνία ή καθορισμένο συμβάν»*

    *(μ) «να πραγματοποιεί οποιοδήποτε άλλο βήμα ή να εκδίδει οποιοδήποτε άλλο διάταγμα με σκοπό τη διαχείριση της υπόθεσης και την προαγωγή του πρωταρχικού σκοπού, περιλαμβανομένης της υλοποίησης ενεργειών με στόχο την υποβοήθηση των διαδίκων στη διευθέτηση της υπόθεσης.»*

23. Σύμφωνα με την νομολογία, συνήθης πρακτική εξέτασης και έγκρισης μιας Αίτησης Αναστολής δημιουργείται όταν εκκρεμούν άλλες παράλληλες διαδικασίες ή διαιτησία ή έφεση που αναμένεται να επηρεάσει καθοριστικά την εκκρεμούσα διαδικασία, στα πλαίσια της οποίας ζητείται η αναστολή.

24. Η λογική που εφαρμόζεται είναι πρωτίστως η εξυπηρέτηση του Πρ[...] Σκοπού, ήτοι του χειρισμού υποθέσεων δίκαια και με αναλογικό κό[...] αναφέρθηκε πιο πάνω.

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡ[...]

25. Ενδεικτικά, στην πολύ πρόσφατη *(20/3/2025)* και σχετική με τα γεγονότα της παρούσας υπόθεσης, απόφαση του High Court of Justice Business & Property Courts of England & Wales, Commercial Court ***"Michael Wilson and Partners Ltd v Emmott [2025] EWHC 716 (Comm)"***, όπου η επίδικη διαφορά εκδικαζόταν επί 13 έτη (στην παρούσα έχουν παρέλθει σχεδόν 10 έτη από την καταχώριση της πρώτης αγωγής ενώπιον του Δικαστηρίου Νότιας Περιφέρειας Νέας Υόρκης) σε ποικίλες δικαιοδοσίες, μεταξύ άλλων των Δικαστηρίων της Νέας Νότιας Ουαλίας και των Δικαστηρίων της Αγγλίας και Ουαλίας. Το Αγγλικό Δικαστήριο ανέστειλε την διαδικασία ενώπιον του, αναφερόμενο στην υποχρέωση του Δικαστηρίου να εξασφαλίσει την ανάλογη διάθεση δικαστικών πόρων σε διαδικασίες με ασύνηθες ιστορικό υπόβαθρο. Το Δικαστήριο απεφάνθη πως θα ήταν άδικο να προχωρήσει σε εκδίκαση αιτήσεων που επηρεάζονταν από θέματα ουσίας που εκκρεμοδικούσαν ενώπιον Εφετείου της χώρας προέλευσης της απόφασης που επιδιώκεται να αναγνωριστεί. Έτσι, το Δικαστήριο ενέκρινε αναστολή της διαδικασίας στηριζόμενο στις εξουσίες του για διαχείριση υποθέσεων, μέχρι ότου ξεκαθαρίσει το θέμα ενώπιον του Δικαστηρίου της χώρας προέλευσης της Απόφασης.

26. Επιπλέον, σε περιπτώσεις όπου εκκρεμούν ταυτόχρονα αίτηση αναστολής διαδικασίας, αλλά και αίτηση παραμερισμού, η επιλογή της εκδίκασης πρώτα της αίτησης αναστολής μπορεί να βάλει στην ουσία μια άνω τελεία στη συνέχιση της διαδικασίας, η οποία αν συνεχιζόταν, πιθανότατα να επέφερε ανεπιθύμητα αποτελέσματα στη διαδικασία, ιδιαίτερα δε προς αποφυγή έκδοσης αντικρουόμενων αποφάσεων, ως συνέβη στην πάλι πολύ πρόσφατη υπόθεση ***Motorola Solutions Inc and others v Hytrera Communications Corporation Ltd and others, [2025] EWHC 257 (Comm)"*** . Στην υπόθεση αυτή, αρχικά εξεδόθη Αγγλική απόφαση στη βάση εγγραφής απόφασης Αμερικανικού Δικαστηρίου, η οποία ανετράπη κατ' έφεση από το Αμερικάνικο Εφετείο, με αποτέλεσμα η Αγγλική απόφαση, η οποία θεωρείτο τελική και νομικά δεσμευτική, να παραμείνει σε ισχύ, ενώ η βάση στην οποία εκδόθηκε να έχει εξαλειφθεί, αναγκάζοντας τους διάδικους να εμπλακούν σε περαιτέρω διαδικασίες αμφισβήτησης της εγκυρότητας της Αγγλικής Απόφασης ή ακύρωσης της, με όλα τα συνεπαγόμενα που αυτό μπορεί να έχει.

27. Το γεγονός ότι εκκρεμεί έφεση αποτελεί ουσιαστικό κριτήριο για ένα Δικαστ... η αναμενόμενη απόφαση στην Έφεση μπορεί να ανατρέψει την πρωτόδικη Α...

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

για την οποία επιδιώκεται η αναγνώριση, με αποτέλεσμα να προκληθεί αναπόφευκτα και το τέλος της παρούσας διαδικασίας.

28. Ειδικότερα δε, όταν όπως στη παρούσα περίπτωση μια απόφαση στην έφεση θα αποφασίσει θέματα δικαιοδοσίας του Δικαστηρίου που έκδωσε τη πρωτόδικη Απόφαση, θέματα διεθνούς αβρότητας και άλλα καθοριστικά ζητήματα επί της ουσίας της Αγωγής, που θα καθορίσουν κατά συνέπεια και την ίδια την τύχη της Αγωγής καθιστώντας την πιθανώς άνευ αντικειμένου.

29. Ακριβώς για αυτό το λόγο, είναι η θέση μας ότι το Δικαστήριο **δεν μπορεί να εξετάσει και τις δύο Αιτήσεις ταυτόχρονα.** Αν, για παράδειγμα, το Εφετείο στις ΗΠΑ καταλήξει στο συμπέρασμα ότι το Πρωτόδικο Δικαστήριο στις ΗΠΑ δεν είχε δικαιοδοσία να εκδικάσει την εκεί αγωγή και, εν τω μεταξύ, το παρόν Δικαστήριο προχωρήσει στην εκδίκαση της Αίτησης παραμερισμού ή ακόμα και της αγωγής και προβεί σε διαφορετικά ευρήματα σε διάφορα θέματα όπως αυτό της δικαιοδοσίας, τότε θα δημιουργηθούν ανυπέρβλητες δυσκολίες επαναφοράς της νόμιμης κατάστασης και/ή τα μέρη θα αναγκαστούν να υποστούν νέες, οικονομικά δυσβάσταχτες και χρονοβόρες, δικαστικές διαδικασίες για αποκατάσταση της νόμιμης κατάστασης και εξασφάλισης των πληγέντων συμφερόντων και δικαιωμάτων τους.

30. Πρέπει να τονιστεί ιδιαιτέρως πως, τυχόν απόφαση του Σεβαστού Δικαστηρίου να εξετάσει και τις δύο Αιτήσεις παράλληλα, ως μια κατά πιθανή συμβιβαστική λύση, ουδέν πρακτικό όφελος θα επιφέρει στη διαδικασία. Αντιθέτως, με δεδομένο πως ο ίδιος ο σκοπός της Αίτησης Αναστολής είναι η μη προώθηση των ουσιαστικών πτυχών της υπόθεσης για περιορισμένο χρονικό διάστημα προς εξοικονόμηση δικαστικού χρόνου και δικηγορικών εξόδων, μια απόφαση για παράλληλη εκδίκαση θα αντιστρατευθεί του πυρήνα της Αίτησης Αναστολής, καθιστώντας την εκδίκαση της μάταιη.

31. Κατ' επέκταση, το ίδιο θα ισχύει και σε περίπτωση εκδίκασης της Αίτησης Παραμερισμού κατά προτεραιότητα, αφού και σε αυτή την περίπτωση η Αίτηση Αναστολής θα καταστεί άνευ αντικειμένου, εκμηδενίζοντας πρακτικά τον λόγο ύπαρξης και τη χρησιμότητα της Αίτησης.



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

32. Παραπέμπουμε επίσης στην υπόθεση **Reichhold Norway ASA and another v Goldman Sachs International** όπου το Αγγλικό Δικαστήριο ανέστειλε την εκδίκαση της υπόθεσης για να μπορεί να ελέγχει διπλές και συναφείς διαδικασίες με σκοπό το αναλογικό κόστος. Το Δικαστήριο έδρασε με γνώμονα, μεταξύ άλλων, πως οι διάδικοι στην παρουσία του ήταν ίδιοι με τους διάδικους ενώπιον της διαιτησίας στην Νορβηγία και πως αν προχωρούσαν παράλληλα οι δύο διαδικασίες, η Διαιτησία θα εξέδιδε απόφαση πολύ νωρίτερα από το Δικαστήριο, η οποία θα είχε πρακτικό αντίκτυπο στην συνέχεια της Αγγλικής διαδικασίας. Σκεπτόμενο το κόστος, την ευχέρεια και τα συμφέροντα της δικαιοσύνης (Interest of Justice), το Δικαστήριο ανέστειλε την διαδικασία ενώπιον του μέχρι την εκδίκαση της Διαιτησίας στην Νορβηγία.

33. Στην υπό εκδίκαση υπόθεση, τόσο οι διάδικοι όσο και τα επίδικα ζητήματα τέμνονται με τις εκκρεμούσες Εφέσεις στις Η.Π.Α, και μάλιστα η όποια απόφαση στην Αμερική αναμένεται να εκδοθεί σύντομα (αν όχι ενωρίτερα μιας απόφασης του παρόντος Δικαστηρίου, περίπου κατά την ίδια χρονική περίοδο), έχοντας δεδομένα καθοριστική και πρακτική επιρροή στην περαιτέρω προώθηση και την εκδίκαση της παρούσης Αγωγής.

34. Είναι σημαντικό και θα θέλαμε να τονίσουμε ότι εκκρεμούντων των Εφέσεων στις Η.Π.Α, το παρόν Δικαστήριο οφείλει και θα πρέπει να επιδείξει τον απαραίτητο σεβασμό στα πλαίσια της αρχής της διεθνούς αβρότητας, επιτρέποντας στη χώρα που εκδικάζει την Έφεση να αποφασίσει τα επίδικα σημεία, προτού αυτά αποφασιστούν από το παρόν Δικαστήριο.

35. Το Δικαστήριο καλείται να είναι επιφυλακτικό στο να προχωρήσει στην εκδίκαση της Αίτησης Παραμερισμού και της ουσίας της Αγωγής, αφ'ής στιγμής η Απόφαση για την οποία ζητείται η αναγνώριση έχει σοβαρές πιθανότητες να ανατραπεί από το Αμερικάνικο Εφετείο.

36. Θεωρούμε ότι μπορεί να δοθεί αναστολή εν αναμονή αποτελέσματος δικα διαδικασίας σε άλλη χώρα, όπως για παράδειγμα έφεσης, καθότι διαδικασία επηρεάζει άμεσα και ουσιαστικά το θέμα της αναγνώρισης της και της χρησιμότητάς της.





ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

37. Εν τέλει, υποβάλλουμε την θέση μας ότι θα πρέπει επιτακτικά να εξασφαλίζεται η μη πρόωρη αναγνώριση της αλλοδαπής απόφασης ή η πρόωρη έκδοση οποιαδήποτε άλλης απόφασης του παρόντος Δικαστηρίου επί θεμάτων που εγείρονται στα πλαίσια Αίτησης παραμερισμού, προτού αυτά τα θέματα αποφασιστούν από το Εφετείο στη χώρα όπου εκδόθηκε η πρωτόδικη απόφαση.

38. Να σημειωθεί ότι σε ανάλογη διαδικασία ενώπιον των Αγγλικών Δικαστηρίων οι διάδικοι συμφώνησαν όπως εκδικασθεί πρώτα η αίτηση αναστολής, χωρίς να είχε εγερθεί από τους Καθ' ων η Αίτηση οποιοδήποτε θέμα καθυστέρησης.

## Ε. ΔΙΚΑΙΟΔΟΣΙΑ ΤΟΥ ΔΙΚΑΣΤΗΡΙΟΥ

39. Αποτελεί επίσης θέση μας ότι το Δικαστήριο έχει την δυνατότητα να επιληφθεί της Αίτησης Αναστολής προτού αποφασίσει κατά πόσο έχει δικαιοδοσία να εκδικάσει την Αγωγή, για τους πιο κάτω λόγους:

    i.   Το Δικαστήριο καλείται να επιληφθεί της Αίτησης Αναστολής στα πλαίσια ρύθμισης της διαδικασίας που θα ακολουθηθεί ενώπιον του και στα πλαίσια εξυπηρέτησης του Πρωταρχικού Σκοπού των Νέων Κανονισμών Πολιτικής Δικονομίας.

    ii.   Το Δικαστήριο, κατά την εξέταση της Αίτησης Αναστολής, δεν απαιτείται να αποφασίσει κατά πόσο έχει δικαιοδοσία επί της ουσίας της Αγωγής, αφού η αναστολή ή όχι της διαδικασίας αποτελεί απόφαση του Δικαστηρίου επί διαδικασίας και όχι επί της ουσίας της υπόθεσης. Το Δικαστήριο κατά την εξέταση της Αίτησης Αναστολής δεν θα υπεισέλθει σε διαπιστώσεις, συμπεράσματα και ευρήματα επί γεγονότων που αφορούν την ουσία της υπόθεσης, ούτως ώστε να απαιτείται η ύπαρξη και πρότερη απόδειξη δικαιοδοτικού υπόβαθρου.

    iii.   Με την εξέταση από το Δικαστήριο του κατά πόσο αυτό έχει ή δεν έχει δικαιοδοσία προτού επιληφθεί της Αίτησης Αναστολής, το Δικαστήριο μεταξύ άλλων θα εξετάσει κάποια από τα θέματα τα οποία θα εξετάσει και το Δικαστήριο στις Η.Π.Α και δυνατόν το παρόν Δικαστήριο να καταλήξει σε απόφαση επ'αυτών, η οποία να είναι αντίθετη από αυτή του Εφετείου. Υπενθυμίζουμε στο σημείο αυτό πως το παρόν Δικαστήριο, στο πλαίσιο της





ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

Παραμερισμού θα κληθεί να εξετάσει εκ νέου την ύπαρξη δικαιοδοσίας του Πρωτόδικου Αμερικανικού Δικαστηρίου, εκτός από την δική του, ως επιτάσσουν οι κανόνες που εφαρμόζονται στις περιπτώσεις αυτές.

iv.    Σημειώνουμε, επίσης, ότι με βάση τον Κανονισμό 12 των Νέων Κανονισμών Πολιτικής Δικονομίας, παρέχεται σε έναν Αιτητή η δυνατότητα με την καταχώρηση της Αίτησης Παραμερισμού να αιτηθεί στην ίδια Αίτηση τόσο τον παραμερισμό της διαδικασίας και/ή της επίδοσης εκτός δικαιοδοσίας, όσο και την αναστολή της διαδικασίας. Εντούτοις, η συμπερίληψη και των δύο θεραπειών στην ίδια Αίτηση ή η παράλληλη εκδίκαση των δύο διαφορετικών Αιτήσεων πιθανόν να οδηγήσει σε επισφαλή συμπεράσματα από το παρόν Δικαστήριο εκκρεμούσης της απόφασης στην Έφεση στις Η.Π.Α. Είναι για αυτό το λόγο που η Εναγόμενη/Αιτήτρια επέλεξε την καταχώρηση δύο διαφορετικών Αιτήσεων προς αποφυγή σύγχυσης κα ασυμβίβαστων διαδικαστικά θεραπειών.

## ΣΤ. ΚΑΤΑΛΗΞΗ

40. Με βάση τη διακριτική του ευχέρεια, το Δικαστήριο έχει την εξουσία να αποφασίσει την ορθή και δίκαιη διαδικασία που θα ακολουθήσει η υπόθεση και οι ενδιάμεσες αιτήσεις, αποφεύγοντας έτσι περιττές διαδικασίες και την πιθανότητα δημιουργίας αντιφατικών αποφάσεων που ίσως επέλθει με την απόφαση του Εφετείου. Δεν είναι πρόσφορο ούτε προς όφελος της δικαιοσύνης το παρόν Δικαστήριο να προχωρήσει με την εκδίκαση (και) της Αίτησης Παραμερισμού εάν στο τέλος η αλλοδαπή Απόφαση για την οποία επιχειρείται η αναγνώριση βρίσκεται ακόμα σε αμφισβήτηση, αφού εκκρεμεί ακόμα το αποτέλεσμα της Έφεσης.

41. Σε κάθε περίπτωση, η εξέταση της Αίτησης Αναστολής  καταπιάνεται με ένα μόνο ζήτημα, καθιστώντας έτσι θεμιτή και προς το συμφέρον της δικαιοσύνης, την εκδίκαση πρώτα της Αίτησης Αναστολής και μετά της Αίτησης Παραμερισμού, η οποία είναι πολυσύνθετη και καταπιάνεται με πλειάδα νομικών και πραγματικών θε... Εάν το Δικαστήριο επιτρέψει την ταυτόχρονη εκδίκαση των δύο Αιτή... εκδίκαση πρώτα της Αίτησης Παραμερισμού, θα σπαταληθεί μάταια... χρόνος του Δικαστηρίου για θέματα που ίσως, ενόψει του αποτελέ... Έφεσης, να αποδειχτούν εν τέλει άνευ αντικειμένου.

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

42. Επίσης, εάν το Δικαστήριο επιτρέψει την παράλληλη εκδίκαση των δύο Αιτήσεων, ή δώσει προτεραιότητα στην εκδίκαση της Αίτησης Παραμερισμού, αυτομάτως η Αίτηση Αναστολής της Αιτήτρια καθίσταται άνευ αντικειμένου. Μια τέτοια απόφαση του Σεβαστού Δικαστηρίου θα αποστερούσε εκ προοιμίου από την Αιτήτρια την ευκαιρία να υποστηρίξει την Αίτηση Αναστολής της, αφού ο κύριος σκοπός, συνυφασμένος με την ίδια την φύση της, είναι η μη προώθηση των ουσιαστικών πτυχών της υπόθεσης για περιορισμένο χρονικό διάστημα, προς εξοικονόμηση δικαστικού χρόνου και εξόδων πριν την έκβαση των εκκρεμών Εφέσων στην αλλοδαπή.

43. Περαιτέρω, η εκδίκαση της Αίτησης Αναστολής κατά προτεραιότητα δεν θα προκαλέσει ουσιαστική καθυστέρηση στην υπόθεση, αλλά αντιθέτως, αποτελεί την ενδεδειγμένη και/ή ορθότερη διαχείριση από το Δικαστήριο της υπόθεσης, ούτως ώστε να διευκολυνθεί η διαδικασία και παράλληλα χωρίς να ελλοχεύουν κίνδυνοι πρόωρης απόφασης. Ξεκάθαρα, τα ωφελήματα που θα προκύψουν από την προσωρινή αναστολή της διαδικασίας, υπερτερούν οποιουδήποτε άλλου χειρισμού της υπόθεσης. Σε κάθε περίπτωση, η εκδίκαση της Αίτησης Αναστολής μπορεί να γίνει σε σύντομο χρονικό διάστημα, αφού αυτή δεν πραγματεύεται πολύπλοκα νομικά ζητήματα.

44. Πιθανή εκδίκαση πρώτα της Αίτησης Παραμερισμού πριν την εκδίκαση της Έφεσης, η οποία διατηρεί σοβαρές και ρεαλιστικές πιθανότητες επιτυχίας, θα δημιουργήσει δυσμενείς επιπτώσεις στην Αιτήτρια, αφού θα βρεθεί αντιμέτωπη με αναγνώριση της Απόφασης και προσπάθειες εκτέλεσης της πριν την τελεσιδικία της διαδικασίας στην Αμερική, με αποτέλεσμα τον δυσμενή και/ή ανεπανόρθωτο επηρεασμό των δικαιωμάτων της.

45. Ευσεβάστως λοιπόν, καλούμε το Σεβαστό Δικαστήριο να αποφασίσει την εκδίκαση της Αίτησης Αναστολής κατά προτεραιότητα, εξασκώντας την διακριτική του ευχέρεια με ευελιξία προς εξυπηρέτηση του Πρωταρχικού Σκοπού.

Υπ..........

**Μ. Χ. ΜΥΛΩΝΑΣ & ΣΥΝΕΡΓΑΤΕΣ**
**Δικηγόροι Εναγόμενης**

Καταχωρήθηκε στις 31/03/2025

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

Neutral Citation Number: [2025] EWHC 257 (Comm)

Case No: CL-2022-000219

# IN THE HIGH COURT OF JUSTICE
# BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
# COMMERCIAL COURT (KBD)

Royal Courts of Justice, Rolls Building Fetter Lane, London, EC4A 1NL

Date: 23 January 2025

Before :

### Sean O'Sullivan KC
### (Sitting as a Deputy Judge of the High Court)

- - - - - - - - - - - - - - - - - - - - -

Between :

(1) **MOTOROLA SOLUTIONS, INC**                              Claimants
(2) **MOTOROLA SOLUTIONS MALAYSIA SDN
    BHD**

- and –

(1) **HYTERA COMMUNICATIONS**                               Defendants
    **CORPORATION LTD**
(2) **HYTERA AMERICA, INC**
(3) **HYTERA COMMUNICATIONS AMERICA
    (WEST), INC**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

Mr Tom Sprange KC and Mr Kabir Bhalla (instructed by King & Spalding) for the Claimants Mr
Stephen Rubin KC and Mr Rupert Allen (instructed by Steptoe International (UK) LLP) for the
Defendants

Hearing dates: **22 and 23 January 2025**

- - - - - - - - - - - - - - - - - - - - -

# JUDGMENT



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

1

**Sean O'Sullivan KC:**

1.    I heard yesterday an application dated 15 July 2024 by the first defendant, which I am going to call
      "Hytera," to set aside or permanently stay the judgment of Cockerill J dated 3 November 2023 in the
      sum of US$136.3 million, which I will call "the English judgment." This is my judgment on that
      application.

2.    The English judgment was itself premised upon one part of a judgment of the Illinois District Court,
      which I will call "the Illinois Court," dated 8 January 2021. I will call that "the Illinois Court
      judgment." At the time when the English judgment was entered, Hytera had already launched an
      appeal against the Illinois Court judgment, the US Appeal, before the Seventh Circuit of the US Court
      of Appeals, which I will call "the US Appeal Court." The US Appeal Court handed down judgment
      on that appeal on 2 July 2024. Hytera's appeal was partially successful, and the US Appeal Court
      reversed the part of the Illinois Court judgment which had been the basis for the English judgment,
      albeit that that element was then remitted or remanded to the Illinois Court for a fresh assessment of the
      damages (on the correct basis).

3.    I have to consider first, briefly, the Claimants ("Motorola")'s application for adjournment of the hearing.
      Motorola's formal position was that the substantive application should be adjourned pending the
      issuance of the further judgment by the Illinois Court (i.e. assessing damages on the correct legal basis).
      Henshaw J directed that the application to adjourn be listed at yesterday's hearing and that it would be:
      "...a matter for the judge hearing the applications to decide in what order they should be ag...
      decided".

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

2

4.  Motorola says that, to the extent I am making any decisions on Hytera's application to release the

security, which Hytera put up as the price for obtaining a stay of execution of the English judgment,

that application depends on the amount of damages eventually awarded under the

Copyright Act by the Illinois Court.  There is a contentious issue between the parties as to the

likely figure for the revised damages.  All that is agreed is that the upper limit of that revised figure is

US$14,674,823, plus interest and costs.

5.  Hytera's position is the adjournment application should be refused because, on both parties' primary

cases, the prospect of a new judgment being issued by the Illinois Court is irrelevant to the outcome of

Hytera's substantive application.

6.  In his oral submissions yesterday, Mr Sprange KC, for Motorola, said very little about the adjournment

application.  He sensibly recognised that it made limited sense simply to adjourn if we are going to have

to descend into the detail of the substantive application in any event.  It seems to me he was right to take

that course.

7.  To the extent that there is a point of principle concerning the court's power to set aside or vary a

judgment, it makes sense for me to resolve that issue.  There is no doubt that point is going to remain

live.  As I will explain, nobody is suggesting that the Illinois Court might revert to a judgment for

damages under the Copyright Act in the sum of US$136.3 million.  To the extent that the reason for

adjourning would be to hold the ring, because a further decision is to be made by the Illinois Court in

due course, that seems to me really to be a question about the appropriate remedy if the application is

successful to any degree.  To use an adjournment to achieve that goal would be unprin

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

3

also be duplicative of effort, potentially requiring the whole application to be fought again at some point

in the future. So, for all of those reasons, I dismiss the application for an adjournment.

8.    I need to describe, at this stage, the facts in a little more detail before turning to the legal issues. I note,

however, that this dispute has already resulted in a series of reported decisions, many of which outline

the factual background. See, for example, the decision of the Court of Appeal with the neutral citation

[2021] EWCA Civ 11. I will focus only on the parts of the story which matter for my purposes. None

of what follows is intended to be controversial.

9.    Hytera is a Chinese developer and manufacturer of two-way radio equipment and related technology.

Motorola is a US competitor of Hytera, headquarters in Chicago, Illinois.

10.   On 14 March 2017, Motorola brought proceedings against Hytera in the Illinois Court, alleging, among

other things, theft of intellectual property, trade secret misappropriation and copyright infringement.

On 14 February 2020, a civil jury in those proceedings returned a verdict in favour of Motorola on the

basis of a theft of 21 distinct trade secrets. A sum was awarded in respect of copyright infringement, on

the basis that the reason for the copyright infringement was so that Hytera could build a competing two-

way radio product using Motorola's source code and trade secrets.

11.   There is now no dispute about the underlying misconduct. Hytera has recently agreed to enter a

voluntary guilty plea to conspiring to steal trade secrets in violation of Title 18 of the United States

Code, s.1832(a)(5) in criminal proceedings brought by the United States Department of

Justice.

12.   The original jury verdict of 14 February 2020 was varied by the Illinois Court on 8 Ja[...]

to reduce the amount of the overall judgment debt to US$543.7 million. That comp[...]



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

4

US$136.3 million in what is described as "disgorged profits" under the US Copyright Act 1976 ("the Copyright Act damages award"); US$135.8 million in disgorged profits under the Defend Trade Secrets Act of 2016; and US$271.6 million in punitive damages under that same act.

13.   On 14 July 2023, Motorola amended its claims in the present English action to claim, among other relief, the sum of US$136.3 million premised upon the Copyright Act damages award. On 8 August 2023, Hytera filed its defence in the present proceedings. Hytera admitted Motorola's claim to enforce the Copyright Act damages award in the amount of US$136.3 million. Hytera says that it had no choice but to make this admission because it is well-established, as a matter of

English law, that a pending appeal does not prevent a foreign judgment being "final and conclusive" for the purpose of enforcement at common law. I will say a little more about that in due course.

14.   However, Hytera also made clear that its defence was pleaded "...expressly without prejudice to its arguments on its appeal before the US Appeals Court" (that is para.2 of the Defence), and, further that: "It is possible that, depending on the outcome of its appeal, elements of the US judgment will be vacated by the US Appeal Court and remitted to the Illinois Court, which could then vary those remitted elements" (that is para.11 of the Defence).

15.   On 2 October 2023, at the first English CMC, Motorola made an application for summary judgment on its claim to enforce the Illinois Court judgment, to the extent of that Copyright Act damages award. As I have said, Hytera had already admitted this part of Motorola's claim. In those circumstances, Hytera consented to summary judgment being entered against it on the

Copyright Damages award.

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

5

16.  At the same time as consenting to summary judgment in respect of that amount, Hytera issued an application for a stay of execution of the resulting judgment. Hytera says that the purpose of this stay application was to avoid the prejudice that Hytera would suffer if it were required to satisfy the English judgment, but the Illinois Court judgment was then set aside by the US Appeal Court. It observes that Motorola, in that context, proposed, as a condition of consenting to a stay of execution, that the amount of the English judgment should be paid into court or held in escrow pending the outcome of the US appeal. The reason for that was expressed in a letter from King & Spalding dated 23 October 2023 to be that: "In the event of a judgment against [Motorola], such funds can be returned to [Hytera] in full."

17.  In due course, Jacobs J granted the stay application, on the basis that the Illinois Court judgment might be set aside on appeal and that Hytera would suffer irremediable prejudice if it had been required to pay to Motorola the sums due under the English judgment in the meantime. He required Hytera to pay into court the sum of US$25 million as a condition of the stay continuing until the US Appeal Court decision was rendered.

18.  In November 2024, Calver J heard the trial in relation to the claims in the present proceedings which were seeking to enforce other ingredients of the Illinois Court judgment. At the risk of oversimplifying a complicated issue, the learned Judge dismissed all of those claims, on the basis that enforcement was precluded by s.5 of the Protection of Trading Interests Act 1980. I understand that permission to appeal has recently been granted by the Court of Appeal.

19.  In the meantime, Hytera had appealed against the Illinois Court judgment. That appeal December 2023 by the US Appeal Court. The US Appeal Court issued its opinion



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

6

vacated the Illinois Court judgment as regards the Copyright Act damages award and remitted

Motorola's claim in that regard to the Illinois Court for it to reassess damages in accordance with the

principles that are outlined in the opinion.

20. Mr Sprange suggested that the US Appeal judgment did not actually reverse the decision in relation to

the Copyright Act damages award, because there is a further stage that is to take place in the appeal

process, i.e. it has been remanded to the Illinois Court, not just reversed. However, on its face, the

order of the US Appeal Court does reverse that part of the Illinois Court judgment. In the absence of

evidence from US lawyers about some difference between US and English proceedings, I would

understand the way it is expressed to mean that the Illinois Court judgment is no longer valid. I would

understand it to work in the same way as when, in this jurisdiction, the Court of Appeal allows an

appeal on a point relevant to quantum and then remits that issue of quantum to the first instance court

for further consideration.

21. To explain why it was remitted, I should explain that the decision of the US Appeal Court in relation to

the Copyright Act damages award was that, first, the Illinois Court had erred in awarding damages by

reference to Hytera's profits on sales **outside** the United States and, second,

that the Illinois Court had, at least on the face of the Illinois Court judgment, erred in failing to

apportion Hytera's profits to take into account Hytera's own contribution to those profits.

22. Motorola points out that the US Appeal Court commented, in its opinion, that, "The most startling fact

about these appeals is that Hytera's liability is not at issue. It concedes that it engaged in

theft of trade secrets and copying of proprietary computer code".

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

7

23.    As I have said, it is now common ground that Hytera's total **US** sales in the relevant period, for the purpose of the Copyright Act claim, were only US$14.6 million or thereabouts. It follows that the maximum amount of the damages which can be awarded under the Copyright Act is US$14.6 million (before interest and costs).

24.    In the light of the opinion of the US Appeal Court, that figure therefore now operates as a cap on the damages which Motorola can recover under this head. I emphasise that that figure does not take into account any apportionment, to reflect Hytera's own contribution to the profits. As I have said, there is a dispute about whether any apportionment is appropriate, which is now before the Illinois Court. I obviously cannot form any view about that one way or another.

25.    Turning to the law, the essential point of principle that arises on this application is what should happen to an English judgment which is premised upon a foreign judgment if the foreign court subsequently allows the judgment debtor's appeal. Hytera's position is that the English judgment should be set aside. Motorola's formal position is that the English judgment has continued and separate vitality, independent of the underlying foreign judgment. Indeed, Motorola contends that the judgment creditor should still be free to enforce the English judgment. It says that this result is not as surprising as it might sound, because the judgment debtor would, or at least might, be able to seek to recover any overpayment from the judgment creditor in the foreign jurisdiction.

26.    However, it is fair to say that Mr Sprange's focus, both in his skeleton and in oral submissions yesterday, was on the fact that we know that the Illinois Court will be issuing a further judgment du maintained the formal position that, even in a simple case in which a foreign

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

8

judgment is reversed on appeal, without anything being remitted, the English judgment would

supposedly continue unaffected. But Mr Sprange could see how unattractive that outcome would be

and he focused his fire on how the English Court should deal with a more nuanced case like the present.

I understand entirely why he takes that approach, but it seems to me that one has to start with the issue

of principle as to what powers the English court has, and what the English Court can and should do

when the foundation for a judgment which has been rendered is undermined by a subsequent appeal in

the foreign court.

27. Slightly surprisingly, the efforts of Counsel did not uncover any English authorities which address

precisely the point of principle to which I have just referred. There are, however, a number of cases

about the circumstances in which a foreign judgment can be enforced under the English common law.

These are to the effect that it does not prevent a foreign judgment being final that it could be, or is,

subject to appeal. The leading case in this regard is perhaps *Nouvion v Freeman* (1889) LR 15 App

Cas 1. At p.13, Lord Watson said:

> "In order to its receiving effect here, a foreign decree need not be final in the
> sense that it cannot be made the subject of appeal to a higher Court; but it
> must be final and unalterable in the Court which pronounced it; and if
> appealable the English Court will only enforce it, subject to conditions
> which will save the interests of those who have the right of appeal."

28. Lord Bramwell made a similar point, but went slightly further, at p.16.

> "If a judgment in a foreign court were reversed upon error and an action
> upon the judgment had been brought in an English court and judgment
> given in that action on the judgment, then afterwards when the original
> judgment was reversed upon error, I suppose there would, in such a case as



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

9

> that, be some remedy for the defendant who has got rid of the first judgment
> against him."

29.   His Lordship indicated that the mechanism by which this would be done would, in the past, have been a

writ of "audita querela" (a procedure which he referred to as "old-fashioned", even in

1889). A writ of "audita querela" apparently stemmed from English common law and served to permit

a defendant who has had a judgment rendered against him or her to seek relief from the consequences of

such a judgment where there was some new evidence or legal defence that was not previously available.

That procedure was abolished in England in 1875. Even before it was abolished, it looks as if it had

been carefully circumscribed in its scope by decisions about the circumstances when it could be used.

30.   Bringing matters right up to date: in *Moss & Ors v Martin & Anor* [2022] EWHC 3258 (Comm),

HHJ Russen KC was concerned with a judgment of the Dallas court which he referred to as the "2022

Judgment". Summary judgment had been granted in England in relation to the claimant's enforcement

proceedings in respect of that 2022 judgment, despite the fact that the 2022 Judgment was subject to

appeal in Texas.

31.   One of the issues before HHJ Russen was whether any order continuing the freezing injunction should

contain an express liberty for the defendants to apply for its discharge or variation in the event of their

appeal in the United States against the 2022 judgment being successful. The learned judge indicated,

at [19], that his "instinctive reaction to that was to say that the defendants' success on the appeal in the

United States... would be a relevant change of circumstance" for the purposes of an application

the injunction. My instinctive reaction is the same.

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

10

32. The judge also had to decide whether to grant a stay of execution in relation to the English judgment which had been entered by way of enforcement of the 2022 Judgment. He refused a stay, but Hytera say that it is nevertheless implicit in his decision that he took the view that the 2022 Judgment would be set aside, if the appeal against the foreign judgment were allowed, in just the same way as a successful appeal against an English domestic judgment would lead to that judgment being set aside.

33. Hence, the judge suggested that:

(1)     A substantive appeal could only be pursued in the foreign court (that is [39]).

(2)     The same principles governed applications for a stay of execution of a foreign judgment pending foreign appeal, as applied to applications for a stay of execution of an English judgment pending a domestic appeal, because these principles "fairly and appropriately balance the interests of the parties while respecting the prima facie and forcibility of a judgment debt" (that is [45][46]).

(3)     The judgment debtor should not be placed in a worse position purely because the underlying judgment is a foreign judgment, rather than an English one, i.e. where a stay would be available pursuant to CPR r.52.16 (that is [48]).

(4)     Most importantly, to quote from [51(ii)]:

> "The appeal which the defendants have filed in Texas is capable of amounting to a special circumstance which renders it inexpedient to enforce the relevant parts of the November Order. That is because the Texas appeal has the potential to undermine the foundation of those parts of the November Order (and the basis of the English Judgment so far as the 2022 Judgment is concerned); and that appeal, rather than an English appeal which might support the application for a stay under CPR 52.16, is the appropriate one for them to pursue in attacking the payment obligation which they say should be stayed."



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

11

34.  I will refer also in this context to the decision of Mr Justice Jacobs in this present litigation just over a

year ago on 19 January 2024, which has the neutral citation *Motorola Solutions, Inc & Anor v Hytera*

*Communications Corporation Ltd & Ors* [2024] EWHC 149 (Comm). He granted a stay of

enforcement, to which I have already referred. He made clear that he did not accept that the question of

whether it is inexpedient to enforce the judgment or order could simply be answered by saying that

there is an appeal pending in a foreign jurisdiction. But he explained why that was at [26] with an

example:

> "I do not consider that any in expediency would arise in the context of an
> appeal involving well-resourced parties, where a payment pursuant to the
> judgment under appeal could be made without difficulty and then returned
> if the appeal succeeds".

35.  He expressed agreement with HHJ Russen KC in *Moss v Martin* to the effect that there was a close

analogy between the approach to stays of enforcement of an English judgment and the approach which

should be used when considering whether or not to order a stay of enforcement of an English judgment

which gives effect to a foreign judgment. Specifically, he outlined (at [28]):

> "In a case solely involving the English courts, there will be a valid
> judgment at first instance, which may be altered by an appeal court; for
> example, where there is a High Court judgment which is subject to an
> appeal to the Court of Appeal. An appeal does not operate as a stay: see
> CPR 52.16. However, principles have been developed, as explained in
> *Hammond Suddard* and other cases, where a stay will be granted. and
> these are discussed in the White Book in the context of CPR 52.16. In a
> case with a foreign element, there is again a valid judgment at first
> instance: here the judgment of Cockerill J, which gives effect to the first
> instance judgment in Illinois. Both first instance judgments may
> potentially be altered by the outcome of an appeal. The only difference
> from the first situation is that the relevant appeal is not in England, but is
> to the appeal court in the foreign jurisdiction. I do not consider there



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

12

should be any difference, however, in the basic principles which are
applied in the two situations when a stay of enforcement is sought."

36. I derive from the cases I have just outlined that the English courts assume now, and have assumed since

the late 19th century, that a successful appeal in relation to a foreign judgment would be relevant to the

enforcement of that foreign judgment in England, even if an English judgment premised upon that

foreign judgment had already been handed down. If that was not the assumption, I cannot see why it

would ever be thought appropriate to stay enforcement of the English judgment by reference to the

possibility of a successful foreign appeal. If the English judgment would be unaffected by a successful

appeal of a foreign judgment on which it was founded, then, for example, HHJ Russen KC would have

been wrong to say that the Texas appeal had "the potential to undermine the foundation" of the English

judgment.

37. Some slightly more tangential insight along the same lines can be gained from *Merchant International
Co Ltd v Natsionalna Aktsionerna Kompaniia Naftogaz Ukrainy* [2012] EWCA Civ

(1)     The Court of Appeal in that case upheld the decision of David Steel J in refusing to set aside,

pursuant to CPR 13.3, a default judgment obtained to enforce a Ukrainian judgment of 2006 that had

then been repealed by a judgment given in 2011. That 2011 judgment does not appear to have been an

appeal, in the sense that we would use that word in England, but was nevertheless a decision by a

superior court.

38. Lord Justice Toulson explained (at [66]) that the defendant had had no defence to the claim

default judgment was answered and, at [67], that:



13

"The basis of the application to set aside was that Naftogaz had subsequently obtained a judgment from the SCCU setting aside the previously final judgment." 39. In that context, he held that:

"It was proper for David Steel J to consider whether the judgment of the SCCU dated 7 April, 2011 [i.e. the 2011 judgment, which purported to overturn the 2006 judgment] violated the principles of substantial or natural justice as understood by the English courts." 40. He then expanded on this at [78]-[79]. At [78]:

> "An English judgment is a form of property which may have a real value... To set aside a judgment properly obtained is to deprive the judgment creditor of an asset. It may be just to do so, but it may not be. Third parties may also be affected. A third party may advance money on the security of it. It is not difficult to envisage circumstances where there could be real injustice to a judgment creditor or a third party by depriving them of the fruits of a judgment properly entered. In deciding whether to exercise the court's discretion under CPR r.13.3 to set the judgment, the court has to consider the question of what is just. In this case the court was being asked to set aside a judgment which had been properly obtained, on the basis of a later proceeding which involved a fundamental denial of legal certainty and a fair process. The judge's refusal to do so was just."

41. There is something for everyone in this decision. Hytera is, in my judgment, right to suggest that the impression conveyed by the Court of Appeal is that the English default judgment would probably have been set aside, but for the problems with the 2011 Ukrainian judgment. If it were otherwise, it is not easy to see why the Court of Appeal expressed itself in the way that it did.

42. For its part, Motorola submits that this decision makes clear that the English court may, in the exercise of its discretion and its analysis of what is just, choose to uphold an English judgment enforcing a foreign debt, notwithstanding the outcome of a foreign appeal. Expressed in that general way, that must also be correct.

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

14

43.   There is no doubt that setting aside a default judgment under CPR 13.3 involves a discretion which may engage questions about what is just in all the circumstances. Quite how that translates to a scenario in which the application is made to set aside summary judgment under CPR 3.1(7), on the basis of a successful appeal where there is no complaint about the conduct of that appeal procedure, is less clear.

44.   I will refer briefly to the case of *Aeroflot-Russian Airlines v Berezovsky* [2013] EWCA Civ 20, where the Court of Appeal considered the correct approach to a claim to enforce the second judgment of the Russian courts, which had increased by tenfold the defendant's liability in respect of claims addressed in an earlier judgment. I have to say that I struggled to see how the discussion in that case, which is really about when the finality principle would be breached in relation to a **foreign** judgment, assists me one way or the other.

45.   More useful, although again only by way of analogy, was the Australian decision in *Benefits Strategies Inc v Prider* [2007] SASC 250. That concerned a very similar situation to ours, where summary judgment had been entered on the basis of a foreign judgment, the latter then being declared to be void in the foreign court. The Australian court set aside the summary judgment, relying on a rule in that jurisdiction, namely r.84.12 of their Supreme Court Rules, which provided that:

> "The Court may vary or set aside a judgment or order at any time if the justice of the case so requires."

46.   The judge explained his approach (at [17]), saying:

> "The clear principle that has emerged is that a foreign judgment is only binding and conclusive so long as it stands. A corollary of this principle is that where a judgment is made entirely on the basis of a foreign judgment



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

15

> and the foreign judgment is later overturned and set aside, a good reason
> exists to set aside the judgment that relied on it."

47.   In *David v Kazal* [2019] NSWSC 1763, it was therefore recorded as being common ground that:

> "If the appeal were allowed any judgments ordered in this court against
> Tony and Adam Kazal could not be enforced and would have to be either
> set aside (as in *Benefit Strategies Group Inc. v. Prider...*) or permanently
> stayed..."

48.   Pulling the threads together in relation to the point of principle (thus far): in my judgment the need for

some procedural mechanism so as to take into account the effect of an appeal on a foreign judgment,

which has itself been relied upon to obtain an English judgment, is perfectly obvious. Where the cases

which have been cited to me (again. thus far) are less helpful is in identifying by what route the foreign

appeal might be taken into account once judgment has been given in England.

49.   Turning to that issue, it appears to be common ground that it would not be straightforward to appeal

such an English judgment. If permission to appeal were sought **before** the foreign appeal succeeded, it

seems to me it would be impossible to show that the first instance English decision was wrong. In a case

like the present, it would therefore be necessary to appeal long out of time.

50.   I accept that an appeal out of time is a possible solution to the problem, but it does not seem to me a very

satisfactory one. It is hard to see why the Court of Appeal would be the appropriate venue for an

application of this kind, which involves nothing which could meaningfully be called a

"review" of the first instance decision. If there was no other option, then I have no doub

Appeal would fashion a remedy in an appropriate case. But is there really no other o



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

16

51. Hytera says that CPR 3.1(7) provides a route which allows this court to set aside the English judgment. In effect, it argues that that rule is the modern means for what would once have been done using a writ of audita querela. CPR 3.1(7) provides:

> "A power of the court under these Rules to make an order includes a power to vary or evoke the order."

52. Since the power of the court to order summary judgment is a power under the CPR, it might be thought to follow that there is a power to vary or revoke such an order.

53. In terms of how that power is to be exercised, and the limits placed on it by authority, my attention was drawn to a series of cases. The first in time was *Roult and North West Strategic Health Authority* [2009] EWCA Civ 444, in which the Court of Appeal held that CPR 3.1(7) is not confined to purely procedural or case management orders, and might extend to non-procedural, but continuing, orders which called for revocation or variation, although it was said that the discretion it conferred would normally be exercised only where the judge who had made the original order had been misled by erroneous information, or a subsequent event had destroyed the basis on which the order had been made. Subject to limited exceptions of that kind, however, their Lordships suggested that CPR 3.1(7) could not be used to revoke a final order disposing of a case.

54. Hughes LJ said (at [15]) that CPR 3.1(7) "cannot constitute a power in a judge to hear an appeal from himself in respect of a final order" and further that such a wide reading of the rule, such as allowing changes of position to justify varying a final order:



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

17

> "...would come close to permitting any party to ask any judge to review his
> own decision and, in effect, to hear an appeal from himself on the basis of
> some subsequent event."

55.    In *Tibbles v SIG* [2012] EWCA Civ 518, the Court of Appeal emphasised (at [39(i)]) that, whilst the

revocation jurisdiction in CPR 3.1(7) is apparently broad and unfettered:

> "...considerations of finality, the undesirability of allowing litigants to have two
> bites of the cherry and the need to avoid undermining the concept of appeal, all
> push towards a principled curtailment of an otherwise open discretion".

56.    The normal justifications for revocation of an interlocutory order include: first, where there has been a

material change of circumstances since the order was made and, second, where the facts on which the

original decision was based were misstated, whether innocently or otherwise.   That is made clear in

*Tibbles* at [39(ii)].  Even in that context (i.e. interlocutory orders), it was said (at [39(vii)]) that:

> "...the successful invocation of the rule is rare ...Such is the interest of
> justice in the finality of a court's orders that it ought normally to take
> something out of the ordinary to lead to variation or revocation of an order,
> especially in the absence of a change of circumstances in an interlocutory
> situation".

57.    I emphasise again that *Tibbles* was a case about interlocutory orders, not final orders like the present.

The Court of Appeal made clear that the test in relation to final orders would be, if anything, more

restrictive.

58.    In *Terry v BCS Corporate Acceptances Ltd* [2018] EWCA Civ 2422, the Court of Appeal

concerned with a final order; a default judgment on a claim that was said to have been



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

18

Their Lordships held that one of the established routes for case where it was alleged that judgment had been obtained by fraud should have been used, namely a fresh action seeking the relief of setting aside the original judgment, or an appeal to the Court of Appeal (seeking to rely upon fresh evidence). The Court of Appeal did not consider that CPR 3.1(7) was an available option.

59.    Hamblen LJ, giving the judgment of the court, explained (at [75]):

> "In summary, the circumstances in which CPR 3.1(7) can be relied upon to vary or revoke an interim order are limited. Normally, it will require a material change of circumstances since the order was made, or the facts on which the original decision was made being misstated. General considerations such as these will not, however, justify varying or revoking a final order. The circumstances in which that will be done are likely to be very rare given the importance of finality."

60.    Hytera admits that "very rare" is not the same as "never". It says the present is an exceptional case, as revealed by the absence of authority dealing with such situations. It is also right to observe that the Court of Appeal in *Terry* noted (at [79]) that the correct procedural route for challenging a default judgment is CPR 13.3, which (I observe) was the discretionary power which had been assumed to be available in the *Merchant International* case.

61.    The case of *Vodafone Group Plc v IPCom GmbH & Co KG* [2023] EWCA Civ 113 might in some ways be said to provide a close analogy with the present case. IPCom had succeeded on a claim that its patent had been infringed by Vodafone. That decision had been unsuccessfully appealed to the Court of Appeal, and the Supreme Court was being petitioned, but in the meantime the underlying patent was revoked by the European Patent Office, with the effect that the patent was retrospectiv...

62.    Lewison LJ described the problem (at [14]) as follows:



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

19

> "The problem is that, despite the revocation of a patent, the declaration of
> the infringement, the order for the inquiry into damages and the costs
> order made by this court still stand, even though the fundamental basis for
> those orders (infringement of a valid patent) has been falsified. Not only
> that, but Vodafone has actually paid the costs. What, if anything, can or
> should this court now do about it?"

63.    Vodafone's answer was that an order should be made setting those previous orders aside under CPR

3.1(7), but the Court of Appeal did not agree. Lewison LJ said (at [35]) that "there is no authority which

absolutely precludes the invocation of CPR rule 3.1(7) in relation to final orders", but he pointed out, if

Vodafone was right in its submission that "...exercise of the court's powers under CPR rule 3.1(7) is

engaged where there is an incontrovertible fact subsequent to judgment which undermines the basis of

that judgment", CPR 3.1(7) would have been engaged in the case of *Roult*. But it was not.


64.    Lewison LJ's conclusion (at [54]) was that:

> "The overwhelming thrust of the authorities is that the court's power under
> CPR rule 3.1(7) to vary or revoke orders either cannot or should not be used
> to discharge a sealed final order. The limited exception thus far even
> contemplated in civil proceedings is the case of a continuing order (such as a
> final injunction)..."

65.    In *Vodafone*, of course, the case was before the Court of Appeal, and hence CPR 52.30 was potentially

engaged. That rule allows appeals to be reopened, but imposes some specific conditions for doing so

which are not mirrored in CPR 3.1(7). For reasons which are not clear, but might have had something

to do with those conditions, Vodafone had not made an application under that rule. Lewison

[45]):

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

20

> "...where CPR r.52.30 is potentially engaged, there is little, if any, room for
> the exercise of a power under CPR rule 3.1 (7)."

66.  Importantly, Lewison LJ pointed out that there were various steps that Vodafone could have taken to

avoid finding themselves in this difficult position, such as seeking a stay of the trial or obtaining an

undertaking from IPCom to repay in the event of the patent being invalidated. Lewison LJ described

those as "well-trodden paths for experienced patent litigators" and was critical of Vodafone for its failure

to take any of them.

67.  In a short concurring judgment, Arnold LJ expressed agreement with Lewison LJ's conclusions

(at [67]), saying that:

> "...this court does not have jurisdiction under CPR rule 3.1(7) to reopen its
> sealed final order of 19 February 2021. Even if there were jurisdiction, it
> should not be exercised because Vodafone is the author of its own
> misfortune through failing to take steps which were open to it to protect
> itself against the foreseeable events which have transpired".

68.  The justification for the second part of that statement is easy to find in Lewison LJ's judgment, having

regard to the features of that case which I have just emphasised. The first is, with respect, less obvious,

at least if this reference to the court not having jurisdiction is read entirely literally. I understand

Lewison LJ's conclusion on the availability of CPR 3.1(7) to have been that it would very rarely be

appropriate to use CPR 3.1(7) to reopen a final order, not that there is a complete prohibition against

ever doing so.

69.  I would suggest that, in that case, the history, and perhaps especially the potential role of

meant that there was no scope for an order under CPR 3.1(7). There was, therefore,



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

21

exercise; no decision left to make. In that sense, there was "no jurisdiction" to make such an order. However, I do not understand Lewison LJ to have been saying that the same would **always** be true in relation to a final order.

70. That analysis seems to me consistent with the approach of Hamblen LJ in *Terry*. The Court of Appeal in that case was saying that it would be very rare that a final order can properly be reopened, but saying that allows for the possibility that doing so could be justified.

71. Assuming that is the correct approach – in other words, assuming that I could have jurisdiction to use CPR 3.1(7) in respect to a final order, in a sufficiently exceptional case – it seems to me that I must compare the facts of our case with the reasons why the Court of Appeal thought no order could or should be made in *Vodafone*.

72. Looking at why setting aside a final order was said to be something which should not be done in *Vodafone*, an important reason given was that it was a problem of the party seeking relief's own making. In our case, I find it difficult to see what Hytera could have done differently in relation to the application for summary judgment. To use Arnold LJ's phrase which I quoted before, I cannot see what steps were "open to it to protect itself". Hytera reserved its position as best it could, but the potential for a foreign appeal is not a ground for resisting summary judgment. I have already explained the logic for that.

73. Mr Sprange suggested that Hytera could nevertheless have fought the summary judgment application in the hope of causing delay, requested an undertaking from Motorola about repayment successful appeal, or a stay of the proceedings before the summary judgment applicat

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

that kind. I am afraid that, in the light of the authorities to which I have referred, none of those options seemed to me remotely realistic. Whatever Mr Sprange might say now, I cannot believe Motorola would have offered any useful undertaking. It would be a counsel of despair to suggest that the right course is for a party to seek to generate delay by advancing hopeless arguments.

74. The next set of reasons why it was said in *Vodafone* that it would rarely be appropriate to set aside a final order, comes under the broad heading of "finality". In this context, it does seem to me that cases like the present are genuinely exceptional. I cannot see that setting aside an English judgment could sensibly be said to offend the principle of finality, on the special facts of this case. It in no way offends the principle of finality for a foreign judgment to be subject to appeal in accordance with the proper procedure in that jurisdiction. This is a peculiar situation where finality is not really relevant.

75. In the same way, setting aside the English judgment could not be said to cut across or undermine the concept of an appeal. If anything, it is respecting the concept of an appeal, but recognising that appeals might, in cases about foreign judgments, properly be heard in another jurisdiction.

76. If it adds anything, I am also in no doubt – as I have already indicated – that a successful appeal could amount to a material change of circumstances. Indeed, it is hard to think of a more fundamental change of circumstances, in a case where the whole claim is premised upon a foreign judgment, than for that judgment to be reversed on appeal.

77. It does not seem to me to add anything to say that this possibility was foreseeable, and even foreseen, by Hytera. As I have said, there was nothing that Hytera could realistically have done to avoid in the position in which they now find themselves.



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

23

78. Most importantly, unlike in *Vodafone*, neither party before me was able to identify any better means by which the summary judgment order might be set aside, if not by using CPR 3.1(7). Mr Rubin KC, for Motorola, made no bones about it. He said that CPR 3.1(7) was the only realistic option.

79. Mr Sprange argued faintly at one point that the correct route might be to start new proceedings in order to obtain an order setting aside the English judgment. But he was unable to articulate the reason for suggesting that fresh proceedings of that type were necessary. A fresh action is undoubtedly an available option when it is alleged that a judgment has been obtained by fraud. That is because the fraud needs to be proved and, if it can be proved, a finding of fraud gives rise to relevant remedies. It is not obvious how that would work on our facts. On what basis would the judge, in the second set of proceedings, be empowered to set aside the summary judgment in the first set of proceedings? Indeed, absent fraud, why would there not be an issue estoppel or the equivalent?

80. Mr Sprange also suggested that an alternative solution would be for me to grant a permanent stay of the English judgment. The problem with that is that I cannot see why using a different procedural power (from the list in CPR 3.1) to achieve the same basic outcome would engage any different principles. Permanently to stay enforcement of the English judgment would be functionally equivalent to setting that judgment aside. It would just involve using a different form of words in my order.

81. If CPR 3.1 permits me to stay execution permanently, I cannot see why it would not allow me to set the judgment aside. The restrictions on the use of CPR 3.1 (7) in relation to final orders - i.e. th[...] have been identified in the decisions of the Court of Appeal to which I have referred[...]

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

24

– are principled restrictions, not mere technical points about the terminology used.

82. Moreover, a permanent stay would seem to me to have the potential to create a number of procedural problems, especially for Motorola, without really putting it in any stronger position in relation to the arguments about the security, which plainly were at the forefront of Mr Sprange's mind. That suggestion seemed to me, in short, to be a blind alley.

83. To my mind, as I have said, the only realistic alternative to using CPR 3.1 to set aside (or, indeed, permanently to stay) the English judgment, would be an appeal to the Court of Appeal out of time. That seems to me to be an unsatisfactory course, for the reasons I have already explained. If I am wrong about that, the Court of Appeal can of course say so and claim any issues of this kind for itself. But I would be reluctant to be the one to suggest that that busy Court must take on all applications of this kind. I should add that that option was not urged on me by Mr Sprange and was strongly deprecated by Mr Rubin.

84. I am comforted in that regard by the fact that in *Nouvion v Freeman*, Lord Bramwell did not suggest that an **appeal** would be the route by which the problem which he had identified would be solved. Instead, Lord Bramwell referred to a type of writ previously used to put right injustices; a power which was expressed in wide terms, but which had been very carefully circumscribed by authority. There does seem to me to be an analogy there with CPR 3.1(7).

85. For all of these reasons, I take the view that there is scope for CPR 3.1(7) to provide the solution to the problem in an exceptional case like the present. I am satisfied that it can be used to set a[side] order in these very specific and limited circumstances, namely where that final orde[r]

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

25

was premised upon a foreign judgment which has been undermined by an appeal in another jurisdiction.

86.    I should perhaps add that Mr Sprange helpfully made clear that he was not saying that I did not have **jurisdiction** to set aside a final order under CPR 3.1(7), just that I should not do so on the facts of this case. Indeed, Motorola's argument was not that CPR 3.1(7) did not permit the order of Cockerill J to be set aside, but rather that what Mr Sprange called the "blunt instrument" of CPR 3.1(7) is not the appropriate procedural tool on the facts of this case.

87.    I have already referred to, and rejected, some of the alternative options which Mr Sprange suggested to me in the course of yesterday's oral submissions. Some other alternatives he offered were much more specific to the facts of this case. For example, he submitted that the right answer might be that Motorola should still be permitted to enforce the summary judgment sum, subject only to an undertaking from Motorola to set off any overpayment against other sums owed to it before the foreign court, or perhaps subject to Hytera's "right" to apply to the Illinois court for restitution of any overpayment.

88.    These do not seem to me to advance matters. The first problem with these options is that they do not actually provide any answer to the issue of principle. To rely upon these as the "solutions" to that issue amounts to accepting that the English court does not have a mechanism to deal with the problem of an appeal in the foreign jurisdiction which comes after judgment being entered here, and therefore that we must either hope that the judgment creditor will be magnanimous enough to offer an undertaking, or that the foreign court has some mechanism for putting right any injustice.

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

26

89.    In relation to the latter possibility, I accept that in *Moss v Martin* (at [58(iiii)]), HHJ Russen KC
       referred, in passing, to the possibility (in the event of the appeal succeeding) of proceedings being
       brought in the US to recover any money which had been paid.  However, the proceedings being in the
       US was said to be an assumption made by the defendants "based upon where the claimants and their
       assets are based."  I do not read that as suggesting that the correct approach would be to pursue
       proceedings in the foreign jurisdiction.  It is simply a recognition that that might end up being the only
       option in that case, given the location of the claimant's assets.  HHJ Russen was indicating that this risk
       – namely, that the defendants might hypothetically have to go to the US to seek recovery – was not a
       sufficient reason, on the facts of that case, for granting a stay of execution.  That is a long way from
       saying that the right, let alone the only, option is to hope that a foreign court will be able to fill this
       supposed hole in English Court procedure.

90.    Moreover, in the present case, neither the proposed undertaking, nor a proposed right to restitution in
       the foreign jurisdiction, would offer a satisfactory solution, from the perspective of the English Court.
       The Illinois Court judgment includes substantial sums which Calver J has held cannot be enforced in
       England.  I do not accept that the English Court must accept an outcome where Motorola would, via a
       back door, be able to enforce US$136 million out of those otherwise unenforceable sums.

91.    In terms of the exercise of my discretion under CPR 3.1(7), however, that still leaves the issue of how I
       should take into account the fact that, while Hytera has succeeded on its appeal against the Illinois
       Court judgment, it may, in practice, only have succeeded in reducing the quantum. As
       finding on liability stands.

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

27

92.   The parties' positions in that regard were, again, starkly different. Hytera argued that there was currently no money judgment in favour of Motorola, and hence the only option was for me to set aside the English judgment and send Motorola back to square one. Motorola argued that I should, in the exercise of my discretion, simply leave the English judgment in place, until the dispute about quantum has been resolved by the Illinois court. Another suggestion from Mr Sprange, to which I have already referred, was that I might stay the English judgment permanently, but nevertheless leave the security in place, ready for that final or that further decision of the Illinois Court.

93.   I did wonder at one point if there might be a middle way, such as varying the English judgment so that it provides for judgment in favour of Motorola in relation to Copyright Act damages, but with the final amount of that judgment to be subject to assessment once a final decision of the Illinois Court had been rendered. However, I have been persuaded that doing so would be wrong as a matter of principle on the specific facts of this case. A foreign judgment can only be enforced in this country if it is for a definite sum of money: see Rule 46 in *Dicey and Morris* at pp.872-874.

If Motorola were to apply for summary judgment today, on the basis of the liability finding in the US, asking for judgment for a sum to be assessed, it seems to me inevitable that the application would be refused. That is true notwithstanding that there is no dispute on liability, but only in relation to quantum.

94.   Mr Sprange offered another variation on the same theme. He suggested that I might only order a further stay of enforcement on an interim basis, pending clarity on the remanded issue. I agree that that course is theoretically open to me, as a matter of discretion, as I consider whether to or

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

28

English judgment be set aside. But what would be the justification for following that course? Motorola says that Hytera want to get away without paying anything towards any judgments in favour of Motorola because those behind Hytera are "crooks". That is an emotive submission, but it is important to remember that Motorola previously sought, and even obtained, a freezing injunction, but that order was reversed by the English Court of Appeal on the grounds that there was no admissible evidence of risk of dissipation. I cannot order that the security be retained on the basis of risk of dissipation, and I should not be deciding whether or not to set aside the English judgment with an eye to how the security might be preserved.

95.   Mr Sprange made much of the timings in this regard. He accepted that it is unclear when the Illinois Court will render its further judgment, but he suggested that it might only be a short number of weeks. On that basis, he encouraged me to hold the ring for now; to wait and see.

However, the fact is that Hytera made the present application in July 2024. If it had been decided then, Mr Sprange's submission, to the effect that the Court should wait and see, would have had very limited force. The fact that the application happened to come on for hearing yesterday, on 22 January 2025, is just a consequence of listing difficulties. It is hard to see why vagaries of listing should make a difference to the way in which I approach the application. To put it another way, it seems to me that both parties are stuck, for good or ill, with the date on which the application has ended up being heard.

96.   Having heard all of the arguments, it seems to me that I ought to grasp the nettle. If I take the view that the English judgment should properly be set aside, then I should make that order, and then see where it leaves me. I should not be trying to find ways to avoid taking any positive step, simply on the Illinois Court may, in due course, render a further judgment, which on any view



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

29

amount. In circumstances where there is, as a result of the US Appeal process, currently no final judgment for an ascertained amount which could properly be enforced in this country, it seems to me that the principled course is for me to set aside the English judgment. If the timing ends up appearing unfortunate for Motorola, I would politely suggest that it is a consequence of the way in which the US proceedings have progressed, rather than any fault with the English procedure.

97.   Indeed, one way of looking at where we are today is that Motorola has obtained summary judgment in England for an amount which the US Appeal Court has now decided was much more than Mototola was entitled to. If that appeal had happened to be decided before the summary judgment application, Motorola would not have obtained the English judgment. It would not yet have been able to obtain any judgment in this country. Motorola is currently unable to enforce a foreign judgment under the English common law, because it cannot show that it is entitled to any definite sum. It cannot show that there is a debt which Hytera is obliged by that foreign judgment to pay. If and when Motorola has a judgment which can be enforced in England, of course, it can amend its pleadings and apply for summary judgment again. If it obtains judgment in England,

and there is no further appeal process outstanding in the US, then it is likely to be able to enforce the same without further delay.

98.   All of these considerations lead towards the same conclusion: namely that the right order to make on the current application is to set aside the English judgment.

99.   Having decided that I should set aside the order granting summary judgment, it seems to follow that the security, which has been put up as the price of staying enforcement



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

judgment, should be released. Again, it must be remembered that the reason for that security being

ordered by Jacob J was that Motorola would, unless a stay of enforcement was granted, be entitled to

enforce the English judgment in the amount of US$136 million. That is not the position today.

100. In the light of the decision I have just made, there is no longer any English judgment for which a stay of

enforcement is required. Mr Rubin says it would therefore not be a legitimate exercise of my discretion

to require Motorola to maintain that security. I agree. Both parties agree that Jacob J's order which

required the putting up of security is to be characterised as the price for the stay of enforcement which

he was granting. It was not to be understood as security for the English judgment, let alone as security

for a potential future judgment. If putting up that security represents the price for continuing the stay,

then the problem for Motorola is that the stay is no longer required. That being so, it does not seem to

me that I can properly require Hytera to continue paying that price.

101. Motorola's justifications for my doing so were all variations on the basic theme that, if I did not, Hytera

would never satisfy the further judgment which Motorola anticipates obtaining in due course. But if

Motorola cannot satisfy the test for a freezing injunction, then I struggle to see how I could properly

order that security be kept in place on that basis.

102. Mr Sprange argued with great vigour that, if I allowed the security to be returned, Motorola would be

prejudiced, because it had been prevented from enforcing the English judgment on the basis

that this security would continue to be available. There are two answers to that. First, it is far from clear

why this kind of balancing of prejudice is relevant to the present exercise. That seems to

can decide what should happen to the security, as if I were sitting under a palm tree

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

31

as I saw fit. But surely I need to start by asking on what basis I am ordering that the security should remain in place? As I have explained, once there is no English judgment and hence no further need for a stay of execution, there is simply no proper basis for requiring the security to be maintained.

103. The second answer is that the prejudice identified by Motorola is that it has been unable to enforce a judgment to which, it now turns out, Motorola was not entitled. I am not convinced that such inability can properly be described as "prejudice". Even if it can, it does not persuade me that I should make the retention of the security a condition of my order setting aside the English judgment.

104. For all of those reasons, I will grant the relief sought by Hytera in its application.



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

Neutral Citation Number: [2024] EWHC 2731 (Comm)

> Case Nos: CL-2006-000270, CL-2011-000610,
> CL-2013-000625, CL-2014-000804, CL-2014-
> 000916, CL-2015-000249, CL-2016-000116,
> CL-2021-000728, CL-2021-000747 and CL-
> 2024-000172

## IN THE HIGH COURT OF JUSTICE
## BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
## COMMERCIAL COURT (KBD)

> Royal Courts of Justice, Rolls Building
> Fetter Lane, London, EC4A 1NL

> Date: 01/11/2024

BEFORE:

### HIS HONOUR JUDGE PELLING KC
### SITTING AS A JUDGE OF THE HIGH COURT
-------------------

BETWEEN:

### MICHAEL WILSON & PARTNERS, LIMITED          Claimant

- and –

### JOHN FORSTER EMMOTT          Defendant

-------------------
-------------------

**Mr Michael Wilson**, Solicitor for the **Claimant**
**The Defendant** appeared in person

Hearing date: 25 October 2024
-------------------



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

# Approved Judgment

This judgment was handed down remotely at 9.30am on 1 November 2024 by circulation to the parties or their representatives by e-mail and by release to the National Archives.

...........................

HIS HONOUR JUDGE PELLING KC SITTING AS A JUDGE OF THE HIGH COURT



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

Double-click to enter the short title

## HH Judge Pelling KC:

### Introduction

1.    By an Order made by me of my own motion on 10 September 2024, I recorded that

   i)      the claimant ("MWP") had commenced proceedings in New South Wales claiming
           against the defendant ("Mr Emmott") sums that MWP quantifies at over US$70m
           ("NSW Claim");

   ii)     this sum is in excess of all sums claimed in this jurisdiction by Mr Emmott against
           MWP and Mr Emmott's assets known to the Court to be located in this jurisdiction;

   iii)    that the NSW claim had been listed for trial commencing on 18 November 2024
           with a time estimate of 5 days

   and directed that the parties attend a hearing for the purpose of showing why these
   proceedings, all pending applications therein and all other proceedings and applications
   between the parties in this Court should not be made subject to a case manangement stay
   until after final judgment in the NSW Claim. This is the hearing that I directed should take
   place.

2.    Mr Emmott submits that the English Commercial Court proceedings should be stayed until
      after final judgment in the NSW Claim and filed a skeleton argument to that effect running
      to 4 pages and 13 paragraphs. Mr Wilson opposes the imposition of the procedural stay
      identified in my September order and in support of that filed a skeleton argument running
      to 15 pages and 99 paragraphs, sub-paragraphs and sub-sub paragraphs.

3.    In addition to the skeleton submissions, (a) MWP filed two witness statements by Mr Wilson
      in opposition to the stay; and (b) Mr Emmott also filed two witness statements essentially in
      answer to at least some of the points made by Mr Wilson in his evidence. The hearing bundle
      filed by Mr Wilson for the purpose of this hearing runs to over 300 pages, In addition he filed
      another bundle erroneously entitled "*Authorities Bundle*" that ran to a further 523 pages.
      The authorities bundle was not such a bundle because it consisted of a selection of judgments
      and orders made in the proceedings between MWP and Mr Emmott not merely here but in
      New Zeeland and Australia. In reality the bundles of material that Mr Wilson filed was a
      hearing bundle in two volumes numbering over 820 pages in aggregate. Following
      completion of the hearing, Mr Wilson submitted by email some further submissions
      I rejected on the basis that if relevant they could and should have been made and
      at the hearing. There were some attachments to the email. If those were rele
      hearing they should have been included in the bundles for the hearing. Adm
      materials defeats the finality principle, adds delay to the process and theref
      adversely of the proportionate amount of time given to these proceedings.

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡ...

4. The authorities bundle contained no authorities relevant to the existence and exercise of the discretion to impose case management stays even though both parties are experienced solicitors of many years standing and even though Mr Wilson's skeleton asserted that the court had no jurisdiction to impose a case management stay.

## Applicable Principles

5. Mr Emmott submitted that the court had a discretion to impose a case management stay of these proceedings but as I have said Mr Wilson asserted that it did not. I accept Mr Emmott's submission and reject those of Mr Willon on this point for the following reasons.

6. The jurisdiction to impose a stay derives from this court's inherent power to control proceedings before it (preserved by operation of s.49(3) of the Senior Courts Act 1981) but in any event is one of the case management powers expressly conferred on the court by CPR r.3.1(2)(f), which provides that a court may "*stay... the whole or any part of any proceedings ... either generally or until a specified date or event...*".

7. Although the discretion is apparently unfettered, to stay a claim is one of the most draconian powers available to a court, which should generally be resorted to only in exceptional circumstances because, as is obvious, its effect is to enable a court to refuse to exercise its jurisdiction when it has been invoked by a party seeking judgment or protection from the court. Unsurprisingly therefore, the starting point is

> "... the fundamental rule that an individual (who is not under a disability, a bankrupt or a vexatious litigant) is entitled to untrammelled access to a court of first instance in respect of a bona fide claim based on a properly pleaded cause of action subject only to the sanction or consideration that he is in peril of an adverse costs order if he is unsuccessful, in respect of which the opposing party may resort to the usual remedies of execution and/or bankruptcy if such order is not complied with. This principle is of course subject to the further proviso that, if the court is satisfied that the action is not properly constituted or pleaded, or is not brought bona fide in the sense of being vexatious, oppressive or otherwise an abuse of process, then the court may dismiss the action or impose a stay whether under the specific provisions of the RSC or the inherent jurisdiction of the court.."

– see Abraham v Thompson [1997] 4 All E.R. 363, *per* Potter LJ at page 374. I [...] that applying the approach identified by Potter LJ is what will make exercise of th[...] stay proceedings, whether under the inherent power of the court or as confer[...] r.3.1(2)(f), compliant with ECHR Article 6 – see by analogy Ebert v Birch [20[...] *per* Lord Woolf MR at 497H.



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

Double-click to enter the short title

8.    In my judgment, subject to the fundamental starting point being that identified by Potter LJ
      in Abraham v Thompson (ibid.), a court is entitled to exercise the power for the purpose of
      achieving case manangement goals where no less intrusive power will assist. I also accept Mr
      Emmott's submission that such goals will include delivering the overriding objective – that
      is dealing with a case justly and at proportionate cost which includes allotting to it an
      appropriate share of the court's resources, while taking into account the need to allot
      resources to other cases – see CPR r. 1.1(2)(e).

9.    Mr Emmott seeks the imposition of the stay not merely for the reasons I identified in my
      September order but also because he contends that MWP is prosecuting these proceedings
      abusively.  As to that, firstly, abuse was not the basis on which I formulated my September
      order, secondly there is no application by Mr Emmott for a stay to be imposed by reason of
      the abuse he alleges and thirdly, the authorities referred to above were decided at a time
      when the Rules of the Supreme Court governed the conduct of civil proceedings in the High
      Court. When the Civil Procedure Rules took effect there was a new procedure included
      which enabled the court in defined circumstances to impose either limited, extended or
      general Civil Restraint Orders on those who routinely issued claims or applications that not
      merely failed but were certified as being totally without merit – see CPR rr. 3.3(9), 3.4(6)
      and 23.12 and Practice Direction 3C – Civil Restraint Orders. Thus, whilst there are a
      number of reported cases including those noted in Abraham v Thompson (ibid.) in which it
      is recognised that a court is entitled to stay proceedings that are being conducted abusively,
      many were decided before the CPR came into effect and it is improbable that a stay will be
      considered appropriate unless it has been demonstrated that the Civil Restraint Order
      regime has not controlled abusive conduct satisfactorily or in the circumstances will not do
      so. As I explain below, the Court of Appeal has only recently concluded in these proceedings
      that the CRO mechanism remains the appropriate way to control the conduct of these
      proceedings.

10.   Aside from the use of stays to control abuse of process, it is likely that stays will be used as a
      means of controlling duplicative and related litigation on proportionality grounds – see by
      way of example Reichhold Norway A.S.A. v Goldman Sachs International [2000] 1 W.L.R.
      173, where the court held and the Court of Appeal upheld the principle that a claimant's
      right, in the absence of abuse or oppression, to sue a defendant of their choice who was
      properly before the English court (the right asserted by MWP as a reason for not staying
      these proceedings as I explain below) was subject to the court's power to control the conduct
      of litigation before it, where related sets of proceedings were concurrently pursued and
      on the facts of that case a stay of the English proceedings was appropriate having
      the nature of the parties' commercial relationship and issues of cost, convenien
      interests of justice. In that case two related sets of proceedings were being pur
      claimant concurrently – one being an arbitration against a contractual counterp
      other in the Commercial Court against its advisors in relation to the relevant
      transaction. It was common ground that (a) it was for the defendants in the



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

proceedings to establish that the ends of justice were better served by the grant of a stay and (b) the English proceedings were not in any way abusive, oppressive, vexatious or brought in bad faith. In upholding the judge's decision in that case Lord Bingham CJ emphasised that "... *stays are only granted in cases of this kind in rare and compelling, circumstances.*" – a point emphasised by the Court of Appeal in the subsequent case of Amlin Corporate Member Ltd v Oriental Assurance Corporation [2012] EWCA Civ 1341.

11.     Whilst the application of these principles will be highly fact sensitive, it is more likely that a stay will be granted where the stay will or may eliminate the  duplication of proceedings between the same parties, where the advantages will include avoiding unnecessary costs and delays, parties being vexed more than once with the same question or claim and where a time limited stay will ensure that no more than a proportionate share of public resources is expended on particular disputes. This last point is of particular concern in this case for the reasons I explain below.

12.     Generally, where two courts are faced with substantially the same question or issue, it is desirable that the question or issue should be determined in only one of those two courts. In my judgment that one of the two courts considering such issues is a foreign court is unlikely to be material, at least where the judgment of the foreign court in such a case will be a final decision as to the relevant issue between the same parties, because such a decision by a foreign court is as a matter of English law of likely to create or at least is capable of giving rise to an issue estoppel – see Carl Zeiss Stiftung v. Raynor & Keeler Ltd [1966] 3 WLR 125. Factors likely to enhance the prospect of a case manangement stay being imposed in such circumstances will include that the foreign court will be determining the question between the parties finally whereas the English proceedings in which the same issue arises are interlocutory in nature.

### The Parties' Submissions

13.     I directed that Mr Emmott should make his submissions first since he was supporting the grant of a stay whereas Mr Wilson was opposing it and because the notional onus rests on those supporting the imposition of a stay as I have explained. Mr Wilson objected to that course only after Mr Emmott had made his oral submissions in reply. In my judgment that objection is without substance for the reasons I have given and was raised only in an attempt to obtain the last word on the application. That view was reinforced by Mr Wilson's attempt to make additional submissions in writing after the conclusion of the hearing.

14.     Mr Emmot's submissions were essentially three in number being in summary that:

i)      There is an issue between the parties concerning what is referred to by on behalf of MWP as the "*Temujin Partnership*" issue, which is relied on in many and perhaps most applications issued by MWP and submission Mr Wilson on its behalf. In essence, as I explain in more detail below, MW



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

that while an employee or director and shareholder of MWP, Mr Emmott together with two other individuals established a secret partnership for the purpose of diverting away from MWP business opportunities that ought to have accrued to the benefit of MWP. The question whether Mr Emmott was a partner in such a partnership is disputed by him in the strongest terms and is an issue that has never been resolved much less resolved finally by any court anywhere in proceedings to which Mr Emmott was a party. As I explain below, that issue was not resolved by the very lengthy arbitration proceedings that took place between MWP and Mr Emmott and was a claim that ultimately the Court of Appeal in England permitted MWP to bring in New South Wales and which led to the commencement by MWP acting by Mr Wilson of the NSW Claim. It is worth noting therefore that the commencement of proceedings in New South Wales was a voluntary act on the part of MWP. Following judgment in the NSW Claim, there will be a final judgment between MWP and Mr Emmott that establishes either that Mr Emmott is (or is not and never has been) a partner in the Temujin Partnership, which will in all probability create an issue estoppel between the parties on that issue;

ii)     MWP maintains that it is entitled to recover circa US$70m from Mr Emmott in the NSW Claim. It follows that if MWP wins the NSW Claim and MWP is proved correct in its quantification, there will be a money judgment in favour of MWP, which is likely to exceed by tens of millions of US Dollars the value of Mr Emmott's judgment against MWP based on the arbitral proceedings between them and thus will end the fractious debate in the Commercial Court proceedings concerning whether and to what extent that judgment debt in favour of Mr Emmott has been eliminated by other subsequent dealings between the parties and their privies for the purpose of deciding whether and to what extent Mr Emmott is entitled to set off his judgment against MWP against sums that have become payable to MWP by Mr Emmott as a result of costs orders made in these proceedings; and

iii)    This litigation is not now and never has been pursued by MWP for any legitimate purpose. On the contrary it has been pursued for years on the as part of a campaign by Mr Wilson to destroy Mr Emmott and in any event has been conducted without restraint or constraint in multiple different jurisdictions for years in a manner that has earned MWP and Mr Wilson in particular very severe criticism from judges in England and Wales up to and including Court of Appeal level. This misconduct has resulted in the grant of no less than two extended CROs against MWP, which however has not brought this litigation under control notwithstanding the warnings given by different judges over the years concerning the manner Mr Wilson conducts this litigation on behalf of MWP.

15.   Notwithstanding the length of Mr Wilson's evidence and submissions, MWP why a stay should not be granted distil to submissions that:



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

i)    The English litigation "... *is much misunderstood and improperly maligned...*" since it involves only an attempt by MWP to reverse what he characterises as "... *the wrongful, acts of ...*" Mr Emmott "...*from 2006 to date...* ";

ii)   There is no jurisdiction for this court to impose a stay of the sort referred to in my September 2024 order – an assertion that I have rejected already for the reasons set out above; MWP is fully entitled to proceed as it has and wishes to because Mr Emmott:

> "... owes enormous sums of money to MWP in all jurisdictions, and MWP is entitled to enforce the recovery of its qua Sinclair debts[1], the judgment debts, the monies that have to be repaid to it, to enforce against assets, bank accounts, cash, commissions, shares, options, warrants, companies, trusts and foundations and to trace into whatever became of the same, its right to damages, to commit the Judgment Debtor, and to bring and make its applications, just as the Judgment Debtor did with gay abandon and when not only he was allowed but positively encouraged to make so many claims and applications against MWP, and to cause such enormous losses and damages to MWP, all for no good and proper reason."

iii)  A stay should not be granted because to grant it "... *would deprive MWP of the recovery of the Sinclair Debts, damages, repayments and costs to which it is properly entitled, and let the Judgment Debtor off--the-hook and from his committal due to his contempts of court and breaches of his undertakings*" and that to grant a stay would be "... *manifestly and grossly unjust and unfair ... at this stage when it is the clear overall winner and has proved fraud, fraudulent conspiracy to injure. theft and breaches of fiduciary duty, the utmost good faith and of full and frank disclosure throughout and is entitled to recovery of the Sinclair Debts, damages, costs, to get its moneys and guarantees back in short order.*"

## Discussion

*Initial Considerations*

16.   In my judgment whether to grant a stay depends on the impact of the first two points relied on by Mr Emmott when viewed in the context of this litigation and the overriding

---

[1] MWP alleges that the trustee in bankruptcy of Mr Sinclair has assigned all Mr Sinclair's rights against MWP and that on a proper analysis of the dealings between Mr Sinclair and Mr Emmott there are mil[...] including the whole of Mr Emmott's judgment debt arising out of the arbitration between MWP and M[...] are due from Mr Emmott to Mr Sinclair and now to MWP as a result of the assignment.



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

of ensuring that only an appropriate share of the court's resources is allocated to particular claims (or as in this case groups of linked claims). Mr Emmott has not issued his own application for a stay based on alleged abuse grounds and as I have said that was not the basis of my September order. In those circumstances, it would be unfair to MWP to consider staying these proceedings on that ground.

17. In relation to a stay until after final judgment in the NSW Claim, Mr Wilson submits that a stay is not merited because:

    i)    MWP is entitled to judgment in relation to various sums that are not the subject of the NSW Claim but are and can only be claimed in the English proceedings and MWP is fully entitled to pursue these claims to the end, just as it is fully entitled to pursue the committal application against Mr Emmott it issued in 2020; that MWP is entitled to recover at least some of those sums now because the sums due to Mr Emmott from MWP have long since been extinguished as a result of various cross claims and agreed set offs with the result that he is entitled to seek Mr Emmott's bankruptcy here, which he does not hesitate to identify as one of his goals;

    ii)    In any event there are sums that MWP is entitled to recover that were paid into court by way of a payment on account of costs claims by Mr Emmott that Mr Emmott has never pursued and is now barred from pursuing;

    iii)    MWP has no less than 12 applications pending in various courts round the world against Mr Emmott including in the Eastern Caribbean Supreme Court, the Federal Court of Australia, various hearings before different state courts in Australia and no less than 7 listed hearings before me including the committal application. He submits it would be unfair and unjust if those applications were now to be stayed; and

    iv)    The trial of the NSW Claim will not take place as it is listed because Mr Wilson has instructed MWP's Australian lawyers to appeal from the decision of the court to list the trial on the date it has been listed and for the length of time it has been listed and is likely to be tried only in mid-2025.

18. It is worthwhile starting a consideration of whether these proceedings should be stayed for case manangement reasons by noting that neither party disputes the factual premises identified in the recitals to my September 2024 order that (a) the NSW Claim if made out will (on MWP's case) result in a final judgment in favour of MWP of circa US$70m; (b) that such a sum is manifestly massively in excess of the sums alleged by Mr Emmott to be due to him under the arbitration Awards; and (c) that the sum claimed in the NSW is in excess of the value of any assets owned by either party known to be located in this jurisdiction. It is also worth noting that neither party disputes that the NSW will resolve finally between the parties the Temujin Partnership issue. I should also note Mr Wilson's reliance on MWP's pending applications in foreign proceedings as

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

irrelevant simply because no one suggests that I have power to stay any proceedings other than those pending in the Commercial Court.

*The Temujin Partnership Issue*

19.   The background facts relating to this issue are set out in summary in the judgment of the Court of Appeal in <u>Michael Wilson & Partners Limited v. John Forster Emmott</u> [2018] EWCA Civ 51 by Sir Terence Etherton MR at [3] to [26]. That appeal was concerned with whether MWP was entitled (as it contended) to bring what became the NSW Claim. It is not necessary for me to dwell further on the arguments each party relied on in that appeal. In the result MWP was successful.

20.   The phrase "*Temujin Partnership*" is an expression used by Mr Wilson to describe the relationship between Mr Emmott and Messrs Slater and Nicholls as summarised by Einstein J ( A Commercial Judge sitting in the Supreme Court of New South Wales) in his judgment in some earlier proceedings in New South Wales between MWP and Messrs Nicholls and Slater and two BVI registered entities called respectively Temujin International Ltd and Temujin Services Ltd. These proceedings did not include Mr Emmott as a defendant. Einstein J's orders were appealed first to the Court of Appeal of New South Wales and then to the High Court of Australia. The end result was that judgment was obtained by MWP against Messrs Nicholls and Slater and the Temujin companies for US$676,335 and €555,259.94 together with interest and costs.

21.   In the NSW Claim between MWP and Mr Emmott that is due to be tried next month, MWP alleges that there was between Messrs Nicholls and Slater, the Temujin companies and Mr Emmott a secret partnership which MWP refers to as the "*Temujin Partnership*". In consequence he routinely refers to Mr Emmott in his evidence and submissions in the English proceedings as a "*Temujin Partner*". The juridical basis of the NSW Claim is that identified by Sir Terence at paragraph 25 of his judgment in these terms:

> "Between October 2015 and August 2016 MWP procured assignments ("the assignments") to itself from the liquidator of TIL, the liquidator of TSL, the trustees in bankruptcy of Mr Nicholls and the trustees in bankruptcy of Mr Slater of the rights of TIL, TSL, Mr Nicholls and Mr Slater respectively ("the assignors") to contribution from Mr Emmott in respect of their joint and several liability in NSW1 and in connection with the Temujin business. Each of the assignments was stated to be subject to the law of New South Wales.
>
> 26. On 2 February 2016 MWP, in reliance on the assignments, commenced NSW2 claiming "joint and several liability, contribution and indemnity on behalf of and in the name of each assignor arising out of [NSW1]" and also various heads of relief



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

Double-click to enter the short title

> (including accounts and enquiries) relating to the assets and affairs
> of what is alleged to have been a partnership between Mr Emmott,
> Mr Nicholls and Mr Slater in Temujin, including the matters which
> were the subject of the diversion allegations in the arbitration."

22.   I now return to the importance of this allegation to the English proceedings. In almost every application made by MWP, Mr Wilson makes two allegations on behalf of MWP being firstly that Mr Emmott is liable to account to MWP as a " *Temujin Partner*" by reason of the assignments referred to by Sir Terence and secondly that the sums that should be accounted for consist of various estimated sums totalling about US$70m. The point that matters for present purposes is that there is a hotly contested issue between Mr Emmott and MWP on the three issues I have identified – the existence of the Temujin Partnership, whether Mr Emmott was a member of the alleged partnership and if he was, whether he is liable to account to MWP as assignee of Messrs Nicholls and Slater for sums or assets said to have been received by him in his capacity as a member of the alleged partnership.

23.   As I have said, these issues are routinely referred to by Mr Wilson in the English proceedings, usually either expressly or impliedly on the basis that either these issues have been resolved in favour of MWP or should be treated as having been by the English courts. Mr Emmott always responds that none of this has ever been found against him by any court anywhere. Most recently these allegations surfaced in a large number of allegations that MWP proposed to make by way of amendment to the Contempt Application it has issued against Mr Emmott. In the end I refused permission in relation to each of the allegations that featured a reference to the Temujin Partnership for other reasons explained at length in a judgment I delivered when refusing permission, other than in relation to a strictly limited number of allegations. However it is relevant to note that for example MWP sought to allege that:

> "In reality, the funder was the Temujin Partnership, as the
> Defendant has been a Temujin Partner, "the backbone of the plot"
> and the person who has "controlled each and every step of Temujin's
> initial and on-going activities" since early September 2005 to date,
> and which Temujin Partnership was formed from within MWP and
> at its cost by the Defendant in gross, serious and dishonest breach of
> fiduciary duty and contract, and over a sustained period of time."

There were a large number of similar allegations such as:

> "Of such monies, the Defendant acting together with his Temujin
> Partners then caused Sandwood to send US$230,467.85c to Messrs
> Henry Davis York on 12 July 2007, (now part of Messrs Norton
> Rose Fulbright, hereinafter collectively called "HDY")."

and:



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

Double-click to enter the short title

> "30. In further breach of the Freezing Orders, on or about 20 July
> 2007, the Defendant, as a Temujin Partner, also caused HDY to
> further pay and transfer US$210,000 to Mr P.A. Shepherd KC,
> then of XXIV Old Buildings & Quadrant Chambers.
>
> 31 These monies properly belonged to the Temujin Partnership,
> and could not be so used or applied, given the provisions of the
> Freezing Orders."

I could go on – the point is an obvious one: in these proceedings these allegations are routinely made by or on behalf of MWP and equally routinely denied by Mr Emmott. Having them resolved finally as between MWP and Mr Emmott will shorten and simplify the proceedings here because whoever wins on the issue in Australia is highly likely to be estopped from asserting the contrary applying the principles identified by the House of Lords in <u>Carl Zeiss Stiftung v. Raynor & Keeler Ltd</u> (ibid.). It is entirely unclear how the Temujin Partnership issue could sensibly be resolved finally in the English proceedings as they are presently constituted. It will however be resolved finally and in relatively short order between MWP and Mr Emmott in the NSW Claim.

*The Claimed Value of the NSW Claim*

24.    Aside from this point, it is highly likely that if MWP was to succeed in obtaining a money judgment in the NSW Claim of the magnitude that Mr Wilson alleges MWP is entitled to, that is likely to bring to an end all or most of the proceedings in England and Wales. I reach that conclusion for the following reasons.

25.    Firstly, there is an ongoing dispute in the English proceedings that is difficult to resolve finally without a trial as to whether the whole of the sum due to Mr Emmott from MWP has been exhausted by cross claims and claimed set offs available to MWP against Mr Emmott that are either agreed or are capable of being proved to a summary judgment standard. One ongoing dispute in these proceedings between MWP and Mr Emmott concerns whether Mr Emmott is entitled to set off against costs orders made against him in these proceedings the sums notionally due to him from MWP. That issue has taken up a substantial amount of time in the SCCO, this court and the Insolvency Court, because on each occasion when MWP succeeds in obtaining a costs order against Mr Emmott, Mr Emmott asserts he is entitled to set off the sum due to him under his judgment against the costs claimed by MWP, MWP disputes this and serves a statutory demand on Mr Emmott and Mr Emmott then applies to the Insolvency Court for an order setting aside the statutory demand on the basis that he alleges he is entitled to set off his arbitration judgment against the sums claimed. This will take up a significant amount of court time to resolve for the following reasons.

26.    Firstly, MWP disputes Mr Emmott's right to set off the costs claims against his judgment as a matter of general legal principle. Now is not the time to set out the



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

Double-click to enter the short title

that arise but in essence it turns upon whether as a matter of law set off is available in the circumstances. This dispute of principle led to an order by a Costs Judge requiring that issue to be resolved by this court. In order to bring this about Mr Emmott issued an application for an order or declaration that will determine the issue of principle between the parties. That application has been the subject of yet further applications by Mr Wilson to alter the focus of that application (which have failed) and to the application being listed and then adjourned in unsatisfactory circumstances. In essence I had directed that the hearing be attended because of its length. The application was listed and Mr Emmott returned to the UK in order to appear in person in support of the application. Very shortly before the hearing Mr Wilson informed me that he was unable to travel because his passport was having a visa attached to it and he requested permission to attend remotely. This was arranged but the hearing had to be ended prematurely because (a) Mr Wilson complained that the camara was at the back of the court and he could not see Mr Emmott's face and (b) in any event the audio link was intermittent. As things stand that Application has been relisted to be determined over 2 days in February 2025.

27. Secondly, aside from the issue of principle I have so far referred to, Mr Wilson maintains that in fact nothing remains of the judgment in favour of Mr Emmott so that even if in principle set off was available to him there is nothing available to fuel a set off defence. This is strenuously opposed by Mr Emmott. I have explained to the parties on a number of occasions the availability of set off in relation to any particular costs order depends on a factual determination of the state of account between the parties at the date when the availability of set off to the particular costs claim is to be adjudicated on. Mr Wilson maintains that this should be resolved by me on the hearing of Mr Emmott's application assuming he is wrong on the issue of principle. He does so on the basis that on MWP's case, set off is not available because MWP is owed much more than MWP owes to Mr Emmott (including sums alleged to have been received by Mr Emmott in his capacity as a member of the Temujin Partnership) and because MWP alleges that the whole of the judgment that Mr Emmott recovered as a result of the arbitration had been assigned to a Mr Sinclair, whose trustee in bankruptcy has assigned all Mr Sinclair's rights to MWP. All this is heavily in dispute.

28. Apart from the Sinclair assignment issue, resolving this dispute will involve identifying the sums due to Mr Emmott and then adding to those sums interest at the judgment rate, then working out what sums it is agreed between the parties should be set off (there are some) and when and how that impacts on the continued accrual of interest on the reduced judgment sums and then attempting to decide whether there are any other sums that Mr W contends should be set off which have been proved to be due to MWP from Mr E the summary judgment standard. It is difficult to see how any final conclusions on could be arrived at on an interlocutory application absent admission and in an enforceability of the individual costs orders will not be in issue on the hea Emmott's application, which is concerned exclusively with the principle. The fac

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ



can only be grappled with by the Insolvency Court which will have to decide on what date the right to set off is to be tested and then to ascertain (to the standard applicable to an application to set aside a statutory demand) the state of account in relation to the sums admitted or (perhaps) proved to the summary judgment standard and the effect of the claimed assignment by Mr Emmott to Mr Sinclair. The demands of this exercise cannot be underestimated.

29.    The key point that matters for present purposes is that this will all become or is likely to become academic if MWP succeeds in the NSW Claim for the sums it claims to be entitled to because the sums claimed in the NSW Claim are so enormous that they will swamp everything alleged to be due to Mr Emmott from MWP in this jurisdiction so as to eliminate at a practical level the ability of Mr Emmott to rely on set off. It is proportionate that attempting to determine these difficult issues should be postponed until after it has become clear whether that is the position or not. That will come with final judgment in the NSW Claim.

*Listing of the Trial of the NSW Claim*

30.    The final consideration is Mr Wilson's point that MWP has appealed the decision of the Supreme Court of New South Wales to list the trial of the NSW Claim on the date and with the time estimate it has been listed. Unsurprisingly there is a dispute as to whether MWP has appealed that decision with Mr Emmott maintaining that MWP has not and is now out of time to do so. Mr Wilson maintains exactly the opposite, although he has not produced any acknowledgement by the NSW Court of Appeal of any such appeal nor any evidence that the listing decision has been stayed. In my view the real point is that none of this matters. If the trial starts as planned then in all probability the parties will have a judgment approximately three months after the trial has ended. Mr Wilson maintains that the trial should be listed during the middle of next year. If that is what happens ultimately it has no material impact on the analysis set out above but in any event if there is some time critical point unknown to me that arises if there is an appeal against the listing direction and if it succeeds then that can be the subject of an application using the liberty to apply that will be provided in the order.

*Conclusions Concerning Stay Until Final Judgment in the NSW Claim*

31.    In my judgment the factors I have so far considered merit staying the proceedings in this court until after final determination of the NSW Claim. Final judgment in that case resolve once and for all the Temujin Partnership issue and whether or not Mr Em was a "*Temujin Partner*". That will be a significant benefit of itself because of the with which MWP and Mr Wilson on its behalf seeks to rely on that iss improbability of that issue being resolved in any proceedings in England. I wo MWP's case at all stages up to the Court of Appeal in England was that it



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

permitted to litigate this issue against Mr Emmott in New South Wales. That was a submission that the Court of Appeal accepted. That is an added factor that supports the grant of a case manangement stay until after final judgment in those proceedings.

32.   In addition, such a stay is justified because of the practical benefits that will follow if MWP succeeds in the NSW Claim to the level he claims. This approach is likely to save several days of Commercial Court time and a number of days of Insolvency Court time (because the statutory demand applications are all currently stayed awaiting a determination as a matter of principle as to whether set off is available to Mr Emmott) if MWP succeeds in the NSW Claim in recovering sums at the level claimed. At a practical level if MWP succeeds in obtaining a judgment for the sums it claims in the NSW Claim that will bring to an end to all of the litigation in England because there is no evidence that Mr Emmott can meet a claim at this level. It will in any event eliminate all further dispute about the availability of set off.

33.   I am fully aware that a step of this sort is exceptional but the circumstances surrounding this litigation are extraordinary and unique at least in my experience. As long ago as February 2019, Peter Jackson LJ concluded his judgment in Emmot v Michael Wilson & Partners Ltd [2019] EWCA Civ 219; [2019] 4 WLR 53 in these terms:

> "Having listened to the history of the litigation between these two solicitors, I protest at the shameful waste of time and money caused by their private dispute, which has now continued for 13 years and left their reputations in tatters. We were told that Mr Emmott's global costs amount to £2·5m, and Mr Wilson's several times that. Courts in four countries have been (and in at least two cases are being, with no end in sight) plagued with their proceedings and counter-proceedings. It appears that Mr Wilson will stop at nothing to prevent Mr Emmott from receiving the award to which, for all his deceit, he is entitled. ... Any court in this jurisdiction that has to consider this dispute in future would do well to remember that the overriding objective in civil proceedings includes a duty on the court to save expense, deal with the case expeditiously and fairly, and allot to it an appropriate share of the court's resources, while taking into account the need to allot resources to other cases; further, that the parties have a duty to help the court to achieve this. This pathological litigation has already consumed far too great a share of the court's resources and if it continues judges will doubtless be astute to allow the parties only an appropriate allotment of court time."

It is a matter of record that since then at least three new claims were commence[d] there have been applications that have generated 37 judgments from me alon[g]



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

reported in the Westlaw database and at least that number of other judgments and rulings that have not made it to that data-base. There have been numerous applications for permission to appeal to the Court of Appeal and as I have said two extended civil restraint orders that have had little or no effect because of necessity they have been made in only some of the issued claims. I refer to this not in relation to the suggestion that these proceedings are abusive but because it shows, regrettably, that the lack of proportionality identified by Peter Jackson LJ has continued. Proportionality lies at the heart of the stay I am imposing.

*Exceptions to the Stay*

34. All of that said, there is some justification for carving out one of the pending application dated 20 October 2023 listed for hearing on 1 November 2024 essentially because it is self-contained, can apparently be determined without considering further either the set off or the Temujin Partnership issues, will have been prepared for by both parties and will not result in a material saving of public resource if vacated at this stage.

*Mr Emmott's Submissions Concerning Abuse*

35. Given the conclusions I have reached so far, it is not necessary for me to consider further the allegation made by Mr Emmott that these proceedings are being maintained by MWP not for any legitimate purpose but as a means of vexing Mr Emmott. I should comment albeit briefly on the points made out of fairness to both parties. Plainly there is every reason to be critical of the manner in which this litigation has been conducted by MWP or by Mr Wilson on its behalf, not least because of the criticism by different judges at various times over the years. I have already referred to the comments of Peter Jackson LJ set out above. I have been critical of the manner in which this litigation has been conducted by or on behalf of MWP in the past, which led me to make an extended CRO and more recently the Court of Appeal has made yet another. In doing so, the Court of Appeal (Andrews and Baker LLJ) ordered that:

> "The Court being satisfied that MWP has persistently made and issued claims which are totally without merit and that the existing Extended Civil Restraint Order, which could not cover proceedings in the Court of Appeal, has proved to be no deterrent to the pursuit by MWP of vexatious litigation in the Court of Appeal, it is appropriate to extend the scope and duration of that Order which is due to expire on 24 April 2024. The Civil Restraint Order made by this Court, which is a separate order, will incept immediately but expire on 24 April 2026."

The Court of Appeal gave as its reasons:



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

> "Whilst the Court is satisfied that there is material which might
> justify a wasted costs order being made against Mr Wilson (at least
> in respect of some of the costs of the Application) setting in train the
> procedure under CPR 46.8 is likely to evoke the kind of response
> which would lead to the disproportionate use of court time and the
> wasting of further costs. At this juncture it is felt that the Civil
> Restraint Order is a better means of seeking to control this type of
> behaviour. It is proportionate, because it means that any applications
> or claims which do have merit will be permitted, and it avoids the
> prospect of further hearings and satellite litigation."

Notwithstanding these criticisms, MWP continues to conduct these proceedings in a manner
that intermittently generates totally without merit findings, most recently by a costs judge on
11 October 2024.

36. Although sent over 9 years ago, Mr Emmot relies on an email sent to him by Mr Wilson, the
relevant part of which is in these terms:

> "In 2016 we confidently expect to over-turn both the judgements
> and orders of Teare J and Whipple J, at the hearings listed in
> November and December 2016.
>
> As you know, we are now the successors of all claims and rights
> against you of Nicholls, and will also be so in respect of Slater,
> including as to the Temujin Partnership, as well ascertain of the
> rights of both TIL and TSL, just two of the Temujin Partnership
> entities.
>
> Accordingly, we are finally free in 2016 to focus on and properly
> deal with you, personally, and once and for all, given the systematic
> fraud you perpetrated on MWP from 2001-2006, which through
> deliberately false and misleading pleadings and evidence you have
> very much continued in the litigation, as such is your real nature and
> persona, behind the smiling facade.
>
> Contrary to your false assertions, I am neither a bully nor mad, but
> given the serial and deliberate wrongs you have committed and costs,
> damages, loss and expense you have caused, and for which you and
> your partners in crime are fully responsible and the guilty parties,
> despite your continued denial, the team at MWP and I will not rest
> and no stone will be left unturned until we have disposed of you,
> once and for all, just as we have successfully done now with
> Nicholls, Slater, TIL and TSL."



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

37.    There is every reason to be critical of the manner in which this litigation has been conducted, particularly in recent years. That said, I do not consider that conduct yet justifies staying these proceedings generally even if I could conclude that a stay on such grounds was properly before me; and in any event alleged abusive misconduct would not justify a stay simply until after final determination of the NSW Claim but something much more general if that was thought to be the appropriate response. I respectfully agree and adopt by analogy the reasoning of the Court of Appeal when making its recent ECRO against MWP – that is that at "... *this juncture it is felt that the Civil Restraint Order is a better means of seeking to control this type of behaviour. It is proportionate, because it means that any applications or claims which do have merit will be permitted, and it avoids the prospect of further hearings and satellite litigation.*" That approach is consistent with the view I expressed earlier concerning the use of a stay as a response to abusive conduct at any rate at this stage.

38.    In the result, had Mr Emmott applied for a stay by reference to MWP's conduct of the litigation alone I would have refused it on the basis that the use of the CRO procedure has not yet been fully worked out and only when all steps possible using that regime have been taken and shown to have failed will it be appropriate to consider staying these proceedings generally. So far, as I have indicated, only extended CROs have been made. When I first made an extended CRO in this case, I made clear that I had considered making a general CRO but had not done so because MWP then issued proceedings from time to time in a professional capacity on behalf of its clients and a general CRO would have been disproportionate for that reason. However, if totally without merit findings continue to accumulate it may be necessary to consider that question again.

## Conclusions

39.    For the reasons set out above I will direct that these proceedings be stayed generally until after final judgment in the NSW Claim save and except for the application dated 20 October 2023 listed for hearing on 1 November 2024. There will be liberty to either party to apply to lift the stay if so advised. The parties are directed to draw up an order giving effect to this judgment. I will hear the parties as to costs at the hand down of this judgment.

40.    Following the circulation of this judgment in draft Mr Wilson submitted on behalf of MWP that my September order made been made only in proceedings bearing the number CL-2024-000172. That is quite simply wrong as the title of that order shows. It rehearses all the numbers of the claims issued between the parties to date that remain active being "*CL-2006-000270 (formerly 2006 Folio 921) CL-2011-000610 (formerly 2011 Folio 1082) CL-2013-000625 (formerly 2013 Folio 400) CL-2014-000804 (formerly 2018 Folio 80*4) *CL*___*000916 (formerly 2014 Folio 1210) CL-2015-000249 and CL-2016-000116*___ CL-2024-000172. It is entirely unclear what the purpose of this erroneous subm___ If the purpose was to suggest that a stay could only apply to the proceedings ___ identifies then he is wrong about that – the stay is being imposed as a case ma___

HIS HONOUR JUDGE PELLING KC SITTING AS A JUDGE OF
THE HIGH COURT
Approved Judgment

Double-click to enter the short title

measure in order to deliver proportionality as I have explained and that requires that a stay
apply to all the proceedings between MWP and Mr Emmott in the Commercial Court in
England and Wales.



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

Neutral Citation Number: [2025] EWHC 716 (Comm)

Case Nos: CL-2006-000270;CL-2011-000610;
CL-2013-000625; CL-2014-000916;
CL-2015-000249; CL- 2016-000116;
CL-2021-000728; CL-2021- 000747
CL-2010-000804  CL-2024-000172

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
COMMERCIAL COURT (KBD)

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 20/03/2025

Before :

HIS HONOUR JUDGE PELLING KC
SITTING AS A JUDGE OF THE HIGH COURT

---------------------

Between :

MICHAEL WILSON & PARTNERS, LIMITED          Claimant
- and -
JOHN FORSTER EMMOTT                          Defendant

---------------------
---------------------

Mr Michael Wilson, Solicitor for the Claimant
The Defendant appeared in person

Hearing dates: 19 March 2025
---------------------

Approved Judgment

This judgment was handed down remotely at 09.30am on 26 March 2025 by circulation to the
parties or their representatives by e-mail and by release to the National Archives.

..............................



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

## HH Judge Pelling KC:

### Introduction

1.   By an Order made by me on 10 February 2025, I directed the parties to file and serve short written submissions as to why a case manangement stay made by me in relation to these proceedings on 1 November 2024 should not be reimposed in the events that have occurred to which I refer in more detail below. The result was that Mr Wilson filed written submissions objecting to the reimposition of the stay while Mr Emmott filed written submissions in support of the reimposition of the stay. In light of this lack of consensus, I directed that there should be a short hearing to determine the issue on the 19 March 2025. The hearing overran as a result of Mr Wilson taking an hour to deliver oral submissions that were repetitive and to an extent at least strayed well beyond what was material to the issue to be decided. Mr Emmott maintained that he had professional commitments that prevented him from remaining for a judgment and I decided to provide a written judgment setting out the order I have decided to make and the reasons for it. That is this judgment.

### Background

2.   The circumstances leading to the imposition by me of a case manangement stay in respect of these proceedings are comprehensively set out in the judgment I gave leading to the 1 November stay order – see [2024] EWHC 2731 (Comm) ("November Judgment") – and I do not intend to repeat what I said there. That judgment should be read before proceeding further with this judgment.

3.   In the result, applying the principles I set out at [5]-[8] and [10]-[12] of the November Judgment, I imposed the 1 November stay for the case specific reasons identified at [16]-[32]. In arriving at the conclusion that I should impose a case manangement stay for those reasons, I drew attention to the extraordinary history of this litigation and the consequent need to ensure that only a proportionate amount of court resources is made available to these proceedings in particular at [33] of the November Judgment. That paragraph bears repetition because it sets out in summary why exceptional steps are necessary in order to control this seemingly never ending litigation. It is in these terms:

> "I am fully aware that a step of this sort is exceptional but the circumstances surrounding this litigation are extraordinary and unique at least in my experience. As long ago February 2019, as Peter Jackson LJ concluded in his judgment in Emmot v Michael Wilson & Partners Ltd 2019] EWCA Civ 219; [2019] 4 WLR 53 in these terms:
>
>> "Having listened to the history of the litigation between these two solicitors, I protest at the shameful waste of time



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

and money caused by their private dispute, which has now
continued for 13 years and left their reputations in tatters.
We were told that Mr Emmott's global costs amount to
£2·5m, and Mr Wilson's several times that. Courts in four
countries have been (and in at least two cases are being, with
no end in sight) plagued with their proceedings and counter-
proceedings. It appears that Mr Wilson will stop at nothing
to prevent Mr Emmott from receiving the award to which,
for all his deceit, he is entitled. ... Any court in this
jurisdiction that has to consider this dispute in future would
do well to remember that the overriding objective in
civil proceedings includes a duty on the court to save
expense, deal with the case expeditiously and fairly,
and allot to it an appropriate share of the court's
resources, while taking into account the need to allot
resources to other cases; further, that the parties have a
duty to help the court to achieve this. This pathological
litigation has already consumed far too great a share of the
court's resources and if it continues judges will doubtless be
astute to allow the parties only an appropriate allotment
of court time."

It is a matter of record that since then at least three new claims were
commenced by MWP, there have been applications that have
generated 37 judgments from me alone that are reported in the
Westlaw database and at least that number of other judgments and
rulings that have not made it to that data-base. There have
been numerous applications for permission to appeal to the Court
of Appeal and as I have said two extended civil restraint orders
that have had little or no effect because of necessity they have been
made in only some of the issued claims. I refer to this not in relation
to the suggestion that these proceedings are abusive but because it
shows, regrettably, that the lack of proportionality identified by
Peter Jackson LJ has continued. Proportionality lies at the heart of
the stay I am imposing"

4.     Since the 1 November stay ceased to apply (in the circumstances to which I re[fer])
avalanche of litigation has continued unabated. I have drawn attention in t[he]
tendentious and prolix terms in which Mr Wilson frames his submissions to co[urt]
continues unabated. In paragraph 25 to 26 of his written submissions for this [...]



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

Wilson summarised what he considered this court was required to resolve. It bears quotation as well:

"25.    As set out in MEW-1, the following is a brief summary of the substantive claims and matters in issue before this Court, which remain to be resolved between the parties;

25.1.    the US$36 million unpaid Sinclair debts;

25.2.    the true ownership of the 14.75m Max Shares, the US$1,050,000 of Max Cash, MWP's unpaid bills, and the Judgment Debtor's under-billing, and as to the involvement of Sinclair and Sokol in the Temujin Partnership fraud, where Sokol stands debarred;

25.3.    the Judgment Debtor's joint and several liability and in contribution with Messrs Nicholls and Slater as his Temujin Partners, as well as TIL, TSL, TTT as Temujin Partnership entities, given the findings by the Trustees and Liquidators and declarations on oath made, and the limited-scope ongoing NSW Injunction, which needs to be lifted;

25.4.    as to the Judgment Debtor's alleged arbitration liability and quantum phase costs, where the Judgment Debtor was debarred on 18.06.24, including for breach of undertaking since 19.11.19 and the consequences thereof, including the payment back to MWP of all moneys, and similarly in relation to the alleged quantum challenge and liability challenge costs, MWP's guarantee, moneys in the CFO, and payments back to MWP;

25.5.    the committal of the Judgment Debtor for his contempts of court and breaches of his personal undertakings since 19.11.19 to date, fines, penalties, and/or imprisonment;

25.6.    the inquiry into MWP's damages and also as to its costs arising from and caused by the specific and worldwide Freezing, three TPDO and all related orders which were wrongly conjured up, sought, applied for, obtained and maintained from 03.03.07 until 2022-2023 by the Judgment Debtor and the Stakeholders in breach of the duties of the utmost good faith and of full and frank disclosure throughout, including without limitation as to the Second Addendum and Sinclair debts and his Temujin Partnership from 09.05 to date, and where there are still ongoing effects of such former



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

orders that must be dealt with in the UK, Australia and the BVI, including ongoing security for costs based upon the same in Australia and the UK, which must be released and set aside;

25.7.      the sequestration of the Judgment Debtor's worldwide assets and estate given that he is a judgment debtor and debtor of MWP in all jurisdictions and has failed and refuses to pay despite having large and copious amounts of cash, assets, houses, shares, options, and warrants at his disposal, including through his designates and nominees, and as a Temujin Partner from 09.05 to date, and subsequent tracing; and

25.8.      the stay and set-aside application of 04.09.20, which has been listed to be heard on numerous occasions, but has been taken out the list at the last minute, through no fault of MWP, and which is also based upon forensic evidence from Messrs Stroz Friedberg.

26.      In addition, as a result of the judgment of 15.01.25, MWP will be bringing an application for a declaration that Mr Emmott has had nothing left as to principal since 2013, and has had nothing left as to principal and interest since 2014, and probably much earlier when all of his asserted and purported set-offs are taken into account. For this purpose, MWP and its forensic accounting team have been working on a revised calculus and Net TQA in light of the Court's guidance given on 15.01.25, as well as enhancing the back-up bundle, even though the burden of proof is on Mr Emmott, which is included in the further HB. "

In addition Mr Wilson has apparently threatened the commencement of yet further litigation against Mr Emmott above and beyond that referred by Mr Wilson in his written submissions for this hearing. As Mr Emmott put it in his written submissions:

"11.      Furthermore, in recent emails MWP has given Mr Emmott notice of yet further applications it intends to make. At page DB/15 is an email dated 31 January 2025 in which MWP advises that it intends to apply for a restraining order against Mr Emmott for his alleged "unlawful and tortious interference, collusion and fraudulent conspiracy to injure".

12.      On 17 March 2025 MWP sent an email to Mr Emmott threatening to "enforce" its alleged security rights over various properties alleged to be owned by Mr Emmott..."



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

The emails to which Mr Emmott refers are exhibited and bear out what he says. The reality is that on Mr Wilson's analysis, this litigation will continue for years to come, notwithstanding his professed desire to bring it to an end.

5. As will be apparent from my last judgment, I stayed all these proceedings aside from some narrowly framed exceptions until after final judgment in the litigation I referred to in the November Judgment as the NSW Claim. I did so for two reasons. Firstly, I did so because what I referred to at [19] and following of my earlier judgment as the "*Temujin Partnership Issue*" was to be resolved finally in the trial of the NSW Claim so as probably to give rise to an issue estoppel between the parties in relation to that issue. Resolution of that issue is of critical importance to the English proceedings for the reasons identified at [22] – [23] of the November Judgment.

6. The other reason why I stayed the English proceedings was because Mr Wilson estimated the value of MWP's claim in the NSW Claim at circa US$70m. That is significant so far as the English proceedings are concerned for two reasons.

7. Firstly there is an ongoing dispute between MWP and Mr Emmott as to whether and if so how much remains due and owing from MWP to Mr Emmott of the judgment sum to which he became entitled in excess of a decade ago. This is relevant because Mr Wilson maintains that MWP is entitled to recover sums provided by MWP as security for Mr Emmott's costs often many years ago over which Mr Emmott asserts a right of set off and because, whenever a costs order is made in MWP's favour, Mr Emmott asserts a right of set off. This has resulted in multiple bankruptcy petitions being presented by MWP seeking Mr Emmott's bankruptcy and the service of multiple statutory demands by MWP, which in turn have become the subject of multiple set aside applications. It resulted too in an application by Mr Emmott for a declaration as to whether in principle he was entitled to set off costs orders made against him against the judgment sum due to him because Mr Wilson has disputed that principle. That principle has now been resolved in favour of Mr Emmott following a direction by a Costs Judge that it be resolved by application to this court. There has been no appeal by either party from that determination.

8. It remains MWP's case however that there is now nothing left due to Mr Emmott and that there has not been anything due to him for at least a decade. That is the issue that Mr Wilson was alluding to in paragraph 25 of his written submissions referred to above. I said of this exercise at [28] of the November Judgment that:

> "... resolving this dispute will involve identifying the sums due to Mr Emmott and then adding to those sums interest at the judgment rate, then working out what sums it is agreed between the parties should be set off (there are some) and when and how that impacts on the continued accrual of interest on the reduced judgment sums and

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

> then attempting to decide whether there are any other sums that Mr
> Wilson contends should be set off which have been proved to be due
> to MWP from Mr Emmott to the summary judgment standard. It is
> difficult to see how any final conclusions on such issues could be
> arrived at on an interlocutory application absent admission and in
> any event the enforceability of the individual costs orders will not be
> in issue on the hearing of Mr Emmott's application, which is
> concerned exclusively with the principle. The factual issues can
> only be grappled with by the Insolvency Court which will have to
> decide on what date the right to set off is to be tested and then to
> ascertain (to the standard applicable to an application to set aside a
> statutory demand) the state of account in relation to the sums
> admitted or (perhaps) proved to the summary judgment standard
> and the effect of the claimed assignment by Mr Emmott to Mr
> Sinclair. The demands of this exercise cannot be underestimated."

Despite a number of failed attempts to make good this element of MWP's case in the past,
Mr Wilson maintains that he now has the expert evidence necessary to enable this task to be
performed. I do not comment further on whether that is so beyond noting that MWP has
produced a spread sheet which appears to follow the scheme I set out and which may have
the effect for which he contends assuming that the underlying factual allegations are
admitted or can be proved.

9.  Secondly, Mr Emmott accepts that if there is ever a judgment in the NSW Claim for
anything approaching the sums claimed by MWP that is likely to bring to an end all or most
of the proceedings in England and Wales – see paragraph 17 of his written submissions for
this hearing. That will depend upon what assets are available to Mr Emmott which is entirely
opaque at the moment. It remains the case however, that if MWP recovers a judgment in the
NSW Claim in anything approaching the sum he claims will be found due in those
proceedings then that will exceed by many millions of US Dollars the total value of the sums
in dispute in these proceedings.

## The NSW Claim

10.  The NSW Claim was dismissed on its merits by the New South Wales Supreme Court
(Hammerschlag J) following a trial on the merits that Mr Wilson did not attend. An
application to Hammerschlag J made at the start of the trial for an order adjourning the trial
because of Mr Wilson's alleged indisposition had been dismissed and the trial
continued in Mr Wilson's absence. MWP had retained counsel for the trial
make the application for an adjournment but then withdraw when that ap
Hammerschlag J's judgment on the merits is final subject to the result of any

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ
ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

11.  The trial followed the dismissal of an earlier application by MWP for an order vacating the trial date and refixing the trial with a longer time estimate some time in 2025. MWP had issued a Bankruptcy Notice in Australia against Mr Emmott concerning some outstanding costs alleged to be due under an order of the High Court of Australia ("HCA"). At the hearing to fix the trial date for the NSW Claim, the judge hearing the application (Ball J) initially fixed the trial to start in late July 2025 but on being told about the Bankruptcy Notice asked MWP for an undertaking not to seek payment until after trial of the NSW Claim. Mr Wilson refused to give that undertaking whereupon Ball J fixed the trial for the date when eventually it took place before Hammerschlag J. MWP argues that this case manangement decision was erroneous. That was the subject of an appeal by MWP to the Supreme Court of New South Wales Court of Appeal ("NSW Court of Appeal"). That appeal was dismissed by the NSW Court of Appeal prior to the commencement of the trial before Hammerschlag J.

12.  Once Hammerschlag J had handed down his judgment dismissing the NSW Claim on the merits, the case manangement stay I had imposed came to an end. This has resulted in Mr Wilson seeking to list a significant number of applications on different days in this court.

13.  MWP has meanwhile launched an appeal from the judgment of Hammerschlag J to the NSW Court of Appeal. There is apparently a dispute as to whether leave to appeal is required which has yet to be resolved. In that appeal, MWP is seeking "… *an immediate stay of the declaration as to their, allegedly, being no Temujin Partnership, that the Respondent is not, and was never a Temujin Partner, and as to costs…*" In addition, MWP is seeking permission from the HCA to appeal from the dismissal by the NSW Court of Appeal of MWP's appeal against the decision of the NSW Supreme Court to refuse to vacate the trial date.

14.  It is not for me to comment on the merits of these proposed appeals or applications for leave to appeal which are exclusively a matter for respectively the NSW Court of Appeal and the HCA. The point that matters for present purposes is that unless and until leave to appeal to the HCA is refused or any appeal for which permission is granted is dismissed and/or the appeal to the NSW Court of Appeal (assuming leave is not required as MWP contends but Mr Emmott disputes) is dismissed, all the factors concerning the Temujin Partnership Issue that led to me imposing a case management stay last year continue to apply. That would be all the more a significant problem if the stay sought by MWP from the NSW Court of Appeal was to be granted since it would arguably preclude Mr Emmott from asseissue estoppel by reference to Hammerschlag J's judgment unless and until MW had been dismissed.

15.  That means that the same debate concerning the Temujin Partnership Issue unabated in the English proceedings with Mr Wilson continuing to maint Emmott was a member of the alleged partnership and that he is liable to account to

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

assignee of Messrs Nicholls and Slater for sums or assets said to have been received by him in his capacity as a member of the alleged partnership. Whilst it is true to say that as long as the NSW Court of Appeal does not grant the stay sought by MWP, Mr Emmott will remain entitled to rely on issue estoppel, that ignores the practical problem posed if the NSW Court of Appeal were to allow MWP's appeal but in the interim this court had proceeded on the basis that Hammerschlag J's judgment is dispositive..

16.    Mr Emmott submits that it would be unjust to him for this court to proceed with any application where the Temujin Partnership Issue arises other than on the basis that an issue estoppel in his favour has arisen in relation to that issue as a result of Hammerschlag J's judgment. By the same token he recognises that if that is how this court approaches such applications and thereafter the pending appeals to the NSW Court of Appeal and the HCA succeed, there is a significant risk of further litigation either before this court, seeking orders setting aside orders made on the basis that the Temujin Partnership Issue had been determined in Mr Emmott's favour by Hammerschlag J's judgment, or appeals to the Court of Appeal on a similar basis. Whilst such a possibility would be of concern in any commercial litigation, it is of particular concern in this case given the points made earlier concerning the need to ensure that only a proportionate amount of court resource is devoted to these proceedings.

17.    Mr Wilson's only answer to this point is that there are certain claims and applications outstanding that are unaffected by the Temujin Partnership Issue and even if (which he does not accept) a stay should be put in place where that issue arises, the continuing uncertainty about that issue is immaterial to those claims and applications where the issue does not arise and for that reason it would be wrong in principle to stay any proceedings where that issue does not arise. Aside from the point made earlier concerning the effect of a judgment in the NSW claim in any sum approaching that which Mr Wilson maintains will be recovered on the availability of a set off defence or Mr Emmott's ability to further defend these proceedings or any enforcement process, Mr Wilson's point is one I accept.

## Determination

18.    It follows that whilst I consider that the stay that applied previously should be reinstated, there should be limited identified exceptions to that order. In summary they are:

    i)     The outstanding contempt application:

    ii)    The outstanding application for an order directing an enquiry as to what is due from Mr Emmott to MWP on his cross undertaking is damages discharge of the freezing order he obtained against MWP;

    iii)   The Part 7 claim bearing the number CL-2021-000728 ("Sinclair Debt



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

iv)    (if issued) a claim or application by MWP for a declaration that in the events that
have happened there is no longer any sum due and owing from MWP to Mr Emmott.

19.    In relation to the outstanding contempt application, I am satisfied that none of the issues that
arise are affected by the Temujin Partnership Issue and set off is immaterial to the issues that
arise as well.

20.    There is one contempt allegation concerning the breach of a long since discharged freezing
order obtained by MWP against Mr Emmott which Mr Emmott suggests is affected by that
issue. Mr Wilson maintains that is not so because the allegation made does not depend upon
the existence of the Temujin Partnership or Mr Emmott's alleged membership of it but
instead depends upon allegations that Mr Emmott dealt with his assets or permitted assets to
be dealt with on his behalf in a manner that was prohibited by the terms of the freezing order.

21.    I was not taken by either party to the judgment I gave permitting  MWP to amend its
contempt Application Notice. On the hearing of that application I refused permission to
amend and in effect struck from the contempt application a large number of allegations. My
recollection is that I permitted the application I am now considering to remain precisely on
the basis that it was unaffected by the Temujin Partnership issue. If that is wrong then Mr
Emmott will have permission to apply to extend the stay to some or all of the contempt
application if so advised.

22.    As things stand, I accept Mr Wilson's submission that there is no proper basis for staying the
contempt application. In any event there are good reasons why that application (which has
ben outstanding for a long time) should be disposed off as quickly as can be achieved.

23.    The enquiry  as to damages application is one where there is a dispute as to what can and
cannot properly be claimed. There has been an exchange of pleadings in order to permit that
question to be answered. The next stage in that application is for it to be restored for further
directions and the strike out of any part of the claim that is not arguably capable of founding
a claim under the cross undertaking in damages. That is unaffected by the Temujin
Partnership Issue. Whether the sum claimed is capable of  being set off will depend in part
on what sum can properly be claimed. As things stand, there is no proper basis for staying
that application.

24.    The Sinclair Debt Claim is a free standing claim for relief premised on MWP having become
the assignee of debt due from Mr Emmott to Mr Sinclair who is now diseased but p
death was made bankrupt on the petition of MWP. MWP was then able t
assignment by Mr Sinclair's trustee of the sums alleged to be due to Mr Sin
Emmott. Those proceedings are highly contentious but are at an early stage
alleged by either party that the Temujin Partnership Issue arises in respect o
of that claim. It is not alleged that Mr Sinclair was ever a member of the alleg
Partnership, which is alleged to have been a relationship between Mr Emmott and

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

Slater and Nicholls. That claim if it succeeds will be for a sum very substantially in excess of the any sum due to Mr Emmott. There is therefore no proper basis for staying it, at least at present.

25. The declaration proceedings have not yet been issued. I have not heard argument about the point but I am unconvinced that the appropriate procedural mechanism for resolving the issue MWP claims is capable of resolution without a trial is the issue of an application notice in some or all of the various extant claims. If the issue is to be pursued at all, some consideration should perhaps be given to applying for a declaration in new Part 8 proceedings. However, as I say, that issue has not been argued before me and I mention it only for the purpose of ensuring that the appropriate exception is correctly formulated. Furthermore given the time these proceedings have been on foot for, I consider that if a claim or application is to be issued for declarations MWP claims to be entitled to, then those proceedings need to be issued promptly. The exception will therefore be subject to an express proviso that requires any such claim or application to be issued within a fixed future period running from the date of this judgment. Provisionally I consider that should be 28 days. Clearly resolving the set off issue is of prime importance. In my view, if a claim or application to resolve that question is issued, it should be heard ahead of either the enquiry or Sinclair Debt Claim. If MWP succeed as they claim to be entitled to, that will eliminate the set off issue.

26. Finally I should address, albeit briefly, Mr Wilson's submission that there should be an exception made for Claim CL-2010-000804. The short answer to that point, is that Mr Emmott is not a defendant to those proceedings. Thus those proceedings were not the subject of the stay I imposed on 1 November and are not affected by any other restriction that currently applies to the litigation between MWP and Mr Emmott. For that reason the claim is entirely irrelevant to the issues that arise and no exception is required in respect of that claim.

27. The parties are directed to submit a draft Order giving effect to these directions by no later than 16.00 London Time on Monday 24 March 2025.



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

a   # Reichhold Norway ASA and another v
    # Goldman Sachs International

COURT OF APPEAL, CIVIL DIVISION

b   LORD BINGHAM OF CORNHILL CJ, OTTON AND ROBERT WALKER LJJ

28 JUNE 1999

*Practice – Stay of proceedings – Exercise of discretion – Plaintiff purchasing shares in company in reliance on report prepared by defendant – Plaintiff referring claim against*
c   *seller under sale agreement to foreign arbitration – Plaintiff commencing High Court proceedings for negligent misstatement against defendant – Whether court correctly exercising discretion to stay proceedings.*

A Norwegian company, J, sold the shares in P, one of its subsidiaries, to R. J had
d   engaged the defendant to act as its financial adviser in connection with the sale. The sale agreement provided that the buyer's only remedy for any breach of warranty should be damages, and that the buyer should not be entitled to rescind the contract for any reason. It further contained an express choice of Norwegian law and provision for arbitration in Oslo. After the sale R gave notice to J of a possible claim under the sale agreement. In March 1998 R commenced
e   proceedings in the High Court against the defendant alleging negligent misstatement and claiming damages of $US 40m. The defendant applied for a stay of the proceedings until after the determination of the arbitration pending between R and J in Norway. R opposed the application on the ground that, as a claimant with a genuine claim against the defendant within the jurisdiction, it had an absolute right to bring proceedings in England, regardless of any claim it might
f   have against anyone else, and that accordingly the court had no jurisdiction to interfere; or, alternatively, that, if it did have jurisdiction to interfere in the claimant's choice it could do so only in exceptional circumstances which were not present in the instant case. The judge held that he did have jurisdiction to stay the proceedings and concluded that it was in the interests of justice that he should
g   grant the stay. R appealed, challenging the judge's exercise of his discretion.

**Held** – Having regard to the fact that forensic practice was changing and developing towards greater control by the courts over the course of proceedings, the Court of Appeal would be very slow to interfere with procedural directions
h   of a judge unless those directions were vitiated by error of law or manifest error. In the instant case, the judge's decision was not vitiated by any such error, since he had neither left out anything which he should have taken into account, nor taken account of anything which he should not have, and had given a fair and judicious summary of all the matters properly to be considered. Accordingly, the
j   appeal would be dismissed (see p 689 *c d* and p 690 *d j* to p 691 *b*, post).

Decision of Moore-Bick J [1999] 1 All ER (Comm) 40 affirmed.

**Notes**

For stay of court proceedings pending arbitration, see 2 *Halsbury's Laws* (4th edn reissue) paras 616–620.



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

### Cases referred to in judgment

*Abraham v Thompson* [1997] 4 All ER 362

*Ashmore v Corp of Lloyd's* [1992] 4 All ER 486, [1992] 1 WLR 446, HL.

*Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1963] 2 All ER 575, [1964] AC 465, [1963] 3 WLR 101, HL.

*Molnlycke AB v Procter & Gamble Ltd* [1992] 4 All ER 47, [1992] 1 WLR 1112, CA.

*Spiliada Maritime Corp v Cansulex Ltd, The Spiliada* [1986] 3 All ER 843, [1987] AC 460, [1986] 3 WLR 972, HL.

*Thermawear Ltd v Linton* [1995] CA Transcript 1175.

### Cases referred to or cited in skeleton arguments

*Barrow v Bankside Members Agency Ltd* [1995] 2 Lloyd's Rep 472.

*Canada Steamship Lines Ltd v R* [1952] 1 All ER 305, [1952] AC 192, PC.

*Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd* [1993] 1 All ER 664, [1993] AC 334, HL.

*Cox v Bankside Members Agency Ltd* [1995] 2 Lloyd's Rep 437, CA.

*Davies (Joseph Owen) v Eli Lilly & Co* [1987] 3 All ER 94, [1987] 1 WLR 1136, CA.

*de Dampierre v de Dampierre* [1987] 2 All ER 1, [1988] AC 92, HL.

*Interest Rate Swap Litigation, Re* (1991) Times, 19 December.

*Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran* [1994] 1 Lloyd's Rep 1, HL.

*Shell Chemicals UK Ltd v P & O Roadtanks Ltd* [1995] 1 Lloyd's Rep 297, CA.

*Witter (Thomas) Ltd v TBP Industries Ltd* [1996] 2 All ER 573.

### Appeal

The plaintiffs, Reichhold Norway ASA and Reichhold Chemicals Inc, appealed from the order of Moore-Bick J ([1999] 1 All ER (Comm) 40) sitting in the Commercial Court on 25 November 1998 whereby, on the application of the defendants, Goldman Sachs International, he ordered that all further proceedings in the action should be stayed under the inherent jurisdiction of the court preserved by s 49(3) of the Supreme Court Act 1981 pending the final determination of the arbitration proceedings commenced by the plaintiffs against Jotun AS in Norway on 17 September 1998. The facts are set out in the judgment of Lord Bingham of Cornhill CJ.

*Christopher Carr QC* and *John McCaughran* (instructed by *Charles Russell*) for Reichhold.

*Gordon Pollock QC* and *David Foxton* (instructed by *Freshfields*) for Goldman Sachs.

**LORD BINGHAM OF CORNHILL CJ.** On 25 November 1998 Moore-Bick J sitting in the Commercial Court ordered, on the application of the defendants in these proceedings, Goldman Sachs International, that all further proceedings in the action should be stayed under the inherent jurisdiction of the court preserved by s 49(3) of the Supreme Court Act 1981 pending the final determination of the arbitration proceedings commenced by the plaintiffs in these proceedings, Reichhold Norway ASA (Reichhold) and Reichhold Chemicals Inc, against Jotun AS in Norway on 17 September 1998 (see [1999] 1 All ER (Comm) 40). Reichhold appeal against that order which Goldman Sachs seek to uphold.

Before the judge the issues between the parties were whether on the facts the judge had jurisdiction to stay the proceedings as he did and, if he did, whether he could properly exercise his discretion so as to make such an order. On appeal the



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

a central issue is whether the order which the judge made was one which he could properly and lawfully make.

The facts are summarised in the judgment and may for present purposes be briefly stated. Towards the end of 1996 Jotun AS wished to explore the possibility of selling one of its subsidiary companies named Jotun Polymer Holding AS. It engaged Goldman Sachs to act on its behalf to investigate the commercial
b possibilities of sale, to arouse interest among potential bidders, to handle the negotiations and to give financial advice. This engagement was the subject of an agreement made between Jotun AS and Goldman Sachs on 20 December 1996, which contained an indemnity clause in these terms:

c 'The Company [Jotun AS] also will indemnify and hold Goldman Sachs harmless against any losses, claims, damages or liabilities to any person arising out of or in connection with the engagement or any matter referred to in the attached letter or this Annex A, except to the extent that any such loss, claim, damage or liability results from the gross negligence or bad faith in performing the services that are the subject of the attached letter or this Annex A of Goldman Sachs or any of its affiliates to which it may delegate
d any of its functions hereunder.'

Reichhold Chemicals became interested in exploring the possibility of purchase and entered into negotiations. For that purpose, understandably, Reichhold needed access to detailed information about the business of Polymer, such information being known between the parties as the evaluation material
e (so-called no doubt because it assisted Reichhold to evaluate the benefits of the purchase and to value the business).

There was accordingly a confidentiality agreement entered into between Jotun AS and Reichhold Chemicals which contained a term to this effect. It was addressed to Reichhold and read:

f '... you understand and accept that neither the Company [Jotun AS], nor any of its respective directors, officers, employees, agents, representatives and advisors have made or make any representation or warranty expressed or implied as to the accuracy or completeness of the Evaluation Material. You agree that none of them shall have any liability to you or any of your
g representatives or advisors resulting from the use of the Evaluation Material.'

Negotiations and investigations were entered into and a draft sale agreement was exchanged containing a number of warranties concerning the usual operation of the business, the absence of material adverse change since the date
h of the last accounts, the absence of any material reduction in the assets or increase in the liabilities and so on.

On 5 June 1997, as it appears, a report was forwarded by Polymer to its parent, Jotun, indicating a significant decrease in profitability for the year 1997 as compared with 1996. On the following day, 6 June, a memorandum was addressed by
j Goldman Sachs to Reichhold in the course of which it was said: 'Management does not currently foresee any reason to adjust the budget for 1997.'

On 11 July 1997 an agreement was made for the sale of the shares. The agreement is a very lengthy document. It contained warranties to very much the same effect as in the draft agreement. It provided in cl 5.3 that the buyer's only remedy for any breach of warranty or of any provision of the agreement should



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

be damages and that there should be no right to rescission. It contained in cl 5.4.1
an agreement between the seller and the buyer that the seller should pay to the
buyer on demand the amount necessary to put the buyer into the position in
which it would have been if the warranties in the agreement had been true and
accurate in all respects.

Clause 6.5 contained a provision that claims should be unenforceable unless
pursued within nine months of notification of the relevant claim.

Clause 17 contained a Norwegian law clause and a provision that any
difference or disagreement between the parties should be resolved by arbitration
in Oslo.

The agreement was duly completed in September 1997 and the shares were
transferred into the name of Reichhold Norway AS, although nothing turns on
any distinction between the two plaintiffs.

On 22 December 1997 Reichhold gave notice to Jotun of a possible claim under
the sale agreement. That notification was followed in March by a letter before
action addressed to Goldman Sachs. On 30 March 1998 the writ was issued in
these proceedings by the plaintiffs against the defendants. It is enough to say that
the claim made in the writ was a *Hedley Byrne* claim based on the Goldman Sachs
memorandum of 6 June, to which I have already referred (see *Hedley Byrne & Co
Ltd v Heller & Partners Ltd* [1963] 2 All ER 575, [1964] AC 465). The damage
claimed by the plaintiffs was some $US 40m.

On 19 May 1998 Goldman Sachs issued this summons seeking a stay of the
proceedings. Later, on 17 September 1998, Reichhold began arbitration
proceedings against Jotun under the arbitration clause in the agreement, this
action, it would seem, being prompted by the time provision in the sale
agreement. At the end of October the suggestion was made by lawyers acting for
Reichhold that the arbitration proceedings should be treated as dormant, with no
steps being taken to complete the establishment of the tribunal and with each
party waiving any relevant time limit, but to that invitation lawyers acting for
Jotun gave a non-committal reply.

Evidence was filed relating to the Goldman Sachs summons to stay the
proceedings and the matter came in due course before the judge.

The judge gave a summary of the argument addressed by Mr Pollock QC on
behalf of Goldman Sachs (see [1999] 1 All ER (Comm) 40 at 46). He drew
attention to the following points. First, since the substance of Reichhold's
complaint was that it had paid too much for Polymer, the natural and most
efficient way of pursuing a remedy was by arbitration against Jotun in Norway
under the sale agreement seeking damages. Second, it was suggested that that
was a relatively straightforward claim in legal terms and any difficulty about the
quantum of damage would be inevitable wherever the claim was pursued. Third,
it was suggested that the proceedings in the arbitration could be expected to
reach a conclusion quickly and relatively cheaply. Fourth, it was urged that
Reichhold could expect to recover in full against Jotun in the arbitration if it had
a good claim, and there was no reason to think that Jotun would be unable to
honour any award. By that route it was urged, fifth, that Reichhold could expect
to obtain justice in a speedy and efficient manner. By contrast, sixth, the present
action against Goldman Sachs was more complex, more difficult as a matter of
law and was inconsistent with the method contemplated by all parties for
resolving disputes of this kind. In those circumstances Mr Pollock argued that the



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

a  court could and should stay all further proceedings in the action until the
   completion of arbitration proceedings in Norway.

   In the judge's assessment Mr Pollock's argument rested essentially on three
   propositions: first, that a plaintiff was no longer entitled to exercise unfettered
   control over the conduct of proceedings, even when they had been commenced
   in this country as of right; secondly, that the court should take an active role in
b  managing proceedings before it in order to ensure that justice was achieved as
   between the parties, while at the same time safeguarding the interests of other
   litigants; and thirdly, that when considering how justice could best be done
   between the parties, the court should view the matter objectively in order to
   assess how that might be achieved at least inconvenience and expense to all
   involved.

c  The judge then turned to consider the counter-arguments addressed by Mr
   McCaughran on behalf of Reichhold. The judge recorded his primary submission
   as being that a plaintiff with a genuine claim against a defendant within the
   jurisdiction (not being a claim liable to be struck out as in any way abusive) had
   an absolute right to bring proceedings against the defendant here. That, it was
d  submitted, was so regardless of whether he might have a claim against anyone
   else in respect of the same or a similar loss elsewhere. The judge said (at 46):

      'In other words, Mr McCaughran submitted that the claimant is entitled to
      choose whom to sue and when and the court has no right to interfere with
      the exercise of his choice, whatever may be the motive behind it.
e     Alternatively, [Mr McCaughran] submitted that if the court does have
      jurisdiction to interfere in the claimant's choice of defendant and forum, it
      can do so only in exceptional circumstances ...'

   which were not present in this case.

f  On the issue of jurisdiction the judge (at 46–47) expressed himself briefly in
   these terms:

      'The court's power to stay proceedings is part of its inherent jurisdiction
      which is expressly preserved by s 49(3) of the Supreme Court Act 1981. It is
      exercised under a wide range of circumstances to achieve a wide variety of
g     ends. Subject only to statutory restrictions, the jurisdiction to stay
      proceedings is unfettered and depends only on the exercise of the court's
      discretion in the interests of justice. I am in no doubt, therefore, that I do
      have jurisdiction to stay the present proceedings; the question is whether it
      would ever be right to do so in a case such as the present, and if so under
      what circumstances.'
h

   The judge then turned to consider at some length the matters which he
   regarded as relevant to the exercise of his discretion. At the outset he accepted
   that in principle a plaintiff who had claims against a number of different people
   was entitled to choose for himself whom to sue and whom not to sue. He is
j  entitled, the judge said, to take proceedings against some and not others for
   whatever reasons seem best to him, and subject only to the need to control abuse
   of its process the court is not concerned with the reasons for his choice or the
   motives that lie behind it. The judge observed that hitherto this had been well
   accepted, although he did not wish to rule out the possibility that the orthodox
   view on this question might change. He went on, however, to say (at 47):



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

'... choosing whom to sue is one thing; choosing in what order to pursue
proceedings against different defendants may be another, especially when
two related sets of proceedings are being, or could be, pursued
concurrently.'

He observed that in such a case the court itself had a greater interest, not only
because there might be undesirable consequences if concurrent proceedings
were pursued, but also because the outcome of one set of proceedings may have
an important effect on the conduct of the other. As an illustration of the court's
power to manage and to prioritise the actions proceeding before it, he made
reference to the well-known management rules which were laid down and
followed in the Commercial Court in the *Lloyd's* litigation. The judge said (at 47):

'In such circumstances the parties to the individual actions no longer enjoy
the unfettered right (if indeed they ever did) to determine how the
proceedings should be conducted; it is recognised that the court is entitled to
impose on them procedures which it considers appropriate in the light of the
nature and content of the litigation as a whole.'

He made reference to *Ashmore v Corp of Lloyd's* [1992] 4 All ER 486, [1992] 1 WLR
446 and *Thermawear Ltd v Linton* [1995] CA Transcript 1175. He added (at 47):

'However, it may be less easy to justify active management of that kind in
a case where proceedings between different parties are taking place in other
forums, for example, in arbitration or proceedings in other jurisdictions.
That is one of the questions raised by this application.'

The judge then pointed out that, since the court's jurisdiction to stay proceedings
was discretionary and the circumstances in which an application for a stay might
be made were almost infinitely variable, he found it difficult to accept Mr
McCaughran's submission that it would never be proper for the court to grant a
stay of an action pending the outcome of proceedings. But he did accept that such
a step should only be taken if there were very strong reasons for doing so and the
benefits which were likely to result from doing so clearly outweighed any
disadvantage to the plaintiff. He said (at 48):

'Ultimately, however, it must be a matter for the court to consider the
circumstances of the case before it and come to its own conclusion. One
factor of importance is likely to be the relationship between the parties to the
proceedings both here and abroad.'

The judge then gave what is in my judgment an important and helpful
summary of the commercial effect of the relationships between the parties in this
case. He said (at 48):

'In the present case that relationship arises out of the three agreements to
which I have already referred. Whether or not Goldman Sachs as a third
party to the confidentiality letter is entitled to invoke its terms against
Reichhold, or whether they are apt to cover the particular facts of this case
are not matters which can be decided on this application. However, I think
it is reasonably clear from the confidentiality letter and from the draft sale
agreement that the commercial basis on which Reichhold pursued the
negotiations with Jotun was that it should have no recourse against Jotun or
anyone acting on its behalf, including Goldman Sachs, in respect of the



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

*a*  accuracy of any of the material disclosed during the negotiations but instead would obtain under the sale agreement warranties of the accuracy of the accounts and of the development of the business in the period since the most recent audited accounts.  In commercial terms that seems to me to make perfectly good sense because a warranty of that kind could be expected to provide a straightforward remedy against the seller which should adequately

*b*  protect the buyer's position while leaving it to the seller to make whatever arrangements he thought fit with those acting on his behalf.  In the present case the third side of the triangle, that is, the relationship between Goldman Sachs and Jotun, was covered by the engagement letter under which Jotun agreed to indemnify Goldman Sachs against any liability to Reichhold. Viewed as a whole, therefore, there was a coherent arrangement under

*c*  which Reichhold would have its remedy under the sale agreement for any misleading or inaccurate information, but would be limited to that remedy, and Jotun alone would be liable to provide that remedy.  Any dispute between them was to be decided in arbitration in accordance with the contract.'

*d*  The judge then returned to his summary of Mr Pollock's submissions to the effect that, as Mr Pollock argued, in the circumstances which had arisen, there was every practical reason for Reichhold to pursue a claim against Jotun under the sale agreement and no sensible reason for its proceeding against Goldman Sachs in this country.  The judge considered there was a lot of force in that

*e*  argument.    He considered that if, in truth, Reichhold's complaint was well-founded it would certainly appear to have had a good claim under the warranties in the sale agreement.  The claim against Goldman Sachs, on the other hand, the judge regarded as more complicated for the reasons which he had already indicated.

*f*  He considered that Mr Pollock was right in saying that there was likely to be substantial argument about whether Goldman Sachs owed Reichhold a duty of care at all, let alone as to whether it was negligent.  For that reason alone, in the judge's opinion, the proceedings here would seem to represent a more difficult route to success for Reichhold than the arbitration in Norway.  The judge observed (at 49):

*g*      'In these circumstances it is not easy to see why Reichhold should wish to pursue these proceedings in preference to the arbitration and no explanation of any kind has been offered.  Mr McCaughran simply fell back on the proposition that Reichhold is entitled to take that course if it so wishes and the court should not interfere.'

*h*  The judge considered at some length the interrelationship between the arbitration proceedings and the court proceedings, discussing the possibility, if the action went ahead, that Goldman Sachs, as defendant, would join Jotun as a third party seeking an indemnity under the terms of its engagement and that Jotun would then seek to rely on its agreement with Reichhold to restrain the

*j*  bringing of proceedings against Goldman Sachs.  The judge also considered the possibility that the arbitration might be left in abeyance.

The judge said (at 50):

    'It is important to emphasise that the question which has to be decided on this application is not whether Reichhold should be required to pursue a



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

claim which it does not wish to pursue at all, but whether it should be
required to pursue its pending claim against Jotun before it proceeds further   *a*
with this action. If Reichhold had abandoned or compromised its claim
against Jotun this application would not have been made or, if made, would
have had no prospect of success. But the fact is that the claim against Jotun
is still pending. Reichhold wishes to maintain its claim against Jotun and will
pursue it if necessary. In the absence of any explanation for its desire to   *b*
pursue this action in preference to the arbitration, the most recent exchange
of correspondence between the parties' Norwegian lawyers looks like
nothing more or less than a tactical move on Reichhold's part. Viewed
objectively there is, on the material before me, no advantage to Reichhold in
taking that course; on the contrary, it appears to be the less favourable
option. In those circumstances the only prejudice which Reichhold is likely   *c*
to suffer if this action is stayed is a delay of about a year. Since delay of that
kind can be compensated by an award of interest if Reichhold is ultimately
successful, that might be considered a small price to pay for the prospect of
avoiding complex and costly litigation.'

The estimate of a year derived from opinions offered as to the likely course of the   *d*
arbitration in Norway. Since the judge's order, we are told, the arbitration has
indeed been progressed and it has not been suggested that that estimate was in
any way unreliable.

The judge referred to two further submissions which were made by
Mr McCaughran for Reichhold. The first drew attention to the House of Lords'   *e*
decision in *Spiliada Maritime Corp v Cansulex Ltd, The Spiliada* [1986] 3 All ER 843,
[1987] AC 460 dealing with forum non conveniens. Mr McCaughran submitted,
by analogy, that in a case such as the present the court should not lightly interfere
with the exercise by the plaintiff of its right to pursue proceedings here, save in
the most exceptional circumstances. The judge observed that he recognised the
burden on the defendant who sought a stay on grounds of forum non conveniens,   *f*
but regarded that situation as somewhat different from that which arose in the
case with which he was dealing. He said (at 51):

'In the case where a stay is sought on the grounds of forum non conveniens
the availability of an alternative forum for the determination of the dispute
means that the court is effectively being asked to decide in which of two   *g*
competing forums the action shall proceed. In practical terms it is not a
question of when but whether the plaintiff should be allowed to pursue the
action here. To that extent the exercise of the court's discretion to stay the
proceedings involves a greater interference with the plaintiff's rights than
the order sought in this case.'   *h*

The judge accepted that there was a very real burden on the defendant in the
case before him to satisfy the court that the ends of justice would be better served
by granting a stay, but did not accept that there was any heavier a burden than
would arise on an application based on grounds of forum non conveniens. The
judge also referred to a second argument of Mr McCaughran's based on the   *j*
Convention on Jurisdiction and the Enforcement of Judgments in Civil and
Commercial Matters 1968 (as set out in Sch 1 to the Civil Jurisdiction and
Judgments Act 1982) (the Brussels Convention) and the Convention on
Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters
1988 (as set out in Sch 3C to 1982 Act) (the Lugano Convention) and the priority



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

a  given to the court first seised. The judge recognised the value of a simple and clear rule of that kind, but pointed out that the case before him fell outside the conventions and therefore enabled the discretion of the court to be exercised in a way which seemed best on the particular facts. The judge summarised his conclusion in this way (at 51–52):

b        'I come then to weigh up the factors for and against granting a stay in this case. The fact that Reichhold has commenced proceedings here as of right is in my view an important factor in its favour, but apart from that there is little of a positive nature to be said against granting a stay. The existence of concurrent proceedings in Norway would ordinarily be a powerful factor in favour of doing so, especially in a case where those proceedings overlap to
c      such a significant degree and could be expected to reach a conclusion within a relatively short space of time. However, that factor inevitably loses some of its force in the light of the steps which have been taken to put the arbitration in abeyance. Unless Reichhold changes its mind (which, in the absence of any agreement, it may) it seems quite possible that the arbitration
d      may remain dormant for some time, but it remains in being and I do not think one can discount the possibility that Reichhold may change its mind or that it may be necessary at some point for it to revive the arbitration in order to ensure that the right to pursue it is not lost altogether. If that were to occur one would be faced with all the undesirable consequences of concurrent proceedings.    Moreover, the very fact that Reichhold is
e      maintaining the proceedings against Jotun must I think be a factor to be taken into account since it shows that Reichhold is minded to pursue those proceedings, if necessary, in the longer term. One therefore comes back to the broader question of the manner in which the dispute involving all three of these parties is to be resolved. In the somewhat unusual circumstances of
f      the present case I do not think that the court is obliged to give undue weight to the mere preference of one party. Considerations of cost and convenience and of the interests of justice generally seem to me to weigh heavily in favour of granting a stay. As to that, the primary consideration as far as Reichhold is concerned is that it should receive such compensation as it is entitled to for whatever loss it has suffered as quickly as possible and with the minimum of
g      inconvenience and expense. No other factor has been suggested. In particular it is worth emphasising that Mr McCaughran did not seek to argue that Reichhold had some legitimate reason, over and above obtaining compensation, for pursuing Goldman Sachs rather than Jotun. As far as Goldman Sachs and Jotun are concerned, the interests of justice require that
h      they should have a full and proper opportunity to meet the claims against them, also at a minimum of inconvenience and expense and, in the case of Jotun, in the agreed forum. If Reichhold wishes to pursue a claim against Jotun at all, then, for the reasons I have given, all these ends are in my judgment most likely to be achieved if the arbitration takes priority. Of
j      course one cannot be absolutely certain of that because whichever claim is pursued first there is the possibility that Reichhold will wish to pursue the other if it is not wholly successful in the first, but I have to decide this application on the basis of the evidence before me making the best assessment I can of the likely outcome. Against all that very little has been put forward by way of counter-argument. It is very striking that Reichhold



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

has not sought to support its case for allowing these proceedings to continue by putting forward any reasoned grounds as to the practical advantages of pursuing the action here in advance of the arbitration, nor has it sought to suggest that it would suffer any prejudice if the action were stayed other than a relatively brief delay which could be adequately compensated by an award of interest. The risks which attend litigation everywhere are not said to be greater in Norway than England; if anything the difficulties attaching to the claim against Goldman Sachs here are greater than those which affect the claim against Jotun. In these circumstances I have reached the conclusion that the right course in this case is to stay these proceedings pending the final determination of the arbitration in Norway.'

In challenging that judgment Mr Christopher Carr QC, for Reichhold, accepts that the court has a very wide discretion to grant a stay. He does not challenge, as I understand, the existence of a power to make an order such as the judge did. But he submitted with considerable vigour that it was a power which could never properly be exercised in a case such as this. His argument proceeded by a number of steps. First, he said, this is not a case in which the plaintiffs' suit in this country can be stigmatised as abusive, oppressive, or in any way vexatious or brought in bad faith. That is accepted; Mr Pollock makes no contrary submission. Secondly, Mr Carr submitted that there is no reported case before the present in which a judge has made an order precisely analogous with the order which the judge made here. That also is accepted. Mr Pollock accepts that the present order represents an advance on previous precedents. Thirdly, and most importantly, Mr Carr submitted that the judge's order violated a fundamental principle that a plaintiff making a bona fide claim, not tainted with abuse, oppression or any vexatious quality, may sue in the English court any defendant over whom the court has jurisdiction. He submitted that the court has no role to decide whom a plaintiff may or may not sue here or, as he put it, a plaintiff does not have to obtain a passport from the court to sue a defendant in this country over whom the court has jurisdiction.

In support of these submissions Mr Carr relied, in particular, on two citations from authority. He relied, first, on *Abraham v Thompson* [1997] 4 All ER 362 at 374 per Potter LJ:

'In my view, the starting point in any case where a stay is sought in circumstances which are not provided for by statute or rules of court, should be the fundamental principle that in this country an individual (who is not under a disability, a bankrupt or a vexatious litigant) is entitled to untrammelled access to a court of first instance in respect of a bona fide claim based on a properly pleaded cause of action, subject only to the sanction or consideration that he is in peril of an adverse costs order if he is unsuccessful, in respect of which the opposing party may resort to the usual remedies of execution and/or bankruptcy if such order is not complied with. This principle is of course subject to the further proviso that, if the court is satisfied that the action is not properly constituted or pleaded, or is not brought bona fide in the sense of being vexatious, oppressive or otherwise an abuse of process then the court may dismiss the action or impose a stay whether under the specific provisions of the rules of court or the inherent jurisdiction of the court.'



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

*a*  Our attention was also drawn to a passage in the judgment of Millett LJ (at 377).
    Secondly, Mr Carr drew our attention to *Molnlycke AB v Procter & Gamble Ltd*
    [1992] 4 All ER 47 at 58, [1992] 1 WLR 1112 at 1124, where Dillon LJ, in a
    judgment with which the other members of the court agreed, said:

*b*      'It is long-established that a plaintiff who has been injured by a number of
        joint tortfeasors can choose which he will sue. He does not have to sue all
        of them. But the defendants have no right whatsoever to dictate which the
        plaintiff shall sue or to make the choice for him.'

    In argument Mr Carr also placed reliance on the current doctrines governing
    cases on lis alibi pendens and forum non conveniens, both of which, he
    submitted, depended on showing disadvantage to the defendant from suit in this
*c*  jurisdiction.
    In resisting Mr Carr's argument, Mr Pollock took issue not so much with the
    general thrust of the argument as with the absolute nature in which it was
    expressed. Thus Mr Pollock did not assert that a plaintiff had to obtain a passport
    from the court in order to sue a particular defendant, and he pointed out that the
*d*  judge had never lent support to any such statement of principle. But Mr Pollock
    did assert that forensic practice was changing and developing and that the
    movement was very clearly towards greater control by the courts over the course
    of proceedings. The Court of Appeal should, he argued, be very slow to interfere
    with procedural directions of a judge unless those directions were vitiated by
    error of law or manifest error, neither of which were demonstrable here.
*e*  Mr Pollock placed reliance on *Ashmore v Corp of Lloyd's* [1992] 4 All ER 486, [1992]
    1 WLR 446, and in particular to strong statements of principle by Lord Roskill and
    Lord Templeman, both of them emphasising the extent to which it was now
    accepted that judges should manage the proceedings before them. Observations
    to a similar effect in *Thermawear Ltd v Linton* [1995] CA Transcript 1175 were
*f*  referred to.
    With reference to *Abraham's* case, Mr Pollock submitted that the observations
    of Potter LJ were somewhat wider than could be justified if account was taken of
    the various circumstances in which the court would restrain the conduct of
    proceedings before it. It is, however, plain that that decision was obviously
    correct since what the defendant was trying to do was to obtain security for costs
*g*  against a plaintiff in a manner for which the Rules of the Supreme Court which
    govern applications for security make no provision at all. Had a stay been
    granted pending the provision of security by the third party in that case, and had
    security not been provided, the effect would have been to stifle proceedings in
    this country effectively for ever. That, Mr Pollock submits, is not the case here.
*h*  With reference to the *Molnlycke* case, Mr Pollock pointed out that the question
    was whether the plaintiff should be allowed to pursue a German company in the
    United Kingdom in addition to American and British companies which it was
    already suing. It was in that case a once and for all decision, and the principle as
    already quoted was that the court would not tell a plaintiff whom he might sue.
*j*  Mr Pollock, however, suggested that in this case the court was not seeking to do
    so. There was no question of precluding Reichhold from suing Goldman Sachs.
    All that had happened was that the judge had delayed the action for a period
    estimated to be about a year.
    In seeking to justify the making of the present application and the order made
    by the judge, Mr Pollock posed a series of examples. Supposing, he said,



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΟΤΟΚΟΛΛΗΤΗΣ

Reichhold issued proceedings in England against Jotun and separately against
Goldman Sachs; the court could order that the action against Goldman Sachs
should await the outcome of the proceedings against Jotun. Similarly, he said,
suppose Reichhold gave notice of arbitration against Jotun in England pursuant
to an English arbitration clause and also sued Goldman Sachs in court
proceedings, in that case also, he suggested, the court could order that the action
against Goldman Sachs should await the outcome of the arbitration reference
against Jotun. He did not submit that in either of those cases the court would
necessarily make that order, but only that on appropriate facts it properly could.
If those propositions were correct, then he posed the bull question: what
difference does it make in principle that the arbitration is in Norway instead of
this country? Mr Pollock contrasted the effect of the judge's order in this case
with an order staying actions on grounds of lis alibi pendens or forum non
conveniens. In those cases the stay would in all probability be permanent and the
plaintiff would be driven from the judgment seat. That was not, he argued, the
case here. Reichhold's claim against Goldman Sachs remains alive and well, but
delayed for a year to await the outcome of the arbitration in Norway and in the
expectation (on the part of the judge) that the action might then not be effective
at all.

I would for my part accept the submissions made by Mr Pollock, subject to all
the qualifications which were inherent in them. Mr Carr went on to submit that
to uphold the judge's order would open the door to a flood of applications, some
successful and some unsuccessful, would involve the court in trying to adjudicate
on matters which were barely justiciable, would introduce a new dimension of
uncertainty and would give a charter to evasive and manipulative defendants.
He suggested that the court would run a risk, if it made such orders, of infringing
art 6 of the European Convention on Human Rights (Convention for the
Protection of Human Rights and Fundamental Freedoms (Rome, 4 November
1950; TS 71 (1953); Cmd 8969). In reliance on all these matters he suggested that
the court should draw back from taking the first and fatal step.

Mr Pollock did not suggest that this would be the only such application of its
kind if the judge's order were upheld, and he would have had difficulty making
such a submission since another application has already been successfully made.
He did, however, suggest that the court was well able to control its own business,
and he accepted that the grant of stays such as this would be a rarity, account
always being taken of the legitimate interests of plaintiffs and the requirement
that there should be no prejudice to plaintiffs beyond that which the interests of
justice were thought to justify. It is plain that in exercising this jurisdiction the
court would have to be mindful of the effect of art 6.

I for my part recognise fully the risks to which Mr Carr draws attention, but I
have no doubt that judges (not least commercial judges) will be alive to these
risks. It will very soon become clear that stays are only granted in cases of this
kind in rare and compelling circumstances. Should the upholding of the judge's
order lead to the making of unmeritorious applications, then I am confident that
judges will know how to react.

It remains to consider the judge's exercise of his discretion here. I have
endeavoured to summarise his judgment fully, without quoting all of it verbatim.
It is in my judgment evident that he assessed and evaluated the factors which he
was called upon to consider. Although it is suggested in Reichhold's skeleton
argument that the judge misdirected himself in approaching the various factors



ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ

*a*  which he had to consider, I for my part am persuaded that he left nothing out of account, took account of nothing of which he should not have taken account, and gave a fair and judicious summary of all the matters properly to be considered. I find no misdirection of law. This was, therefore, a decision within the discretion of the judge, not vitiated by misdirection or manifest error. I would dismiss the appeal.

*b*  **OTTON LJ.** I agree.

**ROBERT WALKER LJ.** I also agree.

*Appeal dismissed. Permission to appeal refused.*

*c*

Kate O'Hanlon   Barrister.

*d*

*e*

*f*

*g*

*h*

*j*

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΑΝΩΤΕΡΗ ΠΡΩΤΟΚΟΛΛΗΤΗΣ