# Exhibit 6

*To the Honorable Judge of the Court of First Instance – Exequatur Chamber – Paris Judicial Court*

----------------------------------------------------------------------------------------

RG no. 24/03275
Notified by the Virtual Private Network for Lawyers (RPVA) on March 24, 2025

## INTERLOCUTORY PLEADINGS NO. 2

FOR:

The **Argentine Republic**, represented by Procuración del Tesoro de la Nación Argentina, Posadas 1641, C1112ADC Buenos Aires, Argentine Republic

**Defendant**

Attorneys:
Emeriane Avocats, Attorneys
at the Paris Bar, 22 rue de la
Paix - 75002 Paris
Tel.: 06 19 91 67 54 - Toque: E2194
Represented in court by Maître Nicolas DEGARDIN

AGAINST:

(1) **Petersen Energía Inversora S.A.U.**,

(2.) **Petersen Energía S.A.U.**,

(3.) **Eton Park Capital Management, L.P.**, (4.) **Eton Park Master Fund, Ltd,**

(5.) **Eton Park Fund L.P.**, **Claimants**

Attorneys:
SELAS Archipel Avocats,
Attorneys at the Paris Bar
92 rue Jouffroy d'Abbans - 75017 Paris
Tel.: 01 40 54 51 00 - Fax: 01 40 54 51 01 - Toque: P122
Represented in court by Maîtres Jacques-Alexandre Genet

1

## MAY IT PLEASE THE PROCEDURAL JUDGE

1.     On February 29, 2024, Petersen Energía Inversora SAU, Petersen Energía SAU, Eton Park Capital Management, L.P., Eton Park Fund, L.P., and Eton Park Master Fund Ltd. (the "**Claimants**") applied to the Tribunal Judiciaire de Paris for an exequatur for the decisions of the United States District Court for the Southern District of New York of March 31 and September 8, 2023, and the final judgment of September 15, 2023.

2.     These rulings and the final judgment ordered the Argentine Republic to pay the Claimants a staggering USD 16.1 billion in compensation for damages suffered as a result of the expropriation of a 51% stake in the Argentine oil company YPF ("YPF"), represented by Class D shares owned by Repsol.

3.     Essentially, the Claimants (who were minority shareholders in YPF when the expropriation proceedings were authorized by the Argentine Congress in 2012, but were no longer minority shareholders when the proceedings concluded in 2014) argued that the expropriation of Repsol's interest in YPF had indirectly caused them loss. According to the Claimants, since YPF's articles of association stipulate that a public offer must be made for all of the company's shares in the event of a takeover, the Argentine Republic could not limit the expropriation to Repsol's 51% stake in YPF without breaching YPF's bylaws. The Argentine Republic firmly contests this position in its appeal of the aforementioned decisions and judgment, currently pending before the U.S. courts.

4.     The existence of this appeal procedure warrants a stay of proceedings in the present case. In any case, however, the exequatur request submitted to the court is inadmissible since the Argentine Republic is entitled to invoke its immunity from jurisdiction.

5.     According to the principles of customary international law, foreign states are immune from jurisdiction when the act that gives rise to the dispute is, by its nature or purpose, an exercise of these states' sovereignty and is therefore not an act of management.

6.     However, the decision to expropriate only the 51% stake held by the majority shareholder (and therefore the decision not to expropriate or otherwise acquire the remaining 49%) is clear in its nature and purpose as an exercise of the sovereignty of the Argentine Republic.

7.     Firstly, the act of expropriation is, by definition, an act by which the state seizes ownership of property considered to be in the public interest by exercising prerogatives of public authority that are outside the scope of ordinary law.

8.     Secondly, Repsol's expropriation was considered necessary to address the depletion of oil and gas reserves, solve Argentina's energy deficit (which was putting a strain on public finances), and guarantee the country's energy independence.

9.      Consequently, since the dispute involves an act that falls under Argentina's sovereignty, the Argentine Republic's immunity from jurisdiction precludes the application for exequatur from being admissible.

10.      For all intents and purposes, the Argentine Republic sets out the facts as presented by the Claimants and formally contests all of their claims. In other words, any alleged facts that are not expressly disputed or corrected in the subsequent developments are not considered admitted. Rather, any submission that is not expressly admitted is considered disputed.

# Table of contents

I.     **FACTS** ......................................................................................................................**5**

  A.   **The parties** ...................................................................................................**5**

     1)   The Argentine Republic ....................................................................... 5

     2)   The Claimants .................................................................................... 6

  B.   **Relevant elements of the underlying litigation** ............................................**9**

     1)   The creation and privatization of the state-owned enterprise YPF................................... 9

     2)   The Claimants' acquisition of shares in YPF ................................................. 10

     3)   Falling oil and gas production, declining reserves and threats to Argentina's energy sovereignty and independence ............................................................... 10

     4)   The Law on Public Utility and the Expropriation of 51% of YPF's share capital........12

     5)   Petersen and Eton Park's loss of shareholder status........................................ 13

     6)   Compensation for Repsol and completion of the expropriation....................... 14

  C.   **Proceedings filed by the Claimants before the U.S. courts** ..................... **15**

  D.   **The U.S. court rulings** ................................................................................**16**

  E.   **Appeal proceedings and attempts at enforcement** .................................... **17**

     1)   Appeal filed by Argentina .................................................................. 17

     2)   Denial of a stay of enforcement........................................................... 19

     3)   Subsequent proceedings in the United States ........................................... 19

     4)   Enforcement procedures in other jurisdictions........................................... 20

II.    **DISCUSSION** .........................................................................................**21**

  A.   **Regarding the motion to stay proceedings** ................................................ **21**

     1)   In law, the judge has sovereign power .................................................... 21

     2)   In fact, the stay of proceedings is justified ............................................... 22

  B.   **In any event, regarding the inadmissibility of the requests for exequatur based on the jurisdictional immunity granted to the Argentine Republic**.................................**26**

     1)   In law, immunity from jurisdiction........................................................ 26

     2)   In fact, the Argentine Republic is entitled to rely on its immunity from jurisdiction....34

I.   <u>FACTS</u>

A.  **The Parties**

1)  <u>The Argentine Republic</u>

11.    Argentina is a sovereign Latin American nation, a federal constitutional republic (the "**Argentine Republic**" or "**Argentina**"). The Argentine Constitution, first enacted in 1853[1], establishes a tripartite system of government divided into an executive branch headed by the president, a legislative branch composed of a two-chamber Congress (the Senate and the Chamber of Deputies), and a judicial branch headed by the Supreme Court of Justice of the Nation.

12.    Argentina has the twenty-fifth largest economy in the world and the third largest in Latin America[2]. Over the past two decades, Argentina has experienced several periods of economic crisis.

13.    From 1998 to 2002, Argentina suffered a severe economic, political, and social crisis marked by a persistent recession, dramatic increases in unemployment and poverty, and an inability to access international financial markets.

14.    The Argentine Republic found itself "bankrupt" due to a decline in its trade balance caused by falling export prices, rising international interest rates, and falling tax revenues resulting from the recession.

15.    Following a strong rebound from 2003 to 2007, the economy was hit hard by the 2008 global financial crisis.

16.    More recently, in 2020, the Covid-19 pandemic further complicated Argentina's economic situation. In 2023, Argentina was hit by a new crisis, which resulted in a recession (-1.6% growth), the highest inflation rate since the hyperinflation episode ended in 1991 (211%), an imbalance in public finances, a depletion of foreign exchange reserves, and a collapse of the peso.

17.    A devaluation of 22% took place in August 2023, followed by another of 54% in December 2023. In 2023, Argentina's tax revenues amounted to 31,116 billion Argentine pesos[3].

18.    In January 2024, Argentina negotiated the reinstatement of its program with the IMF. On June 13, 2024, the IMF Executive Board concluded the eighth review of the 2022 Extended Credit Facility. This resulted in a disbursement of USD 800 million to support the government's efforts to reduce inflation, rebuild fiscal and external buffers, and

---

[1] Last revised in 1994. **Exhibit 1:** Argentine Constitution.

[2] https://www.diplomatie.gouv.fr/fr/dossiers-pays/argentine/presentation-de-l-argentine/.

[3] **Exhibit 2:** Excerpt from the 2024 Annual Report of the Argentine Republic filed with the U.S. Securities and Exchange Commission, page D-108.

promote economic recovery[4]. By June 30, 2024, the IMF had disbursed USD 5.5 billion to Argentina under the[5] Extended Fund Facility.

19.     In March 2025, through Decree 179/2025, the Argentine government authorized the conclusion of a new agreement with the IMF under the Extended Credit Facility program. This agreement is intended to obtain funds to settle part of the National Treasury's debts to the Central Bank of Argentina, as well as to settle public credit operations entered into with the IMF under the 2022 Extended Credit Facility program. These operations are coming due within four years of the agreement's conclusion.The new agreement is in line with the government's commitment to fiscal balance and macroeconomic stabilization[6].

20.     From 2024 to 2025, Argentina implemented drastic measures to reduce structural imbalances and the budget deficit.

21.     The Claimants' assertion that Argentina is a recalcitrant debtor is misleading[7].

22.     Argentina defends itself against vulture funds that try to take advantage of certain countries' economic difficulties to make a purely speculative profit using the legal means at its disposal.

23.     This was the case with NML Capital, a fund managed by Elliott Management. In the 2000s, Argentina was widely known to lack the financial capacity to meet its debt obligations. The vulture fund then bought Argentine sovereign debt on financial markets at a discount. NML Capital refused to participate in the country's debt restructuring with the other creditors and sought repayment of the bonds purchased at a price four times lower, plus interest on arrears[8].

### 2)   The Claimants

#### a.   The Claimants appearing in person

24.     Petersen Energía Inversora SAU and Petersen Energía SAU are two subsidiaries of the Petersen Group. These two entities are registered in Spain solely to hold the Group's interest in YPF (the "**Petersen Entities**" or "**Petersen**"). They are now in receivership in Spain. The group's ultimate beneficial owners are the Eskenazi family (all residents of Argentina).

---

4 **Exhibit 2:** Excerpt from the 2024 Annual Report of the Argentine Republic filed with the U.S. Securities and Exchange Commission, page D-13.

5 **Exhibit 2:** Excerpt from the 2024 Annual Report of the Argentine Republic filed with the U.S. Securities and Exchange Commission, page D-13.

6 https://www.boletinoficial.gob.ar/detalleAviso/primera/322325/20250311.

7 In recent decisions ruling on sovereign bond redemption claims, U.S. courts have recognized that Argentina is no longer a recalcitrant debtor **(Exhibit 23**: Decisions of the United States Court of Appeals for the Second Circuit of October 4, 2019 (Bison Bee LLC v. Republic of Argentina) and March 17, 2020 (Bugliotti v. Republic of Argentina) and unofficial translation of excerpts.

8    https://www.lemonde.fr/paradise-papers/article/2018/04/10/elliott-management-le-fonds-speculatif-qui-a-fait-payer-le-congo-brazzaville_5283333_5209585.html.

25.     Eton Park Capital Management, L.P. was a New York-based hedge fund manager that invested in YPF via two investment funds: Eton Park Fund L.P, located in the state of Delaware and Eton Park Master Fund, Ltd located in the Cayman Islands (together the "**Eton Park Entities**" or "**Eton Park**"). Eton Park ceased operations in 2017 due to poor performance[9].

*b.   The actual claimant: Burford Capital Limited*

26.     In fact, behind these entities, which are formally the Claimants in the proceedings, lies the true claimant: Burford Capital Limited ("**Burford**").

27.     This investment fund specializes in financing legal proceedings and collection procedures. This type of fund either buys out disputed claims or advances the necessary funds to cover claimants' costs and expenses during proceedings. In exchange for this funding, these entities receive a large portion of the penalties imposed and/or the sums recovered. Their goal is to generate a profit equal to the difference between the sums obtained and the financing provided.

28.     These funds are referred to as vulture funds when they target companies or states in difficult situations[10].

29.     Regardless of what the Claimants may assert, Burford is indeed the party whose economic interests are preponderant in this case and is conducting the litigation, even though it is not formally a party to the proceedings.

30.     Burford's interests are in fact highly significant. Burford was initially entitled to 70% of the proceeds from prosecuting Petersen's claims and approximately 75% of the proceeds from prosecuting Eton Park's[11] action. More recently, in its Q3 2024 earnings report, Burford noted that: "*Burford's net entitlement is around 35% of proceeds from the Petersen case and around 73% of proceeds from the Eton Park case, or in the aggregate around 40% of the total*"[12].

31.     This means he can look forward to a considerable gain: "*Burford Capital's stake in the USD 16 billion that a New York judge ordered Argentina to pay for expropriating the oil company YPF S.A in 2012 amounts to approximately USD 6.2 billion. This would give the litigation financier a return on investment of over 37,000%*"[13].

---

9 **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §43 and **Exhibit 4:** New York Times article, March 23, 2017.

10 This is the position of the French Treasury in this case: "*A 'vulture fund' obtains a judgment for the nationalization of YPF in New York. On July 11, the vulture fund Burford Capital obtained a ruling on the nationalization of the YPF oil company in the U.S. District Court for the Southern District of New York.*" **Exhibit 5**: South Cone economic and financial news update for the week of July 6-12, 2018 from the French Embassy in Argentina.

11 **Exhibit 3:** Plaintiffs' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §§ 101 and 103.

12 **Exhibit 6:** Transcript of Burford Capital's Q3 results conference held on November 7, 2024, p. 10, emphasis added.

13 **Exhibit 7:** Burford targets 37,000% return on USD 16 billion damages awarded against Argentina, Buenos Aires Times, September 11, 2023.

32.     Burford's involvement goes beyond financial interest; they steer the litigation and decide on the strategy to follow. During the Q3 2024 financial results conference call held on November 7, 2024 - Burford explained its position and strategy in the matter.

33.     The terms used show that Burford is the claimant and that it considers itself to be Argentina's adversary in this case:

> "*We understand that there's a lot of shareholder interest in the YPF case. That's obvious given its size and its significance for the business. <u>And we know that investors find it frustrating not to be able to get chapter and verse from us about our strategies and their progress.</u> Unfortunately, that is simply the reality of conflict litigation. And none of you, <u>no rational investor, would want us to disclose publicly any information that would give Argentina an edge in that ongoing litigation.</u>*"[14].

> "*The second bucket of activity is around enforcement and recognition proceedings. Because Argentina didn't satisfy the conditions for a stay of the judgment, the trial court judgment is enforceable even though it is on appeal. This allows us to do several things. <u>We</u> are pursuing post-judgment discovery from Argentina, YPF and the third parties in the New York Court, and <u>we</u> have been doing that actively, including engaging in motions to compel information where necessary. <u>We're</u> also seeking substantive enforcement assistance from the New York Court.*

> *For example, <u>we</u> have filed a motion seeking to have Argentina's shares in YPF turned over to us. <u>We're</u> also engaged in global efforts. In order to enforce the judgment in other jurisdictions, we need first to have the local courts in those jurisdictions recognize the judgment. In other words, adopt it as though it was their own judgment <u>We</u> have filed for recognition of the judgment in multiple non-U.S. jurisdictions, and those proceedings are winding their way through the procedural preliminaries in those local courts*"[15].

34.     This communication also makes it clear that Burford defined and implemented a form of multi-jurisdictional judicial harassment. The strategy involves launching multiple proceedings (some of which Burford knows will fail) in several jurisdictions. The aim is to exert sufficient pressure on the opponent to force them to negotiate rather than continue to defend themselves in all these proceedings.

35.     Burford explains: "*the purpose of our strategy is more about bringing Argentina to the table than it is about actually seizing and selling off assets*"[16] or, in more detaile " *Now, stepping back from the lawyering, it's important to bear in mind what enforcement is and isn't and its purpose. <u>The goal of enforcement campaigns is to apply pressure and create friction</u> so that a rational negotiation can occur It is not in and of itself the goal to wander around the countryside,*

---

14 **Exhibit 6:** Transcript of Burford Capital's Q3 results conference held on November 7, 2024, p. 7, emphasis added.
15 **Exhibit 6:** Transcript of Burford Capital's Q3 results conference held on November 7, 2024, p. 8, emphasis added.
16 **Exhibit 6:** Transcript of Burford Capital's Q3 results conference held on November 7, 2024, p. 10, emphasis added.

*trying to pick up an asset here and an asset there and sell them at auction to pay off an enormous judgment. The law around enforcing judgments against sovereigns is complex and often unclear, and we will try many gambits that won't work as a strictly legal matter. That should not concern anyone"*[17].

36.     Burford explains their strategy and the leverage they are trying to use. Argentina's need to access international markets in order to borrow money and finance its economy: "*However, what is really going on here is that, Argentina is rebuilding its economy and resuming its place on the world stage. And to do that, it needs to rejoin the capital markets and participate in the global economy. Having a large unsatisfied U.S. court judgment and ongoing enforcement proceedings around the world that also sweep in third parties is sand in the gears for that normalization process. And it should, in our view, ultimately lead to a commercial resolution. Put simply, we are a nagging problem that Argentina needs to solve*"[18].

37.     This highlights what is at stake for the real claimant in this case and what guides their entire strategy: the profitability and return on investment of speculatively investing in disputed receivables.

### B. Relevant elements of the underlying litigation

38.     The case concerns Argentina's decision to expropriate 51% of YPF's share capital, represented by YPF Class D shares, which are held by the Spanish company Repsol. Two minority shareholders of Repsol claim that they were harmed by this expropriation because the Argentine Republic did not launch a public offer for the remaining 49% of the capital.

### 1)  The creation and privatization of the state-owned enterprise YPF

39.     In 1922, the Argentine Republic established YPF, a state-owned energy company, to ensure a national energy supply.

40.     In 1993, the Argentine Republic privatized YPF through an initial public offering (IPO) of Class D shares on the Buenos Aires Stock Exchange. American Depositary Shares (ADS) representing YPF Class D shares are listed on the New York Stock Exchange and are evidenced by American Depository Receipts (ADR)[19]. YPF is an Argentinean joint-stock company that is headquartered in Argentina and is governed by Argentinean law.

41.     The prospectus for YPF's initial public offering of ADSs in the United States in 1993 confirmed that the company's bylaws were governed by Argentine law. It informed investors that

---

[17] **Exhibit 6:** Transcript of Burford Capital's Q3 results conference held on November 7, 2024, p. 8, emphasis added.
[18] **Exhibit 6:** Transcript of Burford Capital's Q3 results conference held on November 7, 2024, p. 8, emphasis added.
[19] ADSs are financial instruments that enable foreign companies to access the U.S. stock market. An American custodian bank issues the ADSs and holds the underlying shares in their country of origin. Depending on the terms of the ADR program, an ADS can represent a fraction of a foreign share, a complete share, or several shares.

"*[t]he bylaws are governed by Argentine law and any action relating to their application or a shareholder's rights under them must be brought before an Argentine court*"[20].

42.    The Argentine Republic has neither waived its sovereign immunity nor consented to the jurisdiction of the U.S. courts for disputes arising from YPF's bylaws.

43.    YPF was a strategic oil company. It was the market leader for fuels in Argentina and managed 67% of the country's hydrocarbon production. YPF also controlled 52% of Argentina's refining capacity and had a network of 1,600 service stations.

### 2)    The Claimants' acquisition of shares in YPF

44.    At the end of 2001, eight years after its IPO, Spanish oil company Repsol S.A. had acquired over 99% of YPF's share capital. In the years that followed, Repsol sold part of its stake while remaining the controlling shareholder.

45.    From 2008 to 2011, the Petersen Group acquired a 25% stake in YPF from Repsol through two special purpose vehicles established in Spain in order to hold the shares[21]. The Petersen Group did not commit any significant resources of its own to these acquisitions, which were financed by loans granted by Repsol and banks.

46.    Repsol and the banks agreed that the loans granted to the Petersen entities would be repaid using future YPF dividends[22]. Repsol undertook the following: (i) to maintain control of YPF; (ii) to vote in favor of distributing 90% of YPF's profits as dividends each year; and (iii) to vote in favor of paying an exceptional dividend of USD 850 million[23].

47.    From late 2010 to March 2012, Eton Park acquired nearly 3% of YPF's capital, primarily from Repsol, via investment vehicles in the Cayman Islands and Delaware.

### 3)    Falling oil and gas production, declining reserves and threats to Argentina's energy sovereignty and independence

48.    From 2002 to 2011, Argentina's energy production and reserves steadily declined.

49.    From 2001 to 2011, YPF's annual oil production decreased by 41.2%, while production by other oil producers in Argentina fell by only 13.8%. During the same period, YPF's annual natural gas production also fell by 23.8%, while other

---

[20] **Exhibit 8:** Excerpt from the prospectus filed with the U.S. Securities and Exchange Commission in 1993.
[21] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §24.
[22] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §§ 32 and 35.
[23] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §32.

while other natural gas producers in Argentina saw their production increase by 2.3% during this period[24].

50.     Overall, YPF's average net daily crude oil production fell by 38% between 2001 and 2011, and its net daily natural gas production fell by 43% between 2004 and 2011.[25]

51.     At the time, the government criticized management at YPF, controlled by Repsol, blaming it for not increasing production in Argentina sufficiently[26].

52.     YPF's underinvestment in oil and gas production was a direct result of Repsol's decision to distribute at least 90% of YPF's profits each year in dividends as part of the agreement with Petersen, rather than reinvesting them in the company's development[27].

53.     In 2008, 2009 and 2011, YPF paid out more in dividends than its total net income for each year. In 2008, YPF's dividends amounted to nearly 250% of its profits that year[28]. These decisions were made solely to benefit shareholders, at the expense of YPF and Argentina's energy production.

54.     According to the press at the time, Argentina was "*the only country in the region where oil and gas production had declined*," due to YPF's "*four worrying trends: declining reserves, increasing debt, disproportionate dividend payments relative to income, and a reduction in net worth*", so much so that the company was predicted to "*deplete its oil reserves in five years*"[29].

55.     These decisions undermined Argentina's energy independence. In 2010, for the first time in decades, Argentina had to import oil to meet domestic demand[30]. In 2011, Argentina found itself facing an energy deficit, importing more energy than it exported[31].

56.     Overall, in 2011, Argentina's energy bill had "*risen by 110% in just a few years, to USD 9.4 billion*"[32].

---

[24] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the American proceedings - Dkt 393 - §§ 48 and 49.

[25] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §50.

[26] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the American proceedings - Dkt 393 - §§ 51- 52.

[27] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - § 32.

[28] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §53.

[29] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §58.

[30] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §56.

[31] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §57.

[32] **Exhibit 12:** *Le Figaro* article, "Argentina seeks to ensure its energy independence" (*L'Argentine veut assurer son indépendance énergétique*), April 17, 2012.

57.    On the grounds that YPF had failed to make the investments it was obliged to make, several Argentine provinces decided to withdraw YPF's hydrocarbon concessions in 2012[33].

58.    Ultimately, Repsol's management of YPF resulted in underinvestment in oil production, which reduced the country's production capacity and made it necessary to import oil. This worsened the country's trade and energy deficits.

4)    The Law on Public Utility and the Expropriation of 51% of YPF's share capital

59.    On April 16, 2012, Argentina's president submitted a bill to Congress addressing, among other topics, the country's hydrocarbon policy. The bill proposed that 51% of YPF's capital, represented by class D shares held by Repsol, be declared in the public interest and therefore expropriated.

60.    As in France, the government in Argentina can expropriate property if it is in the public interest. According to the Argentine Constitution and the general law on expropriation[34] ("**General Expropriation Act**"), the Argentine Congress has the power to authorize the expropriation of property for public use, provided that compensation is paid.

61.    The president of Argentina issued a decree appointing a temporary "intervener", a special ad hoc representative with the power to assume the duties of YPF's board of directors[35] (the "**Intervention Decree**").

62.    As detailed in the Decree of Intervention, the Argentine government explained the strategic, economic, and social considerations that led to this decision (see below §§ 200 - 208) along with the main intended goals: protecting energy sovereignty and correcting the excesses attributed to previous private management. It was noted in particular that "*the worsening of [Repsol's] strategy, which consisted of practically dismantling the company,*" demonstrated that "*the interests of the majority shareholder differed from those of the Argentine Republic*" and "*compromised the country's energy sovereignty*"[36].

63.    On May 3, 2012, after debating various options, the Argentine Congress passed the law to expropriate YPF[37], which came into force on May 7, 2012 (the "**Public Utility and Expropriation Act"**).

64.    With the aim of ensuring Argentina's energy independence and eliminating its deficit, the Public Utility and Expropriation Act declared (i) that "*self-sufficiency in hydrocarbon supplies*" was "*in the national public interest and a priority for the Argentine Republic*" and (ii) that "*fifty-one percent (51%) of the capital of YPF Sociedad Anónima, represented by the same percentage of Class D shares of said company, held by Repsol*" was "*of public interest and subject to*

---

[33] **Exhibit 10:** Argentine Decree no. 530/2012 of April 16, 2012.
[34] **Exhibit 9:** Argentine Law no. 21,499 of January 17, 1977.
[35] **Exhibit 10:** Argentine Decree no. 530/2012 of April 16, 2012.
[36] **Exhibit 10:** Argentine Decree no. 530/2012 of April 16, 2012.
[37] **Exhibit 11:** Argentine Law no. 26,741 of May 3, 2012.

*expropriation*"[38]. The Public Utility and Expropriation Act also stipulated that YPF would continue to operate as a private, listed company[39].

65.     The French press covered these events: "*Argentina seeks to ensure its energy independence - Buenos Aires hopes to resolve its energy deficit by nationalizing YPF, an oil group owned by Spain's Repsol since the 1990s. According to the text sent to the Senate, the expropriated holdings will be divided between the state (26.01%) and ten of the country's provinces (24.99%). The rest of YPF's capital is expected to remain unchanged. This includes the 17% held by private investors and the 25.4% held by the Argentinian Petersen group. Under this plan, Repsol will hold only 6.4% of the capital, compared with 57% today*"[40].

66.     The Public Utility and Expropriation Act granted the Argentine Republic two years to resolve the expropriation through an agreement[41]. The Act also stipulated that the state would assume Repsol's rights to the expropriated shares through a process known as "temporary occupation" for the duration of the expropriation proceedings.[42].

67.     On May 8, 2012, the National Securities Commission (Comisión Nacional de Valores) called a general meeting of YPF in accordance with Article 13 of the Public Utility and Expropriation Act. At the general meeting on June 4, 2012, Argentina exercised the rights attached to the shares to be expropriated[43]. Neither Petersen nor Eton Park attended this general meeting, nor did they object to Argentina exercising the voting rights attached to the 51% stake.[44].

### 5)   Petersen and Eton Park's loss of shareholder status

68.     In the absence of dividends, the Petersen entities defaulted on the loans in 2012, and their YPF shares were transferred to Repsol and the lending banks[45].

69.     On October 23, 2012, the Petersen entities were declared insolvent, and bankruptcy proceedings were initiated in Spain[46].

70.     Between July 2012 and June 2013, Eton Park sold its entire stake in YPF[47].

---

38 **Exhibit 11:** Argentine Law no. 26,741 of May 3, 2012, arts. 1 and 7.
39 **Exhibit 11:** Argentine Law no. 26,741 of May 3, 2012, art. 15.
40 **Exhibit 12:** *Le Figaro* article, "Argentina seeks to ensure its energy independence" (*L'Argentine veut assurer son indépendance énergétique*), April 17, 2012. Emphasis added.
41 **Exhibit 11:** Argentine Law no. 26,741 of May 3, 2012, art. 11 and **Exhibit 9:** Argentine Law No. 21,499 of January 17, 1977, art. 33.
42 **Exhibit 11:** Argentine Law no. 26,741 of May 3, 2012, art. 13 and **Exhibit 9:** Argentine Law No. 21,499 of January 17, 1977, arts. 57 and 59.
43 **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the American proceedings - Dkt 393 - §§ 73 and 74.
44 **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §79.
45 **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the American proceedings - Dkt 393 - §§84-88.
46 **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §90.
47 **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §91.

6) <u>Compensation for Repsol and completion of the expropriation</u>

71.    Repsol has initiated numerous legal proceedings in Argentine, Spanish, and American courts. The company has also filed an investment arbitration case based on the bilateral investment treaty between Spain and Argentina.[48]

72.    Third parties, including other minority shareholders, have started legal proceedings in Argentine courts. Two minority shareholders argued in Argentine courts that the country should have made an offer to acquire YPF's remaining Class D shares after obtaining a majority stake in YPF through expropriation.[49] This claim, which was brought before the federal courts with jurisdiction over civil and commercial matters, was referred to the federal courts with jurisdiction over administrative litigation.[50]

73.    The Argentine Republic and Repsol entered into negotiations to determine the amount of compensation payable to Repsol.

74.    On February 27, 2014, the Argentine Republic and Repsol entered into a global settlement agreement ("**Global Settlement Agreement**") under which the Argentine Republic agreed to pay Repsol USD 5 billion in compensation for the expropriated shares and any claims Repsol may have against Argentina[51]. The Global Settlement Agreement stipulated that Repsol would either ensure the withdrawal of proceedings brought against Argentina by third parties or compensate the Argentine Republic if such proceedings were not withdrawn[52].

75.    The Argentine National Evaluating Court considered that the agreed valuation was "fair and reasonable" considering the objective value of the expropriated securities[53].

76.    On April 23, 2014, the Argentine Congress passed Law No. 26,932, which ratifies the Global Settlement Agreement in Article 1. It also authorized the issue of National Treasury bonds to pay the USD 5 billion to Repsol[54].

77.    The Global Settlement Agreement took effect on May 8, 2014. On that date, the Argentine Republic paid the agreed-upon compensation, and Repsol transferred ownership of the shares, thus completing the expropriation.

---

[48] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §77.
[49] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §78.
[50] **Exhibit 14:** Argentina Supreme Court ruling of August 20, 2014 in the De San Martín case.
[51] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §92. See also **Exhibit 13:** Global Settlement Agreement entered into between the Argentine Republic and Repsol on February 27, 2014 - Clause 1.
[52] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §95. See also **Exhibit 13:** Global Settlement Agreement entered into between the Argentine Republic and Repsol on February 27, 2014 - Clause 6.1.iii and Appendix VI.
[53] **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §96.
[54] **Exhibit 15:** Argentine Law no. 26,932 of April 23, 2014.

### C. Proceedings filed by the Claimants before the U.S. courts

78.    Throughout this process in Argentina, the Petitioners decided not to bring any action against the State or seek compensation for the alleged losses in Argentina.

79.    The Claimants waited for the Global Settlement Agreement to be concluded before filing proceedings before the U.S. courts.

80.    On April 8, 2015, the Petersen entities brought a lawsuit against the Argentine Republic in the United States District Court for the Southern District of New York (the "**New York District Court**") in connection with the expropriation of 51% of the share capital of YPF. The Petersen entities have claimed compensatory damages for an alleged breach of YPF's articles of association by the Argentine Republic, which they claim occurred during the expropriation of 51% of YPF's share capital represented by YPF class D shares.

81.    A month earlier, in March 2015, as part of the insolvency proceedings filed for the Petersen entities in Spain, Burford, through its subsidiary Prospect Investments LLC, paid EUR 15.101 million for the exclusive rights to pursue Petersen's claims in connection with the expropriation and to receive 70% of any amounts that might be collected[55].

82.    On September 8, 2015, the Argentine Republic motioned to dismiss the complaint, arguing, among other things, that the New York district court lacked jurisdiction under the Foreign Sovereign Immunities Act (FSIA).

83.    On September 9, 2016, the New York District Court partly upheld and partly dismissed the Argentine Republic's petition. It found that while the expropriation fell within Argentina's sovereignty, the question of whether a public offer should have been made following the expropriation fell within the exception of a "*commercial activity*"[56]. On July 10, 2018, the United States Court of Appeals for the Second Circuit upheld the decision of the New York District Court. On June 24, 2019, the U.S. Supreme Court denied the appeal for review of the case.

84.    On November 3, 2016, three years after selling their YPF shares, the Eton Park entities filed a lawsuit against the Argentine Republic in the New York District Court seeking, in the same manner as the Petersen entities, compensatory damages arising from the alleged breach of YPF's articles of incorporation by the Argentine Republic resulting from the expropriation of 51% of YPF's share capital.

---

55 **Exhibit 3:** Claimants' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §100**.** Burford has since sold 38.75% of its rights in the Petersen case to third-party investors, reducing its net share of the proceeds to approximately 35% (58% x 61.25%). **Exhibit 16:** Burford Capital article, Burford Capital statement on YPF damages ruling, September 8, 2023.

56 This decision was based on an exception to the immunity principle provided for in the FSIA (§1605(a)(2)), which covers acts of a commercial nature that occur outside the United States but have a direct effect in the United States. The New York District Court deemed that this exception could be applied because YPF's ADSs were listed on the New York Stock Exchange.

85.     On the same day, Burford, through its subsidiary Ireton LLC, purchased the right to pursue Eton Park's claims in connection with the expropriation and the right to receive 75% of the amounts recovered[57].

### D.  The U.S. court rulings

86.     On August 30, 2019, the Argentine Republic filed a motion to dismiss the claims filed by the Petersen and Eton Park entities on the grounds of *forum non conveniens*. On June 5, 2020, the New York District Court dismissed the motion. To this end, it ruled out the provisions of Argentine law according to which corporate law actions involving Argentine companies fall within the exclusive jurisdiction of Argentine courts, ruling that these provisions apply only in Argentina and not to U.S. courts.

87.     On April 14, 2022, the parties filed cross-motions for summary judgment.

88.     On March 31, 2023, the New York District Court handed down a summary judgment finding the Argentine Republic liable. A summary judgment is a legal procedure in U.S. law that allows a court to rule on a case without going through a full trial, without a hearing, and without a detailed examination of the merits of the case[58].

89.     In finding against the Argentine Republic, the New York District Court rejected all of Argentina's explanations on the operation and interpretation of Argentine law (several expert reports and hundreds of references to case law and legal opinion)[59] without citing any case law in support of its position (no Argentine court has ever ruled on a similar case).

90.     Hearings were then held from July 26 to 28, 2023 on the sole assessment of damages and the applicable interest rate. By decision dated September 8, 2023 and a final judgment dated September 15, 2023[60], the Court ordered the Argentine Republic to pay US$16.1 billion: (i) US$14.4 billion in damages to Petersen and (ii) US$1.7 billion in damages to Eton Park.

91.     The New York District Court will acknowledge that its decision involved "*questions of first impression and questions of Argentine law*"[61].

---

[57] **Exhibit 3:** Plaintiffs' replies of May 26, 2022 to the Argentine Republic's statement of facts in the U.S. proceedings - Dkt 393 - §§102-103.

[58] **Opposing Exhibit 3**.

[59] The New York District Court rejected the arguments of the Argentine Republic, which, among other things, asserted that
(i) the Plaintiffs were no longer shareholders when the Argentine Republic became the owner of the YPF shares in May 2014, (ii) under Argentine law, shareholders can only claim damages if it is impossible to perform the obligation in question in kind, (iii) damages could only be claimed under the procedures set out in Argentina's General Expropriation Law (even though other minority shareholders had followed these procedures).

[60] **Opposing Exhibits no. 4 and 5**.

[61] **Exhibit no. 17:** New York District Court decision of November 21, 2023 on application for stay of execution, emphasis added.

92.    This is an exceptional decision (i) in principle, since the American courts deny a foreign state the benefit of jurisdictional immunity, accept jurisdiction over facts that took place in Argentina, and rule primarily on questions of Argentine law (without taking into account Argentina's interpretation of its own law), and (ii) in quantum, since the sentence handed down breaks all records.

93.    The sum of US$16.1 billion represents (i) more than three times YPF's market capitalization in September 2023[62], (ii) more than three times the compensation obtained by Repsol for the expropriation of its 51% interest in YPF up to 51% of YPF[63] (far more than the minority stake the Plaintiffs previously held), which also included the cost of obtaining the rejection of all third-party claims, and (iii) more than three times the financing provided by the IMF as at June 30, 2024 under the Extended Fund Facility[64]. This is the largest sentence ever handed down by a New York district court against a foreign state[65].

94.    If the situation were reversed -i.e., if a foreign court authorized plaintiffs, financed by an investment fund, to sue the French state, on the basis of French law for acts that took place in France, created an unequivocal right of action, not yet recognized by the French courts, and then pronounced a judgment against France to the tune of almost EUR 175 billion (the equivalent of the judgment in relation to France's estimated tax revenues for 2024)- France would rightly be outraged.

95.    By providing the funding to conduct these proceedings, Burford expects to receive a large proportion of the damages recovered. The market shared this optimism, and Burford's share price jumped 55% on the day of the New York District Court's decision holding Argentina liable[66].

### E.    The appeal procedure and enforcement attempts

#### 1)    Argentina's appeal

96.    On October 10, 2023, the Argentine Republic appealed to the United States Court of Appeals for the Second Circuit against the final judgment handed down on September 15, 2023, as well as against the earlier decisions merged into this judgment. Petersen and Eton Park cross-appealed on October 18, 2023.

97.    The Argentine Republic considers and maintains that the final judgment and the previous decisions should be reversed in their entirety[67].

---

[62] **Exhibit no. 18:** YPF market capitalization equal to US$5.28 billion at September 15, 2023 (https://www.macrotrends.net/stocks/charts/YPF/ypf-sociedad-anonima/market-cap)
[63] **Exhibit 13:** Global Settlement Agreement entered into between the Argentine Republic and Repsol on February 27, 2014.
[64] **Exhibit no. 2 :** Excerpt from the 2024 Annual Report of the Argentine Republic filed with the U.S. Securities and Exchange Commission, page D-13.
[65] **Exhibit 19:** Lawfare article, Peterson v Argentina: analysis of a $16 billion judgment, November 30, 2023.
[66] **Exhibit no. 20:** Reuters article, "This billion-dollar case against Argentine company YPF would not exist without litigation funding. Is this a good thing?", April 3, 2023.
[67] **Exhibit no. 24:** Appeal brief of the Argentine Republic before the United States Court of Appeals for the Second Circuit dated February 22, 2024.

98.    On the <u>one</u> hand, the Argentine Republic argues that the U.S. courts should not retain jurisdiction over the Plaintiffs' claims, which fell exclusively within the jurisdiction of the Argentine courts.

99.    Indeed, (i) Petersen is an Argentine group, controlled by Argentine citizens, which held the YPF shareholding via shell companies registered in Spain; (ii) the defendant is the Argentine Republic; (iii) the events forming the subject of the proceedings and the acts and omissions imputed to the Argentine Republic took place in Argentina; and (iv) none of the parties disputed that the claims made should be assessed in the light of Argentine law, to which both YPF's Articles of Association and the expropriation procedure in question are subject.

100.    On <u>the other hand,</u> the Argentine Republic contends that the New York District Court misapplied Argentine public and private law.

101.    Indeed, (i) the New York District Court treated the Plaintiffs' claim as a claim for compensation based on contractual liability, which is not permitted under Argentine law and which no Argentine case law has recognized in relation to a dispute between partners based on an alleged breach of the Articles of Association; (ii) the New York District Court went beyond Argentine in terms of compensation, awarding damages[68]; (iii) when the Argentine Republic became the owner of the shares following the expropriation process in May 2014, the Plaintiffs were no longer shareholders of YPF and therefore had no standing or interest in asserting an alleged breach of the Articles of Association;
(iv) the New York District Court ignored the specific features of the expropriation procedure by treating the claims solely from the standpoint of private law, whereas according to the case law of the Argentine Supreme Court, these claims should have been considered from the standpoint of public law - as was the case for the claims of the other minority shareholders (filed in Argentina in due course)[69].

102.    <u>Finally,</u> the New York District Court grossly overestimated the amount of damages awarded (i) by retaining an erroneous date of infringement prior to the occurrence of

---

[68] Argentinian law sets out a number of restrictive penalties, which are included in YPF's Articles of Association, namely the loss of voting rights, the loss of dividend or distribution rights, and the non-inclusion of irregularly acquired shares in the calculation of quorums. **Exhibit 12**: YPF Articles of Association, Article 7(h). A claim for compensation is only admissible if it is established that performance in kind is impossible.

[69] **Exhibit no. 14:** Argentina Supreme Court ruling of August 20, 2014 in the De San Martín case. Argentina's General Expropriation Law requires third parties with expropriation-related claims against the government, including those relating to contractual obligations allegedly breached by expropriation, to obtain compensation only through the procedure prescribed by Argentine law, and Argentine administrative law limits the scope of this compensation, excluding loss of earnings.

In the De San Martín case, two minority shareholders of YPF brought an action against the Argentine Republic before the federal civil and commercial courts of Argentina, seeking a court order obliging the Argentine Republic to launch a public tender offer for the remaining Class D shares of YPF at the price specified in YPF's Articles of Association. The Argentine Supreme Court transferred the case from a federal court with jurisdiction over civil and commercial matters to a federal court with jurisdiction over administrative disputes, on the grounds that the case fell within Argentine public law (Supreme Court of Justice of the Nation of Argentina, August 20, 2014, "De San Martín, José et al. v. National State - Executive Power of the Nation," Jurisdiction 731 L.XLIX).

expropriation, (ii) by granting an erroneous prejudgment interest rate[70] and (iii) by using a pesos-US dollar conversion date that was abrogated several years ago.

103.    The written hearing of the case has been completed, and the Argentine Republic and the Plaintiffs have each filed their briefs[71]. The Court of Appeal must now set the oral hearing.

### 2)  No stay of execution

104.    The Argentine Republic applied to the New York District Court for a stay of execution of the final judgment pending appeal.

105.    The New York District Court conditioned the stay of execution of the final judgment during the appeal proceedings on the pledging of collateral by the Argentine Republic, in favor of the Plaintiffs, of its shares in the capital of YPF and its claims relating to a binational power generation dam, and on the establishment of an accelerated timetable for the appeal.

106.    As this condition could not be met either legally or materially, execution of the final judgment was not suspended.

### 3)  Subsequent proceedings in the United States

107.    In parallel with the appeal proceedings, the Plaintiffs have initiated discovery proceedings, requesting that Argentina submit a large number of documents in order to obtain information on its worldwide assets. Argentina has received several requests for documents from the Plaintiffs.

108.    The Plaintiffs have also petitioned the New York District Court to order Argentina to transfer the YPF Class D shares held by Argentina to the U.S. so that they can be seized there.

109.    Argentina opposed the request, and the U.S. government, represented by the Department of Justice, also took a stand against it, arguing that U.S. courts cannot order the seizure of foreign sovereign assets located outside the United States. It also stated that it would be contrary to sovereign immunity to require Argentina to surrender the[72] shares.

110.    The Department of Justice has stated that the U.S. Congress, in passing the Foreign Sovereign Immunities Act (FSIA), did not intend to eliminate immunity for foreign sovereign assets such as YPF shares. It added

---

[70] The 8% annual rate in dollars is well above the rate that would be awarded by Argentine courts with jurisdiction over administrative disputes.

[71] In its appeal, Argentina received the support of *amici curiae* such as Chile, Ecuador, Brazil, Uruguay, the Argentine Association of Administrative Law and several renowned professors of public law (including former judges of the Argentine Supreme Court), the Buenos Aires City Bar Association and several renowned professors of Argentine private law, the Argentine Federal Organization of Hydrocarbon Producing States (whose members are Argentine provinces with significant oil and gas exploration, exploitation and production activities), and professors from the United States.

[72] **Exhibit no. 25:** Letter from the United States of America dated November 6, 2024 and brief from the United States of America dated January 10, 2025 before the District Court of New York in the proceedings 15 Civ. 2739 (LAP) and 16 Civ. 8569 (LAP).

that the removal of immunity would create an anomaly insofar as the assets of a foreign country located in the United States would benefit from greater protection than assets located in the country itself. The Department of Justice also stated that, for reasons of international comity - the respect that countries accord each other by limiting the scope of their laws - New York state law did not oblige Argentina to sell its shares in YPF. The case is currently before the District Court of New York.

### 4) Enforcement procedures in other jurisdictions

111.    Outside the United States, proceedings for recognition and enforcement of the judgment have been initiated not only in France, but also in the United Kingdom, Ireland, Luxembourg and Cyprus. It should be stressed at this stage that no proceedings have been initiated in Argentina. Instead of initiating proceedings in Argentina, the Plaintiffs chose to bring several lawsuits elsewhere in the world, as part of their strategy of multi-jurisdictional judicial harassment.

112.    It was in this context that the Judicial Court of Paris was notified of an application for the exequatur of the final judgment and earlier decisions handed down by the District Court of New York:

- *Opinion* & *Order* of the *United States District Court* for the *Southern District of New York* of March 31, 2023 (refs. 15 Civ. 2739 (LAP) and 16 Civ. 8569 (LAP)) between Petersen Energía Inversora S.A.U., Petersen Energía S.A.U., Eton Park Capital Management L.P., Eton Park Master Fund Ltd. and Eton Park Fund L.P. on the one hand, and the Argentine Republic and YPF S.A. on the other;

- *Findings of fact and conclusions of law* of the *United States District Court* for the *Southern District of New York* of September 8, 2023 (refs. 15 Civ. 2739 (LAP) and 16 Civ. 8569 (LAP)) between Petersen Energía Inversora S.A.U., Petersen Energía S.A.U., Eton Park Capital Management L.P., Eton Park Master Fund Ltd. and Eton Park Fund L.P. on the one hand, and the Argentine Republic and YPF S.A. on the other;

- *Final Judgment* of the *United States District Court* for the *Southern District of New York* of September 15, 2023 (refs. 15 Civ. 2739 (LAP) and 16 Civ. 8569 (LAP)) between Petersen Energía Inversora S.A.U., Petersen Energía S.A.U., Eton Park Capital Management L.P., Eton Park Master Fund Ltd. and Eton Park Fund L.P. on the one hand, and the Argentine Republic and YPF S.A. on the other.

## II.  **DISCUSSION**

113.    In these pleadings, Argentina asserts a procedural objection and a plea of inadmissibility. The formal order of presentation is established by law and specified by case law.

114.    Article 74 paragraph 1 of the Code of Civil Procedure states that : **"Exceptions must, on pain of inadmissibility, be raised** *simultaneously and* **before any** *defense based on* **plea of inadmissibility**. *This is the case even if the rules invoked in support of the exception are of public policy.".*

115.    The Supreme Court of Appeal states that: "*A party is not entitled to raise a procedural objection after an objection has been dismissed, regardless of whether these objections were raised in the same pleadings* "[73].

116.    Thus, a procedural objection and a plea of inadmissibility can be raised jointly in the same pleadings, but on the express condition that the objections appear in the pleadings <u>before</u> the plea of inadmissibility.

117.    Consequently, Argentina intends to request a stay of proceedings pending a decision that will no longer be subject to appeal in the proceedings pending in the United States (**A.**) and, in any event, to raise a plea of inadmissibility based on the immunity from jurisdiction it enjoys (**B.**)

### A.  On the request for a stay of proceedings

118.    In law, the decision to order a stay of proceedings falls within the sovereign power of the judge (**1.**). In particular, he may order it in the interests of the proper administration of justice, as is the case here (**2.**).

#### 1)  <u>In law, the judge's sovereign power</u>

119.    Article 378 of the French Code of Civil Procedure stipulates that "*the decision to stay proceedings suspends the course of the proceedings for the time or until the occurrence of the event it determines.*"

120.    There are cases in which the stay is binding on the judge and the parties, notably when the civil action is for compensation for damage caused by a criminal offense and criminal proceedings are underway to prosecute that offense. As there is no such case in the present matter, we need not dwell on it.

121.    However, the judge has full discretion to order a stay of proceedings when the circumstances of the case justify it. Indeed, "*responsible for ensuring that the proceedings run smoothly, the judge has the power to order a stay of proceedings ex officio in the interests of the proper administration of justice*"[74]. This option is widely recognized in case law, with the judge having discretionary power to assess the appropriateness of the stay of proceedings, its duration and its terms[75].

---

[73] Cass. 2e civ., July 8. 2004, 02-19.694.
[74] Cass. 2e civ., Apr. 12, 2018, no. 17-16.945.
[75] Cass. 3e civ., Oct. 15, 2008, no. 07-14.540.

122.    For example, when a decision to be rendered in another pending proceeding is likely to influence the outcome of the current dispute, the judge hearing the dispute may suspend the proceeding pending the forthcoming decision[76].

123.    With regard to the recognition and enforcement of foreign judgments, the provisions of the European Brussels I bis Regulation are a case in point. It provides that the court hearing an application for refusal of enforcement of a judgment given in a Member State may stay the proceedings if the judgment is the subject of an ordinary appeal in the Member State of origin, even if the judgment is already enforceable:

> "*The court hearing an application for refusal of enforcement or deciding an appeal under Article 49 or an appeal under Article 50 may stay the proceedings if the decision is the subject of an ordinary appeal in the Member State of origin or if the time limit for lodging such an appeal has not expired. In the latter case, the court may set a time limit for lodging the appeal.*"[77]

124.    Thus, there may be an interest in not recognizing judgments or authorizing enforcement measures based on them - a fortiori involving sovereign assets - as long as the principle and contours of the decision on the merits are not definitively fixed, even if the judgments are already enforceable.

## 2)   In fact, the stay of proceedings is justified.

125.    In this case, a stay of proceedings is part of the proper administration of justice and is not prejudicial to any of the parties.

126.    On the <u>one</u> hand, although enforceable, the judgment whose exequatur is sought is not final.

127.    In fact, the conviction is being appealed on all points, i.e.: (i) on the exercise of jurisdiction (which includes the arguments of *forum non conveniens* and international comity), (ii) on the principle of the Argentine Republic's liability, and (iii) on the quantum of the[78] damage.

128.    The existence of this recourse is likely to influence the outcome of the present dispute, since it is likely to result in the total or partial reversal of the judgment in a few months' time, and thus modify the rights of the Claimants as they are currently seeking recognition and enforcement.

129.    The importance of the appeal procedure is all the more fundamental given that this dispute involves the resolution of numerous and complex issues under Argentine law - issues which, incidentally, have never been resolved by the Argentine courts. The District Court of

---

[76] Cass. com., May 29, 1979: Bull. civ. IV, no. 181.
[77] Regulation (EU) no. 1215/2012, Dec. 12, 2012, art. 51.
[78] **Exhibit no. 24:** Appeal brief of the Argentine Republic before the United States Court of Appeals for the Second Circuit dated February 22, 2024.

New York retained liability in a summary judgment on "*questions of first impression and questions of Argentine law* "[79].

130.    Contrary to what the Claimants maintain[80], there is no question here of adding a condition of admissibility that is not provided for by law.

131.    Argentina argues that, given that an appeal is currently pending before the US courts of second instance, and given the nature of the case, the complexity of the legal and factual issues to be decided, and the colossal stakes involved for Argentina, it would be in the interests of the proper administration of justice to stay the proceedings.

132.    On the <u>other</u> hand, a stay of proceedings would not entail any prejudicial consequences for the parties.

133.    Firstly, it would not be excessively long, since the appeal procedure has been fully completed. At the time of writing, only the parties' pleadings remain to be heard before the Court of Appeal can deliver its judgment. As Burford recently reminded us:

> "*These appeals are now fully investigated. In other words, all documents relating to the case have been submitted. The next step is oral argument before a three-judge panel, and we're waiting for the Court to give us an oral argument date, <u>which should be later this year [2024] or early next year</u>. After closing arguments, the court will retire and write its decision. There is no deadline for the publication of this decision, but we expect it later - <u>we expect it a few months after the pleadings</u>*"[81].

134.    The Claimants cannot therefore assert that a stay of proceedings would be contrary to the principle of speedy justice and the Claimants' right "*to obtain enforcement of the U.S. Decisions within a reasonable time*"[82].

135.    They cite judgments of the European Court of Human Rights (**"ECHR"**) relating to cases quite different from the present one. Two of the three decisions cited concern cases in which the applicants had obtained, in their own country, a
**"definitive"** decision, granting them alimony and had taken nearly 10 years to obtain France's assistance in recovering these claims[83]. The last case cited concerns Slovakia's arbitrary refusal to enforce an ICC arbitration award based on a contractual arbitration clause, which did not require any other separate decision to be recognized on its territory[84].

136.    Nothing of the sort in this case.

---

[79] **Exhibit no. 17:** New York District Court decision of November 21, 2023 on application for stay of execution, emphasis added.
[80] Claimants' reply of February 24, 2025, §§ 109 - 114.
[81] **Exhibit no. 6:** Transcript of Burford Capital's Q3 results conference held on November 7, 2024, p. 7, emphasis added.
[82] Claimants' reply of February 24, 2025, § 122.
[83] AJ no. 37: ECHR, November 4, 2008, *Dinu v. Romania and France*, no. 6152/02; AJ no. 38 : ECHR, November 18, 2010,
*Romanczyk v. France*, no. 7618/05.
[84] AJ no. 39: ECHR, June 30, 2022, *BTS holding v. Slovakia*, no. 55617/17.

137.    The Applicants have not put forward any evidence to suggest that a stay would unreasonably delay the examination of their application for exequatur, assuming it is admissible - which Argentina disputes.

138.    And it should be recalled that, unlike the other minority shareholders, who presented their claims during the proceedings in Argentina specifically provided for the resolution of expropriation-related disputes and who were covered by the Global Settlement Agreement in 2014, the Plaintiffs chose not to present their claims during this process and waited until the Global Settlement Agreement had been concluded to launch their proceedings before the US courts.

139.    The Claimants cannot claim that Argentina is engaging in a "*crude strategy*"[85]. Argentina is asserting its rights within the framework of the exequatur proceedings that the Claimants have chosen to initiate, and the fact of not acquiescing to the Claimants' requests or exercising the available remedies cannot be assimilated to a dilatory strategy.

140.    The fact that Argentina has requested delays in exequatur proceedings initiated by the Claimants is not dilatory either. In addition to being legally permissible in the jurisdictions concerned, these requests for delay were necessary to enable Argentina to prepare its defense in five simultaneous proceedings, each subject to a different set of standards, and with different teams of lawyers having to take cognizance of the case, in response to Burford's strategy of harassment. In fact, if the courts have granted these deadlines, it's because the judges considered them to be justified.

141.    Furthermore, there is no risk of the Argentine Republic or its heritage disappearing.

142.    Lastly, the passage of time is not prejudicial to the Claimants, since the judgment is subject to post-judgment default interest until it is paid in full. As Burford reminds us:

> "*The judgment continues to accrue post-judgment interest at a rate of 5.42% compounded annually. That's more than $2 million a day added to the judgment every day it's outstanding*"[86].

143.    Moreover, payment of the condemnation does not represent a vital issue for the Plaintiffs, since they have ceased trading to date. In reality, for Burford it's essentially a question of return on investment and the profitability of the financing advanced.

144.    <u>Conversely</u>, allowing immediate recognition and enforcement of the judgment would enable the Plaintiffs to put in place a freeze on Argentina's assets, as part of a strategy of exhaustion assumed by Burford. This strategy could target sovereign assets, even though they are protected by immunity from execution, and the result would be

---

[85] Plaintiffs' reply of February 24, 2025, § 131.
[86] **Exhibit no. 6:** Transcript of the conference summarizing Burford Capital's 3rd quarter results of November 7, 2024, p. 10, emphasis added; see also **Exhibit No. 21:** Burford Capital's 3rd quarter results presentation of November 7, 2024, p. 13.

unavailability of these resources while the Argentine Republic pursues appropriate remedies.

145.    This is the objective pursued by Burford in these proceedings:

> "*The purpose of enforcement strategies is to exert pressure and create friction [...] we will try many stratagems that will not work from a strictly legal point of view. [...] The fact that we have a major unfulfilled U.S. court decision and ongoing enforcement proceedings around the world that also include third parties is an obstacle to this normalization process [that Argentina is putting in place]. [...] In other words, we are a nagging problem that Argentina has to solve*"[87].

146.    Such considerations do not contribute to the proper administration of justice.

147.    In this respect, it is incorrect to assert, as the Plaintiffs do[88], that Argentina has waived the stay of execution of the American decisions.

148.    As explained above, the New York District Court conditioned the stay of execution of the final judgment during the appeal proceedings on the Argentine Public Reargentina in favor of the Plaintiffs of its shares in the capital of YPF and of its claims relating to a binational power generation dam, and to the establishment of an accelerated timetable for the appeal.

149.    It was neither legally nor materially possible for Argentina to satisfy the conditions imposed by the New York District Court for maintaining the stay of execution[89]. Argentina is a sovereign state, and such decisions must be taken by the various institutions and bodies with jurisdiction. In this case, this would have required a law to be passed by the Argentine Congress. At the same time, due to difficult economic conditions and the need for immediate and urgent reforms to set the economy on a new course, the new Argentine government was unable to pledge assets to secure the $16.1 billion judgment pending appeal. Furthermore, Argentinian budget regulations do not authorize the payment of judgments that are not final under Argentinian law (which means that all existing remedies against the judgment to be enforced must have been exhausted).

150.    As a consequence of the foregoing, the Argentine Republic requests that your Court order a stay of proceedings in this case until such time as a non-appealable decision has been rendered in the U.S. proceedings.

*

---

[87] **Exhibit 6:** Transcript of Burford Capital's Q3 results conference held on November 7, 2024, p. 8, emphasis added.
[88] Plaintiffs' reply of February 24, 2025, §§ 115 to 121.
[89] **Exhibit no. 26:** Letter from the Argentine Republic dated December 19, 2023 before the District Court of New York in the proceedings 15 Civ. 2739 (LAP) and 16 Civ. 8569 (LAP).

**B.  In any event, on the inadmissibility of the exequatur applications on the grounds of the Argentine Republic's immunity from jurisdiction**

151.    Sovereign foreign states enjoy legal immunity from jurisdiction, which prevents French courts from exercising jurisdiction over them (**1.**). In this case, the dispute which gave rise to the judgment concerns an act of sovereignty of the Argentine Republic, so that it is entitled to invoke its immunity from jurisdiction and the claims of the Plaintiffs are inadmissible (**2.**).

152.    In their reply, the Plaintiffs raise two objections, one legal and the other factual.

153.    On the one hand, the Plaintiffs are trying to argue that the French judge could not recognize the merits of the immunity from jurisdiction invoked by Argentina without carrying out a review on the merits prohibited by the American decisions that refused it.

154.    On the other hand, the Plaintiffs claim that the act at the origin of the dispute is not expropriation, but only the alleged violation of YPF's Articles of Association, which does not constitute a sovereign act of public authority.

155.    Neither of these objections is convincing, and they will be answered in the developments that follow.

### 1)  In law, on immunity from jurisdiction

156.    French case law has consistently recognized the principle of immunity from jurisdiction (**a.**) and has gradually defined its contours (**b.**). This principle can also be invoked in exequatur proceedings (**c.**).

#### a.  On the principle of immunity from jurisdiction

157.    International immunity is a privilege of jurisdiction that removes international subjects, notably States and their respective agents, from the national jurisdiction of a State. It ensures that a foreign state cannot be subject to the jurisdiction of another foreign state without its consent.

158.    Everyone agrees that this principle is a customary rule of international law, which itself derives from the sovereign equality of States, a fundamental principle of international order: "*jurisdictional immunities of States and their property derive from a generally accepted principle of customary international law*" [90]. Indeed, the reciprocal independence of states is one of the most commonly recognized principles of the law of nations.

159.    In this respect, France has signed the United Nations Convention of December 2, 2004 on Jurisdictional Immunities of States and Their Property[91]. Although this convention has not yet entered into force due to insufficient ratifications, the European Court of Human Rights, imitated in

---

[90] Preamble to the United Nations Convention of December 2, 2004.
[91] United Nations Convention of December 2, 2004.

to this end, the Supreme Court of Appeal considers that it already reflects customary international law and regularly refers directly to the principles it contains[92].

160.    This immunity is not absolute and must be set aside when the State acts as a private actor (see section II.B.b below). Nevertheless, the principle is the application of immunity from jurisdiction, and its waiver is only the exception: "*[a] State enjoys, for itself and for its property, immunity from jurisdiction in the courts of another State, subject to the provisions of the present Convention*"[93].

161.    From a procedural point of view, international immunity constitutes a preliminary and priority ground for dismissal, which presupposes the existence of the jurisdictional power of the forum court, the exercise of which it tends to paralyze.

162.    It has already been ruled on several occasions that this dismissal does not infringe the right of access to a judge guaranteed by the European Convention on Human Rights:

> " *It follows that the right of access to a court, as guaranteed by article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms and of which the enforcement of a judicial decision constitutes the necessary extension, <u>does not preclude a limitation on this right of access, arising from the immunity of foreign States</u>, provided that this limitation is enshrined in international law and does not go beyond the generally recognized rules on State immunity* "[94].

163.    In practice, when immunity from jurisdiction applies, the French court cannot exercise its jurisdictional power vis-à-vis the defendant state, whatever the nature of the underlying facts.

164.    By way of illustration, the French Supreme Court of Appeal (*Cour de cassation*) has ruled that the criminal nature of an act of terrorism does not, on its own, preclude immunity from jurisdiction:

> "*But whereas foreign States and the organizations that emanate from them enjoy immunity from jurisdiction, a relative and not absolute immunity, only insofar as the act that gives rise to the dispute or that is attributed to them at fault participates, by its nature and purpose, in the exercise of the sovereignty of these States and is therefore not an act of management [.....] <u>the Court of Appeal was able to rule that the Jamahiriya could invoke immunity from jurisdiction, since the criminal nature of an act of terrorism does not, on its own, make it possible to set aside a prerogative of sovereignty</u>*"[95].

---

[92] ECHR June 29, 2011, Sabeh El Leil, aff. 34869/05.

[93] Article 5 of the United Nations Convention of December 2, 2004.

[94] Supreme Court of Appeal, 1st Civil Chamber, June 28, 2023 - No. 21-19.766: "*8. The European Court of Human Rights has ruled (ECHR, Grand Chamber, November 21 2001, Al-Adsani v/ United Kingdom, application no. 35763/97) that <u>"the grant of immunity must be regarded not as a tempering of a substantive right, but as a procedural obstacle to the jurisdiction of national courts and tribunals to rule</u>" that "the granting of sovereign immunity to a State in civil proceedings pursues the legitimate aim of observing international law in order to promote comity and good relations between States through respect for the sovereignty of another State" that "the Convention must, as far as possible, be interpreted in such a way as to reconcile it with the other rules of international law, of which it forms an integral part, including those relating to the granting of immunity to States", and <u>that "it is therefore not generally possible to regard as a disproportionate restriction on the right of access to a court as enshrined in Article 6 § 1</u> the measures taken by a High Contracting Party that reflect the rules of international law generally recognized with respect to States' immunity.*"

[95] Supreme Court of Appeal, 1st Civil Chamber, March 9, 2011 - n° 09-14.743.

*b.   Criteria for the application of immunity from jurisdiction*

165.    In order to declare an action inadmissible on the grounds that the defendant State enjoys immunity from jurisdiction, the courts draw a distinction between "acts of authority", which are acts manifesting the sovereignty of the foreign State, and "acts of management", which are those that do not differ substantially from those that could be performed by private individuals.

166.    This distinction is reflected in the United Nations Convention of December 2, 2004, which excludes from its scope "*commercial transactions*"[96], as well as in French case law.

167.    In this respect, since a decision of the mixed chamber of the Supreme Court of Appeal of June 20, 2003, the Supreme Court of Appeal ruled that:

> "*[f]oreign States and the bodies that emanate from them only **enjoy immunity from jurisdiction insofar as the act which gives rise to the dispute participates, by its nature or purpose, in the exercise of the sovereignty of those States and is therefore not an act of management***"[97].

168.    The approach adopted by the French courts is therefore based on an alternative criterion, since the disputed act must, either by its nature (material criterion) or by its purpose (finalist criterion), participate in the exercise of sovereignty for its author to benefit from immunity.

169.    On the other hand, the assessment of this criterion does not imply a judgment on the conduct, decision, action or omission of the State in question:

> "[*The rules] governing State immunity are procedural in nature and are limited to determining whether the courts of one State are entitled to exercise jurisdiction over another. **They have no bearing on whether the conduct in respect of which the actions were brought was lawful or unlawful** [...]*"[98].

170.    With regard to the material criterion, in the sense of international law, an act of sovereignty is essentially an act of public authority, whatever its legal denomination or formalism[99].

171.    The doctrine defines the notion of prerogatives of public power as those which essentially constitute "***legal means exorbitant from common law which place the administration in a privileged situation in relation to the citizens**. Most of these prerogatives are prerogatives of action, the main one being the possibility of unilaterally issuing prescriptions that are binding on their addressees*"[100]. The following are therefore considered to be prerogatives

---

96 Article 10 of the United Nations Convention of December 2, 2004

97 Cass. ch. mixte, June 20, 2003, Dame Soliman c/ École saoudienne de Paris et Royaume d'Arabie saoudite, bold added.

98 ICJ, February 3, 2012, Jurisdictional Immunities of the State, Germany v. Italy; Greece (intervener), I.C.J. Reports 2012, p. 99, cited in Supreme Court of Appeal, 1st Civil Chamber, June 28, 2023 - no. 21-19.766.

99 Civ. 1st, March 3, 2021, no. 19-22.855, Bull. I.

100 JurisClasseur Procédure civile, Fasc. 400-45: ADMINISTRATIVE AND JUDICIAL COMPETENCE - Acts or operations connected with a public service mission involving the exercise of prerogatives of public authority, Antoine Béal, § 18, bold added.

of public authority "*the obligation to join and pay contributions to a public or private organization, the action or refusal of professional cards conditioning the exercise of an activity, **the right to expropriate**, to requisition, to pre-empt buildings or works of art, the possibility of imposing sanctions, etc.*"[101].

172.    With regard to the finalist criterion, the courts examine finality when the act at the origin of the dispute is not, in itself, sovereign, but participates in an objective pursued by the State, which, for its part, is sovereign. In this case, it doesn't matter whether the act is a purely private-law transaction, since that's not where the focus should be on determining whether or not immunity should be waived.

173.    French case law on the subject provides numerous examples in which one of the two criteria led to the recognition of immunity for the defendant State, or its emanation, and to the inadmissibility of the claims. Immunity has thus been recognized:

-   in favor of the Iranian National Gas Company in a dispute relating to a call for tenders issued by this company for the installation of a gas pipeline protection system, since immunity applies "*not only to acts of public authority but also to those performed <u>in the interest of a public service</u>*"[102], that of energy supply;

-   the Central Bank of Japan, which acts "*in the interest of a public service*" in its foreign exchange control activities[103];

-   to the Senegalese State in the context of a dispute concerning its intervention in the performance of a purely private law contract in an attempt to impose the maintenance of that contract, ruling that such an attempt is" *<u>necessarily an act of public authority</u> covered by immunity from jurisdiction*"[104];

-   to the Russian Federation in the context of a dispute concerning loans issued by the Russian Empire and the North-Donetz Railway Company, since these loans, benefiting from conditions " *<u>exorbitant[es] from ordinary law</u>, granted to the subscribers by the Imperial Government, fell <u>within its prerogatives as a public authority</u>; [and] that, from these findings and statements, it followed that the Imperial Russian Government had acted in the exercise of its sovereignty*"[105];

-   to the Gabonese state in a dispute over the dismantling of advertising hoardings, since the state had "*used public force*"[106];

-   to the Ministry of Presidential Affairs of the Federal State of the United Arab Emirates in the context of a partnership and intermediation contract for the creation of a higher education establishment, since this partnership "*<u>participated by its purpose in the accomplishment of an act in the interest of the public service</u> of education*" and that, as a result, the Ministry of

---

101 JurisClasseur Procédure civile, Fasc. 400-45: ADMINISTRATIVE AND JUDICIAL COMPETENCE - Acts or operations connected with a public service mission involving the exercise of prerogatives of public authority, Antoine Béal, § 19, underlining and bold added.
102 Supreme Court of Appeal, 1st Civil Chamber, May 2 1990 - no. 88-14.363, emphasis added.
103 Supreme Court of Appeal, 1st Civil Chamber, May 19 1976 - no. 74-11.424, emphasis added.
104 Supreme Court of Appeal, Civil Division 1, October 9 1990 - no. 88-19.222, emphasis added.
105 Supreme Court of Appeal, Civil Division 1, November 6, 2019 - n°18-16.437, emphasis added.
106 Council of State, Section, December 22, 2023 - no. 463451, underlining added.

presidential affairs" *had acted in the exercise of the sovereignty of the Federal State of the United Arab Emirates*"[107];

- to the People's Democratic Republic of Laos in a dispute concerning the nationalization of tin mines without compensation, ruling that "the **act of nationalization on which the claim was based constitutes an act of public authority**"[108].

174.    In a recent decision, the French Supreme Court of Appeal (Cour de cassation) ruled in the negative[109]: first, it examined whether the disputed act could be construed as an act of management and, if not, it applied immunity from jurisdiction.

175.    In this case, an American court rejected the Islamic Republic of Iran's immunity from jurisdiction and ordered it to compensate the family of an attack victim, on the grounds that the Iranian state had provided financial support to a terrorist group.

176.    The Cour de cassation approved the Court of Appeal's ruling that "*the acts which gave rise to the dispute [...] in that they consisted of financial support given to a terrorist group which had committed a suicide attack in which Mr. [X]'s daughter had died, did not fall within the scope of acts of management by that State*" and that, consequently, "*the Islamic Republic of Iran could invoke its immunity from jurisdiction*" [110].

177.    In this respect, the Supreme Court of Appeal applies a principle reiterated by the Public Reporter in his conclusions to the Council of State's ruling of December 22, 2023: "*in case of doubt, the consensual principle (which is well expressed in article 5 of the 2004 Convention) remains that immunity is the rule and the absence of immunity the exception: it follows that if the act which gives rise to the dispute is not an act of management in the strict sense, then it necessarily falls, from the point of view of immunity from jurisdiction, within the category of acts of sovereignty, whatever its gravity*"[111].

*c.    Invoking a defense in the context of an exequatur procedure*

178.    There is no longer any debate as to whether immunity from jurisdiction can be invoked in exequatur proceedings. Indeed, since the French judge exercises jurisdiction over the State, it follows that the defendant State is entitled to invoke its immunity.

179.    In a particularly noteworthy decision, the French Council of State ruled on an exequatur application lodged by a Gabonese company seeking recognition of two rulings handed down by the Gabonese Council of State. These rulings recognized the responsibility of the Gabonese state in the dismantling, by public force, of advertising hoardings belonging to the company, and ordered the state to pay the company a total of 11,184,814,496 CFA francs.

---

[107] Supreme Court of Appeal, 1st Civil Chamber, March 3, 2021 - no. 19-22.855, emphasis added.
[108] Cass. 1re civ. Oct 20, 1987, no. 85-18.608, Sté internationale de plantations d'hévéas c/ Sté Lao Import Export et a, underlining and bold added
[109] Supreme Court of Appeal, 1st Civil Chamber, June 28, 2023 - no. 21-19.766.
[110] Supreme Court of Appeal, 1st Civil Chamber, June 28, 2023 - no. 21-19.766, underlining added.
[111] Conclusions of the Reporting Judge for the decision of the Council of State, Section, 22 December 2023 - n° 463451, underlining added.

180.    In this decision, the Council of State recalled that: "*A State may oppose this immunity [of jurisdiction] to a request for exequatur of a jurisdictional decision, even if this decision emanates from the courts of this State.*"[112]

181.    The Supreme Court of Appeal has recently reaffirmed that a judge hearing an application for the exequatur of a foreign judgment rendered against a third country exercises his own jurisdiction over the third country: "*The Court of Appeal rightly stated that, in exequatur proceedings [...] where immunity from jurisdiction is claimed by a foreign State, it is incumbent on the Court to rule beforehand on this objection.*"[113]

182.    Thus, immunity from jurisdiction applies in the context of an application for exequatur of a foreign judgment, including when the decision is rendered by the courts of the defendant state itself.

183.    This principle still holds true when the first judge has rejected the State's immunity from jurisdiction. In a recent decision, the Supreme Court of Appea clearly ruled that:

> "*the fact that the judge who rendered the decision whose exequatur is sought himself disclaimed such immunity from jurisdiction, by virtue of his own law, does not discharge the French judge from exercising his jurisdictional power in order to assess the objection of inadmissibility based on the immunity from jurisdiction invoked before him*"[114].

184.    It is therefore incorrect to argue, as the Plaintiffs attempt to do, that the French court cannot recognize a State's immunity from jurisdiction once the foreign court has rejected it, or that the French court's assessment must relate to the act giving rise to the dispute, "*as characterized by the foreign court*"[115] because of the principle of prohibition of review of the substance of a foreign judgment.

185.    This argument is legally incorrect.

186.    When the exequatur judge examines the question of immunity from jurisdiction, he rules on the admissibility of the exequatur application submitted to him and not on the legality of the foreign judgment, nor a fortiori on the grounds of this judgment. There is therefore no review of the merits of the foreign judgment.

187.    As explained above, the question of admissibility is based on the French judge's assessment of his or her ability to exercise jurisdiction over the defendant State. The absence of power to judge is assessed for each instance independently, and the instance on the merits abroad is distinct from the *exequatur* instance in France.

188.    In carrying out this examination, the French judge applies his own body of standards and cannot be bound by the position adopted by the foreign judge. The opposite, i.e. that the existence or absence of the jurisdictional power of French judges could depend on the decisions of any foreign judges, would be surprising.

---

[112] Council of State, Section, December 22, 2023 - no. 463451, underlining added.

[113] Supreme Court of Appeal, 1st Civil Chamber, June 28, 2023 - no. 21-19.766, underlining added.

[114] Supreme Court of Appeal, 1st Civil Chamber, June 28, 2023 - no. 21-19.766, underlining and bold added.

[115] Conclusions in response from the Plaintiffs dated February 24, 2025, § 60 and §§ 92-104.

189.     It is therefore irrelevant whether the immunity from jurisdiction has been disregarded by the original judge, on the basis of his own law. The assessment made by the exequatur judge on the plea of immunity raised before him is independent of that made by the original judge of the dispute.

190.     A ruling by the International Court of Justice details the analysis that confirms this solution:

> "*128. When a court is requested, as in the present case, that it grant the exequatur of a foreign judgment having been rendered against a third State, <u>it is</u> itself <u>called upon to exercise its jurisdiction with regard to the third State in question</u>. [...] The role of the exequatur judge is therefore not to re-examine all aspects of the merits of the case that has been judged.* <u>**Nevertheless, in granting or refusing exequatur, it exercises a jurisdictional power which results in giving the foreign judgment effects corresponding to those of a judgment rendered on the merits in the requested State**</u>. *The proceedings brought before this court must therefore be regarded as having been brought against the third State condemned by the foreign judgment. [...]*
>
> *130. It follows from the foregoing that <u>the court hearing an application for the exequatur of a foreign judgment against a third State must consider whether the defendant State benefits immunity from jurisdiction, taking into account the nature of the case which has been judged, before the courts of the State in which the exequatur proceedings have been initiated</u>. In other words, it must ask itself whether, if it had itself been requested on the merits of a dispute identical to that decided by the foreign judgment, it would have been obliged under international law to grant immunity to the defendant State [...].*
>
> *132. In order to reach such a conclusion, there is no need to rule on the question of whether the Greek courts themselves violated Germany's immunity, a question which is not before the Court and on which it cannot rule for the reasons given above. The Court will merely note, in general terms, that it may well be the case, in certain circumstances, that the judgment on the merits did not violate the immunity from jurisdiction of the defendant State, for example because the latter waived that immunity before the courts requested of the main proceedings, <u>but that the action for enforcement brought in another State is precluded by the defendant's immunity.</u>"*[116]

191.     The Supreme Court of Appeal has recently taken up and applied this solution, ruling that the principle prohibiting review of the merits of a foreign judgment which has set aside the immunity jurisdiction of the defendant State does not prevent the exequatur judge from exercising his jurisdictional power to assess this immunity himself.

192.     In this case, the U.S. District Court for the District of Columbia had ordered the Islamic Republic of Iran to pay certain sums, and had previously ruled out the application of the immunity from jurisdiction claimed by the Islamic Republic of Iran. Having been filed a request for enforcement of the US judgment, the French courts also ruled on the issue of immunity from jurisdiction, this time upholding that the

---

[116] ICJ, February 3, 2012, Jurisdictional Immunities of the State, Germany v. Italy; Greece (intervener), I.C.J. Reports 2012, p. 57, points 128, 130, 132, underlining and bold added.

Islamic Republic of Iran was entitled to invoke it, and consequently the application for exequatur was inadmissible.

193.    The appeal brought before the Supreme Court of Appeal sought to prohibit the court seised from ruling again on immunity, invoking the prohibition on reviewing the substance of foreign judgments, on the grounds that the issue had already been decided by the foreign court. The Supreme Court of Appeal rejected this argument and ruled unequivocally that "*the fact that the American judge himself rejected Iran's immunity from jurisdiction, pursuant to his own law, in the decision for which enforcement is sought, cannot prevent the French judge from exercising his jurisdiction to assess whether the Islamic Republic of Iran is admissible and well-founded in invoking this immunity before him.*"[117]

194.    Academic commentaries on this ruling endorse the reasoning followed by the High Court.

195.    As one author explains: "**the prohibition on reviewing the merits of a foreign judgment is only imposed, if at all, after the objection based on immunity from jurisdiction has been rejected.** *From this point of view,* **it was clear to the Supreme Court of Appeal that the fact that the American judge had himself rejected such immunity, under his own law, in the decision for which enforcement was sought, did not exempt the French judge from exercising his judicial power to assess whether Iran was admissible and well-founded in invoking the same immunity before him.**"[118]

196.    The same author goes on to say: "*Could this be seen as the Supreme Court of Appeal skilfully circumventing the principle prohibiting review of the merits of a foreign judgment? We think the answer must be no.* **Indeed, it is doubtful that the US judge's decision to reject Iran's immunity from jurisdiction on the basis of a national provision, which is far from reflecting general international law on immunities, as will be seen below, relates to the "merits" of the case before him.** *In fact, the judgment under review merely repeats, without citing the relevant passages, the approach adopted by the International Court of Justice in the Jurisdictional Immunities case between Germany and Italy. [...] In light of these principles,* **it is clear that consideration of the plea of jurisdictional immunity in relation to the admissibility of an exequatur action is without prejudice to the principle prohibiting review of the merits of a foreign judgment. Each national judge assesses independently—that is, without being bound by the foreign judgment on this purely "procedural" point—the question of immunity based on what it considers to be the state of international law on the matter.**"[119]

197.    This ruling by the Supreme Court of Appeal contradicts the position the Plaintiffs are trying to maintain. On this point, the developments they devote to the content of the American decisions are indifferent.

---

[117] Supreme Court of Appeal, 1st Civil Chamber, June 28, 2023 - no. 21-19.766.

[118] Ioannis Prezas, *Immunité - L'office du juge de l'exequatur confronté à la "terrorism exception" dans le contexte de l'immunité de juridiction*, Journal du droit international (Clunet) no. 2, April-May-June 2024, comm. 9, underlining and bold added.

[119] Ioannis Prezas, *Immunité - L'office du juge de l'exequatur confronté à la « terrorism exception » dans le contexte de l'immunité de juridiction*, Journal du droit international (Clunet) no. 2, April-May-June 2024, comm. 9, emphasis added.

198.    The French judge assesses, independently of the position of the American judges, whether Argentina is entitled to invoke its immunity from jurisdiction.

2)    In fact, the Argentine Republic is entitled to invoke its immunity from immunity from jurisdiction

199.    It is clear from the above rules that: (i) Argentina is entitled to invoke its immunity from jurisdiction in these proceedings; (ii) the fact that the U.S. judge has waived immunity from jurisdiction is not binding on your Tribunal, which must appraise the objection raised before it on its own merits; (iii) jurisdictional immunity applies when "*the act giving rise to the dispute*" is not an act of management. This is particularly the case when it is an act of public authority, even when it is part of a private law relationship, or when it is carried out in the public interest.

200.    In this case, Argentina is entitled to invoke its immunity from jurisdiction, since the disputed act **(a.)** is, by its nature **(b.)** and purpose **(c.),** part of the exercise by Argentina of its sovereignty.

*a.    The act giving rise to the dispute*

201.    In this case, the act giving rise to the dispute between the Plaintiffs and the Argentine Republic is the expropriation of Repsol's 51% stake in YPF's share capital.

202.    In the exercise of its sovereignty, the Argentine Republic decided to expropriate YPF's main shareholder - Repsol - and to limit this expropriation to 51% of YPF's share capital, with the aim of maintaining a balance between the federal state, the provinces and private investors.[120]

203.    The aim was to regain strategic control of the company, not to nationalize it completely. If Argentina had wished to nationalize YPF in its entirety, it would have decided to expropriate all shareholders. It has decided otherwise, and whatever its verdict, it is no less sovereign.

204.    The Argentine Congress thus passed the Law of Public Utility and Expropriation so that YPF could continue to operate as a private company, listed on the stock exchange, so as not to deprive it of access to capital markets, and thus enable the financing of its recovery and development.

205.    In this dispute, the alleged breach of YPF's articles of association relied upon by the Plaintiffs - the failure to launch a public offer - results directly and exclusively from

---

[120] **Exhibit No. 11:** Argentine Law no. 26.741 of May 3, 2012 - article 15: "*[t]o carry out their activities, YPF Sociedad Anónima and Repsol YPF GAS S.A. will continue to operate as publicly traded companies, in accordance with the provisions of Chapter II, Section V, of Law 19.550 and related provisions*" and article 8 "*The shares subject to expropriation of YPF Sociedad Anónima and Repsol YPF GAS S.A., in accordance with the preceding section, shall be distributed as follows: fifty-one percent (51%) shall belong to the National State and the remaining forty-nine percent (49%) shall be distributed among the member provinces of the Federal Organization of Hydrocarbon Producing States*".

the expropriation was limited to the 51% of YPF held by Repsol. This is the heart of the dispute.

206.    In fact, the Plaintiffs maintain that when they took control of YPF, they should have benefited from a public offer to purchase the shares they owned, and that Argentina's failure to do so caused them harm.

207.    However, the launch of such an offer was not possible, given that the Argentine Republic had decided (i) to expropriate only 51% of YPF's share capital, (ii) to specifically target Repsol's shareholding and (iii) to maintain YPF as a listed private company. <u>This is the disputed act</u>.

208.    The Plaintiffs attempt to divide the act into two distinct objects: the expropriation law, on the one hand, and the abstention from launching a public offer on the other. The Plaintiffs rely on this illusory dissociation to argue that they are not criticizing the expropriation itself, but only the failure to launch a public offer, and that this abstention does not fall within the scope of an act of public authority.[121] But the distinction is artificial in itself, and all the more so when, as here, the issue is whether the act at the origin of the dispute falls within the sovereignty of Argentina.

209.    The Plaintiffs cannot argue that the decision to expropriate only 51% was sovereign (and therefore not open to criticism in foreign jurisdictions), <u>and at the same time</u> that the decision not to expropriate or otherwise acquire the remaining 49% was not.

210.    There's an intrinsic flaw in this thesis that makes it impossible to subscribe to.

211.    What the Plaintiffs analyze as two distinct objects - which, in their view, should be subject to two distinct legal regimes - is in fact just the same decision described in two different ways, one in the positive and the other in the negative.

212.    Argentina's decision to expropriate only 51% of YPF necessarily implies its decision not to acquire the remaining 49%. The decision not to launch a public offer means expropriating "only" 51%. These two sentences are the necessary corollary for each other, two descriptions of the same Argentine decision. Each is a mirror image of the other, two sides of the same coin.

213.    This is also clear from the Plaintiffs' own arguments in the US proceedings. They claim that "*Argentina <u>issued an executive decree taking control of</u> YPF from its then majority shareholder, followed a few weeks later, <u>by legislation</u> formally <u>expropriating</u> a majority shareholding in the company, **<u>all without complying with the requirement of the articles of association</u>**"*

---

[121] In this respect, the Plaintiffs have maintained a contradictory position in the American proceedings. They first argued that the public offer should have been launched after the expropriation (which was executed in May 2014) in an attempt to distinguish the expropriation and the launch of the public offer and defeat the application of jurisdictional immunity. Then, at the damages stage, they considered that the offer should have been launched as early as 2012 and demanded that the prejudgment to be calculated from that date, two years before the expropriation was carried out, and to be subject to interest for late payment.

*to launch a takeover bid and to respect the rights of YPF's minority shareholders*"[122] or that "*Argentina breached this contractual obligation by acquiring majority control of YPF but refusing to make a takeover bid.*"[123]

214.    The artificiality of the Plaintiffs' distinction becomes even clearer when reasoned the other way round: <u>there is no situation in which it would be possible for</u> (i) <u>an expropriation of only 51% of Repsol to coexist with</u> (ii) <u>the application of the</u> <u>statutory</u> <u>provision</u> <u>requiring the launch of a public offer for 100% of the capital</u>. The two solutions are mutually exclusive and incompatible.

215.    Consequently, ruling that Argentina had to launch a public offer for all of YPF's shares is tantamount to ruling that Argentina could not or did not have the right to expropriate all of YPF's shares.
"only" 51% of the YPF share capital held by Repsol.

216.    Whichever way you look at the Plaintiffs' argument - whatever the temporality of the public offer, which, according to them, was required under YPF's articles of association - it invariably comes down to criticizing Argentina's expropriation decision.

217.    <u>In short, without expropriation, there is no dispute</u>. It is therefore the act that gives rise to the dispute.

218.    In response, the Plaintiffs wish to argue that "*without Statutory Violation, there is no dispute.*"[124]

219.    This is the Plaintiffs' second objection to Argentina's immunity from jurisdiction, which consists of arguing that they are not relying on the expropriation - which they acknowledge to be a sovereign act of public authority - but only on the alleged violation of YPF's statutes that resulted from it.

220.    As we have just seen, these are not two separate events, nor two different acts on the part of Argentina, but a single decision: the expropriation of 51% of YPF's capital belonging to Repsol, excluding the launch of a public offer.

221.    The Plaintiffs are shifting the cursor of scrutiny, but in so doing they are confusing the original act (the expropriation of 51%, precluding the launch of a public offer) with the legal consequences that this act might entail in terms of contractual liability.

222.    The alleged breach of the bylaws does not constitute the act at the origin of the dispute. Rather, it is a legal qualification, i.e. the legal basis on which the Plaintiffs sought to engage Argentina's liability.

---

[122] **Exhibit no. 22:** Plaintiffs' Appeal Brief to the United States Court of Appeals for the Second Circuit dated March 26, 2024- page 2, underlining and bold added.

[123] **Exhibit no. 22:** Plaintiffs' Appeal Brief to the U.S. Court of Appeals for the Second Circuit dated March 26, 2024 - page 46, underlining added.

[124] Plaintiffs' reply of February 24, 2025, § 87.

223.    Clearly, when they invoke the "violation" of YPF's articles of association, they are not invoking an act distinct from the expropriation, but, according to them, the expropriation does not comply with the provisions of the articles of association.

224.    The Plaintiffs could also have tried to base their action on other grounds, such as violation of Argentine stock exchange regulations or violation of Argentine expropriation regulations. These alleged violations would have constituted as many different qualifications for the same disputed act.

225.    To take another example, if a state enters into a contract to supply equipment to a company, and then refuses to supply the equipment, then the company might consider holding the state liable for breach of contract. It is clear that there is only one act at the origin of the dispute (the refusal to supply) and that the legal basis on which the plaintiff company acts (the breach of contract) does not constitute a distinct and autonomous event.

226.    In this respect, it is particularly interesting to note that in granting or refusing the benefit of immunity from jurisdiction, judges do not take into consideration the nature of the rule whose violation is alleged, nor the legal basis of the action for liability against the State.

227.    Immunity has thus been recognized for a State or an emanation, including when they were accused of (i) intervening in a purely private law relationship[125], (ii) breach of the terms of a partnership contract[126], or (iii) failure to pay the price of a cathodic protection system.[127]

228.    In the latter case, it is clear that breach of the obligation to pay the price of the system delivered is a reproach that could be leveled at any commercial company. The Court of Appeal had noted in particular that the contract in question had been concluded between two commercial companies under ordinary law, but this did not prevent the Supreme Court of Appeal from ruling that the claim was inadmissible because it related to an act "*performed in the interest of a public service*" in the field of energy supply.

229.    Thus, the arguments put forward by the Plaintiffs (i) regarding the "private" nature of the obligation to launch a public offer provided for in YPF's articles of association128, (ii) the fact that this rule is not inherently sovereign129, or (iii) the parallel with the existence of similar rules in European law130, are irrelevant to the assessment of the nature and purpose of the act giving rise to the dispute and, consequently, to the validity of the immunity from jurisdiction invoked.

---

[125] Supreme Court of Appeal, Civil Division 1, October 9, 1990 - no. 88-19.222.
[126] Supreme Court of Appeal, 1st Civil Chamber, March 3, 2021 - n° 19-22.855.
[127] Supreme Court, 1st Civil Chamber, May 2 1990 - no. 88-14.363.
[128] Conclusions in response to the Plaintiffs of February 24, 2025, §73, §78.
[129] Conclusions in response to the Plaintiffs of February 24, 2025, § 74.
[130] Conclusions in response to the Plaintiffs of February 24, 2025, §§ 83 - 86.

230.    Similarly, the Plaintiffs' argument that YPF's articles of association were binding on Argentina, which would exclude it from invoking its immunity if it were accused of having violated them and claimed compensation[131], makes no sense.

231.    To reason as the Plaintiffs propose would be tantamount to considering that a State could never invoke its immunity since, by construction, a plaintiff who engages the responsibility of a State always accuses it of non-compliance with a rule that he considers to be applicable to that State.

232.    In conclusion, without the partial expropriation of 51% of YPF's capital, the Plaintiffs could not base their action on an alleged breach of YPF's articles of association, so there would be no dispute. **No expropriation, no litigation**.

> *b.    By its very nature, the disputed act participates in the sovereignty of the State*

233.    In this case, the disputed act is one which, by its very nature, is part of the sovereignty of the Argentine Republic. Expropriation is intrinsically an act of public authority in which the State makes use of the prerogatives of public authority, exorbitant to ordinary law (cf. § 147 supra).

234.    In Argentina, the principle of expropriation is enshrined in Article 17 of the Constitution: "*[p]roperty is inviolable and no inhabitant of the Nation may be deprived of it except by virtue of a judgment based on law. **Expropriation in the public interest must be authorized by a special law and give rise to prior compensation.**"[132]

235.    The expropriation regime is defined in a special law, the General Law on Expropriation. This law organizes the expropriation procedure, sets out the timeframes for its execution, and provides for the compensation process for the expropriated person, remedies and the handling of third-party claims.[133]

236.    In the present case, in accordance with Articles 1 and 2 of the General Expropriation Act, it was indeed the Argentine Congress, the Senate and the Chamber of Deputies, which passed the Public Utility and Expropriation Act[134] on May 3, 2012.

237.    This law, of public order[135], declared the achievement of hydrocarbon self-sufficiency to be in the national public interest: "*It is declared a matter of national public interest and a priority objective of the Argentine Republic to achieve self-sufficiency in hydrocarbons, as well as the exploration, exploitation, industrialization, transportation, and commercialization of hydrocarbons, in order to guarantee economic development with social equity, job creation, increased competitiveness of the various economic sectors, and equitable and sustainable growth of the provinces and regions.*"[136]

---

[131] Plaintiffs' reply of February 24, 2025, §§ 75 - 77 and §§ 79 - 82.
[132] **Exhibit no. 1:** Argentine Constitution, article 17, bold added. In France, it's article 17 of the Declaration of Human Rights and of the Citizen: "*Property is an inviolable and sacred right; no one may be deprived of it except in cases of legally established public necessity, with obvious justification and subject to fair and prior compensation.*".
[133] **Exhibit no. 9:** Argentine Law no. 21,499 of January 17, 1977.
[134] **Exhibit no. 11:** Argentine Law no. 26,741 of May 3, 2012.
[135] **Exhibit no. 11:** Argentine law no. 26,741 of May 3, 2012, article 18.
[136] **Exhibit no. 11:** Argentine law no. 26,741 of May 3, 2012, article 1, emphasis added.

238.    It establishes the principles of the Argentine Republic's hydrocarbon policy, which include (i) *"the promotion of the use of hydrocarbons and their derivatives as a <u>factor for development</u>", (ii) "the maximization of investments and resources used to <u>achieve self-sufficiency in hydrocarbons</u> in the short, medium and long term", (iii) "<u>the integration of national and international public and private capital</u> in strategic alliances aimed at the exploration and exploitation of hydrocarbons," and (iv) "<u>the protection of consumer interests</u> with regard to price, quality and availability."*[137]

239.    In Title III, entitled "*Recovery of control of YPF*", article 7 declares Repsol's 51% stake in YPF to be in the public interest and subject to expropriation:

> "*In order to guarantee compliance with the objectives of this law, fifty-one percent (51%) of the capital of YPF Sociedad Anónima, represented by an equal percentage of the class D shares of said company, held directly or indirectly by Repsol YPF S.A., its controlling companies or its controlled companies, are declared to be in the public interest and subject to expropriation.*"[138]

240.    Article 8 provides for the distribution of titles to be expropriated between the federal state and the provinces.[139]

241.    The law stipulates above all that it is the national executive power that shall exercise "*political rights over all shares subject to expropriation until the expropriation procedure is completed*" and the shares are transferred to the provinces,[140] as well as "a*ll rights conferred by the shares to be expropriated*" during the expropriation procedure "i*n order to ensure the continuity of the hydrocarbon exploration, production, industrialization, and refining activities carried out by YPF Sociedad Anónima and Repsol YPF GAS S. A., as well as their transport, marketing and distribution and the increase in investment flows, for the <u>adequate supply of fuels necessary for the functioning of the national economy.</u>*"[141]

242.    The law clearly states that the expropriation procedure was governed by the General Expropriation Law ("*The expropriation procedure is governed by the provisions of Law 21,499 and the national executive acts as expropriator*") and that the determination of the price of the assets to be expropriated would be subject to "*the provisions of article 10 and the concordant provisions of Law 21,499. The appraisal is carried out by the National Appraisal Tribunal.*"[142]

243.    The Argentine Congress has also provided for the inalienability of the seized shares, the future transfer of the expropriated shares thus being "*prohibited without the authorization of the Honourable Congress of the Nation voted by two-thirds of its members.*"[143]

244.    YPF's Law of Public Utility and Expropriation has not been deemed unconstitutional or otherwise illegal. It remains in force to date.

---

[137] **Exhibit no. 11:** Argentine law no. 26,741 of May 3, 2012, article 3, emphasis added.
[138] **Exhibit no. 11:** Argentine law no. 26,741 of May 3, 2012, article 7.
[139] **Exhibit no. 11:** Argentine law no. 26,741 of May 3, 2012, article 8.
[140] **Exhibit no. 11:** Argentine law no. 26,741 of May 3, 2012, article 9.
[141] **Exhibit no. 11:** Argentine law no. 26,741 of May 3, 2012, article 13, emphasis added.
[142] **Exhibit no. 11:** Argentine law no. 26,741 of May 3, 2012, articles 11 and 12.
[143] **Exhibit no. 11:** Argentine law no. 26,741 of May 3, 2012, article 10.

245.    Even before the law was passed two weeks earlier, the Argentine Republic had made use of its public powers to ensure that the objectives set out in the Intervention Decree were achieved.

246.    By the Decree of Intervention of April 16, 2012, the President of the Argentine Republic ordered the appointment of the Minister of Federal Planning, Public Investments and Services as temporary ad hoc agent to exercise the powers of the Board of Directors and the President of YPF for 30 days.[144]

247.    Argentina was thus able to place YPF under its guardianship while the Law of Public Utility and Expropriation was being examined and voted on, thus preventing the former management from making decisions detrimental to YPF. The Plaintiffs recall in their summons:

> "*under Emergency Decree No. 530/12 also adopted on April 16, 2012, the Republic announced that it was taking immediate and effective control of YPF by appointing Mr. Julio De Vido, then Minister of Planning, as an executor "vested with all the powers of (i) the Board of Directors and (ii) the President of YPF.*
>
> *On the same day, members of the Argentine government took possession of YPF's headquarters and various facilities, and began to take charge of its operations. Some of the executives, including Mr Sebastien Eskenazi, were asked to leave the premises immediately.*"[145]

248.    It follows from the foregoing that (i) the expropriation measure was implemented on the basis of constitutional and legal provisions governing expropriation procedures, (ii) it was preceded by exceptional emergency measures enabling the government to take control of YPF pending the adoption of the Public Utility and Expropriation Law, (iii) the law was adopted by the Argentine national legislature, Congress, which is the repository of legislative power, (iv) the Comprehensive Settlement Agreement between Argentina and Repsol was approved by a law passed by the Argentine Congress, bringing the expropriation procedure[146] to a close.

249.    It cannot be argued that such an act constitutes an act of management. At no time in this expropriation process, which began in 2012 and was resolved in 2014, did the Argentine Republic behave like a private player.

250.    Both the nature of the act and the instruments used by the Argentine Republic demonstrate that the act of expropriation was an exercise of Argentina's sovereignty.

        *c.    The purpose of the disputed act contributes to the sovereignty of the State*

251.    The objectives pursued by the Argentine Republic in this operation also demonstrate that it was a matter of sovereignty, and primarily of energy sovereignty.

---

[144] **Exhibit no. 10:** Argentine Decree no. 530/2012 of April 16, 2012, articles 1, 2 and 3.
[145] Plaintiffs' summons, §§ 21 and 22, emphasis added.
[146] **Exhibit no. 15:** Argentine Law no. 26,932 of April 23, 2014.

252.    In the preamble to its Intervention Decree, the Argentine executive set out in detail the strategic considerations and factual findings that necessitated expropriation.

253.    The Intervention Decree thus reiterates the importance of hydrocarbons for the Argentine national economy and the strategic interest in ensuring the country's self-sufficiency in order to eliminate geopolitical and speculative factors that determine energy import prices and thereby reduce the vulnerability of the State.

254.    He also points out that, in addition to energy independence, there is the issue of preserving the national public finances. The rising energy bill requires the mobilization of resources that could otherwise be directed towards financing the country's economic development through more socially inclusive growth.

255.    At the same time, the Argentine government emphasized the central role of YPF, the country's largest oil company, in the conduct of the country's energy policy, and the misalignment of the interests of its majority shareholder, Repsol, with those of the Argentine Republic.

256.    As detailed above (§§ 42 - 52), Repsol's management of YPF has led to a significant reduction in investment in exploration and production, which, in turn, has resulted in a marked drop in oil and gas production. This was due to the massive and disproportionate distribution of dividends to shareholders, depriving YPF of resources to finance its growth, modernize its infrastructure and increase hydrocarbon production.

257.    This situation, contrary to the interests of the State, has had the effect of increasing Argentina's dependence on oil and gas imports, compromising its energy sovereignty and worsening its trade balance.

258.    It was therefore essential for the Argentine Republic to remedy the situation, without delay, by taking concrete measures to: (i) urgently secure a stable energy supply for the country (ii) regain strategic control of the company to align its operations with national priorities, in particular the achievement of energy self-sufficiency;
(iii) restore public confidence in YPF's ability to fulfill its strategic role; (iv) stimulate investment in the exploration and exploitation of new deposits; (v) redirect profits towards strategic projects rather than excessive distributions to shareholders; and (vi) maintain private equity investors.[147]

259.    <u>It was the pursuit of these objectives that justified the submission to the Argentine Congress, and the latter's vote, of the Public Utility and Expropriation Law.</u>

\*

260.    Ultimately, the act of expropriation at the heart of the dispute (i) constitutes an act of public authority, (ii) results from the use by Argentina of prerogatives exorbitant to common law, (iii)

---

[147] **Exhibit no. 10:** Argentine Decree No. 530/2012 of April 16, 2012, preamble and **Exhibit no. 11:** Argentine law no. 26.741 of May 3, 2012, article 3.

contributes to the public interest in energy, (iv) and more generally to ensuring energy sovereignty and independence. The Plaintiffs do not dispute this.

261. Thus, whatever the grievances formulated against this act, whatever the judgment made on its lawfulness or its conformity with YPF's articles of association, <u>it is an act which, both by its nature and by its purpose, participates in the exercise of Argentina's sovereignty</u>. The expropriation decision at the heart of the dispute combines the two alternative criteria laid down by international law and French case law for determining that an act is sovereign.

262. **Consequently, the Argentine Republic is entitled and well-founded to assert its immunity from jurisdiction, which it has not waived. The Pre-Trial Judge will rule that the Plaintiffs' claims are inadmissible.**

263. Since they are unsuccessful in their claims, Petersen Energía Inversora SAU, Petersen Energía SAU, Eton Park Capital Management, L.P., Eton Park Fund L.P., and Eton Park Master Fund, Ltd. should be ordered to pay the sum of 60,000 euros to the Argentine Republic under Article 700 of the Code of Civil Procedure, and to pay all costs.

42

# FOR THESE REASONS

---

**Having regard to the principles of international law relating to the immunity of foreign States from jurisdiction,**

<u>In limine litis:</u>

- **TO STAY PROCEEDINGS** in this case until the appeal proceedings against (i) *Opinion & Order* of the *United States District Court* for the *Southern District of New York* of March 31, 2023 (refs. 15 Civ. 2739 (LAP) and 16 Civ. 8569 (LAP)) between Petersen Energía Inversora S.A.U., Petersen Energía S.A.U., Eton Park Capital Management L.P., Eton Park Master Fund Ltd. and Eton Park Fund L.P. on the one hand, and the Argentine Republic and YPF S.A. on the other; (ii) *Findings of fact and conclusions of law* of the *United States District Court* for the *Southern District of New York* of September 8, 2023 (refs. 15 Civ. 2739 (LAP) and 16 Civ. 8569 (LAP)) between Petersen Energía Inversora S.A.U., Petersen Energía S.A.U., Eton Park Capital Management L.P., Eton Park Master Fund Ltd. and Eton Park Fund L.P. on the one hand, and the Argentine Republic and YPF S.A. on the other; and
(iii) *Final Judgment* of the *United States District Court* for the *Southern District of New York* of September 15, 2023 (refs. 15 Civ. 2739 (LAP) and 16 Civ. 8569 (LAP)), rendered between Petersen Energía Inversora S.A.U., Petersen Energía S.A.U., Eton Park Capital Management L.P., Eton Park Master Fund Ltd. and Eton Park Fund L.P. on the one hand, and the Argentine Republic and YPF S.A. on the other hand, are given a definitive decision without appeal before the US courts.

<u>Seeking principally the following:</u>

- **JUDGE** that the Argentine Republic is entitled to invoke its immunity from jurisdiction.

**As a result**

- **DECLARE** inadmissible the exequatur applications of Petersen Energía Inversora SAU, Petersen Energía SAU, Eton Park Capital Management, L.P., Eton Park Fund L.P., and Eton Park Master Fund, Ltd.

- **DECLARE** inadmissible the other claims of Petersen Energía Inversora SAU, Petersen Energía SAU, Eton Park Capital Management, L.P., Eton Park Fund L.P, and Eton Park Master Fund, Ltd against the Argentine Republic.

- **CONDEMN,** jointly and severally, the companies Petersen Energía Inversora SAU, Petersen Energía SAU, Eton Park Capital Management, L.P., Eton Park Fund L.P, and Eton Park Master Fund, Ltd to pay all the costs of the proceedings.

- **CONDEMN** jointly the companies Petersen Energía Inversora SAU, Petersen Energía SAU, Eton Park Capital Management, L.P., Eton Park Fund L.P, and Eton Park Master Fund, Ltd to pay the sum of 60,000 euros to the Argentine Republic for legal costs.

**List of documents submitted**

**Exhibit no. 1.**     Argentine Constitution and free translation.

**Exhibit no. 2.**     Extract from the Argentine Republic's Annual Report filed with the U.S. Securities and Exchange Commission in 2024 and free translation of extracts.

**Exhibit no. 3.**     Responses of the Plaintiffs to the Statement of Facts of the Argentine Republic in the American proceedings of May 26, 2022 and free translation.

**Exhibit no. 4.**     New York Times article from March 23, 2017 and free translation.

**Exhibit no. 5.**     South Cone economic and financial news update for the week of July 6-12, 2018 from the French Embassy in Argentina.

**Exhibit no. 6.**     Transcript of Burford Capital's Q3 2024 results conference on November 7, 2024 and free translation of extracts.

**Exhibit no. 7.**     Article from Buenos Aires Times, Burford aims for a 37,000% return on the $16 billion judgment against Argentina, November 9, 2023, and free translation.

**Exhibit no. 8.**     Excerpt from the prospectus filed with the Securities and Exchange Commission in 1993 for YPF's initial public offering, and free translation of excerpts.

**Exhibit no. 9.**     Argentine Law No. 21,499 of January 17, 1977 and free

translation. **Exhibit no. 10.**  Argentine Decree No. 530/2012 of April 16, 2012 and

free translation. **Exhibit no. 11.**     Argentine Law No. 26,741 of May 3, 2012 and

free translation.

**Exhibit no. 12.**     Article in Le Figaro, *L'Argentine veut assurer son indépendance énergétique*, April 17, 2012.

**Exhibit no. 13.**     Global Settlement Agreement entered into between the Argentine Republic and Repsol on February 27, 2014 and free translation of extracts.

**Exhibit no. 14.**     Ruling of the Argentine Supreme Court in the De San Martin case of August 20, 2014 and free translation of extracts.

**Exhibit no. 15.**     Argentine Law No. 26,932 of April 23, 2014 and free translation of extracts.

**Exhibit no. 16.**     Burford Capital article, Burford Capital statement on YPF damages decision, September 8, 2023 and free translation of extracts.

**Exhibit no. 17.**    New York District Court decision on application for stay of execution of November 21, 2023 and free translation of extracts.

**Exhibit no. 18.**    Macrotrends site showing YPF's market capitalization equal to US$5.28 billion on September 15, 2023.

**Exhibit no. 19.**    Lawfare article, Peterson v. Argentina: analysis of a $16 billion judgment, November 30, 2023 and free translation of extracts.

**Exhibit no. 20.**    Reuters article, *This billion-dollar case against Argentine company YPF would not exist without litigation funding. Is that a good thing?*, 3 April 2023 and free translation of extracts.

**Exhibit no. 21.**    Burford Capital's 3rd quarter results presentation of November 7, 2024 and free translation of extracts.

**Exhibit no. 22.**    Plaintiffs' Appeal Brief to the U.S. Court of Appeals for the Second Circuit of March 26, 2024 and free translation of extracts.

**Exhibit no. 23.**    Decisions of the United States Court of Appeals for the Second Circuit of October 4, 2019 (Bison Bee LLC v. Republic of Argentina) and March 17, 2020 (Bugliotti v. Republic of Argentina) and free translation of extracts.

**Exhibit no. 24.**    Argentina's Appeal Brief to the United States Court of Appeals for the Second Circuit, February 22, 2024 and free translation of extracts.

**Exhibit no. 25.**    Letter from the United States of America dated November 6, 2024 and brief from the United States of America dated January 10, 2025 before the District Court of New York in proceedings 15 Civ. 2739 (LAP) and 16 Civ. 8569 (LAP) and free translation of extracts.

**Exhibit no. 26.**    Letter from the Argentine Republic of December 19, 2023 to the District Court of New York in the proceedings 15 Civ. 2739 (LAP) and 16 Civ. 8569 (LAP).

**THE STATE OF TEXAS**        }
                              }
**COUNTY OF HARRIS**          }

### AFFIDAVIT OF ACCURACY

BEFORE ME, the undersigned authority, on this day personally appeared <u>Ana Cristina Didoné</u>, who, by oath and by presentation of identification, is personally known to me to be the person subscribing her name below and, after being by me duly sworn according to law, upon her oath deposes and says in due form of law that to the best of her knowledge, information and belief:

1. "My name is Ana Cristina Didoné and I am over the age of twenty-one years and competent to make this affidavit.

2. I am President of TransLite Solutions LLC.

3. I have been a certified sworn translator since 1988 with a M.A. in Legal Translations from the University of Salvador, Argentina. I am certified by the Argentine Association of Sworn Public Translators to translate from English into Spanish and Spanish into English. I am also certified by the American Translators Association for English to Spanish translations. I hold a degree in Executive Business Management from Rice University.

4. I hereby certify that the translator that performed the translation of the document in French into English, titled "*INTERLOCUTORY PLEADINGS NO. 2*", is a professional legal translator, holds a Bachelor's degree from the University of Michigan, Cum Laude, in Law and Language Studies and a degree in International Law from the University of Michigan Law School, Juris Doctor, Magna Cum Laude, with over 30 years of experience in translations of French>English and qualified to render an accurate translation.

Translator:    Joshua Kline

ANA CRISTINA DIDONE, MA
Certified by American Translators Association

Sworn to before me this  6/6/2025

Notary Public in and for the State of Texas
My commission expires

CAMERON FEDER
Notary Public, State of Texas
Comm. Expires 05-19-2029
Notary ID 129411929

TRANSLITE SOLUTIONS, LLC
LIMITED LIABILITY
SEAL
TEXAS

*A Madame, Monsieur le Juge de la Mise en Etat – Chambre de l'exequatur – Tribunal Judiciaire de Paris*

-----------------------------------------------------

RG n° 24/03275
Communiquées par RPVA le 24 mars 2025

## CONCLUSIONS D'INCIDENT N° 2

POUR :    La **République Argentine**, représentée par Procuración del Tesoro de la Nación Argentina, Posadas 1641, C1112ADC Buenos Aires, République Argentine

**Défenderesse**

Ayant pour Avocats :
Le cabinet Emeriane Avocats
Avocats au Barreau de Paris
22 rue de la Paix – 75002 Paris
Tél. : 06 19 91 67 54 – Toque : E2194
Plaidant par Maître Nicolas DEGARDIN

CONTRE :    (1) La société **Petersen Energía Inversora S.A.U.**,

(2.) La société **Petersen Energía S.A.U.**,

(3.) La société **Eton Park Capital Management, L.P.**,

(4.) La société **Eton Park Master Fund, Ltd**,

(5.) La société **Eton Park Fund L.P.**,

**Demanderesses**

Ayant pour Avocats :
La SELAS Archipel
Avocats au Barreau de Paris
92 rue Jouffroy d'Abbans – 75017 Paris
Tél. : 01 40 54 51 00 – Fax : 01 40 54 51 01 – Toque : P122
Plaidant par Maîtres Jacques-Alexandre Genet

**PLAISE AU JUGE DE LA MISE EN ETAT**

1.     Par assignation datée du 29 février 2024, les sociétés Petersen Energía Inversora SAU, Petersen Energía SAU, Eton Park Capital Management, L.P., Eton Park Fund L.P, et Eton Park Master Fund, Ltd (les « **Demanderesses** ») ont saisi le Tribunal Judiciaire de Paris d'une demande d'exequatur des décisions du tribunal de district des États-Unis pour le district sud de New York des 31 mars et 8 septembre 2023 et du jugement final du 15 septembre 2023.

2.     Ces décisions et ce jugement final ont condamné la République Argentine à payer aux Demanderesses une somme colossale de 16,1 milliards de dollars américains en réparation du préjudice prétendument subi suite à l'expropriation d'une participation de 51% au capital de la société pétrolière argentine YPF (« YPF »), représentée par des actions de classe D appartenant à Repsol.

3.     En substance, les Demanderesses (qui étaient actionnaires minoritaires de YPF lorsque la procédure d'expropriation a été autorisée en 2012 par le Congrès argentin, mais ne l'étaient plus lorsque la procédure d'expropriation s'est conclue en 2014) ont soutenu que l'expropriation de la participation de Repsol dans YPF leur aurait indirectement causé un préjudice. Selon les Demanderesses, les statuts de YPF prévoyant le lancement d'une offre publique sur l'ensemble des titres de la société en cas de prise de contrôle, la République Argentine ne pouvait pas, sans violer les statuts de YPF, circonscrire l'expropriation à la seule participation de Repsol au capital de YPF à hauteur de 51%. La République Argentine conteste fermement cette position dans le cadre de l'appel des décisions et du jugement suscités, actuellement pendant devant les juridictions américaines.

4.     L'existence de cette procédure d'appel justifie le prononcé d'un sursis à statuer dans la présente instance. Mais en tout état de cause, la demande d'exequatur qui vous est soumise est irrecevable puisque la République Argentine est fondée à opposer son immunité de juridiction.

5.     Selon les principes de droit international coutumier, les États étrangers bénéficient d'une immunité de juridiction lorsque l'acte qui donne lieu au litige participe, par sa nature ou sa finalité, à l'exercice de la souveraineté de ces États et n'est donc pas un acte de gestion.

6.     Or, il est manifeste que la décision d'exproprier la seule participation de l'actionnaire majoritaire à hauteur de 51% (et donc la décision de ne pas exproprier ou autrement acquérir les 49% restants) participe par sa nature et sa finalité à l'exercice de la souveraineté de la République Argentine.

7.     Par sa nature d'abord, puisque l'acte d'expropriation est par définition un acte par lequel l'État exerce des prérogatives de puissance publique, exorbitantes du droit commun, pour se saisir, de force, la propriété d'un bien considéré d'utilité publique.

8.     Par sa finalité ensuite, puisque l'expropriation de Repsol a été jugée nécessaire pour remédier à l'épuisement des réserves de pétrole et de gaz, résoudre le déficit énergétique de l'Argentine obérant les finances publiques et assurer l'indépendance énergétique de l'État.

9.      Par conséquent, dès lors que le litige sous-jacent porte sur un acte qui participe à la souveraineté de l'Argentine, l'immunité de juridiction dont bénéficie la République Argentine s'oppose à la recevabilité de la demande d'exequatur.

10.     A toutes fins utiles, la République Argentine précise les faits tels qu'exposés par les Demanderesses et l'ensemble de leurs demandes sont formellement contestés. En d'autres termes, les faits allégués qui ne sont pas expressément contestés ou corrigés dans les développements ci-dessous ne sont pas pour autant admis ; au contraire, toute allégation qui n'est pas expressément admise est à considérer comme contestée.

## <u>Table des matières</u>

I.    FAITS ....................................................................................................................5

    A.  Les parties ..........................................................................................................5

        1)    La République Argentine ..............................................................................5

        2)    Les Demanderesses .......................................................................................6

    B.  Les éléments pertinents du litige sous-jacent ..................................................9

        1)    La création et la privatisation de l'entreprise publique YPF .........................9

        2)    L'acquisition de titres au capital de YPF par les Demanderesses ..................10

        3)    La chute de la production de pétrole et de gaz, le déclin des réserves et les menaces pour la souveraineté et l'indépendance énergétique argentine .................................10

        4)    La Loi d'Utilité Publique et d'Expropriation de 51% du capital social de YPF ...........12

        5)    La perte par les entités Petersen et Eton Park de leur qualité d'actionnaire .................13

        6)    L'indemnisation de Repsol et la réalisation de l'expropriation .........................................14

    C.  L'engagement, par les Demanderesses, de procédures devant les juridictions américaines .............................................................................................................. 15

    D.  Les décisions judiciaires américaines ............................................................ 16

    E.  La procédure d'appel et les tentatives d'exécution ...................................... 17

        1)    L'appel interjeté par l'Argentine ................................................................17

        2)    L'absence de sursis à exécution ..................................................................19

        3)    Les procédures subséquentes aux États-Unis ..............................................19

        4)    Les procédures d'exécution dans les autres juridictions ................................20

II.   DISCUSSION ................................................................................................... 21

    A.  Sur la demande de sursis à statuer ................................................................ 21

        1)    En droit, un pouvoir souverain du juge ......................................................21

        2)    En fait, le sursis à statuer est justifié .........................................................22

    B.  En tout état de cause, sur l'irrecevabilité des demandes d'exequatur tirée de l'immunité de juridiction dont bénéficie la République Argentine .............................. 26

        1)    En droit, sur l'immunité de juridiction ........................................................26

        2)    En fait, la République Argentine est fondée à se prévaloir de son immunité de juridiction ..............................................................................................................34

## I.   FAITS

### A.  Les parties

#### 1)  La République Argentine

11.     L'Argentine est une nation souveraine d'Amérique latine, une république constitutionnelle fédérale (la « **République Argentine** » ou l'« **Argentine** »). La Constitution argentine, adoptée pour la première fois en 1853[1], prévoit un système de gouvernement tripartite divisé en un pouvoir exécutif dirigé par le président, un pouvoir législatif composé d'un congrès bicaméral (le Sénat et la Chambre des Députés) et un pouvoir judiciaire dirigé par la Cour Suprême de Justice de la Nation.

12.     L'Argentine est la vingt-cinquième puissance économique mondiale et troisième d'Amérique latine[2]. Sur les deux dernières décennies, l'Argentine a connu plusieurs périodes de crise économique.

13.     De 1998 à 2002, la République Argentine a subi une grave crise économique, politique et sociale, marquée par une récession persistante, une croissance spectaculaire du chômage et de la pauvreté et l'impossibilité d'accéder aux marchés financiers internationaux.

14.     A la suite du déclin de sa balance commerciale lié à la baisse du prix des biens qu'elle exporte, de la hausse des taux d'intérêts internationaux et de la baisse de ses rentrées fiscales à cause de la récession, la République Argentine s'est trouvée « en faillite ».

15.     Après un fort rebond entre 2003 et 2007, l'économie a souffert de la crise financière mondiale de 2008.

16.     Plus récemment, en 2020, l'épidémie du Covid-19 a exacerbé les difficultés économiques de l'Argentine. En 2023, l'Argentine a été touchée par une nouvelle crise qui s'est traduite par une récession (-1,6% de croissance), une inflation atteignant son plus haut niveau depuis la fin de l'épisode d'hyperinflation en 1991, à 211 %, le déséquilibre des finances publiques, l'attrition des réserves de change et le décrochage du Peso.

17.     Une dévaluation de 22% a eu lieu en août 2023, suivie d'une autre de 54 % en décembre 2023. En 2023, les revenus fiscaux de l'Argentine s'élevaient à 31 116 milliards de pesos argentins[3].

18.     En janvier 2024, l'Argentine a négocié la reprise du programme du FMI. Le 13 juin 2024, le Conseil d'administration du FMI a achevé la huitième revue au titre de facilité élargi de crédit de 2022, ce qui a donné lieu à un décaissement de 800 millions de dollars américains pour soutenir les efforts du gouvernement visant à réduire l'inflation, à reconstituer les amortisseurs budgétaires et

---

[1] Elle fut révisée pour la dernière fois en 1994. **Pièce n° 1 :** Constitution argentine.
[2] https://www.diplomatie.gouv.fr/fr/dossiers-pays/argentine/presentation-de-l-argentine/.
[3] **Pièce n° 2 :** Extrait du Rapport annuel de la République Argentine déposé auprès de la Securities and Exchange Commission des États-Unis en 2024, page D-108.

extérieurs et à favoriser la reprise économique[4]. Au 30 juin 2024, le FMI avait déboursé 5,5 milliards de dollars américains en faveur de la République Argentine au titre du mécanisme élargi de crédit[5].

19.      En mars 2025, le gouvernement argentin a autorisé par le biais du décret 179/2025 la conclusion d'un nouvel accord avec le FMI dans le cadre d'un nouveau programme de facilité élargie de crédit, afin d'obtenir des fonds pour régler une partie des dettes du Trésor national envers la Banque centrale d'Argentine et pour régler les opérations de crédit public conclues avec le FMI dans le cadre du programme de facilités élargies de crédit de 2022 dont les échéances arrivent à terme dans les quatre ans suivant la conclusion du nouvel accord, conformément à son engagement en faveur de l'équilibre budgétaire et de la stabilisation macroéconomique[6].

20.      Tout au long de l'année 2024 et en 2025, l'Argentine a mis en place des mesures drastiques pour résorber les déséquilibres structurels et le déficit budgétaire.

21.      Il est trompeur de prétendre, comme le font les Demanderesses, que l'Argentine serait un débiteur récalcitrant[7].

22.      Lorsque des fonds vautours tentent de tirer avantage des difficultés économiques de certains pays pour réaliser un profit purement spéculatif, l'Argentine se défend contre de telles attaques en utilisant les moyens de droit à sa disposition.

23.      Tel fût le cas dans le dossier NML Capital (fonds géré par Elliot Management) : dans les années 2000, alors qu'il était largement su que l'Argentine n'avait plus les capacités financières de faire face à sa dette, le fonds vautour a acheté, à prix décoté, des titres de dette souveraine argentine sur les marchés financiers, puis a refusé de participer à la restructuration de la dette du pays avec l'ensemble des autres créanciers, et a enfin cherché à obtenir le remboursement, avec intérêt de retard, des obligations achetées à un prix 4 fois inférieur[8].

## 2)  Les Demanderesses

### a.  *Les Demanderesses qui apparaissent facialement*

24.      Petersen Energía Inversora SAU et Petersen Energía SAU sont deux filiales du groupe Petersen, deux entités immatriculées en Espagne dans l'unique but de porter la participation du groupe dans YPF (les « **entités Petersen** » ou « **Petersen** »). Elles sont aujourd'hui en liquidation judiciaire en Espagne. Les bénéficiaires effectifs ultimes du groupe sont la famille Eskenazi (tous résidents d'Argentine).

---

[4] **Pièce n° 2 :** Extrait du Rapport annuel de la République Argentine déposé auprès de la Securities and Exchange Commission des États-Unis en 2024, page D-13.

[5] **Pièce n° 2 :** Extrait du Rapport annuel de la République Argentine déposé auprès de la Securities and Exchange Commission des États-Unis en 2024, page D-13.

[6] https://www.boletinoficial.gob.ar/detalleAviso/primera/322325/20250311.

[7] Dans de récentes décisions statuant sur des demandes de remboursement des obligations souveraines, les juridictions américaines ont reconnu que l'Argentine n'était plus un débiteur récalcitrant (**Pièce n° 23** : Arrêts de la Cour d'appel des États-Unis pour le deuxième circuit du 4 octobre 2019 (Bison Bee LLC c/ République d'Argentine) et du 17 mars 2020 (Bugliotti c/ République d'Argentine) et traduction libre d'extraits.

[8]    https://www.lemonde.fr/paradise-papers/article/2018/04/10/elliott-management-le-fonds-speculatif-qui-a-fait-payer-le-congo-brazzaville_5283333_5209585.html.

25.     Eton Park Capital Management, L.P. était un gestionnaire de fonds spéculatifs situé à New-York ayant investi au capital de YPF via deux fonds d'investissement : Eton Park Fund L.P, situé dans l'état du Delaware et Eton Park Master Fund, Ltd situé aux Iles Caïmans (ensemble les « **entités Eton Park** » ou « **Eton Park** »). Eton Park a fermé en 2017 en raison de mauvaises performances[9].

*b.   La véritable demanderesse : Burford Capital Limited*

26.     En réalité, derrière ces entités, formellement Demanderesses dans la procédure, se trouve la véritable demanderesse : Burford Capital Limited (« **Burford** »).

27.     Il s'agit d'un fonds d'investissement spécialisé dans le financement de procédures judiciaires ou des procédures de recouvrement. Ce type de fonds rachète ainsi des créances contentieuses ou avance les fonds nécessaires aux parties demanderesses pour couvrir les coûts et frais des procédures. En contrepartie de ces financements, ces fonds reçoivent l'essentiel des condamnations prononcées et/ou des sommes recouvrées. L'objectif poursuivi est la réalisation d'un gain égal à la différence entre les sommes obtenues et les financements fournis.

28.     Lorsqu'ils s'attaquent à des entreprises ou des États en difficultés, comme en l'espèce, ces fonds sont qualifiés de fonds vautour[10].

29.     Quoiqu'en disent les Demanderesses, bien que Burford ne soit pas formellement partie à la procédure, c'est bien elle dont les intérêts économiques sont prépondérants dans cette affaire et c'est bien elle qui conduit les procédures contentieuses.

30.     L'intérêt de Burford est en effet très significatif. Burford avait initialement droit à 70% de tout produit provenant de la poursuite des revendications de Petersen et à environ 75% du produit provenant de la poursuite de l'action d'Eton Park[11]. Plus récemment, dans son rapport sur les résultats du 3e trimestre 2024, Burford a indiqué que : « *Le droit de Burford s'élève à environ 35 % des recettes de l'affaire Petersen et à environ 73 % des recettes de l'affaire Eton Park, soit, au total, environ 40 % de l'ensemble des recettes de l'affaire Petersen et de l'affaire Eton Park* »[12].

31.     Cela lui permet d'envisager un gain considérable : « *La part de Burford Capital dans les 16 milliards de dollars américains qu'un juge américain de New York a ordonné à l'Argentine de payer pour l'expropriation en 2012 de la compagnie pétrolière YPF SA s'élève à environ 6,2 milliards de dollars américains, ce qui donnerait au financeur du litige un retour de plus de 37 000 % sur son investissement initial* »[13].

---

[9] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §43 et **Pièce n° 4 :** Article du New York Times du 23 mars 2017.
[10] C'est la position du Trésor français dans cette affaire : « *Un « fonds vautour » obtient le jugement de la nationalisation de YPF à New York. Le fonds procédurier (dit « fonds vautour ») Burford Capital a obtenu le 11 juillet que le jugement sur la nationalisation de la compagnie pétrolière YPF ait lieu à la cour du district sud de New York.* » - **Pièce n° 5** : Point d'actualité économique et financière du Cône Sud de la semaine du 6 au 12 juillet 2018 de l'ambassade de France en Argentine
[11] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §§ 101 et 103.
[12] **Pièce n° 6 :** Transcription de la conférence résumant les résultats du 3e trimestre de Burford Capital du 7 novembre 2024, p. 10, soulignement ajouté.
[13] **Pièce n° 7 :** Burford vise un rendement de 37 000 % sur les 16 milliards de dollars de dommages-intérêts accordés contre l'Argentine, Buenos Aires Times, 11 septembre 2023.

32.     Au-delà de l'intérêt financier, c'est bien Burford qui pilote le contentieux et décide de la stratégie à suivre. Pendant la conférence téléphonique sur la publication des résultats financier du 3ᵉ trimestre 2024, qui s'est tenue le 7 novembre 2024 – Burford a expliqué sa position et sa stratégie dans l'affaire.

33.     Les termes employés démontrent que c'est bien Burford la partie demanderesse et qu'elle se considère elle-même comme l'adversaire de l'Argentine dans cette affaire :

> « Nous comprenons que l'affaire YPF suscite beaucoup d'intérêt de la part des actionnaires. C'est évident, compte tenu de sa taille et de son importance pour l'entreprise. <u>Et nous savons que les investisseurs trouvent frustrant de ne pas pouvoir obtenir de notre part des informations sur nos stratégies et leurs progrès</u>. Malheureusement, c'est tout simplement la réalité des litiges. Et aucun d'entre vous, <u>aucun investisseur rationnel ne voudrait que nous divulguions publiquement des informations qui donneraient à l'Argentine un avantage dans ce litige en cours</u> »[14].

> « La deuxième catégorie d'activités concerne les procédures d'exécution et de reconnaissance. L'Argentine n'ayant pas rempli les conditions d'un sursis à statuer, le jugement du tribunal de première instance est exécutoire, même s'il est en appel. Cela nous permet de faire plusieurs choses. <u>Nous</u> demandons à l'Argentine, à YPF et aux tiers de nous fournir des informations après le jugement devant le tribunal de New York, et <u>nous</u> nous y employons activement, notamment en déposant des requêtes pour obtenir des informations lorsque cela est nécessaire. <u>Nous</u> demandons également au tribunal de New York de nous aider à faire appliquer la loi.

> Par exemple, <u>nous</u> avons déposé une requête pour que les actions de l'Argentine dans YPF <u>nous</u> soient remises. <u>Nous</u> sommes également engagés dans des efforts au niveau mondial. Afin d'exécuter le jugement dans d'autres juridictions, nous devons d'abord obtenir que les tribunaux locaux de ces juridictions reconnaissent le jugement. En d'autres termes, ils doivent l'adopter comme s'il s'agissait de leur propre jugement. <u>Nous</u> avons déposé une demande de reconnaissance du jugement dans plusieurs juridictions non américaines, et ces procédures sont en cours de traitement par les tribunaux de l'Union européenne »[15].

34.     De cette communication, il ressort également que c'est bien Burford qui a défini et mis en place une forme de harcèlement judiciaire multi juridictionnel. La stratégie consiste à lancer de multiples procédures (dont Burford sait que certaines sont vouées à l'échec) dans plusieurs juridictions, dans le but assumé d'exercer une pression suffisamment forte pour contraindre l'adversaire à négocier plutôt que de continuer à se défendre dans l'ensemble de ces procédures.

35.     Burford explique ainsi : « *l'objectif de notre stratégie est davantage d'amener l'Argentine à la table des négociations que de saisir et de vendre des actifs* »[16] ou encore de manière plus détaillée « *Si l'on prend du recul par rapport à l'argumentation juridique, il est important de garder à l'esprit ce qu'est et ce que n'est pas la phase d'exécution ainsi que son objectif. <u>L'objectif des stratégies d'exécution est d'exercer une pression et de créer des frictions</u> afin qu'une négociation rationnelle puisse avoir lieu. Il ne s'agit pas en soi d'errer dans la campagne, en*

---

[14] **Pièce n° 6 :** Transcription de la conférence résumant les résultats du 3ᵉ trimestre de Burford Capital du 7 novembre 2024, p. 7, soulignement ajouté.

[15] **Pièce n° 6 :** Transcription de la conférence résumant les résultats du 3ᵉ trimestre de Burford Capital du 7 novembre 2024, p. 8, soulignement ajouté.

[16] **Pièce n° 6 :** Transcription de la conférence résumant les résultats du 3ᵉ trimestre de Burford Capital du 7 novembre 2024, p. 10, soulignement ajouté.

*essaying de récupérer un bien ici et un bien là et de les vendre aux enchères pour payer un énorme jugement.* <u>*La législation relative à l'exécution des jugements contre les États souverains est complexe et souvent peu claire, et nous essaierons de nombreux stratagèmes qui ne fonctionneront pas d'un point de vue strictement juridique.*</u> *Cela ne devrait inquiéter personne* »[17].

36.    Burford expose également la raison de sa stratégie et le levier qu'elle tente d'utiliser : le besoin de l'Argentine d'accéder aux marchés internationaux pour emprunter et financer son économie : « <u>*En réalité, l'Argentine est en train de reconstruire son économie et de reprendre sa place sur la scène internationale. Pour ce faire, elle doit réintégrer les marchés des capitaux et participer à l'économie mondiale. Le fait d'avoir une importante décision de justice américaine non satisfaite et des procédures d'exécution en cours dans le monde entier qui englobent également des tiers est un obstacle à ce processus de normalisation. Et cela devrait, à notre avis, aboutir à une résolution commerciale. En d'autres termes, nous sommes un problème lancinant que l'Argentine doit résoudre*</u> »[18].

37.    Cela fait apparaître les enjeux de cette affaire pour la véritable demanderesse, ceux qui guident toute sa stratégie : la rentabilité et le retour sur investissement d'un placement spéculatif sur des créances litigieuses.

### B.  Les éléments pertinents du litige sous-jacent

38.    L'affaire concerne la décision de l'Argentine d'exproprier 51% du capital social de YPF représenté par des actions de classe D de YPF détenues par la société espagnole Repsol, deux actionnaires minoritaires estimant avoir été lésés lors de cette expropriation au motif que la République Argentine n'a pas lancé d'offre publique sur les 49% du capital non exproprié.

#### 1)  La création et la privatisation de l'entreprise publique YPF

39.    La République Argentine a créé YPF en 1922 en tant qu'entreprise publique d'énergie afin de garantir un approvisionnement énergétique national.

40.    La République Argentine a privatisé YPF en 1993 par le biais d'une introduction en bourse d'actions de classe D à la bourse de Buenos Aires. Des American Depositary Shares (ADS) représentant des actions de classe D de YPF ont été cotées à la Bourse de New York et attestées par des *American Depository Receipts* (ADR)[19]. YPF est une société anonyme argentine, dont le siège social est situé en Argentine, et dont les statuts sont soumis au droit argentin.

41.    Le prospectus d'introduction en bourse des ADS de YPF aux États-Unis en 1993 confirmait que le droit argentin régissait les statuts de la société. Il informait les investisseurs que

---

[17] **Pièce n° 6 :** Transcription de la conférence résumant les résultats du 3e trimestre de Burford Capital du 7 novembre 2024, p. 8, soulignement ajouté.

[18] **Pièce n° 6 :** Transcription de la conférence résumant les résultats du 3e trimestre de Burford Capital du 7 novembre 2024, p. 8, soulignement ajouté.

[19] Les ADS sont des instruments financiers qui permettent à des entreprises étrangères d'accéder aux marchés boursiers des États-Unis. Les titres de la société étrangère ne sont pas directement cotés aux États-Unis, les ADS sont émises par une banque dépositaire américaine qui détient les actions sous-jacentes dans leur pays d'origine. Une ADS peut représenter une fraction d'une action étrangère, une action complète, ou plusieurs actions, selon les termes du programme ADR.

*« [l]es statuts sont régis par le droit argentin et que toute action relative à l'application des statuts ou aux droits d'un actionnaire en vertu de ceux-ci doit être intentée devant un tribunal argentin »*[20].

42.     La République Argentine n'a pas renoncé à son immunité souveraine ni consenti à la compétence des tribunaux américains pour les litiges découlant des statuts de YPF.

43.     YPF était une société pétrolière stratégique puisqu'elle était le leader sur le marché des combustibles en Argentine, gérait l'extraction de 67 % de sa production d'hydrocarbures en Argentine, contrôlait 52% des capacités de raffinage du pays et disposait d'un réseau de 1.600 stations-service.

2)   L'acquisition de titres au capital de YPF par les Demanderesses

44.     Fin 2001, huit ans après l'introduction en bourse, la compagnie pétrolière espagnole Repsol S.A. avait acquis plus de 99 % du capital social de YPF. Au cours des années suivantes, Repsol a vendu une partie de sa participation tout en restant l'actionnaire de contrôle.

45.     Entre 2008 et 2011, le groupe Petersen a acquis une participation de 25 % dans YPF auprès de Repsol via deux véhicules spécialement constitués en Espagne pour porter les participations[21]. Ces acquisitions ont été financées par le biais de prêts consentis par Repsol d'une part et par des banques d'autres part, de sorte que le groupe Petersen n'a pas engagé de ressources propres significatives.

46.     Repsol et les banques ont convenu que le remboursement des prêts consentis aux entités Petersen serait financé par les futurs dividendes de YPF[22] et Repsol s'est engagée (i) à garder le contrôle de YPF, (ii) à voter chaque année la distribution de dividendes de 90% des profits de YPF et (iii) à voter le paiement d'un dividende exceptionnel de 850 millions de dollars américains[23].

47.     Entre fin 2010 et mars 2012, Eton Park a également acquis près de 3 % du capital de YPF essentiellement auprès de Repsol par l'intermédiaire de véhicules d'investissement des îles Caïmans et du Delaware.

3)   La chute de la production de pétrole et de gaz, le déclin des réserves et les menaces pour la souveraineté et l'indépendance énergétique argentine

48.     Entre 2002 et 2011, la production et les réserves d'énergie en Argentine n'ont cessé de diminuer.

49.     Entre 2001 et 2011, la production annuelle de pétrole de YPF a chuté de 41,2 %, contre 13,8 % pour les autres producteurs de pétrole en Argentine. Au cours de la même période, la production annuelle de gaz naturel de YPF a également chuté de 23,8 %, alors que les autres

---

[20] **Pièce n° 8 :** Extrait du prospectus déposé auprès de la Securities and Exchange Commission des États-Unis en 1993.
[21] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §24.
[22] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §§ 32 et 35.
[23] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §32.

producteurs de gaz naturel en Argentine ont vu leur production augmenter de 2,3 % au cours de cette période[24].

50.    Au total, entre 2001 et 2011, la production journalière nette moyenne de pétrole brut de YPF a baissé de 38 % et, entre 2004 et 2011, sa production journalière nette de gaz naturel a baissé de 43 %[25].

51.    Le gouvernement avait alors critiqué la gestion de YPF, sous le contrôle de Repsol, responsable à ses yeux de ne pas augmenter suffisamment sa production sur le territoire argentin[26].

52.    Le sous-investissement de YPF dans la production de pétrole et de gaz résultait directement de la décision de Repsol de ne pas réinvestir les profits dans le développement de la société mais de distribuer chaque année en dividendes au moins 90% des profits de YPF conformément à l'accord avec Petersen[27].

53.    En 2008, 2009 et 2011, YPF a versé plus de dividendes que son revenu net total pour l'année. En 2008, les dividendes de YPF représentaient près de 250 % de ses bénéfices pour le même exercice[28]. Ces décisions n'étaient motivées que par l'intérêt des actionnaires au détriment de celui de YPF et de la production nationale d'énergie.

54.    La presse de l'époque relevait que l'Argentine était « *le seul pays de la région où la production de [pétrole et gaz] avait régressé* », ce qui s'expliquait par le fait que YPF était « *affectée par quatre tendances inquiétantes : la baisse des réserves, l'augmentation de l'endettement, la distribution disproportionnée des dividendes par rapport aux revenus et la réduction de la valeur nette* » au point qu'elle pouvait « *épuiser ses réserves de pétrole en cinq ans* »[29].

55.    Ces décisions mirent à mal l'indépendance énergétique de l'Argentine. En 2010, pour la première fois depuis des décennies, l'Argentine a dû importer du pétrole pour faire face à la demande nationale[30]. En 2011, l'Argentine s'est retrouvée en situation de déficit énergétique puisqu'elle a dû importer plus d'énergie qu'elle n'en exportait[31].

56.    Au global, en 2011, la facture énergétique de l'Argentine avait « *augmenté de 110% en quelques années, à 9,4 milliards de dollars* »[32].

---

[24] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §§ 48 et 49.
[25] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §50.
[26] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §§ 51- 52.
[27] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - § 32.
[28] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §53.
[29] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §58.
[30] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §56.
[31] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §57.
[32] **Pièce n° 12 :** Article du Figaro, L'Argentine veut assurer son indépendance énergétique, 17 avril 2012.

57.     Considérant que YPF n'avait pas respecté pas les investissements dont elle était responsable, plusieurs provinces argentines avaient décidé de lui retirer des concessions d'hydrocarbures en 2012[33].

58.     En définitive, la gestion de YPF sous le contrôle de Repsol avait ainsi provoqué un sous-investissement structurel dans l'exploitation pétrolière, obérant les capacités de production du pays et obligeant à l'importation de pétrole au prix d'une aggravation du déficit commercial et énergétique.

4)  La Loi d'Utilité Publique et d'Expropriation de 51% du capital social de YPF

59.     Le 16 avril 2012, la présidente de la République Argentine a soumis au Congrès un projet de loi concernant, entre autres, la politique de l'Argentine en matière d'hydrocarbures et proposant que 51 % du capital de YPF, représenté par des actions de classe D détenues par Repsol, soit déclarés d'intérêt public et soumis à l'expropriation.

60.     En Argentine, comme en France, le gouvernement peut exproprier des biens dans l'intérêt public. En vertu de la Constitution argentine et de la loi générale sur l'expropriation[34] (« **Loi Générale sur l'Expropriation** »), le Congrès argentin a le pouvoir constitutionnel d'autoriser l'expropriation d'un bien pour cause d'utilité publique moyennant le paiement d'une indemnité.

61.     La présidente de la République Argentine a par ailleurs publié un décret nommant un « intervenant » temporaire, un mandataire ad hoc spécial chargé d'assumer les pouvoirs du conseil d'administration de YPF[35] (le « **Décret d'Intervention** »).

62.     Dans ce Décret d'Intervention, le gouvernement argentin a détaillé l'ensemble des considérations stratégiques, économiques et sociales ayant conduit à cette décision (voir ci-dessous §§ 200 - 208) ainsi que l'objectif principal poursuivi : protéger la souveraineté énergétique et corriger les dérives attribuées à la gestion privée antérieure. Il était notamment relevé que *« l'aggravation de stratégie [de Repsol] consistant à pratiquement éviscérer l'entreprise »* a démontré que *« les intérêts de l'actionnaire majoritaire ont été différents de ceux de [la] République argentine »* et *« ont compromis [la] souveraineté énergétique du pays »*[36].

63.     Le 3 mai 2012, après avoir débattu de diverses options, le Congrès argentin a adopté la loi d'expropriation de YPF[37], qui est entrée en vigueur le 7 mai 2012 (la « **Loi d'Utilité Publique et d'Expropriation** »).

64.     Dans l'objectif d'assurer l'indépendance énergétique de l'Argentine et d'éliminer son déficit, la Loi d'Utilité Publique et d'Expropriation a déclaré (i) que *« l'autosuffisance en matière d'approvisionnement en hydrocarbures »* était *« un intérêt public national et une priorité pour la République Argentine »* et (ii) que *« cinquante et un pour cent (51%) du capital de YPF Sociedad Anónima, représenté par le même pourcentage d'actions de classe D de ladite société, détenues par Repsol »* était *« d'intérêt public et sujet à*

---

[33] **Pièce n° 10 :** Décret argentin n° 530/2012 du 16 avril 2012.
[34] **Pièce n° 9 :** Loi argentine n° 21.499 du 17 janvier 1977.
[35] **Pièce n° 10 :** Décret argentin n° 530/2012 du 16 avril 2012.
[36] **Pièce n° 10 :** Décret argentin n° 530/2012 du 16 avril 2012.
[37] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012.

*l'expropriation* » [38]. La Loi d'Utilité Publique et d'Expropriation a également disposé que YPF continuerait de fonctionner comme une société privée, cotée en bourse[39].

65.     La presse française a couvert ces évènements : « *L'Argentine veut assurer son indépendance énergétique - En nationalisant le groupe pétrolier YPF, détenu depuis les années 90 par l'espagnol Repsol, Buenos Aires espère résoudre son déficit énergétique. Selon le texte envoyé au Sénat, les titres concernés par l'expropriation seront répartis entre l'État (26,01%) et dix provinces du pays (24,99%). Le reste du capital de YPF devrait rester inchangé, notamment les 17% des investisseurs privés en Bourse et les 25,4% du groupe argentin Petersen. Selon ce schéma, Repsol n'aura plus que 6,4% du capital (contre 57% aujourd'hui)* » [40].

66.     La Loi d'Utilité Publique et d'Expropriation a ouvert une période de deux ans à la République Argentine pour résoudre l'expropriation par voie d'accord[41] et prévoyait également que l'État exercerait les droits de Repsol sur les actions à exproprier - par le biais d'un mécanisme appelé « occupation temporaire » - pendant la durée de la procédure d'expropriation[42].

67.     Le 8 mai 2012, la Commission Nationale des Valeurs Mobilières (*Comisión Nacional de Valores*) a convoqué une assemblée générale de YPF conformément aux dispositions de l'article 13 de la Loi d'Utilité Publique et d'Expropriation. A l'assemblée générale du 4 juin 2012, l'Argentine a exercé les droits attachés aux actions à exproprier[43]. Ni Petersen ni Eton Park ne sont rendus à cette assemblée générale ni n'ont contesté l'exercice des droits de vote attachés au 51% par l'Argentine[44].

### 5)   La perte par les entités Petersen et Eton Park de leur qualité d'actionnaire

68.     En l'absence de dividendes, les entités Petersen ont fait défaut sur les prêts en 2012, et leurs actions de YPF ont été transférées à Repsol et aux banques prêteuses[45].

69.     Le 23 octobre 2012 les entités Petersen ont été déclarées insolvables et des procédures de faillite ont été ouvertes en Espagne[46].

70.     Entre juillet 2012 et juin 2013, Eton Park a vendu la totalité de sa participation au capital de YPF[47].

---

[38] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012, arts. 1 et 7.

[39] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012, art. 15.

[40] **Pièce n° 12 :** Article du Figaro, L'Argentine veut assurer son indépendance énergétique, 17 avril 2012, souligment ajouté.

[41] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012, art. 11 et **Pièce n° 9 :** Loi argentine n° 21.499 du 17 janvier 1977, art. 33.

[42] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012, art. 13 et **Pièce n° 9 :** Loi argentine n° 21.499 du 17 janvier 1977, arts. 57 et 59.

[43] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §§ 73 et 74.

[44] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §79.

[45] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §§84-88.

[46] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §90.

[47] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §91.

6) L'indemnisation de Repsol et la réalisation de l'expropriation

71.     Repsol a engagé de nombreuses procédures devant les juridictions argentines, espagnoles et américaines ainsi qu'un arbitrage d'investissement sur le fondement du traité bilatéral d'investissement entre l'Espagne et l'Argentine[48].

72.     Des tiers, en ce compris d'autres actionnaires minoritaires, ont engagé des procédures devant les juridictions argentines. Deux de ces actionnaires minoritaires ont soutenu devant les juridictions argentines que l'Argentine aurait dû lancer une offre publique d'achat pour acquérir les actions de classe D restantes de YPF si elle obtenait une participation majoritaire au capital de YPF par le biais de l'expropriation[49]. Cette demande, qui avait été portée devant les tribunaux fédéraux compétents en matière civile et commerciale, a été réorientée vers les tribunaux fédéraux compétents en matière de contentieux administratif[50].

73.     La République Argentine et Repsol ont engagé des négociations en vue de fixer l'indemnisation qui serait versée à Repsol.

74.     Le 27 février 2014, la République Argentine et Repsol ont conclu un accord de règlement global (« **Accord de Règlement Global** ») en vertu duquel la République Argentine a accepté de verser à Repsol 5 milliards de dollars américains au titre de compensation pour les actions expropriées et pour toute réclamation à l'encontre de l'Argentine par Repsol[51]. L'Accord de Règlement Global prévoyait également que Repsol obtienne l'abandon des procédures engagées contre l'Argentine par des tiers, ou qu'elle indemnise la République Argentine si ces procédures n'étaient pas abandonnées[52].

75.     Le Tribunal National d'Evaluation argentin a considéré que l'évaluation convenue était « juste et raisonnable » au regard de la valeur objective des titres expropriés[53].

76.     Le 23 avril 2014, le Congrès argentin a adopté la loi n° 26.932, qui ratifie à l'article 1 l'Accord de Règlement Global. Il a également autorisé l'émission d'obligations du Trésor national pour payer les 5 milliards de dollars à Repsol[54].

77.     L'Accord de Règlement Global est entré en vigueur le 8 mai 2014, date à laquelle la République Argentine a versé l'indemnisation convenue et Repsol a transféré la propriété des actions, ce qui a permis de concrétiser l'expropriation.

---

[48] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §77.
[49] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §78.
[50] **Pièce n° 14 :** Arrêt de la Cour Suprême d'Argentine du 20 août 2014 dans l'affaire De San Martín.
[51] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §92. Voir également **Pièce n° 13 :** Accord de Règlement Global conclu entre la République Argentine et Repsol le 27 février 2014 – Clause 1.
[52] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §95. Voir également **Pièce n° 13 :** Accord de Règlement Global conclu entre la République Argentine et Repsol le 27 février 2014 – Clause 6.1.iii et Annexe VI.
[53] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §96.
[54] **Pièce n° 15 :** Loi argentine n° 26.932 du 23 avril 2014.

### C. L'engagement, par les Demanderesses, de procédures devant les juridictions américaines

78.    Pendant tout ce processus qui s'est déroulé en Argentine, les Demanderesses ont décidé de ne pas intenter de recours contre l'État et de ne pas demander de réparation du préjudice allégué en Argentine.

79.    Les Demanderesses ont attendu que soit conclu l'Accord de Règlement Global pour lancer leurs procédures devant les juridictions américaines.

80.    Le 8 avril 2015, les entités Petersen ont engagé une procédure contre la République Argentine devant le tribunal de district des États-Unis pour le district sud de New York (le « **tribunal de district de New York** ») en relation avec l'expropriation de 51% du capital social de YPF. Les entités Petersen ont demandé des dommages-intérêts compensatoires en raison d'une prétendue violation des statuts de YPF par la République Argentine, qui se serait produite lors de l'expropriation de 51 % du capital social de YPF représenté par des actions de classe D de YPF.

81.    Un mois plus tôt, en mars 2015, dans le cadre des procédures de faillite ouvertes pour les entités Petersen en Espagne, Burford, par l'intermédiaire de sa filiale Prospect Investments LLC, a versé 15,101 millions d'euros pour obtenir le droit exclusif de poursuivre les réclamations de Petersen en lien avec l'expropriation et de recevoir 70% des sommes qui seraient obtenues[55].

82.    Le 8 septembre 2015, la République Argentine a demandé le rejet de la plainte, en soutenant, entre autres, que le tribunal de district de New York n'était pas compétent en vertu de la loi américaine sur les immunités des États étrangers (*Foreign Sovereign Immunities Act* – FSIA).

83.    Le 9 septembre 2016, le tribunal de district de New York a accueilli en partie et rejeté en partie la requête de la République Argentine. Il a considéré que si l'expropriation relevait de la souveraineté de l'Argentine, la question du lancement d'une offre publique consécutivement à l'expropriation relevait de l'exception de « *l'activité commerciale* »[56]. Le 10 juillet 2018, la Cour d'appel des États-Unis pour le deuxième circuit a confirmé la décision du tribunal de district de New York. Le 24 juin 2019, la Cour suprême des États-Unis a rejeté la demande d'examen de l'affaire.

84.    Le 3 novembre 2016, trois ans après avoir vendu leurs actions YPF, les entités Eton Park ont engagé une procédure contre la République Argentine devant le tribunal de district de New York en vue d'obtenir, de la même manière que les entités Petersen, des dommages-intérêts compensatoires découlant de la prétendue violation des statuts de YPF par la République Argentine résultant de l'expropriation de 51 % du capital social de YPF.

---

[55] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §100. Burford aurait depuis vendu 38,75 % de ses droits dans l'affaire Petersen à des investisseurs tiers, ce qui ramène sa part nette des recettes à environ 35 % (58 % x 61,25 %). **Pièce n° 16 :** Article de Burford Capital, Déclaration de Burford Capital sur la décision relative aux dommages-intérêts de YPF, 8 septembre 2023.

[56] Cette décision était fondée sur une exception au principe d'immunité prévue par la FSIA (§1605(a)(2)) qui vise les actes de nature commerciale qui se produisent hors des États-Unis mais ayant un effet direct aux États-Unis. Le tribunal de district de New York a considéré que cette exception pouvait s'appliquer parce que les ADS de YPF étaient cotés à la bourse de New York.

85.    Ce même jour, Burford, par l'intermédiaire de sa filiale Ireton LLC, a acheté le droit de poursuivre les réclamations d'Eton Park en lien avec l'expropriation et le droit de recevoir 75% des sommes recouvrées[57].

### D.  Les décisions judiciaires américaines

86.    Le 30 août 2019, la République Argentine a déposé une requête visant à rejeter les actions intentées par les entités Petersen et Eton Park pour cause de *forum non conveniens*. Le 5 juin 2020, le tribunal de district de New York a rejeté la requête. Il a pour cela écarté les dispositions du droit argentin selon lesquelles les actions en matière de droit de sociétés, qui impliquent des sociétés argentines, relèvent de la compétence exclusive des juridictions argentines en jugeant que ces textes s'appliquaient seulement en Argentine et non aux juridictions américaines.

87.    Le 14 avril 2022, les parties ont déposé des requêtes croisées en vue d'un jugement sommaire.

88.    Le 31 mars 2023, le tribunal de district de New York a rendu un jugement sommaire qui déclarait la responsabilité de la République Argentine. Le jugement sommaire (ou *summary judgment*) est une procédure judiciaire dans le droit américain qui permet à un tribunal de rendre une décision sur une affaire sans aller jusqu'à un procès complet, sans audience et sans examen approfondi du fond de l'affaire[58].

89.    Pour condamner la République Argentine, le tribunal de district de New York a écarté l'ensemble des explications fournies par l'Argentine sur le fonctionnement et l'interprétation du droit argentin (plusieurs rapports d'expert et des centaines de références jurisprudentielles et doctrinales)[59], sans citer aucune jurisprudence à l'appui de sa position (aucun tribunal argentin n'ayant jamais jugé d'une affaire similaire).

90.    Des audiences se sont ensuite tenues du 26 au 28 juillet 2023 sur la seule évaluation du préjudice et sur le taux d'intérêt applicable. Par une décision du 8 septembre de 2023 et un jugement final du 15 septembre 2023[60], le tribunal a condamné la République Argentine à payer un montant de 16,1 milliards de dollars américains : (i) 14,4 milliards de dollars de dommages et intérêts à Petersen et (ii) 1,7 milliard de dollars de dommages et intérêts à Eton Park.

91.    Le tribunal de district de New York reconnaîtra que sa décision impliquait « *des questions de première impression et des questions de droit argentin* »[61].

---

[57] **Pièce n° 3 :** Réponses des Demanderesses du 26 mai 2022 à l'exposé des faits de la République Argentine dans la procédure américaine – Dkt 393 - §§102-103.

[58] **Pièce adverse n° 3**.

[59] Le tribunal de district de New York a rejeté les arguments de la République Argentine qui, entre autres, faisait valoir (i) que les Demanderesses n'étaient plus actionnaires quand la République Argentine est devenue propriétaire des actions YPF en mai 2014, (ii) qu'en droit argentin les actionnaires ne peuvent solliciter des dommages et intérêts que si l'exécution en nature de l'obligation en cause est impossible, (iii) que les dommages et intérêts ne pouvaient être sollicités que dans le cadre des procédures prévues par la Loi Générale sur l'Expropriation argentine (alors même que d'autres minoritaires avaient suivis ces procédures).

[60] Pièces adverses n° 4 et 5.

[61] **Pièce n° 17 :** Décision du tribunal de district de New York du 21 novembre 2023 sur la demande de sursis à exécution, soulignement ajouté.

92.    Il s'agit d'une décision exceptionnelle (i) dans son principe puisque les juridictions américaines refusent à un État étranger le bénéfice de l'immunité de juridiction, se reconnaissent compétentes pour des faits qui se sont déroulés en Argentine et tranche principalement des questions de droit argentin (sans tenir compte de l'interprétation par l'Argentine de son propre droit), comme (ii) dans son quantum puisque la condamnation prononcée dépasse tous les records.

93.    La somme de 16,1 milliards de dollars américains représente (i) plus de trois fois la capitalisation boursière de YPF en septembre 2023[62], (ii) plus de trois fois l'indemnisation obtenue par Repsol pour l'expropriation de sa participation à hauteur de 51% de YPF[63] (bien plus que la participation minoritaire que les Demanderesses détenaient auparavant), qui comprenait également le coût de l'obtention du rejet de toutes les demandes de tiers, et (iii) plus de trois fois les financements fournis par le FMI au 30 juin 2024 au titre du mécanisme élargi de crédit[64]. Il s'agit de la condamnation la plus importante jamais prononcée par un tribunal du district de New York contre un État étranger[65].

94.    Si la situation était inversée—c'est-à-dire, si un tribunal étranger autorisait des demanderesses, financées par un fonds d'investissement, à poursuivre l'Etat français, sur le fondement du droit français pour des actes intervenus en France, créait un droit d'action inédit, non encore reconnu par les juridictions françaises, puis prononçait une condamnation contre la France à hauteur de près de 175 milliards d'euros (l'équivalent de la condamnation par rapport aux recettes fiscales estimées de la France pour 2024)—la France serait à juste titre scandalisée.

95.    En fournissant les financements pour mener ces procédures, Burford s'attend à recevoir une grande partie des dommages-intérêts recouvrés. Le marché a partagé cet optimisme et le cours de l'action de Burford a bondi de 55 % le jour de la décision du tribunal de district de New York ayant retenu la responsabilité de l'Argentine[66].

### E.  La procédure d'appel et les tentatives d'exécution

#### 1)  L'appel interjeté par l'Argentine

96.    Le 10 octobre 2023, la République Argentine a interjeté appel du jugement final rendu le 15 septembre 2023, ainsi que contre les décisions antérieures fusionnées dans ce jugement, devant la Cour d'appel des États-Unis pour le deuxième circuit. Les entités Petersen et Eton Park ont fait un appel incident le 18 octobre 2023.

97.    La République Argentine considère et soutient que le jugement final et les décisions antérieures devraient être infirmés dans leur intégralité[67].

---

[62] **Pièce n° 18 :** Capitalisation boursière de YPF égale à 5,28 milliards de dollars américains au 15 septembre 2023 (https://www.macrotrends.net/stocks/charts/YPF/ypf-sociedad-anonima/market-cap)

[63] **Pièce n° 13 :** Accord de Règlement Global conclu entre la République Argentine et Repsol le 27 février 2014.

[64] **Pièce n° 2 :** Extrait du Rapport annuel de la République Argentine déposé auprès de la Securities and Exchange Commission des États-Unis en 2024, page D-13.

[65] **Pièce n° 19 :** Article de Lawfare, Peterson contre l'Argentine : analyse d'un jugement de 16 milliards de dollars, 30 novembre 2023.

[66] **Pièce n° 20 :** Article de Reuters, Cette affaire de milliard contre l'entreprise argentine YPF n'existerait pas sans le financement des litiges. Est-ce une bonne chose ?, 3 avril 2023.

[67] **Pièce n° 24 :** Mémoire d'appel de la République Argentine devant la Cour d'appel des États-Unis pour le deuxième circuit du 22 février 2024.

98.    D'une part, la République Argentine fait valoir que les tribunaux américains ne devraient pas retenir leur compétence pour connaître des demandes des Demanderesses qui relevaient exclusivement des juridictions argentines.

99.    En effet, (i) Petersen est un groupe argentin, contrôlé par des citoyens argentins, qui détenait la participation YPF via des sociétés coquilles immatriculées en Espagne ; (ii) la défenderesse est la République Argentine ; (iii) les événements objet de la procédure et les actes et omissions imputés à la République Argentine se sont déroulés en Argentine et (iv) aucune des parties ne contestaient que les demandes formulées devaient être apprécié à l'aune du droit argentin, auquel sont soumis tant les statuts de YPF que la procédure d'expropriation critiquée.

100.    D'autre part, la République Argentine soutient que le tribunal de district de New York a fait une application erronée du droit public et privé argentin.

101.    En effet (i) le tribunal de district de New York a traité la demande des Demanderesses comme une demande de réparation fondée sur la responsabilité contractuelle, ce que ne permet par le droit argentin et ce qu'aucune jurisprudence argentine n'a reconnu en matière de litige entre associés fondé sur une prétendue violation des statuts ; (ii) le tribunal de district de New York a été au-delà de ce que prévoit le droit argentin en terme de réparation, en accordant des dommages et intérêts[68] ; (iii) lorsque la République Argentine est devenue propriétaire des actions à l'issue du processus d'expropriation en mai 2014, les Demanderesses n'étaient plus actionnaires de YPF et n'avait donc aucune qualité ni intérêt à agir en faisant valoir une prétendue violation des statuts ; (iv) le tribunal de district de New York a ignoré les spécificités résultant de la procédure d'expropriation en traitant les demandes sous le seul angle du droit privé alors que selon la jurisprudence de la Cour Suprême d'Argentine, ces demandes devaient être appréhendées sous l'angle du droit public – comme ce fut le cas pour les demandes des autres minoritaires (introduites en Argentine en temps utile)[69].

102.    Enfin, le tribunal de district de New York a largement surestimé le montant des dommages et intérêts accordés (i) en retenant une date de violation erronée antérieure à la réalisation de

---

[68] Le droit argentin édicte des sanctions limitatives reprises dans les statuts de YPF que sont la privation de droit de vote, la privation des droits à dividendes ou à distribution, la non prise en compte des actions acquises irrégulièrement dans le calcul des quorums. **Pièce adverse n° 12** : Statuts de YPF, article 7(h). Une demande indemnitaire n'est admise que s'il est établi que l'exécution en nature est impossible.

[69] **Pièce n° 14 :** Arrêt de la Cour Suprême d'Argentine du 20 août 2014 dans l'affaire De San Martín. La Loi Générale sur l'Expropriation argentine exige que les tiers ayant des réclamations liées à l'expropriation contre le gouvernement, y compris celles concernant des obligations contractuelles prétendument violées par une expropriation, obtiennent une indemnisation uniquement par le biais d'une action prescrite par la loi argentine, et le droit administratif argentin limite la portée de cette indemnisation, en excluant le manque à gagner.

Dans l'affaire De San Martín, deux actionnaires minoritaires de YPF ont engagé une action contre la République Argentine devant les tribunaux fédéraux compétents en matière civile et commerciale d'Argentine, afin d'obtenir une décision de justice obligeant la République Argentine à lancer une offre publique d'achat sur les actions de classe D restantes de YPF au prix spécifié dans les statuts de YPF. La Cour Suprême d'Argentine a transféré l'affaire d'un tribunal fédéral compétent en matière civile et commerciale à un tribunal fédéral compétent en matière de contentieux administratif au motif que l'affaire relevait du droit public argentin (Cour Suprême de Justice de la Nation d'Argentine, 20 août 2014, « De San Martín, José et autre. v. État national – Pouvoir exécutif de la nation, » Compétence 731 L.XLIX).

l'expropriation, (ii) en accordant un taux d'intérêt de retard en préjugement erroné[70] et (iii) en utilisant une date de conversion pesos-US dollar abrogée depuis plusieurs années.

103.    L'instruction écrite de l'affaire est terminée, la République Argentine et les Demanderesses ont chacune déposée leurs mémoires[71]. Le Cour d'appel doit désormais fixer l'audience de plaidoirie.

### 2)    L'absence de sursis à exécution

104.    La République Argentine a sollicité du tribunal de district de New York la suspension de l'exécution du jugement final pendant la procédure d'appel.

105.    Le tribunal de district de New York a conditionné la suspension de l'exécution du jugement final pendant la procédure d'appel à la mise en gage par la République Argentine en faveur des Demanderesses de ses actions au capital de YPF et de ses créances liées à un barrage binational de production d'électricité et à la mise en place d'un calendrier accéléré pour l'appel.

106.    Cette condition ne pouvant être satisfaite ni juridiquement ni matériellement, l'exécution du jugement final n'a pas été suspendue.

### 3)    Les procédures subséquentes aux États-Unis

107.    Parallèlement à la procédure d'appel, les Demanderesses ont entamé une procédure de découverte (*discovery*) demandant à l'Argentine de produire un grand nombre de documents afin d'obtenir des informations sur ses actifs au niveau mondial. L'Argentine a reçu plusieurs demandes de documents de la part des Demanderesses.

108.    Les Demanderesses ont également saisi le tribunal de district de New York afin qu'il ordonne à l'Argentine de transférer aux États-Unis les actions de classe D de YPF détenues par l'Argentine afin qu'elles puissent faire l'objet de saisies sur le territoire.

109.    L'Argentine s'est opposée à cette demande et le gouvernement américain, représenté par le ministère de la justice, a également pris position contre cette demande en soutenant que les tribunaux américains ne peuvent pas ordonner la saisie de biens souverains étrangers situés en dehors des États-Unis. Il a également déclaré qu'il serait contraire à l'immunité souveraine d'exiger de l'Argentine qu'elle remette les actions[72].

110.    Le ministère de la justice a déclaré que le Congrès américain n'avait pas l'intention, en adoptant la loi sur les immunités souveraines étrangères (*Foreign Sovereign Immunities Act* – FSIA), d'éliminer l'immunité pour les biens souverains étrangers tels que les actions de YPF. Il a ajouté

---

[70] Le taux annuel de 8 % en dollars est nettement supérieur au taux qui serait accordé par les tribunaux argentins compétents en matière de contentieux administratif.

[71] Dans son appel, l'Argentine a reçu le soutien d'*amici curiae* tels que le Chili, l'Équateur, le Brésil, l'Uruguay, l'Association argentine de droit administratif et plusieurs professeurs renommés de droit public (y compris d'anciens juges de la Cour Suprême d'Argentine), l'Ordre des avocats de la ville de Buenos Aires et plusieurs professeurs renommés de droit privé argentin, l'Organisation fédérale argentine des États producteurs d'hydrocarbures (dont les membres sont des provinces argentines ayant d'importantes activités d'exploration, d'exploitation et de production pétrolières et gazières), et des professeurs des États-Unis.

[72] **Pièce n° 25 :** Lettre des Etats-Unis d'Amérique du 6 novembre 2024 et mémoire des Etats-Unis d'Amérique du 10 janvier 2025 devant le tribunal de district de New York dans les procédures 15 Civ. 2739 (LAP) et 16 Civ. 8569 (LAP).

que la suppression de l'immunité créerait une anomalie dans la mesure où les biens d'un pays étranger situés aux États-Unis bénéficieraient d'une plus grande protection que les biens situés dans le pays lui-même. Le ministère de la justice a également déclaré que, pour des raisons de courtoisie internationale, c'est-à-dire le respect que les pays s'accordent mutuellement en limitant la portée de leurs lois, la loi de l'État de New York n'obligeait pas l'Argentine à céder les actions de YPF. L'affaire est actuellement en cours d'examen par tribunal de district de New York.

### 4)  Les procédures d'exécution dans les autres juridictions

111.    En dehors des États-Unis, des procédures visant à la reconnaissance et à l'exécution du jugement ont été engagées non seulement en France, mais également au Royaume-Uni, en Irlande, au Luxembourg et à Chypre. Il convient de souligner à ce stade qu'aucune procédure n'a été engagée en Argentine. Au lieu d'engager une procédure en Argentine, les Demanderesses ont choisi d'engager plusieurs poursuites judiciaires ailleurs dans le monde, dans le cadre de la stratégie de harcèlement judiciaire multi juridictionnel.

112.    C'est dans ce cadre que le Tribunal Judiciaire de Paris a été saisi d'une demande d'exequatur du jugement final et des décisions antérieures rendus par le tribunal du district de New York :

- *Opinion* & *Order* de la *United States District Court* du *Southern District of New York* du 31 mars 2023 (refs. 15 Civ. 2739 (LAP) et 16 Civ. 8569 (LAP)), rendu entre Petersen Energía Inversora S.A.U., Petersen Energía S.A.U., Eton Park Capital Management L.P., Eton Park Master Fund Ltd. et Eton Park Fund L.P. d'une part, et la République Argentine et YPF S.A. d'autre part;

- *Findings of fact and conclusions of law* de la *United States District Court* du *Southern District of New York* du 8 septembre 2023 (refs. 15 Civ. 2739 (LAP) et 16 Civ. 8569 (LAP)), rendu entre Petersen Energía Inversora S.A.U., Petersen Energía S.A.U., Eton Park Capital Management L.P., Eton Park Master Fund Ltd. et Eton Park Fund L.P. d'une part, et la République Argentine et YPF S.A. d'autre part;

- *Final Judgment* de la *United States District Court* du *Southern District of New York* du 15 septembre 2023 (refs. 15 Civ. 2739 (LAP) et 16 Civ. 8569 (LAP)), rendu entre Petersen Energía Inversora S.A.U., Petersen Energía S.A.U., Eton Park Capital Management L.P., Eton Park Master Fund Ltd. et Eton Park Fund L.P. d'une part, et la République Argentine et YPF S.A. d'autre part.

## II.    DISCUSSION

113.    L'Argentine soulève dans les présentes conclusions une exception de procédure ainsi qu'une fin de non-recevoir. L'ordre de présentation formel à respecter est établi par la loi et précisé par la jurisprudence.

114.    L'article 74 alinéa 1er du Code de procédure civile dispose que : « *Les exceptions doivent, à peine d'irrecevabilité, être soulevées simultanément et avant toute défense au fond ou fin de non-recevoir. Il en est ainsi alors même que les règles invoquées au soutien de l'exception seraient d'ordre public.* ».

115.    La Cour de cassation précise que : « *Une partie n'est pas recevable à soulever une exception de procédure après une fin de non-recevoir, peu important que ces incidents aient été présentés dans les mêmes conclusions* »[73].

116.    Ainsi, une exception de procédure et une fin de non-recevoir peuvent conjointement être soulevées dans les mêmes conclusions, mais à la condition expresse que les exceptions figurent dans les écritures <u>avant</u> la fin de non-recevoir.

117.    En conséquence, l'Argentine entend solliciter un sursis à statuer dans l'attente d'une décision qui ne sera plus susceptible de recours dans la procédure pendante aux États-Unis (**A.**) et soulever, en tout état de cause, une fin de non-recevoir tirée de l'immunité de juridiction dont elle bénéficie (**B.**)

### A. Sur la demande de sursis à statuer

118.    La décision d'ordonner un sursis à statuer relève en droit du pouvoir souverain du juge (**1.**). Il peut notamment l'ordonner dans l'intérêt d'une bonne administration de la justice, comme c'est le cas en l'espèce (**2.**).

#### 1)    En droit, un pouvoir souverain du juge

119.    L'article 378 du Code de procédure civile dispose que « *la décision de sursis suspend le cours de l'instance pour le temps ou jusqu'à la survenance de l'événement qu'elle détermine.* »

120.    Il existe des cas dans lesquels le sursis s'impose au juge et aux parties, notamment lorsque l'action civile vise la réparation du préjudice causé par un infraction pénale et qu'une procédure pénale poursuivant cette infraction est en cours. Cette cause n'existant dans la présente affaire, il n'est pas nécessaire de s'y arrêter.

121.    Reste que le juge peut, souverainement, ordonner un sursis à statuer lorsque les circonstances de l'affaire le justifient. En effet, « *chargé de veiller au bon déroulement de l'instance, le juge dispose du pouvoir d'ordonner d'office un sursis à statuer dans l'intérêt d'une bonne administration de la justice* »[74]. Cette faculté est largement reconnue en jurisprudence, le juge disposant d'un pouvoir discrétionnaire pour apprécier l'opportunité du sursis à statuer, sa durée et ses modalités[75].

---

[73] Cass. 2e civ., 8 juill. 2004, 02-19.694.
[74] Cass. 2e civ., 12 avr. 2018, n° 17-16.945.
[75] Cass. 3e civ., 15 oct. 2008, n° 07-14.540.

122.    Par exemple, lorsqu'une décision à rendre dans le cadre d'une autre instance pendante est de nature à influencer la solution du litige en cours, le juge saisi dudit litige peut suspendre l'instance en attendant la décision à venir[76].

123.    En matière de reconnaissance et d'exécution de jugement étranger, on peut évoquer à titre illustratif, les dispositions du règlement européen Bruxelles I bis. Il prévoit que la juridiction saisie d'une demande de refus d'exécution d'une décision rendue dans un État membre peut surseoir à statuer si la décision fait l'objet d'un recours ordinaire dans l'État membre d'origine, et ce même si la décision est déjà exécutoire :

> « *La juridiction saisie d'une demande de refus d'exécution ou qui statue sur un recours au titre de l'article 49 ou sur un pourvoi au titre de l'article 50 peut surseoir à statuer si la décision fait l'objet d'un recours ordinaire dans l'État membre d'origine ou si le délai pour le former n'est pas expiré. Dans ce dernier cas, la juridiction peut impartir un délai pour former ce recours.* »[77]

124.    Ainsi, il peut y avoir un intérêt à ne pas procéder à la reconnaissance de jugements ni à autoriser les mesures d'exécution sur leur fondement – *a fortiori* visant des actifs souverains – tant que le principe et les contours de la décision sur le fond ne sont pas définitivement figés quand bien même les jugements seraient-ils déjà exécutoires.

### 2)    En fait, le sursis à statuer est justifié

125.    Dans la présente affaire, le prononcé d'un sursis à statuer relève de la bonne administration de la justice et n'est préjudiciable pour aucune des parties.

126.    <u>D'une part</u>, bien qu'il soit exécutoire, le jugement dont l'exequatur est sollicité n'est pas définitif.

127.    En effet, la condamnation fait l'objet d'un appel sur tous les points, c'est-à-dire : (i) sur l'exercice de la compétence (qui comprend les arguments de *forum non conveniens* et de courtoisie internationale), (ii) sur le principe de la responsabilité de la République Argentine, et (iii) sur le quantum du préjudice[78].

128.    L'existence de ce recours est de nature à influer sur la solution du présent litige puisqu'il est susceptible d'aboutir dans quelques mois à l'infirmation totale ou partielle du jugement et donc de modifier les droits des Demanderesses tels qu'elles en poursuivent aujourd'hui la reconnaissance et l'exécution.

129.    L'importance de la procédure d'appel est d'autant plus fondamentale que ce litige implique de trancher des questions nombreuses et complexes relevant du droit argentin – des questions qui, par d'ailleurs, n'ont jamais été tranchées par les juridictions argentines. Le tribunal de district de

---

[76] Cass. com., 29 mai 1979 : Bull. civ. IV, n° 181.
[77] Règlement (UE) n° 1215/2012, 12 déc. 2012, art. 51.
[78] **Pièce n° 24 :** Mémoire d'appel de la République Argentine devant la Cour d'appel des États-Unis pour le deuxième circuit du 22 février 2024.

New York a retenu la responsabilité dans un jugement sommaire sur « *des questions de première impression et des questions de droit argentin* »[79].

130.    Contrairement à ce que prétendent les Demanderesses[80], il ne s'agit pas ici d'ajouter une condition de recevabilité que la loi ne prévoit pas.

131.    L'Argentine soutient que, étant donné qu'un recours est actuellement pendant devant les juridictions américaines de second degré, compte tenu de la nature de l'affaire, de la complexité des questions juridiques et factuelles qui doivent être tranchées, et des enjeux colossaux que cela représente pour l'Argentine, il serait d'une bonne administration de la justice de surseoir à statuer.

132.    <u>D'autre part</u>, un sursis à statuer n'entraînerait aucune conséquence préjudiciable pour les parties.

133.    Il ne serait d'abord pas d'une durée excessive puisque la procédure d'appel a été entièrement instruite. A la date des présentes écritures, seules doivent encore intervenir les plaidoiries des parties avant que la Cour d'appel puisse rendre son arrêt. C'est ce qu'a récemment rappelé Burford :

> « *Ces recours sont maintenant entièrement instruits. En d'autres termes, tous les documents relatifs à l'affaire ont été soumis. La prochaine étape est la plaidoirie devant un panel de trois juges, et nous attendons que la Cour nous donne une date de plaidoirie, <u>qui devrait être plus tard dans l'année [2024] ou au début de l'année prochaine</u>. Après les plaidoiries, le tribunal se retirera et rédigera sa décision. Il n'y a pas de délai pour la publication de cette décision, mais nous l'attendons plus tard - <u>nous l'attendons quelques mois après les plaidoiries</u>* »[81].

134.    Les Demanderesses ne peuvent donc affirmer qu'un sursis à statuer serait contraire au principe de célérité de la justice et au droit pour les Demanderesses « *d'obtenir l'exécution des Décisions américaines dans un délai raisonnable* »[82].

135.    Elles citent pour cela des arrêts de la Cour Européenne des Droits de l'Homme (« **CEDH** ») relatifs à des affaires bien différentes de la présente espèce. Deux des trois décisions citées concernent des cas dans lesquels les requérants avaient obtenu dans leur pays une décision « *définitive* » leur accordant une pension alimentaire et avaient mis près de 10 ans à obtenir l'assistance de la France pour obtenir le recouvrement de ces créances[83]. La dernière affaire citée concerne le refus arbitraire, par la Slovaquie, d'exécuter une sentence arbitrale de la CCI fondée sur une clause d'arbitrage contractuelle, qui ne nécessitait aucune autre décision distincte pour être reconnue sur son territoire[84].

136.    Rien de tel en l'espèce.

---

[79] **Pièce n° 17 :** Décision du tribunal de district de New York du 21 novembre 2023 sur la demande de sursis à exécution, soulignement ajouté.

[80] Conclusions en réponse des Demanderesses du 24 février 2025, §§ 109 – 114.

[81] **Pièce n° 6 :** Transcription de la conférence résumant les résultats du 3e trimestre de Burford Capital du 7 novembre 2024, p. 7, soulignement ajouté.

[82] Conclusions en réponse des Demanderesses du 24 février 2025, § 122.

[83] AJ n°37 : CEDH, 4 novembre 2008, *Dinu c. Roumanie et France*, n°6152/02; AJ n°38 : CEDH, 18 novembre 2010, *Romanczyk c. France*, n°7618/05.

[84] AJ n°39 : CEDH, 30 juin 2022, *BTS holding c. Slovaquie*, n°55617/17.

137.    Les Demanderesses n'avancent aucun élément permettant de penser qu'un sursis retarderait de manière déraisonnable l'examen de leur demande d'exequatur, à supposer qu'elle soit recevable – ce que l'Argentine conteste.

138.    Et l'on rappelle, à titre surabondant, qu'à la différence d'autres actionnaires minoritaires, qui ont présentés leurs demandes pendant les procédures en Argentine spécifiquement prévues pour la résolution des différents liés à l'expropriation et qui ont été couverts par l'Accord de Règlement Global en 2014, les Demanderesses ont choisi de ne pas présenter leurs demandes pendant ce processus et ont attendu que soit conclu l'Accord de Règlement Global pour lancer leurs procédures devant les juridictions américaines.

139.    Les Demanderesses ne peuvent prétendre que l'Argentine se livrerait ici à une « *stratégie grossière* »[85]. L'Argentine fait valoir ses droits dans le cadre des procédures d'exéquatur que les Demanderesses ont fait le choix d'engager et le fait de ne pas acquiescer aux demandes des Demanderesses comme celui d'exercer les recours disponibles ne peut s'assimiler à une stratégie dilatoire.

140.    Le fait que l'Argentine ait sollicité des délais dans des procédures d'exéquatur engagées par les Demanderesses n'est pas non plus dilatoire. Outre que ces demandes de délais sont légalement permises dans les juridictions concernées, elles étaient nécessaires pour permettre à l'Argentine de préparer utilement sa défense dans cinq procédures simultanées soumises chacune à un corpus de normes différentes, et avec différentes équipes d'avocats qui devaient prendre connaissance de l'affaire, en réponse à la stratégie de harcèlement assumée par Burford. Au demeurant, si ces délais ont été accordés par les tribunaux concernés, c'est que les juges ont considéré qu'ils étaient justifiés.

141.    Par ailleurs, il n'y a aucun risque de disparation de la République Argentine ni de son patrimoine.

142.    Enfin, le temps qui s'écoule n'est pas préjudiciable pour les Demanderesses puisque le jugement est assorti la condamnation de la République Argentine d'intérêt de retard post-jugement jusqu'à son règlement complet. Ainsi que le rappelle Burford :

> « *Le jugement continue de produire des intérêts postérieurs au jugement au taux de 5,42 % composé annuellement. Cela représente plus de 2 millions de dollars par jour qui s'ajoutent au jugement chaque jour où il est en suspens* »[86].

143.    Du reste, le paiement de la condamnation ne représente pas un enjeu vital pour les Demanderesses puisqu'elles n'ont plus d'activité à ce jour. En réalité, il s'agit essentiellement pour Burford d'une question de retour sur investissement et de rentabilité des financements avancés.

144.    A l'inverse, autoriser immédiatement la reconnaissance et l'exécution du jugement permettrait aux Demanderesses de mettre en place un blocage des actifs de l'Argentine, dans le cadre d'une stratégie d'épuisement assumée par Burford. Cette stratégie pourrait viser des actifs souverains alors même qu'ils sont protégés par l'immunité d'exécution et il en résulterait alors une

---

[85] Conclusions en réponse des Demanderesses du 24 février 2025, § 131.
[86] **Pièce n° 6 :** Transcription de la conférence résumant les résultats du 3ᵉ trimestre de Burford Capital du 7 novembre 2024, p. 10, soulignement ajouté ; voir aussi **Pièce n° 21 :** Présentation des résultats du 3ᵉ trimestre de Burford Capital du 7 novembre 2024, p. 13.

indisponibilité de ces ressources le temps que les recours adéquats de la République Argentine aboutissent.

145.    C'est bien l'objectif poursuivi par Burford dans le cadre de la présente procédure :

> *« L'objectif des stratégies d'exécution est d'exercer une pression et de créer des frictions […] nous essaierons de nombreux stratagèmes qui ne fonctionneront pas d'un point de vue strictement juridique. […] Le fait d'avoir une importante décision de justice américaine non satisfaite et des procédures d'exécution en cours dans le monde entier qui englobent également des tiers est un obstacle à ce processus de normalisation [que l'Argentine est en train de mettre en place]. […] En d'autres termes, nous sommes un problème lancinant que l'Argentine doit résoudre »*[87].

146.    De telles considérations ne participent pas à la bonne administration de la justice.

147.    A cet égard, il est inexact d'affirmer, comme le font les Demanderesses[88], que l'Argentine aurait renoncé au sursis à exécution des décisions américaines.

148.    Ainsi que nous l'avons exposé, le tribunal de district de New York a conditionné la suspension de l'exécution du jugement final pendant la procédure d'appel à la mise en gage par la République Argentine en faveur des Demanderesses de ses actions au capital de YPF et de ses créances liées à un barrage binational de production d'électricité et à la mise en place d'un calendrier accéléré pour l'appel.

149.    Il n'était ni juridiquement ni matériellement possible pour l'Argentine de satisfaire les conditions imposées par le tribunal de district de New York pour le maintien de la suspension de l'exécution[89]. L'Argentine est un Etat souverain pour qui de telles décisions impliquent de saisir les différentes institutions et organes de pouvoir ayant compétence. Au cas présent cela aurait notamment nécessité d'obtenir le vote d'une loi du Congrès argentin. Dans le même temps, en raison des conditions économiques difficiles et de la nécessité de réformes immédiates et urgentes pour mettre l'économie sur une nouvelle voie, le nouveau gouvernement argentin n'était pas en mesure de mettre en gage des actifs pour garantir le jugement de 16,1 milliards de dollars en instance d'appel. De plus, la réglementation budgétaire argentine n'autorise pas le paiement de jugements qui ne sont pas définitifs au regard de la loi argentine (ce qui implique que tous les recours existants contre le jugement à exécuter doivent être épuisés).

150.    En conséquence de ce qui précède, la République Argentine sollicite de votre Tribunal qu'il ordonne un sursis à statuer dans la présente instance jusqu'à ce que soit rendue décision insusceptible de recours dans la procédure américaine.

\*

---

[87] **Pièce n° 6 :** Transcription de la conférence résumant les résultats du 3e trimestre de Burford Capital du 7 novembre 2024, p. 8, soulignement ajouté.

[88] Conclusions en réponse des Demanderesses du 24 février 2025, §§ 115 à 121.

[89] **Pièce n° 26 :** Lettre de la République Argentine du 19 décembre 2023 devant le tribunal de district de New York dans les procédures 15 Civ. 2739 (LAP) et 16 Civ. 8569 (LAP).

**B. En tout état de cause, sur l'irrecevabilité des demandes d'exequatur tirée de l'immunité de juridiction dont bénéficie la République Argentine**

151.    Les États étrangers souverains bénéficient, en droit, d'une immunité de juridiction qui s'oppose à ce que les juridictions françaises puissent exercer leur pouvoir juridictionnel à leur endroit (**1.**). Dans la présente affaire, le litige ayant donné lieu à jugement concerne un acte de souveraineté de la République Argentine de sorte qu'elle est fondée à se prévaloir de son immunité de juridiction et que les demandes des Demanderesses sont irrecevables (**2.**).

152.    Dans leurs conclusions en réponse, les Demanderesses soulèvent deux objections, l'une d'ordre juridique, l'autre d'ordre factuel.

153.    D'une part, les Demanderesses tentent de soutenir que le juge français ne saurait reconnaître le bien-fondé de l'immunité de juridiction invoquée par l'Argentine sans procéder à une révision au fond prohibée des décisions américaines qui l'ont refusée.

154.    D'autre part, les Demanderesses prétendent que l'acte à l'origine du litige ne serait pas l'expropriation mais seulement la violation alléguée des statuts de YPF lequel ne constituerait pas un acte souverain de puissance publique.

155.    Aucune de ces deux objections ne convainc et il y sera répondu dans les développements qui suivent.

### 1)  En droit, sur l'immunité de juridiction

156.    La jurisprudence française reconnaît de manière constante le principe d'immunité de juridiction (**a.**) et en a progressivement défini les contours (**b.**). Ce principe est par ailleurs invocable dans le cadre d'une procédure d'exequatur (**c.**).

#### a.  Sur le principe de l'immunité de juridiction

157.    L'immunité internationale est un privilège de juridiction qui consiste à soustraire les sujets internationaux, notamment les États et leurs agents respectifs, à la juridiction nationale d'un État. Elle assure qu'un État étranger ne puisse être soumis, pour les engagements qu'il contracte, à la juridiction d'un autre État étranger sans y avoir consenti.

158.    Chacun s'accorde à voir dans ce principe une règle coutumière de droit international, qui dérive elle-même de l'égalité souveraine des États, principe fondamental de l'ordre international : « *les immunités juridictionnelles des États et de leurs biens procèdent d'un principe généralement accepté du droit international coutumier* » [90]. En effet, l'indépendance réciproque des États est l'un des principes les plus usuellement reconnus du droit des gens.

159.    A cet égard, la France a signé la Convention des Nations Unies du 2 décembre 2004 sur les immunités juridictionnelles des États et de leurs biens[91]. Si cette convention n'est pas encore entrée en vigueur faute de ratifications suffisantes, la Cour européenne des droits de l'homme, imitée en

---

[90] Préambule de la Convention des Nations Unies du 2 décembre 2004.
[91] Convention des Nations Unies du 2 décembre 2004.

cela par la Cour de cassation, estime qu'elle reflète déjà le droit international coutumier et se réfère régulièrement et directement aux principes qu'elle contient[92].

160.     Cette immunité n'est pas absolue et doit être écartée lorsque l'État agit comme un acteur privé (cf. section II.B.b ci-dessous). Il n'en demeure pas moins que le principe est l'application de l'immunité de juridiction, et son abandon n'est que l'exception : « *[u]n État jouit, pour lui-même et pour ses biens, de l'immunité de juridiction devant les tribunaux d'un autre État, sous réserve des dispositions de la présente Convention* »[93].

161.     D'un point de vue procédural, l'immunité internationale constitue une fin de non-recevoir d'ordre public, préliminaire et prioritaire, qui présuppose l'existence du pouvoir de juridiction du tribunal du for dont elle tend à paralyser l'exercice.

162.     Il a déjà été jugé à plusieurs reprises que cette fin de non-recevoir n'enfreint pas le droit d'accès au juge garanti par la Convention Européenne des Droits de l'Homme et du Citoyen :

> « *Il en résulte que le droit d'accès à un tribunal, tel que garanti par l'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales et dont l'exécution d'une décision de justice constitue le prolongement nécessaire, <u>ne s'oppose pas à une limitation à ce droit d'accès, découlant de l'immunité des États étrangers</u>, dès lors que cette limitation est consacrée par le droit international et ne va pas au-delà des règles généralement reconnues en matière d'immunité des Etats* »[94].

163.     En pratique, lorsque l'immunité de juridiction s'applique, la juridiction française ne peut exercer son pouvoir juridictionnel vis-à-vis de l'État défendeur et ce, quelle que soit la nature des faits sous-jacents.

164.     A titre illustratif, la Cour de cassation a eu l'occasion de juger que la nature criminelle d'un acte de terrorisme ne permet pas, à elle seule, d'écarter l'immunité de juridiction :

> « *Mais attendu que les Etats étrangers et les organisations qui en constituent l'émanation ne bénéficient de l'immunité de juridiction, immunité relative et non absolue, qu'autant que l'acte qui donne lieu au litige ou qui leur est imputé à faute participe, par sa nature et sa finalité, à l'exercice de la souveraineté de ces Etats et n'est donc pas un acte de gestion […] <u>la cour d'appel a pu juger que la Jamahiriya pouvait opposer une immunité de juridiction dès lors que la nature criminelle d'un acte de terrorisme ne permet pas, à elle seule, d'écarter une prérogative de souveraineté</u>* »[95].

---

[92] CEDH 29 juin 2011, Sabeh El Leil, aff. 34869/05.
[93] Article 5 de la Convention des Nations Unies du 2 décembre de 2004.
[94] Cour de cassation, 1re chambre civile, 28 Juin 2023 – n° 21-19.766 : « *8. La Cour européenne des droits de l'homme a jugé (CEDH, Grande chambre, 21 novembre 2001, Al-Adsani c/ Royaume-Uni, requête n° 35763/97) qu'il <u>« faut considérer l'octroi de l'immunité non pas comme un tempérament à un droit matériel, mais comme un obstacle procédural à la compétence des cours et tribunaux nationaux pour statuer sur ce droit</u> », que « <u>l'octroi de l'immunité souveraine à un Etat dans une procédure civile poursuit le but légitime d'observer le droit international afin de favoriser la courtoisie et les bonnes relations entre Etats grâce au respect de la souveraineté d'un autre Etat</u> », que « la Convention doit autant que faire se peut s'interpréter de manière à se concilier avec les autres règles de droit international, dont elle fait partie intégrante, y compris celles relatives à l'octroi de l'immunité aux Etats », et qu'on ne « peut dès lors de façon générale <u>considérer comme une restriction disproportionnée au droit d'accès à un tribunal tel que le consacre l'article 6 § 1</u> des mesures prises par une Haute Partie contractante qui reflètent des règles de droit international généralement reconnues en matière d'immunité des Etats* ».
[95] Cour de cassation, 1re chambre civile, 9 Mars 2011 – n° 09-14.743.

*b.  Sur les critères retenus pour l'application de l'immunité de juridiction*

165.    Pour déclarer une action irrecevable, en retenant que l'État défendeur bénéficie de l'immunité de juridiction, les juridictions opèrent une distinction entre les « actes d'autorité », qui sont les actes manifestant la souveraineté de l'État étranger, et les « actes de gestion » qui sont ceux qui ne diffèrent pas substantiellement de ceux qui pourraient être accomplis par des personnes privées.

166.    Cette distinction apparaît dans la Convention des Nations Unies du 2 décembre 2004 qui exclut de son champ d'application les « *transactions commerciales* »[96], ainsi que dans la jurisprudence française.

167.    A cet égard, depuis un arrêt de la chambre mixte de la Cour de cassation du 20 juin 2003, la Cour de cassation juge que :

> « *[I]es États étrangers et les organismes qui en constituent l'émanation ne* **bénéficient de l'immunité de juridiction qu'autant que l'acte qui donne lieu au litige participe, par sa nature ou sa finalité, à l'exercice de la souveraineté de ces États et n'est donc pas un acte de gestion** »[97].

168.    L'approche des juridictions françaises repose donc sur un critère alternatif, car l'acte litigieux doit soit par <u>sa nature</u> (critère matériel) d'une part, soit par <u>sa finalité</u> (critère finaliste) d'autre part, participer à l'exercice de la souveraineté pour que son auteur bénéficie de l'immunité.

169.    En revanche, l'appréciation de ce critère n'implique pas que soit porté un jugement sur le comportement, la décision, l'action ou l'omission de l'État en cause :

> « *[Les règles] qui régissent l'immunité de l'État sont de nature procédurale et se bornent à déterminer si les tribunaux d'un État sont fondés à exercer leur juridiction à l'égard d'un autre.* <u>*Elles sont sans incidence sur la question de savoir si le comportement à l'égard duquel les actions ont été engagées était licite ou illicite*</u> *[...]* »[98].

170.    S'agissant du critère matériel, au sens du droit international, l'acte de souveraineté est essentiellement un acte de la puissance publique, quels que soient sa dénomination juridique ou son formalisme[99].

171.    La doctrine définit la notion de prérogatives de puissance publique comme celles qui constituent essentiellement « ***des moyens juridiques exorbitants du droit commun qui placent l'administration dans une situation privilégiée par rapport aux administrés****. La plupart de ces prérogatives sont des prérogatives d'action, dont la principale est la possibilité d'édicter unilatéralement des prescriptions obligatoires pour leurs destinataires* » [100]. Sont ainsi considérés comme des prérogatives

---

[96] Article 10 de la Convention des Nations Unies du 2 décembre 2004

[97] Cass. ch. mixte, 20 juin 2003, Dame Soliman c/ École saoudienne de Paris et Royaume d'Arabie saoudite, gras ajouté.

[98] CIJ, 3 février 2012, Immunités juridictionnelles de l'État, Allemagne c/ Italie ; Grèce (intervenant), C.I.J. Recueil 2012, p. 99, cité dans Cour de cassation, 1re chambre civile, 28 Juin 2023 – n° 21-19.766.

[99] Civ. 1ère, 3 mars 2021, n° 19-22.855, Bull. I.

[100] JurisClasseur Procédure civile, Fasc. 400-45 : COMPÉTENCE ADMINISTRATIVE ET JUDICIAIRE. – Actes ou opérations se rattachant à une mission de service public comportant l'exercice de prérogatives de puissance publique, Antoine Béal, § 18, gras ajouté.

de puissance publique « *l'obligation d'adhérer et de verser des contributions à un organisme public ou privé, l'action ou le refus de cartes professionnelles conditionnant l'exercice d'une activité, __le droit d'exproprier__, de réquisitionner, de préempter les immeubles ou les œuvres d'art, la possibilité d'infliger des sanctions, etc.* »[101].

172.    S'agissant du critère finaliste, les juridictions examinent la finalité lorsque l'acte à l'origine du litige n'est pas, en lui-même, souverain mais participe à un objectif poursuivi par l'État qui, pour sa part, l'est. Il importe peu dans ce cas, que l'acte constitue une pure opération de droit privé, ce n'est pas là que le regard doit se porter pour déterminer si l'immunité doit être ou non levée.

173.    La jurisprudence française en la matière fournit de nombreux exemples dans lesquels l'un des deux critères a conduit à la reconnaissance de l'immunité pour l'État défendeur, ou son émanation, et à l'irrecevabilité des demandes. L'immunité a ainsi été reconnue :

-    au bénéfice de la société nationale iranienne du gaz dans le cadre d'un litige relatif à un appel d'offre émis par cette société pour l'installation d'un système de protection de gazoducs dès lors que l'immunité s'applique « *non seulement pour les actes de puissance publique mais aussi pour ceux accomplis __dans l'intérêt d'un service public__* »[102], celui de l'approvisionnement en énergie ;

-    à la banque centrale du Japon qui agit « *dans l'intérêt d'un service public* » dans le cadre de son activité de contrôle des changes[103] ;

-    à l'État sénégalais dans le cadre d'un litige portant sur son intervention dans l'exécution d'un contrat de pur droit privé pour tenter d'imposer le maintien de ce contrat, en jugeant qu'une telle tentative est « *__nécessairement un acte de puissance publique__ couvert par l'immunité de juridiction* »[104] ;

-    à la Fédération de Russie dans le cadre d'un litige portant sur des prêts émis par l'Empire russe et la compagnie du chemin de fer du Nord-Donetz, dès lors que ces prêts bénéficiant de conditions « *__exorbitant[es] du droit commun__, accordé[es] aux souscripteurs par le gouvernement impérial, relevait __de ses prérogatives de puissance publique__ ; [et] que, de ces constatations et énonciations dont il résultait que le gouvernement impérial russe avait agi dans l'exercice de sa souveraineté* »[105] ;

-    à l'État gabonais dans le cadre d'un litige sur le démantèlement de panneaux publicitaires, dès lors que l'État a fait « *usage de la force publique* »[106] ;

-    au Ministère des affaires présidentielles de l'État fédéral des Emirats Arabes Unis dans le cadre d'un contrat de partenariat et d'intermédiation pour la création d'un établissement d'enseignement supérieur, puisque ce partenariat « *__participait par sa finalité à l'accomplissement d'un acte dans l'intérêt du service public__ de l'éducation* » et qu'il en résultait que le ministère des

[101] JurisClasseur Procédure civile, Fasc. 400-45 : COMPÉTENCE ADMINISTRATIVE ET JUDICIAIRE. – Actes ou opérations se rattachant à une mission de service public comportant l'exercice de prérogatives de puissance publique, Antoine Béal, § 19, soulignement et gras ajoutés.
[102] Cour de cassation, 1re chambre civile, 2 Mai 1990 – n° 88-14.363, soulignement ajouté.
[103] Cour de cassation, 1re chambre civile, 19 Mai 1976 – n° 74-11.424, soulignement ajouté.
[104] Cour de cassation, Chambre civile 1, 9 Octobre 1990 – n° 88-19.222, soulignement ajouté.
[105] Cour de cassation, Chambre civile 1, 6 novembre 2019 – n°18-16.437, soulignement ajouté.
[106] Conseil d'État, Section, 22 Décembre 2023 – n° 463451, soulignement ajouté.

affaires présidentielles « *avait agi dans l'exercice de la souveraineté de l'Etat fédéral des Emirats arabes unis* »[107] ;

-   à la République démocratique populaire du Laos dans un litige relatif à la nationalisation sans indemnité de mines d'étain, en jugeant que **« *l'acte de nationalisation sur lequel était fondée la demande, constitue un acte de puissance publique* »**[108].

174.    Dans un arrêt récent, la Cour de cassation raisonne par la négative[109] : elle examine d'abord si l'acte litigieux peut relever d'un acte de gestion et, si la réponse est négative, elle applique l'immunité de juridiction.

175.    Dans cette affaire, une juridiction américaine avait écarté l'immunité de juridiction de la République Islamique d'Iran et l'avait condamné à indemniser la famille d'une victime d'attentat en retenant que l'État iranien avait apporté un soutien financier à un groupe terroriste.

176.    La Cour de cassation a approuvé la Cour d'appel d'avoir jugé « *que les actes ayant donné lieu au litige [...] en ce qu'ils avaient consisté en un soutien financier apporté à un groupe terroriste ayant commis un attentat suicide dans lequel la fille de M. [X] avait trouvé la mort, ne relevaient pas d'actes de gestion de cet Etat* » et qu'en conséquence, « *la République islamique d'Iran pouvait opposer son immunité de juridiction* »[110].

177.    En cela la Cour de cassation applique un principe rappelé par le Rapporteur public dans ses conclusions sous l'arrêt du Conseil d'État du 22 décembre 2023 : « *dans le doute, le principe consensuel (qu'exprime d'ailleurs bien l'article 5 de la Convention de 2004) reste que l'immunité est la règle et l'absence d'immunité l'exception : il en découle que si l'acte qui donne lieu au litige n'est pas un acte de gestion au sens strict, alors il rentre nécessairement, sous l'angle de l'immunité de juridiction, dans la catégorie des actes de souveraineté, quelle que soit sa gravité* »[111].

### c.    L'invocabilité dans le cadre d'une procédure d'exequatur

178.    La question de savoir si l'immunité de juridiction peut être invoquée dans le cadre d'une procédure d'exequatur ne fait plus débat. En effet, dès lors que le juge français exerce un pouvoir juridictionnel vis-à-vis de l'État, il s'en suit que l'État défendeur est recevable à invoquer son immunité.

179.    Dans une décision particulièrement remarquée, le Conseil d'État français s'est prononcé sur une demande d'exequatur formulée par une société gabonaise visant la reconnaissance de deux arrêts rendus par le Conseil d'État gabonais. Ces arrêts avaient reconnu la responsabilité de l'État gabonais dans le démantèlement, par la force publique, de panneaux publicitaires appartenant à la société et avaient condamné cet État à lui verser un total de 11 184 814 496 francs CFA.

---

[107] Cour de cassation, 1re chambre civile, 3 Mars 2021 – n° 19-22.855, soulignement ajouté.
[108] Cass. 1re civ., 20 oct. 1987, n° 85-18.608, Sté internationale de plantations d'hévéas c/ Sté Lao Import Export et a, soulignement et gras ajoutés.
[109] Cour de cassation, 1re chambre civile, 28 Juin 2023 – n° 21-19.766.
[110] Cour de cassation, 1re chambre civile, 28 Juin 2023 – n° 21-19.766, soulignement ajouté.
[111] Conclusions du Rapporteur public pour la décision du Conseil d'État, Section, 22 Décembre 2023 – n° 463451, soulignement ajouté.

180.    Dans cette décision, le Conseil d'État a rappelé que : « *Un Etat peut opposer cette immunité [de juridiction] à une demande d'exequatur d'une décision juridictionnelle, y compris si cette décision émane des juridictions de cet Etat* » [112].

181.    La Cour de cassation a récemment réaffirmé qu'un juge saisi d'une demande d'exequatur d'un jugement étranger rendu contre un État tiers exerce sa propre juridiction à l'égard de l'État tiers : « *La cour d'appel a énoncé à bon droit que, dans une instance en exequatur […] lorsque l'immunité de juridiction est revendiquée par un État étranger, il lui incombe de statuer préalablement sur cette fin de non-recevoir* » [113].

182.    Ainsi, l'immunité de juridiction s'applique dans le cadre d'une demande d'exequatur d'un jugement étranger, y compris lorsqu'il s'agit d'une décision rendue par les juridictions de l'État défendeur lui-même.

183.    Ce principe reste encore vrai lorsque le premier juge a écarté l'immunité de juridiction de l'État. La Cour de cassation a en effet clairement jugé dans un arrêt récent que :

> « ***la circonstance que le juge ayant rendu la décision dont l'exequatur est sollicité ait lui-même écarté une telle immunité de juridiction, en vertu de sa propre loi, ne dispense pas le juge français d'exercer son pouvoir juridictionnel afin d'apprécier la fin de non-recevoir tirée de l'immunité de juridiction invoquée devant lui*** » [114].

184.    Il est donc faux de soutenir, comme tentent de le faire les Demanderesses, que le juge français ne pourrait reconnaître l'immunité de juridiction à un Etat dès lors que le juge étranger l'aurait écartée ou que l'appréciation du juge français doit porter sur l'acte à l'origine du litige « *tel qu'il a été qualifié par le juge étranger* » [115] en raison du principe d'interdiction de la révision au fond du jugement étranger.

185.    Cet argument est en effet juridiquement incorrect.

186.    Lorsque le juge de l'exequatur examine la question de l'immunité de juridiction, il se prononce sur la recevabilité de la demande d'exequatur qui lui est présentée et non sur la régularité du jugement étranger, ni a fortiori sur les motifs de ce jugement. Il n'y a donc aucune révision au fond du jugement étranger.

187.    Comme exposé, la question de recevabilité repose sur l'appréciation, par le juge français, de sa capacité à exercer son pouvoir juridictionnel vis-à-vis de l'Etat défendeur. L'absence de pouvoir de juger s'apprécie pour chaque instance indépendamment, et l'instance au fond à l'étranger est distincte de l'instance en *exequatur* en France.

188.    Dans la conduite de cet examen, le juge français applique son propre corpus de normes et ne saurait être tenu par la position adoptée par le juge étranger. Le contraire, à savoir que l'existence ou l'absence du pouvoir juridictionnel des juges français puissent dépendre des décisions de juges étrangers quel qu'ils soient, serait par ailleurs surprenant.

---

[112] Conseil d'État, Section, 22 Décembre 2023 – n° 463451, soulignement ajouté.
[113] Cour de cassation, 1re chambre civile, 28 Juin 2023 – n° 21-19.766, soulignement ajouté.
[114] Cour de cassation, 1re chambre civile, 28 Juin 2023 – n° 21-19.766, soulignement et gras ajoutés.
[115] Conclusions en réponse des Demanderesses du 24 février 2025, § 60 et §§ 92-104.

189.    Peu importe donc que l'immunité de juridiction ait été méconnue par le juge d'origine, sur le fondement de sa propre loi, l'appréciation portée par le juge de l'exequatur sur l'exception d'immunité soulevée devant lui est indépendante de celle qu'a pu par ailleurs retenir le juge initial du litige.

190.    Un arrêt de la Cour de justice internationale de justice détaille l'analyse qui confirme cette solution :

> « *128. Lorsqu'un tribunal est saisi, comme en l'espèce, d'une demande tendant à ce qu'il accorde l'exequatur d'un jugement étranger ayant statué à l'encontre d'un Etat tiers, <u>il est appelé à exercer lui-même sa juridiction à l'égard de l'Etat tiers en question</u>. […] Le juge de l'exequatur n'a donc pas pour rôle de réexaminer dans tous ses aspects le fond de l'affaire qui a été jugée. <u>**Il n'en reste pas moins que, en accordant ou en refusant l'exequatur, il exerce un pouvoir juridictionnel qui aboutit à donner au jugement étranger des effets correspondant à ceux d'un jugement rendu au fond dans l'Etat requis**</u>. La procédure introduite devant ce juge doit, en conséquence, être regardée comme intentée contre l'Etat tiers condamné par le jugement étranger. […]*
>
> *130. Il résulte de ce qui précède que <u>le juge saisi d'une demande d'exequatur d'un jugement étranger condamnant un Etat tiers est tenu de se demander si l'Etat défendeur bénéficie d'une immunité de juridiction, compte tenu de la nature de l'affaire qui a été jugée, devant les tribunaux de l'Etat dans lequel la procédure d'exequatur a été engagée</u>. En d'autres termes, il doit se demander si, dans le cas où il aurait été lui-même saisi au fond d'un litige identique à celui qui a été tranché par le jugement étranger, il aurait été tenu en vertu du droit international d'accorder l'immunité à l'Etat défendeur […]*
>
> *132. Pour parvenir à une telle conclusion, point n'est besoin de se prononcer sur la question de savoir si les tribunaux grecs ont eux-mêmes violé l'immunité de l'Allemagne, question dont la Cour n'est pas saisie et sur laquelle elle ne saurait d'ailleurs se prononcer pour les raisons rappelées ci-dessus. La Cour se bornera à relever, en termes généraux, qu'il peut parfaitement se produire, dans certaines hypothèses, que le jugement rendu au fond n'ait pas violé l'immunité de juridiction de l'Etat défendeur, par exemple parce que celui-ci y aurait renoncé devant les tribunaux saisis de l'action principale, <u>mais que l'action en exequatur engagée dans un autre Etat se heurte à l'immunité du défendeur</u>* »[116].

191.    La Cour de cassation a récemment repris et appliqué cette solution en jugeant que le principe interdisant la révision au fond du jugement étranger ayant écarté l'immunité de juridiction de l'État défendeur ne s'oppose pas à ce que le juge de l'exequatur exerce son pouvoir juridictionnel afin d'apprécier lui-même cette immunité.

192.    Dans cette affaire, le tribunal de district des Etats-Unis pour le district de Columbia avait condamné la République islamique d'Iran au paiement de certaines sommes et avait préalablement écarté l'application de l'immunité de juridiction dont se prévalait la République islamique d'Iran. Saisies d'une demande d'exequatur du jugement américain, les juridictions françaises se sont, elles-aussi, prononcées sur la question de l'immunité de juridiction en retenant cette fois que la

---

[116] CIJ, 3 février 2012, Immunités juridictionnelles de l'État, Allemagne c/ Italie ; Grèce (intervenant), C.I.J. Recueil 2012, p. 57, points 128, 130, 132, soulignement et gras ajoutés.

République islamique d'Iran était bien-fondée à l'invoquer en qu'en conséquence la demande d'exequatur était irrecevable.

193.    Le pourvoi ayant saisi la Cour de cassation, prétendait interdire, en invoquant la prohibition de la révision au fond des jugements étrangers, à la juridiction requise de se prononcer à nouveau sur l'immunité, au motif que le point avait été déjà tranché par la juridiction étrangère. La Cour de cassation a écarté ce moyen et a jugé sans ambiguïté que « *la circonstance que le juge américain a lui-même écarté cette immunité de juridiction de l'Iran, en vertu de sa propre loi, dans la décision dont l'exequatur est sollicité, ne saurait empêcher le juge français d'exercer son pouvoir juridictionnel afin d'apprécier si la République islamique d'Iran est recevable et bien fondée à invoquer cette immunité devant lui* »[117].

194.    Les commentaires doctrinaux de cet arrêt approuvent le raisonnement suivi par la Haute Juridiction.

195.    Un auteur explique ainsi « *<u>l'interdiction de la révision au fond du jugement étranger n'intervient, le cas échéant, qu'après rejet de l'exception tirée de l'immunité de juridiction.</u> De ce point de vue, <u>il était évident aux yeux de la Cour de cassation que la circonstance que le juge américain avait lui-même écarté pareille immunité, en vertu de sa propre loi, dans la décision dont l'exequatur était sollicité, ne dispensait pas le juge français d'exercer son pouvoir juridictionnel afin d'apprécier si l'Iran était recevable et bien-fondé à invoquer cette même immunité devant lui</u>* »[118].

196.    Ce même auteur poursuit « *Pourrait-on y voir un contournement habile par la Cour de cassation du principe interdisant la révision au fond du jugement étranger ? La réponse nous paraît devoir être négative.* **En effet, il est douteux que le fait que le juge américain d'avoir écarté l'immunité de juridiction de l'Iran sur le fondement d'une disposition nationale, qui est loin de refléter le droit international général des immunités comme on le verra plus loin, relève du « fond » de l'affaire tranchée par lui.** *À vrai dire, l'arrêt ici commenté ne fait que reprendre, sans toutefois citer les passages pertinents, l'approche retenue par la Cour internationale de justice dans l'affaire des Immunités juridictionnelles qui avait opposé l'Allemagne à l'Italie. […] À la lumière de ces principes,* **il est évident que l'examen de l'exception tirée de l'immunité de juridiction au titre de la recevabilité d'une action en exequatur ne porte pas atteinte au principe prohibant la révision au fond du jugement étranger. Chaque juge national apprécie de manière autonome – à savoir sans être lié par le jugement étranger sur ce point proprement « procédural » – la question de l'immunité en fonction de ce qu'il estime être l'état du droit international en la matière** »[119].

197.    Cet arrêt de la Cour de cassation contredit la position que tentent de soutenir les Demanderesses. Les développements qu'elles consacrent au contenu des décisions américaines sont, sur ce point, indifférents.

---

[117] Cour de cassation, 1re chambre civile, 28 Juin 2023 – n° 21-19.766.

[118] Ioannis Prezas, *Immunité - L'office du juge de l'exequatur confronté à la « terrorism exception » dans le contexte de l'immunité de juridiction*, Journal du droit international (Clunet) n° 2, Avril-mai-juin 2024, comm. 9, soulignement et gras ajoutés.

[119] Ioannis Prezas, *Immunité - L'office du juge de l'exequatur confronté à la « terrorism exception » dans le contexte de l'immunité de juridiction*, Journal du droit international (Clunet) n° 2, Avril-mai-juin 2024, comm. 9, gras ajouté.

198.    Le juge français apprécie, indépendamment de la position des juges américains, si l'Argentine est fondée à se prévaloir de son immunité de juridiction.

2)    En fait, la République Argentine est fondée à se prévaloir de son immunité de juridiction

199.    Il ressort des règles rappelées ci avant que : (i) l'Argentine est bien recevable à invoquer son immunité de juridiction dans le cadre de la présente procédure ; (ii) la circonstance que le juge américain a écarté l'immunité de juridiction ne lie pas votre Tribunal qui doit apprécier souverainement la fin de non-recevoir invoquée devant lui ; (iii) l'immunité de juridiction s'applique dès lors que « *l'acte qui donne lieu au litige* » ne relève pas d'un acte de gestion. C'est notamment le cas lorsqu'il s'agit d'un acte de puissance publique, y compris lorsqu'il intervient dans un rapport de droit privé, ou lors qu'il est accompli dans l'intérêt public.

200.    En l'espèce, l'Argentine est bien fondée à se prévaloir de son immunité de juridiction dès lors que l'acte litigieux (**a.**) participe par sa nature (**b.**) et sa finalité (**c.**) à l'exercice, par l'Argentine, de sa souveraineté.

a.    *L'acte qui donne lieu au litige*

201.    En l'espèce, l'acte qui donne lieu au litige entre les Demanderesses et la République Argentine, c'est l'acte d'expropriation de la participation de 51% dans le capital social de YPF détenue par Repsol.

202.    En effet, dans l'exercice de sa souveraineté, la République Argentine a décidé d'exproprier l'actionnaire principal de YPF – Repsol – et de limiter cette expropriation à 51% du capital social de YPF dans le but de maintenir un équilibre entre l'État fédéral, les provinces et les investisseurs privés[120].

203.    L'objectif poursuivi était la reprise du contrôle stratégique de l'entreprise, pas sa nationalisation intégrale. Si l'Argentine avait souhaité nationaliser intégralement YPF, elle aurait décidé d'exproprier l'intégralité des actionnaires. Elle en a décidé autrement et quel que soit le jugement porté sur cette décision, elle n'en est pas moins souveraine.

204.    Le Congrès argentin a ainsi voté la Loi d'Utilité Publique et d'Expropriation afin qu'YPF continue à opérer en tant que société privée, cotée en bourse, pour ne pas la priver de l'accès aux marchés de capitaux, et ainsi permettre le financement de son redressement et de son développement.

205.    Dans ce litige, la violation alléguée des statuts de YPF dont se prévalent les Demanderesses – l'absence de lancement d'une offre publique – résulte directement et exclusivement de

---

[120] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012 – article 15 : « *[p]our mener à bien leurs activités, YPF Sociedad Anónima et Repsol YPF GAS S.A. continueront d'opérer en tant que sociétés cotées en bourse, conformément aux dispositions du chapitre II, section V, de la loi 19.550 et des dispositions connexes* » et article 8 « *Les actions soumises à l'expropriation des sociétés YPF Sociedad Anónima et Repsol YPF GAS S.A., conformément à la section précédente, seront réparties comme suit : cinquante et un pour cent (51 %) appartiendront à l'État national et les quarante-neuf pour cent (49 %) restants seront répartis entre les provinces membres de l'Organisation fédérale des États producteurs d'hydrocarbures* ».

l'expropriation en ce qu'elle a été circonscrite aux seuls 51% de YPF détenus par Repsol. C'est le cœur du litige.

206.    En effet, les Demanderesses soutiennent qu'à l'occasion de la prise de contrôle de YPF, elles auraient dû bénéficier d'une offre publique d'achat des titres qu'elles possédaient et que l'abstention de l'Argentine à cet égard leur a causé un préjudice.

207.    Or, le lancement d'une telle offre ne pouvait pas intervenir dès lors que la République Argentine avait décidé (i) de n'exproprier que 51% du capital social de YPF, (ii) de cibler spécifiquement la participation détenue par Repsol et (iii) de maintenir YPF sous la forme d'une société privée cotée. Il s'agit donc bien de l'acte litigieux.

208.    Les Demanderesses tentent de scinder l'acte en deux objets distincts : la loi d'expropriation d'une part et l'abstention de lancement d'une offre publique d'autre part. Les Demanderesses s'appuient sur cette dissociation illusoire pour soutenir qu'elles ne critiquent pas l'expropriation elle-même mais seulement l'absence de lancement d'une offre publique et que cette abstention ne relèverait pas d'un acte de puissance publique[121]. Mais la distinction est, en soi, artificielle et elle l'est d'autant plus lorsqu'il s'agit, comme ici, d'apprécier si l'acte à l'origine du litige participe de la souveraineté de l'Argentine.

209.    Les Demanderesses ne peuvent soutenir tout à la fois que la décision d'exproprier seulement 51% était souveraine (et donc insusceptible d'être critiquée devant des juridictions étrangères) et dans le même temps que la décision de ne pas exproprier ou autrement acquérir les 49% restants ne l'était pas.

210.    Il y a dans cette thèse une erreur intrinsèque qui exclut que l'on puisse y souscrire.

211.    Ce que les Demanderesses analysent en deux objets distincts – qui, selon elles, devraient être soumis à deux régimes juridiques distincts – n'est en fait que la même décision décrite de deux manières différentes, l'une par la positive et l'autre par la négative.

212.    Décider que l'Argentine n'expropriera YPF qu'à hauteur de 51% implique nécessairement qu'elle décide de ne pas acquérir les 49% restants. L'absence de lancement d'une offre publique, c'est le choix de n'exproprier « que » 51%. Ces deux phrases sont le corollaire nécessaire l'une de l'autre, deux descriptions de la même décision de l'Argentine. Elles sont chacune le miroir l'une de l'autre, les deux faces d'une même pièce.

213.    Cela ressort d'ailleurs clairement de l'argumentation même des Demanderesses dans les procédures américaines. Elles affirment ainsi que « *L'Argentine a émis un décret exécutif prenant le contrôle de YPF à son actionnaire majoritaire de l'époque, suivi quelques semaines plus tard d'une législation expropriant formellement une participation majoritaire dans l'entreprise, le tout sans respecter l'obligation des statuts*

---

[121] A cet égard, les Demanderesses ont soutenu une position contradictoire dans la procédure américaine. Elles ont d'abord soutenu que l'offre publique aurait dû être lancée postérieurement à l'expropriation (qui a été exécutée en mai 2014) pour essayer de distinguer l'expropriation et le lancement de l'offre publique et faire échec à l'application de l'immunité de juridiction. Puis, au stade des dommage et intérêts elles ont considéré que l'offre aurait dû être lancée dès 2012 et exigé que le préjudice soit calculé à partir de cette date, deux ans avant l'exécution de l'expropriation, et soumis à des intérêts de retard.

*de lancer une offre publique d'achat et de respecter les droits des actionnaires minoritaires de YPF* »[122] ou encore que « *L'Argentine a violé cette obligation contractuelle en acquérant le contrôle majoritaire de YPF mais en refusant de faire une offre publique d'achat* »[123].

214.    L'artificialité de la distinction des Demanderesses apparaît encore plus clairement lorsqu'on raisonne dans l'autre sens : il n'existe pas de situation dans laquelle on pourrait à la fois faire coexister (i) une expropriation des seuls 51% de Repsol et (ii) l'application de la disposition statutaire imposant le lancement d'une offre publique sur 100% du capital. Les deux solutions sont incompatibles, mutuellement exclusives l'une de l'autre.

215.    En conséquence, juger que l'Argentine devait lancer une offre publique sur la totalité des titres de YPF, cela revient à juger que l'Argentine ne pouvait pas ou n'avait pas le droit d'exproprier « que » 51% du capital social de YPF détenue par Repsol.

216.    Quel que soit le sens dans lequel on examine la thèse des Demanderesses – quelle que soit la temporalité de l'offre publique qui selon elles s'imposait au regard des statuts de YPF – elle revient invariablement à critiquer la décision d'expropriation de l'Argentine.

217.    En résumé, sans expropriation, il n'y a pas de litige. C'est donc bien l'acte qui donne lieu au litige.

218.    En réponse, les Demanderesses veulent soutenir que « *sans Violation Statutaire, pas de litige* »[124].

219.    Il s'agit ici de la seconde objection des Demanderesses à l'immunité de juridiction de l'Argentine qui consiste à soutenir que, prétendument, elles ne se prévalent pas de l'expropriation – qu'elles reconnaissent être un acte souverain de puissance publique – mais seulement de la violation alléguée des statuts de YPF qui en a résulté.

220.    On vient de le voir, factuellement, il ne s'agit pas de deux événements distincts, ni de deux actes différents de la part de l'Argentine, mais bien d'une seule décision unique : l'expropriation circonscrite à 51% du capital de YPF appartenant à Repsol excluant le lancement d'une offre publique.

221.    Les Demanderesses déplacent le curseur de l'examen, mais ce faisant elles amalgament l'acte à l'origine (l'expropriation de 51% excluant le lancement d'une offre publique) et les conséquences juridiques que cet acte serait susceptible d'emporter sur le plan de la responsabilité contractuelle.

222.    La violation statutaire alléguée ne constitue pas l'acte à l'origine du litige. Il s'agit plutôt d'une qualification juridique, c'est-à-dire le fondement juridique par lequel les Demanderesses ont voulu engager la responsabilité de l'Argentine.

---

[122] **Pièce n° 22 :** Mémoire d'appel des Demanderesses devant la Cour d'appel des États-Unis pour le deuxième circuit du 26 mars 2024– page 2, soulignement et gras ajoutés.

[123] **Pièce n° 22 :** Mémoire d'appel des Demanderesses devant la Cour d'appel des États-Unis pour le deuxième circuit du 26 mars 2024 – page 46, soulignement ajouté.

[124] Conclusions en réponse des Demanderesses du 24 février 2025, § 87.

223.    On voit bien, que dès lors qu'elles invoquent la « violation » des statuts de YPF, elles ne se prévalent pas d'un acte distinct de l'expropriation, mais, selon elles, l'expropriation ne respectent pas les dispositions statutaires.

224.    Les Demanderesses auraient également pu tenter de fonder leur action sur d'autres fondements tels que la violation de la réglementation boursière argentine ou encore la violation de la réglementation argentine en matière d'expropriation. Ces violations alléguées auraient constitué autant de qualifications différentes pour le même acte litigieux.

225.    Prenons un autre exemple, si un Etat conclut un contrat par lequel il s'engage à fournir du matériel à une société et qu'il refuse ensuite de fournir ce matériel, alors la société pourrait envisager d'engager la responsabilité de l'Etat pour manquement contractuel. On voit bien qu'il n'existe qu'un acte à l'origine du litige (le refus de fourniture) et que le fondement juridique sur lequel agit la société demanderesse (la violation du contrat) ne constitue pas un événement distinct et autonome.

226.    A cet égard, il est particulièrement intéressant de constater que pour accorder ou refuser le bénéfice de l'immunité de juridiction, les juges ne prennent pas en considération la nature de la règle dont la violation est alléguée, ni le fondement juridique de l'action en responsabilité contre l'Etat.

227.    L'immunité a ainsi pu être reconnue à un Etat ou à une émanation, y compris lorsque leur était reprochée (i) l'intervention dans un rapport de pur droit privé[125], (ii) la violation des termes d'un contrat de partenariat[126], ou (iii) le défaut de paiement du prix d'un système de protection cathodique[127].

228.    Dans ce dernier cas, on voit bien que la violation de l'obligation de paiement du prix du système livrée constitue un reproche qui pourrait être adressé à n'importe quelle société commerciale. La Cour d'appel avait notamment relevé que le contrat en question était passé entre deux sociétés commerciales dans des conditions de droit commun mais cela n'a pas empêché la Cour de cassation de juger la demande irrecevable car se rattachant à un acte « *accomplis dans l'intérêt d'un service public* » de l'approvisionnement en énergie.

229.    Ainsi, les développements que les Demanderesses consacrent (i) à la nature « privée » de l'obligation de lancement d'une offre publique prévue dans les statuts de YPF[128], (ii) au fait que cette règle n'a rien d'intrinsèquement souverain[129], ou encore (iii) au parallèle avec l'existence de règles similaires en droit européen[130], sont sans conséquence pour l'appréciation de la nature et de la finalité de l'acte à l'origine du litige, et par suite du bien-fondé de l'immunité de juridiction invoquée.

---

[125] Cour de cassation, Chambre civile 1, 9 Octobre 1990 – n° 88-19.222.
[126] Cour de cassation, 1re chambre civile, 3 Mars 2021 – n° 19-22.855.
[127] Cour de cassation, 1re chambre civile, 2 Mai 1990 – n° 88-14.363.
[128] Conclusions en réponse des Demanderesses du 24 février 2025, §73, § 78.
[129] Conclusions en réponse des Demanderesses du 24 février 2025, § 74.
[130] Conclusions en réponse des Demanderesses du 24 février 2025, §§ 83 – 86.

230.    De la même manière, l'argument des Demanderesses selon lequel les statuts de YPF s'imposaient à l'Argentine, ce qui exclurait qu'elle puisse se prévaloir de son immunité si on lui reproche de les avoir violés et lui demande réparation[131], n'a pas de sens.

231.    Raisonner comme le proposent les Demanderesses reviendrait à considérer qu'un Etat ne pourrait jamais invoquer son immunité puisque, par construction, un demandeur qui engage la responsabilité d'un Etat lui reproche toujours le non-respect d'une règle qu'il considère comme étant applicable à cet Etat.

232.    En conclusion, sans expropriation partielle de 51% du capital de YPF, les Demanderesses ne pourraient pas fonder leur action sur une prétendue violation des statuts de YPF, donc il n'existerait pas de litige. **Pas d'expropriation, pas de litige**.

*b.    L'acte litigieux participe par sa nature à la souveraineté de l'État*

233.    En l'espèce, l'acte litigieux est un acte qui, par sa nature, participe à la souveraineté de la République Argentine. L'expropriation est intrinsèquement un acte de puissance publique pour lequel l'État fait usage de prérogatives de puissance publique, exorbitantes du droit commun (cf. § 147 supra).

234.    En Argentine, le principe de l'expropriation est prévu par la Constitution argentine, dans son article 17 : « *[l]a propriété est inviolable et aucun habitant de la Nation ne peut en être dépouillé qu'en vertu d'un jugement fondé sur la loi. **L'expropriation pour cause d'utilité publique doit être autorisée par une loi spéciale et donner lieu à une indemnité préalable** »[132].

235.    Le régime de l'expropriation est quant à lui défini dans une loi spéciale, la Loi Générale sur l'Expropriation. Cette loi organise la procédure d'expropriation, en encadre les délais d'exécution, prévoit le processus d'indemnisation de la personne expropriée, les voies de recours et le traitement des réclamations des tiers[133].

236.    Dans la présente affaire, conformément aux articles 1 et 2 de la Loi Générale sur l'Expropriation, c'est bien le Congrès argentin, le Sénat et la Chambre des Députés, qui a adopté le 3 mai 2012 la Loi d'Utilité Publique et d'Expropriation[134].

237.    Cette loi, d'ordre public[135], a déclaré la réalisation de l'autosuffisance en hydrocarbures d'intérêt public national : « *Il est déclaré d'intérêt public national et objectif prioritaire de la République argentine de parvenir à l'autosuffisance en hydrocarbures, ainsi qu'à l'exploration, l'exploitation, l'industrialisation, le transport et la commercialisation des hydrocarbures, afin de garantir le développement économique dans l'équité sociale, la création d'emplois, l'augmentation de la compétitivité des différents secteurs économiques et la croissance équitable et durable des provinces et des régions* »[136].

---

[131] Conclusions en réponse des Demanderesses du 24 février 2025, §§ 75 – 77 et §§ 79 – 82.
[132] **Pièce n° 1** : Constitution argentine, article 17, gras ajouté. En France, c'est l'article 17 de la Déclaration des Droits de l'Homme et du Citoyen : « *La propriété étant un droit inviolable et sacré, nul ne peut en être privé, si ce n'est lorsque la nécessité publique, légalement constatée, l'exige évidemment, et sous la condition d'une juste et préalable indemnité* ».
[133] **Pièce n° 9** : Loi argentine n° 21.499 du 17 janvier 1977.
[134] **Pièce n° 11** : Loi argentine n° 26.741 du 3 mai 2012.
[135] **Pièce n° 11** : Loi argentine n° 26.741 du 3 mai 2012, article 18.
[136] **Pièce n° 11** : Loi argentine n° 26.741 du 3 mai 2012, article 1, soulignement ajouté.

238.    Elle fixe les principes de la politique des hydrocarbures de la République Argentine au nombre desquels se trouvent (i) « *la promotion de l'utilisation des hydrocarbures et de leurs dérivés comme* *facteur de développement* », (ii) « *la maximisation des investissements et des ressources utilisées pour* *atteindre* *l'autosuffisance en hydrocarbures à court, moyen et long terme* », (iii) « *l'intégration des capitaux publics et privés* *nationaux et internationaux dans des alliances stratégiques visant l'exploration et l'exploitation des hydrocarbures* », et (iv) « *la protection des intérêts des consommateurs en ce qui concerne le prix, la qualité et la disponibilité* »[137].

239.    Dans son Titre III intitulé « *Récupération du contrôle de YPF* », l'article 7 déclare d'utilité publique et soumet à l'expropriation la participation de 51% dans YPF détenue par Repsol :

> « *Afin de garantir le respect des objectifs de la présente loi, cinquante et un pour cent (51 %) du capital* *de YPF Sociedad Anónima, représentés par un pourcentage égal des actions de classe D de ladite société,* *détenus directement ou indirectement par Repsol YPF S.A., ses sociétés de contrôle ou ses sociétés* *contrôlées, sont déclarés d'utilité publique et soumis à l'expropriation* »[138].

240.    L'article 8 prévoit la répartition des titres à exproprier entre l'État fédéral et les provinces[139].

241.    La loi dispose surtout que c'est le pouvoir exécutif national qui exercera « *les droits politiques* *sur toutes les actions faisant l'objet de l'expropriation jusqu'à ce que soit achevée* » la procédure d'expropriation et la cession des actions aux provinces,[140] ainsi que « *tous les droits conférés par les actions à exproprier* » pendant la période de la procédure d'expropriation « *[a]fin de garantir la continuité des activités* *d'exploration, de production, d'industrialisation et de raffinage d'hydrocarbures menés par YPF Sociedad Anónima* *et Repsol YPF GAS S.A., ainsi que leur transport, leur commercialisation et leur distribution et l'augmentation* *du flux d'investissement, pour l'approvisionnement* adéquat des combustibles nécessaires au fonctionnement de *l'économie nationale* »[141].

242.    La loi prévoit bien que la procédure d'expropriation était régie par la Loi Générale sur l'Expropriation (« *La procédure d'expropriation est régie par les dispositions de la loi 21.499 et le pouvoir exécutif* *national agit en qualité d'expropriant* ») et que la détermination du prix des actifs à exproprier serait soumise « *aux dispositions de l'article 10 et aux dispositions concordantes de la loi 21.499. L'évaluation est* *effectuée par le Tribunal National d'Évaluation* »[142].

243.    Le Congrès argentin a également prévu une inaliénabilité des actions saisies, la cession future des actions expropriées étant ainsi « *interdite sans l'autorisation de l'honorable Congrès de la Nation* *votée par les deux tiers de ses membres* »[143].

244.    La Loi d'Utilité Publique et d'Expropriation de YPF n'a pas été jugée inconstitutionnelle ou autrement illégale. Elle demeure en vigueur à date.

---

[137] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012, article 3, soulignement ajouté.
[138] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012, article 7.
[139] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012, article 8.
[140] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012, article 9.
[141] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012, article 13, soulignement ajouté.
[142] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012, articles 11 et 12.
[143] **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012, article 10.

245.     Avant même l'adoption de cette loi, deux semaines plus tôt, la République Argentine avait fait usage de prérogatives de puissance publique pour assurer l'atteinte des objectifs qu'elle fixait avec le Décret d'Intervention.

246.     Par le Décret d'Intervention du 16 avril 2012, la présidente de la République Argentine a ordonné la désignation du ministre de la planification fédérale, des investissements publics et des services en qualité de mandataire ad hoc temporaire pour exercer les pouvoirs du conseil d'administration et du président de YPF pendant 30 jours[144].

247.     L'Argentine a ainsi pu placer YPF sous sa tutelle pendant l'examen et le vote de la Loi d'Utilité Publique et d'Expropriation, évitant ainsi que l'ancienne direction puisse prendre des décisions préjudiciables à la société YPF. Les Demanderesses le rappellent dans leur assignation :

> « *en vertu du décret d'urgence n° 530/12 également adopté le 16 avril 2012, la République a annoncé <u>prendre le contrôle immédiat et effectif</u> de YPF en désignant M. Julio De Vido, alors ministre de la planification, en qualité d'intervenant* » <u>*investi de tous les pouvoirs*</u> *(i) du conseil d'administration et (ii) du président de YPF.*
>
> <u>*Le même jour*</u>*, des membres du gouvernement argentin <u>ont pris possession du siège</u> et des diverses installations de YPF et <u>ont commencé à prendre en charge la conduite de ses opérations</u>. Certains des cadres dirigeants, dont M. Sebastien Eskenazi, se sont vus priés de quitter les locaux sur le champ* »[145].

248.     Il ressort de ce qui précède que (i) l'acte d'expropriation a été mis en œuvre sur le fondement des dispositions constitutionnelles et légales encadrant les procédures d'expropriation, (ii) il a été précédé de mesures d'urgence exceptionnelles permettant de placer le contrôle de YPF entre les mains du gouvernement en attendant le vote de la Loi d'Utilité Publique et d'Expropriation, (iii) la loi a été votée par la représentation nationale argentine, le Congrès, dépositaire du pouvoir législatif, (iv) c'est encore par une loi votée par le Congrès argentin qu'a été approuvé l'Accord de Règlement Global entre la République Argentine et Repsol, clôturant ainsi la procédure d'expropriation[146].

249.     Il ne peut être soutenu qu'un tel acte puisse constituer un acte de gestion. A aucun moment dans ce processus d'expropriation démarré en 2012 et résolu en 2014 la République Argentine ne s'est comportée comme un acteur privé.

250.     <u>Tant la nature de l'acte que les instruments utilisés par la République Argentine démontrent que l'acte d'expropriation procédait pour l'Argentine de l'exercice de sa souveraineté.</u>

### c.     *L'acte litigieux participe par sa finalité à la souveraineté de l'État*

251.     La finalité poursuivie par la République Argentine dans cette opération démontre également qu'il s'agissait pour elle d'un enjeu de souveraineté, et principalement de souveraineté énergétique.

---

[144] **Pièce n° 10 :** Décret argentin n° 530/2012 du 16 avril 2012, articles 1, 2 et 3.
[145] Assignation des Demanderesses, §§ 21 et 22, soulignement ajouté.
[146] **Pièce n° 15 :** Loi argentine n° 26.932 du 23 avril 2014.

252.    Le pouvoir exécutif argentin a exposé en détail dans le préambule de son Décret d'Intervention les considérations stratégiques et les constatations factuelles qui exigeaient de recourir à l'expropriation.

253.    Le Décret d'Intervention rappelle ainsi l'importance des hydrocarbures pour l'économie nationale argentine et l'intérêt stratégique à assurer l'auto-suffisance du pays pour éliminer les aléas géopolitiques et spéculatifs déterminant le prix d'importation des énergies et réduire ainsi la vulnérabilité de l'État.

254.    Il rappelle également qu'outre l'indépendance énergétique, il y a un enjeu de préservation des finances publiques nationales. L'augmentation de la facture énergétique exige la mobilisation de ressources qui pourraient autrement être orientée vers le financement du développement économique du pays par une croissance plus inclusive socialement.

255.    Le gouvernement argentin soulignait dans le même temps le rôle central de YPF, plus grande entreprise du secteur pétrolier, dans la conduite de la politique énergétique du pays et le désalignement des intérêts de son actionnaire majoritaire, Repsol, de ceux de la République Argentine.

256.    Comme cela a été exposé en détail ci-avant (§§ 42 - 52), la gestion de YPF par Repsol a entraîné une baisse significative des investissements dans l'exploration et la production ce qui a provoqué une baisse notable de la production de pétrole et de gaz. Cela s'expliquait par la distribution massive et disproportionnée de dividendes au bénéfice des actionnaires, privant YPF de ressources pour financer sa croissance, moderniser ses infrastructures et augmenter la production d'hydrocarbures.

257.    Cette situation, contraire aux intérêts de l'État, a eu pour effet d'augmenter la dépendance de l'Argentine aux importations de pétrole et de gaz, compromettant sa souveraineté énergétique et dégradant la balance commerciale de l'Argentine.

258.    Il était donc indispensable pour la République Argentine d'y remédier, sans attendre, en prenant des mesures concrètes permettant de : (i) sécuriser d'urgence un approvisionnement énergétique stable pour le pays (ii) reprendre le contrôle stratégique de l'entreprise pour aligner ses opérations avec les priorités nationales, notamment la réalisation de l'autosuffisance énergétique ; (iii) rétablir de la confiance publique dans la capacité de YPF à remplir son rôle stratégique ; (iv) stimuler des investissements dans l'exploration et l'exploitation de nouveaux gisements ; (v) réorienter les bénéfices vers des projets stratégiques plutôt que vers des distributions excessives aux actionnaires ; et (vi) maintenir des investisseurs privés au capital[147].

259.    <u>C'est la poursuite de ces objectifs qui a justifié le dépôt auprès du Congrès argentin, et le vote par ce dernier, de la Loi d'Utilité Publique et d'Expropriation.</u>

*

260.    En définitive, l'acte d'expropriation au cœur du litige (i) constitue un acte de puissance publique, (ii) procède de l'usage par l'Argentine de prérogatives exorbitantes de droit commun, (iii)

---

[147] **Pièce n° 10 :** Décret argentin n° 530/2012 du 16 avril 2012, préambule et **Pièce n° 11 :** Loi argentine n° 26.741 du 3 mai 2012, article 3.

participe par sa finalité à un intérêt public de l'énergie, (iv) et plus généralement à assurer une souveraineté et une indépendance énergétique. Les Demanderesses ne le contestent pas.

261.    Ainsi, quelles que soit les griefs formulés contre cet acte, quel que soit le jugement porté sur sa licéité ou sa conformité aux statuts de YPF, <u>c'est un acte qui tant par sa nature que par sa finalité participe de l'exercice de la souveraineté de l'Argentine.</u> La décision d'expropriation au cœur du litige cumule les deux critères alternatifs posés par le droit international et la jurisprudence française pour déterminer qu'un acte est souverain.

262.    **En conséquence, la République Argentine est recevable et bien fondée à faire valoir son immunité de juridiction à laquelle elle n'a pas renoncé. Le juge de la mise en état jugera que les demandes des Demanderesses sont irrecevables.**

263.    Dès lors qu'elles succombent en leurs demandes, il convient de condamner solidairement les sociétés Petersen Energía Inversora SAU, Petersen Energía SAU, Eton Park Capital Management, L.P., Eton Park Fund L.P, et Eton Park Master Fund, Ltd à payer la somme de 60 000 euros à la République Argentine au titre de l'article 700 du code de procédure civile ainsi qu'aux entiers dépens.

## PAR CES MOTIFS

Vu les principes de droit international relatifs à l'immunité de juridiction des États étrangers,

**In limine litis :**

- **SURSEOIR A STATUER** dans le cadre de la présente instance jusqu'à ce que la procédure d'appel contre (i) *Opinion* & *Order* de la *United States District Court* du *Southern District of New York* du 31 mars 2023 (refs. 15 Civ. 2739 (LAP) et 16 Civ. 8569 (LAP)), rendu entre Petersen Energía Inversora S.A.U., Petersen Energía S.A.U., Eton Park Capital Management L.P., Eton Park Master Fund Ltd. et Eton Park Fund L.P. d'une part, et la République Argentine et YPF S.A. d'autre part; (ii) *Findings of fact and conclusions of law* de la *United States District Court* du *Southern District of New York* du 8 septembre 2023 (refs. 15 Civ. 2739 (LAP) et 16 Civ. 8569 (LAP)), rendu entre Petersen Energía Inversora S.A.U., Petersen Energía S.A.U., Eton Park Capital Management L.P., Eton Park Master Fund Ltd. et Eton Park Fund L.P. d'une part, et la République Argentine et YPF S.A. d'autre part; et (iii) *Final Judgment* de la *United States District Court* du *Southern District of New York* du 15 septembre 2023 (refs. 15 Civ. 2739 (LAP) et 16 Civ. 8569 (LAP)), rendu entre Petersen Energía Inversora S.A.U., Petersen Energía S.A.U., Eton Park Capital Management L.P., Eton Park Master Fund Ltd. et Eton Park Fund L.P. d'une part, et la République Argentine et YPF S.A. d'autre part, fasse l'objet d'une décision définitive, insusceptible de recours devant les juridictions américaines.

**A titre principal :**

- **JUGER** que la République Argentine est recevable et bien-fondé à se prévaloir de son immunité de juridiction.

**En conséquence**

- **DECLARER** irrecevables les demandes d'exequatur des sociétés Petersen Energía Inversora SAU, Petersen Energía SAU, Eton Park Capital Management, L.P., Eton Park Fund L.P, et Eton Park Master Fund, Ltd.

- **DECLARER** irrecevables les autres demandes des sociétés Petersen Energía Inversora SAU, Petersen Energía SAU, Eton Park Capital Management, L.P., Eton Park Fund L.P, et Eton Park Master Fund, Ltd dirigées contre la République Argentine.

- **CONDAMNER** solidairement les sociétés Petersen Energía Inversora SAU, Petersen Energía SAU, Eton Park Capital Management, L.P., Eton Park Fund L.P, et Eton Park Master Fund, Ltd aux entiers dépens de l'instance.

- **CONDAMNER** solidairement les sociétés Petersen Energía Inversora SAU, Petersen Energía SAU, Eton Park Capital Management, L.P., Eton Park Fund L.P, et Eton Park Master Fund, Ltd à payer la somme de 60.000 euros à la République Argentine au titre des frais irrépétibles.

43

## Liste des pièces produites

**Pièce n° 1.**      Constitution argentine et traduction libre.

**Pièce n° 2.**      Extrait du Rapport annuel de la République Argentine déposé auprès de la Securities and Exchange Commission des Etats Unis en 2024 et traduction libre d'extraits.

**Pièce n° 3.**      Réponses des Demanderesses à l'exposé des faits de la République Argentine dans la procédure américaine du 26 mai 2022 et traduction libre.

**Pièce n° 4.**      Article du New York Times du 23 mars 2017 et traduction libre.

**Pièce n° 5.**      Point d'actualité économique et financière du Cône Sud de la semaine du 6 au 12 juillet 2018 de l'ambassade de France en Argentine.

**Pièce n° 6.**      Transcription de la conférence résumant les résultats du 3$^e$ trimestre 2024 de Burford Capital du 7 novembre 2024 et traduction libre d'extraits.

**Pièce n° 7.**      Article de Buenos Aires Times, Burford vise un rendement de 37 000 % sur le jugement de 16 milliards de dollars avec l'Argentine, 9 novembre 2023 et traduction libre**.**

**Pièce n° 8.**      Extrait du prospectus déposé auprès de la Securities and Exchange Commission en 1993 pour l'introduction en bourse de YPF et traduction libre d'extraits.

**Pièce n° 9.**      Loi argentine n° 21.499 du 17 janvier 1977 et traduction libre.

**Pièce n° 10.**      Décret argentin n° 530/2012 du 16 avril 2012 et traduction libre.

**Pièce n° 11.**      Loi argentine n° 26.741 du 3 mai 2012 et traduction libre.

**Pièce n° 12.**      Article du Figaro, L'Argentine veut assurer son indépendance énergétique, 17 avril 2012.

**Pièce n° 13.**      Accord de Règlement Global conclu entre la République Argentine et Repsol le 27 février 2014 et traduction libre d'extraits.

**Pièce n° 14.**      Arrêt de la Cour Suprême Argentine dans l'affaire De San Martin du 20 août 2014 et traduction libre d'extraits.

**Pièce n° 15.**      Loi argentine n° 26.932 du 23 avril 2014 et traduction libre d'extraits.

**Pièce n° 16.**      Article de Burford Capital, Déclaration de Burford Capital sur la décision relative aux dommages-intérêts de YPF, 8 septembre 2023 et traduction libre d'extraits.

**Pièce n° 17.**   Décision du tribunal de district de New York sur la demande de sursis à exécution du 21 novembre 2023 et traduction libre d'extraits.

**Pièce n° 18.**   Site macrotrends montrant que la capitalisation boursière de YPF est égale à 5,28 milliards de dollars américains au 15 septembre 2023.

**Pièce n° 19.**   Article de Lawfare, Peterson contre l'Argentine: analyse d'un jugement de 16 milliards de dollars, 30 novembre 2023 et traduction libre d'extraits.

**Pièce n° 20.**   Article de Reuters, Cette affaire de milliard contre l'entreprise argentine YPF n'existerait pas sans le financement des litiges. Est-ce une bonne chose?, 3 avril 2023 et traduction libre d'extraits.

**Pièce n° 21.**   Présentation des résultats du 3ᵉ trimestre de Burford Capital du 7 novembre 2024 et traduction libre d'extraits.

**Pièce n° 22.**   Mémoire d'appel des Demanderesses devant la Cour d'appel des États-Unis pour le deuxième circuit du 26 mars 2024 et traduction libre d'extraits.

**Pièce n° 23.**   Arrêts de la Cour d'appel des États-Unis pour le deuxième circuit du 4 octobre 2019 (Bison Bee LLC c/ République d'Argentine) et du 17 mars 2020 (Bugliotti c/ République d'Argentine) et traduction libre d'extraits.

**Pièce n° 24.**   Mémoire d'appel de la République Argentine devant la Cour d'appel des États-Unis pour le deuxième circuit du 22 février 2024 et traduction libre d'extraits.

**Pièce n° 25.**   Lettre des Etats-Unis d'Amérique du 6 novembre 2024 et mémoire des Etats-Unis d'Amérique du 10 janvier 2025 devant le tribunal de district de New York dans les procédures 15 Civ. 2739 (LAP) et 16 Civ. 8569 (LAP) et traduction libre d'extraits

**Pièce n° 26.**   Lettre de la République Argentine du 19 décembre 2023 devant le tribunal de district de New York dans les procédures 15 Civ. 2739 (LAP) et 16 Civ. 8569 (LAP).