# Exhibit B

**Axel Kicillof's Press Conference on the YPF Case**

July 1, 2025

We made an invitation to this press conference because of what is publicly known and became an item in the agenda and a topic for conversation that has to do with the decision of the New York Judge Preska with respect to YPF.

The idea of offering a conference open to questions has to do with the fact that much of the debate that has been heard these days is full of inaccuracies, of falsehoods, of matters that are really worth clarifying, on the one hand.

And on the other hand, that this conference repudiates Milei's attitude, the attitude of the national administration, with respect to this situation. So I'm going to start with the beginning, I'm going to try to do it as brief as possible. My idea is first to make a brief introduction, a brief summary of the reasons why the decision was made to recover YPF through expropriation. That, of course, one takes for granted, but it was evidently ignored in the discussion of the last few days.

What was happening with YPF under Repsol's management that resulted in the recovery, the expropriation by the Argentine Congress with a law voted by an extremely large majority. And I am also saying this as a warning, because today Milei and his administration and his candidates and his political force maintain that the solution to almost all the problems related to the provision of goods and services in Argentina is privatization. In other words, privatizing winds are blowing again, at least among that sector of the political leadership. So it is worth remembering what happened the last time YPF was privatized.

What happened? Because otherwise it would seem that privatization is the panacea to solve problems, that everything is fine, and it is good for the collective, national interest, for individuals. And the truth is that the history of the privatization of YPF during the 1990s shows exactly the opposite. Privatizing YPF, particularly at the time of Repsol, was a real disgrace for YPF, for Argentina and, I believe, also for the development possibilities of our country. So I'm going to be very brief with this section, I'll start there.

As you know, YPF was under Repsol's control, after a first privatization stage in 1992, it is under Repsol's control as from 1999, full control, but well, here I show what had been happening since 1997. This is the oil production during Repsol's time, during Repsol's management, which was reduced almost exactly by half. In other words, YPF became half of what it was before this situation as an oil producer and the main company in Argentina. This is the production of oil, this is the production of gas. First, it increases, but that ends in 2004 with a drop of 43% and an end-to-end drop. So in oil and gas, Repsol controlling YPF was a real disgrace, a disaster. Obviously, this situation was also reflected in the fall of oil reserves. A hydrocarbon company, particularly an oil company, can be assessed by its daily production, but also by the amount of resource that it has registered as possible and possible to be extracted, that is to say by its reserve. YPF's oil reserve was also reduced by 50% under Repsol's management. In other words, not only was it producing half, but it had lost half of its resources. Gas reserves had fallen by 55% under Repsol. Obviously, I do not know if it is necessary to say much more about this: YPF was being emptied, it was in a state of destruction, shrinkage, and liquidation, as regards the YPF company, which since 1922, when it was founded by Yrigoyen, has been an Argentine company, a company that has been a key player in the Argentine market and which has made possible a lot of progress from the fuel production point of view, but also, obviously, from the technological point of view through its laboratories and its engineers. All of this was almost completely destroyed by Repsol during the period in which it managed the company. Not all of this period. Other national companies also participated, such as the Eskenazi group. This takes place much later. So this was the evolution of the company under Repsol's management.

What did this do to Argentina's macroeconomy? What did it do to our country as a whole?

Well, since YPF is the leading company, the main producer of energy, of hydrocarbons, but of energy in general in Argentina, what happened with the fall, with the reduction by half of YPF's productive capacity, is that the country lost its energy self-sufficiency. It had to start a process of importing energy in different ways, through fuels and even through ships that brought gas, that is to say, it had solid fuels, I mean, and gas, and Argentina became a deficit country in 2011. This is Argentina's energy trade balance, that is, how much it exports of energy goods and how much it imports. And this is mainly attributable, I would almost dare to say exclusively, but certainly mainly to Repsol's performance. I repeat, Repsol takes over the company and the decline and decrease begin... in terms of oil production, oil and gas reserves. This was an absolute failure. But this pushed the Argentine economy as a whole into a corner. Why do I say this? Because the lack of dollars, I do not have to explain today, with Milei and the problems he has... The lack of dollars is a recurrent issue in the national economy, in the national macroeconomy. What you can see here is that from 2007 to 2011, in annual terms we went from a surplus of 6 billion dollars to a deficit of 3 billion dollars. That is to say, between the deficit that is lost and the surplus that is presented, 9 billion dollars per year start to be missing in the economy due to Repsol's fault and responsibility. And the following years this drain continues, reaching negative 6 billion dollars in 2013. This is important to say because due to the fault and responsibility of Repsol's management in Argentina, in charge of YPF, what starts to happen is that there is not only a lack of fuel, but also a lack of foreign currency and from that moment on there is a need to import fuel, as I have shown here, at a price that at that time was approximately 100 dollars a barrel. This generated not only a problem of foreign trade in dollars but also in pesos because the Argentine government bought the fuel in dollars but sold it in pesos at a price that did not represent the jump that this import need represented. That is to say that Repsol, to make it clear, the private management, the privatization of YPF, ended in a disaster, both for the company itself and for the energy sector, as well as for the general macroeconomic situation. It seems to me that this is being forgotten now that there are voices calling for the privatization of this, of that, including these days of YPF itself. The truth is that it does not seem to be advisable, at least not in such a light way, to give Argentina's main energy company to a foreign company. Obviously, these losses for the nation, for our society, were not necessarily bad numbers for the private company. And that is one of the issues that occur, especially when it comes to private companies that take over strategic sectors or sectors where they have a very important influence, that the company can do well, but society, the country and the macroeconomy can do badly. So this does not mean that YPF has done poorly in terms of its financial statements while Repsol was in charge; actually, it was quite the opposite. In a short time between 1997 and 2010, YPF distributed dividends of 14 million dollars and had bought the company, that is,

Repsol obtains profits and had bought the company I think for 13 billion, that is, in a very short time for a company of these characteristics they recovered through profits what they had paid when they bought it, which shows that it was also mis-sold at that time. Then, I reiterate, the oil reserve falls 50%, gas reserves fall 55%, oil production falls 49%, detonating the Argentine market and forcing Argentina to import at very high prices and putting a lot of pressure on the trade balance, which becomes a deficit in energy matters. In view of this situation, I would like to say that at that time I was not acting as a minister, but as the deputy minister of Economy, but I had several conversations with the Repsol authorities, particularly with Mr. Brufau, who was the one in charge of Repsol, and this challenge was raised with him, this problem was raised with him, and Brufau said, "well, this is a private company, this may be detrimental to Argentina, but well, it is not my problem, do something else." When the truth is that YPF's role in the Argentine energy market is clearly that of a leader. What I mean is that he did not give any favorable response, which triggered what we already know, the recovery of YPF. I'm going to talk about that later. I would first like to talk about the results of the recovery of YPF.

Among the first problems, the main ones with the privatized YPF in the hands of Repsol was the issue of Vaca Muerta. Vaca Muerta is a non-conventional field that is deployed in the Argentine national territory and due to technological changes, due to changes in profitability, it becomes possible, plausible, to exploit so-called unconventional fields, right? That Argentina had, but had not exploited them long before.

So what does Repsol do with Vaca Muerta? Nothing, nothing, absolutely nothing. We were running out of reserves, without hydrocarbon production and Repsol actually decided to sell Vaca Muerta in pieces. Then they start a road show stage, they call it, that is, international exhibitions, to see who can buy and invest in Vaca Muerta. There is no intention to invest either in production, as we have already seen, or in exploration, and even less in the large investments required by unconventional fields. In other words, Repsol was not only destroying the company, but also limiting the possibility of starting the exploitation of the unconventional resources in Vaca Muerta. Let me put it in a simpler way: Without the recovery of YPF, without the expropriation of YPF, there was no Vaca Muerta, without Vaca Muerta there was no start-up and recovery of hydrocarbon production in Argentina. So the truth is that the objective was to put YPF back to work in favor of the national interests that were being absolutely sullied by Repsol's private management. I repeat, what Repsol did was a private decision of a private company, to make problems with the privatized companies, it could be convenient for Repsol, but it left us with resources that we had available, which were necessary and urgent, but were not exploited. In 2002 the decision was made to recover YPF through, I am going to speak now, a series of legal instruments that are framed, they come from the Argentine Constitution, no more and no less. The origin of the episode of Repsol's recovery are powers granted to the Government, but also to the Executive and Congress, under the National Constitution in situations similar to this, that is, when something is of public interest. When something is of public interest it can be subject to expropriation and by complying with certain rules set forth in the Constitution and the laws, the company can be recovered, expropriated.

Now, I wanted to talk about the results. It was recovered in 2012. Today, in the year 2025, all these trends of sharp drop that we have observed have been reversed. They have been reversed. Oil production has grown by 78% since it reached a plateau under Repsol's management, gas production has grown by 18% and it would not be unattainable that in a few years we will be producing one million barrels per day in Argentina. In other words, after recovering the company, Vaca Muerta was immediately put into operation. What I have here is something that dates back to that time. These are samples taken from the first productive drillings in Vaca Muerta that were done within the framework of an agreement between YPF and Chevron at that time. Then, another agreement with Petronas was signed by Malaya [SIC]. Then Vaca Muerta was put into operation, and results began to be seen very quickly, which I must say is also what happened in the unconventional oil and gas fields in other countries, particularly in the United States. It has always been done with a lot of investment from the State because it is a risky investment, because understanding the dynamics of unconventional reservoirs, the so-called know-how of how to exploit them requires a lot of investment work that is very risky. This was done by YPF on its own and in agreement with other companies. And as a result, not only did oil and gas production recover, but also in the year 2024, you will remember this graph showing the energy trade balance, which had turned tremendously negative, last year, in the year 2024, the energy surplus reached 5,696 million dollars, that is to say, we almost reached the values of 2006. Basically in a short time for what are the times of oil and the times of energy and big investments, in a short time it was reached again. Let's see if I can see it in full screen. Down below, yes. In a short time the objective was achieved, Repsol had no interest, no desire to do so and had the power not to do so. So we had to resort to this instance, which was the recovery through expropriation.

What was declared to be of a public interest and subject to expropriation? Control of the company. Not the shares, the control of the company. This implied that 51% of the shares of YPF that were in the hands of the parent company, which was Repsol itself, would be subject to expropriation. In that way they were preserved, because today I heard many discussions, yesterday as well, although this issue arises and resurfaces from time to time, the 51% allowed not only to take control of the company and to have as a result the improvement and increase of investments, production, exploration, start-up of Vaca Muerta, but also ensured that it would be a mixed company as it is today, public-private, public-private and which floats, whose shares are bought and sold in the stock exchanges, particularly in the Buenos Aires and New York stock exchanges. That is to say, it is a mixed company, to put it this way, with control by the majority owner, which is the Argentine State. This process, as I said, is based on the Argentine Constitution, which not only in Argentina, but also in many countries, in the 2009 crisis, even in the pandemic, many countries resorted to the expropriation of private companies for different reasons. This was practically a liquidation and an emptying of YPF's productive capacity and a national urgency, but the United States recovered part of General Motors from large companies in recent and complex situations for that economy. In this case, it was decided to present the control of YPF as being in the public interest and then the expropriation law was applied in all its points, which meant getting a law in the Argentine Congress. That law was voted by an extremely large majority of virtually all political forces that understood the situation and agreed with the need to expropriate 51% of YPF under the Constitution, the laws and a special law to do so, voted by a large majority in Congress.

The truth is that what we are discussing today regarding a ruling that took place some time ago, last year in New York, which orders Argentina to pay at the trial level... at the trial level to pay an amount that is no longer a shareholder of YPF, but a vulture fund that does not even have shares nor can it have them, but simply bought the lawsuit to litigate against YPF, but the first thing to be said is that what they are discussing is whether the bylaws of YPF, a private company... a private company, which in its bylaws can say a lot of things, be approved by a majority, by its shareholders at a meeting, or a law, and more than that, the Argentine Constitution, have more value.

What is more valuable? The power it has, besides the fact that it is duly explained, that it is not subject to any other ownership interest or any other regulation, the power to expropriate given by the Argentine Constitution or the expropriation law. There is no way that anyone would consider that because YPF's bylaws say one thing, the other, that if control is taken over, it is necessary to pay a certain minority group or not, to offer a purchase option as it happens with YPF's bylaws to all shareholders for stratospheric values. Well, none of that is above the Argentine Constitution and laws. Therefore, I am convinced that no Argentine judge, because this is all Argentine legislation, no Argentine judge, regardless of whether he is a sympathizer of one sector or the other, believes that YPF is good or bad, that the State is good or bad, no Argentine judge, no Argentine legal expert, I believe that he can agree that the judgment obtained by a vulture fund in New York is right and just. Among the cases I have to cite of these opinions, there is Bernardo Saravia Frías, former Attorney General in Macri's time, former Attorney General of the Treasury, main lawyer of the State's interests, who held and still holds today this same position. I want to say that this judgment is legal nonsense, that what they are trying to do is to make private interests prevail, but particularly those of a vulture fund on the basis of the bylaws of a company over the power of expropriation under Article 17 of the Argentine Constitution. That is why in this ruling, in addition, other interested parties have appeared, I mean, the regional ones, Brazil, Ecuador, Chile, Uruguay, supporting the Argentine position, because if this criterion does not prevail, it means that it could happen in other countries with similar circumstances, even in central countries someone could claim against a State which is exercising this power based on private bylaws. To put it another way, a building must be expropriated as was done in the City of Buenos Aires to build a freeway. Expropriation is applied, but they say, no, here I have the rules and regulations of the condominium owners establishing that in fact to expropriate you have to pay triple or you have to pay so and so, such and such. Well, that has no legal validity. And the truth is that I am no expert in this, but I must say that when the possibilities were evaluated, it was consulted, discussed in the Argentine Congress and was voted by a very large majority, that is to say, legal experts from all the political spaces, but also all the State agencies themselves, to see if this was the appropriate solution, and they all said the same thing: the power to expropriate is above the bylaws of a private company, which is practically common sense. I say this as an anecdote, yesterday I asked one of these artificial intelligences, but anyone can do it. And how do they do it? They take the average of everything that is written, all the material they have and come up with that solution. But the truth is that it is obvious, quite obvious, trivial and obvious. In other words, this is the starting point. The judgment obtained by a vulture fund in New York is totally beyond the jurisdiction of the court first and then of the authority and then of what legal common sense dictates here. In fact, the history of this claim is quite long and tortuous. In

2012, when YPF is recovered, Repsol starts a series of lawsuits but applying the same expropriation law and the Argentine Constitution, what was proposed was that it had to be by law of Congress, in this case it was passed by a broad majority, and secondly, that a compensation had to be paid, a payment to the person who is deprived of its shares or its assets and property, depending on the appraisal of the National Appraisal Tribunal. Repsol, that came to 5 billion dollars for 51%. Repsol accepted it and waived any right to file a domestic or foreign lawsuit as to this matter. And at that time no minority shareholder, no one, even at that time the one who held 25%, which was Petersen, no one filed any lawsuit. What happened afterwards? This minority shareholder goes bankrupt in a company abroad, in Spain, and the bankruptcy administrator, the bankruptcy trustee, does not file a lawsuit, but sells the lawsuit to a vulture fund. This is the situation whereby a vulture fund goes to court in New York and raises this issue, which is basically about Argentine law. From that moment on, the Argentine Republic, in several different administrations, has built a defense saying virtually exactly what I am saying: that it is not appropriate for this to be discussed in New York, everyone, including the current administration, and secondly, that the judge is not right in making the bylaws of a private company prevail over the Argentine Constitution and the laws. This is quite obvious.

Today this ruling is being appealed, both the ruling and the merits of the ruling. Then Judge Preska, who is Griesa's successor, if anyone has memory, Judge Preska's argument is that, well, she agrees with Burford, with this fund, and she puts an amount in the judgment that is also challenged and has nothing to do with YPF's shares, and now I am going to explain why. She puts a dollar amount on it, calculating interest and making a calculation of when the company's valuation should start to run and different absolutely questionable issues. From my point of view, pure nonsense. So that was also appealed by the Argentine government in an administration that was not ours either, I think it was not either, oh, yes, it was, well, the appeal continues in the same terms. That is to say, that the court can act this way is subject to appeal, the amount that resulted in the judgment has also been appealed, all of this at the trial level. What happened these days? The plaintiffs said that, with a judgment, they wanted to collect on it. And they suggested collecting with YPF shares. Another issue arises here, which is that YPF's shares, according to the YPF expropriation recovery law itself, can only be disposed of by two thirds of the Argentine Congress. That is to say that YPF's shares cannot be delivered, they are in Argentina, there has to be a law, beyond all the discussion, of sovereign immunity, that they go over YPF shares owned by the Argentine State, and several other issues. That is to say that everything we are hearing today is not true; it is questionable. This does not mean that a New York judge, as was the case with Griesa, cannot rule in favor of a vulture fund, in this case a judge in favor of Burford. This is not impossible, but it was very unlikely, so unlikely that the bankruptcy judge, when he sells the judgment, sells it for 15 million euros, which now theoretically results in a 16-billion dollar judgment. Clearly it was quite unlikely because no one is going to get rid of a right that with any certainty can get between 16 billion dollars for 15 million dollars. There is no logic to it. In other words, the truth is that what is absolutely scandalous is that this is being litigated in New York, that this is an effort of vulture funds against the Argentine Republic and that a foreign judge rules that our Constitution is worthless. That our Constitution is worth less than the bylaws of a company really is, from a legal point of view, I believe that this opinion is almost unanimously shared, but the political issues are added to this absolutely unusual judgment, for an exorbitant amount, rendered in New York.

Well, the truth is that it becomes an aggression to Argentine sovereignty. I want to say it very

clearly, because a judge in New York has no right to say that our Constitution is worth less than a piece of paper voted by the shareholders at a meeting. The truth is that it's not like that, it's not like that. And this brings and can bring a lot of international consequences, that is why there are other countries interested. Among them, because nobody said it either, the U.S. Department of Justice tells the judge that she cannot target YPF's shares and this is said without the consolidation of an amicus curiae situation. It warns about this issue of taking assets that are immune. Immune means that countries cannot target a foreign asset because it is like, well, put this situation the other way around: the expropriation of an American company, an Argentine judge decides that you have to go and you have to pay them... Well, evidently what is happening is beyond any reasonableness and it is so evident that, I quote Saravia Frías as well as the current representatives of the Attorney General's Office, it must be said that the Attorney General appointed by Milei excused himself in this case because, if I am not mistaken, he was associated to the claims made against Argentina. That is to say, he appointed as counsel for the State, having this litigation, a person who was against Argentina in these matters or who said that he was not sufficiently objective. Probably one of the largest trials and the most important discussions there were. Then the Deputy Attorney General who is now in charge took over. What I can say is that it sustains the same arguments that it has been sustaining since the appearance of this litigation, which is in 2015, each one of the administrations of different political signs, that is to say, the defense did not change, the arguments of the defense did not change, what I am saying is the official position of Argentina: that this figure is exorbitant is the official position of the Argentine Republic. That the process was not improperly executed, in fact, that Argentina is right, because the Constitution allows expropriating a part of the company without recognizing rights under the bylaws to minority shareholders, which was discussed at length at that time, in 2012, many experts opined and radicalism, different political forces of the Argentine Congress, ended up voting in favor because it did not seem to them that this scandalous possibility was feasible. That it would happen that a vulture fund would buy the lawsuit, that it would go to Griesa's court, today in Preska's hands, and that Preska would tell them that they are right. This is something absolutely absurd. That is the actual situation we are facing. That is the actual situation we are facing.

Maybe time passed, then, well, apart from these discussions, the reasons for the recovery, the results of the recovery have been lost sight of, that's why it was important to bring them up. Now what is so serious about what is happening? That today the ruler of Argentina is Milei and his force, who agree with privatizing everything, giving away everything, surrendering everything. And what he has done, that is why this is the first issue I would like to highlight, that Milei, obviously with his way, with the insults, with everything he does, I think, is absolutely out of place, but beyond that, what he says when he learns about this decision of the judge is that he is going to appeal, that is, that Argentina is against this, because otherwise he would have to say, well, the judge is right.  No, it will be appealed, that is to say, while Milei says that the Argentine State will say that this is not appropriate, he maintains that I am to blame or that those who participated in the expropriation decision are to blame. And the truth is that it is absolutely contradictory and dangerous because the fact that the President of the Nation agrees with the plaintiffs goes against the defense of the national interest. Milei is putting the national interest at risk. Even contradicting its own body of official attorneys. That, to begin with: he is saying that somebody is right when that is not the case. It can be understood that Milei is always in favor of the vultures and not in favor of the country, always in favor of surrendering and not in favor of sovereignty, always in favor of foreign courts or countries and not in favor of the Argentine Republic, that can be

understood. But in this case it is very delicate, because YPF is beginning to be at risk. YPF, which allowed us to recover the energy trade surplus, which started up Vaca Muerta, which offers many possibilities and extends the country's development frontiers. Well, Milei is putting all that at risk today.

Today, what is necessary is to expose the government and Milei for the attack on national sovereignty and for putting YPF at risk. He is putting YPF at risk. Which also calls for different investigations that we are going to initiate because it is known that Milei and his government, as it happened with the case of the cryptocurrency scam, have links, it was known, I cannot confirm this, that is why I say that we are going to investigate it, with representatives of that vulture fund. Also his frequent trips abroad, this situation of the Attorney General and the Deputy Attorney General, well, everything is very suspicious in view of what we are experiencing today. We are seeing a president who is saying that vulture funds that want to end up owning YPF are right when they are not right. That is the president we have today. So, of course I hold Milei responsible for any decision he makes that puts energy sovereignty at risk, that puts YPF at risk, that he opens negotiations with vulture funds when there are still no final and non-appealable rulings, because the other thing that has been said very lightly is that well, nothing else can be done. No, that is not true. This is being appealed. It can then be appealed to the Supreme Court. I do not know and it is unknown how long it will take, but we are on a path of appealing inadequate, illegal and unjust judgments against the national interest.

So what Milei should do is to defend YPF, defend Argentina, defend the government, but well, we know that he came in as a mole to destroy the State. So this is probably part of that set of decisions that put Argentina's future at risk. The future of Argentina. That is why I say again that it is very serious, it is very serious, and that YPF must be defended. So I close with this from the point of view of our political force, but from the point of view of the province of Buenos Aires, which is the main province not producing hydrocarbons but involved in the processing and industrialization of hydrocarbons, we are part of that chain, and we are also the main consumers of energy in Argentina, I say: in the name of all that, YPF will not be sold and I warn Milei: it will not be sold and even less will it be given away or given as a gift. Thank you very much.

| | |
|---|---|
| THE STATE OF TEXAS | } |
| | } |
| COUNTY OF HARRIS | } |

## AFFIDAVIT OF ACCURACY

BEFORE ME, the undersigned authority, on this day personally appeared <u>Ana Cristina Didoné</u>, who, by oath and by presentation of identification, is personally known to me to be the person subscribing her name below and, after being by me duly sworn according to law, upon her oath deposes and says in due form of law that to the best of her knowledge, information and belief:

1. "My name is Ana Cristina Didoné and I am over the age of twenty-one years and competent to make this affidavit.

2. I speak, read, and write fluently in both the English and Spanish languages.

3. I have been a certified sworn translator since 1988 with a M.A. in Legal Translations from the University of Salvador, Argentina. I am certified by the Argentine Association of Sworn Public Translators to translate from English into Spanish and Spanish into English. I am also certified by the American Translators Association for English to Spanish translations. I hold a degree in Executive Business Management from Rice University.

I hereby certify that the Spanish to English translation attached hereto: *"Conferencia de prensa de Axel Kicillof por la causa YPF - 1 de julio de 2025"* is true, correct, fair, accurate and complete English translation to the best of my ability of the transcript (from the beginning until 39:42 - https://www.youtube.com/watch?v=g9xcWHUR2vk) of the original press conference in Spanish.

_____
ANA CRISTINA DIDONE, MA
Certified by American Translators Association

[Notary seal: TODD CAMERON FEDER, Notary Public, State of Texas, Comm. Expires 05-19-2029, Notary ID 129411929]

Sworn to before me this 03 day of July, 2025

_____
Notary Public in and for the State of Texas
My commission expires: 5-11-27

**Conferencia de prensa de Axel Kicillof por la causa YPF**

1 de julio de 2025

Invitamos a esta conferencia de prensa por lo que es de público conocimiento y representó un tema de agenda y de conversación que tiene que ver con la decisión de la jueza de Nueva York, la jueza Preska, con respecto a YPF. La idea de dar una conferencia abierta a preguntas tiene que ver con que buena parte del debate que se estuvo escuchando estos días está repleto de imprecisiones, de falsedades, de cuestiones que realmente vale la pena aclarar eso de un lado. Del otro lado. que esta conferencia contiene una denuncia que es la actitud de Milei, del gobierno nacional, con respecto a esta situación. Así que voy a empezar por el principio, voy a tratar de hacerlo lo más sintéticamente posible. Mi idea es primero hacer una breve exposición, un breve racconto de los motivos por los cuales se resolvió, se decidió recuperar YPF a través de la expropiación. Eso, por supuesto, que uno lo da por sabido, pero evidentemente en la discusión de estos últimos días se pasó totalmente por alto. Qué era lo que ocurría con YPF bajo la gestión de Repsol bajo la propiedad de Repsol y que ocasionó la recuperación, la expropiación por parte del Congreso de la Nación con una ley votada por amplísima mayoría. Y lo digo también con carácter preventivo, porque hoy Milei y su gobierno y sus candidatos y su fuerza política sostienen que la solución para casi todos los problemas vinculados con la prestación de bienes y servicios en la Argentina es la privatización. Es decir, que corren de nuevo, soplan vientos privatizadores, por lo menos en ese sector, de la dirigencia política. Así que vale la pena recordar qué pasó la última vez que se privatizó YPF. ¿Qué pasó? Porque si no, parece que privatizando se resuelven problemas es la panacea, todo anda muy bien y es bueno para el interés colectivo, nacional, para los individuos. Y la verdad es que la historia de la privatización de YPF durante la década de los 90 muestra exactamente lo contrario. Privatizar YPF, particularmente en la época de Repsol, fue una verdadera desgracia para YPF, para la Argentina, para, creo yo, también para las posibilidades de desarrollo de nuestro país. Así que voy a ser muy breve con este tramo, empiezo por ahí.

YPF, como ustedes saben, queda bajo el control de Repsol, después de una primera etapa privatizadora del 92, queda bajo el control de Repsol a partir del año 99, pleno control, pero bueno, ahí muestro desde el 97 lo que venía ocurriendo. Esta es la producción de petróleo durante la época de Repsol, durante la gestión Repsol, que se redujo casi exactamente a la mitad. Es decir, YPF pasó a ser como productora de petróleo y principal empresa de la Argentina la mitad de lo que era antes de esta situación. Esta es la producción de petróleo, esta es la producción de gas, tiene un primer momento de incremento, pero termina a partir de 2004 con una caída del 43% y una caída de punta a punta. Así que en petróleo y gas, lo de Repsol controlando YPF fue una verdadera desgracia, una catástrofe. Obviamente esta situación se reflejó también en la caída de las reservas de petróleo. Una compañía de hidrocarburos, una compañía petrolera particularmente, se puede evaluar por su producción cotidiana, diaria, pero también por la cantidad de recurso que tiene registrado como posible de ser extraída, es decir, por su reserva. La reserva de petróleo de YPF se redujo también en un 50% en la gestión de Repsol. O sea, no solo producía la mitad, sino que había perdido la mitad de sus recursos. Las reservas de gas habían caído en un 55% con Repsol. Obviamente, no sé si hace falta abundar mucho sobre el particular: estaban vaciando YPF, estaba en un estado de destrucción, de achicamiento y de liquidación, en lo que hace a la compañía YPF que es desde 1922, cuando la fundó Yrigoyen en adelante, una compañía de bandera argentina, una compañía testigo para el mercado argentino y la que posibilitó una multiplicidad de avances desde el punto de vista productivo de los combustibles, pero también obviamente desde el punto de vista tecnológico a través de sus laboratorios, de sus ingenieros. Todo eso lo liquidó Repsol casi completamente en el plazo en el que estuvo a cargo de la gestión de la compañía. No todo ese plazo contó también con la participación de

otras empresas nacionales, como la del grupo Eskenazi. Esto ocurre bastante después. Así que esta era la evolución de la empresa bajo la gestión de Repsol.

¿Qué es lo que produjo esto a la macroeconomía argentina? ¿Qué es lo que le produjo a nuestro país en su conjunto?

Bueno, al ser YPF la empresa líder, la principal empresa productora de energía, de hidrocarburos, pero de energía en general en la Argentina, lo que ocurrió con la caída, con la reducción a la mitad de la capacidad productiva de YPF es que el país perdió su autoabastecimiento energético. Tuvo que comenzar un proceso de importación de energía de diversas formas, a través de combustibles y a través incluso de barcos que traían gas, es decir, tuvo combustibles sólidos, quiero decir, y gas, y se convirtió la Argentina entonces, en el año 2011, en un país deficitario. Esta es la balanza comercial energética de la Argentina, o sea cuánto exporta de bienes energéticos y cuánto importa. Y esto es principalmente atribuible, yo casi me animo a decir exclusivamente, pero seguro principalmente al desempeño de Repsol. Repito, Repsol se hace cargo de la compañía y empieza a menguar y disminuir producción de petróleo, reserva de petróleo y gas. Un fracaso absoluto. Pero esto pone en jaque la economía argentina en su conjunto. ¿Por qué digo esto? Porque la falta de dólares, no tengo que explicar hoy, con Milei y los problemas que tiene, la falta de dólares es una cuestión recurrente en la economía nacional, en la macroeconomía nacional. Lo que ustedes pueden ver acá es que de 2007 a 2011, en términos anuales, pasamos de un superávit de 6.000 millones de dólares a un déficit de 3.000 millones de dólares. Es decir, empiezan a faltar 9.000 entre el déficit que se pierde y el superávit que se presenta, 9.000 millones de dólares por año en la economía por culpa y responsabilidad de Repsol. Y los años siguientes continúa este drenaje, llegando en 2013 a 6.000 millones de dólares negativos. Esto es importante decirlo porque por culpa y responsabilidad de la gestión de Repsol en la Argentina, a cargo de YPF, lo que empieza a pasar es que no solo faltan combustibles, sino divisas y se genera a partir de ese momento la necesidad de importación, como lo mostré acá, de combustible, y a un precio que en aquel momento estaba aproximadamente 100 dólares el barril, con lo cual esto genera no solo un problema de super comercial externo de dólares sino de pesos porque el gobierno argentino compra el combustible en dólares pero lo vende en pesos a un precio que no significa el salto que representaba esta necesidad de importación. Es decir, que Repsol, para que quede claro, la gestión privada, la privatización de YPF, terminó en un descalabro, tanto de la propia empresa, como energético, como macroeconómico general. Esto me parece que se está olvidando ahora que aparecen voces que piden la privatización de esto, de aquello, inclusive estos días de la misma YPF. La verdad que no parece, ninguno de estos datos que se puede discutir en cualquier ámbito, no parece aconsejar, por lo menos de una forma tan liviana, darle la compañía energética principal de la Argentina a una empresa extranjera. Que obviamente estos perjuicios para la nación, para nuestra sociedad, no necesariamente fueron malos números para la compañía privada. Y eso es una de las cuestiones que ocurre, sobre todo cuando se trata de compañías privadas que se hacen cargo de sectores estratégicos o sectores donde tienen una influencia muy importante, que a la compañía le puede ir bien, pero le puede ir mal a la sociedad, al país y a la macroeconomía. Entonces esto no quiere decir que a YPF le haya ido mal en sus balances con Repsol, al revés. En poco tiempo entre el 97 y el 2010, YPF distribuyó dividendos por 14 millones de dólares y había comprado la compañía, es decir, Repsol obtiene utilidades, y había comprado la compañía creo que por 13.000, es decir, que en poquísimo tiempo para una empresa de estas características recuperaron a través de las utilidades lo que habían pagado al comprarla, lo cual muestra que se vendió mal en aquel momento también.

Entonces, reitero, cae la reserva de petróleo 50%, de gas 55%, la producción de petróleo el 49%, detona el mercado argentino y obliga a Argentina a importar a precios muy altos y le pone mucha tensión a la balanza comercial que se vuelve deficitaria en materia de energía. Ante esa situación, quiero decir porque yo en aquel momento me desempeñaba no como Ministro, sino como viceministro de Economía, pero tuve varias conversaciones con las autoridades de Repsol, particularmente con el señor Brufau, que era quien la dirigía, y se le planteó esta dificultad, se le planteó este drama, se le planteó este desastre, y Brufau lo que sostenía, "bueno, esta es una empresa privada, esto le puede perjudicar a la Argentina, pero bueno, no es problema mío, hagan otra cosa". Cuando evidentemente, el papel de YPF en el mercado energético argentino es el papel de líder. Es decir, no dio absolutamente ninguna respuesta favorable, lo cual desencadenó lo que ya sabemos, la recuperación de YPF. Voy a hablar de eso después. Quiero hablar antes, segundo tramo, de los resultados de la recuperación de YPF.

Entre los primeros problemas, los principales que había con YPF privatizada en manos de Repsol, estaba la cuestión de Vaca Muerta. Vaca Muerta es un yacimiento no convencional que se despliega en el territorio nacional argentino y por cambios tecnológicos, por cambios de rentabilidad, se vuelve posible, plausible, explotar yacimientos llamados no convencionales, ¿no? Que Argentina tenía, pero no los había explotado bastante tiempo antes.

¿Repsol qué hace teniendo Vaca Muerta? Nada, nada, absolutamente nada. Nos estábamos quedando sin reservas, sin producción de hidrocarburos y Repsol decide en realidad poner en venta Vaca Muerta en pedacitos. Entonces inician una etapa de road show, lo llaman, o sea, exposiciones internacionales, a ver quién puede comprar e invertir en Vaca Muerta. Ninguna intención en invertir ni en producción, porque ya lo vimos, ni en exploración, y menos todavía las grandes inversiones que requieren los yacimientos no convencionales. Es decir que Repsol no solo venía destruyendo la compañía, sino que venía limitando la posibilidad de comenzar con la explotación de los recursos no convencionales de Vaca Muerta. Lo digo de otra manera más sencilla: Sin recuperación de YPF, sin expropiación de YPF, no había Vaca Muerta, sin Vaca Muerta no había puesta en marcha y recuperación de la producción de hidrocarburos en la Argentina. Así que la verdad que el objetivo era poner a funcionar nuevamente YPF en favor de los intereses nacionales que estaban siendo absolutamente mancillados por la gestión privada de Repsol. Repito, lo que hacía Repsol era una decisión privada de una empresa privada. Ese es el problema con las privatizadas, le podía convenir a Repsol, pero nos dejaba a nosotros incluso con recursos que teníamos disponibles, necesarios y urgentes, pero no explotados. En el año 2002 entonces se toma la decisión de recuperar YPF a través de, ahora voy a hablar, una serie de instrumentos legales que están encuadrados, provienen ni más ni menos de la Constitución Nacional. El origen del episodio de la recuperación de Repsol son facultades que le da al Gobierno, pero también al Ejecutivo y al Congreso la Constitución Nacional en situaciones asimilables a esto, o sea cuando algo es de interés público. Cuando algo es de interés público puede poner sujeto a expropiación y cumpliendo ciertas reglas que marcan la Constitución y las leyes, la compañía puede ser recuperada, expropiada.

Ahora, quería hablar de los resultados. Se recupera en el año 2012. Hoy, al año 2025, todas estas tendencias que observamos de caída estrepitosa se han revertido. Se han revertido. La producción de petróleo desde aquel piso que alcanzó con la gestión Repsol creció un 78%, la producción de gas un 18% y no sería algo inalcanzable que en muy poquitos años estemos produciendo un millón de barriles por día en la Argentina. Es decir que efectivamente luego de recuperar la compañía, se puso en marcha inmediatamente Vaca Muerta. Lo que tengo acá es algo que data de aquella época, son muestras sacadas de las primeras perforaciones productivas en Vaca Muerta que se hicieron en el marco de un acuerdo entre YPF y Chevron en aquel momento. Luego, otro acuerdo con Petronas, lo firma malaya [SIC]. Entonces se puso en marcha Vaca Muerta, rápidamente se empezaron a encontrar resultados que debo decir también como ocurrió en los yacimientos de petróleo y gas no convencional de otros países particularmente Estados Unidos. Siempre se hizo con mucha inversión del Estado porque es una inversión de riesgo, porque comprender la dinámica de los yacimientos no convencionales, el llamado conocimiento, el know-how de cómo explotarlo, requiere todo un trabajo de inversión que es de mucho riesgo. Eso lo hizo YPF por sí y en acuerdo con otras compañías. Y como resultado de eso, no solo se recuperó la producción de petróleo y gas, sino que además en el año 2024, ustedes recordarán este gráfico que muestra la balanza comercial energética, que se había puesto tremendamente negativa, el año pasado, en el año 2024, el superávit energético alcanzó 5.696 millones de dólares, es decir que llegamos casi a los valores de 2006. Básicamente en poco tiempo para lo que son los tiempos del petróleo y los tiempos de la energía y de las grandes inversiones, en poco tiempo, se alcanzó nuevamente. A ver si puedo verlo en pantalla completa. Acá abajo, sí. En poco tiempo se logró el objetivo, que Repsol no tenía ningún interés, ninguna gana de hacerlo y tenía potestad para no hacerlo. Así que hubo que recurrir a esta instancia que fue la recuperación a través de una expropiación.

¿Qué es lo que se declaró de interés público y sujeto a expropiación? El control de la compañía. No las acciones, el control de la compañía. Eso implicaba que iba a ser sujeto a expropiación un 51% del paquete accionario de YPF que estaba en manos del controlante que era la misma Repsol. De esa manera se preservaron, porque hoy escuché bastantes discusiones, el día de ayer también, aunque este tema surge y resurge cada tanto, el 51% permitía no solo tomar el control de la compañía y tener como resultado la mejora y el incremento de las inversiones, de la producción, de la exploración, la puesta en marcha de Vaca Muerta, sino que además aseguraba que fuera una compañía mixta como lo sigue siendo hoy, público-privada, público-privada y que flota, cuyas acciones se compran y se venden en las bolsas, particularmente la bolsa de Buenos Aires y la bolsa de Nueva York. Es decir, es una compañía mixta, por ponerlo así, con control de quien tiene la mayoría, ostenta la mayoría, que es el Estado Nacional. Ese proceso, como digo, se basa en la Constitución Nacional, que no solo en la Argentina, sino en muchos países, en la crisis de 2009, en pandemia, incluso, muchos países apelaron a la expropiación de compañías privadas por diferentes cuestiones. Este era prácticamente una liquidación y un vaciamiento de la capacidad productiva de YPF y una urgencia nacional, pero Estados Unidos recuperó parte de General Motors, de grandes compañías en situaciones recientes y complejas para aquella economía. En este caso, se decidió presentar como de interés público el control de YPF y luego se aplicó la ley de expropiación en todos sus puntos, lo que significaba conseguir una ley en el Congreso Nacional. Esa ley fue votada por una amplísima mayoría de prácticamente todas las fuerzas políticas que comprendieron la situación y que coincidieron con la necesidad de expropiar el 51% de YPF en base a la Constitución, a las leyes y con una ley especial para hacerlo, votado por amplísima mayoría en el Congreso.

La verdad que lo que estamos discutiendo hoy en torno a un fallo que ocurrió hace algún tiempo, el año pasado en Nueva York, que condena a la Argentina a pagar en primera instancia, en primera instancia, a pagar un monto, ya no accionista de YPF, sino un fondo buitre que ni siquiera tiene acciones ni las puede tener, sino que simplemente compró el juicio para accionar contra YPF, pero lo primero que hay que decir es que lo que están discutiendo es si tiene más valor el estatuto de YPF, una compañía privada, una empresa privada, que en su estatuto puede decir montones de cosas, ser aprobado por mayoría, por su asamblea, o una ley, y más que eso, la Constitución Nacional.

¿Qué vale más? La potestad que tiene, además de que está debidamente explicitado, que no está sometida a ningún otro dominio ni ninguna otra normativa, la potestad de expropiar que da la Constitución Nacional o las leyes de expropiación. No hay forma de que alguien considere que porque el estatuto de YPF diga una cosa, la otra, sostenga que si se toma el control hay que pagarle a determinado grupo minoritario o no, ofrecer una opción de compra como pasa con el estatuto de YPF a todos los accionistas por valores estratosféricos. Bueno, nada de eso está por encima de la Constitución y de las leyes argentinas. Por lo tanto, yo estoy convencido de que ningún juez argentino, porque esta es toda normativa argentina, ningún juez argentino, por más que sea simpatizante de un sector o del otro, crea que YPF es bueno o malo, que el Estado es bueno o malo, ningún juez argentino, ningún jurista argentino, creo que puede estar de acuerdo con que asiste la razón y el derecho al fallo que obtuvo un fondo buitre en Nueva York. Entre los casos que tengo que citar de estas opiniones, está Bernardo Saravia Frías, ex procurador en la época de Macri, ex procurador del Tesoro, principal abogado de los intereses del Estado, que sostuvo y sostiene al día de hoy esta misma posición. Quiero decir que esta sentencia es un disparate jurídico, que lo que se está intentando hacer es prevalecer intereses privados, pero particularmente de un fondo buitre en base a un estatuto de la compañía sobre la potestad de expropiación que es del artículo 17 de la Constitución Nacional. Es por eso que en este fallo, además, han aparecido otros interesados, digo, de los regionales, Brasil, Ecuador, Chile, Uruguay, acompañando la posición argentina, porque de no primar este criterio, quiere decir que podría ocurrir en otros países con circunstancias similares, incluso en países centrales podría alguien reclamar a un Estado que ejerce esta facultad en base a estatutos privados. Lo pongo de otra manera, hay que expropiar un edificio como se hizo en la Ciudad de Buenos Aires para hacer una autopista. Se aplica la expropiación, pero dicen, no, acá tengo el estatuto del consorcio que dice que en realidad para expropiar hay que pagar el triple o hay que pagarle a tal, tal cosa. Bueno, no tiene validez legal. Y yo la verdad que no soy especialista en esto, pero sí debo decir que cuando se evaluaron las posibilidades, se consultó, se discutió en el Congreso Nacional y fue votado por amplísima mayoría, es decir, juristas de todos los espacios políticos, pero también a todos los organismos propios del Estado, a ver si esta era la solución correspondiente, y todos dijeron lo mismo, la facultad de expropiar está por encima del estatuto de una empresa privada, lo cual es prácticamente de sentido común. Lo digo como anécdota, ayer se lo pregunté a una de estas inteligencias artificiales, pero puede hacerlo cualquiera ¿Y cómo hacen? Toman el promedio de todo lo que está escrito, todo el material que tienen y llegan a esa solución. Pero la verdad es que es evidente, bastante evidente, trivial y obvio. Es decir, este es el punto de partida. El fallo que obtuvo un fondo buitre en Nueva York está totalmente por fuera de la competencia primero y después de las atribuciones y luego del sentido jurídico que tiene esta cuestión. De hecho, la historia de este reclamo es bastante larga y tortuosa. En 2012, cuando se procede a recuperar YPF, Repsol inicia una serie de juicios pero aplicando la misma ley de expropiación y la Constitución Nacional, lo que se plantea es que tiene que ser por ley del Congreso, en este caso fue de amplia mayoría, y segundo, que hay que darle una indemnización, un pago al que es desprovisto de sus acciones o de sus bienes y de su propiedad, tal cual esté tasado por el Tribunal de

Tasaciones de la Nación. Repsol, eso llegó a 5.000 millones de dólares por el 51%, Repsol lo aceptó y desistió de cualquier juicio nacional o extranjero contra este proceso. Y en aquel momento ningún accionista minoritario, nadie, incluso en aquel momento quien detentaba el 25%, que era Petersen, nadie inició ningún juicio. ¿Qué pasa después? Este accionista minoritario va a la quiebra en una empresa en el extranjero, en España, y el administrador de la quiebra, el síndico de la quiebra, no hace juicio, sino que vende el juicio a un fondo buitre. Esta es la situación por la que un fondo buitre va a un juzgado en Nueva York y plantea esto que es básicamente derecho argentino. A partir de ese momento, la República Argentina, en varios gobiernos distintos, lleva adelante una defensa diciendo prácticamente con exactitud lo que yo estoy diciendo: que no corresponde que esto se discuta en Nueva York, todos, incluso la gestión actual, y en segundo lugar, que la jueza no tiene razón en hacer prevalecer el estatuto de una empresa privada sobre la Constitución Nacional y las leyes. Lo cual resulta bastante obvio.

Hoy en día este fallo está apelado, el fallo y el fondo del fallo. Después la jueza Preska, que es la sucesora de Griesa, para que, alguien que tenga memoria, la jueza Preska lo que plantea es que, bueno, le da la razón a Burford, a este fondo, y pone un monto en la sentencia que también está cuestionado y no tiene nada que ver con las acciones de YPF, y ahora voy a explicar por qué. Le pone un monto en dólares, calculando intereses y haciendo un cálculo de cuándo debe empezar a correr la valuación de la empresa y diferentes cuestiones absolutamente cuestionables. Desde mi punto de vista, disparatadas. Así que eso también fue apelado por el gobierno argentino en una gestión que tampoco fue la nuestra, creo que tampoco fue, ah no, esta sí, bueno, continúa la apelación en los mismos términos. Es decir, está apelado que el juzgado lo puede hacer, está apelado el principio que da lugar a la sentencia, está apelado el monto de la sentencia, todo esto en primera instancia. ¿Qué es lo que ocurrió estos días? Que los demandantes dijeron que, habiendo una sentencia, quiero cobrar. Y sugirieron cobrar con las acciones de YPF. Ahí se presenta otra cuestión, que es que las acciones de YPF, según la propia ley de recuperación de expropiación de YPF, solo pueden ser dispuestas por dos tercios del Congreso Nacional. Es decir que las acciones de YPF no se pueden entregar, están en la Argentina, tiene que haber una ley, más allá de toda la discusión, de la inmunidad soberana, de que vayan sobre acciones de YPF en propiedad del Estado Nacional, y varias cuestiones más. Es decir que todo esto que está hoy en cuestión no es verdad; es cuestionable. Lo que no quiere decir que un juez de Nueva York, como fue el caso de Griesa, no pueda fallar a favor de un fondo buitre, en este caso una jueza a favor de Burford. Esto no es imposible, pero era muy improbable, tan improbable que el juez de la quiebra, cuando vende el juicio, lo vende a 15 millones de euros, esto que ahora teóricamente ocasiona una sentencia de 16 mil millones de dólares. Evidentemente era bastante improbable porque nadie se va a desprender de un derecho que con alguna certeza te puede hacer acceder a 16 mil millones de dólares por 15 millones. No tiene lógica. Es decir que la verdad que lo absolutamente escandaloso es que esto se esté juzgando en Nueva York, que sea una actitud de fondos buitres contra la República Argentina y que una jueza extranjera resuelva que nuestra constitución no vale nada. Que nuestra constitución vale menos que el estatuto de una empresa realmente es, desde el punto de vista jurídico, creo que casi unánimemente compartida esta opinión, pero se agregan las cuestiones políticas a este fallo absolutamente insólito, por una cifra exorbitante, juzgado en Nueva York.

Bueno, la verdad es que se convierte en una agresión a la soberanía argentina. Lo quiero decir con toda claridad, porque no tiene derecho una jueza de Nueva York a decir que nuestra constitución vale menos que un papelito votado por una asamblea de accionistas.

La verdad que no es así, no es así. Y esto trae y puede traer muchísimas consecuencias internacionales, por eso hay otros países interesados. Entre ellos, porque tampoco lo dijo nadie, el Departamento de Justicia de los Estados Unidos le dice a la jueza que no puede ir sobre las acciones de YPF y esto lo dice sin consolidarse una situación de amigo, amicus curiae o acompañamiento en el juicio. Advierte sobre esta cuestión de tomar bienes que son inmunes. Inmunes quiere decir que entre los países no se puede ir sobre un bien extranjero porque es como que, bueno, puesta esta situación al revés: la expropiación de una compañía norteamericana, un juez argentino resuelve que hay que ir y hay que pagarle… Bueno, evidentemente está por fuera de cualquier razonabilidad lo que está ocurriendo y es tan evidente que, cito a Saravia Frías, como a los propios hoy representantes en la Procuración, hay que decir que el procurador que puso Milei se excusó en este caso porque, si no me equivoco, estaba asociado a los reclamos que se le hacían a la Argentina. Es decir, puso de abogado del Estado, teniendo este juicio, a una persona que estaba contra Argentina en estas cuestiones o que decía que no era suficientemente objetivo. Probablemente uno de los juicios más cuantiosos y las discusiones más importantes que había. Entonces se hizo cargo el subprocurador que está ahora. Lo que puedo decir es que sostiene los mismos argumentos que venía sosteniendo desde la aparición de este juicio, que es en 2015, cada uno de los gobiernos de diferentes signos políticos, es decir, no cambió la defensa, no cambiaron los argumentos de la defensa, lo que estoy diciendo yo es la posición oficial de la Argentina: que esa cifra es exorbitante es la posición oficial de la República Argentina. Que no estuvo mal hecho el proceso, de hecho, que tiene razón la Argentina, porque la constitución permite expropiar una parte de la compañía sin darle derechos estatutarios a los accionistas minoritarios, lo cual se discutió largamente en aquel momento, en 2012, opinaron muchos expertos y terminaron votando el radicalismo, diferentes fuerzas políticas del Congreso Nacional, porque no les parecía que esta posibilidad escandalosa fuera factible. Que fuera a pasar que un fondo buitre comprara el juicio, que fuera al juzgado de Griesa, hoy en poder de Preska, y que Preska le diera la razón. Algo absolutamente absurdo. Esa es la situación real que tenemos. Esa es la situación real que tenemos.

Tal vez pasó el tiempo, entonces, bueno, aparte de estas discusiones, los motivos de la recuperación, los resultados de la recuperación se hayan perdido de vista, por eso era importante traerlo. Ahora ¿cuál es lo grave de lo que está ocurriendo? Que hoy quien gobierna la Argentina es Milei y su fuerza política, que están de acuerdo con privatizar todo, regalar todo, entregar todo. Y que lo que ha hecho, por eso es la primera cuestión que destaco, que Milei, obviamente con ese modo que tiene, con los insultos, con todo lo que hace absolutamente, creo yo, desubicado, pero más allá de eso, lo que dice al conocer esta decisión de la jueza es que se va a apelar la decisión, es decir, que la Argentina está en contra de esto, porque si no tendría que decir, bueno, tiene razón la jueza. No, se va a apelar, o sea, mientras Milei dice que el Estado argentino va a decir que esto no corresponde, él sostiene que la culpa la tengo yo o la tenemos quienes participamos de la decisión de la expropiación. Y la verdad que es absolutamente contradictorio y peligroso porque que el Presidente de la Nación le dé la razón a los demandantes contradice la defensa del interés nacional. Milei pone en riesgo el interés nacional. Incluso contradiciendo a su propio cuerpo de abogado del Estado. Eso, para empezar: le da la razón a quien no corresponde. Se puede entender de Milei que esté siempre a favor de los buitres y no del país, siempre a favor de la entrega y no de la soberanía, siempre a favor de tribunales o países extranjeros y no de la República Argentina, eso se puede entender.

Pero en este caso es muy delicado, porque empieza a estar en riesgo YPF. YPF, la que nos permitió recuperar de nuevo el superávit comercial energético, la que puso en marcha Vaca Muerta, la que da muchísimas posibilidades y extiende las fronteras de desarrollo del país. Bueno, todo eso pone en riesgo Milei hoy.

Hoy lo que se impone es denunciar al gobierno y a Milei por el ataque a la soberanía nacional y por poner en riesgo a YPF. Está poniendo en riesgo YPF. Lo cual también llama a diferentes investigaciones que nosotros vamos a iniciar porque se sabe que Milei y su gobierno, como pasó con el caso la estafa de las criptomonedas, que tiene vínculos, se supo, yo esto no lo puedo afirmar, por eso digo que lo vamos a investigar, con representantes de ese fondo buitre. También sus viajes al extranjero permanentes, esta situación del procurador y subprocurador, bueno, todo es muy sospechoso a la vista de lo que estamos viviendo hoy. Un presidente que le da la razón, que no la tienen, a fondos buitres que se quieren quedar con YPF. Ese es el presidente que hoy tenemos. Así que, por supuesto que responsabilizo a Milei de cualquier decisión que tome que ponga en riesgo la soberanía energética, que ponga en riesgo a YPF, que abra negociaciones con fondos buitres cuando todavía no hay fallos firmes, porque lo otro que se ha dicho muy ligeramente es que bueno, ya está. No, no está. Esto está siendo apelado en segunda instancia. Puede apelarse luego en la Corte Suprema. Desconozco y se desconocen los tiempos que va a llevar, pero estamos en un camino de apelación a sentencias inadecuadas, ilegales, injustas en contra del interés nacional.

Así que lo que tendría que hacer Milei es defender a YPF, defender a la Argentina, defender al gobierno, pero bueno, sabemos que entró como un topo a destruir el Estado. Así que esto forma parte probablemente de esa batería de decisiones que ponen en riesgo el futuro de la Argentina. El futuro de la Argentina. Por eso yo vuelvo a decir que es gravísimo, que es gravísimo, y que a YPF hay que defenderla. Así que cierro con esto desde el punto de vista de nuestra fuerza política, pero desde el punto de vista de la provincia de Buenos Aires que es la principal provincia no productora de hidrocarburos pero sí en el procesamiento y la industrialización de los hidrocarburos, que somos parte de esa cadena, y además somos principales consumidores de energía en la Argentina digo: en nombre de todo eso, YPF no se vende y se lo advierto a Milei: no se vende y menos todavía se entrega o se regala. Muchas gracias.