**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PETERSEN ENERGÍA INVERSORA,     :
S.A.U. and PETERSEN ENERGÍA, S.A.U., :
                                :
           Plaintiffs,          :
                                :    Case No.:  1:15-CV-02739 (LAP)
           v.                   :
                                :
ARGENTINE REPUBLIC and YPF S.A., :
                                :
           Defendants.          :
                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ETON PARK CAPITAL MANAGEMENT, :
L.P., ETON PARK MASTER FUND, LTD.,:
and ETON PARK FUND, L.P.,       :
                                :
           Plaintiffs,          :
                                :    Case No.:  1:16-CV-08569 (LAP)
           v.                   :
                                :
ARGENTINE REPUBLIC and YPF S.A., :
                                :
           Defendants.          :
                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## JOINT STATUS REPORT

As directed by the Court, the parties submit this Joint Status Report in advance of

the July 29, 2025 Conference to provide an update on the parties' progress in resolving certain

outstanding disputes in connection with Plaintiffs' First and Second Set of Requests for Production

(the "First RFPs" and "Second RFPs"), dated October 16, 2023 and May 15, 2024, respectively,

and the Information Subpoena (the "Questions") dated May 15, 2024, (together, the "Requests").[1]

---

[1]    At the July 15, 2025 conference, the Court directed the parties to submit their joint status
report in advance of the July 29, 2025 conference by Friday, July 25, 2025.  The parties worked
diligently to prepare the joint submission, but were unable to complete preparation of this report

After the Introduction, this Report contains three sections:  (i) Areas of Agreement, (ii) Areas of Partial Agreement, and (iii) Areas of Disagreement.

## INTRODUCTION

### A.      Plaintiffs' Position

The parties have held productive meet-and-confer discussions as ordered by the Court and, as reflected herein, have made progress and reached agreement on a number of issues concerning the searches to be conducted and materials to be produced by the Republic with respect to certain requests.  The primary remaining disputes between the parties arise from the fact that, for many of the requests, the Republic has yet to conduct proper diligence in order to substantiate its objections and enable the parties to discuss any issues of burden with any particularity.  Because the Republic has asserted that complying with certain of Plaintiffs' requested searches would impose an undue burden on it, Plaintiffs have sought to confer to understand the scope and extent of the Republic's purported burden.  The Republic, however, has been unable to provide specific and detailed information about any particular burden that it may face.  That is because, as it turns out, the Republic has not conducted a fulsome review to determine the extent of its burden on many of the Argentine-based requests and others. Instead, the Republic has relied on the overruled executability objection, ECF No. 703, and has failed to comply with the Court's discovery scheduling, ECF No. 707.

While the Republic has now agreed to undertake this long-overdue review, it has refused to agree to a reasonable protocol, which would allow Plaintiffs to understand the nature and extent of the Republic's searches, and enable the parties to proceed efficiently and join issue on matters

---

by the July 25 deadline.  We regret this and apologize to the Court. The parties respectfully request that the Court accept their late submission today, July 26, 2025.

of burden.  Contrary to the Republic's claims, Plaintiffs are not seeking "discovery on discovery," but rather—consistent with the Court's direction—are seeking to engage in the basic and routine negotiations required to establish a credible and effective discovery framework: namely, identifying and agreeing on appropriate custodians, sources, and search methodologies.  *See, e.g., United States for Use & Benefit of M. Frank Higgins & Co. v. Dobco Inc.*, 2023 WL 5302371, at *5 (S.D.N.Y. Aug. 17, 2023).  Further, as Plaintiffs have made clear, with respect to scope, custodians, location, and other discovery matters, we are willing to consider any burden-based objections, but only when supported by a concrete, factual basis.  We should not be required to accept limitations untethered from specific information on how the Republic's internal systems are organized, or why complying with any given request would present undue difficulty for the Republic.

Contrary to the Republic's suggestion, Plaintiffs are not seeking an improper expansion of discovery.  Post-judgment discovery is ongoing and "continues until the judgment shall be satisfied." *See First Tech. Cap., Inc. v. Airborne, Inc.*, 380 F. Supp. 3d 217, 220 (W.D.N.Y. 2019).  In any event, the discovery now being addressed involves previously requested materials that the Republic has simply failed to provide or, as it turns out, even search for.  Remarkably, the Republic even continues to object to Plaintiffs' routine requests to identify individuals with knowledge of the Republic's responses.  Similarly, the Republic advances the meritless position that it will not provide custodians for the new searches, because custodians were previously selected for the unrelated alter ego discovery.  The Republic's position is meritless, as there are plainly different custodians for different topics of discovery.

Despite the Court's direction to confer on non-governmental communication applications and accounts, the Republic has declined our request to discuss this issue. Consistent with the

Court's direction at the conference, we have provided the Court with additional evidence of the pervasive use of these applications, which further justifies the ordering of their search, production, and preservation.

As reflected herein, Plaintiffs seek nothing more than appropriate and reasonable post-judgment discovery, particularly given the massive judgment at issue in this case and the Republic's long history of attempting to thwart such efforts.

### B.    The Republic's Position

Post-judgment discovery in aid of execution "*must* be calculated to assist in collecting on a judgment." *EM Ltd.* v. *Republic of Argentina*, 695 F.3d 201, 206 (2d Cir. 2012) (emphasis added). "[T]he rules do not provide judgment creditors with unfettered license to go on a fishing expedition," *Wall* v. *DO & CO NY Catering, Inc.*, 2021 WL 4133756, at *1 (E.D.N.Y. Sept. 9, 2021) (Tomlinson, M.J.) (citation omitted), nor may post-judgment discovery "be allowed to become a means of harassment of the debtor or third parties," *Gesualdi* v. *D. Gangi Contracting Corp.*, 2019 WL 3821221, at *1 (E.D.N.Y. Aug. 7, 2019) (Bulsara, M.J.); *see NBK Innovation XIII, LLC* v. *Suavei, Inc.*, 2025 WL 1810085, at *2 (N.D. Cal. June 30, 2025) ("[T]here are real limits to [post-judgment] discovery based on proportionality, harassment, and whether the discover[y] is reasonably calculated to lead to relevant information." (citation omitted)).

In keeping with these rules, this Court has repeatedly admonished that Plaintiffs cannot use post-judgment discovery to harass the Republic. (*See, e.g.*, July 15, 2025 Conf. Tr. at 11:22-24, 12:7-8, 13:4-5, 14:15-16, 16:3-4.) Regrettably, Plaintiffs have made clear that their goal is to harass the Republic with increasingly disproportionate, irrelevant, and personally invasive discovery requests for one purpose—as Plaintiffs' litigation funder, Burford Capitol, advised its investors—throwing "sand in the gears" of the Republic's efforts to "rebuild[] its economy and

resum[e] its place on the world stage." (Republic's Ex. 1 (Burford Capital Ltd. Q3 2024 Earnings Call Transcript), at 7.)

While the Republic agrees that the parties have engaged in some productive meet-and-confer sessions, Plaintiffs' description of the Republic's positions and disclosures is not accurate. It is wrong to say that the Republic has "yet to conduct proper diligence" or has been "unable to provide specific and detailed information about any particular burden that it may face." To the contrary, the Republic has explained, over and over, that gathering the information Plaintiffs are now seeking—most significantly, identification of all of Argentina's debts, commercial transactions, letters of credit, escrow accounts, and movable assets *in Argentina*—requires the Republic to search separately in each relevant ministry, secretariat and department in the locations likely to contain the information responsive to each search because none of this information is centrally stored in one place for the entire Government. The Republic has confirmed that this is the case for each category of these assets, which is why it proposed the reasonable compromises it did: searches in centralized repositories at ministries and secretariats where responsive information is likely to be found, with a $25 million value threshold that will streamline the identification of ministries and secretariats likely to have responsive information, reduce burden, and have some proportionality to the judgment in question.

Plaintiffs' real complaint seems to be that the Republic has not yet actually *performed* the disputed collections and reviews to "determine the extent of its burden" with exact precision—an analysis that cannot be done until the scope of the searches is agreed. It is not true that these searches are "long-overdue." The Republic has consistently objected to producing comprehensive information about its assets in Argentina on the ground that such information cannot lead to assets that will ever be subject to execution. As the Supreme Court has held,

"information that could not possibly lead to executable assets is simply not 'relevant' to execution." *Argentina* v. *NML Capital, Ltd.*, 573 U.S. 134, 144-145 (2014).  Notwithstanding the Supreme Court's direction, this Court held that "objections [that] were made on the basis that the responses could not lead to the identification of executable assets . . . [are] overruled." (July 15, 2025 Conf. Tr. at 7:12-17.).  While reserving all its rights, including to seek appellate review, through direct appeal or mandamus, the Republic proposes herein reasonable compromises that should resolve the parties' disputes.  The Republic cannot know the exact burden of every single potential search Plaintiffs wish to require—especially when those searches include looking at "all" government outposts and officials from Buenos Aires to Tierra del Fuego and Buenos Aires to Jujuy and seek to pick up assets valued as low as $1 million.  But the Republic has explained why it is impossible and wholly disproportionate to, for example, search for debts, commercial transactions, and moveable assets beyond centralized sources.

Plaintiffs' other scattershot opening assertions are baseless, as discussed in more detail below.  It was Plaintiffs who failed to confer in good faith on non-governmental communications, when instead of proposing limitations to their illegal and overbroad requests for personal communications of already-existing custodians, they sought to expand custodial searches to (unidentified individuals) across the government.  Plaintiffs' supposed "evidence of the pervasive use" of personal accounts is merely gossip, almost entirely about individuals who are not document custodians (such as President Milei) and all about communications that are duplicative of government email sources and have no relevance to post-judgment discovery.

Plaintiffs never explain why the massive amount of documents that the Republic has already provided about its assets is not sufficient to allow them to identify executable assets.  Notably, Plaintiffs have already received extensive discovery about the Republic's assets spanning

over 96,000 pages (and counting), including about: (1) the Republic's financial accounts in Argentina, the United States, and other foreign countries; (2) the Republic's commercial transactions with counterparties in the United States and foreign countries; (3) the Republic's legal and beneficial interests in assets in foreign countries; and (4) debts owed to the Republic by those in the United States and other countries. This discovery is more than sufficient for Plaintiffs to "uncover any hidden or concealed assets" of the Republic that may be available to satisfy the judgment. *Sentry Select Ins. Co.* v. *Cockrell*, 2023 WL 3609159, at *1 (N.D. Miss. May 23, 2023) (citation omitted). Plaintiffs' ongoing discovery demands simply do not stem from any genuine gaps in the Republic's productions. Indeed, Plaintiffs have not and cannot demonstrate that their latest round of discovery demands are reasonably directed to any legitimate enforcement purpose at all.

Plaintiffs should not be permitted to continue their harassment of a sovereign nation and an important ally of the United States. As this Court rightly recognized, Plaintiffs "can't harass" the Republic. (July 15, 2025 Conf. Tr. at 12:7-9; *id.* at 11:22 ("We are not doing that.").) And as the Second Circuit has recognized, Argentina—like all foreign sovereigns—is entitled to a degree of grace and comity." *Aurelius Capital Master, Ltd.* v. *Argentina*, 589 F. App'x 16, 18 (2d Cir. 2014).

## I.    AREAS OF AGREEMENT

Following the Court's guidance at the conference on July 15, 2025, the parties have conferred, and, in the interest of compromise, the Republic has agreed to produce additional information or the parties have reached certain agreements as follows:

## 1.    Commercial Transactions In The United States And Foreign Countries

The parties agree that the Republic will promptly provide a description of the contents of the National Office of Procurement's database and of search tools to conduct searches

to identify purchases made by the Republic in the United States and foreign countries and to provide reasonable assistance to Plaintiffs in conducting searches of that database. The parties agree to meet and confer as to whether the contents of that database, as set forth in the Republic's forthcoming description, are sufficient to provide a response to Subpoena Question 16 and First RFPs 22.

Plaintiffs state that it is their position that Questions 14, 20 and First RFPs 29 are also properly within the scope of Section I(2) and reserves all rights with respect to seeking additional information in connection with these requests to the extent the information in the database is not sufficient. The Republic disagrees and notes that it has already fully responded to Questions 14 and 20 and First RFP 29.

**2.      Supplemental Responses**

The supplemental production summarized in the Republic's Letter dated July 16, 2025 as to the Republic's diplomatic and consular property located in the United States was made on July 25, 2025. The supplemental production as to a small number of financial accounts located in Argentina that were inadvertently omitted from past productions will be made on or before August 15, 2025.

**3.      Supplementation of Responses**

The parties will confer about supplementation of responses to the Requests by July 28, 2025, and report to the Court at the July 29, 2025 conference.

**4.      Metadata**

With respect to metadata, the parties will continue to meet and confer on this issue and report to the Court.

5.      **Privilege**

The Republic has represented that it has not withheld any documents on the basis of privilege with respect to any of the Requests discussed in this Joint Report.  The Republic reserves the right to withhold on the basis of privilege responsive documents that may be identified through future searches.

## II.      AREAS OF PARTIAL AGREEMENT

Following the Court's guidance at the conference on July 15, 2025, the parties have conferred, and, in the interest of compromise, have reached partial agreement as to aspects of further searches but disagree as to the scope of those searches.  They present the agreed points and their disputes below:

1.      **Movable Assets In The United States**

The Republic previously confirmed that (1) the Armed Forces and Ministry of Foreign Affairs are the only Argentine entities that hold property outside of Argentina; (2) the Armed Forces do not have movable assets in the United States that are valued in excess of $1 million; and (3) the Ministry of Foreign Affairs does not maintain a registry of its moveable assets in the United States.  The parties agree that the Republic will conduct an additional search of its U.S. Embassy and Consulates in the United States to identify any movable assets in the United States valued in excess of [Plaintiffs' position: $1 million; Republic's position: $5 million], excluding assets of the type that would appear in the Janes Database (which the parties previously excluded by agreement).

The Republic will make a production in response to the relevant Requests on or before September 8, 2025 or confirm that no such assets were found.

A.    **Plaintiff's Position**

While the parties have largely reached agreement, they cannot agree as to a threshold value.  Plaintiffs initially proposed $1 million with the caveat that they were amenable to any presentation of burden with respect to that number.  The Republic, to date, has indicated that $1 million is too burdensome, citing potential confusion over whether an asset is worth $1 million.  Instead, the Republic has offered $5 million as the threshold, as apparently in its view that number is less confusing.  Plaintiffs do not find the Republic's articulation of burden to be compelling.

B.    **The Republic's Position**

The search now agreed by the parties cannot be done in centralized sources because the Republic's worldwide embassies and consulates do not maintain registries of their movable assets.  The Republic will have to ask persons in its U.S. Embassy and Consulates in the United States to identify movable assets worth more than the threshold value.  As the Republic explained to Plaintiffs during the parties' meet and confers, setting a higher threshold value will make that search more meaningful and less burdensome because higher value assets are easier to identify.  Plaintiffs' stubborn refusal to move off from their starting point of $1 million simply ignores the Court's guidance at the prior conference.  (July 15, 2025 Conf. Tr. at 16:7-8 ("You people need to agree on a limit, whether it's $5 million or $10 million or whatever it is.").)

2.    **Requests Regarding Certain Assets In Argentina**

The parties agree that the Republic will conduct a reasonable search for information regarding the following categories but disagree about almost every aspect of how that search should be conducted, including whether searches should be of centralized sources and the dollar threshold for responsiveness:

a.  Debts owed to the Republic by persons in Argentina (First RFPs 38; Second RFPs 7, 28, 31, 40, 48; Subpoena Question 10);

b.  Debts owed by the Republic to persons in Argentina (First RFPs 37; Second RFPs 8, 40, 49, 52; Subpoena Question 11);

c.  Commercial transactions with Argentine counterparties (Subpoena Question 16);

d.  Letters of credit issued by Argentine financial institutions (Second RFPs 10; Subpoena Question 17);

e.  Escrow accounts in Argentina (First RFPs 27, 28; Second RFPs 12, 13; Subpoena Question 19);

f.  Movable assets in Argentina and legal and beneficial interests therein (Second RFPs 3, 4).

The parties agree that the Republic may exclude from any forthcoming productions the following categories of documents and information, but disagree, as set forth in their individual position statements, as to what other categories of documents and information may be excluded:

a.  Tax debts owed to the Republic by individual taxpayers;

b.  Tax credits owed by the Republic to individual taxpayers;

c.  Employee and retirement obligations; and

d.  Office furniture inventory.

**A.    Plaintiffs' Position**

The Republic confirmed during the parties' meet and confers that it has not performed specific searches in response to Plaintiffs' Argentina-specific Requests on the basis of executability. As the Republic now agrees to respond to certain of these Requests, and because it has indicated that it is not presently aware with particularity as to where and how potentially responsive materials are stored, Plaintiffs proposed the below protocol. Contrary to the Republic's position that, "Plaintiffs have refused exclusions with respect to basic service contracts," the

purpose of the protocol below is to obtain information that would provide both parties with the information necessary to craft searches of reasonable scope.  Plaintiffs have made clear both in Court and in the parties meet and confers that they too are not interested in contract of *de minimis* value, such as "coffee purchases."   However, absent information specific to the burden of performing searches for relevant information, despite repeated requests, Plaintiffs are in no position to propose—let alone agree—to exclusions in a vacuum. Notably, late this evening (July 25, 2025), the Republic informed Plaintiffs that it is now suggesting a $25 million threshold with respect to its searches of the below categories.  This proposal, consistent with the Republic's failure to perform any informative searches to date, was not presented with factual information to justify an otherwise arbitrary number.  The Republic has offered no information as to why a search for accounts, for example, in excess of $25 million are easier to locate than those with $1 million.  Plaintiffs have no understanding of how such information is kept such that searching for one number versus another makes any meaningful difference with respect to the Republic's searches for responsive materials.

Accordingly, Plaintiffs proposed—and the Republic rejected—the following protocol for the purpose of conducting a reasonable search in response to the above-listed categories at (a)-(f) (the "Categories").  First, Plaintiffs propose the Republic would investigate (i) the existence of any centralized government sources from relevant ministries and secretariats; and (ii) any other location, aside from such centralized sources, that may contain responsive information.  Plaintiffs further propose that the parties meet and confer no later than August 8, 2025, so that the Republic can (i) present the results of its investigative steps to identify the location of materials relevant to a reasonable search in response to the Categories and (ii) propose a protocol for performing such searches, which will include, at minimum, a description of proposed search

methods and identification of the custodian files to be searched. Plaintiffs also proposed that, at the July 29, 2025, conference, the Republic provide the Court with a status update on the steps that it has undertaken to date to investigate the location of sources of information responsive to the Categories and the protocol it proposes for conducting such searches. Plaintiffs agreed to accept a rolling production of materials in response to the above Categories and proposed that such discovery should be completed no later than September 8, 2025.

Plaintiffs fully reserve their rights with respect to any Request not specifically identified above, and, in the interest of compromise, agree to defer any further discussion of such Requests to a future meet and confer following an opportunity to review and evaluate the Republic's responses to the above.

### B.    The Republic's Position

Plaintiffs request information about every debt, commercial transaction, moveable asset, letter of credit, and escrow account of a foreign sovereign in its own territory worth more than $1 million. The burdens of such a search for a sovereign country are staggering and obvious. The Republic has objected (*Petersen* ECF No. 740 at 2) that no discovery of such assets within Argentina is relevant or proportional because it cannot lead to assets that will ever be subject to execution. As the Supreme Court has made clear, "information that could not possibly lead to executable assets is simply not 'relevant' to execution." *Argentina* v. *NML Capital, Ltd.*, 573 U.S. 134, 144-145 (2014). Notwithstanding long-settled law, this Court has overruled the Republic's objection to allow Plaintiffs to conduct massive  discovery of the Republic's assets in Argentina. (July 15, 2025 Conf. Tr. at 7:14-15, 14:3-4, 28:6-7, 43:20-21.)  While reserving all its rights, including to seek appellate review, through direct appeal or mandamus, the Republic will conduct searches of (1) centralized sources (2) for its debts, commercial transactions, moveable assets,

letters of credit, and escrow accounts in Argentina (3) for assets worth more than $25 million (4) at ministries and secretariats where it is reasonably likely to be found.

To be clear, this ministry-by-ministry and secretariat-by-secretariat search will likely consume thousands of hours of time of busy government officials. But Plaintiffs want more because they are interested in harassment, not execution. They have refused to agree to any significant limitations, even though this Court directed at the July 15, 2025 Conference that Plaintiffs "can't harass by [for instance] asking for every debt owed" and that "there has to be a reasonable limit." (July 15, 2025 Conf. Tr. at 12:7-8, 14:17.) Plaintiffs ask the Court to order the Republic to search in every corner of government offices for information about assets worth as little as $1 million, to impose unreasonable deadlines, and to order the Republic to disclose to Plaintiffs each and every detail of its discovery process and its attorneys' work product. None of this is appropriate or proportional.

1.    **The Republic's Proposed Search Parameters Adopt an Appropriate Compromise.** The Republic's proposal to respond to Plaintiffs' request to identify debts, commercial transactions, moveable assets, letters of credit, and escrow accounts in Argentina by searching centralized sources at ministries and secretariats where such documents are reasonably likely to be found and using a $25 million value threshold should be adopted by the Court without Plaintiffs' proposed additions, which seek to harass the Republic and have no relevance to a judgment worth more than $16.1 billion.

The Republic's proposal grants Plaintiffs broad discovery into every aspect of the Republic's significant assets within Argentina. Providing such discovery within Argentina would be an immense undertaking for the Republic—imagine requiring the United States Government to provide discovery about all of its U.S.-based movable assets (including artwork in museums,

emergency vehicles, computer systems), commercial transactions (including vaccine purchases and consulting agreements), and debts (including taxes owed by large corporations).  The Republic has explained that even compiling information from centralized sources on the six categories above and using a $25 million value threshold will require (1) the Republic to confer with each relevant ministry and secretariat, (2) each relevant ministry and secretariat to then conduct a search of their records for responsive information, and (3) the compilation, processing, review, and production of the resulting information.

In their submission, Plaintiffs (1) refuse to raise the $1 million value threshold in their requests or (2) limit the searches to ministries where relevant information is reasonably likely to be found.  Instead, as part of their campaign of harassment, Plaintiffs press that the Republic (i) search "any other location, aside from such centralized sources, that may contain responsive information," *i.e.*, go *beyond* searches of centralized sources and not limit its searches in any way; (ii) provide "discovery-on-discovery" into "the steps that it has undertaken to date to investigate" the searches identified above and "a protocol for performing such searches, which will include, at minimum, a description of proposed search methods and identification of custodian files to be searched"; and (iii) complete all of this in six weeks, by September 8, 2025.

Plaintiffs' proposal would capture, among numerous other examples of overbroad and irrelevant information, art hanging on the walls of government museums, statues in public places, corporate tax debts and credits, and software licenses.  Plaintiffs' only exclusion as to movable assets is *office furniture*.  As to debts, Plaintiffs have agreed only that the Republic may exclude tax debts and credits pertaining to *individual* taxpayers (but not tax debts and credits pertaining to businesses or other entities of any size) and employee and retirement obligations.  Plaintiffs have refused any further exclusions, including "service and supply contracts, including

but not limited to office supplies and pantry items."  Thus, Plaintiffs are indeed seeking to force the Republic to produce documents reflecting the very "coffee purchases" that Plaintiffs assured the Court they were not seeking (July 15, 2025 Conf. Tr. at 9:7-9).  Plaintiffs' refusal to agree to an asset value threshold above $1 million ignores the Court's clear guidance that the parties should agree on a limit *above* $1 million.  (July 15, 2025 Conf. Tr. at 16:7-8 ("You people need to agree on a limit, whether it's $5 million or $10 million or whatever it is.").)

Plaintiffs' proposal also has no end, because if Plaintiffs don't like what they obtain from centralized sources, they can demand that the Republic search "any other location" for additional information.  There is no basis to put a sovereign government to this ridiculous task.  Reasonable and bright line limits—searches in centralized sources only, excluding all tax debts and credits and all service and supply contracts, and with a meaningful $25 million dollar limit—must be imposed by the Court.

**2.    Plaintiffs' Proposed Deadline Is Unworkable.**    The searches even of centralized sources to which the parties agreed are sweeping and will take time to complete on a ministry-by-ministry and secretariat-by-secretariat basis.  The Republic cannot know in advance how long it will take to complete the agreed searches of centralized sources, but is willing to seek to complete those searches within six weeks of the Court's order if Plaintiffs promptly agree on a set of ministries and secretariates to search.  There is no chance of completing the expanded searches Plaintiffs propose in that period because of their failure to agree to any meaningful limitations.  Nor is there any reason for expedition.  While Plaintiffs will undoubtedly point to the dates that they served their Requests and Subpoena, it was *Plaintiffs* who failed to raise any issues regarding the Republic's responses and objections to the Subpoena for *more than seven months*.

3. **Discovery-on-Discovery Should be Denied.**  Plaintiffs seek to expand discovery regarding debts, commercial transactions, movable assets, letters of credit, and escrow accounts in Argentina to include discovery into "the steps that [the Republic] has undertaken to date to investigate" its searches and "a protocol for performing such searches, which will include, at minimum, a description of proposed search methods and identification of custodian files to be searched."  The Court should not countenance such harassing "discovery on discovery" regarding these searches in Argentina.

It is well-settled that "discovery on discovery" is not permitted in this Circuit absent "an adequate factual basis to justify the discovery," which "the Court must closely scrutinize . . . in light of the danger of extending the already costly and time-consuming discovery process *ad infinitum*."  *Williams* v. *Fed. Gov't of Nigeria*, 2025 WL 507702, at *2 (S.D.N.Y. Feb. 14, 2025) (Liman, J.).  Plaintiffs have not made such a showing and clearly cannot do so.  The Republic's proposal is clear: to search centralized sources in relevant ministries and secretariats to identify debts, commercial transactions, moveable assets, letters of credit, and escrow accounts in Argentina with a $25 million value threshold, including obviously irrelevant information such as tax debts and credits and service and supply contracts.  No further information about these searches is needed or warranted.

Plaintiffs' request for listings of "individual custodians" makes no sense:  the Republic will be searching the central files of its ministries, secretariats, and departments to compile information relating to debts, commercial transactions, letters of credit, escrow accounts and moveable assets in Argentina.  Individual custodial searches have nothing to do with these requests.

3.      **Swift Details**

The parties agree that the Republic will produce SWIFT messages by August 1, 2025, for transactions initiated or received by the Republic's U.S. accounts for the two-year period ending on December 31, 2024.

The parties agree that the Republic will request that each included ministry and secretariat (the parties disagree over exclusions) seek to obtain from relevant financial institutions SWIFT messages for the two-year period ending on December 31, 2024 for all transactions initiated or received by that ministry's Argentine's accounts, and will produce such SWIFT messages on a rolling basis when received from the relevant financial institutions.

The Republic further agrees that on or before August 1, 2024, it will provide Plaintiffs with a proposal to supplement its production of SWIFT messages with updated information.

A.      **Plaintiffs' Position**

Plaintiffs propose that the Republic's production will be further supplemented on a rolling basis, to be completed on or before September 8, 2025.

The parties will meet and confer concerning the accounts of the Secretariat of Intelligence to address any national security concerns and SWIFT message from such accounts need not be produced until any such issues are resolved. As noted in the parties' meet and confers, while Plaintiffs agree to exclude any national security information, Plaintiffs do not agree to categorially exclude all military or supply related contracts from the searches as such contracts can include significant expenditures, which, as Plaintiffs have pointed out in prior submissions, such discovery is appropriate. *NML Capital, Ltd. v. Republic of Argentin*a, 680 F.3d 254, 258 (2d Cir. 2012) (sovereign's bank account used to pay for army boots or bullets would be subject to

attachment under FSIA).  Plaintiffs remain available to confer once the Republic has more details on the issue.

As to the Republic's suggestion that Plaintiffs have "information sufficient to identify the accounts owned by each of these entities," Plaintiffs merely have a list produced by the Republic of US, Argentine and Foreign accounts, which contains no usable information as to the use or nature of such accounts, rather such list merely identifies an account number.  Without further information, the list is essentially useless in determining how any of the accounts have been used.

**B.    The Republic's Position**

As set forth above, the parties have agreed on the Republic's production of SWIFT messages through 2024 regarding the Republic's U.S. accounts.  As to the Republic's accounts in Argentina, the parties also agree that the Republic will request from relevant financial institutions SWIFT messages for a two-year period initiated or received by each ministry's Argentine's accounts.

The parties disagree on one point as to SWIFT messages.  Due to national security concerns, the Republic proposes to exclude SWIFT messages for Argentine accounts maintained by the Ministry of Defense, the Secretariat of Intelligence, and the Armed Forces of the Argentine Republic.  Plaintiffs rejected these limits and are only willing to meet and confer about "addressing" any national security concerns for one of these three, the Secretariat of Intelligence.

Plaintiffs have (or will soon have) information sufficient to identify the accounts owned by the Ministry of Defense, the Secretariat of Intelligence, and the Armed Forces.  It is telling that Plaintiffs call this information "useless" after demanding and moving (successfully) to compel its production on the basis that these accounts "can lead to the identification of attachable assets." (*Petersen* ECF No. 568, at 3).  Plaintiffs have never explained why individual transactions

in these highly sensitive accounts in Argentina are relevant or proportional to post-judgment

discovery in this case.  Plaintiffs asserted during meet and confer sessions that it might be relevant

that the army bought "boots" from such an account.  But such a purchase from an account in

Argentina would not make the account any more or less relevant, and the burden of reviewing each

individual transaction to identify and withhold sensitive national security information far

outweighs any benefit.  Plaintiffs' citation to *NML Capital, Ltd.* v. *Republic of Argentina*, 680 F.3d

254, 258 (2nd Cir. 2012) is irrelevant, as it expressly refers to attachment of bank accounts in the

United States under the FSIA, not accounts in Argentina.

**4.    Identification Of Certain Accounts**

The parties agree that the Republic will conduct a reasonable search to identify the

following accounts:

a.    "[T]he accounts in which Argentina made or received any payments concerning the 2012 Facility Agreement for US\$ 2.1 billion and any amendments thereto, with Argentina as borrower, China Development Bank and Industrial and Commercial Bank of China Ltd. as Initial Mandated Lead Arrangers, and China Development Bank as Facility Agent, referenced in Bates-Numbered Documents AR00138642, AR00137905, and AR00138317."  (Subpoena Question 26.)

b.    "[T]he accounts in which Argentina made or received any payments concerning the August 12, 2016 Engineering, Procurement, and Construction Contract for Cauchari I, II, III, the 2017 Preferential Buyer Credit Loan Agreement regarding the Jujuy Photovoltaic Power Plant Project between Argentina and the Export-Import Bank of China, and any amendments thereto, referenced in Bates-Numbered Documents AR00137778, AR00137789, and AR00137865."  (Subpoena Question 27.)

c.    "[T]he accounts in which any payments concerning the Standby Letter of Credit in the amount of €313,876,449.80 euros [*sic*] issued by Santander Bank dated April 3, 2024 were sent, transferred or received, regarding claims filed in the High Court of England and Wales in 2019 by holders of euro-denominated GDP-Warrants issued by Argentina in 2005 and 2010, referenced in Bates-Numbered Document AR00137357."  (Subpoena Question 29.)

d.    "[T]he accounts in which any payments concerning the Yacyretá Dam, Jasyretâ-Apipé Hydroelectric Power Station, or Entidad Binacional Yacyretá, were sent to, transferred to or from, or received by Argentina."  (Subpoena Question 30.)

To the extent Plaintiffs seek to identify accounts used to make or receive payments associated with other specific transactions, the parties will meet and confer about those requests.

The Republic will provide a supplemental production identifying accounts in Argentina that have not been identified to date on or before August 15, 2025.

### A. Plaintiffs' Position

Plaintiffs' position is that the Republic's reasonable search should include the following in addition to the Requests enumerated directly above:

 a. "With respect to any financial agreements between Argentina and China, identify any bank account, brokerage account, trust account, custodial account, or other Financial Institution account through which any Payment has been or will be made, the name of the account holder of such account as it appears on the account, the account number of such account, the current status of such account, and the current balance of such account, with citations to relevant Bates-Numbered Documents." (Subpoena Question 15.)

 b. "List all accounts used by Argentina (whether such accounts are located in Argentina or elsewhere) to make payments to any law firm or consulting firm located in the United States or any Foreign Country, in connection with any legal proceeding to which Argentina has been a party, with citations to relevant Bates-Numbered Documents." (Subpoena Question 18.)

 c. "Provide a list of any escrow account established in connection with the sale of any Asset by Argentina to any Person, with citations to relevant Bates-Numbered Documents. For the avoidance of doubt, this shall include, without limitation, the name and address of the Financial Institution where the account is held, the name of the account holder, and the account number of the account." (Subpoena Question 19.)

As communicated to the Republic in the parties' meet and confers, Plaintiffs are willing to meet and confer as to these Requests, for example, with respect to law firms and other professionals, to find a compromise that provides Plaintiffs with information they believe is crucial to its effort to conduct asset tracing in pursuit of satisfying the judgment.

### B.  The Republic's Position

As set forth in the joint proposal above, the Republic has agreed to identify accounts used for purposes that Plaintiffs have specifically identified in Subpoena Questions 26, 27, 29 and 30—which include, for example, accounts used for an identified 2012 Facility Agreement.  The Republic explained to Plaintiffs that it could not identify accounts used as described in Subpoena Questions 15, 18 and 19 because those categories are too broad.  For Question 18, as an example, the Republic's ministries and secretariats have relationships with many different law firms and consulting firms around the world, and payments are made to these entities from various different accounts depending on, *inter alia*, the law firm/consulting firm, the ministry or secretariat that engaged the law firm/consulting firm, and the matter on which the law firm/consulting firm is providing advice.  It would be unduly burdensome for the Republic to identify every account used to pay a law firm or consulting firm (or, as to Requests 15 and 19, respectively, used for financial arrangements with China or for an escrow account).  Doing so would require ministry-by-ministry and secretariat-by-secretariat investigations, and the burden of such a search is disproportionate to any benefit.  Plaintiffs have never explained the relevance of any of these searches.

As set forth above, to the extent Plaintiffs seek to identify accounts used to make or receive payments associated with *specific* transactions, the Republic agrees to meet and confer about those requests.

### 5.  Privatization-Related Requests

The parties agree that the Republic will reproduce to Plaintiffs on a rolling basis documents regarding privatizations that the Republic has produced or will produce in the *Attestor*, *Bainbridge*, and *Titan* cases.   (No. 1:14-cv-05849-LAP (S.D.N.Y.); No. 1:16-cv-08605-LAP (S.D.N.Y.); No. 1:21-cv-02250-JMC (D.D.C.).)  Specifically, in *Attestor*, the parties agreed that the Republic will produce documents relating to privatizations where concrete, official action

evidencing a real and active privatization process has occurred.  When production is triggered, the Republic will produce key documents concerning the privatization effort, including but not limited to documents related to the issuance of a presidential decree initiating privatization, the preparation of substantive evaluation reports, the adoption of resolutions approving particular privatizations, the publication of bidding terms, and the issuance of resolutions identifying a winning bidder.  This production will continue to Plaintiffs even if the scope of production in *Attestor* is narrowed for any reason.

### A.    Plaintiffs' Position

In furtherance of providing a response to Plaintiffs' privatization requests (Second RFPs 33, 35-39; Subpoena Question 22), the Republic agrees, in the first instance, to reproduce to Plaintiffs on a rolling basis documents regarding privatizations that the Republic has produced or will produce in the *Attestor*, *Bainbridge*, and *Titan* cases pursuant to the agreements reached in those cases.  (No. 1:14-cv-05849-LAP (S.D.N.Y.); No. 1:16-cv-08605-LAP (S.D.N.Y.); No. 1:21-cv-02250-JMC (D.D.C.).)  The Republic will also provide the specific language of the agreement or order governing this production in the *Attestor* matter. Notwithstanding these productions, however, Plaintiffs maintain that documents and communications concerning proposed privatization efforts, which may or may not trigger the production requirements in the *Attestor*, *Bainbridge*, and *Titan* cases, are relevant responses to Plaintiffs' discovery requests including the need for searches of various custodians.  Proposals to privatize various state-owned entities in Argentina represent transactions that would fundamentally reshape the Argentine economy and inject cash—potentially billions of dollars—into the Republic's coffers.  The structure and timing of these proposed transactions is relevant to Plaintiffs' efforts to recover on the judgment. Moreover, efforts by the Republic to restructure or otherwise prepare state-owned entities in advance of privatization are relevant to Plaintiffs' ongoing understanding of the Republic's

movement and organization of its assets.  Such activities by the Republic will not necessarily be captured by the scope of production apparently agreed to in *Attestor*, which does not include privatizations that have been considered or proposed but not yet decreed.

B.    **The Republic's Position**

The agreed scope of discovery in the *Attestor* case as to privatization more than satisfies the needs of post-judgment discovery in this case.  It is telling that plaintiffs' counsel in that case have agreed to the scope of this discovery.  Plaintiffs seek to expand it in two ways: by obtaining documents about (1) potential privatizations that may never occur or even begin, and (2) internal government communications about potential privatizations.  For reasons of relevance and proportionality, no such discovery should be permitted here, either.

As to potential privatizations that have not entered any real or active privatization process, Plaintiffs have no basis to seek discovery.  Plaintiffs say they want privatization-related discovery because privatizations can "reshape the Argentine economy and inject cash" or provide information about "movement and organization of [the Republic's] assets," but that has nothing to do with *possible* sales the government could make that may never happen.  It is not clear why privatizations are relevant in the first place—if Plaintiffs believe they can execute on government-owned property, they can seek to do so at any time—but privatizations certainly have no relevance before they receive any authorization to proceed.  To the extent Plaintiffs' interest is in seeking to intercept funds paid to the Republic in connection with a privatization, discovery concerning real and active privatizations is more than sufficient.

As to custodial searches with respect to privatizations, Plaintiffs have never previously raised this issue.  Nor have they given any cogent explanation of why internal government communications about privatizations are relevant or proportional.  In conferring on this issue, Plaintiffs asserted that such communications could include government admissions of

ownership of certain interests in companies, but any such ownership interests are *already public*. There is no basis to undertake this kind of burdensome and pointless search for communications.

## 6. Information Subpoena Request 31

### A. Plaintiffs' Position

The parties are not able to reach agreement as to Information Subpoena Question 31, which requests identification of individuals with knowledge of the Republic's responses to the Information Subpoena. It is Plaintiffs' view that this is a foundational discovery request that (contrary to the Republic's position) does not constitute work product or discovery on discovery. *See* ECF 741 at 2-3. During the parties' meet and confers, the Republic simply stood on its blanket objection and failed to articulate any specific burden imposed by providing a response. Indeed, underscoring the need for this basic information, the Republic also acknowledged that, for the past year, it has never even searched custodial files of individuals with relevant knowledge for certain requests. For example, the Republic has never searched any custodial files in connection with Plaintiffs' requests related to commercial transactions in the United States. Identification of individuals with knowledge on that topic is necessary to obtain meaningful information.

For these reasons, Plaintiffs proposed that the Republic identify individuals with knowledge for each of (i) the Requests identified in Sections I-VII to which the Republic has agreed to respond; and (ii) the Requests to which the Republic has responded that there are no, or very limited, materials, including but not limited to First RFPs 27, 28 and Subpoena Question 19 (escrow accounts in the U.S), and First RFP 26 (gold reserves). Moreover, Plaintiffs proposed that the parties meet and confer with respect to any alterations to the Protective Order necessary to address any concerns with respect to the identification of individuals with knowledge. Further, Plaintiffs reserve their right to seek further identification of individuals with knowledge with

respect to any Requests not specifically enumerated herein upon review of the Republic's forthcoming responses and production, and our need for this information.

### B.    The Republic's Position

Information Subpoena Request 31 asks the Republic to identify "*all* persons . . . who have been consulted in connection with the preparation of responses to" Plaintiffs' Subpoena.  (Subpoena at Question 31 (emphasis added).)  It is clear that Plaintiffs want this information to start a new front in their campaign of harassment of the Republic, including to demand the depositions of individual public servants in Argentina.

In the interest of compromise, the Republic has already provided Plaintiffs with a list of the relevant government ministries and offices it consulted in the preparation of its Responses.  (*See Petersen* ECF No. 737-1 at 54-55.)  Plaintiffs say they are now limiting this response by only asking for "individuals with knowledge" of "each of the Requests" identified above (to which the Republic has agreed to respond), as well as all of the "Requests to which the Republic has responded that there are no, or very limited, materials."  This reconfiguration is a massive expansion of Question 31:  Plaintiffs seek to extend it beyond the Information Subpoena to all Requests for Production mentioned in this Report *or* as to which the Republic has been unable to locate responsive documents.   This disproportionate and harassing demand should be rejected.

1.    Offering more information about the Republic's preparation process— every person it "consulted" or who has "information" about a search its attorneys have done— would constitute disclosure of attorney work product.   "Plaintiffs do not have the right to such information from the mouths of its adversary."  *Gardner-Alfred* v. *Fed. Rsrv. Bank of New York*, 2022 WL 17961594, at *5 (S.D.N.Y. Dec. 27, 2022) (Liman, J.); *see also Haroun* v. *ThoughtWorks, Inc.*, 2020 WL 6828490, at *1 (S.D.N.Y. Oct. 7, 2020) (Liman, J.) ("[C]ounsel is

not required 'to disclose the manner in which documents are collected, reviewed and produced in response to a discovery request.'"); *Kaye* v. *N.Y.C. Health & Hosps. Corp.*, 2020 WL 283702, at *2 (S.D.N.Y. Jan. 21, 2020) (Cott, M.J.) ("When documents are produced in discovery, whether they be produced electronically or otherwise, the Court does not believe that, in the first instance, the receiving party has a right to examine and evaluate the way the production was made or require collaboration in the review protocol and validation process.").  To obtain work product, Plaintiffs would have to show a "substantial need" for a list of all civil servants with whom the Republic consulted in preparing its Responses—that such information is "essential to the preparation of [its] case." *U.S. Sec. & Exch. Comm'n* v. *Collector's Coffee Inc.*, 337 F.R.D. 70, 78 (S.D.N.Y. 2020) (Gorenstein, M.J.).  In fact, there is *no* need for this information: The parties are engaged in extensive post-judgment discovery to identify assets of the Republic, not anything about the knowledge of individual government officials.

        2.    Information about "individuals with knowledge" of how the Republic performed its post-judgment discovery work simply is not relevant.  Interrogatories about "individuals with knowledge" are directed at individuals "with knowledge of the relevant facts." *See Caldwell-Clements, Inc. v. McGraw-Hill Pub. Co.*, 12 F.R.D. 531, 538 (S.D.N.Y. 1952) (Dimock, J.) ("'[D]iscovery of further sources of evidence such as the existence of documents and the identity of persons having knowledge of relevant facts . . . is a well recognized purpose of interrogatories.'"); *see also* Fed. R. Civ. P. 26(d).  There is no individual or group of individuals who knows about the "relevant facts" here, which (in Plaintiffs' view) are all of the Republic's assets worldwide.  Information about the Republic's debts and accounts, for example, needs to be collected from the records of the Republic's various ministries and secretariats:  it is not within the scope of individual knowledge or based on individual communications.

3.    Because information on the Republic's discovery preparation process is collateral to the Plaintiffs' post-judgment collection efforts, it is impermissible "discovery on discovery." *Williams*, 2025 WL 507702, at *2.  Plaintiffs are not entitled to it unless they "'provide an adequate factual basis to justify the discovery." *Id.*; *see also Mortg. Resol. Servicing, LLC* v. *JPMorgan Chase Bank, N.A.*, 2016 WL 3906712, at *7-8 (S.D.N.Y. July 14, 2016) (Francis, M.J.) (denying plaintiffs' request for Rule 30(b)(6) deposition where they "provided no factual basis to support their skepticism about the defendants'" discovery process).  The Court must "closely scrutinize the request in light of the danger of extending the already costly and time-consuming discovery process *ad infinitum*." *Williams*, 2025 WL 507702, at *2.  Because Plaintiffs have never made the claim—nor could they—that the Republic "has engaged in the sort of misconduct that would merit discovery on discovery," the Court must deny their request.  *246 Sears Rd. Realty Corp.* v. *Exxon Mobil Corp.*, 2011 WL 13254283, at *4 (E.D.N.Y. Apr. 1, 2011) (Azrack, M.J.).

### III.    AREAS OF DISAGREEMENT (SUBJECT TO PRIOR BRIEFING)

Following a conference with the parties on September 3, 2024 (*Petersen* ECF No. 654) with respect to previously submitted pre-motion letters regarding alter ego (*Petersen* ECF Nos. 568, 572, 574) and custodian and search terms proposals (*Petersen* ECF Nos. 641, 642, 646, 648), the parties agreed to a scheduling order regarding briefing ESI and alter ego issues (*Petersen* ECF No. 653).  The parties' opening and reply submissions regarding alter ego and ESI issues are at *Petersen* ECF Nos. 657, 658, 659, 670, 671, 675 and 677.  On February 4, 2025, Plaintiffs made a supplemental submission regarding custodians and alter ego issues (*Petersen* ECF No. 711), to which the Republic responded on February 11, 2025 (*Petersen* ECF No. 715) and the Plaintiffs replied on February 14, 2025 (*Petersen* ECF No. 716).  The parties agree that these issues have been fully briefed and submitted.

Plaintiffs also seek to make a supplemental submission, as set forth below, regarding certain ESI issues with attached supplemental Exhibits A-C. The Republic opposes this submission and responds as set forth below and with attached supplemental Exhibits 1-3.

### A.    Plaintiffs' Position

At the July 15 Conference, the Court directed the parties to meet and confer with respect to the so-called "WhatsApp" issue—*i.e.*, the use of personal devices and/or non-governmental applications to conduct official business. (July 15, 2025 Hr. Tr. at 35:12-16; 36:8-17.) Consistent with Plaintiffs' representations to the Court (*id.* at 32:22-33:4; 37:21-24), and contrary to the Republic's apparent contention that Plaintiffs are somehow seeking to impermissibly supplement the already dense record, Plaintiffs provided the Republic with compendiums of publicly available statements and three emails (produced by the Republic) further evidencing government business being conducted on off-channel applications. *See* Exhibits ("Ex.") A, B & C.

Although Plaintiffs raised the issue in the parties' meet and confers, the Republic has taken the position that it is not willing to engage on this topic. The Court should require the Republic to: (1) search for and produce government-related communications transmitted through personal e-mail accounts or messaging applications such as WhatsApp, Signal, or Gmail, and (2) preserve such communications—steps that should have been taken long ago. Plaintiffs will not repeat the legal, factual and expert evidence that overwhelmingly demonstrates Plaintiffs' entitlement to these materials and the Republic's use of these applications to conduct official business, but respectfully refer the Court to motion sequences, ECF Nos. 642, 657, 670 as well as No. 711 (requesting material in the Republic's possession and providing supplemental information concerning key custodians that the Court reserved decision on at the September 3, 2024 Conference).

To date, the Republic does not appear to deny that Argentine government officials and agencies (like 93% of Argentine public, *see* ECF No. 627-6 at 2) use private messaging platforms like WhatsApp, or private email accounts like Gmail, for government business. The Republic has refused to respond or even confirm whether it has inquired of any officials about their use or preservation of such material (other than to represent generally the Republic "is complying with its preservation obligations"). Rather, the Republic demands that Plaintiffs provide even more evidence of the use of governmental related communications on these applications and to provide evidence of such use even by individuals that have not been identified as alter-ego custodians, given the Republic's failure to timely respond to court-ordered discovery deadlines based on the long-overruled objection of executability. Of course, platforms like WhatsApp are private, encrypted and shielded from public view. Notwithstanding that Plaintiffs have made more than a sufficient showing that official business is being conducted in this manner, the obligation to inquire as to where relevant information may lie and the duty to preserve it— regardless of platform—rests squarely on the Republic. *See e.g.*, Ex. A (chart of official WhatsApp use); *see also* ECF Nos. 712-3 at 2, 712-4 at 12 (WhatsApp use by Santiago Caputo and President Milei, Pablo Quirno); ECF Nos. 644-2, 644-6 (Top Officials use of Gmail and Yahoo), 628-4, 628-5 (use of Gmail for YPF work). As detailed below, the additional evidence further confirms the widespread usage of these applications for governmental business and, consistent with the Court's comments at the July 15 Conference, such communications are the subject of proper discovery. *See* July 15, 2025 Hr. Tr. at 35:13-16. At its most basic, the Republic cannot plausibly respond to Plaintiffs' discovery requests absent a search of these applications—it is largely where the Republic conducts its business.

Specifically, Plaintiffs have attached three appendices at Exs. A, B,[2] and C to this submission that provide a sampling of: (1) public reporting on the widespread use of WhatsApp to conduct government business by the most senior officials including, among others, President Milei, along with Economy Minister Luis Caputo and strategic advisor to the President, Santiago Caputo (both of whom are at issue in pending briefing); (2) the use of personal email addresses, including Gmail, by senior government officials including, among others, the Secretary of the Treasury, Carlos Guberman (a custodian for alter-ego purposes); and (3) the pervasive use and publication of unofficial email addresses, including Gmail, by governmental officials and agencies as the method to contact these agencies including, for example, the Defense Ministry and Ministry of Health.[3]

With respect to the first category, a range of sources confirm that WhatsApp is widely used at the highest levels of government to conduct the Republic's official business. *See* Ex. A. As a starting point, it is well known that President Milei, for example, receives official information overwhelmingly via WhatsApp messaging. *See* Ex. A at ¶ 5 & Ex. D (journalist noting that, in monitoring a session of the Lower House, "[t]he only information the President receives is via WhatsApp through Martín Menem," the Speaker of the Lower House). Indeed, it has been reported President Milei has multiple WhatsApp groups in which he conducts official business, including one with Chief of Staff Nicolás Posse; advisors Santiago Caputo and Federico Sturzenegger; and Economy Minister Luis Caputo. *See* Ex. A at ¶ 3 & Ex. E. Another example is a WhatsApp chat reportedly named "Cabinet" ("Gabinete" in Spanish), which includes the

---

[2]  The Chart at Exhibit B and copies of all emails identified therein have been filed under seal as Exhibits B, K, O & P.

President; the Secretary General of the Presidency, Karina Milei; advisor Santiago Caputo (again); the President's Spokesperson, Manuel Adorni; Secretary of Legal and Technical Affairs Javier Herrera Bravo; and Vice President Victoria Villarruel. *See* Ex. A at ¶ 9 & Ex. F. Other examples of high-level officials conducting government business over WhatsApp, including business of the Senate, include Santiago Caputo (again) and various other members of the Milei administration. *See, e.g.,* Ex. A at ¶ 21 & Ex. G (reporting that "Caputo sent [Vice President Victoria Villaruel] a WhatsApp voice message. . . from Casa Rosada [the presidential palace; seat of the Argentine government] asking her not to open the session [of the Senate].²), ¶ 7 & Ex. H (reporting that the administration, in reaction to a proposed omnibus bill encompassing, among other things, certain privatization targets "began distributing the bill containing the new version of the Framework Law via WhatsApp").

Notably, the failure of the Republic to search these personal applications may explain the absence of evidence on key categories encompassed within Plaintiffs' discovery requests. For example, the Republic claims to have no responsive information on the Gold Reserves. Yet Economy Minister Luis Caputo—one of Plaintiffs' requested custodians—made public statements about the location and purpose of the gold reserves. *See e.g.*, Ex. A at ¶ 22 & Ex. I. The fact that the Republic appears not to have requested or reviewed (or sought to preserve) any of Minister Caputo's off-channel communications on this topic is deeply problematic, especially given the direct evidence of his use of these applications. *See, e.g.*, Ex. A at ¶ 11 & Ex. J.

Consistent with the tone at the top, even the Republic's sparse email production demonstrates routine use of personal emails by government officials for state business, including by, among others, Carlos Guberman, Secretary of the Treasury. *See, e.g.*, Ex. B at ¶ 1 & Ex. K

(January 6, 2024, email from the IMF to various Argentine government and BCRA officials, six of whom use Gmail accounts); *id*. (April 29, 2024, email from the IMF Senior Resident Representative to Argentina, to, inter alia, the Gmail address of the Advisor to Luis Caputo). Moreover, and rather unsurprisingly, the use of private email addresses is pervasive across many Argentine governmental entities. *See, e.g*., Ex. C at ¶ 1 & Ex. L (point of contact for the Argentine Military Attaché in the US); Ex. C at ¶ 9 & Ex. M (points of contact for applications for government medical coverage); Ex. C at ¶ 11 & Ex. N (points of contact for those wishing to obtain remote access to certain paperwork filed with the Ministry of Economy).

In view of this extensive evidence, Plaintiffs respectfully submit that (1) the Republic should be required to search for, produce and preserve communications occurring on personal messaging and email applications that are used for government business whether on governmental or personal devices in response to Plaintiffs' Requests; (2) such searches should include custodians that will be identified by the Plaintiffs in consultation with the Republic as part of the discovery process contemplated above at Sections I-VIII, as well as any alter ego custodians ordered by the Court; and (3) the Republic should further be required to identify an individual with knowledge of its off-channel communication practices and retention policies.   Further, the Republic should have the opportunity to filter the material prior to production to remove any personal and non-responsive material. Given that these applications are designed to be private through encryption, Plaintiffs have no ability to access them and have met any reasonable burden on this issue—if one even applies.

Plaintiffs also note that the Republic's complaints about the purported expansion of discovery in the context of off-channel communication custodians fail to acknowledge that as result of their reliance on an overruled objection much of the required discovery in this case has

yet even to occur.  Moreover, the fact certain custodians were selected for the alter-ego portion of the discovery has no relationship to the need to make such selections with the remainder of the discovery, including but not limited to, searches relevant to the off-channel communication issue.

Should the Court not be inclined to grant this application and require the requested productions, Plaintiffs request that the Court hold an evidentiary hearing with pre-hearing discovery on this issue.

**B.    The Republic's Position**

Notwithstanding the Court's direction at the July 15, 2025 conference (July 15, 2025 Conf. Tr. 39:25-40:3), Plaintiffs have not sought to use the meet-and-confer process over the past nine days to narrow the parties' dispute over whether the Republic must produce custodial documents from personal email and WhatsApp accounts in connection with so-called "alter-ego" discovery concerning YPF and BCRA.  Instead, Plaintiffs' new counsel have taken this as an opportunity to seek a complete do-over of enforcement discovery that has been undertaken by agreement between the parties and under supervision of the Court over the last nearly two years, even though Plaintiffs' deadline to propose custodians expired almost a year ago, on August 23, 2024.  (*Petersen* ECF No. 634.)  Plaintiffs now demand wildly overbroad discovery into all communications on personal devices and accounts generally concerning "government business" for all previously identified alter-ego custodians as to BCRA and YPF *plus* unspecified additional custodians with respect to an undetermined number of other requests.

This request should be denied.  Plaintiffs should not be allowed to (1) reopen the issue of custodial discovery to add unidentified additional custodians on unlimited topics nearly a year after the deadline to do so passed; or (2) obtain irrelevant discovery from personal email and WhatsApp accounts in violation of Argentine law.  These demands plainly are not "calculated to assist in collecting on a judgment," *EM Ltd.*, 695 F.3d at 207, but instead are "a means of

harassment of the debtor or third parties," *Gesualdi*, 2019 WL 3821221, at *1.   Plaintiffs also should not be allowed to (3) inject unripe and baseless purported concerns about preservation into this long-running dispute.

      1.   Plaintiffs have long waived any ability to demand custodial searches for discovery beyond alter-ego requests.   At the request of Plaintiffs, the Court, *last August*, set a deadline of August 23, 2024 for the parties to "agree to a search term and custodian proposal." (*Petersen* ECF No. 634.)   Plaintiffs proposed *only* custodians related to their alter-ego requests concerning BCRA and YPF.   (*Petersen* ECF No. 642.)   After conferring, the parties agreed to some custodians, disagreed on others, briefed the issue through letter briefs (*Petersen* ECF Nos. 641, 642, 648), appeared for a conference before the Court on September 13, 2024 (*Petersen* ECF No. 654), after which Plaintiffs lodged further briefing on this fully submitted issue (*Petersen* ECF Nos. 657, 658, 670, 671), including by demanding that the Republic search personal emails and WhatsApps for custodians as to the alter ego searches for YPF and BCRA.   If Plaintiffs wished to add additional custodians, they were required to raise that issue in August of last year.

      Plaintiffs limited their demands for custodial searches to so-called "alter ego" discovery regarding YPF and BCRA, because custodial searches are generally not relevant or appropriate to identify a sovereign nation's assets.   On the issue of alter-ego discovery, Plaintiffs claimed that communications of certain custodians were needed to assess whether the government was exercising the requisite day-to-day control over YPF and BCRA.   The only custodians and search terms Plaintiffs ever proposed or the Court ever ordered were in relation to these issues, and it is far too late for a "do-over" now.   (*See Petersen* ECF Nos. 642, 670.)[4]

---

[4]    The Republic voluntarily undertook one additional custodial search.   When the Court ordered the Republic to produce "its own documents concerning the [gold] reserves" (*Petersen* ECF No. 703), the Republic searched for documents in the *Sistema de Gestión Documental*

2.   The Court should deny discovery into the personal email and WhatsApp accounts of the YPF and BCRA-related custodians for alter ego discovery (and of any other unidentified government officials), for two reasons:

A.     Plaintiffs have not come close to justifying the relevance or proportionality of personal email and WhatsApp communications to asset recovery.  It was *Plaintiffs* who originally proposed a search only of the email of custodians for alter-ego discovery related to BCRA and YPF.  (Petersen ECF No. 641-2, Ex. A (Plaintiffs' proposal limited to "@bcra" and "@ypf" searches).)  None of Plaintiffs' voluminous exhibits (first shared with the Republic two nights ago) comes close to meeting their burden to "provide some justification for its suspicion that *relevant* messages may be contained *on the [agreed-upon or court-ordered custodians'] personal devices.*"  *Muslims on Long Island, Inc.* v. *Town of Oyster Bay*, 2025 WL 1582250, at *3 (E.D.N.Y. June 4, 2025) (Wicks, M.J.) (emphases added) (alterations and internal quotation marks omitted).  For instance, while Plaintiffs have cited to a collection of unsourced gossip in news articles on President Javier Milei's use of WhatsApp, *see* Pls.' Ex. A, President Milei's use or non-use of WhatsApp has absolutely no bearing on whether the WhatsApp accounts of the agreed-upon or court-ordered custodians—which do not include President Milei—are likely to contain

---

*Electrónica*—which houses the Republic's official reports and communications.  The Republic also searched emails of four custodians it identified as mostly likely to have had responsive information (Joaquín Alberto Guillermo Cottani, the former Secretary of Economic Policy, for the period he was in office; José Luis Daza Narbona, the current Secretary of Economic Policy, from September 2024 to December 2024; the inbox for the institutional account for the Secretariat of Economic Policy, from January 2024 until the account was deactivated in November 2024; and the inbox for the institutional account for the Secretariat of Finance from January 2024 until the account was deactivated in November 2024).  As stated to Plaintiffs on February 28, 2025, the Republic found no responsive documents, which is wholly consistent with the Republic's repeated explanations to Plaintiffs that the reserves are BCRA's and the Republic thus has no "[d]ocuments sufficient to identify, locate, and ascertain the purposes of any gold or other precious metals reserves of Argentina held in the United States or any Foreign Country."  (*See* First RFPs.)

messages relevant to the alleged alter-ego status of YPF or BCRA (or to collection of a judgment). The fact that certain government entities (such as the National Disability Agency) make use of Gmail for limited purposes (such as the Army for recruitment), *see* Pls.' Ex. C, and nine government officials have used Gmail accounts on three occasions, Pls.' Ex. B, is equally irrelevant to this question.[5]  In *all* of their searching (and fishing), Plaintiffs have identified examples of just three custodians using WhatsApp and one custodian using Gmail on *one* occasion each.  And none of these examples remotely suggest that these custodians use their personal devices or accounts to discuss information that could "possibly lead to executable assets."  *NML*, 573 U.S. at 144.  Plaintiffs have therefore entirely failed to show that even the WhatsApp or Gmail accounts of these four custodians are likely to contain *relevant* messages.

        B.     As the Republic has explained in its prior submissions, discovery into personal email and WhatsApp communications that Plaintiffs seek is illegal under Argentine law. (*See Petersen* ECF No. 658 at 6-7.)  Communications from personal devices or accounts of government officials are not in the Republic's possession, custody, or control, and it would be a crime to take them without consent; and even if personal communications were available to the Republic, they would not be disclosable under the Personal Information Regime.  (*See* Expert

---

[5]     In any event, the documents cited in Plaintiffs' Exhibit B do not show that the government officials Plaintiffs' identify use personal email to the exclusion of government email.  For example, in AR00147219 and YPFSUBPOENA00007696, Ricardo Rial's and Eduardo Jorge Oreste's *government* email addresses are included alongside their Gmail addresses on each email.  And in AR00184356, two of the purported government officials on the email are *not* government officials (Vladimir Werning and Federico Furiase) and two others were *former* advisors at the time of the email exchange (Leonardo Madcur and Federico Furiase).  These three dubious examples are presumably the best Plaintiffs could find.  Likewise, as shown above, the material cited in Plaintiffs' Exhibits A and C demonstrates nothing.  Tellingly, nearly all of the  material cited was available to Plaintiffs at the time they made their initial submission on custodians and ESI in September and October 2024 or their prior supplemental submission of "updated evidence" in February 2025.

Report of Miriam Mabel Ivanega dated Sept. 18, 2024 ("Ivanega Rpt.") (*Petersen* ECF No. 660), at ¶ 32.)

Personal devices and accounts are the exclusive property of their owners, and the Argentine Constitution, Criminal Code, and Personal Data Protection Law No. 25,326 all protect individuals' privacy rights with respect to their personal devices and accounts.  *See* Argentine Constitution, Arts. 18 & 19; Argentine Criminal Code, Arts. 153 and 153bis; Argentina's Personal Data Protection Law No. 25,356.  (*See also* Ivanega Rpt. ¶¶ 20-29.)  Collecting, searching, or opening personal communications therefore directly violates Argentine law, and if the Republic were to collect or search the data Plaintiffs are seeking without authorization, the Republic would risk civil fees, and the public officials who were to collect or search that information would risk criminal sanctions.  (*See* Ivanega Rpt. ¶¶ 30-32.)

Moreover, this discovery could not be obtained via the equivalent of a Freedom of Information Act request because the Argentine Public Information Regime specifically precludes public access to "[i]nformation containing personal data."  Right of Access to Public Information Decree No. 206/2017, Law No. 27,275, Art. 8.  (*See* Ivanega Rpt. ¶¶ 17-19.)

The Court cannot order the Republic to violate its own law.  It is a "fundamental principle[]" of international comity that "our courts dedicated to the enforcement of our laws should not take such action as may cause a violation of the laws of a friendly neighbor."  *Ings* v. *Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960); *Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) ("[A] state may not require a person to do an act in another state that is prohibited by the law of that state.").

3. Plaintiffs' effort to muddy the issue of personal email and WhatsApp discovery by demanding a preservation order and a witness on "retention policies" should be denied.  This

issue is (A) not ripe for Court intervention and (2) meritless, because Plaintiffs' suggestion that the Republic has failed to preserve relevant data is baseless.

       A.     Plaintiffs have invented a purported preservation issue out of whole cloth. They made no mention of the Republic's preservation efforts in their two Post-Judgment Requests for Production (*See Petersen* ECF No. 515-3; Republic's Ex. 2 (Plaintiffs' Second Post-Judgment Requests for Productions of Documents from Defendant the Argentine Republic)), or their Post-Judgment Information Subpoena (*Petersen* ECF No. 740-1), or in any letters or communications, including ones exchanged leading up to the July 15, 2025 Conference (*Petersen* ECF Nos. 737-2, 737-3, 736, 740, 741.)  They then sprung the issue on the Republic in Court during the conference without prior notice.  (July 15, 2025 Conf. Tr. 41:24-42:2.)  A letter the next day was Plaintiffs' first written word on the subject, in which Plaintiffs demanded "information on all steps Argentina has taken, *since the start of this case in 2015*, to preserve electronic information concerning government business occurring on non-government devices or platforms."  (Republic's Ex. 3 (July 16, 2025 Pls.' Ltr.), at 3-4 (emphasis added).)  In making this extreme request, Plaintiffs have offered *no* evidence that the Republic has failed to comply with its preservation obligations, and ignored that judgment has been entered (and is on appeal) with respect to the merits.  Similarly, in their submission, they offer only speculation that the Republic has not sufficiently preserved data since judgment.  Put simply, there is no preservation dispute to resolve.

       B.     Plaintiffs' purported concerns about preservation are meritless, and there is no basis for a court order regarding preservation.  Contrary to Plaintiffs' speculation, as the Republic informed plaintiffs, the Republic has confirmed that it has taken reasonable preservation steps, including providing notices to and making collections from relevant ministries and centralized sources, and preserving backup tapes.  In addition, when Plaintiffs in August 2024

identified custodians and potential searches extending beyond the material the Republic has automatically preserved, counsel for the Republic prepared a detailed preservation notice distributed to all relevant ministries and custodians.

No witness on retention policies is warranted or permissible. As a matter of black letter law, the Republic's preservation notice and counsel's other communications regarding the Republic's document collection efforts over the past two years, are protected by the attorney-client privilege and attorney work product doctrine and not subject to discovery. *See Gardner-Alfred*, 2022 WL 17961594, at *5 (plaintiff's request for "[d]ocuments and communications sufficient to ascertain all documents that were searched and reviewed, or proposed to be searched or reviewed" "calls for work product" and "seeks discovery on discovery"); *Roytlender* v. *D. Malek Realty, LLC*, 2022 WL 5245584, at *4 (E.D.N.Y. Oct. 6, 2022) (Wicks, M.J.) ("Instructions to preserve documents by way of formal litigation hold notices exchanged between attorneys and their clients are privileged communications and generally immune from discovery." (collecting cases)); *Haroun*, 2020 WL 6828490, at *1 ("[C]ounsel is not required 'to disclose the manner in which documents are collected, reviewed and produced in response to a discovery request.'"); *Kaye*, 2020 WL 283702, at *2 ("When documents are produced in discovery, whether they be produced electronically or otherwise, the Court does not believe that, in the first instance, the receiving party has a right to examine and evaluate the way the production was made or require collaboration in the review protocol and validation process.").

\*     \*     \*

The parties thank the Court for its consideration and are available to answer any questions or provide more details at the July 29, 2025 conference or at the Court's convenience.

Respectfully submitted,


/s/ Seth L. Levine

Seth L. Levine
Miriam L. Alinikoff
LEVINE LEE LLP
400 Madison Avenue
New York, New York 10017
Telephone: (212) 257-4400
slevine@levinelee.com
malinikoff@levinelee.com


KING & SPALDING LLP
Laura Harris
1185 Avenue of the Americas
New York, NY 10036
Phone: (212) 556-2100
Fax: (212) 556-2222
Email: lharris@kslaw.com

-and-

Reginald R. Smith
1100 Louisiana Street, Suite 4100
Houston, TX 77002
Phone: (713) 751-3200
Fax: (713) 751-3290
Email: rsmith@kslaw.com

KELLOGG, HANSEN, TODD, FIGEL
& FREDERICK, P.L.L.C.
Andrew E. Goldsmith
Alejandra Ávila
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
agoldsmith@kellogghansen.com
aavila@kellogghansen.com


*Counsel for Plaintiffs Petersen Energía*
*Inversora, S.A.U., Petersen Energía, S.A.U.,*
*Eton Park Capital Management, L.P., Eton*
*Park Master Fund, Ltd.,and Eton Park Fund,*
*L.P.*


/s/ Robert J. Giuffra Jr.

Robert J. Giuffra Jr.
Sergio J. Galvis
Amanda F. Davidoff
Thomas C. White
Adam R. Brebner

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588
giuffrar@sullcrom.com
galviss@sullcrom.com
davidoffa@sullcrom.com
whitet@sullcrom.com
brebnera@sullcrom.com

*Counsel for the Argentine Republic*