# EXHIBIT 1

07-Nov-2024

# Burford Capital Ltd. (BUR.GB)

Q3 2024 Earnings Call



1-877-FACTSET    www.callstreet.com

Total Pages: 17
Copyright © 2001-2024 FactSet CallStreet, LLC

**Burford Capital Ltd.** *(BUR.GB)*
Q3 2024 Earnings Call

Corrected Transcript
07-Nov-2024

## CORPORATE PARTICIPANTS

**Christopher P. Bogart**
Chief Executive Officer, Co-Founder & Director, Burford Capital Ltd.

**Jordan Licht**
Chief Financial Officer, Burford Capital Ltd.

**Jonathan Todd Molot**
Chief Investment Officer, Co-Founder & Chair-Commitments Committee, Burford Capital Ltd.

## OTHER PARTICIPANTS

**Mark DeVries**
Analyst, Deutsche Bank Securities, Inc.

**Alexander Bowers**
Analyst, Joh. Berenberg, Gossler & Co. KG (United Kingdom)

**Julian Roberts**
Analyst, Jefferies International Ltd.

## MANAGEMENT DISCUSSION SECTION

**Operator**: Thank you for standing by and welcome to the Burford Capital Third Quarter 2024 Financial Results Conference Call. All lines have been placed on mute to prevent any background noise. After the speakers' remarks, there will be a question-and-answer session. [Operator Instructions] Thank you.

I'd now like to turn the call over to Christopher Bogart, Chief Executive Officer. You may begin.

### Christopher P. Bogart
Chief Executive Officer, Co-Founder & Director, Burford Capital Ltd.

Thanks very much and hello, everybody. Thank you for joining us today. As usual, with me on the call is Jon Molot, Burford's Chief Investment Officer; and Jordan Licht, Burford's Chief Financial Officer. And the three of us will take you through the slides that have been put up on the website.

I'm going to start on slide 4, and it's obviously very nice when a strong quarter like this comes along and we can show you how the business is performing. Our business doesn't really fit neatly in the quarters and the third quarter is often slow, given the summer. So it's particularly nice to have this kind of result, even though we like to look at the business over a longer term than just on a quarter-by-quarter basis. But this slide is purely about the quarter.

And so what you can see here are some real indications of activity. Realizations more than doubled compared to the comparative quarter. Net realized gains almost doubled. We brought in a ton of cash during the quarter, decent income, and our deployments and commitment activity was certainly consistent with this kind of period. In fact, new commitments went up more than 5 times over the comparative period. But because courts and lawyers are often slow in the summer, the third quarter is never what we look to for new business as some sort of bellwether of anything.



**Burford Capital Ltd.** *(BUR.GB)*
Q3 2024 Earnings Call

 **Corrected Transcript**
07-Nov-2024

I'm going to turn to slide 5, which lets us talk a little bit more about the year-to-date. And I will say, just as we start going through these slides, we're going to try to do this at a reasonable pace for you, because it was our intention on this call to give you a little bit more fulsome of an update when we come to talk about the YPF Peterson cases. So we prepared some material for that, including a new slide, and we're going to spend some time talking through that. So we're going to – while not giving short shrift to the quarter, I'm going to dwell on some of these points a little bit less than I might ordinarily.

So on slide 5, which is really more of a year to date, the fundamental message here is that we're having a very strong year. We're seeing real portfolio activity, and Jon's going to talk in some more detail about that. That's driving cases forward. It's creating realizations. You'll see sort of record cases here, not only are the realizations on a record pace, but net realized gains, just through three quarters, are already basically hitting a record annual level.

In addition to the cash that we brought in during the third quarter, we've now brought in, during the course of the year, well over $0.5 billion. And so we're sitting on some meaningful liquidity that Jordan will talk about in a moment. And we continue to be able to write a nice amount of new business in the market, notwithstanding the fact that the team is certainly also occupied by the fairly significant level of portfolio activity that we've got going on.

So with those sort of opening remarks, let me turn you over to Jordan.

## Jordan Licht
*Chief Financial Officer, Burford Capital Ltd.*

Thank you, Chris. Good morning and good afternoon to everyone on the call today. I'm on page 6. This is just a quick summary of the financials for Burford only. As we talked about earlier this year, it's obviously difficult to make comparisons to the prior year periods. 2023, of course, included the positive news regarding summary judgment on the YPF cases that drove a good portion of the 2023 year's overall results. But let's start first looking at the quarter and some of the totals.

Overall, we had $136 million of net income for the second quarter, resulting in $0.61 per share. Net income was just over 60% of total revenues. On the asset side, we are slightly over $3.6 billion of capital provision assets. Of that, our non-YPF assets represent approximately $2.2 billion, in which there's approximately a 35% fair value uplift to deployed cost. Tangible book value is over – excuse me, book value per share is over $11 now and tangible book value is just shy of $10.5.

I'm going to go into more details about revenue, expense and some of the other key metrics now. So why don't we switch to page 7?

On page 7, breaking down the various components to capital provision income, a couple of headlines to focus. If you exclude YPF, our net realized and unrealized gains were up 200% quarter-over-quarter and 17% when looking at the year-to-date figures.

I also want to highlight the net realized gains in the third quarter, in particular, were close to double the same quarter or same period last year. And as Chris had mentioned, and more importantly, the nine-month figure of $186 million is already in line with previous annual records.



**Burford Capital Ltd.** *(BUR.GB)*
Q3 2024 Earnings Call

 Corrected Transcript
07-Nov-2024

And I don't know that people have focused on it before, but, one, to have a loss rate that's below 10% lifetime; and two, just when you look at the breakdown of those losses, those dark shaded bars, those are losses of less than $1 million. Well, what does that mean? It means either it's kind of like an ante, where you put money in and there was a gating issue you knew about at the beginning, and a motion dismissed, and you lost early for not much, or they went along and there was a fair bit of money in it. Something didn't turn out the way it was anticipated. And so, rather than going to trial and taking that risk, the parties decided to settle and we didn't get our full investment back, but we didn't lose our full investment either.

So when I just look at this profile, the spread of the big wins, the really solid singles and doubles, and limited losses, it just has borne out. So, seeing the big realizations that Jordan talked about and seeing the profile of what those consist of, it's a really attractive asset class, and we've got the best team in the business doing it.

And with that, I will hand it over for slide 12 to – I'm going to, for a change, have Chris do a little YPF explanation.

**Christopher P. Bogart**
*Chief Executive Officer, Co-Founder & Director, Burford Capital Ltd.*

Yeah. Thanks. Thanks, Jon. Yeah, it's been a little while since we talked at any length about YPF. And so we thought that it was about time to give a little bit of an update about what we could say.

Look, we understand that there's a lot of shareholder interest in the YPF case. That's obvious, given its size and its significance for the business. And we know that investors find it frustrating not to be able to get chapter and verse from us about our strategies and their progress. Unfortunately, that is simply the reality of conflicts litigation. And none of you, no rational investor, would want us to disclose publicly any information that would give Argentina an edge in that ongoing litigation.

But what we can do is provide here a bunch of information that is publicly available if you dig for it. So nothing I'm about to say is new or not already public, but we're just making it a bit easier than having you had to pore through court documents and media reports on your own. And we're also going to bring together some of what we've said in the past about what we're doing here and how it really relates to the end game.

There are essentially three buckets of activity going on right now in the case. The first bucket of activity is the appeal. Argentina has an appeal as of right from the trial court's judgment against it. That appeal is taken to the Second Circuit Court of Appeals, which is the federal appellate court that covers New York and some other states. And in addition to Argentina appealing its loss, the plaintiffs have also appealed the dismissal of YPF from the case. Those appeals are now fully briefed. In other words, all of the papers for the case have been submitted.

The next step is oral argument before a three-judge panel, and we are waiting for the court to give us an argument date, which we would expect to be later this year or early next year. After oral argument, the court will go away and write its decision. There's no time limit for the release of that decision, but we would expect it later this – we would expect it some months after oral argument.

It's worth remembering that this is not a matter of first impression for the Second Circuit. This case has been before the Appeals Court once already when it recognized that Argentina failed to comply with its obligation to make a tender offer for the remainder of YPF's outstanding shares. In fact, the Second Circuit actually characterized the minority shareholder protection for a compensated exit as undisputed.

So, although the three-judge panel that will hear this appeal will be different than the prior panel, the new panel is bound by the decisions of the old panel. After the decision is released from the Second Circuit, either party may



**Burford Capital Ltd.** *(BUR.GB)*
Q3 2024 Earnings Call



**Corrected Transcript**
07-Nov-2024

seek leave from the US Supreme Court to take a further appeal. There is no right to such an appeal and leave is granted less than 5% of the time on average and probably even lower numbers than that in commercial cases like this.

Appeal really – the Supreme Court really only takes cases when there is a novel legal issue or a disagreement about the law among the various circuit courts of appeal across the United States that doesn't exist here. You'll remember the Supreme Court declined to take this case previously when Argentina sought leave to appeal the Second Circuit's decision that the US courts had jurisdiction to hear this case. So, again, it's not a matter of first impression for the Supreme Court.

The process of deciding whether to grant leave usually takes several months. If the court did elect to hear the matter, perhaps because of its size, that would add somewhere between 12 and 18 months to the process, depending on the time of year the case is heard. But that's what's going on with the bucket number one, the appeal bucket.

The second bucket of activity is around enforcement and recognition proceedings. Because Argentina didn't satisfy the conditions for a stay of the judgment, the trial court judgment is enforceable even though it is on appeal. That allows us to do several things. We are pursuing post-judgment discovery from Argentina, YPF and the third-parties in the New York Court, and we have been doing that actively, including engaging in motions to compel information where necessary.

We're also seeking substantive enforcement assistance from the New York Court. For example, we have filed a motion seeking to have Argentina's shares in YPF turned over to us. We're also engaged in global efforts. In order to enforce the judgment in other jurisdictions, we need first to have the local courts in those jurisdictions recognize the judgment. In other words, adopt it as though it was their own judgment. We have filed for recognition of the judgment in multiple non-US jurisdictions and those proceedings are winding their way through the procedural preliminaries in those local courts.

Now, stepping back from the lawyering, it's important to bear in mind what enforcement is and isn't, and its purpose. The goal of enforcement campaigns is to apply pressure and create friction so that a rational negotiation can occur. It is not in and of itself the goal to wander around the countryside, trying to pick up an asset here and an asset there and sell them at auction to pay off an enormous judgment.

The law around enforcing judgments against sovereigns is complex and often unclear, and we will try many gambits that won't work as a strict legal matter. That should not concern anyone.

However, what is really going on here is that Argentina is rebuilding its economy and resuming its place on the world stage. And to do that, it needs to rejoin the capital markets and participate in the global economy. Having a large unsatisfied US court judgment and ongoing enforcement proceedings around the world that also sweep in third parties is sand in the gears for that normalization process. And it should, in our view, ultimately lead to a commercial resolution. Put simply, we are a nagging problem that Argentina needs to solve.

I want to take a minute to address specifically a couple of filings by the US Department of Justice and the trial court recently, and including one last night, because this is a somewhat technical legal matter that has not been well reported by the media and has clearly been misunderstood by the market.

First, to be clear, the DOJ filings relate only to the turnover motion I mentioned a moment ago and not to the case more broadly. Indeed, the US government has previously supported the pursuit of this breach in contract matter



against Argentina, and it also has not made any filings at all on the appeal, and the time to do that has lapsed now.

So what is actually going on here? We made a motion some months ago asking the US court to order Argentina to bring its YPF shares into the US so that we could then seize them. So just to think about that and put that in maybe layman's terms, this is a bit like you not paying your car loan, but the car now being located in a different country. And instead of us sending the repo man to that other country to get the car back, we are asking a court to require you to drive the car back to New York so that the repo man can grab it there.

So there's no question that is a request that is out of the ordinary. We believe that it is supported by existing law, but we also knew that there was a good chance of governments seeing this differently. And in fact, more than a month ago, Bloomberg ran a piece on this quoting me saying that the US government might well say that we had gone too far in making this motion.

The US government is concerned about the precedent this would set when applied to foreign governments, both because it might interfere with diplomatic relations and also, maybe even more importantly, if it were applied globally, it could mean that other courts, foreign courts, might try to make orders about US government property. So the Department of Justice has asked the court not to grant this particular order, citing legal doctrines that are in some dispute. And again, this is narrowly just about this one turnover order. It has nothing to do with anything more broadly in the case.

Ultimately, the decision is up to the court, which is free to disregard the DOJ position, but this is a complex legal issue either way and we will just have to see what happens over the coming months. In any event, this is just one motion in a broad multi-jurisdictional enforcement strategy. And as I said earlier, the purpose of our strategy is more about bringing Argentina to the table than it is about actually seizing and selling off assets. So that's the state of play on enforcement and recognition.

The third bucket of activity relates to diplomatic and political efforts. This is the bucket that we can say the least about as virtually nothing involved in it is public. It has, however, been publicly reported that Jon met in Buenos Aires with the Office of the Treasury Attorney General, which is in charge of the case for Argentina in December. It has also been publicly reported that Gerry Mato, HSBC's former Head of Banking for the Americas is working on our behalf.

Again, we're just trying to distill public information for you. Beyond that, we can't say anything specific, but this is an important part of our approach as we believe, ultimately, this judgment will be resolved through negotiation and not formal legal process. And we have a number of very experienced advisers on our team in that regard.

So let's turn to slide 13, which you have not seen before. Slide 13 is a reminder of the current economics and the accounting for the YPF matter. The judgment continues to accrue post-judgment interest at a rate of 5.42% compounding annually. That amounts to more than $2 million a day being added to the judgment every day it's outstanding. So the judgment today stands at around $17 billion, up from the original $16.1 billion, although we've made it clear that we don't expect full payment and instead seek a negotiated outcome that will inevitably include a discount.

From whatever is ultimately paid, Burford is entitled to a minority of those ultimate proceeds, with the majority going to the Petersen estate, Eton Park, the secondary buyers and lawyers operating on risk. Burford's entitlement is around 35% of proceeds from the Petersen case and around 73% of proceeds from the Eaton Park case, or in the aggregate, around 40% of the total.



**Burford Capital Ltd.** *(BUR.GB)*
Q3 2024 Earnings Call



**Corrected Transcript**
07-Nov-2024

Burford obviously fair values its assets, including this one for accounting purposes, and the carrying value of this asset today is around $1.5 billion. That is an effort to estimate what a third-party would pay to assume Burford's position today and bear all of the risks and reap the rewards associated with that position. That number does not include any entitlements other than Burford's and it reflects a substantial discount for continuing appellate risk, collection risk and duration. Importantly, it should not be taken as any sort of indication of what the parties would be prepared to accept in a settlement.

As to Argentina's ability and willingness to pay once the appellate process is concluded, we note that since President Milei's term began in December, Argentina's economy is experiencing real growth. Inflation is significantly down and the government has a budget surplus for the first time this decade. Argentina's country risk index, the EMBI+ Index, which measures the spread over US Treasury that the country has to pay to finance itself in US dollars, as calculated by JPMorgan Chase, dropped under 1,000 points for Argentina for the first time since August 2019. If that trajectory continues, Argentina could certainly theoretically return to the international debt markets.

So while this is, of course, a large judgment, the process we follow to turn a judgment into cash is not really size dependent. And this process is unfolding largely as we would have expected or predicted when we obtained the judgment a little bit more than a year ago in September of last year. The only thing that's really different at all is that, because Argentina is a sovereign country, courts are generally prepared to give Argentina more time to move through the process if it asks for it, which Argentina repeatedly uses as a delaying tactic. Nevertheless, we are perfectly happy with and unsurprised by the current posture of things.

I think we can close this YPF discussion by just adverting to a couple of recent statements from Argentine officials. First, President Milei himself has admitted on Twitter that Argentina committed an illegal expropriation of YPF, those are his words. And recently, referencing our case, among others, posted, and this is a quote, it's hard, but we are going to get out of the hole that politicians have sunk us into and we are going to make Argentina great again.

Also, just a couple of weeks ago, representative, José Luis Espert, an economist and former presidential candidate, who is reported to be a close ally of President Milei's stated, it makes me sick when lawsuits come from a useless person like Kicillof in the province of Buenos Aires, who nationalized YPF in 2012, knowingly violating contracts, knowing that this was going to result in a lawsuit that Argentina was going to lose for sure. Because when you violate a contract in any civilized country, you lose the lawsuit because you violated a contract that you signed. Is that clear? It's two plus two. You sign a contract, you don't comply with it, you lose the lawsuit.

And finally, the Chief of Cabinet echoed similar words in reference to another lawsuit, again, just a couple of weeks ago, when he said, it is our greatest commitment to work every day to become a serious country for the world again. And becoming a serious country for the world again implies ultimately getting to a resolution of your outstanding issues.

So that's where we stand on YPF. We hope that was helpful. We understand and sympathize with the frustration that we hear from investors about their inability to get us to explain more regularly and in more detail the inner workings of what's going on. But I'm afraid that we really will just have to live in a world where we can try occasionally to give updates like this to put things in context for you, but it's very difficult for us to expose the inner workings of our strategies, and particularly, the ongoing discussions and efforts on the political and diplomatic fronts.

