**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PETERSEN ENERGÍA INVERSORA, S.A.U. and
PETERSEN ENERGÍA, S.A.U.,

                              Plaintiffs,

            -against-

ARGENTINE REPUBLIC and YPF S.A.,

                             Defendants.

---

ETON PARK CAPITAL MANAGEMENT, L.P.,
ETON PARK MASTER FUND, LTD., and
ETON PARK FUND, L.P.,

                              Plaintiffs,

            -against-

ARGENTINE REPUBLIC and YPF S.A.,

                             Defendants.

Case Nos.:

1:15-cv-02739-LAP
1:16-cv-08569-LAP

 

**<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
SANCTIONS AND A CONTEMPT FINDING AGAINST THE REPUBLIC OF
ARGENTINA</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 4

   A.   The Republic's History of Delay and Evasion in Post-Judgment Discovery ................... 4

   B.   The Republic Continues Its Pattern of Evasion Through Its Obstruction of Alter-Ego Discovery ....................................................................................................................... 7

   C.   The Court Recognizes the Relevance of Off-Channel Communications, Rejects the Republic's Stonewalling, and Warns of Sanctions .......................................................... 9

   D.   The Court Orders Discovery of Off-Channel Communications ................................... 10

   E.   The Republic's Continued Obstruction and Shifting Positions ....................................11

   F.   The Republic Admits It Can Access Off-Channel Communications, While Continuing to Refuse to Produce ........................................................................................................ 14

   G.   The Republic's Token Compliance and Continued Defiance ....................................... 15

ARGUMENT ..................................................................................................................... 17

I.     THE REQUESTED SANCTIONS ARE WARRANTED ................................................. 19

   A.   The Republic Has Willfully Violated the Off-Channel Order ..................................... 19

   B.   The Republic's Sustained Pattern of Bad-Faith Conduct Supports Sanctions ................. 23

   C.   The Duration of the Republic's Non-Compliance Support Sanctions ............................ 24

   D.   The Republic Was Repeatedly Warned of the Consequences of Noncompliance ........... 25

   E.   Lesser Sanctions Are Insufficient to Address the Republic's Noncompliance ................ 25

II.   THE COURT CAN AND SHOULD IMPOSE THE REQUESTED SANCTIONS ........... 25

   A.   The Court Should Issue a Preclusion Order Prohibiting the Republic from Contesting the State-Owned Entities' Alter-Ego Status ..................................................................... 26

   B.   The Court Should Draw Adverse Inferences Supporting Certain Alter-Ego-Related Findings .......................................................................................................................... 28

   C.   The Court Should Hold the Republic in Contempt ...................................................... 31

   D.   If the Republic Chooses to Contest Its Access to Off-Channel Communications or Other Factual Matters, the Court Should Hold an Evidentiary Hearing ..................................... 34

III.  THE COURT SHOULD ORDER THE REPUBLIC TO COMPENSATE PLANTIFFS .... 35

CONCLUSION .................................................................................................................. 36

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Aurelius Cap. Partners, LP v. Republic of Argentina*,
  379 F. App'x 74 (2d Cir. 2010) ............................................................. 4, 23

*Bank of Republic of China v. Grenada*,
  2010 WL 5463876 (S.D.N.Y. Dec. 29, 2010) .......................................... 32

*BOC Aviation Ltd. v. AirBridgeCargo Airlines, LLC*,
  2022 WL 17581775 (S.D.N.Y. Dec. 12, 2022) ........................................ 34

*Chabad v. Russian Fed'n*,
  915 F. Supp. 2d 148 (D.D.C. 2013) ......................................................... 32

*Chevron Corp. v. Donziger*,
  296 F.R.D. 168 (S.D.N.Y. 2013) ................................................. 28, 29, 30

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*,
  602 F.2d 1062 (2d Cir. 1979) ................................................................... 23

*Comverse, Inc. v. Am. Telecomms., Inc. Chile S.A.*,
  2009 WL 464446 (S.D.N.Y. Feb. 24, 2009) ............................................ 31

*Daval Steel Prods. v. M/V Fakredine*,
  951 F.2d 1357 (2d Cir. 1991) ...................................................... 2, 17, 27

*Doe v. Delta Airlines, Inc.*,
  2015 WL 798031 (S.D.N.Y. Feb. 25, 2015) ............................................ 20

*Dole Fresh Fruit Co. v. United Banana Co., Inc.*,
  821 F.2d 106 (2d Cir. 1987) ..................................................................... 33

*Funk v. Belneftekhim*,
  861 F.3d 354 (2d Cir. 2017) ........................................................ 2, 17, 24

*Funnekotter v. Agric. Dev. Bank of Zimbabwe*,
  2015 WL 3526661 (S.D.N.Y. June 3, 2015) ........................................... 23

*Funnekotter v. Republic of Zimbabwe*,
    2011 WL 5517860 (S.D.N.Y. Nov. 10, 2011)..................................................... 27

*Hoffer v. Tellone*,
    128 F.4th 433 (2d Cir. 2025)......................................................................... 29

*Huber v. Marine Midland Bank*,
    51 F.3d 5 (2d Cir. 1995)................................................................ 3, 32, 33

*Icon Int'l, Inc. v. Elevation Health LLC*,
    347 F.R.D. 274 (S.D.N.Y. 2024).................................................................. 24

*In re Fosamax Prods. Liab. Litig.*,
    2013 WL 1176061 (S.D.N.Y. Mar. 21, 2013).............................................. 19

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) ..................................................................... 3, 17, 33

*Int'l Assoc. of Bridge, Structural, Ornamental & Reinforcing Iron Workers Union Loc. 361 v. McNulty*,
    2023 WL 5747345 (S.D.N.Y. Sept. 6, 2023) ............................................. 25

*Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*,
    2017 WL 3671036 (S.D.N.Y. July 18, 2017) ............................................. 27

*Klein v. Torrey Point Grp., LLC*,
    979 F. Supp. 2d 417 (S.D.N.Y. 2013) ........................................................ 35

*Lyondell-Citgo Refin., LP v. Petroleos de Venezuela, S.A.*,
    2005 WL 1026461 (S.D.N.Y. May 2, 2005)................................... 21, 22, 29

*Micula v. Gov't of Romania*,
    2020 WL 6822695 (D.D.C. Nov. 20, 2020) .............................................. 33

*Novak v. Wolpoff & Abramson LLP*,
    536 F.3d 175 (2d Cir. 2008)....................................................................... 35

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
    306 F.3d 99 (2d Cir. 2002)................................................................ 28, 29

*Robertson v. Dowbenko*,
  443 Fed. App'x 659 (2d Cir. 2011) ........................................................................ 20

*S. New Eng. Tel. Co. v. Glob. NAPS Inc.*,
  624 F.3d 123 (2d Cir. 2010) .................................................................................. 31

*S.E.C. v. Syndicated Food Serv. Int'l, Inc.*,
  2014 WL 1311442 (E.D.N.Y. Mar. 28, 2014) ....................................................... 26

*Sang Lan v. Time Warner, Inc.*,
  2015 WL 480378 (S.D.N.Y. Feb. 5, 2015) ............................................................ 35

*Servaas Inc. v. Republic of Iraq*,
  2014 WL 279507 (S.D.N.Y. Jan. 24, 2014) ........................................................... 30

*Sistem Muhendislik Insaat Sanayi Ve Ticaret, A.S. v. Kyrgyz Republic*,
  2018 WL 6251982 (S.D.N.Y. Mar. 30, 2018) ....................................................... 31

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*,
  118 F.3d 955 (2d Cir. 1997) .................................................................................. 26

*Thompson v. Jam. Hosp. Med. Ctr.*,
  2015 WL 7430806 (S.D.N.Y. Nov. 20, 2015) ................................................. 19, 21

*United Mine Workers v. Bagwell*,
  512 U.S. 821 (1994) ...................................................................................... 18, 31, 32

*Vanceah v. Dendy*,
  2023 WL 4199034 (2d Cir. June 26, 2023) ........................................................... 23

**Rules**

Fed. R. Civ. P. 37(b)(2) ..............................................................................Passim

Fed. R. Civ. P. 37(e)(2) ........................................................................... 28, 29

## PRELIMINARY STATEMENT

The Court should impose sanctions against the Republic of Argentina (the "Republic") and hold it in contempt for its willful refusal to comply with the Court's July 29, 2025 order, and related directives, governing off-channel discovery (the "Off-Channel Order"). This defiance is not an anomaly; it is the latest episode in a decades-long pattern in which the Republic has repeatedly obstructed post-judgment discovery, resisted enforcement of final judgments, and disregarded the authority of the Court.

After more than eight years of litigation, the Court entered a $16.1 billion judgment against the Republic. Rather than satisfy the Court's modest conditions for a stay, the Republic has resisted virtually every effort to enforce any portion of that unstayed judgment, engaging in persistent delay and litigation chicanery. In the two years since the unstayed judgment, the Republic has, among other things, repeatedly invoked overruled "executability" objections in refusing to produce documents; delayed court-ordered searches for more than a year; produced only 15 files purporting to represent *every* responsive document relating to debts, commercial transactions, moveable assets, letters of credit, and other assets in Argentina; refused to identify a single witness with knowledge of the Republic's searches, and when finally ordered on multiple occasions to do so, produced unprepared witnesses at depositions. The Republic even baldly claims that its currency-swap agreement with China, which was repeatedly renegotiated at the highest levels of government, exists nowhere within the Republic.

The Republic's tactical evasion of its discovery obligations has culminated in the misconduct at issue in this motion. Plaintiffs seek discovery to determine whether Banco Central de la República Argentina ("BCRA"), Banco de la Nación Argentina ("BNA"), YPF S.A. ("YPF"), and Aerolíneas Argentinas ("AA", collectively, the "State-Owned Entities") are alter egos of the Republic. On July 29, 2025, the Court in the Off-Channel Order directed the Republic to collect

and produce Argentine officials' WhatsApp, Gmail, and other off-channel communications relevant to those State-Owned Entities because it was "obvious" that "major government business" was being conducted through government officials' personal accounts. The Republic has not sought any stay of that order or the underlying judgment. But it has blatantly refused to produce off-channel communications for at least 11 officials (the "Off-Channel Custodians"), including Minister of Economy Luis Caputo, former Secretary of Finance (now Minister of Foreign Affairs) Pablo Quirno Magrane, and National General Treasurer Jorge Horacio Domper.

Rule 37 squarely authorizes the sanctions that Plaintiffs seek. Where there is a "clearly articulated order of the court requiring specified discovery," the Court has authority to impose sanctions for noncompliance. *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1363 (2d Cir. 1991). In determining whether to do so, courts may consider the willfulness of the noncompliance, the duration of the misconduct, whether the noncompliant party was warned of the consequences, and whether lesser sanctions would be sufficient. *Funk v. Belneftekhim*, 861 F.3d 354, 366 (2d Cir. 2017). Here, each factor overwhelmingly favors sanctions. First, the Republic's noncompliance is willful and in bad faith. It has refused to acknowledge its own officials' off-channel use despite Plaintiffs' unrebutted evidence, and categorically and baselessly invoked Argentine-law prohibitions on production, only to reverse itself and instead claim lack of "access" to the Off-Channel Custodians' communications in defiance of the Court's rulings. Months of conferences with the Court, extensions, and warnings have yielded only continued defiance and token productions. Second, the duration of the misconduct warrants sanctions; the Republic has been in open violation of the Off-Channel Order since July 29, 2025, following nearly a year of pre-order stonewalling. Third, the Republic was repeatedly warned by the Court that continued noncompliance could result in sanctions, yet it persisted anyway. Lastly, the Republic's refusal to

pay any of the judgment against it demonstrates that monetary sanctions alone would be insufficient. The Republic's violation of the Off-Channel Order is not the product of confusion or logistical difficulty. It is the foreseeable result of a deliberate strategy to evade discovery and delay enforcement of a valid, unstayed judgment. The Court's exercise of its supervisory power to impose sanctions is therefore both justified and necessary.

Once a violation is established, the Court has broad discretion to craft sanctions that are "just" and tailored to the claims at issue, including preclusion, adverse inferences, and contempt. Fed. R. Civ. P. 37(b)(2)(A); *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982). Plaintiffs respectfully request that the Court impose Plaintiffs' requested sanctions, which are calibrated to the Republic's violations of the Off-Channel Order and the alter-ego issues upon which the withheld evidence bears. Specifically, the Court should: preclude the Republic from contesting that the State-Owned Entities are its alter egos; and impose adverse inferences that the withheld off-channel communications support specific findings relevant to alter-ego discovery. The Court should also exercise its authority under Rule 37 or its inherent powers to find the Republic in contempt. In connection with that contempt finding, the Court can and should impose civil contempt sanctions, including a daily coercive fine of at least $1 million payable to the Court for the Republic's continued noncompliance. The Court should also award Plaintiffs reasonable fees and costs incurred in securing compliance and litigating this motion.

In the face of the Court's clear order and the Republic's noncompliance, the evidentiary burden is on the Republic to prove "plainly and unmistakably that compliance is impossible." *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995) (citation and emphasis omitted). The Republic has made no effort to do so, nor has it offered any evidence of its purported lack of access to the communications. If the Republic disputes the factual basis for the requested sanctions,

including by asserting that it cannot access the communications, Plaintiffs request that the Court move forward with the evidentiary hearing, *see* Dkt. 845, and require live testimony from the Off-Channel Custodians and other relevant witnesses.

## BACKGROUND

### A.    The Republic's History of Delay and Evasion in Post-Judgment Discovery

The Republic's noncompliance with the Off-Channel Order is not an aberration, but the latest installment in a well-documented pattern of evasive and dilatory conduct in post-judgment discovery that has been previously recognized in this District. In *Aurelius Capital Partners LP v. Republic of Argentina*, No. 07-cv-11327 (S.D.N.Y.) ("*Aurelius*"), the Republic refused to comply with repeated post-judgment discovery orders. *Aurelius* Dkts. 135, 169. The Republic's excuse was that it could not obtain documents from its own social-security agency, ANSES—an argument the court had already rejected in holding that those documents were within the Republic's possession, custody, or control. *Aurelius* Dkts. 135; 191-2 at 2, 5-6; 191-10 at 2. Judge Griesa granted Plaintiffs' motion for contempt and an adverse inference. *Aurelius* Dkt. 211.[1]

The Republic repeated this same playbook in *NML Capital, Ltd., et al. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y.) ("*NML*"), where it willfully refused to comply with post-judgment alter-ego discovery, this time invoking vague claims of privilege and appeals to "grace and comity." *NML* Dkt. 794-1 at 151-52. After plaintiffs moved for sanctions, Judge Griesa granted an adverse inference that any property of the Republic in the United States except diplomatic or military property was deemed to be used for commercial activity, explaining that "in

---

[1]  On appeal, the Second Circuit declined to rule on the validity of the contempt order, holding that the issue was moot because the "contempt order [sought] to compel the Republic to comply with discovery orders regarding funds that [the Second Circuit had] subsequently held are immune from attachment." *Aurelius Cap. Partners, LP v. Republic of Argentina*, 379 F. App'x 74, 76 (2d Cir. 2010). There is no analogous issue regarding the permissibility of alter ego discovery here.

view of the obstruction that the Republic . . . has posed to recover recovery on their legitimate obligations," plaintiffs' request was "wholly legitimate," and that the Republic had "failed to respond in anything approaching a complete manner to the discovery order." *NML* Dkt. 819 at 39:18-25.

The Republic follows the same pattern in this case. Plaintiffs served post-judgment discovery requests on October 16, 2023. For more than a year thereafter, the Republic refused to attempt most searches, invoking a blanket "executability" objection, *see* Dkt. 737-1 at 4-5, 54, and asserting—on nothing more than its own say-so—that discovery "could not possibly lead to executable assets." *See, e.g.,* Dkt. 572 at 3. Even after the Court overruled that objection, Dkt. 703 at 2-3, the Republic continued to delay, forcing Plaintiffs to file a motion to compel. Dkt. 736. At the ensuing conference, the Court reminded the Republic, repeatedly, that its executability objection had been rejected. July 15, 2025 Tr. at 7:12-17, 11:5-6, 14:3-4. Although the Republic professed to understand, *id*. at 7:18, and agreed to undertake searches long overdue, Dkt. 763 at 11-12, it continued to raise the same overruled objection, *see id*. at 13, 37.

In connection with Plaintiffs' requests concerning certain assets in Argentina (including debts, commercial transactions, letters of credit, escrow accounts, and movable assets), the Republic initially refused to search because the "burdens" of doing so were "staggering" and would require "thousands of hours," Dkt. 763 at 13-14, while at the same time claiming that it did not even know where potentially responsive materials were stored, *id*. at 10-11. When Plaintiffs proposed that the Republic at least conduct a reasonable investigation into where responsive documents might exist, the Republic refused, calling the proposal harassing and overly burdensome. *Id*. at 12-14. Notwithstanding those objections, the Republic later "identified" certain centralized databases applicable across various ministries. Dkt. 789 at 2-3. After many months,

5

further pressure by Plaintiffs, and repeated Court conferences, it agreed to conduct searches. Dkt. 833 at 10-11. The result of its supposed three-month effort across 114 ministries, however, yielded only 15 files—purportedly the entire universe of documents relating to assets in Argentina. Dkt. 842 at 6.

The Republic has employed the same obstructionist tactics in response to Plaintiffs' Information Subpoena, dated May 15, 2024, seeking the identities of individuals with knowledge regarding Plaintiffs' post-judgment requests. For over a year, the Republic refused to provide any names based on boilerplate objections, including the same overruled executability theory, forcing Plaintiffs to move to compel. Dkt. 736 at 1-2. The Court ordered the parties to confer regarding the identification of individuals on discrete topics. July 15 Tr. at 29:17-19. The Republic again refused, raising new objections. Dkt. 763 at 26-28. After the Court reiterated its directive, Aug. 6 Tr. at 35:3-4, 36:2-16, Plaintiffs narrowed their request to seven topics. Dkts. 808 at 17; 808-7. The Republic responded with months of delay and, once again, a flat refusal to identify anyone. Dkt. 808 at 17-18.

Plaintiffs raised this issue again with the Court, which then ordered the Republic to identify witnesses with knowledge. Oct. 9 Tr. at 40:8-13, 41:7-12. The Republic still did not fully comply, choosing to identify one witness for Plaintiffs' seven topics: a lawyer for the Republic who had previously been involved in attempts to prosecute Plaintiffs' counsel. Dkt 833 at 5-6. When the Republic belatedly realized the witness's testimony would include matters the Republic preferred to conceal, it withdrew the witness, causing further delay. The Court then ordered the Republic to produce one knowledgeable witness per topic. Nov. 4 Tr. at 27:25-28:2. When the Republic finally produced the witnesses for depositions, they were unprepared to answer basic questions about the Republic's searches, including how and when those searches were conducted, what search

instructions were provided, and why certain search locations were selected to the exclusion of others. Dkt. 842 at 8-9.

As Plaintiffs intend to further address with the Court, one of these depositions concerned financial agreements between the Republic and China. *Id.* at 8-9. During the deposition, the Republic took the ludicrous position that it somehow did not have "access" to the China currency "swap agreement" that had been in place since 2009 and was negotiated by officials at the highest levels of the Republic, including the President and Foreign Minister. Dec. 9 Tr. at 47:12-50:21. Remarkably, the Republic still has not produced any documents concerning this agreement. Another deposition concerned the Republic's gold reserves. The Republic's witness admitted that he had no knowledge beyond public materials, and that he had made no inquiries to determine the reserves' location or who within the Republic possesses relevant information. He also did not know whether any senior officials (including Minister Caputo) had communicated on this topic, and admitted that he only read 10 of the 280 pages provided to him in preparation for the deposition.

**B.      The Republic Continues Its Pattern of Evasion Through Its Obstruction of Alter-Ego Discovery**

Plaintiffs' October 16, 2023 discovery requests sought, among other things, information regarding Argentina's relationship with the State-Owned Entities. Those requests encompassed "off-channel communications," *i.e.*, communications concerning official business sent or received on non-official platforms such as WhatsApp and Gmail. Dkt. 540-1 at 3. What followed was a campaign of obstruction by the Republic. After nine months and nineteen meet-and-confers, the Republic produced only 3,530 documents and objected to the production of off-channel communications. Dkt. 599 at 2.

On August 26, 2024, Plaintiffs brought the issue to the Court, explaining that "[m]erits discovery demonstrated that Argentine government officials communicate extensively through non-government e-mail accounts in their official capacities." Dkt. 642 at 1. At a September 3, 2024 hearing, the Court noted that its "inclination would be to include" off-channel communications within the scope of discovery. Sept. 3, 2024 Tr. at 50:12–51:3. Undeterred, the Republic refused to produce this material—continuing to deny, without offering a shred of evidentiary support, that such communications were used for official business or that the Republic could access them—and instead claimed that production "would violate both the Argentine Constitution and its criminal law," and that an Argentine court could compel production only in a criminal proceeding. Dkt. 658 at 6-7. The Republic further argued that such communications are privileged, implicate national security concerns, and that their disclosure "could jeopardize the proper functioning of the financial or banking system." Dkt. 641 at 6; *see also* Dkts. 658 at 4-5, 677 at 1-4.

Plaintiffs submitted expert evidence explaining that the Republic had the practical and legal ability to collect and produce these communications without violating Argentine law. Dkt. 672. Plaintiffs' expert opined that the Argentine law cited by the Republic regulates a citizen's right to access public information, not the power of a U.S. federal judge to order the Republic to produce documents in a civil proceeding to which it is a party, and that no part of that law prohibits the requested discovery. *Id.* at ¶¶ 4-6. Indeed, even if the Republic's proffered law *were* applicable, it specifically *allows* access to internal governmental communications because they qualify as "public information." *Id.* at ¶ 9. Finally, applicable Argentine law allows Argentine and foreign courts to order the Republic to produce internal communications between public officials. *Id.* at ¶¶ 7, 27-28.

Plaintiffs also submitted extensive evidence from available public sources confirming what the Republic continued to deny: that Argentine officials routinely conduct official business through off-channel communications. Dkts. 763-1–763-3. That evidence included numerous reports that Argentine officials, including President Javier Milei, former Chief of Staff Nicolas Posse, and Minister Caputo communicate about official business through off-channel communications, including WhatsApp. Dkts. 763 at 30-31; 763-1–763-3. The Republic has never offered any evidentiary support for its claims of lack of access to its officials' communications. Nor has it sought to address how the Republic could function if its own officials could keep information, including sensitive information, outside of the Republic's control.

### C.    The Court Recognizes the Relevance of Off-Channel Communications, Rejects the Republic's Stonewalling, and Warns of Sanctions

By July 15, 2025, the Court concluded that there was clearly "major government business" conducted through off-channel communications. July 15 Tr. at 36:9-13; *see also id.* at 34:11-13, 35:13-16, 36:3-4. The Court warned the Republic that continued non-compliance could invite sanctions, including the imposition of an adverse inference. *Id.* at 36:21-22.

Even after the Court's unmistakable warning, the Republic continued to obstruct Plaintiffs' access to these communications, claiming that it was "not fully aware of the full extent" of its own officials' use of off-channel communications for official business, July 15 Tr. at 34:14-15, that Plaintiffs' extensive evidence did not establish that "relevant messages may be contained on . . . custodians' personal devices," Dkt. 763 at 36-37 (cleaned up), and that these communications were not "properly the subject of discovery," Levine Decl. Ex. A at 6-7 (cleaned up). The Republic also raised its repeatedly overruled "executability" objection in opposing collection and production. Dkt. 763 at 37. Nor would the Republic even respond to Plaintiffs' inquiries as to whether the

relevant communications were being preserved or if the Republic had taken any steps to ensure that they would be. *Id.* at 30.

### D.    The Court Orders Discovery of Off-Channel Communications

On July 29, 2025, the Court removed any remaining doubt by ordering the Republic to collect and produce off-channel communications by certain Argentine officials regarding the State-Owned Entities. July 29 Tr. at 52:9-53:23; Dkt. 785 at 11-12. The Court found that, given "the small size of the productions of official communications so far," and the "evidence that officials use off-channel communications, like WhatsApp, for official communications," it "seems obvious that these officials are conducting official business on their personal accounts." July 29 Tr. at 53:1-18. To the extent that the Republic claimed Argentine law posed any obstacle to that discovery, the Court concluded that the significant interest of the United States in enforcing a valid and unstayed final judgment meant that international comity "weighs in favor of collecting and reviewing off-channel communications to help plaintiffs determine whether the state-owned entities are alter egos." *Id.* at 53:18-21. In so ruling, the Court found that the good-faith prong did not favor the Republic. *See id.* at 51:9-12 (finding that "given all of the Republic's delay tactics in these cases, the Court is unpersuaded that the Republic's discovery efforts to date are enough to tilt the factor of good faith in its favor").

The Off-Channel Order currently applies to 36 custodians, 29 of which were agreed upon, two of which were ordered at the September 3, 2024 conference, and five of which were ordered at the July 29, 2025 conference after the Court carefully weighed the evidence and made specific

factual findings. The Court denied Plaintiffs' motion to include two other custodians and had previously denied Plaintiffs' motion to include three other custodians.[2]

Of particular note, the Off-Channel Order explicitly found (despite the Republic's argument to the contrary) that Minister Caputo's communications were relevant, citing evidence of his "personal involvement in YPF's business [that] confirm[s] that he likely has communications related to YPF's potential alter ego status," and noting that "there are substantial indicia that [Minister Caputo] is regularly involved in the Republic's relationship with BCRA." July 29 Tr. at 56:3-8.

### E.    The Republic's Continued Obstruction and Shifting Positions

After the Court issued the Off-Channel Order, the Republic neither sought to stay that order nor attempted to comply. Instead, it publicly disavowed the Court's authority, announcing on August 5, 2025 that "under no circumstances" would the Republic "hand over private information of members of the administration and former officials." *See, e.g.*, Dkts. 808-2 at 2; 808-3 at 2. That announcement was not a misunderstanding—it was an open declaration that the Republic intended to flout the Order and continue its strategy of obfuscation, evasion, and delay.

The Republic then moved for reconsideration, claiming that the Court had failed to consider Argentine law. Plaintiffs opposed, submitting further evidence confirming that officials routinely conduct official business relating to State-Owned Entities through off-channel communications—including an interview in which President Javier Milei, Minister Caputo, and BCRA Governor Santiago Bausili told an interviewer that they are "obviously . . . in continuous contact" through a private off-channel chat group, and that Minister Caputo was BCRA Governor

---

[2] The Republic continues to object to two of Plaintiffs' proposed custodians, Diego Aduriz as to YPF and ENARSA and Guillermo Alberto Francos as to BCRA, AA, BNA and ENARSA. Mr. Francos is an agreed-upon custodian for YPF. Dkt. 842-6 at 3.

Santiago Bausili's boss ("jefe"). Dkt. 775-1 at 2-3, 6-7. Plaintiffs also explained that Argentine law does not shield such communications, *see* Dkt. 672, and that the Republic's expert admitted that a court order can require their production, *see* Dkt. 670 at 5 (quoting Dkt. 660 at 9-10).

On August 27, 2025, the Court denied the Republic's motion for reconsideration. As the Court explained, whether Argentina could be required to produce the requested off-channel communications "turns on whether [Argentina] has 'control' over the communications," meaning whether Argentina has the "practical ability to obtain the documents." *See* Dkt. 785 at 3-4, 11. The Court concluded that even "[a]ssuming, without deciding, that Argentine law applies," the Republic has the practical ability to obtain the off-channel communications, because "off-channel communications concerning official business constitute 'public information' under Argentine law, such that the Republic can request the communications from the officials." *Id.* at 11.

That ruling should have ended the matter. It did not. On August 28, 2025, Plaintiffs requested that the Republic "confirm that [it] intend[ed] to collect and produce [off-channel communications] promptly." Levine Decl. Ex. B at 4. The Republic refused to provide that assurance, and instead sought an extension, purportedly because it needed to conduct "a detailed analysis of Argentine law" before it could comply.[3] Dkt. 789 at 4. The Court granted the Republic's extension request. Sept. 4 Tr. at 14:7-10.

Just one week later, the Republic announced (without explanation) that it had "carefully evaluat[ed] what means exist for the Republic to obtain access to the communications consistent with Argentine law," but could not "legally request" those communications because doing so

---

[3] The Republic has not explained why it waited until a full year after the Court indicated it was inclined to include the off-channel communications in discovery to conduct this analysis. The notion that the Republic had not already conducted a "careful" analysis—given its numerous prior submissions on the issue—is not credible and if true, evinces a lack of diligence.

"would amount to coercing individuals to waive their privacy rights," Dkt. 808-1 at 1, despite the Court's contrary rulings, *see, e.g.*, Dkt. 785 at 11-12.

Instead, the Republic offered only to stipulate that Plaintiffs could request that the Court issue Letters of Request for International Judicial Assistance to an Argentine court under the Hague Convention. Dkt. 808-1 at 2. That proposal was purely dilatory. The Republic admitted that it had not considered, and had no view on, whether an Argentine court would grant any such application under the Hague Convention, and refused to commit to support that request once it reached an Argentine court. Dkt. 808 at 3. Moreover, the Republic's positions had shifted again— it had previously asserted that only "an Argentine court order in a ***criminal investigation***" could compel production of off-channel communications, Dkt. 658 at 6 (emphasis added), yet it then reversed course and asserted that such relief was also available in civil proceedings.

Notwithstanding Plaintiffs' repeated requests for clarification and a colloquy on the subject with the Court, *see* Sept. 4 Tr. at 16:7-18:25, the Republic also refused to say what steps (if any) it had taken to preserve the relevant off-channel communications, including which custodians had received the litigation hold notice, whether off-channel communications were covered by the notice, and whether the Republic had taken any steps since the issuance of the litigation hold (which was not until almost a year after Plaintiffs' document requests) to ensure that its officials were complying. Dkt. 808 at 8.[4]

On September 26, 2025, the Republic filed notices of appeal from the Court's Off-Channel Order and the denial of reconsideration (even though those interlocutory rulings are not immediately appealable). Despite filing those notices of appeal, the Republic made no attempt to

---

[4] To this day, the Republic has refused to confirm that it has taken any steps other than the issuance of the hold notice to ensure that all custodians have preserved all off-channel communications. *See, e.g.*, Dkt. 833 at 3.

seek any stay of the Court's rulings pending appeal, either from the Court itself or from the Second Circuit. Instead, it simply continued to fail to comply with the Court's Order.

Plaintiffs were forced once again to seek the Court's intervention. Dkt. 808 at 1-4. At an October 9, 2025 hearing, the Republic proffered the same rejected arguments for its noncompliance, *see* Oct. 9 Tr. at 4:17-5:13, 9:3-22, 16:1-19, 17:3-8, 18:5-7, 18:17-20, 20:10-16, 22:12-20, 23:5-7, and even continued to claim that Plaintiffs "ha[d]n't put forward evidence that there actually is official business being done on off-channel communications." *Id*. at 22:18-20. The Republic insisted that even a "request" to its officials to produce off-channel communications would be an illegal "form of coercion" under Argentine law. *Id.* at 3:16-4:3; *see also* Dkts. 808 at 6, 808-1 at 1. The Court again rejected the Republic's arguments and reaffirmed that off-channel communications concerning official business are "public documents" in the Republic's control. Oct. 9 Tr. at 26:15-27:1. The Court gave the Republic until October 30, 2025 to produce these communications. *Id.*

### F.    The Republic Admits It Can Access Off-Channel Communications, While Continuing to Refuse to Produce

On October 23, 2025, the Republic abruptly reversed its long-standing position that it was legally prohibited from accessing off-channel communications under Argentine law. Dkt. 828-1 at 1. Instead, it announced that it had "determined" that it could request such communications from officials and that doing so would not violate Argentine law. *Id.* But after finally conceding the point that Plaintiffs had been arguing for more than a year (and on which the Court had ruled in Plaintiffs' favor), the Republic nevertheless sought an extension of the October 30, 2025 production deadline because it had not yet begun the collection process. *Id*.

At a November 4, 2025 hearing, the Court made clear that it was unimpressed by this tactic. Nov. 4 Tr. at 10:10-22, 12:1-11. Remarkably, the Republic continued to downplay the

pervasiveness of off-channel communication use by its officials, maintaining that "[t]here is some press about people showing phones to people," and "no evidence of the extent to which [it] was done." *Id.* at 6:3-9. The Court ordered the Republic to produce responsive off-channel communications on a rolling basis, with the goal of completing production by November 21, 2025. *Id.* at 14:6-12. The Court also warned that "if there [was] scant production," there would be "discovery on discovery." *Id.* at 14:16-21.

### G.    The Republic's Token Compliance and Continued Defiance

The Republic began limited rolling productions of off-channel communications on November 21, 2025, but failed to substantially complete its production. Dkt. 842 at 1-2; Dkt. 842-2; Dec. 9 Tr. at 12:16-24. On December 9, 2025, the Republic requested another extension, and the Court ordered the Republic to complete its production by January 10, 2026. Dec. 9 Tr. at 17:15-19. On January 10, 2026, the Republic purported to have completed production for 13 of the 36 custodians. It has not completed production for the remaining 23 custodians.[5] Levine Decl. Ex. C. In total, the Republic has produced approximately 650 pages of off-channel communications.[6] Even the Republic's meager productions to date confirm what the Republic has denied for more than two years: that officials routinely use off-channel communications to conduct official business, including regarding the State-Owned Entities. *See, e.g.*, Dkts. 842 at 1-2; 842-1. For instance, one WhatsApp group chat produced by the Republic shows a former Undersecretary

---

[5] Of those 23 custodians, the Republic has agreed to produce communications for four, but has not yet done so. Another eight have yet to respond to the Republic's inquiries, and the Republic purports to not be able to access the communications of the remaining 11. Plaintiffs reserve the right to seek sanctions if the Republic fails to produce for any of the 23 remaining custodians. Plaintiffs further reserve all rights to the extent the Republic has failed to comply with its production obligations for the custodians for whom it has produced communications.

[6] Plaintiffs have concerns about the methodologies employed in searching for these documents, which Plaintiffs plan to pursue further.

of Energy, multiple Republic officials, and four Energía Argentina ("ENARSA") directors—including its President and Vice-President—discussing official business. *Id.* Another shows Republic officials, a YPF director, and an ENARSA director exchanging relevant documents. *Id.* While Plaintiffs continue to review the Republic's most recent production, it is evident that the production contains, among others, multiple WhatsApp messages between BCRA Governor Bausili and the Secretary of the Treasury, discussing official business.

Despite the Republic's clear demonstration of its practical ability to produce these communications, the Republic has refused to produce anything for 11 total Off-Channel Custodians. Specifically, on December 16, 2025, the Republic confirmed that it would not comply with the Court's Order as to six Off-Channel Custodians: (1) Luis Caputo (Minister of Economy (12/10/23 – present) (custodian for YPF and BCRA)); (2) Pablo Quirno Magrane (former Secretary of Finance and now the Minister of Foreign Affairs (10/28/2025 – present) (BCRA and BNA)); (3) Horacio Federico Veller (Undersecretary of Liquid Fuels (11/29/24 – present) (YPF)); (4) Susana Beatriz Casillas (National Director of the Office of Public Credit (5/1/22 – present) (BCRA)); (5) Jorge Horacio Domper (National General Treasurer (5/1/22 – present) (BCRA)); (6) Franco Hernán Mogetta Prevedello (Secretary of Transportation, Ministry of Economy (12/22/23 – 5/9/2025) (AA)). Levine Decl. at ¶ 5; Dkt. 842-3 at 5-7; 842-4 at 3.  Five of these Off-Channel Custodians—all except Prevedello, who left the current administration in 2025—are current Argentine officials.

On January 10, 2026, the Republic stated its refusal to produce for an additional five Off-Channel Custodians, all of whom are officials from the prior administration: (7) Eduardo Pablo Guillermo Setti (Secretary of Finance (7/10/22 – 1210/23) (BCRA)); (8) Flavia Gabriela Royón (Secretary of Energy (8/12/22 – 12/10/23) (YPF)); (9) José Ignacio de Mendiguren (Secretary of

Industry and Productive Development (8/11/22 – 12/10/23) (YPF)); (10) Sergio Tomás Massa (Minister of Economy (8/3/22 – 12/10/23) (YPF and BCRA)); and (11) Matias Raúl Tombolini (Secretary of Commerce (8/12/22 – 12/10/23) (YPF)). Levine Decl. Ex. C at 2.

The Republic's refusal to produce communications from these 11 Off-Channel Custodians is purportedly based on its inability to access the relevant communications—an objection that this Court has repeatedly rejected, *see, e.g.*, Dkt. 785 at 11-12, and for which there is no evidence in the record, irrespective of whether those custodians are current or former officials.

## ARGUMENT

Rule 37 authorizes sanctions against a party that "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). "Provided that there is a clearly articulated order of the court requiring specified discovery, the district court has the authority to impose Rule 37(b) sanctions for noncompliance with that order." *Daval Steel*, 951 F.2d at 1363. "In imposing Rule 37 sanctions . . . courts properly consider various factors, including: (1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Funk*, 861 F.3d at 366 (cleaned up).

The Court has broad discretion under Rule 37 to craft the specific sanctions imposed. *Daval Steel*, 951 F.2d at 1365. Rule 37 itself specifies several permissible sanctions, including: "prohibiting the disobedient party from supporting or opposing designated claims or defenses," "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims," and treating as "contempt of court the failure to obey any order." Fed. R. Civ. P. 37(b)(2)(A)(i), (ii), (vii). Under Rule 37(b)(2), the relief granted must be "just" and "related to the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ireland*, 456 U.S. at 707.

The Off-Channel Order and the Republic's violation of that order are clear, and the relevant factors plainly favor the imposition of sanctions. Specifically, the Court should issue a preclusion order prohibiting the Republic from contesting that the State-Owned Entities are its alter egos. In addition, the Court should draw the inference that the withheld communications support certain findings related to alter-ego discovery, including that: (i) the Off-Channel Custodians exercise extensive control over the respective State-Owned Entity or Entities for which they serve as document custodians; (ii) the Republic's high-ranking officials also act as high-ranking officers, directors, or employees of the State-Owned Entities, and vice versa; (iii) the State-Owned Entities report to the Republic and act on its behalf; and (iv) the State-Owned Entities use their assets for the benefit of each other and the Republic, and vice versa.

Moreover, the Court can and should treat the Republic's ongoing failure to comply with the Off-Channel Order as contempt. In connection with a contempt finding, the Court may also impose civil contempt sanctions, including a daily fine to compel compliance. *United Mine Workers v. Bagwell*, 512 U.S. 821, 827 (1994) ("[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard."). Plaintiffs propose that the Court impose a sanction of at least $1 million per day, payable to the Court, until the Court is satisfied that the Republic has complied with the Off-Channel Order.

Lastly, the Court should order the Republic to pay reasonable attorneys' fees and costs associated with this motion and Plaintiffs' efforts to compel compliance with the Off-Channel Order.

## I.    THE REQUESTED SANCTIONS ARE WARRANTED

The Republic's clear and unambiguous violation of the Off-Channel Order squarely satisfies the threshold requirements for sanctions. The Order unambiguously required the Republic to produce off-channel communications from certain specified officials, including the Off-Channel Custodians. Yet the Republic has failed to comply, refusing to produce any such communications from the Off-Channel Custodians and making clear that it has no intention of doing so. *See In re Fosamax Prods. Liab. Litig.*, 2013 WL 1176061, at *2 (S.D.N.Y. Mar. 21, 2013) (imposing sanction of case dismissal where discovery order "clearly state[d]" its requirements and there was "no doubt that [the sanctioned party] understood [its] obligation" to produce a sworn questionnaire). That clear and willful violation of this Court's Order warrants sanctions.

### A.    The Republic Has Willfully Violated the Off-Channel Order

The Republic's noncompliance with the Off-Channel Order is not only obvious, but is undeniably willful. "Noncompliance with discovery orders is considered willful when the court's orders have been clear, when the party has understood them, and when the party's noncompliance is not due to factors beyond the party's control." *Thompson v. Jam. Hosp. Med. Ctr.*, 2015 WL 7430806, at *3 (S.D.N.Y. Nov. 20, 2015) (quoting *In re Fosamax.*, 2013 WL 1176061, at *2). Each element is met here.

#### 1.    The Off-Channel Order Is Clear and the Republic Understood It

The Off-Channel Order and the Court's subsequent directives were clearly articulated by the Court and understood by the Republic. The Court granted the Republic multiple opportunities for compliance and multiple extensions—but instead of complying, the Republic repeatedly shifted its positions, delayed, and ultimately refused to produce the Off-Channel Custodians' communications at all. *See, e.g.*, *supra* at 7-17; July 15 Tr. at 33:25-34:2; July 29 Tr. at 52:10-53:23; Sep. 4 Tr. at 14:7-10; Oct. 9 Tr. at 26:15-27:1; Nov. 4 Tr. at 14:6-12; Dec. 9 Tr. at 18:10-25.

19

That record demonstrates a paradigmatic case of willful noncompliance. *See, e.g., Doe v. Delta Airlines, Inc.*, 2015 WL 798031, at *8 (S.D.N.Y. Feb. 25, 2015) ("Willful non-compliance is routinely found, for instance, where a party has 'repeatedly failed to . . . produce documents . . . in violation of the district court's orders.'") (ellipses in original) (quoting *Robertson v. Dowbenko*, 443 Fed. App'x 659, 661 (2d Cir. 2011) (summary order)), *aff'd*, 672 F. App'x 48 (2d Cir. 2016).

To justify its pattern of willful obstruction, the Republic has advanced a series of bad-faith positions designed to resist and evade its obligations. That history confirms that the Republic's refusal to comply with the Court's orders is no accident.

**First**, the Republic ignored for years the evidentiary record establishing that officials routinely conduct government business through off-channel communications. *See, e.g.*, *supra* at 8-9, 11-12, 14-16 ; Dkts. 642 at n.1; 712-3; 712-4; 763-1; 763-2; 763-3; 775-1; 808-4 at 2-3; 808-5 at 2-4. Rather than rebut that evidence, the Republic has repeatedly asserted that Plaintiffs' proof is categorically not credible and therefore cannot establish relevance. *See, e.g.*, *supra* at 8-9, 14-15; July 15, 2025 Tr. at 34:3-37:6; Dkt. 763 at 36-37; Oct. 9 Tr. at 9:9-17, 20:10-16, 22:12-20; Nov. 4 Tr. at 6:3-9. The Republic has continued to take that baseless position even after the Court found that there is "major government business" relevant to this case conducted via off-channel communications, *see, e.g.*, July 15 Tr. at 34:11-15, 36:8-17, and the Republic produced its own documents directly contradicting its position. *See, e.g.*, Dkt. 842-1. And the Republic still refuses to admit or deny that its officials use off-channel communications for official business, or to confirm that all such communications have been, and continue to be, preserved. *See* Oct. 9 Tr. at 30:8-24; Sept. 4 Tr. at 16-18, 21; Dkt. 808 at 8-9, 11-16; Dkt. 833 at 3-5.

**Second**, the Republic has engaged in a pattern of serially shifting legal positions designed to avoid compliance. *See, e.g.*, *supra* at 7-17. It first claimed that Argentine law barred access to

20

any such communications and that only criminal courts could compel production. Dkt. 658 at 6. After the Court rejected those arguments and ordered production, July 29 Tr. at 52:9-53:23, the Republic publicly disavowed compliance, Dkt. 808-2 at 2, moved for reconsideration, Dkt. 767, and, when that failed, *see* Dkt. 785, asserted it needed additional time to conduct a "detailed analysis" of Argentine law. Dkt. 789 at 4. Then, it claimed, without explanation, that it could not even *request* the relevant communications because doing so would be "coerci[ve]." Dkt. 808-1 at 1; *see also* Oct. 9 Tr. at 3:16-4:14. The Republic reversed course again, and after producing a token subset of materials from a minority of the relevant custodians, Dkt. 842-2 at 2, the Republic now claims that it cannot produce the communications of the Off-Channel Custodians because it cannot access them, Dkt. 842 at 2-4: an objection that this Court has already rejected and that has no factual or legal basis. Dkt. 785 at 11-12.

That ongoing failure to comply with the Off-Channel Order is not based on any misunderstanding or logistical difficulty. It is a sustained course of conduct that is designed to delay, evade, and frustrate the Court's Order, and that warrants sanctions.

### 2. The Republic's Noncompliance Is Not Due to Factors Beyond its Control

The Republic also cannot plausibly contend that its noncompliance with the Off-Channel Order is "due to factors beyond [its] control." *Thompson*, 2015 WL 7430806, at *3 (citation omitted). The Court has already rejected the Republic's claims of lack of access, ruling that the off-channel communications are within the Republic's "practical" ability to obtain. *See, e.g.*, July 29 Tr. at 52:9-53:23; Dkt. 785 at 10-12. The Republic cannot continue recycling the same rejected arguments to avoid compliance with the Off-Channel Order. *See Lyondell-Citgo Refin., LP v. Petroleos de Venezuela, S.A.*, 2005 WL 1026461, at *4 (S.D.N.Y. May 2, 2005) (affirming adverse

inference sanction and explaining that "[alt]hough defendant asserts that it is prohibited by Venezuelan law from providing the documents," the court had already rejected those arguments).[7]

In fact, any argument that the Republic has no practical ability to obtain the Off-Channel Custodians' communications relating to their official duties as members of the Argentine government is frivolous and the fact that the Republic has still offered no evidence on its lack of access confirms the point. Like any other employer, the Republic has the practical ability to obtain the work-related communications of its own officials, even when those officials have chosen to send and receive their work-related communications through unofficial platforms rather than official government channels. The Republic has identified nothing in Argentine law that would prevent it from insisting on compliance with that request by imposing discipline up to and including termination on any officials who refuse to comply—which is precisely what the Republic would do if it wanted to obtain those off-channel communications for itself. *See* Dkt. 642 at 2.

Additionally, the Republic's position that it cannot access the communications (including those involving its most senior ministers) is belied by its claims that the off-channel communications are broadly privileged and implicate national security concerns. *See, e.g.*, Dkts. 641 at 6, 658 at 4-5, 677 at 1-4. Surely, the Republic must be able to access any communications that (it says) implicate its serious and sensitive national interests. And, to date, the Republic has offered no actual evidence of its lack of access.

In short, this is a case of willful defiance, not inability. The Republic has simply chosen not to comply with a clear judicial order, despite repeated extensions and warnings. That sustained

---

[7] In *Lyondell-Citgo*, the defendant was sanctioned with an adverse inference only for its "failure to produce Board of Director minutes and related materials." *Id.* at *1. In the instant case, the Republic is denying Plaintiffs access to the plainly probative documents of at least 11 separate custodians, which are contained on multiple different platforms, and relate to multiple alter-ego entities.

recalcitrance warrants sanctions. *See Vanceah v. Dendy*, 2023 WL 4199034, at *2 (2d Cir. June 26, 2023) ("Willfulness may be evident when a party requires 'numerous extensions throughout the discovery process,' continuously fails to 'comply with written and oral discovery-related court orders,' and engages in 'sustained recalcitrance.'" (citation and alterations omitted)); *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, 2015 WL 3526661, at *1 (S.D.N.Y. June 3, 2015) (defendants "seem[ed] to believe that it is their right to ignore a direct order of this court and to do so without explaining themselves. . . . [T]hat demonstrates the willfulness needed to impose a strong sanction").

### B.    The Republic's Sustained Pattern of Bad-Faith Conduct Supports Sanctions

The Republic's willful noncompliance with the Off-Channel Order cannot be viewed in isolation, as the need for sanctions must be assessed "in light of the full record in the case." *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979). Here, the Republic's pattern of bad-faith delay and obstruction in post-judgment discovery has been repeatedly recognized by other courts in this District. *See, e.g.*, *supra* at 4-5; *Aurelius* Dkt. 211; *NML* Dkt. 819. This case is no different. The Court has already observed that the Republic has pursued a "strategy of procedural delay and obfuscation" here, "mouthing an intent to cooperate but refusing to do so," Dkt. 533 at 2-5 (quotations omitted), and that "given all of the Republic's delay tactics in these cases, … the factor of good faith" does not "tilt … in its favor." July 29 Tr. at 51:9-15. Recently, the Court observed that "the tactics employed by the Republic in this litigation" indicate "mere gamesmanship intended to delay collection." Dkt. 843 at 13.

Those observations are well-founded. While paying lip service to its obligations in the post-judgment discovery process, the Republic has failed to comply with those obligations in practice, producing only minimal and incomplete materials after years of discovery disputes and court intervention. *See generally supra* at 5-17. For more than a year, the Republic refused to

conduct basic post-judgment searches based on a blanket "executability" objection and other shifting theories, even after the Court overruled those positions, forcing repeated motion practice and multiple rounds of Court intervention. When pressured to investigate where responsive materials concerning assets in Argentina might exist, it resisted such efforts as "staggering" and "overly burdensome," only to later conduct searches, and assert 'substantial completion' of discovery concerning assets in Argentina after producing only 15 files. *See, e.g.*, Dkt. 842 at 6. The Republic repeated the same pattern in connection with witness identifications and depositions—flat refusals followed by belated, compelled compliance that yielded unprepared witnesses who were unable to explain how searches were conducted. *Id*. at 8-9; *see generally supra* at 5-7.

These episodes are not outliers. They represent the Republic's calculated and evasive approach to every discovery dispute, and they support the imposition of meaningful sanctions.

### C.    The Duration of the Republic's Non-Compliance Support Sanctions

The Republic has been in violation of the Off-Channel Order for over five months, since July 29, 2025, after delaying this issue for more than a year. Courts routinely find shorter periods of defiance sufficient to warrant significant sanctions. *See, e.g.*, *Funk*, 861 F.3d at 369 ("[T]hree months of defiance was sufficient to allow the district court to conclude that defendants never intended to comply with any of the Court's discovery orders") (internal quotations and alterations omitted); *Icon Int'l, Inc. v. Elevation Health LLC*, 347 F.R.D. 274, 289 (S.D.N.Y. 2024) (a "prolonged period of noncompliance" of four months "favor[ed] the imposition of significant sanctions"). Any further delay would serve no purpose. The Republic has unequivocally disavowed compliance with the Order by refusing to produce communications from at least 11 of the Off-Channel Custodians. The duration of the Republic's ongoing non-compliance accordingly supports sanctions.

### D.    The Republic Was Repeatedly Warned of the Consequences of Noncompliance

The Republic has long been on notice that continued noncompliance with the Court's discovery orders could expose it to sanctions. *See* July 15 Tr. at 36:22 ("Are we going to have an adverse inference or what?"). Plaintiffs likewise put the Republic on notice that sanctions would be sought, previewing their intent during multiple hearings, including on October 9 and December 9, 2025. *See* Oct. 9 Tr. at 6:22-24; 25:9-10; Dec. 9 Tr. at 6:17-7:14; 18:3-20:9. Despite these warnings, the Republic chose continued delay and disobedience.

### E.    Lesser Sanctions Are Insufficient to Address the Republic's Noncompliance

The Republic's refusal to pay the judgment against it demonstrates that monetary sanctions alone are insufficient and that non-monetary sanctions are warranted. A party that is already refusing to pay a massive judgment against it will not be moved solely by the prospect of additional financial penalties. *Cf. Int'l Assoc. of Bridge, Structural, Ornamental & Reinforcing Iron Workers Union Loc. 361 v. McNulty*, 2023 WL 5747345, at *9 (S.D.N.Y. Sept. 6, 2023) (given, among other things, "the probable ineffectiveness of monetary sanctions . . . , significant non-monetary sanctions are in order").

## II.    THE COURT CAN AND SHOULD IMPOSE THE REQUESTED SANCTIONS

Plaintiffs respectfully request that the Court impose sanctions in the form of a preclusion order and an adverse inference. The Court should also treat the Republic's ongoing failure to comply as contempt and impose a daily coercive fine of at least $1 million to compel compliance.

### A.    The Court Should Issue a Preclusion Order Prohibiting the Republic from Contesting the State-Owned Entities' Alter-Ego Status

The Court should issue an order precluding the Republic from disputing that the State-Owned Entities are its alter egos.[8] In deciding whether to issue a preclusion order, courts consider "(1) the [offending] party's explanation for the failure to comply with the discovery order; (2) the importance of the . . . precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new [evidence]; and (4) the possibility of a continuance." *S.E.C. v. Syndicated Food Serv. Int'l, Inc.*, 2014 WL 1311442, at *4 (E.D.N.Y. Mar. 28, 2014) (first alteration in original) (quoting *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997)).

The Republic has offered no credible explanation for its refusal to comply with the Off-Channel Order. Its asserted bases for noncompliance have no legal or factual basis in the record and have been repeatedly rejected by this Court. *See supra* at 8-14. The withheld off-channel communications are indisputably important, as the Court has already recognized. *See* July 15 Tr. at 36:9-13 (observing that there was clearly "major government business" being conducted via off-channel communications). Indeed, the Republic's own limited productions to date and the existing evidentiary record have confirmed that these withheld communications are relevant and significant. *Supra* at 8-12, 16.

The requested preclusion order is also directly related to the alter-ego discovery that the Republic has refused to produce, and a preclusion order is a just response to the Republic's willful

---

[8] In addition to BCRA, YPF, BNA, and AA—the "State-Owned Entities," as defined herein—Plaintiffs seek alter-ego discovery as to ENARSA. The Republic has produced a limited number of off-channel communications from the custodians relevant to this entity. While Plaintiffs are not seeking a preclusion order or an adverse inference as to ENARSA at this time, Plaintiffs reserve all rights and remedies should the Republic fail to fully comply with its production obligations as to those custodians.

noncompliance. The discovery requests at issue seek information about the Republic's control over, and involvement in, the operations of the State-Owned Entities with the hope of demonstrating that those entities are the Republic's alter egos. *See* Dkt. 842-3 at 5-10. The Republic's continued nonproduction leaves Plaintiffs litigating alter-ego discovery with an evidentiary blind spot as to multiple custodians, such as Minister Caputo, who clearly possess probative communications on the issue of alter-ego liability. The Republic's refusal to produce these documents significantly prejudices Plaintiffs' ability to make its case. *See Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC,* 2017 WL 3671036, at *20 (S.D.N.Y. July 18, 2017) ("Where the discovery misconduct has deprived the opposing party of key evidence needed to litigate a contested issue, an order prohibiting the disobedient party from contesting that issue— or simply directing that the matter be taken as established—is . . . appropriate"), *report and recommendation adopted*, 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017). And there continues to be no confirmation that the relevant off-channel communications are being preserved, *see supra* at 10, 13-14, 21, further prejudicing (and potentially foreclosing) Plaintiffs' ability to access key, probative evidence relevant to its alter ego claims.

Courts regularly impose preclusion orders where, as here, a party flouts clear discovery orders and uses obstruction to prevent discovery into alter-ego issues. *See, e.g., Daval Steel*, 951 F.2d at 1366 (affirming the district court's imposition of adverse inference and preclusion order sanctions where "[t]he conduct of [defendant's] counsel . . . evince[d] a willful frustration of plaintiffs-appellees' efforts to discover the true facts concerning potential alter ego liability"); *Funnekotter v. Republic of Zimbabwe*, 2011 WL 5517860, at *4 (S.D.N.Y. Nov. 10, 2011) (precluding Zimbabwe from denying the alter-ego status of potential alter ego entities as a sanction in post judgment discovery). The same course is warranted here.

### B.    The Court Should Draw Adverse Inferences Supporting Certain Alter-Ego-Related Findings

Plaintiffs also respectfully request that the Court draw certain adverse inferences involving the relationship between the Republic and the State-Owned Entities, including that: (i) each Off-Channel Custodian exercises extensive control over the respective State-Owned Entity or Entities for which they serve as custodians, *see supra* at 16-17;[9] (ii) the Republic's high-ranking officials also act as high-ranking officers, directors, or employees of the State-Owned Entities, and vice versa; (iii) the State-Owned Entities report to the Republic and act on its behalf; and (iv) the State-Owned Entities use their assets for the benefit of each other and the Republic, and vice versa.[10]

These requested adverse inferences are just and appropriate. "An adverse inference serves the remedial purpose 'of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of [or willful refusal to produce] evidence by the opposing party.'" *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 222 (S.D.N.Y. 2013) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002), *abrogated in other part by* Fed. R. Civ. P. 37(e)(2)) (alteration in original). Where "an adverse inference . . . is sought on the basis that the evidence was not produced . . . the party seeking the [inference] must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the

---

[9] The withheld discovery from the Off-Channel Custodians sought information about the Republic's control over, and involvement in, the operations of the State-Owned Entities. As agreed by the parties and ordered by the Court, the communications of each individual Off-Channel Custodian pertained to one or more, but fewer than all, of the State-Owned Entities. *See supra* at 16-17; Dkt. 842-3 at 5-10. The requested adverse inferences are narrowly tailored to the discovery that the Republic has refused to produce.

[10] These proposed factual findings would be subject to potential third-party defenses.

missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp.*, 306 F.3d at 107.

As to the first element, it is undisputed that the Republic had an obligation to produce the Off-Channel Custodians' communications under the Court's unambiguous order. As to the second, it is equally clear that the Republic had the necessary "culpable state of mind," as it has repeatedly and explicitly expressed its intention not to comply with the Court's order. The Republic's purported reasons for refusing to comply with that order are irrelevant. *See Chevron*, 296 F.R.D. at 222 (granting adverse inference notwithstanding sanctioned party's protests that they were "legally unable to obtain control over the requested documents"); *see also Lyondell-Citgo*, 2005 WL 1026461, at *4 ("the detrimental effect of defendant's failure to produce documents . . . is the same regardless of defendant's reasons for refusing to produce them. [An] adverse inference . . . restores the evidentiary balance.").[11]

As to the third element, the Republic's "bad faith alone" in not producing the communications "is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence [is] unfavorable to [the Republic]." *Chevron*, 296 F.R.D. at 222. The Republic has advanced multiple bad-faith positions to resist the Off-Channel Order and post-judgment discovery in general, *see supra* at 5-15, including by refusing to substantively engage with the merits of the vast evidentiary record of its officials' pervasive off-channel use to conduct government business. *See, e.g.*, Dkts. 642 at n.1; 712-3; 712-4; 763-1; 763-2; 763-3;

---

[11] The "culpable state of mind" element is satisfied under both *Residential Funding Corp.*'s "knowingly" or "negligently" standard, 306 F.3d at 107-08, and the more recent "intent to deprive" standard announced in *Hoffer v. Tellone*, 128 F.4th 433, 435 (2d Cir. 2025) for Rule 37(e)(2) spoliation sanctions.

775-1; 808-4 at 2-3; 808-5 at 2-4. Those bad-faith positions support the conclusion that the Republic is refusing to produce the relevant off-channel communications because they confirm Plaintiffs' arguments.

And even setting aside the Republic's indefensible arguments against production, Plaintiffs have already shown that the Off-Channel Custodians' communications are relevant to their claims, *see, e.g.*, July 15 Tr. at 36:3-13, including with respect to specific individual custodians, *see* Dkts. 775-1; 712-4 at 12. "Where, as here, a party actively seeks legal impediments to justify its non-production, selectively determines when it will produce documents and when it will not, and continues to assert objections to discovery that long have been rejected, that party has willfully and culpably failed to produce evidence and an adverse inference instruction is warranted." *Chevron*, 296 F.R.D. at 223 (citation omitted); *see also NML* Dkt 819 at 39:18-40:19 (granting an adverse inference "in view of the obstruction that the Republic of Argentina has posed").

Finally, the requested adverse inferences are "related to the particular claim" at issue: they squarely match the alter-ego discovery the Republic has refused to produce. The withheld discovery from each Off-Channel Custodian sought information about the Republic's control over, and involvement in, the operations of the State-Owned Entities to show that those entities are the Republic's alter egos. *See supra* at 16-17; Dkt. 842-3 at 5-10. The Republic's refusal to produce off-channel communications from these senior officials—who have been specifically designated (by agreement or Court order) as relevant custodians for the respective State-Owned Entities— deprives Plaintiffs of probative evidence on the central alter-ego issues and materially impairs Plaintiffs' ability to prove those claims. *See Chevron,* 296 F.R.D. at 223.

### C.      The Court Should Hold the Republic in Contempt

In addition to preclusion and adverse inference sanctions, the Court should treat the Republic's failure to comply with the Off-Channel Order as contempt. *Servaas Inc. v. Republic of Iraq*, 2014 WL 279507, at *2 (S.D.N.Y. Jan. 24, 2014) ("A district court clearly has discretion to impose contempt sanctions for violations of post-judgment discovery orders."), *vacated on other grounds, SerVaas Inc. v. Mills*, 661 F. App'x 7 (2d Cir. 2016). The Court may do so under both Rule 37 and its own inherent powers. *See, e.g.*, *Bagwell*, 512 U.S. at 833 ("Contempts such as failure to comply with document discovery . . . impede the court's ability to adjudicate the proceedings before it and thus touch upon the core justification for the contempt power"); *S. New Eng. Tel. Co. v. Glob. NAPS Inc.*, 624 F.3d 123, 144-45 (2d Cir. 2010). "A person may be held in contempt if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Sistem Muhendislik Insaat Sanayi Ve Ticaret, A.S. v. Kyrgyz Republic*, 2018 WL 6251982, at *1 (S.D.N.Y. Mar. 30, 2018) (citation and internal quotation marks omitted), *report and recommendation adopted*, 2018 WL 5629900 (Oct. 31, 2018). These elements are easily satisfied here.

As described above, the Off-Channel Order clearly and unambiguously ordered the production of communications from the Off-Channel Custodians, *see* July 29 Tr. at 52:9-53:23; and the proof of the Republic's noncompliance is similarly clear and convincing. *See Comverse, Inc. v. Am. Telecomms., Inc. Chile S.A.*, 2009 WL 464446, at *3 (S.D.N.Y. Feb. 24, 2009) (finding those elements satisfied where the court's order "set[] forth clear and unambiguous directions to respond to" discovery requests that left "no uncertainty in the minds of those to whom it is addressed") (cleaned up); *supra* at 11, 16-17.

The record makes clear that the Republic has not diligently attempted to comply with the Off-Channel Order in a reasonable manner. The Court granted multiple opportunities and extensions for the Republic to comply with the Off-Channel Order, *see, e.g.*, Sep. 4 Tr. at 14:7-10; Dec. 9 Tr. at 18:10-25, which the Republic in turn abused with months of ever-shifting positions and delay. *See Exp.-Imp. Bank of Republic of China v. Grenada*, 2010 WL 5463876, at *4 (S.D.N.Y. Dec. 29, 2010) (holding Grenada in contempt and explaining that it "has had an inordinate amount of time to comply with post-judgment discovery, has provoked three motions to compel, and required regular attention from this Court. Its efforts have hardly been a model of reasonable diligence or energetic compliance with court orders."); *see supra* at 11-17. Any argument that the Republic has no practical ability to obtain—or lacks access to—the Off-Channel Custodians' communications relating to their official duties as members of the Argentine government is plainly frivolous. *See supra* at 17, 21-23. And unsurprisingly, the Republic has offered no actual evidence that it lacks the practical ability to obtain communications from the Off-Channel Custodians. *Huber*, 51 F.3d at 10 ("The alleged contemnor bears the burden of producing evidence of his inability to comply.").

The Court may also impose civil contempt sanctions, including a daily fine to coerce compliance. *See Bagwell*, 512 U.S. at 827. Plaintiffs propose a coercive sanction of at least $1 million per day payable to the Court until the Court is satisfied that the Republic has complied with the Off-Channel Order. Traditionally, a recurring daily fine, paid to the court, has been a commonly utilized method of coercing compliance.  *See Chabad v. Russian Fed'n*, 915 F. Supp. 2d 148, 154 (D.D.C. 2013) (weighing "what size [daily sanctions] award would be best calibrated to 'coerce compliance' with the [defied] Order").  To be meaningful, any coercive sanction would need to be calibrated to the circumstances of the judgment debtor; in this instance, while

32

recognizing the matter is appropriately in the sound discretion of the Court, the proposed fines are directly related to, and contingent upon, the Republic's continuing noncompliance, and are reasonable in light of the circumstances here, including, for example, the massive size of the judgment against the Republic, accruing daily interest on that judgment, and the Republic's financial resources.

Moreover, the circumstances of the Republic's misconduct with respect to the Off-Channel Order makes clear that such sanctions would be "just." *See Ins. Corp. of Ireland*, 456 U.S. at 707. In imposing coercive sanctions, courts consider "'(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." *Dole Fresh Fruit Co. v. United Banana Co., Inc.*, 821 F.2d 106, 110 (2d Cir. 1987).

Those factors favor coercive sanctions here. First, the Republic's continued contumacy threatens concrete and escalating harm and is causing Plaintiffs ongoing prejudice. The Republic's refusal to comply with the Court's Order is depriving Plaintiffs of uniquely probative off-channel communications central to alter-ego discovery and other categories of discovery, including the resources of alter egos, while forcing Plaintiffs and the Court to expend substantial resources on repeated, avoidable litigation. That harm will grow without severe penalties to compel compliance. Second and third, the proposed monetary sanctions are reasonably designed to compel compliance, particularly given the Republic's longstanding pattern of obstruction and delay. *See Micula v. Gov't of Romania*, 2020 WL 6822695, at *7 (D.D.C. Nov. 20, 2020) ("Petitioners' requested sanctions are not unduly "punitive," especially when the court considers Romania's past conduct, which is relevant to the court's calculus.").

33

**D.    If the Republic Chooses to Contest Its Access to Off-Channel Communications or Other Factual Matters, the Court Should Hold an Evidentiary Hearing**

The burden is on the Republic to prove "plainly and unmistakably that compliance is impossible." *Huber*, 51 F.3d at 10 (citation omitted). The Republic has not carried (and cannot carry) that burden here. *See id*. ("Conclusory statements are inadequate to carry this burden"); *see also BOC Aviation Ltd. v. AirBridgeCargo Airlines, LLC*, 2022 WL 17581775, at *15 (S.D.N.Y. Dec. 12, 2022) (burden not met when contemnor offered only conclusory statements that document production would violate Russian law without supporting evidence). Because the record demonstrates that the Republic has violated the Off-Channel Order and Plaintiffs' proposed sanctions are appropriate, this Court can and should enter the requested sanctions.

The Republic has failed to produce any evidence as to its purported lack of access to any of the Off-Channel Custodians' communications (for both current and former officials). To the extent the Republic contests its access to its current or former officials' off-channel communications, the appropriateness of the proposed sanctions, or any other matters that would require resolving disputed factual issues, Plaintiffs respectfully request that the Court hold an evidentiary hearing in order to hear live testimony from each of the Off-Channel Custodians and any other relevant witnesses. The Court has already set aside time for an evidentiary hearing on this motion to the extent that one may be needed. Dkt. 845.

At an evidentiary hearing, the relevant evidence would include live testimony from the Republic's officials, including the Off-Channel Custodians whose communications the Republic claims are inaccessible. The hearing would also include evidence concerning, among other things, the Republic's use of off-channel communications for official business, how information is shared among the Republic's officials, the process by which the Republic permits its officials to access sensitive information on their private devices and retain that information after they leave the

government, and the Republic's efforts (if any) to preserve the relevant off-channel communications.

## III.    THE COURT SHOULD ORDER THE REPUBLIC TO COMPENSATE PLANTIFFS

In light of the Republic's non-compliance, Rule 37 requires that this Court compel the Republic to pay Plaintiffs' reasonable attorneys' fees and costs incurred in their efforts to compel the Republic to comply with the Off-Channel Order. *See* Fed. R. Civ. P. 37(b)(2)(C). Cost shifting is mandatory "unless one of the two exceptions—substantial justification or other circumstances—applies." *Novak v. Wolpoff & Abramson LLP*, 536 F.3d 175, 178 (2d Cir. 2008).

Neither exception applies here. The "substantial justification" exception applies only if "there was a genuine dispute or if reasonable people could differ as to the appropriateness of the contested action." *Sang Lan v. Time Warner, Inc.*, 2015 WL 480378, at *3 (S.D.N.Y. Feb. 5, 2015) (quoting *Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 442 (S.D.N.Y. 2013)), *report and recommendation adopted in relevant part*, 2016 WL 928731 (S.D.N.Y. Feb. 9, 2016). The Republic cannot meet those conditions, as there is no dispute as to the Republic's obligations under the Off-Channel Order or the Republic's failure to comply with those obligations. *See Sang Lan*, 2015 WL 480378, at *3. As to the "other circumstances" exception, the Republic has not pointed to (and cannot point to) any "other circumstances" that would justify its non-compliance. Rule 37 therefore requires an award of fees and costs. If and when the Court enters that award, Plaintiffs will "file an attorney's affidavit setting forth the basis for costs and attorneys' fees, along with appropriate documentation." *Id.* at *4.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court order sanctions, hold the Republic in contempt, and order any other relief that the Court deems just and proper.

Dated: January 15, 2026                             Respectfully submitted,

                                    LEVINE LEE LLP

                        By:    _/s/ Seth L. Levine_____
                                    Seth L. Levine
                                    Alison M. Bonelli
                                    Julie-Irene A. Nkodo
                                    Adam M. King
                                    400 Madison Ave
                                    New York, New York 10017
                                    Phone: (212) 223-4400
                                    Email: slevine@levinelee.com

                                    KELLOGG, HANSEN, TODD, FIGEL
                                    & FREDERICK, P.L.L.C.
                                    Mark C. Hansen
                                    Derek T. Ho
                                    Andrew E. Goldsmith
                                    Alejandra Ávila
                                    Diego Negrón-Reichard
                                    1615 M Street, N.W., Suite 400
                                    Washington, D.C. 20036
                                    Phone: (202) 326-7900
                                    Fax: (202) 326-7999
                                    Email: mhansen@kellogghansen.com

                                    KING & SPALDING LLP
                                    Laura Harris
                                    1185 Avenue of the Americas
                                    New York, NY 10036
                                    Phone: (212) 556-2100
                                    Fax: (212) 556-2222
                                    Email: lharris@kslaw.com

                                    -and-

Reginald R. Smith
1100 Louisiana Street, Suite 4100
Houston, TX 77002
Phone: (713) 751-3200
Fax: (713) 751-3290
Email: rsmith@kslaw.com

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U., Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*

## <u>LOCAL CIVIL RULE 7.1(c) CERTIFICATION</u>

Pursuant to Local Civil Rule 7.1(c), the total number of words in the foregoing memorandum of law, inclusive of footnotes and exclusive of the caption, indices, tables, signatures blocks, and certificates, is 10,982.

Dated: January 15, 2026

_/s/ Seth L. Levine_____
Seth L. Levine