UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., <br><br> Plaintiffs, <br><br> v. <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br> Defendants. | No. 15 Civ. 2739 (LAP) |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., <br><br> Plaintiffs, <br><br> v. <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br> Defendants. | No. 16 Civ. 8569 (LAP) |

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA
REGARDING PLAINTIFFS' MOTION FOR SANCTIONS AND CONTEMPT**

SEAN S. BUCKLEY
Deputy United States Attorney for the
Southern District of New York
*Attorney for the United States,
Acting Under Authority Conferred by
28 U.S.C. § 515*
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2677
samuel.dolinger@usdoj.gov

SAMUEL DOLINGER
Assistant United States Attorney
– Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 2

DISCUSSION ........................................................................................................ 4

    I.    The Court Should Not Impose Sanctions Arising from Argentina's Efforts to Comply with the Order Regarding Off-Channel Communications ........................ 4

        A.    Plaintiffs' Discovery Requests Were Improper Both Under the Federal Rules of Civil Procedure and in Light of Comity and Reciprocity Concerns ..................................................................................................... 5

        B.    The Court Should Deny Plaintiffs' Request for an Alter-Ego Finding as to Argentine State-Owned Entities as a Discovery Sanction ................. 8

    II.    The Court Should Deny the Request to Impose Monetary Contempt Sanctions on Argentina ......................................................................................... 12

        A.    Orders Imposing Monetary Contempt Sanctions Against a Foreign State Are Unenforceable and Should Not Be Imposed...................................... 13

        B.    The Proposed Monetary Contempt Sanctions Are Punitive in Nature and Inconsistent with the FSIA......................................................................... 16

        C.    Monetary Contempt Sanctions Orders Are Inconsistent with International Practice............................................................................................... 17

        D.    Foreign Relations and Reciprocity Concerns Counsel Against the Imposition of Unenforceable Monetary Sanctions Orders ....................... 19

CONCLUSION...................................................................................................... 20

# TABLE OF AUTHORITIES

**CASES**

*Af-Cap, Inc. v. Republic of Congo,*
    462 F.3d 417 (5th Cir. 2006) ........................................................................ 13, 14, 16

*Agudas Chasidei Chabad v. Russian Fed'n,*
    915 F. Supp. 2d 148 (D.D.C. 2013) ............................................................... 13, 16

*AngioDynamics, Inc. v. Biolitec AG,*
    780 F.3d 420 (1st Cir. 2015) ................................................................................ 16

*Argentine Republic v. Amerada Hess Shipping Corp.,*
    488 U.S. 428 (1989) ............................................................................................. 12

*Aurelius Cap. Master, Ltd. v. Republic of Argentina,*
    589 F. App'x 16 (2d Cir. 2014) .............................................................................. 6

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.,*
    581 U.S. 170 (2017) ............................................................................................. 19

*Boos v. Barry,*
    485 U.S. 312 (1988) ............................................................................................... 8

*De Letelier v. Republic of Chile,*
    748 F.2d 790 (2d Cir. 1984) ........................................................................... 11, 18

*EM Ltd. v. Republic of Argentina,*
    473 F.3d 463 (2d Cir. 2007) ............................................................................... 6, 9

*EM Ltd. v. Republic of Argentina,*
    695 F.3d 201 (2d Cir. 2012) .................................................................................. 5

*Federal Republic of Germany v. Philipp,*
    592 U.S. 169 (2021) ............................................................................................. 19

*FG Hemisphere Assocs., LLC v. Dem. Rep. of Congo,*
    637 F.3d 373 (D.C. Cir. 2011) ................................................................ 12, 13, 14, 16

*First City, Texas-Houston, N.A. v. Rafidain,*
    150 F.3d 172 (2d Cir. 1998) ................................................................................ 10

*First City, Texas Houston, N.A. v. Rafidain Bank,*
    281 F.3d 48 (2d Cir. 2002) .................................................................................. 14

*First National City Bank v. Banco para el Comercio Exterior de Cuba,*
    462 U.S. 611 (1983) ........................................................................................... 9, 10

*Georges v. United Nations,*
    834 F.3d 88 (2d Cir. 2016) ............................................................................ 1

*Gucci Am., Inc. v. Weixing Li,*
    768 F.3d 122 (2d Cir. 2014) ........................................................................ 16

*Hicks ex rel. Feiock v. Feiock,*
    485 U.S. 624 (1988)...................................................................................... 15

*In re Air Crash at Belle Harbor,*
    490 F.3d 99 (2d Cir. 2007) .......................................................................... 12

*In re Estate of Marcos Human Rights Litig.,*
    94 F.3d 539 (9th Cir. 1996) ......................................................................... 15

*Int'l Union, United Mine Workers of Am. v. Bagwell,*
    512 U.S. 821 (1994)...................................................................................... 16

*Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Elahi,*
    546 U.S. 450 (2006)........................................................................................ 8

*National City Bank v. Republic of China,*
    348 U.S. 356 (1955)........................................................................................ 7

*Nationale Industrielle Aérospatiale v. U.S. District Court,*
    482 U.S. 522 (1987)........................................................................................ 7

*Nken v. Holder,*
    556 U.S. 418 (2009)...................................................................................... 11

*Olympic Chartering, S.A. v. Ministry of Industry & Trade of Jordan,*
    134 F. Supp. 2d 528 (S.D.N.Y. 2001) ......................................................... 10

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Technologies, Inc.,*
    369 F.3d 645 (2d Cir. 2004) ........................................................................ 15

*Persinger v. Islamic Republic of Iran,*
    729 F.2d 835 (D.C. Cir. 1984).................................................................. 8, 20

*Petersen Energía Inversora, S.A.U. v. Argentine Republic,*
    No. 15 Civ. 2739 (LAP), 2025 WL 1796392 (S.D.N.Y. June 30, 2025) ............... 2, 3

*Petersen Energía Inversora, S.A.U. v. Argentine Republic,*
    No. 15 Civ. 2739 (LAP), 2025 WL 2463661 (S.D.N.Y. Aug. 27, 2025)................ 4

*Petersen Energía Inversora, S.A.U. v. Argentine Republic,*
    No. 15 Civ. 2739 (LAP), 2025 WL 2989594 (S.D.N.Y. Sept. 2, 2025).................. 6

*Republic of Argentina v. NML Capital, Ltd.*,
  573 U.S. 134 (2014) ............................................................................................... 1, 5, 6

*Republic of Austria v. Altmann*,
  541 U.S. 677 (2004) ..................................................................................................... 20

*Republic of Philippines v. Pimentel*,
  553 U.S. 851 (2008) ..................................................................................................... 10

*Rubin v. Islamic Republic of Iran*,
  637 F.3d 783 (7th Cir. 2011) ........................................................................................ 6

*Samantar v. Yousuf*,
  560 U.S. 305 (2010) ..................................................................................................... 12

*Seijas v. Republic of Argentina*,
  502 F. App'x 19 (2d Cir. 2012) ................................................................................... 10

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) ..................................................................................................... 20

*Thai Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*,
  No. 10 Civ. 5256 (KMW) (DCF), 2013 WL 3970823 (S.D.N.Y. Aug. 2, 2013) .................. 11

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936) ....................................................................................................... 8

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
  300 U.S. 515 (1937) ..................................................................................................... 15

*Walters v. Indus. & Commercial Bank of China, Ltd.*,
  651 F.3d 280 (2d Cir. 2011) .......................................................................................... 9

## STATUTES

28 U.S.C. § 515 ............................................................................................................... 1

28 U.S.C. § 517 ............................................................................................................... 1

28 U.S.C. § 1606 ..................................................................................................... 14, 16

28 U.S.C. § 1609 ............................................................................................................ 13

28 U.S.C. § 1610 ................................................................................................... 6, 8, 13

28 U.S.C. § 1611 ..................................................................................................... 6, 13

## RULES

Fed. R. Civ. P. 26 .................................................................................................. 5, 6

Fed. R. Civ. P. 69 ............................................................................................... 3, 5, 6

## LEGISLATIVE MATERIALS

H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604 ................................. 9, 13

## INTERNATIONAL MATERIALS

European Convention on State Immunity,
    E.T.S. No. 74, 11 I.L.M. 470 (1972), https://rm.coe.int/16800730b1 ...................................... 17

United Nations Convention on Jurisdictional Immunities of States and Their Property,
    G.A. Res. 59/38, annex, Dec. 2, 2004, 44 I.L.M. 803 (2005),
    https://legal.un.org/ilc/texts/instruments/english/conventions/4_1_2004.pdf ........................ 17

## FOREIGN STATUTES

Foreign State Immunity Law of the People's Republic of China (eff. Jan. 1, 2024),
    http://en.npc.gov.cn.cdurl.cn/2023-09/01/c_924629.htm ........................................................ 20

Foreign States Immunities Act 1985 (Austl.),
    https://www.legislation.gov.au/C2004A03235/latest/text .................................................. 18, 20

Foreign States Immunity Law, 5769-2008, SH No. 2189, p.76 (Isr.),
    https://www.coe.int/t/dlapil/cahdi/Source/state_immunities/
    Israel%20Immunities%20January%202009.pdf ...................................................................... 18

State Immunity Act, R.S.C. 1985, c. S-18 (Can.),
    https://laws.justice.gc.ca/pdf/S-18.pdf................................................................................. 18, 20

State Immunity Act, 1978, c. 33 (U.K.),
    https://www.legislation.gov.uk/ukpga/1978/33................................................................... 18, 20

State Immunity Act, 1985, § 17 (Sing.),
    https://sso.agc.gov.sg/Act-Rev/SIA1979....................................................................................... 20

State Immunity Ordinance, No. 6 of 1981 (Pak.),
    https://pakistancode.gov.pk/pdffiles/
    administratore76fcf01a8103c67d13c638ef9545317.pdf.......................................................... 20

**FOREIGN CASES**

*Montasa-Montajes e Instalaciones v. Gobierno Estados Unido de America*,
    No. 177/1997, S. Juz. Prim. (Rota), May 24, 2014 (Spain) ...................................................... 19

*Montasa-Montajes e Instalaciones v. Gobierno Estados Unidos de America*,
    No. 177/1997, I Instancia n° 1 Rota, Jan. 22, 2015 (Spain) ..................................................... 19

**OTHER AUTHORITIES**

Restatement (Third) of Foreign Relations Law of the United States § 442 (1987) ........................ 7

The United States of America, by and through its attorney, Sean S. Buckley, Deputy United States Attorney for the Southern District of New York, acting under authority conferred by 28 U.S.C. § 515, respectfully submits this Statement of Interest in accordance with 28 U.S.C. § 517[1] to provide the views of the United States regarding the pending motion by plaintiffs in these cases for sanctions and a contempt finding against the Argentine Republic ("Argentina"). *See* Dkt. Nos. 852-854.[2]

## PRELIMINARY STATEMENT

Litigation in U.S. courts against foreign states can have significant foreign-affairs implications for the United States and can affect the reciprocal treatment of the U.S. government in the courts of other nations. The property of foreign states in the United States is generally immune from execution, and the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611 ("FSIA"), provides only narrow exceptions to this rule. Although the Supreme Court held in *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014), that the FSIA does not limit the scope of post-judgment discovery into a foreign state's property, the Court also recognized that there may be other grounds that limit such discovery.

The United States has a substantial interest in ensuring that U.S. courts supervising post-judgment discovery into presumptively immune foreign-state property carefully adhere to basic principles of relevance and are sensitive to the significant comity, reciprocity, and foreign-relations concerns raised by potentially burdensome discovery. In this case, it would be improper for the

---

[1] Congress has authorized the Attorney General to send "any officer of the Department of Justice . . . to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States." 28 U.S.C. § 517; *see Georges v. United Nations*, 834 F.3d 88, 91 & n.10 (2d Cir. 2016).

[2] All references to docket entries herein refer to the lead case, *Petersen Energía Inversora S.A.U. v. Argentine Republic*, No. 15 Civ. 2739 (LAP).

Court to impose sanctions on Argentina, or to find Argentina in contempt, despite Argentina's efforts to comply with discovery requests seeking high-level Argentine officials' communications relating to state-owned entities—demands that are themselves inconsistent with considerations of comity and reciprocity that arise in litigation involving foreign sovereigns. The Court should also deny plaintiffs' request for an order precluding Argentina from contesting that the relevant state-owned entities are its alter egos as a discovery sanction, in lieu of seeking to establish any such relationship by sufficient evidence as required by relevant decisional law.

Plaintiffs also seek an order imposing monetary contempt sanctions of at least $1 million per day. The United States has a substantial interest in the question of whether it is appropriate to impose monetary contempt sanctions on a foreign sovereign. Absent a specific waiver by the foreign state, an order of monetary contempt sanctions is unenforceable under the FSIA. Such orders are also inconsistent with international practice, can cause significant friction with foreign governments, and open the door to reciprocal orders against the United States in foreign courts. In the United States' view, these factors, together with basic principles of equity and comity, counsel decisively against issuing such unenforceable orders against a foreign state. Accordingly, it would be improper to impose monetary contempt sanctions on Argentina.

## BACKGROUND

Plaintiffs in *Petersen Energía* and *Eton Park* collectively hold judgments of more than $16 billion against Argentina. *See Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15 Civ. 2739 (LAP), 2025 WL 1796392, at *1 (S.D.N.Y. June 30, 2025). The judgments, entered in September 2023, arise from Argentina's expropriation of a majority stake in YPF in 2012 without

making a tender offer to minority shareholders in conformity with YPF's by-laws. *Petersen Energía*, 2025 WL 1796392 at *3.[3]

Following the entry of judgment, plaintiffs have engaged in post-judgment discovery in aid of execution under Federal Rule of Civil Procedure 69. As relevant here, one category of discovery plaintiffs sought has been termed "off-channel communications" regarding state-owned entities including Banco Central de la República Argentina, Banco de la Nación Argentina, YPF S.A., and Aerolíneas Argentinas (together, the "state-owned entities"). *See* Dkt. No. 853 ("Pl. Br.") at 7-11; *see also* Dkt. No. 772 (transcript of proceedings on July 29, 2025) at 52:9-11 (defining "off-channel communications" as "communications outside the government . . . system or outside the government officials' official platforms"). The off-channel communications encompass communications by Argentine state officials regarding certain state-owned entities using unofficial channels, including WhatsApp and Gmail messages, potentially on those officials' personal devices and accounts. *See* Pl. Br. at 1-2, 7; *see also* Dkt. No. 758 (transcript of proceedings on July 15, 2025) at 30:20-40:2; Dkt. No. 772 at 53:3-23.

The relevant officials include current and former Argentine ministers and other high-level government officials and advisers. *See* Pl. Br. at 16-17; Dkt. No. 889 ("Argentina Br.") at 8-12 & App'x A; Dkt. No. 772 at 55:1-62:11 (order resolving certain disputed custodians, which granted plaintiffs' requests to take discovery from current Minister of Economy, former Minister of Economy, former National Director of Customs of the Argentine Federal Administration of Public Income, former Minister of the Interior, and former Secretary of Commerce). After the Court directed Argentina to produce certain off-channel communications on July 29, 2025, Argentina

---

[3] Those judgments are currently *sub judice* on appeal before the Second Circuit. *See Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 23-7370 (2d Cir. argued Oct. 29, 2025).

sought reconsideration, which the Court denied by order dated August 27, 2025. *See Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15 Civ. 2739 (LAP), 2025 WL 2463661, at *1 (S.D.N.Y. Aug. 27, 2025).

Plaintiffs contend that Argentina has willfully refused to comply with certain portions of the Court's order directing the production of off-channel communications, Pl. Br. at 19-23, and seek sanctions for these alleged violations—including an order precluding Argentina from contesting that the state-owned entities are alter egos of Argentina and adverse inferences that any off-channel communications not produced would have supported such a finding—as well as a finding of contempt and monetary sanctions of at least $1 million per day, *id.* at 3, 25-33.

## DISCUSSION

### I. The Court Should Not Impose Sanctions Arising from Argentina's Efforts to Comply with the Order Regarding Off-Channel Communications

The Court should deny plaintiffs' request for sanctions against Argentina—including an order precluding Argentina from contesting that certain state-owned entities are alter egos of the state and related adverse inferences—on several grounds. First, Argentina represents it has made efforts to comply with the Court's discovery order, even though the underlying requests were not carefully calibrated to discover executable state-owned property, which makes them inappropriate both under the Federal Rules of Civil Procedure and in light of concerns of comity and reciprocity when dealing with a foreign sovereign. Second, plaintiffs have not made the requisite showing that certain state-owned entities are alter egos of Argentina, and it would not be appropriate for the Court to preclude Argentina from contesting that premise, or to impose related adverse inferences, as a discovery sanction.

### A.  Plaintiffs' Discovery Requests Were Improper Both Under the Federal Rules of Civil Procedure and in Light of Comity and Reciprocity Concerns

A party is permitted to obtain through discovery only information that is "relevant" to its claim or defense. Fed. R. Civ. P. 26(b)(1). And a judgment creditor may seek discovery "[i]n aid of the judgment or execution" but only "as provided in [the Federal Rules of Civil Procedure] or by the procedures of the state where the court is located." Fed. R. Civ. P. 69(a)(2).

In its 2014 decision in *NML Capital*, the Supreme Court addressed the "single, narrow question" of whether the FSIA "specifies a different rule" for post-judgment discovery where the judgment debtor is a foreign state. 573 U.S. at 140. The Court concluded that it does not, reasoning that no provision of the FSIA explicitly "forbid[s] or limit[s] discovery in aid of execution," and refusing to imply a discovery limitation from the general rule under the FSIA that a foreign state's property is immune from attachment or execution unless a specific statutory exception applies. *Id.* at 142-43. The Supreme Court made clear, however, that its ruling "concern[ed] only the meaning of the [FSIA]," and posited that "other sources of law ordinarily will bear on the propriety of discovery requests of this nature and scope, such as settled doctrines of privilege and the discretionary determination by the district court whether the discovery is warranted, which may appropriately consider comity interests and the burden that the discovery might cause to the foreign state." *Id.* at 146 n.6 (quotation marks omitted). The Court also left open the question whether "the scope of Rule 69 discovery in aid of execution is limited to assets upon which a United States court can execute." *Id.* at 140 n.2.

While "broad post-judgment discovery in aid of execution is the norm in federal and New York state courts," it nonetheless "must be calculated to assist in collecting on a judgment." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012), *aff'd sub nom. NML Capital*, 573 U.S. 134. As the Supreme Court recognized, "information that could not possibly lead to

executable assets is simply not 'relevant' to execution in the first place." *NML Capital*, 573 U.S. at 144-45 (citing Fed. R. Civ. P. 26(b)(1); N.Y. C.P.L.R. § 5223). Discovery requests seeking information about a foreign sovereign's assets that are immune from attachment (even if such assets were present in the United States and used for commercial activity) are therefore not relevant under Rules 26 and 69, and should therefore not be enforced.[4] *See* 28 U.S.C. § 1611 (identifying types of state-owned property, including foreign central bank property, that is categorically excluded from the enumerated exceptions to sovereign immunity from attachment and execution at § 1610).

Moreover, "Argentina—like all foreign sovereigns—is entitled to a degree of grace and comity." *Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 589 F. App'x 16, 18 (2d Cir. 2014). "Discovery orders that are broad in scope and thin in foundation unjustifiably subject foreign states to unwarranted litigation costs and intrusive inquiries about their . . . assets." *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 796 (7th Cir. 2011). In cases involving foreign states, "discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007). Permitting extensive discovery in aid of execution, without regard to whether any of the property inquired into may actually be subject to execution in U.S. courts under the FSIA, could impose significant burdens on the foreign state and impugn its dignity. Foreign states may be acutely

---

[4] The United States recognizes that the Court has previously overruled objections to post-judgment discovery based on executability. *See, e.g.*, *Petersen Energía Inversora, S.A.U. v. Argentine Republic*, No. 15 Civ. 2739 (LAP), 2025 WL 2989594, at *2 (S.D.N.Y. Sept. 2, 2025) (denying Argentina's motion for clarification and reconsideration regarding executability objections); *see also* Dkt. No. 758 at 7:11-17, 28:6-7; Dkt. No. 772 at 54:15-21. However, for the reasons set forth herein, the government respectfully urges the Court not to impose sanctions or contempt resulting from any claimed violation of such prior orders to the extent discovery was not carefully calibrated to discover executable assets of Argentina.

sensitive to the invasiveness of such discovery requests because "the scope of American discovery is often significantly broader than is permitted in other jurisdictions." *Société Nationale Industrielle Aérospatiale v. U.S. District Court*, 482 U.S. 522, 542 (1987); *see id.* at 546 (explaining that courts ordering extraterritorial discovery should "demonstrate due respect for . . . any sovereign interest expressed by a foreign state"); Restatement (Third) of Foreign Relations Law of the United States § 442, rep. n.1 (1987) (noting significant "friction" that can result from extraterritorial discovery requests).

Here, plaintiffs request discovery from current and former high-level Argentine ministers, officials, and other advisers. *See* Pl. Br. at 16-17; Argentina Br. at 8-12 & App'x A; Dkt. No. 772 at 55:1-62:11. By their nature, the demands for "off-channel communications" seek information from those officials' personal accounts and devices, including on platforms like WhatsApp and Gmail. *See* Dkt. No. 772 at 53:3-23; *see also* Dkt. No. 758 at 30:20-40:2. Moreover, in instances where officials have not agreed to provide access to off-channel communications, plaintiffs suggest that Argentina should "impos[e] discipline up to and including termination on any officials who refuse to comply." Pl. Br. at 22.

Such potentially burdensome and intrusive discovery—coupled with requests that a court demand a foreign sovereign fire its own high-level government officials for failure to comply, on pain of sanctions—could lead to reciprocal adverse treatment of the United States and its officials in foreign courts. *See National City Bank v. Republic of China*, 348 U.S. 356, 362 (1955) (one basis for foreign sovereign immunity is "reciprocal self-interest"). The United States maintains extensive overseas holdings in support of its worldwide diplomatic, security, and law enforcement missions, and engages in widespread financial transactions (both in the United States and internationally) in connection with those and other activities. Because "some foreign states base

their sovereign immunity decisions on reciprocity," *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 841 (D.C. Cir. 1984), a U.S. court's allowance of unduly broad discovery concerning a foreign state's assets—especially assets beyond the jurisdiction of U.S. courts—could result in less favorable treatment for the United States in various respects when sued abroad. *Cf. Boos v. Barry*, 485 U.S. 312, 323 (1988) (highlighting importance of "concept of reciprocity" in international law and diplomacy and explaining that respecting diplomatic immunity of foreign states "ensures that similar protections will be accorded").

Sanctions or contempt arising from Argentina's efforts to comply with broad discovery into sovereign assets—including discovery that could sweep in high-level officials' unofficial and personal communications—also threatens harm to the United States' foreign relations more generally. Such discovery is likely to be perceived as highly objectionable and intrusive, and if different district courts reach different results with respect to different foreign states, then a perception of unequal treatment could also arise. In this "vast external realm, with its important, complicated, delicate and manifold problems," *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936), perceived affronts to foreign states over discovery issues may result over the long term in reduced cooperation in a variety of areas. This risk is accentuated in a case involving an important ally of the United States in the strategically critical Western Hemisphere.

### B. The Court Should Deny Plaintiffs' Request for an Alter-Ego Finding as to Argentine State-Owned Entities as a Discovery Sanction

The FSIA limits the immunity for property held by an agency or instrumentality of a foreign sovereign to a greater extent than it does for property held by the foreign sovereign itself. *See* 28 U.S.C. § 1610(a), (b); *see generally Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Elahi*, 546 U.S. 450, 451-52 (2006). It is well established that "government instrumentalities established as juridical entities distinct and independent from their sovereign

should normally be treated as such," and the FSIA—consistent with law in other countries—does "'not permit execution against the property of one agency or instrumentality to satisfy a judgment against another'" unless the plaintiff overcomes that presumption. *First National City Bank v. Banco para el Comercio Exterior de Cuba*, 462 U.S. 611, 626-28 (1983) ["*Bancec*"] (quoting H.R. Rep. No. 94-1487, at 29-30 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6628-29).[5] The Supreme Court has recognized that this presumption is based on "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations." *Id.* at 626-27. Thus, the assets of a separate juridical entity cannot be executed against to satisfy a judgment against the foreign state unless "'the party seeking attachment carries its burden of demonstrating that the instrumentality's separate juridical status was not entitled to recognition.'" *Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 298 (2d Cir. 2011) (quoting *EM Ltd.*, 473 F.3d at 477; brackets omitted). To make this showing, the party seeking attachment must show that "the instrumentality is 'so extensively controlled by its owner that a relationship of principal and agent is created,'" or that "recognizing the instrumentality's separate juridical status would 'work fraud or injustice.'" *EM Ltd.*, 473 F.3d at 477 (quoting *Bancec*, 462 U.S. at 628-29).

Courts have concluded that the *Bancec* presumption of juridical separateness must inform questions relating to the propriety of post-judgment discovery. As noted above, that presumption

---

[5] The FSIA's definition of "agency or instrumentality" reflects the understanding that, over the last century, "governments throughout the world have established separately constituted legal entities to perform a variety of tasks." *Id.* at 624. While such instrumentalities can take many forms, they are "typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances." *Id.*; *see also id.* at 625-26 ("[T]he instrumentality's assets and liabilities must be treated as distinct from those of its sovereign in order to facilitate credit transactions with third parties."). Unlike entities that are not separate from the state itself, such an entity typically does not engage in core government functions, but instead is "run as a distinct economic enterprise." *Id.* at 624.

is based on principles of comity and respect for the dignity and sovereignty of foreign states, particularly in their operations within their own jurisdiction. *See Bancec*, 462 U.S. at 626; *see generally Republic of Philippines v. Pimentel*, 553 U.S. 851, 865-66 (2008); *In re Schooner Exchange*, 7 Cranch (11 U.S.) 116, 137 (1812). Courts have concluded that it would be inconsistent with *Bancec* and comity principles to order discovery into the property and finances of a separate instrumentality of a foreign-state judgment debtor without some threshold showing by a litigant that there is reason to think a separate juridical entity is an alter ego of the state and accordingly liable for its judgment. *See, e.g.*, *Seijas v. Republic of Argentina*, 502 F. App'x 19, 20-21 (2d Cir. 2012); *Olympic Chartering, S.A. v. Ministry of Industry & Trade of Jordan*, 134 F. Supp. 2d 528, 530 (S.D.N.Y. 2001).

In *Seijas*, the Second Circuit affirmed the district court's denial of jurisdictional discovery into Banco de la Nación Argentina ("BNA"), a bank wholly owned by Argentina, which was alleged to be its alter ego.[6] The court held that the "district court correctly recognized the 'comity concerns implicated by allowing jurisdictional discovery from a foreign sovereign,'" and held that "plaintiffs' burden was to demonstrate a reasonable basis for not according BNA the presumption of separate legal identity from Argentina." 502 F. App'x at 21 (quoting *First City, First City, Texas-Houston, N.A. v. Rafidain*, 150 F.3d 172, 176 (2d Cir. 1998)). The court went on to analyze a variety of allegations regarding the relationship between Argentina and BNA, and found that (even if accepted as true) they were "insufficient to establish the extensive control necessary to sustain an alter ego claim or even to establish a reasonable basis for assuming jurisdiction." *Id.*; *see id.* at 21-23.

---

[6] Notably, plaintiffs seek to preclude Argentina from contesting the alter ego status of the same Argentine bank, BNA. *See* Pl. Br. at 1.

Here, plaintiffs request—as a discovery sanction—that the Court preclude Argentina from disputing the alter ego status of presumptively separate agencies and instrumentalities, and also draw adverse inferences that any off-channel communications not produced would support an alter ego determination. Pl. Br. at 26-30. But finding alter ego status as a result of a preclusion order and adverse inferences, in lieu of requiring plaintiffs to rebut the presumption of juridical separateness, would be inconsistent with *Bancec* and related comity principles.

The Court should also decline plaintiffs' request to enter the requested preclusion order because a court may not sanction a foreign instrumentality for discovery violations committed by the foreign sovereign. *See De Letelier v. Republic of Chile*, 748 F.2d 790, 795 & n.2 (2d Cir. 1984). In *De Letelier*, the district court had rendered an adverse evidentiary finding that the national airline of Chile was not a separate juridical entity from the state as a discovery sanction against Chile. *Id.* at 792-93. The Second Circuit reversed, holding that "one party to litigation will not be subjected to . . . sanctions because of the failure of another to comply with discovery." *Id.* at 795 n.2; *accord Thai Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, No. 10 Civ. 5256 (KMW) (DCF), 2013 WL 3970823, at *6 (S.D.N.Y. Aug. 2, 2013). The alter ego finding that plaintiffs seek—which would essentially punish the Argentine state-owned entities for alleged discovery violations by the sovereign—is inappropriate for the same reasons.[7]

---

[7] Argentina moved to stay further post-judgment discovery pending appeal or, at minimum, stay the order directing production of off-channel communications pending appeal. Dkt. No. 865. While the Court recently denied that request, Dkt. No. 890, the United States notes that the significant comity, reciprocity, and foreign-relations concerns raised by burdensome discovery as to a foreign sovereign, as discussed above, are relevant to the factors a court must weigh when considering a motion for stay pending appeal, including "where the public interest lies." *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

## II. The Court Should Deny the Request to Impose Monetary Contempt Sanctions on Argentina

The Court should deny plaintiffs' request to impose monetary contempt sanctions on Argentina. Plaintiffs here ask for "a daily coercive fine of at least $1 million." Pl. Br. at 3; *see id.* at 32-33. As an initial matter, to the extent the discovery plaintiffs sought was overbroad or otherwise inappropriate, sanctions for noncompliance are not warranted. *Cf. FG Hemisphere Assocs., LLC v. Dem. Rep. of Congo*, 637 F.3d 373, 379 & n.3 (D.C. Cir. 2011) (noting, without passing upon, the government's "serious[ ]" concerns about a district court imposing sanctions against foreign sovereign for noncompliance with overbroad discovery); *In re Air Crash at Belle Harbor*, 490 F.3d 99, 104, 106-07 (2d Cir. 2007) (explaining that, in order to appeal a discovery order, a party must sometimes "defy the district court's enforcement order" and subject itself to a potential contempt finding (quotation marks omitted)).

Furthermore, regardless of the permissible scope of discovery into Argentina's property, it is generally inappropriate for courts to impose unenforceable orders of monetary contempt sanctions against a foreign state. Where the FSIA applies, it provides the sole framework for obtaining and enforcing judgments against a foreign state in United States courts. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-35 (1989); *see also Samantar v. Yousuf*, 560 U.S. 305, 314 (2010). As discussed below, orders of monetary contempt sanctions are unenforceable under the FSIA. As such, a number of factors weigh decisively against imposing them on a foreign sovereign: basic considerations of equity and comity, the fact that such orders are inconsistent with international practice, and foreign relations concerns, including issues of reciprocity raised by such orders.

### A. Orders Imposing Monetary Contempt Sanctions Against a Foreign State Are Unenforceable and Should Not Be Imposed

The FSIA establishes a general rule that property of a foreign state in the United States is immune from execution or attachment. *See* 28 U.S.C. § 1609. Absent a foreign state's waiver of immunity from execution of an order imposing monetary sanctions, such an order does not fall within any statutory exception to immunity from execution. *See id.* § 1610(a). The FSIA thus provides no mechanism for a U.S. court to enter an enforceable contempt order imposing monetary sanctions against an unwilling foreign state. *See Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 428 (5th Cir. 2006) ("A review of the relevant sections, [28 U.S.C.] § 1610 and § 1611, shows that they do not present a situation in which the [sanctions] order could stand. Those sections describe the available methods of attachment and execution against property of foreign states. Monetary sanctions are not included."). The United States is not aware of decisions concluding otherwise, even where other courts have nevertheless imposed monetary contempt sanctions. *See FG Hemisphere*, 637 F.3d at 377 (acknowledging without reaching questions about enforceability of a monetary sanctions order against a foreign state); *Agudas Chasidei Chabad v. Russian Fed'n*, 915 F. Supp. 2d 148, 152 (D.D.C. 2013) (recognizing that enforcement of a monetary sanctions order would be "carefully restricted by the FSIA").

The legislative history of the FSIA also supports the conclusion that contempt sanctions are not enforceable in the absence of a waiver. For example, the accompanying House Report notes in the context of injunctions and specific performance orders that it may be appropriate to issue such orders in certain circumstances, but states that "this is not determinative of the power of the court to enforce such an order." H.R. Rep. No. 94-1487, at 22, *reprinted in* 1976 U.S.C.C.A.N. at 6621. In particular, the report recognized that a contempt "fine for violation of an injunction may be unenforceable if immunity exists under [28 U.S.C. §§] 1609-1610." *Id.*

The courts of appeals have reached varying conclusions on the issue presented here. As noted above, consistent with the United States' position, the Fifth Circuit held that a district court errs in imposing monetary contempt sanctions on a foreign state because the FSIA establishes the "sole, comprehensive scheme" for enforcing judgments against foreign states, and orders imposing monetary sanctions for contempt are not enforceable under the FSIA. *Af-Cap, Inc.*, 462 F.3d at 428-29. In contrast, the D.C. Circuit upheld an order of monetary contempt sanctions against a foreign state; however, that court's holding was narrow, focusing on the limited question of whether the inherent authority of a federal court to impose contempt sanctions had been entirely displaced by the FSIA. *See FG Hemisphere*, 637 F.3d at 377-80 ("We hold today only that the FSIA does not abrogate a court's inherent power to impose contempt sanctions on a foreign sovereign, and that the district court did not abuse its discretion in doing so here.").[8]

The United States does not address the scope of the Court's inherent equitable authority or jurisdiction to entertain contempt proceedings against foreign states. Rather, in the government's view, it would be erroneous for a court to exercise its authority to impose unenforceable monetary contempt orders despite the various considerations weighing against them in this context.

---

[8] The Second Circuit has not yet squarely addressed the propriety of imposing monetary contempt sanctions against a foreign sovereign. In *First City, Texas Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 49 (2d Cir. 2002), the court addressed somewhat related issues, but these are distinguishable from those presented here. That decision affirmed a monetary sanctions order against an instrumentality of a foreign state, not the state itself, in the context of the instrumentality's failure to comply with post-judgment discovery. *See id.* at 49-51. But the imposition of monetary contempt sanctions on a foreign sovereign's agency or instrumentality has no bearing on whether such sanctions may be imposed on the foreign sovereign itself: the foreign sovereign may not be subject to punitive or other non-compensatory damages under the FSIA, but that prohibition does not apply to instrumentalities. *See* 28 U.S.C. § 1606. Moreover, the decision did not consider the propriety of the monetary sanctions order—it addressed only the question of whether the district court had subject-matter and personal jurisdiction over the instrumentality for purposes of conducting the post-judgment proceeding. *See Rafidain*, 281 F.3d at 53-55.

As a general matter, a court "should not issue an unenforceable" order against a foreign state. *In re Estate of Marcos Human Rights Litig.*, 94 F.3d 539, 545, 548 (9th Cir. 1996). In exercising its equitable authority, a court should consider whether its orders will be effective and should utilize the least amount of compulsion necessary to achieve the desired end. *See, e.g.*, *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 637 n.8 (1988); *see also Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 550 (1937) ("[A] court of equity may refuse to give any relief when it is apparent that that which it can give will not be effective or of benefit to the plaintiff."). In this regard, courts are advised to consider "the probable effectiveness of any suggested sanction in bringing about compliance." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Technologies, Inc.*, 369 F.3d 645, 658 (2d Cir. 2004) (brackets and quotation marks omitted).

Plaintiffs frame their request for sanctions as motivated by a desire to compel Argentina's compliance with the off-channel discovery order. Pl. Br. at 32-33. However, an award of monetary contempt sanctions is simply not a meaningful way to ensure a foreign state's compliance with district court orders; it is more likely to accumulate uncollectable penalties. Imposing unenforceable monetary sanctions would not be an effective way to coerce Argentina to comply with the Court's discovery order, and as such it would not serve the purposes of civil contempt.

As discussed below, moreover, there is widespread acceptance in international practice that it is *not* appropriate to impose penalties on foreign states for noncompliance with a court order, so there is almost no possibility that a foreign state would voluntarily pay monetary contempt sanctions. Monetary contempt sanctions are generally viewed by foreign governments as inconsistent with principles of mutual respect and equality among sovereigns. As a result, rather than serving as an effective mechanism for encouraging compliance, such orders are likely to exacerbate existing disputes or lead to friction in the United States' relations with foreign states.

15

Finally, a court issuing a monetary sanctions order against a foreign state has no possibility of enforcing its order: under the FSIA, the court lacks the authority to compel payment of the sanctions absent a specific waiver, and such an order will not be enforced in foreign courts.

### B. The Proposed Monetary Contempt Sanctions Are Punitive in Nature and Inconsistent with the FSIA

A "civil contempt sanction must only be compensatory or coercive, and may not be punitive." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 144 (2d Cir. 2014). And in the context of contempt proceedings involving foreign sovereigns, punitive sanctions run afoul of the FSIA's statutory prohibition on awarding punitive damages against a foreign state under 28 U.S.C. § 1606. Here, the plaintiffs seek extraordinarily weighty monetary fines accruing at a rate of "at least $1 million per day[,] payable to the Court." Pl. Br. at 32. Such an order would eclipse the monetary contempt sanctions that have been imposed on foreign sovereigns in the past. *See, e.g.*, *FG Hemisphere*, 637 F.3d at 376 ($5,000 per week payable to plaintiff, doubling every four weeks until reaching a maximum of $80,000 per week); *Af-Cap, Inc.*, 462 F.3d at 428 ($10,000 per day to the court); *Chabad*, 915 F. Supp. 2d at 154-55 ($50,000 per day to plaintiff).

To be sure, civil contempt sanctions "to some extent" may serve to "punish a prior offense as well as coerce an offender's future obedience." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994); *accord AngioDynamics, Inc. v. Biolitec AG*, 780 F.3d 420, 426 (1st Cir. 2015) ("There is no dichotomous split between coercion and punishment, . . . and a civil contempt sanction may evidence a punitive flavor."). But it is hard to see how the extraordinary monetary sanctions plaintiffs seek could be squared with the FSIA's categorical ban on punitive damages against a foreign state under 28 U.S.C. § 1606.

### C.  Monetary Contempt Sanctions Orders Are Inconsistent with International Practice

A review of international and foreign law sources demonstrates that orders of monetary contempt sanctions against a foreign sovereign are considered inappropriate. For example, the European Convention on State Immunity bars a court from imposing monetary sanctions on a foreign state that is a party to judicial proceedings in another party state for "its failure or refusal to disclose any documents or other evidence." European Convention on State Immunity, art. 18, E.T.S. No. 74, 11 I.L.M. 470 (1972), https://rm.coe.int/16800730b1. Similarly, the United Nations Convention on Jurisdictional Immunities of States and Their Property provides:

> Any failure or refusal by a State to comply with an order of a court of another State enjoining it to perform or refrain from performing a specific act or to produce any document or disclose any other information for the purposes of a proceeding shall entail no consequence other than those which may result from such conduct in relation to the merits of the case. In particular, no fine or penalty shall be imposed on the State by reason of such failure or refusal.

United Nations Convention on Jurisdictional Immunities of States and Their Property, art. 24(1), G.A. Res. 59/38, annex, Dec. 2, 2004, 44 I.L.M. 803 (2005), https://legal.un.org/ilc/texts/instruments/english/conventions/4_1_2004.pdf. The United States is not a signatory to either Convention, and the U.N. Convention is not yet in force. Nevertheless, a number of these Conventions' provisions reflect current international norms and practices regarding foreign state immunity.

Finally, a number of nations that have codified foreign sovereign immunity law, including Canada, the United Kingdom, Israel, and Australia, have prohibited monetary sanctions against a foreign state for its failure to comply with an injunctive order.[9] The United States, as a defendant

---

[9] Canadian law provides that "[n]o penalty or fine may be imposed by a court against a foreign state" for its failure to produce documents or other information to the court, and further provides

to foreign proceedings, has benefitted from the international practice prohibiting such sanctions against sovereigns. While foreign courts for the most part have followed accepted international practice and not allowed monetary contempt sanctions against other sovereigns, orders of U.S. courts imposing monetary sanctions on foreign states may embolden foreign courts to impose similar sanctions on the United States.

The United States respectfully submits that it is highly relevant to consider international norms regarding the acceptability of such sanctions to assess how foreign states are likely to respond. It is also generally appropriate to consider foreign and international legal norms of foreign sovereign immunity in adjudicating cases arising under the FSIA, both in light of the history of the statute and also because of the ramifications for the United States in litigation in foreign courts if U.S. courts diverge from international practice. *See, e.g.*, *De Letelier*, 748 F.2d at 798-99 (examining European Convention on State Immunity and United Kingdom's immunity statute in construing the FSIA's executional immunity provisions).

---

that a state shall be immune *in toto* from any "injunction, specific performance or the recovery of land or other property" unless the foreign state consents. State Immunity Act, R.S.C. 1985, c. S-18, §§ 13(1), 11(1) (Can.), https://laws.justice.gc.ca/pdf/S-18.pdf. The United Kingdom's State Immunity Act similarly provides that a foreign state may not be penalized with monetary sanctions for its failure to disclose or produce any document or other information in court proceedings, and also may not be subject to any "injunction or order for specific performance," absent narrow circumstances not present here. State Immunity Act, 1978, c. 33, § 13(1)-(2) (U.K.), https://www.legislation.gov.uk/ukpga/1978/33. In Israel, "[n]o fine or prison sentence shall be imposed on a foreign state . . . for non-compliance with a judgment or other decision of a court in Israel given against that state." Foreign States Immunity Law, 5769-2008, § 15(b), SH No. 2189, p.76 (Isr.), https://www.coe.int/t/dlapil/cahdi/Source/state_immunities/Israel%20Immunities%20January%202009.pdf. And under Australian law, "[a] penalty by way of fine or committal shall not be imposed in relation to a failure by a foreign State . . . to comply with an order made against the foreign State by a court." Foreign States Immunities Act 1985, § 34 (Austl.), https://www.legislation.gov.au/C2004A03235/latest/text.

### D. Foreign Relations and Reciprocity Concerns Counsel Against the Imposition of Unenforceable Monetary Sanctions Orders

The potential adverse consequences for our foreign relations, as well as for the treatment of the U.S. government abroad, also counsel against U.S. courts issuing unenforceable monetary contempt sanctions orders. The U.S. government has a significant presence abroad and is frequently subject to suit in foreign courts. *See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 183 (2017) (noting that "[a]t any given time the Department of Justice's Office of Foreign Litigation represents the United States in about 1,000 cases in 100 courts around the world"). In extraordinary instances in which a foreign court purports to impose non-compensatory sanctions against the United States, the United States objects that such penalties are not available under international law.

For a variety of reasons, there are circumstances in which the United States may not comply with orders of foreign courts.[10] Orders of U.S. courts imposing monetary contempt sanctions risk creating a precedent that may be relied upon in such cases as a matter of reciprocity.[11] *See Federal Republic of Germany v. Philipp*, 592 U.S. 169, 184 (2021) (permitting suit against foreign

---

[10] Examples of such occasions include where the United States deems the initial service of process to have been ineffective, where a particular U.S. law bans satisfaction of a judgment, and where the United States views the form of relief being sought as inappropriate against a sovereign.

[11] For instance, in 2014, the United States declined to produce post-judgment discovery about its assets after a default judgment was entered by a trial court in Spain, where the United States did not receive service of the complaint in the action in a manner that complied with the requirements of customary international law. Because of this conduct, the Spanish court imposed monetary contempt sanctions and recommended that U.S. officials be subject to criminal proceedings. *See Montasa-Montajes e Instalaciones v. Gobierno Estados Unido de America*, No. 177/1997, slip op. at 2, S. Juz. Prim. (Rota), May 24, 2014 (Spain) (attached as Exhibit A). Although the trial court's decision was reversed on appeal upon a finding that the United States enjoys immunity from such sanctions, *see Montasa-Montajes e Instalaciones v. Gobierno Estados Unidos de America*, No. 177/1997, slip op. at 3, I Instancia n° 1 Rota, Jan. 22, 2015 (Spain) (attached as Exhibit B), other foreign courts might be less willing to extend immunity if U.S. courts do not treat foreign states in like fashion.

19

governments in U.S. courts may "produc[e] friction in our relations with [other] nations and lead[] some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation" (quotation marks omitted)). Indeed, as noted above, "some foreign states base their sovereign immunity decisions on reciprocity." *Persinger*, 729 F.2d at 841.[12]

The United States' foreign relations and reciprocity concerns are matters on which particular deference is owed to "the considered judgment of the Executive." *Republic of Austria v. Altmann*, 541 U.S. 677, 702 (2004); *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) (noting that "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy").

## CONCLUSION

Plaintiffs' motion for an order to imposing preclusion sanctions, adverse inferences, and monetary contempt sanctions upon Argentina do not comport with the principles of comity and reciprocity, or with the FSIA. Accordingly, plaintiffs' motion should be denied.

---

[12] Many foreign states have statutory provisions embodying a reciprocity principle. *See, e.g.*, Foreign State Immunity Law of the People's Republic of China, art. 21 (eff. Jan. 1, 2024), http://en.npc.gov.cn.cdurl.cn/2023-09/01/c_924629.htm ("If the immunity accorded by a State to the People's Republic of China and its property is less favorable than those provided by this Law, the People's Republic of China applies the principle of reciprocity."); Foreign States Immunities Act 1985 § 42(1) (Austl.), https://www.legislation.gov.au/C2004A03235/latest/text ("Where the Minister is satisfied that an immunity or privilege conferred by this Act in relation to a foreign State is not accorded by the law of the foreign State in relation to Australia, the Governor-General may make regulations modifying the operation of this Act with respect to those immunities and privileges in relation to the foreign State."); State Immunity Act, R.S.C. 1985, c. S-18, § 15 (Can.), https://laws.justice.gc.ca/pdf/S-18.pdf (similar); State Immunity Act, 1978, c. 33, § 15(1) (U.K.), https://www.legislation.gov.uk/ukpga/1978/33 (similar); State Immunity Ordinance, No. 6 of 1981, § 16 (Pak.), https://pakistancode.gov.pk/pdffiles/administratore76fcf01a8103c67d13c638ef9545317.pdf (similar); State Immunity Act, 1985, § 17 (Sing.), https://sso.agc.gov.sg/Act-Rev/SIA1979/Published/20141231?ProvIds=P1III-#pr17- (similar).

Dated: February 26, 2026
      New York, New York

                        Respectfully submitted,

                        SEAN S. BUCKLEY
                        Deputy United States Attorney for the
                        Southern District of New York
                        *Attorney for the United States,*
                        *Acting Under Authority Conferred by*
                        *28 U.S.C. § 515*

By:   /s/ Samuel Dolinger
                        SAMUEL DOLINGER
                        Assistant United States Attorney
                        86 Chambers Street, 3rd Floor
                        New York, New York 10007
                        Tel.: (212) 637-2677
                        samuel.dolinger@usdoj.gov

                        BRETT A. SHUMATE
                        Assistant Attorney General

                        ALEXANDER K. HAAS
                        Director, Federal Programs Branch

                        JOSEPH E. BORSON
                        Assistant Branch Director, Federal
                        Programs Branch

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c) and Rule 2.B of the Individual Practices of Judge Loretta A. Preska, the undersigned counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules and Your Honor's Individual practices. As measured by the word processing system used to prepare it, and excluding the items set forth in the rules, this memorandum contains 6,740 words.

 /s/ Samuel Dolinger
SAMUEL DOLINGER
Assistant United States Attorney