UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PETERSEN ENERGIA INVERSORA, S.A.U., et al.,

Plaintiffs,

v.

15 Civ. 2739 (LAP)
16 Civ. 8569 (LAP)

ARGENTINE REPUBLIC, et al.,

Conference

Defendants.

------------------------------x

New York, N.Y.
July 7, 2026
10:00 a.m.

Before:

HON. LORETTA A. PRESKA,

District Judge

APPEARANCES

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC
Attorneys for Plaintiffs
BY: ANDREW GOLDSMITH
TIFFANY PAGES-SANCHEZ

SULLIVAN & CROMWELL, LLP
Attorneys for Argentine Republic
BY: AMANDA DAVIDOFF
ROBERT GIUFFRA, JR.
MADELINE JENKS
ARTURO SCHULTZ

DEBEVOISE & PLIMPTON, LLP
Attorneys for YPF, S.A.
BY: MARK GOODMAN
WENDY REILLY
MICHELLE BAO

THE COURT: Good morning, ladies and gentlemen. Won't you be seated?

Petersen v. Argentina. Are the plaintiffs ready?

MR. GOLDSMITH: Yes, your Honor.

THE COURT: Mr. Goldsmith, good morning.

MR. GOLDSMITH: Good morning.

THE COURT: And for the Republic? Mr. Giuffra, good morning.

MR. GIUFFRA: Good morning, your Honor. I wanted to mention to you, this morning when I came, I was blown away by how easy it was to get into the courthouse through the new entrance. There was literally no line, and I was thinking when I rushed in late, and I know you were involved in that, but there was literally no line. It was unbelievable.

THE COURT: Must be the summer, and we're picking no juries today.

MR. GIUFFRA: It was unbelievable.

THE COURT: Well, good. Thank you. Happy to hear that.

And, Mr. Goodman, where are you?

MR. GOODMAN: I'm here. Good morning, your Honor. Nice to see you.

THE COURT: You too. Thank you, friends.

OK. Thank you so much for the Republic and the plaintiffs talking to each other and narrowing the issues that

we have to talk about.

So, Mr. Guiffra, same -- Ms. Davidoff, who is talking today?

MR. GIUFFRA: Ms. Davidoff.

THE COURT: Ms. Davidoff, same lawyers are representing the plaintiffs in the arbitration, right?

MS. DAVIDOFF: Yes.

THE COURT: So we're not arguing that they are conflicted, right?

MS. DAVIDOFF: I mean, we don't know which lawyers would be representing the plaintiffs.

THE COURT: I think we're assuming they're all the same. Am I wrong, Mr. Goldsmith?

MR. GOLDSMITH: Apologies, your Honor, you are. There will be additional counsel representing plaintiffs in the arbitration.

THE COURT: OK. But I guess the opposite is what I'm asking Ms. Davidoff about. Because it is the same lawyers, we have no problem with that, right? They are not conflicted in any manner?

MS. DAVIDOFF: I guess it's not -- I think it sounds like it's not the same lawyers. Is that right, what Mr. Goldsmith said?

THE COURT: Mr. Goldsmith said there are additional lawyers. My point is as to the same lawyers, there's no

question that they're conflicted out because they were here before, right?

MS. DAVIDOFF: No, I don't think there's any question or conflict as to these lawyers.

THE COURT: OK. So they know the enforcement information that has been produced already, right? They can't unknow it. And my question really is: What is the good-faith reason to make them spend the extra time and money to request and for you to reproduce the same information? I mean, there's no prejudice to you, is there?

MS. DAVIDOFF: There is prejudice. And let me break that down a little bit because I think it sort of falls on each of the issues you just raised. So when we talk about post judgment discovery, this dispute between the Republic and plaintiffs on post-judgment discovery right now, we're talking about basically two categories of information, information about the Republic's worldwide assets and discovery about plaintiffs sort of so-called alter ego theory. And I do just want to note that obviously there's a separate dispute between plaintiffs and YPF about YPF's documents.

OK. So defining post-judgment discovery that way, the question now is whether it can be used in a post-arbitration enforcement proceeding——plaintiffs have agreed it won't be used at the merits phase of an arbitration——and there are really four reasons why we think it shouldn't be used. First of all,

it's going to be irrelevant at that stage. You said why should we go through the burden of reproducing this information. None of this information is going to be produced because none of it is going to be relevant.

THE COURT: Why is it irrelevant? Is it because at that point your view is it will be stale or is it irrelevant in the technical sense?

MS. DAVIDOFF: Well, I think it's irrelevant in the technical sense in part because it will be stale, but that's very important from the perspective of enforcement discovery. Enforcement discovery is aimed at the assets of a judgment debtor at the time the enforcement is happening. The discovery in this case pertains to periods from either 2020 to 2025 or 2022 to 2025. Burford has announced -- or Burford's estimate of how long it takes to run an ICSID arbitration is about five years. So we're talking about --

THE COURT: I'm sorry. How long it takes to run a?

MS. DAVIDOFF: An ICSID arbitration, ICSID --

THE COURT: Thank you.

MS. DAVIDOFF: -- is about five years, so we're talking about a hypothetical enforcement proceeding in 2031 at best. At that time, the information that was produced about the Republic's assets between 2020 and 2022 and 2025 is just not going to be relevant to the Republic's assets in 2031 or even later potentially.

Same issue on alter ego discovery. The question——and plaintiffs have been very clear about this——is the alleged alter ego and alter ego currently at the time of enforcement. Your Honor, in ordering enforcement discovery in this case, didn't have the parties goes back further than usually two or three years; in some cases it went back five years, but that was the absolute maximum. So by the time we get to any post-arbitration proceeding in this case, the materials will be truly irrelevant, and I do think that is shown by the plaintiff's submission here.

Now, their only argument on relevance was that organizational documents and financial information might give them insight into the discovery they would need in this future enforcement proceeding. So they are not saying it's going to replace that discovery. They're not saying it's even directly relevant. They are just saying it might tell them somebody about it.

THE COURT: What about following an asset?

MS. DAVIDOFF: Following an asset?

THE COURT: Yes, ma'am. Let's say that an asset has been identified at this point in time. Five years hence, we'll say, well, what happened to that.

MS. DAVIDOFF: I think that's a great example for why this both would be irrelevant and would vastly increase the burdens in a future enforcement proceeding. So we disclosed

military, consular, and diplomatic assets all around the world, and the plaintiffs may come in five years and try to get information about the Republic's military, diplomatic, and consular assets again. If it turns out that a painting that -- and this is really hypothetical because I believe we didn't locate any assets that exceeded the million-dollar threshold that the parties agreed on that the Court put in place in any of those. But let's take real estate. If there's real estate that the Republic consul owned in France, and it no longer owns that real estate in 2031, that is what it is. I mean, there's no point to going back. You don't trace that real estate. It was sold to somebody. It's no longer an asset of the Republic. If there where are monies received --

THE COURT: But what if it weren't? It's an asset that we know about.

MS. DAVIDOFF: But the future enforcement discovery will be to produce the then current assets, so obviously that's going to happen, and it's going to be done correctly just like it was done here. We didn't need to know sort of what assets the Republic owned five years ago in order to determine what assets it owns now. We just went around and did that work.

I mean, and it would dramatically increase burdens in an enforcement proceeding for somebody to have to explain every change in their assets every five years. I mean, that's really beyond the pale in terms of what burdens importing this

discovery into a later enforcement proceeding would cause. They closed an account. The Republic has to explain why they closed an account or where that money went? No. The Republic would be producing information about its assets. And asking the Republic to go back and trace how those assets changed during a five-or six-year period since the last production would be incredibly burdensome and adds nothing to the question of what assets it owns right now.

I do want to say one more thing on irrelevance, which is the plaintiffs haven't at any point——and I would challenge them to——defended the relevance of the so-called alter ego discovery to a future enforcement proceeding. They've also said what matters for managing alter ego status is current alter ego status. They've never made a claim that anything about the discovery produced in this case would matter to alter ego status five years from now. The alter ego discovery includes sensitive communications of various senior government officials that -- I mean, an argument that that would be relevant in five years is just impossible to make. Those people may not be in government, but even if they are, what is going to matter is the relationship between the Republic and that entity five years from now, not three years ago. So you really can't make a relevance argument out of this so-called alter ego discovery, and they haven't done it. They haven't made it.

Now, it is inherently burdensome to put I think it's over 100,000 pages of documents that are not relevant to an enforcement proceeding into an enforcement proceeding. That then has to be reviewed. The Republic might be asked questions about it. They might have to contextualize the documents. So we think the burdens are real of adding this to this hypothetical future enforcement proceeding, and really importantly, there's no argument that it's going to reduce the burden of that proceeding.

They are not saying -- I mean, it would be a different question if they were. But they are not saying we would give up --

THE COURT: Slow down.

MS. DAVIDOFF: Sorry.

They are not saying we would give up the ability to ask for information about your accounts or about your commercial contracts or your assets in the future if we could hold on to this stuff. Not at all. That would be a burden reduction, but that's not what they are saying because they, of course, don't want to agree to that.

Now, so we've got the irrelevance, the burdens, and then the prejudice to the Republic of letting this material sit out there any longer than it needs to. There's -- there's the prejudice of just expanding the scope unnecessarily of a future enforcement proceeding, and forcing everybody to

review/contextualize/learn about this vast body of now irrelevant information so that witnesses can be prepared, if there are witnesses, so that questions can be answered. So that's prejudicial and burdensome.

But it really is the worst of both worlds to let plaintiffs have this information for some indefinite five-year-plus period. It's very sensitive now, right? We're talking about account information for military/diplomatic/consular operations of a sovereign government, and personal communications of senior government officials sitting out there that are sensitive today. They might not be relevant in five years, but they're sensitive today. Sitting out there for longer than necessary in the hands of private parties, in the hands of Burford, in the hands of discovery vendors.

There's going to a prejudice, a burden of needing to continue to police the protective order through all this for the Court as well as for the parties.

THE COURT: Well, now you are talking about something I'm interested in.

MS. DAVIDOFF: We certainly care about the burdens of the Court, and that's not nothing to have to police a protective order that is binding, you know, in a pretty vast array of people. We've got the plaintiffs here, but we've also got Burford, which is a large organization with a lot of

investments around the world. That makes us very nervous, that Burford, which we don't know, could have access to this information for longer than necessary. And, yes, we may be in here asking the Court to police that order if we have concerns about whether it's being followed.

Now, at this point, we -- the fourth point I wanted to make. I talked about relevance. I talked about prejudice. I talked about burden. The fourth point I wanted to make is that the plaintiffs really don't have any legal interest in this discovery anymore, right? I know your Honor has heard that argument and has your views about that, but I think it's important. Because, you know, the discovery -- yeah, the discovery that we're talking about here, the post-judgment discovery, is something that plaintiffs have no legal interest in.

We cited a case to your Honor about that, the *In Re Philippine* case, that says once a judgment is reversed, you have no substantive interest in the judge. Plaintiff said, oh, that was just the judgment, not discovery. Well, our answer to that is if you have no substantive interest in the judgment, you also have no substantive interest in the discovery. So we're talking all of these down sides of modifying the protective order, the prejudice, the burden, the relevance, and hanging them against the fact that plaintiffs don't have any right to this information at this point.

THE COURT: OK. I got it.

MS. DAVIDOFF: I would just -- one other point. I mean, mistakes happen. There can be inadvertent disclosures of protective information. There's a provision in the protective order that deals with that. At this point, the risk of some inadvertent disclosure of this very, very sensitive information should not be borne by the Republic.

Thank you, your Honor.

THE COURT: All right. Mr. Goldsmith?

MR. GOLDSMITH: Your Honor, as the Court remembers, we spent two years and a lot of litigation gathering this material. We were in front of your Honor repeatedly. And some of that litigation involved prompting the Republic to complete the productions it had given us part of. Ms. Davidoff said they produced everything properly and would do so again in the future. I wouldn't want to suggest improper, but it is the case that there were several times during the enforcement discovery process where the Republic provided lists of accounts or lists of offices, so forth, and we came back to them and said, what about this, and what about that, and they supplemented those lists. So it's not just an instant event that --

THE COURT: I think the phrase in the letter was "produced at the push of a button."

MR. GOLDSMITH: Yes, your Honor. I don't think that

that is what would happen. It's certainly not what would happen as to the new information at some point in the future. I do think the information, as of today, as of the last year or two, is relevant and useful to that future information. It is possible that the Republic will have entirely different financial structures, entirely different bank accounts, entirely different organizational structures, both itself and the alter egos. It doesn't seem very likely. It seems more likely that what we have today will be a head start on what we will be seeking in that enforcement discovery in the future. No. Of course it won't replace it, but it will be a head start, and it will save the parties and the relevant courts and tribunals time and effort and expense.

As to the burden of reviewing these documents, presumably the Republic and current counsel already reviewed these documents, knows what is in them. That knowledge is not just going to disappear. They'll have that available to them in the future. The personal communications that Ms. Davidoff talked about, the Court has held repeatedly that they were not personal communications. They may have been sent on personal devices or on personal platforms, but they were not personal communications. These were business communications.

And certainly, of course, whatever we would want to use in an enforcement proceeding in the future would be business communications, professional communications, not the

personal ones.

THE COURT: Off the record.

(Discussion off the record)

MR. GOLDSMITH: The last point Ms. Davidoff made was our legal interest in the discovery. The case that they cited I don't think stands for the proposition that they are suggesting. It is true that the judgment has been reversed, and that case said that the judgment is treated as if it never existed. I don't think that means we all have to pretend that plaintiffs do not, in fact, have a lot of discovery materials that he obtained that may be useful in this other context.

The parties have agreed, your Honor, or plaintiffs and the Republic have agreed, that merit discovery should be available in the merits stage of arbitration, and the same rule, an analogous rule, should apply in the enforcement stage. The enforcement related discovery should be available if they ever get to an enforcement stage arising from arbitration.

THE COURT: All right. Ms. Davidoff, how do you see the risk of disclosure?

MS. DAVIDOFF: How do I see it?

THE COURT: Yes. I mean, if some material were locked down, obviously subject to confidentiality, I'm not sure how I see the risk of disclosure. It really would have to be some kind of rogue actor, wouldn't it?

MS. DAVIDOFF: Well, there's always a risk of

disclosure because of a security breach.

THE COURT: Of course, but that we live with every day.

MS. DAVIDOFF: We live with that every day, but at this point, that's not a risk we should be bearing for documents that are not going go -- I would like to address the relevance points, but that really aren't going to be useful in the future, and where there's no legal right to the documents sort of at issue from the judgment. So that risk shouldn't be falling on the Republic.

The risk that the documents may be relevant in the future and they don't have them, that should be falling on plaintiffs. But it's not much of a risk because that's where the push of the button comes in because they've produced these documents. They have scepticism --

THE COURT: It wasn't exactly with a push of a button. It was more like pulling teeth.

MS. DAVIDOFF: This is apples and oranges, your Honor. We're talking about stuff that was already produced, was Bates stamped. The general understanding is you can produce that stuff with the push of a button. New stuff takes time, and plaintiffs are going to make that process much more burdensome by trying to create some one-to-one correspondence between old stuff and new stuff. New stuff does take time, but having the old stuff is not going to make that time any less. And getting

the old stuff a second time would be easy, so why should there be any risk of a rogue actor getting access to the Republic's most sensitive financial information when we don't have any risk to think they're ever going to need it.

Now, the main argument I heard about future relevance was we might be able to push the Republic to make a production of some information they are reluctant to make, or we might know about the existence of some source and be able to ask the Republic about it. The discovery that occurred post judgment in the case was extremely well documented in its high-level contours by letters/briefs/submissions before this Court.

THE COURT: I'm not sure what that means.

MS. DAVIDOFF: So in letters to this Court and in letters between the parties, we talked all about where we were searching, what we were searching, how the Republic stored its information.

THE COURT: OK.

MS. DAVIDOFF: And they had access to all that information. It's public. It's all on the docket. They can use that to say: Do you search that same source? Do you still store documents the way you told the Court you stored them back then? The only thing they don't have is the actual account number and the account information, and that's what is going to be stale and unnecessary, so I think that relevance argument just falls apart.

I would also say, your Honor, I did not hear a single relevance argument for the so-called alter ego discovery. All they are saying is we think these are business communications; you think they're personal communications. Let's put that argument aside. I don't hear any argument for relevance, and they shouldn't be able to hang on to documents that they can't even come up with an argument are relevant.

By the way, there is an additional burden to hanging on to the so-called alter ego discovery, which is it may prevent the appeal that is now before the Second Circuit and held in abeyance from becoming moot if they have access to these materials, and that's an addition burden on the courts and the parties to litigate that issue.

THE COURT: All right. Mr. Goldsmith, anything else?

MR. GOLDSMITH: Just briefly, your Honor. On the relevance point, I think the relevance on the alter ego side is essentially the same as the relevance on the asset side. The point is we do have the information today as to how the Republic operates these entities and how they interact with each other. And even if there is some change between now and the future, which there may or may not be, at a minimum, it is a head start toward understanding the status in the future.

THE COURT: OK. Thank you.

With respect to YPF, YPF is in a different situation, isn't it, in that YPF is not apparently going to be a party to

the arbitration, and thus the plaintiffs are not able to obtain documents from YPF.

MR. GOODMAN: Yes, your Honor.

THE COURT: Isn't that a different situation?

MR. GOODMAN: Mark Goodman, for the record, Debevoise & Plimpton, on behalf of YPF.

I'm glad your Honor raised that because the first point I was going to make is the one your Honor has already made, and it is important to distinguish YPF. What the plaintiffs are asking your Honor to do is to modify a protective order -- and I can get into some of the other arguments in a minute, but to modify a protective order in a way that creates for them a right in the arbitration that they would not otherwise have but for your Honor's intervention in this modification of the protective order.

THE COURT: So are you saying that instead of using the material that they have obtained in this proceeding, your preference would be that they Hague Convention you or subpoena you or something-something, and do it all over again? Is that what you're saying?

MR. GOODMAN: Well, and we can brief this if your Honor thinks that it's important, but my understanding is that in this arbitration, the plaintiffs will not have the ability to obtain documents from YPF in discovery. And I know your Honor's order --

THE COURT: So now answer my question. Is your position that they have to ask you all over again?

MR. GOODMAN: I don't think they -- they can ask, but I don't think they have the right to obtain the documents through any method. They are only going to be able to obtain these documents for use in the arbitration because they brought this case in 2015. They brought YPF into this matter. YPF produced documents in this case. Those documents would not be available to them by any method in the arbitration, and it is only as a result of the protective order in this case being modified, if your Honor decides to maintain that position, that they would be able to obtain those documents in the arbitration. They are creating a right through this Court that they do not otherwise have.

THE COURT: OK. Mr. Goldsmith, what do you say to that? Counsel says you have no right to any YPF material in arbitration.

MR. GOLDSMITH: We don't agree with that with respect to the arbitration. Our view, and, again, my understanding comparable to Mr. Goodman, is that we will be able to seek discovery of YPF's files potentially, for example, through the Republic, which is the majority owner of YPF. Surely the Republic will contest that, your Honor. I'm not suggesting they won't, but we believe that that is a point that can be litigated in the arbitration. And as your Honor suggested, the

goal here is to avoid this ancillary litigation.

The other points I want to make in response to what Mr. Goodman said are that your Honor already granted our motion to modify the protective order, and that's important because YPF opposed that motion. They didn't make this argument at all. In their initial opposition to our motion to modify the protective order, they did not say that we wouldn't be able to get the documents in the arbitration, and that was a reason they should get special treatment different from the other entities that produced discovery in this litigation. So that's an argument they're raising for the first time in a motion for reconsideration, and the Court should reject it for that reason alone.

But, in addition, for the reasons I just said, we think that on the merits it's just not true. There will be avenues for the plaintiffs to obtain the documents through the arbitration. And the other -- just one fact I want to highlight, your Honor, is that before judgment was entered in these cases, YPF produced almost three times as many documents as the Republic produced. So I just wanted to point that fact out to make sure there's no thought that a dispute with YPF is somehow ancillary, a sideshow, to the main issue with the Republic. There's a very large swath of documents that are at issue here with respect to YPF.

THE COURT: Thank you.

Mr. Goodman?

MR. GOODMAN: So let me address the first point first. We have checked with local counsel. We have research taken in Argentina. We have checked with the international disputes team at Debevoise who do these cases routinely, which I think your Honor knows that I do not, and we are told that there is no way for the documents to be obtained by the plaintiffs in a treaty arbitration of this kind, and that this notion that they can somehow breach the corporate veil and obtain the documents through the Republic, you know, which is just another alter ego argument, is not an argument that would be sustained been an arbitral panel in a case of this kind. And so we just have a fundamental disagreement about whether there's any way for them to get these documents other than through your Honor.

On this issue that there are all these documents out there that they need access to, as your Honor knows, we have years and years and years of litigation here, including summary judgment, which your Honor knows better than anyone else. There were reams of documents presented to the Court. We also had the appeals to the Second Circuit with lots of documents used there. In all of that activity, we come down to the end of the process, and there are three confidential documents that the plaintiffs have identified in their papers here that were used in all of that litigation. And presumably the litigation, your Honor, involved the core most important documents.

Your Honor has made the point in your order that you assume that the issues that will be litigated in or arbitrated in the arbitration will overlap substantially with what was litigated before your Honor. And through all of that, a minuscule number of confidential YPF documents remain confidential that were used. There were a lot of Republic --

THE COURT: So your point is close enough for government work or what?

MR. GOODMAN: My point is that the idea that there is some large substantial volume of documents that the plaintiffs need for purposes of the arbitration, that they need continuing access to, notwithstanding what was in the protective order, notwithstanding that YPF is not going to be a party, that's just not really a fair way to look at it. It would be one thing -- if you look at the underlying litigation, it would be one thing if they had identified reams of documents that were important here, but that's not what we have.

And I'll just say, I know that your Honor is trying to cut to the chase, but I do think that just on the issue of fairness, in your Honor's opinion and order, you made reference to the notion that YPF did not rely on the protective order. And I'm going to respectfully suggest that YPF did, and maybe more importantly, all of the individual YPF employees then present and past did rely on the protective order. And that language in the protective order is very clear and definitive

about what these documents could and could not be used for. As your Honor knows, the language was completely unambiguous. "The document shall not be used for any other purpose including use in any other legal actions present for future." Period.

THE COURT: That's why we're here Mr. Goodman. I know. I know. That's why we're here.

MR. GOODMAN: But I want to make sure, your Honor, that --

THE COURT: That I didn't forget it. I didn't forget.

MR. GOODMAN: -- we're focused on the fact that there was clear and definitive language that the parties agreed to. And I also think it's important, Judge, that this is not a situation in which the plaintiffs woke up one day and said, we should have thought about this arbitration sooner. In 2015 the plaintiffs filed a notice of arbitration -- pre-arbitration. They have known all along, including in 2020 when they negotiated the terms of protective order, that this was a possibility. That there might be an arbitration.

THE COURT: OK.

MR. GOODMAN: They could have raised that, your Honor. They could have negotiated that within the scope of the agreement.

THE COURT: OK.

MR. GOODMAN: And they decided not to do so. And now they come after the fact, after everybody has relied on the

language that everybody agreed on.

Look, your Honor, just think about it from your perspective on the issue of case management. Don't you think it's important that parties be able to rely -- when an order of this kind is entered and has definitive language about how confidential, sensitive materials are going to be used, shouldn't they be able to rely on that in a definitive way particularly when——and this is a very unusual case——we're dealing with individuals from whom we had to go and get consent?

I think your Honor may view that as more *pro forma* than it was. But I can tell you that Ms. Reilly and I -- Ms. Reilly more than myself -- more than me.

THE COURT: More than I did.

MR. GOODMAN: More than I did, spent months and months on this issue of --

THE COURT: Consent.

MR. GOODMAN: -- persuading individuals that they would be protected. And I think that's really important, your Honor. Your Honor knew reliance was important because you pointed out in your order that reliance was at issue. So I don't want your Honor do think that people blithely agreed to produce materials without taking into account that there was going to be a point at which they were going to be treated confidentially, and then at the end of litigation, 90 days

thereafter, after a request was made, they were going to be destroyed or returned.

On the issue of pushing buttons, your Honor, and having access to these materials, I'm not suggesting that YPF is going to destroy all of these materials. We will continue, if the Court orders us to, to maintain all of these materials. If there's litigation in -- if there's an arbitration proceeding in which there's a question about whether they would or would not be entitled to these materials, we could have that discussion at that point.

But the idea that these plaintiffs, for all the reasons that Ms. Davidoff pointed out, that these plaintiffs would have access owe YPF documents, confidential, sensitive documents that they would not otherwise have had access to for years into the future, it's inconsistent with the order it's inconsistent with maintaining the commitments that we made to YPF and to the individuals. And if you look at the number of documents -- and I'll stop just in one second, your Honor.

THE COURT: It's OK. Take as much time as you want.

MR. GOODMAN: If your Honor looks at what is available to the plaintiffs, right, instead of talking about what is not available to them, let's talk about what is available.

All of the documents that were used, presumably the best evidence on the core issues in the litigation, all of these documents that were used before your Honor that were not

sealed, which is 99.9 percent of the documents, including YPF documents, those are available. All of the Republic's documents are available.

THE COURT: But that's not what we're here to talk about today, are they?

MR. GOODMAN: What we're here to today about, your Honor, from my perspective, is what is fair and what is reasonable and what is sufficient for the plaintiffs to rely on and to have access to in a context in which YPF -- and I'm just going to keep saying this over and over again, your Honor. I apologize for doing that. In a context in which YPF should never have been here in the first place.

And we spent ten years before your Honor litigating this issue, and at the end of all of this, your Honor said, look at these basically two or three paragraphs of bylaws. They are unambiguous. They say what they say, and YPF should never have been here.

Why are we here? We're here because the plaintiffs decided 11 years or whatever it was to add an additional what they consider to be a potential deep pocket to this without regard to the fact that we should never have been here. And now we're here defending ourselves in a situation where our confidential documents that were produced in reliance on a protective order are going to be used in arbitration that we don't participate in, in which we would not produce documents,

in which we have no control over what happens. It's just not fair, your Honor. Fundamentally it's not fair.

And YPF——I've said this to your Honor before——it's a public company. It has shareholders. It has responsibilities to those shareholders. By the way, it makes a lot of SEC and other public disclosures. All of those disclosures are particularly about what happened in the 2012-to-2014 period. All of those disclosures are available to the plaintiffs, and what is really at issue here is——again, 95 percent of it——in these public documents because this is all about what happened publicly and openly in Argentina at the time.

This is not a fraud case. This is not a case where we're trying to figure out whether people were saying things privately that they weren't saying publicly. Look at the pleadings in this case, your Honor, and look at the -- and look at all of the briefing that was done. Your Honor knows that the overwhelming percentage of evidence that was used was material that was all public, and people are interpreting it differently.

So I'm just going to just close by saying, your Honor, that's unfair to YPF to be in a position where their materials that would not otherwise be available are going to be available for years and years into the future in a situation in which the only way that happens is if your Honor modifies a protective order that was clear on its face.

THE COURT: Thank you.

MR. GOODMAN: Thank you, your Honor.

THE COURT: Mr. Goldsmith?

MR. GOLDSMITH: Your Honor, the Court ruled against us as to our claims against YPF. The Court never held that YPF never should have been here, suggesting that there was some sort of impropriety in our bringing claims against them, so I don't think that's a fair characterization. I don't think that's a fair characterization or a reasonable basis to rule on the dispute that we're here for now. I would also add on that front, if YPF were not a party here, we certainly would have sought discovery from them as a nonparty, so we might have exactly the same set of discovery and set of issues that we have now even if they had never been here as a party.

Mr. Goodman mentioned the consents that they obtained from their custodians. We have gone back and forth about the consents for many years now. YPF has never justified its argument under either Argentine law or more importantly under U.S. law that it was actually obligated to get those consents and cannot have produced the documents otherwise. In our view all along, YPF was obligated to produce whatever it was obligated to produce irrespective of any consents. The Court never ruled that those consents mattered in the past during discovery, and I don't think it should conclude that they matter now.

Finally, Mr. Goodman says that his colleagues and cocounsel tell him that we will not be able to get these documents in arbitration. My cocounsel, of course, say the opposite. We're not asking for your Honor to give us a right in the arbitration. The arbitral tribunals will be the ones to decide what is right and wrong in the arbitrations. We're just talking about the protective order in this case.

From the perspective of the protective order, consistent with all of the cases that have addressed these issues, there's no reason that the protective order should prevent plaintiffs from using these documents in a substantially similar litigation that in fact is an arbitration that will have all sorts of confidentiality protections applied to it.

THE COURT: Thank you.

Ms. Davidoff, did you have anything else?

MS. DAVIDOFF: I would just add, your Honor, in response to Mr. Goldsmith's point that the Republic could be forced in arbitration to produce YPF's documents. Our view is that that is incorrect, but Mr. Goodman covered that.

THE COURT: Yes.

Anybody else?

MR. GOODMAN: I just have one more point, your Honor.

THE COURT: Yes, sir.

MR. GOODMAN: Maybe two points.

Number one, this issue of what would or would not be available in the arbitration context, you know, if there is really a disagreement about that, then maybe the thing to do is for the parties to litigation that or arbitrate that in the arbitration context, not have your Honor decide something based on the kind of superficial comments that the parties have made today.

And then, secondly, just an unrelated point, but I want to make sure I make it. In the protective order, paragraph 16 allows the parties to challenge the confidential designation of documents. I want to just make sure that the confidentiality of the documents produced from the files of YPF's email custodians remain confidential during the period going forward, and we're not in a situation where the plaintiffs use that provision many years after the fact to challenge the confidential designation of documents, the confidentiality of which they could have challenged years ago.

We should not be in a situation where now, given what we're talking about, at the last minute, they challenge the confidentiality of documents. We would ask your Honor not to permit, you know, in the short time remaining between now and when the documents would be presumably destroyed, not to permit the confidential designations to be challenged.

Thank you, your Honor.

THE COURT: Anybody else?

MR. GOLDSMITH: May I, your Honor, just to respond to that new point?

THE COURT: Yes, sir.

MR. GOLDSMITH: We do object to that. If we do challenge a confidentiality designation under the procedures outlined in the protective order, YPF can oppose that. The Court can address it. We don't think it's appropriate to close the courthouse door preemptively to that issue.

THE COURT: All right. Ladies and gentlemen, thank you so much.

First of all, this case is different from the *Philippine* case. There the case was dead. That's not the case here. Here the same dispute between the same parties is continuing in a different forum, so I don't see that that is relevant.

With respect to Ms. Davidoff's point about relevance and staleness, certainly the knowledge that has been gained by the plaintiffs, if only with respect to the accounts, the organization, and some of the assets is at the very least a head start on any enforcement discovery that might take place in the future. So I reject the idea that the material is irrelevant and that its staleness at some point in the future might prevent it from being relevant.

I take Mr. Goodman's point about the reliance on the protective order. But, again, these are changed circumstances,

and in my view, when you hear the end of this, there will be no prejudice to any party with respect to its reliance.

With respect to YPF, Mr. Goldsmith is right that this is an improper motion for reconsideration. Nevertheless, in my view, plaintiffs would have received the documents anyway and might in fact be able to obtain them in the arbitration.

So my suggestion, my friends, is that counsel maintain the documents confidentially in their secure locations, and as all of you have pointed out, conditions may change, the documents might or might not be relevant and the like. Any future decisions with respect to use or further production will be made by the tribunal in charge, whether it's the arbitral tribunal or whether going forward it's some enforcement tribunal. But the point is that the documents will be maintained confidentiality by counsel and available at the order of the presiding tribunal as we go forward.

The only question, also, counsel, is whether or not the provision in the protective order should be revised to say that the parties agree that they will use these documents only in connection with the original underlying lawsuit and any related proceedings, including this arbitration. And that would include any prospective enforcement proceedings after the arbitration has been concluded. Would you confer about that point and get back to me? As to the other points, I'll ask you to confer among yourselves and present a revised protective

order.

Is there anything else today, friends?

MR. GOLDSMITH: Yes, your Honor. I mentioned earlier today that we have additional counsel representing plaintiffs --

THE COURT: Right.

MR. GOLDSMITH: -- in the arbitration. So in the order that the Court just delivered indicating that the documents would be in the possession of counsel, we'd ask that counsel include the arbitration counsel so that they can see the documents.

THE COURT: All right. Let us know who it is.

MR. GOLDSMITH: Certainly.

THE COURT: You don't have to do that now.

Yes, Ms. Davidoff?

MS. DAVIDOFF: Thank you, your Honor.

I was going to ask for a slightly different clarification. I think the purpose of your order would be achieved by ordering the Republic's counsel or YPF's counsel to maintain the documents. So plaintiffs go forward with their destruction. We maintain the documents. The gist of your order is that a future tribunal should decide if and how they may be used, and so if plaintiffs then go to that future tribunal, obtain authority to use the documents, they could be reproduced in whole.

THE COURT: At the push of a button. I knew that.

MS. DAVIDOFF: I think that would achieve what the Court has described.

THE COURT: Mr. Goldsmith?

MR. GOLDSMITH: I don't agree, your Honor. And it's related to the point I just made about the additional counsel in the arbitration, which is that for purposes of debating this issue with the arbitral tribunal, I think we should have access to the documents so we can understand what we're talking about and address them with the tribunal, rather than having us litigating in the dark and the Republic still having the documents themselves.

THE COURT: OK. When you inform us who arbitrating counsel is, I'll take a letter on both sides of this. But brief, OK?

Anything else?

MR. GOLDSMITH: Not for plaintiffs, your Honor.

MR. GOODMAN: Your Honor, just to make sure I understand. YPF will also contribute to that because we do think, given the difference between YPF and the others, that Ms. Davidoff's construct is the right construct as to both the Republic and YPF.

THE COURT: So if you want to pile on with Ms. Davidoff, that's fine.

MR. GOODMAN: I want to pile on with Ms. Davidoff. I

often pile on with great results when I'm following Ms. Davidoff.

THE COURT: I can see why.

MR. GOODMAN: Thank you.

THE COURT: All right, counsel. See you next time. Thank you. Good morning.

(Adjourned)

o0o